1   FRED M. PLEVIN (SBN 126185)
    SANDRA L. MCDONOUGH (SBN 193308)
2   ALBERT R. LIMBERG (SBN 211110)
    **PAUL, PLEVIN, SULLIVAN &**
3   **CONNAUGHTON** LLP
    401 B Street, Tenth Floor
4   San Diego, California 92101-4232
    Telephone: 619-237-5200
5   Facsimile: 619-615-0700

6   AMY S. GONZALEZ (SBN 181745)
    **SAN DIEGO COUNTY REGIONAL AIRPORT**
7   **AUTHORITY**
    3225 N. Harbor Drive
8   San Diego, CA 92138
    Telephone: (619) 400-2425
9   Facsimile: (619) 400-2428

10

    Attorneys for Defendant
11  SAN DIEGO COUNTY REGIONAL AIRPORT
    AUTHORITY

12

13              UNITED STATES DISTRICT COURT

14            SOUTHERN DISTRICT OF CALIFORNIA

15  JOSE HERNANDEZ,                     CASE NO.

16           Plaintiff,                 **NOTICE OF REMOVAL OF ACTION:**
                                        **UNDER 28 U.S.C. § 1442(B)**
17       v.                             **(FEDERAL QUESTION)**

18  SAN DIEGO COUNTY
    REGIONAL AIRPORT
19  AUTHORITY, a public entity; and
    DOES 1 through 12, inclusive,       **EXHIBITS 1-25**
20
           Defendants.
21

22  ///

23  ///

24  ///

25

26

27

28

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

NOTICE OF REMOVAL                    1

Stamp: FILED JAN 3 0 2008 CLERK, U.S. DISTRICT COURT SOUTHERN DISTRICT OF CALIFORNIA BY DEPUTY

'08 CV 0184 L CAB



# SAN DIEGO COUNTY
# REGIONAL AIRPORT AUTHORITY

*RECEIVED*
*JUL 12 2006*
*GENERAL COUNSEL*

## Inter-Office Communication

**Date:** July 12, 2006

**To:** Breton K. Lobner, General Counsel

**cc:** Thella F. Bowens, President/CEO
Jeffrey Woodson, Vice President, Administration
Bryan Enarson, Vice President, Development
Vernon Evans, Vice President, Finance/Treasurer

**From:** Sara Real, Administrative Assistant II

**Subject:** Claim No. CL-068 – Jose Hernandez

---

The attached claim was received in our office on Wednesday, July 12, 2006. We are forwarding it to you for further action.

If you have any questions, please telephone me at ext. 2553.



**SAN DIEGO
INTERNATIONAL
AIRPORT**

**1-6**

03/08/2006  03:34  6194002S    SDCRAA    PAGE  02



**SDCRAA**

**JUL 12 2006**

**Corporate Services**

| FOR AUTHORITY CLERK USE ONLY |
|---|
| Document No.: *CL-068* |
| Filed: *7-12-06* |

## SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY
## ACCIDENT OR DAMAGE CLAIM FORM
Please complete all sections.
Incomplete submittals will be returned, unprocessed.
Use typewriter or print in ink.

1) Claimant Name: *JOSE HERNANDEZ*

2) Address to which correspondence regarding this claim should be sent:
*C/O CATHERINE CHINN*
*3990 OLD TOWN AVENUE, SUITE A-109*
*SAN DIEGO, CA 92110*

Telephone No.: *(619) 295-4190*   Date: *7/10/06*

3) Date and time of incident: *FEBRUARY 11, 2006*

4) Location of Incident: *SAN DIEGO INTERNATIONAL AIRPORT*

5) Description of incident resulting in claim:
*PLEASE SEE ATTACHED*

6) Name(s) of the Authority employee(s) causing the injury, damage or loss, if known:

7) Persons having firsthand knowledge of incident:

| Witness (es) | Physician(s): |
|---|---|
| Name: | Name: |
| Address: | Address: |
| | |
| Phone: | Phone: |
| | |

Page 1 of 2

1-7

8)  Describe property damage or personal injury claimed:

9)  Owner and location of damaged property or name/address of person injured:

10)  Detailed list and amount of damages claimed as of date of presentation of claim, including prospective damages.  If amount exceeds $10,000.00, a specific amount need not be included.

Dated: 7/10/06          Claimant: _____
                                            (Signature)

**Notice to Claimant:**

Where space is insufficient, please use additional paper and identify information by proper section number.

Return completed form to:

Tony Russell, Director, Corporate Services/Authority Clerk
Corporate Services Department
P.O. Box 82776
San Diego, CA  92138-2776

CATHRYN CHINN, ESQ. #93340
3990 Old Town Avenue, Ste. A109
San Diego, California 92110
Telephone: (619) 295-4190

Attorney for Plaintiff
JOSE HERNANDEZ

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF SAN DIEGO

| | |
|---|---|
| JOSE HERNANDEZ, | ) Case No. |
| Plaintiff, | ) |
| | ) **COMPLAINT** |
| v. | ) |
| | ) VIOLATION OF CALIFORNIA LABOR |
| | ) CODE SECTION 1102.5, et seq.; |
| SAN DIEGO COUNTY REGIONAL | ) VIOLATION OF SAN DIEGO COUNTY |
| REGIONAL AIRPORT AUTHORITY, | ) REGIONAL AIRPORT AUTHORITY |
| a public entity: and DOES 1 through | ) CODE OF ETHICS SECTION |
| 20, inclusive. | ) 1.0 et seq.; |
| | ) RIGHT TO PRIVACY; |
| Defendants. | ) WRONGFUL DISCHARGE |

I

## FACTS COMMON TO ALL CAUSES OF ACTION

### (Against All Defendants)

1.      All the events herein alleged occurred within the County of San Diego, State of

California.  Plaintiff is a resident of the County of San Diego, State of California and was

employed by the San Diego County Regional Airport Authority at the time of the events

herein alleged.  The defendant SAN DIEGO COUNTY REGIONAL AIRPORT

AUTHORITY (hereafter "AUTHORITY") is, and at all  material times herein was, a

public entity created by state law pursuant to the California Public Utilities Code Section

170000, et seq., Division 17, Chapter 1, Chapter 2, Chapter 3 to operate the San Diego

International Airport (Lindbergh Field) and is an  entity charged by law as the employer

of the staff members of the AUTHORITY and is duly organized and existing under the

laws of the State of California.  Under California Public Utilities Code Section 170032

1-9

the AUTHORITY may be sued in all actions and proceedings in all courts of competent jurisdiction.

2.      The AUTHORITY is responsible for public health and safety surrounding the San Diego Airport, including airport land development and charged with minimizing "the public's exposure to excessive safety hazards around airports." The AUTHORITY'S management and budget of $113.8 million is overseen by the AUTHORITY'S President/CEO Thella Bowens (Doe No.1).  Bowens reports to a Board of Directors and her employment is approved by the San Diego Port District.

3.      The Plaintiff JOSE HERNANDEZ began employment at the San Diego County Regional Airport Authority in March 2001 as Director, Landside Operations.  In this position Plaintiff managed the operations of the airport terminal buildings, the parking lots, the ground transportation services and provided "expert assistance in the planning and long-range business decision making for managing the airport's facilities." Plaintiff reported to the Vice President, Airport Operations, who had managerial responsibility for all aspects of airport operations.  Plaintiff was specifically required to make decisions "in operating the parking facilities to ensure the highest levels of efficiency [and] economic advantage." Plaintiff was also required to represent the Authority in dealing with tenants and contractors.

4.      Plaintiff does not know the true names or capacities (whether individual or other wise) of defendants DOES 2 through 20) and will amend this pleading when their true identities have been ascertained.

5.      All defendants were the agents and employees of each other and performed the acts alleged in this complaint in the course and scope of their agency and employment with the consent and direction of the other; and in dual capacity as individuals, subjecting Plaintiff to, but not limited to, acts of harm, harassment and hostility.

6.      This action arises under the provisions of the California Labor Code Sections 1102.5 to 1102.8 et seq.; as well as the San Diego County Regional Airport Authority's Code of Ethics and the Conflicts of Interest Code, Article 1, Part 1.1, Section 1.17(a);

Article 2, Parts 2.0 to 2.30; Article 3, Part 3.0, Section 3.01; Article 5, Part 5.1. Sections 5.10 to 5.18; San Diego County Regional Airport Authority Policies, Article 2, Part 2.0, Section 2.01 (1)(a)(b)(2) et seq.; California Public Contracts Code Section 100 et seq.

7.     Plaintiff was an outstanding employee who always performed at levels above and beyond what could normally be asked of an employee. Plaintiff's performance was greatly praised by staff members, Board members and individuals from external agencies. The Vice President of Airport Operations stated that the number of employees performing at the Plaintiff's level could be "counted on one hand with several fingers left over." Plaintiff consistently and constantly reported on a daily basis to this Vice President all actions and events he was involved in, and withheld no information regarding his own activities, viewpoints, opinions and observance of the activities of other employees, including management. Plaintiff has never been criticized or disciplined for anything during his employment with the Authority until the events of December 2005 that led to his improper termination from the Authority in February 2006.

### FIRST CAUSE OF ACTION

#### Violation of California Labor Code Section 1102.5 et seq.

Retaliation for Protected Disclosure

(Against All Defendants).

8.     Plaintiff incorporates paragraphs 1 through 7 of the Facts Common to All Causes of Action as though fully set forth herein.

9.     Within the Airport Authority there was tension between the two operating divisions: the Operations Division headed by the Vice President to whom Plaintiff reported that was responsible for Airside, Terminal, and Parking/Ground Transportation; and the Real Estate and Capitol Development Division headed by Vice President Bryan Enarson. There were two distinct camps: Operations was primarily driven to respond to the Authority's airline tenants and airport guests; while Enarson's Real Estate/Capital Development was driven by his need for bureaucracy that prolonged

3

1-11

project completion times and substantially increased project expenses. Enarson had ingratiated himself to Bowens and set himself up as her close advisor. Bowens comes from a background as a budget analyst and is not considered a good public speaker or as a comfortable public spokesperson for the Authority. She looked to Enarson on a daily basis as a confidante and leaned on him as her closest ally. Enarson had Bowen's ear and had not only constant access but also constant influence on Bowen. The tension between Enarson and the Vice President of Airport Operations began to involve Plaintiff and escalated after Enarson's Real Estate/Capital Development received insufferable ratings on the Airport's commissioned Tenant/Customer Satisfaction Survey. Instead of focusing efforts on improving the areas that were weakest, Enarson chose to take a proactive approach to diminish the accomplishments of the Operations Division. Enarson began to insert himself in areas that were not his responsibility such as taking Bowens on walk-throughs of the terminal buildings without the presence of a member from the Operations Division to point out what displeased him and sought to take credit for Operations initiating projects that were not his initiatives and were not pushed forward by him. While Enarson's team was involved in the projects such as Flight Display Upgrades and Security Check Point Reconfiguration the projects were driven by the Operations Division, and not by Enarson. Enarson began escalating his obstruction of development projects.

10.     With space at a premium in the airport, the airport's redevelopment plan included development of an overall concessions plan. Enarson had received unacceptable ratings on the concessions program which he oversaw as Vice President. In the past, Enarson's Development Division had simply taken space, but now resisted and refused to negotiate space needed to improve the women's restroom. The improvement plans had been in the works for over five years and called for a removal of approximately 30 square feet from the news and gift stand belonging to Host. In the process it was revealed that Enarson had entered into side deals with a handshake agreement with Host that restricted the Operations Division's ability to annex the space which was needed to comply with ADA

4

**1-12**

requirements. Because Enarson refused to either take the space away from Host or renegotiate with them, major modifications had to be made that increased the project budget by over $2 million. During the long delays women were forced to endure the long lines to use the restrooms.

11.    The Plaintiff disclosed to members of the Authority Enarson's "side deal" made with out negotiation that restricted the Authority's ability to annex the space needed to comply with ADA requirements for the airport restroom. Plaintiff also disclosed that Enarson's refusal had increased the project budget by over $2 million. On both counts, Plaintiff believed that he was disclosing legal violations: violations of the ADA requirements and also disclosing the unauthorized use of public assets because Enarson had a "handshake" deal. The project suffered over three (3) years of delays due to Enarson's conflict with the airport's food and beverage concessionaire.

