1  FRED M. PLEVIN (SBN 126185)
   SANDRA L. MCDONOUGH (SBN 193308)
2  ALBERT R. LIMBERG (SBN 211110)
   **PAUL, PLEVIN, SULLIVAN & CONNAUGHTON** LLP
3  401 B Street, Tenth Floor
   San Diego, California 92101-4232
4  Telephone: 619-237-5200
   Facsimile: 619-615-0700
5
   AMY S. GONZALEZ (SBN 181745)
6  **SAN DIEGO COUNTY REGIONAL AIRPORT**
   **AUTHORITY**
7  3225 N. Harbor Drive
   San Diego, CA 92138
8  Telephone: (619) 400-2425
   Facsimile: (619) 400-2428
9
10 Attorneys for Defendant
   SAN DIEGO COUNTY REGIONAL AIRPORT
11 AUTHORITY

12           SUPERIOR COURT OF THE STATE OF CALIFORNIA
13                      COUNTY OF SAN DIEGO
14

| | |
|---|---|
| 15  JOSE HERNANDEZ, | CASE NO. GIC871979 |
| 16     Plaintiff, | **DECLARATION OF THELLA F. BOWENS** |
| 17     v. | **IN SUPPORT OF DEFENDANT SAN DIEGO** |
| 18  SAN DIEGO COUNTY REGIONAL | **COUNTY REGIONAL AIRPORT** |
|   AIRPORT AUTHORITY, a public entity; | **AUTHORITY'S MOTION FOR SUMMARY** |
|   and DOES 1 through 12, inclusive, | **JUDGMENT OR, IN THE ALTERNATIVE,** |
| 19 | **SUMMARY ADJUDICATION** |
|      Defendants. | |

20  Date:       November 16, 2007
    Time:       1:30 p.m.
21  Dept:       75
    Judge:      Hon. Richard E. Strauss
22  Complaint Filed:  September 1, 2006
    Trial Date:     January 4, 2008
23
                    **EXEMPT FROM FEES**
24                  **GOVT. CODE § 6103**

25     I, Thella F. Bowens, declare as follows:

26     1.     The facts contained in this declaration are true of my own personal knowledge, and

27  if called as a witness in this matter I could and would testify to the following facts.

28     2.     I am the President and Chief Executive Officer of the San Diego County Regional

PAUL, PLEVIN,     BOWENS DECLARATION IN SUPPORT OF          1
SULLIVAN &        SUMMARY JUDGMENT MOTION
CONNAUGHTON LLP

BY FAX

FILED
CIVIL BUSINESS OFFICE 13
CENTRAL DIVISION

2007 AUG 31  P 4: 31

CLERK OF THE COURT
SAN DIEGO COUNTY, CA

41-451

1  Airport Authority ("the Authority"), a defendant in this action. I have held that position since

2  March 2003. Prior to my appointment as President and CEO of the Authority, I served as the

3  Senior Director of Aviation for the Port District of San Diego for seven years.

4      3.      The Authority tries to conduct exit interviews with employees who leave. Human

5  Resources usually conducts the exit interview, and an employee has the option to meet with me for

6  the exit process.

7      4.      In approximately October or November 2005, an employee named Clifforine Massey

8  resigned from the Authority. Massey asked to meet with me as part of her exit process. She

9  thanked me for the opportunity to work at the Authority. However, during the course of this

10  meeting, Massey raised plaintiff Jose Hernandez as an issue. She said she did not want to complain,

11  but she said that Hernandez is a dangerous person. She also called him "unethical." Massey

12  seemed reluctant to expand and I did not press her for details at the time. However, my impression

13  was that Massey was referring to ethical issues.

14      5.      Within a short period of time after my meeting with Massey, another employee

15  named Jim Prentice independently approached me regarding concerns he had about Hernandez

16  taking favors and benefits from Authority vendors. He specifically told me about free airline

17  tickets, Southwest Airlines drink tickets being handed out by Hernandez, golf outings with vendors,

18  and Hernandez' family trip to Hawaii, all of which Prentice believed that Hernandez had received as

19  a free benefit from Authority vendors.

20      6.      I called Jeffrey Woodson, the Vice President of Administration at the Authority, and

21  advised him of what I had heard from both Prentice and Massey. I instructed Woodson to hire an

22  outside investigator to investigate the concerns raised by Prentice and Massey.

23      7.      I never advised the investigators to prevent Hernandez from disclosing information,

24  or to otherwise prevent Hernandez from speaking about any topic.

25      8.      I received a full briefing from Edward Patrick ("Pat") Swan and John Gamberzky,

26  the individuals who conducted the investigation, in early January 2006 regarding their findings.

27  Based on the information they presented, I requested a written report of their findings and

28  conclusions.

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LL

BOWENS DECLARATION IN SUPPORT OF
SUMMARY JUDGMENT MOTION                    2

41-452

9.    On or about January 19, 2006, I received a written report from Swan (an accurate copy of which is attached as Exhibit 4 to the Notice of Lodgment of Exhibits) detailing the factual findings from the investigation into Hernandez. I discussed the findings of that report with Woodson and Diane Richards, the Director of Human Resources. Woodson and Richards recommended terminating Hernandez' employment because there was sufficient evidence presented by the investigators that Hernandez had engaged in a pattern of conduct that violated the Authority's Ethics Code. Specifically, I was persuaded that Hernandez accepted benefits from the Authority's vendors in excess of that permitted on an annual basis by the California Political Reform Act. I supported and approved Hernandez' termination, and I was the person who made the final decision to terminate his employment based on the investigator's findings and Woodson's recommendation.

10.    In my opinion, airplane tickets received by Hernandez and his family from Hawaiian Airlines and Southwest Airlines had value and conferred a benefit on Hernandez.

11.    I am unaware of any employee at the Authority, other than Hernandez, receiving the level of free benefits that Hernandez received from the Authority's vendors.

12.    I am aware that the Authority conducted another investigation into alleged benefits received by another employee at the Authority. The allegations that led to this additional investigation came to light during the investigation of Hernandez.

13.    I was unaware that Hernandez raised any issues regarding the legality of the women's restroom project in Terminal One or that he ever complained that the project violated any rules or regulations.

14.    I am aware that Hernandez was in meetings where staff discussed the fact that the terms of the General Dynamics lease were set by statute and that the Authority had no choice but to pay the amount set by statute for that lease. I do not recall, however, any statements made by Hernandez regarding the lease, nor do I recall Hernandez ever objecting to the General Dynamics lease.

15.    I am not aware of any concerns or issues that Hernandez may have raised regarding the Authority's lease of property from Teledyne Ryan. I have never served on the Teledyne Ryan task force, and I never received any report or information regarding what Hernandez may or may

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

BOWENS DECLARATION IN SUPPORT OF
SUMMARY JUDGMENT MOTION                    3

41-453

1    not have disclosed to the task force regarding the Teledyne Ryan lease.

2         16.    I am unaware of any issues that Hernandez may have raised regarding the request

3    for proposal ("RFP") process by Lindbergh Parking, Inc. ("LPi"), LPi's workers' compensation

4    billing practice, LPi or Maurice Grey's business integrity, or any alleged illegality between LPi

5    and the Authority. LPi currently has a contract with the Authority, which was entered into on

6    January 30, 2004 with an effective date of February 1, 2004 through January 31, 2009. The

7    current LPi contract was entered into through the RFP process. I did not exert any influence over

8    the process.

9         17.    I do not grant any special favors to LPi due to its status as a minority-owned

10   business. In fact, Maurice Grey, LPi's President, requested in 2005 that the Authority assign LPi's

11   contract to Ace Parking. I did not agree to have the parking agreement assigned to Ace Parking.

12        18.    The Authority assumed ownership and operations of San Diego International

13   Airport from the Unified Port of San Diego on January 1, 2003. From the time that the Authority

14   assumed ownership and operation of San Diego International Airport, to the best of my

15   recollection, I have only received one gratuitous upgrade on an airplane flight. When I checked

16   into my flight, I received a seat in First Class. I do not know why I received the First Class

17   upgrade, and I do not know if I received the upgrade because of my status with the Authority. I

18   did not ask anyone for the upgrade and I am unaware of anyone providing the upgrade to me

19   because of my status with the Authority.

20        19.    I have never requested that anyone change a scheduled flight for me without

21   charging the customary fee charged to members of the public. I am unaware of any "free" ticket

22   changes provided to me, other than those that would be provided to any member of the public free

23   of charge.

24        20.    On one occasion, I was scheduled for a flight, and arrived at the hold room with

25   time to spare before departure. Hernandez met me at the terminal and offered to take me into the

26   Delta Crown Room as I waited for my flight. Although I initially declined the invitation,

27   Hernandez insisted that I wait in the lounge and also indicated that Mark, the Delta station

28   manager, wanted to talk to me. While Hernandez went to find Mark, the station manager, I

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

BOWENS DECLARATION IN SUPPORT OF          4
SUMMARY JUDGMENT MOTION

1    waited in the entrance area to the Delta lounge.  When Mark arrived, he had some complaints

2    regarding Delta's assigned ticket counter locations, and conflicts with Jet Blue's proximity to

3    them.  I had a brief conversation with Mark, promising to talk to the appropriate person about the

4    issue, and then politely excused myself and left the lounge area.

5         21.    The only other times I have been in any airline lounge was to conduct Authority

6    business, such as meeting with consultants who are traveling and will be in the lounge, or to

7    attend an opening or other event sponsored by an airline.  I also have used an airline lounge for

8    international travel when access to the lounge is part of the airplane ticket price.

9         22.    I have never requested any benefits on behalf of my sister.  To my knowledge, my

10   sister has not received any free airline tickets, ticket changes, or free shipments from any person

11   or entity as a result of my position with the Authority.

12        23.    I do not know the owner of the Orlando Magic nor have I ever requested that he

13   receive benefits or free favors from the Authority or any of its vendors.  I have never requested,

14   even through a third party, that an airline donate airplane tickets to benefit the Jackie Robinson

15   YMCA.

16        24.    I was not personally involved in securing any donations from Authority vendors or

17   airlines for any United Way campaigns.

18        25.    I did not take the inaugural flight from San Diego to Maui on Hawaiian Airlines.

19        26.    On one occasion, when my car was being detailed, Ted Sexton volunteered to pick

20   my car up for me because I was stuck in a meeting.  I paid for all the work done on my car, and I

21   did not request that Sexton pick the car up for me.

22        27.    I have more than one parking space assigned to me at the San Diego International

23   Airport, but I do not routinely use one of the spaces.  Upon his request, I gave Vernon Evans

24   permission to use the extra space when it is vacant.  However, I did not give him exclusive use of

25   the space.  As far as I am concerned, anyone at the Authority may use that space when it is vacant.

26        28.    Management at the Authority holds an annual employee appreciation barbecue.

27   Each year, approximately 300 people attend the barbecue.  The Authority does not pay for the

28   food for the barbecue.  Instead, employees at the director-level and above voluntarily decide

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

BOWENS DECLARATION IN SUPPORT OF          5
SUMMARY JUDGMENT MOTION

1    whether they will contribute to the cost of the barbecue. Each year, the meat for the barbecue is

2    purchased from Angelo's Barbecue in Fort Worth, Texas. When we first started shipping the meat

3    in 1998 or 1999, I inquired of the Port's Attorney and he verbally told me that because the meat

4    was for the organization and I received no personal benefit, it was "OK" to allow Southwest

5    Airlines who volunteered to handle the meat to do so at no cost.

6         29.    In 2005, I and several other Authority Vice Presidents, including Ted Sexton, went

7    to Dallas, Texas for a one day meeting with Southwest Airlines management representatives in

8    order to learn about Southwest Airlines employee development programs. It was proper for

9    Sexton to be at that meeting, and his presence accomplished a business purpose.

10        30.    Bryan Enarson did not influence my decision to terminate Hernandez. Further,

11   Enarson had absolutely no input into my decision to initiate an investigation into Hernandez, or to

12   terminate Hernandez' employment. Finally, Enarson has never recommended that I take any

13   employment action with regard to Hernandez.

14        I declare under penalty of perjury under the laws of the State of California that the

15   foregoing is true and correct.

16        Executed this 30th day of August 2007 at San Diego, California.

17                                          _Thella A Bowens_

18                                          THELLA F. BOWENS

19

20

21

22

23

24

25

26

27

28

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

Aug 29 07 10:05a     SDCRAA - Chief Auditor     619-400-2434     P.2

| | |
|---|---|
| 1 | FRED M. PLEVIN (SBN 126185) |
|   | SANDRA L. MCDONOUGH (SBN 193308) |
| 2 | ALBERT R. LIMBERG (SBN 211110) |
|   | **PAUL, PLEVIN, SULLIVAN & CONNAUGHTON** LLP |
| 3 | 401 B Street, Tenth Floor |
|   | San Diego, California 92101-4232 |
| 4 | Telephone: 619-237-5200 |
|   | Facsimile: 619-615-0700 |
| 5 | |
|   | AMY S. GONZALEZ (SBN 181745) |
| 6 | **SAN DIEGO COUNTY REGIONAL AIRPORT** |
|   | **AUTHORITY** |
| 7 | 3225 N. Harbor Drive |
|   | San Diego, CA 92138 |
| 8 | Telephone: (619) 400-2425 |
|   | Facsimile: (619) 400-2428 |

FILED
CIVIL BUSINESS OFFICE 13
CENTRAL DIVISION

2007 AUG 31 P 4 31

CLERK-SUPERIOR COURT
SAN DIEGO COUNTY, CA

9

10  Attorneys for Defendant
    SAN DIEGO COUNTY REGIONAL AIRPORT
11  AUTHORITY

12              SUPERIOR COURT OF THE STATE OF CALIFORNIA

13                          COUNTY OF SAN DIEGO

| | | |
|---|---|---|
| 14 | | |
| 15 | JOSE HERNANDEZ, | CASE NO. GIC871979 |
| 16 | Plaintiff, | **DECLARATION OF MARK BURCHYETT** |
|    |                | **IN SUPPORT OF DEFENDANT SAN DIEGO** |
| 17 | v. | **COUNTY REGIONAL AIRPORT** |
|    |                | **AUTHORITY'S MOTION FOR SUMMARY** |
| 18 | SAN DIEGO COUNTY REGIONAL | **JUDGMENT OR, IN THE ALTERNATIVE,** |
|    | AIRPORT AUTHORITY, a public entity; | **SUMMARY ADJUDICATION** |
| 19 | and DOES 1 through 12, inclusive, | |
| 20 | Defendants. | Date:        November 16, 2007 |
|    |                | Time:        1:30 p.m. |
| 21 |                | Dept:        75 |
|    |                | Judge:       Hon. Richard E. Strauss |
| 22 |                | Complaint Filed:  September 1, 2006 |
|    |                | Trial Date:  January 4, 2008 |
| 23 |                | **EXEMPT FROM FEES** |
| 24 |                | **GOVT. CODE § 6103** |

25      I, Mark Burchyett, declare as follows:

26          1.      The facts contained in this declaration are true of my own personal knowledge, and

27  if called as a witness in this matter I could and would testify to the following facts.

28          2.      I am the Chief Auditor for the San Diego County Regional Airport Authority ("the

PAUL, PLEVIN,          BURCHYETT DECLARATION IN SUPPORT OF          1
SULLIVAN &             SUMMARY JUDGMENT MOTION
CONNAUGHTON LLP

**BY FAX**

1   Authority"), a defendant in this action. I have held that position for one and a half years. Prior to

2   coming to the Authority, I served as the Director of Internal Audit for St. Louis County, Missouri

3   and also as the Director of Internal Audit for St. Charles County, Missouri. Prior to my

4   governmental service, I was employed at Deloitte & Touche as an Enterprise Risk Services

5   Manager.

6        3.    As the Chief Auditor, my responsibilities include: Supporting the Audit

7   Committee in fulfilling its roles and responsibilities that include, but are not limited to, the

8   Authority's ethics, fraud policies, external audit, and internal audit matters; planning, organizing,

9   directing and overseeing the Authority's audit activities and functions; managing and directing the

10  identification of risks requiring audit review and the development and implementation of such

11  audits; and communicating findings and recommendations to Authority Commissioners, senior

12  management and other parties on a variety of important and confidential matters.

13       4.    On July 27, 2006, I received a telephone call from an Authority Board member

14  requesting that the Office of the Chief Auditor ("OCA") review assertions of ethical violations

15  contained in a claim filed by Jose Hernandez with the San Diego County Regional Airport

16  Authority on or about July 12, 2006 (Claim No. CL-068, hereinafter "Claim"). Ultimately, the

17  OCA received authorization to conduct an investigation into the allegations of ethical violations

18  in the Claim from the Chairman of the Audit and Performance Monitoring Committee, Mayor

19  Morris Vance.

20       5.    I began my investigation as Chief Auditor into the allegations set forth in the

21  Claim on or about August 2, 2006. As part of my investigation, I interviewed six Authority

22  employees and two Authority Board Members. I also attempted to conduct an interview with Jose

23  Hernandez, but his attorney Cathryn Chinn rejected my request for an interview. I also forwarded

24  a list of questions to Ms. Chinn for Hernandez to respond to relating to each allegation.

25  Hernandez, through his attorney, Ms. Chinn, refused to provide answers to the submitted

26  questions.

27       6.    As part of my investigation, I also requested, received, and reviewed factual and

28  documentary information from Authority personnel, Board members, and Hernandez' email and

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

BURCHYETT DECLARATION IN SUPPORT OF
SUMMARY JUDGMENT MOTION

2

1   hard drive files.

2       7.      Immediately after I concluded my investigation, I prepared a Report of the Office

3   of the Chief Auditor based on the Investigation into Ethics Violation Claims by Jose Hernandez

4   dated September 5, 2006 ("Report"). A true and correct copy of the Report that I prepared is

5   attached to the Notice of Lodgment of Exhibits filed herewith as Exhibit 6.

6       8.      The Report is a compilation of my findings regarding the allegations asserted by

7   Hernandez in his Claim, and is based on the interviews I conducted, as well as the documents that

8   I reviewed in the course of the investigation.

9       9.      When the Office of the Chief Auditor is asked to conduct an investigation, it

10  always prepares a written report of that investigation. All reports prepared by the Office of the

11  Chief Auditor are retained in the normal course of business in the Office of the Chief Auditor.

12      10.     In this case, the Report is maintained as a business record in the Office of the Chief

13  Auditor.

14      11.     As Chief Auditor, I have responsibility for investigating potential violations of the

15  Authority's Codes and Policies. Attached as Exhibit 3 to the Notice of Lodgment of Exhibits

16  filed herewith is a true and correct copy of Article 2 of the Authority's Codes, including any

17  amendments or supplements to that Article. Attached as Exhibit 7 to the Notice of Lodgment of

18  Exhibits are true and correct copies of other selected portions of the Authority's Codes and

19  Policies.

20      I declare under penalty of perjury under the laws of the State of California that the

21  foregoing is true and correct.

22      Executed this 29ᵗʰ day of _August_  2007 at San Diego, California.

23

24                                  MARK BURCHYETT

25

26

27

28

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

BURCHYETT DECLARATION IN SUPPORT OF
SUMMARY JUDGMENT MOTION                    3

**EXHIBIT 43**

1 | FRED M. PLEVIN (SBN 126185)  
SANDRA L. MCDONOUGH (SBN 193308)  
2 | ALBERT R. LIMBERG (SBN 211110)  
**PAUL, PLEVIN, SULLIVAN & CONNAUGHTON** LLP  
3 | 401 B Street, Tenth Floor  
San Diego, California 92101-4232  
4 | Telephone: 619-237-5200  
Facsimile: 619-615-0700  
5 |  
AMY S. GONZALEZ (SBN 181745)  
6 | **SAN DIEGO COUNTY REGIONAL AIRPORT**  
**AUTHORITY**  
7 | 3225 N. Harbor Drive  
San Diego, CA 92138  
8 | Telephone: (619) 400-2425  
Facsimile: (619) 400-2428  
9 |  
10 | Attorneys for Defendant  
SAN DIEGO COUNTY REGIONAL AIRPORT  
11 | AUTHORITY

FILED  
CIVIL BUSINESS OFFICE 13  
CENTRAL DIVISION  

2007 AUG 31 P 4:31  

SUPERIOR COURT  
SAN DIEGO COUNTY, CA

12 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

13 | COUNTY OF SAN DIEGO

14 |

15 | JOSE HERNANDEZ,

| CASE NO. GIC871979

16 | Plaintiff,

| **DECLARATION OF BRYAN ENARSON IN**  
**SUPPORT OF DEFENDANT SAN DIEGO**  
**COUNTY REGIONAL AIRPORT**  
**AUTHORITY'S MOTION FOR SUMMARY**  
**JUDGMENT OR, IN THE ALTERNATIVE,**  
**SUMMARY ADJUDICATION**

17 | v.

18 | SAN DIEGO COUNTY REGIONAL  
AIRPORT AUTHORITY, a public entity;  
and DOES 1 through 12, inclusive,

19 |

20 | Defendants.

| Date:  November 16, 2007  
Time:  1:30 p.m.  
Dept:  75  
Judge:  Hon. Richard E. Strauss  
Complaint Filed:  September 1, 2006  
Trial Date:  January 4, 2008

21 |

22 |

23 |

| **EXEMPT FROM FEES**  
**GOVT. CODE § 6103**

24 |

25 | I, Bryan Enarson, declare as follows:

26 |     1.     The facts contained in this declaration are true of my own personal knowledge, and

27 | if called as a witness in this matter I could and would testify to the following facts.

28 |     2.     I am the Vice President of Development for the San Diego County Regional

PAUL, PLEVIN,  
SULLIVAN &  
CONNAUGHTON LLP | ENARSON DECLARATION IN SUPPORT OF  
SUMMARY JUDGMENT MOTION | 1

**BY FAX**

1  Airport Authority ("the Authority"), a defendant in this action. I have held that position since

2  December 2003. Prior to my current position, I was the Director of Development for the Port

3  District and the Authority. I began my employment with the Port District on February 3, 1997, as

4  Director of Operations.

5       3.     I was a member of the negotiating team regarding the separation of the Authority

6  from the Port District. Part of the negotiations included the General Dynamics property, which is

7  adjacent to the San Diego International Airport. Negotiations regarding the lease of the General

8  Dynamics property began in approximately 2002. The monetary terms of the lease for calendar

9  years 2003, 2004 and 2005 are set by Public Utility Code section 170056(f)(1), and the Authority

10  complied with those terms and that statute. After the initial three years, the annual rent was

11  determined based on the fair market value of the property as of January 1, 2006, and the market

12  rate of return on that date. The Authority approved the current lease terms for the property at the

13  July 24, 2006 Board meeting. The current lease terms require the Authority to pay $6.75 million

14  per year for a term of 63 years. The amount of $6.75 million annually was reached through arms-

15  length negotiations with the Port. The Authority expects to develop the property and expects that

16  the annual revenues will exceed the annual lease amount over the course of the next 62 years.

17       4.     I was also a member of the negotiation committee with regard to the lease of the

18  Teledyne Ryan property. We began negotiations on the Teledyne Ryan property in approximately

19  late 2002, early 2003. The San Diego Unified Port District owns the Teledyne Ryan property and

20  leases it to the Authority. When the former tenant of that property, Allegheny, vacated the

21  property without notice, the Port filed a lawsuit against Allegheny for breach of the lease. After

22  Allegheny vacated the property without notice, the Port began preparing the property for use as a

23  parking lot.

24       5.     The Port failed to comply with CEQA before beginning their work on the property

25  for the purpose of using it as a parking lot. As a result, the Authority filed a lawsuit against the

26  Port for their failure to comply with CEQA before beginning their parking lot project (the "CEQA

27  lawsuit").

28       6.     Jose Hernandez completed an analysis of potential parking revenues of the

PAUL, PLEVIN,
SULLIVAN &
ONNAUGHTON LLP

ENARSON DECLARATION IN SUPPORT OF       2
SUMMARY JUDGMENT MOTION

1 property and other properties bordering Harbor Drive. He determined that the Authority would

2 lose about $3 to $8 million annually if the Port began developing public parking lots on both the

3 Teledyne Ryan property and the other Harbor Drive properties.

4      7.    The Port and Authority eventually settled the CEQA lawsuit and entered into a

5 settlement agreement whereby the Port agreed to lease the former TDY property to the Authority

6 for $3,000,000 per year for 63 years. In addition, the settlement agreement provided the

7 following: (1) the Port would contribute $9,770,393 plus interest to the demolition and abatement

8 costs on the former TDY property; (2) if demolition and abatement cost more than the $9,770,393

9 contributed by the Port, the Authority and the Port would split the costs for demolition and

10 abatement equally. The settlement agreement became effective on June 1, 2004. A true and

11 correct copy of the executed lease between the Port and the Authority regarding the Teledyne

12 Ryan property, with the settlement agreement as an exhibit, is attached as Exhibit 18 to the Notice

13 of Lodgment of Exhibits filed herewith.

14      8.    The Authority has conducted various projections regarding the annual revenue

15 expected from the property once the contamination is cleaned up. The Authority expects that the

16 annual revenue from the property will eventually far exceed the amount of the lease payment.

17      9.    The Authority organized a Teledyne Ryan Task Force or Redevelopment

18 Committee to evaluate uses for the Teledyne Ryan property and also to assist in any issues that

19 may have arisen regarding use of the Teledyne Ryan property. In 2004 and 2005, Steve Cornell,

20 Iraj Ghaemi, Troy Leech and Paul Manasjan were on the Task Force. All four individuals are still

21 employed by the Authority.

22      10.    I am in charge of the women's restroom project expansion in the Southwest

23 Airlines rotunda in Terminal One of the San Diego International Airport ("women's restroom

24 project").

25      11.    In 2000, the Authority decided to convert a Southwest Airlines' hold room in

26 Terminal One into concession space, which it leased to Host. This decision resulted in an

27 addendum to the Authority's written agreement with Host to improve space in Terminal 1 into

28 additional concession space. The Host agreement required that Host would have to approve any

ENARSON DECLARATION IN SUPPORT OF     3
SUMMARY JUDGMENT MOTION

1  additional space taken from Host after the improvements were made. The amendment to the Host

2  agreement was approved by the Authority's Board.

3      12.    I do not have any side deals with Host. Any agreements that I have entered into

4  with Host have been memorialized in an approved and fully executed agreement.

5      13.    When the Authority was looking to build the enlarged women's restroom on the

6  North side of the Southwest Rotunda of Terminal One, an issue regarding using 30 feet of Host

7  concession space for the restroom arose. The Development Division of the Authority, of which I

8  am a part, opposed using the 30 feet of Host concession space for enlarging the restroom due to

9  previous commitments the Authority made to Host as a result of improving their space. Since the

10  Authority decided not to disturb or reconfigure the concession and use the 30 feet of space on the

11  North side, it decided to place the restroom in another part of the terminal in order to have enough

12  space to comply with the access requirements of the Americans with Disabilities Act ("ADA").

13  In other words, the only way that the Authority could comply with the ADA on the North side of

14  the Southwest rotunda was to negotiate with Host to take the space away. Rather than take the

15  space away from Host, the Development Division decided to construct the expanded women's

16  restroom on the other side of the rotunda.

17      14.    Although I am aware that Jose Hernandez wanted to utilize the 30 feet of space

18  from Host and build the restroom on the North side, I am unaware that Hernandez ever

19  complained that the women's restroom project was unlawful, violated the ADA, or that it was too

20  expensive.

21      15.    I am not aware of any employee of the Authority ever indicating that it planned to

22  violate the ADA with regard to the women's restroom project, nor am I aware of any violations of

23  the ADA with regard to the women's restroom project.

24      16.    I did not have any involvement in the investigation regarding Hernandez' alleged

25  ethical violations in late 2005 or early 2006. Further, I had no input on Hernandez' employment,

26  and I did not have any input or involvement in the termination of Hernandez' employment.

27      17.    I have never been angry with Hernandez.

28

PAUL, PLEVIN,
SULLIVAN &
:ONNAUGHTON LLP

ENARSON DECLARATION IN SUPPORT OF
SUMMARY JUDGMENT MOTION
     4

1    I declare under penalty of perjury under the laws of the State of California that the

2  foregoing is true and correct.

3    Executed this **31** day of *August* 2007 at San Diego, California.

4

5    
     BRYAN ENARSON

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

ENARSON DECLARATION IN SUPPORT OF
SUMMARY JUDGMENT MOTION

5

43-464



RE-ORDER from
BLUEBIRD
OFFICE SUPPLIES
TEL: (888) 477-0700
www.bluebirdonline.com



FILED
CIVIL BUSINESS OFFICE 13
CENTRAL DIVISION

2007 AUG 31  P 4: 31

SUPERIOR COURT
SAN DIEGO COUNTY, CA

1  FRED M. PLEVIN (SBN 126185)
   SANDRA L. MCDONOUGH (SBN 193308)
2  ALBERT R. LIMBERG (SBN 211110)
   **PAUL, PLEVIN, SULLIVAN & CONNAUGHTON** LLP
3  401 B Street, Tenth Floor
   San Diego, California 92101-4232
4  Telephone: 619-237-5200
   Facsimile: 619-615-0700
5
   AMY S. GONZALEZ (SBN 181745)
6  **SAN DIEGO COUNTY REGIONAL AIRPORT**
   **AUTHORITY**
7  3225 N. Harbor Drive
   San Diego, CA 92138
8  Telephone:  (619) 400-2425
   Facsimile: (619) 400-2428
9
10 Attorneys for Defendant
   SAN DIEGO COUNTY REGIONAL AIRPORT
11 AUTHORITY
12
13              SUPERIOR COURT OF THE STATE OF CALIFORNIA
14                       COUNTY OF SAN DIEGO
15 JOSE HERNANDEZ,                         CASE NO. GIC871979
16              Plaintiff,                 **DECLARATION OF JOHN GAMBERZKY**
                                           **IN SUPPORT OF DEFENDANT SAN DIEGO**
17       v.                                **COUNTY REGIONAL AIRPORT**
                                           **AUTHORITY'S MOTION FOR SUMMARY**
18 SAN DIEGO COUNTY REGIONAL               **JUDGMENT OR, IN THE ALTERNATIVE,**
   AIRPORT AUTHORITY, a public entity;     **SUMMARY ADJUDICATION**
19 and DOES 1 through 12, inclusive,
20              Defendants.                 Date:          November 16, 2007
                                           Time:          1:30 p.m.
21                                         Dept:          75
                                           Judge:         Hon. Richard E. Strauss
22                                         Complaint Filed:  September 1, 2006
                                           Trial Date:    January 4, 2008
23
24                                             **EXEMPT FROM FEES**
                                               **GOVT. CODE § 6103**
25
26                                         **BY FAX**
27
28

PAUL, PLEVIN,      GAMBERZKY DECLARATION IN SUPPORT OF
SULLIVAN &         SUMMARY JUDGMENT MOTION
CONNAUGHTON LLP



I, John Gamberzky, declare as follows:

1.     Except as otherwise stated, the facts contained in this declaration are true of my own personal knowledge, and if called as a witness in this matter I could and would testify to the following facts.

2.     I am currently a private investigator. I have had my own investigative practice since 1993. Prior to that, I performed investigative services for insurance companies. I was also employed as a Special Agent of the Federal Bureau of Investigation from 1984 through 1990.

3.     In approximately December 2005, Edward Patrick ("Pat") Swan, Jr., Esq. retained me to assist him with an investigation for the San Diego County Regional Airport Authority (the "Authority") with regard to benefits allegedly received by Jose Hernandez. Mr. Swan and I met with Mr. Hernandez on December 14, 2005, to ask him questions regarding benefits that he may have obtained from Authority vendors.

4.     After the first interview with Mr. Hernandez, Mr. Swan and I conducted an additional interview with Mr. Hernandez at his counsel's office on December 29, 2005. I also interviewed six other non-Authority employees, including Janet Nix from Hawaiian Airlines, Mike Parrish from Southwest Airlines, Tony Hueso from USA Cab, Dave Mueller from Ace Parking, Cheryl Black from Southwest Airlines and Kelly Pond from Image Concepts. I provided my notes from those interviews to Mr. Swan.

5.     I obtained documents from Tony Hueso regarding car repairs that USA Cab performed on Mr. Hernandez' vehicles. I did not require or pressure Mr. Hueso to provide those documents to me.

6.     I assisted Mr. Swan in drafting a 21-page letter with attachments to Thella Bowens that contained the factual findings from the investigation. I am informed that a true and correct copy of that letter with attachments is attached as Exhibit 4 to the Notice of Lodgment of Exhibits filed herewith. I agree with the factual findings in Exhibit 4 insofar as they rely on the portion of the interviews and investigation that I performed. I personally did not conduct any analysis as to whether Mr. Hernandez' conduct violated the Authority's Ethics Code.

///

GAMBERZKY DECLARATION IN SUPPORT OF
SUMMARY JUDGMENT MOTION                    1

1      7.     During the course of my investigation, I was not aware of, nor was I advised by

2  anyone, including Jose Hernandez, of any complaints that Mr. Hernandez may have made

3  regarding the Authority's lease on the General Dynamics property, the Authority's lease on the

4  Toledyne Ryan property, the women's restroom project in Airport Terminal One or the

5  Authority's contract with Lindbergh Parking, Inc.

6      I declare under penalty of perjury under the laws of the State of California that the

7  foregoing is true and correct.

8      Executed this 31st day of August 2007 at Carlsbad, California.

9

10                           JOHN GAMBERZKY

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PAUL, PLEVIN,
SULLIVAN &
ONNAUGHTON LLP

GAMBERZKY DECLARATION IN SUPPORT OF
SUMMARY JUDGMENT MOTION        2

**EXHIBIT 45**

1  FRED M. PLEVIN (SBN 126185)
   SANDRA L. MCDONOUGH (SBN 193308)
2  ALBERT R. LIMBERG (SBN 211110)
   **PAUL, PLEVIN, SULLIVAN & CONNAUGHTON** LLP
3  401 B Street, Tenth Floor
   San Diego, California 92101-4232
4  Telephone: 619-237-5200
   Facsimile: 619-615-0700
5
   AMY S. GONZALEZ (SBN 181745)
6  **SAN DIEGO COUNTY REGIONAL AIRPORT**
   **AUTHORITY**
7  3225 N. Harbor Drive
   San Diego, CA 92138
8  Telephone: (619) 400-2425
   Facsimile: (619) 400-2428
9
10 Attorneys for Defendant
   SAN DIEGO COUNTY REGIONAL AIRPORT
11 AUTHORITY

12                  SUPERIOR COURT OF THE STATE OF CALIFORNIA

13                          COUNTY OF SAN DIEGO

14
   JOSE HERNANDEZ,                          CASE NO. GIC871979
15
            Plaintiff,                      **DECLARATION OF TROY ANN LEECH IN**
16                                          **SUPPORT OF DEFENDANT SAN DIEGO**
       v.                                   **COUNTY REGIONAL AIRPORT**
17                                          **AUTHORITY'S MOTION FOR SUMMARY**
   SAN DIEGO COUNTY REGIONAL               **JUDGMENT OR, IN THE ALTERNATIVE,**
18 AIRPORT AUTHORITY, a public entity;      **SUMMARY ADJUDICATION**
   and DOES 1 through 12, inclusive,
19
            Defendants.
20                                          Date:          November 16, 2007
                                           Time:          1:30 p.m.
21                                          Dept:          75
                                           Judge:         Hon. Richard E. Strauss
22                                          Complaint Filed: September 1, 2006
                                           Trial Date:    January 4, 2008
23
                                                  **EXEMPT FROM FEES**
24                                                **GOVT. CODE § 6103**

25     I, Troy Ann Leech, declare as follows:

26         1.    The facts contained in this declaration are true of my own personal knowledge, and

27 if called as a witness in this matter I could and would testify to the following facts.

28         2.    I am currently employed as the Director of the Real Estate Management for the San

PAUL, PLEVIN,        LEECH DECLARATION IN SUPPORT OF                    1
SULLIVAN &           SUMMARY JUDGMENT MOTION
CONNAUGHTON LLP

1 Diego County Regional Airport Authority ("Authority"), a defendant in this action. I have held

2 this position since January 1, 2003.

3        3.      In the spring/summer of 2004, the Authority created the Teledyne Ryan Task Force

4 ("TDY Task Force"). The TDY Task Force was formed for the following purposes: (1) to

5 conduct a comprehensive review and characterization of both the structural condition and the

6 habitable condition of the existing facilities; (2) to conduct a comprehensive review and

7 characterization of the environmental conditions; and (3) to prepare a redevelopment plan that

8 would generate the most significant amount of new revenues to the Authority while recognizing

9 the priority of utilizing the subject property for those businesses engage in providing airport-

10 related services.

