1  FRED M. PLEVIN (SBN 126185)
   SANDRA L. MCDONOUGH (SBN 193308)
2  ALBERT R. LIMBERG (SBN 211110)
   **PAUL, PLEVIN, SULLIVAN &**
3  **CONNAUGHTON** LLP
   401 B Street, Tenth Floor
4  San Diego, California 92101-4232
   Telephone: 619-237-5200
5  Facsimile: 619-615-0700

6  AMY S. GONZALEZ (SBN 181745)
   **SAN DIEGO COUNTY REGIONAL AIRPORT**
7  **AUTHORITY**
   3225 N. Harbor Drive
8  San Diego, CA 92138
   Telephone: (619) 400-2425
9  Facsimile: (619) 400-2428

10

   Attorneys for Defendant
11 SAN DIEGO COUNTY REGIONAL AIRPORT
   AUTHORITY
12

13            UNITED STATES DISTRICT COURT

14          SOUTHERN DISTRICT OF CALIFORNIA

15 JOSE HERNANDEZ,                    CASE NO.

16            Plaintiff,              **NOTICE OF REMOVAL OF ACTION**
                                      **UNDER 28 U.S.C. § 1442(B)**
17       v.                           **(FEDERAL QUESTION)**

18 SAN DIEGO COUNTY
   REGIONAL AIRPORT
19 AUTHORITY, a public entity; and
   DOES 1 through 12, inclusive,      **EXHIBIT 53**
20                                    **[pps 609 thru 611(1-419)]**
            Defendants.
21

22 ///

23 ///

24 ///

25

26

27

28

'08 CV 0184 L CAB

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

NOTICE OF REMOVAL                         1

**EXHIBIT 53**

1  FRED M. PLEVIN (SBN 126185)
   SANDRA L. MCDONOUGH (SBN 193308)
2  ALBERT R. LIMBERG (SBN 211110)
   **PAUL, PLEVIN, SULLIVAN & CONNAUGHTON** LLP
3  401 B Street, Tenth Floor
   San Diego, California 92101-4232
4  Telephone: 619-237-5200
   Facsimile: 619-615-0700

5

6  AMY S. GONZALEZ (SBN 181745)
   **SAN DIEGO COUNTY REGIONAL AIRPORT**
7  **AUTHORITY**
   3225 N. Harbor Drive
8  San Diego, CA 92138
   Telephone: (619) 400-2425
9  Facsimile: (619) 400-2428

10 Attorneys for Defendant
   SAN DIEGO COUNTY REGIONAL AIRPORT
11 AUTHORITY

12

13              SUPERIOR COURT OF THE STATE OF CALIFORNIA

14                        COUNTY OF SAN DIEGO

15 JOSE HERNANDEZ,                    CASE NO. GIC871979

16        Plaintiff,                  **DEFENDANT SAN DIEGO COUNTY**
                                      **REGIONAL AIRPORT AUTHORITY'S**
17     v.                            **NOTICE OF LODGMENT OF EXHIBITS IN**
                                      **SUPPORT OF MOTION FOR SUMMARY**
18 SAN DIEGO COUNTY REGIONAL          **JUDGMENT OR, IN THE ALTERNATIVE,**
   AIRPORT AUTHORITY, a public entity; **SUMMARY ADJUDICATION**
19 and DOES 1 through 12, inclusive,

20        Defendants.                 Date:          November 16, 2007
                                      Time:          1:30 p.m.
21                                    Dept:          75
                                      Judge:         Hon. Richard E. Strauss
22                                    Complaint Filed: September 1, 2006
                                      Trial Date:    January 4, 2008
23
                                          **EXEMPT FROM FEES**
24                                        **GOVT. CODE § 6103**

25

26

27

28

FILED
CIVIL BUSINESS OFFICE 13

2007 AUG 31  P 4 33

COURT
SAN DIEGO COUNTY, CA

53-609

TO PLAINTIFF JOSE HERNANDEZ AND HIS ATTORNEYS OF RECORD:

Defendant San Diego County Regional Airport Authority (the "Authority") submits the following exhibits in support of its motion for summary judgment or, in the alternative, summary adjudication. The authentication for each exhibit is contained in parentheticals after the description of each exhibit:

**Exhibit 1:** Excerpts of Jose Hernandez' Deposition taken on December 18-22, 2006. (McDonough Dec. ¶ 3.)

**Exhibit 2:** Condensed copies of the Deposition of Jose De Jesus Hernandez, Vols. I-V, taken on December 18-22, 2006. (McDonough Dec. ¶ 4.)

**Exhibit 3:** The San Diego County Regional Airport Authority's Ethics Code (Russell Dec. ¶ 10; Burchyett Dec. ¶ 11)

**Exhibit 4:** January 19, 2006, letter from Edward Patrick Swan to Thella Bowens (Swan Dec. ¶ 12; Bowens Dec. ¶ 9)

**Exhibit 5:** February 3, 2005 Memorandum from Tony Russell (Russell Dec. ¶ 5.)

**Exhibit 6:** Report of the Office of the Chief Auditor; Investigation into Ethics Violation Claims by Jose Hernandez dated September 5, 2006 (Burchyett Dec. ¶ 7)

**Exhibit 7:** Miscellaneous Authority Codes and Policies (Russell Dec. ¶ 10; Burchyett Dec. ¶ 11)

**Exhibit 8:** Form 700, Dated February 4, 2005 and Received by the Authority on February 9, 2005 (Hernandez 259:4-19; Russell Dec. ¶ 8)

**Exhibit 9:** Form 700, dated February 12, 2006 and received by the Authority on February 24, 2006 (Russell Dec. ¶ 8)

**Exhibit 10:** Form 700 filled out by Hernandez (Hernandez 267:9-13; 277:4-19)

**Exhibit 11:** Conflict of Interest Training, Sign-in sheet dated February 4, 2005 (Hernandez 253:10-254:7; Russell Dec. ¶ 7)

**Exhibit 12:** Conflict of Interest Training powerpoint presentation from February 4, 2005 (Russell Dec. ¶ 6)

**Exhibit 13:** Form 700, Statement of Economic Interests (2003/2004) published by the

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

NOTICE OF LODGMEENT OF EXHIBITS IN
SUPPORT OF SUMMARY JUDGMENT MOTION

1

1  Fair Political Practices Commission (McDonough Dec. ¶ 15)[1]

2      **Exhibit 14:**  Discovery Requests propounded by the Authority to Hernandez with

3  Corresponding Responses from Hernandez (McDonough Dec. ¶ 16).

4      **Exhibit 15:**  March 2, 2001 letter from the Port of San Diego to Jose Hernandez

5  (Hernandez 79:17-80:9)

6      **Exhibit 16:**  October 3, 2003 letter from Theodore Sexton to Jose Hernandez (Hernandez

7  93:16-25.)

8      **Exhibit 17:**  Form 700, Statement of Economic Interests (2004/2005) (Hernandez 256:23-

9  257:1)

10      **Exhibit 18:**  Lease between the Authority and the Port with regard to the Teledyne Ryan

11  property (Enarson Dec. ¶ 7).

12      **Exhibit 19:**  Presentation given at a December 17, 2004 meeting regarding the Teledyne

13  Ryan property (Leech Dec. ¶ 6).

14  Dated: August 31, 2007

PAUL, PLEVIN, SULLIVAN &
CONNAUGHTON LLP

16  By: _Sandra L. McD_

17  FRED M. PLEVIN
SANDRA L. MCDONOUGH
18  ALBERT R. LIMBERG
Attorneys for Defendant
19  SAN DIEGO COUNTY REGIONAL
AIRPORT AUTHORITY

20

21

22

23

24

25

26  _____

[1] The Authority requests that the Court take judicial notice of this document pursuant to Evidence Code
27  section 452.

28

NOTICE OF LODGMEENT OF EXHIBITS IN
SUPPORT OF SUMMARY JUDGMENT MOTION

2

**EXHIBIT 1**

CERTIFIED COPY

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN DIEGO

JOSE HERNANDEZ,                          )
                                         )
            Plaintiff,                   )
                                         )
    vs.                                  )   No. GIC 871979
                                         )
SAN DIEGO COUNTY REGIONAL AIRPORT        )
AUTHORITY, a public entity; and          )
DOES 1 through 12, inclusive,            )
                                         )
            Defendants.                  )
_____     )


VOLUME I

DEPOSITION OF JOSE DE JESUS HERNANDEZ, the

plaintiff herein, noticed by Paul, Plevin,

Sullivan & Connaughton, at 401 B Street,

11th Floor, San Diego, California, at

10:00 a.m., Monday, December 18, 2006,

before Jennifer K. Winters, CSR 8543.


Hutchings Number 146564-SD



**HUTCHINGS**℠
**COURT REPORTERS**
**GLOBAL LEGAL SERVICES**

HEADQUARTERS:
6055 E. WASHINGTON BLVD., 8TH FLOOR
LOS ANGELES, CA  90040-2429

**800.697.3210**  323.888.6300
FAX: 323.888.6333 • www.hutchings.com

53-611 (2)

1    you to continue working at Ace Parking?

2         A.  I believe at that particular point I didn't

3    want to -- I didn't want to and I didn't even ask.  It

4    was just -- it was just not the right type environment

5    for -- for me and my family to --

12:01P  6         MS. CHINN:  Can I ask you something off the record?

7         THE WITNESS:  Uh-huh.

8         MS. CHINN:  Is that the time he was drunk?

9         THE REPORTER:  Wait, are we off the record?

10        MS. CHINN:  Yes, we're off the record for a moment.

11        THE VIDEOGRAPHER:  Wait a second --

12        MS. CHINN:  I'm going to ask my client something.

13        THE VIDEOGRAPHER:  -- off the record at 12:01.

14        (Discussion held off the record.)

15        THE VIDEOGRAPHER:  Back on the record at 12:01.

16        MS. CHINN:  There's no question pending.

17        MS. McDONOUGH:  That's right.

18        Q.  Scott Jones is the owner of Ace Parking?

19        A.  Yes.

20        Q.  You mentioned you had some sort of a

21   compensation agreement?

22        A.  Yes.

23        Q.  Is that in writing?

24        A.  I believe I still have it in writing, yeah.

25        Q.  Have you produced your compensation agreement

75

53-611 (3)

```
 1    $72,800 --

 2          A.  Yes.

 3          Q.  -- as the manager of ground transportation?

 4          A.  Yeah.  If you have the documentation in front

 5    of you it must be true.

 6          Q.  I'm not trying to trick you and I don't want

 7    you to assume that anything is true just because I'm

 8    looking at a document.

 9          A.  Yeah.  You know, clearly with mine they're all

10    direct deposits.  I don't -- you know, money to me isn't

11    a focus.  It's -- it's opportunities to do whatever it

12    is I'm going to do.  So you can -- I mean for me to tell

13    you specific on this day I got a raise, I really

14    wouldn't be able to answer that for you because that's

15    not how I'm driven.

16          MS. McDONOUGH:  Okay.  We'll mark as Exhibit 6 a

17    letter dated October 3rd, 2003, from Ted Sexton to

18    you.  [EXH]

19          THE WITNESS:  Okay.

20          MS. McDONOUGH:

21          Q.  Have you seen this document before?

22          A.  Yes.  This is the letter -- this is a letter

23    that finally -- let me see, I believe -- yeah, this is

24    the one where I was extended the opportunity to be

25    director of landside operations.
```

12:23P (line 22)

93

53-611 (4)

1    phased out or they were trying to phase him out of his

2    job in there and so that's why he was so integral in the

3    development of these.  In fact, he probably put this --

4    this chart together here (indicating).

2:02P    5        Q.  Did you have any understanding in 2004 as to

6    why a reorganization was being discussed as a

7    possibility?

8        A.  There was -- there was a thought -- there was a

9    thought at that particular time in a discussion that

10    Ted Sexton and I had that -- that several other VPs were

11    trying to kind of protect themselves and shade -- or

12    shed themselves of responsibilities and kind of hide

13    themselves.  So if there was a re-org those areas of

14    responsibility would shift at that particular time and

15    they were no longer -- and they would no longer be held

16    liable for -- for those situations.  And, you know, in

17    fact, that's -- in my mind that's kind of what happened

18    when the re-org finally came down.

19        Q.  When did your employment with the Authority

20    end?

2:03P    21        A.  I don't have an exact date, February -- was it

22    February?  Yeah, February, 2005:

23        Q.  2006?

24        A.  2006, I'm sorry, yes.

25        Q.  I'm looking at Exhibit 6, which is the

114

53-611 (5)

```
1    October 3rd, 2003, letter --

2         A.  Yes.

3         Q.  -- and the offer of the promotion.

4         A.  Yes.

5         Q.  Did the Authority follow through with the items

6    listed there in the letter?  The first bullet point is

7    that you'll report directly to Ted Sexton and have

8    responsibility for all aspects of the Authority wide

9    landside operations and related activities.  Is that

10   correct --

11        A.  Yes.

12        Q.  -- from October, 2003, to the end of your

13   employment?

14        A.  That's correct.

15        Q.  And at -- starting in October of 2003 did you

16   receive a biweekly salary of thirty-five hundred?

17        A.  I believe that's correct.

18        Q.  And were you entitled to participate in the

19   employee benefit plan?

20        A.  That's correct.

21        Q.  And you were an at-will employee as the third

22   bullet point indicates?

2:04P  23        A.  That's correct.

24        Q.  And did you have any document that modified the

25   terms of that at-will agreement?
```

115

**53-611 (6)**

1          Q.  Had you and Scott Jones ever had any

2     communication where he accused you of stealing?

3          A.  Absolutely never.  I had no reason to.

4          Q.  Have you ever confronted Scott Jones about him

5     accusing you of stealing from Ace?

6          A.  No.

7          Q.  Have you spoken to Scott Jones since you left

8     Ace?

2:18P   9          A.  Never.

10          Q.  Are you aware that Scott Jones is a partial

11     owner of Lindbergh Parking?

12          A.  Yes.  He is -- he is a minority owner.

13          Q.  Do you know how much he owns?

14          A.  I believe it's 40 percent of the company.

15          Q.  Did Scott Jones own 40 percent of

16     Lindbergh Parking when you were employed at the

17     Authority?

18          A.  Yes, I believe so.

19          Q.  And Lindbergh Parking does business with the

20     Authority, or did when you were employed there; is that

21     correct?

22          A.  Yes.

23          Q.  What's the relationship between

24     Lindbergh Parking and the Authority, if you know?

25          A.  Lindbergh Parking is a service provider of the

127

HUTCHINGS COURT REPORTERS, LLC - GLOBAL SERVICES - 800.697.3210

**53-611 (7)**

1    Airport Authority but Scott Jones as an individual is a

2    partner, not as Ace Parking.

2:19P    3      Q.  Did you ever have a parking pass from Ace while

4    you were employed at --

5         A.  Yes.

6         Q.  -- the Authority?

7    Was the pass good at any of the Ace lots?

8         A.  No.

9         Q.  What was the pass good for?

10        A.  The parking pass was only good for Qualcomm

11   stadium and -- and the ballpark downtown.

12        Q.  Petco?

13        A.  Yes.

14        Q.  Where did you obtain the parking pass?

15        A.  Steve Kitts, who was a manager of those

16   properties, happened to be a neighbor.  We lived in the

17   same housing association.  And he gave -- he gave that

18   pass to me.

19        MS. CHINN:  How do you spell his last name?

20        THE WITNESS:  K-I-T-T-S.

21        MS. McDONOUGH:

22        Q.  And when did Steve give you the pass?

23        A.  Probably a little bit after the Padres moved

24   downtown.  I think I only had it for about a year so, I

25   don't know, sometime around 2005.

