HERNANDEZ vs. SAN DIEGO COUNTY REG___ ___L. AIRPORT  December 18, 2006

JOSE DE JESUS HERNANDEZ

Page 61

1    Q.  What is Jeff's position?
2    A.  Station manager at Delta.
3    Q.  He's the current station manager in San Diego?
4    A.  That's correct.
5    Q.  Do you know when he assumed that position?
6    A.  Immediately after -- I'm sorry.  I want to say
7  he has been in that position now for four months.
8    Q.  Did he take over that position shortly after
9  Mark Cunningham left?
10   A.  No.  There was an interim period where -- where
11  there was another station manager for about a little bit
12  under a year.  So Mark left about a year and then
13  Jeff Rasor took over the position.
14   Q.  Do you know what position Jeff Rasor held
15  before he became the station program manager for Delta?
16   A.  Yes.  Jeff Rasor was senior performance leader,
17  senior supervisor.
18   Q.  For Delta?
19   A.  For Delta.
20   Q.  In San Diego?
21   A.  Yes.  So he would be considered almost
22  assistant station manager.
23   Q.  What was the substance of your conversation
24  with Jeff regarding the allegations in the complaint?
25   A.  My -- my conversations with Jeff were -- were

Page 62

1  supportive in nature, where he brought it up, hey, I saw
2  your lawsuit, it was emailed.  It was -- you know, we
3  all -- we all received a copy of it and we just want to
4  let you know we think you're doing the right thing.
5    Q.  Did he make any specific statements or opinions
6  about the allegations in your complaint?
7    A.  He only lent his support if there's anything
8  that -- that he can do to assist me he would be willing
9  to do so.
10   Q.  When was that conversation with Jeff Rasor?
11   A.  That -- that particular conversation just
12  happened two Fridays ago.
13   Q.  Have you had any other conversations with
14  Jeff Rasor regarding your complaint?
15   A.  Yeah, we had an initial conversation
16  immediately after the -- the lawsuit was distributed.
17   Q.  What was the substance of that conversation?
18   A.  That was the -- the supportive conversation
19  that we had, not into specifics but it was more of -- of
20  lending his support.
21   Q.  Have you spoken to any other employees of the
22  airlines regarding allegations in your complaint?
23   A.  Yes, Cheryl Black, current station manager for
24  Southwest Airlines.
25   Q.  When did you first speak to Cheryl Black about

Page 63

1  the allegations in your complaint?
2    A.  I have had -- I haven't had occasion to speak
3  with her until about a month ago.
4    Q.  Who initiated the conversation between you and
5  Cheryl?
6    A.  Cheryl -- Cheryl had called me asking for some
7  specific cruise ship information.
8    Q.  In relation to your current job with --
9    A.  In relation to my current job.
10   Q.  And at some point in that conversation did you
11  talk about your lawsuit?
12   A.  No.  She -- she brought it up.  She brought it
13  up and said, you know what, we should probably get
14  together to go over some of the stuff in your lawsuit.
15   Q.  At what point in the conversation did
16  Cheryl Black bring up your lawsuit?
17   A.  She just -- towards the end, towards the end.
18  You know, and then at that point, you know, obviously
19  I -- I submitted my -- my apologies to her for getting
20  her involved in -- in this.  And she said -- and her
21  response was however, once again, we can support you in
22  this.  We're going to do what we think is right.
23   Q.  Did she say what she meant by we're going to do
24  what we think is right?
25   A.  There was no reason to follow up.

Page 64

1    Q.  So, no, she didn't say what she meant by that?
2    A.  No.
3    Q.  Do you know what she meant when she said that
4  you needed to get together and talk about what was in
5  the complaint?
6    A.  Well, it had been -- she was -- she was -- she
7  had been interviewed by the investigator specific to --
8  to some of the allegations in there.  And so it had been
9  a while since I had talked to her so her request is,
10  hey, we should -- we should probably get together and
11  talk about, you know, what -- what happened here because
12  I personally think it's wrong.
13   Q.  She said that she thought it was wrong?
14   A.  Yes.
15   Q.  Did she say what she thought was wrong?
16   A.  Everything, everything regarding the
17  investigation, the questions that were asked, the
18  insinuations that were made and, you know, above and
19  beyond -- she didn't understand why -- you know, why
20  some people can and some people can't, you know, why --
21  you know, why is it okay that some people get -- get
22  tickets, upgrades, the whole thing, and some people
23  don't.  And -- and it just seems to be arbitrary in
24  nature on -- on who can do it and who can't.
25   Q.  Had you ever spoken to Cheryl Black about the

16 (Pages 61 to 64)

Case 3:08-cv-00184-L-CAB    Document 1-10    Filed 01/30/2008    Page 2 of 145

HERNANDEZ vs. SAN DIEGO COUNTY REG___L AIRPORT  December 18, 2006                    JOSE DE JESUS HERNANDEZ

Page 65

1   allegations in your complaint or the allegations against
2   you prior to the conversation you had with her a month
3   ago?
4       A.  No.  It had been pretty close to a year since I
5   had talked to her.
6       Q.  What was the nature of your conversation with
7   Cheryl Black about a year ago?
8       A.  No, my conversations with her were in the
9   course of business when I was still working at the
10  Airport Authority.  Then I had heard from Mike Parrish
11  that Cheryl Black had been investigated.  I had put in a
12  call at that time to follow up, just to -- to see if she
13  was okay.  She never called me back.  And then here we
14  are a year later, you know, once she called to request
15  this information we -- we talked.
16      Q.  When were you first hired at the airport?
17      A.  March -- it would have been five years, maybe
18  March, 2000, 2001?
19      MS. CHINN:  Five years, you left in --
20      THE WITNESS:  I want to say it was March, 2001,
21  because it was right before 9/11.
22      MS. McDONOUGH:
23      Q.  How did you first find out about the job at the
24  airport?
25      A.  The posting had come up -- the posting had come

Page 66

1   up for the position in the Port of San Diego website and
2   we had run into; God, some employee who said that --
3   that the job -- the job will be coming up for -- for
4   interview.
5       Q.  And what job did you apply for?
6       A.  Manager of ground transportation.
7       Q.  Do you recall how you applied for that
8   position?
9       A.  Yeah.  I believe I submitted -- I submitted a
10  resume and a cover letter.
11      MS. McDONOUGH:  We'll mark as Exhibit 2 a letter
12  dated October 10th, 2000, from you to the San Diego
13  Unified Port District.  [EXH]
14      MS. CHINN:  What year is it?
15      MS. McDONOUGH:  October 10th, 2000.
16      Q.  Have you ever seen this document before?
17      A.  Yeah, I believe that was my -- well, it's my
18  signature so I believe it's -- it's my cover letter
19  for -- for the job.
20      Q.  And you sent this letter to the Port District?
21      A.  Yes.
22      MS. McDONOUGH:  We'll mark as Exhibit 3, appears to
23  be a resume with your name on it.  [EXH]
24      THE WITNESS:  Yes.
25      MS. McDONOUGH:

Page 67

1       Q.  Is this the resume that you just referred to
2   that you sent to the Port District?
3       A.  Yes.
4       Q.  Looking at your resume is everything in here
5   accurate?
6       A.  To the best of my recollection, yes.
7       Q.  At the time you applied for the Port District
8   you were working at Five Star Parking; is that correct?
9       A.  Yes.  I was -- I was managing the valet parking
10  operation out of Barona Casino for Five Star.
11      Q.  Why did you want to leave Five Star Parking?
12      A.  The reason I wanted to leave Five Star Parking
13  was actually for better opportunity.  I had done
14  parking -- parking management for so long and I had an
15  opportunity to work for Dirk Mathiasen who -- who used
16  to be the landlord -- my landlord when I managed parking
17  properties on behalf of the Port.  So I had always known
18  Dirk to be a fair and honest person and it gave me an
19  opportunity to take my parking management skills and --
20  and expand on those in a public setting, just a better
21  opportunity.
22      Q.  Under the Five Star Parking portion of your
23  resume it says that you were the director of business
24  development and marketing.
25      A.  Yes.

Page 68

1       Q.  Is that accurate?
2       A.  Yes.
3       Q.  But at the time that you left Five Star Parking
4   you were managing the valet parking at Barona Casino?
5       A.  Yeah.  What happened was we had -- we had --
6   under my capacity of business development and marketing
7   we had -- we had secured an agreement with Barona to
8   manage their parking properties.  And what happened was
9   we had a manager -- we proposed a manager that was there
10  that didn't work out.  So on an interim period while we
11  went through and hired someone else I had moved over
12  and -- and assisted with the management of those -- of
13  that facility, so not only doing some business
14  development but also managing that facility on behalf of
15  Five Star Parking until we were able to find someone
16  else to replace that position.
17      Q.  How long did you manage the facility at
18  Barona Casino?
19      A.  Maybe, I don't know, maybe two, three months.
20      Q.  Is there a reason why you didn't include that
21  on your resume?
22      A.  Because I was still acting -- it was just a
23  temporary assignment.  I was still acting as director of
24  business development and marketing for -- for
25  Five Star Parking.

17 (Pages 65 to 68)

53-611 (70)

HERNANDEZ vs. SAN DIEGO COUNTY RE___AL AIRPORT  December 18, 2006

JOSE DE JESUS HERNANDEZ

Page 69

1    Q. Did you make a conscious decision not to put
2  the Barona Casino manager on the resume?
3    A. While I was still -- the decision -- it was --
4  my title was still director of business development and
5  marketing.
6    Q. I'm just asking a simple question. Did you
7  make a decision not to put the manager of valet parking
8  at Barona Casino on the resume?
9    MS. CHINN: I'll -- I'll object, it assumes facts
10 not in evidence.
11    THE WITNESS: I didn't even think about it. I
12 just -- you know, I'm reflecting what -- what my
13 position was, what I did on the resume.
14    MS. McDONOUGH:
15    Q. What was the nature of your job duties as
16 director of business development and marketing for
17 Five Star Parking?
18    A. What I would do is -- as director of business
19 development and marketing is we would be the
20 representative for Five Star in association like a a --
21 like the Building Owners and Managers Association. What
22 I would do is I would go through and -- and look and
23 identify properties, try to make contact with the owners
24 and just try to expand on the business. So go out and
25 look for opportunities to add -- add business to -- for

Page 70

1  Five Star Parking.
2    Q. Were you just in charge of the San Diego
3  region?
4    A. Yeah. The -- the nature of Five Star Parking
5  is that it's -- it's -- lack of a better -- it's kind of
6  a franchise where -- where the local owner owns
7  twenty-five percent of the company. So our realm of --
8  our, you know, realm of authority is only within
9  San Diego County. So I can't go out and represent
10 Five Star Parking in Orange County, L.A. or anywhere
11 else. It was just San Diego County.
12    Q. Who was your supervisor at Five Star?
13    A. Direct -- would be the owner, Paul Chacon.
14    Q. Did you voluntarily leave your -- your
15 employment at Five Star?
16    A. Yes, I did.
17    Q. And prior to Five Star you were working at
18 Ace Parking?
19    A. Yes, I was Ace Parking.
20    Q. Why were you at Ace Parking for only six
21 months?
22    A. The owner and I had come up to a disagreement
23 in compensation. So at that particular time it was
24 just -- I didn't feel that it was going to go in the
25 direction that I thought it was going to go so I decided

Page 71

1  to -- to leave employment.
2    Q. What was the nature of the disagreement aside
3  from the general category of compensation?
4    A. My -- my -- my compensation agreement called
5  that -- that I would -- I was entitled to 10 percent of
6  all new revenues and additional revenues that I created
7  with Ace Parking. When -- when the question was raised
8  as to, okay, now show me the budget, show me how much is
9  going towards the end of the year, the owner refused to
10 give me that information. So we had -- we had a
11 disagreement with -- with the compensation.
12    Q. Did you have any sort of a heated disagreement
13 with the owner regarding compensation?
14    A. If you know Scott Jones, yeah, there would be.
15    Q. Did you try to negotiate your compensation with
16 Scott Jones at all prior to leaving?
17    A. No, no, he was just -- you know, it was -- it
18 was just pretty clear to me that that was not the type
19 of environment that I wanted to work -- to work in and
20 that's why I chose to leave Ace Parking.
21    Q. When you were at Ace Parking what was the
22 nature of your position?
23    A. I was vice-president of operations.
24    Q. Did you have that title the entire time?
25    A. Yes.

Page 72

1    Q. And under the second bullet point under
2  Ace Parking management --
3    A. Uh-huh.
4    Q. -- it shows your duties?
5    A. Yeah.
6    Q. Is that an accurate description of --
7    A. Yeah, market analysis, tenant relations,
8  workforce administration, and --
9    Q. Prior to Ace Parking you were working at
10 Allright Corporation?
11    A. Yes, Allright Corporation.
12    Q. Why did you leave Allright?
13    A. Back in May of 1999 or a little bit earlier
14 than that our company -- our company merged with another
15 company called Central Parking. At that particular time
16 when we were going through the merger I was approached
17 by Ace Parking to come and work for them. And, you
18 know, it was an opportunity to go through and work
19 with -- work with the bigger company at that time. And
20 I just wasn't comfortable with -- with joining that new
21 company, Central Parking. So during that whole merger I
22 just split and then went to go work with Ace Parking.
23    Q. What was your title at Allright Corporation?
24    A. Vice-president so I would be the city manager,
25 vice-president. That's how we -- we termed ourselves.

18 (Pages 69 to 72)

53-611 (71)

Page 73

1    Q. Did you hold that title the entire time you
2  worked with Allright?
3    A. No.
4    Q. What was your first title with Allright?
5    A. Management training.
6    Q. How long did you hold that title?
7    A. I want to say I did management training for
8  under a year. We did management training and then --
9  then I was promoted to -- to regional vice-president
10  for -- for San Diego. And that's when -- when I ended
11  up moving down here. So I went from training to
12  vice-president.
13    Q. Sometime in 1994?
14    A. Yeah. Let me see, right around when I got
15  married so 11 years ago, yeah, '94, '95, right in there.
16    Q. And you graduated from Chico State --
17    A. Yes.
18    Q. -- in May of 1992?
19    A. Uh-huh.
20    Q. Yes?
21    A. Yes.
22    Q. What did you do from May, 1992, to May, 1993,
23  in terms of employment?
24    A. I had -- I was working with -- I had gone back
25  to work with -- in the box office for the

Page 74

1  Long Beach Convention Center. I just wanted to take a
2  little bit of time off so I would work part time
3  seasonal at the -- at the box office. And in between
4  after I graduated to here, that's when I started working
5  at Allright Corporation as my first real job.
6    Q. And Allright Corporation was your first
7  experience in the parking field?
8    A. No. I had worked as -- in valet parking
9  operations since I was -- since I turned 18. So I would
10  work -- I forget the name of the company now but I would
11  work -- when I first started working parking I was a
12  valet, kind of a valet lead for some of the local
13  restaurants there in Long Beach.
14    Q. Have you ever been fired from any employment
15  that you've held?
16    A. Fired, you know, the only thing that would
17  be -- that would be close to that would just be our
18  disagreement with -- with Ace Parking.
19    Q. Would you consider your departure from
20  Ace Parking a voluntary departure?
21    A. You know, it was kind of -- kind of a little of
22  both in there where -- where I didn't want to be there
23  and it was just better that -- that I left employment
24  there.
25    Q. Do you know if Scott Jones would have permitted

Page 75

1  you to continue working at Ace Parking?
2    A. I believe at that particular point I didn't
3  want to -- I didn't want to and I didn't even ask. It
4  was just -- it was just not the right type environment
5  for -- for me and my family to --
6    MS. CHINN: Can I ask you something off the record?
7    THE WITNESS: Uh-huh.
8    MS. CHINN: Is that the time he was drunk?
9    THE REPORTER: Wait, are we off the record?
10    MS. CHINN: Yes, we're off the record for a moment.
11    THE VIDEOGRAPHER: Wait a second --
12    MS. CHINN: I'm going to ask my client something.
13    THE VIDEOGRAPHER: -- off the record at 12:01.
14    (Discussion held off the record.)
15    THE VIDEOGRAPHER: Back on the record at 12:01.
16    MS. CHINN: There's no question pending.
17    MS. McDONOUGH: That's right.
18    Q. Scott Jones is the owner of Ace Parking?
19    A. Yes.
20    Q. You mentioned you had some sort of a
21  compensation agreement?
22    A. Yes.
23    Q. Is that in writing?
24    A. I believe I still have it in writing, yeah.
25    Q. Have you produced your compensation agreement

Page 76

1  from Ace Parking in this lawsuit?
2    A. No, I don't believe -- what -- I don't believe
3  it was asked for, was it?
4    MS. CHINN: What was the question?
5    THE WITNESS: If I produced my compensation
6  agreement with Ace Parking.
7    MS. CHINN: I wouldn't produce it anyway. It's not
8  relevant whether it was requested or not. Were you
9  finished answering your question?
10    THE WITNESS: Yeah, that particular question.
11    MS. McDONOUGH:
12    Q. Was Scott Jones your supervisor at Ace Parking?
13    A. No.
14    Q. Who was your supervisor?
15    A. John Baumgartner.
16    Q. Do you know if John still works at Ace Parking?
17    A. Yes.
18    Q. Do you know his title?
19    A. I believe he is president and CEO of
20  Ace Parking -- or president, I'm sorry.
21    Q. Who was your supervisor at Five Star?
22    A. Paul Chacon.
23    Q. Oh, you already --
24    A. Uh-huh.
25    Q. After you submitted the cover letter and resume

19 (Pages 73 to 76)

53-611 (72)

HERNANDEZ vs. SAN DIEGO COUNTY REG___L AIRPORT   December 18, 2006

JOSE DE JESUS HERNANDEZ

Page 77

1 to the Port District did you receive any sort of call or
2 other contact from the Port District regarding your
3 application?
4      A. Yeah. It had gone -- it had gone a pretty long
5 time because if you look at when I was hired and the day
6 I submitted the letter it had gone a while. And then
7 finally I received a call from Rich McClees, who was HR
8 analyst, to setting up an interview date for -- for the
9 position.
10      Q. Did you go into the Port District and interview
11 for the position?
12      A. I don't believe I went into the Port District.
13 I believe the interviews were held at the -- at the
14 Airport Authority -- I'm sorry, at the commuter
15 terminal.
16      Q. How many interviews did you have?
17      A. Two interviews.
18      Q. Were they on the same day?
19      A. No, they were -- they were rather spaced apart.
20      Q. When was your first interview?
21      A. I don't recall.
22      Q. Do you remember who you interviewed with in
23 your first interview?
24      A. Both -- both interviews were -- were panel
25 interviews.

Page 78

1      Q. Do you remember who was on the panel in your
2 first interview?
3      A. I believe initially with obviously
4 Dirk Mathiasen was in both interview because as -- as,
5 you know, the -- the -- as to who I would be working,
6 Cliff Orine Massey, who was the manager for airport
7 traffic officers, I believe we had Rich, the HR analyst,
8 and we had -- I know Ted Sexton was in one of those.
9 But any more than that I don't know but I know both of
10 them were -- were panel interviews.
11      Q. Was the second interview a call back type
12 interview?
13      A. Uh-huh.
14      Q. Yes?
15      A. Yes.
16      Q. And that was a panel again?
17      A. Yeah. I believe the first interview -- from
18 the information that I -- you know, that I gathered, the
19 first one they interviewed about eight -- eight
20 candidates and the second was -- was narrowed down to
21 three. And I believe the last three were, you know,
22 Jim Myhers, Bowers -- Marie Bowers and myself.
23      Q. Do you remember if any other people were on the
24 second panel other than those that you've already
25 mentioned?

Page 79

1      A. I know there was more people because it was a
2 pretty big panel but specifically who was there, I don't
3 remember. All I know, I remember Dirk was there and Ted
4 was there at the second one but, you know, who else was
5 there I can't tell you. I don't remember.
6      Q. And sometime after that second interview you
7 received an offer of employment?
8      A. Sometime after that, yes, I received a call
9 from Rich McClees saying that -- saying that they would
10 be preparing a letter.
11      Q. Did Rich tell you anything in that conversation
12 about the nature of the offer that was going to be sent
13 to you?
14      A. No. He was going to put it in writing.
15      Q. Did you receive a letter?
16      A. Yes.
17      MS. McDONOUGH: I'll mark as Exhibit 4 a letter
18 dated March 2nd, 2001, from the -- [EXH]
19      MS. CHINN: That's five.
20      MS. McDONOUGH: I think it's four.
21      MS. CHINN: The resume is not four?
22      MS. McDONOUGH: The resume is three. The October
23 letter is two.
24      MS. CHINN: Okay. You said three before? So this
25 is going to be four?

Page 80

1      MS. McDONOUGH: Yes.
2      Q. Have you ever seen this letter before?
3      A. Yes, uh-huh.
4      Q. Is this the offer of employment that you
5 received from the Port?
6      A. I believe that that's it, uh-huh.
7      Q. Were you hired as the manager of ground
8 transportation?
9      A. Yes.
10      Q. And was your starting pay twenty-three
11 ninety-four sixty-four biweekly?
12      A. What -- what does that equal monthly -- I mean
13 yearly?
14      Q. Oh, I don't know. I can calculate it very
15 quickly.
16      A. I believe that was -- I believe it was right
17 around sixty, sixty-five a year. It was the starting
18 entry for that position.
19      Q. What were your duties as a manager of ground
20 transportation?
21      A. At that particular time as manager of ground
22 transportation what I would do is I would oversee the
23 permitting office for -- the permitting office for
24 ground transportation. I would oversee the airport
25 traffic officers, not only at the Airport Authority -- I

20 (Pages 77 to 80)

53-611 (73)

Page 81

1  mean on airport property but Port Thailands (phonetic)
2  area. And I would manage all parking services for the
3  port.
4      Q. Do you recall filling out a handwritten
5  application for the Port as well?
6      A. I'm sure if you have it I probably did.
7      MS. McDONOUGH: We'll mark as Exhibit 5 -- [EXH]
8      MS. CHINN: Is that a no?
9      THE WITNESS: No, it looks like -- looking at it
10  now I believe I did.
11     MS. McDONOUGH:
12     Q. Have you ever seen this document before?
13     A. Yes. Well, it's in my writing, yes, ma'am.
14     Q. So the writing on Exhibit 5 is yours?
15     A. Yes.
16     Q. Is that your signature on the first page?
17     A. Yes.
18     Q. Did you sign this document --
19     A. Yes.
20     Q. -- on or about November 24th, 2000?
21     A. That's my writing, yes.
22     Q. Do you have any reason to believe that you
23  didn't sign it on November 24th, 2000?
24     A. I have no reason to believe so.
25     Q. And is everything in this document accurate?

Page 82

1  You can go ahead and take as much time as you need to to
2  read it.
3      (Witness and counsel confer off the record.)
4      THE WITNESS: If I can speak to my attorney.
5      (Discussion held off the record.)
6      THE WITNESS: Okay. There was -- should I --
7      MS. CHINN: There's no question pending.
8      THE WITNESS: Okay.
9      MS. McDONOUGH: Yes, there is.
10     MS. CHINN: There is? Is that about is it
11  accurate?
12     MS. McDONOUGH:
13     Q. Is every -- is everything on Exhibit 5
14  accurate?
15     A. There was -- the only thing that's omitted from
16  here was just maybe a month, less than two, I had been
17  paid through -- through this period with Ace and prior
18  to when I began with Five Star Parking. I just -- I
19  worked with a friend of mine selling used cars for like
20  a month.
21     Q. So you were paid from -- by Ace Parking through
22  December 1st, 1999?
23     A. I was paid through and in between then I had
24  worked, just keeping myself busy because I was
25  negotiating with Five Star Parking on unemployment.

Page 83

1      Q. When was the last day that you physically
2  worked for Ace Parking?
3      A. I don't remember.
4      Q. Was it prior to December 1st, 1999?
5      A. I don't recall the exact date.
6      Q. And what used car lot did you work at?
7      A. It was -- the used car was a company called
8  First Choice, FUQI.
9      Q. And you just sold used cars?
10     A. Yeah, just keeping myself busy.
11     Q. Under Five Star Parking it said that your
12  monthly salary was $4,000 plus incentive?
13     A. Uh-huh.
14     Q. Do you know how much incentive you received on
15  a monthly basis on average from Five Star?
16     A. No, because those -- those agreements were
17  incentives based through -- through accumulated net
18  profits. But I don't believe I received a performance
19  bonus or incentive bonus in that manner.
20     Q. Did you ever receive any sort of incentive from
21  Five Star --
22     A. I -- I don't believe so.
23     Q. So when you put $4,000 plus incentive as your
24  monthly salary what did you mean by that?
25     A. That I had an incentive program but I don't

Page 84

1  believe I received that -- an incentive pay.
2      Q. And under Ace Parking it says $5,200 plus
3  incentive as a monthly salary --
4      A. Yeah, that was my --
5      Q. -- was that accurate?
6      A. Yes. That was the 10 percent of additional
7  revenues and new lots produced, yes.
8      Q. Did you ever receive that 10 percent at any
9  time?
10     A. Never.
11     Q. So did you ever receive an incentive of any
12  sort from Ace Parking?
13     A. No. That was -- that was part of what led me
14  to -- to leave employment, that and as well as other
15  things.
16     Q. The other things are the things we've already
17  discussed?
18     A. No.
19     Q. What other things led you to leave Ace Parking?
20     A. We had -- I had had a disagreement with the
21  owner because on one particular time over the
22  Street Scene. I had worked with -- with the
23  Street Scene organizers to -- to lease out some of
24  our -- the Ace Parking lots to them when it was down in
25  the Gas Lamp.

21 (Pages 81 to 84)

53-611 (74)

HERNANDEZ vs. SAN DIEGO COUNTY RE... AL AIRPORT  December 18, 2006

JOSE DE JESUS HERNANDEZ

Page 85

1    On one particular occasion Scott Jones, the owner,
2  we had come out -- had come out of -- of the
3  Street Scene and he had been drinking and he made it a
4  point to go out and berate me in public as to -- you
5  know, just his show of force. And that was -- that was
6  the issue -- that was one of the issues that -- that and
7  then along with the conversation that caused me to leave
8  Ace Parking.
9    Q. How do you know that Scott Jones had been
10 drinking?
11   A. When -- when his son has to drive for him,
12 that's pretty close to why he had been drinking.
13   Q. How do you know his son had to drive for him?
14   A. Because Keith, his son, told me that he had
15 been drinking and he's going to have to drive his dad
16 home.
17   Q. So on this occasion in the Gas Lamp
18 Keith Jones --
19   A. Yeah.
20   Q. -- told you that his dad had been drinking and
21 he had to drive him home?
22   A. Yeah. It was pretty clear to the employees
23 that he had been drinking.
24   Q. Do you know who else was there when Scott
25 talked to you in the Gas Lamp?

Page 86

1    A. No, I had -- they were -- I had two or three
2  other employees in there. You know, what led to that --
3  what led to that was the day before -- back when they
4  did the Street Scene you would do Street Scene and
5  Action Sports Retail show all together. Action Sports
6  Retail brings in, you know, twenty, thirty thousand
7  people that come for the event. And what happens is
8  those who come in for Action Sports Retail can't find a
9  place to park and park there the whole week and just pay
10 whatever the rates are, you know, twenty, thirty bucks a
11 day.
12   And so the night before Scott had said -- asked to
13 valet the whole parking lot. And so I had a
14 discussion -- because Scott had gone Friday, Saturday,
15 Sunday, you know, to the -- to the Street Scene. I had
16 said, Scott, we can't valet the whole parking lot
17 because over half the cars that are in here in the
18 parking lot we won't see until Sunday because they just
19 parked their car and left it there. He said, no, I want
20 you to valet the whole parking lot.
21   So when we came -- when he came back the next day
22 he only saw some cars up and down the aisles -- up and
23 down the aisles that we had valets, just added extra
24 cars. And that's when he said -- that's when he
25 launched into his tirade that I don't listen to him, I

Page 87

1  don't do what he asks me to do and why isn't the whole
2  parking lot valeted, even though the day before he had
3  agreed with me that, okay, just do the best you can do
4  because there's no way you can valet the whole parking
5  lot.
6    Q. Do you remember what month this was in?
7    A. I believe -- I believe it was always around
8  September.
9    Q. Do you remember exactly what Scott Jones said
10 to you in that parking lot in September of 1999?
11   A. Yeah. I believe he said you're a liar, you're
12 a liar, you never do what I want you to do, we never had
13 that conversation yesterday. And he just -- you know,
14 just started, you know, profanity, tirade. And that was
15 kind of -- you know, I had never worked under those --
16 you know, under those conditions. So that's kind of the
17 beginning of when, you know, I didn't -- I didn't want
18 to work there any more.
19   Q. Do you remember what profanity he used?
20   A. Yeah. I mean like -- like fuck you, asshole.
21 I mean Scott is -- Scott is pretty famous for just going
22 off on these tirades on his employees.
23   Q. And you believe that other employees were there
24 at the time?
25   A. I believe -- yes, because I had lot attendants

Page 88

1  over on -- on duty at that time.
2    Q. Do you remember the names of any of those
3  employees?
4    A. No, I don't.
5    Q. Did Scott ever get upset with you after the
6  Street Scene event at any time from --
7    A. He had --
8    Q. -- September, 1999, to when you left?
9    A. He had never been upset with me beforehand.
10 And for whatever particular reason he didn't want to let
11 this one go. He had asked me to send him an apology
12 letter of which -- you know, which obviously I did, you
13 know, just send him and told him there was a
14 misunderstanding, miscommunication. I sent him an
15 apology letter. He wouldn't let it go, he wouldn't let
16 it go. And then finally, you know, when I had the
17 conversation with -- with John Baumgartner, you know, it
18 was just agreed that -- that I would -- I would not work
19 there any more.
20   Q. Do you have a copy of the apology letter that
21 you sent to Scott?
22   A. No.
23   Q. What was the nature of your conversation with
24 John?
25   A. John had -- John on several occasions had

22 (Pages 85 to 88)

53-611 (75)

HERNANDEZ vs. SAN DIEGO COUNTY RE(    )L AIRPORT    December 18, 2006

JOSE DE JESUS HERNANDEZ

---

Page 89

1  called me because he had -- I don't know if he was
2  trying to arbitrate or mitigate or -- he was just kind
3  of letting me know what -- you know, what Scott was --
4  was thinking which -- you know, what he wanted me to do
5  and he just wouldn't let it go, he just wouldn't let it
6  go.
7      In this particular instance, you know, which --
8  which confounded me was I had gone through and not only
9  leased the -- his parking lots at a much higher rate
10  than he ever had but I also found him a couple of
11  additional properties where he made, you know, much
12  higher profits than he had ever made at any Street Scene
13  before so I don't understand why -- you know, why he
14  focused on -- you know, on -- on that, hey, you didn't
15  valet the whole parking lot, even though we had the
16  conversation before.
17      So that's -- that was the conversation that I was
18  having with -- with John Baumgartner and just
19  couldn't -- couldn't get it, couldn't understand why he
20  wouldn't let that go, even though to me it was trivial
21  in nature.
22      Q.  When was the conversation with John that you
23  were just referring to?
24      A.  I don't -- I don't recall the specific dates in
25  there but -- but it was probably immediately thereafter,

---

Page 90

1  sometime in February -- sometime -- I'm sorry, sometime
2  September, September, October timeframe.
3      Q.  Did you have any conversations with John
4  regarding ending your employment with Ace?
5      A.  We had -- John and I had -- had talked about --
6  had talked about him not letting it go and I had told
7  him, well, you know, our conversations were if he can't
8  let it go then -- then maybe I should just leave in that
9  tone, that tone and nature.
10     Q.  And did John respond to that statement?
11     A.  John just said, well, let me -- let me see what
12  it is that I can do, you know, to try to get this whole
13  thing go away.  But obviously, you know, when --
14  obviously Scott was not about to let it go.
15     Q.  Is there any other reason that you left
16  Ace Parking other than this altercation you had with
17  Scott and the issue over compensation?
18     A.  No, ma'am.
19     Q.  Going back to Exhibit 5 under Allright it says
20  that your monthly salary was $4,000 plus incentives?
21     A.  Yes.
22     Q.  Did you ever receive any incentives --
23     A.  Yes.
24     Q.  -- from Allright?
25     Did you ever receive those on a monthly basis?

---

Page 91

1      A.  No, they were on a quarterly.  They're on a
2  quarterly basis.  As part of my incentive agreement or
3  just every -- every vice-president, when you take over a
4  city they baseline your -- your profits.  And then what
5  you do on a quarterly basis for any new revenues that
6  you bring on a quarterly basis you receive a quarter
7  of -- of that year.  So the first year you didn't get
8  anything but after that year you'll start receiving a
9  quarter of everything that you get.  And at the end of
10  the year you get -- you get a big chunk which is the
11  rest of the year.  Just in case you have a quarter that
12  dips down they make it all right but, yeah.
13     Q.  Do you remember about how much you received in
14  incentives in the last year that you were employed at
15  Allright?
16     A.  I don't -- I don't remember.  I don't remember
17  but during my last year of -- during my last year of
18  employment with Allright Corporation we were also issued
19  stocks, stocks as part of the transfer.  So it was, you
20  know, well in access of twenty, thirty thousand dollars.
21     Q.  In incentives --
22     A.  Uh-huh.
23     Q.  -- in addition to your $4,000 per month?
24     A.  Yes.
25     MS. McDONOUGH:  Cathryn, is this a good time for a

---

Page 92

1  lunch break or do you want to keep going?
2      MS. CHINN:  Whenever you want.
3      MS. McDONOUGH:
4      Q.  Are you fine to continue?
5      A.  We're fine.
6      Q.  Okay.  Back to your position with the airport,
7  how long did you hold the manager of ground
8  transportation position?
9      A.  I believe I was manager of ground
10  transportation until -- I want to say -- my tenure there
11  was just under five years so I believe I was manager of
12  ground transportation two, three years, somewhere in
13  there.  You probably have the dates in front of you.
14  Then I went to an acting position of acting director of
15  landside operations.  And then I finally interviewed and
16  got the -- final director of landside operations
17  so -- you have the dates in front of you.  You can tell
18  me better than I can.
19     Q.  Did you ever receive pay increases from the
20  time -- while you were employed as manager of ground
21  transportation?
22     A.  Yes.
23     Q.  Do you remember what your pay increases were?
24     A.  No.
25     Q.  Do you remember at some point in time making

---

23 (Pages 89 to 92)

HERNANDEZ vs. SAN DIEGO COUNTY REGIONAL AIRPORT  December 18, 2006

JOSE DE JESUS HERNANDEZ

Page 93

1  $72,800 --
2    A. Yes.
3    Q. -- as the manager of ground transportation?
4    A. Yeah. If you have the documentation in front
5  of you it must be true.
6    Q. I'm not trying to trick you and I don't want
7  you to assume that anything is true just because I'm
8  looking at a document.
9    A. Yeah. You know, clearly with mine they're all
10  direct deposits. I don't -- you know, money to me isn't
11  a focus. It's -- it's opportunities to do whatever it
12  is I'm going to do. So you can -- I mean for me to tell
13  you specific on this day I got a raise, I really
14  wouldn't be able to answer that for you because that's
15  not how I'm driven.
16    MS. McDONOUGH: Okay. We'll mark as Exhibit 6 a
17  letter dated October 3rd, 2003, from Ted Sexton to
18  you. [EXH]
19    THE WITNESS: Okay.
20    MS. McDONOUGH:
21    Q. Have you seen this document before?
22    A. Yes. This is the letter -- this is a letter
23  that finally -- let me see, I believe -- yeah, this is
24  the one where I was extended the opportunity to be
25  director of landside operations.

Page 94

1    Q. You said you interviewed for this position?
2    A. Yes.
3    Q. Who did you interview with?
4    A. Interviewed in this position was, let's see,
5  Ted -- no. Was it Ted? I know Diane -- Diane Richards
6  I believe was there, director of Human Resource, or
7  director of Human Resource was there, Paul Kelly was
8  there, who was the assistant federal security director
9  for the TSA. We had Connie -- Connie Adams, who was
10  station manager for Skywest Airlines was on that panel.
11  Maybe -- maybe Ted was there too. But I know there was
12  others. It was all panel interviews -- a panel
13  interview.
14    Q. Did you apply for the director of landside
15  operations position?
16    A. Yes, you have to apply.
17    Q. Do you know why that position opened up?
18    A. Yes, because prior -- prior to -- prior to the
19  split of -- or the separation of Airport Authority from
20  the Port of San Diego Dirk Mathiasen was under a
21  different title but -- but the same capacity, was deputy
22  director of landside operations. When the split came
23  through he decided to maintain his employment with the
24  Port of San Diego. And he moved over as real estate
25  manager for the Maritime Division. So that's how the

Page 95

1  position went up.
2    So between, I want to say just prior to -- to the
3  split of the Airport Authority, around in November,
4  somewhere in there, I had -- I was acting director of
5  landside operations between there and when I finally
6  received the job all this time.
7    Q. So from November, 2002, to October, 2003, you
8  were the acting director --
9    A. Pretty --
10    Q. -- of landside --
11    A. Pretty close.
12    Q. Do you remember when you applied for the actual
13  director position?
14    A. No, I don't.
15    MS. McDONOUGH: We only have a couple minutes left
16  on the tape so this would be a good time to take a lunch
17  break.
18    THE WITNESS: Okay.
19    THE VIDEOGRAPHER: This is the end of
20  Videotape Number 1. Off the record at 12:26.
21    (A lunch recess is taken.)
22    THE VIDEOGRAPHER: This is the beginning of
23  Videotape Number 2. Back on the record at 1:37.
24    MS. McDONOUGH:
25    Q. Is there any reason why you cannot continue to

Page 96

1  give your best testimony?
2    A. No.
3    Q. Did you take any medication over the noon hour?
4    A. No.
5    Q. Did you speak to anyone about your deposition
6  over the noon hour other than your attorney?
7    A. Yes.
8    Q. Who did you speak to?
9    A. It just happened that I got a call from
10  Mike Parrish with Southwest. He gave me a call and I
11  said, hey, can I call you later, I'm in the middle of a
12  deposition, and we just left it at that.
13    Q. Did you talk about the substance of the
14  deposition at all?
15    A. No. I just said I was in the middle of a
16  deposition.
17    Q. Prior to our lunch break we were talking about
18  your application for the director position at the
19  Airport Authority.
20    A. Yes.
21    Q. Do you recall -- well, strike that.
22    Do you know how many people applied for the
23  director position?
24    A. No.
25    Q. Do you know if anyone else applied for it?

24 (Pages 93 to 96)

HERNANDEZ vs. SAN DIEGO COUNTY REG...L AIRPORT  December 18, 2006

JOSE DE JESUS HERNANDEZ

Page 97

1    A. Yes.
2    Q. Who else applied that you know of?
3    A. I know -- I know Clint Welch applied for it,
4  who was a manager of security.  I know that Marie Bowers
5  applied for it with America West.  And I know that --
6  one more -- Danette, Danette Bewley applied for it.
7  Those were just names that were brought to my attention
8  that also applied for that position.
9    Q. Did anyone ever tell you why you were selected
10 over the other candidates for the position?
11    A. I was best qualified for the position.
12    Q. Who told you that?
13    A. Ted Sexton, who hired me.
14    Q. Is Ted your supervisor?
15    A. Direct supervisor.
16    Q. How long had Ted been your supervisor at the
17 time he promoted you to the director position?
18    A. Ted had been my supervisor ever since
19 Dirk Mathiasen left.
20    Q. Dirk was your first supervisor --
21    A. Uh-huh.
22    Q. -- when you started with the Authority, with
23 the Port?
24    A. Uh-huh, yeah.
25    Q. And then Ted became your supervisor when Dirk

Page 98

1  left?
2    A. Yeah, because I was then promoted to the
3  interim or acting -- interim or acting, I don't remember
4  the exact title of -- as director of landside
5  operations.
6    Q. In November of 2002?
7    A. Uh-huh, right around there, uh-huh.
8    Q. You mentioned earlier that the
9  Airport Authority, in your words, split off from the
10 Port?
11    A. Uh-huh.
12    Q. Do you remember what -- what month and year
13 that was?
14    A. That was January 1, 2003, probably, 2002, 2003.
15 No, it had to be -- let me see, 2003.
16    Q. What were your job duties when you were first
17 hired as director?
18    A. In the active position or the -- or the --
19 or --
20    Q. The permanent position.
21    A. The permanent position.  At that particular
22 time we didn't have a manager of terminal operations.
23 We didn't have a manager of ground transportation.  So
24 at that particular time I kind of did it all.  I oversaw
25 all terminal operations, of which we have approximately

Page 99

1  a million square feet, parking, ground transportation,
2  permitting, the traffic enforcement officers, capital
3  improvement developments, major maintenance projects.
4  So really everything -- everything at the airport that
5  did not involve -- in terms of operation that did not
6  involve airside activity.
7    Q. There will be people on this case who have
8  never worked at the airport and don't know much about it
9  so when you say airside and landside can you explain
10 what you mean by that?
11    A. Airports are broken down in three sections.
12 There is landside operations, which is everything from
13 the curbs -- from the terminal curbs out to -- to the
14 main street, which in our case is Harbor Drive.  So that
15 includes your parking, ground transportation and --
16 parking, ground, permitting, that's -- that's what they
17 call landside operations.
18    Now, you have terminal operations.  Terminal
19 operations are the management of the buildings
20 themselves.  And then from the jet bridges out is
21 airside.  So as director of landside operations I manage
22 terminal operations and -- and landside operations.
23    Q. So as director of landside you manage terminal
24 and landside?
25    A. Yes.

Page 100

1    Q. Was there a director of terminal operations?
2    A. No.  No, at that particular time we had
3  Danette Bewley who had left employment with the
4  Airport Authority to join Jacksonville airport.  So at
5  one particular time I not only was the director but also
6  the manager of -- of those two aspects.
7    Q. How did your job duties change when you went
8  from manager of ground transportation to acting director
9  of landside operations?
10    A. They pretty close to doubled at that particular
11 time which, you know, prior to then I only -- my -- my
12 management of the airport stopped at the curbs, at the
13 terminal curbs.  When I moved into this particular
14 position it now involved all -- all the terminal
15 operations inside the terminal.
16    Q. Did your job duties change at all from being
17 acting director of landside operations to permanent
18 director of landside operations?
19    A. They -- they did because now it was formalized.
20 I couldn't -- under the acting position I didn't have
21 full reign to do or to oversee a lot of the projects so
22 a lot of that was split in terms of capital
23 improvements, developments and those.  So, yeah, it
24 increased -- it increased and made it more I guess
25 legitimized the position.

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210

53-611 (78)

HERNANDEZ vs. SAN DIEGO COUNTY REGIONAL AIRPORT   December 18, 2006

JOSE DE JESUS HERNANDEZ

Page 101

1   Q. How did the job increase when you became a
2 permanent director, just in terms of the authority that
3 you had?
4   A. Yeah.
5   Q. The --
6   A. It was more of what -- what I was very
7 conscious of doing --
8   MS. CHINN: You've got to look at Jennifer because
9 if --
10   THE WITNESS: Oh, sorry.
11   MS. CHINN: -- you overspeak the end of her
12 sentence she can't -- is that what you were --
13   THE REPORTER: I'm okay right now.
14   MS. CHINN: Go ahead and signal him.
15   THE WITNESS: As -- as acting director of landside
16 operations I was -- I was very careful to -- to
17 understand that I was only in an acting position. I
18 didn't want to represent myself or misrepresent myself
19 as the permanent director of landside operations if I
20 wasn't going to get the job. So in -- in my
21 correspondence I would still put acting director of
22 landside operations because it was at no point told to
23 me that I was -- it was going to be my job.
24   MS. McDONOUGH: We'll mark as Exhibit 7 an
25 organizational chart. [EXH]

Page 102

1   Q. Have you ever seen this organizational chart?
2   A. Let me look.
3   Q. Okay.
4   A. Yes, I have.
5   Q. Do you know what the organizational chart is
6 for?
7   A. Yeah. This is just to show reporting
8 responsibilities.
9   Q. Within the Airport Authority?
10   A. Uh-huh.
11   Q. By looking at the chart and the names that are
12 listed there can you place this organizational chart in
13 time as far as what year this was for?
14   A. In looking at the chart it -- you -- you see up
15 on top it says Regional Airport Authority so it has to
16 be within that span. You also have to keep in mind
17 that -- that during my tenure there was was also
18 iterations and reiterations of -- of proposed, you know,
19 organizational structures. And, in fact, at my time or
20 when -- when my employment ceased this was no longer the
21 reporting structure.
22   Q. So can you place this reporting structure in
23 time as far as a year or a --
24   A. It probably a little bit after the creation of
25 the Airport Authority because you still had Young Choi

Page 103

1 here as a chief auditor, which was one of the original
2 chief auditors, and then Breton Lobner who started. But
3 just by looking at Young Choi he was there only at the
4 beginning and -- and so was Sunil Harman.
5   Q. So sometime in the beginning of 2003?
6   A. Uh-huh.
7   Q. Yes?
8   A. Right around -- I want to say right around year
9 2003.
10   Q. Okay. In looking down in the bottom left-hand
11 corner --
12   A. Yes; ma'am.
13   Q. -- do you know if this organizational chart was
14 created after you became the permanent director of
15 landside operations?
16   A. I'm not sure when it was created. When it was
17 created I just -- I'm just looking and saying that's
18 pretty much the structure. I can't -- I can't tell you
19 because I didn't write it. This is -- this is probably
20 a document that was either included in -- probably in --
21 in our budget somehow.
22   Q. Assuming that this organizational chart is from
23 2003 does this accurately reflect the reporting
24 relationships at that time looking -- I'm most
25 interested in from your position in landside operations

Page 104

1 on up.
2   A. Yeah. I reported --
3   MS. CHINN: Let me make an objection.
4   THE WITNESS: Sorry.
5   MS. CHINN: It lacks a foundation. Go ahead and
6 answer.
7   THE WITNESS: Okay. From -- from what I see in
8 here I reported directly to Ted, Ted reported to Thella.
9   MS. McDONOUGH:
10   Q. Did your job ever change after you obtained the
11 director position in October, 2003?
12   A. The -- the job always changed because areas --
13 areas of focus and responsibility and new initiatives
14 caused it to be -- to -- for the job to be dynamic.
15 What was -- what was static was the areas of
16 responsibility but items within those changed all the
17 time.
18   Q. Can you give an example of what would change?
19   A. Where, for example, initially manager of
20 terminal operations or under the terminal operations
21 side did not involve the management of overseeing of
22 your security check points or the management and develop
23 of in-line baggage systems. Immediately after --
24 Immediately after I took that interim job it -- it all
25 changed because 9/11 dictated that all -- that the

26 (Pages 101 to 104)

53-611 (79)

HERNANDEZ vs. SAN DIEGO COUNTY RE     L AIRPORT   December 18, 2006

JOSE DE JESUS HERNANDEZ

Page 105

1  baggage screening requirements, passenger screening
2  requirements all changed. Everything came back to the
3  TSA government.
4      So where beforehand we didn't have anything to do
5  with screening, passenger or baggage, you know, that all
6  changed. So now it was up to us as airports to
7  institute or to comply with all the safety and security
8  requirements. So that's just a little idea of the
9  dynamics of -- of the nature and a lot of it is really
10  security so it all changes.
11     Q. Based on the climate in the country or the
12  world?
13     A. Uh-huh.
14     Q. Yes?
15     A. Yes.
16     MS. CHINN: Objection, that calls for speculation.
17  It contradicts his previous -- it contradicts his
18  previous testimony.
19     MS. McDONOUGH:
20     Q. How would you receive notification that your
21  job had changed or expanded or constricted in -- in
22  responsibilities?
23     A. What would happen -- what would happen is -- is
24  we would get together on a weekly basis with -- and have
25  a staff meeting with Ted Sexton. We would go over -- we

Page 106

1  would go over, you know, what we were doing and then he
2  would also present to us direction of areas of focus
3  that he wanted us to do.
4      But being in -- in the positions that we are we
5  kind of already knew or -- or had an idea bullet points
6  of directions or changes that we needed to make at that
7  time. Like, for example, you know, when the Super Bowl
8  came around, it wasn't within anyone's responsibility
9  to -- to oversee the Super Bowl when it came in but yet,
10  you know -- you know, I did it. So it was just, you
11  know, things come around, in and out, and -- and at that
12  time if it's -- if it's within your area or your scope
13  of responsibility it would be tasked with -- with doing
14  that.
15     Q. When you said that we would get together on a
16  weekly basis with Ted who you were referring to?
17     A. Your group -- your core group here that you
18  would see as your -- as Ted's directors. But also
19  within that -- within these directors you would have
20  Amy Gosslin, who was his administrative assistant, and
21  you would also have key individuals or additional
22  individuals such as Amiel Porta and Jay Bass, who were
23  under terminal operations who were involved with the
24  day-to-day operations.
25     You would also have Jim Prentice, who was our

Page 107

1  business analyst in there, and then other key
2  individuals probably -- not probably, Jeff Simons, who
3  was our -- our special IT guy for -- for the
4  Airport Authority.
5      So that was -- that was kind of the group of --
6  oh -- yeah, kind of the group that would be involved
7  with -- with Ted's weekly meetings.
8      Q. And when you were referring to the people who
9  report to Ted you're referring to the five people on
10  Exhibit 7 that are listed --
11     A. Yeah.
12     Q. -- under Ted?
13     A. You had the directors of the five areas of
14  responsibility that it covered and then within -- within
15  below that there was additional staff included in
16  those -- in those staff meetings.
17     Q. Those meetings --
18     A  Managers.
19     Q. -- were on a weekly basis?
20     A. On a weekly basis, for the most part.
21     Q. Do you know if anyone took notes at those
22  meetings?
23     A. Amy Gosslin was supposed to take notes.
24     Q. Do you know if she did take notes?
25     A. I'm sure she did. At some times she did,

Page 108

1  sometimes she wouldn't. Sometimes she was available,
2  sometimes she wasn't so probably.
3      Q. Have you ever seen notes that Amy Gosslin took
4  from the meetings?
5      A. Yeah, they would be emailed. They would --
6  whenever she was there she would take the notes and
7  email them back to the group.
8      Q. Do you still have any of those emails?
9      A. Nope.
10     Q. What was your practice when you received those
11  emails as far as whether you kept them or deleted them
12  from your email system?
13     A. Most of the time I would look at those emails
14  and -- and if they were something that I needed to keep
15  I would, otherwise, I would just delete the emails.
16     Q. From your recollection was everybody that
17  attended the meeting included on the email that had the
18  notes regarding the meeting?
19     A. No, I -- I couldn't even tell you. I would
20  just look and it would come to me and it wasn't -- it
21  wasn't for lack of -- it wasn't my concern who else got
22  it. All I know is it came to me.
23     Q. Did your title ever change after you became
24  director?
25     A. No. It went from acting -- acting or interim

27 (Pages 105 to 108)

53-611 (80)

HERNANDEZ vs. SAN DIEGO COUNTY RE ...AL AIRPORT  December 18, 2006

JOSE DE JESUS HERNANDEZ

**Page 109**

1  to -- to director of landside operations.
2  Q. Did your reporting relationship ever change
3  after you became the permanent director at the airport?
4  A. Only -- only towards the end of my employment
5  where -- but it never took into effect. No, it was
6  always Ted Sexton.
7  Q. Do you know how the reporting relationship was
8  going to change at the end of your employment?
9  A. Yes.
10  Q. What was that plan, if you know?
11  A. What was going to happen was the way it was --
12  the way it was told to me was that I would now be
13  reporting to Bryan Enarson versus Ted Sexton.
14  Ted Sexton would no be -- would now be -- he called
15  it -- he called it staff assistant but none -- none of
16  the VPs reported to him. And all he was -- really kept
17  was -- was -- was the regulated responsibilities, which
18  is -- which is aviation security and airside.
19  And then the parking, parking management would be
20  split off and that would go to real estate reporting to
21  Vernon. And then the terminal operations and
22  development side would be split off and then going to --
23  to Bryan. So they -- they kind of took it in threes.
24  MS. CHINN: Could you read back his answer for me,
25  Jennifer?

**Page 110**

1  (The record is read by the reporter.)
2  MS. CHINN: Thank you.
3  MS. McDONOUGH:
4  Q. So do you know if any of the vice-presidents'
5  titles were going to change after this reorganization
6  that you just talked about?
7  A. Yes. I didn't have a specific title but I
8  believe at that particular time as part of the re-org
9  that Ted's -- Ted's title would change to staff
10  assistant or some name -- some similar name. Bryan's
11  title would change to Port development or capital
12  improvement. There was -- there was different titles
13  that were given to them but I can't recall exactly what
14  they are. But they would be -- they would be changes to
15  titles within that re-org.
16  Q. Do you know when the re-org was supposed to
17  take effect?
18  A. There was an email that was sent out to
19  employees saying that the re-org in its version would
20  take effect immediately after the new year.
21  Q. The new year, January 1st, 2006?
22  A. No, 2005. Is it 2005 or -- no, 2006, you're
23  correct. Do you have a copy of that email?
24  Q. I'm taking your deposition.
25  MS. CHINN: I don't think she does. I don't think

**Page 111**

1  she's seen any of these. Were they on your computer
2  when you --
3  THE WITNESS: No. They were given -- I'm sure you
4  saw them, Amy, coming out.
5  MS. CHINN: But when you left were they on your
6  computer?
7  THE WITNESS: We -- I kept them just under a re-org
8  file but they're -- they're there. It was -- it was --
9  it was an email that had gone out just to clear a lot of
10  the confusion. It was airport wide email that I believe
11  came out from Thella.
12  MS. McDONOUGH:
13  Q. Do you know why there was a reorganization in
14  the airport in January, 2006?
15  MS. CHINN: I'll object. It's vague and ambiguous,
16  calls for speculation. Answer best you can. The
17  question is do you know why.
18  THE WITNESS: No. I can --
19  MS. CHINN: Okay. You're finished, you answered
20  it.
21  MS. McDONOUGH:
22  Q. Has anyone from the Authority ever told you why
23  there was a reorganization at the end of 2005, beginning
24  of 2006?
25  A. Yes.

**Page 112**

1  Q. Who told you something about the reorganization
2  and the reason for it?
3  A. Ted Sexton.
4  Q. What did Ted tell you about the reason for the
5  reorganization?
6  A. Ted Sexton and I had a conversation before I
7  went on vacation because -- to inform me that the
8  thought of the reorganizations were resurfacing again.
9  About a year prior to this there was thoughts about me
10  doing a re-org.
11  A lot of it was centered on Thella's belief that
12  she was losing control or she wasn't an integral part
13  in -- in the day-to-day operations or wasn't seen as an
14  integral part of the Airport Authority in that nature.
15  So she wanted to re-org it -- reorganize the reporting
16  structure so that she can be the center of what they
17  call the wagon wheel of responsibility, where you have
18  the VPs reporting and everything going back to her in
19  the middle versus this where it goes -- it's going up on
20  a pyramid style.
21  Q. Did Ted Sexton relay any other reasons to you
22  for the reorganization?
23  A. For the -- for the most part at that particular
24  time there was -- that was -- that was a primary reason
25  why that was given to me. It was she felt -- once

28 (Pages 109 to 112)

Page 113

1 again, she felt that she was losing credibility within
2 her board because they didn't see her as a functional
3 piece at the Airport Authority and she wanted to
4 position herself in a way that -- that would create her
5 in that position.
6     MS. CHINN: Can we go off the record just for a
7 second? I want to talk to my client, please. Thank
8 you.
9     THE VIDEOGRAPHER: Off the record at 2:00 o'clock.
10    (A recess is taken.)
11    THE VIDEOGRAPHER: Back on the record at 2:01.
12    MS. McDONOUGH:
13    Q. You had mentioned that the Authority discussed
14 a potential reorganization in 2004 as well; is that
15 correct?
16    A. The Authority did not. Ted Sexton discussed
17 with me the potential of a reorganization at that time.
18    Q. Did he tell you in 2004 why there might be a
19 reorganization?
20    A. No. A lot of it -- a lot of it at that
21 particular time was really centered against -- around --
22 I think at that particular time -- I'm trying to respond
23 in -- in really the context. He didn't really say why
24 it was but he was more -- he was more worried about the
25 re-org because he thought that he was trying to be

Page 114

1 phased out or they were trying to phase him out of his
2 job in there and so that's why he was so integral in the
3 development of these. In fact, he probably put this --
4 this chart together here (indicating).
5     Q. Did you have any understanding in 2004 as to
6 why a reorganization was being discussed as a
7 possibility?
8     A. There was -- there was a thought -- there was a
9 thought at that particular time in a discussion that
10 Ted Sexton and I had that -- that several other VPs were
11 trying to kind of protect themselves and shade -- or
12 shed themselves of responsibilities and kind of hide
13 themselves. So if there was a re-org those areas of
14 responsibility would shift at that particular time and
15 they were no longer -- and they would no longer be held
16 liable for -- for those situations. And, you know, in
17 fact, that's -- in my mind that's kind of what happened
18 when the re-org finally came down.
19    Q. When did your employment with the Authority
20 end?
21    A. I don't have an exact date, February -- was it
22 February? Yeah, February, 2005.
23    Q. 2006?
24    A. 2006, I'm sorry, yes.
25    Q. I'm looking at Exhibit 6, which is the

Page 115

1 October 3rd, 2003, letter --
2     A. Yes.
3     Q. -- and the offer of the promotion.
4     A. Yes.
5     Q. Did the Authority follow through with the items
6 listed there in the letter? The first bullet point is
7 that you'll report directly to Ted Sexton and have
8 responsibility for all aspects of the Authority wide
9 landside operations and related activities. Is that
10 correct --
11    A. Yes.
12    Q. -- from October, 2003, to the end of your
13 employment?
14    A. That's correct.
15    Q. And at -- starting in October of 2003 did you
16 receive a biweekly salary of thirty-five hundred?
17    A. I believe that's correct.
18    Q. And were you entitled to participate in the
19 employee benefit plan?
20    A. That's correct.
21    Q. And you were an at-will employee as the third
22 bullet point indicates?
23    A. That's correct.
24    Q. And did you have any document that modified the
25 terms of that at-will agreement?

Page 116

1     A. No. This is -- this was our employment
2 agreement.
3     Q. So there never was a document that guarantees
4 you employment for any specified period of time?
5     A. No. I didn't have a contract. The VPs had
6 contracts, I did not.
7     Q. What efforts did you make to find a position at
8 another company after you left the Authority?
9     A. What efforts -- what I did was I had made some
10 contacts with previous friends or people that I had done
11 business with to try to -- try to get employment. One
12 was at another airport and a couple were going back into
13 private -- private -- in a private -- one of which was
14 BAGS, Incorporated.
15    Q. When did you first start making inquiries about
16 other possible positions?
17    A. After I left -- after I left employment.
18    Q. Did you make any inquiries in January of 2006
19 to try to find another job anywhere?
20    A. In -- in -- when -- when it was becoming clear
21 to me, you know, in terms of the interviews and what was
22 coming back to me I -- I started just putting a list
23 together of possible people who I thought I would want
24 to work for. And -- and then not until my employment
25 history was terminated did I really start looking

HERNANDEZ vs. SAN DIEGO COUNTY RE      AL AIRPORT  December 18, 2006

JOSE DE JESUS HERNANDEZ

## Page 117

1  into -- into to trying to get another job.
2      Q. Which other airports did you look at as far as
3  potential job opportunities?
4      A. John Wayne, Jacksonville International.
5      Q. Did you look at any other airports as potential
6  places for employment?
7      A. No, just those two.
8      Q. Did you actually apply to John Wayne?
9      A. No.
10     Q. Did you actually apply to Jacksonville?
11     A. No.
12     Q. Were there any open positions that you were
13  aware of in 2006 at either of those airports?
14     A. There -- there was at John Wayne.
15     Q. What position are you aware of that was open at
16  John Wayne?
17     A. There was manager of landside operations at
18  John Wayne.
19     Q. And you did not apply for that job?
20     A. No.
21     Q. Why didn't you apply for it?
22     A. I had -- the window was too close and -- and at
23  that particular time after discussing with my wife I
24  didn't want to move from San Diego. So we -- we opted
25  not to -- or I opted not to apply for that position.

## Page 118

1      Q. What do you mean by the window was too close?
2      A. By the time -- by the time I -- my -- my
3  employment had ceased I believe that that Friday was --
4  was the day to -- to file for that position so there
5  was -- there was no way I was able -- going to be able
6  to put my resume together and submit it and then have
7  it -- have it filed as received by that particular day.
8      Q. So the application deadline for the John Wayne
9  position was in --
10     A. Yes.
11     Q. -- February, 2006?
12     What private companies did you look at?
13     A. I had just made basic inquiries in -- with
14  some parking companies, Standard Parking in L.A.,
15  Parking Concepts, none of which operate in San Diego,
16  and -- then BAGS, Incorporated.
17     Q. Did you submit an application or a resume to
18  Standard Parking or Parking Concepts?
19     A. No.
20     Q. Did you submit an application to BAGS,
21  Incorporated?
22     A. No. I believe -- I believe just a basic
23  application.
24     Q. So you did submit an application?
25     A. I believe so, for BAGS, Incorporated after --

## Page 119

1  after I left employment with Airport Authority.
2      Q. Did you have a contact at BAGS, Incorporated --
3      A. Yes.
4      Q. -- before you submitted your application?
5      A. Yes.
6      Q. Who was your contact?
7      A. Dan Sherfield.
8      Q. How did you know Dan?
9      A. Dan had been in -- in San Diego over that past
10  year, year and a half working in setup operations for
11  BAGS, Incorporated in -- in San Diego, cruise ship
12  operations.
13     Q. And you knew him through your employment with
14  the Authority?
15     A. Yes.
16     Q. When did you first start working at BAGS,
17  Incorporated?
18     THE WITNESS: Do you remember what day that is,
19  April or May?
20     MS. CHINN: Yeah, it was March, April, May, maybe
21  in April.
22     THE WITNESS: April or May. It wasn't -- wasn't
23  right -- I want to say April or May.
24     MS. McDONOUGH:
25     Q. In 2006?

## Page 120

1      A. Yes.
2      Q. What was your starting salary at BAGS,
3  Incorporated?
4      A. Ninety-five thousand per year.
5      Q. Have you received a raise since you started?
6      A. No.
7      Q. Do you anticipate receiving a raise soon based
8  on an annual evaluation or any other marker coming up?
9      A. No. My -- my contract is more incentive driven
10  than -- than particular milestones.
11     Q. Do you receive incentives in addition to your
12  base salary?
13     A. Incentives, yes, but they don't kick in until
14  after one year of employment.
15     Q. What incentives will you receive after your
16  first year of employment with BAGS, Incorporated?
17     A. At that particular time I am entitled to 10
18  percent of all -- of all new revenues that I'm able to
19  come up with in terms of net revenues to the company.
20     Q. Do you recall what your ending salary was at
21  the Authority?
22     A. A hundred and two, a hundred and three thousand
23  per year.
24     MS. CHINN: How much?
25     THE WITNESS: A hundred and two or a hundred and

30 (Pages 117 to 120)

HERNANDEZ vs. SAN DIEGO COUNTY RE    - AIRPORT  December 18, 2006

JOSE DE JESUS HERNANDEZ

Page 121

1   three, right around there.
2       MS. McDONOUGH:
3       Q.  What benefits do you receive at BAGS,
4   Incorporated?
5       A.  The only benefits I receive is health benefits
6   for myself and my family, health benefits, medical and
7   dental.
8       Q.  Do you have any sort of a 401K?
9       A.  No.
10      Q.  Are you eligible to participate in a 401K?
11      A.  They don't have a 401K.
12      Q.  Who is your supervisor?
13      A.  Dan Sherfield.
14      Q.  Have you received a performance evaluation of
15  any sort since you started?
16      A.  No.
17      Q.  Have you received any informal performance
18  evaluations or assessments?
19      A.  No.
20      Q.  What is your title at BAGS, Incorporated?
21      A.  I am -- I am regional director, west coast
22  operations.
23      Q.  What are your job duties?
24      A.  I oversee -- I oversee day-to-day operations in
25  marketing and PR responsibilities for the following

Page 122

1   cities, which are Dallas -- Dallas, Denver, San Diego,
2   Los Angeles, San Francisco, Seattle and the
3   Hawaiian Islands.
4       Q.  What kind of a business is BAGS, Incorporated?
5       A.  BAGS, Incorporated is a remote airline check-in
6   service company.
7       Q.  What do you mean by that?
8       A.  We -- BAGS, Incorporated currently represents
9   seven -- seven major airlines that offer domestic
10  flights. We -- what BAGS, Incorporated has is
11  proprietary software that allows us to go to remote
12  locations, locations other than -- than airport
13  property, and offer passenger processing services.
14  We're at convention centers, cruise ships, hotels,
15  anywhere other than the airport and we can process
16  passengers for a fee.
17      Q.  Do you have a contract of employment with BAGS,
18  Incorporated?
19      A.  I have a letter of employment with -- with
20  them.
21      Q.  Did you produce that letter in this litigation?
22      A.  I don't believe it was -- it was asked for in
23  there, in the documentation.
24      Q.  Do you have a copy of that at home?
25      A.  I have just a basic email that I sent to them

Page 123

1   that they agree to -- to the employment. So it would
2   be -- it would be an email or a letter from me to them.
3       Q.  So you sent your letter of employment in email
4   form?
5       A.  Yes.
6       Q.  It's on your email and you can print it out?
7       A.  Yes, ma'am.
8       Q.  Do you have anything that's actually signed --
9       A.  No.
10      Q.  -- as a letter of employment?
11      Did you submit a formal application or your resume
12  to anyone other than BAGS, Incorporated after you left
13  your employment with the Authority?
14      A.  No.  Oh -- no.
15      Q.  Did you see in your job search efforts any jobs
16  for which you were qualified that you just decided not
17  to apply?
18      A.  I had -- I had looked at other positions but at
19  that particular time I -- I wanted to pursue employment
20  with BAGS, Incorporated, or the opportunity.
21      Q.  Did you look in the newspaper for a job after
22  you left the Authority?
23      A.  Have you tried to look in the newspaper for a
24  job?
25      Q.  I'm asking the questions.  Did you look in the

Page 124

1   newspaper for a job?
2       A.  Briefly through the newspaper but -- but really
3   focused on -- on Internet -- on Internet on industry
4   specific websites.
5       Q.  Do you remember what the websites were?
6       A.  Yeah, Parking Today, International Parking
7   Institute, the AAA, which is airport jobs on-line.
8       Q.  Did you use any other job search --
9       A.  Word of mouth.
10      Q.  -- or portals?
11      A.  No.
12      Q.  Monster Dot-Com or anything like that?
13      A.  No.
14      Q.  And word of mouth is your other source?
15      A.  Word of mouth.
16      Q.  Did you see any job opportunities on the
17  websites that you looked at that were in the San Diego
18  area?
19      A.  No.
20      Q.  Any in the Southern California area?
21      A.  In -- only -- only the position at John Wayne.
22  But at that particular time I was more focused on
23  retaining a position in San Diego.
24      Q.  You mentioned earlier that you sent an apology
25  letter to Scott Jones --

31 (Pages 121 to 124)

53-611 (84)

Page 125

1    A. Yes.
2    Q. -- at Ace Parking; is that correct?
3    A. That's correct.
4    Q. Do you remember what the apology letter said?
5    A. It was just -- it was an apology to him as
6    requested by John -- John Baumgartner just apologizing
7    for miscommunication -- for misunderstanding his request
8    to valet the parking lot. That was the apology.
9    Q. Do you remember about how long the letter was?
10   A. Maybe a paragraph or two.
11   Q. Was it handwritten?
12   A. No, it was typed.
13   Q. Did you take the responsibility for the
14   misunderstanding in the letter?
15   A. At that particular time the way I phrased the
16   letter was -- was more of a, yeah, I -- you know, I'll
17   take responsibility because obviously I had
18   misunderstood what you were asking. So it was just of a
19   more of a mea culpa letter just hoping the whole thing
20   would go away.
21   Q. Did you feel that you had misunderstood --
22   A. Absolutely not.
23   Q. -- Scott Jones' instruction?
24   A. Absolutely not.
25   Q. Then why did you send the letter?

Page 126

1    A. Because if it's -- if it comes to either send
2    the letter or be fired you would send the letter as
3    well.
4    Q. Do you remember when you sent the letter?
5    A. No. It would have to have happened right
6    around October -- October or November of 1999.
7    Q. Did Scott Jones ever accuse you of stealing
8    from Ace Parking?
9    A. He had no reason to.
10   Q. Had you ever heard that before?
11   A. I had heard that before but that's pretty
12   typical in -- that is pretty typical in -- in the
13   parking industry where if you have a valued employee
14   it's just easier just to try to discredit him in that
15   manner, well, he was stealing, that's why we fired him.
16   Q. Who did you hear that from?
17   A. Well, I had heard that after I left employment
18   when -- from Paul Chacon.
19   Q. So Paul Chacon told you that Scott Jones had
20   accused you of stealing --
21   A. Yes.
22   Q. -- from Ace?
23   A. Uh-huh.
24   Q. Did you ever steal from Ace?
25   A. No.

Page 127

1    Q. Had you and Scott Jones ever had any
2    communication where he accused you of stealing?
3    A. Absolutely never. I had no reason to.
4    Q. Have you ever confronted Scott Jones about him
5    accusing you of stealing from Ace?
6    A. No.
7    Q. Have you spoken to Scott Jones since you left
8    Ace?
9    A. Never.
10   Q. Are you aware that Scott Jones is a partial
11   owner of Lindbergh Parking?
12   A. Yes. He is -- he is a minority owner.
13   Q. Do you know how much he owns?
14   A. I believe it's 40 percent of the company.
15   Q. Did Scott Jones own 40 percent of
16   Lindbergh Parking when you were employed at the
17   Authority?
18   A. Yes, I believe so.
19   Q. And Lindbergh Parking does business with the
20   Authority, or did when you were employed there; is that
21   correct?
22   A. Yes.
23   Q. What's the relationship between
24   Lindbergh Parking and the Authority, if you know?
25   A. Lindbergh Parking is a service provider of the

Page 128

1    Airport Authority but Scott Jones as an individual is a
2    partner, not Ace Parking.
3    Q. Did you ever have a parking pass from Ace while
4    you were employed at --
5    A. Yes.
6    Q. -- the Authority?
7    Was the pass good at any of the Ace lots?
8    A. No.
9    Q. What was the pass good for?
10   A. The parking pass was only good for Qualcomm
11   stadium and -- and the ballpark downtown.
12   Q. Petco?
13   A. Yes.
14   Q. Where did you obtain the parking pass?
15   A. Steve Kitts, who was a manager of those
16   properties, happened to be a neighbor. We lived in the
17   same housing association. And he gave -- he gave that
18   pass to me.
19   MS. CHINN: How do you spell his last name?
20   THE WITNESS: K-I-T-T-S.
21   MS. McDONOUGH:
22   Q. And when did Steve give you the pass?
23   A. Probably a little bit after the Padres moved
24   downtown. I think I only had it for about a year so, I
25   don't know, sometime around 2005.

32 (Pages 125 to 128)

HERNANDEZ vs. SAN DIEGO COUNTY RI     L AIRPORT   December 18, 2006                    JOSE DE JESUS HERNANDEZ

Page 129

1    Q. And you had it for about a year?
2    A. If that, yeah.
3    Q. Do you still have it?
4    A. No.
5    Q. What do you do with it?
6    A. It was only good -- it was only good for a
7  year. So after that year went out I threw it away.
8    Q. How many times did you use the pass?
9    A. Maybe -- maybe a couple of times.
10   Q. At Petco Park did the pass allow you to park
11 right near the handicapped stalls?
12   A. No, no, you can never park in the handicapped
13 stalls.
14   Q. Not in the handicapped stalls, near the
15 handicapped stalls.
16   A. I don't understand your question.
17   Q. Where were you allowed to park at Petco Park
18 with that pass?
19   A. In Tailgate Park.
20   Q. Was Steve -- oh, strike that.
21   Do you know whether Steve knew that you worked for
22 the Authority when he gave you the pass?
23   A. Yes.
24   Q. Did you ever use the pass at Qualcomm?
25   A. I may have used it once.

Page 130

1    MS. CHINN: Let me object to that. I don't think
2  it's -- I think it's not relevant, lacks foundation.
3  Who cares? Does Steve Kitts work for Ace Parking?
4    THE WITNESS: No, he doesn't work for Ace Parking
5  any more.
6    MS. CHINN: Who does he work for?
7    THE WITNESS: He works for NFL Transportation.
8    MS. McDONOUGH:
9    Q. He worked for Ace at the time though, correct?
10   A. Yeah, but Ace didn't work for the
11 Airport Authority.
12   Q. I'm asking the questions. I'm going to ask the
13 questions.
14   A. Okay.
15   Q. You can object and --
16   MS. CHINN: She doesn't understand it.
17   THE WITNESS: Okay.
18   MS. CHINN: That's okay, just keep going.
19   MS. McDONOUGH:
20   Q. Did you use the parking pass at Qualcomm?
21   A. I may have used it on -- on one or two
22 occasions.
23   Q. Do you know what event you used it for at
24 Qualcomm?
25   A. No.

Page 131

1    Q. Just to clarify, at the time that Steve gave
2  you the parking pass he worked for Ace; is that correct?
3    A. That's correct.
4    Q. And you worked at the Authority at that time?
5    A. Yes, ma'am.
6    Q. What did that pass look like?
7    A. It was just his business card.
8    Q. Steve's business card?
9    A. Yes.
10   Q. Did it say anything on it?
11   A. It just said good for parking and then expires
12 and he had his -- his signature on when it expired.
13   Q. Was it laminated?
14   A. Yes.
15   Q. Who laminated it?
16   A. I had laminated it.
17   Q. Did you laminate it -- laminate it at the
18 Authority?
19   A. I don't believe so.
20   Q. Where did you laminate it?
21   A. I believe I went to either Kinko's or one of
22 those and had it laminated. I don't remember how I
23 laminated it.
24   Q. Did you ever receive one time parking passes
25 from Ace while you were employed at the Authority?

Page 132

1    A. Excuse me?
2    Q. Passes good for one time use at lots other than
3  Qualcomm or Petco Park?
4    A. Yeah, we had received those many times at the
5  request of the Airport Authority and staff itself, not
6  only myself but there was special requests made for --
7  or by Authority for Authority functions, that we
8  provided those as well.
9    Q. Did you request that Jim Myhers give you passes
10 to park in his parking lots?
11   A. Jim Myhers is -- his LPI would not do anything
12 for us.
13   Q. Just answer my question.
14   A. From --
15   Q. Did you ever request Ace parking passes from
16 Jim Myhers?
17   A. Yes.
18   Q. On how many occasions?
19   A. Maybe a couple, maybe a few.
20   Q. Did you use those parking passes?
21   A. Primarily those passes were for other Authority
22 employees who were requesting those passes.
23   Q. Did you ever use those passes?
24   A. I'm trying to remember if I ever used those.
25 I -- I don't remember.

33 (Pages 129 to 132)

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210

53-611 (86)

HERNANDEZ vs. SAN DIEGO COUNTY RE___AL AIRPORT  December 18, 2006                    JOSE DE JESUS HERNANDEZ

Page 133

1  Q. At the time that you requested those Ace
2  parking passes from Jim Myhers was he working for LPI?
3      A. He was working for LPI.
4      Q. And LPI is Lindbergh Parking International; is
5  that correct?
6      A. No.
7      Q. Or Lindbergh Parking Incorporated, sorry.
8      A. That's correct.
9      Q. Do you know how Jim Myhers was able to get Ace
10 parking passes while he was working at LPI?
11     A. I believe he would then submit a request to
12 Dave Mullear for those passes.
13     Q. Who is Dave Mullear?
14     A. Dave Mullear was vice-president of operations.
15 He -- he through a sequence of time had taken over my
16 old position with Ace Parking.
17     Q. So Dave Mullear was vice-president of
18 operations for Ace Parking?
19     A. That's correct.
20     Q. Do you know if Jim Myhers had to pay for those
21 passes from Ace Parking?
22     A. I'm not sure.
23     Q. You said that you requested Ace parking passes
24 from Jim Myhers on behalf of Authority employees?
25     A. That's correct.

Page 134

1  Q. What did you request on behalf of?
2      A. We had -- for example, we had an occasion
3  where -- where the Authority was having a function at
4  Balboa Park. And it was kind of a community outreach
5  program where we knew parking was going to be tough up
6  in -- up in Balboa Park. So the request was made of --
7  of Dave to provide parking passes for Airport Authority
8  employees for those who were going to volunteer for that
9  event. So we received -- we received passes for -- we
10 received those passes and gave them to the Authority
11 employees who ended up parking in the Mr. A's building.
12     THE REPORTER: In what building?
13     THE WITNESS: Mr. A's.
14     MS. McDONOUGH:
15     Q. Do you remember when those passes were
16 requested from Dave?
17     A. It might have been -- I'm going -- I'm going to
18 estimate that it was --
19     MS. CHINN: You don't have to guess. If you don't
20 know, say so.
21     MS. McDONOUGH:
22     Q. An estimate is perfectly fine.
23     A. Probably summer of 2005.
24     Q. Who requested that you obtain those parking
25 passes?

Page 135

1      A. Ted Sexton.
2      Q. Did Ted tell you that -- strike that.
3      Did you pay Ace Parking or Dave Mullear for those
4  parking passes?
5      A. I believe -- I don't remember to be honest with
6  you.
7      Q. I should ask a better question. Did the
8  Authority pay Dave Mullear or Ace Parking for those
9  passes, to your knowledge?
10     A. I don't remember. I don't believe they did.
11     Q. Did Ted Sexton ask you to get those parking
12 passes for free from Ace Parking?
13     A. I believe he said to get them however you can.
14     Q. Did Ted ever tell you that the -- that the
15 Authority did not want to pay for those passes?
16     A. Once again, he said get them however you can
17 get them.
18     Q. Do you know about how many passes were obtained
19 for Mr. A's building?
20     A. Maybe 30 or 40.
21     Q. And you said that Authority employees who
22 volunteered at the event in Balboa Park used them?
23     A. Yes.
24     Q. Do you remember what the function was at
25 Balboa Park?

Page 136

1      A. I remember what the function was but it was
2  part of that community outreach for the -- the vote
3  initiative for airport site selection.
4      Q. Do you know of any reason why the employees
5  could not have pulled into Mr. A's and parked themselves
6  without these passes?
7      MS. CHINN: That calls for speculation. Answer if
8  you can.
9      THE WITNESS: It had been pretty clear or it was
10 pretty clear to -- to everyone, staff included, that
11 unless we secured parking somewhere that employees would
12 not be able to get to -- to the function.
13     MS. McDONOUGH:
14     Q. Unless you secured parking in advance?
15     A. That's correct.
16     Q. Were there any other occasions where you asked
17 Dave Mullear or Jim Myhers for Ace parking passes?
18     A. There was other occasions where employees --
19 where just employees in general had asked for some
20 parking passes because they were going downtown. So we
21 would -- I didn't see any harm in it so I would ask and
22 sometimes he would give them, sometimes he wouldn't.
23     Q. Who specifically asked for parking passes for
24 downtown?
25     A. Specific names I don't -- I don't recall.

34 (Pages 133 to 136)

53-611 (87)



HERNANDEZ vs. SAN DIEGO COUNTY REGIONAL AIRPORT  December 18, 2006                    JOSE DE JESUS HERNANDEZ

Page 137

1    Q. Do you recall anyone that asked for a parking
2  pass?
3    A. You know, I know my -- my assistant asked a
4  couple of times.
5    Q. Jennifer Hamilton?
6    A. Yes, uh-huh.
7    Q. Did you obtain passes for her?
8    A. No. I think that the times that she wanted it
9  we provided it because she has a Weiner dog and they had
10  this Weiner dog festival down at Petco before one of the
11  games. And --
12    MS. CHINN: It wasn't a festival. It was an event.
13    THE WITNESS: Or an event. And so really she asked
14  for it and she just -- she just borrowed -- she just borrowed
15  my pass from Ace Parking.
16    MS. CHINN: Weiner dogs do not drive.
17    THE WITNESS: Oh, I'm sorry.
18    MS. McDONOUGH:
19    Q. So Jennifer Hamilton borrowed your laminated
20  business card pass?
21    A. Yes.
22    Q. Did you ask Jim Myhers prior to actually
23  giving -- oh, strike that.
24    Did you ever ask Jim Myhers for a separate pass for
25  Jennifer Hamilton for that event?

Page 138

1    A. I don't remember, don't recall.
2    Q. Did you ask Dave Mullear for a pass for
3  Jennifer Hamilton for that Weiner dog event?
4    A. I -- I don't -- I don't remember.
5    Q. Did you ask Jim Myhers for a parking pass on
6  any other occasion other than those that you talked
7  about?
8    A. I don't -- I don't recall if I did.
9    Q. Did you ask Dave Mullear for a parking pass on
10  any other occasion?
11    A. I don't recall if I did.
12    Q. Did anyone else use your laminated parking pass
13  other than Jennifer and you?
14    A. We had -- we had lent them out to other
15  employees who -- who had asked for them. We had one gal
16  who worked environmental who asked for the pass a couple
17  times. Matt Connor, who doesn't work for the
18  Airport Authority, had asked for the pass a couple
19  times.
20    Q. Who is the girl in environmental who asked for
21  the pass --
22    A. I don't remember her name.
23    Q. Do you know if anyone else used your laminated
24  parking pass?
25    A. Specific people I don't -- I don't remember.

Page 139

1    Q. Do you know how much parking is in the
2  Petco Tailgate Park?
3    A. No, I don't.
4    MS. CHINN: It's free with the pass, isn't it?
5    MS. McDONOUGH: We'll go ahead and take a break.
6    MS. CHINN: What type of Weiner dog does she have?
7    THE VIDEOGRAPHER: Off the record at 2:32.
8    (A recess is taken.)
9    THE VIDEOGRAPHER: Back on the record at 2:47.
10    MS. McDONOUGH:
11    Q. Is there any reason why you cannot continue to
12  give your best testimony?
13    A. No.
14    Q. Earlier you testified that we, was the term you
15  used, would get the passes or ask Dave Mullear for
16  passes. Who were you referring to when you said we?
17    A. We, just in general, where the passes -- who we
18  asked the passes or of -- just whenever requests was
19  made for passes. We had just meant it as anyone in the
20  Airport Authority when came to me and said, look, can I
21  get a pass for this or there's an event down here, can
22  you help me get some passes. That's what I meant by we.
23    Q. Do you know why employees of the Authority
24  would come to you and ask you to obtain parking passes?
25    A. Because they knew that -- they knew that I was

Page 140

1  with -- you know, that I had come as vice-president --
2  from -- as -- from a position of vice-president of
3  operations for -- for Ace Parking. And I still maintain
4  a good working relationship with -- excluding the owner,
5  you know, I still maintain a good working relationship
6  with a lot of the employees, I mean specifically the
7  front line employees out there.
8    Q. Why did you ask Jim Myhers for Ace parking
9  passes?
10    A. Jim -- Jim would see -- Jim would see
11  Dave Mullear more often than I ever did so I would just
12  ask Jim, hey, if you get a chance to see him, if you
13  don't, you don't, but this is a request that's been
14  made, you know, can you follow through on it, if you
15  can.
16    Q. Do you know why Jim Myhers saw Dave Mullear
17  more often?
18    A. Because he had -- Dave Mullear would see -- I
19  mean Jim would see Dave more often than he would anyone
20  else down there with Ace. I mean that was his -- if he
21  needed to talk to someone at Ace it would be
22  Dave Mullear.
23    Q. Do you know why Jim would need to talk to
24  someone at Ace?
25    A. Why he would need to speak to someone at Ace?

35 (Pages 137 to 140)

53-611 (88)



HERNANDEZ vs. SAN DIEGO COUNTY REGIONAL AIRPORT  December 18, 2006                    JOSE DE JESUS HERNANDEZ

**Page 141**

1    Q. Yes.
2    A. No. I mean that was -- that's -- that was
3  out -- that's his deal with Ace.
4    Q. And you received parking passes from
5  Jim Myhers?
6    A. Parking -- no, I never received parking passes
7  from --
8    Q. Did you ever receive a business card from
9  Jim Myhers --
10   A. No.
11   Q. -- that he got from Ace that would allow you to
12  park anywhere?
13   A. No. Jim Myhers -- Jim Myhers and LPI -- LPI
14  only runs airport properties and -- and LPI does not run
15  any parking properties. His card would be -- would not
16  have any value whatsoever.
17   Q. I'm not asking if you used Jim Myher's cards
18  but did Jim Myhers ever give you cards from Ace to use
19  as parking passes?
20   A. Yes.
21   Q. On how many occasions?
22   A. A few, maybe -- just a few times, exact numbers
23  I don't know.
24   Q. Do you remember when he gave you those
25  parking --

**Page 142**

1    A. No, I don't.
2    Q. -- passes?
3    Do you know whose business card it was that he gave
4  you?
5    A. Dave Mullear's.
6    Q. Was it just the card or was there something
7  signed on it?
8    A. Just a card and a signature, said one time use
9  only.
10   Q. Did you ask Jim Myhers for the parking pass or
11  the business card?
12   A. What do you mean? I don't --
13   Q. Did you ask Jim Myhers to obtain Dave Mullear's
14  business card for you?
15   A. Yeah, when they would -- when a request was
16  made, hey, can you help me find parking here or here I
17  would ask Jim and that's how it would come back as --
18  you know, as Dave Mullear.
19   Q. Did you ever ask Jim Myhers for Dave Mullear's
20  business card to use as a parking pass for your own
21  personal use?
22   A. I don't recall.
23   Q. Did you ever tell Jim Myhers, hey, I want to
24  park downtown for an event, can I please have a parking
25  pass from Ace?

**Page 143**

1    A. I don't recall.
2    Q. If Jim Myhers testifies that you did ask him
3  for a parking pass for personal use would that be a lie?
4    MS. CHINN: Objection, that calls for sheer
5  speculation, lacks foundation.
6    THE WITNESS: Again, I can't -- I can't respond to
7  what he would and would not testify.
8    MS. McDONOUGH:
9    Q. I'm just asking if he says Jose Hernandez asked
10  me for a parking pass for personal use from Ace Parking
11  would he be lying? [QUES]
12   MS. CHINN: It calls for sheer speculation, lacks
13  foundation. Don't answer it. There's no reason --
14   MS. McDONOUGH: You're instructing him not to
15  answer that?
16   MS. CHINN: I don't think he should. I think he's
17  answered -- are you going to answer it differently than
18  you've already --
19   THE WITNESS: No.
20   MS. CHINN: -- answered it? Then, you know, you're
21  just harassing him.
22   MS. McDONOUGH: Can you reask the question?
23   MS. CHINN: Is it Myher or Myhers?
24   MS. McDONOUGH: Myhers. It's M --
25   MS. CHINN: There's an S?

**Page 144**

1    MS. McDONOUGH: M-H-Y-E-R-S.
2    MS. CHINN: I know that.
3    MS. McDONOUGH: No, it's not Myhers, Mhyer,
4  M-H-Y-E-R.
5    THE WITNESS: No.
6    MS. McDONOUGH: M-Y-H-E-R?
7    MS. CHINN: M-Y-H-E-R. Thanks for your help.
8    MS. McDONOUGH: Just trying to run you in circles.
9    MS. CHINN: I can do that by myself but thank you
10  for your help again.
11   (The record is read by the reporter.)
12   THE WITNESS: Once again, I'm not sure what he
13  would testify for or not -- to or not.
14   MS. McDONOUGH:
15   Q. I'm not asking what you think he would testify
16  to. I'm saying if Jim Myher says Jose Hernandez asked
17  me to obtain free parking passes for him from Ace would
18  he be lying if he said that?
19   MS. CHINN: Same objection.
20   THE WITNESS: I'm not sure.
21   MS. McDONOUGH:
22   Q. Did you ask him for parking passes for personal
23  use?
24   A. I'm not sure. I don't recall if I did. I know
25  the majority of the times they were asked were for other

36 (Pages 141 to 144)

HERNANDEZ vs. SAN DIEGO COUNTY RE... L AIRPORT  December 18, 2006                JOSE DE JESUS HERNANDEZ

Page 145

```
 1    people besides myself.
 2       Q.  Have you told me everyone for whom you
 3    requested parking passes?
 4       A.  I'm sure there's others but I don't recall
 5    their names at this time.
 6       Q.  Can you estimate how many times you used your
 7    laminated Ace Parking pass?
 8       A.  I believe I answered that question already.
 9       MS. CHINN:  I think you did too.
10       MS. McDONOUGH:
11       Q.  You answered for Qualcomm.
12       A.  Yeah, maybe combined -- I believe you asked
13    both, at Qualcomm and at Petco, and probably no more
14    than a handful.
15       Q.  A handful being five or six?
16       A.  If that, yeah.
17       Q.  Did you ever obtain tickets to sporting events
18    from Ace Parking?
19       A.  Yes.
20       Q.  On how many occasions?
21       A.  I believe once.
22       Q.  For what event?
23       A.  I believe it was a Raider game.
24       Q.  Do you remember the year?
25       A.  No, I don't.
```

Page 146

```
 1       Q.  Did you attend the game?
 2       A.  Yes.
 3       Q.  Who did you attend with?
 4       A.  With Dave Mullear, Steve -- Steve with --
 5    Steve Burton with Ace and Amiel Porta.
 6       Q.  Who paid for the tickets?
 7       A.  I'm not sure.
 8       Q.  Did you pay for them?
 9       A.  I -- no.
10       Q.  Do you know if Amiel Porta paid for them?
11       A.  I'm not sure.  I never asked him.
12       Q.  Where were the seats located?
13       A.  Those seats ended up being in the -- in the
14    Gold section.
15       Q.  The Gold section?
16       A.  Gold.
17       Q.  Gold?
18       A.  Uh-huh.
19       Q.  I assume that's a good section?
20       A.  It's sort of, depends.
21       MS. CHINN:  Let's face it, it's not the Diamond
22    section.
23       MS. McDONOUGH:
24       Q.  Do you know how much the tickets cost?
25       A.  No.
```

Page 147

```
 1       Q.  Did you have any food while you were at that
 2    game?
 3       A.  I don't remember.
 4       Q.  Do you recall anyone from Ace Parking buying
 5    you any food at the game or drinks?
 6       A.  I can't remember.
 7       MS. McDONOUGH:  We'll mark as Exhibit 8 a copy of
 8    Chargers tickets. [EXH]
 9       THE WITNESS:  Uh-huh.
10       MS. McDONOUGH:
11       Q.  Is this the game that you were referring to?
12       A.  I believe it is, uh-huh.
13       Q.  And these are the tickets that you received
14    from Ace Parking?
15       A.  I don't know because I don't know which ones --
16    which ones we had.  So if -- if you're saying these are
17    it then I'm just assuming they are.
18       MS. CHINN:  No, don't do that.  She doesn't know.
19       THE WITNESS:  I'm not sure.  I don't -- I can -- I
20    don't know which tickets we got from them.  I know I
21    don't have them.
22       MS. McDONOUGH:
23       Q.  How do you know that this is the game that you
24    attended with Ace Parking?
25       A.  I'm looking -- the only thing I'm looking at
```

Page 148

```
 1    is -- is where it says Raiders, what tickets, where we
 2    sat.  All I know is they were in -- in the Gold section
 3    and that was it.
 4       MS. CHINN:  Okay.  So you don't recognize this
 5    document?
 6       THE WITNESS:  No, I -- no.
 7       MS. McDONOUGH:
 8       Q.  Was there ever an occasion where Ace Parking
 9    sent you some tickets and you called Carol from the
10    Authority and asked her to put the tickets in a safe
11    place for you?
12       A.  I don't -- I don't remember.
13       Q.  Do you know who I'm referring to when I say
14    Carol?
15       A.  No.  Which Carol?
16       MS. McDONOUGH:  What was her last name?  Is it
17    Mahaffey?
18       MS. GONZALEZ:  Mahaffey.
19       MS. McDONOUGH:
20       Q.  Carol Mahaffey?
21       A.  I don't know.
22       Q.  Do you know who she is?
23       A.  Yeah, she works for me.
24       Q.  Do you have any recollection of calling her and
25    asking her to put some tickets away for you?
```

37 (Pages 145 to 148)

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210



HERNANDEZ vs. SAN DIEGO COUNTY RE    AL AIRPORT   December 18, 2006

JOSE DE JESUS HERNANDEZ

Page 149

1    A. I don't remember.
2    Q. Did you ever attend any Padres games with
3  tickets provided by Ace?
4    A. Yes. I believe one game we sat in -- in the
5  home plate box.
6    Q. Who attended that game?
7    A. In that particular game was Dave Mullear,
8  myself, Jeff Rasor, which is the station manager for
9  Delta, and Chris -- I forget Chris' last name but he was
10  with Southwest Airlines.
11    Q. Do you know who paid for the tickets?
12    A. No.
13    Q. Did you pay for the tickets?
14    A. I did not.
15    Q. While you were working at the Authority do you
16  know whether Ace Parking ever did business with the
17  Authority?
18    A. The Ace Parking -- Ace Parking I don't believe
19  had -- in the -- I don't believe they had a direct
20  service agreement with Airport Authority, no.
21    Q. Did they have any sort of a business
22  relationship with the Airport Authority, to your
23  knowledge?
24    A. No, their agreement -- their agreement, which I
25  believe you're referring to, was the parking management

Page 150

1  agreement which is -- which is LPI and Scott Jones as an
2  individual. But to my understanding Ace Parking does
3  not have a direct service agreement with
4  Airport Authority.
5    Q. I'm not referring to anything so you don't --
6    A. Okay.
7    Q. Please don't assume for my question that I'm
8  referring to something.
9    MS. CHINN: Believe me, she doesn't know.
10    THE WITNESS: Okay. I'll strike -- the
11  Airport Authority -- the Airport Authority did not
12  have --
13    MS. CHINN: You can't strike your own answer.
14    THE WITNESS: -- a direct service agreement --
15  no, no, no. I'm just --
16    MS. CHINN: Don't try to be a lawyer.
17    MS. McDONOUGH:
18    Q. A clean question and answer.
19    A. Okay.
20    Q. Do you know whether Ace Parking had any sort of
21  business relationship with the Authority while you were
22  working for the Authority?
23    A. No, that --
24    MS. CHINN: Yes or no.
25    THE WITNESS: No.

Page 151

1    MS. McDONOUGH:
2    Q. They did not have a business relationship?
3    A. No.
4    Q. Do you know whether Ace Parking ever tried to
5  obtain any sort of a business relationship with the
6  Authority while you were working there?
7    A. They did.
8    Q. What do you know about that?
9    A. There was -- immediately after or about a year
10  after the parking management agreement was renewed for
11  LPI, which is a five year agreement, a request was made
12  by -- by Maurice -- by Maurice Gray to sell his interest
13  to Scott Jones as an individual, with -- with Ace then
14  assuming the management rights to the parking -- parking
15  management.
16    Q. Do you know about what year that was?
17    A. That was -- I want to say right around January,
18  2005.
19    Q. Prior to January, 2005, do you know whether
20  Ace Parking was trying to set up some sort of business
21  relationship with the Authority?
22    A. No.
23    Q. Do you recall when you attended the Padres
24  game --
25    A. No.

Page 152

1    Q. -- with Dave Mullear?
2    A. I don't recall.
3    Q. Do you remember who played in the game?
4    MS. CHINN: Oh, please.
5    THE WITNESS: No, I don't recall.
6    MS. CHINN: There's only a hundred eighty of them.
7    MS. McDONOUGH:
8    Q. Do you remember what year?
9    A. I believe it was 2005.
10    Q. In the spring?
11    A. All baseball is in the spring.
12    MS. CHINN: I wasn't going to say it.
13    MS. McDONOUGH:
14    Q. Well, it goes for quite a while. But do you
15  know if it was the very -- in the beginning of the year
16  or --
17    A. I don't know.
18    Q. -- at the end or the season I should say?
19    A. It was within the season.
20    Q. No, the beginning -- do you know if it was in
21  the beginning of the season, the middle of the season,
22  the end of the season?
23    A. I don't remember. I just remember it was
24  Jeff Rasor and Chris and Dave Mullear.
25    Q. Okay. Do you remember if any of these other

38 (Pages 149 to 152)

53-611 (91)

Page 153

1  individuals bought you any concessions while you were at
2  the game?
3      A. No, I don't remember.
4      Q. Did you attend any other sporting events with
5  Dave Mullear other than the Padre game and --
6      A. I had -- I had gone to other baseball games but
7  with tickets that -- that I -- that I had purchased.
8      Q. Did you receive any other sporting events
9  tickets from Ace Parking other than the Padre game and
10 the Charger game?
11     A. I don't remember.
12     MS. CHINN: Wait a second. That mischaracterizes
13 his testimony. As I recall, you said you didn't know
14 who paid for the tickets. Is that correct? You said
15 you didn't know who paid for the tickets.
16     THE WITNESS: No, I don't know who paid -- if
17 you're -- could you rephrase your question then?
18     MS. McDONOUGH: That's okay. We can move on.
19     Q. Do you know who Veronica Moreno is?
20     A. Yes.
21     Q. Who is that?
22     A. Veronica Moreno is the customer -- was the
23 customer service manager for Southwest Airlines.
24     Q. Did you ever attend any sporting events with
25 her?

Page 154

1      A. I don't recall.
2      Q. Did you ever receive sporting events tickets
3  from Southwest Airlines?
4      A. We had -- I had -- I had received two tickets
5  to a football game which I couldn't use.
6      Q. Who did you receive those tickets from?
7      A. From Cheryl Black.
8      Q. When did you receive those?
9      A. I don't recall. It was -- it was sometime in
10 2005, football season.
11     Q. Did you accept the tickets from Cheryl?
12     A. Yeah. She had mentioned -- she had mentioned
13 to me that she had two extra tickets and didn't know how
14 to get rid of them, if I knew anyone who -- who would be
15 able to use the tickets.
16     Q. Did you -- and so you took the tickets?
17     A. Yes. I took the tickets because she said she
18 felt bad that I had purchased the week before that four
19 tickets to a baseball game and her and her group
20 couldn't end up going to that game. So she just felt
21 bad and she was trying to make it right.
22     Q. And what did you do with the tickets?
23     A. I believe that day before I had gone to an
24 Aztecs game and on my way in to the Aztecs game I gave
25 those tickets away.

Page 155

1      Q. Do you know who you gave them to?
2      A. Just some people that were there, asking if
3  they wanted to go to the game tomorrow and we gave them
4  away.
5      Q. Did you tell Cheryl that you gave away the
6  tickets?
7      A. No.
8      Q. Do you know if Cheryl knows whether you
9  attended that game or not?
10     A. She never asked.
11     Q. So she doesn't know one way or the other?
12     A. No, she -- I don't know.
13     MS. CHINN: You know what --
14     THE WITNESS: I don't know what she knows.
15     MS. CHINN: -- that calls for speculation.
16     MS. McDONOUGH:
17     Q. You mentioned that you had bought tickets to
18 some sort of sporting event right before Cheryl Black
19 gave you those two tickets?
20     A. Yeah, we had -- we had coordinated an outing
21 with Southwest so I had gone out and -- and received
22 four tickets from my neighbor who works for the Padres
23 and said, hey, can I get four tickets to -- to take a
24 group of Southwest Airlines people with me.
25     He took them -- my friend who works for the Padres,

Page 156

1  which is my neighbor, took them out of his personal bank
2  and said, hey, if you want to use them, go ahead and use
3  them. That afternoon -- that afternoon about
4  2:00 o'clock -- and the game is obviously at 7:00 -- I
5  received a call from Cheryl saying, hey, Cheryl --
6  Cheryl telling -- informing me that she couldn't go to
7  the game. At that particular time I had no one else to
8  give those tickets to so they went -- they went bad,
9  unused.
10     Q. Did you go?
11     A. No.
12     Q. Who was your friend that works for the Padres?
13     A. David Stearns.
14     Q. Did you ask the Authority to purchase tickets
15 so that you could take Southwest?
16     A. No.
17     Q. Did you receive any other sporting events
18 tickets from Southwest Airlines?
19     A. I don't believe so.
20     Q. Did Mike Parrish ever give you sporting events
21 tickets?
22     A. I don't -- I don't recall if he did.
23     Q. Did you ever attend any sporting events with
24 Mike Parrish?
25     A. Yes. On -- on several occasions I took him

39 (Pages 153 to 156)

53-611 (92)

HERNANDEZ vs. SAN DIEGO COUNTY REGIONAL AIRPORT    December 18, 2006

JOSE DE JESUS HERNANDEZ

Page 157

1  to -- to baseball games.
2      Q. How did you obtain the tickets? Did you
3  purchase them?
4      A. I had either purchased them or I received them
5  from my neighbor across the street, my neighbor,
6  David Stearns.
7      Q. Did you receive sporting events tickets from
8  Hawaiian Airlines?
9      A. Did I receive -- I don't -- I don't recall if I
10 did, no.
11     Q. Do you recall Janet Nix giving you
12 Charger/Raider tickets in 2004?
13     A. I don't -- I don't remember.
14     Q. Do you know if you went to the Charger/Raider
15 game in 2004 with Amiel Porta?
16     A. I'm not sure. I don't remember.
17     Q. Did you receive sporting events tickets from
18 any other airline other than what you've already
19 testified to?
20     A. I don't believe so.
21     Q. Did you receive sporting events tickets from
22 any entity that did business with the Authority while
23 you were an Authority employee other than the tickets
24 you received from Cheryl Black?
25     A. I -- I don't believe so.

Page 158

1      Q. Did you go on a charity golf tournament in
2  Mexico as sponsored by Southwest?
3      A. Yes, I did.
4      Q. How many years did you do that?
5      A. I believe I went two years.
6      Q. What was the first year that you went?
7      A. I think it was 2004. I think I went 2004,
8  2005.
9      Q. Did someone from Southwest ask you to attend
10 that event?
11     A. Yeah, Mike Parrish.
12     Q. Do you know what month the event was in?
13     A. I believe it's in September.
14     Q. How did you get to the event in 2004?
15     A. I was -- Mike -- Mike Parrish, who is a station
16 manager, he as -- he as station manager, he has a
17 foursome that he gets. And he had asked if I would like
18 to attend with this foursome. And I had asked Ted if it
19 would be okay if I went down to the game with -- I would
20 go down and play golf in this golf tournament and he
21 said it would not be a problem if I went. I had to let
22 him know where I was going to go.
23     Q. Did you pay an entrance fee for the golf
24 tournament in 2004?
25     A. No, because Mike -- it was given to Mike. He

Page 159

1  wasn't required to pay one so he never asked me to pay
2  one. What we did was when we were down there -- when we
3  were down there for the golf tournament I paid for his
4  dinners and -- and some cocktails as we went through.
5  So he just assumed that would be a trade-off.
6      Q. Do you know who gave the tournament passes to
7  Mike Parrish?
8      A. He did. He's -- it's -- it's their tournament.
9  It's their charity golf tournament.
10     Q. So Southwest gave him --
11     A. He gave himself. It's his -- it's a station
12 specific -- it's their way that they raise money for the
13 Ronald McDonald House.
14     So in return I go down with him or I would go
15 play golf with them. And then what I would do is I
16 would contribute door prizes or -- or raffle prizes to
17 them. We would go down there. You know, I would play
18 golf with them. I would buy them dinner and some drinks
19 and then we just called it even at the end of the day.
20     Q. Do you know how much the entrance fee was
21 for --
22     A. I think it's $80.
23     Q. And you think that Mike Parrish paid that on
24 your behalf?
25     A. No, Mike Parrish didn't have to pay it. It

Page 160

1  was -- it was no -- it was no cost to him.
2      Q. Who paid for the entrance fee?
3      A. He didn't have to. There was no -- there
4  was -- as station manager he was allocated a foursome.
5  It wasn't required for him to pay any fee. He was --
6  there was no -- there was no fee attached to his
7  foursome.
8      Q. The point of the golf tournament is to make
9  money for some charity; is that correct?
10     A. Uh-huh.
11     Q. And it's -- they make money through the
12 entrance fees, correct?
13     A. More -- more raffle than the entrance fees.
14 The entrance fees just go to cover -- just go to cover,
15 you know, golf to go down there. But it's more on the
16 raffle side.
17     Q. Did Southwest Airlines pay for the entrance fee
18 for you?
19     A. No. There was no -- there was no --
20 Mike Parrish was not required to pay for his foursome.
21     Q. I'm not asking what Mike Parrish did. Did
22 somebody at Southwest Airlines, including the
23 corporation itself, pay for your entrance fee?
24     A. No.
25     Q. How do you know that?

40 (Pages 157 to 160)

Page 161

1    A. Because there was no fee. Mike Parrish did not
2  have to pay for that foursome.
3    Q. Mike Parrish is not Southwest Airlines.
4    A. He's the station manager who puts the
5  foursome -- he just -- he has that allocated.
6    Q. How do you know that Southwest Airlines as a
7  corporation did not pay your entrance fee for that
8  charitable golf tournament?
9    A. How do you know they did?
10   Q. Don't get smart with me. I'm asking you a
11 question.
12   MS. CHINN: Wait a minute. Wait a minute. I think
13 you're harassing him.
14   MS. McDONOUGH: I'm not harassing him. I'm asking
15 him a question.
16   MS. CHINN: Well, you are in a way. And I think
17 you're getting smart with him.
18   MS. McDONOUGH: I'm asking a question that I need a
19 response to.
20   THE WITNESS: My -- the -- the answer to your
21 question was, no, they did not. He was not required, no
22 one paid for my entrance fee.
23   MS. McDONOUGH:
24   Q. How do you know that Southwest did not pay for
25 your entrance fee?

Page 162

1    A. I don't.
2    MS. McDONOUGH: That's not a hard question to
3  answer, Cathryn.
4    MS. CHINN: Yeah, but you're talking to him like
5  the way you talk to your kids and it's not good.
6    MS. McDONOUGH: Well, that's -- we have a
7  videotape.
8    MS. CHINN: Thank God.
9    MS. McDONOUGH:
10   Q. Did you take anyone from the Authority with you
11 to Mexico for the golf tournament in 2004?
12   A. Yes. As part of that foursome he also invited
13 Amiel Porta to come along with us.
14   Q. Mike Parrish invited Amiel Porta?
15   A. Yes.
16   Q. Did Amiel go with you in the car?
17   A. Yes.
18   Q. Where did you stay when you were down there?
19   A. We stayed at the resort.
20   Q. Do you remember the name of the resort?
21   A. Real Del Mar.
22   Q. How many nights were you there?
23   A. Just one night.
24   Q. Who paid for the room in 2004?
25   A. I believe -- I believe Mike had paid for the

Page 163

1  room but it was all part of the trade-off for buying
2  drinks and dinner.
3    Q. Where did you go for dinner when you paid for
4  Mike's dinner?
5    A. We went down to Puerto Nuevo.
6    THE REPORTER: Where?
7    THE WITNESS: Puerto Nuevo, for lobster.
8    MS. CHINN: How do you spell it?
9    THE WITNESS: P-U-E-R-T-O, Nuevo, N-U-E-V-O.
10   MS. McDONOUGH:
11   Q. How much did you pay for dinner?
12   A. Yeah, it was over -- I remember his portion and
13 mine was easily over a hundred, hundred fifty dollars.
14   Q. Just for dinner and drinks?
15   A. Yeah.
16   Q. Did you put it on a credit card?
17   A. No, just paid cash.
18   Q. Did you pay for Amiel as well?
19   A. I don't remember. I think Amiel had paid.
20 I -- I can't remember how we did that. All I -- all I
21 remember is the majority of that bill we -- we picked
22 up.
23   Q. Did Southwest Airlines host any dinners or
24 cocktail hours or any sort of events at the golf
25 tournament?

Page 164

1    A. No. The dinner was included. The dinner was
2  after the event was included in there. But your
3  cocktail hour afterwards were part of, you know, the
4  cash bar up at the bar up on top.
5    Q. Did you pay for your own cocktails at the cash
6  bar?
7    A. Yeah.
8    Q. You mentioned that you bought door prizes?
9    A. Yes.
10   Q. What prizes did you buy?
11   A. We had -- I had gone through and bought golf
12 balls, golf gloves, golf bags, just to contribute to --
13 just to contribute back to -- to the event, just as a
14 way to -- to pump up their -- their raffle prizes.
15   Q. Do you have receipts for those?
16   A. No, I don't.
17   Q. Did you buy those items with a credit card?
18   A. No.
19   Q. Did you take any sort of a charitable deduction
20 for buying those items?
21   A. No.
22   Q. Do you know the charity that was supported --
23   MS. CHINN: Objection.
24   MS. McDONOUGH:
25   Q. -- by the golf tournament?

41 (Pages 161 to 164)

53-611 (94)

HERNANDEZ vs. SAN DIEGO COUNTY RE     AL AIRPORT  December 18, 2006                    JOSE DE JESUS HERNANDEZ

Page 165

```
 1      MS. CHINN:  You know what, move to strike her last
 2  question and answer because that has to do with your
 3  taxes. It's not discoverable.
 4      MS. McDONOUGH:
 5      Q.  Do you know what charity was benefiting from
 6  the golf tournament in --
 7      A.  The national charity for Southwest Airlines,
 8  the Ronald McDonald House.
 9      Q.  Was anyone else from the Authority at the 2004
10  golf tournament?
11      A.  I believe Jeff Simons might have been there.
12      Q.  Did Jeff go with you as well?
13      A.  Yeah, I believe so.
14      Q.  Did you, Jeff and Amiel all stay in the same
15  room?
16      A.  Yes, the four of us with Mike.
17      Q.  Do you know if anyone else from the Authority
18  was at the 2004 golf tournament?
19      A.  Yes.
20      Q.  Who else?
21      A.  Mark Dinari (phonetic) was at the golf
22  tournament.
23      Q.  Did he ride down with you?
24      A.  He didn't go with me, no.
25      Q.  Do you know who invited Mark Dinari, if anyone?
```

Page 166

```
 1      A.  Yes. I'm trying to remember.  He had gone down
 2  with SPC, Service Performance -- Dick Jenkins.
 3      Q.  Did you see anyone else from the Authority at
 4  the golf tournament --
 5      A.  I believe there was but I don't -- I don't
 6  remember exactly who -- who was down there.
 7      Q.  You went again in 2005?
 8      A.  Then we went again in 2005, yes.
 9      Q.  You, Amiel and Jeff again?
10      A.  No.  I believe at that particular time it was
11  just I want to say Amiel and myself went down from the
12  Airport Authority. Jeff was out of town. He couldn't
13  go.
14      Q.  Who paid for your room in 2005?
15      A.  By that time Mike -- Mike, once again, as -- as
16  station manager had -- had his room -- had his room but
17  since he had moved back to Vegas couldn't use the
18  foursome.  So he had called me to -- to fill the
19  foursome for him so someone could use that foursome.
20      Q.  So who did you fill the foursome with?
21      A.  We had -- at that particular one we had played
22  with -- I'm trying to remember who played with us. I
23  know that one was Dave -- Dave Stearns from the Padres
24  that played, a friend of mine, Mark McDonald, myself and
25  I think maybe -- I don't remember. There was someone
```

Page 167

```
 1  else. Maybe Rich Cursulos (phonetic) from Huntleigh I
 2  think. But I -- but I don't -- I think -- I think
 3  that's it but I don't remember who our foursome was at
 4  that particular time.
 5      Q.  Rich is from what company?
 6      A.  From Huntleigh.
 7      Q.  What is that?
 8      A.  Huntleigh is a service provider of the
 9  airlines.
10      Q.  Oh, Huntleigh?
11      A.  Huntleigh, H-U-N-T-L-E-I-G-H.
12      Q.  And who paid for the room in 2005?
13      A.  Those were all -- those were all covered -- I
14  believe I paid for the room but the foursome was covered
15  under Mike Parrish's -- you know, as his station
16  manager.  I believe that's how it worked.
17      Q.  So Mike Parrish provided the entrance tickets
18  for --
19      A.  Same --
20      Q.  -- the tournament?
21      A.  -- as he did before.
22      Q.  And you paid for the hotel room?
23      A.  Yeah, and everything else.
24      Q.  What do you mean by everything else?
25      A.  Well, you know, you go down for dinner and then
```

Page 168

```
 1  I had my friends who came along so, you know, dinner and
 2  drinks and -- and everything else that -- that goes
 3  along with going down there for the trip.
 4      Q.  How many nights were you down there in 2005?
 5      A.  Only one night.  And, once again, on this
 6  particular case I had asked Ted Sexton if -- if it would
 7  be possible to go down to that golf tournament and he
 8  said yes.
 9      Q.  Did Ted to your knowledge know who was giving
10  you the tickets for the golf tournament?
11      A.  My conversation with Ted was -- I had asked
12  him -- I had asked him if it would be possible to, once
13  again, go to the Southwest Airlines tournament.
14  Mike Parrish wasn't going to be allowed to go down -- or
15  was in Vegas, he couldn't use it.  And I thought it
16  would be a great opportunity, since I didn't know
17  Cheryl Black that well, to go down to the golf
18  tournament.  And he said go ahead and go down.
19      Q.  So did you tell Ted Sexton that you didn't have
20  to pay for the entrance fee for the golf tournament?
21      A.  I told him I was invited as a -- as a guest at
22  Southwest Airlines.
23      Q.  Did you tell him that both years?
24      A.  Yes.
25      Q.  Did you pay for the hotel room in 2005 on a
```

42 (Pages 165 to 168)

Case 3:08-cv-00184-L-CAB    Document 1-10    Filed 01/30/2008    Page 28 of 145

HERNANDEZ vs. SAN DIEGO COUNTY RE    L AIRPORT  December 18, 2006

JOSE DE JESUS HERNANDEZ

Page 169

1  credit card?
2      A. I believe I paid cash.
3      Q. Do you remember how much it was?
4      A. I think it's -- for being part of the event I
5  believe it's $80.
6      Q. What -- is it a Friday night?
7      A. No, it's like a Tuesday.
8      Q. So you go down on Tuesday morning, you golf and
9  then stay over --
10     A. Tuesday afternoon we stay and then we stay the
11 next day. And then the golf tournament, we have an
12 afternoon tee time, we stay for dinner, we come back
13 that night.
14     Q. Okay. So you go down Tuesday afternoon and you
15 stay in the hotel on Tuesday night. You golf sometime
16 on Wednesday and then go home?
17     A. And then we go home, yes, ma'am.
18     Q. When you took Mike Parrish to lobster in
19 Puerto Nuevo was that on a Tuesday night or a Wednesday
20 night?
21     A. No, always the day before.
22     Q. On the way down?
23     A. Yeah. On the way down we go through -- we
24 leave around noon, 1:00 o'clock so we all work -- we all
25 work half day trying to make sure that we cover the two

Page 170

1  busiest times at the airport, which first 6:30, 8:30 is
2  the busiest time.
3      And then after that we work half day. After that
4  we drive down, we play half a round like nine holes. We
5  all get in the car, we go down for dinner and then come
6  back and -- and then go back up to the bar and have
7  drinks to socialize.
8      Q. Did you tell Jeff Simons in 2004 that he did
9  not need to take a vacation day for the day that he was
10 going down to the tournament with you?
11     A. Yeah. I believe my conversation with -- with
12 Jeff Simons was that he had -- that he had worked other
13 days that he did not submit time for and that I felt it
14 would be appropriate, because he had to come in a couple
15 of times on -- on the weekends and nights in that
16 particular same -- the same reporting week. And that I
17 felt it was appropriate that since he had worked these
18 days, if he wanted to just comp the time out on -- you
19 know, for that tournament it would be okay.
20     Q. So as far as you know Jeff did not put in
21 vacation days for the Tuesday and Wednesday that you
22 were gone?
23     A. I believe if he would have asked me I would
24 have said it was okay because Jeff works -- you know,
25 Jeff had come in on his off time, that he wasn't

Page 171

1  anticipating on -- on submitting for lost time or
2  vacation time.
3      Q. Do you know if Jeff is a salaried employee?
4      A. No, Jeff is an hourly employee.
5      Q. And did he get paid for those Saturdays or
6  Sundays that he was there?
7      A. You know, Jeff is very particular where he
8  would come in -- he would come in and respond to service
9  calls and not -- and not want to submit for -- for pay
10 for those. So when there was opportunities like this it
11 would be okay. But it's pretty safe to say that -- that
12 Jeff Simons does not always get paid for the hours that
13 he -- that he works. That was -- that was a struggle
14 that we had with him, which is a good struggle. But
15 either way I always felt that he should get compensated
16 for every hour that he works.
17     Q. Are you aware of times where Jeff did not
18 submit for time -- for hours that he was working?
19     A. What I tried to do to the best of my ability is
20 capture those hours and adjust his timecard so -- to
21 properly capture those hours that he had come in on
22 service calls.
23     Q. So do you believe that he was paid for every
24 hour that he worked?
25     A. For the most part, yeah.

Page 172

1      Q. So even in those weeks where you went on the
2  golf tournaments you tried to make up for the hours that
3  he worked by adjusting his timecard?
4      A. Yeah. And we -- and as long as -- our -- our
5  kind of general rule was as long as it was within the
6  same reporting period you -- you were able to do that.
7      Q. Whose rule was that?
8      A. Well, he would -- you know, this is our rule
9  when -- when we would talk to Ted, if it would be okay
10 to do that. And that's kind of how it was established.
11     Q. When you say it was our rule who was the our
12 in --
13     A. Landside operations on my section, that I had a
14 little latitude to do that because there would be times
15 where -- there would be -- it would be hard for us to
16 have established hours like you will work Monday through
17 Friday, you know, 8:00 to 5:00 because that just wasn't
18 the way it worked.
19     There would be times that -- that I would get
20 called in on emergency and have to come in Saturday
21 night or Saturday day or both Saturday and Sunday. And
22 then I would flex the time out and take a day off during
23 the week. But for the most part, you know, whenever we
24 did that we tried to kind of even it out. So if -- if I
25 didn't work one day during the week I know that I had

HERNANDEZ vs. SAN DIEGO COUNTY REGIONAL AIRPORT    December 18, 2006

JOSE DE JESUS HERNANDEZ

Page 173

1    made up for it over the weekends when I had to come in
2    to work.
3        Q.  But you were salary, correct?
4        A.  Yes.
5        Q.  For the hourly employees did you pay them for
6    the hours that they worked?
7        A.  Yes, same as -- but we allowed them to flex --
8    we allowed them to flex their schedule as long as we can
9    justify the hours at work to within the work schedule
10   that they put.  So even if he was Monday through Friday,
11   8:00 to 5:00 guy, if he came in and worked on the
12   weekends I would allow him to do that as long as we
13   knew -- we knew how to do it.
14       Q.  And you keep referring to we.  Who are you
15   referring to?
16       A.  Jeff and I or it was understood with the
17   employee that they had worked appropriate times and we
18   can probably justify that, okay, you're going to mark
19   this as a non-work day but I know that you worked over
20   the weekend on these days.  So I can justify that you,
21   in fact, did work that 40 hour work week.
22       Q.  Do you know if Jeff Simons got paid for Tuesday
23   and Wednesday of the week when you went to the golf
24   tournament?
25       A.  I'm not sure.  I don't remember what his --

Page 174

1    what his timecard says.
2        Q.  Do you have any recollection of signing off on
3    his timecard when --
4        A.  I would have to sign off his timecard.  What I
5    do recollect is that there was -- that I felt it
6    justified that he had worked enough hours within that
7    time period to justify him being paid for those hours,
8    yeah.
9        Q.  So you paid him for the Tuesday and Wednesday
10   as well as the Saturday that he worked?
11       A.  No.  He just replaced the kind of comp time he
12   would work.  He had come in on some service calls over
13   the weekend.  And then I felt that it was appropriate
14   enough that he worked those hours that if he didn't work
15   here he can just substitute these hours for those hours.
16       Q.  So you're saying that on his timecard instead
17   of marking down that he came in on Saturday, like he
18   did, he would instead put those hours onto Tuesday?
19       A.  I don't know what his timecard says but, once
20   again, I believe in that -- in that case I felt that it
21   was justified that he had worked appropriate hours to
22   justify what he was paid.  I don't have the timecard in
23   front of me so I'm not sure how he marked it.
24       Q.  Did you ever -- do you ever recall Jeff Simons
25   in any week putting his hours on his timecard on a day

Page 175

1    that he didn't actually work?
2        A.  We had -- I don't remember -- I never had that
3    issue with Jeff Simons.  I know that the issue that we
4    had with Jeff Simons was to ensure that he got paid
5    for -- for times that we had service calls.  So at the
6    end every time when I would look at -- at the log
7    for -- for airport operations and I would notice that
8    Jeff got called in at 2:00 o'clock in the morning on
9    Saturday night and if I looked at his timecard and he
10   didn't mark it I would -- I would talk to Jeff and tell
11   him, hey, we have to adjust your card so you can have --
12   have those hours.
13       Q.  So you would go back and put on the timecard
14   for the Saturday night when he had the service call?
15       A.  Yes.
16       Q.  And you would put those hours in there --
17       A.  I would try to do it to the best of my ability.
18       Q.  -- on the day that he came in for the service
19   call?
20       A.  Uh-huh.
21       Q.  Yes?
22       A.  Or allow him to flex the time, yes.
23       Q.  And was Ted Sexton aware that you were doing
24   this?
25       A.  Yeah, we had talked about it.  We had talked

Page 176

1    the ability to flex as long as -- to flex our schedules
2    as long as it was within the same -- the same time
3    period.
4        Q.  Do you know if Amiel Porta took vacation days
5    to go down to the Southwest --
6        A.  I know Amiel Porta would have a similar
7    situation to this so --
8        Q.  And Amiel Porta was also on call?
9        A.  Yeah, oh, all the time.  Any issues pertaining
10   to -- to security alerts, issues with our -- with our
11   baggage conveyor belts, absolutely.  We're all on call.
12       Q.  Is there a log that shows when Amiel would come
13   in to the airport like say on a weekend?
14       A.  No, because in those particular times we had
15   projects that were going on where -- where certain work
16   would only occur over the off times when the airport was
17   closed.  So we knew that -- that he would be coming in
18   off times or work a day and then we would try to work
19   those under comp time situations for it or submit those
20   hours on his -- on his timecard.
21       Q.  Are you aware of Amiel not putting hours that
22   he worked on his timecard?
23       A.  I am aware that we had to work with Amiel to be
24   sure that he would mark all the appropriate hours as
25   possible.

44 (Pages 173 to 176)

53-611 (97)

HERNANDEZ vs. SAN DIEGO COUNTY RE    AL AIRPORT   December 18, 2006                           JOSE DE JESUS HERNANDEZ

Page 177

1    Q. Are you aware of any time that Amiel worked
2  that he did not put on his timecards?
3    A. I believe that we worked with Amiel to try and
4  ensure that he got paid for all the hours that he
5  worked.
6    Q. So you're not aware of any weeks where Amiel
7  worked hours and he didn't put it on his timecard?
8    A. I'm not aware -- one of the things we wanted to
9  with Amiel is -- Amiel is a real team player and thought
10 that he would be benefiting the Airport Authority if he
11 didn't put in for the hours that he worked. And that
12 was -- that was one of the things that we worked with
13 Amiel, to ensure that he tried to put all the
14 appropriate hours for his timecard.
15    Q. And you approved the timecards for Amiel and
16 for Jeff?
17    A. I did.
18    Q. And did you have ultimate authority to decide
19 whether you could do this flex time that you have been
20 talking about?
21    A. No, because after my cards get signed they go
22 to Ted for his signature.
23    Q. And so Ted had authority on the flex time?
24    A. Yes.
25    Q. Would you go to Ted and say I did flex time for

Page 178

1  this week, these are not actually the hours that they
2  worked but I did some flex time?
3    A. I believe -- I believe Ted was in tuned enough
4  to the situation because of the dynamics of how we work,
5  you know, and hours that we have to work and -- and that
6  when situations were brought up he did not have
7  objection to doing it as long as it was within -- within
8  that same pay period. We didn't -- he didn't want to
9  have a situation where we accumulated flex time in the
10 long run.
11    Q. So do you recall having a specific conversation
12 with Ted on any occasion where you said I decided to do
13 flex time with Amiel or Jeff this week, here's their
14 timecard?
15    A. Yeah, I believe we had that as a forum with --
16 with Ted's meeting where we all talked about as a group,
17 not just my -- me and my group but also with -- with
18 Wayne Harvey in -- in airport maintenance that allowed
19 us -- that's why we came up -- or the thought had came
20 up, one, you got to justify the time and, two, it has to
21 be within the same payroll period because he didn't want
22 accumulated or bank hours in a -- you know, at a future
23 time.
24    Q. I'm asking more on a specific occasion rather
25 than a general meeting regarding policy.

Page 179

1    A. Yeah.
2    Q. Is there any specific occasion that you can
3  recall where you told Ted that on a specific timecard
4  you were giving the employee flex time?
5    A. No, I don't -- I don't remember if I did or
6  not. I know that he was aware that -- that we would do
7  that from time to time.
8    Q. But he didn't know by looking at a timesheet
9  whether that was flex time or not?
10    A. I believe -- I didn't -- there was not a
11 requirement for me to do that to go in and say, look,
12 flex time, flex time, flex time. That wasn't it. As
13 long as ours was more project driven, as long as we
14 covered the times that we needed to cover it was
15 sufficient.
16    Q. So Ted could not tell by looking at the
17 timecard itself whether it was a flex time or a regular
18 week?
19    A. No.
20    Q. And you didn't have a specific conversation
21 with him regarding a specific employee week by week to
22 say whether the timecard was flex time or regular time?
23    A. No, I didn't have the requirement to do that.
24    Q. Is there anyone else that you provided this
25 flex time to other than Jeff and Amiel?

Page 180

1    A. We did. We -- we provided some flex time
2  with -- with Carol Mahaffey, as a matter of fact, with
3  Jennifer Hamilton, with Jay Bass, who also worked in the
4  terminal operations, with -- with my staff and the
5  permitting office.
6    There would be times where -- where times are
7  permitting where I would allow them to come in and work
8  on the weekends and take some time off during the week,
9  once again, specific to permitting because it was easier
10 to work on -- on -- on ground transportation permits
11 when there was no one in the office. So that was one --
12 that was one of the situations where I would work with
13 our staff to improve productivity.
14    Q. Is there anyone else that you can remember
15 doing this flex time for?
16    A. No. It would be more specific to my office
17 staff or to the office staff. The airport traffic
18 officers not as much but to the individuals who worked
19 at -- in the terminal operation side and the individuals
20 who worked in -- in the permitting side, which were both
21 areas of my responsibility. I would allow them to do
22 that.
23    Q. Is there anyone specific in the permitting side
24 that you haven't mentioned already?
25    A. No. Well, there's -- I have -- well, I have

45 (Pages 177 to 180)

53-611 (98)

HERNANDEZ vs. SAN DIEGO COUNTY REGIONAL AIRPORT  December 18, 2006

JOSE DE JESUS HERNANDEZ

Page 181

1  three employees so all three of them, would be Jennifer
2  and I remember -- I forget my other employee's name but
3  I know it's Carol -- Carol, Jennifer and -- and my other
4  employee and I forget her name, I apologize.  And then
5  on the terminal side -- on the terminal side it would be
6  Jay, Amiel and Ron Larson who was there at the time.
7      Q.  Is it Kim?
8      A.  Kimberly, uh-huh, Kimberly Zehner, Z-E-H-N-E-R.
9      Q.  I believe when you spoke to the investigators
10  at the end of 2005 you advised them that you also
11  participated in the Southwest golf tournament in 2003.
12  Do you recall that?
13      A.  No, I don't -- I don't recall.  I told -- I --
14  I had informed him that I believe I had gone down to the
15  golf tournament twice.  He had run off a bunch of years
16  and I don't -- I don't remember.  But I can recall those
17  two times that I went down.
18      Q.  Do you have any documentation that would
19  refresh your recollection as to the years that you went
20  down to the Southwest tournament?
21      A.  No, no shirts, no -- no nothing.
22      Q.  Any receipts?
23      A.  No.
24      Q.  Did you ever golf with Dave Mullear?
25      A.  Yes.

Page 182

1      Q.  On how many occasions?
2      A.  A couple of times, maybe two, three times we
3  had golfed.
4      Q.  Did Dave ever pay for you --
5      A.  We had golfed once.  Dave did not pay but it
6  was paid by -- by another mutual friend of ours when we
7  played Del Mar National.  I believe he had paid and we
8  had -- and I had reciprocated a couple of times when we
9  played, you know, at other golf courses.
10      Q.  Who is the mutual friend that paid for your
11  Del Mar National golf --
12      A.  We had -- we had a friend of ours, Gary Cootes,
13  who -- who was involved in the parking industry but not
14  in San Diego who was down and visiting.  They had an
15  open foursome and I just filled in the -- for the last
16  spot, kind of the last moment.
17      Q.  Where did Gary Cootes work at the time that you
18  golfed at Del Mar National?
19      A.  He is -- he works -- he works for a company
20  called Park and Fly, which is out of Atlanta.
21      Q.  Does Park and Fly have any operations in
22  San Diego?
23      A.  No.
24      Q.  Do you know if Park and Fly, while you were an
25  Authority employee, tried to do business in San Diego?

Page 183

1      A.  No.
2      Q.  When did you golf at Del Mar National with
3  Dave Mullear?
4      A.  Sometime in the middle of 2005.
5      Q.  Do you remember where you golfed with Dave when
6  he paid?
7      A.  No.
8      Q.  Do you know if Ace Parking ever paid for the
9  golfing that you did with Dave?
10      A.  I don't remember.  I don't know.
11      Q.  Did Ace Parking ever pay for any of your
12  golfing trips with anyone?
13      A.  I don't know.
14      Q.  Did you ever golf with John Steele?
15      A.  Yes.
16      Q.  Is he from Ace Parking?
17      A.  He is from Ace but when we -- when we played
18  played Rancho Bernardo and I don't believe we paid to
19  play.  He -- he was a friend of the starters and we got
20  on for free was my understanding.
21      Q.  Do you know what John Steele's position was at
22  Ace when you played golf with him?
23      A.  I believe -- with Ace I believe he was the
24  manager of the shuttle park -- parking operation.
25      Q.  For Ace?

Page 184

1      A.  Yes.  John and I had worked together back at
2  Ace and I had known him and he had been a friend of mine
3  for many years.
4      Q.  And that's just shuttle parking for Ace and not
5  for the airport; is that correct?
6      A.  For Ace, yes.
7      Q.  Who else did you golf with at RBN?
8      A.  I don't remember.  I remember -- I remember
9  when you brought that up that it was -- it was him.  And
10  I'm not sure who else -- who else had played with us.
11      Q.  And did you golf with John Steele on any other
12  occasions?
13      A.  I believe I may have only golfed with him maybe
14  once or twice, if that.
15      Q.  I might have asked this but when -- when did
16  you golf with John Steele?
17      A.  I think it was sometime in 2005, 2004.
18      Q.  Did you golf at Torrey Pines with someone from
19  Baggage Claimers?
20      A.  Yes.
21      Q.  When was that?
22      A.  Let's see Mark -- maybe sometime in 2005.
23      Q.  Who did you golf with from Baggage Claimers?
24      A.  It was just the owner, Mark, Mark Garner,
25  G-A-R-N-E-R.

46 (Pages 181 to 184)

53-611 (99)

HERNANDEZ vs. SAN DIEGO COUNTY REGIONAL AIRPORT   December 18, 2006

JOSE DE JESUS HERNANDEZ

Page 185

1    Q. Who paid for the golf?
2    A. I believe Mark had paid for it.
3    Q. Was Baggage Claimers doing business with the
4  Authority at the time you golfed --
5    A. No.
6    Q. -- with him?
7    A. Baggage Claimers does business with the
8  airlines, not with me -- not with the Airport Authority.
9  They were a service provided by the airlines, not my --
10  not the Airport Authority.
11    Q. They were service providers of the airlines at
12  the time that you golfed with Mark?
13    A. I believe so, uh-huh. The Airport Authority
14  doesn't have a direct service relationship with them.
15    Q. Did anyone else go golfing with you and Mark?
16    A. Yeah, I believe Jeff Simons was also invited on
17  that trip, or on that -- that golf tournament.
18    Q. Did you go golfing with any representatives
19  from airlines at any time other than the Southwest golf
20  tournament?
21    A. We had gone a couple of times with -- where --
22  where we had invited members of -- with Delta to go
23  golfing.
24    Q. Who is we?
25    A. Where I had invited Mark Cunningham and

Page 186

1  Jeff Rasor and one of his employees to come golf with us
2  on a foursome.
3    Q. Who was the fourth in the foursome?
4    A. I'm not sure, just another one of his
5  supervisors.
6    Q. Who paid for that golf?
7    A. I did.
8    Q. Out of your personal funds?
9    A. Out of my personal funds.
10    Q. Do you know when that was?
11    A. No, I don't.
12    MS. McDONOUGH: Let's take another short break.
13    THE VIDEOGRAPHER: Off the record at 3:41.
14    (A recess is taken.)
15    THE VIDEOGRAPHER: This is the beginning of
16  Videotape Number 3. Back on the record at 3:53.
17    MS. McDONOUGH:
18    Q. Is there any reason why you cannot continue to
19  give your best testimony?
20    A. No.
21    Q. Did you ever receive drink coupons from any
22  airlines while you were working at the Authority?
23    A. Did I receive drink coupons, yes, as part of my
24  frequent flyer with Southwest Airlines I have.
25    Q. Did you ever receive any drink coupons aside

Page 187

1  from those that you earned being a frequent flyer?
2    A. Yeah, for distribution to -- to airport
3  customers or distressed customers, yes.
4    Q. Who gave you those drink tickets?
5    A. I used to get a couple from -- or a few from
6  Southwest Airlines because they knew I was around -- out
7  and about a lot, and Delta Airlines as well. Just any
8  time that -- that they thought it would be appropriate
9  to give them out on their behalf would be -- you know,
10  they -- they trusted me enough that they would give me a
11  few and just say, hey, just give them out as a little
12  thank you on behalf of Delta or the Airport Authority,
13  however you want to do it.
14    Q. Did they tell you who to give the drink coupons
15  to?
16    A. No.
17    Q. Did they say you could use them for your own
18  use?
19    A. They said you can -- they said I can either use
20  them, give them away, however -- you know, use them
21  however you think is appropriate.
22    Q. Did -- did you ever report back to the airlines
23  and tell them how you used the drink coupons?
24    A. There was no -- there was no need to. In fact,
25  most of those tickets just went to waste.

Page 188

1    Q. Did you ever use any of the drink coupons that
2  you received from the airlines other than those that you
3  received through your frequent flyer --
4    A. No.
5    Q. You never used them personally?
6    A. No.
7    Q. Who gave you the drink coupons from
8  Southwest Airlines?
9    A. We had Mike Parrish. Mike Parrish knew that --
10  that I would -- I was out and about a lot of times and I
11  would be working with -- you know, just to try to solve
12  situations. And he would give me a few, I mean two,
13  three, you know, every few months and say, hey, if you
14  can, you know, just put them to good use for someone.
15    Q. When did he first start giving you drink
16  coupons?
17    A. I don't -- I don't recall. It would just be
18  from time to time. It wasn't a specific schedule, hey,
19  I'll give you a couple at this time.
20    Q. Did you give any of those drink coupons away?
21    A. Yeah.
22    Q. Who did you give them to?
23    A. There was a time -- there was a time when he
24  knew that -- that Airport Authority employees were
25  flying out and say, hey, do me a favor, here's a couple

47 (Pages 185 to 188)

53-611 (100)

Case 3:08-cv-00184-L-CAB    Document 1-10    Filed 01/30/2008    Page 33 of 145

HERNANDEZ vs. SAN DIEGO COUNTY REGIONAL AIRPORT  December 18, 2006

JOSE DE JESUS HERNANDEZ

Page 189

1 drink coupons for them if you want.
2    Q. Who did you give them to?
3    A. I remember at one particular time I want to say
4 either Colm or Matt. One of those guys were getting
5 married and they were going to a bachelor party in -- in
6 Vegas. So he just asked me to give them to them. I
7 don't know if they ever used them or not.
8    Q. And did you give the drink coupons to Colm or
9 Matt?
10   A. Yeah. We just gave it to them and just said,
11 hey, Mike wanted you to have these. If you want to use
12 them, fine. If not, give them away, whatever you want
13 to do with them.
14   Q. Do you know why Mike gave the coupons to you
15 and not to those people directly?
16   A. No.
17   Q. Did you ever give the Southwest drink coupons
18 to anyone other than Colm or Matt?
19   A. There would be -- you know, there would be
20 Airport Authority employees who were flying out and if
21 they were available I just say, hey, if you can use
22 them.
23      You know, I know on one particular case, you know,
24 Carol Mahaffey was flying out on Delta. Her and her mom
25 were going on -- on a cruise and it just so happened

Page 190

1 that I had some from Delta and said, hey, you know, here
2 are some drink coupons, if you want them, have them. If
3 you don't you don't need to have them, here they are.
4    Q. Who did you receive those from from Delta?
5    A. Delta.
6    Q. Who at Delta?
7    A. From -- I believe it was Jeff Rasor. They're
8 just courtesy coupons that they give away all the time.
9    Q. Do you remember who you -- or what time of year
10 that was?
11   A. No, I don't. I don't remember the year. I
12 just remember from time to time I would receive a couple
13 as courtesy.
14   Q. Do you remember giving Southwest coupons to
15 anyone else at the Authority?
16   A. I don't remember specifically. I remember
17 the -- I remember the Colm one because he had -- either
18 Colm or Matt, it was one of their bachelor parties or
19 something like that that they were going for so I
20 remember giving it specific to them. Other ones were
21 just, hey, you're flying out, you want coupons, they're
22 right there.
23   Q. Did you receive any drink coupons from
24 Hawaiian Airlines?
25   A. Yes. I had them as a courtesy as well and

Page 191

1 never -- never used them.
2    Q. Did you ever give them away?
3    A. I believe -- I believe when I was cleaning up
4 my office they were still there in the office but they
5 had expired.
6    Q. What did you do with them?
7    A. They just got thrown away.
8    Q. Did you ever receive any Buddy Passes from
9 Southwest Airlines?
10   A. Yeah.
11   Q. How many?
12   A. I believe I received a couple. And those were,
13 as we talked about before, was I was going out to Vegas
14 for a meeting and Mike wanted the kids to go out since I
15 was going to be out there, my son and my daughter to go
16 out and spend a couple of days with his family. So what
17 he did was he gave us the Buddy Passes so that he can --
18 so that I can be in Vegas and then my kids would be out
19 there as well. But I would -- I stayed in the hotel and
20 they stayed with him.
21   Q. Did your wife receive a Buddy Pass as well?
22   A. I -- I believe, and I don't remember, I believe
23 she had paid for her own ticket so she was coming down
24 anyways. But he just wanted the kids to come along and
25 he would take care of the kids. So we would kind of

Page 192

1 have -- I would be there at the function and then have
2 some time with my wife at night. And then they would
3 take care of the kids at their house.
4    Q. And a Buddy Pass is a -- essentially a one-way
5 or roundtrip ticket depending on how --
6    A. It's all standby.
7    Q. And it's all standby.
8    A. Uh-huh.
9    Q. Some people call it a non-revenue ticket, yes?
10   A. Exactly, non-revenue, no value.
11   Q. So at this particular time when you went to
12 Vegas for your meeting for work, to the best of your
13 recollection Mike Parrish provided two or three
14 roundtrip tickets for your family?
15   A. I believe it was only my kids because he wanted
16 the kids to come out and spend some time with his kids
17 since, you know, they had come out and they had become
18 to be -- to be friends.
19   Q. And the Authority paid for your ticket because
20 it was a work related --
21   A. It was a work related function.
22   Q. Do you remember when that was?
23   A. No, I don't.
24   Q. Do you remember what the function was?
25   A. I -- I want to say it was a National Parking

48 (Pages 189 to 192)

Case 3:08-cv-00184-L-CAB    Document 1-10    Filed 01/30/2008    Page 34 of 145

HERNANDEZ vs. SAN DIEGO COUNTY REGIONAL AIRPORT  December 18, 2006                    JOSE DE JESUS HERNANDEZ

Page 193

1  Association conference in Vegas and I stayed at the
2  Mandalay Bay.
3      Q. Did you ever receive any other airline tickets
4  from Mike Parrish --
5      A. Huh-uh.
6      Q. -- other than those?
7      A. I don't believe I did.
8      Q. Who initiated the idea for Mike to give you
9  passes for your children?
10     A. Mike did.
11     Q. Did you offer him any money for those passes?
12     A. I had -- the conversation was more of, hey,
13  we're going out -- I said I'm going to take my wife,
14  we're going -- we talked about going to Vegas, you
15  know, as friends do, just, hey, what are you going to do
16  this weekend or next week, hey, I'm going to Vegas.
17  We're going to go this week and drive the kids up, drop
18  them off with their grandparents in L.A. He said you
19  don't need to do that, just why don't you just have them
20  spend a couple of days with my kids and -- with my kids
21  and at our house. So he initiated the idea.
22     Q. And do you remember if your wife came out to
23  Vegas on that trip?
24     A. Yes, she did.
25     Q. You just don't remember how she got out there?

Page 194

1      A. I don't remember. I believe she had -- I
2  believe we had arranged for her and I to fly out. I was
3  already going out. We bought her ticket. And then I
4  believe that -- that was when the kids went out and
5  spent those days with -- with Mike and his wife at their
6  house.
7      Q. If you had bought a ticket for your wife would
8  that have been on a credit card?
9      A. Probably.
10     Q. And at the time Mike Parrish was still working
11  for Southwest Airlines?
12     A. Yes.
13     Q. Did you tell the investigators in December of
14  2005 that you may have used a roundtrip ticket from
15  Mike Parrish to fly to Vegas on your own on another
16  occasion?
17     A. No.
18     Q. Do you have any other recollection of using a
19  Southwest ticket from Mike Parrish?
20     A. I don't remember. I remember one -- the
21  conversation that we had with -- with Investigators,
22  that one day on an afternoon we flew out with Southwest
23  to go look at some other terminal expansions and then
24  came back that afternoon. So I don't know if that's the
25  same incident what you're referring to. But, once

Page 195

1  again, there was Investigators asking very ambiguously
2  so I'm not sure what they -- what they wrote down or
3  what they believe is true according to them.
4      Q. So on one occasion you and Amiel flew out to
5  Las Vegas with Southwest Airlines?
6      A. That's correct.
7      Q. Did the Authority pay for those tickets?
8      A. No.
9      Q. Who paid for the tickets?
10     A. Southwest, as non-rev -- non-revenue passes.
11     Q. Is -- was that an expense that the Authority
12  would have paid for if you had submitted it?
13     A. Maybe but it was the last -- it was -- it was
14  really one of those things that had to happen at that
15  particular time, where they were looking -- if you go
16  through the Southwest Airlines rotunda now they have
17  combined all their gates where when you check in at one
18  counter you're actually checking in for gate two and
19  three, really one, four and five, they just buddied them
20  up. And it was something that needed to occur pretty
21  quick and we needed to look at it and see if it made
22  sense for the Airport Authority to do, which obviously
23  it did. So it was just, hey, if we're going to do it we
24  got to go do it now so it was last moment.
25     Q. So you went with Amiel and who else was

Page 196

1  Southwest Airlines?
2      A. It was -- it was Mike and Jeff who was his
3  manager of ramp operations.
4      Q. You went to the Las Vegas airport?
5      A. Las Vegas, McCarron airport.
6      Q. And they already had this setup?
7      A. They had one particular gate that was already
8  set up in -- in that manner.
9      Q. Do you remember when that trip was?
10     A. No, I don't.
11     Q. Did Mike Parrish take you out to lunch while
12  you were out there too?
13     A. Yeah, we went out to lunch.
14     Q. Who paid for the lunch?
15     A. I believe I had paid for lunch.
16     Q. Did you pay for it with a credit card?
17     A. I don't remember. I know the lunch was only
18  like maybe twenty, thirty dollars, if that.
19     Q. Where did you go to lunch?
20     A. It was some rib place that's out there. I
21  don't remember the name, pretty close to the airport.
22     Q. And then you flew back home?
23     A. And we flew back home.
24     Q. How long have you known Mike Parrish?
25     A. I've known Mike Parrish since the first day

49 (Pages 193 to 196)

53-611 (102)

HERNANDEZ vs. SAN DIEGO COUNTY REGIONAL AIRPORT   December 18, 2006

JOSE DE JESUS HERNANDEZ

**Page 197**

1   that he -- that he came to San Diego as station manager.
2   Q. Do you remember when that was?
3   A. No, I don't.
4   Q. And your family and his family socialize
5   together?
6   A. Yes, we do.
7   Q. How quickly after the first meeting did you
8   form a friendship with him where you would socialize?
9   A. Pretty quick. What happened was Mike Parrish
10  had come out here. He was living all by himself in an
11  apartment just in Point Loma. And just a friend being a
12  friend asked him to dinner a couple of times at my
13  house. He came out, had drinks, dinner, met my kids.
14  Next time he came out -- because his family once a month
15  would come out and visit. Next time he had an
16  opportunity his family came out and -- and we made
17  dinner for them. And the kids just got to know each
18  other. Two out of the three kids because one's already
19  in high school and my kids are only five and nine. So,
20  you know, just through the years we just -- we just
21  became friends.
22  Q. Do you have any recollection of any other
23  roundtrip ticket that you took on Southwest courtesy of
24  Southwest?
25  A. Not that I recall.

**Page 198**

1   Q. Or any one-way ticket?
2   A. (No audible response.)
3   Q. No?
4   A. Not that I recall, no.
5   Q. Or any other tickets given to your family or
6   friends?
7   A. Not that I recall.
8   Q. Did you travel on Hawaiian Airlines in May,
9   2004, to Maui?
10  A. Yes, I did. No. Yes, to Oahu.
11  Q. To Oahu --
12  A. Uh-huh.
13  Q. -- excuse me. How did you receive the tickets
14  to Oahu in May, 2004?
15  A. Janet -- Janet Nix had -- had given me some
16  non-rev passes to go -- to fly on Hawaiian Airlines.
17  Q. I know what they mean but just for the record
18  what is a non-rev pass?
19  A. A non-revenue pass is standby, space available.
20  They have no value whatsoever in the tickets. They are
21  often given as a courtesy or, you know, when customers
22  have complained. The good thing is you can fly
23  somewhere. The bad thing is you're at the mercy of the
24  loads of how busy the -- the airline is or not. There's
25  times that you can wait a week or two weeks before you

**Page 199**

1   get on. So it's all -- it's all standby. That's why
2   they carry no value on them.
3   Q. How did it come about that Janet Nix gave you
4   the non-revenue passes?
5   A. Janet Nix and I had been talking about, you
6   know, I hardly ever take vacation. She says you got to
7   take vacation. I said, okay, we're thinking about going
8   down to Mexico. She says, well, if -- if you want to,
9   you know, we will -- I will give you these non-rev
10  passes if you want to go, you know, because, you know,
11  we want you to -- I want you, if you want to, go to --
12  go to Hawaii. So she had brought up and initiated
13  and -- and given me the passes.
14  Q. How many passes did she give you?
15  A. There was four.
16  Q. One for each member of your family?
17  A. Yes.
18  Q. Do you know if Janet Nix has unlimited access
19  to the non-revenue passes?
20  A. She has full discretion to give those out as
21  she wishes. And even in this particular case had
22  received approval from her direct supervisor to do so.
23  Q. Do you know who her direct supervisor is?
24  A. No. I just remember she had asked permission
25  and she had received permission to give away these --

**Page 200**

1   the non-revenue passes.
2   Q. And your other family members were able to get
3   on a flight before you; is that correct?
4   A. Yes, that's correct.
5   Q. So they went out on one day and then you took
6   the flight the next day?
7   A. And I took the next day.
8   Q. So you used all four of the roundtrip
9   non-revenue passes --
10  A. That's correct.
11  Q. -- to go to Oahu?
12  A. Oahu.
13  Q. Did you ever provide any compensation to
14  Janet Nix for the passes?
15  A. Did I ever pay for -- for no value passes?
16  Q. Yes.
17  A. No.
18  Q. Did your family stay with Amiel Porta's parents
19  when they arrived in Oahu?
20  A. That's correct.
21  Q. And that was just for the one night?
22  A. That was just for the one night.
23  Q. Did you have any work related business in Oahu
24  when you were there?
25  A. No.

50 (Pages 197 to 200)

**53-611 (103)**

HERNANDEZ vs. SAN DIEGO COUNTY RE___L AIRPORT   December 18, 2006                                    JOSE DE JESUS HERNANDEZ

Page 201

1     Q. Did you have any -- well, strike that.
2     Did you sit in first class or in coach when you
3     traveled to --
4     A. No --
5     Q. -- Oahu?
6     A. -- coach.
7     Q. Did you receive free alcoholic beverages?
8     A. No.
9     Q. Then when you returned from Oahu did you just
10    use a pass that you had to get back?
11    A. Same pass.
12    Q. Did you all travel on the same plane --
13    A. We all traveled --
14    Q. -- on the way back?
15    A. -- the same plane.
16    Q. Have you ever received free food from the
17    concessions in the airport terminals?
18    A. Absolutely never.
19    Q. Did you ever contact Jim Myher and ask him to
20    go with you off site to pick up a play yard for your
21    kids or a -- I guess a swing set, play set for your
22    kids?
23    A. Yeah.
24    Q. What was the nature of that --
25    A. I had asked him -- I had asked him if he --

Page 202

1     because I knew he had a truck and I had asked him if he
2     could help me go pick up a play yard that my wife had
3     purchased. And we went out -- and I needed his
4     assistance to do it. We went out, got it, took it to my
5     house and -- and that was it.
6     Q. Was Jim working at LPI at the time?
7     A. He was.
8     Q. And did you ask him to use the LPI truck?
9     A. I asked for his assistance, if he can -- if he
10    can help me pick it up. And then when he came -- when
11    he came and arrived he -- he arrived in the LPI truck.
12    Q. Did you ask him to bring the truck?
13    A. I didn't ask him to bring the truck. I just
14    asked for his assistance.
15    Q. Did you have a car that could have accommodated
16    the play yard?
17    A. I asked for his assistance and he said, hey,
18    I'll take my truck -- or I'll take the truck.
19    Q. And he went out with you to Clairmont Mesa or
20    Kearny Mesa to get the play yard?
21    A. Yes.
22    Q. And then drove it to your house out at
23    Rancho San Diego?
24    A. Yes.
25    Q. And then drove you back to the airport?

Page 203

1     A. And then drove us back.
2     Q. Was that during work hours?
3     A. Yeah, it was an afternoon during work.
4     Q. Why did you ask Jim to help you with that?
5     A. Jim -- I needed to go get it that particular
6     day. My wife had said, hey, I've purchased this play
7     yard but we need to go get it today. Jim was in my
8     office. I said, hey, Jim, would you mind helping me go
9     get this.
10    Q. Oh, I thought you said you called him.
11    A. Well, I remember -- I remember it was something
12    that we needed to go get right away. And so I asked Jim
13    and Jim said, yeah, I'll help you.
14    Q. So when you asked Jim was he in your office?
15    A. I don't remember. I know it was something that
16    had to be done, whether he was in my office or whether I
17    called him. But it was something that we needed to go
18    pick up that day.
19    Q. Why did you choose Jim to help you?
20    A. Because I consider Jim a friend and his
21    schedule was flexible, that he can -- that -- that I
22    asked him if he was flexible enough to go and help me
23    that day and he did.
24    Q. Did you ask him because you knew he had a
25    truck?

Page 204

1     A. Well, that too. But -- but I also asked for
2     his assistance, yeah.
3     Q. Was Jim in a suit that day?
4     A. I don't remember.
5     THE REPORTER: Was Jim what?
6     MS. McDONOUGH: Was Jim in a suit that day.
7     THE WITNESS: I don't remember.
8     MS. McDONOUGH:
9     Q. Did you ever take LPI management out to -- for
10    lunches, Maurice Gray or Jim Myher?
11    A. Yes.
12    Q. About how many times did you take them out to
13    lunch?
14    A. We had gone out to lunch maybe a handful of
15    times on separate occasions.
16    Q. Who paid for those lunches?
17    A. A couple of times Jim would pay, a couple of
18    times Maurice. And then I believe on an occasion or two
19    I paid.
20    Q. Where did you go to lunch?
21    A. Just around, just -- just to primarily
22    Red Sails.
23    Q. Would you say that LPI paid for your lunch more
24    than you paid for theirs?
25    A. Probably, yeah, uh-huh.

51 (Pages 201 to 204)

53-611 (104)

HERNANDEZ vs. SAN DIEGO COUNTY REGIONAL AIRPORT   December 18, 2006

JOSE DE JESUS HERNANDEZ

Page 205

1    Q.  Did you tell the investigator in December,
2  2005, that you kept a list of the lunches that you took
3  with LPI?
4    A.  I had -- I had a list of -- of just put down
5  some appointments of when I would go because I wanted to
6  make sure that I knew what days they were.  I don't have
7  an idea where those list are because I never recovered
8  that.
9    Q.  Where were you keeping the list at the time?
10   A.  I had it in my office.  I want to say they were
11  probably in my computer but I -- since that day I don't
12  have access to my computer.
13   Q.  Why were you keeping a list?
14   A.  I just wanted to make sure that I remembered
15  when it was -- when it was that I would go to lunch with
16  them.
17   Q.  Did you make a list about lunches with any
18  other --
19   A.  Just any list.  It was my -- it was my
20  understanding that -- that -- you know, that -- that I
21  had to report the lunches up to -- if it was cumulative
22  over $50 and half of whatever the -- the -- you know,
23  the -- the public statute is.
24   MS. CHINN:  Fair Employment Practices Act?
25   THE WITNESS:  No, the disclosure.

Page 206

1    MS. CHINN:  It's under the Fair Practices
2  Commission.
3    THE WITNESS:  Yeah, that one, so -- the FCC
4  disclosure.  So I kept them so that if I got over fifty
5  I would report them and then try to remember -- try to
6  give a fair and estimate value of what they were so I
7  could report them on that -- on the documentation.
8    MS. McDONOUGH:
9    Q.  And did you exceed $50 with LPI?
10   A.  I believe I was just above that, yeah.
11   Q.  And did you report it?
12   A.  I had -- I never had -- I did eventually report
13  it but -- but in that particular year I -- I wasn't
14  required to submit that documentation until after.
15   Q.  And what year did you exceed that $50 with LPI?
16   A.  It was 2005.
17   Q.  And you were required to submit the form in
18  what year?
19   A.  2006 after the fiscal year.  So we submitted
20  it -- we submitted it -- I was required to submit that
21  documentation upon termination of my employment,
22  which -- and then the year before that.
23   Q.  Did you have any lunches with LPI in 2004?
24   A.  I don't remember.  I'm sure I did but I don't
25  remember.

Page 207

1    Q.  When did you start making a list of the
2  lunches?
3    A.  Just that last year.  I just wanted to make
4  sure that I had proper documentation.
5    Q.  Did anyone tell you to start making a list?
6    A.  Just one of -- just one those things that
7  occurred to me, hey, I should probably make a list.
8    Q.  So no one told you to make a list?
9    A.  I just -- no, I just -- something I wanted to
10  do.
11   Q.  Is there anyone else on the list that you had
12  lunches with or other appointments with that you kept on
13  a list?
14   A.  I don't -- I don't remember.  If -- I tried to
15  the best of my ability to document those in that -- in
16  that FCC submit.
17   Q.  Okay.  Are there any other companies that do
18  business with the Authority or vendors that you had
19  lunch with other than LPI?
20   A.  I don't remember at this time.
21   Q.  Do you know Kelly Pond?
22   A.  Yes, I do.
23   Q.  Who is she?
24   A.  Kelly Pond is a vendor of -- of -- she -- she
25  provides uniforms for LPI and -- and on some occasions

Page 208

1  Airport Authority.
2    Q.  When did you first meet Kelly Pond?
3    A.  Kelly Pond was introduced to me when we were
4  looking to change out and upgrade the uniforms for the
5  customer service representatives, which are the taxi and
6  shuttle dispatchers.
7    Q.  Who introduced you to Kelly?
8    A.  Jim Myhers and -- Jim Myhers.
9    Q.  Do you know how Jim knew Kelly?
10   A.  Yeah.  She -- she had come through and sold her
11  services to -- to LPI.  And when -- when we
12  approached -- when I approached Jim about redoing the
13  uniforms -- because they were in a drab black and red --
14  he brought her up and she presented samples to us.
15   Q.  Did you ever order clothing or other items from
16  Kelly Pond for your personal use?
17   A.  Yeah.  We had ordered -- my wife had requested
18  and received some shirts, these yellow shirts with --
19  with an embroider on it, probably no more than five
20  bucks.  And she had traded out those uniforms for -- for
21  some cosmetics that Kelly wanted?
22   Q.  So the payment for the uniforms was --
23   A.  Yeah, as a trade-off.
24   Q.  -- in cosmetics?
25   A.  Uh-huh.  She had --

52 (Pages 205 to 208)

Case 3:08-cv-00184-L-CAB    Document 1-10    Filed 01/30/2008    Page 38 of 145

HERNANDEZ vs. SAN DIEGO COUNTY RE...AL AIRPORT  December 18, 2006                    JOSE DE JESUS HERNANDEZ

Page 209

1    Q. Was it more than one shirt that --
2    A. It was for uniforms --
3    Q. -- your wife --
4    A. -- for soccer.
5    Q. Okay. So your wife ordered a yellow
6 embroidered shirt?
7    A. Yeah. It was uniforms. It was like eight --
8 eight T-shirts with an embroidery on it. And then for
9 payment Kelly -- Kelly just traded some -- some makeup.
10    Q. What kind of makeup?
11    A. Mary Kay makeup.
12    Q. Does your wife sell Mary Kay makeup?
13    A. Yeah.
14    Q. Did you receive any other items from Kelly Pond
15 that were personal as opposed to work related?
16    A. Yeah. Kelly -- what Kelly would do is whenever
17 we requested uniforms or uniform samples she would
18 always personalize them, like with Airport Authority
19 logos or those. So she would come in and as part of
20 presentation when we were redoing uniforms for -- for --
21 like the ambassadors that we have at our check points or
22 the customer service reps or looking at different
23 uniform samples for different areas, she would come and
24 leave samples.
25    And then she would just leave them behind. And

Page 210

1 then what I would do is take those uniforms and just
2 distribute them because she had no more use for them.
3 She had already personalized them, you know, by
4 embroidery so she -- she had no use. She couldn't take
5 them back.
6    Q. How many samples did you receive from Kelly?
7    A. I think through the time maybe eight or ten
8 different samples.
9    Q. When did you first start receiving samples from
10 Kelly?
11    A. You know, just -- just through the times she
12 would come through. And whenever we -- we ask for
13 samples on certain uniforms or certain styles she would
14 come in and bring them and leave them behind or there
15 would be times that she would come in and leave samples
16 to -- for the employees, hey, these are uniforms for
17 them, go ahead and give that to them.
18    Q. Who did she give samples to, do you know?
19    A. To -- to the employees.
20    Q. Do you know who specifically?
21    A. She would give -- she would come in and leave
22 samples or what -- what she would do is in her line of
23 business she -- she would have clients that would
24 request samples, not just for the Airport Authority but
25 through all her different clients. And then if she felt

Page 211

1 they fit or they were the right size for certain
2 employees like Jennifer, Carol, Kimberly, Marie Cole on
3 the other side, or any of the guys, she would just
4 personalize them, come in and drop them off with them
5 since she didn't -- she didn't have any other use. She
6 didn't want to have them in her -- in her house.
7    Q. Can you recall any specific employees that she
8 gave samples to?
9    A. Yeah, the ones I just went over.
10    Q. Jennifer, Carol --
11    A. Yeah, Jennifer, Carol, Kimberly. They would
12 all go through and -- she would just -- you know, it
13 was -- it wasn't meant to -- to do anything else but to
14 clear out her house. She had uniform samples, she just
15 wanted to get rid of them.
16    Q. And then she personalized them for those
17 individuals?
18    A. Yeah. She would just put the Airport Authority
19 in embroidery and -- and just distribute them out.
20    Q. How many did you personally receive?
21    A. I think through the years I might have received
22 two, three, you know, of them. But typically --
23 typically I would have to be in a shirt and a tie so I
24 would -- I would take a lot of those and -- and just
25 give them out.

Page 212

1    Q. Did you give them to anyone other than the
2 people you just mentioned?
3    A. Yeah, on -- on a couple of occasions during
4 Christmastime I had purchased windbreakers --
5 windbreakers from Kelly with the Airport Authority logo.
6 I had given those out to -- I believe Ted has one. Ted
7 has one, Amiel has one, Jeff and Jay. So I had bought
8 them as presents for my employees, give away so --
9    Q. You bought those?
10    A. Huh?
11    Q. I'm asking if you gave away any samples to any
12 other employees.
13    A. Yeah. We would just have them -- she would
14 leave them -- she would leave them in my office and
15 then, you know, pretty much the rule was, hey, if -- if
16 they were there and you want them and they fit you, go
17 ahead and take them because she couldn't take them back.
18 She had no use for them.
19    Q. How many samples would you estimate she left in
20 your office?
21    A. I don't know, maybe 15 different types of
22 samples.
23    Q. Over the period of years?
24    A. Yeah.
25    Q. And how many did you keep for you or your

53 (Pages 209 to 212)

HERNANDEZ vs. SAN DIEGO COUNTY REGIONAL AIRPORT  December 18, 2006

JOSE DE JESUS HERNANDEZ

Page 213

1  family?
2    A.  For me, maybe, you know, a shirt here and
3  there, that's it.
4    Q.  And how about for your family?
5    A.  None.
6    Q.  None?
7    A.  Uh-huh.
8    Q.  Did you ever receive a jacket from Kelly?
9    A.  There was a jacket -- there was a black jacket
10  that was there and that -- that -- when I cleared out my
11  office that stayed behind in the office.  That was a
12  sample.  It was a sample that was -- that was given but
13  it's -- to the best of my ability I believe it's still
14  there.  I don't know what they did with my office but it
15  stayed behind.
16    Q.  You didn't take it with you?
17    A.  (No audible response.)
18    Q.  Did you ever wear it?
19    A.  No.  I don't wear jackets.
20    Q.  You never wore that jacket?
21    A.  No.
22    Q.  Did you ask her to bring that jacket?
23    A.  No.  Do you know what jacket you're referring
24  to?
25    Q.  Did you ask her to personalize the jacket for

Page 214

1  you?
2    A.  No.  I never asked --
3    Q.  Was it personalized?
4    A.  I have never asked Kelly Pond to ever give me
5  anything, to ever personalize anything.
6    Q.  What that jacket personalized?
7    A.  I believe if -- if -- if that one there had an
8  Airport Authority logo there was another one that she
9  had received as a sample but when I left employment at
10  Airport Authority it remained right in that office.
11    Q.  So the personalization was just the
12  Airport Authority logo?
13    A.  Just the -- that's what I -- excuse me, that's
14  what I mean by personalization is an Airport Authority
15  logo on it.
16    Q.  Did the -- did Kelly Pond's mom own a sporting
17  goods store?
18    A.  I believe she does.
19    Q.  Did you ever order anything on-line from the
20  sporting goods store?
21    A.  She had -- I had once requested of her if she
22  can -- she can purchase at a discount some Nike golf
23  shoes but her mom was unable to do that.
24    Q.  Did you ever receive anything from her mom's
25  sporting goods store?

Page 215

1    A.  Never.
2    Q.  Either free or paid for?
3    A.  Never.
4    Q.  Did you ever go on the website and say that --
5  tell your employees that you were picking items out?
6    A.  No, never.
7    Q.  Have you ever heard Kelly Pond say that it's
8  expensive to visit you?
9    A.  No.
10    MS. CHINN:  What was the last one?  Can you read it
11  to me, Jennifer, that it was expensive what?
12    (The record is read by the reporter.)
13    MS. McDONOUGH:
14    Q.  Did you speak to Kelly Pond at any time after
15  the investigation began in December, 2005?
16    A.  Absolutely I did.
17    Q.  Did you talk about the allegations and the
18  complaint of the allegations against you?
19    A.  Oh, absolutely.  She called me immediately
20  after the investigators -- immediately after the
21  investigators -- or she got done with her interview with
22  the investigators.
23    Q.  And what was the substance of your
24  conversation?
25    A.  She was -- she was rather perturbed with the

Page 216

1  line -- the line of questioning.
2    THE REPORTER:  I need you to slow down a bit.
3    THE WITNESS:  Okay.  I apologize.
4    MS. McDONOUGH:
5    Q.  Did she say anything specific about the line of
6  questioning?
7    A.  Yes.  She was -- she was perturbed more to the
8  sections that -- that related about possibilities of
9  some sort of relationship between Kelly Pond and I, that
10  we had more than just a working relationship, that I may
11  have had some sort of personal relationship or that I
12  had been cheating on my wife with her.
13    Q.  Did she tell you anything else about her
14  conversation with the investigator?
15    A.  Yeah.  Then she had gone through and asked
16  me -- or went over the same line of questioning that you
17  just did, did they ever give you this, did they ever
18  give you that, you know, how much did you give them, all
19  those type of questions.
20    Q.  Did she tell you what her response was?
21    A.  Yes.
22    Q.  What did she tell you?
23    A.  Pretty much the same what I just told you.
24    Q.  Did you talk to her about anything else about
25  the investigator or the investigation?

53-611 (107)

Page 217

1      A. Just really the focus was on how -- with her on
2  how upset she was on the references that -- you know,
3  that -- or allegations that I may have been cheating on
4  my wife with her.
5      Q. Did Kelly Pond or her mom ever provide you with
6  running shoes?
7      A. No. She provided Jim Myhers with running
8  shoes, never with me.
9      Q. How do you know that she provided Jim Myher
10  with running shoes?
11      A. Because Jim Myhers would walk in with new shoes
12  and say, hey, where did you get those, well, I got them
13  from Kelly.
14      Q. How often did Kelly Pond come into the office
15  say on a monthly basis?
16      A. Maybe a couple of times. There would be times
17  that I wouldn't see her for months and there would be
18  times she would come around.
19      Q. How often?
20      A. So maybe once or twice every couple of weeks.
21  She would be doing business, not just with me but with
22  the terminal operation side. She did business with --
23  with Human Resource.
24      They had -- the Airport Authority created this
25  Airport Authority store where you can go on and -- and

Page 218

1  on the web -- on like an internal website and purchase
2  shirts and sweaters and jackets and stuff that were
3  purchased through Kelly. So she would go and talk to
4  Kim Rodriguez, who kind of ran that store there. And
5  so, you know, those were the type of relations. She
6  would come through or she would just stop by to say hi.
7      Q. What's the name of Kelly's business?
8      A. Image Concepts.
9      Q. Do you know if she still does work for the
10  Authority --
11      A. I'm not sure --
12      Q. -- the shirts?
13      A. I'm not sure who she does -- I'm sure she still
14  continues to do work for LPI. What level of work she
15  does for the Airport Authority I -- I can't tell --
16      MS. CHINN: Is he too fast?
17      THE WITNESS: Sorry.
18      THE REPORTER: It's okay.
19      MS. McDONOUGH:
20      Q. After that conversation you had with Kelly in
21  December of 2005 regarding the investigation have you
22  had any subsequent conversations with her about the
23  allegations in your complaint?
24      A. Yes, I have.
25      Q. How many conversations have you had?

Page 219

1      A. We've probably -- I've probably had occasion to
2  stop by and see her four or five different times. She
3  continues to do uniforms for me and -- and my current
4  company. So I go through -- I give her business. And
5  when we're sitting there and chatting we'll bring it up,
6  we'll mutually bring it up, hey, where are you at with
7  the -- you know, with what's going on with the
8  Airport Authority.
9      Q. Has she ever offered an opinion on the
10  allegations in your complaint?
11      A. I believe she's offered on many occasions to
12  support me with my allegations.
13      Q. Has she said specifically what she will support
14  you with?
15      A. She will -- she will support me to the point
16  that to refute the allegations that she ever gave me --
17  that I ever requested such things from her.
18      Q. Do you know when your wife received the
19  uniforms, the embroidered shirts?
20      A. Maybe two years ago, probably over that, maybe
21  two, three years ago now.
22      Q. It was for a soccer team?
23      A. Yeah, just a soccer team.
24      Q. For one of your children?
25      A. No, for her.

Page 220

1      Q. Oh, for her?
2      A. Uh-huh. Kelly -- Kelly at that particular time
3  had extra yellow shirts -- yellow or green -- yellow or
4  green shirts at her house, you know, that she had
5  purchased. They really looked like under shirts. They
6  were like $2 shirts. And she said, hey, can you use
7  those for uniforms. She said, yeah, I'll embroider them
8  for you.
9      Q. Do you still have any of those shirts at your
10  house?
11      A. No. They don't last that long. Two dollar
12  shirts just don't last that long.
13      Q. Did you ever go to Kelly's Pub -- not
14  Kelly Pond's pub but Kelly's Pub --
15      A. Yes, I have.
16      Q. -- with Amy Gosslin, Amiel --
17      A. Yes.
18      Q. -- Kelly Pond?
19      A. As a going away party for an employee.
20      Q. Who was the employee?
21      A. I believe it's the same employee from
22  environmental. I wish I could remember her name but I
23  don't. I apologize.
24      Q. When was -- when was the occasion that you went
25  there?

55 (Pages 217 to 220)

53-611 (108)

Page 221

1    A. I don't remember. I don't remember. I know it
2  was brought up. You probably have a date, I don't.
3    Q. Who purchased drinks at Kelly's Pub?
4    A. We had all purchased drinks. I had gone
5  through -- because I arrived first and as people came in
6  I bought some round of drinks. Amiel came in, bought a
7  round of drinks. When Kelly -- Kelly Pond came in she
8  round -- bought a round of drinks. So, you know, we all
9  kind of took turns. And probably, you know, no more
10  than half hour after Kelly left -- came in, because she
11  ended up late, I ended up going home.
12    Q. Do you know how many people were there?
13    A. I want to say maybe 10, 12 different people
14  were there.
15    Q. Do you remember who was there?
16    A. No, I don't.
17    Q. Was Amy Gosslin there?
18    A. You said she was.
19    Q. I'm asking you if you remember her being there.
20    A. I -- I believe she was there, yes.
21    Q. Was Amiel there?
22    A. I believe he was there.
23    Q. Do you remember anyone else?
24    A. I don't remember the specifics of who -- who
25  all was there. We had gone there on several other

Page 222

1  occasions.
2    Q. You and whom?
3    A. Amiel or just -- just other members of the
4  Airport Authority, just going down for a drink after
5  work.
6    Q. Was Marie Cole there?
7    A. I don't -- I can't -- I can't tell you whether
8  she was or not.
9    Q. Was Carol there?
10    A. I can't tell you whether she was or not.
11    Q. Jennifer Hamilton?
12    A. I can't tell you whether she was there or not.
13    Q. Is there anything that would refresh your
14  recollection?
15    A. No, a picture if you had one.
16    MS. McDONOUGH: Okay. It's 4:30. We agreed to end
17  the day now. We'll go ahead and conclude today's
18  deposition but we will start tomorrow again at 9:30.
19    THE WITNESS: Okay. In the same room?
20    MS. McDONOUGH: We're going to be actually on the
21  10th floor in the main conference room. So we're just
22  suspending for the day. I'm not finished with your
23  deposition today.
24    We agree that the court reporter will prepare a
25  transcript of today's proceedings. She will send a

Page 223

1  copy -- or the original of the transcript to Ms. Chinn.
2  Ms. Chinn will give it to Mr. Hernandez and he will have
3  30 days to review the transcript and to make any
4  changes, sign it under penalty of perjury.
5    Ms. Chinn agrees to notify our office of
6  Mr. Hernandez's signature of the transcript and to
7  notify us of any changes that are made to the transcript
8  within that 30 day period.
9    In the event that the original transcript is lost
10  or destroyed we agree that a certified copy may be used
11  in lieu thereof. And Ms. Chinn agrees to make the
12  original transcript available at any proceeding upon
13  reasonable notice.
14    MS. CHINN: He'll make the corrections 30 days
15  after the receipt of the transcript. Otherwise, so
16  stipulated.
17    THE VIDEOGRAPHER: Off the record at 4:33.
18    (Whereupon the documents referred to are marked by
19  the reporter as Defense Exhibits 1 through 8 for
20  identification.)
21    (The proceedings concluded at 4:33 p.m.)
22    (Signature on following page.)
23        ***
24
25

Page 224

1    I declare under penalty of perjury under the laws
2  of the State of California that the foregoing is true
3  and correct.
4
5  Executed at _____, California,
6  on _____.
7
8
9
     _____
10           JOSE DE JESUS HERNANDEZ
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

56 (Pages 221 to 224)

53-611 (109)

JOSE DE JESUS HERNANDEZ

Page 225

```
1   STATE OF CALIFORNIA ) ss
2        I, Jennifer K. Winters, CSR 8543, do hereby
3   declare:
4        That, prior to being examined, the witness named in
5   the foregoing deposition was by me duly sworn pursuant
6   to Section 2093(b) and 2094 of the Code of Civil
7   Procedure;
8
9        That said deposition was taken down by me in
10  shorthand at the time and place therein named and
11  thereafter reduced to text under my direction.
12
13       I further declare that I have no interest in the
14  event of the action.
15
16       I declare under penalty of perjury under the laws
17  of the State of California that the foregoing is true
18  and correct.
19
20       WITNESS my hand this _____ day of
21  _____, 2006.
22
23  _____
    Jennifer K. Winters, CSR 8543
24
25
```

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210

53-611 (110)

# Deposition of

# JOSE DE JESUS HERNANDEZ, VOL. II

## HERNANDEZ v. SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

*Taken On*
*December 19, 2006*

Transcript provided by:

# HUTCHINGS℠
## COURT REPORTERS, LLC
CSR #43

GLOBAL LEGAL SERVICES

800.697.3210

Page 226

```
1                    CERTIFIED COPY
2         SUPERIOR COURT OF THE STATE OF CALIFORNIA
3            FOR THE COUNTY OF SAN DIEGO
4
5   JOSE HERNANDEZ,          )
                             )
6        Plaintiff,          )
                             )
7   vs.                      )  No. GIC 871979
                             )
8   SAN DIEGO COUNTY REGIONAL AIRPORT )
    AUTHORITY, a public entity; and  )
9   DOES 1 through 12, inclusive,   )
                             )
10       Defendants.         )
                             )
11   _____)
12
13              VOLUME II
14   DEPOSITION OF JOSE DE JESUS HERNANDEZ, the plaintiff
15   herein, noticed by PAUL, PLEVIN, SULLIVAN &
16   CONNAUGHTON LLP, taken at 401 B Street, 10th
17   Floor, San Diego, California, at 10:10 a.m. on
18   Tuesday, December 19, 2006, before Suzanne M.
19   Soper, CSR 8120.
20
21   Hutchings Number 146567-SD
22
23
24
25
```

Page 228

```
1                    E X H I B I T S
2   Exhibit identification within the transcript is flagged
    with "[EXH]" as an identifier.
3
4   DEFENSE   DESCRIPTION        IDENTIFIED MARKED
5   8  E-mail dated December 13, 2005  231    430
       to Jose Hernandez from
6      Mark McDonald
       [EXH-8]
7
    9  Copy of credit card statement   248    430
8      for Jose Hernandez, Page 2 of 2
       [EXH-9]
9
    10 Copy of check to Jose Hernandez  249    430
10     from Breton K. Lobner for $300
       [EXH-10]
11
    11 Packet of documents, the first  253    430
12     page headed "Sign In Sheet;
       Course Name: Conflict of
13     Interest; Date: 2-4-05"
       [EXH-11]
14
    12 California Form 700 dated       259    430
15     February 4, 2005
       [EXH-12]
16
    13 California Form 700 dated       266    430
17     February 12, 2005
       [EXH-13]
18
    14 Two-page document headed        277    430
19     "Statement Of Economic
       Interests"
20     [EXH-14]
21  15 California Form 700 Schedule D  282    430
       [EXH-15]
22
    16 Memorandum dated November 18,   402    430
23     2003 from Bryan Enarson from
       Airport Operations
24     [EXH-16]
25
```

Page 227

```
1   APPEARANCES OF COUNSEL:
2   For Plaintiff:
3   CATHRYN CHINN, Lawyer
4   3990 Old Town Avenue, Suite A-109
5   San Diego, California 92110
6
7   For Defendants:
8   PAUL, PLEVIN, SULLIVAN & CONNAUGHTON, LLP
9   BY SANDRA L. McDONOUGH
10  401 B Street, Tenth Floor
11  San Diego, California 92101
12
13  Also Present:  JAMES ROBBINS, Videographer
14              AMY GONZALEZ, San Diego County Regional
15              Airport Authority Senior Assistant General
16              Counsel
17
18
19              I N D E X
20  WITNESS:  JOSE DE JESUS HERNANDEZ
21  EXAMINATION BY:              PAGE
22  MS. McDONOUGH               230
23
24
25
```

Page 229

```
1   INDEX (Continued):
2
3   QUESTION MARKED AT THE REQUEST OF MS. CHINN:  302/23
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1 (Pages 226 to 229)

53-611 (112)

Page 230

1     THE VIDEOGRAPHER: This is the beginning of the
2  second volume of the videotaped deposition of Jose
3  Hernandez, beginning at 10:08 a.m. on December 19th,
4  2006.
5     MS. MCDONOUGH: Good morning, Mr. Hernandez.
6     THE WITNESS: Good morning.
7     MS. MCDONOUGH: Would you mind swearing in the
8  witness? Yes.
9     THE REPORTER: Sure.
10
11          JOSE DE JESUS HERNANDEZ,
12  the plaintiff herein, having been sworn, testifies as
13  follows:
14
15          -EXAMINATION-
16
17  BY MS. McDONOUGH:
18     Q. Good morning again.
19     A. Good morning.
20     Q. You understand that you're still under oath,
21  and it's the same oath today as you took yesterday?
22     A. That's correct.
23     Q. And the same ground rules that we discussed
24  yesterday apply today as well. Okay?
25     A. Yes.

Page 231

1     Q. If you need to take a break for any reason,
2  please let me know.
3     And is there any reason why you cannot continue to
4  give your best testimony?
5     A. No.
6     Q. If at any point today you feel that you cannot
7  give your best testimony, please let me know.
8     A. Okay.
9     Q. We'll mark as Exhibit 8 an e-mail from
10  Mark McDonald to you. [EXH-8]
11     A. Mm-hmm.
12     Q. And I'm actually going to mark through
13  something that's on the top. We will redact it before I
14  attach it as an exhibit.
15     Have you ever seen this e-mail before?
16     A. I don't recall.
17     Q. Who is Mark McDonald?
18     A. Mark McDonald is a friend of mine.
19     Q. And he works at First --
20     MS. CHINN: Do you have a --
21     MS. MCDONOUGH:
22     Q. -- American Title?
23     MS. CHINN: -- copy for me?
24     MS. MCDONOUGH: Mm-hmm.
25     MS. CHINN: Thank you.

Page 232

1     THE WITNESS: Yes.
2     MS. CHINN: This is 8?
3     MS. MCDONOUGH: This is 8.
4     Q. And he says, "Korey was wondering if he could
5  get more passes." Do you know who Korey is?
6     A. Korey, I believe, is one of his co-workers.
7     Q. Do you know what passes he's referring to in
8  this e-mail?
9     A. No, I don't.
10     Q. Do you remember responding to this e-mail?
11     A. I don't recall.
12     Q. Have you ever given Mark or Korey passes to
13  anything?
14     A. I don't recall.
15     Q. So you have no idea what this refers to?
16     A. No.
17     Q. Is Mark McDonald still at First American Title?
18     A. Yes, he is.
19     Q. Did Jennifer Hamilton help you plan your wife's
20  birthday party, her 30th birthday party?
21     A. She did at her -- at her request.
22     Q. Did she work on the birthday party during work
23  hours?
24     A. I'm not sure when she worked on it. She had
25  volunteered her time to assist me in working -- or in

Page 233

1  helping plan the party. That's what she wanted to do.
2     Q. Did you ask anyone else to help you plan your
3  wife's 30th birthday party?
4     A. No. I did not ask her. I did not ask her; she
5  volunteered.
6     Q. No. Did you ask Carol to help you?
7     A. I don't recall if I did.
8     Q. How did Jennifer know that you were planning a
9  party for your wife?
10     A. Jennifer and I had occasions to speak on a
11  daily basis, and I had brought up the issue that "Oh,
12  now I" -- "I got to plan a party for my wife for her
13  30th party."
14     She said, "Oh, I'll help you. I like planning
15  parties." In fact, her and I had talked on many
16  occasions where she wanted to go into a meeting plan or
17  event planning. And she thought she was good at it, and
18  she wanted to -- she wanted to help out.
19     Q. What did she want to do to help plan the party?
20     A. She had -- We had worked together to come up
21  with some themes, and she had put some favors together,
22  party favors. She helped -- She kind of helped put it
23  together.
24     Q. Did she create the invitations?
25     A. I don't recall if she did.

2 (Pages 230 to 233)

53-611 (113)

Page 234

1  Q. When did you talk about the themes for the
2  birthday party?
3  A. I don't recall.
4  Q. Was it during work hours?
5  A. Maybe during work hours because that's
6  typically when I would talk to Jennifer.
7  Q. About how long did you spend talking about
8  themes for your --
9  A. Oh --
10  Q. -- wife's birthday party --
11  A. -- probably no more --
12  Q. -- with her?
13  A. -- than a couple minutes.
14  Typically when she would walk in and say "HI" in
15  the morning or during breaks, you know, we would talk
16  about it.
17  Q. What party favors did she put together for your
18  wife's birthday party?
19  A. I don't -- I don't recall.
20  I know that I had given her some money, and she
21  went down to Party City or somewhere and put some stuff
22  together.
23  Q. Do you know if she went to Party City during
24  work hours?
25  A. I'm not sure.

Page 235

1  Q. Did you give her time off to help plan your
2  wife's birthday party?
3  A. I don't believe I did.
4  Q. Did Jennifer Hamilton assist you with any other
5  personal items?
6  A. I don't recall if there was.
7  Q. Do you recall Jennifer Hamilton helping you
8  make a gift certificate for your wife for
9  Valentine's Day?
10  A. I don't recall if I did.
11  Q. Have you ever given your wife a gift
12  certificate for Valentine's Day?
13  A. I don't remember what I gave her last
14  Christmas.
15  Q. Have you ever used Authority vehicles for your
16  own personal use?
17  A. I don't believe I have.
18  Q. Did you ever ask Jeff Simons -- I'm sorry --
19  Simmons to follow you to USA Cab in an Authority
20  vehicle?
21  A. I believe I had asked Jeff on a couple of
22  occasions on his way in to work to pick me up, because
23  he lives off the 5 -- if he can pick me up because I was
24  leaving the car to be serviced.
25  Q. To pick you up from USA Cab?

Page 236

1  A. Yes.
2  Q. Did he ever pick you up in an Authority vehicle
3  from USA --
4  A. I don't --
5  Q. -- Cab?
6  A. -- recall which vehicle there were.
7  A lot of times, if I did, it would be early in the
8  morning where he could pick me up on his way in to work.
9  Q. Do you ever recall a time where Jeff Simmons
10  used an Authority vehicle to pick you up from USA Cab?
11  A. I don't recall specifically when, and if.
12  Q. Have you ever had an Authority vehicle parked
13  at your home?
14  A. Yes.
15  Q. On how many occasions?
16  A. Maybe one or two occasions.
17  The one that comes to mind was during one of
18  Della's barbeques, I had to go --
19  THE REPORTER: You're just slightly left,
20  turning --
21  THE WITNESS: Oh, I'm sorry.
22  THE REPORTER: -- to the left. And if you could
23  just keep your voice up, that --
24  THE WITNESS: Okay.
25  THE REPORTER: -- I would appreciate it.

Page 237

1  THE WITNESS: There was one occasion -- There was
2  one occasion when I took a vehicle home because it was
3  full of hay bales. I had gone out to a feed store in --
4  in the East County full of bales, and then I brought
5  them in. So I went out late at the end of the day, took
6  the hay bales. They were at my house. The next morning
7  drove the car in.
8  MS. MCDONOUGH:
9  Q. Was there any other time that you took an
10  Authority vehicle home at lunchtime?
11  A. I don't recall.
12  Q. Is it possible?
13  A. I don't recall.
14  Q. Did you ever have a business reason to take
15  your Authority vehicle home during lunchtime?
16  A. If -- You know, I -- I don't recall if I did.
17  Q. Did you purchase Poinsettia Bowl tickets for
18  Bret --
19  A. Yes, I did.
20  Q. -- at any point?
21  A. Yes, I did.
22  Q. Where did you obtain those tickets from?
23  A. They were obtained directly from the
24  Poinsettia Bowl box office.
25  Q. Did you pay the full ticket price for those

3 (Pages 234 to 237)

53-611 (114)

Page 238

1  tickets?
2      A. Yes, I did. And receipts were submitted to
3  your office.
4      Q. And did Bret pay you the full ticket price for
5  those tickets?
6      A. That's correct.
7      MS. CHINN: She's talking about Bret Lobner?
8      THE WITNESS: Right, Bret Lobner.
9      MS. MCDONOUGH: "Lobner."
10     Q. Were those tickets tickets that are available
11 to the public?
12     A. No.
13     Q. How did you obtain them?
14     A. I had put in a special call on a request to the
15 Poinsettia Bowl Organizing Committee for access to those
16 tickets.
17     Q. Why do you believe that those tickets are not
18 available to the public?
19     A. Because they were blocked out, and they were
20 booster -- booster alumni -- They were -- They were
21 tickets that would be unavailable for the box office.
22 They were blocked out, blocked-out tickets.
23     Q. But you didn't tell Bret Lobner that they were
24 unavailable to the public?
25     A. I believe I did.

Page 239

1      Q. But not before you purchased the tickets?
2      A. I believe -- I believe when we went through --
3  when we went through the -- the mapping and I was -- and
4  I was told of which tickets were available, we went over
5  and let him know that "These are available. These are
6  good. These are usually set aside just for alumni,
7  alumni boosters, Holiday Bowl Committee."
8      So we went over his options. And he said, "Go
9  ahead and purchase these for me."
10     Q. You specifically told Bret Lobner about the
11 seating chart and the --
12     A. When --
13     Q. -- tickets that were available?
14     A. When we went through, we went over a seating
15 chart that I had printed out. And I don't recall if it
16 was printed out either via email -- on -- on the website
17 or it was printed out off of the -- the map that's in
18 the phone book.
19     Q. Who else was there when you talked to Bret
20 about that?
21     A. The original request had come in from -- from
22 Ted Sexton. I had got a call --
23     THE REPORTER: "From" --
24     THE WITNESS: From Ted Sexton, S-e-x-t-o-n.
25     THE REPORTER: I just couldn't hear you.

Page 240

1      THE WITNESS: I apologize.
2      THE REPORTER: I can't hear you when you turn.
3      THE WITNESS: Okay.
4      THE REPORTER: Sorry.
5      THE WITNESS: I had got -- Ted Sexton -- Ted Sexton
6  was in Bret's office discussing something or other. I'm
7  not sure what it was. Immediately after that meeting,
8  Ted Sexton gave me a call and said, "Could you" --
9  "Could you make some calls and get" -- "and get some
10 good tickets for the counselor?"
11     And I was at the terminals. I came back to the
12 commuter terminal, went upstairs and -- and met with
13 Ted, Bret, in his office, and say, "Okay. What is it
14 you guys want me to do?"
15     "Well, the" -- "the counselor and his family want
16 to go to the game," you know. "Just get them the best
17 tickets you can get. Could you make" -- Specifically
18 from Ted, "Could you make a call to your contacts at the
19 Host Committee and get them some good tickets?"
20     MS. MCDONOUGH:
21     Q. So Ted is the one who asked you to make a call
22 to your contacts?
23     A. That's correct.
24     Q. Bret Lobner never asked you to make a call to
25 your contacts?

Page 241

1      A. The original request came from Ted Sexton to do
2  whatever I could to get him the best tickets possible
3  for that event, him and his family.
4      Q. But Bret Lobner never made a specific request
5  to you to call your contacts to get the tickets?
6      A. The specific request came from Ted Sexton.
7      Q. Just a "yes" or "no."
8      A. Yes.
9      Q. Did Bret Lobner specifically ask you to call
10 your contacts to get tickets for the Holiday --
11     A. Not initially.
12     Q. -- or for the Poinsettia Bowl?
13     A. Not initially, no.
14     Q. Did he ever ask you to call your contacts to
15 get tickets to the Poinsettia Bowl?
16     A. The -- The conversations that were made were
17 just "Try to get me the best tickets available."
18     Q. And that's all he said, was "Try to get me the
19 best tickets available"?
20     A. That's correct.
21     So then I went back to my office. I made a call to
22 the Host Committee and asked them what tickets were
23 available.
24     The Host Committee asked me, "Do you want them for
25 free, or do you not want them for free?"

4 (Pages 238 to 241)

53-611 (115)

HERNANDEZ vs. SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY    December 19, 2006    JOSE DE JESUS HERNANDEZ, VOL. II

Page 242

```
 1    And, you know, went back to the counselor and --
 2  No. Went back to Ted originally and said, "Ted, do you
 3  want the tickets for free or do you not want them for
 4  free?"
 5    He says, "No," you know. "Do whatever you think
 6  you want to do."
 7    So I said -- went back to the Host Committee and
 8  said, "Just tell me which tickets are available."
 9    I printed them out at -- I either printed the map
10  out off the Internet or printed it from the phone book,
11  went back over -- went back over to -- to Bret's office
12  before I purchased the tickets, went over, showed him
13  the map and said, "We either have field level, 50 yards,
14  here," you know, "or in the gold section or the club
15  section up here, 50 yards here. Once again, these
16  tickets are always" -- "or are reserved tickets.
17  They're not available for the public. If you want them,
18  we can get them for you."
19    Q. And you're certain that you told him that
20  these --
21    A. I am certain.
22    Q. Hold on.
23    -- that these tickets were not available to the
24  public?
25    A. I'm certain.
```

Page 243

```
 1    Q. What relationship, if any, did the Authority
 2  have with the Host Committee for the Poinsettia Bowl?
 3    A. There's no relationship.
 4    Q. What was the name of the person that you called
 5  at the -- for the Poinsettia Bowl to get the tickets?
 6    A. I don't remember his last name, but his name is
 7  Mark.
 8    Q. How do you know Mark?
 9    A. Mark -- Mark and I had worked on previous
10  holiday bowls together just helping do some organizing
11  stuff with -- with team arrivals and departures.
12    Q. And the Holiday Bowl sponsors the
13  Poinsettia Bowl; is that correct?
14    A. The Holiday Bowl Committee is the same
15  committee that oversees both bowls.
16    Q. And this was the Holiday -- or I'm sorry -- the
17  Poinsettia Bowl for 2005?
18    A. I believe that was the first Poinsettia Bowl
19  that was put together, yes.
20    MS. CHINN: Can you hear him?
21    MS. MCDONOUGH:
22    Q. And the second one is today.
23    A. Yeah.
24    MS. CHINN: You've really got to pay attention to
25  Suzanne.
```

Page 244

```
 1    THE WITNESS: Okay.
 2    MS. MCDONOUGH: Make a note when she talks to her
 3  client, please. Thanks.
 4    MS. CHINN: Is it better if you turn --
 5    THE REPORTER: Can we go off the record?
 6    MS. CHINN: Yeah.
 7    THE VIDEOGRAPHER: Off the record at 10:23.
 8    (A discussion is held off the record.)
 9    THE VIDEOGRAPHER: Back on the record at 10:25.
10    MS. MCDONOUGH:
11    Q. Let's go back to when you took the map to
12  Bret Lobner and showed him where the seats were.
13    And you testified that Ted was also in the room at
14  that time?
15    A. No.
16    Q. "No."
17    A. "No."
18    Q. It was just you and Bret?
19    A. The -- The initial contact for -- for the
20  tickets had come from Ted. And there was -- you know,
21  lack of a better word -- an initial introduction. "Hey,
22  the counselor wants some tickets for this game. What
23  can you do for him?" He was there at that meeting. The
24  three of them were both -- The three of us were there at
25  that meeting.
```

Page 245

```
 1    I went back, made some calls. It took me a little
 2  bit to get ahold of Mark at the Host Committee. When he
 3  finally came back from -- When I finally made contact
 4  with him, that's what I printed out -- when I printed
 5  out the information, came back and sat down with Bret
 6  before I went and purchased the tickets from -- from the
 7  box office.
 8    Q. Was there anyone else in the room?
 9    A. It was just Bret and myself.
10    Q. How long was that discussion with Bret where
11  you looked at the tickets?
12    A. When we looked at the seating map, probably no
13  more than five minutes.
14    Q. Do you remember if his door was open?
15    A. His door was open.
16    Q. Do you remember if his assistant was sitting
17  out there?
18    A. I don't -- I don't recall if Candy was sitting
19  out at the desk or not.
20    Q. Had you worked with your contact Mark from the
21  Holiday Bowl in connection with the Poinsettia Bowl at
22  all in 2005?
23    A. Yes.
24    Q. What had you worked on with Mark in 2005 in
25  connection with the Poinsettia Bowl?
```

5 (Pages 242 to 245)

53-611 (116)

**Page 246**

1    A.  The only thing we would do with -- with the
2  Poinsettia Bowl was just to work with the committee,
3  just to organize their BFB arrivals.
4    The Host Committee always made it a practice to go
5  out and meet the teams, and he just needed some
6  assistance in -- in coordinating that, not that he
7  couldn't do it by himself, but we had -- we had board
8  members who, as individuals, were part of that Host
9  Committee, and we just wanted to make sure everything
10  was done right.
11    So we -- we -- we would volunteer or I would
12  volunteer to ensure that -- that those -- those events
13  went over right, typically because those team arrivals
14  occurred over the weekend.  So I volunteered my own time
15  to come in and -- and assist them on those.
16    Q.  Did you volunteer your time as an employee of
17  the Authority to assist?
18    A.  I volunteered my time as -- as community
19  service.  "As a community event, I'll go down and help
20  you however" -- "however you think I can."
21    Q.  So not as part of your employment duties with
22  the Authority?
23    A.  No.  It was just a volunteer.  It's a community
24  event, and I just felt, you know, if I can assist in any
25  way possible, I -- I would do so.

**Page 247**

1    Q.  Which board members were on the Host Committee?
2    A.  I believe Xema Jacobsen was part of the Host
3  Committee, and -- and the chairman was -- were part of
4  the Host Committee.
5    Q.  How did you physically obtain the tickets from
6  the Holiday Bowl or Poinsettia Bowl?
7    A.  Once -- Once the decision was made -- was made
8  of which tickets he wanted to purchase, I drove down
9  to -- I then drove down to QUALCOMM stadium and -- and
10  went up to the private ticket office upstairs and met
11  with the ticket manager, which he then pulled them off
12  of hold for me.
13    Q.  So you had already called in advance and put
14  the tickets on hold?
15    A.  That's correct.
16    Q.  And Amiel Porta went with you; is that correct?
17    A.  I believe Amiel Porta and Jennifer Hamilton
18  both had gone with me.
19    Q.  Why did you bring Amiel and Jennifer with you?
20    A.  They were -- They wanted to go get something to
21  eat, I believe.  So we drove out there.  We drove out
22  there, and we just said, "Well, since I got to drive out
23  there, on the way back, we'll just stop and get
24  something to eat."
25    Q.  Did you get any other tickets other than the

**Page 248**

1  ones that you were purchasing for Bret Lobner?
2    A.  No.
3    Q.  How did you pay for the Poinsettia Bowl tickets
4  that you obtained from the ticket manager?
5    A.  I put them on my credit card.
6    Q.  I'll mark as Exhibit 9 a copy of a credit card
7  transaction. [EXH-9]
8    A.  Mm-hmm.
9    Q.  Do you recognize this document?
10    A.  That's correct, yeah.  I do.  This was a
11  document that we provided to your office.
12    Q.  And what is this document that --
13    A.  This --
14    Q.  -- we've marked as Exhibit 9?
15    A.  This is a copy of our credit card statement
16  that we pulled offline showing that -- showing that we
17  had purchased on our credit card -- on my credit card
18  tickets for the Holiday Bowl.
19    Q.  And then we'll mark -- Well, strike that.
20    If you look on transaction date December 2003, it
21  is $300 for the Holiday Bowl.  And that's the $300 that
22  you paid for the tickets for Bret Lobner to go to the
23  Poinsettia Bowl --
24    A.  That's correct.
25    Q.  -- Is that correct?

**Page 249**

1    A.  That's the total price for six tickets.
2    Q.  And then we'll mark as Exhibit 10 a check from
3  Bret Lobner to you dated December 2nd, 2005 in the
4  amount of $300.  [EXH-10]
5    Is this the check that Bret Lobner gave to you to
6  reimburse you for the Poinsettia Bowl tickets?
7    A.  Yes.
8    Q.  And you cashed this check?
9    A.  Yes.
10    Q.  And this check covered the entire cost of the
11  tickets?
12    A.  Yes.
13    Q.  And Bret Lobner paid face value for the
14  tickets?
15    A.  $300.  Yes, ma'am.
16    Q.  That's correct?  "Yes"?
17    A.  Yes.
18    Q.  You mentioned earlier that you were already
19  going down to the stadium to purchase tickets --
20    A.  No.
21    Q.  -- that day?
22    A.  I had no reason.
23    Q.  I thought you said that Ted Sexton offered you
24  to buy tickets for Bret because you said you were
25  already going down there that day.

6 (Pages 246 to 249)

53-611 (117)

Case 3:08-cv-00184-L-CAB    Document 1-10    Filed 01/30/2008    Page 50 of 145

HERNANDEZ vs. SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY    December 19, 2006    JOSE DE JESUS HERNANDEZ, VOL. II

**Page 250**

1  A. I had no reason to go to the stadium that day.
2  Q. Did you go to the Poinsettia Bowl in 2005?
3  A. No, I did not.
4  Q. Did you personally deliver the tickets to
5  Bret —
6  A. Yes, ma'am.
7  Q. — when you returned to the office that day?
8  A. Yes, ma'am.
9  Q. I asked you yesterday regarding buddy passes
10  that you received from Southwest Airlines.
11  A. Yes, ma'am.
12  Q. Do you remember that?
13  A. Yes, ma'am.
14  Q. And you testified that your children received
15  buddy passes to fly to Las Vegas, and you were unsure
16  about whether your wife did. Is that correct?
17  A. That's correct.
18  Q. Do you recall telling investigators, in
19  December 2005, that you used a buddy pass from
20  Mike Parrish to fly to Las Vegas to attend a female's
21  30th birthday party?
22  A. I — I don't recall.
23  Q. Did you ever fly to Las Vegas for just one day
24  to attend a female's 30th birthday party?
25  A. I did. But I don't recall how it is that —

**Page 251**

1  that — that I got there.
2  Q. Who's birthday party was that?
3  A. This is a friend of ours from Orange County,
4  Danielle Kenney.
5  Q. When was her birthday?
6  A. I don't — I — I don't recall.
7  Q. Do you have her contact information?
8  A. No, I don't. They've moved. They've moved
9  from the area.
10  Q. Do you know where she lives now?
11  A. No.
12  Q. Where did she used to live?
13  A. Used to live in Orange County.
14  Q. Do you know where in Orange County?
15  MS. CHINN: I'll object to this entire line of
16  questioning and ask the Court to strike it.
17  MS. MCDONOUGH: What's the basis for the objection?
18  MS. CHINN: It's not relevant. It has nothing to
19  do with this case.
20  If you want to talk about the buddy passes, that's
21  fine. But the identity of this woman, I think it
22  invades her third-party privacy.
23  MS. MCDONOUGH: I'm just trying to figure out when
24  he went to Las Vegas, if he could remember when he went
25  there.

**Page 252**

1  MS. CHINN: Well, you don't need to know this
2  woman's identity and her address and where she lives.
3  MS. MCDONOUGH:
4  Q. If you had purchased the ticket to fly to
5  Las Vegas for Danielle's birthday party, would that
6  purchase have been on your credit card?
7  A. No.
8  Q. How would you --
9  A. It could --
10  Q. — have paid for it?
11  A. It could have either been cash or -- or credit
12  card.
13  Q. Have you ever paid cash for an airline ticket?
14  A. Yes.
15  Q. And you pay cash by going to the ticket counter
16  at the airport?
17  A. Yes.
18  MS. CHINN: Let's go off the record, please. I
19  want to talk to my client.
20  THE VIDEOGRAPHER: Off the record. The time is
21  10:35.
22  (The witness and his counsel confer off the
23  record.)
24  THE VIDEOGRAPHER: Back on the record at 10:37.
25  MS. MCDONOUGH:

**Page 253**

1  Q. Do you remember telling the investigators in
2  December 2005 that you used a buddy pass to fly to
3  Las Vegas for Danielle's birthday party?
4  A. I don't recall. I know that during my
5  conversations with -- with the investigators, there was
6  a lot of insinuations on what I may or may not have
7  done.
8  MS. MCDONOUGH: Strike everything after "I don't
9  recall."
10  Q. Did you ever attend a conflict-of-interest
11  training while you were employed at the Authority?
12  A. I may have.
13  Q. Mark as Exhibit 11 a large packet of
14  information that starts with a sign-in sheet for a
15  course named "Conflict of Interest" dated February 4th,
16  2005. [EXH-11]
17  I'll turn to the third page, which is labeled
18  SDRAA 878.
19  A. Mm-hmm.
20  Q. At the top of that piece of paper, it has your
21  name, Jose Hernandez, a signature, "Landside," and
22  "2690."
23  Do you see that?
24  A. Yes.
25  Q. Was that your writing?

7 (Pages 250 to 253)

Page 254

1    A.  Yes.
2    Q.  Is that your signature?
3    A.  Yes.
4    Q.  Does this document refresh your recollection of
5  a conflict-of-interest training in February 2005?
6    A.  It -- If it's -- If it's here and I signed for
7  it, then I -- yes.
8    Q.  And on the next --
9    MS. CHINN:  I'll object.  It's vague and ambiguous
10  as to "conflict-of-interest training."
11    MS. MCDONOUGH:
12    Q.  On the fourth page --
13  We're still on that --
14    A.  Oh --
15    Q.  -- document.
16    A.  -- I'm sorry.
17    Q.  You can just leave it out.
18  On the fourth page, which is marked SDRAA 879,
19  there's a memorandum dated February 3rd, 2005.
20  Did you receive this memorandum?
21    A.  I don't recall.
22    Q.  Turning to page SDRAA 886 -- and it continues
23  through 895 -- do you recall receiving this handout
24  regarding your duty to file?
25    A.  I -- I don't recall.

Page 255

1    Q.  Have you ever seen this document before?
2    A.  Yes, I have.
3    Q.  When did you first --
4    A.  This --
5    Q.  -- see it?
6    A.  -- particular document here?
7    Q.  Yes.
8    A.  Yeah, I've seen -- I've seen this one before.
9    Q.  Okay.
10  When was the first time you received this?
11    A.  We had -- I believe back when I was with the
12  Port District, but I -- but specifically I don't recall.
13    Q.  So dating back to 2001 or 2002?
14    A.  Yeah.  But there was -- there was a certain
15  period of time that we were -- we were not required to
16  file these documents.
17    Q.  When were you first required to file a
18  conflict-of-interest form?
19    A.  I don't -- I don't recall specifically.
20    Q.  Then --
21  We're not done with that document yet.
22    A.  Okay.
23  No, no.  I'm just putting it to the side.
24    Q.  I still want you to look at it.
25    A.  Okay.  Which page?

Page 256

1    Q.  SDRAA 896 --
2    A.  Okay.
3    Q.  -- through 910.
4    A.  Okay.
5    Q.  This is a copy of a PowerPoint presentation.  I
6  want you to look at it and tell me if you recall seeing
7  this presentation or receiving a copy of the handout.
8    A.  I don't -- I don't recall.  I don't recall.
9  This was over two years ago.
10    Q.  How do you know it was over two years ago?
11    A.  The date was 200- -- 2- -- February 4th, 2005.
12    Q.  Oh, you're just referring to the date of the --
13    A.  That's right.
14    Q.  -- conflict-of-interest --
15    A.  So I --
16    Q.  -- training?
17    A.  -- don't remember.
18    Q.  Please wait till I finish my question.
19  Then look --
20    MS. CHINN:  Were you finished with your answer?
21    THE WITNESS:  Yeah.  I don't recall.
22    MS. MCDONOUGH:
23    Q.  Look at SDRAA 911 through the end.  It's
24  entitled "Form 700, Statement of Economic Interests."
25  Have you ever received this publication?

Page 257

1    A.  I believe I have.  Yes, I have.
2    Q.  When did you first receive it?
3    A.  I don't recall specifically when I received it
4  first.
5    Q.  When you became director at the Authority, you
6  were required to start filling out these Form 700s;
7  correct?
8    A.  I -- I -- I don't recall if I --
9    Q.  Do you have any recollection of ever filling
10  out a Form 700?
11    A.  I believe I filled it out on several occasions,
12  yes, ma'am, specifically when -- when my employment with
13  the Airport Authority was terminated.
14    Q.  And you filled these forms out right at the
15  beginning of the year; is that correct?
16    A.  I don't -- I don't exactly remember when --
17  when they were due.
18    Q.  What were you required to put on the form?
19    MS. CHINN:  Objection.
20    THE WITNESS:  I don't -- I don't recall.
21    MS. CHINN:  It calls for speculation, lack of
22  foundation.
23    MS. MCDONOUGH:
24    Q.  Did anyone ever tell you what you were required
25  to put on Form 700?

8 (Pages 254 to 257)

53-611 (119)

HERNANDEZ vs. SAN DIEGO COUNTY REGIONAL AIRPOR⸱ ⸱HORITY    December 19, 2006    JOSE DE JESUS HERNANDEZ, VOL. II

Page 258

1   A. I don't -- I don't -- I don't remember what --
2   what someone may have told me or not told me.
3   Q. Do you have any understanding of what you were
4   required to report on Form 700?
5   A. I don't -- I'm going to say I -- I don't
6   remember at this time.
7   Q. Did you ever have an understanding of what you
8   were required to report on Form 700?
9   A. My understanding was at -- at -- that I was
10  required to fill that and submit it at certain times.
11  But we would get a memo saying, "This is when you're" --
12  "The forms are" -- "are to be submitted on these days."
13  Q. And a memo like the one we looked at dated
14  February 3rd, 2005?
15  A. I'm not sure if that's the -- the same one, but
16  we would get a memo, yes, ma'am.
17  Q. Something like that, at least?
18  A. Something like that.
19  Q. And it would tell you that you need to fill out
20  this form?
21  A. That's correct.
22  Q. And was there somebody you could go to at the
23  Authority if you needed help filling out the form?
24  A. I don't recall.
25  Q. Was there anyone that you ever went to at the

Page 259

1   Authority to ask questions about the form?
2   A. I don't recall if I did.
3   Q. All right.
4   We'll mark as Exhibit 12 a California Form 700
5   dated February 4th, 2005. [EXH-12]
6   A. Okay.
7   Q. And it says "received" on February 9th, 2005 on
8   the top.
9   Have you ever seen this document before?
10  A. I see my signature in it, so, yes.
11  Q. Did you fill out this form?
12  A. I believe I did.
13  Q. Did you fill it out in approximately
14  February 2005?
15  A. It shows -- shows a date February 4th, 2005 and
16  my signature.
17  Q. So you believe you filled it out sometime in
18  that time frame?
19  A. That's correct. I believe I did.
20  Q. What is your understanding of what this form
21  means?
22  MS. CHINN: Objection. It's vague and ambiguous.
23  MS. MCDONOUGH:
24  Q. Do you know why you had to fill out this form?
25  A. I believe we were -- I believe the document was

Page 260

1   just to make some public disclosures of -- of gifts or
2   things I may have received.
3   Q. What did you believe that you needed to
4   disclose?
5   A. You know, at this time specifically I don't
6   remember. I'd have to go back and read -- read the
7   documentation.
8   Q. Okay. Go ahead and read it.
9   MS. CHINN: What documentation are we referring to?
10  Some other document in this case, Jose? What are you
11  looking at?
12  MS. MCDONOUGH: Let the --
13  THE WITNESS: No. I'm just looking at --
14  MS. MCDONOUGH: -- record reflect --
15  THE WITNESS: -- the memo.
16  MS. MCDONOUGH: -- he's looking at Exhibit 11, page
17  SDRAA 879.
18  THE WITNESS: Okay.
19  MS. MCDONOUGH:
20  Q. Have you had an opportunity to look at
21  Exhibit 11 to refresh your recollection?
22  A. Correct.
23  In looking at SDRAA 903, I believe it shows two --
24  two areas of what should be reported.
25  Q. Are those the only two areas that you believe

Page 261

1   you needed to report?
2   A. That's the ones I see as needed to be reported
3   and being from this -- from this PowerPoint
4   presentation.
5   Q. From the PowerPoint. And that's it?
6   A. That's what it says what should be reported,
7   and that's the only page that's on here.
8   Q. What do you believe that SDRAA 905 is telling
9   you?
10  A. It's telling me "Report investments" --
11  Q. 905.
12  A. Oh, 905?
13  MS. CHINN: Don't read it from the document.
14  MS. MCDONOUGH:
15  Q. I'm just asking for your understanding of it.
16  A. Okay.
17  It just says "Category 1. All investments,
18  business position, interests in real" --
19  MS. CHINN: Don't --
20  THE WITNESS: -- "property" --
21  MS. CHINN: -- read it from the document.
22  THE WITNESS: Question.
23  MS. CHINN: The question was: What was your
24  understanding?
25  THE WITNESS: It was just my understanding if I

9 (Pages 258 to 261)

Page 262

1    had -- you know, if there was any just possibilities
2    of -- of conflicts of interest, I should disclose them.
3         MS. MCDONOUGH: Okay.
4         Q. And these are -- 905 through 908 list the
5    various categories of things that need to be disclosed?
6         MS. CHINN: Don't read from the document.
7    The document speaks for itself.
8         THE WITNESS: Okay.
9         Yeah. In looking at the document now, I believe
10   that's what it says, "Disclosure Categories."
11        MS. MCDONOUGH:
12        Q. So those categories that are listed, 905
13   through 908, are the categories of income or investments
14   that you need to disclose?
15        MS. CHINN: Objection. The document speaks for
16   itself.
17        She can ask you what your understanding is but not
18   to read the document into the record.
19        THE WITNESS: Okay.
20        It was my understanding that any areas of economic
21   interest maybe of those categories, that I would have to
22   disclose them in there, in the --
23        MS. MCDONOUGH:
24        Q. So --
25        A. -- documentation.

Page 263

1         Q. -- you would have to disclose any income or
2    gifts that you received from anyone doing business with
3    the Authority?
4         MS. CHINN: Objection as to "any."
5         THE WITNESS: I -- I'm not sure.
6         MS. MCDONOUGH:
7         Q. What did you think you had to report?
8         A. I'm -- I'm not sure what I had to report
9    exactly.
10        Q. Did you think it was your duty to at least find
11   out what you had to report?
12        A. Um, I'm not sure.
13        Q. You have no understanding right now as we sit
14   here today on what you had to report?
15        A. I have a vague understanding.
16        Q. What is your vague understanding?
17        A. A vague understanding of, you know, disclosure
18   of economic interest, in looking at it, of which I know
19   that I have filled out a couple of documentations and
20   submitted them.
21        Q. How did you know what to put on the forms that
22   you --
23        MS. CHINN: Objection.
24        MS. MCDONOUGH:
25        Q. -- submitted?

Page 264

1         MS. CHINN: The form speaks for itself.
2         THE WITNESS: You have the forms there, and you
3    have the forms there (Indicating).
4         MS. MCDONOUGH:
5         Q. How did you know what to put on the forms?
6         A. They were just an educated guess.
7         Q. And what was your guess as to what should be on
8    the forms?
9         MS. CHINN: Objection.
10        THE WITNESS: Just --
11        MS. CHINN: This is argumentative.
12        MS. MCDONOUGH: I'm just trying to understand --
13        MS. CHINN: No, you're not.
14        MS. MCDONOUGH: -- how he'd know --
15        MS. CHINN: No. I don't --
16        Q. What was -- Why do you --
17        MS. CHINN: Let's leave.
18        Off the record.
19        Every time you do that to him, we will be leaving.
20        Come on. I want to talk to you.
21        MS. MCDONOUGH: Okay.
22        MS. CHINN: Every time you're rude, we will leave.
23   Every time you smirk or you roll your
24   eyes at him -- We're not going to do that today.
25        THE VIDEOGRAPHER: Off the record at 10:52.

Page 265

1         (A recess is taken.)
2         THE VIDEOGRAPHER: Back on the record at 10:55.
3         MS. MCDONOUGH:
4         Q. What is your understanding of what items needed
5    to be disclosed on Exhibit 12?
6         A. Okay. Um, the -- To the best of my ability,
7    any items that I may have received had to be disclosed.
8         I filled out the document to the best of my
9    ability. And if I needed to go back and amend it, I
10   would amend it at a future time.
11        Q. Any items that you had received from whom?
12        A. I believe from individuals doing business with
13   the Airport Authority.
14        Q. And was the reporting period for the year
15   leading up to -- Strike that.
16        For Exhibit 12, was the reporting period 2004?
17        A. I'm not sure. I just remember receiving a
18   document and having to fill it out and -- and submitting
19   it back to Tony Russell.
20        Q. Did you ever fill out another Form 700?
21        A. I believe I had submitted another Form 700
22   as -- as a requirement once I left employment from the
23   Airport Authority, correct.
24        THE REPORTER: Once you left the what?
25        THE WITNESS: Employment at the Airport Authority.

10 (Pages 262 to 265)

53-611 (121)

Page 266

1    MS. MCDONOUGH: We'll mark as Exhibit 13 a document
2    dated February 12th, 2006. [EXH-13] .
3    MS. CHINN: Two pages?
4    MS. MCDONOUGH: Yes.
5    Q. Have you ever seen this document before?
6    A. Yes, ma'am.
7    Q. And do these two pages go together?
8    A. I believe they do.
9    Q. Did you fill out this form on or about
10   February 12th, 2006?
11   A. Yes. The -- The signature shows that I did.
12   Q. Is that your signature on the bottom?
13   A. That's correct.
14   Q. Did anyone assist you, other than your
15   attorney, in filling out this form?
16   MS. CHINN: Objection. It assumes facts not in
17   evidence.
18   THE WITNESS: I believe in consultation with my
19   attorney, we filled out the documentation.
20   MS. MCDONOUGH:
21   Q. Did you consult any publications or other
22   documents to assist you in preparing this Form 700?
23   A. I don't recall.
24   Q. Do you recall consulting any documents or other
25   publications in filling out Exhibit 12?

Page 267

1    A. I don't recall.
2    Q. If you look on what we've just marked as
3    Exhibit 13, the box "Schedule D" is checked.
4    A. Schedule B or Schedule D?
5    Q. Schedule D as in "dog."
6    A. Okay.
7    Q. Is that correct?
8    A. That's correct.
9    Q. And then on the second page is a Schedule D?
10   A. That's correct.
11   Q. And you're disclosing here that in
12   December 2004, you received Charger football tickets
13   from Ace Parking with a value of $600; is that correct?
14   A. That's correct. At the -- I submitted this
15   information because there was, um -- During my exit
16   interview with Ted Sexton, he strongly recommended that
17   when I filled out this information, that I should put
18   that information on there.
19   Q. Do you know why he recommended that?
20   A. You know, because, as he said, there would be
21   people looking at that documenta- -- documentation are
22   sure that that was on there. Whether I -- I thought it
23   was right or not, people would be looking to make sure
24   that I filled this documentation and submitted it in a
25   timely manner.

Page 268

1    Q. Did you think that you needed to disclose these
2    tickets that you received from Ace Parking?
3    A. I don't believe so because the Airport
4    Authority does not have a direct service agreement with
5    Ace Parking.
6    Q. So you only filled out this Schedule D because
7    Ted Sexton told you you should?
8    A. He was -- It was not only strongly recommended,
9    but it was -- yeah, he was -- he was pretty poignant in
10   what he said on that. I should submit it; I should put
11   it down; and there would be people looking at it to
12   ensure that I submitted and put this information on this
13   documentation.
14   Q. But this is true that you received these
15   football tickets from Ace Parking in December 2004;
16   correct?
17   A. I -- What I did was I put -- I put information
18   on here that -- whether right, wrong or indifferent,
19   that it was -- I was told to put it on here; otherwise
20   there would be ramifications if I didn't.
21   Q. Did Ted Sexton tell you what the ramifications
22   would be if you didn't put it on there?
23   A. I didn't need to ask him, not in the context of
24   how he -- how he gave me that information or how he --
25   he said I should do it.

Page 269

1    So, you know, once again, if it -- if it's -- if
2    it's inappropriate or it's something that needs to be
3    amended, I'll just amend it at a different time.
4    Q. What was --
5    A. I --
6    Q. -- your understanding of what --
7    MS. CHINN: Hey.
8    MS. MCDONOUGH:
9    Q. -- the --
10   MS. CHINN: Don't cut him off.
11   What was the end of the answer?
12   THE WITNESS: The end of -- The end?
13   MS. MCDONOUGH: Would you like Suzanne to read the
14   answer back?
15   THE WITNESS: Please.
16   (The answer is read by the reporter.)
17   MS. MCDONOUGH: Thank you.
18   Q. Is there anything else that you need to add to
19   that response?
20   A. Not at this time.
21   Q. What was your understanding of what the
22   ramifications would be if you didn't put the Ace Parking
23   items on the Schedule D?
24   A. I never asked. In the context of how
25   Ted Sexton made that statement, it was -- It was pretty

11 (Pages 266 to 269)

53-611 (122)

Page 270

1    clear to perceive what would happen.
2        Q.  And what would happen?
3        A.  That there would be -- That -- That there would
4    be legal ramifications whether I did it or not, whether
5    I believed it was right or wrong.  It was more of
6    intimidating threat that I should fill it out and I
7    should put that information on there.
8        Q.  Did you have an understanding of what the legal
9    ramifications would be if you didn't put the information
10   on the form?
11       A.  I believe it had more to do with not only legal
12   ramifications but also as a -- as an intimidation tactic
13   that I had to put that information on there.
14       Q.  And you believe that Ted Sexton was the one
15   trying to intimidate you?
16       A.  I believe that -- that he was passing on
17   information that he believed -- I believe he was
18   speaking on behalf of the Airport Authority, not him as
19   an individual.
20       Q.  Is there anyone specifically that you believe
21   he was speaking on behalf of?
22       A.  No.  He said there were people looking --
23   looking to ensure that I submitted this information.
24       Q.  Did you understand who he was referring to when
25   he said there would be people?

Page 271

1        A.  People -- People, I'm sure in -- in the VP
2    level, vice president.
3        THE REPORTER:  Got that.
4        MS. MCDONOUGH:
5        Q.  And the vice president level would be
6    Bryan Enarson or Vernon Evans?
7        A.  He -- Once again, he just said -- We did not go
8    into details; he didn't share specific names with me.
9    But he said there would be people within the
10   organization making sure that I submitted this
11   documentation.
12       Q.  So you don't know who he was referring to?
13       A.  No.  But he was rather quite poignant on -- on
14   ensuring that he had made that statement.
15       Q.  Did you know, in December 2004, that
16   Maurice Gray was trying to have Ace Parking come in and
17   take over the LPI contract?
18       MS. CHINN:  Objection.  It lacks a foundation.  It
19   calls for speculation.  It's vague and ambiguous.  It's
20   overbroad.
21       THE WITNESS:  Could you be more specific, tell
22   me -- tell me what your question is?
23       MS. MCDONOUGH:
24       Q.  You testified yesterday that at some point in
25   time -- and I believe you said in late 2004, early

Page 272

1    2005 -- that Ace Parking was working with Maurice Gray
2    and trying to figure out if they could take over the
3    parking contract and have Maurice Gray step down from
4    LPI.
5        A.  Not Ace Parking but Scott Jones as an
6    individual buying the shares for Maurice Gray.  There's
7    a clear distinction that it's -- this contract is not
8    with Ace Parking; it is with Scott Jones as a
9    individual.
10       Q.  And did you know, in December of 2004, that
11   Scott Jones and Maurice Gray were talking about
12   Scott Jones taking over the contract with the Authority?
13       MS. CHINN:  Objection.
14       THE WITNESS:  I'm not --
15       MS. CHINN:  Answer it if you can.
16       THE WITNESS:  -- sure what their conversations may
17   have been.
18       I apologize.
19       Not sure what their conversations may have been.  I
20   do recall a letter being sent to -- directly to the
21   counselor.
22       MS. CHINN:  There's no question pending.  You said
23   you don't recall.
24       THE WITNESS:  Okay.
25       MS. MCDONOUGH:

Page 273

1        Q.  Did you know, in December of 2004, that there
2    were talks about Scott Jones taking over the contract?
3        A.  I don't recall.
4        Q.  When did you first become aware of that?
5        A.  I don't -- I don't remember specifically what
6    days -- what days those were.
7        Q.  Is there anything that would refresh your
8    recollection?
9        A.  No.
10       Q.  How about the letter that you just referred to?
11       A.  It was pretty close to whenever that letter was
12   submitted.
13       MS. MCDONOUGH:  We'll take a quick break.
14       THE VIDEOGRAPHER:  Off the record at 11:05.
15       (A recess is taken.)
16       THE VIDEOGRAPHER:  Back on the record at 11:14.
17       MS. MCDONOUGH:
18       Q.  Is there any reason why you cannot continue to
19   give your best testimony?
20       A.  No.
21       Q.  Looking at Exhibit 13, what period of time did
22   you believe that this form covered?
23       A.  I believe this period of time covered through
24   the end of my employment with the Airport Authority.
25       Q.  If you look under Box 3 where it says "Type of

12 (Pages 270 to 273)

53-611 (123)

Page 274

1  Statement" on the first page -- and it says right under
2  where you've dated February 7th, 2006 --
3      A. Uh-huh.
4      Q. -- it says, "The period covered is January 1st,
5  2005, through the date of leaving office."
6      Is that the period that you believe you were
7  covering with this form?
8      A. I -- I filled it out just leaving office.
9  That's why I never checked any other one. It was just
10 the assumption that I would be leaving office on that
11 day, tried to cover whatever I could before that.
12     Q. And did you know that you were supposed to
13 report this Ace Parking item on the prior year's form?
14     A. I didn't believe I had to report it.
15     Q. But generally everything is reported right
16 after the year concludes; correct?
17     A. Once again, I'd have to refer to the memo. The
18 memo would say it would cover this period to this
19 period.
20     Q. You can look at the memo if you'd like.
21     A. Yeah.
22     I -- I -- When I received this, I received this
23 during my exit, and there was no memo attached to this
24 particular one.
25     Q. Okay.

Page 275

1      But I'm asking about your understanding in general
2  of Form 700s and what period they cover.
3      A. Should cover some sort of year period.
4      Q. A one-year period?
5      A. Uh-huh.
6      Q. "Yes"?
7      A. Yes.
8      Q. And the preceding year?
9      So if you fill it out in the beginning of, for
10 instance, 2005, then you're looking back at 2004 and the
11 income or gifts that you received in that time period?
12     A. I would guess so.
13     Q. Is that a "yes"?
14     A. I would guess so.
15     Q. Do you have any understanding of that?
16     A. Once again, I would guess -- I would guess
17 would be the case.
18     Q. Is there anything that would refresh your
19 recollection as to whether it is the case?
20     A. No.
21     Q. Even if you looked at the memo?
22     A. Yeah. I just -- The -- The -- I would guess
23 that it would cover the year period leading to that.
24     Q. Please look at the memo that's in Exhibit 11
25 and see if that refreshes your recollection, or any of

Page 276

1  the other publications that are contained in Exhibit 11.
2      MS. CHINN: I'm going to make a continuing
3  objection to this line of questioning on the basis that
4  it calls for a legal conclusion. The instructions on
5  this are statutory regulations, and he's not expected to
6  know them by heart.
7      THE WITNESS: Okay.
8      MS. MCDONOUGH:
9      Q. Do you have any understanding of the time
10 period that's covered by the form?
11     A. There's -- There is -- The only thing I can
12 read is on that -- the second box down, it says "the
13 period covering" --
14     MS. CHINN: Don't read from the document.
15     THE WITNESS: It -- It --
16     MS. CHINN: The document --
17     THE WITNESS: -- should cover --
18     MS. CHINN: -- speaks --
19     THE WITNESS: -- a year.
20     MS. CHINN: Objection. The document speaks for
21 itself.
22     MS. MCDONOUGH:
23     Q. Go ahead.
24     A. Looking at the memo, it does not refer to a
25 specific period that it covers --

Page 277

1      Q. Okay.
2      A. -- in there. So it -- the assumption is just
3  that it covers through the date that I left office.
4      MS. MCDONOUGH: I'm going to mark as Exhibit 14 a
5  Statement of Economic Interests dated April 21st,
6  2006. [EXH-14]
7      MS. CHINN: This is 14?
8      MS. MCDONOUGH: Yes.
9      MS. CHINN: Two pages?
10     MS. MCDONOUGH: Yes.
11     Q. Do these two pages go together?
12     A. Yes, they do.
13     Q. Did you fill out this form on or about
14 April 21st, 2006?
15     A. Yes.
16     Q. Did you send this document anywhere?
17     A. I believe it was submitted to -- to the
18 appropriate agency, back -- back to the Airport
19 Authority.
20     Q. Why did you fill out this form?
21     A. Once again, at the advice of my attorney, she
22 recommended, after we had that conversation regarding my
23 conversation with Ted Sexton --
24     MS. CHINN: Wait a minute. Do not -- Do not
25 disclose the content or substance of any conversation

13 (Pages 274 to 277)

53-611 (124)

HERNANDEZ vs. SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY    December 19, 2006    JOSE DE JESUS HERNANDEZ, VOL. II

Page 278

1  with your attorney.
2      THE WITNESS:  Okay.
3      MS. CHINN:  Just answer her questions without
4  reference --
5      THE WITNESS:  Okay.
6      MS. CHINN:  -- to that.
7      MS. McDONOUGH:
8      Q.  Why did you wait until April 21st, 2006?
9      A.  We -- I waited for this period because I wanted
10  to make sure that anything that I thought that may or
11  may not be covered was in there, and if I had to go back
12  and amend it at a different time because I did not
13  believe it -- it should have been covered in there,
14  that -- that it was -- that it was covered.
15      A lot of this -- My reason for submitting it again
16  were, once again, threats or intimidations from not only
17  Ted but the investigators who came out and talked to me.
18      Q.  Did you ever speak to Ted about the Form 700
19  after your exit interview?
20      A.  Not -- Not after the exit -- I -- I have yet to
21  speak to him once since I've left.
22      Q.  So the last time that you spoke to Ted was
23  during your exit interview?
24      A.  As we both walked out to my car and I was
25  leaving.

Page 279

1      Q.  And you just testified that you filled out this
2  form in April of 2006 because of the threats or
3  intimidations that you felt from Ted Sexton?  Is that
4  correct?
5      A.  Still from there, residual --
6      Q.  So it's --
7      A.  -- from there.
8      Q.  -- from the February conversation that you had
9  with him?
10      A.  Residual from there and then going through
11  and -- and, you know, looking back at the context of
12  some of the -- the questions and comments from the
13  investigators.
14      Q.  What did you look at when you said you were
15  looking back at the comments from the investigators?
16      A.  In looking -- In looking back at what was said
17  during those times, I thought it was just in my best
18  interest or -- in my best interest that I submit it.
19  And if it -- If it happens I didn't have to submit it or
20  to disclose it, I would just submit it at a different
21  time.
22      Q.  And that's your signature on the bottom of the
23  first page --
24      A.  That's correct.
25      Q.  -- of Exhibit 14?

Page 280

1      On the second page you've listed two items.  The
2  first is "Hawaiian Airlines airline tickets, space
3  available passes, standby use only"; is that correct?
4      A.  That's correct.
5      Q.  And are those the four tickets that your family
6  received from Janet Nix that you testified about
7  yesterday?
8      A.  That's correct.
9      Q.  And you received those in May of 2004?
10      A.  That's correct.
11      Q.  And at the time you received those, you
12  understood that Hawaiian Airlines was doing business
13  with the Authority; correct?
14      A.  That's correct.
15      Q.  Why didn't you report this Hawaiian Airlines
16  standby tickets on the prior year's Form 700?
17      A.  It was my understanding that I was not required
18  to do so because they had no value to it, zero value.
19  And that's how it's submitted on each one of these
20  items, as zero value.
21      Q.  Where did you obtain the understanding that you
22  did not have to report the standby tickets?
23      A.  It's my understanding that space -- space
24  available tickets have -- carry no value whatsoever to
25  them, so there's -- there -- there would be no reason on

Page 281

1  my part to disclose things that -- that are really --
2  carry no value to them.
3      Q.  Did anyone ever tell you that you did not have
4  to report standby or non-revenue tickets?
5      A.  I don't -- I don't recall.
6      Q.  And then you listed "Southwest Airlines, 2004,
7  airline tickets, buddy passes, standby use only."
8      Are those the tickets that we've already discussed
9  from Mike Parrish?
10      A.  For -- Yes, for my children.
11      Q.  And it says "CY 2004"?
12      A.  It's somewhere in between calendar year 2004,
13  somewhere.
14      Q.  So "CY" means "calendar year"?
15      A.  Yes, ma'am.
16      Q.  And is there a reason why you didn't report the
17  Southwest Airlines on the prior form?
18      A.  Once again, they carry no value whatsoever.
19      Q.  But you did use these tickets that are listed
20  here to fly somewhere, or your family did; correct?
21      A.  My children went -- flew back to -- to spend a
22  couple days with Mike Parrish's kids, correct.
23      Q.  And they didn't pay anything for the flight?
24      A.  I believe, if they -- if they used the buddy
25  passes, they would -- they would have no value, and they

14 (Pages 278 to 281)

Page 282

1   would not have paid.
2       Q. And the same thing for Hawaiian Airlines that
3   your family used the four tickets to fly to Hawaii and
4   back; correct?
5       A. Yes.
6       Q. And you didn't pay for the flight at all;
7   correct?
8       A. No.
9       Q. And you understood at the time that your
10  children used the Southwest buddy passes that Southwest
11  Airlines was doing business with the Authority; correct?
12      A. That's correct.
13      Q. We'll mark as Exhibit 15 another Schedule D
14  that was by itself in the documents that you produced,
15  so I'm not sure if you submitted this or not. [EXH-15]
16      Have you ever seen this document before?
17      MS. CHINN: There has got to be a second page to
18  this because this is all not signed.
19      Do you have the second page?
20      MS. MCDONOUGH: This is all I received.
21      MS. CHINN: Did we give you this?
22      MS. MCDONOUGH: Yes.
23      We can go off the record briefly and talk about it.
24      THE VIDEOGRAPHER: Off the record at 11:24.
25      (A discussion is held off the record.)

Page 283

1       THE VIDEOGRAPHER: Back on the record at 11:25.
2       MS. MCDONOUGH:
3       Q. As I previously indicated, I received --
4       MS. MCDONOUGH:
5       Q. -- this document --
6       Bless you.
7       MS. GONZALEZ: Thank you.
8       MS. MCDONOUGH:
9       Q. -- as a stand-alone document in documents
10  produced by your counsel, so I'll ask you some questions
11  about it. Okay?
12      A. Okay.
13      Q. Have you ever seen what we have just marked as
14  Exhibit 15?
15      A. Yes. It's in my writing.
16      Q. Did you fill out this form?
17      A. Yes, I did.
18      Q. Do you know when you filled it out?
19      A. I don't recall exactly when I filled it out.
20      Q. Do you know if you ever submitted this form to
21  the Authority or to the Fair Practices Commission?
22      A. I -- I believe if I filled it out, it was
23  submitted, correct.
24      Q. When do you believe you submitted it?
25      A. Don't recall.

Page 284

1       Q. In the upper left-hand corner, it says "Ace
2   Parking, San Diego, Parking Management," and has "Padre
3   ticket," "golf" and "lunch" listed.
4       A. That's correct.
5       Q. Are these all items that you received from
6   Ace Parking?
7       A. These -- This list and this compilation once
8   again was a follow-up, is my recollection, to everything
9   that Ted had requested that I put in there because
10  people would be looking for this there. So where
11  there -- Yeah. I just thought at that particular time
12  when I filled it out, it's just -- I'll just put it all
13  out there, and if I need to amend it, I'll do it later.
14  I still stand by that to this day that, you know, most
15  of these should not have been disclosed.
16      Q. So does that refresh your recollection that
17  this form was filled out after your exit interview?
18      A. Yes, ma'am.
19      Q. So sometime after February 2006?
20      A. Yes, ma'am.
21      Q. February 7, 2006?
22      MS. CHINN: Would you read back the answer about
23  the list, please.
24      (The answer is read by the reporter.)
25      MS. CHINN: Thank you.

Page 285

1       MS. MCDONOUGH:
2       Q. Under "Ace Parking," it says $275 for Padre
3   tickets.
4       Is there a reason that you didn't put the date for
5   those Padre tickets?
6       A. Because I don't remember the dates. I try to
7   fill this out to the best of my recollection.
8       Q. As we sit here today, do you recall the date of
9   the Padre game?
10      A. I do not.
11      Q. And golf for $45, do you remember where you
12  golfed?
13      A. I don't recall. I don't recall. I know
14  that -- that if I remember the days then, I'm not going
15  to remember them now, a year later.
16      Q. So do you remember where you golfed?
17      A. No, I don't.
18      Q. Do you remember who you golfed with?
19      A. No, I don't.
20      Q. How did you know to put down golf and $45 on
21  this form?
22      A. At that particular time, we had gone through --
23  I had gone through and -- and just included everything
24  that I can recall that was presented to me, or
25  accusations or allegations from -- from the

15 (Pages 282 to 285)



Page 286

1  investigator. So whether I thought it was right, wrong,
2  or indifferent, once again, as I was told by -- by Ted,
3  "You better just put it all down because people are
4  going to be looking for it."
5      Q. So your testimony is that if the investigator
6  asked you about something, then you put it down on this
7  form?
8      A. I just put it down because I thought it was
9  easier to do that. And then I would go back, amend it
10  as I felt the right way to do it. But because of the
11  comments --
12      MS. CHINN: Are we off?
13      MS. MCDONOUGH: No. He's just turning the tape.
14      MS. CHINN: Okay.
15      THE WITNESS: But because of the comments that I
16  received from Ted, I just thought it would be more
17  appropriate at that particular time just to submit it,
18  put it all down, and then just go back and amend it
19  later once -- once, you know, I had better time to think
20  about whether that was a proper disclosure or not.
21      MS. MCDONOUGH:
22      Q. Do you remember Ace Parking ever paying for
23  your lunch?
24      A. If I wrote it down, I'm sure it's probably
25  there. But I don't -- I don't recall specifically when

Page 287

1  and where.
2      Q. Did you ever go to lunch with Dave Mullear?
3      A. Yes.
4      Q. Did he pay for your lunch?
5      A. I don't recall.
6      Q. Is there anyone else from Ace Parking that you
7  went to lunch with --
8      A. I don't recall.
9      Q. -- while you were employed at the Authority?
10      A. I don't recall.
11      Q. And when it it says "3" next to "Lunch," that
12  means three different lunches that they paid for?
13      A. Yes.
14      Q. The next --
15      MS. CHINN: Wait. Can we stop? Not on the record,
16  off the record. Just continue. I want to ask my client
17  one thing quickly.
18      THE REPORTER: You're miked up.
19      (A discussion is held off the record.)
20      MS. MCDONOUGH:
21      Q. The next item, going to the right, is "Image
22  Concepts." And that's a company that you testified is
23  owned by Kelly Pond? Is that correct?
24      A. That's correct.
25      Could -- Could -- Could we go back so I can

Page 288

1  properly answer your previous question with regard to
2  the lunch?
3      Q. Sure.
4      A. I believe that that was three separate lunches
5  accumulating to -- to $30, if I -- if I remember
6  correctly.
7      Q. Do you remember the dates of those lunches?
8      A. No, I don't.
9      Q. And you don't remember who they were with?
10      A. No. If -- If I put them down, I put them down,
11  but I -- I don't recall exactly.
12      Q. The next item is "Image Concepts." It has a
13  value of $150 for uniform samples?
14      A. That's correct.
15      Q. How did you arrive at that value?
16      A. Just a -- a -- a fair guesstimate of the value.
17      Q. And those were the samples that we discussed
18  yesterday, including your wife's soccer jerseys?
19      A. No. They were just other samples.
20      Once again, my wife's soccer jerseys were paid for
21  by -- by my wife to Kelly, so those aren't -- those
22  aren't included in those.
23      A. She paid for those by giving her Mary Kay
24  samples?
25      A. That's correct.

Page 289

1      No, not Mary Kay samples, actual Mary Kay
2  cosmetics.
3      Q. Do you know the value of the Mary Kay cosmetics
4  that your wife gave to Kelly?
5      A. No, I don't.
6      Q. Is there any way to ascertain the value of
7  those cosmetics?
8      A. I don't think she even has the information
9  anymore. I know there was maybe eight -- eight, nine
10  shirts at 3 or 4 bucks each, so it couldn't have been
11  more then 30, $40.
12      THE REPORTER: Can you repeat your answer?
13      THE WITNESS: Okay.
14      It couldn't -- And the value of those shirts
15  couldn't have been more than 30 or $40.
16      MS. CHINN: Pay attention --
17      MS. MCDONOUGH: He said at 3 to 4 bucks each, it
18  couldn't have been any more than --
19      MS. CHINN: Look at her.
20      MS. MCDONOUGH: -- 30 to $40.
21      Q. So the uniform samples listed on Exhibit 15
22  under "Image Concepts" are the ones we discussed
23  yesterday that Kelly would bring to your office that
24  would have "Airport Authority" on them?
25      A. That's correct.

16 (Pages 286 to 289)

53-611 (127)

Page 290

1    Q. Do you still have any of those in your
2 possession?
3    A. Not a one.
4    Q. Go down to "Lindbergh Parking, Incorporated" on
5 Exhibit 15. Do you see that?
6    A. That's correct.
7    Q. And you have -- it looks like 12 lunches for a
8 total value of $180 --
9    A. That's correct.
10    Q. -- is that correct?
11    And those are the lunches we discussed yesterday?
12    A. Those were lunches that -- that I'm just --
13 once again just guesstimating based on perceived
14 information that the investigators thought I had gotten.
15 So once again, it was just easier for me to put it down,
16 and if I had the information, I would go back, amend --
17 and amend it later.
18    Q. And you testified yesterday that you did go to
19 lunch with Lindbergh Parking, and Lindbergh Parking paid
20 for your lunch; correct?
21    A. On occasion, correct.
22    Q. Would they have paid for your lunch 12 times?
23    A. I don't think that much.
24    Q. How many times do you think they paid for your
25 lunch?

Page 291

1    A. I don't remember exactly how many times.
2    Q. Do you have an estimate?
3    A. No. Won't even guess.
4    Q. Okay.
5    And do you know the dates of those lunches?
6    A. No, I don't.
7    Q. The next item is "Baggage Claimers"?
8    A. That's correct.
9    Q. And you have three golf occasions for a total
10 of $115, I believe, maybe $105.
11    And did you golf with Baggage Claimers on three
12 different occasions?
13    A. I believe I did, yes. We would -- We actually
14 golfed more times. He would pay for some, I would pay
15 for some, so it would be just a -- just a trade-off.
16 Mark -- Mark was a friend of mine.
17    Q. Mark from Baggage Claimers?
18    A. That's correct.
19    Q. And yesterday you testified that you golfed
20 with Mark at Torrey Pines, I believe --
21    A. That's correct.
22    Q. -- correct?
23    A. Mm-hmm.
24    Q. Where are the other two golf places listed
25 here?

Page 292

1    A. I believe it would have just been somewhere in
2 the East County, maybe Eastlake. But exactly I don't
3 recall.
4    Q. The next one is "Gary Kouch"?
5    A. "Kouch."
6    Q. "Kouch."
7    From Park 'n' Fly?
8    A. Yes.
9    Q. And this is the two golf occasions that we
10 discussed yesterday?
11    A. That's correct.
12    Q. And do you know the dates of those golf
13 outings?
14    A. No, I don't.
15    Q. And the next item is "Southwest Airlines," $120
16 for football tickets?
17    A. That's correct. These were the two tickets
18 that we talked about yesterday that were given to me by
19 Cheryl in exchange for the four tickets, the baseball
20 tickets, that I bought that she never used. She just
21 felt it was a trade-off.
22    Q. And then on the bottom, the comments say that
23 "The file containing the exact information with the
24 proper dates is no longer available"?
25    A. That's correct.

Page 293

1    Q. Where was that file?
2    A. It was just some notes, as I testified
3 yesterday, that I had in my office that I wasn't able to
4 find. That's why there were no exact dates.
5    Q. And do you recall now whether that file was a
6 paper file or whether it was on your computer?
7    A. I don't recall exactly.
8    Q. And the six different entities that are listed
9 on Schedule D, did you have an understanding that all
10 those entities were doing business with the Authority at
11 the time that you did these activities with them?
12    MS. CHINN: Objection. Mischaracterizes his
13 testimony.
14    THE WITNESS: No. Not -- Not everyone was here
15 that does business with the Airport Authority, direct
16 service agreements with them. That is why, once again,
17 you know, at the advice or -- at the advice of Ted, I
18 just put everything out there just so that it was
19 disclosed, whether I thought it was proper or not, just
20 to cover myself, and I would go back and amend it later.
21    MS. MCDONOUGH:
22    Q. Which companies on Exhibit 15 did you believe
23 were doing business with the Authority at the time that
24 you received these gifts or items of value?
25    A. I believe only Lindbergh Parking,

17 (Pages 290 to 293)

Page 294

1 Southwest Airlines and Image Concepts.
2     Q. And Baggage Claimers, you testified, does
3 business with the airlines; correct?
4     A. With individual airlines. I have no control
5 over what -- what they do.
6     Q. Do they do business with specific airlines only
7 or all of the airlines?
8     A. No, specific. There's actually two baggage
9 claim companies, and between them, they -- they service
10 the airlines.
11     Q. Do you know which airlines Baggage Claimers
12 works with?
13     A. No.
14     Q. Do you have any recollection of who you
15 submitted Exhibit 15 to?
16     A. I don't recall. I believe, if I filled it out,
17 it would have been submitted to Tony Russell's
18 attention.
19     Q. Even after you left employment with the
20 Authority?
21     A. Absolutely.
22     Q. Do you have a recollection of filling out any
23 other Form 700s during your employment with the
24 Authority other than those that we've marked as
25 Exhibits 12 through 15?

Page 295

1     A. I don't recall.
2     Q. How would you describe your working
3 relationship with Jennifer Hamilton at the time you left
4 employment with the Authority?
5     A. I believe at that time, it was -- my working
6 relationship with Jennifer Hamilton was a little shaky.
7     Q. How was it shaky?
8     A. We had -- We were going through a bit of a
9 conflict because she -- she had requested -- I'm trying
10 to remember the right term. She had a -- She had
11 requested a desk audit for her position so she could be
12 reclassified and -- and be entered into a higher pay
13 grade.
14     Q. And a desk audit is a request that an employee
15 makes when they want to be put at the next level or the
16 next classification?
17     A. No. That's incorrect.
18     Q. What is a desk audit?
19     A. A desk audit is a submission initially by the
20 employee, by the employee, summarizing their -- their
21 actual duties, their roles and duties.
22     Q. What is the purpose of the desk audit, from
23 your understanding?
24     A. That purpose then is to go through and compare
25 what her and I believe are her roles and

Page 296

1 responsibilities versus what her actual classification
2 specifications call; and if they vary to a large degree,
3 then we would look for the right classification
4 specifications and match her up to that particular pay
5 grade.
6     Q. And the desk audit is initiated by the
7 employee?
8     A. That's correct.
9     Q. Jennifer Hamilton submitted a desk audit to you
10 in 2005?
11     A. That's correct.
12     Q. Did you review the desk audit?
13     A: Yes, I did.
14     Q. Did you make a decision about the desk audit?
15     A. Yes. After consultation with -- with Ted
16 Sexton, going over that documentation, our -- my
17 decision at that time was to not go forward with -- with
18 her request for a -- for a desk audit.
19     Q. Why did you make the decision not to go forward
20 with the desk audit?
21     A. No, no, not to agree with her -- not -- Maybe
22 if I explain it this way it might be --
23     MS. CHINN: Wait.
24     THE WITNESS: -- a little --
25     MS. CHINN: There's no question pending.

Page 297

1     MS. MCDONOUGH:
2     Q. I was just --
3     MS. CHINN: Ask the question.
4     MS. MCDONOUGH:
5     Q. -- using your term. You said you decided not
6 to go forward with the request for a desk audit.
7     A. Okay. A desk --
8     MS. CHINN: Did you misspeak?
9     THE WITNESS: Yes.
10     MS. CHINN: Do you want to correct it?
11     MS. MCDONOUGH: Thank you.
12     Q. So you decided to not go forward with what?
13     A. With -- With the process of reclassifying her
14 to another class, another class.
15     Q. Why did you decide not to go forward with the
16 process of reclassing her?
17     A. After reviewing -- After reviewing her
18 submittal to me, there was some errors in -- or there
19 were some -- there was some information in there that
20 was not exactly correct where -- where there were
21 several projects that her and I worked with or worked
22 on, and she had classified herself as the initiator, the
23 project manager, project coordinator, when in fact, in
24 some of those particular roles, she was just acting in
25 her capacity as my assistant. And so she was

18 (Pages 294 to 297)

53-611 (129)

Page 298

1  overstating her roles in -- in -- in some areas that I
2  didn't feel were -- were appropriate.
3      And -- And then -- That was one portion.
4      And the second portion is, she just didn't want
5  to -- she just didn't want to deal with employees.
6      Q.  What do you mean by she didn't want to deal
7  with employees?
8      A.  We had -- As part of this process, we had sat
9  down, and she had been given opportunity before to -- to
10 . assist with some of the -- the project management duties
11 or just oversee some of the -- the permitting
12 responsibilities, and then just kind of samples or --
13 samples or trial periods where she can go in and -- and
14 see how she -- she was able to deal with employees and
15 employee issues.  And it became pretty evident right off
16 the bat that she wasn't able to -- unable and unwilling
17 to -- to perform those duties.
18     Q.  Did you throw away the desk audit in front of
19 Jennifer Hamilton?
20     A.  No.
21     Q.  So she didn't give it to you, and you just
22 threw it away in the trash right in front of her?
23     A.  Absolutely not.  The process is to then go
24 through that desk audit piece by piece by piece.
25     I took that desk audit, not that I'm required to,

Page 299

1  but went and talked to Ted, gave it to him.  He took a
2  look at that.  We spent a considerable amount of time
3  going over that documentation as I wanted to do what I
4  thought was the right thing to do.
5      Q.  So if Jennifer Hamilton testifies that you
6  threw away the desk audit in front of her, she would be
7  lying?
8      A.  I -- I would say that at no time did I kept --
9  did I receive that desk audit and throw it away in front
10 of her.
11     Q.  Did you submit the desk audit to HR for
12 Jennifer's file?
13     A.  No.  What had -- The -- That's not the
14 requirement.  The requirement is to have -- is to have
15 the desk audit -- the desk audit completed initially
16 by -- by the employee.  The immediate supervisor goes
17 through.  And if the immediate supervisor chooses to go
18 forward with that desk audit, then it is submitted with
19 my approval or the Port Authority's approval to HR for
20 continuation.  What HR then will do is take that
21 documentation and then try to match it up with -- with
22 the right classification.
23     After talking to not only Ted, but consulting
24 with -- with my -- with the department's HR analyst and
25 going over in detail which each -- with each of the

Page 300

1  items, I decided not to move forward.
2      Q..  What do you do with the desk audit if you
3  decide not to move forward?
4      A.  I believe that even -- even after I left
5  employment, the desk audit was still in my office.
6      Q.  So there's no requirement that you submit it to
7  anyone and say -- put a notation on there that you're
8  not going forward with it?
9      A.  No.  I believe I might have even -- in -- in
10 my -- as we kept just internal documentation, not a real
11 HR file, but just little notes so we knew when people
12 were going to leave.  And I believe I had submitted that
13 desk audit and kept it in -- in her employee file.
14     Q.  So you had an employee file for your employees
15 in your office?
16     A.  Just a department file.
17     Q.  And you believe you left those when you left
18 your employment with the Authority?
19     A.  That's correct.
20     Q.  Did you ever talk to Jennifer Hamilton about
21 your decision not to go forward?
22     A.  We did.  We did.  We spent a lot of time going
23 over item by item.  We -- Jennifer Hamilton and
24 I -- I wanted the best for her, but it was clear that in
25 going over this documentation, she wanted something more

Page 301

1  from there that she really wasn't willing to -- to
2  commit to.
3       She wanted to get into a management position or
4  have more areas of responsibility.  But, as she said,
5  she only wanted to work 8:00 to 5:00.  She just --
6       We even came up -- or I had even come up with a --
7  with a plan to put her in -- lack of a better word --
8  some management training positions where we would come
9  up with a contract with the assistance of HR where we
10 could have her assume additional roles and duties and
11 responsibilities to see how it worked out and then go
12 back there and revisit the audit either -- either three
13 months down the road or six months down the road.
14     Q.  Did she respond to that idea to put her in a
15 management training position?
16     A.  No.  She was -- She -- She wanted -- She wanted
17 me to -- to reclassify her in a certain position because
18 I think at that time she wanted more money.
19     Q.  What was the tone of the conversation that you
20 had with Jennifer Hamilton about your decision not to go
21 forward?
22     A.  Obviously it was a little heated on her part,
23 that she -- you know, she spent a considerable amount --
24 considerable -- considerable amount of time putting that
25 documentation together.  It was pretty extensive.

19 (Pages 298 to 301)

53-611 (130)

Page 302

1    And as we went through it and I noted areas on
2  there, she became increasingly frustrated and mad.  And
3  she made some comments during that conversation that
4  caused me to go to Ted -- caused me to go to Ted asking
5  him that -- if there was any possible way that I can get
6  her to -- to go to another department or we can do a
7  trade that had -- as had been done before for
8  administrative assistants.
9    Q.  What comments did she make that led you to talk
10  to Ted about reassigning Jennifer?
11    A.  It was -- There were some threats -- There were
12  some threats that were made to me.  There were some --
13  some insults, some vulgarity through there.  It was
14  pretty clear that -- you know, that she was unhappy with
15  my inability or my unwanting to -- to classify her or to
16  reclassify her, so --
17    Q.  What threats did Jennifer make?
18    A.  There were some threats in there that were
19  made, and I don't remember exactly, but it was kind of
20  the tone, maybe some -- some -- some safety.  I just --
21  that it probably would be best that her and I weren't in
22  the same proximity.
23    Q.  Generally what did she say as far as
24  threatening your safety?
25    A.  You know, I don't -- I don't recall exactly,

Page 303

1  but it was to the point that I had to go to Ted.  And
2  Ted and I had rather extensive -- as my direct
3  supervisor, rather extensive conversations about --
4  about trying to get her for both of our interest, to --
5    Q.  Did you -- Did you --
6    MS. CHINN:  Wait.  Don't cut him off.
7    Were you finished?
8    THE WITNESS:  No, not yet.
9    MS. MCDONOUGH:  He answered my question.
10    MS. CHINN:  Well, that doesn't mean his answer is
11  finished.
12    MS. MCDONOUGH:  You can depose him later if you'd
13  like.
14    MS. CHINN:  Excuse me.
15    Would you read his answer back, please, Suzanne.
16    Don't do that.  I want to hear what he has to say.
17    (The answer is read by the reporter.)
18    MS. CHINN:  Can you finish it, please.
19    THE WITNESS:  Yeah.
20    MS. MCDONOUGH:  He answered my question.  I -- You
21  can ask him a question later.
22    Q.  I said, "What did she say about threatening
23  your safety?"
24    You said you don't recall; correct?
25    A.  That's correct.

Page 304

1    Q.  Did you honestly believe that Jennifer Hamilton
2  would harm you?
3    A.  I -- I honestly did.  And that's why I went to
4  and brought the matter up with Ted.  She was -- At that
5  particular time, there was -- there was -- there were
6  threats intimated for my health and well being.
7  Absolutely there was.
8    Q.  Had you ever seen Jennifer Hamilton do anything
9  that threatened the safety of other employees at the
10  Authority?
11    A.  She had -- On several occasions, we had had
12  some rather heated arguments, so there was enough
13  there -- enough history there that I thought there was
14  some -- some threat to my safety, yes.
15    Q.  Had she previously threatened your safety?
16    MS. CHINN:  Would you mark the question where she
17  cut him off in his answer, please.  Thanks.
18    MS. MCDONOUGH:
19    Q.  Had Jennifer Hamilton previously threatened
20  your safety prior to the meeting that you had with her
21  about the desk audit?
22    A.  In meetings prior she had, but this was -- If
23  you would have -- If you would understand the tone of --
24  of -- of the conversation with her, she got up.  We were
25  on -- on desk -- me on my side of the desk, her on her

Page 305

1  side of the desk.  She threw stuff.  She got up.  She
2  yelled.  I mean, pretty -- pretty heated argument.
3    And I tried to restrain her, trying to keep my
4  calm, just trying to get her to understand the mechanics
5  of -- of what we were trying to do and trying to get --
6  trying to give her alternatives of how she can get to
7  the point that she wanted.  But she wanted nothing to do
8  with it.
9    Q.  What did she throw?
10    A.  She had thrown -- I had papers -- papers, pens.
11  She had thrown some of those -- those around.
12    Q.  Where did she throw them?
13    A.  Just threw them away from my direction, so to
14  the door or to my coat rack.
15    Q.  So she didn't throw the papers and pens at you?
16    A.  No, but she still threw it.
17    Q.  And you said you tried to restrain her?
18    A.  No.  I did not.  I tried to restrain her by --
19  by -- by the words that I used to her.  At no time did I
20  ever touch her.
21    Q.  So you were trying to calm her down?
22    A.  Absolutely.
23    Q.  You didn't physically try to restrain her?
24    A.  Oh, absolutely.  I would never do that.
25    Q.  And what was she yelling at you?

20 (Pages 302 to 305)

53-611 (131)

HERNANDEZ VS. SAN DIEGO COUNTY REGIONAL AIRPORT. AUTHORITY    December 19, 2006    JOSE DE JESUS HERNANDEZ, VOL. II

Page 306

1   A. She -- Exactly what she was yelling I don't
2   remember. But she was pretty -- pretty hostile towards
3   me that I would not agree to move -- to move it forward.
4       Q. Was anyone else in the room with you at that
5   time?
6       A. No. We had closed door.
7       Q. Were you in your office?
8       A. Yes, ma'am.
9       Q. Do you know if anyone heard her yelling at you?
10      A. I'm sure that -- I'm trying to remember exactly
11  if it was during regular work hours, which I believe
12  this was not. But if it was really regular work hours,
13  my office -- right outside of the door would be Kimberly
14  Zehner and Carol Mahaffey, so they would have heard.
15      Q. Did you ever ask Kimberly or Carol if they
16  heard the yelling?
17      A. No, I did not.
18      Q. Have you ever said to Jennifer Hamilton, "Sit
19  there and look pretty" --
20      A. Never --
21      Q. -- or words to that effect?
22      A. Never.
23      Q. Have you ever said to Jennifer Hamilton, "Shut
24  up and look pretty"?
25      A. Never.

Page 307

1       Q. Have you ever said to Jennifer Hamilton, "Shut
2   the fuck up"?
3       A. No. In fact, she has -- she has told me --
4   I don't use that type of language with my
5   employees.
6       Q. You've never used the word "fuck" in the
7   workplace?
8       A. That's -- Not direct -- Not direct to -- to an
9   employee in telling them "You just" -- you know, "You
10  just shut" -- I don't use those words.
11      Q. Have you used the word "fuck" in the workplace?
12      A. Yes.
13      Q. Who have you used that word with?
14      A. I don't recall. Just in general statements
15  where -- as we've been talking, but not specific to
16  employees.
17      Q. Have you yelled at Maurice Gray and used the
18  "f" word?
19      A. No. I don't recall.
20      Q. Did you tell people at the Authority that
21  Jennifer Hamilton's husband was gay?
22      A. No.
23      Q. Have you ever heard that before, that you've
24  accused her husband of being gay?
25      A. No.

Page 308

1       Q. Have you ever told Jennifer Hamilton that her
2   husband is not the right person for her?
3       A. No.
4       MS. MCDONOUGH: Go ahead and take a break.
5       THE WITNESS: Okay.
6       THE VIDEOGRAPHER: Off the record at 11:53.
7       (A recess is taken.)
8       THE VIDEOGRAPHER: Back on the record at 12:01.
9       MS. MCDONOUGH:
10      Q. You mentioned, while we were off the record,
11  that you wanted to go back to some of your previous
12  testimony?
13      A. Yes.
14      Q. What do you want to add?
15      A. Just want to go back and just put on the record
16  some of the comments that -- that I remember from my
17  conversations with -- with -- with Jennifer Hamilton.
18      Q. And this was the conversation where you told
19  her that you were not going to progress with the upward
20  reclassification?
21      A. That's correct.
22      Q. Okay.
23      A. You know, after -- after going through in
24  detail as to why I didn't believe that -- you know, that
25  it would be justified to go through and reclassify her,

Page 309

1   she immediately came very hostile. She started using
2   the profanities like -- like "Fuck you. You're an
3   asshole. I can't believe you won't do this shit for me.
4   Don't you know I need the money?"
5       And -- And, you know, towards the end, she said,
6   "I'm going to get you." And that -- When she said, "I'm
7   going to get you," that was when immediately I went to
8   Ted. I -- I ended that conversation there and said,
9   "Jennifer, I think for everyone's good it's just better
10  if we just end this."
11      And then immediately after that, I went and talked
12  to Ted, informed him, and asked him if there's anything
13  that he can do to help me try to get out this situation
14  with her.
15      Q. When did she throw the papers and the pen in
16  relation to the statements that you said she made?
17      A. As -- As we started going over -- going over
18  the documentation. So that was kind of the summary
19  portion event. But there were still -- I mean, the
20  conversation was rather lengthy because we were going
21  through details by details.
22      And then where she would, you know -- particular
23  when -- there was one section in the classification that
24  said that -- that -- that, you know, as part of her job
25  duties, all -- all documentations or all permit

21 (Pages 306 to 309)

Page 310

1  applications come to her. Then she sends them out to
2  the employees. They all come back to her. She checks
3  them for -- you know, for proper -- if they were filled
4  out or not.
5      And -- And when we were going over the details of
6  those, I -- in other words, telling her that "Everyone
7  has a central role. Applications don't come centrally
8  to you. Everyone aleady knows what the role is to do.
9  And then, at the end of the day, you don't check them
10  for accuracy either. Those individuals do. They check
11  them."
12      So, you know, when we -- when I would bring some of
13  those items to note for her, that's when she started
14  growing increasingly frustrated.
15      Q. And you just gave me a string of statements
16  that she made to you that included profanity; correct?
17      A. That's correct.
18      Q. Did she say that all at once, or was that over
19  the course of the conversation?
20      A. Over -- Over the course.
21      Q. Had she ever used that type of language with
22  you before?
23      A. Yes, she has.
24      Q. Had you ever said anything like that back to
25  her?

Page 311

1      A. No.
2      Q. When she said, "I'm going to get you," what did
3  you think she meant by that?
4      A. That -- That was when I felt intimidated by
5  her. I didn't want to push the issue any further.
6  That's when our conversation ended, and I went straight
7  to Ted and let him know that something had to be done
8  because I -- I feared -- I feared for myself.
9      Q. What did you think she was going to do when she
10  said, "I'm going to get you"?
11      A. You know, all I know is that at that particular
12  time, the way she said it and her tone was -- it would
13  just be better if we no longer worked with each other.
14      Q. Did you work with her after that conversation?
15      A. We did. We had continued to work with each
16  other, but it had -- you know, immediately after that,
17  there was probably a period of maybe four to six weeks
18  that she would not say one word to me.
19      Q. But you continued to work together?
20      A. Yes.
21      Q. Did she ever do anything after that initial
22  conversation that you considered to be threatening?
23      A. The fact -- The fact that she would glare at
24  me, come into work, not say a single word, you know,
25  that was in-- -- enough intimidation, yeah.

Page 312

1      Q. When was that conversation that you had with
2  Jennifer regarding your decision not to upwardly
3  reclassify her?
4      A. I don't recall if you have -- It was probably
5  immediately after she submitted that -- that
6  documentation to me. So if -- if you have that, it's
7  probably a day in there. But I don't recall exactly
8  what day that was.
9      Q. I believe she submitted the desk audit in
10  February of 2005.
11      A. Okay.
12      Q. Does that sound right?
13      A. I don't know. I don't have the documentation.
14      Q. But it was shortly thereafter? Shortly after
15  she submitted the desk audit, you had a conversation
16  with her about your decision?
17      A. That's correct.
18      Q. Is there anything else that Jennifer Hamilton
19  did towards you that you considered threatening other
20  than what you've testified to?
21      A. I -- I'll have to come back, but I don't recall
22  at this time.
23      Q. What refreshed your recollection as to the
24  statements that Jennifer Hamilton made during your
25  conversation with her about the desk audit?

Page 313

1      A. I had -- You know, walking out of the office
2  and being able to walk around, just some of the
3  statements came back to me.
4      Q. What was your reporting relationship with
5  Jennifer Hamilton?
6      A. Jennifer Hamilton would -- was my
7  administrative assistant. She was Administrative
8  Assistant II, so she -- she was my direct administrative
9  assistant.
10      Q. Was there ever a time in 2005 where you tried
11  to have Jim Myhers take over the supervisory
12  responsibilities for your group?
13      A. Immediately after -- Immediately after he
14  joined employment with the Airport Authority, we had
15  gone through and divvied out the areas of
16  responsibility.
17      There had been a time -- a long time there that
18  there was no manager of ground transportation. As I
19  said before, there was no manager of -- of terminal
20  operations. And I was director. So there was a period
21  of about a year there that I acted in all three
22  capacities.
23      So once I was finally able to hire Jim Myhers, I
24  had to divest myself of areas of responsibilities that
25  were just too much for me and that were rightfully under

22 (Pages 310 to 313)

53-611 (133)

Page 314

1   his -- should be under his realm of responsibility,
2   especially looking -- when you look at the
3   classification there.
4        Q. And that was supervisoring -- excuse me --
5   supervising everyone that worked for you?
6        A. No, supervising -- There was -- There was two
7   areas specific to -- to him. One would be supervising
8   the -- the permitting office, which -- in that
9   permitting office and the permitting functions, which
10  were a little bit of what Jennifer did, everything that
11  Kimberly Zehner did and everything that Carol Mahaffey
12  did. And then, on top of that, he would start assuming
13  responsibility for the airport traffic officer program.
14       Q. When you asked Jim Myhers to take over
15  supervising the people you just mentioned, were you
16  having trouble supervising those people?
17       A. I don't recall. I know -- I do recall that --
18  that through the years, there would be drama with --
19  with them. There was, for whatever reason, from time to
20  time that -- you know, that the employees in my office
21  would have conflicts with each other. There was a lot
22  of "he said," "she said."
23       So through the years, I'd have to go through and --
24  or through that -- through the months, I'd have to go
25  through and -- and have sit-downs with both -- both of

Page 315

1   them, specifically with -- with Jennifer Hamilton and
2   Carol Mahaffey, which just did not get along.
3        Q. Did Clifforine Massey work for you at any point
4   in time?
5        A. Yes, she did.
6        Q. What was your working relationship like with
7   Clifforine?
8        A. When she was there, or most of the time when
9   she was not at work?
10       Q. While she worked at the Authority.
11       A. Okay.
12       It was rather a strained working relationship. She
13  was -- In the total number of hours available that you
14  can work, she'd probably be absent one out of every
15  three days, if not one out of every two days. So it'd
16  make it -- it would make it rather stressful for me when
17  you have an employee who was there to oversee certain
18  functions and -- and never -- and was never able to be
19  there to follow through.
20       When -- When I tried to get ahold of her on cell
21  phone, she wouldn't be available, you know. You just
22  never knew when she was going to be there or not. She
23  would choose when she wanted to be involved in the
24  airport officer program, when she didn't. So it was --
25  it was -- it was a rather bad working relationship with

Page 316

1   her.
2        Q. What was Clifforine Massey's job title while
3   she was worked for you?
4        A. Her job title was Senior Airport Traffic
5   Supervisor.
6        Q. Do you know why she was out so often?
7        A. As -- Initially -- Initially there were some --
8   you know, she said she had some medical reasons that
9   were there. And so if that was the case, then I
10  referred her down to Human Resource, HR, to go through
11  and -- and have her figure it out with HR. And if she
12  was okay and HR gave me a note saying it was okay for
13  her not to be there, then that's what -- we went ahead
14  and complied.
15       After -- After that, her and I had conversations
16  where she said, "You know, I" -- "I don't know why I
17  don't come here. I just" -- "Some days I wake up, and I
18  just don't want to come to work."
19       Q. Did she indicate that she didn't want to come
20  to work because she didn't feel well?
21       A. No. No. In fact, she had conversations with
22  Ted. I -- I had worked with her extensively to try to
23  understand why she just didn't want to come to work, you
24  know. What could we do? How can we help her? What
25  type of training? What was it that I needed to do to

Page 317

1   get her to come to work? She just -- She just didn't
2   want to work.
3        Q. Did Clifforine Massey voluntarily leave her
4   employment with the Authority?
5        A. Yes, she did.
6        Q. So you didn't terminate her?
7        A. No.
8        Q. Did you --
9        A. We --
10       Q. Oh. Go ahead.
11       A. No. Go ahead.
12       Q. What were the circumstances surrounding her
13  leaving, if you know?
14       A. We -- With the assistance of -- of Human
15  Resource, we had put her on a progressive disciplinary
16  plan. And -- And, as she said, it was pretty clear to
17  her that she would be unable to comply with that
18  progressive disciplinary plan, and she would have been
19  fired anyways, so she might as well quit.
20       Q. Who would have made the decision to fire her?
21       A. That would be a Ted Sexton/Human Resource
22  decision.
23       Q. Did Clifforine Massey ever say anything to you
24  that you considered to be hostile?
25       A. I don't recall.

23 (Pages 314 to 317)

53-611 (134)

Page 318

1    Q. Did she ever do anything towards you that you
2 would consider to be hostile?
3    A. I don't recall at this time.
4    Q. Did you ever have any sort of a hostile
5 interaction with her at all?
6    A. I don't recall if I did.
7    Q. Do you have any reason to believe that
8 Clifforine Massey is not credible?
9    A. Absolutely.
10    Q. Why?
11    A. Because for -- for years, she had gone through
12 and trying to -- you know, she had a -- she had a -- a
13 good position, good pay at the Airport Authority, and
14 now, when we finally focus on her areas of
15 responsibility and really try to get her to do her work,
16 do what we asked her to do in terms of her class
17 specification, duties, responsibilities, that she just
18 didn't want to do the work. So obviously she would be a
19 little upset because I would not let her continue coming
20 to work when she wanted to come in to work, let her do
21 what she wanted her to do.
22    Yeah, absolutely, there would be reasons why -- why
23 I would believe she would not be credible.
24    Q. In general or just with regard to you?
25    A. In -- I want to say with regard to me or issues

Page 319

1 regarded to me, yeah. When -- When -- I guess would be
2 fair -- When I'm the reason why she doesn't work there
3 anymore, absolutely it would be -- she would -- I'm -- I
4 am sure that she would find ways just to -- just to
5 discredit me or -- or say anything in that manner.
6    Q. But you don't know any -- Strike that.
7    You don't believe that in general she's a liar or
8 doesn't tell the truth?
9    MS. CHINN: Objection. I think the question is
10 vague and ambiguous.
11    If you can answer, go ahead.
12    THE WITNESS: No. I'm not -- I'm not sure.
13    MS. MCDONOUGH:
14    Q. Do you have any information to suggest that
15 Clifforine Massey lies?
16    A. I'd have to think about that.
17    Q. Okay. If you remember later --
18    A. Okay.
19    Q. -- anything, that would be helpful.
20    A. Okay.
21    Q. Did Clifforine Massey supervise the traffic
22 officers then?
23    A. By -- By title, yes.
24    Q. How many people did she supervise?
25    A. Thirty- -- I believe the number was pretty

Page 320

1 close to 36.
2    Q. Did you ever ask Clifforine Massey to put a
3 negative memo in Ray Sterling's file?
4    A. Absolutely.
5    Q. And did she do that?
6    A. I'm not sure if she did.
7    I know we had -- we had issues with Ray Sterling
8 that -- that went up to Ted Sexton's level that we had
9 to remedy, and -- and I believe those memos would all be
10 reflected in Ray Sterling's -- in employee file.
11    Q. Did Clifforine Massey tell you that she didn't
12 want to put the memorandum in Ray's file?
13    A. I don't -- I don't recall.
14    Q. Do you remember if Clifforine objected at all
15 to the criticism of Ray Sterling's performance that was
16 reflected in the memorandum?
17    A. I don't recall if she did.
18    Q. What were the problems with Mr. Sterling's
19 performance, from your point of view?
20    A. The problems with -- with Ray Sterling is he
21 didn't understand the chain of command. He felt he
22 was -- he was above and beyond the position. He had
23 looked at different opportunities to -- to get a
24 different job within the Airport Authority. He just --
25 You know, his job function was airport traffic officer,

Page 321

1 but he just many times would overstep his -- his areas
2 of responsibility.
3    Q. In what ways?
4    A. He would -- What he would do, issues, instead
5 of working through the chain, he had -- whether he had
6 questions, comments or something, instead of taking it
7 to -- to his direct supervisor, he would leap and maybe
8 go to the director of HR or go through, you know, to --
9 directly to Ted Sexton for office hours. In fact, at
10 one particular time --
11    THE REPORTER: "For" what?
12    THE WITNESS: "For office hours."
13    THE REPORTER: "Office hours"?
14    THE WITNESS: "Office hours."
15    MS. MCDONOUGH:
16    Q. "In fact, one particular time" --
17    A. In -- In -- In -- What -- So what he tried to
18 do was -- was over- -- really overstep his bounds and
19 not give his immediate supervisor an opportunity to
20 respond, either to the affirmative or negative, to
21 his -- you know, to his request.
22    Q. And you were about to tell me about one
23 particular time when he did that?
24    A. Well, in -- you know, in -- in one particular
25 time, he would want to set up a weekly meeting with --

24 (Pages 318 to 321)

53-611 (135)

HERNANDEZ vs. SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY    December 19, 2006    JOSE DE JESUS HERNANDEZ, VOL. II

Page 322

1  with Ted Sexton.
2      Q.  Do you know what the substance was supposed to
3  be of that weekly meeting?
4      A.  No, just -- just anything and everything he --
5  whatever he wanted to talk about.
6      Q.  Do you know what race Mr. Sterling is?
7      A.  Yes.  He's African-American.
8      Q.  Do you know what race Clifforine Massey is?
9      A.  African-American.
10     Q.  Was Clifforine responsible for counseling
11  Mr. Sterling?
12     A.  Her and I in tandem would -- would do it.
13     But, yes, she would be in -- in terms of report and
14  responsibility, she would be the first -- actually
15  second, that second chain going up.
16     Q.  How closely did you work with Clifforine when
17  she was in the office?  Did you interact with her often
18  or see her only once a day?
19     A.  No.  We would -- Not often but not -- not once
20  a day.
21     What I would do would -- We work with her closely
22  when memos come out, when ideas came out.  We even --
23  even to the point that I tried to encourage more
24  interaction by setting up weekly meetings where she
25  would submit to me a weekly report, but none of it which

Page 323

1  she -- she followed through.
2      It would be hard to have those type of interactions
3  with her because you just never knew when she was going
4  to be at work.
5      MS. MCDONOUGH:  Why don't we go ahead and break for
6  lunch.
7      THE WITNESS:  Okay.
8      THE VIDEOGRAPHER:  Off the record.  The time is
9  12:20.
10     (A lunch recess is taken.)
11     THE VIDEOGRAPHER:  This is the beginning of
12  Videotape Number 2, Volume II.
13     Back on the record at 1:39.
14     MS. MCDONOUGH:
15     Q.  Is there any reason why you cannot continue to
16  give your best testimony?
17     A.  No.
18     Q.  Did you work with Jim Prentice when you worked
19  at the Authority?
20     A.  Jim Prentice worked in our same department,
21  correct.
22     Q.  Did you have any sort of a reporting
23  relationship with him?
24     A.  No.  He -- Jim Prentice reported directly to
25  Ted Sexton.

Page 324

1      Q.  What was your working relationship like with
2  Jim Prentice?
3      A.  Not really a whole lot.  I would interact with
4  Jim Prentice really only around budget season.  He would
5  help compile our budget slips.
6      Q.  Did you ever have any sort of a hostile
7  interaction with Jim Prentice?
8      A.  I wouldn't call it hostile.  Jim -- Jim
9  Prentice had a tendency about him to be gossipy and to
10  want to incite I guess disruption, if anything else,
11  more than anything else.  He liked -- He liked having
12  chaos, then, where he would come in and create a little
13  chaos and kind of back away and just watch it all go.
14     Q.  Can you give me an example of how he would
15  create chaos?
16     A.  He would -- Just as an example, without
17  specifics, would be, he would -- He would come in to our
18  work group and -- and just say stuff, you know, that --
19  that, "Hey, Jose said this" and -- or -- or "So and so
20  said this," and -- you know, without getting too deep
21  into specifics, and -- and just watch -- watch it all
22  happen, you know.  "So and so said this," and just
23  create gossip and disruption and -- That's kind of --
24  That's kind of who Jim Prentice is.
25     Q.  Do you remember anything specific that

Page 325

1  Jim Prentice said that would cause chaos?
2      A.  Not -- Not at this time.
3      Q.  Do you have any reason to believe that
4  Jim Prentice is not credible?
5      MS. CHINN:  Objection.  It's vague and ambiguous.
6      Answer if you can.
7      THE WITNESS:  Not at this time.
8      MS. MCDONOUGH:
9      Q.  Did you work with Carol Mahaffey?
10     A.  Yes.
11     Q.  What was Carol's position at the Authority
12  while you were there?
13     A.  Carol Mahaffey was Administrative Assistant I,
14  Permitting, for the Airport Authority.
15     Q.  Did she work for you?
16     A.  She worked in my department, yes, ma'am.
17     Q.  Were you her direct supervisor?
18     A.  Yes.
19     Q.  What was your working relationship like with
20  Carol?
21     A.  Depended on the day with her.
22     Q.  What do you mean by that?
23     A.  Carol would -- Carol would either be the
24  greatest employee that you would have, or some days she
25  would just be in a mood and -- and -- and not be.

25 (Pages 322 to 325)

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210

53-611 (136)

Page 326

1    But for the most part, I thought Carol and I had a
2    pretty good working relationship.
3        Q.  Did you have any sort of hostile interaction
4    with Carol at any point in time?
5        A.  No.  A lot of the interaction that I had with
6    Carol really was specific to the dynamics between her
7    and Jennifer Hamilton.
8        Q.  What do you mean by that?
9        A.  Jennifer Hamilton and Carol Mahaffey just did
10   not get along.  So on regular periods, I'd have to sit
11   them both down.  They would have a tendency to come in
12   and -- and tell me what the other person said, and the
13   other person would come in and said what they said about
14   each other, and I just started making a practice to get
15   them both in the same office and -- and try to hash it
16   all out.
17       Q.  Did you ever yell at Carol while there were
18   other people around?
19       A.  I don't recall.
20       Q.  Did you ever yell at Carol at all?
21       A.  I don't recall.
22       Q.  Do you remember Carol ever saying to you,
23   "Don't talk to me like that"?
24       A.  I don't recall.
25       Q.  Do you remember having a meeting where you

Page 327

1    called Carol into your office and you, Jim, Jennifer and
2    Kimberly were there to talk to Carol about her work
3    performance?
4        A.  I don't recall.
5        Q.  Did you ever tell Carol that you were the
6    person who runs the airport?
7        A.  No.
8        Q.  Do you have any reason to believe that
9    Carol Mahaffey is not credible?
10       A.  I have reasons -- Not -- Not at this time.  Not
11   at this time.
12       If I can go back --
13       Q.  Sure.
14       A.  -- please.
15       I believe that that meeting that we had regarding
16   with -- with Jim Myhers, Kimberly Zehner, Jennifer
17   Hamilton and myself was to discuss our internal plan now
18   that Jim Myhers had entered into the work group, and who
19   would assume who -- what responsibilities and how the
20   reporting structure would be and -- and that all.  So it
21   was kind of a -- a mini-organizational meeting within
22   those -- in my -- in my group -- work group, if -- if
23   that is the one that you're referring to.
24       Q.  Did Carol appear to be upset during that
25   meeting?

Page 328

1        A.  Carol appears to be upset on -- I'm not sure --
2    I -- I don't recall for that specific -- at that
3    specific meeting.
4        Q.  What was your working relationship like with
5    Jim Myhers once he started working at the Authority?
6        A.  Jim Myhers -- I have always considered
7    Jim Myhers to be a -- a -- a good employee and a -- and
8    a friend.
9        Q.  Do you still consider him to be a friend?
10       A.  I have not spoken -- I'm -- On two occasions, I
11   believe.  Just other than those occasions, I have -- I
12   haven't interacted with Jim Myhers.
13       Q.  But you say that you've spoken to him on two
14   occasions since you left your employment with the
15   Authority?
16       A.  Just about two occasions, exactly.  Or a couple
17   other occasions, but we've already gone over those
18   specific incidences.
19       Q.  Yesterday when we spoke about the people that
20   you had talked to since you left your employment with
21   the Authority -- Do you remember that?
22       A.  Yes.
23       Q.  Was your attorney present during any of those
24   meetings where you spoke with people from the Authority?
25       A.  Absolutely not.

Page 329

1        Q.  Or other vendors or other people that you said
2    you spoke to since you left your employment?
3        A.  Absolutely no.
4        Q.  What was your relationship like with Jim Myhers
5    at the time you left your employment with the Authority?
6        A.  Jim -- Jim Myhers -- Jim Myhers was genuinely
7    ecstatic to finally get away from -- or -- or to relieve
8    himself of employment with LPI.  He was excited about
9    the opportunities of coming over to the Airport
10   Authority, and he was excited about being able to learn
11   more about, you know, a higher level of -- of
12   management, because him and I had always worked well
13   together, and he was really -- it -- in my mind, was
14   excited to be working for me.
15       Q.  So your relationship was good at the time you
16   left?
17       A.  Yes.
18       Q.  Do you have any reason to believe that
19   Jim Myhers is not credible?
20       A.  Not at this time.
21       If I can go back, please.
22       Q.  Sure.
23       A.  I believe that for -- for the most part, he's
24   credible.  But I believe that he -- you know, that he
25   is -- that he's a bit intimidated over this whole

HUTCHINGS COURT REPORTERS, LLC · GLOBAL LEGAL SERVICES
800.697.3210

53-611 (137)

Page 330

1  situation, having just left his previous employer, you
2  know, being relatively new to this organization. And he
3  might be intimidated about the whole process.
4      So, you know, maybe he could be coerced into saying
5  things he -- he may not generally, you know, would like
6  to say. He's in a tough position.
7      Q. Did you just modify your answer because your
8  attorney made a noise when you said --
9      MS. CHINN: I didn't make a noise.
10     MS. MCDONOUGH:
11     Q. -- "No, not at this time"?
12     A. I had -- I had, you know, a thought come to me
13  and just wanted to recant what -- what I said before.
14     MS. CHINN: I want to say something to my client
15  for a moment.
16     (The witness and his counsel confer off the
17  record.)
18     MS. MCDONOUGH:
19     Q. Do you know what extended-time parking passes
20  are for the Authority?
21     A. Yes, I do.
22     Q. What are those?
23     A. Those are parking passes that are issued
24  through our department that are good for more than a
25  24-hour period.

Page 331

1      Q. What are the extended-time parking passes used
2  for as far -- Well, strike that.
3      Who gets extended-time parking passes?
4      A. They are -- The extended-time parking passes
5  are used by federal agencies who are traveling to and
6  from the airport. They are used as courtesies. They
7  are used as promotionals. They are used as -- Even when
8  we have parking card holders, Airport Authority parking
9  card holders, when they lose their -- or they can't find
10  their card, we issue those.
11     So they're used for a wide range of activity for,
12  once again, promotional, as courtesies. When we have
13  people who have had bad experiences going through the
14  airport, we go ahead and issue those kind of -- you
15  know, once again, as a little courtesy. But we use
16  them -- we use them in all forms.
17     Q. Have you ever used an extended-time parking
18  pass for your own personal use?
19     A. No.
20     Q. Do you ever remember asking Jennifer Hamilton
21  for a stack of extended-time parking passes?
22     A. Yes. And I believe I signed for those.
23     Q. How many did you obtain from her?
24     A. I believe -- Well, how many are you referring
25  to?

Page 332

1      Q. Well, you just said you signed for some passes.
2      A. I've signed for passes. I -- You know, I would
3  use them all the time. I would go out and get passes
4  for -- Whenever we had media events at the Airport
5  Authority, I'll go and get 30 and 40 at a time.
6      We would have guests or visitors coming through the
7  airport, and we would issue those, because a lot of
8  times we had the inability to validate their tickets,
9  and so we had always made it a practice to -- to bring a
10  stack of those passes.
11     Q. Did you always sign for any extended-time
12  parking passes that you checked out?
13     A. We would -- We would sign for the passes,
14  exactly.
15     Q. Did you personally sign for them?
16     A. I believe -- I can't recall if I did at
17  every -- but I know that it was documented whether --
18  you know, who had received those.
19     Q. So every time you received extended-time
20  parking passes, it was documented somehow?
21     A. I believe -- I believe that should have been
22  the case.
23     Q. Did you ever use extended-time parking passes
24  for your own personal use?
25     A. No.

Page 333

1      Q. Or for your family or friends' uses?
2      A. No.
3      Q. Wait till my question is --
4      A. I'm sorry. I apologize.
5      MS. MCDONOUGH: I'm sure Cathryn would like that
6  too.
7      MS. CHINN: And I'd like you to wait for him to
8  finish his answer.
9      MS. MCDONOUGH:
10     Q. In the Complaint in this action, you've accused
11  Bryan Enarson of entering into side deals through a
12  handshake agreement with Host?
13     A. That's correct.
14     Q. What side deals are you referring to?
15     A. There was one specific deal that greatly
16  affected the construction of -- of new and improved
17  restroom facilities at the Southwest Airline rotunda.
18     Q. And that was a written contract?
19     A. The overall concession agreement is with Host,
20  but this specific deal not to -- not to impact the new
21  gift area was -- was the area -- was the side deal that
22  we were referring to.
23     Q. When you say "we were referring to," who are
24  you saying when you say "we"?
25     A. That -- That I'm referring to in the Complaint.

27 (Pages 330 to 333)

53-611 (138)

Page 334

1  Q. So the specific side deal was that --
2  A. That he would not impact that facility.
3  Q. The specific side deal was that Bryan Enarson
4  would not impact the Host concession facility?
5  A. Absolutely.
6  When -- If -- If you are familiar with the
7  facility --
8  Q. In Terminal 1?
9  A. In Terminal 1, Southwest -- where Southwest
10  Airlines has the rotunda, the news and gift actually
11  used to be across the way where the Starbucks is now
12  located.
13  After when the Starbucks came in, there was a
14  deal -- there was a deal that -- that Bryan Enarson had
15  struck with -- I believe his name is Steve Johnson
16  with -- with Host to relocate across the street -- I
17  mean across the aisle, the news and gift space, and then
18  in doing so, that he -- that he told him that he would
19  not, in the future, come back to him and have that space
20  impacted in any way, shape or manner.
21  Q. He would not have the Starbucks space impacted?
22  A. No, the news and gift area.
23  Q. Isn't that agreement in a written contract?
24  A. I don't believe so.
25  Q. How are you aware of the agreement?

Page 335

1  A. We had gone through -- For years we had gone
2  through to try to develop plans to -- to develop the new
3  and improved restrooms up on the mezzanine level of that
4  rotunda; and yet time and time and time again when it
5  got to the point of -- of requesting approximately
6  25 square feet, 30 square feet redaction of space from
7  that news and gift area, Bryan would always oppose
8  the -- the reduction of that space.
9  So finally, after -- you know, after meetings with
10  my counterpart, Troy Leech, she -- you know, she let me
11  know that the reason Bryan did not want to send that
12  letter to take away that space is because when --
13  when -- when the Starbucks was brought in and he
14  relocated across the street, he had specifically told
15  Steve Johnson that he would not impact that space.
16  Q. Why do you refer to that as a side deal?
17  A. Side deal because I don't believe he had the
18  authority to enter into -- into that sort of deal.
19  The -- To us -- To us, the inability of -- of
20  completing or moving forward with -- with the restroom
21  because he didn't want to go in and -- and remove
22  30 square feet from a concession just because he had
23  given him the word, and then as a result, you now go
24  back through and have to go to the drawing board, and it
25  impacts your -- your construction cost by $2 million,

Page 336

1  that -- that would be a side deal.
2  Q. You said, "To us, the inability of moving
3  forward with the restroom was a side deal."
4  Who is the "us"?
5  A. We had, as -- As members of landside operation
6  and terminal operations, we had on the drawing board for
7  about -- approximately three to five years, we had a
8  project on there that called for improved restrooms in
9  the Southwest rotunda.
10  We had gone through and put four or five different
11  iterations of what those -- of what those restrooms
12  would look like. And every time we came through -- and
13  it was just a simple -- These restrooms are -- were
14  vital for -- for -- for -- because the lines up in -- in
15  the Southwest rotunda, specifically the women's
16  restrooms, were horrendous out there.
17  So what we wanted to do was take the men's and
18  women's restroom, redo them into one big women's
19  restroom, and then relocate the men's up on top. But
20  what happened was we needed to have that 30 square feet
21  down below so we can comply with ADA requirements.
22  Q. Okay. Let's back up.
23  As you walk -- As you go up the escalator now into
24  the Southwest rotunda of Terminal 1, Starbucks is on the
25  right.

Page 337

1  A. On the right side.
2  Q. The women's restroom is on the far right, and
3  the news and concession is on the left.
4  A. On the left.
5  Correction. Men's and women's restroom are both
6  on -- on the right, right when you go up the escalator
7  on the right.
8  Q. And the men's restroom is there also.
9  A. Yes, ma'am.
10  Q. Where is the space that you're saying could not
11  be used because of the side deal? Is it on the left or
12  the right?
13  A. It's on the left, which is -- If you're
14  familiar with the property, as you go -- as you go up
15  the escalator, you make a left, and SPC, Service
16  Performance Corporation, has a little utility closet
17  that they use. There is a little landing there that --
18  that needed to be pushed out a little bit further so we
19  can comply with ADA landing requirements.
20  Q. Do you believe that Bryan Enarson received any
21  sort of a kickback, compensation, or other benefit for
22  this side deal?
23  A. Not at this time.
24  Q. Could this deal be in writing?
25  MS. CHINN: Objection. Calls for speculation.

28 (Pages 334 to 337)

53-611 (139)

Page 338

1    THE WITNESS: I'm -- I'm -- In the conversations
2  that I've had with my counterparts, not only with --
3  with -- with Troy Leech and with Ted Sexton, I don't
4  believe that's in writing. But that's -- that's as far
5  as --
6    MS. CHINN: Can you note on the record when she's
7  reading these Post-it notes that are being passed to her
8  by Amy Gonzalez? I'll let you --
9    THE REPORTER: No.
10    MS. CHINN: -- know. She's stopping and reading
11  these notes during the deposition.
12    THE REPORTER: I -- I can't.
13    MS. CHINN: You can't see her; I know. I'll let
14  you know.
15    THE REPORTER: I mean, it's just not in my job
16  description --
17    MS. CHINN: No. I know that.
18    THE REPORTER: -- to follow people --
19    MS. CHINN: I'll let you know.
20    THE REPORTER: -- around the table.
21    MS. CHINN: I'll let you know.
22    If she doesn't listen to the answer, just stop your
23  answer.
24    THE WITNESS: Okay.
25    MS. MCDONOUGH:

Page 339

1    Q. Did anyone ever tell you that this side deal
2  that you have referred to was not in writing?
3    A. Yeah. I don't believe in that specific
4  language it was. But in my conversations with -- once
5  again, with Troy Ann Leech and with Ted Sexton, they
6  both -- they both let me know that Ted had -- that --
7  sorry -- that Bryan had an agreement with Steve Johnson
8  not to impact that space if he agreed to move it over.
9    And that's why he was very, very hesitant even
10  though -- even though he could do it, because it's within
11  the agreement that we can -- we can increase or decrease
12  any Host concession space as we see -- we see fit. But
13  I don't believe -- I don't believe that that is in
14  writing.
15    Q. Why do you believe that the agreement says that
16  the Host concession space can be increased or decreased
17  as the Authority sees fit?
18    A. Because we've had -- we have had other projects
19  that we have gone through and increased space for them
20  or decreased space for -- for some concessions.
21    Q. In that particular area in the Southwest
22  rotunda?
23    A. Not -- Not in that particular space.
24    Not up on the rotunda but at the lower level, there
25  is a -- what used to be called the Top Gun bar. There

Page 340

1  was some space down there where it was extra seating
2  space that we needed to -- when we reconfigured, that
3  was needed for an exit aisle.
4    So when we went in and had to expand because we
5  needed to add two more additional security checkpoint
6  lanes to that space, we went through and we took space
7  away from Host.
8    Q. But you're not aware of the Authority taking
9  space as it sees fit up on the upper level of the
10  Southwest rotunda in the concession area that we're
11  referring to?
12    A. That -- Not in that -- No, not in that
13  particular space, because --
14    Q. Okay.
15    A. -- it was just a nonstarter.
16    Q. So you have testified that Troy Ann Leech and
17  Ted Sexton told you about this side deal that Bryan
18  Enarson had. Is there anyone else who told you about
19  it?
20    A. I think it was pretty common within -- within
21  the terminal operations staff, those who worked with me,
22  that that was an impact, and that was the reason --
23    THE REPORTER: Wait. Wait.
24    THE WITNESS: -- why --
25    THE REPORTER: Okay.

Page 341

1    THE WITNESS: Go ahead.
2    THE REPORTER: Something annoying just happened to
3  my ears and like scared me.
4    So, "I think it was pretty common within the
5  terminal" -- And carry on with the answer, please.
6    THE WITNESS: -- within the terminal operations and
7  Capital Improvement Committee that that was the reason
8  why the restroom project could not move forward.
9    The restroom project should have moved forward back
10  in 2002, and so it had been stalled from 2002 through
11  2005 because Bryan Enarson was unwilling to go back to
12  Host and request a -- and request the redaction of that
13  space.
14    MS. MCDONOUGH:
15    Q. Are you certain that Bryan Enarson never went
16  to Host to request that space?
17    A. According to the information that I had
18  received from -- from Troy, he was unwilling to go back
19  to Host and request that, that space back.
20    Q. What exactly did Troy tell you about Bryan
21  Enarson's unwillingness to go back to Host?
22    A. Troy -- I had gone to Troy -- to Troy, my
23  counterpart, trying to work with her to figure out what
24  it is that we needed to do to get that space.
25    She, you know, quite frankly said, "He is" --

29 (Pages 338 to 341)

53-611 (140)

HERNANDEZ vs. SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY    December 19, 2006

JOSE DE JESUS HERNANDEZ, VOL. II

**Page 342**

1 "Ted" -- I mean, not Ted -- that Bryan was unwilling to
2 go back and get that space. He just didn't want to go
3 back, and we needed to find another alternative to -- to
4 the restroom project. But he was -- he did not --
5 definitely did not want to go back to Steve Johnson
6 and ask for that space.
7     Q. Did she tell you why he didn't want to go back
8 and get that space?
9     A. Because he had made him a promise that he
10 wasn't going to take that space away.
11     Q. When did Troy Ann tell you that?
12     A. It was through -- sometime through that
13 development project space, 2005, 2004. It -- It had
14 been an ongoing -- ongoing discussions.
15     Q. So you believe that she told you about Bryan
16 Enarson's side deal in 2004 or 2005?
17     A. I -- I believe that was the case.
18     Q. Do you know when this side deal was entered
19 into?
20     A. I believe it was part of -- it was part of
21 the -- the -- the whole construction of Starbucks up in
22 that rotunda, so it would have been around that
23 particular time. It just -- It did not surface to my
24 attention until we -- we -- we reintroduced that
25 restroom project that that was the reason why we could

**Page 343**

1 not move forward with that project.
2     Q. Have you ever seen an agreement between Host
3 and the Authority for that upper area of the Terminal 1
4 Southwest rotunda?
5     A. I believe I had read the -- the overall Host
6 concession agreement to just familiarize myself with it,
7 but that -- that was over two years ago, and I don't
8 remember exactly.
9     Q. That's the Host concession agreement for the
10 entire airport?
11     A. Yes, ma'am.
12     Q. Do you know if Host has amendments to that
13 agreement or other portions of the agreement that are
14 specific to certain areas within the airport?
15     A. I don't -- I don't recall.
16     Q. In your Complaint, you've also accused Bryan
17 Enarson of making it more difficult to comply with the
18 ADA -- is that correct? -- through this restroom
19 project?
20     A. It was -- It was more his unwillingness to --
21 to work with us to take that space away from Host would
22 make it impossible for us to comply with ADA
23 requirements because you had -- that space was needed so
24 we can comply with the -- with the 2-percent grade
25 from -- from the floor up to the restrooms and then

**Page 344**

1 landing requirements.
2     So without the ability of having that space, we
3 were unable to move forward with the project because we
4 would not be able to comply with the ADA requirements.
5     Q. When did you first determine that the Authority
6 was going to be unable to comply with the ADA
7 requirements in relation to the restroom and the
8 Terminal 1 Southwest rotunda?
9     A. It was -- It was presented to us even back in
10 maybe 2002, 2003 when -- when the -- I believe it was
11 Parsons who was our construction manager at the time,
12 when they had put some options together for the landing.
13     But it was specific to them, to those drawings,
14 that in order for you to move forward with this project,
15 we needed to have that space and that -- for these
16 reasons: 2-percent grade, landing requirements.
17     Q. So Parsons presented it to the Authority in
18 2002 or 2003?
19     A. It was presented to -- to project sponsors,
20 which was terminal operations, who -- who worked for me,
21 and -- the project sponsors.
22     Q. In what manner was it presented? Was it a
23 written -- written plan, or was it a presentation? What
24 was it?
25     A. There were some rough schematics initially that

**Page 345**

1 were presented to us giving us options of things we can
2 do and not do. And it had been agreed by -- by the
3 group, by everyone who -- who had a stake, all the
4 stakeholders within the Airport Authority, that that was
5 a plan we needed to move forward with if -- if this
6 project was to be completed.
7     Q. And who are the stakeholders that you're
8 referring to?
9     A. Stakeholders would be the construction
10 management staff. You would have terminal operation
11 staff, landside operation staff, which would be groups
12 like -- or individuals like Ted, Jay Bass, who had a
13 stake in -- in management of service performance, which
14 is a custodial; Amiel Porta, who also had some terminal
15 operations, coordinator responsibilities; myself; and --
16 and other interested parties.
17     Q. Who were the other interested parties?
18     A. I believe we had some architects involved, but
19 for the most part it was -- it was terminal operations
20 staff, construction management staff who were trying to
21 put those plans together. And then the other interested
22 parties would be obviously Southwest Airlines, who --
23 who would be affected by -- or who would be affected or
24 benefit by those plans.
25     Q. Are there any other specific people aside from

30 (Pages 342 to 345)

Page 346

1  you, Ted Sexton, Jay Bass, Amiel Porta that were what
2  you refer to as stakeholders in making the decision
3  about this?
4      A.  Oh, yeah.  The -- The -- The real estate -- The
5  real estate management side.  Obviously Troy Ann Leech
6  is a manager of -- or director of real estate, I
7  believe, at that point initially.  We were all managers,
8  and then we went to two director positions.
9      But her -- in her -- her real estate side,
10 interested stakeholder is Bryan's side as -- as a
11 concession staff as well, construction management and
12 landside operations -- or terminal operations.  Excuse
13 me.
14     Q.  So everybody within landside operations?
15     A.  Between terminal operations.
16 I apologize.  I corrected from landside to --
17     Q.  Thank you.
18     A.  -- terminal operations.
19     Q.  So everyone in terminal operations was a
20 decision-maker or a stakeholder in this?
21     A.  Yeah.  We -- We -- We had made it a practice
22 that when projects of this nature would come through,
23 they would be open to discussions of capital
24 improvement -- Capital Improvement Committee.  This
25 would be one of the projects that we presented to -- to

Page 348

1  30 square feet of space on the left-hand side of the
2  area as you go up?
3      A.  That's correct.
4      Q.  Do you have any particular expertise with the
5  ADA?
6      MS. CHINN:  Objection.  That calls for a legal
7  conclusion.
8      THE WITNESS:  What -- Specific to this project and
9  the requirements at 2-percent grade, the specifics to
10 the landing, yeah.  I am -- I was not -- I don't -- I
11 can't label myself as an expert, but I am going off
12 of -- of advice of -- of the architects who put the
13 drawings together.
14     MS. MCDONOUGH:
15     Q.  So with regard to this particular project, your
16 knowledge of the ADA comes from the architects'
17 suggestion?
18     A.  We would always -- We would make it a practice
19 to -- to ensure that the architects fully understood
20 ADA -- ADA requirements, and we would move forward with
21 projects in that manner.
22     Q.  So your specific knowledge of the ADA in this
23 restroom context was from the architects themselves; is
24 that correct?
25     A.  For this particular one, exactly.

Page 347

1  that committee.
2      Q.  Who was on the Capital Improvement Committee at
3  the time that Parsons presented the first rough
4  schematic?
5      A.  It was back in -- When the initial schematics
6  and the thought was to move with this particular one, it
7  was back in 2002.  I don't exactly remember.  But it had
8  been stalled back from 2002 to 2005, and -- and it still
9  hasn't been built.
10     Q.  And when you say "terminal operations staff,"
11 who you are referring to?
12     A.  Referring to -- Let's see.  It was Danette --
13 I -- I believe Danette might -- Danette Bewley may have
14 been there for -- for a period of that time, but also
15 Amiel Porta and Jay Bass.
16     Q.  So Parsons first raised this ADA issue in 2002?
17     A.  Yeah.  It was -- It was part of -- I guess to
18 say it was raised, it was just as part of the
19 requirements to comply with this.  "This is what you
20 need to do if you want to build this project, and this
21 is how we recommend you move forward with this:  You are
22 going to need to take this 30 square feet of space in
23 there."
24     Q.  So if you want to build the restrooms and move
25 forward with it, you're going to need to take the

Page 349

1      Q.  Was there anything else that the architects
2  told you needed to be done other than the 2-percent
3  grade or landing in order to comply with the ADA in
4  relation to the women's restroom project?
5      A.  They had -- In order for us to -- That would be
6  the majority of the part.  If we wanted to -- If we
7  wanted to rebuild -- It was a men's restroom up on that
8  mezzanine level.  If you wanted to build this project,
9  you needed to take that space.  That was -- Everything
10 else had -- that we had drawings ready to go out to bid
11 for the project, and that was the only thing that was
12 holding it up.
13     Q.  And is your understanding that the 2-percent
14 landing or grade only needed to be put in if these new
15 restrooms were put in as well?
16     In other words, if the restrooms stayed as they
17 were, that they didn't need to add a 2-percent grade to
18 where the restrooms were?
19     A.  If the restrooms stayed -- If the restrooms
20 stayed the way they were, there were no requirements for
21 those.  But -- In terms of architecturally speaking,
22 But in terms of customer service, we had to do
23 something.  Those lines in the Southwest restroom were
24 probably some of the most horrendous you've ever seen.
25 There would be times that that -- that women would be waiting

31 (Pages 346 to 349)

53-611 (142)

Page 350

1  to go into those restrooms 20 minutes.
2      We had it documented as part of our presentation,
3  you know, to -- to move this project forward where we've
4  had pictures of a hundred people waiting in line to try
5  to use the women's restroom.
6      So, you know, you could have left it alone, but I
7  doubt that was the type of customer service that -- that
8  the Airport Authority would be comfortable with -- with
9  providing.
10     Q. I just want to make sure I understand where the
11  ADA violation would come in, so I'll just ask a couple
12  questions on that.
13     MS. CHINN: There's no question pending. That's
14  your commentary.
15     MS. MCDONOUGH:
16     Q. So if the restrooms stayed the way they were,
17  even if they created long lines, your understanding is
18  that the Authority didn't need to add anything, such as
19  a grade, in order to make the restrooms, as they were,
20  compliant with the ADA?
21     MS. CHINN: That's not what he said. It
22  mischaracterizes his testimony. Objection.
23     THE WITNESS: Clarify. I don't -- I don't think I
24  understand what you're saying.
25     MS. MCDONOUGH:

Page 351

1      Q. So if the Authority had decided not to renovate
2  the restrooms in the Southwest rotunda, is it your
3  understanding that the Authority would not need to add
4  any grades or anything else to make those restrooms ADA
5  compliant?
6      MS. CHINN: Objection. It assumes facts not in
7  evidence.
8      THE WITNESS: Yeah. I -- I -- I don't think I can
9  properly answer that at this time.
10     MS. MCDONOUGH:
11     Q. Why not?
12     MS. CHINN: It assumes facts not in evidence, and
13  it lacks a foundation.
14     MS. MCDONOUGH:
15     Q. Why can't you answer the question?
16     A. I believe I have to do a little more research.
17  But the decision had already been made to move forward
18  and do the restrooms.
19     So my understanding of that restroom project was
20  that if we were to build it as we all had agreed, we
21  needed to get that space. So the decision had already
22  been made to build the restrooms; just how are you going
23  to build them and what are they going to look like?
24     Q. Was it also your understanding that if the
25  restrooms stayed as they were and there was no

Page 352

1  renovation, that the Authority did not need to do
2  anything else to make those restrooms ADA compliant?
3      MS. CHINN: Objection. That lacks a foundation.
4      THE WITNESS: Having -- Having not spoken to the
5  architects or requested their -- their expert -- their
6  expert opinion, I can't properly answer that one.
7      MS. MCDONOUGH:
8      Q. After the architects presented the rough
9  schematics in 2002 and showed the 2-percent grade that
10  needed to be there, what was your next memory of any
11  discussion about the ADA compliance as it related to the
12  restroom renovation project?
13     A. That was -- That was the one key to -- to ADA
14  compliance.
15     And then at that particular time, building the
16  restrooms, we needed to ensure that -- that we complied
17  with the -- with the new requirements for -- for not
18  only wheelchair accessible restrooms but ambulatory
19  assist restroom stalls and -- and regular stalls and
20  number of urinals. At that particular time that we were
21  going over this project, there was new ADA requirements
22  that were introduced --
23     MS. CHINN: She's not listening to you.
24     THE WITNESS: -- that were introduced, so it
25  brought -- it brought a whole new flurry of -- of

Page 353

1  considerations.
2      MS. MCDONOUGH:
3      Q. When did those additional ADA issues arise?
4      A. Maybe 2004, 2005. But those ADA issues weren't
5  anything that would stop -- stop the project from moving
6  forward. The one -- The one thing that stopped the
7  project from moving forward was the inability to -- to
8  take back that 30 square feet of -- of space.
9      Q. Why do you say that the ADA issues involving
10  the size of the stalls would not stop the project from
11  moving forward?
12     A. There was just some resizing of the stalls at
13  that particular time when you add the ambulatory assist.
14  I don't -- I don't remember the exact sizing of those.
15  It would just cause things to kind of shift down a
16  little bit. But there was enough additional space that
17  it can be absorbed, and it really didn't affect the
18  design of the restroom.
19     Q. And the Authority was changing the stalls as it
20  needed to, from your understanding?
21     A. Yeah, that we -- As one of our capital
22  improvement projects, we had restroom upgrades, where
23  prior to this, we had just -- terminal operations staff
24  had sponsored a project that actually went into United
25  Airlines and revamped the men's restrooms at United

32 (Pages 350 to 353)

53-611 (143)

Page 354

1  Airlines.
2      So we had -- we had gone through and looked at
3  specific restrooms that we wanted to enhance, and we had
4  just finished the United Airlines restroom, and this
5  was -- this was our next project to go through with.
6      Q. Did you ever raise the ADA issue regarding the
7  2-percent grade with anyone at the Authority?
8      A. With Ted.
9      Q. When did you talk to Ted about it?
10     A. With Ted.
11     The -- The -- The requirement for that -- You're
12  focusing on the wrong portion. The -- The -- The -- The
13  space was there on the 2-percent grade. The space was
14  not there on the landing. And that space was required
15  to comply with landing, with the ADA landing
16  requirements, because you have to be have so
17  much space if someone is coming up with a wheelchair.
18     So the -- the -- in order -- in order to have your
19  landing or your 2-percent grade, which is your -- your
20  walk up, walk down, you had the space for that, but you
21  didn't have the space for -- for the landing. So that
22  was -- that was the main question -- I mean the main
23  issue that we had, not the 2-percent grade.
24     Q. So you're saying that in addition to the
25  2-percent grade, you had to have a place for -- a flat

Page 355

1  place for a wheelchair to go on? Is that what you're
2  saying?
3      A. What happens is, whenever you have a landing
4  under the ADA, you have to have a certain amount of
5  radius so that when someone is there in a wheelchair,
6  they can, quite literally, if they wanted to, go in
7  circles. So it's different than you and I walking
8  and -- and being able to make a tight turn on -- on --
9  on two feet -- you know, two feet of space. I can do
10  that turn. You don't have the same -- If you're in a
11  wheelchair, obviously your -- your space is much more
12  than two feet.
13     So there's certain requirements that you must
14  comply with. One -- You know, the 2 percent is because
15  you don't want to have excessive. If you go over the 2
16  percent, then you have to provide railings. And then if
17  you stay -- And then once they do, either going upstairs
18  or coming downstairs, you know, you have that -- those
19  landing requirements to be able to give them enough
20  radius so that they can maneuver around.
21     Q. So the area that's on a 2-percent grade has to
22  be a certain depth or width or --
23     A. That's correct.
24     Q. Okay.
25     When did you raise the issue regarding the size of

Page 356

1  the landing with Ted Sexton?
2      A. The issue was -- The issue had been -- already
3  been raised by -- The issue had already been raised by
4  the architects. And we had -- It was -- It was all part
5  of the drawings when they came back. "Hey, if you want
6  to build them in this certain manner, this is what you
7  need to have done."
8      So the issues that we had brought up to Ted was to
9  brief him on those projects and inform him what it is
10  that needed to be happening and see if there's a way
11  that he could help us convince -- or he can work with
12  Bryan to get that space, take that space back so we can
13  move forward with the project.
14     Q. When did you first brief Ted Sexton on the
15  issues raised by the architects related to the ADA?
16     A. Ted -- Ted Sexton had already been briefed on
17  those since this -- this project. And -- And I don't
18  remember exactly how long it had been on the board, but
19  the project to upgrade the restrooms in the Southwest
20  rotunda had probably been on that board on our capital
21  improvement list for over five years prior -- prior
22  to -- to -- When we were still with the Port District,
23  they had been put on hold. And then -- because we
24  didn't have enough money to continue with that project.
25  And then we -- they came back up, and then we resurfaced

Page 357

1  it to continue and fill out and finish out the project.
2      Q. When did you --
3      A. It was a high property for us.
4      Q. When did you resurface the project?
5      A. I want to say 2004. But the -- the minutes in
6  the capital improvement plan -- there's an actual book
7  that -- that details all the capital improvements
8  projects and by -- by who the sponsor is, and that'll
9  tell you exactly what the timeline is -- timeline is.
10     Q. Did you ever specifically discuss with
11  Ted Sexton the fact that there was not enough room to
12  comply with the ADA?
13     A. That was part of our briefing with him, that
14  if -- that this was the option that we all wanted to
15  move forward to, and unless we got this space, we
16  received this space from the news and gift area, we
17  would be unable to comply with ADA regulations -- or ADA
18  requirements. I apologize.
19     Q. When was this briefing that you had with
20  Ted Sexton?
21     A. Probably in 2003, 2004. I don't -- It was --
22  It had been awhile because we had been working -- we had
23  been working for quite a long time to get those
24  restrooms built. It was a high priority for us.
25     Q. Did you ever raise the ADA issues again with

33 (Pages 354 to 357)

53-611 (144)

Page 358

1  Ted Sexton after that initial briefing in 2003?
2      A. It was understood that at -- that at time, that
3  in order to move forward with this project, that -- that
4  we needed to have those landing requirements, and that
5  the only thing holding the construction of this project
6  was the -- the -- the space for the landing.
7      Q. Who understood that?
8      A. It was understood between all of -- all of my
9  employees from terminal operations, from Ted Sexton,
10  from Troy Leech, the real estate staff and -- and the
11  architects, architects and project construction staff
12  from -- from Parsons at the time.
13      Q. Are you aware of any other Authority employee
14  raising this issue of the space needed for ADA
15  compliance on the restroom project?
16      A. No. I believe that -- that -- that as -- as
17  director and having responsibility for that, that I had
18  directed my employees. I would -- I -- I told them that
19  I would work with Ted to try to get that space.
20      We had then proceeded to -- to look at alternatives
21  or see -- once again negotiate with Troy Leech, see what
22  it is that we needed to do to get that space.
23      Q. So you don't remember any specific
24  conversations with Ted Sexton after that initial
25  briefing in 2003 where you specifically said, "We can't

Page 359

1  comply with the ADA if we don't get more space"?
2      A. No, oh. It was -- It was -- It was an
3  ongoing -- ongoing anytime this project would come up.
4  Ted was a member of that Capital Improvement Committee,
5  so it would be -- it was reoccurring. It wasn't a one
6  conversation. It was -- It was constant note or an item
7  issue that -- that we were trying to resolve.
8      Q. Do you remember the last time you had a
9  conversation with Ted Sexton about the compliance with
10  the ADA?
11      A. You know, all I know is -- No, I don't remember
12  the last time.
13      Q. Was it in 2004?
14      A. It was -- It -- It has been as -- as late as
15  2005.
16      Q. The beginning of 2005 or the end of --
17      A. Towards --
18      Q. -- 2005?
19      A. -- the end. I mean, we -- we had worked -- I
20  had personally worked for over two years to try to do
21  this restroom project, and we would brief it time and
22  time and time again to Ted, sometimes even on a daily
23  basis, sometimes on a weekly basis.
24      But this was -- this was a high priority for us.
25  We had gone through and done some -- some customer

Page 360

1  survey -- customer satisfaction surveys, and the key
2  note that came back was "Your restrooms. You have to
3  improve your restrooms." And that particular restroom
4  had the highest -- the lowest ratings of any restroom at
5  the airport. So that is why we focused on that restroom
6  and enhance the services that we can provide on that
7  restroom.
8      Q. And you don't remember anyone else raising the
9  ADA issue in the Capital Improvement Committee meetings?
10      MS. CHINN: Objection.
11      THE WITNESS: The -- The issue --
12      MS. CHINN: That lacks foundation.
13      THE WITNESS: The issue -- The -- The ADA issue was
14  pretty clear. It was the -- The -- The issue would be
15  the inability to take that space. That's the issue.
16  The -- The -- The plans are there; the drawings are
17  there. So it's not an issue. It's just, "Hey, this is
18  what" -- "If you want to build it, this is what you need
19  to do." The issue was the inability to take that space.
20      MS. MCDONOUGH:
21      Q. Did you ever hear anyone from the Authority
22  say, "We don't want to comply with the ADA? We're just
23  going to build it as we want to build it, and we're not
24  going to comply" --
25      MS. CHINN: Objection.

Page 361

1      MS. MCDONOUGH:
2      Q. -- "with the ADA," or anything --
3      MS. CHINN: Objection.
4      MS. MCDONOUGH:
5      Q. -- of that type?
6      MS. CHINN: That calls for -- That calls for
7  speculation.
8      You can answer it if you can.
9      THE WITNESS: No, I don't think -- I don't think I
10  can answer that.
11      MS. MCDONOUGH:
12      Q. Why can't you answer that?
13      MS. CHINN: I think that's argumentative.
14      THE WITNESS: Yeah. I can't -- I don't believe I
15  can answer that question.
16      MS. MCDONOUGH:
17      Q. I asked you if you ever heard anyone from the
18  Authority say that the Authority did not want to comply
19  with the ADA with regard to the women's restroom.
20      A. I can -- I can only respond to my wanting to
21  comply with -- with all ADA requirements. I can't -- I
22  can only speak for myself.
23      Q. And you wanted to comply with the ADA
24  requirements?
25      A. Yes, I did.

34 (Pages 358 to 361)

HERNANDEZ vs. SAN DIEGO COUNTY REGIONAL AIRPO[ ] [ ]HORITY    December 19, 2006    JOSE DE JESUS HERNANDEZ, VOL. II

Page 362

1    Q. Are you aware of anyone at the Authority that
2  did not want to comply with the ADA requirements with
3  regard to the women's restroom?
4    A. I'm not sure if I can answer that at this time.
5    Q. Why not?
6    A. 'Cause -- 'Cause I can't.
7    MS. CHINN: That's argumentative too.
8    MS. MCDONOUGH:
9    Q. What information do you need in order to
10  respond to that?
11    A. You know, I -- I --
12    MS. CHINN: Objection.
13    THE WITNESS: I don't believe I can -- I can
14  respond to that question for you.
15    MS. MCDONOUGH:
16    Q. Why can't you respond to it?
17    MS. CHINN: It's argumentative.
18    THE WITNESS: Again, it calls for speculation.
19    MS. CHINN: Again, it calls for speculation.
20    MS. MCDONOUGH:
21    Q. You can't respond because you don't know?
22    A. Because I think I'd rather have more time to --
23  to try to recollect if that was the case.
24    But, you know, I -- I tell you that my requirement
25  was to -- or my intent was to comply with -- with the

Page 363

1  ADA requirement.
2    I can answer what I know. I --
3    Q. Do --
4    A. I can't --
5    Q. Do you want to take a break to --
6    A. No.
7    Q. -- to see if you can remember if anyone --
8    MS. CHINN: Don't --
9    MS. MCDONOUGH:
10    Q. -- told you?
11    MS. CHINN: Don't keep talking over him when he's
12  trying to give an answer.
13    She can't do it. She's told us four times. If you
14  can't recall, you can't --
15    THE WITNESS: No.
16    MS. CHINN: -- recall.
17    THE WITNESS: I can't recall.
18    MS. MCDONOUGH:
19    Q. Well, this is the first time you said you can't
20  recall.
21    A. Well --
22    Q. So is that the answer?
23    A. I can't -- I can't respond to your question.
24    Q. Why not?
25    A. Because I -- Because I can't at this time.

Page 364

1    MS. CHINN: Stop arguing with him.
2    THE WITNESS: We keep --
3    MS. MCDONOUGH:
4    Q. What is it --
5    A. -- going back and forth, and I'm going to keep
6  telling you I can't respond to that question. So if you
7  want to keep doing that, we're just going to keep doing
8  this.
9    Q. Why can't you respond?
10    A. Because I can respond to what I know at this
11  particular time if -- if -- But if I don't know it, then
12  I can't -- I can't respond at this particular time.
13    Q. As we sit here today, are you aware of any
14  person at the Authority who did not want to comply with
15  the ADA requirements with regard to the women's
16  restroom?
17    MS. CHINN: Same objection. Move to strike the
18  question.
19    THE WITNESS: I -- I can't respond to that question
20  at this time.
21    MS. MCDONOUGH:
22    Q. What is preventing you from responding?
23    A. I just can't respond to that question at this
24  time.
25    Q. Why can't you tell me what's preventing you

Page 365

1  from responding to the question?
2    A. I'd like to give it a little more thought.
3    Q. Okay. Let's take a --
4    A. Okay.
5    Q. -- break, and we'll come back and talk about
6  it.
7    A. We can -- We can take the break all day long,
8  and I'm still not going to be prepared to answer that
9  question at this time.
10    Q. When will you be prepared to answer the
11  question?
12    A. I'm not sure.
13    Q. Is there any additional information I can
14  provide you that would refresh your recollection?
15    A. No. I -- I -- I wouldn't even -- I wouldn't
16  know -- I wouldn't even know what to ask.
17    MS. MCDONOUGH: Okay. We'll take a break.
18    MS. CHINN: We're going to move for sanctions on
19  this line of questioning under 128.
20    THE VIDEOGRAPHER: Off the record at 2:30.
21    (A recess is taken.)
22    THE VIDEOGRAPHER: Back on the record at 2:44.
23    MS. MCDONOUGH:
24    Q. Is there any reason why you cannot continue to
25  give your best testimony?

35 (Pages 362 to 365)

53-611 (146)

HERNANDEZ vs. SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY        December 19, 2006        JOSE DE JESUS HERNANDEZ, VOL. II

Page 366

1    A. No.
2    Q. Did Bryan Enarson ever tell you that he did not
3  want to comply with the ADA with regard to the women's
4  restroom project?
5    A. Those -- Bryan -- No.
6    Q. Did he ever say anything to that effect?
7    A. No.
8    Q. Did Troy Ann Leech ever tell you that she did
9  not want to comply with the ADA with regard to the
10  women's restroom project?
11    A. No.
12    Q. Do you recall anyone at the Authority ever
13  saying to you that they or the Authority did not want to
14  comply with the ADA with regard to the women's restroom
15  project?
16    A. No.
17    Q. Are you aware of any of the Authority's actions
18  that were contrary to the ADA with regard to the women's
19  restroom project?
20    A. If -- If -- If you look at it in this context,
21  only way you can build this restroom in the manner that
22  was recommended by the stakeholders is by taking that
23  space. Only thing that reflects to me is someone's
24  inability or want to take that space would render --
25  would -- would render this project from being completed.

Page 367

1  So I just put it in that context, is someone's
2  inability or want to take that space would -- would not
3  allow us to complete this project.
4    Q. So you're not saying that the Authority
5  actually violated the ADA.
6    MS. CHINN: Objection. That calls for a legal
7  conclusion, and he can't testify to that.
8    MS. MCDONOUGH:
9    Q. Did you believe that the Authority was
10  violating the ADA?
11    A. I believe that -- It would -- It would be my
12  belief that in order to comply with this project as the
13  stakeholders have requested, we needed to have that
14  landing -- this particular landing in place.
15  Someone's inability or want to take the space for
16  personal reasons or for whatever reasons they were
17  obviously would render this project, you know,
18  unconstructionable. That would be my response.
19    Q. So without the space, they just couldn't do the
20  project?
21    A. Exactly.
22    Q. Do you know if the project to build the -- Is
23  it the women's restroom on the left? Is that the one
24  that was going in on the left?
25    A. The men's restroom.

Page 368

1    Q. I'm sorry.
2  The project to build the men's restroom on the
3  left-hand side of the rotunda as you walk up -- go up
4  the escalator, do you know if that project has ever been
5  actually started, they started construction on it?
6    A. After five years, no.
7  What -- What had happened was, it was strongly
8  recommended to the group that we need to find another
9  alternative, no matter what the cost was. So with --
10  with Bryan's instructions, the -- the architects and --
11  and construction managers went back to the drawing board
12  and devised a new -- a new drawing for -- a new drawing
13  or a new schematic for -- for this project that -- that
14  did not involve the -- you know, the -- not involve the
15  reduction of Host space. That particular project came
16  back at a cost of over $2 million over the original
17  project.
18    Q. And I apologize. I think I might have confused
19  the situation earlier by saying the women's restroom.
20  This whole time you've been talking about a men's
21  restroom on the left?
22    A. The men's restroom -- If -- If I can just
23  explain it this way: What was going to happen was,
24  the -- The existing women's restrooms on the right as
25  you get off the escalators -- there's a men's and

Page 369

1  women's restroom. The first door that you go through is
2  the men's. Your second door that you go through is the
3  women's.
4  What we were going to do, what -- what the project
5  definition was, to take the men's and women's restroom,
6  expand them, and make it into one big restroom with
7  ability within that one big restroom to kind of cordon
8  off half at a time, if you needed to, and then provide
9  for extra corridors where -- where people can get in and
10  do work on the plumbing chases, I believe they're
11  called. So that was it.
12  And then in order to do so, obviously you had to
13  move the men's restroom somewhere else. The men's
14  restroom was -- move on the other side of the corridor
15  and and would go up on the mezzanine level. So you
16  would have to go through that little space that led you
17  to SPC's janitorial closet. That would then be the
18  landing, and then the restrooms would be up on that
19  mezzanine level.
20    Q. Okay.
21  I'm going to reask some questions, then, because I
22  used the term "women's restroom," and I want to make
23  sure we were referring to the same thing.
24  So did Bryan Enarson ever say to you that he did
25  not want to comply with the ADA in regard to the

36 (Pages 366 to 369)

HERNANDEZ vs. SAN DIEGO COUNTY REGIONAL AIRPO... ...THORITY     December 19, 2006     JOSE DE JESUS HERNANDEZ, VOL. II

Page 370

1  restroom project in Terminal 1?
2     A. The -- Repeat that again just so that I
3  understand.
4     Q. Did Bryan Enarson ever tell you that he did not
5  want to comply with the ADA in relation to the women's
6  or men's restroom project in Terminal 1?
7     A. Not specifically.
8     Q. Did he say anything to that effect?
9     A. No. It was more -- It was more action by
10  inaction. The inability to take that landing would not
11  allow you to construct it. So that -- that's why I say
12  action by inaction. His inability to want to take the
13  space would not allow you to do the project. So you can
14  kind of infer from there.
15     Q. Are you aware of anyone at the Authority saying
16  that they did not want to comply with the ADA with
17  regard to the restroom project in Terminal 1?
18     A. I think the -- the -- once again, the unwanting
19  or the unwant to take that space would not allow you to
20  proceed with this project. So you can use it as an
21  argument for and -- and against, or you can't comply
22  with the ADA because -- because you don't have the
23  space. But you don't want to take the space. You see?
24  So it's -- You're kind of in a Catch 22 the way it's
25  presented. "Well, we can't build it because we're not

Page 371

1  going to comply with the ADA."
2     "Well, take the space."
3     "I don't want to take the space."
4     Q. I'm just trying to make sure you didn't hear
5  any statements outright where somebody said, "I just
6  don't want to comply with the ADA."
7     A. No, those -- not those types of statements. .
8  That's why -- That's why the -- the best way I can
9  phrase it as just action by inaction.
10     Q. Okay.
11     MS. CHINN: Let me ask my client something.
12     (The witness and his counsel confer off the
13  record.)
14     MS. MCDONOUGH:
15     Q. Did you ever believe that the initial
16  schematics presented by Parsons for the restroom project
17  in Terminal 1 violated the ADA?
18     A. No. .
19     Q. Do you believe that the new project proposed by
20  Bryan Enarson for the restrooms violates the ADA?
21     A. I don't believe -- I don't believe they do, but
22  it's $2 million more than the original options.
23     Q. But you're not aware of any violation of the
24  ADA with the new project?
25     A. I don't believe so, just it's $2 million more

Page 372

1  for the restroom.
2     Q. It's just more extensive?
3     A. Yes, for not much of a different of a restroom.
4     Q. Did you ever believe that the Authority was
5  violating the ADA in regard to the restroom project?
6     A. I believe -- I believe that the inability to --
7  to -- to secure that space would not allow you to comply
8  with the ADA requirements and thus not allow you to
9  complete that restroom project.
10     Q. So instead of completing the original restroom
11  project, the Authority created a new restroom project --
12     A. A new one to --
13     Q. -- where they could comply with the ADA?
14     MS. CHINN: I think that mischaracterizes his
15  testimony. It's an objection.
16     THE WITNESS: That's incorrect.
17     In -- The -- The A -- A better way to put it would be,
18  bryan's refusal to take the space caused a creation
19  or -- or the development of a new, more expensive
20  project just so he didn't have to take the space. He
21  absolutely did not want to go and ask for that space
22  back.
23     MS. MCDONOUGH:
24     Q. How many times did you raise this ADA issue
25  with Ted Sexton from 2003 to 2005?

Page 373

1     MS. CHINN: I believe that question has been asked
2  and answered, but answer again if you like.
3     THE WITNESS: I believe no less than -- than once a
4  week we would go through -- Ted and I spent an
5  inordinate amount of time with each other, and so we
6  would go over all these issues, you know, casual and not
7  casual. I mean, they -- this was an issue -- this was a
8  big issue for us, or the construction with -- the
9  construction of this restroom project was -- was my
10  number 1 priority.
11     MS. MCDONOUGH:
12     Q. So is it fair to say over 150 times --
13     A. It would be --
14     Q. -- you raised it?
15     A. -- easily -- easily over 50 to 100 times.
16     Q. Over a two-year period?
17     A. Yes, ma'am.
18     Q. Did Ted ever provide any sort of a reaction or
19  a response to you raising this ADA issue?
20     A. Ted -- We would bring up the issue to Ted. Ted
21  said he would take it for action. Weeks would go by or
22  days go by. "Hey, Ted, did you talk to Bryan?"
23     "No, I didn't get a chance to talk to him."
24     And we would go back through again. "Did you talk
25  to him?"

37 (Pages 370 to 373)

53-611 (148)

Page 374

1    "No."
2       So he was -- I think -- I -- I -- I think he was
3    afraid to bring up the issue to Bryan.  He just didn't
4    want to deal with it with Bryan.
5       Q.  You said that "We would bring up the issue to
6    Ted."  Who's the "we"?
7       A.  We -- Myself and -- and my terminal operations
8    staff.
9       Q.  And that's, once again, Amiel and --
10      A.  Amiel; Jay Bass; the -- the manager of terminal
11   operations, which was either Ron Larson or Danette in
12   there for a while; myself.
13      Q.  Why do you believe that Ted was afraid to bring
14   up the issue to Bryan Enarson?
15      A.  Because he wouldn't -- he -- he wouldn't bring
16   resolution to it.  We would -- We would have
17   conversations with him about -- you know, and -- going
18   over the project, trying to understand why they just
19   didn't want to take the space.
20      And he -- he said he would calendar a meeting
21   with -- with Bryan, go over it and get back to us with
22   the resolution, and he never did.  He just dragged it
23   on.
24      Q.  And why do you believe Ted dragged it on?
25      A.  Because, as he said -- as he said was, Bryan

Page 375

1    had entered into a deal or a side deal with Tom -- I
2    mean, it's -- I think it's -- Steve Johnson, I believe
3    is his name, from Host Properties.  And he had told him
4    that he would not take the space.
5       So that was Bryan's argument.  "I told the guy I
6    wasn't going to take the space.  I'm not going to do
7    anything that requires me to take the space.  We got to
8    figure out a different way to do it."  That's a
9    $2 million side deal.
10      Q.  Do you know if Host received any sort of a back
11   or benefit from the new project that you said cost
12   2 million more dollars for the restrooms?
13      A.  The Host -- I don't believe -- No.  I -- I
14   can't -- I -- I don't have the expertise to answer that
15   question or to tell you definitively that they did or --
16   or they did not.
17      Q.  Do you know if anyone aside from Ted and your
18   terminal operations committee -- I'm sorry -- terminal
19   operations staff was aware of you raising the ADA issue?
20      A.  That -- It was, you know, Gus Abigas, who was
21   our architect.
22      MS. CHINN:  How do you spell his last name?
23      THE WITNESS:  A-b-i-g-a-s.
24      Gus was aware of, you know, the issues and
25   requirement for the landing.

Page 376

1       We had another in-house architect -- and I
2    forget -- I forget who they -- who their names are or
3    what their names are.
4       The Parson's manager at the time.
5       It was -- It -- It was -- It was a whole committee
6    that was on those -- I'm not sure -- I don't have the
7    notes in front of me of who was exactly on that
8    committee to review that project, but it was -- it was
9    known that in order for us to proceed with that project,
10   we needed that space.  That was the one and only thing
11   that was holding it up.  We could have built that
12   restroom back in 2002 if we had the space.
13      MS. MCDONOUGH:
14      Q.  Do you believe that you were perceived as the
15   person raising the ADA issue in regard to that project?
16      A.  I believe I was the person who was perceived as
17   bringing up the side deal issue that prevented us
18   from -- from complying with the ADA, which would then
19   allow us to proceed with the project.
20      Q.  Do you believe that anything about the side
21   deal itself is illegal?
22      A.  Absolutely, I do, because I --
23      Q.  What do you think is illegal about that side
24   deal?
25      A.  I don't -- I don't believe -- I don't believe

Page 377

1    that -- that Bryan had the authority to enter into a
2    side deal where he can say, "At no time in the future
3    will I take this space."  I -- I -- I -- I don't believe
4    he had the authority to enter in that type of agreement.
5       Q.  Did you ever ask anyone at the Authority
6    whether Bryan Enarson had the authority to enter into a
7    side deal with Host?
8       A.  When -- In conversations that I had with Ted,
9    we broached that issue, and I think it was determined
10   that -- it was my determination, just in -- In my
11   understanding, that I don't think he did.  I can only
12   bring up the issue to my direct supervisor and -- and
13   have conversations from there.
14      Q.  And you formed that understanding based on your
15   conversations with Ted?
16      A.  That's correct.
17      Q.  What did Ted say that made you believe that
18   Bryan Enarson did not have authority to enter into a
19   side deal?
20      A.  When -- When we asked him if -- if -- if it's
21   possible to go ahead and do those and not have it in
22   writing or -- or amend certain agreements -- because we
23   amend every agreement.  If we take a space, we'll go in,
24   and we'll change that agreement and then to reflect the
25   new.  But this particular one didn't.  So, you know,

38 (Pages 374 to 377)

53-611 (149)



Page 378

1  everything else is documented; why isn't this one?
2      Q. Did --
3      A. So --
4      Q. -- you ever have ask to see an amendment to the
5  Host agreement?
6      A. I had gone through -- I had gone through and
7  looked at the Host agreement. We had gone through and
8  updated -- or that amendment -- that -- I'm sorry. That
9  agreement -- That concessions agreement had to be
10  amended when we added new concession space, when we
11  expanded Gates 1 and 2 in Terminal 1.
12      That amendment then -- That agreement then had to
13  be amended again when we redacted or we -- we reduced
14  space in the Top Gun bar.
15      So there's amendments that go all the way through
16  of -- of additions or deletions of -- of concession
17  space. That one particular there was not -- was not
18  called in.
19      Q. Is it possible that there's an amendment that
20  you did not see?
21      A. It's possible.
22      Q. Do you know who initially approved the restroom
23  project in Terminal 1, the initial idea to go ahead and
24  buy -- or have an architect draw up plans and go forward
25  with at least looking at the project?

Page 379

1      MS. CHINN: Can you read me the question back,
2  please.
3      (The question is read by the reporter.)
4      THE REPORTER: Sorry.
5      MS. CHINN: "Initial approvement"? "Approvement."
6  Is that the word?
7      MS. MCDONOUGH: "Approved."
8      THE REPORTER: "Approved the restroom project in
9  Terminal 1."
10      MS. CHINN: Okay. "Who initially approved it?"
11  I'm sorry. Go ahead.
12      THE WITNESS: Are we ready?
13      The -- The project had already been on -- on the
14  project's listing prior to -- to me being in that
15  position.
16      Where I got involved with the project was right as
17  Dirk Mathiasen was leaving, I'd say 2002, 2003. He
18  was -- He was one -- I mean, Dirk was the guy who was
19  trying to lead that project. We were this close
20  (indicating). We were -- I mean, we had drawings ready
21  to go, probably 60, 65 percent drawings ready to be bid
22  out and try to move the project forward. And then it
23  was stopped because we didn't want -- they didn't want
24  to take that space.
25      So I guess in answer to your question, I'm not sure

Page 380

1  who originally approved it, but it was -- it had already
2  been approved.
3      MS. MCDONOUGH:
4      Q. Do you know who approved the second project
5  that you indicated cost $2 million more than the first?
6      A. The second project that had come through was
7  approved by the CIC Committee.
8      Q. And what is the CIC Committee?
9      A. Capital Improvement Committee.
10      But if I -- if I can go back real quick, I'm not
11  sure -- We were still working on the schematics for the
12  second -- the second one, which is the -- the $2 million
13  more in there. So you had the first project approved to
14  move forward --
15      THE REPORTER: "The" --
16      THE WITNESS: -- and that --
17      THE REPORTER: "The first project approvement to
18  move forward"?
19      THE WITNESS: The first project had been approved
20  to move forward as long as we were able to secure that
21  space.
22      The second one that had come through I believe
23  was -- was then approved at Bryan's request by -- by the
24  CIC Committee. Specifically when that happened, I can't
25  tell you. You'd have to go back and take a look at the

Page 381

1  notes.
2      MS. MCDONOUGH:
3      Q. I just want to make sure I understand.
4      Is it the Capital Improvement Committee that
5  decided finally to abandon the first project and go with
6  the second?
7      A. I believe that's correct.
8      Q. Do you know who was on the Capital Improvement
9  Committee at the time that the decision was made?
10      A. I think -- I can't -- I know who are members of
11  the Capital Improvement Committee, but I -- I -- I can't
12  tell you who was there and approved that -- that and --
13  and if it finally did.
14      But Ted Sexton is on that group, Bryan Enarson,
15  Angela Schaeffer, Woodson, and Thella is a member of
16  that Capital Improvement Committee as well. Bryan. So
17  really at the VP level.
18      Q. How are you aware that the new project was
19  going to cost $2 million more than the original project?
20      A. As part of -- As part of the schematics, I
21  guess what you would call 30-percent submittal, through
22  there you would have your estimators go back through and
23  calculate the cost. That was -- That's all part of your
24  30-percent committal when you do a drawing.
25      "Okay. Now go get me an estimate." Those

39 (Pages 378 to 381)

53-611 (150)

Page 382

1  estimates would then come back. And then we looked
2  at -- we looked at those project costs versus the other
3  ones, and that's when it was disclosed -- or it was
4  presented to us that the new -- the new restroom project
5  would be over $2 million more than the original project.
6      Q.  And when you say "we looked at it," you're
7  referring to the Capital Improvement Committee?
8      A.  The -- The -- The whole committee, the -- the
9  sponsorship committee, which is myself, with the
10  architects, with construction management, with the
11  estimators.
12      Q.  Do you know when the second project was
13  approved?
14      A.  No, I don't.
15      Q.  Or -- I'm sorry -- the new project?
16      A.  No, I don't.
17      Q.  Do you remember the year?
18      A.  No, I don't.  Specifically -- I -- I don't
19  remember specifically when the new revised project was
20  approved.
21      Q.  Did you ever specifically discuss the ADA
22  issues with Bryan Enarson?
23      A.  No. I -- I discussed them with my direct
24  report, which was Ted Sexton.
25      Q.  Do you know if Ted Sexton told Bryan Enarson

Page 383

1  that you had raised ADA issues?
2      MS. CHINN:  Objection.
3      If you know, you can answer.
4      THE WITNESS:  No.  I'm not sure what he -- what he
5  told him.
6      I -- Our request -- Our request to Ted was to
7  communicate with Bryan and try to negotiate release of
8  that space.  That was our request.
9      MS. MCDONOUGH:
10      Q.  And that was you, Jay and Amiel?
11      A.  Yes.  And -- And many times me by myself with
12  Ted.
13      Q.  What was the status of the restroom project at
14  the time you left employment with the Authority?
15      A.  I believe it was in between a 30- and a
16  65-percent submittal.  It had been at that stage
17  where --
18      MS. CHINN:  She's still passing notes, and now
19  it's -- it's bothering me.  I'm sorry.  She's not
20  looking at you; she's reading her notes from Amy.
21      It's not funny, Amy.
22      MS. GONZALEZ:  I think it is.
23      MS. CHINN:  I know you do.  You've been laughing
24  about it all day.  Should have got ready for the
25  deposition before you came.

Page 384

1  Wait till she's paying attention to you to answer a
2  question.
3      MS. MCDONOUGH:  I have a remarkable ability to
4  multitask, so I am paying attention.
5      MS. CHINN:  I don't know what she said.  Do you?
6      MS. MCDONOUGH:
7      Q.  Have you finished answering your question?
8      A.  No.  I was waiting for you to -- I -- I was
9  waiting for -- I saw that you were distracted.  I'm
10  waiting for you.  If you want, we can go ahead and --
11  and start again.
12      Q.  I am not distracted.  I asked you a question.
13      The question was, what was the status of the
14  restroom project at the time you left employment with
15  the Authority?
16      A.  My understanding that -- that -- that it had
17  been decided that we would not be moving forward with --
18  with the initial recommended option, that this new
19  revised $2 million more project would be now moving
20  forward with 65 percent to -- to development to 65
21  percent, and that would be the new and improved plan to
22  move forward with.
23      Q.  What do you mean by "65 percent"?  It was
24  approved?
25      A.  In the development of a project, you first

Page 385

1  start in the initial concepts, and you develop a
2  30-percent submittal, which will give you some rough
3  drawings, and then get into cost and estimates.
4      Then when you go to 65-percent submittal, right
5  around 65 percent, now you have biddable documents --
6      THE REPORTER:  You have what?
7      THE WITNESS:  "Biddable."
8      -- biddable documents where now you can proceed and
9  start soliciting for contractors to come in and do the
10  work in between there.
11      Then you get all the way to 90-percent submittals
12  once you figured out your interiors and everything
13  that's going to go, you know, your -- your shades of
14  color, all those.
15      And then at 100 percent, these are your plans.
16      So I believe when I left employment, it was -- it
17  was either -- it was either -- either pretty close to or
18  at the 65 submittal process, 65-percent submittal
19  process.
20      MS. MCDONOUGH:  Let's go ahead and take a break.
21      THE WITNESS:  Okay.
22      THE VIDEOGRAPHER:  Off the record.  The time is
23  3:10.
24      (A recess is taken.)
25      THE VIDEOGRAPHER:  We're back on the record.  It's

0 (Pages 382 to 385)

53-611 (151)

1    3:23.
2        MS. MCDONOUGH:
3        Q. Is there any reason why you cannot continue to
4    give your best testimony?
5        A. No.
6        Q. You alleged in the Complaint in this action
7    that Bryan Enarson improperly negotiated a lease for the
8    General Dynamics property. Is that correct?
9        A. Yes.
10       Q. What property are you referring to when you
11   talk about the General Dynamics property?
12       A. The -- The -- General Dynamics is -- is
13   actually the -- the former -- the former General
14   Dynamics plant on -- along Pacific Highway at the
15   intersection of Sassafras. It's approximately 85,
16   87 acres located just on the north side -- north side of
17   the airport.
18       Q. Do you know when the lease for that property
19   was negotiated?
20       A. Immediately -- Right around the same time that
21   we split from -- the Airport Authority was created and
22   the airport split from the Port of San Diego.
23       Q. And the lease is between the Authority and who?
24       A. The Authority and the Port of San Diego.
25       Q. So the Port owns the property?

1    information on possible development options specific to
2    parking operations.
3        Q. Do you know if anyone aside from Bryan Enarson
4    was negotiating the General Dynamics lease?
5        A. I believe there was a group of -- there was a
6    group of members from the Airport Authority that were
7    part of that negotiating team, but it was represented to
8    me that Bryan was -- was the lead negotiator on behalf
9    of the Airport Authority.
10       Q. Who represented that to you?
11       A. It was just a -- It was represented -- Well, he
12   had represented himself in that manner.
13       Q. Do you believe that the Authority's lease of
14   the General Dynamics property is illegal?
15       A. I believe -- I believe that based on the
16   require- -- requirements for leasing available use,
17   future use, that we overpaid -- we grossly overpaid for
18   the property.
19       Q. Do you believe that there's anything illegal
20   about that?
21       A. I believe -- I believe the interest of not only
22   the Airport Authority but its tenants would question
23   that lease, yes.
24       Q. What is illegal about the General Dynamics
25   lease?

1        A. The people of California own the property, and
2    it's held in Tidelands Trust by the Port of --
3        THE REPORTER: It is --
4        THE WITNESS: -- San Diego.
5        THE REPORTER: -- what?
6        THE WITNESS: And it's held in --
7        THE REPORTER: "In title in trust"?
8        THE WITNESS: -- in -- Tidelands Trust, with the
9    Port of San Diego being the trustee.
10       MS. MCDONOUGH:
11       Q. And why do you believe that Bryan Enarson
12   negotiated the General Dynamics lease?
13       A. Because during -- during those negotiations, he
14   had come to me multiple times requesting my assistance
15   in putting together revenue forecasts for that property
16   to see how much we can justify paying.
17       Q. Did you provide the forecast that Bryan Enarson
18   requested?
19       A. Multiple times. We -- I would provide -- I
20   would provide them based on the scenarios that he would
21   provide to me.
22       Q. Did Bryan Enarson ever ask you to do anything
23   besides provide forecasts in connection with the
24   General Dynamics lease?
25       A. Provide forecasts and provide informational --

1        A. Well, you know, the specifics -- the
2    specifics -- Let me tell you. The -- The option -- The
3    option -- The option to go in and expand that property,
4    it had -- it -- it had been portrayed that we would --
5    soon after we assume that property, that's base- -- the
6    existing parking lot on General Dynamics, which at the
7    time was -- was airport -- airport connection on -- on
8    the backside, originally with -- Excuse me. Park,
9    Shuttle & Fly, when it was developed --
10       MS. CHINN: Was what?
11       THE WITNESS: Park, Shuttle & Fly. That's the name
12   of the parking lot operation --
13       MS. CHINN: Oh, okay.
14       THE WITNESS: -- 1100 spots.
15       We then tried to expand it to 1600 stalls and then
16   go and extend -- expand it to a permanent 2100 stalls to
17   meet capacity demands.
18       The problem was that as we started getting into the
19   developments, it hadn't been disclosed at the time that
20   we would be unable to -- to develop that property
21   because it -- it had not received a clean closure, a
22   complete clean closure.
23       So I want to say it was only clean to within
24   40 inches from the surface. But when we started pulling
25   core samples, because we needed to put some lights and

53-611 (152)

1  run some conduit to extend the -- the property, that we
2  did not have permission, or it wasn't clean, or it was
3  contaminated under that level, so it really rendered its
4  usability -- it wasn't usable anymore in the fashion
5  that it was originally represented.
6      That's why we haven't -- Although the capacity is
7  there -- If you read the paper this week, there was a --
8  there was a huge article on the airport needing more
9  parking.  That parking lot should have been built if it
10  was -- you know, if it was as representative --
11  represented, we should have had another 1,000 parking
12  spaces there probably three years ago.
13      MS. MCDONOUGH:
14      Q.  Was there anything that was illegal about the
15  General Dynamics lease?
16      A.  Well, there's -- there's --
17      MS. CHINN:  That's going to call for a legal
18  opinion.
19      Answer it if you can.
20      THE WITNESS:  Okay.
21      I can't -- There has to be -- There has to be
22  something there that would restrict -- that would
23  restrict us from overpaying for the property.
24      MS. MCDONOUGH:
25      Q.  So the part of the lease that you believe was

1  illegal was the overpayment.
2      A.  The overpayment, absolutely.
3      Q.  Are you aware that there is a California code
4  section that sets the amount of payments that are
5  required under the lease for the General Dynamics
6  property?
7      MS. CHINN:  Objection.  That mischaracterizes the
8  statute.  And the statute is Public Utilities Code
9  Section 170056.  Are you familiar with that?
10      THE WITNESS:  I -- I don't have that information in
11  front of me.  I can't -- I -- I can't tell you whether
12  that's -- that's the case or not.
13      MS. MCDONOUGH:
14      Q.  Are you aware that any California code even
15  addresses the Authority's lease of the General Dynamics
16  property?
17      A.  I believe -- I believe there is a code that
18  addresses that, the lease, or -- or -- or ratifies the
19  lease payments in there, or to some effect, that calls
20  out what the lease payments are going to be for that
21  property.
22      Q.  When did you first become aware that there was
23  such a code?
24      A.  After -- You know, it had -- it had come to my
25  attention, but I can't tell you exactly when -- when --

1  when I knew.  I can't give you an exact date.
2      Q.  Did it come to your attention at the time that
3  the -- or shortly after the General Dynamics lease had
4  been negotiated?
5      A.  I believe after that.
6      Let me take it back.
7      I believe that that code was then -- was -- was
8  somewhere closer to the time that the subsequent
9  Teledyne-Ryan lease was negotiated.
10      Q.  And about what time period is that?
11      A.  Maybe 2004.
12      Q.  That's when you first have a memory of knowing
13  about the code section?
14      A.  I'm just -- I'm -- I'm estimating, somewhere in
15  there.
16      Q.  Do you know how you become aware of the Public
17  Utilities Code section regarding the General Dynamics
18  lease?
19      A.  I believe it was published.  It was published
20  and distributed to Airport Authority personnel.
21      Q.  Do you know who distributed it?
22      A.  I believe it was sent to me as -- it was sent
23  to me from -- from the real estate department since I
24  had oversight -- primary oversight for that property.
25      Q.  Did you ever tell anyone at the Authority that

1  you thought that the General Dynamics lease was a bad
2  idea?
3      A.  Oh, absolutely.
4      Q.  Who did you tell?
5      A.  Ted Sexton.
6      Q.  What did you specifically say to Ted Sexton?
7      A.  When -- When the deal or the thought of the
8  deal was presented, I went to Ted and say, "Ted, I think
9  we're -- we're paying too much for this property.
10  I've looked at" -- "at the revenue analysis through
11  there.  I know what I can make on parking lot.  I know
12  what we make on the rental cars.  And at the end of the
13  day, we're going to end up losing a couple millon
14  dollars, couple millon dollars which is going to come
15  out of the general budget, and it's going to affect our
16  terminal operations because that's usually where it
17  comes out of."
18      Q.  Do you remember approximately what year that
19  was that you talked to Ted Sexton about the
20  General Dynamics lease?
21      A.  I know it was -- it was prior to -- to the
22  ratification of the agreement because there was already
23  some -- there was some thought of -- of what -- what the
24  payments were going to be.
25      Q.  Do you know when the agreement was ratified for



Page 394

1  the General Dynamics property?
2      A. I can't -- I can't tell you a specific date,
3  no.
4      Q. Is there anything that would refresh your
5  recollection?
6      A. No, unless you had the documents in front of
7  you.
8      Q. "The documents" being the agreement?
9      A. Yes.
10     Q. Did you ever talk to anyone else at the
11 Authority about your belief that the General Dynamics
12 lease was too expensive?
13     A. Ted was -- Ted was my direct supervisor, so I
14 brought it to his attention. And we were going to let
15 it go at that and -- where I would bring it to him and
16 hope he understood the ramifications of that.
17     And when we -- he and I discussed it, he had
18 mentioned to me that that's just the price of freedom
19 that Thella was willing to pay, in his exact words.
20     Q. Do you know what he meant by that?
21     A. Yeah. He said he -- I -- I followed up on --
22 on that remark. And Ted said that Thella was willing to
23 overpay for that property so that she didn't have to be
24 under the control of the -- of the Port District on the
25 backside.

Page 395

1      Q. When was the last time that you raised the
2  issue regarding the overpayment on the General Dynamics
3  lease?
4      A. I believe -- I believe we had brought up that
5  point for discussion with -- with Ted through those
6  negotiating periods, hoping he would have a little bit
7  of influence on those.
8      Once -- Once the -- Once it was negotiated, items
9  would come back up -- would come back up again every
10 budget year because there was adjustments that had to be
11 made.
12     I believe, if I remember the term specifically,
13 the -- the initial first year was 4.6 million -- 4.6,
14 4.7 million, in there -- for the General Dynamics lease.
15 Then there was a 2 -- $2 million escalation, and there
16 was a $2 million escalation after that, finally
17 terminating at 8.6, 8.7 million dollars.
18     Our inability to go through and -- and make those
19 additional $2 -- $2 million incremental came back
20 against our budget.
21     Q. And the lease term began in 2003?
22     A. It's -- The lease terms began a little bit --
23 or -- or commenced a little bit after the Airport
24 Authority was created. So specifically when, I can't
25 tell you the specific date.

Page 396

1      Q. And the last time you talked to Ted about the
2  overpayment issues was while the lease was being
3  negotiated?
4      A. Renegotiated, because initially there was a
5  3 million -- there was a 3-year term, and there had been
6  talk commencing again that -- that -- There was a
7  requirement that after three years, that you would then
8  go back through and renegotiate that lease, absolutely.
9      Q. And when did you have those discussions with
10 Ted? Was that in 2005?
11     A. Right around 2005, 2004.
12     But originally we had discussions as -- as the
13 terms of that agreement with the Port District were
14 being discussed. And that information was shared to me.
15 And I would respond to Ted that "I don't believe we can
16 make that type of money."
17     And the -- the basic uses for that property were
18 parking lot, rent-a-car. I knew what the parking lots
19 made. I knew the rent-a-cars made about another million
20 dollars a year. There was no -- There was no other uses
21 for that property -- it's all undeveloped -- with the
22 exception of -- of the parking lot property.
23     We were precluded from expanding that parking lot
24 property because of the contamination issues that were
25 then discovered. So when we would go through -- you

Page 397

1  know, once that was ratified, then, you know, there's --
2  there's not much I can do. But every budget it would
3  come back up. "Hey, we need to make an adjustment for
4  the $2 million additional lease payment on the
5  General Dynamics" that would hit -- that would hit all
6  our budgets. So then we would come back through and
7  discuss that matter at that time.
8      Q. So your understanding was that the first three
9  years were set by the code and by the lease agreement,
10 and then after that, it was going to be renegotiated?
11     A. I believe that's correct.
12     Q. Was that part of your job, to analyze the
13 revenues from that property?
14     A. Yes. I was -- I was the primary person
15 responsible for managing that property. I had -- I had
16 direct oversight on the parking lot property. I was the
17 key point of contact with the rent-a-cars, and I was key
18 point of contact with the San Diego Convention Center,
19 which also has a little portion -- which also leases a
20 little portion of that property.
21     So, yes, that was part of my responsibility.
22     Q. Did you ever talk to anyone aside from
23 Ted Sexton about your thoughts on the overpayment of the
24 General Dynamics lease?
25     A. No. I went -- I went straight to -- I went

43 (Pages 394 to 397)

53-611 (154)

Page 398

1   straight to my direct supervisor, Ted Sexton, and hoped
2   that he would -- you know, he would do what he felt was
3   right. But those discussions were -- were with
4   Ted Sexton.
5       Q. Do you know if Ted ever told anyone else at the
6   Authority that you had -- that you thought that the
7   lease on the General Dynamics lease was too high?
8       A. I can't answer what -- what he may have said or
9   not said.
10      Q. Do you know if the Authority has actually lost
11  money on that General Dynamics lease?
12      A. Absolutely. When you look at -- It is -- It is
13  my understanding that when you look at dollars in,
14  dollars out specific to that property, that we -- we are
15  unable to cover the debt service, I guess, for those
16  leases. When you look at revenue produced versus rents
17  paid, I don't believe that -- that -- I believe that it
18  would be a losing proposition for the Airport Authority.
19  That's my understanding.
20      Q. Was anyone else present when you talked to
21  Ted Sexton about the overpayment on the General Dynamics
22  lease?
23      A. No. That was a conversation that we had --
24  that we had, just him and I as his senior manager and
25  Ted. And that's why at that particular time he

Page 399

1   disclosed to me, you know, Thella's statement. That's
2   just the price she wanted to pay for freedom.
3       Q. Did you ever tell Ted Sexton that you thought
4   that the General Dynamics lease was illegal?
5       A. I -- My conversations with Ted Sexton were that
6   we had paid too much and that I didn't believe it was
7   right or was in Airport Authority's best interest
8   that we pay those type of rents on the property.
9       Q. You've also alleged in the Complaint in this
10  action that Bryan Enarson negotiated the lease for the
11  Teledyne-Ryan property?
12      A. That's correct.
13      Q. Which property are you referring to?
14      A. Teledyne-Ryan property is located directly west
15  of the air- -- airport's commuter terminal on about --
16  on approximately 46.77 acres of the former Teledyne-Ryan
17  property, extending from the employee park lot at the
18  commuter terminal to the coastguard crossing.
19      Q. Just approximately 46 --
20      A. Just approx- --
21      Q. -- point 77 acres?
22      A. -- approximately -- Believe me, I know -- I
23  know that property.
24      Q. Why do you believe that Bryan Enarson
25  negotiated that lease?

Page 400

1       A. He represented himself to me in that manner.
2   And in the same way that -- that I produced revenue
3   forecasts for the General Dynamics, I produced similar
4   revenue forecasts for him -- for him on -- on the
5   Teledyne-Ryan property with him and Vernon.
6       Q. Was there ever a discussion with Bryan Enarson
7   about who would run the Teledyne-Ryan property if the
8   Authority didn't have the lease? Like who might use the
9   property?
10      In other words, if the Authority decided not to
11  enter into the lease for that property, was there ever a
12  discussion about who might use the property instead of
13  the Authority?
14      A. Yeah. There was -- There had been some thought
15  by -- by -- There had been some -- some thought that the
16  Port District would -- would use that property for
17  parking-related services.
18      Q. Did you ever do any sort of an analysis on how
19  much money the Port District would make on the property
20  if it used it instead of the Authority?
21      A. I did some rough analysis; yes, I did.
22      Q. What did you determine?
23      A. I did some rough analysis on what -- you know,
24  what it would be, the cost dollar for dollar, if -- if
25  things kind of remained the same.

Page 401

1       I -- I -- I don't have the specific numbers in
2   front of me, so I can't tell you exactly, but there
3   would be -- you know, there would be some loss of
4   revenues.
5       Q. You determined that the Authority would lose
6   revenue if it didn't use the -- if it didn't obtain the
7   Teledyne-Ryan property?
8       A. There would be -- The -- The request was, "If
9   they opened up this parking lot here, what would you
10  think the forecasts would be" -- or "What do you think
11  You know, "What do you think they would make on the
12  property, and then what would be the effect on" -- "on
13  Airport Authority parking lots if that was the case?"
14      Q. And what did you determine the effect would be
15  on Airport Authority parking lots if the Port operated
16  the Teledyne-Ryan property?
17      A. It would be -- There would be a little bit of a
18  loss, or there would be some loss or translation of loss
19  at that time. I -- I don't remember what the documents
20  were because it was, you know, two, three years ago.
21  But if you have them there, I'd be happy to explain it
22  for you.
23      Q. Okay.
24      We'll mark as Exhibit 16 --
25      A. Okay.

44 (Pages 398 to 401)

53-611 (155)

Page 402

1    Q. -- a memorandum dated November 18th, 2003 from
2  Airport Operations to Bryan Enarson. [EXH-16]
3      Have you ever seen this document?
4      And go ahead and take time to read it if you need
5  to.
6      A. Yes. I believe this was one of the analysis
7  that I had put together for him.
8      Q. The first sentence says, "The following is a
9  preliminary analysis and forecast for SDIA parking
10 revenue loss due to a Port District parking operation on
11 the former Teledyne-Ryan property"; correct?
12     A. Correct.
13     Q. What did you mean by "SDIA parking revenue
14 loss"?
15     A. San Diego International Airport. And -- And
16 the reason I put "preliminary" were just rough
17 schematics if they were -- if they were to build it as
18 they -- they said they would build it.
19     Q. And based on this document, what did you
20 conclude preliminarily that the Airport Authority would
21 lose in parking revenue if the Port District maintained
22 control of the Teledyne-Ryan property?
23     A. Just -- As initially?
24     As initially, we did kind of a best-case,
25 worst-case scenario; and if all things remained the

Page 403

1  same, if demand on parking didn't increase, these were
2  just some rough numbers that I had put.
3      And really the closer one would be, you know, an
4  estimated loss if they were to be able to build it to
5  the extent that they said they were going to build it,
6  which -- which, as we all know, has -- is -- you can't
7  do because there's contamination in the property.
8      So this would just be general assumptions that, you
9  know, at -- you know, we would be looking at some sort
10 of revenue loss in the amount of approximately
11 $3 million a year.
12     Q. Is it fair to say that at the time of this memo
13 that we've marked as Exhibit 16, that the Authority
14 believed that the Teledyne-Ryan property would be usable
15 for parking?
16     MS. CHINN: Calls for speculation, lacks
17 foundation.
18     THE WITNESS: There was -- It would be fair to say
19 that -- that the Port District was contemplating using
20 the property as -- as a possible parking operation.
21     MS. MCDONOUGH:
22     Q. Do you know if the Authority had any plans to
23 use the property at all?
24     A. At --
25     Q. As of November 2003?

Page 404

1      A. We had used -- The Airport Authority had been
2  using that parking lot for -- for TSA parking, TSA
3  employee parking. We had been using a portion of that
4  parking lot for -- for cell phone, for the initial
5  placement of the cell phone waiting lot. Cell phone
6  waiting lot, exactly. So we -- we had already uses for
7  the property on an interim basis.
8      Q. And you prepared this memo that I marked as
9  Exhibit 16?
10     A. I believe I may have prepared it, yes.
11     Q. When you were preparing this memo, did you make
12 the assumption that the Port District would operate a
13 parking lot on the Teledyne-Ryan property?
14     A. The assumption presented to me was that if --
15 if they indeed -- they indeed operated the property as
16 a --
17     THE REPORTER: Who?
18     MS. MCDONOUGH: "If they indeed."
19     THE REPORTER: "They indeed."
20     THE WITNESS: -- they indeed -- the Port --
21     THE REPORTER: Thank you.
22     THE WITNESS: -- was able -- was able to construct
23 the property at -- or construct the parking operation
24 as -- as presented, what it would be. But -- what the
25 effect would be in there.

Page 405

1      So once again, that's why I made sure to put
2  "preliminary analysis" because I didn't have the
3  specifics on any environmental impacts, whether --
4  whether they had coastal permits or not. It was just a
5  preliminary rough swag on numbers.
6      MS. MCDONOUGH:
7      Q. Are you aware of anyone who had environmental
8  impact reports regarding the Teledyne-Ryan property at
9  the time that you prepared the memo in November of 2003?
10     A. No. I -- No. I would just -- only an
11 assumption that the Port District might have those.
12     Q. And eventually the Authority entered into a
13 lease for the Teledyne-Ryan property; correct?
14     A. Eventually they did.
15     Q. Do you know what the Authority's intent was for
16 the use of the property when they entered into the
17 lease?
18     A. The intent was to go through, construct an
19 approximately 1100 stall parking lot from Rent-A-Car
20 Road back to the commuter terminal, and then go back in
21 and look -- look for other uses for the rest of the --
22 for the rest of the property.
23     So I would be looking at carving out maybe
24 something in the -- in the amount of maybe 10 to
25 15 acres and use for parking, and the rest would be used

45 (Pages 402 to 405)

**53-611 (156)**

Page 406

1  for alternative use; warehouse space, additional office
2  space, or other uses that might be developed.
3      Q.  Okay.
4      At the time that the Authority entered into the
5  lease, did you have any information to suggest that the
6  items that you just identified -- Strike that.
7      At the time that the Authority entered into the
8  lease, did you have any information to suggest that the
9  Authority would not be able to do what it intended to do
10  with the property as you just described?
11      A.  There had been -- There had been conversations
12  that -- that the project may not be able to move forward
13  because the amount of contamination -- the amount of
14  contamination that had a good chance of existing on the
15  property.
16      Q.  When did discussions regarding the amount of
17  contamination first arise, from your understanding?
18      A.  I believe those discussions were already -- had
19  already been -- had already been made public as part of
20  the initial settlements with -- with Teledyne-Ryan, or
21  there had been some thoughts that -- that it was
22  contaminated in there and -- that there was
23  contamination to the property.  I don't exactly know
24  what days.
25      Q.  Did you ever speak to anyone about the

Page 407

1  contamination in the property at the time that the
2  Authority was entering into the lease?
3      A.  No.  It was my assumption -- It was -- It was
4  my assumption at that time that -- that the Airport
5  Authority would have good sense to follow up on -- on
6  those on their own.
7      Q.  Have you ever, at any time, talked about the
8  contamination of the property with anyone at the
9  Authority?
10      A.  Oh, absolutely.
11      Q.  When did you first talk to someone about that?
12      A.  Once -- Once the determination was made.  When
13  the Airport Authority assumed that property, we did --
14  the Airport Authority staff had -- had put together some
15  staff members to start looking at immediate uses for the
16  property.
17      Even -- Even taking a little carve-out, which is
18  about four -- four or five acres, for 350 stalls, we
19  encountered severe environmental issues that restricted
20  our ability to -- to -- to go in and construct that
21  parking lot.
22      And then as we started going into the
23  Teledyne-Ryan -- we put together a Teledyne-Ryan
24  redevelopment plan, we started noticing more and more
25  and more and more and more environmental concerns to the

Page 408

1  point that when the document was all said and done, it
2  was pretty close to $30 million in remediation costs.
3      Q.  Did you think that anything was illegal about
4  the Teledyne-Ryan lease?
5      A.  I believe that that -- considering the
6  usability, that -- the -- the -- our ability to use the
7  property, that we had overpaid for the property.
8      Q.  When did you form that belief?
9      A.  Immediately as we were developing -- as we were
10  developing the -- the design documents for the Phase I
11  of -- of what's called SAN Park -- SAN Park Harbor
12  Drive, which is approximately a 350-space parking lot.
13      Q.  And when was that?
14      A.  2- -- Approximately 2000, late 2003, 2004.
15      Q.  What do you believe is illegal about overpaying
16  on a lease?
17      A.  It's -- You and I can do it as individuals
18  maybe.  But, you know, as a public entity, we -- as a
19  public entity, you make -- need to make sure that --
20  that what you pay you can get out of because we have --
21  it's not just Airport Authority funds; it's -- it's
22  airline funds.  It's -- There's more stakeholders in
23  this, and there's some due diligence or proper due
24  diligence that must be followed when you agree to enter
25  into an extended -- extended lease in this manner.

Page 409

1      Q.  Do you believe that the Authority did not do
2  its due diligence?
3      A.  I believe the Airport Authority grossly
4  estimated -- underestimated the amount of contamination
5  on that property and the amount of litigation that it
6  would take to clean up that property.
7      Q.  Do you know what efforts the Authority made to
8  determine the contamination on the property prior to
9  entering into the lease?
10      A.  It -- It was represented in this manner:  The
11  Airport Authority had taken as face value any reports
12  that the Port District may have produced, which
13  obviously, at the end of the day, ended up being grossly
14  underestimated.  So we just assumed the documents that
15  the Port District had given us were -- were correct, and
16  we did not -- we did not do our own due diligence to
17  get -- get our own counter-number to -- to what was
18  presented to us by -- by the Port District.
19      Q.  Who told you that the Airport Authority had
20  taken the Port District's representations at face value?
21      A.  It was -- It -- It had been -- I -- I don't
22  remember exactly who it was.  I -- I -- I can't give you
23  specifics of who it was.  It was just -- It was just
24  portrayed to me that that's what had happened.  We
25  did -- what had happened.  And as we started to get into

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210

HERNANDEZ vs. SAN DIEGO COUNTY REGIONAL AIRPOR. .HORITY    December 19, 2006    JOSE DE JESUS HERNANDEZ, VOL. II

Page 410

1  doing our own environmental assessments on the property,
2  those numbers greatly shot through the roof.
3      Q. Did you ever tell anyone at the Authority that
4  you thought that the Teledyne-Ryan lease was illegal or
5  unlawful?
6      A. I believe my conversations with Ted -- with
7  Ted Sexton -- once again, my immediate supervisor -- was
8  that we had overpaid for the property, and the property
9  may have been mischaracterized to us and that -- that it
10  could not be developed in -- in the manner in which we
11  had initially thought we could.
12      Q. When did you first have that conversation with
13  Ted Sexton?
14      A. Immediately after we start- -- Immediately as
15  we began to make the -- to -- to make the designs for
16  the SAN Park project.
17      Q. Was that the only conversation you had with Ted
18  about overpayment on the Teledyne-Ryan property?
19      A. No. We had -- We had continuing conversations
20  with them because I had presented to him an option or
21  trying to understand why it is that we would continue to
22  pay $3 million for the whole property when I can only
23  use, you know, five acres of it. Why weren't we -- Why
24  didn't we have the ability to prorate -- to prorate, and
25  then, as we expanded into additional areas, then go

Page 411

1  ahead and increase our -- our rent payments to them in
2  that manner.
3      Q. Did Ted Sexton ever respond to your statements
4  regarding the overpayment of the lease?
5      A. No, not specific. He said he would just
6  present that to his senior team and see what it is that
7  they wanted to do.
8      Q. Do you know if he ever presented it to the
9  senior team?
10      A. I -- I -- I -- I couldn't tell you.
11      Q. Do you know if Ted Sexton ever told anyone that
12  you thought that the Authority overpaid on the
13  Teledyne-Ryan lease?
14      A. I believe -- I believe we had had that
15  conversation before. Who was there or -- Who was there
16  and what was said I can't -- can't exactly tell you.
17  But understanding the usability and what we paid for
18  that property, the statements were made that "We're just
19  paying too much for the property."
20      Q. So do you know if anyone else at the Authority,
21  aside from Ted Sexton, knows that you think that the
22  Teledyne-Ryan property was overpaid for?
23      A. Yeah. When we went through -- When we went
24  through and started doing our redevelopment, the
25  Teledyne-Ryan redevelopment plan, the usability, what we

Page 412

1  can use it for, what we can't, how much revenue we
2  really can get out of it, yes, that's when -- when it
3  was disclosed to the group or when we disclosed to the
4  group that "We just can't" -- "We can't develop the
5  Phase II, the Teledyne-Ryan. Here's what it's going to
6  cost to mitigate those areas," yes, at that time.
7      Q. And who disclosed that to the group?
8      A. And then I -- I made those disclosure because
9  it was part of -- it was part of my area of
10  responsibility. The number 1 focus for that property
11  was to expand the parking properties. If we were able
12  to expand the parking properties and create those 1100
13  spaces in there in a way -- in a way where it was -- it
14  was slow growth so it didn't impact our own airport
15  parking lots, that -- that we would have the ability to
16  pay for the rest of the property by -- by construction
17  of -- by constructing that parking facility.
18      Q. Who is the group that you made this disclosure
19  to?
20      A. It would be the Teledyne-Ryan Redevelopment
21  Plan -- or Redevelopment Committee.
22      Q. Do you know who was on that committee?
23      A. No. I don't have the exact individuals. It
24  was -- It was a cross-section -- cross-section of
25  individuals from -- from real estate, from

Page 413

1  environmental, construction, and obviously my side, the
2  landside operations.
3      Q. Do you remember when this disclosure was?
4      A. No, I don't.
5      Q. Do you remember the year?
6      A. It was early on -- early on in the development,
7  in the design development, for -- for the parking, for
8  the initial Phase I of the Teledyne-Ryan parking
9  project.
10      Q. In 2004 sometime?
11      A. That would probably -- That would probably be a
12  good guess.
13      Q. How long was the meeting where you presented
14  your findings?
15      A. We would meet on a weekly basis, so it was
16  about a two-hour meeting.
17      Q. On a weekly basis?
18      A. Yes.
19      Q. Do you know if anyone took notes of those
20  meetings?
21      A. I'm not sure.
22      Q. Did anyone else in the meeting express
23  dissatisfaction with the terms of the Teledyne-Ryan
24  lease?
25      A. It was more dissatisfaction with -- with the

47 (Pages 410 to 413)

53-611 (158)

Page 414

1  Airport Authority's lack of due diligence in -- in
2  understanding the -- the effects of -- for the
3  contamination of that property.
4      Q.  Who expressed that dissatisfaction?
5      A.  It would be Paul Manasjan, who was tasked --
6  Paul Manasjan was the director of Environmental Affairs,
7  and Paul was tasked with -- with making each and all
8  those environmental assessments.
9      Q.  Is there anyone else who expressed
10  dissatisfaction with the Teledyne-Ryan lease in those
11  meetings?
12      A.  Primarily it was -- it was myself on the
13  revenue side and my inability to be able to expand to
14  those projects, and on Paul Manasjan's side for an
15  underestimation of -- of -- of the environmental
16  mitigation that had to take place on the property.
17      Q.  Is it fair to say at a certain point in time
18  that the whole committee was frustrated with the
19  Teledyne-Ryan lease?
20      A.  Oh, absolutely.
21      Q.  When did that frustration begin?
22      A.  Well, the frustration came to a -- a pretty big
23  head when -- when the initial plan for Teledyne-Ryan was
24  presented to the senior -- senior VP group at a meeting
25  at the Sheraton -- Sheraton Harbor Island where each --

Page 415

1  each member of the task -- of the task force went
2  through and made a presentation on -- on their areas of
3  responsibility so we can give the VPs -- the vice
4  presidents a thorough idea of the property, potential
5  uses, lease rates in those.
6      And, you know, I would talk -- I would talk to the
7  effect of -- of existing parking operations and what the
8  effects or what would need to be happen -- or what would
9  need to happen to expand those and what those would look
10  like when Paul Manasjan would go through, and he finally
11  disclosed what -- what he believed at that time was the
12  full effect of -- full effect of the environmental
13  impact would be closer to $30 million than what it was
14  initially assumed at $10 million.
15      Q.  Do you remember when that meeting was at the
16  Sheraton --
17      A.  No, I don't.
18      Q.  -- Harbor Island?
19      A.  I know we had two presentations to -- to the
20  senior VP group, but it was whatever that first one was.
21  It'd be 2004 or 2005.  Not -- Not exactly sure what day
22  there.
23      Q.  Did both you and Paul speak at the
24  presentation?
25      A.  Yes.  That -- Then -- That Steve Cornell

Page 416

1  chaired that committee, and there should be minutes
2  somewhere of -- of the information that was disclosed at
3  that time.
4      Q.  Do you know who took minutes?
5      A.  No, I don't.
6      Q.  Were there other people at the Authority that
7  you're aware of outside of the committee that thought
8  that the Authority had overpaid on the Teledyne-Ryan
9  lease?
10      A.  No, because this -- the -- the development of
11  the redevelopment plan was really just the concern at
12  that particular time of that -- our particular core
13  group, the -- the task force in there.  And that --
14  that's where those disclosures came at that time.  And
15  then they were made -- they were made then public too.
16      They were made then because they were all
17  non-public meetings.  They were disclosed to the senior
18  VP group.  So there was just a -- a smaller group that
19  was involved in -- in -- in those redevelopment plans.
20      Q.  And after the conclusions were revealed to the
21  senior VP group, did you ever hear anyone at the
22  Authority complain about the Teledyne-Ryan lease?
23      A.  Other than myself?
24      Q.  Yes.
25      A.  No.  I -- I was -- I was a -- a -- I was an

Page 417

1  opponent to that because what I didn't understand --
2      Once again, because it affected my budget in the
3  terminal operations side or on the landside, and it
4  affected my ability to -- to provide services within the
5  terminals, I was -- I was a vocal opponent of those
6  because not only -- not only did -- was I coupled with
7  overpayment on the General Dynamics side, now you got to
8  add that up with the overpayment on -- on -- on the
9  Teledyne-Ryan.  And now we're in the hole somewhere
10  between 3 to $4 million a year --
11      Q.  When was --
12      A.  -- on overpayment on two -- two service
13  agreements -- or two leases.
14      Q.  When was the last time that you opposed the
15  terms of the Teledyne-Ryan lease?
16      A.  I know it was on a continuing basis every time
17  that we would come through or from -- Probably --
18  Probably at least once every other week as we presented
19  the -- the continuation or we presented our current
20  development plans for the -- the Teledyne-Ryan, there
21  was a big push to try to get the parking properties in,
22  to try to mitigate our cost.
23      The problem was we couldn't do it.  It was too
24  expensive.  And then having -- go through the process,
25  having go through their environmental assessments,

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210

53-611 (159)

HERNANDEZ vs. SAN DIEGO COUNTY REGIONAL AIRPORT .  ~HORITY    December 19, 2006    JOSE DE JESUS HERNANDEZ, VOL. II

Page 418

1  environmental remediations, those -- those -- those
2  properties -- it would be easy to say that -- that we
3  did not -- the Airport Authority did not -- Entering
4  Into a 66-year agreement for $3 million a year, you
5  know, that's almost $200 million.
6      You -- You would think someone would have put more
7  effort Into -- into really understanding the
8  environmental -- the environmental concerns with that
9  property. That's a $2 million commitment -- a $200
10  million commitment.
11      Q. When was the last --
12      THE VIDEOGRAPHER: Excuse me, Counsel.
13      MS. MCDONOUGH: Oh. We have to change the tape.
14      THE VIDEOGRAPHER: This is the end of Videotape
15  Number 2, Volume II. Off the record at 4:05 p.m.
16      (A recess is taken.)
17      THE VIDEOGRAPHER: This is the beginning of
18  Videotape Number 3, Volume II.
19      Back on the record at 4:12.
20      MS. MCDONOUGH:
21      Q. You mentioned that the Teledyne-Ryan lease was
22  a 66-year lease; is that correct?
23      A. Approximately. Right in that range, 66 years.
24      Q. And was the amount of the lease on an annual
25  basis consistent throughout the term of the lease?

Page 419

1      A. Believe -- I -- I believe if I -- if I -- I
2  believe it was about $3 million as you go through.
3      Q. So $3 million per year for 66 years?
4      A. As you go through, yes.
5      Q. That never increased over time?
6      A. I'm -- I'm not sure of the specifics or what
7  escalator clauses they had. My general assumption it
8  was approximately $3 million a year.
9      · Q. Did Tom Morgan ever present options for how the
10  Teledyne-Ryan property could be used once the
11  contamination's cleaned up?
12      A. Yes. Tom Morgan was hired as -- as a
13  consultant to come up with ideas and maybe some revenue
14  forecast or development options, yes.
15      Q. What kind of ideas did he come up with for uses
16  of the property?
17      A. Parking.
18      Q. All parking?
19      A. There was a lot of parking in there, and there
20  were uses for -- there was uses for -- for office space,
21  maybe some FBOs, fixed-base operators, charter
22  operations on the backside, some warehouse storage
23  space, maybe some cargo facilities to be used in there
24  as well.
25      Q. Would each of the options that Tom Morgan

Page 420

1  presented bring in a revenue In excess of $3 million per
2  year?
3      A. They would go through -- He had come through
4  and presented some options of what they were, but just
5  some -- some rough numbers of potential revenue streams.
6      And I don't quite remember whether there was some
7  Initial options on what it would cost to get those. And
8  then there was no definite assumption of -- of building
9  in the -- building In the $30 million for remediation.
10      Q. But assuming that the contamination was gone
11  and any one of Tom Morgan's Ideas was Implemented for
12  use of the property, would there have been some sort of
13  income or revenue from that property?
14      A. There was -- There was Ideas that were
15  presented -- that -- that were presented for the
16  property -- and I don't have those numbers In front of
17  me -- that may.
18      But as -- But there were some Ideas that were
19  presented that, knowing how you were going to build, you
20  were not going to build parking structures along Harbor
21  Drive. You were not going to knock the whole property
22  down, which was one of his options, and make a big --
23      THE REPORTER: I'm sorry.
24      THE WITNESS: -- parking lot.
25      THE REPORTER: "You're not going to build" -- "you

Page 421

1  were not going to build" --
2      THE WITNESS: Parking garages.
3      THE REPORTER: -- "parking structures along" --
4      THE WITNESS: "Along Harbor Drive."
5      You were not going to demolish all the properties
6  and pave it into one big parking lot.
7      So there were options presented.· At the end of the
8  day, believe it or not, the option that made the highest
9  amount of revenue was demoing the whole building down
10  and just making the 46.77 acres and making it one big
11  parking lot.
12      MS. MCDONOUGH:
13      Q. Assuming that the contamination was eventually
14  cleaned up, would that option of building an entire
15  parking lot over the entire acreage have produced
16  revenue for the Authority?
17      A. In general concept you could, but it was -- but
18  it was immediately understood that we would not be able
19  to get approval to build such a -- such a facility.
20      Q. Why did you believe you would not be able to
21  get approval to build a facility?
22      A. Because the environmental -- environmental,
23  the -- the impact on Harbor Drive, there was just·too
24  many -- too many nonstarters to even contemplate that
25  as -- as -- as an option.

49 (Pages 418 to 421)

53-611 (160)

Page 422

1    Q. What were the nonstarters?
2    A. Environmental, your remediation, your impacts,
3 your traffic on Harbor Drive, the -- Those are just some
4 of the general ones. And public perception of -- of
5 paving, of creating such a big parking lot along such a
6 scenic area of Harbor Drive.
7    Q. So assume that the contamination was gone from
8 that property. Were there any proposed uses of the
9 property that could have been implemented?
10    A. There was -- It had reached -- It had reached
11 to a point that -- that Tom Morgan had presented the
12 options that he could. But it was an understanding that
13 because of the increase in the environmental, that first
14 environmental would have to be remediated, and then they
15 would visit those development options later.
16    If my timing serves me correct, after the
17 disclosure of these environmental, Tom Morgan's
18 consulting agreement was terminated or ceased, or maybe
19 it coincided with his initials -- whatever his term was
20 because I've never seen his terms of his consulting
21 agreement.
22    Q. Are you aware of a cleanup and abatement order
23 for the property?
24    A. Yes.
25    Q. What do you know about that order?

Page 423

1    A. That it was just -- There was just some
2 requirements now that drag the Airport Authority into
3 being part of -- or -- or being responsible in some sort
4 of fashion to a certain degree to go ahead and clean
5 up -- clean up those -- that property.
6    Q. Are you aware of a cleanup and abatement order
7 that required Teledyne-Ryan to clean up the aboveground
8 contamination?
9    A. I believe that -- I -- I believe there is
10 something, but to -- to -- to what effect, I'm not --
11 I'm not -- I'm not sure if it's just specific to
12 Teledyne-Ryan and only them and they are responsible for
13 that. I don't believe that's the case.
14    Q. Who do you believe is also responsible for it?
15    A. I believe that -- that in the conversations
16 that we had with -- with -- with Paul Manasjan, that the
17 Airport Authority now had some responsibility for -- you
18 know, for mediation of that property, the Port
19 District -- Port District, Teledyne-Ryan, Allegheny.
20 There was -- There was more than -- than one particular
21 party who was responsible for that cleanup and
22 abatement.
23    Q. I'm just focusing right now on the aboveground
24 contamination.
25    A. Mm-hmm.

Page 424

1    Q. You believe that other entities aside from
2 Teledyne-Ryan are responsible for cleaning that up?
3    A. I believe so.
4    Q. And you have that belief from the discussions
5 in your committee?
6    A. Yes, my understanding of -- of -- of -- of
7 those documents or those requests.
8    Q. Have you ever seen a cleanup and abatement
9 order for the property?
10    A. I have not.
11    Q. When did you first become aware that there was
12 a cleanup and abatement order?
13    A. Paul Manasjan had -- had -- had briefed that
14 cleanup and abatement to -- to us -- to -- to staff in
15 one of Ted's weekly meetings.
16    Q. Are you aware of a settlement agreement that
17 the Port District entered into regarding the
18 contamination of the property?
19    A. Yeah. The initial settlement then only
20 required them to pay, you know, maybe $10 million. And
21 that -- that is why I referred to their initial
22 settlement for 10 million when in fact the -- the cost
23 for remediation is -- is $30 million.
24    And then there's -- there's clauses within our
25 agreement that -- that requires the Airport Authority to

Page 425

1 pay some sort of portion of those remediation cost above
2 and beyond that $10 million.
3    Q. How many different -- Well, strike that.
4    Are you aware that there's a cleanup and abatement
5 order and a settlement agreement that are two separate
6 documents?
7    A. I believe they are. The specifics to each
8 of -- one of them I -- I can't tell you. I haven't -- I
9 haven't studied them enough to know -- to know what they
10 are and -- and understand the -- the liability now as I
11 stand here before.
12    Q. Was there ever a time where you understood who
13 had to pay for what cleanup under the cleanup and
14 abatement order and the settlement agreement?
15    A. I believe -- I believe during the time I had a
16 better understanding of that documentation as I was
17 going through the developing options for the parking
18 lots and as -- as the project estimate came through and
19 said, "This is what it's going to cost. This is
20 what" -- I tell you that just on expanding the 350
21 stalls that I had on SAN Park bringing them to 11-, we
22 were going to blow by that $10 million.
23    Q. You indicated previously, I believe, that the
24 estimate was $30 million to clean up the property; is
25 that correct?

50 (Pages 422 to 425)

Page 426

1    A. That was a -- That was a -- a rough number that
2 we had -- that we had been using as, you know, cost
3 for -- for remediation of that property.
4    Q. And you believe that under one of these orders
5 or agreements, that the Port District had to pay for at
6 least $10 million of that --
7    A. There was --
8    Q. -- cleanup?
9    A. -- some thought in there, and that's why I
10 don't -- I don't recall the specifics to that agreement,
11 but it -- it calls for, you know, some settlement that
12 was given, some lump sum payment, but then the
13 Airport Authority being responsible for portions above
14 that 10 million.
15    Q. Have you ever heard that the Port District is
16 required to pay 50 percent of the cleanup?
17    A. Above that $10 million. Yeah, I -- I believe
18 that was my understanding, as I -- as I said before, and
19 then the Airport Authority the other -- the other
20 10 million.
21    Q. So you think --
22    A. The other -- The other -- It was 10 million;
23 and then above that 10 million, Airport Authority. And
24 the Airport Authority and the Port District would --
25 would split those remediations costs.

Page 427

1    Q. Okay.
2    So assuming that it was 30 million total, the
3 Port District would take the first 10 million, and then
4 the Port and the Authority would split the other
5 20 million?
6    A. Yeah. But even that's an overcharacterization
7 of that because the Airport -- the Port District had the
8 abilities within that $10 million to expense or to
9 recover expenses that they had incurred, or loss of
10 revenues against that $10 million. So it wasn't a clean
11 $10 million that were available, my understanding of
12 that documentation.
13    Q. What was your understanding of Tom Morgan's
14 projected revenue for the property once the
15 contamination was cleaned up?
16    A. You know, there was -- there was some -- there
17 were some development options over there, some -- some
18 decent ideas. A lot of it was really centered on
19 parking because how -- that's really how you were going
20 to make your money on these projects.
21    But once again, the thought of how long it would
22 take you to build these things because of environmental
23 concerns was -- was -- was a big nonstarter. I mean,
24 we -- quite frankly, the Airport Authority
25 underestimated the amount of time -- the amount of money

Page 428

1 it would cost to mitigate that property and the amount
2 of time that it would cost them to get through that
3 whole process.
4    Q. Did Tom Morgan ever present projected revenues
5 to your committee?
6    A. I believe he did. In fact, those same -- those
7 same revenues were -- were put together in some sort of
8 presentation that -- that he distributed to the group.
9    Q. Do you remember what his projected revenues
10 were for the Teledyne-Ryan property?
11    A. No, I don't.
12    Q. Do you have an estimate?
13    A. No, I don't.
14    Q. But that was presented in some sort of a
15 document or a PowerPoint presentation?
16    A. Some sort of document and -- on development
17 options for the Teledyne-Ryan.
18    Q. When did you receive that document?
19    A. Maybe 2004 or 2005.
20    MS. MCDONOUGH: We'll go ahead and conclude the
21 deposition for today. I'm not done, once again, with
22 your deposition. We're just suspending the proceedings
23 until tomorrow at 9:30 in the morning.
24    We'll enter the same stipulation as yesterday,
25 Cathryn?

Page 429

1    MS. CHINN: Yes.
2    MS. MCDONOUGH: And I will send that to you -- the
3 other court reporter so she has it.
4    THE VIDEOGRAPHER: Off the record at 4:25.
5    (By instruction of counsel, the reporter has
6 redacted the following stipulation from the deposition
7 of JOSE HERNANDEZ, Volume I, as reproduced below:
8    MS. MCDONOUGH: We agree that the court reporter
9 will prepare a transcript of today's proceedings. She
10 will send a copy -- or the original of the transcript to
11 Ms. Chinn. Ms. Chinn will give it to Mr. Hernandez, and
12 he will have 30 days to review the transcript and to
13 make any changes, sign it under penalty of perjury.
14    Ms. Chinn agrees to notify our office of
15 Mr. Hernandez's signature of the transcript and to
16 notify us of any changes that are made to the transcript
17 within that 30-day period.
18    In the event that the original transcript is lost or
19 destroyed, we agree that a certified copy may be used in
20 lieu thereof. And Ms. Chinn agrees to make the original
21 transcript available at any proceeding upon reasonable
22 notice.
23    MS. CHINN: He'll make the corrections 30 days
24 after the receipt of the transcript. Otherwise, so
25 stipulated.)

51 (Pages 426 to 429)

53-611 (162)

Page 430

1    (Whereupon the documents referred to are marked by
2  the reporter as Defense Exhibits 8 through 16 for
3  identification.)
4    (The proceedings concluded at 4:25 p.m.)
5                    ***
6
7    I declare under penalty of perjury under the laws
8  of the State of California that the foregoing is true
9  and correct.
10
11    Executed at _____, California,
12  on _____.
13
14
15    _____
            JOSE DE JESUS HERNANDEZ
16
17
18
19
20
21
22
23
24
25

Page 431

1  STATE OF CALIFORNIA ) ss
2
3    I, Suzanne Soper, CSR 8120, do hereby declare:
4
5    That, prior to being examined, the witness named in
6  the foregoing deposition was by me duly sworn pursuant
7  to Section 2093(b) and 2094 of the Code of Civil
8  Procedure;
9
10    That said deposition was taken down by me in
11  shorthand at the time and place therein named and
12  thereafter reduced to text under my direction.
13
14    I further declare that I have no interest in the
15  event of the action.
16
17    I declare under penalty of perjury under the laws
18  of the State of California that the foregoing is true
19  and correct.
20
21    WITNESS my hand this _____ day of
22  January, 2007.
23
24
     _____
25  Suzanne Soper, CSR 8120

# Deposition of
# JOSE HERNANDEZ, VOL. III

## JOSE HERNANDEZ v. SAN DIEGO COUNTY

### *Taken On*
### *January 15, 2007*

Transcript provided by:

**HUTCHINGS**ᴺ
COURT REPORTERS, LLC
CSR 649

GLOBAL LEGAL SERVICES

**800.697.3210**

JOSE HERNANDEZ vs. SAN DIEGO COUN...    January 15, 2007    JOSE HERNANDEZ, VOL. III

```
 1                    CERTIFIED COPY
 2
                SUPERIOR COURT OF THE STATE OF CALIFORNIA
 3
                   FOR THE COUNTY OF SAN DIEGO
 4
 5   JOSE HERNANDEZ,              )
                                 )
 6       Plaintiff,              )
                                 )
 7   vs.                         )  No. GIC871979
                                 )
 8   SAN DIEGO COUNTY REGIONAL AIRPORT   )
     AUTHORITY, a public entity; and     ).
 9   DOES 1 through 12 inclusive,    )
                                 )
10       Defendants.             )
11   _____)
12
13            VOLUME III
14   DEPOSITION OF JOSE DE JESUS HERNANDEZ, the
15   plaintiff herein, noticed by PAUL, PLEVIN,
16   SULLIVAN & CONNAUGHTON LLP, at 401 B Street,
17   San Diego, California, at 9:52 a.m., on Wednesday,
18   December 20, 2006, before Della M. Satterlee,
19   CSR 9114.
20
21
22   Hutchings Number 147265-SD
23
24
25
```

Page 434

```
 1           I N D E X
 2   WITNESS: JOSE DE JESUS HERNANDEZ
 3   EXAMINATION BY:           PAGE
 4   Ms. McDonough             436
 5
 6
 7           E X H I B I T S
 8   Exhibit identification within the transcript is flagged
     with "[EXH]" as an identifier.
 9
10   DEFENSE  DESCRIPTION      IDENTIFIED MARKED
11   17    San Diego Unified Port    439    439
           District Lease to San Diego
12         County Regional Airport
           Authority of Property
13         Located at 2701 North Harbor
           Drive, San Diego, California
14         for Sixty-Four (64) Years
           Commencing January 1, 2005
15         and Ending December 31, 2068
           [EXH-17]
16
17   18    Cleanup and Abatement Order  449    449
           No. R9-2004-0258 for
18         Discharges of Waste From
           2701 North Harbor Drive in
19         San Diego, California
           [EXH-18]
20   19    Evaluation Panel, Parking    485    485
           Lot Management RPF
21
22   20    Collection of two Use and    584    585
           Occupancy Permits for Elite
23         Racing
           [EXH-20]
24
25
```

Page 433

```
 1   APPEARANCES OF COUNSEL:
 2
 3   For Plaintiff:
 4   LAW OFFICE OF CATHRYN CHINN
 5   BY CATHRYN CHINN
 6   3990 Old Town Avenue, Suite A-109
 7   San Diego, California 92110
 8
 9   For Defendant SAN DIEGO COUNTY REGIONAL AIRPORT
10   AUTHORITY:
11   PAUL, PLEVIN, SULLIVAN & CONNAUGHTON LLP
12   BY SANDRA L. McDONOUGH
13   401 B Street, 10th Floor
14   San Diego, California 92101
15
16   For Defendant SAN DIEGO COUNTY REGIONAL AIRPORT
17   AUTHORITY:
18   AMY GONZALEZ, Senior Assistant General Counsel
19   P.O. Box 82776
20   San Diego, California 92138-2776
21
22   Also Present:  GORDON MILLER, Video Operator
23
24
25
```

Page 435

```
 1       VIDEO OPERATOR:  Good morning.  Here begins
 2   Videotape Number 1 of the deposition of Jose Hernandez,
 3   Volume III, in the matter of Hernandez versus San Diego
 4   County Regional Airport Authority, et al., Case Number
 5   GIC871979.  The case is in the Superior Court of the
 6   State of California for the County of San Diego.
 7       Today's date is December 20th, 2006, and the time
 8   is 9:52 a.m.  This deposition is taking place at
 9   401 B Street, San Diego, California and is being taken
10   on behalf of the defendant.  The videographer is Gordon
11   Miller appearing on behalf of Hutchings Court Reporters
12   located in San Diego, California.
13       Would Counsel please identify yourselves and state
14   whom you represent.
15       MS. CHINN:  Cathryn Chinn, C-H-I-N-N, for the
16   plaintiff, Jose Hernandez.
17       MS. McDONOUGH:  Sandra McDonough for defendant.
18       MS. GONZALEZ:  Amy Gonzalez for defendant.
19       VIDEO OPERATOR:  Thank you.
20       Would the court reporter please swear in the
21   witness.
22       (Continued on following page.)
23
24
25
```

1 (Pages 432 to 435)

Page 436

1        JOSE DE JESUS HERNANDEZ,
2  the plaintiff herein, having been sworn, testifies as
3  follows:
4
5                -EXAMINATION-
6
7  BY MS. McDONOUGH:
8      Q.  Good morning, Mr. Hernandez.
9      A.  Good morning.
10     Q.  Is there any reason why you cannot give your
11 best testimony today?
12     A.  No.
13     Q.  Have you taken any medication or alcohol in the
14 last 24 hours that would adversely affect your ability
15 to testify today?
16     A.  No.
17     Q.  When we finished up yesterday, we were talking
18 about the Teledyne Ryan property and the Authority's
19 lease for that property.
20         Do you recall that?
21     A.  Yes, ma'am.
22     Q.  Are you aware that the Port District was
23 engaged in litigation with Teledyne Ryan over that
24 property?
25     A.  Some knowledge.

Page 437

1      Q.  What knowledge do you have of that?
2      A.  Some knowledge that Teledyne Ryan -- that the
3  Port District was trying to recover lost rents on the
4  property from -- from Teledyne Ryan.
5      Q.  Are you aware that the Port District obtained a
6  judg- -- obtained a judgment against Teledyne Ryan for
7  over $21 million?
8      A.  I believe I was, yes, ma'am.
9      Q.  Are you aware that out of that judgment, that
10 approximately 9.7 or $9.8 million was to go from the
11 Port to the Authority for demolition on that Teledyne
12 Ryan property?
13     A.  I believe a portion of that, not all of the
14 9.7 million.
15     Q.  What portion do you believe was to go towards
16 that?
17     A.  I believe there was an allocation of 9.7-, of
18 which the Port District could go back and recover
19 additional costs. So it wasn't a net sum of
20 $9.7 million going towards the project.
21         And after that proj- -- after that number, revenues
22 would be split or expenses for demolition or remediation
23 would be split 50-50 between the Port District and the
24 Airport Authority.
25     Q.  And do you have any understanding as to whether

Page 438

1  or not the split would -- between the Port and the
2  Airport Authority would only occur if Teledyne Ryan
3  could not pay the cleanup costs?
4      A.  No, I'm not -- I'm not sure of -- I'm not sure
5  of that language in that documentation.
6      Q.  Have you actually read the documentation
7  regarding the split?
8      A.  I had read the documentation at one time, but
9  not -- not recently.
10     Q.  As we sit here today, do you have any way to
11 recall what was in the agreement regarding the split of
12 who would pay for what?
13     A.  Not specifically, no.
14     Q.  Is there anything that would refresh your
15 recollection on that?
16     A.  Only the ability to read the documentation.
17     Q.  And what documentation are you referring to?
18     A.  There -- There must be some sort of settlement
19 document in there and then some memorandums produced by
20 the Airport Authority to the board members discussing
21 what exactly those costs were, the total remediation
22 costs, the full effect of those remediation costs to
23 Airport Authority budget.
24     Q.  Okay.
25         I'm going to mark as Exhibit 16 -- that would be

Page 439

1  Exhibit 17 the lease from the Port District in the
2  Airport Authority for the Teledyne Ryan
3  property. [EXH-17]
4      A.  Okay.
5         And these you keep; right, at the end of the day?
6      Q.  Thank you.
7  MS. CHINN:  This is 17; right?
8  THE REPORTER:  Yes.
9         (Whereupon the document referred to is marked by
10 the reporter as Defense Exhibit 17 for identification.)
11 MS. McDONOUGH:
12     Q.  Do you recognize the document that I just
13 handed you?
14     A.  I've never seen it before, no.  I mean, not --
15 not this one in this version, no.
16     Q.  Okay.
17         I'll call your attention to what is Exhibit C to
18 the document that I just gave you.
19     A.  Okay.
20     Q.  You're going to go to the very end of it --
21     A.  Uh-huh.
22     Q.  -- and it's marked "50," page 50, in the
23 corner.
24         Do you see the handwritten --
25     A.  Uh-huh.

2 (Pages 436 to 439)

**53-611 (166)**

Case 3:08-cv-00184-L-CAB    Document 1-10    Filed 01/30/2008    Page 99 of 145

JOSE HERNANDEZ vs. SAN DIEGO COUN r        January 15, 2007        JOSE HERNANDEZ, VOL. III

Page 440

1    Q. Okay.
2        That's a settlement agreement between the Port
3    District and the Airport Authority.
4        Have you ever seen that document before?
5    A. I believe I had seen it at one time.
6    Q. And I call your attention to pages 52 and 53 of
7    Exhibit 17 --
8    A. (Indicating.)
9    Q. -- starting with section J1b where it says,
10   "Environmental Clean-Up Costs."
11   A. Okay.
12   Q. Do you see that?
13   A. Uh-huh.
14   Q. Why don't you go ahead and read that section
15   and let me know if it refreshes your recollection as
16   to --
17       MS. CHINN: Read it to yourself.
18       MS. McDONOUGH: Yeah, right.
19       MS. CHINN: What page are you on?
20       MS. McDONOUGH: 52 of Exhibit 17.
21       MS. CHINN: Okay.
22       MS. McDONOUGH:
23   Q. See if it refreshes your recollection as to the
24   amount of money that was to be paid for cleanup costs
25   and who was going to pay for those.

Page 441

1    A. Do you mind if I -- if I just -- I -- Do you
2    mind if I would outline -- I know it's her copy. That's
3    why I don't want to write on it.
4        MS. CHINN: Here (indicating).
5        MS. McDONOUGH: Sure. I can make another copy,
6    so --
7        MS. CHINN: No.
8        MS. McDONOUGH: Okay.
9        MS. CHINN: Use mine (indicating).
10       THE WITNESS: Okay.
11       MS. CHINN: You don't have time for photocopying.
12   You're a busy woman.
13       THE WITNESS: (Indicating.)
14   Okay. All right.
15       MS. McDONOUGH:
16   Q. Does the document that we've marked as
17   Exhibit 17 refresh your recollection as to the agreement
18   between the Port and the authority about payment of the
19   abatement and cleanup costs for the Teledyne Ryan
20   property?
21   A. Yes, ma'am.
22   Q. What is your understanding of the agreement
23   between the Port and the Authority on the --
24   A. The understanding --
25   Q. -- cleanup costs?

Page 442

1    A. My understanding of the agreement was that --
2    or is that the -- the Port District receives about
3    21 million -- a little bit over $21 million in
4    settlement, of which the majority of that portion, with
5    the exception of 9.7 million, was rent for rents owed on
6    that property.
7        Of the $9.7 million, the Airport -- the Port
8    District had an ability to recover all their little --
9    their legal and litigation costs to those, so it's not a
10   net $9.7 million.
11       After that -- After those amounts, the Airport
12   Authority and the Port District would split the costs of
13   remediation 50-50.
14       The problem with this document, it does not outline
15   or it was never disclosed the total cost of remediation.
16   So that is -- that -- that's my point. How could you
17   agree to split remediation costs when you don't know
18   what it is?
19   Q. Have you ever had an understanding of what the
20   remediation costs would be for the Teledyne Ryan
21   property?
22       MS. CHINN: Could you read back the rest of his
23   last answer for me, please. Thanks.
24       (The record is read by the reporter.)
25       MS. CHINN: Okay. Thank you.

Page 443

1        MS. McDONOUGH: And my last question.
2        (The record is read by the reporter.)
3        THE WITNESS: There was not an understanding --
4    There was a number bantered around that based on
5    preliminary -- on preliminary assessments done by the
6    Port District -- or actually, let me take that back --
7    done by Teledyne Ryan as submitted to the Port District.
8    It was assumed it was somewhere within the $10 million
9    range.
10       But the Port District had not taken the time to --
11   to -- to make their own detailed environmental
12   assessment. And then at the time that this agreement
13   was put into place, the Airport Authority did not do an
14   assessment environmental one or environmental two, which
15   would be some sample core drillings to validate that
16   information.
17       MS. McDONOUGH:
18   Q. Do you have any infor- -- Information to
19   suggest that the $10 million number for the remediation
20   cost is not valid?
21   A. Absolutely.
22   Q. What's that information?
23   A. There was -- As part of our Teledyne Ryan
24   assessment, we had -- the group, led by Paul Manasjan,
25   had put together a complete and detailed environmental

3 (Pages 440 to 443)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY          January 15, 2007          JOSE HERNANDEZ, VOL. III

Page 444

1  assessment of every square inch of that property.
2        They had gone in to every office, to every building
3  and identified what it would be to do the demos in
4  different stages, if you brought the buildings down to
5  the ground, what the above-ground remediation would be,
6  what the below-ground remediation costs would be. And
7  that's how it was determined it would be in the
8  $30 million range, grossly over the $10 million.
9        Q. Have you ever heard that it would cost more
10  than $30 million to clean up the Teledyne Ryan property?
11        A. Absolutely.
12        At cost -- That -- That $30 million cost was at --
13  at that day's price of the cost, but it's -- it's
14  definitely understood that the longer it takes you to
15  remediate that property, the more it would cost.
16        Q. Do you have any understanding, as we sit here
17  today, of how much it will cost to remediate the
18  Teledyne Ryan property?
19        A. I believe that the last number that -- that I
20  was -- that was available to me was no less than
21  $30 million.
22        Q. Do you have any information to suggest that it
23  would be more than $30 million?
24        A. Not at this time.
25        Q. When did you first become aware of the

Page 445

1  settlement agreement that we just looked at that's part
2  of Exhibit 17?
3        A. This -- This particular settlement agreement
4  was disclosed as -- to -- to us as part of our -- to
5  them, Teledyne Ryan redevelopment team or task force.
6  And so we had started looking into -- into the details
7  of what it would cost to do specifically the Phase I and
8  Phase II of the parking lot projects.
9        Q. If you look at the settlement agreement on the
10  very last page of Exhibit 17, it was signed on May 20th,
11  2004.
12        A. (Indicating.)
13        Okay.
14        Q. Do you believe that you learned about the
15  settlement agreement sometime in the May 2004 time
16  frame?
17        A. Right around that time frame, yes, ma'am.
18        Q. And when did you first have an understanding
19  that it would cost about $30 million to do a remediation
20  of the Teledyne Ryan property?
21        A. Immediately as we started -- as I started with
22  my sponsorship of the development of the Phase I of the
23  San Park project, it had been -- become clear that the
24  numbers were -- were not going to be sufficient for
25  remediation, because the information that was disclosed

Page 446

1  to us at that time was that initial parcel for 5- -- 350
2  parking spaces was clean.
3        As we went in and put our first light into the
4  ground, environmental -- environmental issues were --
5  were -- were quickly found.
6        Q. Have you been able to refresh your recollection
7  since yesterday as to the date of -- of the San Park
8  Phase I?
9        A. No, I don't.
10        Specifically it was -- we -- it was right around --
11  we had got -- I had got the go-ahead to move forward
12  with that development of that project, but I had to wait
13  until the documentation was found. So it would probably
14  from that the sign -- the date of signature forward.
15        Q. And as you testified under the settlement
16  agreement, the Port was responsible for approximately
17  9.7 million of the remediation costs less any attorneys'
18  fees that the Port incurred in that litigation; is that
19  correct?
20        MS. CHINN: Objection. That mischaracterizes his
21  foundation, lacks -- excuse me -- mischaracterizes his
22  testimony and lacks foundation.
23        THE WITNESS: Absolutely not.
24        That $9.7 million would be contributed as -- as
25  part of the settlement. It is in a contribution by the

Page 447

1  Air- -- by the Port District, but it is -- it's put into
2  remediation costs, but minus -- minus all the litigation
3  costs, which once again were not disclosed to the
4  Airport Authority as part of the settlement.
5        It -- It's a good number to banter around, 9.7-,
6  "Hey, we got 9.7-," but guess what? We didn't get
7  $9.7 million.
8        MS. McDONOUGH:
9        Q. Do you have any understanding of what the
10  amount of the litigation costs were that were deducted
11  from the 9.7 million?
12        A. Specific numbers I do not have, no.
13        Q. Did you ever have an understanding of that?
14        A. It was -- It had been my understanding that it
15  would probably be a little bit right around half of what
16  that total number was, just on -- on rough swag numbers.
17        THE REPORTER: On what numbers?
18        THE WITNESS: On rough swag.
19        MS. McDONOUGH:
20        Q. So you believe --
21        MS. CHINN: Did you say "swag"?
22        THE WITNESS: Yeah.
23        MS. CHINN: Snappy talk.
24        MS. McDONOUGH:
25        Q. So you believe that the Port incurred

4 (Pages 444 to 447)

53-611 (168)

JOSE HERNANDEZ vs. SAN DIEGO COUN...        January 15, 2007        JOSE HERNANDEZ, VOL. III

Page 448

1  approximately $4-1/2 million in litigation costs?
2      A.  In -- just general information that that was
3  bantered around through the group, pretty close to --
4  pretty close to that.
5      Q.  Do you remember who told you that?
6      A.  It was just part of the -- part of the
7  discussions that -- that were with the group.
8      Q.  And the Teledyne Ryan task force?
9      A.  Yes, ma'am.
10     Q.  Did you ever see any documentation as to the
11 amount of the litigation costs?
12     A.  Not specific to the amount of the litigation,
13 no.
14     Q.  Was anybody in the Teledyne task force privy to
15 information regarding litigation costs?
16     A.  I believe those who would be privy to that
17 would be in the real estate staff in the real estate
18 side.  Brian Anderson I'm sure would have a good idea.
19 Troy Leech would have a good idea of what those
20 litigation cost.
21     And also, there was an assumption that the numbers
22 hadn't been completely tallied up.  So people were just
23 guessing on what those litigation costs were going to
24 be.
25     THE REPORTER:  "What those litigation" --

Page 449

1      THE WITNESS:  Costs would be.
2      MS. McDONOUGH:
3      Q.  You are aware that there was a cleanup and
4  abatement order entered into in 2004 that was separate
5  and apart from the settlement agreement that we just
6  looked at?
7      A.  Yes, ma'am.
8      I believe we talked about yesterday.
9      Q.  And under that cleanup and abatement order,
10 Teledyne Ryan was fully responsible for cleaning the
11 above-ground contamination; correct?
12     A.  I believe there was some stipulations to that.
13     Q.  What were the stipulations?
14     A.  I'd have to go back and read the document and
15 refresh my memory on that.
16     Q.  Have you seen the cleanup and abatement order?
17     A.  No.
18     It's only -- It was only -- That cleanup and
19 abatement document was only briefed to us in summary
20 form by Paul Manasjan, our director of environmental
21 affairs.
22     Q.  We'll mark as Exhibit 18 that cleanup and
23 abatement order (indicating). [EXH-18]
24     A.  (Indicating.)
25     (Whereupon the document referred to is marked by

Page 450

1  the reporter as Defense Exhibit 18 for identification.)
2      MS. CHINN:  This will be ours, put Exhibit 18 on
3  there, and you can write on it.
4      THE WITNESS:  (Indicating.)
5      MS. McDONOUGH:
6      Q.  Go ahead and take a look at Exhibit 18 and see
7  if it refreshes your recollection as to who is
8  responsible for any cleanup or remediation under the
9  cleanup and abatement order, and take as much time as
10 you need.
11     A.  (Indicating.)
12     (A discussion between witness and counsel is held
13 off the record.)
14     THE WITNESS:  Okay.  Go ahead.
15     MS. McDONOUGH:
16     Q.  Have you finished reviewing Exhibit 18?
17     A.  In cursory, yes, ma'am.
18     Q.  Has any portion of Exhibit 18 refreshed your
19 recollection as --
20     A.  There's just -- just portions.
21     Q.  Hold on.
22     -- refreshed your recollection as to who was
23 responsible for cleanup under the cleanup and abatement
24 order?
25     A.  This -- This documentation was sent to -- to

Page 451

1  Allegheny, and it's addressed to Allegheny.  But it
2  also, if you look at page 2, 2 of 18, the discharge may
3  not only -- "The Dischargers may not be the only persons
4  responsible for discharges of PCBs and other waste into
5  Convair Lagoon and San Diego Bay."
6      And are you aware that after -- subsequent to this,
7  Allegheny and Teledyne Ryan also included in further
8  lawsuits the Airport Authority, the Port District and
9  anyone else they can drag into -- into this mess to help
10 defray the cost of that remediation?
11     Q.  I'm not going to answer questions today.
12     A.  Okay.
13     Q.  You're the one answering them.
14     A.  Okay.
15     Q.  Are you aware of that litigation?
16     A.  Absolutely.
17     Q.  Okay.
18     Is there anything --
19     MS. CHINN:  Wait a second.  You weren't asking that
20 as a question, you were making that as a statement; is
21 that correct?
22     THE WITNESS:  Yes, ma'am.
23     MS. CHINN:  Thank you.
24     So we have the correction on the record.
25     MS. McDONOUGH:

5 (Pages 448 to 451)

53-611 (169)

Page 452

1   Q. Is there anything else in Exhibit 18 that
2   refreshes your recollection as to who was responsible,
3   under the cleanup and abatement order, for any cleanup
4   on the Teledyne Ryan site?
5   A. I -- I believe -- let me -- let me answer in
6   this way. I believe to characterize this document as
7   the end all to be all and to the cleanup would be --
8   would be incorrect.
9   There were subsequent information that also
10  included additional parties to this which shared some
11  responsibility, and there is also additional litigation
12  that would -- that would also drag other entities into
13  their cleanup and abatement. So this isn't the final
14  documentation as I understand today.
15  Q. So you -- from your understanding, there is
16  additional litigation that is modifying this cleanup and
17  abatement order?
18  A. I believe so.
19  Q. If you look at page 7 of 18 of the cleanup and
20  abatement order, under "Order Directives."
21  MS. CHINN: Is -- Is that a cleanup and abatement
22  order?
23  MS. McDONOUGH: That's what it says at the top,
24  "Cleanup and Abatement Order No. R9-2004-0258."
25  MS. CHINN: Oh, I see. That's the top of the page

Page 453

1   of the first page, but that's not the top of the page of
2   the page that you're looking at; right?
3   THE WITNESS: Go ahead and ask your question again,
4   please, if you can.
5   MS. McDONOUGH: Just to clarify for the record, at
6   the top of page 7 of 18, in the upper left-hand corner,
7   the first line says, "Cleanup and Abatement Order No.
8   R9-2004-0258."
9   THE WITNESS: Okay.
10  MS. CHINN: What's the question?
11  MS. McDONOUGH:
12  Q. Under "Order Directives" on page 7 of 18, do
13  see that?
14  A. Yes, ma'am.
15  Q. I want you to read where it starts with, "It is
16  hereby ordered."
17  MS. CHINN: Read it to yourself, not to the record.
18  MS. McDONOUGH:
19  Q. And read through the top of page 18 -- I'm
20  sorry -- page 8 of 18 until you get to section B.
21  THE REPORTER: "Until you get to section"?
22  MS. McDONOUGH: B.
23  MS. CHINN: Obviously I'm going to object to the
24  whole line of questioning. The document speaks for
25  itself.

Page 454

1   THE WITNESS: Okay. Go ahead.
2   MS. McDONOUGH:
3   Q. Do you have any understanding of what this
4   order directive is that I just had you read?
5   A. Complete understanding, I -- I don't. I don't
6   claim to be a subject matter expert in this
7   documentation or the existing litigation.
8   My objections to the Teledyne Ryan is no one knew
9   or had a complete understanding to what the remediation
10  costs were in there. And that -- that is my point of
11  objection, not specifics or specifics within the
12  document.
13  But just once again, how do you enter into a
14  $20 million lease agreement without having a full
15  understanding of what it is that you were getting
16  yourself into?
17  Q. Do you have any understanding of what the
18  requirements are under this Cleanup and Abate Discharges
19  that I just had you read?
20  A. Specifically, once again, I do not claim to be
21  a subject matter expert. It's just in -- in reviewing
22  objections from my part, because I don't believe it's
23  fully understood by -- by any one party what those are.
24  Q. I'm -- I'm not asking you to give your expert
25  testimony --

Page 455

1   A. Okay.
2   Q. -- nor am I asking you to give any sort of a
3   legal conclusion. I just want to know if after reading
4   the Cleanup and Abate Discharges section and the Order
5   Directives that I just asked you to read, do you have
6   any understanding of what those mean?
7   A. My understanding is that to characterize this
8   document as a final be all, would be incorrect. That
9   would be my -- my determination of the documentation.
10  Q. So you don't have any understanding of what the
11  Cleanup and Abate Discharges mean?
12  A. I do have an understanding, but I also -- I --
13  I am also aware of subsequent information or subsequent
14  conversations that may -- may -- may have amended this
15  or may have included additional parties to -- to the
16  cleanup and abatement.
17  Q. So what is your understanding of the Cleanup
18  and Abate Discharges as is set forth on page 7 that I
19  just had you read?
20  A. Once again, the document speaks for itself.
21  Q. Right, but I'm entitled to your understanding
22  of what it means.
23  MS. CHINN: Did you understand it when you read it?
24  THE WITNESS: I understood it when I read it.
25  MS. McDONOUGH:

6 (Pages 452 to 455)

53-611 (170)

Page 456

1    Q.  Okay.
2        And what is your understanding of what it means?
3        MS. CHINN: I don't know if you can answer it.
4    Look at it again, and tell her if you can answer it
5    without reading the document.
6        MS. McDONOUGH:  He can read it.  That's fine.
7        MS. CHINN:  Not into the record.
8        MS. McDONOUGH:  No, I'm not -- I'm not asking him
9    to read it into the record.  I'm asking for his
10   understanding of the -- of what it means.
11       MS. CHINN: I think the record -- the document
12   speaks for itself too, but --
13       THE WITNESS:  Okay.
14       It just -- my understanding is that this order --
15   this order outlines certain requirements for Teledyne
16   Ryan.
17       MS. McDONOUGH:
18       Q.  To pay the cleanup and -- cleanup charges as
19   detailed in 1a, b and c?
20       A.  I don't believe it specifically calls out for
21   them to pay.  It just says "investigate, cleanup and
22   abate" in there.
23       I don't -- I don't believe it specifically requires
24   them to pay the whole sum.
25       Q.  Are you aware of any agreements, after the

Page 457

1    cleanup and abatement order that we just looked at and
2    market as Exhibit 18, that modified the cleanup and
3    abatement order?
4        A.  I believe there -- from my understanding, that
5    there would be subsequent -- subsequent legal actions
6    taken by -- by Allegheny, by Teledyne Ryan, by the Port
7    District, by the Airport Authority, by the City of
8    San Diego, by Robert Robertus and -- and the -- the
9    water quality board that would be subsequent to this
10   information, which may or may not have modified this --
11   the cleanup and abatement order.
12       Q.  But you're not aware of a signed agreement
13   necessarily?
14       A.  Not at this time.
15       Q.  And as you've testified, you're aware of
16   ongoing litigation regarding the Teledyne Ryan property?
17       A.  I believe it was briefed to me, yes.
18       Q.  Are you aware that there is a case in federal
19   court regarding that issue?
20       A.  I believe so.
21       Q.  What's your understanding of who the parties
22   are and the nature of the litigation in federal court?
23       MS. CHINN:  Objection.  It's overbroad.
24       THE WITNESS: I'm unaware -- I'm not -- I don't
25   have the details to that, and I really -- I really

Page 458

1    couldn't answer those questions.
2        MS. McDONOUGH:
3        Q.  Do you have any understanding as to the thrust
4    of the litigation?
5        A.  I won't even -- I won't even venture to guess.
6    I don't have that document.  I haven't read the
7    litigation.
8        Q.  Has anyone ever told you that the federal court
9    case addresses the underground contamination on that
10   site?
11       A.  I don't have the specifics of those.  Once
12   again, I can't answer.
13       Q.  Have you ever read the Haley & Aldrich report
14   prepared by the Port Dris- -- District regarding the
15   contamination on the Teledyne Ryan site?
16       A.  I believe subsequent -- subsequent reports as
17   follow-up to Haley & Aldrich that we -- that we produced
18   as the Teledyne Ryan task force invalidated those
19   initial estimates.
20       Q.  But you didn't read the original report?
21       A.  There was the original that was used as a
22   baseline, and then part of the Teledyne Ryan task force
23   produced a subsequent more detailed document which
24   invalidated the first one.
25       Q.  Did -- But you actually read the Haley &

Page 459

1    Aldrich report?
2        A.  We had -- It -- It had been provided to us as
3    an issue, as a step of what may or may not be out there.
4        Go into detail, no.  In summary form it had been
5    briefed to me, but once again, we then produced -- we
6    then produced a follow-up document which invalidated the
7    first one, because there was certain premises in the
8    first one which were found to be incorrect.
9        Q.  So your memory is that you were briefed somehow
10   on the summary of the Haley & Aldrich document, but you
11   didn't sit there and pour through each page?
12       MS. CHINN:  Objection.  That mischaracterizes his
13   testimony and lacks a foundation.
14       THE WITNESS:  Go ahead and repeat the question.
15       MS. McDONOUGH:
16       Q.  So you were briefed on the summary of the
17   Haley & Aldrich report, but you didn't read it line by
18   line, page by page; is that correct?
19       A.  Just in summary form, that's correct.
20       Q.  And who provided the summary to you?
21       A.  As -- As part of the tra- -- As part of the
22   transfer -- And -- As part of the transfer of -- of the
23   property from the Port District to the Airport
24   Authority, they were required to hand everything over to
25   us.

7 (Pages 456 to 459)

Page 460

1    In fact, we had -- we, some of the individuals in
2  the Teledyne Ryan, had an opportunity to go over to the
3  Port District in one of their offices where they called
4  it one of the war rooms that they had set up that had
5  all the documentation available.
6    We looked through and identified all the documents
7  that we needed, and those were all handed over to the
8  Airport Authority at one time.
9    Q.  When did you receive the summary of the Haley &
10 Aldrich report?
11   A.  It was just briefed to me by -- by Paul
12 Manasjan, who was our -- our director, the subject
13 matter expert.
14   Q.  Do you remember when that was?
15   A.  No, I don't.
16   Q.  Do you remember the timing of the Authority's
17 rebuttal to the Haley & Aldrich report?
18   A.  I'm not sure if there was a rebuttal to that
19 Haley & Aldrich report, so I would be -- I would be
20 unaware or unable to answer that.
21   Q.  You indicated that the Authority prepared
22 documents or some sort of a calculation that invalidated
23 the Haley & Aldrich report; is that correct?
24   MS. CHINN:  Objection.  That mischaracterizes his
25 testimony.

Page 461

1    THE WITNESS:  Let me --
2    MS. CHINN:  Just "yes" or "no."
3    THE WITNESS:  No.
4    MS. CHINN:  Don't help her.
5    THE WITNESS:  Okay.
6    MS. McDONOUGH:
7    Q.  You indicated that the Authority invalidated
8  the Haley & Aldrich report; correct?
9    A.  That would be incorrect.
10   Q.  Okay.
11   What -- What is correct?
12   A.  The -- The -- The proper way to say it would be
13 that after -- after contracting services for our own
14 report on behalf of the Airport Authority, that the
15 results varied vastly from the initial one provided to
16 us by the Port District.
17   So our point --
18   THE REPORTER:  "By the" what "District"?
19   THE WITNESS:  By the Port District.
20   THE REPORTER:  Thank you.
21   THE WITNESS:  Our intent was not to invalidate it,
22 rather to validate -- validate or come up with our own
23 conclusions to what exactly was provided in the Haley &
24 Aldrich report.
25   MS. McDONOUGH:

Page 462

1    Q.  When did you come to your own conclusions as to
2  the items in the Haley & Aldrich report?
3    A.  During -- During the production of the
4  documentation, and then in summary after it -- it was
5  complied to us.
6    Q.  Do you remember the time frame of that --
7    A.  No, I don't.
8    Q.  -- the year?
9    A.  2004, 2005.
10   Q.  Is there anything that would refresh your
11 recollection?
12   A.  The report itself.
13   Q.  Do you know who -- Did Paul prepare the report?
14   A.  That was prepared for Paul.
15   Q.  By whom?
16   A.  By Haley & Aldrich.
17   Q.  So they prepared a report for Paul based on the
18 assumptions that the Authority provided?
19   A.  Absolutely.
20   Q.  Do you know if the Teledyne Ryan task force
21 ever presented the second Haley & Aldrich report to any
22 one within the Authority?
23   A.  Absolutely.
24   I believe that those -- that those were presented
25 to the vice president group on two different occasions.

Page 463

1    Q.  Was one of those occasions the Sheraton that we
2  talked about yesterday?
3    A.  One of them subsequent follow-up, which I
4  believe was held in the emergency operations center at
5  the commuter terminal.
6    Q.  Who presented the second Haley & Aldrich
7  report?
8    A.  It was all part of the overall -- overall
9  presentation on the Teledyne Ryan --
10   Q.  So Paul was one of the presenters?
11   A.  He -- He -- He would -- We were all tasked.
12 Individuals within that task force had areas of
13 responsibility where I would do the parking.  He would
14 do environmental.
15   Steve Cornell would do the overall as the
16 construction, and, you know, there would be different
17 individuals that would present option.  So he would --
18 he would have a better understanding environmental --
19 environmental ramifications better than anyone else.
20   Q.  We spoke yesterday about Tom Morgan's report of
21 potential uses for the Teledyne Ryan property; correct?
22   A.  Yes, ma'am.
23   Q.  Did that report include potential for building
24 a hotel on the Teledyne Ryan property?
25   A.  I believe one of the options that were

8 (Pages 460 to 463)

Page 464

1  presented, yes, they would.
2       Q. Was that a viable option from your point of
3  view?
4       A. I believe it was never fully vetted out. It
5  would be at the corner, pretty much -- pretty much
6  across from -- from the Coast Guard station. And
7  there -- there might have been implications of -- of
8  FAA -- There would be -- There would have to be certain
9  waivers from the FAA to be able to put that -- that as a
10  viable use on that property.
11       Q. In your mind, did -- was it a potential and
12  viable use for the property?
13       A. I don't believe so.
14       Q. Why not?
15       A. It was termed that -- that Sexton, as it was
16  termed, they would be -- I didn't really believe it to
17  be a viable use for that property. You would have --
18  having a hotel at the foot of -- of -- of your runway,
19  and having the dB levels out there, I just don't --
20  don't believe it would have made it a viable option.
21       Q. Did you ever actually see Tom Morgan's report
22  of the potential uses for the property?
23       A. Absolutely.
24       There was -- There was varying iterations of it.
25       MS. CHINN: You answered it.

Page 465

1       THE WITNESS: Yes.
2       MS. CHINN: Don't help her anymore. Let her do her
3  job. The woman needs to be employed.
4       MS. McDONOUGH:
5       Q. Do you recall that Tom Morgan's report contains
6  assumptions for how much the cleanup and construction
7  costs would be for the property?
8       A. I'd have to be -- My memory would have to be
9  refreshed by being able to look at the documentation of
10  that.
11       Q. Do you have any memory of whether the cleanup
12  costs were included on the projections at all?
13       A. I can't -- Once again, I'd have to look at the
14  documentation.
15       Q. Do you have a memory that Tom Morgan projected
16  that the property would eventually bring in a profit of
17  about $50 million --
18       A. Once again, I --
19       Q. -- each year?
20       A. -- I don't believe the numbers were that high,
21  no.
22       Q. What do you believe the numbers were?
23       A. I'd have to re- -- I'd have to refresh --
24  refresh my memory as to what that was. But, you know,
25  I -- as I sit here today, I couldn't tell you what the

Page 466

1  projected revenues would be, what net revenues would be
2  on those properties.
3       Once again, those assumptions that he made, some
4  were pie in the sky, you know, and some were not. And
5  once again, the most viable one according to what I
6  remember was just flatting the whole thing out, making a
7  parking lot. That was the most viable in terms of -- of
8  revenues for the property.
9       Q. Do you remember how much revenue the Authority
10  would receive if the property was just turned into a
11  parking lot --
12       A. I don't.
13       Q. -- on an annual basis?
14       A. I -- I don't recall what that would be.
15       Once again, those were -- those were numbers
16  that -- that I assisted him in producing, but with the
17  full understanding they could never be to be a
18  parking lot.
19       Q. Is the property currently used as parking lot?
20       A. Only -- Only the 350 parking spaces, yes,
21  ma'am.
22       Q. Assuming that the contamination is cleaned up,
23  do you believe that a $3 million lease, an annual term
24  for 66 years is a good deal?
25       A. I would say it would not be a good deal because

Page 467

1  there was not a full understanding or complete
2  understanding what the remediation costs would be,
3  what -- what legal implications in -- in -- in creating
4  a tenancy in the property would be, what -- what impact
5  it would have on -- on the operating budget, because at
6  the end of the day we still have to or we still were
7  paying the $3 million. And it had to go against
8  someone, because we only had so much money to pay.
9       And there was some "semere" -- some severe
10  ramifications to our operating budget. That's why as
11  you walk through the airport today, you will see screen
12  after screen in the flight information displays that we
13  can't replace or can't be replaced because there was no
14  money in the budget to do so.
15       Q. If you assume that the contamination is cleaned
16  up by 2010, so three years from now --
17       A. That --
18       MS. CHINN: Wait. You know what? Do you want to
19  qualify him as an expert?
20       MS. McDONOUGH: No.
21       MS. CHINN: Okay. Then you can't ask him his
22  opinion --
23       MS. McDONOUGH: Sure I can.
24       MS. CHINN: -- about these things.
25       MS. McDONOUGH: Sure I can.

9 (Pages 464 to 467)

53-611 (173)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY          January 15, 2007                    JOSE HERNANDEZ, VOL. III

Page 468

1  MS. CHINN:  Okay.
2  MS. McDONOUGH:  You can put your objection on the
3  record.
4  MS. CHINN:  You're putting an assumption out there
5  which calls for an opinion, and you haven't laid a
6  foundation.  So that's my objection.
7  MS. McDONOUGH:
8  Q.  If you assu- --
9  MS. CHINN:  It also calls -- Excuse me.  It Also
10  calls for speculation.
11  But if you can answer it, go ahead.
12  MS. McDONOUGH:
13  Q.  If you assume that the contamination is
14  completely cleaned up by 2010, do you believe that the
15  lease at $3 million per year for 66 years is a good
16  deal?
17  A.  I -- I won't even venture to answer that
18  question because I -- I truly do not believe that the
19  property would be fully remediated by 2010.
20  Q.  I'm asking you for purposes of this question
21  only to assume that it is remediated by 2010.
22  A.  Not agreeing with your assumption, I just won't
23  even answer that question.  I can't -- I can't give you
24  a response to -- to a question which I don't believe --
25  I don't believe is -- will ever happen.  I truly do not

Page 469

1  believe, as I sit here today, that that property will be
2  remediated in whole by 2010.
3  Q.  So you can't even assume that if I ask you to?
4  A.  I won't even assume it because I -- the chances
5  are it's not going to happen.
6  Q.  Just assume -- assume that it is cleaned up.
7  MS. CHINN:  Its a false assumption.
8  THE WITNESS:  Assume it won't.
9  MS. CHINN:  It's a false assumption.  You haven't
10  laid a proper foundation for asking the question for his
11  opinion on that.
12  MS. McDONOUGH:  It's a hypothetical.
13  MS. CHINN:  I know that you think it's a
14  hypothetical.  He's saying it's a false assumption so he
15  can't answer it.
16  MS. McDONOUGH:
17  Q.  When do you believe the cleanup will be
18  complete?
19  A.  Having -- Having -- Not having the -- the
20  complete details, you know, and having a -- once again,
21  an up-to-date assumption or an up-to-date understanding
22  of all the litigation that goes -- that is involved, any
23  other orders, I can't -- I can't even tell you.  But it
24  would be a good estimate on my part that before 2010 it
25  won't happen.

Page 470

1  Q.  Do you have any --
2  A.  Then I can answer.
3  Q.  Do you have any estimate of when that will
4  happen?
5  A.  No, I don't.  Not before 2010.
6  Q.  You mentioned yesterday that you disclosed the
7  environmental issues as part of the task force; is that
8  correct?
9  A.  Yes, ma'am.
10  Q.  What's all the documentation that would reflect
11  your disclosures that you're aware of?
12  MS. CHINN:  Objection.  That calls for a narrative.
13  It's overbroad.
14  If you can answer it, go ahead.
15  THE WITNESS:  The documentations not as much.
16  Conversations with -- with -- with my direct
17  supervisor, Ted Sexton, reflecting my objections to --
18  to the Airport Authority's inability or -- inability to
19  identify or -- not having done the right
20  environmental assessments before we entered into that
21  lease agreement for the Teledyne Ryan and understanding
22  the full effects.
23  So these were ongoing conversations with Ted Sexton
24  with the complete understanding that it would have
25  dramatic effects on -- on our operating budget.

Page 471

1  Q.  Are you aware of any documentation that would
2  reflect the disclosures that you made?
3  A.  I would -- I'm not aware of -- Once again,
4  when -- when I left employment at the Airport Authority,
5  I -- I took no -- no documents back with me.  I don't
6  have my file.
7  I know for a fact that I had those conversations on
8  many occasions with Ted Sexton because I had great
9  concern over the impact of those lease, not only over
10  lease, but also the lease for the General Dynamics in
11  our operating budget.
12  Q.  Are you --
13  MS. GONZALEZ:  Can we take a break for a second?
14  MS. McDONOUGH:  Sure.
15  VIDEO OPERATOR:  We are off the record at
16  10:34 a.m.
17  (A recess is taken.)
18  VIDEO OPERATOR:  We are back on the record at
19  10:40 a.m.
20  MS. McDONOUGH:
21  Q.  Are you aware of any documents -- Well, strike
22  that.
23  Are you aware of any minutes of the task force
24  committee meetings that your attended?
25  A.  I'm sure there probably are minutes in there.

10 (Pages 468 to 471)

**53-611 (174)**

JOSE HERNANDEZ vs. SAN DIEGO COU....    January 15, 2007    JOSE HERNANDEZ, VOL. III

Page 472

1  But where they're at, I couldn't tell you where they're
2  at.
3    Q.  Who took the minutes?
4    A.  If anyone would have taken minutes, it would
5  have been Annie Rombold, who worked for Steve Cornell.
6    Q.  Do you know if there's any other documentation
7  that would reflect the disclosures you made regarding
8  the Teledyne Ryan property?
9    A.  I -- I didn't realize I had to make disclosures
10  in writing.  They were -- As I mentioned, it was -- it
11  was -- a lot of them were in -- in the small group
12  discussions or conversations that I had with my direct
13  supervisor, Ted Sexton.
14    Q.  Please don't assume that I'm saying that it's
15  required.  I just want to know if there are any
16  documents that reflect the disclosures you made.
17    A.  I wouldn't -- It wasn't -- It wasn't as much of
18  a concern to me to make sure that it was --
19    MS. CHINN:  That calls for a "yes" or "no."
20  Are you aware?
21    THE WITNESS:  I'm -- I'm not sure.
22    MS. McDONOUGH:
23    Q.  Is there anything that would refresh your
24  recollection as to whether there are documents?
25    A.  The minutes themselves.

Page 473

1    Q.  Other than minutes of the task force meetings,
2  do you believe that there are any other documents that
3  reflect disclosures that you made?
4    A.  I'm -- I'm not sure.
5    Q.  Do you know what the negotiators for the court
6  and the negotiators for the Authority knew about the
7  contamination on the property when they were negotiating
8  the lease for the Teledyne Ryan property?
9    MS. CHINN:  This is being objected to on the basis
10  of calls for speculation.
11    However, you can answer.
12    THE WITNESS:  No, I -- I'm not qualified to answer
13  that question.
14    MS. McDONOUGH:
15    Q.  Did you ever have an understanding of what the
16  negotiators for the Port and the negotiators for the
17  Authority knew about the contamination on the Teledyne
18  Ryan property when they were negotiating the lease?
19    MS. CHINN:  Same objection.
20    Answer if you can.
21    THE WITNESS:  I believe the only assumption was
22  that -- the assumption was that as a result or
23  preliminary views, the contamination limits were
24  somewhere around 10 million.  But once again, those --
25  those numbers were never validated by -- by the Airport

Page 474

1  Authority staff.
2    MS. McDONOUGH:
3    Q.  And you believe that that assumption came from
4  Teledyne Ryan?
5    A.  I believe that it was an initial --
6    MS. CHINN:  Wait.  That calls for speculation.  If
7  you know, you can answer.  Don't guess.
8    THE WITNESS:  Those numbers were an assumption that
9  was made by the Port District.
10    MS. McDONOUGH:
11    Q.  How do you know that those numbers were assumed
12  by the Port District?
13    A.  It was -- It was just num- -- numbers that were
14  communicated to us as to possible levels of
15  contamination to that at around that $10 million range.
16    Q.  When did you first learn of the $10 million
17  number?
18    A.  As part of -- As part of the negotiations.  The
19  exact dates I'm not quite sure.  It was just understood
20  that there was some sort of sentiment out there that
21  would -- that would contribute portions of that
22  9.7 million, $10 million towards -- towards remediation
23  costs.
24    Q.  You've also alleged in the complaint that
25  Lindbergh Parking purposely submitted unattainable

Page 475

1  expense estimates in order to bolster its proposal to
2  the Authority; is that correct?
3    A.  Yes, ma'am.
4    Q.  Why do you believe that LPI purposely submitted
5  unattainable expense estimates?
6    A.  Because in conversations -- It had been after
7  an initial -- after an initial submission, maybe a
8  three-month period of looking at operating expenses
9  versus actual -- versus those that were submitted to us.
10  It was very -- It was very quick -- or we were very
11  quick to understand that those numbers weren't even
12  anywhere close to being in the same ballpark.
13    Q.  Let's go back a little bit in time.
14    Do you remember when LPI submitted its proposal to
15  the Authority to provide services to the Authority?
16    A.  Under -- It was just prior to 2003, somewhere
17  in that in that 2003, 2004 time frame in there.  They
18  had an existing five- -- five-year agreement that was
19  expiring.  And then we had laid out another request for
20  proposal for qualified operators of parking properties.
21    Q.  And LPI, along with other operators of parking
22  properties, submitted bids, essentially, to the
23  Authority --
24    A.  That's correct.
25    Q.  -- for the contract; is that correct?

11 (Pages 472 to 475)

53-611 (175)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY    January 15, 2007    JOSE HERNANDEZ, VOL. III

Page 476

1  A. That's correct.
2  Q. And how long was the new contract going to be?
3  A. The new contract would be for a maximum of five
4  years.
5  Q. And you were on the committee that -- selecting
6  the contractor?
7  A. That's correct.
8  Q. And you selected LPI as the contractor?
9  A. The group selected LPI as the contractor.
10  Q. Do you remember who else was on that committee?
11  A. I believe Troy Leech was on -- Troy Leech in --
12  from real estate was on that committee. It was -- It
13  was a panel with -- I -- I don't remem-- -- I don't
14  remember exactly how many people were on there, but it
15  was a -- it was a broad and varied panel.
16  Q. Do you remember if there was a runner-up --
17  A. Yes.
18  Q. -- to LPI?
19  A. Yes.
20  Q. Who was the runner-up?
21  A. Standard Parking.
22  Q. What was Standard Parking's bid for the --
23  A. The --
24  Q. -- contract?
25  A. The qualifications -- The qualifications or the

Page 477

1  determination for -- for parking management was not just
2  based on -- on a bid number, what's the lowest that you
3  could provide the serv- -- services for, but there was a
4  range of percentiles and work plans, operating plans.
5  There was just a host of different items. We did
6  not want to base the -- you know, our decision of
7  qualifying an operator just based on who could submit
8  the lowest prices.
9  Q. Why did you choose LPI as a committee?
10  A. LPI, largely because their operating expenses
11  were much lower, were much lower than Standard
12  Parking's.
13  Q. Any other reason?
14  A. They had their -- They had done a pretty good
15  job for us at the Airport Authority, but the numbers
16  were, once again, really close, if -- so much so that if
17  today they had submitted their existing numbers, their
18  existing numbers now, meaning current operating
19  expenses, versus what they had submitted, I do not
20  believe that -- I do not believe that they would have
21  retained that agreement, the service agreement.
22  Q. How were you aware of what LPI's current
23  operating expenses are?
24  A. On -- On a monthly basis, their -- they would
25  submit to my attention their -- their profit and loss

Page 478

1  statements. And I would keep a running total of
2  those -- of those documents, and I would have to approve
3  and disapprove their -- their submittals.
4  Q. But you haven't seen those in a year; correct?
5  A. Yes, ma'am.
6  Q. So are you aware of what their current
7  operating expenses are right now?
8  A. Not -- Not -- Not after 2005.
9  Q. Was LPI's bid of projected operating expenses
10  consistent with the operating expenses that LPI had
11  incurred in its prior contract with the Airport?
12  A. Not -- Not specific to -- to the additional
13  properties that were added under that -- under that
14  submission, which would be the General Dynamics
15  property.
16  They had submitted an operating figure of
17  $1.1 million to operate our -- the property along
18  Pacific Highway, and it was quick to -- we were quick to
19  understand that those operating figures would be about
20  half a million dollars more a year, more in the
21  million 5-, million 6- range, versus the million 1- that
22  they had initially submitted.
23  Q. So in LPI's prior contract, which parking lots
24  were they operating?
25  A. They were op- -- under -- under LPI's previous

Page 479

1  contract, they had operated the Airport parking lots
2  on -- along Harbor Drive, those immediate to the Airport
3  property.
4  We had a different vendor, which was Five Star
5  Parking, that operated the parking -- the 1100-stall
6  parking stall -- parking lot on Harbor Drive.
7  Q. So LPI was operating the parking lots that are
8  right there at Terminal 1 and Terminal 2 and the
9  commuter terminal?
10  A. Yes, ma'am.
11  Q. And in the new proposal that was submitted in
12  2003, LPI would be adding the General Dynamics property?
13  A. LPI would not be adding. It was part of the
14  proposal to add it. The Airport Authority made the
15  decision to add that to the -- the overall contract.
16  Instead of having two separate agreements, we would
17  just have one overall agreement for services. We were
18  hoping to gain some synergies by having -- by combining
19  those operations.
20  Q. So in the request for proposal that the
21  Authority put out there in 2003 or so, the Authority was
22  looking for a proposal for one company to operate the
23  terminal parking lots and the General Dynamics parking
24  lot?
25  A. That's correct.

12 (Pages 476 to 479)

53-611 (176)

JOSE HERNANDEZ vs. SAN DIEGO COU...    January 15, 2007    JOSE HERNANDEZ, VOL. III

Page 480

1    Q. Was it -- Were there any other parking lots
2  included in that RFP?
3    A. Yes.
4    If you have -- If you have the documentation, it
5  will also include not only the public parking lots at
6  the terminals, the commuter terminal, Terminal 1,
7  Terminal 2, but it also included customer service
8  representatives, which is our taxi and shuttle dispatch
9  operators.
10    It also included the employee parking lot on Harbor
11  Island, which is termed Employee Parking Lot Number 6.
12    And also included -- or also called for providing
13  parking and providing shuttle services to employee and
14  the employee bus shuttles, and employee bus shuttles and
15  the -- the Red Bus, which is inner terminal bus, so it
16  was a pretty comp- -- comprehensive service.
17    Q. So LPI, in its second contract, was operating
18  at least five more parking lots than it had previously
19  operated?
20    A. One more parking lot.
21    Q. Oh, the General Dynamics, but it was -- wasn't
22  it operating the employee parking lot or not?
23    A. The -- The only addition to -- the only
24  addition to their agreement at the time of bid was
25  the -- that Gen- -- the parking lot on General Dynamics.

Page 481

1    Q. And you believed that LPI underestimated its
2  operating expenses for the General Dynamics property by
3  about $500,000?
4    A. A year.
5    Q. A year.
6    Do you believe that LPI purposely underestimated
7  its operating expenses?
8    A. I believe that in a conversation that I had
9  with Jim Myhers, with Jim Myhers and Mr. Grey going over
10  those numbers and trying to get an understanding of why
11  those numbers are submitted, there was a comment made by
12  Jim that "Well, you know how Ace is, you know. People
13  will just figure it out down the road."
14    Q. Do you know why he said "you know how Ace is"?
15    A. I believe that assumption was made that they
16  had purposely submitted numbers -- numbers to bolster
17  their bid by having lower operating expenses in order to
18  increase their opportunity, LPI -- LPI's opportunity
19  to -- to retain a service agreement.
20    MS. CHINN: Why is Ace involved?
21    THE WITNESS: It's a misnomer. It's LPI's
22  submission. I apologize.
23    MS. CHINN: Oh, so you misspoke?
24    THE WITNESS: Yeah.
25    LPI's submission for -- for that.

Page 482

1    MS. McDONOUGH:
2    Q. Did Jim Myhers or Maurice Grey ever say
3  anything else to you that made you believe that LPI
4  purposely submitted lower operating expenses than what
5  it thought they would really cost?
6    A. I believe -- I believe that that conversation
7  was enough to get an understanding as to what they
8  thought the submissions were.
9    I -- Having put together that request for proposal,
10  I -- I was very, very careful to -- to set up existing
11  operating plans so we could measure submissions apple to
12  apple. There was no difference. This is your staffing.
13  These are the number of hours you're going to have
14  for -- for this cost center, for that cost center.
15    We were very, very careful to outline there was no
16  hidden, there shouldn't have been too many discrepancies
17  between one and the other. At the end of the day,
18  just -- At the end of the day, that was their submission
19  of what they thought the numbers were, which -- which
20  from day one they were no -- nowhere close to that
21  number.
22    Q. When was your conversation with Jim Myhers
23  where he said "you know how LPI is"?
24    A. We had -- We had had a conversation -- probably
25  initially three-month review, six-month review, of a --

Page 483

1  of the service agreement.
2    Q. Is there anything in particular that was
3  driving their operating expenses higher than what they
4  had projected?
5    A. An underestimation of the actual expenses or
6  what those actual expenses would be.
7    It would be easy for me to understand or to read.
8  What I would do is I would -- we had different cost
9  centers where I can compare the General Dynamics by
10  looking at fiscal years on a spreadsheet, this year
11  versus last year.
12    And then I had demarked what days parking company
13  Amer- -- I mean Five Star left and LPI took over. So I
14  was comparing apples to apples on existing parking
15  operations.
16    Q. How much did -- How much were the operating
17  expenses for Five Star when Five Star was operating the
18  General Dynamics property?
19    A. I be- -- I believe those numbers were right in
20  the million -- million 4-, million 5- range per year to
21  operate that property.
22    Q. Did LPI say anything else that would indicate
23  to you that it purposely submitted lower operating --
24  projected operating expenses to the Authority?
25    A. No, those were just the -- the initial

13 (Pages 480 to 483)

53-611 (177)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY          January 15, 2007

JOSE HERNANDEZ, VOL. III

Page 484

```
 1   comments.
 2        Q. You indicated that staffing for the -- for the
 3   contractor was an important consideration; is that
 4   correct?
 5        A. Excuse me?
 6        Q. Staffing, the -- who was going to staff the
 7   parking lots is a -- was an important consideration in
 8   the RFP?
 9        A. Yeah, I believe if -- if -- I don't have the
10   documentation in front of me, but we -- we weighted some
11   criteria, and we outlined several criteria, I believe
12   five or six different areas.
13        And then we -- he gave them each a percentile of --
14   of what we thought each one -- what -- what their
15   contribution would be to the overall agreement, and
16   that's how we came up with that. Staffing -- Staffing
17   plan was a consideration.
18        Q. Do you know who was going to staff LPI's
19   parking operations? Was it employees of LPI --
20        A. Yes, ma'am.
21        Q. -- or any employees from Ace going to staff the
22   LPI parking operations?
23        A. The -- The agreement, once again, was with LPI,
24   and the responsibility for compliance was -- was with
25   LPI. We -- We did not have any agreement with --
```

Page 485

```
 1   with -- with Ace Parking, so it was -- it was LPI. Here
 2   is everything you need to do, and you just figure out
 3   how you're going to get it done.
 4        Q. Did you ever have the understanding that LPI
 5   was going to staff its parking lots with Ace employees?
 6        A. No.
 7        LPI had always staffed their parking lots with LPI
 8   employees.
 9        MS. McDONOUGH: I'm going to mark as Exhibit 19 an
10   "Evaluation Panel, Parking Lot Management RPF." [EXH-19]
11        MS. CHINN: Thanks. This is 19?
12        MS. McDONOUGH: Yes.
13        (Whereupon the document referred to is marked by
14   the reporter as Defense Exhibit 19 for identification.)
15        MS. McDONOUGH:
16        Q. Does this document refresh your recollection as
17   to who was on the RFP panel in 2003 or 2004?
18        MS. CHINN: (Indicating.)
19        THE WITNESS: I -- I believe so.
20        The -- Bret's name is in the bottom, and I'm -- I
21   know he was there as an interested party. I can't
22   recall if he was in the actual panel himself, but I
23   do -- I -- I am aware that he was there as an interested
24   party.
25        MS. McDONOUGH:
```

Page 486

```
 1        Q. For all of your meetings?
 2        A. I believe just on the final, on the final
 3   interviews.
 4        Q. And all the other five persons listed were part
 5   of the panel?
 6        A. Yes.
 7        MS. CHINN: Can we just take a quick break?
 8        MS. McDONOUGH: Sure.
 9        MS. CHINN: Do you mind?
10        MS. McDONOUGH: No.
11        MS. CHINN: Five minutes.
12        VIDEO OPERATOR: We are off the record --
13        MS. CHINN: Thank you.
14        VIDEO OPERATOR: -- at 10:59 a.m.
15        (A recess is taken.)
16        VIDEO OPERATOR: We are back on the record at
17   11:11 a.m.
18        MS. McDONOUGH:
19        Q. Were you the individual on the RFP panel with
20   the most knowledge regarding parking lot management?
21        A. Yes, I was.
22        Q. Is there anyone else even close to your
23   knowledge on parking lot management?
24        A. The second person would be Scott Hagan, who --
25   who held a similar position in John Wayne.
```

Page 487

```
 1        Q. But not for San Diego?
 2        A. No.
 3        Q. When you received the bid from LPI for services
 4   in 2003 or 2004, did you think that the 1.2 million for
 5   the General Dynamics property was low?
 6        A. 1.1 million.
 7        Q. I'm sorry. 1.1 million.
 8        A. Yes.
 9        But what I had -- what I had put together --
10        MS. CHINN: Wait. You answered it.
11        THE WITNESS: Oh, I'm sorry.
12        Yes.
13        MS. McDONOUGH:
14        Q. Did you ever ask LPI about the proposed
15   operating budget for the General Dynamics property prior
16   to granting LPI the contract?
17        A. We did as part of the interview, in the
18   interview process, asked them whether those numbers
19   were un- -- were attainable as -- because in looking at
20   the three-year history for that -- that parking lot,
21   the -- the expenses had never come below a million 4-, a
22   million 5-.
23        And they responded that they would be "creating
24   synergies," quote unquote, that would allow them to --
25   to obtain that $1.1 million in -- for total revenue --
```

14 (Pages 484 to 487)

Page 488

1  for total expenses for the property.
2      Q.  Did you think they were lying to you when
3  they -- when they said they thought they could create
4  synergies?
5      A.  I believe when you have a three-year track
6  history of -- on expenses for a particular property and
7  then the number falls far below, I would believe so.
8      Q.  Why did you, as a committee, grant the contract
9  to LPI if you thought that they couldn't attain the
10 operating expenses that they proposed?
11     A.  When -- When we had looked -- When we had
12 looked at -- at the overall portion, the overall grades
13 for them, there were actually a good split.
14     Standard, once again, was preferred, but also we
15 were -- we were -- as part of the panel, we were, you
16 know, influenced in some way by -- by some of the
17 bystanders who were there, you know, and gave their
18 comments.
19     Ted Sexton, not being part the panel, was -- was --
20 you know, offered his comments.
21     Bret, who I don't believe was part of the panel,
22 also provided his -- his -- his comments.
23     And, you know, also there was -- there was, you
24 know, a little bit of influence for LPI.  Their --
25 Their -- Their advocate, it happens to be a good friend

Page 489

1  of Thella Bowens.
2      Q.  Maurice Grey, is that who you're referring to?
3      A.  No.
4      Q.  Who is their advocate?
5      A.  Elizabeth Stump-Moore, who was hired by -- or
6  who is hired or works in a consulting fashion with --
7  with LPI, happens to be -- happens to be best friends
8  with -- with Thella Bowens.
9      THE REPORTER:  Spelling for the record.
10     THE WITNESS:  Elizabeth Stump, S-T-U-M-P, Moore, as
11 the boxer, her dad, M-O-O-R-E.
12     MS. McDONOUGH:
13     Q.  When did you --
14     MS. CHINN:  Archie Moore?
15     THE WITNESS:  Yeah.  That was her dad.
16     MS. McDONOUGH:
17     Q.  When did you first find out that Elizabeth was
18 friends with Thella?
19     A.  We've known -- I've -- It had been known that
20 Thella and Elizabeth were friends way back to the Port
21 District days.  They would have lunch together.  Before
22 board meetings at the Port District, Thella would go out
23 and -- and meet with Elizabeth beforehand.
24     It was -- It was common knowledge that they were
25 friends.

Page 490

1      Q.  Did anyone ever communicate to you that you
2  needed to award the contract to LPI because Thella was
3  friends with Elizabeth?
4      A.  I believe that more of the communication had to
5  do with -- with -- with well, we have minority-owned
6  business, operating it, even though we had no
7  requirements whatsoever to -- to award or we gave
8  incentive points for minority-owned businesses on the
9  agreement.
10     Q.  Were there any comments specific to Elizabeth
11 being friends with Thella?
12     A.  As part of the interview process, it had been
13 known that, you know, when -- an as advocate, you know,
14 that -- that there may be some influence inserted by
15 her.  So it was -- It was kind of touchy.  No one
16 would -- No one would specifically comment on it, but,
17 you know, it was --
18     MS. CHINN:  Is "advocate" the word you're using,
19 like a lawyer?
20     THE WITNESS:  It would be an advocate, and now
21 they -- they -- a consultant, I just call them
22 advocates, someone who hires and lobbies on behalf.
23 Probably a lobbyist would be the best way.
24     MS. McDONOUGH:
25     Q.  So there were no specific discussions regarding

Page 491

1  Elizabeth being friends with Thella?
2      A.  No.
3      Q.  You mentioned that Ted Sexton sat in on the
4  panel meetings?
5      A.  Yeah.  And in the final interview panels.
6      Q.  And that he made comments in that meeting?
7      A.  Yes.
8      Q.  What comments did he make?
9      A.  Just in comments of -- in comment supporting
10 LPI.  We had, as a panel, split.  Personally I had --
11 I -- I had voted for Standard Parking.  I believe Steve
12 Kozak at that time had voted for Standard Parking.
13     I mean, the close was -- the -- the final
14 calculation was within one swing vote.  Once again, if
15 the budget for Ace was as it is today, I do not believe
16 that they would have retained that agreement.
17     Q.  So five people from the panel voted on who
18 should obtain the contract; is that correct?
19     A.  Yes.
20     Q.  And of the five people listed on Exhibit 19,
21 you and Steve were in favor of Standard, and the other
22 three were in favor of LPI?
23     A.  I believe -- I believe it was closer than that,
24 where there was -- there was actually some ties and we
25 couldn't come up with a determination.

15 (Pages 488 to 491)

53-611 (179)



JOSE HERNANDEZ vs. SAN DIEGO COUNTY          January 15, 2007          JOSE HERNANDEZ, VOL. III

Page 492

1    I believe it was like two and a half, two for one,
2  two for the other and another one was kind of deadlocked
3  into what we wanted to do, what they wanted to do. And
4  that's why it opened up to comments on -- on Bret's
5  side, on Ted's side and finally swung the vote.
6    Q. What specific comments did Ted make in favor of
7  LPI?
8    A. His -- His specific comments just -- just had
9  to do with we have an existing company, and they had --
10  they -- they had a good track record.
11    And he just felt that, you know, the advantage of
12  having a minority-owned company outweighed whatever
13  advantages we would -- we would derive from a new
14  partnership with Standard Parking.
15    Q. And did Ted's comments influence you at all?
16    A. They did -- They did in some manner. They did
17  in some manner.
18    Q. But you --
19    A. I know he influenced the group.
20    Q. But you still voted personally for Standard; is
21  that correct?
22    A. Yes.
23    Q. And you mentioned earlier in your response
24  about three times ago that if Ace's budget was
25  consistent with the operating expenses, then that

Page 493

1  would --
2    A. Yeah.
3    Q. -- have been fine.
4    A. That was -- And once again, that was -- that
5  was a -- a misnomer, LPI. The submittal was submitted
6  by LPI and for LPI.
7    Q. Is there any reason were your accidentally
8  saying Ace instead of LPI?
9    A. No, just -- just mixing up the words.
10    Q. What comments did Bret make in the final RFP
11  meeting that you believe influenced the decision?
12    A. Specifically I don't -- I don't recall at this
13  time.
14    Q. Do you have any recollection of Bret's comments
15  in that meeting?
16    A. I don't recall exactly.
17    Q. Do you know what Elizabeth's race is?
18    A. She's black.
19    Q. Do you remember the date of the final RFP panel
20  meeting?
21    A. No.
22    But I believe those dates are clearly spelled out
23  in the -- in the RFP submittal.
24    Q. Have you ever told anyone at the Authority that
25  you believe that LPI purposely submitted lower operating

Page 494

1  expenses for the General Dynamics property?
2    A. Absolutely.
3    Q. Who did you tell?
4    A. My direct supervisor, Ted Sexton.
5    Q. When did you tell Ted that?
6    A. Immediately after looking at the trends. I
7  believe it was at the -- the -- the three month,
8  six-month submittal.
9    I was very diligent in keeping track of operating
10  expenses and revenues for the property, and it was
11  quickly highlighted -- or I quickly noticed that there
12  was -- there was a large variation versus what they
13  believed they can operate the property for and versus
14  the actual expense numbers.
15    Q. So three or six months into LPI's operation of
16  the new contract --
17    A. Yeah. Typically -- Typically the first three
18  months are -- are, you know, some turnover numbers, but
19  your -- your four- to six-month are really indicative
20  of -- of what the true operating expenses are.
21    You have -- Initially you have some uniform changes
22  that have to be -- which might screw it up a little bit,
23  but your four- to six-month would be more accurate.
24    Q. What the specifically did you say to Ted at
25  that time?

Page 495

1    A. After taking a look at the numbers -- taking a
2  look at the numbers, I -- I went back and pulled out the
3  RFP submittal and took a look at -- took a look at the
4  actualized numbers for them and spoke to Ted and asked
5  him what he wanted me to do, because I didn't
6  believe, you know, the numbers were too far off.
7    And then we had base -- we, the Airport Authority,
8  had based our operating budget on -- on the submittals
9  from the RFP. So we had put in -- or we had reflected,
10  hey, they can do it for a million 1- in our -- my budget
11  for General Dynamics, it was pretty close to that number
12  of a million 1-.
13    Q. Did --
14    Are you finished?
15    A. I'm done.
16    Q. Did Ted respond to your request of what to do
17  about the situation?
18    A. At that particular time, Ted just asked me to
19  go -- just go work it out with -- or told me just to go
20  work it out with -- with -- with LPI.
21    Q. Did you tell Ted that you thought that LPI's
22  submission in the RFP process was unlawful or illegal?
23    A. I believe that the numbers they had submitted
24  were -- were inaccurate and were unattainable.
25    Q. Did you ever tell Ted that you thought that

16 (Pages 492 to 495)

**53-611 (180)**

JOSE HERNANDEZ vs. SAN DIEGO COU... .          January 15, 2007          JOSE HERNANDEZ, VOL. III

Page 496

1    their submission was unlawful or illegal?
2       A. I believe it was untrue in terms of
3    attainability for the -- for their budget numbers.
4       Q. So you didn't tell Ted that you thought it was
5    unlawful or illegal?
6       A. I believe -- I believe I told him, once again,
7    that those numbers -- that their submittals numbers were
8    "unable" -- unattainable and -- and were untrue.
9       Q. And that's all you told him about the actual
10   numbers?
11      A. Those numbers -- We went into details as to the
12   numbers, but if that's a basis of why they were picked
13   over other operators, that would be a key concern.
14      THE REPORTER: "Would be a" what?
15      THE WITNESS: A key concern.
16      MS. McDONOUGH:
17      Q. Did you believe that LPI's submission in the
18   RFP process was unlawful or illegal?
19      A. I believe that their -- that they had submitted
20   unattainable numbers, that -- that they had a good idea
21   that if they were chosen to be -- or chosen to continue
22   as the service provider, that they would be unable to
23   attain those numbers, yes.
24      Q. Did you believe that the submission of
25   unattainable numbers was unlawful or illegal?

Page 497

1       A. I would believe that it would be -- that
2    there -- that there would have to be some more --
3    something in there that -- that would reflect -- Once
4    again, I -- I don't know the general, but I just know
5    that the submission of documents which are unattainable,
6    there has to be something wrong with them.
7       Q. But you didn't know one way or the other
8    whether that was unlawful?
9       A. There -- There would be cause -- There would
10   be -- There would be cause for disqualification for them
11   or disqualifi-- -- disqualification for them as service
12   provider during their existing or future.
13      So there would be -- there would have to be some
14   sort of -- of loss of -- loss of credibility or
15   somewhere to that effect. I don't want to -- I don't
16   want to say it was unlawful, but pretty close.
17      Q. So the consequence would be that they would not
18   be able to contract with the Authority in the future?
19      A. Yeah, they would -- they would -- their
20   contract would be terminated, and there would be an
21   opportunity to -- to list them as a nonres- --
22   nonresponsive party in the future.
23      THE REPORTER: "Nonresponsive party" --
24      THE WITNESS: In the future.
25      MS. McDONOUGH:

Page 498

1       Q. How many conversations did you have with Ted
2    Sexton regarding the unattainable numbers submitted by
3    LPI?
4       A. We had more than a few.
5       Q. And they -- those conversations began sometime
6    in 2004?
7       A. I -- I don't have the documents in front of me,
8    so I'd have to look at the trends and see when I first
9    spotted those trends. And it was -- it was a
10   continue -- a "continuant" -- a continual -- First it
11   was -- it was multiple conversations within a few weeks.
12      And then at the -- at the point of submission,
13   for -- for every one of their profit and loss
14   statements, go back and reflect to him
15   what -- you know, what the numbers were in terms of --
16   of -- of actual expense numbers versus what LPI had
17   submitted in their submittal. So just -- I wanted to
18   keep him informed of what the trends were.
19      Q. When was the last time that you had a
20   conversation with Ted Sexton about the unattainable
21   numbers submitted by LPI in the RFP process?
22      A. Those continued through -- Those were
23   continuing on a regular basis through the end of my
24   employment with Airport Authority.
25      Q. Did you communicate with anyone else regarding

Page 499

1    the unattainable -- unattainable numbers submitted by
2    LPI?
3       A. In this particular case, I felt that it would
4    be more appropriate if I -- if I directed those comments
5    to my direct supervisor.
6       Q. And I assume that those comments were all
7    verbal; correct?
8       A. (Nods head in the affirmative.)
9       Q. Are you aware of any documentation reflecting
10   those comments to Ted Sexton?
11      A. I'm -- I'm unaware if there are.
12      Q. Did you believe that the -- that LPI's
13   submission of unattainable operating expenses violated
14   the Authority's rules or regulations?
15      A. I believe they -- I believe they violated the
16   spirit of the contract -- contract and law.
17      Q. Spirit of the contract and law?
18      A. Of the -- Of contracting -- or -- I forget
19   exactly what it's called, but our -- a contracting and
20   procurement.
21      Q. The contract and procurement from who?
22      A. Regulations for the Airport Authority.
23      Q. So you believe that the Airport Authority had
24   some sort of a contract, code or rule?
25      A. Yeah.

17 (Pages 496 to 499)

53-611 (181)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY       January 15, 2007

JOSE HERNANDEZ, VOL. III

Page 500

1    Q. And what spirit did -- do you think that the
2  LPI submission violated?
3    A. I believe the spirit of submitting a fair, just
4  and attainable proposal is -- is key and to the point of
5  contracting with any agency or any individual.
6    And purposely submitting numbers that are
7  unattainable with the thought that everything would just
8  get figured out down the road is -- is not within that
9  spirit of -- of that con- -- those contracts and
10  regulations.
11    Q. Do you know what the specific contract codes
12  are that you're referring to?
13    A. No.
14    The specific -- what their names are, not -- no,
15  but I'm sure by contacting or by making contact with --
16  with the Airport Authority, you know, requesting those,
17  those can be provided too.
18    Q. You also allege in your complaint that LPI
19  double-billed the Authority for workers' compensation
20  costs?
21    A. Yes, they did.
22    Q. When did that occur?
23    A. I don't have the spreadsheets in front of me,
24  but I believe starting in 2000 and again in around 2005.
25    Q. Do you know if you were the first person to

Page 501

1  notice the double billing?
2    A. Yes.
3    Q. What did you do when you noticed the double
4  billing?
5    A. Immediately -- What I -- What I did immediately
6  was -- was contact my direct supervisor, Ted Sexton, and
7  informed him of -- of the situation and what I had and
8  what the numbers looked like.
9    Q. Then what did you do?
10    A. And then took his -- took his advice and made
11  contact with LPI requesting backup information, or -- or
12  specific backup information that can justify the
13  increase in -- in those workers' comp expenses.
14    Q. What was LPI's response to your inquiry?
15    A. They -- They -- LPI tried to go back and take
16  a -- look at the numbers. I believe it was a period of
17  time, maybe a couple of weeks, that I finally requested
18  a meeting for -- from -- requested a meeting from
19  Maurice Grey. And Maurice Grey -- and he came in, and
20  we went over the specific numbers with him.
21    Q. Then what happened?
22    A. Then it was finally determined on their part
23  that they -- they were not only including the
24  individualized workers' comp numbers, but also including
25  those workers' comp expenses on the payroll overhead.

Page 502

1    Q. So the double billing was that LPI was
2  submitting its workers' comp expenses under one line
3  item in the operating expenses, and then also had it in
4  the payroll overhead?
5    A. That's correct.
6    Q. Did LPI make any efforts to correct that
7  situation?
8    A. At that particular time, the Airport Authority
9  had made the decision to go back and credit -- and take
10  credit for that double billing.
11    What I then did was go back through and take a look
12  at all the months that I believed -- that I believed the
13  Airport Authority was double-billed, went through and
14  itemized all the expenses and then -- and turned in the
15  submission to LPI -- to LPI, Maurice Grey, notifying
16  them of the credit that the Airport Authority intended
17  to take against -- against that double billing.
18    Q. Who at the Authority decided to go back and
19  take credit for any double billings?
20    A. I had made the decision with -- with approval
21  of my direct supervisor, Ted Sexton.
22    Q. Was Ted Sexton pleased that you had discovered
23  this double-billing problem?
24    A. I believe Ted Sexton wanted me to ensure
25  that -- that it was taken care of in a -- in a -- in

Page 503

1  a -- in a quiet and quick manner. He didn't want it to
2  be made public that that was the case.
3    Q. Was he upset that you found the double billing?
4    A. He -- I believe -- I believe he didn't care
5  either way.
6    Q. Did you tell anyone else about the double
7  billing on the workers' compensation?
8    A. Yes, ma'am.
9    We had -- We had an analyst in account- --
10  accounting analyst by the name of Andrew McIntyre.
11  Andrew McIntyre was tracking work for the finance
12  department, accounting department, and he was tracking
13  our -- our revenues and expenses.
14    And I needed to notify him that there would be a
15  lump-sum credit taken back against those accounts for
16  LPI. So I needed to notify him that that was the case.
17    He then came to my office, and we went through all
18  the documentation in specific so he -- so that he can be
19  informed as to what the credits would be.
20    Q. When did you tell Andrew McIntyre about the
21  double billing?
22    A. Once -- Once I had figured out which ones I was
23  going to go back and take credit and thought that I had
24  narrowed down or specifically -- and -- and had specific
25  numbers that we were looking to take credits against.

18 (Pages 500 to 503)

53-611 (182)

Page 504

1    Q. Was that in the beginning of 2005?
2    A. Right around the beginning of 2005, yes, ma'am.
3    Q. Is there anyone else that you communicated with
4 about the double billing of the workers' compensation
5 expenses?
6    A. No.
7    Ted Sexton -- Ted -- Ted Sexton, Andrew McIntyre, I
8 know that I requested the assistance of my executive
9 assistant, Jennifer Hamilton, to assist me in compiling
10 all this information.
11    Q. And you also spoke to Maurice Grey about it;
12 correct?
13    A. And speak to Maur- -- Maurice Grey.
14    Once again, at that particular time I did not have
15 a director of grounds -- or manager of ground
16 transportation, so it was me.
17    Q. Do you believe that the -- that LPI's double
18 billing of the workers' compensation was inadvertent?
19    A. No, I don't.
20    Q. Why do you believe that it was purposeful?
21    A. I believe when you look at -- there is some
22 intent that goes into -- there has to be some intent
23 to -- to double -- to double-bill in that fashion. And
24 there was -- there wasn't sufficient documentation
25 coming back to me or presented to me as -- as an

Page 505

1 individual at the Airport Authority that would
2 substantiate such a claim.
3    Q. When you met with Maurice Grey to go over the
4 issue of double billing with him, did he seem surprised?
5    A. He seemed upset.
6    Q. How did you know he was upset?
7    A. You -- You could see it in his face. You can
8 see it in his face, and he just did not know how to
9 react to -- to the items of double billing. It was a
10 substantial amount.
11    And understanding the structure of their company,
12 it should be pretty quick to red-flag that for a
13 five-month period. You've seen your revenues go up
14 by -- by a pretty good amount of money.
15    I mean, theirs -- their business is pretty -- the
16 fees, the management fees that they typically receive
17 are -- you know, are pretty standard from January, just
18 what he can expect, February, he can expect.
19    And when you look at a -- at a -- at a trend, four-
20 to-six-month trend where they're just going through the
21 roof, doubling, tripling, I mean, there has got to be a
22 reason. I mean, a typical person would go back and try
23 to research of why those numbers were the way they were.
24    Q. Was there anything more that Maurice Grey said
25 or did that made you believe that he or LPI purposely

Page 506

1 double-billed the Authority?
2    A. No.
3    There was -- In fact, in reverse, there was no
4 information that he provided to me that -- that would
5 substantiate that they did it.
6    Q. Did he ever tell you that it was a mistake?
7    A. No.
8    Q. Did he ever say that he didn't know that
9 payroll expenses included the workers' comp expenses?
10    A. The -- Under- -- Understanding way --
11 understanding the way that documents are -- are
12 produced, he sees all those documentations, and he signs
13 them under penalty of perjury that all the numbers
14 are -- are true and correct.
15    So he has final say over that documentation. So
16 he's gone through and he's -- he's, in fact, attested
17 that he's gone through and he believes and -- you know,
18 that he believes all those numbers are true.
19    Q. By signing it under penalty of perjury?
20    A. (Nods head in the affirmative.)
21    Q. When you look at the -- Was it a monthly
22 operating expense that LPI submits?
23    A. Yes, ma'am.
24    Q. When you look at the monthly operating expenses
25 and you see the category for payroll expenses, is there

Page 507

1 a subcategory for workers' compensation on the monthly
2 operating expenses that LPI submits?
3    A. It's all line item categories from -- from
4 payroll, workers' comp, health benefits. Everything --
5 Everything is line item, step by step by step by step.
6    Q. So did it say workers' comp expenses twice on
7 the monthly expense --
8    A. No.
9    Q. -- spreadsheet?
10    A. No.
11    It was -- It was your worker's comp lumped into --
12 I believe when we finally determined when those
13 expenses, I believe they were lumped into your
14 liability, some insurance or liability in there. Once
15 again, I don't have the documentation in front of me,
16 but it was lined item as workers' comp.
17    And then once again, lined item were hidden into
18 another category, an insurance category like -- I
19 believe it was liability insurance, but once again, I
20 don't have the documentation in front of me.
21    Q. So under the insurance category, did it say
22 workers' comp?
23    A. The -- Under the specific workers' comp
24 category, it said workers' comp.
25    Q. Was there anywhere else on the monthly

19 (Pages 504 to 507)

53-611 (183)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY          January 15, 2007

JOSE HERNANDEZ, VOL. III

Page 508

1   operating expense sheet where it said workers' comp?
2       A.  I don't -- Once again, I don't have the
3   documentation.  I can't respond accordingly --
4   accordingly.
5       Q.  Do you remember it at all?
6       A.  I'd have to go back and take a look.
7       Q.  Do you know if the Authority received credit
8   for the double billing on the workers' comp?
9       A.  I believe in one of their statements, one of
10  their statements, we took credit, we took full credit
11  for -- for those operating expenses.  And, you know,
12  exact amount I don't quite remember, but it was easily
13  over $100,000.
14      Q.  So as far as you were aware, the Authority
15  recovered whatever it double-paid on the workers' comp?
16      A.  Yes.
17      Q.  And that problem on the double billing was
18  fixed in later monthly expense submissions?
19      A.  I believe that was correct.
20      Q.  Did you believe that LPI's submission of double
21  expenses for workers compensation was a violation of the
22  law?
23      THE REPORTER:  "Was a" what?
24      MS. McDONOUGH:  Violation of the law.
25      THE WITNESS:  You know, I'm not -- I'm not quite

Page 509

1   sure, I mean, how best to answer that question at this
2   time.
3       MS. McDONOUGH:
4       Q.  Do you need any further information from me or
5   clarification in my question?
6       A.  I would -- I believe -- Let me -- Let me confer
7   and just make sure that I'm going to answer it or say it
8   in a way that I think would be the best.
9       Q.  Well, before we go off the record, do you
10  understand my question?
11      A.  Could you repeat it again.
12      Q.  Sure.
13      Did you believe that LPI's submission of double
14  expenses for workers' compensation was a violation of
15  law?
16      A.  Okay.  Let me get back with you.
17      Q.  Did -- No --
18      A.  I -- I understand the question.
19      Q.  Right.
20      Did you believe that at any time?
21      A.  Let me -- Let me talk to my attorney, and --
22      Q.  I'm entitled to your response before you talk
23  to your attorney about it.  If you can't -- If you don't
24  understand my question, then please let me know.
25      A.  I do understand your question, but I need to

Page 510

1   make sure that I can articulate it in the proper manner.
2   So I'm asking for about ten seconds of your time.
3       Q.  But I need the answer from you, not from your
4   attorney.
5       A.  The --
6       MS. CHINN:  Go ahead, answer it, Jose.
7       THE WITNESS:  I believe -- I believe that -- I
8   would believe that the submission of or the request for
9   reimbursement for those insurance numbers were in an
10  attempt to -- to kind of on a trial period see if we
11  would pay those expenses, and then just kind of keep it
12  going until they continued and see if -- if -- if they
13  got caught.
14      MS. McDONOUGH:
15      Q.  Did you believe that that was illegal to do
16  that?
17      A.  Would you believe it's illegal to double bill?
18      MS. CHINN:  No, go -- I know you mean that --
19      THE WITNESS:  As a statement.
20      MS. CHINN:  -- rhetorically --
21      THE WITNESS:  I know.
22      MS. CHINN:  But go ahead --
23      MS. McDONOUGH:
24      Q.  Did you --
25      MS. CHINN:  -- make your statement.

Page 511

1       MS. McDONOUGH:
2       Q.  Did you believe that it was illegal for LPI to
3   submit the double billing on workers' comp?
4       A.  I believe it was wrong that they submitted a
5   request for proposal -- a request for reimbursement
6   in such a manner.
7       MS. CHINN:  Are you saying that you're not
8   qualified to give a legal --
9       THE WITNESS:  Yes.
10      MS. CHINN:  -- a legal response, a legal
11  conclusion.
12      MS. McDONOUGH:
13      Q.  Did you have a belief at any time that the
14  double billing on the workers' compensation was illegal
15  or unlawful?
16      A.  I -- I wouldn't be qualified, I know -- I'm
17  qualified to say that it -- that it's wrong.  But, you
18  know, specifically I don't believe I'd be qualified to
19  say.
20      Q.  Why do you believe it's wrong?
21      A.  Because you are submitting to an agency -- to
22  anyone to reimburse you for expenses that -- that you
23  didn't actually incur.
24      MS. CHINN:  Okay.  Now you can talk to me.  You've
25  answered it.

20 (Pages 508 to 511)

JOSE HERNANDEZ vs. SAN DIEGO COUN...    January 15, 2007    JOSE HERNANDEZ, VOL. III

Page 512

```
 1    VIDEO OPERATOR:  Go off the record?
 2    MS. McDONOUGH:  Oh, yes.
 3    VIDEO OPERATOR:  Okay.
 4    We are off the record at 11:42 a.m.
 5    (A recess is taken.)
 6    VIDEO OPERATOR:  We are back on the record at
 7  11:44 a.m.
 8    MS. McDONOUGH:
 9    Q.  Were any of your complaints to Ted Sexton or
10  Maurice Grey about the double billing in writing?
11    A.  No.
12    They were in verbal communication with -- with Ted,
13  my -- I'm not sure.  Once again, I don't have the files
14  in front of me, my files pertaining to LPI.  So there
15  may have been, but I don't have those files.
16    Q.  But as we sit here today, you're not aware of
17  any documentation that would reflect your complaints
18  about the double billing?
19    A.  I believe there was documentation that needed
20  to be provided in -- in the profit and loss statements
21  that would document there are -- are -- you know, the
22  Port Authority taking credit for such a large amount of
23  money.
24    Q.  So there would be documents that show the
25  credit, there would be the original documents that show
```

Page 513

```
 1  the double billing?
 2    A.  That's correct.
 3    Q.  But you're not aware of any documents that
 4  actually show you complaining about the double billing?
 5    A.  The -- The -- My conversations, once again,
 6  were with my direct supervisor, and informing him of the
 7  situation in verbal and requesting assistance in how I
 8  should best follow up in that.  On no point, to the best
 9  of my recollection, did he -- did he ever have me or
10  request that I document that in writing.
11    Q.  And I'm not trying to trick you.  I just want
12  to know if there's documents that I should go try to
13  find.  So --
14    MS. CHINN:  He says yes.
15    MS. McDONOUGH:
16    Q.  Are there any documents that show that you
17  complained about the double billing on the workers'
18  comp?
19    A.  Probably.
20    Q.  What documents would those be?
21    A.  They would be -- Any such documents would be
22  held in -- in the parking management file for LPI.
23    Q.  And who has that file?
24    A.  That file is held in -- I believe it's in
25  the -- in the -- in the permitting office -- In the
```

Page 514

```
 1  Landside Operations office, we have a file where we --
 2  where we document all -- where we hold all the profit
 3  and loss statements.  And there is a contract file in
 4  there that we hold any documentation for to and from
 5  vendors that -- that we oversee.
 6    Q.  So if there is any documentation about your
 7  complaints, it would be in that file?
 8    A.  I would think it would be in there.
 9    Q.  After the Authority received credit for the
10  double billing of the workers' compensation, did you
11  ever talk to anyone at the Authority about the double
12  billing again?
13    A.  I had gone through with Ted and informed him
14  what -- what the resolution was with them and, once
15  again, reiterated to Ted that I don't believe -- you
16  know, that -- that I didn't believe what had happened
17  was right, there -- there is just something wrong with
18  the whole situation.
19    Q.  When did you reiterate that to Ted?
20    A.  Just as the follow-ups -- follow-up
21  conversations with him.  Ted and I probably spent, you
22  know, a good half hour, hour talking to each other every
23  day and just going over different issues.  We had a lot
24  of items on our plate, so I would just brief them in
25  summary form to him.
```

Page 515

```
 1    Q.  Was that a one-time briefing after the credit
 2  had been issued to -- to tell Ted, "The issue has been
 3  revolved.  I don't think it's right that they double
 4  billed" and that was the end of it?
 5    A.  No, I believe we -- we continued -- we -- we
 6  continued with subsequent conversations to see if --
 7  what -- what he wanted to do with it and see if -- if --
 8  just trying to get additional -- additional advice as to
 9  how best to handle the situation or if he felt we should
10  just go ahead and close the issue and -- and move on.
11    Q.  When was the last time that you remember having
12  a conversation with Ted Sexton about the double billing
13  on the workers' compensation?
14    A.  I -- I don't recall.
15    Q.  Did you ever keep any notes of your
16  conversations with Ted Sexton about the issues that
17  we've discussed, the General Dynamics lease, the
18  Teledyne Ryan lease, LPI or the restroom project?
19    A.  Not as much because most of the conversations
20  that we had with him were -- there was a lot of
21  verbal -- We had meetings with -- with them with, you
22  know, in -- in our small groups, the -- the operations
23  group that we do.  So -- So not as much -- not as much
24  in terms of notes.  I --
25    Q.  Do -- Do you remember taking any notes, say on
```

21 (Pages 512 to 515)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY        January 15, 2007        JOSE HERNANDEZ, VOL. III

Page 516

1  a calendar? Some people write things down on a calendar
2  or in a journal?
3      A.  Not as much. No, not as much.
4      Q.  You're saying "not as much," does that mean you
5  don't remember any or there were some? What -- What do
6  you mean by that?
7      A.  No, typically, typically I wasn't -- wasn't
8  within my practice to take certain notes like that.
9      MS. CHINN: Can I talk to you for --
10     THE WITNESS: Yeah.
11     MS. CHINN: -- one second just right here.
12     (A discussion between witness and counsel is held
13  off the record.)
14     MS. McDONOUGH:
15     Q.  Is there something you wanted to add?
16     A.  Yeah.
17     Just, you know, my conversations with Ted
18  initially, unless specifically requested, were loud and
19  verbal. I wanted to get a good understanding from him
20  as to which direction he wanted to take so that I could
21  comply with -- with his directives.
22     You know, even -- even with this, trying to get his
23  ideas of, "Hey, do you think this is legal, it's not
24  illegal?"
25     Personally -- Personally I would think or have a

Page 517

1  reason to believe that there -- some -- some -- some
2  sense of impropriety or -- or -- or not lawfulness in
3  their -- their submissions of -- of -- you see the
4  pattern.
5      First they submit proposal with un- -- unattainable
6  numbers. Now we have a situation where they might be
7  double-billing, trying to increase their revenues, you
8  know, what next? What -- You know, what's going to
9  happen next?
10     So what I first want to do is, once again, go to my
11  direct supervisor, inform him of the situation and see
12  where he wanted to take it, you know.
13     Q.  And once again, I'm not implying that there
14  should be documentation. I'm just trying to find out if
15  there is documentation.
16     So do you have any recollection of taking notes,
17  either on a piece of paper, a journal, a calendar,
18  anyplace regarding the conversations you had with Ted
19  Sexton?
20     A.  I -- You know, I wouldn't -- not having the
21  information in front of me, I'm -- I'm not sure. There
22  may or may not be.
23     Q.  You indicated that you thought that LPI was
24  testing the Authority to see if it could double-bill
25  workers' compensation; correct?

Page 518

1      A.  That's correct.
2      Q.  Why did you believe that LPI was testing the
3  Authority?
4      A.  What -- You know, if -- if an error of that
5  magnitude, if it goes through once, okay. But a
6  continuation of that, until someone catches you, then
7  that would be let's see how long we can continue going
8  with this.
9      That's -- That's my personal opinion, that unless
10  we caught it, I doubt they would come back to us and
11  say, "Hey, here is a credit for all this amount that we
12  doubled-billed you."
13     So it was up to us at that point to go through and
14  try to catch -- catch -- catch the issue and then
15  address it. It was going to be at our point, at our
16  time, not theirs anymore.
17     MS. CHINN: Take this off.
18     (A discussion between witness and counsel is held
19  off the record.)
20     MS. McDONOUGH:
21     Q.  When I asked you if you had any documentation,
22  you said, "I wouldn't have any information. I'm not
23  sure if there may or may not be," what do you mean by
24  that, that you don't have the information?
25     A.  You had mentioned if I had any documentation.

Page 519

1  Documentation specific to the LPI parking contract,
2  whether they'd be letters or information back to -- to
3  LPI, would be held within that file. Any additional
4  information, like notes, probably not unless I put them
5  in there, in that particular file.
6      MS. CHINN: You're saying you don't remember what's
7  in the file?
8      THE WITNESS: I don't remember what's in the file.
9      MS. McDONOUGH:
10     Q.  Okay.
11     So when you were talking about there may or may not
12  be, it's just whatever is in the LPI file in the parking
13  office -- I'm sorry -- in the -- you said earlier where
14  it is.
15     A.  That's correct. We -- What -- What I did was I
16  held two separate files. We had one, the contracting
17  file, which is the formal file, and one which is
18  little -- with -- with additional information, another
19  file that I held in my office.
20     So between those two files, if there is any
21  information that's in writing, it would be between those
22  two files.
23     MS. McDONOUGH: This is probably a good stopping
24  point for lunch. Do you want to take it now?
25     MS. CHINN: Oh, sure, if you want to.

22 (Pages 516 to 519)

53-611 (186)

Page 520

1    VIDEO OPERATOR: This is the end of Videotape
2  Number 1 in the continuing deposition of Jose Hernandez,
3  Volume III. We are off the record at 11:54 a.m. on
4  December 20th, 2006.
5    (A recess is taken.)
6    VIDEO OPERATOR: We are back on the record at
7  1:11 p.m. on December 20th, 2006. This is the beginning
8  of Videotape Number 2 in the continuing deposition of
9  Jose Hernandez, Volume III.
10   MS. McDONOUGH:
11   Q. Is there any reason why you cannot continue to
12  give your best testimony?
13   A. No, ma'am.
14   Q. You testified earlier that you notified Ted
15  Sexton of the LPI issues, including the underestimated
16  expenses and the double billing of the workers'
17  compensation; correct?
18   A. That's correct.
19   Q. Do you know if Ted told anyone else about the
20  double billing or the expense issue with LPI?
21   A. I'm not -- I'm not sure if he did.
22   Ted, at some points, would either choose or not
23  chose, you know, to take whatever action he wanted. So
24  I'm not -- I'm not sure. I know that -- that I thought
25  it was my obligation to report to my immediate

Page 521

1  supervisor. Whether he took it anywhere from there,
2  it's -- you know, it's his choice.
3    Q. What specific authority codes or policies do
4  you believe were violated by LPI's actions?
5    A. I believe -- I believe that -- that I had --
6  that I had good faith to believe that as there was
7  violations of the -- of the contracting rules and
8  regulations by the Airport Authority, were violated by
9  not only the submission of their -- of their proposal
10  but also their submission of their request for
11  reimbursement.
12   Q. And when you say the Authority's rules or
13  regulations, are you referring to the Authority's code?
14   A. Contracting requirements. So specific which
15  ones I can't tell you, but I know that our procurement
16  and -- procurement and contracting is governed by -- by
17  code, which I believe mirrors the California
18  procurements code in there. But the exact title I -- I
19  can't tell you, but I believe we do have contracting
20  code at the Airport Authority.
21   MS. CHINN: Yeah, I didn't hear the whole answer.
22  You dropped your voice a little.
23   THE WITNESS: I apologize.
24   MS. CHINN: That's okay.
25   Do you mind telling me what the answer was.

Page 522

1    (The record is read by the reporter.)
2    MS. CHINN: Okay. Thank you very much.
3    MS. McDONOUGH:
4    Q. In your complaint, you allege that when you
5  first raised the doubling-billing issue with Ted Sexton,
6  that he said that you needed to work out the issues with
7  Maurice Grey because LPI was a minority-owned business,
8  and the Authority needed the relationship in order to
9  comply with FAA regulations; is that true?
10   A. Yes.
11   Q. Was anyone else present when Ted told you that?
12   A. No.
13   I felt that there is -- an issue of this magnitude
14  would be better served if -- if I broached the issue
15  with -- with Ted directly and no one else at that time.
16   THE REPORTER: And what at that time?
17   THE WITNESS: And no one else at that time.
18   MS. McDONOUGH:
19   Q. Did you ever complain in writing regarding the
20  LPI workers' compensation or operating-expense issue?
21   A. No.
22   I felt that communicating my -- my dissatisfaction
23  or my concerns directly to my supervisor in verbal would
24  suffice.
25   Q. Did you ever complain in writing about the

Page 523

1  Teledyne Ryan lease, the General Dynamics lease or the
2  restroom project in Terminal 1?
3    A. I -- I felt that communicating my concerns
4  directly to my immediate supervisor would suffice as --
5  as my articulation of those -- of -- of my thoughts.
6    Q. So you did not complain in writing about those
7  issues?
8    A. I believe that communicating to my direct
9  supervisor, you know, by word would -- would suffice.
10   Q. It just calls for a "yes" and "no" -- "yes" or
11  "no."
12   Did you complain in writing about the restroom
13  project at Terminal 1, the Teledyne Ryan lease or the
14  General Dynamics lease?
15   A. No.
16   Q. In your complaint, you allege that LPI's
17  actions violated the code of contracts, the California
18  code of contracts.
19   Do you know what that refers to?
20   A. I believe it's -- it's -- it's the -- the --
21  their -- the California code of contracts is a document
22  that was pretty much mirrored by the Airport Authority
23  that would govern or create the Airport Authority's
24  contracting policies.
25   Q. What's the basis of your understanding about

23 (Pages 520 to 523)

Page 524

1  what the California code of contracts is?
2      THE REPORTER: Counsel, I need that again.
3      MS. McDONOUGH:
4      Q.  What's the basis of your understanding about
5  what the California code of contracts is?
6      A.  I believe that document lays down the outline
7  for specific requirements on which public agencies would
8  contract with -- with service providers, vendors and --
9  and so on.
10     Q.  Have you ever read the California code of
11 contracts?
12     A.  I believe that at one time I had looked at a
13 summary of that as we were going through and working
14 with our procurement department to clarify those --
15 clarify the language in those -- in -- in our
16 internal -- Airport Authority internal contracting
17 requirements.
18     Q.  Was there an issue that you were looking at
19 specifically when you were working with procurement?
20     A.  There were multiple issues that we had looked
21 at.  In fact, Amy was part of that group where we had
22 looked at ways that we can streamline -- streamline or
23 better clarify the contract and requirements -- or
24 contract in process at the Airport Authority.  So there
25 was -- it was a subset -- it was a working group that we

Page 525

1  had put together.
2      Q.  There was a group specifically at the Authority
3  that was looking at the contracting process?
4      A.  Yes.
5      MS. CHINN: That mischaracterizes his testimony.
6      (Interruption in proceedings.)
7      MS. McDONOUGH:
8      Q.  Do you remember when that group was created?
9      A.  The development of the -- of the group was part
10 of -- was a subset or a task group from what we call --
11 what we call the directors forum.
12     The directors from the various department on a
13 monthly basis would get together and identify areas that
14 we, as directors, felt that needed addressing or
15 improvement.  The procurement and procurement processes
16 happened to be one of those items that were at the top
17 of the list.
18     Q.  In the complaint, you've alleged that the vice
19 president of operations paid $1200 for a ticket to Texas
20 to obtain ice cream; is that correct?
21     A.  That's correct.
22     Q.  And when you say the vice president of
23 operations in the complaint, who are you referring to?
24     A.  Ted Sexton.
25     Q.  Isn't it true that on the trip where Ted Sexton

Page 526

1  obtained ice cream from Texas, Mr. Sexton was also in
2  Texas on business?
3      A.  I believe that was a pretext of why he was
4  there.
5      Q.  Isn't it true that Ted Sexton met with
6  representatives of Southwest Airlines in Dallas on the
7  same trip where he obtained the ice cream?
8      A.  That is correct.
9      Q.  Isn't it true that other members of the
10 Authority went with Ted Sexton to Texas on that occasion
11 to meet with a Southwest Airlines representatives?
12     A.  That is true, but Ted Sexton was not part of
13 the original group to -- designated to go to -- to visit
14 Southwest Airlines.
15     Q.  Who is the original group designated to visit
16 Southwest Airlines?
17     A.  I believe in my recollection it would have been
18 Thella Bowens, Jeffrey Woodson, Angela Shafer and at
19 that time our -- Teresa or Terri -- I forget her last
20 name, but she was our vice president of marketing.
21     Q.  Do you know the purpose of the meeting with the
22 representatives of Southwest Airlines?
23     A.  At that current time, the Airport Authority
24 hide -- had identified certain companies or
25 organizations around the country that they can look to

Page 527

1  or visit on -- in their -- in their hope to develop
2  their own internal cultural -- culture.
3      Q.  The Airport Authority was looking to Southwest
4  Airlines internal operations to figure out if the
5  Authority could modify its own internal operations to
6  mirror that?
7      MS. CHINN: Objection.  That mischaracterizes his
8  testimony.
9      THE WITNESS:  Okay.
10     No, I don't believe that was the case.  I believe
11 the case was to get an understanding or to visit or to
12 be briefed on -- on particular culture that that
13 excelling agencies have, such as the Vancouver Airport,
14 Dallas -- I mean Southwest Airlines and other similar --
15 that makes them -- that make them well recognized as
16 having superior cultures or work cultures.
17     MS. McDONOUGH:
18     Q.  When was the trip to Texas?
19     A.  It was approximately August or September 2004.
20     Q.  Do you know when Ted Sexton decided to go to
21 Texas for that meeting?
22     A.  I believe he had finally decided to go on that
23 meeting under a week's notice.  That's why the ticket
24 ended up being so expensive.
25     Q.  How do you know the price of the ticket?

24 (Pages 524 to 527)

JOSE HERNANDEZ vs. SAN DIEGO COU....    January 15, 2007    JOSE HERNANDEZ, VOL. III

Page 528

1   A. Because I was in his office when Amy came in.
2  Amy Gosslin, his administrative assistant came in, and
3  asked him to sign the information for his travel
4  reimbursement.
5   Q. Did Ted ever talk to you about that trip to
6  Texas?
7   A. Absolutely he did.
8   Q. What did he say?
9   A. Initially he had gone through -- we had talked
10 about his trip or his intent to go on that trip prior --
11 prior to. Our conversations were -- were kind of to the
12 effect that he had no choice but he had to go find a way
13 to go get the Blue Bell ice cream.
14   I had tried to communicate why or -- you know,
15 trying to find alternatives of other ice cream that we
16 can get, why it was so important to -- to get this
17 particular ice cream.
18   And he said he had no choice, he had to figure out
19 away to get that ice cream because it was -- it was near
20 and dear tore -- to -- to Vernon and Thella, who both
21 grew up in -- in Texas, and it really gave them a -- a
22 remembrance of -- of Texas.
23   Q. Did Ted tell you that the only reason he was
24 going to Texas was to get ice cream?
25   A. Ted -- Ted had mentioned to me that he -- he

Page 529

1  found that -- that he now had an opportunity where -- or
2  an opportunity had presented himself where now he can
3  now go out to Texas and get the ice cream.
4   Q. He could go out to Texas for business and get
5  the ice cream at the same time?
6   A. I -- No.
7   MS. CHINN: That mischaracterizes his testimony.
8  He didn't say that.
9   THE WITNESS: I believe that's in- -- that's
10 incorrect.
11   I believe now that he can insert himself into that
12 trip because the primary -- the primary reason for it
13 was for him to go get that ice cream. And now he can
14 legitimize making that trip.
15   MS. McDONOUGH:
16   Q. Are you testifying that there was no reason for
17 Ted Sexton to meet with Southwest Airlines on that
18 occasion?
19   A. I'm -- I'm testifying to the point that he was
20 not part of the original group, and that although he did
21 meet with -- with Southwest Airlines while on that trip,
22 it was not the pri- -- the primary reason for going on
23 that trip.
24   Q. Do you know if Ted Sexton provided any input
25 during the meeting with Southwest Airlines?

Page 530

1   A. I was not at that meeting, so I -- I could
2  not -- I could not respond.
3   Q. Do you know anything about the role that Ted
4  Sexton played in the meeting with Southwest Airlines?
5   A. No.
6   Q. Do you know anything about --
7   MS. CHINN: Let me ask my client something real
8  quick. Excuse me.
9   (A discussion between witness and counsel is held
10 off the record.)
11   THE WITNESS: Okay. Go on.
12   MS. McDONOUGH:
13   Q. Do you know if any of the information gathered
14 from that meeting with the Southwest Airlines
15 representatives was later used by the Authority in
16 developing other policies or internal operating systems
17 or anything like that?
18   MS. CHINN: Objection. That lacks a foundation,
19 calls for speculation.
20   You can answer if --
21   THE WITNESS: I -- I would not be qualified to
22 answer that question.
23   MS. McDONOUGH:
24   Q. Do you know if any information obtained from
25 Southwest Airlines was ever used by the Authority in any

Page 531

1  context?
2   MS. CHINN: Same objection.
3   THE WITNESS: I -- I would not be qualified to
4  answer that question.
5   MS. McDONOUGH:
6   Q. Do you know how Ted Sexton obtained the ice
7  cream once he was in Texas?
8   A. Oh, absolutely.
9   That was -- This would get to the point why we
10 figured out or why it's understood by myself that that
11 was the whole reason why he went there.
12   In advance to going to that trip, he had us make
13 contact with the airline station manager for American
14 Airlines, and tried to understand what the -- what the
15 rules and regulations were for -- for flying back ice
16 cream with dry ice.
17   We then made contact with MCRD, where we went out
18 and rented coolers large enough to bring back I believe
19 it was three or four tubs of 5-gallon ice cream back
20 there.
21   We had also made contact over the phone with --
22 with the Wal-Mart, which I believe is where he bought
23 the dry ice.
24   And we also made contact with the dairy
25 manufacturer in some small outlying town where he would

25 (Pages 528 to 531)

53-611 (189)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY          January 15, 2007          JOSE HERNANDEZ, VOL. III

Page 532

1  be -- eventually go out and drive to and get the ice
2  cream.
3      So we had, prior to his trip, gone through and
4  detailed what vehicle he needed to get, what the whole
5  process was, where he needed to go and all the specifics
6  of -- of getting that ice cream back.
7      Q.  And did he get the ice cream from Wal-Mart or
8  from the dairy manufacturer?
9      A.  No, he -- he got the dry ice from the dairy
10  manufacturer.  He got the dry ice from Wal-Mart and --
11  and got the ice cream from the dairy -- the dairy
12  manufacturer.
13      Q.  Okay.  Sorry.
14      When you said that we contacted MCRD and we
15  contacted the station manager, who is the "we" that
16  you're referring to?
17      A.  I believe -- I -- I know I had made contact
18  with them.  Dan Frazee, who was part of that ice cream
19  committee, was also involved in those meetings.
20      And Amiel Porta was also part of the -- You don't
21  understand how important this ice cream was to them.
22      Q.  Are you saying there was an ice cream
23  committee?
24      A.  There was an ice cream subcommittee.  It was
25  that important that they get that ice cream that as part

Page 533

1  of Thella's Barbecue, there was an ice cream
2  subcommittee.
3      Q.  And Ted paid for the rental of the coolers from
4  MCRD; correct?
5      A.  I believe all those -- I believe he did and was
6  reimbursed through -- through the funds for -- for
7  the -- for the -- for her barbecue or for the
8  barbecue.
9      Q.  But the funds for the barbecue are paid by the
10  executives at the -- at the Authority?
11      MS. CHINN:  Objection.  That lacks a foundation.
12      Answer if you can.
13      THE WITNESS:  Portions, portions of those, but
14  not -- not all in its entirety.
15      MS. McDONOUGH:
16      Q.  How do you believe that the barbeque is funded?
17      A.  The barbecue is funded -- The barbecue, in
18  order to be properly funded, had to be renamed from
19  Thella's Barbecue, which at one time was -- was funded
20  by senior executives from manager level and above.
21      Eventually it grew to such a large number that it
22  was renamed in order to be able to qualify it as an
23  em- -- an employee activity, so where senior managers
24  still contribute to -- still contribute to -- to that
25  function, and Airport Authority picks up the bill for

Page 534

1  other portions of that function.
2      Q.  What portion of the function does the Airport
3  Authority pay for?
4      A.  I believe that -- I believe in not having the
5  exact details on how it's broken up, but I believe that
6  they paid for -- they paid for setup, tables -- the
7  setups, tables and -- and other accouterments.
8      Q.  What kind of accouterments?
9      A.  The hay bales -- hay bales, the little peanuts
10  that you put on the table, the decorations, the
11  speakers, the -- the tents --
12      MS. CHINN:  They couldn't --
13      THE WITNESS:  -- the tables.
14      MS. CHINN:  They couldn't get the peanuts from the
15  airlines?
16      MS. McDONOUGH:
17      Q.  So the funds for the cooler came from the
18  executives?
19      A.  I -- I -- I don't have --
20      MS. CHINN:  Objection.
21      THE WITNESS:  -- exact breakdown.  The funds -- The
22  funds that were contributed by -- by senior executives
23  primarily went to fund the meat.
24      THE REPORTER:  "Funding"?
25      THE WITNESS:  The meat.

Page 535

1      MS. McDONOUGH:
2      Q.  How do you know how the barbecue was funded?
3      A.  The barbecue was funded because we had -- Ted
4  Sexton was always point of contact for the Texas
5  barbecue committee, and we would go in detail and put
6  together budget -- and put together a line-item budget
7  and try to figure out how we would fund this every year.
8      Q.  So you were -- you assisted in preparing the
9  budget?
10      A.  That's correct.
11      Q.  Do you know if Ted Sexton paid for the dry ice?
12      A.  He paid -- He paid him.  Whether he was
13  reimbursed or not, I'm not -- not quite sure.
14      Q.  And Ted Sexton paid for the ice cream as well?
15      A.  He did.
16      Q.  How do you know that Ted was reimbursed for the
17  rental of the coolers?
18      A.  He had submitted all his receipts to Amy
19  Gosslin, his assistant.  And at the end of the function,
20  there were some -- some statements made and -- and some
21  requests for reimbursement for certain individuals
22  who -- who paid for items for that function out of their
23  own pockets.
24      Q.  How do you know about that?
25      A.  I know that because I bought the hay bales, and

26 (Pages 532 to 535)

JOSE HERNANDEZ vs. SAN DIEGO COU...    January 15, 2007    JOSE HERNANDEZ, VOL. III

Page 536

1  I had to submit -- I had to submit a reimbursement for
2  the hay bales. That's how I know that -- that that was
3  done.
4      Q. How do you know that Ted Sexton submitted a
5  reimbursement for the coolers?
6      A. He had mentioned that to me, that he had to put
7  together all his bills to be reimbursed for -- for the
8  coolers, one of which he could, the ice cream, the dry
9  ice and anything else that he had.
10     Q. When you contacted the station managers to ask
11 about transporting the ice cream on the airplanes, did
12 you ask for any special favors in connection with the
13 transportation of the ice cream?
14     A. The -- Our -- Our questions or -- initially --
15 initially or the -- our request to Bob Stuart, the
16 station manager, was how much -- what's the maximum
17 amount of ice that we can put --
18     THE REPORTER: "What's the maximum" --
19     THE WITNESS: Amount of dry ice that we can carry
20 on checked luggage. That was our request to Bob Stuart.
21     MS. McDONOUGH:
22     Q. And so you weren't asking the airline to allow
23 you to carry more dry ice than what the -- what was
24 permitted?
25     A. We -- The initial request was -- was what

Page 537

1  was -- what is the maximum amount of ice, because that
2  is regulated by -- by the FAA that you can -- that you
3  can check in a -- in a piece of luggage or in -- in a
4  cooler.
5      Q. And is your understanding that Ted Sexton did
6  not transport more dry ice than that allowed by FAA
7  regulations?
8      MS. CHINN: Objection.
9      THE WITNESS: Once again, I was not -- I was not
10 there when he transported it, so I can only assume that
11 if he transported it, then he was within the limits.
12     MS. McDONOUGH:
13     Q. Do you have any reason to believe that Ted
14 Sexton received special favors in the transportation of
15 the ice cream on the airline?
16     A. No reason to believe that he did.
17     Q. Did you ever tell Ted Sexton that he should not
18 go to Texas to obtain the ice cream?
19     A. We had in our conversations -- I had
20 recommended to him to try to find alternatives to it.
21 It was just too big of a hassle. It was just too much
22 to do and probably wasn't right that he just flew out
23 there under the pretext of -- of picking up that ice
24 cream.
25     Q. In your complaint you allege that the ice cream

Page 538

1  is available in San Diego?
2      A. Subsequent -- The subsequent year, not being
3  involved with the procurement of the ice cream, that
4  year, to that level, the subsequent year, I took it upon
5  myself -- myself to find an alternative where we might
6  be able to purchase that ice cream locally and not
7  having to expose Ted to -- to now make a trip to
8  Austin-Bergstrom Airport to buy the ice cream.
9      MS. CHINN: "Expose Ted?" You mean they don't want
10 him at that airport anymore?
11     THE WITNESS: No. No, no, no. Their -- They --
12 They -- Him and Dan Frazee were going to make a trip or
13 had thought about making a trip on a site visit to
14 Austin-Bergstrom, or planning a trip when I -- when I
15 was able to find that ice cream locally.
16     MS. McDONOUGH:
17     Q. Did you ever protest the fact that Ted Sexton
18 purchased the ice cream in Texas --
19     A. Excuse me?
20     Q. Did you ever protest in -- in any way the fact
21 that Ted Sexton purchased the Blue Bell ice cream in
22 Texas?
23     A. I protested to Ted the expense of having to go
24 get the ice cream in Texas.
25     Q. Did you believe that it was unlawful or illegal

Page 539

1  for Ted to obtain the ice cream from Texas?
2      A. I believe it would be -- I had reasonable
3  belief that -- that there would be -- there would be
4  some issues involved with -- with using a pretext in
5  that manner to -- to purchase ice cream.
6      Q. What would be the issues that were involved?
7      A. Well, the issues -- the issues of -- of saying
8  you're going to go down and visit last moment Southwest
9  Airlines when really you're just there to buy ice cream.
10     So when you look at it, this ice cream cost us
11 somewhere around $1500 to the Airport Authority. It was
12 just better usage for the money than -- than to fly
13 someone out to -- to Dallas to buy ice cream.
14     Q. And Ted Sexton never told you that he was going
15 to Texas just to buy ice cream; correct?
16     A. Ted Sexton -- Ted Sexton had -- we had talked,
17 and -- and he had mentioned that, and it was really
18 clear to me that the only reason he was going out there
19 was to go get the ice cream.
20     In fact, when he came back from the trip, he had
21 mentioned that he was itchy to get out of that meeting,
22 and it dragged on so long. And that's why he almost
23 wasn't able to go get the ice cream.
24     MS. CHINN: "Itchy"? He used that word, "itchy"?
25     MS. McDONOUGH:

27 (Pages 536 to 539)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY          January 15, 2007          JOSE HERNANDEZ, VOL. III

**Page 540**

1    Q. But Ted Sexton never told you that he was going
2  to Texas just to get the ice cream; right?
3    A. It was --
4    Q. Say "yes" or "no."
5    A. He told me that he was going to Texas to go get
6  the ice cream, yes.
7    Q. And that that was the sole purpose of his trip?
8    A. That he had found a pretext to go get that ice
9  cream.
10   Q. He used the word "pretext"?
11   A. That now he had an opportunity. He used the
12 word "opportunity" where he could now go to Texas and
13 get the ice cream.
14   Q. Because he had a business purpose for going
15 to --
16   MS. CHINN: Objection. That mischaracterizes his
17 statement.
18   THE WITNESS: That would be incorrect.
19   MS. CHINN: What did you think he meant when he
20 said, "I now have the opportunity to go to Texas"?
21   THE WITNESS: I think it was clear that he was
22 using that trip or that opportunity or -- he was using
23 that opportunity that others were going to Texas so that
24 he could involve himself in that meeting with -- with
25 the sole purpose of getting that ice cream.

**Page 541**

1    MS. McDONOUGH:
2    Q. Is there any reason that you're aware of that
3  the original people slated to go on the trip to Texas
4  could not have gone and gotten the ice cream?
5    A. No.
6    Q. When you told Ted -- Strike that.
7  I said "Strike that." I'm sorry. I mumbled it.
8  You said you protested to Ted the expense of having
9  to go get the ice cream in Texas; correct?
10   A. That's correct.
11   Q. Did Ted have any response to your protest?
12   A. No.
13   Q. When was that protest?
14   A. After he came back from the trip, I said,
15 "That's pretty expensive ice cream."
16   And he goes, "Yeah. I had no choice. I got to get
17 it."
18   Q. That was sometime in September 2004?
19   A. That was prior to -- in between my trip from
20 going back to Dallas and prior to -- prior to the -- the
21 barbeque.
22   Q. And the barbecue was in what month?
23   A. It's August or September.
24   Q. And this was in 2004; correct?
25   A. I believe it was 2004, yes, ma'am.

28 (Pages 540 to 543)

**Page 542**

1    Q. Did you ever talk to Ted Sexton about his trip
2  to Texas to get the ice cream after your conversation in
3  September 2004?
4    A. Other than those -- those conversations and me
5  expressing what I thought, not -- not as much.
6    Q. In your complaint, you say that Ted Sexton told
7  you to "Shut that little shit up"?
8    A. That's correct.
9    Q. Is that referring to Jim Prentice --
10   A. That's correct.
11   Q. -- the "little shit"?
12   Do you know why Ted told you to "Shut that little
13 shit up"?
14   A. Ted -- Ted had called me into an -- into his
15 office and was rather frustrated. He -- He closed the
16 door and said, "You know, we got to figure out what
17 we're going to do with Jimmy," you know. "Jimmy is now
18 telling everyone" -- or "Jimmy is making a big issue
19 about" -- "about me flying out to Texas just to get the
20 ice cream. We got to figure out a way to shut that
21 little shit up."
22   Q. Why do you think that Ted was telling you to
23 figure out a way to shut up Jim?
24   A. Because he didn't want it to be made public
25 that that's the reason why -- why he went out to go get

**Page 543**

1  that -- to go get that ice cream, because Jimmy had been
2  spreading the word that -- to -- to anyone who would
3  listen to him, that's the only reason he went out to --
4  to Texas was to go get the ice cream, the Blue Bell ice
5  cream.
6    Q. Didn't Ted tell you that he wanted Jim to stop
7  spreading misinformation about the trip to Texas?
8    A. No.
9  What it was more characterized as, "This is the
10 information that needs to be spread, not what he's
11 saying." So he wanted -- he wanted to know if I would
12 talk to Jim and try to provide Ted's version of why he
13 went out there.
14   At that particular time, I told him I wasn't -- it
15 wasn't right for me to do it. Jimmy doesn't work for
16 me. He works for Ted. And, you know, if he had issues
17 with him, he had to take it because I wouldn't.
18   I was -- It would be hard for me to go and tell Jim
19 something, to tell him not to do something, which I felt
20 was true.
21   Q. Did Ted say in that conversation what his
22 version was of what happened, what Ted's version was?
23   A. Ted said he wanted it out that the re- --
24 that -- that he had gone -- his primary purpose was,
25 "Hey, look, just tell everyone that I was there, and

JOSE HERNANDEZ vs. SAN DIEGO CO.....    January 15, 2007    JOSE HERNANDEZ, VOL. III

Page 544

1  while I was there visiting with Southwest, I went and
2  got the ice cream." That was his version that he wanted
3  out.
4      Q.  Did you believe that was a lie?
5      A.  Yeah, I believe it was.
6      Q.  Did you protest to anyone aside from Ted Sexton
7  about the ice cream trip?
8      A.  No.
9      I was -- I -- I felt that making my issues or my
10  concerns known to my direct supervisor would suffice. I
11  have to work with him.
12      Q.  Once again, any protests to Ted were just in
13  verbal conversations either way?
14      A.  That's correct.
15      Q.  You allege in your complaint that Thella Bowens
16  would purchase her own airline tickets and then request
17  date changes and upgrades; is that correct?
18      A.  That's correct.
19      Q.  How many times did that occur?
20      A.  Multiple times.  Exact dates and times not
21  sure, but on several occasions either myself, Amiel
22  Porta or Jeff Simmons were requested to, when she flew
23  on American, to make contact with -- with Bob Stuart,
24  who was the airline station manager.
25      If she was flying an American Airlines flight, we

Page 545

1  would always try to get her upgraded to first class.  If
2  she was flying on Delta, we would -- we would try to do
3  the same.
4      Q.  Did this happen on more than five occasions?
5      A.  Pretty -- Pretty close.  Pretty close.
6      Q.  Somewhere around five?
7      A.  Approximately.
8      Q.  Who made the request that you either change the
9  tickets or get upgrades for Thella?
10      A.  Typically the requests -- Typically the
11  requests would come through Ted Sexton.  I had
12  conversations with Thella.  Ted Sexton would come to us
13  and say, "Hey, Thella's flying.  Here's her itinerary.
14  Go talk to Bob or" -- "or" -- "or Mark Cunningham and
15  see what it is that we can do about -- about upgrading
16  her flight."
17      Q.  Did Ted tell you that Thella had specifically
18  requested an upgrade?
19      A.  Coming -- Coming from Ted saying this is his
20  information, I could only infer that that was -- that
21  that was the case.
22      Q.  But he never specifically said Thella had asked
23  for an upgrade?
24      A.  Thella -- Thel- -- He had said that Thella had
25  asked if there was anything we could do with her seat.

Page 546

1      Q.  So he specifically said that Thella asked for
2  that break?
3      A.  Yeah, "if there is anything you could do about
4  this seat."
5      Q.  Did you have an understanding, when he said
6  "anything you could do about this seat," whether she was
7  asking to be moved within coach?
8      A.  When -- When -- It was my understanding that
9  when -- when you -- when it was said in that manner was
10  to try to get her upgraded to first class.
11      Q.  How did you form that understanding?
12      A.  It -- It had just been -- It -- It had been
13  that we needed to get her the best seat we possibly
14  could in -- in my conversations with Ted.
15      Q.  Did Ted Sexton tell you to get Thella the best
16  seat at no cost?
17      A.  Ted Sexton had said, "Go and get her the best
18  seat and" -- "and bring me her new boarding pass."  At
19  no time did he offer -- did he ever offer to -- to pay
20  for those seats.
21      And there was -- you know, you could only infer
22  by -- by contacting us directly and us having to talk to
23  the station manager that he wanted those changes done at
24  no cost.
25      Q.  Ted wanted the changes done at no cost?

Page 547

1      A.  That -- The traveler or Ted, however, wanted
2  those tickets changed at no cost.
3      Q.  Did you actually contact Bob Stuart or Mark
4  Cunningham about the changes?
5      A.  I -- I -- It was either -- It was either myself
6  or -- either myself if I was available, or Amiel Porta
7  if he was available, and if not Jeff Simmons if he was
8  available.
9      In addition, some of those requests for the changes
10  would come through his -- through his administrative
11  assistant.
12      Q.  That was Amy Gosslin?
13      A.  No.
14      Q.  Oh.
15      A.  No, Thella's administrative assistant.
16      Q.  Oh, through Thella's.  I thought you said
17  through his.
18      That's Grace Hill?
19      A.  That's correct.
20      Q.  Did American Airlines grant your request for an
21  upgrade on behalf of Thella?
22      A.  Whenever possible they tried.
23      Q.  Was there ever a time where they did not give
24  you the upgrade?
25      A.  Only -- The only reason they would not give us

29 (Pages 544 to 547)

53-611 (193)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY          January 15, 2007                    JOSE HERNANDEZ, VOL. III

Page 548

1  an upgrade, if -- if those seats were already taken up.
2       Q.  Do you remember an occasion where you asked for
3  an upgrade for Thella and the airline did not give it to
4  you?
5       A.  Not -- not specifically.
6       Q.  Did the airline ever charge you or the
7  Authority for the upgrade?
8       A.  No.
9       Q.  How do you know that?
10      A.  Because I remember never paying for it, and
11  adjustments never have been made -- or never being made
12  to those tickets.
13      We would -- When we would go to the airline station
14  manager, he would make the changes.  We would go to the
15  ticket counter, and we would be issued the new boarding
16  passes.
17      So the transaction was finalized, and there was
18  no -- there would be no additional payments attached
19  to -- to that transaction.
20      Q.  Would you know if the credit card assigned to
21  the transaction had been charged an upgrade fee?
22      A.  They would, because what you would receive was
23  you would receive your new boarding pass, and then
24  attached to that you would receive an additional
25  receipt, which is the -- similar to a boarding pass, but

Page 549

1  it'll show additional charges to that, PNR, which is
2  that flight record in there.
3      So yes, we would have -- we would have a record.
4  "Here is your new boarding pass, and here is what
5  they've charged you for the upgrade."
6       Q.  And did you ever see a charge for the upgrade?
7       A.  Never.
8       Q.  Did Thella ever directly ask you for an upgrade
9  or a change in flight?
10      A.  No.
11      Those requests would always come through Ted
12  Sexton.
13      Q.  Do you know if Thella knew that the upgrades
14  were provided complimentary?
15      A.  I believe that she had -- I -- I would beli- --
16  I believe that it would be fair to say that she would,
17  that -- that her seat was booked at a certain class and
18  a certain seat, and then tickets were then delivered to
19  her which now put her in first class.
20      They -- It would be fair to say that she would
21  have -- would -- would have a good idea that yes, they
22  were provided at -- at no cost.
23      Q.  Do you have any way to confirm that Thella knew
24  that the upgrades were provided at no cost?
25      A.  I have no way to confirm it.

Page 550

1       Q.  Do you remember the destination of any of the
2  trips that -- for which you requested upgrades for
3  Thella?
4       A.  Yes.
5      Typically, Thella would be going back to Atlanta on
6  Delta where I believe her sister lives.  She would be
7  making trips back to Dallas/Fort Worth, where her family
8  lives.  So typical destinations would be -- would be
9  either to DFW or Atlanta.
10      Q.  So were these only for personal trips?
11      A.  I believe -- I believe they would be a
12  combination of both, some personal trips, some business
13  trips.  But the ones that at this time come to mind
14  would be, you know, trips to DFW and -- and Atlanta.
15      Q.  Did you ever request any ticket changes for
16  Thella Bowen?
17      A.  Yes, we did.
18      Q.  How many did you request?
19      A.  We -- We would request easily say over a
20  handful.
21      Q.  That's over six?
22      A.  Over -- Over five.  I don't have six fingers,
23  five fingers.
24      Q.  You never know.
25      So over five times?

Page 551

1       A.  Over five times, exactly.
2       Q.  And are you including the upgrades and the
3  flight changes as one --
4       A.  No.
5       Q.  -- when you're talking about numbers?
6      So five upgrades and five flight changes?
7       A.  No less than five upgrades, and no less than
8  five different itinerary changes.
9       Q.  Did you do as many as ten upgrades?
10      A.  I don't believe at many as ten personally, no.
11      Q.  How about seven?
12      A.  I -- My -- I can -- The best way I can
13  approximate it would be over five.
14      Q.  But less than ten?
15      A.  Right around that ballpark, yes, ma'am.
16      Q.  Same thing for the flight changes, over five
17  but less than ten?
18      A.  Right around there somewhere.
19      Q.  What kind of flight changes were you requesting
20  on her behalf?
21      A.  Itinerary changes, either date changes, time
22  changes.  Her schedule would be running behind, and we'd
23  go down to -- or we'd have to go down to the ticket
24  counter or to the airline station manager and request
25  changes in flights.

30 (Pages 548 to 551)

53-611 (194)

JOSE HERNANDEZ vs. SAN DIEGO COU....    January 15, 2007    JOSE HERNANDEZ, VOL. III

Page 552

```
1       Q.  Is this for Delta and American Airlines as
2   well?
3       A.  Yeah, yeah, to -- to whatever the ticket was,
4   we would go down to -- we would have to go down to the
5   airline station manager directly to get those changes
6   made.
7       Q.  The time changes that you're referring to, are
8   those same day/time changes?
9       A.  They would either be same day/time changes or
10  different day/time changes.
11      Q.  Do you have any understanding of whether Delta
12  or American Airlines charges the general public for
13  change fees if there is a time change on the same day?
14      A.  Pretty close to, yes.
15      Q.  And what's your understanding?
16      A.  Yes, I -- itinerary changes generally go -- and
17  date changes generally range between $50 to $100 per --
18  per boarding document.
19      Q.  If you actually change the date of your flight?
20      A.  Regardless, whether you change your flight --
21  any changes to -- to your passenger itinerary could
22  result in additional fees of -- of somewhere in the
23  range of 50 to $100.
24      Q.  So if someone has, say, a 2:00 o'clock flight
25  and gets to the airport at 11:00 o'clock and wants to
```

Page 553

```
1   take an earlier flight, do you believe that there is a
2   change fee for that?
3       A.  There could be a change fee for that unless
4   you -- you opted to go on standby, and if the space was
5   available, then it would be -- it may be provided.
6   Depends on the class that you booked your ticket in.
7   Some -- Some -- Some especially if you bought them
8   through Travelocity or any of those services, there --
9   there is a fee attached.
10      Q.  For the flight time changes that you made for
11  Thella's tickets where it just changed the time on a
12  specific day versus changing the date that you were
13  flying, do you have any understanding of whether the
14  airlines would have charged a change fee for those time
15  changes?
16      A.  Yes, ma'am.
17      Q.  What's your understanding?
18      A.  My understanding is they would have charged a
19  change fee somewhere between 50 and $100 to change the
20  tickets.
21      Q.  Why do you have that understanding?
22      A.  Having worked at the airport for close to five
23  years and having worked closely with the airlines, that
24  would be -- that would be more than a reasonable
25  assumption on my -- my behalf.
```

Page 554

```
1       Q.  Do you know whether the airlines ever charged a
2   change fee for the date or time changes that you
3   obtained for Thella?
4       A.  I don't believe they did because if it was --
5   if it would be that simple to change them, you know, you
6   could have just called reservations.
7       But there was -- there was some intent in having me
8   contact the airline station manager directly so that we
9   can -- so that she could not be charged for those
10  tickets or -- or ticket changes.
11      Q.  Who requested that you make the date or time
12  changes on Thella's behalf?
13      A.  The request would come through, once again, Ted
14  Sexton.  He said, "Hey, either Grace Hill called me or
15  Thella called me and she's running late.  Could you make
16  the following changes," never early, always later in --
17  in her -- in her flights.
18      Q.  Did Ted ever tell you that Thella had
19  specifically asked that you make the change?
20      A.  The -- The request would come through Ted, and
21  Ted -- Ted would assign, for lack of a better -- assign
22  the request.  Typically he would -- he would come to
23  either myself or Amiel Porta to try to make those
24  changes on her behalf.
25      Q.  So your understanding is that Thella just asked
```

Page 555

```
1   Ted to make it happen, and then Ted used his discretion
2   on whomever he chose to make it happen?
3       A.  That's correct.
4       MS. CHINN:  Well, that's not -- that calls for
5   speculation.
6       MS. McDONOUGH:
7       Q.  Did Thella ever directly ask you for a date or
8   time change?
9       A.  Thella never directly, but if it wasn't Ted
10  Sexton, it would be Grace Hill.
11      Q.  But you never spoke directly to Thella about a
12  date or time change?
13      A.  Never directly.
14      Q.  Do you know why Ted Sexton chose you as the
15  person to change the itineraries?
16      A.  Ted Sexton would come to me because he knew
17  that I had great working relationships with the
18  airlines -- with the airlines having worked with station
19  managers and -- and knowing the personnel.
20      And there would be a higher -- If -- If I had
21  requested that -- If I personally would go down and
22  request that change, it would be a higher likely --
23  likelihood that they would do that on our behalf, or on
24  my behalf.
25      Q.  Were you happy to request the changes?
```

31 (Pages 552 to 555)

53-611 (195)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY          January 15, 2007

JOSE HERNANDEZ, VOL. III

Page 556

1    A. At that particular time I did not feel that I
2 really had a choice but to go down and -- and request
3 those changes when -- when a request is being made by
4 your president/CEO coming through your direct
5 supervisor, who happened to be the vice president of
6 operations and then comes to me.
7    I don't think I really have a choice, so I just
8 took it for -- for what it was. Okay. It must be okay
9 to do, so I'll just go ahead and do it.
10    Q. Did you ever tell anyone that you didn't want
11 to request the upgrades or the flight changes?
12    A. I never believed that there was -- oh, I didn't
13 believe that there was anything wrong. And -- And, you
14 know, who -- who would I go to? I mean, it's -- it's my
15 direct supervisor who is asking me to do this. Where
16 would I go?
17    Q. So that's a "no"?
18    A. Yes.
19    Q. You also allege that Thella requested premier
20 lounge access?
21    A. That's correct.
22    Q. Do you know if she was a premier club member
23 for any airline?
24    A. I do not believe so.
25    Q. Which airlines did she request premier lounge

Page 557

1 access for?
2    A. Delta Airlines and the United Red Carpet room,
3 and -- and the Admirals Club for American.
4    Q. Was this request for lounge access at the
5 San Diego Airport?
6    A. Yes, ma'am.
7    Q. About how far in advance does Thella arrive for
8 flights, if you know?
9    A. Typically between under -- under an hour and a
10 half, hour 15, an hour.
11    Q. Do you know if Ted Sexton usually accompanies
12 Thella to the boarding gate?
13    A. That's correct, almost always.
14    Q. Did you ever obtain lounge access for Thella?
15    A. Yes, I did.
16    Q. Do you know if Ted Sexton accompanied Thella to
17 the lounge?
18    A. No.
19    The Only reason I would be -- I would be at her
20 departures were if Ted Sexton had a prior commitment and
21 could not accompany her. So I would -- I would be
22 assigned by Ted to be her driver to go get her car,
23 drive it, pick her up in front of the commuter terminal,
24 take her to whatever airlines she's going to, park her
25 car in a designated spot and then go back and take the

Page 558

1 keys to her, and then --
2    Q. So you --
3    A. -- escort it through -- escort her through --
4 through screening and then walk her to her gate.
5    Q. So you walked Thella to her gate on occasion as
6 well?
7    A. Yes, ma'am.
8    Q. Did you ever sit in a -- an airline lounge with
9 Thella?
10    A. Yes.
11    Q. A premier lounge?
12    A. Yes.
13    Q. Which one?
14    A. In the United Re- -- Red Carpet room and the --
15 the Delta Crown Room.
16    Q. Who requested that you obtained access to the
17 United Red Carpet room and the Crown Room?
18    A. Ted -- Ted, as -- part of his instructions to
19 me were that if the plane was running late, that I
20 should get her access to -- to those rooms so she didn't
21 have to wait in -- in the general waiting rooms.
22    Q. How many occasions did you sit in a lounge
23 with -- a premier access lounge with Thella?
24    A. Probably on four to five occasions.
25    Q. Did Thella directly ever request a premier

Page 559

1 lounge?
2    A. The request had come from Ted, that if -- that
3 if the plane was running late or it was delayed or, if
4 possible, even -- even for the briefest of moments, to
5 have her sit in there. And then when -- when the -- the
6 flight was ready to board, take her up and -- and put
7 her on -- on -- on the plane.
8    Q. What's the longest time period that you sat in
9 a premier lounge with Thella?
10    A. Little bit -- Little bit over an hour.
11    Q. Do you know if there is any sort of a sign-in
12 sheet for the premier lounge?
13    A. Yeah, we didn't have to sign in.
14    THE REPORTER: The reporter needs to change paper.
15    MS. CHINN: Sure.
16    MS. McDONOUGH: Okay.
17    VIDEO OPERATOR: We are off the record at 2:00 p.m.
18    (Interruption in proceedings.)
19    VIDEO OPERATOR: We are back on the record at
20 2:02 p.m.
21    MS. McDONOUGH:
22    Q. Did Thella ever ask you if you obtained access
23 to the premier lounge?
24    A. Never asked me.
25    It -- She -- She never asked, but as we would go

32 (Pages 556 to 559)

**53-611 (196)**

Page 560

1 into -- as we would go into the premier lounge, we would
2 just let the tenants know that we had prior coordination
3 with the airline station manager.
4 THE REPORTER: "With the airline station" --
5 THE WITNESS: Manager.
6 MS. McDONOUGH:
7 Q. How many times did you obtain premier lounge
8 access for Thella?
9 A. I believe I already said somewhere around
10 four -- four to five different times personally.
11 Q. I'm asking not just the times you accompanied
12 her but just overall, how many times did you obtain the
13 access for her?
14 A. Oh, overall?
15 Q. Yes.
16 A. Those -- I believe just those -- those times
17 myself, I know there was other requests, but for those
18 you'd have to ask, you know, people like Amiel or Ted
19 what additional times she had access to those, but those
20 would be from my part.
21 Q. In the complaint you've alleged that Thella
22 Bowens requested airline flight privileges for her
23 sister?
24 A. That's correct.
25 Q. How many times was that request made to you?

Page 561

1 A. That was a communication that was made to me by
2 the airline station manager for Southwest Airlines, Mike
3 Parrish.
4 THE REPORTER: Mike who?
5 THE WITNESS: Mike Parrish, P-A-R-R-I-S-H.
6 MS. McDONOUGH:
7 Q. What did Mike say about travel for Thella
8 Bowens' sister?
9 A. In one of our conversations, Mike had mentioned
10 to me that Ted Sexton had called her to see if there is
11 anything that he can do about trying to obtain special
12 privileges for Thella's sister to fly on Southwest
13 Airlines.
14 Q. Did Mike Parrish tell you what kind of special
15 privileges Ted was seeking on behalf of Thella?
16 A. I believe Ted was -- the privileges that he was
17 seeking were either reduced flight, reduced -- reduced
18 flight tickets or comp tickets or just anything that he
19 can do to -- so it wouldn't be as expensive for her to
20 fly on Southwest Airlines.
21 Q. Did Mike tell you whether he granted that
22 request?
23 A. The last conversations that I had with Mike was
24 that he was going back and forth, eventually making
25 contact with Thella's sister directly. And from then on

Page 562

1 I haven't -- I haven't followed up on where it went.
2 Q. So you don't know if that was ever provided to
3 Thella's sister?
4 A. I'm not sure. I know that the request was made
5 by Ted on Thella's behalf.
6 Q. Do you know when that request was made?
7 A. Somewhere around calendar year 2004, 2005.
8 Q. Did you ever communicate with anyone about
9 Ted's request to Mike Parrish?
10 A. No.
11 Q. In a complaint, you allege that this request by
12 Thella Bowens to obtain flight privileges for her sister
13 violates the ethics code.
14 What does that refer to?
15 A. I believe that she was -- she was -- was
16 requesting or maybe using her position for special
17 privileges from -- for special privileges on behalf of
18 her sister from -- from Southwest Airlines.
19 Q. So do you believe that requesting a free or a
20 reduced-fare flight from Southwest Airlines was a
21 violation of the ethics code?
22 A. I believe --
23 MS. CHINN: Objection --
24 THE REPORTER: Hang on. I didn't hear the tail end
25 of that.

Page 563

1 MS. McDONOUGH: A violation of the ethics code.
2 No, wait, wait. No, no, no. Respond to the
3 question before --
4 MS. CHINN: I want to get my objection on the
5 record.
6 MS. McDONOUGH: Okay. That's fine.
7 MS. CHINN: Would you read the question back again.
8 Thanks.
9 THE REPORTER: No problem.
10 (The record is read by the reporter.)
11 MS. CHINN: The question is vague and ambiguous,
12 and it mischaracterizes his testimony.
13 THE WITNESS: Could you clarify -- clarify it,
14 please.
15 MS. McDONOUGH:
16 Q. In the complaint you've alleged that Thella
17 Bowens' request for special airline flight privileges
18 for her sister violates the ethics code; is that
19 correct?
20 A. I -- I believe that requesting in that manner,
21 a direct request, would -- would some- -- somehow
22 infringe on -- on the ethics code.
23 Q. What was it about the way that Thella requested
24 the privileges that would -- that violated the ethics
25 code?

33 (Pages 560 to 563)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY          January 15, 2007                    JOSE HERNANDEZ, VOL. III

Page 564

1    MS. CHINN: Objection. That mischaracterizes his
2  testimony.
3    THE WITNESS: The -- The request, as I understand,
4  was -- was Thella -- Thella through Ted to -- to Mike,
5  that "Thella would like you to do him a favor and do her
6  a favor and see what you can do to work with her
7  sister."
8    MS. McDONOUGH:
9    Q. Why do you believe that that request violates
10  the ethics code?
11    A. Because she was using her -- you got the
12  president and the CEO -- the president/CEO of the
13  Airport Authority requesting of -- a direct request to
14  the airline to obtain -- to obtain those -- those
15  privileges on her sister's behalf. That's just, you
16  know, my -- my general idea of why it would.
17    Q. So the fact that Thella Bowens is the president
18  requesting a free flight or a reduced flight for her
19  sister from the airlines directly, that's a violation of
20  the ethics code?
21    A. I would --
22    MS. CHINN: I think that mischaracterizes his
23  testimony. He gave you the answer.
24    MS. McDONOUGH:
25    Q. I'm just trying to understand what about that

Page 565

1  transaction violated the ethics code.
2    MS. CHINN: He did tell you. He ans- --
3    MS. McDONOUGH: Well, I don't understand his
4  answer, so I'm asking him to clarify.
5    MS. CHINN: Okay.
6    Can you read back his previous answer, not the last
7  one, the one before that.
8    (The record is read by the reporter.)
9    MS. CHINN: That's his answer.
10    MS. McDONOUGH: I don't understand the answer, so
11  I'm trying to clarify it.
12    MS. CHINN: Okay.
13    MS. McDONOUGH:
14    Q. What is it about the direct request by Thella
15  that violates the ethics code?
16    A. I believe that she was seeking special
17  privileges for her sister by using her position and
18  trying to -- just trying to influence -- possibly
19  influence Mike's decision on whether he would grant
20  those privileges or not.
21    Q. Because he might be more inclined to give her a
22  free flight because she's the president of the
23  Authority?
24    MS. CHINN: Objection. That mischaracterizes his
25  testimony. That's not what he said.

Page 566

1    MS. McDONOUGH: I'm not summarizing his testimony.
2  I'm asking --
3    MS. CHINN: Well, you're making a comment on the
4  record, and I'm letting you know that
5  mischaracterizes --
6    MS. McDONOUGH: Okay.
7    MS. CHINN: -- his testimony. That's your
8  testimony.
9    THE WITNESS: Yeah, that -- that would be
10  incorrect, a flight ticket not for her but for her --
11  her sister.
12    MS. McDONOUGH:
13    Q. So is it the fact that she was getting it for
14  her sister that makes it a violation of the ethics code?
15    MS. CHINN: Objection. That mischaracterizes his
16  testimony again.
17    THE WITNESS: I believe specific to this one was
18  that request -- the request on her behalf to Mike to
19  obtain special privileges would be -- would -- would
20  possibly be or will be or could be or is a violation of
21  the ethics code.
22    MS. McDONOUGH:
23    Q. I'm asking why.
24    A. I -- I believe I've already answered that
25  question.

Page 567

1    Q. I don't understand why in this specific
2  situation that was a violation of the ethics code.
3    MS. CHINN: Objection to the question. It lacks a
4  foundation.
5    If you don't understand her answer -- his answer,
6  you can question him about the answer. But I don't
7  think he can help you with your understanding any other
8  way than for you to be more specific.
9    MS. McDONOUGH:
10    Q. Do you feel that it was a violation of the
11  ethics code for Thella to request special privileges
12  because Mike Parrish might be more inclined to give the
13  special privileges to Thella because she's the
14  president?
15    A. I believe -- Let me answer in this way. I
16  believe that -- that the accusations and the allegations
17  which -- which -- which led -- which led to the eventual
18  dismissal or my separation with the Airport Authority,
19  that would -- that would corroborate -- or collab- --
20  yeah, corroborate my thinking that that -- that that
21  would be a violation of -- of the ethics code where I
22  personally was accused or -- or alleged that I perform
23  certain duties, and that would be right in line with
24  those particular duties.
25    MS. McDONOUGH: Let's take a break.

34 (Pages 564 to 567)

53-611 (198)

Page 568

1    THE WITNESS: Okay.
2    VIDEO OPERATOR: We are off the record at 2:12 p.m.
3    (A recess is taken.)
4    VIDEO OPERATOR: We are back on the record at
5    2:21 p.m.
6    MS. McDONOUGH:
7    Q. Do you know Thella Bowens' sister's name?
8    A. No, I do not.
9    Q. You allege in the complaint that the chairman
10   of the board of the Authority requested a first-class
11   upgrade on the day of his departure to I believe Hawaii;
12   is that correct?
13   A. That is correct.
14   Q. Who made that request?
15   A. The request had come from -- from the chairman
16   of the board to Ted Sexton and then -- then to myself.
17   Q. So you spoke to Ted about the upgrade?
18   A. We spoke to Ted, and on several occasions
19   during that transaction, we were on speakerphone with --
20   with the chairman.
21   Q. And The chairman's name is Joe?
22   A. Joe Craver.
23   THE REPORTER: Spelling for the record.
24   THE WITNESS: Joe, J-O-E, Craver, C-R-A-V-E-R.
25   MS. McDONOUGH:

Page 569

1    Q. How many telephone conferences did you have
2    with Joe Craver?
3    A. I believe it was a -- a couple leading up to
4    the transaction and one while he was away on -- on
5    business.
6    Q. What did Ted tell you about what the chairman
7    of the board wanted on this trip to Hawaii?
8    A. It was a rather complicated request. What he
9    wanted to do was obtain -- obtain a first-class upgrade
10   for his wife, but he only wanted to pay day-of-departure
11   prices.
12   Q. What do you mean by "day-of-departure prices"?
13   A. If -- If you were to -- Just general numbers,
14   if you were to purchase say a code C on a flight to
15   Hawaii and back, say it's $400. If you wanted to get a
16   first class, say it's $800.
17   But if you -- if you walked up on day of and the
18   space was available, that seat was available, you would
19   only pay 150 bucks. So there is a reduction of, I don't
20   know, 3-, $400 by -- by risking going in advance.
21   Q. And so the chairman was requesting that someone
22   obtain day-of-departure, first-class-upgrade prices more
23   than a day in advance of the flight?
24   MS. CHINN: Something like that.
25   THE WITNESS: Something like that. It's a walk-up

Page 570

1    price. You can't do it a day in advance. It's -- It's
2    a walk-up price.
3    He wanted to secure -- He wanted to secure that
4    rate, the walk-up price, in advance so that they
5    would -- he -- him and his wife would just show up --
6    show up to -- to the flights and already have their
7    upgrades taken care of.
8    MS. McDONOUGH:
9    Q. Did Joe Craver already have a first-class
10   ticket booked?
11   A. I do not believe he had a first class. I
12   believe he had a coach, and -- he had a coach, but he
13   would submit for reimbursement for that first-class
14   upgrade. And -- And he would pay out of his own pocket
15   for his wife's first-class upgrade.
16   Q. Because as a board member traveling more than a
17   couple hours, he is allowed to go first class; correct?
18   A. I believe he was entitled to -- to fly in first
19   class if business class was not available.
20   Q. Did you try to accommodate Joe Craver's
21   request?
22   A. Yes, I did.
23   Q. What did you do?
24   A. At the request of -- At the request of Ted
25   Sexton, I went down to speak to Janet Nix at Hawaiian

Page 571

1    Airlines to figure out if there was a way that we can
2    make all this happen, because it was rather an odd
3    request, and I'm not sure if it had ever been presented
4    to her.
5    Q. What did Janet say, if anything?
6    A. She had to think about it -- once again, I
7    don't believe that that was a request she'd ever had
8    before -- and wanted -- wanted me to provide her the
9    existing flight information. And she would think about
10   what it is that -- that she can try to do for -- to
11   honor that request.
12   Q. Did you ever follow up with Janet about the
13   request?
14   A. Yes, we did.
15   The -- The difficult part with that request was the
16   first-class upgrade was requested on the return trip
17   from -- I believe it was Kona, Kona, Oahu, Oahu back to
18   San Diego. So she had to --
19   MS. CHINN: Wait a minute.
20   Did you get it?
21   (The record is read by the reporter.)
22   THE WITNESS: That's correct.
23   And so she had -- what Janet needed to do was make
24   contact with the airline station manager George out
25   in -- in Oahu because only he would have the authority

35 (Pages 568 to 571)

53-611 (199)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY          January 15, 2007                    JOSE HERNANDEZ, VOL. III

Page 572

1  to in effect block a seat and then open it up when the
2  chairman was there.
3      MS. McDONOUGH:
4      Q. Do you know if she did that?
5      A. Yes, she did.
6      Q. Do you know if Janet Nix eventually received
7  the upgrade for Joe Craver's wife?
8      A. Yes, she did.
9      In fact, we had received -- we had received some --
10  some calls not only from Joe, Joe Craver the chairman,
11  but -- but George the station manager in -- in Hawaii,
12  because I guess there was some sort -- some sense of
13  miscommunication that the chairman believed, you know,
14  that those upgrades would be granted to him for free.
15      (Interruption in proceedings.)
16      VIDEO OPERATOR: We're off the record at 2:27 p.m.
17      (A recess is taken.)
18      VIDEO OPERATOR: We are back on the record at
19  2:29 p.m.
20      MS. McDONOUGH:
21      Q. Do you know if Joe Craver paid for the upgrade
22  for his wife?
23      A. I believe he did.
24      Once he was issued -- he was issued his new
25  boarding passes when he arrived in Oahu. When he

Page 573

1  arrived in Oahu, what he needed to do then was at that
2  particular time, I guess there was some issues with
3  ticketing, but he at that point needed to pay for his
4  upgrades.
5      He was stopped by the station manager, who happened
6  to be the gate attendant at that time when he was
7  boarding his flight and asked to come back to the ticket
8  counter to pay for -- to pay for the upgrades.
9      So from that incident that was portrayed to us
10  by -- by George, the airline station manager in Hawaii,
11  I believe he did eventually have to pay for those
12  upgrades.
13      Q. Do you know how much Joe Craver paid for the
14  upgrade?
15      A. I believe it was about $150 for -- for each
16  upgrade.
17      Q. Do you believe that that's the price that was
18  charged to any member of the public for the upgrades?
19      A. I believe that if by complying with -- with --
20  with the rules, walk up, there's available a plane, that
21  that's exactly -- well, that would be the price that you
22  would pay if you -- if you were a walk-up requesting an
23  upgrade.
24      Q. You alleged in the complaint that Joe Craver's
25  request for the first-class upgrade violates the ethics

Page 574

1  code; is that correct?
2      A. I believe so.
3      Q. Why do you believe that request violates the
4  ethics code?
5      A. I believe that his request to us -- to us would
6  be a violation in ethics code because it's not -- it's
7  not a privilege or -- that's available to the general
8  public, and that his request to -- to us as the board
9  member, he was trying to use his position -- his
10  position and my position to influence the granting of
11  that request.
12      Q. And the request that was not available to the
13  public was to get day-of-departure prices in advance?
14      A. That is correct.
15      Q. You also allege that Joe Craver requested that
16  the Authority enter into a temporary lease for the
17  parking lot at Harbor Island?
18      A. Yeah, that's correct.
19      Q. What event are you referring to?
20      A. Fleet Week Parade.
21      Q. On how many occasions did Joe Craver request
22  that the Authority enter into a lease for Fleet Week?
23      A. On two separate occasions.
24      Q. How are you aware of the request by Joe Craver
25  for the lease?

Page 575

1      A. Joe Craver -- Joe Craver called me directly and
2  asked if I would work with the chairman of Fleet Week
3  to -- to try to make that parking facility available.
4  And in fact, Amy helped me with the temporary use and
5  occupancy permit for -- for that event.
6      Q. Do you know if the Authority made the parking
7  lot available for Fleet Week?
8      A. Yes, on two occasions.
9      Q. What amount was paid for the use of the
10  property for Fleet Week?
11      A. I believe the -- the use of those properties
12  were granted at -- at no charge to -- to the event.
13      Q. On what basis do you hold that belief?
14      A. In my recollection of the temporary use and
15  occupancy permit.
16      THE REPORTER: "In" the -- "my recollection of the
17  temporary use" --
18      THE WITNESS: Of the -- It's called a TUOP, the
19  temporary use and occupancy permit -- occupancy permit.
20      MS. McDONOUGH:
21      Q. What did the permit say that makes you believe
22  that there was no charge?
23      A. In -- In the terms, I believe there was no --
24  there was no charge. There was a segregation of a
25  certain amount of parking stalls at no cost to the

36 (Pages 572 to 575)

53-611 (200)

Page 576

1  organizing committee to that event.
2      Q. Did Joe Craver have any sort of a relationship
3  to the organizers of Fleet Week?
4      A. Joe, as an individual, I believe was a member
5  of the board for that organization, but not as a
6  representative of the Airport Authority.
7      Q. Do you know if any other entity has used that
8  same parking lot for parking?
9      A. I believe -- I believe that would be the one
10 that would come to -- to my attention.
11     Q. So has any other entity used that same parking
12 lot?
13     A. Not -- I -- I don't recall at this time if
14 someone else has.
15     MS. CHINN: I -- I think the question calls for
16 speculation.
17     If you know, you know. If you don't know, you can
18 say you don't know.
19     MS. McDONOUGH:
20     Q. I'm not trying to confuse you. I just want to
21 know if someone else has used the parking lot, to your
22 knowledge.
23     A. I don't --
24     MS. CHINN: Under those same --
25     THE WITNESS: I don't know.

Page 577

1      MS. CHINN: -- terms or conditions you mean?
2      MS. McDONOUGH: Under any terms or conditions.
3      Q. Are you aware of anyone other than airport
4  pat- -- patrons or people who would normally use the
5  parking lot using that parking lot for a special event?
6      A. I -- I don't recall at this time.
7      Q. When were the requests by Joe Craver made for
8  the Fleet Week parking?
9      A. I believe it was leading up to the events that
10 are somewhere in -- in July maybe, which is the --
11 whenever the Fleet Week is. It was those months leading
12 up to -- to that event.
13     Q. Of which years?
14     A. 2004, 2005.
15     Q. Did you ever tell anyone that you thought it
16 was wrong for the parking lot to be used for Fleet Week?
17     A. After we executed the first agreement -- the
18 first -- on the first agreement, I did not believe there
19 was an issue. It was our assumption or my assumption
20 that that -- that the chairman was somehow affiliated on
21 behalf of the Airport Authority for this event going
22 through our development of -- of the temporary use and
23 occupancy permit.
24     On the second one, Ted and I had a rather poignant
25 discussion where he -- he brought up the matter to me.

Page 578

1  He said, "You know what? I'm not sure we're supposed to
2  be doing this. This is not authorized used of airport
3  property. The airport does not have" -- "is not a
4  direct participant of" -- "of this event. They" --
5  "There is just" -- "There is just no reason. I don't
6  know if we can justify using the" -- "using the
7  property."
8      Q. Did you make any inquiry after Ted's comment to
9  determine whether the Authority could let the Fleet Week
10 participants use the property?
11     A. Ted and I -- Ted and I went into that -- that
12 issue in great detail. In -- In fact, I believe I had
13 recommended to him that -- that we shouldn't do it.
14 But, you know, once again, his recommendation was a
15 little too late to -- to pull back on -- on that
16 request.
17     Q. Didn't the request for the use of the parking
18 lot come from Ted Sexton?
19     A. No.
20     The request came from -- from the chairman. The
21 chairman -- The chairman then would provide to us the
22 contact information from -- for -- for Fleet Week and th
23 Fleet Week organizers, and Ted Sexton would help with
24 it -- the coordination of and execution of that
25 document.

Page 579

1      THE REPORTER: "And execution of" --
2      THE WITNESS: Of the document.
3      MS. McDONOUGH:
4      Q. After Ted Sexton notified you of whether the
5  use of the parking lot was proper or not, did you have
6  any further discussions with Ted or anyone else about
7  whether it was proper to use the parking lot for Fleet
8  Week?
9      A. What -- My conversations with Ted were just to
10 disclose my concerns with him, and then trusted his
11 judgment that he would do what he felt was the
12 appropriate thing to do.
13     Q. And your concerns about use of the property
14 were the same that Ted Sexton had already raised to you?
15     A. That was correct.
16     Q. You also allege that the General Dynamics
17 property was used at the request an Authority board
18 member for an event as well; is that correct?
19     A. That is correct.
20     Q. What event was that for?
21     A. The Rock 'n' Roll Marathon.
22     Q. And which board member requested that?
23     A. The -- Actually, the -- the request had come
24 from Bill Lynch.
25     Q. Do you know who Bill Lynch talked to initially

37 (Pages 576 to 579)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY        January 15, 2007        JOSE HERNANDEZ, VOL. III

Page 580

1  about use of the property for the Rock 'n' Roll
2  Marathon?
3      A.  The request – as -- as we had an initial
4  request, meaning the Airport Authority had initial
5  request for use of that property, initial
6  conversations -- initial conversations concerning the --
7  the specifics to the use, what they wanted, how it would
8  be used, what hours they wanted, had gone to myself in
9  airport operations, and through Troy Anne Leech's office
10  in real estate management.
11      We had an initial conversation with the organizers
12  of the Rock 'n' Roll Marathon where we had penciled up
13  some numbers or drawn up preliminary lease figure for
14  the lease of that property in the amount of 24-, $25,000
15  for the use of the property and for the three-day
16  period.
17      As they walked out of the meeting, the organizers
18  said they would be in contact with the board members
19  and -- in contact with the board members to see if there
20  is a way that they can seek a reduction of those fees.
21      Within a -- Within a week or two of that initial
22  meeting with the Rock 'n' Roll Marathon organizers, Bill
23  Lynch had made contact with -- with Brian in the real
24  estate department and asked if there is a way that we
25  can come up with -- with a reduced figure for that

Page 581

1  facility.
2      Q.  Do you know if a reduced figure was provided to
3  Elite Racing?
4      A.  Yes.
5      The -- The number -- The number all the far below
6  market value, that was agreed upon is more in the -- was
7  more in the range of I believe $12,000.
8      Q.  What year was the request originally made for
9  the Rock 'n' Roll Marathon to use the General Dynamics
10  property for parking?
11      A.  2000 -- It's either 2003 -- 2004.
12      Q.  Are you aware that there is an analysis done to
13  determine the fair market value of the parking for that
14  property for that event?
15      A.  Yeah.
16      I believe that analysis was -- was in an effort to
17  back into the number -- a particular number. The
18  initial analysis that -- that we had put together --
19  that I had put together in terms of -- of rent brought
20  that number to -- to the $24,000 mark versus, you know,
21  the reduced rate.
22      Q.  Who helped you put together your initial
23  analysis of the value of the parking?
24      A.  I had put, with the assistance of -- of -- I
25  believe it was Troy Leech, I had put together -- she had

Page 582

1  asked me to put together a number of what I thought fair
2  market rent for that property would be.
3      I had initially put that number, and the number
4  that we had recommended was in the $24,000 mark.
5      Q.  Was your recommendation as to the fair market
6  value of the property put in writing?
7      A.  Yeah, I believe it was, yes, ma'am.
8      Q.  Was it in a memorandum form?
9      A.  It should have been in a memorandum form
10  because it was a number that we presented to -- to -- to
11  the group as part of our meeting.
12      Q.  To what group?
13      A.  We had -- We had initial meeting with -- with
14  the Rock 'n' Roll Marathon organizers, Troy, myself, and
15  then they had some staff with them as well.
16      Q.  Was there anyone from the Authority other than
17  you and Troy at the initial meeting with the organizers
18  from Elite Racing?
19      A.  I believe there may have been others, but the
20  ones that come to mind would be myself and Troy.
21      Q.  Do you -- Strike that.
22      Do you know who helped Thella Bowens -- Well,
23  strike that.
24      Have you ever actually seen the agreement with a
25  lease -- Elite Racing regarding use of the property?

Page 583

1      A.  Yes.
2      Q.  Did you ever make a conclusion as to whether
3  the agreement accurately reflected the fair market value
4  of the property?
5      A.  In conversations that -- that I had with Troy
6  and with Ted Sexton, were that -- that we receive --
7  that we kind of got jobbed on --- on -- on the deal for
8  the Rock 'n' Roll Marathon, that it cost us much more
9  time and effort, and the -- and the rental car companies
10  much more time and effort than what the $12,000 figure
11  would actually -- would accurately reflect.
12      Q.  When did you have that convers- --
13      MS. CHINN:  Would you read his answer back for me,
14  please.  I'm not sure what he said.
15      THE WITNESS:  Okay.
16      (The record is read by the reporter.)
17      MS. CHINN:  Thank you.
18      MS. McDONOUGH:
19      Q.  Did you ever review a memorandum from Thella
20  Bowens to Zane Gresham, Brian Anderson and Troy Anne
21  Leech regarding the fair market value of that property
22  for Elite Racing?
23      A.  I -- I don't recall.
24      Q.  Have you ever heard that there was such a
25  memorandum?

38 (Pages 580 to 583)

53-611 (202)

JOSE HERNANDEZ vs. SAN DIEGO COUN...    January 15, 2007    JOSE HERNANDEZ, VOL. III

Page 584

1    A. I don't recall.
2    Q. Did you participate in providing any numbers or
3    statistics to Thella Bowens in looking at the fair
4    market value of that property?
5    A. Not having the document in front of me, I don't
6    recall.
7    MS. McDONOUGH: Just take a two-second break.
8    THE WITNESS: Okay.
9    MS. McDONOUGH: You don't even have to turn that
10    off, but --
11    VIDEO OPERATOR: Okay.
12    MS. McDONOUGH: -- it's just going to be a little
13    break in the proceeding.
14    (Interruption in proceedings.)
15    MS. McDONOUGH: Okay. I think I need a slightly
16    longer break.
17    VIDEO OPERATOR: All right.
18    We are off the record at 2:46 p.m.
19    (A recess is taken.)
20    VIDEO OPERATOR: We are back on the record at
21    2:55 p.m.
22    MS. McDONOUGH: I'm going to mark as Exhibit 19 a
23    packet of Use and Occupancy Permits for Elite
24    Racing. [EXH-20]
25    THE REPORTER: That should be Exhibit 20.

Page 585

1    MS. CHINN: I think it is 20.
2    MS. McDONOUGH: As Exhibit 20.
3    (Whereupon the document referred to is marked by
4    the reporter as Defense Exhibit 20 for identification.)
5    MS. CHINN: Go ahead and write on that one.
6    MS. McDONOUGH:
7    Q. Let's start with the first document.
8    Have you ever seen this Use and Occupancy Permit?
9    A. I believe I have.
10    Q. And if you look at the top of the second page
11    of the first use and occupancy agreement, it says that
12    the rental will be $18,800.
13    A. Yep.
14    Q. Do you believe that that amount is under fair
15    market value for the General Dynamics property for Elite
16    Racing's purposes?
17    A. I believe -- I believe it is.
18    Q. How far below fair market value do you believe
19    that is?
20    A. If -- If my memory serves me correct from --
21    that is, that the fair market value was closer to
22    $24,000.
23    Q. Did you determine that the fair market value
24    was 24,000 in 2003?
25    A. Yeah, that the -- that the original

Page 586

1    determination for -- for rent was based on a formula
2    that called for $2 per -- per day per car that we had
3    been using with -- with the rental cars that parked
4    their vehicles out at -- at the facility.
5    What we did was then went back and calculated the
6    total amount of cars that would fit in the -- in the
7    space that was requested by Elite Racing. And that's
8    how we came up with that original number, 20- -- $24,000
9    $25,000.
10    Q. So you calculated it as $2 per day per space?
11    A. When we factored in the amount of space that
12    they were looking to use for the amount of time, and we
13    then said, "Okay. This is how many cars can fit in that
14    particular property at $2 a day," that's how we came up
15    with the number.
16    Q. Do you know if when the rental cars are there
17    they all parked in the space?
18    For instance, do they put more in the lot than what
19    fit in standard spaces?
20    A. No.
21    We had -- We had arrived into a particular formula
22    that -- but I don't -- not having the documentation in
23    front of me, I wasn't -- I'm not sure exactly what the
24    square footage was for that we had calculated -- or the
25    square footage per parked car was.

Page 587

1    Q. Then beginning on page 1735 --
2    A. Okay.
3    Q. -- it's a Use and Occupancy Permit for 2004.
4    A. Okay.
5    Q. And on the second page of that agreement it
6    says that the rental will be $17,568.
7    A. Okay.
8    Q. Do you believe that that amount is under the
9    fair market value?
10    A. I believe that the fair market value is -- is
11    closer to right around 24,000. I don't -- Once again, I
12    don't have the proper calculations in front of me, but
13    that would be my -- my guess at this time.
14    Q. And that's in 2004 as well?
15    A. 2004, correct.
16    Q. Have you ever seen this Use and Occupancy
17    Permit before?
18    A. I've seen a use and occupancy for the permit.
19    I'm not sure if this is the right one because it's not
20    executed.
21    Q. And then turn to the last page.
22    A. Okay.
23    Q. Do you recognize that document?
24    A. Yes.
25    Q. What is this document?

39 (Pages 584 to 587)

53-611 (203)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY          January 15, 2007          JOSE HERNANDEZ, VOL. III

Page 588

1    A. This is a document that -- that -- which was
2 the operating plan for -- for Elite Racing or Five Star
3 Parking for the management of parking services.
4    Q. So did you prepare this budget?
5    A. This is a document that I helped assist prepare
6 for the event, yes, ma'am.
7    Q. And is this document an attempt to come up with
8 the operating costs for that parking lot for the
9 Rock 'n' Roll Marathon?
10    A. It was an attempt to mitigate -- This document
11 was an attempt to come to some sort of -- or to
12 negotiate cost for services to be provided by Five Star
13 Parking to Elite Services.
14    Q. Do you know who the negotiator was of the cost
15 of services?
16    A. We had just all three got together and worked,
17 negotiated back and forth, on -- on what -- what proper
18 staffing levels were -- were required, what those
19 costs -- those costs were already entered into by -- you
20 know, by the operator. My point was just to get
21 together with them and assure that we had sufficient
22 staffing.
23    Q. So when you say the three of us, you're --
24 you're referring to you, Five Star Parking and Elite
25 Racing?

Page 589

1    A. Yes, ma'am.
2    Q. Do you remember who you talked with from
3 Five Star Parking?
4    A. I -- I don't recall. It may have been David
5 Bonaparte, who was a -- the property manager for
6 Five Star Parking.
7    Q. Do you believe -- Well, strike that.
8    Do you know if Elite Racing eventually retained
9 Five Star to operate the parking lot for the Rock 'n'
10 Roll Marathon?
11    A. I believe they did.
12    Q. Do you believe that Elite Racing paid Five Star
13 Parking the fair market value for their services?
14    A. I believe that -- I believe that they did.
15    Q. Did Bill Lynch ask for any special favors in
16 connection with the use of the parking lot for Elite
17 Racing?
18    A. The information that was relayed to me by -- by
19 staff, by Troy was that Bill Lynch or -- by Troy and
20 Ted, because this is an issue was that Mr. Lynch had --
21 had become involved, and we needed to figure out a way
22 that we can make this work for -- for Elite Racing.
23    Q. Did Ted or Troy ever tell you that Mr. Lynch
24 was demanding that the property be leased to Elite
25 Racing for under the fair market value?

Page 590

1    A. I believe the request was to -- for staff to
2 work it out with -- to work it out with -- with Elite
3 Racing so that they can use the property.
4    Q. Do you know if Mr. Lynch ever requested that
5 the Authority offer the property to Elite Racing for
6 under the fair market value?
7    A. I believe that, once again, the request was to
8 work out a way -- work out a lease arrangement that made
9 sense for Elite Racing.
10    Q. And that's the extent of your knowledge
11 regarding Mr. Lynch's request?
12    A. Yes, that's correct.
13    Q. Do you know what was meant by "work out a lease
14 arrangement that made sense"?
15    A. I believe was -- the way I could interpret it
16 was Elite Racing was willing to pay a certain price and
17 to work out a formula that would substantiate payment of
18 whatever that price was.
19    Q. Did you ever protest the use of the General
20 Dynamics property for Elite Racing?
21    A. Absolutely.
22    Q. What did you protest to?
23    A. I protested it to my direct supervisor, Ted
24 Sexton.
25    Q. When was that?

Page 591

1    A. On each occasion. It's a tremendous amount of
2 work to clear out that square footage. We probably on
3 any given -- on any given day, probably have 2,000 cars
4 out there.
5    And our requirement to clear out that space is a
6 tremendous amount of work, not just on Airport
7 Authority's behalf, but on the rental cars. They incur
8 a substantial amount of -- of expenses having to clear
9 out that property.
10    So understanding the work it -- the work it took
11 the Airport Authority understanding the rental cars far
12 below market value.
13    Q. So you said something to Ted Sexton each
14 year --
15    A. Yes.
16    Q. -- from 2003 to 2005?
17    A. Yeah.
18    Q. Did Ted ever respond to your protest?
19    A. That was in -- in talking to Ted about -- in
20 talking to Ted about -- about that lease -- about the
21 lease, you know, I felt that was, you know, voicing my
22 concerns to him and see if there's anything he can do.
23    Obviously, you know, he reiterated that that --
24 that the -- that the board member had been involved and
25 we needed to -- we needed to work it out to make it all

40 (Pages 588 to 591)

53-611 (204)



Page 592

1  happen.
2      Q. Do you know if Ted told anyone else about your
3  protest?
4      A. Where it went to Ted, I'm -- I'm not sure where
5  it went from there.
6      Q. And once again, these protests were verbal and
7  not in writing?
8      A. Yes.
9      Q. Why do you believe that Bill Lynch's request
10  for use of the General Dynamics property violated the
11  ethics code?
12      A. I believe that he was using his position to
13  influence staff and make -- and -- and have -- have us
14  enter into a lease agreement below market value for
15  that -- for the property.
16      Q. Which code do you believe that violated?
17      A. I believe that that is -- Do me a favor, repeat
18  that again if you can.
19      Q. Which code --
20      MS. CHINN: Are you getting tired?
21      THE WITNESS: I'm getting tired. I got the sun
22  now. Could --
23      MS. McDONOUGH: We can stop to --
24      THE WITNESS: See, if you stop -- yeah.
25      MS. McDONOUGH: -- make you more comfortable.

Page 593

1      THE WITNESS: No, no, it just -- now the light went
2  down. I'm right -- Now it's right here (indicating).
3      MS. McDONOUGH: We need -- We need to move our --
4      MS. CHINN: You didn't think --
5      THE WITNESS: It needs to come down, yeah.
6      MS. McDONOUGH: -- file folder.
7      THE WITNESS: Yeah.
8      MS. CHINN: Oh, Gordon, you got more work to do?
9      THE REPORTER: Can we go off the record?
10      MS. McDONOUGH: Sure.
11      VIDEO OPERATOR: This is the end of Videotape
12  Number 2 in the continuing deposition of Jose Hernandez,
13  Volume III.
14      We are off the record at 3:06 p.m. on
15  December 20th, 2006.
16      (A recess is taken.)
17      VIDEO OPERATOR: We are back on the record at
18  3:10 p.m. on December 20, 2006. This is the beginning
19  of Videotape Number 3 in the continuing deposition of
20  Jose Hernandez, Volume III.
21      MS. McDONOUGH:
22      Q. Last question before we went off the record was
23  whether you were too tired to proceed.
24      Are you too tired to proceed?
25      A. No, ma'am.

Page 594

1      The blind -- The sun was blinding me.
2      Q. And we fixed the sun; right?
3      A. For now.
4      MS. CHINN: You fixed the sun? That's a hell of an
5  overstatement.
6      MS. McDONOUGH:
7      Q. What ethics code do you believe was violated by
8  Bill Lynch's request for use of the General Dynamics
9  property for the Rock 'n' Roll Marathon?
10      A. I believe that -- that the board member was
11  in- -- was using his influence to procure special
12  treatment for Elite Racing.
13      Q. Which ethics code do you believe that request
14  violated?
15      A. For use of his position.
16      Q. Is there a specific code that you're thinking
17  of?
18      A. I don't have the document in front of me to --
19      Q. And --
20      A. -- to be specific.
21      Q. And that's just the Authority's internal ethics
22  code; correct?
23      A. I believe so, yes, ma'am.
24      Q. The complaint says that the board members'
25  actions violate other laws and regulations as well.

Page 595

1      Do you know what that refers to?
2      A. I believe there was just attempts to influence
3  proper contract and procurement regulations.
4      Q. Are there any specific laws or regulations that
5  you have in mind that that violates?
6      A. Not being an expert, just in general.
7      Q. The same thing with Joe Craver's request for
8  the Fleet Week parking, are there any laws or
9  regulations that you believe that violates?
10      A. I believe -- I believe use of -- use of that
11  property may be construed as a gift of public funds
12  for -- for the property.
13      Q. When was the first time that you formed that
14  belief?
15      A. When it was brought to my attention that on the
16  second use of that property for those terms may or may
17  not be allowable or -- or probably weren't allowable,
18  un- -- unallowable use for the -- for the property.
19      Q. You've alleged that a board member requested
20  assistance in rearranging an itinerary for the Little
21  League World Championships in Williamsport,
22  Pennsylvania; is that correct?
23      A. That's correct.
24      Q. Which board member are you referring to?
25      A. Now you got me. Morris Vance, the mayor of

41 (Pages 592 to 595)

**53-611 (205)**

JOSE HERNANDEZ vs. SAN DIEGO COUNTY          January 15, 2007                    JOSE HERNANDEZ, VOL. III

Page 596

1   Vista. I can only remember so many names.
2       THE REPORTER: Spelling for the record.
3       THE WITNESS: Morris, M-O-R-R-I-S; Vance,
4   V-A-N-C-E.
5       MS. McDONOUGH:
6       Q. When did Mr. Vance request this rearrangement
7   or assistance of his itinerary?
8       A. Back around in the exact dates -- it's whenever
9   Vista Little League made -- made the World Series.
10  Mr. Vance had called Ted to request his assistance in
11  rearranging his flights, not only some flight times, but
12  some seat arrangements that needed to be made.
13      His original itinerary was rather hodgepodgey,
14  going -- going to Atlanta, Atlanta to Pittsburgh. It
15  was rather a -- a complicated itinerary there that he
16  had, I believe making two stops on three different
17  airlines.
18      Q. Was -- Was this request on one occasion for one
19  Little League World Championship?
20      A. The only one they've made.
21      Q. You said whenever they make the Little League
22  World Championships. I just want to make sure there was
23  just one occasion.
24      A. The last time they made, which is the only time
25  they made the World Series, that would give you an

Page 597

1   approximate time of when this request was made.
2       Q. Would the seat arrangements that he
3   requested -- Strike that.
4       Did Mayor Vance request an exit row because of his
5   height?
6       A. In several other requests that Mr. Vance
7   requested, you know, in the past he had requested
8   assistance in -- in bulkhead rows that actually have
9   more leg room, not exit-row seats.
10      Q. On this occasion did Mayor Vance request the
11  bulkhead row again?
12      A. His specific request to Ted I can't -- I can't
13  testify to. I can testify to what Ted's specific
14  request to me was.
15      Q. What was Ted's specific request to you?
16      A. That Ted had asked if I can go through and I
17  believe change some times, change some flights around
18  and try to get him upgraded to first class as much as
19  possible.
20      Q. Did you follow Ted's request?
21      A. Ted requested, and finally when I received his
22  full itinerary, I believe there was a total of three
23  different airlines that I had to go visit to try to make
24  those -- try to make -- try to follow through with --
25  with those requests.

Page 598

1       Q. Were there three airlines coming and going?
2       A. He was -- He had a rather complicated itinerary
3   where I bel- -- I mean, very complicated where he would
4   go to Atlanta, Atlanta to Charlotte, Charlotte to -- or
5   excuse me -- San Diego to Atlanta, Atlanta to Charlotte,
6   Charlotte to Williamsport or -- or Atlanta to -- to
7   Philly or Pittsburgh.
8       It was a rather complicated itinerary. So what he
9   wanted to do was uncomplicate that itinerary so that he
10  can get there in time for -- for the first game.
11      Otherwise, under his itinerary, he was going miss
12  the first day. And -- And if he were to miss the first
13  two games, he would -- he would get there and just have
14  to turn around and come home.
15      Q. Did you contact any of the airlines to
16  determine whether you could upgrade Mayor Vance or
17  change his itinerary?
18      A. I went down and contacted them in person at Ted
19  Sexton's request.
20      Q. And what happened after that?
21      A. After going through and looking at those
22  itineraries, we were able to modify his itinerary as he
23  had requested.
24      Q. As Ted had requested?
25      A. As Ted had requested, yes, ma'am.

Page 599

1       Q. Do you know if Mayor Vance received a
2   first-class upgrade on any of the flight segments?
3       A. Yes, he did.
4       Q. On how many?
5       A. I believe it was at least a minimum of two
6   upgrades.
7       Q. Do you know whether any portion of Mayor
8   Vance's ticket was paid as a first-class ticket?
9       A. It -- It would be -- It was my understanding or
10  is my understanding that -- that there were no charges
11  to Mr. Vance either on itinerary changes or first-class
12  upgrades.
13      Q. Do you have any understanding as to whether
14  Mayor Vance had a first-class ticket for any portion of
15  the segment prior to making any changes?
16      A. I believe there was a segment that he had first
17  class, but there were many sections -- or segments that
18  he did not.
19      Q. So he had at least one segment that was already
20  first class and paid for, and then you may have upgraded
21  one other segment?
22      A. No, no. Two in addition to the one. I believe
23  he had a first class from here to Atlanta or Charlotte,
24  one of those connections, and then there were several
25  other first-class upgrades that needed to be made.

42 (Pages 596 to 599)

53-611 (206)

JOSE HERNANDEZ vs. SAN DIEGO COUN . .          January 15, 2007          JOSE HERNANDEZ, VOL. III

Page 600

1  Q. Was there a charge for the upgrades that you
2  obtained for Mayor Vance?
3  A. There were no charges to upgrades or flight
4  itinerary changes.
5  Q. Did Ted Sexton ask you to obtain these upgrades
6  for free?
7  A. Ted Sexton -- Ted -- Ted Sexton was to go make
8  it happen.
9  Q. Did you complain to anyone about having to make
10 these changes for Mayor Vance?
11 A. No.
12 The -- The request came from my direct supervisor,
13 and, you know, just wanted -- you know, it was -- it was
14 a -- a direct request. So just, you know, obviously if
15 it comes from a board member -- board member to Ted, you
16 know, my assumption was there was nothing wrong with it.
17 Q. So at the time you didn't believe that anything
18 was wrong with the request?
19 A. I -- At that time I -- I did not believe so.
20 Q. In your complaint, you allege that the request
21 from Ted to change Mayor Vance's ticket violates the
22 ethics code; correct?
23 A. Correct.
24 Q. Which ethics code does that request violate?
25 A. I believe -- I believe now the way it was

Page 601

1  iterated to me through -- through the whole
2  investigation on my part was that -- that him using his
3  influence with me to ask me to make those changes, where
4  to follow through with those may have been -- may have
5  been an ethics violation.
6  Q. So you learned through your own investigation
7  what may or may not be a violation of the ethics code?
8  A. No, that --
9  MS. CHINN: Objection --
10 THE WITNESS: -- that's incorrect.
11 MS. CHINN: -- that mischaracterizes his --
12 MS. McDONOUGH:
13 Q. Okay.
14 Then what -- what were you meaning to say about
15 that? Sorry.
16 MS. CHINN: You are not going to let me put that
17 objection?
18 MS. McDONOUGH: No, put the objection.
19 MS. CHINN: Did you get it?
20 THE REPORTER: I got your objection. I didn't get
21 his answer.
22 MS. CHINN: Okay.
23 MS. McDONOUGH: That's okay. Put it on. Sorry. I
24 didn't mean to --
25 MS. CHINN: That's okay.

Page 602

1  MS. McDONOUGH: -- interrupt you.
2  MS. CHINN: She wants your answer.
3  THE WITNESS: No. Go ahead and repeat it, please.
4  MS. CHINN: Did you learn about the ethics
5  violations because of your own investigation?
6  MS. McDONOUGH: No, wait. I was thinking about my
7  next question.
8  THE WITNESS: Okay.
9  MS. CHINN: Okay.
10 MS. McDONOUGH:
11 Q. I asked you which ethics code Ted's actions
12 violated by requesting you to change the tickets for
13 Mayor Vance.
14 You answered that the way that it was related to
15 you through the whole investigation on your part,
16 that -- was that Ted or Mayor Vance was using his
17 influence with you to ask you to make those changes.
18 What -- What was told to you in the investigation
19 about the ethics code?
20 A. It was -- It was understood -- It was -- It was
21 my understanding, because it was common practice without
22 the Airport Authority, that, you know, requesting
23 tickets, changing tickets, getting upgrades, getting --
24 were -- were just a common practice at the Airport
25 Authority, that -- that not just some people did it but

Page 603

1  many people did it.
2  So that's why in -- at my particular point of view,
3  practice overcame whatever terms of policy there may
4  have been.
5  Obviously when the determinations of the
6  investigation -- of my investigation by the Airport
7  Authority, that unfortunately was described to me in a
8  different manner.
9  So now going back and taking a look at -- at the
10 way -- the -- the letter of the law on -- on -- on the
11 ethics policy, now I view back and say yes, those were
12 violations of the ethics policy.
13 Q. Who described to you what the ethics policy was
14 in the course of your investigation?
15 A. In -- I think in the course of which
16 investigation?
17 Q. The investigation into your behavior.
18 A. At the end -- Finally at the end, Ted Sexton
19 had -- had said that my -- you know, that there may have
20 been some insinuation that I used my position to -- to
21 obtain rights and privileges that would not be available
22 to the general public.
23 Q. Did you agree with that insinuation?
24 A. That's -- I strongly disagree.
25 MS. CHINN: Can you read the rest of his answer to

43 (Pages 600 to 603)

53-611 (207)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY        January 15, 2007        JOSE HERNANDEZ, VOL. III

Page 604

1  me.
2      (The record is read by the reporter.)
3      MS. CHINN:  Thank you.
4      MS. McDONOUGH:
5      Q.  In your complaint, you allege that the
6  Authority's vice president of budget and finance
7  repeatedly requested changes in flight schedules; is
8  that correct?
9      A.  That's correct.  That's correct.
10     Q.  Are you referring to Vernon Evans?
11     A.  That is correct.
12     Q.  How many times did Vernon Evans request
13  assistance in changing flight schedules from you?
14     A.  Easily -- Easily over ten times.
15     Q.  Over the course of how long?
16     A.  Over the course -- If you would look over the
17  course of his employment at the Airport Authority, maybe
18  over the last two years, we've probably made no less
19  than 15 to 20 changes on his flight itinerary.
20     Q.  When you say "we," who are you referring to?
21     A.  Amiel Porta -- Amiel Porta, Jeffrey Simmons and
22  myself.
23     Q.  Did Vernon directly ask you to make the
24  changes?
25     A.  In several occasions he asked me directly.

Page 605

1      On several other occasions he asked his
2  administrative assistant.
3      On several other occasions, those requests came
4  from Ted Sexton.
5      Q.  Who was Vernon's administrative assistant at
6  the time?
7      A.  He's probably gone through ten of them, so I
8  don't -- I don't even remember.
9      Q.  Do you have any specific memory of a certain
10  administrative assistant asking you to make changes for
11  Vernon Evans?
12     A.  On -- I do have.  I do have -- My office was
13  probably four doors, five doors from -- from his office.
14  And so they would come over and say, "Hey, Vernon" --
15  "Vernon would like you to change a ticket" either going
16  to Dallas, coming back from Dallas, going to Vegas or
17  coming back from Vegas.
18     Q.  Do you know if the flights that Vernon was
19  talking were for work-related purposes?
20     A.  It would be fair to say that over half of them
21  were -- were not.  They were personal travel.
22     Q.  How do you know that it was personal travel?
23     A.  Because he was going to Vegas to gamble.
24     Q.  Which airlines would he ask you to change the
25  tickets on?

Page 606

1      A.  He was -- His three airlines of preference
2  would be America West, Southwest Airlines, and American
3  Airlines when he went to back to visit his girlfriend in
4  Dallas.
5      Q.  Did Southwest Airlines charge a change-ticket
6  fee, to your knowledge?
7      A.  Yes, they do.
8      Q.  What kind of a fee do they charge?
9      A.  It's depending on your itinerary change and
10  tickets available at that time.  It depends on how much
11  he bought it for.
12     Q.  Is it your understanding that Southwest
13  Airlines only charges you the difference between the
14  price of the fare that you paid for the leg of the trip
15  that you want to change and the price of the fare for
16  that leg on the day that you change it?
17     A.  Pretty close.  Pretty close.
18     Q.  Okay.
19     What's your understanding of Southwest's policy on
20  change-ticket fees?
21     A.  That would be pretty close to it, that you
22  would take the difference between what you paid for that
23  ticket and what it would be or what tickets -- what
24  tickets were available for that flight, what class of
25  ticket there were available for that flight, and you

Page 607

1  would pay the difference.
2      Q.  At the time you make the change?
3      A.  At the time you make the change.
4      Q.  But there isn't a flat 75 or $100 change-ticket
5  fee?
6      A.  No.
7      That's what makes Southwest a little bit different.
8      Q.  Did you comply with Vernon's requests to make
9  flight changes?
10     A.  Yes.
11     I don't -- I really didn't think I had a choice but
12  to comply.
13     Q.  Did Vernon ever request a flight upgrade?
14     A.  Vernon, his -- his requests were more -- were
15  more specific to time and date changes.  On several
16  occasions he was having a good time in Vegas and wanted
17  to stay another -- another day, or wanted to leave later
18  in the evening.  So those -- those -- those were the
19  type of changes that -- that he would send -- or he
20  would request.
21     Q.  Did you ever tell Vernon that you did not want
22  to make the changes?
23     A.  My -- You know, my conversations with -- my --
24  never directly to -- never directly with -- to Vernon,
25  no.

44 (Pages 604 to 607)

53-611 (208)

Page 608

1  Q. Did you tell anyone else that you did not want
2  to make the changes?
3  A. My conversations related to Vernon's activities
4  were directly with Ted Sexton.
5  Q. What did you tell Ted in that regard?
6  A. We just -- I wanted to -- I wanted to get Ted's
7  reaction to his continuing requests for changes, wanted
8  to get his opinion whether we should continue doing it
9  and wanted to get Ted's opinion on whether it was okay
10  to do it.
11  Q. When did you have this conversation with Ted
12  that you're referring to?
13  A. Throughout a two-year period.
14  THE REPORTER: I didn't hear the answer.
15  THE WITNESS: Throughout a two-year period.
16  MS. McDONOUGH:
17  Q. So you said you wanted to get Ted's reaction to
18  Vernon's continuing request for changes; is that
19  correct?
20  A. We wanted to keep Ted Sexton briefed up on the
21  situation.
22  Q. Did Ted have a reaction to Vernon's request for
23  changes?
24  A. Ted's response was, "Just do" -- "do whatever
25  you can."

Page 609

1  Q. Did you ever ask Ted if it was okay to make the
2  changes for Vernon?
3  A. Yes.
4  And he said if it was possible for me to cha- -- to
5  make those changes to go ahead and make those changes.
6  Q. Did you advise Ted that -- that the changes
7  were at no cost to Vernon or the Authority?
8  A. Ted knew.
9  Q. How do you know that Ted knew?
10  A. Because those requests -- Once again, if --
11  If -- If an individual's intent was to pay for upgrades
12  or changes, they would just call reservations.
13  There was a reason why those requests were made
14  through us, so that there would be no charge or no
15  additional expenses to those tickets. Why else -- Why
16  else would you -- would you request of those changes?
17  He had an administrative assistant. She could have
18  called reservation.
19  Q. Is that the assumption you're making?
20  A. That's -- That is -- That is my -- That would
21  be my assumption, yes, ma'am.
22  Q. Did you ever tell Ted that you thought that
23  Vernon's request for flight changes violated the
24  Authority's policies or codes?
25  A. The conversation that I had with Ted after he

Page 610

1  said -- after he mentioned that it was okay, I said,
2  "Hey, Ted, is it okay if we make these changes?"
3  "Yeah, there is not a problem to it."
4  The -- The conversations that I had with him is,
5  "It happens all the time," you know, "It's okay to do
6  them."
7  "Is it okay to do them?"
8  "Yes, it's okay."
9  "Do we have to do them all the time?" Because they
10  were -- I mean, every week there would be a different
11  request. So more -- more of whether it was okay to do
12  it or, you know, it just seemed a little -- a little
13  imposing on -- on staff.
14  Q. Did you ever specifically tell Ted that you
15  thought making the flight changes for Vernon was a
16  violation of the Authority's ethics code or policies?
17  A. I don't believe I did, because once again, it
18  was common practice within the Airport Authority to not
19  only change tickets for Vernon, but to board members to
20  other -- for other staff as we've -- as I outlined in
21  there.
22  So, you know, understanding what practice was, I
23  really, really did not believe it was a violation. I
24  just thought it was more of a -- you know, an irritation
25  that every week we would have to go through and make

Page 611

1  changes.
2  Q. Why did you decide to speak to Ted about
3  Vernon's requests but not about some of the other
4  requests, such as Thella's requests?
5  A. I believe -- I believe that would be in- --
6  that would be incorrect if you would say that.
7  Q. Okay.
8  So you talked to Ted about Thella's requests also?
9  A. That -- As -- As we talked before, most if not
10  all of the requests from board members, from Thella,
11  from some other staff members, most of that would be
12  funneled through Ted, from Ted, then he -- then we would
13  be told, "Hey, this is what we need you" -- "you to do."
14  So Ted was fully aware of not only those requests
15  made by Vernon, but from -- from board members and
16  anyone else.
17  Q. Did you ever tell Ted that you were irritated
18  by Thella's requests?
19  A. No.
20  Q. Why did you tell Ted that you were irritated by
21  Vernon's requests but not by Thella's?
22  A. Only by Vernon's requests because Vernon made
23  these changes all the time. There would be times where
24  in one particular instance, he probably made three
25  changes to the same itinerary on the same day where he

45 (Pages 608 to 611)

53-611 (209)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY          January 15, 2007          JOSE HERNANDEZ, VOL. III

Page 612

1  said, "I'm flying out this day. Hey, go get it changed
2  because I'm having a good day at the table." "Oh, you
3  know what? Go get it changed again." "Go get it
4  changed again."
5       And that was the irritation of -- of having to go
6  back and change those not. So once again, not more of
7  an ethics, it was more of an irritation, me having to go
8  down to the station manager and say, "Hey, look, stop
9  whatever you're doing. Could you make your changes for
10 me again."
11      Q. And your complaint alleges that Vernon's
12 actions in requesting the changes violates the ethics
13 code; correct?
14      A. I believe now in reflection -- in reflection
15 the way those -- the ethics policy was applied to me,
16 yes, they are.
17      Q. And which portion of the ethics code does it
18 violate?
19      A. And that particular one it was requesting
20 upgrades for tickets or special privileges that would
21 not otherwise be available to the general public.
22      Q. In your complaint, you allege that the chairman
23 of the board requested that his office be surveyed for
24 listening devices?
25      A. That's correct.

Page 613

1       Q. How many occasions did that occur --
2       A. In --
3       Q. -- that you're aware of?
4       A. One -- One specific occasion.
5       Q. Why do you believe that this request by the
6  chairman of the board was a waste of Authority funds?
7       A. I didn't understand -- I didn't understand
8  why -- why that needed to be done. We're a public
9  agency. Documents are public. You know, why
10 would you need your -- your -- your office swept for
11 bugs?
12      Q. Did you understand what kind of listening
13 devices the chairman was having the contractor look for?
14      A. He was just looking for -- for whatever the
15 reason -- for whatever reason he brought up the issue in
16 the conversation that we had with Ted at his office.
17 He -- He once again wanted something in writing or
18 wanted to be assured that you could not listen -- or you
19 could not use listening devices to look through --
20 through his windows.
21      And he wanted someone to go back again and sweep
22 his office so that no one would listen in into his
23 conversation. So he had specifically once again asked
24 Ted, "Hey, same as you did last time, could you have
25 someone come in and check my phones, you know, just

Page 614

1  sweep my whole office and make sure there's no listening
2  devices in there."
3       Q. Do you have any understanding whether it's
4  legal to eavesdrop on a conversation?
5       MS. CHINN: That's going to call for a legal
6  conclusion.
7       Answer if you can.
8       THE WITNESS: No, I -- I don't think I'm -- I don't
9  think I'm -- I'm -- I don't think I -- I can answer that
10 question.
11      MS. McDONOUGH:
12      Q. Do you know of any requirement that any
13 conversation that's held in the Authority be open to the
14 public?
15      MS. CHINN: Same objection.
16      THE WITNESS: Once -- Once again, I don't think I
17 can --
18      MS. CHINN: Calls for a legal conclusion.
19      MS. McDONOUGH:
20      Q. Do you know how much the Authority paid for the
21 sweep of the chairman's office?
22      A. No.
23      Those documents weren't -- weren't made -- weren't
24 made available to me.
25      Q. Are you aware of the Authority conducting any

Page 615

1  other sweep of any other area aside from the chairman's
2  office?
3       A. As we left -- As we left that office with Ted
4  Sexton and walked back to his, you know, I asked --
5  specifically asked Ted if others had -- if others had
6  their offices swept. He said, "No, he's the only one."
7       Q. If the chairman of the board said he was
8  concerned about security, would it be unreasonable for
9  him to have his office swept?
10      MS. CHINN: Objection. It assumes facts not in
11 evidence.
12      THE WITNESS: I -- I -- I wouldn't understand why
13 he would.
14      MS. McDONOUGH:
15      Q. But if he did feel for some reason that there
16 might be a security threat, would it be unreasonable for
17 him to have a listening -- his office swept for
18 listening devices?
19      A. A sec-- --
20      MS. CHINN: That calls for completely improper
21 opinion.
22      THE WITNESS: Go -- Go ahead and repeat it, please.
23      MS. McDONOUGH:
24      Q. If the chairman of the board felt for some
25 reason that there might be a security threat, would it

46 (Pages 612 to 615)

53-611 (210)

JOSE HERNANDEZ vs. SAN DIEGO COUN...    January 15, 2007    JOSE HERNANDEZ, VOL. III

Page 616

1  be unreasonable for him to have his office swept for
2  listening devices?
3      MS. CHINN: It calls -- It calls for an opinion,
4  speculation and there is a lack of foundation.
5      If you can answer it, go ahead.
6      THE WITNESS: Security threat to him or security
7  threat to who?
8      MS. McDONOUGH:
9      Q. To him or to the Authority.
10     A. He's a policy guy. Security threats wouldn't
11  be going through -- through the board member. They
12  would be going through -- through another office.
13     I guess I'm not understanding what security threats
14  or what threats would be -- that would require him to --
15  you know, to have his office bugged in that manner -- or
16  debugged in that manner.
17     Q. Did you ever hear that the chairman was worried
18  about a security threat?
19     A. No.
20     Specifically he was more worried about the FBI
21  listening in on him is the words that he used during --
22  during our meeting.
23     Q. Do you know why he was concerned that the FBI
24  would listen in?
25     A. No.

Page 617

1      Q. In your complaint, you allege that -- Well,
2  strike that.
3      Did you ever tell anyone that you thought that the
4  chairman's request for sweeping of his office was wrong?
5      A. Yes, I told Ted that I believed that it was a
6  waste of money, that we can once again use those type of
7  funds, whatever those funds would be, for better use.
8      Q. Did you believe that sweeping of the office was
9  a violation of law?
10     A. I believe that it was a -- a waste of public
11  funds.
12     Q. Even though you didn't know how much it was?
13     A. Yeah. Well, any -- whatever the amount, I
14  thought it was a waste of public funds.
15     Q. When did you tell Ted that?
16     A. As we walked out of the chairman's office down
17  the hallway back to his office.
18     Q. Do you remember the date --
19     A. No, I don't.
20     Q. -- or the year?
21     A. It was in 2005 sometime.
22     Q. Was it in the beginning of the year?
23     A. It was towards the end of the year.
24     Q. Did Ted respond to your concern?
25     A. No.

Page 618

1      Q. Do you know if Ted told anyone about your
2  concern of the money used on sweeping the chairman's
3  office?
4      A. No.
5      I am unaware of where he took it from there. Once
6  again, I -- I voiced my opinions and concerns to my
7  direct supervisor, hoping that he would do the right
8  thing or take it to wherever, you know, whatever proper
9  level he thought -- he thought it needed to be addressed
10  at.
11     Q. Have you ever heard that sweeps have been done
12  on other offices within the Authority?
13     A. Never beforehand.
14     MS. CHINN: Can I --
15     MS. McDONOUGH:
16     Q. You never heard of it?
17     A. I -- To that point, it -- I was unaware of any
18  other office -- of being swept for any type of devices.
19     MS. McDONOUGH: Do you need a break?
20     MS. CHINN: No, just for a second.
21     (A discussion between witness and counsel is held
22  off the record.)
23     THE WITNESS: Go ahead.
24     MS. McDONOUGH:
25     Q. As we sit here today, are you aware of any

Page 619

1  other offices that have been swept at the Authority?
2      A. I'm unaware of any other offices that were
3  swept.
4      Q. You allege in your complaint that you were
5  requested to obtain free round-trip airline tickets to
6  be donated to the United Way campaign?
7      A. That's correct.
8      Q. Who requested that you do that?
9      A. The request came from -- from -- Thella Bowens
10  as -- from Thella Bowens to Ted Sexton to myself.
11     Q. What did Ted say to you on that issue?
12     A. Ted had called me, asked me to meet him at his
13  office. He said, Ted, "Thella, as part of the United
14  Way campaign, would like you to go to Hawaiian Airlines
15  and obtain two tickets to Hawaii. And if you can, go
16  down to Southwest Airlines and go get two tickets to
17  Vegas."
18     Q. And Ted told you that Thella wanted you to go
19  get the tickets?
20     A. That's correct.
21     It -- It is -- It is assumed or it is common
22  knowledge that within the Airport Authority that Thella
23  was on the board of the United Way. This is -- The
24  United Way campaign is her campaign, and -- and so it
25  can be assumed, as Ted said, "Thella would like you to

47 (Pages 616 to 619)

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210

**53-611 (211)**

JOSE HERNANDEZ vs. SAN DIEGO COUNTY          January 15, 2007                    JOSE HERNANDEZ, VOL. III

Page 620

1　go get this for the grand prize package."
2　　　Q.　Did you go to Hawaiian Airlines and request
3　tickets?
4　　　A.　Yes, I did.
5　　　Q.　Did you tell Hawaiian Airlines that the tickets
6　would be for United Way?
7　　　A.　Yes.
8　　　I -- I went to Hawaiian Airlines, Janet Nix, and
9　explained to her that -- the whole story, that Thella
10　is -- you know, Thella has this annual United Way
11　campaign, if there is a way at her request that she can
12　contribute two tickets to -- to the campaign to be given
13　away as part of the raffle.
14　　　Q.　Do you know if the tickets were contributed on
15　behalf of Hawaiian Airlines, in other words --
16　　　A.　Excuse me?
17　　　Q.　-- that Hawaiian Airlines contributed the
18　tickets as a charitable donation?
19　　　A.　I believe they were contributed at -- I do not
20　believe -- they were contributed to the Airport
21　Authority, not to the United Way campaign.
22　　　Q.　Did you go to Southwest and ask for tickets as
23　well?
24　　　A.　Yes, I did.
25　　　Q.　And did you say the same thing to Southwest?

Page 621

1　　　A.　Same.
2　　　Q.　And were the Southwest tickets -- Strike that.
3　Did Southwest give you tickets?
4　　　A.　Yes, they did.
5　　　Q.　Were the tickets just regular buddy passes, or
6　were they specific to Las Vegas?
7　　　A.　Those tickets were specific to -- specifics to
8　Las Vegas.
9　　　Q.　And those tickets were also donated to the
10　Authority?
11　　　A.　They were donated to the Airport Authority.
12　　　Q.　Do you have any understanding of whether those
13　tickets were used in a United Way campaign?
14　　　A.　I believe they were put into the United Way
15　campaign -- the United Way campaign, the -- the grand
16　giveaway basket, as an inclusion in that.
17　　　Q.　What -- Do you know if there was a raffle for
18　the basket?
19　　　A.　I believe there was a raffle for the basket.
20　　　Q.　Do you know if there was any indication, when
21　the basket was raffled off, as to whether the tickets
22　were being donated on behalf of the Airport Authority or
23　donated on behalf of the airlines?
24　　　A.　I believe the indication was that regardless of
25　how it there, the -- the tickets were -- were from the

Page 622

1　Airport Authority, that the Airport Authority had
2　procured these -- these tickets as part of their
3　campaign.
4　　　Q.　And how -- how did you obtain that
5　understanding?
6　　　A.　Just -- Just my understanding of -- of how the
7　union -- it's the Airport Authority's United Way
8　campaign.　The Airport Authority put this basket
9　together, and whoever wins gets to have whatever in the
10　basket.
11　　　Q.　Did you protest obtaining these tickets for the
12　United Way campaign?
13　　　A.　At that particular time, I didn't think there
14　was -- there was cause of reason for -- for protest.
15　　　Q.　Because at that time you didn't think there was
16　anything wrong with it?
17　　　A.　At that particular time, I did not think there
18　was -- there was -- there was anything wrong with that.
19　　　Q.　In the complaint, you allege that Thella Bowens
20　requested a marked reserved parking stall for her
21　personal use?
22　　　A.　That is correct.
23　　　Q.　And then you also allege that she did not use
24　the stall, and instead reassigned the stall to Vernon
25　Evans; is that correct?

Page 623

1　　　A.　She kept the stall marked the same but allowed,
2　kind of assigned it to Vernon Evans.
3　　　Q.　Did you ever follow up to find out why Thella
4　Bowens did not use that stall?
5　　　A.　Yes, I did.
6　　　I -- I had made contact with Ted Sexton and asked
7　him if she would prefer that we move the stall to a
8　different area.
9　　　This particular reserved parking stall is located
10　to the east of the commuter terminal, and Thella's
11　office is located on the west side of the commuter
12　terminal, so, you know, fair distance to her office.
13　She chose to park in the public parking lot in front, in
14　front of the commuter terminal.
15　　　I then followed up with Ted and asked him if he
16　would like me to remove that, the reserve parking stall,
17　and he said no, that it would be assigned to Vernon
18　Evans.　Vernon Evans would be using that parking space.
19　　　Q.　Did you believe that there was anything wrong
20　with Thella Bowens requesting the parking space for
21　herself, a reserve parking space?
22　　　A.　I don't believe there was any -- They -- I do
23　not believe there was -- there was a -- no, never
24　questioned it.　Thella, she's president/CEO.　She's okay
25　with it.

48 (Pages 620 to 623)

53-611 (212)

JOSE HERNANDEZ vs. SAN DIEGO COUN..    January 15, 2007    JOSE HERNANDEZ, VOL. III

Page 624

1    Q. Do you thinking there's anything wrong with
2  Vernon Evans having a parking space that he can use --
3    A. Oh, abs- --
4    Q. -- that's reserved?
5    A. Absolutely.
6    I -- In my position, as -- as director of landside
7  operations or manager of grounds transportation, we
8  would have continual requests for special marked parking
9  spaces from employees. And I believe that was
10  preferential treatment on her behalf to assign that
11  parking spot to him.
12    Q. Do you know of any other vice presidents that
13  had assigned or reserved parking spaces?
14    A. He was in -- To the best of my knowledge, he is
15  the only one.
16    Q. Do you know of any Authority employees that pay
17  for parking?
18    MS. CHINN: Objection. It's overbroad.
19    THE WITNESS: I.
20    MS. McDONOUGH:
21    Q. Do Authority employees receive parking for free
22  at the airport while they're working?
23    A. Yes, they do.
24    Q. And how -- how do employees obtain access to
25  the parking lot for free?

Page 625

1    A. Parking permits.
2    Q. Is it a hang tag?
3    A. It's a hang tag, yes, ma'am.
4    Q. Are there specific lots that employees have to
5  park in at the Authority?
6    A. Airport, yes, they are.
7    Q. Do all Airport Authority employees park in the
8  same lot?
9    A. No, they -- No, they do not.
10    Q. Does the director -- Oh, strike that.
11    Do the vice presidents park in the same lots as the
12  receptionist at the commuter terminal?
13    MS. CHINN: Objection. It calls for speculation.
14    Answer it if you can.
15    THE WITNESS: The -- The vice presidents have --
16  depending on their work location, have areas that they
17  have an opportunity to park at.
18    MS. McDONOUGH:
19    Q. That are closer than some of the other
20  employees of the Authority?
21    A. No, no, that are within their -- their general
22  workspace. For example, if you're working out of the
23  west wing, which is the modular building to the west of
24  the commuter terminal, then you would be assigned a
25  parking spot in that facility, in that parking lot.

Page 626

1    If you worked at the commuter terminal, then you
2  would be assigned to park in parking lot 8, which is on
3  the east side of -- the east side of the commuter
4  terminal.
5    If you were assigned to work with the airport
6  planning, you were assigned to -- to park in one of 12
7  spaces within the Terminal 2 public parking lot.
8    If you were in airport maintenance, then you would
9  be assigned to park in one of the parking lots on the
10  far side of the west side of the airport, which we
11  termed as parking lot C.
12    MS. McDONOUGH: Let's take our final break.
13    THE WITNESS: Okay.
14    VIDEO OPERATOR: We are off the record at 3:48 p.m.
15    (A recess is taken.)
16    VIDEO OPERATOR: We are back on the record at
17  3:57 p.m.
18    MS. McDONOUGH:
19    Q. Were those employees of the Authority who were
20  director level and above entitled to park in any of the
21  parking lots at the airport for free?
22    A. There -- There would be certain individuals who
23  were -- certain employees who were allocated either
24  parking passes, yeah, that you can go park on travel
25  sometimes as business as long as you weren't impacting

Page 627

1  general travel, yeah. It -- It was just kind of a perk
2  for working at the airport.
3    Q. Director level or above?
4    A. No, any employee. Any employee who wanted to
5  do it can park at -- at the -- at the -- at the parking
6  lot. Some -- Some for -- you know, for -- you know,
7  some had parking passes for the public parking lots,
8  others -- others did not.
9    Q. Was there a rhyme or reason to how the passes
10  were assigned for the public parking lot?
11    A. Yes.
12    The -- The general rule of thumb was that if you
13  were in a position that -- that required you to be on
14  call on 24-hour notice or respond in an immediate
15  fashion to the airport, that you would be allocated a --
16  a parking pass.
17    Q. Do you know if all director level and aboves
18  were allocated the parking pass to park in any public
19  parking lot?
20    A. You know, not having it -- for the most part.
21    Q. Did you have such a pass?
22    A. Yes, I did.
23    Q. In your complaint, you allege that allowing
24  Vernon Evans to use Thella's parking space was a
25  violation of Airport Authority rules and regulations;

49 (Pages 624 to 627)