JOSE HERNANDEZ vs. SAN DIEGO COUNTY          January 15, 2007          JOSE HERNANDEZ, VOL. III

Page 628

1 correct?
2      THE WITNESS:  Is that how we put it?
3      MS. CHINN:  I think it mischaracterizes his
4 testimony.
5      THE WITNESS:  No.
6      MS. CHINN:  I don't recall him saying that.
7      MS. McDONOUGH:
8      Q.  I'm reading from the complaint, page --
9      A.  Okay.
10     Q.  -- 22 of the First Amended Complaint, lines 5
11 through 7 says, "The designation of the parking stall to
12 the vice president of budget and finance clearly
13 connotes preferential treatment and is a violation of
14 Airport Authority rules and regulations"; is that true?
15     A.  I believe that the violation would be that the
16 only authorized person to use that spot was Thella
17 Bowens and Thella Bowens herself.
18     Q.  Which Airport Authority rules and regulations
19 are violated by that --
20     A.  I believe it was -- I believe it would be
21 the -- the parking regulations 9.- -- 9.-something or
22 other.
23     MS. CHINN:  I just want to say on the record that
24 I'll object because I wrote that complaint.  My client
25 didn't write the complaint.

Page 629

1      THE WITNESS:  If I can expand --
2      MS. McDONOUGH:  It's okay.
3      MS. CHINN:  I'm not saying that the complaint is
4 accurate.
5      MS. McDONOUGH:  Well, that's why I'm asking him.
6      MS. CHINN:  It might be, but it might not be.  And
7 I'm not sure if you and he are talking about the same
8 thing there.
9      THE WITNESS:  I'll -- I'll expand in this matter if
10 I can.
11     If -- If anyone other -- If anyone other -- If any
12 other person would park in that spot, we would issue to
13 them a parking violation for parking in a reserved
14 parking stall.
15     MS. McDONOUGH:
16     Q.  Even another employee of the Authority?
17     A.  Even another employee, Mr. Tony Russell.
18     MS. McDONOUGH:  Just to address Cathryn's concern,
19 that's why asking him if he believes it's correct or
20 not.
21     Q.  Have you ever given a -- Strike that.
22     Are you aware of a parking ticket being given to
23 anyone for parking in Thella Bowens' spot?
24     A.  Yes, on -- on several occasions we issued
25 parking violations to a vehicle in that parking stall

Page 630

1 that was eventually found to be -- to belong to Mr. Tony
2 Russell.
3      Q.  And do you know if Tony Russell paid those
4 parking violations?
5      A.  Yeah.
6      The requests had come down -- The requests had been
7 made to dismiss those -- to dismiss those parking
8 violations.
9      Q.  And do you know if the requests were granted?
10     A.  Yes.
11     Q.  So as far as you know, Tony Russell did not pay
12 for parking violations?
13     A.  Yes.
14     I dismissed those tickets.
15     Q.  Why did you dismiss the tickets?
16     A.  It was requested by -- by Vernon and by Ted to
17 go ahead and dismiss those tickets.
18     Q.  What was Tony Russell's position at the time
19 that you dismissed the tickets?
20     A.  Tony was director of -- he was district --
21 Authority clerk.  So director records and something or
22 other.
23     Q.  Did you ever hear from any source that Tony was
24 authorized by Thella to park in that space?
25     A.  Never.

Page 631

1      Q.  Do you have any reason to believe that Thella
2 did not authorize Tony to park in that space?
3      A.  Yes, I did.
4      Q.  Why do you believe that?
5      A.  Because when -- when we confronted Tony about
6 parking in the space, he -- he told me that -- that --
7 he told me that Vernon said it would be okay for him to
8 park there if he wasn't using those.
9      So whenever he was on vacation, he could use them.
10 If he wasn't in town, he can use it.  He can use that
11 space whenever Vernon wasn't using the parking space.
12     Q.  And you said that you believe that someone else
13 using the space instead of Thella Bowens violated
14 parking violation 9.-something?
15     A.  The -- The airport's parking regulation.  In
16 sev-- On several occasions we did issue tickets to
17 individuals parking in that -- in that stall on several
18 occasions, even at the request of Vernon, that someone
19 was in his parking space.  And so yes, on -- on more
20 than one occasion, we had issued -- we had issued
21 tickets to individuals parking in that space.
22     Q.  Since you can't remember the exact number of
23 the parking regulation, what's the thrust of that
24 parking regulation?
25     A.  Unauthorized airport parking.  Parking where

50 (Pages 628 to 631)

53-611 (214)

Page 632

1  you're not supposed to be.
2  Q. Did you ever complain to anyone about Vernon
3  Evans using Thella Bowens' parking space?
4  A. Yes, to my direct supervisor, Ted Sexton.
5  Q. When did you complain to Ted?
6  A. We had -- immediately after it had come to our
7  attention, and several of my employees, airport traffic
8  officers, voice- -- voiced their concern of having
9  Thella's space used by -- by Vernon.
10  Q. When was that?
11  A. Maybe as far back, almost -- almost initially
12  after -- after Vernon -- maybe 2003, 2004, right around
13  there. It had -- It had been a couple years.
14  Q. Did you obtain the parking space for Thella in
15  2003 as well?
16  A. Yeah.
17  We had designated that parking space for -- for
18  Thella. I was the person responsible for procuring the
19  sign, installing the sign and making sure that I
20  provided to her a memo that it was her parking spot and
21  this is where it was. I provided her a map detailing
22  exactly where that parking spot was.
23  Q. And that was in 2003?
24  A. That was right around 2003, yes, ma'am.
25  Q. And sometime shortly thereafter, you talked to

Page 633

1  Ted about the fact that Vernon was using the space?
2  A. Well, once -- you know, once it had come to our
3  attention that she was -- she wasn't using the space and
4  that Vernon was now using the space, I -- I -- you know,
5  I made issue of it to -- to Ted, asking him why -- why
6  it was okay for her to designate that parking space to
7  him.
8  Q. When did it come to your attention that Vernon
9  was using the space instead of Thella?
10  A. We had issued a couple of parking citations to
11  the vehicle, and then Vernon had brought those -- Vernon
12  had brought those parking citations back to us, to my
13  department, and then that -- when he informed me that
14  Thella had assigned it to him or allowed him to use that
15  space --
16  Q. What --
17  A. -- on her behalf.
18  Q. What year was that?
19  A. I don't know. Maybe 2000 -- Once again,
20  approximately 2003, 2004.
21  Q. Did you ever talk to Ted about Vernon using
22  Thella's parking space after 2003 or 2004?
23  A. It was -- It was pretty much an ongoing issue.
24  It ended up being -- It ended up being an employee
25  morale issue where we had -- you know, where we would

Page 634

1  have employees consistently come to me and ask me why it
2  was that Vernon had his own spot, what they needed to do
3  to get their own spot, you know, and -- and those type
4  of issues. It had become an employee morale issue.
5  Q. Which employees came to you to ask you about
6  why Vernon was take -- was parking in that spot?
7  A. My office staff had come -- had come to me,
8  airport traffic officers, several other -- several other
9  employees had come to me. Jim Prentice had come to me
10  and asked me why. You know, there was -- it didn't just
11  come from one source.
12  It was -- It was kind of a source of irritation to
13  a lot of the employees because everyone -- it would be
14  great for everyone to have their -- their designated
15  parking spot, but I didn't have my own designated
16  parking spot.
17  Q. So a lot of employees expressed their
18  frustration and dissatisfaction with this?
19  A. Oh, absolutely.
20  At times, although there are enough spaces in that
21  parking lot, there is times that you have to park in the
22  park- -- in the back end, and it would be great to be
23  front row center.
24  Q. Which specific employees of your office staff
25  complained?

Page 635

1  A. My office staff in entirety from Clifforine
2  Massey, John McGuire, who worked at that time, Carol
3  Mahafey, Jennifer Hamilton.
4  Q. Which airport traffic officers complained?
5  A. Specifically their names, not quite sure.
6  But it was an issue because it was harder -- it
7  would be hard for them to regulate those, and that's
8  what they were in charge, for regulating parking in the
9  parking lot.
10  Q. You mentioned Jim Prentice as well.
11  Are there any other specific employees that you can
12  think of that came to you about the parking issue?
13  A. Not at this particular time.
14  Q. At the time that you left employment with
15  Authority, was Vernon Evans still using Thella's
16  designated space for parking?
17  A. As far as I know he still is, yes, ma'am.
18  Q. About the time you left the Authority?
19  A. I believe -- I believe he did and he still is
20  to this day.
21  Q. Why do you believe he still is?
22  A. I've seen his vehicle parked there.
23  Q. Did Thella ever obtain another designated space
24  somewhere?
25  A. Yes, she did.

51 (Pages 632 to 635)

53-611 (215)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY          January 15, 2007          JOSE HERNANDEZ, VOL. III

Page 636

1    Q.  Where is her designated space?
2    A.  Her designated space is located in the -- the
3  public parking lot, commuter terminal.  And it is -- The
4  only way -- There is a one-way exit -- If you're looking
5  from the commuter terminal out to Harbor Island, there
6  is an entrance one way in, one way out.
7    If you look to the far right, there is a designated
8  exit only for card holders.  The first space to the
9  immediate right of it has another Thella Bowens
10 designated parking stall there.
11   Q.  What does it say?  Does it say "Thella Bowen"?
12   A.  It says, "Airport Authority Vehicle Only" --
13 yeah -- no -- "authorized Airport Authority Vehicle
14 Only."  And that was the language that -- that Ted had
15 requested so that it didn't specifically say Thella
16 Bowens on there.
17   Q.  What does the space that Vernon Evans uses say
18 on it?
19   A.  It says, "Reserved Airport Authority Executive
20 Director, Presidency of" -- something to that -- to that
21 language.  It's specific to -- to Thella Bowen's
22 position.
23   Q.  You've alleged in your complaint that Ted
24 Sexton told you to secure a limousine from one of the
25 airport service providers to be used for a colleague's

Page 637

1  wife's funeral --
2    A.  That's correct.
3    Q.  -- is that correct?
4    A.  That's correct.
5    Q.  Are you referring to Mark Denari?
6    A.  That's correct.
7    Q.  Let me make that more clear.
8    Are you referring to Mark Denari's wife's funeral?
9    A.  Yes, I am referring to Linda Denari's funeral.
10   Q.  Did you volunteer to obtain a limousine for the
11 funeral?
12   A.  No.
13   The request had -- The request was made of me or to
14 me to secure a limousine by contacting some of those
15 individuals where I work and see if there is a way that
16 I can get a limousine for -- for that event.
17   Q.  Who made that request to you?
18   A.  It had come from Ted Sexton.
19   Q.  Did he say if anyone had asked him to ask you?
20   A.  Excuse me?
21   Q.  Did Ted say that anyone had asked him to ask
22 you to get the limousine, or was the -- did the request
23 originate with Ted?
24   A.  The request originated from Ted.  For -- For
25 whatever reason, Ted volunteered himself to -- to

Page 638

1  coordinate her -- Linda Denari's -- maybe her wake
2  services.
3    And he had then requested that staff or certain
4  staff, he had a special meeting in his office where Mat
5  Connor, Colm Marmion, Amiel Porta, myself, Dan Frazee,
6  Amy Gosslin and other individuals were called in to help
7  coordinate his activities, so much so at the point that
8  he volunteered us all to pay for -- for the majority of
9  the -- of the costs for -- for -- for that event.
10   Q.  Did Ted ask you to get the limousine for free?
11   A.  He asked me -- I -- I specifically asked him
12 Ted, "How would you" -- "Do you want me to get a special
13 rate, or do you want me to see if you can get" -- "get,
14 you know, get it?  Just say" --
15   And he said, "Do me a favor.  See what" -- "See
16 what the best thing you can do is."
17   I then called a limousine company and asked them --
18 I asked them what they can do for me.
19   And he says, "Jose, we can give it to you at this
20 rate" or "We can give it to you for free."
21   I then went back to Ted and said, "Ted, the agency
22 is looking" -- "is" -- "is willing to allocate a vehicle
23 for free as long as we tip the driver.  Would that be
24 okay?"
25   And he said, "Yes.  Go ahead and" -- "and secure

Page 639

1  the vehicle."
2    Q.  Did you tell Ted that the limousine service had
3  also quoted you a rate?
4    A.  It had -- It had given me a -- a rate.  I'm not
5  quite sure what the hourly rate is.  But he had said,
6  "Go secure the vehicle.  See what the best rate is."
7    The response from the limousine company was, "What
8  do you want to pay, or do you want it for free?"
9    Q.  Did you tell Ted that the limousine had quoted
10 you a price for it as well?
11   A.  That -- That was part of the language of
12 whatever you want to pay or you can have it for free.
13   Q.  So you did tell Ted that?
14   A.  Yes.
15   Q.  Which limousine service was it?
16   A.  I -- I don't recall at this time.  I believe it
17 may have been LaCosta Limo.
18   Q.  Do you know who the limousine was for?
19   A.  Yeah.
20   It was for Mark Denari and his immediate family.
21   THE REPORTER:  Denari spelling for the record.
22   THE WITNESS:  D-E-N-A-R-I.
23   MS. McDONOUGH:
24   Q.  Do you know who paid the tip for the limousine?
25   A.  I believe the tip was paid by -- by Dan Frazee,

52 (Pages 636 to 639)

53-611 (216)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY    January 15, 2007    JOSE HERNANDEZ, VOL. III

Page 640

1  I initially and reimbursed by other Airport Authority
2  employees.
3      Q. Did you contribute any money towards the
4  funeral?
5      A. Yes, ma'am.
6      Q. How much did you contribute?
7      A. I believe $150 to the funeral.
8      Q. Did the Denari family pay you back for any
9  money that you contributed?
10      A. No.
11      In fact, Ted Sexton had volunteered us to go in --
12  go in and -- and pay for part of the -- We even had --
13  We even had a quite frank conversation with Ted where I
14  expressed my -- my concerns over volunteering employees
15  to cover those costs.
16      Q. What concerns did you tell Ted?
17      A. Well, if -- if you know Ted, Ted wants to make
18  this big, grandiose ceremony, and the -- the problem is,
19  he has got deep pockets. We all don't. So making his
20  plans, getting the limos, getting flowers, getting
21  music, those all cost money. Those all cost money.
22      He says, "Oh, yeah, at the end of the end we'll" --
23  "we'll split it all between all you guys."
24      And so I said, "Ted, we have" -- "we have
25  individuals in the badging office that maybe make 30-,

Page 641

1  35,000 a year. I mean, do you" -- "are you really going
2  to go to them and ask them for couple hundred bucks
3  because you want to be a big shot and try to coordinate
4  this activity for Mr. Mark Denari? I know you mean
5  well. If you want to, you pay for it yourself."
6      He said, "No, we'll just all figure it out."
7      When the bill finally came, you know, to -- to my
8  horror was, you know, on -- on our part it was, "Hey,"
9  you know, "not only did you help coordinate it, but here
10  is a bill for 150 bucks. I need you to pay me."
11      Initially Amiel said -- Amiel came over to me and
12  said, "Hey, I think your portion is 150 bucks."
13      I said, "That's crazy. 150 bucks for this?"
14      And then immediately he went back, told Ted. Ted
15  called me in the office and said, "You will pay me
16  $150." I had no choice.
17      And it was just -- And so that was the issue
18  that -- that I had with Ted was him volunteering. I
19  mean, he's trying to be a nice guy, but you know, I
20  didn't feel it was right. You want to do it and because
21  you want to feel good, good, you pony up the money. You
22  don't volunteer people to pay -- you know, pay that
23  unless they want to.
24      Q. Who did he volunteer the payment to?
25      A. What he did was -- the most of the -- most of those

Page 642

1  expenses had come to him in terms of invoices and --
2  and -- and such things. And then -- then he would use
3  the funds -- like he -- he -- he kind of paid everything
4  out of his pocket, took all the invoices and then said,
5  "Okay. What's it going to take? What do I need to ask
6  people for to make up" -- "to make up for that?"
7      Q. Do you know the initi- -- initial amount that
8  Ted paid for the funeral expenses?
9      A. No, no, I don't.
10      I -- I also know that there was, you know,
11  additional -- I want to say, you know, another service
12  provider for the Airport Authority, which I for- -- his
13  name escapes me -- had paid for I think either the
14  rosary services or -- or the music at the -- at the
15  mass, something like that.
16      So I --
17      Q. Did --
18      A. -- I don't understand. All I know is -- I
19  don't understand the -- the full number of what it cost,
20  what the contributions are, but all I know is, "You will
21  pay me $150."
22      Q. Do you know if other people from the Authority
23  paid Ted for some of the expenses?
24      A. I -- I believe they did.
25      Q. Do you know anyone specifically who did?

Page 643

1      A. Yeah, the -- the -- the groups from -- from
2  Mat, Colm -- Mat, Colm, Amiel, Dan Frazee, other
3  individuals paid, paid his contributions.
4      Q. Did -- Did everyone pay $150?
5      A. I don't -- I don't know what the exact
6  breakdown was, but I know mine was pretty close. It was
7  over 100, and the number, my guess was right around
8  100 -- 150 bucks.
9      Q. Did Mark Denari request that you pay for a
10  portion of his wife's funeral?
11      A. No.
12      The volunteer came -- The -- The -- The request to
13  volunteer came from Ted Sexton.
14      Q. Did you ever complain to anyone other than Ted
15  about having to pay for the funeral?
16      A. No. Other than my wife? Other than my wife,
17  probably not.
18      You -- You have to understand the dynamics of the
19  Airport Authority, and --
20      MS. CHINN: She would never have allowed it.
21      THE WITNESS: You have to understand the dynamics.
22  There's really not a whole lot of people you could turn
23  to. I mean, who would I go to, Brian? You know, Brian
24  and Ted are usually a conflict. Who am I going to go
25  to, Brian? Brian? Now, normally Brian and Ted are

53 (Pages 640 to 643)

53-611 (217)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY          January 15, 2007                    JOSE HERNANDEZ, VOL. III

Page 644

1  usually in con- -- It's not a whole lot of people you
2  can turn to in there.
3      So, you know, once I bring it to Ted and Ted's
4  attention, who am I going to got to?  Thella said she
5  has an open-door policy, you know.  I -- I would never
6  go to her office.  There's just -- You don't have that
7  sense of having an open-door policy even though she said
8  she does.  It's -- It's just not there.
9      Q.  So is it fair to say that the only person you
10 felt you could ever complain to is Ted?
11     A.  Yeah.
12     Q.  About any issue?
13     A.  About -- Yeah.  He was my immediate supervisor,
14 and I thought that him being what, ten, 11 years at the
15 Airport Authority, that -- you know, and I respected the
16 chain of command that he is the guy that should do it.
17     Q.  Did you feel it was wrong to ask the limousine
18 service for a limousine for the funeral?
19     A.  You know, initial -- I didn't think it was
20 wrong.  Otherwise -- I -- I thought that -- that by Ted
21 saying it was okay, that's why he got the options.
22 "What do you want to pay for it, or do you want to get
23 it?"
24     You know, going to Ted and saying, "Hey, here
25 is" -- "here is the deal," you know, "What do you want

Page 645

1  to do?"
2      And him saying, "It's okay to get it for free."
3  I -- I didn't think there was a problem.  It was a
4  simple -- simple request.  I said yeah, I didn't -- I
5  didn't think at that time that was -- there was an
6  issue.
7      Q.  Did you --
8      A.  Once again, there is -- there is practice and
9  there is policy.
10     Q.  Did you ever complain to anyone about having to
11 obtain the limousine?
12     A.  No.
13     The only gripe I had at the end was that after all
14 that -- all that effort -- all that effort in -- in not
15 only paying but helping to coordinate that, never once
16 did we get a thank you from Mark Denari, not that we
17 expected it, but never a -- a thank you for all your
18 support.
19     Q.  You indicated that there was some sort of a
20 conflict between Brian Anderson and Ted Sexton?
21     A.  Absolutely.
22     Q.  What kind of a conflict?
23     A.  There was -- I'm going to say, for lack of a
24 better word, there was a little bit of a power struggle
25 between Ted and Brian, of which it was clearly known

Page 646

1  that -- that Brian had -- had more control or -- or had
2  the ear of Thella.
3      Q.  How did that conflict manifest itself?
4      A.  What -- What happened was, there would always
5  be -- or -- or on many occasions, Brian would take it --
6  you know, take an opportunity to look at ways to
7  discredit airport operations, which is -- which is our
8  staff, where she would go -- where he would go through
9  without informing Ted and go on walk-throughs to the
10 airport -- through the airport property and point out --
11 you know, point out construction projects that were
12 going on as if they were his construction projects or
13 through his sponsorship, or also take opportunities to
14 point out maybe errors of deficiency.
15     They were calculating on when he would do it.
16 Obviously, you know that -- you know, around
17 11:00 o'clock, 1:00 o'clock there is a huge mass of
18 people that leave the airport.  It -- It would be
19 hard -- It would be hard to keep it 100 percent clean at
20 that particular time, although if you would go back in
21 an hour, it would clean itself up.
22     But he would go at particular times with Thella,
23 "Hey, Thella, let's go for a walk-through" and then make
24 it a point to point out issues that weren't related to
25 his area of responsibility in an effort to thrash that.

Page 647

1      Q.  Do you believe there was anything unlawful or
2  illegal about the conflict between Brian and Ted?
3      A.  I wouldn't say unlawful, unlegal.  I just --
4  you know, just -- just kind of rat like.
5      MS. CHINN:  Mickey Mouse with gloves --
6      THE WITNESS:  No, like -- like --
7      MS. CHINN:  -- or real rats, sewer rats?
8      THE WITNESS:  No, like can of -- I mean, my -- the
9  best way is just kind of rat like, just someone trying
10 to RF another person.
11     MS. McDONOUGH:
12     Q.  RF?
13     A.  Yes, rat --
14     MS. CHINN:  You know --
15     MS. McDONOUGH:  On that note, I think we can
16 conclude for today.  I have one more --
17     MS. CHINN:  Uh-huh.
18     MS. McDONOUGH:  -- day.  I think we'll finish
19 tomorrow, but we'll reconvene tomorrow at 9:30.
20     And I'll have the same stipulation.
21     MS. CHINN:  Yep.
22     VIDEO OPERATOR:  This is the end of Videotape 3,
23 and this concludes Volume III in the videotaped
24 deposition of Jose Hernandez.
25     We are off the record at 4:22 p.m. on

54 (Pages 644 to 647)

JOSE HERNANDEZ vs. SAN DIEGO COUN...    January 15, 2007    JOSE HERNANDEZ, VOL. III

Page 648

1  December 20th, 2006.
2      (By instruction of counsel, the reporter has
3  redacted the following stipulation from Volume I of the
4  deposition of JOSE DE JESUS HERNANDEZ as reproduced
5  below:)
6      That the court reporter will prepare a transcript
7  of today's proceedings and send the original to
8  Ms. Chinn;
9      That Ms. Chinn will give it to Mr. Hernandez, and
10 he will have 30 days after receipt to review the
11 transcript and to make any changes, sign it under
12 penalty of perjury;
13     That Ms. Chinn agrees to notify counsel of
14 Mr. Hernandez's signature and of any changes that are
15 made to the transcript within that 30-day period.
16     That in the event that the original transcript is
17 lost or destroyed, it is agreed that a certified copy
18 may be used in lieu thereof;
19     And that Ms. Chinn agrees to make the original
20 transcript available at any proceeding upon reasonable
21 notice.)
22     (The proceedings concluded at 4:22 p.m.)
23     (Signature on following page.)
24                      ***
25

Page 649

1      I declare under penalty of perjury under the laws
2  of the State of California that the foregoing is true
3  and correct.
4
5      Executed at _____, California,
6  on _____
7
8
9      _____
        JOSE DE JESUS HERNANDEZ
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 650

1  STATE OF CALIFORNIA ) ss
2
3      I, Delia M. Satterlee, CSR 9114, do hereby declare:
4
5      That, prior to being examined, the witness named in
6  the foregoing deposition was by me duly sworn pursuant
7  to Section 2093(b) and 2094 of the Code of Civil
8  Procedure;
9
10     That said deposition was taken down by me in
11 shorthand at the time and place therein named and
12 thereafter reduced to text under my direction.
13
14     I further declare that I have no interest in the
15 event of the action.
16
17     I declare under penalty of perjury under the laws
18 of the State of California that the foregoing is true
19 and correct.
20
21     WITNESS my hand this _____ day of
22 _____, 200___.
23
24
      _____
25 Delia M. Satterlee, CSR 9114

55 (Pages 648 to 650)

53-611 (219)

# Deposition of

# JOSE HERNANDEZ, VOL. IV

## JOSE HERNANDEZ v. SAN DIEGO COUNTY

*Taken On*
*December 21, 2006*

Transcript provided by:

**HUTCHINGS**℠
**COURT REPORTERS, LLC**
CSR 649

GLOBAL LEGAL SERVICES

**800.697.3210**

JOSE HERNANDEZ vs. SAN DIEGO COUNTY          December 21, 2006          JOSE HERNANDEZ, VOL. IV

---

**Page 653**

```
1
2                          CERTIFIED COPY

3        SUPERIOR COURT OF THE STATE OF CALIFORNIA

4              FOR THE COUNTY OF SAN DIEGO

5    JOSE HERNANDEZ,              )
                                  )
6         Plaintiff,              )
                                  )
7    vs.                          ) No. GIC871979
                                  )
8    SAN DIEGO COUNTY REGIONAL AIRPORT  )
     AUTHORITY, a public entity; and    )
9    DOES 1 through 12 inclusive,       )
                                         )
10        Defendants.             )
                                  )
11   _____)
12
13              VOLUME IV
14   DEPOSITION OF JOSE DE JESUS HERNANDEZ, the
15   plaintiff herein, noticed by PAUL, PLEVIN,
16   SULLIVAN & CONNAUGHTON LLP, at 401 B Street,
17   San Diego, California, at 10:29 a.m., on Thursday,
18   December 21, 2006, before Delia M. Satterlee,
19   CSR 9114.
20
21
22        Hutchings Number 147404-SD
23
24
25
```

```
1                          I N D E X
2    WITNESS: JOSE DE JESUS HERNANDEZ
3    EXAMINATION BY:                      PAGE
4    Ms. McDonough                    654
5
6
7                      E X H I B I T S
8    Exhibit identification within the transcript is flagged
     with "[EXH]" as an identifier.
9
10   DEFENSE  DESCRIPTION         IDENTIFIED  MARKED
11   21     San Diego County Regional    672      672
            Airport Authority Codes,
12          Article 2, Part 2.0,
            Section 2.10
13          [EXH-21]
14   22     One sheet of handwritten     850      850
            and typed notes from
15          Dr. Berger
            [EXH-22]
16
17
18
19
20
21
22
23
24
25
```

---

**Page 652**

```
1    APPEARANCES OF COUNSEL:
2
3    For Plaintiff:
4    LAW OFFICE OF CATHRYN CHINN
5    BY CATHRYN CHINN
6    3990 Old Town Avenue, Suite A-109
7    San Diego, California 92110
8
9    For Defendant SAN DIEGO COUNTY REGIONAL AIRPORT
10   AUTHORITY:
11   PAUL, PLEVIN, SULLIVAN & CONNAUGHTON LLP
12   BY SANDRA L. McDONOUGH
13   401 B Street, 10th Floor
14   San Diego, California 92101
15
16   For Defendant SAN DIEGO COUNTY REGIONAL AIRPORT
17   AUTHORITY:
18   AMY GONZALEZ, Senior Assistant General Counsel
19   P.O. Box 82776
20   San Diego, California 92138-2776
21
22   Also Present:  JAMES SOEFFNER, Video Operator
23
24
25
```

---

**Page 654**

```
1        VIDEO OPERATOR:  Good morning.  My name is James
2    Soeffner.  This is the beginning of Videotape Number 1,
3    Volume IV on December 21st, 2006.  The time is
4    10:29 a.m.
5        Would Counsel please identify yourselves and state
6    whom you represent.
7        MS. CHINN:  Cathryn Chinn, C-H-I-N-N, for the
8    plaintiff, who is --
9        THE WITNESS:  Jose Hernandez.
10       MS. McDONOUGH:  Sandra McDonough for defendant.
11       MS. GONZALEZ:  Amy Gonzalez for defendant.
12       VIDEO OPERATOR:  Thank you.
13       Would the reporter please reswear in the witness.
14
15            JOSE DE JESUS HERNANDEZ,
16   the plaintiff herein, having been resworn, testifies
17   further as follows:
18
19               -EXAMINATION-
20
21   BY MS. McDONOUGH:
22   Q.  Good morning, Mr. Hernandez.
23   A.  Good morning.
24   Q.  Is there any reason why you cannot give your
25   best testimony today?
```

1 (Pages 651 to 654)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY          December 21, 2006                    JOSE HERNANDEZ, VOL. IV

Page 655

1    A. No.
2    Q. Have you taken any medication or consumed any
3  drugs or alcohol in the last 24 hours that would affect
4  your ability to testify today?
5    A. No.
6    Q. For any reason you feel that you cannot give
7  your best testimony, please let me know, and we'll
8  suspend the proceedings today; okay?
9    A. Okay.
10    Q. And you realize that you are under penalty of
11  perjury, and the same ground rules that we talked about
12  the very first day apply today as well; correct?
13    A. That is correct.
14    Q. In your complaint, you allege that Thella
15  Bowens and Ted Sexton asked you to ship meat for the
16  barbecue and that this violated the ethics code; is that
17  true?
18    A. They didn't ask me directly to ship the meat.
19  They asked for the range -- for me to arrange the
20  shipment of meat.
21    Q. Who specifically asked you to ship meat?
22    A. Ted Sexton.
23    Q. What did he say?
24    A. Ted Sexton asked me to make arrangements to
25  have ship flown out from Thella's favorite restaurant,

Page 656

1  Angelo's, in Dallas/Fort Worth, and to figure out a way
2  that I can get that shipped -- that -- the meat shipped
3  out for free as we had in the past.
4    Q. And this is for the annual employee barbecue?
5    A. For Thella's Texas barbecue.
6    Q. Is this the same barbecue that we discussed
7  yesterday in relation to the ice cream?
8    A. Yes, ma'am.
9    Q. On how many occasions did Ted Sexton ask you to
10  arrange for the shipment of the meat for the barbecue?
11    A. On three separate occasions.
12    Q. Three separate years?
13    A. Three secutive -- consecutive years.
14    Q. Starting with what year?
15    A. 2003, 2004, 2005.
16    Q. We established yesterday that the barbecue was
17  sometime in the September time frame?
18    A. Approximately, yeah.
19    Q. Did you follow Ted's instruction regarding the
20  arranging for the shipping of the meat?
21    A. Yes, I did.
22    Q. What did you do?
23    A. Ted -- Ted had called me into his office and
24  asked me if I could once again, at Thella's direction,
25  coordinate the shipment of meat from Angelo's and to

Page 657

1  make contact with Southwest Airlines and make it all
2  happen.
3    Q. Did you do that?
4    A. Yes, I did.
5    Q. Who did you call at Southwest Airlines?
6    A. I called Mike Parrish, who was an airline
7  station manager for Southwest Airlines on the first two
8  years. The last year was Cheryl Black.
9    Q. What did you ask Mike Parrish to do?
10    A. I asked -- I asked Mike Parrish if he -- if it
11  would be possible to once again fly out the meat on a
12  Southwest Airlines flight. Thella was having her annual
13  barbecue, and she had requested if he can -- if he could
14  once again fly the meat out on -- on his airline.
15    Q. And what did Mike Parrish say?
16    A. Mike Parrish said at Thella's request he would.
17    Q. Did Mike tell you that there would be a charge
18  for shipping the meat?
19    A. No.
20    The communication was could you go ahead and fly
21  that meat out as CO-MAT, which would be company
22  material, at no charge.
23    Q. Who gave you that instruction?
24    A. The instructions from Ted were we need to go
25  ahead and get that meat flown out again. We don't have

Page 658

1  a budget to fly the meat out, and if we did, it would
2  just be -- it would be so cost prohibitive that we would
3  not be able to have the barbecue.
4    Q. Do you know who's invited to the barbecue each
5  year?
6    A. I believe only Airport em- -- Airport Authority
7  employees are allowed -- are allowed to attend the
8  barbeque, and a select few outsiders that Thella and
9  only Thella had the authority to invite.
10    Q. Are the outsiders from any of the airlines?
11    A. No.
12    Q. Do you know who paid for the meat?
13    A. The meat were -- The meat was paid primarily by
14  executive management.
15    Q. Did you ever contribute towards the meat?
16    A. Yes, I did.
17    Q. How much did you contribute in 2003?
18    A. I believe -- I believe the minimum that I've
19  ever contributed was about 50 -- in the 50 to $75 range.
20    Q. What's the maximum that you've ever contributed
21  to the barbeque?
22    A. Maybe right around the 50 to the $100 range.
23    Q. Did you start contributing after you became a
24  director?
25    A. No, I -- I had been contributing even back when

2 (Pages 655 to 658)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY        December 21, 2006        JOSE HERNANDEZ, VOL. IV

Page 659

1  I was a manager.
2      Q.  Did you contribute every year that you were
3  employed with the Authority?
4      A.  I believe I did.
5      Q.  And did this barbecue also occur when the
6  Port -- when you were an employee of the Port?
7      A.  I believe it did, yes, ma'am.
8      Q.  Did you contribute at that time as well?
9      A.  I -- I don't recall, but I believe I did.
10     Q.  Do you know if Thelia knew that the meat was
11 being shipped at no charge?
12     A.  Absolutely.
13     Q.  How do you know that?
14     A.  She knew it.  It was part of -- It was part of
15 the briefing that Ted would give to her.  She would be
16 presented with the budget.  Ted would -- Ted would go
17 through line item by line item on what it is that we're
18 going to do, the setup, where it was going to be.
19     She would be involved in the initial meeting or the
20 initial setup meeting for the Texas barbecue, just so we
21 understood dates, times, places, because obviously
22 that -- the date of -- the date and time of the barbecue
23 always had to coincide with her calendar.
24     Q.  And so you believe that she knew about the cost
25 of the shipping through the briefings?

Page 660

1      A.  I would -- I would testify that there would be
2  a -- it would be impossible for her not to know that the
3  meat was flown out for free.
4      Q.  Why would that be impossible?
5      A.  Because it was common knowledge throughout the
6  Airport Authority that the requests would go through
7  Southwest Airlines for the shipping of meat for free.
8      Q.  And did Cheryl Black agree to ship the meat as
9  CO-MAT in 2005?
10     A.  Yes, she did.
11     Q.  Do you know whether Southwest flew the meat out
12 this year as CO-MAT in 2006?
13     A.  Not being involved in the -- with the Airport
14 Authority, I -- I could not even venture to guess on
15 that.
16     Q.  Do you know if Southwest ever allows companies
17 or other entities to fly items out CO-MAT?
18     A.  I'm -- I wouldn't be able to -- to respond to
19 that question.
20     Q.  You don't have any knowledge either way?
21     A.  I don't have any knowledge either way.
22     Q.  Are you aware that members of the public can
23 pay for an airline to ship boxes or other packages in
24 their luggage compartments?
25     MS. CHINN:  Objection.  It lacks a foundation.

Page 661

1      Go ahead and answer if you can.
2      THE WITNESS:  No, I -- I believe you're
3  contradicting what you're asking.  Could you please
4  clarify, because I'm not sure -- I'm not sure you're
5  asking what you think you're asking.
6      MS. McDONOUGH:
7      Q.  Are you aware that members of the public can
8  pay an airline to ship packages or other boxes or
9  anything on -- on the airline?
10     For instance, instead of bringing luggage with you,
11 you could pay an airline to ship something and have
12 someone come to the airport and pick it up?
13     A.  Yeah, that would be referred as cargo.
14     Q.  So you're aware that members of public can do
15 that?
16     A.  Select members of the public.
17     Q.  Who are the select members of the public?
18     A.  What you have -- There's -- Depending on who
19 your shippers are, you either have to be a known shipper
20 or you have to fall within a certain criteria to be able
21 to do that.
22     But -- But this particular case with the shipment
23 of meat, we had to qualify or work with Angelo's to
24 qualify them as a known shipper.
25     Q.  If the Authority had been shipping the meat as

Page 662

1  cargo, do you know how much that it would have cost?
2      A.  It was approximately 235 to 250 pounds at about
3  $10 approximately a pound.  It would have been at least
4  2500 to $3,000 to ship that meat out.  Those were rough
5  numbers that were given to me.
6      Q.  Who gave you those numbers?
7      A.  Just on rough numbers from Mike Parrish, the
8  airline station manager.
9      Q.  Do you know if any employees from Southwest
10 were invited to attend Thelia's barbecue in any year?
11     A.  Absolutely not.
12     In fact, that was an issue of content with
13 Southwest Airlines that -- that Thelia would impose
14 herself on asking her -- asking them to use her
15 airline -- or their airline to ship the meat out, and
16 she didn't even have the courtesy to invite them to
17 the -- to the barbecue.
18     Q.  Who -- Who expressed that unhappiness to you?
19     A.  Mike Parrish, the airline station manager.
20     Q.  Did anyone else tell you that they were unhappy
21 that they were not invited to the barbecue?
22     A.  There were several airline station managers who
23 had expressed that feeling as well, understanding that
24 they -- they somehow contribute to that -- to that event
25 as part of their rates and charges.

3 (Pages 659 to 662)

53-611 (223)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY    December 21, 2006    JOSE HERNANDEZ, VOL. IV

Page 663

1 Q. What other station managers had expressed
2 unhappiness with you?
3 A. Specifically, there was -- Specific names I'm
4 not sure, but there was comments bantered around during
5 the Lindbergh airport managers council meeting that
6 would immediately follow that -- those barbecue
7 functions.
8 Q. Did you see the invitation list every year from
9 2003 to 2005 for the barbecue?
10 A. No, I did not.
11 That -- That invitation list, other than Airport
12 Authority employees, was -- was held, I don't know,
13 maybe not in secret, but held in confidence by -- by
14 Thella and Ted. Only they can -- they can make the --
15 the additional parties list of who were invited to come
16 to the event.
17 Q. Would you say that all of the employees who
18 attended the barbecue benefited from the shipping of the
19 meat?
20 A. Not -- No, I would say no.
21 Q. Who would you say benefited from the shipping
22 of the meat on CO-MAT?
23 A. Those who ate it.
24 Q. Did you have any other involvement in arranging
25 for the meat to come to the barbecue other than what

Page 664

1 you've already testified about?
2 A. No, I had complete involvement from putting
3 together the schedules, the flight schedules;
4 Meeting the plane as it arrived in San Diego;
5 Taking them -- taking the meat up to the -- the
6 third floor, kitchen area;
7 Cutting up the meat;
8 Putting it back in tins;
9 Finding a secure place to hold the meat, either
10 with host concessions or sky chefs who were there at --
11 at 2003;
12 And also arrangement for the warming up of the
13 meat, the delivery of the meat, and then the storing of
14 the meat. So complete involvement in -- in that whole
15 process.
16 Q. You personally did all of those things that you
17 just listed?
18 A. I -- Personally I was involved along with --
19 along with others, but personally I was involved in --
20 in -- in portions of all those functions.
21 Q. Do you have an understanding of how the meat
22 got from Angelo's to the airport and onto the Southwest
23 airline?
24 A. Yes, I do.
25 Q. How did that happen?

Page 665

1 A. What we would -- What Ted would do would
2 coordinate with -- would coordinate with Angelo's to
3 have the meat cooked the night before, and they would
4 ship it in bulk.
5 And one of their drivers, Skeeter, and believe me,
6 that's a real name, Skeeter, would go ahead and drive
7 that name down to -- to Southwest cargo.
8 Southwest cargo would then go ahead and --
9 Southwest cargo at -- in -- in Dallas Hobe Air -- no,
10 Dallas -- in Love Field -- excuse me -- would send it to
11 Love Field.
12 MS. CHINN: Excuse me?
13 THE WITNESS: Love.
14 MS. CHINN: Oh, Love.
15 THE WITNESS: Love Field.
16 And then that may -- would be accepted as Southwest
17 Airlines company material. This way it would exempt --
18 that would exempt Angelo's from having to go through the
19 no-shipper qualifications, and the meat would then get
20 shipped over as Southwest Airlines company material and
21 eventually arrive in San Diego.
22 MS. McDONOUGH:
23 Q. Did you ever tell Ted that you didn't want to
24 be in charge of getting the meat out from Texas to the
25 barbecue?

Page 666

1 A. No.
2 I -- At that particular time I didn't -- I
3 didn't -- you know, understanding practice, really I
4 didn't understand or didn't believe there was anything
5 wrong with that at that time.
6 Q. And that was an every year --
7 A. It -- It -- That practice had occurred even
8 before I arrived at the Airport Authority.
9 Q. So at no time in 2003, 2004 or 2005 did you
10 believe there was anything wrong with arranging for the
11 meat to be shipped CO-MAT?
12 A. Not particular to the arranging of the meat as
13 CO-MAT, but as the known shipper requirements changed,
14 there was some expression of -- of -- of hesitation with
15 Ted whether it would be okay.
16 And, you know, if I personally would have any
17 liabilities by -- by shipping that meat as -- as CO-MAT
18 with Southwest Airlines. He said, "Hey, if they're okay
19 doing it, then don't worry about it."
20 Q. And once Ted said if they're okay, don't worry
21 about it, you felt okay as well?
22 A. Yes, I did.
23 Q. When did the shipper requirements change?
24 A. Probably 2000 -- Maybe 2004.
25 The difference -- The differences you alluded to

4 (Pages 663 to 666)

53-611 (224)

Page 667

1    was, there was a time where anyone can go up to -- to a
2    cargo, say, "This is" -- "This is what I want to ship.
3    Go ahead and ship it."
4         But then those requirements changed, and in -- in
5    order to ship materials or any cargo in excess of some
6    number, you had to qualify yourself as a known shipper.
7    That's why a lot of -- lot of the airlines now don't --
8    have either closed or reduce their -- the -- their
9    acceptance of walk-up cargo at their facilities.
10        Q.  Did you ever communicate to -- to anyone
11   outside the Authority that you did not want to be
12   involved in asking Southwest to ship the meat out?
13        A.  I don't believe I -- I don't believe I ever
14   expressed that to Southwest that I didn't want to be
15   involved.  It was a directive that was given to me by my
16   direct supervisor, and as a result I felt I had to -- I
17   had to do it.
18        Q.  And you never said to anyone, not just at
19   Southwest but even at the Authority, that you didn't
20   want to be involved in arranging for the meat to be
21   shipped out?
22        A.  No.
23        Who -- Who would I tell?
24        Q.  Did you ever go to Ruth Chris Steak House with
25   people from Hawaiian Airlines in 2003?

Page 668

1         A.  I believe I may have, yes, ma'am.
2         Q.  Who did you go with?
3         A.  We had met -- It was Amiel Porta, myself.  We
4    met Janet Nix, one of her employees, and Blaine
5    Miyasato, who is their vice president of customer
6    service.
7         Q.  For Hawaiian Air?
8         A.  Yes, ma'am.
9         MS. CHINN:  Do you want to spell Blaine's last
10   name, please, for the record.
11        THE WITNESS:  Blaine -- M-I-Y-A-S-A-T-O, I believe.
12        THE REPORTER:  What's the first name?
13        THE WITNESS:  Blaine, B-L-A-I-N-E.
14        THE REPORTER:  Thank you.
15        MS. McDONOUGH:
16        Q.  Was there a stated purpose for that dinner?
17        A.  Yeah.
18        Jan- -- It wasn't a dinner initially.  What -- What
19   Janet had asked us to do, meaning Amiel and I, if we can
20   stop by and meet with her boss just to say hi.
21        We said, "Okay.  We'll stop by.  We'll" -- you
22   know, "We'll buy you guys a couple of drinks," meaning
23   to Janet.  And then while we were there, Blaine had
24   invited us to go ahead and sit down with them for
25   dinner.

Page 669

1         Q.  Did you end up buying any of the employees from
2    Hawaiian Airlines some drinks?
3         A.  Yes, we -- we had bought a couple of rounds of
4    drinks before -- before we sat down for -- for dinner.
5    In fact, our intent of going there wasn't to sit down,
6    wasn't to go to dinner other than just have a drink or
7    two with them while we met Blaine.
8         Q.  Did you submit ex- -- expense reports for those
9    drinks?
10        A.  I don't believe I did.
11        Q.  Who paid for dinner?
12        A.  I'm not sure who paid for dinner.
13        Q.  Did you pay for dinner?
14        A.  No, because I -- all I did was have the
15   continuation of the drinks that I had at the bar, and I
16   don't remember what -- what I may or may not have eaten.
17        Q.  Do you know if Amiel paid for dinner?
18        A.  I'm not sure.
19        Q.  Are you aware that the Authority has an ethics
20   code?
21        A.  Yes.
22        Q.  When did you first become aware of the ethics
23   code?
24        A.  I believe there was a presentation that you've
25   shown me before on -- you know, on -- on a presentation

Page 670

1    that was given to employees.
2         Q.  When was the presentation given?
3         A.  Exact date I'm not sure.
4         Q.  Was there any sort of a presentation given when
5    the Authority became your employer?
6         A.  I don't remember at this time, don't recall.
7         Q.  If you wanted to look at a portion of the
8    ethics code while you were an employee of the Authority,
9    did you know where you could find it?
10        A.  Not -- At this time, I'm sure if I wanted to
11   find it, maybe go down to Tony Russell's office.  Maybe
12   it was available at that time, yes, ma'am.
13        Q.  Are you aware that the ethics code's available
14   on the Internet?
15        A.  On the Internet?
16        Q.  Yes.
17        A.  If -- At this time, I - I'm not sure.
18        Q.  Were you ever aware of that?
19        A.  It's -- It -- It may have been, but not -- not
20   quite sure.
21        Q.  Do you have any memory of reading the ethics
22   code at any time?
23        A.  No specific memory of having to sit down and
24   reading that -- that documentation, no, ma'am.
25        Q.  Are you aware that there is an ethics code

5 (Pages 667 to 670)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY          December 21, 2006          JOSE HERNANDEZ, VOL. IV

Page 671

1    regarding receipt of benefits?
2        A. I believe those were explained to me during the
3    investigation, yes, ma'am.
4        Q. Is that the first time that you ever knew about
5    the ethics code having a receipt-of-benefits policy?
6        A. I -- I wouldn't recall at this time when
7    exactly the first time it was presented to me.
8        MS. CHINN: I'll object to the use of the word
9    "policy."
10       MS. McDONOUGH:
11       Q. Had anyone ever told you, during your
12   employment with the Authority, that you could not accept
13   a gift or a benefit from any entity that was doing
14   business with the Authority?
15       MS. CHINN: I will object as vague and ambiguous as
16   to accept any gift from any agency, because that calls
17   for a legal conclusion and is not what the code says.
18       THE WITNESS: I don't know.
19       THE REPORTER: Did you say "I don't know"?
20       THE WITNESS: Yeah.
21       MS. McDONOUGH:
22       Q. Did you ever have a conversation with Ted
23   Sexton about whether or not the -- an airline could
24   purchase gifts for you or take you to lunch or pay for
25   other benefits for you?

Page 672

1        A. I don't believe I ever had that conversation
2    with Ted.
3        MS. CHINN: Excuse me. I'm going to object as
4    vague and ambiguous.
5        Are you talking about a conversation occurring
6    during his employment or when he was being terminated?
7        MS. McDONOUGH: I'm asking at any time.
8        MS. CHINN: Okay.
9        Then that's a broader question. I don't know if
10   there's an answer to that or not.
11       MS. McDONOUGH:
12       Q. Did you need to change your answer?
13       A. No, not at this time.
14       MS. McDONOUGH: We'll mark as Exhibit 21 a
15   San Diego County Regional Airport Authority ethics code,
16   Prohibited Receipt of Benefits. [EXH-21]
17       (Whereupon the document referred to is marked by
18   the reporter as Defense Exhibit 21 for identification.)
19       MS. McDONOUGH:
20       Q. I want you to take a look at what I've just
21   marked as Exhibit 21.
22       A. Okay.
23       Q. And let me know if you've ever seen this code
24   before.
25       A. (Indicating.)

Page 673

1        MS. CHINN: Can you identify for the record which
2    section of the ethics code this is, Counsel.
3        MS. McDONOUGH: Section 2.10.
4        MS. CHINN: And as you refer to the exhibit, would
5    you please identify specifically which part you're
6    addressing.
7        MS. McDONOUGH: Sure.
8        Q. So my first question is just whether you've
9    seen this code section before.
10       A. I believe I may have.
11       Q. When is the first time that you saw this code
12   section?
13       A. I don't recall.
14       Q. Can you recall the year?
15       A. Don't -- I don't recall when -- when the first
16   time I saw this was.
17       Q. Under Section (b)(3) --
18       A. (B)(3) (indicating).
19   Okay.
20       Q. -- it references "one-half the amount of gifts
21   permitted under the California Political Reform Act."
22       A. Okay.
23       Q. Do you know what amount that refers to?
24       A. No, I do not.
25       MS. CHINN: Objection; calls for a legal

Page 674

1    conclusion.
2        MS. McDONOUGH:
3        Q. Did you ever know what amount that referred to?
4        MS. CHINN: Don't disclose anything that you
5    learned during attorney-client conversation.
6        THE WITNESS: No.
7        MS. McDONOUGH:
8        Q. Those are all the questions I have about that
9    code.
10       A. Okay.
11       Q. In your complaint, you allege that other people
12   at the Authority received similar benefits as to the
13   ones that you were accused of receiving, but those
14   employees were not terminated --
15       A. Correct.
16       Q. -- is that true?
17       A. That's correct.
18       Q. Have you told me about all of the similar
19   benefits that you believe other employees received?
20       A. The specif- --
21       MS. CHINN: Let me --
22       THE WITNESS: I'm sorry.
23       MS. CHINN: -- put the objection on the records.
24   Thank you.
25       THE WITNESS: Okay.

6 (Pages 671 to 674)

53-611 (226)

Page 675

1    MS. CHINN: It's overbroad, vague and ambiguous,
2 calls for a narrative and may not be able to be answered
3 without specific reference.
4    But please give it your best answer.
5    THE WITNESS: Yeah. Okay.
6    It would be pair -- It would be pretty fair to
7 assume that if other individuals are subjected to the
8 same amount of investigation that I -- that I was, that
9 you would be able to find multiple employees who engaged
10 in similar activity up to the extent -- in addition to
11 what I have outlined in my -- in my suit.
12    MS. McDONOUGH:
13    Q. Are there any additional instances of which you
14 are aware that we haven't already talked about where
15 other people at the Authority received similar benefits
16 as to the ones that you were accused of receiving?
17    A. I believe -- I believe specifics to be able to
18 tell you, I would not be able to. But if you conducted
19 similar investigations on individuals, I believe -- of
20 all individuals in the same manner that you -- that I
21 was investigated, I'm sure you will find multiple people
22 upon multiple people who had similar if not more
23 egregious, you know, as you term it, same -- same --
24 same as I was accused.
25    Q. Have you told me about --

Page 676

1    MS. CHINN: Excuse me.
2    If you are unable to recall at this time other
3 specific instances --
4    THE WITNESS: Uh-huh.
5    MS. CHINN: -- would you so state.
6    THE WITNESS: Okay.
7    MS. CHINN: And if you do know for a fact that
8 there are other specific instances, I would like you to
9 answer that question. And if you need time to think
10 about it and come back to it, you will be allowed that
11 time.
12    THE WITNESS: Okay.
13    MS. CHINN: Is that correct, Counsel?
14    MS. McDONOUGH: Absolutely.
15    THE WITNESS: Okay.
16    We'll come -- I -- I will think of it and try to
17 get some details, and we'll -- before these proceedings
18 end, and I'll -- we'll get back to that, if that's okay.
19    MS. McDONOUGH:
20    Q. That's fine.
21    Would it be helpful to take a break right now?
22    A. No, if we can continue, and I'll just think
23 as -- as we're going along.
24    MS. CHINN: Look, nobody gave you permission to
25 think during this depo. You're not here for that.

Page 677

1 You're here to answer those questions. You think on
2 your own time.
3    THE WITNESS: Okay.
4    MS. McDONOUGH:
5    Q. Are you aware of Mike Parrish providing
6 Southwest Airline tickets or buddy passes to anyone else
7 aside from you and possibly Theila Bowens' sister as
8 we've already discussed?
9    A. I'm unaware. I'm unaware of specific incidents
10 where -- where he might have, but probably so.
11    Q. Why do you say "probably so"?
12    A. Because he had mentioned -- he had mentioned to
13 me that others ask him for passes, and he doesn't have a
14 problem giving them -- giving those passes to them.
15    Q. Did he ever tell you who else asked for passes?
16    A. No, never ask -- never -- never -- never caused
17 concern to me, to figure out who it was that might have
18 received those passes.
19    Q. Have you ever asked anyone else at the
20 Authority if they have received passes from Mike
21 Parrish?
22    A. No.
23    Q. Do you know who Terry Benevides is?
24    A. Uh-huh.
25    Terry Benevides is the airline station manager for

Page 678

1 Aloha Airlines.
2    Q. Do -- Is that a male or female?
3    A. That's a male.
4    Q. Has -- Are you aware of him giving free tickets
5 to any Authority employees?
6    A. I believe he has.
7    Q. Who do you believe he's given tickets to?
8    A. I believe he was asked to issue tickets -- to
9 issue tickets on some similar raffles. I believe he may
10 have given tickets to Bryan Enarson to fly on his -- on
11 his airline.
12    And I believe Terry Benevides also assisted me in
13 making some seat changes for Mayor Morris Vance when him
14 and his family were flying out to -- to Hawaii on a
15 family trip.
16    THE REPORTER: Benevides spelling for the record,
17 please.
18    THE WITNESS: Let me spell that one (indicating).
19 B-E-N-E-V-I-D-E-S.
20    THE REPORTER: Thank you.
21    MS. McDONOUGH:
22    Q. Do you know what raffles Terry might have
23 provided tickets for?
24    A. Not specifically, but I -- I understand that --
25 that it was a -- it was kind of a big issue when he did.

7 (Pages 675 to 678)

53-611 (227)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY         December 21, 2006                    JOSE HERNANDEZ, VOL. IV

Page 679

1  Once again, those -- those tickets that were provided
2  were space-available tickets when the person who won
3  those tickets wasn't able to -- to get on a flight, that
4  they became rather agitated.
5       Ted Sexton became involved, wrote a ticket to
6  Terry, which in turn had to —
7       MS. CHINN:  He wrote a ticket?
8       THE WITNESS:  No.  I'm sorry.  He wrote a letter
9  requesting that those space-available tickets be
10  replaced by positive-space tickets on his airline.
11      MS. McDONOUGH:
12      Q.  What year was this?
13      A.  I believe it was 2005.
14      Q.  Do you know approximately the time of year in
15  2005?
16      A.  No, I don't.
17      Ted Sexton would probably be able to answer that
18  more specifically since he's the one that wrote the
19  letter to Terry Benevides.
20      MS. CHINN:  Can we go back.  Would you tell me
21  which airline it was, please, that Terry Benevides was
22  station manager for.
23      MS. McDONOUGH:  It's Aloha Airlines.
24      MS. CHINN:  I know it was.
25      THE REPORTER:  Yeah, I think it is, but you want me

Page 680

1  to still go back?
2       MS. CHINN:  Yeah.
3       (The record is read by the reporter.)
4       (A discussion is held off the record.)
5       MS. CHINN:  Thank you very much.
6       MS. McDONOUGH:
7       Q.  You said that you understood that the
8  space-available tickets were kind of a big issue because
9  it was only space available and not an actual ticket
10  that could be used on any flight.
11      Who did you gain that understanding from about the
12  issue that was created by it?
13      A.  It was brought to my attention by -- by some of
14  the other airline station managers who couldn't believe
15  that it was brought to that level.
16      The one thing to understand about space- --
17  space-available tickets, they carry no value.  They're
18  not worth anything.  They're not worth anything if the
19  space isn't available on a flight.
20      So it's kind of a risk, and that's why they -- some
21  airlines don't mind giving them, even as courtesies.
22  It's not worth anything to them because if the seats are
23  there, they'd rather have it full.  If it's not there,
24  they didn't lose any money.
25      So in this particular case, when the person who won

Page 681

1  the raffle was trying to get on the flight, they
2  couldn't get on the flight because all the seats were
3  available.
4       Q.  Which station managers told you that this was a
5  big deal?
6       A.  It was just through — through -- through word
7  specifically.  I don't -- I don't recall, but I do
8  understand that it was a port- — it was -- it was kind
9  of briefed in -- in quick summary in the airline -- in
10  the airline station manager's portion of an L.A.M.C.
11      They didn't understand why, you know, it got to
12  that point where Ted had to write a letter, and -- and
13  Ted Bene- -- Terry Benevides had to go ahead and modify
14  the type of ticket that he had issued to the Airport
15  Authority.
16      Q.  Did you assist Ted in preparing the letter?
17      A.  No, I did not.
18      Q.  Did you have any involvement in trying
19  to convert the standby ticket to a regular ticket?
20      A.  Not that particular one, no, ma'am.
21      Q.  You mentioned that Terry Benevides may have
22  given tickets to Bryan Enarson?
23      A.  I believe that was -- that's what I was told,
24  that he had been approached by other Airport Authority
25  employees and granted them space-available tickets.

Page 682

1       Q.  Who told you that?
2       A.  I believe Terry did.
3       Q.  Did Terry tell you where Bryan was flying on
4  those tickets?
5       A.  They can only go to Hawaii, to Maui.
6       Q.  To Maui?
7       A.  Yeah.
8       Q.  Do you remember the year?
9       A.  No, I don't.
10      Q.  Did you ever make any effort to find out
11  whether it was true that Terry gave tickets to Bryan
12  Enarson?
13      A.  Why would I not believe it was true?  If he
14  said it, I just took it for -- for his word.
15      Q.  I'm just asking you if you made any efforts to
16  find out if that was true.
17      A.  There was no need on my part.
18      Q.  And you mentioned that Terry may have given
19  Mayor Vance some sort of an upgrade for a flight to
20  Hawaii or tickets?
21      A.  Yeah.
22      In fact, I was personally involved in that
23  transaction.
24      Q.  And what was that transaction?
25      A.  Mayor Vance -- Mayor Vance had put in a call to

8 (Pages 679 to 682)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY          December 21, 2006          JOSE HERNANDEZ, VOL. IV

Page 683

1  Ted Sexton, once again, asking if he can juggle up some
2  seat assignments going to Hawaii and coming back from
3  Hawaii, primarily because one of his daughters had a
4  newborn, and he needed to assure himself that he can get
5  some bulk-- bulkhead seating because he is rather tall
6  and he didn't need -- he -- he wanted to stretch his
7  legs.
8      Q. How did you become aware that Mayor Vance was
9  seeking bulkhead seating?
10     A. First, Ted Sexton gave me a call, went to his
11 office. We got on a speaker -- speaker call to Mayor
12 Vance's office. He explained to me what it was that he
13 was looking for. He gave me his -- his office number at
14 that time.
15     Went back to Terry, worked with him to rearrange
16 the seats. Came back with him with some options, and --
17 and Mayor Vance personally approved those changes on the
18 fleet -- on -- on those seats going to and coming back
19 from -- from Maui.
20     Q. What were the options that you presented to
21 Mayor Vance?
22     A. He had -- He -- It was rather a big group, if I
23 remember correctly. It was something like eight to 12
24 individuals flying on it.
25     He wanted -- He wanted to make sure that we can

Page 684

1  re- -- rearrange the seats for -- you know, for him and
2  his wife to have bulkhead seating, you know, to have
3  extra room for his -- for his daughter who had -- I
4  believe it was a newborn, had a baby, and so was going
5  through and rearranging -- rearranging these seats to --
6  you know, to kind of fit his needs.
7      He -- He went through by detail and said, "This
8  is" -- believe he's got two daughters -- "This is my
9  daughter. This is my family. This is my daughter.
10 This is their family and this is my wife and I."
11     So just making sure that you, you know, and each one
12 had particular needs, not necessarily all had to be
13 together, but they had -- all had to be a little bit
14 different.
15     Q. Were all of the new seats in coach?
16     A. I don't recall the specifics at this time.
17     Q. Were there -- Oh, strike that.
18     Do you know the year of Mayor Vance's request for
19 seat changes on Aloha Airlines?
20     A. I believe it might have been calendar year 2005
21 sometime.
22     Q. Do you have any specific recollection of the
23 date?
24     A. Specifics, no.
25     Q. Generally the time of year?

Page 685

1      A. No.
2      Q. Are there any other times that you're aware of
3  where you had to go to Terry and ask for any sort of a
4  flight change or upgrade or free ticket?
5      A. Not at this time.
6      Q. Are you aware of Bob Stuart providing tickets
7  to Authority employees other than what we might have
8  discussed yesterday?
9      A. I'm aware of -- of many instances where Bob
10 Stuart was requested to either make seat changes, ticket
11 changes for Airport Authority employees.
12     Specifics I'm not aware of, but I do understand
13 that it was kind of a source of irritation for him
14 because these requests would come all the time. Anyone
15 who was flying on American, you know, wanted to get
16 first-cla- -- first-class upgrades, wanted to get either
17 tickets changes.
18     And, you know, it got to the point that -- you
19 know, that -- with him, that we would just go to his --
20 Vince Tulley, who happened to be his assistant manager
21 at the time or any of his supervisors.
22     Q. Did he ever tell you what specific Authority
23 employees asked for upgrades or flight changes?
24     A. Typically senior management employees who were
25 flying either to Dallas or back from Dallas.

Page 686

1      Q. Did he give you any specific names of who in
2  senior management?
3      A. Thella specifically, that typically every time
4  she would fly on his airlines would want to have special
5  flight arrangements made for her.
6      Q. Did he ever tell you that Thella asked him
7  directly for changes to the flight?
8      A. Typically those -- those requests would either
9  come from his administrative assistant, or the requests
10 would come through Ted and Ted to Bob Stuart.
11     Q. Are you aware of any other member of the
12 Authority asking Bob Stuart for an upgrade or a flight
13 change or receiving a free ticket from him?
14     A. Specific names not at this time.
15     Q. Are you aware of any Authority employee
16 actually receiving a free ticket, nonrevenue or
17 otherwise, from Bob Stuart?
18     A. Specific, I'm not sure at this time.
19     Q. Who is Brian Anderson?
20     A. Brian who?
21     Q. Anderson.
22     A. I don't know who Brian Anderson is.
23     MS. CHINN: It's Enarson, E-N-A-R-S- --
24     MS. McDONOUGH: I know who Bryan Enarson is.
25     MS. CHINN: Oh, okay.

9 (Pages 683 to 686)

53-611 (229)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY          December 21, 2006          JOSE HERNANDEZ, VOL. IV

Page 687

```
 1     MS. McDONOUGH:
 2     Q. You don't know Brian Anderson?
 3     A. I don't know who Brian Anderson is.
 4     Q. Have you ever told anyone that Bryan Enarson
 5  asked for free Hawaiian Air tickets?
 6     A. Yes.
 7     Q. What are you aware of in that regard?
 8     A. We had -- I had made -- those disclosures made
 9  to -- to the investigator when -- during my
10  investigation that Janet Nix had -- you know, had
11  over -- over conversations mentioned that Darlene Dunn
12  had called him requesting tickets, free tickets, upgrade
13  tickets, would consistently come to her whenever he was
14  flying to -- anywhere to the Hawaiian islands trying to
15  get special flight privileges.
16     Q. How are you aware of Darlene Dunn asking for
17  flight privileges for Bryan Enarson?
18     A. From Janet Nix.
19     Q. Do you know when these privileges were
20  requested?
21     A. Probably throughout her tenure as she -- she's
22  probably been the airline station manager in -- in L.A.
23  somewhere in 2004 through -- through the present.
24     Q. Janet Nix has been --
25     A. Yes.
```

Page 688

```
 1     Q. -- Hawaiian Airline station manager since 2004?
 2     A. Approximately.
 3     Is that right?
 4     MS. CHINN: I think it lacks a foundation. Janet
 5  opened the station to -- here -- for Hawaiian Airlines
 6  from L.A. When did she open it? Was that after 9-11?
 7     THE WITNESS: No, it was --
 8     MS. CHINN: Could it have been 2001?
 9     THE WITNESS: -- another gentleman who works for
10  Aloha opened up the station, and then when they -- they
11  left, she came in and took over the station.
12     MS. CHINN: Could it have been 2001? It was after
13  9-11.
14     THE WITNESS: 2000 -- Probably 2002 -- somewhere --
15  approximately. Don't -- I don't have the exact dates.
16  It's whenever -- Maybe six months to nine months after
17  Hawaiian Airlines started service in San Diego.
18     MS. McDONOUGH:
19     Q. Do you know if Bryan Enarson actually received
20  any of these upgrades or ticket changes?
21     A. I believe he did according to Janet Nix.
22     Q. When did Janet Nix tell you about Bryan
23  Enarson's request for these flight upgrades?
24     A. When she became -- She had just mentioned it in
25  casual conversation that she would receive calls from
```

Page 689

```
 1  not only Bryan, as she called the worst culprit of them
 2  all, but from -- from Darlene Dunn, his administrative
 3  assistant, who would also fly back to Hawaii because her
 4  brother is a pilot on -- on Hawaiian Airlines.
 5     But other -- you know, typically anyone who was
 6  going to Hawaii would -- you know, Airport Authority
 7  employees would -- would call and ask her for -- you
 8  know, to be listed on or to be put on first class or try
 9  to make any special flight privileges on her airline.
10     Q. Did she mention anyone else who asked for
11  flight privileges or upgrades?
12     A. No.
13     Typically it was -- it was them two as -- once
14  again, as the worst culprits of them all. And, you
15  know, really when she started, you know, telling me
16  specifically who they were where -- after she was -- you
17  know, she was interviewed by the investigator on -- on
18  my case.
19     Q. Is Darlene Dunn Bryan Enarson's assistant?
20     A. That's correct.
21     Q. Do you know if Bryan Enarson was aware that
22  Darlene was asking for the upgrades for him?
23     A. Yes.
24     Q. How do you know that?
25     A. Once again, he -- they would be -- it would be
```

Page 690

```
 1  impossible for him not to -- not to know that that would
 2  be the case.
 3     Q. Why would it be impossible?
 4     A. Once again, if you book your flight at a
 5  certain class, at a certain ticket and then you arrive
 6  at the gate and oh, it just happens you're on first --
 7  first class, there must be some sort of instructions or
 8  interaction between both of them that that's what was
 9  going to happen.
10     Q. Do you know who Rob Wigington is?
11     A. Yes.
12     Q. Who is that?
13     A. Rob Wigington is -- is or used to be director
14  of marketing and public relations -- director of
15  marketing -- I apologize -- for the Airport Authority.
16     Q. Did you tell the investigators that Rob asked
17  for free airline tickets and upgrades?
18     A. That's correct.
19     That -- That's another name that Janet had
20  mentioned to me that he had on several occasions asked
21  for free tickets to fly on her airline.
22     Q. For free tickets?
23     A. For free tickets to fly on her airline.
24     Q. Did Janet tell you whether she gave those free
25  tickets to Rob?
```

10 (Pages 687 to 690)

53-611 (230)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY          December 21, 2006          JOSE HERNANDEZ, VOL. IV

Page 691

1    A. I didn't follow up on that type of question,
2  you know. That was just another name that she had
3  mentioned.
4    Q. So you don't know one way or the other whether
5  Rob received the free tickets?
6    A. No, I can't concretely tell you whether that
7  was the case or not.
8    Q. Did Janet tell you the year in which Rob asked
9  for the free tickets?
10    A. I believe -- Well, Rob's employment started
11  maybe in 2004. Specifically now, maybe 2004, 2005.
12    Q. Did you also tell the investigators that Rob
13  asked for free tickets or upgrades on Aloha Air?
14    A. That's correct.
15    Q. How are you aware of that?
16    A. From Terry Benevides.
17    Q. Did Terry tell you the specifics of Rob asking
18  for those tickets or upgrades?
19    A. I believe what happened was they -- Aloha
20  Airlines was -- they were having some sort of inaugural
21  where they added additional service or they were having
22  some -- marketing had put together an event to promote
23  flight service with Aloha. And -- And at that
24  particular time, Rob had asked them for -- asked him
25  for -- for flight tickets on his -- on his airline.

Page 692

1    Q. Do you know if Rob received those tickets?
2    A. I -- I couldn't tell you.
3    Q. Do you know who Ron Larson is?
4    A. Yes.
5    Q. Who is he?
6    A. Ron Larson used to work for the Airport
7  Authority as manager of terminal operations.
8    Q. Did you tell the investigators that Ron asked
9  for free flight requests or changes on Southwest
10  Airlines?
11    A. On a weekly basis, yes.
12    Q. What kinds of flight changes would he request?
13    A. Ron -- Ron was -- Although Ron worked here in
14  San Diego, his family actually lived in -- in
15  Sacramento. So what he did was he had projected out
16  months of tickets in order to get the -- the cheaper
17  flights, the $39-each-way flights, and then -- and just
18  get whatever that class was or that particular flight
19  was to get the cheaper ticket.
20    And then what he would do on a weekly basis is go
21  get his ticket, either go talk to -- either go talk to
22  Mike Parrish or several of his supervisors to try to get
23  it changed to the right time that he needed to fly on.
24    Q. How are you aware of Ron asking for these
25  flight changes?

Page 693

1    A. Because Mike Parrish -- Mike Parrish gave me a
2  call to -- just to give me a briefing on what was going
3  on with Ron.
4    Q. When did Mike call -- excuse me -- call you?
5    A. You know, specifically I'm not sure, but once
6  again, it was every week that -- that -- that Ron Larson
7  would go and -- and request changes to his flight.
8    Q. Every week for what period of time?
9    A. It was every week for probably six- to
10  nine-month period of time.
11    Q. In 2004?
12    A. You know, maybe 2004 or 2005; right. Kind
13  of -- That's approximate.
14    Q. And Ron Larson's no longer an employee at the
15  Authority?
16    A. I believe -- I don't believe so.
17    Q. Did Mike Parrish tell you whether Ron Larson
18  ever paid for these flight changes?
19    A. I don't believe he did.
20    Q. Did you ever talk to Ron about the flight
21  changes?
22    A. I only had a conversation with Ron specific to
23  his flights on when he was trying to leave every Friday.
24  His flights, he was trying to leave about 2:00 o'clock.
25  And him and I have never talked about changes to his

Page 694

1  schedule in that manner. So my conversation with Ron
2  was -- was to ensure that he would -- or his flights
3  were at 5:00 or a little bit later, one.
4    And then two was just to be a little more conscious
5  about when he was booking his flights, because he was --
6  he was kind of being an irritant to Southwest, who
7  didn't really mind doing these changes but didn't
8  really want to do them on that frequent -- in that -- at
9  that frequency.
10    Q. Did you tell the investigators that Amiel Porta
11  made requests for airline tickets to Hawaii?
12    A. I believe he had -- Specifically requests
13  with them?
14    Q. With -- Just to Hawaii, not with any particular
15  airline.
16    A. He may have had some -- some discussions with
17  Janet about receiving flights or making arrangements to
18  fly to Hawaii to visit his family.
19    Q. Do you know about any of those discussions?
20    A. No.
21    Those were -- Those were just, once again,
22  commenting with Janet -- by Janet to me that Amiel had
23  come by and wanted to talk about tickets to -- to
24  Hawaii.
25    Q. Do you know if Amiel ever received free tickets

11 (Pages 691 to 694)

53-611 (231)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY          December 21, 2006          JOSE HERNANDEZ, VOL. IV

Page 695

1  to Hawaii from any airline?
2      A. I'm not sure if he did.
3      Q. Do you know if Amiel ever received upgrades or
4  ticket changes to Hawaii?
5      A. I -- You know, Janet would probably be better
6  to answer than -- than myself in -- on that.
7      Q. So you don't know one way or the other?
8      A. Well, you know, I -- I -- I understand that on
9  a few occasions he was listed for first class, but
10  whether he took them, once again I wasn't on that flight
11  and couldn't tell you if that was -- if that was the
12  case.
13      Q. How do you have the understanding that Amiel
14  was listed for first class?
15      A. Just from Janet, conversations that I had with
16  Janet.
17      Q. Do you know the years that Amiel was listed for
18  first class?
19      A. No, specifically I don't know. Mayb- -- 2003
20  to 2005, whatever trips he may or may not have taken
21  during that time.
22      Q. Did Janet tell you the years in which Amiel
23  might have asked her about free tickets?
24      A. No.
25      Once again, just on -- on casual conversations

Page 696

1  with -- with Janet.
2      Q. You've just testified about free tickets or
3  upgrades that Bryan Enarson, Mayor -- Rob Wigington, Ron
4  Larson and Amiel may have --
5      A. Yeah.
6      Q. -- received from the airlines.
7      Do you have any information to suggest that Thella
8  Bowens knew about these tickets or upgrades?
9      A. Specifically that she know -- that she knew
10  that other individuals were -- were getting tickets, you
11  know, I -- I wouldn't even venture to guess.
12      Q. Do you know who at the Authority knew about
13  these tickets and upgrades that you've just testified
14  about?
15      A. These specific ones here?
16      Q. Yes.
17      A. Not -- Not sure. I knew I knew of them.
18      Q. Do you know if anyone else knew about them?
19      A. I'm sure, you know, Ted's pretty smart and
20  pretty savvy. He probably would know what was going on
21  with -- with the information, with -- with some -- some
22  of this activity.
23      As I mentioned with -- you know, with the upgrades,
24  ticket changes, usually Ted was involved. He knew what
25  was going on, especially if it came from a senior

Page 697

1  management level or -- or -- or from the -- the board
2  member level.
3      As -- As -- As I testified before, a lot of times
4  people would come to Ted, "Hey, is there anything you
5  can do to help me out?"
6      "Yeah, sure. Jose, come do this."
7      Q. If Ted wasn't specifically involved in
8  obtaining the ticket or upgrade, do you have any reason
9  to believe that he knew about other Authority employees
10  obtaining tickets or upgrades?
11      A. Specifically, like I knew for a fact that he
12  did it, I -- I -- I wouldn't be able to testify at this
13  point.
14      MS. CHINN: Are you asking just about the ones that
15  you just talked about today or all of them?
16      MS. McDONOUGH: Yes, just --
17      MS. CHINN: Just today.
18      MS. McDONOUGH: -- the ones that we just talked
19  about.
20      MS. CHINN: To your knowledge, any of the ones that
21  she specifically asked you about today involve Ted?
22      THE WITNESS: As I mentioned, the ones with -- with
23  Mayor Vance, the tickets in trying to change the space
24  available to a positive space, yeah, those he -- he
25  would know.

Page 698

1      MS. McDONOUGH:
2      Q. And those you testified that Ted was involved?
3      A. Uh-huh.
4      Q. Right.
5      But I'm asking for the ones where Ted was not
6  specifically involved, to your knowledge, do you believe
7  that Ted knew about those flight changes or
8  upgrades for --
9      A. Once again, I -- I can't testify to what he
10  would know or would not know.
11      MS. McDONOUGH: Why don't we go ahead and take a
12  break.
13      THE WITNESS: Okay.
14      MS. McDONOUGH: Sure.
15      VIDEO OPERATOR: Going off the record. The time is
16  11:22.
17      (A recess is taken.)
18      VIDEO OPERATOR: Going back on the record. The
19  time is 11:33.
20      MS. McDONOUGH:
21      Q. Is there any reason why you cannot continue to
22  give your best testimony?
23      A. No.
24      Q. Are you aware of an investigation in December
25  of 2005 into benefits that you may have received?

12 (Pages 695 to 698)

53-611 (232)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY         December 21, 2006                    JOSE HERNANDEZ, VOL. IV

**Page 699**

1    A. Absolutely I'm aware of it.
2    Q. How did you become aware of the investigation?
3    A. What happened was I had received a -- I had
4  received a message from HR, Diane Richards, requesting
5  my attendance at her office the following morning,
6  whatever day that may have been, to review our -- you
7  know, our tentative proposal for the -- for our
8  teamsters agreement with our airport traffic officers.
9    Q. Were you previously involved in the teamsters
10 agreement with the airport traffic officers?
11    A. Yes, I was. Noting that that was one of my
12 key -- key areas of responsibility, yes, I was involved.
13    Q. Do you remember what time the meeting was for?
14    A. I believe it may have been right around
15 9:00 o'clock in the morning.
16    Q. Did you go to Diane Richards' office the next
17 morning --
18    A. Yes, I did.
19    Q. -- at 9:00 a.m.?
20    A. Yes, I did.
21    Q. Did you talk at all about the teamsters
22 contract?
23    A. Not a one.
24    Q. Was there anyone else in Diane Richards' office
25 when you arrived?

**Page 700**

1    A. Right when I arrived at the meeting, Diane
2  Richards was in the meeting, Pat Swan and the
3  investigator.
4    Q. Had you previously met Pat Swan?
5    A. Never.
6    Q. However -- Strike that.
7    Did he introduce himself?
8    A. Not immediately.
9    Q. Who introduced him to you?
10    A. Pretty much the conversation went as followed.
11 As I walked into the room, Diane Richards halfway ran
12 out of the room saying, "You need to talk to these
13 investigators," and closed the door behind her.
14    Q. Is that all that Diane said before she left the
15 room?
16    A. Pretty close to it, uh-huh.
17    Q. Is there anything else that you can recall?
18    A. I believe in my recollection that's about all
19 she said.
20    Q. Did you ask Diane any questions, such as, "Who
21 are these investigators?" and "Why are we here?"
22    A. I believe the door had closed before she
23 finished her last word.
24    Q. What's the first thing you remember happening
25 after that?

**Page 701**

1    A. Then the two investigators looked at me and
2  said, you know, they wanted to follow up on -- on issues
3  that may or may not be happening at the airport.
4    Q. Did they mention what the issues might be?
5    A. No.
6    I asked -- I asked for an idea of what it was or if
7  they had a list or anything they could provide to me,
8  and they said they -- they said they did not have
9  anything to give to me.
10    Q. Did they then begin asking you questions?
11    A. Then he -- Then he went on to mention that
12 these were -- these issues that they were investigating
13 were brought in general nature and not specific. Then
14 he started going through -- through the list.
15    Q. Was there one investigator that was talking
16 more than another?
17    A. I believe it was equal share, both.
18    Q. Do you remember any questions that the
19 investigators asked you?
20    A. They were just asking specific questions as to
21 you know, possible benefits, if -- if I knew that people
22 were receiving maybe flight benefits or, you know,
23 what -- what I may or may not have known. Kind of in
24 general of -- of, you know, those type of questions.
25    Q. Did you answer the questions truthfully?

**Page 702**

1    A. Absolutely, I -- and to the best of my ability.
2    Q. About how long was the meeting?
3    A. That particular meeting ran about three hours.
4    Q. And the entire time you were in Diane Richards'
5  office?
6    A. Yes.
7    Q. Was it in question-answer format, most of the
8  meeting?
9    A. It was in kind of accusatory format. About --
10 Probably about 45 minutes into the meeting, I had to
11 stop, stand up, and that's when I asked the
12 investigators, "This is about me; right?" And I said,
13 "Shouldn't I have someone present if I could?"
14    I didn't feel comfortable talking to them because
15 the way they were asking the questions were rather sly
16 in nature. They weren't very direct. They were, once
17 again, accusatory in nature. There was in my mind an
18 agenda already set. It wasn't -- It was by far a fair
19 and impartial line of questioning.
20    MS. CHINN: It was?
21    THE WITNESS: It was by far -- by far -- far
22 from --
23    MS. CHINN: Oh.
24    THE WITNESS: -- fair and impartial. Excuse me.
25 Far from fair and impartial.

13 (Pages 699 to 702)

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210

53-611 (233)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY        December 21, 2006        JOSE HERNANDEZ, VOL. IV

Page 703

1    MS. McDONOUGH:
2        Q. Did the investigators respond when you said
3    it's about me, isn't it?
4        A. The -- At that particular time, they responded
5    by, "We're just going to continue the questioning."
6        And I said, "Well, I believe that if" -- "if it is
7    about me, you need to" -- "you need to tell me so. I
8    don't believe that you guys are being up front with me.
9    I believe that, you know, the way the line of
10   questioning is going now that I should probably have
11   someone present or have an opportunity to have someone
12   present. And I'm not" -- "I don't feel comfortable
13   continuing with these lines of questioning."
14       And they said, "No. You will sit here until we
15   end." I didn't feel -- At that point, I did not feel
16   that I had a choice but to sit there. I felt a little
17   trapped.
18       Q. Did the investigators ever acknowledge that the
19   investigation was about you?
20       A. Not -- Not until the end of -- of the
21   conversation did they make implications in that manner.
22   But throughout the whole investigation, it was pretty
23   clear that it was about me and asking questions. And
24   once again, the questions were -- weren't fair and
25   impartial questions, just "investigory" -- investigatory

Page 704

1    questions.
2        They were -- You know, they -- they were after
3    certain answers, and they would phrase their questions
4    in certain ways that did -- you know, that would solicit
5    a certain response.
6        Q. What kind of implications did they make that
7    the investigation was about you?
8        A. They -- just implications that -- that now --
9    "Now, you took this right?" you know, or -- you know,
10   rath- -- you know, rather accusatory a lot in that --
11   that nature, "Now, this is what you did; right?" Or --
12   Or, "And then you did this, and then you made your
13   employee do this?"
14       So, you know, it was absolutely -- absolutely
15   conducted in a manner that I would never conduct any one
16   of my employees. There wasn't the thought of, "Hey,
17   let's just look at this and see where it goes,"
18   absolutely not.
19       They -- There was an agenda in place that "You did
20   this. You did this. You did this. You did this. You
21   did this." And at any time that I would
22   respond in a certain fashion, they would get back or
23   it's -- or say, you know, "You're" -- "You're
24   probably" -- or -- or redirect the question as, "You're
25   probably talking about this person. Well, we're not

Page 705

1    talking about that person."
2        "Well, you asked" -- Once again in general nature,
3    we just -- Once again at the beginning of the
4    questioning was, they just talked about things that may
5    or may not be happening at the Airport Authority.
6        So then they would direct the questions directly to
7    me. Then when I would expand it to others at the
8    Airport Authority, they just didn't want to hear it.
9        Q. So is it fair to say that you believed the
10   investigation was about you because they were asking so
11   many specific questions about you directly?
12       A. It was -- It was -- It would be fair that at
13   the end of it, it was my understanding that it was -- it
14   was about me.
15       Q. Do you have any understanding as to how that
16   investigation in December 2005 was initiated?
17       A. No, I don't.
18       Q. Do you have any belief as to why or how the
19   investigation in December 2005 was initiated?
20       A. I believe, you know -- I believe in -- in
21   looking back at that investigation that I -- actually I
22   have more than a reasonable belief that it was -- it was
23   pretty much of a witch hunt, that there was thoughts of,
24   "We just got to figure out a way, and we're going to dig
25   enough into this guy until we find something so we can

Page 706

1    find grounds to terminate him."
2        Q. Who do you believe initiated the witch hunt as
3    you describe it?
4        A. You know, I'm -- You know, exactly who, not
5    sure. But, you know, individuals within the Airport
6    Authority who I held to -- you know, who -- who -- you
7    know, who may have been embarrassed by some of the
8    things I've said in terms of what I thought was right
9    and -- and what I thought was wrong.
10       And, you know, I'm -- you know, there -- there
11   would be enough cause from others, even though I was
12   looking -- looking into the best interest of the Airport
13   Authority, that people would want to find a reason and
14   try to terminate me.
15       Q. What cause would people have to find a reason
16   to terminate you?
17       A. You know, when -- You know, when you look at
18   certain deals like -- like Bryan's deal, you know, sort
19   of embarrasses him on people finding out that he had a
20   handshake deal that would prohibit him or prohibit him
21   Airport Authority or restrict us from taking — taking
22   part of and using gifts.
23       That I was able to go through and discover that in
24   our airport parking agreement, that not only was that
25   proposal submitted, you know, in -- in a manner that

14 (Pages 703 to 706)

53-611 (234)

Page 707

1  could not be completed as filed, but we were able to go
2  through and find billing irregularities, and then able
3  to look into areas that were not consistent to that
4  agreement.
5      You know, look at -- look at and -- and be
6  outspoken on deals on a General Dynamics property, that
7  once again may have embarrassed Bryan as the lead
8  negotiator for those properties.
9      Just enough out there that there would be -- that
10  would cause someone to launch an investigation, once
11  again a witch hunt, on -- you know, just find -- just
12  find a way to do it.
13      And I believe that it was, once again, not -- not
14  fair and impartial. There was -- If you would look at
15  others and investigate them to the same manner as you
16  did as I was done, you would find many more people
17  who -- who did more things than I would -- that was ever
18  alleged of me at that Airport Authority.
19      Q. So are you saying that you believe the
20  investigation may have started because of the issues you
21  raised with LPI, the General Dynamics lease, the -- the
22  restroom project and the side deal and anything else?
23  Is there --
24      A. I would be -- I would believe that those would
25  be contributing factors to launching this sort of

Page 708

1  investigation.
2      You have to understand, the investigation wasn't --
3  it was so broad in nature, and it was -- it was -- it
4  would be hard to believe or hard pressed that someone
5  would be looking at specific allegations that someone
6  would say in this particular letter or this particular
7  allegations we received, "We're just going to look at
8  this." It wasn't like that. It was, "We're going to
9  look at everything," you know.
10      And -- And to my nature, the level of
11  investigation -- We've had employees out there who have
12  threatened to kill each other. At no time has any
13  investigation ever come to this level for -- for these
14  allegations. There has been worse stuff out there, and
15  obviously in my mind it was punitive in nature.
16      Q. Do you have a memory of what you told the
17  investigators during that first meeting?
18      A. Not -- Not verbatim, no.
19      Q. I'm going to ask you about some items, and
20  please tell me if you remember telling the investigators
21  about them --
22      A. Okay.
23      Q. -- okay?
24      Did you tell the investigators in that first
25  meeting that you had approximately 25 lunches with LPI,

Page 709

1  and that you knew that you had to report those lunches
2  if they were in the $325 or $350 range?
3      A. No, I don't remember specifically.
4      Once again, I don't remember a lot of the specifics
5  of what our -- what I may or may not have said during
6  that. It was -- It was rather hazy at that point. I
7  mean, it really caught me -- caught me by surprise.
8      MS. CHINN: What -- What was the question again,
9  please?
10      (The record is read by the reporter.)
11      MS. McDONOUGH:
12      Q. Is that statement true, that you had 25 lunches
13  with LPI, and that you knew you had to report them if
14  they were in a certain range?
15      A. You know, if -- if I would have -- I don't
16  believe -- You know, I'm not sure, and I can't respond
17  to that.
18      But 25 lunches is one lunch with them every other
19  week, and I don't believe I took that many lunches
20  with -- with any one particular group or anyone. Most
21  of the times, I didn't even take lunches.
22      Once again, that -- the whole -- the circumstances
23  of that investigation were so out of the blue, and --
24  and when I asked for assistance or time to think about
25  what was going -- I was never afforded those

Page 710

1  opportunities. It's hard for me to remember what may or
2  may not have been said during that investigation.
3      Q. And I'll remember that through this entire line
4  of questioning, so I'll ask you about each of these, and
5  if --
6      A. Okay.
7      Q. -- you remember them, that's fine, and if not,
8  that's --
9      A. Okay.
10      Q. -- fine too.
11      Did you tell the investigators that the lunches
12  with LPI occurred about every three weeks?
13      A. I don't recall.
14      Q. Is that a true statement?
15      A. I don't recall.
16      Q. Did you tell the investigators that you're not
17  prohibited from taking free lunches, but you just have
18  to report them?
19      A. I don't recall.
20      Q. Is that a true statement?
21      A. I don't recall.
22      MS. CHINN: No, is it a true statement that you
23  would have to report them?
24      THE WITNESS: If -- If we had lunches with LPI and
25  we report them and they were -- you know, I guess there

15 (Pages 707 to 710)

53-611 (235)

Page 711

1  would be some sort of -- of sense that you may have to
2  report it, but not -- you know, it's -- you know, it
3  de- -- it de- -- I guess it would depend, but -- it
4  would depend.
5      MS. McDONOUGH:
6      Q.  What would it depend on?
7      A.  You know, most -- on several of those occasions
8  that we had with -- with LPI, it's just, you know, two
9  guys going to lunch.  I would buy lunch, they would buy
10  lunch, you know, but it was, you know, rather informal.
11      Q.  So are you saying nonbusiness related?
12      A.  Yeah, most of the lunches were nonbusiness
13  related.
14      Q.  And so you believe that if it was not business
15  related, then you didn't have to report the lunch?
16      A.  Well, you have to understand, like Jim -- Jim
17  and I have known each other since even before we worked
18  at the Airport Authority.
19      Q.  Jim Myhers?
20      A.  So I -- there was just -- Yeah.
21      Q.  I'm just trying to understand what you thought
22  you had to report and what you didn't.
23      A.  Okay.
24      Q.  So if you went out to lunch with Jim Myhers and
25  it was personal and not business related, you didn't

Page 712

1  think you had to report that?
2      A.  That -- Yeah, if it's not business related,
3  why -- why would it matter.
4      Q.  Did anyone ever tell you you didn't have to
5  report personal lunches with persons who worked for
6  vendors of the Authority?
7      A.  I -- I don't understand your question.
8      Q.  Did anyone ever tell you that if a lunch was
9  personal in nature and nonbusiness related, that you
10  didn't have to report it?
11      A.  No, no one ever -- It was -- You know, it
12  was -- you didn't -- it wasn't practice at the
13  Airport -- Airport Authority to do that.  In fact, if
14  you look at the construction management staff, you have
15  integrated vendors into that staff.  Do you -- They go
16  out and have lunch all the time.
17      I mean, if -- if you held -- you held everyone to
18  the same standards, they would report every lunch they
19  had every day.  There was just -- There was just no need
20  to do that.
21      Q.  Are there any specific people that you can
22  think of that you just referred to?
23      A.  No.
24      That -- That's why in -- in -- in general when you
25  look at, you know, that every person who ever goes out

Page 713

1  with anyone, you just can't do it.  It's impossible to
2  be done.
3      Q.  Did you tell the investigators in the first
4  meeting that you never had free lunches or drinks at the
5  airport from the airport vendors?
6      A.  I don't recall what I may or may not have said
7  to them.
8      Q.  Did you tell the investigators that you
9  reciprocate buying coffee for vendors?
10      A.  We go out, I make it a practice to go -- or I
11  had made it a practice that in the mornings, every
12  morning at around 6:30 in the morning, we would -- we
13  will walk through the Airport Author- -- through the
14  airport property, you know.  If we saw an airline
15  station manager, we'd -- we'd buy them coffee.  I mean,
16  other times they would buy coffee back for us.
17      But typically it was -- you know, we would go back
18  and forth with other front -- front-line employees, you
19  know, individuals who we would see in -- on a daily
20  basis.  Every day just about that I worked at that
21  Airport Authority, I would walk from one end of the
22  airport all the way through.
23      Q.  Who is the "we" that you're referring to?
24      A.  A lot of times it would probably -- Jeff
25  Simmons and I as we're going through.  6:30 is probably

Page 714

1  one of the busiest times at the airport. We would walk
2  through from one end of the airport to the other just
3  looking at, you know, levels of cleanliness, looking at
4  the hold room and making sure all the equipment worked,
5  the paging systems worked.  We spent a lot of time at
6  that airport.
7      Q.  Did you tell the investigators about this
8  practice?
9      A.  They never asked.
10      Q.  So no?
11      A.  I'm not sure if I did.
12      Q.  Did you tell the investigators that you park in
13  lot A at the airport and that you drive a 2005 Ford
14  Sport Trac truck?
15      A.  Lot A?  There is -- There is no lot A at the
16  airport.
17      Q.  So you didn't tell them that?
18      A.  Well, there is no lot A at the airport.
19      Q.  Just answer my question.  I'm not trying to
20  trick you.
21      A.  No, I just -- Once again, I'm -- there is no
22  lot A, so I -- I would find it hard for me to say that.
23      Q.  Did you tell the investigators that you drive a
24  2005 Ford Sport Trac truck?
25      A.  I -- I don't remember what I may or may not

16 (Pages 711 to 714)

**Page 715**

1 have told them on what car I had.
2    Q. Is it true that you had a 2005 Ford Sport Trac
3 truck in December of 2005?
4    A. I have one now.
5    Q. Do you remember if you had it in December of
6 2005?
7    A. I -- I don't remember. I know that -- that
8 there was a period or -- in between there some time I
9 switched cars from a -- from a black truck, Ford truck,
10 to -- to that truck, the Ford -- the grey Sports Trac.
11    Q. Did you tell the investigators that you had
12 taken your wife's car to USA Cab for work to be done on
13 the car?
14    A. Yes.
15    Q. Do you know if USA Cab was a vendor of the
16 Authority at the time that USA Cab did work on your
17 wife's car?
18    A. Yeah, USA Cab was not a vendor of the Airport
19 Authority at that time.
20    Q. Did USA Cab have any relationship with the
21 Airport Authority at the time they did work on your
22 wife's car?
23    A. USA Cab was a permit holder of the Airport
24 Authority.
25    Q. At the time they did the work on your wife's

**Page 716**

1 car?
2    A. That's correct.
3    Q. Did you know that at that time?
4    A. Yes, I did.
5    Q. Did you tell the investigators that you paid
6 for the work that USA Cab did on your wife's car?
7    A. Yes, I did.
8    Q. And that you paid for it with a MasterCard or
9 Visa?
10    A. Yes.
11    And the records that they provided to the
12 investigator should be able to substantiate the payment
13 for all the work that was done on her car.
14    Q. Did you tell the investigators that you would
15 give them a copy of the receipt of the work that was
16 done on the car?
17    A. No, they -- their question was, would you
18 have -- would you have a copy of those receipts, I
19 believe. And I -- And when we met with them again, I
20 believe I provided whatever type of receipts I may have
21 had.
22    Q. So you don't remember agreeing to give them
23 those receipts?
24    A. No.
25    Q. Did you tell the investigators that you did not

**Page 717**

1 receive a discount on the -- on the work that USA Cab
2 did?
3    A. Yeah, I never believed I -- I believe I -- I --
4 I paid the -- the fair value for the work that was done
5 on the -- on the vehicles.
6    Q. Did you tell the investigators that you got
7 free oil changes at Evans Tires in Lemon Grove in
8 exchange for giving blood?
9    A. Yeah, I had received -- I had one time given
10 blood with the -- with the Red Cross, and I had a
11 certificate and -- and got a free oil change.
12    Q. Do you know if USA Cab does work for members of
13 the public?
14    A. Absolutely they do.
15    Q. How do you know that?
16    A. Because it's an open shop to the public. Not
17 only do they service their specific cab fleet, but it's
18 also open to -- to anyone. You can drive up today, and
19 they would do any type of work on your car.
20    Q. Did you tell the investigators that you took
21 one of the Authority vehicles home one time to fill it
22 with hay bales?
23    A. I didn't take that home to fill it with hay
24 bales.
25    Q. Why did you take it home?

**Page 718**

1    A. We -- We talked about that incident yesterday
2 or the day before where I, on the way down to my house
3 in Lemon Grove, I bought some hay bales, took the
4 vehicle home overnight, since it was at the end of the
5 night, and brought the hay bales in the morning.
6    Q. Right.
7    So you use a vehicle and you filled it with hay
8 bales, took it home and then brought it in the next
9 morning?
10    A. Yes, ma'am.
11    Q. Did you tell the investigators about that?
12    A. I -- I don't -- I -- I may or may not have.
13    Q. Did you tell the investigators that you did not
14 use an Authority vehicle in connection with picking up
15 your car from USA Cab?
16    A. I don't recall where I -- what I may have told
17 them.
18    Q. Did you tell the investigators that there were
19 approximately nine people who report to you in the
20 office?
21    A. I don't recall what I may or may not have told
22 them.
23    Q. Did you tell the investigators that Jeff
24 Simmons, Ron Larson, Amiel Porta and Jay Bass can drive
25 official vehicles?

17 (Pages 715 to 718)

53-611 (237)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY          December 21, 2006          JOSE HERNANDEZ, VOL. IV

Page 719

1    A. Once again, I don't recall what I may or may
2  not have told them.
3    Q. Is that true, that a true statement?
4    A. I'd have to go back and take a look at the
5  records and see if they were certified --
6    MS. CHINN: She is asking you -- Yeah.
7    MS. McDONOUGH:
8    Q. Did you tell the investigators that you
9  received a $350 monthly allowance for gas from the
10 Authority?
11   A. I don't recall what I may or may not have told
12 them.
13   Q. Is that a true statement?
14   A. I'd have to look at -- at my -- my -- my
15 payroll stubs.
16   Q. Did you receive any sort of an allowance from
17 the Authority for gas that you recall?
18   A. I believe that may have been part of my benefit
19 packet.
20   Q. Do you remember the amount?
21   A. I don't recall, ma'am.
22   Q. Did you deny receiving any gifts from the
23 airlines in the --
24   A. I don't --
25   Q. -- in the course of the investigation?

Page 720

1    A. I don't recall what I may or may not have told
2  them.
3    Q. Is that true, that you've never received a gift
4  from the airlines?
5    A. I don't believe that would be true.
6    Q. What's untrue about that?
7    A. Just as a general statement.
8    Q. Are there any specific incidents that you can
9  recall?
10   A. Not at this time.
11   Q. So as we sit here today, you cannot recall any
12 specific gifts that you've received from the airlines?
13   A. No, ma'am.
14   MS. CHINN: Are you talking about from any airline?
15   MS. McDONOUGH: Yes.
16   MS. CHINN: During the whole course of his
17 employment?
18   MS. McDONOUGH: Yes.
19   MS. CHINN: Have you ever gotten anything for
20 Christmas or anything?
21   THE WITNESS: They've -- You know, we've exchanged
22 Christmas gifts. You know, at one time I received a --
23 a little model plane from SkyWest Airlines.
24   Once again, we've -- we've exchanged Christmas
25 gifts. Every Christmas I'd make it a practice out of my

Page 721

1  own funds to go through and deliver Christmas gifts to
2  any, if not all the airlines. And then in response they
3  have reciprocated to me.
4    MS. McDONOUGH:
5    Q. What gifts have you given to the airlines?
6    For instance, in 2004 did you have a standard gift
7  that you gave to station managers?
8    A. Yeah.
9    Typically -- Typically around the holidays, unless
10 I knew that they like something different, I would give
11 them a bottle of champagne. It's just been a tradition
12 with -- within my family to go ahead and give that just
13 as a -- as a token of friendship.
14   Q. Were there specific station managers that you
15 would give the bottle of champagne to or just all of
16 them?
17   A. As many as I could.
18   Q. Did you focus on the ones that were your
19 friends, such as Mike Parrish or Janet Nix or people
20 like that?
21   A. No.
22   It was -- It's equal treatment for all the
23 airlines, and in -- for those -- for those who I can --
24 I can -- you know, I was able to do it, yeah. For those
25 who I couldn't, then -- then I couldn't. Just, you

Page 722

1  know, it's once again equal treatment. We try -- I try
2  to treat everyone the same.
3    Q. Do you recall any holiday gifts that you
4  received from the airlines in 2004?
5    A. I don't recall.
6    Q. In any year?
7    A. In any year, ma'am.
8    (Interruption in proceedings.)
9    MS. McDONOUGH:
10   Q. Just so I make sure I got everything, do you
11 remember any gifts that you received from any airline at
12 any time, other than the model airplane that you just
13 mentioned?
14   A. No, I don't re-- I don't recall.
15   (A discussion between witness and counsel is held
16 off the record.)
17   MS. McDONOUGH:
18   Q. Did you tell the investigators in that first
19 meeting that you played golf in the Southwest Airlines
20 tournament?
21   A. That -- It was probably a good chance, but I
22 don't -- once again, I don't recall the specifics of
23 what I may or may not have told the investigators at
24 that time.
25   Q. And did you tell the investigators that you

18 (Pages 719 to 722)

Page 723

1  played with Amiel Porta, David Stearns and Mark
2  McDonald?
3      A.  Once again, I don't remember what I may or may
4  not have told them at that time.
5      Q.  And as we already discussed, you did play in
6  that golf tournament for Southwest Airlines in 2005;
7  correct?
8      A.  That is correct.
9      Q.  And those individuals were also at the
10  tournament?
11      A.  I believe so, yes, ma'am.
12      Q.  Did you tell the investigators that you played
13  in the Southwest tournament in 2004?
14      A.  I don't recall what I may -- may or may not
15  have told them.
16      Q.  Did you tell the investigators that Mike Dias
17  invited you to the 2004 Southwest tournament?
18      A.  Once again, I don't recall what I may -- may or
19  may not have told them.
20      Q.  Is that a true statement, that Mike Dias
21  invited you?
22      A.  No.
23      The statement was that Mike and I had -- Mike Dias
24  and I had run -- run into each other and said, "Hey, I
25  don't believe Mike is using his" -- "he has allocated a

Page 724

1  foursome" because he was the airline station manager at
2  the time.  "And he asked me or he said he would be in
3  contact with you, that he wanted you to go ahead and
4  take the" -- "his foursome if you can."
5      Mike Dias's organizer and Mike Dias and I had
6  worked in the past where I would be able to provide
7  raffle prizes.
8      Q.  How do you spell Dias?
9      A.  D-I-A-S.
10      Q.  Did you tell the investigators that you did not
11  purchase any giveaway gifts for the Southwest tournament
12  in 2004?
13      A.  Once again, I don't recall what I may or may
14  not have told them.
15      Q.  Is that a true statement?
16      A.  Excuse me?
17      Q.  Is it true that you did not purchase any
18  giveaway gifts for the Southwest tournament in 2004?
19      A.  I don't -- I don't recall.
20      Q.  Let me just take a two-minute break, please.
21      A.  Okay.
22      Q.  Thanks.
23      VIDEO OPERATOR:  Going off the record.  The time is
24  12:02.  This marks the end of Tape Number 1.
25      (A recess is taken.)

Page 725

1      VIDEO OPERATOR:  Going back on the record.  The
2  time is 12:07.  This marks the beginning of Tape
3  Number 2.
4      MS. McDONOUGH:
5      Q.  Do you remember telling the investigators that
6  at the Southwest Airlines tournament, Southwest had a
7  hospitality suite and provided free drinks, and that
8  they also paid for the golf tournament and dinner
9  afterward?
10      A.  I don't -- Once again, I don't recall what I
11  may have told them.
12      Q.  Was that a true statement, that -- that they
13  had the hospitality suite, the drinks, tournament and
14  dinner?
15      A.  Yeah, that -- but not in those specific words.
16      Q.  Generally you told them about that?
17      A.  No.
18      I believe -- I believe the proper response was that
19  the day before Southwest Airlines would host the
20  hospitality suite, the event consisted of golf and then
21  a dinner afterwards -- dinner and raffle afterwards.
22      Q.  Did you tell the investigators in that first
23  meeting that in 2002, you flew to Las Vegas with Mike
24  Parrish and Amiel Porta to look at Southwest?
25      A.  I believe we've talked about that, covered that

Page 726

1  already.
2      Q.  Right.
3      Did you tell the investigators about that?
4      A.  I -- I don't recall if I specifically did or
5  not.
6      Q.  Did you tell the investigators that you had
7  lunch at Memphis Barbecue?
8      A.  Once again, I don't recall the specific place
9  that we did have lunch.
10      Q.  And you don't know if you told the investigator
11  about it?
12      A.  I don't remember.
13      Q.  Did you tell the investigator that you didn't
14  know who paid for the lunch on that trip?
15      A.  I don't recall what I may have told them.
16      Q.  Was that true, that you don't know who paid for
17  the lunch?
18      A.  That's true.  I don't -- I don't remember who
19  paid for that lunch.
20      Q.  Did you tell the investigators that "It was bad
21  judgment on our part for Southwest Airlines to pay for
22  those airline tickets"?
23      A.  Once again, I don't remember what I may have
24  told them.
25      Q.  Do you feel that way, that it was bad judgment

19 (Pages 723 to 726)

53-611 (239)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY    December 21, 2006    JOSE HERNANDEZ, VOL. IV

Page 727

```
 1   on your part to let Southwest Airlines pay for those
 2   tickets?
 3        A.  I wouldn't be able to answer that at this
 4   point.
 5        Q.  You don't have an opinion either way?
 6        A.  I don't have an opinion either way.
 7        Once again, that -- that -- the -- the whole
 8   environment was very accusatory, and I was under extreme
 9   duress, did not have an opportunity, really, to -- you
10   know, to take time and answer any questions.  So, you
11   know, it would be very difficult for me to answer what I
12   may or may not have told them during -- during that
13   course of that interview.
14        Q.  I'm just asking right now if you have an
15   opinion if it was bad judgment on your part to have
16   Southwest Airlines pay for the tickets.
17        A.  I have no opinion at this time.
18        Q.  Do you feel under duress right now?
19        A.  A little bit, but not as much.
20        Q.  Why do you feel under duress right now?
21        A.  Just the line of questioning, but it's okay.
22        Q.  Is it the way I'm questioning you?
23        A.  No.
24        Q.  Just stressful to be here having your
25   deposition taken?
```

Page 728

```
 1        A.  No, not as much.  It's -- It's -- It's going
 2   back and -- and recanting the horror, the horror and the
 3   level of anxiety and duress that I was succumbed to as
 4   part of that interview.
 5        People should not be treated -- It doesn't matter
 6   who you are, you should never be treated the way that
 7   those investigators treated me at that that meeting, you
 8   know, very secretive, you know -- you know, kind of
 9   agenda seeking.
10        I mean, we -- we -- I had conducted investigations
11   with employees many times.  I would never do that to any
12   one of my employees.
13        And then not having Airport Authority personnel
14   there, you know, you would think your director of human
15   resource would be, you know, to -- to kind of have a
16   better understanding of what's going on.
17        No, she flew right out that door.  So there was no
18   control, absolutely no control whatsoever, from anyone
19   over that investigation.
20        Q.  So is it fair to say that you feel a little
21   duress right now because of the subject matter of the
22   line of questioning and not because of the situation in
23   this room or the way I'm asking the questions?
24        A.  No, it's not the questioning, it's just that --
25   the flashbacks, lack of a better word, of -- of what I
```

Page 729

```
 1   went through as part of that investigation.
 2        MS. CHINN:  Are you uncomfortable answering these
 3   questions?
 4        THE WITNESS:  I -- I'm uncomfortable asking those
 5   questions -- answering those questions because the
 6   assumption made from you is that I would have a full
 7   understanding of what those questions were and a full
 8   remembrance of what the answer was.
 9        But you have to understand, as you see them in
10   black and white today, that wasn't really the tone or
11   the way they may have been asked to me at that time.
12        MS. McDONOUGH:
13        Q.  That's why I'm asking you about them to -- to
14   understood your recollection of that event and
15   whether -- whether what I'm asking you about is true or
16   not.
17        A.  Well, I would call it a question, a lot of
18   what -- You know, I would call it a question, you know,
19   a lot of what that document in front of you reflects.
20        Q.  You don't know what I'm looking at, though, do
21   you?
22        A.  Well, I just figure you're reading off a list
23   that may have been a summary of what that interview was.
24   So if my assumptions are correct, I would call in
25   question what you have be- -- before you.
```

Page 730

```
.1        Q.  But I haven't told you what I'm looking at, and
 2   you can't --
 3        A.  Not --
 4        Q.  -- see it; is that correct?
 5        A.  Not at this time, no.
 6        MS. CHINN:  You know, I'm going to object right
 7   here because I think the document speaks for itself.
 8        And secondly, I think there is a lack of foundation
 9   to the line of questioning, because we had an experience
10   with the same investigators in my office where their
11   notes were completely inaccurate and they weren't
12   listening to the client.  They were fumbling around
13   trying to write things down, and it was clear that
14   things were inaccurate.  So if there are inaccuracies,
15   it would be helpful to point that out if you can recall
16   them.
17        So we -- my objection is that it lacks foundation.
18   The document is not reliable if it is the investigators'
19   notes.  And until those notes have been produced to the
20   plaintiff, we won't have an opportunity to reconstruct
21   in detail what occurred during that investigation and
22   whether the notes are accurate or not.
23        Answer as best you can.
24        MS. McDONOUGH:
25        Q.  Do you remember telling the investigator that
```

20 (Pages 727 to 730)

53-611 (240)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY    December 21, 2006    JOSE HERNANDEZ, VOL. IV

Page 731

1    you asked for and received the tickets from Cheryl Black
2    for the United Way drive?
3        A. I don't -- Once again, I don't recall, but as I
4    testified before, I did.
5        Q. Do you remember telling the investigator that
6    Paul Webb, in planning, won those tickets?
7        A. I don't -- Once again, I don't remember who won
8    those tickets. Someone won them, and I -- I don't
9    recall exactly who won those tickets.
10       Q. Do you remember telling the investigators that
11   a new female employee won the tickets that Hawaiian
12   Airlines donated to the United Way raffle?
13       A. I don't -- I don't remember exactly what I told
14   them. Someone won them.
15       Q. Do you remember telling the investigators that
16   Jeffrey Woodson asked you to get the Hawaiian Airlines
17   tickets for the United Way raffle?
18       A. I don't recall exactly who -- you know, what --
19   what I told them or what conversation I may have had
20   regarding Jeffrey Woodson.
21       Q. Is it true that Jeffrey Woodson asked you to
22   get the tickets from Hawaii Airlines for the -- for the
23   United Way raffle in any year?
24       A. I believe -- I will -- Is it true?  Probably
25   not.

Page 732

1        Q. Did Jeffrey Woodson ever ask you to obtain free
2    tickets or travel or upgrades for him or anyone else?
3        A. Not Jeffrey Woodson, no.
4        Q. Did you tell the investigators that you asked
5    Southwest Airlines for free shipping of the barbecue
6    meat for Thella's Barbecue?
7        A. That's correct, on Thella's request.
8        Q. On Ted Sexton's request?
9        A. On Ted --
10       MS. CHINN: Objection. That mischaracterizes his
11   testimony. He is testifying, not you.
12       THE WITNESS: At the request of Thella through Ted.
13       MS. McDONOUGH:
14       Q. Did the investigators asked you about a trip
15   that you may have taken to Phoenix on Southwest
16   Airlines?
17       A. I -- I don't recall such a trip or such a
18   conversation.
19       Q. Did the investigators ask you about a trip that
20   you had recently taken to Orlando with your family?
21       A. I don't recall if they did.
22       Q. Did you tell the investigators that you had
23   paid for a trip that you took to Orlando with your
24   family out of your own personal funds?
25       A. I don't recall what I may have told them.

Page 733

1        Q. Is that true, that you paid for that trip out
2    of your own funds?
3        A. I'd have to -- I'd have to go back and -- and
4    research that.
5        Q. Do you remember taking a trip to Orlando with
6    your family in December 2005?
7        A. I did.
8        Q. Do you have any memory of who paid for that
9    trip?
10       A. I don't recall specifically.
11       Q. Did you tell the investigators that Vernon
12   Evans had asked you to upgrade or change his tickets to
13   Las Vegas and Dallas?
14       A. I don't remember specifically, but it probably
15   did happen.
16       Q. Did you tell the investigators in that first
17   meeting that no one else at the Authority, aside from
18   Vernon Evans, had asked you to change or upgrade their
19   personal tickets?
20       A. I -- I don't believe I would have said such a
21   comment.
22       Q. Did you tell the investigators about a trip
23   that you took to AeroMexico in September 2001?
24       A. I don't re- -- I don't recall having such a
25   conversation with them.

Page 734

1        Q. Did you tell the investigators about your trip
2    to Hawaii with your family?
3        A. I -- I don't recall exactly what -- what I may
4    have talked to them about regarding that trip.
5        Q. Did you tell the investigators in that first
6    meeting that you paid for the 2004 trip that your family
7    took to Hawaii?
8        A. I believe that would be an incorrect -- an
9    incorrect statement.
10       Q. Did you tell the investigators that?
11       A. Yes.
12       Q. Did you tell the investigators that you paid
13   for the airline tickets to Hawaii in May 2004?
14       A. I don't believe that question was ever asked --
15   asked of me at that time.
16       Q. Did you ever tell them, make that statement to
17   the investigators?
18       A. Never.
19       Q. Did you tell the investigators that you still
20   had three sample shirts from Kelly Pond?
21       A. I don't recall what I may have -- may have told
22   them at that time.
23       Q. Did you tell the investigators that Kelly Pond
24   would put samples on mannequins and display them so that
25   you could select clothing as uniforms?

21 (Pages 731 to 734)

Page 735

1  A. I don't recall if I said that, but that -- that
2  would have been her practice.
3  Q. Did you tell the investigators that Kelly Pond
4  gave you three shirts in connection with coaching her
5  son's soccer team?
6  A. I don't recall what I may have told them.
7  Q. Is that true, that Kelly Pond gave you three
8  shirts that said, "Coach Jose," "Coach David" and "Team
9  Mom Roxi"?
10  A. I believe that she had on one occasion provided
11  those at her own with- -- without me requesting those,
12  yes.
13  Q. Do you know the value of those shirts?
14  A. Once again, they were sample shirts that she
15  had at home. So, you know, I probably -- I don't know,
16  couple of bucks each or something. They're --
17  They're -- She's already purchased them as samples, so
18  she was just trying to provide use to clear out her
19  house.
20  Q. Did you tell the investigators that Kelly Pond
21  had attended your wife's 30th birthday party?
22  A. I don't recall who -- what I may have told them
23  on who attended the party.
24  Q. Do you recall if Kelly Pond attended your
25  wife's party?

Page 736

1  A. She may have.
2  Q. Did you tell the investigators that Kelly Pond
3  paid for lunch for you at the Cheesecake Factory in
4  2002?
5  A. I don't recall.
6  Q. Is that true?
7  A. I don't recall.
8  Q. Did you deny receiving any clothing apparel
9  from Kelly Pond for your wife's soccer team?
10  A. I don't believe -- I don't believe I denied it,
11  no.
12  Q. Because as we already discussed, Kelly Pond
13  provided that in exchange for cosmetics from your wife?
14  A. That's correct.
15  Q. Did you tell the investigators in that first
16  meeting that Dave Mueller had invited you to a Padre
17  game and that you sat on the first-base line?
18  A. I don't recall what I may have told them.
19  Q. Is that the Padre game that we've already
20  discussed?
21  A. I'm not sure.
22  Q. Do you recall that event?
23  A. I don't recall.
24  Q. Did you tell the investigators that you and
25  Dave Mueller played golf together?

Page 737

1  A. I don't recall if I did tell them at that
2  point.
3  Q. As we've already discussed, you have played
4  golf with Dave Mueller on at least one occasion?
5  A. Yes.
6  Q. Do you recall telling the investigators
7  anything about golf outings that you may have had with
8  Steve Burton or Dave Mueller?
9  A. I don't recall what I may have talked to them
10  about.
11  MS. CHINN: What time is it?
12  MS. McDONOUGH: 12:20.
13  THE WITNESS: 12:23.
14  MS. CHINN: Okay.
15  We have to leave in five minutes.
16  THE WITNESS: Okay.
17  MS. McDONOUGH:
18  Q. Did you tell the investigators that you
19  received two free tickets to the Charger-Raider game in
20  2003 from Dave Mueller?
21  A. I don't believe I said that in those exact
22  words, no.
23  Q. What do you believe you said?
24  A. I believe what happened was, I was presented
25  with the fax copy that you have shown me here before,

Page 738

1  and implications were made by the investigators, "And
2  you received two of these four tickets?"
3  Q. And what did you say to that question?
4  A. And I said, "If" -- "If you believe that's the
5  case, then that's" -- you know, "that's" -- "then that
6  is the case."
7  Q. Did you believe that you had received those
8  tickets?
9  A. I don't -- Once again, you know, not looking at
10  seating plans, no, I -- You know, the implications were
11  made that "You received two of these" -- "two of these
12  tickets," so I don't -- I wouldn't know either way.
13  Q. And the tickets are the ones that we marked as
14  Exhibit 8?
15  A. That's correct.
16  Q. And I'm showing them to you right now
17  (indicating).
18  A. That's correct.
19  Q. Why did you say to the investigators, "If you
20  believe I've received those tickets then I did"?
21  A. Understand the amount of duress I was in in
22  that investigation. These weren't questions, these were
23  accusations rather quite pointly, "And you did this;
24  right? And you did this?"
25  These -- These weren't questions like, "Hey, let's

22 (Pages 735 to 738)

Page 739

1 figure out if it was" -- "if it's true or not true," no.
2 It was, "And you did this."
3    So, you know, at that point I wanted the whole
4 thing over, you know. Once again, I did not have an
5 opportunity to consult with -- with counsel if I needed.
6 I was never afforded that opportunity. I was never
7 afforded to speak to anyone within the Airport Authority
8 to get a full understanding of what was going on.
9    Q. Did you tell the investigators that you sat in
10 the upper plaza with Dave Mueller at a Charger game?
11    A. I don't recall what I may have told them.
12    Q. Is that true, that you went to some Charger
13 game with Dave Mueller and sat in the upper plaza?
14    A. I don't recall.
15    Q. Did you tell the investigators that you
16 received four tickets to the Holiday Bowl in 2004?
17    A. I don't recall.
18    Q. Do you remember receiving tickets from Mark in
19 2004 for the Holiday Bowl?
20    A. I don't -- I don't recall.
21    Q. Did you go to the Holiday Bowl in 2004?
22    A. I may have gone.
23    Q. Do you know how you received the tickets?
24    A. No.
25    Q. Did the investigators ask you about the Super

Page 740

1 Bowl, going to the Super Bowl?
2    A. I don't -- I don't recall.
3    In fact, I know I did not go to the Super Bowl.
4    Q. Did the investigators ever ask you how you were
5 feeling or doing in the course of their interview with
6 you?
7    A. Never once. Never once.
8    I asked -- I asked for some time. I asked for some
9 water. At one particular time I asked for water, it
10 never came.
11    Pat walked out of the office, said, "I'll get you
12 water right now." You know, probably took me asking him
13 another four or five times before the water finally came
14 out, and he said, "Oh, sorry. It was outside the door."
15    Q. So Pat got up, left and said he would get you
16 water and came back without water?
17    A. He came back with nothing. "Oh, it'll be
18 delivered right now."
19    Q. Did you believe that he had asked somebody for
20 water?
21    A. I would hope to believe that he would have
22 asked someone for water and it would have been delivered
23 in a timely fashion, not 40 minutes later after having
24 to repeatedly ask him for water or time to get some air
25 or -- you know, or just -- just time to take a breath.

Page 741

1    Once again, I didn't -- I did not have an
2 opportunity to leave that office.
3    Q. Do you know the other investigator's name who
4 is in the -- in the room with Pat Swan?
5    A. I believe his last name's Gambiersky.
6    Q. Is it John? John Gambiersky?
7    A. I just know the last name. I don't remember
8 his first name. Gamblersky.
9    Q. When Pat Swan left the room to get water, do
10 you remember if John asked you any questions?
11    MS. CHINN: Objection. That assumes facts not in
12 evidence that he left to get the water. He doesn't know
13 why he left.
14    THE WITNESS: I don't -- I don't remember if there
15 was any questions.
16    MS. McDONOUGH:
17    Q. Did -- Did the investigators at any time in
18 that first meeting ask you if you believe that the
19 questioning or the process that they were going through
20 was fair?
21    A. Oh, absolutely they never asked me that.
22    Q. Did you ever volunteer to get the investigators
23 records that they needed?
24    A. Not -- Not in total. There was specific ones
25 regarding some bills, but never -- I had never offered

Page 742

1 to them an opportunity to review any records that I may
2 have, no.
3    It was never implied. It was never said. No, I
4 would not provide to them that information. I never
5 gave my even tacit approval that they can look at any of
6 my records.
7    MS. McDONOUGH: Go ahead and break for lunch.
8    THE WITNESS: Okay.
9    MS. CHINN: Uh-huh.
10    VIDEO OPERATOR: Going off the record. The time is
11 12:26.
12    (A lunch recess is taken.)
13    VIDEO OPERATOR: Going back on the record. The
14 time is 2:06.
15    MS. McDONOUGH:
16    Q. Sir, any reason why you cannot continue to give
17 your best testimony?
18    A. Not at this time, no.
19    Q. Did you have any alcohol at lunch?
20    A. Today, no.
21    Q. Did you tell the investigators in your first
22 meeting that you had received airline drink coupons from
23 Hawaiian Airlines?
24    A. I don't recall what -- what I may have told
25 them.

23 (Pages 739 to 742)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY        December 21, 2006        JOSE HERNANDEZ, VOL. IV

Page 743

1     Q. Did you tell the investigators in your first
2 meeting that Delta Airlines had given you a stack of
3 airline drink coupons to give out?
4     A. Once again, I don't recall what I may have told
5 them.
6     Q. Is it true that Delta Airlines gave you a stack
7 of free airline drink coupons to give out?
8     A. It is true, yes.
9     Q. What did you do with those drink coupons?
10     A. Those coupons were given to me because the
11 airline knew I would walk around the airport. They
12 asked if anytime that I thought it would be necessary
13 for customer service reasons to issue them out if -- you
14 know, they're -- they're not -- it's an entirety.
15     Drink coupons, they're also headset coupons, all
16 part of the same one. It's not -- It's -- They're not
17 specific to drink coupons, no, ma'am.
18     Q. So you gave them out in the airport?
19     A. Yeah, we would give them out or I would give
20 them out. It wasn't a big stack. It was maybe ten, 15
21 of them that we would give out as customer service.
22 Maybe they'd be someone having trouble getting through
23 the security checkpoint line or someone having issues
24 with their children.
25     And so we would just say, "Hey, look, hopefully

Page 744

1 this'll make your flight a little bit easier. Here is
2 two headset coupons for the movie. Hopefully that will
3 calm your kids down."
4     Q. Did you tell the investigators in the first
5 meeting that Southwest Airlines had given you four to
6 six free drink coupon books?
7     A. I don't recall exact -- an exact amount which I
8 may have told them.
9     Q. Do you remember telling them that you received
10 drink coupons from Southwest?
11     A. I don't remember exactly.
12     Q. Do you remember having a conversation with the
13 investigators in that first meeting about Chili's gift
14 cards?
15     A. I don't recall.
16     Q. Do you remember LPI purchasing Chili's gift
17 cards for LPI employees during a holiday season?
18     A. I -- I don't remember.
19     Q. You have no recollection of that?
20     A. I believe they may have, but I don't remember
21 when that was.
22     Q. What do you know about LPI purchasing Chili's
23 gift cards for its employees?
24     A. Okay.
25     I believe that at one time as a -- as a courtesy

Page 745

1 for them or Christmas, I had issued or they had asked
2 for permission to purchase Chili's gift cards.
3     Q. For LPI employees?
4     A. For their parking lot employees, yes, ma'am.
5     Q. And do you know if the expense for the Chili
6 gift cards were submitted to the Authority for payment?
7     A. I believe they did.
8     Q. From LPI?
9     A. Not having the documentation in front of me,
10 but I believe they did, yes, ma'am.
11     Q. Do you remember that LPI received additional $5
12 gift cards for every 20 or $25 in gift -- gift cards
13 that it purchased?
14     A. I believe that was the terms that were
15 negotiated with -- with the Chili's, yes, ma'am.
16     Q. Do you know what LPI did with those additional
17 $5 gift cards?
18     A. I believe that LPI had issued some -- some of
19 those coupons or gift cards back to us that I can issue
20 to my employees.
21     Q. And did you give those out to your employees?
22     A. I believe I did, yes, ma'am.
23     Q. Do you remember about how many $5 gift cards
24 you gave to your employees?
25     A. No, I don't.

Page 746

1     Q. Did you take any of them?
2     A. I believe they were allocated equally
3 through -- through the department.
4     Q. So if you gave two to everyone, you would have
5 taken two as well?
6     A. I don't remember.
7     MS. CHINN: Objection. That mischaracterizes his
8 testimony.
9     MS. McDONOUGH:
10     Q. Is that what you're saying, that if -- if you
11 gave out a certain number to each employee, that you
12 would have taken that same amount for yourself as well?
13     A. I -- I don't -- I don't recall at this time.
14     Q. Do you remember telling the investigators that
15 you had a free parking pass from Ace Parking?
16     A. Once again, I don't remember what I would have
17 told them.
18     Q. Did you tell the investigators that you
19 recognize that there may be an appearance of impropriety
20 because you had the free parking pass from Ace?
21     A. I don't believe that's what I said, no, ma'am.
22     Q. Do you remember any conversation like that?
23     A. I don't believe that I would -- that I would
24 say something in those words, no, ma'am.
25     Q. Why don't you believe you would say something

24 (Pages 743 to 746)

53-611 (244)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY          December 21, 2006                JOSE HERNANDEZ, VOL. IV

Page 747

1  of those words?
2     A.  Because I don't believe those would be words
3  that I would say.
4     Q.  Do you think that there may have been an
5  appearance of impropriety because you had an Ace Parking
6  pass?
7     A.  I wouldn't believe so, no.
8     Q.  Do you remember telling the investigators that
9  you had taken extended-stay passes for special events?
10    A.  I don't remember if I did at that time or not.
11    Q.  Do you remember talking to the investigators in
12 that first meeting about dismissing parking tickets?
13    A.  I don't remember.
14    Could -- Could we (indicating).
15    MS. McDONOUGH:  Oh, we have a problem again with
16 the sunlight coming in and --
17    THE WITNESS:  Yes.
18    MS. McDONOUGH:  -- and getting in Mr. Hernandez's
19 eyes, so we're going to fix it.
20    VIDEO OPERATOR:  Could we go off the record?
21    MS. McDONOUGH:  Yes.
22    VIDEO OPERATOR:  Going off the record.  The time is
23 2:12.
24    (A recess is taken.)
25    VIDEO OPERATOR:  Going back on the record.  The

Page 748

1  time is 2:14.
2     MS. McDONOUGH:
3     Q.  Do you remember talking to the investigators at
4  the first meeting about the driver-permitting process at
5  the airport?
6     A.  Once again, I don't -- I don't remember exactly
7  what I -- what I talked to them during the extent of
8  that conversation.
9     Q.  Do you remember talking to them generally about
10 the driver-permitting process or anything to that
11 effect?
12    A.  I'm not sure.
13    Q.  Do you remember the investigators asking you
14 about whether or not you took soda home from LPI?
15    A.  I don't recall.
16    Q.  Do you remember telling the investigators that
17 Jennifer Hamilton did not do personal errands for you?
18    A.  I don't -- I -- I don't recall saying such a
19 thing, no.
20    Q.  Do you remember telling the investigators that
21 Jennifer Hamilton assisted you with preparing rosters
22 for teams that your family was involved in?
23    A.  I'm not -- I -- I don't recall if I did or did
24 not.
25    Q.  Has Jennifer Hamilton ever helped you prepare

Page 749

1  rosters?
2     A.  She may -- may have.
3     Q.  Do you have any recollection of that?
4     A.  No, I don't.
5     Q.  Do you remember telling the investigators that
6  you had gone to lunch with David Bonaparte from Five
7  Star Parking?
8     A.  I don't -- I don't recall.
9     Q.  Do you remember talking to the investigators
10 about trips to Jacksonville, Florida?
11    A.  I don't recall if I did or not.
12    Q.  Do you have a family member that got married in
13 Florida at any point in time?
14    A.  If I do, I'd like to know who it is.
15    Q.  So that's a "no"?
16    A.  That would be an absolute "no."
17    Q.  Do you have a brother that got married while
18 you were employed at the Authority?
19    A.  I don't -- I don't recall.
20    Q.  Do you have a brother?
21    A.  I have five brothers.
22    Q.  Is there anything that would refresh your
23 recollection as to whether any of your brothers got
24 married while you were employed by the Authority?
25    A.  No, unless you have information.  Unless -- do

Page 750

1  you -- you have different information, no, I don't -- I
2  don't -- I don't recall.
3     Q.  Are any of your brothers married?
4     A.  One.
5     MS. CHINN:  I'll object to this entire line of
6  questioning.  It has nothing to do with his employment.
7     THE WITNESS:  What -- I don't understand the -- the
8  question.  Yes.
9     MS. McDONOUGH:
10    Q.  Yes?
11    A.  Yes.
12    Q.  Yes, you have brothers who are married?
13    A.  Yes.
14    Q.  Did you remember telling the investigators that
15 employees at the Authority have gotten Bowens' cars
16 detailed or picked up from time to time?
17    MS. CHINN:  Let me make that a continuing
18 objection.  The question assumes facts not in evidence
19 that these Author- -- that these investigators act- --
20 asked any of these questions when she asked if he
21 remembers telling them.
22    In fact, the question has never been asked on this
23 record whether he actually told these investigators any
24 of these things.
25    So I want to make that clear what you're answering

25 (Pages 747 to 750)

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210

53-611 (245)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY          December 21, 2006          JOSE HERNANDEZ, VOL. IV

Page 751

1  here. Thank you very much.
2      THE WITNESS: Go ahead and repeat the question,
3  please.
4      MS. McDONOUGH:
5      Q. Did you tell the investigators that you -- that
6  Authority employees on occasion took Bowens' car to get
7  detailed or they picked it up from the detail shop?
8      A. I don't -- I don't recall if I said it
9  specifically at that time, but I do understand that to
10 be true.
11     Q. Where did you obtain that understanding?
12     A. Having picked up her vehicle personally on
13 multiple occasions.
14     Q. How many times have you picked up her car?
15     A. I personally have picked up her car from the
16 detail shop on Knob Hill on no less than four occasions.
17     Q. Do you know the name of the detail shop?
18     A. No.
19     It's -- it's right where the Knob Hill restaurant
20 is, one block down, across the street, right on the
21 corner.
22     MS. CHINN: First -- First Street? First Avenue?
23     THE WITNESS: It's on First Street, uh-huh.
24     MS. McDONOUGH:
25     Q. Do you know if that's Thella Bowens' personal

Page 752

1  car?
2      A. Her personal Infiniti, yes, ma'am.
3      Q. Do you know anyone else who picked up Thella
4  Bowens' car from the detail shop?
5      A. Yes. Ted Sexton, Grace Hill.
6      Q. Do you know how many times Ted picked up the
7  car?
8      A. On multiple occasions, typically when Thella
9  would be -- would go out on travel, he mentioned to me
10 that she would like to have her car detailed, and he
11 would personally take her vehicle up there, get it
12 detailed and -- and return to pick up the vehicle and
13 have it ready for her when she returned from her trip.
14     Q. Do you know how many times Ted did that?
15     A. I would -- I would -- It would just be a guess
16 on my part.
17     Q. How do you know that Ted picked up Thelia's
18 car, took it to the detail shop?
19     A. I had to -- On -- On a couple of occasions, he
20 asked me to go follow him while he took the car up there
21 so that he could have a ride coming back.
22     Q. How do you know that Grace Hill picked up
23 Thella Bowens' car from the detail shop?
24     A. On -- On a couple of occasions, I -- I, once
25 again, followed Grace Hill as she took the vehicle up

Page 753

1  and gave her a ride back.
2      Q. On three or four occasions?
3      A. At least.
4      Q. On more than ten occasions?
5      A. Maybe not that much, but spread out through
6  about a two-year period at least five each.
7      Q. Did you tell the investigators that you're a
8  demanding person to work for and some employees may be
9  negative about you?
10     A. I don't -- I don't recall if that would -- if I
11 would have told them such a thing.
12     Q. Do you believe that to be true?
13     A. I -- I believe I'm a fair and equitable person
14 who -- who is held at high standards and is required
15 to -- to perform.
16     Q. Did you ever tell the investigators that you
17 thought that they were investigating you because someone
18 was upset with you?
19     MS. CHINN: Wait. I didn't hear your question.
20 What was the question?
21     MS. McDONOUGH:
22     Q. Did you ever tell the investigators that you
23 thought that they were investigating you because someone
24 was upset with you?
25     A. Once again, I don't recall, you know, in -- in

Page 754

1  the time that I was there during interview, I didn't
2  have a clue why I was there.
3      Q. How did the investigation meeting conclude on
4  that first occasion?
5      A. If -- If --
6      MS. CHINN: Do you understand what she means by
7  "conclude"?
8      THE WITNESS: That it was over.
9      MS. McDONOUGH:
10     Q. Were there any concluding remarks made by the
11 investigators?
12     A. If my memory serves me correct, at the end of
13 the conclusion -- at the conclusion of the questioning,
14 Pat walked on over to the telephone and made a call to
15 Jeffrey Woodson.
16     Q. How do you know he called Jeffrey Wooden --
17 Woodson?
18     A. He said, "Jeffrey Woodson, I'm ready for you to
19 come back."
20     Q. And then what happened?
21     A. Probably 15, 20 minutes later, the -- someone
22 knocked on the door, and it was Jeffrey Woodson and Ted
23 Sexton. He said, "I'll be right back."
24     They walked two offices down, and they had, once
25 again, a brief little meeting, maybe 15-, 20-minute

26 (Pages 751 to 754)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY          December 21, 2006          JOSE HERNANDEZ, VOL. IV

Page 755

1  meeting. I was required to stay in the room, not leave,
2  not get water, not get air, nothing.
3      Then the meeting came back. Then Pat Swan came
4  back in the room, Ted and Jeffrey came back in and
5  informed me that I would be -- that I was put on
6  temporary suspension.
7      Q. How do you know that Jeffrey Woodson and Ted
8  Sexton went two offices down?
9      A. Because then I was -- I was asked to go -- I
10 was asked to go to that office -- I was asked -- If I
11 could take it back.
12     Pat -- Pat Swan came back into the office and said,
13 "Okay. Now Jeffrey and Ted are ready for you." And
14 then I was escorted down two offices down, and that is
15 where that particular meeting happened.
16     Q. I just want to make sure I understand the
17 sequence of events.
18     So at the end of the interview of you, Pat Swan
19 called Jeffrey Woodson and said, "I'm ready for you" or
20 words to that effect?
21     A. That is correct.
22     Q. Jeffrey Woodson and Ted Sexton came down?
23     A. Yeah, they were -- it took them a long time, so
24 I don't know where they were, but it took probably 15,
25 20 minutes to get -- to get there.

Page 756

1      Q. And then you believe that they went and had a
2  meeting somewhere?
3      A. I believe -- I believe they did. It wasn't
4  within my presence, but it was -- it was in that -- in
5  that general vicinity. I saw them walk into the office
6  two -- two doors down.
7      Q. And who do you think had a meeting at that
8  time?
9      A. I believe it was a meeting between Jeffrey
10 Woodson, Ted Sexton and Pat Swan.
11     Q. Where was John Gambiersky at this time?
12     A. I believe John Gambiersky may have still been
13 in the room at that time because I was -- I was not
14 allowed to leave the room.
15     Q. How long were Ted, Jeffrey and Pat Swan out of
16 the room?
17     A. I don't recall exactly.
18     Q. Was anything said between the time that Pat
19 Swan called Jeffrey Woodson to the office and the time
20 that Jeffrey Woodson and Ted Sexton showed up at the
21 office?
22     A. I don't recall if there was.
23     Q. Then you said you were called into the office
24 two doors down where Ted and Jeff- -- Jeffrey Woodson
25 were?

Page 757

1      A. That's correct.
2      Q. And then what happened?
3      A. And then that was when I was informed that I
4  would be put on temporary suspension pending
5  investigation.
6      At -- At that point I responded, "For what? I need
7  to know what" -- "what this is all about." And no
8  information was provided to me at that time.
9      Q. Who told you that you would be put on temporary
10 suspension?
11     A. I believe that -- I believe those were the
12 comments from Jeffrey Woodson.
13     Q. What was Jeffrey Woodson's position at that
14 time?
15     A. I believe he was vice president of
16 administration.
17     Q. Did you have an understanding of whether your
18 suspension would be paid or not paid?
19     A. The assumption -- No, not at that time.
20     Q. Do you know if the suspension was paid?
21     A. I believe it was, yes, ma'am.
22     Q. And you asked why you were being suspended, and
23 no response was given?
24     A. Yes.
25     I was -- I had asked for full details of the

Page 758

1  investigation, what I was being investigated for. I
2  wanted a full and complete understanding so that I could
3  go seek legal advice as to -- or try to seek some advice
4  as to what the hell was going on.
5      Q. And no one told you?
6      A. No one told me.
7      Q. Did Ted say anything in this meeting where you
8  learned that you were being put on suspension?
9      A. He -- I don't recall what he may have said.
10 I'm sure he said some comments, but I'm not sure what he
11 said.
12     Q. What happened next?
13     A. After that I was escorted back up to my office
14 where I -- where I picked up my -- my personal goods
15 from the office.
16     Q. What did you pick up at that time?
17     A. I picked up my backpack.
18     Q. Did you take anything else with you --
19     A. No.
20     Q. -- at that time?
21     A. No.
22     In fact, one of -- one of the ridicules of this
23 whole thing was that the door was not locked or closed
24 behind me while I was in the office.
25     Ted and Bryan were -- I mean, Ted and -- and -- and

JOSE HERNANDEZ vs. SAN DIEGO COUNTY          December 21, 2006          JOSE HERNANDEZ, VOL. IV

Page 759

1  Jeff were at the door, and as I picked up my bag, Ted
2  rifled through my bag. I said, "Hey, you can't be doing
3  that."
4      He said, "No, I'm going to do that." So he rifled
5  through my bag, my backpack, without asking permission
6  for it and searched through everything that was in the
7  bag.
8      Q. How long did he search through your backpack?
9      A. He probably searched it for maybe around a
10  minute time frame.
11     Q. For one minute?
12     A. Yes.
13     Q. Did Ted Sexton keep anything from your
14  backpack?
15     A. There was nothing in there to keep.
16     Q. What was in the backpack to your recollection?
17     A. My -- maybe a notebook and my car keys and
18  my -- my wallet.
19     Q. What was in the notebook?
20     A. Like one of these (indicating).
21     Q. Was there anything written down?
22     MS. CHINN: You know what?
23     THE WITNESS: I -- I don't --
24     MS. CHINN: I'm going to object to that. I'm going
25  to object to this line of questioning. I think -- I

Page 760

1  think there has been one invasion of privacy, and I
2  think the questioning is another invasion of his
3  privacy.
4      But go ahead and answer the questions.
5      THE WITNESS: No, I believe -- I believe the
6  notebook was just one like this (indicating), just a
7  blank --
8      MS. McDONOUGH:
9      Q. Just a blank notebook?
10     A. Yeah.
11     Yeah, I'm sure if there was anything of value to
12  anyone, I would not be allowed to -- to walk out of that
13  office with it.
14     Q. And then what happened after you obtained your
15  backpack from the office?
16     A. And at that point I was escorted to my car,
17  where I handed over my airport SIDA badge. I
18  volunteered my parking pass for -- for the employee
19  parking lot, and I drove home.
20     (A discussion between witness and counsel is held
21  off the record.)
22     MS. McDONOUGH:
23     Q. What was the next contact, if any, that you had
24  with the investigators?
25     A. As a follow-up -- As a follow-up, I had

Page 761

1  retained counsel in an effort to try to figure out what
2  the hell was going on.
3      Then they had communicated -- My -- They
4  communicated through my attorney.
5      Q. So sometime after you left this first meeting
6  with the investigator you retained counsel, and then
7  after that the communications were through your counsel?
8      A. Long time after that, yes, ma'am.
9      Q. How long?
10     A. Longer than shorter. I'm not sure exactly.
11     Q. Did you have a second meeting with the
12  investigator?
13     A. Yes, we had a second meeting with counsel
14  present.
15     Q. Do you remember when that meeting was?
16     A. No, I do not.
17     Q. Do you know why a second meeting was scheduled?
18     A. The second meeting was scheduled because the
19  investigator was seeking clarification.
20     Q. Have you ever been informed from any source
21  other than your counsel that your counsel requested the
22  second meeting?
23     MS. CHINN: Objection.
24     Don't disclose anything that occurred between you
25  and me under any circumstances.

Page 762

1  MS. McDONOUGH:
2      Q. Yeah, I'm -- I don't want to know anything that
3  you and Ms. Chinn spoke about.
4      I just want to know if from any other source than
5  Ms. Chinn did you learn that your counsel had requested
6  the second meeting with the investigator.
7      A. I believe the second meeting was requested by
8  the investigator, not from counsel.
9      Q. Where did you obtain that understanding?
10     A. I believe it was --
11     Q. Don't -- Don't tell me if Ms. Chinn told you.
12     A. No. No, I believe it was -- it was a request
13  that -- You know, I can't -- I can't answer it because
14  it's privileged information.
15     Q. Okay.
16     Where did the second meeting take place?
17     A. At the office of my attorney.
18     Q. Do you recall the investigators asking you in
19  the second meeting if you had had any contact with
20  airport-related individuals since your first meeting
21  with the investigators?
22     A. I don't recall specifically what they may have
23  asked me at that time.
24     Q. Do you have any recollection of what was
25  discussed in the second meeting?

28 (Pages 759 to 762)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY        December 21, 2006        JOSE HERNANDEZ, VOL. IV

Page 763

1    A. Vague -- Vague recollection.
2    Q. What is your recollection?
3    A. Vague. It was just -- Really, the recollection
4  was they came in -- they came in, they -- they wanted to
5  seek clarifications of -- to questions or inquiries that
6  were asked.
7        Even larger than that, it was really highly
8  contentious on behalf of John Gamblersky and -- and Pat
9  Swan. And really my recollection was them producing
10 auto repair records that no one had ever authorized them
11 to -- to have. That's what I remember about that.
12   Q. Do you remember anything else about that second
13 meeting with the investigators?
14   A. I was disgusted and appalled that they would
15 misrepresent themselves as Airport Authority employees
16 or -- as Airport Authority employees to -- to
17 individuals who I had done business with in an effort to
18 coerce them to release auto repair bills that at no time
19 did I ever authorize them to -- to have.
20   Q. Did you speak to any Airport Authority or
21 Authority-related employees about the investigation
22 between your first and your second meeting with the
23 investigators?
24   A. I may have.
25   Q. Do you remember any?

Page 764

1    A. No, I don't.
2    Q. Did you call any Authority employees after you
3  were placed on suspension?
4    A. I -- I may have.
5    Q. As we sit here today, you don't have any
6  recollection of that?
7    A. I -- I may have.
8    Q. Do you have any recollection of the people that
9  you contacted?
10   A. No, I don't.
11   Q. How quickly after you were placed on suspension
12 did you retain counsel?
13   A. I don't recall the exact timing -- exact
14 timing.
15   Q. Was it within a week?
16   A. Once again, I don't recall exact timing.
17   Q. Is there anything that would refresh your
18 recollection?
19   A. Exact timing, no.
20   Q. Were you upset that the investigators had
21 records from USA Cab?
22   A. I was upset that -- that they once again
23 misrepresented themselves and coerced someone who I felt
24 was a good friend of mine into producing those under the
25 threat of legal actions, some against me personally.

Page 765

1  Yes, I was highly upset.
2    Q. Why do you believe that the investigat- --
3  investigators misrepresented and coerced -- is it the
4  owner of USA Cab?
5    A. One of the owners, yes, ma'am.
6    Q. Why do you believe that the investigators
7  misrepresented and coerced him to provide the records?
8    A. I had following up -- as a follow-up to that
9  meeting, I had occasion to go meet with -- with the
10 owner of USA Cab. And in an inquiry to try to find out
11 why -- you know, why. -- Now I lost my train of thought.
12 Ask me the question again. I apologize.
13   Q. Why do you believe -- Well, let's go back.
14   A. Okay.
15   Q. Are you referring to Tony?
16   A. Tony Hueso.
17   Q. Hueso?
18   A. Uh-huh.
19   Q. From USA Cab?
20   A. Yes.
21   Q. Why do you believe that the investigators
22 misrepresented or coerced Tony Hueso to give the records
23 to them?
24   A. Oh, I know so. I had a conversation, detailed
25 conversation, with Mr. Hueso following that meeting

Page 766

1  with -- with the investigator.
2    Q. Following the second meeting?
3    A. The second meeting, yes, ma'am.
4    Q. About how long after that second meeting did you
5  have the discussion with --
6    A. Prob-- --
7    Q. -- Mr. Hueso?
8    A. Probably within a week or two of that meeting.
9    Q. And what did Mr. Hueso say to you about the
10 investigators?
11   A. I -- I had gone down to go meet with Tony in an
12 effort to ask him how it was that -- that the
13 investigator received those documents.
14       He explained or detailed to me that out of nowhere
15 one day, you know, John Gamblersky showed up at his --
16 at his doorstep and represented himself as an Airport
17 Authority employee. And he was requesting documentation
18 for any auto repair work that I may have had done on any
19 of my vehicles.
20       Tony said -- Tony, at that time, explained to him
21 that unless -- unless he had approval or an approval
22 letter on my behalf he was unable to do that.
23       At that point John says, "If you" -- you know,
24 probably "If you know what's best for" -- "for your
25 friend, you would produce those documents for me at this

29 (Pages 763 to 766)

53-611 (249)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY    December 21, 2006    JOSE HERNANDEZ, VOL. IV

Page 767

1  time.  Otherwise there would" -- "Otherwise it would be
2  a greater of intent of legal action against" -- "against
3  your friend."
4      Q.  Did Tony ever tell you that the investigator
5  contacted him in advance to set up an appointment to
6  come to USA Cab to look at the records?
7      A.  I don't recall exactly whether that may have
8  been said or not.  The -- The conversation was more
9  centered around when he did show up to -- to the auto
10  replay -- auto repair place, to their place of business.
11      Q.  And you said that the investigator told Tony
12  that there would be a greater intent of legal action
13  against you?
14      A.  Yeah.
15      Q.  What do you mean by that?
16      A.  That's correct.  According to Tony, he -- he
17  was told or he understood that things would go better
18  and it would be greater assistance to myself if at that
19  point in time the records were produced.  It would be
20  better for me if he would produce those records at that
21  time.
22      Q.  And so did Tony tell you he then produced the
23  records?
24      A.  Tony -- Tony mentioned to me that, you know,
25  there was two things going on.  One, he wanted to do

Page 768

1  what was right and produce the documents in an effort
2  to -- to assist me because he didn't believe anything
3  was wrong in our business interactions.
4      And two, was that he was -- he had been intimidated
5  in some form by -- by John -- John Gambiersky.  Once
6  again, he did not represent himself as a prime
7  investigator.  He represented himself as a
8  representative of the Airport Authority.
9      Q.  Do you know exactly what he said as far as his
10  title or position with --
11      A.  No, he --
12      Q.  -- the Airport Authority?
13      A.  -- his conversation or -- according to what
14  Tony Hueso said to me was that he came in representing
15  himself as -- as -- as someone from the Airport
16  Authority.
17      Q.  Had you also gathered your own records
18  regarding the vehicle repairs in preparation for that
19  second interview with the investigators?
20      A.  I had gathered whatever records I may have had
21  at that time.
22      Q.  Do you remember what records you had?
23      A.  No, I don't.
24      Q.  Were you prepared to give those to the
25  investigator to look at?

Page 769

1      MS. CHINN:  Objection.  That calls for speculation.
2      THE WITNESS:  I don't -- I -- I was not prepared to
3  give them to them at that time, no.
4      MS. McDONOUGH:
5      Q.  Were you prepared to show them to the
6  investigators?
7      A.  That would be -- That would be a question
8  for -- for my counselor -- for my counsel if she felt it
9  would be appropriate.  But I was not prepared to -- to
10  show any of that documentation to anyone at that time.
11      Q.  So you were leaving it to up to Ms. Chinn to
12  decide to whether to give the documents or not?
13      MS. CHINN:  Objection.  That mischaracterizes his
14  testimony.
15      THE WITNESS:  I had brought that documentation with
16  me with no intent to show -- to show them.  I just --
17  If -- If I felt at the time that I had to do it, then I
18  would, but I had no intent.  It wasn't -- It wasn't a --
19  a show-and-tell or intent to -- to show these documents,
20  no, ma'am.
21      MS. McDONOUGH:
22      Q.  Do you believe that the repair records that
23  USA Cab provided to the investigators were private?
24      A.  Absolutely I know they're private.
25      Q.  What do you think are private about the car

Page 770

1  repair records?
2      A.  I believe those documents are covered under the
3  Auto -- the Bureau of Automotive Repair, and those are
4  private documents that could not be released unless --
5  unless myself, either verbal, in writing, produces those
6  documents.
7      Q.  Is there anything actually contained in the
8  documents that you feel is embarrassing?
9      MS. CHINN:  Objection.  That discloses the content
10  of the document, and it's vague and ambiguous as to
11  "embarrassing."
12      If you can answer the question, go ahead.
13      THE WITNESS:  I feel that someone -- that someone
14  looking into my -- my details, how I live my life is
15  embarrassing.  They have no right to do that.
16      You know, how would you like it if I went in and
17  looked at your information?  I don't think you'd be
18  embarrassed yourself.
19      MS. McDONOUGH:
20      Q.  Did you think that there was anything in the
21  records beyond just the date of repairs and the amount
22  paid for repairs and what repairs were done?
23      MS. CHINN:  Objection.  That question asks for the
24  content of the document, and the document speaks for
25  itself.  And also, I think it discloses private

30 (Pages 767 to 770)

53-611 (250)

**Page 771**

1   information that you're not entitled to, unless you lay
2   a foundation.
3       You can answer it if you're comfortable answering
4   it --
5       THE WITNESS: No.
6       MS. CHINN: -- if you want to answer it.
7       THE WITNESS: No answer.
8       MS. McDONOUGH:
9       Q. It just asks for a "yes" or "no." I'm not
10  asking for the content of what you think was in there
11  beyond just the date of the repair and -- and whether
12  they were done. So I'll ask it again, and --
13      MS. CHINN: Ask it in a different way. You
14  probably can get another answer. But you can't ask him
15  if it -- if they were embarrassing.
16      MS. McDONOUGH: That's not what I asked.
17      Q. I just want a "yes" or "no" to this question.
18      Did you think there was anything in the records
19  beyond just the date of repairs, the amount paid for
20  repairs and what repairs were done?
21      MS. CHINN: If you know the answer to that, you can
22  answer it, but don't guess.
23      THE WITNESS: No, I -- I won't even venture to
24  guess at this time.
25      MS. McDONOUGH:

**Page 772**

1       Q. Do you know what was in the records?
2       A. You know, I -- Well, no, I wouldn't even
3   venture to guess what were on those records.
4       Q. Did the investigators ever show you the
5   records?
6       A. I believe that during that second meeting, the
7   investigator sitting down was thumbing through them,
8   thumbing through all the records. And when confronted
9   to show those he refused, even though he admitted that
10  those were all my private records.
11      Q. He admitted that they were private?
12      A. Yeah.
13      He said -- What we asked him was, "How do you have
14  all my records from the automotive repair place?" I
15  said, "Those were the records" -- "Those were the
16  records that you received from" -- "from Tony Hueso at
17  USA" -- "at USA Cab." I said, "Did you get those
18  there?"
19      He never refuted it. He received those doc-- --
20  that documentation. He had them, kind of like a dumb
21  little kid who is looking through the books and sees,
22  "Oh, you know, I think I got caught."
23      Q. Did the investigators ever say anything about
24  whether they thought that the records were private or
25  not?

**Page 773**

1       A. I believe we confronted them -- we confronted
2   them with the fact that those records were private, we
3   had never consented to him viewing those -- that
4   documentation, and that he had no right to have that
5   documentation, yes, ma'am.
6       Q. And did the investigator respond?
7       A. His exact response I don't remember, but I
8   think it was clearly understood by him and Pat Swan, the
9   attorney, that they were not entitled to those records
10  whatsoever.
11      Q. Why do you believe it was clearly understood by
12  them?
13      A. Because quickly then they put those records
14  away and would not provide those records to us or even
15  let us see those records furthermore.
16      Q. Did you ever obtain the records from Tony?
17      A. I had no need to obtain the records after that.
18      Q. Have you ever looked at the records?
19      A. No, ma'am.
20      Q. Do you have any way of knowing whether --
21  what's in the records?
22      A. No, ma'am.
23      Q. Did you tell the investigators in your second
24  meeting that you had received free airline tickets for
25  trips to Hawaii and Las Vegas?

**Page 774**

1       A. I don't recall what I may have told them.
2       Q. Did you tell the investigators that Mike
3   Parrish gave your family three buddy passes to use to go
4   out to Las Vegas to meet you and to spend time with Mike
5   Parrish's family?
6       MS. CHINN: I have an objection. I think all of
7   these questions have been asked and answered previously.
8       THE WITNESS: I -- I don't recall, once again, what
9   I may have told them, but I believe we've had
10  discussions on this issue before.
11      MS. McDONOUGH:
12      Q. We had discussions about the actual trip. I
13  was just asking if you told the investigator that you
14  received buddy passes from Mike Parrish.
15      A. I don't recall.
16      MS. CHINN: Are you talking about the second
17  meeting?
18      MS. McDONOUGH: Yes.
19      Q. Did you tell the investigators in the second
20  meeting that you had never flown on Aloha Air?
21      A. I don't recall if I did.
22      Q. Is that true, that you've never flown on Aloha
23  Air?
24      A. I've never flown on Aloha Air.
25      Q. Did you tell the investigators in the second

31 (Pages 771 to 774)

53-611 (251)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY            December 21, 2006            JOSE HERNANDEZ, VOL. IV

Page 775

1  meeting that your wife received those uniforms that
2  we've already discussed in exchange for your wife giving
3  Mary Kay cosmetics to Kelly Pond?
4      A.  Yeah, I don't recall if I did, no.
5      Q.  Did you tell the investigators in the second
6  meeting that Cheryl Black gave you those two tickets to
7  a sporting event that we already discussed?
8      A.  Once again, I think we've discussed it, but I
9  don't recall what -- the -- Those meetings were so
10 frustrating, and it -- it would be hard for -- for me to
11 sit here and tell you what I may or may not have -- have
12 talked about.
13     Just the whole point of those meetings, especially
14 when you have the attorney come in like a little
15 bulldog, "I need to sit in the big-boy chair. I'm not
16 going to sit on the couches outside," you know, "I need
17 to be in a power position." I mean, the -- there --
18 that was, once again, far from an impartial secondary
19 meeting.
20     Q.  Did you tell the investigators in the second
21 meeting that Janet Nix offered you tickets for the
22 December 2005 Charger-Raider game, but you couldn't go
23 because your family was going to Orlando?
24     A.  No, I don't recall, ma'am.
25     Q.  Is that true, that Janet Nix offered you

Page 776

1  tickets for that game, but you couldn't go because you
2  were in Orlando?
3      A.  I don't recall, ma'am.
4      Q.  So you don't recall giving the investigators a
5  chance to look at the records that --
6      MS. CHINN:  Objection.
7      MS. McDONOUGH:
8      Q.  -- you bought -- that you brought with you
9  regarding your car repair records?
10     MS. CHINN:  Objection. That -- That contains facts
11 not in evidence, and it assumes facts not in evidence.
12 His testimony is the opposite. It mischaracterizes what
13 he's -- what he's testified to.
14     THE WITNESS:  I believe I already answered that,
15 ma'am. No, at no time did I allow them to view any of
16 my private records.
17     MS. McDONOUGH:
18     Q.  Did you tell the investigators in the second
19 meeting about the time when you went to a bar in Old
20 Town and Kelly Pond was there also, and you paid for a
21 round of drinks?
22     A.  I don't recall.
23     Q.  To -- Did you tell the investigators in the
24 second meeting about golf trips that you had had with
25 airport-related individuals?

Page 777

1      A.  I don't recall the exact contents of the second
2  meeting, no.
3      Q.  Did you tell the investigators in the second
4  meeting about Dave Mueller asking you to get tickets
5  through at IpayOne for a concert?
6      THE REPORTER:  At what?
7      MS. McDONOUGH:  IpayOne. It's all one word. It's
8  the name of a center.
9      THE WITNESS:  Yeah, I don't -- I don't recall,
10 ma'am.
11     MS. McDONOUGH:
12     Q.  Do you recall your attorney asking questions of
13 you during that second meeting with the investigators?
14     A.  No, I -- I don't recall.
15     THE REPORTER:  Excuse me one second, Counsel
16 (indicating).
17     MS. McDONOUGH:
18     Q.  Do you recall telling the investigators at the
19 second interview that Jennifer Hamilton and Amy Gosslin
20 have access to your Outlook calendar?
21     MS. CHINN:  Could you repeat the question, please.
22     (The record is read by the reporter.)
23     THE WITNESS:  I don't recall.
24     MS. McDONOUGH:
25     Q.  Did you tell the investigators in that second

Page 778

1  interview whether Ted Sexton knew that you received
2  those tickets on Hawaiian Air or the buddy passes from
3  Southwest?
4      A.  No, I don't recall.
5      Q.  Do you think that Ted Sexton knew that you
6  received the tickets from Hawaiian Airlines or from
7  Southwest Air?
8      A.  I don't -- You know, that -- that would be a
9  question for him.
10     Q.  So you don't know either way?
11     A.  No.
12     Q.  Do you remember talking to the investigators in
13 that second meeting about any ethics training that you
14 may have had?
15     A.  I don't recall, ma'am.
16     Q.  Did you tell the investigators in that second
17 meeting that Ted Sexton told you, "You can never buy
18 lunch for a contractor, but a contractor can buy lunch
19 for you"?
20     A.  I don't recall.
21     Q.  Has Ted Sexton ever said that to you?
22     A.  I believe he had on a couple of occasions.
23     Q.  When was the first time that you remember Ted
24 Sexton telling you that you could never buy lunch for a
25 contractor, but they could buy lunch for you?

32 (Pages 775 to 778)

53-611 (252)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY          December 21, 2006          JOSE HERNANDEZ, VOL. IV

Page 779

1   A. Maybe 2004, 2005, somewhere in that time frame.
2   Q. Was there a context to that statement?
3   A. There was.
4   We had -- We had a submittal by one of our
5   employees, Jay Bass, that -- that he had on several
6   occasions bought lunch for employees of Service
7   Performance Corporation. Obviously those -- those
8   statements come to me for approval, and then secondary
9   approval to Ted Sexton.
10   In that particular one I asked him what he thought
11   of Jay buying lunch for -- for contractors.
12   He said, "Do me a favor. Go back and tell him that
13   it's" -- you know, "that it's" -- "that it's not okay
14   for us to go" -- "to buy lunch for" -- "for contractors,
15   but they can buy lunch for you." It's just an easier
16   way to do it.
17   Q. Do you remember Ted Sexton telling you that on
18   any other occasion?
19   A. I believe that -- I believe that was the one
20   that specific -- that I remember specifically. He may
21   or may not have.
22   Q. Did you tell the investigators in the second
23   interview about Jennifer Hamilton's desk audit?
24   A. I don't recall, ma'am.
25   Q. About how long did that second interview last?

Page 780

1   A. Approximately maybe two hours.
2   Q. Did you have any further contact with the
3   investigators after that second interview?
4   A. I don't recall at this time if I did.
5   Q. What was the next contact that you had with
6   anyone from the Authority after that second interview?
7   A. I believe that my next contact was with Diane
8   Richards.
9   Q. When was that?
10   A. I don't recall the exact timing.
11   Q. Do you have an approximation?
12   A. No.
13   Maybe about a week or two after that second one, I
14   would call her on -- you know, on a regular basis trying
15   to figure out what -- where we were.
16   And this invest- -- the investigation lam- --
17   lasted, geez, I want to say maybe 45 days. I mean, it
18   was a long time from whatever beginning of December all
19   the way through, you know, the final date of separation.
20   Q. What did Diane Richards say to you in that next
21   conversation you had with her?
22   A. She said, "I will get back to you when" --
23   "when we're ready to talk to you."
24   Q. Was that --
25   A. "I'll get back with you until we're ready to

Page 781

1   talk to you."
2   Q. Was that the extent of your conversation with
3   Diane at that point?
4   A. My conversations with her were, you know, "I
5   really want to know what this is all about." I wanted
6   to be provided information as to, you know, what the
7   allegations were in writing. I -- I wanted to know what
8   was going on. "What was going on? Why is it so
9   devious" or -- or "What is so special about this that
10   you can't tell me what's going on?"
11   Q. Did Diane respond to that question?
12   A. She said she could not provide that information
13   to me.
14   Q. Did you say anything else to her in those
15   meetings -- or in those telephone conversations?
16   A. No.
17   Those were just conversations that I had with Diane
18   trying to get an idea of what was going on, trying to
19   figure out when we can finalize this whole issue, what I
20   needed to do to -- to move on.
21   I mean, it's -- it's a scary feeling when you're at
22   home. No one will tell you what's going on. You can't
23   go to work. Your friends aren't allowed to talk to you
24   anymore.
25   I mean, you're all alone. You can't sleep. You

Page 782

1   can't eat. Probably lost 20 -- 20 pounds during that.
2   I mean, that is a scary, scary feeling and a scary
3   position to be in when no one will tell you what's going
4   on.
5   Q. Prior to the investigation, what was your
6   working relationship like with Diane Richards?
7   A. It was -- It was okay. It was okay. We -- You
8   know, we had, for the most part -- you know, it was
9   fairly amicable. You know, Diane Richards has a way
10   about her of -- you know, it's her way and that's the
11   right way to do things.
12   And we just had a different view of the way things
13   should be done, you know, a little bit for -- a little
14   bit more fair and open. So, you know, it's just a
15   differentiation in -- in styles, but, you know, it
16   wasn't -- it was fairly amicable, if that.
17   Q. No personal hostility between the two of you?
18   A. I don't see why there would be.
19   Q. Was there any hostility between you and Diane
20   Richards during the investigation itself?
21   A. There would be hesitations on her part, yes.
22   Q. What kind of hesitations?
23   A. She would distance herself. There was -- There
24   was -- far from her being professional in those -- in
25   this -- where "I'm just not going to tell you" or "No,

33 (Pages 779 to 782)

53-611 (253)

Page 783

1  that's not the way it's going to be."
2      So it was fairly hostile on her part, where all I
3  wanted was information.  How -- How hard could that have
4  been for her to provide?  "Just tell me what's going on.
5  Tell me what the allegations are.  Where is this leading
6  to?  Can't you tell me something?"
7      "No, I'm not going to tell you anything."
8      Q.  Did Diane Richards do anything else during --
9  during the investigation that you considered hostile?
10     A.  Well, you know, when you look -- when you look
11  back, her -- you know, her -- you know, and almost back
12  from the beginning, you know, when this whole thing
13  starts, you know, why can't you just spend a little bit
14  of time and tell an employee, "This is what's going on.
15  This is who they are.  This is what we're going to talk
16  about," as opposed to, "You need to talk to these guys"
17  and she blows right out the door.  Highly, highly
18  unprofessional.
19     I would never do that to an employee, just leave
20  them out there to kind of fend for themselves.  You
21  know, when you ask her for information, you know, I
22  guess you would think that they understand that there is
23  an ongoing investigation.
24     But, you know, employees are entitled to understand
25  what's going on.  You're just not going to tell them

Page 784

1  anything?  You don't even tell them the process?  You
2  know, you don't -- I mean, there is nothing being said.
3      Q.  Did Diane Richards do anything else that you
4  considered to be hostile during the investigation?
5      A.  Towards the end, prior to the last meeting,
6  when she finally asked -- say, "Okay.  I think we pretty
7  much concluded this investigation," you know, "Here is a
8  day that I want you to come in."
9      And she -- you know, and so I asked her, you know,
10  "Can I bring counsel?"
11     "You can't bring anyone."
12     "What you do mean, I can't bring anyone?  Tell me
13  where it says that," you know, "that I'm not entitled to
14  some sort represent-" --
15     "I'm not going to tell you.  You just can't bring
16  anyone."
17     Q.  Did you say anything in response to that?
18     A.  Yeah, I said, you know, "I really need to
19  understand what's going on, and it really needs to be
20  explained to me why I can't bring my counsel."
21     "We're not going to tell you anything.  If you want
22  to come, you got to come by yourself."
23     Q.  And that was the end of the discussion on that
24  issue?
25     A.  And then -- then once again, it was reiterated

Page 785

1  when I did my -- my final interview with -- with Ted
2  and --
3      MS. CHINN:  We're not there yet.
4      THE WITNESS:  No.  All right.
5      MS. McDONOUGH:
6      Q.  In your complaint, you've alleged that you had
7  never been criticized or disciplined for anything during
8  your employment with the Authority until the events of
9  December 2005 that led to your improper termination from
10  the Authority in February of 2006.
11     Is that an accurate statement?
12     A.  I believe that if you would look at my employee
13  file, there should not be any documentation in there,
14  any written warnings, verbal warnings that would reflect
15  anything other than exemplary service on my behalf.
16     If you take a look at my performance evaluations,
17  I've always rated between a 4 and 4.5, nothing but
18  commendations in there.
19     In fact, I took a look at my employee file before I
20  left employment.  There should not be one single
21  document in that employee file that would reflect other
22  than -- you know, than above-average performance on my
23  behalf.
24     Q.  And you had received consistent pay raises and
25  promotions over time?

Page 786

1      A.  I believe so, yes, ma'am.
2      Q.  So the statement that I read to you from your
3  complaint is accurate?
4      A.  I believe that in looking at your doc- -- If
5  you -- the -- as reflected through the -- on the
6  employee file, that would -- that would prove to be
7  accurate.
8      Q.  And you believe that that's accurate?
9      A.  I believe that I have worked in exemplary
10  fashion that would warrant consistent pay raises and
11  promotions, that I've worked in -- that my work
12  performance speaks for itself.
13     That I was -- I was a top performer that produced
14  projects at a -- at a high level and a higher quality
15  than most individuals at the airport that have gone
16  through and played an integral part in reorganizing
17  the -- the culture between the tenants and -- and the
18  Airport Authority.
19     At one particular time we would go to Lindbergh
20  Airport managers' counsel, they would read off the list
21  like you can't believe.  "We hate you for all these
22  reasons."
23     And guess what?  You know, two, three years into my
24  tenure, all we did at that, it was just a big love fest.
25  "We love you guys."

JOSE HERNANDEZ vs. SAN DIEGO COUNTY          December 21, 2006          JOSE HERNANDEZ, VOL. IV

Page 787

1  You know -- You know why? Because I made myself
2  available. "You want to call me at any time, here is my
3  number. Here is my home number. You can always get
4  ahold of me, and don't worry about it. I'll take care
5  of it."
6  Q. So prior to December 2005, you had not received
7  any sort of a criticism, disciplinary action or anything
8  else in your employment with the Authority?
9  A. People get criticized all the time, but in
10  terms of -- of written documentation in my employee
11  file, I don't believe there should be any documents in
12  there, or I don't remember going through such -- go --
13  going through or warranting anything to that level.
14  You know, once again, we all get criticized. You
15  know, no one's perfect, but there should not be anything
16  in my employee file that reflects -- that would reflect
17  or substantiate that.
18  Q. And when -- in the statement that I read, it
19  says "Into the events of December 2005," is that
20  referring to the investigation?
21  A. I believe so.
22  Just, you know, prior to that -- prior to that and
23  looking at my -- you know, my employee file.
24  MS. CHINN: I'll -- I'll object. I wrote the
25  complaint. I'm not looking at it, but I don't think he

Page 788

1  can testify to what's written in the complaint.
2  But he can answer that if he's able to.
3  THE WITNESS: Okay.
4  I -- I believe that there should be nothing in my
5  file prior to the commencement and investigation that
6  would warrant -- that would go opposite to the
7  statement.
8  MS. McDONOUGH:
9  Q. Okay. I can ask it another way.
10  It -- Was the investigation the first event in your
11  employment you felt was a -- some sort of a disciplinary
12  action or a significant criticism of your employment at
13  the Authority?
14  MS. CHINN: Would you repeat that.
15  THE WITNESS: We -- We get --
16  MS. CHINN: I'm sorry. I -- I'm not sure I
17  understood the question. Perhaps you can just tell me
18  what it is.
19  MS. McDONOUGH:
20  Q. Was the investigation the first event in your
21  employment where you felt some sort -- it was some sort
22  of a disciplinary action or a significant criticism of
23  your employment at the Authority?
24  MS. CHINN: The investigation? It's vague and
25  ambiguous.

Page 789

1  Answer if you can.
2  THE WITNESS: You know, criticisms come in all
3  different levels. I get criticized in my position from
4  everyone, from -- from the TSA, from the employees, from
5  the 50,000 people that go through the property.
6  Yeah, we -- I get criticized all the time. It just
7  happens to be the nature of the job. Disciplinary
8  action I -- I don't believe had gone through any other
9  disciplinary action that would be documented in my
10  employee file.
11  MS. McDONOUGH:
12  Q. Until your termination?
13  A. Yes, ma'am.
14  Q. You indicated that there was eventually a
15  meeting back at the Authority.
16  Was that in February 2006?
17  A. Pretty close, ma'am.
18  Q. And were you told the purpose of that meeting?
19  A. I believe --
20  Q. -- in advance?
21  THE REPORTER: I didn't hear the tail end.
22  MS. McDONOUGH: In advance.
23  THE WITNESS: No. No, the call had come from --
24  the call had come from Diane Richards asking me to -- to
25  present myself or when I was available for a meeting

Page 790

1  with -- with herself.
2  MS. McDONOUGH:
3  Q. Did Diane tell you that the meeting was just
4  with her --
5  (Telephonic interruption in proceedings.)
6  MS. CHINN: Sorry.
7  MS. McDONOUGH: Do you need a break?
8  MS. CHINN: I can't read it anyway. I can't see.
9  Sorry. I couldn't see the button to turn it off.
10  Is this off (indicating)? Excuse me just for a
11  second.
12  THE WITNESS: (Indicating.)
13  MS. CHINN: For the purposes of not ever having
14  that happen in a deposition.
15  THE WITNESS: Where is the button (indicating)?
16  MS. CHINN: Oh, never mind. Give it to me.
17  THE WITNESS: (Indicating.)
18  MS. CHINN: Thanks (indicating.)
19  THE WITNESS: Go ahead, repeat.
20  MS. McDONOUGH:
21  Q. Did Diane tell you that the meeting at the
22  Authority in February 2006 was just going to be with
23  her?
24  A. She wouldn't tell me who it was with, and she
25  wouldn't tell me what it was about. I asked for the

35 (Pages 787 to 790)

53-611 (255)

Page 791

1  contents. I asked her what I needed to bring to be
2  prepared, what should I be ready for, can I bring
3  counsel. Nothing, nothing, nothing, nothing, nothing,
4  nothing.
5      Q. How far in advance of the meeting was your
6  conversation with Diane?
7      A. It -- It would be hard to guess. Maybe about a
8  week.
9      Q. And then you came to the Airport Authority for
10 a meeting --
11     A. Yes.
12     Q. -- in February 2006?
13     A. Approximately, yes, ma'am.
14     Q. Where did you go for the meeting?
15     A. The meeting was in Diane Richards' office in
16 the west wing building.
17     Q. Did you have to check in at the front disk when
18 you came in for the meeting?
19     A. I believe that was common practice to do so,
20 yes, ma'am.
21     Q. Even as an employee?
22     A. Ma'am, I -- I do not believe I was considered
23 an employee at that time.
24     Q. I'm -- I'm just trying to understand.
25        When you were an active employee at the Authority,

Page 792

1  did you check in at the front desk?
2      A. I believe the -- anyone seeking access for
3  the -- to the human resource department was required to
4  check in.
5      Q. So on that day in February of 2006, you checked
6  in?
7      A. I must have, yes, ma'am.
8      Q. And then you went to Diane Richards' office?
9      A. Yes.
10     Q. Was anyone else there when you arrived?
11     A. Ted Sexton was.
12     Q. And then what happened?
13     A. At that particular time, I had voiced my
14 objections to -- to Diane Richards for, once again, not
15 informing me or providing me sufficient information on
16 what the meeting was all about.
17        You know, I, once again, expressed my frustration
18 with her with not treating me fair and equitably, and
19 wanted to understand exactly what -- what we were here
20 to do.
21        And I really wanted to know from her if I had an
22 opportunity to seek counsel. And if I did, I would have
23 made a call as we had our counsel prepared to come down
24 immediately.
25     Q. Did Diane respond to those objections?

Page 793

1      A. She just said, "You're not going to have
2  counsel. You're not going to have counsel. We're just
3  going to take care of it right here."
4      Q. Did Ted say anything in response to your
5  objections?
6      A. Ted just sat there.
7      Q. What's the next thing that happened?
8      A. Then I believe that they had brought out some
9  prepared comments and statements on a piece of paper
10 that were prepared as was the nature with Diane
11 Richards, the script, for lack of a better word, and
12 they just started going down items on the script.
13     Q. You believe that's Diane Richards' practice; is
14 that what you just said?
15     A. That -- That is her practice. On -- On
16 previous employee disciplinary matters, she had always
17 made it a practice to put together scripts for -- for
18 meetings.
19     Q. And you've been in there as a manager or
20 supervisor of the employee receiving the discipline?
21     A. As not the person receiving the discipline, but
22 as part of the -- the manager or director having
23 oversight for an employee receiving discipline, yes,
24 ma'am.
25     Q. Did someone read the prepared comments or

Page 794

1  statements?
2      A. Yes.
3      Ted -- At that point, Ted Sexton took -- took
4  control of the meeting or, you know, then -- then
5  started speaking.
6      Q. What did Ted say?
7      A. He just started going down the script.
8      Q. And what did he say?
9      A. I don't remember exactly the exact words that
10 he said.
11     Q. Do you remember in general what he said?
12     A. No -- Let me -- If I could ask because I
13 think --
14     MS. CHINN: Do you want to take a little break for
15 a minute --
16     THE WITNESS: Yeah, could I take a break, please.
17     MS. CHINN: -- so you can think about it?
18     THE WITNESS: It's -- is -- I just need to remember
19 if -- I need to remember some things, and then I can
20 come back.
21     MS. McDONOUGH:
22     Q. Okay.
23        You said you wanted to ask something?
24     A. Well, what happened was, there was -- it
25 started going down the script of whatever the questions

JOSE HERNANDEZ vs. SAN DIEGO COUNTY        December 21, 2006                JOSE HERNANDEZ, VOL. IV

Page 795

1  were going to be. And then just, you know, not an
2  opportunity.
3       It was -- Once again, it wasn't a -- that meeting
4  wasn't a final determination or an opportunity for us to
5  kind of chat and see what an amicable reso- --
6  resolution might be. It was, "This is" -- "This is
7  what's going to happen."
8       Q. And what are you going to do right now during
9  the break to refresh your recollection as to what
10 happened?
11      MS. CHINN: Well, we're not just taking -- going to
12 actually take a break. We'll just go off the record for
13 a few minutes to give him time to collect his thoughts.
14 We'll just sit right here.
15      MS. McDONOUGH: That's fine. I just --
16      THE WITNESS: Okay.
17      MS. McDONOUGH: You just need a second to collect
18 your thoughts?
19      MS. CHINN: Yeah.
20      THE WITNESS: Yes, ma'am.
21      MS. McDONOUGH: Okay.
22      MS. CHINN: Let him think about it.
23      Just think about it. Sit here and just try to
24 remember it, recall it, relax.
25      Don't bother us.

Page 796

1      THE WITNESS: Okay. All right. Thank you.
2      MS. CHINN: That wasn't very long.
3      THE WITNESS: No, that's close enough.
4      MS. CHINN: Okay.
5      THE WITNESS: Okay.
6      MS. McDONOUGH:
7      Q. Do you now recall what Ted Sexton said to you?
8      A. Pretty close. You know, at the -- at the onset
9  of his comments were, "I want to assure you this was not
10 a witch hunt," which at that point I clearly objected.
11 Of course it was a witch hunt.
12      You know, when -- You know, "How" -- "How is it
13 that you can say it's not a witch hunt when" -- "when no
14 information was provided to me? Obviously from the
15 questioning of my friends' family's business" --
16 "business partners that you were just looking for
17 anything and everything?"
18      "Oh, I assure you it wasn't a witch hunt."
19      "Then tell me what this was all about." He would
20 not provide any information for me.
21      Q. And then what did he say?
22      A. And then he started going down -- down the
23 lines of, okay, and these are -- you know, there was
24 some -- there was some other chitchat or conversations,
25 but then he said, "Okay. Now, these are your three

Page 797

1  options" at that point.
2      And once again, I asked, "Shouldn't I have an
3  opportunity to discuss this with someone?"
4      He said, "No." He said, "You're going to stay in
5  this office, and you're not going to leave until you
6  make a decision."
7      I said, "Are you sure you can do that, Ted?" You
8  know, "Are you sure you can keep me in this room?"
9      He goes, "You bet I can." He said, "I have all
10 day. I have cleared my calendar. You are not going to
11 leave this office until you make a decision, and these
12 are your three options."
13      Q. And what were the three options that he gave
14 you?
15      A. I believe one was -- was to quit on my own
16 accord, submit my resignation, of which he already had a
17 prepared -- you know, prepared letter of resignation.
18      The second one was to be fired at will or be fired
19 at cause.
20      Q. What did you say in response to the options?
21      A. At that time, I -- I -- I said, "Ted, you know
22 what? I really need an opportunity to discuss this with
23 someone."
24      He said, "You're not going to discuss it with
25 anyone. You are going to stay in this room until you

Page 798

1  make a decision. I can stay here all day."
2      Q. And then what happened?
3      A. And at that point, you know, after thinking
4  about it, you know, understand wanting to put -- you
5  know, maybe, you know, an end to this particular step
6  in -- in the audacity that was the -- the investigation,
7  that at this time it was just easier for me -- And once
8  again, at the advice of Ted, "Hey, listen, there might
9  be legal" -- you know, this -- "I'll tell you that if
10 you quit now, it all ends here. If not, we're going to
11 continue. We're going to continue, and you know what?
12 There might be legal ramifications for you at that
13 point."
14      So I felt threatened -- I felt threatened at that
15 point that I either quit or this thing would never end.
16      And Diane Richards was in the meeting at that time.
17      Q. Did Diane every leave the meeting?
18      A. No, she was there.
19      I had always been told that you could never hold
20 any employee against their will.
21      Q. Did you feel that you were being held against
22 will?
23      A. Oh, absolutely.
24      That's why I asked. I said, "Listen, I'm not" --
25 "I need time to think about this."

37 (Pages 795 to 798)

53-611 (257)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY    December 21, 2006    JOSE HERNANDEZ, VOL. IV

Page 799

```
1       "No, you're not going to leave this office.  You're
2   not leaving this office until you make a decision.
3       And so what happened was they boxed me in.  There
4   was a round table in -- in Diane Richards' office.  I
5   was in the corner.  Diane was on this side.  Ted was on
6   this side (indicating).  I was not allowed -- I was
7   never given an opportunity to even think, go get some
8   air, nothing.
9       Q.  Do you have any understanding of what would
10  happened if you had left the room?
11      A.  Put it this way, I never was afforded an
12  opportunity to leave the room.  The point was, "You will
13  make a decision."  The threat was pretty -- pretty
14  imminent.  "You will make a decision.  You will not
15  leave that seat until you make a decision.  That's the
16  only way your leaving this room."  That was pretty clear
17  to me (indicating).
18      Q.  How long did you take to think about your
19  decision?
20      A.  You know, not wanting to be further
21  intimidated, probably -- maybe 15, 20 minutes to make my
22  decision.
23      That is just not the right environment that we
24  should put anyone.
25      Q.  Did you sit there in silence while you were
```

Page 800

```
1   making your decision, or was there conversation?
2       A.  No, sit there in -- in silence, in disgust and
3   fury, yeah, all those --- all -- every type of -- of
4   feeling that can rush through you at that particular
5   time.
6       Why would anyone want to treat any particular
7   individual in this manner?  Absolutely just sit there,
8   just in complete disgust, you know, and not wanting to
9   put myself or my family through this any more,
10  absolutely, I had no option at that time but to resign.
11      Q.  So you eventually decided to resign in that
12  meeting?
13      A.  Well, let me ask --
14      MS. CHINN:  Objection.  That's Vague and ambiguous
15  and assumes facts not in evidence that he decided
16  anything.
17      MS. McDONOUGH:
18      Q.  You were provided three options; correct?
19      A.  Yes, ma'am.
20      Q.  And out of those three options, you chose to
21  resign?
22      A.  I believe that -- that at that particular time,
23  after having more time to -- to -- think about, you
24  know, further legal ramifications, you know, or -- or
25  the threats that were implied, that at that particular
```

Page 801

```
1   time it was just best for me and my family to go ahead
2   and submit my resignation.
3       Q.  And then what happened?
4       A.  Then I went ahead and signed the documentation.
5   I believe at that time I may have been -- may have been
6   given my final checks -- my final checks, and -- and
7   then Ted escorted me off the property.
8       Q.  Did Diane say anything in the meeting after she
9   responded to your objection about not knowing what the
10  meeting was about?
11      A.  I don't recall Diane saying very much.  She
12  was -- Her -- Her influence or -- I -- I -- I just don't
13  recall much of Diane doing much of anything through this
14  whole -- through this whole process.
15      Q.  Did Ted ever tell you why the Authority would
16  be terminating you for cause as one of the options?
17      A.  I don't recall specifically.  He said -- No,
18  I -- I don't.
19      Q.  Do you recall Ted or anyone at the Authority
20  ever giving you a reason for what you've deemed a forced
21  resignation or termination?
22      A.  No.
23      I believe -- I believe he had said something to the
24  effect of "making not smart decisions."
25      And where I responded, "Not smart decisions?  Then
```

Page 802

```
1   shit, half the people here should get fired."
2       Q.  As we sit here today, do you have any
3   understanding as to why the Authority was giving you the
4   opportunity to resign, or why it would -- was going to
5   terminate your employment?
6       A.  No.
7       MS. CHINN:  I'll object.  The question does call
8   for speculation.  It does lack a foundation, calls for
9   opinion, assumes facts not in evidence, misstates his
10  testimony as to "opportunity."
11      But if you understand the question, try to answer
12  it.
13      THE WITNESS:  Okay.
14      The -- Go ahead and -- and restate your question.
15      MS. McDONOUGH:
16      Q.  Has anyone from the Authority ever told you why
17  the Authority gave you three options during your
18  resignation or termination meeting?
19      A.  Now I remember -- No.  Specifically why they
20  gave me those, no, but -- no.
21      MS. CHINN:  Did anyone tell you why they gave you
22  those three options?
23      THE WITNESS:  No.
24      It's -- It -- I believe the conversations with --
25  with Ted were, "You can either go quietly or we're going
```

8 (Pages 799 to 802)

53-611 (258)

Page 803

1  to make this very difficult for you."
2  MS. McDONOUGH:
3  Q. Is --
4  A. "So here are your three options."
5  Q. Is it fair to say that your employment with the
6  Authority was terminated?
7  A. It was fair to say that I did not have an
8  option, but one way or another it would be.
9  Q. I'm just trying to simplify how we refer to
10  this.
11  So if I refer to your employment being terminated,
12  can we agree that that means that you were forced to
13  resign?
14  MS. CHINN: It's okay with me. I don't care. If
15  it's okay with the witness.
16  MS. McDONOUGH:
17  Q. Is that okay with you?
18  A. That's okay.
19  Q. Has anyone ever told you why your employment
20  with the Authority was terminated?
21  A. I believe in -- in -- in talking to Ted, he had
22  outlined some issues of -- of why -- you know, of -- you
23  know, of reasons why I was going to be terminated.
24  You know, I -- one of them -- you know, I don't
25  remember exactly, but we got into a discussion of

Page 804

1  practice versus policy, you know, why -- where I got
2  into great detail with Ted is, "Listen, you're telling
3  me what's on" -- "what's on the letter, black and white,
4  but yet you know and I know, Ted, that practice is much
5  different.
6  "You know, for you to say or to insinuate that it
7  was wrong for someone to take tickets, you know, or
8  whatever or be given tickets, but yet it's okay for
9  people to go through, get upgrades, get their flights
10  changed. You know, that is" -- you know, "that is
11  uneven application of whatever the policy is. You
12  understand, Ted, that that is not the practice here at
13  the Airport Authority."
14  He said, "That's our policy."
15  I said, "Ted, once again, that's not practice. And
16  my understanding is that practice supersedes policy."
17  Q. So was one of the issues that Ted raised in
18  that meeting --
19  MS. CHINN: I don't think he was finished with his
20  answer.
21  THE WITNESS: I believe -- and -- and then -- then
22  further, going into why is it okay, you know, that, once
23  again, "Thella gets special favors and, you know, why is
24  it okay for her to get meat, but no one else can ever do
25  anything?"

Page 805

1  And that's when he responded, "Well, that's an
2  acceptable industry standard."
3  I said, "Acceptable industry standard? What does
4  that mean? What -- What industry? Are -- Are we in the
5  airport industry? Are we in the government agency?
6  Please, someone explain to me what acceptable industry
7  standard means," of which he offered no response.
8  MS. McDONOUGH:
9  Q. Are you finished?
10  A. Yes, at this time.
11  Q. Did Ted Sexton provide you with specific
12  examples of how your acts violated airport policy or
13  code, or did he simply say, "We believe that your acts
14  violated airport policy or code"?
15  A. One -- Once again, I don't recall the specific
16  language, but as we were going through just some general
17  statements that he said, that's when I was, you know,
18  bringing up -- you know, bringing up those issues what
19  led to, which I wanted to discuss with him and
20  understand, you know, practice versus policy, you know,
21  which one -- which one's worth more or which one -- you
22  know, what -- what is the guiding principle here?
23  You know, we asked, "Acceptable industry standards?
24  What does" -- "What does that mean? What's acceptable
25  to what industry? You know, you're saying it's okay for

Page 806

1  Thella to ask for me or to have her special favors
2  because in some industry it's okay for the presidency
3  yell to ask for it. Is that the industry that we're in?
4  "You know, I'm trying to understand that and trying
5  to understand why is it that" -- "you know, that it
6  would be okay that, you know, we have individuals at the
7  Airport Authority who are former" -- "former airline
8  people, you know. Is it okay that they retain their --
9  their flight privileges?"
10  "You know, isn't there" -- "Isn't there some
11  insinuation or some thought that" -- "you know, that
12  because you accept or retain flight privileges for a
13  previous employer for yours, that that would not show
14  some sort of conflict of interest?"
15  And once again, none of those. He refused to
16  answer to every one of those.
17  Q. Did Ted tell you in that termination meeting
18  that the Authority believed that your acts had violated
19  the Authority's codes or policies?
20  A. You know, once again, I -- I don't recall if
21  that was specific. I remember asking him specifically
22  if he had evidence that at any point in time that any of
23  my actions and any of my decisions would show favoritism
24  or if he was able to prove in any -- in any way, shape
25  or form that what I did, you know -- you know, hanging

39 (Pages 803 to 806)

53-611 (259)

Page 807

1  out with friends, you know, whatever it was, that it
2  somehow influenced to -- in a negative fashion against
3  the Airport Authority.
4      If he can show that, look, I'm friends with Mike
5  Parrish, okay. "Now, this is what you did in return for
6  Mike Parrish."
7      I don't believe that -- And then at that particular
8  point in time, he said, "No." He said, "Absolutely
9  not."
10     Q.  Did Ted raise any specific incidents in that
11 termination meeting, such as receiving airline tickets
12 from Hawaiian Airlines or Southwest Airlines?
13     A.  And once again, I -- I -- I don't recall
14 specifics -- what -- specifically what it was. My
15 understanding was going into, you know, I guess the
16 philosophies of why that was -- you know, why it was
17 whatever he was saying.
18     So I don't recall exactly what it was, but those
19 were -- you know, those were terms that we were
20 discussing as to, you know -- why it's okay that
21 some people do this, that some people don't, you know,
22 what -- what is -- what's acceptable industry standard.
23 I mean, all those -- you know, and why -- and even
24 more -- why didn't anyone ever tell me what the hell was
25 going on?

Page 808

1      MS. McDONOUGH:  Let's take a short break.
2      THE WITNESS:  Okay.
3      VIDEO OPERATOR:  Going off the record.  The time is
4  3:22.  This marks the end of Tape Number 2.
5      (A recess is taken.)
6      VIDEO OPERATOR:  Going back on the record.  The
7  time is 3:33.  This marks the beginning of Tape
8  Number 3.
9      MS. McDONOUGH:
10     Q.  Is there any reason why you cannot continue to
11 give your best testimony?
12     A.  No.
13     Q.  As we sit here today, do you have any
14 understanding of why your employment was terminated from
15 the Authority?
16     A.  I believe after having a little bit of time to
17 think, some of the issues that Ted had outlined was the
18 acceptance of those tickets for Hawaiian Airlines and --
19 and Southwest for -- for my children, you know, being in
20 possession of a -- of a parking card and -- and maybe
21 going on those golf trips, I believe.
22     Q.  Do you remember any other specific incidents
23 that Ted mentioned in the termination meeting?
24     A.  I believe it was -- I believe it was just those
25 issues, and that's why -- you know, that's why as he

Page 809

1  went through and -- and brought up the issues of the
2  airline tickets, you know, I had asked why that would be
3  different than, you know, what -- what the board
4  members, what other staff had done and why I was being
5  singled out in that fashion, you know.
6      My response to the -- the parking pass -- you know,
7  the -- the parking pass was given to me by -- by my
8  neighbor, who -- who I happened to introduce him to his
9  wife.
10     And then -- you know, and then the -- the golf
11 trips were, "Ted, I asked you.  You said it would be
12 okay to go."
13     Q.  And just for clarification, it was acceptance
14 of the tickets for Hawaiian Airlines for your family and
15 the Southwest tickets for your children; is that
16 correct?
17     A.  No, I believe it was just the issue surrounding
18 the -- the Hawaiian Airlines and -- and Southwest
19 Airlines, even though those -- and I think the last part
20 was, you know, and -- and -- you know, I guess those --
21 you know, those may show bad judgment or something.
22     So I said, "Well, that's why" -- "why once again
23 it's in bad judgment, then half the people here should
24 get fired."
25     Q.  I'm just asking for clarification because the

Page 810

1  way that your initial response read, it was a little
2  vague as to the "children" modifier.  And so I just want
3  to make sure, you said "Ted had outlined the acceptance
4  of the tickets for Hawaii Airlines and Southwest for my
5  children."
6      So I just want to make sure that the Hawaiian
7  Airlines was the four for your family and Southwest for
8  the tickets for your -- just your children.
9      MS. CHINN:  If -- If Ted said that.
10     THE WITNESS:  Yeah, I believe -- Yeah, if -- I
11 believe it was just the -- the -- the issue surrounding
12 the Hawaiian Airlines and -- and Southwest Airlines.
13     MS. CHINN:  Were you finished with your answer?
14 Because I know you've been interrupted a couple times.
15     THE WITNESS:  And -- And then just, you know,
16 issues that he says I couldn't be trusted anymore.
17     MS. CHINN:  Was anything related to your job
18 performance?
19     THE WITNESS:  Oh, yeah.  I apologize.
20     You know, and -- and that was when -- then I went,
21 followed up and said, "Ted, I don't" -- you know, for
22 each one of those allegations, we went through over
23 those -- those issues of why they were choosing to go
24 the path, I asked him, I said, "Ted, here is what I
25 don't understand," you know, "why are you guys doing

0 (Pages 807 to 810)

53-611 (260)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY        December 21, 2006        JOSE HERNANDEZ, VOL. IV

Page 811

1  this?"
2      You know, I said, "I" -- "I think it would be
3  pretty fair to say that I am probably one of the top
4  performers in this Airport Authority."
5      He said, "Yeah, absolutely I can count the number
6  of employees who are better than you or who perform
7  better than you in less than one hand."
8      You know, I said, "Then" -- "Then let me ask you,
9  is" -- "do you think any I" -- "anything that I did may
10  have influenced any business decisions that we made, you
11  know, that would" -- "that would quite frankly reflect
12  direct conflicts of interests?"
13      He said, "No, not at all. In our" -- "In our
14  investigation, nothing came up that would" -- "that
15  would show that you did special favors for" -- "for
16  anyone at the" -- "at this" -- "at the airport, any
17  business vendors, anyone here at the airport."
18      And I said, "So how can you say there was
19  conflicts?"
20      He said, "Well, that's" -- "that's just the way
21  we're choosing to do it at this time."
22      MS. CHINN: Did he ever mention criminal activity?
23      THE WITNESS: Oh, absolutely.
24      MS. CHINN: I just want to know.
25      THE WITNESS: Wait. I apologize.

Page 812

1      And we did -- we -- we had touched that -- on that
2  before as -- as to -- you know, as to the -- the
3  follow-up on that, that if -- you know, if that -- they
4  had that -- the investigation had also shown that I was
5  not involved in any criminal activity whatsoever.
6      MS. McDONOUGH: Cathryn --
7      THE WITNESS: I apologize.
8      MS. McDONOUGH:
9      Q. Go ahead.
10      A. No, so that was -- you know, I -- I wanted to
11  understand how -- how all this kind of worked together
12  is conflicts of interest, okay. "Now, tell me where the
13  conflict of interest was?"
14      "None to be shown."
15      I said, "Okay. Do you think I did anything?"
16      "No, nothing. We've" -- "We looked, and nothing
17  illegal. But if you keep pressing us, pre-" -- "keep
18  pressing us on this issue, you know, we're going to keep
19  going, going, going, and then I'm sure, you know, we're
20  going to look for something. It might be criminal in
21  nature."
22      I said, "Why" -- "You know, why would you do that?"
23      He says, "Well, the easiest way for you to get out
24  of this thing is just to submit your resignation."
25      Q. Did you have an understanding that Ted was

Page 813

1  trying to protect you when he said, "You don't want us
2  to keep pressing this because there might be something
3  criminal"?
4      MS. CHINN: Objection. That calls for speculation.
5      THE WITNESS: Yeah.
6      MS. CHINN: Go ahead and answer it.
7      THE WITNESS: I can't -- You know, I can't tell you
8  what -- what his intent was. I can't. I -- I can't
9  tell you what he was doing --
10      MS. McDONOUGH:
11      Q. What was --
12      A. -- or why he said the things he did.
13      Q. What was Ted's tone when he said that last bit
14  to you about pressing the issue?
15      A. It was -- It was not helpful, a helpful tone
16  that, "Hey, this is something you really should be
17  doing." I mean, this was -- it was a tone of -- "You
18  do this or else."
19      You know, this is -- it was a -- an accusatory, you
20  know, tone that would -- more of a demanding and
21  forceful tone that "This is what you will do, or
22  this" -- "this is what will happen. And we will keep
23  doing this, and we will keep" -- "keep at this whole
24  thing, and it" -- "and" -- "and it'll get worse and
25  it'll get uglier.

Page 814

1      "And then we'll go talk to more people, and then
2  we'll embarrass you more. And we will make life ugly
3  for you if that's" -- "if you choose to go down the
4  road." That's how I -- I interpreted his tone.
5      Q. Just for clarification, he didn't say those
6  last things, but that was the tone that he had?
7      A. Yeah, you -- you asked for interpretation of
8  his tone, and that would be my interpretation of his
9  tone.
10      Q. When Ted said that "We have not found any
11  conflicts," do you know who the "we" was that he was
12  referring to?
13      A. I believe that the -- the product of the
14  investigation to -- because I asked him, I asked him, I
15  said, "You tell me where." I said, "Tell me. I wish to
16  know. I want to understand where it is that there might
17  have been potentials of conflicts of interest or
18  where" -- you know, "something I did, you know, was not
19  in line with the best interest of the Airport
20  Authority."
21      And he said, "Listen, I can tell you right here,
22  right now as I speak that we were unable to find one
23  single thing."
24      Q. One single conflict of interest?
25      A. One single instance that would "collaborate,"

41 (Pages 811 to 814)

53-611 (261)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY    December 21, 2006    JOSE HERNANDEZ, VOL. IV

Page 815

1  you know, some sort of conflict of interest,
2  preferential treatment, you know, that sort of -- you
3  know, that sort of thing.
4      Q. Is there anything else that you remember about
5  that termination meeting?
6      A. As we -- really, now I find I had gone through,
7  signed my resignation -- which was already prepared for
8  me, you know -- closed -- closed the proceedings there.
9      As I walked out, you know, Ted said, "Let me walk
10 you out to your car," put his arm over my shoulder and
11 looked at me and said, "Holy shit. I knew something
12 like this would happen when the reorg-" -- "when the
13 reorganization was going down."
14     I said, "Ted, what do you mean?"
15     He said -- He said, you know, "I just knew
16 something like this" -- "something was happening,
17 and" -- "and someone was trying to do something that" --
18 you know, "and it was going to be a problem." And he
19 said, "And I was worried it was going to be me."
20     And I said, "Well, Ted, here is what I need to
21 understand from you. Is it okay for people to talk to
22 me again," you know, "because here I have" -- "here I've
23 been going through this thing for 60 days, 40 days,
24 however long it's been, and you guys have intimidated
25 and threatened people who I believe were my friends into

Page 816

1  not becoming my friends anymore. You told them that if
2  they talked to me that there would be actions,
3  repercussions against them."
4      I said, "I don't think people should ever be
5  threatened in that manner." I said, "I want my friends
6  to be able to talk to me, so I want to know from you
7  what you're going to do."
8      "Well," you know, "we'll send out an e-mail to tell
9  people that you've just submitted your resignation."
10     I said, "No, that's not enough. You need to go
11 back and you need to tell every single individual that
12 it's okay to talk to me. Otherwise, how do they know?
13     "You know, even to this day, to this day, I talk to
14 people at the Airport Authority, and they told me
15 because they were scared to talk to you. You know why?
16 Because people were still mad that they believe that you
17 shit all over them," quote unquote.
18     Q. That who shit all over them?
19     A. That they believe that there's still people --
20 you know, that there are still people at the Airport
21 Authority who feel that they would be retaliated against
22 if they spoke to me, you know, my -- my former
23 employees, coworkers, that if people in the -- in -- you
24 know, would find out that they were still my friends
25 that they would be retaliated against.

Page 817

1      No one's ever told them it was okay to come back
2  and talk to me and be my friend again, but yet they told
3  them quite frankly, "If you talk to him" -- you know,
4  "You are prohibited from talking to him."
5      Q. How do you know that no one has ever told your
6  friends that it's okay to talk to you?
7      A. They never told them. They never told them it
8  was okay to continue to talk to me because not one
9  person has told me it was okay.
10     You know, they were -- they were pretty poignant
11 about telling them that they couldn't talk to me.
12 Shouldn't there have been a subsequent conversation,
13 "Hey, it's okay. Don't worry about it. You can be
14 their friend."
15     Q. How do you know that the Authority told your
16 friends not to talk to you?
17     A. They told me. They told me. They said, "Jose,
18 I'm sorry, but you know what? The Airport Authority has
19 threatened us, but we feel intimidated that" -- "that
20 every single one after the investigation, 'You can't
21 talk to Jose.'"
22     Q. Who told you that?
23     A. Those employees. Those employees who I had
24 gone through and talked about or had discussed portions
25 in the investigation with me from Jennifer Hamilton,

Page 818

1      Jeff Simmons, Amiel Porta, Amy Gosslin, you know, and --
2  and -- you know, who knows.
3      Those employees that were there were at the end of
4  each -- of each interrogation, for lack of a better
5  word, interview, that they were told that "You are
6  restricted, prohibited from talking to Jose. In total,
7  not just about this case, you could not talk to him."
8      Q. You've talked to each of those individuals
9  since your termination; correct?
10     A. Yes, ma'am.
11     Q. Are you aware of any retaliation against those
12 individuals for talking to you?
13     A. I believe that the individuals still to this
14 date are upset or are -- are -- are in fear of
15 retaliation or ret- -- retribution to the point just
16 specifically, just -- just recently we had a position
17 of -- of director -- well, like a manager of terminal
18 operations position that was dissolved, you know.
19     What happened was Ron Larson was a previous person
20 in -- in that position. He left employment, you know,
21 naturally because the need is there, would be to, you
22 know, hire one of the existing terminal operations
23 coordinators into that position or open it up, open it
24 up for qualification.
25     And, you know, Amiel Porta, you know, obvious --

42 (Pages 815 to 818)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY          December 21, 2006          JOSE HERNANDEZ, VOL. IV

**Page 819**

1  you know, was excited. He thought he would have an
2  opportunity for that job, at least to compete for that
3  position, not that it was his, but to compete for that
4  position.
5      Guess what? The position went away. And then now
6  the qualifications, you know, are much higher and then
7  brought in, so that position's kind of gone away,
8  terminal operations.
9      And, you, know my position has been backfilled,
10 but, you know, he -- he -- he believes that that
11 position was dissolved as retribution so that there
12 would be, you know, as -- as an opportunity to -- to
13 say, "Well," you know, "we can't really give you a
14 promotion, Amiel, because that position is not there
15 anymore," even though I believe he is the -- he is the
16 most qualified for that position.
17     Q. Did Amiel tell you that he feels that he was
18 retaliated against in connection with that position?
19     A. I believe that that -- that it -- it was pretty
20 clear to him and individuals at the airport why that
21 position was dissolved, and why -- you know, and that,
22 you know, someone just did not want him in that
23 position, you know.
24     Regardless whether it -- it was centered around all
25 this investigation, you would think that once an

**Page 820**

1  investigation is closed, all the documents are signed,
2  everyone would be treated equally from then on out, but
3  that's not the case. Individuals to these days will not
4  talk to me at that airport because they are afraid of
5  retribution and retaliation.
6      Q. Is there anyone else that you think has been
7  retaliated against for talking to you?
8      A. I'll tell you that -- that Jim Myhers I had
9  known before this whole thing. Jim Myhers was a friend
10 of mine. I would talk to him.
11     In fact, you know, I had kind of looked at him as
12 an apprentice where we had gone through and looked at --
13 at parking. You know, his level and understanding of
14 parking and parking management, although -- although
15 very astute, you know, lacked some development, or he
16 could have greatly benefited from working with me.
17     So, you know, I took it upon me to -- to -- you
18 know, to work with him so that he can understand, you
19 know, different areas. He would, oh, constantly call
20 and seek me for advice.
21     To this day he won't even take my call. He said,
22 "Jose, I can't talk to you." He said, "You don't
23 understand the way it is up there." He said, "I can't
24 talk to you. I can't take your call. I can't respond
25 to an e-mail. I" -- "I am afraid to talk to you."

**Page 821**

1      Q. Do you believe that Jim Myhers has been
2  retaliated against for talking to you at all?
3      A. You know, I believe that Jim Myhers is afraid
4  to put himself in that position, that, you know, him and
5  I will go chat or -- or have lunch together or anything
6  because he is afraid that something will happen to him,
7  or that he will be retaliated or it would look negative
8  against him.
9      Q. Do you believe that anyone else has been
10 retaliated against for talking to you?
11     A. I believe that individuals at the Airport
12 Authority are trying to -- are -- are once again keeping
13 their distance from me because they believe that if they
14 do, that they would be retaliated against.
15     Q. But you're not aware of any actual retaliation?
16     A. In the conversations that I have had with
17 individuals, they are saying, "We're not even going to
18 put ourselves in that position because it's pretty clear
19 in that environment that if any of us befriend you again
20 like we did before, we're going to have problems."
21     Q. Have those individuals told you who they
22 believe will retaliate against them?
23     A. It would just -- Insinuation is individuals
24 in -- in -- in senior management position in the VP
25 level.

**Page 822**

1      Q. Anyone in particular?
2      A. You know, I believe -- I believe that, you
3  know -- you know, individuals say that their -- their
4  immediate managers. I believe that -- I strongly
5  believe that Amiel -- Amiel is afraid that -- that --
6  you know, that Bryan will retaliate in some -- some
7  manner against him. I truly believe that.
8      Q. Let's get back to the reasons outlined by Ted
9  for your termination.
10     A. Okay.
11     Q. You indicated that after you had had some time
12 to think about it, that Ted outlined that the acceptance
13 of the tickets from Hawaiian Airlines and Southwest, the
14 possession of your parking card from Ace and the golf
15 trips were issues that had led to your termination.
16     Were there other issues that you can remember?
17     A. Other than what I've already talked about, I
18 believe those were the -- the primary ones.
19     Once again he said, "Well," you know, "making bad
20 decisions."
21     I said, "Ted, we" -- "we make great decisions, and
22 we make bad decisions. It happens all the time." I
23 mean, that's just part of what we do. We -- We don't
24 win everything.
25     He says, "Well," you know -- you know, "It's just

43 (Pages 819 to 822)

53-611 (263)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY          December 21, 2006          JOSE HERNANDEZ, VOL. IV

Page 823

1  your decision making."
2      I said, "Well, Ted, if my decision making is so
3  bad, then why have I always scored" -- "you know, my
4  performance level been at the level that it's been for
5  so long? I said I -- "Once again," you know, "you tell
6  me who has" -- you know, "who performs at a higher level
7  than I do here at the Airport Authority."
8      He said once again, "I can count it in one hand" --
9  "In less than one hand."
10     Q. Any other reasons that you recall that Ted gave
11 you for the termination of your employment?
12     A. I don't -- I don't recall.
13     Q. Have you ever heard any other reasons for the
14 termination of your employment other than the ones that
15 Ted gave you in those meetings --
16     A. I believe --
17     Q. -- excuse me -- in that meeting.
18     A. No, I believe that those were -- you know,
19 those were the -- the primary reasons, or those reasons
20 that were articulated to me.
21     Q. Do you believe that the reasons provided by Ted
22 were the real reasons for your termination?
23     A. No, I -- I -- I believe, you know, to be quite
24 frankly that that's just a bunch of BS, that those were
25 just made-up reasons, that those were in direct conflict

Page 824

1  to common practice at the Airport Authority.
2      You know that what they were looking to me was,
3  "Well," you know, "now on this occasion we're going to
4  enforce black and white," even though it was fully
5  understood from Thella's level to the vice president
6  level that these are -- these are nothing. This happens
7  all the time.
8      You know, once again, why is it okay that -- that I
9  go out and they ask me to go out and change tickets for
10 Vernon? You know, when you accumulate those -- if it's
11 a question of money. God, those flight tickets are --
12 far exceed whatever it would have been, you know, any
13 tickets to anyone.
14     Q. When you just said that on this occasion
15 they're "going to enforce black and white," are you
16 indicating that on this occasion, they wanted to follow
17 the policy, whereas in other occasions they followed the
18 practice; is that what you're saying?
19     A. I -- I --
20     MS. CHINN: Objection. That's ambiguous.
21     MS. McDONOUGH: I'll ask it again --
22     MS. CHINN: Wait --
23     MS. McDONOUGH: -- in a different way.
24     MS. CHINN: -- wait, wait. I want to think for a
25 second.

Page 825

1      MS. McDONOUGH: I'm withdrawing the question.
2      MS. CHINN: That assumes -- Right, because it
3  assumes facts in evidence that they ever followed the
4  policy, that the policy actually existed.
5      MS. McDONOUGH: I'm withdrawing the question.
6      MS. CHINN: Okay.
7      MS. McDONOUGH:
8      Q. What did you mean when you said on this
9  occasion we are "going to enforce black and white"?
10     A. What -- What I meant was that -- that I
11 found -- I found it a little ornery that in -- in -- in
12 my circumstances that someone would want to impose
13 the -- you know, the code of ethics, you know, and by
14 someone's interpretation, even though it was fully
15 understood that no one's ever followed it.
16     You know, sure, you may have it, but that's not
17 common practice. That's not -- That's not what people
18 do over there. And so I found it once again ornery that
19 on this occasion, you know, no one ever followed it
20 before. It wasn't -- It wasn't implemented to -- you
21 know, to the level that it was trying to be implemented
22 against me.
23     Q. What do you believe was the real reason for
24 your termination from the Authority?
25     A. You know, it's -- it's -- it's a whole host of

Page 826

1  things. I mean, it would be -- you know, it -- it would
2  kind of be easy to say, "Well, look, at the beginning of
3  the investigation, this is what they're looking for
4  (indicating) and this is what we found" (indicating).
5      But it's not. It was a complete witch hunt. There
6  was an intent to go in there and to discredit me,
7  humiliate me to the point that something would be found
8  somewhere to eventually either ask me to resign or to
9  terminate my employment.
10     You know, there may have been some circumstances
11 where -- you know, where I was a little too outspoken
12 with regard to contracts at the airport, you know,
13 secret side deals, you know, to -- to bad decision by
14 senior management.
15     You know that there was some situations where --
16 you know, where we uncovered or I uncovered, you know,
17 issues of great concern, like -- like the LPI contract,
18 the submission of their proposal, you know, the -- the,
19 you know, finding out that -- you know, that they had
20 been double billing.
21     You know, the -- the part -- the part you also have
22 to understand is -- is -- is Elizabeth Stump-Moore, who
23 happens to be the -- the advocate or -- or lobbyist for
24 LPI, of course this is embarras- -- embarrassing for
25 them.

4 (Pages 823 to 826)

53-611 (264)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY          December 21, 2006                    JOSE HERNANDEZ, VOL. IV

Page 827

1  You know who Thella's best friend is? Elizabeth
2  Moore. There has to be some sort of connection in
3  there. There has to be some sort of connection.
4     So let me ask you, why is it okay? I mean, is it
5  okay, does Thella ever disclose every single lunch or
6  breakfast or meeting that she ever has with Elizabeth
7  Stump-Moore? Aren't they friends? Is she -- Is there
8  cause that every single time that she disclose that
9  they -- you know, that they went to lunch, they had
10 breakfast?
11    I knew on many occasions she would be over --
12 Elizabeth would be over at -- at -- at Thella's house,
13 because for whatever reason, Ted would be there, "Oh,
14 yeah," you know, "Elizabeth was there."
15    You know, I believe this whole reason or everything
16 around this was one big witch hunt, you know, either to
17 discred- -- you know, to discredit him, "We" -- "We just
18 don't want him here anymore."
19    If that was the case, you know, obviously I
20 understand. I -- Was I not well employed? Don't you
21 think that would have been easier? But there was
22 some -- there was great intent and -- and -- there was
23 some intent in there to ensure that I would never be in
24 this industry whatsoever again. It was to that point.
25    You know, if it was that clean that someone didn't

Page 828

1  want me, good, then get me gone. But there was -- there
2  was some thought to -- to humiliate me in this
3  particular one, discredit me, humiliate me, ensure that
4  I could never come back again.
5     Q. In your complaint, you allege that you were
6  retaliated against for complaining about the rest rooms
7  and the side deal, the General Dynamics lease, the
8  Teledyne Ryan lease and the LPI issues that you've
9  raised; is that correct?
10    A. I believe I did, yes, ma'am.
11    Q. Are there any other complaints or disclosures
12 that you made that you were -- you feel you were
13 retaliated against for making?
14    A. You know, the -- You know, those are the
15 primary ones. I'm sure there's others. You know, I
16 have to give it more thought, but I tell you that those
17 were some key ones because they were rather embarrassing
18 for -- for senior management staff, Bryan in particular,
19 in there, you know, some board members in there as well.
20    The -- The -- The thing you have to understand is
21 from the point of initial investigation, you know, where
22 issues were alleged of me and I would respond in a
23 certain manner that "Why are you asking me? You should
24 go ask the board member about this or go ask senior
25 management about this or senior management about this."

Page 829

1  What happened was there had to have been some
2  thought by them, it's like, "Okay. Good," you know, "he
3  knows too much" or "he might know too much that we need
4  to get him gone, because it's not going to come back on
5  me. So we're going to" -- "that's it. Now we're going
6  to screw him."
7     So yeah, I was -- I felt that as I've disclosed --
8  as I disclosed further details, I was retaliated against
9  up to this point, yes, ma'am.
10    Q. Are there any other complaints or disclosures
11 for which you feel you were retaliated against other
12 than the four that I just identified?
13    A. I believe that -- that the -- you know, that
14 those that we have gone over, and my disclosures that
15 that I had gone over, or that -- that were products of
16 investigation caused further retaliation investigation
17 themselves.
18    And what I had disclosed or whatever the -- you
19 know, whatever my responses were, you know, that as they
20 were briefed back to the vice president's group, yeah,
21 they caused retaliation on my part that, once again,
22 instead of making it, which I don't believe it was ever
23 fair and impartial, just made it worse, just said,
24 "Okay. Good. He's going to say that against me, we're
25 going to get him." The whole thing was -- The whole

Page 830

1  thing was retaliatory in nature.
2     Q. What do you mean by "the whole thing"?
3     A. The whole investigation that as it gathered
4  storm, you know, on their level and not on my level, as
5  "Okay. Now we're going to" -- "Now let's" -- "let's go
6  look at other people. Now" -- "Okay. Now let go" --
7  "Let's go talk to Cheryl. Let's go talk to this person.
8  Let's go to Tony Hueso."
9     I mean, there had been -- there was some -- the
10 whole thing was retaliatory. Once again, "If the
11 investigation" -- "why couldn't I never have been
12 provided with the" -- "with the exact specifics if this
13 is the investigation and this is what we're going to
14 do?"
15    "No, it just" -- "we're just going to look at
16 everything. We're going to find a reason why we're
17 going to get rid of you."
18    Q. Do you believe that the initiation of the
19 investigation itself was retali- -- retaliatory?
20    A. I believe in -- in -- in -- at some stage it
21 was, yes, ma'am.
22    Q. What stage did it become retaliatory?
23    A. Just that it -- it had to have been. It had
24 to -- Someone was upset about something or someones were
25 upset about something that "Good, we're going to

45 (Pages 827 to 830)

53-611 (265)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY          December 21, 2006          JOSE HERNANDEZ, VOL. IV

Page 831

1 retaliate against him. We're going to figure out a way
2 that we can get him fired," yes, ma'am.
3    Q. So from the beginning of the investigation
4 itself, you -- you believed it was retaliatory?
5    A. I -- I believe it would have to be, because
6 the -- the questions -- the questions that were
7 asked, you know, the -- the intent of those
8 questions, you know, the -- the -- the whole thing. I
9 mean, there was -- it wasn't a fair and impartial, once
10 again, an interview or an investigation.
11    There was an agenda. There was an agenda in place
12 that that -- that I picked up on that it wasn't -- we
13 were going to figure out a way. That's -- That's what
14 my thought, they are going to figure out a way, they're
15 going to look at something. Something's going to happen
16 one way or another.
17    I know that when I walked out of there, I'm never
18 going to work here again because they're going to find
19 something, and if not, they were going to make something
20 up.
21    Q. Do you believe that there is a particular
22 person who wanted to retaliate against you and who
23 initiated the investigation?
24    A. I think there were particular persons at that
25 time just, you know, surrounding -- you know, issues

Page 832

1 surrounding -- you know, surrounding everything that was
2 going on at the time. Any -- Any number of people could
3 have done it.
4    Q. Who do you believe could have done it?
5    A. You know, Bryan -- Bryan Enarson might have --
6 you know, would have had reason to -- to -- to do
7 something like that because he was upset that we -- I
8 was outspoken with regard to some of those
9 contracts, you know, even more the -- you know, the
10 restroom project up at the Terminal 1 rotunda.
11    You know, I would think that -- that Jennifer
12 Hamilton would have reason to -- you know, to -- to
13 launch an investigation that way because I didn't give
14 her the money she wanted, even know she didn't want the
15 responsibility.
16    You know, I would think that -- that Carol Mahafey
17 might have reasons to do it because, you know, I -- you
18 know, she wasn't happy with her job. She wasn't happy
19 with herself, you know, or -- You know, there is a whole
20 host of reasons.
21    You know, I -- there could be reasons that -- you
22 know, that -- you know, an investigation may have come
23 up through the parking. Because guess what? You know,
24 unless we do something, Maurice -- Maurice Grey can't
25 justify his job, and we're going to have to figure out

Page 833

1 something how to do it.
2    So guess what? Maurice, you get -- you go ahead
3 and go get your lobbyist, Elizabeth Stump-Moore, and
4 figure out a way that we can get him fired. So they'd
5 just figure out, we're going to find a way.
6    So, you know, there is whole lot of reasons why
7 this thing could have gotten started. No -- No one ever
8 explained it to me from the beginning, so yeah, it's
9 that -- that portion -- I -- I -- I could only -- I can
10 only think of what they are, but no one's ever told me
11 why.
12    Q. Is there anyone else who you believe may have
13 wanted to retaliate against you at the start of the
14 investigation?
15    A. You know, there might be. You know, that
16 the -- the environment at the Airport Authority is a
17 little bit different, is that if you're a key performer,
18 people look down on you. You know why? Because it's an
19 organization of mediocrity. It's, "Listen, you are
20 performing too high. Come back down. You're making us
21 all look bad."
22    So, I mean, that's what it is. So people look
23 at -- at -- at key performers, like -- like myself,
24 Amiel Porta, Jeff Simmons, you know, that if you're
25 good, you're above the norm, you know, you're a problem

Page 834

1 for us, because you're making us all look bad.
2    So, I mean, it's -- it's really a gossip little
3 organization in that nature that people are not allowed
4 to -- to be peak performers. I mean, it's a problem for
5 people.
6    So anyone can do it. Anyone is -- Look, Jose --
7 Jose was here in five years, and guess what? He became
8 a director. Yeah, they don't understand I would work 60
9 to 80 hours a week to get to that position.
10    Q. Is there anyone else that you feel wanted to
11 retaliate against you for those disclosures or
12 complaints that you made?
13    A. You know --
14    Q. And other than the individuals you've already
15 identified.
16    A. You know, at different levels, you know, maybe
17 Vernon might have got mad that -- you know, that --
18 that, you know, I brought issue with us having to change
19 his tickets so often. I mean, there is -- there is a
20 lot of pettiness out there, and who knows why people do
21 the things they do.
22    I mean, I can go -- we can go on and on, but the
23 fact is I would go -- I would go to that work, and I
24 performed to the level that I was asked and above and
25 beyond that level. I had great working relationships

46 (Pages 831 to 834)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY     December 21, 2006     JOSE HERNANDEZ, VOL. IV

Page 835

1  with the airlines and with the tenants, so I -- I -- I
2  just don't understand.
3      Q. Do you know who made the decision to terminate
4  your employment?
5      A. I believe -- I believe Ted -- I believe in --
6  in Ted where -- where he -- you know, I believe Ted said
7  that he had made the decision to terminate my
8  employment.
9      Q. Do you have any understanding about how
10  termination decisions are made for director-level
11  employees at the Authority?
12      MS. CHINN: Objection. It assumes facts not in
13  evidence that there is a manner in which those decisions
14  are made. But you can lay a foundation for that if you
15  want.
16      THE WITNESS: Not specifically, no, ma'am.
17      MS. McDONOUGH:
18      Q. Do you believe that anyone other than Ted was
19  involved in making the decision to terminate your
20  employment?
21      A. I know so for a fact.
22      Q. Who else do you believe was involved?
23      A. I know that as part of this investigation,
24  the -- the attorney had to disclose to us that he had to
25  go make briefings to Thella Bowens and to the senior

Page 836

1  management staff and to Bret Lobner, the attorney.
2      Q. Do you know who the -- Do you know who Pat Swan
3  was referring to when he said "senior management staff"?
4      A. The senior VP group.
5      Q. When did Pat Swan tell you that he had to brief
6  Thella, the senior management staff and Bret?
7      A. I believe towards the end of that second --
8  that second meeting, or at the end of the second
9  meeting.
10      Q. Do you believe that any of those individuals,
11  Thella Bowens, the senior management staff or Bret
12  Lobner, made the decision to terminate your employment?
13      A. You know, I -- I -- I believe it was -- it was
14  a collaborative effort, because when you look at my
15  responses to those questions, I believe it involves just
16  about everyone there.
17      So yeah, you just -- you come after me, this is
18  what you're going to look, look. This is, you're going
19  to come after me for this, look what this person does.
20  Now that agitates that person and agitates that person.
21  You know, it -- it -- it was by far an impartial
22  investigation.
23      MS. CHINN: An impartial?
24      THE WITNESS: Yeah, im- -- Impartial?
25      MS. CHINN: I'm asking you. You thought it was

Page 837

1  impartial?
2      THE WITNESS: No, by far.
3      MS. CHINN: Not? You mean not?
4      THE WITNESS: It was nowhere fair -- Yeah, it was
5  not -- not --
6      MS. McDONOUGH:
7      Q. If Ted testifies in this litigation that he was
8  not the person who made the decision to terminate your
9  employment, would that be contrary to what he told you
10  in your termination meeting?
11      A. The -- Would --
12      MS. CHINN: It -- It -- It's going to call for some
13  speculation.
14      Answer it if you're -- if you can.
15      THE WITNESS: I -- I tell you -- I -- I wouldn't --
16  I wouldn't even venture to guess what he would say if he
17  was --.
18      MS. McDONOUGH:
19      Q. I'm not asking you to guess. I'm -- I'm going
20  to tell you that if Ted testifies in this litigation
21  that he is not the person who made the decision to
22  terminate your employment, would that testimony
23  contradict what he told you in your termination meeting?
24      A. I'm not -- I'm not sure if it would or would
25  not.

Page 838

1      Q. What specifically did Ted tell you in your
2  termination meeting about who made the decision to
3  terminate your employment?
4      A. You know, once again, I don't remember exactly,
5  but -- I don't remember exactly how that came about, but
6  he was the one conducting the termination proceedings.
7      Q. Did Ted tell you that he was the one who made
8  the decision to terminate your employment?
9      A. I don't recall.
10      Q. Do you recall any discussion with Ted or anyone
11  else at the Authority where you learned who made the
12  decision to terminate your employment?
13      A. No, I don't recall.
14      Q. Have you learned from any source -- Well,
15  strike that.
16      Has anyone ever told you at any time who made the
17  decision to terminate your employment?
18      A. I don't believe so.
19      Q. Have you heard, even through the grapevine, who
20  made the decision to terminate your employment?
21      MS. CHINN: You've answered that question three
22  times now.
23      THE WITNESS: Same as the question before.
24      MS. McDONOUGH:
25      Q. After your termination meeting with Ted Sexton,

47 (Pages 835 to 838)

53-611 (267)

Page 839

1  you said he escorted you out of building?
2      A.  That's correct.
3      Q.  Did you have any opportunity to go back to your
4  office?
5      A.  Not -- Not that particular day, no, ma'am.
6      Q.  Did you come back on another day to clean out
7  your office?
8      A.  Yes, I did.
9      Q.  Was that on a Saturday?
10     A.  That's correct.
11     Q.  And was Ted there with you?
12     A.  Yes, he was.
13     Q.  Did you talk to Ted at all on that day?
14     A.  No.
15     I was still rather infuriated with Ted.  He just --
16  We met at the -- We met at the -- at the base of the
17  commuter terminal, went up to my office, and he stood
18  there while I cleaned up my office.
19     Q.  How long were you at the Authority cleaning out
20  your office?
21     A.  I don't recall exact -- how long it took.
22     Q.  Is that the last time that you were in your
23  office at the Authority?
24     A.  I believe that may have been the last time I
25  was in my office, yes, ma'am.

Page 840

1      Q.  And you're still at the airport now in your
2  current job --
3      MS. CHINN:  Objection.
4      MS. McDONOUGH:
5      Q.  -- for BAGS, Incorporated; correct?
6      MS. CHINN:  "At the airport" is vague and
7  ambiguous.
8      MS. McDONOUGH:
9      Q.  On the airport site.
10     A.  I still go to airport property as part of my
11  current -- my current employment, yes, ma'am.
12     Q.  Did the investigators ever tell you to keep the
13  investigation confidential?
14     A.  I believe at one point they did, but I also
15  asked what -- what right they had to -- to tell me that.
16  Why under -- under -- I wanted to know what -- what
17  right they had me not to talk to people or not to talk
18  about this issue.
19     Q.  What did the investigators tell you with regard
20  to confidentiality?
21     A.  They just mentioned -- I asked them why, and I
22  don't believe I ever got a proper response as to why I
23  couldn't talk to anyone about this.
24     Q.  I want to go back to the beginning of the
25  discussion with the investigators about confidentiality.

Page 841

1      A.  Yeah.
2      Q.  Did the investigators raise the issue of
3  confidentiality?
4      A.  I don't recall exactly what the language was.
5      Q.  Did they say, "Please don't talk to anybody
6  about this"?
7      A.  I don't -- I -- I -- I don't recall.
8      Q.  Do you have any memory of being told not to
9  talk about the investigation by the investigators?
10     A.  We had -- There was some conversation about --
11  about the investigation on whether I can talk to people
12  or not.  But once again, I asked under what -- why --
13  why I couldn't, and tell me why I can't. · And there was
14  no proper response given to me at that time.
15     Q.  Did the investigators ever tell you not to talk
16  to anyone about the investigation?
17     A.  I don't recall.
18     Q.  You allege in the complaint that you've
19  suffered from emotional distress as a result of -- .
20     A.  Yeah.
21     Q.  -- your termination and the investigation; is
22  that correct?
23     A.  Absolutely.
24     Q.  What is the extent of your emotional distress?
25     A.  Oh, my God, where do I start?  You know, from

Page 842

1  the -- from the day of the investigation, I went home
2  and I suffered severe emotional distress.
3      I couldn't sleep for days on end.  I'd -- I had to
4  go to my doctor and request some -- some sleep
5  medication.
6      I was -- You know, I had depression.  I had high
7  levels of anxiety.  You know, I would -- I would wake up
8  in the middle of the night whenever I was asleep and
9  just be sweating, drenching.
10     I couldn't eat.  Couldn't drink.  I couldn't go out
11  in public because I felt embarrassed.  You know, I
12  lost -- I would say other than my immediate family, I
13  believe I lost over 95 percent of all my friends who
14  worked at the airport.
15     You know, subjection to ridicule, subjection to
16  embarrassment.  You know, I was afraid to go out in
17  public.  I couldn't go out.  I couldn't even walk to the
18  airport, even when friends and family were flying in.
19     I mean, it's -- every range of emotion that you can
20  have was there, is -- for -- you know, you just -- once
21  again, under -- you know, not knowing what was going
22  on, you know, knowing that there would be people --
23  people calling your friends and family and accusing you
24  of -- of things that no one else should ever have
25  happened.

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210

JOSE HERNANDEZ vs. SAN DIEGO COUNTY            December 21, 2006                    JOSE HERNANDEZ, VOL. IV

Page 843

1    You know that now you have people going through
2    and -- and -- you know, and talking about you behind
3    your back. I mean, there is -- there is just, you know,
4    every range of emotion, you know, loss of sleep.
5    . I -- Once again, I probably lost 20 pounds through
6    that. Through that I couldn't sleep, couldn't eat, you
7    know. It was -- It was just an awful, awful, awful
8    month experience.
9        Q. Do you still feel that way today?
10       A. Absolutely, to this day. To this date, I can't
11   go back to the airport in the same manner. You know, I
12   can't -- I can't go to the commuter terminal even though
13   I have business to be at the commuter terminal.
14       You know, every time I go out there, my friends
15   don't talk to me. Once again, all those who I believe
16   were my friends at the Airport Authority are all
17   intimidated from coming back and being my friends.
18       You know, I go out there and, you know, they -- the
19   people who I do business now, you can hear it. And it
20   is -- it is -- it is -- not a pleasant experience the
21   way this whole investigation went down. It is -- You
22   know, having opportunities as I did, you know, those
23   opportunities won't come back again.
24       Q. What opportunities are you referring to?
25       A. Opportunities for -- for not only continuing

Page 844

1    employment here at the Airport Authority, but at any
2    other airport that I wish to go back and -- and -- and
3    work at if I wanted to.
4        You know, there was -- there was too much said in
5    the way that these -- that the investigation went down,
6    that it was just -- it was made public by the --
7    by -- by the investigators and the Airport Authority.
8        Q. Why do you believe that you have lost
9    opportunities to obtain employment at other airports?
10       A. Because -- Because I no longer -- I mean,
11   I'm -- I'm a couple of months from being vested out
12   there at five years; okay? When all of these -- this
13   work comes down and just all of a sudden -- all of a
14   sudden I am -- you know, I had -- I had worked closely
15   with a lot of my partners at the other airports from
16   here all the way to Seattle, all the way to Phoenix, on
17   daily conversations that we would have.
18       We even created this California Landside Managers
19   Association where we had representatives from every.
20   airport from here, you know, from San Diego,
21   Palm Springs, Orange County, LAX, On- -- Ontario,
22   Burbank, going -- every major airport that goes from
23   here all the way to Sacramento.
24       And we would talk on a daily basis, weekly basis.
25   You know, believe me, they knew. They knew that the day

Page 845

1    that sent me e-mails and those e-mails were not
2    returned, that was a problem.
3        You don't just get up and leave on your own accord
4    for that position.
5        Q. Are you aware of anyone from the Authority
6    saying anything to employees from other airports about
7    your termination?
8        A. I believe that I've had conversations with --
9    not particular to -- excuse me -- not particular to
10   employees of other airports, but there have been
11   conversations with -- that have come back to me through
12   my current airline partners.
13       Q. And what are those conversations?
14       A. There was conversations that I've had with a
15   couple of our airline partners that -- that kind of
16   outlined that I had been terminated by the Airport
17   Authority pretty much in a -- in a malicious manner to
18   get me fired from my position.
19       Q. Who told you that?
20       A. It had come through by -- It had come through
21   through one of our contacts at one of the airlines that
22   their -- their real estate department had been told that
23   I was fired.
24       Q. What contact?
25       . A. It was through one of our contacts with

Page 846

1    American Airlines.
2        Q. Who?
3        A. Roy -- His name's -- His name's Roy. I forget
4    his last name. I apologize.
5        Q: And you believe that the American Airlines real
6    estate department had heard that you were terminated in
7    a malicious manner?
8        A. I believe what had happened was that the -- the
9    that -- the -- the real estate manager for American
10   Airlines was told at one of these AAAC meetings, which
11   is your -- the real estate meetings for the airlines,
12   that it was told to him by an airport employee that I
13   had been terminated from employee at -- employment at
14   the Airport Authority.
15       Q. Do you know the real estate manager's name?
16       A. No, I don't.
17       Q. Is it a real estate manager at San Diego
18   Airport?
19       A. No.
20       Q. Do you know where he's located?
21       A. No, I don't.
22       That was just -- It had been shared to me in
23   confidence that -- you know, that "Hey, look, some
24   people are" -- "at the Airport Authority are saying that
25   you were terminated."

49 (Pages 843 to 846)

53-611 (269)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY          December 21, 2006                    JOSE HERNANDEZ, VOL. IV

Page 847

1    Q.  Roy from American Airlines --
2    A.  Yes.
3    Q.  -- shared that with you?
4    A.  Uh-huh.
5    Q.  "Yes"?
6    A.  Yes.
7    Q.  Do you know which Authority employee told the
8    real estate manager from American Airlines about your
9    termination?
10   A.  No, I don't.
11   Q.  Are there any other statements that you've
12   heard from other airlines regarding your termination?
13   A.  No.
14       The airlines have been very supportive in this
15   case, you know, especially after having an opportunity
16   to read our -- our pending action.
17   Q.  You indicated earlier that you had a -- a --
18   conversations with a couple of your -- the airline
19   partners that outlined that you had been terminated in a
20   malicious manner.
21       Are there any other airline partners aside from
22   American Airlines?
23   A.  We do.  We do.  It just -- once again, these
24   conversations were -- were after -- occurred after they
25   had an opportunity to read the contents of -- of -- of

Page 848

1    the lawsuit that we submitted.
2    Q.  And had any of those individuals told you that
3    they had heard negative things about your termination
4    from Air- -- Airport Authority employees?
5    A.  Yeah, there was -- there was a couple of
6    L.A.M.C.s, Lindbergh Airport Managers Council meetings
7    that -- where they had asked, because every month they
8    would ask, they had asked Bryan, "Hey, where is Jose
9    at?"  Initially he would say, "Well," you know, "he" --
10   "he is only" -- "he is only even in one particular
11   time."  He -- He said, "Well, that's an employee matter.
12   He is just not here anymore."
13   Q.  Bryan Enarson said that?
14   A.  Yes.
15   Q.  Who told you that?
16   A.  Multiple airline managers, Janet Nix being one
17   of them.
18   Q.  Any other people that you can recall?
19   A.  I don't recall other ones, but it was -- it
20   was -- it was made in a rather public forum.
21   Q.  Are there any other statements by Authority
22   employees regarding your termination that you're aware
23   of?
24   A.  Not at this time.
25   Q.  You said that immediately you could not sleep

Page 849

1    for days on end and that you went to a doctor; is that
2    correct?
3    A.  Yes, I did.
4    Q.  What doctor did you say see?
5    A.  My -- My attending physician was Dr. John
6    Berger.
7    Q.  How many times did you see Dr. Berger for these
8    symptoms that you were feeling?
9    A.  Specific number of times, I'm not sure.  But
10   immediately went to -- to see Dr. -- Dr. Berger, and he
11   prescribed to me antianxi- -- antianxiety medication
12   and -- and sleep medication.
13   THE REPORTER:  Berger spelling for the record.
14   THE WITNESS:  B-E-R-G-E-R.
15   MS. McDONOUGH:
16   Q.  Had you ever taken antianxiety medication
17   before that date?
18   A.  No, I had not.
19   Q.  Do you remember the first day that you went to
20   see Dr. Berger?
21   A.  No, I don't.
22   Q.  Would anything refresh your recollection as to
23   the date of that appointment?
24   A.  I don't -- I don't recall.  I know that -- that
25   after -- you know, after I was sent home -- after I was

Page 850

1    sent home from -- from that, I had trouble sleeping
2    and -- and eating.
3        And, you know, finally -- finally my wife
4    recommended that I go see Dr. Berger and see what kind
5    of -- you know, go discuss the issue with him and see
6    what it is that I can get.
7    MS. McDONOUGH:  I'm going to mark as Exhibit 22 --
8    THE WITNESS:  Okay.
9    MS. McDONOUGH:  -- a document that I will represent
10   my office subpoenaed from Dr. Berger's office.  [EXH-22]
11   (Whereupon the document referred to is marked by
12   the reporter as Defense Exhibit 22 for Identification.)
13   MS. McDONOUGH:
14   Q.  I want you to -- I will start with the
15   typewritten portion in the middle that says,
16   "December 16th, 2005.  Hernandez," comma, "Jose."
17   Can you read that typewritten portion there?
18   MS. CHINN:  Read it to yourself, please.
19   THE WITNESS:  (Indicating.)
20   MS. McDONOUGH:
21   Q.  Have you read the typewritten portion in the
22   middle of Exhibit 22?
23   MS. CHINN:  (Indicating.)
24   THE WITNESS:  Oh, that one.  Okay.  (Indicating.)
25   Okay.

:0 (Pages 847 to 850)

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210

**53-611 (270)**

Page 851

1    MS. McDONOUGH:
2    Q. Does that notation refresh your recollection as
3  to the day that you saw Dr. Berger for the first time?
4    A. It might, uh-huh.
5    Q. Does it?
6    A. It -- If it's on the record, probably so.
7    I don't recall -- Other than this, I just have to
8  go off the documentation and hope that the -- the doctor
9  represented accordingly. I -- I can't tell you, yeah,
10  okay, now I remember it's -- it's 12-16, no.
11    Q. Does it seem right that you went to see
12  Dr. Berger a couple of days after you were placed on
13  leave?
14    A. It would -- It would seem right, absolutely.
15  You know, one day you're okay to sleep and eat, and then
16  the next day, guess what? None of it.
17    Q. Is the typewritten portion here on Exhibit 22
18  accurate?
19    A. It would be a good initial summary of -- of the
20  symptoms at that time, yes, ma'am.
21    Q. So it's an accurate summary of the symptoms as
22  of December 16th, 2005?
23    A. Initial summary, yes, ma'am.
24    Q. And the notation says that you're being started
25  on Zoloft at 50 milligrams a day; is that correct?

Page 852

1    A. Yes, ma'am.
2    Q. Did you actually take the Zoloft?
3    A. I believe I did, yes, ma'am.
4    Q. Are you still taking Zoloft?
5    A. No, I did not.
6    Q. When did stop taking Zoloft?
7    A. I don't recall.
8    Q. Do you have any recollection as to how long you
9  took Zoloft?
10    A. No, I don't.
11    Q. Do you remember which pharmacy you got your
12  Zoloft filled at?
13    A. No, I don't, ma'am.
14    Q. Is there a pharmacy that you regularly use?
15    A. No, not a regular one, no, ma'am.
16    Q. And it says that you were given Ambien to help
17  you sleep at night?
18    A. Yes.
19    Q. Did you take the Ambien?
20    A. I took the Ambien, but it did not have a -- a
21  proper effect on me. I still couldn't sleep.
22    Q. How many times did you try Ambien?
23    A. I don't -- At least a -- a week's period.
24    Q. Any longer than one week?
25    A. I don't -- I don't remember exactly what it

Page 853

1  was, but I just even -- even after taking the
2  medication, I still couldn't -- I still couldn't sleep.
3  It just -- It had no effect.
4    Q. Prior to December 16th, 2005, had you ever
5  taken Ambien?
6    A. I don't believe I ever have, no, ma'am.
7    Q. Had you ever taken Zoloft --
8    A. I don't remember that.
9    Q. -- prior to December 16th, 2005?
10    A. I -- I don't believe I have.
11    Q. Is it true that as of December 16th, 2005 you
12  were not feeling suicidal?
13    A. I believe those were the notations submitted
14  by -- by my doctor at that time.
15    Q. Is it -- Is that a true characterization of how
16  you were feeling at that time?
17    A. Tell -- Tell me again. I'm sorry.
18    Q. That you were not feeling suicidal as of
19  December 16th, 2005.
20    A. Explain to me what you mean, "as of."
21    Q. On that date, did you feel suicidal?
22    A. On that particular day, I had -- my feelings at
23  that time were not suicidal for that particular moment.
24    Q. Did you ever develop suicidal feelings?
25    A. I believe there was -- there was a sense on my

Page 854

1  part that my world had been crumbling around me, and --
2  and maybe some sort of heavy depression, light cases of
3  suicidalness, but not -- not extreme.
4    Q. Was there ever a time where your depression and
5  your -- the feeling of your world crumbling down on you
6  peaked?
7    A. I think it's still ongoing now.
8    Q. Has it been at the same level since December of
9  last year till today?
10    A. I believe it comes and goes.
11    Q. Is there ever a time where it was worse than it
12  is today?
13    A. Absolutely.
14    There was always worse -- There was -- There was
15  levels of -- that I would say were worse as I was going
16  through -- through the investigation not knowing -- not
17  knowing anything about anything. Absolutely those
18  were -- those were the peaks of this, and then
19  immediately after -- after that final termination
20  proceeding. I mean, it was -- it was an extended period
21  that I was -- had the peak of the peak.
22    Q. From December to February?
23    A. Pretty close, yes, ma'am.
24    Q. Was there ever a time since last December where
25  you started feeling a little bit better as far as

51 (Pages 851 to 854)

53-611 (271)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY          December 21, 2006          JOSE HERNANDEZ, VOL. IV

Page 855

1 depression?
2     A. Just I guess to -- to a great extent, no.
3     Q. And you're not currently on any medication for
4 depression or anxiety?
5     A. Not at this time, no, ma'am.
6     Q. Did you try any other medications for
7 depression or anxiety other than Zoloft?
8     A. I believe the -- the next line down will show
9 that I had switch over to Lunesta.
10     Q. How long were you on Lunesta?
11     A. I don't recall exactly. Maybe -- Maybe a
12 30-day period, 45-day period.
13     Q. And you're referring to the notation that seems
14 to be on January 6th, 2006?
15     A. That's correct.
16     Q. Do you have a recollection that you went to see
17 your doctor on January 6th, 2006?
18     A. I don't recall exactly, but I do understand
19 that I had follow-up meetings with my doctor.
20     Q. Does this document refresh your recollection as
21 to how many follow-up meetings that you had with your
22 doctor?
23     A. I believe these may have been a -- a couple of
24 the -- of the initial meetings, yes. The total number
25 of meetings I'm not sure, or appointments with him I'm

Page 856

1 not sure.
2     Q. At the top of Exhibit 22, it has a date stamp
3 of "December 20th, 2005," and then another stamp of
4 "Missed Appointment."
5     A. Uh-huh.
6     Q. Do you recall missing an appointment on
7 December 20th, 2005?
8     A. I -- I don't recall.
9     Q. On the notation of January 6th, 2006, it says
10 your weight was 178 pounds?
11     A. Tell me -- Tell me where, ma'am.
12     Q. January 6th, 2006, it says, "WT 178."
13     A. Okay.
14     Q. Do you believe that that was an accurate weight
15 for January 2006?
16     A. Pretty -- Well, if it's there, it has to be.
17     Q. Did you gain weight from the 178 -- Is it --
18 Well, I'll go back.
19     You said earlier that you gained weight as a result
20 of the investigation, the termination.
21     A. (Shakes head in the negative.)
22     Q. Oh, you lost weight?
23     A. Yes, ma'am.
24     Q. Did you lose weight from the 178 pounds?
25     A. I believe that at that particular time I had

Page 857

1 lost a couple of more pounds, but there was -- there was
2 some loss of weight between the initial investigation to
3 -- to that point.
4     Q. What's the lowest weight that you were at after
5 the investigation began?
6     A. I know at one time I was a little bit under
7 170.
8     Q. What's your current weight?
9     A. Current weight right now is about 1- -- 180.
10     Q. Are you back at what is a normal weight for
11 you?
12     A. No, ma'am.
13     Q. You're still thinner than what you normally
14 are?
15     A. Yes, ma'am.
16     Q. What -- What would you say is your normal
17 weight?
18     A. Well, I had gone about six to eight years about
19 200 pounds, so I'm still 20 pounds -- what -- what my
20 normal weight would be.
21     Q. And you indicated that you were having trouble
22 sleeping?
23     A. Yes.
24     Q. Have you ever had trouble sleeping before
25 December 2005?

Page 858

1     A. Not to this extent, no, ma'am.
2     Q. Had you ever been depressed prior to
3 December 2005?
4     A. Haven't we all?
5     Q. Have you ever been depressed to the point where
6 you sought medical care for the depression prior to
7 December 2005?
8     A. I believe this is the first time I have.
9     Q. Did you go to see any psychiatrists,
10 psychologists or other counselors or therapists --
11     A. I don't --
12     Q. -- after the investigation began?
13     A. I don't recall if I did, ma'am.
14     Q. Is there anything that would refresh your
15 recollection as to whether or not you went to see a
16 counselor or psychiatrist?
17     A. And -- I don't recall anything that might --
18 that may or may not.
19     At that particular time, I didn't want to go to
20 anywhere. I stood at my house and never left.
21     Q. Have you gone to see a psychiatrist or a
22 psychologist in the last year?
23     A. I don't believe I have, ma'am.
24     Q. Are you currently seeing a psychiatrist or
25 psychologist?

2 (Pages 855 to 858)

Page 859

1 A. No, ma'am.
2 Q. Counselor, therapist, whatever you want to
3 call?
4 A. No.
5 Q. Healthcare provider?
6 A. No, ma'am.
7 Q. Are -- Are you regularly seeing Dr. Berger for
8 any of the symptoms that you described to me?
9 A. No, because my insurance coverages have -- have
10 lapsed, you know. I don't have the same insurance
11 coverages, and they're -- and I haven't seen him --
12 haven't had occasion to see him lately other than for
13 renew a prescription for Pravachol.
14 THE REPORTER: For what?
15 THE WITNESS: For Pravachol.
16 MS. McDONOUGH:
17 Q. And that's for cholesterol?
18 A. Yes, ma'am.
19 Q. Does your current insurance cover appointments
20 to Dr. Berger?
21 A. I believe they might now, yes, ma'am.
22 Q. How long did you have a lapse in insurance?
23 A. I don't recall the specific period.
24 Q. What was the date of your hire at BAGS,
25 Incorporated?

Page 860

1 A. I don't recall specifically.
2 Q. Is there anything that would refresh your
3 recollection as to the date you were hired at BAGS,
4 Incorporated?
5 A. No, I don't have a specific date in front of
6 me.
7 Q. How often are you at the airport site in
8 San Diego with your current job at BAGS, Incorporated?
9 A. Sometimes I have occasions to be there every
10 day, sometimes not for a week on end. But being on
11 average, maybe two, three times a week.
12 Q. And how long do you spend on site when you're
13 there?
14 A. Not as much as I probably need to. Maybe, you
15 know, an hour or two at a time.
16 Q. What are you doing when you're on the airport
17 site in your current job?
18 A. We're either making -- making baggage
19 deliveries from -- you know, to each of the specific
20 airlines.
21 I'm meeting with the airlines just to go over
22 operations plans or briefing the airlines, customer
23 relations with the airlines, meeting with the TSA,
24 just -- you know, just work.
25 Q. Who do you meet with from the airlines when

Page 861

1 you're on site?
2 A. I typically meet with the airline station
3 managers.
4 MS. McDONOUGH: Let's go off the record.
5 VIDEO OPERATOR: Going off the record. The time is
6 4:32.
7 (A recess is taken.)
8 VIDEO OPERATOR: Going back on the record. The
9 time is 4:39.
10 MS. McDONOUGH:
11 Q. You indicated that you felt you were subject to
12 ridicule --
13 A. Absolutely.
14 Q. -- after you went out on the investigatory
15 leave?
16 A. Yes, ma'am.
17 Q. Who did you think was ridiculing you?
18 A. It's a a -- It's a thought in your head that --
19 that someone as -- as public is -- you know, people are
20 just used to seeing me there. I'm -- I show up as
21 6:30 every day in the morning. I leave -- I leave at
22 night.
23 I have occasions to be -- to walk that airport from
24 stem to stern, from one side to the other, at least once
25 a day, if not twice a day, being involved in

Page 862

1 checkpoint -- checkpoint activities and not being there
2 anymore.
3 You know, the fact that I had dedicated four and a
4 half, five years of my life to there and not being there
5 anymore, you know, was -- yeah, it would be a thought of
6 ridicule or always having that thought in your head, you
7 know, that people are talking about you.
8 Q. Are you actually aware of anyone ridiculing
9 you?
10 A. I think there is just that -- that thought, you
11 know, that -- that, you know, someone's out there or
12 someone's like, "Good, we finally got rid of that guy."
13 Q. Kind of you were thinking of the worst-case
14 scenario?
15 A. Well, you know, it also -- you know, "We're
16 going to put that guy through the biggest hell that we
17 could ever put him through," which, in fact, it was
18 pretty close.
19 Q. Who did you think was thinking that about you?
20 A. Just everyone, from investigators, from -- from
21 everyone who was involved in this investigation. I
22 mean, it was everyone.
23 Q. Even your friends?
24 A. I think that -- I think they were put in the
25 hell just as -- just as bad as mine.

53 (Pages 859 to 862)

Page 863

1    Q. But did you think your friends were ridiculing
2  you?
3    A. I think those who did not like me were
4  ridiculing me.
5    Q. Do you have any friends that don't like you?
6  MS. CHINN:  You -- Don't answer that.
7  MS. McDONOUGH:
8    Q. Did you ever get to the point where you were
9  not afraid to go out in public?
10    A. It took -- It took some time, and even to this
11  date, I don't feel comfortable walking in the same
12  manner as I did before at the airport.
13    Q. What do you mean by that?
14    A. Well, you know, before, you know, the -- the
15  thought that -- that I can walk up to anyone and talk to
16  anyone and not be afraid or they not be afraid.  You
17  know, that -- that's just not there today, and I don't
18  think that'll ever be -- that'll ever be there.
19    I can't -- I can't run into former employees that I
20  did before, chitchat with them, you know, talk for about
21  ten, 15 minutes or five minutes or two minutes before
22  they get all sketchy and want to leave.
23    Q. Do you have to go to the commuter terminal as
24  part of your current job?
25    A. I do, but that's one of the -- that's one of

Page 864

1  the locations where I'm, you know, quite frankly
2  death- -- deathly afraid of going.
3    Q. Has anyone at the Authority ever told you not
4  to go to the commuter terminal or on sight at the
5  airport?
6    A. I don't -- I don't believe they have, but
7  the -- It's not as welcoming.  I mean, I -- I do
8  understand it's a public facility, but believe me, I
9  don't get that sense of publicness at -- at the airport
10  anymore.
11    Q. Do you still have any friends who are Authority
12  employees?
13    A. Friends, friends as I did before?  You know, at
14  one time -- at one time I would guesstimate that Amiel
15  was still my friend, but no, not after a conversation I
16  had with him this week.
17    Q. What conversation did you have with Amiel this
18  week?
19    A. I had a conversation with him to see how he was
20  going and, you know, just -- just to touch base with
21  him.
22    And he said -- And that's when he informed me, he
23  said -- he said, "I'm not sure if we can be friends
24  anymore.  It's just too scary down there.  You don't
25  understand."

Page 865

1    You know, as he said is, "A lot of people feel
2  that" -- "that you have shit all over them," quote
3  unquote.  "And" -- "And I'm just afraid they're going to
4  retaliate against me."
5    I said, "Amiel, I'm not going to put you through
6  that.  I will not put you through that, you know.  If
7  within a day it's better for you" -- And I -- And I
8  always think of the best for my friends, but you just
9  can't lose friends like that.  You can't have people
10  force you to not be friends with someone because
11  they're upset, whatever.
12    We all deal with people we don't like, but guess
13  what?  That's just the way life is.  But the hard part
14  about it is that they have to.  They feel intimidated.
15  They -- There is reasons why they have to do what people
16  are telling them what to do, and that's just not the
17  right environment to be in.
18    Q. I guess I still don't understand what you mean
19  when you say that people feel that you have shit all
20  over them.
21    A. Well, that's exactly what I want to know.
22  MS. CHINN:  Excuse me.
23  MS. McDONOUGH:
24    Q. Is that --
25  MS. CHINN:  Excuse me.  Excuse me.  That assumes

Page 866

1  facts not in evidence.
2    Is that what Amiel told you?
3  THE WITNESS:  That's correct.
4  MS. McDONOUGH:
5    Q. Do you have any understanding of what Amiel
6  meant when he said that?
7    A. My only understanding, that there is
8  Individuals at the Airport Authority that -- that hold
9  great hos- -- hostility against me and my allegations,
10  and that are -- that are -- I want to say reflecting --
11  that are understanding that -- that they can't impose
12  their hostility on me as much, that, you know, they --
13  they will look -- you know, they're looking at -- at
14  Individuals who were close to me, you know, and maybe
15  retal- -- being retaliatory towards them.
16    Q. Have you ever talked to Amiel about interviews
17  or investigations related to this lawsuit, the actual
18  lawsuit?
19    A. No.
20    My conversations with Amiel are -- are much
21  different than that.  It's just really as a friend,
22  making sure he's okay, and we don't get into specifics
23  as to, "Hey, what did they tell you.  What did they tell
24  me?"  That's not -- That -- That isn't the conversations
25  that I had with them or individuals.

4 (Pages 863 to 866)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY          December 21, 2006                    JOSE HERNANDEZ, VOL. IV

Page 867

1    You know, my conversations with Amiel are just to
2  ensure his well-being, seeing how his career is
3  developing. And that is a great source of concern
4  and -- and really depressing for him as the way it's
5  explained -- expressed to me.
6    Q. Do you believe that employees of the
7  Authority -- at the Authority are retaliating against
8  your friends --
9    A. I believe --
10   Q. -- at the authority?
11   A. I believe they are. I believe that for --
12 for -- during this investigation, people were even
13 afraid to say my name.
14   I believe that today -- that today, regardless of
15 all the good that I may have done, it just -- you just
16 can't use the "Jose" name at the Airport Authority.
17   Q. Who do you believe is doing the retaliating?
18   A. I believe -- Once again, I believe that
19 retal- -- the threat of -- of investigation and
20 retaliation keeps them from -- from -- from -- from
21 doing that. So what they do is they're just kind of
22 quiet in silence because if -- you know, if they say
23 anything --
24   MS. CHINN: Who is it?
25   MS. McDONOUGH:

Page 868

1    Q. I -- No, I'm not asking who feels --
2    MS. CHINN: Who is it? Who makes them feel that
3  way?
4    THE WITNESS: I -- I believe -- I believe -- You
5  know, specific to Amiel, I believe he is greatly
6  intimidated by Bryan.
7    MS. McDONOUGH:
8    Q. Anyone else that you feel is retaliating
9  against your friends?
10   A. I just believe that there is some sort of
11 intimidation coming from Vernon, you know, from Thella,
12 from -- from Ted, from -- from Bryan.
13   You know, not Angela, no. You know, we -- You
14 know, from Jeffrey Woodson, no.
15   But, you know, there is that sense from that
16 certain VP group that you, know, he dragged us all into
17 that. I didn't drag anyone into this. You dragged
18 yourself into this.
19   Q. Are you aware that the Authority conducted an
20 investigation into your allegations of ethics
21 violations?
22   A. I -- I --
23   MS. CHINN: Objection.
24   THE WITNESS: Uh-huh.
25   MS. CHINN: Mischaracterizes and assumes facts not

Page 869

1  in evidence that there was an investigation. The word
2  is vague and ambiguous. You will have to lay a
3  foundation for that. That's a conclusion.
4    THE WITNESS: It is my understanding that the
5  investigation -- no, that -- that the Airport Authority
6  conducted a pseudoinvestigation.
7    MS. McDONOUGH:
8    Q. How do you have that understanding?
9    MS. CHINN: Hey, finish your answer.
10   MS. McDONOUGH: I thought he was done. I'm sorry.
11   THE WITNESS: I'm sorry.
12   MS. CHINN: I know. You -- Everyone's tired.
13   Keep going. Don't pause. We don't have time for a
14 pauses.
15   THE WITNESS: Pauses.
16   That the Airport Authority conducted a
17 pseudoinvestigation, not anywhere near the degree that I
18 was investigated.
19   There was -- You know, there was -- there was
20 letters sent, "Hey, could you answer these questions and
21 send them back to me."
22   You know, there weren't specific interviews. They
23 were just, "Hey, if you can get back to me on this short
24 time frame, then get back to me. And if you have
25 questions, call me and we'll see if we can set up an

Page 870

1  interview."
2    There -- It was -- It was -- It was a sham is what
3  it was. It wasn't -- It was not by any way, shape or
4  form a complete investigation by I believe Mark
5  Burchyett.
6    Q. Do you know if the Authority ever attempted to
7  interview you in connection with the investigation?
8    A. I know they did not.
9    Q. How do you know that?
10   A. I never received communication. No one ever
11 called me. No one ever sent a letter to me.
12   Q. Do you know if anyone ever said -- asked your
13 attorney?
14   MS. CHINN: Objection.
15   Do not disclose any -- anything that your attorney
16 may have ever said to you.
17   THE WITNESS: Okay.
18   MS. McDONOUGH:
19   Q. That's right. Don't tell me anything that she
20 said.
21   MS. CHINN: Including on this question.
22   THE WITNESS: Okay. Right.
23   MS. CHINN: Don't answer it.
24   MS. McDONOUGH: He -- He can answer the question if
25 it's from somebody other than you.

55 (Pages 867 to 870)

53-611 (275)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY    December 21, 2006    JOSE HERNANDEZ, VOL. IV

Page 871

1  MS. CHINN: Well, then ask it that way.
2  MS. McDONOUGH:
3  Q. Have you learned from any source other than
4  your attorney that the investigator from the Authority
5  attempted to contact you in connection with its
6  investigation into your allegations of ethics
7  violations?
8  A. I don't believe so.
9  Q. Are you aware from any source -- Well, strike
10 that.
11 You indicated that the auditor sent a list of
12 questions for you to respond to; is that correct?
13 MS. CHINN: Objection.
14 THE WITNESS: No, that's incorrect.
15 MS. McDONOUGH:
16 Q. What -- What did you say in connection with --
17 MS. CHINN: Hey, let me make an objection.
18 It assumes facts not in evidence. You've got to
19 lay a foundation for that.
20 MS. McDONOUGH:
21 Q. You testified earlier that there were questions
22 sent that you needed to send back that weren't specific
23 interviews but were just questions to say answer this on
24 a short time frame; is that correct?
25 A. No, that's incorrect.

Page 872

1  Q. What were you referring to when you said there
2  was a list of questions?
3  MS. CHINN: You know, you're going to need to let
4  me get these objections on the record.
5  The question mischaracterizes his testimony. He
6  said it's not correct. Now ask another question.
7  MS. McDONOUGH:
8  Q. Did you testify regarding questions that were
9  sent in written form --
10 MS. CHINN: No, the testimony speaks for itself.
11 MS. McDONOUGH: I'm laying the foundation that
12 you're requesting.
13 Q. Did you testify regarding written questions
14 sent in the course of the auditor's investigation?
15 A. Sent -- Sent to who?
16 Q. Anybody.
17 MS. CHINN: You know what? It's vague and
18 ambiguous. His testimony speaks for itself.
19 MS. McDONOUGH: Okay. Can you go back to page 195,
20 line 6 and read the answer, please.
21 (The record is read by the reporter.)
22 MS. McDONOUGH: Oh, I have a different -- I'm
23 sorry. I must have a different line.
24 THE REPORTER: You said 195, line 6?
25 MS. McDONOUGH: Yeah.

Page 873

1  (The record is read by the reporter.)
2  MS. McDONOUGH: It's a little bit further down.
3  Ms. Chinn says, "I know everyone is tired. Keep going.
4  Don't pause. We don't have time for a pause." And then
5  it's the answer after that.
6  THE REPORTER: The -- "That the Airport
7  Authority" --
8  MS. McDONOUGH: Uh-huh.
9  THE REPORTER: Okay.
10 (The record is read by the reporter.)
11 MS. CHINN: My objection still stands. You need to
12 reask that question. If you don't understand his
13 answer, you can question him about that.
14 MS. McDONOUGH: That's what I'm trying to do.
15 Q. Did you just hear the answer that court
16 reporter --
17 MS. CHINN: Wait a minute.
18 MS. McDONOUGH:
19 Q. -- read back?
20 MS. CHINN: We're not going to argue with what's on
21 the record.
22 Are you testifying?
23 MS. McDONOUGH: No, no, no, no.
24 MS. CHINN: Wait. I want to ask him --
25 MS. McDONOUGH: No, you -- if --

Page 874

1  MS. CHINN: -- something for clarification.
2  MS. McDONOUGH: -- this is not your opportunity to
3  ask questions. You can --
4  MS. McDONOUGH: Did you test- --
5  MS. McDONOUGH: Okay. We are stopping for the day.
6  MS. McDONOUGH: Did you -- Did you testify that you got
7  anything in writing?
8  THE WITNESS: No, that's -- that's -- and that was
9  my clarification. I never received anything in writing.
10 MS. McDONOUGH: Cathryn, you're asking me to lay
11 the foundation, so let me lay it.
12 MS. CHINN: Okay.
13 MS. McDONOUGH: This is not your opportunity to ask
14 questions.
15 MS. CHINN: You know, go ahead and lay the
16 foundation.
17 MS. McDONOUGH:
18 Q. In the answer that the court reporter just read
19 back, you mentioned some questions, and it said -- and
20 you said something to the effect of, "Hey, answer these
21 questions and send them back to me."
22 What was that referring to?
23 A. Okay.
24 There was -- It had been mentioned to me by -- by
25 individuals that an e-mail was sent out by the auditor

56 (Pages 871 to 874)

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210

53-611 (276)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY          December 21, 2006          JOSE HERNANDEZ, VOL. IV

Page 875

1   with a list of questions.
2       What specific questions they were and where -- I
3   can't tell you, but there was -- that was the intent of
4   their investigation is could you answer these questions
5   and get back to me.
6       That was -- That's -- That's the extent of that
7   audit that was conducted or investigation that was
8   conducted into my allegation, from what I understand.
9       Q. Who told you about those written questions?
10      A. I knew there was a copy provided to me.
11      Q. Who provided it to you?
12      A. I don't recall.
13      I received a -- a -- a blank copy in the mail.
14      Q. Was there a return address?
15      A. No, ma'am.
16      Q. So you have no idea who you got that from?
17      A. No, I don't.
18      It was just a -- a one sheet, envelope, no return
19  address, just on -- on an envelope that was sent to me.
20      Q. Was there any indication on the list of
21  questions that was sent to you as to who the intended
22  recipient of the questions --
23      A. No.
24      Q. -- would be?
25      A. No, it was just a -- a blank -- a form of

Page 876

1   questions, a form of questions in there that -- you
2   know, that were sent out.
3       Q. Do you know who was interviewed or asked
4   questions in connection with the auditor's
5   investigation?
6       A. Specifically, I don't, no.
7       Q. Do you know if you were ever asked to provide
8   information in connection with the auditor's
9   investigation?
10      A. I don't -- I don't believe so, no, ma'am.
11      Q. So as we sit here today, you're not aware of
12  any request for information from you in connection with
13  the auditor's investigation?
14      A. As -- As I understand it, I don't believe that
15  auditor ever contacted me regarding any information.
16      MS. McDONOUGH: Let's just stop for the day. I'm
17  not done yet. We'll start tomorrow at 9:30.
18      VIDEO OPERATOR: Going off the record. The time is
19  4:54.
20      (The proceedings concluded at 4:54 p.m.)
21      (Signature on following page.)
22              ***
23
24
25

Page 877

1       I declare under penalty of perjury under the laws
2   of the State of California that the foregoing is true
3   and correct.
4
5       Executed at _____, California,
6   on _____.
7
8
9
        _____
10              JOSE DE JESUS HERNANDEZ
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 878

1   STATE OF CALIFORNIA ) ss
2
3       I, Delia M. Satterlee, CSR 9114, do hereby declare:
4
5       That, prior to being examined, the witness named in
6   the foregoing deposition was by me duly sworn pursuant
7   to Section 2093(b) and 2094 of the Code of Civil
8   Procedure;
9
10      That said deposition was taken down by me in
11  shorthand at the time and place therein named and
12  thereafter reduced to text under my direction.
13
14      I further declare that I have no interest in the
15  event of the action.
16
17      I declare under penalty of perjury under the laws
18  of the State of California that the foregoing is true
19  and correct.
20
21      WITNESS my hand this _____ day of
22  _____, 200___.
23
24
25  _____
    Delia M. Satterlee, CSR 9114

57 (Pages 875 to 878)

53-611 (277)

# Deposition of
## JOSE HERNANDEZ, VOL. V

### JOSE HERNANDEZ v. SAN DIEGO COUNTY

*Taken On*
*December 22, 2006*

Transcript provided by:

# HUTCHINGS[SM]
## COURT REPORTERS, LLC
CSR 649

GLOBAL LEGAL SERVICES

800.697.3210

Page 881

```
 1                CERTIFIED COPY
 2
    SUPERIOR COURT OF THE STATE OF CALIFORNIA
 3
       FOR THE COUNTY OF SAN DIEGO
 4
 5  JOSE HERNANDEZ,            )
                              )
 6       Plaintiff,           )
                              )
 7    vs.                     )  No. GIC871979
                              )
 8  SAN DIEGO COUNTY REGIONAL AIRPORT   )
    AUTHORITY, a public entity; and     )
 9  DOES 1 through 12 inclusive,        )
                              )
10      Defendants.           )
    _____)
11
12
13          VOLUME V
14  DEPOSITION OF JOSE DE JESUS HERNANDEZ, the
15  plaintiff herein, noticed by PAUL, PLEVIN,
16  SULLIVAN & CONNAUGHTON LLP, at 401 B Street,
17  San Diego, California, at 9:56 a.m., on Friday,
18  December 22, 2006, before Della M. Satterlee,
19  CSR 9114.
20
21
22  Hutchings Number 147470-SD
23
24
25
```

EXHIBITS

Exhibit identification within the transcript is flagged with "[EXH]" as an identifier.

| DEFENSE | DESCRIPTION | IDENTIFIED | MARKED |
|---|---|---|---|
| 23 | Letter dated 8-24-06 from Ms. Gonzalez to Ms. Chinn and attachment [EXH-23] | 883 | 883 |
| 24 | Jose Hernandez Salary/Promotion History [EXH-24] | 887 | 888 |
| 25 | San Diego County Regional Airport Authority Codes, Article 2, Part 2.0, Section 2.14 [EXH-25] | 900 | 900 |

Questions the witness refuses to answer are indicated in the transcript by a "[QUES]" identifier at the end of the question and are located on the following page(s): 886

Page 880

```
 1  APPEARANCES OF COUNSEL:
 2
 3  For Plaintiff:
 4  LAW OFFICE OF CATHRYN CHINN
 5  BY CATHRYN CHINN
 6  3990 Old Town Avenue, Suite A-109
 7  San Diego, California 92110
 8
 9  For Defendant SAN DIEGO COUNTY REGIONAL AIRPORT
10  AUTHORITY:
11  PAUL, PLEVIN, SULLIVAN & CONNAUGHTON LLP
12  BY SANDRA L. McDONOUGH
13  401 B Street, 10th Floor
14  San Diego, California 92101
15
16  Also Present:  JAMES SOEFFNER, Video Operator
17
18
19           I N D E X
20  WITNESS: JOSE DE JESUS HERNANDEZ
21  EXAMINATION BY:            PAGE
22  Ms. McDonough          882, 922, 925
23  Ms. Chinn              918, 924
24
25
```

Page 882

```
 1     VIDEO OPERATOR:  Good morning.  My name is James
 2  Soeffner.  This is the beginning of Videotape Number 1,
 3  Volume V on December 22nd, 2006.  The time is 9:56 a.m.
 4     Would Counsel please identify yourselves and state
 5  whom you represent.
 6     MS. CHINN:  Cathryn Chinn, C-H-I-N-N, for the
 7  plaintiff.
 8     MS. McDONOUGH:  Sandra McDonough for defendant.
 9     VIDEO OPERATOR:  Thank you.
10     Would the reporter please reswear in the witness.
11
12          JOSE DE JESUS HERNANDEZ,
13  the plaintiff herein, having been resworn, testifies
14  further as follows:
15
16            -EXAMINATION-
17
18  BY MS. McDONOUGH:
19     Q.  Good morning, Mr. Hernandez.
20     A.  Good morning.
21     Q.  Is there any reason why you cannot give your
22  best testimony today?
23     A.  No.
24     Q.  Do you know if Paul Manasjan is still at the
25  Authority?
```

1 (Pages 879 to 882)

53-611 (279)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY          December 22, 2006          JOSE HERNANDEZ, VOL. V

Page 883

1    A. I have not spoken to him. I have no reason to
2  believe he is not.
3    MS. McDONOUGH: I'm going to mark as Exhibit 23 a
4  letter from Amy Gonzalez to Cathryn Chinn
5  (indicating). [EXH-23]
6    Q. Go ahead and take a look at it and let me know
7  if you've ever seen this document before.
8    MS. CHINN: Is this 23?
9    MS. McDONOUGH: Yes.
10    (Whereupon the document referred to is marked by
11  the reporter as Defense Exhibit 23 for identification.)
12    THE WITNESS: I don't recall if I have.
13    MS. McDONOUGH:
14    Q. You will see in Exhibit 23 that the first page
15  is the letter, and the -- the remaining pages contain a
16  chart with some questions.
17    Did you see that?
18    A. Yes, ma'am, uh-huh.
19    Q. Have you ever seen the chart with questions
20  that starts at page 2 of Exhibit 23?
21    A. I don't recall if I have.
22    Q. Does that chart with the questions look like
23  the questions that you identified yesterday that came in
24  the mail to you without a return address?
25    A. No.

Page 884

1    Q. What do you remember about the list of
2  questions that came to you in the mail without a return
3  address that you identified yesterday?
4    A. It was just a -- a list of questions in -- it
5  was just maybe asking for policies or procedures or, you
6  know, to airline practices, just request for information
7  on certain airline practices.
8    Q. And I believe you testified that you thought
9  that that quest- -- that list of questions was part of a
10  pseudoinvestigation by the auditor at the Authority; is
11  that correct?
12    A. Yes, pseudo-sham investigation.
13    Q. How did you obtain the understanding that the
14  questions were from the auditor at the Authority?
15    A. After -- After I looked at the information,
16  didn't really know what it was, threw it away. And then
17  down -- down the line or a few days later, I had read in
18  the newspaper that the Airport Authority had conducted
19  its own investigation or internal investigation, so I
20  kind of just figured one had to do with the other.
21    Q. Do you remember the date that you received
22  those questions in the mail?
23    A. No, I don't.
24    Q. Do you know anything else about the
25  investigation that the Authority conducted into the

Page 885

1  allegations that you made, other than the list of
2  questions that you just identified?
3    MS. CHINN: This is going to be uncertain as to
4  time.
5    Is this after he left the Authority or while he was
6  there?
7    MS. McDONOUGH: At any time, and then we'll narrow
8  it down.
9    MS. CHINN: I'm sorry. When?
10    MS. McDONOUGH: At any time, and then we'll narrow
11  it down.
12    MS. CHINN: Okay.
13    THE WITNESS: The only additional information that
14  I may have is that I had received a call from Mike
15  Parrish in Vegas, in Las Vegas, informing me that he had
16  received some sort of information from some audit by the
17  Airport Authority.
18    And he was -- he didn't have the time to fill out
19  whatever documentation it was, but that he would try to
20  call. There was a number to I believe the auditor, Mark
21  Burchyett, that he would try to give him a call and see
22  if he could just take care of it over the phone instead
23  of having to sit down and -- and write -- respond to the
24  document.
25    MS. McDONOUGH:

Page 886

1    Q. Do you know if any Authority employees were
2  interviewed in connection with audits investigation of
3  your allegations?
4    A. Not at all, ma'am.
5    Q. If you read the first page of Exhibit 23
6  please.
7    MS. CHINN: Oh, I'm sorry. That's hers
8  (indicating).
9    THE WITNESS: Wait. (Indicating.)
10    MS. McDONOUGH:
11    Q. About three quarters of the way down on the
12  paragraph it says, "I respectfully request that your
13  client provide written answers to the questions attached
14  to this letter."
15    Do you see that?
16    A. Yes, ma'am.
17    Q. Were you ever aware that Amy Gonzalez from the
18  Authority had requested that you provide written answers
19  to the questions that are attached beginning at page 2
20  of Exhibit 23? [QUES]
21    MS. CHINN: Objection. Protect your
22  attorney-client interest if it applies here, and do not
23  disclose anything between us if there is anything.
24    THE WITNESS: On those same grounds, I -- I don't
25  think it would be proper for me to answer.

2 (Pages 883 to 886)

53-611 (280)

Page 887

1   MS. McDONOUGH:
2   Q. So any knowledge that you have about Exhibit 23
3   would be from your attorney, so you can't answer that
4   question?
5   A. Yes, ma'am.
6   Q. In your complaint, you allege that internal
7   audit at the Authority had determined that LPI was
8   double-billing?
9   A. That's incorrect.
10  Q. That's incorrect?
11  A. That's incorrect.
12  Q. Are you aware of any internal audit that
13  determined that LPI was double-billing?
14  A. The only internal audit conducted was by
15  myself.
16  Q. And then you mentioned previously that Andrew
17  McIntyre had some involvement in crediting the double
18  billing?
19  A. That's incorrect.
20  Q. Oh, okay.
21  We'll mark as Exhibit 24 a document entitled "Jose
22  Hernandez Salary/Promotion History." [EXH-24]
23  I want you to look at this document and let me know
24  if it accurately reflects your salary and your job title
25  changes from January 1st, 2003 through October 3rd,

Page 888

1   2005 --
2   MS. CHINN: Objection.
3   MS. McDONOUGH:
4   Q. -- from the Authority.
5   MS. CHINN: It lacks a foundation. You have to
6   establish have you seen it before before he can testify
7   as to anything on the document.
8   (Whereupon the document referred to is marked by
9   the reporter as Defense Exhibit 24 for Identification.)
10  MS. McDONOUGH: I can guarantee he's never seen it
11  before. I'm not asking -- I'm not asking him to
12  authenticate the document.
13  MS. CHINN: Okay.
14  MS. McDONOUGH: I'm asking about the information
15  contained on it.
16  MS. CHINN: Okay.
17  Do you want to put that on the record?
18  MS. McDONOUGH: Sure, I just did.
19  MS. CHINN: No.
20  Do you want to put some questions on the record for
21  him?
22  MS. McDONOUGH: I did.
23  Q. If you just look at what I just marked as
24  Exhibit 24, can you let me know if the dates, the
25  salaries and the job titles accurately reflect your job

Page 889

1   titles and your salary increases while you were employed
2   at the Authority.
3   MS. CHINN: But then he's testifying about the
4   document. I think you need to ask him separately.
5   MS. McDONOUGH: Can we go off record, please.
6   VIDEO OPERATOR: Going off the record. The time is
7   10:04.
8   (A discussion is held off the record.)
9   VIDEO OPERATOR: Going back on the record. The
10  time is 10:07.
11  MS. McDONOUGH:
12  Q. Were you the manager of ground transportation
13  at the Authority in January of 2003?
14  A. I believe that was the time frame.
15  Q. Was your approximate salary $80,000?
16  A. Approximately.
17  Q. Were you appointed as the director of landside
18  operations -- excuse me -- the acting director of
19  landside operations in approximately May of 2003?
20  A. Approximately.
21  Q. Did you receive a pay increase when you were
22  appointed as acting director?
23  A. I -- I -- I can't tell you either way. I don't
24  recall.
25  Q. Were you promoted to a permanent director of

Page 890

1   landside operations in October of 2003?
2   A. The -- The exact dates, approximately, but I
3   think there is a little variation here with regard to
4   the -- the difference of -- or when the -- a normal
5   appointment from manager to -- to director of lan- --
6   landside operations. I can't accurately tell you
7   whether that was the case. Just ballpark is pretty
8   close.
9   Q. Ballpark sometime in the fall of 2003 -- ·
10  A. Sometime, yeah.
11  Q. -- you were promoted to director of landside
12  operations?
13  A. That's correct.
14  Q. Did you receive a pay increase to $91,500 when
15  you were promoted to permanent director?
16  A. I may have.
17  Q. Is that a good approximation?
18  A. Approximately.
19  Q. Did you receive a raise to $95,000 in April of
20  2004?
21  A. Approximately.
22  Q. That's approximately the amount?
23  A. Approximately.
24  Q. Did you receive an approximate raise of -- to
25  $99,000 in October of 2004?

3 (Pages 887 to 890)

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210

JOSE HERNANDEZ vs. SAN DIEGO COUNTY · December 22, 2006    JOSE HERNANDEZ, VOL. V

Page 891

1    A. Approximately, yes.
2    Q. Did you receive an approximate raise to
3  $104,000 in October of 2005?
4    A. Approximately.
5    Q. Did you ever refuse to participate in any
6  activity at the Authority because you thought that the
7  activity was unlawful or illegal?
8    A. You know, understanding the prac- --
9  understanding the process of those activities, it was my
10  understanding that they may not be. So I had no reason
11  to believe that they -- that they were.
12    Q. So as you sit here today, you can't recall
13  refusing to participate in any activity because you
14  thought it was illegal or unlawful?
15    A. No.
16    I think the questions were more, you know,
17  inquisitory by nature. "Is this okay to do? Yeah, it's
18  okay. We do it all the time. Okay. All right."
19    So, you know, being -- one, being fairly new to the
20  organization, and two, having the instructions or
21  clarifications communicated to me by my direct
22  supervisors, I would just assume that that would be the
23  case.
24    Q. In your complaint, you allege that the
25  Authority invaded your privacy by asking questions of

Page 892

1  others about your marriage?
2    A. Absolutely.
3    Q. What questions are you aware of that were asked
4  about your marriage?
5    A. There was questions concerning how stable our
6  relationship was. If there was any understanding by any
7  individuals that I may be cheating on my wife. You
8  know, asking questions of whether we had arguments.
9    Just really trying to get an understanding of -- of
10  what the state of the relationship was between my wife
11  and I, if there was cheating. If I had, you know, went
12  to Kelly, she was quite pointly asked if -- if she was
13  dating me.
14    Q. Are there any other questions or information
15  that was gathered regarding your marriage that you're
16  aware of?
17    A. No, there was -- primarily they were centered
18  around that type of questioning is, "Tell me about what
19  you know about Jose and his wife. Tell me whether you
20  know that they're having troubles. Tell me if you" --
21  "if you think or you know that Jose may be cheating on
22  someone. Tell me if you know or you think that Jose may
23  be cheating with Kelly, you know, or" -- "or such
24  inquiries."
25    But that was primarily the focus of -- of the

Page 893

1  questions, or -- or excuse me -- or if you think or you
2  know that he might be cheating with anyone else.
3    Q. Who told you that they were asked such
4  questions?
5    A. Kelly Pond, immediately after her interview
6  with investigators, gave me a call by telephone to
7  inform me that she was rather disgusted by the line of
8  questioning, and that, you know, ever more perturbed
9  with the questioning surrounding her -- you know, any --
10  any thoughts of infidelity on my part.
11    You know, Kelly lives with her -- with her
12  boyfriend/fiance, and she understands and she knows that
13  I've been married to my wife for about 11 years now.
14    Q. Is there anyone else that told you that they
15  were asked questions about your marriage?
16    A. Mike Parrish had asked -- had -- Mike Parrish
17  was asked if on a particular trip to Vegas that I had
18  taken if he knew or he had information that I had taken
19  Kelly Pond on that trip.
20    Q. We already talked about that; correct?
21    A. Yes, that's correct.
22    Q. Were there any other people who told you that
23  they were asked about your marriage?
24    A. I believe Janet Nix may have been asked about
25  my wife -- my marriage as well.

Page 894

1    Q. Did she tell you what the investigators asked
2  her?
3    A. Once again, same line of questioning, if
4  what -- what she thought or what she knew or what she --
5  what kind of comments she would like to make on -- you
6  know, on -- on my marriage or state of my marriage
7  with -- with my wife.
8    Q. Was there anyone else who told you that the
9  investigators asked the witness about your marriage?
10    A. None that I could remember at this time.
11    Q. When you applied to BAGS, Incorporated for
12  employment, did you have to provide a reason for the
13  ending of your employment with the Authority?
14    MS. CHINN: I'm going to object. I think it
15  invades his privacy. It can't possibly lead to
16  admissible evidence here.
17    But you're welcome to answer the question.
18    THE WITNESS: No, I don't -- I don't -- I don't
19  recall.
20    MS. McDONOUGH:
21    Q. I believe you testified yesterday that you
22  could not recall if anyone had ever told you who made
23  the decision to terminate your employment?
24    A. Yeah, I don't recall specifically who may have
25  made that decision.

4 (Pages 891 to 894)

53-611 (282)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY          December 22, 2006          JOSE HERNANDEZ, VOL. V

Page 895

1    I do recall that conversations with Ted Sexton
2  during the time of my final interview, that he -- you
3  know, that he had made comments to the effect that there
4  wasn't a day that had gone by, from the beginning of the
5  investigation through the end of the investigation, that
6  the -- my matter was not discussed with Thella Bowens
7  and the senior VP group.
8    And I said, "What do you mean?"
9    He said every day during the VP meeting they would
10 go over issues surrounding my -- my investigation.
11   Q.  Has anything refreshed your recollection since
12 yesterday --
13   MS. CHINN:  Were you finished with your answer?
14   THE WITNESS:  No -- For now, yeah.
15   MS. McDONOUGH:
16   Q.  Has anything refreshed your recollection since
17 yesterday about whether you've learned from any source
18 who made the decision to terminate your employment?
19   A.  No, there has just -- there -- there was just
20 thoughts that -- you know, thoughts that Thella had
21 either made that decision or, you know, that Thella was
22 just fed up with the whole thing, just said, "We need to
23 get him terminated.  He needs to go."
24   Q.  What do you mean by thoughts that Thella had
25 made the decision?

Page 896

1    A.  There was just -- You know, you can take it --
2  There was varying -- I mean, from -- from comments that
3  were made to me, specifically who I don't remember.
4    You know, Ted can say he did it or, you know, it
5  could say that it was a decision by the vice president
6  group.  It could be -- You know, there is -- there is,
7  you know, thoughts, "Oh, Thella, Thella wanted you
8  fired," you know, "So she fired you," or Ted.
9    You know, understanding whatever this was, I doubt
10 it was just Ted's decision to -- to -- to terminate my
11 employment or to give me those three options at that
12 time, but it was -- there is -- it depends.
13   Q.  So is it your belief that Thella made the
14 decision to terminate your employment?
15   A.  I believe she had some -- some involvement
16 in -- in the decision.  Otherwise, why would you take
17 time out of senior -- senior staff on a daily basis as
18 Ted had -- has communicated to me that every
19 day, from the first day that this investigation started,
20 that "We've gone over your investigation."
21   So that -- that -- It's only -- it's only me to
22 assume that that's the case.  And Thella chairs that
23 meeting, and the VPs are all in that meeting.
24   Q.  We've talked fairly extensively about
25 disclosures that you've made with regard to the restroom

Page 897

1  project, the General Dynamics lease, the Teledyne Ryan
2  lease and the LPI issues.
3    Do you have any reason to believe that your office
4  staff knew about those disclosures?
5    A.  I believe they might have.  You know, we -- I
6  would communicate with -- with my staff just in general,
7  under -- just in -- not specific to them.
8    But, you know, we may have had conversations with
9  them especially around budget time, "Hey, we have to" --
10 "we have to tighten the belts a little bit," you know.
11 "We have to absorb another $2 million either on the
12 General Dynamics or Teledyne Ryan."  Have to explain to
13 them the effects of our operating budget.
14   So, you know, the -- specific incidences, not sure
15 but, you know, they -- there would be some comments that
16 they would understand exactly what -- what was going on,
17 or what my feelings were.
18   Q.  And when I said "office staff," who were you
19 thinking of?
20   A.  My direct office staff with -- meaning my
21 permitting staff, Jennifer, Kimberly, Carol Mahafey.
22   And then most definitely probably my -- my -- my
23 terminal operations staff, which is Amiel, Jay and --
24 and Ron at the time.
25   Q.  Do you know if anyone else aside from your

Page 898

1  office staff and Ted Sexton knew about the disclosures
2  that you made?
3    A.  I don't -- I -- I wouldn't be able to tell you.
4    Q.  In your complaint, you allege that witnesses
5  were intimidated in the course of the investigation that
6  went from December 2005 to February 2006.
7    A.  Yes, ma'am.
8    Q.  Who do you believe was intimidated?
9    MS. CHINN:  I think he's asked and answered that
10 question several times yesterday.
11   You're free to answer it again.
12   THE WITNESS:  I believe -- I believe those who
13 were -- those same individuals that were investigated,
14 specifically employees, employees of the Airport
15 Authority and vendors of the Airport Authority, not as
16 much to airlines.
17   But those -- the ones again specifically employees
18 for the Airport Authority, they were told, "You can't
19 talk about this.  You can't talk to Jose.  You can't
20 discuss this."  And, you know, they -- you know,
21 everyone to a T has -- has told me that they felt
22 intimidated by -- by those threats.
23   MS. McDONOUGH:
24   Q.  The -- The intimidation was that they couldn't
25 discuss it with you?

5 (Pages 895 to 898)

53-611 (283)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY          December 22, 2006          JOSE HERNANDEZ, VOL. V

Page 899

1    A. Well, the intimidation was just that -- the
2    intimidation of -- of -- of the whole circumstance, the
3    whole investigation, "You will not talk to anyone. You
4    will not" -- you know, threats.
5        I mean, those -- those are -- those are pretty
6    serious when someone says you can't -- your friend
7    who -- you've had friends for a long time, you will not
8    talk to them anymore. You know, you would be scared
9    swell.
10   Q. And that was what we talked about yesterday
11   when you said that some people at the Authority felt
12   that there might be retaliation if they talked to you?
13   A. Abso- --
14   Q. Is that what you're referring to?
15   A. Yes, ma'am.
16   Q. Were there any other intimidating tactics or
17   statements that were made in the investigation that
18   you're aware of?
19   A. You know, I -- I remembered some conversations
20   that I've had with -- with -- with Amiel and some of my
21   other employees that, you know, Ted was -- was rather
22   forthright with them that they should not -- they should
23   not be talking to -- to me.
24   Q. Anything else?
25   A. No.

Page 900

1        There was just that -- those threats -- those
2    threats and -- and words of intimidation were enough,
3    enough for them, you know, to -- to -- even to this day
4    they're -- they're afraid to talk to me.
5        These were people who I had developed great
6    friendships with, you know, in terms of the four and a
7    half, five years that I was there. And then to one day
8    come in and be told, "You can't talk to him anymore,"
9    you know. And -- And even at the end of it, no one's
10   ever told them, "Hey, it's okay to go back and talk to
11   him."
12   Q. Are you aware of any Authority code that allows
13   an employee to go to the board if the employee feels
14   that he or she is being retaliated against?
15   A. I -- I wouldn't recall at this time, ma'am.
16   MS. McDONOUGH: I will mark as Exhibit 25 Section
17   2.14 of the San Diego County Regional Airport Authority
18   Codes. [EXH-25]
19   Q. Have you ever seen this document before?
20   A. I don't recall. I don't recall if I have.
21   Q. Did you look at it?
22   A. Uh-huh, I saw when you --
23   Q. Did you read it?
24   (Whereupon the document referred to is marked by
25   the reporter as Defense Exhibit 25 for identification.)

Page 901

1    THE WITNESS: (Indicating.) Okay.
2    MS. McDONOUGH:
3    Q. You've now read it?
4    A. I think I've seen it before, but I don't -- I
5    don't recall when I've originally seen it.
6    Q. If you look at Section (c) on the first page --
7    A. Uh-huh.
8    Q. -- it says, "Any person who believes that he or
9    she has been subjected to any action prohibited by this
10   section may file a complaint with the Board."
11   A. Uh-huh.
12   Q. Did you ever file such a Complaint?
13   A. No.
14   You -- Once -- Once again, these -- I never had an
15   opportunity to file such a complaint because I was put
16   on suspension. I couldn't go back to the board.
17   And you have to also understand my position. Some
18   of the disclosures were specific to board members, so
19   it's -- it's making a report to those who I'm reporting
20   on.
21   So do you understand the Catch-22? I'm -- I'm
22   going to say something about you, and I want you to do
23   something about it. Not very likely.
24   Q. Did you ever consider filing a complaint prior
25   to December of 2005?

Page 902

1    A. Once again, prior -- prior to that, I didn't
2    think anything was wrong. I thought everything was
3    okay, the way the practice was at the Airport Authority,
4    "Hey, go get them a ticket. Go get them upgrades."
5    You know, it's okay to have these favors done for
6    people. "Are you sure?" "Yeah, it's okay." It's done
7    all the time, so why would I have reason to -- to feel
8    that it wasn't anything other than that.
9    Q. In the complaint, you allege that you spoke
10   with Maurice Grey for some period of time to ask him to
11   prepare a job description of his own job and then to
12   justify the pay that he was receiving --
13   A. That's correct.
14   Q. -- is that accurate?
15   A. That's correct.
16   Q. When did you first begin that discussion with
17   Maurice Grey?
18   A. You know, we had looked -- the specific dates I
19   don't recall, but it had been -- it -- it had been
20   almost through a one-year period that I was working
21   with -- that I was working with Maurice Grey and his
22   staff to try to streamline some of the -- the -- the
23   expenses that were getting out of control.
24   So "This is what you bid," you know, "These are
25   your numbers. What can we do within those budgets to

6 (Pages 899 to 902)

53-611 (284)

Page 903

1 try to figure it out, and if there is anything I can do
2 how did I help you?"
3     And then we went through and we not only with
4 Maurice Grey's job description, we went through and
5 pulled job descriptions for all his -- I guess lack of a
6 better word, his senior management staff and try to see
7 where duplication of services were.
8     And then when it funneled all the way to the top
9 with Maurice Grey, and we looked and I looked at his
10 initial job description, in -- in reviewing that
11 documentation, I actually had Jim Myhers and Wendell
12 Tanks, who was a chief auditor for LPI.
13     When I looked at their individual job descriptions
14 and then looked at Maurice Grey's, in fact, Maurice
15 Grey's areas of responsibilities were the same that they
16 were doing.
17     So that is when I -- I talked to Maurice Grey and
18 said, "Look, there" -- "there" -- "there seems to be
19 some duplication, and I think it's" -- "it's at your
20 point.
21     "You know, what is it" -- "what I really need to
22 understand on your part is, what is it that you do
23 specifically that is not already covered by" -- "by Jim
24 Myhers and by Wendell Tanks that will justify your
25 salary of I believe $55,000 a year?

Page 904

1     "I need to be able to justify these expenses
2 because they're going to go through," you know, "If" --
3 "If I'm audited on yours, I need to be ju-" -- "I need
4 to able to justify the salaries that are being paid."
5     Q. Was that discussion with Maurice Grey after the
6 RFP committee approved the new contract for LPI?
7     A. Yes, I believe it -- it was right around
8 after -- in the six-month period, one-year period
9 following -- following the renewal.
10     Q. Do you know when the renewal was for LPI's
11 contract?
12     A. I don't recall specifically. It would have to
13 be -- It would have to be around January -- no --
14 February 1, 2003, I believe.
15     MS. CHINN: 2001?
16     THE WITNESS: 3.
17     MS. McDONOUGH:
18     Q. In your complaint, you allege that at one of
19 the briefing -- briefings of the vice presidents in the
20 Teledyne Ryan -- or for the Teledyne Ryan task force,
21 that Bryan Enarson was agitated and that you received
22 reports that Bryan Enarson was angry?
23     A. Yeah, he was agitated that we made issues or
24 that we spotlighted the -- the fact that, you know,
25 initially it was represented or -- or misrepresented

Page 905

1 that contamination in that facility was right around the
2 $10 million range, but then yet our reports had come
3 back stating otherwise, that they were closer to the
4 $30 million range. So he felt maybe a little agitated,
5 a little humiliated, which he expressed to his staff.
6     Q. Who did -- Who did you receive reports from
7 about Bryan Enarson's anger?
8     A. It had just come through I believe
9 conversations -- specifically who it was I don't recall,
10 but it was subsequent meetings of the Teledyne Ryan task
11 force -- that he was just not happy with the fact that
12 we -- we exposed those areas, and that he -- that he was
13 a little agitated on my part for -- for making issue
14 of -- making issue of that specifically when I was
15 trying to brief the expansion plans for the Teledyne
16 Ryan property.
17     Once again, we started with 350 stalls going into
18 briefing, and briefing not only in the development of
19 that project, but issues that we had encountered --
20 environmental issues that we had encountered --
21 encountered in that development.
22     And then -- then briefing the Phase II project and
23 not only talking about the -- you know, the -- the
24 specifics of that project, but really getting deep into
25 the items that would restrict us from completing those

Page 906

1 within some sort of acceptable budget.
2     Q. Did you ever hear that Bryan Enarson was angry
3 with Paul Manasjan for the items he raised as well?
4     A. I believe he was agitated about the -- the
5 environmental disclosures in -- in total. Specifically
6 with Paul Manasjan, I'm not sure, but it was specific to
7 those disclosures in the environmental.
8     Q. I believe you indicated, maybe even in day one,
9 that the station managers have discretion to give
10 nonrevenue passes to individuals as they see fit; is
11 that accurate?
12     A. I believe that could be in -- in general, yes,
13 ma'am.
14     Q. Do you have any understanding as to -- as to
15 whether station managers at the airlines give nonrevenue
16 passes to individuals on a daily basis?
17     A. I believe -- I could -- I couldn't accurately
18 tell you whether they give them on a daily basis, no,
19 ma'am.
20     Q. Do you know anything about the times or
21 conditions where station managers might give nonrevenue
22 passes to people?
23     A. Not specifically. It just -- once again, my
24 understanding of their ability to give nonrev passes
25 is -- is really discretionary on behalf of the airline

7 (Pages 903 to 906)

53-611 (285)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY          December 22, 2006                    JOSE HERNANDEZ, VOL. V

Page 907

1  station manager.
2      Once again, those passes are -- are kind of as --
3  as -- they -- they don't carry any value to them
4  whatsoever. They're all space available, and that's why
5  they have more discretion.
6      If you were giving someone positive-space passes,
7  well, maybe that's a little bit different, and I'm not
8  sure exactly what the requirements would be for those.
9  But, you know, they are discretion in nature, and it's
10  really up to -- up to the airline station manager to
11  give them out as he or she fits -- sees fit.
12     Q. When you received the -- the passes from
13  Hawaiian Airlines, did you believe that -- that Janet
14  Nix gave out passes to any member of public who said,
15  "Hey, I want to go on a vacation. Can I go on a
16  vacation?"
17     MS. CHINN: Objection. That calls for speculation.
18     THE WITNESS: I couldn't -- I couldn't accurately
19  respond to that. I knew -- I can -- I can tell you that
20  she had given out, you know, nonrev passes in the past
21  to friends, family, business partners. Specifically who
22  they are, I'm not sure.
23     But, you know, once again, as the airline station
24  manager, she would have discretion to give those passes,
25  you know, to any member of the general public, you know,

Page 908

1  that she sought fit. They weren't specific to -- to
2  people by title, by name. It was just any member of the
3  general public for whatever reason she saw fit.
4     MS. McDONOUGH:
5     Q. Do you know if Janet Nix regu-- -- regularly
6  gave out nonrevenue passes to members of the general
7  public?
8     A. I -- I wouldn't be able to respond to that.
9     Q. Do you know if Mike Parrish regularly gave out
10  buddy passes to members of the general public?
11     A. Buddy passes, I'm not sure how he gave them,
12  but there -- there is a difference. Buddy passes are --
13  are for use for, once again, his personal tickets, not
14  company passes. Those are his personal tickets, and he
15  can give them out to whoever he -- he would like to give
16  them out to.
17     Personal -- Personal buddy passes are issued to
18  employees of Southwest-Airline as -- as earned credits
19  for them. So they were -- they were his, Mike
20  Parrish's, tickets. They were not Southwest Airline
21  tickets.
22     Q. They were tickets where he receives a certain
23  number every year and he can give them out as he would
24  like?
25     A. I'm not sure exactly how he gets them, but

Page 909

1  he -- somehow he gets them as an employee incentive.
2     Q. And so the tickets that your kids used to go to
3  Las Vegas, those were Mike Parrish's personal buddy
4  passes, as opposed to company nonrevenue tickets?
5     A. That's why they're called buddy passes.
6     Q. So yes?
7     A. Yes, ma'am.
8     Q. Are you aware of any Authority rule or policy
9  that prevents an employee from disclosing information to
10  a government agency?
11     A. That's -- That's kind of rather broad. I'm not
12  exactly sure what you're leading to.
13     Q. I'm just asking if you're aware of any
14  Authority rule or policy that tells its employees you
15  cannot disclose unlawful or illegal information to a
16  governmental agency.
17     A. I don't recall.
18     Q. Do you know if Steve Kitts -- is that his name?
19     A. Yes.
20     Q. Do you know if he gave Ace Parking passes to
21  anyone else?
22     A. I wouldn't be able to -- to talk to his
23  specific practices of who he gave those passes out to or
24  not.
25     Q. Have you ever known?

Page 910

1     A. No, ma'am.
2     Q. Did you pay Steve Kitts anything for the Ace
3  Parking pass?
4     A. I don't recall if I did.
5     MS. McDONOUGH: Let's take a break.
6     MS. CHINN: Sure.
7     VIDEO OPERATOR: Going off the record. The time is
8  10:35.
9     (A recess is taken.)
10     VIDEO OPERATOR: Going back on the record. The
11  time is 10:46.
12     MS. McDONOUGH:
13     Q. Do you know how many people attended the
14  Southwest golf tournament in 2005?
15     A. I don't.
16     How many total people?
17     Q. Yes.
18     A. No, I don't.
19     Q. Do you have an estimate?
20     A. I wouldn't even venture to guess how many total
21  people were there.
22     Q. You've talked quite a bit about the Teledyne
23  Ryan property and the contamination on that property.
24  There are a lot -- Well, strike that.
25     Are there other Authority employees who have

8 (Pages 907 to 910)

53-611 (286)

Page 911

1  complained about the contamination on the Teledyne Ryan
2  property?
3      A.  I'm -- Others specifically, no.  All -- All I
4  understand is my -- you know, my complaints.
5      Q.  Are you aware that others are frustrated by the
6  fact that there is contamination on that property?
7      A.  After -- After the initial -- Let me put it
8  this way.  After going through the initial construction
9  phases, the conceptual phases and identifying
10  environmental issues on those and then making those
11  disclosures, probably encouraged other employees to go
12  ahead and -- and complain as well, because the amount of
13  contamination out there is -- is more than you would
14  ever believe.
15      Q.  Is it fair to say, then, that you complained
16  first, other people became aware of it, and then they
17  complained as well?
18      MS. CHINN:  Objection to the construct of the
19  question, "Is it fair to say." ·
20      If you can answer -- answer the question, you're
21  welcome to, but it would be better to rephrase the
22  question without "Is it fair to say."
23      THE WITNESS:  Do you want to rephrase or do you
24  want to --
25      MS. McDONOUGH:  (Shakes head in the negative.)

Page 912

1      THE WITNESS:  Go ahead, ask your question again.
2      MS. McDONOUGH:
3      Q.  Is it fair to say that first you complained,
4  and other people at the Authority became aware of
5  contamination, and then they complained as well about
6  the contamination after that?
7      A.  I think it would just be fair to say that when
8  the levels of contamination were -- when -- when -- in
9  my process of developing the areas of responsibility
10  that I had, that -- that that led to other issues.
11      But first -- yeah, first levels of disclosure
12  probably would have come from me, and then where they
13  came from and as you started getting into the project,
14  it started getting bigger and bigger, like everything
15  started unraveling and yeah, became a big source of
16  frustration for other employees.
17      Q.  You've also talked about the General Dynamics
18  lease, and I believe you testified that at least the
19  first three years of the lease amount is set forth in a
20  statute; is that correct, or code?
21      A.  Probably.
22      MS. CHINN:  Would you read that back for me.
23  Thanks.
24      (The record is read by the reporter.)
25      MS. CHINN:  I'm going to object.  The code speaks

Page 913

1  for itself.  And I think the -- the question is vague
2  and ambiguous.
3      If you -- If you understand the question, please go
4  ahead and answer it.
5      THE WITNESS:  I just -- Probably.
6      MS. McDONOUGH:
7      Q.  And you said that you complained to Ted Sexton
8  about the amount that the Authority was paying under the
9  lease; is that correct?
10      A.  I did.  I did.
11      As I testified before, I had a pretty involved role
12  in identifying or producing profit-and-loss documents.
13  And I just -- you know, understanding, once again, the
14  effects that it would have on the operating budget,
15  didn't quite understand, you know, how it ever- -- how
16  everything penciled out.
17      You know, I had a decent understanding of -- of
18  allowable uses on there.  I had probably, you know, as
19  good an understanding as anyone else as to existing
20  revenue streams.  So I just -- I -- I -- I personally
21  couldn't reconcile why we were paying what we were
22  paying.
23      Q.  And you were looking at what the Authority was
24  paying for those first three years under the lease?
25      A.  Yes.

Page 914

1      Understand -- Understand that when you run an
2  airport, unlike private, you really don't have an
3  opportunity to speculate like you and I will.  You know,
4  you and I will go out and buy a house and say, you know, ·
5  "Maybe I'll overpay now, but down the road it might make
6  sense."
7      As public agencies, I don't think you have that
8  same opportunity to speculate.  You have to make what
9  makes -- You have to make decisions on what makes sense
10  now and understand the ramifications of, "Okay.  If I go
11  in and I overpay 2 million here, guess what?  I've got
12  to come up with the $2 million somewhere."
13      And then typically where those come out were other
14  areas of my responsibility, which were the management
15  of -- of the terminals having effect on -- you know, on
16  paging systems, on escalators, on maintenance, on
17  cleanliness.  I mean, it has great effect.  It's got to
18  come out of somewhere.  And -- And that's why.
19      Q.  I was looking more at the time frame. ·
20      Were the complaints just for those first three
21  years in the amounts that the Authority was paying under
22  the lease?
23      A.  I believe that the initial -- that the
24  complaints were -- the complaints were on those three
25  years, and then how the formulas would be from then on

9 (Pages 911 to 914)

53-611 (287)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY          December 22, 2006          JOSE HERNANDEZ, VOL. V

Page 915

1  out. It's almost the whole -- that the -- the lease in
2  total would be a complaint, because this is just the
3  beginning.
4      So, I mean, it's -- okay. How are you going to
5  figure it out? Are you going to fig- -- Are you going
6  to figure out future rent -- future rent payments on
7  similar formulas as to what we have here that brought
8  those 2 million, $4 million losses to the Airport
9  Authority?
10     So really the complaints were to the -- to -- to
11  the rent payments, not just the first three years, but
12  then calculations from then on out.
13     Q. At the time you left your employment with the
14  Authority, do you know if the lease amount had been set
15  for the fourth year of the General Dynamics lease?
16     A. I -- I don't have specific recollection on
17  that.
18     Q. Did you make any complaints specifically about
19  amounts that were being discussed for the fourth year of
20  the General Dynamics lease?
21     A. No, ma'am.
22     I believe that at that particular time I was -- I
23  didn't have direct involvement, or it was just the
24  beginning of the negotiations, so I -- I don't have
25  specific numbers of what those lease numbers would be.

Page 916

1      MS. CHINN: She's not the queen of England. You
2  don't have to call her "ma'am."
3      MS. McDONOUGH:
4      Q. Can you approximate how much money you lost in
5  salary between the termination of your employment and
6  the beginning of -- the termination of your employment
7  with the Authority and the beginning of your employment
8  with BAGS, Incorporated?
9      A. I wouldn't -- I wouldn't be able to estimate
10  those -- those salary losses at this time. I think my
11  losses -- I -- It would be pretty fair to say that not
12  only did I -- did I incur substantial losses in -- in
13  terms of salary, but even greater losses in terms of
14  respect and ability to secure future employment.
15     Q. And yesterday you testified about emotional
16  distress that you've suffered.
17     A. Absolutely.
18     Q. And are there any other damages, aside from
19  emotional distress and the loss of your salary, between
20  the termination of your employment with the Authority
21  and the beginning of your employment with BAGS,
22  Incorporated?
23     A. Yeah, I don't think I can speculate to what
24  those -- what those would be at this time specifically.
25     Q. Do you have any way of determining what those

Page 917

1  damages are?
2      A. Probably not at this time, no, ma'am.
3      Q. You've alleged a violation of privacy claim in
4  the complaint, and in that claim it sets forth the
5  questions that the investigator asked about your
6  marriage --
7      A. Yes, ma'am.
8      Q. -- and also obtaining the car repair records.
9      Q. Do you contend that any other act by the Authority
10  or its investigators violated your privacy?
11     A. I believe that at this particular time, that
12  those -- those are the beginning. I'm sure there's
13  others discussing, you know, private employee matters
14  with -- with -- with others outside the agency, the
15  subordinates from within -- subordinates of mine with
16  the Airport Authority.
17     I'm sure that if you look in there, I don't -- once
18  again, I don't claim to know the law, but there -- there
19  probably are specific incidences in there that would
20  violate privacy.
21     Q. Are you aware of any at this time?
22     A. I'm not aware of any at this time, but it -- I
23  can only speculate that there are multiple.
24     Q. I apologize to go back to the Southwest golf
25  tournament, but do you know if any other individuals

Page 918

1  received entrance to the Southwest golf tournament
2  without paying the actual entrance fee?
3      A. I can't tell you specifically. I'm sure there
4  are, but I can't tell you specifically.
5      MS. McDONOUGH: Well, those are all the questions I
6  have for now. I -- I will reserve the right in the
7  event that there are additional causes of action or
8  claims that are alleged in the future for us to come
9  back in and reopen the deposition since there isn't a
10  final complaint in the answer on file.
11     MS. CHINN: I only have one question.
12
13         -EXAMINATION-
14
15  BY MS. CHINN:
16     Q. She asked you earlier today something about the
17  Authority -- Hold on just a second.
18     Well, in the interest of time, she asked you
19  something about the Authority having a rule that you
20  could not disclose information to a governmental agency.
21     Do you remember that?
22     A. I believe so.
23     Q. Okay.
24     And I think you testified that you couldn't recall?
25     A. Yes.

10 (Pages 915 to 918)

Case 3:08-cv-00184-L-CAB    Document 1-11    Filed 01/30/2008    Page 76 of 153

JOSE HERNANDEZ vs. SAN DIEGO COUNTY          December 22, 2006          JOSE HERNANDEZ, VOL. V

Page 919

1  Q. Was any such rule that you could not disclose
2  information applied to you by anyone from the Authority?
3  A. Yeah, I believe --
4  MS. McDONOUGH: Object. That lacks foundation that
5  there was such a rule.
6  But go ahead.
7  THE WITNESS: Okay.
8  I -- Well, I --
9  MS. CHINN: Well, wait a second. Let's go back to
10 that.
11 Q. Did anyone make a rule that prohibited you from
12 disclosing information while you were still employed at
13 the agency?
14 A. The specific rules were -- were the disclosure
15 rules that -- that during the terms of -- or during the
16 times of the investigation where I was strictly
17 prohibited from making any communication, or that the
18 intent was, "You can't communicate to anyone. You can't
19 talk to anyone. You will not discuss this" -- "this
20 investigation with anyone."
21 So, you know, that would probably be as -- the
22 closest to mine, a sense of role that prohibited me from
23 making any typical -- any type of disclosures.
24 Q. At any point during this investigation, did you
25 attempt to disclose further information to these

Page 920

1  investigators acting on behalf of the Authority?
2  A. I did. I did.
3  Q. And what happened when you did that?
4  A. And whenever any kind of specific disclosures
5  would come up, they would skip it. They would want to
6  ignore it. They did not want to get further details.
7  They were, once again, there to speak to me, try --
8  They had a specific agenda on what they were trying to
9  do. They -- It wasn't an open -- It wasn't an open
10 forum, "Tell me more. Tell me what you think about
11 this." It was, once again, specific agenda, what they
12 were looking for and --
13 Q. Other than that, did you attempt to make any
14 specific disclosure to these investigators, "yes" or
15 "no"?
16 A. Yes.
17 Q. What were the specific re- --
18 MS. CHINN: Can I --
19 MS. CHINN:
20 Q. -- disclosures that you can recall?
21 MS. McDONOUGH: Hold on. I --
22 You can answer that question.
23 But are you going to ask a lot of questions?
24 MS. CHINN: No.
25 MS. McDONOUGH: Because if you are, I want to bring

Page 921

1  my client --
2  MS. CHINN: No.
3  MS. McDONOUGH: -- in.
4  MS. CHINN: We're not going to --
5  MS. McDONOUGH: Are we done?
6  MS. CHINN: This is it.
7  MS. McDONOUGH: Okay.
8  MS. CHINN: I just want to know --
9  MS. McDONOUGH: Okay.
10 MS. CHINN: -- one area.
11 MS. McDONOUGH: Okay.
12 MS. CHINN: I'm not sure it's on the record so I
13 thought we should get it in there.
14 MS. McDONOUGH: Okay.
15 THE WITNESS: Okay.
16 Yeah, we had -- I had --
17 MS. CHINN: Is your client here?
18 MS. McDONOUGH: In -- In the building?
19 MS. CHINN: Yeah.
20 MS. McDONOUGH: No.
21 MS. CHINN: Okay.
22 Q. I'm sorry. Go ahead.
23 A. No, I had -- I had attempted to make specific
24 disclosures at the time of the investigation, which were
25 subsequently enclosed in -- in the suit that we

Page 922

1  submitted. But --
2  Q. But what are they? What did you try to tell
3  them?
4  A. Well, just -- just once again, specific --
5  specifics to other benefits that -- that people have
6  received, you know, flights, just things that -- that --
7  that would substantiate on my part, you know, practice
8  at the Airport Authority versus the policy that they
9  were trying to apply to me.
10 MS. CHINN: Okay.
11 Thank you. I don't have anything else.
12 MS. McDONOUGH: I just have a couple follow-ups on
13 that recent line of questioning.
14
15          -EXAMINATION-
16
17 BY MS. McDONOUGH:
18 Q. What specifically did the investigators tell
19 you with regard to not discussing the investigation?
20 A. They had specifically -- in specific words, I
21 am not to discuss this -- this -- the investigation with
22 anyone.
23 And so my response was, "Un-" -- "Under what law?
24 Under what right do you have to tell me that I can't
25 discuss this with anyone?" You know, "This is" --

11 (Pages 919 to 922)

53-611 (289)

JOSE HERNANDEZ vs. SAN DIEGO COUNTY          December 22, 2006          JOSE HERNANDEZ, VOL V

Page 923

1  "obviously is going to be an issue that involves me, my
2  family and my life. I need to understand why you think
3  or why you're telling me that I can't discuss this with
4  anyone."
5      Q. What did you think that the investigators meant
6  when they said you can't discuss the investigation --
7      A. That --
8      Q. -- focusing on the word "investigation"?
9      A. That they -- No, it wasn't just the
10 investigation or any aspects of that investigation, so
11 really you can't talk to anyone about anything. That's
12 how I understood it.
13     Q. Did they say that you can't talk to anyone
14 about anything?
15     A. Once again, you asked what -- what I thought
16 that meant, and that's what I thought it meant.
17     Q. This is a new question.
18     Did -- Did the investigators say that you couldn't
19 talk to anyone about anything?
20     A. Investigators said I could not talk to anyone
21 about anything. And when -- And that's how I interpret
22 it was, "You can't talk to anyone about anything
23 regarding anything that we've talked about."
24     Q. Did the investigators ever tell you that their
25 meetings with you were attorney-client privileged?

Page 924

1      A. I don't recall.
2      They're not my attorney. Why would it -- Why would
3  they be attorney-client privilege?
4      MS. McDONOUGH: Move to strike everything after "I
5  don't recall."
6      Okay.
7      THE WITNESS: Okay.
8      MS. McDONOUGH: That's all.
9      And --
10     MS. CHINN: I have a follow-up to that one.
11
12             -EXAMINATION-
13
14 BY MS. CHINN:
15     Q. Were these investigators attorneys?
16     A. One -- One of the investigators was an
17 attorney. The other one -- The other investigator was a
18 private investigator.
19     Q. Did the attorney ever tell you that he was
20 representing you?
21     A. Never, never did he ever represent himself as
22 my representative.
23     Q. Did he ask if he could represent you?
24     A. Never.
25     Q. Would you have wanted him to represent you?

Page 925

1      A. Why? I -- I didn't know who he was.
2      Q. Did you consider him to be your attorney?
3      A. Never at one time.
4      MS. CHINN: Okay. Thanks.
5
6             -EXAMINATION-
7
8  BY MS. McDONOUGH:
9      Q. Did the attorney/investigator ever tell you
10 that he was the attorney for the Authority?
11     A. I don't recall.
12     MS. McDONOUGH: That's all I have.
13     THE WITNESS: Okay.
14     MS. McDONOUGH: Okay. We're done.
15     We're going to, like I said before, reserve the
16 right that in the event that there is another complaint
17 filed and that there are additional claims or -- or
18 causes of action added, that we reserve the right to
19 reopen the deposition to ask about new matters and new
20 causes of action.
21     MS. CHINN: Only in the event there are additional
22 claims added, I'll stipulate to it.
23     VIDEO OPERATOR: Going off the record.
24     The time is 11:03. This concludes today's
25 deposition of Volume V.

Page 926

1      (The proceedings concluded at 11:03 a.m.)
2                        ***
3      I declare under penalty of perjury under the laws
4  of the State of California that the foregoing is true
5  and correct.
6
7      Executed at _____, California,
8  on _____.
9
10
11
       _____
       JOSE DE JESUS HERNANDEZ
12
13
14
15
16
17
18
19
20
21
22
23
24
25

12 (Pages 923 to 926)

53-611 (290)

Page 927

```
 1    STATE OF CALIFORNIA ) ss
 2
 3       I, Della M. Satterlee, CSR 9114, do hereby declare:
 4
 5       That, prior to being examined, the witness named in
 6    the foregoing deposition was by me duly sworn pursuant
 7    to Section 2093(b) and 2094 of the Code of Civil
 8    Procedure;
 9
10       That said deposition was taken down by me in
11    shorthand at the time and place therein named and
12    thereafter reduced to text under my direction.
13
14       I further declare that I have no interest in the
15    event of the action.
16
17       I declare under penalty of perjury under the laws
18    of the State of California that the foregoing is true
19    and correct.
20
21       WITNESS my hand this _____ day of
22    _____, 200___.
23
24
      _____
25    Della M. Satterlee, CSR 9114
```

13 (Page 927)

53-611 (291)

**EXHIBIT 3**

# SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## CODES

ARTICLE  2    -   ETHICS
    PART  2.0   -   ETHICS AND CONDUCT
SECTION  2.01  -   PURPOSE

---

(a)    The San Diego County Regional Airport Authority (the "**Authority**") was established by the State of California to improve air transportation service and planning for the San Diego region; its jurisdiction is countywide. The citizens and businesses of the County of San Diego that the Authority serves are entitled to fair, ethical and accountable regional government. The effective functioning of good government requires that:

(1)    Public officials, both elected and appointed, comply with both the letter and spirit of the laws and policies affecting the operations of government;

(2)    Public officials shall be independent, impartial and fair in their judgment and actions;

(3)    Public office shall be used for the public good and not for personal gain; and

(4)    Public deliberations and processes shall be conducted openly, unless legally confidential, in an atmosphere of respect and civility.

(b)    To this end, the Authority hereby adopts this Code of Ethics and Conduct set forth in Sections 2.01 to 2.16 of this Code (this "**Ethics Code**") governing the conduct of the members of the Authority's Board of Directors (the "**Board**") and its employees. As used herein, "employees" includes the Authority's Executive Director, General Counsel, other officers and consultants. The purposes of this Ethics Code are to ensure public confidence in the integrity of the Authority and its effective and fair operation. This Ethics Code shall be broadly construed to effectuate its purposes.

(c)    Capitalized terms not defined in Sections 2.02 to 2.16 shall have the respective meanings set forth in this Section.

[Resolution No. 2002-02 dated September 20, 2002.]
[Superceded by Resolution No. _____ dated _____.]

---

**53-611 (293)**

# SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## CODES

| | | | |
|---|---|---|---|
| ARTICLE | 2 | - | ETHICS |
| PART | 2.0 | - | ETHICS AND CONDUCT |
| SECTION | 2.02 | - | ACT IN THE PUBLIC INTEREST |

---

(a)     Recognizing that stewardship of the public interest must be their primary concern, Board members and employees of the Authority will work for the common good of the people of the County of San Diego and not for any private or personal interest, and they will ensure fair and equal treatment of all persons, claims and transactions coming before the Board.

[Resolution No. 2002-02 dated September 20, 2002.]
[Superceded by Resolution No. _____ dated _____.]

53-611 (294)

## SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

### CODES

ARTICLE  2      -   ETHICS
PART  2.0   -   ETHICS AND CONDUCT
SECTION  2.03   -   NON-INTERFERENCE WITH ADMINISTRATION

---

(a)      Except for the purpose of inquiry into the affairs of the Authority and the conduct of any Authority department or office, the Board and its members shall deal with Authority employees who are subject to the direction and supervision of the Executive Director or his or her designee (the **"Executive Director"**) solely through the Executive Director.  Neither the Board nor its members shall: (1) give or attempt to give orders to any officer or employee either publicly or privately; (2) attempt to coerce or influence the Executive Director or any officer or employee with respect to any contract or purchase of supplies or any other administrative action; or (3) in any manner direct or request the appointment of any person to, or his removal from office by the Executive Director or his or her subordinates.

[Resolution No. 2002-02 dated September 20, 2002.]
[Superceded by Resolution No. _____ dated _____.]

---

53-611 (295)

# SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## CODES

| | | |
|---|---|---|
| **ARTICLE 2** | **-** | **ETHICS** |
| **PART 2.0** | **-** | **ETHICS AND CONDUCT** |
| **SECTION 2.04** | **-** | **NON-DISCLOSURE OF CONFIDENTIAL INFORMATION** |

---

(a)     No Board member or employee of the Authority shall disclose any confidential information concerning the properties and airports under the jurisdiction of the Authority, personnel or affairs of the Authority, except as specifically required by law, as evidenced by a final order of a court of competent jurisdiction. This prohibition on disclosure of confidential information shall remain in effect in perpetuity after leaving Authority service. Disclosure to a law enforcement agency of confidential government information concerning conduct that may involve waste, fraud, corruption, criminal activity or a violation of this Ethics Code is not prohibited. For purposes of this Ethics Code, "**confidential**" shall mean information that is not subject to disclosure under the California Public Records Act, or is properly the subject of discussion in closed session pursuant to the Ralph M. Brown Act.

[Resolution No. 2002-02 dated September 20, 2002.]
[Superceded by Resolution No. _____ dated _____.]

---

**53-611 (296)**

# SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## CODES

**ARTICLE  2  -  ETHICS**
**PART  2.0  -  ETHICS AND CONDUCT**
**SECTION  2.05  -  COMPLIANCE WITH LAWS, RULES AND REGULATIONS**

---

(a)     Board members and employees of the Authority shall comply with the laws of the United States and the State of California and the ordinances, codes, rules and regulations of the Authority in the performance of their public duties.  These laws include, but are not limited to: the United States and California constitutions and statutes; and laws pertaining to conflicts of interest, election campaigns, financial disclosure, employer responsibilities and open processes of government.

(b)     In the furtherance of public and legislative confidence in the integrity and accountability, the Authority shall also conform to applicable provisions of Government Code Section 53232-53235.2.

(c)     Ethics Training for Board Members and Designated Employees.

(1)  Board members and employees designated below shall take a minimum of two (2) hours of ethics training every two (2) years as set forth in Government Code Sections 53234-53235.2.

(i)  Applicabililty.  The provisions of this section regarding Ethics Training shall apply to each and every Board member and to the following designated employees:  President/CEO, General Counsel, Chief Auditor, all Vice Presidents.

(ii) For Board members and designated employees in office as of January 1, 2006, shall complete the required training prior to January 1, 2007.  Board members and designated employees who have taken or take office after January 1, 2006, shall complete the required training no later than their one year anniversary with the Authority.  Where a Board member or a designated employee serves more than one agency that is subject to Government Code Sections 53235-53235.2, the training only need be completed once every two years without regard to the number of local agencies with whom the member/employee serves.

(2)  The ethics training shall at a minimum include the topics specified in Government Code Section 53234(d) to wit:

(i) Laws relating to personal financial gain by public servants, including laws prohibiting bribery and conflict of interest laws.

---

Page 1 of 2



(ii) Laws relating to claiming prerequisites of office, including gift and travel restrictions, prohibitions against use of public resources for personal or political purposes, prohibitions against gifts of public funds, mass mailing restrictions, and prohibitions against acceptance of free or discounted transportation by transportation companies.

(iii) Government transparency laws, including financial interest disclosure requirements and open government laws.

(iv) Laws relating to fair process, including common law bias prohibitions, due process requirements, incompatible offices, competitive bidding requirements for public contracts, and disqualification from participating in decisions affecting family members.

(3) If the Authority develops its own curricula to satisfy the requirements regarding ethics training, the General Counsel shall forward the curricula to the Fair Political Practices Commission and the Attorney General for review of the curricula's sufficiency and accuracy.

(4) The Authority, through the Director, Corporate Services, shall regularly and at least annually inform Board members and designated employees of the availability of ethics training courses that satisfy the requirements of this section. The training may be offered through formal training courses or sets of self-study materials with tests. The courses may be taken in-person, at home, or online.

(5) The Authority, through the Director, Corporate Services, shall maintain records indicating the date each Board member or designated employee received the required ethics training and the entity that provided the training. The records shall be maintained for a minimum of five years after the date of the training. The records are public records and subject to the California Public Records Act.

[Amended by Resolution No. 2006-0084 dated July 6, 2006.]
[Resolution No. 2002-02 dated September 20, 2002.]

**53-611 (298)**

# SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## CODES

ARTICLE 2 - ETHICS
PART 2.0 - ETHICS AND CONDUCT
SECTION 2.06 - CONDUCT OF BOARD

---

(a)    The professional and personal conduct of Board members must be above reproach and avoid even the appearance of impropriety.  Board members shall refrain from abusive conduct, personal charges or verbal attacks upon the character or motives of each other or the public.  Board members shall not engage in conduct detrimental to the reputation and good order of the Authority.

(b)    Board members shall perform their duties in accordance with all established policies and rules of order governing the deliberation of public policy issues, meaningful involvement of the public and implementation of policy decisions.

(c)    Board members shall prepare themselves for public issues, listen courteously and attentively to all public discussions before the Board and focus on the business at hand.  They shall refrain from interrupting other speakers, making personal comments not germane to the business of the Board or otherwise interfering with the orderly conduct of meetings.

[Resolution No. 2002-02 dated September 20, 2002.]
[Superceded by Resolution No. _____ dated _____.]

---

53-611 (299)

# SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## CODES

ARTICLE  2    -   ETHICS
PART  2.0    -   ETHICS AND CONDUCT
SECTION  2.07    -   MAINTENANCE OF POSITIVE WORK ENVIRONMENT

---

   (a)    Board members and employees of the Authority shall support the maintenance of a positive and constructive work place environment for each other and for citizens and businesses dealing with the Authority.

[Resolution No. 2002-02 dated September 20, 2002.]
[Superceded by Resolution No. _____ dated _____.]

53-611 (300)

# SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## CODES

| | | |
|---|---|---|
| ARTICLE 2 | - | ETHICS |
| PART 2.0 | - | ETHICS AND CONDUCT |
| SECTION 2.08 | - | PROHIBITED CONFLICTS OF INTEREST |

---

(a)    The Authority is required to adopt a Conflict of Interest Code pursuant to Section 87300 of the California Political Reform Act. The Authority's Conflict of Interest Code is contained in Authority Code Section No. 2.30. The Conflict of Interest Code incorporates many of the provisions of the California Political Reform Act pertaining to conflicts of interest.

(b)    This Ethics Code incorporates and makes applicable to the Board members and employees of the Authority: (1) the Authority's Conflict of Interest Code; and (2) the provisions of the California Political Reform Act and the regulations of the Fair Political Practices Commission pertaining to conflicts of interest, including, but not limited to, Government Code Section 84308, which governs any Board member who is running or has run for elective office. In some instances, the provisions of this Ethics Code may be more restrictive than the provisions of the California Political Reform Act or the regulations of the Fair Political Practices Commission. The provisions of this Ethics Code shall apply in such cases.

(c)    By way of summary, a conflict of interest occurs when a Board member or employee, acting in an official capacity, makes, participates in making or in any way attempts to use his or her official position to influence a decision of the Authority in which he or she knows or has reason to know that he or she has a financial interest. Financial interests include:

(1)    A business entity in which a Board member or employee or an immediate family member has an investment or holds a management position;

(2)    Real property in which a Board member or employee or an immediate family member owns an interest; and

(3)    Any person or entity that is a source of income or loans to a Board member or employee or to an immediate family member.

(d)    Notwithstanding a conflict of interest, certain exceptions contained within the California Political Reform Act and the regulations of the Fair Political Practices Commission may result in the official or employee not being disqualified.

(e)    If a disqualifying conflict exists, the Board member or employee must be disqualified from making, participating in making or attempting to use his or her official position in any way to influence the Authority's decision which involves that financial interest.

---

**53-611 (301)**

(f)    Every Board member and employee of the Authority is responsible for knowing the conflict of interest rules and knowing when he or she has a disqualifying conflict of interest. However, Board members and employees may consult the Authority's Ethics Officer or such other authorized individual designated by the Authority (the "**Ethics Officer**") when faced with conflict of interest issues.  As soon as a Board member or employee has a disqualifying conflict of interest, he or she shall:

(1)    Promptly file with the Ethics Officer a signed statement disclosing the nature and extent of the conflict of interest;

(2)    Immediately stop participating further in the matter;

(3)    If an employee, notify his or her supervisor about the disqualification; and

(4)    If a Board member, set forth the disqualification in the official record of the Authority.

(g)    The Authority may prepare supplementary material regarding the applicable conflict of interest rules and distribute such material to Authority officials and employees.

[Resolution No. 2002-02 dated September 20, 2002.]
[Superceded by Resolution No. _____ dated _____.]

**53-611 (302)**

# SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## CODES

ARTICLE 2    -    ETHICS
PART 2.0    -    ETHICS AND CONDUCT
SECTION 2.09    -    PROHIBITED OUTSIDE POSITIONS

---

(a)    No Board member or employee of the Authority shall be a paid employee (whether full or part time), attorney, agent, broker, officer, director, trustee or consultant for anyone that the Board member or employee knows or should know is doing business or seeking to·do business with the Authority or that the Board member or employee knows or should know has or is seeking a license, permit, grant or benefit from or is entering into a contract with the Authority.

[Resolution No. 2002-02 dated September 20, 2002.]
[Superceded by Resolution No. _____ dated _____.]

53-611 (303)

# SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## CODES

ARTICLE   2    -   ETHICS
PART   2.0    -   ETHICS AND CONDUCT
SECTION   2.10    -   PROHIBITED RECEIPT OF BENEFITS

---

(a)    Definitions

(1)    "**Benefit**" means any honorarium, gift or travel expense made to, or in the interest of, an individual or a member of the individual's immediate family. The term benefits does not include anything that would otherwise be considered a benefit, but which is (A) returned unused to the donor or the donor's agent or intermediary within 30 calendar days of receipt or (B) delivered to the Authority within 30 calendar days of receipt for donation to the Authority's general fund, without being claimed by the individual as a deduction from income for tax purposes.

(2)    "**Gift**" means any payment that confers a personal benefit on the recipient, to the extent that consideration of equal or greater value is not received and includes a rebate or discount in the price of anything of value unless the rebate or discount is made in the regular course of business to members of the public without regard to official status.

(3)    "**Honorarium**" means, except as provided below, any payment made in consideration for any speech given, article published or attendance at any public or private conference, convention, meeting, social event, meal or like gathering. The term "honorarium" does not include earned income for personal services that are customarily provided in connection with the practice of a bona fide business, trade or profession, such as teaching, practicing law, medicine, insurance, real estate, banking or building contracting, unless the sole or predominant activity of the business, trade or profession is making speeches.

(4)    "**Travel expenses**" means reasonable payments, advances or reimbursements for travel, including actual transportation and related lodging, food and beverages.

(b)    Restrictions on Benefits

(1)    No Board member or employee of the Authority shall request a benefit from any person or entity or accept any benefit intended to influence official duties.

(2)    No Board member or employee of the Authority shall accept anything of value from anyone, other than the Authority or another Board member or employee, for doing his or her job.

---

**53-611 (304)**

(3)     No Board member or employee of the Authority shall accept benefits aggregating more than one-half (1/2) the amount of gifts permitted under the California Political Reform Act in any calendar year from any single source:

(A)     That the Board member or employee knows or should know is doing business with the Authority or intends to do business with the Authority or has done business with the Authority during the previous 12 months; or

(B)     That the Board member or employee knows or should know has or is seeking a license, permit, grant or benefit from the Authority; or

(C)     That the Board member or employee knows or should know is an agent (whether compensated or not) of any person or entity described in Subsections (A) or (B).

(4)     No person designated in the Authority's Conflict of Interest Code shall accept an honorarium from any source if that person would be required to report the receipt of income or gifts from that source on his or her statement of economic interests pursuant to the Appendix to the Authority's Conflict of Interest Code.

(c)     Acceptance of Benefits

(1)     A benefit is "accepted" when the recipient knows that he or she has either actual possession of the benefit or takes any action exercising direction or control over the benefit.

(2)     In the case of a rebate or discount, a benefit is "accepted" when the recipient receives the rebate or discount and knows that the rebate or discount is not made in the regular course of business to members of the public.

(3)     Turning a benefit over to another person does not negate receipt of acceptance of the benefit.

(d)     Exceptions to Restrictions on Benefits

The following are not considered benefits for the purpose of this Section and are not subject to the restrictions of Subsection (b):

(1)     A gift or loan from an individual's spouse, child, parent, grandparent, grandchild, brother, sister, parent-in-law, brother-in-law, sister-in-law, nephew, niece, aunt, uncle or first cousin or the spouse of any such person, unless the individual giving the gift or making the loan is acting as an agent or intermediary for any person not identified in this Subsection (1);

(2)     Gifts exchanged between a Board member or employee of the Authority and an individual, other than a lobbyist, on holidays, birthdays or similar occasions provided that the presents exchanged are not substantially disproportionate in value;

(3)     Any devise, bequest or inheritance;

(4)    A prize or award received in a bona fide competition not related to the recipient's status as a Board member or employee of the Authority;

(5)    A personalized plaque or trophy with an individual value that is the greater of $160 or one half the aggregate amount permitted by the Fair Political Practices Commission for gifts in a calendar year from a single source;

(6)    Campaign contributions, including rebates or discounts received in connection with campaign activities, although such campaign contributions must be reported in the time and manner required by the California Political Reform Act;

(7)    Admission, food, beverages and similar non-cash nominal benefits provided to the Board member or employee of the Authority at an event at which a Board member or employee participates in a panel or seminar in his or her official capacity as a Board member or employee or provides a similar service, provided, however, that such food and beverages must be consumed on the day of the activity in which the Board member or employee participates;

(8)    Travel expenses approved by the Board for travel within California provided directly in connection with an event at which a Board member or employee of the Authority gives a speech, participates in a panel or seminar or provides a similar service;

(9)    Travel expenses approved by the Board for travel outside California but within the United States (although such expenses may be reportable on the Board member or employee's statement of economic interests) if:

(A)    The travel is reasonably related to a legislative or governmental purpose; and

(B)    The travel is made in connection with an event at which the Board member or employee gives a speech, participates in a panel or seminar or provides a similar service; and

(C)    The lodging and subsistence expenses in this case are limited to the day immediately preceding, the day of and the day immediately following the speech, panel or other similar service.

(10)    Travel expenses approved by the Board for travel within the United States (although such expenses may be reportable on the Board member or employee's statement of economic interests) if:

(A)    The travel is reasonably related to a legislative or governmental purpose; and

(B)    The payment is provided by the Authority or any other public agency or a bona fide public or private educational institution, as defined in Section 203 of the Revenue and Taxation Code, or by a nonprofit organization that is exempt from taxation under Section 501(c)(3) of the Internal Revenue Code, or by a person that is domiciled outside the



United States and that substantially satisfies the requirements for tax exempt status under Section 501(c)(3) of the Internal Revenue Code.

(11)    Travel expenses that are reasonably necessary in connection with a bona fide business, trade or profession and that satisfies the criteria for federal income tax deduction for business expenses in Sections 162 and 274 of the Internal Revenue Code, unless the sole or predominant activity of the business, trade or profession is making speeches, although such travel expenses may be reportable on the Board member's or employee's statement of economic interests;

(12)    Income received as a payment for a comedic, dramatic, musical or other similar artistic performance; and payments received for the publication of books, plays or screenplays, although such income may be reportable on the Board member's or employee's statement of economic interest;

(13)    Income earned for the Board member's or employee's personal services if the services are provided in connection with a bona fide business, trade or profession — such as teaching, practicing law, medicine, insurance, real estate, banking or building contracting — and the services are customarily provided in connection with the business, trade or profession, although such income may be reportable on the Board member or employee's statement of economic interests; and

(14)    Any exception in this section applicable to a Board member or employee attending an event in his or her official capacity shall apply equally to any Board member or employee attending an event in his or her official capacity as an elected or appointed official of another public agency.

[Resolution No. 2002-02 dated September 20, 2002.]
[Amended by Resolution No. 03-007 R dated February 6, 2003.]

53-611 (307)

# SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## CODES

| | | |
|---|---|---|
| ARTICLE 2 | - | ETHICS |
| PART 2.0 | - | ETHICS AND CONDUCT |
| SECTION 2.11 | - | USE OF AUTHORITY POSITION OR RESOURCES |

(a)    No Board member or employee of the Authority shall use his or her position or prospective position, or the power or authority of his or her office or position, in any manner intended to induce or coerce any person to provide, directly or indirectly, anything of value that shall accrue to the private advantage, benefit or economic gain of the Board member or employee or of any other person. As used in this section, the term "private advantage, benefit or economic gain" means any advantage, benefit or economic gain, distinct from that enjoyed by members of the public without regard to official status or not resulting naturally from lawful and proper performance of duties. A Board member or employee of the Authority engages in a prohibited use of his or her official position or prospective position when he or she engages in activities other than in the lawful and proper performance of his or her Authority duties.

(b)    No Board member or employee of the Authority shall use public resources not available to the public in general, such as Authority staff time, equipment, supplies or facilities, for private gain or personal purposes.

(c)    No Board member or employee of the Authority shall appear on behalf of the private interests of third parties before the Board.

(d)    No Board member or employee of the Authority shall use any Authority resource, including, but not limited to, offices, telephones and computers, to advocate the election or defeat of any candidate, initiative or referendum, including raising funds therefor.

(e)    No Board member or employee of the Authority shall advocate the election or defeat of any candidate, initiative or referendum, including raising funds therefor, during hours for which he or she is paid by the Authority.

(f)    No Board member or employee of the Authority shall knowingly ask, directly or indirectly, any of the following for a political contribution or to do any political activity:

(1)    Any Board member or employee of the Authority; and

(2)    Anyone that the Board member or employee knows or should know does business or intends to do business with the Authority or has done business with the Authority during the previous 12 months.

(g)    As used in this section, the term "advocate the election or defeat of any candidate, initiative or referendum, including raising funds therefor," shall be broadly construed.

---

53-611 (308)

   (h)    Nothing in this section shall prohibit the use of Authority resources to provide information to the public regarding the possible effects of any ballot measure relating to Authority activities, operations or policies, provided that the information provided constitutes a fair and impartial presentation of relevant facts to aid the electorate in reaching an informed judgment regarding the ballot measure.

[Resolution No. 2002-02 dated September 20, 2002.]
[Superceded by Resolution No. _____ dated _____.]

**53-611 (309)**

# SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## CODES

ARTICLE  2   -   ETHICS
PART  2.0   -   ETHICS AND CONDUCT
SECTION  2.12   -   EX PARTE CONTACTS

---

(a) .    An "**ex parte contact**" is any written or oral communication between a Board member and any interested person, other than an individual on the Authority's staff acting in his or her official capacity, about a matter pending before and within the jurisdiction of the Authority, and which does not occur in a public hearing, workshop or other official proceeding, or appear in the official record of the proceeding on the matter.

(b)    Ex parte contacts shall be avoided if possible.  If an ex parte communication is received by a Board member, he or she shall report it to the Executive Director within five days of the communication or prior to the proceeding on the matter relating to the communication, whichever occurs earlier.  The Executive Director shall ensure that all of the following is a part of the record in the proceeding:

(1)    If the communication is written, the writing; and

(2)    If the communication is oral, a statement by the Executive Director or the Board member regarding the substance of the communication.

(c)    During the proceeding at which evidence of an ex parte contact is made part of the record, any party to the matter that was not involved in the ex parte contact shall be permitted to comment on the communication on the record.

(d)    Notwithstanding the foregoing, in any proceeding involving formal procurement or contracting, no oral or written communications regarding a substantive issue in the proceeding shall be permitted between an interested person and any Board member, a Board member's personal advisor or the Executive Director from any time after the issuance of a Request for Proposals or Request for Qualifications regarding the procurement or contracting until the Board makes a final decision on the matter or decides not to make a decision on the matter.

(e)    As used in this section, "**interested person**" means any of the following:

(1)    any applicant, protestant, respondent, petitioner, complainant, defendant, interested party who has made a formal appearance, or the agents or employees of any of them, including persons receiving consideration to represent any of them;

(2)    any person with a financial interest, as described in the California Political Reform Act, in a matter at issue before the Board, or such person's agents or employees, including persons receiving consideration to represent such a person; or

---

**53-611 (310)**

CODE SECTION NO. 2.12

(3)    a representative acting on behalf of any formally organized civic, environmental, neighborhood, business, labor, trade or similar association who intends to influence the decision of a Board member on a matter before the Board, even if that association is not a party to the matter.

[Resolution No. 2002-02 dated September 20, 2002.]
[Superceded by Resolution No. _____ dated _____.]

**53-611 (311)**

# SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## CODES

ARTICLE  2    -    ETHICS
PART  2.0    -    ETHICS AND CONDUCT
SECTION  2.13    -    REPRESENTATION OF OFFICIAL POSITIONS OF THE
AUTHORITY

---

(a)    Board members and employees of the Authority shall represent the official policies or positions of the Authority to the best of their ability when designated as delegates for this purpose.  When presenting their individual opinions and positions, Board members and employees shall explicitly state they do not represent the Board or the Authority, nor will they allow the inference that they do.

[Resolution No. 2002-02 dated September 20, 2002.]
[Superceded by Resolution No. _____ dated _____.]

---

53-611 (312)

# SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## CODES

ARTICLE  2   -   ETHICS
PART  2.0   -   ETHICS AND CONDUCT
SECTION  2.14   -   PROTECTION OF EMPLOYEES AGAINST RETALIATION FOR
                    REPORTING VIOLATIONS

---

(a)    No Board member or employee of the Authority shall use or threaten to use any official power or influence to discourage, restrain or interfere with any other person for the purpose of preventing such person from acting in good faith to report or otherwise bring to the attention of the Board or other appropriate agency, office or department any information which, if true, would constitute:

(1)    a work-related violation by a Board member or employee of any law or regulation, including this Ethics Code;

(2)    a gross waste of Authority funds;

(3)    a gross abuse of power;

(4)    a conflict of interest of a Board member or employee; or

(5)    a specific and substantial danger to public health or safety due to an act or omission of a Board member or employee, use of an Authority office or position or use of Authority resources for personal gain.

(b)    No Board member or employee of the Authority shall use or threaten to use any official authority or influence to effect any action as a reprisal against a Board member or employee who reports or otherwise brings to the attention of the Board or other appropriate agency, office or department, any information regarding the subjects described above in Subsection (a).

(c)    Any person who believes that he or she has been subjected to any action prohibited by this section may file a complaint with the Board. The Board shall thereupon investigate the complaint in accordance with applicable Authority procedures. Upon the conclusion of its investigation, the Board may take appropriate action as allowed under its enforcement authority.

**53-611 (313)**

CODE SECTION NO. 2.14

(d)     In the event the Board determines that it has a conflict of interest in an investigation of a retaliation complaint, the Board staff shall refer the investigation of the retaliation complaint to the Ethics Subcommittee or appropriate subcommittee of the Board, who shall take appropriate action as otherwise provided by law.

[Resolution No. 2002-02 dated September 20, 2002.]
[Superceded by Resolution No. _____ dated _____.]

53-611 (314)

# SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## CODES

ARTICLE 2 - ETHICS
PART 2.0 - ETHICS AND CONDUCT
SECTION 2.15 - REGISTRATION AND CONDUCT OF LOBBYISTS

---

(a)  "**Lobbyist**" means any individual who receives or becomes entitled to receive at least $100 in any calendar month to communicate, directly or through his or her agents, with any Board member or employee of the Authority for the purpose of influencing any action of the Authority. Neither the preparation and submission of written comments to all Board members or to staff for inclusion in the official records nor addressing the Board at a publicly noticed meeting of the Board constitutes lobbying.

(b)  All lobbyists shall register as an Authority lobbyist with the Clerk of the Board within ten days of qualifying as a lobbyist, using the Authority's Lobbyist Registration Statement. The Lobbyist Registration Statement shall include the full name, business address and telephone phone number of the lobbyist and his or her employer, if any, along with the name, address and telephone number of each person who is employing the lobbying services of the lobbyist. Lobbyist registration shall be valid for one calendar year.

(c)  All lobbyists shall file quarterly Lobbyist Reports listing: (1) each person who is employing the lobbying services of the lobbyist; (2) compensation received for lobbying the Authority for each employer; (3) expenses paid, incurred, or provided by the lobbyist; (4) campaign contributions made or delivered by the lobbyist to any Board member or employee of the Authority; and (5) the specific Authority decision for which the lobbyist represented each employer.

(d)  All Lobbyist Registration Statements and Lobbyist Reports shall be filed under penalty of perjury.

(e)  The Board may amend the Lobbyist Registration Statement and the Lobbyist Report in its discretion, provided the revised forms are not inconsistent with this Ethics Code.

(f)  No Board member or employee of the Authority shall serve as a lobbyist while serving the Authority and for a period of two years after leaving the Authority.

[Resolution No. 2002-02 dated September 20, 2002.]
[Superceded by Resolution No. _____ dated _____.]

**53-611 (315)**

# SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## CODES

ARTICLE 2      -   ETHICS
       PART  2.0   -   ETHICS AND CONDUCT
SECTION  2.16   -   ENFORCEMENT

---

(a)   In addition to the criminal, civil and administrative penalties set forth in the Political Reform Act, the Authority will enforce this Ethics Code to achieve its intended purposes.

(b)   Potential violations of this Ethics Code will be investigated impartially and promptly.  The Board shall determine whether an infraction has been committed only after a public hearing at which the person or persons alleged to have committed the violation shall, with reasonable prior notice of the allegations, be given an opportunity to present a defense.

(c)   Actions to enforce violations of this Ethics Code shall be commenced within four years after the date on which the violation occurred.

(d)   The Authority shall take the following action upon learning that a violation of this Ethics Code may have occurred:

(1)   Form an Ethics Subcommittee of the Board, which shall consist of three members of the Board, not including the Board member or members to be investigated for allegedly violating this Ethics Code;

(2)   The Ethics Subcommittee of the Board shall investigate the alleged ethical violation, make public findings and recommend penalties;

(3)   The full Board of the Authority, less the Board member subject to the investigation, if any, shall determine the appropriate penalty if a violation of this Ethics Code is found to have occurred; and

(4)   Penalties for violating this Ethics Code may include censure, fine, providing restitution and recommending that the person be removed from office, all to the extent permitted and authorized by law.

[Resolution No. 2002-02 dated September 20, 2002.]
[Superceded by Resolution No. _____ dated _____.]

---

**53-611 (316)**

# SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## CODES

| ARTICLE | 2 | - | ETHICS |
|---|---|---|---|
| PART | 2.3 | - | CONFLICTS OF INTEREST |
| SECTION | 2.30 | - | CONFLICTS OF INTEREST |

(a)    The California Political Reform Act, Government Code Sections 81000, *et seq.*, requires state and local government agencies to adopt and promulgate Conflict of Interest Codes. The Fair Political Practices Commission has adopted a regulation, 2 Cal. Code of Regs. Section 18730, which contains the terms of a standard model Conflict of Interest Code, which can be incorporated by reference, and which may be amended by the Fair Political Practices Commission to conform to amendments in the California Political Reform Act after public notice and hearings. Therefore, the terms of 2 Cal. Code of Regs. Section 18730 and any amendments to it duly adopted by the Fair Political Practices Commission along with the attached Appendix in which officials and employees are designated and disclosure categories are set forth, are hereby incorporated by reference and constitute the Conflict of Interest Code of the San Diego County Regional Airport Authority (the "**Authority**").

(b)    Designated employees shall file statements of economic interests with the Clerk of the Authority (the "**Clerk**"), which will make the statements available for public inspection and reproduction. (Gov. Code Section 81008). Upon receipt of the statements of economic interest filed by designated employees, the Clerk shall date stamp and retain the original statements and forward a copy to the Clerk of the San Diego County Board of Supervisors.

(c)    Appendices

(1)    Appendix A - Designated Employee Positions

| LIST OF DESIGNATED POSITIONS | *ASSIGNED DISCLOSURE CATEGORY |
|---|---|
| Board Member | 1 |
| Advisory Committee Member | 1 |
| President/CEO (Executive Director) | 1 |
| General Counsel | 1 |
| Chief Auditor | 1 |
| Vice President, Administration | 1 |
| Vice President, Development | 1 |
| Vice President, Finance/Treasurer | 1 |
| Vice President, Marketing & Communications | 1 |
| Vice President, Regulated & Executive Operations | 1 |

*See page 5 for definitions

53-611 (317)



| | |
|---|---|
| Vice President, Strategic Planning | 1 |
| Director, Facilities Development | 4,5 |
| Director, Financial Planning and Budget | 5 |
| Director, Information Technology | 5 |
| Senior Attorney | 1 |
| Director, Accounting | 5 |
| Director, Aviation Security & Public Safety | 5 |
| Director, Facilities Maintenance | 4,5 |
| Director, Inter-Governmental Relations | 5 |
| Director, Human Resources | 5 |
| Director, Marketing & Route Service Development | 5 |
| Director, Real Estate Management | 2,3,4,5 |
| Attorney | 1 |
| Director, Airport Planning | 2,4,5 |
| Director, Airport Systems Planning | 2,4,5 |
| Director, Airside Operations | 5 |
| Director, Business Planning | 5 |
| Director, Corporate Services | 5 |
| Director, Customer Service & Customer Relations | 5 |
| Director, Environmental Affairs | 3,5 |
| Director, Landside Operations | 3,4,5 |
| Director, Small Business Development | 3,5 |
| Director, Procurement | 3,5 |
| Director, Public & Community Relations | 5 |
| Director, Airport Master Plan | 5 |
| Deputy Director, Facilities Development | 4,5 |
| Capital Project Manager | 4,6 |
| Senior Capital Project Manager | 4,6 |
| Deputy Director, Airport Noise Mitigation | 5 |
| Senior Engineer | 4,5 |
| Construction Manager | 4,5 |
| Construction Manager, Quieter Home Program | 4,5 |
| Database Administrator | 6 |
| Accounting Supervisor | 6 |
| Deputy Director, Customer Service | 6 |
| Deputy Director, Marketing | 6 |
| Deputy Director, Public & Community Relations | 6 |
| Manager, Airport Planning | 4,6 |
| Manager, Audit Services | 3,4,5 |
| Manager, Aviation and Landside Property | 6 |
| Manager, Concession Development | 5 |
| Manager, Environmental Affairs | 6 |
| Manager, Human Resources | 6 |
| Manager, Inter-Governmental Relations | 6 |

**53-611 (318)**



| | |
|---|---|
| Manager, Terminal Operations | 6 |
| Manager, Landside and Ground Transportation | 3,6 |
| Manager, Risk Management | 5 |
| Manager, Employee Safety Programs | 5 |
| Manager, Quieter Home Program | 6 |
| Manager, Facilities Maintenance | 6 |
| Manager, Technical Services | 6 |
| Manager, Contract Services | 6 |
| Manager, Public Safety and Emergency Management | 6 |
| Manager, Ground Transportation | 6 |
| Program Manager, Facilities Development | 6 |
| Senior Project Engineer | 4,5 |
| Real Estate Manager | 6 |
| Senior Project Architect | 6 |
| Contract Manager | 5 |
| Project Architect | 6 |
| Project Engineer | 4,5 |
| Deputy Authority Clerk | 6 |
| Airport Planner I/ II (Flex) | 6 |
| Airport System Planner I/II (Flex) | 6 |
| Associate Engineer | 4,5 |
| Auditor | 3,4,5 |
| Senior Auditor | 3,4,5 |
| Ethics Compliance Coordinator/Auditor | 3,4,5 |
| Senior Purchasing Analyst | 5 |
| Senior Marketing Specialist | 6 |
| Purchasing Analyst | 6 |
| Manager, Document Control | 5 |
| Property Administrator | 2,3,4 |
| Contracts Administrator (Facilities Maintenance) | 5 |
| Quieter Home Program Coordinator | 6 |
| Senior Airport Traffic Supervisor | 3 |
| Senior Construction Inspector/QHP | 3,4 |
| Construction Inspector/QHP | 4 |
| Senior Maintenance Project Inspector | 3,4 |
| Assistant Purchasing Analyst | 5 |
| Code Compliance Investigator | 3,5 |
| Consultant* | 1** |

CODE SECTION NO. 2.30

\*     Consultants are persons who meet the definition found in 2 Cal. Code of Regs. Section 18701(a)(2).

\*\*    Consultants shall disclose pursuant to Category 1, the broadest disclosure category in this Conflict of Interest Code, unless the Executive Director determines in writing that a particular consultant, although a designated employee, is hired to perform a range of duties that are limited in scope and thus is not required to comply with the disclosure requirements described in this Appendix. Such determination shall include a description of the consultant's duties and, based upon that description, a statement of the extent of disclosure requirements. The determination of the Executive Director is a public record and shall be retained for public inspection in the same manner and location as this Conflict of Interest Code. Nothing herein excuses any such consultant from any other provision of this Conflict of Interest Code.

(2) Appendix B - Disclosure Categories

General Provisions. The San Diego County Regional Airport Authority has jurisdiction throughout the County of San Diego. Accordingly, when a designated employee or individual is required to disclose investments, business positions, and sources of income, he or she need only disclose investments in business entities and sources of income that do business in the County of San Diego, plan to do business in the County of San Diego, or have done business in the County of San Diego within the past two years. In addition to other activities, a business entity is doing business within the County of San Diego if it owns real property within the County of San Diego. When a designated employee or individual is required to disclose real property, he or she need only disclose that which is located in whole or in part within or not more than two miles outside the boundaries of the County of San Diego or within two miles of any land owned or used by the San Diego County Regional Airport Authority.

**53-611 (320)**


CODE SECTION NO. 2.30

## Definition of Disclosure Categories

__Category 1__.  All investments, business positions, interests in real property and sources of income.

__Category 2__.  All interests in real property.

__Category 3__.  All investments, business positions, interests in real property and sources of income subject to the regulatory, permit or licensing authority of the San Diego County Regional Airport Authority.

__Category 4__.  Investments in business entities and sources of income that engage in land development, construction, or the acquisition of real property.

__Category 5__.  Investments in business entities and sources of income of the type that contracts with the San Diego County Regional Airport Authority to provide services, supplies, materials, machinery or equipment to any department of the San Diego County Regional Airport Authority.

__Category 6__.  Investments in business entities and sources of income of the type that contracts with the San Diego County Regional Airport Authority to provide to the designated employee's department services, supplies, materials, machinery or equipment.

[Amended by Resolution No. 2006-0133 dated November 13, 2006]
[Amended by Resolution No. 2004-0097 dated October 4, 2004.]
[Resolution No. 2002-02 dated September 20, 2002.]

53-611 (321)

## SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

### *SUPPLEMENT INSERTION GUIDE*

## CODES

### Supplement No. 1 – July 3, 2003

This supplement consists of reprinted Code Sections, which replace existing Code Sections in the San Diego Regional Airport Authority Code.

Remove the Sections listed in the column headed "Remove Sections," and in their places insert the Sections listed in the column "Insert Sections."

This Supplement Insertion Guide should be inserted in the front of the Code Book and retained as a permanent record of supplemented Sections.

| REMOVE SECTIONS | INSERT SECTIONS |
|---|---|
| **2.10** – Prohibited Receipt of Benefits (Adopted 9/20/02) | **2.10** – Prohibited Receipt of Benefits (Amended 2/6/03) |
| Article 9 – Table of Content | Article 9 – Table of Content |
|  | **9.40** – Airport Use Regulations at San Diego International Airport (Adopted 5/1/03) |

RESOLUTION NO. 03-007 R

A RESOLUTION OF THE BOARD OF THE SAN
DIEGO COUNTY REGIONAL AIRPORT AUTHORITY
AMENDING SECTIONS 2.10(a) and 2.10(b) OF THE
SAN DIEGO COUNTY REGIONAL AIRPORT
AUTHORITY CODE.

WHEREAS, on September 20, 2002, the Interim Board of the San Diego
County Regional Airport Authority adopted Section 2.10 of the San Diego County
Regional Airport Authority Code, the Ethics and Conduct Code; and

WHEREAS, Section 2.10(b)(3) of the San Diego County Regional Airport
Authority Code prohibits Board members and employees of the Authority from
accepting a benefit from any person or entity that the Board member or
employee knows or should know (a) is doing business with the Authority or
intends to do business with the Authority or has done business with the Authority
during the previous 12 months; or (b) has or is seeking a license, permit, grant,
or benefit from the Authority; or (c) is an agent (whether compensated or not) of
any person or entity described in (a) or (b) above (collectively, a "Prohibited
Source"); and

WHEREAS, Section 2.10(a)(1) of the San Diego County Regional Airport
Authority Code defines "benefit" to include any "honorarium"; and

WHEREAS, on January 16, 2003 the Board directed Staff to review the
limits on the receipt of gifts and honoraria imposed by other public entities for the
Board's consideration in determining whether to amend the benefit restrictions in
the Ethics and Conduct Code; and

WHEREAS, at its regular meeting on February 6, 2003, the Board
considered potential amendments to the Ethics and Conduct Code and found
that it was desirable to amend the Ethics and Conduct Code to prohibit Authority
Board members and employees from accepting gifts and travel expenses from
any Prohibited Source aggregating more than one-half the amount of gifts
permitted under the California Political Reform Act in any calendar year.

NOW THEREFORE BE IT RESOLVED THAT Section 2.10(a)(1) of the
San Diego County Regional Airport Authority Code shall be revised to substitute
the requirements of the Political Reform Act with respect to honoraria for the
former requirements of the Ethics and Conduct Code by deleting "honorarium"
from the definition of "benefit"; and

BE IT FURTHER RESOLVED THAT Section 2.10(b)(3) of the San Diego
County Regional Airport Authority Code shall be amended to read as follows:



Resolution No. 03-007 R
Page 2 of 2

"(3) No Board member or employee of the Authority shall accept benefits aggregating more than one-half (1/2) the amount of gifts permitted under the California Political Reform Act in any calendar year from any single source:"

BE IT FURTHER RESOLVED THAT THE Clerk of the Board is authorized to prepare and distribute a revised San Diego County Regional Airport Authority Code to reflect the aforementioned amendment.

PASSED, ADOPTED AND APPROVED by the Board of the San Diego County Regional Airport Authority at a regular meeting this 6th day of February, 2003 by the following vote:

AYES:      Boardmembers: Craver, Inzunza, Jacobson, Lynch, Nieto, Peterson, Sessom, Zettel

NOES:      Boardmembers: None

ABSENT:    Boardmembers: Johnson

ATTEST:

Tony R Russell
TONY RUSSELL
AUTHORITY CLERK

APPROVED AS TO FORM:

ZANE O. GRESHAM
INTERIM AUTHORITY ATTORNEY

**53-611 (324)**

*DRAFT OF 13 FEBRUARY 03*

# SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## CODES

ARTICLE  2  -  ETHICS
PART  2.0  -  ETHICS AND CONDUCT
SECTION  2.10  -  PROHIBITED RECEIPT OF BENEFITS

---

(a)  <u>Definitions</u>

(1)  **"Benefit"** means any gift or travel expense made to, or in the interest of, an individual or a member of the individual's immediate family. The term benefits does not include anything that would otherwise be considered a benefit, but which is (A) returned unused to the donor or the donor's agent or intermediary within 30 calendar days of receipt or (B) delivered to the Authority within 30 calendar days of receipt for donation to the Authority's general fund, without being claimed by the individual as a deduction from income for tax purposes.

(2)  **"Gift"** means any payment that confers a personal benefit on the recipient, to the extent that consideration of equal or greater value is not received and includes a rebate or discount in the price of anything of value unless the rebate or discount is made in the regular course of business to members of the public without regard to official status.

(3)  **"Honorarium"** means, except as provided below, any payment made in consideration for any speech given, article published or attendance at any public or private conference, convention, meeting, social event, meal or like gathering. The term "honorarium" does not include earned income for personal services that are customarily provided in connection with the practice of a bona fide business, trade or profession, such as teaching, practicing law, medicine, insurance, real estate, banking or building contracting, unless the sole or predominant activity of the business, trade or profession is making speeches.

(4)  **"Travel expenses"** means reasonable payments, advances or reimbursements for travel, including actual transportation and related lodging, food and beverages.

(b)  <u>Restrictions on Benefits</u>

wc-78818

**53-611 (325)**

(1)     No Board member or employee of the Authority shall request a benefit from any person or entity or accept any benefit intended to influence official duties.

(2)     No Board member or employee of the Authority shall accept anything of value from anyone, other than the Authority or another Board member or employee, for doing his or her job.

(3)     No Board member or employee of the Authority shall accept benefits aggregating more than one-half (1/2) the amount of gifts permitted under the California Political Reform Act in any calendar year from any single source:

(A)     That the Board member or employee knows or should know is doing business with the Authority or intends to do business with the Authority or has done business with the Authority during the previous 12 months; or

(B)     That the Board member or employee knows or should know has or is seeking a license, permit, grant or benefit from the Authority; or

(C)     That the Board member or employee knows or should know is an agent (whether compensated or not) of any person or entity described in Subsections (A) or (B).

(4)     No person designated in the Authority's Conflict of Interest Code shall accept an honorarium from any source if that person would be required to report the receipt of income or gifts from that source on his or her statement of economic interests pursuant to the Appendix to the Authority's Conflict of Interest Code.

(c)     <u>Acceptance of Benefits</u>

(1)     A benefit is "accepted" when the recipient knows that he or she has either actual possession of the benefit or takes any action exercising direction or control over the benefit.

(2)     In the case of a rebate or discount, a benefit is "accepted" when the recipient receives the rebate or discount and knows that the rebate or discount is not made in the regular course of business to members of the public.

(3)     Turning a benefit over to another person does not negate receipt of acceptance of the benefit.

(d)     <u>Exceptions to Restrictions on Benefits</u>

The following are not considered benefits for the purpose of this Section and are not subject to the restrictions of Subsection (b):

(1)     A gift or loan from an individual's spouse, child, parent, grandparent, grandchild, brother, sister, parent-in-law, brother-in-law, sister-in-law,

wc-78818

53-611 (326)

nephew, niece, aunt, uncle or first cousin or the spouse of any such person, unless the individual giving the gift or making the loan is acting as an agent or intermediary for any person not identified in this Subsection (1);

(2)    Gifts exchanged between a Board member or employee of the Authority and an individual, other than a lobbyist, on holidays, birthdays or similar occasions provided that the presents exchanged are not substantially disproportionate in value;

(3)    Any devise, bequest or inheritance;

(4)    A prize or award received in a bona fide competition not related to the recipient's status as a Board member or employee of the Authority;

(5)    A personalized plaque or trophy with an individual value that is the greater of $160 or one half the aggregate amount permitted by the Fair Political Practices Commission for gifts in a calendar year from a single source;

(6)    Campaign contributions, including rebates or discounts received in connection with campaign activities, although such campaign contributions must be reported in the time and manner required by the California Political Reform Act;

(7)    Admission, food, beverages and similar non-cash nominal benefits provided to the Board member or employee of the Authority at an event at which a Board member or employee participates in a panel or seminar in his or her official capacity as a Board member or employee or provides a similar service, provided, however, that such food and beverages must be consumed on the day of the activity in which the Board member or employee participates;

(8)    Travel expenses approved by the Board for travel within California provided directly in connection with an event at which a Board member or employee of the Authority gives a speech, participates in a panel or seminar or provides a similar service;

(9)    Travel expenses approved by the Board for travel outside California but within the United States (although such expenses may be reportable on the Board member or employee's statement of economic interests) if:

(A)    The travel is reasonably related to a legislative or governmental purpose; and

(B)    The travel is made in connection with an event at which the Board member or employee gives a speech, participates in a panel or seminar or provides a similar service; and

(C)    The lodging and subsistence expenses in this case are limited to the day immediately preceding, the day of and the day immediately following the speech, panel or other similar service.

wc-78818

**53-611 (327)**

(10)    Travel expenses approved by the Board for travel within the United States (although such expenses may be reportable on the Board member or employee's statement of economic interests) if:

(A)  .  The travel is reasonably related to a legislative or governmental purpose; and

(B)    The payment is provided by the Authority or any other public agency or a bona fide public or private educational institution, as defined in Section 203 of the Revenue and Taxation Code, or by a nonprofit organization that is exempt from taxation under Section 501(c)(3) of the Internal Revenue Code, or by a person that is domiciled outside the United States and that substantially satisfies the requirements for tax exempt status under Section 501(c)(3) of the Internal Revenue Code.

(11)    Travel expenses that are reasonably necessary in connection with a bona fide business, trade or profession and that satisfies the criteria for federal income tax deduction for business expenses in Sections 162 and 274 of the Internal Revenue Code, unless the sole or predominant activity of the business, trade or profession is making speeches, although such travel expenses may be reportable on the Board member's or employee's statement of economic interests;

(12)    Income received as a payment for a comedic, dramatic, musical or other similar artistic performance; and payments received for the publication of books, plays or screenplays, although such income may be reportable on the Board member's or employee's statement of economic interest;

(13)    Income earned for the Board member's or employee's personal services if the services are provided in connection with a bona fide business, trade or profession — such as teaching, practicing law, medicine, insurance, real estate, banking or building contracting — and the services are customarily provided in connection with the business, trade or profession, although such income may be reportable on the Board member or employee's statement of economic interests; and

(14)    Any exception in this section applicable to a Board member or employee attending an event in his or her official capacity shall apply equally to any Board member or employee attending an event in his or her official capacity as an elected or appointed official of another public agency.

[Resolution No. 2002-02 dated September 20, 2002.]
[Superceded by Resolution No. 03-007 R dated February 6, 2003.]

wc-78818



## SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

### *SUPPLEMENT INSERTION GUIDE*

## CODES

### <u>Supplement No. 2 – November 24, 2003</u>

This supplement consists of reprinted Code Sections, which replace existing Code Sections in the San Diego Regional Airport Authority Code.

Remove the Sections listed in the column headed "Remove Sections," and in their places insert the Sections listed in the column "Insert Sections."

This Supplement Insertion Guide should be inserted in the front of the Code Book and retained as a permanent record of supplemented Sections.

## [There were no code adoptions or amendments for this supplement]

**SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY**

***SUPPLEMENT INSERTION GUIDE***

**CODES**

**Supplement No. 3 – April 5, 2004**

This supplement consists of reprinted Code Sections, which replace existing Code Sections in the San Diego Regional Airport Authority Code.

Remove the Sections listed in the column headed "Remove Sections," and in their places insert the Sections listed in the column "Insert Sections."

This Supplement Insertion Guide should be inserted in the front of the Code Book and retained as a permanent record of supplemented Sections.

# [There are no code adoptions or amendments for this supplement]

# SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## *SUPPLEMENT INSERTION GUIDE*

## CODES

### Supplement No. 4 – October 15, 2004

This supplement consists of reprinted Code Sections, which replace existing Code Sections in the San Diego Regional Airport Authority Code.

Remove the Sections listed in the column headed "Remove Sections," and in their places insert the Sections listed in the column "Insert Sections."

This Supplement Insertion Guide should be inserted in the front of the Code Book and retained as a permanent record of supplemented Sections.

| REMOVE SECTIONS | INSERT SECTIONS |
|---|---|
| **2.30 – Conflict of Interest (Adopted 9/20/04)** | **2.30 – Conflict of Interest (Amended 10/4/04)** |



## RESOLUTION NO. 2004-0097

A RESOLUTION OF THE BOARD OF THE SAN DIEGO
COUNTY REGIONAL AIRPORT AUTHORITY AMENDING
SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY
CODE SECTION 2.30 (c)(1), CONFLICT OF INTEREST
CODE, ADDING DESIGNATED EMPLOYEE POSITIONS

WHEREAS, San Diego County Regional Airport Authority Policy 2.30 (c)(1)
(Attachment A) established the Authority's Conflict of Interest Code;

WHEREAS, Government Code Section 87306.5 requires every local government
agency to review its Conflict of Interest Code biennially to determine if it is accurate or if
the Code must be amended;

WHEREAS; the Authority has reviewed its Conflict of Interest Code as required
and the Board wishes to amend the code to add the additional designated employee
positions outlined in Attachment A;

NOW THEREFORE BE IT RESOLVED, that the proposed amendment to Code
Section 2.30 establishing the Conflict of Interest Code is hereby approved;

BE IT FURTHER RESOLVED that the Director, Corporate Services/Authority
Clerk or designee is hereby directed to forward the amended Conflict of Interest Code to
the San Diego County Board of Supervisors for approval; and

BE IT FURTHER RESOLVED that the Board of the San Diego County Regional
Airport Authority finds that this Board action is not a "project" as defined by the
California Environmental Quality Act (CEQA) Pub. Res. Code Section 21065; and is not
a "development" as defined by the California Coastal Act Pub. Res. Code Section
30106.

Resolution No. 2004-0097
Page 2 of 2

PASSED, ADOPTED AND APPROVED by the Board of the San Diego County Regional Airport Authority at a regular meeting this 4th day of October, 2004 by the following vote:

AYES:        Board Members:    Craver, Jacobson, Johnson, Lynch, Nieto, Peterson, Reynolds, Sessom

NOES:        Board Members:    None

ABSENT:    Board Members:    Inzunza

ATTEST:

TONY R. RUSSELL
DIRECTOR, CORPORATE SERVICES/
AUTHORITY CLERK

APPROVED AS TO FORM:

BRETON K. LOBNER
GENERAL COUNSEL

53-611 (333)

*DRAFT*                    *ATTACHMENT A*

# SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## CODES

ARTICLE  2    -    ETHICS
PART  2.3    -    CONFLICTS OF INTEREST
SECTION  2.30    -    CONFLICTS OF INTEREST

---

(a)    The California Political Reform Act, Government Code Sections 81000, *et seq.*, requires state and local government agencies to adopt and promulgate Conflict of Interest Codes. The Fair Political Practices Commission has adopted a regulation, 2 Cal. Code of Regs. Section 18730, which contains the terms of a standard model Conflict of Interest Code, which can be incorporated by reference, and which may be amended by the Fair Political Practices Commission to conform to amendments in the California Political Reform Act after public notice and hearings. Therefore, the terms of 2 Cal. Code of Regs. Section 18730 and any amendments to it duly adopted by the Fair Political Practices Commission along with the attached Appendix in which officials and employees are designated and disclosure categories are set forth, are hereby incorporated by reference and constitute the Conflict of Interest Code of the San Diego County Regional Airport Authority (the "**Authority**").

(b)    Designated employees shall file statements of economic interests with the Clerk of the Authority (the "**Clerk**"), which will make the statements available for public inspection and reproduction. (Gov. Code Section 81008). Upon receipt of the statements of economic interest filed by designated employees, the Clerk shall date stamp and retain the original statements and forward a copy to the Clerk of the San Diego County Board of Supervisors.

(c)    Appendices

(1)    Appendix A - Designated Employee Positions

| LIST OF DESIGNATED POSITIONS | ASSIGNED DISCLOSURE CATEGORY |
|---|---|
| Board Member ~~(interim or permanent)~~ | 1 |
| Advisory Committee Member | 1 |
| President/CEO (Executive Director) ~~(interim or permanent)~~ | 1 |
| General Counsel | 1 |
| Chief Auditor | 1 |
| Vice President, Administration | 1 |
| Vice President, Development | 1 |
| Vice President, Finance/Treasurer | 1 |
| Vice President, Marketing & Communications | 1 |
| Vice President, Operations | 1 |
| Vice President, Strategic Planning | 1 |

**53-611 (334)**



| | |
|---|---|
| Director, Facilities Development | 4,5 |
| Director, Financial Planning | 5 |
| Director, Information Technology | 5 |
| Senior Attorney | 1 |
| Director, Accounting | 5 |
| Director, Airport Security & Public Safety | 5 |
| Director, Facilities Maintenance | 4,5 |
| Director, Inter-Governmental Affairs | 5 |
| Director, Human Resources | 5 |
| Director, Marketing & Route Service Development | 5 |
| Director, Real Estate Management | 2,3,4,5 |
| Attorney | 1 |
| Director, Airport Planning | 2,4,5 |
| Director, Airport Systems Planning | 2,4,5 |
| Director, Airside Operations | 5 |
| Director, Business Planning | 5 |
| Director, Corporate Services | 5 |
| Director, Customer Service & Customer Relations | 5 |
| Director, Environmental Affairs | 3,5 |
| Director, Landside Operations | 3,4,5 |
| Director, Small & Emerging Business | 3,5 |
| Director, Procurement | 3,5 |
| Director, Public & Community Relations | 5 |
| Deputy Director, Facilities Development | 4,5 |
| Capital Projects Manager | 4,6 |
| Senior Capital Projects Manager | 4,6 |
| Deputy Director, Airport Noise Mitigation | 5 |
| Senior Engineer | 4,5 |
| Construction Manager | 4,5 |
| Database Administrator | 6 |
| Accounting Manager | 6 |
| Deputy Director, Customer Service | 6 |
| Deputy Director, Marketing | 6 |
| Deputy Director, Public & Community Relations | 6 |
| Manager, Airline Property | 3,6 |
| Manager, Airport Planning | 4,6 |
| Manager, Cargo & Airside Property | 6 |
| Manager, Concession Development | 5 |
| Manager, Environmental Affairs | 6 |
| Manager, Ground Transportation | 5 |
| Manager, Human Resources | 6 |
| Manager, Terminal Operations | 6 |
| Manager, Parking & Landside Property | 3,6 |
| Senior Project Engineer | 4,5 |
| Contract Manager, Procurement Department | 5 |

53-611 (335)

| | |
|---|---|
| Project Architect | 6 |
| Project Engineer | 4,5 |
| Deputy Authority Clerk | 6 |
| Airport Planner II (Flex) | 6 |
| Associate Engineer | 4,5 |
| Auditor | 3,4,5 |
| Senior Purchasing Analyst | 5 |
| Manager, Document Control~~Executive Assistant to President/CEO~~ | 5 |
| Property Administrator | 2,3,4 |
| Contracts Administrator (Facilities Maintenance) | 5 |
| ~~Special Projects Accountant~~ | |
| Quieter Home Program Coordinator | 6 |
| Senior Airport Traffic Supervisor | 3 |
| Senior Construction Inspector | 3,4 |
| Construction Inspector | 4 |
| ~~Paralegal~~ | |
| Senior Maintenance Project Inspector | 3,4 |
| Maintenance Project Inspector | 3,4 |
| Assistant Purchasing Analyst | 5 |
| Code Compliance Investigator | 3,5 |
| Consultant* | 1** |

*   Consultants are persons who meet the definition found in 2 Cal. Code of Regs. Section 18701(a)(2).

**  Consultants shall disclose pursuant to Category 1, the broadest disclosure category in this Conflict of Interest Code, unless the Executive Director ~~(interim or permanent, as applicable)~~ determines in writing that a particular consultant, although a designated employee, is hired to perform a range of duties that are limited in scope and thus is not required to comply with the disclosure requirements described in this Appendix. Such determination shall include a description of the consultant's duties and, based upon that description, a statement of the extent of disclosure requirements. The determination of the Executive Director is a public record and shall be retained for public inspection in the same manner and location as this Conflict of Interest Code. Nothing herein excuses any such consultant from any other provision of this Conflict of Interest Code.

53-611 (336)



(2) Appendix B - Disclosure Categories

<u>General Provisions</u>.  The San Diego County Regional Airport Authority has jurisdiction throughout the County of San Diego.  Accordingly, when a designated employee or individual is required to disclose investments, business positions, and sources of income, he or she need only disclose investments in business entities and sources of income that do business in the County of San Diego, plan to do business in the County of San Diego, or have done business in the County of San Diego within the past two years.  In addition to other activities, a business entity is doing business within the County of San Diego if it owns real property within the County of San Diego.  When a designated employee or individual is required to disclose real property, he or she need only disclose that which is located in whole or in part within or not more than two miles outside the boundaries of the County of San Diego or within two miles of any land owned or used by the San Diego County Regional Airport Authority.

<u>Category 1</u>.  All investments, business positions, interests in real property and sources of income.

<u>Category 2</u>.  All interests in real property.

<u>Category 3</u>.  All investments, business positions, interests in real property and sources of income subject to the regulatory, permit or licensing authority of the San Diego County Regional Airport Authority.

<u>Category 4</u>.  Investments in business entities and sources of income that engage in land development, construction, or the acquisition of real property.

<u>Category 5</u>.  Investments in business entities and sources of income of the type that contracts with the San Diego County Regional Airport Authority to provide services, supplies, materials, machinery or equipment to any department of the San Diego County Regional Airport Authority.

<u>Category 6</u>.  Investments in business entities and sources of income of the type that contracts with the San Diego County Regional Airport Authority to provide to the designated employee's department services, supplies, materials, machinery or equipment.

[Resolution No. 2002-02 dated September 20, 2002.]
[Superceded by Resolution No. _____ dated _____.]



## SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

### *SUPPLEMENT INSERTION GUIDE*

## CODES

### Supplement No. 5 – January 10, 2005

This supplement consists of reprinted Code Sections, which replace existing Code Sections in the San Diego Regional Airport Authority Code.

Remove the Sections listed in the column headed "Remove Sections," and in their places insert the Sections listed in the column "Insert Sections."

This Supplement Insertion Guide should be inserted in the front of the Code Book and retained as a permanent record of supplemented Sections.

| REMOVE SECTIONS | INSERT SECTIONS |
| --- | --- |

## THERE ARE NO CHANGES

# SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## *SUPPLEMENT INSERTION GUIDE*

## CODES

### Supplement No. 6 – March 2, 2005

This supplement consists of reprinted Code Sections, which replace existing Code Sections in the San Diego Regional Airport Authority Code.

Remove the Sections listed in the column headed "Remove Sections," and in their places insert the Sections listed in the column "Insert Sections."

This Supplement Insertion Guide should be inserted in the front of the Code Book and retained as a permanent record of supplemented Sections.

| REMOVE SECTIONS | INSERT SECTIONS |
| --- | --- |

## THERE ARE NO CHANGES

# SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## *SUPPLEMENT INSERTION GUIDE*

## CODES

### Supplement No. 7 – April 19, 2005

This supplement consists of reprinted Code Sections, which replace existing Code Sections in the San Diego Regional Airport Authority Code.

Remove the Sections listed in the column headed "Remove Sections," and in their places insert the Sections listed in the column "Insert Sections."

This Supplement Insertion Guide should be inserted in the front of the Code Book and retained as a permanent record of supplemented Sections.

| REMOVE SECTIONS | INSERT SECTIONS |
| --- | --- |

## THERE ARE NO CHANGES



# SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## *SUPPLEMENT INSERTION GUIDE*

## CODES

### <u>Supplement No. 8 – June 23, 2005</u>

This supplement consists of reprinted Code Sections, which replace existing Code Sections in the San Diego Regional Airport Authority Code.

Remove the Sections listed in the column headed "Remove Sections," and in their places insert the Sections listed in the column "Insert Sections."

This Supplement Insertion Guide should be inserted in the front of the Code Book and retained as a permanent record of supplemented Sections.

| REMOVE SECTIONS | INSERT SECTIONS |
|---|---|

# THERE ARE NO CHANGES

# SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## *SUPPLEMENT INSERTION GUIDE*

## CODES

### Supplement No. 9 -- July 8, 2005

This supplement consists of reprinted Code Sections, which replace existing Code Sections in the San Diego Regional Airport Authority Code.

Remove the Sections listed in the column headed "Remove Sections," and in their places insert the Sections listed in the column "Insert Sections."

This Supplement Insertion Guide should be inserted in the front of the Code Book and retained as a permanent record of supplemented Sections.

| REMOVE SECTIONS | INSERT SECTIONS |
|---|---|

# THERE ARE NO CHANGES



## SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

### *SUPPLEMENT INSERTION GUIDE*

## CODES

### <u>Supplement No. 10 – October 27, 2005</u>

This supplement consists of reprinted Code Sections, which replace existing Code Sections in the San Diego Regional Airport Authority Code.

Remove the Sections listed in the column headed "Remove Sections," and in their places insert the Sections listed in the column "Insert Sections."

This Supplement Insertion Guide should be inserted in the front of the Code Book and retained as a permanent record of supplemented Sections.

| REMOVE SECTIONS | INSERT SECTIONS |
|---|---|

## THERE ARE NO CHANGES



## *ADDENDUM – 11/1/05*

### SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

### *SUPPLEMENT INSERTION GUIDE*

## CODES

### <u>Supplement No. 10 – October 27, 2005</u>

This supplement consists of reprinted Code Sections, which replace existing Code Sections in the San Diego Regional Airport Authority Code.

Remove the Sections listed in the column headed "Remove Sections," and in their places insert the Sections listed in the column "Insert Sections."

This Supplement Insertion Guide should be inserted in the front of the Code Book and retained as a permanent record of supplemented Sections.

| REMOVE SECTIONS | INSERT SECTIONS |
|---|---|

# THERE ARE NO CHANGES



## SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

### *SUPPLEMENT INSERTION GUIDE*

## CODES

### Supplement No. 11 – March 3, 2006

This supplement consists of reprinted Code Sections, which replace existing Code Sections in the San Diego Regional Airport Authority Code.

Remove the Sections listed in the column headed "Remove Sections," and in their places insert the Sections listed in the column "Insert Sections."

This Supplement Insertion Guide should be inserted in the front of the Code Book and retained as a permanent record of supplemented Sections.

| REMOVE SECTIONS | INSERT SECTIONS |
|---|---|

# THERE ARE NO CHANGES

# SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## *SUPPLEMENT INSERTION GUIDE*

## CODES

### Supplement No. 13– May 25, 2006

This supplement consists of reprinted Code Sections, which replace existing Code Sections in the San Diego Regional Airport Authority Code.

Remove the Sections listed in the column headed "Remove Sections," and in their places insert the Sections listed in the column "Insert Sections."

This Supplement Insertion Guide should be inserted in the front of the Code Book and retained as a permanent record of supplemented Sections.

# THERE ARE NO CHANGES

# SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## *SUPPLEMENT INSERTION GUIDE*

## CODES

### Supplement No. 13 Addendum -- May 25, 2006

This supplement consists of reprinted Code Sections, which replace existing Code Sections in the San Diego Regional Airport Authority Code.

Remove the Sections listed in the column headed "Remove Sections," and in their places insert the Sections listed in the column "Insert Sections."

This Supplement Insertion Guide should be inserted in the front of the Code Book and retained as a permanent record of supplemented Sections.

# THERE ARE NO CHANGES



# SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## *SUPPLEMENT INSERTION GUIDE*

## CODES

### Supplement No. 14– July 28, 2006

This supplement consists of reprinted Code Sections, which replace existing Code Sections in the San Diego Regional Airport Authority Code.

Remove the Sections listed in the column headed "Remove Sections," and in their places insert the Sections listed in the column "Insert Sections."

This Supplement Insertion Guide should be inserted in the front of the Code Book and retained as a permanent record of supplemented Sections.

| REMOVE SECTIONS | INSERT SECTIONS |
|---|---|
| | |
| **2.05** – Compliance with Laws, Rules and Regulations (Adopted 9/20/02) | **2.05** – Compliance with Laws, Rules and Regulations (Amended 7/6/06) |
| **7.05** – Trespassing (Adopted 9/20/02) | **7.05** – Trespassing (Amended 7/6/06) |

# SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## CODES

**ARTICLE  2   -  ETHICS**
**PART  2.0   -  ETHICS AND CONDUCT**
**SECTION  2.05   -  COMPLIANCE WITH LAWS, RULES AND REGULATIONS**

(a)     Board members and employees of the Authority shall comply with the laws of the United States and the State of California and the ordinances, codes, rules and regulations of the Authority in the performance of their public duties. These laws include, but are not limited to: the United States and California constitutions and statutes; and laws pertaining to conflicts of interest, election campaigns, financial disclosure, employer responsibilities and open processes of government.

(b)     In the furtherance of public and legislative confidence in the integrity and accountability, the Authority shall also conform to applicable provisions of Government Code Section 53232-53235.2.

(c)     Ethics Training for Board Members and Designated Employees.

(1) Board members and employees designated below shall take a minimum of two (2) hours of ethics training every two (2) years as set forth in Government Code Sections 53234-53235.2.

(i) Applicabililty. The provisions of this section regarding Ethics Training shall apply to each and every Board member and to the following designated employees: President/CEO, General Counsel, Chief Auditor, all Vice Presidents.

(ii) For Board members and designated employees in office as of January 1, 2006, shall complete the required training prior to January 1, 2007. Board members and designated employees who have taken or take office after January 1, 2006, shall complete the required training no later than their one year anniversary with the Authority. Where a Board member or a designated employee serves more than one agency that is subject to Government Code Sections 53235-53235.2, the training only need be completed once every two years without regard to the number of local agencies with whom the member/employee serves.

(2) The ethics training shall at a minimum include the topics specified in Government Code Section 53234(d) to wit:

(i) Laws relating to personal financial gain by public servants, including laws prohibiting bribery and conflict of interest laws.

53-611 (349)

(ii) Laws relating to claiming prerequisites of office, including gift and travel restrictions, prohibitions against use of public resources for personal or political purposes, prohibitions against gifts of public funds, mass mailing restrictions, and prohibitions against acceptance of free or discounted transportation by transportation companies.

(iii) Government transparency laws, including financial interest disclosure requirements and open government laws.

(iv) Laws relating to fair process, including common law bias prohibitions, due process requirements, incompatible offices, competitive bidding requirements for public contracts, and disqualification from participating in decisions affecting family members.

(3) If the Authority develops its own curricula to satisfy the requirements regarding ethics training, the General Counsel shall forward the curricula to the Fair Political Practices Commission and the Attorney General for review of the curricula's sufficiency and accuracy.

(4) The Authority, through the Director, Corporate Services, shall regularly and at least annually inform Board members and designated employees of the availability of ethics training courses that satisfy the requirements of this section. The training may be offered through formal training courses or sets of self-study materials with tests. The courses may be taken in-person, at home, or online.

(5) The Authority, through the Director, Corporate Services, shall maintain records indicating the date each Board member or designated employee received the required ethics training and the entity that provided the training. The records shall be maintained for a minimum of five years after the date of the training. The records are public records and subject to the California Public Records Act.

[Amended by Resolution No. 2006-0084 dated July 6, 2006.]
[Resolution No. 2002-02 dated September 20, 2002.]



# SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## CODES

ARTICLE 7 - SAFETY AND SECURITY
PART 7.0 - REGULATION OF CONDUCT
SECTION 7.05 - TRESPASSING

---

(a)     It shall be unlawful for any person, to remain within a passenger terminal at the San Diego International Airport ("Airport") between the hours of 11:00 p.m. and 6:00 a.m. of the following day after having been requested to leave the terminal by a representative of the San Diego County Regional Airport Authority ("Authority") or by a duly appointed law enforcement officer. This section does not apply to:

   (1)    Any person holding a valid airline ticket for travel within 24 hours;

   (2)    Any person in the terminal meeting a specific and identifiable arriving passenger or accompanying a departing ticketed passenger;

   (3)    Any Airport employee;

   (4)    Any employee of a government entity or an approved business located or doing business within the Airport terminal; and

   (5)    Any person whose presence in the terminal is substantially and directly related to the air transportation of passengers or property.

(b)     It shall be unlawful for any person, whose actions at the Airport constitute a proximate and cognizable threat to the safety of personnel or to Airport security, to remain on Airport property after having been requested to leave the property by a duly appointed law enforcement officer.

(c)     It shall be unlawful for any person to remove any food item, including a beverage, from an unattended table within a food-serving concession area at the Airport and thereafter consume said item where the person neither originally purchased the food item nor received permission from the purchaser of the food item to consume the food item. For the purpose of this section, "food-serving concession area" means any area adjacent to a food-serving business or concession within which are located dining tables for the convenience of the customers of the food-serving business or concession.

[Amended by Resolution No. 2006-0089 dated July 6, 2006.]
[Resolution No. 2002-02 dated September 20, 2002.]

---

# SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## *SUPPLEMENT INSERTION GUIDE*

## CODES

## Supplement No. 15– January 10, 2007

This supplement consists of reprinted Code Sections, which replace existing Code Sections in the San Diego Regional Airport Authority Code.

Remove the Sections listed in the column headed "Remove Sections," and in their places insert the Sections listed in the column "Insert Sections."

This Supplement Insertion Guide should be inserted in the front of the Code Book and retained as a permanent record of supplemented Sections.

| REMOVE SECTIONS | INSERT SECTIONS |
|---|---|
| **2.30** – Conflict of Interest (Amended 10/4/04) | **2.30** – Conflict of Interest (Amended 11/13/06) |

# SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## CODES

ARTICLE   2   -   ETHICS
PART   2.3   -   CONFLICTS OF INTEREST
SECTION   2.30   -   CONFLICTS OF INTEREST

(a)    The California Political Reform Act, Government Code Sections 81000, *et seq.*, requires state and local government agencies to adopt and promulgate Conflict of Interest Codes. The Fair Political Practices Commission has adopted a regulation, 2 Cal. Code of Regs. Section 18730, which contains the terms of a standard model Conflict of Interest Code, which can be incorporated by reference, and which may be amended by the Fair Political Practices Commission to conform to amendments in the California Political Reform Act after public notice and hearings. Therefore, the terms of 2 Cal. Code of Regs. Section 18730 and any amendments to it duly adopted by the Fair Political Practices Commission along with the attached Appendix in which officials and employees are designated and disclosure categories are set forth, are hereby incorporated by reference and constitute the Conflict of Interest Code of the San Diego County Regional Airport Authority (the "**Authority**").

(b)    Designated employees shall file statements of economic interests with the Clerk of the Authority (the "**Clerk**"), which will make the statements available for public inspection and reproduction. (Gov. Code Section 81008). Upon receipt of the statements of economic interest filed by designated employees, the Clerk shall date stamp and retain the original statements and forward a copy to the Clerk of the San Diego County Board of Supervisors.

(c)    Appendices

(1)    Appendix A - Designated Employee Positions

| LIST OF DESIGNATED POSITIONS | *ASSIGNED DISCLOSURE CATEGORY |
|---|---|
| Board Member | 1 |
| Advisory Committee Member | 1 |
| President/CEO (Executive Director) | 1 |
| General Counsel | 1 |
| Chief Auditor | 1 |
| Vice President, Administration | 1 |
| Vice President, Development | 1 |
| Vice President, Finance/Treasurer | 1 |
| Vice President, Marketing & Communications | 1 |
| Vice President, Regulated & Executive Operations | 1 |

*See page 5 for definitions

53-611 (353)

CODE SECTION NO. 2.30

| | |
|---|---|
| Vice President, Strategic Planning | 1 |
| Director, Facilities Development | 4,5 |
| Director, Financial Planning and Budget | 5 |
| Director, Information Technology | 5 |
| Senior Attorney | 1 |
| Director, Accounting | 5 |
| Director, Aviation Security & Public Safety | 5 |
| Director, Facilities Maintenance | 4,5 |
| Director, Inter-Governmental Relations | 5 |
| Director, Human Resources | 5 |
| Director, Marketing & Route Service Development | 5 |
| Director, Real Estate Management | 2,3,4,5 |
| Attorney | 1 |
| Director, Airport Planning | 2,4,5 |
| Director, Airport Systems Planning | 2,4,5 |
| Director, Airside Operations | 5 |
| Director, Business Planning | 5 |
| Director, Corporate Services | 5 |
| Director, Customer Service & Customer Relations | 5 |
| Director, Environmental Affairs | 3,5 |
| Director, Landside Operations | 3,4,5 |
| Director, Small Business Development | 3,5 |
| Director, Procurement | 3,5 |
| Director, Public & Community Relations | 5 |
| Director, Airport Master Plan | 5 |
| Deputy Director, Facilities Development | 4,5 |
| Capital Project Manager | 4,6 |
| Senior Capital Project Manager | 4,6 |
| Deputy Director, Airport Noise Mitigation | 5 |
| Senior Engineer | 4,5 |
| Construction Manager | 4,5 |
| Construction Manager, Quieter Home Program | 4,5 |
| Database Administrator | 6 |
| Accounting Supervisor | 6 |
| Deputy Director, Customer Service | 6 |
| Deputy Director, Marketing | 6 |
| Deputy Director, Public & Community Relations | 6 |
| Manager, Airport Planning | 4,6 |
| Manager, Audit Services | 3,4,5 |
| Manager, Aviation and Landside Property | 6 |
| Manager, Concession Development | 5 |
| Manager, Environmental Affairs | 6 |
| Manager, Human Resources | 6 |
| Manager, Inter-Governmental Relations | 6 |

53-611 (354)



| | |
|---|---|
| Manager, Terminal Operations | 6 |
| Manager, Landside and Ground Transportation | 3,6 |
| Manager, Risk Management | 5 |
| Manager, Employee Safety Programs | 5 |
| Manager, Quieter Home Program | 6 |
| Manager, Facilities Maintenance | 6 |
| Manager, Technical Services | 6 |
| Manager, Contract Services | 6 |
| Manager, Public Safety and Emergency Management | 6 |
| Manager, Ground Transportation | 6 |
| Program Manager, Facilities Development | 6 |
| Senior Project Engineer | 4,5 |
| Real Estate Manager | 6 |
| Senior Project Architect | 6 |
| Contract Manager | 5 |
| Project Architect | 6 |
| Project Engineer | 4,5 |
| Deputy Authority Clerk | 6 |
| Airport Planner I/ II (Flex) | 6 |
| Airport System Planner I/II (Flex) | 6 |
| Associate Engineer | 4,5 |
| Auditor | 3,4,5 |
| Senior Auditor | 3,4,5 |
| Ethics Compliance Coordinator/Auditor | 3,4,5 |
| Senior Purchasing Analyst | 5 |
| Senior Marketing Specialist | 6 |
| Purchasing Analyst | 6 |
| Manager, Document Control | 5 |
| Property Administrator | 2,3,4 |
| Contracts Administrator (Facilities Maintenance) | 5 |
| Quieter Home Program Coordinator | 6 |
| Senior Airport Traffic Supervisor | 3 |
| Senior Construction Inspector/QHP | 3,4 |
| Construction Inspector/QHP | 4 |
| Senior Maintenance Project Inspector | 3,4 |
| Assistant Purchasing Analyst | 5 |
| Code Compliance Investigator | 3,5 |
| Consultant* | 1** |

\*    Consultants are persons who meet the definition found in 2 Cal. Code of Regs. Section 18701(a)(2).

\*\*   Consultants shall disclose pursuant to Category 1, the broadest disclosure category in this Conflict of Interest Code, unless the Executive Director determines in writing that a particular consultant, although a designated employee, is hired to perform a range of duties that are limited in scope and thus is not required to comply with the disclosure requirements described in this Appendix. Such determination shall include a description of the consultant's duties and, based upon that description, a statement of the extent of disclosure requirements. The determination of the Executive Director is a public record and shall be retained for public inspection in the same manner and location as this Conflict of Interest Code. Nothing herein excuses any such consultant from any other provision of this Conflict of Interest Code.

(2) Appendix B - Disclosure Categories

General Provisions. The San Diego County Regional Airport Authority has jurisdiction throughout the County of San Diego. Accordingly, when a designated employee or individual is required to disclose investments, business positions, and sources of income, he or she need only disclose investments in business entities and sources of income that do business in the County of San Diego, plan to do business in the County of San Diego, or have done business in the County of San Diego within the past two years. In addition to other activities, a business entity is doing business within the County of San Diego if it owns real property within the County of San Diego. When a designated employee or individual is required to disclose real property, he or she need only disclose that which is located in whole or in part within or not more than two miles outside the boundaries of the County of San Diego or within two miles of any land owned or used by the San Diego County Regional Airport Authority.

53-611 (356)



CODE SECTION NO. 2.30

## Definition of Disclosure Categories

**Category 1.** All investments, business positions, interests in real property and sources of income.

**Category 2.** All interests in real property.

**Category 3.** All investments, business positions, interests in real property and sources of income subject to the regulatory, permit or licensing authority of the San Diego County Regional Airport Authority.

**Category 4.** Investments in business entities and sources of income that engage in land development, construction, or the acquisition of real property.

**Category 5.** Investments in business entities and sources of income of the type that contracts with the San Diego County Regional Airport Authority to provide services, supplies, materials, machinery or equipment to any department of the San Diego County Regional Airport Authority.

**Category 6.** Investments in business entities and sources of income of the type that contracts with the San Diego County Regional Airport Authority to provide to the designated employee's department services, supplies, materials, machinery or equipment.

[Amended by Resolution No. 2006-0133 dated November 13, 2006]
[Amended by Resolution No. 2004-0097 dated October 4, 2004.]
[Resolution No. 2002-02 dated September 20, 2002.]

**53-611 (357)**



# SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## *SUPPLEMENT INSERTION GUIDE*

## CODES

### <u>Supplement No. 16 – March 8, 2007</u>

This supplement consists of reprinted Code Sections, which replace existing Code Sections in the San Diego Regional Airport Authority Code.

Remove the Sections listed in the column headed "Remove Sections," and in their places insert the Sections listed in the column "Insert Sections."

This Supplement Insertion Guide should be inserted in the front of the Code Book and retained as a permanent record of supplemented Sections.

| REMOVE SECTIONS | INSERT SECTIONS |
| --- | --- |
| None | None |



# SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## *SUPPLEMENT INSERTION GUIDE*

## CODES

### <u>Supplement No. 17 – July 17, 2007</u>

This supplement consists of reprinted Code Sections, which replace existing Code Sections in the San Diego Regional Airport Authority Code.

Remove the Sections listed in the column headed "Remove Sections," and in their places insert the Sections listed in the column "Insert Sections."

This Supplement Insertion Guide should be inserted in the front of the Code Book and retained as a permanent record of supplemented Sections.

| REMOVE SECTIONS | INSERT SECTIONS |
|-----------------|-----------------|
| None | None |

**EXHIBIT 4**

# LUCE FORWARD

ATTORNEYS AT LAW • FOUNDED 1873
LUCE, FORWARD, HAMILTON & SCRIPPS LLP

600 West Broadway
Suite 2600
San Diego, CA 92101
619.236.1414
619.232.8311 fax
www.luce.com

EDWARD PATRICK SWAN, JR., PARTNER
DIRECT DIAL NUMBER 619.699.2415
DIRECT FAX NUMBER 619.645.5321
EMAIL ADDRESS pswan@luce.com

January 19, 2006

**VIA MESSENGER**

**PRIVILEGED AND CONFIDENTIAL**

Ms. Thella F. Bowens
President and CEO
San Diego County Regional Airport Authority
San Diego International Airport
Post Office Box 82776
San Diego, CA 92130

Re:     Results of the Investigation Regarding the Alleged Acceptance of Benefits by Jose
         Hernandez

Dear Ms. Bowens:

On behalf of the San Diego County Regional Airport Authority (the "Authority"), you requested that Luce, Forward, Hamilton & Scripps LLP ("LFHS") conduct a confidential internal investigation into allegations that Authority employee Jose Hernandez ("Hernandez") was accepting benefits from vendors, contractors and airlines doing business with the Authority. In the course of our investigation, we interviewed 17 persons who are listed in Exhibit A, and consulted with Bret Lobner, Jeffrey Woodson and Diane Richards. We also reviewed documents provided to us by the Authority and others, including Hernandez.

On January 5, 2006, we met with you and provided a summary of the results of our investigation. We asked whether you wanted us to do further investigation, or to submit a written report of our investigation to date. You requested a written report.

This report summarizes the results of our investigation. It contains LFHS' mental impressions and thoughts, is protected by the attorney-client privilege and the work product protection, and is not discoverable.

## Questions Presented

1.      Is there sufficient evidence that Hernandez accepted benefits from Authority vendors and contractors?

2.      If so, is there sufficient evidence that Hernandez violated the Authority's Ethics Code?

PRIVILEGED AND CONFIDENTIAL PURSUANT
TO THE ATTORNEY-CLIENT PRIVILEGE AND
WORK PRODUCT PROTECTION – NOT DISCOVERABLE

CARMEL VALLEY-DEL MAR     •     LOS ANGELES     •     SAN DIEGO     •     SAN FRANCISCO

**SDRAA 116**

**53-611 (361)**

**LUCE FORWARD**
ATTORNEYS AT LAW • FOUNDED 1873
LUCE, FORWARD, HAMILTON & SCRIPPS LLP

Ms. Thella F. Bowens
January 19, 2006
Page 2

### Short Answers

1.      Yes.  Interviews and documents demonstrate there is sufficient evidence that Hernandez accepted benefits from Authority vendors and contractors from 2003 to date.[1]

2.      Yes.  Interviews and documents demonstrate there is sufficient evidence that Hernandez violated the Authority's Ethics Code.[2]

### Background

The Authority is a public entity created by California State law to operate the San Diego International Airport (the "Airport").  On January 1, 2003, the San Diego Unified Port District (the "Port District") transferred the Airport to the Authority.

Hernandez was an employee of the Port District before the Authority was formed.  The Port District hired him on March 23, 2001 as the Manager of Ground Transportation.  Prior to his employment by the Port District, Hernandez was the Director of Business Development for Five Star Parking from January 1, 2000 to March 2001.  Prior to that, he was the Vice President of Operations for Ace Parking from May 1, 1999 through December 1, 1999.[3]

Hernandez became an Authority employee on January 1, 2003.  On October 3, 2003, Hernandez was promoted to be the Director of Landside Operations at the Authority.  Hernandez has held that position through the current date.

---

[1]  We were not asked to investigate what benefits Hernandez may have accepted as a public employee of the San Diego Unified Port District in 2001 and 2002.

[2]  We were not asked to determine whether Hernandez violated any state or federal laws by accepting gifts as a public employee from Authority vendors and contractors, and we have not made any such determination.  Likewise, we have not been asked to investigate or make any determination regarding benefits accepted by other Authority employees or Board members from Authority vendors and contractors.  During the course of our investigation, we were told of such benefits.  However, the types and value of such benefits pale in comparison to the benefits accepted by Hernandez from 2003 to date.

[3]  Hernandez' prior employment history is from his Port District job application.  In the application, he listed the reason for leaving Ace Parking as "Mutual Split."  He also stated that he graduated from college in 1992.  He is 36 years old.

PRIVILEGED AND CONFIDENTIAL PURSUANT
TO THE ATTORNEY-CLIENT PRIVILEGE AND
WORK PRODUCT PROTECTION – NOT DISCOVERABLE

# LUCE FORWARD
ATTORNEYS AT LAW · FOUNDED 1873
LUCE, FORWARD, HAMILTON & SCRIPPS LLP

Ms. Thella F. Bowens
January 19, 2006
Page 3

As Director of Landside Operations, Hernandez has approximately nine direct reports. His department exercises discretion over contracts with and the operations of numerous Authority vendors and contractors. His authority extends to all Airport operations from the parking lots into the terminals, and includes taxi and shuttle operations.[4] By all accounts, Hernandez is a hard worker and gets along well with Authority vendors and contractors. Based on his excellent performance reviews, he appears to be an effective manager, although a number of Authority employees had complaints about his management style.[5]

Because of his managerial status, the Authority requires Hernandez to file a State of California Statement of Economic Interests, Fair Political Practices Commission ("FPPC") Form 700. In this form, Hernandez is required to list, among other things, gifts. According to the FPPC, a gift is anything of value for which the reporting person has not provided equal or greater consideration to the donor. A gift is reportable if its fair market value is $50.00 or more. The FPPC states that it is the acceptance of a gift, not the ultimate use to which it is put, that imposes a reporting obligation. Since January 1, 2005, gifts are limited to a value of $360 from any one source in a calendar year.[6]

To date, Hernandez has only been required to file one Form 700, which he signed on February 4, 2005 and filed on February 9, 2005. The reporting period started on December 14, 2004 and it appears that the Form 700 only covered the last 18 days of 2004 up to December 31, 2004. For that period, Hernandez reported no reportable gifts.[7] Hernandez' Form 700 for 2005 is not due to be filed until later this calendar year.

---

[4]  Lindbergh Parking, Inc. ("LPI") operates the Airport parking system through an Authority contract. The parking contract generated in excess of $25 million in gross income last year. Ace Parking owns 40% of LPI, and also serves as a subcontractor to LPI on the Airport contract. Ace Parking also handles all the "back office" operations for LPI.

[5]  A number of employees complained about Hernandez' management style. We were not asked to investigate these complaints and we have not. However, we considered these complaints in evaluating possible bias, interest and motives of the interviewees.

[6]  The limit was $340 for 2003 and 2004.

[7]  A copy of Hernandez' Form 700 is attached as Exhibit B.

PRIVILEGED AND CONFIDENTIAL PURSUANT
TO THE ATTORNEY-CLIENT PRIVILEGE AND
WORK PRODUCT PROTECTION – NOT DISCOVERABLE.

# LUCE FORWARD

ATTORNEYS AT LAW • FOUNDED 1873
LUCE, FORWARD, HAMILTON & SCRIPPS LLP

Ms. Thella F. Bowens
January 19, 2006
Page 4

The Authority has adopted Codes to govern and regulate the conduct of, among other persons, Authority employees.[8] Included in the Codes is an Ethics Code at Article 2. Section 2.10 is titled "Prohibited Receipt of Benefits." Section 2.10(b)(3) prohibits any employee of the Authority from accepting benefits aggregating more than one-half the amount permitted under the California Political Reform Act in any calendar year from any source that the employee knows or should know is doing business with the Authority, or intends to do business with the Authority or has done business with the Authority during the previous 12 months, or that the employee knows or should know has or is seeking a license, permit, grant or benefit from the Authority, or that the employee knows or should know is an agent of such a person or entity.[9] Section 2.10(b)(2) prohibits an employee from accepting anything of value from anyone, other than the Authority or another board member or employee, for "doing his or her job."

Pursuant to the Authority's Ethics Code, Hernandez is prohibited from accepting benefits aggregating more than $180 in 2005 (or $170 in 2003 or 2004) from any single source that he

---

[8]  Section 2.01(b) states that the Ethics Code governs the conduct of the Authority's Board of Directors and its "employees." Section 2.01(b) further states that "employees" includes the "Authority's Executive Director, General Counsel, other officers and consultants." While an argument might be made that this definition limits who is an employee, we do not believe this is the intended meaning. Otherwise, it would be contrary to the preceding sentence that states that the Ethics Code is to govern Authority employees, and the last sentence that the Ethics Code should be broadly construed to effectuate its purpose. It would also be contrary to section 2.01 of the Authority's Policies that states the purpose was to establish a policy that governs the ethical conduct of "members of the Board of Directors, officers and employees of" the Authority.

We believe the language in Section 2.01(b) regarding "employees" is to include persons who might not otherwise be considered Authority employees, such as the Executive Director and General Counsel who are employed by the Authority's Board. The term "includes" does not mean that other persons working for the Authority, such as Hernandez, are not Authority employees. If this was the purpose of the language, it would have been easy to state that "employees" "means" or is "limited to" certain individuals. Instead, inclusive, not exclusive language was used. Therefore, we believe Hernandez is an employee governed by the Authority's Ethics Code. We consulted with Mr. Lobner on this issue, and he agreed with our position.

[9]  We believe this definition would include Ace Parking. Through its 40% ownership of LPI, and its subcontract with LPI, Ace parking is either "doing business with the Authority," or is an agent of LPI, such a person.

PRIVILEGED AND CONFIDENTIAL PURSUANT
TO THE ATTORNEY-CLIENT PRIVILEGE AND
WORK PRODUCT PROTECTION – NOT DISCOVERABLE

## LUCE FORWARD
ATTORNEYS AT LAW • FOUNDED 1873
LUCE, FORWARD, HAMILTON & SCRIPPS LLP

Ms. Theila F. Bowens
January 19, 2006
Page 5

knows does business with the Authority. If the benefit is for "doing his . . . job," Hernandez is prohibited from accepting anything of value.[10]

### <u>Benefits Accepted by Hernandez while an Authority Employee</u>

The investigation was initiated based on allegations that Hernandez had accepted benefits from vendors and contractors at the Airport. Our investigation focused on determining whether the allegations were credible and substantiated. As discussed below, we were able to confirm a number of the allegations through statements by the giver of the benefit, and the receiver of the benefit, Hernandez.

We interviewed Hernandez on two occasions. The first interview took place on December 14, 2005 on Authority premises at the Authority. At the beginning of the first interview, we informed Hernandez that you had retained us on behalf of the Authority to investigate allegations that he had accepted benefits from vendors and contractors at the Airport. We asked for his cooperation, and asked him to give his most truthful and complete answers to our questions. Hernandez agreed. We also advised Hernandez that the interview was covered by the attorney-client privilege, that the Authority was the client and held the privilege, and that only the Authority could waive the privilege. Hernandez said he understood and agreed not to discuss the interview without the Authority's permission. Finally, we asked and Hernandez agreed not to contact or communicate with other Authority employees or third parties who would be witnesses or potential witnesses or interviewees in the investigation.[11] We then interviewed Hernandez and he admitted the acceptance of certain benefits, but denied the receipt of other benefits that he later acknowledged during the second interview that took place on December 29, 2005.[12]

---

[10] Hernandez admitted to us that he knew the Authority had an Ethics Codes, and he said he signed for it. We have not seen any document confirming his receipt. Hernandez told us he received little if any training on the Ethics Code or Conflict of Interest issues. We have not seen any document showing that he received training on the Ethics Code, but we have reviewed documents showing he attended a Conflict of Interest presentation on February 4, 2005, and that he was given written materials regarding Form 700 and related issues, including the receipt of benefits.

[11] We similarly advised each of the other Authority employees we interviewed, and received similar promises from them.

[12] A copy of a memorandum summarizing the December 14, 2005 interview is attached as Exhibit C.

PRIVILEGED AND CONFIDENTIAL PURSUANT
TO THE ATTORNEY-CLIENT PRIVILEGE AND
WORK PRODUCT PROTECTION – NOT DISCOVERABLE



**LUCE FORWARD**
ATTORNEYS AT LAW · FOUNDED 1873
LUCE, FORWARD, HAMILTON & SCRIPPS LLP

Ms. Thella F. Bowens
January 19, 2006
Page 6

After the first interview, we learned that Hernandez contacted or was communicating with other Authority employees or third parties who might be witnesses and or interviewees in this investigation. We also interviewed individuals who told us of benefits accepted by Hernandez that Hernandez denied during the first interview.

San Diego attorney Cathryn Chinn contacted us and said Hernandez retained her in connection with our investigation. Chinn requested that we reinterview Hernandez, and that we do so in her office where Hernandez might be more comfortable. We agreed.

The second interview of Hernandez was conducted on December 29, 2005 in Chinn's office. During the second interview, Hernandez admitted the receipt of additional benefits that we independently verified between the first and second interviews, and which Hernandez apparently knew we knew since he had communications with several of the witnesses or interviewees between the first interview (December 14, 2005) and the second interview (December 29, 2005).[13]

Based upon our investigation, we believe there is sufficient evidence that Hernandez accepted benefits in violation of the Authority's Ethics Code. These benefits include, but are not limited to the following:

1.  **Free Airline Tickets**

**Finding:  In May 2004, Hernandez accepted four free round-trip airline tickets from Hawaiian Airlines to travel with his wife and two minor children from San Diego to Oahu to Maui for a family vacation.  The approximate retail value of the tickets was between $796 and $2,400.**

Prior to interviewing Hernandez on December 14, 2005, we were told by interviewees that Hernandez and his family took a vacation trip to Maui in 2004, and that he may have received free airline tickets. During our interview of Hernandez on December 14, 2004, we asked him about his family's vacation trip to Maui in 2004. We asked him who paid for the trip, and whether he had received any airline tickets for free. Hernandez told us he paid all the expenses of the trip, including the airline tickets.

---

[13] A copy of a memorandum summarizing the December 29, 2005 interview is attached as Exhibit D.

PRIVILEGED AND CONFIDENTIAL PURSUANT
TO THE ATTORNEY-CLIENT PRIVILEGE AND
WORK PRODUCT PROTECTION – NOT DISCOVERABLE