# LUCE FORWARD
### ATTORNEYS AT LAW • FOUNDED 1873
LUCE, FORWARD, HAMILTON & SCRIPPS LLP

Ms. Thella F. Bowens
January 19, 2006
Page 7

On December 22, 2005, we interviewed Janet Nix, the San Diego Station Manager for Hawaiian Airlines. Nix told us that as Station Manager, she has the "autonomy" to issue free air travel tickets to anyone she chooses. These tickets are coach-class stand-by tickets. In approximately April or May 2004, Nix said she decided to offer these tickets to Hernandez for travel to Maui with his family. She said she called Hernandez and asked him if he would like the tickets. She said Hernandez accepted her offer and chose a travel date in approximately May 2004. On the day of the planned travel, Hernandez and his family arrived at the Airport. Nix escorted them aboard the aircraft and waited while Hernandez' wife Roxy and their two children were seated. Unfortunately, a full flight prevented Hernandez from being seated, and Hernandez had to fly to Oahu the next day when a stand-by seat was available. The Hernandez family then flew free on Hawaiian Airlines from Oahu to Maui.

Nix recalled that the Hernandez family stayed in Hawaii for four to seven days and then returned on free stand-by tickets on Hawaiian Airlines to San Diego. Nix believed that the entire family flew back to San Diego together. Nix assessed the value of the stand-by tickets as zero dollars because they are free to her and not resalable by the user. She estimated that the purchased tickets would cost between $199.00 and $600.00 each. Therefore, the value of the four round-trip airline tickets was at least $796 and may have been as much as $2,400.

When we interviewed Hernandez on December 29, 2005, he admitted the receipt of the four free round-trip airline tickets from Hawaiian Airlines to Maui in May 2004.[14] Hernandez said he did not recall us asking him during the first interview about the receipt of free airline tickets from Hawaiian Airlines. He further denied that he told us he had paid for the Hawaii Airline tickets during the first interview.

During the second interview, Hernandez told us that the four free Hawaiian Airline round-trip tickets to Maui were non-revenue, stand-by tickets that had no value.[15] Hernandez said that the tickets were offered to him by Nix, and he confirmed the travel details provided by Nix. Both Hernandez and his attorney did not believe he did anything wrong in accepting the four free round-trip airline tickets to Hawaii.[16]

---

[14] Hernandez admitted that he had spoken to Nix after we interviewed her.

[15] Chinn contended that these non-revenue, stand-by tickets are generally available to the public.

[16] After the December 29, 2005 interview, we were told that Nix is Chinn's sister (although we did not independently confirm this). At no time did Chinn or Hernandez disclose the relationship to us.

PRIVILEGED AND CONFIDENTIAL PURSUANT
TO THE ATTORNEY-CLIENT PRIVILEGE AND
WORK PRODUCT PROTECTION – NOT DISCOVERABLE

# LUCE FORWARD
**ATTORNEYS AT LAW • FOUNDED 1873**
LUCE, FORWARD, HAMILTON & SCRIPPS LLP

Ms. Thelia F. Bowens
January 19, 2006
Page 8

**Finding: Hernandez accepted at least five free round-trip airline tickets from Southwest Airlines, and used at least four for travel by himself and his family between San Diego and Las Vegas in approximately 2004.**

During our first interview of Hernandez on December 14, 2004, he denied receiving any free airline tickets from Southwest Airlines other than once for Authority-related travel.[17]

On December 29, 2005, we interviewed Mike Parrish, the Assistant Customer Service Manager for Southwest Airlines in Las Vegas, Nevada. From December 2002 through June 2005, Parrish was the San Diego Station Manager for Southwest Airlines. During that period of time, he worked closely with Hernandez, and they became friends.

Parrish said he has access to free Southwest Airline tickets that are given to him and are known as "Buddy Passes." Parrish has the ability to give the Buddy Passes away to personal friends, which he does, including to Hernandez (but to no other Authority employee). A Buddy Pass may be used on any flight that has room for a stand-by passenger, and has a one-year expiration date.

On more than one occasion, and less than five times, Parrish said he gave Buddy Passes to Hernandez. He typically gave Hernandez one Buddy Pass at a time, except on one occasion when he gave Hernandez two Buddy Passes for use by Hernandez and his wife Roxy. Parrish said he did not know where Hernandez and his wife traveled to with the passes. Parrish said he last gave Hernandez a Buddy Pass in 2005. On one occasion, Hernandez told Parrish that he used the Buddy Pass to fly to Las Vegas. Parrish did not know the details of the trip. Other than the one Las Vegas trip, Parrish said he did not know where Hernandez flew using the Buddy Passes. Parrish said Hernandez was free to use or give away the Buddy Passes. He did not know whether Hernandez ever gave away any of the Buddy Passes.

When we re-interviewed Hernandez on December 29, 2005, Hernandez admitted that he did receive and use free Southwest Airline tickets provided by Parrish for travel by himself, his wife and children, between San Diego and Las Vegas.[18]

---

[17] Hernandez told us that Authority employee Amiel Porta and he traveled to Las Vegas with Southwest Airline representatives (including Mike Parrish) on Authority-related business, and Southwest Airlines paid for all the airline tickets. Hernandez said that this was an "error in judgment."

[18] Hernandez admitted that he had spoken to Parrish after we interviewed him, Hernandez, the first time.

PRIVILEGED AND CONFIDENTIAL PURSUANT
TO THE ATTORNEY-CLIENT PRIVILEGE AND
WORK PRODUCT PROTECTION – NOT DISCOVERABLE

# LUCE FORWARD
ATTORNEYS AT LAW • FOUNDED 1873
LUCE, FORWARD, HAMILTON & SCRIPPS LLP

Ms. Thella F. Bowens
January 19, 2006
Page 9

Hernandez said approximately one year ago he was planning to attend an Authority-related conference in Las Vegas, sponsored either by the American Association of Airport Executives ("AAAE") or the International Parking Institute.[19]  Parrish was aware of the conference and offered free air travel to Hernandez for his family's use, so that their families, who are friends, could get together in Las Vegas. Hernandez accepted the offer of the three free round-trip airline tickets for his wife and children. Hernandez said he flew to Las Vegas on an Authority-paid-for ticket and his family followed later that day using the free tickets from Parrish. Hernandez said he did not know the details as Parrish handled the arrangements.  Hernandez did not recall whether his family returned to San Diego with him on the same flight or whether they returned on a different flight.[20]

During the December 29, 2005 interview, Hernandez acknowledged accepting one or two "buddy tickets" from Parrish, but only recalled using one to fly to Las Vegas on a weekend, date unknown, to attend a friend's 30th birthday party. Hernandez denied any other free travel for personal use. Hernandez does not believe he used the one additional Buddy Pass he received from Parrish, and he did not give it away. We do not know the whereabouts of or the expiration date on this Buddy Pass.

## 2.    Free Sport Tickets and Golf Outings

**Finding:   Hernandez accepted two or four free San Diego Charger-Oakland Raider football tickets from Ace Parking for the game in San Diego on December 28, 2003, and used at least two of the tickets for himself and Amiel Porta.**

We interviewed an individual who produced copies of four San Diego Charger-Oakland Raider football tickets for the game in San Diego on December 28, 2003. The individual made the copies after the tickets were delivered to Hernandez' office in an envelope that the individual believed came from Ace Parking. The tickets were for Club Level seats and had a face value of $235 each, for a total value of $940. Copies of the tickets are attached as Exhibit E.

During his interview on December 14, 2005, Hernandez recalled receiving two free tickets from Dave Mueller of Ace Parking for the 2003 Charger-Raider game. Hernandez said Mueller called

---

[19]  According to Hernandez' expense reports, the conference was the 76th Annual AAAE Conference and Exposition in Las Vegas, Nevada from June 21-24, 2004.

[20]  During the trip, Hernandez stayed at the Mandalay Bay Hotel with his wife and children.  The Authority paid for the hotel room, and it does not appear that the number of occupants increased the room rate.

PRIVILEGED AND CONFIDENTIAL PURSUANT
TO THE ATTORNEY-CLIENT PRIVILEGE AND
WORK PRODUCT PROTECTION – NOT DISCOVERABLE

# LUCE FORWARD
ATTORNEYS AT LAW • FOUNDED 1873
LUCE, FORWARD, HAMILTON & SCRIPPS LLP

Ms. Thella F. Bowens
January 19, 2006
Page 10

him and offered the tickets and dropped them off. Hernandez did not recall how much they cost, but thought they were approximately $65 each. He said they were in the upper plaza. Hernandez said he went with Amiel Porta, and does not recall receiving four tickets. We showed Hernandez the copy of the four tickets, and Hernandez acknowledged that the tickets were on the Club Level and were $235 each. He still did not recall receiving four tickets.

We interviewed Dave Mueller, the Vice President of Operations for Ace Parking, on December 19, 2005. Mueller said Ace Parking had four Club Level season tickets for the San Diego Chargers. Mueller said he attended a game during the 2003 season and took Hernandez and an unidentified second person. Steve Burton, the President of Ace Parking, also attended the game. Mueller gave the two tickets to Hernandez for free.

**Finding:  Hernandez accepted free San Diego Charger football tickets from Southwest Airlines and Hawaiian Airlines in approximately 2004 and 2005.**

During his interview on December 14, 2005, Hernandez did not recall receiving any San Diego Charger football tickets other than those from Dave Mueller of Ace Parking. After the interview, we interviewed Cheryl Black, the current San Diego Station Manager for Southwest Airlines. She told us that during the 2005 football season, she received two San Diego Charger tickets shortly before the game. She said she offered them to Hernandez, who accepted them. Black did not know the location of the seats. Later she asked Hernandez how the game was and he thanked her. She said she did not know who may have gone to the game with Hernandez.

During his second interview on December 29, 2005, Hernandez admitted to receiving the two San Diego Charger football tickets from Black of Southwest Airlines. He explained that late on a Friday night, Black offered him the two tickets as she was unable to find anyone else to give them to. Hernandez went to the Airport and picked up the tickets at his office on a Saturday morning and then gave them to his wife who was going to the game with a friend. Hernandez said his wife and her friend already had tickets, so his wife gave away the free tickets at the stadium to strangers and did not resell the tickets. Hernandez said they were not very good seats. According to the San Diego Chargers, the minimum ticket price for a 2005 home game was $54 per ticket.

During our December 22, 2005 interview of Janet Nix, the San Diego Station Manager for Hawaiian Airlines, she told us that on one occasion in 2003 or 2004, she received two free San Diego Charger - Oakland Raider football tickets from Peter Dufay, the Hawaiian Airlines Air Charter Operations Manager based in Las Vegas. Dufay runs the Hawaiian Airlines' charter service for the Raiders. Nix said she may have given the Dufay tickets to Hernandez and Porta, both of whom are Raider fans. She said the seats were not very good.

PRIVILEGED AND CONFIDENTIAL PURSUANT
TO THE ATTORNEY-CLIENT PRIVILEGE AND
WORK PRODUCT PROTECTION – NOT DISCOVERABLE

# LUCE FORWARD
ATTORNEYS AT LAW • FOUNDED 1873
LUCE, FORWARD, HAMILTON & SCRIPPS LLP

Ms. Thella F. Bowens
January 19, 2006
Page 11

During our second interview of Hernandez on December 29, 2005, Hernandez initially denied receiving any other free Charger tickets from anyone affiliated with the Authority. We asked if he had received Charger tickets from Nix. Hernandez then said that Nix offered him tickets for the December 2005 Charger-Raider game that he did not accept because he was in Orlando, Florida with his family. He said he did not know who got the tickets.

Hernandez said Nix also offered him tickets for the 2004 Charger-Raider game that he did accept. Hernandez said he already had his own tickets that he obtained through his sister via her job at TicketMaster, and he gave away the free tickets from Nix to strangers at the stadium.[21]

**Finding:  Hernandez accepted free San Diego Padre tickets from Ace Parking in approximately 2004 and 2005.**

During his interview on December 14, 2005, Hernandez recalled that Dave Mueller of Ace Parking invited him to one San Diego Padre game. He went alone with Mueller, and they sat on the first base line. He believed the ticket was valued at $45. He did not recall any other free Padre games.

On December 19, 2005, Dave Mueller of Ace Parking told us that Ace Parking has field level seats at Petco Park, and the seating area is food and drink catered. Parking is also included. Mueller said he has offered free Padre tickets to Hernandez, and the last game they attended was a daytime game during the 2005 season. Mueller did not recall how many games Hernandez had attended.

During the interviews of other Authority employees, we learned of several Padre games that Hernandez attended using free Ace Parking-supplied tickets. Some of these employees attended the games with Hernandez using the free tickets.

**Finding:  Hernandez accepted free rounds of golf from Ace Parking and Baggage Claimers in approximately 2004 and 2005.**

During his interview on December 14, 2005, Hernandez said he had played golf with Dave Mueller of Ace Parking approximately five times over the last two years. A couple of occasions were Authority golf tournaments. On the three other occasions, Mueller paid twice and Hernandez paid once. Hernandez said he did not recall any other occasions where his golf was paid for other than the Southwest Airlines' tournaments discussed below.

---

[21] We do not know what the value of these two tickets was.

PRIVILEGED AND CONFIDENTIAL PURSUANT
TO THE ATTORNEY-CLIENT PRIVILEGE AND
WORK PRODUCT PROTECTION – NOT DISCOVERABLE

# LUCE FORWARD
ATTORNEYS AT LAW • FOUNDED 1873
LUCE, FORWARD, HAMILTON & SCRIPPS LLP

Ms. Thella F. Bowens
January 19, 2006
Page 12

During our interview of Dave Mueller of Ace Parking, he could only recall one non-tournament outing where he played with Hernandez. They played at Del Mar Grand in Carmel Valley, and Ace Parking paid.

After Hernandez' first interview, we interviewed an Authority employee who told us that recently an Airport-based company, Baggage Claimers, had taken Hernandez and another employee for a free round of golf at Torrey Pines Golf Course.

During his second interview on December 29, 2005, Hernandez admitted that he and another Authority employee played golf at Torrey Pines Golf Course once with Mark Gardiner, a friend who operates the Baggage Claimers service at the Airport. Hernandez said that Baggage Claimers is a service used by the airlines, not the Authority. Gardiner paid for the round of golf.

**Finding: Hernandez accepted free entry fees from Southwest Airlines for its annual charity golf tournament in 2003, 2004 and 2005 at the Real Del Mar Golf Resort & Country Club south of Tijuana, Mexico.**

During his interview on December 14, 2005, Hernandez admitted playing in the Southwest Airlines annual charity golf tournament at the Real Del Mar Golf Resort & Country Club south of Tijuana, Mexico in 2004 and 2005. He said Southwest Airlines invited him, and paid for his entry fee for golf and the dinner afterwards. Hernandez thinks the entry fee was $125 per person. Hernandez said that in 2005, he purchased giveaway gifts with his own money that equaled, in his mind, what it would cost to play in a golf tournament. He said the giveaway gifts were Callaway Golf items he purchased from a Target store. He estimated that he probably spent $200. He did not make any out-of-pocket giveaway gift purchases in 2004. He did not seek reimbursement from the Authority or anyone else for the Target purchases.

Hernandez said that during the 2004 tournament, he stayed in a hotel room paid for by Mike Parrish of Southwest Airlines. Hernandez said he slept on the floor. Hernandez said he paid for his own room in 2005.

During subsequent interviews of Cheryl Black and Mike Parrish of Southwest Airlines, we confirmed that Hernandez played in each of the annual tournaments in 2003, 2004 and 2005. We also confirmed this through interviews of other Authority employees who also attended and played for free during these annual charity tournaments. During our second interview of Hernandez on December 29, 2005, he said he may have played each of the past three years.

We do not know the actual entry fee for the three Southwest Airlines golf tournaments, or the actual value of the round of golf and meal afterward. Parrish estimated the tournament entry fee was $75 per person in 2003 and 2004. Cheryl Black did not provide an estimate. According to

PRIVILEGED AND CONFIDENTIAL PURSUANT
TO THE ATTORNEY-CLIENT PRIVILEGE AND
WORK PRODUCT PROTECTION – NOT DISCOVERABLE

## LUCE FORWARD
ATTORNEYS AT LAW  ·  FOUNDED 1873
LUCE, FORWARD, HAMILTON & SCRIPPS LLP

Ms. Thella F. Bowens
January 19, 2006
Page 13

the Real Del Mar Golf Resort & Country Club website, the green fees for 18 holes during the week are $59, and from Friday to Sunday are $79.

### 3.    Benefits from Kelly Pond

**Finding:  Hernandez accepted free clothing from Kelly Pond of Image Concepts between 2003 and 2005.**

Kelly Pond is the owner of Image Concepts, a clothing and uniform distributor. She operates the business out of her house, and told us that in the past year she had done approximately $800,000 worth of business. Her clients include the Authority, and LPI, which has the parking contract at the Airport.[22]  As the Director of Landside Operations for the Authority, Hernandez is responsible for approving reimbursements for uniform purchases that LPI makes from Pond. He is also responsible for issuing purchase orders to Pond for clothing purchased for Authority employees.

Prior to our first interview of Hernandez, we learned from other interviewees that Pond regularly gave Hernandez free sample shirts and other clothing that he kept or gave to other Authority employees. We were told that Pond had given Hernandez and his family free athletic clothing and shoes. We were also told that Hernandez requested (or subtlety demanded) free clothing from Pond.

During our first interview of Hernandez on December 14, 2005, Hernandez said that Pond had given him free sample shirts, and he either kept the samples or gave them away. Hernandez said he still had three sample shirts. Two are dress shirts and one is a casual shirt. He gave the other samples to persons at the Authority.

Hernandez said he never asked Pond for anything, or suggested he wanted anything. However, during the summer of 2005, when he was coaching his son's soccer team, Pond gave him three free shirts. They were monogrammed with the names "Coach Jose," "Coach David," and "Team Mom Roxy." Hernandez said the shirts cost approximately $8 each.

Hernandez denied that Pond had provided any clothing apparel of any type to his children's soccer teams or his wife's soccer teams, and denied the receipt of any other clothing apparel from Pond.

---

[22]  According to Authority records, LPI purchased $68,276.02 in uniforms from Pond's company between February and November 2005.

PRIVILEGED AND CONFIDENTIAL PURSUANT
TO THE ATTORNEY-CLIENT PRIVILEGE AND
WORK PRODUCT PROTECTION – NOT DISCOVERABLE

**LUCE FORWARD**
ATTORNEYS AT LAW • FOUNDED 1873
LUCE, FORWARD, HAMILTON & SCRIPPS LLP

Ms. Thella F. Bowens
January 19, 2006
Page 14

On December 15, 2005, we interviewed Pond at my office. She told us that she had given samples of clothing to Hernandez. She also admitted giving him the three or four shirts monogrammed for his child's soccer team. She said they cost her $3.50 each.

Pond said approximately two years ago, she also provided approximately 7 to 11 green v-neck soccer shirts that Roxy, Hernandez' wife, had picked out. She said the shirts cost approximately $3 each. In return, Roxy gave Pond Avon cosmetic products that Pond said cost more than the shirts. Pond also recalled giving Roxy a birthday present, namely a $25 gift card to Bed, Bath & Beyond. Pond denied giving anything else of value to Hernandez or his family.

During interviews of other Authority employees, we were told that Pond had given free golf shoes to Hernandez and free athletic shoes to Hernandez' wife. We found this information credible, but we were unable to substantiate it. We were also told that during a recent going away party for an Authority employee, Pond gave Hernandez a $100 bill to buy drinks that Hernandez used to buy drinks at the bar where the party was held.

During the second interview of Hernandez on December 29, 2005, Hernandez admitted that several years ago, his wife traded Mary Kay Cosmetics to Pond for green-colored uniform shirts for his wife's indoor soccer team.[23] Hernandez said the shirts were valued at $3 to $4 each. Hernandez denied that he or his wife ever received shoes of any kind from Pond. Hernandez denied receiving $100 from Pond to pay for drinks. He first stated that Pond gave the money to Amiel Porta to buy drinks, then stated "the money was on the table." He said the money was used to buy drinks at the party, including drinks he consumed.

4.    <u>Benefits from USA Cab -- Personal Automobile Repair</u>

**Finding: Hernandez accepted work from USA Cab on his family's personal automobiles, and it appears he paid for the work.**

Prior to our first interview of Hernandez, we learned through interviews that Hernandez had taken his personally owned black Ford Ranger pickup truck for repairs at USA Cab's facility on Imperial Avenue. USA Cab is one of the taxi companies that fall under Hernandez' jurisdiction as the Director of Landside Operations.

---

[23] Hernandez admitted that he had spoken to Pond after we interviewed her. During her interview, Pond told us that Hernandez called us after his first interview, but before we interviewed her.

PRIVILEGED AND CONFIDENTIAL PURSUANT
TO THE ATTORNEY-CLIENT PRIVILEGE AND
WORK PRODUCT PROTECTION – NOT DISCOVERABLE

**LUCE FORWARD**
ATTORNEYS AT LAW • FOUNDED 1873
LUCE, FORWARD, HAMILTON & SCRIPPS LLP

Ms. Thella F. Bowens
January 19, 2006
Page 15

During his first interview on December 14, 2005, Hernandez said he currently drove a 2000 silver Ford Sportrac pickup truck. He said he had owned it for one year. He said he previously owned a black 1996 Ford Ranger pickup truck. Hernandez denied that any work has been performed on his trucks by an Authority-related company. However, he said he had taken his wife's gold Ford Explorer to USA Cab for brake work. He said Tony Hueso was the owner, and the repair business is "open to anyone." About six months ago, his wife's Explorer needed brake work. The master cylinder was failing. Hernandez said he was desperate to get the brakes fixed and called Hueso to ask whether he knew of a reliable shop that could repair his wife' brakes. Hueso told him to bring the vehicle to USA Cab. Hernandez took it to USA Cab because he did not know of a trusted repair facility. He took it in the morning and it was in the shop for a day. One week later, he had to take it back to have the lines bled. He got rides to and from USA Cab from Authority employees. He paid for the work with his personal credit card.

On December 15, 2005, we interviewed Tony Hueso, one of the owners of USA Cab. Hueso said USA Cab operates a repair shop that provides repair and maintenance services for their taxicabs plus other companies' taxicabs. USA also services non-taxi vehicles for companies and individuals, typically customers who are familiar with the business or its employees. Hueso said Hernandez was one of the individuals whose personally owned vehicle has been serviced at USA Cab. Hueso admitted that his shop is not licensed by the California Department of Motor Vehicles, Bureau of Automotive Repair, to offer auto repair services to the general public.

Without looking at any records, Hueso recalled repairing the brakes on Hernandez' wife's Ford Explorer in the summer of 2005. Hernandez told Hueso he did not know whom to trust to repair the brakes. Hueso offered to have a USA Cab mechanic look at the vehicle. Hernandez drove the Explorer to USA Cab, dropped it there, and then called someone to pick him up. Hernandez returned later in the day to retrieve the Explorer after USA Cab replaced the brakes. Hernandez paid for the brake job.

Hueso also recalled that in the spring of 2005, Hernandez told him that his Ford Ranger pickup truck, or his Ford Explorer, needed new tires. Hueso said USA Cab sold and installed four new tires for Hernandez. USA Cab purchased the tires from a Firestone tire dealership, and Hernandez paid for the tires and installation.

Hueso retrieved invoices for 2003, 2004 and 2005 from manila folders stored in file cabinets. The invoices were hand-searched, and five Hernandez-related USA Cab invoices were found dating from February 26, 2003 to April 1, 2005. The following summarizes the five invoices:

PRIVILEGED AND CONFIDENTIAL PURSUANT
TO THE ATTORNEY-CLIENT PRIVILEGE AND
WORK PRODUCT PROTECTION – NOT DISCOVERABLE

LUCE FORWARD
ATTORNEYS AT LAW • FOUNDED 1873
LUCE, FORWARD, HAMILTON & SCRIPPS LLP

Ms. Thella F. Bowens
January 19, 2006
Page 16

| Date | Vehicle | Work Done | Invoice Amount |
|------|---------|-----------|----------------|
| 02/26/03 | 1996 Ford Explorer (3SVG996) | Install three Firestone tires, reinstall spare and check fluids. | $169.46 |
| 02/25/04 | 1996 Ford Explorer (3SVG996) | Shock absorbers, fuel, air & oil filters, spark plugs, transmission filter & fluid, oil change, bleed brakes, brakes | $510.85 |
| 12/13/04 | 1997 Ford Ranger Truck (5Z54352) | Brake work, bearings, seals, rotate tires[24] | $236.51 |
| 03/04/05 | 1996 Ford Explorer (3SVG996) | Brake check, master cylinder, check motor oil, trans oil, P/S oil, radiator, air pressure tires | $173.14 |
| 04/01/05 | 1996 Ford Explorer (3SVG996) | Brake pedal low/master cylinder, under warranty | No charge |

Hueso stated that Hernandez paid for all automotive repairs received at USA Cab, and that the type of payment would be recorded in a separate accounting record maintained by USA Cab. We did not have an opportunity to review these payment records.

During our second interview of Hernandez on December 29, 2005, Hernandez produced his copy of the USA Cab invoices for the same five visits. Some, but not all, included stapled-on copies of charge card receipts as proof of payment. It was pointed out to Hernandez that one of the invoices indicated repair on his personal Ford Ranger pickup truck on December 13, 2004, and Hernandez admitted he now recalled work being done on his own personal vehicle, in addition to

---

[24]   According to this USA Cab invoice dated December 13, 2004, Hernandez' personal vehicle, a Ford Ranger, was repaired on this date. This is inconsistent with Hernandez' claim (in his first interview on December 14, 2005) that he sought only one vehicle repair at USA Cab, namely a brake job for his wife's Explorer. This invoice also shows that Hernandez had brake work done at USA Cab before 2005 when he needed brake work done on his wife's Explorer.

PRIVILEGED AND CONFIDENTIAL PURSUANT
TO THE ATTORNEY-CLIENT PRIVILEGE AND
WORK PRODUCT PROTECTION – NOT DISCOVERABLE

# LUCE FORWARD
ATTORNEYS AT LAW • FOUNDED 1873
LUCE, FORWARD, HAMILTON & SCRIPPS LLP

Ms. Thella F. Bowens
January 19, 2006
Page 17

his wife's vehicle. Hernandez stated he could not recall if USA Cab did any other work on his personal Ranger truck before he sold it (along with the repair paperwork) to an individual who took it to Tijuana, Mexico.

Hernandez reiterated that he paid for all the work performed on his vehicle and his wife's vehicle by USA Cab. Hernandez said that anyone could have repair work done on his or her personal vehicles at USA Cab.

Based on our investigation, we believe that Hernandez paid for the personal automobile repair performed for him by USA Cab. Based on the work described in the invoices, the invoice amounts appear to be reasonable. However, although he paid for the work on his personal vehicles, we believe Hernandez accepted a benefit from USA Cab – namely, USA Cab performed personal automobile repair work for Hernandez that was not generally available or known to the public at large. Quantifying the value of this benefit is difficult if not impossible.

5.    **Other Benefits**

**Finding:  Hernandez accepted a free Ace Parking parking pass for use at Qualcomm Stadium and Petco Park.**

During his first interview on December 14, 2005, Hernandez said Steve Kitt, his neighbor, gave him a free Ace Parking parking pass for use at Qualcomm Stadium and Petco Park. Hernandez said Kitt manages Ace Parking at Qualcomm Stadium and Petco Park. Kitt gave it to Hernandez in 2004 when the San Diego Padres started playing at Petco Park. He has used it on several occasions and let other Authority employees use it. The free parking pass has no expiration date. Hernandez said he has known Kitt for years as a neighbor, and Hernandez does not think Kitt gave him the free parking pass because Hernandez works at the Authority. Hernandez said he is close to Kitt and introduced Kitt to Kitt's new second wife. Hernandez said he did not believe that there was an appearance of impropriety.[25]

---

[25]    On December 19, 2005, Dave Mueller of Ace Parking said he does not know whether Hernandez  has a permanent or VIP Ace parking pass. He said he does not believe that Hernandez has one, and that there is no such thing as a permanent parking pass for Petco or Qualcomm.

PRIVILEGED AND CONFIDENTIAL PURSUANT
TO THE ATTORNEY-CLIENT PRIVILEGE AND
WORK PRODUCT PROTECTION – NOT DISCOVERABLE



LUCE FORWARD
ATTORNEYS AT LAW • FOUNDED 1873
LUCE, FORWARD, HAMILTON & SCRIPPS LLP

Ms. Thella F. Bowens
January 19, 2006
Page 18

**Finding:   Hernández accepted free meals and sodas from Authority vendors and contractors.**

During his first interview on December 14, 2005, Hernandez said he has lunches about every three weeks with the parking management staff at LPI. He said he has kept a list of the lunches and there have been approximately 25 lunches. He said he knows he has to report them if they are in the $325 or $350 range. He said the lunches cost approximately $8 to $10 each, and are generally at the Red Sails Inn. He has lunch with John Steele, the LPI Shuttle Manager, and/or Maurice Gray, the owner of LPI. Hernandez said he has paid for some of the lunches, but does not believe he can submit them for reimbursement. He said he is not prohibited from taking free lunches; he just has to report them. He believes he can offset the lunches by paying for some and that he does not have to report them.

Hernandez denied any free lunches or drinks at the Airport from Airport vendors. He said he reciprocates buying coffee for vendors. Hernandez said that Kelly Pond bought him lunch at the Cheesecake Factory when he first met her approximately three years ago. He denied any other free meals.

Through our interviews of other Authority employees, we learned that Hernandez would invite himself to lunch with LPI personnel in at least half of the lunches he had with them. We also learned that Hernandez rarely, if ever, paid for the lunches. The lunches would typically average $10 per person, and would generally be at the Red Sails Inn or the Brigantine. If Dave Mueller of Ace Parking joined the lunch, they would sometimes go to Miguel's Cocina Mexican Restaurant. The lunches occurred at least twice a month for the past three years.

During our second interview of Hernandez on December 29, 2005, Hernandez told us that two to three years ago, his supervisor Ted Sexton told him that "you can never buy lunch for a contractor, but a contractor can buy lunch for you." Hernandez told us that on one occasion in the past, one of Hernandez' reports asked him if they could submit a reimbursement request for a meal they bought for a contractor. Hernandez told the employee that the expense would be reimbursed one time only, and told the employee that the policy was "you can never buy lunch for a contractor, but a contractor can buy lunch for you."

These statements by Hernandez are contrary to the Business Expense Reports that Hernandez submitted during fiscal year 2004 through fiscal year 2006. These Business Expense Reports show that between July 24, 2003 and June 24, 2005, Hernandez submitted receipts and was reimbursed for 13 breakfasts and lunches in San Diego with representatives of Northwest Airlines (1), Park, Shuttle & Fly (2), Southwest Airlines (3), LPI (1), TSA (3), Neal Electric (1), Hertz (1) and Alaska Airlines (1).

PRIVILEGED AND CONFIDENTIAL PURSUANT
TO THE ATTORNEY-CLIENT PRIVILEGE AND
WORK PRODUCT PROTECTION – NOT DISCOVERABLE

**LUCE FORWARD**
ATTORNEYS AT LAW · FOUNDED 1873
LUCE, FORWARD, HAMILTON & SCRIPPS LLP

Ms. Thella F. Bowens
January 19, 2006
Page 19

Other Authority employees told us that they had seen Hernandez taking LPI supplied soda home with him. When interviewed on December 14, 2005, Hernandez admitted that he might occasionally take a can or two of soda home with him, but not the quantities claimed to have been observed by other Authority employees.

**Finding: Hernandez accepted free airline drink coupons from Delta Airlines, Southwest Airlines and Hawaiian Airlines.**

During his first interview on December 14, 2005, Hernandez admitted he accepted free airline drink coupons from Delta Airlines, Southwest Airlines and Hawaiian Airlines. He said he received two free airline drink coupons from an agent at Hawaiian Airlines. He said he still has them. He said Delta Airlines has also given him a stack of free airline drink coupons to give out. He still has a stack and has not given them out. Southwest Airlines has given him four or six free drink coupon books. There are approximately 12 coupons in each book. He does not have them anymore. On December 29, 2005, Hernandez told us he also has received free headset tickets from Delta Airlines.

6.    **Miscellaneous**

We investigated a number of other allegations of alleged receipt of benefits that we were not able to substantiate. In addition, other miscellaneous allegations were made that we believe merit brief discussion. Based on our investigation, we believe there is credible evidence that:

(a)    Hernandez used Authority vehicles for personal use on more than one occasion to travel to his home or elsewhere.

(b)    Hernandez used Authority personnel for personal use on more than one occasion. In particular, Hernandez' Administrative Assistant, Jennifer Hamilton, spent a number of work hours, paid for by the Authority, assisting in the planning and preparation of the 30th birthday party for Hernandez' wife in 2004.

(c)    Hernandez routinely dismisses Airport parking tickets for Airport-based contractors and vendors regardless of the merits of the violations.

(d)    Hernandez has kept Airport Authority extended time parking passes in his office, and given them out in his unfettered discretion and on unknown occasions.

(e)    Hernandez has granted permits to shuttle drivers without following proper protocol.

PRIVILEGED AND CONFIDENTIAL PURSUANT
TO THE ATTORNEY-CLIENT PRIVILEGE AND
WORK PRODUCT PROTECTION – NOT DISCOVERABLE

LUCE FORWARD
ATTORNEYS AT LAW • FOUNDED 1873
Luce, Forward, Hamilton & Scripps LLP

Ms. Thella F. Bowens
January 19, 2006
Page 20

(f)     In December 2004, Hernandez authorized LPI to purchase approximately 120 Chili's Restaurant Gift Cards, costing $20 each, for LPI employees. As part of the transaction, LPI received approximately 120 free/no cost gift certificates valued at $5 each, with a total value of $600 that LPI gave to Hernandez and that Hernandez claims he distributed to Authority personnel.

<u>Conclusion</u>

Based on our investigation, and Hernandez' own statements, we believe Hernandez accepted benefits in violation of the Authority's Ethics Code. In particular, Hernandez accepted benefits aggregating more than one-half the amount of gifts permitted under the California Political Reform Act in any calendar year from a single source knowing that the source is doing business with the Authority.

In 2003 and 2004, the Authority's Ethics Code prohibited Hernandez from accepting benefits aggregating more than $170 from Hawaiian Airlines, which he knew was doing business with the Authority. Nonetheless, in May 2004, Hernandez accepted four free round-trip airline tickets to Hawaii from Hawaiian Airlines, which he knew was doing business with the Authority. While these tickets are non-revenue and may be of no value to Hawaiian Airlines, they certainly have value to the user who otherwise would have to pay for the airline travel. Janet Nix of Hawaiian Airlines, who gave the free tickets to Hernandez, estimated that the retail cost of such round trip travel would have been between $199 and $600 per ticket. Therefore, the total value of the tickets is estimated to be between $796 and $2,400

Similarly, in 2003, Hernandez accepted at least two, or four, free San Diego Charger-Oakland Raider football tickets from Ace Parking, the total value of which is estimated to be $470 to $940. At the time, Hernandez knew Ace Parking was doing business with the Authority through its ownership of or subcontract with LPI.

It is unknown if the benefits Hernandez accepted from Southwest Airlines in any calendar year exceeded $170 or $180. It is likely they did in 2004 when he accepted the free roundtrip airline tickets for his wife and children's travel between San Diego and Las Vegas.

As discussed above, Hernandez accepted other benefits from these same and other sources that he knew were doing business with the Authority during calendar years 2003, 2004 and 2005. While it appears that the lunches received in any calendar year from LPI exceeded $170 or $180, we cannot make that finding with certainty. Likewise, the aggregate value of benefits accepted by Hernandez from Ace Parking (even if we distinguish it from LPI) appears to exceed $170 or $180 in any calendar year. However, we again cannot make such a finding with any certainty.

PRIVILEGED AND CONFIDENTIAL PURSUANT
TO THE ATTORNEY-CLIENT PRIVILEGE AND
WORK PRODUCT PROTECTION – NOT DISCOVERABLE

# LUCE FORWARD

ATTORNEYS AT LAW • FOUNDED 1873

LUCE, FORWARD, HAMILTON & SCRIPPS LLP

Ms. Thella F. Bowens
January 19, 2006
Page 21

The Authority's Ethics Code also prohibits Hernandez from accepting anything of value from anyone, other than the Authority or another board member or employee, for "doing his . . . job," regardless of the value of the benefit. See Section 2.10(b)(2). However, the Authority's Ethics Code does not describe when this prohibition applies or how it should be interpreted. As a result, while we believe an argument can be made that most, if not all, the benefits discussed above were given to Hernandez for "doing" his job, we are disinclined to make such a finding at this point.

If you have any questions or comments, please do not hesitate to contact me.

Very truly yours,

Edward Patrick Swan, Jr.
of
LUCE, FORWARD, HAMILTON & SCRIPPS LLP

EPS/wp
Enclosures

cc:     Mr. John Gamberzky

PRIVILEGED AND CONFIDENTIAL PURSUANT
TO THE ATTORNEY-CLIENT PRIVILEGE AND
WORK PRODUCT PROTECTION – NOT DISCOVERABLE

A

SDRAA 137

53-611 (382)

## PERSONS INTERVIEWED

### Authority Personnel

1. Amy Goslin

2. Jennifer Hamilton

3. Jose Hernandez (twice)

4. Carol Mahaffey

5. Jim Myhers (formerly worked for LPI)

6. Amiel Porta (twice)

7. Jim Prentice

8. Ted Sexton

9. Jeff Simons

### Former Authority Personnel

10. Cliforine Massey

11. John McGuire

### Non-Authority Personnel

12. Cheryl Black, Southwest Airlines

13. Tony Hueso, USA Cab

14. Dave Mueller, Ace Parking

15. Janet Nix, Hawaiian Airlines

16. Mike Parrish, Southwest Airlines

17. Kelly Pond, Image Concepts

2143687.1

**EXHIBIT A**

B

**CALIFORNIA FORM 700**
FAIR POLITICAL PRACTICES COMMISSION

**STATEMENT OF ECONOMIC INTERESTS**

**COVER PAGE**

*A Public Document*

Date Stamp
RECEIVED
FEB 0 9 2005
Corporate Services

*Please type or print in ink*

| NAME (LAST) | (FIRST) | (MIDDLE) | DAYTIME TELEPHONE NUMBER |
|---|---|---|---|
| Hernandez | Jose | De Jesus | ( 619 ) 400-2690 |

MAILING ADDRESS          STREET
(May use business address)
3225 N. Harbor Drive

| CITY | STATE | ZIP CODE | OPTIONAL: FAX / E-MAIL ADDRESS |
|---|---|---|---|
| San Diego | CA | 92101 | |

---

### 1. Office, Agency, or Court

Name of Office, Agency, or Court:

San Diego County Regional Airport Authority

Division, Board, District, if applicable:

Landside Operations

Your Position:

Director

➡ If filing for multiple positions, list additional agency(ies)/
position(s): (Attach a separate sheet if necessary.)

Agency: _____

Position: _____

### 2. Jurisdiction of Office (Check at least one box)

☐ State
☐ County of _____
☐ City of _____
☐ Multi-County _____
☒ Other  San Diego County Regional Airport Authority

### 3. Type of Statement  (Check at least one box)

☒ Assuming Office/Initial   Date: 12 / 14 / 04

☐ Annual:  The period covered is January 1, 2004,
through December 31, 2004.

-or-

○ The period covered is _____/_____/_____, through
December 31, 2004.

☐ Leaving Office  Date Left: _____/_____/_____
(Check one)

○ The period covered is January 1, 2004, through the
date of leaving office.

-or-

○ The period covered is _____/_____/_____ through
the date of leaving office.

☐ Candidate

---

### 4. Schedule Summary
(Check applicable schedules or "No reportable interests.")

➡ During the reporting period, did you have any reportable
interests to disclose on:

Schedule A-1          ☐ Yes – schedule attached
*Investments (Less than 10% Ownership)*

Schedule A-2          ☐ Yes – schedule attached
*Investments (10% or greater Ownership)*

Schedule B          ☐ Yes – schedule attached
*Real Property*

Schedule C          ☐ Yes – schedule attached
*Income, Loans, & Business Positions (Income Other than Gifts and
Travel Payments)*

Schedule D (Eliminated – report loans on Schedule C)

Schedule E          ☐ Yes – schedule attached
*Income – Gifts*

Schedule F          ☐ Yes – schedule attached
*Income – Travel Payments*

-or-

➡ ☒ No reportable interests on any schedule

Total number of pages
completed including this cover page: ___1___

---

### 5. Verification

I have used all reasonable diligence in preparing this statement.
I have reviewed this statement and to the best of my knowledge
the information contained herein and in any attached schedules
is true and complete.

I certify under penalty of perjury under the laws of the State
of California that the foregoing is true and correct.

Date Signed _____ February 4, 2005 _____
(month, day, year)

Signature _____
(File the originally signed statement with your filing official.)

FPPC Form 700 (2004/2005)
FPPC Toll-Free Helpline: 866/ASK-FPPC

---

SDRAA 140

53-611 (385)

C

SDRAA 141

53-611 (386)

# MEMORANDUM

30981-00006

**TO:**        File

**FROM:**      Pat Swan

**RE:**        San Diego County Regional Airport Authority

**SUBJECT:**   Interview of Jose Hernandez on December 14, 2005

**DATE:**      December 28, 2005

---

On December 14, 2005, John Gamberzky and I interviewed Jose Hernandez in the office of Diane Richards. We introduced ourselves and told Hernandez that we were investigating allegations that he had accepted gifts from contractors and vendors at the airport. We told Hernandez that we were conducting the investigation at the request of Thella Bowens, the President of the San Diego County Regional Airport Authority ("Authority").

We told Hernandez it was important for him to be truthful and forthright with us as his responses would factor into our report to the Authority. We told Hernandez that we were conducting a factual inquiry, and that it was important for us to get the most complete and truthful facts possible. W told Hernandez that the interview was protected by the attorney-client privilege, that the Authority was our client, and only the Authority could waive the privilege. Therefore, Hernandez could not disclose what we talked about without the Authority's permission. Hernandez said he understood and agreed, and said he would talk with us.

This memo contains my mental thoughts and impressions, and is not a verbatim record of the interview. This memo is protected by the attorney-client privilege and my work product protection, and is not discoverable.

I asked Hernandez if he ever accepted any free gifts from contractors or vendors. He said there were "occasional lunches." He said he would report him on his Form 700 this year. "I know what I have to report." He said the lunches were with the parking management staff at LPI. LPI is a Disadvantaged Business Enterprise in partnership with Ace Parking. Hernandez has kept a list of the lunches. He said there have been approximately twenty-five (25) lunches and he knows that he has to report if they are in $325 or $350 range. He is keeping a list of lunches on his Outlook. He said the lunches cost approximately $8 to $10 each and occur about every three (3) weeks. They are generally at the Red Sails Inn. He has lunched with John Steele, the Shuttle Manager, and/or Maurice Gray, the Owner. He has paid for some of the lunches, but does not believe he can submit them for reimbursement. He is not prohibited from taking free lunches, he just has to report them. He believes he can offset the lunches by paying for some and then he does not have to report them.

Hernandez denied any free lunches or drinks at the airport from airport vendors.

PRIVILEGED AND CONFIDENTIAL –
NOT DISCOVERABLE                              1

Hernandez said he reciprocates buying coffees for vendors. Most of the time this occurs on the airport site.

Hernandez parks in Lot A at the airport. He currently drives a 2005 Ford Sportrac truck. It is silver and he has owned it for one (1) year. He previously owned a black 1996 Ford Ranger truck, but it only sat two (2) people.

Hernandez denied that any work has been performed on his trucks by an airport vendor. However, he said he had taken his wife's car to USA Cab for work. His wife owns a two (2) door, gold Ford Explorer. USA Cab has a vehicle repair business. Tony Hueso is the owner. The repair business is "open to anyone." About six (6) months ago, the Explorer needed brake work. The master cylinder was failing. He took it to USA Cab because he did not know of a trusted repair facility. He took it in the morning and it was in the shop for a day. One (1) week later he had to take it back to have the lines bled. He got rides to or from USA Cab from Authority employees. He paid for the work with his credit card. It should be either on his MasterCard or Visa. He will get us a copy of the receipt. He did not receive a discount. He paid for the work.

Hernandez gets oil changes at Evan's Tires in Lemon Grove. He got free oil changes for giving blood. The only brake work that has ever been done was at USA Cab on his wife's Explorer. He does not recall having brake work done on the Ranger. He sold the Ranger because he needed a bigger car. He sold it to a third party. Before bringing in his wife's Explorer, he called Hueso in advance. He asked if the repair shop was open to the public. Hueso said yes, bring it in. Hernandez was desperate to get the brakes fixed.

The Authority has three (3) pool vehicles. There is one (1) truck, a white Ford, and a green Ford. They have official plates and are exempt from meter regulations. All are marked with removable placards. They are for business purposes only, no personal use. He has never been reported by the general public regarding personal use. He does not know of any misuse of the pool vehicles. He took one (1) of the vehicles home one (1) time. There was an employee barbeque and he needed to take the truck home to fill it with hay bales. He obtained the hay bales from a feed store in Lemon Grove. This was on or about August 17, 2005.

Hernandez lives in Spring Valley. He has never used any of the official vehicles to run personal errands. The official vehicle was not used to transport him for his brake work. He has asked Jeff Simons for rides. Simons works for Hernandez.

Hernandez has approximately nine (9) people who report to him in the office. These include Jeff Simons, Jim Myhers, Jennifer Hamilton, Carol Mahaffey, Kimberly Zehner, Ron Larson, Amiel Porta, Jay Bass, and Marie Cole. There are also approximately forty-one (41) airport traffic officers. Simons, Larson, Porta, and Bass can drive the official vehicles. All are enrolled in the driver pool program.

Hernandez receives a $350 monthly allowance for gas from the Authority.

Hernandez denied receiving any gifts from any of the airlines. He paid his own way last week to Orlando. He volunteered to produce his receipts.

PRIVILEGED AND CONFIDENTIAL –
NOT DISCOVERABLE

2

Hernandez admitted that he had played in a golf outing sponsored by Southwest Airlines. It was in September, 2005. He played with Amiel Porta and two (2) other persons, David Sterns, who is with the Padres, and Mark McDonald, who is with First American Title Company. Yes, Jeff Simons went too. The tournament was at Real del Mar Golf Course, which is south of Tijuana. It was a one (1) day event during the workweek. Leave was taken. Hernandez paid for the hotel room and meals. The golf was comped. They went down the day before. They played golf late on the first day and then in the tournament the next day. Three (3) of them and Sterns shared a room. Sterns played in another golf group. Hernandez and the others each paid for the late practice round the first day.

Hernandez admitted he also played the year before in 2004. He was invited by Southwest Airlines again. The invitation was from Mike Parrish, who is a Southwest Airlines Station Manager. Parrish is now in Las Vegas. Cheryl Black is now the Southwest Airlines Station Manager. Mike Dias works for Southwest Airlines and runs the tournament. Dias invited Hernandez. The tournament is a charitable event and all proceeds go to Ronald McDonald House.

Hernandez said he purchased giveaway gifts with his own money that equaled, in his mind, what it would cost to play in the golf tournament. He said the giveaway gifts were Callaway golf things he purchased from Target. He probably spent $200 in 2005. He did not purchase anything in 2004. He did not seek reimbursement from the Authority or anyone else for the Target purchases. Hernandez thinks the entry fee was $125 per person.

During the 2004 tournament, Hernandez stayed in Parrish's room and slept on the floor. Parrish paid for the room. Shortly thereafter Parrish transferred to Las Vegas.

In 2005, Hernandez paid for his room. Southwest Airlines had a hospitality suite and provided free drinks. They also paid for the golf tournament and dinner afterward. Hernandez denied any free lunches from Southwest Airlines.

We asked Hernandez if he had ever flown for free on Southwest Airlines. Hernandez said yes, one time. He said approximately three (3) years ago, he flew to Las Vegas with Parrish on a one (1) day Authority-related trip. Porta went with him and Parrish, and Jeff (last name unknown), a Southwest Manager of Ramp Operations, also went. They had lunch at Memphis BBQ. He does not know who paid for the lunch. The purpose of the trip was to look at possible changes to baggage equipment that Southwest Airlines was upgrading. Southwest Airlines paid for the airline tickets for Hernandez and Porta. It was "bad judgment on our part." While in Las Vegas, they used Mike Parrish's wife's car. Hernandez said there were no other trips with Parrish or free tickets from Southwest Airlines.

We asked Hernandez if he had received anything else free from Southwest Airlines. Hernandez said that as part of the United Way Drive, he asked for and received two (2) roundtrip airline tickets to Las Vegas from Southwest Airlines. Cheryl Black issued them, and Hernandez gave them to the United Way Committee to raffle. He believes Paul Webb in Planning won the tickets. Hernandez said he also was asked to ask Hawaiian Airlines to give two (2) roundtrip tickets to Oahu for the United Way Committee to raffle. He believes a new female employee won these tickets at a drawing that was held at an all-hands meeting. Ted Sexton, who is the

PRIVILEGED AND CONFIDENTIAL –
NOT DISCOVERABLE

3

Chair of the United Way Committee, asked him to get the Southwest Airlines tickets. The previous year, Jeffrey Woodson, asked him to get the Hawaiian Airlines tickets.

Also, every year, for the Authority's Texas BBQ, Hernandez asked Southwest Airlines for free shipping of barbeque meat from Dallas. Sexton asked Hernandez to ask Southwest Airlines.

There have been no other personal gifts from Southwest Airlines. Hernandez denied any trip to Phoenix.

Hernandez said he flew American Airlines to Orlando with his family last week for a personal vacation, and paid for the trip himself.

Hernandez denied receiving any airline ticket upgrades personally. He is asked, from time to time, to get upgrades and to change flights by higher ups at the Authority and he does it. Vernon Evans, the Vice President of Finance for the Authority, has asked him on multiple occasions to upgrade or change his personal tickets to Las Vegas and Dallas. No one else at the Authority has asked him regarding personal tickets.

We asked Hernandez if he had made any other trips to Mexico in the last three (3) years. He said the last trip was to Puerto Vallarta in or around September 11, 2001. He flew on Aero Mexico and paid for the trip himself. He has made no other trips to Mexico since.

We asked Hernandez if he had made any trips to Hawaii. He said two (2) or three (3) years ago he went and stayed at the Kaanapali Beach Hotel. He found the rates for the hotel on the Internet. He flew on Hawaiian Airlines. His wife, Roxy, and their two (2) children went the day before and stayed with Amiel Porta's family. He then joined them and they went on to Maui. He paid for the trip himself.

He really doesn't fly anywhere. The one "error in judgment was the trip to Las Vegas." He does not ask for or get personal upgrades, free tickets, etc.

We asked Hernandez about Kelly Pond. She owns Image Concepts. She does uniforms. He has known her for about two (2) or three (3) years through her LPI affiliation. She does uniforms for LPI. He does (or approves) the uniform purchases for reimbursement. She also does "some of our uniforms." She did the blue Hawaiian shirts. Hernandez does Purchase Orders for the uniforms for LPI and the Terminal Operations staff. A different supplier, Ace Uniforms, does uniforms for Traffic Control. Pond does approximately $10,000 to $20,000 in business a year.

Pond will provide free sample shirts. It is part of her "sales gimmick" to ask what they are looking for and then make them up and give them away as samples. He keeps the samples or gives them away. He still has three (3) sample shirts. Two (2) are dress shirts and one (1) is a casual shirt. He gives the other samples to persons at the Authority.

Hernandez has asked Pond to make specific clothing when the uniforms were changed for the SanPark parking operations. She made separate samples and they were put on mannequins and presented to senior staff for approval.

PRIVILEGED AND CONFIDENTIAL –
NOT DISCOVERABLE                    4

SDRAA 145

53-611 (390)

Hernandez has never asked Pond for anything, or suggested he wanted anything. However, approximately six (6) months ago, when he was coaching his son's soccer team, Pond gave him three (3) shirts. They were monogrammed with the names "Coach Jose," "Coach David," and "Team Mom Roxy." Pond came in and said that she had made them up for him. The shirts cost approximately $8 each. Pond knew from chatting with Hernandez that he was coaching his son's four (4) year-old soccer team. Hernandez told Pond who the coaches were and who the team mom was.

Pond attended Roxy's 30th birthday party approximately 1 ½ years ago. Pond has not been to his house. He has been to her house for a housewarming party. She works out of her house in Mission Hills. Her cell phone number is (619) 895-0677.

Hernandez said that he has received no other gifts from Pond. When he first met her approximately three (3) years ago, she paid for his lunch at the Cheesecake Factory.

Hernandez denied that Pond has provided any clothing apparel of any type to his children's' soccer teams or his wife's soccer team. He does not recall receiving any other soccer related gifts.

Hernandez denied giving Pond off hour access to the Authority's office. He also denied any discussion with Pond regarding obtaining free trips.

We asked Hernandez if he had ever received any free tickets to sporting events. He said yes. He said Dave Mueller, the Vice President of Operations at Ace Parking, invited him to one (1) Padre game. They sat on the first base line. The ticket was probably $45. He went alone with Mueller. It was this past season. He will disclose this ticket on his Form 700.

Mueller and Hernandez have also played golf together. Twice in the past year. Hernandez has known Mueller for two (2) years and they have played golf five (5) times. A couple of occasions were the Authority's golf tournament. On the other three (3) occasions, Mueller paid twice and Hernandez paid once. They played at Del Mar Meadows in 2004 and Mueller paid. They played at Del Mar Meadows twice over the last two (2) years. Steve Burton, the President of Ace Parking, played once and paid for the golf in approximately September or October of 2005. Hernandez paid for the golf when they played at Eastlake Country Club approximately 1 ½ years ago.

Hernandez has a neighbor unrelated to the Authority who sells Padres tickets and gives Hernandez free Padre tickets.

Hernandez said he received two (2) free tickets to the San Diego Charger-Raider game in 2003 from Dave Mueller. Hernandez went with Porta. Mueller called Hernandez and said he had tickets. Mueller dropped them off. Hernandez does not know how much they cost. He thinks they were $65 a ticket. He said they were in the upper plaza. He is not sure if they were club level seats. I asked if there were four (4) tickets and Hernandez said he did not believe so.

Hernandez said he was given four (4) tickets to the Holiday Bowl last year. He received the tickets from Mark (last name unknown), who does transportation for the Holiday Bowl teams. Hernandez helped coordinate the team arrivals and departures.

PRIVILEGED AND CONFIDENTIAL –
NOT DISCOVERABLE                               5

SDRAA 146

53-611 (391)

Hernandez denied going to the Superbowl.

I showed Hernandez copies of the four (4) Raiders tickets for the game on December 28, 2003. The tickets were in the club level section and have a price of $235 each. Hernandez said he did not recall four (4) tickets. He acknowledged that the tickets were on the club level and were $235 each.

At this point, we asked Hernandez how he was doing. He said he was fine. We asked him if he believed the process we were going through was fair. He said yes. He volunteered he would get us records that we needed.

I asked Hernandez if the Authority had a code of ethics. He said yes and that he had signed for it. I showed him Section 2.10 and asked him to read paragraph (b)(2) to himself. This paragraph prohibits an employee of the Authority from accepting anything of value from anyone, other than the Authority or another Board Member or employee, for doing his or her job. Hernandez agreed that this meant he could not take any gifts from others for doing his job. But he said he believed the remainder of Paragraph (b) allowed him to accept gifts.

At this point, Hernandez asked if he could have a glass of water. We got a glass of water for him.

We asked Hernandez if he had ever submitted an expense report for airline travel that included expenses that were comped. He denied doing this. He said he has to submit receipts for anything over $25. He gives his expense reports to Sexton for approval and then they go to Finance. He said he has never submitted expense vouchers with expenses not personally paid for.

We asked Hernandez about airline drink coupons. Hernandez admitted that he had received them from the airlines. He received two (2) free airline drink coupons from Hawaiian Airlines. He still has them. An agent gave them to him for free.

Delta Airlines has also given him a stack of free airline drink coupons to give out. He still has the stack and has not given them out.

Southwest Airlines has given him four (4) to six (6) free drink coupon books. There are approximately twelve (12) coupons in each book. He does not have them anymore.

We asked Hernandez about Chili's gift cards. Hernandez said last year they went out and bought Chili gift cards for LPI employees that cost $20 to $25 each. The gift cards were paid for by the Authority as reimbursement. With each gift card, they received a free $5 gift certificate. Hernandez took these gift certificates and gave them to his employees. He believed each employee got two (2) $5 gift certificates.

We asked Hernandez if he had a free parking pass from Ace Parking. He said yes. He said it was given to him by his neighbor, Steve Kitt. Kitt manages Ace Parking at Qualcomm and Petco. He got it this year. No, actually, he got it in 2004 when the Padres started playing at Petco. He has used it and let others use it, including Colm, Porta, and Hamilton. The free parking pass has no expiration date. He has known Kitt for years as a neighbor. Hernandez does

PRIVILEGED AND CONFIDENTIAL –
NOT DISCOVERABLE                              6

SDRAA 147

53-611 (392)

not think he got the free parking pass because he works at the Authority. He is close to Kitt and introduced Kitt to Kitt's new second wife. Hernandez does not recognize that there may be an appearance of impropriety.

We asked if there were free parking passes at the airport. Hernandez said there were three (3) different free parking passes. One is a validation pass that is good for ten (10) hours. The second is good for twenty-four (24) hours. The third is for an extended stay. It is the same as a twenty-four (24) hour pass, but it is stamped with an extended stamp pass. The extended stay pass is used by the FAA and the NTF. Hernandez has also issued extended stay passes for customer service reasons when a customer has had a bad experience. These passes are kept in the permit office. He has taken stacks of them for special events. However, he has never taken stacks with extended stay stamps on them.

We asked Hernandez about parking tickets and whether he has the authority to dismiss them. He said he has the authority, as does Jim Myhers. Before Myhers, McGuire had the authority. Hernandez said there were no written guidelines regarding dismissal of tickets. We asked him how he decided. Hernandez said that if an employee gets a ticket, he dismisses the ticket and gives them a warning. If a ticket is issued to the general public, they can file an appeal with the City. Zehner then does a review and she either dismisses the ticket or not, or asks Hernandez or Myhers whether the ticket should be dismissed. If a ticket is issued to a contractor, Hernandez will typically dismiss the ticket and then "give guidance" to the program manager. He does the same thing with tenants. Tickets are generally dismissed for members of the "Airport Community."

We asked Hernandez about the driver permitting process. He said taxi cab drivers go through the San Diego Sheriff to get a Sheriff placard. The Sheriff does a ten (10) year background check. Drivers for shuttles for hire go through a ten (10) year background check that is done by the Harbor Police. There is a criteria for disqualifying a driver. Hernandez can get it for us. They have the discretion to "clear people." Myhers does notices of intent to deny. The driver then has ten (10) days to appeal. The driver does a meet and confer in ten (10) days with Hernandez and Myhers and try to resolve it. If they are unable to resolve it, then it goes to an ALJ. They have gone to an ALJ "plenty of times." The last one was two (2) to three (3) weeks ago.

They will give drivers temporary permits and then learn of disqualifying events and then issue a notice of intent to revoke. Hernandez denied ever approving a driver who had a disqualifying event.

We asked and Hernandez admitted that he traded lunches with Myhers when Myhers was at LPI. Hernandez admitted that maybe Myhers bought "a little bit more" of the lunches.

Hernandez denied ever taking home a case of soda bought by LPI. He may have taken home one (1) to two (2) cans.

We asked Hernandez about anyone at the Authority doing personal errands for him. He said he was not aware of any written guidelines. He said, from time to time, personal errands are done. He denied asking Jennifer Hamilton to do personal errands. However, he admitted he had asked

PRIVILEGED AND CONFIDENTIAL –
NOT DISCOVERABLE

7

Jennifer Hamilton to assist him with preparing rosters for non-Authority teams. Hernandez said that Hamilton asked if she could help Hernandez coordinate his wife's 30th birthday party. She was very good at planning. She sent out invitations. She helped with the layout. She also helped that weekend with the setup. It was Hamilton's idea to go to Party City to buy party items. Hernandez admitted that Hamilton also laminated photographs for the party.

We then asked Hernandez the broad question of whether he had ever received anything else of value while working for the Authority from any contractor or vendor of the Authority or airport. He said he had gone to lunch with David Bonapart, the General Manager of Parking Operations for 5 Star Parking. 5 Star lost the airport agreement two (2) years ago. Hernandez offered to go through a list of the airport vendors to see if he could refresh his recollection.

We asked Hernandez what was the best way to contact him outside the office. He said his home phone number was (619) 670-6632 and his cell number was (619) 840-2005. He said his e-mail address is joseroxy@att.net.

Hernandez said that Kelly Pond's e-mail address is pondiego@aol.com.

Hernandez asked if he was the only focus of the investigation. I told him he was not the only focus, but he was a primary focus.

We asked Hernandez if he had any relationship with Host International. He said he just received employee discounts, and never received any free food. He told us to talk to Darrell Murray, the General Manager, who will say Hernandez never asked for or received anything for free.

We asked if any of the airlines had premium rooms. He said Delta, American, and United had premium rooms. He denied ever asking to use any of these rooms for his personal benefit or for the Authority. He then said that yesterday he asked for access to the United Red Carpet Room for Bowens and a board member who were leaving today for a trip to Japan.

We asked Hernandez about trips to Jacksonville. He said he had gone to Jacksonville for Authority business to assist the airport in Jacksonville for their Superbowl. "Airports help each other." The trips to Jacksonville were pure business trips. There was no personal visits or visits for a wedding.

On his trip to Hawaii, the seats were all coach or one class. He paid for all the expenses on the trip to Hawaii.

We asked Hernandez if there was anything else he wanted to tell us about gifts to anyone at the airport. Hernandez said he is asked by the Authority to help with airline tickets, and he goes to the Station Managers for help. We asked if he felt anyone was abusing their authority. Hernandez said that he and other staff are put in a difficult position when asked to do this. However, he has never refused such a request. He believes Porta has been asked to do it, and maybe Bass and Larson. It is not frequent, just occasionally. We asked if he felt burdened or imposed upon. He said yes, at times.

Hernandez said on occasions they have gotten Bowen's car detailed or picked up. They have also helped board members and vice-president level employees change their ticket for airline

PRIVILEGED AND CONFIDENTIAL –
NOT DISCOVERABLE                          8

flights. However, they have not gotten upgrades. Upgrades are not typical. The requests are generally to change tickets. Hernandez said that the tickets are changed for free. If the people could do it themselves for free, they would do it themselves.

Hernandez said that he is a demanding person to work for and maybe some employees would be negative about him. However, the demands he makes are within policy. Hernandez said that he is harder on himself and he works from 6:30 in the morning until 5:00 at night. "Either they really like me or they don't." "I don't ask for anything and I don't need anything. I have two kids and a wife at home."

Hernandez said he had nothing else to offer or say. At this point, I reminded Hernandez about the attorney-client privilege, and Hernandez said he understood. I also asked and Hernandez agreed not to talk to any other employees about the substance of the investigation or anything I asked about. He said he would make every effort to give me all the requested documents and information I had requested. Hernandez said he had never abused any position for personal gain. He said he would call me directly with any information. He said he believed the process has been fair. The interview then concluded.

2141922.1

PRIVILEGED AND CONFIDENTIAL –
NOT DISCOVERABLE                9

SDRAA 150

53-611 (395)

D

SDRAA 151

53-611 (396)

# JOHN R. GAMBERZKY, PRIVATE INVESTIGATOR

Former Special Agent, F.B.I. • Investigation & Specialized Research Services

## Confidential Memo

(Attorney Work Product)

<u>**Via e-Mail**</u>

Date:        January 3, 2006

For:         Pat Swan, Esq.
             Luce, Forward
             San Diego, CA
             pswan@luce.com

Re:          **Airport Authority-Jose Hernandez matter;**
             **Interview of Jose Hernandez, on December 29, 2005**

On Thursday, December 29, 2005, Pat Swan, Esq. and John Gamberzky, P.I. interviewed Jose Hernandez at the office of Jose's attorney, Cathryn Chinn, 3990 Old Town Avenue, Suite A-109, San Diego. On December 28, 2005, Ms. Chinn had requested that Pat Swan interview Jose again, at her office so Jose would feel comfortable. Pat Swan agreed. (Note that Jose Hernandez was originally interviewed by Pat Swan and John Gamberzky on December 14, 2005 in the Airport Authority office of Diane Richards.)

Pat Swan told Jose Hernandez that the attorney-client privilege remained in place and that this interview like the prior one was confidential. Pat Swan requested that Jose not discuss interview-content with anyone other than his attorney, and that he not contact anyone involved with the investigation. Jose agreed.

Pat Swan asked Jose whether he had any contact with airport-related individuals since the original interview on December 14, 2005. Jose stated that he had not initiated any contacts, including of Authority employees, but had received calls from Kelly Pond (uniform supplier), Janet Nix (San Diego Station Manager, Hawaiian Air) and Mike Parrish (former San Diego Station Manager, Southwest Air, now with Southwest Air, Las Vegas), all of whom called Jose after they were interviewed ... and asked Jose what was going on. Jose told each of the callers that he was not free to discuss the matter. He did not recall talking to those individuals after his original interview but before their interviews.

Pat Swan asked Jose if there was anything he wanted to change from his interview of December 14, 2005, to which Ms. Chinn immediately interjected "Do you even remember?" Jose responded by saying that he did not recall what he said during the original interview. (Note that later in this December 29th

1

**SDRAA 152**

**53-611 (397)**

interview Jose made specific references to points he had made during the December 14th interview.) Jose then said that on December 14th ... for the first 1½ hours of the interview ... he didn't know what the subject or purpose of the interview was.

Pat Swan asked Jose if everything he said during the December 14th interview was truthful and accurate, to which Jose replied affirmatively. Jose said that he had been as truthful as possible and that he tried to answer all questions to the best of his ability.

Pat Swan told Jose that he'd like to ask the same question he asked on December 14, 2005, namely whether in the course of performing his Authority duties he had received anything of value from any airport-related vendor, contractor or tenant. Jose replied that he had not thought about it ... but that he did retrieve proofs-of-payment from his personal files for automobile work that had been performed on his personal vehicle at USA Cab. Jose noted that "this was what he thought his assignment was" at the conclusion of the December 14, 2005 interview.

Pat Swan asked Jose whether he had received any free airline tickets other than a ticket for a previously-discussed trip to Las Vegas wherein Jose met with Mike Parrish on the subject of airport business. Jose replied "yes", stating that he had received free air tickets for trips to Hawaii and Las Vegas.

As to free airline tickets to Hawaii:
Jose had asked Janet Nix "where was a good place to go in Hawaii?" ... for himself, his wife and their two (2) children. In reply, Janet Nix asked Jose if he'd like non-revenue, standby tickets ... and that she would check with her manager, which she did, and thereafter gave Jose the tickets ... at no cost to him.

Jose told Janet Nix what day he hoped to travel on, but knew that he might not be able to actually fly on that date. He did not recall the date, but "it was a few years back". Jose made hotel and rental car reservations, which he paid for, and hoped that the actual flight date would coincide with the standby flight date.

Jose explained that the tickets were not for assigned seats but for non-revenue standby seats ... which were non-transferrable and had no value.

As it turned out, Jose was unable to fly with his family on the planned departure date as there were only three (3) available standby seats. Jose's family departed for Oahu without him. The (entire) Hernandez family had planned in advance to spend one day in Oahu with Amiel Porta's family. The Hernandez' ultimate destination was Maui. Jose explained that his co-worker, Amiel Porta, has family in Hawaii, and that Amiel's father picked-up Jose's wife and children at the Oahu airport in his own vehicle.

Note that at this point in the interview Cathryn Chinn began to interject her own answers when Pat Swan asked Jose for details of the Hawaii trip. She also informed John Gamberzky and Pat Swan that she practices law in Hawaii, flies there frequently, always first class, and never pays for airline tickets. She also stated, "Jose, you did nothing wrong." From this point forward, despite several requests from Pat Swan, Ms. Chinn repeatedly interrupted Pat's questions by answering questions directed to Jose, herself, and by asking her own questions of Jose.

Pat Swan asked Jose why in the December 14th interview, he did not reveal that he had taken a no-cost flight to Hawaii, to which Jose replied that he did not remember being asked about free airline tickets during that interview. As to December 14th, Jose also denied being asked whether he and or any family member flew to Hawaii on not-paid-for tickets ... and denied being asked to tell who paid for the Hawaii tickets during that interview.

2

As to the continuation of Jose's wife and children's trip from Oahu to Maui, Jose stated that after he arrived in Oahu he flew with his family, on standby, from Oahu to Maui. On the two (2)-leg return trip to San Diego (Maui to Oahu and Oahu to San Diego) the family flew standby, on the same plane, but Jose sat separately due to limited seat availability.

Pat Swan asked Jose whether he had ever flown anywhere else on non-revenue standby tickets, to which Jose replied that he did not recall whether he did.

As to free airline tickets to Las Vegas:
Jose said that he did make use of Southwest Air non-revenue standby tickets provided by Mike Parrish for Jose's wife and children. At that time, approximately one (1) year ago, Jose was planning to attend an Authority conference in Las Vegas, sponsored either by the American Association of Airport Executives or the International Parking Institute. As Mike Parrish was aware of the conference, Mike offered free air travel to Jose for his family's use, so that their families, who are friends, could get together in Las Vegas. Jose accepted the offer of three (3) tickets.

Jose flew to Las Vegas on an Authority-paid-for ticket and his family followed later that day using Mike Parrish's non-revenue tickets. Jose did not know details as the arrangements were handled by Mike. Jose did not recall whether his family returned to San Diego with him on the same flight or whether they returned on a different flight.

On that trip, Jose stayed at the Mandalay Bay Hotel. On one (1) of two (2) nights there, Jose's children stayed with him and his wife at the hotel. On the other night the children stayed at Mike Parrish's home so they could play with Mike's children.

Mary Erickson (phonetic spelling), an Authority employee from the Real Estate Department, may have been on the same flight to Las Vegas that Jose was on, but she was not traveling with Jose.

Pat Swan asked Jose if Mike Parrish had ever given him a free airline ticket, to which Jose replied "Yes, a buddy ticket." Jose said that approximately one and one-half to two (1½ - 2) years ago, before Mike Parrish was transferred to Las Vegas, Jose received one or two (1-2) buddy tickets from Mike Parrish, but only recalled using one (1) to fly to Las Vegas ... on a Saturday, to attend a female's 30th birthday party. On that trip, Jose did not rent a hotel room in Las Vegas and returned to San Diego on Sunday.

Jose said he did not recall receiving any other buddy passes or similar tickets from any other airlines for himself or his family. Ms. Chinn then stated that each airline has a similar program and the buddy tickets are easy to get.

Pat Swan asked Jose whether he knew of any other Authority employee who had traveled on a non-revenue ticket or a buddy pass, to which Jose replied that he was sure that there were employees who did so but that he could not think of any at the moment.

Jose did not recall that he traveled on any other trip besides Las Vegas, on any airline, on a non-revenue ticket or buddy pass. His wife and children did not fly on free tickets other than on the Las Vegas trip.

John Gamberzky asked Jose whether he recalled any additional information regarding receiving or asking for airline free drink coupons/tickets. Jose stated that he had free drink tickets from Southwest Air, two drink (2) tickets from Hawaiian Air and some drink and headset tickets from Delta Air. Ms. Chinn then stated that anyone can get free drink tickets.

SDRAA 154

53-611 (399)

Jose recalled possibly having one (1) additional non-revenue buddy pass for Southwest Air, which he received from Mike Parrish. He did not use the pass or give it away.

John Gamberzky asked Jose whether he had ever flown on any airline on Authority business ... without paying for his air ticket, to which Jose replied that he never did. John Gamberzky rephrased the question and Jose provided the same response.

Jose has knowledge of:
- Mike Parrish providing free Southwest Air tickets to Authority employees.
- Terry Benevides (phonetic spelling), a female, providing free Aloha Air tickets to Authority employees.
- Bob Stewart, providing free American Air tickets to Authority employees.
- Brian Anderson, an Authority employee, asking for free Hawaiian Air tickets, upgrades and flight changes.
- Vernon Evans, an Authority employee, asking for free (unknown) airline tickets, upgrades and flight changes.
- Morris Vance (phonetic spelling), an Authority Board Member, asking for free first class ticket s on three (3) airlines, for travel to Williamsport, PA to attend the Little League World Series.
- Joe Craver (phonetic spelling), an Authority Board Member, asking for free first class upgrades for himself and his wife ... days in advance ... for (unknown) airline travel.

On numerous occasions, Jose has also been asked by Authority Board Members to obtain free upgrades and or flight changes ... which prompted Jose to tell his supervisor, Ted Sexton "You gotta have them quit asking me to do this". The request was ignored by Ted Sexton.

Jose also noted that Marketing Department employees including Rob Wigington, Authority Vice President of Marketing, ask for free airline tickets and upgrades on Aloha Air and Hawaiian Air. In the summer of 2005, Jose was told by a Station Manager that Rob Wigington had made such requests. When asked to provide details of the tickets and upgrades received by Rob Wigington, Jose stated that Rob had asked for but did not actually receive either benefit.

Jose also noted that Ron Larson (phonetic spelling), who works for Jose, lives in Sacramento and commutes to San Diego. Although Ron purchased a block of $39 (thirty nine dollar) Southwest Air tickets in advance, he frequently needed to change his flights to accommodate his work schedule ... and always asked for free tickets. After approximately ten (10) such requests, Southwest Air supervisors including Mike Parrish and Veronica Moreno, asked Jose to tell Ron to stop making the free change requests.

Jose also noted that Amiel Porta, who works for Jose, goes back and forth to Hawaii, most recently prior to Thanksgiving, 2005 ... and makes (unknown) requests of the airline(s).

Jose stated that he has never flown on Aloha Air.

Pat Swan asked Jose whether he or his wife, Roxy, received anything of value from Kelly Pond, a supplier of clothing and uniforms, other than the previously-discussed three (3) coaches shirts, sample clothing and their first (original meeting) lunch at the Cheesecake Factory. Jose replied by saying that several years ago his wife traded Mary Kay cosmetics to Kelly Pond for green-colored uniform shirts, for his wife's, Roxy's, indoor soccer team. The shirts were valued at $3 to $4 (three to four dollars) each. Neither Jose nor his wife ever received shoes of any kind from Kelly Pond.

4

SDRAA 155

53-611 (400)

Pat Swan asked Jose whether he received Chargers football tickets, other than four (4) previously-discussed tickets for a 2003 Chargers-Raiders game. Jose replied that he had, but that he did not attend the game. He explained that late on a Friday night, Cheryl Black, Southwest Air Station Manager, had offered him two (2) tickets for not-very-good-seats, after Cheryl was unable to find anyone else to give them to. Jose picked-up the tickets at his office on a Saturday morning, then gave them to his wife who with a co-coach friend, had their own tickets and were planning to go to the game. His wife gave away the free tickets at the stadium, to strangers; she did not re-sell the tickets.

Pat Swan asked Jose whether he had received any other free Charger tickets, to which Jose replied that he had not received any other free Charger tickets from anyone affiliated with the Authority.

Pat Swan asked Jose if he had received Charger tickets from Janet Nix, Hawaiian Air Station Manager, to which Jose replied that he had ... explaining that Janet Nix offered him tickets for the December, 2005 Charger-Raider game which he did not accept because he was in Orlando, FL with his family. He does not know who got the tickets. Janet Nix also offered him tickets for the 2004 Charger-Raider game ... which he did accept. He explained that he already had his own tickets, obtained through his sister and her job at Ticketmaster, and that he gave away the free tickets to strangers at the stadium.

Note that at this point in the interview, Cathryn Chinn asked Jose whether other Authority employees receive free Charger tickets, to which Jose replied that "he's heard, but he does not know".

Pat Swan asked to see Jose's documentation for automobile work performed on Jose's personal vehicle at USA Cab. Jose stated that his wife "keeps a file for her 96-97 Explorer". Pat Swan then looked at Jose's yellow-copy USA Cab invoices dated April 3, 2002, February 26, 2003, February 25, 2004, December 13, 2004 and March 4, 2005. Some, not all, invoices bore stapled-on copies of charge card receipts as proof-of-payment. Pat Swan then told Jose that one (1) invoice indicated repair of a Ranger truck ... and showed the invoice, dated 12-13-04, to Jose ... who looked at it and said "Yes, I recall". When asked whether any other work had been performed on his truck ... distinguishing his Ranger truck from his wife's Explorer ... Jose stated that he did not recall, and noted that when he sold the Ranger truck he gave-away his paperwork with it. The Ranger pickup truck was sold to an individual who took it to Tijuana, Mexico.

Note that while John Gamberzky was comparing Jose's invoice-copies with invoice-copies obtained from USA Cab on December 15, 2005, Jose observed same and stated that "he (John Gamberzky) has his own copies". Cathryn Chinn then asked Pat Swan and John Gamberzky whether Jose's permission was obtained prior to seeking information from USA Cab, to which Pat Swan replied that no permission was obtained. Ms. Chinn then stated to Jose, "You should call Tony Hueso today". She then stated to Pat Swan and John Gamberzky, "That's a privacy issue involving Jose and his wife's income".

Pat Swan asked Jose whether he ever received any money from Kelly Pond ... to pay for drinks for himself and other Authority employees. Jose replied that he had not. Pat Swan then asked Jose if he received $100 (one hundred dollars) from Kelly to pay for drinks. Jose first stated that "Kelly gave the money to Amiel to buy drinks", then stated that "the money was on the table". Jose explained that he and ten to fifteen (10-15) Authority employees attended a going away party at a bar, for Authority employee (first name unknown) Padilla, a female, who worked in the Environmental Department. At the time that Jose departed the party, Kelly Pond's $100 had been expended.

Pat Swan asked Jose whether he played golf, at no cost to him, with airport-related individuals, to which Jose replied that:

  - He played in the Southwest Air tournament in Real Del Mar, Mexico, in each of the past two or three (2-3) years.

5

SDRAA 156

53-611 (401)

- He played twice (2x) with Ace Parking personnel at Authority-sponsored tournaments.
- He played once (1x), approximately one (1) year ago at the Rancho Bernardo Inn, with John Steele, manager of the Ace Airport Shuttle Service, plus Dave Mueller of Ace Parking and an unidentified individual. The round-of-golf was provided at no cost as John Steele knew the golf course Starter.
- He played once (1x), approximately two to three (2-3) years ago, in a Neal Electric annual tournament. Jeff Simons, who works for Jose, and John Graves, an Authority Marketing Department employee, also played.
- He recalled no other golf-playing involving airport-affiliated individuals.

Pat Swan asked Jose whether he ever played golf at Torrey Pines with airport-related individuals, to which Jose replied that:
- He played at Torrey Pines in 2005 with the Authority's Washington, DC lobbyist.
- He played at Torrey Pines once (1x) with Jeff Simons and Mark Gardiner, a friend who works for The Baggage Claimers, a service used by the airlines, not the Authority; also with an employee of Mark's. Mark Gardiner paid for the round of golf.

Jose noted that CES, another baggage delivery company, also works for the airlines.

Pat Swan asked Jose whether he ever attended a concert at the ipayone Center (Sports Arena), to which Jose replied that he had not, but that his wife had. Jose had asked Dave Mueller of Ace Parking to use his direct-access to ipayone, and Jose provided Dave with his, Jose's, credit card number. Jose ended up paying a higher handling-fee through ipayone than he would have if he purchased the tickets via his sister's Ticketmaster-employer. Jose stated that his wife attended the concert with a friend of hers. When John Gamberzky asked what the friend's name was, Cathryn Chinn stopped the interview, stating that Jose's privacy was being invaded. Pat Swan then told Ms. Chinn that she could stop him at any time if she did not wish the interview to continue. Pat Swan reminded Ms. Chinn that she had asked for the interview, to which she replied the Pat was right.

Pat Swan then asked Jose whether there was anything else Jose wanted to tell him ... at which time Ms. Chinn stopped the interview ... telling Jose not to answer the question. Pat re-asked the question ... as to whether there was anything else of value that Jose had received during the course of his Authority employment ... at which time Ms. Chinn again interjected her own answers ... then told Jose to "tell him (Pat) everything".

Jose stated that he had lunches with many airport-related individuals, including:
- Jim Myhers, John Steele and Dave Mueller, as previously discussed.
- Bob Mellons of the Transportation Security Administration (TSA). Jose and Bob "traded-off" paying for lunch.
- Starla Matthews, Legal Counsel for the Transportation Security Administration. Jose paid for lunch using his personal credit card, and submitted an expense voucher to the Authority ... which was reviewed by Ted Sexton.
  Jose also played racquetball with Starla Matthews, who had a club membership with guest privileges. Jose had requested and received approval from Ted Sexton for this activity.
- Mark Denari, Director of Airport Security and Public Safety. Mark has also had lunches with TSA.
- Mike Parrish, former Southwest Air Station Manager in San Diego. Jose and Mike "traded-off" paying for lunch, or Jose paid for lunch using his personal credit card and submitted an expense voucher to the Authority.
- Jose Atuñez, Station Manager for Northwest Air. Jose Hernandez paid for lunch using his personal credit card and submitted an expense voucher to the Authority.

6

Pat Swan asked Jose whether he has received anything of value that he did not pay for. Ms. Chinn interjected, telling Jose to "talk about anything he received, asked for, been offered or given." Jose replied that he:
- Received offers of free food from Darryl Murray, Manager at Host, an airport food service provider ... but declined the offers.
- Received offers of air travel upgrades and free drink coupons from unnamed employees of Delta Air ... but declined the upgrade offers. He previously discussed receiving some free drink and headset coupons from Delta.

Jose added that he has never received a free upgrade from an airline and has never asked the airlines to give him anything.

Note that at this point in the interview, Cathryn Chinn asked Jose whether his employees have access to his daily planning-calendar, to which Jose replied that both his administrative assistant, Jennifer Hamilton, and Ted Sexton's administrative assistant, Amy Goslin, have access to his Outlook Calendar ... and that they know where he is at all times.

Pat Swan asked Jose whether he ever told Ted Sexton that he received free travel on Hawaiian Air, to which Jose replied that he did not recall.

Pat Swan asked Jose whether he ever told Ted Sexton that he received free buddy passes for travel on Southwest Air, to which Jose replied that he did not recall.

Pat Swan asked Jose whether he ever told Ted Sexton that he received free buddy passes that he used for himself and or his family, for travel to Las Vegas, to which Jose replied that he did not tell Ted.

Pat Swan asked Jose whether his Outlook Calendar indicated that he traveled to Hawaii and or Las Vegas on free passes or buddy tickets, to which Jose replied that his calendar did not indicate such travel. Jose added that he's "never hidden his daily activity" on his Outlook Calendar.

Pat Swan asked Jose who, if anyone, knew that he traveled to Hawaii and or Las Vegas on free passes or buddy tickets, to which Jose replied that he never discussed it with Amiel (Porta), but that he assumed that Amiel knew.

Pat Swan asked Jose who, if anyone, at the Authority, he ever told that he traveled to Hawaii and or Las Vegas on free passes or buddy tickets, to which Jose replied that he told no one, and that he did not feel that he had to ask or tell anyone.

Jose stated that he never had any real ethics training, and that two to three (2-3) years ago, Ted Sexton told him that "you can never buy lunch for a contractor, but a contractor can buy lunch for you".

On one (1) occasion in the past, an employee of Jose's asked him if he/she could submit a reimbursement request for a meal he/she bought for a contractor. Jose told the employee that the expense would be reimbursed one time (1x) ... then told the employee that the policy was "you can never buy lunch for a contractor, but a contractor can buy lunch for you".

Ms. Chinn, seemingly agitated at this point in the interview, objected to Pat Swan's questions and asked Pat to identify the individual who made allegations against Jose. Pat declined to do so and asked that he be allowed to continue the interview. Pat reminded Ms., Chinn that it was her offer that brought us to her office today.

7

Ms. Chinn then directed a series of leading, rapid-fire questions at Jose, prompting him on the subject of an encounter he had with Jennifer Hamilton, his administrative assistant. Jose related, via answers to Ms. Chinn's questions, that he had been threatened on one (1) occasion approximately two to three (2-3) months ago. At that time, Jennifer Hamilton submitted a formal request to have her job classification upgraded with a corresponding pay increase. Jose's review of the request indicated that Jennifer overstated her duties and did not deserve the upgrade. When Jose informed Jennifer of his denial she "blew up" on him ... prompting Jose to consult Ted Sexton who told Jose to ignore Jennifer's comments.

Ms. Chinn, still agitated, then announced that she knows that it was Jennifer who made the allegations against Jose ... and that Jennifer was retaliating against Jose for her promotion-denial. She added (in an accusatory tone) that "you (Pat Swan) have an F.B.I. guy and I have an F.B.I. guy who can investigate". She then pressed Jose to "tell how Jennifer acted". Jose replied by repeating what he said moments earlier, adding that when Jennifer "blew up" she had been sitting across from him at his/her desk ... and that she "was very loud". He was "trying to calm her".

Ms. Chinn asked Jose whether Jennifer had money problems ... and that because she did not qualify for a job reclassification she had to obtain a second mortgage on her home. Note that at this point in the interview, Ms. Chinn's rapid-fire, leading questions seemed to confuse Jose who was unable to answer any question before another was asked of him.

Jose stated that Jennifer's application for reclassification did not accurately reflect her true duties and responsibilities ... and that Jennifer did not speak to him for two to three (2-3) weeks after he denied her request. Jose asked Ted Sexton to "make a change" regarding Jennifer's position as his assistant.

Ms. Chinn then asked Pat Swan whether he had taken notes during the original (12-14-05) interview, to which Pat Swan replied that he had. Ms. Chinn stated that she may need to access those notes later, then stated (to Pat Swan and John Gamberzky) that "you collected records behind my client's back".

Pat Swan asked Jose who else besides Jennifer Hamilton had made allegations against him ... to which Ms. Chinn replied by instructing Jose not to answer.

At this point, Pat Swan informed Ms. Chinn that he had nothing further to ask and would conclude the interview.

Interview times were approximately 12:00 p.m. to 2:45 p.m.

End of Memo.

:\Luce-EPS-airport.JH ivw 12.29.05.Memo

3525 Del Mar Heights Road #314 • San Diego, CA 92130 • (760) 473-4993 • Fax (760) 736-8366
JohnGambPI@yahoo.com • California P.I. 16423

8

SDRAA 159

53-611 (404)

E

SDRAA 160

53-611 (405)



SDRAA 161

53-611 (406)

**EXHIBIT 5**



# SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## INTEROFFICE MEMORANDUM

**Date:**      February 3, 2005

**To:**        Designated Employees

**From:**      Tony R. Russell, Director, Corporate Services/Authority Clerk

**Subject:**   Annual Statement of Economic Interests Filing

---

The San Diego County Regional Airport Authority's Conflict of Interest Code requires that certain designated employees file an Annual Statement of Economic Interests. Your Annual Statement of Economic Interests is due in my office on Thursday, February 17, 2005, by 5:00 p.m. I encourage you to complete your Form 700 and return it as soon as possible.

Enclosed you will find a copy of the Authority's Conflict of Interest Code; a copy of the filing categories; Form 700, with instructions; and a Fact Sheet entitled "Your Duty to File."

Please be sure to:

- Fill in your daytime telephone number and your address, street, city, and Zip Code.

- Complete the schedules for which you have reportable interests and check the "Yes" box on the cover sheet for each schedule you complete. Attach only those schedules for which you have reportable interests.

- If you have no reportable interests (have completed no schedules), check the box stating, "No Reportable Interests."

- Fill in the total number of pages.

- Sign and date the verification.

**53-611 (408)**

Annual Statement of Economic Interests
February 3, 2005
Page 2

For answers to specific questions regarding your filings, I recommend you call the Fair Political Practices Commission directly, Mondays through Fridays at (916) 322-5660 or 1-866-ASK FPPC. The Fair Political Practices Commission now provides electronic access to Form 700 with instructions. You can access the forms at:

http://www.fppc.ca.gov/fppc/

If you require additional forms, or if I can be of further assistance, please do not hesitate to call me at x 2551.

TRR:mcs

Attachments



SAN DIEGO
INTERNATIONAL
AIRPORT

53-611 (409)

# SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## CODES

| | | |
|---|---|---|
| **ARTICLE 2** | - | **ETHICS** |
| **PART 2.3** | - | **CONFLICTS OF INTEREST** |
| **SECTION 2.30** | - | **CONFLICTS OF INTEREST** |

---

(a)    The California Political Reform Act, Government Code Sections 81000, *et seq.*, requires state and local government agencies to adopt and promulgate Conflict of Interest Codes. The Fair Political Practices Commission has adopted a regulation, 2 Cal. Code of Regs. Section 18730, which contains the terms of a standard model Conflict of Interest Code, which can be incorporated by reference, and which may be amended by the Fair Political Practices Commission to conform to amendments in the California Political Reform Act after public notice and hearings. Therefore, the terms of 2 Cal. Code of Regs. Section 18730 and any amendments to it duly adopted by the Fair Political Practices Commission along with the attached Appendix in which officials and employees are designated and disclosure categories are set forth, are hereby incorporated by reference and constitute the Conflict of Interest Code of the San Diego County Regional Airport Authority (the "Authority").

(b)    Designated employees shall file statements of economic interests with the Clerk of the Authority (the "Clerk"), which will make the statements available for public inspection and reproduction. (Gov. Code Section 81008). Upon receipt of the statements of economic interest filed by designated employees, the Clerk shall date stamp and retain the original statements and forward a copy to the Clerk of the San Diego County Board of Supervisors.

(c)    Appendices

(1)    Appendix A - Designated Employee Positions

| LIST OF DESIGNATED POSITIONS | ASSIGNED DISCLOSURE CATEGORY |
|---|---|
| Board Member | 1 |
| Advisory Committee Member | 1 |
| President/CEO (Executive Director) | 1 |
| General Counsel | 1 |
| Chief Auditor | 1 |
| Vice President, Administration | 1 |
| Vice President, Development | 1 |
| Vice President, Finance/Treasurer | 1 |
| Vice President, Marketing & Communications | 1 |
| Vice President, Operations | 1 |
| Vice President, Strategic Planning | 1 |

53-611 (410)



CODE SECTION NO. 2.30

| | |
|---|---|
| Director, Facilities Development | 4,5 |
| Director, Financial Planning | 5 |
| Director, Information Technology | 5 |
| Senior Attorney | 1 |
| Director, Accounting | 5 |
| Director, Airport Security & Public Safety | 5 |
| Director, Facilities Maintenance | 4,5 |
| Director, Inter-Governmental Affairs | 5 |
| Director, Human Resources | 5 |
| Director, Marketing & Route Service Development | 5 |
| Director, Real Estate Management | 2,3,4,5 |
| Attorney | 1 |
| Director, Airport Planning | 2,4,5 |
| Director, Airport Systems Planning | 2,4,5 |
| Director, Airside Operations | 5 |
| Director, Business Planning | 5 |
| Director, Corporate Services | 5 |
| Director, Customer Service & Customer Relations | 5 |
| Director, Environmental Affairs | 3,5 |
| Director, Landside Operations | 3,4,5 |
| Director, Small & Emerging Business | 3,5 |
| Director, Procurement | 3,5 |
| Director, Public & Community Relations | 5 |
| Deputy Director, Facilities Development | 4,5 |
| Capital Projects Manager | 4,6 |
| Senior Capital Projects Manager | 4,6 |
| Deputy Director, Airport Noise Mitigation | 5 |
| Senior Engineer | 4,5 |
| Construction Manager | 4,5 |
| Database Administrator | 6 |
| Accounting Manager | 6 |
| Deputy Director, Customer Service | 6 |
| Deputy Director, Marketing | 6 |
| Deputy Director, Public & Community Relations | 6 |
| Manager, Airline Property | 3,6 |
| Manager, Airport Planning | 4,6 |
| Manager, Cargo & Airside Property | 6 |
| Manager, Concession Development | 5 |
| Manager, Environmental Affairs | 6 |
| Manager, Ground Transportation | 5 |
| Manager, Human Resources | 6 |
| Manager, Terminal Operations | 6 |
| Manager, Parking & Landside Property | 3,6 |
| Senior Project Engineer | 4,5 |
| Contract Manager, Procurement Department | 5 |

53-611 (411)



CODE SECTION NO. 2.30

| Project Architect | 6 |
|---|---|
| Project Engineer | 4,5 |
| Deputy Authority Clerk | 6 |
| Airport Planner II (Flex) | 6 |
| Associate Engineer | 4,5 |
| Auditor | 3,4,5 |
| Senior Purchasing Analyst | 5 |
| Manager, Document Control | 5 |
| Property Administrator | 2,3,4 |
| Contracts Administrator (Facilities Maintenance) | 5 |
| Quieter Home Program Coordinator | 6 |
| Senior Airport Traffic Supervisor | 3 |
| Senior Construction Inspector | 3,4 |
| Construction Inspector | 4 |
| Senior Maintenance Project Inspector | 3,4 |
| Maintenance Project Inspector | 3,4 |
| Assistant Purchasing Analyst | 5 |
| Code Compliance Investigator | 3,5 |
| Consultant* | 1** |

\* Consultants are persons who meet the definition found in 2 Cal. Code of Regs. Section 18701(a)(2).

\*\* Consultants shall disclose pursuant to Category 1, the broadest disclosure category in this Conflict of Interest Code, unless the Executive Director determines in writing that a particular consultant, although a designated employee, is hired to perform a range of duties that are limited in scope and thus is not required to comply with the disclosure requirements described in this Appendix. Such determination shall include a description of the consultant's duties and, based upon that description, a statement of the extent of disclosure requirements. The determination of the Executive Director is a public record and shall be retained for public inspection in the same manner and location as this Conflict of Interest Code. Nothing herein excuses any such consultant from any other provision of this Conflict of Interest Code.

53-611 (412)

(2) Appendix B - Disclosure Categories

General Provisions. The San Diego County Regional Airport Authority has jurisdiction throughout the County of San Diego. Accordingly, when a designated employee or individual is required to disclose investments, business positions, and sources of income, he or she need only disclose investments in business entities and sources of income that do business in the County of San Diego, plan to do business in the County of San Diego, or have done business in the County of San Diego within the past two years. In addition to other activities, a business entity is doing business within the County of San Diego if it owns real property within the County of San Diego. When a designated employee or individual is required to disclose real property, he or she need only disclose that which is located in whole or in part within or not more than two miles outside the boundaries of the County of San Diego or within two miles of any land owned or used by the San Diego County Regional Airport Authority.

Category 1. All investments, business positions, interests in real property and sources of income.

Category 2. All interests in real property.

Category 3. All investments, business positions, interests in real property and sources of income subject to the regulatory, permit or licensing authority of the San Diego County Regional Airport Authority.

Category 4. Investments in business entities and sources of income that engage in land development, construction, or the acquisition of real property.

Category 5. Investments in business entities and sources of income of the type that contracts with the San Diego County Regional Airport Authority to provide services, supplies, materials, machinery or equipment to any department of the San Diego County Regional Airport Authority.

Category 6. Investments in business entities and sources of income of the type that contracts with the San Diego County Regional Airport Authority to provide to the designated employee's department services, supplies, materials, machinery or equipment.

[Amended by Resolution No. 2004-0097 dated October 4, 2004.]
[Resolution No. 2002-02 dated September 20, 2002.]

53-611 (413)

## CONFLICT OF INTEREST CODE DISCLOSURE CATEGORIES

Category 1.  All investments, business positions, interests in real property and sources of income.

Category 2.  All interests in real property.

Category 3.  All investments, business positions, interests in real property and sources of income subject to the regulatory, permit or licensing authority of the San Diego County Regional Airport Authority.

Category 4.  Investments in business entities and sources of income that engage in land development, construction, or the acquisition of real property.

Category 5.  Investments in business entities and sources of income of the type that contracts with the San Diego County Regional Airport Authority to provide services, supplies, materials, machinery or equipment to any department of the San Diego County Regional Airport Authority.

Category 6.  Investments in business entities and sources of income of the type that contracts with the San Diego County Regional Airport Authority to provide to the designated employee's department services, supplies, materials, machinery or equipment.

**53-611 (414)**

# *Your Duty To File*

## A Basic Overview
## of State Economic Disclosure Law
## And Reporting Requirements
## For Public Officials



## Fair Political Practices Commission
### 428 J Street, Suite 620
### Sacramento, CA 95814
### Toll-free advice line: 1 (866) ASK-FPPC
### Web site: *www.fppc.ca.gov*

53-611 (415)

## A Basic Overview of State Economic Disclosure Law And Reporting Requirements

### Introduction

The Political Reform Act of 1974 (Gov. Code sections 81000-91014) requires many state and local public officials and employees to disclose certain personal financial holdings. The Act, which frequently has been amended, began as a ballot initiative approved by over 70 percent of California voters in the wake of the Watergate political scandals.

One of the Act's stated purposes declares:

*Assets and income of public officials which may be materially affected by their official actions should be disclosed and in appropriate circumstances the officials should be disqualified from acting in order that conflicts of interest may be avoided. (Cal. Gov't. Code section 81002(c).)*

In its findings and declarations, the Act adds:

*Public officials, whether elected or appointed, should perform their duties in an impartial manner, free from bias caused by their own financial interests or the financial interests of persons who have supported them. (Cal. Gov't. Code section 81001(b).)*

The Act and its practical implementation have a broad reach across California



Chart 1

government. Many tens of thousands of public workers, ranging from the governor to local department heads to board and commission members, are required to file public, personal financial disclosure reports known as "statements of economic interests."

The Act establishes a complex, decentralized system of managing this disclosure in which each state and local government agency is required to adopt and implement a separate conflict-of-interest code. The administration of this decentralized system is divided between the Fair Political Practices Commission and re-

53-611 (416)

FPPC

sponsible officials at more than 7,000 state and local agencies.

Employees and officeholders at virtually all state and local agencies, as well as candidates for public office, use the Fair Political Practices Commission's *form 700* to file their statements of economic interests. The statements are sometimes informally referred to as "SEIs," "700s" or "conflict-of-interest statements." The form is available from your agency or in an interactive version on the FPPC web site. Form 700 amendment schedules, also available from your agency and the web site, are used to file amendments to a previously filed statement.

Most of these forms are not filed directly with the FPPC. Rather, they are filed with the agency's filing officer or filing official, or, in the case of candidates, with election offices or local clerk offices. In some cases, the agency will forward the original form to the FPPC while retaining a copy.

Filers must sign the form 700 under penalty of perjury (see section 81004 of the Act). Once filed, the form is a public document and must be made available to the public on request (section 81008). Public officials are generally not required to list their home addresses or home telephone numbers on the form.

The forms alert public officials about their own economic interests and potential areas of conflict in relation to their duties, and provide information to members of the public who may monitor official actions for any conflicts.

*While sometimes popularly called "conflict-of-interest statements," the forms list only personal financial interests and don't in themselves disclose any conflicts of interests. Any conflict of interest under the Political Reform Act can only come about if a public official makes or participates in making a government decision that has a reasonably foreseeable material financial effect on the official's personal financial interests. Also, the law does not require all relevant personal financial interests (such as ownership of a personal residence in most cases) to be disclosed on the statement of economic interests.*

The form 700 includes extensive instructions on how to fill it out. Your agency or the FPPC can provide individual help if you have further questions about the form, or where and when to file it.

The FPPC and agencies have the authority to levy penalties when a statement of economic interests is not filed on time. The FPPC also has the authority to levy administrative fines of up to $5,000 per violation of the Political Reform Act, or to seek civil penalties in the courts. The FPPC does not have the power to bring criminal charges but may refer cases to another law enforcement authority such as a district attorney.



---

- - -

53-611 (417)

## Who must disclose?

The Act establishes two categories of public officials and employees who must disclose their personal financial interests. See Chart 1 on Page 1 for a basic diagram of how the law works.

### I. Officials required to disclose under section 87200 of the Government Code

Section 87200 contains a specific list of officials, including high-ranking elected officeholders, who are subject to the most extensive disclosure requirements under the Act. These officials are listed in Chart 2, found in the right column of this page.

Officials specified in section 87200, and candidates for the elective offices specified in section 87200, must file form 700 periodically to disclose certain investments, interests in real property, sources of income, gifts, loans and business positions. These officials are sometimes informally referred to as "87200 filers."

### II. Officials and employees required to disclose under section 87300

Every state and local government agency is required to adopt a "conflict-of-interest code" under the Act (see Cal. Gov't. Code section 87300). The Act lists the provisions required for such codes (section 87302) and requires that each code be approved by a "code reviewing body" (section 87303).

---

**Chart 2 — Officials required to file disclosure statements under section 87200 of the Cal. Gov't. Code**

**State Offices:**
Governor
Lieutenant governor
Attorney general
Controller
Insurance commissioner
Secretary of state
Treasurer
Members of the state legislature
Superintendent of public instruction
State Board of Equalization members
Public utilities commissioners
State energy resources conservation and development commissioners
State coastal commissioners
Elected CalPERS board members
Fair Political Practices Commission members
State public officials who manage public investments

**Judicial Offices:**
Supreme, appellate and superior court judges
Court commissioners
Retired and pro-tem judges, part-time court commissioners

**County and city offices:**
Members of boards of supervisors
Mayors and members of city councils
Chief administrative officers
District attorneys
County counsels
City attorneys
City managers
Planning commissioners
County and city treasurers
County and city public officials who manage public investments

---

53-611 (418)

**FPPC**

The law requires this decentralized system. Section 87301 states:

> It is the policy of this act that Conflict of Interest Codes shall be formulated at the most decentralized level possible, but without precluding intradepartmental review. Any question of the level of a department which should be deemed an "agency" for purposes of Section 87300 shall be resolved by the code reviewing body.

When an agency adopts or amends its conflict-of-interest code, how does it determine which agency positions are covered under the code and which are not?

Each agency conflict-of-interest code must designate, or include, the employee positions within that agency "which involve the making or participation in the making of decisions which may foreseeably have a material effect on any financial interest" of the employee (section 87302(a)).

These officials and employees must file form 700 periodically and disclose certain investments, interests in real property, sources of income, gifts, loans and business positions. These filers are sometimes informally referred to as "designated employees" or "code filers."

In some cases, consultants to government agencies are required to file statements of economic interests under agency conflict-of-interest codes. Generally speaking, consultants who perform the duties of a government employee over a significant period of time, or who make or participate — without significant intervening review — in the making of government decisions, may be required to file (See FPPC Regulation 18701).

Every state and local government official, employee and consultant _must_ refrain from making or participating in a government decision that has a reasonably foreseeable material financial effect on his or her personal financial interests, _regardless of whether the individual is required to file a statement of economic interests._

Unlike the officials who must disclose under section 87200 of the Act, certain employees designated under agency conflict-of-interest codes may have to make only limited disclosures of their financial interests. The amount of disclosure will depend upon their duties. In general, those employees in positions with broader decision-making authority will have to provide broader disclosure of their personal financial interests.

Agencies must amend their conflict-of-interest codes when necessary to add or delete designated positions and disclosure categories. Conflict-of-interest codes are reviewed every two years. If an employee believes the amount of disclosure required for his or her position should be revised, those concerns can be addressed by the agency, including during the review process.

The FPPC reviews conflict-of-interest codes for all state agencies and all multi-

1   FRED M. PLEVIN (SBN 126185)
    SANDRA L. MCDONOUGH (SBN 193308)
2   ALBERT R. LIMBERG (SBN 211110)
    **PAUL, PLEVIN, SULLIVAN &**
3   **CONNAUGHTON** LLP
    401 B Street, Tenth Floor
4   San Diego, California 92101-4232
    Telephone: 619-237-5200
5   Facsimile: 619-615-0700

6   AMY S. GONZALEZ (SBN 181745)
    **SAN DIEGO COUNTY REGIONAL AIRPORT**
7   **AUTHORITY**
    3225 N. Harbor Drive
8   San Diego, CA 92138
    Telephone:  (619) 400-2425
9   Facsimile: (619) 400-2428

10

    Attorneys for Defendant
11  SAN DIEGO COUNTY REGIONAL AIRPORT
    AUTHORITY

12

13              UNITED STATES DISTRICT COURT

14           SOUTHERN DISTRICT OF CALIFORNIA

15  JOSE HERNANDEZ,                    CASE NO.

16          Plaintiff,                 **NOTICE OF REMOVAL OF ACTION:**
                                       **UNDER 28 U.S.C. § 1442(B)**
17      v.                             **(FEDERAL QUESTION)**

18  SAN DIEGO COUNTY
    REGIONAL AIRPORT
19  AUTHORITY, a public entity; and
    DOES 1 through 12, inclusive,      **EXHIBIT 53**
20                                     **[pps 611(420-843)]**
            Defendants.
21

22  ///

23  ///

24  ///

25

26

27

28

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP        NOTICE OF REMOVAL                    1

**FILED**

JAN 3 0 2008

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

08 CV 0184 L CAB

**FPPC**

county agencies – approximately 1,000 codes. Codes adopted by other local agencies are reviewed by the appropriate county board of supervisors or city council, depending upon the jurisdiction of the agency (see section 82011).

The FPPC has adopted regulations to assist agencies in adopting conflict-of-interest codes. All state agencies and most local agencies now use a regulation (FPPC Regulation 18730) as the body of their indi-

vidual conflict-of-interest codes, with each agency adding its individual list of designated employees and the types of disclosure required of different employee positions. This regulation can be found on the FPPC web site, *www.fppc.ca.gov*. FPPC staff members also provide assistance or training on conflict-of-interest codes to local and state agencies and code-reviewing bodies. Check the FPPC web site or call 1-866-ASK-FPPC for a schedule of upcoming training seminars.

---

### Chart 3 — Examples of where form 700 is filed:

- City Councilperson Rodriguez must disclose under section 87200 of the Political Reform Act. She files her form 700 with the city clerk (filing *official*), who retains a copy and forwards the original to the FPPC (filing *officer*). The city clerk also receives and retains forms filed by employees of city agencies who have been designated in the city's conflict-of-interest code. For the employees' forms, the city clerk is the filing *officer*.

- State Senator Smith is an official specified in Gov. Code section 87200. She files her form 700 with the secretary of the senate (filing *official*), who retains a copy and forwards the original to the FPPC (filing officer).

- The Department of Social Services is a state agency and has adopted a conflict-of-interest code designating those positions within the agency that must file form 700. The code requires the forms to be filed with the agency. However, the code also states that the personnel division will retain a copy of the form filed by the agency director and forward the original to the FPPC. The personnel division is the filing *officer* for forms filed by the employees and is the filing *official* for the director. The FPPC is the filing *officer* for the director.

- Chief Jones occupies a position designated by the conflict-of-interest code adopted by the Siskiyou County Fire Services District, a local government agency. The form 700s from Jones and the district's elected board members are filed with and retained by the county. As set out in the conflict-of-interest code, forms filed by all other designated employees are filed with and retained by the district.

---

Fair Political Practices Commission　　5　　*Your Duty To File* (revised 09/04)

53-611 (420)

## An outline of the disclosure process — Chart 4

1. **Two types of filers:**
   — "87200 filers" whose positions are listed in Gov. code section 87200
   — "Designated officials" — state and local government agencies are required to adopt a conflict-of-interest code and designate decision makers who file disclosure statements

2. **Types of statements filed on form 700:**
   — Assuming office/initial
   — Annual
   — Leaving Office
   — Candidate
   — Amended statements

3. **Places to file the form:**
   — Section 87200 filers file with their state, city or county agency, which in most cases retains a copy and forwards the original to the FPPC
   — "Designated officials" file their forms with their agency
      1) Most of these originals retained by agency
      2) Some originals forwarded to the FPPC (such as state department heads, board and commission members, selected multi-county agencies) with copies retained by the agency
      3) Senate and Assembly staff members file directly with the FPPC
   — Candidate statements are filed with the appropriate election official, such as the local registrar of voters or clerk

4. **Filing officers and filing officials**
   — Filing *officer* retains original statements
      1) Supplies forms, notifies filers
      2) Logs statements, notifies non-filers
      3) Reviews statements and requests amendments
      4) Imposes late filing penalties
      5) Provides public access
   — Filing *official* retains copy and forwards original to filing officer
      1) Supplies forms, notifies filers
      2) Sends names of filers to filing officers
      3) Logs forms sent to filing officer
      4) Provides public access to copies of forms

53-611 (421)

**FPPC**

### Where do I file my form 700?

The Act mandates a decentralized system for filing, reviewing and retaining the form 700 statements of economic interests. This system is specified in section 87500 of the Government Code. Examples can be found in Chart 3 on Page 5, and the process is outlined in Chart 4 on Page 6.

Candidates file their statements of economic interests with their election official, such as their registrar of voters or city clerk.

The vast majority of public officials and employees file their form 700 with a filing *officer* at their own agency. This person reviews, logs and files the statement, provides public access to the form and performs other duties.

In most other cases, public officials and employees file their statement with a filing *official* at their agency, who acts as an intermediary and, after making a copy, forwards the original statement to the FPPC or to a county filing officer.

The FPPC receives – and is the filing officer for – approximately 20,000 statements of economic interest filed on an intermediary basis with other agencies. These statements include the officials specified in section 87200 as well as the following:

➤ designated employees of the state senate and state assembly

➤ members appointed to state boards and commissions

➤ state department heads (agency secretaries, directors and chief deputy directors of state agencies)

➤ employees of certain multi-county agencies

Regulation 18115 explains the respective roles of filing officers and filing officials. Briefly, filing officers assess fines for late-filed statements, review all statements for facial compliance, perform an in-depth review of some statements, and refer problems to the FPPC for potential enforcement actions. The FPPC now has an expedited and streamlined enforcement program for late-filed statements of economic interests.

### Deadlines for filing statements of economic interests (form 700)

Candidates for certain elected positions must file a candidate statement prior to their election. Each type of statement has a specified "reporting period" (such as a calendar year) and is filed on the form 700 statement of economic interests.

Upon assuming his or her public office or job, an official first files an "assuming office" or "initial" statement of economic interests. After that, the official or employee files an annual statement each year until he or she leaves office, at which time a leaving office statement must be filed.

**Candidate statements:** Candidates for elective offices specified in section 87200 must file form 700 no later than the deadline for filing a declaration of candidacy to appear on a ballot. State and local elec-

---

53-611 (422)

**FPPC**

tions occur throughout the year, and filing times vary. Some local conflict-of-interest codes may require candidates for other elective offices (such as school board or city clerk) to file candidate statements. Most do not have this requirement.

**Assuming Office Statements:**

➤ *elected officials:* file 30 days after assuming office.

➤ *appointed officials under section 87200:* file 30 days after assuming office or 10 days after appointment or nomination if subject to state Senate or judicial confirmation.



➤ other appointed officials: file 30 days after assuming office or 30 days after appointment or nomination if subject to state Senate confirmation.

**Initial statements (officials whose positions are added to a new or amended conflict of interest code):** file 30 days after the effective date of the conflict-of-interest code or amendment to an existing code.

**Annual Statements:**

➤ *elected state officers; judges and court*

*commissioners; members of state boards and commissions specified in section 87200:* file on March 1.

➤ elected CalPERS board members: file on April 1.

➤ all others: file on April 1. (Some local agency conflict-of-interest codes may specify a different date.)

***Leaving office statements:*** file within 30 days of leaving office.

***Amendments:*** an amendment to a form 700 may be filed at any time—there is no deadline. A filer may submit more than one amendment.

***Expanded Statements:*** many officials hold more than one position covered under the Act and may combine all of their filing obligations on one form, with a copy containing an original signature filed with each agency.

<u>**Exceptions:**</u>

There are several exceptions to the filing deadlines:

➤ Elected state officers (newly elected) may not be required to file assuming office statements. They file a candidate

53-611 (423)

FPPC

statement, then the next annual statement.

➤ An official who completes a term of office and, within 30 days, begins a new term in the same office is not required to file a leaving or assuming office statement (such as when an elected official is reelected to the same office).

➤ An official who leaves an office and, within 30 days, assumes another position with the same agency, or in the same jurisdiction (such as when a city planning commissioner is elected mayor) is not required to file a leaving or assuming office statement.

➤ An official who assumes office between October 1 and December 31, and who properly files an assuming office statement, is not required to file the next annual statement, but will wait until the following year.

➤ A candidate who has filed an assuming office or an annual statement within 60 days prior to filing a declaration of candidacy is not required to file a candidate statement.

➤ Certain statements may be combined. For example, if an official who normally files an annual statement on March 1 leaves office between January 1 and February 28, he or she can combine the annual and leaving office statements, as long as the statement is filed by March 1.

➤ Retired judges who serve part-time, *pro tempore* judges, and part-time court commissioners are required to file form 700 only if they serve 30 days or more in a calendar year.

➤ Any deadline that falls on a Saturday, Sunday or official state holiday is automatically moved to the next business day.

### Important note

This Fair Political Practices Commission fact sheet discusses provisions of California's Political Reform Act relating to economic disclosure and reporting requirements for public officials. While we hope you find the information helpful, *you should not rely on the fact sheet alone to ensure compliance with the Act.* If you have any questions, consult the Act and FPPC regulations, your agency's filing official or legal counsel, or call the FPPC's toll-free help line at 1-866-ASK-FPPC (1-866-275-3772). This fact sheet, the Act, regulations and other important information are on our web site, *www.fppc.ca.gov.*

*A good idea –*
*Call for toll-free advice at:*
*1-866-ASK-FPPC*
*(1-866-275-3772)*

| Fair Political Practices Commission | 9 | *Your Duty To File* (revised 09/04) |



2004/2005

# FORM 700
## Statement of Economic Interests

a public document

**Fair Political Practices Commission**
428 J Street, Suite 620 • Sacramento, CA 95814
Toll-Free Advice Line: 866-ASK-FPPC • (866) 275-3772
Telephone: (916) 322-5660
*www.fppc.ca.gov*

53-611 (425)

## QUICK TIPS FOR EASIER FILING

Most questions asked by filers are answered in detail in the instructions opposite each schedule. In addition, here are some quick tips for easier filing.

### 1. Know your jurisdiction
You only have to report investments and business positions in business entities, real property, and income from sources that are located or doing business in your agency's jurisdiction. Gifts are reportable regardless of the jurisdiction. (See Appendix-9 for an explanation of jurisdiction.)

### 2. Determine your type of disclosure
Two types of public officials complete the Form 700.

- If you file this form because you hold a position listed under Gov. Code section 87200, or you are filing as a board/commission member of a newly created agency not yet covered under a conflict-of-interest code, disclose all of your economic interests in your agency's jurisdiction. (See Appendix-1 for a complete list of 87200 filers and information on newly created agencies.)

- If you file because your position is listed in a state or local agency's conflict-of-interest code, review your disclosure categories because they will describe the specific interests you must report. Obtain your disclosure categories from your agency. They are part of your agency's conflict-of-interest code, and are not contained in the Form 700.

### 3. Reporting periods
Generally speaking, you should not change the pre-printed dates on the form. Refer to Appendix-2 if you need help determining the correct reporting period for your statement.

### 4. Check your calendar
File this form by the due date. Statements that are mailed are considered filed on the date of the postmark. The law does not provide for filing deadline extensions.

Statements of 30 pages or fewer may be faxed by the deadline as long as the paper version is sent within 24 hours. The faxed version must be the same as the paper version.

### 5. Use the provided schedules
Do not attach brokerage statements or other financial documents. For further guidance, the instructions for each schedule contain a detailed list of reportable interests.

### 6. Use your computer
An interactive version of Form 700 is available on our website (*www.fppc.ca.gov*).

### 7. Review your statement
Your Form 700 is a public record. Take a second look at your statement for accuracy and completeness before it is filed.

### 8. Sign your statement
File your originally signed statement with your filing official. Keep a copy of your statement for your files. Remember that when you sign your statement, you are stating under penalty of perjury that it is true and correct.

### 9. Amendments
You may amend your statement at any time. Amendment schedules are available from your filing official, the FPPC, or on our website (*www.fppc.ca.gov*).

### 10. Call us
Call toll-free at 866-ASK-FPPC or locally at (916) 322-5660 if you need assistance.

❖ ❖ ❖ ❖ ❖ ❖

## Form 700 Public Access

Statements of Economic Interests are public documents. The filing officer must permit any member of the public to inspect and copy any statement.

- Forms are available for public inspection during the agency's regular business hours.

- No conditions may be placed on persons seeking access to the forms.

- No information or identification may be requested from persons seeking access.

- Reproduction fees of no more than 10 cents per page may be charged.

| Where to Find... |
| --- |
| ❖ Types of Statements — See Appendix-2 |
| ❖ When to File — See Appendix-3 |
| ❖ Where to File — See Appendix-3 |
| ❖ Terms and Definitions — See Appendix-5 |

# INTRODUCTION

The Political Reform Act (Gov. Code sections 81000-91015) requires most state and local government officials and employees to publicly disclose their personal assets and income. They also must disqualify themselves from participating in decisions which may affect their personal economic interests. The Fair Political Practices Commission (FPPC) is the state agency responsible for issuing the attached Statement of Economic Interests, Form 700, and for interpreting the law's provisions.

## Gift Prohibition

Most state and local officials, employees, and candidates are prohibited from accepting gifts totaling more than $360 (effective January 1, 2005) in a calendar year from a single source.

In addition, state officials, state candidates, and certain state employees are subject to a $10 limit per calendar month on gifts from lobbyists and lobbying firms registered with the Secretary of State. (See Appendix-7 for more detailed information.)

State and local officials and employees also should check with their agency to determine if any other restrictions apply.

## Honorarium Ban

Most state and local officials, employees, and candidates are prohibited from accepting an honorarium for any speech given, article published, or attendance at a conference, convention, meeting, or like gathering. (See Appendix-7 for more detailed information.)

## Loan Prohibitions

State and local public officials may not receive any personal loan totaling more than $250 from an official, employee, or consultant of, or from anyone who contracts with, their governmental agencies. In addition, elected officials may not receive any personal loan totaling more than $500 from a single lender unless certain terms of the loan are specified in writing. Under certain circumstances, a personal loan that is not being repaid or is being repaid below certain amounts may become a gift to the official who received it. (See Appendix-10 for more detailed information.)

## Disqualification

Public officials are, under certain circumstances, required to disqualify themselves from making, participating in, or attempting to influence governmental decisions that will affect their economic interests. This may include interests they are not required to disclose (for example, certain sources of income of $500 or more are not reportable, but may be disqualifying). Specific disqualification requirements apply to 87200 filers (for example, city councilmembers, members of boards of supervisors and planning commissioners). These officials must orally identify the economic interest that creates a conflict of interest and leave the room before a discussion or vote takes place at a public meeting. For more information, consult Government Code section 87105 and regulation 18702.5, or refer to the booklet entitled "Can I Vote? Conflicts of Interest Overview," all of which are available on the FPPC website. Visit *www.fppc.ca.gov* and click on the Library & Publications icon.

## Post-Governmental Employment

Members of the State Legislature and certain state agency officials and employees who leave office are subject to restrictions on representing clients or employers before their former agencies. For more information, refer to the fact sheet entitled "Leaving Your State Job? Post-Employment Restrictions May Affect You," available on the FPPC website.

## Registered Domestic Partners (Effective January 1, 2005)

When reporting activity for the year 2005, filers must report investments and interests in real property held by, and sources of income to, registered domestic partners. In most cases this will apply to assuming or leaving office statements. (*In re Roberts* (2004) 17 FPPC Ops. 9.)

## Federal Employees (Effective January 1, 2005)

A federal officer or employee serving in an official federal capacity on a state or local government agency is not required to fill out the Form 700. (SB 1353, Chapter 484, Stats. 2004.)

## Late Filing

The filing officer who retains originally signed statements of economic interests may impose a fine for any statement that is filed late. The fine is $10 per day up to a maximum of $100. Late filing penalties can be reduced or waived under certain circumstances.

Persons who fail to timely file their Form 700 may be referred to the FPPC's enforcement division (and in some cases to the Attorney General or district attorney) for investigation and possible prosecution. In addition to the late filing penalties, a fine of up to $5,000 per violation may be imposed.

For assistance concerning reporting, prohibitions, and restrictions under the Act:

- Call the FPPC toll-free at (866) ASK-FPPC.
- See the booklet entitled "Your Duty to File: A Basic Overview of State Economic Disclosure Law and Reporting Requirements for Public Officials."

# INSTRUCTIONS — COVER PAGE

Enter your name, mailing address, and daytime telephone number in the spaces provided. Because the Form 700 is a document available for public review, you may list your business/office address instead of your home address.

**Part 1. Office, Agency, or Court**

- Enter the name of the office sought or held, or the agency or court. (Examples: State Assembly; Board of Supervisors; Office of the Mayor; Department of Finance; Hope County Superior Court.)

- Indicate the name of your division, board, or district, if applicable. (Examples: Division of Waste Management; Board of Accountancy; District 45.)

- Enter your position title. (Examples: Director; Chief Counsel; City Council Member; Staff Services Analyst.)

- If you hold multiple positions (for example, a city council member who also is a member of a county board or commission), you may be required to file statements with each agency.

  To simplify your filing obligations, you may complete an expanded statement.

  To do this, enter the name of the other agency(ies) with which you are required to file and your position title(s) in the space provided. Attach an additional sheet if necessary. Complete one statement covering the disclosure requirements for all positions. Each copy must contain an original signature. Therefore, before signing a statement make a copy for each agency. Sign each copy with an original signature and file with each agency.

  Remember that if you assume or leave a position after a filing deadline, you must complete a separate statement. For example, a city council member who assumes a position with a county special district after the April 1 annual filing deadline must file a separate assuming office statement. In subsequent years, the city council member may expand his or her annual filing to include both positions.

**Part 2. Jurisdiction of Office**

- Check the box indicating the jurisdiction of your agency and, if applicable, identify the jurisdiction. Judges, judicial candidates, and court commissioners have statewide jurisdiction. All other filers should review Appendix-9 to determine their jurisdiction.

- If your agency is a multi-county office, list each county in which your agency has jurisdiction.

- If your agency is other than a state office, court, county office, city office, or multi-county office (for example, school districts and special districts), check

the "other" box and enter the county or city in which the agency has jurisdiction.

**Example:**
This filer is a member of a water district board with jurisdiction in a portion of Sutter County.

| 1. Office, Agency, or Court |
|---|
| Name of Office, Agency, or Court |
| South Sutter Water District |
| Division, Board, District, if applicable |
| |
| Position |
| Board member |
| ➤ If filing for multiple positions, list additional agency(ies)/ position(s) (Attach a separate sheet if necessary) |
| Agency: |
| Position: |

| 2. Jurisdiction of Office (check at least one box) |
|---|
| ☐ State |
| ☐ County of _____ |
| ☐ City of _____ |
| ☐ Multi-County _____ |
| ☑ Other ___ Sutter County ___ |

**Part 3. Type of Statement**

Check at least one box. The period covered by a statement is determined by the type of statement you are filing. If you are completing a 2004 Annual Statement, do not change the pre-printed dates to reflect 2005. Your annual statement is used for reporting the previous year's economic interests. Economic interests for your annual filing covering January 1, 2005, through December 31, 2005, will be disclosed on your statement filed in 2006. (See Appendix-2 for detailed information about types of statements.)

Combining Statements: Certain types of statements may be combined. For example, if you leave office after January 1 but before the deadline for filing your annual statement, you may combine your annual and leaving office statements. File by the earliest deadline. Consult your filing officer or the FPPC.

**Part 4. Schedule Summary**

- Check the "Yes" box for each schedule you use to disclose interests.

  - or -

  If you have nothing to disclose on any schedules, check the "No reportable interests" box. Please do not attach any blank schedules.

- Enter the total number of completed pages including the cover page.

**Part 5. Verification**

Complete the verification by signing the statement and entering the date signed. When you sign your statement, you are stating, under penalty of perjury, that it is true and correct. An unsigned statement is not considered filed and you are subject to late filing penalties.

53-611 (428)

**CALIFORNIA FORM 700**
FAIR POLITICAL PRACTICES COMMISSION

**STATEMENT OF ECONOMIC INTERESTS**

**COVER PAGE**

Date Received
Official Use Only

*Please type or print in ink*

*A Public Document*

| NAME (LAST) | (FIRST) | (MIDDLE) | DAYTIME TELEPHONE NUMBER |
|---|---|---|---|
| MAILING ADDRESS STREET (May use business address) | CITY | STATE ZIP CODE | ( ) OPTIONAL: FAX / E-MAIL ADDRESS |

## 1. Office, Agency, or Court

Name of Office, Agency, or Court:

Division, Board, District, if applicable:

Your Position:

➡ If filing for multiple positions, list additional agency(ies)/ position(s): (Attach a separate sheet if necessary.)

Agency: _____

Position: _____

## 2. Jurisdiction of Office (Check at least one box)

☐ State
☐ County of _____
☐ City of _____
☐ Multi-County _____
☐ Other _____

## 3. Type of Statement (Check at least one box)

☐ Assuming Office/Initial    Date: ___/___/___

☐ Annual: The period covered is January 1, 2004, through December 31, 2004.

-or-

○ The period covered is ___/___/___ through December 31, 2004.

☐ Leaving Office  Date Left: ___/___/___
(Check one)

○ The period covered is January 1, 2004, through the date of leaving office.

-or-

○ The period covered is ___/___/___, through the date of leaving office.

☐ Candidate

## 4. Schedule Summary
*(Check applicable schedules or "No reportable interests.")*

➡ During the reporting period, did you have any reportable interests to disclose on:

Schedule A-1   ☐ Yes – schedule attached
*Investments (Less than 10% Ownership)*

Schedule A-2   ☐ Yes – schedule attached
*Investments (10% or greater Ownership)*

Schedule B   ☐ Yes – schedule attached
*Real Property*

Schedule C   ☐ Yes – schedule attached
*Income, Loans, & Business Positions (Income Other than Gifts and Travel Payments)*

Schedule D (Eliminated – report loans on Schedule C)

Schedule E   ☐ Yes – schedule attached
*Income – Gifts*

Schedule F   ☐ Yes – schedule attached
*Income – Travel Payments*

-or-

➡ ☐ No reportable interests on any schedule

Total number of pages
completed including this cover page: _____

## 5. Verification

I have used all reasonable diligence in preparing this statement. I have reviewed this statement and to the best of my knowledge the information contained herein and in any attached schedules is true and complete.

I certify under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date Signed _____
(month, day, year)

Signature _____
(File the originally signed statement with your filing official.)

FPPC Form 700 (2004/2005)
FPPC Toll-Free Helpline: 866/ASK-FPPC

**53-611 (429)**

## WHAT SCHEDULE DO I USE TO REPORT?

Business positions .................................................................................................. Schedule A-2 or Schedule C

Commission income .............................................................................. Schedule A-2 or Schedule C (see Appendix-5)

Gifts received by family members ................................................. Disclosure may not be required, see Schedule E

Gifts received from family members ........................................................ Disclosure not required, see Schedule E

Income to my business .............................................................................................................. Schedule A-2

Individual Retirement Account ................................................. Schedule A-1 or Schedule B (see Appendix-10)

Investments ................................................................................................................. Schedule A-1 or Schedule A-2

Loans made to others ................................................ Disclosure not required, but report repayments on Schedule C

Loans received .................................................................. Schedule B for real property or Schedule C

Loans to my business ............................................................................................................... Schedule A-2

Owning a business or partnership
   If I own less than 10% .......................................................................................................... Schedule A-1
   If I own 10% or more .............................................................................................................. Schedule A-2

Real estate holdings ................................................ Schedule B (Schedule A-2 if held by a business entity/trust)

Rental income ................................................................................................... Schedule B or Schedule C

Rental property ................................................ Schedule B (Schedule A-2 if held by a business entity/trust)

Sale of my home/automobile/boat ........................................................................................... Schedule C

Sole proprietorship ..................................................................................................................... Schedule A-2

Spouse's or registered domestic partner's income ............................................. Schedule A-2 or Schedule C

Stock holdings
   If I own less than 10% of a company's stock ................................................................. Schedule A-1
   If I own 10% or more of a company's stock ................................................................... Schedule A-2

Tickets and passes ...................................................................................................................... Schedule E

Travel reimbursements or payments .......................................................................................... Schedule F

Trusts ........................................................................................................... Schedule A-2 (see Appendix-11)

53-611 (430)

## QUESTIONS AND ANSWERS

Q. I hold two other board positions in addition to my position with the county. Must I file three statements of economic interests?

A. Yes. However, you may complete one statement listing the county and the two boards on the cover page of the Form 700 as the agencies for which you will be filing. Report your economic interests using the broadest jurisdiction and disclosure requirements assigned to you by the three agencies. Make two copies of the entire statement before signing it, sign each copy with an original signature, and distribute one original to the county and to each of the two boards. Remember to complete separate statements for positions that you leave or assume during the year.

Q. How do I disclose my spouse's or registered domestic partner's income from an employer?

A. Report the name of the employer as a source of income on Schedule C. Beginning in 2005, filers must report the income received by a registered domestic partner. Therefore, this new requirement will affect assuming and leaving office statements filed in 2005. Because the 2004 annual statement covers income received in 2004, income from a registered domestic partner is not required to be reported on an annual statement.

Q. I am classified as a department head but recently began acting as city manager. Should I file as the city manager?

A. Yes. File an assuming office statement as city manager. Persons serving as "acting" or "interim" or "alternate" must file as if they hold the position.

Q. I left one state agency to work for another state agency. Must I file a leaving office statement?

A. Yes.

Q. I have an investment interest in shares of stock in a company that does not have an office in my jurisdiction. Must I still disclose my investment interest in this company?

A. Probably. The definition of "doing business in the jurisdiction" is not limited to whether the business has an office in your jurisdiction. See Appendix-9 for guidance.

Q. My spouse and I have a living trust. The trust holds rental property in my jurisdiction, our primary residence, and investments in diversified mutual funds. I have full disclosure. How is this trust disclosed?

A. Disclose the name of the trust, the rental property and its income on Schedule A-2. Your primary residence and investments in diversified mutual funds registered with the SEC are not reportable.

Q. I believe I am not required to disclose the names of clients from whom my pro rata share of income is $10,000 or more on Schedule A-2 because of their right to privacy. Is there an exception for reporting clients' names?

A. Regulation 18740 provides a procedure in which a client's name may not be disclosed if disclosure of the name would violate a legally recognized privilege under California law. This regulation may be obtained from our website at *www.fppc.ca.gov*.

Q. I am the sole owner of my business. Where do I disclose my income - on Schedule A-2 or C?

A. Sources of income to a business in which you have an ownership interest of 10% or greater are disclosed on Schedule A-2. See Appendix-6 which defines "business entity" for more information.

Q. I am required to report all investments. I hold many stocks through an account managed by a brokerage firm. Must I disclose these stocks even though I did not decide which stocks to purchase?

A. Yes, you must disclose on Schedule A-1 or A-2 any stock worth $2,000 or more in a business entity located or doing business in your jurisdiction.

Q. If I receive a gift of two tickets to a concert valued at $100 each, but gave the tickets to a friend because I could not attend the concert, do I have any reporting obligations?

A. Yes. Since you accepted the gift and exercised direction and control of the use of the tickets, you must disclose the gift on Schedule E.

53-611 (431)

# INSTRUCTIONS – SCHEDULES A-1 AND A-2
# INVESTMENTS

"Investment" means a financial interest in any business entity which is located in, doing business in, planning to do business in, or which has done business during the previous two years in your agency's jurisdiction (see Appendix-9) in which you, your spouse or registered domestic partner, or your dependent children had a direct, indirect, or beneficial interest totaling $2,000 or more at any time during the reporting period. (Filers must report investments of a registered domestic partner if the reporting period covers activity in 2005.)

**Reportable investments include:**
- Stocks, bonds, warrants, and options, including those held in margin or brokerage accounts
- Sole proprietorships
- Your own business or your spouse's or registered domestic partner's business (see Appendix-5 for the definition of business entity)
- Your spouse's or registered domestic partner's investments that are legally separate property
- Partnerships (for example, a law firm or family farm)
- Investments in reportable business entities held in a retirement account (see Appendix-11)
- If you, your spouse or registered domestic partner, or dependent children had a 10% or greater ownership interest in a business entity or trust (including a living trust), you must disclose investments held by the business entity or trust. (See Appendix-11 for more information on disclosing trusts.)
- Business trusts

**You are not required to disclose:**
- Diversified mutual funds registered with the Securities and Exchange Commission (SEC) under the Investment Company Act of 1940
- Bank accounts, savings accounts, and money market accounts
- Insurance policies
- Annuities
- Shares in a credit union

---

**REMINDERS**
- Do you know your agency's jurisdiction?
- Did you hold investments at any time during the period covered by this statement?
- Code filers – Your disclosure categories may require disclosure only of specific investments.

---

- Government bonds (including municipal bonds)
- Retirement accounts invested in non-reportable interests (for example, insurance policies, diversified mutual funds, or government bonds – see Appendix-9)
- Defined benefit pension plans and profit sharing plans qualified under Internal Revenue Code section 401(a)
- Interests held in a blind trust (see Appendix-11)

**Use Schedule A-1** to report investments if your ownership interest in the entity was less than 10% (for example, stock). You also may be required to complete Schedule C to indicate gross income received. (See second example below.)

**Use Schedule A-2** to report investments in which your ownership interest in the entity was 10% or greater (for example, a sole proprietorship).

**TO COMPLETE SCHEDULE A-1:**
*Do not attach brokerage or financial statements.*
- Disclose the name of the business entity.
- Provide a general description of the business activity of the entity (for example, pharmaceuticals, computers, automobile manufacturing, or communications).
- Check the box indicating the highest fair market value of your investment during the reporting period. If you are filing a candidate or an assuming office statement, indicate the fair market value on the filing date or the date you took office, respectively.
- Identify the nature of your investment (for example, stocks, warrants, options, or bonds).
- If you initially acquired or disposed of your entire investment interest during the reporting period, enter the date acquired or disposed.

**Examples:**
John Smith left his state position in February 2005. His conflict-of-interest code requires full disclosure of investments. John must disclose his stock holdings of $2,000 or more in any company that does business in California as well as those stocks held by his spouse or registered domestic partner and dependent children.

Susan Jones is a city council member. She has a 4% interest, worth $5,000, in a limited partnership located in the city. Susan must disclose the partnership on Schedule A-1 and income of $500 or more received from the partnership on Schedule C.

FPPC Form 700 (2004/2005)
FPPC Toll-Free Helpline: 866/ASK-FPPC

Instructions-4

## SCHEDULE A-1
### Investments
### Stocks, Bonds, and Other Interests
(Ownership Interest Is Less Than 10%)
*Do not attach brokerage or financial statements.*



CALIFORNIA FORM **700**
FAIR POLITICAL PRACTICES COMMISSION

Name _____

---

➤ **NAME OF BUSINESS ENTITY**

**GENERAL DESCRIPTION OF BUSINESS ACTIVITY**

**FAIR MARKET VALUE**
- ☐ $2,000 – $10,000
- ☐ $100,001 – $1,000,000
- ☐ $10,001 – $100,000
- ☐ Over $1,000,000

**NATURE OF INVESTMENT**
- ☐ Stock
- ☐ Other _____
  (Describe)

IF APPLICABLE, LIST DATE:
___/___/ 04          ___/___/ 04
ACQUIRED           DISPOSED

➤ **NAME OF BUSINESS ENTITY**

**GENERAL DESCRIPTION OF BUSINESS ACTIVITY**

**FAIR MARKET VALUE**
- ☐ $2,000 – $10,000
- ☐ $100,001 – $1,000,000
- ☐ $10,001 – $100,000
- ☐ Over $1,000,000

**NATURE OF INVESTMENT**
- ☐ Stock
- ☐ Other _____
  (Describe)

IF APPLICABLE, LIST DATE:
___/___/ 04          ___/___/ 04
ACQUIRED           DISPOSED

➤ **NAME OF BUSINESS ENTITY**

**GENERAL DESCRIPTION OF BUSINESS ACTIVITY**

**FAIR MARKET VALUE**
- ☐ $2,000 – $10,000
- ☐ $100,001 – $1,000,000
- ☐ $10,001 – $100,000
- ☐ Over $1,000,000

**NATURE OF INVESTMENT**
- ☐ Stock
- ☐ Other _____
  (Describe)

IF APPLICABLE, LIST DATE:
___/___/ 04          ___/___/ 04
ACQUIRED           DISPOSED

➤ **NAME OF BUSINESS ENTITY**

**GENERAL DESCRIPTION OF BUSINESS ACTIVITY**

**FAIR MARKET VALUE**
- ☐ $2,000 – $10,000
- ☐ $100,001 – $1,000,000
- ☐ $10,001 – $100,000
- ☐ Over $1,000,000

**NATURE OF INVESTMENT**
- ☐ Stock
- ☐ Other _____
  (Describe)

IF APPLICABLE, LIST DATE:
___/___/ 04          ___/___/ 04
ACQUIRED           DISPOSED

➤ **NAME OF BUSINESS ENTITY**

**GENERAL DESCRIPTION OF BUSINESS ACTIVITY**

**FAIR MARKET VALUE**
- ☐ $2,000 – $10,000
- ☐ $100,001 – $1,000,000
- ☐ $10,001 – $100,000
- ☐ Over $1,000,000

**NATURE OF INVESTMENT**
- ☐ Stock
- ☐ Other _____
  (Describe)

IF APPLICABLE, LIST DATE:
___/___/ 04          ___/___/ 04
ACQUIRED           DISPOSED

➤ **NAME OF BUSINESS ENTITY**

**GENERAL DESCRIPTION OF BUSINESS ACTIVITY**

**FAIR MARKET VALUE**
- ☐ $2,000 – $10,000
- ☐ $100,001 – $1,000,000
- ☐ $10,001 – $100,000
- ☐ Over $1,000,000

**NATURE OF INVESTMENT**
- ☐ Stock
- ☐ Other _____
  (Describe)

IF APPLICABLE, LIST DATE:
___/___/ 04          ___/___/ 04
ACQUIRED           DISPOSED

**Comments:** _____

FPPC Form 700 (2004/2005) Sch. A-1
FPPC Toll-Free Helpline: 866/ASK-FPPC

**53-611 (433)**

# INSTRUCTIONS – SCHEDULE A-2
# INVESTMENTS

Use Schedule A-2 to report investments in a business entity or trust (including a living trust), in which you, your spouse or registered domestic partner, or your dependent children had a 10% or greater interest, valued at $2,000 or more, during the reporting period and which is located in, doing business in, planning to do business in, or which has done business during the previous two years in your agency's jurisdiction (see Appendix-9). (Filers must report investments of a registered domestic partner if the reporting period covers activity in 2005.) A trust located outside your agency's jurisdiction is reportable if it holds assets that are located in or doing business in the jurisdiction. You are not required to report a trust that contains no reportable interests. For example, if you have a trust containing only your personal residence, your savings account, and some municipal bonds, you would not report this trust, because these interests are not reportable.

Also report on Schedule A-2 investments and real property held by that entity or trust if your pro rata share of the interest was $2,000 or more during the reporting period.

## TO COMPLETE SCHEDULE A-2:

**Part 1.** Disclose the name and address of the business entity or trust. If you are reporting an interest in a business entity, check "Business Entity" and complete the box as follows:

- Provide a general description of the business activity of the entity.
- Check the box indicating the fair market value of your investment.
- If you initially acquired or entirely disposed of this interest during the reporting period, enter the date acquired or disposed.
- Identify the nature of your investment.
- Disclose the job title or business position you held with the entity, if any (for example, if you were a director, officer, partner, trustee, employee, or held any position of management).

**Part 2.** Check the box indicating your gross income. Gross income is the total amount of income before deducting expenses, losses, or taxes. (This includes your pro rata share of the gross income received by the business entity or trust, as well as your community property interest in your spouse's or registered domestic partner's share.)

**Part 3.** Disclose the name of each source of income which is located in, doing business in, planning to do business in,

or which has done business during the previous two years in your agency's jurisdiction, as follows:

- Disclose each source of income and outstanding loan to the business entity or trust identified in part 1 if your pro rata share of the gross income (including your community property interest in your spouse's or registered domestic partner's share) to the business entity or trust from that source was $10,000 or more during the reporting period. (See Appendix-8 for example.) Loans from commercial lending institutions made in the lender's regular course of business on terms available to members of the public without regard to your official status are not reportable.

- Disclose each individual or entity that was a source of commission income of $10,000 or more during the reporting period through the business entity identified in part 1. (See Appendix-5 for an explanation of commission income.)

  You may be required to disclose sources of income located outside your jurisdiction. For example, you may have a client who resides outside your jurisdiction but who does business on a regular basis with you. Such a client, if a reportable source of $10,000 or more, must be disclosed.

Leave Part 3 blank if you do not have any reportable $10,000 sources of income to disclose. Adding phrases such as "various clients" or "not disclosing sources pursuant to attorney-client privilege" may trigger a request for an amendment to your statement. (See Appendix-10 for details about privileged information.)

**Part 4.** Report any investments or interests in real property held by the entity or trust identified in part 1 if your pro rata share of the interest held was $2,000 or more during the reporting period.

- Check the applicable box identifying the interest held as real property or an investment.
- If investment, provide the name and description of the business entity.
- If real property, report the address or other precise location (for example, an assessor's parcel number).
- Check the box indicating the fair market value of your interest in the real property or investment.
- Identify the nature of your interest.
- Enter the date acquired or disposed only if you initially acquired or entirely disposed of your interest in the property or investment during the reporting period.

# SCHEDULE A-2
## Investments, Income, and Assets
## of Business Entities/Trusts
(Ownership Interest Is 10% or Greater)

**CALIFORNIA FORM 700**
FAIR POLITICAL PRACTICES COMMISSION

Name

---

**► 1. BUSINESS ENTITY OR TRUST**

Name

Address

**Check one**
☐ Trust, go to 2   ☐ Business Entity, complete the box, then go to 2

**GENERAL DESCRIPTION OF BUSINESS ACTIVITY**

**FAIR MARKET VALUE**
☐ $2,000 - $10,000
☐ $10,001 - $100,000
☐ $100,001 - $1,000,000
☐ Over $1,000,000

**IF APPLICABLE, LIST DATE:**
__/__/04 ACQUIRED   __/__/04 DISPOSED

**NATURE OF INVESTMENT**
☐ Sole Proprietorship   ☐ Partnership   ☐ _____ Other

YOUR BUSINESS POSITION _____

**► 2. IDENTIFY THE GROSS INCOME RECEIVED (INCLUDE YOUR PRO RATA SHARE OF THE GROSS INCOME TO THE ENTITY/TRUST)**

☐ $0 - $499          ☐ $10,001 - $100,000
☐ $500 - $1,000      ☐ OVER $100,000
☐ $1,001 - $10,000

**► 3. LIST THE NAME OF EACH REPORTABLE SINGLE SOURCE OF INCOME OF $10,000 OR MORE**

**► 4. INVESTMENTS AND INTERESTS IN REAL PROPERTY HELD BY THE BUSINESS ENTITY OR TRUST**

**Check one box:**
☐ INVESTMENT   ☐ REAL PROPERTY

Name of Business Entity or
Street Address or Assessor's Parcel Number of Real Property

Description of Business Activity or
City or Other Precise Location of Real Property

**FAIR MARKET VALUE**
☐ $2,000 - $10,000
☐ $10,001 - $100,000
☐ $100,001 - $1,000,000
☐ Over $1,000,000

**IF APPLICABLE, LIST DATE:**
__/__/04 ACQUIRED   __/__/04 DISPOSED

**NATURE OF INTEREST**
☐ Property Ownership/Deed of Trust   ☐ Stock   ☐ Partnership

☐ Leasehold _____ Yrs. remaining   ☐ Other _____

☐ Check box if additional schedules reporting investments or real property are attached

---

**► 1. BUSINESS ENTITY OR TRUST**

Name

Address

**Check one**
☐ Trust, go to 2   ☐ Business Entity, complete the box, then go to 2

**GENERAL DESCRIPTION OF BUSINESS ACTIVITY**

**FAIR MARKET VALUE**
☐ $2,000 - $10,000
☐ $10,001 - $100,000
☐ $100,001 - $1,000,000
☐ Over $1,000,000

**IF APPLICABLE, LIST DATE:**
__/__/04 ACQUIRED   __/__/04 DISPOSED

**NATURE OF INVESTMENT**
☐ Sole Proprietorship   ☐ Partnership   ☐ _____ Other

YOUR BUSINESS POSITION _____

**► 2. IDENTIFY THE GROSS INCOME RECEIVED (INCLUDE YOUR PRO RATA SHARE OF THE GROSS INCOME TO THE ENTITY/TRUST)**

☐ $0 - $499          ☐ $10,001 - $100,000
☐ $500 - $1,000      ☐ OVER $100,000
☐ $1,001 - $10,000

**► 3. LIST THE NAME OF EACH REPORTABLE SINGLE SOURCE OF INCOME OF $10,000 OR MORE**

**► 4. INVESTMENTS AND INTERESTS IN REAL PROPERTY HELD BY THE BUSINESS ENTITY OR TRUST**

**Check one box:**
☐ INVESTMENT   ☐ REAL PROPERTY

Name of Business Entity or
Street Address or Assessor's Parcel Number of Real Property

Description of Business Activity or
City or Other Precise Location of Real Property

**FAIR MARKET VALUE**
☐ $2,000 - $10,000
☐ $10,001 - $100,000
☐ $100,001 - $1,000,000
☐ Over $1,000,000

**IF APPLICABLE, LIST DATE:**
__/__/04 ACQUIRED   __/__/04 DISPOSED

**NATURE OF INTEREST**
☐ Property Ownership/Deed of Trust   ☐ Stock   ☐ Partnership

☐ Leasehold _____ Yrs. remaining   ☐ Other _____

☐ Check box if additional schedules reporting investments or real property are attached

---

Comments: _____

FPPC Form 700 (2004/2005) Sch. A-2
FPPC Toll-Free Helpline: 866/ASK-FPPC

53-611 (435)

# INSTRUCTIONS – SCHEDULE B
## INTERESTS IN REAL PROPERTY

Report interests in real property located in your agency's jurisdiction (see Appendix-9) in which you, your spouse or registered domestic partner, or your dependent children had a direct, indirect, or beneficial interest totaling $2,000 or more any time during the reporting period. (Filers must report interests in real property of a registered domestic partner if the reporting period covers activity in 2005.)

Interests in real property include:

- An ownership interest (including a beneficial ownership interest)
- A deed of trust, easement, or option to acquire property
- A leasehold interest (see Appendix-9)
- A mining lease
- An interest in real property held in a retirement account (see Appendix-10)
- An interest in real property held by a business entity or trust in which you, your spouse or registered domestic partner, or your dependent children had a 10% or greater ownership interest (report on Schedule A-2)
- Your spouse's or registered domestic partner's interests in real property that are legally held separately by him or her

You are not required to report:

- A residence, such as a home or vacation cabin, used exclusively as a personal residence. However, a residence for which you claim a business deduction may be reportable. In this situation, you may report the portion of the residence claimed as the tax deduction as the fair market value.
- Interests in real property held through a blind trust (see Appendix-11 for exceptions).

TO COMPLETE SCHEDULE B:

- Report the address or other precise location (for example, an assessor's parcel number) of the real property.
- Check the box indicating the fair market value of your interest in the property (regardless of what you owe on the property).
- Enter the date acquired or disposed only if you initially acquired or entirely disposed of your interest in the property during the reporting period.

REMINDERS

- Income and loans already reported on Schedule B are not also required to be reported on Schedule C.
- Code filers – Do your disclosure categories require disclosure of real property?

- Identify the nature of your interest. If it is a leasehold, disclose the number of years remaining on the lease.
- If you received rental income, check the box indicating the gross amount you received.
- If you had a 10% or greater interest in real property and received rental income, list the name of the tenant if your pro rata share of the gross rental income from a single tenant was $10,000 or more during the reporting period. Otherwise, leave this section blank. Adding phrases such as "various tenants" or "tenants" may trigger a request for an amendment to your statement.
- Loans from a private lender that total $500 or more and are secured by real property may be reportable. Reportable loans may be disclosed on Schedule B or Schedule C. Loans from commercial lending institutions made in the lender's regular course of business on terms available to members of the public without regard to your official status are not reportable.
  - Provide the name and address of the lender.
  - Describe the lender's business activity.
  - Disclose the interest rate and term of the loan. The term of a loan is the total number of months or years given for repayment of the loan at the time the loan was entered into. For variable interest rate loans, disclose the conditions of the loan (for example, Prime + 2) or the average interest rate paid during the reporting period.
  - Check the box indicating the highest balance of the loan during the reporting period.
  - Identify a guarantor, if applicable.

If you have more than one reportable loan on a single piece of real property, report the additional loan(s) on Schedule C.

Example:
Joe Nelson is a city planning commissioner. Joe received rental income of $12,000 during the reporting period from a single tenant who rented property Joe owned in the city's jurisdiction. If Joe had received the $12,000 from two or more tenants, the tenants' names would not be required as long as no single tenant paid $10,000 or more.

FPPC Form 700 (2004/2005)
FPPC Toll-Free Helpline: 866/ASK-FPPC

Instructions-6

## SCHEDULE B
### Interests In Real Property
(Including Rental Income)



**CALIFORNIA FORM 700**
FAIR POLITICAL PRACTICES COMMISSION

Name

---

> **STREET ADDRESS OR PRECISE LOCATION**

**CITY**

**FAIR MARKET VALUE**
☐ $2,000 - $10,000
☐ $10,001 - $100,000
☐ $100,001 - $1,000,000
☐ Over $1,000,000

**IF APPLICABLE, LIST DATE:**
___/___/ 04      ___/___/ 04
ACQUIRED        DISPOSED

**NATURE OF INTEREST**
☐ Ownership/Deed of Trust      ☐ Easement

☐ Leasehold _____      ☐ _____
                Yrs. remaining              Other

**IF RENTAL PROPERTY, GROSS INCOME RECEIVED**
☐ $0 - $499      ☐ $500 - $1,000      ☐ $1,001 - $10,000
☐ $10,001 - $100,000      ☐ OVER $100,000

**SOURCES OF RENTAL INCOME:** If you own a 10% or greater interest, list the name of each tenant that is a single source of income of $10,000 or more.

**NAME OF LENDER***

**ADDRESS**

**BUSINESS ACTIVITY OF LENDER**

**INTEREST RATE**          **TERM (Months/Years)**
_____%  ☐ None

**HIGHEST BALANCE DURING REPORTING PERIOD**
☐ $500 - $1,000      ☐ $1,001 - $10,000
☐ $10,001 - $100,000      ☐ OVER $100,000

☐ Guarantor, if applicable

---

> **STREET ADDRESS OR PRECISE LOCATION**

**CITY**

**FAIR MARKET VALUE**
☐ $2,000 - $10,000
☐ $10,001 - $100,000
☐ $100,001 - $1,000,000
☐ Over $1,000,000

**IF APPLICABLE, LIST DATE:**
___/___/ 04      ___/___/ 04
ACQUIRED        DISPOSED

**NATURE OF INTEREST**
☐ Ownership/Deed of Trust      ☐ Easement

☐ Leasehold _____      ☐ _____
                Yrs. remaining              Other

**IF RENTAL PROPERTY, GROSS INCOME RECEIVED**
☐ $0 - $499      ☐ $500 - $1,000      ☐ $1,001 - $10,000
☐ $10,001 - $100,000      ☐ OVER $100,000

**SOURCES OF RENTAL INCOME:** If you own a 10% or greater interest, list the name of each tenant that is a single source of income of $10,000 or more.

**NAME OF LENDER***

**ADDRESS**

**BUSINESS ACTIVITY OF LENDER**

**INTEREST RATE**          **TERM (Months/Years)**
_____%  ☐ None

**HIGHEST BALANCE DURING REPORTING PERIOD**
☐ $500 - $1,000      ☐ $1,001 - $10,000
☐ $10,001 - $100,000      ☐ OVER $100,000

☐ Guarantor, if applicable

---

**Comments:** _____

∗ Loans from commercial lending institutions made in the lender's regular course of business on terms available to members of the public without regard to your official status are not reportable.

FPPC Form 700 (2004/2005) Sch. B
FPPC Toll-Free Helpline: 866/ASK-FPPC

**53-611 (437)**

## INSTRUCTIONS – SCHEDULE C
## INCOME, LOANS, & BUSINESS POSITIONS
### (Income Other than Gifts and Travel Payments)

Report the source and amount of gross income of $500 or more you received during the reporting period. Gross income is the total amount of income before deducting expenses, losses, or taxes and includes loans other than loans from a commercial lending institution. Also report your job title with each reportable business entity, even if you received no income during the reporting period. You must also report the source of income to your spouse or registered domestic partner if your community property share is $500 or more during the reporting period. (Filers must report income received by a registered domestic partner if the reporting period covers activity in 2005.)

A source of income must be reported only if the source is located in, doing business in, planning to do business in, or has done business during the previous two years in your agency's jurisdiction. (See Appendix-8 and 9 for more information about doing business in the jurisdiction.) Reportable sources of income may be further limited by your agency's conflict-of-interest code.

Commonly reportable income and loans include:
- Salary/wages, per diem, reimbursement for expenses
- Community property interest (50%) in your spouse's or registered domestic partner's income - report the employer's name and all other required information
- Income received from investment interests, such as partnerships, reported on Schedule A-1
- Commission income not required to be reported on Schedule A-2 (see Appendix-5)
- Gross income from any sale, including the sale of a house or car (report the total sale price)
- Rental income not required to be reported on Schedule B
- Prizes or awards not disclosed as gifts
- Payments received on loans you made to others, including loan repayments from a campaign committee
- An honorarium received prior to becoming a public official (see Appendix-7 concerning your ability to receive future honoraria)
- Incentive compensation (see Appendix-9)

You are not required to report:
- Salary, reimbursement for expenses or per diem, social security, disability, or other similar benefit payments received by you or your spouse or registered domestic partner from a federal, state, or local government agency.

### REMINDERS
- Code filers – Your disclosure categories may not require disclosure of all sources of income.
- If you or your spouse or registered domestic partner is self-employed, report the business entity on Schedule A-2.
- Do not disclose on Schedule C income, loans or business positions already reported on Schedules A-2 or B.

- Income of dependent children.
- Payments received under an insurance policy.
- Interest, dividends, or premiums on a time or demand deposit in a financial institution, shares in a credit union, an insurance policy, or a bond or other debt instrument issued by a government agency.
- Alimony or child support payments.

See Appendix-8 for more exceptions to income reporting.

### TO COMPLETE SCHEDULE C:
#### 1. Name of Source of Income
- Disclose the name and address of each source of income or loan or each business entity with which you held a business position.
- Provide a general description of the business activity of the source or business entity (for example, law firm).
- Disclose the job title or business position, if any, you held with the business entity, even if you did not receive income during the reporting period.
- Check the box indicating the amount of gross income received or the highest balance of the loan during the reporting period.
- Identify the consideration for which the income was received.
- For income from commission sales, check the box indicating the gross income received and list the name of each source of commission income of $10,000 or more (see Appendix-5).
- For income from rental property that is not required to be listed on Schedule B, enter "Rental Income" under "Name of Source," check the box indicating the gross income received, and, if you had a 10% or greater interest in the rental property, list the name of each tenant if your pro rata share of the gross income from that tenant was $10,000 or more during the reporting period.

#### 2. Loans Received
- Disclose the interest rate and the term of the loan.
  - The term of the loan is the total number of months or years given for repayment of the loan at the time the loan was entered into.
  - For variable interest rate loans, disclose the conditions of the loan (for example, Prime + 2) or the average interest rate paid during the reporting period.
- Identify the security, if any, for the loan.

If more than one loan was received or outstanding during the reporting period and the security for each loan is the same, fill out box 2 only once and indicate in the comments section that the information in box 2 applies to all loans. If the security is different, fill out a separate box 2 for each loan.

FPPC Form 700 (2004/2005)
FPPC Toll-Free Helpline: 866/ASK-FPPC

Instructions-7

# SCHEDULE C
## Income, Loans* & Business Positions
(Other than Gifts and Travel Payments)



**CALIFORNIA FORM 700**
FAIR POLITICAL PRACTICES COMMISSION

Name

---

**1. NAME OF SOURCE OF INCOME**

ADDRESS

BUSINESS ACTIVITY, IF ANY, OF SOURCE

YOUR BUSINESS POSITION

GROSS INCOME RECEIVED/HIGHEST BALANCE DURING REPORTING PERIOD, IF LOAN
- ☐ $500 - $1,000        ☐ $1,001 - $10,000
- ☐ $10,001 - $100,000   ☐ OVER $100,000

CONSIDERATION FOR WHICH INCOME WAS RECEIVED
- ☐ Salary     ☐ Spouse's Income    ☐ Loan repayment
- ☐ Sale of _____
                    (Property, car, boat, etc.)
- ☐ Commission or ☐ Rental Income, list each source of $10,000 or more

_____
_____
- ☐ Other _____
                    (Describe)
- ☐ LOAN RECEIVED (complete box 2)

---

**1. NAME OF SOURCE OF INCOME**

ADDRESS

BUSINESS ACTIVITY, IF ANY, OF SOURCE

YOUR BUSINESS POSITION

GROSS INCOME RECEIVED/HIGHEST BALANCE DURING REPORTING PERIOD, IF LOAN
- ☐ $500 - $1,000        ☐ $1,001 - $10,000
- ☐ $10,001 - $100,000   ☐ OVER $100,000

CONSIDERATION FOR WHICH INCOME WAS RECEIVED
- ☐ Salary     ☐ Spouse's Income    ☐ Loan repayment
- ☐ Sale of _____
                    (Property, car, boat, etc.)
- ☐ Commission or ☐ Rental Income, list each source of $10,000 or more

_____
_____
- ☐ Other _____
                    (Describe)
- ☐ LOAN RECEIVED (complete box 2)

---

**1. NAME OF SOURCE OF INCOME**

ADDRESS

BUSINESS ACTIVITY, IF ANY, OF SOURCE

YOUR BUSINESS POSITION

GROSS INCOME RECEIVED/HIGHEST BALANCE DURING REPORTING PERIOD, IF LOAN
- ☐ $500 - $1,000        ☐ $1,001 - $10,000
- ☐ $10,001 - $100,000   ☐ OVER $100,000

CONSIDERATION FOR WHICH INCOME WAS RECEIVED
- ☐ Salary     ☐ Spouse's Income    ☐ Loan repayment
- ☐ Sale of _____
                    (Property, car, boat, etc.)
- ☐ Commission or ☐ Rental Income, list each source of $10,000 or more

_____
_____
- ☐ Other _____
                    (Describe)
- ☐ LOAN RECEIVED (complete box 2)

---

**2. LOAN RECEIVED**

INTEREST RATE                    TERM (Months/Years)

_____ %  ☐ None

SECURITY FOR LOAN
- ☐ None         ☐ Personal residence
- ☐ Real Property _____
                         Street address
                    _____
                         City
- ☐ Guarantor _____
- ☐ Other _____
                    (Describe)

\* You are not required to report loans from commercial lending institutions, or any indebtedness created as part of a retail installment or credit card transaction, made in the lender's regular course of business on terms available to members of the public without regard to your official status.

Comments:

_____

FPPC Form 700 (2004/2005) Sch. C
FPPC Toll-Free Helpline: 866/ASK-FPPC

53-611 (439)

## SCHEDULE D
### (ELIMINATED)



CALIFORNIA FORM **700**
FAIR POLITICAL PRACTICES COMMISSION

### Report loans on
### Schedule A-2, B, or C

- You are not required to report loans from commercial lending institutions made in the lender's regular course of business on terms available to members of the public without regard to your official status.

- You are not required to report any indebtedness created as part of a retail installment or credit card transaction if made in the lender's regular course of business on terms available to members of the public without regard to your official status.

FPPC Form 700 (2004/2005) Sch. D
FPPC Toll-Free Helpline: 866/ASK-FPPC

# INSTRUCTIONS – SCHEDULE E
# INCOME – GIFTS

A gift is anything of value for which you have not provided equal or greater consideration to the donor. A gift is reportable if its fair market value is $50 or more. In addition, multiple gifts totaling $50 or more received during the reporting period from a single source must be reported. **Gifts are reportable regardless of where the donor is located.**

It is the acceptance of a gift, not the ultimate use to which it is put, that imposes your reporting obligation. Except as noted below, you must report a gift even if you never used it or if you gave it away to another person.

If the exact amount of a gift is not known, you must make a good faith estimate of the item's fair market value. Listing the value of a gift as "over $50" or "value unknown" is not adequate disclosure. In addition, if you received a gift through an intermediary, you must disclose the name, address, and business activity of both the donor and the intermediary.

**Commonly reportable gifts include:**
- Tickets/passes to sporting or entertainment events
- Tickets/passes to amusement parks
- Parking passes
- Food, beverages, and accommodations, including those provided in direct connection with your attendance at a convention, conference, meeting, social event, meal, or like gathering, where you did not give a speech, participate in a panel or seminar, or provide a similar service
- Rebates/discounts not made in the regular course of business to members of the public without regard to official status
- Wedding gifts (see Appendix-12 to determine value)
- An honorarium. You may report an honorarium as income on Schedule C, rather than as a gift on Schedule E, if you provided services of equal or greater value than the payment received. (See Appendix-7 regarding your ability to receive future honoraria.)
- Transportation and lodging (see Schedule F)
- Forgiveness of a loan received by you

**You are not required to disclose:**
- Gifts that were not used and which, within 30 days after receipt, were returned to the donor or delivered to a charitable organization without being claimed by you as a charitable contribution for tax purposes

> **REMINDERS**
> - Gifts are limited by law to a value of $360 from any one source in a calendar year.
> - See Appendix-7 for additional gift and honoraria prohibitions.
> - Code filers – You only need to report gifts from reportable sources.

- Gifts from your spouse or registered domestic partner, child, parent, grandparent, grandchild, brother, sister, aunt, uncle, niece, nephew, or first cousin. Included in this exception are gifts from your spouse or domestic partner's children, parents, brothers and sisters, and the spouse or registered domestic partner of the individuals listed above. The exception does not apply if the donor was acting as an agent or intermediary for a reportable source who was the true donor.
- Gifts of hospitality involving food, drink, or occasional lodging provided in an individual's home when the individual or a member of the individual's family was present
- Gifts equal in value exchanged between you and an individual, other than a lobbyist, on holidays, birthdays, or similar occasions
- Gifts of informational material provided to assist you in the performance of your official duties (for example, books, pamphlets, reports, calendars, periodicals, or educational seminars)
- A bequest or inheritance. However, inherited investments or real property may be reportable on other schedules.
- Personalized plaques and trophies with an individual value of less than $250
- Campaign contributions
- Tickets to a fundraising event for an Internal Revenue Code section 501(c)(3) organization
- Tickets to political fundraisers
- Gifts given directly to members of your immediate family unless you received direct benefit from the gift or you exercised direction and control over the use or disposition of the gift
- A pass or ticket that provided a one-time admission to an event (theater performance, sporting event) that was not used and was not transferred to another person. Commission regulation 18946.1 provides a method for determining the value of a ticket or pass that was used or transferred to another person and for determining the value of passes or tickets which provide repeated admission to facilities or services.
- Food, beverages, and necessary accommodations provided directly in connection with an event at which you gave a speech, participated in a panel or seminar, or provided a similar service

**TO COMPLETE SCHEDULE E:**
- Disclose the name, address and business activity, if any, of the source.
- Provide the date (month, day, and year) of receipt, and disclose the fair market value and description of the gift.

FPPC Form 700 (2004/2005)
FPPC Toll-Free Helpline: 866/ASK-FPPC

Instructions-8

## SCHEDULE E
## Income – Gifts

CALIFORNIA FORM **700**
FAIR POLITICAL PRACTICES COMMISSION

Name _____



---

**NAME OF SOURCE** _____

**ADDRESS** _____

**BUSINESS ACTIVITY, IF ANY, OF SOURCE** _____

| DATE (mm/dd/yy) | VALUE | DESCRIPTION OF GIFT(S) |
|---|---|---|
| __/__/__ | $_____ | _____ |
| __/__/__ | $_____ | _____ |
| __/__/__ | $_____ | _____ |

**NAME OF SOURCE** _____

**ADDRESS** _____

**BUSINESS ACTIVITY, IF ANY, OF SOURCE** _____

| DATE (mm/dd/yy) | VALUE | DESCRIPTION OF GIFT(S) |
|---|---|---|
| __/__/__ | $_____ | _____ |
| __/__/__ | $_____ | _____ |
| __/__/__ | $_____ | _____ |

---

**NAME OF SOURCE** _____

**ADDRESS** _____

**BUSINESS ACTIVITY, IF ANY, OF SOURCE** _____

| DATE (mm/dd/yy) | VALUE | DESCRIPTION OF GIFT(S) |
|---|---|---|
| __/__/__ | $_____ | _____ |
| __/__/__ | $_____ | _____ |
| __/__/__ | $_____ | _____ |

**NAME OF SOURCE** _____

**ADDRESS** _____

**BUSINESS ACTIVITY, IF ANY, OF SOURCE** _____

| DATE (mm/dd/yy) | VALUE | DESCRIPTION OF GIFT(S) |
|---|---|---|
| __/__/__ | $_____ | _____ |
| __/__/__ | $_____ | _____ |
| __/__/__ | $_____ | _____ |

---

**NAME OF SOURCE** _____

**ADDRESS** _____

**BUSINESS ACTIVITY, IF ANY, OF SOURCE** _____

| DATE (mm/dd/yy) | VALUE | DESCRIPTION OF GIFT(S) |
|---|---|---|
| __/__/__ | $_____ | _____ |
| __/__/__ | $_____ | _____ |
| __/__/__ | $_____ | _____ |

**NAME OF SOURCE** _____

**ADDRESS** _____

**BUSINESS ACTIVITY, IF ANY, OF SOURCE** _____

| DATE (mm/dd/yy) | VALUE | DESCRIPTION OF GIFT(S) |
|---|---|---|
| __/__/__ | $_____ | _____ |
| __/__/__ | $_____ | _____ |
| __/__/__ | $_____ | _____ |

---

**Comments:** _____

_____

FPPC Form 700 (2004/2005) Sch. E
FPPC Toll-Free Helpline: 866/ASK-FPPC

**53-611 (442)**

# INSTRUCTIONS — SCHEDULE F
## TRAVEL PAYMENTS, ADVANCES
## AND REIMBURSEMENTS

Travel payments reportable on Schedule F include advances and reimbursements for travel and related expenses, including lodging and meals.

Gifts of travel may be subject to a $360 gift limit. In addition, certain travel payments are reportable gifts, but are not subject to the gift limit. To avoid possible misinterpretation or the perception that you may have received a gift in excess of the gift limit, you may wish to provide a specific description of the purpose of your travel. See the FPPC fact sheet entitled "Limitations and Restrictions on Gifts, Honoraria, Travel, and Loans," which can be obtained from your filing officer or the FPPC at *www.fppc.ca.gov.*

You are **not** required to disclose:

- Travel payments received from any state, local, or federal government agency for which you provided services equal or greater in value than the payments received

- Travel payments received from your employer in the normal course of your employment

- Payments or reimbursements for transportation within California in connection with an event at which you gave a speech, participated in a panel or seminar, or performed a similar service

- Food, beverages, and necessary accommodations received directly in connection with an event held inside or outside California at which you gave a speech, participated in a panel, or provided a similar service Note that payments for transportation outside of California are reportable.

- A travel payment that was received from a nonprofit entity exempt from taxation under Internal Revenue Code section 501(c)(3) for which you provided equal or greater consideration

**TO COMPLETE SCHEDULE F:**

- Disclose the name and address of the source of the travel payment.

- Identify the business activity, if any, of the source.

- Check the box to identify the payment as a gift or income, report the amount, and disclose the date(s) if applicable.

  - Travel payments are gifts if you did not provide services that were equal to or greater in value than the payments received. You must disclose gifts totaling $50 or more from a single source during the period covered by the statement. Gifts of travel are reportable without regard to where the donor is located.

    When reporting travel payments that are gifts, you must provide a description of the gift and the date(s) received.

  - Travel payments are income if you provided services that were equal to or greater in value than the payments received. You must disclose income totaling $500 or more from a single source during the period covered by the statement. You have the burden of proving the payments are income rather than gifts.

    When reporting travel payments as income, you must describe the services you provided in exchange for the payment. You are not required to disclose the date(s) for travel payments that are income.

**Example:**
City council member Rick Chandler is a board member of the League of California Cities. The League reimburses its board members for travel and lodging, as well as meals and other expenses associated with board meetings. If Rick provides equal or greater consideration for the travel and lodging when he participates in the meeting, the reimbursements are reported as income.

| NAME OF SOURCE |
| --- |
| League of California Cities |
| ADDRESS |
| 1400 K Street, Suite 400 |
| CITY AND STATE |
| Sacramento, CA |
| BUSINESS ACTIVITY, IF ANY, OF SOURCE |
| Association of city officials |
| DATE(S): 9 /16 /04 – 9 /17 /04  AMT. $ 588.00 |
| TYPE OF PAYMENT (must check one) ☐ Gift  ☒ Income |
| DESCRIPTION: Travel reimbursement for board meeting |

FPPC Form 700 (2004/2005)
FPPC Toll-Free Helpline: 866/ASK-FPPC

Instructions-9

53-611 (443)



### SCHEDULE F
### Income – Gifts
### Travel Payments, Advances,
### and Reimbursements

**CALIFORNIA FORM 700**
FAIR POLITICAL PRACTICES COMMISSION

Name _____

---

- **Reminder – you must mark the gift or income box.**
- **You are not required to report "income" from government agencies.**

---

**> NAME OF SOURCE**

**ADDRESS**

**CITY AND STATE**

**BUSINESS ACTIVITY, IF ANY, OF SOURCE**

DATE(S): ___/___/___ - ___/___/___  AMT: $ _____
    *(if applicable)*

TYPE OF PAYMENT: (must check one)  ☐ Gift  ☐ Income

DESCRIPTION: _____

---

**> NAME OF SOURCE**

**ADDRESS**

**CITY AND STATE**

**BUSINESS ACTIVITY, IF ANY, OF SOURCE**

DATE(S): ___/___/___ - ___/___/___  AMT: $ _____
    *(if applicable)*

TYPE OF PAYMENT: (must check one)  ☐ Gift  ☐ Income

DESCRIPTION: _____

---

**> NAME OF SOURCE**

**ADDRESS**

**CITY AND STATE**

**BUSINESS ACTIVITY, IF ANY, OF SOURCE**

DATE(S): ___/___/___ - ___/___/___  AMT: $ _____
    *(if applicable)*

TYPE OF PAYMENT: (must check one)  ☐ Gift  ☐ Income

DESCRIPTION: _____

---

**> NAME OF SOURCE**

**ADDRESS**

**CITY AND STATE**

**BUSINESS ACTIVITY, IF ANY, OF SOURCE**

DATE(S): ___/___/___ - ___/___/___  AMT: $ _____
    *(if applicable)*

TYPE OF PAYMENT: (must check one)  ☐ Gift  ☐ Income

DESCRIPTION: _____

---

**Comments:** _____

_____

**53-611 (444)**

# APPENDIX
## TWO CATEGORIES OF FILERS

### 1. Officials and Candidates Specified in Gov. Code Section 87200 and Members of Boards/Commissions of Newly Created Agencies

The Act requires the following individuals to fully disclose their personal assets and income described in the attached Form 700:

#### State Offices

- Governor
- Lieutenant Governor
- Attorney General
- Controller
- Insurance Commissioner
- Secretary of State
- Treasurer
- Members of the State Legislature
- Superintendent of Public Instruction
- State Board of Equalization Members
- Public Utilities Commissioners
- State Energy Resources Conservation and Development Commissioners
- State Coastal Commissioners
- Fair Political Practices Commissioners
- State Public Officials (including employees and consultants) Who Manage Public Investments
- Elected members of and candidates for the Board of Administration of the California Public Employees' Retirement System

Other officials and employees of state boards, commissions, agencies, and departments file Form 700 as described in part 2 on this page..

#### Judicial Offices

- Supreme, Appellate, and Superior Court Judges
- Court Commissioners
- Retired Judges, Pro-Tem Judges, and part-time Court Commissioners who serve or expect to serve 30 days or more in a calendar year

#### County and City Offices

- Members of Boards of Supervisors
- Mayors and Members of City Councils
- Chief Administrative Officers
- District Attorneys
- County Counsels
- City Attorneys
- City Managers
- Planning Commissioners
- County and City Treasurers
- County and City Public Officials (including employees and consultants) Who Manage Public Investments

#### Members of Boards/Commissions of Newly created Agencies

Members must fully disclose their investments, interests in real property, business positions and income until the positions are covered under a conflict-of-interest code.

### 2. State and Local Officials and Employees Designated in a Conflict-of-Interest Code

The Act requires every state and local government agency to adopt a unique conflict-of-interest code. The code lists each position within the agency filled by individuals who make or participate in making governmental decisions that could affect their personal economic interests. The code also requires individuals holding those positions to periodically file Form 700 disclosing certain personal economic interests as determined by the code's "disclosure categories." These individuals are called "designated employees" or "code filers."

Obtain your disclosure categories from your agency-- they are not contained in the Form 700. Persons with broad decisionmaking authority must disclose more interests than those in positions with limited discretion. For example, you may be required to disclose only investments and business positions in or income from businesses of the type that contract with your agency, or you may not be required to disclose real property interests.

In addition, certain consultants to public agencies may qualify as public officials because they make, participate in making, or act in a staff capacity for governmental decisions.

Note:

- An official who holds a position specified in Gov. Code section 87200 is not required to file statements under the conflict-of-interest code of any agency that has the same or a smaller jurisdiction (for example, a state legislator who also sits on a state or local board or commission).

# TYPES OF STATEMENTS

**Assuming Office Statement:**

If you are a newly elected or newly appointed official or are newly employed in a position designated in a state or local agency's conflict-of-interest code, your assuming office date is the date you were sworn in, employed, or otherwise authorized to serve in the position.

- Investments, interests in real property, and business positions held on the date you assumed the office or position must be reported. In addition, income (including loans, gifts, and travel payments) received during the 12 months prior to the date you assumed the office or position is reportable.

For positions subject to confirmation by the State Senate or the Commission on Judicial Performance, your assuming office date is the date you were appointed or nominated to the position.

**Example:**

Maria Lopez was appointed by the Governor to serve on a state agency board that is subject to State Senate confirmation. The assuming office date is the date Maria accepts the position. Maria must report investments, interests in real property, and business positions she holds on that date, and income, including loans, gifts, and travel payments received during the 12 months prior to that date.

**Initial Statement:**

If your office or position has been added to a newly adopted or newly amended conflict-of-interest code, use the effective date of the code or amendment, whichever is applicable.

- Investments, interests in real property, and business positions held on the effective date of the code or amendment must be reported. In addition, income (including loans, gifts, and travel payments) received during the 12 months prior to the effective date of the code or amendment is reportable.

**Annual Statement:**

Generally, the period covered is January 1, 2004, through December 31, 2004. If the period covered by the statement is different than January 1, 2004, through December 31, 2004 (for example, you assumed office between October 1, 2003 and December 31, 2003, or you are combining statements), you must specify the period covered.

- Investments, interests in real property, business positions held and income (including loans, gifts, and travel payments) received during the period covered by the statement must be reported. Do not change the preprinted dates on Schedules A-1, A-2, and B unless you are required to report the acquisition or disposition of an interest that did not occur in 2004.

**Leaving Office Statement:**

Generally, the period covered is January 1, 2004, through the date you stopped performing the duties of this position. If the period covered differs from January 1, 2004, through the date you stopped performing the duties of this position (for example, you assumed office between October 1, 2003 and December 31, 2003, or you are combining statements), the period covered must be specified.

- Investments, interests in real property, business positions held and income (including loans, gifts, and travel payments) received during the period covered by the statement must be reported. Do not change the preprinted dates on Schedules A-1, A-2, and B unless you are required to report the acquisition or disposition of an interest that did not occur in 2004.

**Candidate Statement:**

If you are filing a statement in connection with your candidacy for state or local office, investments, interests in real property, and business positions held on the date of filing your declaration of candidacy must be reported. In addition, income (including loans, gifts, and travel payments) received during the 12 months prior to the date of filing your declaration of candidacy is reportable. Do not change the preprinted dates on Schedules A-1, A-2, and B.

Candidates running for special district offices (for example, school board trustees and water district board members) should consult the agency's conflict-of-interest code to determine if candidate statements are required and what economic interests to disclose.

**Amendments:**

If you discover errors or omissions on any statement, file an amendment as soon as possible. To obtain amendment schedules, contact the FPPC, your filing official, or the FPPC website at *www.fppc.ca.gov.*

**53-611 (446)**

## WHERE TO FILE

**1. Officials Specified in Gov. Code Section 87200 (listed in Appendix-1):**

In most cases, the filing officials listed below will retain a copy of your statement and forward the original to the FPPC.

| 87200 Filers | Where to File |
|---|---|
| State offices | Your agency |
| Judicial offices | The clerk of your court |
| Retired Judges | Directly with FPPC |
| County offices | Your county clerk |
| City offices | Your city clerk |
| Multi-County offices | Your agency |

| 87200 Candidates | |
|---|---|
| State offices | County election official |
| Judicial offices | with whom you file your |
| Multi-County offices | declaration of candidacy |
| County offices | County Clerk |
| City offices | City Clerk |
| Public Employees' Retirement System (CalPERS) | CalPERS |

**2. Members of Boards/Commissions of Newly Created Agencies:**

File with your newly created agency or with your agency's code reviewing body as provided by your code reviewing body.

**3. Code Filers — State and Local Officials and Employees Designated in a Conflict-of-Interest Code:**

File with your agency, board, or commission unless it is otherwise specified in your agency's conflict-of-interest code. In most cases, the agency, board, or commission will retain the statements.

State Senate and Assembly staff members file statements directly with the FPPC.

Exceptions:

- Elected state officers are not required to file statements under any agency's conflict-of-interest code.

- 87200 filers are not required to file statements under any agency's conflict-of-interest code in the same jurisdiction. For example, a county supervisor who is appointed to serve for an agency with jurisdiction in the same county has no additional filing obligations.

## WHEN TO FILE

**Assuming Office and Initial Statements:**

| Filer | Deadline |
|---|---|
| Elected officials | 30 days after assuming office |
| Appointed positions specified in Gov. Code section 87200 (listed in Appendix-1) **or** Newly created board and commission members not covered by a conflict-of-interest code | 30 days after assuming office **or** 10 days after appointment or nomination if subject to Senate or judicial confirmation |
| Other appointed positions (including newly-hired employees) designated in a conflict-of-interest code | 30 days after assuming office (30 days after appointment or nomination if subject to Senate confirmation) |
| Positions newly-added to a new or amended conflict-of-interest code | 30 days after the effective date of the code or code amendment |

Exceptions:

- Elected state officers who assume office in December or January are not required to file an assuming office statement, but will file the next annual statement due.

- If you complete a term of office and, within 30 days, begin a new term of the same office (for example, you are reelected or reappointed), you are not required to file an assuming office statement. Instead, you may file the next annual statement due.

- If you leave an office specified in Gov. Code section 87200 and, within 30 days, you assume another office or position specified in section 87200 that has the same jurisdiction (for example, a city planning commissioner elected mayor), you are not required to file an assuming office statement. Instead, you may file the next annual statement due.

- If you transfer from one designated position to another designated position within the same agency, contact your filing officer or the FPPC to determine your filing obligations.

FPPC Form 700 (2004/2005)
FPPC Toll-Free Helpline: 866/ASK-FPPC

Appendix-3



## WHEN TO FILE
### Continued

**Annual Statements:**

1. Elected state officers (including members of the state legislature and members elected to the Board of Administration of the California Public Employees' Retirement System);

   Judges and court commissioners; and

   Members of state boards and commissions specified in Gov. Code section 87200 (listed in Appendix-1):

   File no later than **Tuesday, March 1, 2005.**

2. County and city officials specified in Gov. Code section 87200:

   File no later than **Friday, April 1, 2005.**

3. Multi-County officials:

   File no later than **Friday, April 1, 2005.**

4. State and local officials and employees designated in a conflict-of-interest code:

   File on the date prescribed in the code (April 1 for most filers).

**Exception:**

- If you assumed office between October 1, 2004, and December 31, 2004, and filed an assuming office statement, you are not required to file an annual statement until March 1, 2006, or April 1, 2006, whichever is applicable. The annual statement will cover the day after you assumed office through December 31, 2005.

Incumbent officeholders who file candidate statements also must file annual statements by the specified deadlines.

**Leaving Office Statements:**

Leaving office statements must be filed no later than 30 days after leaving the office or position.

**Exceptions:**

- If you complete a term of office and, within 30 days, begin a new term of the same office (for example, you are reelected or reappointed), you are not required to file a leaving office statement. Instead, you may file the next annual statement due.

- If you leave an office specified in Gov. Code section 87200 and, within 30 days, you assume another office or position specified in section 87200 that has the same jurisdiction (for example, a city planning commissioner elected mayor), you are not required to file a leaving office statement. Instead, you may file the next annual statement due.

- If you transfer from one designated position to another designated position within the same agency, contact your filing officer or the FPPC to determine your filing obligations.

**Candidate Statements:**

All candidates (including incumbents) for offices specified in Gov. Code section 87200 must file statements no later than the final filing date for their declaration of candidacy.

**Exceptions:**

- If you have filed an assuming office or annual statement for the same jurisdiction **within 60 days** before filing a declaration of candidacy, you are not required to file a candidate statement.

- For elective offices designated in an agency's conflict-of-interest code, you must file a candidate statement only if the code specifically requires one to be filed. You should obtain a copy of the disclosure categories from the code to verify what interests are reportable. Contact the agency to verify whether you are required to file and to obtain a copy of your disclosure categories.

53-611 (448)

## TERMS & DEFINITIONS

The instructions located on the back of each schedule describe the types of interests that must be reported. The purpose of this section is to explain other terms used in this form that are not defined in the instructions to the schedules or elsewhere.

**Blind Trust:** See Trusts, Appendix-11.

**Business Entity:** Any organization or enterprise operated for profit, including a proprietorship, partnership, firm, business trust, joint venture, syndicate, corporation, or association. This would include a business for which you take business deductions for tax purposes (for example, a small business operated in your home).

**Code Filer:** An individual who has been designated in a state or local agency's conflict-of-interest code to file statements of economic interests.

**Commission Income:** "Commission income" means gross payments of $500 or more received during the period covered by the statement as a broker, agent, or salesperson, including insurance brokers or agents, real estate brokers or agents, travel agents or salespersons, stockbrokers, and retail or wholesale salespersons, among others.

In addition, you may be required to disclose the names of sources of commission income if your pro rata share of the gross income was $10,000 or more from a single source during the reporting period. If your spouse or registered domestic partner received commission income, you would disclose your community property share (50%) of that income (for example, the names of sources of $20,000 or more in gross commission income received by your spouse or registered domestic partner). (You must report your community property share (50%) of your registered domestic partner's income only if you were reporting activity in 2005.)

Report commission income as follows:

- If the income was received through a business entity in which you or your spouse or registered domestic partner had a 10% or greater ownership interest (or if you receive commission income **on a regular basis** as an independent contractor or agent), use Schedule A-2.

- If the income was received through a business entity in which you or your spouse or registered domestic partner **did not** receive commission income on a regular basis or you had a less than a 10% ownership interest, use Schedule C.

The "source" of commission income generally includes all parties to a transaction, and each is attributed the full value of the commission.

Examples:

- You are a partner in Smith and Jones Insurance Company and have a 50% ownership interest in the company. You sold two Businessmen's Insurance Company policies to XYZ Company during the reporting period. You received commission income of $5,000 from the first transaction and $6,000 from the second. On Schedule A-2, report your partnership interest in and income received from Smith and Jones Insurance Company in parts 1 and 2. In part 3, list both Businessmen's Insurance Company and XYZ Company as sources of $10,000 or more in commission income.

- You are a stock broker for Prime Investments, but you have no ownership interest in the firm. You receive commission income on a regular basis through the sale of stock to clients. Your total gross income from your employment with Prime Investments was over $100,000 during the reporting period. On Schedule A-2, report your name as the name of the business entity in part 1 and the gross income you have received in part 2. (You do not need to complete the information in the box in part 1 indicating the general description of business activity, fair market value, or nature of investment.) In part 3, list Prime Investments and the names of any clients who were sources of $10,000 or more in commission income to you.

- You sell real estate on a part-time basis for Super Realty and you have no ownership interest in the company. Since you are not receiving commission income on a regular basis, you are not considered to be a business entity. On Schedule C, if you received gross commission income of $500 or more, identify Super Realty as a source of income to you. If you received commission income of $10,000 or more from a real estate transaction, you must report the name(s) of the source(s) on Schedule C.

Note: If your pro rata share of commission income from a single source is $500 or more, you may be required to disqualify yourself from decisions affecting that source of income, even though you are not required to report the income. *For information regarding disclosure of "incentive compensation," see Appendix-9.*



**Conflict of Interest:** A public official or employee has a conflict of interest under the Act when all of the following occur:

- The official makes, participates in making, or uses his or her official position to influence a governmental decision;

- It is reasonably foreseeable that the decision will affect the official's economic interest;

- The effect of the decision on the official's economic interest will be material; and

- The effect of the decision on the official's economic interest will be different than its effect on the public generally. Check the Commission's website (*www.fppc.ca.gov*) for a fact sheet entitled, "Can I Vote? Conflict of Interest Overview"

**Conflict-of-Interest Code:** The Act requires every state and local government agency to adopt a conflict-of-interest code. The code may be contained in a regulation, policy statement, or a city or county ordinance, resolution, or other document.

An agency's conflict-of-interest code must designate all officials and employees of, and consultants to, the agency who make or participate in making governmental decisions that could cause conflicts of interest. These individuals are required by the code to file statements of economic interests and to disqualify themselves when conflicts of interest occur.

The disclosure required under a conflict-of-interest code for a particular designated official or employee should include only the kinds of personal economic interests he or she could significantly affect through the exercise of his or her official duties. For example, an employee whose duties are limited to reviewing contracts for supplies, equipment, materials, or services provided to the agency should be required to report only those interests he or she holds that are likely to be affected by the agency's contracts for supplies, equipment, materials, or services.

**Consultant:** An individual who contracts with or whose employer contracts with state or local government agencies and who makes, participates in making, or acts in a staff capacity for making governmental decisions. Consultants may be required to file Form 700. The obligation to file Form 700 is always imposed on the individual who is providing services to the agency, not on the business or firm that employs the individual.

FPPC regulation 18701 defines "consultants" as including the following individuals who make a governmental decision whether to:

- Approve a rate, rule, or regulation

- Adopt or enforce a law

- Issue, deny, suspend, or revoke any permit, license, application, certificate, approval, order or similar authorization or entitlement

- Authorize the agency to enter into, modify, or renew a contract provided it is the type of contract that requires agency approval

- Grant agency approval to a contract that requires agency approval and to which the agency is a party, or to the specifications for such a contract

- Grant agency approval to a plan, design, report, study or similar item

- Adopt, or grant agency approval of, policies, standards, or guidelines for the agency, or for any of its subdivisions

A consultant also is an individual who:

- serves in a staff capacity with the agency and in that capacity participates in making a governmental decision; or

- performs the same or substantially all the same duties for the agency that would otherwise be performed by an individual holding a position specified in the agency's conflict-of-interest code.

**Designated Employee:** An official or employee of a state or local government agency whose position has been designated in the agency's conflict-of-interest code to file statements of economic interests. Individuals who contract with government agencies (consultants) may also be designated in a conflict-of-interest code.

A federal officer or employee serving in an official federal capacity on a state or local government agency is not a designated employee.

**Disclosure Categories:** The section of an agency's conflict-of-interest code that specifies the types of personal economic interests officials and employees of the agency must disclose on their statements of economic interests. Disclosure categories are usually contained in an appendix or attachment to the conflict-of-interest code. Contact your agency to obtain a copy of your disclosure categories.

**Diversified Mutual Fund:** Diversified portfolios of stocks, bonds, or money market instruments that are managed by investment companies whose business

FPPC Form 700 (2004/2005)
FPPC Toll-Free Helpline: 866/ASK-FPPC

Appendix-8



is pooling the money of many individuals and investing it to seek a common investment goal. Mutual funds are managed by trained professionals who buy and sell securities. A typical mutual fund will own between 75 to 100 separate securities at any given time so they also provide instant diversification. *Only diversified mutual funds registered with the Securities and Exchange Commission under the Investment Company Act of 1940 are exempt from disclosure.*

**Elected State Officer:** Elected state officers include the Governor, Lieutenant Governor, Attorney General, Insurance Commissioner, State Controller, Secretary of State, State Treasurer, Superintendent of Public Instruction, members of the State Legislature, members of the State Board of Equalization, and elected members of the Board of Administration of the California Public Employees' Retirement System.

**Enforcement:** The FPPC investigates suspected violations of the Act. Other law enforcement agencies (the Attorney General or district attorney) also may initiate investigations under certain circumstances. If violations are found, the Commission may initiate administrative enforcement proceedings that could result in fines of up to $5,000 per violation.

Instead of administrative prosecution, a civil action may be brought for negligent or intentional violations by the appropriate civil prosecutor (the Commission, Attorney General, or district attorney); or a private party residing within the jurisdiction. In civil actions, the measure of damages is up to the amount or value not properly reported.

Persons who violate the conflict-of-interest disclosure provisions of the Act also may be subject to agency discipline, including dismissal.

Finally, a knowing or willful violation of any provision of the Act is a misdemeanor. Persons convicted of a misdemeanor may be disqualified for four years from the date of the conviction from serving as a lobbyist or running for elective office, in addition to other penalties that may be imposed. The Act also provides for numerous civil penalties, including monetary penalties and damages, and injunctive relief from the courts.

**Expanded Statement:** Some officials or employees may have multiple filing obligations (for example, a city council member who also holds a designated position with a county agency, board, or commission). Such officials or employees may complete one expanded statement covering the disclosure requirements for all positions and file a complete, originally signed copy with each agency.

**Fair Market Value:** When reporting the value of an investment, interest in real property, or gift, you must disclose the fair market value – the price at which the item would sell for on the open market. This is particularly important when valuing gifts, because the fair market value of a gift may be different from the amount it cost the donor to provide the gift. For example, the wholesale cost of a bouquet of flowers may be $10, but the fair market value may be $25 or more. In addition, there are special rules for valuing free tickets and passes. Call the FPPC for assistance.

**Gift and Honoraria Prohibitions:**

**Gifts:**

State and local officials who are listed in Gov. Code section 87200 (except judges – see below), candidates for these elective offices (including judicial candidates), and officials and employees of state and local government agencies who are designated in a conflict-of-interest code are prohibited from accepting a gift or gifts totaling more than $360 in a calendar year from a single source.

In addition, elected state officers, candidates for elective state offices, and officials and employees of state agencies are subject to a $10 per calendar month limit on gifts from lobbyists and lobbying firms registered with the Secretary of State.

**Honoraria:**

State and local officials who are listed in Gov. Code section 87200 (except judges – see below), candidates for these elective offices (including judicial candidates), and employees of state and local government agencies who are designated in a conflict-of-interest code are prohibited from accepting honoraria for any speech given, article published, or attendance at any public or private conference, convention, meeting, social event, meal, or like gathering.

**Exceptions:**

• Some gifts are not reportable or subject to the gift and honoraria prohibitions, and other gifts may not be subject to the prohibitions but are reportable. For detailed information, see the FPPC fact sheet entitled "Limitations and Restrictions on Gifts, Honoraria, Travel, and Loans," which can be obtained from your filing officer or the FPPC's website (*www.fppc.ca.gov*).

- The $360 gift limit and the honorarium prohibition do not apply to a part-time member of the governing board of a public institution of higher education, unless the member is also an elected official.

- If you are designated in a state or local government agency's conflict-of-interest code, the $360 gift limit and honorarium prohibition are applicable only to sources you would otherwise be required to report on your statement of economic interests. However, this exception is not applicable if you also hold a position listed in Gov. Code section 87200 (see Appendix-1).

- For state agency officials and employees, the $10 lobbyist/lobbying firm gift limit is applicable only to lobbyists and lobbying firms registered to lobby your agency. This exception is not applicable if you are an elected state officer or a member or employee of the State Legislature.

**Judges:**
Section 170.9 of the Code of Civil Procedure imposes gift limits on judges and prohibits judges from accepting any honorarium. Section 170.9 is enforced by the Commission on Judicial Performance. The FPPC has no authority to interpret or enforce the Code of Civil Procedure. Court commissioners are subject to the gift limit under the Political Reform Act.

**Income Reporting:** Reporting income under the Act is different than reporting income for tax purposes. The Act requires gross income (the amount received before deducting losses, expenses, or taxes) to be reported.

<u>Pro Rata Share</u>: The instructions for reporting income refer to your pro rata share of the income received. Your pro rata share is normally based on your ownership interest in the entity or property. For example, if you are a sole proprietor, you must disclose 100% of the gross income received by your business entity. If you own 25% of a piece of rental property, you must report 25% of the gross rental income received. If the income is community property, your pro rata share is 50% of your spouse's or your registered domestic partner's share.

When you are required to report sources of income to a business entity, sources of rental income, or sources of commission income, you are only required to disclose individual sources of income of $10,000 or more. However, you may be required to disqualify yourself from decisions affecting sources

of $500 or more in income, even though you are not required to report them.

**Example:**

- Alicia Ruiz is an attorney with her own law firm. As a candidate for mayor, she must disclose reportable sources of income to the firm of $10,000 or more. Her husband Ed is also a public official. His community property share in her income is 50%, so he must disclose reportable sources of income to Alicia's law firm of $20,000 or more.

You are <u>not</u> required to report:

- Salary, reimbursement for expenses or per diem, social security, disability, or other similar benefit payments received by you or your spouse or registered domestic partner from a federal, state, or local government agency.
- Campaign contributions.
- A cash bequest or cash inheritance.
- Returns on a security registered with the Securities and Exchange Commission, including dividends, interest, or proceeds from a sale of stocks or bonds.
- Payments received under an insurance policy.
- Interest, dividends, or premiums on a time or demand deposit in a financial institution, shares in a credit union, an insurance policy, or a bond or other debt instrument issued by a government agency.
- Your spouse's or registered domestic partner's income which is legally "separate" income.
- Income of dependent children.
- Automobile trade-in allowances from dealers.
- Loans and loan repayments received from your spouse or registered domestic partner, child, parent, grandparent, grandchild, brother, sister, parent-in-law, brother-in-law, sister-in-law, nephew, niece, aunt, uncle, or first cousin unless he or she was acting as an intermediary or agent for any person not covered by this provision.
- Alimony or child support payments.
- Payments received under a defined benefit pension plan qualified under Internal Revenue Code section 401(a).
- Any loan from a commercial lending institution made in the lender's regular course of business on terms available to the public without regard to your official status.
- Any retail installment or credit card debts incurred in the creditor's regular course of business on terms available to the public without regard to your official status.
- Loans made to others. However, repayments may be reportable on Schedule C.

- A loan you co-signed for another person unless you made payments on the loan during the reporting period

**Incentive Compensation:** "Incentive compensation" means income over and above salary that is either ongoing or cumulative, or both, as sales or purchases of goods or services accumulate. Incentive compensation is calculated by a predetermined formula set by the official's employer which correlates to the conduct of the purchaser in direct response to the effort of the official.

Incentive compensation does not include:

- Salary
- Commission income *(for information regarding disclosure of "commission income" see Appendix-5)*
- Bonuses for activity not related to sales or marketing, the amount of which is based solely on merit or hours worked over and above a predetermined minimum
- Executive incentive plans based on company performance, provided that the formula for determining the amount of the executive's incentive income does not include a correlation between that amount and increased profits derived from increased business with specific and identifiable clients or customers of the company
- Payments for personal services which are not marketing or sales

The purchaser is a source of income to the official if all three of the following apply:

- the official's employment responsibilities include directing sales or marketing activity toward the purchaser;
- there is direct personal contact between the official and the purchaser intended by the official to generate sales or business; and
- there is a direct relationship between the purchasing activity of the purchaser and the amount of the incentive compensation received by the official.

Report incentive compensation as follows:

- In addition to salary, reimbursement of expenses, and other income received from your employer, separately report on Schedule C the name of each person who purchased products or services sold, marketed or represented by you if you received incentive compensation of $500 or more attributable to the purchaser during the period covered by the statement.

- If incentive compensation is paid by your employer in a lump sum, without allocation of amounts to specific customers, you must determine the amount the incentive compensation attributable to each of your customers. This may be based on the volume of sales to those customers.

(See regulations 18703.3 and 18728.5 for more information.)

**Jurisdiction:** You must disclose investments and sources of income that are located in or doing business in your jurisdiction, are planning to do business in your jurisdiction, or that have done business during the previous two years in your jurisdiction, and interests in real property located in your jurisdiction.

A business entity is located in or doing business in your jurisdiction if the entity has business contacts on a regular or substantial basis with a person who maintains a physical presence in your jurisdiction.

Business contacts include, but are not limited to, manufacturing, distributing, selling, purchasing, or providing services or goods. Business contacts do not include marketing via the internet, telephone, television, radio, or printed media.

The same criteria are used to determine whether an individual, organization, or other entity is located in or doing business in your jurisdiction.

Exception:

- Gifts are reportable regardless of the location of the donor. For example, a state agency official with full disclosure must report gifts from sources located outside of California. (Designated employees should consult their disclosure categories to determine if the donor of a gift is of the type that must be disclosed.)

For reporting interests in real property, if your jurisdiction is the state, you must disclose real property located within the state of California unless your agency's conflict-of-interest code specifies otherwise.

For local agencies, an interest in real property is located in your jurisdiction if any part of the property is located in, or within two miles of, the region, city, county, district, or other geographical area in which the agency has jurisdiction, or if the property is located within two miles of any land owned or used by the agency.



See the following explanations to determine what your jurisdiction is:

**State Offices and All Courts:** Your jurisdiction is the state if you are an elected state officer, a state legislator, or a candidate for one of these offices. Judges, judicial candidates, and court commissioners have statewide jurisdiction. (*In re Baty* (1979) 5 FPPC Ops. 10). If you are an official or employee of, or a consultant to, a state board, commission, or agency, or of any court or the State Legislature, your jurisdiction is the state.

**County Offices:** Your jurisdiction is the county if you are an elected county officer, a candidate for county office, or if you are an official or employee of, or a consultant to, a county agency or any agency with jurisdiction solely within a single county.

**City Offices:** Your jurisdiction is the city if you are an elected city officer, a candidate for city office, or you are an official or employee of, or a consultant to, a city agency or any agency with jurisdiction solely within a single city.

**Multi-County Offices:** If you are an elected officer, candidate, official or employee of, or a consultant to, a multi-county agency, your jurisdiction is the region, district, or other geographical area in which the agency has jurisdiction. (Example: A water district has jurisdiction in a portion of two counties. Members of the board are only required to report interests located or doing business in that portion of each county in which the agency has jurisdiction.)

**Other (for example, school districts and special districts):** If you are an elected officer, candidate, official or employee of, or a consultant to, an agency not covered above, your jurisdiction is the region, district, or other geographical area in which the agency has jurisdiction. See the multi-county example above.

**Leasehold Interest:** The term "interest in real property" includes leasehold interests. An interest in a lease on real property is reportable if the value of the leasehold interest is $2,000 or more. The value of the interest is the total amount of rent owed by you during the reporting period or, for a candidate, assuming office, or initial statement, during the prior 12 months.

You are not required to disclose a leasehold interest with a value of less than $2,000 or a month-to-month tenancy.

**Loans:** State and local elected and appointed officials and employees are prohibited from receiving any personal loan totaling more than $250 from an official, employee, or consultant of their governmental agencies or any governmental agency over which the official or the official's agency has direction or control. In addition, loans of more than $250 from any person who has a contract with the official's agency or an agency under the official's control are prohibited unless the loan is from a commercial lending institution or part of a retail installment or credit card transaction made in the regular course of business on terms available to members of the public.

State and local elected officials are also prohibited from receiving any personal loan of $500 or more unless the loan is in writing and clearly states the terms of the loan, including the parties to the loan agreement, the date, amount, and term of the loan, the date or dates when payments are due, the amount of the payments, and the interest rate on the loan.

Campaign loans and loans from family members are not subject to the $250 and $500 loan prohibitions.

A personal loan made to a public official that is not being repaid or is being repaid below certain amounts will become a gift to the official under certain circumstances. Contact the FPPC for further information, or see the FPPC fact sheet entitled "Limitations and Restrictions on Gifts, Honoraria, Travel, and Loans," which can be obtained from your filing officer or the FPPC's website (*www.fppc.ca.gov*).

You are not required to report loans from commercial lending institutions, or any indebtedness created as part of retail installment or credit card transactions that are made in the lender's regular course of business, without regard to official status, on terms available to members of the public.

**Privileged Information:** You are not required to disclose on Schedule A-2, Part 3, the name of a person who paid fees or made payments to a business entity if disclosure of the name would violate a legally recognized privilege under California law. For example, a name is protected by attorney-client privilege when facts concerning an attorney's representation of an anonymous client are publicly known and those facts, when coupled with disclosure of the client's identity, might expose the client to an official investigation or to civil or criminal liability.

A patient's name is protected by physician-patient privilege when disclosure of the patient's name would also reveal the nature of the treatment received by the patient because, for example, the physician is recognized as a specialist.

FPPC Form 700 (2004/2005)
FPPC Toll-Free Helpline: 866/ASK-FPPC

Appendix-10

FPPC regulation 18740 sets out specific procedures that must be followed in order to withhold the name of a source of income.

**Public Officials Who Manage Public Investments:** Individuals who invest public funds in revenue-producing programs must file Form 700. This includes individuals who direct or approve investment transactions, formulate or approve investment policies, and establish guidelines for asset allocations. FPPC regulation 18701 defines "public officials who manage public investments" to include the following:

- Members of boards and commissions, including pension and retirement boards or commissions, and committees thereof, who exercise responsibility for the management of public investments;

- High-level officers and employees of public agencies who exercise primary responsibility for the management of public investments (for example, chief or principal investment officers or chief financial managers); and

- Individuals who, pursuant to a contract with a state or local government agency, perform the same or substantially all the same functions described above.

**Retirement Accounts (for example, deferred compensation and individual retirement accounts (IRAs)):** Assets held in retirement accounts must be disclosed if the assets are reportable items, such as common stock (investments) or real estate (interests in real property). For help in determining whether your investments and real property are reportable, see the instructions to Schedules A-1, A-2, and B.

If your retirement account holds reportable assets, disclose only the assets held in the account, not the account itself. You may have to contact your account manager to determine the assets contained in your account.

Schedule A-1: Report any business entity in which the value of your investment interest was $2,000 or more during the reporting period. (Use Schedule A-2 if you have a 10% or greater ownership interest in the business entity.)

Schedule B: Report any piece of real property in which the value of your interest was $2,000 or more during the reporting period.

**Examples:**

- Alice McSherry deposits $500 per month into her employer's deferred compensation program. She has chosen to purchase shares in two diversified mutual funds registered with the Securities and Exchange Commission. Because her funds are invested solely in non-reportable mutual funds (see Schedule A-1 instructions), Alice has no disclosure requirements with regard to the deferred compensation program.

- Bob Allison has $6,000 in an individual retirement account with an investment firm. The account contains stock in several companies doing business in his jurisdiction. One of his stock holdings, Gala Computers, reached a value of $2,500 during the reporting period. The value of his investment in each of the other companies was less than $2,000. Bob must report Gala Computers as an investment on Schedule A-1 because the value of his stock in that company was $2,000 or more.

- Adriane Fisher has $5,000 in a retirement fund that invests in real property located in her jurisdiction. The value of her interest in each piece of real property held in the fund was less than $2,000 during the reporting period. Although her retirement fund holds reportable assets, she has no disclosure requirement because she did not have a $2,000 or greater interest in any single piece of real property. If, in the future, the value of her interest in a single piece of real property reaches or exceeds $2,000, she will be required to disclose the real property on Schedule B for that reporting period.

**Trusts:** Investments and interests in real property held by a trust (including a living trust) are reported on Schedule A-2 if you, your spouse or registered domestic partner, or your dependent children had a 10% or greater interest in the trust and your pro rata share of a single investment or interest in real property was $2,000 or more. (Filers must report investments held by a trust of a registered domestic partner if the reporting period covers activity in 2005.)

You have an interest in a trust if you are a trustor and:

- Can revoke or terminate the trust;

- Have retained or reserved any rights to the income or principal of the trust or retained any reversionary or remainder interest; or

- Have retained any power of appointment, including the power to change the trustee, or the beneficiaries.

Or you are a beneficiary and:

- Presently receive income; or
- Have an irrevocable future right to receive income or principal. (See FPPC regulation 18234 for more information.)

Examples:

- Sarah Murphy has set up a living trust which holds her principal residence, stock in several companies that do business in her jurisdiction, and a rental home in her agency's jurisdiction. Since Sarah is the trustor and she can revoke or terminate the trust, she must disclose any stock worth $2,000 or more and the rental home on Schedule A-2. Sarah's residence is not reportable.

- Ben Yee is listed as a beneficiary in his grandparents' trust. However, Ben does not presently receive income from the trust, nor does he have an irrevocable future right to receive income or principal. Therefore, Ben is not required to disclose any assets contained in his grandparents' trust.

Blind Trusts:

A blind trust is a trust managed by a disinterested trustee who has complete discretion to purchase and sell assets held by the trust. If you have a direct, indirect, or beneficial interest in a blind trust, you may not be required to disclose your pro rata share of the trust's assets or income. However, the trust must meet the standards set out in FPPC regulation 18235, and you must disclose reportable assets originally transferred into the blind trust and income from those original assets until they have been disposed of by the trustee.

Trustees:

If you are only a trustee, you do not have a reportable interest in the trust. However, you may be required to report the income you received from the trust for performing trustee services.

Wedding Gifts: Wedding gifts must be disclosed if they were received from a reportable source during the period covered by the statement. Gifts valued at $50 or more are reportable; however, a wedding gift is considered a gift to both spouses equally. Therefore, you would count one half the value of a wedding gift to determine if it is reportable and need only report individual gifts with a total value of $100 or more unless a particular gift can only be used by you or is intended only for your use.

For example, you receive a placesetting of china valued at $150 from a reportable source as a wedding gift. Because the value to you is $50 or more, you must report the gift on Schedule E but may state its value as $75.

Wedding gifts are not subject to the $360 gift limit, but they are subject to the $10 lobbyist/lobbying firm gift limit for state officials.

Privacy Information Notice

Information requested on all FPPC forms is used by the FPPC to administer and enforce the Political Reform Act (Government Code sections 81000-91014 and California Code of Regulations sections 18109-18997). All information required by these forms is mandated by the Political Reform Act. Failure to provide all of the information required by the Act is a violation subject to administrative, criminal or civil prosecution. All reports and statements provided are public records open for public inspection and reproduction.

If you have any questions regarding this Privacy Notice or how to access your personal information, please contact the FPPC at:

Manager, Filing Officer Programs
428 J Street, Suite 620
Sacramento, CA  95814
(916) 322-5660

53-611 (456)

**EXHIBIT 6**

# Report of the Office of the Chief Auditor

**INVESTIGATION INTO ETHICS VIOLATION CLAIMS
BY JOSE HERNANDEZ**

September 5, 2006

# REPORT OF THE OFFICE OF THE CHIEF AUDITOR
## INVESTIGATION INTO ETHICS VIOLATION CLAIMS BY JOSE HERNANDEZ

### TABLE OF CONTENTS

I.      BACKGROUND OF INVESTIGATION...............................................1

II.     PROCEDURES.................................................................................1

III.    SUMMARY OF CLAIMS....................................................................3

IV.     INVESTIGATION FINDINGS.............................................................8

V.      RECOMMENDED REMIDIAL ACTIONS...........................................24

ATTACHMENTS

## I.    BACKGROUND OF INVESTIGATION

On Wednesday, July 12, 2006, the San Diego County Regional Airport Authority ("Authority") received Claim Number CL-068 ("Claim") from Jose Hernandez. The Claim was sent on behalf of Mr. Hernandez's attorney, Cathryn Chinn, ESQ. The Claim specifically provides the complaint that the Authority violated California Labor Code Section 1102.5 (see Attachment 1), violated the Authority's Code of Ethics (see Attachment 2), violated Mr. Hernandez's right to privacy, and wrongfully discharged Mr. Hernandez.

The Claim was received by the Corporate Service Department and then forwarded to the General Counsel's Office. The Claim was placed on the Authority Board agenda on Monday, July 24, 2006, as Resolution 2006-0098 ("Resolution"). The Resolution was passed by the Board and authorized the rejection of the Claim.

On Thursday, July 27, 2006, Mark Burchyett, the Authority's Chief Auditor, received a telephone call from Paul Peterson, Authority Board Member and Member of the Audit and Performance Monitoring Committee. Mr. Peterson requested that the Office of the Chief Auditor ("OCA") review the Claim's ethical violation allegations, and speak with Breton Lobner, the Authority's General Counsel, to determine if it was within the OCA's purview to investigate the allegations.

On Wednesday, August 2, 2006, Mr. Burchyett met with Mr. Lobner. Also present at this meeting was Amy Gonzalez, Senior Assistant General Counsel. These discussions concluded that it was in the purview of the OCA to investigate the Claim's allegations and that Mr. Lobner would recuse himself from legal counsel in this matter since he is named in the Claim. On August 8, 2006, the General Counsel's Office sent the OCA a memorandum requesting the OCA to investigate the ethical violation allegations contained in the Claim.

As required by the Authority's audit policies, the OCA received authorization to conduct this investigation from the Chairman of the Audit and Performance Monitoring Committee, Mayor Morris Vance.

## II.    INVESTIGATION PROCEDURES

The following investigation procedures were used to evaluate the ethical violation allegations contained in the Claim:

- Interviewed the following Authority employees in order to obtain background and information regarding the Claim:

    - Thella Bowens, President/CEO;
    - Bryan Enarson, Vice President – Development;
    - Ted Sexton, Vice President – Regulated and Executive Operations;
    - Vernon Evans, Vice President – Finance and Treasurer;
    - Breton Lobner, General Counsel; and
    - Jeffrey Woodson, Vice President – Administration.

- Interviewed the following Authority Board Members in order to obtain background and information regarding the allegations contained in the Claim:

1

> Joseph Craver, Chairman of the Board; and
> Mayor Morris Vance, Authority Board Member and Chairman of the Audit and Performance Monitoring Committee.

- Requested and received information from Authority personnel and Board Members that would assist in determining the accuracy of the Claim.

- Requested and received information from airlines operating at the San Diego International Airport ("SDIA") regarding airline policies and procedures and Authority communications and activities.

- Requested an interview with Mr. Hernandez in order to obtain additional information related to the allegations. A request for an interview was rejected by Ms. Chinn, Mr. Hernandez's attorney. Subsequently, we forwarded a list of questions to Ms. Chinn relating to each allegation. We provided a deadline of Wednesday, August 30, 2006, for response to the questions, and as of the issuance of this report we have not received any reply to the submitted questions.

- Reviewed Mr. Hernandez's electronic files contained on the Authority's hard drive, and reviewed Mr. Hernandez's saved emails on the Authority's system. This information was reviewed to determine if there was any evidence contained in the communications that could substantiate the Claim.

- Reviewed the investigative report of Luce, Forward, Hamilton & Scripps LLP ("LUCE FORWARD"), into the actions by Mr. Hernandez, resulting in his resignation as an Authority employee, in order to identify the basis for their investigation, procedures used to conduct the investigation and the findings resulting from the investigation.

It should be noted that Mr. Hernandez has failed to cooperate with our investigation by either allowing an interview or by providing answers to written questions submitted to him by the OCA. Being able to obtain information from Mr. Hernandez with regard to the specifics of his claims (e.g., what airline was used, with whom did he speak to at the airlines, the time frame for these requests) would have helped enable the OCA to better investigate specific information with regard to Mr. Hernandez's Claim.

2

**53-611 (461)**

## III.   SUMMARY OF CLAIM

Following is a summary of the ethical violation allegations contained in the Claim, along with reference(s) to the Claim filing page numbers and paragraphs.   Details of our review of each Claim allegation appear on pages 8 through 23.

| # | Claim Allegation | Document Reference(s) |
|---|---|---|
| 1 | **Restroom Repair Project:** Mr. Hernandez claims that Bryan Enarson, Vice President – Development, entered into side deals through a handshake agreement with an Authority vendor named Host, restricting the Operations Division's ability to annex the space that was needed to remodel terminal restrooms and comply with American Disability Act ("ADA") requirements.  The action by Mr. Enarson resulted in a 3-year project delay and cost the Authority significant dollars. | p. 4, par. 10 |
| 2 | **General Dynamic's Property Lease:** Mr. Hernandez claims that Bryan Enarson improperly negotiated a lease for the General Dynamic's property resulting in the waste of Authority funds.  He claims that the lease was too expensive and that failure to properly negotiate the lease was a violation of the law. | p. 5, par. 12 |
| 3 | **Teledyne Ryan Property Lease:** Mr. Hernandez claims that Bryan Enarson, Vice President – Development, improperly negotiated a lease for the Teledyne Ryan property.  The lease estimated $10 million in costs to clean up the property's contamination, but it was later discovered that cleaning up the property's contamination would cost $30 million.  Also, because of the contamination, the use of the property was limited to 350 parking spaces rather than an anticipated 1,300 spaces. | pp. 5-6, par. 13 |

3



| # | Claim<br>Allegation | Document<br>Reference(s) |
|---|---|---|
| 4 | **Lindbergh Parking Issues:**<br>Lindbergh Parking, Inc. (LPi) was awarded a service agreement from the Authority for the management of the SDIA's employee and public parking lots.  The filing claims that:<br><ul><li>The bid was awarded on the basis that LPi's operating expenses would be $1.3 million annually, but later $1.7 million in operating expenses were incurred.  Mr. Hernandez alleges that LPi purposely submitted unattainable expense estimates in order to bolster its proposal.</li><li>Mr. Hernandez alleges special preferences for LPI by Authority senior management because LPI is a minority firm under the control of an African American, the same racial background as the Authority's President/CEO, Thella Bowens.</li><li>Mr. Hernandez claims he discovered that LPi was double billing the Authority for Workers Compensation Insurance, and after reporting this issue to senior management, no action was taken by the Authority.</li><li>He states that by September 2005 an Authority internal audit of parking management operating expenses had determined that LPi had double-billed the Authority.</li></ul> | p. 7, par. 14<br>p. 8, par. 14<br>p. 9, par. 17 |
| 5 | **Tension Between Development and Operations Divisions:**<br>The Claim alleges that there was tension between Bryan Enarson, Vice President - Development, and Ted Sexton, Vice President - Operations.<br>Mr. Hernandez states Operations was responsive to tenants, while the Real Estate Development Department, under Development, was driven by bureaucracy.  This bureaucracy prolonged project completion times and substantially increased project costs.<br>Tensions between Operations and Development escalated after the Real Estate Department received insufferable ratings on the Airport's commissioned Tenant/Customer Satisfaction Survey.  This resulted, the Claim alleges, in Mr. Enarson taking actions to diminish the accomplishments of the Operations Division. | pp. 3-4, par. 9 |
| 6 | **Blue Bell Ice Cream Trip:**<br>Mr. Hernandez claims that Ted Sexton received $1,200 in reimbursement for an airline ticket to Texas for the purpose of obtaining Blue Bell ice cream for Thella Bowen's annual barbeque.  Mr. Hernandez claims the expense for this trip was not reasonably related to governmental business. | p. 17, par. 37a |

4



| # | Claim<br>Allegation | Document<br>Reference(s) |
|---|---|---|
| 7 | **President/CEO Ticket Changes and Premier Club Access:**<br>Mr. Hernandez claims that Thella Bowens purchased her own airline tickets and then would request free schedule changes, upgrades, and Premier Lounge access. He states that these requests were made to either Ted Sexton or himself. Changes for ticket itinerary changes, upgrades and lounge access should have cost between $50-250. Mr. Hernandez states that these free services were obtained for Ms. Bowens more than 30 times. Mr. Hernandez states that these actions violated the Authority's Ethics Policy. | p. 17, par. 37b |
| 8 | **Shipment of Meat for Annual Barbeque:**<br>Mr. Hernandez claims that, at Thella Bowens' behest, he contacted an airline to make arrangements for the free delivery of meat for the annual barbeque. He states that the meat weighed 200 lbs. and should have cost approximately $2,500 to ship. Mr. Hernandez states that these actions violated the Authority's Ethics Policy. | p. 18, par. 37c |
| 9 | **Airline Privileges for Thella Bowens Sister:**<br>Mr. Hernandez claims that Thella Bowens requested, through a Vice President, that he obtain special airline flight privileges for Ms. Bowens' sister. Ms. Bowens' sister lives in Texas. He claims that Ms. Bowens asked for either stand by or reduced rate tickets for the sister for business and personal travel. Mr. Hernandez states that these actions violated the Authority's Ethics Policy. | p. 18, par. 37d |
| 10 | **Board Chairman 1st Class Ticket Upgrade:**<br>Mr. Hernandez claims that the Chairman of the Board requested a 1st Class ticket upgrade for his wife and himself on the day of his planned departure. He states that the free upgrade saved the Chairman $250. Mr. Hernandez states that these actions violated the Authority's Ethics Policy. | p. 18, par. 37e |
| 11 | **Harbor Island Parking Lot Lease:**<br>Mr. Hernandez claims that the Chairman of the Board, on several occasions, requested a temporary lease for the use of a portion of the Authority's parking lot at Harbor Island, at no expense, for a non-airport activity. Mr. Hernandez states that the lease of Authority property for non-aviation use is strictly prohibited and is a violation of the Authority's Ethics Policy, as well as other laws and regulations. | p. 18, par. 37f |

5

| # | Claim<br>Allegation | Document<br>Reference(s) |
|---|---|---|
| 12 | <u>General Dynamics Property Lease</u>:<br>Mr. Hernandez claims that an Authority Board Member annually asserts his official authority to influence negotiations pertaining to a community event and the rental of the General Dynamics property at a rate lower than the fair market value. Mr. Hernandez states that these actions are a violation of the Authority's Ethics Policy as well as other laws and regulations. | p. 18, par. 37g |
| 13 | <u>Little League World Championship Upgrade</u>:<br>Mr. Hernandez claims that an Authority Board Member requested assistance in rearranging his itinerary to obtain 1st Class upgrades so that he could attend the Little League World Championship in Williamsport, Pennsylvania. Mr. Hernandez states that these actions are a violation of the Authority's Ethics Policy. | p. 19, par. 37h |
| 14 | <u>Upgrades for Vice President – Finance and Treasurer</u>:<br>Mr. Hernandez claims that the Vice President of Finance and Treasurer requested assistance in changing flight schedules between 15 to 20 times over a 1-year period for personal trips to Las Vegas and Texas. Mr. Hernandez states that these actions are a violation of the Authority's Ethics Policy. | p. 19, par. 37I |
| 15 | <u>Tickets to Poinsettia Bowl</u>:<br>Mr. Hernandez claims that the Authority's General Counsel, Breton Lobner, used his official position to obtain eight 50-yard line seats at the Poinsettia Bowl football game in San Diego, by directing him to make contact with the Holiday Bowl Committee and request a favor. He states that the tickets cost $400. Mr. Hernandez states that he paid for the tickets and then Mr. Lobner reimbursed him. Mr. Hernandez states that this is a violation of the Authority's Ethics Policy. | p. 19, par. 37j |
| 16 | <u>Survey of Office for Listening Devices</u>:<br>Mr. Hernandez claims that the Chairman of the Board requested a contractor be hired to survey his Authority office space three (3) times for "listening devices." Mr. Hernandez states that these requests were a gross waste of Authority funds. | p. 19, par. 37k |

6



| # | Claim<br>Allegation | Document<br>Reference(s) |
|---|---|---|
| 17 | **Investigation Into Mr. Hernandez Work Conduct:**<br><br>Mr. Hernandez claims that an attorney, LUCE FORWARD, was hired by the Authority for the purpose of investigating his work conduct. LUCE FORWARD then hired an investigator to assist with some of the investigative work. Mr. Hernandez claims that the attorney for LUCE FORWARD and the investigator interviewed him in a distressful manner, improperly obtained personal car repair records, and inappropriately contacted acquaintances regarding Mr. Hernandez's personnel life and marriage. He states that this has brought emotional stress and disgrace to him and was a breach of his expectation of privacy. | pp. 11-15, par. 23-33 |
| 18 | **Retaliation Based on Disclosure of Legal Violations:**<br><br>Mr. Hernandez claims that he was forced to resign his employment with the Authority based on retaliation by Authority Senior Management because of his disclosure of legal violations taking place within the Authority's operations. He claims that this retaliation is a violation of California Labor Code Section 1102.5. | p. 9, par. 15-16 |

7

53-611 (466)

## IV.    INVESTIGATION FINDINGS

The OCA has completed its investigation into the Claim submitted by Jose Hernandez on Wednesday, July 12, 2006. We were able to obtain information relating to each claim with the assistance of Authority employees, Board Members and the airlines. The OCA has made the following determinations regarding each claim based on the information we were able to obtain.

It should be noted that our determinations have been made in the absence of any cooperation from, and/or supporting evidence provided by, Jose Hernandez. The OCA requested an interview with Mr. Hernandez through his attorney, but Mr. Hernandez's attorney would not allow the OCA to interview Mr. Hernandez. The OCA then developed questions to help us obtain additional information for each claim and forwarded the questions to Mr. Hernandez's attorney. Mr. Hernandez refused to provide answer to these questions and/or provide any supporting evidence in order to substantiate his Claim.

### 1. Restroom Repair Project

Background:

Mr. Hernandez claims that the restroom enlargement project was delayed for three (3) years because of "side deals" by Bryan Enarson and other actions by the Development Division, resulting in additional costs of $2 million to the Authority for the project. Also, he claims that these delays resulted in the restroom not being in compliance with ADA requirements.

The project referred to in the Claim appears to be for the enlargement of a women's restroom in Terminal 1. Previous to the restroom enlargement plan being discussed, a decision had been made to convert a Southwest Airlines' hold room into concession space. This resulted in an agreement with Host to improve space in Terminal 1 into additional concession space. The agreement with Host required that any space taken from Host after the improvements would have to be first approved by Host.

When the need for enlarging the women's restroom first surfaced, the plan was delayed until a Master Plan for Terminal 1 was developed. After the 9/11 incident, airport management made a decision to not spend a significant amount of money on improvements to Terminal 1, which resulted in a decision to go forward with the enlargement of the women's restroom.

The issue of using 30 feet of Host concession space came up during the development of the restroom enlargement plan. Since Host had recently agreed to spend significant dollars on improving the space for concessions, and assurances had been made to not interfere with these additions, the Development Division opposed using the 30 feet for enlarging the restroom. Additionally, at this time the Authority was negotiating with Host to improve other concessions areas within the airport terminals.

Because of the Host space issue, accommodations had to be made to the project, and according to Bryan Enarson, the project probably did cost more than if the accommodations wouldn't have been necessary. However, the OCA could not find any evidence as to the existence of any study and/or calculation that analyzed the cost differentials due to not using the Host space for the enlargement.

8

<u>Claim Conclusions</u>:

While it does appear that the project was delayed, the delay appears to be due to space limitations contained in the Host agreement. These restrictions resulted in the need for alternative development plans. The OCA did not find any evidence that the delay was due to any "side deals" by Bryan Enarson or through intentional actions by the Development Division. Also, we found no evidence that Bryan Enarson made any "side deals" with Host relating to the unauthorized use of public assets.

It should be noted that, according to the Authority's General Counsel's Office, there was no requirement to upgrade the bathroom in question to ADA compliance, because the facility had been grandfathered, and there were no requirements to comply with ADA requirements until the restrooms were remodeled or replaced.

### 2. General Dynamics Property Lease

<u>Background</u>:

Mr. Hernandez claimed that Bryan Enarson improperly negotiated the lease for the General Dynamic's property, resulting in a waste of Authority funds and in violation of the law.

The General Dynamics Property lease was required by the State of California statute that created the Authority and the lease cost for the first 3 years was dictated by the statute.

The Public Utility Code at Section 170056(f) states:

> (f) Notwithstanding any provision of this section, the port shall agree to lease for a period of 66 years, commencing on January 1, 2003, to the authority parcels 1, 2, and 3 of the property originally leased to General Dynamics (identified in Document No. 12301 on file with the clerk of the port) consisting of approximately 89.75 acres west of the Pacific Highway and including property leased to JIMSAIR (identified as Parcel #016-042), property leased to Federal Express Corporation (identified as Parcel #015-008) and the Park, Shuttle and Fly lot operated by Five Star Parking under a management agreement with the port (identified as Clerk Document No. 38334, dated March 29, 1999), subject to the following terms:
>
> (1) The rent shall be paid monthly in arrears at the rate of four million seven hundred thousand dollars ($4,700,000) for calendar year 2003, six million seven hundred thousand dollars ($6,700,000) for calendar year 2004, and eight million seven hundred thousand dollars ($8,700,000) for calendar year 2005. Thereafter, the annual rent shall be level, for the balance of the term, based on the fair market value of the property as of January 1, 2006, and a market rate of return on that date.

The Authority approved the current lease for the property at the July 24, 2006, Board meeting. The current lease terms require the Authority to pay $6.75 million per year for a term of 63-years.

9



Claim Conclusions:

The OCA did not find any evidence that the lease terms for the General Dynamics property were less than fair market value or that the terms of the lease were in violation of the law. In fact, the original lease terms were set by the Public Utility Code Section 170056(f). The subsequent 63-year lease payments was set at a rate comparable with the amount prescribed by Public Utility Code Section 170056(f), and were set as the result of arms length negotiations with the San Diego Unified Port District ("PORT") in order to arrive at a fair market price.

### 3. Teledyne Ryan Property Lease

Background:

Mr. Hernandez claims that Bryan Enarson neglected to take into consideration the contamination of the Teledyne Ryan property, resulting in a lease that is a drain on the Authority's funding.

The Teledyne Ryan property (commonly known as the "Sky Chef's" property) became available when the tenant at the time, Allegany, walked away from the lease without notice. The Teledyne Ryan property consists of 2.34 acres and two buildings totaling approximately 39,600 square feet. The Authority is currently in legal action pursuing judgment against Allegany for breach of the lease terms and for contamination clean-up costs.

As a result of the property being vacated, the PORT, which owns the property, began pursuing plans to build multi-structure parking garages and other rental space on the property. The Authority determined that if the PORT proceeded with their plans for these projects millions of dollars would be diverted from the Authority's parking operations. An analysis was completed by Mr. Hernandez for the Authority's management indicating that the revenue diverted from Authority operations, which would result from the PORT going forward with these projects, would amount to $3 - 8 million annually. This analysis contributed to Authority management making a decision to enter into negotiations with the PORT for the lease of the property.

During negotiations with the PORT, it came to light that it would take several million dollars to clean up the above and below ground contamination. As part of the lease agreement with the PORT the parties agreed to share the costs of clean up at a 50-50 share, after any settlement amount received from Allegany. The lease requires the Authority to pay the PORT an annual property lease of $350,000 for a period of 63-years. This lease was approved by the Authority Board at the July 24, 2006, Board Meeting.

Claim Conclusions:

The OCA did not find any evidence to substantiate Mr. Hernandez's claim that Bryan Enarson neglected to take into consideration the contamination of the Teledyne Ryan property, resulting in a lease that is a drain on the Authority's funding. The Authority pursued leasing the property from the PORT because it was determined that the Authority could use the property for airport expansion purposes and to ensure that the property was used within the Authority's best interest.

10

53-611 (469)

The contamination issues came to light after the former tenant vacated the property. The Authority is pursuing payment from the former tenant for clean up costs, and an agreement for the PORT and Authority to share the clean up costs at a 50-50 share after the previous tenants clean up cost payment appears to be reasonable.

The lease payments were agreed to as the result of arms length negotiation with the PORT and appear to be set at a reasonable rate.

### 4. *Lindbergh Parking Issues*

Background:

Mr. Hernandez claims that the LPi contract was awarded on the basis that LPi could provide parking services for operating expenses of $1.3 million annually, but later $1.7 million in expenses were needed to provide the services. Mr. Hernandez alleges that LPi purposely submitted unattainable expense estimates in order to bolster their proposal. Also, Mr. Hernandez alleges special preferences for LPi by Authority senior management because LPi is a minority firm under the control of an African American, the same racial background as the Authority's President/CEO, Thella Bowens.

The Authority entered into an agreement with LPi on January 30, 2004. The agreement provided that LPi provide parking management service at SDIA. The agreement began on February 1, 2004, and expires on January 31, 2009.

The selection of LPi was the result of a competitive bidding process. A request for proposal ("RFP") was issued by the Authority, and five (5) vendors that provided proposals were considered as finalist. The finalists were interviewed by an evaluation panel consisting of the following individuals:

- Troy Ann Leach, Director - Real Estate Management
- Steve Kozak, Director – Financial Planning and Budget
- Scot Hagan, Manager – Landside Operation, John Wayne Airport
- Jose Hernandez, Director – Landside Operations
- Wayne Harvey, Director – Facilities Maintenance
- Breton Lobner, Authority General Counsel

According to an email sent to the evaluation panel by Jose Hernandez on Wednesday, September 3, 2003, the following criteria/weights were used to score the finalists.

- Experience and Skill (20%)
- Primary Staff (15%)
- Respondent's Work Plan (20%)
- References (10%)
- In-Person Interview (15%)
- Reasonableness of Budget (10%)
- Response to Submittal Questions (10%)

As a result of finalist interviews with the evaluation panel, each finalist was scored by the evaluation panel, and LPi was selected as the parking management service provider.

11

53-611 (470)

Claim Conclusions:

The OCA identified that the LPi contract was awarded based on a competitive bid process. Mr. Hernandez was a significant player in the bid and vendor evaluation process, so if LPi was under-estimating its expenses it would have been Mr. Hernandez's job to help identify the problem during the proposal evaluation stage of vendor selection.

We identified that the contract appears to be weak, since it requires the payment of LPi's actual expenses and does not require that LPi look for the lowest cost provider.

Also, the contract requires that expenditures over LPi's submitted budget be approved by the Authority. This would have been the responsibility of the contract administrator, Mr. Hernandez. Except for limited expenditure disallowances, we did not find any evidence that significant expenses were disallowed. Also, we did not find any evidence that Mr. Hernandez ever brought concerns regarding LPi's significantly over budget expenditures to senior management's attention.

Mr. Hernandez alleges special preferences for LPi by Authority senior management because LPi is a minority firm under the control of an African American, the same racial background as the Authority's President/CEO, Thella Bowens. We did not find any evidence to substantiate this claim, or that LPi or its President was treated any differently than other vendors contracted by the Authority. For example, after entering into the contract, LPi's President, Maurice Grey, requested that the contract be assigned to ACE Parking[1], and that Mr. Grey would become an employee of ACE. Thella Bowens and senior management would not agree to the assignment of the contract to ACE Parking.

Mr. Hernandez alleges that he discovered that LPi was double-billing the Authority for Worker's Compensation Insurance, and after reporting this issue to senior management no action was taken. The OCA did not find any evidence that LPi double billed the Authority for Worker's Compensation Insurance, or that this claim was ever reported to senior management.

Also, Mr. Hernandez states that by September 2005 an Authority internal audit of parking management operating expenses had determined that LPi had double-billed the Authority. There is no record that an internal audit by the OCA ever uncovered double-billing for Worker's Compensation Insurance by LPi, or that this double-billing was reported to management by the OCA. At the time the Claim was filed, the OCA was conducting a comprehensive audit of LPi's contract and service. When the Claim came to the attention of the OCA, we expanded our audit work to determine if the Claim could be substantiated. The OCA found no evidence that LPi had double-billed the Authority for Worker's Compensation Insurance.

### 5. Tension Between Development and Operations Divisions

Background

Mr. Hernandez claims that there was tension between Bryan Enarson, Vice President - Development, and Ted Sexton, Vice President - Operations. He states that Operations

---

[1] Maurice Grey, LPi's President, owns a 40% share of ACE Parking.

12

53-611 (471)

was responsive to tenants, while the Real Estate Management Department (REM) of the Development Division was driven by bureaucracy. He adds that this bureaucracy prolonged project completion times and substantially increased project costs.

Mr. Hernandez also claims that tensions between the Operations and Development Divisions escalated after Bryan Enarson's REM Department received insufferable ratings on the Airport's commissioned Tenant/Customer Satisfaction Survey. He states that this resulted in Mr. Enarson taking actions to diminish the accomplishments of the Operations Division.

Before the reorganization of Authority Departments at the end of 2005, the Development Division was responsible for developing airport properties, and the Operations Division was responsible for the day-to-day operations of the airport. The Vice Presidents for Development and Operations were Bryan Enarson and Ted Sexton, respectively. In addition, Mr. Enarson served in the role as Vice President of Operations while at the PORT before being assigned to the responsibilities as Vice President of Development for the Authority, at which time Mr. Sexton took over as Vice President of Operations.

Claim Conclusions:

The OCA did not find any evidence that actions by the Development Division prolonged project completion times and/or substantially increased Authority costs.

Both Mr. Enarson and Mr. Sexton admitted that there was a healthy competition between the two parties. The parties noted that while they have heatedly disagreed several times on issues, they have always been able to work out their disagreements. It is OCA's assessment that disagreements between management members are not uncommon within organizations, and at times can be healthy for decision making, because these types of tensions can produce open, frank, and detailed discussion of problems and possible remedies.

The OCA did not find any evidence that the Development Division, or Mr. Enarson, took any specific actions to diminish the accomplishments of the Operations Division. It is the OCA's assessment that the fact that the Development Division may have at times disagreed with the position of the Operations Division on some issues, it does not constitute working to undermine Operations' accomplishments.

**6. Blue Bell Ice Cream Trip**

Background:

Mr. Hernandez claims that Ted Sexton received a $1,200 reimbursement for an airline ticket to Texas for the purpose of obtaining Blue Bell ice cream for Thella Bowen's annual barbeque, and that the expense for this trip was not reasonably related to government business.

It appears that this claim refers to a trip taken by Ted Sexton, in which he was part of a group of Vice Presidents and Directors touring businesses, including airports, around the country in order to learn about employee development programs at these businesses. All these trips and meetings were set up by the Marketing Division. On this trip to Dallas, Texas, the group met with Southwest Airlines ("SWA") at the SWA

13

Headquarters. The Authority participants flew in the night before the meeting with SWA, stayed at a nearby hotel, and then attended the meeting the next day. The meeting ended around 2:30 pm. The Authority rented a van for the employees in order to facilitate transportation during the stay.

After the meeting, Mr. Sexton took the Authority rented van to purchase the ice cream locally, and purchased two coolers and dry ice. The ice cream was packed in dry ice within the coolers, and was taken as part of Mr. Sexton's luggage on the return flight at no additional expense to the airlines or the Authority.

Claim Conclusions:

The OCA did not find any evidence to substantiate Mr. Hernandez's claim. OCA found that the trip to Texas was related to the Authority business, which consisted of educating management on development programs of other businesses and airports. We also found that the side trip by Mr. Sexton to purchase the ice cream, and the shipment of the ice cream, were at no additional cost to the Authority.

### 7. President/CEO Ticket Changes and Premier Club Access

Background:

Mr. Hernandez claims that Thella Bowens purchased her own airline tickets and then requested free date changes and free upgrades, along with free Premier Lounge access. He claims that these requests were made to either Ted Sexton or himself. He states that the ticket itinerary changes, upgrades, and lounge access should have costs between $50-250. Mr. Hernandez states that these services were obtained for Ms. Bowens at no cost from the airlines more than 30 times. Mr. Hernandez states that this violated the Authority's Ethics policy.

We interviewed Ms. Bowens as part of this investigation, and Ms. Bowens stated that she never contacted Mr. Hernandez, or Ted Sexton, requesting that ticket changes, upgrades, or premier club access be obtained from the airlines for free; and Ms. Bowens has no knowledge regarding the specific basis of the allegations. In addition, she stated that to her knowledge, her Executive Assistant at the time, Grace Hill, did not contact these individuals requesting any free ticket changes, free upgrades, or free premier club access. Ms. Hill confirmed Ms. Bowen's statement, and stated that she had never been instructed by Ms. Bowens to obtain any special favors from the airlines for free ticket changes, upgrades or premier club access.

We contacted the station manager for each airline operating at SDIA with regard to these claims. The airline station managers that we were able to obtain information from, without exception, responded that Authority personnel have never contacted their airline requesting favors to receive free ticket changes, free ticket upgrades, and/or free access to a premier airline club.

Claim Conclusions:

OCA did not find any evidence to substantiate Mr. Hernandez's claim that Thella Bowens requested free ticket changes, free ticket upgrades, or free access to premier airline clubs as a favor from the airlines.

14

### 8. Shipment of Meat for Annual Barbeque

Background:

Mr. Hernandez claims that at Thella Bowen's behest, Mr. Hernandez contacted an airline to make arrangements for the free airline delivery of meat served at the annual barbeque. He claims that the meat weighed 200 pounds, and that the shipment should have cost approximately $2,500. Mr. Hernandez states that free shipment of the meat violated the Authority's Ethics Policy.

For several years the Authority has held an annual barbeque for Authority employees. The meat served at the barbeque is purchased from Angelo's Barbecue in Fort Worth, Texas. The cost for the meat for the barbeque in 2005 was approximately $2,280, plus $75 paid to the driver for Angelo's in Texas for delivering the meat to the Dallas-Fort Worth International Airport.

The barbeque was paid for solely by Ms. Bowens in the 1st year of the event. Since that time volunteer donations have been collected from the Authority's Vice Presidents and Directors, with most Directors and Vice Presidents donating approximately $100. Any balance due for the meat not covered by donations is paid for from the personal funds of Thella Bowens. Ms. Bowens' personal cost for this event has amounted to approximately $500 to $600 annually. From the records we reviewed, Authority funds have not been used to pay for the annual barbeque meat.

The meat was flown COMAT (Company Material) on a convenient flight to San Diego at no additional cost to the Authority. Authority has received the free transportation for the meat from Southwest Airlines since 1998. According to Ted Sexton, Director of Regulated and Executive Operations, it is common practice for airlines to provide COMAT shipment services to airports. Airlines did provide feedback that this service is provided at times, if space is available on the flight, but is usually accompanied by a request from the airport to the airline's station manager explaining the reason.

Claim Conclusions:

The claim that the meat was flown for free has been substantiated. The Authority has received free transportation for the meat served at the annual employee appreciation barbeque from Southwest Airlines since 1998. On all but a couple of the shipments we obtained evidence that the Authority did submit this type of request to Southwest Airlines, and Southwest Airlines the approved the request.

Since all employees at the Authority benefited from the free shipment of meat, and no specific employee of the Authority benefited personally from the free shipment, it is unclear to the OCA whether this action was a breach in the Authority's Ethics Policy. However, it is the OCA's position that in the future, any shipment of meat for the Annual Employee Barbeque should be paid for at a charge that would be normally charged to the public. This would alleviate any questions as to ethical practices at the Authority.

### 9. Airline Privileges for Thella Bowens Sister

Background:

Mr. Hernandez claims that Thella Bowens requested, through a Vice President, that special airline flight privileges for Ms. Bowens' sister, who lives in Texas, be obtained.

15



He claims that Ms. Bowens asked for either stand-by or reduced rate tickets for her sister. He states that these flight privilege requests were related to business and personal travel of Ms. Bowens' sister. Mr. Hernandez claims that the flight privilege requests violated the Authority's Ethics Policy.

Claim Conclusions:

The OCA did not find any evidence that Ms. Bowens requested special airline flight privileges for her sister. Thella Bowens, Ted Sexton (Vice President – Operations), the airlines, and Grace Hill[2] (Ms. Bowens' former Executive Assistant) did not have any knowledge regarding the alleged request for these favors. Also, Ms. Hill added that in her opinion this type of request would have been totally out of character for Ms. Bowens.

### 10. Board Chairman 1st Class Ticket Upgrade

Background:

Mr. Hernandez claims that the Chairman of the Board requested a 1st Class ticket upgrade for his wife and himself on the day of his planned departure on a trip. He states that this saved the Chairman $250 in upgrade expenses. Mr. Hernandez states that obtaining this upgrade for free violated the Authority's Ethics Policy.

It appears that this allegation refers to a trip that Joseph Craver, Chairman of the Board, took to the American Association of Airport Executives ("AAAE") conference in Kauai, Hawaii, on January 10-16, 2004. His wife, Rayma-Lew, accompanied Mr. Craver to the 2004 AAAE conference.

Claim Conclusions:

The OCA has not found any evidence to substantiate the claim that Mr. Craver or his wife received free 1st class upgrades. We did obtain evidence that for the trip to the AAAE Conference in Hawaii, both Mr. Carver and his wife obtained 1st class upgrades. The Authority paid for Mr. Craver's 1st class upgrade, and Mr. Craver paid for his wife's 1st class upgrade with his personal credit card. It should be noted that Mr. Craver also paid for his wife's original ticket with his personal credit card.

Policy Section 3.40, Board Business Expense Reimbursement Policy, provides the alternative for Board members to fly 1st class for flights of over 2 hours in flight time. The policy states that a Board Member "may elect to travel business class air travel within the United States of more than two hours flight time. Board Members may elect to travel the next higher class if business class is not available." The flight to Kauai, Hawaii, was over 6 hours in duration. We were not able to obtain any evidence as to whether business class was or was not available at the time the upgrades were obtained.

---

[2] Ms. Hill terminated her employment with the Authority in early 2006 and is no longer employed by the Authority.

16

### 11. Harbor Island Parking Lot Lease

Background:

Mr. Hernandez claims that the Chairman of the Board on several occasions requested a temporary lease to use a portion of the Authority's parking lot at Harbor Island at no expense. Mr. Hernandez states that the lease of Authority property for non-aviation use is strictly prohibited and is a violation of the Authority's Ethics Code as well as other laws and regulations.

It appears that this claim refers to the Parade of Ships event during Fleet Week, which is held each year in the early Fall. The event is put together by a group of volunteers, the San Diego Fleet Week Foundation (Foundation), which organizes several events in the San Diego area for veterans. The Parade of Ships takes place in the bay off Harbor Island. Joe Craver, Chairman of the Board, serves as a Board Member for the not-for-profit organization that organizes the Parade of Ships.

Mr. Craver stated that he did receive a phone call from one of the Parade of Ships' organizers who was trying to determine if it would be possible to be put in contact with someone from the Authority regarding using the parking lot at Harbor Island for VIP parking during the Parade of Ships event. Mr. Craver placed the organizer in contact with Ted Sexton, Vice President –Operations, by asking Mr. Sexton if he would call the organizer in order to determine the organization's needs, and to investigate whether leasing the property to the group would be appropriate under the Authority's guidelines.

Mr. Sexton confirmed Mr. Craver's account of the event, and stated that Mr. Craver did not try to influence the decision on whether to provide the property or the price to be charged for the property's use.

From our review of Authority records, the OCA identified that the Authority has entered into leases to provide parking spaces located at the airport's employee lot on Harbor Island for the Parade of Ships event. In 2003 the Authority provided the spaces for free by becoming a Gold Sponsor of the event; however, in subsequent years the Authority provided the property for this event at a reduced rate or at no charge.

The OCA determined that the lease with the PORT restricts use of the property by the Authority. The lease states at paragraph 2, "Authority agrees that the Leased Premises shall be used only for vehicle parking by Authority's employees, customers, vendors, visitors, and invitees and shall not be used for public parking or for any other purposes whatsoever. The restriction on the use of the Leased Premises absolutely prohibits a change in use."

In order to provide the property for Fleet Week, the Authority has entered into a special agreement with the PORT, allowing the use of the property for special purposes. We found evidence that the special use agreement was in place with the PORT for 2003 and 2004, but we were not able to obtain evidence that a special use agreement was

17

53-611 (476)



entered into for the 2005 lease. The 2005 lease agreement allowed the Foundation to use the property for free.[3]

Claim Conclusions:

From the evidence the OCA has reviewed, it does appear that the property was provided to the Foundation at less than fair market value. However, the OCA has not found any evidence that Mr. Craver improperly used his influence as the Chairman of the Board to influence the lease amount decision. Also, we did not find any evidence that use of Authority property for non-airport activities is a violation of the Authority's Ethics Policy, leases that have been entered into with the PORT, or any other law or regulation.

However, the OCA recommends that the Authority management consider implementing a policy requiring that if properties, either owned or leased by the Authority, are used for any event, function, or other purpose that it should be leased at a fair market value. The fair market value should be determined as the result of arms length negotiations and should be calculated using reasonable assumptions and basis. This will help ensure that all parties leasing Authority properties are treated in a fair and equitable manner.

### 12. General Dynamics Property Lease

Background:

Mr. Hernandez claims that an Authority Board Member annually inserts his official authority to influence negotiations between a community event and the rental of the General Dynamics property at a rate lower than the fair market value. Mr. Hernandez states that renting this property at less than fair market value is a violation of the Authority's Ethics Code as well as other laws and regulations.

The Authority was asked to provide parking space at the General Dynamics property for vehicle parking by Elite Racing (a not-for-profit organization). Elite Racing was contracted to produce the Rock and Roll Marathon event that is held annually in San Diego and raises money for charity. Since 2003, Elite Racing has requested parking for one day for approximately 8,500 cars, which amounts to approximately 2,762,500 square feet. The area that Elite Racing requested to use was occupied by Authority tenants. In order for Elite Racing to use the property, it was necessary to request some of the tenants to relocate for four (4) days.

A memorandum was sent by Thella Bowens, the Authority President/CEO, on April 15, 2003, stating that Federal law prohibits providing the space or facilities at the airport at less than fair market value. The memorandum was sent to Zane O. Gresham, Bryan Enarson and Troy Ann Leech. The memorandum provides an analysis of how the Authority determined fair market value for leasing the property for the event. The memorandum stated that fair market value for the property rental should range between

---

[3] It should be noted that we did identify at least one other event (i.e., Gator by the Bay) for which this property has been used for parking, and for which the Authority entered into an agreement with the PORT for special use of the property and allowing the Authority to charge for the special use.

18

53-611 (477)

$18,800 and $20,000. The Authority rented the property to Elite Parking for $18,800 and $17,568 for the years 2003 and 2004, respectively.

Mr. Craver received a phone call from one of the event organizers trying to determine if he could be put in contact with someone from the Authority regarding using part of the Airport facility for parking during the Rock and Roll Marathon event. Mr. Craver placed the organizer in contact with Ted Sexton by asking Mr. Sexton if he could call the organizer to determine the organizations needs, and if it would be appropriate under the Authority's guidelines. Mr. Craver emphasized that at no time did he put any pressure on Mr. Sexton, or any other Authority employee, to provide the property for rent or any reduced price. He added that he had no involvement in the negotiation of the property rental or lease arrangements. Ted Sexton confirmed Mr. Craver's account of Mr. Craver's involvement in the property lease.

Claim Conclusions:

The OCA did not find any evidence to substantiate Mr. Hernandez's claim that Mr. Craver inserted his official authority and/or influence to obtain favors in pricing for the Rock and Roll Marathon event.

The OCA did not find any evidence to substantiate Mr. Hernandez's claim that the Authority provided the General Dynamics property for this event at below fair market rates. The OCA determined that in fact the Authority did calculate a fair market rate for the lease, that this calculation appears to have been based on reasonable assumptions and basis, and that the Authority rented the property at or close to the fair market value it had determined from its analysis.

### 13. Little League World Championship Upgrades

Background:

Mr. Hernandez claims that an Authority Board Member requested assistance in rearranging his itinerary and obtaining free 1st Class upgrades so that he could attend the Little League World Championship in Williamsport, Pennsylvania. Mr. Hernandez states that these actions violated the Authority's Ethics Policy.

The OCA identified the Authority Board Member referred to in this claim was Mayor Morris Vance. We determined that Mayor Vance did receive a 1st Class upgrade for his flight. However, Mr. Vance stated that he did not request or receive any change in itinerary, and did not request or expect an upgrade to 1st class. These statements were substantiated by Ted Sexton.

Mayor Vance contacted Ted Sexton, Vice President – Operations, to determine if it would be possible to get a change in seat assignment for his flights to the Little League World Championship, so that he could be seated in an exit row seat. He requested the change in seat since exit row seats have more leg room to accommodate his height (6'2"), and because the trip to Pennsylvania had 3 separate stops and the flight home to California had 4 separate stops requiring extensive flying time. Mr. Vance was informed that the arrangements had been made by Mr. Sexton.

When Mayor Vance arrived at the airport the airline ticket agent handed him a 1st class ticket. Mayor Vance stated that he was surprised but continued on to the flight. When

19

he returned from the trip, Mayor Vance approached Ted Sexton and recounted the incident, to which Mr. Sexton replied that the airlines sometimes do that sort of thing. These events were substantiated by Ted Sexton.

We identified that the City of Vista, which had originally scheduled and paid for the airline tickets, did pay for the 1st class portion of the airfare from Chicago to Philadelphia, but the other portions of the 1st class upgrade were not charged by the airlines.

Claim Conclusions:

The OCA found that Mayor Vance did receive a 1st class upgrade for part of his flight, and it does appear that the costs of these upgrades were not charged by the airlines. However, the OCA did not find any evidence that Mayor Vance requested or expected any upgrades to 1st class ticketing.  Mayor Vance and Ted Sexton did not have any knowledge of how or why the upgrades were provided by the airlines, and both parties agreed that Mayor Vance had only requested a change of seating to an exit row seat, which would generally be available for free to anyone from the general public.

The OCA did not find any evidence that there was any intent by Mayor Vance to circumvent the Authority's Ethic's Policy; so therefore, it does not appear that Mr. Vance violated the Ethics Policy.

### 14. Upgrades for the Vice President – Finance and Treasurer

Background:

Mr. Hernandez claims that the Vice President of Finance and Treasurer requested assistance in changing flight schedules between 15 to 20 times over a 1-year period for personal trips to Las Vegas and Texas.  Mr. Hernandez states that these actions violated the Authority's Ethics Policy.

Mr. Evans, Vice President – Finance and Treasurer, stated that he had contacted Jose Hernandez approximately 3-5 times to request changes in schedule due to business related meeting conflicts.  Mr. Evans stated that he did not contact Mr. Hernandez on any occasion to change any personal flights.

Mr. Evans stated that there have been numerous times that his schedule has changed due to last minute Authority related meeting conflicts.  If he is scheduled for a flight when a schedule conflict arises, it is necessary to change his flight schedule.  He stated that requests were limited to changing his flight schedule, and that he never asked that the changes be made for free.  Mr. Evans noted that if additional costs would have been involved with flight changes due to business conflicts, he believes that the Authority's travel policies would accommodate payment of these fees because of the nature of the changes.

Also, Mr. Evans stated that it was impossible to answer the allegations specifically, since the allegations are general and provide no detail on the dates and flights in question.  He stated that if he was provided specific dates or flights he would be more than willing to research and provide detail on circumstances surrounding the specific schedule change.

20

Claim Conclusions:

The OCA has not found any evidence to substantiate Mr. Hernandez's claim that Vernon Evans violated the Authority's Ethics Policy.

### 15. Tickets to Poinsettia Bowl

Background:

Mr. Hernandez claims that the Authority's General Counsel, Breton Lobner, used his official position to obtain eight 50-yard line seats at the Poinsettia Bowl football game in San Diego. He claims that these tickets were obtained by Mr. Lobner directing Mr. Hernandez to make contact with the Holiday Bowl Committee and request a favor. He states that the tickets cost $400. Mr. Hernandez states that he paid for the tickets, and then Mr. Lobner reimbursed him. Mr. Hernandez states that this action violated the Authority's Ethics Policy.

Ted Sexton stated that the request for the tickets occurred while he was in the General Counsel's Office. The subject of the tickets to the game came up in conversation between Mr. Lobner and Mr. Sexton, and Mr. Lobner inquired as to the remaining availability of tickets for the game. Mr. Sexton said that he mentioned to Mr. Lobner that Mr. Hernandez was going over to obtain some tickets, and that Mr. Sexton would see if Mr. Hernandez could pick him up some tickets. Mr. Sexton stated that Mr. Lobner said that would be fine, and that he would reimburse Mr. Hernandez for the price of the tickets. Mr. Lobner stated that he had no idea that the tickets were offered for free and had no expectations of obtaining free tickets.

Claim Conclusions:

The OCA determined that Mr. Hernandez obtained tickets for Mr. Lobner, but we did not find any evidence that Mr. Lobner requested or obtained any special favor or obtained any special pricing for the tickets that was not available to the general public. Also, we obtained evidence that Mr. Lobner reimbursed Mr. Hernandez by check in the amount of $300 for the 8 tickets.

Therefore, the OCA did not find any evidence that the actions taken by Mr. Lobner in obtaining tickets violated the Authority's Ethic's Policy.

### 16. Survey of Office for Listening Devices

Background:

Mr. Hernandez claims that the Chairman of the Board requested a contractor be hired to survey his Authority office space 3 times for "listening devices." Mr. Hernandez states that these surveys were a gross waste of Authority funds.

Ted Sexton, Vice President of Regulated and Executive Operations, stated that the Authority does periodically scan offices for listening devices to help ensure industrial safety and security. The Authority hires a contractor to perform the scanning, and each survey is performed at a cost of $3,000. Mr. Sexton stated that the offices that have been scanned include the Board Members' offices, the Tuskegee Meeting Room, General Counsel's Office, the President/CEO's office and the Vice President of Finance and Treasurer's office.

21

According to Joseph Craver, he did approach Mr. Sexton once to inquire whether the Authority had a practice of scanning offices for listening devices. This inquiry was prompted after items were stolen out of Mr. Craver's office on the 3rd floor of the Commuter Terminal.

<u>Claim Conclusions:</u>

The OCA has not found any evidence that the practice of scanning offices for listening devices is a gross waste of Authority funds, or that Mr. Craver requested his office be scanned 3 times. Considering the need for security within the Airport's operation, and the fact that the Authority is often involved in litigation and negotiation involving millions of dollars, it appears to the OCA to be a prudent practice to periodically survey offices for listening devices in select areas of the Authority's workplace.

### 17. Investigation Into Mr. Hernandez's Work Conduct

<u>Background:</u>

Mr. Hernandez claims that an attorney, LUCE FORWARD, was hired by the Authority for the purpose of investigating Mr. Hernandez's work conduct. Mr. Hernandez claims that the attorney and investigator interviewed him in a distressful manner, improperly obtained personal car repair records, and inappropriately contacted acquaintances regarding Mr. Hernandez's personnel life and marriage. He states that these actions have brought emotional stress and disgrace to Mr. Hernandez and was a breach of Mr. Hernandez's expectation of privacy.

An investigation was initiated into Mr. Hernandez's work conduct based on allegations from an Authority employee that Mr. Hernandez had personally benefited from gifts and/or favors from vendors and contractors at SDIA. The Authority hired LUCE FORWARD to conduct an independent investigation into the allegations. LUCE FORWARD provided a final report regarding its investigation findings on January 19, 2006, to Thella Bowens. The OCA reviewed the report and the related interview supporting documentation provided to the Authority regarding LUCE FORWARD's investigation into Mr. Hernandez's work conduct.

<u>Claim Conclusions:</u>

The OCA did not find any evidence to substantiate the claim that LUCE FORWARD improperly obtained personal car repair records and/or breached Mr. Hernandez's expectation of privacy by obtaining these records. The acquisition of Mr. Hernandez's car repair records resulted from a direct allegation against Mr. Hernandez's work conduct. The records were obtained from a company that does business on the airport property; and Mr. Hernandez's position at the Authority had influence on whether the company was able to continue providing services at the airport. It seems reasonable that LUCE FORWARD would request and obtain these records, independent of Mr. Hernandez, in order to ensure their accuracy and authenticity. Also, since the company provided services on the airport property, it is standard practice of the Authority to request and review the records of vendors and service providers.

The OCA did not find any evidence to substantiate the claim that LUCE FORWARD inappropriately contacted acquaintances regarding Mr. Hernandez's personnel life and marriage. The supporting documentation we reviewed indicated that LUCE

22

FORWARD's investigation interviews were limited to nine (9) Authority employees, two (2) former Authority employees and six (6) non-Authority personnel. All non-Authority personnel were related to vendors or contractors doing business with the Authority or operating at SDIA and were directly related to allegations that had been made against Mr. Hernandez. It appears reasonable to the OCA that each of the people interviewed were part of the investigation.

As to the allegation that individuals were asked questions regarding Mr. Hernandez's personal life and marriage, Mr. Hernandez does not provide the specific persons to which these questions were asked, and has refused to cooperate with, or respond to, the OCA's inquires into the specifics of these allegations. We did not find any evidence in the supporting documentation provided as part of the LUCE FORWARD report to substantiate this claim.

### 18. Retaliation Based on Disclosure of Legal Violations

Background:

Mr. Hernandez claims that he was forced to resign his employment with the Authority based on retaliation by Authority senior management for disclosure of legal violations within the Authority's operations, and that this retaliation was a violation of California Labor Code Section 1102.5.

Claim Conclusions:

The OCA did not find any evidence to substantiate Mr. Hernandez's claim that he was forced to resign based on retaliation by the Authority's senior management, resulting from Mr. Hernandez disclosing legal violations within the Authority's operations. Our evidence indicates that the allegations against Mr. Hernandez originated from an employee who was a direct report to Mr. Hernandez, and was not from any management personnel within the organization senior in position to Mr. Hernandez. We also determined that this employee had directly related their concerns to Thella Bowens, and that Ms. Bowens requested that the Authority's Administration Division look into the allegations.

Based on the findings of the investigation conducted by LUCE FORWARD[4] regarding Mr. Hernandez's work conduct, the Authority appeared to have ample evidence to seek action against Mr. Hernandez. Also, The OCA did not find any evidence that the Authority violated California Labor Code Section 1102.5 in this matter.

---

[4] See page 22, Claim number 17, for a description of the reasons for the LUCE FORDWARD investigation.

53-611 (482)

## V.    RECOMMENDED REMEDIAL ACTIONS

During our investigation the OCA did identify remedial actions that the Authority could take to improve ethical compliance and improve operations. Following are the remedial actions that the OCA recommends to the Authority:

1. In fulfillment of the recently Board approved Ethics Program, the Authority should consider implementing policies and procedures requiring all Board Members and senior level personnel (i.e., Managers, Directors, Vice Presidents, Chief Auditor, General Counsel, and President/CEO) receive ethics training on an annual basis. Ethics training will help ensure that appropriate ethical conduct expectations are communicated and understood by Board Members and senior level Authority personnel.

   This training should include instruction regarding the definition and practical application related to restrictions on receiving items of value from vendors and contractors, and the roles of Board Members and Authority personnel in Authority operations. Also, participation in the ethics training should be documented and tracked.

2. Authority management should consider implementing a policy requiring that if properties, either owned or leased by the Authority, are used for any event, function, or other purposes, that it should be leased at a fair market value. Fair market value should be determined as the result of arms length negotiations and should be calculated using reasonable assumptions and basis. This will help ensure that all parties leasing Authority properties are treated in a fair and equitable manner.

   Waiver of this policy should be in writing and approved by the President/CEO and the Board of Directors.

3. Authority management should consider implementing a policy requiring that all transactions with vendors and contractors of the Authority should be at a price that is normally charged to the general public. This policy would alleviate any questions as to ethical practices at the Authority.

   Waiver of this policy should be in writing and approved by the President/CEO and the Board of Directors.

4. At the time that the parking management contract is put for bid, Authority management should consider including in the new contract provisions requirements that the selected vendor obtain the lowest cost provider for all reimbursable expenses, unless waiver is obtained in writing by the responsible Vice President.

   Also, management should consider placing provisions in the parking management contract limiting the amount that reimbursable expenses can exceed proposed amounts. Any waiver of this provision should be obtained in writing by the responsible Vice President.

24

53-611 (483)

ATTACHMENT 1

### California Labor Code Section 1102.5

(a) An employer may not make, adopt, or enforce any rule, regulation, or policy preventing an employee from disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation.

(b) An employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation.

(c) An employer may not retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute or a violation or on compliance with a state or federal rule or regulation.

(d) An employer may not retaliate against an employee for having exercised his or her rights under subdivision (a), (b), or (c) in any former employment.

(e) A report made by an employee of a government agency to his or her employer is a disclosure of information to a government or law enforcement agency pursuant to subdivisions (a) and (b).

(f) In addition to other penalties, an employer that is a corporation or limited liability company is liable for a civil penalty not exceeding ten thousand dollars ($10,000) for each violation of this section.

(g) This section does not apply to rules, regulations, or policies which implement, or to actions by employers against employees who violate, the confidentiality of the lawyer-client privilege of Article 3 (commencing with Section 950), the physician-patient privilege of Article 6 (commencing with Section 990) of Chapter 4 of Division 8 of the Evidence Code, or trade secret information.

1

### Authority Ethics Code, Section 2.01

(a) The San Diego County Regional Airport Authority (the "Authority") was established by the State of California to improve air transportation service and planning for the San Diego region; its jurisdiction is countywide. The citizens and businesses of the County of San Diego that the Authority serves are entitled to fair, ethical and accountable regional government. The effective functioning of good government requires that:

> (1) Public officials, both elected and appointed, comply with both the letter and spirit of the laws and policies affecting the operations of government;

> (2) Public officials shall be independent, impartial and fair in their judgment and actions;

> (3) Public office shall be used for the public good and not for personal gain; and

> (4) Public deliberations and processes shall be conducted openly, unless legally confidential, in an atmosphere of respect and civility.

(b) To this end, the Authority hereby adopts this Code of Ethics and Conduct set forth in Sections 2.01 to 2.16 of this Code (this "Ethics Code") governing the conduct of the members of the Authority's Board of Directors (the "Board") and its employees. As used herein, "employees" includes the Authority's Executive Director, General Counsel, other officers and consultants. The purposes of this Ethics Code are to ensure public confidence in the integrity of the Authority and its effective and fair operation. This Ethics Code shall be broadly construed to effectuate its purposes.

(c) Capitalized terms not defined in Sections 2.02 to 2.16 shall have the respective meanings set forth in this Section.

53-611 (485)

**EXHIBIT 7**

# SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## CODES

**ARTICLE 1** - **ADMINISTRATION AND GOVERNANCE**
**PART 1.0** - **CONSTRUCTION**
**SECTION 1.01** - **SHORT TITLE**

---

(a)     This Code of the San Diego County Regional Airport Authority (this "**Code**") contains administrative, regulatory and revenue ordinances of the San Diego County Regional Airport Authority, a local entity of regional government.  It shall be sufficient to (1) refer to this Code as the "**Code**" in any legal proceeding pursuant to any of its provisions and (2) designate any ordinance adding to, amending or repealing this Code as an addition or amendment to or a repeal of this Code.

(b)     Capitalized terms not otherwise defined in any Code sections will have the meaning set forth in Section 1.03 of this Code.

[Resolution No. 2002-02 dated September 20, 2002.]
[Superceded by Resolution No. _____ dated _____.]

---

53-611 (487)

## SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

### CODES

| | | | |
|---|---|---|---|
| ARTICLE | 1 | - | ADMINISTRATION AND GOVERNANCE |
| PART | 1.0 | - | CONSTRUCTION |
| SECTION | 1.02 | - | CONSTRUCTION |

(a)    The provisions of this Code and all proceedings under it are to be construed with a view to effect its objectives and to promote justice.

[Resolution No. 2002-02 dated September 20, 2002.]
[Superceded by Resolution No. _____ dated _____.]

53-611 (488)

## SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

### CODES

ARTICLE  **1**   -   **ADMINISTRATION AND GOVERNANCE**
PART  **1.0**   -   **CONSTRUCTION**
SECTION  **1.03**   -   **DEFINITIONS AND INTERPRETATION**

---

(a)    The following words and phrases whenever used in this Code shall be construed as defined in this section, unless a different meaning is specifically defined or the context otherwise requires:

**"Airport"** shall mean the San Diego International Airport.

**"Authority"** shall mean the San Diego County Regional Airport Authority, a local entity of regional government.

**"Board"** shall mean the Board of Directors of the Authority.

**"Code"** shall mean the Code of the Authority, as duly adopted by the Board and as amended from time to time.

**"County"** shall mean the County of San Diego.

**"Executive Director"** shall mean the Executive Director of the Authority or his or her designee.

**"Facilities"** shall mean any and all facilities and airports under the jurisdiction of the Authority.

(b)    The following words and phrases whenever used in this Code shall be interpreted as follows, unless the context otherwise requires:

**"Genders."** Any gender includes the other gender.

**"Oath"** includes affirmation.

**"Office."** The use of the title of any officer, employee or any office, or ordinance shall mean such officer, employee, office or ordinance of the Authority, unless otherwise specifically designated.

**"Person"** shall mean a natural person, joint venture, joint stock company, partnership, association, club, company, corporation, limited liability company, business trust, organization, or the manager, lessee, agent, servant, officer or employee of any of them.

---

**53-611 (489)**

"**Shall**" and "**May**." "Shall" is mandatory; "May" is permissive.

"**Singular**" and "**Plural**." The singular number includes the plural, and the plural number includes the singular.

"**Tenses**." Words used in the present tense include the past and future tense and vice versa.

"**Use of Words and Phrases**." Words and phrases used in this Code and not specifically defined shall be construed according to the context and approved usage of the language.

"**Written**" shall include printed, typewritten, mimeographed, multigraphed or electronic form.

[Resolution No. 2002-02 dated September 20, 2002.]
[Superceded by Resolution No. _____ dated _____.]

## SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## CODES

ARTICLE  1    -  ADMINISTRATION AND GOVERNANCE
PART  1.0    -  CONSTRUCTION
SECTION  1.04    -  EFFECT OF HEADING

---

(a)    Headings contained herein shall not be deemed to govern, limit, modify or in any manner affect the scope, meaning or intent of the provisions of any article, part or section hereof.

[Resolution No. 2002-02 dated September 20, 2002.]
[Superceded by Resolution No. _____ dated _____.]

---

53-611 (491)

# SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## CODES

| | | | |
|---|---|---|---|
| **ARTICLE** | **1** | - | **ADMINISTRATION AND GOVERNANCE** |
| **PART** | **1.0** | - | **AUTHORITY AND ENFORCEMENT** |
| **SECTION** | **1.10** | - | **DELEGATION OF AUTHORITY** |

(a)    Whenever a power is granted to, or a duty is imposed upon the Executive Director of the San Diego County Regional Airport Authority or his or her designee (the "**Executive Director**") by the provisions of this Code, such power or duty may be exercised or performed by an assistant or such person as the Executive Director may designate.

[Resolution No. 2002-02 dated September 20, 2002.]
[Superceded by Resolution No. _____ dated _____.]

**53-611 (492)**

# SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## CODES

**ARTICLE 1** - **ADMINISTRATION AND GOVERNANCE**
**PART 1.1** - **AUTHORITY AND ENFORCEMENT**
**SECTION 1.11** - **REFERENCES TO ACTS OR OMISSIONS WITHIN THE AUTHORITY**

---

(a)     This Code shall refer only to the omission or commission of acts within the jurisdiction of the San Diego County Regional Airport Authority.

[Resolution No. 2002-02 dated September 20, 2002.]
[Superceded by Resolution No. _____ dated _____.]

**53-611 (493)**

# SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## CODES

ARTICLE  1   -  ADMINISTRATION AND GOVERNANCE
PART  1.1   -  AUTHORITY AND ENFORCEMENT
SECTION  1.12   -  POLICE AUTHORITY

---

(a)     Nothing in this Code shall be construed to limit the jurisdiction of the police departments of the cities within the jurisdiction of the San Diego County Regional Airport Authority.

[Resolution No. 2002-02 dated September 20, 2002.]
[Superceded by Resolution No. _____ dated _____.]

53-611 (494)


# SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## CODES

ARTICLE  1   -  ADMINISTRATION AND GOVERNANCE
PART  1.1   -  AUTHORITY AND ENFORCEMENT
SECTION  1.13  -  EFFECT OF CODE ON PAST ACTIONS AND OBLIGATIONS
PREVIOUSLY ACCRUED

---

(a)    Neither the adoption of this Code nor the repeal of any ordinance of any city or area within the jurisdiction of the San Diego County Regional Airport Authority shall in any manner affect the prosecution for violations of ordinances, which violations were committed prior to the effective date of this Code, nor be construed as a waiver of any fee, rate, license, charge, fine or penalty at said effective date due and unpaid under such ordinances, and all rights and obligations thereunder appertaining shall continue in full force and effect.

[Resolution No. 2002-02 dated September 20, 2002.]
[Superceded by Resolution No. _____ dated _____.]

---

53-611 (495)

# SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## CODES

ARTICLE   1   -   ADMINISTRATION AND GOVERNANCE
PART   1.1   -   AUTHORITY AND ENFORCEMENT
SECTION   1.14   -   SERVICE AND PROOF OF NOTICES

---

(a)     Whenever a notice is required to be given under this Code, unless different provisions herein are otherwise specifically made, such notice may be given either by personal delivery thereof to the person to be notified or by deposit with the United States Postal Service in a sealed envelope, postage prepaid, addressed to such person to be notified at his last known business or residence address as the name appears in the public records or other records pertaining to the matter to which such notice is directed.  Service by mail shall be deemed to have been completed at the time of deposit with the United States Postal Service.

(b)     Proof of giving any notice may be made by the certificate of any officer or employee of the San Diego County Regional Airport Authority or by affidavit of any person over the age of 18 years, which shows service in conformity with this Code or other provisions of law applicable to the subject matter concerned.

[Resolution No. 2002-02 dated September 20, 2002.]
[Superceded by Resolution No. _____ dated _____.]

---

53-611 (496)

# SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## CODES

| | | | |
|---|---|---|---|
| **ARTICLE** | **1** | - | **ADMINISTRATION AND GOVERNANCE** |
| **PART** | **1.1** | - | **AUTHORITY AND ENFORCEMENT** |
| **SECTION** | **1.15** | - | **VALIDITY OF CODE** |

---

(a)    If any section, subsection, sentence, clause, phrase or portion of this Code is for any reason held to be invalid or unconstitutional by the decision of any court of competent jurisdiction, then such decision shall not affect the validity of the remaining portions of this Code. The Board of Directors of the San Diego County Regional Airport Authority hereby declares that it would have adopted this Code and each section, subsection, sentence, clause, phrase or portion thereof irrespective of the fact that any one or more sections, subsections, sentences, clauses, phrases or portions be declared invalid or unconstitutional.

[Resolution No. 2002-02 dated September 20, 2002.]
[Superceded by Resolution No. _____ dated _____.]

---

**53-611 (497)**

## SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## CODES

ARTICLE  1    -   ADMINISTRATION AND GOVERNANCE
PART  1.1   -   AUTHORITY AND ENFORCEMENT
SECTION  1.16   -   GENERAL PENALTY

---

(a)     Any person violating any of the provisions or failing to comply with any of the mandatory requirements of this Code shall be guilty of a misdemeanor, unless, at the sole option of the San Diego County Regional Airport Authority, the violation is cited and prosecuted as an infraction.

(b)     An "**infraction**" is punishable by:

(1)     A fine not exceeding $100.00 for a first violation, and a misdemeanor for any subsequent violation.

(2)     An infraction is not punishable by imprisonment. A person charged with an infraction shall not be entitled to a trial by jury. A person charged with an infraction shall not be entitled to have the public defender or other counsel appointed at public expense to represent him or her unless he or she is arrested and not released on his or her written promise to appear, on his or her own recognizance, or upon a deposit of bail.

(c)     A "**misdemeanor**" is punishable by:

(1)     Imprisonment in the County jail not exceeding six months; or by a fine not exceeding $1,000.00; or by both.

(d)     Each such person described in Section (a) above, shall be guilty of a separate offense for each and every day during any portion of which any violation of any provision of this Code is committed, continued or permitted by any such person, and he or she shall be punished accordingly.

(e)     Payment of a fine shall not excuse payment of any fee required by this Code.

(f)     In addition to the foregoing, any violation of the provisions of this Code is deemed to be a public nuisance. Such violations may be abated by civil action or pursuant to applicable administrative abatement procedures.

(g)     A violation of any Code section may, at the discretion of the prosecutor, if the violation is initially charged as a misdemeanor rather than an infraction, be prosecuted as an infraction, subject to the procedures described in Subsection (b)(2) above, and Subsection (h) below, when:

---

**53-611 (498)**

(1)    The prosecutor files a complaint charging the offense as an infraction, unless the defendant, at the time he or she is arraigned, after being informed of his or her rights, elects to have the case proceed as a misdemeanor; or

(2)    The court of relevant jurisdiction, with the consent of the defendant, determines that the offense is an infraction in which event the case shall proceed as if the defendant had been arraigned on an infraction complaint.

(h)    Except as otherwise provided by law, all provisions of law related to misdemeanors shall apply to infractions, including, but not limited to, powers of authorized officers, jurisdiction of courts, periods for commencing action and bringing a case to trial and burden of proof.

[Resolution No. 2002-02 dated September 20, 2002.]
[Superceded by Resolution No. _____ dated _____.]

**53-611 (499)**

## SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## CODES

ARTICLE 1 - ADMINISTRATION AND GOVERNANCE
PART 1.1 - AUTHORITY AND ENFORCEMENT
SECTION 1.17 - ACTS INCLUDE CAUSING, PERMITTING, AIDING OR ABETTING

---

(a)    Whenever in this Code any act or omission is made unlawful, it shall include causing, permitting, aiding or abetting such act or omission.

[Resolution No. 2002-02 dated September 20, 2002.]
[Superceded by Resolution No. _____ dated _____.]

53-611 (500)

# SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## CODES

ARTICLE  1    -  ADMINISTRATION AND GOVERNANCE
PART  1.1    -  AUTHORITY AND ENFORCEMENT
SECTION  1.18    -  HOLIDAYS

---

(a)    The Executive Director or his or her designee of the San Diego County Regional Airport ("**Authority**") shall provide the holidays observed by the Authority.

[Resolution No. 2002-02 dated September 20, 2002.]
[Superceded by Resolution No. _____ dated _____.]

---

sd-107789                                                        Page 1 of 1

**53-611 (501)**

# SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## CODES

**ARTICLE 5** - **CONTRACTING AND DEBARMENT**
**PART 5.1** - **DEBARMENT**
**SECTION 5.10** - **DEFINITIONS**

---

(a)     For purposes of Sections 5.10 to 5.18 of this Code, certain words and phrases used herein are defined as follows:

(1)     **"Affiliate"** means business entities, organizations or individuals who either directly or indirectly:

(A)     control one another or have the power to control one another; or

(B)     are controlled by a third party or are subject to control by a third party. **"Affiliates"** include chief executive officers and members of boards of directors or their equivalents.

(2)     **"Authority"** means the San Diego County Regional Airport Authority.

(3)     **"Bidder"** means any individual, organization, legal entity, company or affiliate responding to a bid for any project distributed by the Authority.

(4)     **"Board"** means the Board of Directors of the Authority.

(5)     **"Claim"** includes any request or demand for money, property or services made to any employee, officer or agency of the Authority.

(6)     **"Contractor"** means any third-party individual, legal entity, contractor, bidder, vendor or consultant that:

(A)     directly or indirectly, for example through an affiliate, submits offers for or is awarded or reasonably may be expected to submit offers for or be awarded, an Authority public works contract; or

(B)     conducts business or reasonably may be expected to conduct business with the Authority as an agent or representative of another public works contractor.

(7)     **"Debarment"** means action taken by the Board to exclude a Contractor, from contracting with the Authority for a reasonable, specified period.

(8)     **"Executive Director"** means the Executive Director of the Authority or his or her designee.

---

sd-107960                                                                     Page 1 of 2

**53-611 (502)**

(9)     "**Hearing Officer**" is the individual appointed by the Authority to hear the information presented by the Contractor facing debarment.

(10)     "**Knowing**" and "**Knowingly**" means that, with respect to information, a person does any of the following:

(A)     has actual knowledge of the information;

(B)     acts in deliberate ignorance of the truth or falsity of the information; or

(C)     acts in reckless disregard of the truth or falsity of the information.

(11)     "**Person**" includes any natural person affiliate, corporation, firm, association, organization, partnership, limited liability company, business or trust.

[Resolution No. 2002-02 dated September 20, 2002.]
[Superceded by Resolution No. _____ dated _____.]

**53-611 (503)**

# SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## CODES

**ARTICLE 5**    -    **CONTRACTING AND DEBARMENT**
   **PART 5.1**    -    **DEBARMENT**
  **SECTION 5.11**    -    **GROUNDS FOR DEBARMENT, PUBLIC WORKS CONTRACT**

---

(a)    In accordance with procedures set forth below and any dispute resolution provisions set forth in the applicable public works contract, a Contractor may be declared ineligible to bid on public works contracts of the San Diego Country Regional Airport Authority (the "**Authority**") for a period not to exceed three years for any of the following reasons:

(1)    Two or more claims of computational or other error in bid submission within a two year period;

(2)    Unjustified failure or refusal to timely provide or properly execute contract documents;

(3)    Unsatisfactory performance of contract, as determined in the sole and reasonable discretion of the Authority;

(4)    Two or more occasions within a five year period of failure to submit bond or insurance documents acceptable to the Authority in the time periods required;

(5)    Unjustified refusal to properly perform or complete contract work or warranty performance, as determined in the sole and reasonable discretion of the Authority;

(6)    Unjustified failure to honor or observe contractual obligations or legal requirements pertaining to the contract, as determined in the sole and reasonable discretion of the Authority;

(7)    Conviction under a federal or state statute or municipal ordinance for fraud, bribery, theft, falsification or destruction of records, receiving stolen property or of any other similar crime;

(8)    Any offense or action that indicates a lack of business integrity and that could directly affect the reliability and credibility of performance of the Contractor on future contracts with the Authority;

(9)    Any debarment of the Contractor by another governmental agency;

(10)    Failure to timely submit accurate certified payrolls as required by law;

(11)    Any serious safety violation, whether or not resulting in citation by OSHA or CALOSHA;

---

53-611 (504)

CODE SECTION NO. 5.11

(12)    Two or more occasions in a two year period of using an unauthorized/unlisted subcontractor;

(13)    Conviction under state or federal antitrust statutes involving public contracts or the submission of bid proposals for any corrupt practices involving the administration or award of a contract with the Authority;

(14)    Permanent debarment of the Contractor by another governmental agency; or

(15)    Such other reasons as reasonably may be determined by the Authority's Executive Director or his or her designee.

(b)    Any person who commits any of the following acts shall be debarred as set forth in Subsection (a) above:

(1)    Knowingly presents or causes to be presented to an officer or employee of the Authority a false claim for payment or approval;

(2)    Knowingly makes, uses or causes to be made or used a false record or statement to get a false claim paid or approved by the Authority; or

(3)    Conspires to defraud the Authority by getting a false claim allowed or paid by the Authority.

[Resolution No. 2002-02 dated September 20, 2002.]
[Superceded by Resolution No. _____ dated _____.]

**53-611 (505)**

# SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## CODES

ARTICLE  5   -   CONTRACTING AND DEBARMENT
   PART  5.1  -   DEBARMENT
SECTION  5.12  -   DEBARMENT PROCEDURE

---

(a)     The Senior Director of Public Works/Chief Engineer or his or her designee (the "**Senior Director**") of the San Diego County Regional Airport Authority (the "**Authority**") shall conduct an investigation into the circumstances that may warrant debarment of any Contractor.

(b)     After completing such investigation, the Senior Director shall determine whether sufficient facts exist to warrant debarment, and, if so, shall issue a Notice of Intent to Debar.

(c)     The Contractor shall be provided with written notice of the proposed action, and the reasons for the proposed action, within 14 days of the Senior Director's determination that sufficient facts exist to warrant debarment.

(d)     The Contractor shall have ten calendar days from the date of issuance of the Notice of Intent to Debar to request in writing to the Authority's Executive Director or his or her designee (the "**Executive Director**") a hearing (a "**Hearing**") on the proposed debarment. If no such request is timely filed, the proposed action shall be final.

(e)     If a timely request is submitted, a Hearing shall be conducted no later than ten calendar days after the request is received. The Contractor shall be notified in writing of the time and place of the Hearing.

(f)     The officer of the Hearing (the "**Hearing Officer**") shall be the Executive Director. The Contractor may appeal the decision of the Hearing Officer to the Board. This appeal must be in writing and must be made no later than five calendar days after the Hearing Officer renders the decision.

(g)     The Hearing Officer shall base his or her decision on the record presented to him or her by the Authority and such information as the Contractor may present. The Senior Director will determine whether the Contractor will receive written notice of the Hearing Officer's decision. Strict rules of evidence shall not apply.

(h)     In the event of an appeal from the decision of the Hearing Officer, the Board shall consider the matter at a regularly scheduled meeting. The Board's consideration shall be limited to the record before the Hearing Officer. No new evidence may be submitted and the Board's decision shall be final.

[Resolution No. 2002-02 dated September 20, 2002.]
[Superceded by Resolution No. _____ dated _____.]

---

**53-611 (506)**

# SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## CODES

| | | | |
|---|---|---|---|
| ARTICLE | 5 | - | CONTRACTING AND DEBARMENT |
| PART | 5.1 | - | DEBARMENT |
| SECTION | 5.13 | - | DEBARMENT PROCEDURES FOR MATERIALS, SUPPLIES, EQUIPMENT, INSURANCE OR PERSONAL SERVICE CONTRACTS |

(a)    Authority contracts covered by Sections 5.10 to 5.18 of this Code include materials, supplies, equipment, insurance and personal services contracts entered into with the Authority.

(b)    Debarment procedures for materials, supplies, equipment, insurance and personal service contracts are the same as for public works covered by Sections 5.10 to 5.18 of this Code, unless otherwise governed by applicable federal, state or local laws.

[Resolution No. 2002-02 dated September 20, 2002.]
[Superceded by Resolution No. _____ dated _____.]

53-611 (507)

# SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## CODES

ARTICLE  5    -   CONTRACTING AND DEBARMENT
   PART  5.1    -   DEBARMENT
SECTION  5.14    -   GENERAL

---

(a)    A Contractor's debarment shall be effective throughout all divisions of the Authority. Debarment prohibits all of the Authority's employees from executing contracts with a debarred Contractor. Debarred Contractors shall be placed on a list maintained by the Authority Clerk in accordance with Section 5.15 of this Code.

(b)    Debarment constitutes debarment of all divisions or other organizational elements of the Contractor.  The Authority may extend the debarment decision to include any affiliate of the Contractor if the affiliate is:

    (1)    specifically named; and

    (2)    given written notice of the proposed debarment and an opportunity to respond.

[Resolution No. 2002-02 dated September 20, 2002.]
[Superceded by Resolution No. _____ dated _____.]

---

**53-611 (508)**

# SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## CODES

**ARTICLE  5**    -   **CONTRACTING AND DEBARMENT**
**PART  5.1**    -   **DEBARMENT**
**SECTION  5.15**    -   **LIST OF DEBARRED CONTRACTORS**

---

(a)    The Executive Director of the Authority or his or her designee shall:

    (1)    Compile a current, consolidated list of all debarred Contractors; said list shall be maintained by the office of the Authority's Clerk;

    (2)    Periodically revise and distribute the list and issue supplements; and

    (3)    Establish procedures to provide for effective use of the list of debarred Contractors, to ensure that the Authority does not solicit offers from or award contracts to any entity on the list.

(b)    The list of debarred Contractors shall indicate:

    (1)    The names and addresses of all debarred Contractors with cross references when more than one name is involved in a single action;

    (2)    The cause for the action; and

    (3)    The termination date for each listing.

[Resolution No. 2002-02 dated September 20, 2002.]
[Superceded by Resolution No. _____ dated _____.]

53-611 (509)

# SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## CODES

ARTICLE  5  -  CONTRACTING AND DEBARMENT
PART  5.1  -  DEBARMENT
SECTION  5.16  -  EFFECT OF LISTING

---

(a)    Debarred Contractors are excluded from receiving contracts, and the Authority shall not solicit offers from or award contracts to debarred Contractors. Debarred Contractors and their affiliates are also excluded from conducting business with the Authority as agents or representatives of other Contractors.

(b)    After the opening of bids or receipt of proposals, the requesting department of the Authority shall review the list of debarred Contractors.

(c)    Bids received from any listed Contractor in response to an invitation for bids shall be recorded as received, and then rejected by reason in writing of debarment. The Authority's Senior Director of Public Works/Chief Engineer or his or her designee will determine whether the Contractor will receive a written letter of rejection.

(d)    Proposals, quotations or offers received from any listed Contractor shall not be evaluated for award or included in the competitive process during the period the Contractor is on the list.

(e)    Immediately prior to award of a contract, the Executive Director or his or her designee shall again review the debarred Contractors' list to ensure that no award is made to a listed Contractor.

(f)    If because of inadvertence or misrepresentation on their part, the debarred Contractor or affiliate is awarded a contract, the Executive Director or his or her designee reserves the right to cancel the contract and seek damages in the event performance has begun.

[Resolution No. 2002-02 dated September 20, 2002.]
[Superceded by Resolution No. _____ dated _____.]

---

**53-611 (510)**

# SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## CODES

**ARTICLE 5** - **CONTRACTING AND DEBARMENT**
**PART 5.1** - **DEBARMENT**
**SECTION 5.17** - **CONTINUATION OF EXISTING CONTRACTS**

---

(a)    Immediately upon debarment, any existing contracts between the Authority and the Contractor shall be terminated.

(b)    Notwithstanding the foregoing, the Authority's Board may continue any contract in existence at the time the Contractor is debarred upon advice from the Authority's Executive Director or his or her designee as to the effect of termination of the existing contract.

[Resolution No. 2002-02 dated September 20, 2002.]
[Superceded by Resolution No. _____ dated _____.]

---

**53-611 (511)**

# SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## CODES

ARTICLE  **5**    -    **CONTRACTING AND DEBARMENT**
PART  **5.1**    -    **DEBARMENT**
SECTION  **5.18**    -    **SCOPE OF DEBARMENT**

---

(a)    The fraudulent, criminal or other seriously improper conduct of any officer, director, shareholder, partner, employee or other individuals associated with a Contractor may be imputed to the Contractor when the conduct occurred in connection with the individual's performance of duties for, or on behalf of, the Contractor, or with the Contractor's knowledge, approval or acquiescence. The acceptance of the benefits derived from the conduct by the Contractor shall be evidence of such knowledge, approval or acquiescence.

(b)    The fraudulent, criminal or other seriously improper conduct of a Contractor may be imputed to any officer, director, shareholder, partner, employee or other individual associated with the Contractor who participated in, knew of, or had reason to know of the conduct of the Contractor.

(c)    The fraudulent, criminal or other seriously improper conduct of one Contractor participating in a joint venture or similar arrangement may be imputed to other participating Contractors if the conduct occurred, for, on approval of, or acquiescence of these Contractors, vendors or consultants.  Acceptance of the benefits derived from the conduct shall be evidence of such knowledge, approval or acquiescence.

[Resolution No. 2002-02 dated September 20, 2002.]
[Superceded by Resolution No. _____ dated _____.]

**53-611 (512)**

## SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

### POLICIES

| | | | |
|---|---|---|---|
| ARTICLE | 1 | - | ADMINISTRATION AND GOVERNANCE |
| PART | 1.0 | - | BOARD POWERS AND FUNCTIONS |
| SECTION | 1.01 | - | ADOPTION OF POLICIES AND CODES |

---

**PURPOSE:**   To establish a policy for the adoption of the policies and codes of the San Diego County Regional Airport Authority (the "**Authority**").

**POLICY STATEMENT:**

(1)    The Authority's Board of Directors (the "**Board**") has determined that the adoption of the Authority's policies and codes is critical for the safe, efficient and orderly operations of the facilities and airports under the Authority's jurisdiction.

(2)    Accordingly, the Board shall adopt and approve:

(a)    *Policies* that, among other things, address the Authority's internal operations and governance; and

(b)    *Codes* that, among other things, govern and regulate the conduct of persons, organizations and other third parties that use the facilities and airports under the Authority's jurisdiction, including the San Diego International Airport.

(3)    These policies and codes shall address, among other things, the following matters:

- Administration and governance;
- Ethics and conflicts of interest;
- Personnel;
- Finance and accounting;
- Contracting and debarment;
- Facilities and airports and tenant management;
- Safety and security; and
- Operation, use and maintenance of the facilities and airports under the Authority's jurisdiction, including the San Diego International Airport.

(4)    The Executive Director or his or her designee may develop guidelines and procedures for the appropriate dissemination and distribution of the policies and codes. Copies of the policies and codes will be distributed and disseminated to the Board and key members of the Authority's staff. A copy of the policies and codes will be maintained in the office of the Authority's Clerk.

(5)    The Board periodically shall review the policies and codes for consistency with the Authority's operations and applicable federal, state and local laws. The policies and codes

---

**53-611 (513)**

adopted and approved by the Board shall comply with and be subject to, all applicable federal, state and local laws.  In the event of any inconsistency between the policies and codes and applicable federal, state and local laws, such laws shall govern.

[Resolution No. 2002-02 dated September 20, 2002.]
[Superceded by Resolution No. _____ dated _____.]

53-611 (514)

## SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## POLICIES

ARTICLE **1**   -   ADMINISTRATION AND GOVERNANCE
PART **1.0**   -   BOARD POWERS AND FUNCTIONS
SECTION **1.02**   -   POWERS AND FUNCTIONS OF THE BOARD OF DIRECTORS

---

**PURPOSE:**   To establish a policy describing the powers and functions of the Board of Directors (the "**Board**") of the San Diego County Regional Airport Authority (the "**Authority**").

**POLICY STATEMENT:**

(1)   The Board shall exercise its vested powers to govern the Authority in accordance with the San Diego County Regional Airport Authority Act, Sections 170000 *et seq.* of the California Public Utilities Code, as amended from time to time.

(2)   The Board shall make reasonable efforts to keep the public informed of the Authority's operations.

(3)   The Board shall conduct its business as a body, at meetings duly called in accordance with the policies adopted and approved by the Board.

[Resolution No. 2002-02 dated September 20, 2002.]
[Superceded by Resolution No. _____ dated _____.]

---

sd-101082                                                    Page 1 of 1

**53-611 (515)**

## SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## POLICIES

ARTICLE  2    -    ETHICS
PART  2.0    -    ETHICS AND CONDUCT
SECTION  2.01    -    CONDUCT OF MEMBERS OF THE BOARD OF DIRECTORS,
OFFICERS AND EMPLOYEES

---

PURPOSE:    To establish a policy that governs the ethical conduct of members of the Board of Directors, officers and employees of the San Diego County Regional Airport Authority (the "**Authority**"), and ensure public confidence in the integrity of the Authority and its effective and fair operation.

**POLICY STATEMENT:**

(1)    The Authority was established by the State of California to improve air transportation service and planning for the County of San Diego. The citizens and businesses of the County of San Diego are entitled to fair, ethical and accountable regional government that has earned the public's full confidence for integrity. The effective functioning of good government requires that:

(a)    Public officials, both elected and appointed, shall comply with both the letter and spirit of the laws affecting the operations of government;

(b)    Public officials shall be independent, impartial and fair in their judgment and actions;

(c)    Public office shall be used for the public good, not for personal gain; and

(d)    Public deliberations and processes shall be conducted openly, unless legally confidential, in an atmosphere of respect and civility.

(2)    The Authority may adopt, institute and maintain a Code of Ethics and Conduct, Conflicts of Interest Code and any other policies and codes to further the objectives set forth in this policy.

[Resolution No. 2002-02 dated September 20, 2002.]
[Superceded by Resolution No. _____ dated _____.]

---

**53-611 (516)**

## SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## POLICIES

| | | | |
|---|---|---|---|
| **ARTICLE** | **3** | - | **PERSONNEL** |
| **PART** | **3.3** | - | **REIMBURSEMENT** |
| **SECTION** | **3.30** | - | **BUSINESS EXPENSE REIMBURSEMENT POLICY** |

---

**PURPOSE:**  To establish a policy for the reimbursement of business expenses for the members of the Board (the "**Board**") and employees of the San Diego County Regional Airport Authority (the "**Authority**").

**POLICY STATEMENT:**

(1)  <u>Objectives</u>.  The objectives of this policy are to:

(a)  Comply with Section 170024(2)(b) of the San Diego County Regional Airport Authority Act, as amended, which provides that Board members may be paid for direct out-of-pocket expenses;

(b)  Ensure that the Board and employee business expenses are cost effective and necessary for the Authority's business;

(c)  Determine which business expenses are appropriate and therefore reimbursable;

(d)  Ensure that Board members and employees are reimbursed on a timely basis for all appropriate business expenses that they incur; and

(e)  Incorporate applicable provisions of Government Code § 53232.2 – 53232.3.

(2)  <u>General.</u>

(a)  Reimbursement for any expense that does not fall within this policy shall require the Board's or President/CEO's approval which must be obtained before the expense is incurred.

(b)  Board members attending meetings at the expense of the Authority shall provide a brief oral or written report at the next regularly scheduled meeting of the Board.

(c)  All reimbursement requests should be submitted to the Administrator within a reasonable amount of time, but no later than thirty (30) days after the completion of the out-of-town travel.

(d)  All business expense advances must be cleared no later than thirty (30) days after issuance of the advance.

---

53-611 (517)

(e)    Should the Board member or employee owe the Authority for a portion of any unused advances, the Board member or employee must pay to the Authority the unused portion by cash or personal check.

(f)    Failure to account for business expense advances within the required 30-day period may result in the suspension of privileges to obtain further advances. All reimbursement requests shall be in U.S. dollars, with sufficient supporting documentation for any corresponding currency conversion rates for expenses incurred outside of the United States.

(g)    Expenses specifically excluded from this policy are: political contributions, specifically expenses incurred for the purpose of supporting or opposing or raising money to support or oppose any candidate, ballot measure, or political party; gifts to Board members and/or employees; expenses incurred with any club or organization that discriminates on the basis of race, gender, religion, sexual orientation or other legally protected criteria in its membership policy.

(3)    In-Town and Out-of Town Business Expenses. This policy addresses the following types of business expenses:

(a)    *In-town business expenses*, which are direct, out-of-pocket expenses incurred by an employee while conducting Authority business within 50 miles of the Authority's principal business office.

(b)    *Out-of-town business expenses*, which are direct, out-of-pocket expenses incurred by an employee while conducting Authority business more than 50 miles from the Authority's principal business office.

(4)    Administrator Approval. The reimbursement of certain business expenses requires the approval of a responsible officer (the "**Administrator**") in the manner set forth in this policy. As used in this policy, the appropriate Administrator shall be designated as follows:

| Authority Position | Corresponding Administrator |
|---|---|
| Board Member | Individual expenses of $500 or more require the approval of a disinterested Executive Committee member. |
| President/CEO, General Counsel and Chief Auditor | Individual expenses of $500 or more requires approval of the Chair of the Board. |
| Vice President | Individual expenses under $250 require the approval of another Vice President; individual expenses of $250 or more require the approval of the President/CEO or his or her designee (the "**President/CEO**"). |

53-611 (518)

| | |
|---|---|
| | If the President/CEO's designee is the Vice President requesting the reimbursement, then the President/CEO (and not a designee) must approve the reimbursement. |
| Department Head | Individual expenses under $250 require the approval of the corresponding Vice President; individual expenses of $250 or more require the approval of the President/CEO.   If the President/CEO's designee is the Vice President of the Department Head requesting the reimbursement, then the President/CEO (and not a designee) must approve the reimbursement. |
| Other employees | Individual expenses under $250 require the approval of the Department Head; individual expenses of $250 or more require the approval of the President/CEO. |

(5)    Expense Reimbursement Forms.

    (a)    *Meal/Entertainment Reimbursement Request.*  All reimbursable in-town expenses (other than in-town mileage and parking expenses) are processed on a "Reimbursement Request." Board members and employees must execute and deliver to the Administrator the Reimbursement Request no later than thirty (30) days after the incurrence of the corresponding expense.

    (b)    *Monthly Mileage and Parking Fee Reimbursement Request.*  Each Board member or employee who seeks reimbursement for in-town mileage and parking expenses must complete and attach to the corresponding Monthly Reimbursement Report a "Monthly Mileage and Parking Fee Reimbursement Request" no later than thirty (30) days after the end of the corresponding calendar month.

(6)    Supporting Documentation for All Authorization and Reimbursement Requests.

    (a)    Board members and employees shall submit reimbursement requests only for actual and reasonable reimbursable business expenses that directly relate to the transaction of the Authority's business.

    (b)    For each authorization and reimbursement request described in Section 4 of this policy, employees should clearly document and explain the business purpose of the proposed or actual expenditures, including, without limitation, the type of expenditure and the reason why such expenditure directly relates to Authority business.

(c)    All expenses must be itemized (e.g., a detailed list of individual expenses, no groupings of expenses) in each authorization and reimbursement request. For example, if a Board member or employee pays for a meal of an Authority customer or business associate, then the name and business affiliation of the customer or business associate, as well as the purpose for the meeting, must be listed on the reimbursement request.

(d)    The original, itemized, detailed receipts must be provided in all reimbursement requests. Each receipt must be imprinted with the name of the business and date. Reimbursement requests will not be processed without a related receipt, unless the employee submits a written statement of the circumstances why the receipt is not submitted. Excluded from this requirement are the payments of tips to taxi drivers, bellhops, room attendants, and others where receipts are generally not available or required.

(e)    Claims that have not been properly prepared, authorized or supported by documentation shall be returned to the Board member or employee within 14 days with the reasons given for not processing the claim.

(7)    Approval for Certain Business Expenses.

(a)    The Administrator will approve in writing each reimbursement request if the Administrator determines that the corresponding expenditure is a reimbursable expense under this policy.

(b)    Board members or employees who are uncertain whether a proposed expenditure is reimbursable in accordance with this policy may request, at least fifteen (15) days prior to the incurrence of such expenditure, pre-approval of such expenditure with the Administrator.

(c)    Alcohol expenses are not reimbursable unless specifically pre-approved by the Executive Committee for all Board member requests or the President/CEO for all Authority staff requests.

(8)    Payment of Approved Business Expenses. The Authority generally will process payments for reimbursement requests by issuing a check made to the Board member or employee eligible for such reimbursement.

(9)    Subsequent Audit by the Authority. All reimbursement requests and corresponding payments are subject to subsequent audit by the Authority on a periodic basis. If the Authority subsequently determines that reimbursements have been inappropriately made, then the Authority may retroactively disallow such reimbursements and the Board member or employee will be required to reimburse the Authority for such amounts.

53-611 (520)

POLICY SECTION NO. 3.30

**ATTACHMENT A**

**BUSINESS EXPENSES**

(1)    <u>Reimbursable Business Expenses</u>. This section lists *business expenses* that generally are reimbursable, and sets forth the requirements and procedures for Board members and employees to obtain reimbursement for such expenses. Any expense(s) not listed in this attachment may not be authorized nor reimbursed without special pre-approval by the respective Administrator:

    (a)    *Meals, Entertainment and Gratuities:*

        (i)    *Definition of Meal, Entertainment and Gratuity Expenses.*

            (1) *Meals* – expenses include the costs of food, beverages and taxes. Alcohol expenses are not reimbursable unless specifically pre-approved by the Executive Committee for all Board member requests or the President/CEO for all Authority staff requests.

            (2) *Entertainment* – expenses incurred in any activity generally considered to provide socially appropriate entertainment, amusement or recreation, including the entertainment of customers or clients of the Authority at social, athletic and cultural activities or events.

            (3) *Gratuities* – expenses for gratuities in connection with meals and entertainment should be reasonable. Receipts generally are not required for the reimbursement of gratuities if such gratuities are included in the expenses for the corresponding meal or entertainment activity.

            (4) *Exclusions* – Specifically excluded from reimbursement are meals between Authority employees and/or Board members; meals with vendors or contractors with whom the Authority already has an existing relationship/contract.

        (ii)    *Requirements for Reimbursement.* Expenses for meals, entertainment and gratuities are only reimbursable if the Authority determines that these expenses are (1) actual, (2) reasonable and (3) directly related to the transaction of the Authority's business. Such expenses only will be considered "directly related" to the transaction of the Authority's business if the Board member or employee actively is engaged, during the meal or entertainment activity, in discussions, meetings, negotiations or other business transactions with business associate(s) for the purpose of generating revenues for the Authority or another specific business benefit such as the enhancement of the Authority's image. Discussions, meetings, negotiations or other business transactions that only are incidental to the meal or entertainment will not meet the "directly related" test.

53-611 (521)

(iii)   *Procedure to Request Reimbursement.*  Board members and employees shall request reimbursement for meal, entertainment and gratuity expenses on the Meal/Entertainment Reimbursement Request form for in-town or on the Travel Expense Reimbursement Request form for out-of-town.  The reimbursement request shall itemize (1) the business expense, (2) the name, title and Authority affiliation of the business associate(s) who participated in the meal or entertainment activity and (3) a description of why the business expense is directly related to the transaction of the Authority's business.  If an employee requests reimbursement for a meal or entertainment activity that includes business associate(s) who are not directly related to the transaction of the Authority's business, then expenses relating to these individuals shall be excluded from the reimbursement request.

(b)   *Seminars and Conferences.*

(i)   *Definition of Seminar and Conference Expenses.*  Seminar and conference expenses include the applicable seminar or conference registration fee and related supplies and books that are purchased during the course of the seminar or conference.

(ii)   *Requirements for Reimbursement.*  Expenses for seminars and conferences are only reimbursable if such expenses are (1) actual, (2) reasonable and (3) directly related to the transaction of the Authority's business.

(iii)   *Procedure to Request Reimbursement.*  Employees should request reimbursement for seminars and conferences on the Monthly Reimbursement Report for in-town expenses or on the Travel Expense Reimbursement Request for out-of-town expenses.

(c)   *Vehicle, Mileage and Parking Fees.*

(i)   *Definition of Vehicle and Mileage Expenses.*  Vehicle and mileage expenses include expenses that are incurred by Board members or employees with his or her personal vehicle parking, mileage and toll fees for authorized use of a personal vehicle; vehicle and mileage expenses may include:

- parking, taxi and shuttle fees to and from the airport, bus or train station; and

- rental car payments in limited circumstances.

- or a vehicle authorized for use by the Authority.

- and, will be paid at the current rate established by the Internal Revenue Service (IRS) for that year, or the rate that is established from time to time by the Authority at its discretion.

(ii)    *Requirements for Reimbursement.*  Expenses for vehicle use, mileage and parking fees are only reimbursable if they directly relate to the transaction of the Authority's business.  Board members and employees authorized to operate a privately-owned vehicle on Authority business must possess a valid California Driver's License and maintain their vehicles in a safe operating condition.

(iii)    *Procedure to Request Reimbursement.*  Board members and employees should request reimbursement for vehicle use, mileage and parking fees on the Monthly Mileage and Parking Fee Reimbursement Request for in-town expenses or on the Travel Expense Reimbursement Request form for out-of-town expenses.  Board members and employees should attach copies of all parking receipts to the Monthly Mileage and Parking Fee Reimbursement Request.

(A)    Board members and employees shall attach copies of all parking and toll receipts to the Request.

(B)    If an Administrator determines that such Board member or employee will drive to an out-of-town location with his or her personal automobile instead of flying to such location, then such Board member or employee may request reimbursement for vehicle, mileage, parking and toll fees in an amount that shall not exceed the expenses incurred in flying to such location in accordance with this policy.

(C)    If a Board member or employee determines to fly or take alternative transportation (e.g., bus or train) to the out-of-town location, then the employee may request reimbursement for an amount that is the lesser of (1) the parking fees to store his or her vehicle in long-term parking during the duration of the out-of-town trip, or (2) the cost of the taxi or shuttle to and from the airport, bus or train station.

(D)    A Board member or employee may only use a rental car while on out-of-town business if (1) the need for a car is necessary to transact Authority business, (2) the use of taxi services or public transportation would not be economical or practicable and (3) the Administrator has approved in advance the rental car usage.

(E)    Board members and employees should choose the least expensive and more effective type of ground transportation where practical, including the use of taxis, shuttles, ferries, buses or other public transportation.

(d)    *Office Supplies (Board members only).*

(i)    *Definition of Office Supply Expenses.*  Office supplies subject to this section include paper, toner, writing utensils, copy expenses, facsimile expenses, and mailing and overnight shipping expenses.

(ii)    *Requirements for Reimbursement.*  Expenses for office supplies only are reimbursable if such office supplies directly relate to the Board member's transaction of the Authority's business.

(iii)    *Procedure to Request Reimbursement.*  Board members should request reimbursement for office supplies on the Monthly Reimbursement Report.

(e)    Telephone Services.

(i)    *Definition of Telephone Call Expenses.* Telephone expenses include local and long-distance telephone calls made from a land line or cellular phone.

(ii)    *Requirements for Reimbursement.*  Expenses for telephone calls made from a land line or cellular phones are reimbursable only if such expenses are (1) actual, (2) reasonable and (3) directly related to the transaction of the Authority's business.

(iii)    *Procedure to Request Reimbursement.*  Employees should request reimbursement for telephone calls on the Monthly Reimbursement Report for in-town expenses and the Travel Expense Reimbursement Request for out-of-town expenses, and should attach copies of the corresponding telephone bills that highlight the specific calls for which reimbursement is sought.  Employees may request reimbursement of the actual and reasonable cost of one personal telephone call per day during an out-of-town assignment.

[Amended by Resolution No. 2007-0071 dated July 5, 2007.]
[Amended by Resolution No. 2006-0042 dated April 3, 2006.]
[Amended by Resolution No. 2005-0100 dated October 3, 2005.]
[Amended by Resolution No. 03-010 RR dated April 3, 2003.]
[Resolution No. 2002-2 dated September 20, 2002.]

53-611 (524)



# SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## POLICIES

| | | | |
|---|---|---|---|
| ARTICLE | 3 | - | PERSONNEL |
| PART | 3.4 | - | REIMBURSEMENT |
| SECTION | 3.40 | - | TRAVEL AND LODGING EXPENSE REIMBURSEMENT POLICY |

**PURPOSE:** To establish a policy for the reimbursement of travel expenses for the members of the Board (the **"Board"**) and employees of the San Diego County Regional Airport Authority (the **"Authority"**).

**POLICY STATEMENT:**

(1)  <u>Objectives</u>. The objectives of this policy are to:

   (a)  Comply with section 170024(2)(b) of the San Diego County Regional Airport Authority Act, as amended, which provides that Board members may be paid for direct out-of-pocket expenses;

   (b)  Ensure that the Board member's and employee's travel expenses are reasonable, cost effective and necessary for the Authority's business;

   (c)  Determine which travel expenses are appropriate and therefore reimbursable;

   (d)  Ensure that Board members and employees are reimbursed on a timely basis for all appropriate travel expenses that they incur; and

   (e)  Incorporate applicable provisions of Government Code § 53232.2 – 53232.3.

(2)  <u>General.</u>

   (a)  Board members and employees shall use available government and/or group rates for travel and lodging. Lodging expenses incurred in connection with a conference or organized educational activity shall not exceed the maximum group rate published by the conference or activity sponsor. If the group rate is not available, the Board member or employee shall use comparable lodging.

   (b)  Reimbursement for any expense that does not fall within this policy shall require the Board's or President/CEO's approval which must be obtained before the expense is incurred.

   (c)  Domestic travel for the purpose of this policy includes travel within and between the 50 United States.

53-611 (525)



(d)      Board members and employees are encouraged to execute and deliver to their respective Administrator the Out-of-Town Travel Authorization Request at least three (3) weeks prior to the anticipated travel departure date, but this advance notice period is not required if the Authority provides less than three (3) weeks' notice in requesting that a Board member or employee conduct out-of-town travel.

(e)      The Out-of-Town Travel Expense Reimbursement Request, and, as applicable, the Meal/Entertainment Reimbursement Request, should be submitted to the Administrator within a reasonable amount of time, but no later than thirty (30) days after the completion of the out-of-town travel.

(f)      All domestic travel advances must be cleared no later than thirty (30) days after the completion of the domestic travel, and all international travel advances must be cleared no later than forty-five (45) days after the completion of the international travel.

(g)      Should the Board member or employee owe the Authority for a portion of any unused travel advance, the Board member or employee must pay to the Authority the unused portion by cash or personal check. Failure to account for travel advances within the required 30-day period may result in the suspension of privileges to obtain further advances.

(h)      All reimbursement requests shall be in U.S. dollars, with sufficient supporting documentation for any corresponding currency conversion rates for expenses incurred outside of the United States.

(3)      <u>Administrator Approval</u>. The reimbursement of travel and certain business expenses requires the approval of a responsible officer (the "**Administrator**") in the manner set forth in this policy. As used in this policy, the appropriate Administrator shall be designated as follows:

| Authority Position | Corresponding Administrator |
|---|---|
| Board Member | Individual expenses of $500 or more requires the approval of a disinterested Executive Committee member. |
| President/CEO, General Counsel and Chief Auditor | Individual expenses of $500 or more requires approval of the Chair of the Board. |
| Vice President | Individual expenses under $250 require the approval of another Vice President; individual expenses of $250 or more require the approval of the President/CEO or his or her designee (the "**President/CEO**"). If the President/CEO's designee is the Vice President requesting the reimbursement, then the President/CEO (and not a designee) must approve the reimbursement. |

53-611 (526)

| Department Head | Individual expenses under $250 require the approval of the corresponding Vice President; individual expenses of $250 or more require the approval of the President/CEO. If the President/CEO's designee is the Department Head requesting the reimbursement, then the President/CEO (and not a designee) must approve the reimbursement. |
|---|---|
| Other employees | Individual expenses under $250 require the approval of the Department Head; individual expenses of $250 or more require the approval of the President/CEO. |

(4)  <u>Expense Reimbursement Forms</u>.

(a)  *Out-of-Town Travel Authorization Request.* Board members and employees who wish to engage in out-of-town travel that directly relates to the transaction of the Authority's business must complete, prior to such out-of-town travel, the "Out-of-Town Travel Authorization Request".

(b)  *Out-of-Town Travel Expense Reimbursement Request.* If a Board member or employee receives authorization for out-of-town travel by their Administrator, then such Board member or employee must complete, after such out-of-town travel, an "Out-of-Town Travel Expense Reimbursement Request".

(c)  *Meal/Entertainment Reimbursement Request.* Each Board member or employee who seeks reimbursement of meal and entertainment expenses associated with out-of-town travel must complete and attach to the corresponding Travel Expense Reimbursement Request a "Meal/Entertainment Reimbursement Request" (refer to policy 3.30, Business Reimbursement Expense.)

(5)  <u>Supporting Documentation for All Authorization and Reimbursement Requests</u>.

(a)  Board members and employees shall submit reimbursement requests only for actual and reasonable reimbursable travel expenses that directly relate to the transaction of the Authority's business.

(b)  All travel and lodging expenses must be itemized (e.g., a detailed list of individual expenses, no groupings of expenses) in each authorization and reimbursement request.

(c)  The *original, itemized, detailed* travel and lodging receipts must be provided in all reimbursement requests. Each receipt must be imprinted with the name of the business and date. Reimbursement requests will not be processed without a related receipt, unless the Board member or employee submits a written statement of the circumstances why the receipt is not submitted.

53-611 (527)

(d)    Claims that have not been properly prepared, authorized or supported by documentation shall be returned to the Board member or employee within 14 days with the reasons given for not processing the claim.

(6)    Approval for Certain Expenses.

(a)    The Administrator will approve in writing each travel authorization request and corresponding reimbursement request if the Administrator determines that the corresponding expenditure is a reimbursable expense under this policy.

(7)    Cancellation and Penalties.  A Board member or employee who does not attend an event that the Authority has pre-paid at such Board member's or employee's request shall be responsible for any pre-paid costs, unless the Board member's or employee's inability to attend such event is for valid medical reasons, personal emergencies, or reasons attributable to the Authority.  Board members and employees who cancel an out-of-town trip must return any travel advances no later than five (5) days after the date of such cancellation.  If for some reason a Board Member or employee is incapacitated, then a reasonable amount of time will be given to return any travel expenses.

(8)    Payment of Approved Travel and Business Expenses.  The Authority generally will process payments for reimbursement requests by issuing a check made to the Board member or employee eligible for such reimbursement.

(9)    Subsequent Audit by the Authority.  All reimbursement requests and corresponding payments are subject to subsequent audit by the Authority on a periodic basis.  If the Authority subsequently determines that reimbursements have been inappropriately made, then the Authority may retroactively disallow such reimbursements and the Board member or employee will be required to reimburse the Authority for such amounts.

53-611 (528)



POLICY SECTION NO. 3.40

## ATTACHMENT A

## TRAVEL EXPENSES

<u>Reimbursable Travel Expenses</u>.  Expenses shall be reasonable and directly related to the transaction or representation of the Authority's business. Directly related is defined as a Board Member or employee actively engaged, during the travel activity, in discussions, meetings, negotiations or other business transactions with business associate(s) for the benefit of the Authority.

This section lists *air travel and lodging expenses* that generally are reimbursable, and sets forth the requirements and procedures for Board members and employees to obtain reimbursement for such expenses:

    (a)    *Air Travel.*

        (i)    *Definitions.*

•   *Air Travel Expenses.*  Air travel expenses include the cost of the airline ticket and the cost of air phone calls when directly related to the transaction of Authority business.

•   *Domestic travel.* Domestic travel includes travel within and between the 50 United States.

        (ii)    *Requirements for Reimbursement.*  Expenses for air travel to out-of-town locations are only reimbursable if the expenses are (1) actual, (2) reasonable and (3) directly related to the transaction of the Authority's business.

        (iii)    *Procedure to Request Reimbursement.*

        (A)    *Pre-Approval of Air Travel.*  Board members and employees shall submit an Out-of-Town Travel Authorization Request that describes the proposed air travel to the respective Administrator as soon as the travel requirement is known; preferably, at least three (3) weeks prior to the anticipated travel departure date. This advance notice period is not required if the Authority provides less than three (3) weeks' notice in requesting that a Board member or employee participate in travel.

        (B)    *Airline Tickets.*  Board members are encouraged to not personally make travel arrangements for air travel approved by the Authority.

•   In the event that a Board member chooses to personally purchase airline tickets then such Board member must:

    (1)  obtain the lowest fare available,

    (2)  purchase coach fare for *domestic travel,*

---

53-611 (529)

- Board members and employees may elect to travel business class for non-domestic air travel in cases where the flight time is greater than six hours. If business class is unavailable, Board members and employees may elect a one class upgrade,

- Give preference to airlines with operations at the San Diego International Airport,

- Board members and employees who opt to upgrade their airline tickets beyond the standards set forth in this policy will be responsible for paying any additional expense for such upgrade.

(C)     *Early and Late Departures.* Board members and employees as approved by the Administrator are permitted to depart one or two days early (e.g., on a Saturday for a meeting beginning on Monday morning) or stay one or two extra days (e.g., until Sunday after a meeting ending on Friday or Saturday) if (1) they are able to obtain a discounted airfare for which they would not otherwise be eligible and (2) the combined cost of the discounted airfare and additional allowable expenses are less than the cost of the lowest airfare otherwise available. The Authority will reimburse the cost of allowable expenses relating to advance arrivals or late departures only for the minimum number of days required to obtain the discounted fare. If the Board member or employee elects to travel extra days, the respective Administrator must pre-approve such extra travel day(s) and obtain appropriate documentation to support such pre-approval.

(D)     *Airline Air Phone Usage.* Board members and employees only may request reimbursement for air phone usage when the corresponding call is (1) actual, (2) reasonable and (3) directly related to the transaction of the Authority's business.

(E)     *Frequent Flyer Award Programs.* The Authority does not reimburse individuals for the value of frequent flyer miles or points that are redeemed to acquire airline tickets or hotel rooms on Authority business. Membership dues in frequent flyer and similar award programs are a personal expense and not reimbursable by the Authority.

(b)     *Lodging and Associated Expenses.*

(i)     *Definition of Lodging and Associated Expenses.* Lodging and associated expenses may include the cost of the lodging, laundry and dry cleaning expenses in certain circumstances.

(ii)     *Requirements for Reimbursement.* Expenses for out-of-town lodging and associated expenses are only reimbursable if the expenses are (1) actual, (2) reasonable and (3) directly related to the transaction of the Authority's business.

(iii)     *Procedure to Request Reimbursement.*

**53-611 (530)**

(A)    *Reimbursement Request.* Board members and employees shall request reimbursement for lodging and associated expenses on the Out-of-Town Travel Expense Reimbursement Request, including business expenses that directly relate to the transaction of the Authority's business (e.g., business facsimiles, internet, etc.).

(B)    *Lodging.* Lodging for Board members and employees will be determined by the respective Administrator based on the price and quality of similarly situated lodging.

(C)    *Laundry and Dry Cleaning.* Board members and employees may request reimbursement for reasonable laundry and dry cleaning costs for out-of-town assignments of three or more consecutive nights.

(c)    *Seminar and Conference fees, Meals, Entertainment, and Gratuities:* Board members and employees should refer to Policy 3.30, Business Reimbursement Expense, for authorization and reimbursement requests associated with travel and lodging.

[Amended by Resolution No. 2007-0071 dated July 5, 2007.]
[Amended by Resolution No. 2006-0084 dated July 6, 2006.]
[Amended by Resolution No. 2005-0101 dated September 8, 2005.]
[Amended by Resolution No. 03-069 dated November 10, 2003.]
[Resolution No. 03-010 RR dated April 3, 2003.]

53-611 (531)

## SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## POLICIES

| | | |
|---|---|---|
| **ARTICLE 5** | - | **CONTRACTING AND DEBARMENT** |
| **PART 5.0** | - | **CONTRACTING AND PURCHASING** |
| **SECTION 5.01** | - | **PROCUREMENT OF SERVICE AND CONSULTING AGREEMENTS AND THE PURCHASE OF SUPPLIES, MATERIALS AND EQUIPMENT** |

---

**PURPOSE:** To establish a policy governing the procurement of service and consulting agreements and the purchase of supplies, materials and equipment for the San Diego County Regional Airport Authority (the "**Authority**").

**POLICY STATEMENT:**

In the procurement of service and consulting agreements and the purchase of supplies, materials and equipment, the Authority's Executive Director or his or her designee (the "**Executive Director**") shall be responsible for following all procedures required by (1) the Authority, (2) the San Diego County Regional Airport Authority Act, as amended from time to time, and (3) other applicable federal, state and local laws.

(1)    Service and Consulting Agreements.

    (a)    Minor Service Agreements of $50,000 or Less. Subject to federal requirements, when the expenditure is $50,000 or less, a competitive RFP or RFQ process is not required. The issuing department will evaluate potential candidates and recommend the final candidate to the Executive Director. The Executive Director shall award the agreement based on the issuing department's recommendation and inform the Authority's Board of Directors (the "**Board**") at its next meeting.

    (b)    Intermediate Service Agreements of $50,001 through $100,000. When the expenditure is between $50,001 and $100,000, an agreement shall be awarded after the Authority has completed its evaluation process, including the completion of a competitive RFP or RFQ process, subject to federal requirements. The issuing department will evaluate and recommend the final candidate to the Executive Director. The Executive Director shall award the agreement based on the issuing department's recommendation and inform the Board at its next meeting.

    (c)    Major Service Agreements Over $100,000. When the expenditure exceeds $100,000, an agreement shall be awarded after the Authority has completed its evaluation process, including, subject to federal requirements: (i) the completion of a competitive RFP or RFQ process; (ii) the holding of an information exchange meeting with potential candidates; and (iii) the advertisement of the services sought under the RFP or RFQ. An evaluation committee selected by the Authority then shall interview potential candidates. The evaluation committee and the issuing department shall recommend the top three ranking candidates to the Executive

---

53-611 (532)

Director for selection via a final report. The Executive Director shall award the agreement based on the final report and inform the Board at its next meeting.

(d)    Certain Professional Services Agreements. In accordance with Section 4526 of the California Government Code and the procedures described above in this Paragraph 1 (and subject to federal requirements), the Authority shall follow an RFQ process to obtain the professional services of private architectural, landscape architectural, engineering, environmental, land surveying or construction project management firms on the basis of demonstrated competence and on the professional qualifications necessary for the satisfactory performance of the services required.

(2)    Purchasing of Supplies, Materials and Equipment. When supplies, materials or equipment are to be purchased, the Executive Director shall proceed as follows:

(a)    For purchases between $5,000 and $50,000, the Executive Director shall secure competitive quotations. The contract shall be awarded to the person whose quotation the Executive Director determines to be in the best interests of the Authority, taking into account: (i) the person's qualifications, fitness, capacity and experience; (ii) factors relating to the public interest; and (iii) such other factors as the Executive Director reasonably deems appropriate and in the best interests of the Authority.

(b)    When the estimated expenditure for any one purchase is in excess of $50,000, but does not exceed $100,000, informal written bids shall be solicited from appropriate suppliers. The call for informal bids shall specify a time period within which bids will be received. All bids received shall be considered together at the expiration of this period. The contract shall be awarded to the bidder whose bid the Executive Director determines to be in the best interests of the Authority, taking into account: (i) the bidder's qualifications, fitness, capacity and experience; (ii) factors relating to the public interest; and (iii) such other factors as the Executive Director reasonably deems appropriate and in the best interests of the Authority.

(c)    When the estimated expenditure for any one purchase exceeds $100,000, the Executive Director shall publish a notice inviting sealed bids. Such notice shall specify a time period within which bids shall be received, which shall be not less than ten days after publication of such notice. All bids received shall be considered together at the expiration of this period. The contract shall be awarded to the bidder whose bid the Executive Director determines to be in the best interests of the Authority, taking into account: (i) the bidder's qualifications, fitness, capacity and experience; (ii) factors relating to the public interest; and (iii) such other factors as the Executive Director reasonably deems appropriate and in the best interests of the Authority. Purchases that exceed $100,000 shall be reported to the Board at its next meeting.

(3)    Change Orders.

(a)    The Executive Director is authorized to negotiate and execute any change order without Board action for any agreement or contract originally awarded following the informal procedures described above in Paragraph 1(a), 1(b), 2(a) or 2(b); provided, however, that the Board's approval shall be required for any change order that causes the aggregate amount of the

relevant agreement or contract (*i.e.,* the original agreement or contract amount plus the amount of the change order) to be $110,000 or greater.

(b)     In addition, for any agreement or contract originally awarded following the procedures described above in Paragraph 1(c) or 2(c), the Executive Director is authorized to negotiate and execute any change order without Board action for:

(i)     Agreements or contracts awarded for less than or equal to $1,000,000, in an amount not to exceed 10% of the original agreement or contract award, and extending time for completion for a period not to exceed 90 days;

(ii)     Agreements or contracts awarded for more than $1,000,000, but less than or equal to $5,000,000, in an amount not to exceed 6% of the original agreement or contract award, and extending time for completion for a period not to exceed 90 days; and

(iii)     Agreements or contracts awarded for more than $5,000,000, in an amount not to exceed 4% of the original agreement or contract award, and extending time for completion for a period not to exceed 90 days.

Notwithstanding the foregoing, with respect to any agreement or contract originally awarded following the procedures described above in Paragraph 1(c) or 2(c), any change order that exceeds the budget approved by the Board for the relevant expenditure shall be presented to the Board for action.

(c)     The Executive Director shall notify the Board at its next meeting of any change orders approved by the Executive Director.

(d)     The Executive Director may, at his or her sole discretion, bring any change order before the Board for action.

(4)     <u>Execution of Contracts</u>.  The Executive Director shall execute all service and consulting agreements and contracts for the purchase of supplies, materials and equipment, except where otherwise provided by law.

(5)     <u>Emergency Purchases</u>.

(a)     Notwithstanding any other provisions of this policy, the Executive Director may make or authorize others to make emergency procurements if:  (i) there exists a threat to public health, welfare or safety; or (ii) a situation exists that makes compliance with the procurement process contrary to the public interest.  Emergency procurements shall be made with such competition as the Executive Director deems appropriate under the circumstances.

(b)     A written determination of the basis for the emergency and for the award of the particular contract shall be included in the contract file.

Emergency procurements authorized by the Executive Director that exceed $100,000 shall be reported to the Board at its next meeting.

(6)    Sole Source Procurement.  A contract may be awarded without complying with the otherwise applicable competitive procedures under this policy when the Executive Director determines in writing that:  (a) there is only one known source for the required supply, service or item; or (b) one source is the only practical way to respond to overriding circumstances that make compliance with the otherwise applicable competitive procedures under this policy not in the best interests of the Authority.

(7)    Specifications.

    (a)    Pursuant to Section 3400 of the California Public Contract Code, the Authority shall not draft RFPs, RFQs or specifications for bids (i) in a manner that limits the RFP or RFQ process or bidding, directly or indirectly, to any one specific concern, or (ii) calling for a designated material, product or service by specific brand or trade name unless the specification lists at least two brands or trade names of comparable quality or utility and is followed by the words "or equal" so that respondents may furnish any equal material, product or service.  The Authority shall, if aware of an equal product manufactured in California, name that product in the specification.  In those cases involving a unique or novel product application required to be used in the public interest, or where only one brand or trade name is known to the Authority, it may list only one.  Specifications shall provide a period of time prior to or after, or prior to and after, the award of the agreement or contract for submission of data substantiating a request for a substitution of "an equal" item.  If no time period is specified, data may be submitted any time within 35 days after the award of the agreement or contract.

    (b)    Paragraph 7(a) shall not be applicable if the Authority makes a finding that is described in the RFP, RFQ or invitation for bids that a particular material, product or service is designated by specific brand or trade name for either of the following purposes:  (i) in order that a field test or experiment may be made to determine the product's suitability for future use; or (ii) in order to match other products in use on a particular public improvement either completed or in the course of completion.

(8)    Disadvantaged Business Enterprises.  The Authority's procurement of service and consulting agreements and contracts for the purchase of supplies, materials and equipment shall be consistent with the Federal Aviation Administration's policies relating to the participation of disadvantaged business enterprises.

(9)    Indemnification.  The Executive Director shall determine the appropriate indemnification provisions to include in service and consulting agreements and contracts for the purchase of supplies, materials and equipment.

(10)    Insurance Requirement.  The Executive Director shall determine the appropriate insurance provisions to include in service and consulting agreements and contracts for the purchase of supplies, materials and equipment.

(11)    <u>Compliance with all Applicable Laws</u>.  In any situation where compliance with this policy will place the Authority in conflict with any applicable provisions of state or federal law, the Authority shall comply with such provisions, notwithstanding this policy.

[Resolution No. 2002-02 dated September 20, 2002.]
[Superceded by Resolution No. _____ dated _____.]

53-611 (536)

## SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## POLICIES

| | | | |
|---|---|---|---|
| **ARTICLE** | **5** | - | **CONTRACTING AND DEBARMENT** |
| **PART** | **5.0** | - | **CONTRACTING AND PURCHASING** |
| **SECTION** | **5.02** | - | **PROCUREMENT OF CONTRACTS FOR PUBLIC PROJECTS** |

**PURPOSE:** To establish a policy governing the procurement of contracts for Public Projects (as defined below) for the San Diego County Regional Airport Authority (the "**Authority**").

**POLICY STATEMENT:**

In the procurement of contracts for Public Projects (as defined below), the Authority's Executive Director or his or her designee (the "**Executive Director**") shall be responsible for following all procedures required by (1) the Authority, (2) the San Diego County Regional Airport Authority Act, as amended from time to time, and (3) other applicable federal, state and local laws.

This policy relates to the Authority's procurement of contracts for Public Projects (as defined below). See Section 5.01 for the Authority's policy relating to the procurement of service and consulting agreements and the purchase of supplies, materials and equipment.

This policy is designed to provide for increased economy in procurement activities and to enable the Authority to maximize the purchasing value of Authority funds by fostering effective broad-based competition while ensuring fair and equitable treatment of all persons who deal with Authority procurement.

Fair and equitable treatment includes (but is not limited to): fair and equitable contractor selection processes, utilization of prevailing wages, Disadvantaged Business Enterprise goals for federally funded work, opportunities for small business, proper employment of apprentices, equal employment opportunities, payment bonds and safe and healthful working conditions on all contracts executed by the Authority.

(1)     Awarding of Contracts for Public Projects.

    (a)     The following terms shall have the below-specified meanings:

        (i)     "**Public Project**" means (a) construction, reconstruction, erection, alteration, renovation, improvement, demolition or repair work involving any publicly owned, leased or operated Facility; and (b) painting or repainting of any such Facility.

        (ii)     "**Facility**" means any plant, building, structure, ground facility, utility system, real property, streets and highways or other public work improvement.

53-611 (537)

(iii)  **"Maintenance Work"** means (a) routine, recurring, and usual work for the preservation or protection of any publicly owned or publicly operated Facility for its intended purposes; (b) minor repainting; (c) recarpeting; (d) resurfacing of streets and highways at less than one inch; or (e) landscape maintenance, including mowing, watering, trimming, pruning, planting, replacement of plants, and servicing of irrigation and sprinkler systems.

(iv)  **"Fee-producing infrastructure project"** or **"fee-producing infrastructure facility"** means the operation of the infrastructure project or facility will be paid for by the persons or entities benefited by or utilizing the project or facility.

(v)  **"Design-Build (D-B)"** is a project delivery method under which one entity performs both architecture/engineering and construction under a single contract. Design-build procurements will use a qualifications based selection (QBS) process, or a QBS with a competitive design and price proposal.

(vi)  **"Construction Manager at Risk (CMAR)"** is a project delivery method under which the contractor is selected using a QBS and works with the architect/engineer providing pre-construction services during design, and then constructs the project under a negotiated Guaranteed Maximum Price (GMP) or fixed price.

(vii)  **"Multiple Award Task Order Contracting (MATOC)"** is a project delivery method under which the contractor is contracted for using a QBS and there is a multiple award to two or more contractors.  The contractors will competitively compete for small projects, or negotiate a GMP or fixed price.  Projects implementation under a MATOC type contract can utilize the D-B-B, A+B, D-B or CMAR project delivery approaches.

(viii)  **"Design-Bid-Build"** is a project delivery method under which the architecture/engineering is contracted for separately from the contractor.  The contractor is selected based upon being the lowest responsive and responsible bidder.  A+B contracting is a variation of this system.

(ix)  **"A+B"** is a project delivery method under which the contractor is selected based on a combination of weighted factors that include both cost and schedule components.

(x)  **"Qualifications Based Selection (QBS)"** is a process where the contractor, or design-build team, is selected based upon the attributes of that entity which is judged, or reviewed, to determine conformity to predetermined standards and requirements that are determined to be in the best interest of the Authority.

53-611 (538)

(xi)   **"Guaranteed Maximum Price (GMP)"** is a sum established in an agreement between the Authority and a Design-Build Team, or a Construction Manager at Risk as the maximum cost of performing specified work on the basis of cost of labor and materials plus overhead expenses and profit.

(b)   Public Projects of $25,000 or less may be performed by Authority employees, by negotiated contract or by purchase order.

(c)   When the contract amount for a Public Project is more than $25,000 but less than or equal to $100,000, the Authority shall follow the informal procedures set forth below:

(i)   The Authority shall create and maintain a list of qualified contractors identified by categories of work.

(ii)   All contractors on the list maintained by the Authority for the category of work being bid, and/or such construction trade journals as are determined by the Executive Director (which may include one or more of the trade journals specified for San Diego County by the California Uniform Cost Accounting Commission pursuant to Section 22036 of the California Public Contract Code), shall be mailed a notice inviting informal bids unless the product or service is proprietary.

(iii)   The mailing of notices to contractors and construction trade journals must be completed not less than 10 calendar days before bids are due.

(iv)   The notice inviting informal bids shall: (a) describe the Public Project in general terms; (b) describe how to obtain more detailed information about the Public Project; and (c) state the time and place for the submission of bids.

(v)   After the time for submission of bids has expired, the Executive Director may award the contract to the bidder whose bid the Executive Director determines to be in the best interests of the Authority, taking into account: (a) the bidder's qualifications, fitness, capacity and experience; (b) factors relating to the public interest; and (c) such other factors as the Executive Director reasonably deems appropriate and in the best interests of the Authority.

(vi)   If all bids received are in excess of $100,000, then the Executive Director may award the contract to a bidder whose bid is under $110,000, if any, taking into account the factors listed above in Paragraph 1(c)(v). If no bid is under $110,000, then all bids shall be rejected and the Authority's cost estimate shall be reviewed to determine its reasonableness. If necessary, the cost estimate shall be revised and the project rebid using the procedures appropriate for the revised cost estimate.

**53-611 (539)**

(vii)   The Executive Director shall notify the Authority's Board of Directors (the **"Board"**) at its next meeting of any contracts awarded using the foregoing informal procedures.

(d)     When the contract amount for a Public Project is more than $100,000, the Authority shall follow the formal bidding procedures set forth below:

(i)     The Board shall adopt plans and specifications and working details for the Public Project.

(ii)    The Authority may pre-qualify a select bidders' list of contractors for a single project if the Executive Director determines this to be in the best interests of the Authority.

(iii)    Notice of the Public Project shall be published in a newspaper of general circulation, printed and distributed within the jurisdiction of the Authority at least 14 calendar days prior to opening of bids.

(iv)    Notice inviting formal bids also shall be mailed to such construction trade journals as are determined by the Executive Director (which may include one or more of the trade journals specified for San Diego County by the California Uniform Cost Accounting Commission pursuant to Section 22036 of the California Public Contract Code), at least 30 calendar days prior to the bid opening date.

(v)     After the time for submission of bids has expired, the Board may award the contract to the bidder whose bid the Board determines to be in the best interests of the Authority, taking into account: (a) the bidder's qualifications, fitness, capacity and experience; (b) factors relating to the public interest; (c) consideration of schedule and price where time has a financial impact (A+B bidding) and (d) such other factors as the Board reasonably deems appropriate and in the best interests of the Authority.

(e)     Notwithstanding the requirements set forth above in this Paragraph 1, and subject to federal requirements, the Authority may follow a competitive RFP or RFQ process for design-build, construction manager at risk, multiple award task order form of contracts. After the time for submission of proposals or qualifications has expired, the Executive Director may award the contract to the person or firm whose proposal or response the Executive Director determines to be in the best interests of the Authority, taking into account: (i) the person's or firm's qualifications, fitness, capacity and experience; (ii) factors relating to the public interest; and (iii) such other factors as the Board reasonably deems appropriate and in the best interests of the Authority; provided, however, that the Board, instead of the Executive Director, shall award design-build, construction manager at risk, multiple award task order form of contracts when the contract amount or task/job order is more than $100,000.

(2)     If deemed appropriate and in the best interest of the Authority, the Authority may utilize private investment capital to study, plan, design, construct, develop, finance, maintain, rebuild, improve, repair, or operate, or any combination thereof, fee-producing infrastructure facilities in accordance with Government Code Section 5956-5956.10.

(3)    <u>Federally-Funded Contracts</u>. Notwithstanding any provision in this policy to the contrary, the Authority shall comply with all federal requirements applicable to federally-funded Public Projects, including, without limitation, any terms and conditions that the Federal Aviation Administration (the "FAA") requires as a condition to the Authority's receipt of federal funds in connection with the FAA's Airport Improvement Program.

(4)    <u>Change Orders</u>.

(a)    The Executive Director is authorized to negotiate and execute any change order without Board action for any contract for a Public Project originally awarded following the informal procedures described above in Paragraph 1(b) or 1(c); <u>provided</u>, <u>however</u>, that the Board's approval shall be required for any change order that causes the aggregate amount of the relevant contract (*i.e.*, the original contract amount plus the amount of the change order) to be $110,000 or greater.

(b)    In addition, for any contract for a Public Project originally awarded following the procedures described above in Paragraph 1(d) or 1(e), the Executive Director is authorized to negotiate and execute any change order without Board action for:

(i)    Contracts awarded for less than or equal to $1,000,000, in an amount not to exceed 10% of the original contract award, and extending time for completion for a period not to exceed 90 days;

(ii)    Contracts awarded for more than $1,000,000, but less than or equal to $5,000,000, in an amount not to exceed 6% of the original contract award, and extending time for completion for a period not to exceed 90 days; and

(iii)    Contracts awarded for more than $5,000,000, in an amount not to exceed 4% of the original contract award, and extending time for completion for a period not to exceed 90 days.

Notwithstanding the foregoing, with respect to any contract originally awarded following the procedures described above in Paragraph 1(d) or 1(e), any change order that exceeds the budget approved by the Board for the relevant Public Project shall be presented to the Board for action.

(c)    The Executive Director shall notify the Board at its next meeting of any change orders approved by the Executive Director.

(d)    The Executive Director may, at his or her sole discretion, bring any change order before the Board for action.

(5)    <u>Execution of Contracts</u>. The Executive Director shall execute all contracts for Public Projects, except where otherwise provided by law.

(6)    Acceptance and Notice of Completion.  Upon the completion of a contract for a Public Project, the Executive Director may execute and record the "Acceptance and Notice of Completion," in accordance with applicable law.

(7)    Emergency Purchases.

(a)    Notwithstanding any other provisions of this policy, the Executive Director may make or authorize others to make emergency procurements if: (i) there exists a threat to public health, welfare or safety; or (ii) a situation exists that makes compliance with the procurement process contrary to the public interest.  Emergency procurements shall be made with such competition as the Executive Director deems appropriate under the circumstances.

(b)    A written determination of the basis for the emergency and for the selection of the particular contractor shall be included in the contract file.

(c)    Emergency procurements authorized by the Executive Director that exceed $100,000 shall be reported to the Board at its next meeting.

(8)    Sole Source Procurement.  A contract for a Public Project may be awarded without complying with the otherwise applicable competitive procedures under this policy when the Executive Director determines in writing that: (a) there is only one known source for the required supply, service, item or construction; or (b) one source is the only practical way to respond to overriding circumstances that make compliance with the otherwise applicable competitive procedures under this policy not in the best interests of the Authority.

(9)    Specifications.

(a)    Pursuant to Section 3400 of the California Public Contract Code, the Authority shall not draft RFPs, RFQs or specifications for bids (i) in a manner that limits the RFP or RFQ process or bidding, directly or indirectly, to any one specific concern, or (ii) calling for a designated material, product or service by specific brand or trade name unless the specification lists at least two brands or trade names of comparable quality or utility and is followed by the words "or equal" so that respondents may furnish any equal material, product or service.  The Authority shall, if aware of an equal product manufactured in California, name that product in the specification.  In those cases involving a unique or novel product application required to be used in the public interest, or where only one brand or trade name is known to the Authority, it may list only one.  Specifications shall provide a period of time prior to or after, or prior to and after, the award of the contract for submission of data substantiating a request for a substitution of "an equal" item.  If no time period is specified, data may be submitted any time within 35 days after the award of the contract.

(b)    Paragraph 8(a) shall not be applicable if the Authority makes a finding that is described in the RFP, RFQ or invitation for bids that a particular material, product or service is designated by specific brand or trade name for either of the following purposes: (i) in order that a field test or experiment may be made to determine the product's suitability for future use; or (ii) in order to match other products in use on a particular public improvement either completed or in the course of completion.

(10)    Disadvantaged Business Enterprises.  The Authority's procurement of contracts for Public Projects shall be consistent with the FAA's policies relating to the participation of disadvantaged business enterprises.

(11)    Performance and Payment Bonds.  Performance and payment bonds or equivalent acceptable security shall be required at the discretion of the Executive Director, or to the extent required by applicable law (including, without limitation, Section 3247 *et seq.* of the California Civil Code).

    (a)    Bond Must be Delivered Prior to Issuing Contract Document.  If required, a performance and payment bond satisfactory to the Authority, executed by a surety company authorized to do business in California or otherwise secured in a manner satisfactory to the Authority, shall be presented to the Authority prior to issuance of a contract document that authorizes the work (i.e. construction).

    (b)    Substitutes for Bonds Acceptable.  Except as required by applicable law (including, without limitation, Section 3248 of the California Civil Code), in lieu of a performance and payment bond, the Authority may accept cash, money order, certified check, cashiers check or irrevocable letter of credit.  Such alternate form of security shall be for the same purpose and shall be subject to the same conditions as a performance and payment bond.

    (c)    Reduction of Bond Amount.  The Executive Director may reduce the amount of performance and payment bonds required on a specific contract, except as required by applicable law.  Disclosure of the reduction shall be present in the notice inviting bids.

    (d)    Authority to Require Additional Bonds.  Nothing in this section shall be construed to limit the authority of the Executive Director to require a performance bond or other security in addition to those bonds, or in circumstances other than to those specified in this policy.

(12)    Indemnification.  The Executive Director shall determine the appropriate indemnification provisions to include in contracts for Public Projects.

(13)    Insurance Requirement.  The Executive Director shall determine the appropriate insurance provisions to include in contracts for Public Projects.

(14)    Compliance with all Applicable Laws.  In any situation where compliance with this policy will place the Authority in conflict with any applicable provisions of state or federal law, the Authority shall comply with such provisions, notwithstanding this policy.

[Amended by Resolution No. 2005-0061 dated May 2, 2005]
[Resolution No. 2002-02 dated September 20, 2002.]

53-611 (543)