1    Date: 10/13/06                              _Cathryn Chinn_

2                                               CATHRYN CHINN

3                                               Attorney for Plaintiff
                                                Jose Hernandez
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-4-

PLAINTIFF'S RESPONSE TO DEFENDANTS FIRST REQUEST FOR PRODUCTION..........

**53-611 (655)**

## VERIFICATION

I am the Plaintiff in the above-entitled action or proceeding.

I have read the foregoing:

PLAINTIFF'S RESPONSES TO DEFENDANTS REQUEST FOR PRODUCTION OF DOCUMENTS, SET ONE; PLAINTIFF'S RESPONSE TO DEFENDANTS REQUEST FOR FORM INTERROGATORIES SET ONE EMPLOYMENT; PLAINTIFF'S RESPONSE TO FORM INTERROGATORIES, SET ONE; PLAINTIFF'S RESPONSE TO DEFENDANTS REQUEST FOR SPECIAL INTERROGATORIES;

and know the content thereof, and I certify that the same is true of my own knowledge, except as to those matters which are therein stated upon my information and belief, and as to those matters, I believe it to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed at San Diego, California on this 13th day of October 2006.

JOSE HERNANDEZ

**53-611 (656)**

1  CATHRYN CHINN, ESQ. 393340
   3990 Old Town Avenue, Ste. A109
2  San Diego, California 92110
   Telephone: 619-295-4190
3
   Attorney for Plaintiff
4      JOSE HERNANDEZ

5

6

7          **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

8            **FOR THE COUNTY OF SAN DIEGO**

9

10

11 JOSE HERNANDEZ,                    ) Case No. GIC 871979
                                      )
12        Plaintiff,                  ) PLAINTIFF'S SUPPLEMENTAL
                                      ) RESPONSE O DEFENDANTS
13     v.                             ) SPECIAL INTERROGATORIES
                                      ) SET ONE
14 SAN DIEGO COUNTY REGIONAL          )
   AIRPORT AUTHORITY, a public entity;)
15 and DOES 1 through 10, inclusive,  )
                                      )
16        Defendants.                 )

17

18 No. 16:

19 It was the intent of the Plaintiff to state in his response that he complained about the status of Lpi
   every week, and sometimes on a daily basis, about the non-compliance and deficiencies of Lpi.

20 No. 19:

21 Amile Porta, Jeff Simons, Jennifer Hamilton, Amy Gosslin, Cheryl Black, Janet Nix, Mike
   Parrish, Dave Muellar, Tony Hueso, Kelly Pond, Jim Myhers
22
23 No. 20:

24 All of the individuals identified in No. 19 indicated various levels of coercive behavior by the
   defendants investigators.
25
   No. 21:
26
   Mike Parrish, Kelly Pond, Amile Porta, Jennifer Hamilton, Amy Gosslin.
27
   No. 24:
28
   The dates of all Capital Improvement Committee weekly Director's staff meetings and weekly
   Operations staff meetings during the years 2003, 2004, 2005.

                                    -1-

53-611 (657)

1  All dates are contained in the Outlook Calendar contained in the Plaintiff's computer that is in
2  the possession of the defendants.

3  No. 25:

4  The identification of each person present at the above-stated meetings is contained in the meeting
   notes for each committee meeting identified above in No. 24.
5  All attendees are identified in the meeting notes held by the chairperson for each committee
   identified herein and are in the possession of the defendants.

6  No. 26:

7  All dates are contained in the Outlook Calendar contained in the Plaintiff's computer in the
8  possession of the defendants.

9  Nos. 30-36:

10 The complaints were made routinely at each meeting identified during the years 2003, 2004, and
   2005. The dates and names of the attendees are identified in the meeting notes for each
11 committee described above. These documents are in the possession of the defendants.

12 No. 38:

13 Plaintiff's answer is the same as that in the response to No. 16 stated above.

14 Dated: _November 9, 2006_                    _Cathryn Chinn_
15                                              CATHRYN CHINN
                                                Attorney for
16

17

18

19

20

21

22

23

24

25

26

27

28

-2-

PLAINTIFF'S SUPPLEMENTAL RESPONSES TO INTERROGATORIES..........

**53-611 (658)**

## VERIFICATION

I am the Plaintiff in the above-entitled action or proceeding.

I have read the foregoing:

**PLAINTIFF'S SUPPLEMENTAL RESPONSES TO DEFENDANTS FIRST REQUEST FOR FORM INTERROGATORIES, FORM EMPLOYMENT INTERROGATORIES, SPECIAL INTERROGATORIES AND 44 PAGES OF DOCUMENTS PRODUCED PURSUANT TO DEFENDANTS REQUEST FOR PRODUCTION OF DOCUMENTS**

and know the content thereof, and I certify that the same is true of my own knowledge, except as to those matters which are therein stated upon my information and belief, and as to those matters, I believe it to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed at San Diego, California on this 9th day of November 2006.

JOSE HERNANDEZ

53-611 (659)

Hernandez v. Airport Authority SDSC GIC 871979

## PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF SAN DIEGO.

     I, the undersigned, declare that I am employed in the aforesaid County, State of California. I am over the age of 18 and not a party to the within action. My business address is 3990 Old Town Avenue, Suite A109, San Diego, California 921108. On November 9, 2006 I served upon the interested party(ties) in this action the following documents described as:

**PLAINTIFF'S SUPPLEMENTAL RESPONSES TO DEFENDANTS SPECIAL INTERROGATORIES SET NO. ONE; TO DEFENDANTS FORM INTERROGATORIES SET ONE; DEFENDANTS FORM INTERROGATORIES - EMPLOYMENT**
By placing thereof enclosed in sealed envelope(s) addressed for processing by the following method:

     SANDRA L.MCDONOUGH, ESQ.
     PAUL, PLEVIN, SULLIVAN
     401 B STREET TENTH FLOOR
     SAN DIEGO CA 92101

<u>X</u>     By depositing such envelope(s) with postage thereon fully prepaid in a post box, mailbox, sub-post office, substation, mail chute, or other like facility regularly maintained by the United States Postal Service in San Diego, California.

     I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on November 9, 2006  at San Diego, California.

             \ CATHRYN CHINN

**EXHIBIT 15**

**53-611 (661)**



# Port of San Diego
### and Lindbergh Field Air Terminal

(619) 686-6200 • P.O. Box 120488, San Diego, California 92112-0488
www.portofsandiego.org

March 2, 2001

Mr. Jose Hernandez
10139 Tres Lagos Court
Spring Valley, CA 91977

Dear Mr. Hernandez:

This is an offer of employment as a Manager, Ground Transportation with the Port of San Diego at approximately $2,394.64 bi-weekly **(based on 26.1 pay periods).** In addition, we offer a variety of benefits to our employees **including mandatory participation in a retirement plan.** This offer is contingent upon satisfactory completion of the following items:

1. Passing a post offer pre-employment medical examination and a chemical substance test **(complete medical history form before medical exam).**
2. Presentation of California Class C drivers license.
3. Presentation of Department of Motor Vehicle (DMV – form H6) driving history
4. Approval of outside employment, regarding conflict of interest.
5. Presentation of birth certificate or passport for retirement benefit purposes.
6. Completion of INS Form I-9 and verification of eligibility for employment.
7. Statement of Economic Interest **(depending on position)**
8. Passing a background investigation of references and employment history during at least the last 10 years, if required **(depending on position).**
9. Passing a background investigation for Commercial Driver's License (CDL) holders: Alcohol and Controlled Substance Testing/Training from previous employer, if required **(depending on position).**

Forms for items number 6, 7, 8 and 9 will be provided to you and must be completed in the Human Resources Department prior to your scheduled pre-employment medical exam. Job offer may be rescinded if documents are not provided within ten (10) days before the start date.

**PLEASE DO NOT QUIT YOUR PRESENT EMPLOYMENT UNTIL THE ABOVE ITEMS HAVE BEEN RESOLVED.** You will be given time to give adequate notification to your current employer.

If you have any questions or you require additional information, please contact me at (619) 686-6315.

Sincerely,

*Richard McIlwee*

Karen Porteous
Assistant Human Resources Director

**EXHIBIT 16**



**SAN DIEGO COUNTY
REGIONAL AIRPORT AUTHORITY**

P.O. BOX 82776, SAN DIEGO, CA 92138-2776
619.400.2400  WWW.SAN.ORG

October 3, 2003

Jose Hernandez
10139 Tres Lagos Court
Spring Valley, CA 91977

Dear Jose:

It is a privilege to extend an offer of promotion to you as the Director, Landside Operations, with the San Diego County Regional Airport Authority (SDCRAA). We look forward to your working with us beginning today, October 3, 2003.

Below I have outlined some of the particulars regarding your employment.

- You will report directly to me and have responsibility for all aspects of the Authority-wide landside operations and related activities.
- The SDCRAA will pay you a bi-weekly salary of approximately $3,505.76 gross (based on 26.1 pay periods) as an exempt employee, payable in accordance with the Authority's usual payroll practices. You will be entitled to participate in the director level employee benefit plans, a summary of which is enclosed, and be eligible for a six-month salary review.
- Your employment with the SDCRAA as Director, Landside Operations, will be as an unclassified employee which means you are an "at-will" employee and your employment may be terminated at any time, with or without cause. These terms may not be modified except in writing by the undersigned.

Once again I would like to congratulate you on your promotion, and the Authority looks forward to more of the same fine work in the future.

Sincerely,



Theodore C. Sexton
Vice President, Operations

If the above meets with your understanding, please sign below and return a copy.

Signature: Jose Hernandez          Date  10/8/03

Enclosures: Benefits Overview – Director

**SAN DIEGO
INTERNATIONAL
AIRPORT**

53-611 (664)

**EXHIBIT 17**



2004/2005

# FORM 700
## Statement of Economic Interests

a public document

**Fair Political Practices Commission**
428 J Street, Suite 620 • Sacramento, CA  95814
Toll-Free Advice Line:  866-ASK-FPPC • (866) 275-3772
Telephone:  (916) 322-5660
*www.fppc.ca.gov*

53-611 (666)

## QUICK TIPS FOR EASIER FILING

Most questions asked by filers are answered in detail in the instructions opposite each schedule. In addition, here are some quick tips for easier filing.

### 1. Know your jurisdiction
You only have to report investments and business positions in business entities, real property, and income from sources that are located or doing business in your agency's jurisdiction. Gifts are reportable regardless of the jurisdiction. (See Appendix-9 for an explanation of jurisdiction.)

### 2. Determine your type of disclosure
Two types of public officials complete the Form 700.

- If you file this form because you hold a position listed under Gov. Code section 87200, or you are filing as a board/commission member of a newly created agency not yet covered under a conflict-of-interest code, disclose all of your economic interests in your agency's jurisdiction. (See Appendix-1 for a complete list of 87200 filers and information on newly created agencies.)

- If you file because your position is listed in a state or local agency's conflict-of-interest code, review your disclosure categories because they will describe the specific interests you must report. Obtain your disclosure categories from your agency. They are part of your agency's conflict-of-interest code, and are not contained in the Form 700.

### 3. Reporting periods
Generally speaking, you should not change the pre-printed dates on the form. Refer to Appendix-2 if you need help determining the correct reporting period for your statement.

### 4. Check your calendar
File this form by the due date. Statements that are mailed are considered filed on the date of the postmark. The law does not provide for filing deadline extensions.

Statements of 30 pages or fewer may be faxed by the deadline as long as the paper version is sent within 24 hours. The faxed version must be the same as the paper version.

### 5. Use the provided schedules
Do not attach brokerage statements or other financial documents. For further guidance, the instructions for each schedule contain a detailed list of reportable interests.

### 6. Use your computer
An interactive version of Form 700 is available on our website (*www.fppc.ca.gov*).

### 7. Review your statement
Your Form 700 is a public record. Take a second look at your statement for accuracy and completeness before it is filed.

### 8. Sign your statement
File your originally signed statement with your filing official. Keep a copy of your statement for your files. Remember that when you sign your statement, you are stating under penalty of perjury that it is true and correct.

### 9. Amendments
You may amend your statement at any time. Amendment schedules are available from your filing official, the FPPC, or on our website (*www.fppc.ca.gov*).

### 10. Call us
Call toll-free at 866-ASK-FPPC or locally at (916) 322-5660 if you need assistance.

❖ ❖ ❖ ❖ ❖

## Form 700 Public Access

Statements of Economic Interests are public documents. The filing officer must permit any member of the public to inspect and copy any statement.

- Forms are available for public inspection during the agency's regular business hours.

- No conditions may be placed on persons seeking access to the forms.

- No information or identification may be requested from persons seeking access.

- Reproduction fees of no more than 10 cents per page may be charged.

### Where to Find...

❖ **Types of Statements** — See Appendix-2
❖ **When to File** — See Appendix-3
❖ **Where to File** — See Appendix-3
❖ **Terms and Definitions** — See Appendix-5

# INTRODUCTION

The Political Reform Act (Gov. Code sections 81000-91015) requires most state and local government officials and employees to publicly disclose their personal assets and income. They also must disqualify themselves from participating in decisions which may affect their personal economic interests. The Fair Political Practices Commission (FPPC) is the state agency responsible for issuing the attached Statement of Economic Interests, Form 700, and for interpreting the law's provisions.

## Gift Prohibition

Most state and local officials, employees, and candidates are prohibited from accepting gifts totaling more than $360 (effective January 1, 2005) in a calendar year from a single source.

In addition, state officials, state candidates, and certain state employees are subject to a $10 limit per calendar month on gifts from lobbyists and lobbying firms registered with the Secretary of State. (See Appendix-7 for more detailed information.)

State and local officials and employees also should check with their agency to determine if any other restrictions apply.

## Honorarium Ban

Most state and local officials, employees, and candidates are prohibited from accepting an honorarium for any speech given, article published, or attendance at a conference, convention, meeting, or like gathering. (See Appendix-7 for more detailed information.)

## Loan Prohibitions

State and local officials may not receive any personal loan totaling more than $250 from an official, employee, or consultant of, or from anyone who contracts with, their governmental agencies. In addition, elected officials may not receive any personal loan totaling more than $500 from a single lender unless certain terms of the loan are specified in writing. Under certain circumstances, a personal loan that is not being repaid or is being repaid below certain amounts may become a gift to the official who received it. (See Appendix-10 for more detailed information.)

## Disqualification

Public officials are, under certain circumstances, required to disqualify themselves from making, participating in, or attempting to influence governmental decisions that will affect their economic interests. This may include interests they are not required to disclose (for example, certain sources of income of $500 or more are not reportable, but may be disqualifying). Specific disqualification requirements apply to 87200 filers (for example, city councilmembers, members of

boards of supervisors and planning commissioners). These officials must orally identify the economic interest that creates a conflict of interest and leave the room before a discussion or vote takes place at a public meeting. For more information, consult Government Code section 87105 and regulation 18702.5, or refer to the booklet entitled "Can I Vote? Conflicts of Interest Overview," all of which are available on the FPPC website. Visit *www.fppc.ca.gov* and click on the Library & Publications Icon.

## Post-Governmental Employment

Members of the State Legislature and certain state agency officials and employees who leave office are subject to restrictions on representing clients or employers before their former agencies. For more information, refer to the fact sheet entitled "Leaving Your State Job? Post-Employment Restrictions May Affect You," available on the FPPC website.

## Registered Domestic Partners (Effective January 1, 2005)

When reporting activity for the year 2005, filers must report investments and interests in real property held by, and sources of income to, registered domestic partners. In most cases this will apply to assuming or leaving office statements. (*In re Roberts* (2004) 17 FPPC Ops. 9.)

## Federal Employees (Effective January 1, 2005)

A federal officer or employee serving in an official federal capacity on a state or local government agency is not required to fill out the Form 700. (SB 1353, Chapter 484, Stats. 2004.)

## Late Filing

The filing officer who retains originally-signed statements of economic interests may impose a fine for any statement that is filed late. The fine is $10 per day up to a maximum of $100. Late filing penalties can be reduced or waived under certain circumstances.

Persons who fail to timely file their Form 700 may be referred to the FPPC's enforcement division (and in some cases to the Attorney General or district attorney) for investigation and possible prosecution. In addition to the late filing penalties, a fine of up to $5,000 per violation may be imposed.

For assistance concerning reporting, prohibitions, and restrictions under the Act:

- Call the FPPC toll-free at (866) ASK-FPPC.

- See the booklet entitled "Your Duty to File: A Basic Overview of State Economic Disclosure Law and Reporting Requirements for Public Officials."

# INSTRUCTIONS — COVER PAGE

Enter your name, mailing address, and daytime telephone number in the spaces provided. Because the Form 700 is a document available for public review, you may list your business/office address instead of your home address.

## Part 1. Office, Agency, or Court

- Enter the name of the office sought or held, or the agency or court. (Examples: State Assembly; Board of Supervisors; Office of the Mayor; Department of Finance; Hope County Superior Court.)

- Indicate the name of your division, board, or district, if applicable. (Examples: Division of Waste Management; Board of Accountancy; District 45.)

- Enter your position title. (Examples: Director; Chief Counsel; City Council Member; Staff Services Analyst.)

- If you hold multiple positions (for example, a city council member who also is a member of a county board or commission), you may be required to file statements with each agency.

   To simplify your filing obligations, you may complete an expanded statement.

   To do this, enter the name of the other agency(ies) with which you are required to file and your position title(s) in the space provided. Attach an additional sheet if necessary. Complete one statement covering the disclosure requirements for all positions. Each copy must contain an original signature. Therefore, before signing a statement make a copy for each agency. Sign each copy with an original signature and file with each agency.

   Remember that if you assume or leave a position after a filing deadline, you must complete a separate statement. For example, a city council member who assumes a position with a county special district after the April 1 annual filing deadline must file a separate assuming office statement. In subsequent years, the city council member may expand his or her annual filing to include both positions.

## Part 2. Jurisdiction of Office

- Check the box indicating the jurisdiction of your agency and, if applicable, identify the jurisdiction. Judges, judicial candidates, and court commissioners have statewide jurisdiction. All other filers should review Appendix-9 to determine their jurisdiction.

- If your agency is a multi-county office, list each county in which your agency has jurisdiction.

- If your agency is other than a state office, court, county office, city office, or multi-county office (for example, school districts and special districts), check

the "other" box and enter the county or city in which the agency has jurisdiction.

**Example:**

This filer is a member of a water district board with jurisdiction in a portion of Sutter County.

## Part 3. Type of Statement

Check at least one box. The period covered by a statement is determined by the type of statement you are filing. If you are completing a 2004 Annual Statement, do not change the pre-printed dates to reflect 2005. Your annual statement is used for reporting the previous year's economic interests. Economic interests for your annual filing covering January 1, 2005, through December 31, 2005, will be disclosed on your statement filed in 2006. (See Appendix-2 for detailed information about types of statements.)

Combining Statements: Certain types of statements may be combined. For example, if you leave office after January 1 but before the deadline for filing your annual statement, you may combine your annual and leaving office statements. File by the earliest deadline. Consult your filing officer or the FPPC.

## Part 4. Schedule Summary

- Check the "Yes" box for each schedule you use to disclose interests.

   - or -

   If you have nothing to disclose on any schedules, check the "No reportable interests" box. Please do not attach any blank schedules.

- Enter the total number of completed pages including the cover page.

## Part 5. Verification

Complete the verification by signing the statement and entering the date signed. When you sign your statement, you are stating, under penalty of perjury, that it is true and correct. An unsigned statement is not considered filed and you may be subject to late filing penalties.

53-611 (669)

CALIFORNIA FORM **700**
FAIR POLITICAL PRACTICES COMMISSION

# STATEMENT OF ECONOMIC INTERESTS
## COVER PAGE
*A Public Document*

Date Received
Official Use Only

Please type or print in ink

| NAME     (LAST) | (FIRST) | (MIDDLE) | DAYTIME TELEPHONE NUMBER |
|---|---|---|---|
| | | | ( ) |

| MAILING ADDRESS     STREET (May use business address) | CITY | STATE   ZIP CODE | OPTIONAL: FAX / E-MAIL ADDRESS |
|---|---|---|---|
| | | | |

## 1. Office, Agency, or Court

Name of Office, Agency, or Court:
_____

Division, Board, District, if applicable:
_____

Your Position:
_____

➡ If filing for multiple positions, list additional agency(ies)/
position(s): (Attach a separate sheet if necessary.)

Agency: _____

Position: _____

## 2. Jurisdiction of Office (Check at least one box)

☐ State
☐ County of _____
☐ City of _____
☐ Multi-County _____
☐ Other _____

## 3. Type of Statement   (Check at least one box)

☐ Assuming Office/Initial   Date: ___/___/___

☐ Annual:  The period covered is January 1, 2004,
through December 31, 2004.

**-or-**

○ The period covered is ___/___/___, through
December 31, 2004.

☐ Leaving Office   Date Left: ___/___/___
(Check one)

○ The period covered is January 1, 2004, through the
date of leaving office.

**-or-**

○ The period covered is ___/___/___, through
the date of leaving office.

☐ Candidate

## 4. Schedule Summary
(Check applicable schedules or "No reportable interests.")

➡ During the reporting period, did you have any reportable
interests to disclose on:

Schedule A-1   ☐ Yes – schedule attached
*Investments (Less than 10% Ownership)*

Schedule A-2   ☐ Yes – schedule attached
*Investments (10% or greater Ownership)*

Schedule B   ☐ Yes – schedule attached
*Real Property*

Schedule C   ☐ Yes – schedule attached
*Income, Loans, & Business Positions (Income Other than Gifts and
Travel Payments)*

Schedule D (Eliminated -- report loans on Schedule C)

Schedule E   ☐ Yes – schedule attached
*Income – Gifts*

Schedule F   ☐ Yes – schedule attached
*Income – Travel Payments*

**-or-**

➡ ☐ No reportable interests on any schedule

Total number of pages
completed including this cover page: _____

## 5. Verification

I have used all reasonable diligence in preparing this statement.
I have reviewed this statement and to the best of my knowledge
the information contained herein and in any attached schedules
is true and complete.

I certify under penalty of perjury under the laws of the State
of California that the foregoing is true and correct.

Date Signed _____
(month, day, year)

Signature _____
(File the originally signed statement with your filing official.)

FPPC Form 700 (2004/2005)
FPPC Toll-Free Helpline: 866/ASK-FPPC

**53-611 (670)**

# WHAT SCHEDULE DO I USE TO REPORT?

Business positions ...................................................................................Schedule A-2 or Schedule C

Commission income.........................................................Schedule A-2 or Schedule C (see Appendix-5)

Gifts received by family members ...............................Disclosure may not be required, see Schedule E

Gifts received from family members........................................Disclosure not required, see Schedule E

Income to my business ...................................................................................................Schedule A-2

Individual Retirement Account ....................................Schedule A-1 or Schedule B (see Appendix-10)

Investments...............................................................................................Schedule A-1 or Schedule A-2

Loans made to others ............................Disclosure not required, but report repayments on Schedule C

Loans received.............................................................Schedule B for real property or Schedule C

Loans to my business .....................................................................................................Schedule A-2

Owning a business or partnership
    If I own less than 10%.....................................................................................Schedule A-1
    If I own 10% or more.......................................................................................Schedule A-2

Real estate holdings...........................................Schedule B (Schedule A-2 if held by a business entity/trust)

Rental income .....................................................................................Schedule B or Schedule C

Rental property.....................................................Schedule B (Schedule A-2 if held by a business entity/trust)

Sale of my home/automobile/boat.........................................................................................Schedule C

Sole proprietorship .........................................................................................................Schedule A-2

Spouse's or registered domestic partner's income ...........................................Schedule A-2 or Schedule C

Stock holdings
    If I own less than 10% of a company's stock ................................................Schedule A-1
    If I own 10% or more of a company's stock ..................................................Schedule A-2

Tickets and passes .............................................................................................................Schedule E

Travel reimbursements or payments.......................................................................................Schedule F

Trusts ...................................................................................Schedule A-2 (see Appendix-11)

**53-611 (671)**

# QUESTIONS AND ANSWERS

**Q.** I hold two other board positions in addition to my position with the county. Must I file three statements of economic interests?

**A.** Yes. However, you may complete one statement listing the county and the two boards on the cover page of the Form 700 as the agencies for which you will be filing. Report your economic interests using the broadest jurisdiction and disclosure requirements assigned to you by the three agencies. Make two copies of the entire statement before signing it, sign each copy with an original signature, and distribute one original to the county and to each of the two boards. Remember to complete separate statements for positions that you leave or assume during the year.

**Q.** How do I disclose my spouse's or registered domestic partner's income from an employer?

**A.** Report the name of the employer as a source of income on Schedule C. Beginning in 2005, filers must report the income received by a registered domestic partner. Therefore, this new requirement will affect assuming and leaving office statements filed in 2005. Because the 2004 annual statement covers income received in 2004, income from a registered domestic partner is not required to be reported on an annual statement.

**Q.** I am classified as a department head but recently began acting as city manager. Should I file as the city manager?

**A.** Yes. File an assuming office statement as city manager. Persons serving as "acting" or "interim" or "alternate" must file as if they hold the position.

**Q.** I left one state agency to work for another state agency. Must I file a leaving office statement?

**A.** Yes.

**Q.** I have an investment interest in shares of stock in a company that does not have an office in my jurisdiction. Must I still disclose my investment interest in this company?

**A.** Probably. The definition of "doing business in the jurisdiction" is not limited to whether the business has an office in your jurisdiction. See Appendix-9 for guidance.

**Q.** My spouse and I have a living trust. The trust holds rental property in my jurisdiction, our primary residence, and investments in diversified mutual funds. I have full disclosure. How is this trust disclosed?

**A.** Disclose the name of the trust, the rental property and its income on Schedule A-2. Your primary residence and investments in diversified mutual funds registered with the SEC are not reportable.

**Q.** I believe I am not required to disclose the names of clients from whom my pro rata share of income is $10,000 or more on Schedule A-2 because of their right to privacy. Is there an exception for reporting clients' names?

**A.** Regulation 18740 provides a procedure in which a client's name may not be disclosed if disclosure of the name would violate a legally recognized privilege under California law. This regulation may be obtained from our website at *www.fppc.ca.gov*.

**Q.** I am the sole owner of my business. Where do I disclose my income - on Schedule A-2 or C?

**A.** Sources of income to a business in which you have an ownership interest of 10% or greater are disclosed on Schedule A-2. See Appendix-5 which defines "business entity" for more information.

**Q.** I am required to report all investments. I hold many stocks through an account managed by a brokerage firm. Must I disclose these stocks even though I did not decide which stocks to purchase?

**A.** Yes, you must disclose on Schedule A-1 or A-2 any stock worth $2,000 or more in a business entity located or doing business in your jurisdiction.

**Q.** If I receive a gift of two tickets to a concert valued at $100 each, but gave the tickets to a friend because I could not attend the concert, do I have any reporting obligations?

**A.** Yes. Since you accepted the gift and exercised direction and control of the use of the tickets, you must disclose the gift on Schedule E.

53-611 (672)

## INSTRUCTIONS – SCHEDULES A-1 AND A-2
## INVESTMENTS

"Investment" means a financial interest in any business entity which is located in, doing business in, planning to do business in, or which has done business during the previous two years in your agency's jurisdiction (see Appendix-9) in which you, your spouse or registered domestic partner, or your dependent children had a direct, indirect, or beneficial interest totaling $2,000 or more at any time during the reporting period. (Filers must report investments of a registered domestic partner if the reporting period covers activity in 2005.)

**Reportable investments include:**

- Stocks, bonds, warrants, and options, including those held in margin or brokerage accounts
- Sole proprietorships
- Your own business or your spouse's or registered domestic partner's business (see Appendix-5 for the definition of business entity)
- Your spouse's or registered domestic partner's investments that are legally separate property
- Partnerships (for example, a law firm or family farm)
- Investments in reportable business entities held in a retirement account (see Appendix-11)
- If you, your spouse or registered domestic partner, or dependent children had a 10% or greater ownership interest in a business entity or trust (including a living trust), you must disclose investments held by the business entity or trust. (See Appendix-11 for more information on disclosing trusts.)
- Business trusts

**You are not required to disclose:**

- Diversified mutual funds registered with the Securities and Exchange Commission (SEC) under the Investment Company Act of 1940
- Bank accounts, savings accounts, and money market accounts
- Insurance policies
- Annuities
- Shares in a credit union

> **REMINDERS**
> - Do you know your agency's jurisdiction?
> - Did you hold investments at any time during the period covered by this statement?
> - Code filers – Your disclosure categories may require disclosure only of specific investments.

- Government bonds (including municipal bonds)
- Retirement accounts invested in non-reportable interests (for example, insurance policies, diversified mutual funds, or government bonds - see Appendix-9)
- Defined benefit pension plans and profit sharing plans qualified under Internal Revenue Code section 401(a)
- Interests held in a blind trust (see Appendix-11)

**Use Schedule A-1** to report investments if your ownership interest in the entity was less than 10% (for example, stock). You also may be required to complete Schedule C to indicate gross income received. (See second example below.)

**Use Schedule A-2** to report investments in which your ownership interest in the entity was 10% or greater (for example, a sole proprietorship).

**TO COMPLETE SCHEDULE A-1:**

*Do not attach brokerage or financial statements.*

- Disclose the name of the business entity.
- Provide a general description of the business activity of the entity (for example, pharmaceuticals, computers, automobile manufacturing, or communications).
- Check the box indicating the highest fair market value of your investment during the reporting period. If you are filing a candidate or an assuming office statement, indicate the fair market value on the filing date or the date you took office, respectively.
- Identify the nature of your investment (for example, stocks, warrants, options, or bonds).
- If you initially acquired or disposed of your entire investment interest during the reporting period, enter the date acquired or disposed.

**Examples:**

John Smith left his state position in February 2005. His conflict-of-interest code requires full disclosure of investments. John must disclose his stock holdings of $2,000 or more in any company that does business in California as well as those stocks held by his spouse or registered domestic partner and dependent children.

Susan Jones is a city council member. She has a 4% interest, worth $5,000, in a limited partnership located in the city. Susan must disclose the partnership on Schedule A-1 and income of $500 or more received from the partnership on Schedule C.



