1  FRED M. PLEVIN (SBN 126185)
   SANDRA L. MCDONOUGH (SBN 193308)
2  ALBERT R. LIMBERG (SBN 211110)
   **PAUL, PLEVIN, SULLIVAN &**
3  **CONNAUGHTON** LLP
   401 B Street, Tenth Floor
4  San Diego, California 92101-4232
   Telephone: 619-237-5200
5  Facsimile: 619-615-0700

6  AMY S. GONZALEZ (SBN 181745)
   **SAN DIEGO COUNTY REGIONAL AIRPORT**
7  **AUTHORITY**
   3225 N. Harbor Drive
8  San Diego, CA 92138
   Telephone:  (619) 400-2425
9  Facsimile: (619) 400-2428

10

   Attorneys for Defendant
11 SAN DIEGO COUNTY REGIONAL AIRPORT
   AUTHORITY

12

13                  UNITED STATES DISTRICT COURT

14              SOUTHERN DISTRICT OF CALIFORNIA

15 JOSE HERNANDEZ,                    CASE NO.

16          Plaintiff,                **NOTICE OF REMOVAL OF ACTION:**
                                       **UNDER 28 U.S.C. § 1442(B)**
17      v.                            **(FEDERAL QUESTION)**

18 SAN DIEGO COUNTY
   REGIONAL AIRPORT
19 AUTHORITY, a public entity; and    **EXHIBITS 54-75**
   DOES 1 through 12, inclusive,
20
          Defendants.
21

22 ///

23 ///

24 ///

25

26

27

28

PAUL, PLEVIN,
SULLIVAN &        NOTICE OF REMOVAL                          1
CONNAUGHTON LLP



'08 CV 0184 L CAB

FILED

JAN 3 0 2008

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                          DEPUTY

F I L E D
CIVIL BUSINESS OFFICE
CENTRAL DIVISION

SEP 0 7 2007

CLERK, SUPERIOR COURT
SAN DIEGO COUNTY, CA

1  FRED M. PLEVIN (SBN 126185)
   SANDRA L. MCDONOUGH (SBN 193308)
2  ALBERT R. LIMBERG (SBN 211110)
   **PAUL, PLEVIN, SULLIVAN & CONNAUGHTON** LLP
3  401 B Street, Tenth Floor
   San Diego, California 92101-4232
4  Telephone: 619-237-5200
   Facsimile: 619-615-0700

5
   AMY S. GONZALEZ (SBN 181745)
6  **SAN DIEGO COUNTY REGIONAL AIRPORT
   AUTHORITY**
7  3225 N. Harbor Drive
   San Diego, CA 92138
8  Telephone: (619) 400-2425
   Facsimile: (619) 400-2428

9

10  Attorneys for Defendant
    SAN DIEGO COUNTY REGIONAL AIRPORT
11  AUTHORITY

12

13            SUPERIOR COURT OF THE STATE OF CALIFORNIA

14                      COUNTY OF SAN DIEGO

15  JOSE HERNANDEZ,                         CASE NO. GIC871979

16            Plaintiff,                     **DEFENDANT SAN DIEGO COUNTY
                                             REGIONAL AIRPORT AUTHORITY'S
17       v.                                  NOTICE OF ERRATA IN SUPPORT OF ITS
                                             MOTION FOR SUMMARY JUDGMENT OR,
18  SAN DIEGO COUNTY REGIONAL               IN THE ALTERNATIVE, SUMMARY
    AIRPORT AUTHORITY, a public entity;     ADJUDICATION**
19  and DOES 1 through 12, inclusive,

20            Defendants.                    Date:          November 16, 2007
                                            Time:          1:30 p.m.
21                                          Dept:          75
                                            Judge:         Hon. Richard E. Strauss
22                                          Complaint Filed: September 1, 2006
                                            Trial Date:    January 4, 2008
23
                                                    **EXEMPT FROM FEES
24                                                  GOVT. CODE § 6103**

25

26       TO PLAINTIFF JOSE HERNANDEZ AND HIS ATTORNEYS OF RECORD:

27       Defendant San Diego County Regional Airport Authority hereby submits the following

28  notice of errata in support of its motion for summary judgment or, in the alternative, summary

PAUL, PLEVIN,          NOTICE OF ERRATA IN SUPPORT OF MOTION          1
SULLIVAN &             FOR SUMMARY JUDGMENT
CONNAUGHTON LLP

1  adjudication.  Fact numbers 12, 51 and 52 in the separate statement filed in support of the motion

2  contained inadvertent errors and should have read as follows:

| Undisputed Material Fact | Evidence |
|---|---|
| 12.  Hernandez alleges that he was advised to keep the investigation confidential. | Hernandez 840:12-15 [Exh. 2]; Second Amended Complaint p. 11, lines 26-28. |

**Adjudication No. 7:  Hernandez' First Cause of Action under Labor Code section 1102.5(a) fails as a matter of law because Hernandez has not identified a rule, regulation, or policy made, adopted or enforced by the Authority that prevents an employee from disclosing information to a governmental agency.**

| Undisputed Material Fact | Evidence |
|---|---|
| 51.  Hernandez alleges that he was advised to keep the investigation confidential. | Hernandez 840:12-15 [Exh. 2]; Second Amended Complaint p. 11, lines 26-28. |

**Adjudication No. 8:  Hernandez' First Cause of Action under Labor Code section 1102.5(a) fails as a matter of law because any instructions regarding confidentiality were made to implement the protection of the attorney-client privilege (See Labor Code section 1102.5(g)).**

| Undisputed Material Fact | Evidence |
|---|---|
| 52.  Mr. Swan advised Hernandez that he should keep the interview confidential because the investigation was an attorney-client privileged investigation. | Swan 2:26-28. |

The above changes are incorporated into the amended separate statement filed herewith.

Dated: September 7, 2007                    PAUL, PLEVIN, SULLIVAN &
                                            CONNAUGHTON LLP


                                            By: _Sandra L. McDonough_
                                            /FRED M. PLEVIN
                                            SANDRA L. MCDONOUGH
                                            ALBERT R. LIMBERG
                                            Attorneys for Defendant
                                            SAN DIEGO COUNTY REGIONAL
                                            AIRPORT AUTHORITY

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

NOTICE OF ERRATA IN SUPPORT OF MOTION          2
FOR SUMMARY JUDGMENT

1

## PROOF OF PERSONAL SERVICE

2

3      I, the undersigned, certify and declare that I am a citizen of the United States, over the age

of eighteen, employed in the County of San Diego, State of California, and not a party to the

4

within-entitled action. My business address is 4665 Park Blvd., San Diego, CA 92116.

5
       On _____ at _____ a.m./p.m., I served a true copy of the within:

6

7      •   **DEFENDANT SAN DIEGO COUNTY REGIONAL AIRPORT
           AUTHORITY'S NOTICE OF ERRATA IN SUPPORT OF ITS MOTION
           FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY
8          ADJUDICATION;**

9      •   **DEFENDANT SAN DIEGO COUNTY REGIONAL AIRPORT
           AUTHORITY'S AMENDED SEPARATE STATEMENT OF UNDISPUTED
           MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY
10         JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION**

11     by delivering for personal service to the following:

12
       Cathryn Chinn, Esq.
13     1901 First Avenue, Suite F
       San Diego, CA 92101
14     Tel: 619-295-4190 / Fax: 619-295-9529
       **Attorney for Plaintiff Jose Hernandez**

15

16     I hereby certify that I am employed by Diversified Legal Services, at whose direction the

17     personal service was made.

18     Executed September 7, 2007, at San Diego, California.

19

20                                        _____
                                          DIVERSIFIED LEGAL SERVICES
21                                        MESSENGER

22

23

24

25

26

27

28

**PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP**

PROOF OF PERSONAL SERVICE            1

| GREG A. KLAWITTER<br>PAUL, PLEVIN, SULLIVAN & CONNAUGH..., ..) LLP<br>401 B STREET TENTH FLOOR  SAN DIEGO, CA 92101 | SBN: 222746 | FOR COURT USE ONLY |
|---|---|---|

TELEPHONE NO.: (619) 237-5200       FAX NO. (Optional): (619) 615-0700
E-MAIL ADDRESS (Optional):

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO**
STREET ADDRESS: **330 WEST BROADWAY**
MAILING ADDRESS:
CITY AND ZIP CODE: **SAN DIEGO, CA 92101**
BRANCH NAME: **SAN DIEGO**

PLAINTIFF (name each): **SDCRAA**

DEFENDANT (name each): **HERNANDEZ**

CASE NUMBER:
GIC 871979

| **PROOF OF HAND DELIVERY** | HEARING DATE: | DAY: | TIME: | DEPT.: | Ref No. or File No.:<br>**MARTHA/SDCRAA** |
|---|---|---|---|---|---|

AT THE TIME OF SERVICE I WAS AT LEAST 18 YEARS OF AGE AND NOT A PARTY TO THIS ACTION, AND **I SERVED COPIES** OF THE:

    **NOTICE OF ERRATA; AMENDED SEPARATE STATEMENT**

        NAME OF ATTORNEY:   **CATHRYN CHINN**

        DELIVERED TO:   **PETER FREEZEN - AUTHORIZED TO ACCEPT - ATTORNEY**

DATE & TIME OF DELIVERY:   **09/07/2007**
                          **04:45 pm**

ADDRESS, CITY, AND STATE:   **1901 FIRST AVE, SUITE 400**
                              **SAN DIEGO, CA 92101**

MANNER OF SERVICE:
    **Delivery to Law Office:  Service was made by delivery to the attorney's office; or by leaving the document(s) with his clerk over the age of 18 therein; or with a person having charge thereof; or if there was no such person in the office, by leaving them between the hours of nine in the morning and five in the afternoon, in a conspicuous place in the office. [CCP §1011(1)]**

Fee for Service: **42.50**
    County:  **SAN DIEGO**
    Registration No.:  **1129**
    **DIVERSIFIED LEGAL SERVICES, INC.**
    **4665 PARK BLVD**
    **SAN DIEGO, CA 92116**
    **(619) 260-8224**

I declare under penalty of perjury under the laws of the State of California that the foregoing information contained in the return of service and statement of service fees is true and correct and that this declaration was executed on **September 19, 2007.**

Signature: _____
              **ERIC LOOMIS**

**PROOF OF HAND DELIVERY**

# Diver fied Legal Services nc.

**4665 Park Blvd, San Diego, CA 92116  Fed ID# 33-0524333**
**Tel: (619) 260-8224 e-mail: kevin@dlsusa.com  Fax: (619) 260-0316**

Order #: 99255

Date Received: **September 19, 2007**
Acct. No: **3375**
Client: **PAUL, PLEVIN, SULLIVAN & CONNAUGHTON LLP**
**401 B STREET**
**(619) 237-5200**
**SAN DIEGO, CA 92101**

Your File No: **MARTHA/SDCRAA**

Attorney: **GREG A. KLAWITTER**
Bar No: **222746**

Case No: **GIC 871979**
Court: **SAN DIEGO COUNTY SUPERIOR COURT CENTRAL**
Plaintiff: **SDCRAA**
vs Defendant: **HERNANDEZ**
Depo/Hearing Date:
Servee: **CATHRYN CHINN**
Server: **None assigned**

## **TODAY**

Due Date: **September 7, 2007**

Business Address:

**1901 FIRST AVE, SUITE 400**
**SAN DIEGO, CA 92101**

Home Address:

*RETURN TO ATTORNEY*

Documents:
**NOTICE OF ERRATA; AMENDED SEPARATE STATEMENT**

Comments:

| DATE | A.M. | P.M. | Due Diligence | Billing Code |
|------|------|------|---------------|--------------|
|      |      |      |               | RUSH   1   2 |
|      |      |      |               | SVCDT |
|      |      |      |               | SVC   1   2 |
|      |      |      |               | OCRUSH |
|      |      |      |               | SVCOUT |
|      |      |      |               | SHIP/FEDEX |
|      |      |      |               | FA |
|      |      |      |               | BAD |
|      |      |      |               | BADOUT |

Served At:  ☐ Residence    ☐ Business    ☐ Other

Person Served:                          Title/Relationship:

Description:
| | Age | Race | Sex | Eyes | Hair | Ht. | Wt. |
|--|-----|------|-----|------|------|-----|-----|
| | | | | | | | |

☐ Personal   ☐ Substitute   ☐ Non-Service   ☐ Posted/Mailed   ☐ Other

Date:        A.M.        P.M.        Server/Reg.#:

Order#: 99255/GWORK

54-616

**EXHIBIT 55**

1  FRED M. PLEVIN (SBN 126185)
   SANDRA L. MCDONOUGH (SBN 193308)
2  ALBERT R. LIMBERG (SBN 211110)
   **PAUL, PLEVIN, SULLIVAN & CONNAUGHTON LLP**
3  401 B Street, Tenth Floor
   San Diego, California 92101-4232
4  Telephone: 619-237-5200
   Facsimile: 619-615-0700
5
                                                          SEP 7'07 PM 4:33
6  AMY S. GONZALEZ (SBN 181745)
   **SAN DIEGO COUNTY REGIONAL AIRPORT**
   **AUTHORITY**
7  3225 N. Harbor Drive
   San Diego, CA 92138
8  Telephone:  (619) 400-2425
   Facsimile: (619) 400-2428
9

10 Attorneys for Defendant
   SAN DIEGO COUNTY REGIONAL AIRPORT
11 AUTHORITY

12                SUPERIOR COURT OF THE STATE OF CALIFORNIA

13                           COUNTY OF SAN DIEGO

14

| | |
|---|---|
| JOSE HERNANDEZ, | CASE NO. GIC871979 |
| Plaintiff, | **DEFENDANT SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY'S AMENDED SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION** |
| v. | |
| SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY, a public entity; and DOES 1 through 12, inclusive, | |
| Defendants. | |

Date:              November 16, 2007
Time:              1:30 p.m.
Dept:              75
Judge:             Hon. Richard E. Strauss
Complaint Filed:   September 1, 2006
Trial Date:        January 4, 2008

**EXEMPT FROM FEES**
**GOVT. CODE § 6103**

25  TO PLAINTIFF JOSE HERNANDEZ AND HIS ATTORNEYS OF RECORD:

26      Defendant San Diego County Regional Airport Authority (hereinafter referred to as "the

27 Authority") submits the following <u>Amended</u> Separate Statement of Undisputed Material Facts in

28

AMENDED SEPARATE STATEMENT IN            1
SUPPORT OF SUMMARY JUDGMENT MOTION

55-617

support of its Motion for Summary Judgment as to plaintiff Jose Hernandez' Second Amended Complaint:

| Undisputed Material Fact | Evidence |
|---|---|
| 1.  Jose Hernandez became the Director of Landside Operations for defendant San Diego County Regional Airport Authority (the "Authority") on or about October 2003. | Hernandez Depo. 93:16-25 and 114:25-115:14 [Exh. 1].  Exhibit 16. |
| 2.  Article 2, Part 2.0, Section 2.10(b) of the Authority's Ethics Code provides in part:<br><br>Restrictions on Benefits<br><br>(1) No Board member or employee of the Authority shall request a benefit from any person or entity or accept any benefit intended to influence official duties.<br><br>(2) No Board member or employee of the Authority shall accept anything of value from anyone, other than the Authority or another Board member or employee, for doing his or her job.<br><br>(3) No Board member or employee of the Authority shall accept benefits aggregating more than one-half (1/2) the amount of gifts permitted under the California Political Reform Act in any calendar year from any single source:<br><br>(A)      That the Board member or employee knows or should know is doing business with the Authority or intends to do business with the Authority or has done business with the Authority during the previous 12 months; or<br><br>(B)      That the Board member or employee knows or should know has or is seeking a license, permit, grant or benefit from the Authority; or<br><br>(C)      That the Board member or employee knows or should know is an agent (whether compensated or not) of any person or entity described in Subsections (A) or (B) | Exhibit 3, pp. 12-13. |
| 3.  In approximately October or November | Bowens Dec. p. 2, lines 7-19 (hereinafter noted |

AMENDED SEPARATE STATEMENT IN
SUPPORT OF SUMMARY JUDGMENT MOTION

2

55-618

| | | |
|---|---|---|
| 1<br>2<br>3 | 2005, two Authority employees advised Thella Bowens that they believed that Hernandez was behaving unethically and receiving benefits from the Authority's vendors. | as "Page:Line Numbers") |
| 4<br>5<br>6<br>7 | 4. In November 2005, Bowens asked the Authority's Vice President of Administration, Jeffrey Woodson, to have an outside investigator conduct an investigation into the allegations that Hernandez had received benefits from the Authority's vendors. | Woodson Dec. 2:5-8; Bowens Dec. 2:20-22 |
| 8<br>9<br>10<br>11 | 5. Woodson approved the retention of Luce, Forward, Hamilton & Scripps ("Luce Forward") to conduct an investigation into the allegations made regarding Hernandez receiving benefits from the Authority's vendors. | Swan Dec. 2:9-12; Woodson Dec. 2:9-13 |
| 12<br>13<br>14 | 6. Edward Patrick Swan, Jr. of Luce Forward conducted an investigation, with assistance from John Gamberzky, regarding the allegations that Hernandez received benefits from the Authority's vendors. | Swan Dec. 3:1-10. |
| 15<br>16<br>17<br>18 | 7. Hernandez admits that he received four non-revenue tickets from Hawaiian Airlines in 2004, and that he knew Hawaiian Airlines was doing business with the Authority at the time he received the tickets. | Swan Dec. 3:11-12; Hernandez Depo. 198:8-200:17 and 280:1-14 [Exh. 1] |
| 19<br>20<br>21 | 8. Hernandez admits that he received at least two buddy passes from Southwest Airlines in 2004 for his children, and that he knew Southwest Airlines was doing business with the Authority at the time he received the tickets. | Hernandez Depo. 191:8-20 and 281:6-12 [Exh. 1]. |
| 22<br>23<br>24<br>25<br>26 | 9. Mr. Swan concluded in his investigation that there was sufficient evidence that Hernandez had accepted benefits from Authority vendors and contractors. He also concluded that there was sufficient evidence that Hernandez had violated Section 2.10 of the Authority's Ethics Code. | Swan Dec. 4:6-14; Exhibit 4, pp. 2 and 20-21; Exh. 3, pp. 12-13. |
| 27<br>28 | 10. Mr. Swan prepared a written report of his findings and sent them to Thella Bowens on or about January 19, 2006. | Swan Dec. 3:25-4:2; Exhibit 4 |

| 11. After reviewing the findings contained in Mr. Swan's January 19, 2006 report, and upon the recommendation of Jeffrey Woodson and the Authority's Director of Human Resources, Diane Richards, Bowens determined that Hernandez' employment should be terminated because it appeared that he had accepted benefits in violation of Section 2.10 of the Authority's Ethics Code. | Bowens Dec. 3:1-10; Exh. 3, pp. 12-13 [Ethics Code]; Woodson Dec. 2:25-3:4 |
|---|---|
| 12. Hernandez alleges that he was advised to keep the investigation confidential. | Hernandez 840:12-15 [Exh. 2]; Second Amended Complaint p. 11, lines 26-28. |

In the alternative, the Authority submits the following Separate Statement of Undisputed Material Facts in Support of Its Motion for Summary Adjudication in regards to each cause of action and claim in plaintiff Jose Hernandez' Second Amended Complaint:

**Adjudication No. 1:  Hernandez' First Cause of Action fails as a matter of law because the Authority's Codes are not a Federal or State law, rule or regulation.**

| Undisputed Material Fact | Evidence |
|---|---|
| 13. The Second Amended Complaint alleges that Hernandez disclosed violations of the Authority's Codes. | Second Amended Complaint 7:26-27; 8:17-19; 9:7-8; 10:11-14 |
| 14. The Authority's Code contains administrative, regulatory and revenue ordinances of the San Diego County Regional Airport Authority. | Exhibit 7 [Section 1.01 (a)] of the Authority's code |
| 15. The Authority is a local government entity. | Public Utilities Code section 170002 |

**Adjudication No. 2:  Hernandez' First Cause of Action fails as a matter of law because Hernandez could not have had a reasonable belief that he was disclosing activity made unlawful by a federal or state law, rule or regulation.**

| Undisputed Material Fact | Evidence |
|---|---|
| 16. Hernandez alleges that he disclosed that | Hernandez Depo. 393:6-17 [Exh. 1]. |

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

AMENDED SEPARATE STATEMENT IN
SUPPORT OF SUMMARY JUDGMENT MOTION

4

| | |
|---|---|
| the Authority overpaid for the General Dynamics Lease.[1] | |
| 17. The terms of the General Dynamics Lease are set by statute. | See Public Utilities Code section 170056(f)(1); Hernandez Depo. 391:14-392:24 and 397:8-11 [Exh. 1]. |
| 18. Hernandez alleges that he disclosed that the Authority overpaid for the Teledyne Ryan lease. | Hernandez Depo. 410:3-11 and 408:3-25 [Exh. 1]. |
| 19. Hernandez alleges that he disclosed that unless the Authority received space from Host, it would not be able to comply with the ADA regulations on the restroom project, and thus the project was held up. | Hernandez Depo. 343:16-344:4 and 357:10-358:6 [Exh. 1] |
| 20. Hernandez alleges that he disclosed that LPi underbid the Authority and that LPi double-billed workers' compensation. | Hernandez Depo. 521:3-20 [Exh. 1] |

**Adjudication No. 3:  Hernandez' First Cause of Action fails as a matter of law because there is no causal connection between Hernandez' alleged protected activities and his termination because the disclosures were too remote in time.**

| Undisputed Material Fact | Evidence |
|---|---|
| 21. Hernandez first made the disclosure regarding the restroom project in 2003 or 2004. | Hernandez Depo. 357:19-24 [Exh. 1]. |
| 22. Hernandez first made the disclosure regarding the General Dynamics Lease in approximately 2003. | Hernandez 393:1-24 [made the disclosure prior to the ratification of the lease]; Hernandez 396:9-16 [original discussions were as the terms of the agreement were being discussed with the Port]; Hernandez 386:18-22 [General Dynamics' lease was negotiated around the time that the Authority split from the Port] |
| 23. Hernandez first made the disclosure regarding the Teledyne Ryan Lease in late 2003 or 2004. | Hernandez 410:3-16 [Hernandez disclosed to Sexton immediately as they began to make the designs for the SAN Park project]; Hernandez 408:3-14 [developed the design documents for the SAN Park project in late 2003 or 2004] |

---

[1] The Authority does not admit that Hernandez made any disclosures, or that he engaged in any protected activities.  However, for purposes of this motion only, the Authority will not dispute the content of Hernandez' alleged disclosures as set forth in any admissible evidence contained in Hernandez' deposition.

