1    accordingly addressed in Hernandez' points and authorities.  Additional facts relevant to the

2    evaluation of this argument are as follows:

3    **PLAINTIFF'S ADDITIONAL**                    **PL'S SUPPORTING EVIDENCE**
     **UNDISPUTED FACTS**

4

5    24.    With regard to the "free rounds of          24.    Decl. J. Hernandez ¶ 9; Plaintiff's
     golf," Hernandez cleared the trip with his      depo. 158:18-22; 168:5-24
6    boss, Sexton, before going, after disclosing
     the nature of the outing and that the golf
7    rounds were supplied by Mike Parrish.

8    25.    In the process, Sexton admitted he         25.    Decl. J. Hernandez ¶ 9
     had attended the same golf outing under
9    similar circumstances.

10   26.    Hernandez compensated Parrish for          26.    Decl. J. Hernandez ¶ 9; Decl. P.
     the round by buying Parrish's lunch and       Swan; Plaintiff's depo. 159:14-19; 163:3-13;
11   dinner and by making gift contributions for   164:10-14
     the raffle.  The net personal value to
12   Hernandez was negative by over $200.

13   27.    Hernandez had a strong social             27.    Decl. J. Hernandez ¶ 9; Decl. P.
     relationship with Parrish, which included    Swan; Decl. M. Parrish par. 2
14   joint family outings and gatherings, dinners,
     barbecues and sporting events.

15   28.    With regard to the Hawaii ticket,          28.    Decl. J. Hernandez ¶ 10-11; Decl. P.
     ticketing benefits were regarded by          Swan; Plaintiff's depo. 240:1-25; 602:20-25;
16   management as normal benefit of their         609:1-611:25
     workplace, and that Sexton assigned
17   Hernandez responsibility on frequent
     occasions to obtain ticket upgrades for
18   various employees and board members.
     Hernandez specifically discussed whether
19   the practice was ethically acceptable and
     Sexton replied it was.

20

21   29.    Notwithstanding the practice among        29.    Decl. J. Hernandez ¶ 10-11; Decl. P.
     Hernandez' superiors to receive passes and   Swan; Plaintiff's depo. 199:3-22; Decl. M.
22   upgrades, Hernandez' receipt of those        Parrish ¶ 3
     benefits was limited to gifts from personal
23   friends.  The tickets on Southwest came
     from Parrish.  The tickets on Hawaiian Air
24   came from Janet Nix, another personal
     friend, who told him she gave tickets like
25   those to all kinds of friends having nothing
     to do with business.

26   30.    Moreover, the Hawaiian tickets were       30.    Decl. J. Hernandez ¶ 10-11; Decl. P.
     listed as "space available" and further     Swan; ; Plaintiff's Depo. 280:15-20, 23-25;
27   identified as having "no dollar value" and   281:1-2; Decl. M. Parrish par. 3
     could not be transferred or redeemed.

28

| | |
|---|---|
| 31.    With regard to the football tickets, ACE parking did not have a contractor or vendor agreement of any sort with the Authority. | 31.    Decl. J. Hernandez ¶ 12; Decl. P. Swan; Plaintiff's Depo. 268:1-4; 272:5-9 |
| 32.    Hernandez had a longstanding friendship with the ACE Parking manager who invited him to the game which preceded Hernandez' employment with the Authority. They were friends from Hernandez' prior employment relationship with ACE Parking. | 32.    Decl. J. Hernandez ¶ 12; Decl. P. Swan |
| 33.    During Swan's interviews with Hernandez, he expressed no interest in the fact that Parrish and Hernandez were close personal friends. | 33.    Decl. J. Hernandez ¶ 13 |
| 34.    He avoided discussion of the tendency of other employees such as Bowens and Sexton to make active and aggressive use of their positions to acquire ticketing upgrades and benefits worth thousands of dollars. | 34.    Decl. J. Hernandez ¶ 13 |
| 35.    When Hernandez attempted to explain these friendships and practices, Swan cut him off and would state that he was not interested in the nature of those friendships and what the office practice was. | 35.    Decl. J. Hernandez ¶ 13 |
| 36.    Hernandez had previously received outstanding performance evaluations. | 36.    Decl. J. Hernandez ¶ 14; Plaintiff's Depo. 786:9-18 |
| 37.    The Authority did, in fact, have a progressive disciplinary policy set forth in writing, which emphasizes the Authority's commitment to preserve employment through pre-termination warnings and training. | 37.    Decl. J. Hernandez ¶ 14; Plaintiff's Depo. 317:14-16 |
| 38.    That the Authority failed to adhere to this policy and instead routed the matter to an expensive and contentious law firm is a truly extraordinary decision. | 38.    Decl. J. Hernandez ¶ 14 |
| 39.    Ace Parking did not have a direct service agreement with the Airport Authority.  Ace did not have any sort of a business relationship with the Airport Authority. | 39.    Plaintiff's depo. 149:15-20; 150:20-25 |
| 41.    Ted Sexton told Hernandez it would be okay to go to the Southwest Airline Golf Tournaments.  Sexton knew he was a guest of Southwest's. | 41.    Plaintiff's depo. 158:18-22; 168:5-8, 12-13, 18, 21-24 |

PL'S SEP. STATEMENT OF ADDIT. UNDISPUTED MATERIAL FACTS IN OPPOS. TO SDCRAA'S MSJ
- 23 -

| | |
|---|---|
| 42.     Hernandez had absolutely never received free food from the concessions in the Airport terminals. | 42.     Plaintiff's depo. 201:16-18 |
| 44.     Ted Sexton told Hernandez to write everything on the form, whether he thought it proper to do so or not. | 44.     Plaintiff's depo. 293:14-20 |
| 74.     Hernandez requested ticket changes for Thella Bowens over five times. He did no less than five different itinerary changes, plus date changes and time changes. The airlines' charges for itinerary and date changes range between $50 to $100 per boarding document. Thella Bowens was not charged by the airlines for the changes. Thella could have changed her tickets by simply calling reservations. | 74.     Plaintiff's depo. 550:15-551:1, 6-8; 551:21-22; 554:1-10 |
| 75.     Ted Sexton instructed Hernandez that he should get Thella access to premier airline lounges so she wouldn't have to wait in the public waiting rooms. Sexton requested that even for the briefest moments if the plane was late to have Thella sit in the lounge. | 75.     Plaintiff's depo. 556:19-23; 558:18-24; 559:2-7 |
| 76.     Ted Sexton asked if special privileges could be obtained for Thella Bowens' sister. | 76.     Plaintiff's depo. 561:1-25 |
| 77.     Authority board member Morris Vance requested and received at least two upgrades to first class and there were no charges. He requested several other first-class upgrades and paid no charges for upgrades or flight changes. | 77.     Plaintiff's depo. 595:25; 596:10-12; 599:1-6; 599:25; 600:3 |
| 78.     Authority Vice-President Vernon Evans repeatedly requested changes in flight schedules no less than 15-20 times in the last two years. Ted Sexton told Hernandez to "do whatever you can." Sexton knew the changes were at no cost. Hernandez asked Sexton if it was okay to change Evans' tickets at the time. | 78.     Plaintiff's depo. 604:5-11; 604:12-25; 605:18-23; 607:8-12; 608:6-10; 609:8-18; 610:1-13; 612:17-21 |
| 79.     Thella Bowens requested two free airline tickets from Hawaiian Airlines and from Southwest Airlines because she was on the board of United Way. The tickets were all donated to the Authority. | 79.     Plaintiff's depo. 619:12-17; 619:22-23; 620:19-21; 621:9-11 |

| | |
|---|---|
| 80.    There was a power struggle between Bryan Enarson and Ted Sexton. Enarson had more control and had one ear of Thella Bowens'. | 80.    Plaintiff's depo. 645:19-25; 646:1-2 |
| 81.    Authority Vice-President Bryan Enarson requested free tickets, upgrades and special privileges from Hawaiian Airlines. | 81.    Plaintiff's depo. 687:4-15 |

**Adjudication No. 6:  Hernandez' First Cause of Action fails as a matter of law because he has no evidence of pretext.**

This is not a proper issue for determination as a "summary adjudication" but an argument in favor of the adjudication of the first cause of action.  The legal importance of the argument is accordingly addressed in Hernandez' points and authorities.  Additional facts relevant to the evaluation of this argument are as follows:

| PLAINTIFF'S ADDITIONAL UNDISPUTED FACTS | PL'S SUPPORTING EVIDENCE |
|---|---|
| 19.    Hernandez reported these overcharges to Sexton, Enarson and Bowens, in October 2005 and placed LPI on a 90-day timetable to explain and justify all the expenses.  He informed Sexton, Enarson and Bowens that the LPI contract constituted an unwarranted expenditure of public money to LPI. | 19.    Decl. J. Hernandez ¶ 7; Plaintiff's Depo. 505:11-23; 506:10-23; 508:7-13; 511:16-23 |
| 20.    The negotiating agent on behalf of LPI–Elizabeth Stump-Moore–was, however, a friend of Bowens'. | 20.    Decl. J. Hernandez ¶ 7; Plaintiff's Depo. 488:25; 489:19-25; 490:10-15 |
| 21.    On November 2, 2005 , Bowens engaged a law firm to investigate Hernandez for "ethics" violations associated with the receipt of benefits from the Authority's vendors.  This was the first occasion in the history of the Authority that a law firm was retained to investigate an employee for alleged ethics violations. | 21.    Decl. J. Hernandez ¶ 7; Decl. P. Swan ¶ 3 |
| 22.    The law firm, per report submitted by Patrick Swan, Esq., concluded Hernandez received (1) free rounds of golf; (2) airline tickets to Hawaii; and (3) charger football tickets, the value of which placed Hernandez in violation of the Ethics Code applicable to Authority employees. | 22.    Decl. P. Swan |

58-712

| | | |
|---|---|---|
| 1 | 23.    Bowens claims to have terminated Hernandez' employment based on the conclusions in the report. | 23.    Decl. T. Bowens ¶ 9 |
| 2 | | |
| 3 | 24.    With regard to the "free rounds of golf," Hernandez cleared the trip with his boss, Sexton, before going, after disclosing the nature of the outing and that the golf rounds were supplied by Mike Parrish. | 24.    Decl. J. Hernandez ¶ 9; Plaintiff's depo. 158:18-22; 168:5-24 |
| 4 | | |
| 5 | | |
| 6 | 25.    In the process, Sexton admitted he had attended the same golf outing under similar circumstances. | 25.    Decl. J. Hernandez ¶ 9 |
| 7 | | |
| 8 | 26.    Hernandez compensated Parrish for the round by buying Parrish's lunch and dinner and by making gift contributions for the raffle. The net personal value to Hernandez was negative by over $200. | 26.    Decl. J. Hernandez ¶ 9; Decl. P. Swan; Plaintiff's depo. 159:14-19; 163:3-13; 164:10-14 |
| 9 | | |
| 10 | | |
| 11 | 27.    Hernandez had a strong social relationship with Parrish, which included joint family outings and gatherings, dinners, barbecues and sporting events. | 27.    Decl. J. Hernandez ¶ 9; Decl. P. Swan; Decl. M. Parrish par. 2 |
| 12 | | |
| 13 | | |
| 14 | 28.    With regard to the Hawaii ticket, ticketing benefits were regarded by management as normal benefit of their workplace, and that Sexton assigned Hernandez responsibility on frequent occasions to obtain ticket upgrades for various employees and board members. Hernandez specifically discussed whether the practice was ethically acceptable and Sexton replied it was. | 28.    Decl. J. Hernandez ¶ 10-11; Decl. P. Swan; Plaintiff's depo. 240:1-25; 602:20-25; 609:1-611:25 |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | 29.    Notwithstanding the practice among Hernandez' superiors to receive passes and upgrades, Hernandez' receipt of those benefits was limited to gifts from personal friends. The tickets on Southwest came from Parrish. The tickets on Hawaiian Air came from Janet Nix, another personal friend, who told him she gave tickets like those to all kinds of friends having nothing to do with business. | 29.    Decl. J. Hernandez ¶ 10-11; Decl. P. Swan; Plaintiff's depo. 199:3-22; Decl. M. Parrish ¶ 3 |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | 30.    Moreover, the Hawaiian tickets were listed as "space available" and further identified as having "no dollar value" and could not be transferred or redeemed. | 30.    Decl. J. Hernandez ¶ 10-11; Decl. P. Swan; ; Plaintiff's Depo. 280:15-20, 23-25; 281:1-2; Decl. M. Parrish ¶ 3 |
| 26 | | |
| 27 | | |
| 28 | | |

| | |
|---|---|
| 31.   With regard to the football tickets, ACE parking did not have a contractor or vendor agreement of any sort with the Authority. | 31.   Decl. J. Hernandez ¶ 12; Decl. P. Swan; Plaintiff's Depo. 268:1-4; 272:5-9 |
| 32.   Hernandez had a longstanding friendship with the ACE Parking manager who invited him to the game which preceded Hernandez' employment with the Authority. They were friends from Hernandez' prior employment relationship with ACE Parking. | 32.   Decl. J. Hernandez ¶ 12; Decl. P. Swan |
| 33.   During Swan's interviews with Hernandez, he expressed no interest in the fact that Parrish and Hernandez were close personal friends. | 33.   Decl. J. Hernandez ¶ 13 |
| 34.   He avoided discussion of the tendency of other employees such as Bowens and Sexton to make active and aggressive use of their positions to acquire ticketing upgrades and benefits worth thousands of dollars. | 34.   Decl. J. Hernandez ¶ 13 |
| 35.   When Hernandez attempted to explain these friendships and practices, Swan cut him off and would state that he was not interested in the nature of those friendships and what the office practice was. | 35.   Decl. J. Hernandez ¶ 13 |
| 36.   Hernandez had previously received outstanding performance evaluations. | 36.   Decl. J. Hernandez ¶ 14; Plaintiff's Depo. 786:9-18 |
| 37.   The Authority did, in fact, have a progressive disciplinary policy set forth in writing, which emphasizes the Authority's commitment to preserve employment through pre-termination warnings and training. | 37.   Decl. J. Hernandez ¶ 14; Plaintiff's Depo. 317:14-16 |
| 38.   That the Authority failed to adhere to this policy and instead routed the matter to an expensive and contentious law firm is a truly extraordinary decision. | 38.   Decl. J. Hernandez ¶ 14 |
| 39.   Ace Parking did not have a direct service agreement with the Airport Authority.  Ace did not have any sort of a business relationship with the Airport Authority. | 39.   Plaintiff's depo. 149:15-20; 150:20-25 |
| 41.   Ted Sexton told Hernandez it would be okay to go to the Southwest Airline Golf Tournaments.  Sexton knew he was a guest of Southwest's. | 41.   Plaintiff's depo. 158:18-22; 168:5-8, 12-13, 18, 21-24 |

PL'S SEP. STATEMENT OF ADDIT. UNDISPUTED MATERIAL FACTS IN OPPOS. TO SDCRAA'S MSJ
- 27 -

58-714

1

42.    Hernandez had absolutely never
received free food from the concessions in
2    the Airport terminals.

42.    Plaintiff's depo. 201:16-18

3

44.    Ted Sexton told Hernandez to write
everything on the form, whether he thought
4    it proper to do so or not.

44.    Plaintiff's depo. 293:14-20

5

74.    Hernandez requested ticket changes
for Thella Bowens over five times. He did
6    no less than five different itinerary changes,
plus date changes and time changes. The
7    airlines' charges for itinerary and date
changes range between $50 to $100 per
8    boarding document. Thella Bowens was not
charged by the airlines for the changes.
9    Thella could have changed her tickets by
simply calling reservations.

74.    Plaintiff's depo. 550:15-551:1, 6-8;
551:21-22; 554:1-10

10

11

75.    Ted Sexton instructed Hernandez
that he should get Thella access to premier
12    airline lounges so she wouldn't have to wait
in the public waiting rooms. Sexton
13    requested that even for the briefest moments
if the plane was late to have Thella sit in the
lounge.
14

75.    Plaintiff's depo. 556:19-23; 558:18-
24; 559:2-7

15

76.    Ted Sexton asked if special
privileges could be obtained for Thella
16    Bowens' sister.

76.    Plaintiff's depo. 561:1-25

17

77.    Authority board member Morris
Vance requested and received at least two
18    upgrades to first class and there were no
charges. He requested several other first-
19    class upgrades and paid no charges for
upgrades or flight changes.

77.    Plaintiff's depo. 595:25; 596:10-12;
599:1-6; 599:25; 600:3

20

78.    Authority Vice-President Vernon
Evans repeatedly requested changes in flight
21    schedules no less than 15-20 times in the last
two years. Ted Sexton told Hernandez to
22    "do whatever you can." Sexton knew the
changes were at no cost. Hernandez asked
23    Sexton if it was okay to change Evans'
tickets at the time.
24

78.    Plaintiff's depo. 604:5-11; 604:12-
25; 605:18-23; 607:8-12; 608:6-10; 609:8-
18; 610:1-13; 612:17-21

25

79.    Thella Bowens requested two free
airline tickets from Hawaiian Airlines and
26    from Southwest Airlines because she was on
the board of United Way. The tickets were
all donated to the Authority.

79.    Plaintiff's depo. 619:12-17; 619:22-
23; 620:19-21; 621:9-11

27

28

| | | |
|---|---|---|
| 80. | There was a power struggle between Bryan Enarson and Ted Sexton. Enarson had more control and had one ear of Thella Bowens'. | 80. | Plaintiff's depo. 645:19-25; 646:1-2 |
| 81. | Authority Vice-President Bryan Enarson requested free tickets, upgrades and special privileges from Hawaiian Airlines. | 81. | Plaintiff's depo. 687:4-15 |

**Adjudication No. 7:  Hernandez' First Cause of Action under Labor Code section 1102.5(a) fails as a matter of law because Hernandez has not identified a rule, regulation, or policy made, adopted or enforced by the Authority that prevents an employee from disclosing information to a governmental agency.**

This is not a proper issue for determination as a "summary adjudication" but an argument in favor of the adjudication of the first cause of action. The legal importance of the argument is accordingly addressed in Hernandez' points and authorities. For the Court's convenience, this opposition does not allege a violation of 1102.5(a), but focuses upon the 1102.5(b) violation. Since a determination of this issue does not dispose of Hernandez cause of action, this should not be raised as an issue requiring adjudication.

**Adjudication No. 8:  Hernandez' First Cause of Action under Labor Code section 1102.5(a) fails as a matter of law because any instructions regarding confidentiality were made to implement the protection of the attorney-client privilege (See Labor Code section 1102.5(g)).**

This is not a proper issue for determination as a "summary adjudication" but an argument in favor of the adjudication of the first cause of action. The legal importance of the argument is accordingly addressed in Hernandez' points and authorities. For the Court's convenience, this opposition does not allege a violation of 1102.5(a), but focuses upon the 1102.5(b) violation. Since a determination of this issue does not dispose of Hernandez cause of action, this should not be raised as an issue requiring adjudication.

**Adjudication No. 9:  Hernandez' First Cause of Action fails as a matter of law under Labor Code section 1102.5(c) because Hernandez did not refuse to participate in any unlawful activity.**

58-716

1    This is not a proper issue for determination as a "summary adjudication" but an argument

2  in favor of the adjudication of the first cause of action. The legal importance of the argument is

3  accordingly addressed in Hernandez' points and authorities. For the Court's convenience, this

4  opposition does not allege a violation of 1102.5(c), but focuses upon the 1102.5(b) violation.

5  Since a determination of this issue does not dispose of Hernandez cause of action, this should not

6  be raised as an issue requiring adjudication.

7  **Adjudication No. 10:  The Authority is immune from Hernandez' Labor Code section**

8  **1102.5 cause of action under Government Code section 821.6**

9    This is not a proper issue for determination as a "summary adjudication" but an argument

10  in favor of the adjudication of the first cause of action. The legal importance of the argument is

11  accordingly addressed in Hernandez' points and authorities. Since a determination of this issue

12  does not dispose of Hernandez cause of action, this should not be raised as an issue requiring

13  adjudication.

14  **Adjudication No. 11:  This court lacks jurisdiction over Hernandez' Labor Code section**

15  **1102.5 cause of action because he failed to exhaust his administrative remedies under**

16  **Labor Code sections 98.6 and 98.7**

17    This is not a proper issue for determination as a "summary adjudication" but an argument

18  in favor of the adjudication of the first cause of action. The legal importance of the argument is

19  accordingly addressed in Hernandez' points and authorities. Since a determination of this issue

20  does not dispose of Hernandez cause of action, this should not be raised as an issue requiring

21  adjudication.

22  **GENERAL DYNAMICS DISCLOSURE:**

23  **Adjudication No. 12:  Hernandez' First Cause of Action under Labor Code section 1102.5,**

24  **insofar as it is based on any alleged disclosure regarding the General Dynamics' lease, fails**

25  **as a matter of law because Hernandez could not have had a reasonable belief that the**

26  **General Dynamics' lease was unlawful.**

27    This is not a proper issue for determination as a "summary adjudication" but an argument

28  in favor of the adjudication of the first cause of action. The legal importance of the argument is

PL'S SEP. STATEMENT OF ADDIT. UNDISPUTED MATERIAL FACTS IN OPPOS. TO SDCRAA'S MSJ
- 30 -

58-717

1 | accordingly addressed in Hernandez' points and authorities. Additional facts relevant to the

2 | evaluation of this argument are as follows:

3 | **PLAINTIFF'S ADDITIONAL**         **PL'S SUPPORTING EVIDENCE**
    **UNDISPUTED FACTS**

4

5 | 5.      One of Hernandez' duties was the evaluation of a lease from the Port of property located on the north side of the Airport (General Dynamics property). The lease price contemplated the use of the property for parking, and revenues which would generate to the lease holder for 2100 stalls.

           5.      Decl. J. Hernandez ¶ 2, Plaintiff's depo. 387:11-21, 389:15-17, 396:1-8

6

7

8

9 | 6.      Hernandez' understanding of the lease was that the lease price was set by code for the years 2003, 2004 and 2005, and was thereafter subject to renegotiation.

           6.      Decl. J. Hernandez ¶ 2; PUC § 170056(f)(1-3); Plaintiff's depo. 396:1-8; 397:8-11

10

11

12 | 7.      Hernandez conducted an evaluation of the cash flow of the property when the lease came up for renegotiation, and determined that deficiencies in the property prevented from generating sufficient revenue to cover the lease price by at least $2 million per year. The deficiency centered on the discovery of toxic waste in the soil beneath the property which severely limited the development of the property for parking.

           7.      Decl. J. Hernandez ¶ 2; Plaintiff's depo. 397:3-7

13

14

15

16

17 | **Adjudication No. 13:** Hernandez' First Cause of Action under Labor Code section 1102.5,

18 | insofar as it is based on any alleged disclosure regarding the General Dynamics' lease, fails

19 | as a matter of law because Hernandez has not identified a state or federal statute, rule or

20 | regulation of which he disclosed a violation.

21 |       This is not a proper issue for determination as a "summary adjudication" but an argument

22 | in favor of the adjudication of the first cause of action. The legal importance of the argument is

23 | accordingly addressed in Hernandez' points and authorities. Additional facts relevant to the

24 | evaluation of this argument are as follows:

25

26

27

28

58-718

| PLAINTIFF'S ADDITIONAL UNDISPUTED FACTS | PL'S SUPPORTING EVIDENCE |
|---|---|
| 5.     One of Hernandez' duties was the evaluation of a lease from the Port of property located on the north side of the Airport (General Dynamics property).  The lease price contemplated the use of the property for parking, and revenues which would generate to the lease holder for 2100 stalls. | 5.     Decl. J. Hernandez ¶ 2, Plaintiff's depo. 387:11-21, 389:15-17, 396:1-8 |
| 6.     Hernandez' understanding of the lease was that the lease price was set by code for the years 2003, 2004 and 2005, and was thereafter subject to renegotiation. | 6.     Decl. J. Hernandez ¶ 2; PUC § 170056(f)(1-3); Plaintiff's depo. 396:1-8; 397:8-11 |
| 7.     Hernandez conducted an evaluation of the cash flow of the property when the lease came up for renegotiation, and determined that deficiencies in the property prevented from generating sufficient revenue to cover the lease price by at least $2 million per year.  The deficiency centered on the discovery of toxic waste in the soil beneath the property which severely limited the development of the property for parking. | 7.     Decl. J. Hernandez ¶ 2; Plaintiff's depo. 397:3-7 |

**Adjudication No. 14:  Hernandez' First Cause of Action fails as matter of law, insofar as it is based on any alleged disclosure regarding the General Dynamics' lease, because there is no causal connection between his alleged protected activity and his termination.**

This is not a proper issue for determination as a "summary adjudication" but an argument in favor of the adjudication of the first cause of action.  The legal importance of the argument is accordingly addressed in Hernandez' points and authorities.  Additional facts relevant to the evaluation of this argument are as follows:

| PLAINTIFF'S ADDITIONAL UNDISPUTED FACTS | PL'S SUPPORTING EVIDENCE |
|---|---|
| 5.     One of Hernandez' duties was the evaluation of a lease from the Port of property located on the north side of the Airport (General Dynamics property).  The lease price contemplated the use of the property for parking, and revenues which would generate to the lease holder for 2100 stalls. | 5.     Decl. J. Hernandez ¶ 2, Plaintiff's depo. 387:11-21, 389:15-17, 396:1-8 |

1   6.   Hernandez' understanding of the lease was that the lease price was set by code for the years 2003, 2004 and 2005, and was thereafter subject to renegotiation.

6.   Decl. J. Hernandez ¶ 2; PUC § 170056(f)(1-3); Plaintiff's depo. 396:1-8; 397:8-11

7.   Hernandez conducted an evaluation of the cash flow of the property when the lease came up for renegotiation, and determined that deficiencies in the property prevented from generating sufficient revenue to cover the lease price by at least $2 million per year. The deficiency centered on the discovery of toxic waste in the soil beneath the property which severely limited the development of the property for parking.

7.   Decl. J. Hernandez ¶ 2; Plaintiff's depo. 397:3-7

21.   On November 2, 2005 , Bowens engaged a law firm to investigate Hernandez for "ethics" violations associated with the receipt of benefits from the Authority's vendors. This was the first occasion in the history of the Authority that a law firm was retained to investigate an employee for alleged ethics violations.

21.   Decl. J. Hernandez ¶ 7; Decl. P. Swan ¶ 3

22.   The law firm, per report submitted by Patrick Swan, Esq., concluded Hernandez received (1) free rounds of golf; (2) airline tickets to Hawaii; and (3) charger football tickets, the value of which placed Hernandez in violation of the Ethics Code applicable to Authority employees.

22.   Decl. P. Swan

23.   Bowens claims to have terminated Hernandez' employment based on the conclusions in the report.

23.   Decl. T. Bowens ¶ 9

24.   With regard to the "free rounds of golf," Hernandez cleared the trip with his boss, Sexton, before going, after disclosing the nature of the outing and that the golf rounds were supplied by Mike Parrish.

24.   Decl. J. Hernandez ¶ 9; Plaintiff's depo. 158:18-22; 168:5-24

25.   In the process, Sexton admitted he had attended the same golf outing under similar circumstances.

25.   Decl. J. Hernandez ¶ 9

26.   Hernandez compensated Parrish for the round by buying Parrish's lunch and dinner and by making gift contributions for the raffle. The net personal value to Hernandez was negative by over $200.

26.   Decl. J. Hernandez ¶ 9; Decl. P. Swan; Plaintiff's depo. 159:14-19; 163:3-13; 164:10-14

27.    Hernandez had a strong social relationship with Parrish, which included joint family outings and gatherings, dinners, barbecues and sporting events.

27.    Decl. J. Hernandez ¶ 9; Decl. P. Swan; Decl. M. Parrish par. 2

28.    With regard to the Hawaii ticket, ticketing benefits were regarded by management as normal benefit of their workplace, and that Sexton assigned Hernandez responsibility on frequent occasions to obtain ticket upgrades for various employees and board members. Hernandez specifically discussed whether the practice was ethically acceptable and Sexton replied it was.

28.    Decl. J. Hernandez ¶ 10-11; Decl. P. Swan; Plaintiff's depo. 240:1-25; 602:20-25; 609:1-611:25

29.    Notwithstanding the practice among Hernandez' superiors to receive passes and upgrades, Hernandez' receipt of those benefits was limited to gifts from personal friends. The tickets on Southwest came from Parrish. The tickets on Hawaiian Air came from Janet Nix, another personal friend, who told him she gave tickets like those to all kinds of friends having nothing to do with business.

29.    Decl. J. Hernandez ¶ 10-11; Decl. P. Swan; Plaintiff's depo. 199:3-22; Decl. M. Parrish ¶ 3

30.    Moreover, the Hawaiian tickets were listed as "space available" and further identified as having "no dollar value" and could not be transferred or redeemed.

30.    Decl. J. Hernandez ¶ 10-11; Decl. P. Swan; ; Plaintiff's Depo. 280:15-20, 23-25; 281:1-2; Decl. M. Parrish ¶ 3

31.    With regard to the football tickets, ACE parking did not have a contractor or vendor agreement of any sort with the Authority.

31.    Decl. J. Hernandez ¶ 12; Decl. P. Swan; Plaintiff's Depo. 268:1-4; 272:5-9

32.    Hernandez had a longstanding friendship with the ACE Parking manager who invited him to the game which preceded Hernandez' employment with the Authority. They were friends from Hernandez' prior employment relationship with ACE Parking.

32.    Decl. J. Hernandez ¶ 12; Decl. P. Swan

33.    During Swan's interviews with Hernandez, he expressed no interest in the fact that Parrish and Hernandez were close personal friends.

33.    Decl. J. Hernandez ¶ 13

34.    He avoided discussion of the tendency of other employees such as Bowens and Sexton to make active and aggressive use of their positions to acquire ticketing upgrades and benefits worth thousands of dollars.

34.    Decl. J. Hernandez ¶ 13

PL'S SEP. STATEMENT OF ADDIT. UNDISPUTED MATERIAL FACTS IN OPPOS. TO SDCRAA'S MSJ

| | |
|---|---|
| 1 | 35.    When Hernandez attempted to explain these friendships and practices, Swan cut him off and would state that he was not interested in the nature of those friendships and what the office practice was. | 35.    Decl. J. Hernandez ¶ 13 |

35.    When Hernandez attempted to explain these friendships and practices, Swan cut him off and would state that he was not interested in the nature of those friendships and what the office practice was.

35.    Decl. J. Hernandez ¶ 13

36.    Hernandez had previously received outstanding performance evaluations.

36.    Decl. J. Hernandez ¶ 14; Plaintiff's Depo. 786:9-18

37.    The Authority did, in fact, have a progressive disciplinary policy set forth in writing, which emphasizes the Authority's commitment to preserve employment through pre-termination warnings and training.

37.    Decl. J. Hernandez ¶ 14; Plaintiff's Depo. 317:14-16

38.    That the Authority failed to adhere to this policy and instead routed the matter to an expensive and contentious law firm is a truly extraordinary decision.

38.    Decl. J. Hernandez ¶ 14

39.    Ace Parking did not have a direct service agreement with the Airport Authority.  Ace did not have any sort of a business relationship with the Airport Authority.

39.    Plaintiff's depo. 149:15-20; 150:20-25

41.    Ted Sexton told Hernandez it would be okay to go to the Southwest Airline Golf Tournaments.  Sexton knew he was a guest of Southwest's.

41.    Plaintiff's depo. 158:18-22; 168:5-8, 12-13, 18, 21-24

42.    Hernandez had absolutely never received free food from the concessions in the Airport terminals.

42.    Plaintiff's depo. 201:16-18

44.    Ted Sexton told Hernandez to write everything on the form, whether he thought it proper to do so or not.

44.    Plaintiff's depo. 293:14-20

74.    Hernandez requested ticket changes for Thella Bowens over five times.  He did no less than five different itinerary changes, plus date changes and time changes.  The airlines' charges for itinerary and date changes range between $50 to $100 per boarding document.  Thella Bowens was not charged by the airlines for the changes. Thella could have changed her tickets by simply calling reservations.