12.    The General Dynamics property is approximately 85 acres and sits along Pacific Coast Highway on the north side of the airport. The property contains a 1,600 parking stall long term parking lot (SAN Park Pacific Highway), and provides for Convention Center truck staging, rental car storage, and Cruise Ship truck staging. The terms of the original three year lease called for rent of $4.6 million year one, $6.6 million year two, and $8.6 million year three. Enarson was the lead negotiator on the lease. When Plaintiff compared the revenue potential of the approximately $3 million net from the parking operation and $1 million from the vehicle storage, the lease payments were too expensive and out of line. Plaintiff disclosed that the increased lease payments pulled funds away from the operating budget and he believed it was an unauthorized use of the Authority funds. Plaintiff also believed the failure to negotiate the lease properly was a violation of law. When the disclosure was made to Airport members and officers, the amount of waste was met with incredulity. Enarson decided the matter would go up to the Vice President level, where it died and no corrective action was taken.

13.    The Authority's Teledyne Ryan property lease calls for $3 million in annual payments for the 46.77 acre property, located immediately east of the airport along

Harbor Drive. At the time the lease was negotiated, with Enarson as the lead negotiator, contamination of the property allegedly required approximately $10 million. The failure to properly inspect and analyze the actual contamination resulted in a finding that the contamination remediation range would be approximately $30 million and would limit the use of the property to the existing 350 space long term parking lot (SAN Park Harbor Drive). Current revenues derived from the parking lot are approximately $1.2 million a year with about $700,000.00 in expenses, netting the Authority only $500,000.00. The original plan for the property was to phase in the parking development from what is now Phase I, 350 parking stalls, to Phase 2, approximately 1,300 stalls. If the project had stayed as planned the property would now be developed and be positioned to take advantage of the increasing occupancy levels in the market. When the development process began the discovery of the deep environmental concerns with the property, which were not previously disclosed before Enarson completed the negotiations for the lease, significantly curtailed the purpose of the lease because of the unusable areas. Plaintiff disclosed the findings that there was no way to open Phase 2 of the parking development and also disclosed the enormous amount of money the Authority was paying for the lease. Plaintiff asked the Authority members, including Enarson, "Why are we paying all this money? Why are we paying the rent?" Enarson replied, "We're obligated to pay the rent." Plaintiff stated that "we can use a little bit, 351 parking stalls, yet we're paying $3 million and we can't use any of the rest. We're on the hook for the $30 million. We should only pay a pro rata amount." Enarson's response was that it would get pushed up to the Vice President group. When the Plaintiff re-briefed the Vice Presidents again, at a second meeting, the members and officers were in awe, and asked, "Are you sure it's $30 million? Are you kidding me?" Enarson was agitated and Plaintiff received reports that Enarson was angry.

14.    In January 2004 Lindbergh Parking (hereafter "LPi") was awarded a new five (5) year service agreement for the management of the airports' employee and public parking lots. Services included the management of the airport's inter-terminal, "Red Bus" and the

6

1-14

Employee shuttle service, as well as the taxicab and shuttle-for-hire dispatch system. The total operating budget is approximately $8 million. Although the Request for Proposal process was highly contested LPi was the preferred candidate largely because of its' lower operating expenses. The contract commenced on February 1, 2004. There were immediate disagreements with the operator because of contractual requirements. As a key component of the shuttle service, the operator was to provide new vehicles at the beginning of the agreement and change them over every 2 ½ years. The vehicles did not arrive until four months later. During these four months, the operator was able to make a substantial amount of profit because they did not have to make monthly lease payments for the vehicles since they had already ben paid off. The fleet consisted of six (6) employee, three (3) Red Bus vehicles, and two (2) interchangeable shuttles. The average lease of a vehicle was $1,650.00 per month and amounted to approximately $18,150.00 per month in extra profit for the operators. Their contract provided for an hourly reimbursable for operating hours plus fuel expense. No vehicle lease cost meant more profit. These difficulties were chalked up as operational issues and the Authority moved on.

During the Request for Proposal process Lpi had indicated they could operate the long term parking lot, SAN Park Pacific Highway, 1,600 parking stalls along Pacific Highway, for approximately $1.3 million annually. As the operating numbers began to appear the actual expenses were projected at $1.7 million annually, higher than the previous operator. Expense projections for the other Authority parking properties projected similar increases. I t was clear that LPI purposely submitted unattainable expense numbers in order to bolster their proposal. Although unhappy with the operator the Plaintiff had no choice but to work with the operator to control expenses.

Maurice Grey is the President of LPI. Plaintiff made it clear to Grey that he wanted to see the Liability and Workers Compensation Coverage for the parking service competitively bid for renewal. On the day before the existing coverage was set to expire Grey presented Plaintiff with a premium scale which far exceed expense projections.

7

Plaintiff met with Grey and stressed to him that he needed to go through in detail all of the operating expenses and analyze each of the employee job positions, including Grey's. As part of the process Plaintiff asked Grey to prepare a job description of his own job and the jobs of each of his managers. All of them were interviewed to get a good understanding of their duties. The process determined that most, if not all, of the duties claimed by Grey were actually performed by others. Plaintiff explained to Grey that he needed to be able to justify continuing paying his salary and that on paper, the salary was not justified. Plaintiff informed Grey he would give him three months, until the end of summer, to show his job duties that would justify the pay and if not he would have to go. Subsequently, Grey's management skills resulted in his expenses being out of control, he failed to hire proper personnel, and he could not properly bid items. Again Plaintiff extended Grey's deadline to substantiate his job worth until the end of the year, December 31, 2005.

Plaintiff then discovered that LPI was double billing the Authority for Workers Compensation Insurance. He had noted that the premiums were running twice the amount of the previous year and were being billed to a different expense category. As a result Plaintiff posted a credit of approximately $150,000.00 against LPI's monthly request for reimbursement. Plaintiff had communicated throughout the process and disclosed LPI's wrongdoing and financial misuse issues with his direct supervisor, the Vice President of Airport Operations. The Vice President asked Plaintiff to work out the issues with Grey because he was a Minority Owned Business and the Authority needed the relationship in order to comply with FAA regulations governing Minority participation. Plaintiff had disclosed computational or other errors in LPI's bid submission; the unsatisfactory performance of the contract; the failure of LPI to submit insurance documents acceptable to the Authority; Grey's unjustified refusal to warrant his performance and other offenses and actions that indicated a lack of business integrity by LPI. Plaintiff believed that disclosures he made pursuant to the contract contained violations of the Ethics Code and also of rules and regulations of law.

8

15.    On or about July 11, 2006 Plaintiff filed his San Diego County Regional Airport Authority Damage Claim Form alleging the incidents of disclosure contained above herein and for the retaliation he suffered based on the disclosures of legal violations described above.  On                    2006 defendant AUTHORITY denied Plaintiff's claim.

16.    California Labor Code Section 1102.5 is intended to encourage employees to report legal violations or a refusal to participate in such violations.  Plaintiff in good faith reported, disclosed, divulged and brought to the attention of his employer facts and information relative to both suspected and actual violations of law directly related to his job.  Plaintiff observed improper governmental activity by employees of the San Diego County Regional Airport Authority undertaken in the performance of the employees' official duties that demonstrated economic waste, incompetency and inefficiency in a government agency.  Under California Labor Code Section 1102.5 c) an employer may not retaliate against an employee for refusing to participate in an activity that would result in a violation of a state or federal statute, or a violation or noncompliance with a state or federal rule or regulation.  Further, under California Labor Code Section 1102.5 (b) an employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of noncompliance with a state or federal rule or regulation.  Under California Labor Code Section 1102.5 (e) a report made by an employee of a government agency to his employer is a disclosure of information to a government or law enforcement agency pursuant to subdivisions (a) and (b).

17.    By September 2005 an Authority Internal Audit of parking management operating expenses had determined that Lpi had double-billed the Authority for Workers Compensation Insurance for a total of four (4) months.

18.    By October 2005 the Plaintiff had met with the Vice President of Operations to inform the Vice President of Operations of the status of LPI's non-compliance and areas

9

of deficiencies and to obtain agreement that Maurice Gray would step down as President of LPI should he not be able to comply with the standards and improve the deficiencies and clarify his job duties for his position.

19.    By November 2005 the Vice President to whom the Plaintiff reported was well aware that the Plaintiff would be leaving early in December for a planned vacation out of state.  On the late afternoon of December 1, 2005 the Plaintiff met with the Vice President of Operations to see if there were any matters that needed to be attended to before the start of his vacation.  The Vice President of Operations advised the Plaintiff that talks of "reorganization" had "resurfaced" but that final outcome of any "reorganization" would be determined by Thella Bowens (Doe No. 1) and the Authority Administration.

20.    On December 6, 2005 while on vacation the Plaintiff received a telephone call from the Vice President of Operations, who was clearly upset, and who informed him of the specifics of the plan of the reorganization.  Both the responsibilities of the Vice President and those of the Plaintiff were severely diminished.  Over two-thirds of the Authority employees had reported to the Vice President's office: now he had been reassigned Chief of Staff for Thella Bowens (Doe No.1) even though it was well known that Thella Bowens (Doe No.1) had no staff.  He was permitted to keep the title of Vice President. .

21.    Vice President Bryan Enarson had convinced Thella Bowens (Doe No. 1) to relieve him from the problems he had created as the Vice President of Development (including the unresolved monetary havoc he had negotiated with the properties of Jim's Air, General Dynamics, and Teledyne Ryan) and reposition him in a position with Terminal Operations and other responsibilities.

22.    On December 7, 2005 the Plaintiff participated in a single telephone conference call to discuss the Authority's reorganization specific to Parking and Ground Transportation.  The Authority no longer has a person with expertise managing those positions.  On December 8, 2005 all Authority employees were informed by e-mail that

10



the reorganization would take effect on January 3, 2006.

23.    On December 14, 2005 the Plaintiff was requested to attend a meeting with two individuals, an attorney with LUCE FORWARD and an investigator hired by LUCE FORWARD. Neither of the individuals informed the Plaintiff of what the purpose of their meeting was with the Plaintiff. The attorney asked a number of vague and a number of specific questions, interviewing the Plaintiff and asking him if he had requested or taken personal gifts from any company at the airport (No); if he had requested airline tickets from any airline (No); if he had requested first-class upgrades from airlines (No); if he had attended a wedding in Jacksonville, Florida (No); if he had received money from an airport vender (Never) and if he knew of other employees at the airport that accepted gifts or items of value (Yes). The questions did not include follow-up inquiries to the information regarding his knowledge of other employees who had in fact accepted gifts or items of value. The attorney's questions were asked in a hostile and unprofessional manner and the Plaintiff knew that he had been hired specifically to find some wrong-doing on his part. Following this odd interrogation the Plaintiff was told by two Vice Presidents that he was being put on Paid Administrative Leave "until an investigation could be completed." He was also told specifically that he could not discuss anything related to this interrogation or "the investigation" with anyone else. Under California Labor Code section 1102.5 an employer may not make or enforce any rule or policy preventing an employee from disclosing information to a government agency, including the Authority, where the employer has reasonable cause to believe that the information discloses a violation of state statute, or a violation or noncompliance with a state rule or regulation. The Plaintiff asked the Vice Presidents to clarify the specific charges but they refused to do so.

24.    The attorney from LUCE FORWARD and his hired investigator then began to contact various people of the Plaintiff's acquaintance. These witnesses immediately contacted the Plaintiff to complain about the hostile, rude and demanding treatment of the

11

attorney from LUCE FORWARD and the Plaintiff informed each witness that he was unable to discuss anything regarding the matter, but all of the contacting witnesses reported similar unprofessional treatment and reported their own conversations and attempts at conversation with the lawyer from LUCE FORWARD. The lawyer seemed to be fishing to find anything he could about the Plaintiff that might put him in a negative light, and by all accounts he seemed to be failing. The lawyer from LUCE FORWARD was reduced to "suggesting" various scenarios to the witnesses, some of whom laughed at the lawyer and concluded he was engaged in a "witch hunt" to do harm to the Plaintiff. The Plaintiff, unable to respond and tell the contacting witnesses anything, was unable to defend himself. The Plaintiff knew what Thella Bowens (Doe No.1) was doing to him and why she was doing it but could not disclose anything about it.