11        4.      The following individuals where core members of TDY Task Force Team:

12 Theodore Anasis, Steve Cornell, Iraj Ghaemi, Paul Manasjan, Tom Morgan and me. Jose

13 Hernandez, along with other Authority employees, was a stakeholder member of the TDY Task

14 Force.

15        5.      On December 17, 2004, the Teledyne Ryan Task Force made a presentation at the

16 Sheraton Hotel in San Diego to the Executive Committee to brief them on the following: the

17 facilities assessment which examined the viability of reuse of the buildings on the former TDY

18 site; the environmental assessment of the site which examined the environmental conditions of

19 the structures as well as the below-ground contamination, which was already known to the

20 Authority; and the redevelopment opportunities which examined a preliminary set of

21 redevelopment concepts.

22 ///

23 ///

24 ///

25 ///

26 ///

27 ///

28

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

LEECH DECLARATION IN SUPPORT OF
SUMMARY JUDGMENT MOTION

2

1    6.    Attached as Exhibit 19 is a copy of the power point presentation that was given at

2    the December 17th meeting at the Sheraton.

3    I declare under penalty of perjury under the laws of the State of California that the

4    foregoing is true and correct.

5    Executed this 31st day of August, 2007 at San Diego, California.

6

7    TROY ANN LEECH

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

LEECH DECLARATION IN SUPPORT OF
SUMMARY JUDGMENT MOTION

3

45-470

EXHIBIT 46

1   FRED M. PLEVIN (SBN 126185)
    SANDRA L. MCDONOUGH (SBN 193308)
2   ALBERT R. LIMBERG (SBN 211110)
    **PAUL, PLEVIN, SULLIVAN & CONNAUGHTON** LLP
3   401 B Street, Tenth Floor
    San Diego, California 92101-4232
4   Telephone: 619-237-5200
    Facsimile: 619-615-0700
5
    AMY S. GONZALEZ (SBN 181745)
6   **SAN DIEGO COUNTY REGIONAL AIRPORT
    AUTHORITY**
7   3225 N. Harbor Drive
    San Diego, CA 92138
8   Telephone: (619) 400-2425
    Facsimile: (619) 400-2428
9
10  Attorneys for Defendant
    SAN DIEGO COUNTY REGIONAL AIRPORT
11  AUTHORITY

12              SUPERIOR COURT OF THE STATE OF CALIFORNIA

13                       COUNTY OF SAN DIEGO

14
    JOSE HERNANDEZ,                          CASE NO. GIC871979
15
              Plaintiff,                     **DECLARATION OF SANDRA L.
16                                           MCDONOUGH IN SUPPORT OF
                                             DEFENDANT SAN DIEGO COUNTY
17       v.                                  REGIONAL AIRPORT AUTHORITY'S
                                             MOTION FOR SUMMARY JUDGMENT OR,
18  SAN DIEGO COUNTY REGIONAL                IN THE ALTERNATIVE, SUMMARY
    AIRPORT AUTHORITY, a public entity;      ADJUDICATION**
19  and DOES 1 through 12, inclusive,

20            Defendants.                     Date:         November 16, 2007
                                             Time:         1:30 p.m.
21                                           Dept:         75
                                             Judge:        Hon. Richard E. Strauss
22                                           Complaint Filed: September 1, 2006
                                             Trial Date:   January 4, 2008
23
                                                    **EXEMPT FROM FEES
24                                                  GOVT. CODE § 6103**

25       I, Sandra L. McDonough, declare as follows:

26       1.      I am a partner in the firm of Paul, Plevin, Sullivan & Connaughton LLP, attorneys

27  for defendant, San Diego County Regional Airport Authority (the "Authority"), in this action. If

28  called as a witness, I could and would competently testify to the following facts.

PAUL, PLEVIN,
SULLIVAN &            MCDONOUGH DECLARATION IN SUPPORT OF          1
CONNAUGHTON LLP       SUMMARY JUDGMENT MOTION

1  FRED M. PLEVIN (SBN 126185)
   SANDRA L. MCDONOUGH (SBN 193308)
2  ALBERT R. LIMBERG (SBN 211110)
   **PAUL, PLEVIN, SULLIVAN & CONNAUGHTON** LLP
3  401 B Street, Tenth Floor
   San Diego, California  92101-4232
4  Telephone: 619-237-5200
   Facsimile: 619-615-0700
5
   AMY S. GONZALEZ (SBN 181745)
6  **SAN DIEGO COUNTY REGIONAL AIRPORT
   AUTHORITY**
7  3225 N. Harbor Drive
   San Diego, CA 92138
8  Telephone:  (619) 400-2425
   Facsimile: (619) 400-2428
9

10 Attorneys for Defendant
   SAN DIEGO COUNTY REGIONAL AIRPORT
11 AUTHORITY

12              SUPERIOR COURT OF THE STATE OF CALIFORNIA

13                         COUNTY OF SAN DIEGO

14
   JOSE HERNANDEZ,                          CASE NO. GIC871979
15
              Plaintiff,                    **DECLARATION OF SANDRA L.
16                                          MCDONOUGH IN SUPPORT OF
                                            DEFENDANT SAN DIEGO COUNTY
17         v.                               REGIONAL AIRPORT AUTHORITY'S
                                            MOTION FOR SUMMARY JUDGMENT OR,
18 SAN DIEGO COUNTY REGIONAL                IN THE ALTERNATIVE, SUMMARY
   AIRPORT AUTHORITY, a public entity;      ADJUDICATION**
19 and DOES 1 through 12, inclusive,
                                            _____
20            Defendants.
                                            Date:        November 16, 2007
21                                          Time:        1:30 p.m.
                                            Dept:        75
22                                          Judge:       Hon. Richard E. Strauss
                                            Complaint Filed:  September 1, 2006
23                                          Trial Date:  January 4, 2008

24                                          **EXEMPT FROM FEES
                                            GOVT. CODE § 6103**
25    I, Sandra L. McDonough, declare as follows:

26        1.      I am a partner in the firm of Paul, Plevin, Sullivan & Connaughton LLP, attorneys

27 for defendant, San Diego County Regional Airport Authority (the "Authority"), in this action.  If

28 called as a witness, I could and would competently testify to the following facts.

PAUL, PLEVIN,     | MCDONOUGH DECLARATION IN SUPPORT OF              1
SULLIVAN &        | SUMMARY JUDGMENT MOTION
CONNAUGHTON LLP

1     2.     This declaration is made in support of defendant's motion for summary judgment

2 or, in the alternative, summary adjudication.

3     3.     Attached as **Exhibit 1** to the Notice of Lodgment of Exhibits filed herewith is a

4 true and correct copy of excerpts from plaintiff Jose Hernandez' deposition, which I took on

5 December 18, 19, 20, 21 and 22, 2006.  Our office has not received signature pages from Mr.

6 Hernandez for any of his deposition transcripts.  Our office has requested the signature pages

7 from plaintiff's counsel and will provide them to the court when we receive them.

8     4.     Attached as **Exhibit 2** to the Notice of Lodgment of Exhibits filed herewith is a

9 true and correct copy of the condensed transcript for each day of plaintiff Jose Hernandez'

10 deposition, which took place on December 18, 19, 20, 21, and 22, 2006.

11     5.     Attached as **Exhibit 3** to the Notice of Lodgment of Exhibits filed herewith is a

12 true and correct copy of the Authority's Ethics Code, including any supplements.  The code is

13 authenticated in paragraph 10 of Tony Russell's Declaration and paragraph 11 of Mark

14 Burchyett's declaration.

15     6.     Attached as **Exhibit 4** to the Notice of Lodgment of Exhibits filed herewith is a

16 true and correct copy of a letter dated January 19, 2006, from Edward Patrick Swan, Jr. of Luce,

17 Forward, Hamilton & Scripps to Thella Bowens.  Exhibit 4 is authenticated at paragraph 12 of

18 Edward Patrick Swan, Jr.'s declaration and Bowens Declaration ¶ 9.

19     7.     Attached as **Exhibit 5** to the Notice of Lodgment of Exhibits filed herewith is a

20 true and correct copy of a February 3, 2005 Memorandum from Tony Russell, which is

21 authenticated at Russell Dec. ¶ 5.

22     8.     Attached as **Exhibit 6** to the Notice of Lodgment of Exhibits filed herewith is a

23 true and correct copy of the Report of the Office of the Chief Auditor; Investigation into Ethics

24 Violation Claims by Jose Hernandez dated September 5, 2006, which is authenticated at

25 Burchyett Dec. ¶ 7.

26     9.     Attached as **Exhibit 7** to the Notice of Lodgment of Exhibits filed herewith is a

27 true and correct copy of certain of the Authority's codes and policies, authenticated at Russell

28 Dec. ¶ 10.

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

MCDONOUGH DECLARATION IN SUPPORT OF     2
SUMMARY JUDGMENT MOTION

1   10. Attached as **Exhibit 8** to the Notice of Lodgment of Exhibits filed herewith is a

2 true and correct copy of Form 700, dated February 4, 2005 and received by the Authority on

3 February 9, 2005, authenticated at Hernandez 259:4-19 and Russell Dec. ¶ 8.

4   11. · Attached as **Exhibit 9** to the Notice of Lodgment of Exhibits filed herewith is a

5 true and correct copy of Form 700, dated February 12, 2006 and received by the Authority on

6 February 24, 2006, authenticated at Russell Dec. ¶ 8.

7   12. Attached as **Exhibit 10** to the Notice of Lodgment of Exhibits filed herewith is a

8 true and correct copy of Form 700's filled out by Hernandez and authenticated at his deposition at

9 267:9-13 and 277:4-19.

10   13. Attached as **Exhibit 11** to the Notice of Lodgment of Exhibits filed herewith is a

11 true and correct copy of a Conflict of Interest Training, Sign-in sheet dated February 4, 2005,

12 authenticated at Hernandez 253:10-254:7 and Russell Dec. ¶ 7.

13   14. Attached as **Exhibit 12** to the Notice of Lodgment of Exhibits filed herewith is a

14 true and correct copy of a Conflict of Interest Training powerpoint presentation from February 4,

15 2005, authenticated at Russell Dec. ¶ 6.

16   15. Attached as **Exhibit 13** to the Notice of Lodgment of Exhibits filed herewith is a

17 true and correct copy of Form 700, Statement of Economic Interests (2003/2004) published by the

18 Fair Political Practices Commission. This is a document prepared by the Fair Political Practices

19 Commission, a State entity, and is judicially noticeable under Evidence Code § 452. I obtained

20 Exhibit 13 from the FPPC's website located at http://www.fppc.ca.gov/index.html?id=435.

21   16. Attached as **Exhibit 14** to the Notice of Lodgment of Exhibits filed herewith is a

22 true and correct copy of special and form interrogatories propounded by the Authority to

23 Hernandez on or about September 15, 2006, with Corresponding responses from Hernandez.

24   17. Attached as **Exhibit 15** to the Notice of Lodgment of Exhibits filed herewith is a

25 true and correct copy of a March 2, 2001 letter from the Port of San Diego to Jose Hernandez,

26 authenticated in Hernandez' deposition at 79:17-80:9.

27   18. Attached as **Exhibit 16** to the Notice of Lodgment of Exhibits filed herewith is a

28 true and correct copy of an October 3, 2003 letter from Theodore Sexton to Jose Hernandez,

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

MCDONOUGH DECLARATION IN SUPPORT OF  3
SUMMARY JUDGMENT MOTION

46-474

1    authenticated in Hernandez' deposition at 93:16-25.

2         19.    Attached as **Exhibit 17** to the Notice of Lodgment of Exhibits filed herewith is a

3    true and correct copy of a Form 700, Statement of Economic Interests (2004/2005), authenticated

4    in Hernandez' deposition at 256:23-257:1.

5         20.    Attached as **Exhibit 18** to the Notice of Lodgment of Exhibits filed herewith is a

6    true and correct copy of the lease between the Authority and the Port with regard to the Teledyne

7    Ryan property, authenticated at Enarson Dec. ¶ 7.

8         21.    Attached as **Exhibit 19** to the Notice of Lodgment of Exhibits filed herewith is a

9    true and correct copy of a presentation given at a December 17, 2004 meeting regarding the

10   Teledyne Ryan property, authenticated at Leech Dec. ¶ 6.

11        I declare under penalty of perjury under the laws of the State of California that the

12   foregoing is true and correct.

13        Executed this 31st day of August, 2007, at San Diego, California.

14

15                                    _Sandra L. McDonough_

16                                    SANDRA L. MCDONOUGH

17

18

19

20

21

22

23

24

25

26

27

28

PAUL, PLEVIN,          MCDONOUGH DECLARATION IN SUPPORT OF          4
SULLIVAN &             SUMMARY JUDGMENT MOTION
CONNAUGHTON LLP

08/28/2007 09:50 FAX 619 686 8          AIRPORT OPERATION                                    ☑002

1  FRED M. PLEVIN (SBN 126185)
   SANDRA L. MCDONOUGH (SBN 193308)
2  ALBERT R. LIMBERG (SBN 211110)
   PAUL, PLEVIN, SULLIVAN & CONNAUGHTON LLP
3  401 B Street, Tenth Floor
   San Diego, California 92101-4232
4  Telephone: 619-237-5200
   Facsimile: 619-615-0700
5
   AMY S. GONZALEZ (SBN 181745)
6  SAN DIEGO COUNTY REGIONAL AIRPORT
   AUTHORITY
7  3225 N. Harbor Drive
   San Diego, CA 92138
8  Telephone: (619) 400-2425
   Facsimile: (619) 400-2428
9
10 Attorneys for Defendant
   SAN DIEGO COUNTY REGIONAL AIRPORT
11 AUTHORITY

12                  SUPERIOR COURT OF THE STATE OF CALIFORNIA

13                            COUNTY OF SAN DIEGO

14

15 JOSE HERNANDEZ,                          CASE NO. GIC871979

16         Plaintiff,                       DECLARATION OF JIM PRENTICE IN
                                            SUPPORT OF DEFENDANT SAN DIEGO
17    v.                                    COUNTY REGIONAL AIRPORT
                                            AUTHORITY'S MOTION FOR SUMMARY
18 SAN DIEGO COUNTY REGIONAL                JUDGMENT OR, IN THE ALTERNATIVE,
   AIRPORT AUTHORITY, a public entity;      SUMMARY ADJUDICATION
19 and DOES 1 through 12, inclusive,

20         Defendants.                      Date:          November 16, 2007
                                            Time:          1:30 p.m.
21                                          Dept:          75
                                            Judge:         Hon. Richard E. Strauss
22                                          Complaint Filed: September 1, 2006
                                            Trial Date:    January 4, 2008
23
                                                  EXEMPT FROM FEES
24                                                GOVT. CODE § 6103

25      I, Jim Prentice, declare as follows:

26      1.     The facts contained in this declaration are true of my own personal knowledge, and

27 if called as a witness in this matter I could and would testify to the following facts.

28      2.     I began working with the San Diego Unified Port District approximately nineteen

PAUL, PLEVIN,      PRENTICE DECLARATION IN SUPPORT OF              1
SULLIVAN &         SUMMARY JUDGMENT MOTION
CONNAUGHTON LLP

FILED
CIVIL BUSINESS OFFICE 13
CENTRAL DIVISION

2007 AUG 31  P 4: 32

SUPERIOR COURT
SAN DIEGO COUNTY, CA

BY FAX

47-476

1  years ago as a Traffic Enforcement Officer. Over the years, I was promoted to roles such as

2  Traffic Enforcement Supervisor and Automatic Vehicle Identification Coordinator. I became a

3  Management/Business Analyst about five or six years ago, and I still hold that position today. In

4  2003, I became an employee of the Authority. In my role as Management/Business Analyst, my

5  supervisor at the time that Jose Hernandez was employed at the Authority was Ted Sexton.

6  Hernandez and I were co-workers.

7      3.    In October 2005, I was driving Thella Bowens around the San Diego International

8  Airport and I told her about questionable benefits received by Hernandez. I initiated the

9  conversation regarding Hernandez because I believed that Hernandez' actions possibly violated

10 the Authority's codes.

11     4.    In particular, I told Ms. Bowens that I believed that Hernandez received free airline

12 tickets to Phoenix and Las Vegas and a free golfing trip to Mexico from Southwest Airlines. I

13 also told Bowens that I had observed Hernandez walking up to, and receiving free food from,

14 various concessions run by Host at the Airport, including McDonald's, Starbucks and La Salsa. I

15 also told Bowens that Hernandez went to Florida for his brother's birthday, but he tried to turn it

16 into a business trip to talk to the Superbowl committee. It was my belief that Hernandez had the

17 Authority pay for Hernandez' hotel room for the entire trip to Florida.

18     5.    About one month after I spoke with Ms. Bowens, I was interviewed by an

19 investigator named Pat Swan regarding Hernandez. I told Mr. Swan about my suspicions that

20 Hernandez received the free benefits outlined in the preceding paragraph from the Authority's

21 vendors.

22     6.    In my discussions with both Ms. Bowens and Mr. Swan, I told the truth regarding

23 my observations of Hernandez and the information that I received from Hernandez and other

24 employees.

25     7.    I am unaware that Hernandez had ever complained about the Authority's alleged

26 violations of the Americans with Disabilities Act with regard to the women's restroom project in

27 Terminal One. I am also unaware of Hernandez complaining about any alleged side deal between

28 Host and Bryan Enarson, or about the women's restroom project being too expensive.

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

PRENTICE DECLARATION IN SUPPORT OF            2
SUMMARY JUDGMENT MOTION

08/28/2007 08.33 FAX 018 080 9       AIRPORT OPERATION                    ⓘ004

1      8.    I am unaware that Hernandez ever disclosed any unlawful aspects regarding the

2  leases of the General Dynamics property or the Teledyne Ryan property leased by the Authority.

3      9.    I am unaware that Hernandez ever complained that Lindbergh Parking, Inc. ("LPi")

4  double-billed the Authority for workers' compensation or that LPi underbid the Authority.

5     I declare under penalty of perjury under the laws of the State of California that the

6  foregoing is true and correct.

7     Executed this 28 day of August 2007 at San Diego, California.

8

9                      JIM PRENTICE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

PRENTICE DECLARATION IN SUPPORT OF        3
SUMMARY JUDGMENT MOTION

47-478

Recycled Paper

**BLUEBIRD**
(310) 477-0700

EXHIBIT 48

1  FRED M. PLEVIN (SBN 126185)
   SANDRA L. MCDONOUGH (SBN 193308)
2  ALBERT R. LIMBERG (SBN 211110)
   **PAUL, PLEVIN, SULLIVAN & CONNAUGHTON** LLP
3  401 B Street, Tenth Floor
   San Diego, California 92101-4232
4  Telephone: 619-237-5200
   Facsimile: 619-615-0700

5
   AMY S. GONZALEZ (SBN 181745)
6  **SAN DIEGO COUNTY REGIONAL AIRPORT
   AUTHORITY**
7  3225 N. Harbor Drive
   San Diego, CA 92138
8  Telephone: (619) 400-2425
   Facsimile: (619) 400-2428

9

10 Attorneys for Defendant
   SAN DIEGO COUNTY REGIONAL AIRPORT
11 AUTHORITY

12                    SUPERIOR COURT OF THE STATE OF CALIFORNIA

13                            COUNTY OF SAN DIEGO

14
   JOSE HERNANDEZ,                        CASE NO. GIC871979
15
              Plaintiff,                  **DECLARATION OF TONY RUSSELL IN
16                                        SUPPORT OF DEFENDANT SAN DIEGO
       v.                                 COUNTY REGIONAL AIRPORT
17                                        AUTHORITY'S MOTION FOR SUMMARY
   SAN DIEGO COUNTY REGIONAL              JUDGMENT OR, IN THE ALTERNATIVE,
18 AIRPORT AUTHORITY, a public entity;    SUMMARY ADJUDICATION**
   and DOES 1 through 12, inclusive,
19
              Defendants.                 Date:          November 16, 2007
20                                        Time:          1:30 p.m.
                                          Dept:          75
21                                        Judge:         Hon. Richard E. Strauss
                                          Complaint Filed:  September 1, 2006
22                                        Trial Date:    January 4, 2008

23                                        **EXEMPT FROM FEES
                                          GOVT. CODE § 6103**
24

25      I, Tony Russell, declare as follows:

26      1.      The facts contained in this declaration are true of my own personal knowledge, and

27 if called as a witness in this matter I could and would testify to the following facts.

28      2.      I am the Director of Corporate Services/Authority Clerk for the San Diego County

BY FAX

FILED
CIVIL BUSINESS OFFICE 13
CENTRAL DIVISION

2007 AUG 31 P 4: 32

CLERK SUPERIOR COURT
SAN DIEGO COUNTY, CA

48-479

1   Regional Airport Authority ("the Authority"), a defendant in this action. I have held that position

2   since January 6, 2003.

3       3.     As the Authority Clerk, I am vested with the responsibility for maintaining

4   custodial control over the Authority's files, records, codes and policies. I am also responsible for

5   ensuring compliance with the Form 700 filings and recordkeeping requirements under the

6   Authority's codes and policies.

7       4.     In approximately October 2004, Section 2.30 of the Authority's Ethics Code was

8   amended to include certain designated employee positions that were required to file annual

9   statements of economic interests with the Clerk of the Authority. Under that amendment, the

10   position of Director of Landside Operations was required to file an annual statement of economic

11   interest.

12       5.     I sent a memorandum dated February 3, 2005, to employees who were required to

13   submit an Annual Statement of Economic Interests, or a Form 700. Jose Hernandez was one of

14   those employees who was required to submit such an Annual Statement of Economic Interests,

15   and he should have received my February 3, 2005 memorandum to him. A true and correct copy

16   of the memorandum, with attachments, is attached as Exhibit 5 to the Notice of Lodgment of

17   Exhibits filed herewith. This memorandum was prepared in the ordinary course of business and

18   in furtherance of the Authority's obligations under the California Political Reform Act to ensure

19   timely filing of the Statements of Economic Interests by the designated employees.

20       6.     On February 4, 2005, I conducted a training on the Conflict of Interest Code for

21   Authority employees. A true and correct copy of the materials that I presented and handed out to

22   participants at that training is attached as Exhibit 12 to the Notice of Lodgment of Exhibits filed

23   herewith. I maintain a copy of all trainings that I conduct regarding the Conflict of Interest Code.

24   Exhibit 12 is from the file that was created shortly after I performed the training on or about

25   February 4, 2005. I also handed out a copy of my February 3, 2005 memorandum [Exhibit 5] at

26   the training.

27       7.     Attached as Exhibit 11 to the Notice of Lodgment of Exhibits is a true and correct

28   copy of the sign-in sheet signed by each person in attendance at the February 4, 2005 training. I

PAUL, PLEVIN,
SULLIVAN &
ONNAUGHTON LLP

RUSSELL DECLARATION IN SUPPORT OF
SUMMARY JUDGMENT MOTION         2

48-480

1  maintain these sign-in sheets in the ordinary course of business along with the training materials.

2      8.      According to the Authority Clerk's records, Hernandez submitted two Form 700

3  statements to the Authority Clerk relating to his employment with the Authority. The first form

4  was received by my Department on or about February 9, 2005, and is attached as Exhibit 8 to the

5  Notice of Lodgment of Exhibits filed herewith. The Authority received the second Form 700 on

6  or about February 24, 2006, and the second form is attached as Exhibit 9 to the Notice of

7  Lodgment of Exhibits.

8      9.      My office is responsible for collecting all Statements of Economic Interests (Form

9  700) filed by Authority employees. As soon as we receive the forms, we file them by year in our

10 file room. Exhibits 8 and 9 are kept in the ordinary course of business at the Authority, and were

11 created in the ordinary course of business.

12     10.     As Authority Clerk, I am also responsible for maintaining an updated set of the

13 Authority's Codes and Policies. Attached as Exhibit 3 to the Notice of Lodgment of Exhibits

14 filed herewith is a true and correct copy of Article 2 of the Authority's Codes, including any

15 amendments or supplements to that Article. Attached as Exhibit 7 to the Notice of Lodgment of

16 Exhibits are true and correct copies of other selected portions of the Authority's Codes and

17 Policies.

18     I declare under penalty of perjury under the laws of the State of California that the

19 foregoing is true and correct.

20     Executed this 30th day of August, 2007 at San Diego, California.

21

22                                          TONY RUSSELL

23

24

25

26

27

28

PAUL, PLEVIN,        RUSSELL DECLARATION IN SUPPORT OF        3
SULLIVAN &           SUMMARY JUDGMENT MOTION
CONNAUGHTON LLP

08/31/2007 11:23 FAX 619 686 8          AIRPORT OPERATION                          ☒002

1   FRED M. PLEVIN (SBN 126185)
    SANDRA L. MCDONOUGH (SBN 193308)
2   ALBERT R. LIMBERG (SBN 211110)
    **PAUL, PLEVIN, SULLIVAN & CONNAUGHTON** LLP
3   401 B Street, Tenth Floor
    San Diego, California 92101-4232
4   Telephone: 619-237-5200
    Facsimile: 619-615-0700
5
    AMY S. GONZALEZ (SBN 181745)
6   **SAN DIEGO COUNTY REGIONAL AIRPORT**
    **AUTHORITY**
7   3225 N. Harbor Drive
    San Diego, CA 92138
8   Telephone: (619) 400-2425
    Facsimile: (619) 400-2428
9
10  Attorneys for Defendant
    SAN DIEGO COUNTY REGIONAL AIRPORT
11  AUTHORITY

                                FILED
                        CIVIL BUSINESS OFFICE 13
                          CENTRAL DIVISION

                        2007 AUG 31  P 4: 32

                        SUPERIOR COURT
                        SAN DIEGO COUNTY, CA

12              SUPERIOR COURT OF THE STATE OF CALIFORNIA

13                         COUNTY OF SAN DIEGO

14  JOSE HERNANDEZ,                      CASE NO. GIC871979

15          Plaintiff,                   **DECLARATION OF THEODORE SEXTON**
                                         **IN SUPPORT OF DEFENDANT SAN DIEGO**
16                                       **COUNTY REGIONAL AIRPORT**
        v.                               **AUTHORITY'S MOTION FOR SUMMARY**
17                                       **JUDGMENT OR, IN THE ALTERNATIVE,**
    SAN DIEGO COUNTY REGIONAL            **SUMMARY ADJUDICATION**
18  AIRPORT AUTHORITY, a public entity;
    and DOES 1 through 12, inclusive,
19
          Defendants.                    Date:          November 16, 2007
20                                       Time:          1:30 p.m.
                                         Dept:          75
21                                       Judge:         Hon. Richard E. Strauss
                                         Complaint Filed:   September 1, 2006
22                                       Trial Date:    January 4, 2008

23                                              **EXEMPT FROM FEES**
                                                **GOVT. CODE § 6103**
24

25          I, Theodore Sexton, declare as follows:

26          1.      The facts contained in this declaration are true of my own personal knowledge, and

27  if called as a witness in this matter I could and would testify to the following facts.

28          2.      I joined the San Diego Unified Port District as a Staff Assistant to the Manager of

PAUL, PLEVIN,     SEXTON DECLARATION IN SUPPORT OF                1
  SULLIVAN &      SUMMARY JUDGMENT MOTION
CONNAUGHTON LLP                                                          **BY FAX**

                                                                        49-482

1  Operations in 1995. From Summer 1997 through 2000, I served as Airport Coordinator for the

2  Port District's Airport Master Plan. In January 2000, I became Director of Airport Operations,

3  and in January 2003, I became Vice President of Airport Operations and an employee of the

4  Authority. I am currently the Vice President of the Regulated Operations and Executive

5  Programs, and I have held that position since approximately January 2006.

6         3.      I was Hernandez' direct supervisor in my role as Vice President of Airport

7  Operations. I promoted Hernandez to Director of Ground Transportation at the Authority in

8  October 2003. Hernandez held that position until his termination on February 6, 2006.

9         4.      I did not make the decision to terminate Hernandez' employment.

10        5.      When I learned that the Authority had decided to terminate Hernandez'

11 employment, I asked that Hernandez be given an opportunity to resign from his employment

12 instead of having the Authority terminate him. Ms. Bowens, President/CEO, approved this

13 suggestion.

14        6.      I met with Hernandez on or about February 6, 2006 and advised him that the

15 Authority was going to terminate his employment based on the findings of the investigation

16 conducted by Pat Swan. I also advised him that he had the opportunity to resign from his

17 employment in lieu of termination. Hernandez chose to resign.

18        7.      During Hernandez' employment, I never had any understanding or belief that

19 Hernandez was complaining that any of the Authority's conduct was unlawful or illegal.

20        8.      During Hernandez' employment, I occasionally requested that Hernandez change

21 airline tickets for certain Authority employees and board members whose travel plans had

22 changed. Based on my personal experience, airlines routinely process requests for passenger

23 itinerary changes and, consistent with their company guidelines, may or may not add fees to the

24 ticket price.

25        9.      Management at the Authority holds an annual employee appreciation barbecue.

26 Each year, approximately 300 people attend the barbecue. The Authority does not pay for the

27 food for the barbecue. Instead, employees at the director-level and above voluntarily decide

28 whether they will contribute to the cost of the barbecue. Each year, the meat for the barbecue is

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

SEXTON DECLARATION IN SUPPORT OF    2
SUMMARY JUDGMENT MOTION

1    purchased from Angelo's Barbecue in Fort Worth, Texas.  I requested that Hernandez arrange for

2    the air shipment of the meat from Texas to San Diego.

3         10.    In 2005, I went to Dallas, Texas in the company of the President/CEO, other

4    Authority Vice Presidents and the Authority Director of Human Resources for a one day meeting

5    with Southwest Airlines management representatives in order to learn about Southwest Airlines

6    employee development programs in connection with my position as a Vice President for the

7    Authority.  As a result, the airline ticket to travel to Dallas, Texas was a business expense, and

8    was paid for by the Authority.  After the meeting was over, I went to Blue Bell ice cream and

9    purchased ice cream for the annual employee appreciation barbecue.  In order to transport the ice

10   cream back to San Diego, I rented coolers and dry ice.  The coolers with the ice cream were

11   checked as part of my luggage on the return flight, and I was not afforded any special treatment

12   with regard to transportation of the ice cream, nor was there any additional cost incurred by the

13   Airport Authority or the airline in transporting the ice cream.

14        11.    I was unaware of any unlawful conduct by Lindbergh Parking, Inc. ("LPi") in the

15   competitive bidding process, and I did not believe that LPi had underbid the Authority.  The

16   original contract with LPi was dated January 30, 2004, and was then amended in January 2005 to

17   include two additional parking lots at the San Diego International Airport ("Airport").

18        12.    Ms. Bowens never applied any pressure on me to treat LPi differently than any

19   other contractor at the Airport.

20        13.    In 2005, I became aware that Maurice Grey, the 60% owners of LPi, requested that

21   the LPi contract be assigned to Ace Parking.  I was not inclined to support such a transfer of

22   responsibilities based on LPi's record of successful management practices under his leadership at

23   the Airport.  Further, LPi's selection was based partly on the Authority's belief that its leadership

24   structure and senior management team would remain in place.

25        14.    I received a call from Authority Board Member Morris Vance, Mayor of Vista,

26   California, on one occasion when his office was making last minute travel plans for him to

27   represent the City at the Little League World Championships in Williamsport, Pennsylvania.  He

28   advised me that he needed more leg room on his flight and was wondering if I could look into the

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

SEXTON DECLARATION IN SUPPORT OF                    3
SUMMARY JUDGMENT MOTION

1  possibility of getting an exit row seat for him due to his height. I contacted Hernandez and asked

2  him to see what he could do about accommodating Vance's request for an exit row. I received a

3  response from Hernandez, which included Vance's row number and a re-routed return trip that

4  was more convenient for Mayor Vance. I believed that this re-routed itinerary did not result in

5  any additional expense for the airline. I never requested that Mayor Vance receive an upgrade to

6  First Class, nor was I aware that Mayor Vance traveled first class on any of the flight segments

7  until after he returned. I understood the City of Vista had to authorize any seating upgrades and

8  had done so in the Mayor's case because of the short lead time.

9       15.   On occasion, I have received requests from Vernon Evans, the Vice President of

10  Finance, to have my office look into changing his schedule for business trips. I passed on most of

11  these requests to Hernandez, but I never requested that Hernandez obtain these schedule changes

12  free of charge, or that he otherwise obtain a benefit not available to the public in performing the

13  schedule change.

14       16.   I am aware that Hernandez alleges in this lawsuit that he advised me of various

15  improprieties or illegalities with regard to the General Dynamics lease, the Teledyne Ryan

16  property and lease, LPi's contract and billing practices, and the women's restroom project in

17  Terminal One. Not only am I unaware of any such disclosures by Hernandez, I never shared any

18  such disclosures with anyone at the Authority, including Thella Bowens, Jeffrey Woodson and

19  Diane Richards.

20       I declare under penalty of perjury under the laws of the State of California that the

21  foregoing is true and correct.

22       Executed this 31ST day of AUGUST 2007 at San Diego, California.

23                                    _____
                                    THEODORE SEXTON

24

25

26

27

28

SEXTON DECLARATION IN SUPPORT OF          4
SUMMARY JUDGMENT MOTION

**EXHIBIT 50**

1  FRED M. PLEVIN (SBN 126185)
   SANDRA L. MCDONOUGH (SBN 193308)
2  ALBERT R. LIMBERG (SBN 211110)
   **PAUL, PLEVIN, SULLIVAN & CONNAUGHTON** LLP
3  401 B Street, Tenth Floor
   San Diego, California 92101-4232
4  Telephone: 619-237-5200
   Facsimile: 619-615-0700
5
   AMY S. GONZALEZ (SBN 181745)
6  **SAN DIEGO COUNTY REGIONAL AIRPORT
   AUTHORITY**
7  3225 N. Harbor Drive
   San Diego, CA 92138
8  Telephone: (619) 400-2425
   Facsimile: (619) 400-2428
9
10 Attorneys for Defendant
   SAN DIEGO COUNTY REGIONAL AIRPORT
11 AUTHORITY

12              SUPERIOR COURT OF THE STATE OF CALIFORNIA

13                        COUNTY OF SAN DIEGO

14

15 JOSE HERNANDEZ,                      CASE NO. GIC871979

16         Plaintiff,                   **DECLARATION OF EDWARD PATRICK
                                        SWAN, JR. IN SUPPORT OF DEFENDANT
17     v.                               SAN DIEGO COUNTY REGIONAL
                                        AIRPORT AUTHORITY'S MOTION FOR
18 SAN DIEGO COUNTY REGIONAL            SUMMARY JUDGMENT OR, IN THE
   AIRPORT AUTHORITY, a public entity;  ALTERNATIVE, SUMMARY
19 and DOES 1 through 12, inclusive,    ADJUDICATION**

20         Defendants.

21                                      Date:       November 16, 2007
                                        Time:       1:30 p.m.
22                                      Dept:       75
                                        Judge:      Hon. Richard E. Strauss
23                                      Complaint Filed:  September 1, 2006
                                        Trial Date:  January 4, 2008
24
                                        **EXEMPT FROM FEES
25                                      GOVT. CODE § 6103**

26

27

28

PAUL, PLEVIN,                    1
SULLIVAN &                              SWAN DECLARATION IN SUPPORT OF
CONNAUGHTON LLP                         SUMMARY JUDGMENT MOTION

FILED
CIVIL BUSINESS OFFICE 13
CENTRAL DIVISION

2007 AUG 31 P 4:32

CLERK SUPERIOR COURT
SAN DIEGO COUNTY, CA

I, Edward Patrick Swan, Jr., declare as follows:

1.    Except as otherwise stated, the facts contained in this declaration are true of my own personal knowledge, and if called as a witness in this matter I could and would testify to the following facts.

2.    I am currently a partner at Luce, Forward, Hamilton and Scripps ("Luce Forward"), and I have held that position since 1993.    I have been an attorney licensed to practice in California since 1979.  In my current position, as well as my former position as Assistant U.S. Attorney, I have conducted numerous factual and legal investigations.

3.    On or about November 2, 2005, the San Diego County Regional Airport Authority (the "Authority") contacted Luce Forward regarding conducting an investigation into potential violations of the Authority's Ethics Code by one of its employees, Jose Hernandez.  I was asked by one of my partners to conduct the investigation.

4.    I initially met with Jeffrey Woodson and Diane Richards of the Authority on November 4, 2005, who informed me that two different individuals had reported to Thella Bowens, the President and CEO of the Authority, on separate occasions that Mr. Hernandez may have accepted benefits from Authority vendors.

5.    After my initial meeting with Mr. Woodson and Ms. Richards, I met with four different individuals, including the two individuals who made the initial disclosures to Ms. Bowens.  The first four individuals advised me that they believed that Mr. Hernandez was accepting benefits from the Authority's vendors.

6.    Shortly after those initial interviews, I retained John Gamberzky, a private investigator who previously was a Special Agent with the Federal Bureau of Investigation to assist me with the investigation.  Mr. Gamberzky and I met with Mr. Hernandez on December 14, 2005, to ask him questions regarding benefits that he may have obtained from Authority vendors.