HUTCHINGS COURT REPORTERS, LLC - GLOBAL SERVICES - 800.697.3210

53-611 (8)

1        MS. McDONOUGH:

2        Q.  They did not have a business relationship?

3        A.  No.

4        Q.  Do you know whether Ace Parking ever tried to

5   obtain any sort of a business relationship with the

6   Authority while you were working there?

7        A.  They did.

8        Q.  What do you know about that?

9        A.  There was -- immediately after or about a year

10  after the parking management agreement was renewed for

11  LPI, which is a five year agreement, a request was made

12  by -- by Maurice -- by Maurice Gray to sell his interest

13  to Scott Jones as an individual, with -- with Ace then

14  assuming the management rights to the parking -- parking

15  management.

16       Q.  Do you know about what year that was?

17       A.  That was -- I want to say right around January,

18  2005.

19       Q.  Prior to January, 2005, do you know whether

20  Ace Parking was trying to set up some sort of business

21  relationship with the Authority?

22       A.  No.

23       Q.  Do you recall when you attended the Padres

24  game --

25       A.  No.

151

HUTCHINGS COURT REPORTERS, LLC - GLOBAL SERVICES - 800.697.3210

**53-611 (9)**

1      Q.   Or any one-way ticket?

2      A.   (No audible response.)

3      Q.   No?

4      A.   Not that I recall, no.

5      Q.   Or any other tickets given to your family or

6  friends?

7      A.   Not that I recall.

8      Q.   Did you travel on Hawaiian Airlines in May,

9  2004, to Maui?

10     A.   Yes, I did.  No.  Yes, to Oahu.

11     Q.   To Oahu --

12     A.   Uh-huh.

13     Q.   -- excuse me.  How did you receive the tickets

14  to Oahu in May, 2004?

15     A.   Janet -- Janet Nix had -- had given me some

16  non-rev passes to go -- to fly on Hawaiian Airlines.

17     Q.   I know what they mean but just for the record

18  what is a non-rev pass?

19     A.   A non-revenue pass is standby, space available.

20  They have no value whatsoever in the tickets.  They are

21  often given as a courtesy or, you know, when customers

22  have complained.  The good thing is you can fly

23  somewhere.  The bad thing is you're at the mercy of the

24  loads of how busy the -- the airline is or not.  There's

25  times that you can wait a week or two weeks before you

198

HUTCHINGS COURT REPORTERS, LLC - GLOBAL SERVICES - 800.697.3210

1   get on.  So it's all -- it's all standby.  That's why

2   they carry no value on them.

4:06P  3       Q.  How did it come about that Janet Nix gave you

4   the non-revenue passes?

5       A.  Janet Nix and I had been talking about, you

6   know, I hardly ever take vacation.  She says you got to

7   take vacation.  I said, okay, we're thinking about going

8   down to Mexico.  She says, well, if -- if you want to,

9   you know, we will -- I will give you these non-rev

10  passes if you want to go, you know, because, you know,

11  we want you to -- I want you, if you want to, go to --

12  go to Hawaii.  So she had brought up and initiated

13  and -- and given me the passes.

14      Q.  How many passes did she give you?

15      A.  There was four.

16      Q.  One for each member of your family?

17      A.  Yes.

18      Q.  Do you know if Janet Nix has unlimited access

19  to the non-revenue passes?

20      A.  She has full discretion to give those out as

21  she wishes.  And even in this particular case she had

22  received approval from her direct supervisor to do so.

4:07P  23     Q.  Do you know who her direct supervisor is?

24      A.  No.  I just remember she had asked permission

25  and she had received permission to give away these --

HUTCHINGS COURT REPORTERS, LLC - GLOBAL SERVICES - 800.697.3210

**53-611 (11)**

1    the non-revenue passes.

2        Q.  And your other family members were able to get

3    on a flight before you; is that correct?

4        A.  Yes, that's correct.

5        Q.  So they went out on one day and then you took

6    the flight the next day?

7        A.  And I took the next day.

8        Q.  So you used all four of the roundtrip

9    non-revenue passes --

10       A.  That's correct.

11       Q.  -- to go to Oahu?

12       A.  Oahu.

13       Q.  Did you ever provide any compensation to

14   Janet Nix for the passes?

15       A.  Did I ever pay for -- for no value passes?

16       Q.  Yes.

17       A.  No.

18       Q.  Did your family stay with Amiel Porta's parents

19   when they arrived in Oahu?

20       A.  That's correct.

21       Q.  And that was just for the one night?

22       A.  That was just for the one night.

23       Q.  Did you have any work related business in Oahu

24   when you were there?

25       A.  No.

200

HUTCHINGS COURT REPORTERS, LLC - GLOBAL SERVICES - 800.697.3210

**53-611 (12)**

1          I declare under penalty of perjury under the laws

2     of the State of California that the foregoing is true

3     and correct.

4

5          Executed at _____, California,

6     on _____.

7

8

9          _____
                  JOSE DE JESUS HERNANDEZ

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HUTCHINGS COURT REPORTERS, LLC - GLOBAL SERVICES - 800.697.3210

**53-611 (13)**

1    STATE OF CALIFORNIA ) ss

2

3        I, Jennifer K. Winters, CSR 8543, do hereby declare:

4

5        That, prior to being examined, the witness named in

6    the foregoing deposition was by me duly sworn pursuant

7    to Section 2093(b) and 2094 of the Code of Civil

8    Procedure;

9

10       That said deposition was taken down by me in

11   shorthand at the time and place therein named and

12   thereafter reduced to text under my direction.

13

14       I further declare that I have no interest in the

15   event of the action.

16

17       I declare under penalty of perjury under the laws

18   of the State of California that the foregoing is true

19   and correct.

20

21       WITNESS my hand this _____2nd_____ day of

22   _____January_____, _____2007_____.

23

24   _Jennifer K. Winters_____

25   Jennifer K. Winters, CSR 8543

                          225

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
                   800.697.3210

53-611 (14)

CERTIFIED COPY

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN DIEGO

JOSE HERNANDEZ,                          )
                                         )
              Plaintiff,                 )
                                         )
        vs.                              )    No. GIC 871979
                                         )
SAN DIEGO COUNTY REGIONAL AIRPORT        )
AUTHORITY, a public entity; and          )
DOES 1 through 12, inclusive,            )
                                         )
              Defendants.                )
_____)


VOLUME II

DEPOSITION OF JOSE DE JESUS HERNANDEZ, the plaintiff

herein, noticed by PAUL, PLEVIN, SULLIVAN &

CONNAUGHTON LLP, taken at 401 B Street, 10th

Floor, San Diego, California, at 10:10 a.m. on

Tuesday, December 19, 2006, before Suzanne M.

Soper, CSR 8120.


Hutchings Number 146567-SD



**HUTCHINGS**℠
**COURT REPORTERS**
**GLOBAL LEGAL SERVICES**

HEADQUARTERS:
6055 E. WASHINGTON BLVD., 8TH FLOOR
LOS ANGELES, CA 90040-2429

**800.697.3210**  323.888.6300
FAX: 323.888.6333 • www.hutchings.com

53-611 (15)

23:21    1          On the second page you've listed two items.  The

         2     first is "Hawaiian Airlines airline tickets, space

         3     available passes, standby use only"; is that correct?

         4          A.   That's correct.

23:21    5          Q.   And are those the four tickets that your family

         6     received from Janet Nix that you testified about

         7     yesterday?

         8          A.   That's correct.

         9          Q.   And you received those in May of 2004?

23:21   10          A.   That's correct.

        11          Q.   And at the time you received those, you

        12     understood that Hawaiian Airlines was doing business

        13     with the Authority; correct?

        14          A.   That's correct.

23:21   15          Q.   Why didn't you report this Hawaiian Airlines

        16     standby tickets on the prior year's Form 700?

        17          A.   It was my understanding that I was not required

        18     to do so because they had no value to it, zero value.

        19     And that's how it's submitted on each one of these

23:21   20     items, as zero value.

        21          Q.   Where did you obtain the understanding that you

        22     did not have to report the standby tickets?

        23          A.   It's my understanding that space -- space

        24     available tickets have -- carry no value whatsoever to

23:22   25     them, so there's -- there -- there would be no reason on

                                    280

              HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
                                800.697.3210

                                                        **53-611 (16)**

23:22   1     my part to disclose things that -- that are really --

        2     carry no value to them.

        3         Q.  Did anyone ever tell you that you did not have

        4     to report standby or non-revenue tickets?

23:22   5         A.  I don't -- I don't recall.

        6         Q.  And then you listed "Southwest Airlines, 2004,

        7     airline tickets, buddy passes, standby use only."

        8         Are those the tickets that we've already discussed

        9     from Mike Parrish?

23:22  10         A.  For -- Yes, for my children.

       11         Q.  And it says "CY 2004"?

       12         A.  It's somewhere in between calendar year 2004,

       13     somewhere.

       14         Q.  So "CY" means "calendar year"?

23:23  15         A.  Yes, ma'am.

       16         Q.  And is there a reason why you didn't report the

       17     Southwest Airlines on the prior form?

       18         A.  Once again, they carry no value whatsoever.

       19         Q.  But you did use these tickets that are listed

23:23  20     here to fly somewhere, or your family did; correct?

       21         A.  My children went -- flew back to -- to spend a

       22     couple days with Mike Parrish's kids, correct.

       23         Q.  And they didn't pay anything for the flight?

       24         A.  I believe, if they -- if they used the buddy

23:23  25     passes, they would -- they would have no value, and they

                                    281

**53-611 (17)**

02:05    1    not move forward with that project.

2    Q.  Have you ever seen an agreement between Host

3    and the Authority for that upper area of the Terminal 1

4    Southwest rotunda?

02:05    5    A.  I believe I had read the -- the overall Host

6    concession agreement to just familiarize myself with it,

7    but that -- that was over two years ago, and I don't

8    remember exactly.

9    Q.  That's the Host concession agreement for the

02:05    10    entire airport?

11    A.  Yes, ma'am.

12    Q.  Do you know if Host has amendments to that

13    agreement or other portions of the agreement that are

14    specific to certain areas within the airport?

02:06    15    A.  I don't -- I don't recall.

16    Q.  In your Complaint, you've also accused Bryan

17    Enarson of making it more difficult to comply with the

18    ADA -- is that correct? -- through this restroom

19    project?

02:06    20    A.  It was -- It was more his unwillingness to --

21    to work with us to take that space away from Host would

22    make it impossible for us to comply with ADA

23    requirements because you had -- that space was needed so

24    we can comply with the -- with the 2-percent grade

02:06    25    from -- from the floor up to the restrooms and then

343

**53-611 (18)**

02:06    1    landing requirements.

2         So without the ability of having that space, we

3    were unable to move forward with the project because we

4    would not be able to comply with the ADA requirements.

02:06    5         Q.  When did you first determine that the Authority

6    was going to be unable to comply with the ADA

7    requirements in relation to the restroom and the

8    Terminal 1 Southwest rotunda?

9         A.  It was -- It was presented to us even back in

02:07    10    maybe 2002, 2003 when -- when the -- I believe it was

11    Parsons who was our construction manager at the time,

12    when they had put some options together for the landing.

13         But it was specific to them, to those drawings,

14    that in order for you to move forward with this project,

02:07    15    we needed to have that space and that -- for these

16    reasons:  2-percent grade, landing requirements.

17         Q.  So Parsons presented it to the Authority in

18    2002 or 2003?

19         A.  It was presented to -- to project sponsors,

02:07    20    which was terminal operations, who -- who worked for me,

21    and -- the project sponsors.

22         Q.  In what manner was it presented?  Was it a

23    written -- written plan, or was it a presentation?  What

24    was it?

02:08    25         A.  There were some rough schematics initially that

344

02:10    1    that committee.

2    Q.   Who was on the Capital Improvement Committee at

3    the time that Parsons presented the first rough

4    schematic?

02:10    5    A.   It was back in -- When the initial schematics

6    and the thought was to move with this particular one, it

7    was back in 2002.  I don't exactly remember.  But it had

8    been stalled back from 2002 to 2005, and -- and it still

9    hasn't been built.

02:11    10    Q.   And when you say "terminal operations staff,"

11    who you are referring to?

12    A.   Referring to -- Let's see.  It was Danette --

13    I -- I believe Danette might -- Danette Bewley may have

14    been there for -- for a period of that time, but also

02:11    15    Amiel Porta and Jay Bass.

16    Q.   So Parsons first raised this ADA issue in 2002?

17    A.   Yeah.  It was -- It was part of -- I guess to

18    say it was raised, it was just as part of the

19    requirements to comply with this.  "This is what you

02:11    20    need to do if you want to build this project, and this

21    is how we recommend you move forward with this:  You are

22    going to need to take this 30 square feet of space in

23    there."

24    Q.   So if you want to build the restrooms and move

02:11    25    forward with it, you're going to need to take the

347

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210

**53-611 (20)**

02:11    1    30 square feet of space on the left-hand side of the

         2    area as you go up?

         3         A.   That's correct.

         4         Q.   Do you have any particular expertise with the

02:12    5    ADA?

         6         MS. CHINN:  Objection.  That calls for a legal

         7    conclusion.

         8         THE WITNESS:  What -- Specific to this project and

         9    the requirements at 2-percent grade, the specifics to

02:12   10    the landing, yeah.  I am -- I was not -- I don't -- I

        11    can't label myself as an expert, but I am going off

        12    of -- of advice of -- of the architects who put the

        13    drawings together.

        14         MS. MCDONOUGH:

02:12   15         Q.   So with regard to this particular project, your

        16    knowledge of the ADA comes from the architects'

        17    suggestion?

        18         A.   We would always -- We would make it a practice

        19    to -- to ensure that the architects fully understood

02:12   20    ADA -- ADA requirements, and we would move forward with

        21    projects in that manner.

        22         Q.   So your specific knowledge of the ADA in this

        23    restroom context was from the architects themselves; is

        24    that correct?

02:13   25         A.   For this particular one, exactly.

                              348

          HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
                            800.697.3210

**53-611 (21)**

02:22   1      it to continue and fill out and finish out the project.

        2          Q.  When did you --

        3          A.  It was a high property for us.

        4          Q.  When did you resurface the project?

02:22   5          A.  I want to say 2004.  But the -- the minutes in

        6      the capital improvement plan -- there's an actual book

        7      that -- that details all the capital improvements

        8      projects and by -- by who the sponsor is, and that'll

        9      tell you exactly what the timeline -- timeline is.

02:23  10          Q.  Did you ever specifically discuss with

       11      Ted Sexton the fact that there was not enough room to

       12      comply with the ADA?

       13          A.  That was part of our briefing with him, that

       14      if -- that this was the option that we all wanted to

02:23  15      move forward to, and unless we got this space, we

       16      received this space from the news and gift area, we

       17      would be unable to comply with ADA regulations -- or ADA

       18      requirements.  I apologize.

       19          Q.  When was this briefing that you had with

02:23  20      Ted Sexton?

       21          A.  Probably in 2003, 2004.  I don't -- It was --

       22      It had been awhile because we had been working -- we had

       23      been working for quite a long time to get those

       24      restrooms built.  It was a high priority for us.

02:23  25          Q.  Did you ever raise the ADA issues again with

                                  357

**53-611 (22)**

02:23    1    Ted Sexton after that initial briefing in 2003?

2         A.  It was understood that at -- that at time, that

3    in order to move forward with this project, that -- that

4    we needed to have those landing requirements, and that

02:24    5    the only thing holding the construction of this project

6    was the -- the -- the space for the landing.

7         Q.  Who understood that?

8         A.  It was understood between all of -- all of my

9    employees from terminal operations, from Ted Sexton,

02:24    10    from Troy Leech, the real estate staff and -- and the

11    architects, architects and project construction staff

12    from -- from Parsons at the time.