# SCHEDULE A-1
## Investments
### Stocks, Bonds, and Other Interests
(Ownership Interest is Less Than 10%)
*Do not attach brokerage or financial statements.*



CALIFORNIA FORM **700**
FAIR POLITICAL PRACTICES COMMISSION
Name

---

➤ **NAME OF BUSINESS ENTITY**

**GENERAL DESCRIPTION OF BUSINESS ACTIVITY**

**FAIR MARKET VALUE**
☐ $2,000 - $10,000     ☐ $10,001 - $100,000
☐ $100,001 - $1,000,000     ☐ Over $1,000,000

**NATURE OF INVESTMENT**
☐ Stock

☐ Other _____
(Describe)

**IF APPLICABLE, LIST DATE:**
__ / __ / 04     __ / __ / 04
ACQUIRED     DISPOSED

---

➤ **NAME OF BUSINESS ENTITY**

**GENERAL DESCRIPTION OF BUSINESS ACTIVITY**

**FAIR MARKET VALUE**
☐ $2,000 - $10,000     ☐ $10,001 - $100,000
☐ $100,001 - $1,000,000     ☐ Over $1,000,000

**NATURE OF INVESTMENT**
☐ Stock

☐ Other _____
(Describe)

**IF APPLICABLE, LIST DATE:**
__ / __ / 04     __ / __ / 04
ACQUIRED     DISPOSED

---

➤ **NAME OF BUSINESS ENTITY**

**GENERAL DESCRIPTION OF BUSINESS ACTIVITY**

**FAIR MARKET VALUE**
☐ $2,000 - $10,000     ☐ $10,001 - $100,000
☐ $100,001 - $1,000,000     ☐ Over $1,000,000

**NATURE OF INVESTMENT**
☐ Stock

☐ Other _____
(Describe)

**IF APPLICABLE, LIST DATE:**
__ / __ / 04     __ / __ / 04
ACQUIRED     DISPOSED

---

➤ **NAME OF BUSINESS ENTITY**

**GENERAL DESCRIPTION OF BUSINESS ACTIVITY**

**FAIR MARKET VALUE**
☐ $2,000 - $10,000     ☐ $10,001 - $100,000
☐ $100,001 - $1,000,000     ☐ Over $1,000,000

**NATURE OF INVESTMENT**
☐ Stock

☐ Other _____
(Describe)

**IF APPLICABLE, LIST DATE:**
__ / __ / 04     __ / __ / 04
ACQUIRED     DISPOSED

---

➤ **NAME OF BUSINESS ENTITY**

**GENERAL DESCRIPTION OF BUSINESS ACTIVITY**

**FAIR MARKET VALUE**
☐ $2,000 - $10,000     ☐ $10,001 - $100,000
☐ $100,001 - $1,000,000     ☐ Over $1,000,000

**NATURE OF INVESTMENT**
☐ Stock

☐ Other _____
(Describe)

**IF APPLICABLE, LIST DATE:**
__ / __ / 04     __ / __ / 04
ACQUIRED     DISPOSED

---

➤ **NAME OF BUSINESS ENTITY**

**GENERAL DESCRIPTION OF BUSINESS ACTIVITY**

**FAIR MARKET VALUE**
☐ $2,000 - $10,000     ☐ $10,001 - $100,000
☐ $100,001 - $1,000,000     ☐ Over $1,000,000

**NATURE OF INVESTMENT**
☐ Stock

☐ Other _____
(Describe)

**IF APPLICABLE, LIST DATE:**
__ / __ / 04     __ / __ / 04
ACQUIRED     DISPOSED

---

Comments: _____

FPPC Form 700 (2004/2005) Sch. A-1
FPPC Toll-Free Helpline: 866/ASK-FPPC

# INSTRUCTIONS – SCHEDULE A-2
# INVESTMENTS

Use Schedule A-2 to report investments in a business entity or trust (including a living trust), in which you, your spouse or registered domestic partner, or your dependent children had a 10% or greater interest, valued at $2,000 or more, during the reporting period and which is located in, doing business in, planning to do business in, or which has done business during the previous two years in your agency's jurisdiction (see Appendix-9). (Filers must report investments of a registered domestic partner if the reporting period covers activity in 2005.) A trust located outside your agency's jurisdiction is reportable if it holds assets that are located in or doing business in the jurisdiction. You are not required to report a trust that contains no reportable interests. For example, if you have a trust containing only your personal residence, your savings account, and some municipal bonds, you would not report this trust, because these interests are not reportable.

Also report on Schedule A-2 investments and real property held by that entity or trust if your pro rata share of the interest was $2,000 or more during the reporting period.

**TO COMPLETE SCHEDULE A-2:**

**Part 1.** Disclose the name and address of the business entity or trust. If you are reporting an interest in a business entity, check "Business Entity" and complete the box as follows:

- Provide a general description of the business activity of the entity.

- Check the box indicating the fair market value of your investment.

- If you initially acquired or entirely disposed of this interest during the reporting period, enter the date acquired or disposed.

- Identify the nature of your investment.

- Disclose the job title or business position you held with the entity, if any (for example, if you were a director, officer, partner, trustee, employee, or held any position of management).

**Part 2.** Check the box indicating your **gross income.** Gross income is the total amount of income before deducting expenses, losses, or taxes. (This includes your pro rata share of the gross income received by the **business entity** or trust, as well as your community property interest in your spouse's or registered domestic partner's share.)

**Part 3.** Disclose the name of each source of income which is located in, doing business in, planning to do business in,

or which has done business during the previous two years in your agency's jurisdiction, as follows:

- Disclose each source of income and outstanding loan to the **business entity** or trust identified in part 1 if your pro rata share of the **gross income** (including your community property interest in your spouse's or registered domestic partner's share) to the business entity or trust from that source was $10,000 or more during the reporting period. (See Appendix-8 for example.) Loans from commercial lending institutions made in the lender's regular course of business on terms available to members of the public without regard to your official status are not reportable.

- Disclose each individual or entity that was a source of commission income of $10,000 or more during the reporting period through the business entity identified in part 1. (See Appendix-5 for an explanation of commission income.)

    You may be required to disclose sources of income located outside your jurisdiction. For example, you may have a client who resides outside your jurisdiction but who does business on a regular basis with you. Such a client, if a reportable source of $10,000 or more, must be disclosed.

Leave Part 3 blank if you do not have any reportable $10,000 sources of income to disclose. Adding phrases such as "various clients" or "not disclosing sources pursuant to attorney-client privilege" may trigger a request for an amendment to your statement. (See Appendix-10 for details about privileged information.)

**Part 4.** Report any investments or interests in real property held by the entity or trust identified in part 1 if your pro rata share of the interest held was $2,000 or more during the reporting period.

- Check the applicable box identifying the interest held as real property or an investment.

- If investment, provide the name and description of the business entity.

- If real property, report the address or other precise location (for example, an assessor's parcel number).

- Check the box indicating the fair market value of your interest in the real property or investment.

- Identify the nature of your interest.

- Enter the date acquired or disposed only if you initially acquired or entirely disposed of your interest in the property or investment during the reporting period.

## SCHEDULE A-2
## Investments, Income, and Assets
## of Business Entities/Trusts
(Ownership Interest Is 10% or Greater)

CALIFORNIA FORM **700**

FAIR POLITICAL PRACTICES COMMISSION

Name
_____

### ► 1. BUSINESS ENTITY OR TRUST

Name
_____

Address
_____

Check one
☐ Trust, go to 2    ☐ Business Entity, complete the box, then go to 2

**GENERAL DESCRIPTION OF BUSINESS ACTIVITY**

FAIR MARKET VALUE
☐ $2,000 - $10,000
☐ $10,001 - $100,000
☐ $100,001 - $1,000,000
☐ Over $1,000,000

IF APPLICABLE, LIST DATE:
__/__/04 ACQUIRED    __/__/04 DISPOSED

NATURE OF INVESTMENT
☐ Sole Proprietorship    ☐ Partnership    ☐ _____ Other

YOUR BUSINESS POSITION _____

### ► 2. IDENTIFY THE GROSS INCOME RECEIVED (INCLUDE YOUR PRO RATA SHARE OF THE GROSS INCOME TO THE ENTITY/TRUST)

☐ $0 - $499
☐ $500 - $1,000
☐ $1,001 - $10,000
☐ $10,001 - $100,000
☐ OVER $100,000

### ► 3. LIST THE NAME OF EACH REPORTABLE SINGLE SOURCE OF INCOME OF $10,000 OR MORE

### ► 4. INVESTMENTS AND INTERESTS IN REAL PROPERTY HELD BY THE BUSINESS ENTITY OR TRUST

Check one box
☐ INVESTMENT    ☐ REAL PROPERTY

Name of Business Entity or
Street Address or Assessor's Parcel Number of Real Property

Description of Business Activity or
City or Other Precise Location of Real Property

FAIR MARKET VALUE
☐ $2,000 - $10,000
☐ $10,001 - $100,000
☐ $100,001 - $1,000,000
☐ Over $1,000,000

IF APPLICABLE, LIST DATE:
__/__/04 ACQUIRED    __/__/04 DISPOSED

NATURE OF INTEREST
☐ Property Ownership/Deed of Trust    ☐ Stock    ☐ Partnership

☐ Leasehold _____ Yrs. remaining    ☐ Other _____

☐ Check box if additional schedules reporting investments or real property are attached

### ► 1. BUSINESS ENTITY OR TRUST

Name
_____

Address
_____

Check one
☐ Trust, go to 2    ☐ Business Entity, complete the box, then go to 2

**GENERAL DESCRIPTION OF BUSINESS ACTIVITY**

FAIR MARKET VALUE
☐ $2,000 - $10,000
☐ $10,001 - $100,000
☐ $100,001 - $1,000,000
☐ Over $1,000,000

IF APPLICABLE, LIST DATE:
__/__/04 ACQUIRED    __/__/04 DISPOSED

NATURE OF INVESTMENT
☐ Sole Proprietorship    ☐ Partnership    ☐ _____ Other

YOUR BUSINESS POSITION _____

### ► 2. IDENTIFY THE GROSS INCOME RECEIVED (INCLUDE YOUR PRO RATA SHARE OF THE GROSS INCOME TO THE ENTITY/TRUST)

☐ $0 - $499
☐ $500 - $1,000
☐ $1,001 - $10,000
☐ $10,001 - $100,000
☐ OVER $100,000

### ► 3. LIST THE NAME OF EACH REPORTABLE SINGLE SOURCE OF INCOME OF $10,000 OR MORE

### ► 4. INVESTMENTS AND INTERESTS IN REAL PROPERTY HELD BY THE BUSINESS ENTITY OR TRUST

Check one box
☐ INVESTMENT    ☐ REAL PROPERTY

Name of Business Entity or
Street Address or Assessor's Parcel Number of Real Property

Description of Business Activity or
City or Other Precise Location of Real Property

FAIR MARKET VALUE
☐ $2,000 - $10,000
☐ $10,001 - $100,000
☐ $100,001 - $1,000,000
☐ Over $1,000,000

IF APPLICABLE, LIST DATE:
__/__/04 ACQUIRED    __/__/04 DISPOSED

NATURE OF INTEREST
☐ Property Ownership/Deed of Trust    ☐ Stock    ☐ Partnership

☐ Leasehold _____ Yrs. remaining    ☐ Other _____

☐ Check box if additional schedules reporting investments or real property are attached

Comments: _____

FPPC Form 700 (2004/2005) Sch. A-2
FPPC Toll-Free Helpline: 866/ASK-FPPC

**53-611 (676)**



# INSTRUCTIONS – SCHEDULE B
# INTERESTS IN REAL PROPERTY

Report interests in real property located in your agency's jurisdiction (see Appendix-9) in which you, your spouse or registered domestic partner, or your dependent children had a direct, indirect, or beneficial interest totaling $2,000 or more any time during the reporting period. (Filers must report interests in real property of a registered domestic partner if the reporting period covers activity in 2005.)

Interests in real property include:

- An ownership interest (including a beneficial ownership interest)
- A deed of trust, easement, or option to acquire property
- A leasehold interest (see Appendix-9)
- A mining lease
- An interest in real property held in a retirement account (see Appendix-10)
- An interest in real property held by a business entity or trust in which you, your spouse or registered domestic partner, or your dependent children had a 10% or greater ownership interest (report on Schedule A-2)
- Your spouse's or registered domestic partner's interests in real property that are legally held separately by him or her

You are not required to report:

- A residence, such as a home or vacation cabin, used exclusively as a personal residence. However, a residence for which you claim a business deduction may be reportable. In this situation, you may report the portion of the residence claimed as the tax deduction as the fair market value.
- Interests in real property held through a blind trust (see Appendix-11 for exceptions)

TO COMPLETE SCHEDULE B:

- Report the address or other precise location (for example, an assessor's parcel number) of the real property.
- Check the box indicating the fair market value of your interest in the property (regardless of what you owe on the property).
- Enter the date acquired or disposed only if you initially acquired or entirely disposed of your interest in the property during the reporting period.

---

REMINDERS
- Income and loans already reported on Schedule B are not also required to be reported on Schedule C.
- Code filers – Do your disclosure categories require disclosure of real property?

---

- Identify the nature of your interest. If it is a leasehold, disclose the number of years remaining on the lease.
- If you received rental income, check the box indicating the gross amount you received.
- If you had a 10% or greater interest in real property and received rental income, list the name of the tenant if your pro rata share of the gross rental income from a single tenant was $10,000 or more during the reporting period. Otherwise, leave this section blank. Adding phrases such as "various tenants" or "tenants" may trigger a request for an amendment to your statement.
- Loans from a private lender that total $500 or more and are secured by real property may be reportable. Reportable loans may be disclosed on Schedule B or Schedule C. Loans from commercial lending institutions made in the lender's regular course of business on terms available to members of the public without regard to your official status are not reportable.
  - Provide the name and address of the lender.
  - Describe the lender's business activity.
  - Disclose the interest rate and term of the loan. The term of a loan is the total number of months or years given for repayment of the loan at the time the loan was entered into. For variable interest rate loans, disclose the conditions of the loan (for example, Prime + 2) or the average interest rate paid during the reporting period.
  - Check the box indicating the highest balance of the loan during the reporting period.
  - Identify a guarantor, if applicable.

If you have more than one reportable loan on a single piece of real property, report the additional loan(s) on Schedule C.

Example:
Joe Nelson is a city planning commissioner. Joe received rental income of $12,000 during the reporting period from a single tenant who rented property Joe owned in the city's jurisdiction. If Joe had received the $12,000 from two or more tenants, the tenants' names would not be required as long as no single tenant paid $10,000 or more.

FPPC Form 700 (2004/2005)
FPPC Toll-Free Helpline: 866/ASK-FPPC

Instructions-6

53-611 (677)

## SCHEDULE B
## Interests in Real Property
### (Including Rental Income)

**CALIFORNIA FORM 700**
FAIR POLITICAL PRACTICES COMMISSION

Name _____

---

**STREET ADDRESS OR PRECISE LOCATION**
_____

**CITY**
_____

**FAIR MARKET VALUE**
☐ $2,000 - $10,000
☐ $10,001 - $100,000
☐ $100,001 - $1,000,000
☐ Over $1,000,000

**IF APPLICABLE, LIST DATE:**
___/___/04    ___/___/04
ACQUIRED    DISPOSED

**NATURE OF INTEREST**
☐ Ownership/Deed of Trust    ☐ Easement

☐ Leasehold _____    ☐ _____
   Yrs. remaining    Other

**IF RENTAL PROPERTY, GROSS INCOME RECEIVED**
☐ $0 - $499    ☐ $500 - $1,000    ☐ $1,001 - $10,000
☐ $10,001 - $100,000    ☐ OVER $100,000

**SOURCES OF RENTAL INCOME:** If you own a 10% or greater interest, list the name of each tenant that is a single source of income of $10,000 or more.

_____
_____

**NAME OF LENDER***
_____

**ADDRESS**
_____

**BUSINESS ACTIVITY OF LENDER**
_____

**INTEREST RATE**         **TERM (Months/Years)**
_____% ☐ None    _____

**HIGHEST BALANCE DURING REPORTING PERIOD**
☐ $500 - $1,000    ☐ $1,001 - $10,000
☐ $10,001 - $100,000    ☐ OVER $100,000

☐ Guarantor, if applicable

---

**STREET ADDRESS OR PRECISE LOCATION**
_____

**CITY**
_____

**FAIR MARKET VALUE**
☐ $2,000 - $10,000
☐ $10,001 - $100,000
☐ $100,001 - $1,000,000
☐ Over $1,000,000

**IF APPLICABLE, LIST DATE:**
___/___/04    ___/___/04
ACQUIRED    DISPOSED

**NATURE OF INTEREST**
☐ Ownership/Deed of Trust    ☐ Easement

☐ Leasehold _____    ☐ _____
   Yrs. remaining    Other

**IF RENTAL PROPERTY, GROSS INCOME RECEIVED**
☐ $0 - $499    ☐ $500 - $1,000    ☐ $1,001 - $10,000
☐ $10,001 - $100,000    ☐ OVER $100,000

**SOURCES OF RENTAL INCOME:** If you own a 10% or greater interest, list the name of each tenant that is a single source of income of $10,000 or more.

_____
_____

**NAME OF LENDER***
_____

**ADDRESS**
_____

**BUSINESS ACTIVITY OF LENDER**
_____

**INTEREST RATE**         **TERM (Months/Years)**
_____% ☐ None    _____

**HIGHEST BALANCE DURING REPORTING PERIOD**
☐ $500 - $1,000    ☐ $1,001 - $10,000
☐ $10,001 - $100,000    ☐ OVER $100,000

☐ Guarantor, if applicable

---

**Comments:** _____

\* Loans from commercial lending institutions made in the lender's regular course of business on terms available to members of the public without regard to your official status are not reportable.

FPPC Form 700 (2004/2005) Sch. B
FPPC Toll-Free Helpline: 866/ASK-FPPC

**53-611 (678)**

## INSTRUCTIONS – SCHEDULE C
## INCOME, LOANS, & BUSINESS POSITIONS
### (Income Other than Gifts and Travel Payments)

Report the source and amount of gross income of $500 or more you received during the reporting period. Gross income is the total amount of income before deducting expenses, losses, or taxes and includes loans other than loans from a commercial lending institution. Also report your job title with each reportable business entity, even if you received no income during the reporting period. You must also report the source of income to your spouse or registered domestic partner if your community property share is $500 or more during the reporting period. (Filers must report income received by a registered domestic partner if the reporting period covers activity in 2005.)

A source of income must be reported only if the source is located in, doing business in, planning to do business in, or has done business during the previous two years in your agency's jurisdiction. (See Appendix-8 and 9 for more information about doing business in the jurisdiction.) Reportable sources of income may be further limited by your agency's conflict-of-interest code.

Commonly reportable income and loans include:
- Salary/wages, per diem, reimbursement for expenses
- Community property interest (50%) in your spouse's or registered domestic partner's income - report the employer's name and all other required information
- Income received from investment interests, such as partnerships, reported on Schedule A-1
- Commission income not required to be reported on Schedule A-2 (see Appendix-5)
- Gross income from any sale, including the sale of a house or car (report the total sale price)
- Rental income not required to be reported on Schedule B
- Prizes or awards not disclosed as gifts
- Payments received on loans you made to others, including loan repayments from a campaign committee
- An honorarium received prior to becoming a public official (see Appendix-7 concerning your ability to receive future honoraria)
- Incentive compensation (see Appendix-9)

You are not required to report:
- Salary, reimbursement for expenses or per diem, social security, disability, or other similar benefit payments received by you or your spouse or registered domestic partner from a federal, state, or local government agency.

**REMINDERS**
- Code filers – Your disclosure categories may not require disclosure of all sources of income.
- If you or your spouse or registered domestic partner is self-employed, report the business entity on Schedule A-2.
- Do not disclose on Schedule C income, loans or business positions already reported on Schedules A-2 or B.

- Income of dependent children.
- Payments received under an insurance policy.
- Interest, dividends, or premiums on a time or demand deposit in a financial institution, shares in a credit union, an insurance policy, or a bond or other debt instrument issued by a government agency.
- Alimony or child support payments.

See Appendix-8 for more exceptions to income reporting.

**TO COMPLETE SCHEDULE C:**

1. Name of Source of Income
- Disclose the name and address of each source of income or loan or each business entity with which you held a business position.
- Provide a general description of the business activity of the source or business entity (for example, law firm).
- Disclose the job title or business position, if any, you held with the business entity, even if you did not receive income during the reporting period.
- Check the box indicating the amount of gross income received or the highest balance of the loan during the reporting period.
- Identify the consideration for which the income was received.
- For income from commission sales, check the box indicating the gross income received and list the name of each source of commission income of $10,000 or more (see Appendix-5).
- For income from rental property that is not required to be listed on Schedule B, enter "Rental Income" under "Name of Source," check the box indicating the gross income received, and, if you had a 10% or greater interest in the rental property, list the name of each tenant if your pro rata share of the gross income from that tenant was $10,000 or more during the reporting period.

2. Loans Received
- Disclose the interest rate and the term of the loan.
  - The term of the loan is the total number of months or years given for repayment of the loan at the time the loan was entered into.
  - For variable interest rate loans, disclose the conditions of the loan (for example, Prime + 2) or the average interest rate paid during the reporting period.
- Identify the security, if any, for the loan.

If more than one loan was received or outstanding during the reporting period and the security for each loan is the same, fill out box 2 only once and indicate in the comments section that the information in box 2 applies to all loans. If the security is different, fill out a separate box 2 for each loan.

FPPC Form 700 (2004/2005)
FPPC Toll-Free Helpline: 866/ASK-FPPC

Instructions-7

# SCHEDULE C
## Income, Loans* & Business Positions
### (Other than Gifts and Travel Payments)



**CALIFORNIA FORM 700**
FAIR POLITICAL PRACTICES COMMISSION

Name _____

---

**1. NAME OF SOURCE OF INCOME**

ADDRESS _____

BUSINESS ACTIVITY, IF ANY, OF SOURCE _____

YOUR BUSINESS POSITION _____

GROSS INCOME RECEIVED/HIGHEST BALANCE DURING REPORTING PERIOD, IF LOAN
- ☐ $500 - $1,000      ☐ $1,001 - $10,000
- ☐ $10,001 - $100,000  ☐ OVER $100,000

CONSIDERATION FOR WHICH INCOME WAS RECEIVED
- ☐ Salary      ☐ Spouse's income      ☐ Loan repayment
- ☐ Sale of _____
  (Property, car, boat, etc.)
- ☐ Commission or ☐ Rental income, list each source of $10,000 or more
_____
_____
- ☐ Other _____
  (Describe)
- ☐ LOAN RECEIVED (complete box 2)

---

**1. NAME OF SOURCE OF INCOME**

ADDRESS _____

BUSINESS ACTIVITY, IF ANY, OF SOURCE _____

YOUR BUSINESS POSITION _____

GROSS INCOME RECEIVED/HIGHEST BALANCE DURING REPORTING PERIOD, IF LOAN
- ☐ $500 - $1,000      ☐ $1,001 - $10,000
- ☐ $10,001 - $100,000  ☐ OVER $100,000

CONSIDERATION FOR WHICH INCOME WAS RECEIVED
- ☐ Salary      ☐ Spouse's income      ☐ Loan repayment
- ☐ Sale of _____
  (Property, car, boat, etc.)
- ☐ Commission or ☐ Rental income, list each source of $10,000 or more
_____
_____
- ☐ Other _____
  (Describe)
- ☐ LOAN RECEIVED (complete box 2)

---

**1. NAME OF SOURCE OF INCOME**

ADDRESS _____

BUSINESS ACTIVITY, IF ANY, OF SOURCE _____

YOUR BUSINESS POSITION _____

GROSS INCOME RECEIVED/HIGHEST BALANCE DURING REPORTING PERIOD, IF LOAN
- ☐ $500 - $1,000      ☐ $1,001 - $10,000
- ☐ $10,001 - $100,000  ☐ OVER $100,000

CONSIDERATION FOR WHICH INCOME WAS RECEIVED
- ☐ Salary      ☐ Spouse's income      ☐ Loan repayment
- ☐ Sale of _____
  (Property, car, boat, etc.)
- ☐ Commission or ☐ Rental income, list each source of $10,000 or more
_____
_____
- ☐ Other _____
  (Describe)
- ☐ LOAN RECEIVED (complete box 2)

---

**2. LOAN RECEIVED**

INTEREST RATE _____% ☐ None      TERM (Months/Years) _____

SECURITY FOR LOAN
- ☐ None      ☐ Personal residence
- ☐ Real Property _____
  Street address
  _____
  City
- ☐ Guarantor _____
- ☐ Other _____
  (Describe)

---

\* You are not required to report loans from commercial lending institutions, or any indebtedness created as part of a retail installment or credit card transaction, made in the lender's regular course of business on terms available to members of the public without regard to your official status.

Comments: _____
_____

FPPC Form 700 (2004/2005) Sch. C
FPPC Toll-Free Helpline: 866/ASK-FPPC

53-611 (680)

**SCHEDULE D**
(ELIMINATED)



## Report loans on
## Schedule A-2, B, or C

---

- You are not required to report loans from commercial lending institutions made in the lender's regular course of business on terms available to members of the public without regard to your official status.

- You are not required to report any indebtedness created as part of a retail installment or credit card transaction if made in the lender's regular course of business on terms available to members of the public without regard to your official status.

**53-611 (681)**

# INSTRUCTIONS – SCHEDULE E
## INCOME – GIFTS

A gift is anything of value for which you have not provided equal or greater consideration to the donor. A gift is reportable if its fair market value is $50 or more. In addition, multiple gifts totaling $50 or more received during the reporting period from a single source must be reported. Gifts are reportable regardless of where the donor is located.

It is the acceptance of a gift, not the ultimate use to which it is put, that imposes your reporting obligation. Except as noted below, you must report a gift even if you never used it or if you gave it away to another person.

If the exact amount of a gift is not known, you must make a good faith estimate of the item's fair market value. Listing the value of a gift as "over $50" or "value unknown" is not adequate disclosure. In addition, if you received a gift through an intermediary, you must disclose the name, address, and business activity of both the donor and the intermediary.

**Commonly reportable gifts include:**

- Tickets/passes to sporting or entertainment events
- Tickets/passes to amusement parks
- Parking passes
- Food, beverages, and accommodations, including those provided in direct connection with your attendance at a convention, conference, meeting, social event, meal, or like gathering, where you did not give a speech, participate in a panel or seminar, or provide a similar service
- Rebates/discounts not made in the regular course of business to members of the public without regard to official status
- Wedding gifts (see Appendix-12 to determine value)
- An honorarium. You may report an honorarium as income on Schedule C, rather than as a gift on Schedule E, if you provided services of equal or greater value than the payment received. (See Appendix-7 regarding your ability to receive future honoraria.)
- Transportation and lodging (see Schedule F)
- Forgiveness of a loan received by you

**You are not required to disclose:**

- Gifts that were not used and which, within 30 days after receipt, were returned to the donor or delivered to a charitable organization without being claimed by you as a charitable contribution for tax purposes

---

**REMINDERS**

- Gifts are limited by law to a value of $360 from any one source in a calendar year.
- See Appendix-7 for additional gift and honoraria prohibitions.
- Code filers – You only need to report gifts from reportable sources.

---

- Gifts from your spouse or registered domestic partner, child, parent, grandparent, grandchild, brother, sister, aunt, uncle, niece, nephew, or first cousin. Included in this exception are gifts from your spouse or domestic partner's children, parents, brothers and sisters, and the spouse or registered domestic partner of the individuals listed above. The exception does not apply if the donor was acting as an agent or intermediary for a reportable source who was the true donor.
- Gifts of hospitality involving food, drink, or occasional lodging provided in an individual's home when the individual or a member of the individual's family was present
- Gifts equal in value exchanged between you and an individual, other than a lobbyist, on holidays, birthdays, or similar occasions
- Gifts of informational material provided to assist you in the performance of your official duties (for example, books, pamphlets, reports, calendars, periodicals, or educational seminars)
- A bequest or inheritance. However, inherited investments or real property may be reportable on other schedules.
- Personalized plaques and trophies with an individual value of less than $250
- Campaign contributions
- Tickets to a fundraising event for an Internal Revenue Code section 501(c)(3) organization
- Tickets to political fundraisers
- Gifts given directly to members of your immediate family unless you received direct benefit from the gift or you exercised direction and control over the use or disposition of the gift
- A pass or ticket that provided a one-time admission to an event (theater performance, sporting event) that was not used and was not transferred to another person. Commission regulation 18946.1 provides a method for determining the value of a ticket or pass that was used or transferred to another person and for determining the value of passes or tickets which provide repeated admission to facilities or services.
- Food, beverages, and necessary accommodations provided directly in connection with an event at which you gave a speech, participated in a panel or seminar, or provided a similar service

**TO COMPLETE SCHEDULE E:**

- Disclose the name, address and business activity, if any, of the source.
- Provide the date (month, day, and year) of receipt, and disclose the fair market value and description of the gift.

FPPC Form 700 (2004/2005)
FPPC Toll-Free Helpline: 866/ASK-FPPC

Instructions-6

## SCHEDULE E
## Income – Gifts

**CALIFORNIA FORM 700**

FAIR POLITICAL PRACTICES COMMISSION

Name

---

**> NAME OF SOURCE**

ADDRESS

BUSINESS ACTIVITY, IF ANY, OF SOURCE

| DATE (mm/dd/yy) | VALUE | DESCRIPTION OF GIFT(S) |
|---|---|---|
| ___/___/___ | $_____ | _____ |
| ___/___/___ | $_____ | _____ |
| ___/___/___ | $_____ | _____ |

**> NAME OF SOURCE**

ADDRESS

BUSINESS ACTIVITY, IF ANY, OF SOURCE

| DATE (mm/dd/yy) | VALUE | DESCRIPTION OF GIFT(S) |
|---|---|---|
| ___/___/___ | $_____ | _____ |
| ___/___/___ | $_____ | _____ |
| ___/___/___ | $_____ | _____ |

**> NAME OF SOURCE**

ADDRESS

BUSINESS ACTIVITY, IF ANY, OF SOURCE

| DATE (mm/dd/yy) | VALUE | DESCRIPTION OF GIFT(S) |
|---|---|---|
| ___/___/___ | $_____ | _____ |
| ___/___/___ | $_____ | _____ |
| ___/___/___ | $_____ | _____ |

**> NAME OF SOURCE**

ADDRESS

BUSINESS ACTIVITY, IF ANY, OF SOURCE

| DATE (mm/dd/yy) | VALUE | DESCRIPTION OF GIFT(S) |
|---|---|---|
| ___/___/___ | $_____ | _____ |
| ___/___/___ | $_____ | _____ |
| ___/___/___ | $_____ | _____ |

**> NAME OF SOURCE**

ADDRESS

BUSINESS ACTIVITY, IF ANY, OF SOURCE

| DATE (mm/dd/yy) | VALUE | DESCRIPTION OF GIFT(S) |
|---|---|---|
| ___/___/___ | $_____ | _____ |
| ___/___/___ | $_____ | _____ |
| ___/___/___ | $_____ | _____ |

**> NAME OF SOURCE**

ADDRESS

BUSINESS ACTIVITY, IF ANY, OF SOURCE

| DATE (mm/dd/yy) | VALUE | DESCRIPTION OF GIFT(S) |
|---|---|---|
| ___/___/___ | $_____ | _____ |
| ___/___/___ | $_____ | _____ |
| ___/___/___ | $_____ | _____ |

---

Comments: _____

_____

FPPC Form 700 (2004/2005) Sch. E
FPPC Toll-Free Helpline: 866/ASK-FPPC

# INSTRUCTIONS — SCHEDULE F
## TRAVEL PAYMENTS, ADVANCES AND REIMBURSEMENTS

Travel payments reportable on Schedule F include advances and reimbursements for travel and related expenses, including lodging and meals.