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

AMENDED SEPARATE STATEMENT IN
SUPPORT OF SUMMARY JUDGMENT MOTION

5

| Undisputed Material Fact | Evidence |
|---|---|
| 24. Hernandez first made the disclosure regarding LPi's expenses in 2004. | Hernandez 493:24-495:15 [Hernandez made his first disclosure at the three-month or six-month submittal]; Sexton Dec. 3:15-17 [the LPi contract began in January 2004] |
| 25. The investigation into alleged benefits received by Hernandez began in approximately November 2005. | Bowens Dec. 2:7-22; Woodson Dec. 2:5-8. |
| 26. Hernandez' employment with the Authority ended in February 2006. | Hernandez Depo. 114:19-24 [Exh. 1]. |

**Adjudication No. 4:** Hernandez' First Cause of Action fails as a matter of law because there is no causal connection between Hernandez' alleged protected activities and his termination because the decisionmaker was not aware of the protected activities.

| Undisputed Material Fact | Evidence |
|---|---|
| 27. Thella Bowens made the decision to terminate Hernandez' employment. | Bowens Dec. 3:1-10 |
| 28. Bowens was unaware of any of Hernandez' alleged protected activities. | Bowens Dec. 3:18-4:8 |

**Adjudication No. 5:** Hernandez' First Cause of Action fails as a matter of law because the Authority had a legitimate non-retaliatory business reason for terminating Hernandez' employment.

| Undisputed Material Fact | Evidence |
|---|---|
| 29. Jose Hernandez became the Director of Landside Operations for defendant San Diego County Regional Airport Authority (the "Authority") on or about October 2003. | Hernandez Depo. 93:16-25 and 114:25-115:14 [Exh. 1]. Exhibit 16. |
| 30. Article 2, Part 2.0, Section 2.10(b) of the Authority's Ethics Code provides in part:<br><br>Restrictions on Benefits<br><br>(1) No Board member or employee of the Authority shall request a benefit from any person or entity or accept any benefit intended to influence official duties.<br><br>(2) No Board member or employee of the Authority shall accept anything of value from anyone, other than the Authority or | Exhibit 3, pp. 12-13. |

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

AMENDED SEPARATE STATEMENT IN
SUPPORT OF SUMMARY JUDGMENT MOTION

6

| | |
|---|---|
| another Board member or employee, for doing his or her job.<br><br>(3) No Board member or employee of the Authority shall accept benefits aggregating more than one-half (1/2) the amount of gifts permitted under the California Political Reform Act in any calendar year from any single source:<br><br>    (A)    That the Board member or employee knows or should know is doing business with the Authority or intends to do business with the Authority or has done business with the Authority during the previous 12 months; or<br><br>    (B)    That the Board member or employee knows or should know has or is seeking a license, permit, grant or benefit from the Authority; or<br><br>    (C)    That the Board member or employee knows or should know is an agent (whether compensated or not) of any person or entity described in Subsections (A) or (B) | |
| 31. In approximately October or November 2005, two Authority employees advised Thella Bowens that they believed that Hernandez was behaving unethically and receiving benefits from the Authority's vendors. | Bowens Dec. p. 2, lines 7-19 (hereinafter noted as "Page:Line Numbers") |
| 32. In November 2005, Bowens asked the Authority's Vice President of Administration, Jeffrey Woodson, to have an outside investigator conduct an investigation into the allegations that Hernandez had received benefits from the Authority's vendors. | Woodson Dec. 2:5-8; Bowens Dec. 2:20-22 |
| 33. Woodson approved the retention of Luce, Forward, Hamilton & Scripps ("Luce Forward") to conduct an investigation into the allegations made regarding Hernandez receiving benefits from the Authority's vendors. | Swan Dec. 2:9-12; Woodson Dec. 2:9-13 |
| 34. Edward Patrick Swan, Jr. of Luce Forward conducted an investigation, with assistance from John Gamberzky, regarding the allegations that Hernandez | Swan Dec. 3:1-10. |

| | |
|---|---|
| received benefits from the Authority's vendors. | |
| 35. Hernandez admits that he received four non-revenue tickets from Hawaiian Airlines in 2004, and that he knew Hawaiian Airlines was doing business with the Authority at the time he received the tickets. | Swan Dec. 3:11-12; Hernandez Depo. 198:8-200:17 and 280:1-14 [Exh. 1] |
| 36. Hernandez admits that he received at least two buddy passes from Southwest Airlines in 2004 for his children, and that he knew Southwest Airlines was doing business with the Authority at the time he received the tickets. | Hernandez Depo. 191:8-20 and 281:6-12 [Exh. 1]. |
| 37. Mr. Swan concluded in his investigation that there was sufficient evidence that Hernandez had accepted benefits from Authority vendors and contractors. He also concluded that there was sufficient evidence that Hernandez had violated Section 2.10 of the Authority's Ethics Code. | Swan Dec. 4:6-14; Exhibit 4, pp. 2 and 20-21; Exh. 3, pp. 12-13. |
| 38. Mr. Swan prepared a written report of his findings and sent them to Thella Bowens on or about January 19, 2006. | Swan Dec. 3:25-4:2; Exhibit 4 |
| 39. After reviewing the findings contained in Mr. Swan's January 19, 2006 report, and upon the recommendation of Jeffrey Woodson and the Authority's Director of Human Resources, Diane Richards, Bowens determined that Hernandez' employment should be terminated because it appeared that he had accepted benefits in violation of Section 2.10 of the Authority's Ethics Code. | Bowens Dec. 3:1-10; Exh. 3, pp. 12-13 [Ethics Code]; Woodson Dec. 2:25-3:4 |

**Adjudication No. 6: Hernandez' First Cause of Action fails as a matter of law because he has no evidence of pretext.**

| Undisputed Material Fact | Evidence |
|---|---|
| 40. Jose Hernandez became the Director of Landside Operations for defendant San Diego County Regional Airport Authority (the "Authority") on or about October 2003. | Hernandez Depo. 93:16-25 and 114:25-115:14 [Exh. 1]. Exhibit 16. |

55-624

| | |
|---|---|
| 41. Article 2, Part 2.0, Section 2.10(b) of the Authority's Ethics Code provides in part:<br><br>Restrictions on Benefits<br><br>(1) No Board member or employee of the Authority shall request a benefit from any person or entity or accept any benefit intended to influence official duties.<br><br>(2) No Board member or employee of the Authority shall accept anything of value from anyone, other than the Authority or another Board member or employee, for doing his or her job.<br><br>(3) No Board member or employee of the Authority shall accept benefits aggregating more than one-half (1/2) the amount of gifts permitted under the California Political Reform Act in any calendar year from any single source:<br><br>    (A)    That the Board member or employee knows or should know is doing business with the Authority or intends to do business with the Authority or has done business with the Authority during the previous 12 months; or<br><br>    (B)    That the Board member or employee knows or should know has or is seeking a license, permit, grant or benefit from the Authority; or<br><br>    (C)    That the Board member or employee knows or should know is an agent (whether compensated or not) of any person or entity described in Subsections (A) or (B) | Exhibit 3, pp. 12-13. |
| 42. In approximately October or November 2005, two Authority employees advised Thella Bowens that they believed that Hernandez was behaving unethically and receiving benefits from the Authority's vendors. | Bowens Dec. p. 2, lines 7-19 (hereinafter noted as "Page:Line Numbers") |
| 43. In November 2005, Bowens asked the Authority's Vice President of Administration, Jeffrey Woodson, to have an outside investigator conduct an investigation into the allegations that | Woodson Dec. 2:5-8; Bowens Dec. 2:20-22 |

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

AMENDED SEPARATE STATEMENT IN
SUPPORT OF SUMMARY JUDGMENT MOTION

9

55-625

| | |
|---|---|
| Hernandez had received benefits from the Authority's vendors. | |
| 44. Woodson approved the retention of Luce, Forward, Hamilton & Scripps ("Luce Forward") to conduct an investigation into the allegations made regarding Hernandez receiving benefits from the Authority's vendors. | Swan Dec. 2:9-12; Woodson Dec. 2:9-13 |
| 45. Edward Patrick Swan, Jr. of Luce Forward conducted an investigation, with assistance from John Gamberzky, regarding the allegations that Hernandez received benefits from the Authority's vendors. | Swan Dec. 3:1-10. |
| 46. Hernandez admits that he received four non-revenue tickets from Hawaiian Airlines in 2004, and that he knew Hawaiian Airlines was doing business with the Authority at the time he received the tickets. | Swan Dec. 3:11-12; Hernandez Depo. 198:8-200:17 and 280:1-14 [Exh. 1] |
| 47. Hernandez admits that he received at least two buddy passes from Southwest Airlines in 2004 for his children, and that he knew Southwest Airlines was doing business with the Authority at the time he received the tickets. | Hernandez Depo. 191:8-20 and 281:6-12 [Exh. 1]. |
| 48. Mr. Swan concluded in his investigation that there was sufficient evidence that Hernandez had accepted benefits from Authority vendors and contractors. He also concluded that there was sufficient evidence that Hernandez had violated Section 2.10 of the Authority's Ethics Code. | Swan Dec. 4:6-14; Exhibit 4, pp. 2 and 20-21; Exh. 3, pp. 12-13. |
| 49. Mr. Swan prepared a written report of his findings and sent them to Thella Bowens on or about January 19, 2006. | Swan Dec. 3:25-4:2; Exhibit 4 |
| 50. After reviewing the findings contained in Mr. Swan's January 19, 2006 report, and upon the recommendation of Jeffrey Woodson and the Authority's Director of Human Resources, Diane Richards, Bowens determined that Hernandez' employment should be terminated because it appeared that he had accepted benefits in violation of Section 2.10 of the Authority's Ethics Code. | Bowens Dec. 3:1-10; Exh. 3, pp. 12-13 [Ethics Code]; Woodson Dec. 2:25-3:4 |

AMENDED SEPARATE STATEMENT IN
SUPPORT OF SUMMARY JUDGMENT MOTION

10

55-626

**Adjudication No. 7:** Hernandez' First Cause of Action under Labor Code section 1102.5(a) fails as a matter of law because Hernandez has not identified a rule, regulation, or policy made, adopted or enforced by the Authority that prevents an employee from disclosing information to a governmental agency.

| Undisputed Material Fact | Evidence |
| --- | --- |
| 51. Hernandez alleges that he was advised to keep the investigation confidential. | Hernandez 840:12-15 [Exh. 2]; Second Amended Complaint p. 11, lines 26-28. |

**Adjudication No. 8:** Hernandez' First Cause of Action under Labor Code section 1102.5(a) fails as a matter of law because any instructions regarding confidentiality were made to implement the protection of the attorney-client privilege (See Labor Code section 1102.5(g)).

| Undisputed Material Fact | Evidence |
| --- | --- |
| 52. Mr. Swan advised Hernandez that he should keep the interview confidential because the investigation was an attorney-client privileged investigation. | Swan 2:26-28. |

**Adjudication No. 9:** Hernandez' First Cause of Action fails as a matter of law under Labor Code section 1102.5(c) because Hernandez did not refuse to participate in any unlawful activity

| Undisputed Material Fact | Evidence |
| --- | --- |
| 53. Hernandez did not refuse to participate in any activity because he thought it was unlawful or illegal. | Hernandez Depo. 891:5-15 [Exh. 1].) |

**Adjudication No. 10:** The Authority is immune from Hernandez' Labor Code section 1102.5 cause of action under Government Code section 821.6

| Undisputed Material Fact | Evidence |
| --- | --- |
| 54. Hernandez alleges harm in his Second Amended Complaint arising out of the Authority's investigation of his activities and his resulting termination. | See Second Amended Complaint generally, including paragraphs 23-30. |
| 55. In November 2005, Bowens asked the Authority's Vice President of Administration, Jeffrey Woodson, to have an outside investigator conduct an investigation into the allegations that Hernandez had received benefits from the Authority's vendors. | Woodson Dec. 2:5-8; Bowens Dec. 2:20-22 |

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

AMENDED SEPARATE STATEMENT IN
SUPPORT OF SUMMARY JUDGMENT MOTION

11

| | Undisputed Material Fact | Evidence |
|---|---|---|
| 56. | Woodson approved the retention of Luce, Forward, Hamilton & Scripps ("Luce Forward") to conduct an investigation into the allegations made regarding Hernandez receiving benefits from the Authority's vendors. | Swan Dec. 2:9-12; Woodson Dec. 2:9-13 |
| 57. | Edward Patrick Swan, Jr. of Luce Forward conducted an investigation, with assistance from John Gamberzky, regarding the allegations that Hernandez received benefits from the Authority's vendors. | Swan Dec. 3:1-10. |
| 58. | Mr. Swan concluded in his investigation that there was sufficient evidence that Hernandez had accepted benefits from Authority vendors and contractors. He also concluded that there was sufficient evidence that Hernandez had violated Section 2.10 of the Authority's Ethics Code. | Swan Dec. 4:6-14; Exhibit 4, pp. 2 and 20-21; Exh. 3, pp. 12-13. |
| 59. | Mr. Swan prepared a written report of his findings and sent them to Thella Bowens on or about January 19, 2006. | Swan Dec. 3:25-4:2; Exhibit 4 |
| 60. | After reviewing the findings contained in Mr. Swan's January 19, 2006 report, and upon the recommendation of Jeffrey Woodson and the Authority's Director of Human Resources, Diane Richards, Bowens determined that Hernandez' employment should be terminated because it appeared that he had accepted benefits in violation of Section 2.10 of the Authority's Ethics Code. | Bowens Dec. 3:1-10; Exh. 3, pp. 12-13 [Ethics Code]; Woodson Dec. 2:25-3:4 |

**Adjudication No. 11:  This court lacks jurisdiction over Hernandez' Labor Code section 1102.5 cause of action because he failed to exhaust his administrative remedies under Labor Code sections 98.6 and 98.7**

| Undisputed Material Fact | Evidence |
|---|---|
| 61.  Hernandez has not alleged that he filed a claim with the Labor Commissioner. | See Second Amended Complaint. |

PAUL, PLEVIN, SULLIVAN & CONNAUGHTON LLP

AMENDED SEPARATE STATEMENT IN
SUPPORT OF SUMMARY JUDGMENT MOTION

12

## GENERAL DYNAMICS DISCLOSURE:[2]

**Adjudication No. 12**: Hernandez' First Cause of Action under Labor Code section 1102.5, insofar as it is based on any alleged disclosure regarding the General Dynamics' lease, fails as a matter of law because Hernandez could not have had a reasonable belief that the General Dynamics' lease was unlawful.

| Undisputed Material Fact | Evidence |
| --- | --- |
| 62. Hernandez alleges that he disclosed that the Authority overpaid for the General Dynamics Lease. | Hernandez Depo. 393:6-17 [Exh. 1]. |
| 63. The terms of the General Dynamics Lease are set by statute. | See Public Utilities Code section 170056(f)(1); Hernandez Depo. 391:14-392:24 and 397:8-11 [Exh. 1]. |

**Adjudication No. 13**: Hernandez' First Cause of Action under Labor Code section 1102.5, insofar as it is based on any alleged disclosure regarding the General Dynamics' lease, fails as a matter of law because Hernandez has not identified a state or federal statute, rule or regulation of which he disclosed a violation.

| Undisputed Material Fact | Evidence |
| --- | --- |
| 64. Hernandez alleges that he disclosed that the Authority overpaid for the General Dynamics Lease. | Hernandez Depo. 393:6-17 [Exh. 1]. |
| 65. The terms of the General Dynamics Lease are set by statute. | See Public Utilities Code section 170056(f)(1); Hernandez Depo. 391:14-392:24 and 397:8-11 [Exh. 1]. |

**Adjudication No. 14**: Hernandez' First Cause of Action fails as matter of law, insofar as it is based on any alleged disclosure regarding the General Dynamics' lease, because there is no causal connection between his alleged protected activity and his termination.

| Undisputed Material Fact | Evidence |
| --- | --- |
| 66. Hernandez first made the disclosure regarding the General Dynamics Lease in | Hernandez 393:1-24 [made the disclosure prior to the ratification of the lease]; Hernandez |

---

[2] For summary adjudication purposes, separate allegedly wrongful acts give rise to separate causes of action - whether or not they are pleaded in the same or separate counts. (*Lillenthal & Fowler v. Superior Court* (1993) 12 Cal.App.4th 1848, 1854-1855.) Accordingly, a motion may be made and granted on the separate allegations - even if the pleader has chosen to combine the claim with other counts within the same numbered cause of action. (*Ibid.*) It is thus proper to adjudicate each of these "disclosures" separately. If the court grants any one of Adjudications 1 through 6 or 10 through 11, then the Court does not need to address Adjudications 12-24, which simply seek to separately adjudicate each alleged protected activity.

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

AMENDED SEPARATE STATEMENT IN
SUPPORT OF SUMMARY JUDGMENT MOTION

13

| | |
|---|---|
| approximately 2003. | 396:9-16 [original discussions were as the terms of the agreement were being discussed with the Port]; Hernandez 386:18-22 [General Dynamics' lease was negotiated around the time that the Authority split from the Port] |
| 67. Hernandez' employment with the Authority ended in February 2006. | Hernandez Depo. 114:19-24 [Exh. 1]. |
| 68. Thella Bowens made the decision to terminate Hernandez' employment. | Bowens Dec. 3:1-10 |

## TELEDYNE RYAN DISCLOSURE:

**Adjudication No. 15:**  Hernandez' First Cause of Action under Labor Code section 1102.5, insofar as it is based on any alleged disclosure regarding the Teledyne Ryan lease, fails as a matter of law because Hernandez could not have had a reasonable belief that the Teledyne Ryan lease was unlawful.

| Undisputed Material Fact | Evidence |
|---|---|
| 69. Hernandez alleges that he disclosed that the Authority overpaid for the Teledyne Ryan lease. | Hernandez Depo. 410:3-11 and 408:3-25 [Exh. 1]. |

**Adjudication No. 16:**  Hernandez' First Cause of Action under Labor Code section 1102.5, insofar as it is based on any alleged disclosure regarding the Teledyne Ryan lease, fails as a matter of law because Hernandez has not identified a state or federal statute, rule or regulation of which he disclosed a violation.

| Undisputed Material Fact | Evidence |
|---|---|
| 70. Hernandez alleges that he disclosed that the Authority overpaid for the Teledyne Ryan lease. | Hernandez Depo. 410:3-11 and 408:3-25 [Exh. 1]. |
| 71. The Authority's Code contains administrative, regulatory and revenue ordinances of the San Diego County Regional Airport Authority. | Exhibit 7 [Section 1.01 (a)] |
| 72. The Authority is a local government entity. | Public Utilities Code section 170002 |

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

AMENDED SEPARATE STATEMENT IN
SUPPORT OF SUMMARY JUDGMENT MOTION

14

55-630

**Adjudication No. 17**: Hernandez' First Cause of Action fails as matter of law, insofar as it is based on any alleged disclosure regarding the Teledyne Ryan lease, because there is no causal connection between his alleged protected activity and his termination.

| Undisputed Material Fact | Evidence |
|---|---|
| 73. At the time that the Authority entered into the lease on the Teledyne Ryan property, it was aware that there was contamination on the property. | Hernandez Depo. 406:4-24 [Exh. 1] |
| 74. Hernandez did not speak to anyone regarding the contamination on the property until after the Authority entered into the lease with regard to the Teledyne Ryan property. | Hernandez Depo. 406:25-408:2 [Exh. 1] |
| 75. Paul Manasjan also expressed dissatisfaction regarding the Teledyne Ryan Lease. | Hernandez Depo. 413:22-414:6 [Exh. 1] |
| 76. Paul Manasjan is still employed at the Authority. | Woodson Dec. 3:19-20. |
| 77. Hernandez first made the disclosure regarding the Teledyne Ryan Lease in late 2003 or 2004. | Hernandez 410:3-16 [Hernandez disclosed to Sexton immediately as they began to make the designs for the SAN Park project]; Hernandez 408:3-14 [developed the design documents for the SAN Park project in late 2003 or 2004] |
| 78. Hernandez' employment with the Authority ended in February 2006. | Hernandez Depo. 114:19-24 [Exh. 1]. |
| 79. Thella Bowens made the decision to terminate Hernandez' employment. | Bowens Dec. 3:1-10 |

## RESTROOM PROJECT DISCLOSURE:

**Adjudication No. 18**: Hernandez' First Cause of Action under Labor Code section 1102.5, insofar as it is based on any alleged disclosure regarding the restroom project, fails as a matter of law because Hernandez could not have had a reasonable belief that the restroom project was unlawful.

| Undisputed Material Fact | Evidence |
|---|---|
| 80. Hernandez alleges that he disclosed that unless the Authority received space from Host, it would not be able to comply with the ADA regulations on the restroom project, and thus the project was held up. | Hernandez Depo. 343:16-344:4 and 357:10-358:6 [Exh. 1] |

PAUL, PLEVIN, SULLIVAN & CONNAUGHTON LLP

AMENDED SEPARATE STATEMENT IN SUPPORT OF SUMMARY JUDGMENT MOTION

15

55-631

**Adjudication No. 19:** Hernandez' First Cause of Action under Labor Code section 1102.5, insofar as it is based on any alleged disclosure regarding the restroom project, fails as a matter of law because Hernandez admits that the Authority did not violate the ADA, nor did it express its intention to violate the ADA.

| Undisputed Material Fact | Evidence |
|---|---|
| 81. The Authority never indicated that it did not want to comply with the ADA, nor did the Authority at any time violate the ADA. | Hernandez 366:12-367:21; 371:15-372:22. |

**Adjudication No. 20:** Hernandez' First Cause of Action under Labor Code section 1102.5, insofar as it is based on any alleged disclosure regarding the restroom project, fails as a matter of law because Hernandez has not identified a state or federal statute, rule or regulation of which he disclosed a violation.

| Undisputed Material Fact | Evidence |
|---|---|
| 82. Hernandez alleges that he disclosed that unless the Authority received space from Host, it would not be able to comply with the ADA regulations on the restroom project, and thus the project was held up. | Hernandez Depo. 343:16-344:4 and 357:10-358:6 [Exh. 1] |
| 83. The Authority's Code contains administrative, regulatory and revenue ordinances of the San Diego County Regional Airport Authority. | Exhibit 7 [Section 1.01 (a)] |
| 84. The Authority is a local government entity. | Public Utilities Code section 170002 |

**Adjudication No. 21:** Hernandez' First Cause of Action, insofar as it is based on any alleged disclosure regarding the restroom project, fails as matter of law because there is no causal connection between his alleged protected activity and his termination.

| Undisputed Material Fact | Evidence |
|---|---|
| 85. Hernandez first made the disclosure regarding the restroom project in 2003 or 2004. | Hernandez Depo. 357:19-24 [Exh. 1]. |
| 86. Parsons first raised the issue regarding the necessity of taking the 30 square feet of space in 2002. | Hernandez Depo. 347:16-348:3 [Exh. 1] |
| 87. The investigation into alleged benefits received by Hernandez began in approximately November 2005. | Bowens Dec. 2:7-22; Woodson Dec. 2:5-8. |

| 88. Hernandez' employment with the Authority ended in February 2006. | Hernandez Depo. 114:19-24 [Exh. 1]. |
| 89. Thella Bowens made the decision to terminate Hernandez' employment. | Bowens Dec. 3:1-10 |

### LPI DISCLOSURE

**Adjudication No. 22:**  Hernandez' First Cause of Action under Labor Code section 1102.5, insofar as it is based on any alleged disclosure regarding LPi, fails as a matter of law because Hernandez could not have had a reasonable belief that he disclosed unlawful acts.

| Undisputed Material Fact | Evidence |
|---|---|
| 90. Hernandez alleges that he disclosed that LPi underbid the Authority and that LPi double-billed workers' compensation. | Hernandez Depo. 521:3-20 [Exh. 1] |

**Adjudication No. 23:**  Hernandez' First Cause of Action under Labor Code section 1102.5, insofar as it is based on any alleged disclosure regarding LPi, fails as a matter of law because Hernandez has not identified a state or federal statute, rule or regulation of which he disclosed a violation.

| Undisputed Material Fact | Evidence |
|---|---|
| 91. The Second Amended Complaint alleges that Hernandez disclosed violations of the Authority's Codes. | Second Amended Complaint 7:26-27; 8:17-19; 9:7-8; 10:11-14 |
| 92. The Authority's Code contains administrative, regulatory and revenue ordinances of the San Diego County Regional Airport Authority. | Exhibit 7 [Section 1.01 (a)] |
| 93. The Authority is a local government entity. | Public Utilities Code section 170002 |

**Adjudication No. 24:**  Hernandez' First Cause of Action fails as matter of law, insofar as it is based on any alleged disclosure regarding LPi, because there is no causal connection between his alleged protected activity and his termination.

| Undisputed Material Fact | Evidence |
|---|---|
| 94. Hernandez first made the disclosure regarding LPi's expenses in 2004. | Hernandez 493:24-495:15 [Hernandez made his first disclosure at the three-month or six-month submittal]; Sexton Dec. 3:15-17 [the LPi contract began in January 2004] |

| 95. The investigation into alleged benefits received by Hernandez began in approximately November 2005. | Bowens Dec. 2:7-22; Woodson Dec. 2:5-8. |
|---|---|
| 96. Hernandez' employment with the Authority ended in February 2006. | Hernandez Depo. 114:19-24 [Exh. 1]. |
| 97. Thella Bowens made the decision to terminate Hernandez' employment. | Bowens Dec. 3:1-10 |

Dated: September 7, 2007

PAUL, PLEVIN, SULLIVAN & CONNAUGHTON LLP

By: *Sandra L. McDonough*

    FRED M. PLEVIN
    SANDRA L. MCDONOUGH
    ALBERT R. LIMBERG
    Attorneys for Defendant
    SAN DIEGO COUNTY REGIONAL
    AIRPORT AUTHORITY

55-634

**EXHIBIT 56**

Cathryn Chinn, Esq. (State Bar 93340)
1901 First Avenue, Suite 400
San Diego, California 92101
Telephone (619) 234-9000
Facsimile (619) 699-1159

Attorney for Plaintiff
JOSE HERNANDEZ

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SAN DIEGO, CENTRAL BRANCH, GENERAL UNLIMITED

| | |
|---|---|
| JOSE HERNANDEZ, | Case No. : GIC 871979 |
| Plaintiff, | PLAINTIFF JOSE HERNANDEZ' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION |
| v. | |
| SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY, a public entity and DOES 1 through 12, Inclusive, | |
| Defendants. | |

DATE:        November 16, 2007
TIME:         1:30 p.m.
DEPT.:        75
JUDGE:      HON. RICHARD E. STRAUSS
ACTION FILED:    9/1/06
TRIAL DATE:      1/4/08

///
///
///
///
///
///
///
///

PL'S MEMO OF P'S&A'S IN OPPOS. TO DEF SDCRAA'S MSJ OR SUMM. ADJUD.