74.    Plaintiff's depo. 550:15-551:1, 6-8; 551:21-22; 554:1-10

58-722

75.    Ted Sexton instructed Hernandez that he should get Thella access to premier airline lounges so she wouldn't have to wait in the public waiting rooms.  Sexton requested that even for the briefest moments if the plane was late to have Thella sit in the lounge.

75.    Plaintiff's depo. 556:19-23; 558:18-24; 559:2-7

76.    Ted Sexton asked if special privileges could be obtained for Thella Bowens' sister.

76.    Plaintiff's depo. 561:1-25

77.    Authority board member Morris Vance requested and received at least two upgrades to first class and there were no charges.  He requested several other first-class upgrades and paid no charges for upgrades or flight changes.

77.    Plaintiff's depo. 595:25; 596:10-12; 599:1-6; 599:25; 600:3

78.    Authority Vice-President Vernon Evans repeatedly requested changes in flight schedules no less than 15-20 times in the last two years.  Ted Sexton told Hernandez to "do whatever you can."  Sexton knew the changes were at no cost.  Hernandez asked Sexton if it was okay to change Evans' tickets at the time.

78.    Plaintiff's depo. 604:5-11; 604:12-25; 605:18-23; 607:8-12; 608:6-10; 609:8-18; 610:1-13; 612:17-21

79.    Thella Bowens requested two free airline tickets from Hawaiian Airlines and from Southwest Airlines because she was on the board of United Way.  The tickets were all donated to the Authority.

79.    Plaintiff's depo. 619:12-17; 619:22-23; 620:19-21; 621:9-11

80.    There was a power struggle between Bryan Enarson and Ted Sexton.  Enarson had more control and had one ear of Thella Bowens'.

80.    Plaintiff's depo. 645:19-25; 646:1-2

81.    Authority Vice-President Bryan Enarson requested free tickets, upgrades and special privileges from Hawaiian Airlines.

81.    Plaintiff's depo. 687:4-15

## Teledyne Ryan Disclosure:

**Adjudication No. 15:  Hernandez' First Cause of Action under Labor Code section 1102.5, insofar as it is based on any alleged disclosure regarding the Teledyne Ryan lease, fails as a matter of law because Hernandez could not have had a reasonable belief that the Teledyne Ryan lease was unlawful.**

This is not a proper issue for determination as a "summary adjudication" but an argument

1  in favor of the adjudication of the first cause of action.  The legal importance of the argument is

2  accordingly addressed in Hernandez' points and authorities.  Additional facts relevant to the

3  evaluation of this argument are as follows:

4  **PLAINTIFF'S ADDITIONAL**                              **PL'S SUPPORTING EVIDENCE**
   **UNDISPUTED FACTS**

5
   10.    Another of Hernandez' duties was         10.    Decl. J. Hernandez ¶ 4; Plaintiff's
6  the evaluation of a lease from the Port of      depo. 388:8-12
   property located at the west side of the
7  Airport.  (The Teledyne Ryan property)  The
   lease of that property likewise contemplated
8  the generation of revenues to cover the lease
   through its use as a parking lot.  The lease
9  had been negotiated by Enarson and was not
   subject to renegotiation.
10
   11.    Hernandez discovered this property       11.    Decl. J. Hernandez ¶ 4; Plaintiff's
11 was likewise contaminated by toxic waste        depo. 389:19-22, 390:3-5, 396:20-25
   and only a small portion of it was usable.
12
   12.    The contamination was grossly            12.    Decl. J. Hernandez ¶ 4; Plaintiff's
13 understated by the Port as a $10 million         depo. 407:2-408:2, 409:3-6
   expense (which the Port agreed to pay) when
14 the real cost of remediation was in excess of
   $30 million.
15
   **Adjudication No. 16:  Hernandez' First Cause of Action under Labor Code section 1102.5,**
16
   **insofar as it is based on any alleged disclosure regarding the Teledyne Ryan lease, fails as a**
17
   **matter of law because Hernandez has not identified a state or federal statute, rule or**
18
   **regulation of which he disclosed a violation.**
19
           This is not a proper issue for determination as a "summary adjudication" but an argument
20
   in favor of the adjudication of the first cause of action.  The legal importance of the argument is
21
   accordingly addressed in Hernandez' points and authorities.  Additional facts relevant to the
22
   evaluation of this argument are as follows:
23

24

25

26

27

28

| **PLAINTIFF'S ADDITIONAL** | **PL'S SUPPORTING EVIDENCE** |
|---|---|
| **UNDISPUTED FACTS** | |

10.   Another of Hernandez' duties was the evaluation of a lease from the Port of property located at the west side of the Airport. (The Teledyne Ryan property)  The lease of that property likewise contemplated the generation of revenues to cover the lease through its use as a parking lot.  The lease had been negotiated by Enarson and was not subject to renegotiation.

10.   Decl. J. Hernandez ¶ 4; Plaintiff's depo. 388:8-12

11.   Hernandez discovered this property was likewise contaminated by toxic waste and only a small portion of it was usable.

11.   Decl. J. Hernandez ¶ 4; Plaintiff's depo. 389:19-22, 390:3-5, 396:20-25

12.   The contamination was grossly understated by the Port as a $10 million expense (which the Port agreed to pay) when the real cost of remediation was in excess of $30 million.

12.   Decl. J. Hernandez ¶ 4; Plaintiff's depo. 407:2-408:2, 409:3-6

**Adjudication No. 17:  Hernandez' First Cause of Action fails as matter of law, insofar as it is based on any alleged disclosure regarding the Teledyne Ryan lease, because there is no causal connection between his alleged protected activity and his termination.**

This is not a proper issue for determination as a "summary adjudication" but an argument in favor of the adjudication of the first cause of action.  The legal importance of the argument is accordingly addressed in Hernandez' points and authorities.  Additional facts relevant to the evaluation of this argument are as follows:

| **PLAINTIFF'S ADDITIONAL** | **PL'S SUPPORTING EVIDENCE** |
|---|---|
| **UNDISPUTED FACTS** | |

10.   Another of Hernandez' duties was the evaluation of a lease from the Port of property located at the west side of the Airport. (The Teledyne Ryan property)  The lease of that property likewise contemplated the generation of revenues to cover the lease through its use as a parking lot.  The lease had been negotiated by Enarson and was not subject to renegotiation.

10.   Decl. J. Hernandez ¶ 4; Plaintiff's depo. 388:8-12

11.   Hernandez discovered this property was likewise contaminated by toxic waste and only a small portion of it was usable.

11.   Decl. J. Hernandez ¶ 4; Plaintiff's depo. 389:19-22, 390:3-5, 396:20-25

58-725

| | | |
|---|---|---|
| 1 | 12. The contamination was grossly understated by the Port as a $10 million expense (which the Port agreed to pay) when the real cost of remediation was in excess of $30 million. | 12. Decl. J. Hernandez ¶ 4; Plaintiff's depo. 407:2-408:2, 409:3-6 |
| 2 | | |
| 3 | | |
| 4 | 21. On November 2, 2005, Bowens engaged a law firm to investigate Hernandez for "ethics" violations associated with the receipt of benefits from the Authority's vendors. This was the first occasion in the history of the Authority that a law firm was retained to investigate an employee for alleged ethics violations. | 21. Decl. J. Hernandez ¶ 7; Decl. P. Swan ¶ 3 |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | 22. The law firm, per report submitted by Patrick Swan, Esq., concluded Hernandez received (1) free rounds of golf; (2) airline tickets to Hawaii; and (3) charger football tickets, the value of which placed Hernandez in violation of the Ethics Code applicable to Authority employees. | 22. Decl. P. Swan |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | 23. Bowens claims to have terminated Hernandez' employment based on the conclusions in the report. | 23. Decl. T. Bowens ¶ 9 |
| 14 | | |
| 15 | 24. With regard to the "free rounds of golf," Hernandez cleared the trip with his boss, Sexton, before going, after disclosing the nature of the outing and that the golf rounds were supplied by Mike Parrish. | 24. Decl. J. Hernandez ¶ 9; Plaintiff's depo. 158:18-22; 168:5-24 |
| 16 | | |
| 17 | | |
| 18 | 25. In the process, Sexton admitted he had attended the same golf outing under similar circumstances. | 25. Decl. J. Hernandez ¶ 9 |
| 19 | | |
| 20 | 26. Hernandez compensated Parrish for the round by buying Parrish's lunch and dinner and by making gift contributions for the raffle. The net personal value to Hernandez was negative by over $200. | 26. Decl. J. Hernandez ¶ 9; Decl. P. Swan; Plaintiff's depo. 159:14-19; 163:3-13; 164:10-14 |
| 21 | | |
| 22 | | |
| 23 | 27. Hernandez had a strong social relationship with Parrish, which included joint family outings and gatherings, dinners, barbecues and sporting events. | 27. Decl. J. Hernandez ¶ 9; Decl. P. Swan; Decl. M. Parrish par. 2 |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

58-726

28.    With regard to the Hawaii ticket, ticketing benefits were regarded by management as normal benefit of their workplace, and that Sexton assigned Hernandez responsibility on frequent occasions to obtain ticket upgrades for various employees and board members. Hernandez specifically discussed whether the practice was ethically acceptable and Sexton replied it was.

28.    Decl. J. Hernandez ¶ 10-11; Decl. P. Swan; Plaintiff's depo. 240:1-25; 602:20-25; 609:1-611:25

29.    Notwithstanding the practice among Hernandez' superiors to receive passes and upgrades, Hernandez' receipt of those benefits was limited to gifts from personal friends. The tickets on Southwest came from Parrish. The tickets on Hawaiian Air came from Janet Nix, another personal friend, who told him she gave tickets like those to all kinds of friends having nothing to do with business.

29.    Decl. J. Hernandez ¶ 10-11; Decl. P. Swan; Plaintiff's depo. 199:3-22; Decl. M. Parrish ¶ 3

30.    Moreover, the Hawaiian tickets were listed as "space available" and further identified as having "no dollar value" and could not be transferred or redeemed.

30.    Decl. J. Hernandez ¶ 10-11; Decl. P. Swan; ; Plaintiff's Depo. 280:15-20, 23-25; 281:1-2; Decl. M. Parrish ¶ 3

31.    With regard to the football tickets, ACE parking did not have a contractor or vendor agreement of any sort with the Authority.

31.    Decl. J. Hernandez ¶ 12; Decl. P. Swan; Plaintiff's Depo. 268:1-4; 272:5-9

32.    Hernandez had a longstanding friendship with the ACE Parking manager who invited him to the game which preceded Hernandez' employment with the Authority. They were friends from Hernandez' prior employment relationship with ACE Parking.

32.    Decl. J. Hernandez ¶ 12; Decl. P. Swan

33.    During Swan's interviews with Hernandez, he expressed no interest in the fact that Parrish and Hernandez were close personal friends.

33.    Decl. J. Hernandez ¶ 13

34.    He avoided discussion of the tendency of other employees such as Bowens and Sexton to make active and aggressive use of their positions to acquire ticketing upgrades and benefits worth thousands of dollars.

34.    Decl. J. Hernandez ¶ 13

58-727

1    35.    When Hernandez attempted to      35.    Decl. J. Hernandez ¶ 13
      explain these friendships and practices,
2    Swan cut him off and would state that he
      was not interested in the nature of those
3    friendships and what the office practice was.

4    36.    Hernandez had previously received      36.    Decl. J. Hernandez ¶ 14; Plaintiff's
      outstanding performance evaluations.       Depo. 786:9-18
5

      37.    The Authority did, in fact, have a      37.    Decl. J. Hernandez ¶ 14; Plaintiff's
6    progressive disciplinary policy set forth in      Depo. 317:14-16
      writing, which emphasizes the Authority's
7    commitment to preserve employment
      through pre-termination warnings and
8    training.

9    38.    That the Authority failed to adhere to      38.    Decl. J. Hernandez ¶ 14
      this policy and instead routed the matter to
10   an expensive and contentious law firm is a
      truly extraordinary decision.
11

12   39.    Ace Parking did not have a direct      39.    Plaintiff's depo. 149:15-20; 150:20-
      service agreement with the Airport       25
      Authority. Ace did not have any sort of a
13   business relationship with the Airport
      Authority.
14

15   41.    Ted Sexton told Hernandez it would      41.    Plaintiff's depo. 158:18-22; 168:5-8,
      be okay to go to the Southwest Airline Golf    12-13, 18, 21-24
16   Tournaments. Sexton knew he was a guest
      of Southwest's.

17   42.    Hernandez had absolutely never      42.    Plaintiff's depo. 201:16-18
      received free food from the concessions in
18   the Airport terminals.

19   44.    Ted Sexton told Hernandez to write      44.    Plaintiff's depo. 293:14-20
      everything on the form, whether he thought
20   it proper to do so or not.

21   74.    Hernandez requested ticket changes      74.    Plaintiff's depo. 550:15-551:1, 6-8;
      for Thella Bowens over five times. He did     551:21-22; 554:1-10
22   no less than five different itinerary changes,
      plus date changes and time changes. The
23   airlines' charges for itinerary and date
      changes range between $50 to $100 per
24   boarding document. Thella Bowens was not
      charged by the airlines for the changes.
25   Thella could have changed her tickets by
      simply calling reservations.

26

27

28

| | | | |
|---|---|---|---|
| 1 | 75.    Ted Sexton instructed Hernandez that he should get Thella access to premier airline lounges so she wouldn't have to wait in the public waiting rooms.  Sexton requested that even for the briefest moments if the plane was late to have Thella sit in the lounge. | 75.    Plaintiff's depo. 556:19-23; 558:18-24; 559:2-7 | |

75.    Ted Sexton instructed Hernandez that he should get Thella access to premier airline lounges so she wouldn't have to wait in the public waiting rooms.  Sexton requested that even for the briefest moments if the plane was late to have Thella sit in the lounge.

75.    Plaintiff's depo. 556:19-23; 558:18-24; 559:2-7

76.    Ted Sexton asked if special privileges could be obtained for Thella Bowens' sister.

76.    Plaintiff's depo. 561:1-25

77.    Authority board member Morris Vance requested and received at least two upgrades to first class and there were no charges.  He requested several other first-class upgrades and paid no charges for upgrades or flight changes.

77.    Plaintiff's depo. 595:25; 596:10-12; 599:1-6; 599:25; 600:3

78.    Authority Vice-President Vernon Evans repeatedly requested changes in flight schedules no less than 15-20 times in the last two years.  Ted Sexton told Hernandez to "do whatever you can."  Sexton knew the changes were at no cost.  Hernandez asked Sexton if it was okay to change Evans' tickets at the time.

78.    Plaintiff's depo. 604:5-11; 604:12-25; 605:18-23; 607:8-12; 608:6-10; 609:8-18; 610:1-13; 612:17-21

79.    Thella Bowens requested two free airline tickets from Hawaiian Airlines and from Southwest Airlines because she was on the board of United Way.  The tickets were all donated to the Authority.

79.    Plaintiff's depo. 619:12-17; 619:22-23; 620:19-21; 621:9-11

80.    There was a power struggle between Bryan Enarson and Ted Sexton.  Enarson had more control and had one ear of Thella Bowens'.

80.    Plaintiff's depo. 645:19-25; 646:1-2

81.    Authority Vice-President Bryan Enarson requested free tickets, upgrades and special privileges from Hawaiian Airlines.

81.    Plaintiff's depo. 687:4-15

## RESTROOM PROJECT DISCLOSURE:

**Adjudication No. 18:** Hernandez' First Cause of Action under Labor Code section 1102.5, insofar as it is based on any alleged disclosure regarding the restroom project, fails as a matter of law because Hernandez could not have had a reasonable belief that the restroom project was unlawful.

This is not a proper issue for determination as a "summary adjudication" but an argument

58-729

1 | in favor of the adjudication of the first cause of action. The legal importance of the argument is
2 | accordingly addressed in Hernandez' points and authorities. Additional facts relevant to the
3 | evaluation of this argument are as follows:

| PLAINTIFF'S ADDITIONAL UNDISPUTED FACTS | PL'S SUPPORTING EVIDENCE |
|---|---|
| 14. Another of Hernandez' duties was to oversee the construction and/or maintenance of public facilities at the terminals, including public restrooms. Hernandez attempted to expand the size of the public restrooms to alleviate overcrowding in the east terminal and bring them into compliance with the state requirements that they be accessible by wheel chair, as required by the Americans with Disabilities Act (ADA). | 14. Decl. J. Hernandez ¶ 5; Plaintiff's depo. 349:23-350:5, 352:3-353:8, 336:20-21, 337:17-19 |
| 15. He needed to annex 30 sq. ft. space from a concessionaire in order to comply with ADA requirements, but was told he could not do so by Enarson because Enarson had made handshake agreements with the concessionaires. | 15. Decl. J. Hernandez ¶ 5; Plaintiff's depo. 333:10-17, 335:4-8, 339:6-8, 336:20-21, 343:20-25 |

**Adjudication No. 19:** Hernandez' First Cause of Action under Labor Code section 1102.5, insofar as it is based on any alleged disclosure regarding the restroom project, fails as a matter of law because Hernandez admits that the Authority did not violate the ADA, nor did it express its intention to violate the ADA.

This is not a proper issue for determination as a "summary adjudication" but an argument in favor of the adjudication of the first cause of action. The legal importance of the argument is accordingly addressed in Hernandez' points and authorities. Additional facts relevant to the evaluation of this argument are as follows:

58-730

| PLAINTIFF'S ADDITIONAL UNDISPUTED FACTS | PL'S SUPPORTING EVIDENCE |
|---|---|
| 14.      Another of Hernandez' duties was to oversee the construction and/or maintenance of public facilities at the terminals, including public restrooms.  Hernandez attempted to expand the size of the public restrooms to alleviate overcrowding in the east terminal and bring them into compliance with the state requirements that they be accessible by wheel chair, as required by the Americans with Disabilities Act (ADA). | 14.      Decl. J. Hernandez ¶ 5; Plaintiff's depo. 349:23-350:5, 352:3-353:8, 336:20-21, 337:17-19 |
| 15.      He needed to annex 30 sq. ft. space from a concessionaire in order to comply with ADA requirements, but was told he could not do so by Enarson because Enarson had made handshake agreements with the concessionaires. | 15.      Decl. J. Hernandez ¶ 5; Plaintiff's depo. 333:10-17, 335:4-8, 339:6-8, 336:20-21, 343:20-25 |

**Adjudication No. 20:**  Hernandez' First Cause of Action under Labor Code section 1102.5, insofar as it is based on any alleged disclosure regarding the restroom project, fails as a matter of law because Hernandez has not identified a state or federal statute, rule or regulation of which he disclosed a violation.

This is not a proper issue for determination as a "summary adjudication" but an argument in favor of the adjudication of the first cause of action.  The legal importance of the argument is accordingly addressed in Hernandez' points and authorities.  Additional facts relevant to the evaluation of this argument are as follows:

| PLAINTIFF'S ADDITIONAL UNDISPUTED FACTS | PL'S SUPPORTING EVIDENCE |
|---|---|
| 14.      Another of Hernandez' duties was to oversee the construction and/or maintenance of public facilities at the terminals, including public restrooms.  Hernandez attempted to expand the size of the public restrooms to alleviate overcrowding in the east terminal and bring them into compliance with the state requirements that they be accessible by wheel chair, as required by the Americans with Disabilities Act (ADA). | 14.      Decl. J. Hernandez ¶ 5; Plaintiff's depo. 349:23-350:5, 352:3-353:8, 336:20-21, 337:17-19 |

| | |
|---|---|
| 1 | 15.   He needed to annex 30 sq. ft. space from a concessionaire in order to comply with ADA requirements, but was told he could not do so by Enarson because Enarson had made handshake agreements with the concessionaires. | 15.   Decl. J. Hernandez ¶ 5; Plaintiff's depo. 333:10-17, 335:4-8, 339:6-8, 336:20-21, 343:20-25 |

**Adjudication No. 21:  Hernandez' First Cause of Action, insofar as it is based on any alleged disclosure regarding the restroom project, fails as matter of law because there is no causal connection between his alleged protected activity and his termination.**

This is not a proper issue for determination as a "summary adjudication" but an argument in favor of the adjudication of the first cause of action.  The legal importance of the argument is accordingly addressed in Hernandez' points and authorities.  Additional facts relevant to the evaluation of this argument are as follows:

| **PLAINTIFF'S ADDITIONAL UNDISPUTED FACTS** | **PL'S SUPPORTING EVIDENCE** |
|---|---|
| 14.   Another of Hernandez' duties was to oversee the construction and/or maintenance of public facilities at the terminals, including public restrooms.  Hernandez attempted to expand the size of the public restrooms to alleviate overcrowding in the east terminal and bring them into compliance with the state requirements that they be accessible by wheel chair, as required by the Americans with Disabilities Act (ADA). | 14.   Decl. J. Hernandez ¶ 5; Plaintiff's depo. 349:23-350:5, 352:3-353:8, 336:20-21, 337:17-19 |
| 15.   He needed to annex 30 sq. ft. space from a concessionaire in order to comply with ADA requirements, but was told he could not do so by Enarson because Enarson had made handshake agreements with the concessionaires. | 15.   Decl. J. Hernandez ¶ 5; Plaintiff's depo. 333:10-17, 335:4-8, 339:6-8, 336:20-21, 343:20-25 |
| 21.   On November 2, 2005 , Bowens engaged a law firm to investigate Hernandez for "ethics" violations associated with the receipt of benefits from the Authority's vendors.  This was the first occasion in the history of the Authority that a law firm was retained to investigate an employee for alleged ethics violations. | 21.   Decl. J. Hernandez ¶ 7; Decl. P. Swan ¶ 3 |

| | | |
|---|---|---|
| 1 | 22.    The law firm, per report submitted by Patrick Swan, Esq., concluded Hernandez received (1) free rounds of golf; (2) airline tickets to Hawaii; and (3) charger football tickets, the value of which placed Hernandez in violation of the Ethics Code applicable to Authority employees. | 22.    Decl. P. Swan |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | 23.    Bowens claims to have terminated Hernandez' employment based on the conclusions in the report. | 23.    Decl. T. Bowens ¶ 9 |
| 6 | | |
| 7 | 24.    With regard to the "free rounds of golf," Hernandez cleared the trip with his boss, Sexton, before going, after disclosing the nature of the outing and that the golf rounds were supplied by Mike Parrish. | 24.    Decl. J. Hernandez ¶ 9; Plaintiff's depo. 158:18-22; 168:5-24 |
| 8 | | |
| 9 | | |
| 10 | 25.    In the process, Sexton admitted he had attended the same golf outing under similar circumstances. | 25.    Decl. J. Hernandez ¶ 9 |
| 11 | | |
| 12 | 26.    Hernandez compensated Parrish for the round by buying Parrish's lunch and dinner and by making gift contributions for the raffle.  The net personal value to Hernandez was negative by over $200. | 26.    Decl. J. Hernandez ¶ 9; Decl. P. Swan; Plaintiff's depo. 159:14-19; 163:3-13; 164:10-14 |
| 13 | | |
| 14 | | |
| 15 | 27.    Hernandez had a strong social relationship with Parrish, which included joint family outings and gatherings, dinners, barbecues and sporting events. | 27.    Decl. J. Hernandez ¶ 9; Decl. P. Swan; Decl. M. Parrish par. 2. |
| 16 | | |
| 17 | | |
| 18 | 28.    With regard to the Hawaii ticket, ticketing benefits were regarded by management as normal benefit of their workplace, and that Sexton assigned Hernandez responsibility on frequent occasions to obtain ticket upgrades for various employees and board members. Hernandez specifically discussed whether the practice was ethically acceptable and Sexton replied it was. | 28.    Decl. J. Hernandez ¶ 10-11; Decl. P. Swan; Plaintiff's depo. 240:1-25; 602:20-25; 609:1-611:25 |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | 29.    Notwithstanding the practice among Hernandez' superiors to receive passes and upgrades, Hernandez' receipt of those benefits was limited to gifts from personal friends.  The tickets on Southwest came from Parrish.  The tickets on Hawaiian Air came from Janet Nix, another personal friend, who told him she gave tickets like those to all kinds of friends having nothing to do with business. | 29.    Decl. J. Hernandez ¶ 10-11; Decl. P. Swan; Plaintiff's depo. 199:3-22; Decl. M. Parrish ¶ 3 |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

PL'S SEP. STATEMENT OF ADDIT. UNDISPUTED MATERIAL FACTS IN OPPOS. TO SDCRAA'S MSJ

| | |
|---|---|
| 30. Moreover, the Hawaiian tickets were listed as "space available" and further identified as having "no dollar value" and could not be transferred or redeemed. | 30. Decl. J. Hernandez ¶ 10-11; Decl. P. Swan; ; Plaintiff's Depo. 280:15-20, 23-25; 281:1-2; Decl. M. Parrish ¶ 3 |
| 31. With regard to the football tickets, ACE parking did not have a contractor or vendor agreement of any sort with the Authority. | 31. Decl. J. Hernandez ¶ 12; Decl. P. Swan; Plaintiff's Depo. 268:1-4; 272:5-9 |
| 32. Hernandez had a longstanding friendship with the ACE Parking manager who invited him to the game which preceded Hernandez' employment with the Authority. They were friends from Hernandez' prior employment relationship with ACE Parking. | 32. Decl. J. Hernandez ¶ 12; Decl. P. Swan |
| 33. During Swan's interviews with Hernandez, he expressed no interest in the fact that Parrish and Hernandez were close personal friends. | 33. Decl. J. Hernandez ¶ 13 |
| 34. He avoided discussion of the tendency of other employees such as Bowens and Sexton to make active and aggressive use of their positions to acquire ticketing upgrades and benefits worth thousands of dollars. | 34. Decl. J. Hernandez ¶ 13 |
| 35. When Hernandez attempted to explain these friendships and practices, Swan cut him off and would state that he was not interested in the nature of those friendships and what the office practice was. | 35. Decl. J. Hernandez ¶ 13 |
| 36. Hernandez had previously received outstanding performance evaluations. | 36. Decl. J. Hernandez ¶ 14; Plaintiff's Depo. 786:9-18 |
| 37. The Authority did, in fact, have a progressive disciplinary policy set forth in writing, which emphasizes the Authority's commitment to preserve employment through pre-termination warnings and training. | 37. Decl. J. Hernandez ¶ 14; Plaintiff's Depo. 317:14-16 |
| 38. That the Authority failed to adhere to this policy and instead routed the matter to an expensive and contentious law firm is a truly extraordinary decision. | 38. Decl. J. Hernandez ¶ 14 |
| 39. Ace Parking did not have a direct service agreement with the Airport Authority. Ace did not have any sort of a business relationship with the Airport Authority. | 39. Plaintiff's depo. 149:15-20; 150:20-25 |

| | |
|---|---|
| 41.   Ted Sexton told Hernandez it would be okay to go to the Southwest Airline Golf Tournaments.  Sexton knew he was a guest of Southwest's. | 41.   Plaintiff's depo. 158:18-22; 168:5-8, 12-13, 18, 21-24 |
| 42.   Hernandez had absolutely never received free food from the concessions in the Airport terminals. | 42.   Plaintiff's depo. 201:16-18 |
| 44.   Ted Sexton told Hernandez to write everything on the form, whether he thought it proper to do so or not. | 44.   Plaintiff's depo. 293:14-20 |
| 74.   Hernandez requested ticket changes for Thella Bowens over five times.  He did no less than five different itinerary changes, plus date changes and time changes.  The airlines' charges for itinerary and date changes range between $50 to $100 per boarding document.  Thella Bowens was not charged by the airlines for the changes. Thella could have changed her tickets by simply calling reservations. | 74.   Plaintiff's depo. 550:15-551:1, 6-8; 551:21-22; 554:1-10 |
| 75.   Ted Sexton instructed Hernandez that he should get Thella access to premier airline lounges so she wouldn't have to wait in the public waiting rooms.  Sexton requested that even for the briefest moments if the plane was late to have Thella sit in the lounge. | 75.   Plaintiff's depo. 556:19-23; 558:18-24; 559:2-7 |
| 76.   Ted Sexton asked if special privileges could be obtained for Thella Bowens' sister. | 76.   Plaintiff's depo. 561:1-25 |
| 77.   Authority board member Morris Vance requested and received at least two upgrades to first class and there were no charges.  He requested several other first-class upgrades and paid no charges for upgrades or flight changes. | 77.   Plaintiff's depo. 595:25; 596:10-12; 599:1-6; 599:25; 600:3 |
| 78.   Authority Vice-President Vernon Evans repeatedly requested changes in flight schedules no less than 15-20 times in the last two years.  Ted Sexton told Hernandez to "do whatever you can."  Sexton knew the changes were at no cost.  Hernandez asked Sexton if it was okay to change Evans' tickets at the time. | 78.   Plaintiff's depo. 604:5-11; 604:12-25; 605:18-23; 607:8-12; 608:6-10; 609:8-18; 610:1-13; 612:17-21 |

| | |
|---|---|
| 79.    Thella Bowens requested two free airline tickets from Hawaiian Airlines and from Southwest Airlines because she was on the board of United Way.  The tickets were all donated to the Authority. | 79.    Plaintiff's depo. 619:12-17; 619:22-23; 620:19-21; 621:9-11 |
| 80.    There was a power struggle between Bryan Enarson and Ted Sexton.  Enarson had more control and had one ear of Thella Bowens'. | 80.    Plaintiff's depo. 645:19-25; 646:1-2 |
| 81.    Authority Vice-President Bryan Enarson requested free tickets, upgrades and special privileges from Hawaiian Airlines. | 81.    Plaintiff's depo. 687:4-15 |

## LPI DISCLOSURE

**Adjudication No. 22:  Hernandez' First Cause of Action under Labor Code section 1102.5, insofar as it is based on any alleged disclosure regarding LPI, fails as a matter of law because Hernandez could not have had a reasonable belief that he disclosed unlawful acts.**

This is not a proper issue for determination as a "summary adjudication" but an argument in favor of the adjudication of the first cause of action.  The legal importance of the argument is accordingly addressed in Hernandez' points and authorities.  Additional facts relevant to the evaluation of this argument are as follows:

| **PLAINTIFF'S ADDITIONAL UNDISPUTED FACTS** | **PL'S SUPPORTING EVIDENCE** |
|---|---|
| 17.    Another of Hernandez' duties was to help negotiate and monitor contracts for the management of parking services.  The low bidder (based on "projected" reimbursable expenses) on a contract to manage the Airport's parking lots was Lindbergh Parking Incorporated (LPI). | 17.    Decl. J. Hernandez ¶ 6 |

58-736

| | |
|---|---|
| 18.    Its bid was so low that Hernandez–who had managed parking himself–suspected the bid was insincere. He thereafter closely monitored the performance of the contract and noted LPI was overcharging the Authority approximately $1 million to 1.5 million per year. This estimate was based, among other things, on the fact that LPI (1) did not lease new shuttle transportation vehicles as stated in its bid (but instead used older shuttles owned by LPI); (2) was seeking reimbursement for an unnecessary management position (owner/manager being paid for management work he did not perform); and (3) double-billing the Authority for workers' compensation insurance. | 18.    Decl. J. Hernandez ¶ 6; Plaintiff's Depo. 478:16-22; 481:1-4; 483:2-6 |

**Adjudication No. 23:  Hernandez' First Cause of Action under Labor Code section 1102.5, insofar as it is based on any alleged disclosure regarding LPI, fails as a matter of law because Hernandez has not identified a state or federal statute, rule or regulation of which he disclosed a violation.**

This is not a proper issue for determination as a "summary adjudication" but an argument in favor of the adjudication of the first cause of action. The legal importance of the argument is accordingly addressed in Hernandez' points and authorities. Additional facts relevant to the evaluation of this argument are as follows:

| PLAINTIFF'S ADDITIONAL UNDISPUTED FACTS | PL'S SUPPORTING EVIDENCE |
|---|---|
| 17.    Another of Hernandez' duties was to help negotiate and monitor contracts for the management of parking services. The low bidder (based on "projected" reimbursable expenses) on a contract to manage the Airport's parking lots was Lindbergh Parking Incorporated (LPI). | 17.    Decl. J. Hernandez ¶ 6 |