25.    As the attorney for LUCE FORWARD became more desperate to find some wrong doing from people who did not want to see the Plaintiff harmed, he utilized the Private Investigator to go after tangential subjects and try to get some "hard evidence" that the Plaintiff had done something, anything, wrong. The attorney for LUCE FORWARD sent the investigator over to the car repair place the Plaintiff used and threatened and coerced the owner to give him copies of the repair bills for the Plaintiff's car. The investigator specifically represented himself as working for the Authority and not for LUCE FORWARD. The Plaintiff had never been asked to produce these car repair bills and did not give his permission to the owner of the repair place to give them to the investigator or to anyone else. The investigator produced the documents in front of the attorney for LUCE FORWARD and in front of the Plaintiff. The investigator and the attorney for LUCE FORWARD refused to say where they had obtained them. In fact, it was the witness who called the Plaintiff and told him about the incident. The car repair bills yielded no evidence of wrong doing by the Plaintiff.

26.    Next the attorney for LUCE FORWARD questioned witnesses about what they knew about the Plaintiff's marriage, including whether they had observed "communication" problems in the marriage. The witnesses quickly defended the

12

Plaintiff's marriage and quickly informed the Plaintiff of the attorney's specific
invasion into the Plaintiff's marriage and informed him that it was a great marriage and
asked the Plaintiff why this attorney was asking questions that had nothing to do with the
Plaintiff's job and were also none of his business.

27.     On February 7, 2006 the Plaintiff was called into a meeting by his former
Vice President of Operations and told they were here to "discuss the disposition of
of the recent investigation concerning possible misconduct on your behalf." The former
Vice President had prepared a written outline reference to which he claimed would show
the Plaintiff that "it was no witch hunt." The Plaintiff vehemently objected and told him
that the 'investigation' "was just that: a witch hunt aimed at specifically terminating my
employment' with the Authority" and "the point was made clear to me by the was the
'investigation' was conducted and through the questions asked by the 'investigators'."
The Plaintiff asked the former Vice President if it was his opinion that the Plaintiff had
asked for favors in exchange for 'gifts.' The former Vice President then reiterated his
statement that the 'investigation' had concluded that there was no Quid Pro Quo.
The former Vice President then stated that "the reason for such an extensive
'investigation' was to assure the Authority that there were no signs of criminal activity
from [the Plaintiff's] behavior." The Plaintiff asked him if there was and the former
Vice President stated: "to date" no evidence to support this allegation could be found."
The former Vice President and the Plaintiff then discussed the Authority Policy
concerning "Conflict of Interest". He specifically singled out one airline for his
acceptance of a comp stand-by ticket, available by the airline to the general public.

28.     Plaintiff then pointed out his points of concern to the former Vice President: (1)
the ambiguousness of the "Conflict of Interest" Code, and (2) more importantly, the
application of the policy among Authority employees. The Plaintiff mentioned the
specific abuse of the policy from the Authority Vice Presidents, Board Members, ant
the President/CEO Thella Bowens (Doe No.1) This included airline ticket changes,
upgrades, access to First Class lounges and other routinely-demanded expensive

13

privileges not allowed to other Authority employees. The Plaintiff pointed out to the Vice President that the application of the "Conflict of Interest" Code policy was selective and unfairly enforced.

29.    The Plaintiff had discussed such items as the above-stated violations of the Authority's policy with the former Vice President when he had been the Vice President and the Plaintiff's supervisor and he had always seen no reason for concern, and no action had been taken. This very former Vice President had himself directed the Plaintiff to take care of tickets for Authority employees and Board Members. The Plaintiff asked why it was okay for Thella Bowens (Doe No.1) to ask and receive favors and not okay for employees to receive the same benefits. One example was Bowen's request to fly in in BB meat from Texas. The former Vice President defended this practice as approved as an "Accepted Industry Practice", which connotes that among the Regional Airport Authority for the Counties paying to fly in meat from another state is a billable expense.

30.    The former Vice President then told the Plaintiff that the Authority could no longer trust his judgment and they are "forced to discontinue working relations." His "choice" was to sign a resignation or they would terminate him. When the former Vice President, now Chief of Staff to Thella Bowens (Doe No.1), asked the Plaintiff for final comments he told him his opinion as to the unfairness of the 'investigation' and the lack of professionalism on the part of the 'hired help' (the lawyer from LUC FORWARD and the 'investigator' he hired). The Plaintiff stated that the outcome of the had already been pre-determined and that the 'investigators' were not impartial and did not let the 'truth come out.' The Plaintiff asked the following questions, all of which went unanswered: How did this 'investigation' come about? Why were allegations never properly explained? Why was the reasoning behind being placed on administrative leave never disclosed? Am I the only person being 'investigated' or are there others? What authority was given to the 'investigators' to allow them to invade my privacy and procure privileged information? The former Vice President's last comment to the

14

Plaintiff was: "Holy shit, I knew something like this would happen as part of the reorganization."

31.     The conduct of the Authority employees and DOES 1 through 20 was a substantial factor in causing the Plaintiff's harm.

32.     As a direct and proximate cause of the acts and conduct described above, Plaintiff has been and continues to be subjected to shame, humiliation and extreme emotional distress, all to the Plaintiff's damage in a sum as yet undetermined, and Plaintiff requests leave of court to state such damages in accordance with proof at trial.

33.     As a direct and proximate cause of said acts of harm and conduct against the Plaintiff by Defendants and DOES 1 through 20 the Plaintiff has lost standing in his community, been held up to ridicule and shame, suffered great mental and emotional distress, worry, fear of his economic future and depression, all to the Plaintiff's damage in a sum that cannot be computed at this time, and the Plaintiff requests leave to amend this complaint to state these damages in accordance with proof at trial.

### SECOND CAUSE OF ACTION
#### (Violation of Ethics Code)
#### (Against All Defendants)

34.     Plaintiff incorporates paragraphs 1 through 7 of the Facts Common to All Causes of Action as though fully set forth herein and paragraphs 8 through 33 of the First Cause of Action as though fully set forth herein.

35.     " It is the policy of the San Diego County Regional Airport Authority that (a) Public officials, both elected and appointed, shall comply with both the letter and the spirit of the laws affecting the operations of government; (b) Public officials shall be independent, impartial and fair in their judgment and actions; ( c ) Public office shall be used for the public good, not for personal gain;." SDCRAA Policies Art. 2 Ethics, Part 2.0; Section 2.01 POLICY STATEMENT  The Authority then adopted a Code of Ethics

15

and Conduct and specifically designated that the "employees" includes "the Authority's Executive Director" [Thella Bowens, Doe No.1] . General Counsel [Bret Lobner] "other officers and consultants." Further, "This Ethics Code shall be broadly construed to effectuate its purposes." The citizens served by the Authority "are entitled to fair, ethical and accountable . . . government." Code of Ethics, Art. 2, Part 2.0, Section 2.01

36.    Ethics Code Art. 2, Part 2.0, Section 2.02 "Act in the Public Interest" requires "[e]mployees of the Authority will work for the common good of the people of the County of San Diego and not for any private or personal interest. . . ." Under the Code of Ethics, Art. 2, Part 2.0, Section 2.10   "Prohibited Receipt of Benefits" (a) **"Benefit"** means any honorarium, gift or **travel expense** made to, or in the interest of, an individual or a member of the individual's immediate family." (2) **"Gift"** means any payment that confers a personal benefit on the recipient . . . *unless the rebate or discount is made in the regular course of business to members of the public without regard to official status."* The complimentary stand-by airline ticket given to the Plaintiff is the marked "No Value Complimentary" and is routinely made in the regular course of business to members of the public "without regard to official status." There was no requirement for the Plaintiff to report the gift of a stand-by complementary ticket whether it was used or not. In order to be a "benefit" the recipient must know that the rebate or discount is not made in the regular course of business to members of the public. Ethics Code, *supra, I* (4)(d)

37.    The Ethics Code Art. 2, Part 2.0, Section 2.10 contains specific Restriction on Benefits under (b) (1) No Board member or employee of the Authority shall request a benefit from any person or entity or accept any benefit intended to influence official duties. (B)(2) No Board member or employee of the Authority shall accept anything of value from anyone, other than the Authority or another Board member or employee, for doing his or her job. Violations of the above-stated Ethics Code, Sections 2.01; 2.02; and 2.10 occurred during the Plaintiff's employment as a Director with the Authority

16

**1-24**

including, but not limited to the following incidents:

a.     The Vice President of Operations paid $1200.00 for a ticket on an airline to get Blue Bell ice cream for Thella Bowen's BB, received reimbursement for the travel expense, then discovered the ice cream was available in Southern California. When word got around the Authority about the cost of going to Texas for ice cream, the Vice President directed the Plaintiff to "shut that little shit up" referring to the budget analyst who continued to comment on it. The Plaintiff refused the directive. This travel expense was not reasonably related to a governmental purpose.

b.     Each time an Authority employee requested a change in their airline ticket a benefit was accepted when the recipient took "any action exercising control over the benefit." Thella Bowen would purchase her own tickets and then request date changes and upgrades, along with Premier Lounge Access (only permitted for airline premier club members). Any change to any ticket itinerary is approximately fifty to one hundred dollars, a service charge, plus the cost in set p rice for an upgrade on a ticket, ranging from one hundred fifty to two hundred dollars each way. Thella Bowens routinely instructed her Assistant to contact either the Plaintiff or the Vice President that the Plaintiff reported to, to make the changes described above. The Plaintiff would make the changes for Bowen by going directly to the airline Station Manager and requesting the change for Thella Bowens. The Plaintiff performed this
benefit accommodation more than thirty times for Bowen. All of these requested benefits were in violation of the Ethics policy.

c.     Each year Thella Bowens requested an employee BB named "Thella's BB." The event drew from fifty to over three hundred attendees. The centerpiece of the event called for pork, beef ribs and brisket to be flown out from her favorite restaurant in the Dallas Fort Worth area, Angelo's. Employees from the Director level and above were required to pay money to help subsidize the expense of the meat. Currently Thella's BB has been renamed the "Annual Employee Appreciation Employees BB" and now costs

17

1-25

approximately ten to fifteen thousand dollars, not including the cost of the labor for the Authority employees who are designated to support the event.   The Plaintiff was then instructed to contact an airline to make arrangements at her behest for free airline delivery of the meat.  The net weight of the total delivery was over two hundred pounds at an approximate cost of $2500.00.  The free flight of the meat violated the Ethics policy.  The cost of the BB comes from the revenue collected by the Authority from the airlines and its users.

     d.     Thella Bowens requested through a Vice President that he obtain special airline flight privileges for her sister who lives in Texas.  Bowens asked for the ability to get either stand by or reduced rate tickets for her sister for business and personal travel. The request was made to the airline Station Manager.  The airline Station Manager then responded to the conditions under which they could do it.  This request by Thella Bowens (Doe No.1) violates the Ethics Code.

     e.     The request from the Chairman of the Board of the Authority to secure First Class upgrade airline tickets on the day of his planned departure for his wife and himself required the intervention of the airline Station Manager.  This tactic allowed the Chairman of the Board of the Authority to save approximately two hundred fifty dollars for the upgrade expenses.  This action violates the Ethics Code.

     f.     The Chairman of the Board of the Authority on several occasions requested to enter into a temporary lease to use a portion of the parking lot at Harbor Island for no expense for an activity he is involved with annually.  The lease of Authority property for non-aviation use is strictly prohibited and a violation of the Ethics Code as well as other laws and regulations.

     g.     An Authority Board member annually inserts his official authority to influence negotiations between a community event and the rental of the General Dynamics property at a rate lower than the fair market value.  As a condition of this use, all rental cars must be removed from the property and a large amount of vehicles

18

relocated from the property. This violates the Ethics Code as well as other laws and regulations.

h.    An Authority Board member requested assistance in rearranging his intenary so that he could attend the Little League World Championships in Williamsport, Pennsylvania. The Plaintiff had to work with three different airlines to coordinate the First Class upgrade the Board member requested, as well as the time changes to allow the Authority Board member his desired schedule. This violates the Ethics Code.

I.    The Authority's Vice President of Budget and Finance repeatedly requested from the Plaintiff assistance in changing flight schedules. Over a one year period the Plaintiff assisted with the change of approximately fifteen to twenty schedules, all to accommodate personal and non Authority business travel to Las Vegas and Texas. This violates the Ethics Code.

j.    The General Counsel of the Authority used his official position to obtain fifty-yard-line premier seating at the Poinsettia Bowl football game by directing the Plaintiff to make contact with the Holiday Bowl Committee and request a favor. This involved securing eight tickets for $400.00, which the Plaintiff paid for so that the General Counsel had to reimburse the Plaintiff. When the Holiday Bowl Committee member asked the Plaintiff if the tickets were complimentary for no charge the Plaintiff refused the gift and paid for them. The General Counsel knew he was in violation of the Ethics Code when he made the request for the favor from the Plaintiff.

k.    The Plaintiff was present with the Vice President of Operations when the Chairman of the Board of the Authority requested a contractor to be hired to re-survey his Authority office space for "listening devices." The Chairman's office space had previously on two separate occasions been surveyed for "bugging devices" or other "listening apparatus." The Chairman was worried that his communications could be intercepted by the FBI or similar such agencies. This contract request is a gross waste of the Authority funds.