7.    During my first meeting with Mr. Hernandez, I advised him that the investigation was an attorney-client privileged investigation.  I also told him that because the Authority was the holder of the attorney-client privilege, he should keep our interview confidential.

///

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

2

SWAN DECLARATION IN SUPPORT OF
SUMMARY JUDGMENT MOTION

1  8. After the first interview with Mr. Hernandez, Mr. Gamberzky and I conducted

2 additional interviews with current and former Authority employees, as well as interviews with

3 non-Authority personnel, to determine whether Mr. Hernandez received benefits from the

4 Authority's vendors. In addition, we conducted an additional interview with Mr. Hernandez at his

5 counsel's office on December 29, 2005. In total, I interviewed approximately nine current

6 Authority employees and two former Authority employees. I also spoke to several current

7 Authority employees in order to obtain background information, policies, and other documents

8 related to my investigation. In addition, I spoke to one non-Authority employee and Mr.

9 Gamberzky provided notes to me regarding interviews that he conducted with five other non-

10 Authority employees.

11  9. In the second interview with Mr. Hernandez, Mr. Hernandez admitted to me that

12 he had received non-revenue tickets from Hawaiian Airlines in 2004 for his entire family of four,

13 and that he had also received free tickets from a Southwest Airlines station manager. Mr.

14 Hernandez also told me that he had received several rounds of golf for free from Southwest

15 Airlines, from a representative from Ace Parking, and from Baggage Claimers, an entity that does

16 business with the Authority.

17  10. In my second interview with Mr. Hernandez, he admitted to receiving tickets to a

18 Chargers-Raiders game on December 28, 2003. He recalled receiving at least two of those

19 tickets, valued at $235 each, from Dave Mueller, the Vice President of Operations for Ace

20 Parking.

21  11. On January 5, 2006, Ms. Bowens requested that I prepare a written summary of the

22 factual findings of our investigation of the benefits received by Mr. Hernandez. I was also asked

23 to opine as to whether I believed that Mr. Hernandez had violated the Authority's Ethics Code

24 through receipt of those benefits.

25  12. As a result of Ms. Bowens' request for a written report, I drafted a 21-page letter

26 with attachments to Ms. Bowens. Mr. Gamberzky also assisted me in drafting the written report.

27 I am informed that a true and correct copy of that letter with attachments is attached as Exhibit 4

28 ///

PAUL PLEVIN,
SULLIVAN &
ONN AUGHTON LLP

3

SWAN DECLARATION IN SUPPORT OF
SUMMARY JUDGMENT MOTION

50-488

1  to the Notice of Lodgment of Exhibits filed herewith. I sent Exhibit 4 to Ms. Bowens via

2  messenger service on or about January 19, 2006.

3      13.    Exhibit 4 is an accurate report of my findings based on the interviews and

4  gathering of information that I did, as well as the interviews and information obtained by Mr.

5  Gamberzky that were communicated to me.

6      14.    I concluded, as a result of our investigation into Mr. Hernandez' receipt of

7  benefits, that there was sufficient evidence that Mr. Hernandez had accepted benefits from

8  Authority vendors and contractors from 2003 through January 2006. I also concluded that there

9  was sufficient evidence that Mr. Hernandez had violated Section 2.10 of the Authority's Ethics

10  Code by virtue of accepting benefits from the Authority's vendors in an amount that exceeded

11  more than one-half the amount of gifts permitted under the California Political Reform Act in any

12  calendar year from a single source knowing that the source is doing business with the Authority.

13  In 2003 and 2004, the California Political Reform Act permitted gifts of $340, and in 2005, it

14  permitted gifts of $360.

15      15.    Specifically, I concluded that in May 2004, Mr. Hernandez accepted four free

16  round-trip airline tickets to Hawaii from Hawaiian Airlines, which he knew was doing business

17  with the Authority. While these tickets are non-revenue and may be of no value to Hawaiian

18  Airlines, they had value to Mr. Hernandez who otherwise would have to pay for the airline travel.

19  Based on information provided by Hawaiian Airlines, the estimated retail cost of each round trip

20  travel would have been between $199 and $600 per ticket. Therefore, I concluded that the total

21  value of the tickets was estimated to be between $796 and $2,400.

22      16.    I also concluded that in 2003, Mr. Hernandez accepted at least two, and possibly

23  four, free San Diego Charger-Oakland Raider football tickets from Ace Parking, the total value of

24  which is estimated to be between $470 and $940 based on the face value of the ticket. I

25  determined that Mr. Hernandez knew that Ace Parking was doing business with the Authority

26  through its ownership of or subcontract with Lindbergh Parking, Inc.

27      17.    I also concluded that it was likely that the free airline tickets that Mr. Hernandez

28  admitted to receiving in 2004 from Southwest Airlines exceeded $170.

PAUL, PLEVIN,
SULLIVAN &
ONNAUGHTON LLP

4

SWAN DECLARATION IN SUPPORT OF
SUMMARY JUDGMENT MOTION

1    18.    The remainder of my conclusions and findings are contained in Exhibit 4.

2    19.    I was never advised by anyone, including Mr. Hernandez, during the course of my

3    investigation of any complaints that Mr. Hernandez may have made regarding the Authority's

4    lease on the General Dynamics property or the Teledyne Ryan property. I was also unaware of

5    any complaints that Mr. Hernandez may have made regarding the women's restroom project in

6    Terminal One of the San Diego International Airport, or regarding the Authority's contract with

7    Lindberg Parking, Inc.

8    20.    In the course of my investigation of Mr. Hernandez, I did not ask any of the

9    individuals that I interviewed any questions about the status of Mr. Hernandez' marriage.

10    I declare under penalty of perjury under the laws of the State of California that the

11    foregoing is true and correct.

12    Executed this 28ᵗʰ day of August, 2007 at San Diego, California.

13

14

15    EDWARD PATRICK SWAN, JR.

16

17

18

19

20

21

22

23

24

25

26

27

28

50-490

EXHIBIT 51

1  FRED M. PLEVIN (SBN 126185)
   SANDRA L. MCDONOUGH (SBN 193308)
2  ALBERT R. LIMBERG (SBN 211110)
   PAUL, PLEVIN, SULLIVAN & CONNAUGHTON LLP
3  401 B Street, Tenth Floor
   San Diego, California 92101-4232
4  Telephone: 619-237-5200
   Facsimile: 619-615-0700
5
   AMY S. GONZALEZ (SBN 181745)
6  SAN DIEGO COUNTY REGIONAL AIRPORT
   AUTHORITY
7  3225 N. Harbor Drive
   San Diego, CA 92138
8  Telephone: (619) 400-2425
   Facsimile: (619) 400-2428
9
10 Attorneys for Defendant
   SAN DIEGO COUNTY REGIONAL AIRPORT
11 AUTHORITY

12

FILED
CIVIL BUSINESS OFFICE 13
CENTRAL DIVISION
2007 AUG 31  P 4: 32
CLERK SUPERIOR COURT
SAN DIEGO COUNTY, CA

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN DIEGO

| | |
|---|---|
| JOSE HERNANDEZ,<br><br>Plaintiff,<br><br>v.<br><br>SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY, a public entity; and DOES 1 through 12, inclusive,<br><br>Defendants. | CASE NO. GIC871979<br><br>**DECLARATION OF JEFFREY WOODSON IN SUPPORT OF DEFENDANT SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION**<br><br>Date: November 16, 2007<br>Time: 1:30 p.m.<br>Dept: 75<br>Judge: Hon. Richard E. Strauss<br>Complaint Filed: September 1, 2006<br>Trial Date: January 4, 2008<br><br>**EXEMPT FROM FEES GOVT. CODE § 6103** |

I, Jeffrey Woodson, declare as follows:

1.    The facts contained in this declaration are true of my own personal knowledge, and if called as a witness in this matter I could and would testify to the following facts.

2.    I am the Vice President of Administration of the San Diego County Regional

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

WOODSON DECLARATION IN SUPPORT OF
SUMMARY JUDGMENT MOTION

1

51-491

1   Airport Authority ("the Authority"), a defendant in this action. I have held that position for

2   almost five years.

3       3.     In my position as Vice President of Administration, I am responsible for Human

4   Resources issues at the Authority. I report directly to the President and CEO, Thella Bowens.

5       4.     In approximately November 2005, Thella Bowens advised me that two different

6   Authority employees had told her that they believed that Jose Hernandez was receiving free

7   benefits from the Authority's vendors. She asked that I retain an outside investigator to

8   investigate the allegations made against Hernandez.

9       5.     I directed Diane Richards, director of Human Resources, to hire outside counsel to

10   conduct the investigation. Richards advised me that she had contacted Luce, Forward, Hamilton

11   and Scripps and asked an attorney from that firm to conduct the investigation. Ultimately, the

12   Authority retained Edward Patrick ("Pat") Swan, Jr. to conduct an investigation into the

13   allegations against Hernandez. I approved of that retention.

14       6.     Richards and I met with Mr. Swan on or about November 4, 2005, and advised

15   him of the content of the allegations against Hernandez as I understood them.

16       7.     Mr. Swan met with Richards and me again in early December 2005, to advise us

17   that he had interviewed four different employees at the Authority and they had given him

18   information regarding benefits that Hernandez allegedly received. Richards advised me that she

19   set up an interview for Mr. Swan with Hernandez to take place on or about December 14, 2005.

20       8.     Based on the initial information gathered by Mr. Swan, I recommended placing

21   Hernandez on a paid administrative leave while the investigation was pending. Ms. Bowens

22   concurred with that recommendation. Therefore, after Hernandez' interview with Mr. Swan on

23   December 14, 2005, I met with Hernandez and advised him that he was on paid administrative

24   leave.

25       9.     I reviewed a written report dated January 19, 2006, regarding Mr. Swan's

26   investigation. A true and correct copy of the report that I reviewed is attached as Exhibit 4 to the

27   Notice of Lodgment of Exhibits filed with this declaration.

28       10.     Based on the findings of Mr. Swan's investigation, as stated in the January 19,

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

WOODSON DECLARATION IN SUPPORT OF       2
SUMMARY JUDGMENT MOTION

1  2006 report, I recommended the termination of Jose Hernandez' employment from the Authority

2  because I believed that there was sufficient evidence that Hernandez received benefits in violation

3  of the Authority's Ethics Code. I communicated this recommendation to Ms. Bowens, and she

4  ultimately made the decision to terminate Hernandez.

5        11.    I was unaware that Hernandez raised any issues regarding the legality of the

6  women's restroom project in Terminal One or that he ever complained that the project violated

7  any rules or regulations.

8        12.    I am unaware that Hernandez made any statements regarding the Authority's lease

9  of the General Dynamics property.

10        13.    I am not aware of any concerns or issues that Hernandez may have raised regarding

11  the Authority's lease of property from Teledyne Ryan. I have never served on the Teledyne Ryan

12  task force, and I never received any report or information regarding what Hernandez may or may

13  not have disclosed to the task force regarding the Teledyne Ryan lease.

14        14.    I am unaware of any issues that Hernandez may have raised regarding the bidding

15  process by Lindbergh Parking, Inc. ("LPi"), LPi's workers' compensation billing practice, or any

16  alleged illegality between LPi and the Authority.

17        15.    I am unaware of any Authority employees, other than Hernandez, receiving

18  benefits in violation of the Authority's Ethics Code.

19        16.    Paul Manasjan is a current employee of the Authority, and has been continuously

20  employed by the Authority from February 21, 2003, through the present.

21        I declare under penalty of perjury under the laws of the State of California that the

22  foregoing is true and correct.

23  Executed this ⟨29⟩ day of ⟨August⟩ 2007 at San Diego, California.

24

25  JEFFREY WOODSON

26

27

28

WOODSON DECLARATION IN SUPPORT OF
SUMMARY JUDGMENT MOTION

3

51-493

1  FRED M. PLEVIN (SBN 126185)
   SANDRA L. MCDONOUGH (SBN 193308)
2  ALBERT R. LIMBERG (SBN 211110)
   **PAUL, PLEVIN, SULLIVAN & CONNAUGHTON** LLP
3  401 B Street, Tenth Floor
   San Diego, California 92101-4232
4  Telephone: 619-237-5200
   Facsimile: 619-615-0700

5

6  AMY S. GONZALEZ (SBN 181745)
   **SAN DIEGO COUNTY REGIONAL AIRPORT**
7  **AUTHORITY**
   3225 N. Harbor Drive
8  San Diego, CA 92138
   Telephone: (619) 400-2425
9  Facsimile: (619) 400-2428

10 Attorneys for Defendant
   SAN DIEGO COUNTY REGIONAL AIRPORT
11 AUTHORITY

12

13            SUPERIOR COURT OF THE STATE OF CALIFORNIA

14                      COUNTY OF SAN DIEGO

15 JOSE HERNANDEZ,                      CASE NO. GIC871979

16         Plaintiff,                   **DEFENDANT SAN DIEGO COUNTY
                                        REGIONAL AIRPORT AUTHORITY'S**
17    v.                                **NOTICE OF LODGMENT OF NON-
                                        CALIFORNIA AUTHORITIES IN SUPPORT**
18 SAN DIEGO COUNTY REGIONAL            **OF MOTION FOR SUMMARY JUDGMENT**
   AIRPORT AUTHORITY, a public entity;  **OR, IN THE ALTERNATIVE, SUMMARY**
19 and DOES 1 through 12, inclusive,    **ADJUDICATION**

20         Defendants.
                                        ─────────────────────────────
21                                      Date:          November 16, 2007
                                        Time:          1:30 p.m.
22                                      Dept:          75
                                        Judge:         Hon. Richard E. Strauss
23                                      Complaint Filed: September 1, 2006
                                        Trial Date:    January 4, 2008
24
                                            **EXEMPT FROM FEES**
25                                          **GOVT. CODE § 6103**

26

27

28

PAUL, PLEVIN,       NOTICE OF LODGMENT OF NON-CALIFORNIA
SULLIVAN &          AUTHORITIES IN SUPPORT OF SUMMARY
CONNAUGHTON LLP     JUDGMENT MOTION

FILED
CIVIL BUSINESS OFFICE 13
CENTRAL DIVISION

2007 AUG 31 P 4: 32

CLERK ... ERIOR COURT
SAN DIEGO COUNTY, CA

1    TO PLAINTIFF JOSE HERNANDEZ AND HIS ATTORNEYS OF RECORD:

2    Defendant San Diego County Regional Airport Authority hereby lodges the following non-

3    California authorities in support of its motion for summary judgment or, in the alternative,

4    summary adjudication:

5        1.    *Abdel v. Ikon Office Solutions, Inc.* (N.D. Cal. 2006) 2006 WL 2474331

6        2.    *Brooks v. City of San Mateo* (9th Cir. 2000) 229 F.3d 917

7        3.    *Clark County School District v. Breeden* (2001) 532 U.S. 268, 121 S.Ct. 1508

8        4.    *Jurado v. Eleven-Fifty Corp.* (9th Cir. 1987) 813 F.2d 1406

9        5.    *Nelson v. J.C. Penney Co.* (8th Cir. 1996) 75 F.3d 343

10       6.    *Trent v. Valley Electric Association, Inc.* (9th Cir. 1994) 41 F.3d 524

11       7.    *Unt v. Aerospace Corp.* (9th Cir. 1985) 765 F.2d 1440

12       8.    *Yartzoff v. Thomas* (9th Cir. 1987) 809 F.2d 1371

13       9.    *Neveu v. City of Fresno* (E.D. Cal. 2005) 392 F.Supp.2d 1159

14   Dated: August 31, 2007             PAUL, PLEVIN, SULLIVAN &
                                     CONNAUGHTON LLP

15

16                       By: *Sandra L McD*

17                         FRED M. PLEVIN

18                         SANDRA L. MCDONOUGH
                      ALBERT R. LIMBERG

19                         Attorneys for Defendant
                      SAN DIEGO COUNTY REGIONAL
                      AIRPORT AUTHORITY

20

21

22

23

24

25

26

27

28

NOTICE OF LODGMENT OF NON-CALIFORNIA
AUTHORITIES IN SUPPORT OF SUMMARY
JUDGMENT MOTION

    1

52-495

1

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 2474331 (N.D.Cal.)

(Cite as: Not Reported in F.Supp.2d)

C

Abdel v. Ikon Office Solutions, Inc.

N.D.Cal.,2006.

Only the Westlaw citation is currently available.

United States District Court,N.D. California.

CY M. ABDEL, Plaintiff(s),

v.

IKON OFFICE SOLUTIONS, INC., Defendant(s).

No. C-05-1685 JCS.

Aug. 25, 2006.

Thomas E. Kotoske, Law Office of Thomas E. Kotoske, Palo Alto, CA, for Plaintiff(s).

Robin Elaine Weideman, Mark S. Spring, Carlton, Disante & Freudenberger LLP, Sacramento, CA, for Defendant(s).

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT [Docket No. 38]

JOSEPH C. SPERO, Magistrate Judge.

I. INTRODUCTION

*1 On Friday, August 11, 2006, at 1:30 p.m., Defendant's Motion for Partial Summary Judgment (" the Motion" ) came on for hearing. For the reasons stated below, the Motion is GRANTED in part and DENIED in part.

II. BACKGROUND

A. Facts[FN1]

FN1. Unless otherwise indicated, the Court relies on facts that it finds to be undisputed.

Plaintiff's employment with Defendant IKON Office Solutions (" IKON". ) began on March 20, 1995. Plaintiff's Declaration in Opposition to IKON's Motion for Summary Judgment (" Abdel Decl." ), ¶ 2. In 2004, Abdel held the position of Major Account Representative in the San Francisco area. Id.; see also Declaration of Curt Albrecht in Support of Defendant IKON Office Solutions, Inc.'s Motion for Partial Summary Judgment (" Albrecht Decl." ), ¶ 2.

He alleges-and IKON concedes-that he was a " star performer" in his office. Id.; Motion at 2 (conceding that Abdel was " one of IKON's top producing and highest paid sales representatives in IKON's Westbay Marketplace" ).

On August 12, 2004, Abdel was terminated. Abdel Decl., ¶ 3. The decision to terminate Abdel was made by Curt Albrecht, who at that time was Vice President of the Westbay Marketplace at IKON. Albrecht Decl., ¶ 1. Albrecht based his decision on the recommendation of Crisi Dominguez, a Human Resources Senior Generalist at IKON. Id., ¶ 5. Dominguez, in turn, made her recommendation after conducting an investigation of Abdel relating to suspected alteration of a document. Declaration of Robin E. Weideman in Support of Defendant IKON Office Solutions, Inc.'s Motion for Partial Summary Judgment (" Weideman Decl." ), Ex. C (Deposition of Curt Albrecht (" Albrecht Depo." )) at 106.

According to Albrecht, he terminated Abdel for the sole reason that he was found to have altered a document, in violation of IKON's Code of Ethics. Albrecht Decl., ¶ 5. Abdel, however, asserts that his termination was, instead, retaliation for earlier complaints that he had made to Albrecht and Vice President Scott Payne, as well as to the State Labor Commission, concerning various practices by IKON that Plaintiff believed to be illegal. Id. at ¶ 35.

1. Abdel's Complaints About IKON Practices

According to Abdel, between 2002 and July 2004, he complained to Albrecht and to another Vice President, Scott Payne, about a variety of practices by IKON that he believed to be illegal. Abdel Decl., ¶ 16. Specifically, he states that he complained about the following conduct: 1) double billing of Abdel's customers, including the Transnational account, despite Abdel's complaints to management, including Albrecht, about the practice; 2) billing of customers, including the Joe Boxer account, for services that had not been rendered, despite Abdel's complaints to management, including Albrecht, about the practice; 3) forging of Abdel's signature on some of his time sheets by his immediate supervisor, Jim Fuller, which allegedly resulted in loss of vacation pay and wages, despite Abdel's complaints to management; 4) forging of customer signatures on order documents

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 2474331 (N.D.Cal.)

(Cite as: Not Reported in F.Supp.2d)

Page 2

by individual's in IKON's Hawaii office, including Jimmy Osaka and Thai Thuei, despite complaints by Abdel to management, including Albrecht and Payne; 5) failure to pay wages and commissions when due and owing. *Id.*

**\*2** With respect to IKON's alleged failure to pay wages and commissions, Abdel states that he and another employee, Cory Harrison, " led a campaign of IKON employees in our office who also were not paid their wages and commissions on time." *Id.,* ¶ 16. Abdel describes the campaign as follows:
This campaign raged throughout 2004 and involved more than a half dozen IKON employees who filed claims with the State Labor Commission concerning IKON's failure to pay wages and commissions when due. Virtually every IKON employee won their case against IKON. Cory and I helped these employees to prepare and file their claims with the State Labor Commission.

*Id.* According to Abdel, all of the employees who filed complaints with the State Labor Commission for failure to pay wages and commissions, including Abdel and Harrison, subsequently were terminated by IKON. *Id.,* ¶ 2 1; *see also* Plaintiff's Statement of Disputed Facts and Undisputed Facts in Opposition to Motion for Summary Judgment (" Plaintiff's Disputed Facts" ), Ex. D (Deposition of Cory Harrison (" Harrison Depo." )) at 86 (testifying that IKON " blacklisted" employees who went to the Labor Commission).

Abdel also states that in response to his complaints, Vice President Payne [FN2] " repeatedly warned [him] that the conduct [Abdel] was complaining of about IKON was extremely explosive" and that if Abdel did not " stop complaining to the Labor Commissioner ... IKON would fire [Abdel] to shut [him] up." Abdel Decl., ¶ 18. Payne, in turn, testified that he received a " tremendous amount of phone calls" from Abdel in which Abdel made " very substantial claims about certain accounting procedures that were going on at IKON in San Francisco." Disputed Facts, Ex. B (Deposition of Scott Payne (" Payne Depo." )) at 22-23. According to Payne, he reminded Abdel that " California is an at will firing state ... and you can be fired for any reasons whatsoever, so you better basically either-if you want to do something with the information, you'd better do something with it or shut up, or you'll find yourself not working there anymore...." *Id.* at 26.

FN2. Payne had worked as Abdel's office manager in San Francisco between December 1997 and March 2001. Disputed Facts, Ex. B (Payne Depo.) at 13. After Payne was promoted to IKON's Central Valley office, in March 2001, he had no supervisory authority over Abdel but Abdel continued to call Payne to discuss " what was going on in the west bay marketplace." *Id.* at 15, 22-23.

### 2. Suspected Forging of Signatures by Abdel

According to IKON, Abdel was suspected of forging signatures on IKON documents on two occasions in 2004. First, Albrecht points to testimony by Albrecht that five or six weeks before the events that led to Abdel's termination, a customer named Columbia Trust complained to IKON that it had not signed a particular document and that the signature on the document was a forgery. Weideman Decl., Ex. C (Albrecht Depo.) at 21. According to Albrecht, an investigation was conducted by Human Resources specialist Crisi Dominguez, but it could not be proven that Abdel had forged the signature. *Id.* As a result, no disciplinary action was taken. *Id.*

Abdel asserts that Albrecht's testimony is incorrect. Abdel Decl., ¶ 4. According to Abdel, he was accused of forging a signature on a Columbia Trust document in 2002, not 2004, and received an apology when it was proved that the accusation was false. *Id.*

**\*3** Second, Abdel received a written warning from his supervisor, Jim Fuller on April 5, 2004. Weideman Decl., Ex. D (Deposition of Crisi Dominguez (Dominguez Depo.)), Ex. 9. This document, entitled " First and Final Written Warning" listed numerous alleged deficiencies relating to Abdel's work. *Id.* Among these is the following statement:
There is some question as to how Steve Slawson's signature appeared on NASD and WO documents, when he had never seen them. You are hereby alerted that you are not empowered to sign Steve's name, or any other name, to any such document in the future.

*Id.* At the conclusion, Fuller writes, " Cy, while allowing for the diversity you bring to the team, I am done tolerating your consitent [sic] voicing of negativity relative to IKON. While certainly no company is perfect and we have engineered many changes, I expect a sales professional with integrity

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 2474331 (N.D.Cal.)

**(Cite as: Not Reported in F.Supp.2d)**

to find the positive prior to expressing the negative...." *Id.*

Abdel denies forging IKON employee Steve Slawson's signature, and points to testimony by order coordinator Therese Demers and sales representative Cory Harrison that on several occasions Jim Fuller forged Slawson's signature on NASD and WO forms when Slawson was unavailable and his signature was needed to complete paperwork. Plaintiff's Disputed Facts, Ex. C (Deposition of Therese Demers (" Demers Depo." )) at 50; Ex. D (Harrison Depo.) at 25-26.

### 3. Alleged Forging of Documents by Other Employees

In addition to the testimony cited above that Fuller forged the signature of Steve Slawson, Abdel states in his declaration that Jim Fuller forged Abdel's signature on time sheets. Abdel Decl., ¶ 16. According to Abdel, he complained to management about the forged signatures and Fuller admitted to forging the signatures, but Fuller was not disciplined. *Id.* Similarly, Harrison testified that Fuller forged Harrison's signature on several time sheets and admitted to Harrison that he had done so. Disputed Facts, Ex. D (Harrison Depo.) at 17-18. According to Harrison, these forged signatures on his time sheets were a subject of one of his complaints to the Labor Commission. *Id.*

Abdel also states that he complained to IKON management, including Albrecht, that IKON employees in the Hawaii office were forging signatures on customer order documents but that no action was taken to stop these practices. Abdel Decl., ¶ 4. Harrison also testified about forged signatures from the Hawaii office. According to Harrison, on one occasion he was standing at the printer when five orders came in from the Hawaii office, supposedly signed by five different customers but all signed in the same handwriting. Disputed Facts, Ex. D (Harrison Depo.) at 33; *see also id.* at 16 (testifying that Harrison referred in conversation with Albrecht to practice of forging of documents in Hawaii office to increase bonuses).

### 4. The " Doctored" MARP

According to IKON, Abdel was fired because it was believed he altered a document called a MARP. Albrecht Decl., ¶ 2. A MARP is a document used in some deals that " allows a sales representative to use a certain lease rate based on a customer's commitment to provide a specified amount of business to IKON." *Id.* Generally, the MARP was issued to the sales representative via e-mail by Marc Lera, an employee of General Electric, which finances IKON's deals. Abdel Decl., ¶ 13.

*4 At IKON, when a Major Account Representative enters into a deal with a customer to sell IKON goods and services, he is required to submit certain deal paperwork to IKON's order processing department. Albrecht Decl., ¶ 3. An order coordinator (O/C) processes the deal by making sure all the required paperwork and necessary signatures are included. *Id.* The paperwork is then passed on to another employee to audit the deal and again check that the necessary paperwork and signatures are included. *Id.*

According to IKON, the altered MARP that led to Abdel's termination was found by IKON employee Yesenia Martinez in an order package for one of Abdel's deals, involving a customer called Tuscan Inn. Weideman Decl., Ex. B (Deposition of Yesenia Martinez (" Martinez Decl." )) at 46. Martinez testified that on August 3, 2004, she conducted an audit of the paperwork for the Tuscan Inn deal, which had already been reviewed by Abdel's O/C, Therese Demers. *Id.* at 38. She found deficiencies in the paperwork, including the fact that the MARP was missing, and therefore returned the package to O/C Demers with instructions to fix these problems. *Id.* at 43-44. Later that day, Martinez testified, she found the package in her in-box, apparently placed there by Demers to be re-audited. *Id.* at 46. When she audited the package for the second time, she found a MARP that had not been in the package the first time. *Id.* The MARP was for an entity called Kimpton Hotel and Restaurant Group LLC, of which Tuscan Inn is a subsidiary. *Id* at 47 & Ex. 4. The MARP was in the form of an e-mail message from Marc Lera to Abdel and reflected an expiration date of 9/30/04. *Id.* According to Martinez, she questioned whether the Tuscan Inn had been added to the Kimpton MARP and therefore called Marc Lera to check. *Id.* at 47. Lera pulled up the MARP in his e-mail and found that it expired on 6/30/04 and told Martinez that the hard copy of the MARP included in the Tuscan Inn package must have been altered. *Id.* at 50. According to Martinez, Lera advised her to notify her manager of the altered MARP, which she did. *Id.* at 13-14.

Abdel disputes Martinez's account. Abdel Decl., ¶¶

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2474331 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

29-3 1. According to Abdel, when he gave the deal package for Tuscan Inn to O/C Demers, on August 3, 2004, he did not include a MARP because he had just requested a MARP for Tuscan Inn from Marc Lera that day. Abdel Decl., ¶¶ 23, 29 & Ex. 2 (e-mail from Cy Abdel to Mark Lera dated August 3, 2004 requesting MARP for Tuscan Inn). Abdel points out that two days later, on August 5, Lera e-mailed the Tuscan Inn MARP to Abdel. *Id.*, ¶ 24 & Ex. 3 (e-mail from Mark Lera to Cy Abdel with MARP for Tuscan Inn). He states the he " never ' doctored' or ' altered' the MARP that Martinez ' discovered' on August 3, 2004." *Id.*, ¶ 3 1. He further states that he had never seen the altered document until it was shown to him by Crisi Dominguez as part of her investigation. *Id.*

*5 Abdel instead points to evidence suggesting that Martinez herself may have altered the MARP. According to Abdel, Martinez had an " acid dislike" of him. Abdel Decl., ¶ 27. Abdel states that when Martinez was assigned to him as his O/C, she refused to process orders without being given bribes and that he complained " vigorously" about this to Martinez's manager, Greg Walston. *Id.*, ¶ 26; *see also* Plaintiff's Disputed Facts, Ex. D (Harrison Depo.) at 73 (testimony that Harrison complained to Albrecht about Martinez's practice of demanding payment from sales representatives to process their orders and Albrecht did nothing). On one occasion, Abdel states, he " had to give Martinez a gift certificate for $300.00 to Banana Republic for processing an order." Abdel Decl., ¶ 27 & Ex. 5. As a result of these complaints, Abdel was reassigned to O/C Demers, but Martinez continued to audit his deals. *Id.* According to Abdel, Martinez told him she would " get even" with him. *Id.*

Abdel's new O/C, Therese Demers, describes Martinez's relation ship with Abdel in similar terms. She testified as follows:
... Yesenia didn't like him. I knew for a fact that she didn't like him because she would always complain to me about him. And he got her in trouble, just recently right before this whole thing happened. She would always tell me what an asshole he is, not to do any favors. And she said, Oh you know, he makes all this money and he doesn't even give you anything for it.... She couldn't stand him and that's why I became his O/C.

Plaintiff's Disputed Facts, Ex. C (Demers Depo.) at 25. Demers further testified that she was " dead sure" Martinez herself altered the MARP because she "

couldn't stand"  Abdel. *Id.* at 29-30. Demers noted that it would be " easy"  to change the MARP on the system. *Id.* at 30. She also questioned Martinez's motives in notifying Human Resources of the discrepancy without first asking Demers about the MARP. *Id.*

**5. The Investigation**

Martinez's manager, Greg Walston, notified Human Resources specialist Crisi Dominguez, of the altered document on August 5, 2004. Declaration of Crisi Fromherz in Support of Defendant IKON Office Solutions, Inc.'s Motion for Partial Summary Judgment (" Fromherz Decl." ),[FN3] ¶ 9. Dominguez, in turn, spoke with Albrecht, informing him that it was her intention to conduct an investigation of the altered MARP. *Id.* Albrecht had also spoken to Marc Lera, who had shown him a copy of his original MARP and the altered MARP. Albrecht Decl., ¶ 4. Albrecht told Dominguez to do whatever she " needed to do." Fromherz Decl., ¶ 10.

> FN3. Crisi Dominguez is Crisi Fromherz's maiden name. Because IKON employees knew and referred to her as Crisi Dominguez, the Court does the same.

Dominguez conducted her investigation from August 6 through August 10, 2004. *Id.*, ¶ 12. According to Dominguez, during the course of her investigation, she interviewed Marc Lera, Cy Abdel, Therese Demers, Yesenia Martinez, and Greg Rudy. *Id.*, ¶ 13. Jim Fuller, who was replaced as Abdel's supervisor in late July or early August of 2004 by Art Aronson, was not involved in the investigation or the decision to terminate Abdel. *Id.*, ¶ 27. She also notified Steve Bottini, Director of Sales, that she was conducting an investigation. *Id.*, ¶ 11. Bottini told her that he might have authorized Abdel to change the MARP. *Id.*

*6 On August 9, 2004, Dominguez interviewed Abdel. *Id.*, ¶ 15. Art Aronson was also present. *Id.* Dominguez testified that going into the meeting, she believed that Abdel might have been authorized by Steve Bottini to alter the expiration date on the MARP, but that Abdel immediately denied having altered the MARP or having spoken to Steve Bottini about it. Weideman Decl., Ex. D (Dominguez Depo.) at 80-81. According to Dominguez, after initially denying having altered the MARP, Abdel began to answer more evasively. Fromherz Decl., ¶ 15. She states that when she and Aronson explained why they

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 2474331 (N.D.Cal.)

**(Cite as: Not Reported in F.Supp.2d)**

believed Abdel altered the MARP, he answered, " it's a tough question." *Id.* According to Dominguez, he also said, " I'm not sure if I did it because I didn't need it," explaining that because the Tuscan Inn deal was based on a zero percent financing rate, he would not have needed to rely on the MARP lease rate. *Id.* At the conclusion of the meeting, Abdel left. *Id.* However, he returned after several minutes, denying he had altered the MARP and demanding that Dominguez give him her interview notes. *Id.* at 16. Dominguez states that based on Abdel's conduct and statements during the interview, she concluded that Abdel had altered the MARP. *Id.,* ¶ 17. She further states that Aronson expressed to her that he also believed Abdel had falsified the MARP. *Id.*

Dominguez also interviewed Therese Demers. *Id.,* ¶ 18. According to Dominguez, Demers told her that the altered MARP was included in the Tuscan Inn deal that Abdel had submitted to her, but that she didn't pay attention to it because Abdel was not using the MARP leasing rate but instead was using zero percent financing. *Id.* When asked whether or not someone other than the sales representative could put something into an order package, Demers stated that this was theoretically possible, but she was not aware of this happening. *Id.* Demers stated that the only person she could imagine touching a deal on her desk was the sales representative and the O/C. *Id.*

Dominguez interviewed Martinez as well. Dominguez's account of her interview with Martinez is consistent with Martinez's own deposition testimony, described above, as to how she came upon the MARP and ultimately discovered that it had been altered. According to Dominguez, Martinez also rejected the possibility that Abdel might not be using a MARP for the Tuscan Inn deal, stating that Abdel was " definitely trying to use the MARP because not all of the equipment in the deal qualified for zero percent financing." *Id.* In particular, she stated that Abdel was using the MARP lease rate for some equipment included in the Tuscan Inn deal. *Id.*

Ultimately, Dominguez concluded that Abdel was responsible for the altered MARP, in part because she did not find Abdel's denials credible and in part because both Martinez and Demers had confirmed that the altered MARP was included in Abdel's order and had his name on it. *Id.* at ¶ 22. Dominguez states that she " knew of absolutely no reason why anyone other than Mr. Abdel would have any reason to doctor the MARP and put it in *Mr. Abdel's* deal, and

not a single witness I interviewed (not even Mr. Abdel) suggested that someone other than Mr. Abdel might have been responsible for the alteration." *Id.* (emphasis in original). Dominguez further concluded that this conduct was a terminable offense under IKON's Code of Ethics. *Id.* at 24. Dominguez also discussed her conclusion with her supervisor, Trina DeWitt, who agreed with Dominguez's recommendation that Abdel be terminated. *Id.,* ¶ 25.

*7 Abdel, however, challenges Dominguez's motives in conducting the investigation, suggesting she intentionally ignored evidence that Martinez might have altered the MARP to retaliate against him. He states that Dominguez herself intensely disliked Abdel because he had reported Dominguez to her manager for providing another employee, Anisa Jones, with a false statement of income earnings so that Jones would qualify for low-income housing. Abdel Decl., ¶ 33. Abdel states that he has reviewed the notes of the August 9 interview and that they are " false and fabricated" and attribute to him things he never said. *Id.,* ¶ 34.

Abdel also points to testimony by Therese Demers in her deposition. In particular, Demers testified that after she spoke with Crisi, she talked to Greg Walston, Martinez's supervisor, and told him that she believed Martinez had altered the MARP to get Abdel fired. Plaintiff's Disputed Facts, Ex. C (Demers Depo.) at 100. Demers testified that Walston agreed with her that this was " highly possible," and told Demers that he would talk to Dominguez about it. *Id.* at 100-101. Demers testified that she had not told Dominguez that she thought Martinez was responsible for the altered MARP because she had " to work directly with Yesenia, and ... [she] was scared of getting her in trouble." *Id.* at 97.

### 6. The Decision to Terminate Abdel

According to Albrecht, he terminated Abdel based on Dominguez's conclusion that Abdel had altered the MARP in violation of IKON's Code of Ethics. Albrecht Decl., ¶ 5. He states that he did not participate in the investigation or review Dominguez's investigation notes. *Id.* He further states that he " had no reason to believe that Crisi Dominguez was untruthful in reporting her investigatory findings and recommendations to [him]" and " no reason to believe that someone else had altered the MARP found in Plaintiff's deal." *Id.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 2474331 (N.D.Cal.)