13        Q.  Are you aware of any other Authority employee

14    raising this issue of the space needed for ADA

02:24    15    compliance on the restroom project?

16        A.  No.  I believe that -- that -- that as -- as

17    director and having responsibility for that, that I had

18    directed my employees.  I would -- I -- I told them that

19    I would work with Ted to try to get that space.

02:25    20        We had then proceeded to -- to look at alternatives

21    or see -- once again negotiate with Troy Leech, see what

22    it is that we needed to do to get that space.

23        Q.  So you don't remember any specific

24    conversations with Ted Sexton after that initial

02:25    25    briefing in 2003 where you specifically said, "We can't

358

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210

53-611 (23)

03:23    1    3:23.

         2        MS. MCDONOUGH:

         3        Q.   Is there any reason why you cannot continue to

         4    give your best testimony?

03:23    5        A.   No.

         6        Q.   You alleged in the Complaint in this action

         7    that Bryan Enarson improperly negotiated a lease for the

         8    General Dynamics property.  Is that correct?

         9        A.   Yes.

03:24   10        Q.   What property are you referring to when you

        11    talk about the General Dynamics property?

        12        A.   The -- The -- General Dynamics is -- is

        13    actually the -- the former -- the former General

        14    Dynamics plant on -- along Pacific Highway at the

03:24   15    intersection of Sassafras.  It's approximately 85,

        16    87 acres located just on the north side -- north side of

        17    the airport.

        18        Q.   Do you know when the lease for that property

        19    was negotiated?

03:24   20        A.   Immediately -- Right around the same time that

        21    we split from -- the Airport Authority was created and

        22    the airport split from the Port of San Diego.

        23        Q.   And the lease is between the Authority and who?

        24        A.   The Authority and the Port of San Diego.

03:24   25        Q.   So the Port owns the property?

386

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210

**53-611 (24)**

03:29   1   illegal was the overpayment.

2   A. The overpayment, absolutely.

3   Q. Are you aware that there is a California code

4   section that sets the amount of payments that are

03:29   5   required under the lease for the General Dynamics

6   property?

7   MS. CHINN: Objection. That mischaracterizes the

8   statute. And the statute is Public Utilities Code

9   Section 170056. Are you familiar with that?

03:30   10   THE WITNESS: I -- I don't have that information in

11   front of me. I can't -- I -- I can't tell you whether

12   that's -- that's the case or not.

13   MS. MCDONOUGH:

14   Q. Are you aware that any California code even

03:30   15   addresses the Authority's lease of the General Dynamics

16   property?

17   A. I believe -- I believe there is a code that

18   addresses that, the lease, or -- or -- or ratifies the

19   lease payments in there, or to some effect, that calls

03:30   20   out what the lease payments are going to be for that

21   property.

22   Q. When did you first become aware that there was

23   such a code?

24   A. After -- You know, it had -- it had come to my

03:30   25   attention, but I can't tell you exactly when -- when --

391

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210

**53-611 (25)**

03:30    1    when I knew.  I can't give you an exact date.

2    Q.  Did it come to your attention at the time that

3    the -- or shortly after the General Dynamics lease had

4    been negotiated?

03:31    5    A.  I believe after that.

6    Let me take it back.

7    I believe that that code was then -- was -- was

8    somewhere closer to the time that the subsequent

9    Teledyne-Ryan lease was negotiated.

03:31    10    Q.  And about what time period is that?

11    A.  Maybe 2004.

12    Q.  That's when you first have a memory of knowing

13    about the code section?

14    A.  I'm just -- I'm -- I'm estimating, somewhere in

03:31    15    there.

16    Q.  Do you know how you became aware of the Public

17    Utilities Code section regarding the General Dynamics

18    lease?

19    A.  I believe it was published.  It was published

03:31    20    and distributed to Airport Authority personnel.

21    Q.  Do you know who distributed it?

22    A.  I believe it was sent to me as -- it was sent

23    to me from -- from the real estate department since I

24    had oversight -- primary oversight for that property.

03:32    25    Q.  Did you ever tell anyone at the Authority that

392

53-611 (26)

03:32    1        you thought that the General Dynamics lease was a bad

         2        idea?

         3              A.  Oh, absolutely.

         4              Q.  Who did you tell?

03:32    5              A.  Ted Sexton.

         6              Q.  What did you specifically say to Ted Sexton?

         7              A.  When -- When the deal or the thought of the

         8        deal was presented, I went to Ted and say, "Ted, I think

         9        we're" -- "we're paying too much for this property.

03:32   10        I've looked at" -- "at the revenue analysis through

        11        there.  I know what I can make on parking lot.  I know

        12        what we make on the rental cars.  And at the end of the

        13        day, we're going to end up losing a couple millon

        14        dollars, couple millon dollars which is going to come

03:32   15        out of the general budget, and it's going to affect our

        16        terminal operations because that's usually where it

        17        comes out of."

        18              Q.  Do you remember approximately what year that

        19        was that you talked to Ted Sexton about the

03:33   20        General Dynamics lease?

        21              A.  I know it was -- it was prior to -- to the

        22        ratification of the agreement because there was already

        23        some -- there was some thought of -- of what -- what the

        24        payments were going to be.

03:33   25              Q.  Do you know when the agreement was ratified for

                                      393

            HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
                                800.697.3210

**53-611 (27)**

03:36    1        Q.   And the last time you talked to Ted about the

2    overpayment issues was while the lease was being

3    negotiated?

4        A.   Renegotiated, because initially there was a

03:36    5    3 million -- there was a 3-year term, and there had been

6    talk commencing again that -- that -- There was a

7    requirement that after three years, that you would then

8    go back through and renegotiate that lease, absolutely.

9        Q.   And when did you have those discussions with

03:36   10   Ted?  Was that in 2005?

11       A.   Right around 2005, 2004.

12     But originally we had discussions as -- as the

13    terms of that agreement with the Port District were

14    being discussed.  And that information was shared to me.

03:36   15   And I would respond to Ted that "I don't believe we can

16    make that type of money."

17     And the -- the basic uses for that property were

18    parking lot, rent-a-car.  I knew what the parking lots

19    made.  I knew the rent-a-cars made about another millon

03:37   20   dollars a year.  There was no -- There was no other uses

21    for that property -- it's all undeveloped -- with the

22    exception of -- of the parking lot property.

23     We were precluded from expanding that parking lot

24    property because of the contamination issues that were

03:37   25   then discovered.  So when we would go through -- you

396

**53-611 (28)**

03:37 1  know, once that was ratified, then, you know, there's --

 2  there's not much I can do.  But every budget it would

 3  come back up:  "Hey, we need to make an adjustment for

 4  the $2 million additional lease payment on the

03:37 5  General Dynamics" that would hit -- that would hit all

 6  our budgets.  So then we would come back through and

 7  discuss that matter at that time.

 8    Q.  So your understanding was that the first three

 9  years were set by the code and by the lease agreement,

03:37 10  and then after that, it was going to be renegotiated?

 11    A.  I believe that's correct.

 12    Q.  Was that part of your job, to analyze the

 13  revenues from that property?

 14    A.  Yes.  I was -- I was the primary person

03:38 15  responsible for managing that property.  I had -- I had

 16  direct oversight on the parking lot property.  I was the

 17  key point of contact with the rent-a-cars, and I was key

 18  point of contact with the San Diego Convention Center,

 19  which also has a little portion -- which also leases a

03:38 20  little portion of that property.

 21    So, yes, that was part of my responsibility.

 22    Q.  Did you ever talk to anyone aside from

 23  Ted Sexton about your thoughts on the overpayment of the

 24  General Dynamics lease?

03:38 25    A.  No.  I went -- I went straight to -- I went

397

**53-611 (29)**

03:49    1    for alternative use; warehouse space, additional office

2    space, or other uses that might be developed.

3    Q.  Okay.

4    At the time that the Authority entered into the

03:49    5    lease, did you have any information to suggest that the

6    items that you just identified -- Strike that.

7    At the time that the Authority entered into the

8    lease, did you have any information to suggest that the

9    Authority would not be able to do what it intended to do

03:50    10    with the property as you just described?

11    A.  There had been -- There had been conversations

12    that -- that the project may not be able to move forward

13    because the amount of contamination -- the amount of

14    contamination that had a good chance of existing on the

03:50    15    property.

16    Q.  When did discussions regarding the amount of

17    contamination first arise, from your understanding?

18    A.  I believe those discussions were already -- had

19    already been -- had already been made public as part of

03:50    20    the initial settlements with -- with Teledyne-Ryan, or

21    there had been some thoughts that -- that it was

22    contaminated in there and -- that there was

23    contamination to the property.  I don't exactly know

24    what days.

03:50    25    Q.  Did you ever speak to anyone about the

406

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210

**53-611 (30)**

03:50   1    contamination in the property at the time that the

        2    Authority was entering into the lease?

        3         A.   No.   It was my assumption -- It was -- It was

        4    my assumption at that time that -- that the Airport

03:51   5    Authority would have good sense to follow up on -- on

        6    those on their own.

        7         Q.   Have you ever, at any time, talked about the

        8    contamination of the property with anyone at the

        9    Authority?

03:51   10        A.   Oh, absolutely.

        11        Q.   When did you first talk to someone about that?

        12        A.   Once -- Once the determination was made.   When

        13   the Airport Authority assumed that property, we did --

        14   the Airport Authority staff had -- had put together some

03:51   15   staff members to start looking at immediate uses for the

        16   property.

        17        Even -- Even taking a little carve-out, which is

        18   about four -- four or five acres, for 350 stalls, we

        19   encountered severe environmental issues that restricted

03:51   20   our ability to -- to -- to go in and construct that

        21   parking lot.

        22        And then as we started going into the

        23   Teledyne-Ryan -- we put together a Teledyne-Ryan

        24   redevelopment plan, we started noticing more and more

03:52   25   and more and more and more environmental concerns to the

                                407

53-611 (31)

03:52    1    point that when the document was all said and done, it

2    was pretty close to $30 million in remediation costs.

3        Q.  Did you think that anything was illegal about

4    the Teledyne-Ryan lease?

03:52    5        A.  I believe that that -- considering the

6    usability, that -- the -- the -- our ability to use the

7    property, that we had overpaid for the property.

8        Q.  When did you form that belief?

9        A.  Immediately as we were developing -- as we were

03:52    10    developing the -- the design documents for the Phase I

11    of -- of what's called SAN Park -- SAN Park Harbor

12    Drive, which is approximately a 350-space parking lot.

13        Q.  And when was that?

14        A.  2- -- Approximately 2000, late 2003, 2004.

03:53    15        Q.  What do you believe is illegal about overpaying

16    on a lease?

17        A.  It's -- You and I can do it as individuals

18    maybe.  But, you know, as a public entity, we -- as a

19    public entity, you make -- need to make sure that --

03:53    20    that what you pay you can get out of because we have --

21    it's not just Airport Authority funds; it's -- it's

22    airline funds.  It's -- There's more stakeholders in

23    this, and there's some due diligence or proper due

24    diligence that must be followed when you agree to enter

03:53    25    into an extended -- extended lease in this manner.

408

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210

53-611 (32)

03:55    1    doing our own environmental assessments on the property,

2    those numbers greatly shot through the roof.

3         Q.  Did you ever tell anyone at the Authority that

4    you thought that the Teledyne-Ryan lease was illegal or

03:55    5    unlawful?

6         A.  I believe my conversations with Ted -- with

7    Ted Sexton -- once again, my immediate supervisor -- was

8    that we had overpaid for the property, and the property

9    may have been mischaracterized to us and that -- that it

03:55    10    could not be developed in -- in the manner in which we

11    had initially thought we could.

12         Q.  When did you first have that conversation with

13    Ted Sexton?

14         A.  Immediately after we start- -- Immediately as

03:55    15    we began to make the -- to -- to make the designs for

16    the SAN Park project.

17         Q.  Was that the only conversation you had with Ted

18    about overpayment on the Teledyne-Ryan property?

19         A.  No.  We had -- We had continuing conversations

03:56    20    with them because I had presented to him an option or

21    trying to understand why it is that we would continue to

22    pay $3 million for the whole property when I can only

23    use, you know, five acres of it.  Why weren't we -- Why

24    didn't we have the ability to prorate -- to prorate, and

03:56    25    then, as we expanded into additional areas, then go

410

53-611 (33)

| | | |
|---|---|---|
| 03:58 | 1 | environmental, construction, and obviously my side, the |
| | 2 | landside operations. |
| | 3 | Q. Do you remember when this disclosure was? |
| | 4 | A. No, I don't. |
| 03:59 | 5 | Q. Do you remember the year? |
| | 6 | A. It was early on -- early on in the development, |
| | 7 | in the design development, for -- for the parking, for |
| | 8 | the initial Phase I of the Teledyne-Ryan parking |
| | 9 | project. |
| 03:59 | 10 | Q. In 2004 sometime? |
| | 11 | A. That would probably -- That would probably be a |
| | 12 | good guess. |
| | 13 | Q. How long was the meeting where you presented |
| | 14 | your findings? |
| 03:59 | 15 | A. We would meet on a weekly basis, so it was |
| | 16 | about a two-hour meeting. |
| | 17 | Q. On a weekly basis? |
| | 18 | A. Yes. |
| | 19 | Q. Do you know if anyone took notes of those |
| 03:59 | 20 | meetings? |
| | 21 | A. I'm not sure. |
| | 22 | Q. Did anyone else in the meeting express |
| | 23 | dissatisfaction with the terms of the Teledyne-Ryan |
| | 24 | lease? |
| 03:59 | 25 | A. It was more dissatisfaction with -- with the |

413

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210

| | | |
|---|---|---|
| 03:59 | 1 | Airport Authority's lack of due diligence in -- in |
| | 2 | understanding the -- the effects of -- for the |
| | 3 | contamination of that property. |
| | 4 | Q.  Who expressed that dissatisfaction? |
| 04:00 | 5 | A.  It would be Paul Manasjan, who was tasked -- |
| | 6 | Paul Manasjan was the director of Environmental Affairs, |
| | 7 | and Paul was tasked with -- with making each and all |
| | 8 | those environmental assessments. |
| | 9 | Q.  Is there anyone else who expressed |
| 04:00 | 10 | dissatisfaction with the Teledyne-Ryan lease in those |
| | 11 | meetings? |
| | 12 | A.  Primarily it was -- it was myself on the |
| | 13 | revenue side and my inability to be able to expand to |
| | 14 | those projects, and on Paul Manasjan's side for an |
| 04:00 | 15 | underestimation of -- of -- of the environmental |
| | 16 | mitigation that had to take place on the property. |
| | 17 | Q.  Is it fair to say at a certain point in time |
| | 18 | that the whole committee was frustrated with the |
| | 19 | Teledyne-Ryan lease? |
| 04:00 | 20 | A.  Oh, absolutely. |
| | 21 | Q.  When did that frustration begin? |
| | 22 | A.  Well, the frustration came to a -- a pretty big |
| | 23 | head when -- when the initial plan for Teledyne-Ryan was |
| | 24 | presented to the senior -- senior VP group at a meeting |
| 04:01 | 25 | at the Sheraton -- Sheraton Harbor Island where each -- |

414

1        (Whereupon the documents referred to are marked by

2    the reporter as Defense Exhibits 8 through 16 for

3    identification.)

4        (The proceedings concluded at 4:25 p.m.)

5                              * * *

6

7        I declare under penalty of perjury under the laws

8    of the State of California that the foregoing is true

9    and correct.

10

11       Executed at _____, California,

12    on _____.