Gifts of travel may be subject to a $360 gift limit. In addition, certain travel payments are reportable gifts, but are not subject to the gift limit. To avoid possible misinterpretation or the perception that you may have received a gift in excess of the gift limit, you may wish to provide a specific description of the purpose of your travel. See the FPPC fact sheet entitled "Limitations and Restrictions on Gifts, Honoraria, Travel, and Loans," which can be obtained from your filing officer or the FPPC at www.fppc.ca.gov.

**You are not required to disclose:**

- Travel payments received from any state, local, or federal government agency for which you provided services equal or greater in value than the payments received

- Travel payments received from your employer in the normal course of your employment

- Payments or reimbursements for transportation within California in connection with an event at which you gave a speech, participated in a panel or seminar, or performed a similar service

- Food, beverages, and necessary accommodations received directly in connection with an event held inside or outside California at which you gave a speech, participated in a panel, or provided a similar service Note that payments for transportation outside of California are reportable.

- A travel payment that was received from a nonprofit entity exempt from taxation under Internal Revenue Code section 501(c)(3) for which you provided equal or greater consideration

**TO COMPLETE SCHEDULE F:**

- Disclose the name and address of the source of the travel payment.

- Identify the business activity, if any, of the source.

- Check the box to identify the payment as a gift or income, report the amount, and disclose the date(s) if applicable.

  - Travel payments are gifts if you did not provide services that were equal to or greater in value than the payments received. You must disclose gifts totaling $50 or more from a single source during the period covered by the statement. Gifts of travel are reportable without regard to where the donor is located.

    When reporting travel payments that are gifts, you must provide a description of the gift and the date(s) received.

  - Travel payments are income if you provided services that were equal to or greater in value than the payments received. You must disclose income totaling $500 or more from a single source during the period covered by the statement. You have the burden of proving the payments are income rather than gifts.

    When reporting travel payments as income, you must describe the services you provided in exchange for the payment. You are not required to disclose the date(s) for travel payments that are income.

**Example:**
City council member Rick Chandler is a board member of the League of California Cities. The League reimburses its board members for travel and lodging, as well as meals and other

| NAME OF SOURCE | |
|---|---|
| League of California Cities | |
| ADDRESS | |
| 1400 K Street, Suite 400 | |
| CITY AND STATE | |
| Sacramento, CA | |
| BUSINESS ACTIVITY, IF ANY, OF SOURCE | |
| Association of city officials | |
| DATE(S) 9 .16./04 . 9 .17./04  AMT $ 588.00 | |
| TYPE OF PAYMENT (must check one) ☐ Gift ☒ Income | |
| DESCRIPTION Travel reimbursement for board meeting | |

expenses associated with board meetings. If Rick provides equal or greater consideration for the travel and lodging when he participates in the meeting, the reimbursements are reported as income.

FPPC Form 700 (2004/2005)
FPPC Toll-Free Helpline: 866/ASK-FPPC

Instructions-9

**53-611 (684)**

## SCHEDULE F
## Income – Gifts
## Travel Payments, Advances,
## and Reimbursements

**CALIFORNIA FORM 700**

LAIR POLITICAL PRACTICES COMMISSION

Name

---

- **Reminder – you must mark the gift or income box.**
- **You are not required to report "Income" from government agencies.**

---

> NAME OF SOURCE

ADDRESS

CITY AND STATE

BUSINESS ACTIVITY, IF ANY, OF SOURCE

DATE(S): ___/___/___ - ___/___/___  AMT. $ _____
(if applicable)

TYPE OF PAYMENT: (must check one)  ☐ Gift  ☐ Income

DESCRIPTION: _____

> NAME OF SOURCE

ADDRESS

CITY AND STATE

BUSINESS ACTIVITY, IF ANY, OF SOURCE

DATE(S): ___/___/___ - ___/___/___  AMT. $ _____
(if applicable)

TYPE OF PAYMENT: (must check one)  ☐ Gift  ☐ Income

DESCRIPTION: _____

> NAME OF SOURCE

ADDRESS

CITY AND STATE

BUSINESS ACTIVITY, IF ANY, OF SOURCE

DATE(S): ___/___/___ - ___/___/___  AMT. $ _____
(if applicable)

TYPE OF PAYMENT: (must check one)  ☐ Gift  ☐ Income

DESCRIPTION: _____

> NAME OF SOURCE

ADDRESS

CITY AND STATE

BUSINESS ACTIVITY, IF ANY, OF SOURCE

DATE(S): ___/___/___ - ___/___/___  AMT. $ _____
(if applicable)

TYPE OF PAYMENT: (must check one)  ☐ Gift  ☐ Income

DESCRIPTION: _____

Comments: _____

_____

FPPC Form 700 (2004/2005) Sch. F
FPPC Toll-Free Helpline: 866/ASK-FPPC

**53-611 (685)**

# APPENDIX
## TWO CATEGORIES OF FILERS

**1. Officials and Candidates Specified in Gov. Code Section 87200 and Members of Boards/Commissions of Newly Created Agencies**

The Act requires the following individuals to fully disclose their personal assets and income described in the attached Form 700:

State Offices

- Governor
- Lieutenant Governor
- Attorney General
- Controller
- Insurance Commissioner
- Secretary of State
- Treasurer
- Members of the State Legislature
- Superintendent of Public Instruction
- State Board of Equalization Members
- Public Utilities Commissioners
- State Energy Resources Conservation and Development Commissioners
- State Coastal Commissioners
- Fair Political Practices Commissioners
- State Public Officials (including employees and consultants) Who Manage Public Investments
- Elected members of and candidates for the Board of Administration of the California Public Employees' Retirement System

Other officials and employees of state boards, commissions, agencies, and departments file Form 700 as described in part 2 on this page.

Judicial Offices

- Supreme, Appellate, and Superior Court Judges
- Court Commissioners
- Retired Judges, Pro-Tem Judges, and part-time Court Commissioners who serve or expect to serve 30 days or more in a calendar year

County and City Offices

- Members of Boards of Supervisors
- Mayors and Members of City Councils
- Chief Administrative Officers
- District Attorneys
- County Counsels
- City Attorneys

- City Managers
- Planning Commissioners
- County and City Treasurers
- County and City Public Officials (including employees and consultants) Who Manage Public Investments

Members of Boards/Commissions of Newly created Agencies

Members must fully disclose their investments, interests in real property, business positions and income until the positions are covered under a conflict-of-interest code.

**2. State and Local Officials and Employees Designated in a Conflict-of-Interest Code**

The Act requires every state and local government agency to adopt a unique conflict-of-interest code. The code lists each position within the agency filled by individuals who make or participate in making governmental decisions that could affect their personal economic interests. The code also requires individuals holding those positions to periodically file Form 700 disclosing certain personal economic interests as determined by the code's "disclosure categories." These individuals are called "designated employees" or "code filers."

Obtain your disclosure categories from your agency—they are not contained in the Form 700. Persons with broad decisionmaking authority must disclose more interests than those in positions with limited discretion. For example, you may be required to disclose only investments and business positions in or income from businesses of the type that contract with your agency, or you may not be required to disclose real property interests.

In addition, certain consultants to public agencies may qualify as public officials because they make, participate in making, or act in a staff capacity for governmental decisions:

Note:

- An official who holds a position specified in Gov. Code section 87200 is not required to file statements under the conflict-of-interest code of any agency that has the same or a smaller jurisdiction (for example, a state legislator who also sits on a state or local board or commission).

**53-611 (686)**

# TYPES OF STATEMENTS

**Assuming Office Statement:**

If you are a newly elected or newly appointed official or are newly employed in a position designated in a state or local agency's conflict-of-interest code, your assuming office date is the date you were sworn in, employed, or otherwise authorized to serve in the position.

- Investments, interests in real property, and business positions held on the date you assumed the office or position must be reported. In addition, income (including loans, gifts, and travel payments) received during the 12 months *prior to* the date you assumed the office or position is reportable.

For positions subject to confirmation by the State Senate or the Commission on Judicial Performance, your assuming office date is the date you were appointed or nominated to the position.

**Example:**

Maria Lopez was appointed by the Governor to serve on a state agency board that is subject to State Senate confirmation. The assuming office date is the date Maria accepts the position. Maria must report investments, interests in real property, and business positions she holds on that date, and income, including loans, gifts, and travel payments received during the 12 months prior to that date.

**Initial Statement:**

If your office or position has been added to a newly adopted or newly amended conflict-of-interest code, use the effective date of the code or amendment, whichever is applicable.

- Investments, interests in real property, and business positions held on the effective date of the code or amendment must be reported. In addition, income (including loans, gifts, and travel payments) received during the 12 months *prior to* the effective date of the code or amendment is reportable.

**Annual Statement:**

Generally, the period covered is January 1, 2004, through December 31, 2004. If the period covered by the statement is different than January 1, 2004, through December 31, 2004 (for example, you assumed office between October 1, 2003 and December 31, 2003, or you are combining statements), you must specify the period covered.

- Investments, interests in real property, business positions held and income (including loans, gifts, and travel payments) received during the period covered by the statement must be reported. Do not change the preprinted dates on Schedules A-1, A-2, and B unless you are required to report the acquisition or disposition of an interest that did not occur in 2004.

**Leaving Office Statement:**

Generally, the period covered is January 1, 2004, through the date you stopped performing the duties of this position. If the period covered differs from January 1, 2004, through the date you stopped performing the duties of this position (for example, you assumed office between October 1, 2003 and December 31, 2003, or you are combining statements), the period covered must be specified.

- Investments, interests in real property, business positions held and income (including loans, gifts, and travel payments) received during the period covered by the statement must be reported. Do not change the preprinted dates on Schedules A-1, A-2, and B unless you are required to report the acquisition or disposition of an interest that did not occur in 2004.

**Candidate Statement:**

If you are filing a statement in connection with your candidacy for state or local office, investments, interests in real property, and business positions held on the date of filing your declaration of candidacy must be reported. In addition, income (including loans, gifts, and travel payments) received during the 12 months *prior to* the date of filing your declaration of candidacy is reportable. Do not change the preprinted dates on Schedules A-1, A-2, and B.

Candidates running for special district offices (for example, school board trustees and water district board members) should consult the agency's conflict-of-interest code to determine if candidate statements are required and what economic interests to disclose.

**Amendments:**

If you discover errors or omissions on any statement, file an amendment as soon as possible. To obtain amendment schedules, contact the FPPC, your filing official, or the FPPC website at *www.fppc.ca.gov.*

## WHERE TO FILE

**1. Officials Specified in Gov. Code Section 87200 (listed in Appendix-1):**

In most cases, the filing officials listed below will retain a copy of your statement and forward the original to the FPPC.

| 87200 Filers | Where to File |
|---|---|
| State offices | Your agency |
| Judicial offices | The clerk of your court |
| Retired Judges | Directly with FPPC |
| County offices | Your county clerk |
| City offices | Your city clerk |
| Multi-County offices | Your agency |

| 87200 Candidates | |
|---|---|
| State offices | County election official |
| Judicial offices | with whom you file your |
| Multi-County offices | declaration of candidacy |
| County offices | County Clerk |
| City offices | City Clerk |
| Public Employees' Retirement System (CalPERS) | CalPERS |

**2. Members of Boards/Commissions of Newly Created Agencies:**

File with your newly created agency or with your agency's code reviewing body as provided by your code reviewing body.

**3. Code Filers — State and Local Officials and Employees Designated in a Conflict-of-Interest Code:**

File with your agency, board, or commission unless it is otherwise specified in your agency's conflict-of-interest code. In most cases, the agency, board, or commission will retain the statements.

State Senate and Assembly staff members file statements directly with the FPPC.

Exceptions:

- Elected state officers are not required to file statements under any agency's conflict-of-interest code.
- 87200 filers are not required to file statements under any agency's conflict-of-interest code in the same jurisdiction. For example, a county supervisor who is appointed to serve for an agency with jurisdiction in the same county has no additional filing obligations.

## WHEN TO FILE

**Assuming Office and Initial Statements:**

| Filer | Deadline |
|---|---|
| Elected officials | 30 days after assuming office |
| Appointed positions specified in Gov. Code section 87200 (listed in Appendix-1) **or** Newly created board and commission members not covered by a conflict-of-interest code | 30 days after assuming office **or** 10 days after appointment or nomination if subject to Senate or judicial confirmation |
| Other appointed positions (including newly-hired employees) designated in a conflict-of-interest code | 30 days after assuming office (30 days after appointment or nomination if subject to Senate confirmation) |
| Positions newly-added to a new or amended conflict-of-interest code | 30 days after the effective date of the code or code amendment |

Exceptions:

- Elected state officers who assume office in December or January are not required to file an assuming office statement, but will file the next annual statement due.
- If you complete a term of office and, within 30 days, begin a new term of the same office (for example, you are reelected or reappointed), you are not required to file an assuming office statement. Instead, you may file the next annual statement due.
- If you leave an office specified in Gov. Code section 87200 and, within 30 days, you assume another office or position specified in section 87200 that has the same jurisdiction (for example, a city planning commissioner elected mayor), you are not required to file an assuming office statement. Instead, you may file the next annual statement due.
- If you transfer from one designated position to another designated position within the same agency, contact your filing officer or the FPPC to determine your filing obligations.

FPPC Form 700 (2004/2005)
FPPC Toll-Free Helpline: 866/ASK-FPPC

Appendix-3

**53-611 (688)**

## WHEN TO FILE
### Continued

**Annual Statements:**

1. Elected state officers (including members of the state legislature and members elected to the Board of Administration of the California Public Employees' Retirement System);

   Judges and court commissioners; and

   Members of state boards and commissions specified in Gov. Code section 87200 (listed in Appendix-1):

   File no later than **Tuesday, March 1, 2005.**

2. County and city officials specified in Gov. Code section 87200:

   File no later than **Friday, April 1, 2005.**

3. Multi-County officials:

   File no later than **Friday, April 1, 2005.**

4. State and local officials and employees designated in a conflict-of-interest code:

   File on the date prescribed in the code (April 1 for most filers).

**Exception:**

- If you assumed office between October 1, 2004, and December 31, 2004, and filed an assuming office statement, you are not required to file an annual statement until March 1, 2006, or April 1, 2006, whichever is applicable. The annual statement will cover the day after you assumed office through December 31, 2005.

Incumbent officeholders who file candidate statements also must file annual statements by the specified deadlines.

**Leaving Office Statements:**

Leaving office statements must be filed no later than 30 days after leaving the office or position.

**Exceptions:**

- If you complete a term of office and, within 30 days, begin a new term of the same office (for example, you are reelected or reappointed), you are not required to file a leaving office statement. Instead, you may file the next annual statement due.

- If you leave an office specified in Gov. Code section 87200 and, within 30 days, you assume another office or position specified in section 87200 that has the same jurisdiction (for example, a city planning commissioner elected mayor), you are not required to file a leaving office statement. Instead, you may file the next annual statement due.

- If you transfer from one designated position to another designated position within the same agency, contact your filing officer or the FPPC to determine your filing obligations.

**Candidate Statements:**

All candidates (including incumbents) for offices specified in Gov. Code section 87200 must file statements no later than the final filing date for their declaration of candidacy.

**Exceptions:**

- If you have filed an assuming office or annual statement for the same jurisdiction within 60 days before filing a declaration of candidacy, you are not required to file a candidate statement.

- For elective offices designated in an agency's conflict-of-interest code, you must file a candidate statement only if the code specifically requires one to be filed. You should obtain a copy of the disclosure categories from the code to verify what interests are reportable. Contact the agency to verify whether you are required to file and to obtain a copy of your disclosure categories.

53-611 (689)

# TERMS & DEFINITIONS

The instructions located on the back of each schedule describe the types of interests that must be reported. The purpose of this section is to explain other terms used in this form that are not defined in the instructions to the schedules or elsewhere.

**Blind Trust:** See Trusts, Appendix-11.

**Business Entity:** Any organization or enterprise operated for profit, including a proprietorship, partnership, firm, business trust, joint venture, syndicate, corporation, or association. This would include a business for which you take business deductions for tax purposes (for example, a small business operated in your home).

**Code Filer:** An individual who has been designated in a state or local agency's conflict-of-interest code to file statements of economic interests.

**Commission Income:** "Commission Income" means gross payments of $500 or more received during the period covered by the statement as a broker, agent, or salesperson, including insurance brokers or agents; real estate brokers or agents, travel agents or salespersons, stockbrokers, and retail or wholesale salespersons, among others.

In addition, you may be required to disclose the names of sources of commission income if your pro rata share of the gross income was $10,000 or more from a single source during the reporting period. If your spouse or registered domestic partner received commission income, you would disclose your community property share (50%) of that income (for example, the names of sources of $20,000 or more in gross commission income received by your spouse or registered domestic partner. (You must report your community property share (50%) of your registered domestic partner's income only if you are reporting activity in 2005.)

Report commission income as follows:

- If the income was received through a business entity in which you or your spouse or registered domestic partner had a 10% or greater ownership interest (or if you receive commission income on a regular basis as an independent contractor or agent), use Schedule A-2.

- If the income was received through a business entity in which you or your spouse or registered domestic partner **did not receive commission income on a regular basis** or you had a **less than a 10% ownership interest,** use Schedule C.

The "source" of commission income generally includes all parties to a transaction, and each is attributed the full value of the commission.

Examples:

- You are a partner in Smith and Jones Insurance Company and have a 50% ownership interest in the company. You sold two Businessmen's Insurance Company policies to XYZ Company during the reporting period. You received commission income of $5,000 from the first transaction and $6,000 from the second. On Schedule A-2, report your partnership interest in and income received from Smith and Jones Insurance Company in parts 1 and 2. In part 3, list both Businessmen's Insurance Company and XYZ Company as sources of $10,000 or more in commission income.

- You are a stock broker for Prime Investments, but you have no ownership interest in the firm. You receive commission income on a regular basis through the sale of stock to clients. Your total gross income from your employment with Prime Investments was over $100,000 during the reporting period. On Schedule A-2, report your name as the name of the business entity in part 1 and the gross income you have received in part 2. (You do not need to complete the information in the box in part 1 indicating the general description of business activity, fair market value, or nature of investment.) In part 3, list Prime Investments and the names of any clients who were sources of $10,000 or more in commission income to you.

- You sell real estate on a part-time basis for Super Realty and you have no ownership interest in the company. Since you are not receiving commission income on a regular basis, you are not considered to be a business entity. On Schedule C, if you received gross commission income of $500 or more, identify Super Realty as a source of income to you. If you received commission income of $10,000 or more from a real estate transaction, you must report the name(s) of the source(s) on Schedule C.

Note: If your pro rata share of commission income from a single source is $500 or more, you may be required to disqualify yourself from decisions affecting that source of income, even though you are not required to report the income. *For information regarding disclosure of "incentive compensation," see Appendix-9.*

FPPC Form 700 (2004/2005)
FPPC Toll-Free Helpline: 866/ASK-FPPC

Appendix-5

53-611 (690)



**Conflict of Interest:** A public official or employee has a conflict of interest under the Act when all of the following occur:

- The official makes, participates in making, or uses his or her official position to influence a governmental decision;

- It is reasonably foreseeable that the decision will affect the official's economic interest;

- The effect of the decision on the official's economic interest will be material; and

- The effect of the decision on the official's economic interest will be different than its effect on the public generally. Check the Commission's website (*www.fppc.ca.gov*) for a fact sheet entitled, "Can I Vote? Conflict of Interest Overview"

**Conflict-of-Interest Code:** The Act requires every state and local government agency to adopt a conflict-of-interest code. The code may be contained in a regulation, policy statement, or a city or county ordinance, resolution, or other document.

An agency's conflict-of-interest code must designate all officials and employees of, and consultants to, the agency who make or participate in making governmental decisions that could cause conflicts of interest. These individuals are required by the code to file statements of economic interests and to disqualify themselves when conflicts of interest occur.

The disclosure required under a conflict-of-interest code for a particular designated official or employee should include only the kinds of personal economic interests he or she could significantly affect through the exercise of his or her official duties. For example, an employee whose duties are limited to reviewing contracts for supplies, equipment, materials, or services provided to the agency should be required to report only those interests he or she holds that are likely to be affected by the agency's contracts for supplies, equipment, materials, or services.

**Consultant:** An individual who contracts with or whose employer contracts with state or local government agencies and who makes, participates in making, or acts in a staff capacity for making governmental decisions. Consultants may be required to file Form 700. The obligation to file Form 700 is always imposed on the individual who is providing services to the agency, not on the business or firm that employs the individual.

FPPC regulation 18701 defines "consultants" as including the following individuals who make a governmental decision whether to:

- Approve a rate, rule, or regulation

- Adopt or enforce a law

- Issue, deny, suspend, or revoke any permit, license, application, certificate, approval, order or similar authorization or entitlement

- Authorize the agency to enter into, modify, or renew a contract provided it is the type of contract that requires agency approval

- Grant agency approval to a contract that requires agency approval and to which the agency is a party, or to the specifications for such a contract

- Grant agency approval to a plan, design, report, study or similar item

- Adopt, or grant agency approval of, policies, standards, or guidelines for the agency, or for any of its subdivisions

A consultant also is an individual who:

- serves in a staff capacity with the agency and in that capacity participates in making a governmental decision; or

- performs the same or substantially all the same duties for the agency that would otherwise be performed by an individual holding a position specified in the agency's conflict-of-interest code.

**Designated Employee:** An official or employee of a state or local government agency whose position has been designated in the agency's conflict-of-interest code to file statements of economic interests. Individuals who contract with government agencies (consultants) may also be designated in a conflict-of-interest code.

A federal officer or employee serving in an official federal capacity on a state or local government agency is not a designated employee.

**Disclosure Categories:** The section of an agency's conflict-of-interest code that specifies the types of personal economic interests officials and employees of the agency must disclose on their statements of economic interests. Disclosure categories are usually contained in an appendix or attachment to the conflict-of-interest code. Contact your agency to obtain a copy of your disclosure categories.

**Diversified Mutual Fund:** Diversified portfolios of stocks, bonds, or money market instruments that are managed by investment companies whose business



is pooling the money of many individuals and investing it to seek a common investment goal. Mutual funds are managed by trained professionals who buy and sell securities. A typical mutual fund will own between 75 to 100 separate securities at any given time so they also provide instant diversification. *Only diversified mutual funds registered with the Securities and Exchange Commission under the Investment Company Act of 1940 are exempt from disclosure.*

**Elected State Officer:** Elected state officers include the Governor, Lieutenant Governor, Attorney General, Insurance Commissioner, State Controller, Secretary of State, State Treasurer, Superintendent of Public Instruction, members of the State Legislature, members of the State Board of Equalization, and elected members of the Board of Administration of the California Public Employees' Retirement System.

**Enforcement:** The FPPC investigates suspected violations of the Act. Other law enforcement agencies (the Attorney General or district attorney) also may initiate investigations under certain circumstances. If violations are found, the Commission may initiate administrative enforcement proceedings that could result in fines of up to $5,000 per violation.

Instead of administrative prosecution, a civil action may be brought for negligent or intentional violations by the appropriate civil prosecutor (the Commission, Attorney General, or district attorney); or a private party residing within the jurisdiction. In civil actions, the measure of damages is up to the amount or value not properly reported.

Persons who violate the conflict-of-interest disclosure provisions of the Act also may be subject to agency discipline, including dismissal.

Finally, a knowing or willful violation of any provision of the Act is a misdemeanor. Persons convicted of a misdemeanor may be disqualified for four years from the date of the conviction from serving as a lobbyist or running for elective office, in addition to other penalties that may be imposed. The Act also provides for numerous civil penalties, including monetary penalties and damages, and injunctive relief from the courts.

**Expanded Statement:** Some officials or employees may have multiple filing obligations (for example, a city council member who also holds a designated position with a county agency, board, or commission). Such officials or employees may complete one expanded statement covering the disclosure requirements for all

positions and file a complete, originally signed copy with each agency.

**Fair Market Value:** When reporting the value of an investment, interest in real property, or gift, you must disclose the fair market value – the price at which the item would sell for on the open market. This is particularly important when valuing gifts, because the fair market value of a gift may be different from the amount it cost the donor to provide the gift. For example, the wholesale cost of a bouquet of flowers may be $10, but the fair market value may be $25 or more. In addition, there are special rules for valuing free tickets and passes. Call the FPPC for assistance.

**Gift and Honoraria Prohibitions:**

**Gifts:**
State and local officials who are listed in Gov. Code section 87200 (except judges – see below), candidates for these elective offices (including judicial candidates), and officials and employees of state and local government agencies who are designated in a conflict-of-interest code are prohibited from accepting a gift or gifts totaling more than $360 in a calendar year from a single source.

In addition, elected <u>state</u> officers, candidates for elective <u>state</u> offices, and officials and employees of <u>state</u> agencies are subject to a $10 per calendar month limit on gifts from lobbyists and lobbying firms registered with the Secretary of State.

**Honoraria:**
State and local officials who are listed in Gov. Code section 87200 (except judges – see below), candidates for these elective offices (including judicial candidates), and employees of state and local government agencies who are designated in a conflict-of-interest code are prohibited from accepting honoraria for any speech given, article published, or attendance at any public or private conference, convention, meeting, social event, meal, or like gathering.

**Exceptions:**
- Some gifts are not reportable or subject to the gift and honoraria prohibitions, and other gifts may not be subject to the prohibitions but are reportable. For detailed information, see the FPPC fact sheet entitled "Limitations and Restrictions on Gifts, Honoraria, Travel, and Loans," which can be obtained from your filing officer or the FPPC's website (*www.fppc.ca.gov*).

- The $360 gift limit and the honorarium prohibition do not apply to a part-time member of the governing board of a public institution of higher education, unless the member is also an elected official.

- If you are designated in a state or local government agency's conflict-of-interest code, the $380 gift limit and honorarium prohibition are applicable only to sources you would otherwise be required to report on your statement of economic interests. However, this exception is not applicable if you also hold a position listed in Gov. Code section 87200 (see Appendix-1).

- For state agency officials and employees, the $10 lobbyist/lobbying firm gift limit is applicable only to lobbyists and lobbying firms registered to lobby your agency. This exception is not applicable if you are an elected state officer or a member or employee of the State Legislature.

Judges:
Section 170.9 of the Code of Civil Procedure imposes gift limits on judges and prohibits judges from accepting any honorarium. Section 170.9 is enforced by the Commission on Judicial Performance. The FPPC has no authority to interpret or enforce the Code of Civil Procedure. Court commissioners are subject to the gift limit under the Political Reform Act.

Income Reporting: Reporting income under the Act is different than reporting income for tax purposes. The Act requires gross income (the amount received before deducting losses, expenses, or taxes) to be reported.

Pro Rata Share: The instructions for reporting income refer to your pro rata share of the income received. Your pro rata share is normally based on your ownership interest in the entity or property. For example, if you are a sole proprietor, you must disclose 100% of the gross income received by your business entity on Schedule A-2. If you own 25% of a piece of rental property, you must report 25% of the gross rental income received. If the income is community property, your pro rata share is 50% of your spouse's or your registered domestic partner's share.

When you are required to report sources of income to a business entity, sources of rental income, or sources of commission income, you are only required to disclose individual sources of income of $10,000 or more. However, you may be required to disqualify yourself from decisions affecting sources of $500 or more in income, even though you are not required to report them.

Example:

- Alicia Ruiz is an attorney with her own law firm. As a candidate for mayor, she must disclose reportable sources of income to the firm of $10,000 or more. Her husband Ed is also a public official. His community property share in her income is 50%, so he must disclose reportable sources of income to Alicia's law firm of $20,000 or more.

You are not required to report:

- Salary, reimbursement for expenses or per diem, social security, disability, or other similar benefit payments received by you or your spouse or registered domestic partner from a federal, state, or local government agency.
- Campaign contributions.
- A cash bequest or cash inheritance.
- Returns on a security registered with the Securities and Exchange Commission, including dividends, interest, or proceeds from a sale of stocks or bonds.
- Payments received under an insurance policy.
- Interest, dividends, or premiums on a time or demand deposit in a financial institution, shares in a credit union, an insurance policy, or a bond or other debt instrument issued by a government agency.
- Your spouse's or registered domestic partner's income which is legally "separate" income.
- Income of dependent children.
- Automobile trade-in allowances from dealers.
- Loans and loan repayments received from your spouse or registered domestic partner, child, parent, grandparent, grandchild, brother, sister, parent-in-law, brother-in-law, sister-in-law, nephew, niece, aunt, uncle, or first cousin unless he or she was acting as an intermediary or agent for any person not covered by this provision.
- Alimony or child support payments.
- Payments received under a defined benefit pension plan qualified under Internal Revenue Code section 401(a).
- Any loan from a commercial lending institution made in the lender's regular course of business on terms available to the public without regard to your official status.
- Any retail installment or credit card debts incurred in the creditor's regular course of business on terms available to the public without regard to your official status.
- Loans made to others. However, repayments may be reportable on Schedule C.



- A loan you co-signed for another person unless you made payments on the loan during the reporting period

**Incentive Compensation:** "Incentive compensation" means income over and above salary that is either ongoing or cumulative, or both, as sales or purchases of goods or services accumulate. Incentive compensation is calculated by a predetermined formula set by the official's employer which correlates to the conduct of the purchaser in direct response to the effort of the official.