56-635

# **TABLE OF CONTENTS**

I.    INTRODUCTION ......................................................... 1

II.   OBJECTION ............................................................ 1

III.  STATEMENT OF FACTS ................................................. 2

IV.   ARGUMENT ............................................................ 7

      A.    An Employee's Notice Obligation in a Public Policy
            Termination Does Not Require His Articulation of
            the Specific Law ............................................... 7

      B.    The Policy of the State of California Requires Diligent
            Conservation and Precludes the Gift of Public Funds ............ 8

            1.    The California Constitution ............................... 8

            2.    General Legislative Enactments --
                  Pen. Code § 424 and Govt. Code § 822 ..................... 9

            3.    State-Enabling Legislation for the Airport Authority ..... 10

      C.    There is Substantial Evidence to Support the Existence of
            a Causal Relationship Between Hernandez/ Complaints and
            His Termination .............................................. 13

      D.    Defendant Airport Authority Has No. Technical Defenses ........ 15

            1.    Immunity ................................................ 15

            2.    Failure to Exhaust Administrative Remedies .............. 16

V.    CONCLUSION .......................................................... 18

## TABLE OF AUTHORITIES

**STATUTES**

CIVIL CODE

    1689 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

CODE OF CIVIL PROCEDURE

    437c(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

GOVERNMENT CODE

    820.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    821.6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

    822 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

    8314 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    12940 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    12940(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    19683 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

LABOR CODE

    98.7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

    987.6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    1100 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    1102.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 16, 17, 18

    1102.5(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

PENAL CODE

    424 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

PUBLIC CONTRACT CODE

    100(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

PUBLIC UTILITIES CODE

    170000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

56-637

**TABLE OF AUTHORITIES** (Continued)

PUBLIC UTILITIES CODE (Continued)

170056 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

170056(a)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

170056(f)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

170056(f)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

170056(f)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

170056(f)(1-3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

170062 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

170062(E) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

170064(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

170064 (c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11


**CALIFORNIA CASES**

*Caldwell v. Montoya*

(1995) 10 Cal. 4th 972 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*California Fair Employment and Housing v. California Court of Appeal*

(2004) 122 Cal. App. 4th 1004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Campbell v. Regents of the Univ. of Cal.*

(2005) 35 Cal. 4th 311 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Common Cause v. Board of Supervisors*

(1989) 49 Cal.3d 432 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Flait v. North American Watch*

(1992) 3 Cal. App. 4th 467 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Gantt v. Sentry Insurance Co.*

(1992) 1 Cal.4th 1083 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Green v. Ralee Engineering*

(1998) 19 Cal.4th 66 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

PL'S MEMO OF P'S&A'S IN OPPOS. TO DEF SDCRAA'S MSJ OR SUMM. ADJUD.

- iii -

56-638




**TABLE OF AUTHORITIES** (Continued)

**CALIFORNIA CASES** (Continued)

*Kemmerer v. County of Fresno*

    (1988) 200 Cal.App.3d 1426 ............................................... 15

*Leibert v. Transworld Systems, Inc.*

    (1995) 32 Cal. App. 4th 1693 ............................................... 17

*Sequoia Ins. Co. v. Superior Court*

    (1993) 13 Cal.App.4th 1472 ................................................. 7

*Shoemaker v. Myers*

    (1992) 2 Cal. App. 4th 1407 ............................................. 15, 16

*Stanson v. Mott*

    (1976) 17 Cal.3d 206 ...................................................... 9

*Stevenson v. Superior Court*

    (1997) 16 Cal.4th 880 ..................................................... 7

*Summers v. City of Cathedra City*

    (1990) 225 Cal. App. 3d 1047 ............................................. 15

*Tribe v. Donaldson*

    (June 2007) CA-APP3, CO519O2 ......................................... 16

**FEDERAL CASES**

*Neveau v. City of Fresno*

    (2005) 392 F.Supp. 2d 1159 .............................................. 17

*Paterson v. Cal. Dep't of Gen. Servs.*

    2007 U.S. Dist. LEXIS 25957 (E.D. Cal. Mar. 8, 2007) ...................... 17

**OTHER**

Authority's Contracting and Debarment Code, Art. 5, § 5.11(a)(3)-(6)(8) ................ 10

Authority's Contracting and Debarment Code, Art. 5, § 5.18(a) ........................ 10

California Constitution, Article XVI, § 6 ........................................... 8

PL'S MEMO OF P'S&A'S IN OPPOS. TO DEF SDCRAA'S MSJ OR SUMM. ADJUD.

- iv -

56-639

**I.**

## INTRODUCTION

Over a period of time Plaintiff Jose Hernandez persistently complained that the public was being ripped-off to the tune of tens of millions of dollars. He complained to his boss, Ted Sexton (Vice-President of Operations), of fraudulent disclosures in property leases and contracts affecting the financial viability of the San Diego County International Airport. He last complained the Airport was being bilked by a friend of the Authority's CEO (Thella Bowens) on a parking management contract with a company named Lindbergh Parking Incorporated (LPI). He placed that company on a 90-day notice to explain what appeared to be improper charges for its services. Within 30 days, Bowens hired a San Diego law firm to assemble a case for Hernandez' termination.

In this motion Defendant advances the argument that there is no public policy which favors the conservation of public funds. If Defendant is correct, as trustee of the San Diego Airport it has no legal obligation whatsoever to shield the public treasury from waste and wilful misappropriation. Defendant further contends that because there is no such obligation, it was entitled, as a matter of law, to terminate Hernandez' employment for the exposure of such waste and misappropriation. Defendant's position is essentially self-refuting. This response will enumerate the constitutional and statutory authority supportive of a policy against the wilful and/or negligent waste of public resources.

**II.**

## OBJECTION

Plaintiff hereby objects to the format of the portion of this motion identified as a "summary adjudication." Section 437c(f) of the California Code of Civil Procedure allows for summary adjudication only as to "causes of action" or "affirmative defenses" and precludes the adjudication of issues which make up less than an entire claim or defense. Therefore, the characterization of "issues" for summary adjudication is done in error. The points raised do not and cannot constitute an adjudication unless the Court's determination reaches the entire cause of action. As noted in Hernandez' objection to the Airport's Separate Statement, the issues proposed are not more than argumentative statements, and may not be responded to except be way of argument. Defendant's

56-640

choice in structuring the motion in this way has made it awkward in responding to its Separate

1  Statement, and has required the generation of cumbersome responsive documentation significantly

2  in excess of what should have been necessary.

3  ### III.

4  ### STATEMENT OF FACTS

5      Defendant San Diego County Regional Airport Authority (Authority) was created in 2003

6  by the California Legislature. [Exh. A] Prior to 2003, the operations of the Airport were managed

7  by the San Diego Port District (Port), which also retained the revenues generated through the

8  operation of the Airport facilities and properties. [Exh. A] The Authority formation involved the

9  creation of a board of directors and the appointment of an executive committed designed to establish

10 the independence of the authority and its accountability to the public as public agency. [Exh. A].

11 Thella Bowens--who had once served as an employee of the Port--was appointed to the position of

12 CEO/president director of the Authority. [Exh. A]

13      Plaintiff Jose Hernandez was hired in March 2001 as manager of ground transportation. In

14 2003 he became director of landside operations. His responsibilities included management of airport

15 parking and terminal facilities and development and adherence to a budget for the operation of those

16 facilities. He worked within a budget dictated by anticipated revenues from the management of

17 Airport properties and facilities. Hernandez reported directly to Theodore Sexton, Vice-President

18 of Operations, who reported to Thella Bowens. Bryan Enarson, Vice-President of Development, was

19 a close confidant of Thella Bowens', and the lead negotiator on land lease contracts made with

20 General Dynamics and Teledyne Ryan. [Plaintiff's Separate Statement of Additional Undisputed

21 Material Facts (hereinafter "SAF") Nos. 1-3]

22      One of Hernandez' duties was the performance of the revenue forecasts associated with a

23 lease from the Port of property located on the north side of the Airport (General Dynamics property).

24 The lease price contemplated the use of the property for parking and revenues which would generate

25 to the lease holder for 2100 stalls. [SAF No. 5] Hernandez' understanding of the lease was that the

26 lease price was set by code for the years 2003, 2004 and 2005, and was thereafter subject to

27 renegotiation. [SAF No. 6; California Public Utilities Code ("PUC") § 170056(f)(1-3)] Hernandez

28 conducted an evaluation of the cash flow of the property when the lease came up for renegotiation

PL'S MEMO OF P'S&A'S IN OPPOS. TO DEF SDCRAA'S MSJ OR SUMM. ADJUD.

- 2 -

and determined that deficiencies in the property prevented from generating sufficient revenue to

1  cover the lease price by at least $2 million per year.  The deficiency centered on the discovery of

2  benzine contamination in the soil beneath the property which severely limited the development of

3  the property for parking.  [SAF No. 7]  Hernandez communicated the deficiency in the property to

4  Sexton and Bowens, and that the continuation of the lease at its existing rate would amount to a gift

5  of public money to the Port.  [SAF Nos. 8, 57, 59, 60]

6       Sexton and Bowens refused to renegotiate the terms of the lease.  Sexton, then speaking on

7  Bowens' behalf, justified the lease amount by stating, "that's just the price of freedom that Thella

8  was willing to pay." [SAF Nos. 9, 58]

9       Another of Hernandez' duties was the performance of revenue forecasts associated with the

10  evaluation of a lease from the Port of property located at the west side of the Airport (the Teledyne

11  Ryan property).  The lease of that property likewise contemplated the generation of revenues to cover

12  the lease through its use as a parking lot.  The lease had been negotiated by Enarson and was not

13  subject to renegotiation.   [SAF No. 10]  Hernandez discovered this property was likewise

14  contaminated and only a small portion of it was usable.  [SAF No. 11]  The contamination was

15  grossly understated by the Port as a $10 million expense (which the Port agreed to pay) when the real

16  cost of remediation was in excess of $30 million.  [SAF Nos. 12, 61, 65]  Hernandez then informed

17  Sexton, Enarson and Bowens that the lease constituted an unwarranted expenditure of public money

18  to the Port of over $3 million per year.  [SAF Nos. 13, 63, 64, 67][1]

19       Another of Hernandez' duties was to oversee the construction and/or maintenance of public

20  facilities at the terminals, including public restrooms.  Hernandez attempted to expand the size of

21  the public restrooms to alleviate overcrowding in the east terminal and bring them into compliance

22  with the federal requirements that they be accessible by wheelchair, as required by the Americans

23  with Disabilities Act (ADA).  [SAF No. 14]  He needed to annex 30 sq. ft. space from a

24  concessionaire in order to comply with ADA requirements, but was told he could not do so by

25  Enarson because Enarson had made handshake agreements with the concessionaires.  [SAF No. 15]

26

27

28

---

[1] Today that property is used for only 350 parking spaces for which the Authority pays the $3 million.  The property will not be remediated by 2010; it won't happen.  It will not be remediated in whole by 2010.  [SAF No.66]

PL'S MEMO OF P'S&A'S IN OPPOS. TO DEF SDCRAA'S MSJ OR SUMM. ADJUD.

- 3 -

**56-642**

He told Sexton, Enarson and Bowens that he did not believe Enarson had the authority to enter into

1   such agreements with the concessionaires, and that Enarson's enforcement of the agreements

2   constituted a gift to the concessionaires. [SAF No. 16]  The necessary improvements were never

3   made.[2]

4          Another of Hernandez' duties was to help negotiate and monitor contracts for the

5   management of parking services. The low bidder (based on "projected" reimbursable expenses) on

6   a contract to manage the Airport's parking lots was Lindbergh Parking Incorporated (LPI). [SAF

7   No. 17] Its bid was so low that Hernandez–whose job included management of Authority–suspected

8   the bid was insincere. He thereafter closely monitored the performance of the contract and noted LPI

9   was overcharging the Authority approximately $1 million to 1.5 million per year. This estimate was

10  based, among other things, on the fact that (1) LPI did not lease new shuttle transportation vehicles

11  as stated in its bid (but instead used older shuttles owned by LPI); (2) LPI was seeking

12  reimbursement for an unnecessary management position (owner/manager being paid for management

13  work he did not perform); and (3) LPI was double-billing the Authority for workers' compensation

14  insurance. [SAF Nos. 18, 68, 69, 70]

15         Hernandez reported these overcharges to Sexton, Enarson and Bowens, and placed LPI on

16  a 90-day timetable to explain and justify all the expenses. He informed Sexton, Enarson and Bowens

17  that the LPI contract constituted an unwarranted expenditure of public money to LPI. [SAF Nos. 19,

18  71, 72] The negotiating agent on behalf of LPI–Elizabeth Stump-Moore–was, however, a close

19  personal friend of Bowens'. [SAF No. 20]

20         Within a month of being told LPI could not justify or explain its expenditures, Bowens

21  engaged a law firm to investigate Hernandez for "ethics" violations associated with the receipt of

22  benefits from the Authority's vendors. This was the first occasion in the history of the Authority that

23  a law firm was retained to investigate an employee for alleged ethics violations. [SAF No. 21] The

24

25         ────────────────
          [2] The restroom project was stalled from 2002 through 2005 because V.P. Bryan Enarson was unwilling to
26  request the redaction of 30 sq. ft. from Host. It still hasn't been built. It was V.P. Enarson's unwillingness to take that
    space away that made it impossible for the Authority to comply with ADA requirements of a 2% grade from the floor.
27  up to the restrooms and then landing requirements. Hernandez raised the ADA issues with Sexton. He briefed it time
    and time and time again to Ted, sometimes on a daily, sometimes on a weekly, basis. Hernandez raised the ADA issue
28  with Sexton because it was his number one priority. He raised the issue with Ted 50 to 100 times over a two-year period.
    Sexton was afraid to bring up the issue to Bryan Enarson. He just didn't want to deal with him. [SAF Nos. 53-56]

                    PL'S MEMO OF P'S&A'S IN OPPOS. TO DEF SDCRAA'S MSJ OR SUMM. ADJUD.
                                                    - 4 -

56-643

law firm, per report submitted by Patrick Swan, Esq., concluded Hernandez received (1) free rounds

1   of golf; (2) airline tickets to Hawaii and Las Vegas; and (3) charger football tickets, the value of

2   which placed Hernandez in violation of the Ethics Code applicable to Authority employees. [SAF

3   No. 22] Bowens claims to have terminated Hernandez' employment based on the conclusions in the

4   report. [SAF No. 23]

5        Regarding the "free rounds of golf," Swan's report failed to mention Hernandez cleared the

6   trip with his boss, Sexton, before going, after disclosing the nature of the outing and that the golf

7   rounds were supplied by Mike Parrish. [SAF No. 24, 41] In the process, Sexton admitted he had

8   attended the same golf outing under similar circumstances. [SAF No. 25] Swan also failed to

9   mention Hernandez compensated Parrish for the round by buying Parrish's lunch and dinner and by

10  making gift contributions for the raffle. The net personal value to Hernandez was negative by over

11  $200. [SAF No. 26] Swan also failed to mention Hernandez had a strong social relationship with

12  Parrish, which included joint family outings and gatherings, dinners, barbecues and sporting events.

13  [SAF No. 27]

14       Regarding the plane tickets, Swan failed to mention that ticketing benefits were regarded by

15  management as normal benefits of their workplace, and that Sexton assigned Hernandez the

16  responsibility on frequent occasions to obtain ticket upgrades for various employees and board

17  members. Hernandez specifically discussed whether the practice was ethically acceptable and

18  Sexton replied it was. [SAF Nos. 28, 74-78, 79, 81] Swan's report failed to mention,

19  notwithstanding the practice among Hernandez' superiors to receive passes and upgrades, that

20  Hernandez' receipt of those benefits was limited to gifts from personal friends. The tickets on

21  Southwest came from Parrish. The tickets on Hawaiian Air came from Janet Nix, another personal

22  friend, who told him she gave tickets like those to all kinds of friends having nothing to do with

23  business. Moreover, the Hawaiian tickets were listed as "space available" and further identified as

24  having "no dollar value" and could not be transferred or redeemed. [SAF No. 29, 30]

25       Regarding the football tickets, Swan's report failed to mention ACE Parking did not have

26  a contractor or vendor agreement of any sort with the Authority. [SAF No 31, 39] He further failed

27  to mention Hernandez had a longstanding friendship with the ACE Parking manager who invited

28  him to the game which preceded Hernandez' employment with the Authority. They were friends

PL'S MEMO OF P'S&A'S IN OPPOS. TO DEF SDCRAA'S MSJ OR SUMM. ADJUD.

- 5 -

from Hernandez' prior employment relationship with ACE Parking. [SAF No. 32][3]

1    During Swan's interviews with Hernandez, Swan expressed no interest in the fact that Parrish

2    and Hernandez were close personal friends. [SAF No. 33] He avoided discussion of the tendency

3    of other employees, such as Bowens and Sexton, to make active and aggressive use of their positions

4    to acquire ticketing upgrades and benefits worth thousands of dollars.  [SAF No. 34]   When

5    Hernandez attempted to explain these friendships and practices, Swan cut him off stating he was not

6    interested in the nature of those friendships and what the office practice was. [SAF No. 35]

7    Given that Hernandez had previously received outstanding performance evaluations and that

8    there was considerable ambiguity in this so-called "ethics" policy, Hernandez might have responded

9    well to a warning before a final decision to terminate his employment.  The Authority did, in fact,

10   have a progressive disciplinary policy set forth in writing, which emphasized the Authority's

11   commitment to preserve employment through pre-termination warnings and training.  That the

12   Authority failed to adhere to this policy and instead routed the matter to an expensive and

13   contentious law firm is a truly extraordinary decision. [SAF Nos. 36, 37, 38]

14   Hernandez had absolutely never received free food from the concessions in the Airport

15   terminals. [SAF No. 42] To this day Hernandez still stands by the fact that most of the items on the

16   conflict-of-interest state form should not have been disclosed.  [SAF No. 44] [4]

17   ///

18   ///

19   ///

20   ///

21   ///

22

23   [3] In late 2004, early 2005, Ace Parking was not working to take over the parking contract.  It was Scott Jones, as an individual, trying to buy the shares of Maurice Gray.  There's a clear distinction.  This contract is not with Ace Parking.  It is with Scott Jones, as an individual. [SAF No. 49] Hernandez purchased tickets that were not available to the public for the Authority's general counsel, Bret Lobner.  The tickets were blocked-out and unavailable for the box office to sell.  Hernandez told Lobner they were unavailable to the public.  Ted Sexton told Hernandez to get the tickets for Lobner.  Hernandez was not already going to the stadium to purchase tickets that day. [SAF No. 50]

26   [4] Clifforine Massey–who supposedly informed Bowens of Hernandez' receipt of food gratuities–was an unreliable and undependable employee who refused to come to work.  She was repeatedly counseled by Hernandez and placed on a disciplinary work plan by Human Resources.  Massey refused to abide by the work plan and quit. [ SAF No. 51].  Jim Prentice–another "source" for Bowens–was a gossip who reported to Sexton.  Prentice stirred-up gossip and chaos.  He was an unreliable and undependable employee.  Sexton referred to him as "that little shit." [SAF No. 52]

PL'S MEMO OF P'S&A'S IN OPPOS. TO DEF SDCRAA'S MSJ OR SUMM. ADJUD.
- 6 -

56-645

## IV.

### ARGUMENT

1

**A.**    **An Employee's Notice Obligation in a Public Policy Termination Does Not Require His**

**Articulation of the Specific Law.**

While an employer is entitled to know what the employee thinks he has done wrong, the entitlement is to "information" forming a reasonable basis of the violation of a statute. Commentary on the identity and the content of laws is an occupational pastime for lawyers, not for employees seeking protection under Labor Code § 1102.5. The employee's duty is to supply the facts and to believe "reasonably" that those facts relate to an act which the state prohibits. California Labor Code § 1102.5 provides:

> An employer may not retaliate against an employee for disclosing
> information to a government or law enforcement agency, where the
> employee has reasonable cause to believe that the information
> discloses a violation of state or federal statute, or a violation or
> noncompliance with a state or federal rule or regulation.

The statutory language requiring implicit reference to a violation of a "state or federal statute" aligns with modern cause authority supporting what in common law is referred to as a "public policy" claim. Such a claim prohibits retaliation against employees who are subject to retaliation for raising matters which implicate important public "policies." *Gantt v. Sentry Insurance Co.* (1992) 1 Cal.4th 1083, 1094. The decision further established the importance of "tethering" a claim to "fundamental policies that are delineated in constitutional or statutory provisions." *Id.* at 1095.

This statute thus appears to follow the "Public Policy" doctrine which prohibits terminations which violate a policy tethered to a statute. [*See Gantt v. Sentry Insurance Co.* (1992) 1 Cal.4th 1083, 1095]. Under the Public Policy doctrine, to say the public policy at issue "must have been articulated at the time of the discharge," *Stevenson v. Superior Court* (1997) 16 Cal.4th 880, 889-890, does not mean the employee must cite chapter and verse of statutes, regulations, and cases to the employer before the wrongful termination. Instead, it is only necessary, as a matter of law, that the policy was "well established at the time of the discharge." *Id.* at 894. It is only necessary for Plaintiff to now show that at the time of the discharge the applicable statutes and regulations "sufficiently described the type of prohibited conduct to enable an employer to know the fundamental public policies that are expressed in that law." *Sequoia Ins. Co. v. Superior Court*

PL'S MEMO OF P'S&A'S IN OPPOS. TO DEF SDCRAA'S MSJ OR SUMM. ADJUD.

- 7 -

(1993) 13 Cal.App.4th 1472, 1480.

1       Contrary to what the Airport Authority claims, neither the Labor Code nor cases setting forth

2   the "public policy" doctrine in employment cases require Hernandez to either articulate or know the

3   specific statute which is being violated. Just as it is unlikely he would know the statute which

4   embodies the state proscription against murder, it is unlikely he would know the statute or statutes

5   which proscribe the misappropriation of public funds. Yet he may have a reasonable basis on which

6   to believe that a homicide or a misappropriation of funds is illegal.

7       Therefore, Defendant cannot plausibly disclaim knowledge of the law's requirements when

8   the nature of the wrong–misappropriation of public resources–is a plainly-stated concern. As the

9   authorities set forth below, the protection of public resources against wilful and negligent waste is

10  not only a public policy, but one of the central organizing principles of representative government.

11  **B.**   **The Policy of the State of California Requires Diligent Conservation and Precludes the**

12        **Gift of Public Funds.**

13      It is difficult to imagine any public servant or official–legislative, judicial or executive–would

14  have the audacity or "brass" to state publicly that he is not obliged as a matter of law to protect

15  against the waste and/or misappropriation of public funds. But that is precisely what the Airport

16  Authority has done in this motion. Significantly, none of the declarants in support of this motion

17  adhere in writing to the politically suicidal proposition that they are under no legal duty to protect

18  public money. They have, instead, assigned the task of explaining that position to their lawyers.[5]

19      **1.**   **The California Constitution**

20      There is abundant support in California law in support of a policy which would prohibit the

21  gift of Airport money to other municipal agencies and to private entities. That authority begins with

22  the California Constitution. Article XVI, § 6, states:

23

24      [5] The Port District has implied, though not expressly stated, that Hernandez is limited to statutory violations

25  identified in his complaint. There is no such requirement restriction under the law. [See *Green v. Ralee Engineering* (1998) 19 Cal.4th 66, at p. 83, fn 7, implying that Plaintiff must by time of opposition to summary judgment identify

26  specific statutory authority.] Though not required of him in his complaint, Hernandez did identify the legislative act–i.e., PUC § 170000, et. seq.–which reposed a public trust in employees of the Airport Authority. Included in that trust, as

27  discussed below, are clear principles established in statute which preclude the negligent or intentional waste or gift of public funds. Moreover, the complaint mentioned specific statutory mandates in PUC § 170000, et seq., which require

28  the Authority maximize revenues, negotiate leases on commercial reasonable terms, and to exercise care to meet the needs of the users of the airport.

                    PL'S MEMO OF P'S&A'S IN OPPOS. TO DEF SDCRAA'S MSJ OR SUMM. ADJUD.

)

> The Legislature shall have no power to give or to lend, or to authorize the giving or lending, of the credit of the State, or of any county, city and county, city, township or other political corporation or subdivision of the State now existing, or that may be hereafter established, in aid of or to any person, association, or corporation, whether municipal or otherwise, or to pledge the credit thereof, in any manner whatever, for the payment of the liabilities of any individual, association, municipal or other corporation whatever; nor shall it have power to make any gift or authorize the making of any gift, of any public money or thing of value to any individual, municipal or other corporation whatever.