58-737

| | |
|---|---|
| 18.    Its bid was so low that Hernandez–who had managed parking himself–suspected the bid was insincere. He thereafter closely monitored the performance of the contract and noted LPI was overcharging the Authority approximately $1 million to 1.5 million per year. This estimate was based, among other things, on the fact that LPI (1) did not lease new shuttle transportation vehicles as stated in its bid (but instead used older shuttles owned by LPI); (2) was seeking reimbursement for an unnecessary management position (owner/manager being paid for management work he did not perform); and (3) double-billing the Authority for workers' compensation insurance. | 18.    Decl. J. Hernandez ¶ 6; Plaintiff's Depo. 478:16-22; 481:1-4; 483:2-6 |

**Adjudication No. 24:  Hernandez' First Cause of Action fails as matter of law, insofar as it is based on any alleged disclosure regarding LPI, because there is no causal connection between his alleged protected activity and his termination.**

This is not a proper issue for determination as a "summary adjudication" but an argument in favor of the adjudication of the first cause of action.  The legal importance of the argument is accordingly addressed in Hernandez' points and authorities.  Additional facts relevant to the evaluation of this argument are as follows:

| **PLAINTIFF'S ADDITIONAL UNDISPUTED FACTS** | **PL'S SUPPORTING EVIDENCE** |
|---|---|
| 17.    Another of Hernandez' duties was to help negotiate and monitor contracts for the management of parking services.  The low bidder (based on "projected" reimbursable expenses) on a contract to manage the Airport's parking lots was Lindbergh Parking Incorporated (LPI). | 17.    Decl. J. Hernandez ¶ 6 |

58-738

| | |
|---|---|
| 18.    Its bid was so low that Hernandez–who had managed parking himself–suspected the bid was insincere. He thereafter closely monitored the performance of the contract and noted LPI was overcharging the Authority approximately $1 million to 1.5 million per year. This estimate was based, among other things, on the fact that LPI (1) did not lease new shuttle transportation vehicles as stated in its bid (but instead used older shuttles owned by LPI); (2) was seeking reimbursement for an unnecessary management position (owner/manager being paid for management work he did not perform); and (3) double-billing the Authority for workers' compensation insurance. | 18.    Decl. J. Hernandez ¶ 6; Plaintiff's Depo. 478:16-22; 481:1-4; 483:2-6 |
| 21.    On November 2, 2005 , Bowens engaged a law firm to investigate Hernandez for "ethics" violations associated with the receipt of benefits from the Authority's vendors.  This was the first occasion in the history of the Authority that a law firm was retained to investigate an employee for alleged ethics violations. | 21.    Decl. J. Hernandez ¶ 7; Decl. P. Swan ¶ 3 |
| 22.    The law firm, per report submitted by Patrick Swan, Esq., concluded Hernandez received (1) free rounds of golf; (2) airline tickets to Hawaii; and (3) charger football tickets, the value of which placed Hernandez in violation of the Ethics Code applicable to Authority employees. | 22.    Decl. P. Swan |
| 23.    Bowens claims to have terminated Hernandez' employment based on the conclusions in the report. | 23.    Decl. T. Bowens ¶ 9 |
| 24.    With regard to the "free rounds of golf," Hernandez cleared the trip with his boss, Sexton, before going, after disclosing the nature of the outing and that the golf rounds were supplied by Mike Parrish. | 24.    Decl. J. Hernandez ¶ 9; Plaintiff's depo. 158:18-22; 168:5-24 |
| 25.    In the process, Sexton admitted he had attended the same golf outing under similar circumstances. | 25.    Decl. J. Hernandez ¶ 9 |
| 26.    Hernandez compensated Parrish for the round by buying Parrish's lunch and dinner and by making gift contributions for the raffle.  The net personal value to Hernandez was negative by over $200. | 26.    Decl. J. Hernandez ¶ 9; Decl. P. Swan; Plaintiff's depo. 159:14-19; 163:3-13; 164:10-14 |

| | | |
|---|---|---|
| 1 | 27.    Hernandez had a strong social relationship with Parrish, which included | 27.    Decl. J. Hernandez ¶ 9; Decl. P. Swan; Decl. M. Parrish par. 2 |
| 2 | joint family outings and gatherings, dinners, barbecues and sporting events. | |
| 3 | | |
| 4 | 28.    With regard to the Hawaii ticket, ticketing benefits were regarded by | 28.    Decl. J. Hernandez ¶ 10-11; Decl. P. Swan; Plaintiff's depo. 240:1-25; 602:20-25; |
| 5 | management as normal benefit of their workplace, and that Sexton assigned | 609:1-611:25 |
| 6 | Hernandez responsibility on frequent occasions to obtain ticket upgrades for | |
| 7 | various employees and board members. Hernandez specifically discussed whether the practice was ethically acceptable and | |
| 8 | Sexton replied it was. | |
| 9 | 29.    Notwithstanding the practice among Hernandez' superiors to receive passes and | 29.    Decl. J. Hernandez ¶ 10-11; Decl. Swan; Plaintiff's depo. 199:3-22; Decl. M. |
| 10 | upgrades, Hernandez' receipt of those benefits was limited to gifts from personal | Parrish ¶ 3 |
| 11 | friends.  The tickets on Southwest came from Parrish.  The tickets on Hawaiian Air | |
| 12 | came from Janet Nix, another personal friend, who told him she gave tickets like | |
| 13 | those to all kinds of friends having nothing to do with business. | |
| 14 | | |
| 15 | 30.    Moreover, the Hawaiian tickets were listed as "space available" and further | 30.    Decl. J. Hernandez ¶ 10-11; Decl. P. Swan; ; Plaintiff's Depo. 280:15-20, 23-25; |
| 16 | identified as having "no dollar value" and could not be transferred or redeemed. | 281:1-2; Decl. M. Parrish ¶ 3 |
| 17 | 31.    With regard to the football tickets, ACE parking did not have a contractor or | 31.    Decl. J. Hernandez ¶ 12; Decl. P. Swan; Plaintiff's Depo. 268:1-4; 272:5-9 |
| 18 | vendor agreement of any sort with the Authority. | |
| 19 | | |
| 20 | 32.    Hernandez had a longstanding friendship with the ACE Parking manager | 32.    Decl. J. Hernandez ¶ 12; Decl. P. Swan |
| 21 | who invited him to the game which preceded Hernandez' employment with the Authority. They were friends from Hernandez' prior | |
| 22 | employment relationship with ACE Parking. | |
| 23 | 33.    During Swan's interviews with Hernandez, he expressed no interest in the | 33.    Decl. J. Hernandez ¶ 13 |
| 24 | fact that Parrish and Hernandez were close personal friends. | |
| 25 | | |
| 26 | 34.    He avoided discussion of the tendency of other employees such as | 34.    Decl. J. Hernandez ¶ 13 |
| 27 | Bowens and Sexton to make active and aggressive use of their positions to acquire ticketing upgrades and benefits worth | |
| 28 | thousands of dollars. | |

PL'S SEP. STATEMENT OF ADDIT. UNDISPUTED MATERIAL FACTS IN OPPOS. TO SDCRAA'S MSJ
- 53 -

| | | |
|---|---|---|
| 1 | 35.    When Hernandez attempted to explain these friendships and practices, Swan cut him off and would state that he was not interested in the nature of those friendships and what the office practice was. | 35.    Decl. J. Hernandez ¶ 13 |
| 2 | | |
| 3 | | |
| 4 | 36.    Hernandez had previously received outstanding performance evaluations. | 36.    Decl. J. Hernandez ¶ 14; Plaintiff's Depo. 786:9-18 |
| 5 | | |
| 6 | 37.    The Authority did, in fact, have a progressive disciplinary policy set forth in writing, which emphasizes the Authority's commitment to preserve employment through pre-termination warnings and training. | 37.    Decl. J. Hernandez ¶ 14; Plaintiff's Depo. 317:14-16 |
| 7 | | |
| 8 | | |
| 9 | 38.    That the Authority failed to adhere to this policy and instead routed the matter to an expensive and contentious law firm is a truly extraordinary decision. | 38.    Decl. J. Hernandez ¶ 14 |
| 10 | | |
| 11 | | |
| 12 | 39.    Ace Parking did not have a direct service agreement with the Airport Authority.  Ace did not have any sort of a business relationship with the Airport Authority. | 39.    Plaintiff's depo. 149:15-20; 150:20-25 |
| 13 | | |
| 14 | | |
| 15 | 41.    Ted Sexton told Hernandez it would be okay to go to the Southwest Airline Golf Tournaments.  Sexton knew he was a guest of Southwest's. | 41.    Plaintiff's depo. 158:18-22; 168:5-8, 12-13, 18, 21-24 |
| 16 | | |
| 17 | 42.    Hernandez had absolutely never received free food from the concessions in the Airport terminals. | 42.    Plaintiff's depo. 201:16-18 |
| 18 | | |
| 19 | 44.    Ted Sexton told Hernandez to write everything on the form, whether he thought it proper to do so or not. | 44.    Plaintiff's depo. 293:14-20 |
| 20 | | |
| 21 | 74.    Hernandez requested ticket changes for Thella Bowens over five times.  He did no less than five different itinerary changes, plus date changes and time changes.  The airlines' charges for itinerary and date changes range between $50 to $100 per boarding document.  Thella Bowens was not charged by the airlines for the changes.  Thella could have changed her tickets by simply calling reservations. | 74.    Plaintiff's depo. 550:15-551:1, 6-8; 551:21-22; 554:1-10 |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

1   75.    Ted Sexton instructed Hernandez       75.    Plaintiff's depo. 556:19-23; 558:18-
    that he should get Thella access to premier      24; 559:2-7
2   airline lounges so she wouldn't have to wait
    in the public waiting rooms.  Sexton
3   requested that even for the briefest moments
    if the plane was late to have Thella sit in the
4   lounge.

5   76.    Ted Sexton asked if special            76.    Plaintiff's depo. 561:1-25
    privileges could be obtained for Thella
6   Bowens' sister.

7   77.    Authority board member Morris          77.    Plaintiff's depo. 595:25; 596:10-12;
    Vance requested and received at least two         599:1-6; 599:25; 600:3
8   upgrades to first class and there were no
    charges.  He requested several other first-
9   class upgrades and paid no charges for
    upgrades or flight changes.
10
    78.    Authority Vice-President Vernon        78.    Plaintiff's depo. 604:5-11; 604:12-
11  Evans repeatedly requested changes in flight      25; 605:18-23; 607:8-12; 608:6-10; 609:8-
    schedules no less than 15-20 times in the last    18; 610:1-13; 612:17-21
12  two years.  Ted Sexton told Hernandez to
    "do whatever you can."  Sexton knew the
13  changes were at no cost.  Hernandez asked
    Sexton if it was okay to change Evans'
14  tickets at the time.

15  79.    Thella Bowens requested two free       79.    Plaintiff's depo. 619:12-17; 619:22-
    airline tickets from Hawaiian Airlines and        23; 620:19-21; 621:9-11
16  from Southwest Airlines because she was on
    the board of United Way.  The tickets were
17  all donated to the Authority.

18  80.    There was a power struggle between     80.    Plaintiff's depo. 645:19-25; 646:1-2
    Bryan Enarson and Ted Sexton.  Enarson
19  had more control and had one ear of Thella
    Bowens'.
20
    81.    Authority Vice-President Bryan        81.    Plaintiff's depo. 687:4-15
21  Enarson requested free tickets, upgrades and
    special privileges from Hawaiian Airlines.
22

23  DATED:  November 2, 2007
                                                 _Cathryn Chinn_
24                                               CATHRYN CHINN, Attorney for
                                                 Plaintiff JOSE HERNANDEZ
25

26

27

28

58-742

1   Cathryn Chinn, Esq. (State Bar 93340)
    1901 First Avenue, Suite 400
2   San Diego, California  92101
    Telephone (619) 234-9000
3   Facsimile (619) 699-1159

4

5   Attorney for Plaintiff
    JOSE HERNANDEZ

6

7

8              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9       **COUNTY OF SAN DIEGO, CENTRAL BRANCH, GENERAL UNLIMITED**

| | |
|---|---|
| 10  JOSE HERNANDEZ, | Case No. :  GIC 871979 |
| 11           Plaintiff, | DECLARATION OF PLAINTIFF JOSE HERNANDEZ IN OPPOSITION TO |
| 12  v. | DEFENDANT SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY'S |
| 13  SAN DIEGO COUNTY REGIONAL | MOTION FOR SUMMARY JUDGMENT OR, |
|     AIRPORT AUTHORITY, a public entity | IN THE ALTERNATIVE, SUMMARY |
| 14  and DOES 1 through 12, Inclusive, | ADJUDICATION |
| 15           Defendants. | DATE:      November 16, 2007 |
| | TIME:      1:30 p.m. |
| 16 | DEPT.:     75 |
| | JUDGE:    HON. RICHARD E. STRAUSS |
| 17 | ACTION FILED:   9/1/06 |
| | TRIAL DATE:    1/4/08 |

18

19

20      I, JOSE HERNANDEZ, declare as follows:

21        1.      I am Plaintiff in the above-captioned action.  The facts set forth herein are personally

22  known to me and, if called upon to testify, I could and would do so competently.  I was hired in 2001

23  as Manager of Ground Transportation.  In 2003 I became Director of Landside Operations.  My

24  responsibilities included the management of airport parking and terminal facilities and the

25  development of and adherence to a budget for the operation of those facilities. I worked within a

26  budget dictated by anticipated revenues from the management of Airport properties and facilities.

27  I reported directly to Theodore Sexton, Vice-President of Operations, who reported to Thella

28

           PLAINTIFF HERNANDEZ' DECL. IN OPPOS. TO DEF SDCRAA'S MSJ OR SUMM. ADJUD.

1  Bowens. Bryan Enarson, Vice-President of Development, was a close confidant of Thella Bowens'

2  and the lead negotiator on land lease contracts made with General Dynamics and Teledyne Ryan.

3       2.     One of my duties was the evaluation of the flow of revenues associated with lease

4  from the Port of property located on the north side of the Airport (General Dynamics property). The

5  lease price contemplated the use of the property for parking and revenues, which would generate to

6  the lease holder for 2100 stalls. My understanding of the lease was that the lease price was set by

7  code for the years 2003, 2004 and 2005, and was thereafter subject to renegotiation. I conducted an

8  evaluation of the cash flow of the property when the lease came up for renegotiation and developed

9  the opinion that deficiencies in the property prevented generating sufficient revenue to cover the

10 lease price by at least $2 million per year. The deficiency centered on the discovery of toxic waste

11 in the soil beneath the property, which severely limited the development of the property for parking.

12 I communicated the deficiency in the property to Sexton and Bowens and that the continuation of

13 the lease at its existing rate would amount to a gift of public money to the Port.

14      3.     Despite my comments, Ted Sexton and Thella Bowens refused to renegotiate the

15 terms of the lease. Sexton then justified the lease amount by stating, "that was the price for Thella's

16 (Bowens') freedom."

17      4.     Another of my duties was the evaluation of the flow of revenues associated with the

18 lease of property from the Port of property located at the west side of the Airport (the Teledyne Ryan

19 property). I was informed by Sexton, as part of the description of my duties, that the lease of that

20 property contemplated the generation of revenues to cover the lease through its use as a parking lot.

21 He further told me that the lease had been negotiated by Enarson and was not subject to

22 renegotiation. In the process of attempting to make use of the property, I discovered, through experts

23 we retained, that this property was likewise contaminated by toxic waste and that only a small

24 portion of it was usable. Our experts further informed us that the cost of remediation of the toxic

25 waste would be in excess of $30 million. Port officials had told us remediation expenses would only

26 be $10 million and the Port obtained a settlement in the amount of $10 million from the previous

27 lease holder to remediate the property. I then informed Sexton and Bowens that the lease constituted

28

PLAINTIFF HERNANDEZ' DECL. IN OPPOS. TO DEF SDCRAA'S MSJ OR SUMM. ADJUD.
- 2 -

1   an unwarranted expenditure of public money to the Port of over $3 million per year.

2       5.      Another of my duties was to oversee the construction and/or maintenance of public

3   facilities at the terminals, including public restrooms. I attempted to expand the size of the public

4   restrooms in the east terminal at the Southwest Airlines Rotunda, to address public needs to alleviate

5   overcrowding of that facility and to bring it into compliance with federal requirements that they

6   accessible by wheel chair, as required by the Americans with Disabilities Act (ADA). I needed to

7   annex 30 sq. ft. space from a concessionaire in order to comply with ADA requirements, but was told

8   I could not do so by Enarson, because Enarson had made handshake agreements with the

9   concessionaires. I told Sexton, Enarson and Bowens that I did not believe Enarson had the authority

10  to enter into such agreements with the concessionaires and that Enarson's enforcement of the

11  agreements constituted a gift of public resources to the concessionaires.    The necessary

12  improvements were never made.

13      6.      Another of my duties was to help negotiate and monitor contracts for the management

14  of parking services. The low bidder (based on "projected" reimbursable expenses) on a contract to

15  manage the Airport's parking lots was Lindbergh Parking Incorporated (LPI). Its bid was so low that

16  I suspected the bid was insincere.   I have special expertise in parking management, as I had

17  performed similar work for several national parking companies. I thereafter closely monitored the

18  performance of the contract and noted LPI was overcharging the Authority approximately $1 million

19  to $1.5 million per year. This estimate was based, among other things, on (1) LPI did not lease new

20  shuttle transportation vehicles as stated in its bid (but instead used older shuttles owned by LPI); (2)

21  LPI was seeking reimbursement for an unnecessary management position (owner/manager being paid

22  for management work he did not perform); and (3) LPI double-billed the Authority for workers'

23  compensation insurance.

24      7.      I reported these overcharges to Sexton, Enarson and Bowens, and placed LPI on a 90-

25  day timetable to explain and justify all the expenses. In October 2005 I informed Sexton, Enarson

26  and Bowens that the LPI contract constituted an unwarranted expenditure of public money to LPI.

27  The negotiating agent on behalf of LPI–Elizabeth Stump-Moore–was, however, a friend of Bowens'.

28

1    I knew this because Sexton told me.

2         8.     In December 2005 I was contacted by Patrick Swan, a lawyer from Luce Forward, and

3    an investigator. They asked me questions about my invitation to sporting events and the receipt of

4    air travel tickets. This was the first occasion in the history of the Authority, that I was aware of, that

5    anyone had been questioned about the receipt of the tickets. It was surprising to me that the

6    Authority would retain counsel to examine this issue because Sexton often had assigned me the task

7    on many occasions of obtaining airline passes and upgrades for senior executive employees, board

8    members and Thella Bowens. I had asked him if it was ethically acceptable to make those

9    arrangements, and he told me that it was, explaining "this comes with the job."

10         9.     I have examined Mr. Swan's report. He has omitted important information from his

11    report. With regard to the "free rounds of golf," I cleared the trip with his boss, Sexton, before

12    going, after disclosing the nature of the outing and that the golf rounds were supplied by Mike

13    Parrish. In response, Sexton admitted he had attended the same golf outing under similar

14    circumstances. Further, I compensated Parrish for the round by buying Parrish's lunch and dinner

15    and by making gift contributions for the raffle. The net personal value to me was negative by over

16    $200. I had a significant personal and familial relationship with Parrish, which included joint family

17    outings and gatherings, dinners, barbecues and sporting events.

18         10.     Given that Sexton had told me that the receipt of airline passes and upgrades were

19    acceptable, I would have appreciated a conversation with him explaining the change of policy before

20    being handed a notice of termination. Notwithstanding Sexton's comments, my own receipt of such

21    benefits were from persons with whom I had personal friendships. The tickets I received on

22    Southwest were from Parrish, a close personal and family friend (see § 9).

23         11.     With regard to the Hawaii tickets, I discussed the tickets with Janet Nix before

24    accepting them. I regarded her as a personal friend and socialized with her on occasion outside the

25    business context. She told me that the tickets had no value, were only available to fill vacant seats,

26    and that she provided similar tickets to many of her friends with whom she had no business

27    relationship. The tickets were listed as "space available" and further identified as having "no dollar

28

1  value" and could not be transferred or redeemed.  I did not discuss the receipt of the tickets with my

2  boss, Sexton, because I had already had numerous conversations with him in which he indicated

3  complementary passes and upgrades of that nature were an acceptable "perk" of the job.

4          12.     Swan's commentary about my receipt of football tickets is quite perplexing.  Ace

5  Parking did not have a contractor or vendor agreement of any sort with the Authority.  Also, I had

6  a longstanding friendship with the Ace Parking senior managers, who invited me to the game which

7  preceded Hernandez' employment with the Authority. They were friends from my prior employment

8  relationship with ACE Parking.

9          13.     During Swan's interviews with me,  he expressed no interest in the fact that Parrish

10  and I  were close personal friends, and avoided conversation about the fact that other employees,

11  such as Bowens and Sexton, made active and aggressive use of their positions to acquire ticketing

12  upgrades and benefits worth thousands of dollars.  When I attempted to explain these friendships and

13  practices, Swan cut me off stating he was not interested in the nature of those friendships and what

14  the office practice was.

15          14.     As I mentioned above in § 10, if Sexton or Bowens had informed me that receipt of

16  airline passes and upgrades was unethical, I can state with certainty I would not have accepted them

17  for my own use, no matter how close a friend or relative the donor might be.  It was my intention to

18  comply with the Authority's ethical rules and to do a good job.  I had received an "outstanding"

19  performance rating in all of the preceding four years I worked for the Airport.  I was informed by my

20  superior that the Authority had a progressive disciplinary policy which emphasized the Authority's

21  commitment to preserve employment through pre-termination warnings and training.  I was told I

22  would benefit from such a policy and I was further told by Sexton and Bowens that it was my duty

23  to implement such a policy with the employees who worked for me.  I have never been told, nor have

24  ///

25  ///

26  ///

27  ///

28

59-747

1    I ever witnessed, at the Authority or elsewhere, the use of an attorney to conduct an investigation

2    alleged "violations" of this nature.

3        I declare under penalty of perjury under the laws of the State of California that the foregoing

4    is true and correct.  Executed this second day of November, 2007, in San Diego, California.

5

6

7                        JOSE HERNANDEZ

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

59-748

**EXHIBIT 60**

1  Cathryn Chinn, Esq. (State Bar 93340)
   1901 First Avenue, Suite 400
2  San Diego, California 92101
   Telephone (619) 234-9000
3  Facsimile (619) 699-1159

4

5  Attorney for Plaintiff
   JOSE HERNANDEZ

6

7

8                SUPERIOR COURT OF THE STATE OF CALIFORNIA

9       COUNTY OF SAN DIEGO, CENTRAL BRANCH, GENERAL UNLIMITED

10 JOSE HERNANDEZ,                          Case No. : GIC 871979

11              Plaintiff,                   DECLARATION OF MIKE PARRISH IN
                                             OPPOSITION TO DEFENDANT SAN
12 v.                                        DIEGO COUNTY REGIONAL AIRPORT
                                             AUTHORITY'S MOTION FOR SUMMARY
13 SAN DIEGO COUNTY REGIONAL                 JUDGMENT OR, IN THE ALTERNATIVE,
   AIRPORT AUTHORITY, a public entity        SUMMARY ADJUDICATION
14 and DOES 1 through 12, Inclusive,
                                             DATE:       November 16, 2007
15              Defendants.                  TIME:       1:30 p.m.
                                             DEPT.:      75
16                                           JUDGE:      HON. RICHARD E. STRAUSS
                                             ACTION FILED:   9/1/06
17                                           TRIAL DATE:     1/4/08

18

19

20     I, MIKE PARRISH, declare as follows:

21     1.      In 2005, I was the station manager for Southwest Airlines at the San Diego Airport.

22 My duties include running the day-to-day operations of Southwest Airlines.

23     2.      While working in San Diego I became a friend of Jose Hernandez.  Our relationship

24 began as a business friendship, but then developed into a personal friendship.  We socialize

25 frequently.  Our families have gathered together several times.  Our children play together. I have

26 visited at his house, and he has stayed at mine.

27 ///

28
                          PARRISH DECL. IN OPPOS. TO DEF SDCRAA'S MSJ OR SUMM. ADJUD.

1     3.     One of the benefits we receive as employees of Southwest Airlines is what is referred

2 to as "buddy passes." These passes can be used by anyone who possesses them to obtain passage

3 on our airline flights. These passes are provided to us as a "perk" of our employment, and are

4 provided for us to give to our friends. We are specifically instructed not to use these passes for

5 business purposes or to influence anyone for a business objective. They are meant for our personal

6 use and may be used to promote personal friendships.

7     4.     I have provided "buddy passes" to Jose Hernandez. My gift of those passes to him

8 were because of to my personal friendship with him. They had nothing to do with our business

9 relationship.

10     5.     I have the ability and am authorized to bring people to participate in my foursome

11 for the Southwest golf tournaments. I asked Jose to play with us because of our friendship.

12     6.     Brian Enarson asked me to donate two free confirmed round trip tickets to be used

13 system-wide and eligible for confirmed reservations. I did so.

14     7.     I was questioned by an investigator from the Airport Authority. The questioning

15 impressed me as an attempt to construct something out of nothing. The questions were misleading

16 and were not presented in an appropriate light. In my view, nothing which involved Jose Hernandez

17 was out of the ordinary or inappropriate.

18     I declare under penalty of perjury under the laws of the State of California that the foregoing

19 is true and correct. Executed this second day of November, 2007, in San Diego, California.

20

21

22     MIKE PARRISH

23

24

25

26

27

28

60-750



RE-ORDER from
BLUEBIRD
OFFICE SUPPLIES
TEL (888) 47-0700
www.bluebirdonline.com

**EXHIBIT 61**

1 | Cathryn Chinn, Esq. (State Bar 93340)
1901 First Avenue, Suite 400
2 | San Diego, California 92101
Telephone (619) 234-9000
3 | Facsimile (619) 699-1159

4

5 | Attorney for Plaintiff
JOSE HERNANDEZ

6

7

8 | **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9 | **COUNTY OF SAN DIEGO, CENTRAL BRANCH, GENERAL UNLIMITED**

10 | JOSE HERNANDEZ,                    Case No. : GIC 871979

11 |            Plaintiff,             DECLARATION OF CATHRYN CHINN IN OPPOSITION TO DEFENDANT SAN

12 | v.                                DIEGO COUNTY REGIONAL AIRPORT AUTHORITY'S MOTION FOR SUMMARY

13 | SAN DIEGO COUNTY REGIONAL          JUDGMENT OR, IN THE ALTERNATIVE, AIRPORT AUTHORITY, a public entity   SUMMARY ADJUDICATION

14 | and DOES 1 through 12, Inclusive,

15 |            Defendants.            DATE:      November 16, 2007
                                      TIME:      1:30 p.m.
16 |                                  DEPT.:     75
                                      JUDGE:     HON. RICHARD E. STRAUSS
17 |                                  ACTION FILED:   9/1/06
                                      TRIAL DATE:     1/4/08

18

19

20 |        1.      I am an attorney licensed to practice before all courts in the State of California. I am

21 | counsel of record for Plaintiff JOSE HERNANDEZ in the above-captioned action. The facts set

22 | forth herein are personally known to me and, if called upon to testify, I could and would do so

23 | competently.

24 |        2.      True and correct copies of an information printout from Airport's web site are

25 | attached as Exhibit A to the Notice of Lodgment filed herewith and made a part hereof.

26 | ///

27 | ///

28

CHINN DECL. IN OPPOS. TO DEF SDCRAA'S MSJ OR SUMM. ADJUD.

1      3.      A true and correct copy of the condensed transcript of Vol. I of the deposition of

2  Plaintiff taken 12/18/06 is attached as Exhibit B to the Notice of Lodgment filed herewith and made

3  a part hereof.

4      4.      A true and correct copy of the condensed transcript of Vol. II of the deposition of

5  Plaintiff taken 12/19/06 is attached as Exhibit C to the Notice of Lodgment filed herewith and made

6  a part hereof.

7      5.      A true and correct copy of the condensed transcript of Vol. III of the deposition of

8  Plaintiff taken 12/20/06 is attached as Exhibit D to the Notice of Lodgment filed herewith and made

9  a part hereof.

10      6.      A true and correct copy of the condensed transcript of Vol. IV of the deposition of

11  Plaintiff taken 12/21/06 is attached as Exhibit E to the Notice of Lodgment filed herewith and made

12  a part hereof.

13      7.      A true and correct copy of the condensed transcript of Vol. V of the deposition of

14  Plaintiff taken 12/22/06 is attached as Exhibit F to the Notice of Lodgment filed herewith and made

15  a part hereof.

16      I declare under penalty of perjury under the laws of the State of California that the foregoing

17  is true and correct.  Executed this second day of November, 2007, in San Diego, California.

18

19                                    _____

20                                    CATHRYN CHINN

21

22

23

24

25

26

27

28

CHINN DECL. IN OPPOS. TO DEF SDCRAA'S MSJ OR SUMM. ADJUD.
- 2 -

**61-752**

1    Cathryn Chinn, Esq. (State Bar 93340)
     1901 First Avenue, Suite 400
2    San Diego, California 92101
     Telephone (619) 234-9000
3    Facsimile (619) 699-1159
     Attorney for Plaintiff
4    JOSE HERNANDEZ

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF SAN DIEGO, CENTRAL BRANCH, GENERAL UNLIMITED**

| | |
|---|---|
| JOSE HERNANDEZ, | Case No. : GIC 871979 |
|          Plaintiff, | DECLARATION OF JANET NIX IN OPPOSITION TO DEFENDANT SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY'S MOTION FOR SUMMARY JUDGMENT |
| v. | |
| SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY, a public entity and DOES 1 through 12, Inclusive, | |
|          Defendants. | Date: November 16, 2007 <br> Time: 1:30 p.m. <br> Dept: 75 <br> Judge: Hon. Richard E. Strauss <br> Complaint Filed: September 1, 2006 <br> Trial Date: January 4, 2008 |

I, Janet Nix, declare as follows:

1.    The facts contained in this declaration are true of my own personal knowledge, and if called as a witness in this matter I could and would testify to the following facts.

2.    I am the Station Manager for Hawaiian Airlines at the San Diego International Airport. In my position I have the autonomy to give non-revenue, no value stand-by tickets to whomever I wish.

3.    I give those non-revenue, no value stand-by tickets to members of the general public at my discretion.

4.    The Airport Authority, through its managers and vice-presidents, has asked me to donate non-revenue, no value stand-by tickets to them on more than one occasion.

5.    Ted Sexton, Vice President of the Airport Authority, called me in June 2002

NIX DECL. IN OPPOS. TO DEF SDCRAA'S MSJ OR SUMM. ADJUD.

1   and told me that Thella Bowens, CEO and President of the Airport Authority, would like to take

2   the Hawaiian Airlines inaugural flight to Hawaii. He did not request a reservation for her, and

3   he did not make a reservation for her. He wanted a free ticket for her and I agreed to provide it.

4

5          6.     Ted Sexton, Vice President of the Airport Authority, asked for a first-class

6   upgrade on a ticket on Hawaiian Airlines for Joe Craver, the Chairman of the Board of the

7   Airport Authority. Sexton said that Craver wanted to confirm an upgrade that was beyond

8   our standard procedure regarding upgrades only made on the day of departure. ~~Craver~~ Sexton wanted

9   me to confirm that he would get the upgrade well ahead of the day of departure. This is never

10  done and constituted a special privilege for the Authority's Chairman. Rather than pay for a

11  first-class ticket he wanted to pay only for the day of departure upgrade and he wanted to do it

12

13  with me holding the first class seats without him paying the first-class ticket rate. He did so.

14         7.     On Craver's return trip to San Diego from Hawaii he caused a scene on the

15  jet way as he attempted to board the flight. He wanted the Station Manager in Honolulu to

16  hold first-class upgrade seats for him ahead of his departure date. He wanted the Station Manager

17  in Honolulu to use his authority to grant him a first-class seat for himself. This required

18

19  Hawaiian Airlines to take a positive space revenue seat, which is never done, and give it to

20  him as a special privilege. Craver attempted to board the aircraft without paying for the

21  upgrade. The Station Manager had to stop him from boarding and have him return to the

22

23  check in counter in order to collect the cost of the first-class upgrade. Craver expected to

24  board the aircraft and take a first-class seat for free without even paying for the upgrade.