38.    "No Board member or employee of the Authority shall use or threaten to use any official power or influence to discourage, restrain or interfere with any other person for the purpose of preventing such person from acting in good faith to report or otherwise to bring to the attention of the Board *or any other appropriate agency, office or department* any information which, if true, would constitute:

(1) a work-related violation by a Board member or employee of any law or regulation, including this Ethics Code;

(2) a gross waste of Authority funds;

(3) a gross abuse of power;

(4) a conflict of interest of a Board member or employee; or

(5) No Board member or employee of the Authority shall use or threaten to use any official authority or influence to effect any action as a reprisal against a Board member or employee who reports or otherwise brings to the attention of the Board or other appropriate agency, office or department, any information regarding the subjects described in Subsection (a)

The Plaintiff attempted, time and time again, to bring to the attention of the attorney from LUCE FORWARD the above-stated Ethics violations and every single time the attorney from LUCE FORWARD interrupted and spoke over the Plaintiff to prevent the Plaintiff from reporting violations, both legal and ethical, that he was aware of and had not been 'investigated.' The attorney was not interested in knowing about the above-stated violations or any incident that did not show wrongdoing by the Plaintiff. The Plaintiff did his best to report, disclose, divulge and bring to the attention of his employer's 'investigator' (the attorney from LUCE FORWARD) facts and information relative to both suspected and actual violations of state law directly related to his job. The Plaintiff observed improper governmental activity by employees of the Authority undertaken in the performance of the employee's official duties that demonstrated economic waste, incompetency and inefficiency. The 'investigator' Thella Bowens hired

20

(the lawyer from LUCE FORWARD) attempted to use and used, both directly and indirectly, intimidating, threatening, coercing, and commanding tactics to influence the information he was told by the Plaintiff and by the witnesses during their interviews. Thella Bowens could not have reasonably believed that taking personnel action, including hiring and directing an 'investigation' into the Plaintiff's alleged but not articulated violations of the Authority's Ethics policy was and is justified based on her own and her direct report employees' own well-known violations of the same policies and Codes. Bowens was well aware that the evidence of her own violations were known to the Plaintiff and when he reported those violations to her hired 'investigator' he was cut off and told not to discuss them. Other witnesses also disclosed to Bowen's 'investigator' knowledge of Bowne's wrongdoing as well as the Ethics violations by her Vice Presidents that Bowens condoned and ratified.

39.    The Plaintiff contends he disclosed a number of legal violations for which the Authority retaliated against him.

The first disclosure arose from the Plaintiff's opposition to a "side deal" that Bryan Enarson made with a concessionaire at the airport, Host, that restricted the Authority's ability to annex the space needed to comply with ADA requirement for the women's restrooom at the airport.. The result of Enarson's actions increased the project budget by over $2 million. The Plaintiff believed this resulted in legal noncompliance with the ADA requirements which were well settled at that time and took precedence over the handshake agreement Enarson made without negotiation with Host.

The second disclosure also arose from events involving Enarson, who was the lead negotiator on behalf of the Airport for the property known as the General Dynamics property. Enarson proceeded with the negotiations without ascertaining the extent of the "public hazards around the airport"and resulted in a lease agreement that loses millions of dollars per year for the Authority.

The third disclosure involved the misuse and waste of the usable land around the

21

property known as the Teledyne Ryan property. Enarson proceeded with the negotiations without ascertaining the extent of the "public hazards around the airport" and that resulted in a lease agreement that loses millions of dollars per year for the Authority. Enarson then blocked open discussion of the problem and no resolution has been attempted.

The fourth and final disclosure encompassed the issue of the contract bid by the Lindbergh Parking, Inc. (LPI) and its failure to meet its contract expectations and the offenses and actions by the LPI that indicate a lack of business integrity.

The Plaintiff believes it was the personal relationship of the President/CEO of the Authority, Thella Bowens (Doe No.1) who has shown favoritism, partiality and a refusal to hold those of the same minority race as herself to the same accountability as the Ethics Code and other laws and regulations require. Besides Enarson, who is white, and a premier kiss ass, Bowens has never applied the same policy standards to herself or to her Vice Presidents who are black. Maurice Gray is black and is the beneficiary of not having to comply with the standards and requirements that other Authority contractors have been held to. By eliminating the Plaintiff from his job she has assured that no one else surrounding her at the high management levels will speak up or oppose whatever it is she desires to do, both personally and in her job position. Thella Bowens (Doe No.1) made it clear through the attorney she hired from LUCE FORWARD and through the investigator the attorney hired that she alone would make the determinations as to conclusions and findings of the two. Bowens (Doe No.1) met on a regular, if not daily basis, with the two she hired and reviewed their "findings" and personally directed them in their 'work', including their 'work' that invaded the Plaintiff's privacy and had no relation whatsoever to the Plaintiff's job or his job performance.

36.    The Ethics Code, Art. 2, Part 2.0, Section 2.05 (a) requires that : "Board members and employees of the Authority shall comply with the laws of the . . . State of California and the ordinances, codes, rules and regulations of the Authority in the performance of

22

their public duties. . . ." Section 1.17 (a) of the Ethics Code provides: "Whenever in this Code any act or omission is made unlawful, it shall include causing, permitting, aiding or abetting such act or omission." Under these laws, all employees, including Thella Bowens (Doe No.1) and her Vice Presidents and Directors who participated in acts that violated the Ethics Code, whether by requesting them, directing them, condoning them or ratifying them, are "causing, permitting, aiding or abetting" the acts.

40.    The Plaintiff believed in good faith that LPI was in violation of California Public Contracting laws found in the California Public Contract Code Section 100 et seq.  The discovery that LPI had presented false expenses in its bid submission, combined with the unsatisfactory performance of the contract, its failure to submit insurance documents and its lack of business integrity when given time and opportunities to correct its wrongdoing seriously affected the reliability and credibility of the performance of LPI.  The final deadline for Maurice Gray to submit a job description that detailed the duties he performed as President of LPI to justify his salary of $60,000.00 was quickly approaching when Thella Bowens (Doe No.1) made the decision to begin an 'investigation' of the Plaintiff.  Bowens wanted Maurice Gray to continue in that position, partly because he was black, and she favored protection of the black employees, but also because she did not want anyone, including the Plaintiff, to speak up and oppose whatever decisions she made, whether they involved misuse of government funds as the Plaintiff believed when he opposed and objected to the leases that cost the Authority millions of dollars for nothing in exchange.  Over and over again the Plaintiff voiced his opinions that waste of money occurred when Enarson, with Bowen's approval, failed to consider the budget and its inability to sustain payments when no revenue could be generated from projects improperly negotiated and Bowen's refusal to address those problems.  LPI was the last straw for Bowens.  The Plaintiff believed that Bowens and her Vice Presidents were using favoritism as a form of corruption in the LPI contract.  There is no other "justification" for the timing, the identity of the retaliators, and the secretive and calculated course of

23

1-31

conduct that Bowens called for choosing to 'investigate' the Plaintiff at that time.
Bowens cannot show independent reasons for her hiring of an 'investigator' that
demonstrates clear and convincing evidence that she would have conducted an
'investigation' if the Plaintiff had not engaged in protected disclosures or refused to
participate in suspected and actual violations of state law governing public contracts.

41.    The Ethics policies and Code are not uniformly followed, enforced or used by
Authority management.  The Plaintiff was singled out because he opposed and objected
on numerous occasions to the actions of the Authority's President/CEO Thella Bowens
and her Vice Presidents when he believed he had reasonable cause to believe that the
opposition was necessary to disclose a violation of state statute, or a violation or
noncompliance with a state statute, rule or regulation.  The Authority, as the Plaintiff's
employer, retaliated against the Plaintiff for having exercised his rights under Labor Code
section 1102.5(a)(b)©).

42.    The conduct of the Defendant Authority and DOES 1 through 20 was a
substantial factor in causing the Plaintiff's harm.

43.    As a direct and proximate cause of said acts of harm and conduct described above,
Plaintiff has been and continued to be subjected to shame, humiliation and extreme
emotional distress, all to the Plaintiff's damage in a sum as yet undetermined, and
Plaintiff requests leave of court to state such damages in accordance with proof at trial.

44.    As a direct and proximate cause of said acts of harm and conduct against the
Plaintiff by Defendants and DOES 1 through 20 the Plaintiff has lost standing in his
community, been held up to ridicule and shame, suffered great mental and emotional
distress, worry, fear of his economic future and depression, all to the Plaintiff's damage in
a sum that cannot be computed at this time, and the Plaintiff requests leave to amend this
complaint to state these damages in accordance with proof at trial.

24

**1-32**

## THIRD CAUSE OF ACTION

### (Violation of the Right to Privacy)

### (Against All Defendants)

45. .   Plaintiff incorporates paragraphs 1 through 7 of the Facts Common to all Causes of Action and paragraphs 8 through 33 of the Plaintiff's First Cause of Action and paragraphs 34-44 of the Second Cause of Action as though fully set forth herein.

46.     Thella Bowens (Doe No. 1) hired an attorney from LUCE FORWARD and he hired an investigator to supposedly look into "allegations" of violations of the Ethics policy and Code by the Plaintiff. There is nothing in either the Ethics policy or the Ethics Code of the Authority that invites intrusion into the private life of the Plaintiff, including "investigating" anything in regard to his marriage. The Plaintiff's private life, including his marriage, has nothing to do with his job duties, his job position or any matter that is of any concern to the Authority or to Thella Bowens personally. The attorney from LUCE FORWARD hired by Thella Bowens and the investigator hired by the attorney from LUCE FORWARD are both subject to the Authority's Ethics policies and to the Ethics Code of the Authority, as both were hired by Thella Bowens on behalf of the Authority as consultants to her and the officers of the Authority with whom she shared the decision making of the 'investigation.' In addition, Thella Bowens and all of those with whom she shared the 'investigation' responsibilities were and are charged with knowledge of the Ethics policies and Ethics Code of the Authority and as so charged knowingly with the actions of intrusion committed by them individually and in the dual capacity of their job duties on behalf of the Authority.

47.     The Plaintiff had a reasonable expectation of privacy in regard to his marriage. The interrogation of witnesses as to their observations, personal knowledge or opinions regarding the Plaintiff's marriage, including communication within his marriage, the manner of communication between the Plaintiff and his wife, the appearance of the

25

marriage to outsiders, and any other matters that the attorney for LUCE FORWARD and his hired investigator made regarding the Plaintiff's marriage from witnesses who were being interviewed regarding an 'investigation' whose subject matter had not been revealed to the Plaintiff was intentionally intruded in by the hired help of the Authority. The intrusion of the Authority's 'consultants' and the stated discussion regarding the findings of the 'consultants' with the Authority management on a regular basis that included findings of the interrogation of witnesses on the subject of the Plaintiff's marriage was highly offensive to the Plaintiff and would be highly offensive to a reasonable person.

48.    The investigator hired by the attorney from LUCE FORWARD also intruded into the Plaintiff's privacy by coercing the owner of the car repair shop (where the Plaintiff had his car repaired) to hand over copies of car repair records and invoices showing payment of the car repairs. The owner immediately contacted the Plaintiff to explain that the investigator told him he was hired by the Authority to look into the Plaintiff's records and threatened him with legal proceedings if he did not immediately turn over the records to him. The owner protested and opposed the demand but was coerced into providing the records by the investigator. Neither the Authority, the attorney for LUCE FORWARD or the investigator had sought permission from the Plaintiff to obtain or look at those private records. The Plaintiff was furious at the intrusion into his private affairs without his knowledge or permission. Given the instruction that he could not tell the owner what the circumstances of the invasion into his privacy meant, the Plaintiff was further denied the opportunity to defend himself from the invasion or explain the reason why the investigator had committed this act of intrusion. Once again, the Plaintiff was left in a position of not knowing himself the reason for the 'investigation' and the embarrassment that this investigator could act to further leave the Plaintiff in another position of looking like he had done something wrong when he had not.