(Cite as: Not Reported in F.Supp.2d)

Abdel challenges Albrecht's motives, stating that his termination was " pure retaliation for [Abdel's] continued complaints of IKON's illegal conduct which Albrecht refused to stop." Abdel Decl., ¶ 35. He asserts that Albrecht " had to know" that Abdel had complained to Dominguez's manager about her alleged provision of a false income statement to Anisa Jones and, therefore, that Dominguez was biased against Abdel. Plaintiff's Disputed Facts at 8. In addition, he asserts that Albrecht knew Dominguez was biased against Abdel because Albrecht knew Dominguez " had taken steps to improperly destroy the career of another co-employee for which she was disciplined." Id. In support of this assertion, Abdel cites Dominguez's deposition testimony that her supervisor in Human Resources, Trina DeWitt, informed her of a complaint against her lodged by an employee whom Dominguez had investigated based on allegations of sexual harassment by another employee. Plaintiff's Disputed Facts, Ex. .H (Dominguez Depo.) at 163-173. Finally, Abdel points to testimony by Cory Harrison that Albrecht told him on August 2, 2004-the day Harrison was fired-that another senior sales representative would soon be fired. Disputed Facts at 8 & Ex. D at 119-121. According to Abdel, this testimony shows that Albrecht had already made up his mind to terminate before the altered MARP was even discovered, on August 3, 2004.

**7. The Recorded Telephone Calls**

*8 Following his termination, Abdel tape recorded " several" telephone conversations with his former supervisor, Art Aronson, and a telephone conversation with Greg Rudy. Weideman Decl., Ex. A (Abdel Depo.) at 101. Although he testified in his deposition that he recorded " three or four" conversations with Aronson, he states in his declaration that he recorded only three conversations with Aronson. Abdel Decl., ¶ 38. He concedes that he did not tell either Aronson or Rudy that they were being recorded or ask for their consent. Id. at 102-103.

Abdel does not dispute that Rudy had no reason to believe his conversation with Abdel was being recorded or overheard. Plaintiff's Disputed Facts at 12. On the other hand, he asserts that Aronson had no expectation the recorded conversations would be confidential. Id. at 11-12. He points out that Aronson took all three of the calls that Abdel recorded on his speaker phone and that during each of these calls,

Abdel could hear other people in Aronson's office " asking him questions and conducting business." Abdel Decl., ¶ 39. In addition, Abdel cites testimony by IKON employees Matt Clement and Kim Blodgett that each was present in Aronson's office during a telephone conversation between Aronson and Abdel and heard the entire conversations on the speaker phone. See Plaintiff's Disputed Facts, Ex. E (Blodgett Depo.) at 163-164; Ex. F (Declaration of Matt Clement in Support of Opposition to IKON's Motion for Summary Judgment (" Clement Decl." )), ¶ 5. Finally, Clement states that Aronson " kept the door to his office open" and that " [h]is habit was to use his speaker phone to take phone calls." Id., Ex. F (Clement Decl.), ¶ 4.

**B. Procedural Background**

Plaintiff filed this action on January 18, 2005, in California state court. He asserts the following claims: 1) violation of California Labor Code §§ 1102.5(c) and (d), prohibiting retaliation for reporting to a government entity or law enforcement agency something an employee believes to be illegal or refusing to participate in an illegal activity (" the Whistleblower Claim" ); 2) wrongful termination in violation of public policy based on the same statutory provisions as the Whistleblower Claim (" the Public Policy Claim" ); and 3) violation of California Labor Code §§ 200-201, 210 and 216 based on IKON's alleged failure to pay wages and commissions due Abdel upon his termination (" the Wage Claim" ). Plaintiff seeks a variety of damages, including general and punitive damages.

On March 4, 2005, IKON filed a Cross-Complaint against Abdel asserting he violated the California Invasion of Privacy Act, Cal.Penal Code §§ 632 et seq., when he recorded telephone conversations with Aronson and Rudy (" the Invasion of Privacy Claim" ). On the same day, IKON removed the action to this Court on the basis of diversity jurisdiction.

**C. The Motion**

In the Motion, IKON asserts that it is entitled to summary judgment on the following grounds: 1) Abdel's Whistleblower and Public Policy Claims fail because IKON has demonstrated that it had a legitimate non-discriminatory reason for terminating him and Abdel has not made an adequate showing of pretext; 2) Abdel is not entitled to punitive damages because, as a matter of law, no officer, director or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2474331 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

Page 7

managing agent of IKON has engaged in any fraudulent, oppressive, or malicious conduct against Abdel or ratified or authorized any wrongful conduct; and 3) IKON has established, as a matter of law, that Abdel violated the Invasion of Privacy Act based on the undisputed evidence that he secretly recorded conversations with Aronson and Rudy.

*9 In his Opposition, Abdel asserts that he has presented sufficient evidence of pretext to survive summary judgment as to his Whistleblower and Public Policy Claims. With respect to his request for punitive damages, Abdel points to evidence that some of the alleged wrongful conduct was committed by Albrecht, who is an officer of IKON. Finally, while Abdel essentially concedes that IKON is entitled to summary judgment on the Invasion of Privacy Claim as to the conversation with Rudy, he argues that summary judgment is not warranted as to the Aronson conversations because Penal Code § 632(c) applies only where the individual being recorded does not " reasonably expect that the communication may be overheard or recorded." [FN4]

> FN4. Defendant filed Objections to Deposition Testimony Submitted by Plaintiff in Opposition to Motion for Partial Summary Judgment (" Defendant's Objections" ). To the extent these objections relate to evidence the Court relies on in its ruling, these objections are addressed below.

## III. ANALYSIS

### A. Legal Standard

Summary judgment is appropriate " if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden persuasion at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Further, " Celotex requires that for issues on which the movant would bear the burden of proof at trial, that party must show affirmatively the absence of a

genuine issue of material fact," that is, " that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th Cir.1993). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate " specific facts showing there is a genuine issue for trial." Id. at 323. On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### A. Evidence of Pretext

IKON asserts that it is entitled to summary judgment on both the Whistleblower Claim and the Public Policy Claim because it has presented evidence that IKON terminated Abdel for a legitimate, non-discriminatory reason, and Abdel has not presented sufficient evidence of pretext to give rise to a genuine issue of material fact. The Court agrees.

Abdel's Whistleblower and Public Policy Claims are based on the assertion that IKON terminated Abdel in retaliation for his complaints to the California Labor Commission as well as his other complaints about conduct he believed to be illegal. For both of these claims, California courts apply the burden-shifting approach articulated by the Supreme Court in McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). First, to establish a prima facie case of retaliation, Abdel must demonstrate that: 1) he engaged in protected activity; 2) that his employer subjected him to an adverse employment action; and 3) there was a causal link between the protected activity and the adverse employment action. Patten v. Grant Joint Union High School Dist., 134 Cal.App.4th 1378, 1384, 37 Cal.Rptr.3d 113 (2005) (Cal. Labor Code § 1102.5); Colarossi v. Coty U.S. Inc., 97 Cal.App. 4th 1102, 1152 (2002) (wrongful termination in violation of public policy). Once the plaintiff has established a prima facie case, the employer is required to offer a legitimate, non-discriminatory reason for the adverse employment action. Patten, 134 Cal.App.4th at 1384, 37 Cal.Rptr.3d 113; Colarossi, 97 Cal.App.4th at 1152, 119 Cal.Rptr.2d 131. The burden then shifts back to the plaintiff to show that the explanation given by the employer for the adverse employment action is " mere pretext." Patten, 134 Cal.App.4th at 1384, 37 Cal.Rptr.3d 113; Colarossi, 97 Cal.App.4th

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 2474331 (N.D.Cal.)

(Cite as: Not Reported in F.Supp.2d)

Page 8

at 1152, 119 Cal.Rptr.2d 131.

**\*10** Where a plaintiff has established a prima facie case of discrimination and the employer has, in turn, articulated a legitimate non-discriminatory reason for the action, the plaintiff can survive summary judgment only if he produces " specific, substantial evidence of pretext" showing that there remains a genuine factual issue for trial. *Payne v. Norwest Corp.,* 113 F.3d 1079, 1080 (9th Cir.1997) (quoting *Wallis v. J.R. Simplot Co.,* 26 F.3d 885, 890 (9th Cir.1994)). " This burden is hardly an onerous one: the plaintiff who has established a prima facie case need produce very little evidence of discriminatory motive to raise a genuine issue of fact as to pretext." *Id.* (citations omitted). On the other hand, " [i]t is not enough for the employee simply to raise triable issues of fact concerning whether the employer's reasons for taking the adverse action were sound." *Hersant v. Dep't of Soc. Servs.,* 57 Cal.App.4th 997, 1005, 67 Cal.Rptr.2d 483 (1997). The court in *Hersant* explained:

The employee cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.... Rather, the employee must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence, ... and hence infer that the employer did not act for the asserted non-discriminatory reasons.

*Id.* (quoting *Fuentes v. Perskie,* 32 F.3d 759,765 (3d Cir.1996) (citations omitted)).[FN5]

FN5. In his Opposition, Abdel cites to Labor Code § 1102.6, suggesting that IKON's burden on summary judgment is to produce " clear and convincing evidence" that the Abdel would have been terminated even if he had not engaged in protected activity. Section 1102.6 provides as follows:
In a civil action or administrative proceeding brought pursuant to Section 1102.5, once it has been demonstrated by a preponderance of the evidence that an activity proscribed by Section 1102.5 was a contributing factor in the alleged prohibited action against the employee, the employer shall have the burden of proof to demonstrate by clear and convincing evidence that the alleged action would have occurred for legitimate, independent reasons even if the employee had not engaged in activities protected by Section 1102.5.
Cal. Labor Code § 1102.6. The Court concludes that this provision does not alter the analysis of pretext at the summary judgment stage in cases involving § 1102.5. *See, e.g., Patten v. Grant Joint Union High School Dist.,* 134 Cal.App.4th 1378, 1384, 37 Cal.Rptr.3d 113 (2005).

Here, IKON has conceded for the purposes of the Motion that Abdel has established a prima facie case of retaliation. IKON, in turn, has proffered a legitimate non-discriminatory reason for Plaintiff's termination: that Plaintiff had altered a MARP. Thus, the Court must resolve whether Abdel has produced sufficient evidence of pretext to show a genuine issue of material fact for trial. In support of his assertion that IKON's stated reason for terminating him is pretext, Abdel points to evidence that he contends shows that: 1) Dominguez, because of her own animosity toward Abdel, conducted a flawed investigation, intentionally disregarding the lack of direct proof that Abdel falsified the MARP and ignoring evidence that Martinez might have altered the MARP; 2) Albrecht followed Dominguez's recommendation, even though he " had to know" that Dominguez was biased against Abdel, *see* Plaintiff's Disputed Facts at 8; and 3) Albrecht had decided to terminate Abdel before the altered MARP was even discovered, telling Harrison on August 2 that another senior sales representative would soon be fired..

Although Abdel has presented evidence that might create fact questions about the motivations of Martinez and/or Dominguez, the Court notes that there is a genuine issue of material fact relating to whether Albrecht's decision to terminate Abdel was in retaliation for his complaints.

**\*11** First, there is no evidence in the record from which a fact finder could reasonably conclude that Albrecht, who ultimately made the decision to terminate Abdel, knew that Dominguez might have had a reason to be biased against Abdel. Although Abdel states in his Disputed Facts that Albrecht " had to know" that Abdel had complained to Dominguez's manager about her alleged provision of a false

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 2474331 (N.D.Cal.)

(Cite as: Not Reported in F.Supp.2d)

Page 9

income statement to Anisa Jones, there is no evidence in the record that this is so. Abdel states in his own declaration only that he reported Dominguez to her manager. Abdel Decl., ¶ 33. Testimony by Harrison indicates that Dominguez's manager was at that time acting Human Resources Director John Hawkins. Plaintiff's Disputed Facts, Ex. D (Harrison Depo.) at 13. But there is no testimony by Abdel, Albrecht or anyone else indicating that Albrecht was ever told about Abdel's complaint about Dominguez.

Nor is the Court persuaded by Abdel's assertion that Albrecht was aware of Dominguez's bias because he " had to know that she had taken steps to improperly destroy the career of another co-employee for which she was disciplined." Plaintiff's Disputed Facts at 8. In support of this assertion, Abdel cites Dominguez's deposition testimony that her supervisor in Human Resources, Trina DeWitt, informed her of a complaint against her lodged by an employee whom Dominguez had investigated based on allegations of sexual harassment by another employee. Plaintiff's Disputed Facts, Ex. H (Dominguez Depo.) at 163-173. Abdel's reliance on this testimony to show pretext fails for several reasons. First, although Dominguez initially stated that she had been disciplined, she immediately clarified that there had been no disciplinary action against her and that she was merely informed of the complaint. No reasonable fact finder could read this testimony otherwise. Second, there is no evidence in the record that Albrecht was informed of the complaint by Trina DeWitt or anyone else. Third, even if he had been informed, there is no evidence in the record that Abdel had anything to do with this incident and, therefore, Albrecht would have had no basis to conclude that it indicated bias on Dominguez's part towards Abdel.

Second, there is no evidence in the record that anyone ever suggested to Albrecht-or even Dominguez-that the altered MARP might have been inserted into Abdel's deal by Martinez (or anyone else). In particular, while Demers testified that she raised this possibility with her supervisor, Greg Walston, and said that Walston told her he would talk to Dominguez, see Plaintiff's Disputed Facts, Ex. C (Demers Depo.) at 100-101,[FN6] there is no evidence in the record that Walston spoke to Dominguez or Albrecht (or anyone else involved in making the decision).

FN6. In addition, the Court sustains

Defendant's objection to Demers' testimony on the basis that Walston's statements to Demers are inadmissible hearsay. See Objections at 2:25-26. Therefore, the Court rejects Plaintiff's reliance on this evidence on that basis as well.

Third, Payne's statements to Abdel that he might " find [himself] not working [at IKON] anymore" if he didn't " do something with it or shut up," see Plaintiff's Disputed Facts, Ex. B (Payne Depo.) at 26, do not provide evidence of retaliatory intent. Those statements were made by Payne in conversations with Abdel long after he had any supervisory authority over Abdel, when he worked in an entirely different office, in the Central Valley. Although Payne says that he told his own supervisor, Ken Griffith, about Abdel's complaints, see id. at 25,[FN7] there is no evidence in the record that either Payne or Griffith were in any way involved in the decision to terminate Abdel.

FN7. Defendant objects to this testimony as containing hearsay, improper opinion and as lacking personal knowledge. The Court overrules these objections because it relies on this testimony only as evidence that Payne told Griffith about his conversations with Abdel.

*12 Fourth, the reference to Abdel's " negativity" in Jim Fuller's April 5, 2004 warning letter do not raise a fact question regarding pretext because there is no evidence that Fuller had any involvement in the decision to terminate Abdel.

Fifth, Abdel's and Harrison's assertions that IKON " blacklisted" employees who went to the Labor Commission is not supported by the kind of specific and substantial evidence that would allow the Court to find a fact question on pretext. In particular, Abdel has not provided any specific information about the complaints-when they were brought, what they involved, and who brought them-or the employment histories of the individuals involved. Indeed, Abdel has not provided any documentation of his own complaints or how they were resolved. Nor has Abdel provided any evidence regarding the stated reasons for these employees' termination or evidence that these reasons were pretext.[FN8]

FN8. In addition, the Court sustains Defendant's objections to Harrison's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 2474331 (N.D.Cal.)

(Cite as: Not Reported in F.Supp.2d)

deposition testimony that a number of former IKON employees were " blacklisted." *See* Objections at 3:22-23. There is no indication that Harrison had any personal knowledge of the reasons for these employees' termination.

Sixth, Harrison's testimony that he was told at the time he was terminated-about a week before Abdel's termination-that another employee was going to be fired, *see* Plaintiff's Disputed Facts, Ex. D (Harrison Depo.) at 15, 119-121, [FN9] is not sufficiently specific and probative to show that Albrecht had already decided to terminate *Abdel.* Contrary to the representation made in Plaintiff's briefs that Harrison testified Albrecht said only that someone else was going to be fired soon. *See id.* Harrison made clear in his deposition that Albrecht did not state who was going to be terminated or the reason for that individual's future termination. The bare statement that someone was going to be terminated is not sufficient to create a material issue of fact as to pretext.

> FN9. Defendant objects to this testimony on the basis that it was given in response to a leading question. The objection is overruled.

Thus, the Court is left with evidence that Abdel did, in fact, complain about a number of practices he considered to be illegal-often to Albrecht. The Court concludes that this evidence, by itself, is not sufficient to create a fact question as to pretext. If it were, any Plaintiff who engaged in protected activity and subsequently was terminated would be able to survive summary judgment, thus rendering the burden-shifting framework meaningless.

Therefore, the Court concludes that IKON is entitled to summary judgment on Abdel's Whistleblower and Public Policy Claims.

### C. Availability of Punitive Damages

In his complaint, Abdel alleges that he is entitled to punitive damages on his Whistleblower and Public Policy Claims. He does not expressly seek punitive damages on his Wage Claim but rather, seeks statutory penalties under Labor Code § 210. Thus, to the extent the Court has concluded that IKON is

entitled to summary judgment on the Whistleblower and Public Policy Claims, the Court need not reach this issue.

### D. Invasion of Privacy Claim

IKON asserts that it is entitled to summary judgment on its Invasion of Privacy Claim under California Penal Code § 632. That section imposes monetary penalties where an individual " intentionally and without the consent of all parties to a confidential communication, by means of any electronic amplifying or recording device.. records the confidential communication." Cal.Penal Code § 632(a). The word " confidential" is defined as follows:

*13 The term " confidential communication" includes any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto,

but excludes a communication made in a public gathering or in any legislative, judicial, executive or administrative proceeding open to the public, or in any other circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded.

Cal.Penal Code § 632(c).

Abdel testified that he recorded a conversation with Rudy without Rudy's knowledge. Weideman Decl., Ex. A (Abdel Depo.) at 101. He also concedes that Rudy had no reason to believe his conversation with Abdel was being recorded or overheard. Plaintiff's Disputed Facts at 12. This undisputed evidence would allow a fact finder to conclude that Abdel violated Penal Code § 632(a) with respect to the Rudy telephone call. Therefore, IKON is entitled to summary judgment to the extent the Invasion of Privacy Claim is based on that call.

In contrast, Abdel has presented evidence that Aronson customarily took his calls on speaker phone, left his door open, and often conducted telephone conversations while others were in his office. Abdel has also presented evidence that during the telephone calls with Aronson that he recorded, there were, in fact, other people in Aronson's office. This evidence is sufficient to create a fact question as to whether Aronson had a reasonable expectation that the conversations would be overheard. Accordingly,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 2474331 (N.D.Cal.)

**(Cite as: Not Reported in F.Supp.2d)**

IKON is not entitled to summary judgment on that aspect of the Invasion of Privacy Claim.

### IV. CONCLUSION

For the reasons stated above, the Motion is GRANTED in part and DENIED in part as follows: summary judgment is GRANTED as to Plaintiff's Whistleblower Claim (Claim One) and his Public Policy Claim (Claim Two), which are dismissed with prejudice; summary judgment also is GRANTED as to IKON's counterclaim for Invasion of Privacy to the extent that claim is based on Plaintiff's recording of a conversation with Greg Rudy. Summary judgment is DENIED as to IKON's counterclaim for Invasion of Privacy to the extent that claim is based on Plaintiff's recording of conversations with Art Aronson.

IT IS SO ORDERED.

N.D.Cal.,2006.
Abdel v. Ikon Office Solutions, Inc.
Not Reported in F.Supp.2d, 2006 WL 2474331 (N.D.Cal.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**2**

Westlaw.

229 F.3d 917                                                          Page 1

229 F.3d 917, 86 Fair Empl.Prac.Cas. (BNA) 1221, 00 Cal. Daily Op. Serv. 8503, 2000 Daily Journal D.A.R. 11,324
(Cite as: 229 F.3d 917)

▷
Brooks v. City of San Mateo
C.A.9 (Cal.),2000.

United States Court of Appeals,Ninth Circuit.
Patricia A. BROOKS, Plaintiff-Appellant,
v.
CITY OF SAN MATEO, a municipal corporation;
San Mateo Police Department; John Stangl, Chief
of Police; Steven Selvaggio, Defendants-Appellees.
No. 98-15818.

Argued and Submitted May 14, 1999.
Filed Oct. 23, 2000.

Former city employee sued the city, the police department, and its chief for sexual harassment and retaliatory discrimination in violation of Title VII and the California Fair Employment and Housing Act (FEHA). The United States District Court for the Northern District of California, William H. Orrick, Jr., J., granted summary judgment for defendants, and plaintiff appealed. On denying motion for rehearing and for rehearing en banc, the Court of Appeals, Kozinski, Circuit Judge, held that: (1) single incident in which fellow employee touched plaintiff's stomach and then her breast under her sweater, while very offensive, did not rise to the level of harassment for which Title VII offers a remedy, especially given that the city took prompt steps to remove fellow employee from the workplace, and (2) none of the complained of incidents constituted adverse employment action, so as to support retaliation claim.

Affirmed.

Opinion, 214 F.3d 1082, superseded.
West Headnotes
[1] Civil Rights 78 ⟵1116(2)

78 Civil Rights
    78II Employment Practices

78k1108 Employers and Employees Affected
    78k1116 Public Employers and Employees
        78k1116(2)   k.   Individuals   as   "
Employers". Most Cited Cases
    (Formerly 78k143)
Senior dispatchers in city's communications center, taking 911 calls, are not "supervisors" such that they can be held liable for sexual harassment of fellow employees under the California Fair Employment and Housing Act (FEHA). West's Ann.Cal.Gov.Code § 12940(h).

[2] Civil Rights 78 ⟵1182

78 Civil Rights
    78II Employment Practices
        78k1181   Sexual   Harassment;   Work
Environment
            78k1182 k. In General. Most Cited Cases
    (Formerly 78k167)
Sexual harassment is a species of gender discrimination under Title VII. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1).

[3] Civil Rights 78 ⟵1184

78 Civil Rights
    78II Employment Practices
        78k1181   Sexual   Harassment;   Work
Environment
            78k1184 k. Quid Pro Quo. Most Cited Cases
    (Formerly 78k167)

Civil Rights 78 ⟵1185

78 Civil Rights
    78II Employment Practices
        78k1181   Sexual   Harassment;   Work
Environment
            78k1185   k.   Hostile   Environment;
Severity, Pervasiveness, and Frequency. Most Cited Cases

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.3d 917                                                                    Page 2

229 F.3d 917, 86 Fair Empl.Prac.Cas. (BNA) 1221, 00 Cal. Daily Op. Serv. 8503, 2000 Daily Journal D.A.R. 11,324
(Cite as: 229 F.3d 917)

(Formerly 78k167)
A "hostile work environment" sex discrimination claim involves a workplace atmosphere so discriminatory and abusive that it unreasonably interferes with the job performance of those harassed, while a "quid pro quo claim" occurs when a supervisor demands sexual favors in return for a job benefit. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1).

[4] Civil Rights 78 ⊂═1185

78 Civil Rights
    78II Employment Practices
        78k1181    Sexual    Harassment;    Work Environment
            78k1185    k.    Hostile    Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
    (Formerly 78k167)
In order to prevail on hostile work environment sex discrimination claim, employee had to show that her workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment, and the working environment had to be both subjectively and objectively be perceived as abusive. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1).

[5] Civil Rights 78 ⊂═1185

78 Civil Rights
    78II Employment Practices
        78k1181    Sexual    Harassment;    Work Environment
            78k1185    k.    Hostile    Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
    (Formerly 78k167)
Court of Appeals uses a totality of the circumstances test to determine whether a plaintiff's allegations make out a colorable claim of hostile work environment sex discrimination, and when assessing the objective portion of a plaintiff's claim, Court assumes the perspective of the reasonable victim. Civil Rights Act of 1964, § 703(a)(1), 42

U.S.C.A. § 2000e-2(a)(1).

[6] Civil Rights 78 ⊂═1532

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1532 k. Pleading. Most Cited Cases
    (Formerly 78k375)
Female employee alleged sufficient facts to support the subjective portion of her hostile work environment sex discrimination claim under Title VII by claiming that incident in which she was fondled by fellow employee pervaded her work environment to such a degree that she required psychological help and even then was unable to successfully return to her job. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1).

[7] Civil Rights 78 ⊂═1189

78 Civil Rights
    78II Employment Practices
        78k1181    Sexual    Harassment;    Work Environment
            78k1189    k.    Knowledge or Notice; Preventive or Remedial Measures. Most Cited Cases
    (Formerly 78k167)
To hold city liable under Title VII for sexual harassment committed by supervisor, employee was required to show that she reasonably feared she would be subject to such misconduct in the future because the city encouraged or tolerated the harassment. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1).

[8] Civil Rights 78 ⊂═1185

78 Civil Rights
    78II Employment Practices
        78k1181    Sexual    Harassment;    Work Environment
            78k1185    k.    Hostile    Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
    (Formerly 78k167)

Civil Rights 78 ⊂═1189

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.3d 917                                                                                          Page 3

229 F.3d 917, 86 Fair Empl.Prac.Cas. (BNA) 1221, 00 Cal. Daily Op. Serv. 8503, 2000 Daily Journal D.A.R. 11,324
(Cite as: 229 F.3d 917)

78 Civil Rights
    78II Employment Practices
        78k1181    Sexual    Harassment;    Work Environment
            78k1189 k. Knowledge or Notice; Preventive or Remedial Measures. Most Cited Cases
    (Formerly 78k167)
To establish objective component of hostile work environment sex discrimination claim, plaintiff could not rely on fellow employee's misconduct with other female employees where she did not know about it at the time of his attack on her, especially where the fellow employee's conduct was not known to the employer city until after the assault on plaintiff. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1).

[9] Civil Rights 78 ☞1185

78 Civil Rights
    78II Employment Practices
        78k1181    Sexual    Harassment;    Work Environment
            78k1185 k. · Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
    (Formerly 78k167)
Sexual harassment directed towards others of which an employee is unaware can have no bearing on whether she reasonably considered her working environment abusive, · especially where the harassment comes from an individual who is terminated as soon as his misdeeds come to light. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1).

[10] Civil Rights 78 ☞1528

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1526 Persons Liable
            78k1528 k. Vicarious Liability; Respondeat Superior. Most Cited Cases
    (Formerly 78k371)
Knowledge of fellow employee's sexually harassing conduct could not be imputed to employer city, for purposes of supporting objective component of

another employee's hostile work environment sex discrimination claim, where the employee with prior knowledge, as a senior dispatcher in city's communications center, lacked power to change the conditions of employment, did not serve as a conduit to off-site managers and never actually received a formal complaint about the abusive employee. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1).

[11] Civil Rights 78 ☞1185

78 Civil Rights
    78II Employment Practices
        78k1181    Sexual    Harassment;    Work Environment
            78k1185 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
    (Formerly 78k167)
The required showing of severity or seriousness of the sexually harassing conduct varies inversely with the pervasiveness or frequency of the conduct in a Title VII action, and if a single incident can ever suffice to support a hostile work environment claim, the incident must be extremely severe. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1).

[12] Civil Rights 78 ☞1185

78 Civil Rights
    78II Employment Practices
        78k1181    Sexual    Harassment;    Work Environment
            78k1185 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
    (Formerly 78k167)

Civil Rights 78 ☞1189

78 Civil Rights
    78II Employment Practices
        78k1181    Sexual    Harassment;    Work Environment
            78k1189 k. Knowledge or Notice; Preventive or Remedial Measures. Most Cited Cases

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

52-511

229 F.3d 917

Page 4

229 F.3d 917, 86 Fair Empl.Prac.Cas. (BNA) 1221, 00 Cal. Daily Op. Serv. 8503, 2000 Daily Journal D.A.R. 11,324
**(Cite as: 229 F.3d 917)**

(Formerly 78k167)
Single incident in which fellow employee, over a period of five minutes, touched female employee's stomach and then her breast under her sweater, while very offensive, did not rise to the level of harassment for which Title VII offers a remedy, especially given that the employer city took prompt steps to remove fellow employee from the workplace, in case in which the female employee did not allege that she sought or required hospitalization, and did not suffer any physical injuries at all. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1).

**[13] Civil Rights 78 ☞1537**

78 Civil Rights
   78IV Remedies Under Federal Employment Discrimination Statutes
      78k1534 Presumptions, Inferences, and Burden of Proof
         78k1537 k. Sex Discrimination. Most Cited Cases
   (Formerly 78k379)
Even if it were presumed that the unwelcome, intentional touching of a female employee's stomach and breast by fellow employee was sufficiently offensive to alter the conditions of her working environment and constitute a violation of Title VII, the brief duration of the incident coupled with the employer city's effective remedial action would suffice to rebut the presumption. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1).

**[14] Civil Rights 78 ☞1145**

78 Civil Rights
   78II Employment Practices
      78k1143 Harassment; Work Environment
         78k1145 k. Practices Prohibited or Required in General; Elements. Most Cited Cases
   (Formerly 78k145)
Not all workplace conduct that may be described as harassment affects a term, condition, or privilege of employment within the meaning of Title VII. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[15] Civil Rights 78 ☞1185**

78 Civil Rights
   78II Employment Practices
      78k1181 Sexual Harassment; Work Environment
         78k1185 k. Hostile Environment; Severity, Pervasiveness, and Frequency. Most Cited Cases
   (Formerly 78k167)

**Civil Rights 78 ☞1528**

78 Civil Rights
   78IV Remedies Under Federal Employment Discrimination Statutes
      78k1526 Persons Liable
         78k1528 k. Vicarious Liability; Respondeat Superior. Most Cited Cases
   (Formerly 78k371)
Because an employer cloaks a supervisor with authority, a supervisor's conduct ordinarily is attributed directly to the employer, and, thus, a sexual assault by a supervisor, even on a single occasion, may well be sufficiently severe so as to alter the conditions of employment and give rise to a hostile work environment claim under Title VII. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1).

**[16] Civil Rights 78 ☞1243**

78 Civil Rights
   78II Employment Practices
      78k1241 Retaliation for Exercise of Rights
         78k1243 k. Practices Prohibited or Required in General; Elements. Most Cited Cases

**Federal Civil Procedure 170A ☞2497.1**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)2 Particular Cases
            170Ak2497 Employees and Employment Discrimination, Actions Involving
               170Ak2497.1 k. In General. Most Cited Cases

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.3d 917                                                                 Page 5

229 F.3d 917, 86 Fair Empl.Prac.Cas. (BNA) 1221, 00 Cal. Daily Op. Serv. 8503, 2000 Daily Journal D.A.R. 11,324
(Cite as: 229 F.3d 917)

(Formerly 255k40(1) Master and Servant)

To defeat summary judgment on a retaliation claim under Title VII or the California Fair Employment and Housing Act (FEHA), a plaintiff must show (1) involvement in a protected activity, (2) an adverse employment action and (3) a causal link between the two; thereafter, the burden of production shifts to the employer to present legitimate reasons for the adverse employment action, and once the employer carries this burden, plaintiff must demonstrate a genuine issue of material fact as to whether the reason advanced by the employer was a pretext, and only then does the case proceed beyond the summary judgment stage. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; West's Ann.Cal.Gov.Code § 12940 et seq.

[17] Civil Rights 78 ⊸1244

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1244 k. Activities Protected. Most Cited Cases
    (Formerly 255k30(6.10) Master and Servant)

Asserting her civil rights, as female employee did by complaining of offensive touching by fellow employee, is a protected activity under Title VII and the California Fair Employment and Housing Act (FEHA). Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; West's Ann.Cal.Gov.Code § 12940 et seq.

[18] Civil Rights 78 ⊸1245

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1245 k. Adverse Actions in General. Most Cited Cases
    (Formerly 255k30(6.10) Master and Servant)

Only non-trivial employment actions that would deter reasonable employees from complaining about Title VII violations will constitute actionable retaliation; among those employment decisions that can constitute an "adverse employment action" are termination, dissemination of a negative employment reference, issuance of an undeserved negative performance review and refusal to consider for promotion, but declining to hold a job open for an employee, badmouthing an employee outside the job reference context, and transferring an employee where salary is unaffected do not constitute adverse employment actions. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

[19] Civil Rights 78 ⊸1245

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1245 k. Adverse Actions in General. Most Cited Cases
    (Formerly 255k30(6.10) Master and Servant)

Ostracism suffered at the hands of co-workers cannot constitute an "adverse employment action," for purposes of a retaliation claim under Title VII, especially since holding an employer liable because its employees refuse to associate with each other might well be unconstitutional. U.S.C.A. Const.Amend. 1; Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

[20] Municipal Corporations 268 ⊸218(3)

268 Municipal Corporations
    268V Officers, Agents, and Employees
        268V(C) Agents and Employees
            268k218 Removal, Discharge, Transfer or Demotion
                268k218(3) k. Grounds. Most Cited Cases

City employee's being required to attend group therapy sessions and discuss incident of offensive touching by fellow employees in front of co-workers could not be the basis for a retaliation claim under Title VII, where these sessions were workshops designed to better inform the city's workforce of its sexual harassment policy, employee was not singled out for the sessions, and they were employer's legitimate effort to deal with a traumatic workplace situation and educate its employees regarding sexual harassment. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.3d 917

229 F.3d 917, 86 Fair Empl.Prac.Cas. (BNA) 1221, 00 Cal. Daily Op. Serv. 8503, 2000 Daily Journal D.A.R. 11,324
(Cite as: 229 F.3d 917)

Page 6

**[21] Municipal Corporations 268 ⊃218(3)**

268 Municipal Corporations
   268V Officers, Agents, and Employees
      268V(C) Agents and Employees
         268k218 Removal, Discharge, Transfer or Demotion
            268k218(3) k. Grounds. Most Cited Cases
That fellow employee who had been friendly with employee who sexually harassed plaintiff was sometimes present on the city's dispatch floor when plaintiff worked did not support retaliation claim under Title VII, absent evidence that the city put the two of them together knowing that plaintiff would be uncomfortable or that the friend was hostile toward plaintiff. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[22] Civil Rights 78 ⊃1250**

78 Civil Rights
   78II Employment Practices
      78k1241 Retaliation for Exercise of Rights
         78k1250 k. Harassment; Work Environment. Most Cited Cases
   (Formerly 255k30(6.10) Master and Servant)
A victim of sexual harassment is not entitled to avoid contact with the harasser's friends, for purpose of determining whether employee scheduling constituted adverse employment action for retaliation purposes; so long as they show no outward signs of hostility, they are entitled to continue doing their jobs even though it brings them in contact with the victim. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[23] Municipal Corporations 268 ⊃218(3)**

268 Municipal Corporations
   268V Officers, Agents, and Employees
      268V(C) Agents and Employees
         268k218 Removal, Discharge, Transfer or Demotion
            268k218(3) k. Grounds. Most Cited Cases
The fact that the city used all of its allotted 90 days to process plaintiff's worker's compensation claim could not be deemed retaliatory under Title VII for reporting sexual harassment, where plaintiff offered no evidence that the city treated her differently from other employees seeking workers' compensation benefits. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[24] Municipal Corporations 268 ⊃218(3)**

268 Municipal Corporations
   268V Officers, Agents, and Employees
      268V(C) Agents and Employees
         268k218 Removal, Discharge, Transfer or Demotion
            268k218(3) k. Grounds. Most Cited Cases
That plaintiff's performance review was downgraded from "satisfactory" to "needs improvement" after she complained about sexual harassment was not an "adverse employment action" for purposes of retaliation claim under Title VII because it was subject to modification by the employer city, and plaintiff refused to accept the review and appealed, though she abandoned her job while the appeal was pending. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[25] Municipal Corporations 268 ⊃218(3)**

268 Municipal Corporations
   268V Officers, Agents, and Employees
      268V(C) Agents and Employees
         268k218 Removal, Discharge, Transfer or Demotion
            268k218(3) k. Grounds. Most Cited Cases
That employer city rescheduled plaintiff to an unfavorable shift and denied her vacation preference after she complained about sexual harassment was not an "adverse employment action" for purposes of retaliation claim under Title VII because those actions were not final, and when plaintiff complained, the city accommodated her preferences by allowing her to switch shifts and vacation dates with other employees. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.3d 917                                                                         Page 7

229 F.3d 917, 86 Fair Empl.Prac.Cas. (BNA) 1221, 00 Cal. Daily Op. Serv. 8503, 2000 Daily Journal D.A.R. 11,324
(Cite as: 229 F.3d 917)

|26| **Municipal Corporations 268 ☞218(3)**

268 Municipal Corporations
    268V Officers, Agents, and Employees
        268V(C) Agents and Employees
            268k218 Removal, Discharge, Transfer or Demotion
            268k218(3) k. Grounds. Most Cited Cases
That certain police officers allegedly refused to provide city telephone dispatcher with services that were routinely provided to other employees, after she reported sexual harassment by fellow employee, did not support retaliation claim under Title VII because the police did not employ dispatcher and thus could not be held liable for retaliating against her. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

|27| **Civil Rights 78 ☞1123**

78 Civil Rights
    78II Employment Practices
        78k1123 k. Constructive Discharge. Most Cited Cases
    (Formerly 78k145)
"Constructive discharge" occurs when the working conditions deteriorate, as a result of discrimination, to the point that they become sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

|28| **Civil Rights 78 ☞1123**

78 Civil Rights
    78II Employment Practices
        78k1123 k. Constructive Discharge. Most Cited Cases
    (Formerly 78k145)
Plaintiff employee's complaints about her working conditions, ranging from the trivial, such as issues with the pictures of harasser in office photo album, to the routine, such as scheduling conflicts, were not sufficiently extraordinary or egregious to amount to a constructive discharge, so as to support a Title VII retaliation claim after plaintiff reported sexual harassment by fellow employee. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

|29| **Civil Rights 78 ☞1123**

78 Civil Rights
    78II Employment Practices
        78k1123 k. Constructive Discharge. Most Cited Cases
    (Formerly 78k145)
Where a Title VII plaintiff fails to demonstrate the severe and pervasive harassment necessary to support a hostile work environment claim, it will be impossible for her to meet the higher standard of constructive discharge. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

\*921 John F. Prentice and Sheila A. Reid, Prentice & Scott, San Francisco, California, argued the cause for the plaintiff-appellant.
Nancy E. Pritikin, Littler, Mendelson, San Francisco, California, argued the cause for defendants-appellees, City of San Mateo, et al. With her on the briefs were Ronald J. Holland and Susan A.P. Woodhouse.
Alison Berry-Wilkinson, Rains, Lucia & Wilkinson, LLP, Pleasant Hill, California, argued the cause for defendant-appellee Steven Selvaggio. With her on the briefs was Kamili A. Williams.