13

14

15    _____

16                    JOSE DE JESUS HERNANDEZ

17

18

19

20

21

22

23

24

25

                              430

1    STATE OF CALIFORNIA ) ss

2

3        I, Suzanne Soper, CSR 8120, do hereby declare:

4

5        That, prior to being examined, the witness named in

6    the foregoing deposition was by me duly sworn pursuant

7    to Section 2093(b) and 2094 of the Code of Civil

8    Procedure;

9

10        That said deposition was taken down by me in

11    shorthand at the time and place therein named and

12    thereafter reduced to text under my direction.

13

14        I further declare that I have no interest in the

15    event of the action.

16

17        I declare under penalty of perjury under the laws

18    of the State of California that the foregoing is true

19    and correct.

20

21        WITNESS my hand this _____11TH_____ day of

22    January, 2007.

23

24        _____Suzanne M Soper_____

25    Suzanne Soper, CSR 8120

                        431

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
                    800.697.3210

**53-611 (37)**

CERTIFIED COPY

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN DIEGO

JOSE HERNANDEZ,

        Plaintiff,

    vs.

        No. GIC871979

SAN DIEGO COUNTY REGIONAL AIRPORT
AUTHORITY, a public entity; and
DOES 1 through 12 inclusive,

        Defendants.

VOLUME III

DEPOSITION OF JOSE DE' JESUS HERNANDEZ, the plaintiff herein, noticed by PAUL, PLEVIN, SULLIVAN & CONNAUGHTON LLP, at 401 B Street, San Diego, California, at 9:52 a.m., on Wednesday, December 20, 2006, before Delia M. Satterlee, CSR 9114.

Hutchings Number 147265-SD



**HUTCHINGS**℠
**COURT REPORTERS**
**GLOBAL LEGAL SERVICES**

HEADQUARTERS:
6055 E. WASHINGTON BLVD., 8TH FLOOR
LOS ANGELES, CA 90040-2429
800.697.3210   323.888.6300
FAX: 323.888.6333 • www.hutchings.com

53-611 (38)

10:44    1    expense estimates in order to bolster its proposal to

         2    the Authority; is that correct?

         3        A.   Yes, ma'am.

         4        Q.   Why do you believe that LPI purposely submitted

10:44    5    unattainable expense estimates?

         6        A.   Because in conversations -- It had been after

         7    an initial -- after an initial submission, maybe a

         8    three-month period of looking at operating expenses

         9    versus actual -- versus those that were submitted to us.

10:45   10    It was very -- It was very quick -- or we were very

        11    quick to understand that those numbers weren't even

        12    anywhere close to being in the same ballpark.

        13        Q.   Let's go back a little bit in time.

        14        Do you remember when LPI submitted its proposal to

10:45   15    the Authority to provide services to the Authority?

        16        A.   Under -- It was just prior to 2003, somewhere

        17    in that in that 2003, 2004 time frame in there.  They

        18    had an existing five- -- five-year agreement that was

        19    expiring.  And then we had laid out another request for

10:46   20    proposal for qualified operators of parking properties.

        21        Q.   And LPI, along with other operators of parking

        22    properties, submitted bids, essentially, to the

        23    Authority --

        24        A.   That's correct.

10:46   25        Q.   -- for the contract; is that correct?

                                    475

53-611 (39)

10:46    1         A.   That's correct.

         2         Q.   And how long was the new contract going to be?

         3         A.   The new contract would be for a maximum of five

         4    years.

10:46    5         Q.   And you were on the committee that -- selecting

         6    the contractor?

         7         A.   That's correct.

         8         Q.   And you selected LPI as the contractor?

         9         A.   The group selected LPI as the contractor.

10:46   10         Q.   Do you remember who else was on that committee?

        11         A.   I believe Troy Leech was on -- Troy Leech in --

        12    from real estate was on that committee.  It was -- It

        13    was a panel with -- I -- I don't remem- -- I don't

        14    remember exactly how many people were on there, but it

10:47   15    was a -- it was a broad and varied panel.

        16         Q.   Do you remember if there was a runner-up --

        17         A.   Yes.

        18         Q.   -- to LPI?

        19         A.   Yes.

10:47   20         Q.   Who was the runner-up?

        21         A.   Standard Parking.

        22         Q.   What was Standard Parking's bid for the --

        23         A.   The --

        24         Q.   -- contract?

10:47   25         A.   The qualifications -- The qualifications or the

                                          476

| 11:19 | 1 | would -- |
|---|---|---|
| | 2 | A.  Yeah. |
| | 3 | Q.  -- have been fine. |
| | 4 | A.  That was -- And once again, that was -- that |
| 11:19 | 5 | was a -- a misnomer, LPI.  The submittal was submitted |
| | 6 | by LPI and for LPI. |
| | 7 | Q.  Is there any reason were your accidentally |
| | 8 | saying Ace instead of LPI? |
| | 9 | A.  No, just -- just mixing up the words. |
| 11:20 | 10 | Q.  What comments did Bret make in the final RFP |
| | 11 | meeting that you believe influenced the decision? |
| | 12 | A.  Specifically I don't -- I don't recall at this |
| | 13 | time. |
| | 14 | Q.  Do you have any recollection of Bret's comments |
| 11:20 | 15 | in that meeting? |
| | 16 | A.  I don't recall exactly. |
| | 17 | Q.  Do you know what Elizabeth's race is? |
| | 18 | A.  She's black. |
| | 19 | Q.  Do you remember the date of the final RFP panel |
| 11:20 | 20 | meeting? |
| | 21 | A.  No. |
| | 22 | But I believe those dates are clearly spelled out |
| | 23 | in the -- in the RFP submittal. |
| | 24 | Q.  Have you ever told anyone at the Authority that |
| 11:21 | 25 | you believe that LPI purposely submitted lower operating |

493

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210

**53-611 (41)**

11:21    1    expenses for the General Dynamics property?

2    A.    Absolutely.

3    Q.    Who did you tell?

4    A.    My direct supervisor, Ted Sexton.

11:21    5    Q.    When did you tell Ted that?

6    A.    Immediately after looking at the trends.    I

7    believe it was at the -- the -- the three month,

8    six-month submittal.

9         I was very diligent in keeping track of operating

11:21    10    expenses and revenues for the property, and it was

11    quickly highlighted -- or I quickly noticed that there

12    was -- there was a large variation versus what they

13    believed they can operate the property for and versus

14    the actual expense numbers.

11:21    15    Q.    So three or six months into LPI's operation of

16    the new contract --

17    A.    Yeah.    Typically -- Typically the first three

18    months are -- are, you know, some turnover numbers, but

19    your -- your four- to six-month are really indicative

11:22    20    of -- of what the true operating expenses are.

21         You have -- Initially you have some uniform changes

22    that have to be -- which might screw it up a little bit,

23    but your four- to six-month would be more accurate.

24    Q.    What the specifically did you say to Ted at

11:22    25    that time?

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210

11:22   1          A.   After taking a look at the numbers -- taking a

        2   look at the numbers, I -- I went back and pulled out the

        3   RFP submittal and took a look at -- took a look at the

        4   actualized numbers for them and spoke to Ted and asked

11:22   5   him what he wanted me to do, because I didn't

        6   believe, you know, the numbers were too far off.

        7          And then we had base -- we, the Airport Authority,

        8   had based our operating budget on -- on the submittals

        9   from the RFP.  So we had put in -- or we had reflected,

11:22  10   hey, they can do it for a million 1- in our -- my budget

       11   for General Dynamics, it was pretty close to that number

       12   of a million 1-.

       13          Q.   Did --

       14   Are you finished?

11:22  15          A.   I'm done.

       16          Q.   Did Ted respond to your request of what to do

       17   about the situation?

       18          A.   At that particular time, Ted just asked me to

       19   go -- just go work it out with -- or told me just to go

11:23  20   work it out with -- with -- with LPI.

       21          Q.   Did you tell Ted that you thought that LPI's

       22   submission in the RFP process was unlawful or illegal?

       23          A.   I believe that the numbers they had submitted

       24   were -- were inaccurate and were unattainable.

11:23  25          Q.   Did you ever tell Ted that you thought that

                                495

11:26    1          Q.   How many conversations did you have with Ted

         2    Sexton regarding the unattainable numbers submitted by

         3    LPI?

         4          A.   We had more than a few.

11:26    5          Q.   And they -- those conversations began sometime

         6    in 2004?

         7          A.   I -- I don't have the documents in front of me,

         8    so I'd have to look at the trends and see when I first

         9    spotted those trends.  And it was -- it was a

11:26   10    continue -- a "continuant" -- a continual -- First it

        11    was -- it was multiple conversations within a few weeks.

        12          And then at the -- at the point of submission,

        13    for -- for every one of their profit and loss

        14    statements, go back through and -- and reflect to him

11:26   15    what -- you know, what the numbers were in terms of --

        16    of -- of actual expense numbers versus what LPI had

        17    submitted in their submittal.  So just -- I wanted to

        18    keep him informed of what the trends were.

        19          Q.   When was the last time that you had a

11:26   20    conversation with Ted Sexton about the unattainable

        21    numbers submitted by LPI in the RFP process?

        22          A.   Those continued through -- Those were

        23    continuing on a regular basis through the end of my

        24    employment with Airport Authority.

11:27   25          Q.   Did you communicate with anyone else regarding

                                         498

             HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
                               800.697.3210

**53-611 (44)**

| | | |
|---|---|---|
| 11:27 | 1 | the unattainable -- unattainable numbers submitted by |
| | 2 | LPI? |
| | 3 | A. In this particular case, I felt that it would |
| | 4 | be more appropriate if I -- if I directed those comments |
| 11:27 | 5 | to my direct supervisor. |
| | 6 | Q. And I assume that those comments were all |
| | 7 | verbal; correct? |
| | 8 | A. (Nods head in the affirmative.) |
| | 9 | Q. Are you aware of any documentation reflecting |
| 11:27 | 10 | those comments to Ted Sexton? |
| | 11 | A. I'm -- I'm unaware if there are. |
| | 12 | Q. Did you believe that the -- that LPI's |
| | 13 | submission of unattainable operating expenses violated |
| | 14 | the Authority's rules or regulations? |
| 11:27 | 15 | A. I believe they -- I believe they violated the |
| | 16 | spirit of the contract -- contract and law. |
| | 17 | Q. Spirit of the contract and law? |
| | 18 | A. Of the -- Of contracting -- or -- I forget |
| | 19 | exactly what it's called, but our -- a contracting and |
| 28 | 20 | procurement. |
| | 21 | Q. The contract and procurement from who? |
| | 22 | A. Regulations for the Airport Authority. |
| | 23 | Q. So you believe that the Airport Authority had |
| | 24 | some sort of a contract, code or rule? |
| 28 | 25 | A. Yeah. |

499

1    I declare under penalty of perjury under the laws

2    of the State of California that the foregoing is true

3    and correct.

4

5    Executed at _____, California,

6    on _____.

7

8

9

10    JOSE DE JESUS HERNANDEZ

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

649

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210

1    STATE OF CALIFORNIA ) ss

2

3        I, Delia M. Satterlee, CSR 9114, do hereby declare:

4

5        That, prior to being examined, the witness named in

6    the foregoing deposition was by me duly sworn pursuant

7    to Section 2093(b) and 2094 of the Code of Civil

8    Procedure;

9

10       That said deposition was taken down by me in

11    shorthand at the time and place therein named and

12    thereafter reduced to text under my direction.

13

14       I further declare that I have no interest in the

15    event of the action.

16

17       I declare under penalty of perjury under the laws

18    of the State of California that the foregoing is true

19    and correct.

20

21       WITNESS my hand this _____15th_____ day of

22    _____January_____, 200_7__.

23

24    _____

25    Delia M. Satterlee, CSR 9114

650

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210

53-611 (47)

CERTIFIED COPY

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN DIEGO

JOSE HERNANDEZ,              )
                             )
          Plaintiff,         )
                             )
     vs.                     )  No. GIC871979
                             )
SAN DIEGO COUNTY REGIONAL AIRPORT )
AUTHORITY, a public entity; and  )
DOES 1 through 12 inclusive, )
                             )
          Defendants.        )
─────────────────────────────)

VOLUME V

DEPOSITION OF JOSE DE JESUS HERNANDEZ, the

plaintiff herein, noticed by PAUL, PLEVIN,

SULLIVAN & CONNAUGHTON LLP, at 401 B Street,

San Diego, California, at 9:56 a.m., on Friday,

December 22, 2006, before Delia M. Satterlee,

CSR 9114.

Hutchings Number 147470-SD



**HUTCHINGS**
**COURT REPORTERS**
**GLOBAL LEGAL SERVICES**

HEADQUARTERS:
6055 E. WASHINGTON BLVD., 8TH FLOOR
LOS ANGELES, CA 90040-2429

**800.697.3210**   323.888.6300
FAX: 323.888.6333 • www.hutchings.com

10:10   1          A.   Approximately, yes.

        2          Q.   Did you receive an approximate raise to

        3     $104,000 in October of 2005?

        4          A.   Approximately.

10:10   5          Q.   Did you ever refuse to participate in any

        6     activity at the Authority because you thought that the

        7     activity was unlawful or illegal?

        8          A.   You know, understanding the prac- --

        9     understanding the process of those activities, it was my

10:11  10     understanding that they may not be.  So I had no reason

       11     to believe that they -- that they were.

       12          Q.   So as you sit here today, you can't recall

       13     refusing to participate in any activity because you

       14     thought it was illegal or unlawful?

10:11  15          A.   No.

       16          I think the questions were more, you know,

       17     inquisitory by nature.  "Is this okay to do?  Yeah, it's

       18     okay.  We do it all the time.  Okay.  All right."

       19          So, you know, being -- one, being fairly new to the

10:11  20     organization, and two, having the instructions or

       21     clarifications communicated to me by my direct

       22     supervisors, I would just assume that that would be the

       23     case.

       24          Q.   In your complaint, you allege that the

10:11  .25    Authority invaded your privacy by asking questions of

                                   891

```
 1          (The proceedings concluded at 11:03 a.m.)

 2                              ***

 3          I declare under penalty of perjury under the laws

 4     of the State of California that the foregoing is true

 5     and correct.

 6

 7          Executed at _____, California,

 8          on _____

 9

10

11          _____

12              JOSE DE JESUS HERNANDEZ

13

14

15

16

17

18

19

20

21

22

23

24

25
```

926

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210

**53-611 (50)**

1    STATE OF CALIFORNIA ) ss

2

3        I, Delia M. Satterlee, CSR 9114, do hereby declare:

4

5        That, prior to being examined, the witness named in

6    the foregoing deposition was by me duly sworn pursuant

7    to Section 2093(b) and 2094 of the Code of Civil

8    Procedure;

9

10        That said deposition was taken down by me in

11    shorthand at the time and place therein named and

12    thereafter reduced to text under my direction.

13

14        I further declare that I have no interest in the

15    event of the action.

16

17        I declare under penalty of perjury under the laws

18    of the State of California that the foregoing is true

19    and correct.

20

21        WITNESS my hand this _____15th_____ day of

22    _____January_____, 2007__.