Incentive compensation does not include:

- Salary
- Commission income *(for information regarding disclosure of "commission income" see Appendix-5)*
- Bonuses for activity not related to sales or marketing, the amount of which is based solely on merit or hours worked over and above a predetermined minimum
- Executive incentive plans based on company performance, provided that the formula for determining the amount of the executive's incentive income does not include a correlation between that amount and increased profits derived from increased business with specific and identifiable clients or customers of the company
- Payments for personal services which are not marketing or sales

The purchaser is a source of income to the official if all three of the following apply:

- the official's employment responsibilities include directing sales or marketing activity toward the purchaser, and
- there is direct personal contact between the official and the purchaser intended by the official to generate sales or business; and
- there is a direct relationship between the purchasing activity of the purchaser and the amount of the incentive compensation received by the official.

Report incentive compensation as follows:

- In addition to salary, reimbursement of expenses, and other income received from your employer, separately report on Schedule C the name of each person who purchased products or services sold, marketed or represented by you if you received incentive compensation of $500 or more attributable to the purchaser during the period covered by the statement.

- If incentive compensation is paid by your employer in a lump sum, without allocation of amounts to specific customers, you must determine the amount the incentive compensation attributable to each of your customers. This may be based on the volume of sales to those customers.

(See regulations 18703.3 and 18728.5 for more information.)

**Jurisdiction:** You must disclose investments and sources of income that are located in or doing business in your jurisdiction, are planning to do business in your jurisdiction, or that have done business during the previous two years in your jurisdiction, and interests in real property located in your jurisdiction.

A business entity is located in or doing business in your jurisdiction if the entity has business contacts on a regular or substantial basis with a person who maintains a physical presence in your jurisdiction.

Business contacts include, but are not limited to, manufacturing, distributing, selling, purchasing, or providing services or goods. Business contacts do not include marketing via the Internet, telephone, television, radio, or printed media.

The same criteria are used to determine whether an individual, organization, or other entity is located in or doing business in your jurisdiction.

**Exception:**

- Gifts are reportable regardless of the location of the donor. For example, a state agency official with full disclosure must report gifts from sources located outside of California. (Designated employees should consult their disclosure categories to determine if the donor of a gift is of the type that must be disclosed.)

For reporting interests in real property, if your jurisdiction is the state, you must disclose real property located within the state of California unless your agency's conflict-of-interest code specifies otherwise.

For local agencies, an interest in real property is located in your jurisdiction if any part of the property is located in, or within two miles of, the region, city, county, district, or other geographical area in which the agency has jurisdiction, or if the property is located within two miles of any land owned or used by the agency.



See the following explanations to determine what your jurisdiction is:

**State Offices and All Courts:** Your jurisdiction is the state if you are an elected state officer, a state legislator, or a candidate for one of these offices. Judges, judicial candidates, and court commissioners have statewide jurisdiction. (*In re Baty* (1979) 5 FPPC Ops. 10.) If you are an official or employee of, or a consultant to, a state board, commission, or agency, or of any court or the State Legislature, your jurisdiction is the state.

**County Offices:** Your jurisdiction is the county if you are an elected county officer, a candidate for county office, or if you are an official or employee of, or a consultant to, a county agency or any agency with jurisdiction solely within a single county.

**City Offices:** Your jurisdiction is the city if you are an elected city officer, a candidate for city office, or you are an official or employee of, or a consultant to, a city agency or any agency with jurisdiction solely within a single city.

**Multi-County Offices:** If you are an elected officer, candidate, official or employee of, or a consultant to, a multi-county agency, your jurisdiction is the region, district, or other geographical area in which the agency has jurisdiction. (Example: A water district has jurisdiction in a portion of two counties. Members of the board are only required to report interests located or doing business in that portion of each county in which the agency has jurisdiction.)

**Other (for example, school districts and special districts):** If you are an elected officer, candidate, official or employee of, or a consultant to, an agency not covered above, your jurisdiction is the region, district, or other geographical area in which the agency has jurisdiction. See the multi-county example above.

**Leasehold Interest:** The term "interest in real property" includes leasehold interests. An interest in a lease on real property is reportable if the value of the leasehold interest is $2,000 or more. The value of the interest is the total amount of rent owed by you during the reporting period or, for a candidate, assuming office, or initial statement, during the prior 12 months.

You are not required to disclose a leasehold interest with a value of less than $2,000 or a month-to-month tenancy.

**Loans:** State and local elected and appointed officials and employees are prohibited from receiving any personal loan totaling more than $250 from an official, employee, or consultant of their governmental agencies or any governmental agency over which the official or the official's agency has direction or control. In addition, loans of more than $250 from any person who has a contract with the official's agency or an agency under the official's control are prohibited unless the loan is from a commercial lending institution or part of a retail installment or credit card transaction made in the regular course of business on terms available to members of the public.

State and local elected officials are also prohibited from receiving any personal loan of $500 or more unless the loan is in writing and clearly states the terms of the loan, including the parties to the loan agreement, the date, amount, and term of the loan, the date or dates when payments are due, the amount of the payments, and the interest rate on the loan.

Campaign loans and loans from family members are not subject to the $250 and $500 loan prohibitions.

A personal loan made to a public official that is not being repaid or is being repaid below certain amounts will become a gift to the official under certain circumstances. Contact the FPPC for further information, or see the FPPC fact sheet entitled "Limitations and Restrictions on Gifts, Honoraria, Travel, and Loans," which can be obtained from your filing officer or the FPPC's website (*www.fppc.ca.gov*).

You are not required to report loans from commercial lending institutions, or any indebtedness created as part of retail installment or credit card transactions that are made in the lender's regular course of business, without regard to official status, on terms available to members of the public.

**Privileged Information:** You are not required to disclose on Schedule A-2, Part 3, the name of a person who paid fees or made payments to a business entity if disclosure of the name would violate a legally recognized privilege under California law. For example, a name is protected by attorney-client privilege when facts concerning an attorney's representation of an anonymous client are publicly known and those facts, when coupled with disclosure of the client's identity, might expose the client to an official investigation or to civil or criminal liability.

A patient's name is protected by physician-patient privilege when disclosure of the patient's name would also reveal the nature of the treatment received by the patient because, for example, the physician is recognized as a specialist.

FPPC regulation 18740 sets out specific procedures that must be followed in order to withhold the name of a source of income.

**Public Officials Who Manage Public Investments:** Individuals who invest public funds in revenue-producing programs must file Form 700. This includes individuals who direct or approve investment transactions, formulate or approve investment policies, and establish guidelines for asset allocations. FPPC regulation 18701 defines "public officials who manage public investments" to include the following:

- Members of boards and commissions, including pension and retirement boards or commissions, and committees thereof, who exercise responsibility for the management of public investments;

- High-level officers and employees of public agencies who exercise primary responsibility for the management of public investments (for example, chief or principal investment officers or chief financial managers); and

- Individuals who, pursuant to a contract with a state or local government agency, perform the same or substantially all the same functions described above.

**Retirement Accounts (for example, deferred compensation and individual retirement accounts (IRAs)):** Assets held in retirement accounts must be disclosed if the assets are reportable items, such as common stock (investments) or real estate (interests in real property). For help in determining whether your investments and real property are reportable, see the instructions to Schedules A-1, A-2, and B.

If your retirement account holds reportable assets, disclose only the assets held in the account, not the account itself. You may have to contact your account manager to determine the assets contained in your account.

<u>Schedule A-1:</u> Report any business entity in which the value of your investment interest was $2,000 or more during the reporting period. (Use Schedule A-2 if you have a 10% or greater ownership interest in the business entity.)

<u>Schedule B:</u> Report any piece of real property in which the value of your interest was $2,000 or more during the reporting period.

**Examples:**

- Alice McSherry deposits $500 per month into her employer's deferred compensation program. She has chosen to purchase shares in two diversified mutual funds registered with the Securities and Exchange Commission. Because her funds are invested solely in non-reportable mutual funds (see Schedule A-1 instructions), Alice has no disclosure requirements with regard to the deferred compensation program.

- Bob Allison has $6,000 in an individual retirement account with an investment firm. The account contains stock in several companies doing business in his jurisdiction. One of his stock holdings, Gala Computers, reached a value of $2,500 during the reporting period. The value of his investment in each of the other companies was less than $2,000. Bob must report Gala Computers as an investment on Schedule A-1 because the value of his stock in that company was $2,000 or more.

- Adriane Fisher has $5,000 in a retirement fund that invests in real property located in her jurisdiction. The value of her interest in each piece of real property held in the fund was less than $2,000 during the reporting period. Although her retirement fund holds reportable assets, she has no disclosure requirement because she did not have a $2,000 or greater interest in any single piece of real property. If, in the future, the value of her interest in a single piece of real property reaches or exceeds $2,000, she will be required to disclose the real property on Schedule B for that reporting period.

**Trusts:** Investments and interests in real property held by a trust (including a living trust) are reported on Schedule A-2 if you, your spouse or registered domestic partner, or your dependent children had a 10% or greater interest in the trust and your pro rata share of a single investment or interest in real property was $2,000 or more. (Filers must report investments held by a trust of a registered domestic partner if the reporting period covers activity in 2005.)

You have an interest in a trust if you are a <u>trustor</u> and:

- Can revoke or terminate the trust;

- Have retained or reserved any rights to the income or principal of the trust or retained any reversionary or remainder interest; or

- Have retained any power of appointment, including the power to change the trustee, or the beneficiaries.

**FPPC Form 700 (2004/2005)**
**FPPC Toll-Free Helpline: 866/ASK-FPPC**

**Appendix-11**

53-611 (696)

Or you are a <u>beneficiary</u> and:

- Presently receive income; or
- Have an irrevocable future right to receive income or principal. (See FPPC regulation 18234 for more information.)

Examples:

- Sarah Murphy has set up a living trust which holds her principal residence, stock in several companies that do business in her jurisdiction, and a rental home in her agency's jurisdiction. Since Sarah is the trustor and she can revoke or terminate the trust, she must disclose any stock worth $2,000 or more and the rental home on Schedule A-2. Sarah's residence is not reportable.

- Ben Yee is listed as a beneficiary in his grandparents' trust. However, Ben does not presently receive income from the trust, nor does he have an irrevocable future right to receive income or principal. Therefore, Ben is not required to disclose any assets contained in his grandparents' trust.

Blind Trusts:

A blind trust is a trust managed by a disinterested trustee who has complete discretion to purchase and sell assets held by the trust. If you have a direct, indirect, or beneficial interest in a blind trust, you may not be required to disclose your pro rata share of the trust's assets or income. However, the trust must meet the standards set out in FPPC regulation 18235, and you must disclose reportable assets originally transferred into the blind trust and income from those original assets until they have been disposed of by the trustee.

Trustees:

If you are only a trustee, you do not have a reportable interest in the trust. However, you may be required to report the income you received from the trust for performing trustee services.

**Wedding Gifts:** Wedding gifts must be disclosed if they were received from a reportable source during the period covered by the statement. Gifts valued at $50 or more are reportable; however, a wedding gift is considered a gift to both spouses equally. Therefore, you would count one half the value of a wedding gift to determine if it is reportable and need only report individual gifts with a total value of $100 or more unless a particular gift can only be used by you or is intended only for your use.

For example, you receive a placesetting of china valued at $150 from a reportable source as a wedding gift. Because the value to you is $50 or more, you must report the gift on Schedule E but may state its value as $75.

Wedding gifts are not subject to the $360 gift limit, but they are subject to the $10 lobbyist/lobbying firm gift limit for state officials.

**Privacy Information Notice**

Information requested on all FPPC forms is used by the FPPC to administer and enforce the Political Reform Act (Government Code sections 81000-91014 and California Code of Regulations sections 18109-18997). All information required by these forms is mandated by the Political Reform Act. Failure to provide all of the information required by the Act is a violation subject to administrative, criminal or civil prosecution. All reports and statements provided are public records open for public inspection and reproduction.

If you have any questions regarding this Privacy Notice or how to access your personal information, please contact the FPPC at:

Manager, Filing Officer Programs
428 J Street, Suite 620
Sacramento, CA  95814
(916) 322-5660

**EXHIBIT 18**

Recording Requested by
and mailed to:

District Clerk
San Diego Unified Port District
P.O. Box 120488
San Diego, CA 92112

No Document Fee
Recordation for Benefit of District

San Diego Unified Port District
Document No. **49654**
Filed
NOV 16 2005
Office of the District Clerk

(41)

DOC # 2005-0883367

OCT 12. 2005    2:29 PM
OFFICIAL RECORDS
SAN DIEGO COUNTY RECORDER'S OFFICE
GREGORY J SMITH, COUNTY RECORDER
FEES:        0.00
OC:          NA
PAGES:       61

2005-0883367

## SAN DIEGO UNIFIED PORT DISTRICT

### LEASE TO

### SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

### OF PROPERTY LOCATED AT

### 2701 NORTH HARBOR DRIVE

### SAN DIEGO, CALIFORNIA

### FOR SIXTY-FOUR (64) YEARS

### COMMENCING JANUARY 1, 2005

### AND ENDING DECEMBER 31, 2068

99170 v4

ORIGINAL 

## TABLE OF CONTENTS

Paragraph/Exhibit                                                          Page Number

1.   TERM .................................................................................................1
2.   USE.....................................................................................................1
3.   RENT.................................................................................................2
4.   IMPROVEMENTS ...........................................................................3
5.   TITLE TO IMPROVEMENTS .........................................................4
6.   LIENS ...............................................................................................5
7.   LEASE ENCUMBRANCE ...............................................................5
8.   ASSIGNMENT -- SUBLEASE ........................................................11
9.   DEFAULTS AND REMEDIES.........................................................11
10.  EMINENT DOMAIN........................................................................14
11.  TERMINATION OF PRIOR AGREEMENTS..................................18
12.  MAINTENANCE AND REPAIR .....................................................18
13.  TAXES AND UTILITIES ................................................................19
14.  CONFORMANCE WITH LAWS AND REGULATIONS ...............19
15.  NONDISCRIMINATION ..................................................................19
16.  PARTIAL INVALIDITY ..................................................................19
17.  HOLD HARMLESS...........................................................................19
18.  SUCCESSORS IN INTEREST .........................................................20
19.  EASEMENTS ....................................................................................20
20.  TITLE OF PORT...............................................................................20
21.  INSURANCE .....................................................................................24
22.  POLICY OF PORT............................................................................24
23.  WARRANTIES-GUARANTEES-COVENANTS..............................24
24.  QUITCLAIM OF AUTHORITY'S INTEREST UPON TERMINATION ..............24
25.  PEACEABLE SURRENDER.............................................................24
26.  WAIVER ...........................................................................................25
27.  HOLDOVER ......................................................................................25

49654    2

28.    PARAGRAPH HEADINGS .................................................25

29.    ENTIRE UNDERSTANDING .............................................25

30.    TIME IS OF THE ESSENCE ............................................26

31.    NOTICES ....................................................................26

32.    REMOVAL OF MATERIALS..............................................26

33.    NUMBER AND GENDER ................................................27

34.    EQUAL EMPLOYMENT OPPORTUNITY AND NON-DISCRIMINATION........27

35.    ATTORNEY FEES .......................................................28

36.    HAZARDOUS MATERIALS AND DEMOLITION WORK ...........................28

36.1  WORK PLAN AND BUDGET FOR DEMOLITION/ENVIRONMENTAL
       CLEAN-UP ACTIVITIES...............................................34

37.    UNDERGROUND STORAGE TANKS.....................................36

38.    ABOVEGROUND STORAGE TANKS.....................................36

39.    ACKNOWLEDGMENT OF IMPROVEMENTS...............................37

40.    PORT COOPERATION ..................................................37

41.    TERMINATION OF LEASE IF AIRPORT RELATED OPERATIONS CEASE ......37

42.    ABSTRACT OF LEASE .................................................38

Exhibit "A"

Exhibit "B"

Exhibit "C"

49654                                                                     3

53-611 (701)

# LEASE

THIS LEASE, made and entered into this __11th__ day of _ October_____, 2005, between the SAN DIEGO UNIFIED PORT DISTRICT, a public corporation, hereinafter "Port" or "Port District," and the SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY, a local governmental entity of regional government, hereinafter "Authority" or "Airport Authority," WITNESSETH:

WHEREAS, the Port District and Airport Authority entered into a Settlement Agreement dated May 20, 2004, a copy of which is attached hereto as Exhibit "C" and by this reference is made a part hereof, resolving the case of San Diego County Regional Airport Authority v. San Diego Unified Port District, et al. and related cross action, San Diego Superior Court Case No. 821224; and

WHEREAS, this Lease embodies the terms and conditions specified in Section J.1. of said Settlement Agreement;

NOW, THEREFORE, Port, for the consideration hereinafter set forth, hereby leases to Authority for the term and upon the conditions hereinafter set forth, a portion of those lands within Port's jurisdiction, which lands are more particularly described as follows:

> Approximately 2,070,705 square feet of land located at 2701 North Harbor Drive in the City of San Diego, California, more particularly described and delineated on Drawing No. 008-010 dated May 21, 2004, attached hereto as Exhibits "A" and "B" and by this reference made a part hereof, hereinafter "Leased Premises".

TO HAVE AND TO HOLD said Leased Premises for the term of the Lease and upon the conditions as follows:

1.    TERM:  The term of the Lease shall be for a period of sixty-four (64) years, commencing on the 1ˢᵗ day of January, 2005, hereinafter called the "Commencement Date," and ending on the 31st day of December, 2068, hereinafter called the "Termination Date," unless sooner terminated as herein provided.

2.    USE:  Port and Authority agree that the Leased Premises shall be used for any type of use permitted by law.

1

49654    4

**53-611 (702)**

3.    RENT: Authority agrees to pay to Port rent in accordance with the following:

(a)    The rent for the period of January 1, 2005 through February 3, 2005 shall be the sum of One Hundred Thirty-Nine Thousand Seven Hundred Twenty-Six Dollars and Six Cents ($139,726.06); the rent for the period of February 4, 2005 through February 28, 2005 shall be the sum of Two Hundred Five Thousand Four Hundred Seventy-Nine Dollars and Twenty-Five Cents ($205,479.25); and the rent for the period of March 1, 2005 through December 31, 2068 of this Lease shall be the sum of Two Hundred Fifty Thousand Dollars ($250,000) per month which shall be payable in advance on or before the first day of each month. The parties agree that said rent is a negotiated settlement amount applicable only to this Lease and shall not be used for any purpose in any market value appraisal. The parties also agree that all of the rent paid by Authority to Port under the Right of Entry License Agreement between the parties dated February 11, 2005 and bearing Port Document No. 48336 (including rental credits received thereto but excluding the utilities and security costs for which Authority is required to reimburse Port) shall be applied to the rent Authority is required to pay Port under this Lease so that the Authority is not paying rent twice for the same property.

(b)    All payments shall be delivered to Port's Treasurer. Checks shall be made payable to the San Diego Unified Port District and mailed to the Treasurer's Office, San Diego Unified Port District, Post Office Box 120488, San Diego, California 92112-0488, or delivered to the Treasurer's Office, San Diego Unified Port District, 3165 Pacific Highway, San Diego, California. Port may change the designated place of payment and filing at any time upon ten (10) days' written notice to Authority. Authority assumes all risk of loss and responsibility for late charges, as herein described, if payments are made by mail.

(c)    Authority hereby acknowledges that late payment by Authority to Port of rent and other sums due hereunder will cause Port to incur costs not contemplated by this Lease. Accordingly, in the event Authority is delinquent in remitting the rent due in accordance with the rent provisions of this Lease, Authority shall pay, in addition to the unpaid rent, five percent (5%) of the delinquent rent. If rent is still unpaid at the end of fifteen (15) days, Authority shall pay an additional five percent (5%) [being a total of ten percent (10%)]. The parties hereby agree that said late charges are appropriate to compensate Port for loss resulting from rent delinquency including, without limitation, lost interest, opportunities, legal costs, and the cost of servicing the delinquent

2

49654            5

53-611 (703)

account.   Acceptance of such late charges and any portion of the late payment by Port shall in no event constitute a waiver of Authority's default with respect to such overdue amount, nor prevent Port from exercising any of its other rights and remedies. The Executive Director of Port shall have the right to waive for good cause any late charges upon written application of Authority for any such delinquency period.

All payments by Authority to Port shall be by a good and sufficient check. No payment made by Authority or receipt or acceptance by Port of a lesser amount than the correct amount of rent due under this Lease shall be deemed to be other than a payment on account of the earliest rent due hereunder, nor shall any endorsement or statement on any check or any letter accompanying any check or payment be deemed an accord and satisfaction, and Port may accept such check or payment without prejudice to Port's right to recover the balance or pursue any other available remedy.

(d)    Port and Authority acknowledge the existence of a Promissory Note (the "Note") executed by the Port in favor of the Authority in the amount of Fifty Million Dollars ($50,000,000). The Note shall be amortized over twenty-five (25) years commencing January 1, 2006, with an interest rate fixed at 5½% per annum.   The Note is subordinated to the Port's bonded indebtedness. Should the Port fail to pay the Authority when due one or more payments on the Note for any reason whatsoever, the Authority shall have the right to discontinue its Lease payments to the Port in an amount equal to the unpaid amounts (plus interest) until payments on the Note are brought current.

4.    IMPROVEMENTS: Port and Authority are parties to the "Settlement Agreement Between the San Diego Unified Port District and the San Diego County Regional Airport Authority", dated May 20, 2004, ("Settlement Agreement"), a copy of which is attached hereto as Exhibit "C" and is incorporated herein by reference. Port and Authority agree that what follows in this Paragraph 4 and in Paragraph 5 below are subject to and modified by paragraph J.1.b. in the Settlement Agreement titled "Environmental Clean-up Costs," and by paragraph J.1.c. in the Settlement Agreement titled "Demolition Funds." Port and Authority further agree that by no later than December 31, 2011, the costs for environmental clean-up and remediation of the leased premises, as well as costs for demolition and abatement of improvement as referenced in paragraph J.1.b. and J.1.c. of the Settlement Agreement, shall be determined and agreed to by the Port and Authority (or submitted to binding arbitration as provided in the Settlement Agreement).   In the event there are additional environmental cleanup, remediation, demolition and/or abatement of improvement costs identified after December 31, 2011, above the amount agreed to and fixed by

3

49654

the parties pursuant to the preceding sentence, Authority shall have sole responsibility for said additional costs.

Port shall not be required to make any improvements whatsoever on or for the benefit of the Leased Premises. Authority may, at its own expense, make alterations or changes, or cause to be made, built, installed, or remove any structures, machines, appliances, utilities, signs, or other improvements necessary or desirable for the authorized use of the Leased Premises without the approval of Port.

5.    TITLE TO IMPROVEMENTS: For the purpose of this Paragraph, "Improvements" shall include, but are not limited to subsurface improvements. On the Commencement Date of this Lease, all existing structures, buildings, installations, and improvements located on the Leased Premises are owned by and title thereto is vested in either Authority or Authority's sublessees. Subject to Paragraph 4 above, all said existing structures, buildings, installations, and improvements, as well as all structures, buildings, installations, and improvements of any kind placed on the Leased Premises by Authority subsequent to the Commencement Date of this Lease shall, at the option of Port, if consistent with applicable law, be removed by Authority at Authority's expense. Port may exercise said option as to any or all of such structures, buildings, installations, and improvements either before or after the Termination Date or sooner termination of this Lease. If Port exercises such option, Authority shall remove such structures, buildings, installations, and/or improvements by no later than the latter of (the "Removal Period") (i) seven hundred thirty (730) days from the effective date of a written notice given or served pursuant to Paragraph 31 of this Lease or (ii) one hundred eighty (180) days after the Termination Date of this Lease or sooner termination thereof. Provided, however, Authority agrees to repair any and all damage occasioned by their removal. Title to any such structures, buildings, installations, and/or improvements not so removed by the last day of the Removal Period shall vest in Port, without cost to Port and without any payment to Authority, except that Port shall have the right to have them removed and to repair any and all damage occasioned by their removal, all at the expense of Authority.

On the Commencement Date of this Lease, all existing machines, appliances, equipment, and trade fixtures located on the Leased Premises are owned by and title thereto is vested in Authority or Authority's sublessees. Furthermore, all machines, appliances, equipment, and trade fixtures placed on the Leased Premises by Authority subsequent to the Commencement Date of this Lease are also owned by and title thereto is vested in Authority. All machines, appliances, equipment, and trade fixtures shall be removed by Authority, at Authority's expense, during the Removal Period. Provided, however, Authority agrees to repair any and all damage occasioned by their removal.

4

49654            7

If machines, appliances, equipment, and trade fixtures required by Port to be removed are not removed by Authority by the last day of the Removal Period, the same may be considered abandoned and shall thereupon become the property of Port, without cost to Port and without any payment to Authority, except that Port shall have the right to have them removed and to repair any and all damage occasioned by their removal, all at the expense of Authority.

During any period of time employed by Authority under this Paragraph to remove structures, buildings, installations, improvements, machines, appliances, equipment, and trade fixtures, Authority shall continue to pay the full rent to Port in accordance with this Lease, which said rent shall be prorated daily.

6.    LIENS:  Authority shall defend, indemnify, and hold harmless Port against all claims and liens for labor, services, or materials in connection with improvements, repairs, or alterations made by Authority or Authority's sublessees, contractors, and agents on the Leased Premises, and the costs of defending against such claims and liens, including reasonable attorneys' fees.

In the event any such claim or lien, or any other claim(s), lien(s) or levy(ies) whatsoever of any nature caused by Authority or Authority's sublessees, contractors, and agents, is filed against the Leased Premises or the leasehold interests of Authority therein, Authority shall, upon written request of Port, deposit with Port a bond conditioned for the payment in full of all claims upon which said lien(s) or levy(ies) have been filed.  Such bond shall be acknowledged by Authority, as principal, and by an entity licensed by the Insurance Commissioner of the state of California to transact the business of a fidelity and surety insurance company, as surety.  Port shall have the right to declare this Lease in default in the event the bond required by this Paragraph has not been deposited with Port within twenty (20) days after written request has been delivered to Authority.

This provision shall not apply to a foreclosure of a trust deed or mortgage encumbering the leasehold if the encumbrance has previously received Port consent in accordance with Paragraph 7 herein.

7.    LEASE ENCUMBRANCE:  Authority shall not encumber the Lease, leasehold interest, and the improvements thereon by a deed of trust, mortgage, or other security instrument to assure the payment of Authority's promissory note, without Port's prior written consent, in each instance.  If Authority enters into any deed of trust, mortgage, or other security instrument that encumbers the Lease, leasehold interest, or the improvements thereon without Port's prior written consent, Port shall have the right to declare this Lease in default.

In the event Authority requests Port's consent to any Lease encumbrance, hereinafter

5

49654                    8

**53-611 (706)**

referred to as a "transaction" in this Paragraph 7, Authority shall reimburse Port for all Port's reasonable costs and expenses associated with said transaction. Said costs shall include reasonable legal fees and disbursements relating to or arising out of any such transaction, regardless of whether such transaction is consummated.

The term "Consented-to-Lender" as hereinafter used in this Lease, means the lender holding an encumbrance consented to by Port. It may include one or more lenders holding obligations of the Authority secured by a single deed of trust, mortgage, or other security instrument.

Without the prior written consent of the Consented-to-Lender, should Authority owe the Consented-to-Lender any amounts under any security instrument encumbering this Lease, leasehold interest, or the improvements thereon, Port will not accept the voluntary surrender, cancellation, or termination of this Lease before the expiration of the term thereof.

If a deed of trust, mortgage, or other security instrument consented to by Port is in default at any time, the Consented-to-Lender shall, as provided by law, have the right, without Port's prior consent, to:

(a)    Accept an assignment of the Lease in lieu of foreclosure; or

(b)    Cause a foreclosure sale to be held pursuant to either judicial proceedings or power of sale as provided in its deed of trust, mortgage, or other security instrument.

Provided, however, with the exception of said Consented-to-Lender, no assignment to the successful bidder shall be effective without Port's prior written consent.

Before said Consented-to-Lender, or any other future consented-to assignee, acquires the leasehold interest, it shall, as an express condition precedent, agree in writing to assume each and every obligation under the Lease. Furthermore, before any said Consented-to-Lender, or any other future consented-to assignee or purchaser, may subsequently assign or sublease all or any portion of the leasehold interest, it shall, in each instance, obtain Port's prior written consent.

Further, a Consented-to-Lender that has: (i) acquired the leasehold interest and assumed the Authority's obligations, or (ii) entered into a new lease pursuant to Paragraph 9 herein, concurrently with a termination of this Lease, shall be released from all further obligations under this Lease after it assigns the leasehold interest to an assignee consented to by Port, in accordance with this Paragraph 7.

49654

9

53-611 (707)

Whenever a Consented-to-Lender is required by the provisions of this Paragraph 7 to obtain Port's prior consent to an:

(a)   Assignment to the successful bidder upon a foreclosure by said Consented-to-Lender; or

(b)   Assignment or sublease of all or substantially all of the Leased Premises by said Consented-to-Lender should it become the Authority by reason of: (i) being the successful bidder upon said foreclosure, or (ii) an assignment in lieu of foreclosure, or (iii) under a new lease entered into pursuant to Paragraph 9 herein; then Port will grant such consent if:

(1)   The principal(s) of such assignee, purchaser, or sublessee are reputable (meaning the absence of reputations for dishonesty, criminal conduct, or association with criminal elements -- "reputable" does not mean "prestigious," nor does the determination of whether one is reputable involve considerations of personal taste or preference);

(2)   The principal(s) of such assignee, purchaser, or sublessee possess sufficient business experience and financial means to perform Authority's obligations under this Lease—according to the then-current standards for business experience and financial means that Port generally requires of new or renewed lessees at the time of the request; and

(3)   The assignee, purchaser, or sublessee agrees in writing to assume each and every obligation under this Lease.

Further, Port will not unreasonably or arbitrarily withhold such consent. Provided, however, no such assignee, purchaser, or sublessee shall subsequently: (i) assign, transfer, or sublease any or all of the Leased Premises without Port's prior written consent; or (ii) encumber the Lease, leasehold interest, and improvements thereon without Port's prior written consent, in accordance with this Paragraph 7.

Provided further, if said Consented-to-Lender becomes the Authority by reason of: (i) being the successful bidder upon foreclosure, or (ii) an assignment in lieu of foreclosure, or (iii) being the Authority of a new lease entered into pursuant to Paragraph 9 herein, then said Consented-to-Lender may, upon a subsequent assignment or subleasing of all or substantially all of the Leased Premises, take back from its assignee, purchaser, or sublessee, a purchase money deed of trust, mortgage, or security instrument. Provided, however, said Consented-to-Lender must execute

7

49654                                    10

and submit to Port documentation substantially in the same form and content as was originally submitted to Port when consent was granted to the earlier encumbrance. Only said Consented-to-Lender or the successful bidder upon said foreclosure may enforce the provisions of this Paragraph 7. Further, no other third party shall have the rights or remedies, as third-party beneficiaries, or otherwise, hereunder.