This provision of California law which precludes the gift of public money is interesting in two respects: (1) it sets forth as a foundational rule of government a policy valuing the conservation of public resources; and (2) it reposes accountability for such resources in each governmental entity, thereby precluding gifts between municipal corporations. The second item would therefore clearly preclude exactly the kind of casually administered accountability observed in this case, where one local entity–the Airport Authority–makes large financial gifts to another local entity–the Port District. The Airport Authority cannot therefore argue that political considerations related to the establishment of a friendly relationship between the Airport and the Port justify gifts between them, nor can it plausibly support gifts from the Airport to the LPI. Accordingly, the termination of an employee who questions the Airport's generosity is the proper subject of a lawsuit.

2. **General Legislative Enactments–Pen. Code § 424 and Govt. Code § 822**

There is additional support in California law in its general legislative enactments. The California Supreme Court in *Stanson v. Mott* (1976) 17 Cal.3d 206, 225 states:

> We recognize, of course, that public officials who either retain custody of public funds or are authorized to direct the expenditure of such funds bear a peculiar and very grave public responsibility, and that courts and legislatures, mindful of the need to protect the public treasury, have traditionally imposed stringent standards upon such officials.

At least from the point of view of the California Supreme Court, it is reasonable to assume that the negligent and/or intentional waste of public funds violates state law. In making the above statement, the Court referred to two statutes, i.e., California Penal Code § 424 [which applies criminal penalties to the appropriation of "public moneys...without authority of law...for the use of another" or to one who "Fraudulently alters, falsifies, conceals, destroys, or obliterates any account" of public money], and § 822 of the California Government Code [which confers civil liability for a

PL'S MEMO OF P'S&A'S IN OPPOS. TO DEF SDCRAA'S MSJ OR SUMM. ADJUD.
- 9 -

56-648

loss of public money "sustained as a result of his own negligent or wrongful act or omission."] The

1    Supreme Court has held that these statutes support a taxpayer's cause of action against a public

2    employee who negligently misappropriates public funds. [6]

3            Any time a public official misappropriates public money, he is subject to scrutiny which

4    implicates criminal and civil penalties. Hernandez' complaints thus address statutory prohibitions

5    against both the negligent [Govt. Code § 822] and intentional [Penal Code § 424] misappropriation

6    of public resources. He put the Airport on notice of the onerous and inequitable lease terms made

7    with the Port, of inappropriate commitments to private concessionaires, and of fraudulently billing

8    by a parking management company (LPI).[7] When the Airport received such information, it insisted

9    on continuing with financial losses numbering in the tens of millions of dollars. It was, as Sexton

10    suggested, something which personally benefitted the Airport CEO (Bowens) because the onerous

11    leases with the Port were the "price of her freedom." The negotiating agent of LPI was her close

12    personal friend. This behavior thus implicates state policies of sufficient magnitude to bear criminal

13    sanctions. That is to say, after Hernandez notified Sexton and Bowens of the commercially

14    unreasonable arrangements with the Port and other individuals, they could no longer persist with

15    those arrangements without, in effect, misappropriating those funds. Therefore, as Hernandez

16    persisted in his objection to the continuation of those arrangements, he was, in effect, objecting to

17    the criminal misappropriation of public money.

18        **3.    State-Enabling Legislation for the Airport Authority**

19            California Public Utilities Code (PUC) § 170056 provides authorization to the Airport

20

21            [6] The exact reading of Government Code § 822 is, "A public employee is not liable for money stolen from
22    his official custody. Nothing in this section exonerates a public employee from liability if the loss was sustained as a
      result of his own negligent or wrongful act or omission." Government Code § 8314 further supports a public policy
23    precluding the use of funds for purposes not expressly authorized: "(a) It is unlawful for any elected state or local
      officer, including any state or local appointee, employee, or consultant, to use or permit others to use public resources
24    for a campaign activity, or personal or other purposes which are not authorized by law. (b) For purposes of this section:
      (1) "Personal purpose" means those activities the purpose of which is for personal enjoyment, private gain or advantage,
25    or an outside endeavor not related to state business."

26            [7]        The protection of "handshake" arrangements with private concessionaires not only constitutes a
      misappropriation of Airport land resources to those entities, but implicates other laws designed to protect the interests
27    of the handicapped under the Americans with Disabilities Act and Govt. Code §12940. The Airport's acquiescence to
      fraudulent contractor behavior likewise implicates state law prohibiting such conduct. See California Public Contract
28    Code Section 100(b) and the Authority's Contracting and Debarment Code, Article 5, Section 5.11(a)(3)-(6)(8) and
      Section 5.18(a).

Authority to take possession of property–subject to the negotiation of leases–held in trust by the

1    Airport. PUC § 170064(b) and (c) provide the following general mandate:

2           (b) Upon the completion of the transfer pursuant to Section
            170062, the authority shall assume all revenue stream revenues to
3           fund its activities, operations, and investments consistent with its
            purposes. The sources of revenue available to the authority may
4           include, but are not limited to, imposing fees, rents, or other
            charges for facilities, services, the repayment of bonded
5           indebtedness, and other expenditures consistent with the purposes of
            the authority.
6           (c) To the extent practicable, the authority shall endeavor to
            maximize the revenues generated from enterprises located on the
7           property of the authority. [Emphasis added.]

8           Subsection (c) appears to confirm and substantiate policies identified in law cited above, i.e.,

9    that it is charged with the task of protecting its autonomy and with serving as trustee over funds

10   necessary for its effective operation. PUC § 170062(E) further authorizes and enables the Airport

11   Authority to preserve its autonomy vis-a-vis the Port District:

12          (E) Performance of all these services shall be subject to the
            direction and control of the authority, and shall be provided in
13          accordance with specifications, policies, and procedures as
            communicated by the authority to the Port from time to time. In all
14          cases, the Port shall provide services of sufficient quality,
            quantity, reliability, and timeliness to ensure that the Authority
15          can continue the operation, maintenance, planning and improvement
            of and for San Diego International Airport consistent with the
16          standards and practices under which the airport is operated on the
            effective date of the act that added this subparagraph or higher
17          standards as the Authority may adopt, or as may be required in the
            Authority's judgment to meet the requirements of federal or state law,
18          or the needs of the users of the airport for the safe, secure, and
            efficient operation of the airport. The Authority also, from time to
19          time, may establish performance standards for and may conduct
            financial or performance audits, or both, of all services provided by
20          the Port and all charges or claims for payment for the services
            provided. [Emphasis added.]

21

22          Insofar as Hernandez' complaints concern the improper surrender of Airport resources to

23   concessionaires where there are needs to expand and improve Airport restrooms and the improper

24   payment of expenses to the parking management company (LPI), these would go directly to the

25   legislative mandate under PUC § 170064(c) to maximize the revenues" of the Airport and PUC §

26   170062(E) to provide for "the needs of the users of the airport for the safe, secure, and efficient

27   operation of the airport." The gift of public resources to parking contractors who defraud the Airport

28   and to concessionaires who pose an obstacle to the modification of public restrooms wold be

PL'S MEMO OF P'S&A'S IN OPPOS. TO DEF SDCRAA'S MSJ OR SUMM. ADJUD.
- 11 -

56-650

inconsistent with such a mandate.

1    While Defendant is correct in stating that some of the terms of the Airport's lease with the

2 Port on the General Dynamics property are legislatively enacted in PUC § 170056(f)(1) and (2),

3 Defendant's omission of the last sentence of §§ 170056(f)(1) and 170056(f)(3) is significant. Those

4 provisions read:

5    **(1)** The rent shall be paid monthly in arrears at the rate of four million
    seven hundred thousand dollars ($4,700,000) for calendar year 2003,
6    six million seven hundred thousand dollars ($6,700,000) for calendar
    year 2004, and eight million seven hundred thousand dollars
7    ($8,700,000) for calendar year 2005. <u>Thereafter, the annual rent shall
    be level, for the balance of the term, based on the fair market value of</u>
8    <u>the property as of January 1, 2006, and a market rate of return on that
    date.</u> [Emphasis added.]

9    . . .

    **(3)** All other terms of the ground lease shall be in accordance with
10    reasonable commercial practice in the San Diego area for long-term
    real property ground leases.

11

12    The provision–not referenced in Defendant's moving papers–appears to confirm the

13 renegotiation of the General Dynamics lease for 2006 onward was not legislatively stabilized and,

14 in fact, placed a duty on the Airport Authority to assure the terms were commercially reasonable and

15 at a fair market rate.

16    PUC § 170056(a)(1)(B) provides the Airport Authority with right of possession of the

17 Teledyne Ryan property. While it is unclear on the face of the statute what obligation, if any, the

18 Airport had to Teledyne Ryan, it is clear the Airport negotiated a lease with the Port based on bad

19 information about the available use of that property. The Port originally represented the property

20 was available for use as a parking facility, subject to $10 million in environmental cleanup.

21 Hernandez discovered the Port's representation had been false and $30 million in cleanup would

22 be required. The terms of a lease could be rescinded and/or renegotiated based on fraud, mistake

23 or violation of the public interest. [See Cal Civ Code § 1689] Since the remedy is available, a

24 negligent or willful failure to do so would, in effect, constitute a gift to the Port, and is hardly

25 consistent with the Airport's mandate to maximize its revenues.[8]

26

27    _____

[8] In light of the fact that the enabling statutes which set forth duties of the Authority are themselves legislative
28 acts embodied in statute, Defendant's first proposed summary "adjudication" is unintelligible. While the "ethics code"
to which Defendant alludes is arguably a non-statutory code, PUC 170056(f) (1) and (3) and 170064(b) and (c),

PL'S MEMO OF P'S&A'S IN OPPOS. TO DEF SDCRAA'S MSJ OR SUMM. ADJUD.
- 12 -

**C.**   **There Is Substantial Evidence to Support the Existence of a Causal Relationship**

1        **Between Hernandez' Complaints and His Termination.**

2        There are three major reasons why a reasonable person could infer Hernandez' termination

3   was motivated in part by his complaints.

4        First, Hernandez' revelations on the leases, restroom expansion, and the overpayment LPI

5   would likely be personally threatening to Thella Bowens, the Airport CEO.  The allegations, at a

6   minimum, suggest incompetent or collusive behavior likely to attract public scorn to the highest

7   level of the organization, i.e., Thella Bowens, the CEO.  Her past employment with the Port and her

8   friendship with the negotiating agent of LPI would certainly not help to abate criticism directed

9   toward her for the waste of tens of millions in public resources.  Hernandez' insistence that LPI

10  forbear a 90-day scrutiny and audit was likely to make Bowens uncomfortable.

11       Second, the fact that Bowens personally commenced an investigation of Hernandez'

12  allegedly unethical behavior within 30 days of Hernandez' demands against LPI suggests a causal

13  relationship between the two events.  Close temporal relationships between complaints and

14  retaliatory acts–in this case an ethics investigation–are prima facie evidence of a retaliatory motive.

15  [See in context of Govt. Code § 12940(h)–retaliation for discrimination complaint– *Flait v. North*

16  *American Watch* (1992) 3 Cal. App. 4th 467, 479; *California Fair Employment and Housing v.*

17  *California Court of Appeal* (2004) 122 Cal. App. 4th 1004, 1023.]

18       Third, and no less important, is the fact that the reason given for Hernandez' termination

19  is pretext.  An inference of pretext is supported by the following:

20       (1)   The airport did not conduct its own investigation.  What most reasonable

21  persons might consider a "normal" investigation of an individual with outstanding performance

22  reviews might consist of a conversation with Hernandez.  Instead the Airport appears to have spent

23  in excess of $30,000 in the retention of a law firm–cloaked in the secrecy of attorney-client

24  privilege–on a fault-finding mission.  The report itself is immoderate, as if the person who prepared

25  it was tasked to slant his conclusions in favor of ethical breaches, and neglected important details,

26  such as the fact that ACE Parking was Hernandez' past employer and had no relationship with the

27

28  _____

referenced above are included in the statutory mandate under which the Airport Authority was created.

PL'S MEMO OF P'S&A'S IN OPPOS. TO DEF SDCRAA'S MSJ OR SUMM. ADJUD.

- 13 -

56-652

airport, that Hernandez and his family had close personal and social ties to Parrish (the Southwest

1   Airlines agent and organizer of the golf tournament). [SAF Nos. 21-23, 33-35]

2            (2)    Hernandez did not breach any ethical rules of the Airport Authority. Even

3   the strongest case for the receipt of improper gifts–free standby tickets to Hawaii–were arguably

4   outside the scope of the ethical rule which prohibited the receipt of benefits "not available to the

5   general public." The tickets themselves were marked "no value,"allowed travel only on unsold

6   seats, and could not be sold or transferred to others. Janet Nix, the Hawaiian Airlines ticket donor,

7   was a personal friend of Hernandez', and swears she regularly gives the tickets to members of the

8   general public. Giving the Authority the benefit doubt under these circumstances, one can at best

9   make an ambiguous claim against Hernandez for ethical violations. [SAF Nos. 29, 30]

10           (3)    Hernandez' superiors regularly engaged in the same conduct of which

11  Hernandez was accused, and told Hernandez that such conduct was acceptable. Hernandez was,

12  in fact, tasked to procure first-class upgrades for senior Authority executives and board members

13  by his boss, Sexton. In the course of procuring benefits for Enarson, Sexton, and Bowens, he asked

14  if it was ethically acceptable and Sexton confirmed it was.[9] [SAF No. 28]

15           (4)    The Airport's failure to follow its policy of progressive discipline was

16  patently unreasonable. Given the ambiguousness of the content and application of ethical rules at

17  the Airport, the only reasonable way of managing Hernandez' alleged violations would have been

18  a conversation designed to clarify that Hernandez' should not accept flight passes and upgrades

19  under any circumstances. Such an approach would have been highly consistent with the Airport's

20  written policy emphasizing progressive discipline, which stresses the value of rehabilitative

21  measures in dealing with employees. A reasonable person would likely take such an approach with

22  Hernandez, especially given the frequent donation of upgrades to senior management and

23  Hernandez' documented history of outstanding performance. One ought, therefore, conclude from

24  the failure to apply progressive discipline in this case that the reason given for termination is

25  pretext. [SAF Nos. 36-38]

26  ///

27  _____

28      [9]      Nix also corroborates Hernandez' claim that the donation of upgrades on Hawaiian Airlines to senior employees and Airport board members was a regular occurrence.

PL'S MEMO OF P'S&A'S IN OPPOS. TO DEF SDCRAA'S MSJ OR SUMM. ADJUD.

- 14 -

56-653

**D.    Defendant Airport Authority Has No Technical Defenses.**

1    Reserved for discussion at the tail end of Defendant's Points and Authorities are the

2    technical defenses of "immunity" and "failure to exhaust administrative remedies," occupying less

3    than two pages of argument.  These defenses are without merit.

4    **1.    Immunity.**

5    Government Code § 821.6 reads as follows:

> A public employee is not liable for injury caused by his instituting
> or prosecuting any judicial or administrative proceeding within the
> scope of his employment, even if he acts maliciously and without
> probable cause.

9    It is clear on the face of the statute that the immunity applies only to the commencement of

10    a judicial or administrative proceeding.  The cases on which Defendant relies all involve the

11    commencement of civil service proceedings.  In both *Kemmerer v. County of Fresno* (1988) 200

12    Cal.App.3d 1426, 1436 and *Summers v. City of Cathedra City* (1990) 225 Cal. App. 3d 1047, 1064,

13    the immunity was applied because the public employees being sued commenced and pursued

14    employment subject to review by the civil service system.  The case of *Shoemaker v. Myers* (1992)

15    2 Cal. App. 4th 1407, 1423-1424 (also cited by Defendant), also involved an employee terminated

16    under administrative procedures mandated by civil service.  The Court in *Shoemaker* explained that

17    in *Kemmerer* (*supra*) § 821.6 applied because termination by an employer in an employment system

18    governed by civil service protections involves the commencement of an administrative proceeding

19    and prefaced its analysis of the termination claim by clarifying that it was "Accepting defendants'

20    characterization of plaintiff's whistle-blower and *Tameny* claims as falling under the general rubric

21    of malicious prosecution."[10]   [Cites omitted.]

22    Hernandez was not a civil service employee, and the commencement of an "investigation"

23    against him was not preparatory or pursuant to any existing or contemplated administrative

24    proceeding.  Section 821.6 is, therefore, inapplicable.

25    Even assuming, *arguendo*, that § 821.6 is applicable to commencement of an investigation

26

27    [10] The only other case to which Defendant cites is *Caldwell v. Montoya* (1995) 10 Cal.4th 972, which is not applicable because the opinion was directed at the application of Govt. Code § 820.2–"discretionary immunity" applied

28    to legislatively instituted termination. In footnote 7 of the *Caldwell* decision, the Supreme Court observed whistleblower statutes in general are not subject to § 821.6 immunity.

PL'S MEMO OF P'S&A'S IN OPPOS. TO DEF SDCRAA'S MSJ OR SUMM. ADJUD.

- 15 -

**56-654**

which cannot lead to a "judicial or administrative proceeding," the *Shoemaker* case explicitly rejects

1    application of § 821.6 where the theory of liability is predicated on a whistleblower statute such as

2    § 1102.5. In *Shoemaker*, when considering whether the policy expressed in Government Code §

3    19683–a whistleblower statute very similar to § 1102.5–would override the policy expressed in §

4    821.6, the Court stated:[11]

5            Recognition of section 821.6 immunity for cases falling within
             section 19683 would largely emasculate the latter section and
6            thereby frustrate the legislative purpose behind its enactment. Thus,
             violators of section 19683 are not entitled to section 821.6 immunity.
7            We conclude defendants are not entitled to immunity in respect to
             plaintiff's section 19683 claim. [*Shoemaker, supra*, at 1425]

8

9    *Shoemaker*, therefore, quite emphatically supports the application of § 1102.5 liability, even

10   where the public employee engages in the commencement of an administrative or judicial

11   proceeding–which is not the case here.    Defendant's citation to *Shoemaker* is, therefore,

12   inexplicable.

13       2.    **Failure to Exhaust Administrative Remedies.**

14       Defendant's argument is predicated on language in Labor Code § 98.7, which provides

15   Hernandez "<u>may</u> file a complaint with the division within six months" for a number of Labor Code

16   violations, including those enumerated under § 1100, et seq.    The language is, on its face

17   permissive, using the word "may" and thus not mandatory using the word "shall" or "must." It is

18   a well-settled principle of statutory construction that the word "may" is ordinarily construed as

19   permissive, whereas "shall" is ordinarily construed as mandatory.    *Tribe v. Donaldson* (June 2007)

20   CA-APP3, CO5190‌2; *Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 443.

21   Moreover, on the face of § 98.7 at subsection (f) the Code reads: "The rights and remedies provided

22   by this section do not preclude an employee from pursuing any other rights and remedies under any

23   other law."    This suggests a legislative intent, noted on the face of the statute, not to disable or

24   restrict other options under law–i.e., to liberalize rather than restrict remedies.

25       Defendant's reliance on the case of *Campbell v. Regents of the Univ. of Cal.* (2005) 35 Cal.

26   _____

27       [11] Govt. Code § 19683 confers liability against a "state officer or employee [or] any person whatsoever [who]…
     directly or indirectly use[s] or threaten[s] to use any official authority or influence in any manner whatsoever which
28   tends to discourage, restrain coerce or discriminate against any other state officer or employee" because the latter has
     reported information relating to an actual or suspected violation of law.

4th 311, 333-4 is misplaced.  In *Campbell* the issue was whether § 1102.5 on its face abrogated

1   mandatory internal grievance procedures set forth by the University.  The opinion never addressed

2   whether Labor Code § 98.7–by contrast with the required internal administrative procedures of the

3   University–was designed to impose mandatory primary jurisdiction in the labor board.  Since §

4   1102.5 is silent on whether it is designed to override mandatory internal administrative remedies

5   in other contexts, and since Labor Code § 98.7 uses permissive–not mandatory–language, there is

6   no basis on which conclude that Hernandez' choices have been legislatively limited.   The

7   permissive wording of § 98.7, together with the language in § 1102.5(f), which expresses a

8   legislative intent to preserve rather than restrict options, strongly imply that an administrative

9   recourse is not required.

10       The only other authority addressing the issue directly are federal district court cases

11   published with inconsistent holdings. One such holding cited in Defendant's brief is *Neveau v. City*

12   *of Fresno* (2005) 392 F.Supp. 2d 1159, 1180.  But that holding is criticized in another federal

13   district court holding in *Paterson v. Cal. Dep't of Gen. Servs.*, 2007 U.S. Dist. LEXIS 25957 (E.D.

14   Cal. Mar. 8, 2007) stating, "To the extent that *Neveu* interprets *Campbell* as requiring that remedies

15   before the Labor Commissioner must necessarily be exhausted as a prerequisite to suit under §

16   1102.5, this Court disagrees." *Id.*, fn 5.  California authority, on the other hand, has preserved an

17   unfettered right to bring an action for employment retaliation in the courts. In *Leibert v. Transworld*

18   *Systems, Inc.* (1995) 32 Cal. App. 4th 1693, 1705-1705, the Court confirmed § 98.7 would have no

19   effect on common law claims for retaliatory termination stating: "In light of the clear statutory

20   language, respondent apparently concedes that the section 98.7 administrative remedies are not

21   exclusive and that, generally, exhaustion of these remedies is not required before instituting a civil

22   suit alleging certain non-statutory claims. Respondent's concessions are again warranted." So again,

23   what is the basis for concluding that § 987.6, operating on its own, confers exclusive jurisdiction

24   on the Labor Board?  There appears to be none.[12]

25   _____

26   [12] Since, as noted above, the elements of a Labor Code § 1102.5 claim are exactly the same as those for a
     termination in violation of public policy. Hernandez has, as a practical matter, plead his way out of any administrative
27   exhaustion requirement.  If not already apparent in the pleading itself, Hernandez would request leave to amend his
     complaint to include "Wrongful Termination in Violation of Public Policy" among the monikers under which the First
28   Cause of Action is identified. Thus, rather than enter summary judgment on this case, the Court should permit the case
     to go forward as a public policy claim.

## V.

## CONCLUSION

It is difficult to imagine a more direct and compelling public interest than the preservation of public resources. Accordingly, the Authority's insistence that no such interest is addressed or implicated in federal and state laws and rules is incredulous. Hernandez' conflict with Thella Bowens was more than difference of opinion over which expenditures were wise or prudent. His investigation revealed fundamental deficiencies in leases and contracts which were bleeding the Authority of ten in millions of dollars. When he brought those deficiencies to light and the Authority continued its course, both criminal and civil laws were broken. Even if, in the final analysis, such laws were not broken, § 1102.5 protects Hernandez' right to raise the issues without being subject to termination.

DATED: November 2, 2007

CATHRYN CHINN, Attorney for
Plaintiff JOSE HERNANDEZ

56-657

1   Cathryn Chinn, Esq. (State Bar 93340)
    1901 First Avenue, Suite 400
2   San Diego, California 92101
    Telephone (619) 234-9000
3   Facsimile (619) 699-1159

4

5   Attorney for Plaintiff
    JOSE HERNANDEZ

6

7

8           SUPERIOR COURT OF THE STATE OF CALIFORNIA

9      COUNTY OF SAN DIEGO, CENTRAL BRANCH, GENERAL UNLIMITED

10  JOSE HERNANDEZ,                      Case No. : GIC 871979

11              Plaintiff,               PROOF OF SERVICE

12  v.

13  SAN DIEGO COUNTY REGIONAL
    AIRPORT AUTHORITY, a public entity
14  and DOES 1 through 12, Inclusive,    DATE:        November 16, 2007
                                         TIME:        1:30 p.m.
15              Defendants.              DEPT.:       75
                                         JUDGE:       HON. RICHARD E. STRAUSS
16                                       ACTION FILED:    9/1/06
                                         TRIAL DATE:      1/4/08
17

18

19

20

21

22

23

24

25

26

27

28

        PL'S PROOF OF SERVICE (DOCS. IN OPPOS. TO DEF SDCRAA'S MSJ OR SUMM. ADJUD.)

**Hernandez v. SD Regional Airport Authority**
Diego County Superior Court Case No. GIC 871979

## DECLARATION OF PERSONAL SERVICE

I, the undersigned, declare: That I am, and was at the time of service of the papers herein referred to, over the age of eighteen years, and not a party to the action; and I am employed in the County of San Diego, State of California, in which county the within-mentioned service occurred. My business address is _____ , San Diego, California. I served the following document(s):

see attached list

on the parties in said action by personal service on:

FRED M. PLEVIN (SBN 126185)
SANDRA L. MCDONOUGH (SBN 193308)
ALBERT R. LIMBERG (SBN 211110)
PAUL, PLEVIN, SULLIVAN & CONNAUGHTON LLP
401 B Street, Tenth Floor
San Diego, California 92101-4232
Telephone: 619-237-5200
Facsimile: 619-615-0700
**ATTORNEYS FOR DEFENDANT SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY**

by delivery to:

Name (and title) of person left with:    _____

Address where served:    same as above

Date of delivery:    November 2, 2007

Time of delivery:    ____ _.m.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on November 2, 2007, at San Diego, California.