25         8.     Bryan Enarson, a Vice President of the Airport Authority, was the worst

26  culprit of them all at the Airport Authority. He was always ~~demanding~~ requesting either reservation

27  changes or upgrades at no cost. Enarson was well known among the airline Station

28

NIX DECL. IN OPPOS. TO DEF SDCRAA'S MSJ OR SUMM. ADJUD.
- 2 -

62-754

1    Managers for demanding services for which the public was routinely charged. Not Enarson,

2    he expected his changes and upgrades to be given to him at no charge and they were.

3        9.    Vernon Evans, a Vice President for the Airport Authority, won a free non-revenue

4

5    ticket from Aloha Airlines, which required him as any other member of the general public, to

6    fly stand-by. Evans went into a scathing rage and said the non-revenue ticket wasn't worth

7    anything. Evans demanded a positive space ticket upgraded to first-class. The Station Manager

8    for the airline had no choice but to give it to Evans. This incident was discussed among all the

9    airline Station Managers at the airport.

10

11       10.    Ted Sexton, a Vice President for the Airport Authority, wrote a letter that was

12   distributed to all of the airline Station Managers apologizing for the rage displayed by

13   Vice President Vernon Evans over his demands for a free first-class ticket.

14       11.    Jose Hernandez has never asked me for anything, either from me or from

15   Hawaiian Airlines. He and his family are friends of mine. I gave him non-revenue tickets to fly

16

17   stand-by for him and his family because I wanted them to experience Hawaiian Airlines. I have

18   never given him special treatment or special privileges of any kind.

19       12.    . The non-revenue tickets have no value and are not positive space tickets. The

20   tickets I gave to Mr. Hernandez and his family are the same ones that I give to members of the

21   general public at my discretion. They are the same tickets that the Airport Authority has asked

22   me to donate to them on many occasions.

23

24       13.    I have read Theodore Sexton's declaration, presented to court in this case on

25   behalf of his position as the Vice President of the Airport Authority. It was understood that

26   when Ted Sexton called for changes to itineraries and upgrades for members of the Airport

27   Authority that he wanted those changes to be at no cost, otherwise the individuals for whom

28

NIX DECL. IN OPPOS. TO DEF SDCRAA'S MSJ OR SUMM. ADJUD.
- 3 -

1  he called would have requested those changes themselves.  Ted Sexton was the conduit, as were

2  other higher officials of the Airport Authority, for no cost special privileges when they asked

3

4  for them.  This was not a matter of adding fees for the general public, because the Airport

5  Authority had a business relationship with all of the airlines.  The airlines pay the fees that fund

6  the Airport Authority.

7      I declare under penalty of perjury under the laws of the State of California that the

8  foregoing is true and correct.

9      Executed this 31 day of October 2007 at San Diego .

10

11                                  JANET NIX

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT 63**

1 | Cathryn Chinn, Esq. (State Bar 93340)
1901 First Avenue, Suite 400
2 | San Diego, California 92101
Telephone (619) 234-9000
3 | Facsimile (619) 699-1159

4

5 | Attorney for Plaintiff
JOSE HERNANDEZ

6

7

8 | **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9 | **COUNTY OF SAN DIEGO, CENTRAL BRANCH, GENERAL UNLIMITED**

10 | JOSE HERNANDEZ,                         Case No. : GIC 871979

11 |              Plaintiff,                 PLAINTIFF JOSE HERNANDEZ' NOTICE
                                            OF LODGMENT IN OPPOSITION TO
12 | v.                                      DEFENDANT SAN DIEGO COUNTY
                                            REGIONAL AIRPORT AUTHORITY'S
13 | SAN DIEGO COUNTY REGIONAL              MOTION FOR SUMMARY JUDGMENT OR,
AIRPORT AUTHORITY, a public entity         IN THE ALTERNATIVE, SUMMARY
14 | and DOES 1 through 12, Inclusive,       ADJUDICATION

15 |              Defendants.                DATE:      November 16, 2007
                                            TIME:      1:30 p.m.
16 |                                         DEPT.:     75
                                            JUDGE:     HON. RICHARD E. STRAUSS
17 |                                         ACTION FILED:   9/1/06
                                            TRIAL DATE:     1/4/08
18

19

20 |      Plaintiff JOSE HERNANDEZ lodges the following documents in support of his opposition

21 | to Defendant SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY's Motion for Summary

22 | Judgment or, in the Alternative, Summary Adjudication, as follows:

23 | Exhibit A      -      Information printout from Airport's web site;

24 | Exhibit B      -      Condensed transcript of Vol. I of deposition of Plaintiff taken 12/18/06;

25 | Exhibit C      -      Condensed transcript of Vol. II of deposition of Plaintiff taken 12/19/06;

26 | Exhibit D      -      Condensed transcript of Vol. III of deposition of Plaintiff taken 12/20/06; and

27 | ///

28

PL'S NOTICE OF LODGMENT IN OPPOS. TO DEF SDCRAA'S MSJ OR SUMM. ADJUD.

**63-757**

1 | Exhibit E     -     Condensed transcript of Vol. IV of deposition of Plaintiff taken 12/21/06; and

2 | Exhibit F     -     Condensed transcript of Vol. V of deposition of Plaintiff taken 12/22/06.

3 | DATED: November 2, 2007

4 | CATHRYN CHINN, Attorney for
Plaintiff JOSE HERNANDEZ

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT A

San Diego County Regional Airport Authority fact sheet                    http://www.san.org/airport_authority/authority_fact_sheet.asp




Home | News | Employment | Site Map | Contact Us

**SAN DIEGO COUNTY**
**REGIONAL AIRPORT AUTHORITY**


AIRPORT AUTHORITY

**Fact Sheet**

The San Diego County Regional Airport Authority was created on January 1, 2003, as an independent agency to manage the day-to-day operations of San Diego International Airport and address the region's long-term air transportation needs.

The legislation that created the Airport Authority mandates three main responsibilities:

- Operate San Diego International Airport.
- Plan for the future air transportation needs of the region.
- Serve as the region's Airport Land Use Commission and ensure the adoption of land use plans that protect public health and safety surrounding all 16 of the county's airports.

The Airport Authority Board is comprised of nine members. The Appointing Authority differs for each member.

| | |
|---|---|
| Alan D. Bersin (Chairman) | Appointed by: Mayor, City of San Diego |
| Charlene Zettel | Appointed by: Governor, State of California |
| Robert J. Watkins | Appointed by: Sheriff, County of San Diego |
| Councilmember Tony Young | Appointed by: Mayor, City of San Diego |
| Ramona Finnila | Appointed by: North Coastal area mayor |
| Jack Miller | Appointed by: Mayor, City of Chula Vista |
| Bruce R. Boland | Appointed by: Mayor, City of San Diego |
| Jim Panknin | Appointed by: East County area mayors |
| Jim Desmond , Mayor, San Marcos | Appointed by: North Inland area mayors |

Public meetings of the full Airport Authority Board take place at 9:00 a.m. on the first Thursday of every month on the Third Floor of the Commuter Terminal at the Airport.

Airport Authority President/CEO Thella F. Bowens is responsible for management oversight of the Airport Authority, the Airport Authority's annual budget and a staff of approximately 300 aviation professionals.

The Airport Authority's operating revenues for Fiscal Year 2006 were $119.5 million. In addition, there were $38.8 million in non-operating revenues (primarily Passenger Facility Charges) and $12.1 million in capital grant contributions in Fiscal Year 2006. Operating expenses for the same period totaled $132.9 million. The Airport Authority is funded through user fees, not local taxes.

Home | News | Employment | Site Map | Contact Us
Legal Disclaimer and Conditions of Use

P.O. Box 82776 San Diego, CA 92138-2776
Phone: 619.400.2400

©2003-2007 San Diego County Regional Airport Authority. All rights reserved.

**63-760**

San Diego County Regional Airport Authority · Untitled Document          b·· ··//www.san.org/airport_authority/sota_2004.asp





Home | News | Employment | Site Map | Contact Us



**SAN DIEGO COUNTY**
**REGIONAL AIRPORT AUTHORITY**



AIRPORT AUTHORITY

Airport Authority

Airport Master Plan

Land Use Compatibility

Environmental Affairs

Airport Noise

Business Opportunities

Ethics Program

Contact Us



SAN DIEGO
INTERNATIONAL
AIRPORT

**State of the Authority Address**

Joseph W. Craver, Chairman
San Diego County Regional Airport Authority

11:00 a.m., Thursday, January 22, 2004
Commuter Terminal, Wright Brothers Conference Room

**Introduction**

Good morning, and thank you all for joining us today for this first annual State of the Airport Authority Address.

It is about something people will be caring about not just tomorrow or next month or next year, but for generations to come.

And that's because the San Diego County Regional Airport Authority is really all about one thing: this region's air transportation link. Currently, that link is made up of San Diego International Airport and a series of small general aviation and military airports and airfields spread throughout the County.

While there are many transportation arteries leading in and out of the region – roadways, rail lines, sea lanes – none connect us to the outside world in the same way as the air transportation link.

And while sea lanes dictated development through the end of the 18th Century and railroads ruled the 19th Century, to be surpassed by automobiles and trucks in the 20th, it is aviation and airports which will dominate global commerce in the 21st Century.

Indeed, the trend is already clear, with economists telling us that a full 40 percent of the total value of world trade currently is carried by air. Take a moment and really think about what an airport – this Airport – actually is.

This is the place where more people come from and go to locations farther away – and do so more quickly – than is the case with any other transportation mode or facility in the region. It truly is our link to the wider world.

And it would have the potential, if it were located in a place with more room to grow, to be so much more.

Anyone who has visited airports from Amsterdam to Ontario, from Dulles to Dallas/Fort Worth, knows the kind of economic vibrancy that a full-fledged commercial air transportation facility can pump into a region.

How effective our air transportation link is, and how effective it is in the future, will have direct consequences on the quality of life, economic strength and global competitiveness of our region.

The vital importance of this link – and the understanding that its preservation and enhancement should be a matter of regional importance and regional effort – led to the formation of this Airport Authority.

**Our Partners**

As public stewards of the region's air transportation link, we know the importance of the tasks we are charged with. And we are grateful to have some tremendous partners helping us accomplish those tasks. They include:

The Federal Aviation Administration, Transportation Security Administration, U.S. Customs & Border Protection, and other Federal agencies, as well as the Harbor Police, which work so hard with us to keep San Diego International Airport safe, secure and running smoothly;

The proud airlines that serve San Diego International Airport, and the Airport's many other important tenants;

State, county and city agencies and governments of the region;

Our partners in the military and business sectors of the community;

Our many other stakeholders, including citizen groups, neighboring residents, and – of course – the millions of passengers who pass through the Airport each year.

We also know who depends on the work we do in concert with our partners:

Residents from all corners of the County depend on us to reach destinations, and receive visitors from, around the world. They also depend on us to get their mail and other goods shipped by air;

Businesses from the region's signature sectors – from biotech to software, communications to agriculture – depend on us to stay competitive in the global economy;

The region's all-important visitor and tourism industries depend on us to stay vibrant;

And all who use the Airport depend on us – through our partnership with the Federal government and local law enforcement – to keep them safe while visiting Lindbergh Field and to deliver their friends and loved-ones in the same fashion.

Finally, the voters depend on us to come up with a meaningful approach to addressing the region's long-term air transportation needs, an approach which they will vote on at the polls in November 2006.

**The Year that Was**

Let's take a look at what your Airport Authority has done in the past year to preserve and enhance the region's air transportation link, and what it plans to accomplish with our many partners in the months and years ahead.

**Transition**

Perhaps one of the greatest successes of the year was the historic and virtually seamless transition of this Airport to the Authority after 40

years of stewardship by the San Diego Unified Port District.

It was a great success because it happened with no disruption to the traveling public. All during a time of unprecedented security measures and other major changes in the aviation industry.

The transition may have been seamless to the traveling public, but it was a monumental job carried out with trademark professionalism and efficiency by those at the Port and the Airport Authority.

After all the negotiations, all the transition planning, all the hiring of employees, all the outfitting of new space, and all the development of new policies, procedures and programs ... something special emerged.

A new kind of public agency to serve the region's air transportation needs, led by a Board representing all sections of the County and powered by employees committed to being the region's pre-eminent operations experts, planning professionals and development specialists.

And, above all, an agency dedicated to providing world-class service in all it does.

## Operations

In 2003, we provided that world-class service to some 15 million passengers who passed through our terminals. That's more people who passed through this Airport last year than the populations in the counties of San Diego, Los Angeles and Riverside combined.

And it marked an increase of some 300,000 more passengers than the prior year, reinforcing Lindbergh Field's status as the busiest single-runway, major-hub commercial-service airport in the nation.

We're a busy Airport, and the people of the region rely on us ... especially during times of crisis. During the worst firestorms in the County's history last fall, I'm proud to point out that Airport staff rose to the challenge and worked closely with the FAA to keep the Airport operational throughout the emergency.

## Airport Site Selection

While operations at the Airport carried on smoothly day by day, the question on everyone's mind was: "What about a new airport?"

It's a question that has been asked generation after generation. In 2003, we took some big steps to come up with a real answer.

With the current Airport hemmed in on all sides and set to reach capacity in the next 1-2 decades, those with the vision to look 20 years down the road know that the region will lose out if we don't act now ... if we don't decide together, as a region, how to accommodate the projected air transportation needs by augmenting or replacing Lindbergh Field.

In 2003, with the help of public input and intense scrutiny by stakeholders in the Public Working Group, a list of potential sites to replace or supplement the Airport was narrowed down, from 32 to the current seven sites.

This list will be finalized over the next few months as we embark on a more rigorous Phase 2 analysis. We recently brought on board the highly reputable consulting firm of Ricondo & Associates to assist us with this analysis, which will include the use of sophisticated Geographic Information System technology to ensure that no potential airport site is overlooked.

We have committed to the voters to present a ballot recommendation for an airport solution in November 2006.

We owe it to them to make sure that ballot measure is the result of thorough evaluation, exhaustive public input and a credible and transparent process.

After all, it will be one of this generation's greatest public policy decisions, and one that will continue to shape our region for generations to come.

## Economic Impact

It should be a decision that is made with enthusiasm, because a new airport solution will bring new jobs, new opportunities and new hope for the region.

In the year 2030, if the region does not meet full demand for air transportation service, it will forego $4.6 billion dollars to $8 billion dollars in Gross Regional Product, 34,000 to 56,000 jobs and $1.4 billion dollars to $2.5 billion dollars in total personal income.

We know this because even the current Airport, as limited in size as it is, serves as one of the greatest single contributors to the regional economy – contributing some $4.5 billion dollars a year in economic activity.

## Airport Land Use Commission

We also know that airports impact the communities they serve in ways beyond dollars and sense.

That is why the Airport Authority also serves as the region's Airport Land Use Commission, a responsibility formerly carried out by the San Diego Association of Governments.

In this capacity, the Board in 2003 reviewed several land use issues near airports throughout the County to ensure compatibility with existing Comprehensive Land Use Plans for those airports.

## Customer Service

But a great airport can also be a great public space, where members of the regional community come to do more than just hop on a plane.

At San Diego International Airport, our customer service and public outreach programs set the standard in 2003.

Several hundred children and adults came to Lindbergh Field in August for a Family Day celebration of the Airport's 75th Anniversary and the Centennial of Powered Flight. All eyes looked skyward as a striking replica of Charles Lindbergh's Spirit of St. Louis, built by the San Diego Aerospace Museum, made an historic flyover and landing right outside this building.

The celebrations continued in October when the San Diego Symphony presented the 'Symphony of Flight' concert and the Airport screened its documentary film 'The Future Takes Wing' to over 2,000 people in Balboa Park ... and in December when we joined with Airports around the country to present Passenger Appreciation Day.

But customer service is much more than impressive events at San Diego International Airport. We take the needs of our customers seriously on a daily basis, with innovative programs to assist people with disabilities, an active Airport Ambassadors program, the nation's largest airport USO center to assist service members, ongoing cultural and performing arts programs, and more.

All of these programs kept our customers front-and-center throughout 2003.

San Diego County Regional Airport Authority - Untitled Document                              http://www.san.org/airport_authority/sota_2004.asp

**Route Service Development**

Some would argue the best customer service an airport can provide people is more flights, with more choices of airlines, and to more of the places they want to go.

We don't disagree. And that's why we are working hard to attract new air service to San Diego and enhance the service already provided.

We scored some notable successes on this front in 2003:

The Airport's newest airline, Jet Blue, began daily non-stop service between San Diego and New York City on June 26, and quickly added two more daily non-stops.

Not to be outdone, Southwest Airlines launched its first non-stop transcontinental service from San Diego to Baltimore Washington International on July 6, providing a convenient new link to the nation's capital.

To further enhance air service offered from San Diego International Airport, the Authority is pursuing new and expanded nonstop routes to underserved markets, both domestic and international.

**Security**

In today's world, there is something that passengers want from their airports even more than great customer service and more route choices.

And that, of course, is to be safe and secure when they are at the airport. A nation on high alert since 9/11 makes security a major factor.

In 2003, the Airport worked closely with the newly created Transportation Security Administration to implement new security screening procedures required by the Aviation and Transportation Security Act.

We're proud that San Diego International Airport was one of the first airports in the nation to implement the state-of-the-art security procedures and equipment requirements mandated by this law.

TSA and Airport Authority officials worked together throughout 2003 to fine-tune the Airport's comprehensive security program. Both agencies hold passenger safety and security as their highest priorities and remain tightly focused on this common goal.

**Looking Ahead**

I'll conclude with a look ahead.

In 2004, the Airport Authority will continue to enhance programs and facilities, seek new air service, maintain vigilant security and operate Lindbergh Field as the world-class facility it is.

The Authority Board will continue its role as the region's Airport Land Use Commission, working with local municipalities to determine if projects are in line with their comprehensive land use plans – all intended to safeguard the public health and safety by minimizing exposure to excessive noise and safety hazards around airports.

And 2004 will see the further scrutiny and gradual narrowing of airport site recommendations as a more rigorous, detailed study of the remaining sites proceeds in Phase 2 of our analysis. Continued public discourse will be a vital component of this process.

**Conclusion**

We are a new agency and have the energy and drive that come with newness. But we also have experienced staff with a strong track record of professionalism and dedication uniquely qualified to carry out the tasks before us.

And with regional representation from throughout the County, our Board is uniquely structured to spearhead the accomplishment of those tasks.

Reaching out to, working alongside – and made up of – the people of this region, your Airport Authority stands ready to meet the challenges ahead with all the spirit and resourcefulness for which this coveted corner of the world is known.

Thank you.

# # #

Home | News | Employment | Site Map | Contact Us
Legal Disclaimer and Conditions of Use

P.O. Box 82776 San Diego, CA 92138-2776
Phone: 619.400.2400

©2003-2007 San Diego County Regional Airport Authority. All rights reserved.



# SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

## CODES

ARTICLE  2    -    ETHICS
PART  2.0    -    ETHICS AND CONDUCT
SECTION  2.02    -    ACT IN THE PUBLIC INTEREST

---

(a)    Recognizing that stewardship of the public interest must be their primary concern, Board members and employees of the Authority will work for the common good of the people of the County of San Diego and not for any private or personal interest, and they will ensure fair and equal treatment of all persons, claims and transactions coming before the Board.

[Resolution No. 2002-02 dated September 20, 2002.]
[Superceded by Resolution No. _____ dated _____.]

**63-764**

EXHIBITS B thru F LODGED WITH COURT - NOT SERVED

1  Cathryn Chinn, Esq. (State Bar 93340)
   1901 First Avenue, Suite 400
2  San Diego, California  92101
   Telephone (619) 234-9000
3  Facsimile (619) 699-1159

4

5  Attorney for Plaintiff
   JOSE HERNANDEZ

6

7

8              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9         **COUNTY OF SAN DIEGO, CENTRAL BRANCH, GENERAL UNLIMITED**

10 JOSE HERNANDEZ,                        Case No. :  GIC 871979

11              Plaintiff,                PLAINTIFF JOSE HERNANDEZ'
                                          COMPENDIUM OF FEDERAL CASES IN
12 v.                                     OPPOSITION TO DEFENDANT SAN
                                          DIEGO COUNTY REGIONAL AIRPORT
13 SAN DIEGO COUNTY REGIONAL             AUTHORITY'S MOTION FOR SUMMARY
   AIRPORT AUTHORITY, a public entity    JUDGMENT OR, IN THE ALTERNATIVE,
14 and DOES 1 through 12, Inclusive,      SUMMARY ADJUDICATION

15              Defendants.               DATE:       November 16, 2007
                                          TIME:       1:30 p.m.
16                                        DEPT.:      75
                                          JUDGE:      HON. RICHARD E. STRAUSS
17                                        ACTION FILED:   9/1/06
                                          TRIAL DATE:     1/4/08
18

19

20        Plaintiff JOSE HERNANDEZ submits his Compendium of Federal Cases in support of his

21 opposition to Defendant SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY's Motion

22 for Summary Judgment or, in the Alternative, Summary Adjudication, as follows:

23 Exhibit 1       -       *Neveau v. City of Fresno* (2005) 392 F.Supp. 2d 1159

24 Exhibit 2       -       *Paterson v. Cal. Dep't of Gen. Servs.* 2007 U.S. Dist. LEXIS 25957 (E.D.
                          Cal. Mar. 8, 2007)
25
   DATED:  November 2, 2007
26                                        CATHRYN CHINN, Attorney for
                                          Plaintiff JOSE HERNANDEZ
27

28

   PL'S COMPENDIUM OF FEDERAL CASES IN OPPOS. TO DEF SDCRAA'S MSJ OR SUMM. ADJUD.

EXHIBIT 1

Page 1

392 F. Supp. 2d 1159, *; 2005 U.S. Dist. LEXIS 37400, **

LEXSEE 392 F. SUPP. 2D 1179

**MICHAEL NEVEAU, Plaintiff, v. CITY OF FRESNO, a municipality; JERRY DYER, individually; MICHAEL GUTHRIE, individually; GREG GARNER, individually; DARREL FIFIELD, individually; MARTY WEST, individually; ROGER ENMARK, individually; and DOES 1 through 10, Defendants.**

1:04-cv-06490 OWW LJO

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF CALIFORNIA

*392 F. Supp. 2d 1159; 2005 U.S. Dist. LEXIS 37400*

**July 15, 2005, Decided**

**COUNSEL:** [**1] For Michael Neveu, Plaintiff: Michael Alan Morguess, Michael Andrew McGill, Lackie and Dammeier LLP, Upland, CA.

For City of Fresno, Fresno Police Department, Jerry Dyer, Darrel Fifield, Marty West, Defendants: Joseph D. Rubin, Betts & Wright, Fresno, Ca.

For Dennis Montejano, John Fries, Roger Enmark, Greg Garner, Fremen Hunter, Defendants: Francine Marie Kanne, Fresno City Attorney's Office, Fresno, CA; Joseph D. Rubin, Betts & Wright, Fresno, Ca.

For Michael -- Guthrie, Defendant: Joseph D. Rubin, Betts & Wright, Fresno, Ca.

**JUDGES:** Oliver W. Wanger, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Oliver W. Wanger

**OPINION**

[*1165] **MEMORANDUM DECISION AND**

**ORDER RE DEFENDANTS'**

**(1) MOTION TO DISMISS PURSUANT TO** *FED. R. CIV. P. 12(b)(6)*;

**(2) MOTION FOR A MORE DEFINITE STATEMENT PURSUANT TO** *FED. R. CIV. P. 12(e)*; **AND**

**(3) MOTION TO STRIKE PORTIONS OF THE SECOND AMENDED COMPLAINT PURSUANT TO** *FED. R. CIV. P. 12(f)*.

**I. INTRODUCTION**

This is a civil rights action by a City of Fresno police officer against the City of Fresno ("CITY") and several individual [**2] members of the City of Fresno Police Department. Michael Neveu ("Plaintiff") brings a civil rights claim under *42 U.S.C. § 1983* and under two California state "whistleblower" statutes. Defendants CITY OF FRESNO, JERRY DYER, MICHAEL GUTHRIE, GREG GARNER, DARREL FIFIELD, MARTY WEST, and ROGER ENMARK ("Defendants") move to dismiss Plaintiff's Second Amended Complaint. (Doc. 33, Def.'s Mem.). Plaintiff opposes the motion. (Doc. 27, Pl.'s Opp.).

392 F. Supp. 2d 1159, *; 2005 U.S. Dist. LEXIS 37400, **

## II. PROCEDURAL HISTORY

Plaintiff filed his original Complaint on November 11, 2004. [1] (Doc. 1, Compl.). Plaintiff filed a First Amended Complaint against the same defendants on December 17, 2004. (Doc. 19, First Am. Compl.). The defendants named in the First Amended Complaint moved to dismiss on January 18, 2005. (Doc. 20, Def.'s First Mot.). Plaintiff stipulated to file a Second Amended Complaint on January 28, 2005 (Doc. 22), and filed a Second Amended Complaint on March 4, 2005. (Doc. 23, Second Am. Compl.). The Second Amended Complaint is the operative complaint and it is this complaint that the Defendants now seek to dismiss. (See Doc. 33, Def.'s Mem.). [2]

> 1  The defendants named in the original Complaint were: City of Fresno; Fresno Police Department; Jerry Dyer, Darrel Fifield; Marty West; Dennis Montejano; John Fries; Roger Enmark; Greg Garner; Fremen Hunter; Michael Guthrie; and Keith Foster.

**[**3]**

> 2  Defendants filed their original Motion to Dismiss and Memorandum in Support on March 25, 2005. (See Docs. 24, 25). Due to formatting problems, Defendants refiled their supporting memorandum on May 12, 2005. (Doc. 33). All citations will be to the corrected document (i.e., Doc. 33).

Plaintiff opposes Defendants' Motion. (Doc. 27, Pl.'s Opp, filed March 15, 2005). Defendants replied. (Doc. 28, Def.'s Reply). Oral argument was heard on May **[*1166]** 23, 2005. Michael A. Morguess, Esq., appeared on behalf of Plaintiff. Joseph D. Rubin, Esq., appeared on behalf of Defendants.

## III. SUMMARY OF PLEADINGS

This civil rights action is brought by a Fresno City police officer against the City of Fresno, the Fresno Police Chief, and five individual Fresno City pPolice officers. Plaintiff brings his § *1983* claim based on an alleged violation of his *First Amendment* right to freedom of expression. Plaintiff claims he was retaliated against for reporting to his superiors a number of incidents of sexual harassment, racial discrimination, and cheating on police department exams. The allegations in the **[**4]** complaint are taken as true for the purpose of this motion to dismiss.

Plaintiff is and was at all relevant times a Fresno City police officer and has worked as a police officer for Fresno since February 1995. (Doc. 1, Compl. PP 3, 11).

Defendant JERRY DYER is and was during all relevant times the Chief of Police of the City of Fresno. Defendant ROGER ENMARK was at all relevant times Captain and Deputy Chief of the Fresno Police Department. Defendant DARREL FIFIELD was at all relevant times Deputy Chief for the Fresno Police Department. Defendant MICHAEL GUTHRIE was at all relevant times a Lieutenant for the Department. Defendants MARTY WEST and GREG GARNER were at all relevant times Captains for the Department. (*Id.* at PP 4-8).

Plaintiff alleges that Defendants retaliated against him for having reported sexual misconduct and racial discrimination to the Internal Affairs and Human Resources Departments of the Fresno Police Department, and for having testified at an investigatory hearing that cheating was occurring on Fresno Police Department promotional exams. Plaintiff alleges two adverse employment actions. The first is that from June 1997 through December 2002, Defendants **[**5]** failed to promote him despite his high qualifications. The second is that, in March 2004, Defendants placed Plaintiff on administrative leave and required Plaintiff to undergo psychological examinations to determine his fitness for duty. Despite the recommendations of three psychologists that he was fit for duty, Defendants refused to reinstate

392 F. Supp. 2d 1159, *; 2005 U.S. Dist. LEXIS 37400, **

him to duty in July 2004. ³

3  Plaintiff has since been reinstated to duty.

Plaintiff began working for the Fresno Police Department in 1995. (Doc. 1, Second Am. Compl. P 11). Plaintiff alleges that he "has never scored anything below exceeds expectations' on [his] evaluations. . . ." (*Id.* at P 13). Plaintiff alleges that he "has had only one incident of discipline in his personnel record spanning his career." (*Id.* at P 14).

Plaintiff asserts he was retaliated against for four protected *First Amendment* activities. First, Plaintiff reported to Police Department Internal Affairs Investigators alleged sexual misconduct by a Richard Mata, who was a police department [**6] official who was "suspended due to allegations of sexual molestation" and was "investigated for sexual intimacy and improper behavior towards a teenage girl." (*Id.* at P 16). On or about July 16, 1996, Plaintiff was transferred from patrol to the post of "Explorer Post Advisor," the position from which Richard Mata had been suspended. Plaintiff alleges that unidentified Internal Affairs investigators instructed him to report directly to them any additional information relating to Richard Mata. In July 1996, Plaintiff learned of "administrative improprieties that appeared designed to foster opportunities for further sex crimes" and reported these in [*1167] writing to Internal Affairs. (*Id.* at PP 21, 23). In or around August 1996, after he submitted the report, Defendant WEST "ordered [Plaintiff] not to put any information he obtained regarding the Mata allegations in writing, and to only verbally report it to [Plaintiff's immediate supervisors]." (*Id.* at P 27). According to Plaintiff, Internal Affairs had instructed him not to report any information regarding Mata to his immediate supervisors, even if they instructed him to do so. Plaintiff "refused to follow WEST'S order and [**7] reiterated that he was going to do exactly as Internal Affairs and Chief

Winchester ordered." (*Id.* at P 28).

Second, Plaintiff alleges that "[o]n or around December 23, 1996, [Plaintiff] documented and reported to [his immediate supervisors] racial harassment of Southeast Asian Explorers by Police Activity League volunteers. . . ." (*Id.* at P 29). One of Plaintiff's immediate supervisors, (not a named defendant) advised him that "Plaintiff should not have documented the racial harassment because it caused staff at the Police Activity league to become upset, including retired Deputy Chief Lee Piscola, and that pissing off a retired Chief is a bad career move.'" (*Id.*).

Third, Plaintiff alleges that "[o]n or around December, 1996, [Plaintiff] submitted an extensive end of the year report documenting potentially embarrassing or troubling incidents involving [his immediate supervisors], including the banking' of overtime hours, which were unlawfully denied to [Plaintiff]." (*Id.* at P 30). Furthermore, Plaintiff alleges that Defendant WEST prevented the report from reaching Chief Winchester's office. (*Id.*).

Fourth, Plaintiff alleges that in or about March [**8] 2002, he testified at an administrative hearing that cheating occurred on Department promotional exams. On or around March 2001, a new promotional testing system for the promotion to the rank of Sergeant was implemented by Chief DYER. (*Id.* at PP 32-34). According to Plaintiff, the system was created at the request of Defendants GARNER AND ENMARK. However, after the new system was implemented, some of the candidates complained that the system was "tainted and therefore inaccurate." (*Id.* at P 34). The complaints resulted in a hearing that took place before the Civil Service Commission in February/March 2002. (*Id.*). Plaintiff he informed attorneys handling the hearing "that some promotional candidates were unlawfully given the answers prior to taking the . . . promotional exam." The day after Plaintiff reported this information to the attorneys,

Page 4

392 F. Supp. 2d 1159, *; 2005 U.S. Dist. LEXIS 37400, **

Defendant GARNER "brought [Plaintiff] into his office, confronted [Plaintiff] in a hostile manner and stated words to the effect that Yesterday I spent the better part of the afternoon on the stand getting my [a ** ] chewed off and I only kept wondering one thing -- why your name had come up as a witness." (*Id.* at P 36). [**9] Moreover, Plaintiff alleges that "[i]n an attempt to discredit NEVEU's testimony, Captain GARNER advised attorneys handling the hearing that NEVEU was a crack pot,' screwball,' and that he had ethical problems.'" (*Id.* at P 37). On or about March 12, 2002, Plaintiff, as well as his wife, testified before the hearing "as to the improprieties and outright cheating on in the testing process." (*Id.* at P 38).