49.    The Plaintiff had a reasonable expectation of privacy in regard to his private

26

vehicle and its repair documents and invoices. The intentional intrusion and false statements used by the investigator hired by the attorney for LUCE FORWARD to obtain the Plaintiff's private records were highly offensive to him and would be highly offensive to a reasonable person. The circumstances surrounding the Authority's intrusion were part of a calculated scheme to find some violation that could "justify" the termination of the Plaintiff because he had made disclosures regarding the Authority's operations and budget that he believed were illegal and would prevent the Plaintiff and others from reporting similar violations by the Authority and allow the Authority to continue to operate in whatever manner it desired to do so regardless of the consequences to the budget of the Authority.

50.     The Plaintiff did not consent to the Defendant Authority's or Defendants DOES 1 through 20's intrusion into either his marriage or the records of his car repair.

51.     The Plaintiff suffered harm from the Defendant Authority's and Defendants DOES 1 through 20's wrongful intrusion into his private affairs and Defendants' conduct was a substantial factor in causing the Plaintiff harm.

52.     The Plaintiff suffered severe emotional distress The Defendants' conduct was a substantial factor in causing Plaintiff severe emotional distress. As a direct and proximate result of the acts and conduct described above, Plaintiff has been and continues to be subjected to shame, humiliation, and extreme emotional distress, all to the Plaintiff' damage in a sum as yet undetermined, and Plaintiff requests leave of court to state such damages in accordance with proof at trial.

53.     As a direct and proximate cause of said acts of harm and conduct against the Plaintiff by Defendants the Plaintiff has lost standing in his community, been held up to ridicule and shame, suffered great mental and emotional distress, worry, fear of his economic future and depression, all to the Plaintiff's damage in a sum that cannot be computed at this time, and the Plaintiff requests leave to amend this complaint to state those damages in accordance with proof at trial.

27

## FOURTH CAUSE OF ACTION
### (Wrongful Discharge in Violation of Public Policy)
### (Against All Defendants)

54.     Plaintiff incorporates paragraphs 1 through 7 of the Facts Common to All Causes of Action and paragraphs 8 through 33 of the First Cause of Action and paragraphs 34 to 44 of the Second Cause of Action and paragraphs 45 to 53 of the Third Cause of Action as though fully set forth herein.

55.     The Plaintiff was discharged from employment for reasons that violate a public policy.  The Plaintiff was forced to resign his position from the Authority because he had disclosed in good faith to his own Authority, a government agency, the violations of the Authority regarding its misuse of money, waste of government funds, the violations of law regarding four projects of which he had personal knowledge of the violations of law and rules and regulations that the Authority violated repeatedly.

56.     The Plaintiff was exercising a statutory right or privilege to disclose the legal violations he in good faith believed were violations and in doing so was reporting to his own agency violations of statutes, rules and regulations that were of paramount public importance.  It is well settled in California law that in addition to statutory provisions, valid administrative regulations such as Ethics Code may serve as a source of fundamental public policy because those regulations implement fundamental public policy.

57.     The Plaintiff absolutely made  clear his opposition in private meetings, in public meetings, at open door and closed door meetings to the failure of the Authority to implement the annexation of the space needed to have the women's restroom comply with the ADA requirements and to complete the project at a reasonable cost and in a timely manner.

58.     The Plaintiff made clear to the Vice President to whom he reported that he

28

**1-36**

objected and opposed during the negotiations and the due diligence process that Enarson ( Vice President and confidante to Thella Bowens ) was not properly understanding the lawful use and conditions of the General Dynamics property that resulted and continues to result in losses of millions of dollars for the Authority.

59.     The Plaintiff disclosed and opposed the misuse and waste of the unusable land around the Teledyne Ryan property at Capitol Improvement meetings, at weekly Operations meetings, at Directors meetings and other times.

60.     The Plaintiff conducted numerous disclosure meetings with the Vice President to whom he reported regarding the failure of LPI to meet the expenses and conditions that the company had used to bid on the parking operations contract. The Plaintiff also met repeatedly with Maurice Gray of LPI and gave him extended help and time to come into compliance on the contract and he failed and refused to do so. This correlated with the idea of conducting an 'investigation' of the Plaintiff rather than of the contractor.

61.     The conduct of the Defendants was a substantial factor in causing the Plaintiff's harm.

62.     As a direct and proximate cause of the acts and conduct described above, Plaintiff has ben and continues to be subjected to shame, humiliation and extreme emotional distress, all to the Plaintiff's damages in a sum as yet undetermined, and Plaintiff requests leave of court to state such damages in accordance with proof at trial.

63.     As a direct and proximate cause of said acts of harm and conduct against the Plaintiff by Defendants and DOES 1 through 20 the Plaintiff has lost standing in his community, been held up to ridicule and shame, suffered great mental and emotional distress, worry, fear of his economic future and depression, all to the Plaintiff's damage in a sum that cannot be computed at this time, and the Plaintiff requests leave to amend this complaint to state those damages in accordance with proof at trial.

////

///

29

WHEREFORE, Plaintiff JOSE HERNANDEZ respectfully prays this court:

1.    For general damages according to proof;

2.    For attorneys fees and costs on this suit pursuant to CCP Section 1021.5;

3.    For such other and further relief as the court deems just and proper.


Dated:

_____

CATHRYN CHINN, Attorney for

Plaintiff Jose Hernandez

30

**1-38**

| Hernandez Complaint and Causes of Action | | | | |
|---|---|---|---|---|
| Filed: July 12, 2006<br>Attorney:  Cathryn Chinn Chin | | | | |
| Complaint<br>Causes of Action | I – Common Facts<br>II – 1st C/A: Labor Code 1102.5 *et seq.*<br>III – 2nd C/A: Ethics Code Violations<br>IV – 3rd C/A: Right to Privacy<br>V - 4th C/A: Wrongful Discharge vs Public Policy | | | |
| Allegations of wrongful conduct by SDCRAA employees and officers: | CA Lab. Code §§1102.5 to 1102:8 | | | |
| | SDCRAA Ethics & Conflict of Interest Code §§ 1.17(a); 2.0-2.30; 3.01, 5.10-5.18 | | | |
| | SDCRAA Policies §2.01(1)(a)(b)(2) | | | |
| | Cal. Pub. Contracts Code §100 et seq. | | | |
| **ALLEGATION** | **¶** | **Analysis and Disclosure to whom?** | | |
| **Tension between Enarson (Ops.) & Sexton (RE)**<br>• Ops responding to tenants<br>• RE driven by bureaucracy<br>• Enarson – Bowens relations<br>• Enarson – Poor ratings<br>• Enarson – Obstruct projects | 9 | No crime alleged (setting up waste?) | |
| **Women's restroom (30 sq. ft) not improved in Host leasehold by Enarson**<br>• Private handshake deal<br>• Can't meet ADA<br>• $2M higher budget<br>• Long lines for women | 10, 11, 39, 57 | Crime alleged: ADA violation<br>Crime alleged: Wrongful use of public assets | Disc.-<br>No names |
| **General Dynamics 3 year Lease:**<br>• Lease too expensive<br>• Unauthorized use of funds<br>• Failure to properly negotiate K was violation of law<br>• "Waste"<br>• no determination of hazards | 12, 39, 58 | Crime alleged: Failure to negotiate lease.<br><br>Mistaken facts.  State law mandated GD | Disc. –<br>no names |

JUL 2 0 2006

2-39

| | | | |
|---|---|---|---|
| **Teledyne Ryan Lease**<br>• Failed to inspect/Analyze contamination<br>• Remediation $10M to $30M<br>• Failure to complete project to make money on property | 13, 39, 59 | No crime alleged | D<br>No<br>names |
| **Lpi Lindbergh Parking Contract:**<br>• Late new shuttle vehicles met more money for Lpi<br>• Annual Expenses $1.7 from RFP estimate of $1.3<br>• Request for Grey's job description delayed to justify $60K salary<br>• Double billing for workers compensation insurance $150K<br>• Special allowances for Lpi because minority<br>• TB personal relationship protected Lpi<br>• Bid computational errors<br>• Unsatisfactory performance<br>• Poor insurance documents<br>• Removal of H protection for Grey | 14, 17, 18, 39, 40, 60 | No crime alleged.<br>Ethics violation alleged<br>Pub. Con. Code 100 et seq.<br>Rules & Regs violated?<br><br>Comment: Contract issues only. No law violations. | D<br>Sexton |
| **Reorganization of Ops/RE:** | 19, 20, 21,22 | No crime allegation | |
| **Luce Forward Investigation:**<br>• 12/14/05 Interview<br>• Allegations of taking gifts, upgrades, money,<br>• Hostile manner<br>• Informed could <u>not</u> discuss with anyone else | 23 | Alleged LC 1102.5 violation | |
| **Luce Forward Investigation – Car Repair bills:**<br>• Contacting third parties in rude manner<br>• Fishing and no disclosures<br>• Suggesting scenarios<br>• TB "doing him" and knew why<br>• Investigator got car repair bills | 24, 25, 48, 49 | No crime allegation<br><br>Tort: expectation of privacy | |

| | | | |
|---|---|---|---|
| through threats & w/o telling Hernandez first<br>• Attempt to "find" violation to "justify" termination because of disclosures<br>• No consent | | | |
| **Luce Forward Investigation:**<br>• Investigator questioned witnesses about H's marriage<br>• H had reasonable expectation of privacy<br>• Intentional intrusion<br>• Witness interviews intrusion | 26, 46, 47 | No crime<br>Alleges Ethics policy and code violations<br><br>Tort of invasion of privacy | |
| **Sexton Meeting on 2/7/06:**<br>• Sexton says no quid quo pro<br>• Sexton says no evidence of crimes<br>• Sexton tells of airline tickets<br>• H points out "ambiguousness" of conflict of interest code<br>• H tells of abuse of conflict policy by Bowens, Board & VPs. (airline upgrades, 1st Class upgrades, expensive privileges.<br>• H alleges selective enforcement of policy<br>• Sexton asked H to perform some of actions<br>• TB and BBQ meat flown in<br>• Sexton advises can't trust H<br>• Sexton gives H choice of resignation or termination<br>• Investigation predetermined against H | 27, 28, 29, 30 | No criminal violation alleged | |
| **Blue Bell Ice Cream Purchase:**<br>• Sexton paid $1200 for airline ticket to get ice cream in Texas<br>• Ice Cream available in CA<br>• Sexton directed H tell complaining budget analyst to shut up<br>• H refused to do this | 37a | Violation of Ethics Code | |

**2-41**

| | | | |
|---|---|---|---|
| • Expenditure not related to governmental purpose | | | |
| **Changes to Tickets for TB:**<br>• H was requested to and obtained date changes to tickets for free (30 times @ minimum of $50)<br>• H obtained premier lounge request at TB's request | 37b | Violation of Ethics Code | |
| **BBQ Event- Request for Contributions, etc:**<br>• TB required Directors and VPs to give money for BBQ<br>• BBQ cost $10K to $15K<br>• TB asked H to make flight arrangements for meat ($2500) | 37c | Violation of Ethics Code | |
| **Special flight privileges for TB sister:**<br>• TB requested VP to obtain special flight privileges of stand by or reduced rate<br>• Station Manager told H rules | 37d | Violations of Ethics Code | |
| **First Class Upgrade for Board Chair & wife:**<br>• On day of departure, Chair asked for upgrades - value of $250<br>• Station Manager gave how could do | 37e | Violation of Ethics Code | |
| **Special Temporary Lease at parking lot (Harbor Island):**<br>• Chair requested lease to use part of parking lot for free for activity he is involved in<br>• Authority policy bars this | 37f | Violation of Ethics Code | |
| **Board member uses position to influence lease negotiations on GD property**<br>• Board member requests rate below FMV<br>• Removal of rental cars | 37g | Violation of Ethics Code | |
| **Board Member request ticket assistance for Little League** | 37h | Violation of Ethics Code | |

| | | | |
|---|---|---|---|
| **World Series**<br>• Board member requested help with itinerary<br>• Work with 3 airlines to coordinate<br>• Upgrade to 1st Class<br>• Time changes obtained | | | |
| **VP of Budget & Finance requested flight schedule changes:**<br>• Requested changes 15-20 times<br>• All personal travel to LV & Texas | 37i | Violation of Ethics Code | |
| **General Counsel used position to obtain 50 yard seating at Poinsettia Bowl**<br>• Directed H to make contact with Bowl Committee & request favor<br>• Request for favor was ethics violation<br>• General Counsel paid full price for tickets | 37j | Violation of Ethics Code<br><br>*Poinsettia Bowl* | |
| **Board Chair requests contractor be hired to screen office**<br>• 3rd time screened for bugs<br>• gross waste of public funds | 37k | Violation of Ethics Code | |
| **Luce Forward investigators ignore H's allegations of violations**<br>• H attempted to tell Luce Forward of other violations<br>• LF ignored H | 38 | Equal Protection<br>No crime alleged | D |
| **TB Hired Luce Forward and directed investigation:**<br>• TB knew she was not justified in hiring law firm<br>• TB knew of other violations<br>• TB violated ethics code<br>• Met daily with law firm<br>• TB can't show independent reasons for hiring LF | 38, 39, 40, 45 | No crime alleged | |
| **Ethics Policy and Code not** | 41 | Lab. Code 1102.5 a, b, c | |

| | | | |
|---|---|---|---|
| uniformly enforced against others in Authority<br>• H singled out<br>• H retaliated against | | | |
| **Termination violated public policy**<br>• Disclosure to Authority of above<br>• Misuse of public money<br>• Waste of public funds<br>• Violation of law on 4 projects | 54, 55, 56, 57 | No crime alleged<br><br>Tort: Wrongful discharge in violation of public policy | D<br>No identified |