Appeal from the United States District Court for the Northern District of California; William H. Orrick, Jr., District Judge, Presiding. D.C. No. CV-96-03753-WHO.

Before: WOOD, Jr.,[FN*] KOZINSKI and RYMER, Circuit Judges.

    FN* The Honorable Harlington Wood, Jr., Senior Circuit Judge for the Seventh Circuit Court of Appeals, sitting by designation.

**ORDER**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.3d 917                                                                    Page 8

229 F.3d 917, 86 Fair Empl.Prac.Cas. (BNA) 1221, 00 Cal. Daily Op. Serv. 8503, 2000 Daily Journal D.A.R. 11,324
(Cite as: 229 F.3d 917)

The opinion filed June 5, 2000, and reported at 214 F.3d 1082, is withdrawn and superseded by the attached opinion. The petition for rehearing is otherwise denied. The full court was advised of the petition for rehearing en banc. A judge of the court requested a vote on whether to rehear the matter en banc, but the matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed. R.App. P. 35. The petition for rehearing en banc is denied.

## OPINION

KOZINSKI, Circuit Judge:
We consider the legal implications of a single, rather unsavory, episode of workplace sexual harassment.

### I

Our story begins when Patricia Brooks, a telephone dispatcher for the City of San Mateo, California, and her coworker, senior dispatcher Steven Selvaggio, manned the city's Communications Center, taking 911 calls on the evening shift. At some point during the evening, Selvaggio approached Brooks as she was taking a call. He placed his hand on her stomach and commented on its softness and sexiness. Brooks told Selvaggio to stop touching her and then forcefully pushed him away. Perhaps taking this as encouragement, Selvaggio later positioned himself behind Brooks's chair, boxing her in against the communications console as she was taking another 911 call. He forced his hand underneath her sweater and bra to fondle her bare breast. After terminating the call, Brooks removed Selvaggio's hand again and told him that he had "crossed the line." To this, Selvaggio responded "you don't have to worry about cheating [on your husband], I'll do everything." Selvaggio then approached Brooks as if he would fondle her breasts again. Fortunately, another dispatcher arrived at this time, and Selvaggio ceased his behavior. Soon thereafter Selvaggio took a break and left the building. Brooks immediately reported the incident and, the following *922 day, the city placed Selvaggio on administrative leave pending an investigation.

This, it turned out, was not the first time Selvaggio had made improper advances to co-workers. At least two other female employees, including Pat P., another senior dispatcher, had been subjected to similar treatment from Selvaggio. However, Selvaggio's earlier victims had not reported his misconduct. Only after the city launched its investigation into Brooks's allegations did these other incidents come to light.

While Selvaggio denied any misconduct, the investigation adopted Brooks's version of events and concluded that Selvaggio had violated the city's sexual harassment policy. Selvaggio resigned after the city initiated termination proceedings against him. He later pled no contest to misdemeanor sexual assault charges and spent 120 days in jail.

Despite the city's prompt remedial action, Brooks had trouble recovering from the incident. She took a leave of absence immediately afterward and began seeing a psychologist. She returned to work six months later. According to Brooks, her work environment had changed dramatically: The male employees ostracized her and her supervisors mistreated her. Brooks alleges that she had trouble getting her desired work shift and preferred vacation dates, while other employees with less seniority got their preferences. She also alleges that the city delayed approval of her sick leave benefits, reprimanded her for conduct it overlooked in other employees [FN1] and gave her an unwarranted negative performance evaluation. Brooks signed the evaluation but indicated that she would appeal it. She submitted a written appeal which expressed her view that the evaluation was intended to retaliate against her for complaining about Selvaggio's behavior. While the city was considering her appeal, Brooks left work and never returned.

FN1. Brooks has not renewed her argument that the reprimand was retaliatory. See Smith v. Marsh, 194 F.3d 1045, 1052 (9th Cir.1999) ( "[O]n appeal,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.3d 917

Page 9

229 F.3d 917, 86 Fair Empl.Prac.Cas. (BNA) 1221, 00 Cal. Daily Op. Serv. 8503, 2000 Daily Journal D.A.R. 11,324
(Cite as: 229 F.3d 917)

arguments not raised by a party in its opening brief are deemed waived.") (citing *Brookfield Communications, Inc. v. West Coast Entertainment Corp.,* 174 F.3d 1036, 1046 n. 7 (9th Cir.1999)).

[1] Brooks obtained right to sue notices from the EEOC and the California Department of Fair Employment and Housing. She then sued the city, the Police Department and its chief, John Stangl, for sexual harassment and retaliatory discrimination in violation of Title VII of the Civil Rights Act, *see* 42 U.S.C. § 2000e *et. seq.,* and the California Fair Employment and Housing Act (FEHA), *see* Cal. Gov.Code § 12940 *et seq.*[FN2] All defendants moved for summary judgment.

> FN2. Brooks also named Selvaggio as a defendant in her FEHA complaint. Unlike Title VII, FEHA grants victims a cause of action for discrimination practiced by "any other person" in addition to that practiced solely by employers. *Compare* 42 U.S.C. § 2000e-2(a) *with* Cal. Govt.Code § 12940(h). Nonetheless, the California Supreme Court has recently held that FEHA, like Title VII, does not support a claim of harassment against a fellow employee. *See Carrisales v. Department of Corrections,* 21 Cal.4th 1132, 1140, 90 Cal.Rptr.2d 804, 988 P.2d 1083 (1999) (" Consistent with the FEHA's primary concern with unlawful employment *practices,* it does not also impose personal liability for harassment on nonsupervisory coworkers."). Thus, Selvaggio cannot be held liable unless senior dispatchers are supervisors. We conclude they are not. *See* note 6 *infra.*

The district court held that Selvaggio's assault of Brooks in the Communications Center was not severe enough to give rise to a hostile work environment claim. As for Brooks's retaliation claims, the district court held that she failed to show that she suffered any adverse employment consequences. Based on these rulings, the district

court granted the summary judgment motion.

On appeal, Brooks complains that the district court erred in ruling that the sexual assault was not sufficient to create a hostile work environment. She also argues*923 that the city is liable under FEHA and Title VII for failing to take steps to prevent Selvaggio's misconduct of which it had actual or constructive notice. Finally, Brooks claims that the district court erred in finding no adverse job action to support her retaliation claim. While Brooks argues that she was subjected to sexual discrimination under Title VII as well as FEHA, we need only assess her claim under federal law because Title VII and FEHA operate under the same guiding principles.[FN3]

> FN3. *See Beyda v. City of Los Angeles,* 65 Cal.App.4th 511, 517, 76 Cal.Rptr.2d 547 (Cal.Ct.App.1998) ("Although the wording of title VII differs in some particulars from the wording of FEHA, the antidiscriminatory objectives and overriding public policy purposes of the two acts are identical. In an area of emerging law, such as employment discrimination, it is appropriate to consider federal cases interpreting title VII.") (internal quotation marks and citations omitted); *Okoli v. Lockheed Tech. Operations Co.,* 36 Cal.App.4th 1607, 1614 n. 3, 43 Cal.Rptr.2d 57 (Cal.Ct.App.1995) ("Since the antidiscrimination objectives and public policy purposes of [FEHA and Title VII] are the same, we may rely on federal decisions to interpret analogous parts of the state statute.") (quoting *Sandhu v. Lockheed Missiles & Space Co.,* 26 Cal.App.4th 846, 851, 31 Cal.Rptr.2d 617 (Cal.Ct.App.1994)).

## II

[2] Title VII prohibits employment discrimination based on any of its enumerated grounds: " 'race, color, religion, sex, or national origin.' " *Harris v.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.3d 917                                                                                              Page 10

229 F.3d 917, 86 Fair Empl.Prac.Cas. (BNA) 1221, 00 Cal. Daily Op. Serv. 8503, 2000 Daily Journal D.A.R. 11,324
(Cite as: 229 F.3d 917)

*Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (quoting 42 U.S.C. § 2000e-2(a)(1)). Sexual harassment is a species of gender discrimination: Harassing an employee on account of sex is, conceptually, the same as refusing to hire on account of sex, or paying less for the same work, or imposing more onerous duties for the same pay. In each such case, the employer violates Title VII by offering terms and conditions to employees of one gender that are less favorable than those it offers to employees of the other gender. Sexual harassment, if committed or tolerated by the employer, becomes a new and onerous term of employment.

[3] Sexual harassment falls into two major categories: hostile work environment and quid pro quo. *See* EEOC, Policy Guidance on Sexual Harassment, 8 BNA FEP Manual 405:6681 (Mar. 19, 1990) (hereinafter EEOC Policy Guide). A hostile work environment claim involves a workplace atmosphere so discriminatory and abusive that it unreasonably interferes with the job performance of those harassed. A quid pro quo claim, as the name implies, occurs when a supervisor demands sexual favors in return for a job benefit. *See generally* Barbara Lindemann & David D. Kadue, *Sexual Harassment in Employment Law* (1992). Additionally, employees who are subject to adverse employment actions because they lodged complaints of sexual harassment can raise a retaliation claim under Title VII. *See id.* at 275. Brooks alleges she suffered hostile work environment harassment during her encounter with Selvaggio, and retaliation by the city when she returned from the leave of absence precipitated by the incident.

### Hostile Work Environment

[4][5] In order to prevail on her hostile work environment claim, Brooks must show that her " workplace [was] permeated with discriminatory intimidation ... that [was] sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Harris*, 510 U.S. at 21, 114 S.Ct.

367 (internal quotation marks and citations omitted). "The working environment must both subjectively and objectively be perceived as abusive. " *Fuller v. City of Oakland*, 47 F.3d 1522, 1527 (9th Cir.1995) (citing *Harris*, 510 U.S. at 21-22, 114 S.Ct. 367). We use a totality of the circumstances test to determine whether a plaintiff's allegations make out a colorable claim of hostile work environment. *See* *924Harris*, 510 U.S. at 23, 114 S.Ct. 367. *Harris* lists frequency, severity and level of interference with work performance among the factors particularly relevant to the inquiry. When assessing the objective portion of a plaintiff's claim, we assume the perspective of the reasonable victim. *See Ellison v. Brady*, 924 F.2d 872, 879 (9th Cir.1991) ("[A] female plaintiff states a prima facie case of hostile environment sexual harassment when she alleges conduct which a reasonable woman would consider sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment.") (footnotes and citation omitted).

[6] Brooks claims the incident pervaded her work environment to such a degree that she required psychological help and even then was unable to successfully return to her job. She has alleged sufficient facts to support the subjective portion of her hostile work environment claim. The question remains whether her apprehension was objectively reasonable.

Because only the employer can change the terms and conditions of employment, an isolated incident of harassment by a co-worker will rarely (if ever) give rise to a reasonable fear that sexual harassment has become a permanent feature of the employment relationship. By hypothesis, the employer will have had no advance notice and therefore cannot have sanctioned the harassment beforehand. And, if the employer takes appropriate corrective action, it will not have ratified the conduct. In such circumstances, it becomes difficult to say that a reasonable victim would feel that the terms and conditions of her employment have changed as a result of the misconduct.[FN4]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.3d 917                                                                                            Page 11

229 F.3d 917, 86 Fair Empl.Prac.Cas. (BNA) 1221, 00 Cal. Daily Op. Serv. 8503, 2000 Daily Journal D.A.R. 11,324
(Cite as: 229 F.3d 917)

FN4. A case involving a single incident of sexual harassment is obviously distinct from one involving a series of incidents, which the employer knows about and does nothing to correct. In such circumstances, the non-action by the employer can fairly be characterized as acquiescence, i.e., having changed the terms and conditions of employment to include putting up with harassment from other employees. See, e.g., Hostetler v. Quality Dining, Inc., 218 F.3d 798, 802-05 (7th Cir.2000).

[7] Which is why Selvaggio's conduct, while relevant, is not the primary focus of our inquiry. No one could reasonably dispute that what Selvaggio did was egregious; he was, after all, immediately removed from his job and prosecuted. He spent time in jail. But it is the city, and not Selvaggio, who is the defendant here. To hold her employer liable for sexual harassment under Title VII, Brooks must show that she reasonably feared she would be subject to such misconduct in the future because the city encouraged or tolerated Selvaggio's harassment.

[8][9] In support of her claim, Brooks points to Selvaggio's previous inappropriate advances toward female employees, in addition to her own encounter with him in the Communications Center. However, Brooks cannot rely on Selvaggio's misconduct with other female employees because she did not know about it at the time of Selvaggio's attack. Harassment directed towards others of which an employee is unaware can, naturally, have no bearing on whether she reasonably considered her working environment abusive. This is especially true where the harassment comes from an individual who is terminated as soon as his misdeeds come to light.

Brooks next attempts to morph Selvaggio's single assault into a course of conduct by claiming that each of his improper touchings constituted a separate incident. While Selvaggio did touch Brooks inappropriately on her stomach and breast, this happened within the course of a few minutes and was part of a single episode. Additionally, Selvaggio had no chance to become bolder because

the city removed him from the workplace once his actions were uncovered. No reasonable woman in Brooks's position would believe that Selvaggio's misconduct had permanently altered the terms or conditions of her employment.

*925 [10] The single case Brooks cites to the contrary, Al-Dabbagh v. Greenpeace, Inc., 873 F.Supp. 1105, 1111 (N.D.Ill.1994), holds only that a plaintiff can demonstrate the subjective element of a hostile work environment claim based on a single incident, even though she lacked knowledge of the offender's past misconduct. Al-Dabbagh did not rely on the perpetrator's past misconduct to establish an objectively hostile working environment, except to the extent the employer failed to discipline him for incidents of which it had knowledge.[FN5] Even were we to assume that the city's knowledge is relevant to establishing a hostile work environment, but see note 5 supra, Selvaggio's conduct was not known to the city until after the assault. [FN6] Brooks therefore can rely only on the single instance of sexual harassment directed toward her to support her hostile work environment claim.

FN5. The objective portion of Al-Dabbagh's claim was based on the severity of the incident plus negligence on the part of the employer, Greenpeace:

Al-Dabbagh alleges that Greenpeace had turned a blind eye to Mitchell's sexual abuse of female employees in its Chicago office before she fell victim to it and consequently suffered grave bodily and psychological injury. As already stated, Greenpeace's single response to Mitchell's earlier conduct-an oral reprimand for his drinking-fell far short of addressing the more serious problems posed by his conduct. There is no question that those allegations, credited as they must be on the present motion, amply support the first (objective) element of a hostile-environment claim-the evaluation of Mitchell's conduct by a reasonable person.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.3d 917                                                                                                    Page 12

229 F.3d 917, 86 Fair Empl.Prac.Cas. (BNA) 1221, 00 Cal. Daily Op. Serv. 8503, 2000 Daily Journal D.A.R.
11,324
(Cite as: 229 F.3d 917)

*Al-Dabbagh*, 873 F.Supp. at 1111. It is unclear why past misconduct of which the complainant is unaware can contribute to a hostile work environment simply because the employer is negligent in disciplining the employee who committed the misconduct. The lack of sufficient discipline for an earlier and unknown act of misconduct does not, after all, make the later misconduct more severe or pervasive with respect to the harassed employee. Lack of adequate discipline might be a relevant consideration in assessing the employer's liability once a hostile work environment is shown to exist, but it seems to have no logical bearing on whether there is a hostile work environment in the first place.

FN6. Brooks claims that knowledge of Selvaggio's conduct can be imputed to the city because Pat P. knew of it (indeed was a victim) and was a supervisor by virtue of her position as a senior dispatcher. Brooks relies on *Lamb v. Household Credit Servs.*, 956 F.Supp. 1511 (N.D.Cal.1997), for the proposition that an employer is deemed to know of harassment of which a supervisor is aware.
The city also relies on *Lamb*. It points to language indicating that supervisors, as that term is defined for Title VII purposes, are only those who have authority to "hire, fire, or discipline employees, or recommend such action." *Id.* at 1517. It is undisputed that senior dispatchers lacked the authority to hire and fire dispatchers. While there is a vague reference to senior dispatchers assisting with disciplinary measures, this is not sufficient. *See id.* at 1517 (finding work flow supervisor with "limited set of purely ministerial employee training and monitoring" functions not to be a supervisor for Title VII purposes).
*Lamb* also provides for imputation where an employee who has "general responsibility for passing

employment-related complaints up the corporate hierarchy" receives a complaint of harassment. *See id.* at 1516 (citing *Llewellyn v. Celanese Corp.*, 693 F.Supp. 369, 380 (W.D.N.C.1988)). While senior dispatchers do have this responsibility, *Lamb* confines the responsibility of these non-management employees. *See id.* at 1517:
[F]or purposes of Title VII, " management-level employees" encompass . .. non-management employees charged with substantial responsibility for relaying employee complaints to management, particularly where management is located away from the workplace. If a co-worker has knowledge of a harassee's complaint, but that co-worker lacks authority to counsel, investigate, suspend, or fire the accused harasser, or to change the conditions of the harassee's employment, the co-worker's inaction does not spark employer liability unless that co-worker has an official or strong de facto duty to act as a conduit to management for complaints about work conditions.
Because Pat P., as a Senior Dispatcher, lacked power to change the conditions of employment, did not serve as a conduit to off-site managers and never actually received a formal complaint about Selvaggio, her knowledge of his conduct cannot be imputed to the city.

[11] We need not decide whether a single instance of sexual harassment can ever be sufficient to establish a hostile *926 work environment.[FN7] As we have previously held, "the required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct." *Ellison*, 924 F.2d at 878 (citing *King v. Board of Regents*, 898 F.2d 533, 537 (7th Cir.1990)). If a single incident can ever suffice to support a hostile work environment claim, the incident must be extremely severe. *See* EEOC Policy Guide, page 6 *supra*, at 405:6690-91 ("[A] single unusually severe incident of harassment may be sufficient to constitute a Title VII violation; the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.3d 917                                                                                                          Page 13

229 F.3d 917, 86 Fair Empl.Prac.Cas. (BNA) 1221, 00 Cal. Daily Op. Serv. 8503, 2000 Daily Journal D.A.R. 11,324
(Cite as: 229 F.3d 917)

more severe the harassment, the less need to show a repetitive series of incidents. This is particularly true when the harassment is physical."). In *Al-Dabbagh,* a single incident was held to be sufficient where the assailant "slapped [plaintiff], tore off her shirt, beat her, hit her on the head with a radio, choked her with a phone cord and ultimately forced her to have sex with him." *Al-Dabbagh,* 873 F.Supp. at 1108. The perpetrator held the victim captive overnight; when she finally managed to escape, she had to be hospitalized for her injuries. *See id.*

> FN7. *See Brown v. Hot, Sexy & Safer Prods., Inc.,* 68 F.3d 525, 541 n. 13 (1st Cir.1995) ("We do not hold that a one-time episode is *per se* incapable of sustaining a hostile environment claim. The frequency of the alleged harassment is a significant factor, but only one of many to be considered in determining whether the conduct was sufficiently severe or pervasive that a reasonable person would find that it had rendered the environment hostile or abusive.") (internal quotation marks omitted).

[12][13] If the incident here were as severe as that in *Al-Dabbagh,* we would have to grapple with the difficult question whether a single incident can so permeate the workplace as to support a hostile work environment claim. Because the incident here was much less severe, we need not answer that question. Brooks did not allege that she sought or needed hospitalization; indeed, she did not suffer any physical injuries at all. The brief encounter between Brooks and Selvaggio was highly offensive, but nothing like the ordeal suffered by the unfortunate young woman in *Al-Dabbagh,* who was held captive from evening until early the next morning. Utilizing the *Harris* factors of frequency, severity and intensity of interference with working conditions, we cannot say that a reasonable woman in Brooks's position would consider the terms and conditions of her employment altered by Selvaggio's actions. [FN8] Brooks was harassed on a single occasion for a matter of minutes in a way

that did not impair her ability to do her job in the long-term, especially given that the city took prompt steps to remove Selvaggio from the workplace.

> FN8. *But see* EEOC Policy Guide, page 6 *supra,* at 405:6691 ("The Commission will presume that the unwelcome, intentional touching of a charging party's intimate body areas is sufficiently offensive to alter the conditions of her working environment and constitute a violation of Title VII.") We are not convinced that such a presumption is consistent with the Supreme Court's totality of the circumstances test approach in *Harris.* Nevertheless, even were we to adopt this presumption, the brief duration of the incident coupled with the city's effective remedial action would suffice to rebut it.

Selvaggio's conduct is akin to that reported in cases where plaintiff was held *not* to have alleged harassment severe enough to support a hostile work environment claim. *See, e.g., Candelore v. Clark County Sanitation Dist.,* 975 F.2d 588, 590 (9th Cir.1992) (per curiam) ("[I]solated incidents of sexual horseplay alleged by Candelore took place over a period of years and were not so egregious as to render Candelore's work environment 'hostile.' ") (quoting *Jordan v. Clark,* 847 F.2d 1368, 1374-75 (9th Cir.1988)); *Del Valle Fontanez v. Aponte,* 660 F.Supp. 145, 146-47, 149 (D.P.R.1987) (finding a single incident where defendant "pressed [plaintiff] against the door with his body" and plaintiff "felt defendant's erect sexual organ against her body" twice in a five minute period not severe or pervasive enough to create a hostile working environment); *927 see also Saxton v. American Tel. & Telegraph Co.,* 10 F.3d 526, 528, 534 (7th Cir.1993) (finding insufficient harassment to constitute a hostile work environment where plaintiff was rubbed and kissed on one occasion, and resisted an attempted groping on another).

*Ellison* is not to the contrary. Ellison alleged a sustained campaign of harassing conduct directed at

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.3d 917                                                                                                Page 14

229 F.3d 917, 86 Fair Empl.Prac.Cas. (BNA) 1221, 00 Cal. Daily Op. Serv. 8503, 2000 Daily Journal D.A.R.
11,324
(Cite as: 229 F.3d 917)

her. *See Ellison*, 924 F.2d at 873-75 (recounting alleged harassment including love letters and date requests after plaintiff made it known that advances were unwelcome). Additionally, the course of conduct alleged by Ellison became more intense over time. Gray, the harasser, started by asking Ellison out a few times. He then sent her a brief love note followed by two letters. One of these comprised three single-spaced typed pages, and the other was sent after Gray had been told by his supervisors to cease his behavior. *See id.* Because Gray had continually ratcheted up the intensity of his advances, a reasonable woman could fear that this pattern would continue for as long as they were working in the same office. Nor did Ellison's employer effectively address Gray's behavior. After a brief transfer, Gray was again assigned to work with Ellison. Ellison's working environment, characterized by a pattern of increasingly intense sexual advances from a co-worker and inadequate employer responses to her complaints, could cause a reasonable woman to believe that tolerating harassing behavior had become a term or condition of her employment.

[14][15] Our holding in no way condones Selvaggio's actions. Quite the opposite: The conduct of which Brooks complains was highly reprehensible. But, while Selvaggio clearly harassed Brooks as she tried to do her job, "not all workplace conduct that may be described as harassment affects a term, condition, or privilege of employment within the meaning of Title VII." *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (internal quotation marks and citation omitted). The harassment here was an entirely isolated incident. It had no precursors, and it was never repeated. In no sense can it be said that the city imposed upon Brooks the onerous terms of employment for which Title VII offers a remedy.[FN9] *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) ("[T]hese standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.' ") (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)). We therefore

affirm the district court's grant of summary judgment with respect to Brooks's hostile work environment claims under Title VII and FEHA. [FN10]

FN9. A different question would arise if Selvaggio were Brooks's supervisor, rather than her co-worker. Because the employer cloaks the supervisor with authority, we ordinarily attribute the supervisor's conduct directly to the employer. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). Thus, a sexual assault by a supervisor, even on a single occasion, may well be sufficiently severe so as to alter the conditions of employment and give rise to a hostile work environment claim.

FN10. Brooks also argues that the city is liable for its failure to take remedial steps once it had knowledge, through Pat P., of Selvaggio's prior offending conduct. She relies on *Fuller v. City of Oakland*, 47 F.3d 1522 (9th Cir.1995), to support her claim. But, as we have noted, senior dispatchers are not supervisors whose knowledge can be imputed to the city. *See* note 6 *supra.* In any case, *Fuller* does not establish a cause of action that is separate from that for a hostile work environment or quid pro quo harassment. It simply defines the liability of employers. "[I]f a hostile work environment exists, an employer is only liable for failing to remedy harassment of which it knows or should know." *Id.* at 1527 (quoting *Ellison*, 924 F.2d at 881). As there was no actionable sexual harassment, there is no liability to assign to the city.

### Retaliation

Six months after Selvaggio assaulted her, Brooks returned to work. While Selvaggio*928 had resigned under threat of termination, Brooks claims

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.3d 917                                                                    Page 15

229 F.3d 917, 86 Fair Empl.Prac.Cas. (BNA) 1221, 00 Cal. Daily Op. Serv. 8503, 2000 Daily Journal D.A.R.
11,324
(Cite as: 229 F.3d 917)

she returned to a very different workplace than the one she had left. Brooks initially noticed that her coworkers shunned her. Specifically, the males in the office refused to speak to her about anything other than work. She also saw pictures of Selvaggio in the Dispatch Center photo album, which were removed on her demand. Additionally, the city took its full 90 days to process Brooks's worker's compensation claim. Later, she was required to attend group therapy sessions and discuss the incident in front of coworkers. She had problems getting the shift she had when she took her leave of absence; was assigned to work with another dispatcher, Mike C., who had been close to Selvaggio and allegedly became openly hostile to Brooks; and had difficulty securing vacation time. According to Brooks, this treatment culminated in an unfavorable job evaluation.

[16] We recently set out the peculiar dynamics of a retaliation claim under Title VII in *Payne v. Norwest Corp.*, 113 F.3d 1079 (9th Cir.1997). We noted that a plaintiff must show (1) involvement in a protected activity, (2) an adverse employment action and (3) a causal link between the two. *See id.* at 1080. Thereafter, the burden of production shifts to the employer to present legitimate reasons for the adverse employment action. Once the employer carries this burden, plaintiff must demonstrate a genuine issue of material fact as to whether the reason advanced by the employer was a pretext. *See id.* Only then does the case proceed beyond the summary judgment stage. We examine FEHA claims under the same burden-shifting structure. *See Flait v. North Am. Watch Corp.*, 3 Cal.App.4th 467, 476, 4 Cal.Rptr.2d 522 (Cal.Ct.App.1992).

[17] Asserting one's civil rights, as Brooks did by complaining of Selvaggio's conduct, is a protected activity under Title VII and FEHA. *See EEOC v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1013 (9th Cir.1983); *Blom v. N.G.K. Spark Plugs (USA), Inc.*, 3 Cal.App.4th 382, 388, 4 Cal.Rptr.2d 139 (Cal.Ct.App.1992). Brooks's complaint about Selvaggio's harassment thus satisfies the first step of our inquiry.

[18] The next question is whether Brooks alleged that she was subjected to an adverse employment action. In *Strother v. Southern Cal. Permanente Med. Group*, 79 F.3d 859 (9th Cir.1996), we noted that "[n]ot every employment decision amounts to an adverse employment action." *Id.* at 869. We recognize the countervailing concerns in this area of the law. On the one hand, we worry that employers will be paralyzed into inaction once an employee has lodged a complaint under Title VII, making such a complaint tantamount to a "get out of jail free " card for employees engaged in job misconduct. On the other hand, we are concerned about the chilling effect on employee complaints resulting from an employer's retaliatory actions. In an effort to strike the proper balance, we have held that only non-trivial employment actions that would deter reasonable employees from complaining about Title VII violations will constitute actionable retaliation. *See Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir.2000) ("[A]n action is cognizable as an adverse employment action if it is reasonably likely to deter employees from engaging in protected activity.").

Among those employment decisions that can constitute an adverse employment action are termination, dissemination of a negative employment reference, issuance of an undeserved negative performance review and refusal to consider for promotion.[FN11] By contrast, we have held that declining to hold a job open for *929 an employee and badmouthing an employee outside the job reference context do not constitute adverse employment actions.[FN12] With these principles in mind, we examine Brooks's allegations of retaliatory treatment by the city.

FN11. *See O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 763 (9th Cir.1996) (termination); *Hashimoto v. Dalton*, 118 F.3d 671, 676 (9th Cir.1997) (negative reference); *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir.1987) (negative performance reviews); *Ruggles v. California Polytechnic State Univ.*, 797 F.2d 782, 786 (9th Cir.1986) (refusing to consider for promotion).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.3d 917

Page 16

229 F.3d 917, 86 Fair Empl.Prac.Cas. (BNA) 1221, 00 Cal. Daily Op. Serv. 8503, 2000 Daily Journal D.A.R. 11,324
(Cite as: 229 F.3d 917)

FN12. *See McAlindin v. County of San Diego,* 192 F.3d 1226, 1238-39 (9th Cir.1999) (refusing to hold job open for employee); *Nunez v. City of Los Angeles,* 147 F.3d 867, 875 (9th Cir.1998) (badmouthing).

[19] Because an employer cannot force employees to socialize with one another, ostracism suffered at the hands of coworkers cannot constitute an adverse employment action. *See Strother,* 79 F.3d at 869 (" [M]ere ostracism in the workplace is not enough to show an adverse employment decision.") (citing *Fisher v. San Pedro Peninsula Hosp.,* 214 Cal.App.3d 590, 615, 262 Cal.Rptr. 842 (Cal.Ct.App.1989)). Indeed, holding an employer liable because its employees refuse to associate with each other might well be unconstitutional: "The First Amendment prevents the government, except in the most compelling circumstances, from wielding its power to interfere with its employees' freedom to believe and associate." *DiRuzza v. County of Tehama,* 206 F.3d 1304, 1308 (9th Cir.2000) (quoting *Rutan v. Republican Party of Ill.,* 497 U.S. 62, 76, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990)).

[20] The group therapy sessions about which Brooks complains were workshops designed to better inform the city's workforce of its sexual harassment policy. Brooks does not claim she was singled out for the sessions, as all city employees were required to participate in them. Her complaint seems to boil down to the non-private character of the sessions. But the employer has an interest in educating its employees about the adverse effects of misconduct that has occurred in the workplace. An employer's legitimate effort to deal with a traumatic workplace situation and educate its employees regarding sexual harassment cannot be the basis for a retaliation claim under Title VII.

[21][22] Next, we turn to Brooks's claims that she was scheduled with a co-worker, Mike C., who was openly hostile to her. While this might be an adverse employment action under certain circumstances, the undisputed facts demonstrate

that it was not here. Brooks was never scheduled to work with Mike C. He was sometimes on the dispatch floor when she worked, but Brooks has presented no evidence that the city put the two of them together knowing that Brooks would be uncomfortable. Nor did Brooks present evidence that Mike C. was openly hostile, or hostile at all, toward her. She admits that he showed her no animus, nor did he express skepticism to her about her account as to what happened with Selvaggio. While it appears that Mike C. had been friendly with Selvaggio, a victim of sexual harassment is not entitled to avoid contact with the harasser's friends. So long as they show no outward signs of hostility, they are entitled to continue doing their jobs even though it brings them in contact with the victim.

[23] As for the fact that the city used all of its allotted 90 days to process the worker's compensation claim, Brooks offers no evidence that the city treated her differently from other employees seeking workers' compensation benefits. Absent a showing of disparate treatment, the city's delay cannot be deemed retaliatory.

[24] Brooks also alleges that her performance review was downgraded from "satisfactory" to " needs improvement" because of her complaint about Selvaggio. We have previously held that an undeserved negative performance review can constitute an adverse employment action. *See Yartzoff,* 809 F.2d at 1376 ("Transfers of job duties and undeserved performance ratings, if proven, would constitute 'adverse employment decisions' cognizable under [Title VII].") (citation omitted). Nevertheless, the evaluation here *930 was not an adverse employment action because it was subject to modification by the city. Brooks refused to accept the review and appealed, but she abandoned her job while the appeal was pending. Because the evaluation could well have been changed on appeal, it was not sufficiently final to constitute an adverse employment action. *Cf. Dobbs-Weinstein v. Vanderbilt Univ.,* 185 F.3d 542, 546 (6th Cir.1999) ("Dobbs-Weinstein succeeded in the grievance process, and Vanderbilt's final decision was to grant her tenure. She has not here suffered a final or lasting adverse employment action sufficient to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

229 F.3d 917                                                                                           Page 17

229 F.3d 917, 86 Fair Empl.Prac.Cas. (BNA) 1221, 00 Cal. Daily Op. Serv. 8503, 2000 Daily Journal D.A.R. 11,324
(Cite as: 229 F.3d 917)

create a prima facie case of employment discrimination under Title VII. To rule otherwise would be to encourage litigation before the employer has an opportunity to correct through internal grievance procedures any wrong it may have committed.").

[25][26] Finally, Brooks claims that the city rescheduled her to an unfavorable shift and denied her vacation preference. However, like the evaluation, these actions were not final. When Brooks complained, the city accommodated her preferences by allowing her to switch shifts and vacation dates with other employees.[FN13] The district court did not err in rejecting Brooks's retaliation claim.

>    FN13. Brooks also alleges that, after she complained about Selvaggio, certain police officers refused to provide her services that were routinely provided to other dispatchers. However, the police did not employ Brooks and cannot be held liable for retaliating against her. See City of Los Angeles, Dept. of Water & Power v. Manhart, 435 U.S. 702, 718 n. 33, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978) ("Title VII ... primarily govern[s] relations between employees and their employer, not between employees and third parties.").

### III

[27] Brooks alludes briefly in her moving papers to a constructive discharge theory citing *Turner v. Anheuser-Busch, Inc.,* 7 Cal.4th 1238, 32 Cal.Rptr.2d 223, 876 P.2d 1022 (1994), and *Watson v. Nationwide Ins., Co.,* 823 F.2d 360 (9th Cir.1987). As explained in *Turner,* constructive discharge occurs when the working conditions deteriorate, as a result of discrimination, to the point that they become "sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer." *Turner,* 7 Cal.4th at 1246, 32 Cal.Rptr.2d 223, 876 P.2d 1022; *see also Watson,*

823 F.2d at 361 (noting that constructive discharge is found where a working environment is "so intolerable and discriminatory as to justify a reasonable employee's decision [to leave]"); EEOC Policy Guide, page 6 *supra,* at 405:6693 ("[A]n employer is liable for constructive discharge when it imposes intolerable working conditions [which] foreseeably would compel a reasonable employee to quit....").

[28] Brooks's complaints about her working conditions range from the trivial, such as issues with the pictures of Selvaggio in the dispatch center photo album, to the routine, such as scheduling conflicts. Taken collectively, these circumstances are not sufficiently extraordinary or egregious to amount to a constructive discharge.