23

24

25    Delia M. Satterlee, CSR 9114

927
HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210

53-611 (51)

**EXHIBIT 2**

# Deposition of

## JOSE DE JESUS HERNANDEZ

## HERNANDEZ v. SAN DIEGO COUNTY REGIONAL AIRPORT

### *Taken On*
### *December 18, 2006*

Transcript provided by:

**HUTCHINGS**SM
**COURT REPORTERS, LLC**
CSR 649

GLOBAL LEGAL SERVICES

**800.697.3210**

Case 3:08-cv-00184-L-CAB    Document 1-9    Filed 01/30/2008    Page 59 of 73

HERNANDEZ vs. SAN DIEGO COUNTY REGIONAL AIRPORT  December 18, 2006
JOSE DE JESUS HERNANDEZ

**Page 1**

1
2                          CERTIFIED COPY
3        SUPERIOR COURT OF THE STATE OF CALIFORNIA
            FOR THE COUNTY OF SAN DIEGO
4
5    JOSE HERNANDEZ,              )
                                  )
6           Plaintiff,            )
                                  )
7        vs.                      ) No. GIC 871979
                                  )
8    SAN DIEGO COUNTY REGIONAL AIRPORT   )
     AUTHORITY, a public entity; and     )
9    DOES 1 through 12, inclusive,       )
                                  )
10          Defendants.           )
     _____ )
11
12                    VOLUME I
13   DEPOSITION OF JOSE DE JESUS HERNANDEZ, the
14   plaintiff herein, noticed by Paul, Plevin,
15   Sullivan & Connaughton, at 401 B Street,
16   11th Floor, San Diego, California, at
17   10:00 a.m., Monday, December 18, 2006,
18   before Jennifer K. Winters, CSR 8543.
19
20   Hutchings Number 146564-SD
21
22
23
24
25

**Page 2**

1    APPEARANCES OF COUNSEL:
2
3    For Plaintiff:
4    LAW OFFICE OF CATHRYN CHINN
5    BY CATHRYN CHINN
6    3990 Old Town Avenue, Suite A-109
7    San Diego, California 92110
8
9    For Defendant SAN DIEGO COUNTY REGIONAL AIRPORT
10   AUTHORITY:
11   PAUL, PLEVIN, SULLIVAN & CONNAUGHTON
12   BY SANDRA L. McDONOUGH
13   401 B Street, 11th Floor
14   San Diego, California 92101
15
16   Also Present: AMY GONZALEZ
17             JAMES ROBBINS (Videographer)
18
19
20
21
22
23
24
25

**Page 3**

1                 I N D E X
2    WITNESS: JOSE DE JESUS HERNANDEZ
3    EXAMINATION BY:               PAGE
4    MS. McDONOUGH                  5
5
6
7
8                E X H I B I T S
9    Exhibit identification within the transcript is flagged
     with "[EXH]" as an identifier.
10
11   DEFENSE    DESCRIPTION          IDENTIFIED  MARKED
12   1   Fourth Amended Notice of      9       223
13       Taking Videotaped Deposition
         of Plaintiff, Jose Hernandez
14   2   Letter, October 20, 2000     66       223
15   3   Resume                       66       223
16   4   Employment Application       79       223
17   5   Letter, March 2, 2001        81       223
18   6   Letter, October 3, 2003      93       223
19   7   Organizational chart        101       223
20   8   Charger tickets             147       223
21
22   Questions the witness refuses to answer are indicated in
     the transcript by a "[QUES]" identifier at the end of
23   the question and are located on the following page(s):
     143
24
25

**Page 4**

1        THE VIDEOGRAPHER:  My name is James Robbins.  I'm
2    a videotape operator with Visual Litigation Services
3    located in Costa Mesa, California.
4        This is the beginning of the videotaped deposition
5    of Jose Hernandez beginning at 10:00 a.m. on
6    December 18th, 2006, in the matter of Hernandez versus
7    San Diego County Regional Airport Authority,
8    Case Number GIC 871979, taken at 401 West B Street --
9    excuse me, 401 B Street on the ninth floor in San Diego,
10   California.
11       MS. McDONOUGH:  The 11th floor.
12       THE VIDEOGRAPHER:  The 11th floor, sorry.
13       This deposition is being taken on behalf of
14   defense.  And may we please have introductions beginning
15   with the witness.
16       THE WITNESS:  Jose Hernandez.
17       MS. McDONOUGH:  Sandra McDonough for defendant.
18       MS. GONZALEZ:  Amy Gonzalez for the defendant.
19       MS. CHINN:  Cathryn Chinn for the plaintiff.
20
21       (Continued on following page.)
22
23
24
25

1 (Pages 1 to 4)

53-611 (54)

Page 5

1          JOSE DE JESUS HERNANDEZ,
2   the plaintiff herein, having been sworn, testifies as
3   follows:
4
5              -EXAMINATION-
6
7   BY MS. McDONOUGH:
8      Q.  Good morning.
9      A.  Good morning.
10     Q.  Would you please state your full name for the
11  record?
12     A.  Sure, Jose De Jesus Hernandez.
13     Q.  My name is Sandra McDonough.  I met you briefly
14  before the deposition today.  I represent the San Diego
15  Regional Airport Authority in the action that you filed
16  against the Authority.  Today I'll be using the term
17  Authority and by that I refer to the San Diego Regional
18  Airport Authority who is a defendant in this matter.  Is
19  that understood?
20     A.  That's understood.
21     Q.  Thank you.  Have you ever had your deposition
22  taken before?
23     A.  Never.
24     Q.  I assume that you had an opportunity to talk to
25  your attorney about the deposition today and the

Page 6

1   procedure but I'll go ahead and go over some ground
2   rules --
3      A.  Okay.
4      Q.  -- with you just so we're on the same page.
5   Okay?
6      A.  (No audible response.)
7      Q.  There is a court reporter sitting to your
8   right.  She is taking down everything that is said today
9   in this room.  After the proceeding she will prepare a
10  transcript which will come to you in booklet form.
11     You will have an opportunity to review the
12  transcript and to make any changes that you feel are
13  necessary.  I must caution you that if you change a yes
14  to a no or make some other material change anyone in
15  this lawsuit may comment on that change and it may
16  adversely affect your credibility.
17     I would prefer that if you remember during the
18  course of the deposition that an answer that you
19  previously gave is incorrect, if you could go ahead and
20  let me know while we're going forward with the
21  deposition so we can go back and re-visit that issue.
22     A.  Okay.
23     Q.  Also you're doing a good job of it so far but
24  the court reporter can only take down audible words, not
25  uh-huh, huh-uh.  That doesn't come across in a

Page 7

1   transcript, or nods of the head.  So continue to give
2   full audible responses in response to my questions.
3   Okay?
4      A.  Okay.
5      Q.  Also you're doing a good job of waiting until
6   my question is finished before you respond.  And
7   continue to do that because the court reporter cannot
8   take down two people talking at once.  Okay?
9      A.  (No audible response.)
10     Q.  Do you understand that?
11     A.  Yes, I do.
12     Q.  If at any time you do not understand a question
13  that I ask, please ask me to repeat it or rephrase it.
14  And I will assume that if you've answered a question
15  that you understood it.  Okay?
16     A.  Yes.
17     Q.  If you need to take a break at any time, just
18  let me know and we can take a break.  And if at any time
19  you feel that you cannot continue to give your best
20  testimony I want you to let me know and we will suspend
21  the proceedings for the day or for however long you
22  need.  Okay?
23     A.  Okay.
24     Q.  Is there any reason why you feel you cannot
25  give your best testimony today?

Page 8

1      A.  No.
2      Q.  Have you taken any medications over the last 24
3   hours that would affect your ability to recall or to
4   testify?
5      A.  No.
6      Q.  Have you consumed any alcohol in the last 24
7   hours?
8      A.  No.
9      Q.  Are you currently on any medication?
10     A.  Yes.
11     Q.  What medication?
12     A.  Provacol.
13     Q.  How long have you been on Provacol?
14     A.  A little bit under two years now.
15     Q.  What do you take that for?
16     A.  Cholesterol.
17     Q.  Are you taking any other medications on a
18  regular basis right now?
19     A.  That's it.
20  THE REPORTER:  I'm sorry?
21  THE WITNESS:  That's it.
22  MS. McDONOUGH:
23     Q.  What have you done to prepare for today's
24  deposition?  I'm not looking for any attorney/client
25  privileged information.

2 (Pages 5 to 8)

Page 9

1       A. Just getting together, going over the documents
2    that you have in front of you and just conferring with
3    my attorney.
4       Q. What documents did you review?
5       A. The submission of -- of our lawsuit and then
6    any responding documents from your law firm.
7       MS. McDONOUGH: I'll mark as Exhibit 1
8    Fourth Amended Notice of Taking Videotaped Deposition of
9    Plaintiff, Jose Hernandez. [EXH]
10      Q. Have you ever seen this document?
11      A. No.
12      Q. I'll call your attention to the fourth page.
13   It says Number 3 but it's right after the Exhibit A.
14      A. Okay.
15      Q. It's the Definitions and then on the next page
16   there are documents requested. Have you ever seen these
17   requests for productions?
18      A. Yes.
19      Q. Have you read the request for productions?
20      A. Yes.
21      Q. Do you have any understanding of what this
22   document is?
23      MS. CHINN: Objection, that's vague and ambiguous.
24      MS. McDONOUGH:
25      Q. You can go ahead and answer if you understand

Page 10

1    the question.
2       A. No, I've never seen this document before. I've
3    seen this in a separate document but not in -- not in
4    this document (indicating).
5       Q. Okay. And this, you're referring to the
6    request for productions?
7       A. Yes.
8       Q. Do you have an understanding that the request
9    for productions are requesting that you look for certain
10   documents and produce them if you have them?
11      A. Yes.
12      Q. Did you make any attempt at any point in time
13   in this litigation to search for documents that you
14 ·  might have in response to our request for productions?
15      A. Yes, any and all.
16      Q. And what -- what attempts did you make to find
17   documents?
18      A. Going through step-by-step each one of the
19   questions and any information that was requested if I
20   had available I produced to my attorney. If I didn't
21   then it was responded unable to find it, I never had it
22   or just responded to -- in that manner.
23      Q. Where did you search for the documents?
24      A. Well, the only place I can look for them, my
25   house.

Page 11

1       Q. Did you contact any of your credit card
2    companies to obtain records for purchases that you may
3    have made?
4       A. I had copies of those documents which were
5    provided to you.
6       Q. So you did not contact credit card companies
7    in --
8       A. I can go on-line --
9       Q. -- in response to --
10      A. I can go on-line and pull them.
11      Q. Okay. And did you do that?
12      A. Uh-huh.
13      Q. Yes?
14      A. Yes, ma'am.
15      Q. Did you search for any files on your home
16   computer?
17      A. I -- I didn't have -- I don't have any business
18   files on my home computer.
19      Q. So you did not search for any files on your
20   home computer?
21      A. I didn't have any on my computer.
22      Q. Did you search for files on your computer?
23      A. No.
24      Q. Did you ask any accountants or any other people
25   who have worked on your behalf in the past for documents

Page 12

1    that they may have that are responsive to the request?
2       A. No.
3       Q. In this deposition notice there are a few
4    document requests that were not included in the original
5    document requests that my office sent several months
6    ago. And those start on what's numbered as Page 14 of
7    this document, Exhibit 1, beginning with Request for
8    Production Number 74 through 77. Have you ever seen
9    those requests before?
10      A. No.
11      Q. Have you made any attempt to locate documents
12   that are responsive to these requests?
13      A. No, having never seen them, no.
14      Q. Do you have any documents that are responsive
15   to this request?
16      A. Could I take five minutes to read what it is
17   that you have?
18      Q. Please, read them carefully.
19      (Witness and counsel confer off the record.)
20      MS. McDONOUGH: Can you please let the record
21   reflect that Ms. Chinn just whispered to Mr. Hernandez.
22      MS. CHINN: Is it on -- it should be on the video,
23   isn't it, James?
24      MS. McDONOUGH: I just want to make sure it's on
25   the written transcript.

3 (Pages 9 to 12)

53-611 (56)

HERNANDEZ vs. SAN DIEGO COUNTY REG...L AIRPORT  December 18, 2006

JOSE DE JESUS HERNANDEZ

Page 13

1  MS. CHINN: You can consult with me any time --
2  THE WITNESS: Okay.
3  MS. CHINN: -- that you need to.
4  THE WITNESS: Okay. Yeah, I don't believe I have
5  any of these documents.
6  MS. McDONOUGH:
7  Q. Did you talk to anyone other than your attorney
8  in order to prepare for today's deposition?
9  A. My wife.
10  Q. Anyone else?
11  A. No.
12  Q. Have you spoken to anyone who has relayed to
13  you that they have spoken to me about this case?
14  A. No.
15  Q. Who have you spoken to from the Authority since
16  you left the Authority?
17  A. Who have I spoken to?
18  Q. Yes.
19  A. From the Authority?
20  Q. Yes.
21  A. In what nature?
22  Q. In any nature.
23  A. In any nature?
24  Q. Yes.
25  MS. CHINN: I'm going to object. Go ahead and

Page 14

1  answer if you can.
2  (Interruption in proceedings.)
3  MS. McDONOUGH: Can we take a brief break?
4  THE VIDEOGRAPHER: Off the record at 10:11.
5  (A recess is taken.)
6  THE VIDEOGRAPHER: Back on the record at 10:17.
7  MS. McDONOUGH:
8  Q. Is there any reason why you cannot continue to
9  give your best testimony?
10  A. No.
11  Q. One of my admonitions earlier, I did forget to
12  say that although we are in the informal setting of my
13  conference room your testimony today is under penalty of
14  perjury and has the same force and effect as if we were
15  in a courtroom in front of a judge or a jury. Do you
16  understand that?
17  A. Yes.
18  Q. Have you spoken to any current or former
19  Authority employee about your employment with the
20  Authority from February, 2006, to the present, basically
21  since leaving the --
22  A. I was not -- I was not employed in 2006.
23  Q. Right, since leaving the Authority have you --
24  A. I was not employed after 2006.
25  Q. Wait for the question.

Page 15

1  A. Okay.
2  Q. Since you left the Authority, after the time
3  that you left the Authority have you spoken to any
4  former or current Authority employee regarding
5  allegations in your complaint?
6  A. Yes.
7  Q. Who have you spoken to?
8  A. It's a pretty extensive list.
9  Q. That's okay.
10  A. Okay. Going through, God, Jim Myhers --
11  Jim Myhers, Amiel Porta, Matt Conner, Colm Marmion,
12  trying to remember, Jeff Simons, Jennifer Hamilton,
13  trying to remember who else, Susan Roybale,
14  Steve Gilbert. I'm sure there's more but that's --
15  that's for now.
16  Q. What did you speak to Jim Myhers about after
17  you left your employment with the Authority?
18  A. My concern -- my conversation with Jim Myhers
19  were just to make sure that he was okay with everything,
20  he felt comfortable that, you know, whatever -- whatever
21  the situation was is, you know, just related to me. It
22  was more conversations of concern with him and -- and my
23  former employees than anything else.
24  Q. When did you speak to Jim Myhers?
25  A. I've spoken to him on several occasions.

Page 16

1  Q. When was the first time after you left your
2  employment with the Authority?
3  A. Probably that afternoon after I left
4  employment.
5  Q. Please tell me everything you remember about
6  that conversation in the afternoon that you left your
7  employment.
8  A. I just called him, let -- let him know what the
9  resolution of the matter was and -- and just, once
10  again, just trying to make sure that him and his family
11  were okay with -- with -- with whatever, whatever
12  happened.
13  Q. What did you tell him about the resolution?
14  A. I told him at that particular time that, you
15  know, after everything that happened and, you know,
16  the -- the -- the accusations that were laid in front of
17  me, that it was just best at this time just -- that I
18  submit my resignation.
19  Q. Why were you concerned that everything was okay
20  with Jim?
21  A. I'm concerned about the -- the -- the health
22  and wellness of all my employees or former employees or
23  even friends because some of those on that list are
24  friends of mine who -- who, you know, regardless of what
25  the situation was, you know, I just -- that's -- that's

4 (Pages 13 to 16)

Page 17

1  Just how empathetic or sympathetic I am towards -- you
2  know, towards those who -- that I've either done
3  business with or even considered friends.
4      Q. Why did you believe that his health or wellness
5  might be compromised at that point in time?
6      A. Well, Jim Myhers had just joined the
7  Airport Authority after years of service, ten, eleven
8  years, with -- with LPI. And I just wanted to assure
9  him, or hopefully assure him -- you know, he had just
10  left an employer for eleven years. He's probably a
11  month or two into a new job. And I just wanted to -- to
12  try to get to him and just -- or -- or let him know that
13  whatever the situation was regarding me should have no
14  effect on -- on him whatsoever.
15      Q. Did you talk to Jim Myhers at that point in
16  time about the substance of the allegations against you?
17      A. No, not -- not into detail, no.
18      Q. When was the next time that you spoke to
19  Jim Myhers after that first conversation?
20      A. I want to say I spoke to him -- probably spoke
21  to him a couple months thereafter.
22      Q. What was the substance of that conversation?
23      A. That was a follow-up after the -- the lawsuit
24  was published in the newspaper.
25      Q. Did you call him?