The burden of producing evidence and the burden of proof showing Port that a prospective assignee, purchaser, or sublessee meets each and all of the aforesaid qualifications and standards shall be on said Consented-to-Lender or successful bidder upon foreclosure. Port's decision shall be based upon Port's high duty of care in administering a valuable public resource, which it holds in trust for the people of the state of California. In the absence of fraud or arbitrary or unreasonable action in applying or failing to apply said standards, Port's decision shall be final.

In the event Port rejects: (i) the successful bidder upon foreclosure, or (ii) a proposed assignee or sublessee of the Consented-to-Lender (said successful bidder or Consented-to-Lender being sometimes referred to hereinafter as the "Aggrieved Party," and said successful bidder, or proposed assignee or sublessee from the Consented-to-Lender being sometimes referred to hereinafter as the "Applicant"). the sole remedy of the Aggrieved Party shall be to seek relief in the nature of specific performance through the arbitration procedure hereinafter established. Further, in no event shall Port be liable to the Aggrieved Party or Applicant, or any person or entity whatsoever, for money damages. Provided, however, the Aggrieved Party shall be entitled to recover such damages, if any, it may sustain as a result of Port's failure or refusal to comply with a Superior Court order confirming an award in favor of the Aggrieved Party in said arbitration.

The issue to be submitted to arbitration shall be whether Port's Board of Port Commissioners' record contains substantial evidence to support the decision to reject the Applicant in accordance with the standards of reputation, business experience, and financial means, as provided herein. The Aggrieved Party may submit said issue to arbitration.

The arbitration shall be conducted pursuant to Title 9 of Part 3 of the California Code of Civil Procedure (section references herein shall be to the Code of Civil Procedure), as amplified and modified by the following provisions:

(a) Arbitration shall be initiated by the Aggrieved Party filing a written demand for arbitration with Port no later than thirty (30) days following Port's adoption of a resolution rejecting the Applicant. If the Aggrieved Party so elects, Port shall be deemed to have adopted a resolution rejecting an Applicant if Port has not acted within ninety (90) days after

8

49654

the Aggrieved Party files a written application for Port to approve the Applicant;

(b)    Said arbitration shall be conducted by a single neutral arbitrator who shall not be a County of San Diego resident;

(c)    If the parties have not agreed on the selection of the arbitrator within five (5) days after said demand for arbitration is filed, either party may petition the Superior Court of the state of California, county of San Diego, to select the arbitrator pursuant to Section 1281.6;

(d)    Each party shall submit its nominees, if any, to the court within five (5) days after said petition is served and filed;

(e)    Said arbitrator shall not conduct a trial de novo, but shall consider only said record before Port's Board of Port Commissioners. Provided, however, said arbitrator may consider evidence outside said record if the arbitrator believes that the Board's decision was affected by Port's fraudulent action which was not reasonably discoverable prior to the Board's decision;

(f)    Said arbitrator shall make the award in writing within forty-five (45) days of being appointed;

(g)    The right of any party to take depositions for discovery purposes, as provided in Section 1283.05, shall be waived;

(h)    Certain time periods established in said Title 9 shall be shortened as follows:

    (1)    Sections 1284, 1288.4, 1290.2, and 1290.6--halved;

    (2)    Section 1288--four years to 30 days and 100 days to 15 days; and

    (3)    Section 1288.2--100 days to 15 days;

(i)    San Diego, California shall be the venue of the arbitration hearing and any court proceedings;

(j)    The decision of the Superior Court in any proceeding to confirm, correct, or vacate the award shall be final, and the parties to said arbitration

9

49654

12

53-611 (710)

waive any rights to appeal therefrom, as provided in Sections 1294 and 1294.2, or otherwise; and

(k)     The parties shall bear their costs, fees, and expenses incurred in connection with said arbitration, in accordance with the provisions of Section 1284.2.

Said Consented-to-Lender shall include a statement in any Notice of Foreclosure Sale covering the foregoing requirements for Port's consent to an assignment upon said foreclosure.     Except for subleases, utility easements, and other necessary rights-of-way, Port shall not expressly consent to a subsequent lien or encumbrance against the Leased Premises without said Consented-to-Lender's prior written consent.

Said Consented-to-Lender shall not assign its security interest in the Leased Premises in whole or in part without Port's prior written consent, in each instance. Provided, however, Port's consent to such an assignment shall be deemed granted (and such assignee will for all purposes of this Lease be deemed to be a Consented-to-Lender) if the assignment is to:

(a)     A financial institution in good legal standing under the laws of its jurisdiction of incorporation having assets exceeding Five Billion Dollars ($5,000,000,000); or

(b)     The United States of America or any state thereof, or any agency thereof; or

(c)     An assignee by operation of law; e.g., a state insurance department engaged in supervising the liquidation or rehabilitation of an insurance company lender.

Provided, however, for purposes of the foregoing provisions "financial institution" shall mean: (i) an insurance company qualified to do business in the state of California; or (ii) a federally- or state-chartered bank, savings bank, or savings and loan association; or (iii) a pension or retirement fund operated for the employees and former employees of, and regulated and controlled by, the United States of America or any state thereof, or any agency thereof; e.g., the California State Teachers' Retirement System.

Provided, further, no subsequent assignment by such assignee will be permitted unless:

(a)     The assignment conforms to all requirements of this Paragraph 7;

10

49654          13

(b)    A duplicate original(s) of such assignment is furnished Port; and

(c)    In case of an assignment where Port's consent is deemed granted: (i) assignee promptly furnishes Port reasonably satisfactory evidence that said assignee complies with the foregoing requirements, and (ii) said assignee expressly agrees to take such assignment subject to all Port's rights under this Lease.

Notwithstanding anything to the contrary in this Paragraph 7, pledges by Authority's sublessees of their subleasehold interests for financing purposes that do not extend beyond the term of this Lease shall not require the Port's consent.

8.    ASSIGNMENT - SUBLEASE: Subject to applicable law, Authority shall have the right to assign all or any portion of this Lease to any person or entity on terms and conditions acceptable to Authority. Authority shall not be required to give any notice to, or seek any approval or consent with any proposed assignment, except as required by applicable law; provided however, Authority shall provide Port with a copy of each executed lease assignment that covers more than twenty-five percent (25%) of the square footage of the Leased Premises within thirty (30) days of such assignment.

Subject to applicable law, Authority shall have the right to sublease, license or otherwise permit the occupancy, use or management of all or any portion of the Leased Premises by any person or entity on terms and conditions acceptable to Authority. Authority shall not be required to give any notice to, seek any approval or consent from, Port in connection with any such proposed sublease, license or permit; provided however, Authority shall provide Port with a copy of each executed sublease, license, or permit that covers more than twenty-five percent (25%) of the square footage of the Leased Premises within thirty (30) days of such sublease, license or permit.

9.    DEFAULTS AND REMEDIES:

(a)    Defaults. The occurrence of any one (1) or more of the following events shall constitute a default hereunder:

(1)    Abandonment of the Leased Premises. Abandonment is herein defined to include, but is not limited to, any absence by Authority from the Leased Premises for thirty (30) consecutive days or longer.

(2)    Failure by Authority to pay, when due, any Lease-required rent,

11

49654    14

53-611 (712)

other payment, and/or charge herein, where such failure continues for a period of ten (10) days after written notice thereof. Provided, however, any such notice provided in this Paragraph 9(a)(2) or in subsequent Paragraph 9(a)(3) shall be in lieu of, and not in addition to, any notice required under Section 1161 of the California Code of Civil Procedure, as amended.

(3)     Failure by Authority to perform any other express or implied covenants or conditions in this Lease, should such failure continue for thirty (30) days after written notice thereof, provided that, if such default is not reasonably susceptible of cure within said thirty (30) days and Authority has commenced action within said thirty (30) day period to cure the default and is diligently prosecuting said action to completion, such time period shall be extended by the time necessary to cure such default, provided however, in no event shall such extension period to cure the default continue for a time period in excess of one hundred eighty (180) days.

(4)     Subject to any restrictions or limitations placed on Port by applicable laws governing bankruptcy, Authority's:   (a) applying for, consenting to, or suffering the appointment of a receiver, trustee, or liquidator for all or a substantial portion of its assets; (b) making a general assignment for the benefit of creditors; (c) admitting in writing its inability to pay its debts or its willingness to be adjudged a bankrupt; (d) being adjudged a bankrupt; (e) filing a voluntary petition or suffering an involuntary petition under any bankruptcy, arrangement, reorganization, or insolvency law (unless in the case of an involuntary petition, the same is dismissed within thirty (30) days of such filing); (f) convening a meeting of its creditors, or any class thereof, for purposes of effecting a moratorium, extension, or composition of its debts; (g) suffering, or permitting to continue unstayed and in effect for ten (10) consecutive days, any attachment, levy, execution, or seizure of all or a substantial portion of Authority's assets or of Authority's interest in this Lease; or (h) a judicial sale of Authority's leasehold interest.

This Paragraph 9(a)(4) shall not be applicable or binding on the beneficiary of any deed of trust, mortgage, or other security instrument on the Leased Premises which is of record with Port and has been consented to by resolution of Port, or to said beneficiary's successors in interest consented to by resolution of

12

49654                    15

53-611 (713)

Port, as long as there remains any monies to be paid by Authority to such beneficiary under the terms of such deed of trust; provided that such beneficiary or its successors in interest, continuously and timely pays to Port all rent due or coming due under the provisions of this Lease, and provided that said beneficiary agrees in writing to assume and perform each and every obligation under the Lease.

(b)  **Remedies.** In the event of any default, Port may exercise the following remedies:

(1)  **Termination:** In the event of an occurrence of default pursuant to Paragraphs 9(a)(1) and/or 9(a)(2) only, terminate Authority's right to possession of the Leased Premises whereupon this Lease shall terminate and Authority shall immediately surrender possession of the Leased Premises to Port. In such event, Port shall be entitled to recover from Authority:

(i)  The "Worth at the Time of Award", as hereinafter defined, of the unpaid rent which had been earned at the time of termination;

(ii)  If the Authority has not surrendered the Leased Premises at the time of termination, the "Worth at the Time of Award" of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such loss that Authority proves could have been reasonably avoided;

(iii)  Any other amount necessary to compensate Port for all the detriment proximately caused by said defaults of Authority including, but not limited to, the cost of recovering possession of the Leased Premises and reasonable attorneys' fees.

The "Worth at the Time of Award" of the amounts referred to in Paragraphs 9(b)(1)(i) and 9(b)(1)(ii) shall be computed by charging interest at ten percent (10%) per annum from the dates such amounts accrued to Port.

(2)  **Other:** In the event of an occurrence of default pursuant to Paragraphs 9(a)(1), 9(a)(2), 9(a)(3), and/or 9(a)(4), any and/or all

13

49654

16

53-611 (714)

other rights or remedies of Port specified elsewhere in this Lease or provided by law.

In the event Port has consented to an encumbrance of this Lease for security purposes in accordance with Paragraph 7 of this Lease, it is understood and agreed that Port shall furnish copies of all notice(s) of default(s) to the beneficiary or mortgagee under said encumbrance by certified mail (provided Authority has delivered to Port written request, therefore, together with the name and address of any such beneficiary or mortgagee) contemporaneously with the furnishing of such notices to Authority. Furthermore, in the event Authority fails to cure such default(s) within the time permitted herein, said beneficiary or mortgagee shall be permitted to cure such default(s) at any time within fifteen (15) days following the expiration of the period within which Authority may cure said default(s); provided, however, Port shall not be required to furnish any further notice(s) of default(s) to said beneficiary or mortgagee.

In the event this Lease is terminated pursuant to the provisions of this Paragraph 9, Port shall continue to have all rights provided in Paragraph 5 of this Lease.

Notwithstanding the foregoing, should a default not be cured within the cure periods referred to above, said Lease shall not be terminated as to said beneficiary or mortgagee unless Port first legally offers to enter into a valid lease with said beneficiary or mortgagee, and said offer is not accepted in writing within (30) days after said offer is made. Furthermore, such new lease must be entered into as a condition concurrent with such termination for the then-remaining term of this Lease. Furthermore, the new lease must contain the same terms, conditions, and priority as this Lease, provided the mortgagee or beneficiary promptly cures all then-existing defaults under this Lease when and to the extent it is able to cure them. Such new lease may be entered into even though possession of the Leased Premises has not been surrendered by the defaulting Authority. In such event, unless legally restrained, Port shall promptly proceed to obtain possession of the Leased Premises and to deliver possession to said mortgagee or beneficiary as soon as the same is obtained. Should the mortgagee or beneficiary fail to accept said offer in writing within said thirty- (30) day period, or, having so accepted said offer, should it fail promptly to cure all existing defaults under this Lease when and to the extent it is able to cure them, then such termination shall also be effective as to said mortgagee or beneficiary.

10. **EMINENT DOMAIN:**

    (a)    <u>Taking</u>. Subject to the provisions of the Port District Act, as it may be amended from time to time, if, during the term of this Lease, the whole or any material part of the Leased Premises or Improvements shall be taken by power of eminent domain or condemned by any competent authority for any public or quasi-public use or purpose, or if any adjacent

14

49654

property or street shall be so taken or condemned, or reconfigured or vacated by such competent authority in such manner as to require the use, reconstruction or remodeling of any part of the Leased Premises or Improvements, or if Port shall grant a deed or other instrument in lieu of such taking by eminent domain or condemnation which is not successfully contested by Authority pursuant to Paragraph 10(e) below, and (i) such taking renders the Leased Premises unsuitable for Authority's business operations on the Leased Premises, or (ii) the Improvements cannot be repaired, restored, or replaced at a reasonable expense for the uses and purposes permitted by this Lease, this Lease may at the option of Authority be terminated as of the date of such taking by written notice to Port within ninety (90) calendar days after such taking, and the rights of Port and Authority in and to the award or awards upon any such taking shall be determined in accordance with this Paragraph 10.   As used herein, the terms "taken" or "taking" shall mean an acquisition and/or damaging, including severance damage, by eminent domain, or by inverse condemnation, or by deed or transfer in lieu thereof, or for any public or quasi-public use under any statute or law; and the taking shall be considered to take place as of the earlier of (x) the date actual physical possession is taken by the condemnor, or (y) the date on which title vests in the condemnor.

(b)    **Partial Taking:**  If less than the entire Leased Premises shall be taken and this Lease is not terminated as provided in Paragraph 10(a) (a "Partial Taking"), Authority shall, to the extent of any award paid to Authority on account of such taking, restore, repair, and replace that portion of the Improvements not so taken.  The rights of Port and Authority in and to any award upon any such taking shall be determined in accordance with Paragraph 10(c)(2) below.

(c) .  **Distribution of Award:**  The rights of Port and Authority in and to any award and other compensation upon any such taking, including damages and interest (the "Award") shall be determined as follows:

    (1)    In the event of any taking of the whole of the Leased Premises of the nature covered by Paragraph 10(a) above, all compensation and damages therefor shall be payable in the following order of priority:

        (i)    Port shall first be entitled to payment for the value of the condemned land only, considered as unimproved and encumbered by this Lease, and without reference to, or

15

49654          18

53-611 (716)

inclusion of, Port's reversionary interest in the value of the Improvements (the "Condemned Land Value");

(ii)    Each Leasehold Lender (in order of lien priority and not pro rata), shall next be entitled to payment of all sums secured by its Leasehold Mortgage as and to the extent provided therein together with its reasonable out of pocket expenses and charges, including, without limitation, its reasonable attorneys' fees, incurred in the taking;

(iii)    If there is no Leasehold Lender which has received a portion of the award pursuant to the preceding subparagraph (ii), then (A) Authority shall next receive a portion of the balance of the award equal to the value of Authority's leasehold interest in this Lease, but exclusive of the value of the Improvements for the then remaining term of this Lease, and (B) the balance of the award shall be divided pari passu between Port and Authority, with Port receiving the value of Port's reversionary interest in the Improvements and Authority receiving the value of the Improvements for the remaining term of this Lease;

(iv)    If any Leasehold Lender has received a portion of the award pursuant to Paragraph 10(c)(1)(ii),then:

    (A)    Authority shall next receive a portion of the balance of the award equal to the value of Authority's leasehold interest in this Lease. Authority's leasehold interest shall be calculated (1) exclusive of any lien or encumbrances of Leasehold Lenders and (2) exclusive of the value of the Improvements for the then remaining term of this Lease.

    (B)    The balance of the award shall be divided pari passu between Port and Authority, with Port receiving the value of Port's reversionary interest in the Improvements, and Authority receiving the value of the Improvements at the time of the taking for the remaining term of this Lease.

(v)    Notwithstanding the foregoing provisions, any portion of the award which has been specifically designated by the

16

condemning authority or in the judgment of any court to be payable to Port or Authority on account of any interest in the Leased Premises or the Improvements separate and apart from Condemned Land Value, the value of the Port's reversionary interest in the Improvements, Authority's leasehold interest in this Lease, or the value of the Improvements for the remaining term of this Lease, shall be paid to Port or Authority, as applicable, as so designated by the condemning authority or judgment.

(2)    In the event of any partial taking of the Leased Premises of the nature covered by Paragraph 10(b) above, the award shall be applied first to the restoration, repair and replacement of the Improvements by Authority, and the remainder thereof shall be divided between Port and Authority with respect to any portion of the Leased Premises and Improvements so taken in the manner provided by Paragraph 10(c)(i) above.

(d)    <u>Temporary Taking</u>.

(1)    Subject to Paragraph 10(d)(2) below, if the Leased Premises or any portion thereof or any Improvements thereon should be taken for governmental occupancy for a limited period not extending beyond December 30, 2068 (a "Temporary Taking"), this Lease shall not terminate and Authority shall continue to perform and observe all of its obligations hereunder as though such taking had not occurred, except only to the extent that Authority may be prevented from performing such obligations by reason of such taking. In such event, Authority (subject to the rights of any Leasehold Lender) shall be entitled to receive the entire amount of any awards, compensation and damages made for such taking, and Port hereby assigns any and all of its interest in such awards, compensation and damages to Authority to the extent that the governmental occupancy does not extend beyond December 30, 2068.

(2)    If a Temporary Taking extends for a period of time greater than six (6) months, then Authority shall have the right to terminate this Lease. Authority (subject to the rights of any Leasehold Lender) shall be entitled to receive the amount of any awards, compensation and damages made for such Temporary Taking that is attributable to the period of time up until the effective date of

17

49654    *20*

53-611 (718)

Authority's termination pursuant to this Section 10(d)(2).

(e) **Grant of Deed In-Lieu.** If Port shall propose to grant a deed or instrument in lieu of a taking by eminent domain or condemnation, Port shall provide Authority with written notice of such intention not less than thirty (30) days prior to the date of any such grant. If Authority, within such thirty (30) day period, notifies Port that it elects to contest the validity of the threatened eminent domain or condemnation, Port shall not grant any such deed or instrument if Authority, within thirty (30) days following such notice to Port, assumes the defense (at the sole expense of Authority) of any pending eminent domain or condemnation proceedings, or takes appropriate action to establish the invalidity of any threatened proceedings or actions. In such event, Port agrees to assign to Authority, without recourse, all of its legal rights, remedies, defenses, counterclaims and cross-complaints with respect to such eminent domain or condemnation proceedings upon Authority's agreement to provide appropriate indemnification of Port with respect to any costs, expenses and liabilities of Port in respect thereof.

11. **TERMINATION OF PRIOR AGREEMENT(S):** Any and all existing permits, leases, or rental agreements between Port and Authority for the Leased Premises which have not already expired or terminated, are hereby terminated on the effective date of this Lease, including without limitation, (i) the Operating Contract between the parties hereto dated December 17, 2002 and bearing Port Document No. 45265; (ii) the Tideland Use and Occupancy Permit between the parties hereto dated April 2, 2003 bearing Port Document No. 45833; and (iii) the Right of Entry License Agreement between the parties hereto dated February 11, 2005 and bearing Document No. 48836 and as subsequently amended four times. Any rights, duties, and obligations of the parties pursuant to the terms, covenants, and conditions in any such hereby terminated agreements, including without limitation the utilities and security costs that Authority has agreed to reimburse Port for in said Right of Entry License Agreement in (iii) above, shall remain enforceable and subject to all defenses, including without limitation any applicable statute of limitations. Further, said statute shall not be waived or extended because of this Lease. Nothing herein is intended nor shall be construed as a waiver of any such rights, or as a release of any such duties or obligations, whether known or unknown at this time or upon the effective date of this Lease.

12. **MAINTENANCE AND REPAIR:** As part of the consideration for this Lease, Authority shall assume full responsibility for operation and maintenance of the Leased Premises throughout the term and without expense to Port. Authority shall perform all maintenance, which includes all painting, repairs, and replacements necessary to

18

49654    21

**53-611 (719)**

maintain and preserve the Leased Premises in a good, safe, healthy, and sanitary condition and in compliance with all applicable laws. Further, Authority shall provide appropriate containers for trash and garbage and keep the Leased Premises free and clear of rubbish, litter, and any other fire hazards. Authority waives all rights to make repairs at the expense of Port, as provided in Section 1942 of the California Civil Code, and all rights provided by Section 1941 of said Code.

13.   TAXES AND UTILITIES:  This Lease may result in a taxable possessory interest and be subject to the payment of property taxes.   Authority shall pay before delinquency all taxes and assessments of any kind assessed or levied upon Authority or the Leased Premises by reason of: (i) this Lease; (ii) any buildings, machines, or other improvements of any nature whatsoever erected, installed, or maintained by Authority; or (iii) the business or other activities of Authority upon or in connection with the Leased Premises.   Authority also shall pay any fees imposed by law for licenses or permits for any business or activities of Authority upon the Leased Premises, or under this Lease, and shall pay before delinquency any and all charges for utilities at or on the Leased Premises.  Notwithstanding the foregoing, Authority may contest, in good faith, any such taxes or utility charges provided that Authority shall take such actions as may be reasonably appropriate to protect the Leased Premises from any lien or other material adverse effects of such contest and shall promptly comply with the final determination of such contest.

14.   CONFORMANCE WITH LAWS AND REGULATIONS:  Authority agrees that, in all activities on or in connection with the Leased Premises, and in all uses thereof, including the making of any alterations, changes, installations, or other improvements, it will abide by and conform to all applicable laws and regulations.

15.   NONDISCRIMINATION:  Authority agrees at all times to fully comply with all laws prohibiting discrimination against any person or class of persons by reason of race, color, religion, sex, national origin, ancestry, physical or mental disability, veteran status, medical condition, marital status, age, sexual orientation, pregnancy, or other non-job related criteria.  In complying with all such laws, including without limitation the Americans With Disabilities Act of 1990, Authority shall be solely responsible for such compliance and required programs, and there shall be no allocation of any such responsibility between Port and Authority.

16.   PARTIAL INVALIDITY:  If any term, covenant, condition, or provision of this Lease is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remainder of the provisions herein shall remain in full force and effect, and shall in no way be affected, impaired, or invalidated thereby.

17.   HOLD HARMLESS:  Authority shall, to the fullest extent permitted by law, defend, indemnify, and hold harmless Port and its officers, employees, and agents for

19

49654        22

53-611 (720)



any and all liability, claims, judgments, or demands (collectively "Liabilities") related to the Leased Premises to the extent arising during the period commencing on the Commencement Date and ending on the termination of this Lease, but excluding any Liabilities arising from the gross negligence or willful misconduct of the Port. Port shall, to the fullest extent permitted by law, defend, indemnify and hold harmless Authority and its officers, employees, and agents for any and all Liabilities related to the Leased Premises arising prior to the Commencement Date, but excluding any Liabilities arising from the gross negligence or willful misconduct of the Authority.

18.  SUCCESSORS IN INTEREST:  Unless otherwise provided in this Lease, the terms, covenants, conditions, and agreements herein shall apply to and bind the heirs, successors, executors, administrators, and assigns of all the parties hereto, all of whom shall be jointly and severally liable hereunder.

19.  EASEMENTS:  This Lease and all rights granted hereunder are subject to all easements and rights-of-way previously granted or reserved by Port in, upon, over, and across the Leased Premises for any purpose whatsoever.

20.  TITLE OF PORT:  Port's title is derived from the provisions of the San Diego Unified Port District Act, Appendix 1, Harbors & Navigation Code, and is subject to the provisions of said Act.  This Lease is granted subject to the terms and conditions of said Act.

21.  INSURANCE:  Authority shall maintain insurance acceptable to Port in full force and effect throughout the term of this Lease.  The policies for said insurance shall, as a minimum, provide the following:

(a)  Forms of Coverage

(1)  "OCCURRENCE" form Commercial General Liability covering the Leased Premises, operations, and contractual liability assumed by Authority in this Lease in the amount of not less than Three Hundred Million Dollars ($300,000,000) combined single limit per occurrence for bodily injury, personal injury, and property damage. The general aggregate shall be Three Hundred Million Dollars ($300,000,000).

(2)  Fire and Extended Coverage, including water damage and debris cleanup provisions, in an amount not less than ninety percent (90%) of full replacement value of all improvements located within the Leased Premises.  The fire and extended coverage policies shall be endorsed with a Loss Payee endorsement in favor of Port.

20

49654    23

All insurance proceeds issued prior to January 1, 2059, shall be controlled by Authority and used for any purpose on the Leased Premises that Authority may determine to the extent consistent with applicable law. Commencing on January 1, 2059, it is agreed that any insurance proceeds in excess of One Million Dollars ($1,000,000) (which sum shall be adjusted by the percentage change in the Consumer Price Index for All Urban Consumers for Los Angeles/Riverside/Orange County, CA/All Items as published by the United States Department of Labor's Bureau of Labor Statistics ("CPI") that has occurred between the October 2002 CPI and the October 2058 CPI (or if both CPIs are not available, another index generally recognized as authoritative shall be substituted by agreement of the parties) resulting from a loss under said policies shall be payable into a special financial institution account controlled by Authority established for the purpose of ensuring that said proceeds will be reinvested in rebuilding and/or repairing the damaged portions of the Leased Premises and any damaged or destroyed improvements located thereon. On the Termination Date or sooner termination of this Lease, any funds remaining in said special financial institution account shall immediately be paid to Port. Provided, however, if there is a Port-consented to mortgage or deed of trust encumbering the leasehold, then all fire and extended coverage policies shall be made payable jointly to the mortgagee or beneficiary and Authority, to ensure that any proceeds shall be held by said mortgagee or beneficiary for the following purposes:

    (i)    As a trust fund to pay for the reconstruction, repair, or replacement of the damaged or destroyed improvements, in kind and scope, in progress payments as the work is performed. Any funds remaining after completion of said work shall be retained by said mortgagee or beneficiary and applied to reduce any debt secured by such mortgage or deed of trust. Furthermore, any funds remaining after full payment of said debt shall be paid to Authority; or

    (ii)    In the event that this Lease is terminated with consent of both Port and said mortgagee or beneficiary and the improvements are not reconstructed, repaired, or replaced, the insurance proceeds shall be retained, without liability, by said mortgagee or beneficiary to the extent necessary to fully discharge the debt secured by said

49654

24

53-611 (722)

mortgage or deed of trust. Furthermore, said mortgagee or beneficiary shall hold the balance thereof to restore the Leased Premises to a neat and clean condition. Any remaining funds shall lastly be paid to Port and Authority, as their interests may appear.

(3)   In the event underground storage tanks are located on the Leased Premises, Authority is required to comply with Code of Federal Regulations, Title 40, Chapter I, Subchapter H or Title 23, Division 3, Chapter 18 of California Code of Regulations, collectively, herein "UST Law." At the time Authority is required to comply with any provisions of UST Law requiring financial assurance mechanisms, Authority shall provide Port with a certified copy of its Certification of Financial Responsibility. If Authority's program for financial responsibility requires insurance, then Authority's policy(ies) shall name Port and its officers, employees, and agents as additional insureds, and all other terms of Subparagraph (b), below, shall apply. Should Authority change its financial assurance mechanisms, Authority shall immediately provide Port with a certified copy of its revised Certification of Financial Responsibility.

(b)   <u>General Requirements</u>

(1)   All required insurance shall be in force the first day of the term of this Lease, and shall be maintained continuously in force throughout the term of this Lease. In addition, the cost of all required insurance shall be borne by Authority. During the entire term of this Lease, Authority shall provide Port with Certificates, in a form acceptable to Port, evidencing the existence of the necessary insurance policies and original endorsements effecting coverage required by this Paragraph. The Certificates and endorsements for each insurance policy are to be signed by a person authorized by that insurer to bind insurance on its behalf. Notwithstanding the foregoing, Port reserves the right to require complete, certified copies of all required policies at any time.

(2)   All liability insurance policies shall name, or be endorsed to name Port and its officers, employees, and agents as additional insureds and protect Port and its officers, employees, and agents against any legal costs in defending claims. All liability policies shall provide cross-liability coverage. All insurance policies shall be

22

49654

25

49654

α>

notice by certified mail. All insurance policies shall be endorsed to state that Authority's insurance is primary and not excess or contributory to any insurance issued in the name of Port. Further, all insurance companies must be satisfactory to Port.

(3)    Any deductibles or self-insured retentions must be declared and acceptable to Port. If the deductibles or self-insured retentions are unacceptable to Port, then Authority shall have the option to either: (i) reduce or eliminate such deductibles or self-insured retentions as respects the Port and its officers, employees, and agents; or, (ii) procure a bond guaranteeing payment of losses and related investigations, claim administration, and defense expenses.

(4)    Port shall retain the right at any time to review the coverage, form, and amount of insurance required herein. If, in the opinion of Port, the insurance provisions in this Lease do not provide adequate protection for Port and/or members of the public using the Leased Premises or using services connected with Authority's use or occupancy of the Leased Premises, Port may require Authority to obtain insurance sufficient in coverage, form, and amount to provide adequate protection. Port's requirements shall be reasonable, but shall be designed to ensure protection from and against the kind and extent of risks that exist at the time a change in insurance is required.

(5)    Port shall notify Authority in writing of changes in the insurance requirements. With respect to changes in insurance requirements that are available from Authority's then-existing insurance carrier, Authority shall deposit Certificates evidencing acceptable insurance policies with Port incorporating such changes within sixty (60) days of receipt of such notice. With respect to changes in insurance requirements that are not available from Authority's then-existing insurance carrier, Authority shall deposit Certificates evidencing acceptable insurance policies with Port, incorporating such changes, within one hundred twenty (120) days of receipt of such notice. In the event Authority fails to deposit insurance Certificates as required herein, this Lease shall be in default without further notice to Authority, and Port shall be entitled to exercise all legal remedies as provided in Paragraph 9(b) of this

23

49654

26

Lease.