_____

#____

56-659

## LIST OF DOCUMENTS

PLAINTIFF JOSE HERNANDEZ' MEMORANDUM OF **POINTS AND AUTHORITIES** IN OPPOSITION TO DEFENDANT SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

**DECLARATION OF PLAINTIFF** JOSE HERNANDEZ IN OPPOSITION TO DEFENDANT SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

**DECLARATION OF MIKE PARRISH** IN OPPOSITION TO DEFENDANT SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

**DECLARATION OF CATHRYN CHINN** IN OPPOSITION TO DEFENDANT SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

**DECLARATION OF JANET NIX** IN OPPOSITION TO DEFENDANT SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

PLAINTIFF JOSE HERNANDEZ' **OPPOSITION TO DEFENDANT SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY'S AMENDED SEPARATE STATEMENT** OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

PLAINTIFF JOSE HERNANDEZ' **SEPARATE STATEMENT** OF ADDITIONAL UNDISPUTED MATERIAL FACTS IN OPPOSITION TO DEFENDANT SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

PLAINTIFF JOSE HERNANDEZ' **NOTICE OF LODGMENT** IN OPPOSITION TO DEFENDANT SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

PLAINTIFF JOSE HERNANDEZ' **COMPENDIUM OF FEDERAL CASES** IN OPPOSITION TO DEFENDANT SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

PLAINTIFF JOSE HERNANDEZ' **WRITTEN OBJECTIONS TO EVIDENCE** IN OPPOSITION TO DEFENDANT SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

**ORDER** ON PLAINTIFF JOSE HERNANDEZ' WRITTEN OBJECTIONS TO EVIDENCE IN OPPOSITION TO DEFENDANT SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

1   Cathryn Chinn, Esq. (State Bar 93340)
    1901 First Avenue, Suite 400
2   San Diego, California 92101
    Telephone (619) 234-9000
3   Facsimile (619) 699-1159

4

5   Attorney for Plaintiff
    JOSE HERNANDEZ

6

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9       COUNTY OF SAN DIEGO, CENTRAL BRANCH, GENERAL UNLIMITED

10  JOSE HERNANDEZ,                          Case No. : GIC 871979

11              Plaintiff,                    PLAINTIFF JOSE HERNANDEZ'
                                              OPPOSITION TO DEFENDANT SAN
12  v.                                        DIEGO COUNTY REGIONAL AIRPORT
                                              AUTHORITY'S AMENDED SEPARATE
13  SAN DIEGO COUNTY REGIONAL                 STATEMENT OF UNDISPUTED
    AIRPORT AUTHORITY, a public entity        MATERIAL FACTS IN SUPPORT OF
14  and DOES 1 through 12, Inclusive,         MOTION FOR SUMMARY JUDGMENT OR,
                                              IN THE ALTERNATIVE, SUMMARY
15              Defendants.                   ADJUDICATION

16                                            DATE:      November 16, 2007
                                             TIME:      1:30 p.m.
17                                            DEPT.:     75
                                             JUDGE:     HON. RICHARD E. STRAUSS
18                                            ACTION FILED:    9/1/06
                                             TRIAL DATE:      1/4/08
19

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28
        PL'S OPPOS. TO DEF SDCRAA'S AMENDED SEP. STATEMENT IN SUPP. OF MSJ OR SUMM. ADJUD.

1         Plaintiff JOSE HERNANDEZ opposes Defendant SAN DIEGO COUNTY REGIONAL

2   AIRPORT AUTHORITY's Separate Statement of Undisputed Material Facts in support of its

3   Motion for Summary Judgment or, in the Alternative, Summary Adjudication, as follows:

4   **DEF'S ALLEGED UNDISPUTED FACTS/**           **PL'S RESPONSE/**
  **SUPPORTING EVIDENCE**                   **SUPPORTING EVIDENCE**

5

6   1.     Jose Hernandez became the Director     1.     Not disputed.
          of Landside Operations for defendant

7           San Diego County Regional Airport
          Authority (the "Authority") on or
          about October 2003.

8   Hernandez Depo. 93:16-25 and

9   114:25-115:14 [Exh. 1]. Exhibit 16.

10   2.     Article 2, Part 2.0, Section 2.10(b) of     2.     Not disputed.
          the Authority's Ethics Code provides

11           in part:
  Restrictions on Benefits

12   (1)     No Board member or employee of
  the Authority shall request a benefit from

13   any person or entity or accept any benefit
  intended to influence official duties.

14   (2)     No Board member or employee of
  the Authority shall accept anything of value

15   from anyone, other than the Authority or
  another Board member or employee, for

16   doing his or her job.
  (3)     No Board member or employee of

17   the Authority shall accept benefits
  aggregating more than one-half (½) the

18   amount of gifts permitted under the
  California Political Reform Act in any

19   calendar year from any single source:
  (A)     That the Board member or employee

20   knows or should know is doing business
  with the Authority or intends to do business

21   with the Authority or has done business with
  the Authority during the previous 12

22   months; or
  (B)     That the Board member or employee

23   knows or should know has or is seeking a
  license, permit, grant or benefit from the

24   Authority; or
  (C)     That the Board member or employee

25   knows or should know is an agent (whether
  compensated or not) of any person or entity

26   described in Subsections (A) or (B).

27   Exhibit 3, pp. 12-13.

28

57-662

| | | |
|---|---|---|
| 3. | In approximately October or November 2005, two Authority employees advised Thella Bowens that they believed that Hernandez was behaving unethically and receiving benefits from the Authority's vendors. | 3. Disputed. |

Bowens Dec. p. 2, lines 7-19 (hereinafter noted as "Page:Line Numbers")

| | | |
|---|---|---|
| 4. | In November 2005, Bowens asked the Authority's Vice President of Administration, Jeffrey Woodson, to have an outside investigator conduct an investigation into the allegations that Hernandez had received benefits from the Authority's vendors. | 4. Not disputed |

Woodson Dec. 2:5-8; Bowens Dec. 2:20-22

| | | |
|---|---|---|
| 5. | Woodson approved the retention of Luce, Forward, Hamilton & Scripps ("Luce Forward") to conduct an investigation into the allegations made regarding Hernandez receiving benefits from the Authority's vendors. | 5. Not disputed |

Swan Dec. 2:9-12; Woodson Dec. 2:9-13

| | | |
|---|---|---|
| 6. | Edward Patrick Swan, Jr. of Luce Forward conducted an investigation, with assistance from John Gamberzky, regarding the allegations that Hernandez received benefits from the Authority's vendors. | 6. Not disputed |

Swan Dec. 3:1-10.

| | | |
|---|---|---|
| 7. | Hernandez admits that he received four non-revenue tickets from Hawaiian Airlines in 2004, and that he knew Hawaiian Airlines was doing business with the Authority at the time he received the tickets. | 7. Disputed. He received the tickets from Janet Nix, in her capacity as a personal friend. Decl. J. Hernandez par. 11; Decl. J. Nix par. 11. |

Swan Dec. 3:11-12; Hernandez Depo. 198:8-200:17 and 280:1-14 [Exh. 1]

57-663

| | |
|---|---|
| 8.    Hernandez admits that he received at least two buddy passes from Southwest Airlines in 2004 for his children, and that he knew Southwest Airlines was doing business with the Authority at the time he received the tickets. | 8.    Disputed.  He received the tickets from Mike Parrish, in his capacity as a personal friend. Decl. J. Hernandez par. 9-10; Decl. M. Parrish par. 2-3. |

Hernandez Depo. 191:8-20 and 281:6-12 [Exh. 1].

| | |
|---|---|
| 9.    Mr. Swan in his investigation that there was sufficient evidence that Hernandez had accepted benefits from Authority vendors and contractors.  He also concluded that there was sufficient evidence that Hernandez had violated Section 2.10 of the Authority's Ethics Code. | 9.    Not disputed subject to Objection. Improper Opinion (See Objection nos. 8-12 ) |

Swan Dec. 4:6-14; Exhibit 4, pp. 2 and 20-21; Exh. 3, pp. 12-13.

| | |
|---|---|
| 10.    Mr. Swan prepared a written report of his findings and sent them to Thella Bowens on or about January 19, 2006. | 10.    Not disputed. |

Swan Dec. 3:25-4:2; Exhibit 4

| | |
|---|---|
| 11.    After reviewing the findings contained in Mr. Swan's January 19, 2006 report, and upon the recommendation of Jeffrey Woodson and the Authority's Director of Human Resources, Diane Richards, Bowens determined that Hernandez' employment should be terminated because it appeared that he had accepted benefits in violation of Section 2.10 of the Authority's Ethics Code. | 11.    Disputed.. Decl. J. Hernandez in its entirety; Decl. J. Nix in its entirety; Decl. M. Parrish in its entirety. |

Bowens Dec. 3:1-10; Exh. 3, pp. 12-13 [Ethics Code]; Woodson Dec. 2:25-3:4

| | |
|---|---|
| 12.    Hernandez alleges that he was advised to keep the investigation confidential. | 12.    Not disputed. |

Hernandez 840:12-15 [Exh. 2]; Second Amended Complaint p. 11, lines 26-28.

    In the alternative, the Authority submits the following Separate Statement of Undisputed

PL'S OPPOS. TO DEF SDCRAA'S AMENDED SEP. STATEMENT IN SUPP. OF MSJ OR SUMM. ADJUD.

1  Material Facts in Support of Its Motion for Summary Adjudication in regards to each cause of

2  action and claim in plaintiff Jose Hernandez' Second Amended Complaint:

3  **Adjudication No. 1:  Hernandez' First Cause of Action fails as a matter of law because the**

4  **Authority's Codes are not a Federal or State law, rule or regulation.**

5        This is not a proper issue for determination as a "summary adjudication" but an argument

6  in favor of the adjudication of the first cause of action.  The legal importance of the argument is

7  accordingly addressed in Hernandez' points and authorities.

8

| DEF'S ALLEGED UNDISPUTED MATERIAL FACT/SUPPORTING EVIDENCE | PL'S RESPONSE/ SUPPORTING EVIDENCE |
|---|---|
| 13.  The Second Amended Complaint alleges that Hernandez disclosed violations of the Authority's Codes. | 13.  Not disputed. |
| Second Amended Complaint 7:26-27; 8:17-19; 9:7-8; 10:11-14 | |
| 14.  The Authority's Code contains administrative, regulatory and revenue ordinances of the San Diego County Regional Airport Authority. | 14.  Not disputed. |
| Exhibit 7 [Section 1.01 (a)] of the Authority's code | |
| 15.  The Authority is a local government entity. | 15.  Not disputed. |
| Public Utilities Code section 170002 | |

20  **Adjudication No. 2:  Hernandez' First Cause of Action fails as a matter of law because**

21  **Hernandez could not have had a reasonable belief that he was disclosing activity made**

22  **unlawful by a federal or state law, rule or regulation.**

23        This is not a proper issue for determination as a "summary adjudication" but an argument

24  in favor of the adjudication of the first cause of action.  The legal importance of the argument is

25  accordingly addressed in Hernandez' points and authorities.

| DEF'S ALLEGED UNDISPUTED MATERIAL FACT/SUPPORTING EVIDENCE | PL'S RESPONSE/ SUPPORTING EVIDENCE |
|---|---|
| 16.    Hernandez alleges that he disclosed that the Authority overpaid for the General Dynamics Lease. <br><br> Hernandez Depo. 393:6-17 [Exh. 1]. | 16.    Not disputed |
| 17.    The terms of the General Dynamics Lease are set by statute. <br><br> See Public Utilities Code section 170056(f)(1); Hernandez Depo. 391:14-392:24 and 397:8-11 [Exh. 1]. | 17.    Disputed. The statute leaves terms undecided following January 2006. PUC section 170056(f)(1)-(3) |
| 18.    Hernandez alleges that he disclosed that the Authority overpaid for the Teledyne Ryan lease. <br><br> Hernandez Depo. 410:3-11 and 408:3-25 [Exh. 1]. | 18.    Not disputed |
| 19.    Hernandez alleges that he disclosed that unless the Authority received space from Host, it would not be able to comply with the ADA regulations on the restroom project, and thus the project was held up. <br><br> Hernandez Depo. 343:16-344:4 and 357:10-358:6 [Exh. 1] | 19.    Not disputed |
| 20.    Hernandez alleges that he disclosed that LPi underbid the Authority and that LPi double-billed workers' compensation. <br><br> Hernandez Depo. 521:3-20 [Exh. 1] | 20.    Not disputed |

**Adjudication No. 3: Hernandez' First Cause of Action fails as a matter of law because there is no causal connection between Hernandez' alleged protected activities and his termination because the disclosures were too remote in time.**

       This is not a proper issue for determination as a "summary adjudication" but an argument in favor of the adjudication of the first cause of action. The legal importance of the argument is accordingly addressed in Hernandez' points and authorities.

| DEF'S ALLEGED UNDISPUTED MATERIAL FACT/SUPPORTING EVIDENCE | PL'S RESPONSE/ SUPPORTING EVIDENCE |
|---|---|
| 21. Hernandez first made the disclosure regarding the restroom project in 2003 or 2004.<br><br>Hernandez Depo. 357:19-24 [Exh. 1]. | 21. Not disputed |
| 22. Hernandez first made the disclosure regarding the General Dynamics Lease in approximately 2003.<br><br>Hernandez 393:1-24 [made the disclosure prior to the ratification of the lease]; Hernandez 396:9-16 [original discussions were as the terms of the agreement were being discussed with the Port]; Hernandez 386:18-22 [General Dynamics' lease was negotiated around the time that the Authority split from the Port] . | 22. Not disputed |
| 23. Hernandez first made the disclosure regarding the Teledyne Ryan Lease in late 2003 or 2004.<br><br>Hernandez 410:3-16 [Hernandez disclosed to Sexton immediately as they began to make the designs for the SAN Park project]; Hernandez 408:3-14 [developed the design documents for the SAN Park project in late 2003 or 2004] | 23. Not disputed |
| 24. Hernandez first made the disclosure regarding LPi's expenses in 2004.<br><br>Hernandez 493:24-495:15 [Hernandez made his first disclosure at the three-month or six-month submittal]; Sexton Dec. 3:15-17 [the LPi contract began in January 2004] | 24. Not disputed |
| 25. The investigation into alleged benefits received by Hernandez began in approximately November 2005.<br><br>Bowens Dec. 2:7-22; Woodson Dec. 2:5-8. | 25. Not disputed |
| 26. Hernandez' employment with the Authority ended in February 2006.<br><br>Hernandez Depo. 114:19-24 [Exh. 1]. | 26. Not disputed |

1  **Adjudication No. 4:  Hernandez' First Cause of Action fails as a matter of law because**

2  **there is no causal connection between Hernandez' alleged protected activities and his**

3  **termination because the decisionmaker was not aware of the protected activities.**

4  　　　This is not a proper issue for determination as a "summary adjudication" but an argument

5  in favor of the adjudication of the first cause of action.  The legal importance of the argument is

6  accordingly addressed in Hernandez' points and authorities

7
| DEF'S ALLEGED UNDISPUTED MATERIAL FACT/SUPPORTING EVIDENCE | PL'S RESPONSE/ SUPPORTING EVIDENCE |
|---|---|
| 27.    Thella Bowens made the decision to terminate Hernandez' employment. | 27.    Not disputed to the extend that she is included among others who contributed to the decision. |
| Bowens Dec. 3:1-10 | |
| 28.    Bowens was unaware of any of Hernandez' alleged protected activities. | 28.    Disputed.  Decl. J. Hernandez ¶ 4; Decl. J. Hernandez ¶ 5; Decl. J. Hernandez ¶ 7 . |
| Bowens Dec. 3:18-4:8 | |

14  **Adjudication No. 5:  Hernandez' First Cause of Action fails as a matter of law because the**

15  **Authority had a legitimate non-retaliatory business reason for terminating Hernandez'**

16  **employment.**

17  　　　This is not a proper issue for determination as a "summary adjudication" but an argument

18  in favor of the adjudication of the first cause of action.  The legal importance of the argument is

19  accordingly addressed in Hernandez' points and authorities.

20
| DEF'S ALLEGED UNDISPUTED MATERIAL FACT/SUPPORTING EVIDENCE | PL'S RESPONSE/ SUPPORTING EVIDENCE |
|---|---|
| 29.    Jose Hernandez became the Director of Landside Operations for defendant San Diego County Regional Airport Authority (the "Authority") on or about October 2003. | 29.    Not disputed |
| Hernandez Depo. 93:16-25 and 114:25-115:14 [Exh. 1].  Exhibit 16. | |

26

27

28

| | |
|---|---|
| 30.     Article 2, Part 2.0, Section 2.10(b) of the Authority's Ethics Code provides in part: | 30.     Not disputed |

30.     Article 2, Part 2.0, Section 2.10(b) of the Authority's Ethics Code provides in part:

Restrictions on Benefits

(4)     No Board member or employee of the Authority shall request a benefit from any person or entity or accept any benefit intended to influence official duties.

(5)     No Board member or employee of the Authority shall accept anything of value from anyone, other than the Authority or another Board member or employee, for doing his or her job.

(6)     No Board member or employee of the Authority shall accept benefits aggregating more than one-half (½) the amount of gifts permitted under the California Political Reform Act in any calendar year from any single source:

(A)     That the Board member or employee knows or should know is doing business with the Authority or intends to do business with the Authority or has done business with the Authority during the previous 12 months; or

(B)     That the Board member or employee knows or should know has or is seeking a license, permit, grant or benefit from the Authority; or

(C)     That the Board member or employee knows or should know is an agent (whether compensated or not) of any person or entity described in Subsections (A) or (B)

Exhibit 3, pp. 12-13.

| | |
|---|---|
| 31.     In approximately October or November 2005, two Authority employees advised Thella Bowens that they believed that Hernandez was behaving unethically and receiving benefits from the Authority's vendors. | 31.     Disputed. |

Bowens Dec. p. 2, lines 7-19 (hereinafter noted as "Page:Line Numbers")

57-669

| | | |
|---|---|---|
| 32. | In November 2005, Bowens asked the Authority's Vice President of Administration, Jeffrey Woodson, to have an outside investigator conduct an investigation into the allegations that Hernandez had received benefits from the Authority's vendors. | 32. Not disputed |

Woodson Dec. 2:5-8; Bowens Dec. 2:20-22

| | | |
|---|---|---|
| 33. | Woodson approved the retention of Luce, Forward, Hamilton & Scripps ("Luce Forward") to conduct an investigation into the allegations made regarding Hernandez receiving benefits from the Authority's vendors. | 33. Not disputed |

Swan Dec. 2:9-12; Woodson Dec. 2:9-13

| | | |
|---|---|---|
| 34. | Edward Patrick Swan, Jr. of Luce Forward conducted an investigation, with assistance from John Gamberzky, regarding the allegations that Hernandez received benefits from the Authority's vendors. | 34. Not disputed |

Swan Dec. 3:1-10.

| | | |
|---|---|---|
| 35. | Hernandez admits that he received four non-revenue tickets from Hawaiian Airlines in 2004, and that he knew Hawaiian Airlines was doing business with the Authority at the time he received the tickets. | 35. Disputed. He received the tickets from Janet Nix, in her capacity as a personal friend. Decl. J. Hernandez par. 11; Decl. J. Nix par. 11. |

Swan Dec. 3:11-12; Hernandez Depo. 198:8-200:17 and 280:1-14 [Exh. 1]

| | | |
|---|---|---|
| 36. | Hernandez admits that he received at least two buddy passes from Southwest Airlines in 2004 for his children, and that he knew Southwest Airlines was doing business with the Authority at the time he received the tickets. | 36. Disputed. He received the tickets from Mike Parrish, in his capacity as a personal friend. Decl. J. Hernandez par. 9-10; Decl. M. Parrish par. 2-3. |

Hernandez Depo. 191:8-20 and 281:6-12 [Exh. 1].

57-670

| | | | |
|---|---|---|---|
| 1 | 37. | Mr. Swan concluded in his investigation that there was sufficient evidence that Hernandez had accepted benefits from Authority vendors and contractors.  He also concluded that there was sufficient evidence that Hernandez had violated Section 2.10 of the Authority's Ethics Code. | 37. | Not disputed subject to Objection. Improper Opinion (See Objection nos. 8-12 ) |

Swan Dec. 4:6-14; Exhibit 4, pp. 2 and 20-21; Exh. 3, pp. 12-13.

| | | | |
|---|---|---|---|
| 38. | Mr. Swan prepared a written report of his findings and sent them to Thella Bowens on or about January 19, 2006. | 38. | Not disputed. |

Swan Dec. 3:25-4:2; Exhibit 4

| | | | |
|---|---|---|---|
| 39. | After reviewing the findings contained in Mr. Swan's January 19, 2006 report, and upon the recommendation of Jeffrey Woodson and the Authority's Director of Human Resources, Diane Richards, Bowens determined that Hernandez' employment should be terminated because it appeared that he had accepted benefits in violation of Section 2.10 of the Authority's Ethics Code. | 39. | Disputed.. Decl. J. Hernandez in its entirety; Decl. J. Nix in its entirety; Decl. M. Parrish in its entirety. |

Bowens Dec. 3:1-10; Exh. 3, pp. 12-13 [Ethics Code]; Woodson Dec. 2:25-3:4

**Adjudication No. 6:  Hernandez' First Cause of Action fails as a matter of law because he has no evidence of pretext.**

This is not a proper issue for determination as a "summary adjudication" but an argument in favor of the adjudication of the first cause of action.  The legal importance of the argument is accordingly addressed in Hernandez' points and authorities.

PL'S OPPOS. TO DEF SDCRAA'S AMENDED SEP. STATEMENT IN SUPP. OF MSJ OR SUMM. ADJUD.
- 11 -

| | DEF'S ALLEGED UNDISPUTED MATERIAL FACT/SUPPORTING EVIDENCE | PL'S RESPONSE/ SUPPORTING EVIDENCE |
|---|---|---|
| 1 | | |
| 2 | | |
| 3 | 40.   Jose Hernandez became the Director of Landside Operations for defendant San Diego County Regional Airport Authority (the "Authority") on or about October 2003. | 40.   Not disputed |
| 4 | | |
| 5 | | |
| 6 | Hernandez Depo. 93:16-25 and 114:25-115:14 [Exh. 1].  Exhibit 16. | |
| 7 | 41.   Article 2, Part 2.0, Section 2.10(b) of the Authority's Ethics Code provides in part: | 41.   Not disputed |
| 8 | Restrictions on Benefits | |
| 9 | (7)   No Board member or employee of the Authority shall request a benefit from | |
| 10 | any person or entity or accept any benefit intended to influence official duties. | |
| 11 | (8)   No Board member or employee of the Authority shall accept anything of value | |
| 12 | from anyone, other than the Authority or another Board member or employee, for | |
| 13 | doing his or her job. | |
| 14 | (9)   No Board member or employee of the Authority shall accept benefits | |
| 15 | aggregating more than one-half (½) the amount of gifts permitted under the | |
| 16 | California Political Reform Act in any calendar year from any single source: | |
| 17 | (A)   That the Board member or employee knows or should know is doing business | |
| 18 | with the Authority or intends to do business with the Authority or has done business with | |
| 19 | the Authority during the previous 12 months; or | |
| 20 | (B)   That the Board member or employee knows or should know has or is seeking a | |
| 21 | license, permit, grant or benefit from the Authority; or | |
| 22 | (C)   That the Board member or employee knows or should know is an agent (whether | |
| 23 | compensated or not) of any person or entity described in Subsections (A) or (B) | |
| 24 | Exhibit 3, pp. 12-13. | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

| | | |
|---|---|---|
| 42. | In approximately October or November 2005, two Authority employees advised Thella Bowens that they believed that Hernandez was behaving unethically and receiving benefits from the Authority's vendors. | 42.    Not disputed |

Bowens Dec. p. 2, lines 7-19 (hereinafter noted as "Page:Line Numbers")

| | | |
|---|---|---|
| 43. | In November 2005, Bowens asked the Authority's Vice President of Administration, Jeffrey Woodson, to have an outside investigator conduct an investigation into the allegations that Hernandez had received benefits from the Authority's vendors. | 43.    Not disputed |

Woodson Dec. 2:5-8; Bowens Dec. 2:20-22

| | | |
|---|---|---|
| 44. | Woodson approved the retention of Luce, Forward, Hamilton & Scripps ("Luce Forward") to conduct an investigation into the allegations made regarding Hernandez receiving benefits from the Authority's vendors. | 44.    Not disputed |

Swan Dec. 2:9-12; Woodson Dec. 2:9-13

| | | |
|---|---|---|
| 45. | Edward Patrick Swan, Jr. of Luce Forward conducted an investigation, with assistance from John Gamberzky, regarding the allegations that Hernandez received benefits from the Authority's vendors. | 45.    Not disputed |

Swan Dec. 3:1-10.

| | | |
|---|---|---|
| 46. | Hernandez admits that he received four non-revenue tickets from Hawaiian Airlines in 2004, and that he knew Hawaiian Airlines was doing business with the Authority at the time he received the tickets. | 46.    Disputed. He received the tickets from Janet Nix, in her capacity as a personal friend. Decl. J. Hernandez par. 11; Decl. J. Nix par. 11. |

Swan Dec. 3:11-12; Hernandez Depo. 198:8-200:17 and 280:1-14 [Exh. 1]

PL'S OPPOS. TO DEF SDCRAA'S AMENDED SEP. STATEMENT IN SUPP. OF MSJ OR SUMM. ADJUD.