Plaintiff alleges these activities are protected *First Amendment* activities and that Defendants retaliated against him for engaging in these activities. Plaintiff alleges two separate adverse employment actions. First, he alleges that from approximately June 1997 and December 2002, Defendants WEST, FIFIELD, GUTHRIE, and GARNER failed to promote Plaintiff. (*Id.* at P 41). Plaintiff claims that someone informed him that "at staff meetings, WEST, FIFIELD, GUTHRIE, and GARNER [*1168] always disapproved of any promotion or selection of NEVEU to . . . [a] special unit, despite NEVEU's record and commendations." (*Id.*). Furthermore, Plaintiff alleges that these Defendants denied the promotions because of reporting the Mata allegations, the alleged racial harassment, the "banking" [**10] of overtime hours, and testifying before the Civil Service Commission. (*Id.*). Finally, Plaintiff claims that on or about July 25, 2002, the sergeants promotion list containing Plaintiff's name was "killed" before reaching Plaintiff's name in retaliation for testifying before the Civil Service Commission. This allegation is not related to any particular defendant, although Plaintiff alleges in the next paragraph that he "was further informed that Captain WEST and that group' had done similar black

listing' to other officers who spoke up." (*Id.* at P 43).

Second, Plaintiff alleges that on March 1, 2004, Defendants DYER and ENMARK, with the assistance of GUTHRIE, placed him on administrative leave pending a fitness for duty examination. (*Id.* at P 45). Plaintiff alleges that DYER, ENMARK, and GUTHRIE placed him on administrative leave "for engaging in the aforementioned protected activities." (*Id.* at P 47). Plaintiff was subsequently examined by three psychologists who declared him fit for duty. (*Id.* at P 49). Plaintiff alleges that "[o]n or around July 6, 2004, Chief DYER and Deputy Chief ENMARK refused to reinstate [him]." (*Id.* at P 50).

On November 1, 2004, the [**11] same date that the original Complaint in this action was filed, Plaintiff filed a government tort claim pursuant to the California Tort Claims Act (*Cal. Gov. Code §§ 910 et seq.).* Plaintiff received a response dated December 13, 2004, which stated that any causes of action accruing before November 1, 2003, were not presented within one year after the incident. (*Id.* at P 51). Plaintiff interpreted this response as a rejection of his claim. (*Id.*).

## IV. LEGAL STANDARDS

### A. Motion to Dismiss Pursuant to *Fed. R. Civ. P. 12(b)(6).*

*Fed. R. Civ. P. 12(b)(6)* allows a defendant to attack a complaint for failure to state a claim upon which relief can be granted. A motion to dismiss under *Fed. R. Civ. P. 12(b)(6)* is disfavored and rarely granted: "[a] complaint should not be dismissed unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Van Buskirk v. CNN, Inc., 284 F.3d 977, 980 (9th Cir. 2002)* (citations omitted). In deciding [**12] whether to grant a motion to dismiss, the court "accept[s] all factual allegations of the complaint as true and draw[s] all reasonable inferences in favor of the

nonmoving party." *TwoRivers v. Lewis, 174 F.3d 987, 991 (9th Cir. 1999).*

"The court need not, however, accept as true allegations that contradict matters properly subject to judicial notice or by exhibit. Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001)* (citations omitted). For example, matters of public record may be considered under *Fed. R. Evid. 201*, including pleadings, orders and other papers filed with the court or records of administrative bodies. *See Lee v. City of Los Angeles, 250 F.3d 668, 688 (9th Cir. 2001).* Conclusions of law, conclusory allegations, unreasonable inferences, or unwarranted deductions of fact need not be accepted. *See Western Mining Council v. Watt, 643 F.2d 618, 624 (9th Cir. 1981).*

[*1169] "Where the facts and dates alleged in a complaint demonstrate that the complaint [**13] is barred by the statute of limitations, a *Federal Rule of Civil Procedure 12(b)(6)* motion should be granted." *Ritchie v. United States, 210 F. Supp. 2d 1120, 1123 (N.D. Cal. 2002).* There is no requirement, however, that affirmative defenses, including statutes of limitation, appear on the face of the complaint. *Hyatt Chalet Motels, Inc. v. Carpenters Local 1065, 430 F.2d 1119, 1120 (9th Cir. 1970).* "When a motion to dismiss is based on the running of the statute of limitations, it can be granted only if the assertions of the complaint, read with the required liberality, would not permit the plaintiff to prove that the statute was tolled." *Jablon v. Dean Witter & Co., 614 F.2d 677, 682 (1980); see also TwoRivers, 174 F.3d at 991.*

**B. Motion for a More Definite Statement Pursuant to** *Fed. R. Civ. P. 12(e).*

A motion for a more definite statement pursuant to *Fed. R. Civ. P. 12(e)* attacks the unintelligibility of the complaint, not simply the mere lack of detail, and is only proper when a party [**14] is unable to determine how to frame a response to the issues raised by the complaint. A court will deny the motion where the complaint is specific enough to apprise the defendant of the substance of the claim being asserted. *Bureerong v. Uvawas, 922 F. Supp. 1450, 1461 (C.D. Cal. 1996); see also Famolare, Inc. v. Edison Bros. Stores, Inc., 525 F. Supp. 940, 949 (E.D. Cal. 1981)* (finding a *Rule 12(e)* motion proper "only where the complaint is so indefinite that the defendant cannot ascertain the nature of the claim being asserted"). A motion for a more definite statement is proper only where the complaint is "so vague or ambiguous that the opposing party cannot respond, even with a simple denial, in good faith or without prejudice to himself." *Cellars v. Pacific Coast Packaging, Inc., 189 F.R.D. 575, 578 (N.D. Cal. 1999)* (internal quotations and citation omitted); *see also Sagan v. Apple Computer Inc., 874 F. Supp. 1072, 1077 (C.D. Cal. 1994)* (citing *Van Dyke Ford, Inc. v. Ford, 399 F. Supp. 277, 284 (E.D. Wis. 1975))* ("A *Rule 12(e)* motion is more likely to be granted where the complaint is so general [**15] that ambiguity arises in determining the nature of the claim or the parties against whom it is being made."); *Boxall v. Sequoia Union High Sch. Dist., 464 F. Supp. 1104, 1114 (N.D. Cal. 1979)* (finding a motion for a more definite statement should not be granted unless the defendant literally cannot frame a responsive pleading).

"*Rule 12(e)* is designed to strike an unintelligibility rather than want of detail. . . . A motion for a more definite statement should not be used to test an opponent's case by requiring him to allege certain facts or retreat from his allegations." *Palm Springs Med. Clinic, Inc. v. Desert Hosp., 628 F. Supp. 454, 464-65 (C.D. Cal. 1986)* (quoting *Juneau Square Corp. v. First Wis. Nat'l Bank, 60 F.R.D. 46, 48 (E. D. Wis. 1973)).* A *Rule 12(e)* motion "is likely to be denied where the substance of the claim has been alleged, even

392 F. Supp. 2d 1159, *; 2005 U.S. Dist. LEXIS 37400, **

though some of the details are omitted." *Sagan, 874 F. Supp. at 1077* (citing *Boxall, 464 F. Supp. at 1113-14*).

This liberal standard of pleading is consistent with *Fed. R. Civ. P. 8(a)(2)* which allows pleadings that [**16] contain a "short and plain statement of the claim." Both rules assume that the parties will familiarize themselves with the claims and ultimate facts through the discovery process. *See Sagan, 874 F. Supp. at 1077* ("Motions for a more definite statement are viewed with disfavor and are rarely granted because of the minimal pleading requirements of the Federal Rules."). If the detail sought by a motion for a more definite statement is obtainable through discovery, the motion should be denied. [*1170] *See McHenry v. Renne, 84 F.3d 1172, 1176 (9th Cir. 1996)* (granting *12(e)* motion where complaint "does not provide defendants with a fair opportunity to frame a responsive pleading"); *see also Sagan, 874 F. Supp. at 1077* ("Parties are expected to use discovery, not the pleadings, to learn the specifics of the claims being asserted."); *Beery v. Hitachi Home Elecs. (Amer.), Inc., 157 F.R.D. 477, 480 (C.D. Cal. 1993)* (finding motion for a more definite statement should be denied if the detail sought is obtainable through discovery); *Federal Savings and Loan Ins. Corp. v. Musacchio, 695 F. Supp. 1053, 1060 (N.D. Cal. 1988)* [**17] (finding that if plaintiff's complaint meets the notice requirements of *Fed. R. Civ. P. 8*, and defendants are provided with a sufficient basis to respond, the proper avenue for eliciting additional detail is through discovery); *Famolare, Inc. v. Edison Brothers Stores, Inc., 525 F. Supp. 940, 949 (E.D. Cal. 1981)* ("A motion for a more definite statement should not be granted unless the defendant cannot frame a responsive pleading."); *CMAX, Inc. v. Hall, 290 F.2d 736, 738 (9th Cir. 1961)*.

**C. Motion to Strike Pursuant to *Fed. R. Civ. P. 12(f)*.**

*Fed. R. Civ. P. 12(f)* provides that "redundant, immaterial, impertinent, or scandalous matters" may be "stricken from any pleading." *Fed. R. Civ. P. 12(f)*. "[O]nly pleadings are subject to motions to strike." *See Sidney-Vinstein v. A.H. Robins Co., 697 F.2d 880, 885 (9th Cir. 1983)*.

Motions to strike are disfavored and infrequently granted. *See Pease & Curren Ref., Inc. v. Spectrolab, Inc., 744 F. Supp. 945, 947 (C.D. Cal. 1990)*, [**18] abrogated on other grounds by *Stanton Road Ass'n v. Lohrey Enters., 984 F.2d 1015 (9th Cir. 1993)*. "[M]otions to strike should not be granted unless it is clear that the matter to be stricken could have no possible bearing on the subject matter of the litigation." *Colaprico v. Sun Microsystems, Inc., 758 F. Supp. 1335, 1339 (N.D. Cal. 1991)* (citation omitted).

**D. *42 U.S.C. § 1983***

"*Section 1983* provides for liability against any person acting under color of law who deprives another of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." ' *S. Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 887 (9th Cir. 2003)* (quoting *42 U.S.C. § 1983*).

4    Specifically, *42 U.S.C. § 1983* provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper

392 F. Supp. 2d 1159, *; 2005 U.S. Dist. LEXIS 37400, **

proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

**[**19] 1. Suits Against Local Governments: The *Monell* Doctrine.**

Local governments are "persons" subject to suit for "constitutional tort[s]" under *42 U.S.C. § 1983*. [5] *Haugen v. Brosseau, 339 F.3d 857, 874* [*1171] *(9th Cir. 2003)* (citing *Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 n. 55, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)).* "[T]he legislative history of the *Civil Rights Act of 1871* compels the conclusion that Congress did intend municipalities and other local government units to be included among those persons to whom *§ 1983* applies." *Monell, 436 U.S. at 690*. Local governments can be sued for monetary, declaratory, or injunctive relief where such suits arise out of unconstitutional actions that implement or execute a "policy statement, ordinance, or decision officially adopted and promulgated by that body's officers. . . ." *Id.* 690-1. If no official policy exists, "customs and usages" may fulfill this element of a *§ 1983* claim against a local government. *Id.*

> 5  "There is certainly no constitutional impediment to municipal liability. The *Tenth Amendment's* reservation of nondelegated powers to the States is not

implicated by a federal-court judgment enforcing the express prohibitions of unlawful state conduct enacted by the *Fourteenth Amendment.*'" *Monell, 436 U.S. at 691* (quoting *Milliken v. Bradley, 433 U.S. 267, 291, 97 S. Ct. 2749, 53 L. Ed. 2d 745 (1977))*. There is no "basis for concluding that the *Eleventh Amendment* is a bar to municipal liability." *Id.* (citing *Fitzpatrick v. Bitzer, 427 U.S. 445, 456, 96 S. Ct. 2666, 49 L. Ed. 2d 614 (1976)*; *Lincoln County v. Luning, 133 U.S. 529, 530, 10 S. Ct. 363, 33 L. Ed. 766 (1890))*.

[**20] A local government's liability is limited, however. Although a local government can be held liable for its official policies or customs, it will not be held liable for an employee's actions outside of the scope of these policies or customs. "A municipality cannot be held liable solely because it employs a tortfeasor -- or, in other words, a municipality cannot be held liable under *§ 1983* on a *respondeat superior* theory." *Monell, 436 U.S. at 691*. "A local government may not be sued under *§ 1983* for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its law-makers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under *§ 1983*." *Id. at 694*.

To prevail on a *§ 1983* complaint against a local government under *Monell*, a plaintiff must satisfy a three-part test:

> (1) The local government official(s) must have intentionally violated the plaintiff's constitutional rights;
>
> (2) The violation must be a part of policy or custom and may not be an isolated [**21] incident; and

392 F. Supp. 2d 1159, *; 2005 U.S. Dist. LEXIS 37400, **

(3) A nexus must link the specific policy or custom to the plaintiff's injury.

*See Monell, 436 U.S. at 690-92.*

## 2. Suits Against Governmental Officials (a) Official-Capacity Suits

"*[Section] 1983* claims against government officials in their official capacities are really suits against the governmental employer because the employer must pay any damages awarded." *Butler v. Elle, 281 F.3d 1014, 1023 (9th Cir. 2002)* (citing *Ky. v. Graham, 473 U.S. 159, 165-66, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985))*; *see also Doe v. Lawrence Livermore Nat'l Lab., 131 F.3d 836, 839 (9th Cir. 1997)* (finding that "a suit against a state official in his official capacity is no different from a suit against the [official's office or the] State itself") (citing *Will v. Mich. Dep't of State Police, 491 U.S. 58, 70-71, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989)*. "As the Supreme Court has stated, official-capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Ruvalcaba v. City of Los Angeles, 167 F.3d 514, 524 n.3 (9th Cir. 1999)* (quoting *Graham, 473 U.S. at 165*). [**22**] "'As long as the government entity receives [*1172] notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.'" *Ruvalcaba, 167 F.3d at 524 n.3* (quoting *Graham, 473 U.S. at 166.*).

### (b) Personal-Capacity Suits

"'Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law.'" *Dittman v. Cal., 191 F.3d 1020, 1027 (9th Cir. 1999)* (quoting *Graham, 473 U.S. at 165*); *see also Hafer v. Melo, 502 U.S. 21, 25, 112 S. Ct. 358, 116 L. Ed. 2d 301 (1991)* (finding that "[p]ersonal capacity suits seek to impose liability on state officials for acts taken under

color of state law"); *Stivers v. Pierce, 71 F.3d 732, 749 (9th Cir. 1995)*. In setting forth the distinctions between personal and official capacity suits, the Supreme Court said:

Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. See, e.g., *Scheuer v. Rhodes, 416 U.S. 232, 237-238, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)*. Official-capacity suits, in contrast, [**23**] "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell[], 436 U.S. at 690, n. 55 []*. As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. *Brandon v. Holt, 469 U.S. 464, 471-472, 105 S. Ct. 873, 83 L. Ed. 2d 878*. It is not a suit against the official personally, for the real party in interest is the entity. Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself.

*Graham, 473 U.S. 159, 166, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985)*.

"While the plaintiff in a personal-capacity suit need not establish a connection to governmental policy or custom,' officials sued in their personal capacities, unlike those sued in their official capacities, may assert personal immunity defenses such as objectively reasonable reliance on existing law." *Pena v.*

392 F. Supp. 2d 1159, *; 2005 U.S. Dist. LEXIS 37400, **

*Gardner, 976 F.2d 469, 473 (9th Cir. 1992)* (quoting [**24] *Graham, 473 U.S. at 166-167).* Individuals are not immune under the doctrine of qualified immunity if they violated "clearly established statutory or constitutional rights of which a reasonable person would have known." 'Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982).* "A victory in such a suit is a victory against the individual defendant, rather than against the entity that employs him.'" *Cerrato v. San Francisco Community College Dist., 26 F.3d 968, 973 (9th Cir. 1994)* (quoting *Graham, 473 U.S. at 166-67).*

> 6  Immunity is not absolute, as the Ninth Circuit has explained:
>
> > This court has held that, when a public official acts in reliance on a duly enacted statute or ordinance, that official ordinarily is entitled to qualified immunity. *See Grossman v. City of Portland, 33 F.3d 1200, 1210 (9th Cir. 1994)* (holding that "an officer who reasonably relies on the legislature's determination that a statute is constitutional should be shielded from personal liability"). The existence of an authorizing statute is not dispositive, however. Qualified immunity does not extend to a public official who enforces a statute that is "patently violative of fundamental constitutional principles." *Id. at 1209.*

*Dittman, 191 F.3d at 1027.*

[**25]  [*1173]  **E. State Law Claims Against Public Entities and the California Tort Claims Act.**

Plaintiff brings the following state law claims against Defendants: violation of *Cal. Labor Code § 1102.5* and violation of *Cal. Gov. Code § 53298, et seq.* The California Tort Claims Act governs tort claims against public entities and their officials. *See Cal. Gov. Code § 810 et seq.* The *California Tort Claims Act* ("CTCA") requires plaintiffs to present a written claim to the public entity allegedly responsible for their damage before initiating suit on the cause of action. *Cal. Gov. Code § 945.6.*

Under the California Tort Claims Act, no suit for "money or damages" may be brought against a public entity until a written claim has been presented to the public entity and the claim either has been acted upon or is deemed to have been rejected. *Hart v. Alameda County, 76 Cal. App. 4th 766, 778, 90 Cal. Rptr. 2d 386 (Cal. Ct. App. 1999).* The CTCA requires a plaintiff to file a timely tort claim with the public entity; if the claim is not timely, the public entity may reject the claim.

If a claimant fails to timely file [**26] a claim with the public entity, and its claim is consequently rejected by the public entity for that reason, courts are without jurisdiction to hear the claimant's cause of action. *Greyhound Lines, Inc. v. County of Santa Clara, 187 Cal. App. 3d 480, 487, 231 Cal. Rptr. 702 (1986); Moyer v. Hook, 10 Cal. App. 3d 491, 492-3, 89 Cal. Rptr. 234 (Cal. Ct. App. 1970); Carr v. State of Cal., 58 Cal. App. 3d 139, 144-6, 129 Cal. Rptr. 730 (Cal. Ct. App. 1976); Williams v. Mariposa County Unified Sch. Dist., 82 Cal. App. 3d 843, 848-9, 147 Cal. Rptr. 452 (Cal. Ct. App. 1978).* For causes of action for death, personal injury, or injury to personal property, a claimant must file a claim within six months of the accrual of the cause of action. *Cal. Gov. Code § 911.2.*

The CTCA also permits the filing of an application to file a late claim for certain claims: "[w]hen a claim that is required by

392 F. Supp. 2d 1159, *; 2005 U.S. Dist. LEXIS 37400, **

*Section 911.2* to be presented not later than six months after the accrual of the cause of action is not presented within that time, a written application may be made to the public entity for leave to present that claim." *Cal. Gov. Code § 911.4.* The CTCA's six-month [**27] limitations period applies to causes of action for death, personal injury, or injury to personal property. *Id.* at *§ 911.2.* If a claimant fails to timely file a petition to file a late claim, courts are without jurisdiction to hear the cause of action.

The overall policy of the claim requirements and time limitations of the California Tort Claims Act are to: (1) "give the governmental entity an opportunity to settle just claims before suit is brought;" (2) "permit the entity to make an early investigation of the facts on which a claim is based, thus enabling it to defend itself against unjust claims and to correct the conditions or practices which gave rise to the claim;" and (3) "avoid multiple suits arising out of the same transaction or occurrence and thus further[] the goal of judicial economy." *Greyhound Lines, 187 Cal. App. 3d at 487* (quoting *Gehman v. Super. Ct., 96 Cal. App. 3d 257, 262, 265, 158 Cal. Rptr. 62 (Cal. Ct. App. 1979)*, disapproved on other grounds by *Dept. of Transportation v. Super Ct. ("Frost"), 26 Cal.3d 744, 759 n. 5, 163 Cal. Rptr. 585, 608 P.2d 673 (1980)*).

### E. State Law Claims.

*Cal. Labor Code § 1102.5* is a "whistleblower" [**28] statute that establishes liability for employers who retaliate against their employees for disclosing information to government or law enforcement agencies. Specifically, *§ 1102.5(b)* provides that:

> An employer may not retaliate against an employee for disclosing information [*1174] to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of

state or federal statute, or a violation or noncompliance with a state or federal rule or regulation.

*Cal. Gov. Code § 53298(a)* establishes liability for any local agency officer, manager, or supervisor who retaliates against any employee for filing a complaint with the local agency reporting "gross mismanagement, a significant waste of funds, an abuse of authority, or a specific and substantial danger to public health or safety." *Cal. Gov. Code §§ 53298(a), 53296(c); see also LeVine v. Weis, 90 Cal. App. 4th 201, 212, 108 Cal. Rptr. 2d 562 (2001)* (discussing *§ 53298* in *dicta*).

## V. ANALYSIS

### A. Whether Plaintiff's § 1983 Claims Are Time-Barred.

A plaintiff is ordinarily not required to plead [**29] around affirmative defenses. *Hyatt Chalet Motels, 430 F.2d at 1120.* The statute of limitations is an affirmative defense. A complaint may nevertheless be dismissed pursuant to *Rule 12(b)(6)* if the facts and dates alleged demonstrate that the complaint is time-barred. *Ritchie, 210 F. Supp. 2d at 1123; Jablon, 614 F.2d at 682.* Defendants argue that Plaintiff's § 1983 claims are time-barred based on the allegations in the Second Amended Complaint. (Doc. 33, Def.'s Mem. 2-6).

In California, claims brought under *42 U.S.C. § 1983* are governed by California's statute of limitations for personal injury actions. *Taylor v. Regents of Univ. of Cal., 993 F.2d 710, 711-2 (9th Cir. 1993)*. Plaintiff's *42 U.S.C. § 1983* claim is therefore governed by California's statute of limitations for personal injuries under *Cal. Civ. Proc. § 335.1.* Currently, the limitations period is two years; however, prior to January 1, 2003, the limitations period for personal injuries was one year. [?] The applicable statute of limitations here is two years since the Complaint was filed after

Page 11

392 F. Supp. 2d 1159, *; 2005 U.S. Dist. LEXIS 37400, **

January 1, 2003. [**30]

7    California Senate Bill 688 amended the one year statute of limitations to two years, effective January 1, 2003.

"Although state law prescribes the statute of limitations applicable to *section 1983* claims, federal law governs the time of accrual." *Gibson v. United States, 781 F.2d 1334, 1339 (9th Cir. 1986)*. "Under federal law, a cause of action generally accrues when a plaintiff knows or has reason to know of the injury which is the basis of his action." *Id.* (internal quotations omitted).

Plaintiff's *§ 1983* claims are based on allegations of retaliation for his exercise of expression under the *First Amendment*. The adverse employment actions alleged include the following: (1) from June 1997 to December 2002, Plaintiff was passed over for promotions and special assignments (including an incident in July 2002 when Defendants intentionally "killed" a promotional list with Plaintiff's name to avoid promoting Plaintiff); and (2) on March 1, 2004, Plaintiff was placed on Administrative Leave [**31] pending a fitness for duty examination. (*See* Doc. 27, Pl.'s Opp. 10).

Defendants do not dispute that Plaintiff's March 1, 2004, Administrative Leave is not time-barred. (*See* Doc. 33, Def.'s Mem. 6; Doc. 28, Def.'s Reply 4). Plaintiff's complaint was filed on November 1, 2004. [8] Plaintiff's *§ 1983* claim based on [*1175] his placement on Administrative Leave was therefore filed within the 2-year statutory period. Likewise, Defendants do not dispute that alleged incidents of failure to promote Plaintiff that occurred after November 1, 2002 are not time-barred. The only issue is whether incidents of failure to promote that occurred before November 1, 2002 are time-barred.

8    Neither party addresses Plaintiff's *§ 1983* claim in light of the relation back doctrine of *Rule 15*. Defendants assume for purposes of argument that November

1, 2004, is the operative date, instead of March 3, 2005, which is the date the Second Amended Complaint was filed. Before proceeding with the statute of limitations analysis, the operative date of filing must be determined through a *Rule 15* analysis.

*Fed. R. Civ. P. 15(c)(2)* provides that "[a]n amendment of a pleading relates back to the date of the original pleading when . . . the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." Here, Plaintiff's original Complaint contained *§ 1983* claims. (Doc. 1, Compl. P 62). Those claims related to the same protected activities alleged in the Second Amended Complaint; i.e., reporting (a) the Mata sexual misconduct allegations; (b) racial harassment of Southeast Asian Explorers; (c) the "banking" of overtime hours; and (d) testifying before the hearing regarding cheating on the promotional examination. Plaintiff's *§ 1983* claims in its Second Amended Complaint therefore arise out of the same transactions alleged in its original complaint. The relation back doctrine applies and the operative date for statute of limitations purposes is November 1, 2004.

[**32]    Plaintiff argues that incidents occurring before November 1, 2002 are not time-barred because they are part of a "continuing violation." Plaintiff argues that the Ninth Circuit's "related acts" test applies, and cites two Ninth Circuit cases in support (i.e., *Green v. Los Angeles County Superintendent of Schools, 883 F.2d 1472, 1480-81; Williams v. Owens-Illinois, Inc., 665 F.2d 918, 924 (9th Cir. 1982)*). Defendants respond that the "related acts" test does not apply here because that test was overruled by the United States Supreme Court in *Nat'l R. R. Passenger Corp.*

392 F. Supp. 2d 1159, *; 2005 U.S. Dist. LEXIS 37400, **

*v. Morgan, 536 U.S. 101, 114, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002).* Defendants note that the *Morgan* Court held that where a plaintiff alleges discrete retaliatory acts, the statute of limitations runs separately from each act. Defendants argue that Plaintiff's allegations that he was passed over for promotions a number of times from 1997 to December 2002 constitute discrete acts. Defendants argue that Plaintiff cannot base his § *1983* claim on alleged incidents of failure to promote that occurred before November 1, 2002 because the statute of limitations for each of those alleged actions has run. **[**33]**

Discrete employment actions are not subject to the continuing violations doctrine. *Morgan, 536 U.S. 101, 114, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002).* The United States Supreme Court includes "failure to promote" among discrete employment actions. *Id.* Each of Plaintiff's allegations of failure to promote is therefore a separate actionable violation with a distinct accrual date. Although *Morgan* was an employment discrimination action brought under *Title VII*, the Ninth Circuit applies the Supreme Court's holding in *Morgan* to actions brought under § *1983. RK Ventures, Inc. v. City of Seattle, 307 F.3d 1045, 1061 (9th Cir. 2002); Carpinteria Valley Farms, Ltd. v. County of Santa Barbara, 344 F.3d 822 (9th Cir. 2003); Thompson v. City of Shasta Lake, 314 F. Supp. 2d 1017, 1027 (E.D. Cal. 2004).*

Plaintiff argues that "[a] continuing violation may be established by showing a series of related acts against a single individual, one or more of which falls within the limitations period." (Doc. 27, Pl.'s Opp. 11). Plaintiff cites *Green v. Los Angeles County Superintendent of Schools, 883 F.2d 1472, 1480-81; Williams v. Owens-Illinois, Inc., 665 F.2d 918, 924 (9th Cir. 1982)* **[**34]** in support of its argument that the "related acts" doctrine applies in determining whether alleged discriminatory acts **[*1176]** constitute continuing violations. However, as the Ninth Circuit noted recently:

*Morgan* overruled previous Ninth Circuit authority holding

> that, if a discriminatory act was "related and similar to" acts that took place outside the limitations period, all the related acts -- including the earlier acts -- were actionable as part of a continuing violation. [citation] *Morgan* held that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges."

*RK Ventures, Inc. v. City of Seattle, 307 F.3d 1045, 1061 (9th Cir. 2002)* (quoting *Morgan, 122 S.Ct. at 2072*).

Insofar as Plaintiff's § *1983* claims are based on incidents of failure to promote that occurred before November 1, 2002 Defendants' Motion to Dismiss is **GRANTED**. This ruling has no bearing on the evidentiary admissibility of such prior acts or omissions, which must be separately determined.

**B. Whether Plaintiff States Individual Capacity Claims Against the Individual Defendants [**35]** Under § *1983*.**

Defendants argue that Plaintiff fails to state individual capacity claims under § *1983* against the Defendants GARNER, DYER, ENMARK, FIFIELD, and GUTHRIE because Plaintiff fails to state a claim for *First Amendment* retaliation. Defendants also argue that Plaintiff fails to state individual capacity claims against all individual Defendants because they are entitled to qualified immunity. (Doc. 33, Def.'s Mem. 8-12).

**1. Whether Plaintiff States Claims for *First Amendment* Retaliation.**

The underlying constitutional violation on which Plaintiff bases his § *1983* claim is *First Amendment* retaliation. To state a claim for

retaliation based on exercise of *First Amendment* rights, a plaintiff must allege the following elements: (1) the plaintiff engaged in expressive conduct that addressed a matter of public concern; (2) the government official took an adverse action against the plaintiff; and (3) the expressive conduct was a substantial or motivating factor for the adverse action taken by the government official. *Alpha Energy Savers, Inc. v. Hansen, 381 F.3d 917, 923 (9th Cir. 2004).*

Defendants GARNER, DYER, and ENMARK argue that Plaintiff's [**36] *§ 1983* claim against them must be dismissed because Plaintiff fails to allege the second element of a *First Amendment* retaliation claim, i.e., that GARNER, DYER, and ENMARK took an "adverse employment action" against Plaintiff. (Doc. 33, Def.'s Mem. at 8-12). However, Plaintiff responds that he alleges that all three of these defendants took an "adverse employment action" against him. (*See* Doc. 27, Pl.'s Opp. 15 n. 7; 16, n. 8). In a *First Amendment* retaliation case, an "adverse employment action" is an act that is reasonably likely to deter employees from engaging in constitutionally protected speech; it is not necessary that the plaintiff demonstrate the loss of a valuable governmental benefit or privilege. *Coszalter v. City of Salem, 320 F.3d 968, 975 (9th Cir. 2003)* (holding that to determine whether an act constitutes an adverse employment action, "the inquiry is whether the exercise of the *first amendment* rights was deterred by the government employer's action") (internal quotations omitted). First, Plaintiff alleges that GARNER failed to promote him as retaliation for his "whistleblowing." (Doc. 1, Compl. P 41). Second, Plaintiff alleges that DYER and ENMARK [**37] placed Plaintiff on Administrative Leave after his complaints. (*Id.* at P 45). Third, Plaintiff alleges that DYER and ENMARK refused to reinstate Plaintiff despite that three psychologists declared [*1177] Plaintiff fit for duty. (*Id.* at P 50). Each of these allegations identifies individual adverse employment action by each supervisor

specifically directed against Plaintiff. Plaintiff has sufficiently alleged the "adverse employment action" element of a *First Amendment* retaliation claim against GARNER, DYER, and ENMARK.

Defendants also argue that Plaintiff fails to state a claim against Defendants FIFIELD and GUTHRIE because he did not allege the third element for a *First Amendment* Retaliation claim; i.e., that FIFIELD and GUTHRIE's failure to promote Plaintiff was motivated by Plaintiff's expression. (Doc. 33, Def.'s Mem. 12). However, Plaintiff notes that Paragraph 41 of the Complaint does allege causation: "NEVEU was denied each and every promotion as a result of WEST, FIFIELD, GUTHRIE, and GARNER'S actions, and in retaliation for NEVEU reporting the Mata allegations, the alleged racial harassment, and the end of the year report. . . ."