**EXHIBIT 3**

SUM-100

# SUMMONS
## (CITACION JUDICIAL)

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY, a
public entity; and DOES 1 through 20, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
JOSE HERNANDEZ

FOR COURT USE ONLY
CENTRAL DIVISION

2006 SEP -1 PH 4:11

CLERK SUPERIOR COURT
SAN DIEGO COUNTY, CA

San Diego County Regional Airport Authority

Document No. **S-030**

Filed **9-5-06**

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*
330 W. Broadway, San Diego, CA 92101

CASE NUMBER:
*(Número del Caso):*
GIC **871979**

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
CATHRYN CHINN, Attorney at Law
3990 Old Town Ave. Ste. A109, San Diego, CA 92110

| DATE: SEP - 1 2006 | Clerk, by | R. CERSOSIMO | , Deputy |
|---|---|---|---|
| *(Fecha)* | *(Secretario)* | | *(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):* San Diego County Regional Airport authority

   under: ☐ CCP 416.10 (corporation)    ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)    ☐ CCP 416.90 (authorized person)
   ☒ other *(specify):* a Public Entity

4. ☒ by personal delivery on *(date):* 9/5/06

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 485

3-45

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO
## INDEPENDENT CALENDAR CLERK
330 W. Broadway
San Diego, CA 92101

TO:

CATHRYN CHINN
3990 OLD TOWN AVE STE A109
SAN DIEGO, CA  92110

| | |
|---|---|
| JOSE HERNANDEZ         **Plaintiff(s)** | Case No.: GIC871979 |
| vs. | **NOTICE OF CASE ASSIGNMENT** |
| SAN DIEGO COUNTY REGIONAL AIRPORT AU     **Defendant(s)** | Judge: RICHARD E. L. STRAUSS<br>Department: 75<br>Phone: 619-685-6120 |

**COMPLAINT FILED** 09/01/06

IT IS THE DUTY OF EACH PLAINTIFF (AND CROSS-COMPLAINANT) TO SERVE A COPY OF THIS NOTICE WITH THE COMPLAINT (AND CROSS-COMPLAINT).

ALL COUNSEL WILL BE EXPECTED TO BE FAMILIAR WITH SUPERIOR COURT RULES WHICH HAVE BEEN PUBLISHED AS DIVISION II, AND WILL BE STRICTLY ENFORCED.

**TIME STANDARDS:** The following timeframes apply to general civil cases and must be adhered to unless you have requested and been granted an extension of time. General civil consists of all cases except: Small claims appeals, petitions, and unlawful detainers.

**COMPLAINTS:** Complaints must be served on all named defendants, and a CERTIFICATE OF SERVICE (SDSC CIV-345) filed within 60 days of filing. This is a mandatory document and may not be substituted by the filing of any other document. (Rule 2.5)

**DEFENDANT'S APPEARANCE:** Defendant must generally appear within 30 days of service of the complaint. (Plaintiff may stipulate to no more than a 15 day extension which must be in writing and filed with the Court.) (Rule 2.6)

**DEFAULT:** If the defendant has not generally appeared and no extension has been granted, the plaintiff must request default within 45 days of the filing of the Certificate of Service. (Rule 2.7)

THE COURT ENCOURAGES YOU TO CONSIDER UTILIZING VARIOUS ALTERNATIVES TO LITIGATION, INCLUDING MEDIATION AND ARBITRATION, PRIOR TO THE CASE MANAGEMENT CONFERENCE. MEDIATION SERVICES ARE AVAILABLE UNDER THE DISPUTE RESOLUTION PROGRAMS ACT AND OTHER PROVIDERS. SEE ADR INFORMATION PACKET AND STIPULATION.

YOU MAY ALSO BE ORDERED TO PARTICIPATE IN ARBITRATION PURSUANT TO CCP 1141.10 AT THE CASE MANAGEMENT CONFERENCE. THE FEE FOR THESE SERVICES WILL BE PAID BY THE COURT IF ALL PARTIES HAVE APPEARED IN THE CASE AND THE COURT ORDERS THE CASE TO TO ARBITRATION PURSUANT TO CCP 1141.10. THE CASE MANAGEMENT CONFERENCE WILL BE CANCELLED IF YOU FILE FORM SDSC CIV-359 PRIOR TO THAT HEARING.

ALSO SEE THE ATTACHED NOTICE TO LITIGANTS.

### CERTIFICATE OF SERVICE

I certify that I am not a party to the above-entitled case; on the date shown below, I served this notice on the parties shown by personally handing it to the attorney or their personal representative at     SAN DIEGO California.

DATED: 09/01/06

BY: CLERK OF THE SUPERIOR COURT

SDSC CIV-721(Rev 7-03)          **ASG-NOTICE OF CASE ASSIGNMENT**

**3-46**

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| CATHRYN CHINN, ESQ. #93260<br>3990 Old Town Ave. Ste. A 109<br>San Diego CA 92110<br>TELEPHONE NO: (619)295-4190    FAX NO.:<br>ATTORNEY FOR (Name): Plaintiff JOSE HERNANDEZ | CIVIL BUSINESS OFFICE<br>CENTRAL DIVISION<br><br>2006 SEP -1 PM 4:10<br><br>CLERK-SUPERIOR COURT<br>SAN DIEGO COUNTY. CA |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO
STREET ADDRESS: 330 W. Broadway
MAILING ADDRESS:
CITY AND ZIP CODE: San Diego CA 92101
BRANCH NAME: Hall of Justice

CASE NAME:

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: 871659 GIC |
|---|---|---|
| [✓] Unlimited (Amount demanded exceeds $25,000) | [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter [ ] Joinder<br>Filed with first appearance by defendant (Cal. Rules of Court, rule 1811). | JUDGE:<br>DEPT: |

*Items 1–5 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[✓] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 1800–1812)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint (not specified above) (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition (not specified above) (43)

2. This case [ ] is [✓] is not complex under rule 1800 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
a. [ ] Large number of separately represented parties
b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
c. [ ] Substantial amount of documentary evidence
d. [ ] Large number of witnesses
e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
f. [ ] Substantial postjudgment judicial supervision

3. Type of remedies sought (check all that apply):
a. [✓] monetary  b. [ ] nonmonetary; declaratory or injunctive relief  c. [ ] punitive

4. Number of causes of action (specify): 4

5. This case [ ] is [✓] is not a class action suit.

6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: August 31, 2006
CATHRYN CHINN, ESQ.
(TYPE OR PRINT NAME)                              (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 201.8.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 1800 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. January 1, 2006]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 201.8, 1800–1812;
Standards of Judicial Administration, § 19
www.JuriSearch.com

3-47

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO
### INDEPENDENT CALENDAR CLERK
330 W. Broadway
San Diego, CA 92101

**TO:**

| | |
|---|---|
| JOSE HERNANDEZ<br><br>Plaintiff(s)<br><br>vs.<br><br>SAN DIEGO COUNTY REGIONAL AIRPORT AU<br>Defendant(s) | Case No.:  GIC871979<br><br>**STIPULATION TO USE OF ALTERNATIVE DISPUTE RESOLUTION PROCESS**<br><br>(CRC 1590.1)<br>Judge:    RICHARD E. L. STRAUSS<br>Department:    75 |

The parties and their attorneys stipulate that the matter is at issue and the claims in this action shall be submitted to the following alternative dispute resolution process.  Selection of any of these options will not delay any case management time-lines.

☐ Court-Referred Mediation Program
☐ Private Neutral Evaluation
☐ Private Mini-Trial
☐ Private Summary Jury Trial
☐ Private Settlement Conference With Private Neutral
☐ Other (specify):_____

☐ Court-Ordered Nonbinding Arbitration (Cases valued at $50,000 or less)
☐ Court-Ordered Binding Arbitration (Stipulated)
☐ Private Reference to General Referee
☐ Private Reference to Judge
☐ Private Binding Arbitration

It is also stipulated that the following shall serve as arbitrator, mediator or other neutral: (Name) _____

_____

Alternate: (mediation & arbitration only) _____

Date:_____          Date:_____

Name of Plaintiff                    Name of Defendant

Signature                            Signature

Name of Plaintiff's Attorney          Name of Defendant's Attorney

Signature                            Signature

(Attach another sheet if additional names are necessary).  It is the duty of the parties to notify the court of any settlement pursuant to California Rules of Court, Rule 225.  Upon notification of the settlement the court will place this matter on a 45-day dismissal calendar.

No new parties may be added without leave of court and all unserved, non-appearing or actions by named parties are dismissed.

**IT IS SO ORDERED.**

Dated: _____          _____
                                JUDGE OF THE SUPERIOR COURT

SDSC CIV-359(Rev. 8-03)     ADR-STIPULATION TO USE OF ALTERNATIVE DISPUTE RESOLUTION PROCESS

3-48

## NOTICE TO LITIGANTS/ADR INFORMATION PACKAGE

You are required to serve a copy of this Notice to Litigants/ADR Information Package and a copy of the blank Stipulation to Use of Alternate Dispute Resolution Process (received from the Civil Business Office at the time of filing) with a copy of the Summons and Complaint on all defendants in accordance with San Diego Superior Court Rule 2.5, Division II and CRC Rule 201.9.

## ADR POLICY

It is the policy of the San Diego Superior Court to strongly support the use of Alternative Dispute Resolution ("ADR") in all general civil cases. The court has long recognized the value of early case management intervention and the use of alternative dispute resolution options for amenable and eligible cases. The use of ADR will be discussed at all Case Management Conferences. It is the court's expectation that litigants will utilize some form of ADR – i.e. the court's mediation or arbitration programs or other available private ADR options as a mechanism for case settlement before trial.

## ADR OPTIONS

**1) CIVIL MEDIATION PROGRAM:** The San Diego Superior Court has established a Civil Mediation Program to replace the Mediation Pilot Program established by Code of Civil procedure sections 1730 et seq. The Civil Mediation Program, in effect for cases filed on or after May 1, 2003 or upon stipulation, is designed to assist parties with the early resolution of their dispute. All general civil independent calendar cases, including construction defect, complex and eminent domain cases are eligible to participate in the program. Limited civil collection cases are not eligible at this time. San Diego Superior Court Local Rule 2.31, Division II addresses this program specifically. Mediation is a non-binding process in which a trained mediator 1) facilitates communication between disputants, and 2) assists parties in reaching a mutually acceptable resolution of all or part of their dispute. In this process, the mediator carefully explores not only the relevant evidence and law, but also the parties' underlying interests, needs and priorities. The mediator is not the decision-maker and will not resolve the dispute – the parties do. Mediation is a flexible, informal and confidential process that is less stressful than a formalized trial. It can also save time and money, allow for greater client participation and allow for more flexibility in creating a resolution.