[29] While *Watson* holds that the determination of whether working conditions are sufficiently egregious to support a constructive discharge theory is usually a jury question, *see Watson,* 823 F.2d at 361, the district court did not err in deciding that Brooks's claim fails as a matter of law. Taking the evidence in the light most favorable to Brooks, we cannot see how a reasonable trier of fact could find that she was driven from the workplace. Where a plaintiff fails to demonstrate the severe or pervasive harassment necessary to support a hostile work environment claim, it will be impossible for her to meet the higher standard of constructive discharge: conditions so intolerable that a reasonable person would leave the job. *Cf. Thomas v. Douglas,* 877 F.2d 1428, 1434 (9th Cir.1989) (constructive discharge requires some aggravating*931 factors, such as a continuous pattern of discriminatory treatment).

**AFFIRMED.**

C.A.9 (Cal.),2000.
Brooks v. City of San Mateo
229 F.3d 917, 86 Fair Empl.Prac.Cas. (BNA) 1221, 00 Cal. Daily Op. Serv. 8503, 2000 Daily Journal D.A.R. 11,324

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**3**

Westlaw.

121 S.Ct. 1508    Page 1

532 U.S. 268, 121 S.Ct. 1508, 85 Fair Empl.Prac.Cas. (BNA) 730, 80 Empl. Prac. Dec. P 40,442, 149 L.Ed.2d
509, 69 USLW 3681, 69 USLW 3684, 152 Ed. Law Rep. 492, 01 Cal. Daily Op. Serv. 3153, 2001 Daily Journal
D.A.R. 3893
(Cite as: 532 U.S. 268, 121 S.Ct. 1508)

▷
Clark County School Dist. v. Breeden
U.S.,2001.

Supreme Court of the United States
CLARK COUNTY SCHOOL DISTRICT,
Petitioner,
v.
Shirley A. BREEDEN, Respondent.
No. 00-866.

April 23, 2001.Rehearing Denied June 11, 2001.
See 533 U.S. 912, 121 S.Ct. 2264.

School district employee sued district under Title
VII, alleging retaliation for engaging in protected
activities. The United States District Court for the
District of Nevada, Hagen, J., granted summary
judgment for district. The Ninth Circuit Court of
Appeals, 232 F.3d 893, reversed. On grant of
petition for writ of certiorari, the Supreme Court
held that: (1) no reasonable person could have
believed that single incident of alleged sexual
harassment violated Title VII, precluding retaliation
claim based on employee's internal complaints
about incident, and (2) fact that Equal Employment
Opportunity    Commission    (EEOC)    issued
right-to-sue letter to employee three months before
employee's    supervisor    announced    she    was
contemplating employee's transfer was insufficient
to establish causation element of retaliation claim.

Reversed.
West Headnotes
[1] Civil Rights 78 ☞1185

78 Civil Rights
    78II Employment Practices
        78k1181    ·    Sexual    Harassment;    Work
Environment
            78k1185    k.    Hostile    Environment;
Severity, Pervasiveness, and Frequency. Most Cited

Cases
    (Formerly 78k167)
Sexual harassment is actionable under Title VII
only if it is so severe or pervasive as to alter
conditions of victim's employment and create an
abusive working environment. Civil Rights Act of
1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1).

[2] Civil Rights 78 ☞1185

78 Civil Rights
    78II Employment Practices
        78k1181    Sexual    Harassment;    Work
Environment
            78k1185    k.    Hostile    Environment;
Severity, Pervasiveness, and Frequency. Most Cited
Cases
    (Formerly 78k167)
Factors in whether workplace environment is
sufficiently hostile or abuse to support sexual
harassment claim under Title VII include frequency
of discriminatory conduct, its severity, whether it is
physically threatening or humiliating or a mere
offensive utterance, and whether it unreasonably
interferes with employee's work performance. Civil
Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. §
2000e-2(a)(1).

[3] Civil Rights 78 ☞1244

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1244 k. Activities Protected. Most
Cited Cases

Schools 345 ☞63(1)

345 Schools
    345II Public Schools
        345II(C) Government, Officers, and District
Meetings

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

121 S.Ct. 1508                                                                    Page 2

532 U.S. 268, 121 S.Ct. 1508, 85 Fair Empl.Prac.Cas. (BNA) 730, 80 Empl. Prac. Dec. P 40,442, 149 L.Ed.2d
509, 69 USLW 3681, 69 USLW 3684, 152 Ed. Law Rep. 492, 01 Cal. Daily Op. Serv. 3153, 2001 Daily Journal
D.A.R. 3893
(Cite as: 532 U.S. 268, 121 S.Ct. 1508)

345k63 District and Other Local Officers
    345k63(1)    k.    Appointment,
Qualification, and Tenure. Most Cited Cases
No reasonable person could have believed that Title
VII sex discrimination provision was implicated by
single incident during school district's review of job
applicants' profiles, in which male supervisor, in
presence of one male and one female employee who
were also participating in review, read aloud
sexually explicit statement attributed to one
applicant, stated that he did not know what it meant,
and was told by male employee, "I'll tell you later,"
at which both men laughed; thus, incident did not
support female employee's Title VII retaliation
claim alleging that adverse actions followed her
internal complaints about exchange. Civil Rights
Act of 1964, §§ 703(a)(1), 704(a), 42 U.S.C.A. §§
2000e-2(a)(1), 2000e-3(a).

[4] Civil Rights 78 ⇐1252

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1252 k. Causal Connection; Temporal
Proximity. Most Cited Cases

Schools 345 ⇐63(1)

345 Schools
    345II Public Schools
        345II(C) Government, Officers, and District
Meetings
            345k63 District and Other Local Officers
                345k63(1)    k.    Appointment,
Qualification, and Tenure. Most Cited Cases
Fact that school district was contemplating
employee's transfer prior to learning of employee's
Title VII sexual harassment complaint against
district rendered immaterial, in employee's action
alleging retaliation for filing of complaint, fact that
transfer was carried out one month after district
learned of complaint. Civil Rights Act of 1964, §§
703(a)(1), 704(a), 42 U.S.C.A. §§ 2000e-2(a)(1),
2000e-3(a).

[5] Civil Rights 78 ⇐1252

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1252 k. Causal Connection; Temporal
Proximity. Most Cited Cases

Schools 345 ⇐63(1)

345 Schools
    345II Public Schools
        345II(C) Government, Officers, and District
Meetings
            345k63 District and Other Local Officers
                345k63(1)    k.    Appointment,
Qualification, and Tenure. Most Cited Cases
Fact that Equal Employment Opportunity
Commission (EEOC) issued right-to-sue letter to
school district employee three months before
employee's supervisor announced she was
contemplating employee's transfer was insufficient
to establish causation element of employee's Title
VII retaliation action; if supervisor was presumed
to know about letter, supervisor also had to be
presumed to know about filing of original EEOC
complaint 20 months earlier. Civil Rights Act of
1964, §§ 703(a)(1), 704(a), 706(b, e), 42 U.S.C.A. §
§ 2000e-2(a)(1), 2000e-3(a), 2000e-5(b, e); 29
C.F.R. § 1601.14.

**1509 Carol Davis Zucker, Kamer, Zucker &
Abbott, Las Vegas, Nevada, Kathy M. Banke,
Crosby, Heafey, Roach & May, Oakland,
California, for Petitioner.
Richard Segerblom, Las Vegas, Nevada, for
Respondent.
*269 PER CURIAM.
Under Title VII of the Civil Rights Act of 1964, 78
Stat. 255, as amended, 42 U.S.C. § 2000e-3(a), it is
unlawful "for an employer to discriminate against
any of his employees ... because [the employee] has
opposed any practice made an unlawful
employment practice by [Title VII], or because [the
employee] has made a charge, testified, assisted, or
participated in any manner in an investigation,
proceeding, or hearing under [Title VII]." In 1997,
respondent filed a § 2000e-3(a) retaliation claim

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

121 S.Ct. 1508                                                                                                   Page 3

532 U.S. 268, 121 S.Ct. 1508, 85 Fair Empl.Prac.Cas. (BNA) 730, 80 Empl. Prac. Dec. P 40,442, 149 L.Ed.2d 509, 69 USLW 3681, 69 USLW 3684, 152 Ed. Law Rep. 492, 01 Cal. Daily Op. Serv. 3153, 2001 Daily Journal D.A.R. 3893
(Cite as: 532 U.S. 268, 121 S.Ct. 1508)

against petitioner Clark County School District. The claim as eventually amended alleged that petitioner had taken two separate adverse employment actions against her in response to two different protected activities in which she had engaged. The District Court granted summary judgment to petitioner, No. CV-S-97-365-DWH(RJJ) (D.Nev., Feb. 9, 1999), but a panel of the Court of Appeals for the Ninth Circuit reversed over the dissent of Judge Fernandez, No. 99-15522, 2000 WL 991821 (July 19, 2000) *(per curiam)* (unpublished), judgt. order reported at 232 F.3d 893. We grant the writ of certiorari and reverse.

On October 21, 1994, respondent's male supervisor met with respondent and another male employee to review the psychological evaluation reports of four job applicants. The report for one of the applicants disclosed that the applicant had once commented to a co-worker, "I hear making love to you is like making love to the Grand Canyon." Brief in Opposition 3. At the meeting respondent's supervisor read the comment aloud, looked at respondent and stated, "I don't know what that means." *Ibid.* The other employee then said, "Well, I'll tell you later," and both men chuckled. *Ibid.* Respondent later complained about the comment to the offending employee, to Assistant Superintendent George Ann Rice, the employee's supervisor, and to another assistant *270 superintendent of petitioner. Her first claim of retaliation asserts that she was punished for these complaints.

The Court of Appeals for the Ninth Circuit has applied § 2000e-3(a) to protect employee " oppos[ition]" not just to practices that are actually " made ... unlawful" by Title VII, but also to practices that the employee could reasonably believe were unlawful. 2000 WL 991821, at *1 (stating that respondent's opposition was protected "if she had a reasonable, good faith belief that the incident involving the sexually explicit remark constituted unlawful sexual harassment"); *Trent v. Valley Electric Assn. Inc.,* 41 F.3d 524, 526 (C.A.9 1994). We have no occasion to rule on the propriety of this interpretation, because even assuming it is

correct, no one could reasonably believe that the incident recounted above violated Title VII.

[1][2] Title VII forbids actions taken on the basis of sex that "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a)(1). Just three Terms ago, we reiterated, what was plain from our previous decisions, that sexual harassment is actionable under Title VII only if it is "so 'severe or pervasive' as to 'alter the conditions of [the victim's] employment and create an abusive working environment.' " *Faragher v. Boca Raton,* 524 U.S. 775, 786, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (quoting *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (some internal quotation marks omitted)). See also *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 752, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (Only harassing conduct that is "severe or pervasive" can produce a "constructive alteratio[n] in the **1510 terms or conditions of employment"); *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (Title VII "forbids only behavior so objectively offensive as to alter the 'conditions' of the victim's employment"). Workplace conduct is not measured in isolation; instead, "whether an environment is sufficiently hostile or abusive" must be judged "by 'looking at all the circumstances,' including the 'frequency of the discriminatory*271 conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' " *Faragher v. Boca Raton, supra,* at 787-788, 118 S.Ct. 2275 (quoting *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). Hence, "[a] recurring point in [our] opinions is that simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the ' terms and. conditions of employment.' " *Faragher v. Boca Raton, supra,* at 788, 118 S.Ct. 2275 (citation and internal quotation marks omitted).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

121 S.Ct. 1508

Page 4

532 U.S. 268, 121 S.Ct. 1508, 85 Fair Empl.Prac.Cas. (BNA) 730, 80 Empl. Prac. Dec. P 40,442, 149 L.Ed.2d
509, 69 USLW 3681, 69 USLW 3684, 152 Ed. Law Rep. 492, 01 Cal. Daily Op. Serv. 3153, 2001 Daily Journal
D.A.R. 3893
(Cite as: 532 U.S. 268, 121 S.Ct. 1508)

[3] No reasonable person could have believed that the single incident recounted above violated Title VII's standard. The ordinary terms and conditions of respondent's job required her to review the sexually explicit statement in the course of screening job applicants. Her co-workers who participated in the hiring process were subject to the same requirement, and indeed, in the District Court respondent "conceded that it did not bother or upset her" to read the statement in the file. App. to Pet. for Cert. 15 (District Court opinion). Her supervisor's comment, made at a meeting to review the application, that he did not know what the statement meant; her co-worker's responding comment; and the chuckling of both are at worst an "isolated inciden[t]" that cannot remotely be considered "extremely serious," as our cases require, *Faragher v. Boca Raton, supra,* at 788, 118 S.Ct. 2275. The holding of the Court of Appeals to the contrary must be reversed.

[4] Besides claiming that she was punished for complaining to petitioner's personnel about the alleged sexual harassment, respondent also claimed that she was punished for filing charges against petitioner with the Nevada Equal Rights Commission and the Equal Employment Opportunity Commission (EEOC) and for filing the present suit. Respondent filed her lawsuit on April 1, 1997; on April 10, 1997, respondent's supervisor, Assistant Superintendent Rice, " mentioned *272 to Allin Chandler, Executive Director of plaintiff's union, that she was contemplating transferring plaintiff to the position of Director of Professional Development Education, " App. to Pet. for Cert. 11-12 (District Court opinion); and this transfer was "carried through" in May, Brief in Opposition 8. In order to show, as her defense against summary judgment required, the existence of a causal connection between her protected activities and the transfer, respondent " relie[d] wholly on the temporal proximity of the filing of her complaint on April 1, 1997 and Rice's statement to plaintiff's union representative on April 10, 1997 that she was considering transferring plaintiff to the [new] position." App. to Pet. for Cert. 21-22 (District Court opinion). The District

Court, however, found that respondent did not serve petitioner with the summons and complaint until April 11, 1997, one day *after* Rice had made the statement, and Rice filed an affidavit stating that she did not become aware of the lawsuit until after April 11, a claim that respondent did not challenge. Hence, the court concluded, respondent "ha[d] not shown that any causal connection exists between her protected activities and the adverse employment decision." *Id.,* at 21.

The Court of Appeals reversed, relying on two facts: The EEOC had issued a right-to-sue letter to respondent three months before Rice announced she was contemplating the transfer, and the actual **1511 transfer occurred one month after Rice learned of respondent's suit. 2000 WL 991821, at *3. The latter fact is immaterial in light of the fact that petitioner concededly was contemplating the transfer before it learned of the suit. Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality.

[5] As for the right-to-sue letter: Respondent did not rely on that letter in the District Court and did not mention it in *273 her opening brief on appeal. Her demonstration of causality all along had rested upon the connection between the transfer and the filing of her lawsuit-to which connection the letter was irrelevant. When, however, petitioner's answering brief in the Court of Appeals demonstrated conclusively the lack of causation between the filing of respondent's lawsuit and Rice's decision, respondent mentioned the letter for the first time in her reply brief, Reply Brief in No. 99-15522(CA9) pp. 9-10. The Ninth Circuit's opinion did not adopt respondent's utterly implausible suggestion that the *EEOC's* issuance of a right-to-sue letter-an action in which the employee takes no part-is a protected activity of the employee, see 42 U.S.C. § 2000e-3(a). Rather, the opinion suggests that the letter provided petitioner with its first notice of respondent's charge before the EEOC, and hence allowed the inference that the transfer

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

121 S.Ct. 1508

Page 5

532 U.S. 268, 121 S.Ct. 1508, 85 Fair Empl.Prac.Cas. (BNA) 730, 80 Empl. Prac. Dec. P 40,442, 149 L.Ed.2d 509, 69 USLW 3681, 69 USLW 3684, 152 Ed. Law Rep. 492, 01 Cal. Daily Op. Serv. 3153, 2001 Daily Journal D.A.R. 3893
(Cite as: 532 U.S. 268, 121 S.Ct. 1508)

proposal made three months later was petitioner's reaction to the charge. See 2000 WL 991821, at *3. This will not do.

First, there is no indication that Rice even knew about the right-to-sue letter when she proposed transferring respondent. And second, if one presumes she knew about it, one must also presume that she (or her predecessor) knew *almost two years earlier* about the protected action (filing of the EEOC complaint) that the letter supposedly disclosed. (The complaint had been filed on August 23, 1995, and both Title VII and its implementing regulations require that an employer be given notice within 10 days of filing, 42 U.S.C. §§ 2000e-5(b), (e)(1); 29 CFR § 1601.14 (2000).) The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be "very close," *O'Neal v. Ferguson Constr. Co.,* 237 F.3d 1248, 1253 (C.A.10 2001). See, *e.g., Richmond v. ONEOK, Inc.,* 120 F.3d 205, 209 (C.A.10 1997) (3-month period insufficient); *Hughes v. Derwinski,* 967 F.2d 1168, 1174-1175 (C.A.7 1992) *274 4-month period insufficient). Action taken (as here) 20 months later suggests, by itself, no causality at all.

In short, neither the grounds that respondent presented to the District Court, nor the ground she added on appeal, nor even the ground the Court of Appeals developed on its own, sufficed to establish a dispute substantial enough to withstand the motion for summary judgment. The District Court's granting of that motion was correct. The judgment of the Court of Appeals is reversed.

*It is so ordered.*

U.S.,2001.
Clark County School Dist. v. Breeden
532 U.S. 268, 121 S.Ct. 1508, 85 Fair Empl.Prac.Cas. (BNA) 730, 80 Empl. Prac. Dec. P 40,442, 149 L.Ed.2d 509, 69 USLW 3681, 69 USLW 3684, 152 Ed. Law Rep. 492, 01 Cal. Daily

Op. Serv. 3153, 2001 Daily Journal D.A.R. 3893

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**4**

Westlaw.

813 F.2d 1406

Page 1

813 F.2d 1406, 43 Fair Empl.Prac.Cas. (BNA) 870, 42 Empl. Prac. Dec. P 36,960, 55 USLW 2598, 106 Lab.Cas.
P 12,310
**(Cite as: 813 F.2d 1406)**

▷
Jurado v. Eleven-Fifty Corp.
C.A.9, 1987.

United States Court of Appeals,Ninth Circuit.
Valentine JURADO, aka Val Valentine,
Plaintiff-Appellant,
v.
ELEVEN-FIFTY CORPORATION, a Delaware
Corporation d.b.a. Radio Station KIIS-FM, Los
Angeles; the Pacific and Southern Company, Inc., a
Delaware Corporation; Combined Communications
Corporation, an Arizona Corporation; Gannett
Company, Inc., a Delaware Corporation,
Defendants-Appellees.
No. 86-5606.

Submitted on Briefs Jan. 8, 1987.
Decided April 2, 1987.

Terminated radio disc jockey sued radio station and
others for alleged violation of civil rights based on
race and national origin discrimination.
Defendants moved for summary judgment. The
United States District Court for the Central District
of California, 630 F.Supp. 569, William J. Rea, J.,
granted the motion. Plaintiff appealed. The Court
of Appeals, Wiggins, Circuit Judge, held that: (1)
plaintiff failed to establish prima facie disparate
treatment case; English-only order was motivated
by market, rather than racial, considerations; (2)
plaintiff failed to produce any evidence that he
engaged in any activity protected by Title VII from
retaliation by employer; (3) plaintiff's only basis for
disparate impact claim, that English-only order
somehow disproportionately disadvantaged
Hispanics, was without merit as applied to
employee who was fluently bilingual and could
easily conform to order; (4) district court correctly
dismissed § 1981 claims; and (5) district court
lacked jurisdiction over both claims for retaliation
in breach of collective bargaining agreement.

Affirmed.
West Headnotes
**[1] Civil Rights 78 ☞1535**

78 Civil Rights
    78IV Remedies Under Federal Employment
Discrimination Statutes
        78k1534 Presumptions, Inferences, and
Burden of Proof
            78k1535 k. In General. Most Cited Cases
        (Formerly 78k377.1, 78k377, 78k43)
In order for employee to prevail on Title VII claim
based on disparate treatment theory, employee had
to ultimately prove that employer intended to
discriminate against him in the dismissal. Civil
Rights Act of 1964, §§ 701-718, 42 U.S.C.A. §§
2000e to 2000e-17.

**[2] Civil Rights 78 ☞1545**

78 Civil Rights
    78IV Remedies Under Federal Employment
Discrimination Statutes
        78k1543 Weight and Sufficiency of Evidence
            78k1545 k. Prima Facie Case. Most Cited
Cases
        (Formerly 78k383, 78k44(1))
To establish prima facie case of disparate treatment,
employee must offer evidence that gives rise to
inference of unlawful discrimination. Civil Rights
Act of 1964, §§ 701-718, 42 U.S.C.A. §§ 2000e to
2000e-17.

**[3] Federal Civil Procedure 170A ☞2491.5**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2491.5 k. Civil Rights Cases in
General. Most Cited Cases
Failure to allege "sufficient facts" that establish
existence of prima facie case of disparate treatment

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

813 F.2d 1406, 43 Fair Empl.Prac.Cas. (BNA) 870, 42 Empl. Prac. Dec. P 36,960, 55 USLW 2598, 106 Lab.Cas.
P 12,310
(Cite as: 813 F.2d 1406)

renders grant of summary judgment appropriate. Civil Rights Act of 1964, §§ 701-718, 42 U.S.C.A. § § 2000e to 2000e-17; Fed.Rules Clv.Proc.Rule 56(e), 28 U.S.C.A.

[4] Civil Rights 78 ⊛⇒1545

78 Civil Rights
  78IV Remedies Under Federal Employment Discrimination Statutes
      78k1543 Weight and Sufficiency of Evidence
        78k1545 k. Prima Facie Case. Most Cited Cases
    (Formerly 78k383, 78k44(1))
Employee, who was fired for refusing to comply with employer's decision to change format of employee's radio program to English only, instead of English and Spanish, after employer assured employee of continued employment if employee complied, failed to establish prima facie disparate treatment case; English-only order was motivated by market, rather than racial, considerations. Civil Rights Act of 1964, §§ 701-718, 42 U.S.C.A. §§ 2000e to 2000e-17.

[5] Federal Civil Procedure 170A ⊛⇒2470.1

170A Federal Civil Procedure
  170AXVII Judgment
    170AXVII(C) Summary Judgment
      170AXVII(C)1 In General
        170Ak2465 Matters Affecting Right to Judgment
          170Ak2470.1 k. Materiality and Genuineness of Fact Issue. Most Cited Cases
Party opposing summary judgment cannot create genuine question of fact by contradicting his original prior sworn statement. Fed.Rules Civ.Proc.Rule 56(e), 28 U.S.C.A.

[6] Civil Rights 78 ⊛⇒1545

78 Civil Rights
  78IV Remedies Under Federal Employment Discrimination Statutes
      78k1543 Weight and Sufficiency of Evidence
        78k1545 k. Prima Facie Case. Most Cited Cases

(Formerly 78k383, 78k44(1))
Mere fact that radio station adopts format designed to entice target ethnic audience does not show racial animus in employment, for purpose of establishing prima facie disparate treatment case. Civil Rights Act of 1964, §§ 701-718, 42 U.S.C.A. §§ 2000e to 2000e-17.

[7] Civil Rights 78 ⊛⇒1120

78 Civil Rights
  78II Employment Practices
      78k1120 k. Particular Cases. Most Cited Cases
    (Formerly 78k142, 78k9.10)

Civil Rights 78 ⊛⇒1137

78 Civil Rights
  78II Employment Practices
      78k1137 k. Motive or Intent; Pretext. Most Cited Cases
    (Formerly 78k142, 78k9.10)
That employer permitted white employee to use Spanish on his radio program, but did not permit employee/radio announcer of Mexican-American and Native-American descent, who was bilingual in Spanish and English, to use Spanish on his program, did not suggest that employer intended to discriminate against latter employee; employer permitted former employee to use some Spanish because his program was popular, and not to place latter employee at some disadvantage, and two programs used different formats and had different audiences.

[8] Civil Rights 78 ⊛⇒1033(1)

78 Civil Rights
  78I Rights Protected and Discrimination Prohibited in General
      78k1030 Acts or Conduct Causing Deprivation
        78k1033 Discrimination in General
          78k1033(1) k. In General. Most Cited Cases
    (Formerly 78k111, 78k13.4(6))
Discriminatory motive cannot be divined by

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

813 F.2d 1406                                                                                          Page 3

813 F.2d 1406, 43 Fair Empl.Prac.Cas. (BNA) 870, 42 Empl. Prac. Dec. P 36,960, 55 USLW 2598, 106 Lab.Cas.
P 12,310
(Cite as: 813 F.2d 1406)

comparing individual decisions about dissimilar radio programs.

**[9] Civil Rights 78 ☞1118**

78 Civil Rights
    78II Employment Practices
        78k1118 k. Practices Prohibited or Required in General; Elements. Most Cited Cases
        (Formerly 78k142, 78k9.10)
Employer can properly enforce limited, reasonable and business-related English-only rule against employee who can readily comply with rule and who voluntarily chooses not to observe it as matter of individual preference.

**[10] Civil Rights 78 ☞1541**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1534 Presumptions, Inferences, and Burden of Proof
        78k1541 k. Retaliation Claims. Most Cited Cases
        (Formerly 255k34.1, 255k34 Master and Servant)
Order and allocation of proof for Title VII disparate treatment cases outlined in *McDonnell Douglas Corporation* governs actions for retaliatory discharge. Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e-3(a).

**[11] Civil Rights 78 ☞1243**

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
        78k1243 k. Practices Prohibited or Required in General; Elements. Most Cited Cases
        (Formerly 255k40(4) Master and Servant)
To establish prima facie case of discriminatory retaliation, employee had to show that he engaged in activity protected under Title VII, that his employer subjected him to adverse employment action, and that employer's action was causally linked to protected activity. Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e-3(a).

**[12] Civil Rights 78 ☞1244**

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
        78k1244 k. Activities Protected. Most Cited Cases
    (Formerly 255k30(6.10), 255k30(6.5) Master and Servant)
Employee need only reasonably believe that employer has engaged in unlawful employment practice, for purpose of establishing prima facie case of discriminatory retaliation. Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e-3(a).

**[13] Civil Rights 78 ☞1244**

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
        78k1244 k. Activities Protected. Most Cited Cases
    (Formerly 255k30(6.10) Master and Servant)
Although English-only order does not violate Title VII, opposition based on reasonable belief that order is discriminatory is protected. Civil Rights Act of 1964, §§ 701-718, 42 U.S.C.A. §§ 2000e to 2000e-17.

**[14] Civil Rights 78 ☞1244**

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
        78k1244 k. Activities Protected. Most Cited Cases
    (Formerly 255k40(4) Master and Servant)
Employee, who was fired for failing to comply with English-only order failed to produce any evidence that he engaged in any activity protected by Title VII from retaliation by employer; employee's concerns were based upon his fear for his personal " success" and his "numbers" and not his concern about discrimination against himself or other Hispanics. Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e-3(a).

**[15] Civil Rights 78 ☞1140**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

813 F.2d 1406

Page 4

813 F.2d 1406, 43 Fair Empl.Prac.Cas. (BNA) 870, 42 Empl. Prac. Dec. P 36,960, 55 USLW 2598, 106 Lab.Cas.
P 12,310
(Cite as: 813 F.2d 1406)

78 Civil Rights
   78II Employment Practices
      78k1140 k. Disparate Impact. Most Cited
Cases
   (Formerly 78k153, 78k9.10)
Disparate impact case involves facially neutral
employment practice that disproportionately
disadvantages one group as against another. Civil
Rights Act of 1964, §§ 701-718, 42 U.S.C.A. §§
2000e to 2000e-17.

[16] Civil Rights 78 ⌐➞1545

78 Civil Rights
   78IV Remedies Under Federal Employment
Discrimination Statutes
      78k1543 Weight and Sufficiency of Evidence
         78k1545 k. Prima Facie Case. Most Cited
Cases
   (Formerly 78k383, 78k44(1))
To establish prima facie case of disparate impact,
employee must identify employment practice that
has significant adverse impact on protected group,
but need not show that employer intended to
discriminate. Civil Rights Act of 1964, §§ 701-718,
42 U.S.C.A. §§ 2000e to 2000e-17.

[17] Civil Rights 78 ⌐➞1140

78 Civil Rights
   78II Employment Practices
      78k1140 k. Disparate Impact. Most Cited
Cases
   (Formerly 78k153, 78k9.10)
Employee's only basis for disparate impact claim,
that English-only order somehow disproportionately
disadvantaged Hispanics, was without merit as
applied to employee who was fluently bilingual and
could easily conform to order. Civil Rights Act of
1964, §§ 701-718, 42 U.S.C.A. §§ 2000e to
2000e-17.

[18] Civil Rights 78 ⌐➞1138

78 Civil Rights
   78II Employment Practices
      78k1138 k. Disparate Treatment. Most Cited
Cases

   (Formerly 78k153, 78k13.4(6))
As with Title VII disparate treatment and retaliation
actions, claims under § 1981 require proof of
intentional discrimination. Civil Rights Act of
1964, §§ 701-718, 42 U.S.C.A. §§ 2000e to
2000e-17; 42 U.S.C.A. § 1981.

[19] Federal Civil Procedure 170A ⌐➞1793.1

170A Federal Civil Procedure
   170AXI Dismissal
      170AXI(B) Involuntary Dismissal
         170AXI(B)4 Particular Actions,
Insufficiency of Pleadings in
         170Ak1793 Employees and
Employment Discrimination, Actions Involving
         170Ak1793.1 k. In General. Most
Cited Cases
   (Formerly 170Ak1793, 78k13.16)
District court correctly dismissed § 1981 claims of
employee who failed to put forth genuine issues of
fact regarding disparate treatment or retaliation
under Title VII. Civil Rights Act of 1964, §§
701-718, 42 U.S.C.A. §§ 2000e to 2000e-17; 42
U.S.C.A. § 1981.

[20] Labor and Employment 231H ⌐➞1352

231H Labor and Employment
   231HXII Labor Relations
      231HXII(F) Disputes and Concerted
Activities
         231HXII(F)1 In General
         231Hk1350 Activities of Individual
Employees
         231Hk1352 k. Particular Actions.
Most Cited Cases
   (Formerly 232Ak281 Labor Relations)
Employee's engaging in union negotiations and
voicing rights under collective bargaining
agreement were "concerted activities" protected by
National Labor Relations Act. Labor Management
Relations Act, 1947, § 301, 29 U.S.C.A. § 185;
National Labor Relations Act, §§ 7, 8(a)(1), as
amended, 29 U.S.C.A. §§ 157, 158(a)(1).

[21] Labor and Employment 231H ⌐➞1676(1)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

813 F.2d 1406                                                                      Page 5

813 F.2d 1406, 43 Fair Empl.Prac.Cas. (BNA) 870, 42 Empl. Prac. Dec. P 36,960, 55 USLW 2598, 106 Lab.Cas.
P 12,310
**(Cite as: 813 F.2d 1406)**

231H Labor and Employment
  231HXII Labor Relations
    231HXII(I) Labor Relations Boards and
Proceedings
      231HXII(I)1 In General
        231Hk1669 Exclusive, Concurrent, and
Conflicting Jurisdiction
          231Hk1676 Practices of Employer
            231Hk1676(1) k. In General.
Most Cited Cases
  (Formerly 232Ak510 Labor Relations)
Violations of employee's right to engage in
concerted activities are within exclusive jurisdiction
of National Labor Relations Board except when
activity is also arguably a breach of collective
bargaining agreement, in which case federal district
court has concurrent jurisdiction under Labor
Management Relations Act. Labor Management
Relations Act, 1947, § 301, 29 U.S.C.A. § 185;
National Labor Relations Act, §§ 7, 8(a)(1), as
amended, 29 U.S.C.A. §§ 157, 158(a)(1).

**[22] Federal Courts 170B ⟋202**

170B Federal Courts
  170BIII Federal Question Jurisdiction
    170BIII(C) Cases Arising Under Laws of the
United States
      170Bk201 Labor Relations
        170Bk202 k. Labor Contracts. Most
Cited Cases
District court lacked jurisdiction over both of radio
station employee's claims for retaliation in breach of
collective bargaining agreement; no provision of
agreement was breached by retaliation for engaging
in collective bargaining negotiations or for
demanding translation fees. Labor Management
Relations Act, 1947, § 301, 29 U.S.C.A. § 185;
National Labor Relations Act, §§ 7, 8(a)(1), as
amended, 29 U.S.C.A. §§ 157, 158(a)(1).

**\*1408** William A. Snyder, Irvine, Cal., for
plaintiff-appellant.
Robert L. Murphy, Leslie A. Swain, Diane J.
Crumpacker, Los Angeles, Cal., for
defendants-appellees.

Appeal from the United States District Court for the
Central District of California.

Before FERGUSON, BOOCHEVER and
WIGGINS, Circuit Judges.
WIGGINS, Circuit Judge:
Valentine Jurado appeals a summary judgment
denying his race and national origin discrimination
claims under 42 U.S.C. § 1981 (section 1981) and
Title VII of the Civil Rights Act of 1964 (Title VII),
42 U.S.C. §§ 2000e to e-17, and his claims for
breach of a collective bargaining agreement under
section 301 of the Labor Management Relations Act
(LMRA § 301), 29 U.S.C. § 185. Jurado's claims
stem from his discharge as a disc jockey by
defendant owners and operators of Los Angeles
radio station KIIS-FM (collectively "KIIS") after
KIIS told him to broadcast only in English. We
affirm.

FACTS

Jurado is a radio announcer of Mexican-American
and Native-American descent who is bilingual in
Spanish and English. He began performing as a
disc jockey at KIIS under the name "Val Valentine"
in 1977. For several years, he broadcasted in
English only. At the request of the then program
director, Jurado started using some "street" Spanish
words and phrases on the air in an effort to attract
Hispanic listeners. A consultant later concluded
that the bilingual format hurt KIIS' ratings because
it confused listeners about KIIS' programming, the
rest of which was in English. After reviewing the
station's Arbitron ratings, which showed no increase
in the program's target Hispanic audience, the new
program director, Donald Benson, agreed with the
consultant's recommendation. On August 27,
1981, Benson told Jurado to stop speaking Spanish
on the air, assuring Jurado of continued
employment if he complied. What happened the
next day is disputed. Jurado claims he was fired
without an opportunity to comply with the order.
KIIS contends that Jurado quit, but for the purpose
of summary judgment admits that he was fired for
refusing to comply.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

813 F.2d 1406                                                                                                           Page 6

813 F.2d 1406, 43 Fair Empl.Prac.Cas. (BNA) 870, 42 Empl. Prac. Dec. P 36,960, 55 USLW 2598, 106 Lab.Cas.
P 12,310
(Cite as: 813 F.2d 1406)

**\*1409** Jurado brought an action against KIIS in federal district court under, *inter alia*, section 1981, alleging in part that KIIS fired him for his refusal to comply with its instructions to cease broadcasting in Spanish. The district court dismissed the complaint with leave to amend, in part because a dismissal resulting from a voluntary refusal to abide by that instruction was not actionable under section 1981.

Jurado then filed a first amended complaint under 42 U.S.C. §§ 1981, 1985(3) and 1986, Cal.Gov't Code § 12940(a), and LMRA § 301, alleging that KIIS discharged him without giving him an opportunity to conform his broadcast format to the English-only format. The district court held that these allegations stated a section 1981 claim. Jurado later filed a supplemental complaint adding claims under Title VII. The district court dismissed the LMRA § 301 claims for lack of jurisdiction. The court later granted KIIS' motion for summary judgment of the section 1981, Title VII and Cal.Gov't Code § 12940(a) discrimination claims because: (1) Jurado had not shown retaliation, disparate treatment, or disparate impact in his employment; and (2) KIIS' actions were protected under the First Amendment and section 326 of the Communications Act of 1934, 47 U.S.C. § 326. *Jurado v. Eleven-Fifty Corp.*, 630 F.Supp. 569 (C.D.Cal.1985). Jurado timely appeals the judgment of his LMRA § 301, Title VII and section 1981 claims. We have jurisdiction under 28 U.S.C. § 1291.

### STANDARD OF REVIEW

We review a grant of summary judgment de novo, and will affirm only if, viewing the evidence most favorably to the nonmoving party, there are no genuine issues of material fact and the district court correctly applied the substantive law. *Ashton v. Cory*, 780 F.2d 816, 818 (9th Cir.1986).

### DISCUSSION

### I. TITLE VII DISPARATE TREATMENT

**[1][2][3][4]** Jurado contends that KIIS discharged him in violation of Title VII based on a disparate treatment theory. To prevail he must ultimately prove that KIIS intended to discriminate against him in the dismissal. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). In a disparate treatment case, we apply the analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05, 93 S.Ct. 1817, 1824-25, 36 L.Ed.2d 668 (1973):

**[A]** plaintiff must first establish a *prima facie* case of discrimination. If the plaintiff establishes a *prima facie* case, the burden then shifts to the defendant to articulate a legitimate nondiscriminatory reason for its employment decision. Then, in order to prevail, the plaintiff must demonstrate that the employer's alleged reason for the adverse employment decision is a pretext for another motive which is discriminatory.