Page 18

1      A. I called him in a separate matter, yeah.
2      Q. What did you call him about?
3      A. I don't remember. It was -- it didn't have any
4  concern -- oh, I'm sorry, no, I did, I called him to see
5  if he wanted to go have lunch, just -- I just wanted to
6  check up on him and see how he was doing.
7      Q. Did you have lunch with him?
8      A. No. We just met for coffee or soda.
9      Q. Did you speak about anything on the phone when
10  you called him to set up the lunch or coffee?
11      A. No.
12      Q. Just let's go get together --
13      A. Hey, you want to get together.
14      Q. What was the substance of your conversation
15  with Jim when you met for coffee?
16      A. It was -- it was soda and we met at the taxi --
17  taxi and shuttle hold dock out on the west side of the
18  airport, just went and, once again, just wanted to make
19  sure that he was okay and everything was -- was going
20  all right and wanted to let him know that if I can ever
21  be of assistance to him to please feel free to give me a
22  call.
23      Q. How long was your conversation?
24      A. Maybe half hour, 45 minutes.
25      Q. What else was said during that conversation?

Page 19

1      A. We did go into some of the details of the
2  lawsuit but not -- not particular. He -- he just -- you
3  know, really, he just had some points or reiterated some
4  of the points that -- that were spelled out in the
5  lawsuit specific to the LPI.
6      Q. What did Jim tell you specific to LPI?
7      A. Just, you know, he -- specific to LPI he -- you
8  know, he -- he understood, you know, a lot of what was
9  in there, LPI, as the former general manager, you know,
10  and what I wanted -- you know, then going into detail
11  was, you know, all this is spelled out in -- in the
12  lawsuit regarding LPI, all happened after -- after his
13  employment. So just going into those and, once again,
14  wanted to reflect on that, you know, those items that
15  were spelled out in there weren't -- you know, it
16  wasn't -- it wasn't a dig on him. It was after he left,
17  you know, this is everything that happened.
18      Q. What did Jim tell you that he understood about
19  the complaint in LPI?
20      A. I -- I didn't have -- I didn't have cause to
21  ask him what he understood about the LPI.
22      Q. So what specifically did he say?
23      A. We just went in -- in general form and he just
24  said I wish you well, you obviously have to do what you
25  have to do and we'll leave it at that.

Page 20

1      Q. Did Jim say during that conversation anything
2  about benefits that he had given you while he was
3  working for LPI?
4      A. No, there was no reason to.
5      Q. Did Jim acknowledge during that conversation
6  that LPI may have done the things that you've alleged in
7  your complaint?
8      A. No. There was no reason to ask those type of
9  questions.
10      Q. Did you have any occasion to speak to
11  Jim Myhers after that soda meeting?
12      A. I believe I -- I called him once just to see if
13  we had some information, if he had some documentation
14  that I can -- that I can submit out of the request for
15  public record on a Super Bowl plan that I had put
16  together for the Airport Authority back for the
17  Super Bowl in 2002 -- 2003.
18      Q. What did he say?
19      A. He said he would look for it and I believe
20  that's the last time I talked to him.
21      Q. When was that conversation?
22      A. Maybe about a month and a half ago, two months.
23      Q. Did you ask him for the Super Bowl
24  documentation -- strike that.
25      Did you ask Jim Myhers to give you the Super Bowl

5 (Pages 17 to 20)

53-611 (58)

HERNANDEZ vs. SAN DIEGO COUNTY REGIONAL AIRPORT  December 18, 2006                    JOSE DE JESUS HERNANDEZ

Page 21

1  documentation without having to go through a formal
2  public records act request?
3       A.  I asked -- I asked him -- I asked him if he
4  could provide -- if it would be easier for him to
5  provide the information to Phoenix Sky Harbor or if he
6  prefer that I go through public and then get it from him
7  and submit it to them, because we've always -- when it's
8  agency to agency we've always just submitted that --
9  that documentation without have to go to request for
10  public record.
11       Q.  So you didn't ask that he give it directly to
12  you?
13       A.  I asked him if he were -- if he could give it
14  to me, otherwise -- and then he responded, yeah, you
15  have to go through request for public record.  I said,
16  well, would it be easier for you if you just gave it to,
17  you know, Phoenix Sky Harbor because that's exactly what
18  I'm going to do.  I'm just going to get it and give it
19  to them.
20       Q.  So first you asked Jim for the Super Bowl
21  documentation and then Jim said you need to file a
22  public records act request?
23       A.  Well, first I asked if he had it.  And then --
24  and then he had to go and look for it.  And I said, hey,
25  if it's -- is that something you can provide to me or do

Page 22

1  you want me to submit a request for public record or
2  would it be easier if you just submitted it or if I just
3  gave you the contact information for Phoenix Sky Harbor
4  and you just sent it directly to them.
5       Q.  It was Jim who first raised the issue of the
6  public records act request?
7       A.  I think we -- I think it was understood between
8  both of us and -- and so I think we kind of both asked
9  the question at the same time, was -- is that something
10  you can provide to me or is that something I need to
11  submit a request for public record for.
12       Q.  So you don't recall one way or the other --
13       A.  No.
14       Q.  -- who --
15       A.  But it was -- it was understood between both of
16  us.
17       Q.  Hold on, just wait for the question.  You don't
18  recall one way or the other who brought up the public
19  records act request first?
20       A.  I don't recall.
21       Q.  Have you ever submitted a public records act
22  for the Super Bowl documentation?
23       A.  I don't believe I have.
24       Q.  Do you know if that documentation was sent to
25  Phoenix Sky Harbor?

6 (Pages 21 to 24)

Page 23

1       A.  I don't believe I -- I -- I'm not sure to be
2  honest with you.
3       Q.  Why did you want the information to be sent to
4  Phoenix Sky Harbor?
5       A.  Back -- back when I worked for the
6  Airport Authority I had put together a pretty
7  substantial Super Bowl operating plan on behalf of the
8  NFL, so much so that after that -- after -- after we put
9  together that airport operating plan for San Diego the
10  NFL Transportation Committee has always referred future
11  airports to make contact with me so that I can get a
12  sample of their documentation so they can form their own
13  documentation going forward.
14       So even I -- even to this day I continue to make
15  contact with -- or continue to be in contact with the
16  NFL.  And so they called me and said, hey, do you have
17  the documentation, we just want to be able to provide it
18  to Phoenix for a -- for a sample.
19       Q.  Do you know how the NFL contacted you since you
20  were no longer an Authority employee a couple months
21  ago?
22       A.  Yeah.
23       MS. CHINN:  Let me make an objection, calls for
24  speculation.  Please answer if you know.
25       THE WITNESS:  I had -- I had after I joined BAGS,

Page 24

1  BAGS, Incorporated, made contact with Greg --
2  Chris Hagerty, which is their -- the director of NFL
3  transportation, who I have known for -- for many years,
4  and just said, hey, just as a -- as a kind of referral
5  or point that I was no longer in the Airport Authority
6  and if I can ever be of assistance down the road here
7  was my new contact information.
8       Q.  Did you give him your personal phone number --
9       A.  Uh-huh, my home number.
10       Q.  -- your cell phone?
11       A.  My home number and cell phone number.
12       Q.  Have you ever received any compensation from
13  the NFL since you left the Authority?
14       A.  No.
15       Q.  Have you told me about every conversation
16  you've had with Jim Myhers following the termination of
17  your employment with the Authority?
18       A.  To my recollection I believe that's --
19  that's -- that should be all of them.  There may be some
20  fewer there but not -- nothing that I remember.
21       Q.  Have you had any other communication with him
22  via email or letter correspondence?
23       A.  I don't believe so.
24       Q.  What contact have you had with
25  Jennifer Hamilton since leaving the airport?

HERNANDEZ vs. SAN DIEGO COUNTY RE      . AIRPORT  December 18, 2006

JOSE DE JESUS HERNANDEZ

Page 25

1    A. Only one contact.
2    Q. And what was that?
3    A. Jennifer -- Jennifer and I went to -- went to
4 lunch.
5    Q. When did you go to lunch with Jennifer?
6    A. Maybe six -- six months ago.
7    Q. Who initiated that lunch?
8    A. Jennifer -- I had received a postcard in the
9 mail from Jennifer just wishing me and my family well.
10 And I believe the contents of that, because I don't have
11 it, were maybe we should get together for lunch one day.
12    Q. And did you produce that postcard in this
13 litigation?
14    A. I believe it's been submitted.
15    Q. Where did you meet for lunch?
16    A. China Town.
17    Q. What was the substance of your conversation
18 with Jennifer at lunch?
19    A. We had -- we had met at lunch and just wanted
20 to make sure, once again, that she was okay and that all
21 my former employees, you know, in that -- in the
22 permitting were doing okay as well.
23    Q. Did Jennifer say anything about the allegations
24 in your complaint?
25    A. I asked her what -- I asked her just in general

Page 26

1 what she thought were -- I don't believe she had seen
2 the complaint yet but I believe it was just more in
3 general of what she thought about everything that
4 happened.
5    Q. What did she say?
6    A. Her response was that she -- her response to me
7 was that she didn't think it was fair.
8    Q. Did she tell you what she thought was unfair?
9    A. She thought the whole thing wasn't fair,
10 that -- that the Airport Authority would pick on -- on
11 an employee who worked so hard and dedicated himself so
12 hard to Airport Authority, to come down in this manner
13 when she knew, in fact, there's -- there's -- there's
14 lazier people or people who do -- you know, or people
15 who deserve it more and yet the Airport Authority never
16 does anything to them.
17    Q. You said Jennifer said the whole thing was
18 unfair?
19    A. Uh-huh.
20    Q. Do you know what she was referring to by saying
21 the whole thing --
22    A. She -- I believe her reference to the whole
23 thing was the investigation and everything -- everything
24 surrounding, you know, my eventual termination with the
25 Airport Authority, of employment.

Page 27

1    Q. Did she say who she thought deserved the
2 termination more than you?
3    A. No.
4    Q. Do you know who she was referring to?
5    A. No.
6    Q. You said that she said other people do worse
7 things than you; is that correct?
8    A. I don't believe it was worse things. I just
9 said other people more deserving.
10    Q. More deserving.
11    A. Yes.
12    Q. And you have no idea what she was talking
13 about --
14    A. No.
15    Q. -- when she said that?
16    A. There was no -- there was no reason for me to
17 ask her names. And we've -- Jennifer and I have gone
18 through several situations with -- with employees as her
19 as my -- my assistant, you know, that the
20 Airport Authority has treated much more lenient than
21 this, you know, where we have had situations where
22 employees threaten employees, other employees, you know,
23 where employees threaten myself or -- or, you know,
24 there was just more situations out there that were
25 treated in a much more benign way than this.

Page 28

1    Q. And we'll come back to that later.
2    A. Uh-huh.
3    Q. Have you had any other contact with Jennifer?
4    A. No. That's the one and only time I talked to
5 her.
6    Q. What contact have you had with Susan Roybale?
7    A. Susan Roybale I just had casual conversation
8 with. She is -- she is the girlfriend to Amiel Porta,
9 who happens to be one of my good friends.
10    Q. Have you talked to her about the investigation
11 or your termination?
12    A. Just in general, once again, with her, just in
13 general surrounding the health and wellness of her
14 family but her -- really, her concern over the health
15 and wellness of my family.
16    Q. What's Susan's position with the Authority?
17    A. She used to work in the marketing -- PR market.
18 And I believe she works in real estate now, just a real
19 estate -- I'm not sure what the title is but she might
20 be a real estate assistant or somewhere in that fashion,
21 not a real estate manager but in some assistant
22 capacity.
23    Q. Have you talked to her about the substance of
24 the allegations against you or the allegations that you
25 have made in the complaint?

7 (Pages 25 to 28)

53-611 (60)

HERNANDEZ vs. SAN DIEGO COUNTY REGIONAL AIRPORT  December 18, 2006
JOSE DE JESUS HERNANDEZ

Page 29

1    A. No, they were just -- they was just, once
2  again, the overall kind of detail just in general.
3    Q. Did she make any sort of a value judgment on
4  your situation?
5    A. No. Once again, she was just more concerned
6  that regardless of what -- whatever happened, she just
7  wanted to make sure that -- that my family was okay --
8  myself and my family was okay.
9    Q. You said you've spoken to Steve Gilbert?
10   A. Uh-huh.
11   Q. What is Steve's position with the Authority?
12   A. I believe he just works in the real estate
13 side. He's a real estate manager.
14   Q. When did you speak to Steve?
15   A. Maybe six months ago.
16   Q. What was the substance of that conversation?
17   A. Once again, he just -- I ran into him in one of
18 the parking lots at the Airport Authority. And he just
19 wanted to make sure that -- that, once again, myself and
20 my family were -- were okay. And at no time did we
21 discuss any details of the -- the lawsuit.
22   Q. How many times have you spoken to Matt Connor
23 since you left your employment?
24   A. Matt Connor is actually my neighbor and no
25 longer works at the Airport Authority so I probably see

Page 30

1  Matt Conner once -- once a week, if that.
2    Q. How many times have you spoken to him about the
3  substance of the allegations against you or the
4  allegations in the complaint?
5    A. Maybe 15, 20 times.
6    Q. Has he ever offered an opinion on the
7  allegations against you?
8    A. He has offered -- maybe just in general, maybe
9  just in general because he -- he -- once again, he had
10 more of an opinion once -- once the lawsuit was filed
11 and published in the paper. So originally our
12 conversations were just, hey, hope everything's okay,
13 once again, concern for you and your family. Then he
14 got into the details of -- of this. And then his I
15 guess value judgment on it is -- is, you know, this
16 stuff kind of happens all the time down there, you know,
17 why did they pick on you.
18   Q. So from your perspective after he read the
19 complaint that you filed his judgment was that this
20 happens all the time with the Authority?
21   A. I -- I believe his judgment and I can't
22 speak -- I can't speak for Matt -- was that it's -- that
23 it was a little over the top of what they did and how
24 they proceeded and with investigations and all these
25 allegations.