(6)     If Authority fails or refuses to maintain insurance as required in this Lease, or fails to provide proof of insurance, Port has the right to declare this Lease in default without further notice to Authority, and Port shall be entitled to exercise all legal remedies as provided in Paragraph 9(b) of this Lease.

(7)     The procuring of such required policies of insurance shall not be construed to limit Authority's liability hereunder, nor to fulfill the indemnification provisions and requirements of this Lease.

(8)     Authority agrees not to use the Leased Premises in any manner, even if use is for purposes stated herein, that will result in the cancellation of any insurance Port may have on the Leased Premises or on adjacent premises, or that will cause cancellation of any other insurance coverage for the Leased Premises or adjoining premises. Authority further agrees not to keep on the Leased Premises or permit to be kept, used, or sold thereon, anything prohibited by any fire or other insurance policy covering the Leased Premises. Authority shall, at its sole expense, comply with all reasonable requirements for maintaining fire and other insurance coverage on the Leased Premises.

22.     POLICY OF PORT:  It is Port's policy that prevailing wage rates shall be paid all persons employed on the lands within Port's jurisdiction.

23.     WARRANTIES-GUARANTEES-COVENANTS:     Port makes no warranty, guarantee, covenant, including but not limited to covenants of title and quiet enjoyment, or averment of any nature whatsoever concerning the condition of the Leased Premises, including the physical condition thereof, or any condition which may affect the Leased Premises.

24.     QUITCLAIM OF AUTHORITY'S INTEREST UPON TERMINATION:     Upon termination of this Lease for any reason, including but not limited to (i) termination because of default by Authority or (ii) termination because airport operations by Authority has ceased to exist on the Leased Premises, Authority shall execute, acknowledge, and deliver to Port within thirty (30) days after receipt of written demand therefor, a good and sufficient deed whereby all Authority's right, title, and interest in the Leased Premises is quitclaimed to Port.

25.     PEACEABLE SURRENDER:  Upon expiration of this Lease or earlier termination

49654

27

53-611 (725)

or cancellation thereof, as herein provided, Authority shall peaceably surrender the Leased Premises to Port. If Authority fails to surrender the Leased Premises at the expiration of this Lease or the earlier termination or cancellation thereof, Authority shall defend and indemnify Port from all liability and expense resulting from the delay or failure to surrender, including without limitation any succeeding Authority claims based on Authority's failure to surrender.

26.    WAIVER: Should either Port or Authority waive any breach by the other of any Lease covenant, condition, or agreement, such waiver shall not be, nor be construed to be, a waiver of any subsequent or other breach of the same or any other Lease covenant, condition, or agreement. Further, failure on the part of either party to require or exact the other's full and complete compliance with any of the Lease covenants, conditions, or agreements shall not be, nor be construed as in any manner changing the terms, or preventing the enforcement in full, of the provisions hereof. In addition, Port's subsequent acceptance of rent hereunder shall not be deemed to be a waiver of any preceding Authority breach of any Lease term, covenant, or condition, other than Authority's failure to pay the particular rent so accepted, regardless of Port's knowledge of Authority's preceding breach at the time rent is accepted.

27.    HOLDOVER: This Lease shall terminate without further notice at expiration of the term. Any holding over by Authority after either expiration or termination shall not constitute a renewal or extension, or give Authority any rights in or to the Leased Premises.

If Authority, with Port's consent, remains in possession of the Leased Premises after Lease expiration or termination, such possession shall be deemed a month-to-month tenancy terminable upon thirty (30) days' notice furnished at any time by either party to the other. In addition, all provisions of this Lease, except those pertaining to term, shall apply to the month-to-month tenancy, and Authority shall continue to pay all rent required by this Lease.

28.    PARAGRAPH HEADINGS: The Table of Contents and Paragraph Headings contained herein are for convenience in reference and are not intended to define or limit the scope of any provision thereof.

29.    ENTIRE UNDERSTANDING: This Lease contains the entire understanding and agreement of the parties. Authority acknowledges there is no other written or oral understanding or agreement between the parties with respect to the Leased Premises, and that this Lease supersedes all prior negotiations, discussions, obligations, and rights of the parties hereto. No waiver, modification, amendment, or alteration of this Lease shall be valid unless it is expressly in writing and signed by authorized representatives of the parties hereto. Each of the parties to this Lease acknowledges

25

49654

28

53-611 (726)

that no other party, agent, or representative has made any promise, representation, waiver, or warranty whatsoever, expressed or implied, which is not expressly contained in writing in this Lease. Each party further acknowledges it has not executed this Lease in reliance upon any collateral promise, representation, waiver, or warranty, or in reliance upon any belief as to any fact not expressly recited in this Lease.

30. TIME IS OF THE ESSENCE: Time is of the essence of each and all of the terms and provisions of this Lease. This Lease shall inure to the benefit of and be binding upon the parties hereto and any successors of Authority as fully and to the same extent as though specifically mentioned in each instance. All covenants, conditions, and agreements in this Lease shall extend to and bind any assigns and sublessees of Authority.

31. NOTICES: All notices provided for by this Lease or by law to be given or served upon Port or Authority shall be in writing and: (i) personally served upon Port or Authority, or any person hereafter authorized by either party in writing to receive such notice, or (ii) served by certified letter addressed to the appropriate address hereinafter set forth, or to such other address designated in writing by the respective party.

| To Port | To Authority |
|---|---|
| Executive Director | President/CEO |
| San Diego Unified Port District | San Diego County Regional Airport Authority |
| Post Office Box 120488 | Post Office Box 82776 |
| San Diego, CA 92112-0488 | San Diego, CA 92138-2776 |

Should any consented-to assignee, consented-to purchaser, or Consented-to-Lender notify Port in writing of its desire to receive notices, such party shall also be personally served, or served by certified letter at such appropriate address designated in writing by the respective party.

Any notice or notices given or served as provided herein shall be effectual and binding for all purposes upon the parties so served; provided, however, if served by certified mail, service will be considered completed and binding on the party served forty-eight (48) hours after deposit in the U.S. Mail.

32. REMOVAL OF MATERIALS: Authority shall, upon expiration of this Lease or sooner termination as herein provided, remove from the Leased Premises within sixty (60) days all materials, including without limitation all airplanes, debris and surplus and salvage items, hereinafter "Materials," placed on the Leased Premises during the term of this Lease, so as to leave the same in substantially the same condition as when first occupied by Authority, subject to reasonable wear and tear. Provided, however, if

26

49654                    27

53-611 (727)

Authority fails to remove all Materials within sixty (60) days, Port may remove, sell, or destroy said Materials at the expense of Authority. Further, Authority agrees to pay Port the reasonable cost of such removal, sale, or destruction; or, at the option of Port, said Materials not removed, sold, or destroyed by Authority shall become the property of Port, without cost to Port, and without any payment to Authority.

During any period of time required to remove said Materials, or to test for and/or remediate Contaminants as required in Paragraph 36 herein, Authority shall continue to pay the full rent to Port in accordance with this Lease, which said rent shall be prorated daily.

33.    NUMBER AND GENDER:  Words of any gender used in this Lease shall include any other gender and each word in the singular number shall include the plural whenever the tense requires.

34.    EQUAL EMPLOYMENT OPPORTUNITY AND NONDISCRIMINATION:  Authority shall comply with Title VII of the Civil Rights Act of 1964, as amended; the Civil Rights Act of 1991; the California Constitution; the California Fair Employment and Housing Act; the Americans with Disabilities Act of 1990; and any other applicable federal, state, or local laws and regulations now existing or hereinafter enacted, requiring equal employment opportunities or prohibiting discrimination.  This shall include without limitation, laws and regulations prohibiting discrimination because of race, color, religion, sex, national origin, ancestry, physical or mental disability, veteran status, medical condition, marital status, age, sexual orientation, pregnancy, or other non-job related criteria.  In complying with all such laws, including without limitation the Americans with Disabilities Act of 1990, Authority shall be solely responsible for such compliance and required programs, and there shall be no allocation of any such responsibility between Port and Authority.

Annually, Authority shall formulate and file with Port an approved:  (i) "Equal Employment Opportunity and Nondiscrimination Program," and (ii) "Statement of Compliance" for the promotion of equal employment opportunities and nondiscrimination. Authority shall make such progress reports as required by Port, and, upon Port's reasonable notice, Authority shall make available for inspection and copying all of its records relevant to compliance with this Paragraph.  Provided, however, Authority is only required to file the Program and Statement when the average annual employment level operating on the Leased Premises exceeds fifty (50) employees.  Provided further, should Authority be subject to a federally-mandated affirmative action program for employees, Authority may, in lieu of filing the Program and Statement, annually certify in writing to Port that Authority is subject to such a program, and, upon Port's request, Authority shall furnish evidence thereof.

For the purposes and provisions of this Paragraph, a sublessee shall be considered the Authority should the sublessee become the prime operator of the Leased Premises.

27

49654                    30

Authority's compliance with this Paragraph is an express condition hereof, and any failure by Authority to so comply and perform shall be a default as provided in this Lease, and Port may exercise any right as provided herein, and as otherwise provided by law.

35. **ATTORNEY FEES:** Should any suit be commenced to enforce, protect, or establish any right or remedy of any of the terms and conditions hereof, including without limitation a summary action commenced by Port under the laws of the state of California relating to the unlawful detention of property, the prevailing party shall be entitled to have and recover from the losing party reasonable attorney fees and costs of suit.

36. **HAZARDOUS MATERIALS AND DEMOLITION WORK:**

    A.   <u>Overview</u>: The Port and the Authority agree that what follows in this Paragraph 36 and in Paragraph 36.1, are subject to and modified by paragraph J.1.b. in the Settlement Agreement entitled "Environmental Clean-Up Costs," and by paragraph J.1.c. in the Settlement Agreement entitled "Demolition Funds," as fully set forth in "Exhibit C." Subject to B, C, and D below, the Port and the Authority further agree to: (1) pool all monies recovered or received from former tenants of the Leased Premises, insurance policies, and any third party as a result of litigation for the purpose of applying such monies to the demolition of existing buildings, removal of existing underground and aboveground storage tanks, and environmental clean-up and remediation of existing hazardous materials on, in and under the Leased Premises (collectively "Demolition/Environmental Clean-Up Activities") except to the extent provided otherwise in subparagraph 36.C. below; and (2) agree to split, on a 50/50 basis, all remaining costs for the Demolition/Environmental Clean-Up Activities. To that end, the parties agree to the provisions set forth in this Paragraph 36 and 36.1 regarding Demolition/Environmental Clean-up Activities.

    B.   <u>Federal Court Case</u>: The Port and the Authority are parties to federal litigation seeking to recover environmental clean-up costs and environmental damages in the case entitled <u>San Diego Unified Port District v. TDY Industries</u>, et al and related cross actions, Case No. 3:03CV1146: The Port and the Authority agree that all monies received as a result of this litigation, including insurance proceeds that are from parties adverse to the Port and/or the Authority, and monies received from former tenants and third parties, shall be pooled for the purpose of applying such monies to pay for the Demolition/Environmental Clean-up Activities. After the pooled monies are applied to the total cost of Demolition/Environmental Clean-up Activities, the parties further agree to split, on a 50/50 basis, all remaining costs for the Demolition/Environmental Clean-up Activities. The

28

49654

31

53-611 (729)

distribution of all monies received as a result of the federal litigation shall be done in accordance with the provisions set forth below.

1. <u>Cost Sharing</u>:  The parties agree that all monies received as a result of the federal litigation (including insurance proceeds, monies from former tenants and monies from third parties) shall be pooled and applied to the total cost for Demolition/Environmental Clean-up Activities.  The monies shall be treated as set forth below:

2. <u>Insurance Monies Received Pursuant to Claims Made by the Port and/or the Authority for Attorney Fees and Litigation Costs.</u>

   a. <u>Attorneys Fees, Expert Fees and Litigation Costs</u>.  The Port and the Authority agree the Authority has the right to seek reimbursement for attorney fees, expert fees and litigation costs that it incurred or incurs in the federal litigation pursuant to insurance policies and coverages paid by the Port or by airport revenue funds.

   b. <u>Assignment Agreement</u>.  The Authority and Port shall enter into an assignment agreement whereby the Port agrees to assign certain insurance policies to the Authority ("Assignment Agreement").  As to the Authority's right to seek reimbursement of the Authority's attorney's fees, expert fees and litigation costs in the federal litigation from those insurance policies and coverages assigned pursuant to the Assignment Agreement, in accordance with the provisions of this subparagraph b, Authority shall first be obligated to tender such claims to one or more of the insurance companies who issued the policies, based on consultation with the Port, seeking recovery of attorney's fees, expert fees and litigation costs.  The Port agrees to make all reasonable efforts to cooperate and support the Authority as necessary in such tender and claims efforts, the parties recognizing that the Port is making similar tenders and claims to other insurance companies under policies that are not identified in the Assignment Agreement, for payment of the Port's legal fees and costs.  The Port agrees that it shall not seek reimbursement from insurance policies assigned to the Authority pursuant to the Assignment Agreement.  The Authority shall not sell back or commute any policy or coverage assigned by the Port without the prior consent of the Port, which consent shall not be unreasonably withheld.

   c. <u>Coverage/Bad Faith Litigation</u>.  Should no insurance company or policy assigned pursuant to the Assignment Agreement agree to defend the Authority and agree to reimburse Authority attorney's fees, expert fees and litigation costs in the federal litigation,

29

49654          32

Authority and Port shall then be required to commence coverage and/or bad faith litigation seeking such a defense unless the parties jointly agree that said litigation is not in the best interest of the parties. Where coverage is denied, Authority agrees that it will undertake all reasonable efforts to pursue coverage litigation. The Port agrees to support the Authority's coverage and/or bad faith litigation efforts, if any, and to share equally in the attorney's fees and costs associated with such litigation. Authority shall notify the Port in writing on the fifth (5th) day of each month, of the total cost of said attorney's fees and costs incurred during the preceding month. Authority agrees that it will not unreasonably abandon any litigation or appeal without first notifying the Port. The Port shall have the opportunity, in the event the Authority decides to abandon, to substitute counsel of its choice to pursue the Authority's rights in the name of the Authority. Should the Port prevail, any recovery under the policies on behalf of the Authority shall be credited first to the fees and costs incurred by the Port in pursuing the coverage suit on behalf of the Authority, until such fees and costs have been fully reimbursed. Should the Port not prevail, it shall bear its own fees and costs incurred in its pursuit of the Authority's coverage suit. Should it become necessary for either party to file separate coverage litigation to preserve either party's claim to a defense and/or reimbursement rights, the parties shall make their best efforts to consolidate all coverage suits. Should a determination be made that the Port is the only party entitled to a defense or other recovery under the policies assigned pursuant to the Assignment Agreement, the Port and Authority agree that any and all recovery under the assigned policies shall be assigned or transferred to the Authority for reimbursement of attorney's fees, expert fees and litigation costs incurred by the Authority or spent in defending itself in the federal litigation from the inception of the litigation. Except as otherwise provided herein, each party shall bear its own fees and costs in any litigation with insurance carriers seeking rights under the policies assigned in the Assignment Agreement.

d. Procedure When Coverage Suits Unsuccessful. In the unlikely event that the Authority and/or the Port's coverage suits are unsuccessful in obtaining a defense of the Authority and reasonable reimbursement of legal fees, expert fees and litigation costs in the federal litigation, the Port will work cooperatively with the Authority to identify and assign other insurance policies to the Authority in an effort to assist the Authority in its efforts to obtain reimbursement from the inception of the federal litigation involving the Authority. The Authority acknowledges that the Port cannot control any insurance carrier's response or decision to any request

30

49654

33

53-611 (731)

for defense, nor can the Port guarantee that any insurance carrier will accept the defense of the Authority in the federal litigation. However, it is the express intent of the parties that the Authority and the Port receive insurance reimbursements for attorney's fees, expert fees and litigation costs at the insured rate. Both the Port and the Authority agree to work cooperatively in any reimbursement efforts, acknowledging the implied covenant of good faith and fair dealing. While it is anticipated that insurance coverage for the Authority should be forthcoming as a result of cooperation of the parties, in the unlikely event no insurance company provides basic and excess/umbrella coverage for and reimbursement to the Authority, the Port and the Authority agree there shall be an equitable and fair distribution and sharing of whatever insurance proceeds are recovered by the Port from insurance for its attorney's fees, expert fees and litigation costs. Under such circumstances, the parties recognize that the insurance should be for the benefit of both.

e. <u>Disputes Between the Port and Authority Regarding Insurance Money for Attorney's Fees and Costs</u>:  Any disputes between the Port and Authority regarding these provisions shall be submitted to binding arbitration before a retired judge, sitting as a special master, within thirty (30) days of either party's request.

f. <u>Exception</u>.  The Port is entitled to reimbursement of all out-of-pocket money spent on attorney's fees and costs from February 1, 2003 until December 22, 2004, in accordance with J.1.b. of the Settlement Agreement.

g. <u>Umbrella and Excess Coverages</u>.
   i.   All insurance monies received from umbrella and excess policies shall be contributed to the pool of money to be used for Demolition/Environmental Clean-up Activities.

3. <u>Money Received from TDY Industries and Allegheny, its former and successor entities ("TDY Industries")</u>

a. All money received from TDY Industries shall be contributed to the pool of funds to be used to pay costs for Demolition/Environmental Clean-up Activities.

4. <u>Money Received from Third Parties</u>

a. All money received from Third Parties as a result of the federal litigation will be contributed to the pool of funds to be used to pay costs for Demolition/Environmental Clean-up Activities.

31

49654        34

C.  State Court Case:  The Port received a Judgment on Special Verdict and Entry of Judgment on March 29, 2004, in the litigation entitled TDY Industries, Inc. v. San Diego Unified Port District and San Diego Unified Port District v. TDY Industries, Inc., San Diego Superior Court Case No. GIC 7749490, in the amount of $21,347,519.  This judgment is currently on appeal.  Of this amount, $9,770,393 represents an award of damages for demolition of existing improvements and abatement costs on the Leased Premises.  The Port agrees that this sum of $9,770,393, plus any accrued interest, will be contributed to the pool of money which will be used for the Demolition/Environmental Clean-up Activities and the remainder shall be retained by Port.  The Authority shall not be entitled to share in the damages awarded ($11,577,126 plus interest) in this state court action recovered for breach of the lease for matters related to non-payment of rent, attorneys fees and costs.  This subparagraph C shall be modified, superseded or deleted in the event of modification or reversal of judgment on appear.   In the event that the judgment is modified or reversed, the parties agree that all money due (plus interest, if any) recovered by the Port for demolition of existing improvements and abatement costs in any subsequent litigation will be contributed to the pool of money which will be used for Demolition/Environmental Clean-Up Activities on the Leased Premises.

1.  In the event the Port only recovers a portion of the verdict due to bankruptcy or settlement, the Port will contribute a pro-rata amount of the settlement to the pooled funds to be used for Demolition/Environmental Clean-up Activities.

D.  Remaining Costs:  After all monies described above have been pooled and the appropriate credits have been deducted, the parties agree that the net remaining costs needed for the Demolition/Environmental Clean-up Activities shall be shared on a 50/50 basis.

E.  Authority Responsible for Contamination Occurring As a Result of its Activities During Lease Term:

1.  The Authority's duties and obligations under this subparagraph shall not apply to the presence, release, or threatened release of any hazardous substances into the environment on or from the Leased Premises connected with TDY's occupation of the Leased Premises.  Authority shall be liable and responsible for any Contaminants arising out of its own occupancy or use (including without limitation Authority sublessees and contractors) of the Leased Premises ("Authority Contaminants") commencing with its entry onto the Leased Premises on October 4, 2004 pursuant to the Right of Entry License Agreement provided the Authority by the Port dated

32

49654,

35

February 11, 2005 and bearing Port Document No. 48336. Authority's liability and responsibility shall include, but is not limited to: (i) removal of any Authority Contaminants from the Leased Premises and/or obtaining site closure by all appropriate regulatory agencies based on future land use; (ii) removal of any such Authority Contaminants from any area outside the Leased Premises, including but not limited to surface and ground water, which Authority Contaminants were generated from the Leased Premises; (iii) damages to persons, property, and the Leased Premises; (iv) all claims resulting from those damages enumerated in (iii) above; (v) fines imposed by any governmental agency; and (vi) any other liability as provided by law, provided the liability or responsibility was caused by the Authority's use or occupancy (including without limitation Authority sublessees and contractors) of the Leased Premises.

2.  Authority shall comply with all laws regarding hazardous substances, materials, wastes, or petroleum products or fraction thereof, collectively herein "Authority Contaminants," relative to the Leased Premises during the terms of this Lease.

3.  Authority shall defend, indemnify, and hold harmless Port and its officers, employees, and agents for any and all responsibilities, damages, liabilities, claims, judgments, costs, fines, expenses, and demands, including without limitation any costs, expenses, and attorney fees therefore related to the environmental liabilities from Contaminants arising out of Authority's occupancy or use (including without limitation Authority sublessees and contractors) of the Leased Premises during the term of this Lease. Said liabilities shall include, but are not limited to, costs of environmental assessments, costs of remediation and removal, any necessary response costs, damages for injury to natural resources or the public, and costs of any health assessment or health effect studies. Port shall have a direct right of action against Authority even if no third party has asserted a claim. Notwithstanding the foregoing, Authority shall not, by virtue of this Lease, waive any rights or remedies against Port, at law or in equity, for any environmental liabilities caused by, arising from or resulting from Contaminants that migrated from Port-owned property adjacent to the Leased Premises.

4.  The parties agree that the respective responsibilities of each party under the provisions of Paragraphs 36 and 37 of this Lease are determined by the base line environmental conditions and assessments conducted at or prior to October 4, 2004. The conditions and assessments shall be based on the historical surveys conducted and the existing studies on file with the Port and Authority. These shall serve as the source documents to determine

33

49654

36

the existence, presence and amounts of Contaminants on the Leased Premises as of October 4, 2004 for which the Authority is not legally or contractually responsible.

F. **Compliance with Environmental Laws**: Compliance with applicable environmental laws shall be deemed to have been achieved upon the receipt of a "closure" or "no further action" letter, or other comparable document (collectively "Closure Letter"), issued by an agency or agencies that have exercised jurisdiction with regard to environmental conditions at the Leased Premises. Unless expressly stated otherwise in the Closure Letter, issuance of a Closure Letter regarding environmental conditions for one medium (e.g., soil) shall not constitute compliance with environmental conditions for any other media (e.g., groundwater).

## 36.1. WORK PLAN AND BUDGET FOR DEMOLITION/ENVIRONMENTAL CLEAN-UP ACTIVITIES:

A. **Overview**: Pursuant to paragraph 36 of this Lease, the Port and the Authority agree to: (1) pool all monies recovered or received from former tenants of the Leased Premises, insurance policies, and any third party as a result of litigation for the purpose of applying such monies to the Demolition/Environmental Clean-up Activities, except to the extent otherwise provided in subparagraph 36.C. above; and (2) agree to split, on a 50/50 basis, all remaining costs for the Demolition/Environmental Clean-Up Activities. To that end, the parties agree to the following regarding Demolition/Environmental Clean-up Activities.

B. **Work Plan and Budget**: No later than the first day of February of each year, the Authority shall provide the Port with an annual work plan and budget for the following fiscal year beginning on July 1, describing the Demolition/Environmental Clean-up Activities and costs proposed to be performed during said fiscal year. The annual work plan and budget shall include the following:

1. Description of the contemplated work to be done to accomplish the proposed Demolition/Environmental Clean-up Activities;

2. Cost estimates of the contemplated work;

3. Statement regarding whether the work will be performed by the Authority or by outside contractor(s);

4. Identification of Authority employee(s) who will be overseeing the project;

5. Identification of regulatory agencies that may be involved in the

34                                          49654

37

proposed Demolition/Environmental Clean-up Activities.

C.   **Objection to Work Plan and Budget**:  The Port may object to the annual work plan and budget by following the steps set forth below:

    1.   Within thirty (30) days of receipt of the annual work plan and budget, the Port shall serve upon the Authority its written objections setting forth in detail the basis for the objections;

    2.   Within thirty (30) days of receipt of the Port's objections, the Authority shall serve upon the Port its response to each of the objections that the Authority does not agree with and accept;

    3.   Within fifteen (15) days of service of the Authority's response, the parties shall meet and confer in person in an attempt to resolve the issues;

    4.   If the parties are unable to resolve the issues, the unresolved matters shall be submitted to binding arbitration no later than thirty (30) days from the date of the meet and confer meeting;

       a.   If the parties cannot agree upon a single arbitrator to hear and decide the matter, each party shall select an arbitrator within said thirty (30) days and the two selected arbitrators shall promptly select a third arbitrator, all of whom shall hear and decide the matter.

       b.   The decision of the arbitrator(s) shall be final.

       c.   Arbitrator(s) shall be American Arbitration Association (AAA) certified or retired federal or state court judges.

       d.   Port and Authority shall mutually request that the arbitrator(s) render a decision within ninety (90) days following appointment.

D.   **Advanced Funding of the Work Plan by the Authority**:

    1.   The Authority may agree, with concurrence from the Port, on occasion, to advance to the Port money for the purpose of meeting the Port's financial obligation for the Demolition/Environmental Clean-up Activities.  The Port agrees to repay the Authority the advanced sums within five (5) years and further agrees that the advanced sums shall bear an interest rate of five percent (5%) per annum until paid in full.

E.   **Good Faith Assurance**:  The Authority and Port are each committed to

49654    32

53-611 (736)

making good faith efforts: (a) to use appropriate industry standards to accomplish the Demolition/Environmental Clean-up Activities and (b) to minimize and contain the costs of the Demolition/Environmental Clean-up Activities wherever lawful, possible and feasible.

37.    UNDERGROUND STORAGE TANKS:  In the event any underground storage tanks are hereinafter placed on the Leased Premises by any party during the term or extension of this Lease, Authority shall be responsible for tank monitoring of all such underground storage tanks as required by the County of San Diego Hazardous Material Management Division (HMMD) or any other responsible agency.  Authority further agrees to take responsibility for reporting unauthorized releases to HMMD and the Port within twenty-four (24) hours after receiving actual notice of such unauthorized release.  Authority will be responsible for all fees and costs related to the unauthorized release of Contaminants including but not limited to investigative, surface and groundwater cleanup, and expert and agency fees except to the extent such release occurred prior to the Commencement Date.  Authority further agrees to be responsible for maintenance and repair of the storage tanks, obtaining tank permits, filing a business plan with HMMD or other responsible agency and for paying underground storage tank fees, permit fees, and other regulatory agency fees relating to underground storage tanks during the term of this Lease.

Furthermore, Authority shall be responsible for compliance with all other laws and regulations presently existing or hereinafter enacted applicable to underground storage tanks, including without limitation any such laws and regulations which alter any of the above requirements.

38.    ABOVEGROUND STORAGE TANKS:  In the event any aboveground storage tanks are hereinafter placed on the Leased Premises by any party during the term or extension of this Lease, Authority shall be responsible for any aboveground storage tanks on the Leased Premises.  Authority shall, in accordance with this Lease and applicable laws and regulations, secure and pay for all necessary permits and approvals, prepare a spill prevention control counter measure plan and conduct periodic inspections to ensure compliance therewith, including conformance with the latest version of said laws and regulations.  In addition, Authority shall maintain and repair said tanks and conform and comply with all other applicable laws and regulations for aboveground storage tanks, including without limitation all of the requirements of Health & Safety Code, Sections 25270 through 25170.13 as presently existing or as hereinafter amended.  The Authority shall be responsible for all costs associated with an unauthorized release from such tanks, including but not limited to, investigative, surface and groundwater cleanup, expert and agency fees except to the extent such release occurred prior to the Commencement Date.

36

49654        39

53-611 (737)

39.   ACKNOWLEDGMENT OF IMPROVEMENTS:   Authority agrees that it has examined the Leased Premises and the condition thereof, that the improvements thereon in their present condition are satisfactory and usable for Authority's purposes, and that no representations as to value or condition have been made by or on behalf of Port.

40.   PORT COOPERATION: During the term of this Lease, Port shall, in its reasonable discretion and at the request of Authority, cooperate with Authority by (i) executing, acknowledging, and delivering further consents, affidavits, estoppel certificates, documents, and instruments and (ii) taking other actions as the owner of the Leased Premises that are reasonably necessary or appropriate to implement or effectuate the rights of the Authority pursuant to this Lease. Notwithstanding the foregoing, under no circumstances shall Port be obligated to assume any liability or incur any out-of-pocket expenses in its cooperation with the Authority pursuant to this Paragraph 40.

41.   TERMINATION OF LEASE IF AIRPORT RELATED OPERATIONS CEASE: Except as otherwise provided by applicable law, if any time during the term of this Lease, the Lease between the parties dated December 17, 2002, bearing Port Document No. 45264 (Abstract of Lease recorded by the San Diego County Recorder's Office on January 6, 2003 as Document #2003-0011593) covering property located at 3225-3707 North Harbor Drive in the City of San Diego, California as more particularly described in Port's Drawing No. 011-027 dated November 6, 2002, terminates for any reason, this Lease shall also terminate and control of the Leased Premises shall revert to Port.



37

49654    40

53-611 (738)

## ABSTRACT OF LEASE

42.   **ABSTRACT OF LEASE:**  This is the final Paragraph and Abstract of Lease, hereinafter "Abstract," dated October 11  , 2005, between SAN DIEGO UNIFIED PORT DISTRICT, Port, and SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY, Authority, concerning the Leased Premises described in Exhibits "A" and "B," attached hereto and by this reference made a part hereof.

For good and adequate consideration, Port leases the Leased Premises to Authority, and Authority hires them from Port, for the term and on the provisions contained in the Lease dated  October 11  , 2005, including without limitation provisions prohibiting assignment, subleasing, and encumbering said leasehold without the express written consent of Port in each instance, all as more specifically set forth in said Lease, which said Lease is incorporated in this Abstract by this reference.

The term is sixty-four (64) years, beginning January 1, 2005, and ending December 31, 2068.

This Abstract is not a complete summary of the Lease.  Provisions in this Abstract shall not be used in interpreting the Lease provisions.  In the event of conflict between this Abstract and other parts of the Lease, the other parts shall control.  Execution hereof constitutes execution of the Lease itself.