- 13 -

57-673

| 47. | Hernandez admits that he received at least two buddy passes from Southwest Airlines in 2004 for his children, and that he knew Southwest Airlines was doing business with the Authority at the time he received the tickets. | 47. | Disputed. He received the tickets from Mike Parrish, in his capacity as a personal friend. Decl. J. Hernandez par. 9-10; Decl. M. Parrish par. 2-3. |

Hernandez Depo. 191:8-20 and 281:6-12 [Exh. 1].

| 48. | Mr. Swan concluded in his investigation that there was sufficient evidence that Hernandez had accepted benefits from Authority vendors and contractors. He also concluded that there was sufficient evidence that Hernandez had violated Section 2.10 of the Authority's Ethics Code. | 48. | Not disputed subject to Objection. Improper Opinion (See Objection nos. 8-12 ) |

Swan Dec. 4:6-14; Exhibit 4, pp. 2 and 20-21; Exh. 3, pp. 12-13.

| 49. | Mr. Swan prepared a written report of his findings and sent them to Thella Bowens on or about January 19, 2006. | 49. | Not disputed |

Swan Dec. 3:25-4:2; Exhibit 4

| 50. | After reviewing the findings contained in Mr. Swan's January 19, 2006 report, and upon the recommendation of Jeffrey Woodson and the Authority's Director of Human Resources, Diane Richards, Bowens determined that Hernandez' employment should be terminated because it appeared that he had accepted benefits in violation of Section 2.10 of the Authority's Ethics Code. | 50. | Disputed. Decl. J. Hernandez in its entirety; Decl. J. Nix in its entirety; Decl. M. Parrish in its entirety. |

Bowens Dec. 3:1-10; Exh. 3, pp. 12-13 [Ethics Code]; Woodson Dec. 2:25-3:4

**Adjudication No. 7:  Hernandez' First Cause of Action under Labor Code section 1102.5(a) fails as a matter of law because Hernandez has not identified a rule, regulation, or policy made, adopted or enforced by the Authority that prevents an employee from disclosing information to a governmental agency.**

57-674

1    This is not a proper issue for determination as a "summary adjudication" but an argument

2   in favor of the adjudication of the first cause of action. The legal importance of the argument is

3   accordingly addressed in Hernandez' points and authorities. For the Court's convenience, this

4   opposition does not allege a violation of 1102.5(a), but focuses upon the 1102.5(b) violation.

| DEF'S ALLEGED UNDISPUTED MATERIAL FACT/SUPPORTING EVIDENCE | PL'S RESPONSE/ SUPPORTING EVIDENCE |
|---|---|
| 51.    Hernandez alleges that he was advised to keep the investigation confidential.<br><br>Hernandez 840:12-15 [Exh. 2]; Second Amended Complaint p. 11, lines 26-28. | 51.    Not disputed |

**Adjudication No. 8:  Hernandez' First Cause of Action under Labor Code section 1102.5(a) fails as a matter of law because any instructions regarding confidentiality were made to implement the protection of the attorney-client privilege (See Labor Code section 1102.5(g)).**

14    This is not a proper issue for determination as a "summary adjudication" but an argument

15   in favor of the adjudication of the first cause of action. The legal importance of the argument is

16   accordingly addressed in Hernandez' points and authorities. For the Court's convenience, this

17   opposition does not allege a violation of 1102.5(a), but focuses upon the 1102.5(b) violation.

| DEF'S ALLEGED UNDISPUTED MATERIAL FACT/SUPPORTING EVIDENCE | PL'S RESPONSE/ SUPPORTING EVIDENCE |
|---|---|
| 52.    Mr. Swan advised Hernandez that he should keep the interview confidential because the investigation was an attorney-client privileged investigation.<br><br>Swan 2:26-28. | 52.    Disputed to the extent that the attorney-client investigation is pretext to silence Hernandez in violation of Section 1102.5(a) |

**Adjudication No. 9:  Hernandez' First Cause of Action fails as a matter of law under Labor Code section 1102.5(c) because Hernandez did not refuse to participate in any unlawful activity.**

27    This is not a proper issue for determination as a "summary adjudication" but an argument

28   in favor of the adjudication of the first cause of action. The legal importance of the argument is

57-675

1  accordingly addressed in Hernandez' points and authorities. For the Court's convenience, this

2  opposition does not allege a violation of 1102.5(a), but focuses upon the 1102.5(b) violation.

3  **DEF'S ALLEGED UNDISPUTED MATERIAL**                    **PL'S RESPONSE/**
   **FACT/SUPPORTING EVIDENCE**                             **SUPPORTING EVIDENCE**

4

5  53.  Hernandez did not refuse to          53.  Not disputed
        participate in any activity because he
        thought it was unlawful or illegal.

6

7  Hernandez Depo. 891:5-15 [Exh. 1].)

8  **Adjudication No. 10: The Authority is immune from Hernandez' Labor Code section**

9  **1102.5 cause of action under Government Code section 821.6**

10        This is not a proper issue for determination as a "summary adjudication" but an argument

11  in favor of the adjudication of the first cause of action. The legal importance of the argument is

12  accordingly addressed in Hernandez' points and authorities.

13  **DEF'S ALLEGED UNDISPUTED MATERIAL**                   **PL'S RESPONSE/**
    **FACT/SUPPORTING EVIDENCE**                            **SUPPORTING EVIDENCE**

14

15  54.  Hernandez alleges harm in his        54.  Not disputed
        Second Amended Complaint arising
        out of the Authority's investigation

16      of his activities and his resulting
        termination.

17

18  See Second Amended Complaint generally,
    including paragraphs 23-30.

19  55.  In November 2005, Bowens asked       55.  Not disputed
        the Authority's Vice President of

20      Administration, Jeffrey Woodson, to
        have an outside investigator conduct

21      an investigation into the allegations
        that Hernandez had received benefits

22      from the Authority's vendors.

23  Woodson Dec. 2:5-8; Bowens Dec. 2:20-22

24

25

26

27

28

)

| | | | |
|---|---|---|---|
| 1 | 56. | Woodson approved the retention of Luce, Forward, Hamilton & Scripps ("Luce Forward") to conduct an investigation into the allegations made regarding Hernandez receiving benefits from the Authority's vendors. | 56.    Not disputed |

2

3

4

5    Swan Dec. 2:9-12; Woodson Dec. 2:9-13

6    57.    Edward Patrick Swan, Jr. of Luce          57.    Not disputed
             Forward conducted an investigation,
7            with assistance from John
             Gamberzky, regarding the allegations
8            that Hernandez received benefits
             from the Authority's vendors.
9
      Swan Dec. 3:1-10.
10

11   58.    Mr. Swan concluded in his              58.    Not disputed subject to Objection.
             investigation that there was sufficient        Improper Opinion (See Objection
12           evidence that Hernandez had                    nos. 8-12 )
             accepted benefits from Authority
13           vendors and contractors.  He also
             concluded that there was sufficient
14           evidence that Hernandez had
             violated Section 2.10 of the
15           Authority's Ethics Code.

16    Swan Dec. 4:6-14; Exhibit 4, pp. 2 and
      20-21; Exh. 3, pp. 12-13.
17

18   59.    Mr. Swan prepared a written report      59.    Not disputed
             of his findings and sent them to
19           Thella Bowens on or about January
             19, 2006.
20
      Swan Dec. 3:25-4:2; Exhibit 4
21

22

23

24

25

26

27

28

57-677

| 60. | After reviewing the findings contained in Mr. Swan's January 19, 2006 report, and upon the recommendation of Jeffrey Woodson and the Authority's Director of Human Resources, Diane Richards, Bowens determined that Hernandez' employment should be terminated because it appeared that he had accepted benefits in violation of Section 2.10 of the Authority's Ethics Code. | 60. | Disputed.. Decl. J. Hernandez in its entirety; Decl. J. Nix in its entirety; Decl. M. Parrish in its entirety. |

Bowens Dec. 3:1-10; Exh. 3, pp. 12-13 [Ethics Code]; Woodson Dec. 2:25-3:4

**Adjudication No. 11:  This court lacks jurisdiction over Hernandez' Labor Code section 1102.5 cause of action because he failed to exhaust his administrative remedies under Labor Code sections 98.6 and 98.7**

This is not a proper issue for determination as a "summary adjudication" but an argument in favor of the adjudication of the first cause of action. The legal importance of the argument is accordingly addressed in Hernandez' points and authorities.

| **DEF'S ALLEGED UNDISPUTED MATERIAL FACT/SUPPORTING EVIDENCE** | **PL'S RESPONSE/ SUPPORTING EVIDENCE** |

| 61. | Hernandez has not alleged that he filed a claim with the Labor Commissioner. | 61. | Not disputed |

See Second Amended Complaint.

**GENERAL DYNAMICS DISCLOSURE:**

**Adjudication No. 12:  Hernandez' First Cause of Action under Labor Code section 1102.5, insofar as it is based on any alleged disclosure regarding the General Dynamics' lease, fails as a matter of law because Hernandez could not have had a reasonable belief that the General Dynamics' lease was unlawful.**

This is not a proper issue for determination as a "summary adjudication" but an argument in favor of the adjudication of the first cause of action. The legal importance of the argument is accordingly addressed in Hernandez' points and authorities.

57-678

| DEF'S ALLEGED UNDISPUTED MATERIAL FACT/SUPPORTING EVIDENCE | PL'S RESPONSE/ SUPPORTING EVIDENCE |
|---|---|
| 62. Hernandez alleges that he disclosed that the Authority overpaid for the General Dynamics Lease.<br><br>Hernandez Depo. 393:6-17 [Exh. 1]. | 62. Not disputed |
| 63. The terms of the General Dynamics Lease are set by statute.<br><br>See Public Utilities Code section 170056(f)(1); Hernandez Depo 391:14-392:24 and 397:8-11 [Exh. 1]. | 63. Disputed. Some terms of the lease are left open by statute. PUC 170056(f)(1)-(3) |

**Adjudication No. 13:** Hernandez' First Cause of Action under Labor Code section 1102.5, insofar as it is based on any alleged disclosure regarding the General Dynamics' lease, fails as a matter of law because Hernandez has not identified a state or federal statute, rule or regulation of which he disclosed a violation.

This is not a proper issue for determination as a "summary adjudication" but an argument in favor of the adjudication of the first cause of action. The legal importance of the argument is accordingly addressed in Hernandez' points and authorities.

| DEF'S ALLEGED UNDISPUTED MATERIAL FACT/SUPPORTING EVIDENCE | PL'S RESPONSE/ SUPPORTING EVIDENCE |
|---|---|
| 64. Hernandez alleges that he disclosed that the Authority overpaid for the General Dynamics Lease.<br><br>Hernandez Depo. 393:6-17 [Exh. 1]. | 64. Not disputed |
| 65. The terms of the General Dynamics Lease are set by statute.<br><br>See Public Utilities Code section 170056(f)(1); Hernandez Depo. 391:14-392:24 and 397:8-11 [Exh. 1]. | 65. Disputed. Some terms of the lease are left open by statute. PUC 170056(f)(1)-(3) |

**Adjudication No. 14:** Hernandez' First Cause of Action fails as matter of law, insofar as it is based on any alleged disclosure regarding the General Dynamics' lease, because there is no causal connection between his alleged protected activity and his termination.

///

57-679

1    This is not a proper issue for determination as a "summary adjudication" but an argument

2    in favor of the adjudication of the first cause of action. The legal importance of the argument is

3    accordingly addressed in Hernandez' points and authorities.

| **DEF'S ALLEGED UNDISPUTED MATERIAL FACT/SUPPORTING EVIDENCE** | **PL'S RESPONSE/ SUPPORTING EVIDENCE** |
| --- | --- |
| 66. Hernandez first made the disclosure regarding the General Dynamics Lease in approximately 2003. | 66. Not disputed |
| Hernandez 393:1-24 [made the disclosure prior to the ratification of the lease]; Hernandez 396:9-16 [original discussions were as the terms of the agreement were being discussed with the Port]; Hernandez 386:18-22 [General Dynamics' lease was negotiated around the time that the Authority split from the Port] | |
| 67. Hernandez' employment with the Authority ended in February 2006. | 67. Not disputed |
| Hernandez Depo. 114:19-24 [Exh. 1]. | |
| 68. Thella Bowens made the decision to terminate Hernandez' employment. | 68. Not disputed to the extend that she is included among others who contributed to the decision. |
| Bowens Dec. 3:1-10 | |

17    **Teledyne Ryan Disclosure:**

18    **Adjudication No. 15:  Hernandez' First Cause of Action under Labor Code section 1102.5,**

19    **insofar as it is based on any alleged disclosure regarding the Teledyne Ryan lease, fails as a**

20    **matter of law because Hernandez could not have had a reasonable belief that the Teledyne**

21    **Ryan lease was unlawful.**

22    This is not a proper issue for determination as a "summary adjudication" but an argument

23    in favor of the adjudication of the first cause of action. The legal importance of the argument is

24    accordingly addressed in Hernandez' points and authorities.

| **DEF'S ALLEGED UNDISPUTED MATERIAL FACT/SUPPORTING EVIDENCE** | **PL'S RESPONSE/ SUPPORTING EVIDENCE** |
|---|---|

69.  Hernandez alleges that he disclosed that the Authority overpaid for the Teledyne Ryan lease.

            69.  Not disputed

Hernandez Depo. 410:3-11 and 408:3-25 [Exh. 1].

**Adjudication No. 16:**  Hernandez' First Cause of Action under Labor Code section 1102.5, insofar as it is based on any alleged disclosure regarding the Teledyne Ryan lease, fails as a matter of law because Hernandez has not identified a state or federal statute, rule or regulation of which he disclosed a violation.

This is not a proper issue for determination as a "summary adjudication" but an argument in favor of the adjudication of the first cause of action.  The legal importance of the argument is accordingly addressed in Hernandez' points and authorities.

| **DEF'S ALLEGED UNDISPUTED MATERIAL FACT/SUPPORTING EVIDENCE** | **PL'S RESPONSE/ SUPPORTING EVIDENCE** |
|---|---|

70.  Hernandez alleges that he disclosed that the Authority overpaid for the Teledyne Ryan lease.

            70.  Not disputed

Hernandez Depo. 410:3-11 and 408:3-25 [Exh. 1].

71.  The Authority's Code contains administrative, regulatory and revenue ordinances of the San Diego County Regional Airport Authority.

            71.  Not disputed

Exhibit 7 [Section 1.01 (a)]

            72.  Not disputed

72.  The Authority is a local government entity.

Public Utilities Code section 170002

**Adjudication No. 17:**  Hernandez' First Cause of Action fails as matter of law, insofar as it is based on any alleged disclosure regarding the Teledyne Ryan lease, because there is no causal connection between his alleged protected activity and his termination.

This is not a proper issue for determination as a "summary adjudication" but an argument

1    in favor of the adjudication of the first cause of action.  The legal importance of the argument is

2    accordingly addressed in Hernandez' points and authorities.

3    **DEF'S ALLEGED UNDISPUTED MATERIAL**                     **PL'S RESPONSE/**
     **FACT/SUPPORTING EVIDENCE**                              **SUPPORTING EVIDENCE**
4
5    73.    At the time that the Authority            73.    Not disputed
            entered into the lease on the
6           Teledyne Ryan property, it was
            aware that there was contamination
7           on the property.

8    Hernandez Depo. 406:4-24 [Exh. 1]

9    74.    Hernandez did not speak to anyone        74.    Not disputed
            regarding the contamination on the
10          property until after the Authority
            entered into the lease with regard to
11          the Teledyne Ryan property.

12   Hernandez Depo. 406:25-408:2 [Exh. 1]

13   75.    Paul Manasjan also expressed            75.    Not disputed
            dissatisfaction regarding the
14          Teledyne Ryan Lease.

15   Hernandez Depo. 413:22-414:6 [Exh. 1]

16   76.    Paul Manasjan is still employed at      76.    Not disputed
            the Authority.

17   Woodson Dec. 3:19-20.

18   77.    Hernandez first made the disclosure     77.    Not disputed
            regarding the Teledyne Ryan Lease
19          in late 2003 or 2004.

20   Hernandez 410:3-16 [Hernandez disclosed
     to Sexton immediately as they began to
21   make the designs for the SAN Park project];
     Hernandez 408:3-14 [developed the design
22   documents for the SAN Park project in late
     2003 or 2004]
23
24   78.    Hernandez' employment with the         78.    Not disputed
            Authority ended in February 2006.
25
     Hernandez Depo. 114:19-24 [Exh. 1].
26

27

28

57-682

| | | | |
|---|---|---|---|
| 1 | 79.  Thella Bowens made the decision to terminate Hernandez' employment. | 79. | Not disputed to the extend that she is included among others who contributed to the decision. |
| 2 | | | |

Bowens Dec. 3:1-10

### RESTROOM PROJECT DISCLOSURE:

**Adjudication No. 18**: Hernandez' First Cause of Action under Labor Code section 1102.5, insofar as it is based on any alleged disclosure regarding the restroom project, fails as a matter of law because Hernandez could not have had a reasonable belief that the restroom project was unlawful.

This is not a proper issue for determination as a "summary adjudication" but an argument in favor of the adjudication of the first cause of action. The legal importance of the argument is accordingly addressed in Hernandez' points and authorities.

| **DEF'S ALLEGED UNDISPUTED MATERIAL FACT/SUPPORTING EVIDENCE** | | **PL'S RESPONSE/ SUPPORTING EVIDENCE** |
|---|---|---|
| 80.  Hernandez alleges that he disclosed that unless the Authority received space from Host, it would not be able to comply with the ADA regulations on the restroom project, and thus the project was held up. | 80. | Not disputed |

Hernandez Depo. 343:16-344:4 and 357:10-358:6 [Exh. 1]

**Adjudication No. 19**: Hernandez' First Cause of Action under Labor Code section 1102.5, insofar as it is based on any alleged disclosure regarding the restroom project, fails as a matter of law because Hernandez admits that the Authority did not violate the ADA, nor did it express its intention to violate the ADA.

This is not a proper issue for determination as a "summary adjudication" but an argument in favor of the adjudication of the first cause of action. The legal importance of the argument is accordingly addressed in Hernandez' points and authorities.

57-683

| **DEF'S ALLEGED UNDISPUTED MATERIAL FACT/SUPPORTING EVIDENCE** | **PL'S RESPONSE/ SUPPORTING EVIDENCE** |
|---|---|
| 81. The Authority never indicated that it did not want to comply with the ADA, nor did the Authority at any time violate the ADA. | 81. Not disputed |

Hernandez 366:12-367:21; 371:15-372:22.

**Adjudication No. 20:** Hernandez' First Cause of Action under Labor Code section 1102.5, insofar as it is based on any alleged disclosure regarding the restroom project, fails as a matter of law because Hernandez has not identified a state or federal statute, rule or regulation of which he disclosed a violation.

This is not a proper issue for determination as a "summary adjudication" but an argument in favor of the adjudication of the first cause of action. The legal importance of the argument is accordingly addressed in Hernandez' points and authorities.

| **DEF'S ALLEGED UNDISPUTED MATERIAL FACT/SUPPORTING EVIDENCE** | **PL'S RESPONSE/ SUPPORTING EVIDENCE** |
|---|---|
| 82. Hernandez alleges that he disclosed that unless the Authority received space from Host, it would not be able to comply with the ADA regulations on the restroom project, and thus the project was held up. | 82. Not disputed |

Hernandez Depo. 343:16-344:4 and 357:10-358:6 [Exh. 1]

| | |
|---|---|
| 83. The Authority's Code contains administrative, regulatory and revenue ordinances of the San Diego County Regional Airport Authority. | 83. Not disputed |

Exhibit 7 [Section 1.01 (a)]

| | |
|---|---|
| 84. The Authority is a local government entity. | 84. Not disputed |

Public Utilities Code section 170002

**Adjudication No. 21:** Hernandez' First Cause of Action, insofar as it is based on any alleged disclosure regarding the restroom project, fails as matter of law because there is no causal connection between his alleged protected activity and his termination.

57-684

1        This is not a proper issue for determination as a "summary adjudication" but an argument

2    in favor of the adjudication of the first cause of action. The legal importance of the argument is

3    accordingly addressed in Hernandez' points and authorities.

| DEF'S ALLEGED UNDISPUTED MATERIAL FACT/SUPPORTING EVIDENCE | PL'S RESPONSE/ SUPPORTING EVIDENCE |
|---|---|
| 85.   Hernandez first made the disclosure regarding the restroom project in 2003 or 2004.<br><br>Hernandez Depo. 357:19-24 [Exh. 1]. | 85.   Not disputed |
| 86.   Parsons first raised the issue regarding the necessity of taking the 30 square feet of space in 2002.<br><br>Hernandez Depo. 347:16-348:3 [Exh. 1] | 86.   Not disputed |
| 87.   The investigation into alleged benefits received by Hernandez began in approximately November 2005.<br><br>Bowens Dec. 2:7-22; Woodson Dec. 2:5-8. | 87.   Not disputed |
| 88.   Hernandez' employment with the Authority ended in February 2006.<br><br>Hernandez Depo. 114:19-24 [Exh. 1]. | 88.   Not disputed |
| 89.   Thella Bowens made the decision to terminate Hernandez' employment.<br><br>Bowens Dec. 3:1-10 | 89.   Not disputed to the extend that she is included among others who contributed to the decision. |

## LPI DISCLOSURE

21    **Adjudication No. 22: Hernandez' First Cause of Action under Labor Code section 1102.5,**

22    **insofar as it is based on any alleged disclosure regarding LPi, fails as a matter of law**

23    **because Hernandez could not have had a reasonable belief that he disclosed unlawful acts.**

24        This is not a proper issue for determination as a "summary adjudication" but an argument

25    in favor of the adjudication of the first cause of action. The legal importance of the argument is

26    accordingly addressed in Hernandez' points and authorities.

57-685

| DEF'S ALLEGED UNDISPUTED MATERIAL FACT/SUPPORTING EVIDENCE | PL'S RESPONSE/ SUPPORTING EVIDENCE |
|---|---|

90. Hernandez alleges that he disclosed that LPi underbid the Authority and that LPi double-billed workers' compensation.

90.    Not disputed

Hernandez Depo. 521:3-20 [Exh. 1]

**Adjudication No. 23:  Hernandez' First Cause of Action under Labor Code section 1102.5, insofar as it is based on any alleged disclosure regarding LPi, fails as a matter of law because Hernandez has not identified a state or federal statute, rule or regulation of which he disclosed a violation.**

This is not a proper issue for determination as a "summary adjudication" but an argument in favor of the adjudication of the first cause of action.  The legal importance of the argument is accordingly addressed in Hernandez' points and authorities.

| DEF'S ALLEGED UNDISPUTED MATERIAL FACT/SUPPORTING EVIDENCE | PL'S RESPONSE/ SUPPORTING EVIDENCE |
|---|---|

91. The Second Amended Complaint alleges that Hernandez disclosed violations of the Authority's Codes.

91.    Not disputed

Second Amended Complaint 7:26-27; 8:17-19; 9:7-8; 10:11-14

92. The Authority's Code contains administrative, regulatory and revenue ordinances of the San Diego County Regional Airport Authority.

92.    Not disputed

Exhibit 7 [Section 1.01 (a)]

93. The Authority is a local government entity.

93.    Not disputed

Public Utilities Code section 170002

**Adjudication No. 24:  Hernandez' First Cause of Action fails as matter of law, insofar as it is based on any alleged disclosure regarding LPi, because there is no causal connection between his alleged protected activity and his termination.**

This is not a proper issue for determination as a "summary adjudication" but an argument

57-686

1    in favor of the adjudication of the first cause of action.  The legal importance of the argument is

2    accordingly addressed in Hernandez' points and authorities.