Defendants' arguments that Plaintiff has [**38] not alleged all three elements of a *First Amendment* claim are without merit and find no support in the pleadings. Defendants' Motion to Dismiss Plaintiff's *§ 1983* claims against the individual Defendants on the grounds that Plaintiff fails to allege *First Amendment* retaliation claims against them is **DENIED.**

### 2. Qualified Immunity.

Defendants next argue that GARNER, DYER, ENMARK, FIFIELD, GUTHRIE, and WEST are entitled to qualified immunity. Public officials sued in their individual capacity, as here, are immune from suit if "their conduct [did] not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982); Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001); Dittman, 191 F.3d at 1027.* "To determine whether qualified immunity is appropriate, a court must identify the specific right allegedly violated and determine whether that right was so clearly established as to alert a

Page 14

392 F. Supp. 2d 1159, *; 2005 U.S. Dist. LEXIS 37400, **

reasonable officer to its constitutional parameters; if the law is clearly established, it determines whether a reasonable officer could have believed lawful [**39] the particular conduct at issue." *Knox v. Southwest Airlines, 124 F.3d 1103, 1107 (9th Cir. 1997)* (internal quotations and citations omitted); *see also Saucier, 533 U.S. at 201.* Defendants' arguments in support of qualified immunity consist solely of conclusory statements that the individual defendants in question are immune from suit. (Doc. 33, Def.'s Mem., 10.4; 11.7; 11.25; 12:8). Defendants cite a few cases that address general immunity principles, but cite no authority to support that police officials are immune from suit when they retaliate against a whistleblowing employee for reporting sexual or racial discrimination to superiors, or for testifying that other officers were cheating on promotional exams. *See Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985); Brewster v. Bd. of Educ. of the Lynwood Unifid Sch. Dist., 149 F.3d 971, 977 (9th Cir. 1988); Knox v. Southwest Airlines, 124 F.3d 1103, 1107 (9th Cir. 1997).*

Plaintiff alleges that his superiors denied him promotions and placed him on administrative leave because he reported misconduct/harassment and racial discrimination and testified [**40] that cheating was occurring on police department promotional exams. Plaintiff argues that these allegations are sufficient to overcome qualified immunity at this stage in the litigation.

Plaintiffs' allegations do not establish that the officers here acted reasonably under the totality of the circumstances or in [*1178] reasonable reliance on a clearly established statute or constitutional provision. Plaintiff complains that he was retaliated against for having reported racial discrimination, sexual misconduct, and overtime improprieties, and for having testifying regarding cheating in the police department. Reporting such activities is expressive conduct regarding matters of public concern and is conduct facially protected by the

*First Amendment* right to free speech. Defendants do not attempt to identify any statute or constitutional provision under which Defendants could have reasonably carried out such actions. Defendant's Motion to Dismiss Plaintiff's § 1983 claims on qualified immunity grounds is **DENIED**.

### C. Whether Plaintiff States a Claim Against the CITY Under § 1983.

Defendants argue that Plaintiff fails to state a claim against the CITY because he does not allege [**41] the existence of a *Monell* policy or custom. (Doc. 33, Def.'s Mem. 13; *see also* Doc. 28, Def.'s Reply 5-6). Plaintiff responds, in conclusory fashion, that he has alleged that Chief DYER has policy-making authority. Plaintiff does not argue that he has alleged the existence of a defined policy that operated to violate his civil rights. Defendants argue that the alleged actions of Chief DYER do not constitute a "policy." (Doc. 28, Def.'s Reply 6.18-27).

Local governments are "persons" subject to suit for "constitutional tort[s]" under *42 U.S.C. § 1983. Haugen, 339 F.3d at 874-875.* The CITY, as a local government, is therefore subject to suit under *§ 1983.* However, local governments can only be sued where the claims arise out of unconstitutional actions by their employees who implement or execute a "policy statement, ordinance, or decision officially adopted and promulgated by that body's officers. . . ." *Monell, 436 U.S. at 690-1.* In other words, a municipality cannot be held liable for an employee's actions outside the scope of implementation of the policies or customs on a *respondeat superior* theory. *Id.* A municipality [**42] can, however, be held liable for the acts of one of its employees acting in an "official" capacity. "'[O]fficial-capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Ruvalcaba, 167 F.3d at 524 n. 3* (quoting *Graham, 473 U.S. at 165*).

Here, Plaintiff attempts to plead an "official

392 F. Supp. 2d 1159, *; 2005 U.S. Dist. LEXIS 37400, **

capacity" suit against Defendant DYER. However, Plaintiff's conclusory allegations regarding the purported policy implemented and/or created by Defendant DYER do not define or describe what that policy is. (See Compl. PP 4, 54). Plaintiff's "official capacity" claim against the CITY is deficient.

Defendants argue that Plaintiff fails to state a claim against the CITY because he has not alleged that the Defendant officers had policy-making authority. Plaintiff responds that he has alleged that Chief DYER has policy-making authority. (Doc. 27, Pl.'s Opp. 17). Plaintiff cites Paragraphs 4 and 54 of his Complaint, which do contain allegations that Defendant DYER has policy-making authority. (Id.). However, Defendants correctly note that the alleged actions of Defendant DYER in a specific case are not [**43] per se an official policy. (Doc. 28, Def.'s Reply 6). Just as Plaintiff fails to state a claim against the CITY because he fails to identify the CITY's policy by describing a pattern or practice, Plaintiff also fails to state a claim against Defendant DYER in his official capacity for failing to define the same purported policy. Alleging that DYER had policy-making authority without defining the policy and its operation is not sufficient.

Plaintiff's argument that delegation of authority to subordinates can subject [*1179] a municipality to liability also fails. Plaintiff argues that municipal liability can be established by showing that "'an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate.'" (Doc. 27, Pl.'s Opp. 18 (quoting Ulrich v. City and County of San Francisco, 308 F.3d 968, 985 (9th Cir. 2002)). However, Plaintiff fails to identify any allegations in the Complaint that identify what decision-making authority DYER delegated to his subordinates. Defendant notes that Plaintiff incorporates Paragraphs 1-52 into his cause of action and that "[s]uch allegations include numerous actions taken [**44] by a variety of other

officers. . . ." (Doc. 28, Def.'s Reply 6). To the extent that Plaintiff attempts to allege official capacity claims against the Defendant Officers other than DYER, Plaintiff's attempts fail. Plaintiff's allegations of decision-making and policy-making authority are conclusory and insufficient. In addition, no policy is identified or defined.

Defendants' Motion to Dismiss Plaintiff's § 1983 claim against the CITY is **GRANTED** with leave to amend.

**D. Whether Plaintiff Can Maintain a § 1983 Claim Based On a Violation of the Fourteenth Amendment.**

Defendants argue in a footnote that Plaintiff's § 1983 claim should be dismissed insofar as it is based on a violation of the Fourteenth Amendment. (Doc. 33, Def.'s Mem. 16, n. 3). Plaintiff does not address this argument in his opposition. (See Doc. 28, Def.'s Reply 5). Defendants argue that Plaintiff appears to allege that Defendants violated his rights under the Equal Protection Clause of the Fourteenth Amendment by treating him differently for having exercised his rights to free speech. (Doc. 33, Def.'s Mem. 16, n. 3).

"To state a claim under 42 U.S.C. § 1983 for a violation [**45] of the Equal Protection Clause of the Fourteenth Amendment a plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." Lee v. City of Los Angeles, 250 F.3d 668, 686 (9th Cir. 2001). The purpose of the equal protection clause is to "secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." Village of Willowbrook v. Olech, 528 U.S. 562, 564, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000) (per curiam) (quoting Sioux City Bridge Co. v. Dakota County, 260 U.S. 441, 445, 43 S. Ct. 190, 67 L. Ed. 340 (1923)). A successful equal

Page 16

392 F. Supp. 2d 1159, *; 2005 U.S. Dist. LEXIS 37400, **

protection claim may be brought by a "class of one," where the plaintiff alleges that he has been intentionally treated differently from others similarly situated. *Id. at 563*.

Plaintiff identifies no allegations in his Complaint that he was treated differently from others who were similarly situated.

Defendant's Motion to Dismiss Plaintiff's *§ 1983* claims insofar as they are based on alleged violations of the *Equal Protection Clause of the Fourteenth Amendment* **[**46]** is **GRANTED**.

**E. State Law Claims.**

**1. Whether Jurisdiction Exists over Plaintiff's Claim Under *Cal. Labor Code § 1102.5*.**

*Cal. Labor Code § 1102.5* establishes liability for employers who retaliate against their employees for disclosing information to government or law enforcement agencies. Defendants argue that a federal court lacks jurisdiction to hear Plaintiff's claim for violation of *Cal. Labor Code § 1102.5* because, pursuant to *Cal. Labor Code §§ 98.6* and *98.7*, claims under *Section 1102.5* are solely within the province **[*1180]** of the Labor Commissioner. (Doc. 33, Def.'s Mem. 17; Doc. 28, Def.'s Reply 7). Plaintiff responds that, pursuant to *Cal. Labor Code § 96*, Plaintiff "may" file a claim with the Labor Commissioner, although he is not required to do so.

*Cal. Labor Code § 98.7* provides that "[a]ny person who believes that he or she has been discharged or otherwise discriminated against in violation of any law under the jurisdiction of the Labor Commissioner may file a complaint with the **[**47]** division within six months after the occurrence of the violation." *Cal. Labor Code § 98.6(a)* describes claims brought pursuant to various sections of the labor code, including *§ 1102.5*, as brought "under the jurisdiction of the labor Commissioner." Neither of the provisions

Defendants cite provides that **exclusive** jurisdiction over *§ 1102.5* claims lies with the Labor Commissioner. Defendants argue that Plaintiff cites no cases allowing a court to hear a claim under *§ 1102.5*. Defendants also cite no cases holding that the Labor Commissioner has exclusive jurisdiction over *§ 1102.5* claims and that a court is *not* allowed to hear a *§ 1102.5* claim.

The California Supreme Court has recently held that a litigant seeking damages under *§ 1102.5* is required to exhaust administrative remedies before the Labor Commissioner prior to bringing suit. *Campbell v. Regents of the Univ. of Cal., 35 Cal. 4th 311, 333-4, 25 Cal. Rptr. 3d 320, 106 P.3d 976 (2005)* ("We conclude that absent a clear indication of legislative intent, we should refrain from inferring a statutory exemption from our settled rule requiring exhaustion of administrative remedies.") The exhaustion of administrative **[**48]** remedies rule is "well established in California jurisprudence." *Id. at 321*. "'[T]he rule is that where an administrative remedy is provided by statute, relief must be sought from the administrative body and this remedy exhausted before the courts will act.'" *Id.* (quoting *Ablelleira v. Dist. Ct. of Appeal, 17 Cal. 2d 280, 292, 109 P.2d 942 (1941)*). "Exhaustion of administrative remedies is a jurisdictional prerequisite to resort to the courts." *Id.* (quoting *Johnson v. City of Loma Linda, 24 Cal. 4th 61, 70, 99 Cal. Rptr. 2d 316, 5 P.3d 874 (2000)* (internal quotations omitted)).

Plaintiff does not allege that he exhausted available administrative remedies, including bringing a complaint before the Labor Commissioner, before bringing suit.

Defendants' Motion to Dismiss Plaintiff's claim under *Cal. Labor Code § 1102.5* is **GRANTED** on the grounds that there is no jurisdiction. [9]

9  Because there is no jurisdiction to hear this claim, Defendants' substantive

Case 3:08-cv-00184-L-CAB    Document 2-5    Filed 01/30/2008    Page 82 of 123

Page 17
392 F. Supp. 2d 1159, *; 2005 U.S. Dist. LEXIS 37400, **

arguments regarding the sufficiency of Plaintiff's *Section 1102.5* claim will not be addressed.

**[**49]  2. Whether Plaintiff States a Claim Under *Cal. Gov. Code § 53298, et seq.***

*Cal. Gov. Code § 53298(a)* establishes liability for any local agency officer, manager, or supervisor who retaliates against any employee for filing a complaint with the local agency reporting "gross mismanagement, a significant waste of funds, an abuse of authority, or a specific and substantial danger to public health or safety." *Cal. Gov. Code §§ 53298(a), 53296(c)*; *see also LeVine*, 90 Cal. App. 4th at 212 (discussing *§ 53298 in dicta*).

Plaintiff's claim under *§ 53298* arises out of his allegations that he was placed on Administrative Leave because of (1) his written reports of sexual molestation by former-officer Mata and of "administrative improprieties that appeared designed to foster opportunities for further sex crimes;" and (2) his "written reports of racial [*1181] harassment of Southeast Asian Explorers by Police Activity League volunteers." (Doc. 23, Second Am. Compl. PP 21, 29, 60). Although Plaintiff's allegations are not entirely clear, it appears he filed at least some of these reports with the [**50] Internal Affairs and Human Resources Departments of the Fresno Police Department. (*See id.*). Plaintiff alleges that his reports of alleged sexual misconduct by Officer Mata and racial discrimination against "Southeast Asian Explorers" constituted "an abuse of authority and a substantial and specific danger to public health and safety." (*Id.* at P 60).

**(a) Whether Plaintiff States a *Cal. Gov. Code § 53298* Claim against the CITY.**

Defendants argue that Plaintiff is not entitled to bring a *§ 53298* claim against the CITY as is explicitly set forth in the statute. (Doc. 33, Def.'s Mem. 18). Plaintiff does not dispute Defendant's argument in his opposition. (*See* Doc. 28, Def.'s Reply 9).

*Cal. Gov. Code § 53298.5(b)* provides that

no cause of action for violation of that section shall be brought against the local public entity:

> In no way [] shall the provisions of this article establish . . . any new cause of action against the local public entity other than liabilities contained in existing law.

Defendant's Motion to Dismiss Plaintiff's Claim Under *Cal. Gov. Code § 53298, et seq.*, against the CITY [**51] is GRANTED.

**(b) Whether Plaintiff States a *Cal. Gov. Code § 53298* Claim against the Individual Defendants.**

Defendants argue that Plaintiff fails to state a claim under *§ 53298* against the individual officers because he has not pleaded all required elements as set forth in *Cal. Gov. Code §§ 53296(c)-(d), 53297(a)-(d)*, and *53298(a)*. Plaintiff argues that he has complied with the pleading requirements.

The elements for this whistleblower cause of action are not clearly listed in any single section of the statute. Also, there does not appear to be any case law interpreting this statute. According to the statute's various provisions, it appears that the elements of a claim under *§ 53298* include the following:

> 1) The employee filed a complaint with a local agency regarding gross mismanagement, a significant waste of funds, an abuse of authority, or a specific and substantial danger to public health or safety. *Cal. Gov. Code §§ 53297(a), 53296(c)-(d)*.

> 2) The complaint was filed within 60 days of the date of the act or event that is the subject of the complaint. *Id.* at *§ 53297(a)*.

> 3) [**52] The complaint was filed under penalty of perjury. *Id.*

392 F. Supp. 2d 1159, *; 2005 U.S. Dist. LEXIS 37400, **

at § 53297(d).

4) The complaint was filed in accordance with the locally adopted administrative procedure, or in the alternative there was no administrative procedure available. *Id.* at § 53297(c).

5) The employee made a good faith effort to exhaust all available administrative remedies before filing the complaint. [10] *Id.* at § 53297(b).

6) A local agency officer, manager, or supervisor took a reprisal action against the employee for filing the complaint. *Id.* at § 53298(a).

10  "The 60-day time limit specified in [§ 53297(a)] shall be extended by the amount of time actually utilized by the employee in pursuing administrative remedies." *Id.* at § 53297(b).

Plaintiff here has alleged three of the six elements listed above: (1) the complaints [*1182] he filed with Internal Affairs and/or Human Resources related to abuse of authority and a substantial and specific danger to public health or safety; (2) that these complaints [**53] were filed in accordance with the CITY's administrative policies and procedures; and (3) that his supervisors, who were local agency officers, took a reprisal action (i.e., placing him on Administrative Leave) as the result of his filing these complaints. Plaintiff has not alleged the three remaining elements; i.e., (1) that he filed these complaints within 60 days of the acts or events; (2) that the complaints were filed under penalty of perjury; and (3) that he attempted, in good faith, to exhaust the available administrative remedies before filing his complaint, or in the alternative

that there were no available administrative remedies.

Assuming that the elements defined by the statute are pleading requirements, Plaintiff has failed to allege all elements necessary to state a claim. Defendants' Motion to Dismiss Plaintiff's claim under § 53298 is **GRANTED** with leave to amend.

**(c)  Whether Plaintiff fails to allege causation between Plaintiff's whistleblowing activities and the retaliatory act.**

Defendants argue that because the whistleblowing activities alleged took place in 1996 and 1997, and the alleged retaliatory act (i.e., the placement of Plaintiff on Administrative [**54] Leave) took place over seven years later in March 2004, Plaintiff fails to establish a causal connection. Plaintiff's response is to refer to several paragraphs of the Second Amended Complaint (PP 28-29, 37, 39-41, 43). Plaintiff states in his opposition that "[w]hile the allegations are too extensive to set forth in full here, a quick perusal of the Complaint as a whole demonstrates the existence, if not presumption of a causal link." (Doc. 27, Pl.'s Opp. 20).

Plaintiff's Complaint alleges that, from 1997 to 2002, he was retaliated against by being passed over for promotions, and that eventually the retaliation culminated in his being placed on administrative leave in March 2004. While Plaintiff's argument about causation is tenuous, Defendants' contention that Plaintiff has failed to "establish" causation, ignores that this issue is for the fact-finder and cannot be resolved at the pleading stage.

Defendant's Motion to Dismiss Plaintiff's § 53298 claim on the grounds of failure to allege causation is **DENIED.**

**(d)  Whether Plaintiff's § 53298 Claim is Time-Barred for Failure to Timely File a Claim under the California Tort Claims Act.**

Under the California Tort Claims [**55] Act, no suit for "money or damages" may be

392 F. Supp. 2d 1159, *; 2005 U.S. Dist. LEXIS 37400, **

brought against a public entity until a written claim has been presented to the public entity and the claim either has been acted upon or is deemed to have been rejected. *Hart v. Alameda County, 76 Cal. App. 4th 766, 778, 90 Cal. Rptr. 2d 386 (Cal. Ct. App. 1999)*. The CTCA requires a plaintiff to file a timely tort claim with the public entity; if the claim is not timely, the public entity may reject the claim. If a claimant fails to timely file a claim with the public entity, and its claim is consequently rejected by the public entity for that reason, courts are without jurisdiction to hear the claimant's cause of action. *Greyhound Lines, 187 Cal. App. 3d at 487; Moyer, 10 Cal. App. 3d at 492-3; Carr, 58 Cal. App. 3d at 144-6; Williams v. Mariposa County, 82 Cal. App. 3d at 848-9*. For causes of action for death, personal injury, or injury to personal property, a claimant must file a claim within six months of the accrual of the cause of action. *Cal. Gov. Code § 911.2*.

[*1183] The parties dispute when Plaintiff's cause of action under § 53298 accrued. Defendants [**56] argue that it accrued in March 2004, when Plaintiff was placed on administrative leave. Plaintiff suggests that it accrued on July 6, 2004, when Defendants DYER and ENMARK refused to reinstate Plaintiff after allegedly having received opinions from three psychiatrists that he was fit for duty. Neither party offers any argument or authority as to when a claim under § 53298 accrues. Plaintiff argued that the earliest he reasonably could have been aware of his whistleblower claim was July 2004, when Defendants refused to reinstate him to duty after having been declared fit for duty by three psychologists. Construing Plaintiff's allegations in the most favorable light, as is required on a *Rule 12(b)(6)* motion, Plaintiff's whistleblower claim under § 53298 is not deficient for failure to timely file a complaint under the California Tort Claims Act.

Defendant's Motion to Dismiss Plaintiff's § 53298 claim on the grounds it is barred by the California Tort Claims Act is **DENIED**.

**F. Defendants' Motion to Strike Pursuant to *Fed. R. Civ. P. 12(f)*.**

"[M]otions to strike should not be granted unless it is clear that the matter to be [**57] stricken could have no possible bearing on the subject matter of the litigation." *Colaprico, 758 F. Supp. at 1339* (citation omitted).

**1. Plaintiff's Claim for Punitive Damages under § 1983.**

First, Defendants argue that Plaintiff's claim for punitive damages under § 1983 against the individual defendants should be dismissed because Plaintiff fails to plead sufficient facts to support claims of malice against them. (Doc. 33, Def.'s Mem. 20). Under § 1983, punitive damages are proper either when a defendant's conduct was driven by evil motive or intent, or when it involved a reckless or callous indifference to the constitutional rights of others. *Smith v. Wade, 461 U.S. 30, 56, 103 S. Ct. 1625, 75 L. Ed. 2d 632 (1983); Larez v. City of Los Angeles, 946 F.2d 630, 639 (9th Cir. 1991)*. A public entity cannot be sued under § 1983 as a matter of law for punitive damages. *City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 271, 101 S. Ct. 2748, 69 L. Ed. 2d 616 (1981)*. Insofar as Defendants seek to strike Plaintiff's punitive damages claim against the CITY, their motion is **GRANTED**.

As to the punitive damages claims against the individual defendants, Defendants' conclusory [**58] argument that "Plaintiff's [sic] allegations are insufficient to meet [the] standard as to all six individual Defendants" is not persuasive. It is not clear from Plaintiff's allegations whether the individual defendants were motivated by evil intent or whether they acted with recklessness or callous indifference to Plaintiff's constitutional rights. Plaintiff's allegations are sufficient to infer malice. *See Fed. R. Civ. P. 9(b)*. Whether the officers acted with malice is a question of fact not properly decided on a motion to dismiss. Defendants' Motion to Strike Plaintiff's claim for punitive

392 F. Supp. 2d 1159, *; 2005 U.S. Dist. LEXIS 37400, **

damages against the individual defendants is **DENIED.**

**2. Plaintiff's Claim for Punitive Damages under *Cal. Gov. Code § 53298.***

Second, Defendants argue that Plaintiffs' claim for punitive damages under *Cal. Gov. Code § 53298* should be stricken for failure to plead malice. In support, Defendants cite the definition of malice at *Cal. Civ. Code § 3294(c)(1)* and two California state cases regarding malice pleading requirements. Federal district courts sitting in diversity [**59] apply the substantive [*1184] law of the forum state, but apply procedural rules as stated in the Federal Rules of Civil Procedure. *Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78, 58 S. Ct. 817, 82 L. Ed. 1188 (1938); see also Clark v. Allstate Ins. Co., 106 F. Supp. 2d 1016, 1019 n.3 (S.D. Cal. 2000).* The California law Defendants cite is not controlling. While *Cal. Civ. Code § 3294(a)* applies insofar as it allows for the recovery of punitive damages on a successful tort claim (including statutory torts), [11] the Federal Rules of Civil Procedure govern pleading standards in federal district court.

> 11    *Cal. Civ. Code § 3294(a)* allows for an award of punitive damages against a tortfeasor whose acts are characterized by oppression, fraud, or malice.

Specifically, *Rule 9(b)* governs pleading requirements for malice: "Malice, intent, knowledge and other condition[s] of mind of a person may be averred generally." The court in *Clark,* following other federal district courts [**60] in California, held that "conclusory assertions that a defendant acted intentionally, with malice' or with conscious disregard'" are "adequate to plead the mental state required under *Section 3294.*" *Clark, 106 F. Supp. 2d at 1019-20* (holding that because plaintiff's complaint alleges that defendant intentionally denied plaintiff's insurance claim and that it acted with an intent to injure plaintiff, the Complaint complied with *Fed. R. Civ. P. 8, 9*).

Here Plaintiff alleges that Defendants retaliated against Plaintiff for his "whistleblowing" activities. (*See* Doc. 23, Second Am. Compl. P 60). Allegations of retaliation are sufficient to infer intent to injure. Defendants' Motion to Strike Plaintiff's claim for punitive damages under *Cal. Gov. Code § 53298* is **DENIED.**

**3.   Plaintiff's Allegations Relating to Defendants' Failure to Promote Plaintiff "Between June 1997 and December 2002."**

Defendants argue that Plaintiff's allegations relating to Defendants' failure to promote Plaintiff "between approximately June 1997 and December 2002" should be stricken [**61] because one of Plaintiff's previously-filed complaints alleged different dates. Specifically, Plaintiff's First Amended Complaint alleged that Defendants failed to promote him "between June 1997 and January 2002." Defendants argue that Plaintiff's "new" allegations contradict the allegations in the First Amended Complaint, that Plaintiff provided no explanation for the purported contradiction, and that therefore the "new" allegations need not be accepted as true and should be stricken. (Doc. 33, Def.'s Mem. 21). Defendants cited no law or rule that does not allow a plaintiff to expand the time period of alleged wrongdoing. The expanded time period in the operative complaint does not contradict the allegation in the earlier complaint. Defendants' Motion to Strike Plaintiffs' allegations relating to Defendants' failure to promote him between June 1997 and December 2002 is **DENIED.**

**4. Plaintiff's Allegations Relating to Adverse Employment Actions Taken Before November 1, 2002.**

Defendants argue that Plaintiff's allegations relating to adverse employment actions taken before November 1, 2002, should be stricken as time-barred. Under notice pleading requirements, a party is [**62] not required to plead evidentiary facts. *See Fed. R. Civ. P.*

392 F. Supp. 2d 1159, *; 2005 U.S. Dist. LEXIS 37400, **

8(a). Allegations relating to adverse employment actions may be evidence of improper motive, even if a § 1983 claim based upon those actions would be time-barred. *Carpinteria Valley Farms, Ltd. v. County of Santa Barbara*, 344 F.3d 822, 829 (9th Cir. 2003). It is not proper to make evidentiary rulings at the [*1185] pleading stage. Striking allegations of adverse actions outside the statutory period for § 1983 violations is therefore not appropriate. Defendants' Motion to Strike Plaintiff's allegations relating to adverse actions prior to November 1, 2002 is **DENIED.**

**5. Plaintiff's Allegations Relating to his Written Reports of the Alleged Sexual Misconduct of Officer Mata.**

Defendants' papers do not make clear the precise allegations regarding Officer Mata that they move to strike. Defendants refer to Paragraphs 16-28 of the Second Amended Complaint in their motion and their reply, and appear to move to strike all allegations contained in these paragraphs. However, Defendants' argument relates only to Plaintiff's allegations regarding the purported dispute between [**63] Internal Affairs and Plaintiff's chain of command as to whether Plaintiff should report issues relating to Officer Mata in writing. (Doc. 28, Def.'s Reply 12). Defendants assume that Plaintiff's § 1983 cause of action is based upon this purported internal police dispute. Defendants argue that the allegations regarding the disagreement over the form of the reports does not, as a matter of law, relate to a matter of public concern, and is therefore not protected speech under the *First Amendment*. Plaintiff's response does not relate specifically to his allegations regarding the form of the reports, but instead appears to relate to all of his allegations regarding Mata. Plaintiff argues that reports of sexual misconduct by a police officer address matters of public concern and are therefore protected speech.

The parties' treatment of this complex *First*

*Amendment* issue is cursory and deficient. First, Defendants appear to raise an argument on the merits, which is not appropriate on a *Rule 12(f)* motion to strike. See *Ritzer v. Gerovicap Pharmaceutical Corp.*, 162 F.R.D. 642, 644 (D. Nev. 1995). Defendant appears to argue that internal disputes over the form of reports are [**64] not, as a matter of law, matters of public concern. This argument goes to the merits of Plaintiff's *First Amendment* retaliation claim and is more appropriately dealt with on a *Rule 12(b)(6)* motion to dismiss.

Second, Defendants' characterization of Plaintiff's § 1983 claim is inaccurate, although Plaintiff does not dispute Defendants' characterization in his opposition. Defendants state that Plaintiff's § 1983 violation is "based on a dispute between the Internal Affairs Division and his chain of command as to whether he should report issues relating to Officer Mata in writing." (Doc. 33, Def.'s Mem. 24). Plaintiff's § 1983 cause of action, as stated in the Second Amended Complaint, contains no specific allegations regarding the protected speech upon which his § 1983 claim is based. (*See* Doc. 23, Second Am. Compl. PP 53-4). Allegations elsewhere in the complaint, however, provide additional information. Specifically, Plaintiff alleges that he was retaliated against for having reported to Internal Affairs, in writing, information regarding purported sexual misconduct by Officer Mata. Furthermore, Plaintiff alleges that he was retaliated against for disobeying orders from his [**65] immediate chain of command not to report the sexual misconduct to Internal Affairs, in writing or otherwise, and that he was only to report the alleged sexual misconduct to his immediate superiors.

Plaintiff's allegations regarding a purported "dispute" within the Fresno Police Department over whether reports of Officer Mata's alleged sexual misconduct should be in writing are irrelevant to Plaintiff's § 1983 claim and should therefore [*1186] be stricken is not appropriately decided on a motion to strike.

392 F. Supp. 2d 1159, *; 2005 U.S. Dist. LEXIS 37400, **

Public employees do not relinquish their right to free speech by virtue of their employment. *Ceballos v. Garcetti, 361 F.3d 1168, 1173 (9th Cir. 2004)*. However, public employees do not enjoy absolute *First Amendment* rights. *Id.* To determine whether a public employee's speech is protected by the *First Amendment*, courts in the Ninth Circuit apply a two-step test. *Id.* The first step is to determine whether the speech addresses a matter of public concern. *Id.* If it does, the next step is to engage in a balancing analysis established by the United States Supreme Court in *Pickering v. Bd. of Educ. of Township High School Dist. 205, 391 U.S. 563, 568, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968)*. [**66] The balancing test requires a court to determine whether the public employee's interest in expressing him-or herself outweighs the government's interest "in promoting workplace efficiency and avoiding workplace disruption." *Id.*

Defendants argue that allegations regarding the dispute between Internal Affairs and Plaintiff's chain of command over whether the reports regarding Officer Mata should be in writing are not matters of public concern and are therefore irrelevant to Plaintiff's *First Amendment* claim and should be stricken. This argument goes to the merits of Plaintiff's *First Amendment* retaliation claim and should not be dealt with on a motion to strike. The issue whether the expressive conduct upon which Plaintiff bases his *First Amendment* retaliation claim is protected speech was not fully briefed by the parties and should not be decided in the context of this motion.

The dispute over the reports concerning alleged violations of law by police officers is part of the overall alleged scheme of discrimination. Defendants' Motion to Strike Plaintiff's allegations in Paragraphs 16 through 28 is **DENIED.** Defendants' motion to strike the Mata allegations as irrelevant to [**67] the state whistleblower claims is **MOOT.**

**VI. CONCLUSION**

Defendants' Motions to Dismiss pursuant to *Rule 12(b)(6)*:

(1) Plaintiff's *§ 1983* claims insofar as they are based on adverse employment actions occurring before November 1, 2002 is **GRANTED** with prejudice;

(2) Plaintiff's *§ 1983* claims against the individual Defendants is **DENIED;**

(3) Plaintiff's *§ 1983* claim against the CITY is **GRANTED** with leave to amend; Defendants' Motion for a More Definite Statement pursuant to *Rule 12(e)* as to Plaintiff's *§ 1983* claim against the CITY is **MOOT;**

(4) Plaintiff's *§ 1983* claim based on deprivation of rights under the *Fourteenth Amendment* is **GRANTED;**

(5) Plaintiff's *Cal. Labor Code § 1102.5* claim is **GRANTED;** and

(6) Plaintiff's *Cal. Gov. Code § 53298* claim against the CITY is **GRANTED;** Plaintiff's *Cal. Gov. Code § 53298* claim against the individual

392 F. Supp. 2d 1159, *; 2005 U.S. Dist. LEXIS 37400, **

Defendants on the grounds of failure to plead all elements is **GRANTED** with leave to amend; Plaintiff's *§ 53298* claim against individual defendants on all other grounds [**68] is **DENIED.**

Defendants' Motions to Strike pursuant to *Rule 12(f)* Plaintiff's claim for punitive damages as to the CITY is **GRANTED.** Defendants' Motion to Strike all remaining claims is **DENIED.**

**SO ORDERED.**

**DATED: July 15, 2005.**

**Oliver W. Wanger**

**UNITED STATES DISTRICT JUDGE**

EXHIBIT 2

2007 U.S. Dist. LEXIS 25957, *

Page 1

LEXSEE

**SHARON PATERSON, Plaintiff, v. CALIFORNIA DEPARTMENT OF GENERAL SERVICES, RAY ASBELL and INTER-CON SECURITY SYSTEMS, INC., Defendants.**

**No. 2:05-cv-0827-MCE-JFM**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF CALIFORNIA**

*2007 U.S. Dist. LEXIS 25957*

**March 8, 2007, Decided**
**March 8, 2007, Filed**

**SUBSEQUENT HISTORY:** Reconsideration granted by *Paterson v. Cal. Dep't of Gen. Servs., 2007 U.S. Dist. LEXIS 44384 (E.D. Cal., June 8, 2007)*

**COUNSEL:** [*1] For Sharon Paterson, Plaintiff: Lawrence Joseph King, LEAD ATTORNEY, Law Office of Lawrence J. King, Petaluma, CA.; William Tobin Darden, Attorney General's Office of the State of California, Sacramento, CA.