**Assignment to Mediation, Cost and Timelines:** Parties may stipulate to mediation at any time up to the CMC or may stipulate to mediation at the CMC. Mediator fees and expenses are split equally by the parties, unless otherwise agreed. Mediators on the court's approved panel have agreed to the court's payment schedule for court-referred mediation: $150.00 per hour for each of the first two hours and their individual rate per hour thereafter. Parties may select any mediator, however, the court maintains a panel of court-approved mediators who have satisfied panel requirements and who must adhere to ethical standards. All court-approved mediator fees and other policies are listed in the Mediator Directory at each court location to assist parties with selection. **Discovery:** Parties do not need to conduct full discovery in the case before mediation is considered, utilized or referred. **Attendance at Mediation:** Trial counsel, parties and all persons with full authority to settle the case must personally attend the mediation, unless excused by the court for good cause.

**2) JUDICIAL ARBITRATION:** Judicial Arbitration is a binding or non-binding process where an arbitrator applies the law to the facts of the case and issues an award. The goal of judicial arbitration is to provide parties with an adjudication that is earlier, faster, less formal and less expensive than trial. The arbitrator's award may either become the judgment in the case if all parties accept or if no trial de novo is requested within the required time. Either party may reject the award and request a trial de novo before the assigned judge if the arbitration was non-binding. If a trial de novo is requested, the trial will usually be scheduled within a year of the filing date.

**Assignment to Arbitration, Cost and Timelines:** Parties may stipulate to binding or non-binding judicial arbitration or the judge may order the matter to arbitration at the case management conference, held approximately 150 days after filing, if a case is valued at under $50,000 and is "at issue". The court maintains a panel of approved judicial arbitrators who have practiced law for a minimum of five years and who have a certain amount of trial and/or arbitration experience. In addition, if parties select an arbitrator from the court's panel, the court will pay the arbitrator's fees. Superior Court Local Rules Division II Chapter III and Code of Civil Procedure 1141 et seq. address this program specifically.

SDSC CIV-730 (Rev. 11-04)                                                                 Page 1 of 2

**3) SETTLEMENT CONFERENCES:** The goal of a settlement conference is to assist the parties in their efforts to negotiate a settlement of all or part of the dispute. Parties may, at any time, request a settlement conference before the judge assigned to their case; request another assigned judge or a pro tem to act as settlement officer; or may privately utilize the services of a retired judge. The court may also order a case to a mandatory settlement conference prior to trial before the court's assigned Settlement Conference judge.

**4) OTHER VOLUNTARY ADR:** Parties may voluntarily stipulate to private ADR options outside the court system including private binding arbitration, private early neutral evaluation or private judging at any time by completing the "Stipulation to Use Alternative Dispute Resolution Process" which is included in this ADR Package. Parties may also utilize mediation services offered by programs that are partially funded by the county's Dispute Resolution Programs Act. These services are available at no cost or on a sliding scale based on need. For a list of approved DRPA providers, please contact the County's DRPA program office at (619) 338-2797.

**ADDITIONAL ADR INFORMATION:** For more information about the Civil Mediation Program, please contact the Civil Mediation Department at (619) 515-8908. For more information about the Judicial Arbitration Program, please contact the Arbitration Office at (619) 531-3818. For more information about Settlement Conferences, please contact the Independent Calendar department to which your case is assigned. Please note that staff can only discuss ADR options and cannot give legal advice.

1  CATHRYN CHINN, ESQ. #93340
2  3990 Old Town Avenue, Ste. A109
   San Diego, California 92110
3  Telephone: (619) 295-4190

4      Attorney for Plaintiff
           JOSE HERNANDEZ

5

6            SUPERIOR COURT OF THE STATE OF CALIFORNIA

7               FOR THE COUNTY OF SAN DIEGO

8

9   JOSE HERNANDEZ,              )  Case No.  GIC 871979
                                  )
10         Plaintiff,             )  COMPLAINT
                                  )
11      v.                        )  VIOLATION OF CALIFORNIA LABOR
                                  )  CODE SECTION 1102.5, et seq.;
12  SAN DIEGO COUNTY              )  VIOLATION OF SAN DIEGO COUNTY
    REGIONAL AIRPORT AUTHORITY,   )  REGIONAL AIRPORT AUTHORITY
13  a public entity: and DOES 1 through )  CODE OF ETHICS SECTION
    20, inclusive.                )  1.0 et seq.;
14                                )  RIGHT TO PRIVACY;
           Defendants.            )  WRONGFUL DISCHARGE
15

16                               I

17           FACTS COMMON TO ALL CAUSES OF ACTION

18                  (Against All Defendants)

19  1.    All the events herein alleged occurred within the County of San Diego, State of

20  California.  Plaintiff is a resident of the County of San Diego, State of California and was

21  employed by the San Diego County Regional Airport Authority at the time of the events

22  herein alleged.  The defendant SAN DIEGO COUNTY REGIONAL AIRPORT

23  AUTHORITY (hereafter "AUTHORITY") is, and at all material times herein was, a

    public entity created by state law pursuant to the California Public Utilities Code Section

24  170000, et seq., Division 17, Chapter 1, Chapter 2, Chapter 3 to operate the San Diego

25  International Airport (Lindbergh Field) and is an entity charged by law as the employer

26  of the staff members of the AUTHORITY and is duly organized and existing under the

27  laws of the State of California.  Under California Public Utilities Code Section 170032

28

1  the AUTHORITY may be sued in all actions and proceedings in all courts of competent

2  jurisdiction.

3  2.    The AUTHORITY is responsible for public health and safety surrounding the San

4  Diego Airport, including airport land development and charged with minimizing "the

5  public's exposure to excessive safety hazards around airports." The AUTHORITY'S

6  management and budget of $113.8 million is overseen by the AUTHORITY'S

7  President/CEO Thella Bowens (Doe No.1).  Bowens reports to a Board of Directors and

8  her employment is approved by the San Diego Port District.

9  3.    The Plaintiff JOSE HERNANDEZ began employment at the San Diego County

10  Regional Airport Authority in March 2001 as Manager, Ground Transportation and was

11  then promoted to Director, Landside Operations..  In this position Plaintiff managed the

12  operations of the airport terminal buildings, the parking lots, the ground transportation

13  services and provided "expert assistance in the planning and long-range business decision

14  making for managing the airport's facilities." Plaintiff reported to the Vice President,

15  Airport Operations, who had managerial responsibility for all aspects of airport

16  operations.  Plaintiff was specifically required to make decisions "in operating the

17  parking facilities to ensure the highest levels of efficiency [and] economic advantage."

18  Plaintiff was also required to represent the Authority in dealing with tenants and

    contractors.

19  4.    Plaintiff does not know the true names or capacities (whether individual or other

20  wise) of defendants DOES 2 through 20) and will amend this pleading when their true

21  identities have been ascertained.

22  5.    All defendants were the agents and employees of each other and performed the

23  acts alleged in this complaint in the course and scope of their agency and employment

24  with the consent and direction of the other; and in dual capacity as individuals, subjecting

25  Plaintiff to, but not limited to, acts of harm, harassment and hostility.

26  6.    This action arises under the provisions of the California Labor Code Sections

27  1102.5 to 1102.8 et seq.; as well as the San Diego County Regional Airport Authority's

28                                                2

Code of Ethics and the Conflicts of Interest Code, Article 1, Part 1.1, Section 1.17(a); Article 2, Parts 2.0 to 2.30; Article 3, Part 3.0, Section 3.01; Article 5, Part 5.1. Sections 5.10 to 5.18; San Diego County Regional Airport Authority Policies, Article 2, Part 2.0, Section 2.01 (1)(a)(b)(2) et seq.; California Public Contracts Code Section 100 et seq.

7.     Plaintiff was an outstanding employee who always performed at levels above and beyond what could normally be asked of an employee. Plaintiff's performance was greatly praised by staff members, Board members and individuals from external agencies. The Vice President of Airport Operations stated that the number of employees performing at the Plaintiff's level could be "counted on one hand with several fingers left over." Plaintiff consistently and constantly reported on a daily basis to this Vice President all actions and events he was involved in, and withheld no information regarding his own activities, viewpoints, opinions and observance of the activities of other employees, including management. Plaintiff has never been criticized or disciplined for anything during his employment with the Authority until the events of December 2005 that led to his improper termination from the Authority in February 2006.

### FIRST CAUSE OF ACTION
#### Violation of California Labor Code Section 1102.5 et seq.
Retaliation for Protected Disclosure

(Against All Defendants).

8.     Plaintiff incorporates paragraphs 1 through 7 of the Facts Common to All Causes of Action as though fully set forth herein.

9.     Within the Airport Authority there was tension between the two operating divisions: the Operations Division headed by the Vice President to whom Plaintiff reported that was responsible for Airside, Terminal, and Parking/Ground Transportation; and the Real Estate and Capitol Development Division headed by Vice President Bryan Enarson. There were two distinct camps: Operations was primarily driven to respond to the Authority's airline tenants and airport guests; while Enarson's Real

3

4-53

1  Estate/Capital Development was driven by his need for bureaucracy that prolonged

2  project completion times and substantially increased project expenses. Enarson had

3  ingratiated himself to Bowens and set himself up as her close advisor. Bowens comes

4  from a background as a budget analyst and is not considered a good public speaker or as a

5  comfortable public spokesperson for the Authority. She looked to Enarson on a daily

6  basis as a confidante and leaned on him as her closest ally. Enarson had Bowen's ear and

7  had not only constant access but also constant influence on Bowen. The tension between

8  Enarson and the Vice President of Airport Operations began to involve Plaintiff and

9  escalated after Enarson's Real Estate/Capital Development received insufferable ratings

10  on the Airport's commissioned Tenant/Customer Satisfaction Survey. Instead of focusing

11  efforts on improving the areas that were weakest, Enarson chose to take a proactive

12  approach to diminish the accomplishments of the Operations Division. Enarson began to

13  insert himself in areas that were not his responsibility such as taking Bowens on walk-

14  throughs of the terminal buildings without the presence of a member from the Operations

15  Division to point out what displeased him and sought to take credit for Operations

16  initiating projects that were not his initiatives and were not pushed forward by him.

17  While Enarson's team was involved in the projects such as Flight Display Upgrades and

18  Security Check Point Reconfiguration the projects were driven by the Operations

19  Division, and not by Enarson. Enarson began escalating his obstruction of development

20  projects.

21  10.   With space at a premium in the airport, the airport's redevelopment plan included

22  development of an overall concessions plan. Enarson had received unacceptable ratings

23  on the concessions program which he oversaw as Vice President. In the past, Enarson's

24  Development Division had simply taken space, but now resisted and refused to negotiate

25  space needed to improve the women's restroom. The improvement plans had been in the

26  works for over five years and called for a removal of approximately 30 square feet from

27  the news and gift stand belonging to Host. In the process it was revealed that Enarson

28  had entered into side deals with a handshake agreement with Host that restricted the

4

Operations Division's ability to annex the space which was needed to comply with ADA requirements. Because Enarson refused to either take the space away from Host or renegotiate with them, major modifications had to be made that increased the project budget by over $2 million. During the long delays women were forced to endure the long lines to use the restrooms.

11.     The Plaintiff disclosed to members of the Authority Enarson's "side deal" made with out negotiation that restricted the Authority's ability to annex the space needed to comply with ADA requirements for the airport restroom. Plaintiff also disclosed that Enarson's refusal had increased the project budget by over $2 million. On both counts, Plaintiff believed that he was disclosing legal violations: violations of the ADA requirements and also disclosing the unauthorized use of public assets because Enarson had a "handshake" deal. The project suffered over three (3) years of delays due to Enarson's conflict with the airport's food and beverage concessionaire.

12.     The General Dynamics property is approximately 85 acres and sits along Pacific Coast Highway on the north side of the airport. The property contains a 1,600 parking stall long term parking lot (SAN Park Pacific Highway), and provides for Convention Center truck staging, rental car storage, and Cruise Ship truck staging. The terms of the original three year lease called for rent of $4.6 million year one, $6.6 million year two, and $8.6 million year three. Enarson was the lead negotiator on the lease. When Plaintiff compared the revenue potential of the approximately $3 million net from the parking operation and $1 million from the vehicle storage, the lease payments were too expensive and out of line. Plaintiff disclosed that the increased lease payments pulled funds away from the operating budget and he believed it was an unauthorized use of the Authority funds. Plaintiff also believed the failure to negotiate the lease properly was a violation of law and contrary to public interest. Despite the Plaintiff's objections to the actual revenue streams, Enarson decided the matter would go up to the Vice President level, where it died and no corrective action was taken. The lease was signed contrary to the objections of true forms of revenue streams.