*Yartzoff v. Thomas*, 809 F.2d 1371, 1373-74 (9th Cir.1987) (quoting *Lowe v. City of Monrovia*, 775 F.2d 998, 1005 (1985), *amended*, 784 F.2d 1407 (9th Cir.1986)). To establish a prima facie case of disparate treatment, the employee must offer evidence that "give[s] rise to an inference of unlawful discrimination." *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093; *Yartzoff*, 809 F.2d at 1374. Failure to allege "specific facts" that establish the existence of a prima facie case renders a grant of summary judgment appropriate. *Yartzoff*, 809 F.2d at 1374; *Palmer v. United States*, 794 F.2d 534, 536-39 (9th Cir.1986); *see* Fed.R.Civ.P. 56(e). Jurado's prima facie disparate treatment case fails because there is insufficient evidence that KIIS discharged him for discriminatory motives.

**[5]** There is no genuine dispute that Jurado was fired for refusing to comply with KIIS' decision to change his format to English only, after KIIS assured him of continued employment if he did so. Jurado alleged in his amended complaint that he was fired without the opportunity to conform to the format change. However, Jurado stated in an affidavit to the National Labor Relations Board (NLRB) that:

Benson wanted me to stop speaking Spanish

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

813 F.2d 1406

Page 7

813 F.2d 1406, 43 Fair Empl.Prac.Cas. (BNA) 870, 42 Empl. Prac. Dec. P 36,960, 55 USLW 2598, 106 Lab.Cas.
P 12,310
(Cite as: 813 F.2d 1406)

altogether. I did not comply with Benson's wishes because it would *1410 have taken my character away. He told me to speak English or quit. I told him I would not quit, he would have to fire me. I refused to give up my bi-lingual presentation. We talked for a while and finally he suggested that we talk the next day.

Also, in my original unverified complaint he stated that he was fired for refusing to give up his bilingual format. Further, his counsel filed a statement of position with the Equal Employment Opportunity Commission (EEOC) in 1982 which stated: "[Jurado] was given the ultimatum that he change his character into a solely english [sic] speaking character, or be terminated from employment. [Jurado] refused to accede to management's demand and was terminated [sic] from employment on August 27, 1981." Jurado's NLRB affidavit statement shows that there is no genuine dispute that Jurado was fired for refusing to comply with the English-only order. The party opposing summary judgment cannot create a genuine question of fact by contradicting his prior sworn statement. See *Foster v. Arcata Assocs.*, 772 F.2d 1453, 1462-63 (9th Cir.1985) (party's declaration contradicting her deposition created no genuine issues of fact and summary judgment appropriate), *cert. denied*, 475 U.S. 1048, 106 S.Ct. 1267, 89 L.Ed.2d 576 (1986).

Jurado nevertheless argues that the English-only order itself was racially motivated and that his refusal to comply with it was therefore not a proper ground to discharge him. We need not decide whether an employee's refusal to comply with a racially-motivated order states a Title VII claim, for we find insufficient evidence that the English-only order was racially motivated. There is no genuine dispute that the order was a programming decision motivated by marketing, ratings, and demographic concerns. The evidence shows that KIIS adopted Jurado's bilingual format to improve his show's performance, and later dropped it in response to a study of the show's market and ratings. Benson, the program director, was worried that the bilingual format might cause listeners to become confused about the nature of KIIS' programming and lose interest in the station. Also, the bilingual format had not improved KIIS' performance in the target Hispanic community.

[6] Jurado claims that there is evidence that the order was racially motivated. He notes that a consultant wrote in reference to Jurado's program that KIIS was "preoccupied with ethnicity [sic] to a frightening degree." This statement fails to show racial animosity toward Jurado. In context, ethnicity refers to the "ethnic" audience market, as contrasted to KIIS' target "pop" or "top 40" market. Jurado also cites Benson's alleged statement that Jurado should drop the bilingual format because Jurado's show was "too ethnic" and KIIS did not " need the Mexicans or the blacks to win in L.A." Benson was referring to KIIS' demographic and marketing concerns, not expressing racial animus toward Jurado. Success in radio depends on appealing to specific segments of the listening community. Station formats are often directed at particular ethnic, racial, or social groups. The mere fact that a station adopts a format designed to entice a target ethnic audience does not tend to show racial animus in employment.

[7][8] Jurado also argues that KIIS' failure to prohibit Rick Dees, a white KIIS disc jockey, from using Spanish on his program shows unequal treatment based on race. Dees' program features fictional comic call-in personalities, several of which use some Spanish from time to time. That KIIS allows Dees to use Spanish on his program, but does not permit Jurado to do so on his, does not suggest KIIS intended to discriminate against Jurado. KIIS permits Dees to use some Spanish because his program is popular, not to place Jurado at some disadvantage. The two programs use different formats and have different audiences. Discriminatory motive cannot be divined by comparing individual decisions about dissimilar programs. *Cf. Montgomery v. Yellow Freight Sys.,* 671 F.2d 412, 413 (10th Cir.1982) (no Title VII violation to discharge black employee, but not others, for breach of "no sleeping" rule if situations not comparable).

*1411 [9] Jurado further argues that KIIS'

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

813 F.2d 1406                                                                                    Page 8

813 F.2d 1406, 43 Fair Empl.Prac.Cas. (BNA) 870, 42 Empl. Prac. Dec. P 36,960, 55 USLW 2598, 106 Lab.Cas.
P 12,310
(Cite as: 813 F.2d 1406)

English-only order itself is a discriminatory discharge criterion as used against a bilingual person such as himself. *See Diaz v. American Tel. & Tel.,* 752 F.2d 1356, 1361 (9th Cir.1985) (evidence of employment action based on discriminatory employment criteria satisfies prima facie case of disparate treatment). We disagree. An employer can properly enforce a limited, reasonable and business-related English-only rule against an employee who can readily comply with the rule and who voluntarily chooses not to observe it as "a matter of individual preference." *Garcia v. Gloor,* 618 F.2d 264, 270 (5th Cir.1980), *cert. denied,* 449 U.S. 1113, 101 S.Ct. 923, 66 L.Ed.2d 842 (1981); *see also* Guidelines on Discrimination Because of National Origin, 29 C.F.R. § 1606.7 (1986) (EEOC presumes employer's English-only rule is national origin discrimination if enforced at all times, but permits rule if enforced only at certain times, justified by business necessity, and adequate notice is provided); *cf. Saucedo v. Brothers Well Serv.,* 464 F.Supp. 919 (S.D.Tex.1979) (employer who fired Spanish language dominant employee for using two words of Spanish to coworker in breach of informal English-only rule violated Title VII). Jurado does not dispute his English proficiency. He broadcasted in English for several years before going to the bilingual format. He had the ability to conform to the English-only order, but chose not to do so. The order was limited to on-air time and was reasonably related to KIIS' exercise of discretion over its broadcast programming.

It is not genuinely disputed that KIIS discharged Jurado for refusing to comply with its order to broadcast only in English. Jurado has failed to produce sufficient evidence that the order was racially motivated or that he was discharged on the basis of discriminatory employment criteria. The court properly granted summary judgment of the disparate treatment claim.

## II. TITLE VII RETALIATION

[10][11][12][13] An employer violates Title VII by retaliating against an employee who has "opposed any practice made an unlawful employment practice

" under Title VII. 42 U.S.C. § 2000e-3(a). The order and allocation of proof for Title VII disparate treatment cases outlined in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), also governs actions for retaliatory discharge under section 704(a). *Miller v. Fairchild Indus.,* 797 F.2d 727, 730 (9th Cir.1986). To establish a prima facie case of discriminatory retaliation, Jurado must show that: (1) he engaged in activity protected under Title VII, (2) his employer subjected him to an adverse employment action, and (3) the employer's action is causally linked to the protected activity. *Yartzoff,* 809 F.2d at 1375; *Miller,* 797 F.2d at 731. Jurado contends that he believed the English-only order violated Title VII, that he opposed the order as discriminatory, and that he was fired in retaliation for his opposition. KIIS concedes that it fired Jurado for failing to comply with the English-only order, and so adverse employment action and causal link are undisputed. Also, the employee need only reasonably believe that the employer has engaged in an unlawful employment practice. *EEOC v. Crown Zellerbach Corp.,* 720 F.2d 1008, 1013 (9th Cir.1983). While the English-only order does not violate Title VII, *see supra* section I, opposition based on a reasonable belief that the order is discriminatory is protected.

[14] However, Jurado has failed to produce evidence that he engaged in any activity protected by Title VII. *Cf. Crown Zellerbach,* 720 F.2d at 1012-13 (letter protesting unspecified "racism" and "discrimination" in employer's practices is protected opposition activity); *Sias v. City Demonstration Agency,* 588 F.2d 692, 695 (9th Cir.1978) (employee's letter to HUD complaining of employment discrimination against him and other Hispanics is protected). Jurado has not shown that he ever opposed the format change as discriminatory before he was fired. He merely opposed the change for personal reasons-he wanted to preserve the value of his radio personality. Jurado claims he did oppose the order as discriminatory by telling Benson that "a lot of the numbers that I was getting on the air, a lot of those numbers *1412 were from Hispanic people, the presentation that I did at KIIS, my success at KIIS

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

813 F.2d 1406                                                                    Page 9

813 F.2d 1406, 43 Fair Empl.Prac.Cas. (BNA) 870, 42 Empl. Prac. Dec. P 36,960, 55 USLW 2598, 106 Lab.Cas.
P 12,310
(Cite as: 813 F.2d 1406)

and the numbers that I had, a lot of them was attributed to the Hispanics and that ethnic flavor." However, his statement merely expressed his fear for his personal "success at KIIS" and his "numbers, " not his concern about discrimination against him or other Hispanics. The district court correctly granted summary judgment of the retaliation claim.

### III. TITLE VII DISPARATE IMPACT

[15][16] A disparate impact case involves a facially neutral employment practice that disproportionately disadvantages one group as against another. *Palmer,* 794 F.2d at 538. To establish a prima facie case, the employee must identify an employment practice which has a significant adverse impact on the protected group, *id.,* but need not show the employer intended to discriminate, *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

[17] The district court found Jurado's only basis for a disparate impact claim was that the English-only order somehow disproportionately disadvantaged Hispanics. The court found this theory was without merit as applied to Jurado because Jurado was fluently bilingual and could easily conform to the order. 630 F.Supp. at 580 (citing *Garcia v. Gloor,* 618 F.2d at 270). We agree.

### IV. SECTION 1981

[18][19] An employee may seek relief under both Title VII and section 1981 for racial discrimination in employment. *Lowe,* 775 F.2d at 1010. As with Title VII disparate treatment and retaliation actions, claims under section 1981 require proof of intentional discrimination. *Id.* The same standards apply, and facts sufficient to give rise to a Title VII claim are also sufficient for a section 1981 claim. *Id.* Because Jurado has not put forward genuine issues of fact regarding disparate treatment or retaliation under Title VII, the district court correctly dismissed his section 1981 claims based on the same facts.

### V. LMRA § 301

Jurado claimed breach of the collective bargaining agreement (Agreement) then in effect between Jurado's union, the American Federation of Television and Radio Artists (AFTRA), and KIIS, under section 301(a) of the LMRA, 29 U.S.C. § 185(a). He alleged KIIS retaliated against him in breach of the Agreement for his work for AFTRA in collective bargaining negotiations and for his demanding translation fees. The district court found that these retaliation claims were within the NLRB's exclusive jurisdiction and granted KIIS summary judgment. Jurado argues that the district court had concurrent jurisdiction.

[20][21] Jurado's engaging in union negotiations and voicing rights under a collective bargaining agreement (the right to translation fees) are " concerted activities" protected under section 7 of the National Labor Relations Act (NLRA), 29 U.S.C. § 157. KIIS' alleged retaliation against Jurado for engaging in these concerted activities would be an unfair labor practice under section 8(a)(1) of the NLRA, 29 U.S.C. § 158(a)(1). Violations of an employee's right to engage in concerted activities are within the exclusive jurisdiction of the NLRB, except when the activity is also arguably a breach of a collective bargaining agreement, in which case the federal district court has concurrent jurisdiction under LMRA § 301. *Hotel & Restaurant Employees, & Bartenders Union Local 703 v. Williams,* 752 F.2d 1476, 1478 (9th Cir.1985).

[22] The district court properly dismissed both of Jurado's claims for lack of jurisdiction. First, no provision of the Agreement is breached by retaliation for engaging in collective bargaining negotiations. Jurado's claim of breach of the Agreement for such retaliation is thus within the NLRB's exclusive competence. Likewise, the Agreement is not breached by retaliation for demanding translation fees. Jurado cites language in the Agreement providing that a disc jockey be paid *1413 for translation work. That provision supports a breach of contract claim under LMRA § 301 for failure to pay for translation work, not one

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

813 F.2d 1406

813 F.2d 1406, 43 Fair Empl.Prac.Cas. (BNA) 870, 42 Empl. Prac. Dec. P 36,960, 55 USLW 2598, 106 Lab.Cas.
P 12,310
**(Cite as: 813 F.2d 1406)**

of retaliation for asserting that contract right. The claim of retaliation for demanding translation fees is also in the NLRB's exclusive jurisdiction.

### CONCLUSION

Because we hold that there are no genuine issues of fact as to Jurado's Title VII and section 1981 claims, we do not address the district court's other ground for summary judgment: that KIIS' actions were protected under the First Amendment and the Communications Act of 1934. The judgment is AFFIRMED.

C.A.9, 1987.
Jurado v. Eleven-Fifty Corp.
813 F.2d 1406, 43 Fair Empl.Prac.Cas. (BNA) 870, 42 Empl. Prac. Dec. P 36,960, 55 USLW 2598, 106 Lab.Cas. P 12,310

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**5**

Westlaw.

75 F.3d 343

Page 1

75 F.3d 343, 69 Fair Empl.Prac.Cas. (BNA) 1328, 67 Empl. Prac. Dec. P 43,894
(Cite as: 75 F.3d 343)

▷
Nelson v. J.C. Penney Co., Inc.
C.A.8 (Iowa),1996.

United States Court of Appeals,Eighth Circuit.
Dale NELSON, Appellee/Cross-Appellant,
v.
J.C. PENNEY COMPANY, INC.,
Appellant/Cross-Appellee.
Equal Employment Opportunity Commission,
Amicus Curiae.
Nos. 95-1253, 95-1305.

Submitted Sept. 13, 1995.
Decided Jan. 24, 1996.
Rehearing and Suggestion for Rehearing En Banc
Denied March 4, 1996.

Former employee brought action against employer for age discrimination, retaliatory discharge, invasion of privacy, intentional infliction of emotional distress, and defamation. The United States District Court for the Northern District of Iowa, Donald E. O'Brien, Senior District Judge, 858 F.Supp. 914, entered judgment on jury verdict for employee on age discrimination and retaliatory discharge claims, and parties appealed. The Court of Appeals, Morris Sheppard Arnold, Circuit Judge, held that: (1) employee failed to make out submissible case of age discrimination or retaliatory discharge; (2) North Dakota Supreme Court would not recognize employee's claim for invasion of privacy; and (3) employee waived and/or abandoned any claim regarding intentional infliction of emotional distress or defamation.

Affirmed in part, vacated in part and remanded.

Superseding on denial of rehearing, 70 F.3d 962.
West Headnotes
[1] Federal Courts 170B ⚯764

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(K) Scope, Standards, and Extent
         170BVIII(K)1 In General
            170Bk763   Extent   of   Review
Dependent on Nature of Decision Appealed from
               170Bk764 k. Taking Case from Jury. Most Cited Cases
In reviewing denial of defendant's motion for judgment as a matter of law in age discrimination case submitted to jury, Court of Appeals focuses on ultimate factual issue of whether employer intentionally discriminated against employee on account of age; Court evaluates three questions: (1) whether plaintiff established prima facie case; (2) whether employer rebutted presumption of unlawful discrimination created by such case by offering reasons for its actions that, if believed by jury, would allow jury to conclude that plaintiff's age was not reason for his termination; and (3) whether plaintiff presented evidence capable of proving that real reason for termination was discrimination based on age.

[2] Civil Rights 78 ⚯1539

78 Civil Rights
   78IV Remedies Under Federal Employment Discrimination Statutes
      78k1534   Presumptions,   Inferences,   and Burden of Proof
         78k1539 k. Age Discrimination. Most Cited Cases
         (Formerly 78k380)
Employer rebutted presumption of unlawful age discrimination created by former employee's prima facie case by offering evidence that managerial employees older than employee were still working and had even been promoted and that employee had difficulties in dealing with his fellow employees both before and after his transfer.

[3] Civil Rights 78 ⚯1551

78 Civil Rights
   78IV Remedies Under Federal Employment

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

75 F.3d 343

Page 2

75 F.3d 343, 69 Fair Empl.Prac.Cas. (BNA) 1328, 67 Empl. Prac. Dec. P 43,894
(Cite as: 75 F.3d 343)

Discrimination Statutes
    78k1543 Weight and Sufficiency of Evidence
        78k1551 k. Age Discrimination. Most
Cited Cases
    (Formerly 78k388)
In context of age discrimination claim, evidence capable of proving that real reason for employee's termination was discrimination based on age must include conduct or statements by persons involved in decisionmaking process that may be viewed as directly reflecting alleged discriminatory attitude of extent sufficient to permit jury to infer that that attitude was more likely than not motivating factor in employer's decision.

**[4] Civil Rights 78 ☞1555**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1555 k. Questions of Law or Fact. Most Cited Cases
    (Formerly 78k389)
Former employee did not make out submissible case of age discrimination even though he adduced evidence that workers who replaced him in managerial positions following his transfer and termination were both younger than him and that supervisors noted his age during various communications concerning him; such evidence was insufficient to establish that employer's proffered reason for firing him-difficulties in dealing with his employees both before and after transfer-was pretextual.

**[5] Civil Rights 78 ☞1137**

78 Civil Rights
    78II Employment Practices
        78k1137 k. Motive or Intent; Pretext. Most Cited Cases
    (Formerly 78k153)
In context of age discrimination claim, simple fact that employer's testimony is necessarily self-interested is not enough to allow jury to find that employer's proffered reasons were pretextual.

**[6] Civil Rights 78 ☞1555**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1555 k. Questions of Law or Fact. Most Cited Cases
    (Formerly 255k40(4) Master and Servant)
Standing alone, fact that employee was fired one month after he filed age discrimination charge and that supervisors involved in firing knew of that charge did not make out submissible case of retaliatory discharge.

**[7] Torts 379 ☞341**

379 Torts
    379IV Privacy and Publicity
        379IV(B) Privacy
            379IV(B)2 Intrusion
            379k341 k. Particular Cases in General. Most Cited Cases
    (Formerly 379k8.5(4))
North Dakota Supreme Court would not recognize former employee's cause of action against employer for invasion of privacy based on supervisor's opening of employee's locked desk to obtain employee's personnel file.

**[8] Torts 379 ☞327**

379 Torts
    379IV Privacy and Publicity
        379IV(A) In General
            379k327 k. What Law Governs. Most Cited Cases
    (Formerly 379k26(1))
In action brought by former employee in federal district court in Iowa, employer's failure to plead applicability of North Dakota law did not deprive employer of benefit of that law on employee's claim for invasion of privacy, absent any contention by employee that district court improperly interpreted Iowa conflicts of law rules.

**[9] Federal Courts 170B ☞617**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(D) Presentation and Reservation in Lower Court of Grounds of Review

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

75 F.3d 343

Page 3

75 F.3d 343, 69 Fair Empl.Prac.Cas. (BNA) 1328, 67 Empl. Prac. Dec. P 43,894
(Cite as: 75 F.3d 343)

170BVIII(D)1 Issues and Questions in Lower Court
170Bk617 k. Sufficiency of Presentation of Questions. Most Cited Cases

**Federal Courts 170B ☞915**

170B Federal Courts
170BVIII Courts of Appeals
170BVIII(K) Scope, Standards, and Extent
170BVIII(K)7 Waiver of Error in Appellate Court
170Bk915 k. In General. Most Cited Cases
Where plaintiff did not argue either at trial level or in his brief on cross-appeal that case relied on by trial court in rendering its decision was inapplicable or did not foreclose his claim for intentional infliction of emotional distress, and plaintiff's counsel in fact stated with respect to that case that it appeared to control, plaintiff effectively waived or abandoned any claim with regard to intentional infliction of emotional distress.

**[10] Federal Courts 170B ☞617**

170B Federal Courts
170BVIII Courts of Appeals
170BVIII(D) Presentation and Reservation in Lower Court of Grounds of Review
170BVIII(D)1 Issues and Questions in Lower Court
170Bk617 k. Sufficiency of Presentation of Questions. Most Cited Cases
Plaintiff abandoned defamation claim by failing to object when trial court's set of proposed jury instructions included no instruction on defamation and plaintiff's counsel stated that he had no problems with trial court's instructions regarding absence of defamation instruction.

**\*344** P. Kevin Connelly, Chicago, IL, argued ( Michael J. Sheehan and Michael H. Cramer, Chicago, IL and Douglas L. Phillips, Sioux City, IA, on the brief), for appellant.
James C. Zalewski, Lincoln, NE, argued ( Emmanual S. Bikakis, Sioux City, IA, on the brief), for appellee.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Before LOKEN, HANSEN, and MORRIS SHEPPARD ARNOLD, Circuit Judges.
MORRIS SHEPPARD ARNOLD, Circuit Judge.
Dale Nelson began working for J.C. Penney department stores in 1960. In 1983, he became the manager of a store in Iowa. In late 1990, he was transferred to become the manager of a smaller store in North Dakota. Four and a half months later, shortly after he turned 55, he was fired.

Mr. Nelson sued Penney in federal court in Iowa in late 1991, alleging age discrimination, retaliatory discharge (he had filed an age discrimination charge with the appropriate administrative agency a month before he was fired), and discharge in violation of the Employee Retirement Income Security Act (ERISA) (all under federal law), and disability discrimination, invasion of privacy, intentional infliction of emotional distress, and defamation (under Iowa law).

At an eight-day mixed jury/bench trial in mid-1993, the trial court dismissed the claims of invasion of privacy and intentional infliction of emotional distress for failure to state a claim. The trial court did not instruct the jury on the claim of defamation. The jury then found for Mr. Nelson on the age discrimination and retaliatory discharge claims. The trial court found for Penney on the claims of discharge in violation of ERISA and disability discrimination. See Nelson v. J.C. Penney Co., 858 F.Supp. 914 (N.D.Iowa 1994). After denying post-trial motions, the trial court entered judgment for Mr. Nelson in the amount of approximately $930,000. Both sides appeal. We affirm in part and reverse in part and remand the case for the entry of the appropriate judgments.

I.

[1] Penney contended that Mr. Nelson was fired, after repeated warnings, because of an abrasive and intimidating management style. Mr. Nelson contended that Penney's stated reason for firing him was merely a pretext for age discrimination. The trial court denied Penney's motions for judgment **\*345** as a matter of law, both at trial and post-trial, on the age discrimination claim. Penney appeals

75 F.3d 343

Page 4

75 F.3d 343, 69 Fair Empl.Prac.Cas. (BNA) 1328, 67 Empl. Prac. Dec. P 43,894
(Cite as: 75 F.3d 343)

those denials. In reviewing the denial of a defendant's motion for judgment as a matter of law in an age discrimination case submitted to a jury, we "focus on the ultimate factual issue of whether the employer intentionally discriminated against the employee on account of age." *Nelson v. Boatmen's Bancshares, Inc.*, 26 F.3d 796, 800 (8th Cir.1994). That process requires an evaluation of three different questions. *Id.* at 801.

First, we determine whether the plaintiff established a *prima facie* case—i.e., that he was "within the protected age group, ... [that] he was performing his job at a level that met his employer's legitimate expectations, ... [then] he was discharged, and ... [that] his employer attempted to replace him." *Radabaugh v. Zip Feed Mills, Inc.*, 997 F.2d 444, 448 (8th Cir.1993). For the purposes of this appeal, we assume that Mr. Nelson established a *prima facie* case and thus created a presumption of unlawful age discrimination by Penney. *Nelson*, 26 F.3d at 801. The existence of that presumption placed an obligation upon Penney to rebut it, if possible. *Id.*

[2] To rebut a presumption of unlawful age discrimination created by a plaintiff's *prima facie* case, an employer has to offer reasons for its actions that, if believed by a jury, would allow the jury to conclude that the plaintiff's age was not the reason for his termination. *Id.* Penney did so. There was evidence that many store managers older than Mr. Nelson were still working and had even been promoted. There was additional and considerable, evidence of Mr. Nelson's difficulties in dealing with his employees in Iowa and of a continuation of those difficulties after his transfer to North Dakota (there was, moreover, no evidence that Penney failed to discipline younger store managers with the same or similar difficulties). Finally, both of the supervisors who participated in the decision to fire Mr. Nelson denied that his age was a factor in that decision.

[3] Because Penney presented evidence of reasons other than age for its decision to terminate Mr. Nelson, it is considered to have rebutted his *prima facie* case. *Id.* The presumption of unlawful age discrimination therefore drops out of the case, *id.*,

and we evaluate, last, only whether Mr. Nelson presented evidence "capable of proving that the real reason for his termination was discrimination based on age." *Id.* Such evidence must include " ' conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude ' " of an extent " 'sufficient to permit the [jury] to infer that that attitude was more likely than not a motivating factor in the employer's decision.' " *Id.* at 800, quoting *Ostrowski v. Atlantic Mutual Insurance Companies*, 968 F.2d 171, 182 (2d Cir.1992). With that standard in mind, we examine the evidence offered by Mr. Nelson as the basis for his age discrimination claim. *Nelson*, 26 F.3d at 802.

[4] We have read the entire trial transcript with care. As far as we can tell, Mr. Nelson presented four specific bases for his claim of age discrimination. The first was the fact that when he was transferred to North Dakota, and again when he was fired, his replacements were younger than he was. Then, late in 1990, around the time that Mr. Nelson was transferred to the store in North Dakota, the district manager for Iowa (Mr. Nelson's prior supervisor) called the district manager for North Dakota (Mr. Nelson's new supervisor) to advise him about Mr. Nelson's background. During that call, the district manager for North Dakota made notes, among which he included the information that Mr. Nelson was 54 years old. That inclusion was the second basis for Mr. Nelson's age discrimination claim. At a lunch in early 1991 attended by Mr. Nelson, his wife, the district manager for North Dakota, and two other Penney employees, the district manager told Mr. Nelson that he knew Mr. Nelson's age. That statement was the third basis for Mr. Nelson's age discrimination claim. Finally, although Mr. Nelson received negative comments on his management style from various supervisors earlier in his career, he was never otherwise disciplined or transferred because of them until he was 54 years old.

*346 It is true that the replacements for Mr. Nelson at both stores were younger than he was; at the Iowa store, however, the age difference between Mr. Nelson and his successor was only one month.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

75 F.3d 343

75 F.3d 343, 69 Fair Empl.Prac.Cas. (BNA) 1328, 67 Empl. Prac. Dec. P 43,894
(Cite as: 75 F.3d 343)

It is also true that the district manager for North Dakota wrote down Mr. Nelson's age when discussing him with the district manager for Iowa. But the fact that Mr. Nelson's replacement in North Dakota was significantly younger than he possesses, in our view, insufficient probative value to persuade a reasonable jury that Mr. Nelson was discriminated against. Such a fact is consistent with age discrimination, but it cannot alone support a reasonable inference of it. Nor do we believe that the fact that the district manager knew Mr. Nelson's age could furnish the basis for a reasonable inference that his age was a basis for his termination. A fact finder may not simply convert a condition that is necessary for a finding of liability (here, knowledge of a plaintiff's age) into one that is sufficient for such a finding.

[5] We have said that in "some cases, evidence that an employer's proffered nondiscriminatory explanation is wholly without merit or obviously contrived might serve double duty, ... permitting an inference that age discrimination was a motivating factor in a plaintiff's termination." *Id.* at 801. This is not such a case. There was no conflicting testimony or other substantial evidence of deviousness on the part of the employer, *see id.* at 802, from which a reasonable fact finder could conclude that the employer's proffered reasons for Mr. Nelson's termination were pretextual. *See also Gaworski v. ITT Commercial Finance Corp.*, 17 F.3d 1104, 1110 (8th Cir.1994), *cert. denied*, 513 U.S. 946, 115 S.Ct. 355, 130 L.Ed.2d 310 (1994). We do not think that the simple fact that the employer's testimony is necessarily self-interested is enough under our previous cases to allow the jury to find that the employer's proffered reasons were pretextual. If it were, then any case in which the plaintiff makes a prima facie case is a submissible one because it must go to the jury whether or not the employer produces bona fide reasons for its actions-and we have never held that. Mr. Nelson's personnel file did contain occasional comments from earlier supervisors about his need to improve his relationships with his employees. There is no evidence in the record, however, showing that any of those remarks was preceded by the number, intensity, or scope of employee complaints that occurred in the year before Mr. Nelson was fired.

In view of all of these circumstances, and considering the insubstantial character of the evidence presented with respect to age discrimination, we cannot agree with the trial court that Mr. Nelson established a submissible case that age " '*actually motivated* ' " Penney's decision to fire him. *Nelson*, 26 F.3d at 800, quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610, 113 S.Ct. 1701, 1706, 123 L.Ed.2d 338 (1993) (emphasis supplied in *Nelson* ). We see no evidence " ' directly reflecting the alleged discriminatory attitude.' " *Nelson*, 26 F.3d at 800, quoting *Ostrowski*, 968 F.2d at 182. We therefore vacate the judgment on the age discrimination claim and remand the case for the entry of judgment for Penney on that claim.

II.

[6] The evidence of retaliatory discharge was even less substantial, consisting only of the facts that Mr. Nelson was fired a month after filing an age discrimination charge with the appropriate administrative agency and that both of the supervisors involved in firing Mr. Nelson knew of that charge. There is no evidence in the record that others who filed age discrimination charges were fired, that Mr. Nelson's supervisors discussed the filing with each other, or that either of them even commented to Mr. Nelson on that filing. There was considerable evidence, moreover, that Mr. Nelson was reprimanded several times and was given a final warning about the status of his job before his supervisors knew of the age discrimination charge.

In light of all of these circumstances, we cannot agree with the trial court that the mere coincidence of timing established a submissible case of retaliatory discharge. *See, e.g., Caudill v. Farmland Industries, Inc.*, 919 F.2d 83, 86-87 (8th Cir.1990) (close temporal proximity between filing of age discrimination charges and firing of plaintiff was *\*347 only a "slender reed of evidence" for which "rank speculation" would be required to assume causal connection between the two events, in light of other evidence presented); *see also Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 501 (3d

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

75 F.3d 343                                                                      Page 6

75 F.3d 343, 69 Fair Empl.Prac.Cas. (BNA) 1328, 67 Empl. Prac. Dec. P 43,894
(Cite as: 75 F.3d 343)

Cir.1991), *cert. denied,* 502 U.S. 940, 112 S.Ct. 376, 116 L.Ed.2d 327 (1991) ("inference based on timing alone" was insufficient in light of other evidence presented). We therefore vacate the judgment on the retaliatory discharge claim and remand the case for the entry of judgment for Penney on that claim.

### III.

Mr. Nelson cross-appeals the trial court's judgment for Penney on his claims of discharge in violation of ERISA and disability discrimination. We have carefully read the entire trial transcript. We see no basis for vacating those judgments.

### IV.

[7] Mr. Nelson's claim under state law for invasion of privacy was based on a supervisor's opening of Mr. Nelson's locked desk at the North Dakota store in his absence to obtain his personnel file. The trial court dismissed that claim on the first day of trial, stating that the alleged tort had occurred in North Dakota and that no such tort is or would be recognized in North Dakota. Mr. Nelson cross-appeals that dismissal.

The North Dakota Supreme Court has acknowledged that in the states where the tort of invasion of privacy is recognized, it usually takes one or more of four forms-"(1) appropriation of a name or picture for commercial purposes without written consent; (2) intrusion upon one's solitude or seclusion; (3) public disclosure of private information which is not necessarily defamatory; and (4) placing a person in a false light ... in otherwise legitimate news stories." *City of Grand Forks v. Grand Forks Herald, Inc.,* 307 N.W.2d 572, 578 n. 3 (N.D.1981). In at least two cases, the North Dakota Supreme Court has assumed for the sake of argument that a cause of action may exist for commercial appropriation of a name without consent but has sidestepped the question of the actual existence of that tort by finding consent to use of the name. *See American Mutual Life Insurance Co. v. Jordan,* 315 N.W.2d 290, 296

(N.D.1982), and *Volk v. Auto-Dine Corp.,* 177 N.W.2d 525, 529 (N.D.1970). In at least one case, that court has assumed for the sake of argument that a cause of action may exist for public disclosure of private information but has sidestepped the question of the actual existence of that tort by finding no evidence of proximate cause. *See Schleicher v. Western State Bank,* 314 N.W.2d 293, 296 (N.D.1982).

We have found no authority, however (and have been directed to none), that would allow us to conclude that North Dakota might recognize a cause of action for the type of intrusion into a person's solitude or seclusion of which Mr. Nelson complains. Indeed, although it has been given a number of opportunities to hold that some types of invasion of privacy are actionable, the Supreme Court of North Dakota has consistently refused to do so. We believe that the trial court therefore correctly decided that this studied reluctance does not bode well for the acceptance of this kind of cause of action in North Dakota in the future. Accordingly, we decline to disturb the trial court's ruling with respect to the claim for invasion of privacy.

[8] In his reply brief, Mr. Nelson argues that Penney never pleaded the applicability of North Dakota law and, therefore, that the law of Iowa (where the case was tried) should have been applied. That argument might prevail in the Iowa state courts (a question upon which we express no opinion), but Mr. Nelson sued in federal court, where pleadings are governed by the federal rules. *See, e.g., Bank of St. Louis v. Morrissey,* 597 F.2d 1131, 1134-35 (8th Cir.1979); *see also Asay v. Hallmark Cards, Inc.,* 594 F.2d 692, 698-99 (8th Cir.1979) ("a federal court cannot be bound by a state's technical pleading rules"). "The federal courts are required to take judicial notice of the laws of every state of the union. Consequently, it is not necessary to plead state law, whether it be the forum state's law or the law of another state." *See* 5 C. Wright and A. Miller, *Federal Practice and Procedure: Civil* 2d § 1253 at 357-58 (1990). Since Mr. Nelson does not contend *348 that the trial court interpreted Iowa conflicts law improperly, we reject the argument that Penney's failure to plead the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

75 F.3d 343

Page 7

75 F.3d 343, 69 Fair Empl.Prac.Cas. (BNA) 1328, 67 Empl. Prac. Dec. P 43,894
(Cite as: 75 F.3d 343)

applicability of North Dakota law deprives Penney of the benefit of that law on the claim for invasion of privacy.

V.

[9] Mr. Nelson had serious health problems beginning in mid-1989. His claim under state law for intentional infliction of emotional distress was based on Penney's transferring him to North Dakota "with wanton disregard for [his] physical and mental health." The trial court dismissed that claim on the first day of trial, stating that because Mr. Nelson had no expert testimony on the question of emotional distress, he could not prevail, as a matter of law. Mr. Nelson cross-appeals that dismissal.

In dismissing this claim, the trial court relied on Vaughn v. Ag Processing, Inc., 459 N.W.2d 627, 636 (Iowa 1990) (en banc ), in which the Iowa Supreme Court held that when physical problems are alleged to have derived from emotional distress, expert testimony is required. We are dubious about the applicability of Vaughn in the absence of claims for physical problems consequent to emotional distress (and Mr. Nelson evidently does not allege any such physical problems). We note, however, that Mr. Nelson made no argument in the trial court (or, for that matter, in his briefs on cross-appeal) that Vaughn did not apply or that his claim for intentional infliction of emotional distress could survive based solely on his subjective reaction to his transfer. Indeed, Mr. Nelson's lawyer stated at trial, with respect to Vaughn, that he had no " contrary authority" and that Vaughn appeared to control ("that appears to be the Iowa law as far as what the cases have said"). Such a concession amounts, in our view, to a waiver (or an abandonment) of Mr. Nelson's claim for intentional infliction of emotional distress.

On cross-appeal, moreover, Mr. Nelson offers arguments based on the sufficiency of the evidence on his claim for intentional infliction of emotional distress. He made none of those arguments in the trial court, as far as we can tell. Under all of these circumstances, we decline to disturb the trial court's

ruling on Mr. Nelson's claim for intentional infliction of emotional distress. See, e.g., Pedigo v. P.A.M. Transport, Inc., 60 F.3d 1300, 1304 (8th Cir.1995).

VI.

[10] Mr. Nelson's defamation claim was based on the alleged compelled self-publication by Mr. Nelson to two of his employees of statements about himself-but written by Penney-that Mr. Nelson considered defamatory. He submitted two proposed jury instructions on defamation before trial. After the close of the evidence, the trial court gave to the parties a set of proposed jury instructions. No instruction on defamation was included in that set.