Page 31

1    Q. Did he ever give you any specifics of how these
2  things happen at the Authority and --
3    A. No, I had no reason to go into detail with him.
4    Q. Has he ever made a specific comment on any of
5  your allegations in your complaint?
6    A. No. Matt didn't work for him and he was in a
7  separate department and -- no, we just went in general.
8  There was no reason to go into detail with him.
9    Q. How many times have you spoken to Colm?
10   A. Colm, maybe I've talked to him eight to ten
11 times.
12   Q. Have you ever spoken to him about the substance
13 of the allegations against you or your allegations?
14   A. Only after they were published in the paper.
15   Q. And what was the substance of that
16 conversation?
17   A. Once again, just wishing myself and my family
18 well and, you know, he knew or he just said, hey, you
19 got to do what you got to do and I wish you well.
20   Q. Did you actually speak about the substance of
21 the allegations?
22   A. No, just in general.
23   Q. How many times have you spoken to Jeff Simons?
24   A. I've probably spoken to Jeff -- I see him in
25 the terminals walking through the terminals so I

Page 32

1  probably just spoken to him in general 10, 15 times.
2    Q. Have you ever spoken to him about the substance
3  of the allegations against you or the allegations in
4  your complaint?
5    A. No, not with Jeff. Jeff's a pretty quiet and
6  private guy so there was no reason to go into those --
7  that type of detail with him.
8    Q. How many times have you spoken to Amiel Porta
9  about your complaint or the allegations against you
10 since you left your employment with the Authority?
11   A. Probably 20 times.
12   Q. Have you spoken about the substance of the
13 allegations?
14   A. I believe so, in great -- in great detail.
15   Q. What do you remember about what Amiel has said
16 about the substance?
17   A. I believe that Amiel can make himself a pretty
18 credible witness to substantiate the majority of all my
19 complaints.
20   Q. The majority of what's in your complaint?
21   A. Uh-huh.
22   Q. What has he specifically said about what's in
23 your complaint?
24   A. Specific to the -- the change of tickets,
25 specific to the first class upgrades, specific to access

8 (Pages 29 to 32)

53-611 (61)

Page 33

1  to crown rooms, specifics to the flying of me to
2  Southwest -- from Southwest Airlines, specifics to -- to
3  requests from board members for special privileges. So
4  he -- he can make himself a pretty credible witness.
5      Q.  Have you ever talked to Amiel about the
6  allegations against you?
7      A.  Yes, after they were published.
8      Q.  What was the substance of those -- of that
9  conversation?
10     A.  Once again, the substance was to go into
11  detail -- was just -- you know, my question to him is
12  you tell me, you think -- you tell me I'm way off -- way
13  off base or not and, you know, at the end of the day,
14  you know, he doesn't believe I am.
15     Q.  You asked him if he thought you were way off
16  base about what?
17     A.  Just on -- on the complaints that I was
18  asserting.
19     Q.  I'm asking about the allegations against you,
20  the investigation.  Did you ever talk to Amiel about the
21  allegations against you as a part of the investigation?
22     A.  Uh-huh.
23     Q.  Yes?
24     A.  Yes.
25     Q.  What was the substance of that conversation?

Page 34

1      A.  Just going into -- he -- just going into
2  details after -- after the case was closed.  And no time
3  during the point investigation, just a point of
4  clarification, did we talk concerning this.  Our -- our
5  conversations have been after -- after I left employment
6  with the Airport Authority.  On -- and even then they
7  didn't happen until -- you know, until I had an
8  opportunity to put the documentation together.  So right
9  around the time it was published we had an opportunity
10 to -- to sit down and kind of go over -- kind of go over
11 in detail what -- what was in the documentation.
12     MS. McDONOUGH:  Can you reread my last question,
13 please?
14     (The record is read by the reporter.)
15     MS. McDONOUGH:  I'll ask it again.
16     Q.  What was the substance of your conversation
17 with Amiel regarding the allegations against you?
18     A.  Okay.  The -- the substance were trying to get
19 his viewpoint on whether -- whether the allegations
20 against me were cause for, you know, the action
21 investigation.  That was the substance of our
22 conversation.
23     Q.  Did he offer an opinion?
24     A.  I believe he offered an opinion and said it was
25 a little -- you know, he felt it was a little over the

Page 35

1  top and punitive in nature.
2      Q.  Did he ever offer an opinion to you about
3  whether or not the allegations against you were valid?
4      A.  I believe his opinion -- his opinion were that
5  that -- that it would be no, that he didn't -- he
6  believed that -- that these allegations were, you know,
7  once again, over the top and they were just fishing and
8  try to figure out a reason why they wanted to terminate
9  you.
10     Q.  Did he ever tell you that the allegations
11 against you were false, that he believed that they were
12 false?
13     A.  I don't -- I believe it was just in general
14 what he thought of the whole thing, not specific.  And
15 then his -- his opinion at that point was -- to me was
16 that this whole thing was -- was if I can use it -- was
17 bullshit, quote, unquote.
18     Q.  I'm asking more specifically about the
19 allegations and not the outcome.
20     A.  No, the allegations.
21     MS. CHINN:  If you -- if you need clarification of
22 her question you can ask because I think you're trying
23 to answer them but they're vague and ambiguous.  So I
24 think you're doing your best --
25     THE WITNESS:  Yeah.

Page 36

1      MS. CHINN:  -- but don't hesitate to tell her you
2  don't know what she's asking you.
3      THE WITNESS:  That -- to the best that's how I can
4  answer that question.
5      MS. McDONOUGH:
6      Q.  Have you spoken to anyone from any of the
7  airlines --
8      A.  Every one of them.
9      Q.  -- after your employment ended with the
10 Authority?
11     A.  Every one of them.  Not only -- not only were
12 they -- not only were they business partners of the
13 Airport Authority but the majority, if not all of them,
14 continued to be friends of mine.
15     Q.  Have you spoken to any of the representatives
16 from the airlines regarding the termination of your
17 employment?
18     A.  Yes.  Those who were -- those -- specifically
19 those who were involved with -- with the investigation.
20     Q.  Who did you speak to?
21     A.  Mike Parrish with Southwest Airlines.
22     Q.  Anyone else?
23     A.  Janet Nix with Hawaiian Airlines.
24     Q.  Anyone else?
25     A.  I'm trying to think, Mark Cunningham with Delta

9 (Pages 33 to 36)

53-611 (62)

HERNANDEZ vs. SAN DIEGO COUNTY RE[   ]AL AIRPORT  December 18, 2006
JOSE DE JESUS HERNANDEZ

**Page 37**

1  and Jeff Rasor with Delta.
2      Q.  What did you talk to Mike Parrish about?
3      A.  Immediately -- immediately after the
4  investigator went out to -- to Vegas where he was then
5  working he called me to give me a brief or a summary
6  of -- of everything -- of the substance of his
7  investigation and then offered his opinion on what he
8  believed, you know -- you know, what his thoughts were
9  of the whole -- the whole thing.
10     Q.  What did Mike Parrish tell you about the
11  investigatory interview?
12     A.  Quite frankly, he believed -- he believed
13  that -- that the investigation was far from being
14  impartial, that they -- that the investigator came there
15  with an agenda and phrased his questions in a certain
16  way and manner to solicit a certain response, so much so
17  that probably within five minutes of his conversation
18  with him he had to get him to stop and ask him just
19  to -- asked him to ask his questions, you know, specific
20  and neutral in nature because, once again, he felt
21  that -- that there was an agenda in place and his
22  investigator was trying to solicit certain responses and
23  phrase questions in a certain way to try to solicit that
24  response.
25     Q.  Did Mike Parrish tell you anything about the

**Page 38**

1  substance of the --
2      A.  Uh-huh.
3      Q.  -- questions that the interviewer asked?
4      A.  Yeah, he had asked -- he had asked specific
5  if -- if he had given me tickets to -- to fly on
6  Southwest Airlines.  He -- there was questions on
7  whether I knew -- whether I knew -- or whether he knew
8  if -- you know, questions regarding my marriage with my
9  wife, questions regarding any additional benefits that I
10  may have received from Southwest Airlines and really
11  specific questions to -- to try and define our
12  relationship, meaning Mike Parrish and I, you know, how
13  he would view -- view us.
14     Q.  Did Mike tell you what his response was to
15  those questions?
16     A.  Oh, yeah, absolutely.  Mike -- Mike reiterated
17  to me that not only, you know, that he believed that --
18  that him and I are much more than just business partners
19  or just have -- we work in the same environment.  Mike
20  happens to be -- as I said, my family, our family happen
21  to be good friends.  Our kids are about the same age,
22  you know, they spend time together.  His kids will fly
23  out and spend the weekend with ours.  Our kids will fly
24  out and spend time with them.  You know, that at no time
25  did he think there was anything wrong with anything that

**Page 39**

1  we did.  And, once again, he felt that a lot of those
2  questions were -- you know, were far from being
3  impartial.
4      MS. McDONOUGH:  Move to strike everything after
5  yeah as nonresponsive.
6      Q.  Did --
7      MS. CHINN:  I'll have a continuing objection to the
8  question as being vague and ambiguous.
9      MS. McDONOUGH:
10     Q.  Did Mike Parrish tell you what his response was
11  to the investigator's question regarding whether Mike
12  had ever given you tickets to fly on Southwest Airlines?
13     A.  Yes.  He had said -- he had said to the
14  investigator that -- that my family in -- in a trip or
15  two -- I think it was one trip -- that my kids were
16  given tickets to fly out and spend the weekend with his
17  kids.  They were Buddy Passes.
18     Q.  Is that all that Mike told you that he told the
19  investigator about free tickets on Southwest --
20     A.  I believe.
21     THE REPORTER:  Please wait until the question is
22  finished.
23     THE WITNESS:  Oh, sorry.
24     MS. McDONOUGH:
25     Q.  You believe?

**Page 40**

1      A.  I believe so.
2      Q.  Did Mike Parrish tell you what response he
3  provided the investigator regarding questions about your
4  wife?
5      A.  Yes.
6      Q.  Okay.  First of all, what were the questions
7  that Mike Parrish relayed to you that the investigator
8  asked about your wife?
9      MS. CHINN:  If you know the question --
10     THE WITNESS:  If I --
11     MS. CHINN:  -- you can answer.  Let me make the
12  objection first.
13     THE WITNESS:  Okay.  I believe the questions were
14  related or -- or were surrounding whether he thought --
15  you know, trying to understand the state of the marriage
16  between my wife and I.  Do -- questions like do you know
17  his wife; do they get along, do they fight, you know, do
18  you -- try to get an idea of those.  In fact, he even
19  asked -- one question is on a recent trip do you know if
20  Jose brought another woman to -- to Vegas on that trip.
21     MS. McDONOUGH:
22     Q.  Did Mike tell you what his response was to the
23  question of whether you and your wife get along?
24     A.  Yes.
25     Q.  What did he tell you he said?

10 (Pages 37 to 40)

53-611 (63)

Page 41

1    A. His response was that for as long as he's known
2  me and my wife we have always had a great relationship
3  and he found no reason why there would be any -- any
4  sense, you know, that -- that we would not be getting
5  along, or we would have an abnormal marriage.
6    Q. Did Mike Parrish tell you what his response was
7  to the question about you bringing another woman to
8  Vegas?
9    A. Yes.
10    Q. What did he say?
11    A. He says that's impossible because during his
12  stay in Vegas I stayed with him. I stayed at his house.
13  He says that would be impossible to happen because he
14  stayed with me.
15    Q. Do you know what questions the investigator
16  asked Mike Parrish about benefits with
17  Southwest Airlines?
18    A. No.
19    Q. You mentioned that Mike told you that there
20  were questions regarding benefits.
21    A. Yeah.
22    Q. And you don't know --
23    A. He just said --
24    Q. -- what those questions were?
25    A. No.

Page 42

1    MS. CHINN: He just said what?
2    THE WITNESS: No. His -- his conversation was --
3  was more into details or as -- as to the state of -- of
4  the inquiry. There were some -- some questions which we
5  went over that -- that he provided specifics to. But
6  really my conversations with him were -- were more, once
7  again, to make sure that myself and my family were okay.
8  But he also wanted to portray his summary of events,
9  that, once again, he felt the whole investigation was --
10  was far from being impartial.
11    MS. McDONOUGH:
12    Q. Have you had any other conversations with
13  Mike Parrish about the investigation -- the
14  investigation against you or the allegations that you've
15  made in your complaint?
16    A. Yes, I have.
17    Q. When was your next conversation with
18  Mike Parrish about those issues?
19    A. I probably have an opportunity to talk to Mike
20  at least every other week.
21    Q. And do you speak about the allegations in --
22    A. Just in general. We just speak in general
23  on -- on, once again, making sure that the family was
24  okay. And then with -- you know, and him offering
25  his -- his support toward my allegations. And if he

Page 43

1  needed my support he would be more than happy to give
2  it -- to give it now. And, you know, even he has just
3  left employment with Southwest Airlines and he said now,
4  you know, once again, even though I don't work with the
5  airline any more however it is that you want me to
6  support you we will.
7    Q. Do you know where Mike Parrish works now?
8    A. He doesn't work at this time.
9    Q. Do you know why he left Southwest Airlines?
10    A. Yeah. He had gone back home and he just --
11  he -- he went back -- he left the station manager here,
12  went back there and he was just done with it. He's a 20
13  year guy with the airlines and just had enough of
14  working with the airlines.
15    Q. So Mike Parrish --
16    MS. McDONOUGH: I'm sorry, can you read his last
17  response?
18    (The record is read by the reporter.)
19    MS. McDONOUGH:
20    Q. What did you mean when you said he left the
21  station manager there, went back there and was done with
22  it? What are you referring to?
23    A. Mike -- Mike was relatively new to
24  Southwest Airlines. He had -- his history was -- he was
25  almost a 15 -- 15 year employee with America West. He

Page 44

1  left that position and then went to go with a couple of
2  startup airlines and then got -- and then he got into
3  remote airline check-in when he was director of
4  operations for -- and business development for a company
5  called CAPS out of -- out of Las Vegas.
6    When -- when 9/11 hit CAPS, which does the same
7  thing that our company does now, remote airline
8  check-in, went -- went bankrupt or they ceased -- they
9  really ceased operations. He wanted to get back into
10  the airline industry and his former boss with
11  America West offered him a position with
12  Southwest Airlines.
13    He worked in Vegas for about a year or round about
14  a year, year and a half, and then he was promoted to be
15  station manager position in San Diego. So he was
16  working in San Diego but his family lived in Vegas. So
17  for about two years he commuted. So when the position
18  of assistant manager of customer service opened up in
19  Vegas he was given an opportunity to go back home, which
20  is what he wanted to do, so he could be closer to his
21  family. Otherwise, he was commuting to his family in
22  Vegas and he could only see them two times -- two days a
23  month.
24    Q. Do you know if Mike Parrish voluntarily quit
25  his employment with Southwest Airlines?

11 (Pages 41 to 44)

53-611 (64)



HERNANDEZ vs. SAN DIEGO COUNTY REGIONAL AIRPORT  December 18, 2006

JOSE DE JESUS HERNANDEZ

Page 45

1    MS. CHINN: I'll object to that. You can answer if
2 you want.
3    MS. McDONOUGH: What's the basis for the objection?
4    MS. CHINN: I think it invades Mike Parrish's
5 privacy and it's not relevant to this lawsuit.
6    THE WITNESS: I can't -- I can't answer either way
7 because I've never -- I've never really asked him why he
8 left. All I know is he left. And, once again, I
9 respect his privacy to the point of not to get -- not to
10 get into details. He just said he left
11 Southwest Airlines and that's where we left it.
12    MS. McDONOUGH:
13    Q.  Okay. And just listen to my question. It's
14 very specific. Do you know whether he voluntarily quit
15 Southwest Airlines?
16    A.  Never asked him.
17    MS. CHINN: That's the same objection and invades a
18 third party's privacy.
19    MS. McDONOUGH:
20    Q.  Do you know when he left his employment with
21 Southwest Airlines?
22    A.  He left his employment with Southwest maybe two
23 months ago.
24    Q.  Do you know whether he still lives in
25 Las Vegas?