Dated: 5 October , 2005

Port Attorney

By _____


Approved as to Form

By _____

Office of General Counsel

SAN DIEGO UNIFIED PORT DISTRICT

By _____
E. Daniel Strum
Director, Real Estate


SAN DIEGO COUNTY REGIONAL
AIRPORT AUTHORITY

By _____
Thella F. Bowens
President/CEO

38

49654   41

53-611 (739)

(FOR USE BY SAN DIEGO UNIFIED PORT DISTRICT)


STATE OF CALIFORNIA)

COUNTY OF SAN DIEGO)


On ___October 12, 2005___ before me, ___Ralph M. Carpio, Notary___,
personally appeared ___E. Daniel Strum, Director Real Estate___, personally
known to me ~~(or proved to me on the basis of satisfactory evidence)~~ to be the
person~~(s)~~ whose name~~(s)~~ is~~/are~~ subscribed to the within instrument and acknowledged
to me that he~~/she/they~~ executed the same in his~~/her/their~~ authorized capacity~~(ies)~~, and
that by his~~/her/their~~ signature~~(s)~~ on the instrument the person~~(s)~~, or the entity upon
behalf of which the person~~(s)~~ acted, executed the instrument.


WITNESS my hand and official seal.



Signature _____

39

49654        42



Legal Description for
San Diego County
Regional Airport Authority
TIDELAND LEASE
Parcel / Drawing No 008-010
Within Corporate Limits of San Diego

All that certain portion of land conveyed to the San Diego Unified Port District by that certain Act of Legislature of the State of California pursuant to Chapter 67, Statutes of 1962, First Extraordinary Session, as amended, and delineated on that certain Miscellaneous Map No. 564, filed in the Office of the San Diego County Recorder on May 28, 1976, File No. 76-164686, in the City of San Diego, County of San Diego, State of California, and more particularly described as follows:

Commencing at a 3" diameter brass disk monument stamped "SDUPD-007" as shown on Record of Survey 16668, filed in the Office of the San Diego County Recorder on July 25, 2000; thence leaving said monument North 75°49'29" East a distance of 675.01 feet (calc.) to a point on the southerly line of the San Diego County Regional Airport Authority Boundary as shown on R.O.S. 17566 and filed in the Office of the San Diego County Recorder on October 17, 2002; said point also being on the westerly right-of-way line of Winship Lane; said point also being a point on a 40.00 foot radius curve concave to the northeast, to which a radial bears South 43°43'11" West; said point also being the TRUE POINT OF BEGINNING; thence coincident with said right-of-way line of Winship Lane northwesterly along the arc of said curve through a central angle of 50°21'09" an arc distance of 35.15 feet; thence North 4°04'20" East a distance of 40.08 feet to the beginning of a 294.00 foot radius curve concave to the southeast; thence along the arc of said curve through a central angle of 18°46'09" an arc distance of 96.31 feet; thence North 22°50'28" East a distance of 202.11 feet to the southwest corner of the Sky Chefs leasehold; thence leaving said right-of-way line of Winship Lane and coincident with the southerly line of said Sky Chefs leasehold South 73°20'28" East a distance of 445.24 feet; thence coincident with the westerly line of said Sky Chefs leasehold North 22°50'28" East a distance of 54.72 feet; thence North 73°29'06" West a distance of 82.71 feet; thence North 16°30'54" East a distance of 83.57 feet; thence South 73°29'06" East a distance of 149.59 feet; thence North 16°30'54" East a distance of 105.60 feet; thence North 8°26'48" West a distance of 66.79 feet; thence North 22°50'28" East a distance of 372.89 feet to a point on the southerly line of said San Diego County Regional Airport Authority Boundary; thence leaving the westerly line of said Sky Chefs leasehold and coincident with the southerly line of said San Diego County Regional Airport Authority Boundary South 73°29'06" East a distance of

Sheet 1 of 2

EXHIBIT "A"

49654

43

1,570.10 feet; thence South 16°30'54" West a distance of 75.00 feet; thence South 73°29'06" East a distance of 382.52; thence South 34°39'11" East a distance of 953.36 feet; thence leaving the southerly line of said San Diego County Regional Airport Authority Boundary South 15°24'42" West a distance of 113.13 feet to a point on the northerly right-of-way line of North Harbor Drive in the City of San Diego, as said North Harbor Drive right-of-way is shown on S.D.U.P.D. Document 71 on file in the Office of the District Clerk, said point is also the beginning of a non-tangent 1,346.00 foot radius curve concave to the northeast, a radial to said point bears South 5°03'23" West; thence coincident with said northerly right-of-way line of North Harbor Drive northwesterly along the arc of said curve through a central angle of 16°56'22" an arc distance of 397.95 feet; thence North 68°00'15" West a distance of 735.10 feet to the beginning of a 2,102.50 foot radius curve concave to the southwest; thence northwesterly along the arc of said curve through a central angle of 17°55'42" an arc distance of 657.88 feet; thence North 85°55'57" West a distance of 681.00 feet; thence North 73°02'41" West a distance of 63.96 feet; thence North 84°55'57" West a distance of 214.00 feet; thence North 85°55'57" West a distance of 170.00 feet to the beginning of a 152.00 foot radius curve concave to the northeast; thence northwesterly along the arc of said curve through a central angle of 11°21'44" an arc distance of 30.14 feet; thence North 74°34'13" West a distance of 30.47 feet to the beginning of a 154.00 foot radius curve concave to the southwest; thence northwesterly along the arc of said curve through a central angle of 11°21'44" an arc distance of 30.54 feet; thence North 85°55'57" West a distance of 202.00 feet; thence North 4°04'03" East a distance of 16.00 feet; thence North 85°55'57" West a distance of 12.00 feet to the beginning of a 40.00 foot radius curve concave to the northeast; thence northwesterly along the arc of said curve through a central angle of 39°39'08" an arc distance of 27.68 feet to a point on the southerly line of said San Diego County Regional Airport Authority Boundary which bears South 43°43'11" West from the center of said curve, said point also being the TRUE POINT OF BEGINNING, containing 2,070,705 square feet or 47.54 acres of tidelands area.

The above described land area is delineated on the San Diego Unified Port District Drawing No. 008-010, dated 21 May 2004 and made a part of this agreement.

All bearings and distances in the above legal description are grid, and based upon the California Coordinate System, Zone 6, N.A.D. 83, Epoch 1991.35.

Charles J. Sefkow      6-2-04

Charles J. Sefkow                Date
L.S. 7876 Expires 31 Dec. 2006
Land Surveyor
San Diego Unified Port District

LICENSED LAND SURVEYOR
CHARLES J. SEFKOW
PLS NO. 7876
EXP. 12/31/06
STATE OF CALIFORNIA

Sheet 2 of 2

49654

44

53-611 (742)



LOCATION MAP AND
SHEET INDEX
NO SCALE

| DRAWN JED | SAN DIEGO UNIFIED PORT DISTRICT | DATE MAY 21, 2004 |
| CHECKED A. SANTONIL | TIDELAND LEASE | SCALE NO SCALE |
| REVIEWED | WITHIN CORPORATE LIMITS OF SAN DIEGO | REF. ROS 17566 FIELD SURVEY |
| APPROVED | SAN DIEGO COUNTY | DRAWING NO. |
| LAND SURVEYOR S.D.#2 | REGIONAL AIRPORT AUTHORITY | SHEET 1 OF 5 |
| | | 008-010 |

EXHIBIT "B"

49654

45

SAN DIEGO
INTERNATIONAL AIRPORT
LINDBERGH FIELD

SAN DIEGO COUNTY
REGIONAL AIRPORT AUTHORITY
R.O.S. 17566

DISTRICT TIDELANDS

S73°29'06"E
1,570.19'

012-025
SKY CHEFS, INC.

2,070,705 SQ. FT.
(47.54 ACRES)

SEE SHEET 3

WINSHIP LN.

S73°20'28"E 445.24'

℄ NORTH HARBOR DRIVE
(S.D.U.P.D. DOC. 71)

681.00'
N85°55'57"W

T.P.O.B.    N85°55'57"W

N75°49'29"E
675.01' (CALC.)

P.O.C.
3" DIA BRASS DISK MON.
STAMPED "S.D.U.P.D.-007" AS
SHOWN ON R.O.S. NO. 16668

007-035
THE HERTZ CORPORATION

007-036
AVIS RENT-A CAR SYSTEMS, INC.

CAR RENTAL ROAD

MATCH LINE

NOTES:
1. LEASE AREA SHOWN SHADED.
2. SEE SHEET 5 FOR DATA TABLES.
3. BEARINGS AND DISTANCES ARE BASED ON THE
   CALIFORNIA COORDINATE SYSTEM, ZONE 6, N.A.D. 83, 1991.35.
4. CITY OF SAN DIEGO UTILITY EASEMENTS SHOWN HATCHED.

GRAPHIC SCALE:
0   50' 100'        200'

1" = 200'

| DRAWN JED | SAN DIEGO UNIFIED PORT DISTRICT | DATE MAY 21, 2004 |
| CHECKED A. SANTANIL | TIDELAND LEASE | SCALE 1"= 200' |
| REVIEWED S.D. CHOA | WITHIN CORPORATE LIMITS OF SAN DIEGO | REF. ROS. 17566, FIELD SURVEY |
| APPROVED | SAN DIEGO COUNTY | DRAWING NO. SHEET 2 OF 5 |
| LAND SURVEYOR, SD.P.D. | REGIONAL AIRPORT AUTHORITY | 008-010 |

49654

4b

DEVSERV\3EMI\EY\008-010\008-010_052104.DWG

53-611 (744)



SAN DIEGO INTERNATIONAL AIRPORT
LINDBERGH FIELD

SAN DIEGO COUNTY
REGIONAL AIRPORT AUTHORITY
R.O.S. 17566

S73°29'06"E—1,570.19'

DISTRICT TIDELANDS

2,070,705 SQ. FT.
(47.54 ACRES)

S16°30'54"W—75.00'

S73°29'06"E
382.52'

Δ=17°55'42"
R=2,102.50'
L=657.88'

N85°55'57"W—681.00'

EXIST CITY R/W ℄ NORTH HARBOR DRIVE
(S.D.U.P.D. DOC. 71)

N68°00'15"W
735.10'

007–038
NATIONAL CAR
RENTAL

SEE TYP.
DETAIL
SHT. 5 OF 5

SAN DIEGO BAY

N4°04'03"E—R

N21°59'45"E—R
SDUPD LIMITS

MATCH LINE
SEE SHEET 2
SEE SHEET 4
MATCH LINE

APPROX.
TOP OF BANK

GRAPHIC SCALE
0   50' 100'        200'

1" = 200'

DENSERVA REMIX(E3\003–062_042804

| DRAWN JED | SAN DIEGO UNIFIED PORT DISTRICT | DATE MAY 21, 2004 |
| CHECKED A. SANTONIL | TIDELAND LEASE | SCALE 1"=200' |
| REVIEWED | WITHIN CORPORATE LIMITS OF SAN DIEGO | REF. ROS 17566, FIELD SURVEY |
| APPROVED | SAN DIEGO COUNTY | DRAWING NO. |
| Charles J. Sykes | REGIONAL AIRPORT AUTHORITY | SHEET 3 OF 5 |
| LAND SURVEYOR S.D.U.P.D. | | 008-010 |

49654          47

53-611 (745)



SAN DIEGO INTERNATIONAL AIRPORT
LINDBERGH FIELD

S16°30'54"W—75.00'

S73°29'06"E
382.52'

SAN DIEGO COUNTY
REGIONAL AIRPORT AUTHORITY
R.O.S. 17566

DISTRICT
TIDELANDS

2,070,705 SQ. FT.
(47.54 ACRES)

SEE SHEET 3

S34°39'11"E—953.36'

S50°13'23"W—R

S21°59'45"W—?

Δ=16°56'22"
R=1,346.00'
L=397.95'

S15°24'42"W
113.13'

N68°00'15"W—735.10'

℄ NORTH HARBOR
(S.O.U.P.D. DOC. 71)

DRIVE

54°54'

108'

EXIST CITY R/W

SEE TYP.
DETAIL
SHT. 5 OF 5

MATCH LINE

U.S. COAST
GUARD BASE

S.D.U.P.D. LIMITS

GRAPHIC SCALE:
0   50' 100'   200'

1" = 200'

| DRAWN JED | |
|---|---|
| CHECKED A. SANTONIL | |
| REVIEWED | |
| APPROVED | |
| LAND SURVEYOR R.C.E./P.D. | |

**SAN DIEGO UNIFIED PORT DISTRICT**
TIDELAND LEASE
WITHIN CORPORATE LIMITS OF SAN DIEGO
SAN DIEGO COUNTY
REGIONAL AIRPORT AUTHORITY

DATE MAY 21, 2004
SCALE 1"=200'
REF. ROS 17566, FIELD SURVEY

DRAWING NO.
SHEET 4 OF 5
008-010

DESERVA REM\ES\008-010\008-010_052104.DWG

49654                    48

## DATA TABLE

| | | | |
|---|---|---|---|
| ① | S43°43'11"W–R | ⑯ | N85°55'57"W–170.00' |
| ② | Δ=50°21'09"<br>R=40.00<br>L=35.15' | ⑰ | N4°04'03"E · R |
| ③ | N85°55'40"W–R | ⑱ | Δ=11°21'44"<br>R=152.00'<br>L=30.14' |
| ④ | N4°04'20"E–40.08' | ⑲ | S15°25'47"W–R |
| ⑤ | N85°55'40"W–R | ⑳ | N74°34'13"W–30.47' |
| ⑥ | Δ=18°46'09"<br>R=294.00'<br>L=86.31' | ㉑ | N15°25'47"E–R |
| ⑦ | N67°09'32"W–R | ㉒ | Δ=11°21'44"<br>R=154.00'<br>L=30.54' |
| ⑧ | N22°50'28"E–54.72' | ㉓ | N4°04'03"E–R |
| ⑨ | N73°29'06"W–82.71' | ㉔ | N85°55'57"W–202.00' |
| ⑩ | N16°30'54"E–83.57' | ㉕ | N4°04'03"E–16.00' |
| ⑪ | S73°29'06"E–149.59' | ㉖ | N85°55'57"W–12.00' |
| ⑫ | N16°30'54"E–105.60' | ㉗ | S4°04'03"W–R |
| ⑬ | N8°26'48"W–66.79' | ㉘ | Δ=39°39'08"<br>R=40.00'<br>L=27.68' |
| ⑭ | N73°02'41"W–63.96' | | |
| ⑮ | N84°55'57"W–214.00' | | |

## EASEMENT DATA

⚠1 512–001, S.D.G.& E. 20' EASEMENT

⚠2 CITY OF SAN DIEGO GENERAL UTILITY 46' EASEMENT
(R/W VACATED BY CITY OF S.D. COUNCIL RES. NO. 189562)

⚠3 512–018, S.D.G.& E. 6' EASEMENT

⚠4 11557–7–D, CITY OF SAN DIEGO SEWER 15' EASEMENT

⚠5 508–003, 11556–8–D CITY OF SAN DIEGO 15' DRAINAGE EASEMENT



CURB

LEASE LINE/RW LINE

PLANTER

FACE OF CURB    1'±

## DETAIL
SCALE: 1" = 20'    NORTH HARBOR DRIVE

DEVSERV\REM\E8\008-010\008-010_052104.DWG

| DRAWN JED<br>CHECKED A. SANTONIL<br>REVIEWED *[signature]*<br>APPROVED<br>*[signature]* Charles J Sifkul<br>LAND SURVEYOR & D.U.D. | **SAN DIEGO UNIFIED PORT DISTRICT**<br>TIDELAND LEASE<br>WITHIN CORPORATE LIMITS OF SAN DIEGO<br>SAN DIEGO COUNTY<br>REGIONAL AIRPORT AUTHORITY | DATE MAY 21, 2004<br>SCALE 1"=200'<br>REF. ROS 17566, FIELD SURVEY<br>DRAWING NO.<br>SHEET 5 OF 5<br>**008-010** |
|---|---|---|

49654    49

(12)

## SETTLEMENT AGREEMENT
## BETWEEN
## THE SAN DIEGO UNIFIED PORT DISTRICT
## AND
## THE SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

WHEREAS, the SAN DIEGO UNIFIED PORT DISTRICT (hereinafter the "Port District") and the SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY (hereinafter referred to as the "Airport Authority") are engaged in litigation in the case of <u>San Diego County Regional Airport Authority v. San Diego Unified Port District, et al.</u>, and related cross-action, Case No. GIC 821224 ("Litigation"); and

WHEREAS, the Port District and the Airport Authority have been engaged in discussions regarding the settlement of the Litigation, and in the resolution of a number of other related and unrelated disputes and issues between them; and

WHEREAS, the Board of Port Commissioners of the Port District and the Board of the Airport Authority each have approved a settlement of the Litigation and also have agreed to resolve a number of both related and unrelated other disputes and issues; and

WHEREAS, the Port District and the Airport Authority desire to memorialize the settlement agreement by this document which specifies in detail the agreed upon settlement points; and

NOW, THEREFORE, IT IS MUTUALLY AGREED as follows:

A.    <u>Effective Date.</u>  The Port District and the Airport Authority agree that this Settlement Agreement will be effective June 1, 2004, except where a different effective date is specified for a particular matter herein in which case the different effective date shall be applicable.

B.    <u>Authorization to Sign.</u>  The persons signing this Settlement Agreement are authorized to sign this Settlement Agreement on behalf of their respective parties and to bind their respective parties to the terms and conditions of this Settlement Agreement.

C.    <u>Entire Agreement.</u>  This Settlement Agreement contains the entire agreement between the Port District and Airport Authority concerning its subject matter. This Settlement Agreement may be modified only by a writing duly signed by authorized representatives of both parties.

San Diego Unified Port District
Document No. __47492__
Filed __MAY 27 2004__
Office of the District Clerk

1

**EXHIBIT "C"**

49654    50

53-611 (748)

D.    <u>Laws of California.</u> This Settlement Agreement shall be governed by and construed in accordance with the laws of the State of California.

E.    <u>Execution in Counterparts.</u> This Settlement Agreement may be executed in counterparts, all of which together shall constitute one and the same agreement.

F.    <u>Consultation with Legal Counsel.</u>

    1.    The parties have each consulted with legal counsel of their own choosing regarding this Settlement Agreement.

    2.    The Port District consents that the Airport Authority's General Counsel, Breton K. Lobner, may represent the Airport Authority in all matters, including future matters, and that it will not seek to disqualify Breton K. Lobner from representing the Airport Authority in any pending or future matter.

    3.    The Port District consents that Morrison & Foerster LLP may represent the Airport Authority in all matters, including future matters, except matters adverse to the Port District.

G.    <u>Interpretation.</u> The language of all parts of this Settlement Agreement shall in all cases be construed as a whole, according to its fair meaning, and not strictly for or against any party. No presumptions or rules of interpretation based upon the identity of the party preparing or drafting the Settlement Agreement, or any part thereof, shall be applicable or invoked.

H.    <u>Elements of Settlement Interdependent.</u> The parties have reached this settlement based on an overall assessment of the benefits of the settlement taken as a whole, and not each item separately. The matters resolved are not being settled individually, but as part of a single whole understanding. Each of the terms of settlement set forth herein is in consideration of all other terms and agreements set forth herein.

I.    <u>Admissions.</u> Liability for all matters included in this Settlement Agreement is disputed, and specifically denied by both parties. Neither this Settlement Agreement nor any discussion or communications made or information or materials transmitted in the course of negotiations pertaining to this Settlement Agreement shall be admissible or presented in any action or proceeding before any court, agency, administrative body or other tribunal. Additionally, nothing in this Settlement agreement shall be construed

2

EXHIBIT "C"

49654

47492

51

as an agreement by any party to any other party's position, an admission by any party of a lack of merit in their position, or an admission by any party of the existence of merit of any other party's position.

J.  Settlement Terms for Leases.

1.  Teledyne Ryan (TDY Industries, Inc./Allegheny Teledyne) -- Total of 46.88 acres on North Harbor Drive.

a.  Rent: Commencing January 1, 2005 through the term of a lease between the parties expiring December 31, 2068, the Airport Authority shall pay the Port District annual rent in the amount of three million dollars ($3,000,000) per year for the Teledyne Ryan property. The parties agree that the agreed upon rent of $3,000,000.00 per year is a negotiated settlement amount applicable only to the lease of the Teledyne Ryan property and shall not be used for any purpose in any market value appraisal.

Use:  The lease by the Port District to the Airport Authority shall allow any type of use permitted by law.

b.  Environmental Clean-up Costs:  The Port District presently is engaged in federal litigation seeking to recover clean-up costs and environmental damages in the case of San Diego Unified Port District v. TDY Industries, et al, Case No. 3:03CV1146. The Port District agrees to credit and apply all funds received as a result of settlement or judgment in this litigation ("award funds") for the use of the Airport Authority to the environmental clean-up and remediation of the Teledyne Ryan property. However, the parties agree that the Port District shall first be reimbursed for all litigation costs and attorneys' fees incurred by the Port District in the litigation. Should these funds received by the Port District be insufficient to cover all clean-up and remediation costs, the parties agree to be equally responsible and to share equal payment of the net remaining clean-up and remediation costs. The amount of money that constitutes the "net remaining clean-up and remediation costs" shall be agreed upon by the Airport Authority and the Port District. Should the parties be unable to agree upon the "net remaining clean-up and remediation costs," this issue shall be submitted to binding arbitration for resolution no later than 60 days after receipt by the Port District of the award funds, unless the parties mutually agree to an extension of time.

c.  Demolition Funds: The Port District received a Judgment on Special Verdict and Entry of Judgment on March 29, 2004, in the litigation entitled TDY Industries, Inc. v. San Diego Unified Port District and San Diego Unified Port District v. TDY Industries, Inc., San Diego Superior Court Case No. GIC 779490, in the amount of

3

EXHIBIT "C"

49654                                47492                    52

$21,347,519. Of this amount $9,770,393 represents an award of damages to the Port District for demolition of the existing improvements and abatement costs on the Teledyne Ryan property. The Port District agrees that this sum will be contributed for use of the Airport Authority for the demolition and abatement of the improvements. In the event the Port District only recovers a portion of the verdict due to bankruptcy or settlement, the Port District will pay the Airport Authority a pro-rata amount of the settlement for the demolition and abatement and the remaining amounts shall be retained by the Port District.

Should the amounts received by the Port District be insufficient to cover all demolition and building abatement costs, the parties agree to be equally responsible and to share equal payment of the net remaining demolition and building abatement costs. Should the parties be unable to agree upon the "net remaining demolition and building abatement costs," this issue shall be submitted to binding arbitration for resolution no later than 60 days after receipt by the Port District of the final amount available for demolition and building abatement as set forth above, unless the parties mutually agree to an extension.

d.     Documents. The Port District agrees to provide the Airport Authority for its use all drawings, related materials, specifications and environmental documents prepared for and relating to the proposed parking lot project planned for the Teledyne Ryan property. The Port District further agrees to provide the Airport Authority with all drawings, documents, records, cost estimates, architectural plan, geotechnical reports, and any other information relating to the existing or proposed facilities on or relating to the Teledyne Ryan property, which were not previously produced to the Airport Authority in response to its requests to the Port District for public records dated August 2003 and December 2003.

e.     Except as otherwise provided, the Lease described in paragraph 1.a above shall have substantially the same terms and conditions as the current lease between the Port District and the Airport Authority for the General Dynamics property (Document No. 45263 on file with the clerk of the Port District).

2.     Organizational Development ("OD") Building Located on Pacific Highway.

a.     The Port District will continue to lease the OD Building on Pacific Highway from the Airport Authority for the next 10 years, commencing from January 1, 2004, at the current rental rate with no CPI adjustment. Each party shall have the option to terminate in accordance with the terms of the lease.

b.     The parties agree to amend the lease to reflect these

4

EXHIBIT "C"

47492    53

changes.

3.    Harbor Island Properties - Total of approximately 278,815 sq. ft. northeast of Harbor Island Drive "T" Section and 81,779 sq. ft. on the east side of Harbor Island Drive.

a.    The Airport Authority will continue to lease the properties currently used for an airport employee parking lot and an airport taxi and shuttle holding lot for the next ten years, commencing January 1, 2004 at the current rental rate with no CPI adjustment. Each party shall have the option to terminate in accordance with the terms of the lease

b.    The parties agree to amend the leases to reflect these changes.

K.    Other Financial Disputes.

1.    NTC Environmental Mitigation Funds.  As part of this overall settlement, the Airport Authority agrees that the Port District shall retain the entire amount of $3,143,117 paid by the United States Navy to the Port District for environmental mitigation of the Naval Training Center (NTC) property located near the Point Loma end of the airport runway. This Settlement Agreement supercedes the specific portion of section 17 of Exhibit A of the MOU between the parties specifying that the Airport Authority is to receive said funds.

2.    Miscellaneous Identified Disputes.  As part of this overall settlement, the Airport Authority will pay the Port District a total net amount of $150,000 to settle all of the following claims:

a.    Assignment of IT Licenses and Databases - 125 Oracle Licenses: $125,000.

b.    Assignment of IT Licenses and Databases - Microsoft Licenses: (Included in subparagraph a., above).

c.    Assignment of IT Licenses and Databases - WinZip Licenses: (Included in subparagraph a., above).

d.    Assignment of IT Licenses and Databases - Blue Vista: (Included in subparagraph a., above).

5

EXHIBIT "C"

47492    54

e.   Rental Credit for American Airlines: $450.

f.   Accounts Payable - Moldings Plus, Inc.: $273,000

g.   Accounts Payable - F.H. Pashen:    (Included in subparagraph f., above).

h.   Accounts Payable - Linscott Law & Greenspan: (Included in subparagraph f., above).

i.   Accounts Payable - Linscott Law & Greenspan: (Included in subparagraph f., above).

j.   Accounts Payable - Linscott Law & Greenspan: (Included in subparagraph f., above).

k.   Accounts Payable D San Diego State University Foundation: (Included in subparagraph f., above).

l.   Accounts Payable - Hertz Equipment Rental & Leasing: (Included in subparagraph f., above).

m.   Accounts Payable - M.R. Thompson: (Included in subparagraph f., above).

n.   Accounts Payable - Invoice for Airport Video: (Included in subparagraph f., above).

o.   Miscellaneous Outstanding Claims (Engle, Denne, Taralon, Nalepa, Munoz, Bryant, Ramirez, Rosado, Spierer, Beeler, Boland and Scherman): $90,000.

p.   Accounts Payable - Ducks Unlimited (payment for Western Salt Mitigation Plan): $400,000.

q.   Airport Tenant Issue - British Airways: $175,000.

r.   Airport Tenant Issue - Trans World Airlines: (Included in subparagraph q., above).

6

EXHIBIT "C"

47492

55

s.    Airport Tenant Issue - Jimsair and Emery (Included in subparagraph q., above).

t.    <u>McClier Corporation v. Port District</u>, U.S.D.C. No. 03CV1762K (POR): (settled for $608,470 new money above payments already made by the Port District, the amount due to McClier to be split evenly between the Port District and the Airport Authority, each to pay $304,235.39 to McClier).

u.    Pension Contributions (Holiday Premium Pay for 2002): $74,000.

v.    Employers' FICA Contribution (Port District): $38,900.

w.    Miscellaneous Invoices (Port District): $30,417.

x.    SBC Yellow Pages Advertising: $3,814.

y.    Service Billing to Airport Authority for May 2003: $6,593.

z.    Service Billing to Airport Authority for June 2003: $3,789.

aa.   SDCERS Administrative Costs: $52,116.

bb.   Service Billing to Airport Authority for Training and Seminars October 2003: $430.

3.    <u>Pond 20 (Parcel No. 034-002)</u>. The parties agree to split the difference between the two original appraisals.

a.    The Port District's September 2002 appraisal was $2,378,000.   The Airport Authority's January 2003 appraisal was $4,280,000.

b.    The parties agreed that the value of Pond 20 shall be the average value of the two original appraisals.

7

EXHIBIT "C"

47492   54 ⁊

53-611 (754)

c. $2,378,000 plus $4,280,000 equals $6,658,000 divided by 2 equals $3,329,000.

d. The Port District agrees to pay the Airport Authority $3,329,000 to fulfill the obligations specified in Pub. Util. Code section 170056(a)(1)(F)(i).

e. To fulfill the requirements of Pub. Util. Code §170056(a)(1)(F), subject to the conditions set forth below, the parties agree to continue to abide by the provisions of the subsection (ii), which states as follows:

> "On January 1, 2003, the port shall commence repayment to the airport of the negotiated or arbitrated fair market value for the property. The repayment schedule shall be a 10-year amortized payment plan with interest based upon the rate of 1 percent above the prevailing prime rate."

The Port District, because its past payments were below the final negotiated fair market value, agrees to adjust and increase its future to payments to the Airport Authority using a payment plan that will ensure repayment of the correct amount during the identical 10-year amortization period.

4. <u>Port District Overhead Costs (Direct and Indirect).</u> The tentative agreement mutually defined by Jeff McEntee and Vernon Evans and accepted by both negotiating teams is acceptable to both parties. The basic terms are as follows:

a. Port District charges for direct costs must be directly related to the delivery of airport services requested by the Airport Authority and shall include the cost of training specific to the airport and required by the TSA or the FAA.

b. Port District charges for indirect departmental overhead cost must be related to the delivery of services requested by the Airport Authority and shall exclude training costs for sworn officers other than general management, supervision and

8

**EXHIBIT "C"**

47492        57



leadership.    Charges for police academy training are specifically excluded.

c.  Port District charges for indirect G&A costs shall be billed at only 15% of the total billed cost before G&A.

d.  This methodology is retroactive to January 1, 2003.

L.    **Non-Competition Clause**

1.  <u>No Airport-Related Uses:</u> The Port District agrees to an airport-related non-compete agreement and covenant on its properties for the benefit of the Airport Authority covering its rental car lots on North Harbor Drive, the airport employee parking lot on Harbor Island, and the taxi shuttle lot on Harbor Island.

2.  The parties agree to abide by the provisions of Cal. Pub. Util. Code § 170056.

3.  <u>Grandfathered Operations:</u> The foregoing clause will not apply to other existing Port District public parking lot operations serving the airport if they were in place and operational during 2002, provided they are not expanded in parking capacity

M.    **$50,000,000 Promissory Note.**

1.    The terms and conditions of the Promissory Note remain in full force and effect, subject to the following modifications which shall be set forth either in an amended and restated promissory note containing the following modifications or in a new Promissory Note, the form being subject to the Airport Authority's option:

a.  The Note shall be amortized over 25 years commencing January 1, 2006;

b.  The interest on the Note shall be fixed at 5 1/2 % per annum; and

c.  The Note will be subordinated to the other Port District

9

EXHIBIT "C"

47492

58

indebtedness. However, should the Port District fail to pay when due one or more payments on the Note for any reason whatsoever, the Airport Authority has the right to discontinue its lease payments to the Port District for General Dynamics and Teledyne Ryan in an amount equal to the unpaid amounts (plus interest) until payments on the Note are brought current.