3    **DEF'S ALLEGED UNDISPUTED MATERIAL**                        **PL'S RESPONSE/**
     **FACT/SUPPORTING EVIDENCE**                                **SUPPORTING EVIDENCE**

4

5    94.   Hernandez first made the disclosure              94.   Not disputed
           regarding LPi's expenses in 2004.

6    Hernandez 493:24-495:15 [Hernandez made
     his first disclosure at the three-month or

7    six-month submittal]; Sexton Dec. 3:15-17
     [the LPi contract began in January 2004]

8
     95.   The investigation into alleged                   95.   Not disputed
9          benefits received by Hernandez
           began in approximately November

10         2005.

11   Bowens Dec. 2:7-22; Woodson Dec. 2:5-8.

12   96.   Hernandez' employment with the                   96.   Not disputed
           Authority ended in February 2006.

13
     Hernandez Depo. 114:19-24 [Exh. 1].

14
     97.   Thella Bowens made the decision to              97.   Not disputed to the extend that she is
15         terminate Hernandez' employment.                       included among others who
                                                                  contributed to the decision.

16   Bowens Dec. 3:1-10

17
     DATED:  November 2, 2007

18                                                       CATHRYN CHINN, Attorney for
                                                         Plaintiff JOSE HERNANDEZ

19

20

21

22

23

24

25

26

27

28

57-687

**EXHIBIT 58**

1  Cathryn Chinn, Esq. (State Bar 93340)
   1901 First Avenue, Suite 400
2  San Diego, California 92101
   Telephone (619) 234-9000
3  Facsimile (619) 699-1159

4

5  Attorney for Plaintiff
   JOSE HERNANDEZ

6

7

8              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9       **COUNTY OF SAN DIEGO, CENTRAL BRANCH, GENERAL UNLIMITED**

10  JOSE HERNANDEZ,                    | Case No. : GIC 871979

11           Plaintiff,               | PLAINTIFF JOSE HERNANDEZ'
                                       | SEPARATE STATEMENT OF
12  v.                                 | ADDITIONAL UNDISPUTED MATERIAL
                                       | FACTS IN OPPOSITION TO DEFENDANT
13  SAN DIEGO COUNTY REGIONAL          | SAN DIEGO COUNTY REGIONAL
    AIRPORT AUTHORITY, a public entity | AIRPORT AUTHORITY'S MOTION FOR
14  and DOES 1 through 12, Inclusive,  | SUMMARY JUDGMENT OR, IN THE
                                       | ALTERNATIVE, SUMMARY
15           Defendants.               | ADJUDICATION

16                                     | DATE:       November 16, 2007
                                       | TIME:        1:30 p.m.
17                                     | DEPT.:      75
                                       | JUDGE:      HON. RICHARD E. STRAUSS
18                                     | ACTION FILED:    9/1/06
                                       | TRIAL DATE:     1/4/08

19

20          Plaintiff JOSE HERNANDEZ presents his Separate Statement of Additional Undisputed

21  Material Facts in Opposition to Defendant SAN DIEGO COUNTY REGIONAL AIRPORT

22  AUTHORITY's Motion for Summary Judgment or, in the Alternative, Summary Adjudication,

23  as follows:

24  ///

25  ///

26  ///

27  ///

28

        PL'S SEP. STATEMENT OF ADDIT. UNDISPUTED MATERIAL FACTS IN OPPOS. TO SDCRAA'S MSJ

| | |
|---|---|
| **PLAINTIFF'S ADDITIONAL UNDISPUTED FACTS** | **PL'S SUPPORTING EVIDENCE** |

1.    Plaintiff Jose Hernandez was hired in March 2001 as Manager of Ground Transportation.  He then became Director of Landside Operations in 2003. His responsibilities included the management of airport parking and terminal facilities, and the development and adherence to a budget for the operation of those facilities.

1.    Decl. J. Hernandez ¶ 1; Depo. J. Hernandez 104: 8; 397:14-16

2.    He worked within a budget dictated by anticipated revenues from the management of Airport properties and facilities.

2.    Decl. J. Hernandez ¶ 1; Depo J. Hernandez 397:3-7; 417:13

3.    Hernandez reported directly to Theodore Sexton, Vice President of Operations, who reported to Thella Bowens.

3.    Decl. J. Hernandez ¶ 1

4.    Bryan Enarson, Vice President of Development, was a close confidant of Thella Bowens', and the lead negotiator on land lease contracts made with General Dynamics and Teledyne Ryan.

4.    Decl. J. Hernandez ¶ 1; Depo. J. Hernandez 646:1-2; 388:8-12; 399:9-12; 400:1

5.    One of Hernandez' duties was the evaluation of a lease from the Port of property located on the north side of the Airport (General Dynamics property).  The lease price contemplated the use of the property for parking, and revenues which would generate to the lease holder for 2100 stalls.

5.    Decl. J. Hernandez ¶ 2, Plaintiff's depo. 387:11-21, 389:15-17, 396:1-8

6.    Hernandez' understanding of the lease was that the lease price was set by code for the years 2003, 2004 and 2005, and was thereafter subject to renegotiation.

6.    Decl. J. Hernandez ¶ 2; PUC § 170056(f)(1-3); Plaintiff's depo. 396:1-8; 397:8-11

7.    Hernandez conducted an evaluation of the cash flow of the property when the lease came up for renegotiation, and determined that deficiencies in the property prevented from generating sufficient revenue to cover the lease price by at least $2 million per year.  The deficiency centered on the discovery of toxic waste in the soil beneath the property which severely limited the development of the property for parking.

7.    Decl. J. Hernandez ¶ 2; Plaintiff's depo. 397:3-7

58-689

1   8.      Hernandez communicated the deficiency in the property to Sexton and Bowens, and that the continuation of the lease at its existing rate would amount to a gift of public money to the Port.

8.      Decl. J. Hernandez ¶ 2; Plaintiff's depo. 393:6-24

4   9.      Sexton and Bowens refused to renegotiate the terms of the lease. Enarson, then speaking on Bowens' behalf, justified the lease amount by stating, "that was the price for Thella's (Bowens') freedom."

9.      Decl. J. Hernandez ¶ 3; Plaintiff's depo. 393:6-24; 393:21-24; 394:17-25

7   10.     Another of Hernandez' duties was the evaluation of a lease from the Port of property located at the west side of the Airport. (The Teledyne Ryan property)  The lease of that property likewise contemplated the generation of revenues to cover the lease through its use as a parking lot.  The lease had been negotiated by Enarson and was not subject to renegotiation.

10.     Decl. J. Hernandez ¶ 4; Plaintiff's depo. 388:8-12

12  11.     Hernandez discovered this property was likewise contaminated and only a small portion of it was usable.

11.     Decl. J. Hernandez ¶ 4; Plaintiff's depo. 389:19-22, 390:3-5, 396:20-25

14  12.     The contamination was grossly understated by the Port as a $10 million expense (which the Port agreed to pay) when the real cost of remediation was in excess of $30 million.

12.     Decl. J. Hernandez ¶ 4; Plaintiff's depo. 407:2-408:2, 409:3-6

17  13.     Hernandez then informed Sexton, Enarson and Bowens that the lease constituted an unwarranted expenditure of public money to the Port of over $3 million per year.

13.     Decl. J. Hernandez ¶ 4; Plaintiff's depo. 417:14-22, 418:3-10

20  14.     Another of Hernandez' duties was to oversee the construction and/or maintenance of public facilities at the terminals, including public restrooms.  Hernandez attempted to expand the size of the public restrooms to alleviate overcrowding in the east terminal and bring them into compliance with the state requirements that they be accessible by wheel chair, as required by the Americans with Disabilities Act (ADA).

14.     Decl. J. Hernandez ¶5; Plaintiff's depo. 349:23-350:5, 352:3-353:8, 336:20-21, 337:17-19

26  15.     He needed to annex 30 sq. ft. space from a concessionaire in order to comply with ADA requirements, but was told he could not do so by Enarson because Enarson had made handshake agreements with the concessionaires.

15.     Decl. J. Hernandez ¶ 5; Plaintiff's depo. 333:10-17, 335:4-8, 339:6-8, 336:20-21, 343:20-25

58-690

16.    He told Sexton, Enarson and Bowens that he did not believe Enarson had the authority to enter into such agreements with the concessionaires, and that Enarson's enforcement of the agreements constituted a gift to the concessionaires.

16.    Decl. J. Hernandez ¶ 5; Plaintiff's depo. 335:17-18; 336:1; 354:6-9; 368:10-16; 377:1-4

17.    Another of Hernandez' duties was to help negotiate and monitor contracts for the management of parking services. The low bidder (based on "projected" reimbursable expenses) on a contract to manage the Airport's parking lots was Lindbergh Parking Incorporated (LPI).

17.    Decl. J. Hernandez ¶ 6

18.    Its bid was so low that Hernandez–who had managed parking himself–suspected the bid was insincere. He thereafter closely monitored the performance of the contract and noted LPI was overcharging the Authority approximately $1 million to 1.5 million per year. This estimate was based, among other things, on the fact that LPI (1) did not lease new shuttle transportation vehicles as stated in its bid (but instead used older shuttles owned by LPI); (2) was seeking reimbursement for an unnecessary management position (owner/manager being paid for management work he did not perform); and (3) double-billing the Authority for workers' compensation insurance.

18.    Decl. J. Hernandez ¶ 6; Plaintiff's Depo. 478:16-22; 481:1-4; 483:2-6

19.    Hernandez reported these overcharges to Sexton, Enarson and Bowens, in October 2005 and placed LPI on a 90-day timetable to explain and justify all the expenses. He informed Sexton, Enarson and Bowens that the LPI contract constituted an unwarranted expenditure of public money to LPI.

19.    Decl. J. Hernandez ¶ 7; Plaintiff's Depo. 505:11-23; 506:10-23; 508:7-13; 511:16-23

20.    The negotiating agent on behalf of LPI–Elizabeth Stump-Moore–was, however, a friend of Bowens'.

20.    Decl. J. Hernandez ¶ 7; Plaintiff's Depo. 488:25; 489:19-25; 490:10-15

21.    On November 2, 2005 , Bowens engaged a law firm to investigate Hernandez for "ethics" violations associated with the receipt of benefits from the Authority's vendors. This was the first occasion in the history of the Authority that a law firm was retained to investigate an employee for alleged ethics violations.

21.    Decl. J. Hernandez ¶ 7; Decl. P. Swan ¶ 3

58-691

| | | | |
|---|---|---|---|
| 1 | 22. The law firm, per report submitted by Patrick Swan, Esq., concluded Hernandez received (1) free rounds of golf; (2) airline tickets to Hawaii; and (3) charger football tickets, the value of which placed Hernandez in violation of the Ethics Code applicable to Authority employees. | 22. | Decl. P. Swan |

22. The law firm, per report submitted by Patrick Swan, Esq., concluded Hernandez received (1) free rounds of golf; (2) airline tickets to Hawaii; and (3) charger football tickets, the value of which placed Hernandez in violation of the Ethics Code applicable to Authority employees.

22. Decl. P. Swan

23. Bowens claims to have terminated Hernandez' employment based on the conclusions in the report.

23. Decl. T. Bowens ¶ 9

24. With regard to the "free rounds of golf," Hernandez cleared the trip with his boss, Sexton, before going, after disclosing the nature of the outing and that the golf rounds were supplied by Mike Parrish.

24. Decl. J. Hernandez ¶ 9; Plaintiff's depo. 158:18-22; 168:5-24

25. In the process, Sexton admitted he had attended the same golf outing under similar circumstances.

25. Decl. J. Hernandez ¶ 9

26. Hernandez compensated Parrish for the round by buying Parrish's lunch and dinner and by making gift contributions for the raffle. The net personal value to Hernandez was negative by over $200.

26. Decl. J. Hernandez ¶ 9; Decl. P. Swan; Plaintiff's depo. 159:14-19; 163:3-13; 164:10-14

27. Hernandez had a strong social relationship with Parrish, which included joint family outings and gatherings, dinners, barbecues and sporting events.

27. Decl. J. Hernandez ¶ 9; Decl. P. Swan; Decl. M. Parrish ¶ 2

28. With regard to the Hawaii ticket, ticketing benefits were regarded by management as normal benefit of their workplace, and that Sexton assigned Hernandez responsibility on frequent occasions to obtain ticket upgrades for various employees and board members. Hernandez specifically discussed whether the practice was ethically acceptable and Sexton replied it was.

28. Decl. J. Hernandez ¶ 10-11; Decl. P. Swan; Plaintiff's depo. 240:1-25; 602:20-25; 609:1-611:25

29. Notwithstanding the practice among Hernandez' superiors to receive passes and upgrades, Hernandez' receipt of those benefits was limited to gifts from personal friends. The tickets on Southwest came from Parrish. The tickets on Hawaiian Air came from Janet Nix, another personal friend, who told him she gave tickets like those to all kinds of friends having nothing to do with business.

29. Decl. J. Hernandez ¶ 10-11; Decl. P. Swan; Plaintiff's depo. 199:3-22; Decl. M. Parrish ¶ 3

PL'S SEP. STATEMENT OF ADDIT. UNDISPUTED MATERIAL FACTS IN OPPOS. TO SDCRAA'S MSJ

- 5 -

58-692

30.     Moreover, the Hawaiian tickets were listed as "space available" and further identified as having "no dollar value" and could not be transferred or redeemed.

30.     Decl. J. Hernandez ¶ 10-11; Decl. P. Swan; ; Plaintiff's Depo. 280:15-20, 23-25; 281:1-2; Decl. M. Parrish par. 3

31.     With regard to the football tickets, ACE parking did not have a contractor or vendor agreement of any sort with the Authority.

31.     Decl. J. Hernandez ¶ 12; Decl. P. Swan; Plaintiff's Depo. 268:1-4; 272:5-9

32.     Hernandez had a longstanding friendship with the ACE Parking manager who invited him to the game which preceded Hernandez' employment with the Authority. They were friends from Hernandez' prior employment relationship with ACE Parking.

32.     Decl. J. Hernandez ¶ 12; Decl. P. Swan

33.     During Swan's interviews with Hernandez, he expressed no interest in the fact that Parrish and Hernandez were close personal friends.

33.     Decl. J. Hernandez ¶ 13

34.     He avoided discussion of the tendency of other employees such as Bowens and Sexton to make active and aggressive use of their positions to acquire ticketing upgrades and benefits worth thousands of dollars.

34.     Decl. J. Hernandez ¶ 13

35.     When Hernandez attempted to explain these friendships and practices, Swan cut him off and would state that he was not interested in the nature of those friendships and what the office practice was.

35.     Decl. J. Hernandez ¶ 13

36.     Hernandez had previously received outstanding performance evaluations.

36.     Decl. J Hernandez ¶ 14; Plaintiff's Depo. 786:9-18

37.     The Authority did, in fact, have a progressive disciplinary policy set forth in writing, which emphasizes the Authority's commitment to preserve employment through pre-termination warnings and training.

37.     Decl. J. Hernandez ¶ 14; Plaintiff's Depo. 317:14-16

38.     That the Authority failed to adhere to this policy and instead routed the matter to an expensive and contentious law firm is a truly extraordinary decision.

38.     Decl. J. Hernandez ¶ 14

58-693

| | |
|---|---|
| 1 | 39. Ace Parking did not have a direct service agreement with the Airport Authority. Ace did not have any sort of a business relationship with the Airport Authority. |
| 2 | |
| 3 | |

39. Plaintiff's depo. 149:15-20; 150:20-25

40. Ted Sexton, Vice-President of Operations at the Authority, requested Hernandez obtain Ace Parking passes for Authority employees. The Authority did not pay for the Ace passes.

40. Plaintiff's depo. 134:25; 135:11-17

41. Ted Sexton told Hernandez it would be okay to go to the Southwest Airline Golf Tournaments. Sexton knew he was a guest of Southwest's.

41. Plaintiff's depo. 158:18-22; 168:5-8, 12-13, 18, 21-24

42. Hernandez had absolutely never received free food from the concessions in the Airport terminals.

42. Plaintiff's depo. 201:16-18

43. To this day Hernandez still stands by the fact that most of the items on the conflict-of-interest state form should not have been disclosed.

43. Plaintiff's depo. 284:11-15

44. Ted Sexton told Hernandez to write everything on the form, whether he thought it proper to do so or not.

44. Plaintiff's depo. 293:14-20

45. Ted Sexton told Hernandez to report any Ace Parking item, even though Ace does not have a direct service agreement with the Authority Parking.

45. Plaintiff's depo. 268:1-5; 274:12-14; 267:14-18; 268:8-13

46. Sexton told Hernandez if he did not put this information on the form there would be ramifications. There would be legal ramifications whether Hernandez did it or not, whether he believed it was right or wrong.

46. Plaintiff's depo. 268:8-13; 268:19-20; 270:3-7

47. Sexton spoke on behalf of the Airport Authority, not as an individual. Sexton said people at the vice-president level would be looking at that documentation. Whether Hernandez thought it was right or not, people would be looking to make sure he filled it in.

47. Plaintiff's depo. 270:14-19; 267:19-25; 270:24-25; 271:1-2; 271:9-11

48. Hernandez' reason for submitting it was threats or intimidation from not only Ted [Sexton], but the investigators.

48. Plaintiff's depo. 278:15-17

58-694

| | | |
|---|---|---|
| 1 | 49.    In late 2004, early 2005, Ace Parking was not working to take over the parking contract. It was Scott Jones, as an individual, trying to buy the shares of Maurice Gray. There's a clear distinction. This contract is not with Ace Parking. It is with Scott Jones, as an individual. | 49.    Plaintiff's depo. 272:5-6, 6-9 |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | 50.    Hernandez purchased tickets that were not available to the public for the Authority's general counsel, Bret Lobner. The tickets were blocked-out and unavailable for the box office to sell. Hernandez told Lobner they were unavailable to the public. Ted Sexton told Hernandez to get the tickets for Lobner. Hernandez was not already going to the stadium to purchase tickets that day. | 50.    Plaintiff's depo. 237:17-25; 238:10-12, 13-16, 17-22, 23-25; 240:5-10, 15-23; 242:19-25; 249:18-25; 250:1 |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |
| 11 | 51.    Clifforine Massey was an unreliable and undependable employee who refused to come to work. She was repeatedly counseled by Hernandez and placed on a disciplinary work plan by Human Resources. Massey refused to abide by the work plan and quit. | 51.    Plaintiff's depo. 315:13-25; 316:1-25; 317:1-2; 318:1-25 |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | 52.    Jim Prentice was a gossip who reported to Sexton. Prentice stirred-up gossip and chaos. He was an unreliable and undependable employee. Sexton referred to him as "that little shit." | 52.    Plaintiff's depo. 323:17-25; 324:9-25; 542:6-25; 543:1-25; 544:1-5 |
| 16 | | |
| 17 | | |
| 18 | 53.    The restroom project was stalled from 2002 through 2005 because V.P. Bryan Enarson was unwilling to request the redaction of 30 sq. ft. from Host. It still hasn't been built. | 53.    Plaintiff's depo. 341:9-13; 347:8-9 |
| 19 | | |
| 20 | | |
| 21 | 54.    It was V.P. Enarson's unwillingness to take that space away that made it impossible for the Authority to comply with ADA requirements of a 2% grade from the floor up to the restrooms and then landing requirements. | 54.    Plaintiff's depo. 343:20-25; 344:1 |
| 22 | | |
| 23 | | |
| 24 | 55.    Hernandez raised the ADA issues with Sexton. He briefed it time and time and time again to Ted, sometimes even on a daily, sometimes on a weekly, basis. Hernandez raised the ADA issue with Sexton because it was his number one priority. He raised the issue with Ted 50 to 100 times over a two-year period. | 55.    Plaintiff's depo. 354:6-9; 357:13, 17-18; 359:19-24; 373:3-23 |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

58-695

| | | |
|---|---|---|
| 1 | 56.    Sexton was afraid to bring up the issue to Bryan Enarson. He just didn't want to deal with him. | 56.    Plaintiff's depo. 374:2-4 |
| 2 | | |
| 3 | 57.    Hernandez told Sexton the Authority was paying too much for the General Dynamics property. They would lose a couple million dollars, which would come out of the general budget and affect the terminal operations. This was prior to the ratification of the agreement. | 57.    Plaintiff's depo. 393:4-24 |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | 58.    Ted Sexton said Thella was willing to overpay for that property so that she didn't have to be under the control of the Port District. | 58.    Plaintiff's depo. 394:17-25 |
| 8 | | |
| 9 | 59.    At every budget meeting it would come back up that they needed to make an adjustment for the $2 million additional lease payments on the General Dynamics lease. | 59.    Plaintiff's depo. 397:3-7 |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | 60.    Hernandez told Ted Sexton that the Authority had paid too much and he didn't believe it was right or was in the Authority's best interest that it pay those type of rents on the property. | 60.    Plaintiff's depo. 399:3-8 |
| 14 | | |
| 15 | | |
| 16 | 61.    The Authority put together a Teledyne Ryan redevelopment plan and noticed more and more and more environmental concerns to the point that it was close to $30 million in remediation costs. | 61.    Plaintiff's depo. 407:23-25; 408:1-2 |
| 17 | | |
| 18 | | |
| 19 | 62.    As a public entity, it is necessary to make sure that what is paid can be recovered because it's not just Authority funds, it's airline funds. Proper due diligence must be followed when in agreeing to enter into an extended lease in this manner. When the Authority's own environmental assessments were done, those numbers greatly shot through the roof. | 62.    Plaintiff's depo. 408:17-25; 410:1-2 |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | 63.    Hernandez had continuing conversations with Ted Sexton because the Authority overpaid for the property and he wanted to understand why the Authority would continue to pay $3 million for the whole property when he could use only 5 acres of it. | 63.    Plaintiff's depo. 410:3-25 |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

PL'S SEP. STATEMENT OF ADDIT. UNDISPUTED MATERIAL FACTS IN OPPOS. TO SDCRAA'S MSJ

- 9 -

58-696

1

64.    Hernandez was a vocal opponent because he was coupled with overpayment on the General Dynamics side and now add that to one overpayment on Teledyne Ryan. And now the Authority is in the hole between $3 and $4 million a year in overpayment on two leases. Entering into a 66-year agreement for $3 million a year is almost $200 million.

64.    Plaintiff's depo. 417:13-22; 418:3-10

2

3

4

5

6

65.    The cost for remediation is $30 million with the settlement requiring the Port to pay $9.7 million, with the Port having the ability within the $9.7 million to recover expenses incurred against that money.

65.    Plaintiff's depo. 424:19-23; 427:7-12

7

8

9

66.    Today that property is used for only 350 parking spaces for which the Authority pays the $3 million. The property will not be remediated by 2010; it won't happen. It will not be remediated in whole by 2010.

66.    Plaintiff's depo. 466:19-20; 468:18-19; 469:1-2; 469:23-25; 470:3-5

10

11

12

67.    Hernandez had ongoing conversations with Ted Sexton about his objections to the Authority's failure to properly assess the environmental aspects prior to entering the lease agreement and without understanding the full effects on the Authority's operating budget. There were many conversations with Sexton.

67.    Plaintiff's depo. 470:16-25; 471:7-11

13

14

15

16

17

68.    LPI submitted an operating figure of $1.1 million and the Authority understood those actual operating expenses would be about a half a million dollars more a year. Hernandez told Ted Sexton immediately that there was a large variation between their submitted operating expenses and actual expense numbers.

68.    Plaintiff's depo. 478:16-22; 481:1-4; 482:9-21; 494:2-25

18

19

20

21

69.    LPI double-billed the Authority for workers' compensation costs starting in 2000 and again in 2005.

69.    Plaintiff's depo. 500:18-24

22

23

24

70.    The Authority took credit for the double-billing. It was around the beginning of 2005. The Authority took full credit for those LPI expenses and it was easily over $100,000.00.

70.    Plaintiff's depo. 502:8-25; 504:1-2; 508:7-13

25

26

71.    Hernandez kept Ted Sexton informed.

71.    Plaintiff's depo. 501:5-8; 502:20-21; 514:13-25; 515:5-10

27

28

PL'S SEP. STATEMENT OF ADDIT. UNDISPUTED MATERIAL FACTS IN OPPOS. TO SDCRAA'S MSJ
- 10 -

1  72.    Maurice Grey (LPI's owner) signs
the expense documents to the Authority
2  under penalty of perjury.

72.    Plaintiff's depo. 506:10-23

3  73.    Ted Sexton requested that Hernandez
upgrade Thella's flight multiple times at no
4  charge to Thella.

73.    Plaintiff's depo. 544:15-20; 545:1-
25; 546:1-25; 547:1-2; 548:2-25; 549:1-7;
549:14-22

5  74.    Hernandez requested ticket changes
for Thella Bowens over five times. He did
6  no less than five different itinerary changes,
plus date changes and time changes. The
7  airlines' charges for itinerary and date
changes range between $50 to $100 per
8  boarding document. Thella Bowens was not
charged by the airlines for the changes.
9  Thella could have changed her tickets by
simply calling reservations.