For California Department of General Services, Defendant: William Tobin Darden, LEAD ATTORNEY, Attorney General's Office of the State of California, Sacramento, CA.

For Raymond Asbell, Defendant: Daniel Gerard O'Donnell, Clancey Doyle and O'Donnell, Sacramento, CA.; William Tobin Darden, Attorney General's Office of the State of California, Sacramento, CA.

For Inter-Con Security Systems, Inc., Defendant: Ellen L Uy, Jeffrey D. Polsky, LEAD ATTORNEYS, Kauff McClain & McGuire LLP, San Francisco, CA.; William Tobin Darden, Attorney General's Office of the

State of California, Sacramento, CA.

**JUDGES:** MORRISON C. ENGLAND, JR., UNITED STATES DISTRICT JUDGE.

**OPINION BY:** MORRISON C. ENGLAND, JR.

**OPINION**

MEMORANDUM AND ORDER

Through the present lawsuit, Plaintiff Sharon Paterson ("Plaintiff") seeks redress for alleged sexual harassment and retaliation which she claims ultimately led to her discharge as a security guard employed by Defendant Inter-Con Security Systems, Inc. ("Inter-Con"). [*2] Plaintiff also named the California Department of General Services ("DGS") and one of its employees, Ray Asbell, as Defendants on grounds that much of the claimed harassment, as well as her ultimate termination, was instigated by Mr. Asbell.

While both DGS and Inter-Con initially filed Motions for Summary Judgment scheduled to be heard concurrently, DGS' motion has since been vacated as a result of its settlement with Plaintiff. The Court is also

informed that Plaintiff has also resolved her claims against Ray Asbell. That leaves only Inter-Con's Motion for Partial Summary Judgment presently before the Court for adjudication. As set forth below, that Motion will be granted in part and denied in part. [1]

> 1  Because oral argument will not be of material assistance, the Court orders this matter submitted on the briefs. E.D. Cal. Local Rule 78-230(h).

## BACKGROUND

Plaintiff was employed by Inter-Con, a private provider of security services to state facilities in Sacramento, California, between August of [*3] 2002 and October of 2003. Plaintiff was initially assigned as a guard at the Bateson Building, and claims that a state employee at that location began making inappropriate sexual comments and unwelcome sexual advances to her in the Fall of 2002. According to Plaintiff, when the employee in question, a janitorial supervisor, began to retaliate against Plaintiff for refusing his advances, she filed a written report with Inter-Con protesting the treatment she received. Plaintiff was subsequently transferred from her then job assignment. She claims she was then forced to take work at a series of less favorable locations and/or shifts.

After being reassigned to a state building under the supervision of Inter-Con employee John Cullifer, Plaintiff claims that Cullifer began a campaign of harassment in retaliation for Plaintiff's sexual harassment complaint. She alleges she was subjected to relentless verbal altercations, including comments with sexual innuendo, as well as attempted physical assault. Plaintiff asserts that this treatment ultimately precipitated a panic attack, along with a resulting medical leave beginning on December 3, 2002.

When Plaintiff returned to work on July 1, 2003, she [*4] was assigned to the Department of General Services, where she had

supervisorial responsibility over seven or eight Inter-Con security guards patrolling State garages. She claims that Inter-Con's pattern of harassment continued unabated, and included subjecting her work performance to excessive scrutiny and discipline to which other employees were not subjected, providing her with inadequate equipment and interfering with the performance of her job duties.

It is undisputed that Plaintiff received substantial direction from DGS employee John Asbell, who provided daily instruction to Plaintiff and required regular reports from her concerning the performance of contracted security guards. Plaintiff alleges that Asbell interceded on her behalf in attempting to curb Inter-Con's continuing harassment and retaliation. About a month after initially reporting to Asbell, Plaintiff claims that Asbell insisted she provide oral sex because she "owed" him.

According to Plaintiff, during August and September of 2003, Asbell used his supervisorial position, and threats to have Plaintiff fired, in order to force Plaintiff to repeatedly engage in oral sex. Plaintiff and Asbell ultimately had sexual [*5] intercourse at Plaintiff's house at the end of September 2003. Plaintiff describes this incident as rape; Asbell claims the sex was consensual.

On October 1, 2003, just days after the alleged rape, Plaintiff (who described herself as emotionally distraught) was involved in a verbal altercation with the Manager of the State garage's Service Center concerning a repair to her vehicle that she felt had not been performed properly. After Plaintiff initially complained to Ray Asbell about the incident, he launched an investigation despite Plaintiff's apology for any unprofessional conduct on her part. Ultimately, Asbell and his manager asked that Plaintiff be removed from her assignment with DGS, and Plaintiff was subsequently terminated by Inter-Con for misconduct and insubordination.

Plaintiff asserts that Asbell learned, during

2007 U.S. Dist. LEXIS 25957, *

the course of his investigation, that Plaintiff had filed a sexual harassment complaint prior to her DGS assignment. Plaintiff alleges that Asbell wanted to get rid of her because he feared she would make a similar harassment claim against him in connection with the repeated sexual favors he demanded. She further claims that the incident provided an excuse for [*6] Inter-Con to terminate her, both in light of their continuing retaliation in response to her previous complaint and due to the fact that she had made yet another complaint against a State employee.

According to Plaintiff, she initially went to the Sacramento office of the California Department of Fair Employment and Housing ("DFEH" on February 19, 2004 to complain about the treatment she received. She completed a Pre-Complaint Questionnaire at that time (attached as pp. 178-79 to Exhibit "B" to the Declaration of Lawrence J. King in Opposition to this Motion), which indicates that she was subsequently interviewed when she returned to DFEH on February 24, 2004. While Plaintiff circled only the category of sex discrimination in connection with her termination, and did not denote either harassment or retaliation, in a Supplemental Questionnaire prepared the day of her interview she referred to sexual harassment twice and raised the specter of retaliation by referring to her prior sexual harassment claim as constituting the "real reason" she was terminated. (King Decl., Ex. "B", pp. 184-87). In addition, Plaintiff provided a written statement to the DFEH dated February 23, 2004 (*Id.* [*7] at Ex. "J") in which she discusses both sexual harassment and retaliation in detail. Her allegations in that regard include the following unequivocal statement:

> "I believe I was fired from my position as security guard 2 (SG2) at Inter-Con because of my initial reporting of a sexual harassment claim, which Inter-Con disclosed

to Ray Asbel [sic], a supervisor employed by the State of California, facilitated by Inter-Con's desire to dismiss me and its illegal disclosure of my confidential and personal information."

Plaintiff further alleges that at the time of her interview itself she also recounted what had happened, including her initial sexual harassment complaint, the subsequent retaliation she received from Inter-Con, and her encounters with Mr. Asbell. (Decl. of Sharon Paterson, P 16).

The actual charge filed by DFEH on February 24, 2004 nonetheless alleges only that Plaintiff was terminated on the basis of her sex and replaced by a male employee. (DFEH Compl., Ex. "A" to the Decl. Of Jeffrey D. Polsky, p. IC-0182). In her Declaration, Plaintiff contends that she protested the scope of the complaint that was prepared to no avail:

> "The DFEH told me I [*8] had to sign the complaint forms they had prepared [2] if I wanted to go forward with my complaints. I told them that the forms they prepared did not seem to cover why I came to them and what I was complaining about. They told me that the forms they prepared were sufficient and I had to sign them if I wanted them to file my DFEH complaints. I was confused, but trusted they knew what they were doing."

(Paterson Decl., P 16). [3]

2    DFEH filed a second complaint against DGS concurrently with the Inter-Con complaint.

3    Inter-Con has filed numerous objections to the Paterson Declaration. The Court has relied on that Declaration only with respect to Plaintiff's own version of events and her personal opinion as to what transpired with respect to the terms and conditions of her employment. Inter-Con's objections to those portions of the Declaration (including P 16), are hereby overruled; the Court need not rule on the remainder of the objections. Significantly, Inter-Con does not allege that the opinions expressed by Plaintiff in her Declaration are contrary to the contents of her deposition.

[*9] The Motion for Summary Judgment presently before the Court is largely premised on Inter-Con's argument that Plaintiff's DFEH filings were insufficient to exhaust her administrative remedies as a prerequisite to filing civil claims against Inter-Con in this lawsuit. Inter-Con also alleges, however, that Plaintiff cannot state a triable issue with respect to her claims for sex discrimination. [4]

4    While Inter-Con also alleges that Plaintiff cannot state a claim under California's Whistle Blower Protection Act, *Cal. Gov't Code § 8547.1*, in her Opposition papers Plaintiff expresses her intent to withdraw the Fifth Cause of Action to that effect. Summary adjudication as to the Fifth Cause of Action will therefore be granted.

## STANDARD

The Federal Rules of Civil Procedure provide for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and [*10] that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c).* One of the principal purposes of *Rule 56* is to

dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).*

*Rule 56* also allows a court to grant summary adjudication on part of a claim or defense.

See *Fed. R. Civ. P. 56(a)* ("A party seeking to recover upon a claim . . . may . . . move . . . for a summary judgment in the party's favor upon all or any part thereof."); *see also Allstate Ins. Co. v. Madan, 889 F. Supp. 374, 378-79 (C.D. Cal. 1995); France Stone Co., Inc. v. Charter Township of Monroe, 790 F. Supp. 707, 710 (E.D. Mich. 1992).*

The standard that applies to a motion for summary adjudication is the same as that which applies to a motion for summary judgment. See *Fed. R. Civ. P. 56(a), 56(c); Mora v. Chem-Tronics, Inc., 16 F. Supp. 2d 1192, 1200 (S.D. Cal. 1998).*

In considering a motion for summary judgment, the [*11] court must examine all the evidence in the light most favorable to the non-moving party. *United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962).* Once the moving party meets the requirements of *Rule 56* by showing that there is an absence of evidence to support the non-moving party's case, the burden shifts to the party resisting the motion, who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).* Genuine factual issues must exist that "can be resolved only by a finder of fact, because they may reasonably be resolved in favor of either party." *Id. at 250.* In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence. See *T.W. Elec. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630-631 (9th Cir. 1987),* citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed.*

2007 U.S. Dist. LEXIS 25957, *

2d 538 (1986).

## ANALYSIS

### 1. Exhaustion of Administrative Remedies as to Plaintiff's Discrimination/Retaliation Claims

It is undisputed that the DFEH Complaint [*12] filed on Plaintiff's behalf on February 24, 2004 was also concurrently filed by DFEH with the United States Equal Employment Opportunity Commission ("EEOC"), and that both DFEH and the EEOC issued right-to-sue letters in January and February 2005, following which this action was timely filed. (Inter-Con's Statement of Undisputed Fact No. 13-14; see also Plaintiff's Complaint, P 8). Inter-Con's request for summary adjudication as to the First Cause of Action (for discrimination and harassment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII")), and the Second Cause of Action (alleging the same conduct as running afoul of California's Fair Employment and Housing Act ("FEHA")) instead hinges on a claim that the allegations made in those claims were not raised during the administrative process and consequently cannot now be asserted through the present civil action. Inter-Con properly points out that the scope of the administrative complaint generally defines the permissible scope of a subsequent lawsuit. *Ong v. Cleland, 642 F.2d 316, 318 (9th Cir. 1981)*; *Yurick v. Sup. Ct., 209 Cal. App. 3d 1116, 1122-23, 257 Cal. Rptr. 665 (1989)*. If allegations made [*13] in a civil action are neither similar nor reasonably related to the substance of the administrative charges they may be precluded under that standard. *Ong, 642 F.2d at 320*; *Yurick, 209 Cal. App. 3d at 1121.*

An exception to this general principle has been recognized, however, where the complainant informs the administrative agency of allegations that the agency nonetheless elects not to include in its complaint. In *Albano v. Schering-Plough Corp., 912 F.2d 384 (9th Cir. 1990)*, for example, Albano's initial EEOC complaint alleged age discrimination in promotion. When Albano asked the EEOC to amend his charge to include a claim of constructive discharge, the EEOC refused to allow him to do so and assured him that his original charge for failure to promote encompassed the discharge claim. Albano subsequently filed suit and the district court granted summary judgment because the scope of Albano's civil complaint exceeded the scope of his civil charge. The Ninth Circuit reversed that decision on appeal, holding that equitable considerations may excuse a claimant's noncompliance with the scope requirement. *Id. at 387.* In [*14] making that determination, the court emphasized that the EEOC charge is primarily directed towards informal investigation and conciliation as opposed to a pleading giving notice to the employer. It found that the claimant should not be penalized because of the EEOC's own errors in failing to provide notice to an employer, and consequently determined that the plaintiff's action should proceed. *Id. at 388.*

In this case Inter-Con has not disputed that Plaintiff presented documentation to the DFEH, including both her Supplement to Pre-Complaint Questionnaire and the February 23, 2004 written narrative, prior to the filing of an administrative charge that unquestionably did not encompass the breadth of Plaintiff's allegations as contained in those documents, which clearly reference both sexual harassment and retaliation. Inter-Con has also produced no evidence to dispute Plaintiff's claim that she questioned DFEH personnel about whether the charge that was prepared included the full scope of her complaints. According to Plaintiff's Declaration, she was informed that the DFEH complaint was sufficient and that she had to sign it if she wished to proceed. (Paterson Decl. [*15] , P 16).

Although the facts in Albano differ from those in the case at bar in that the plaintiff in Albano sought to amend his complaint, and

2007 U.S. Dist. LEXIS 25957, *

made repeated calls to the EEOC in an effort to do so, this Court does not view those distinctions as dispositive. Plaintiff here has produced evidence that she furnished evidence to the DFEH, both orally and in writing, that was not included within the subsequently filed complaint despite her having questioned the adequacy of that complaint as prepared. Plaintiff also claims she was told that the DFEH complaint was sufficient to cover all her claims. If true, those allegations on Plaintiff's part point to fault on the part of the EEOC for failing to file an adequate complaint. Albano stands for the proposition that those circumstances provide an equitable rationale for not barring Plaintiff herein from bringing her claims in court. This Court simply cannot determine as a matter of law, based on the record before it, that summary adjudication in Inter-Con's favor is appropriate on a failure to exhaust theory.

Caselaw standing for the opposite conclusion is in the Court's view unpersuasive. In *Rodriguez v. Airborne Express, 265 F.3d 890 (9th Cir. 2001)*, [*16] for instance, the Ninth Circuit did bar the plaintiff's claims on failure to exhaust grounds. While Rodriguez claimed he asked the DFEH consultant to pursue a charge of disability discrimination, he also indicated he may have been discharged for other reasons and there is no indication that Rodriguez challenged the adequacy of the ensuing complaint. Here, on the other hand, Plaintiff claims she not only recounted the instances of claimed sexual harassment and retaliation in her pre-complaint interview, but she also furnished documentation outlining the nature of those allegations and protested the adequacy of the complaint once it was prepared. The circumstances of this matter clearly fall closer to *Albano* than *Rodriquez*.

## 2. Failure to State Viable FEHA/EEOC Claims

Having concluded that Plaintiff's First and Second Causes of Action survive summary adjudication on a failure to exhaust theory, both claims are procedurally viable insofar as they allege sexual harassment and retaliation. Inter-Con nonetheless cannot claim that Plaintiff is barred from bringing a claim for sex discrimination per se. Sexual harassment is a form of sex discrimination in employment.

[*17] *Rojo v. Kliger, 52 Cal. 3d 65, 73, 90, 276 Cal. Rptr. 130, 801 P.2d 373 (1990)*. Hence if Plaintiff can state a claim for sexual harassment she has by definition also been subject to sex discrimination.

The evidence here establishes that Plaintiff's claim for sex discrimination hinges on the viability of her claim for sexual harassment. Plaintiff has produced no evidence to show, for example, that she was terminated because Inter-Con wanted to replace her with a male employee. Instead, the gravamen of her charge is 1) that she was retaliated against by Inter-Con for making sexual harassment claims, both at the onset of her employment at the Bateson Building and later by Ray Asbell while she worked at DGS; and 2) that she was harassed by John Cullifer prior to her medical leave in December of 2002, and by Mr. Asbell in August and September of 2003.

Hence the viability of Plaintiff's sex discrimination claim hinges on whether she can present an actionable sexual harassment claim at this time. As indicated above, Plaintiff's administrative charge with the DFEH was filed on February 24, 2004, and was concurrently filed with the EEOC. With respect to the sexual harassment Plaintiff alleges at the hands [*18] of the janitorial supervisor, even in the unlikely event Inter-Con did bear any liability for that incident (the supervisor was a state employee and Plaintiff has alleged no special circumstances pursuant to which Inter-Con could incur such liability for the supervisor's conduct), the harassment at issue occurred in the Fall of 2002, well over a year before the presentation of Plaintiff's administrative complaint.

2007 U.S. Dist. LEXIS 25957, *

The provisions of FEHA plainly state, at *California Government Code § 12960(d)*, that "no complaint may be filed after the expiration of one year from the date upon which the alleged unlawful practice or refusal to cooperate occurred . . ." Title VII provides an even shorter filing period in requiring that any claim also instituted with a State agency be filed not later than three hundred (300) days following the alleged unlawful employment practice. *42 U.S.C. § 2000e-5(e)*. Clearly, under either statutory scheme, Plaintiff's administrative complaint was untimely with respect to the Bateson Building harassment, and Plaintiff has offered no excuse and/or justification for her late filing in that regard. Consequently Plaintiff [*19] cannot pursue her present claims for sex discrimination in reliance on that harassment. A timely administrative charge is a precondition to the filing of a discrimination charge in court, whether under Title VII or FEHA. See *Grywczynski v. Shasta Bevs., Inc., 606 F. Supp. 61, 65 (1984)* and cases cited therein (California law); *Inda v. United Air Lines, Inc., 565 F.2d 554, 559 (9th Cir. 1977)* (Title VII).

With regard to later harassment at the hands of Inter-Con and its employees, all of that harassment, with one possible exception, was retaliatory rather than sexual in nature and consequently cannot provide the underpinnings for a sex discrimination claim.

The one exception concerns Plaintiff's allegation that John Cullifer ordered her to "zip her jacket up, no, I mean all the way up" at a point in time between November 26, 2002, when Plaintiff began working under Cullifer's supervision, and December 2, 2002, when she went out on disability leave. See Paterson Decl., P 8). Even if Mr. Cullifer's comment in that regard could be considered sexual harassment, which is by no means certain, the comment still occurred well over a year before [*20] Plaintiff filed her administrative complaint and consequently cannot be asserted as a basis for relief in this proceeding.

The only other allegations sounding in sexual harassment concern Ray Asbell's alleged sexual demands. The Court was notified, however, on February 2, 2007 that Plaintiff had settled her claims against both Mr. Asbell and DGS. Inter-Con cannot incur any vicarious liability for claims against Mr. Asbell that Plaintiff has settled directly.

In sum, partial summary judgment is granted as to the First and Second Causes of Action only with respect to sex discrimination. Plaintiff continues to have viable claims against Inter-Con under both causes of action, however, for retaliation.

## 3. Failure to Exhaust California Government Code § 1102.5 Claim

Inter-Con argues that Plaintiff's Fourth Cause of Action, for breach of *California Labor Code § 1102.5*, is precluded because Plaintiff failed to exhaust her administrative remedies before the Labor Commissioner prior to bringing suit. *Section 1102.5* prohibits retaliation by an employer against an employee who reports what he or she believes to be a statutory violation to a governmental [*21] agency.

Inter-Con cites *Neveau v. City of Fresno, 392 F. Supp. 2d 1159, 1180 (E.D. Cal. 2005)* in support of its proposition that exhaustion of remedies before the Labor Commissioner is required. In Neveu, however, the plaintiff filed a government tort claim pursuant to the California Tort Claims Act (*Cal. Gov. Code §§ 910 et seq.*) that was simply rejected as untimely with respect to all claims before a certain date. There was no indication the claim was otherwise processed and the court noted the plaintiff had not even alleged that available administrative remedies had been exhausted. Id.

In *Campbell v. Regents of Univ. of Cal., 35 Cal. 4th 311, 25 Cal. Rptr. 3d 320, 106 P.3d 976 (2005)*, the California Supreme Court found that while § 1102.5 was silent on any

2007 U.S. Dist. LEXIS 25957, *

exhaustion requirement, the plaintiff in that case nonetheless had to exhaust the University of California's internal grievance procedure before filing suit. *Id. at 329, 336.* [5] Here, there is no question that Plaintiff did exhaust administrative remedies, with respect to the same conduct [6] that underlies her § 1102.5 claim, by filing claims with the DFEH and EEOC. That exhaustion **[\*22]** appears consistent with *Campbell*'s requirement.

> 5    To the extent that *Neveu* interprets Campbell as requiring that remedies before the Labor Commissioner must necessarily be exhausted as a prerequisite to suit under § 1102.5, this Court disagrees.

> 6    Plaintiff claims that Inter-Con engaged in a campaign of retaliation against her for complaining about unlawful sexual harassment she suffered on the job.

Although the decision in *Murray v. Oceanside Unified Sch. Dist., 79 Cal. App. 4th 1338, 95 Cal. Rptr. 2d 28 (2000)* technically deals with 1102.1 (dealing with harassment on the basis of sexual orientation) rather than *Section 1102.5*, its reasoning is nonetheless instructive on the issue presently before the Court. The Murray court noted that where there

were multiple administrative remedies that potentially applied to the plaintiff's claims, resort to one such remedy rather than all sufficed for exhaustion purposes. *Id. at 1358.*

The Court finds that because Plaintiff did resort **[\*23]** to administrative remedies, the primary purpose of which is to promote investigation and conciliation between the parties (*Albano, 912 F.2d at 388*), her § 1102.5 claim does not fail for want of exhaustion.

## CONCLUSION

Based on the foregoing, Inter-Con's Motion for Partial Summary Adjudication is granted with respect to claims of sex discrimination asserted in the First and Second Causes of Action. The Motion is also granted as to the Fifth Cause of Action, for violation of California's Whistle Blower Protection Act, *Cal. Gov't Code § 8547.1*, which Plaintiff has agreed to withdraw. Inter-Con's Motion is otherwise, however, denied.

IT IS SO ORDERED.

Dated: March 8, 2007

MORRISON C. ENGLAND, JR.

UNITED STATES DISTRICT JUDGE

Recycled Paper

**BLUEBIRD**
(310) 477-0700

EXHIBIT 65

1  Cathryn Chinn, Esq. (State Bar 93340)
   1901 First Avenue, Suite 400
2  San Diego, California  92101
   Telephone (619) 234-9000
3  Facsimile (619) 699-1159

4

5  Attorney for Plaintiff
   JOSE HERNANDEZ

6

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9       COUNTY OF SAN DIEGO, CENTRAL BRANCH, GENERAL UNLIMITED

10  JOSE HERNANDEZ,                    Case No. :  GIC 871979

11              Plaintiff,             PLAINTIFF JOSE HERNANDEZ' WRITTEN
                                       OBJECTIONS TO EVIDENCE IN
12  v.                                 OPPOSITION TO DEFENDANT SAN
                                       DIEGO COUNTY REGIONAL AIRPORT
13  SAN DIEGO COUNTY REGIONAL          AUTHORITY'S MOTION FOR SUMMARY
    AIRPORT AUTHORITY, a public entity JUDGMENT OR, IN THE ALTERNATIVE,
14  and DOES 1 through 12, Inclusive,  SUMMARY ADJUDICATION

15              Defendants.            DATE:      November 16, 2007
                                       TIME:      1:30 p.m.
16                                     DEPT.:     75
                                       JUDGE:     HON. RICHARD E. STRAUSS
17                                     ACTION FILED:    9/1/06
                                       TRIAL DATE:      1/4/08
18

19

20          Plaintiff JOSE HERNANDEZ submits his Written Objections to Evidence in support of his

21  opposition to Defendant SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY's Motion

22  for Summary Judgment or, in the Alternative, Summary Adjudication, as follows:

23  **OBJECTION TO Declaration of Mark Burchyett dated 8/29/07:**

24      **Objection 1:  Object to declaration in its entirety.**

25          **Grounds for Objection 1:**  Irrelevant and immaterial.

26      **Objection 2:  Object to ¶ 6** (declaration filed separately; ¶ 6 is on 2:27-28–3:1):

27              "6.      As part of my investigation, I also requested, received, and reviewed

28

        PL'S WRITTEN OBJECTIONS TO EVIDENCE IN OPPOS. TO DEF SDCRAA'S MSJ OR SUMM. ADJUD.

1  factual and documentary information from Authority personnel, Board members, and Hernandez'

2  email and hard drive files."

3      **Grounds for Objection 2:** Lacks foundation.

4  **OBJECTION TO Declaration of Thella Bowens dated 8/30/07:**

5      **Objection 3: Objection to ¶ 4** (declaration filed separately; ¶ 4 is on 2:7-13):

6          "4.    In approximately October or November 2005, an employee named Clifforine

7  Massey resigned from the Authority. Massey asked to meet with me as part of her exit process. She

8  thanked me for the opportunity to work at the Authority. However, during the course of this

9  meeting, Massey raised plaintiff Jose Hernandez as an issue. She said she did not want to complaint,

10  but she said that Hernandez is a dangerous person. She also called him "unethical." Massey seemed

11  reluctant to expand and I did not press her for details at the time. However, my impression was that

12  Massey was referring to ethical issues."

13      **Grounds for Objection 3:** Hearsay (as to the truth of the matter).

14      **Objection 4: Objection to ¶ 5** (declaration filed separately; ¶ 5 is on 2:14-19):

15          "5.    Within a short period of time after my meeting with Massey, another

16  employee named Jim Prentice independently approached me regarding concerns he had about

17  Hernandez taking favors and benefits from Authority vendors. He specifically told me about free

18  airline tickets, Southwest Airlines drink tickets being handed out by Hernandez, gold outings with

19  vendors, and Hernandez' family trip to Hawaii, all of which Prentice believed that Hernandez had

20  received as a free benefit from Authority vendors."

21      **Grounds for Objection 4:** Hearsay (as to the truth of the matter).

22      **Objection 5: Objection to ¶ 11** (declaration filed separately; ¶ 11 is on 3:13-14):

23          "11.    I am unaware of any employee at the Authority, other than Hernandez,

24  receiving the level of free benefits that Hernandez received from the Authority's vendors."

25      **Grounds for Objection 5:** Vague and ambiguous as to "the level of."

26  ///

27  ///

28

PL'S WRITTEN OBJECTIONS TO EVIDENCE IN OPPOS. TO DEF SDCRAA'S MSJ OR SUMM. ADJUD.
- 2 -

**65-801**

1  **OBJECTION TO Declaration of Patrick Swan dated 8/28/07:**

2       **Objection 6:  Objection to ¶12** (declaration filed separately; ¶ 12 is on 3:25-4:2):

3           "12.    As a result of Ms. Bowens' request for a written report, I drafted a 21-

4  page letter with attachments to Ms. Bowens Mr. Gamberzky also assisted me in drafting the written

5  report.  I am informed that a true and correct copy of that letter with attachments is attached as

6  Exhibit 4 to the Notice of Lodgment of Exhibits filed herewith.  I sent Exhibit 4 to Ms. Bowens via

7  messenger service on or about January 19, 2006."

8       **Grounds for Objection 6:**  Privacy privilege (based on unauthorized recording.

9  Penal Code § 632(d).

10       **Objection 7:  Objection to ¶ 13** (declaration filed separately; ¶ 13 is on 4:3-5):

11           "13.    Exhibit 4 is an accurate report of my findings based on the interviews

12  and gathering of information that I did, as well as the interviews and information obtained by Mr.

13  Gamberzky that were communicated to me."

14       **Grounds for Objection 7:**  Privacy privilege (based on unauthorized recording.

15  Penal Code § 632(d).

16       **Objection 8:  Objection to ¶ 14** (declaration filed separately; ¶ 14 is on 4:6-14):

17           "14.    I concluded, as a result of our investigation into Mr. Hernandez'

18  receipt of benefits, that there was sufficient evidence that Mr. Hernandez had accepted benefits from

19  Authority vendors and contractors from 2003 through January 2006. I also concluded that there was

20  sufficient evidence that Mr. Hernandez had violated Section 2.10 of the Authority's Ethics Code by

21  virtue of accepting benefits from the Authority's vendors in an amount that exceeded more than one-

22  half the amount of gifts permitted under the California Political Reform Act in any calendar year

23  from a single source knowing that the source is doing business with the Authority.  In 2003 and

24  2004, the California Political Reform Act permitted gifts of $340, and in 2005, it permitted gifts of

25  $360."

26       **Grounds for Objection 8:** Improper opinion (Swan not designated "expert"); opinions

27  otherwise improper as to matters of law; lack foundation.

28

**65-802**

1  **Objection 9:  Objection to ¶ 15** (declaration filed separately; ¶ 15 is on 4:15-21):

2  "15.     Specifically, I concluded that in May 2004, Mr. Hernandez accepted

3  four free round-trip tickets to Hawaii from Hawaiian Airlines, which he knew was doing business

4  with the Authority.   While these tickets are non-revenue and may be of no value to Hawaiian

5  Airlines, they had value to Mr. Hernandez who otherwise would have to pay for the airline travel.

6  Based on information provided by Hawaiian Airlines, the estimated retail cost of each round trip

7  travel would have been between $199 and $600 per ticket. Therefore, I concluded that the total value

8  of the tickets was estimated to be between $796 and $2,400."

9  **Grounds for Objection to ¶ 15:**  Improper opinion (Swan not designated "expert");

10  opinions otherwise improper as to matters of law; lack foundation.

11  **Objection 10:  Objection to ¶ 16** (declaration filed separately; ¶ 16 is on 4:22-26):

12  "16.     I also concluded that in 2003, Mr. Hernandez accepted at least two,

13  and possibly four, free San Diego Charger-Oakland Raider football tickets from Ace Parking, the

14  total value of which is estimated to be between $470 and $940 based on the face value of the ticket.

15  I determined that Mr. Hernandez knew that Ace Parking was doing business with the Authority

16  through its ownership of our subcontract with Lindbergh Parking, Inc."

17  **Grounds for Objection 10:**  Improper opinion (Swan not designated "expert");

18  opinions otherwise improper as to matters of law; lack foundation.

19  **Objection 11:  Objection to ¶ 17** (declaration filed separately; ¶ 17 is on 4:27-28):

20  "17.     I also concluded that it was likely that the free airline tickets that Mr.

21  Hernandez admitted to receiving in 2004 from Southwest Airlines exceeded $170."

22  **Grounds for Objection 11:**  Improper opinion (Swan not designated "expert");

23  opinions otherwise improper as to matters of law; lack foundation.

24  **Objection 12:  Objection to ¶ 18** (declaration filed separately; ¶ 18 is on 5:1):

25  "18.     The remainder of my conclusions and findings are contained in Exhibit

26  4."

27  **Grounds for Objection 12:**  Improper opinion (Swan not designated "expert");

28

PL'S WRITTEN OBJECTIONS TO EVIDENCE IN OPPOS. TO DEF SDCRAA'S MSJ OR SUMM. ADJUD.
- 4 -

65-803

1  opinions otherwise improper as to matters of law; lack foundation.

2  **OBJECTION TO Declaration of Brian Enarson dated 8/31/07:**

3        **Objection 13:  Objection to ¶ 3** (declaration filed separately; ¶ 3 is on 2:5-16):

4              "3.     I was a member of the negotiating team regarding the separation of the

5  Authority from the Port District.  Part of the negotiations included the General Dynamics property,

6  which is adjacent to the San Diego International Airport.  Negotiations regarding the lease of the

7  General Dynamics property began in approximately 2002.  The monetary terms of the lease for

8  calendar years 2003, 2004 and 2005 are set by Public Utility Code section 170056(f)(1), and the

9  Authority complied with those terms and that statute.  After the initial three years, the annual rent

10  was determined based on the fair market value of the property as of January 1, 2006, and the market

11  rate of return on that date.  The Authority approved the current lease terms for the property at the

12  July 24, 2006 Board meeting.  The current lease terms require the Authority to pay $6.75 million per

13  year for a term of 63 years.  The amount of $6.75 million annually was reached through arms-length

14  negotiations with the Port.  The Authority expects to develop the property and expects that the

15  annual revenues will exceed the annual lease amount over the course of the next 62 years."