5

1  Operations Division's ability to annex the space which was needed to comply with ADA

2  requirements.  Because Enarson refused to either take the space away from Host or

3  renegotiate with them, major modifications had to be made that increased the project

4  budget by over $2 million.  During the long delays women were forced to endure the long

5  lines to use the restrooms.

6  11.     The Plaintiff disclosed to members of the Authority Enarson's "side deal" made

7  with out negotiation that restricted the Authority's ability to annex the space needed to

8  comply with ADA requirements for the airport restroom.  Plaintiff also disclosed that

9  Enarson's refusal had increased the project budget by over $2 million.  On both counts,

10  Plaintiff believed that he was disclosing legal violations: violations of the ADA

11  requirements and also disclosing the unauthorized use of public assets because Enarson

12  had a "handshake" deal.  The project suffered over three (3) years of delays due to

13  Enarson's conflict with the airport's food and beverage concessionaire.

14  12.     The General Dynamics property is approximately 85 acres and sits along Pacific

15  Coast Highway on the north side of the airport.  The property contains a 1,600 parking

16  stall long term parking lot (SAN Park Pacific Highway), and provides for Convention

17  Center truck staging, rental car storage, and Cruise Ship truck staging.  The terms of the

18  original three year lease called for rent of $4.6 million year one, $6.6 million year two,

19  and $8.6 million year three.  Enarson was the lead negotiator on the lease.  When Plaintiff

20  compared the revenue potential of the approximately $3 million net from the parking

21  operation and $1 million from the vehicle storage, the lease payments were too expensive

22  and out of line.  Plaintiff disclosed that the increased lease payments pulled funds away

23  from the operating budget and he believed it was an unauthorized use of the Authority

24  funds.  Plaintiff also believed the failure to negotiate the lease properly was a violation of

25  law and contrary to public interest.  Despite the Plaintiff's objections to the actual

26  revenue streams, Enarson decided the matter would go up to the Vice President level,

27  where it died and no corrective action was taken.  The lease was signed contrary to the

28  objections of true forms of revenue streams.

5

13.     The Authority's Teledyne Ryan property lease calls for $3 million in annual payments for the 46.77 acre property, located immediately east of the airport along Harbor Drive.  At the time the lease was negotiated, with Enarson as the lead negotiator, contamination of the property allegedly required approximately $10 million.  The failure to properly inspect and analyze the actual contamination resulted in a finding that the contamination remediation range would be approximately $30 million and would limit the use of the property to the existing 350 space long term parking lot (SAN Park Harbor Drive).  Current revenues derived from the parking lot are approximately $1.2 million a year with about $700,000.00 in expenses, netting the Authority only $500,000.00.  The original plan for the property was to phase in the parking development from what is now Phase I, 350 parking stalls, to Phase 2, approximately 1,300 stalls.  If the project had stayed as planned the property would now be developed and be positioned to take advantage of the increasing occupancy levels in the market.  When the development process began the discovery of the deep environmental concerns with the property, which were not previously disclosed before Enarson completed the negotiations for the lease, significantly curtailed the purpose of the lease because of the unusable areas.  Plaintiff disclosed the findings that there was no way to open Phase 2 of the parking development and also disclosed the enormous amount of money the Authority was paying for the lease. Plaintiff asked the Authority members, including Enarson, "Why are we paying all this money?  Why are we paying the rent?" Enarson replied, "We're obligated to pay the rent." Plaintiff stated that "we can use a little bit, 351 parking stalls, yet we're paying $3 million and we can't use any of the rest.  We're on the hook for the $30 million.  We should only pay a pro rata amount." Enarson's response was that it would get pushed up to the Vice President group.  When the Teledyne Ryan transition team, of which the Plaintiff was a member,  re-briefed the Vice Presidents, at a second meeting, the members and officers were in awe, and asked, "Are you sure it's $30 million?  Are you kidding me?" Enarson was agitated and Plaintiff received reports that Enarson was angry.

14.     In January 2004 Lindbergh Parking (hereafter "LPi") was awarded a new five (5)

6

year service agreement for the management of the airports' employee and public parking lots. Services included the management of the airport's inter-terminal, "Red Bus" and the Employee shuttle service, as well as the taxicab and shuttle-for-hire dispatch system. The total operating budget is approximately $8 million. Although the Request for Proposal process was highly contested LPi was the preferred candidate largely because of its' lower operating expenses. The contract commenced on February 1, 2004. There were immediate disagreements with the operator because of contractual requirements. As a key component of the shuttle service, the operator was to provide new vehicles at the beginning of the agreement and change them over every 2 ½ years. The vehicles did not arrive until four months later. During these four months, the operator was able to make a substantial amount of profit because they did not have to make monthly lease payments for the vehicles since they had already been paid off. The fleet consisted of six (6) employee, three (3) Red Bus vehicles, and two (2) interchangeable shuttles. The average lease of a vehicle was $1,650.00 per month and amounted to approximately $18,150.00 per month in extra profit for the operators. Their contract provided for an hourly reimbursable for operating hours plus fuel expense. No vehicle lease cost meant more profit. These difficulties were chalked up as operational issues and the Authority moved on.

During the Request for Proposal process Lpi had indicated they could operate the long term parking lot, SAN Park Pacific Highway, 1,600 parking stalls along Pacific Highway, for approximately $1.3 million annually. As the operating numbers began to appear the actual expenses were projected at $1.7 million annually, higher than the previous operator. Expense projections for the other Authority parking properties projected similar increases. I t was clear that LPI purposely submitted unattainable expense numbers in order to bolster their proposal. Although unhappy with the operator the Plaintiff had no choice but to work with the operator to control expenses.

Maurice Grey is the President of LPI. Plaintiff made it clear to Grey that he wanted to see the Liability and Workers Compensation Coverage for the parking service

7

competitively bid for renewal. On the day before the existing coverage was set to expire Grey presented Plaintiff with a premium scale which far exceed expense projections. Plaintiff met with Grey and stressed to him that he needed to go through in detail all of the operating expenses and analyze each of the employee job positions, including Grey's. As part of the process Plaintiff asked Grey to prepare a job description of his own job and the jobs of each of his managers. All of them were interviewed to get a good understanding of their duties. The process determined that most, if not all, of the duties claimed by Grey were actually performed by others. Plaintiff explained to Grey that he needed to be able to justify continuing paying his salary and that on paper, the salary was not justified. Plaintiff informed Grey he would give him three months, until the end of summer, to show his job duties that would justify the pay and if not he would have to go. Subsequently, Grey's management skills resulted in his expenses being out of control, he failed to hire proper personnel, and he could not properly bid items. Again Plaintiff extended Grey's deadline to substantiate his job worth until the end of the year, December 31, 2005.

Plaintiff then discovered that LPI was double billing the Authority for Workers Compensation Insurance. He had noted that the premiums were running twice the amount of the previous year and were being billed to a different expense category. As a result Plaintiff posted a credit of approximately $150,000.00 against LPI's monthly request for reimbursement. Plaintiff had communicated throughout the process and disclosed LPI's wrongdoing and financial misuse issues with his direct supervisor, the Vice President of Airport Operations. The Vice President asked Plaintiff to work out the issues with Grey because he was a Minority Owned Business and the Authority needed the relationship in order to comply with FAA regulations governing Minority participation. Plaintiff had disclosed computational or other errors in LPI's bid submission; the unsatisfactory performance of the contract; the failure of LPI to submit insurance documents acceptable to the Authority; Grey's unjustified refusal to warrant his performance and other offenses and actions that indicated a lack of business integrity by

8

LPI. Plaintiff believed that disclosures he made pursuant to the contract contained violations of the Ethics Code and also of rules and regulations of law.

15. On or about July 11, 2006 Plaintiff filed his San Diego County Regional Airport Authority Damage Claim Form alleging the incidents of disclosure contained above herein and for the retaliation he suffered based on the disclosures of legal violations described above. On or about August 1, 2006 defendant AUTHORITY denied Plaintiff's claim.

16. California Labor Code Section 1102.5 is intended to encourage employees to report legal violations or a refusal to participate in such violations. Plaintiff in good faith reported, disclosed, divulged and brought to the attention of his employer facts and information relative to both suspected and actual violations of law directly related to his job. Plaintiff observed improper governmental activity by employees of the San Diego County Regional Airport Authority undertaken in the performance of the employees' official duties that demonstrated economic waste, incompetency and inefficiency in a government agency. Under California Labor Code Section 1102.5 ( c) an employer may not retaliate against an employee for refusing to participate in an activity that would result in a violation of a state or federal statute, or a violation or noncompliance with a state or federal rule or regulation. Further, under California Labor Code Section 1102.5 (b) an employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of noncompliance with a state or federal rule or regulation. Under California Labor Code Section 1102.5 (e) a report made by an employee of a government agency to his employer is a disclosure of information to a government or law enforcement agency pursuant to subdivisions (a) and (b).

17. By September 2005 an Authority Internal Audit of parking management operating expenses had determined that Lpi had double-billed the Authority for Workers Compensation Insurance for a total of four (4) months.

9

18.      By October 2005 the Plaintiff had met with the Vice President of Operations to inform the Vice President of Operations of the status of LPI's non-compliance and areas of deficiencies and to obtain agreement that Maurice Gray would step down as President of LPI should he not be able to comply with the standards and improve the deficiencies and clarify his job duties for his position.

19.      By November 2005 the Vice President to whom the Plaintiff reported was well aware that the Plaintiff would be leaving early in December for a planned vacation out of state.  On the late afternoon of December 1, 2005 the Plaintiff met with the Vice President of Operations to see if there were any matters that needed to be attended to before the start of his vacation.  The Vice President of Operations advised the Plaintiff that talks of "reorganization" had "resurfaced" but that final outcome of any "reorganization" would be determined by Thella Bowens (Doe No. 1) and the Authority Administration.

20.      On December 6, 2005 while on vacation the Plaintiff received a telephone call from the Vice President of Operations, who was clearly upset, and who informed him of the specifics of the plan of the reorganization.  Both the responsibilities of the Vice President and those of the Plaintiff were severely diminished.  Over two-thirds of the Authority employees had reported to the Vice President's office: now he had been reassigned Chief of Staff for Thella Bowens (Doe No.1) even though no one reported to him in that assignment..  He was permitted to keep the title of Vice President. .

21.      Vice President Bryan Enarson had convinced Thella Bowens (Doe No. 1) to relieve him from the problems he had created as the Vice President of Development (including the unresolved monetary havoc he had negotiated with the properties of Jim's Air, General Dynamics, and Teledyne Ryan) and reposition him in a position with Terminal Operations and other responsibilities.

22.      On December 7, 2005 the Plaintiff participated in a single telephone conference call to discuss the Authority's reorganization specific to Parking and Ground Transportation.  The Authority no longer has a person with expertise managing those

10

4-61

positions.  On December 8, 2005 all Authority employees were informed by e-mail that the reorganization would take effect on January 3, 2006.

23.    On December 14, 2005 the Plaintiff was requested to attend a meeting with two individuals, an attorney with LUCE FORWARD and an investigator hired by LUCE FORWARD.  Neither of the individuals informed the Plaintiff of what the purpose of their meeting was with the Plaintiff.  The attorney asked a number of vague and a number of specific questions, interviewing the Plaintiff and asking him if he had requested or taken personal gifts from any company at the airport (No); if he had requested airline tickets from any airline (No); if he had requested first-class upgrades from airlines (No); if he had attended a wedding in Jacksonville, Florida (No); if he had received money from an airport vender (Never) and if he knew of other employees at the airport that accepted gifts or items of value (Yes).  The questions did not include follow-up inquiries to the information regarding his knowledge of other employees who had in fact accepted gifts or items of value.  The attorney's questions were asked in a hostile and unprofessional manner and the Plaintiff knew that the attorney had been hired specifically to find some wrong-doing on his part.  Following this odd interrogation the Plaintiff was told by two Vice Presidents that he was being put on Paid Administrative Leave "until an investigation could be completed." He was also told specifically that he could not discuss anything related to this interrogation or "the investigation" with anyone else.  Under California Labor Code section 1102.5 an employer may not make or enforce any rule or policy preventing an employee from disclosing information to a government agency, including the Authority, where the employer has reasonable cause to believe that the information discloses a violation of state statute, or a violation or noncompliance with a state rule or regulation. The Plaintiff asked the Vice Presidents to clarify the specific charges but they refused to do so.

24.    The attorney from LUCE FORWARD and his hired investigator then began to contact various people of the Plaintiff's acquaintance.  These witnesses immediately

11