During the jury instructions conference, the trial court asked the parties to specify, with respect to the set given to them, both the instructions objected to and any instructions omitted but still requested. The lawyer for Mr. Nelson asked for the addition of two jury instructions, neither of which related to defamation, and stated that he had "no other problems" with the trial court's set. On at least five other occasions, Mr. Nelson's lawyer repeated that he was "done," that he had "nothing else," that the trial court's set seemed "fine," that he could not " think of anything else," and that he had no further " problems or any record ... to make ... or anything else" to bring up with the trial court.

By his lawyer's explicit acceptance of the trial court's proposed jury instructions and his failure to offer during the jury instructions conference any additional instructions on defamation, Mr. Nelson abandoned his defamation claim. We therefore reject his argument on cross-appeal that the defamation claim should have been submitted to the jury.

VII.

For the reasons stated, we affirm the trial court with respect to all of Mr. Nelson's claims except age discrimination and retaliatory discharge. We

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

75 F.3d 343

75 F.3d 343, 69 Fair Empl.Prac.Cas. (BNA) 1328, 67 Empl. Prac. Dec. P 43,894
**(Cite as: 75 F.3d 343)**

vacate the judgments on **349** those claims, as well
as the associated judgments awarding attorney's
fees, and remand the case for the entry of judgment
for Penney on all claims.

C.A.8 (Iowa),1996.
Nelson v. J.C. Penney Co., Inc.
75 F.3d 343, 69 Fair Empl.Prac.Cas. (BNA) 1328,
67 Empl. Prac. Dec. P 43,894

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**6**

Westlaw.

41 F.3d 524

Page 1

41 F.3d 524, 66 Fair Empl.Prac.Cas. (BNA) 769, 65 Empl. Prac. Dec. P 43,388
**(Cite as: 41 F.3d 524)**

**H**
Trent v. Valley Elec. Ass'n Inc.
C.A.9 (Nev.);1994.

United States Court of Appeals,Ninth Circuit.
Victoria L. TRENT, aka Victoria L. Winebarger,
Plaintiff-Appellant,
v.
VALLEY ELECTRIC ASSOCIATION INC.;
Richard Burasco; Ross Dohlen,
Defendants-Appellees.
No. 93-15458.

Submitted Nov. 17, 1994 FN*.

FN* The panel unanimously found this case suitable for decision without oral argument. Fed.R.App.P. 34(a) and Ninth Circuit Rule 34-4.
Decided Dec. 1, 1994.

Meter reader for public utility company brought retaliatory discharge claim under Title VII against company. The United States District Court for the District of Nevada, Lloyd D. George, Chief Judge, granted summary judgment in favor of company, and meter reader appealed. The Court of Appeals, Pregerson, Circuit Judge, held that meter reader had reasonable belief that it was unlawful under Title VII for her to be subjected to series of sexually offensive remarks at seminar that company required her to attend to learn about essential aspects of her job and thus, meter reader engaged in a protected activity, the first element of prima facie case of retaliatory discharge.

Reversed and remanded.
West Headnotes
**[1] Federal Courts 170B ☜776**

170B Federal Courts
  170BVIII Courts of Appeals
    170BVIII(K) Scope, Standards, and Extent

170BVIII(K)1 In General
  170Bk776 k. Trial De Novo. Most Cited Cases
Court of Appeals reviews grant of summary judgment de novo.

**[2] Civil Rights 78 ☜1243**

78 Civil Rights
  78II Employment Practices
    78k1241 Retaliation for Exercise of Rights
      78k1243 k. Practices Prohibited or Required in General; Elements. Most Cited Cases
      (Formerly 255k40(1) Master and Servant)
To succeed on retaliation claim under Title VII, plaintiff must establish a prima facie case and to do this she must demonstrate that she was engaging in a protected activity, that she suffered adverse employment decision, and that there was causal link between her activity and the employment decision. Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e-3(a).

**[3] Civil Rights 78 ☜1244**

78 Civil Rights
  78II Employment Practices
    78k1241 Retaliation for Exercise of Rights
      78k1244 k. Activities Protected. Most Cited Cases
      (Formerly 255k40(1) Master and Servant)
To establish first element of prima facie case of retaliatory discharge under Title VII, namely that plaintiff was engaging in a protected activity, plaintiff must only show that she had reasonable belief that employment practice she protested was prohibited under Title VII; plaintiff does not need to prove that employment practice at issue was in fact unlawful under Title VII. Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e-3(a).

**[4] Civil Rights 78 ☜1244**

78 Civil Rights

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

41 F.3d 524                                                                    Page 2

41 F.3d 524, 66 Fair Empl.Prac.Cas. (BNA) 769, 65 Empl. Prac. Dec. P 43,388
(Cite as: 41 F.3d 524)

78II Employment Practices
    78k1241 Retaliation for Exercise of Rights
        78k1244 k. Activities Protected. Most
Cited Cases
    (Formerly 255k30(6.10) Master and Servant)
Meter reader for public utility company had
reasonable belief that it was unlawful under Title
VII for her to be subjected to series of sexually
offensive remarks at seminar that company required
her to attend to learn about essential aspect of her
job and thus, reader engaged in a protected activity,
the first element of a prima facie case of retaliatory
discharge under Title VII. Civil Rights Act of
1964, § 704(a), 42 U.S.C.A. § 2000e-3(a).


*525 Ian Christopherson,Burke & Christopherson,
Las Vegas, NV, for plaintiff-appellant.
Renee R. Reuther, Jones, Jones, Close & Brown,
Las Vegas, NV, for defendants-appellees.


Appeal from the United States District Court for the
District of Nevada.

Before:        LAY,FN** PREGERSON,        and
O'SCANNLAIN, Circuit Judges.

        FN** The Honorable Donald P. Lay,
        Senior United States Circuit Judge for the
        Eighth Circuit, sitting by designation.

PREGERSON, Circuit Judge:
Victoria Trent appeals the district court's grant of
partial summary judgment in favor of defendants on
her retaliatory discharge claim under § 704 of Title
VII of the 1964 Civil Rights Act, 42 U.S.C. §
2000e-3(a) (1981). We reverse and remand.


BACKGROUND

On February 8, 1988, the Valley Electric
Association ("VEA"), a rural public utility
company, hired Victoria Trent to read residential
electric meters. On July 20, 1988, she attended a
mandatory safety meeting. VEA hired Ruralite
Services, Inc. to conduct the meeting. During his
presentation, the instructor from Ruralite used foul
language and made a series of sexually offensive

references. These included a description of the
sexual experiences of linemen at a Nevada brothel.
Trent was the only woman present at the lecture.

Trent complained about the offensive remarks to
Richard Burasco, VEA's office manager. On
August 19, 1988, Burasco asked Trent to put her
complaint in writing. She submitted a written
report to Ross Dohlen, VEA's general manager and
later spoke with him about the safety meeting
incident. When Trent remarked she "was not one
of the boys," Dohlen replied that "for some purposes
" she was. On August 31, 1988, Dohlen wrote to
Ruralite complaining about the lecturer's offensive
comments. On September 19, 1988, VEA fired
Trent.


ANALYSIS

[1] We review a grant of summary judgment de
novo. *Jesinger v. Nevada Fed. Credit Union*, 24
F.3d 1127, 1130 (9th Cir.1994). Trent challenges
her dismissal under the "opposition clause" of §
704 of Title VII of the 1964 Civil Rights Act, 42
U.S.C. § 2000e-3(a) (1981). The clause makes it
illegal for an employer to discriminate against an
employee where the employee "has opposed any
practice made an unlawful employment practice by
this subchapter...." Courts have interpreted "
unlawful employment*526 practices" to include a
panoply of actions involving discrimination and
sexual harassment.

[2] To succeed on a retaliation claim, Trent must
first establish a prima facie case. *E.E.O.C. v.
Hacienda Hotel*, 881 F.2d 1504, 1513 (9th
Cir.1989). She must demonstrate (1) that she was
engaging in a protected activity, (2) that she
suffered an adverse employment decision, and (3)
that there was a causal link between her activity and
the employment decision. *Id.* at 1513-14.

In granting summary judgment in favor of VEA, the
district court concluded that Trent failed as a matter
of law to establish the first element of a prima facie
case. We disagree.

The district court, relying on *Silver v. KCA, Inc.*,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

41 F.3d 524                                                                                                Page 3

41 F.3d 524, 66 Fair Empl.Prac.Cas. (BNA) 769, 65 Empl. Prac. Dec. P 43,388
(Cite as: 41 F.3d 524)

586 F.2d 138 (9th Cir.1978), found that because Trent complained about the practice of an outside consultant, not her employer, she was not protesting an "unlawful employment practice" under Title VII, and thus her conduct did not constitute a "protected activity." In *Silver*, the plaintiff was fired after confronting a co-employee and protesting a racially offensive remark he had made about her trainee. Her protest was directed solely to the employee who made the offensive remark. We said that "[t]he opposition must be directed at an unlawful employment practice of an employer, not an act of discrimination by a private individual." *Id.* at 141.

Whether Ruralite is a "private individual" is questionable. VEA did, in fact, hire Ruralite to train its employees, a function often carried out by company supervisors. We have held that when an employee protests the actions of a supervisor such opposition is a "protected activity." *E.E.O.C. v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1014 (9th Cir.1983).[FN1]

> FN1. At least one court has held employers liable for acts of outside contractors under Title VII. *See People v. Hamilton*, 125 A.D.2d 1000, 511 N.Y.S.2d 190 (N.Y.Sup.Ct.1986) (employer liable when it failed to discharge an independent polygraph operator who sexually harassed employees); *see also Waltman v. Int'l Paper Co.*, 875 F.2d 468 (5th Cir.1989) (triable issue whether employer took prompt remedial action in response to allegations of sexual harassment, some involving employees of independent contractor).

[3] But we need not delve into the subject whether "protected activity" under Title VII includes an employee's protest to her employer of an outside consultant's conduct. As we first explained in *Sias v. City Demonstration Agency*, 588 F.2d 692, 695 (9th Cir.1978), a plaintiff does not need to prove that the employment practice at issue was in fact unlawful under Title VII. To establish the first element of a prima facie case, Trent must only show that she had a "reasonable belief" that the

employment practice she protested was prohibited under Title VII. *Id.* at 696; *see also E.E.O.C. v. Crown Zellerbach Corp.*, 720 F.2d at 1013 (" opposition clause protection will be accorded whenever the [employee's] opposition is based on a 'reasonable belief' that the employer has engaged in an unlawful employment practice"). Most courts agree. *See Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1137-38 (5th Cir.1981) (reasonable belief that conduct being opposed was discriminatory must only be " reasonable") (quoting *Hearth v. Metropolitan Transit Commission*, 436 F.Supp. 685, 688-89 (D.Minn.1977)), *cert. denied*, 455 U.S. 1000, 102 S.Ct. 1630, 71 L.Ed.2d 866 (1982); *Sisco v. J.S. Alberici Construction Co.*, 655 F.2d 146, 150 (8th Cir.1981) (same), *cert. denied*, 455 U.S. 976, 102 S.Ct. 1485, 71 L.Ed.2d 688 (1982); *Berg v. La Crosse Cooler Co.*, 612 F.2d 1041, 1045-46 (7th Cir.1980) (employee need only have a "reasonable belief" that the practice she opposes is unlawful); *Hearth*, 436 F.Supp. at 688-89 (if employee " reasonably believes" that discrimination exists, his or her protest is a protest of an unlawful employment practice under Title VII); *see also* Barbara Lindemann & David D. Kadue, *Sexual Harassment in Employment Law* 280 (1992) ("The EEOC and most courts have stated that § 704(a) protects opposition [to an employment practice] so long as the employee has a reasonable and good-faith belief that the practice opposed constituted a violation of Title VII").

This reading of Title VII is consistent with its purpose to eliminate discrimination in employment. To find that Title VII's opposition clause only protects those who can prove that the conduct at issue is actually unlawful "[w]ould not only chill the legitimate assertion of employee rights under Title VII but *527 would tend to force employees to file formal charges rather than seek conciliation or informal adjustment of grievances." *Sias*, 588 F.2d at 695.

[4] Trent need only show that she had a reasonable belief that it was unlawful under Title VII for her to be subjected to a series of sexually offensive remarks at a seminar her employer required her to attend. The record in this case could support a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

41 F.3d 524

41 F.3d 524, 66 Fair Empl.Prac.Cas. (BNA) 769, 65 Empl. Prac. Dec. P 43,388
**(Cite as: 41 F.3d 524)**

finding that Trent had such a reasonable belief.
After all, Trent was obligated to attend the safety
lecture to learn about an essential aspect of her job.
She certainly would be justified in believing that
Title VII would protect her from the offensive
remarks she endured while attending the meeting.

For the reasons set forth above, we conclude that
the record before the district court on summary
judgment would support a finding that Trent
engaged in a "protected activity"-the first element
of a prima facie case of retaliatory discharge.[FN2]
The district court erred when it found to the
contrary. Accordingly, we reverse and remand.

> FN2. We do not decide whether or not
> summary judgment would be appropriate
> on the second or third elements of Trent's
> prima facie case.

C.A.9 (Nev.),1994.
Trent v. Valley Elec. Ass'n Inc.
41 F.3d 524, 66 Fair Empl.Prac.Cas. (BNA) 769,
65 Empl. Prac. Dec. P 43,388

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**7**

Westlaw.

765 F.2d 1440                                                                                          Page 1

765 F.2d 1440, 38 Fair Empl.Prac.Cas. (BNA) 999, 37 Empl. Prac. Dec. P 35,427, 2 Fed.R.Serv.3d 524
(Cite as: 765 F.2d 1440)

▷
Unt v. Aerospace Corp.
C.A.9 (Cal.),1985.

United States Court of Appeals,Ninth Circuit.
Erik UNT, Plaintiff-Appellant,
v.
The AEROSPACE CORPORATION, United States
Air Force, Space and Missile Systems Organization,
and Air Force Systems Command,
Defendants-Appellees.
No. 82-6087.

Argued and Submitted Jan. 7, 1985.
Decided July 19, 1985.

Employee of not-for-profit corporation engaged in
business with the United States brought action
under Title VII and Privacy Act against his
employer, the United States Air Force and
government agencies. The United States District
Court for the Central District of California, Robert
M. Takasugi, J., entered judgment in favor of
defendants on Title VII claim, and dismissed claim
for violation of the Privacy Act. On appeal, the
Court of Appeals, Poole, Circuit Judge, held that:
(1) district court's findings that employee was not
subject to retaliatory conduct by employer were not
clearly erroneous; (2) private right of civil action
created by the Privacy Act is specifically limited to
actions against agencies of the United States
government; (3) employer, a not-for-profit
corporation engaged in business with the United
States, was not an agency of the government within
the definition of the Privacy Act; and (4) letter
written by employee to government agency was not
a "record" afforded protection within meaning of
the Privacy Act, and therefore its disclosure was not
in violation of the statute.

Affirmed.

Ferguson, Circuit Judge, filed dissenting opinion.
West Headnotes

[1] Federal Courts 170B ⟡858

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)5 Questions of Fact, Verdicts
and Findings
                170Bk855 Particular Actions and
Proceedings, Verdicts and Findings
                    170Bk858 k. Civil Rights Cases.
Most Cited Cases
Clearly erroneous standard, and not abuse of
discretion standard, applied in reviewing district
court decision that employee was not the subject of
retaliatory discrimination, as the complex issue of
retaliation involved factual inquiry into employer's
motivation and intent. Fed.Rules Civ.Proc.Rule
52(a), 28 U.S.C.A.

[2] Federal Civil Procedure 170A ⟡2282.1

170A Federal Civil Procedure
    170AXV Trial
        170AXV(K) Trial by Court
            170AXV(K)2 Findings and Conclusions
                170Ak2282 Sufficiency
                    170Ak2282.1 k. In General. Most
Cited Cases
    (Formerly 170Ak2282)
Federal Civil Rule 52(a), which requires court in all
actions tried upon facts without jury to find the facts
specially, requires court to state its findings
sufficient to indicate the factual basis for its
ultimate conclusion. Fed.Rules Civ.Proc.Rule
52(a), 28 U.S.C.A.

[3] Federal Civil Procedure 170A ⟡2282.1

170A Federal Civil Procedure
    170AXV Trial
        170AXV(K) Trial by Court
            170AXV(K)2 Findings and Conclusions
                170Ak2282 Sufficiency
                    170Ak2282.1 k. In General. Most

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

765 F.2d 1440

765 F.2d 1440, 38 Fair Empl.Prac.Cas. (BNA) 999, 37 Empl. Prac. Dec. P 35,427, 2 Fed.R.Serv.3d 524
**(Cite as: 765 F.2d 1440)**

Cited Cases
   (Formerly 170Ak2282)
Under Federal Civil Rule 52(a), which requires the court in all actions tried upon the facts without a jury to find the facts specially, the findings must be explicit enough to give appellate court a clear understanding of basis of trial court's decision, and to enable it to determine the ground on which the trial court reached its decision. Fed.Rules Civ.Proc.Rule 52(a), 28 U.S.C.A.

**[4] Federal Civil Procedure 170A ⚷2282.1**

170A Federal Civil Procedure
   170AXV Trial
     170AXV(K) Trial by Court
      170AXV(K)2 Findings and Conclusions
       170Ak2282 Sufficiency
        170Ak2282.1 k. In General. Most
Cited Cases
   (Formerly 170Ak2282)
District court's findings in support of its conclusion that employee was not the subject of retaliatory discrimination, though consisting mainly of mere conclusions, preceded only by an unhelpful chronology of events, were sufficient to comply with Federal Civil Rule 52(a), which requires the court to find the facts specially in all actions tried upon the facts without a jury, as the basis for the court's decision was clear, and record gave substantial and unequivocal support for ultimate conclusion that employer's actions against employee were justified and that no retaliatory motive was involved. Fed.Rules Civ.Proc.Rule 52(a), 28 U.S.C.A.

**[5] Federal Civil Procedure 170A ⚷2280**

170A Federal Civil Procedure
   170AXV Trial
     170AXV(K) Trial by Court
      170AXV(K)2 Findings and Conclusions
       170Ak2279 Form
        170Ak2280 k. Preparation by
Counsel. Most Cited Cases
Verbatim adoption of findings suggested by a party is not automatically objectionable so long as those findings are supported by the record.

**[6] Federal Courts 170B ⚷848**

170B Federal Courts
   170BVIII Courts of Appeals
     170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)5 Questions of Fact, Verdicts and Findings
       170Bk848 k. Findings of Court in General. Most Cited Cases
Because the Court of Appeals applies the clearly erroneous standard when reviewing factual findings, it cannot affirm a district court whose findings are "skeletal" or conclusory unless the record clearly reflects basis for trial court's determinations.

**[7] Civil Rights 78 ⚷1553**

78 Civil Rights
   78IV Remedies Under Federal Employment Discrimination Statutes
     78k1543 Weight and Sufficiency of Evidence
      78k1553 k. Retaliation Claims. Most Cited Cases
   (Formerly 255k40(4), 255k40(3) Master and Servant)
District court was not clearly erroneous in its findings that record did not support employee's claim of retaliatory conduct by employer in violation of Title VII [42 U.S.C.A. § 2000e et seq.] either because of his opposition to unlawful employment practices or participation in procedures to remedy employment discrimination. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[8] Civil Rights 78 ⚷1122**

78 Civil Rights
   78II Employment Practices
     78k1122 k. Discharge or Layoff. Most Cited Cases
   (Formerly 78k144, 78k9.10)
An employee is not protected by Title VII [42 U.S.C.A. § 2000e et seq.] when he violates legitimate company rules, knowingly disobeys company orders, disrupts the work environment of his employer, or willfully interferes with attainment of employer's goals. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

765 F.2d 1440

Page 3

765 F.2d 1440, 38 Fair Empl.Prac.Cas. (BNA) 999, 37 Empl. Prac. Dec. P 35,427, 2 Fed.R.Serv.3d 524
(Cite as: 765 F.2d 1440)

**[9] Civil Rights 78 ⌖1535**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1534 Presumptions, Inferences, and Burden of Proof
          78k1535 k. In General. Most Cited Cases
    (Formerly 78k377.1, 78k377, 78k43)
Once employer articulated proper reason for disciplining employee, employee had burden of proving that stated reason was only a pretext for discrimination prohibited under Title VII [42 U.S.C.A. § 2000e et seq.]. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[10] Federal Courts 170B ⌖776**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
          170BVIII(K)1 In General
            170Bk776 k. Trial De Novo. Most Cited Cases
Court of Appeals reviews de novo a dismissal for failure to state a claim upon which relief can be granted by inquiring whether it is certain that no relief could be granted to appellant under any set of facts.

**[11] Records 326 ⌖31**

326 Records
    326II Public Access
        326II(A) In General
          326k31 k. Regulations Limiting Access; Offenses. Most Cited Cases
Private right of civil action created by the Privacy Act [5 U.S.C.A. § 552a] is specifically limited to actions against agencies of the United States; therefore, the civil remedy provisions of the statute do not apply against private individuals, state agencies, private entities, or state and local officials.

**[12] Records 326 ⌖31**

326 Records
    326II Public Access
        326II(A) In General

          326k31 k. Regulations Limiting Access; Offenses. Most Cited Cases
Private not-for-profit corporation engaged in business with the United States government was not an agency of the government within definition of the Privacy Act [5 U.S.C.A. § 552a], nor did mere fact that it received funding and was regulated to some extent by federal government bring it within the reaches of the Act.

**[13] Records 326 ⌖31**

326 Records
    326II Public Access
        326II(A) In General
          326k31 k. Regulations Limiting Access; Offenses. Most Cited Cases
Section of the Privacy Act [5 U.S.C.A. § 552a(i)(3)], which provides that any person who knowingly and willfully requests or obtains any record concerning an individual from an agency under false pretenses is guilty of a misdemeanor, provides for criminal penalties only and generates no civil right of action.

**[14] Records 326 ⌖31**

326 Records
    326II Public Access
        326II(A) In General
          326k31 k. Regulations Limiting Access; Offenses. Most Cited Cases
Letter to government agency by employee of not-for-profit corporation engaged in business with the government was not a "record" afforded protection within meaning of the Privacy Act [5 U.S.C.A. § 552a(a)(4)], and thus letter's disclosure was not in violation of the statute, as the letter was not about employee but was about his employer, reflecting directly on performance by employer of its contract with the government, and only indirectly on any quality or characteristic possessed by employee.

**[15] Federal Civil Procedure 170A ⌖2839**

170A Federal Civil Procedure
    170AXX Sanctions
        170AXX(F) On Appeal

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

765 F.2d 1440                                                                                                    Page 4

765 F.2d 1440, 38 Fair Empl.Prac.Cas. (BNA) 999, 37 Empl. Prac. Dec. P 35,427, 2 Fed.R.Serv.3d 524
(Cite as: 765 F.2d 1440)

170Ak2837 Grounds
170Ak2839    k.    Frivolousness    in
General. Most Cited Cases
(Formerly 170Ak2747)
An appeal is frivolous, for purposes of Federal
Appellate Rule 38, which provides for award of just
damages and single or double costs to appellee in
case of a frivolous appeal, when arguments are
entirely without merit and when result is obvious.
F.R.A.P.Rule 38, 28 U.S.C.A.

[16] Civil Rights 78 €==1599

78 Civil Rights
78IV  Remedies Under Federal Employment
Discrimination Statutes
78k1599 k. Costs and Fees on Appeal. Most
Cited Cases
(Formerly 78k422, 78k46(33))
Resolution of employee's claim against employer
for retaliatory discrimination under Title VII [42
U.S.C.A. § 2000e et seq.] was not so clear as to
render employee's appeal frivolous within meaning
of Federal Appellate Rule 38, which provides for an
award of damages and single or double costs to
appellee in case of a frivolous appeal. Civil Rights
Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et
seq.; F.R.A.P.Rule 38, 28 U.S.C.A.

*1442 Daniel C. Lavery, Tarzana, Cal., for
plaintiff-appellant.
David Clark, Chase, Rotchford, Drukker & Bogust,
Los Angeles, Cal., for defendants-appellees.

Appeal from the United States District Court for the
Central District of California.

Before SNEED, POOLE and FERGUSON, Circuit
Judges.
POOLE, Circuit Judge:
Erik Unt appeals the trial court's judgment in favor
of appellee Aerospace Corporation (Aerospace) on
his first claim under Title VII of the Civil Rights
Acts of 1964, 42 U.S.C. § 2000e et seq. He also
appeals the dismissal of his second claim for
violation of the Privacy Act, 5 U.S.C. § 552a,
against appellees Aerospace, the United States Air
Force (Air Force), Space and Missile Systems

Organization (SAMSO), and Air Force Systems
Command. We affirm.

FACTS

On December 12, 1972, appellant Erik Unt, a
naturalized citizen of the United States born in
Estonia, was employed as a Level 1 member of the
Aerospace technical staff. Aerospace is a
California nonprofit corporation formed for the
purpose of providing systems engineering and
technical direction to the Air Force missile and
space program.

In August 1975, Unt filed an informal internal
grievance against Aerospace, claiming
discrimination based on national origin. This
discrimination allegedly was manifested by
appellant's July 1975 performance review and the
refusal of Aerospace to promote him to a Level 2
management position. Additionally, Unt applied
for, but did not receive, promotion to various other
higher level management positions*1443 in 1975.
Aerospace contended that appellant lacked the
requisite qualifications, whereas Unt charged
discriminatory conduct.

Aerospace investigated Unt's grievance and found
the charges to be unsubstantiated. This finding was
discussed with Unt, at which time he agreed to
abandon his grievance and pursue his disagreements
through the Aerospace "open door policy," under
which upper level management made themselves
available to employees to solve employee problems.
Subsequently, on December 15, 1975, Unt was
given a 3.6% raise, which was lower than the
average Aerospace employee raise of 8.5%. Three
days later, he wrote letters to various high level Air
Force officers and administrators regarding his
dispute with Aerospace management over his
performance.

Aerospace management considered Unt's letters
inappropriate because they tended to reduce the
effectiveness and credibility of the performance of
Aerospace personnel in the Air Force-Aerospace
joint program office, to which Unt was assigned.
Consequently, management met with Unt and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

765 F.2d 1440                                                                    Page 5

765 F.2d 1440, 38 Fair Empl.Prac.Cas. (BNA) 999, 37 Empl. Prac. Dec. P 35,427, 2 Fed.R.Serv.3d 524
(Cite as: 765 F.2d 1440)

discussed the letters in light of Unt's overall performance. Specific suggestions for improvement were provided. Aerospace also conducted an internal investigation of the allegations contained in Unt's letters, and no wrongdoing at Aerospace was revealed.

In February 1976, appellant was notified of his probationary transfer from the Aerospace Global Positioning System (GPS) program office to the Guidance and Control support division. He was also instructed in writing not to communicate with SAMSO concerning Aerospace business matters or attend joint program office meetings without approval. Approximately two months later, Unt reinstated his internal equal employment opportunity (EEO) grievance, and in September 1976, he filed a discrimination charge with the Equal Employment Opportunity Commission (EEOC) alleging that he had been subject to acts of reprisal for complaining about Aerospace management.

A final decision pursuant to the Aerospace grievance procedure was rendered in February 1977 denying Unt's grievance. In June of that same year, Unt wrote to General Morgan, Commander of SAMSO, calling attention to claimed violations of the law by Aerospace management. Unt's charges were again investigated and found to be unsubstantiated. Appellant was dismissed on July 7, 1977, for making false allegations of management misconduct to SAMSO and for willful violation of instructions and the conditions of his continued employment.

In September 1978, Unt received a Notice of Right to Sue from the EEOC. He filed this action on December 22, 1978. The court dismissed the Privacy Act claim against Aerospace on May 23, 1979, and against Frank Bane, SAMSO Contract Management Officer, on June 8, 1979. The federal defendants (Air Force, SAMSO, and Air Force Systems Command) were similarly dismissed on September 3, 1980. The remaining Title VII claims against Aerospace were tried by the bench. Unt's Title VII claim for national origin discrimination was dismissed at the close of his case in chief. This ruling was not appealed. At the

conclusion of trial, the parties submitted written final argument and proposed Findings of Fact and Conclusions of Law on the remaining claim of retaliation. On November 4, 1982, the court issued its judgment in favor of Aerospace. Unt subsequently moved to amend the court's findings and conclusions, but this motion was denied as untimely. A timely notice of appeal was filed on December 3, 1982. We assume jurisdiction under 28 U.S.C. § 1291.

## DISCUSSION

On appeal, we are presented with two main issues. First, we must determine whether the district court's finding that appellant failed to establish his claim of retaliatory discrimination was clearly erroneous. Second, we must consider whether the district court abused its discretion in dismissing appellant's second cause of action under the Privacy Act against all defendants. Because we find the actions of *1444 the district court appropriate in each case, we affirm.

## I. RETALIATORY DISCRIMINATION

[1] Both Aerospace and Unt contend that we should apply the abuse of discretion standard in reviewing the district court decision that Unt was not the subject of retaliatory discrimination. The complex issue of retaliation, however, involves a factual inquiry into the employer's motivation and intent. Thus, Federal Rule of Civil Procedure 52(a) applies, and we will set aside the trial court's finding on retaliation only if it is clearly erroneous. *See Pullman-Standard v. Swint*, 456 U.S. 273, 288-90, 102 S.Ct. 1781, 1790-91, 72 L.Ed.2d 66 (1982) (intent to discriminate under § 703(h) of Title VII is a pure question of fact subject to the clearly erroneous standard); *Nicholson v. Board of Education Torrance Unified School Dist.*, 682 F.2d 858, 864 (9th Cir.1982) (employer's motivation for dismissing employee is a factual finding reviewed under clearly erroneous standard). Appellant challenges both the form and the substance of the trial court's findings. We will examine each challenge separately.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

765 F.2d 1440                                                                Page 6

765 F.2d 1440, 38 Fair Empl.Prac.Cas. (BNA) 999, 37 Empl. Prac. Dec. P 35,427, 2 Fed.R.Serv.3d 524
(Cite as: 765 F.2d 1440)

## A. Form of Findings

Appellant first argues that the findings of fact adopted by the district court are insufficient because they (1) fail to clearly indicate the facts supporting the court's ultimate legal conclusions, (2) are conclusory and vague, and (3) are almost identical to the proposed findings submitted by Aerospace a year earlier.

[2][3] Rule 52(a) of the Federal Rules of Civil Procedure[FN1] requires the court, in all actions tried upon the facts without a jury, to "find the facts specially." The court must state findings sufficient to indicate the factual basis for its ultimate conclusion. *Kelley v. Everglades Drainage District,* 319 U.S. 415, 422, 63 S.Ct. 1141, 1145, 87 L.Ed. 1485 (1943). "Statements conclusory in nature are to be eschewed in favor of statements of the preliminary and basic facts on which the District Court relied. Otherwise, their findings are useless for appellate purposes." *Dalehite v. United States,* 346 U.S. 15, 24 n. 8, 73 S.Ct. 956, 962 n. 8, 97 L.Ed. 1427 (1953) (citation omitted). The findings must be "explicit enough to give the appellate court a clear understanding of the basis of the trial court's decision, and to enable it to determine the ground on which the trial court reached its decision." *United States v. Alpine Land & Reservoir Co.,* 697 F.2d 851, 856 (9th Cir.), *cert. denied,* 464 U.S. 863, 104 S.Ct. 193, 78 L.Ed.2d 170 (1983) (citations omitted); *Nicholson,* 682 F.2d at 866; *Lumbermen's Underwriting Alliance v. Can-Car, Inc.,* 645 F.2d 17, 18 (9th Cir.1980); *Fluor Corp. v. United States ex rel. Mosher Steel Co.,* 405 F.2d 823, 828 (9th Cir.), *cert. denied,* 394 U.S. 1014, 89 S.Ct. 1632, 23 L.Ed.2d 40 (1969).

> FN1. Fed.R.Civ.P. 52(a) states in relevant part:
> In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon * * *. Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.

[4] The district court's findings certainly are not well done. They consist mainly of mere conclusions, preceded only by an unhelpful chronology of events. They do not articulate specific factual bases for the trial court's boilerplate determination that Aerospace's actions were justified by "legitimate business reasons." Nonetheless, while it is a close case, we do not believe we must remand for more detailed findings, for despite the factual shortcomings, the basis for the court's decision is clear. The record gives substantial and unequivocal support for the ultimate conclusion that Aerospace's actions against Unt were indeed justified, and thus that no retaliatory motive was involved.

[5] Appellant also urges error in the trial court's adoption of findings very similar to those proposed by Aerospace. We have previously disapproved of the mechanical adoption of findings and conclusions prepared by the victorious party. *1445 Lumbermen's Underwriting Alliance v. Can-Car, Inc.,* 645 F.2d at 18. The verbatim adoption of findings suggested by a party is not automatically objectionable, however, so long as those findings are supported by the record. *United States v. El Paso Natural Gas Company,* 376 U.S. 651, 656, 84 S.Ct. 1044, 1047, 12 L.Ed.2d 12 (1964) (citing *United States v. Crescent Amusement Co.,* 323 U.S. 173, 184-85, 65 S.Ct. 254, 259-60, 89 L.Ed. 160).

[6] As the Supreme Court has aptly noted, we appreciate assistance from the district courts with our responsibility of reviewing the oftentimes extensive records in the cases before us. *See United States v. Marine Bancorporation, Inc.,* 418 U.S. 602, 615-16 n. 13, 94 S.Ct. 2856, 2866-67, 41 L.Ed.2d 978 (1974). When the trial court fails to provide us with detailed findings of fact, our burden of review is made that much more difficult. Because we apply the "clearly erroneous" standard when reviewing factual findings, we cannot affirm a district court whose findings are "skeletal" or conclusory unless the record, as here, clearly reflects the basis for the trial court's determinations. Although the district court's findings are lacking in particularity, we conclude that they are not so

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

765 F.2d 1440                                                                                           Page 7

765 F.2d 1440, 38 Fair Empl.Prac.Cas. (BNA) 999, 37 Empl. Prac. Dec. P 35,427, 2 Fed.R.Serv.3d 524
**(Cite as: 765 F.2d 1440)**

deficient as to prevent us from effectively exercising our role of review.

### B. Substance of Findings

[7] Appellant argues that the findings of fact are not supported by the record, and thus, that they must be set aside as "clearly erroneous." In fact, he contends that the record supports his claim of retaliatory conduct by Aerospace in violation of Title VII,[FN2] both because of his opposition to unlawful employment practices and participation in procedures to remedy employment discrimination. The trial court disagreed, and so do we.

> FN2. Title VII of the Civil Rights Act of 1964, § 704(a), as codified in 42 U.S.C. § 2000e-3(a) (1972), provides:
> It shall be an unlawful employment practice for an employer to discriminate against any of his employees * * * because he has opposed any practice made an unlawful employment practice by this Title, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

Seven actions taken by Aerospace are claimed to have been retaliatory: (1) the 1974-75 performance evaluation, (2) denial of promotions, (3) decrease in anticipated merit raise for 1975, (4) probationary transfer, (5) restricted communication with SAMSO, (6) discharge, and (7) Aerospace's failure to provide certain documents and a fair hearing. The record indicates, however, that these were legitimate nondiscriminatory actions justified by Unt's substandard performance at Aerospace.

**Performance evaluation.** The record supports the conclusion that Unt's performance review for 1974-75 was "an accurate and fair appraisal" of his performance. Unt himself so characterized the evaluation. That evaluation, prepared prior to the filing of any grievance by Unt, ranked him fourteenth of sixteen program office members. This poor performance was not based on his

opposition to what he considered to be discriminatory employment practices, but on his history of conflict with associates and his inability to complete work assignments.

**Denial of Promotions.** The court could have reasonably concluded from the evidence that Unt's application for Manager of Avionics Systems Software was rejected because he lacked not only the requisite technical qualifications, but also the communication skills needed to function effectively as a manager. Consequently, there was no error in the trial court's finding that Aerospace's decision to hire another and more qualified applicant was based on legitimate business reasons. The record similarly supports the company's rejection of other applications by appellant for managerial positions during 1975.

**Merit Increase.** The trial court found that Aerospace was justified in awarding appellant a 3.6% merit increase in December 1975, rather than the average employee raise of 8.5%. The evidence supported the conclusion that the low increase was due to Unt's consistently inadequate, and even deteriorating*1446 performance between the date the raise was recommended and the date that it was to become effective. Other employees showing substandard performance were also given raises less than originally projected. Thus, the court's finding on this issue of fact is not clearly erroneous.

**Transfer.** The trial court concluded that Unt's transfer to another division in February 1976 was justified by legitimate business reasons. This finding is supported by evidence of Unt's poor performance in the GPS Program Office. Aerospace management rated Unt's performance in the program office below average. This evaluation was reinforced by Unt's two unauthorized communications with the Air Force. Unt's writing to the Air Force violated a company policy that such written communication be approved by management. His supervisors believed that the violations jeopardized the very sensitive working relationship between the company and the Air Force. Testimony at trial supports the conclusion that appellant's filing of a grievance against Aerospace was not a factor in Unt's transfer to a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.