Page 46

1    A.  Yes, he does.
2    Q.  Do you know his address in Las Vegas?
3    A.  No, I don't.
4    Q.  Do you know his phone number?
5    A.  I know his phone number.
6    Q.  What's his phone number?
7    A.  I would have to -- can I pull it out of my bag?
8    Q.  Sure.
9    MS. CHINN: Yeah. Give it to her off the record.
10    THE WITNESS: Okay. Off the record we'll --
11    MS. McDONOUGH: Okay. We'll do it at the break.
12    Q.  You said you spoke to Janet Nix --
13    A.  Yes.
14    Q.  -- about the allegations in your complaint?
15    A.  Yes.
16    Q.  When did you first speak to Janet about the
17 allegations in your complaint?
18    A.  I first spoke to Janet after she contacted
19 me -- after she contacted me informing me that the
20 investigator had stopped by to see her at her office
21 or -- I'm sorry, first that an investigator had called
22 her to set up an appointment for -- to go and see her
23 about -- about these issues.
24    Q.  Is Janet Nix Cathryn Chinn's sister, if you
25 know?

Page 47

1    A.  Yes.
2    Q.  Do you know how Janet obtained your contact
3 information to tell you that an investigator had
4 contacted her?
5    A.  Yeah.
6    MS. CHINN: I'll object. You can answer. I didn't
7 give it to her.
8    MS. McDONOUGH: I'm not asking that. I'm just
9 asking --
10    MS. CHINN: Okay. But I'm putting that on the
11 record because you implied. Go ahead, Jose.
12    MS. McDONOUGH: They were completely separate
13 questions. There was no implication there.
14    THE WITNESS: Janet Nix, once again, her and I have
15 had a great working relationship. And in the past she
16 has needed to get ahold of me off hours via my phone.
17 She has -- she's had my home number and my cell phone
18 number contact information so she just called me at
19 home.
20    MS. McDONOUGH:
21    Q.  Did you talk to Janet Nix about the
22 investigation?
23    A.  Yes.
24    Q.  Did you talk to her about the investigation
25 prior to Janet meeting with the investigator?

Page 48

1    A.  I believe she had -- I'm trying to recall. She
2 had called me to let me know that -- that the
3 investigator would be stopping by to see her and then
4 she would let me know what the outcome of that
5 investigation was after that.
6    MS. CHINN: The question was did you speak to her
7 about the investigation.
8    MS. McDONOUGH:
9    Q.  Prior to her meeting with the investigator.
10    A.  I don't recall.
11    Q.  What was the substance of the first
12 conversation that you had with Janet Nix about the
13 investigation?
14    A.  The first after? Probably -- rephrase that, at
15 which time, after she had been contacted with the
16 investigator?
17    Q.  Did you actually talk to Janet Nix when she
18 called you to tell you that she would be meeting with
19 the investigator?
20    A.  Yes.
21    Q.  How long was that conversation?
22    A.  I want to say that that conversation may have
23 been pretty short, under five minutes.
24    Q.  Did you offer any opinion on the investigation
25 when you talked to Janet?

12 (Pages 45 to 48)

53-611 (65)

Page 49

1     A. Not at that time, no.
2     Q. When was your next conversation with Janet
3  about the investigation?
4     A. The follow-up conversation was immediately
5  after she had met with -- with the investigator.
6     Q. What was the substance of that conversation?
7     A. Just going into details of questions that she
8  had asked or that were asked of her by -- by the
9  investigator.
10     Q. What questions did she tell you the
11  investigator asked?
12     A. She had wanted to talk about -- the questions
13  that he had gone over were if at any time I specifically
14  had requested any -- any flight benefits from her, me
15  requesting of her any flight benefits on
16  Hawaiian Airlines.
17     Q. Did she tell you about any other questions that
18  the investigator asked her?
19     A. She had also -- also -- I believe there was
20  also other questions related to any flight benefits that
21  other -- that others in the Airport Authority had
22  requested of her.
23     Q. Did Janet tell you about any other questions
24  that were asked of her by the investigator?
25     A. I don't -- I don't recall that conversation.

Page 50

1  It was probably a year ago.
2     Q. Did Janet tell you what information, if any,
3  that she provided to the investigator?
4     A. I don't recall.
5     Q. Have you had any other conversations with Janet
6  since that one that you were just referring to?
7     A. Yes.
8     Q. When was the next conversation?
9     A. I've had -- I've -- I probably have occasion
10  to -- to make contact with Janet at least once a week.
11     Q. In the context of your new job?
12     A. Yes, primarily.
13     Q. Have you spoken to Janet Nix about the
14  substance of the allegations against you or the
15  allegations that you've made in the complaint at any
16  time after that conversation that you were just
17  referring to?
18     A. Yes. In fact, this -- when the lawsuit was
19  published it was distributed to all airport -- all
20  airport airline managers.
21     Q. Do you know who distributed it --
22     A. No.
23     Q. -- to airline managers?
24     A. All I know is -- all I know is -- is there was
25  an email received and the email was there to all

Page 51

1  airlines. So every airline at the Airport Authority has
2  had occasion to read the lawsuit.
3     MS. CHINN: Do you know -- have you ever seen the
4  email?
5     THE WITNESS: No. All I know is after -- after it
6  was distributed I got calls from the airlines saying now
7  I know why you're not here any more.
8     MS. McDONOUGH:
9     Q. How do you know that there was an email
10  distributed?
11     A. Because -- because it was made contact to me
12  at -- the airlines -- I still have occasion to work for
13  the airlines because I -- I work for seven different
14  airlines. So they all still have my contact
15  information, they have everything. And then as I would
16  go through and make contact with them, you know, just on
17  my -- on what I currently do each one would show their
18  support to me saying, hey, I've had a chance -- we've
19  received it via email or, you know, we got a link to it
20  in the paper and we read it. And we just want to
21  show -- we want to show you our support for -- for what
22  you're doing.
23     Q. So someone from the airlines told you that they
24  received a copy of your complaint via email?
25     A. Uh-huh.

Page 52

1     Q. Yes?
2     A. Yes.
3     Q. Who told you that?
4     A. We've had this -- Janet Nix had -- had let me
5  know that she had received it via email or she had
6  pulled a link to it. Jeff Rasor with Delta had pulled
7  it. Northwest Airlines was acting, yes, but it's fair
8  to say that this lawsuit was distributed between all the
9  airline managers. Who did it, I'm not sure. I have no
10  reason -- I have no reason myself to do it but it was
11  there.
12     Q. Did you send the email?
13     A. No.
14     MS. CHINN: And neither did I. I want that on the
15  record.
16     MS. McDONOUGH: Okay.
17     Q. Do you know who sent the email?
18     A. No, I don't.
19     Q. Have you ever asked anyone who sent --
20     A. Don't ask, don't care.
21     Q. -- the email?
22     Did you talk to Janet about the substance of the
23  allegations in your complaint?
24     A. Yes.
25     Q. What was the substance of that conversation?

13 (Pages 49 to 52)

53-611 (66)

HERNANDEZ vs. SAN DIEGO COUNTY RE    AL AIRPORT  December 18, 2006

JOSE DE JESUS HERNANDEZ

Page 53

1    A. That -- that substance, once again, was to show
2  a support for -- for my situation. She said she would
3  be -- you know, that she knows of -- of instances that,
4  you know, that would support allegations from -- or
5  assertions that are in here specific to board member
6  Craver (phonetic) should be -- you know, she can -- she
7  can support me on that documentation. So she read the
8  ones that were specific to Hawaiian Airlines and say,
9  yeah, I remember that. And -- and, you know, we can
10  support your allegations on those and on top of that
11  were, you know -- and then we got more.
12    MS. CHINN:  More what?
13    MS. McDONOUGH:
14    Q. Do you know what she meant when she --
15    A. Other -- you know, other instances of similar
16  violations.
17    Q. Was she specific about what other instances
18  there were?
19    A. No. I didn't ask -- I had no occasion to ask
20  her.
21    Q. Did you know what she was referring to?
22    A. Yes.
23    Q. What was she referring to?
24    A. She was referring to requests from other
25  Airport Authority employees for -- for tickets or ticket

Page 54

1  upgrades or ticket changes, in that manner.
2    Q. Who was she specifically referring to?
3    A. I didn't ask her.
4    Q. How do you know that she was referring to
5  requests from other --
6    A. Because we just talked -- we -- she had
7  mentioned those -- those specific actions.
8    Q. What specific actions had she mentioned?
9    A. She had -- she had -- I'm trying to remember.
10  She had mentioned a couple of Airport Authority
11  employees, in fact, I believe three in nature,
12  Bryan Enarson, when he flies requests upgrades,
13  Darlene Dunn, his assistant, you know, requests ticket
14  changes or upgrades or access to tickets, and, you
15  know -- and several other employees that when they fly
16  out there is -- you know, there is requests made for
17  special treatment when they fly.
18    Q. What other employees have requested special
19  treatment from Janet Nix to your knowledge?
20    A. Those were the only two that she -- she had
21  requested.
22    MS. McDONOUGH:  Let's take a short break, please.
23    THE WITNESS:  Okay.
24    THE VIDEOGRAPHER:  Off the record at 11:06.
25    (A recess is taken.)

Page 55

1    THE VIDEOGRAPHER:  Back on the record at 11:35.
2    MS. McDONOUGH:
3    Q. Is there any reason why you cannot continue to
4  give your best testimony?
5    A. No.
6    Q. You testified that you spoke with
7  Mark Cunningham from Delta after you left your
8  employment with the Authority; is that correct?
9    A. That's correct.
10    Q. What was the substance of your conversation
11  with Mark Cunningham?
12    A. I had -- I had to make contact with
13  Mark Cunningham because he had transferred over with
14  Delta Phoenix and -- and our company was in the process,
15  and is still in the process of setting up an office in
16  Phoenix. So I made contact with -- with Mark.
17    Q. So Mark was previously stationed in San Diego
18  and then moved to Phoenix?
19    A. That's correct. He used to be -- Mark used to
20  be the airline station manager for Delta here in
21  San Diego.
22    Q. Do you know when he moved to Phoenix?
23    A. I don't recall the exact date, no.
24    Q. Do you remember the date of your conversation
25  with him?

Page 56

1    A. No, I don't.
2    Q. What was the substance of that conversation?
3    A. My conversation with him was primarily had to
4  do with -- with the setup of -- the setup of our company
5  in -- in the Phoenix area. And at that end of the
6  conversation he brought it up. He said, oh, yeah, by
7  the way, I've had a chance to look at your -- your
8  lawsuit, you know, and if you need my assistance in
9  corroborating some of your allegations in there I'll be
10  more than happy to help you.
11    Q. Did he tell you what he could specifically
12  corroborate?
13    A. Specific -- specific to the request by -- by
14  Vernon Evans to -- to fly out the owner of Orlando Magic
15  for -- it's in the documentation -- specific to request
16  by Vernon Evans and Thella to get flight privileges for
17  the owner of Orlando Magic to come out and speak at one
18  of their Jackie Robinson YMCA functions, their annual
19  dinner I believe it was, and several upgrade requests on
20  behalf of senior staff.
21    Q. Is there anything else he told you he could
22  testify about?
23    A. No. They was just -- he was pretty specific to
24  those.
25    Q. What did he tell you about Vernon Evans'

14 (Pages 53 to 56)

**53-611 (67)**

HERNANDEZ vs. SAN DIEGO COUNTY RE      L AIRPORT   December 18, 2006                                        JOSE DE JESUS HERNANDEZ

Page 57

1  request to fly out the owner of the Orlando Magic?
2      A.  That's correct.  He said he would -- the
3  situation -- because the request -- the request was
4  first made via Vernon Evans and Thella to Bryan -- I
5  mean to Ted Sexton -- Ted Sexton knowing that I had --
6  that -- that there was a higher likelihood of -- of
7  getting a positive response called me and said, hey, I
8  know you're good friends with Mark, why don't you go and
9  ask him if there's something you can do.
10     And I said, well, please explain to me the whole
11 separation.  And that's how I knew it was
12 Jackie Robinson YMCA, it was their annual dinner, it was
13 Thella and -- and Vernon are on the board.  And so I
14 went and spoke to Mark and said, Mark, this is something
15 that -- that they're requesting if you can do.  And
16 there was enough detail that he remembered -- he
17 remembered that -- that conversation.
18     Q.  Do you remember when the date on which Ted
19 requested that you speak to Mark Cunningham about flying
20 out the owner?
21     A.  No.
22     Q.  Do you remember the year?
23     A.  It was -- should be 2005.  If you go back I'm
24 sure you can research when -- when their Jackie Robinson
25 annual dinner is.

Page 58

1      Q.  Do you have any recollection of the month?
2      A.  No, I don't.  It was -- I want to say just
3  after summertime, maybe September, right around there.
4      Q.  Did anyone tell you that you needed to get the
5  ticket for free?
6      A.  Absolutely.
7      Q.  Who told you that?
8      A.  Vernon and Ted.
9      Q.  Did Thella ever tell you that you needed to get
10 that ticket for free?
11     A.  The way the conversation came around was
12 Vernon -- Vernon represented himself and Thella in
13 that -- as board members of the Jackie Robinson YMCA and
14 this would be something -- something good if you were
15 able to do for us.  So not only -- not only my bosses,
16 meaning vice-president of finance and the president CEO,
17 but, you know, also as board members and it would be
18 good if the Airport Authority contributed in that
19 manner.
20     Q.  So Thella never directly asked you to obtain
21 the ticket for the owner of the Orlando Magic?
22     A.  Never directly but it was represented by Vernon
23 that he was speaking on both of their behalves.
24     MS. McDONOUGH:  Move to strike everything after
25 directly as not responsive.

Page 59

1      MS. CHINN:  Move to strike the question.
2      MS. McDONOUGH:
3      Q.  Do you know whether the ticket for the owner of
4  the Orlando Magic was to be considered as a charitable
5  donation to the YMCA?
6      A.  The request was never presented in that manner.
7  The manner was Ted -- I mean Vernon and Thella would
8  like you to -- to produce this ticket.  There was never
9  any documentation provided that and if you do, you know,
10 this is how you can write the thing off, no, never
11 presented in that manner.
12     Q.  Did you obtain the ticket for the owner of the
13 Orlando Magic?
14     A.  After -- after contemplation by Delta they --
15 they decided not to -- not to give it to him.
16     Q.  Do you know who made the decision not to give
17 the owner a ticket?
18     A.  All -- all I know was -- I then followed up
19 after repeated requests by Vernon and Ted, hey, did you
20 get -- what did they tell you, what did they tell you,
21 what did they tell you.  Finally I went in and -- and
22 got ahold of Mark and Mark said, hey, we're not going to
23 do that.
24     Q.  Do you know the owner's name from the
25 Orlando Magic?

Page 60

1      A.  No.  All I know was -- specific information
2  that I received from Vernon was a proposed flight
3  itinerary.  We need him to fly out and here's his
4  flights.  He's going from Orlando, Atlanta, Atlanta,
5  Atlanta to here on this flight on Delta and on return he
6  wants to go on this flight.  So I had specific flight
7  information that I was trying to obtain.
8      Q.  Do you know whether the owner of the
9  Orlando Magic ever came out to San Diego for the
10 Jackie Robinson event?
11     A.  No.
12     Q.  You don't know?
13     A.  No, I don't.
14     Q.  Did you ever ask any other airline for a ticket
15 for the owner of the Orlando Magic?
16     A.  No.  That request was specific to -- for Delta.
17     Q.  Have you now told me everything you can recall
18 about your conversations with Mark Cunningham regarding
19 the allegations in this complaint?
20     A.  I believe -- I believe so, yes.
21     Q.  You testified that you spoke to Jeff Frazier
22 about the allegations in the complaint?
23     A.  Jeff Rasor.
24     Q.  Oh, I'm sorry.
25     A.  R-A-S-O-R.

15 (Pages 57 to 60)

53-611 (68)