### N.    Litigation and Release.

1.    Dismissal of Litigation. The Port District and Airport Authority agree to move for dismissal with prejudice of the current litigation between the parties in San Diego Superior Court Case No. GIC 821224 as it affects the Teledyne Ryan property; the party's CEQA actions; the debts alleged in the Port District's cross-complaint; and the objections and challenges to the environmental actions taken by either party relating to past, present and future parking operations on Teledyne Ryan and General Dynamics. The dismissal is without prejudice as to any new interpretation or application of Cal. Pub. Util. Code § 170056. The parties agree that they will jointly seek dismissal of the Petition for Writ of Mandate currently pending before the California Court of Appeal (Docket No. D043695) in which the Port District seeks disqualification of Morrison & Foerster, LLP as counsel for the Airport Authority. The parties further agree that each party will bear its own costs and attorneys fees incurred in the litigation.

2.    Mutual Release of All Claims. The parties agree to a mutual release which is intended to effect the legal consequences provided in §1541 of the California Civil Code, that is, the extinguishment of obligations as set forth herein. The parties execute this Settlement Agreement to settle the disputes and differences enumerated herein.

In consideration of the mutual relinquishment of their respective legal rights with reference to the disputes and differences set forth herein, and in consideration of the payments made by each party, each of the parties, for themselves, their successors, representatives and assigns, expressly releases the other party and their successors, representatives and assigns, from all liability for all past, present and future claims and demands arising out of the aforementioned itemized matters and for the accounting for funds derived therefrom, the allegations in the complaint and the cross complaint, and relating to the disputes and differences set forth herein. This mutual release is not intended by the parties to alter their continuing obligations under this Settlement Agreement from and after the date of execution of this Settlement Agreement.

10

47492

EXHIBIT "C"

59 )

53-611 (757)

O.    Further Assurances.

Each party agrees (a) to furnish upon request to each other party such further information, (b) to execute and deliver to each other party such other documents, and (c) to do such other acts and things, all as another party may reasonably request for the purpose of carrying out the intent of this Settlement Agreement and the transactions contemplated by this Settlement Agreement. The parties agree to work together in good faith and in a cooperative manner to implement the terms and conditions of this Settlement Agreement and to support and to facilitate all terms and conditions of this Settlement Agreement before all federal, state and local governmental agencies.


[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

11



EXHIBIT "C"

47492

60

53-611 (758)

The undersigned have read this Settlement Agreement, fully understand its contents, and by the signatures below agree to its terms on behalf of their respective public agencies.

SAN DIEGO UNIFIED PORT DISTRICT

By: _____
        BRUCE B. HOLLINGSWORTH
        Executive Director/ President and CEO

Approved as to Form:

_____
        DUANE E. BENNETT
        Port Attorney

DATED: ___05-20-04___

SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

By: _____
        THELLA F. BOWENS
        President and CEO

Approved as to Form:

_____
        BRETON K. LOBNER
        General Counsel

DATED: ___5/20/04___

12

EXHIBIT "C"

47492    611

**EXHIBIT 19**



Page 2



# Agenda

Introduction                                    Steve Cornell

- Airport Master Plan                           Ted Anasis

- Facilities Assessment                          Iraj Ghaemi

- Environmental Assessment                       Paul Manasjan

- Real Estate Business Plan                      Troy Leech
                                                 José Hernandez
                                                 Tom Morgan

- Workshop



# Draft Preliminary Concepts



**AIRPORT MASTER PLAN**
SAN DIEGO INTERNATIONAL AIRPORT

| Concept | Airfield | Terminal | Ground Transportation | Airport Support |
|---|---|---|---|---|
| Minimal Build | | | | |
| A | | | | |
| B | | | | |
| C | | | | |
| F | | | | |

53-611 (764)

# Minimal Build Concept
## Airfield

AIRPORT MASTER PLAN
SAN DIEGO INTERNATIONAL AIRPORT



U S MARINE CORPS RECRUIT DEPOT

A▷ Taxiway B Upgrade to Group V
A▷ Potential for South Parallel Taxiway north of T2 West

A▷ Potential Taxiway C Extension
A▷ Additional RON Positions

Page 3

53-611 (765)



# Concept A - Airfield

AIRPORT MASTER PLAN
SAN DIEGO INTERNATIONAL AIRPORT

U S MARINE CORPS RECRUIT DEPOT

A  Taxiway B Upgrade to Group V
A  Dual South Parallel Taxiway Length of Terminal Area

A  Taxiway C Extension
A  Additional RON Positions

Page 4



# Concept B - Airfield

AIRPORT MASTER PLAN
SAN DIEGO INTERNATIONAL AIRPORT

U S MARINE CORPS RECRUIT DEPOT

Taxiway B Group V Upgrade
Dual South Parallel Taxiway - West Airfield

Taxiway C Extension
Additional RON Positions

Page 5

# Concept C - Airfield



AIRPORT MASTER PLAN
SAN DIEGO INTERNATIONAL AIRPORT

U S MARINE CORPS RECRUIT DEPOT

Taxiway B Group V Upgrade
Dual South Parallel Taxiway - West Airfield

Taxiway C Extension
Additional RON Positions

Page 6

# Draft Preliminary Concepts
# Key Components



AIRPORT MASTER PLAN
SAN DIEGO INTERNATIONAL AIRPORT

| Concept | Airfield | Terminal | Ground Transportation | Airport Support |
|---|---|---|---|---|
| Minimal Build | • Taxiway B - Group V Upgrade<br>• Additional RON Positions<br>• Partial Dual Parallel Taxiway B<br>• Possible Taxiway C Extension | • Enhance Concessions<br>• T2 West Build Out & Processor<br>• 8 to 10 Additional Gates<br>• T1 East Expansion & Processor<br>• Up to 2 Additional Gates | • Expanded Surface Parking<br>• Expanded Rental Car Facilities | • Expanded and Improved Cargo Facilities for IOV and GD Sites<br>• Possible for FBO Expansion |
| A | • Taxiway B - Group V Upgrade<br>• Additional RON Positions<br>• Full Dual Parallel Taxiway B<br>• Taxiway C Extension | • Phase 1: T2 West Build Out & Processor<br>• Phase 2: T1 Replacement with Linear Concourse<br>• Up to 65 Gates Total | • Expanded Surface & Structured Parking<br>• Expanded Rental Car Facilities<br>• Improved Airport Road Entrance | • Expanded and Improved Cargo Facilities<br>• Potential for FBO Expansion<br>• Possible Hydrant Fueling |
| B | • Taxiway B - Group V Upgrade<br>• Additional RON Positions<br>• Half Dual Parallel Taxiway B<br>• Taxiway C Extension | • Phase 1: T2 West Build Out & Processor & New East Terminal<br>• Phase 2: Full Replacement of T1 With Linear Concourse<br>• Up to 60 Gates Total | • Expanded Rental Car Facilities<br>• Possible Structures<br>• Expanded Surface Parking in Terminal Area<br>• Improved Airport Road Entrance | • Expanded and Improved Cargo Facilities<br>• Potential for FBO Expansion<br>• Possible Hydrant Fueling |
| C | • Taxiway B - Group V Upgrade<br>• Additional RON Positions<br>• Half Dual Parallel Taxiway B<br>• Taxiway C Extension | • Phase 1: T2 West Build Out & Replacement of T1 East with Linear Concourse<br>• Phase 2: Replace T1 West<br>• Up to 60 Gates Total | • Expanded Rental Car Facilities<br>• Possible Structures<br>• Expanded Surface Parking in Terminal Area<br>• Improved Airport Road Entrance | • Expanded and Improved Cargo Facilities<br>• Possible for FBO Expansion<br>• Possible Hydrant Fueling |
| F | • Major Airfield Improvements<br>• Second Runway<br>• Improvements to all Taxiways | • New and Expanded Terminal System<br>• Potential North Terminal | • Potential for North & South Access for Passengers if Dual Terminal<br>• Parking / Rental Car Structures | • New and Expanded Cargo Facilities<br>• Relocated AARF Facility<br>• Expanded AARF Facility<br>• Flight Kitchen Expansion |

53-611 (769)

# Key Requirements



AIRPORT MASTER PLAN
SAN DIEGO INTERNATIONAL AIRPORT

➤ **Airfield:**
   - Efficiency, Aircraft Circulation and Safety Improvements Required to Reduce Congestion

➤ **Terminal:**
   - Additional Gates Required Immediately

➤ **Ground Transportation:**
   - Opportunities at Teledyne Ryan Property

➤ **Airport Support:**
   - Opportunities at Teledyne Ryan Property

53-611 (770)

# Summary of AMP + TDY



AIRPORT MASTER PLAN
SAN DIEGO INTERNATIONAL AIRPORT

➤ Interim Uses Compatible with AMP:

- Taxiway B Upgrade to Group V
- Surface / Covered Vehicle Parking
- Air Cargo –
  - Relocate Freight Forwarders from Air Lane to TDY
  - Expanded Building and Apron
- FBO Expansion
- Terminal Expansion in 2015 – 2030 timeframe

➤ Consider Opportunities:

- Gateway Improvements on North Harbor Drive
- Coordination with Port of SD along North Harbor Drive
- New Authority Offices

Page 9

53-611 (771)



# Teledyne Ryan
# Facilities
# Assessments

## December 2004

Presented by: Iraj Ghaemi

Facilities Development

53-611 (772)



# Facilities Assessments
## Executive Summary

- ## Project Introduction

  - 47 Acres
  - Approximately 55 buildings & other site facilities
  - Building 120 was built around 1939
  - On going operation until 1999, with 750 people working
  - Fabrication of Apache helicopter & unmanned drones including Global Hawk
  - All buildings are vacant, various building systems have been totally or partially removed

Page 2



# Objective of Study/Project Approach

## Objectives

- To provide an overview of the condition of the buildings opted to remain and order of magnitude costs to renovate to leasable condition (Report Phase 1)

- To provide order of magnitude costs for various buildings opted for demolition

( Report Phases 2,3,4).

Page 3

# Phases I, II, III, and IV

Page 4



**TELEDYNE - RYAN**
**FACILITY ASSESSMENTS**

PHASE I - TO REMAIN : 720,799 Sq.Ft.

PHASE II - DEMOLITION : 54,429 Sq.Ft.

PHASE III - DEMOLITION : 66,805 Sq.Ft.
(MASTER PLAN)

PHASE IV - DEMOLITION : 273,145 Sq.Ft.

"SAN Park" PROJECT
(Not Part of the Facilities Assessment)

BUILDINGS TO REMAIN     96,130 Sq.Ft.

BUILDINGS TO REMOVE    25,140 Sq.Ft.

——— PROJECT BOUNDARY

- - - - UNDERGROUND CABLE

COMMUTER
TERMINAL

# Team Members



The team members are as follows:

| | |
|---|---|
| Project Management | John van Blerck, JVB Consulting, Inc. |
| Architecture | Mike Yopp, AIA, DMJMHolmes & Narver, Inc. |
| Electrical Engineering | Isariya Duncan, P.E., DMJMHolmes & Narver, Inc. |
| Mechanical Engineering | Harry Oh Bansi Parekh, DMJMHolmes & Narver, Inc. |
| Structural / Seismic | Carolyn Stegon and Bryan Seamer, P.E., DMJMHolmes & Narver, Inc. |
| Civil | Lee Johnson, DMJM+Harris, Inc. |
| Roofing | Doug O'Brien, O'Brien-Largen, Inc. |
| Fire / Life Safety | Mick Yuan, AIA, DMJMHolmes & Narver, Inc. |
| Environmental / Hazardous Materials | Linda McKnight, DMJM+Harris, Inc. |
| Estimator | Mike Koppi, DMJMHolmes & Narver, Inc. |
| Overall Facilities Assessments | Wayne Hopkins, Former Teledyne Ryan Employee |

Page 5

# Objective of Study/Project Approach (cont'd)



- **Project Approach**
  - A multi-disciplinary project team.
  - Review of available project information.
  - Interview of people familiar with the site.
  - Formulation of the report.
  - Phase approach (Phases I, II, III, and IV).

# Project Approach (cont'd)



- Phase 1
  - Consisted of inspections of the buildings opted to remain
  - Buildings examined in this Phase are; 100,102,104,105,120,121,127,140,146,146A,147, 148,149,150,180,181,183,236, 536 and Civil site investigation
  - Total area of the buildings investigated 720,799 sq.ft.



# Project Approach (cont'd)

## Phases 2 & 3

- Consisted of inspections of the buildings opted for demolition

- Buildings inspected in Phase 2 included the followings: 100, 111, 112, 128, 160, 167, 168, 169, 170, 180 Annex, 182, 221, and 240

- Total area of the buildings inspected 54,429 sq.ft.

Page 8

53-611 (779)



# Project Approach (cont'd)



## • Phase 2 & 3 (cont'd)

- Buildings inspected in Phase 3 included the followings: 115, 123, 125, 126, 129, 130, 159, and 166

- Total area of the buildings inspected 66,805 sq.ft.



# Project Approach (cont'd)

- ## Phase 4

  - Consisted of a review of certain buildings inspected in Phase 1.

  - Buildings inspected in Phase 4 included the followings: 120, 121, 127, 181, 183, and 236.

  - Total area of the buildings inspected 273,145 sq.ft.

Page 10

53-611 (781)





# Findings

## Architectural

- Vast majority of the restrooms have been demolished

- ADA violations

- Fire code violations

- Buildings with historical significance

Page 12

Architectural





53-611 (783)



Page 13

Architectural





Page 14

# Findings (cont'd)



- Electrical, Data and Telecommunications

  – Aged electrical systems in a state of disrepair

  – Partially or completely demolished electrical systems

  – Many unsafe conditions

  – Lack of dedicated metering for each buildings

  – Multiple power source

  – Stripped phone, data and telecommunications systems





# Electrical, Data and Telecommunications



Page 15



# Electrical, Data and Telecommunications





# Findings (cont'd)



- Roofing
  - Roof systems
  - Roofs in poor condition beyond their useful lives
  - Many deficiencies observed
  - Leaking due to structural and other damages
  - Many open roof penetrations

53-611 (788)





# Roofing





Page 18

Page 19

Roofing









# Findings (cont'd)

- ## Mechanical / Water
  - Systems are aged and in poor condition
  - Idle systems and lack of decommissioning
  - Many restrooms and mezzanines have been removed
  - Violation of ADA requirements
  - Lack of water metering



Page 21



Mechanical / Water



53-611 (792)





# Mechanical / Water

Page 22



# Findings (cont'd)

## Environmental/ Hazardous materials

- Reviewed surveys by Ninyo and Moore, and Haley and Aldrich

- Close coordination with Environmental Assessment Team



# Environmental / Hazardous Material

Page 24

Page 25

# Environmental / Hazardous Material





Page 26

# Findings (cont'd)



- ## Fire / Life Safety Systems

  - Fire suppression (fire sprinkler system)
  - The majority of the buildings have fire protection system



Page 27





# Findings (cont'd)

- <u>Structural</u>
  - Most of the buildings were constructed in the 1940's
  - Structural weaknesses
  - Existing structural damage
  - Ongoing structural damage

Page 28

Structural







53-611 (799)

Page 29

Structural







# Findings (cont'd)

- ## Demolition

  – Demolition above the existing slab

  – Termination of electrical and other services to other buildings

  – Environmental clean-up requirements



# Findings (cont'd)



- ## Civil and other

  – Pavement, landscaping, miscellaneous tanks, and other systems common to buildings

  – Severely aged asphalt, lack of proper grading, standing water, various tripping hazards

  – Extremely worn or lack of roadway signage

53-611 (802)

Page 32

Civil and other





Page 33

Civil and other







# Conclusions / Caveats



- This report was a cursory, brief study of these buildings.

- The underground utilities were not investigated in this report.

- 60 years old facilities, and the level of reliability of the underground utilities should be considered very cautiously.



# Teledyne Ryan Environmental Assessment

### December 2004

Presented by: Paul Manasjan
Environmental Affairs

SAN DIEGO COUNTY REGIONAL · AIRPORT AUTHORITY

53-611 (806)



Page 2

# Environmental Issues



- Site Contamination  (On-site)

- Stormwater Discharges  (Off-site)

- Legal Issues (Responsibilities & costs)



Site Contamination Areas

- Buildings/exterior surfaces
- Subsurface (soil, soil vapor, groundwater)
- Convair Lagoon

Site Contamination and Proposed Remediation Areas of Former Teledyne Ryan Facility

Page 3

# Redevelopment Scenarios for Environmental Assessments





1) Re-use of existing building(s).

2) Demolish existing building(s) & use space for new building(s).

3) Demolish existing building(s) & use as outdoor paved surface.

4) Develop existing outdoor area as paved surface.

5) Develop existing outdoor area with new building(s).

Page 4



# Remedial Options & Feasibility Studies

Feasibility of remedial options for buildings, exterior areas and subsurface contamination:

- Hazardous materials abatement

- Vapor mitigation measures

- Soil remediation

- Groundwater remediation & monitoring

Page 5



# Building Remediation Costs

| Remedial Activities | Option 1 Bldgs with New Roofs[1] | Option 2 Bldgs with Patched Roofs[1] | Option 3 Demolish Buildings[2] |
|---|---|---|---|
| Hazardous Materials Abatement | Pending | Pending | Pending |
| Annual inspections & Repairs | Pending | Pending | ∅ |
| Total Costs | Pending | Pending | Pending |

1. Includes demolition of selected buildings.

2. $9,427,480 + half remaining costs available through settlement agreement.

Page 6

53-611 (811)

# Subsurface Remediation Costs





| | Redevelopment Scenario | Remediation Costs |
|---|---|---|
| 1 | Reuse existing buildings | Pending |
| 2 | Demo & replace with new buildings | Pending |
| 3 | Demo existing buildings & pave area | Pending |
| 4 | Repave existing outdoor areas | Pending |
| 5 | Build new bldg in existing outdoor areas | Pending |

Page 7

53-611 (812)

# Stormwater Requirements



| Objectives | Specific Tasks Involved | Costs |
|---|---|---|
| **Stormwater Planning Documents** | •Prepare Site Mitigation Plan<br>•Develop BMPs<br>• Update Stormwater Mgmt Plan | Pending |
| **Site Hydrology Study** | •Study site hydrology/hydraulics<br>•Assess infrastructure & BMPs<br>•Make recommendations | Pending |
| **Infrastructure Assessments & Repairs** | •Assess improvement needs<br>•Clean and repair system<br>•Install structural BMPs | Pending |

Page 8

# Site Remediation Planning Costs



| Planning Components | Costs |
|---|---|
| Remedial Options | Pending |
| Feasibility Studies | Pending |
| Remedial Action Plan | Pending |
| Regulatory Negotiations | Pending |
| Further Investigations | Pending |
| Total Cost | Pending |

Page 9



53-611 (814)

# Site Drainage into Convair Lagoon



Storm Drainage System

PCB contamination focus of RWQCB's Cleanup and Abatement Order

Undetermined remediation costs.

Convair Lagoon

San Diego International Airport

0    125    250    500    Feet

**Legend**
- Catch Basin
- Drain Inlet
- Drain Lines
- Former Teledyne Ryan Buildings
- Former Teledyne Ryan Site
- San Diego International Airport

Page 10

53-611 (815)

# Legal Issues



| Legal Actions | Status |
|---|---|
| Port v. TDY Litigation #1: Lease & Demo Costs | • $9.4 award Port for demo.<br>• Case on appeal. |
| Port v. TDY Litigation #2: Site Contamination | • Case in Federal Court.<br>• Continued until Dec. 2005. |
| Cleanup & Abatement Order | • TDY ordered to cleanup site.<br>• Workplan due Jan. 28, 2005.<br>• Petition filed to add RPs. |

Page 11



# TDY Site Agreements with Environmental Language

## Agreements on environmental cleanup responsibilities and costs:

- Settlement Agreement
- Lease Agreement
- Right of Entry License Agreement

53-611 (817)

# Environmental Legal Factors Affecting TDY Site



Page 13

1. CAO: Water Board Cleanup and Abatement Order
2. ROE: Right of Entry Permit issued by Port District.

## Recommendations




- Have outside environmental counsel assess pending legal actions and agreements.

- Develop site assessment and remediation plans in line with Cleanup & Abatement Order.

- Develop and implement effective storm water management program.

- Cleanup site with regulatory "closure" letter as objective.

Page 14

53-611 (819)



53-611 (820)



Teledyne Ryan
Interim Re-use
Business Plan

December 2004

Presented by: Tom Morgan

Real Estate Management

53-611 (821)







# Real Estate Management
# Interim Re-use Business Plan

## Introduction

The Authority's Teledyne Ryan Re-Use Team has compiled the following real estate land use information, " a work in progress", for the TDY Business Plan:

- Fair Market Rent appraisal;

- Off-airport parking demand study;

- Long-term parking expansion: General Dynamics vs. TDY;

- Five potential re-use scenarios and revenue projections;

Page 2

53-611 (822)



# Purpose



- Recommendation to achieve immediate and substantial revenue sources to the Authority. (2005 through 2015);




# Assumptions

The following assumptions have been utilized and are believed critical to the creation of the ultimate TDY Business Plan:

- Fully Executed lease from Port;

- Tenant access and occupancy not hindered by pending litigation;

- Tenant occupancy not hindered by the Regional Water Quality Control Board's Cleanup and Abatement Order;

- Environmental remediation will not restrict the normal use and occupancy of the property;

Page 4

53-611 (824)



# Assumptions (cont'd)

- Authority will receive timely reimbursement for demolition and remediation expenses;

- Airport Master Plan implementation will not adversely affect occupancy, prior to January 2015;

- "Rough Order of Magnitude" cost estimates are valid for the Business Plan decision making process;

- Walker Parking Consultants' Demand Study accurately reflects long-term off-airport parking demand for 2005-2010;

- The Buss-Shelger Fair Market Rent Appraisal accurately reflects realistically achievable rents.

Page 5

Page 6

# Findings



Two reports used in evaluating potential temporary uses of the TDY property include:

1. **Fair Market Rent Appraisal** by Buss-Shelger. A brief summary of recommended rental rates follows:



53-611 (826)



# Findings (cont'd)

| Building | Projected Use | Square Footage | Monthly Rent/S. F. | Total Annual Rent |
|---|---|---|---|---|
| 100 | General & FBO Office | 28,072 | $ .40 | $134,746 |
| 102 | General Office | 75,394 | $ .35 | $316,655 |
| 104 | General Office | 10,034 | $ .45 | $54,184 |
| 105 | General Office | 44,620 | $ .40 | $214,176 |
| 120 | Air Cargo/freight/storage/market | 205,304 | $ .30 | $739,094 |
| 121 | Warehouse/Boat Sales/Storage | 19,538 | $ .35 | $82,060 |
| 140 | Air Cargo/freight/covered/valet car | 128,103 | $ .40 | $614,894 |
| 146 | Warehouse/Storage/Office | 124,298 | $ .35 | $522,052 |
| 180 | FBO Hangar/Storage | 29,092 | $ .50 | $174,552 |
| 181 | FBO/Storage | 20,067 | $ .40 | $96,322 |
| 183 | FBO/Storage | 19,818 | $ .45 | $107,017 |
| | Totals: | 704,340 | | $3,055,752 |

Page 7

53-611 (827)



# Findings (cont'd)

2. **Parking Demand Study**, for **"daily use"** (long term) parking, was received from Walker Parking Consultants;

   • Focus of Walker's study: **long-term parking** users at SDIA, Airport Connection, TDY and off-airport facilities.

   • <u>Not an "apples to apples" comparison with HNTB's short-term and long-term SDIA parking analysis.</u>

Page 8



# Findings (cont'd)

A brief summary of WPC's estimates of parking demand include:

| | 2004 | 2005 | 2008 | 2010+ |
|---|---|---|---|---|
| **Parking Supply** | | | | |
| Totals | 9,779 | 12,789 | 12,779 | 12,779 |
| | | | | |
| **Parking Demand** | | | | |
| Totals | 10,845 | 11,234 | 12,402 | 13,181 |
| | | | | |
| Net Surplus (Deficiency) | (1,066) | 1,555 | 377 | (402) |

*Prepared by American Airport Associates utilizing Walker Parking Consultants Data* 12/08/04

*More recent data is being obtained and this portion of the report will be updated.

Page 9



# Findings (cont'd)

WPC's study further indicates:

1. Market demand will support Airport Connection's 500-space expansion;

2. Market demand will support both the SAN Park Phase I and II - 1,450-space facility;

3. Both of these facilities should reach 80% occupancy within one-year of build-out;

4. Any future expansion of long-term airport parking, not required prior to 2010.

53-611 (830)

# Findings (cont'd)

△ Five preliminary re-use scenarios and rental income summaries follow:

△ Scenario 1



SAN Park 1,450-space Surface Parking
● Building 140 - 390 Covered / Valet spaces
● Building 120 - Air Cargo / Freight + Ramp Area
● Buildings 100, 102, 104 and 105 - General Office Use
● Buildings 121 - Air Cargo / Freight / FBO Support Space
● Hangar Building 180 - Small FBO Operation
● Demolition of Remaining Buildings

COMMUTER TERMINAL

SCENARIO 1

Page 11



# Findings (cont'd)

Page 12

Scenario 1 Rental Income Summary:

| Buildings | Uses | Square Footage | Net Annual Rent (Conservative) | Net Annual Rent (Optimistic) |
|---|---|---|---|---|
| SAN Park; 100, 102, 104, 105, 120, 121, 140, 180 | Long-term parking; general office; covered parking; air cargo; FBO; FBO support | 540,000 s.f. | $5,590,500* | $7,526,000* |

* Year 3 Stabilized Income

# Findings (cont'd)

## Scenario 2





Page 13

SAN Park 1,450-space Surface Parking

o Building 140 and 146 Air Cargo / Freight Operation
  + Improved Ramp Area

o Building 100 - FBO and General Office Space

o Hangar Building 180 - Major FBO Operation + Improved Ramp Area

• Demolition of Remaining Buildings

SCENARIO 2

COMMUTER TERMINAL





# Findings (cont'd)

Scenario 2 Rental Income Summary:

| Buildings | Uses | Square Footage | Net Annual Rent (Conservative) | Net Annual Rent (Optimistic) |
|---|---|---|---|---|
| SAN Park; 100, 140, 146, and 180 | Long-term parking; general/FBO office; air cargo; and FBO | 251,000 s.f. | $4,812,000* | $7,006,000* |

* Year 3 Stabilized Income

Page 14

53-611 (834)

# Findings (cont'd)




Scenario 3



SAN Park 1,450-space Surface Parking

- Building 140 and 146 - Warehouse / Storage + Related Office Use
- Building 120 - Air Cargo / Freight Facility + Improved Ramp Area
- Building 121 - FBO Support Services or Storage, or Boat Repair / Sales
- Hangar Building 180 - Small FBO Operation + Improved Ramp Area
- Demolition of Remaining Buildings

S C E N A R I O   3

Page 15



# Findings (cont'd)

Scenario 3 Rental Income Summary:

| Buildings | Uses | Square Footage | Net Annual Rent (Conservative) | Net Annual Rent (Optimistic) |
|---|---|---|---|---|
| SAN Park; 120, 121, 140, 146, and 180 | Long-term parking; general office; warehouse/ storage; air cargo; FBO; FBO support | 506,335 s.f. | $5,012,000* | $8,156,000* |

\* Year 3 Stabilized Income

Page 16

53-611 (836)

# Findings (cont'd)

## Scenario 4



A



SCENARIO 4

- SAN Park 1,450-space Surface Parking
  - Building 140 - 390 Covered / Valet Spaces
  - Building 120 - Air Cargo / Freight Facility + Improved Ramp Area
  - Building 100 - General Office Use + Support for Air Cargo / Freight Operations
- Demolition of Remaining Buildings

COMMUTER TERMINAL





# Findings (cont'd)

Page 18

## Scenario 4 Rental Income Summary:

| Buildings | Uses | Square Footage | Net Annual Rent (Conservative) | Net Annual Rent (Optimistic) |
|---|---|---|---|---|
| SAN Park; 120, 121, 140, 146, and 180 | Long-term parking; general office; warehouse/ storage; air cargo; FBO; FBO support + SAN Park Expansion | 361,479 s.f. | $5,562,000* | $7,287,000* |

\* Year 3 Stabilized Income

53-611 (838)

# Findings (cont'd)



A   <u>Scenario 5</u>



PHASE ONE = 291 Spaces
PHASE TWO = 1,151 Spaces
PHASE THREE = 2,867 Spaces
PHASE FOUR = 1,974 Spaces

SAN Park 6,283 Space Surface Parking
● Demolition of All Buildings

SCENARIO 5



# Findings (cont'd)



Scenario 5 Rental Income Summary:

| Buildings | Uses | Square Footage | Net Annual Rent 2007 | Net Annual Rent 2009 |
|---|---|---|---|---|
| Entire Site | Long-term airport parking | - | $9,500,000* | $13,500,000 |

* Year 3 Stabilized Income

53-611 (840)



# Findings (cont'd)

## Rental Income Summary Comparison Table:

|  | Net Annual Rent (Conservative) | Net Annual Rent (Optimistic) |
|---|---|---|
| Scenario 1 | $5,590,000 | $7,526,000 |
| Scenario 2 | $4,812,000 | $7,006,000 |
| Scenario 3 | $5,012,000 | $8,156,000 |
| Scenario 4 | $5,562,000 | $7,287,000 |
| Scenario 5 | $9,500,000 | $13,500,000 |

53-611 (841)

Page 22



# Findings (cont'd)

## Recommendations

1. Continue refinement of the above re-use scenarios. Two plans recommended to Senior Management;

2. Proceed with entitlement process for SAN Park Phase II-surface parking only (1,450-spaces);

3. Obtain Senior Management direction concerning Authority's desire for a second FBO operator;



**53-611 (842)**



# Findings (cont'd)

## Recommendations

4. Obtain approval from Senior Management to hire an architect to evaluate the following:

- Adaptability for Building 140 and 146 for air cargo/freight operations;
- Evaluate office space for ADA compliance; prepare a standard office suite plan;
- Prepare a landscape, parking and circulation plan.

Page 23

53-611 (843)