74.    Plaintiff's depo. 550:15-551:1, 6-8;
551:21-22; 554:1-10

10
11  75.    Ted Sexton instructed Hernandez
that he should get Thella access to premier
12  airline lounges so she wouldn't have to wait
in the public waiting rooms. Sexton
13  requested that even for the briefest moments
if the plane was late to have Thella sit in the
14  lounge.

75.    Plaintiff's depo. 556:19-23; 558:18-
24; 559:2-7

15  76.    Ted Sexton asked if special
privileges could be obtained for Thella
16  Bowens' sister.

76.    Plaintiff's depo. 561:1-25

17  77.    Authority board member Morris
Vance requested and received at least two
18  upgrades to first class and there were no
charges. He requested several other first-
19  class upgrades and paid no charges for
upgrades or flight changes.

77.    Plaintiff's depo. 595:25; 596:10-12;
599:1-6; 599:25; 600:3

20  78.    Authority Vice-President Vernon
Evans repeatedly requested changes in flight
21  schedules no less than 15-20 times in the last
two years. Ted Sexton told Hernandez to
22  "do whatever you can." Sexton knew the
changes were at no cost. Hernandez asked
23  Sexton if it was okay to change Evans'
tickets at the time.

78.    Plaintiff's depo. 604:5-11; 604:12-
25; 605:18-23; 607:8-12; 608:6-10; 609:8-
18; 610:1-13; 612:17-21

24
25  79.    Thella Bowens requested two free
airline tickets from Hawaiian Airlines and
26  from Southwest Airlines because she was on
the board of United Way. The tickets were
all donated to the Authority.

79.    Plaintiff's depo. 619:12-17; 619:22-
23; 620:19-21; 621:9-11

27

28

58-698

| | |
|---|---|
| 80.    There was a power struggle between Bryan Enarson and Ted Sexton.  Enarson had more control and had one ear of Thella Bowens'. | 80.    Plaintiff's depo. 645:19-25; 646:1-2 |
| 81.    Authority Vice-President Bryan Enarson requested free tickets, upgrades and special privileges from Hawaiian Airlines. | 81.    Plaintiff's depo. 687:4-15 |

**Adjudication No. 1:  Hernandez' First Cause of Action fails as a matter of law because the Authority's Codes are not a Federal or State law, rule or regulation.**

This is not a proper issue for determination as a "summary adjudication" but an argument in favor of the adjudication of the first cause of action.  The legal importance of the argument is accordingly addressed in Hernandez' points and authorities.  Additional facts relevant to the evaluation of this argument are as follows:

| **PLAINTIFF'S ADDITIONAL UNDISPUTED FACTS** | **PL'S SUPPORTING EVIDENCE** |
|---|---|
| 5.    One of Hernandez' duties was the evaluation of a lease from the Port of property located on the north side of the Airport (General Dynamics property).  The lease price contemplated the use of the property for parking, and revenues which would generate to the lease holder for 2100 stalls. | 5.    Decl. J. Hernandez ¶ 2, Plaintiff's depo. 387:11-21, 389:15-17, 396:1-8 |
| 6.    Hernandez' understanding of the lease was that the lease price was set by code for the years 2003, 2004 and 2005, and was thereafter subject to renegotiation. | 6.    Decl. J. Hernandez ¶ 2; PUC § 170056(f)(1-3); Plaintiff's depo. 396:1-8; 397:8-11 |
| 7.    Hernandez conducted an evaluation of the cash flow of the property when the lease came up for renegotiation, and determined that deficiencies in the property prevented from generating sufficient revenue to cover the lease price by at least $2 million per year.  The deficiency centered on the discovery of toxic waste in the soil beneath the property which severely limited the development of the property for parking. | 7.    Decl. J. Hernandez ¶ 2; Plaintiff's depo. 397:3-7 |

1  10.    Another of Hernandez' duties was the evaluation of a lease from the Port of
2  property located at the west side of the Airport.  (The Teledyne Ryan property)  The
3  lease of that property likewise contemplated the generation of revenues to cover the lease
4  through its use as a parking lot.  The lease had been negotiated by Enarson and was not
5  subject to renegotiation.

10.    Decl. J. Hernandez ¶ 4; Plaintiff's depo. 388:8-12

6  11.    Hernandez discovered this property was likewise contaminated by toxic waste
7  and only a small portion of it was usable.

11.    Decl. J. Hernandez ¶ 4; Plaintiff's depo. 389:19-22, 390:3-5, 396:20-25

8  12.    The contamination was grossly understated by the Port as a $10 million
9  expense (which the Port agreed to pay) when the real cost of remediation was in excess of
10  $30 million.

12.    Decl. J. Hernandez ¶ 4; Plaintiff's depo. 407:2-408:2, 409:3-6

11  14.    Another of Hernandez' duties was to oversee the construction and/or maintenance
12  of public facilities at the terminals, including public restrooms.  Hernandez attempted to
13  expand the size of the public restrooms to alleviate overcrowding in the east terminal
14  and bring them into compliance with the state requirements that they be accessible by
15  wheel chair, as required by the Americans with Disabilities Act (ADA).
16

14.    Decl. J. Hernandez ¶ 5; Plaintiff's depo. 349:23-350:5, 352:3-353:8, 336:20-21, 337:17-19

17  15.    He needed to annex 30 sq. ft. space from a concessionaire in order to comply
18  with ADA requirements, but was told he could not do so by Enarson because Enarson
19  had made handshake agreements with the concessionaires.

15.    Decl. J. Hernandez ¶ 5; Plaintiff's depo. 333:10-17, 335:4-8, 339:6-8, 336:20-21, 343:20-25

20  17.    Another of Hernandez' duties was to help negotiate and monitor contracts for the
21  management of parking services.  The low bidder (based on "projected" reimbursable
22  expenses) on a contract to manage the Airport's parking lots was Lindbergh
23  Parking Incorporated (LPI).

17.    Decl. J. Hernandez ¶ 6

24
25
26
27
28

58-700

| | |
|---|---|
| 1 | 18.    Its bid was so low that Hernandez—who had managed parking himself—suspected the bid was insincere. He thereafter closely monitored the performance of the contract and noted LPI was overcharging the Authority approximately $1 million to 1.5 million per year. This estimate was based, among other things, on the fact that LPI (1) did not lease new shuttle transportation vehicles as stated in its bid (but instead used older shuttles owned by LPI); (2) was seeking reimbursement for an unnecessary management position (owner/manager being paid for management work he did not perform); and (3) double-billing the Authority for workers' compensation insurance. | 18.    Decl. J. Hernandez ¶ 6; Plaintiff's Depo. 478:16-22; 481:1-4; 483:2-6 |
| 10 | 20.    The negotiating agent on behalf of LPI—Elizabeth Stump-Moore—was, however, a friend of Bowens'. | 20.    Decl. J. Hernandez ¶ 7; Plaintiff's Depo. 488:25; 489:19-25; 490:10-15 |

**Adjudication No. 2:  Hernandez' First Cause of Action fails as a matter of law because**

**Hernandez could not have had a reasonable belief that he was disclosing activity made**

**unlawful by a federal or state law, rule or regulation.**

This is not a proper issue for determination as a "summary adjudication" but an argument in favor of the adjudication of the first cause of action. The legal importance of the argument is accordingly addressed in Hernandez' points and authorities. Additional facts relevant to the evaluation of this argument are as follows:

| | |
|---|---|
| **PLAINTIFF'S ADDITIONAL UNDISPUTED FACTS** | **PL'S SUPPORTING EVIDENCE** |
| 5.    One of Hernandez' duties was the evaluation of a lease from the Port of property located on the north side of the Airport (General Dynamics property). The lease price contemplated the use of the property for parking, and revenues which would generate to the lease holder for 2100 stalls. | 5.    Decl. J. Hernandez ¶ 2, Plaintiff's depo. 387:11-21, 389:15-17, 396:1-8 |
| 6.    Hernandez' understanding of the lease was that the lease price was set by code for the years 2003, 2004 and 2005, and was thereafter subject to renegotiation. | 6.    Decl. J. Hernandez ¶ 2; PUC § 170056(f)(1-3); Plaintiff's depo. 396:1-8; 397:8-11 |

58-701

| 1 | 7.    Hernandez conducted an evaluation of the cash flow of the property when the | 7.    Decl. J. Hernandez ¶ 2; Plaintiff's depo. 397:3-7 |

7.    Hernandez conducted an evaluation of the cash flow of the property when the lease came up for renegotiation, and determined that deficiencies in the property prevented from generating sufficient revenue to cover the lease price by at least $2 million per year.  The deficiency centered on the discovery of toxic waste in the soil beneath the property which severely limited the development of the property for parking.

7.    Decl. J. Hernandez ¶ 2; Plaintiff's depo. 397:3-7

10.    Another of Hernandez' duties was the evaluation of a lease from the Port of property located at the west side of the Airport.  (The Teledyne Ryan property)  The lease of that property likewise contemplated the generation of revenues to cover the lease through its use as a parking lot.  The lease had been negotiated by Enarson and was not subject to renegotiation.

10.    Decl. J. Hernandez ¶ 4; Plaintiff's depo. 388:8-12

11.    Hernandez discovered this property was likewise contaminated by toxic waste and only a small portion of it was usable.

11.    Decl. J. Hernandez ¶ 4; Plaintiff's depo. 389:19-22, 390:3-5, 396:20-25

12.    The contamination was grossly understated by the Port as a $10 million expense (which the Port agreed to pay) when the real cost of remediation was in excess of $30 million.

12.    Decl. J. Hernandez ¶ 4; Plaintiff's depo. 407:2-408:2, 409:3-6

14.    Another of Hernandez' duties was to oversee the construction and/or maintenance of public facilities at the terminals, including public restrooms.  Hernandez attempted to expand the size of the public restrooms to alleviate overcrowding in the east terminal and bring them into compliance with the state requirements that they be accessible by wheel chair, as required by the Americans with Disabilities Act (ADA).

14.    Decl. J. Hernandez ¶ 5; Plaintiff's depo. 349:23-350:5, 352:3-353:8, 336:20-21, 337:17-19

15.    He needed to annex 30 sq. ft. space from a concessionaire in order to comply with ADA requirements, but was told he could not do so by Enarson because Enarson had made handshake agreements with the concessionaires.

15.    Decl. J. Hernandez ¶ 5; Plaintiff's depo. 333:10-17, 335:4-8, 339:6-8, 336:20-21, 343:20-25

58-702

17.    Another of Hernandez' duties was to help negotiate and monitor contracts for the management of parking services. The low bidder (based on "projected" reimbursable expenses) on a contract to manage the Airport's parking lots was Lindbergh Parking Incorporated (LPI).

17.    Decl. J. Hernandez ¶ 6

18.    Its bid was so low that Hernandez–who had managed parking himself–suspected the bid was insincere. He thereafter closely monitored the performance of the contract and noted LPI was overcharging the Authority approximately $1 million to 1.5 million per year. This estimate was based, among other things, on the fact that LPI (1) did not lease new shuttle transportation vehicles as stated in its bid (but instead used older shuttles owned by LPI); (2) was seeking reimbursement for an unnecessary management position (owner/manager being paid for management work he did not perform); and (3) double-billing the Authority for workers' compensation insurance.

18.    Decl. J. Hernandez ¶ 6; Plaintiff's Depo. 478:16-22; 481:1-4; 483:2-6

20.    The negotiating agent on behalf of LPI–Elizabeth Stump-Moore–was, however, a friend of Bowens'.

20.    Decl. J. Hernandez ¶ 7; Plaintiff's Depo. 488:25; 489:19-25; 490:10-15

**Adjudication No. 3:  Hernandez' First Cause of Action fails as a matter of law because there is no causal connection between Hernandez' alleged protected activities and his termination because the disclosures were too remote in time.**

This is not a proper issue for determination as a "summary adjudication" but an argument in favor of the adjudication of the first cause of action. The legal importance of the argument is accordingly addressed in Hernandez' points and authorities. Additional facts relevant to the evaluation of this argument are as follows:

**PLAINTIFF'S ADDITIONAL UNDISPUTED FACTS**

**PL'S SUPPORTING EVIDENCE**

8.    Hernandez communicated the deficiency in the property to Sexton and Bowens, and that the continuation of the lease at its existing rate would amount to a gift of public money to the Port.

8.    Decl. J. Hernandez ¶ 2; Plaintiff's depo. 393:6-24

58-703

| | | |
|---|---|---|
| 1 | 13.    Hernandez then informed Sexton, Enarson and Bowens that the lease constituted an unwarranted expenditure of public money to the Port of over $3 million per year. | 13.    Decl. J. Hernandez ¶ 4; Plaintiff's depo. 417:14-22, 418:3-10 |
| 2 | | |
| 3 | | |
| 4 | 16.    He told Sexton, Enarson and Bowens that he did not believe Enarson had the authority to enter into such agreements with the concessionaires, and that Enarson's enforcement of the agreements constituted a gift to the concessionaires. | 16.    Decl. J. Hernandez ¶ 5; Plaintiff's depo. 335:17-18; 336:1; 354:6-9; 368:10-16; 377:1-4 |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | 19.    Hernandez reported these overcharges to Sexton, Enarson and Bowens, in October 2005 and placed LPI on a 90-day timetable to explain and justify all the expenses.  He informed Sexton, Enarson and Bowens that the LPI contract constituted an unwarranted expenditure of public money to LPI. | 19.    Decl. J. Hernandez ¶ 7; Plaintiff's Depo. 505:11-23; 506:10-23; 508:7-13; 511:16-23 |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | 20.    The negotiating agent on behalf of LPI–Elizabeth Stump-Moore–was, however, a friend of Bowens'. | 20.    Decl. J. Hernandez ¶ 7; Plaintiff's Depo. 488:25; 489:19-25; 490:10-15 |
| 13 | | |
| 14 | 21.    On November 2, 2005 , Bowens engaged a law firm to investigate Hernandez for "ethics" violations associated with the receipt of benefits from the Authority's vendors.  This was the first occasion in the history of the Authority that a law firm was retained to investigate an employee for alleged ethics violations. | 21.    Decl. J. Hernandez ¶ 7; Decl. P. Swan ¶ 3 |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | 22.    The law firm, per report submitted by Patrick Swan, Esq., concluded Hernandez received (1) free rounds of golf; (2) airline tickets to Hawaii; and (3) charger football tickets, the value of which placed Hernandez in violation of the Ethics Code applicable to Authority employees. | 22.    Decl. P. Swan |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | 23.    Bowens claims to have terminated Hernandez' employment based on the conclusions in the report. | 23.    Decl. T. Bowens ¶ 9 |
| 24 | | |
| 25 | 24.    With regard to the "free rounds of golf," Hernandez cleared the trip with his boss, Sexton, before going, after disclosing the nature of the outing and that the golf rounds were supplied by Mike Parrish. | 24.    Decl. J. Hernandez ¶ 9; Plaintiff's depo. 158:18-22; 168:5-24 |
| 26 | | |
| 27 | | |
| 28 | | |

25.    In the process, Sexton admitted he had attended the same golf outing under similar circumstances.

25.    Decl. J. Hernandez ¶ 9

26.    Hernandez compensated Parrish for the round by buying Parrish's lunch and dinner and by making gift contributions for the raffle. The net personal value to Hernandez was negative by over $200.

26.    Decl. J. Hernandez ¶ 9; Decl. P. Swan; Plaintiff's depo. 159:14-19; 163:3-13; 164:10-14

27.    Hernandez had a strong social relationship with Parrish, which included joint family outings and gatherings, dinners, barbecues and sporting events.

27.    Decl. J. Hernandez ¶ 9; Decl. P. Swan; Decl. M. Parrish par. 2

28.    With regard to the Hawaii ticket, ticketing benefits were regarded by management as normal benefit of their workplace, and that Sexton assigned Hernandez responsibility on frequent occasions to obtain ticket upgrades for various employees and board members. Hernandez specifically discussed whether the practice was ethically acceptable and Sexton replied it was.

28.    Decl. J. Hernandez ¶ 10-11; Decl. P. Swan; Plaintiff's depo. 240:1-25; 602:20-25; 609:1-611:25

29.    Notwithstanding the practice among Hernandez' superiors to receive passes and upgrades, Hernandez' receipt of those benefits was limited to gifts from personal friends. The tickets on Southwest came from Parrish. The tickets on Hawaiian Air came from Janet Nix, another personal friend, who told him she gave tickets like those to all kinds of friends having nothing to do with business.

29.    Decl. J. Hernandez ¶ 10-11; Decl. P. Swan; Plaintiff's depo. 199:3-22; Decl. M. Parrish ¶ 3

30.    Moreover, the Hawaiian tickets were listed as "space available" and further identified as having "no dollar value" and could not be transferred or redeemed.

30.    Decl. J. Hernandez ¶ 10-11; Decl. P. Swan; ; Plaintiff's Depo. 280:15-20, 23-25; 281:1-2; Decl. M. Parrish par. 3

31.    With regard to the football tickets, ACE parking did not have a contractor or vendor agreement of any sort with the Authority.

31.    Decl. J. Hernandez ¶ 12; Decl. P. Swan; Plaintiff's Depo. 268:1-4; 272:5-9

32.    Hernandez had a longstanding friendship with the ACE Parking manager who invited him to the game which preceded Hernandez' employment with the Authority. They were friends from Hernandez' prior employment relationship with ACE Parking.

32.    Decl. J. Hernandez ¶ 12; Decl. P. Swan

58-705

1  33.   During Swan's interviews with
2  Hernandez, he expressed no interest in the
   fact that Parrish and Hernandez were close
   personal friends.
3

   33.   Decl. J. Hernandez ¶ 13

4  34.   He avoided discussion of the
   tendency of other employees such as
5  Bowens and Sexton to make active and
   aggressive use of their positions to acquire
6  ticketing upgrades and benefits worth
   thousands of dollars.

   34.   Decl. J. Hernandez ¶ 13

7  35.   When Hernandez attempted to
   explain these friendships and practices,
8  Swan cut him off and would state that he
   was not interested in the nature of those
9  friendships and what the office practice was.

   35.   Decl. J. Hernandez ¶ 13

10 36.   Hernandez had previously received
   outstanding performance evaluations.
11

   36.   Decl. J. Hernandez ¶ 14; Plaintiff's
   Depo. 786:9-18

12 37.   The Authority did, in fact, have a
   progressive disciplinary policy set forth in
13 writing, which emphasizes the Authority's
   commitment to preserve employment
14 through pre-termination warnings and
   training.

   37.   Decl. J. Hernandez ¶ 14; Plaintiff's
   Depo. 317:14-16

15 38.   That the Authority failed to adhere to
   this policy and instead routed the matter to
16 an expensive and contentious law firm is a
   truly extraordinary decision.
17

   38.   Decl. J. Hernandez ¶ 14

18 39.   Ace Parking did not have a direct
   service agreement with the Airport
19 Authority.  Ace did not have any sort of a
   business relationship with the Airport
20 Authority.

   39.   Plaintiff's depo. 149:15-20; 150:20-
   25

21 41.   Ted Sexton told Hernandez it would
   be okay to go to the Southwest Airline Golf
22 Tournaments.  Sexton knew he was a guest
   of Southwest's.

   41.   Plaintiff's depo. 158:18-22; 168:5-8,
   12-13, 18, 21-24

23 42.   Hernandez had absolutely never
   received free food from the concessions in
24 the Airport terminals.

   42.   Plaintiff's depo. 201:16-18

25 44.   Ted Sexton told Hernandez to write
   everything on the form, whether he thought
26 it proper to do so or not.

   44.   Plaintiff's depo. 293:14-20

27

28

58-706

| | | |
|---|---|---|
| 1 | 74.    Hernandez requested ticket changes for Thella Bowens over five times. He did | 74.    Plaintiff's depo. 550:15-551:1, 6-8; 551:21-22; 554:1-10 |
| 2 | no less than five different itinerary changes, plus date changes and time changes. The | |
| 3 | airlines' charges for itinerary and date changes range between $50 to $100 per | |
| 4 | boarding document. Thella Bowens was not charged by the airlines for the changes. | |
| 5 | Thella could have changed her tickets by simply calling reservations. | |
| 6 | | |
| 7 | 75.    Ted Sexton instructed Hernandez that he should get Thella access to premier | 75.    Plaintiff's depo. 556:19-23; 558:18-24; 559:2-7 |
| 8 | airline lounges so she wouldn't have to wait in the public waiting rooms. Sexton | |
| 9 | requested that even for the briefest moments if the plane was late to have Thella sit in the | |
| 10 | lounge. | |
| 11 | 76.    Ted Sexton asked if special privileges could be obtained for Thella | 76.    Plaintiff's depo. 561:1-25 |
| 12 | Bowens' sister. | |
| 13 | 77.    Authority board member Morris Vance requested and received at least two | 77.    Plaintiff's depo. 595:25; 596:10-12; 599:1-6; 599:25; 600:3 |
| 14 | upgrades to first class and there were no charges. He requested several other first- | |
| 15 | class upgrades and paid no charges for upgrades or flight changes. | |
| 16 | 78.    Authority Vice-President Vernon Evans repeatedly requested changes in flight | 78.    Plaintiff's depo. 604:5-11; 604:12-25; 605:18-23; 607:8-12; 608:6-10; 609:8-18; 610:1-13; 612:17-21 |
| 17 | schedules no less than 15-20 times in the last two years. Ted Sexton told Hernandez to | |
| 18 | "do whatever you can." Sexton knew the changes were at no cost. Hernandez asked | |
| 19 | Sexton if it was okay to change Evans' tickets at the time. | |
| 20 | | |
| 21 | 79.    Thella Bowens requested two free airline tickets from Hawaiian Airlines and | 79.    Plaintiff's depo. 619:12-17; 619:22-23; 620:19-21; 621:9-11 |
| 22 | from Southwest Airlines because she was on the board of United Way. The tickets were | |
| 23 | all donated to the Authority. | |
| 24 | 80.    There was a power struggle between Bryan Enarson and Ted Sexton. Enarson | 80.    Plaintiff's depo. 645:19-25; 646:1-2 |
| 25 | had more control and had one ear of Thella Bowens'. | |
| 26 | 81.    Authority Vice-President Bryan Enarson requested free tickets, upgrades and | 81.    Plaintiff's depo. 687:4-15 |
| 27 | special privileges from Hawaiian Airlines. | |
| 28 | | |

1  Adjudication No. 4:  Hernandez' First Cause of Action fails as a matter of law because

2  there is no causal connection between Hernandez' alleged protected activities and his

3  termination because the decisionmaker was not aware of the protected activities.

4          This is not a proper issue for determination as a "summary adjudication" but an argument

5  in favor of the adjudication of the first cause of action.  The legal importance of the argument is

6  accordingly addressed in Hernandez' points and authorities.  Additional facts relevant to the

7  evaluation of this argument are as follows:

8  **PLAINTIFF'S ADDITIONAL**                    **PL'S SUPPORTING EVIDENCE**
   **UNDISPUTED FACTS**
9

10  8.      Hernandez communicated the        8.      Decl. J. Hernandez ¶ 2; Plaintiff's
    deficiency in the property to Sexton and         depo. 393:6-24
11  Bowens, and that the continuation of the
    lease at its existing rate would amount to a
12  gift of public money to the Port.

13  13.     Hernandez then informed Sexton,    13.     Decl. J. Hernandez ¶ 4; Plaintiff's
    Enarson and Bowens that the lease                depo. 417:14-22, 418:3-10
14  constituted an unwarranted expenditure of
    public money to the Port of over $3 million
15  per year.

16  16.     He told Sexton, Enarson and Bowens 16.    Decl. J. Hernandez ¶ 5; Plaintiff's
    that he did not believe Enarson had the          depo. 335:17-18; 336:1; 354:6-9; 368:10-16;
17  authority to enter into such agreements with      377:1-4
    the concessionaires, and that Enarson's
18  enforcement of the agreements constituted a
    gift to the concessionaires.

19  19.     Hernandez reported these          19.     Decl. J. Hernandez ¶ 7
    overcharges to Sexton, Enarson and
20  Bowens, in October 2005 and placed LPI on
    a 90-day timetable to explain and justify all
21  the expenses.  He informed Sexton, Enarson
    and Bowens that the LPI contract constituted
22  an unwarranted expenditure of public money
    to LPI.
23
    Adjudication No. 5:  Hernandez' First Cause of Action fails as a matter of law because the
24
    Authority had a legitimate non-retaliatory business reason for terminating Hernandez'
25
    employment.
26
            This is not a proper issue for determination as a "summary adjudication" but an argument
27
    in favor of the adjudication of the first cause of action.  The legal importance of the argument is
28