16        **Grounds for Objection 13**: Improper opinion; legal conclusion; lack of foundation;

17  hearsay.

18        **Objection 14:  Objection to ¶ 4** (declaration filed separately; ¶ 4 is on 2:17-23):

19              "4.     I was also a member of the negotiation committee with regard to the

20  lease of the Teledyne Ryan property.  We began negotiations on the Teledyne Ryan in approximately

21  late 2002, early 2003.  The San Diego Unified Port District owns the Teledyne Ryan property and

22  leases it to the Authority.  When the former tenant of that property, Allegheny, vacated the property

23  without notice, the Port filed a lawsuit against Allegheny for breach of the lease.  After Allegheny

24  vacated the property without notice, the Port began preparing the property for use as a parking lot."

25        **Grounds for Objection 14**: Lacks foundation.

26        **Objection 15:  Objection to ¶ 5** (declaration filed separately; ¶ 5 is on 2:24-27):

27              "5.     The Port failed to comply with CEQA before beginning their work on

28

1 the property for purposes of using it as a parking lot. As a result, the Authority filed a lawsuit

2 against the Port for their failure to comply with CEQA before beginning their parking lot project (the

3 "CEQA lawsuit")."

4         **Grounds for Objection 15:** Lacks foundation.

5      **Objection16: Objection to ¶ 8** (declaration filed separately; ¶ 8 is on 3:14-16):

6         "8.    The Authority has conducted various projections regarding the annual

7 revenue expected from the property once the contamination is cleaned up. The Authority expects

8 that the annual revenue from the property will eventually far exceed the amount of the lease

9 payment."

10         **Grounds for Objection 16:** Lacks foundation; calls for speculation.

11      **Objection 17: Objection to ¶ 11** (declaration filed separately; ¶ 11 is on 3:25-4:2):

12         "11.    In 2000, the Authority decided to convert a Southwest Airlines' hold

13 room in Terminal One into concession space, which it leased to Host. This decision resulted in an

14 addendum to the Authority's written agreement with Host to improve space in Terminal 1 into

15 additional concession space. The Host agreement required that Host would have to approve any

16 additional space taken from Host after the improvements were made. The amendment to the Host

17 agreement was approved by the Authority's Board."

18         **Grounds for Objection 17:** Irrelevant.

19      **Objection 18: Objection to ¶ 12** (declaration filed separately; ¶ 12 is on 4:3-4):

20         "12.    I do not have any side deals with Host. Any agreements that I have

21 entered into with Host have been memorialized in an approved and fully executed agreement."

22         **Grounds for Objection 18:** Lacks foundation as to time.

23 **OBJECTION TO Declaration of James Prentice dated 8/28/07:**

24      **Objection 19: Objection to ¶ 4** (declaration filed separately; ¶ 4 is on 2:11-17):

25         "4.    In particular, I told Ms. Bowens that I believed that Hernandez had

26 received free airline tickets to Phoenix and Las Vegas and a free golfing trip to Mexico from

27 Southwest Airlines. I also told Ms. Bowens that I had observed Hernandez walking up to, and

28

PL'S WRITTEN OBJECTIONS TO EVIDENCE IN OPPOS. TO DEF SDCRAA'S MSJ OR SUMM. ADJUD.
- 6 -

**65-805**

1  receiving free food from, various concessions run by Host at the Airport, including McDonald's,

2  Starbucks and La Salsa.  I also told Bowens that Hernandez went to Florida for his brother's

3  birthday, but he tried to turn it into a business trip to talk to the Superbowl committee.  It was my

4  belief that Hernandez had the Authority pay for Hernandez' hotel room for the entire trip to Florida."

5          **Grounds for Objection 19:**  Lacks foundation.

6        **Objection 20:  Objection to ¶ 5** (declaration filed separately; ¶ 5 is on 2:18-21):

7                "5.    About one month after I spoke with Ms. Bowens, I was interviewed

8  by an investigator named Pat Swan regarding Hernandez.  I told Mr. Swan about my suspicions that

9  Hernandez received the free benefits outlined in the preceding paragraph from the Authority's

10  vendors."

11          **Grounds for Objection 20:**  Lacks foundation.

12        **Objection 21:  Objection to ¶ 6** (declaration filed separately; ¶ 6 is on 2:22-24):

13                "6.    In my discussions with both Ms. Bowens and Mr. Swan, I told the

14  truth regarding my observations of Hernandez and the information that I received from Hernandez

15  and other employees."

16          **Grounds for Objection 21:**  Hearsay; lacks foundation.

17        **Objection 22:  Objection to ¶ 7** (declaration filed separately; ¶ 7 is on 2:25-28):

18                "7.    I am unaware that Hernandez had ever complained about the

19  Authority's alleged violations of the Americans with Disabilities Act with regard to the women's

20  restroom project in Terminal One.  I am also unaware of Hernandez complaining about any alleged

21  side deal between Host and Bryan Enarson, or about the women's restroom project being too

22  expensive."

23          **Grounds for Objection 22:**  Lacks foundation.

24        **Objection 23:  Objection to ¶ 8** (declaration filed separately; ¶ 8 is on 3:1-2):

25                "8.    I am unaware that Hernandez ever disclosed any unlawful aspects

26  regarding the leases of the General Dynamics property or the Teledyne Ryan property leased by the

27  Authority."

28

    PL'S WRITTEN OBJECTIONS TO EVIDENCE IN OPPOS. TO DEF SDCRAA'S MSJ OR SUMM. ADJUD.

1    **Grounds for Objection 23**: Lacks foundation.

2    **Objection 24**:  **Objection to ¶ 9** (declaration filed separately; ¶ 9 is on 3:3-4):

3    "9.    I am unaware that Hernandez  ever complained that Lindbergh

4    Parking, Inc. ("LPi") double-billed the Authority for workers' compensation or that LPi underbid

5    the Authority."

6    **Grounds for Objection 24**: Lacks foundation.

7    **OBJECTION TO Declaration of Theodore Sexton dated 8/31/07**:

8    **Objection 25**:  **Objection to ¶ 8** (declaration filed separately; ¶ 8 is on 2:20-24):

9    "8.    During Hernandez' employment, I occasionally requested that

10    Hernandez change airline tickets for certain Authority employees and board members whose travel

11    plans had changed.  Based on my personal experience, airlines routinely process requests for

12    passenger itinerary changes and, consistent with their company guidelines, may or may not add fees

13    to the ticket price."

14    **Grounds for Objection 25**:  Improper opinion; lacks foundation.

15    **OBJECTION TO Declaration of John Gamberzky dated 8/31/07**;

16    **Objection 26**:  **Objection to ¶ 4** (declaration filed separately; ¶ 4 is on 1:13-18):

17    "4.    After the first interview with Mr. Hernandez, Mr. Swan and I

18    conducted an additional interview with Mr. Hernandez at his counsel's office on December 29, 2005.

19    I also interviewed six other non-Authority employees, including Janet Nix from Hawaiian Airlines,

20    Mike Parrish from Southwest Airlines, Tony Hueso from USA Cab, Dave Mueller from Ace

21    Parking, Cheryl Black from Southwest Airlines and Kelly Pond from Image Concepts.  I provided

22    my notes from those interviews to Mr. Swan."

23    **Grounds for Objection 26**:  Privacy privilege (based on unauthorized recording).

24    Penal Code § 632(d); calls for speculation.

25    **Objection 27**:  **Objection to ¶ 5** (declaration filed separately; ¶ 5 is on 1:19-21):

26    "5.    I obtained documents from Tony Hueso regarding car repairs that USA

27    Cab performed on Mr. Hernandez' vehicles. I did not require or pressure Mr. Hueso to provide those

28

PL'S WRITTEN OBJECTIONS TO EVIDENCE IN OPPOS. TO DEF SDCRAA'S MSJ OR SUMM. ADJUD.
- 8 -

65-807

1    documents to me."

2    **Grounds for Objection 27**: Privacy privilege.

3    **OBJECTION TO Defendant's Exhibit 4 (Swan's 1/19/06 letter)**:

4    **Objection 28:  Objection the entirety of Exhibit 4.**

5    **Grounds for Objection 28**: Hearsay (as to the truth of the matter); improper opinion

6    (Swan not identified as an expert); lacks foundation; privacy privilege (derived from unauthorized

7    recording - Penal Code § 632(d)); calls for speculation.

8    **OBJECTION TO Defendant's Exhibit 6 (Burchyett's 9/5/06 report)**:

9    **Objection 29:  Objection the entirety of Exhibit 6.**

10    **Grounds for Objection 29**: Hearsay (as to the truth of the matter); improper opinion

11    (Burchyett not identified as an expert); lacks foundation (Burchyett's status as auditor does not

12    qualify him to investigate employment matters); calls for speculation.

13

14    DATED:  November 2, 2007

15    CATHRYN QHINN, Attorney for
Plaintiff JOSE HERNANDEZ

16

17

18

19

20

21

22

23

24

25

26

27

28



Recycled Paper

BLUEBIRD
(310) 477-0700

**EXHIBIT 66**

1

2

3

4

5

6

7

8                **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9        **COUNTY OF SAN DIEGO, CENTRAL BRANCH, GENERAL UNLIMITED**

10   JOSE HERNANDEZ,                              Case No. : GIC 871979

11                        Plaintiff,             ORDER ON PLAINTIFF JOSE
                                                 HERNANDEZ' WRITTEN OBJECTIONS TO
12   v.                                          EVIDENCE IN OPPOSITION TO
                                                 DEFENDANT SAN DIEGO COUNTY
13   SAN DIEGO COUNTY REGIONAL                   REGIONAL AIRPORT AUTHORITY'S
     AIRPORT AUTHORITY, a public entity          MOTION FOR SUMMARY JUDGMENT OR,
14   and DOES 1 through 12, Inclusive,           IN THE ALTERNATIVE, SUMMARY
                                                 ADJUDICATION
15                        Defendants.
                                                 DATE:        November 16, 2007
16                                               TIME:        1:30 p.m.
                                                 DEPT.:       75
17                                               JUDGE:       HON. RICHARD E. STRAUSS
                                                 ACTION FILED:   9/1/06
18                                               TRIAL DATE:     1/4/08

19

20
          Plaintiff JOSE HERNANDEZ submits his Written Objections to Evidence in support of his
21
     opposition to Defendant SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY's Motion
22
     for Summary Judgment or, in the Alternative, Summary Adjudication, as follows:
23
     **OBJECTION TO Declaration of Mark Burchyett dated 8/29/07:**
24
          **Objection 1:   Object to Burchyett declaration in its entirety.**
25
          **Grounds for Objection 1:  Irrelevant and immaterial.**
26
     **Court's Ruling on Objection 1: Sustained _____    Overruled: _____**
27
     ///
28
          ORDER ON PL'S OBJECTIONS TO EVIDENCE IN OPPOS. TO DEF SDCRAA'S MSJ OR SUMM. ADJUD.

1     **Objection 2:  Object to ¶ 6** (Burchyett declaration filed separately; ¶ 6 is on 2:27-28–3:1):

2             "6.     As part of my investigation, I also requested, received, and reviewed

3   factual and documentary information from Authority personnel, Board members, and Hernandez'

4   email and hard drive files."

5     **Grounds for Objection 2**: Lacks foundation.

6   **Court's Ruling on Objection 2: Sustained _____  Overruled: _____**

7

8   **OBJECTION TO Declaration of Thella Bowens dated 8/30/07:**

9     **Objection 3:  Objection to ¶ 4** (Bowens declaration filed separately; ¶ 4 is on 2:7-13):

10          "4.     In approximately October or November 2005, an employee named Clifforine

11   Massey resigned from the Authority.  Massey asked to meet with me as part of her exit process.  She

12   thanked me for the opportunity to work at the Authority.  However, during the course of this

13   meeting, Massey raised plaintiff Jose Hernandez as an issue.  She said she did not want to complaint,

14   but she said that Hernandez is a dangerous person.  She also called him "unethical." Massey seemed

15   reluctant to expand and I did not press her for details at the time.  However, my impression was that

16   Massey was referring to ethical issues."

17     **Grounds for Objection 3**: Hearsay (as to the truth of the matter).

18   **Court's Ruling on Objection 3: Sustained _____  Overruled: _____**

19

20     **Objection 4:  Objection to ¶ 5** (Bowens declaration filed separately; ¶ 5 is on 2:14-19):

21          "5.     Within a short period of time after my meeting with Massey, another

22   employee named Jim Prentice independently approached me regarding concerns he had about

23   Hernandez taking favors and benefits from Authority vendors.  He specifically told me about free

24   airline tickets, Southwest Airlines drink tickets being handed out by Hernandez, gold outings with

25   vendors, and Hernandez' family trip to Hawaii, all of which Prentice believed that Hernandez had

26   received as a free benefit from Authority vendors."

27     **Grounds for Objection 4**: Hearsay (as to the truth of the matter).

28

ORDER ON PL'S OBJECTIONS TO EVIDENCE IN OPPOS. TO DEF SDCRAA'S MSJ OR SUMM. ADJUD.
- 2 -

**66-810**

1   **Court's Ruling on Objection 4: Sustained** _____   **Overruled:** _____ .

2

3   **Objection 5:  Objection to** ¶ 11 (Bowens declaration filed separately; ¶ 11 is on 3:13-14):

4   "11.   I am unaware of any employee at the Authority, other than Hernandez,

5   receiving the level of free benefits that Hernandez received from the Authority's vendors."

6   **Grounds for Objection 5:**  Vague and ambiguous as to "the level of.

7   **Court's Ruling on Objection 5: Sustained** _____   **Overruled:** _____

8

9   **OBJECTION TO Declaration of Patrick Swan dated 8/28/07**:

10   **Objection 6:  Objection to** ¶12 (Swan declaration filed separately; ¶ 12 is on 3:25-4:2):

11   "12.   As a result of Ms. Bowens' request for a written report, I drafted a 21-

12   page letter with attachments to Ms. Bowens Mr. Gamberzky also assisted me in drafting the written

13   report.  I am informed that a true and correct copy of that letter with attachments is attached as

14   Exhibit 4 to the Notice of Lodgment of Exhibits filed herewith.  I sent Exhibit 4 to Ms. Bowens via

15   messenger service on or about January 19, 2006."

16   **Grounds for Objection 6:**  Privacy privilege (based on unauthorized recording. Penal Code

17   § 632(d).

18   **Court's Ruling on Objection 6: Sustained** _____   **Overruled:** _____

19

20   **Objection 7:  Objection to** ¶ 13 (Swan declaration filed separately; ¶ 13 is on 4:3-5):

21   "13.   Exhibit 4 is an accurate report of my findings based on the interviews

22   and gathering of information that I did, as well as the interviews and information obtained by Mr.

23   Gamberzky that were communicated to me."

24   **Grounds for Objection 7:**   Privacy privilege (based on unauthorized recording.  Penal

25   Code § 632(d).

26   **Court's Ruling on Objection 7: Sustained** _____   **Overruled:** _____

27

28

**Objection 8:   Objection to ¶ 14 (Swan declaration filed separately; ¶ 14 is on 4:6-14):**

"14.    I concluded, as a result of our investigation into Mr. Hernandez' receipt of benefits, that there was sufficient evidence that Mr. Hernandez had accepted benefits from Authority vendors and contractors from 2003 through January 2006. I also concluded that there was sufficient evidence that Mr. Hernandez had violated Section 2.10 of the Authority's Ethics Code by virtue of accepting benefits from the Authority's vendors in an amount that exceeded more than one-half the amount of gifts permitted under the California Political Reform Act in any calendar year from a single source knowing that the source is doing business with the Authority.  In 2003 and 2004, the California Political Reform Act permitted gifts of $340, and in 2005, it permitted gifts of $360."

**Grounds for Objection 8:** Improper opinion (Swan not designated "expert); opinions otherwise improper as to matters of law; lack foundation.

**Court's Ruling on Objection 8: Sustained _____    Overruled: _____**

**Objection 9:   Objection to ¶ 15 (Swan declaration filed separately; ¶ 15 is on 4:15-21):**

"15.    Specifically, I concluded that in May 2004, Mr. Hernandez accepted four free round-trip tickets to Hawaii from Hawaiian Airlines, which he knew was doing business with the Authority.  While these tickets are non-revenue and may be of no value to Hawaiian Airlines, they had value to Mr. Hernandez who otherwise would have to pay for the airline travel. Based on information provided by Hawaiian Airlines, the estimated retail cost of each round trip travel would have been between $199 and $600 per ticket. Therefore, I concluded that the total value of the tickets was estimated to be between $796 and $2,400."

**Grounds for Objection 9:**  Improper opinion (Swan not designated "expert); opinions otherwise improper as to matters of law; lack foundation.

**Court's Ruling on Objection 9: Sustained _____    Overruled: _____**

///

///

66-812

1  **Objection 10:  Objection to ¶ 16** (Swan declaration filed separately; ¶ 16 is on 4:22-26):

2  "16.    I also concluded that in 2003, Mr. Hernandez accepted at least two,

3  and possibly four, free San Diego Charger-Oakland Raider football tickets from Ace Parking, the

4  total value of which is estimated to be between $470 and $940 based on the face value of the ticket.

5  I determined that Mr. Hernandez knew that Ace Parking was doing business with the Authority

6  through its ownership of our subcontract with Lindbergh Parking, Inc."

7  **Grounds for Objection 10:**  Improper opinion (Swan not designated "expert"); opinions

8  otherwise improper as to matters of law; lack foundation.

9  **Court's Ruling on Objection 10:  Sustained _____   Overruled: _____**

10

11  **Objection 11:  Objection to ¶ 17** (Swan declaration filed separately; ¶ 17 is on 4:27-28):

12  "17.    I also concluded that it was likely that the free airline tickets that Mr.

13  Hernandez admitted to receiving in 2004 from Southwest Airlines exceeded $170."

14  **Grounds for Objection 11:**  Improper opinion (Swan not designated "expert"); opinions

15  otherwise improper as to matters of law; lack foundation.

16  **Court's Ruling on Objection 11:  Sustained _____   Overruled: _____**

17

18  **Objection 12:  Objection to ¶ 18** (Swan declaration filed separately; ¶ 18 is on 5:1):

19  "18.    The remainder of my conclusions and findings are contained in Exhibit

20  4."

21  **Grounds for Objection 12:**  Improper opinion (Swan not designated "expert"); opinions

22  otherwise improper as to matters of law; lack foundation.

23  **Court's Ruling on Objection 12:  Sustained _____   Overruled: _____**

24

25  **OBJECTION TO Declaration of Brian Enarson dated 8/31/07:**

26  **Objection 13:  Objection to ¶ 3** (Enarson declaration filed separately; ¶ 3 is on 2:5-16):

27  "3.    I was a member of the negotiating team regarding the separation of the

28

ORDER ON PL'S OBJECTIONS TO EVIDENCE IN OPPOS. TO DEF SDCRAA'S MSJ OR SUMM. ADJUD.
- 5 -

66-813

1  Authority from the Port District. Part of the negotiations included the General Dynamics property,

2  which is adjacent to the San Diego International Airport. Negotiations regarding the lease of the

3  General Dynamics property began in approximately 2002. The monetary terms of the lease for

4  calendar years 2003, 2004 and 2005 are set by Public Utility Code section 170056(f)(1), and the

5  Authority complied with those terms and that statute. After the initial three years, the annual rent

6  was determined based on the fair market value of the property as of January 1, 2006, and the market

7  rate of return on that date. The Authority approved the current lease terms for the property at the

8  July 24, 2006 Board meeting. The current lease terms require the Authority to pay $6.75 million per

9  year for a term of 63 years. The amount of $6.75 million annually was reached through arms-length

10 negotiations with the Port. The Authority expects to develop the property and expects that the

11 annual revenues will exceed the annual lease amount over the course of the next 62 years."

12        **Grounds for Objection 13**: Improper opinion; legal conclusion; lack of foundation; hearsay.

13 **Court's Ruling on Objection 13: Sustained _____  Overruled: _____**

14

15        **Objection 14:  Objection to ¶ 4** (Enarson declaration filed separately; ¶ 4 is on 2:17-23):

16              "4.      I was also a member of the negotiation committee with regard to the

17 lease of the Teledyne Ryan property. We began negotiations on the Teledyne Ryan in approximately

18 late 2002, early 2003. The San Diego Unified Port District owns the Teledyne Ryan property and

19 leases it to the Authority. When the former tenant of that property, Allegheny, vacated the property

20 without notice, the Port filed a lawsuit against Allegheny for breach of the lease. After Allegheny

21 vacated the property without notice, the Port began preparing the property for use as a parking lot."

22        **Grounds for Objection 14**: Lacks foundation.

23 **Court's Ruling on Objection 14: Sustained _____  Overruled: _____**

24

25        **Objection 15:  Objection to ¶ 5** (Enarson declaration filed separately; ¶ 5 is on 2:24-27):

26              "5.      The Port failed to comply with CEQA before beginning their work on

27 the property for purposes of using it as a parking lot. As a result, the Authority filed a lawsuit

28

ORDER ON PL'S OBJECTIONS TO EVIDENCE IN OPPOS. TO DEF SDCRAA'S MSJ OR SUMM. ADJUD.
- 6 -

1  against the Port for their failure to comply with CEQA before beginning their parking lot project (the

2  "CEQA lawsuit")."

3       **Grounds for Objection 15**: Lacks foundation.

4  **Court's Ruling on Objection 15: Sustained** _____  **Overruled:** _____

5

6       **Objection16:  Objection to ¶ 8** (Enarson declaration filed separately; ¶ 8 is on 3:14-16):

7            "8.      The Authority has conducted various projections regarding the annual

8  revenue expected from the property once the contamination is cleaned up.  The Authority expects

9  that the annual revenue from the property will eventually far exceed the amount of the lease

10 payment."

11      **Grounds for Objection 16**:  Lacks foundation; calls for speculation.

12 **Court's Ruling on Objection 16: Sustained** _____  **Overruled:** _____

13

14      **Objection 17: Objection to ¶ 11** (Enarson declaration filed separately; ¶ 11 is on 3:25-4:2):

15           "11.     In 2000, the Authority decided to convert a Southwest Airlines' hold

16 room in Terminal One into concession space, which it leased to Host.  This decision resulted in an

17 addendum to the Authority's written agreement with Host to improve space in Terminal 1 into

18 additional concession space.  The Host agreement required that Host would have to approve any

19 additional space taken from Host after the improvements were made.  The amendment to the Host

20 agreement was approved by the Authority's Board."

21           **Grounds for Objection 17**:  Irrelevant.

22 **Court's Ruling on Objection 17: Sustained** _____  **Overruled:** _____

23

24      **Objection 18:  Objection to ¶ 12** (Enarson declaration filed separately; ¶ 12 is on 4:3-4):

25           "12.     I do not have any side deals with Host.  Any agreements that I have

26 entered into with Host have been memorialized in an approved and fully executed agreement."

27      **Grounds for Objection 18**:  Lacks foundation as to time.

28

ORDER ON PL'S OBJECTIONS TO EVIDENCE IN OPPOS. TO DEF SDCRAA'S MSJ OR SUMM. ADJUD.
- 7 -

66-815

1     **Court's Ruling on Objection 18: Sustained** _____ **Overruled:** _____

2

3     <u>**OBJECTION TO Declaration of James Prentice dated 8/28/07:**</u>

4        **Objection 19: Objection to ¶ 4** (Prentice declaration filed separately; ¶ 4 is on 2:11-17):

5             "4.      In particular, I told Ms. Bowens that I believed that Hernandez had

6 received free airline tickets to Phoenix and Las Vegas and a free golfing trip to Mexico from

7 Southwest Airlines. I also told Ms. Bowens that I had observed Hernandez walking up to, and

8 receiving free food from, various concessions run by Host at the Airport, including McDonald's,

9 Starbucks and La Salsa. I also told Bowens that Hernandez went to Florida for his brother's

10 birthday, but he tried to turn it into a business trip to talk to the Superbowl committee. It was my

11 belief that Hernandez had the Authority pay for Hernandez' hotel room for the entire trip to Florida."

12        **Grounds for Objection 19:** Lacks foundation.

13 **Court's Ruling on Objection 19: Sustained** _____ **Overruled:** _____

14

15        **Objection 20: Objection to ¶ 5** (Prentice declaration filed separately; ¶ 5 is on 2:18-21):

16             "5.      About one month after I spoke with Ms. Bowens, I was interviewed

17 by an investigator named Pat Swan regarding Hernandez. I told Mr. Swan about my suspicions that

18 Hernandez received the free benefits outlined in the preceding paragraph from the Authority's

19 vendors."

20        **Grounds for Objection 20:** Lacks foundation.

21 **Court's Ruling on Objection 20: Sustained** _____ **Overruled:** _____

22

23        **Objection 21: Objection to ¶ 6** (Prentice declaration filed separately; ¶ 6 is on 2:22-24):

24             "6.      In my discussions with both Ms. Bowens and Mr. Swan, I told the

25 truth regarding my observations of Hernandez and the information that I received from Hernandez

26 and other employees."

27        **Grounds for Objection 21:** Hearsay; lacks foundation.

28

ORDER ON PL'S OBJECTIONS TO EVIDENCE IN OPPOS. TO DEF SDCRAA'S MSJ OR SUMM. ADJUD.
- 8 -

66-816

1  **Court's Ruling on Objection 21: Sustained _____    Overruled: _____**

2

3      **Objection 22:  Objection to ¶ 7 (Prentice declaration filed separately; ¶ 7 is on 2:25-28):**

4          "7.    I am unaware that Hernandez had ever complained about the

5  Authority's alleged violations of the Americans with Disabilities Act with regard to the women's

6  restroom project in Terminal One.  I am also unaware of Hernandez complaining about any alleged

7  side deal between Host and Bryan Enarson, or about the women's restroom project being too

8  expensive."

9      **Grounds for Objection 22:** Lacks foundation.

10  **Court's Ruling on Objection 22: Sustained _____    Overruled: _____**

11

12      **Objection 23:  Objection to ¶ 8 (Prentice declaration filed separately; ¶ 8 is on 3:1-2):**

13          "8.    I am unaware that Hernandez ever disclosed any unlawful aspects

14  regarding the leases of the General Dynamics property or the Teledyne Ryan property leased by the

15  Authority."

16      **Grounds for Objection 23:** Lacks foundation.

17  **Court's Ruling on Objection 23: Sustained _____    Overruled: _____**

18

19      **Objection 24:  Objection to ¶ 9 (Prentice declaration filed separately; ¶ 9 is on 3:3-4):**

20          "9.    I am unaware that Hernandez  ever complained that Lindbergh

21  Parking, Inc. ("LPi") double-billed the Authority for workers' compensation or that LPi underbid

22  the Authority."

23      **Grounds for Objection 24:** Lacks foundation.

24  **Court's Ruling on Objection 24: Sustained _____    Overruled: _____**

25  ///

26  ///

27  ///

28

66-817

**OBJECTION TO Declaration of Theodore Sexton dated 8/31/07**:

    **Objection 25: Objection to ¶ 8** (Sexton declaration filed separately; ¶ 8 is on 2:20-24):

        "8.    During Hernandez' employment, I occasionally requested that Hernandez change airline tickets for certain Authority employees and board members whose travel plans had changed. Based on my personal experience, airlines routinely process requests for passenger itinerary changes and, consistent with their company guidelines, may or may not add fees to the ticket price."

    **Grounds for Objection 25:** Improper opinion; lacks foundation.

**Court's Ruling on Objection 25: Sustained _____ Overruled: _____**

**OBJECTION TO Declaration of John Gamberzky dated 8/31/07**;

    **Objection 26: Objection to ¶ 4** (Gamberzky declaration filed separately; ¶ 4 is on 1:13-18):

        "4.    After the first interview with Mr. Hernandez, Mr. Swan and I conducted an additional interview with Mr. Hernandez at his counsel's office on December 29, 2005. I also interviewed six other non-Authority employees, including Janet Nix from Hawaiian Airlines, Mike Parrish from Southwest Airlines, Tony Hueso from USA Cab, Dave Mueller from Ace Parking, Cheryl Black from Southwest Airlines and Kelly Pond from Image Concepts. I provided my notes from those interviews to Mr. Swan."

    **Grounds for Objection 26:** Privacy privilege (based on unauthorized recording). Penal Code § 632(d); calls for speculation.

**Court's Ruling on Objection 26: Sustained _____ Overruled: _____**

    **Objection 27: Objection to ¶ 5** (Gamberzky declaration filed separately; ¶ 5 is on 1:19-21):

        "5.    I obtained documents from Tony Hueso regarding car repairs that USA Cab performed on Mr. Hernandez' vehicles. I did not require or pressure Mr. Hueso to provide those documents to me."

    **Grounds for Objection 27:** Privacy privilege.

66-818

1   Court's Ruling on Objection 27: Sustained _____   Overruled: _____

2

3   **OBJECTION TO Defendant's Exhibit 4 (Swan's 1/19/06 letter):**

4       **Objection 28:  Objection the entirety of Exhibit 4.**

5       **Grounds for Objection 28:**  Hearsay (as to the truth of the matter); improper opinion (Swan

6   not identified as an expert); lacks foundation; privacy privilege (derived from unauthorized recording

7   - Penal Code § 632(d)); calls for speculation.

8   Court's Ruling on Objection 28: Sustained _____   Overruled: _____

9

10  **OBJECTION TO Defendant's Exhibit 6 (Burchyett's 9/5/06 report):**

11      **Objection 29:  Objection the entirety of Exhibit 6.**

12      **Grounds for Objection 29:**  Hearsay (as to the truth of the matter); improper opinion

13  (Burchyett not identified as an expert); lacks foundation (Burchyett's status as auditor does not

14  qualify him to investigate employment matters); calls for speculation.

15  Court's Ruling on Objection 29: Sustained _____   Overruled: _____

16

17  DATED:
                                          _____
18                                        HON. RICHARD E. STRAUSS
                                          JUDGE OF THE SUPERIOR COURT
19

20

21

22

23

24

25

26

27

28

**66-819**

1  | Cathryn Chinn, Esq. (State Bar 93340)
   | 1901 First Avenue, Suite 400
2  | San Diego, California 92101
   | Telephone (619) 234-9000
3  | Facsimile (619) 699-1159

4

5  | Attorney for Plaintiff
   | JOSE HERNANDEZ
6

7

8  | **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9  | **COUNTY OF SAN DIEGO, CENTRAL BRANCH, GENERAL UNLIMITED**

10 | JOSE HERNANDEZ,                            Case No. : GIC 871979

11 |                   Plaintiff,              PLAINTIFF'S ASSOCIATION OF COUNSEL

12 | v.

13 | SAN DIEGO COUNTY REGIONAL
   | AIRPORT AUTHORITY, a public entity
14 | and DOES 1 through 12, Inclusive,

15 |                   Defendants.

16

17

18

19

20 |         Cathryn Chinn, attorney of record for Plaintiff JOSE HERNANDEZ, hereby associates Peter

21 | G. Friesen, Esq., as co-counsel for Plaintiff in the above-entitled matter.  Co-counsel's address is as

22 | follows:

23 | ///

24 | ///

25 | ///

26 | ///

27 | ///

28

ASSOCIATION OF COUNSEL

**67-820**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Peter G. Friesen (State Bar No. 107631)
1901 First Avenue, Suite 400
San Diego, CA 92101
Telephone (619) 234-9000
Facsimile (619) 699-1159

Dated:  November 5, 2007

CATHRYN CHINN, Attorney for
Plaintiff JOSE HERNANDEZ

Peter G. Friesen hereby accepts the above association.

Dated:  November 5, 2007

PETER G. FRIESEN, ESQ., Co-Counsel for
Plaintiff JOSE HERNANDEZ

ASSOCIATION OF COUNSEL

- 2 -

67-821

BLUEBIRD (888) 477-0700
OFFICE SUPPLIES www.bluebirdonline.com

**EXHIBIT 68**