1  FRED M. PLEVIN (SBN 126185)
   SANDRA L. MCDONOUGH (SBN 193308)
2  ALBERT R. LIMBERG (SBN 211110)
   **PAUL, PLEVIN, SULLIVAN & CONNAUGHTON** LLP
3  401 B Street, Tenth Floor
   San Diego, California 92101-4232
4  Telephone: 619-237-5200
   Facsimile: 619-615-0700
5
6  AMY S. GONZALEZ (SBN 181745)
   **SAN DIEGO COUNTY REGIONAL AIRPORT**
   **AUTHORITY**
7  3225 N. Harbor Drive
   San Diego, CA 92138
8  Telephone: (619) 400-2425
   Facsimile: (619) 400-2428
9
10 Attorneys for Defendant
   SAN DIEGO COUNTY REGIONAL AIRPORT
11 AUTHORITY
12
                SUPERIOR COURT OF THE STATE OF CALIFORNIA
13
                        COUNTY OF SAN DIEGO
14
15 JOSE HERNANDEZ,                          CASE NO. GIC871979

16          Plaintiff,                      **DEFENDANT SAN DIEGO COUNTY**
                                            **REGIONAL AIRPORT AUTHORITY'S**
17     v.                                   **CONCORDANCE IN SUPPORT OF**
                                            **MOTION FOR SUMMARY JUDGMENT OR,**
                                            **IN THE ALTERNATIVE, SUMMARY**
18 SAN DIEGO COUNTY REGIONAL                **ADJUDICATION**
   AIRPORT AUTHORITY, a public entity;
19 and DOES 1 through 12, inclusive,

20          Defendants.                     Date:          November 16, 2007
                                            Time:          1:30 p.m.
21                                          Dept:          75
                                            Judge:         Hon. Richard E. Strauss
22                                          Complaint Filed: September 1, 2006
                                            Trial Date:    January 4, 2008
23
                                            **EXEMPT FROM FEES**
24                                          **GOVT. CODE § 6103**

25     TO PLAINTIFF JOSE HERNANDEZ AND HIS ATTORNEYS OF RECORD:

26 Defendant San Diego County Regional Airport Authority (hereinafter referred to as "the

27 Authority") submits the following concordance and supporting evidence in support of its Motion

28 for Summary Judgment as to plaintiff Jose Hernandez' Second Amended Complaint:

PAUL, PLEVIN,    CONCORDANCE IN SUPPORT OF SUMMARY          1
SULLIVAN &       JUDGMENT MOTION
CONNAUGHTON LLP

| UNDISPUTED MATERIAL FACT | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE | REPLY |
|---|---|---|
| 1. Jose Hernandez became the Director of Landside Operations for defendant San Diego County Regional Airport Authority (the "Authority") on or about October 2003.<br><br>Hernandez Depo. 93:16-25 and 114:25-115:14 [Exh. I]. Exhibit 16. | Not disputed. | This fact remains undisputed. |
| 2. Article 2, Part 2.0, Section 2.10(b) of the Authority's Ethics Code provides in part:<br><br>Restrictions on Benefits<br><br>(1) No Board member or employee of the Authority shall request a benefit from any person or entity or accept any benefit intended to influence official duties.<br><br>(2) No Board member or employee of the Authority shall accept anything of value from anyone, other than the Authority or another Board member or employee, for doing his or her job.<br><br>(3) No Board member or employee of the Authority shall accept benefits aggregating more than one-half (1/2) the amount of gifts permitted under the California Political Reform Act in any calendar year from any single source: | Not disputed. | This fact remains undisputed. |

1

CONCORDANCE IN SUPPORT OF SUMMARY JUDGMENT MOTION

|  |  |
| --- | --- |
| (A)   That the Board member or employee knows or should know is doing business with the Authority or intends to do business with the Authority or has done business with the Authority during the previous 12 months; or<br><br>(B)   That the Board member or employee knows or should know has or is seeking a license, permit, grant or benefit from the Authority; or<br><br>(C)   That the Board member or employee knows or should know is an agent (whether compensated or not) of any person or entity described in Subsections (A) or (B)<br><br>Exhibit 3, pp. 12-13. |  |
| 3.   In approximately October or November 2005, two Authority employees advised Thella Bowens that they believed that Hernandez was behaving unethically and receiving benefits from the Authority's vendors.<br><br>Bowens Dec. p. 2, lines 7-19 (hereinafter noted as "Page:Line Numbers") | Disputed.[1]<br><br>This fact remains undisputed because Hernandez has not provided any evidence to dispute this fact. |

[1] Hernandez has failed to abide by California Rule of Court by citing to the evidence that supports his position that this fact is disputed.  (Cal. Rules of Court, rule 3.1350(f).)  As to other facts that are allegedly "disputed" herein, Hernandez has failed to cite to the page and line numbers of the alleged evidence to support his position as required by the California Rules of Court, rule 3.1350(f).

CONCORDANCE IN SUPPORT OF SUMMARY JUDGMENT MOTION

2

| | | |
|---|---|---|
| 4. In November 2005, Bowens asked the Authority's Vice President of Administration, Jeffrey Woodson, to have an outside investigator conduct an investigation into the allegations that Hernandez had received benefits from the Authority's vendors.<br><br>Woodson Dec. 2:5-8; Bowens Dec. 2:20-22 | Not disputed. | This fact remains undisputed. |
| 5. Woodson approved the retention of Luce, Forward, Hamilton & Scripps ("Luce Forward") to conduct an investigation into the allegations made regarding Hernandez receiving benefits from the Authority's vendors.<br><br>Swan Dec. 2:9-12; Woodson Dec. 2:9-13 | Not disputed. | This fact remains undisputed. |
| 6. Edward Patrick Swan, Jr. of Luce Forward conducted an investigation, with assistance from John Gamberzky, regarding the allegations that Hernandez received benefits from the Authority's vendors.<br><br>Swan Dec. 3:1-10. | Not disputed. | This fact remains undisputed. |
| 7. Hernandez admits that he received four non-revenue tickets from Hawaiian Airlines in 2004, and that he knew Hawaiian Airlines was doing business with the Authority at the time he received the tickets. | Disputed. He received the tickets from Janet Nix, in her capacity as a personal friend. Decl. J. Hernandez par. 11; Decl. J. Nix par. 11. | This fact remains undisputed. The tickets were for a flight on Hawaiian Airlines, and Janet Nix was an employee of Hawaiian Airlines at the time that she gave the tickets to Hernandez. (Nix Dec. ¶2, p. 1:19-20; Hernandez Depo. 687:24-688:17 [Exh. 2].) The alleged fact that Nix was a friend when she gave the tickets to |

70-914

| | | |
|---|---|---|
| Swan Dec. 3:11-12; Hernandez Depo. 198:8-200:17 and 280:1-14 [Exh. I] | | Hernandez is immaterial, and does not contradict the fact that Hernandez received Hawaiian Airlines tickets. |
| 8. Hernandez admits that he received at least two buddy passes from Southwest Airlines in 2004 for his children, and that he knew Southwest Airlines was doing business with the Authority at the time he received the tickets.<br><br>Hernandez Depo. 191:8-20 and 281:6-12 [Exh. I]. | Disputed. He received the tickets from Mike Parrish, in his capacity as a personal friend. Decl. J. Hernandez par. 9-10; Decl. M. Parrish par. 2-3. | This fact remains undisputed. The tickets were for a flight on Southwest Airlines, and Mike Parrish was an employee of Southwest Airlines at the time that he gave the tickets to Hernandez. (Hernandez Depo. 194:10-12 [Exh. 2]; Parrish Dec. ¶1, p. 1, lines 21-22.) The alleged fact that Parrish was a friend when he gave the tickets to Hernandez is immaterial, and does not contradict the fact that Hernandez received Southwest Airlines tickets. Even Hernandez admits in his deposition that he received buddy passes *from* Southwest Airlines. (Hernandez Depo. 191:8-11 [Exh. 2].) |
| 9. Mr. Swan concluded in his investigation that there was sufficient evidence that Hernandez had accepted benefits from Authority vendors and contractors. He also concluded that there was sufficient evidence that Hernandez had violated Section 2.10 of the Authority's Ethics Code.<br><br>Swan Dec. 4:6-14; Exhibit 4, pp. 2 and 20-21; Exh. 3, pp. 12-13. | Not disputed subject to Objection. Improper Opinion (See Objection nos. 8-12) | This fact remains undisputed. |
| 10. Mr. Swan prepared a written report of his findings and sent them to Thella Bowens on or about January 19, 2006.<br><br>Swan Dec. 3:25-4:2; Exhibit 4 | Not disputed. | This fact remains undisputed. |

70-915

| UNDISPUTED MATERIAL FACT | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE | REPLY |
|---|---|---|
| 11. After reviewing the findings contained in Mr. Swan's January 19, 2006 report, and upon the recommendation of Jeffrey Woodson and the Authority's Director of Human Resources, Diane Richards, Bowens determined that Hernandez' employment should be terminated because it appeared that he had accepted benefits in violation of Section 2.10 of the Authority's Ethics Code.<br><br>Bowens Dec. 3:1-10; Exh. 3, pp. 12-13 [Ethics Code]; Woodson Dec. 2:25-3:4 | Disputed.  Decl. J. Hernandez in its entirety; Decl. J. Nix inits entirety; Decl. M. Parrish in its entirety. | This fact remains undisputed.  Hernandez has not disputed that Bowens made a determination as to Hernandez' termination after reviewing the findings contained in Mr. Swan's report. |
| 12. Hernandez alleges that he was advised to keep the investigation confidential.<br><br>Hernandez 840:12-15 [Exh. 2]; Second Amended Complaint p. 11, lines 26-28. | Not disputed. | This fact remains undisputed. |

In the alternative, the Authority submits the following Separate Statement of Undisputed Material Facts in Support of Its Motion for Summary Adjudication in regards to each cause of action and claim in plaintiff Jose Hernandez' Second Amended Complaint:

**Adjudication No. 1:** Hernandez' First Cause of Action fails as a matter of law because the Authority's Codes are not a Federal or State law, rule or regulation.

| UNDISPUTED MATERIAL FACT | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE | REPLY |
|---|---|---|
| 13. The Second Amended Complaint alleges that Hernandez disclosed violations of the Authority's Codes. | Not disputed. | This fact remains undisputed. |

70-916

Second Amended Complaint 7:26-27; 8:17-19; 9:7-8; 10:11-14

| UNDISPUTED MATERIAL FACT | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE | REPLY |
|---|---|---|
| 14. The Authority's Code contains administrative, regulatory and revenue ordinances of the San Diego County Regional Airport Authority. Exhibit 7 [Section 1.01 (a)] of the Authority's code | Not disputed. | This fact remains undisputed. |
| 15. The Authority is a local government entity. Public Utilities Code section 170002 | Not disputed. | This fact remains undisputed. |

**Adjudication No. 2:** Hernandez' First Cause of Action fails as a matter of law because Hernandez could not have had a reasonable belief that he was disclosing activity made unlawful by a federal or state law, rule or regulation.

| UNDISPUTED MATERIAL FACT | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE | REPLY |
|---|---|---|
| 16. Hernandez alleges that he disclosed that the Authority overpaid for the General Dynamics Lease.[2] Hernandez Depo. 393:6-17 [Exh. 1]. | Not disputed. | This fact remains undisputed. |
| 17. The terms of the General Dynamics Lease | Disputed. The statute leaves terms undecided | It remains undisputed that the terms of the |

[2] The Authority does not admit that Hernandez made any disclosures, or that he engaged in any protected activities. However, for purposes of this motion only, the Authority will not dispute the content of Hernandez' alleged disclosures as set forth in any admissible evidence contained in Hernandez' deposition.

CONCORDANCE IN SUPPORT OF SUMMARY JUDGMENT MOTION

70-917

| UNDISPUTED MATERIAL FACT | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE | REPLY |
|---|---|---|
| are set by statute.<br><br>See Public Utilities Code section 170056(f)(1); Hernandez Depo. 391:14-392:24 and 397:8-11 [Exh. 1]. | following January 2006.  PUC section 170056(f)(1)-(3). | General Dynamics Lease are set by statute. The statute itself states how the monetary portion of the lease will be determined following January 2006.  PUC § 170056(f). |
| 18. Hernandez alleges that he disclosed that the Authority overpaid for the Teledyne Ryan lease.<br><br>Hernandez Depo. 410:3-11 and 408:3-25 [Exh. 1]. | Not disputed. | This fact remains undisputed. |
| 19. Hernandez alleges that he disclosed that unless the Authority received space from Host, it would not be able to comply with the ADA regulations on the restroom project, and thus the project was held up.<br><br>Hernandez Depo. 343:16-344:4 and 357:10-358:6 [Exh. 1] | Not disputed. | This fact remains undisputed. |
| 20. Hernandez alleges that he disclosed that LPi underbid the Authority and that LPi double-billed workers' compensation.<br><br>Hernandez Depo. 521:3-20 [Exh. 1] | Not disputed. | This fact remains undisputed. |

**Adjudication No. 3:  Hernandez' First Cause of Action fails as a matter of law because there is no causal connection between Hernandez' alleged protected activities and his termination because the disclosures were too remote in time.**

CONCORDANCE IN SUPPORT OF SUMMARY JUDGMENT MOTION

7

70-918

| | | | |
|---|---|---|---|
| 21. Hernandez first made the disclosure regarding the restroom project in 2003 or 2004.<br><br>Hernandez Depo. 357:19-24 [Exh. 1]. | Not disputed. | | This fact remains undisputed. |
| 22. Hernandez first made the disclosure regarding the General Dynamics Lease in approximately 2003.<br><br>Hernandez 393:1-24 [made the disclosure prior to the ratification of the lease]; Hernandez 396:9-16 [original discussions were as the terms of the agreement were being discussed with the Port]; Hernandez 386:18-22 [General Dynamics' lease was negotiated around the time that the Authority split from the Port] | Not disputed. | | This fact remains undisputed. |
| 23. Hernandez first made the disclosure regarding the Teledyne Ryan Lease in late 2003 or 2004.<br><br>Hernandez 410:3-16 [Hernandez disclosed to Sexton immediately as they began to make the designs for the SAN Park project]; Hernandez 408:3-14 [developed the design documents for the SAN Park project in late 2003 or 2004] | Not disputed. | | This fact remains undisputed. |
| 24. Hernandez first made the disclosure regarding LPI's expenses in 2004.<br><br>Hernandez 493:24-495:15 [Hernandez made his first disclosure at the three-month or six-month submittal]; Sexton | Not disputed. | | This fact remains undisputed. |

8

70-919

| | | This fact remains undisputed. |

| | | This fact remains undisputed. |

**Adjudication No. 4:** Hernandez' First Cause of Action fails as a matter of law because there is no causal connection between Hernandez' alleged protected activities and his termination because the decisionmaker was not aware of the protected activities.

| UNDISPUTED MATERIAL FACT | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE | REPLY |
|---|---|---|
| Dec. 3:15-17 [the LPi contract began in January 2004] | | |
| 25. The investigation into alleged benefits received by Hernandez began in approximately November 2005.<br><br>Bowens Dec. 2:7-22; Woodson Dec. 2:5-8. | Not disputed. | This fact remains undisputed. |
| 26. Hernandez' employment with the Authority ended in February 2006.<br><br>Hernandez Depo. 114:19-24 [Exh. 1]. | Not disputed. | This fact remains undisputed. |
| 27. Thella Bowens made the decision to terminate Hernandez' employment.<br><br>Bowens Dec. 3:1-10 | Not disputed to the extend *[sic]* that she is included among others who contributed to the decision. | This fact remains undisputed. |
| 28. Bowens was unaware of any of Hernandez' alleged protected activities.<br><br>Bowens Dec. 3:18-4:8 | Disputed. Decl. J. Hernandez ¶ 4; Decl. J. Hernandez ¶ 5; Decl. J. Hernandez ¶ 7. | Objection. It is improper to create a triable issue of fact by disputing prior testimony. *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 21-22 [where "there is a clear and unequivocal admission by the plaintiff ... in his deposition ... [the trial court is] forced to conclude there is no substantial evidence of the existence of a triable issue of fact [notwithstanding a contradictory |

70-920

declaration in opposition to summary judgment.]"

Hernandez admitted in his deposition that he only complained to Ted Sexton and a handful of others (Hernandez Depo. 354:6-8 [Hernandez complained to Ted Sexton regarding the restroom project]; 394:10-16; 397:22-398:9 [Hernandez only told Ted Sexton about the General Dynamics lease]; 410:3-413:18 [Hernandez only told Sexton and the Teledyne Task Force about the Teledyne Ryan property]; 493:24-494:8; 498:25-499:11 [Hernandez only told Ted Sexton about LPI]; 501:3-8 [Hernandez told Sexton about double billing]; 503:5-504:6 [the only other person that Hernandez told about the double billing was Andrew McIntyre]; 522:4-523:5; 644:9-16). He further stated that although Thella Bowens had an open door policy, he would never go to her office and utilize the open door policy. (Hernandez Depo. 644:3-8.)

The above deposition testimony flatly contradicts Hernandez' declaration and thus Hernandez cannot create a triable issue of fac on this issue.

**Adjudication No. 5:** Hernandez' First Cause of Action fails as a matter of law because the Authority had a legitimate non-retaliatory business reason for terminating Hernandez' employment.

| UNDISPUTED MATERIAL FACT | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE | REPLY |
|---|---|---|

| | | |
|---|---|---|
| 29. Jose Hernandez became the Director of Landside Operations for defendant San Diego County Regional Airport Authority (the "Authority") on or about October 2003.<br><br>Hernandez Depo. 93:16-25 and 114:25-115:14 [Exh. 1]. Exhibit 16. | Not disputed. | This fact remains undisputed. |
| 30. Article 2, Part 2.0, Section 2.10(b) of the Authority's Ethics Code provides in part:<br><br>Restrictions on Benefits<br><br>(1) No Board member or employee of the Authority shall request a benefit from any person or entity or accept any benefit intended to influence official duties.<br><br>(2) No Board member or employee of the Authority shall accept anything of value from anyone, other than the Authority or another Board member or employee, for doing his or her job.<br><br>(3) No Board member or employee of the Authority shall accept benefits aggregating more than one-half (1/2) the amount of gifts permitted under the California Political Reform Act in any calendar year from any single source:<br><br>(A)    That the Board member or employee knows or should know is doing business with the Authority or intends to do business with the | Not disputed. | This fact remains undisputed |

| | | |
|---|---|---|
| Authority or has done business with the Authority during the previous 12 months; or<br><br>(B)    That the Board member or employee knows or should know has or is seeking a license, permit, grant or benefit from the Authority; or<br><br>(C)    That the Board member or employee knows or should know is an agent (whether compensated or not) of any person or entity described in Subsections (A) or (B)<br><br>Exhibit 3, pp. 12-13. | | |
| 31. In approximately October or November 2005, two Authority employees advised Thella Bowens that they believed that Hernandez was behaving unethically and receiving benefits from the Authority's vendors.<br><br>Bowens Dec. p. 2, lines 7-19 | Disputed. | This fact remains undisputed because Hernandez has not provided any evidence to dispute this fact. |
| 32. In November 2005, Bowens asked the Authority's Vice President of Administration, Jeffrey Woodson, to have an outside investigator conduct an investigation into the allegations that Hernandez had received benefits from the Authority's vendors.<br><br>Woodson Dec. 2:5-8; Bowens Dec. 2:20-22 | Not disputed. | This fact remains undisputed. |

CONCORDANCE IN SUPPORT OF SUMMARY JUDGMENT MOTION

70-923

| | | |
|---|---|---|
| 33. Woodson approved the retention of Luce, Forward, Hamilton & Scripps ("Luce Forward") to conduct an investigation into the allegations made regarding Hernandez receiving benefits from the Authority's vendors.<br><br>Swan Dec. 2:9-12; Woodson Dec. 2:9-13 | Not disputed. | This fact remains undisputed. |
| 34. Edward Patrick Swan, Jr. of Luce Forward conducted an investigation, with assistance from John Gamberzky, regarding the allegations that Hernandez received benefits from the Authority's vendors.<br><br>Swan Dec. 3:1-10. | Not disputed. | This fact remains undisputed |
| 35. Hernandez admits that he received four non-revenue tickets from Hawaiian Airlines in 2004, and that he knew Hawaiian Airlines was doing business with the Authority at the time he received the tickets.<br><br>Swan Dec. 3:11-12; Hernandez Depo. 198:8-200:17 and 280:1-14 [Exh. 1] | Disputed. He received the tickets from Janet Nix, in her capacity as a personal friend. Decl. J. Hernandez par. 11; Decl. J. Nix par. 11. | This fact remains undisputed. The tickets were for a flight on Hawaiian Airlines, and Janet Nix was an employee of Hawaiian Airlines at the time she gave the tickets to Hernandez. (Nix Dec. ¶2, p. 1:19-20; Hernandez Depo. 687:24-688:17 [Exh. 2].) The alleged fact that Nix was a friend when she gave the tickets to Hernandez is immaterial, and does not contradict the fact that Hernandez received Hawaiian Airlines tickets. |
| 36. Hernandez admits that he received at least two buddy passes from Southwest Airlines in 2004 for his children, and that he knew Southwest Airlines was doing business with the Authority at the time he received the tickets. | Disputed. He received the tickets from Mike Parrish, in his capacity as a personal friend. Decl. J. Hernandez par. 9-10; Decl. M. Parrish par. 2-3. | This fact remains undisputed. The tickets were for a flight on Southwest Airlines, and Mike Parrish was an employee of Southwest Airlines at the time that he gave the tickets to Hernandez. (Hernandez Depo. 194:10-12 [Exh. 2]; Parrish Dec. ¶ 1, p. 1, lines 21-22.) The alleged fact that Parrish was a friend when |

70-924

| | | |
|---|---|---|
| Hernandez Depo. 191:8-20 and 281:6-12 [Exh. 1]. | he gave the tickets to Hernandez is immaterial, and does not contradict the fact that Hernandez received Southwest Airlines tickets. Even Hernandez admits in his deposition that he received buddy passes *from* Southwest Airlines. (Hernandez Depo. 191:8-11 [Exh. 2].) | This fact remains undisputed. |
| 37. Mr. Swan concluded in his investigation that there was sufficient evidence that Hernandez had accepted benefits from Authority vendors and contractors. He also concluded that there was sufficient evidence that Hernandez had violated Section 2.10 of the Authority's Ethics Code.<br><br>Swan Dec. 4:6-14; Exhibit 4, pp. 2 and 20-21; Exh. 3, pp. 12-13. | Not disputed subject to Objection. Improper Opinion (See Objection nos. 8-12) | |
| 38. Mr. Swan prepared a written report of his findings and sent them to Thella Bowens on or about January 19, 2006.<br><br>Swan Dec. 3:25-4:2; Exhibit 4 | Not disputed. | This fact remains undisputed |
| 39. After reviewing the findings contained in Mr. Swan's January 19, 2006 report, and upon the recommendation of Jeffrey Woodson and the Authority's Director of Human Resources, Diane Richards, Bowens determined that Hernandez' employment should be terminated because it appeared that he had accepted benefits in violation of Section 2.10 of the Authority's Ethics Code. | Disputed. Decl. J. Hernandez in its entirety; Decl. J. Nix in its entirety; Decl. M. Parrish in its entirety. | This fact remains undisputed. Hernandez has not disputed that Bowens made a determination as to Hernandez' termination after reviewing the findings contained in Mr. Swan's report. |

70-925

| Bowens Dec. 3:1-10; Exh. 3, pp. 12-13 [Ethics Code]; Woodson Dec. 2:25-3:4 | | |
|---|---|---|

**Adjudication No. 6: Hernandez' First Cause of Action fails as a matter of law because he has no evidence of pretext.**

| UNDISPUTED MATERIAL FACT | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE | REPLY |
|---|---|---|
| 40. Jose Hernandez became the Director of Landside Operations for defendant San Diego County Regional Airport Authority (the "Authority") on or about October 2003.<br><br>Hernandez Depo. 93:16-25 and 114:25-115:14 [Exh. 1]. Exhibit 16. | Not disputed. | This fact remains undisputed |
| 41. Article 2, Part 2.0, Section 2.10(b) of the Authority's Ethics Code provides in part:<br><br>**Restrictions on Benefits**<br><br>(1) No Board member or employee of the Authority shall request a benefit from any person or entity or accept any benefit intended to influence official duties.<br><br>(2) No Board member or employee of the Authority shall accept anything of value from anyone, other than the Authority or another Board member or employee, for doing his or her job.<br><br>(3) No Board member or employee of the | Not disputed. | This fact remains undisputed |

CONCORDANCE IN SUPPORT OF SUMMARY JUDGMENT MOTION

70-926

| | | |
|---|---|---|
| Authority shall accept benefits aggregating more than one-half (1/2) the amount of gifts permitted under the California Political Reform Act in any calendar year from any single source:<br><br>(A)    That the Board member or employee knows or should know is doing business with the Authority or intends to do business with the Authority or has done business with the Authority during the previous 12 months; or<br><br>(B)    That the Board member or employee knows or should know has or is seeking a license, permit, grant or benefit from the Authority; or<br><br>(C)    That the Board member or employee knows or should know is an agent (whether compensated or not) of any person or entity described in Subsections (A) or (B)<br><br>Exhibit 3, pp. 12-13. | | |
| 42. In approximately October or November 2005, two Authority employees advised Thella Bowens that they believed that Hernandez was behaving unethically and receiving benefits from the Authority's vendors.<br><br>Bowens Dec. p. 2, lines 7-19 (hereinafter noted as "Page:Line Numbers") | Not disputed. | This fact remains undisputed |

CONCORDANCE IN SUPPORT OF SUMMARY JUDGMENT MOTION

| | | |
|---|---|---|
| 43. In November 2005, Bowens asked the Authority's Vice President of Administration, Jeffrey Woodson, to have an outside investigator conduct an investigation into the allegations that Hernandez had received benefits from the Authority's vendors.<br><br>Woodson Dec. 2:5-8; Bowens Dec. 2:20-22 | Not disputed. | This fact remains undisputed |
| 44. Woodson approved the retention of Luce, Forward, Hamilton & Scripps ("Luce Forward") to conduct an investigation into the allegations made regarding Hernandez receiving benefits from the Authority's vendors.<br><br>Swan Dec. 2:9-12; Woodson Dec. 2:9-13 | Not disputed. | This fact remains undisputed |
| 45. Edward Patrick Swan, Jr. of Luce Forward conducted an investigation, with assistance from John Gamberzky, regarding the allegations that Hernandez received benefits from the Authority's vendors.<br><br>Swan Dec. 3:1-10. | Not disputed. | This fact remains undisputed |
| 46. Hernandez admits that he received four non-revenue tickets from Hawaiian Airlines in 2004, and that he knew Hawaiian Airlines was doing business with the Authority at the time he received the tickets. | Disputed. He received the tickets from Janet Nix, in her capacity as a personal friend. Decl. J. Hernandez par. 11; Decl. J. Nix par. 11. | This fact remains undisputed. The tickets were for a flight on Hawaiian Airlines, and Janet Nix was an employee of Hawaiian Airlines at the time that she gave the tickets to Hernandez. (Nix Dec. ¶2, p. 1:19-20; Hernandez Depo. 687:24-688:17 [Exh. 2].) The alleged fact that Nix was a friend when she gave the tickets to |

| | | |
|---|---|---|
| Swan Dec. 3:11-12; Hernandez Depo. 198:8-200:17 and 280:1-14 [Exh. 1] | | Hernandez is immaterial, and does not contradict the fact that Hernandez received Hawaiian Airlines tickets. |
| 47. Hernandez admits that he received at least two buddy passes from Southwest Airlines in 2004 for his children, and that he knew Southwest Airlines was doing business with the Authority at the time he received the tickets<br><br>Hernandez Depo. 191:8-20 and 281:6-12 [Exh. 1]. | Disputed. He received the tickets from Mike Parrish, in his capacity as a personal friend. Decl. J. Hernandez par. 9-10; Decl. M. Parrish par. 2-3. | This fact remains undisputed. The tickets were for a flight on Southwest Airlines, and Mike Parrish was an employee of Southwest Airlines at the time that he gave the tickets to Hernandez. (Hernandez Depo. 194:10-12 [Exh. 2]; Parrish Decl. ¶ 1, p. 1, lines 21-22.) The alleged fact that Parrish was a friend when he gave the tickets to Hernandez is immaterial, and does not contradict the fact that Hernandez received Southwest Airlines tickets. Even Hernandez admits in his deposition that he received buddy passes *from* Southwest Airlines. (Hernandez Depo. 191:8-11 [Exh. 2].) |
| 48. Mr. Swan concluded in his investigation that there was sufficient evidence that Hernandez had accepted benefits from Authority vendors and contractors. He also concluded that there was sufficient evidence that Hernandez had violated Section 2.10 of the Authority's Ethics Code.<br><br>Swan Dec. 4:6-14; Exhibit 4, pp. 2 and 20-21; Exh. 3, pp. 12-13. | Not disputed subject to Objection. Improper Opinion (See Objection nos. 8-12) | This fact remains undisputed. |
| 49. Mr. Swan prepared a written report of his findings and sent them to Thella Bowens on or about January 19, 2006.<br><br>Swan Dec. 3:25-4:2; Exhibit 4 | Not disputed. | This fact remains undisputed |

CONCORDANCE IN SUPPORT OF SUMMARY JUDGMENT MOTION

18

70-929

| UNDISPUTED MATERIAL FACT | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE | REPLY |
|---|---|---|
| 50. After reviewing the findings contained in Mr. Swan's January 19, 2006 report, and upon the recommendation of Jeffrey Woodson and the Authority's Director of Human Resources, Diane Richards, Bowens determined that Hernandez' employment should be terminated because it appeared that he had accepted benefits in violation of Section 2.10 of the Authority's Ethics Code.<br><br>Bowens Dec. 3:1-10; Exh. 3, pp. 12-13 [Ethics Code]; Woodson Dec. 2:25-3:4 | Disputed. Decl. J. Hernandez in its entirety; Decl. J. Nix in its entirety; Decl. M. Parrish in its entirety. | This fact remains undisputed. Hernandez has not disputed that Bowens made a determination as to Hernandez' termination after reviewing the findings contained in Mr. Swan's report. |

**Adjudication No. 7: Hernandez' First Cause of Action under Labor Code section 1102.5(a) fails as a matter of law because Hernandez has not identified a rule, regulation, or policy made, adopted or enforced by the Authority that prevents an employee from disclosing information to a governmental agency.**

| UNDISPUTED MATERIAL FACT | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE | REPLY |
|---|---|---|
| 51. Hernandez alleges that he was advised to keep the investigation confidential.<br><br>Hernandez 840:12-15 [Exh. 2]; Second Amended Complaint p. 11, lines 26-28. | Not disputed. | This fact remains undisputed |

**Adjudication No. 8: Hernandez' First Cause of Action under Labor Code section 1102.5(a) fails as a matter of law because any instructions regarding confidentiality were made to implement the protection of the attorney-client privilege (See Labor Code section 1102.5(g)).**

| UNDISPUTED MATERIAL FACT | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE | REPLY |
|---|---|---|
|  |  |  |

CONCORDANCE IN SUPPORT OF SUMMARY JUDGMENT MOTION

70-930

| | | REPLY |
|---|---|---|
| 52. Mr. Swan advised Hernandez that he should keep the interview confidential because the investigation was an attorney-client privileged investigation.<br><br>Swan 2:26-28. | Disputed to the extent that the attorney-client investigation is pretext to silence Hernandez in violation of section 1102.5(a) | This fact remains undisputed. |

**Adjudication No. 9: Hernandez' First Cause of Action fails as a matter of law under Labor Code section 1102.5(c) because Hernandez did not refuse to participate in any unlawful activity**

| UNDISPUTED MATERIAL FACT | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE | REPLY |
|---|---|---|
| 53. Hernandez did not refuse to participate in any activity because he thought it was unlawful or illegal.<br><br>Hernandez Depo. 891:5-15 [Exh. 1].) | Not disputed. | This fact remains undisputed |

**Adjudication No. 10: The Authority is immune from Hernandez' Labor Code section 1102.5 cause of action under Government Code section 821.6**

| UNDISPUTED MATERIAL FACT | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE | REPLY |
|---|---|---|
| 54. Hernandez alleges harm in his Second Amended Complaint arising out of the Authority's investigation of his activities and his resulting termination.<br><br>See Second Amended Complaint | Not disputed. | This fact remains undisputed |

CONCORDANCE IN SUPPORT OF SUMMARY JUDGMENT MOTION

20

| | | |
|---|---|---|
| generally, including paragraphs 23-30. | | |
| 55. In November 2005, Bowens asked the Authority's Vice President of Administration, Jeffrey Woodson, to have an outside investigator conduct an investigation into the allegations that Hernandez had received benefits from the Authority's vendors.<br><br>Woodson Dec. 2:5-8; Bowens Dec. 2:20-22. | Not disputed. | This fact remains undisputed |
| 56. Woodson approved the retention of Luce, Forward, Hamilton & Scripps ("Luce Forward") to conduct an investigation into the allegations made regarding Hernandez receiving benefits from the Authority's vendors.<br><br>Swan Dec. 2:9-12; Woodson Dec. 2:9-13 | Not disputed. | This fact remains undisputed |
| 57. Edward Patrick Swan, Jr. of Luce Forward conducted an investigation, with assistance from John Gamberzky, regarding the allegations that Hernandez received benefits from the Authority's vendors.<br><br>Swan Dec. 3:1-10. | Not disputed. | This fact remains undisputed |
| 58. Mr. Swan concluded in his investigation that there was sufficient evidence that Hernandez had accepted benefits from Authority vendors and contractors. He also concluded that there was sufficient evidence that Hernandez had violated | Not disputed subject to Objection. Improper Opinion (See Objection nos. 8-12) | This fact remains undisputed. |

CONCORDANCE IN SUPPORT OF SUMMARY JUDGMENT MOTION

70-932

| UNDISPUTED MATERIAL FACT | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE | REPLY |
|---|---|---|
| Section 2.10 of the Authority's Ethics Code. Swan Dec. 4:6-14; Exhibit 4, pp. 2 and 20-21; Exh. 3, pp. 12-13. | | |
| 59. Mr. Swan prepared a written report of his findings and sent them to Thella Bowens on or about January 19, 2006. Swan Dec. 3:25-4:2; Exhibit 4 | Not disputed. | This fact remains undisputed |
| 60. After reviewing the findings contained in Mr. Swan's January 19, 2006 report, and upon the recommendation of Jeffrey Woodson and the Authority's Director of Human Resources, Diane Richards, Bowens determined that Hernandez' employment should be terminated because it appeared that he had accepted benefits in violation of Section 2.10 of the Authority's Ethics Code. Bowens Dec. 3:1-10; Exh. 3, pp. 12-13 [Ethics Code]; Woodson Dec. 2:25-3:4 | Disputed. Decl. J. Hernandez in its entirety; Decl. J. Nix in its entirety; Decl. M. Parrish in its entirety. | This fact remains undisputed. Hernandez has not disputed that Bowens made a determination as to Hernandez' termination after reviewing the findings contained in Mr. Swan's report. |

**Adjudication No. 11:** This court lacks jurisdiction over Hernandez' Labor Code section 1102.5 cause of action because he failed to exhaust his administrative remedies under Labor Code sections 98.6 and 98.7

| UNDISPUTED MATERIAL FACT | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE | REPLY |
|---|---|---|
| 61. Hernandez has not alleged that he filed a claim with the Labor Commissioner. | Not disputed. | This fact remains undisputed |

CONCORDANCE IN SUPPORT OF SUMMARY JUDGMENT MOTION

70-933

See Second Amended Complaint.

## GENERAL DYNAMICS DISCLOSURE:[3]

**Adjudication No. 12:** Hernandez' First Cause of Action under Labor Code section 1102.5, insofar as it is based on any alleged disclosure regarding the General Dynamics' lease, fails as a matter of law because Hernandez could not have had a reasonable belief that the General Dynamics' lease was unlawful.

| UNDISPUTED MATERIAL FACT | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE | REPLY |
|---|---|---|
| 62. Hernandez alleges that he disclosed that the Authority overpaid for the General Dynamics Lease.<br><br>Hernandez Depo. 393:6-17 [Exh. 1]. | Not disputed. | This fact remains undisputed |
| 63. The terms of the General Dynamics Lease are set by statute.<br><br>See Public Utilities Code section 170056(f)(1); Hernandez Depo. 391:14-392:24 and 397:8-11 [Exh. 1]. | Disputed.  Some terms of the lease are left open by statute.  PUC 170056(f)(1)-(3) | It remains undisputed that the terms of the General Dynamics Lease are set by statute. The statute itself states how the monetary portion of the lease will be determined following January 2006.  PUC § 170056(f). |

---

[3] For summary adjudication purposes, separate allegedly wrongful acts give rise to separate causes of action - whether or not they are pleaded in the same or separate counts. (*Lilienthal & Fowler v. Superior Court* (1993) 12 Cal.App.4th 1848, 1854-1855.)  Accordingly, a motion may be made and granted on the separate allegations - even if the pleader has chosen to combine the claim with other counts within the same numbered cause of action. (*Ibid.*)  It is thus proper to adjudicate each of these "disclosures" separately.  If the court grants any one of Adjudications 1 through 6 or 10 through 11, then the Court does not need to address Adjudications 12-24, which simply seek to separately adjudicate each alleged protected activity.

CONCORDANCE IN SUPPORT OF SUMMARY JUDGMENT MOTION

23

70-934

**Adjudication No. 13:** Hernandez' First Cause of Action under Labor Code section 1102.5, insofar as it is based on any alleged disclosure regarding the General Dynamics' lease, fails as a matter of law because Hernandez has not identified a state or federal statute, rule or regulation of which he disclosed a violation.

| UNDISPUTED MATERIAL FACT | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE | REPLY |
|---|---|---|
| 64. Hernandez alleges that he disclosed that the Authority overpaid for the General Dynamics Lease.<br><br>Hernandez Depo. 393:6-17 [Exh. 1]. | Not disputed. | This fact remains undisputed |
| 65. The terms of the General Dynamics Lease are set by statute.<br><br>See Public Utilities Code section 170056(f)(1); Hernandez Depo. 391:14-392:24 and 397:8-11 [Exh. 1]. | Disputed. Some terms of the lease are left open by statute. PUC 170056(f)(1)-(3) | It remains undisputed that the terms of the General Dynamics Lease are set by statute. The statute itself states how the monetary portion of the lease will be determined following January 2006. PUC § 170056(f). |

**Adjudication No. 14:** Hernandez' First Cause of Action fails as matter of law, insofar as it is based on any alleged disclosure regarding the General Dynamics' lease, because there is no causal connection between his alleged protected activity and his termination.

| UNDISPUTED MATERIAL FACT | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE | REPLY |
|---|---|---|
| 66. Hernandez first made the disclosure regarding the General Dynamics Lease in approximately 2003.<br><br>Hernandez 393:1-24 [made the disclosure prior to the ratification of the lease]; | Not disputed. | This fact remains undisputed |

CONCORDANCE IN SUPPORT OF SUMMARY JUDGMENT MOTION

24

70-935

| UNDISPUTED MATERIAL FACT | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE | REPLY |
|---|---|---|
| Hernandez 396:9-16 [original discussions were as the terms of the agreement were being discussed with the Port]; Hernandez 386:18-22 [General Dynamics' lease was negotiated around the time that the Authority split from the Port] | | |
| 67. Hernandez' employment with the Authority ended in February 2006.<br><br>Hernandez Depo. 114:19-24 [Exh. 1]. | Not disputed. | This fact remains undisputed |
| 68. Thella Bowens made the decision to terminate Hernandez' employment.<br><br>Bowens Dec. 3:1-10 | Not disputed to the extend [sic] that she is included among others who contributed to the decision. | This fact remains undisputed |

## TELEDYNE RYAN DISCLOSURE:

**Adjudication No. 15:** Hernandez' First Cause of Action under Labor Code section 1102.5, insofar as it is based on any alleged disclosure regarding the Teledyne Ryan lease, fails as a matter of law because Hernandez could not have had a reasonable belief that the Teledyne Ryan lease was unlawful.

| UNDISPUTED MATERIAL FACT | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE | REPLY |
|---|---|---|
| 69. Hernandez alleges that he disclosed that the Authority overpaid for the Teledyne Ryan lease.<br><br>Hernandez Depo. 410:3-11 and 408:3-25 [Exh. 1]. | Not disputed. | This fact remains undisputed |

25

70-936

**Adjudication No. 16:** Hernandez' First Cause of Action under Labor Code section 1102.5, insofar as it is based on any alleged disclosure regarding the Teledyne Ryan lease, fails as a matter of law because Hernandez has not identified a state or federal statute, rule or regulation of which he disclosed a violation.

| UNDISPUTED MATERIAL FACT | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE | REPLY |
|---|---|---|
| 70. Hernandez alleges that he disclosed that the Authority overpaid for the Teledyne Ryan lease<br><br>Hernandez Depo. 410:3-11 and 408:3-25 [Exh. 1]. | Not disputed. | This fact remains undisputed |
| 71. The Authority's Code contains administrative, regulatory and revenue ordinances of the San Diego County Regional Airport Authority.<br><br>Exhibit 7 [Section 1.01 (a)] | Not disputed. | This fact remains undisputed |
| 72. The Authority is a local government entity.<br><br>Public Utilities Code section 170002 | Not disputed. | This fact remains undisputed |

26

CONCORDANCE IN SUPPORT OF SUMMARY JUDGMENT MOTION

**Adjudication No. 17:** Hernandez' First Cause of Action fails as matter of law, insofar as it is based on any alleged disclosure regarding the Teledyne Ryan lease, because there is no causal connection between his alleged protected activity and his termination.

| UNDISPUTED MATERIAL FACT | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE | REPLY |
|---|---|---|
| 73. At the time that the Authority entered into the lease on the Teledyne Ryan property, it was aware that there was contamination on the property.<br><br>Hernandez Depo. 406:4-24 [Exh. 1] | Not disputed. | This fact remains undisputed |
| 74. Hernandez did not speak to anyone regarding the contamination on the property until after the Authority entered into the lease with regard to the Teledyne Ryan property.<br><br>Hernandez Depo. 406:25-408:2 [Exh. 1] | Not disputed. | This fact remains undisputed |
| 75. Paul Manasjan also expressed dissatisfaction regarding the Teledyne Ryan Lease.<br><br>Hernandez Depo. 413:22-414:6 [Exh. 1] | Not disputed. | This fact remains undisputed |
| 76. Paul Manasjan is still employed at the Authority.<br><br>Woodson Dec. 3:19-20. | Not disputed. | This fact remains undisputed |
| 77. Hernandez first made the disclosure regarding the Teledyne Ryan Lease in late 2003 or 2004. | Not disputed. | This fact remains undisputed |

CONCORDANCE IN SUPPORT OF SUMMARY JUDGMENT MOTION

27

| | | |
|---|---|---|
| Hernandez 410:3-16 [Hernandez disclosed to Sexton immediately as they began to make the designs for the SAN Park project]; Hernandez 408:3-14 [developed the design documents for the SAN Park project in late 2003 or 2004] | | |
| 78. Hernandez' employment with the Authority ended in February 2006. Hernandez Depo. 114:19-24 [Exh. 1]. | Not disputed. | This fact remains undisputed |
| 79. Thella Bowens made the decision to terminate Hernandez' employment. Bowens Dec. 3:1-10 | Not disputed to the extend [sic] that she is included among others who contributed to the decision. | This fact remains undisputed |

**RESTROOM PROJECT DISCLOSURE:**

**Adjudication No. 18:** Hernandez' First Cause of Action under Labor Code section 1102.5, insofar as it is based on any alleged disclosure regarding the restroom project, fails as a matter of law because Hernandez could not have had a reasonable belief that the restroom project was unlawful.

| UNDISPUTED MATERIAL FACT | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE | REPLY |
|---|---|---|
| 80. Hernandez alleges that he disclosed that unless the Authority received space from Host, it would not be able to comply with the ADA regulations on the restroom project, and thus the project was held up. Hernandez Depo. 343:16-344:4 and | Not disputed. | This fact remains undisputed |

CONCORDANCE IN SUPPORT OF SUMMARY JUDGMENT MOTION

70-939

357:10-358:6 [Exh. 1]

**Adjudication No. 19:** Hernandez' First Cause of Action under Labor Code section 1102.5, insofar as it is based on any alleged disclosure regarding the restroom project, fails as a matter of law because Hernandez admits that the Authority did not violate the ADA, nor did it express its intention to violate the ADA.

| UNDISPUTED MATERIAL FACT | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE | | REPLY |
|---|---|---|---|
| 81. The Authority never indicated that it did not want to comply with the ADA, nor did the Authority at any time violate the ADA.<br><br>Hernandez 366:12-367:21; 371:15-372:22. | Not disputed. | | This fact remains undisputed |

**Adjudication No. 20:** Hernandez' First Cause of Action under Labor Code section 1102.5, insofar as it is based on any alleged disclosure regarding the restroom project, fails as a matter of law because Hernandez has not identified a state or federal statute, rule or regulation of which he disclosed a violation.

| UNDISPUTED MATERIAL FACT | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE | | REPLY |
|---|---|---|---|
| 82. Hernandez alleges that he disclosed that unless the Authority received space from Host, it would not be able to comply with the ADA regulations on the restroom project, and thus the project was held up.<br><br>Hernandez Depo. 343:16-344:4 and 357:10-358:6 [Exh. 1] | Not disputed. | | This fact remains undisputed |

29

CONCORDANCE IN SUPPORT OF SUMMARY JUDGMENT MOTION

| UNDISPUTED MATERIAL FACT | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE | REPLY |
|---|---|---|
| 83. The Authority's Code contains administrative, regulatory and revenue ordinances of the San Diego County Regional Airport Authority.<br><br>Exhibit 7 [Section 1.01 (a)] | Not disputed. | This fact remains undisputed |
| 84. The Authority is a local government entity.<br><br>Public Utilities Code section 170002 | Not disputed. | This fact remains undisputed |

**Adjudication No. 21:** Hernandez' First Cause of Action, insofar as it is based on any alleged disclosure regarding the restroom project, fails as matter of law because there is no causal connection between his alleged protected activity and his termination.

| UNDISPUTED MATERIAL FACT | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE | REPLY |
|---|---|---|
| 85. Hernandez first made the disclosure regarding the restroom project in 2003 or 2004.<br><br>Hernandez Depo. 357:19-24 [Exh. 1]. | Not disputed. | This fact remains undisputed |
| 86. Parsons first raised the issue regarding the necessity of taking the 30 square feet of space in 2002.<br><br>Hernandez Depo. 347:16-348:3 [Exh. 1] | Not disputed. | This fact remains undisputed |
| 87. The investigation into alleged benefits received by Hernandez began in approximately November 2005. | Not disputed. | This fact remains undisputed |

CONCORDANCE IN SUPPORT OF SUMMARY JUDGMENT MOTION

70-941

| | | |
|---|---|---|
| Bowens Dec. 2:7-22; Woodson Dec. 2:5-8. | | |
| 88. Hernandez' employment with the Authority ended in February 2006.<br><br>Hernandez Depo. 114:19-24 [Exh. 1]. | Not disputed. | This fact remains undisputed |
| 89. Thella Bowens made the decision to terminate Hernandez' employment.<br><br>Bowens Dec. 3:1-10 | Not disputed to the extend *[sic]* that she is included among others who contributed to the decision. | This fact remains undisputed |

### LPI DISCLOSURE

**Adjudication No. 22:  Hernandez' First Cause of Action under Labor Code section 1102.5, insofar as it is based on any alleged disclosure regarding LPI, fails as a matter of law because Hernandez could not have had a reasonable belief that he disclosed unlawful acts.**

| UNDISPUTED MATERIAL FACT | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE | REPLY |
|---|---|---|
| 90. Hernandez alleges that he disclosed that LPI underbid the Authority and that LPI double-billed workers' compensation.<br><br>Hernandez Depo. 521:3-20 [Exh. 1] | Not disputed. | This fact remains undisputed |

**Adjudication No. 23:  Hernandez' First Cause of Action under Labor Code section 1102.5, insofar as it is based on any alleged disclosure regarding LPI, fails as a matter of law because Hernandez has not identified a state or federal statute, rule or regulation of which he disclosed a violation.**

---

CONCORDANCE IN SUPPORT OF SUMMARY JUDGMENT MOTION

31

| UNDISPUTED MATERIAL FACT | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE | REPLY |
|---|---|---|
| 91. The Second Amended Complaint alleges that Hernandez disclosed violations of the Authority's Codes.<br><br>Second Amended Complaint 7:26-27; 8:17-19; 9:7-8; 10:11-14 | Not disputed. | This fact remains undisputed |
| 92. The Authority's Code contains administrative, regulatory and revenue ordinances of the San Diego County Regional Airport Authority.<br><br>Exhibit 7 [Section 1.01 (a)] | Not disputed. | This fact remains undisputed |
| 93. The Authority is a local government entity.<br><br>Public Utilities Code section 170002 | Not disputed. | This fact remains undisputed |

**Adjudication No. 24:**  Hernandez' First Cause of Action fails as matter of law, insofar as it is based on any alleged disclosure regarding LPI, because there is no causal connection between his alleged protected activity and his termination.

| UNDISPUTED MATERIAL FACT | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE | REPLY |
|---|---|---|
| 94. Hernandez first made the disclosure regarding LPI's expenses in 2004.<br><br>Hernandez 493:24-495:15 [Hernandez made his first disclosure at the three- | Not disputed. | This fact remains undisputed |

32

CONCORDANCE IN SUPPORT OF SUMMARY JUDGMENT MOTION

70-943

| | | This fact remains undisputed |
|---|---|---|
| month or six-month submittal]; Sexton Dec. 3:15-17 [the LPi contract began in January 2004] | | |
| 95. The investigation into alleged benefits received by Hernandez began in approximately November 2005.<br><br>Bowens Dec. 2:7-22; Woodson Dec. 2:5-8. | Not disputed. | This fact remains undisputed |
| 96. Hernandez' employment with the Authority ended in February 2006.<br><br>Hernandez Depo. 114:19-24 [Exh. 1]. | Not disputed. | This fact remains undisputed |
| 97. Thella Bowens made the decision to terminate Hernandez' employment.<br><br>Bowens Dec. 3:1-10 | Not disputed to the extend *[sic]* that she is included among others who contributed to the decision. | This fact remains undisputed |

Dated: November 9, 2007

PAUL, PLEVIN, SULLIVAN & CONNAUGHTON LLP

By: _Sandra L McDrf_
   FRED M. PLEVIN
   SANDRA L. MCDONOUGH
   ALBERT R. LIMBERG
   Attorneys for Defendant\
   SAN DIEGO COUNTY REGIONAL AIRPORT
   AUTHORITY

33

CONCORDANCE IN SUPPORT OF SUMMARY JUDGMENT MOTION



**EXHIBIT 71**

1  FRED M. PLEVIN (SBN 126185)
   SANDRA L. MCDONOUGH (SBN 193308)
2  ALBERT R. LIMBERG (SBN 211110)
   **PAUL, PLEVIN, SULLIVAN & CONNAUGHTON** LLP
3  401 B Street, Tenth Floor
   San Diego, California 92101-4232
4  Telephone: 619-237-5200
   Facsimile: 619-615-0700
5
   AMY S. GONZALEZ (SBN 181745)
6  **SAN DIEGO COUNTY REGIONAL AIRPORT
   AUTHORITY**
7  3225 N. Harbor Drive
   San Diego, CA 92138
8  Telephone:  (619) 400-2425
   Facsimile: (619) 400-2428
9

10 Attorneys for Defendant
   SAN DIEGO COUNTY REGIONAL AIRPORT
11 AUTHORITY

12

13              SUPERIOR COURT OF THE STATE OF CALIFORNIA

14                       COUNTY OF SAN DIEGO

15 JOSE HERNANDEZ,                      CASE NO. GIC871979

16          Plaintiff,                  **DEFENDANT SAN DIEGO COUNTY
                                        REGIONAL AIRPORT AUTHORITY'S
17     v.                               OBJECTION TO EVIDENCE SUBMITTED
                                        BY PLAINTIFF IN OPPOSITION TO
18 SAN DIEGO COUNTY REGIONAL            DEFENDANT'S MOTION FOR SUMMARY
   AIRPORT AUTHORITY, a public entity;  JUDGMENT OR, IN THE ALTERNATIVE,
19 and DOES 1 through 12, inclusive,    SUMMARY ADJUDICATION**

20          Defendants.

21                                      Date:           November 16, 2007
                                        Time:           1:30 p.m.
22                                      Dept:           75
                                        Judge:          Hon. Richard E. Strauss
23                                      Complaint Filed: September 1, 2006
                                        Trial Date:     January 4, 2008
24
                                           **EXEMPT FROM FEES
25                                         GOVT. CODE § 6103**

26

27

28

PAUL, PLEVIN,
SULLIVAN &         DEFENDANT'S OBJECTION TO EVIDENCE
CONNAUGHTON LLP    SUBMITTED BY PLAINTIFF

*F I L E D*
*Clerk of the Superior Court*
*NOV 0 9 2007*
*By: M. WONG-JIMENEZ, Deputy*

1    Defendant San Diego County Regional Airport Authority ("Defendant") submits the

2    following objections to the evidence submitted by plaintiff Jose Hernandez in opposition to

3    Defendant's motion for summary judgment or, in the alternative, summary adjudication.

4                          **OBJECTIONS TO EVIDENCE**

5                      **DECLARATION OF MIKE PARRISH**

| Evidence Objection To | Basis for Objection | Ruling Circled |
|---|---|---|
| 1.  "Brian Enarson asked me to donate two free confirmed round trip tickets to be used system-wide and eligible for confirmed reservations.  I did so."  (¶ 6, p. 2:12-13.) | Hearsay. (Evid. Code § 1200.) Irrelevant (Evid. Code §§ 210, 350.) Vague as to time and as to the phrase "systemwide and eligible for confirmed reservations". | Sustained<br><br>Overruled |

                      **DECLARATION OF JANET NIX**

| Evidence Objection To | Basis for Objection | Ruling Circled |
|---|---|---|
| 2.  "I give those non-revenue, no value stand-by tickets to members of the general public at my discretion."  (¶ 3, p. 1:23-24.) | **Lacks Foundation.  (Evid. Code § 403.)  Irrelevant.  (Evid. Code §§ 210, 350.)**<br><br>Nix fails to lay foundation to establish that she has discretion to give tickets to members of the general public. Further, Nix does not establish that the tickets are generally available to the public such that any member of the public could request the tickets and receive them automatically.  Rather, Nix decides who receives the tickets. | Sustained<br><br>Overruled |
| 3.  "The Airport Authority, through its managers and vice-presidents, has asked me to donate non-revenue, no value stand-by tickets to them on more than one occasion."  (¶ 4, p.1:25-26.) | **Lacks Foundation.  (Evid. Code § 403.)  Hearsay.  (Evid. Code § 1200.)  Vague.**<br><br>Nix fails to lay foundation or identify any "manager" or "vice-president" who asked her to donate tickets to the Authority. | Sustained<br><br>Overruled |
| 4.  "He wanted a free ticket for her and I agreed to provide it."  (¶ 5, p. 2:3.) | **Lacks Foundation.  (Evid. Code § 403.)  Hearsay.  (Evid. Code § 1200.)**<br><br>Nix fails to lay foundation that he wanted a free ticket.  Further, any | Sustained<br><br>Overruled |

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

DEFENDANT'S OBJECTION TO EVIDENCE                    1
SUBMITTED BY PLAINTIFF

| | Evidence Objection To | Basis for Objection | Ruling Circled |
|---|---|---|---|
| | | statement by Sexton is hearsay. | |
| 5. | "Sexton said that Craver wanted to confirm an upgrade that was beyond our standard procedure regarding upgrades only made on the date of departure." (¶ 6, p. 2:7-8.) | **Hearsay and double hearsay. (Evid. Code § 1200.)** <br><br> Sexton's out of court statement is inadmissible hearsay to establish that Craver wanted an upgrade. | Sustained <br><br> Overruled |
| 6. | "Rather than pay for a first-class ticket he wanted to pay only for the day of departure upgrade and he wanted to do it with me holding the first class seats without him paying the first-class ticket rate. He did so." (¶ 6, p. 2:11-13.) | **Hearsay. (Evid. Code § 1200.) Lacks Foundation. (Evid. Code § 403.) Lacks Personal Knowledge. (Evid. Code § 702.)** <br><br> Sexton's out of court statement is inadmissible hearsay to establish that Craver wanted an upgrade. <br><br> Further, Nix fails to establish that she has personal knowledge that Craven wanted any upgrades. | Sustained <br><br> Overruled |
| 7. | "On Craver's return trip to San Diego from Hawaii he caused a scene on the jet way as he attempted to board the flight. He wanted the Station Manager in Honolulu to hold first-class upgrade seats from him ahead of his departure date. He wanted the Station Manager in Honolulu to use his authority to grant him a first-class seat for himself. This required Hawaiian Airlines to take a positive space revenue seat, which is never done, and give it to him as a special privilege. Craver attempted to board the aircraft without paying for the upgrade. The Station Manager had to stop him from boarding and have him return to the check in counter in order to collect the cost of the first-class upgrade. Craver expected to board the aircraft and take a first-class seat for free without even paying for the upgrade." (¶ 7, p.2:14-24.) | **Lacks Foundation. (Evid. Code § 403.) Lacks Personal Knowledge. (Evid. Code § 702.)** <br><br> Nix does not state any facts to establish that she has personal knowledge of the facts contained in this statement, it is not competent evidence and should be ignored. | Sustained <br><br> Overruled |
| 8. | "Bryan Enarson, a Vice President of Airport Authority, was the worst culprit of them all at the Airport Authority." (¶ 8, p. 2:25-26.) | **Lacks Foundation. (Evid. Code § 403.) Lacks Personal Knowledge. (Evid. Code § 702.) Improper Opinion. § 800.)** | Sustained <br><br> Overruled |

| Evidence Objection To | Basis for Objection | Ruling Circled |
|---|---|---|
| | Nix fails state any facts to establish that she has personal knowledge that Enarson is the "worst culprit" or that she has knowledge regarding the actions of all other employees of the Authority. | |
| 9. "Enarson was well known among the airline Station Managers for requesting services for which the public was routinely charged." (¶ 8, p. 2:27-3:1.) | **Lacks Foundation. (Evid. Code § 403.) Lacks Personal Knowledge. (Evid. Code § 702.)**<br><br>Nix fails to state facts to establish that she has personal knowledge that Enarson was "well-known" for requesting services. Further, she does not lay any foundation or identify any Station Managers who allegedly thought Enarson was "well known." | Sustained<br><br>Overruled |
| 10. "Evans went into a scathing rage and said the non-revenue ticket wasn't worth anything. Evans demanded a positive space ticket upgraded to first-class. The Station Manager for the airline had no choice but to give it to Evans. This incident was discussed among all the airline Station Managers at the airport." (¶ 9, p. 3:6-9.) | **Lacks Foundation. (Evid. Code § 403.) Lacks Personal Knowledge. (Evid. Code § 702.) Hearsay. (Evid. Code § 1200.)**<br><br>Nix does not state facts to establish that she has personal knowledge of Evans' alleged behavior or the reaction of the unidentified Station Manager.<br><br>Further, any discussion among Station Managers is inadmissible to prove that the incident occurred. | Sustained<br><br>Overruled. |
| 11. "Ted Sexton, a Vice President for the Airport Authority, wrote a letter that was distributed to all of the airline Station Managers apologizing for the rage displaced by Vice President Vernon Evans over his demands for a free first-class ticket." (¶ 10, p. 3:11-13.) | **Lacks Foundation. (Evid. Code § 403.) Lacks Personal Knowledge. (Evid. Code § 702.) Best Evidence. (Evid. Code § 1523.) Hearsay. (Evid. Code. § 1200.)**<br><br>Nix does not state facts to establish that she has personal knowledge of the letter. Further, oral testimony is inadmissible to prove the content of a writing.<br><br>Finally, the statements in the letter are inadmissible hearsay to prove that Evans took any action. | Sustained<br><br>Overruled |

| | | |
|---|---|---|
| 12. "I gave him non-revenue tickets to fly stand-by for him and his family because I wanted them to experience Hawaiian Airlines." (¶ 11, p. 3:15-16.) | **Irrelevant (Evid. Code §§ 210, 350.)** | Sustained<br><br>Overruled |
| 13. "They are the same tickets that the Airport Authority has asked me to donate to them on many occasions." (¶ 12, p. 3:21-22.) | **Irrelevant (Evid. Code §§ 210, 350.) Lacks Foundation. (Evid. Code § 403.)  Vague as to time.**<br><br>Nix fails to lay foundation or identify anyone at the Authority who asked her to donate tickets. | Sustained<br><br>Overruled |
| 14. "It was understood that when Ted Sexton called for changes to itineraries and upgrades for members of the Airport Authority that he wanted those changes to be at no cost, otherwise the individuals for whom he called would have requested those changes themselves."  (¶ 13, p. 3:25-4:1.) | **Lacks Foundation. (Evid. Code § 403.)  Lacks Personal Knowledge. (Evid. Code § 702.)**<br><br>Nix fails to establish that she has any personal knowledge regarding Sexton's requests when he called for changes to itineraries.<br><br>Further, she lays no foundation and fails to establish that she has personal knowledge regarding who "understood" anything about Sexton and how they formed that understanding. | Sustained<br><br>Overruled |
| 15. "This was not a matter of adding fees for the general public, because the Airport Authority had a business relationship with all of the airlines. The airlines pay the fees that fund the Airport Authority." (¶ 13, p. 4:3-6.) | **Lacks Foundation. (Evid. Code § 403.)  Lacks Personal Knowledge. (Evid. Code § 702.)  Improper opinion.  (Evid. Code § 800.)**<br><br>Nix fails to establish that she has personal knowledge regarding the business relationship between the Authority and the airlines or the existence of any fees paid by the airlines.  Nix is not qualified to offer an opinion on how the Authority is funded. | Sustained<br><br>Overruled |

1

2

### DECLARATION OF PLAINTIFF JOSE HERNANDEZ

3

4

| Evidence Objection To | Basis for Objection | Ruling Circled |
|---|---|---|
| 16. "Bryan Enarson, Vice-President of Development, was a close confidant of Thella Bowens' …" (¶ 1, p. 2:1-2.) | **Lacks Foundation. (Evid. Code § 403.) Lacks Personal Knowledge (Evid. Code § 702)**<br><br>Hernandez fails to establish how he has information regarding whether Enarson was a close confidant of Bowens. | Sustained<br><br>Overruled |
| 17. "I communicated the deficiency in the property to Sexton and Bowens and that the continuation of the lease at its existing rate would amount to a gift of public money to the Port." (¶ 2, p. 2:12-13.) | **Lacks Foundation. (Evid. Code § 403.) Lacks Personal Knowledge. (Evid. Code § 702.) Asserts a Legal Conclusion. (Evid. Code § 800). Hearsay. (Evid. Code § 1200.)**<br><br>Hernandez' statement is inadmissible because it contradicts his prior sworn testimony that he only told Sexton, and not Bowens, about his concerns regarding the General Dynamics lease (Hernandez Depo. 394:10-16; 397:22-398:9; 522:4-523:5 [Exh. 2]). (*D'Amico v. Board of Med. Examiners* (1974) 11 Cal.3rd 1, 21 [affidavits conflicting with prior sworn testimony submitted by a party opposing summary judgment should be disregarded].)  Hernandez further testified that although Thella Bowens had an open door policy, he would never go to her office and utilize the open door policy (Hernandez Depo. 644:3-8 [Exh. 2]) and that the only person he felt he could go to was Ted Sexton (Hernandez Depo. 644:9-16 [Exh. 2]).<br><br>Further, Hernandez' statement is inadmissible hearsay to prove that the continuation of the lease would amount to a gift of public money.<br><br>Further, although Hernandez does not state that the gift of funds was illegal, or that he believed the gift was illegal, to the extent that this statement is construed to be a legal conclusion, it is improper. (Evid. Code § 800.) | Sustained<br><br>Overruled |

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| | Evidence Objection To | Basis for Objection | Ruling Circled |
|---|---|---|---|
| 1 2 | | | |
| 3 4 5 6 | 18. "Ted Sexton and Thella Bowens refused to renegotiate the terms of the lease." (¶ 3, p. 2:14-15.) | **Lacks Foundation. (Evid. Code § 403.) Lacks Personal Knowledge. (Evid. Code § 702.)**<br><br>Hernandez' fails to establish that he has personal knowledge regarding the actions of Sexton and Bowens. | Sustained<br><br>Overruled |
| 7 8 9 10 11 12 13 | 19. "Sexton then justified the lease amount by stating, 'that was the price for Thella's (Bowens') freedom.'" (¶ 3, p. 2:15-16.) | **Lacks Foundation. (Evid. Code § 403.) Lacks Personal Knowledge. (Evid. Code § 702.) Hearsay. (Evid. Code § 1200.)**<br><br>This statement is hearsay if offered to prove that the lease amount was the price for Bowens' freedom. Further, Hernandez fails to lay foundation and state facts to show that he has personal knowledge that Sexton's comment was intended to justify the lease amount. | Sustained<br><br>Overruled |
| 14 15 16 17 18 19 20 21 22 23 24 25 26 27 28 | 20. "I then informed Sexton and Bowens that the lease constituted an unwarranted expenditure of public money to the Port of over $3 million per year." (¶ 4, p. 2:27-3:1.) | **Lacks Foundation. (Evid. Code § 403.) Lacks Personal Knowledge. (Evid. Code § 702.) Hearsay. (Evid. Code § 1200.) Improper Opinion. (Evid. Code § 800.)**<br><br>This statement is hearsay if offered to prove that the lease was an unwarranted expenditure.<br><br>Further, it is improper to create a triable issue of fact by disputing prior testimony. *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 21-22.<br><br>Hernandez admitted in his deposition that he only complained to Ted Sexton and the Teledyne Task Force about the Teledyne Ryan lease. (Hernandez Depo. 410:3-413:18; 522:4-523:5.) Hernandez further testified that although Thella Bowens had an open door policy, he would never go to her office and utilize the open door policy (Hernandez Depo. 644:3-8 [Exh. 2]), and that the only person he felt he could go to was Ted Sexton (Hernandez Depo. 644:9-16 [Exh. 2]). Since Hernandez admitted that he only | Sustained<br><br>Overruled |

| Evidence Objection To | Basis for Objection | Ruling Circled |
|---|---|---|
| | informed Sexton and the Teledyne Ryan Task Force about the Teledyne Ryan lease, he cannot now create a triable issue of fact by alleging in his declaration that he also told Bowens. | |
| 21. "I attempted to expand the size of the public restrooms in the east terminal . . . to bring it into compliance with federal requirements that they accessible [*sic*] by wheel chair, as required by the Americans with Disabilities Act (ADA). I needed to annex 30 sq. ft. space from a concessionaire in order to comply with ADA requirements." | **Lacks Foundation. (Evid. Code § 403.) Lacks Personal Knowledge. (Evid. Code § 702.) Improper Legal Conclusion. (Evid. Code § 800).** | Sustained<br><br>Overruled |
| 22. "I told Sexton, Enarson and Bowens that I did not believe Enarson had the authority to enter into such agreements with the concessionaires and that Enarson's enforcement of the agreements constituted a gift of public resources to the concessionaires." (¶ 5, p. 3:9-11.) | **Lacks Foundation. (Evid. Code § 403.) Lacks Personal Knowledge. (Evid. Code § 702.) Hearsay. (Evid. Code § 1200.) Asserts a Legal Conclusion. (Evid. Code § 800).**<br><br>This statement is hearsay if offered to prove that Hernandez did not believe that Enarson had the authority to enter into agreements. Further, Hernandez fails to lay foundation and state facts to show that he has personal knowledge that Sexton's comment was intended to justify the lease amount.<br><br>Finally, this statement is inadmissible as an improper legal conclusion to establish that Enarson's enforcement of the agreement was a gift.<br><br>Finally, it is improper to create a triable issue of fact by disputing prior testimony. *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 21-22.<br><br>Hernandez admitted in his deposition that he only complained to Ted Sexton and a handful of others regarding the restroom project. (Hernandez Depo. 354:6-8; 375:17-21; 522:4-523:5 [Exh. 2].) Hernandez further testified that although Thella Bowens had an open door policy, he would never go | Sustained<br><br>Overruled |

| Evidence Objection To | Basis for Objection | Ruling Circled |
|---|---|---|
| | to her office and utilize the open door policy. (Hernandez Depo. 644:3-8.) Finally, Hernandez testified that the only person that he felt he could complain to was Ted. (Hernandez Depo. 644:9-16.)<br><br>Since Hernandez admitted that he only informed Sexton, the terminal operations committee and the architect about the Restroom Project, he cannot now create a triable issue of fact by alleging in his declaration that he also told Bowens. | |
| 23. "The necessary improvements were never made." (¶ 5, p. 3:11-12.) | **Lacks Foundation. (Evid. Code § 403.) Lacks Personal Knowledge. (Evid. Code § 702.)**<br><br>Hernandez fails to state facts to establish that he has personal knowledge regarding the "improvements." | Sustained<br><br>Overruled |
| 24. "I reported these overcharges to Sexton, Enarson and Bowens, and placed LPI on a 90-day timetable to explain and justify all the expenses." (¶ 7, p. 3:24-25.) | **Hearsay. (Evid. Code § 1200.)**<br>It is improper to create a triable issue of fact by disputing prior testimony. *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 21-22. Hernandez admitted in his deposition that he only complained to Ted Sexton and Andrew McIntyre regarding LPI. (Hernandez Depo. 493:24-494:8; 498:25-499:11; 501:3-8; 503:5-504:6; 522:4-523:5 [Exh. 2].) Hernandez further testified that although Thella Bowens had an open door policy, he would never go to her office and utilize the open door policy (Hernandez Depo. 644:3-8 [Exh. 2]), and that the only person he felt he could go to was Ted Sexton (Hernandez Depo. 644:9-16 [Exh. 2]).<br><br>Since Hernandez admitted that he only informed Sexton and McIntyre about LPI, he cannot now create a triable issue of fact by alleging in his declaration that he also told Bowens. | Sustained<br><br>Overruled |

| Evidence Objection To | Basis for Objection | Ruling Circled |
|---|---|---|
| 25. "In October 2005, I informed Sexton, Enarson and Bowens that the LPI contract constituted an unwarranted expenditure of public money to LPI." (¶ 7, p. 3:25-26.) | Hearsay. (Evid. Code § 1200.)<br><br>This statement is hearsay if offered to prove that the LPI contract constituted an unwarranted expenditure.<br><br>Further, this statement is an improper contradiction of Hernandez' prior sworn testimony. Hernandez first made the disclosure regarding LPi's expenses in 2004. (Hernandez 493:24-495:15 [Hernandez made his first disclosure at the three-month or six-month submittal]; Sexton Dec. 3:15-17 [the LPi contract began in January 2004].) | Sustained<br><br>Overruled |
| 26. "Given that Sexton had told me that the receipt of airlines passes and upgrades were acceptable …" (¶ 10, p. 4,:18-19.) | Hearsay. (Evid. Code § 1200.)<br><br>This statement is hearsay if offered to prove that the receipt of airlines passes and upgrades were acceptable. | Sustained<br><br>Overruled |
| 27. "She told me that the tickets had no value, were only available to fill vacant seats, and that she provided similar tickets to many of her friends with whom she had no business relationship." (¶ 11, p. 4:25-27.) | Hearsay. (Evid. Code § 1200.) Best Evidence Rule. (Evid. Code § 1523.)<br><br>This statement is inadmissible hearsay to establish that the tickets had no value and that she provided other friends with tickets. | Sustained<br><br>Overruled |
| 28. "The tickets were listed as 'space available' and further identified as having 'no dollar value' and could not be transferred or redeemed." (¶ 11, p. 4:25-5:1.) | Lacks Foundation. (Evid. Code § 403.) Hearsay. (Evid. Code § 1200.) | Sustained<br><br>Overruled |
| 29. "he indicated complementary passes and upgrades of that nature were an acceptable 'perk' of the job." | Hearsay. (Evid. Code § 1200.)<br><br>This statement is inadmissible hearsay to establish that the tickets Hernandez received from Nix were an acceptable perk of the job. | Sustained<br><br>Overruled |
| 30. "Ace Parking did not have a contractor or vendor agreement of any sort with the Authority." (¶ 12, p. 5:4-5.) | Lacks Foundation. (Evid. Code § 403.) Lacks Personal Knowledge. (Evid. Code § 702.) Improper Legal Opinion.<br><br>Hernandez does not lay foundation or | Sustained<br><br>Overruled |

DEFENDANT'S OBJECTION TO EVIDENCE
SUBMITTED BY PLAINTIFF

9

| Evidence Objection To | Basis for Objection | Ruling Circled |
|---|---|---|
| | establish that he has personal knowledge of all of the Authority's contacts and agreements.<br><br>Further, Hernandez' statement that no contract or agreement existed between Ace Parking and the Authority is an improper legal opinion and improperly contradicts prior sworn testimony. Objection. Lacks foundation. Hernandez knew that Ace Parking tried to obtain a business relationship with the Authority in January 2005. (Hernandez Depo. 151:4-18 [Exh. 1].) Even prior to that, Lindbergh Parking, Inc. ("LPi") was a vendor doing business with the Authority. (*Id.* at 127:19-22.) Scott Jones, the owner of Ace Parking, is a 40% owner of LPi. (*Id.* at 75:18-19, 127:10-128:2.) | |
| 31. "I was informed by my superior that the Authority had a progressive disciplinary policy which emphasized the Authority's commitment to preserve employment through pre-termination warnings and training." (¶ 14, p. 5:19-21.) | **Lacks Foundation. (Evid. Code § 403.) Hearsay. (Evid. Code § 1200.)**<br><br>Hernandez fails to lay foundation or identify the supervisor who made the alleged statement. Further, this statement is hearsay if offered to prove that the Authority does have a progressive disciplinary policy. | Sustained<br><br>Overruled |

## HERNANDEZ' DEPOSITION TESTIMONY OFFERED IN SUPPORT OF HIS

## SEPARATE STATEMENT

| Evidence Objection To | Basis for Objection | Ruling Circled |
|---|---|---|
| 32. "Ace Parking did not have a direct service agreement with the Airport Authority. Ace did not have any sort of a business relationship with the Airport Authority. Plaintiff's depo. 149:15-20; 150:20-25." (Plaintiff's alleged undisputed material fact filed in support of his separate statement ("Plaintiff UMF") #39) | **Lacks foundation. (Evid. Code § 403.)**<br><br>Hernandez knew that Ace Parking tried to obtain a business relationship with the Authority in January 2005. (Hernandez Depo. 151:4-18 [Exh. 1].) Even prior to that, Lindbergh Parking, Inc. ("LPi") was a vendor doing business with the Authority. (*Id.* at 127:19-22.) Scott Jones, the owner of Ace Parking, is a 40% owner of LPi. | Sustained<br><br>Overruled |

| | | | |
|---|---|---|---|
| 1 | | (*Id.* at 75:18-19, 127:10-128:2.) | |
| 2 | 33. "Ted Sexton, Vice-President of Operations at the Authority, requested Hernandez obtain Ace Parking passes for Authority employees. The Authority did not pay for the Ace passes. Plaintiff's depo. 134:25; 135:11-17." (Plaintiff's UMF #40) | **Lacks foundation and personal knowledge as to whether the Authority paid for the Ace passes. (Evid. Code §§ 403 and 702.)** | Sustained<br><br>Overruled |
| 6 | 34. "Ted Sexton told Hernandez it would be okay to go to the Southwest Airline Golf Tournaments. Sexton knew he was a guest of Southwest's. Plaintiff's depo. 158:18-22; 168:5-8, 12-13, 18, 21-24." (Plaintiff's UMF #41) | **Lacks foundation. (Evid. Code § 403.) Hearsay. (Evid. Code § 1200.)** | Sustained<br><br>Overruled |
| 10 | 35. "To this day Hernandez still stands by the fact that most of the items on the conflict-of-interest state form should not have been disclosed. Plaintiff's depo. 284:11-15." (Plaintiff's UMF #43) | **Lacks foundation. (Evid. Code § 403.)**<br><br>Hernandez' deposition was taken in December 2006, almost one year ago. Therefore, the stated evidence does not support Hernandez' opinion of the items on the conflict of interest form as of today. | Sustained<br><br>Overruled |
| 15 | 36. "Ted Sexton told Hernandez to write everything on the form, whether he thought it proper to do so or not. Plaintiff's depo. 293:14-20." (Plaintiff's UMF #44) | **Vague as to "he." Hearsay. (Evid. Code § 1200.)** | Sustained<br><br>Overruled |
| 18 | 37. "Ted Sexton told Hernandez to report any Ace Parking item, even though Ace does not have a direct service agreement with the Authority Parking. Plaintiff's depo. 268:1-5; 274:12-14; 267:14-18; 268:8-13." (Plaintiff's UMF #45) | **Hearsay. (Evid. Code § 1200.) Lacks foundation. (Evid. Code § 403.)**<br><br>Hernandez knew that Ace Parking tried to obtain a business relationship with the Authority in January 2005. (Hernandez Depo. 151:4-18 [Exh. 1].) Even prior to that, Lindbergh Parking, Inc. ("LPi") was a vendor doing business with the Authority. (*Id.* at 127:19-22.) Scott Jones, the owner of Ace Parking, is a 40% owner of LPi. (*Id.* at 75:18-19, 127:10-128:2.) | Sustained<br><br>Overruled |
| 26 | 38. "Sexton told Hernandez if he did not put this information on the form there would be ramifications. There would be legal ramifications whether Hernandez did it or not, whether he believed it was right or wrong. | **Hearsay. (Evid. Code § 1200.)** | Sustained<br><br>Overruled |

PAUL, PLEVIN, SULLIVAN & CONNAUGHTON LLP

DEFENDANT'S OBJECTION TO EVIDENCE SUBMITTED BY PLAINTIFF

11

| | | |
|---|---|---|
| Plaintiff's depo. 268:8-13; 268:19-20; 270:3-7." (Plaintiff's UMF #46) | | |
| 39. "Sexton spoke on behalf of the Airport Authority, not as an individual. Sexton said people at the vice-president level would be looking at that documentation. Whether Hernandez thought it was right or not, people would be looking to make sure he filled it in. Plaintiff's depo. 270:14-19; 267:19-25; 270:24-25; 271:1-2; 271:9-11." (Plaintiff's UMF #47) | **Lacks foundation and lacks personal knowledge. (Evid. Code §§ 403 and 702.) Hearsay. (Evid. Code § 1200.)**<br><br>Hernandez was the one who held the belief that Sexton spoke on behalf of the Airport Authority, not as an individual; Sexton did not make this assertion. | Sustained<br><br>Overruled |
| 40. "Hernandez' reason for submitting it was threats or intimidation from not only Ted [Sexton], but the investigators. Plaintiff's depo. 278:15-1749." (Plaintiff's UMF #48) | **Irrelevant. (Evid. Code § 350.)**<br><br>The reason for submitting the form does not negate that Hernandez admitted that he received the benefits set forth on the form. (Hernandez Depo. 280:1-282:12 [Exh. 2].) | Sustained<br><br>Overruled |
| 41. "In late 2004, early 2005, Ace Parking was not working to take over the parking contract. It was Scott Jones, as an individual, trying to buy the shares of Maurice Gray. There's a clear distinction. This contract is not with Ace Parking. It is with Scott Jones, as an individual. Plaintiff's depo. 272:5-6, 6-9." (Plaintiff's UMF #49) | **Lacks foundation.**<br><br>Hernandez knew that Ace Parking tried to obtain a business relationship with the Authority in January 2005. (Hernandez Depo. 151:4-18 [Exh. 1].) Even prior to that, Lindbergh Parking, Inc. ("LPi") was a vendor doing business with the Authority. (*Id.* at 127:19-22.) Scott Jones, the owner of Ace Parking, is a 40% owner of LPi. (*Id.* at 75:18-19, 127:10-128:2.) | Sustained<br><br>Overruled |
| 42. "Hernandez purchased tickets that were not available to the public for the Authority's general counsel, Bret Lobner. The tickets were blocked-out and unavailable for the box office to sell. Hernandez told Lobner they were unavailable to the public. Ted Sexton told Hernandez to get the tickets for Lobner. Hernandez was not already going to the stadium t purchase tickets that day. Plaintiff's depo. 237:17-25; 238:10-12, 13-16, 17-22, 23-25; 240:5-10, 15-23; 242:19-25; 249:18-25; 250:1." (Plaintiff's UMF #50) | **Lacks foundation and personal knowledge. (Evid. Code §§ 403 and 702.) Hearsay. (Evid. Code § 1200.)** | Sustained<br><br>Overruled |
| 43. "Clifforine Massey was an unreliable and undependable employee who refused to come to work. She was repeatedly counseled by Hernandez and placed on a disciplinary work plan by | **Lacks foundation and irrelevant. (Evid. Code §§ 350, 403 and 702.)** | Sustained<br><br>Overruled |

DEFENDANT'S OBJECTION TO EVIDENCE
SUBMITTED BY PLAINTIFF

12

71-957

| | | |
|---|---|---|
| Human Resources. Massey refused to abide by the work plan and quit. Plaintiff's depo. 315:13-25; 316:1-25; 317:1-2; 318:1-25." (Plaintiff's UMF #51) | | |
| 44. "Jim Prentice was a gossip who reported to Sexton. Prentice stirred-up gossip and chaos. He was an unreliable and undependable employee. Sexton referred to him as "that little shit." Plaintiff's depo. 323:17-25; 324:9-25; 542:6-25; 543:1-25; 544:1-5." (Plaintiff's UMF #52) | **Lacks foundation; hearsay; irrelevant. (Evid. Code §§ 350, 403, 702 and 1200.)** | Sustained<br><br>Overruled |
| 45. "The restroom project was stalled from 2002 through 2005 because V.P. Bryan Enarson was unwilling to request the redaction of 30 sq. ft. from Host. It still hasn't been built. Plaintiff's depo. 341:9-13; 347:8-9." (Plaintiff's UMF #53) | **Lacks foundation and personal knowledge; hearsay; irrelevant. (Evid. Code §§ 350, 403, 702 and 1200.)**<br><br>Whether the project is stalled is not material to this motion. | Sustained<br><br>Overruled |
| 46. "It was V.P. Enarson's unwillingness to take that space away that made it impossible for the Authority to comply with ADA requirements of a 2% grade from the floor up to the restrooms and then landing requirements. Plaintiff's depo. 343:20-25; 344:1." (Plaintiff's UMF #54) | **Lacks foundation; improper opinion; irrelevant. (Evid. Code §§ 350, 403, 702 and 800.)** | Sustained<br><br>Overruled |
| 47. "Sexton was afraid to bring up the issue to Bryan Enarson. He just didn't want to deal with him. Plaintiff's depo. 374:2-4." (Plaintiff's UMF #56) | **Lacks foundation and personal knowledge. (Evid. Code §§ 403 and 702.)** | Sustained<br><br>Overruled |
| 48. "Ted Sexton said Thella was willing to overpay for that property so that she didn't have to be under the control of the Port District. Plaintiff's depo. 394:17-25." (Plaintiff's UMF #58) | **Lacks foundation and personal knowledge; improper opinion; hearsay. (Evid. Code §§ 350, 403, 702, 800 and 1200.)** | Sustained<br><br>Overruled |
| 49. "At every budget meeting it would come back up that they needed to make an adjustment for the $2 million additional lease payments on the General Dynamics lease. Plaintiff's depo. 397:3-7." (Plaintiff's UMF #59) | **Vague; lacks foundation and personal knowledge. (Evid. Code §§ 403 and 702.)** | Sustained<br><br>Overruled |

71-958

| | | |
|---|---|---|
| 50. "As a public entity, it is necessary to make sure that what is paid can be recovered because it's not just Authority funds, it's airline funds. Proper due diligence must be followed when in agreeing to enter into an extended lease in this manner. When the Authority's own environmental assessments were done, those numbers greatly shot through the roof. Plaintiff's depo. 408:17-25; 410:1-2." (Plaintiff's UMF #62) | **Improper opinion and legal conclusion; lacks foundation. (Evid. Code §§ 403, 702 and 800.)** | Sustained<br><br>Overruled |
| 51. "Hernandez had continuing conversations with Ted Sexton because the Authority overpaid for the property and he wanted to understand why the Authority would continue to pay $3 million for the whole property when he could use only 5 acres of it. Plaintiff's depo. 410:3-25." (Plaintiff's UMF #63) | **Lacks foundation and personal knowledge; improper opinion. (Evid. Code §§ 403, 702 and 800.)** | Sustained<br><br>Overruled |
| 52. "Hernandez was a vocal opponent because he was coupled with overpayment on the General Dynamics side and now add that to one overpayment on Teledyne Ryan. And now the Authority is in the hole between $3 and $4 million a year in overpayment on two leases. Entering into a 66-year agreement for $3 million a year is almost $200 million. Plaintiff's depo. 417:13-22; 418:3-10." (Plaintiff's UMF #64) | **Lacks foundation; improper opinion. (Evid. Code §§ 403, 702 and 800.) Hearsay. (Evid. Code § 1200.)** | Sustained<br><br>Overruled |
| 53. "The cost for remediation is $30 million with the settlement requiring the Port to pay $9.7 million, with the Port having the ability within the $9.7 million to recover expenses incurred against that money. Plaintiff's depo. 424:19-23; 427:7-12." (Plaintiff's UMF #65) | **Lacks foundation; improper opinion. (Evid. Code §§ 403, 702 and 800.)** | Sustained<br><br>Overruled |
| 54. "Today that property is used for only 350 parking spaces for which the Authority pays the $3 million. The property will not be remediated by 2010; it won't happen. It will not be remediated in whole by 2010. Plaintiff's depo. 466:19-20; 468:18-19; 469:1-2; 469:23-25; 470:3-5." | **Lacks foundation; improper opinion. (Evid. Code §§ 403, 702 and 800.)**<br><br>Hernandez' deposition was in December 2006, almost one year ago. This fact has no bearing on what the property is used for today. | Sustained<br><br>Overruled |

| | | |
|---|---|---|
| (Plaintiff's UMF #66) | | |
| 55. "Hernandez had ongoing conversations with Ted Sexton about his objections to the Authority's failure to properly assess the environmental aspects prior to entering the lease agreement and without understanding the full effects on the Authority's operating budget. There were many conversations with Sexton. Plaintiff's depo. 470:16-25; 471:7-11." (Plaintiff's UMF #67) | Hearsay. (Evid. Code § 1200.) | Sustained<br><br>Overruled |
| 56. "LPI submitted an operating figure of $1.1 million and the Authority understood those actual operating expenses would be about a half a million dollars more a year. Hernandez told Ted Sexton immediately that there was a large variation between their submitted operating expenses and actual expense numbers. Plaintiff's depo. 478:16-22; 481:1-4; 482:9-21; 494:2-25." (Plaintiff's UMF #68) | **Lacks foundation because Hernandez cannot opine as to what "the Authority understood;" vague and ambiguous. (Evid. Code §§ 403 and 702.)** | Sustained<br><br>Overruled |
| 57. "LPI double-billed the Authority for workers' compensation costs starting in 2000 and again in 2005. Plaintiff's depo. 500:18-24." (Plaintiff's UMF #69) | **Improper opinion; lacks foundation. (Evid. Code §§ 403, 702 and 800.)** | Sustained<br><br>Overruled |
| 58. "Ted Sexton requested that Hernandez upgrade Thella's flight multiple times at no charge to Thella. Plaintiff's depo. 544:15-20; 545:1-25; 546:1-25; 547:1-2; 548:2-25; 549:1-7; 549:14-22." (Plaintiff's UMF #73) | **Irrelevant; hearsay. (Evid. Code §§ 350 and 1200.)** | Sustained<br><br>Overruled |
| 59. "Hernandez requested ticket changes for Thella Bowens over five times. He did no less than five different itinerary changes, plus date changes and time changes. The airlines' charges for itinerary and date changes range between $50 to $100 per boarding document. Thella Bowens was not charged by the airlines for the changes. Thella could have changed her tickets by simply calling reservations. Plaintiff's depo. 550:15-551:1, 6-8; 551:21-22; 554:1-10." (Plaintiff's UMF #74) | **Irrelevant; hearsay; improper opinion; lacks foundation and personal knowledge. (Evid. Code §§ 350, 403, 702 and 1200.)**<br><br>Hernandez testified that Bowens never directly asked him for an upgrade or flight change. (Hernandez Depo. 549:8-10 [Exh. 2].) This statement also lacks foundation as to how much and whether an airline charges for changes and upgrades. | Sustained<br><br>Overruled |

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

DEFENDANT'S OBJECTION TO EVIDENCE
SUBMITTED BY PLAINTIFF

15

71-960

| | | |
|---|---|---|
| 60. "Ted Sexton instructed Hernandez that he should get Thella access to premier airline lounges so she wouldn't have to wait in the public waiting rooms. Sexton requested that even for the briefest moments if the plane was late to have Thella sit in the lounge. Plaintiff's depo. 556:19-23; 558:18-24; 559:2-7." (Plaintiff's UMF #75) | **Irrelevant and hearsay. (Evid. Code §§ 350 and 1200.)** | Sustained<br><br>Overruled |
| 61. "Ted Sexton asked if special privileges could be obtained for Thella Bowens' sister.<br><br>Plaintiff's depo. 561:1-25 | **Vague; hearsay; lacks foundation or personal knowledge. (Evid. Code § 1200.)** Hernandez has no personal knowledge of Ted Sexton's request and only obtained knowledge regarding Ted Sexton's alleged request on behalf of Thella's sister from Mike Parrish. (Hernandez Depo. 560:21-561:5 [Exh. 2].) | Sustained<br><br>Overruled |
| 62. "Authority board member Morris Vance requested and received at least two upgrades to first class and there were no charges. He requested several other first-class upgrades and paid no charges for upgrades or flight changes. Plaintiff's depo. 595:25; 596:10-12; 599:1-6; 599:25; 600:3." (Plaintiff's UMF #77) | **Lacks foundation and hearsay. (Evid. Code §§ 403, 702 and 1200.)** | Sustained<br><br>Overruled |
| 63. "Authority Vice-President Vernon Evans repeatedly requested changes in flight schedules no less than 15-20 times in the last two years. Ted Sexton told Hernandez to "do whatever you can." Sexton knew the changes were at no cost. Hernandez asked Sexton if it was okay to change Evans' tickets at the time. Plaintiff's depo. 604:5-11; 604:12-25; 605:18-23; 607:8-12; 608:6-10; 609:8-18; 610:1-13; 612:17-21." (Plaintiff's UMF #78) | **Hearsay and lacks foundation. (Evid. Code §§ 403 and 1200.)** | Sustained<br><br>Overruled |
| 64. "Thella Bowens requested two free airline tickets from Hawaiian Airlines and from Southwest Airlines because she was on the board of United Way. The tickets were all donated to the Authority. Plaintiff's depo. 619:12-17; 619:22-23; 620:19-21; 621:9-11." (Plaintiff's UMF #79) | **Lacks foundation and personal knowledge; hearsay. (Evid. Code §§ 403, 702 and 1200.)**<br><br>Hernandez testified that Bowens never asked him directly for any airline benefits. (Hernandez Depo. 549:8-10 [Exh. 2].) | Sustained<br><br>Overruled |

PAUL, PLEVIN, SULLIVAN & CONNAUGHTON LLP

DEFENDANT'S OBJECTION TO EVIDENCE SUBMITTED BY PLAINTIFF

16

71-961

| | | |
|---|---|---|
| 65. "There was a power struggle between Bryan Enarson and Ted Sexton. Enarson had more control and had one ear of Thella Bowens'. Plaintiff's depo. 645:19-25; 646:1-2." (Plaintiff's UMF #80) | **Lacks foundation and personal knowledge. (Evid. Code §§ 403 and 702.)** | Sustained<br><br>Overruled |
| 66. "Authority Vice-President Bryan Enarson requested free tickets, upgrades and special privileges from Hawaiian Airlines. Plaintiff's depo. 687:4-15." | **Hearsay; lacks foundation. (Evid. Code §§ 403, 702 and 1200.)**<br><br>Hernandez' only knowledge of Enarson's alleged tickets and upgrades comes from other people. (Hernandez Depo. 687:4-15 [Exh. 2].) Further, this fact is irrelevant because it does not state that Enarson actually received any of the alleged requested items. | Sustained<br><br>Overruled |

Dated: November 9, 2007

PAUL, PLEVIN, SULLIVAN &
CONNAUGHTON LLP


By: _Sandra L. McDonough_
  FRED M. PLEVIN
  SANDRA L. MCDONOUGH
  ALBERT R. LIMBERG
  Attorneys for Defendant
  SAN DIEGO COUNTY REGIONAL
  AIRPORT AUTHORITY

DEFENDANT'S OBJECTION TO EVIDENCE
SUBMITTED BY PLAINTIFF

17

71-962



1  FRED M. PLEVIN (SBN 126185)
   SANDRA L. MCDONOUGH (SBN 193308)
2  ALBERT R. LIMBERG (SBN 211110)
   **PAUL, PLEVIN, SULLIVAN & CONNAUGHTON LLP**
3  401 B Street, Tenth Floor
   San Diego, California 92101-4232
4  Telephone: 619-237-5200
   Facsimile: 619-615-0700

5
   AMY S. GONZALEZ (SBN 181745)
6  **SAN DIEGO COUNTY REGIONAL AIRPORT**
   **AUTHORITY**
7  3225 N. Harbor Drive
   San Diego, CA 92138
8  Telephone: (619) 400-2425
   Facsimile: (619) 400-2428
9
   Attorneys for Defendant
10 SAN DIEGO COUNTY REGIONAL AIRPORT
   AUTHORITY

11

12            SUPERIOR COURT OF THE STATE OF CALIFORNIA

13                      COUNTY OF SAN DIEGO

14 JOSE HERNANDEZ,                    CASE NO. GIC871979

15          Plaintiff,               **DEFENDANT SAN DIEGO COUNTY**
                                      **REGIONAL AIRPORT AUTHORITY'S**
16      v.                            **RESPONSE TO PLAINTIFF JOSE**
                                      **HERNANDEZ' WRITTEN OBJECTIONS**
17 SAN DIEGO COUNTY REGIONAL          **TO EVIDENCE IN OPPOSITION TO**
   AIRPORT AUTHORITY, a public entity; **DEFENDANT'S MOTION FOR SUMMARY**
18 and DOES 1 through 12, inclusive,  **JUDGMENT OR, IN THE ALTERNATIVE,**
                                      **SUMMARY ADJUDICATION**
19          Defendants.

20                                    Date:          November 16, 2007
                                      Time:          1:30 p.m.
21                                    Dept:          75
                                      Judge:         Hon. Richard E. Strauss
22                                    Complaint Filed: September 1, 2006
                                      Trial Date:    January 4, 2008
23
                                          **EXEMPT FROM FEES**
24                                        **GOVT. CODE § 6103**

25      TO PLAINTIFF JOSE HERNANDEZ AND HIS ATTORNEYS OF RECORD:

26 Defendant San Diego County Regional Airport Authority submits the following response to

27 plaintiff's written objections to evidence in support of its Motion for Summary Judgment as to

28 plaintiff Jose Hernandez' Second Amended Complaint:

PAUL, PLEVIN,    DEFENDANT'S RESPONSE TO PLAINTIFF'S
SULLIVAN &       OBJECTIONS TO ITS EVIDENCE IN SUPPORT
CONNAUGHTON LLP  OF ITS MSJ/ MSA

| Objection No. | Proposed Evidence Objected To | Basis for Objection | Authority's Response | Ruling Circled |
|---|---|---|---|---|
| | **DECLARATION OF MARK BURCHYETT:** | | | |
| 1 | Objection to declaration in its entirety. | Irrelevant and immaterial. | Mark Burchyett's declaration provides foundation for the auditor's report and provides support for the Authority's position that it has investigated other allegations of violation of the Ethics Code. | Sustained<br><br>Overruled |
| 2 | Objection to ¶ 6 (declaration filed separately; ¶ 6 is on 2:27-28–3:1):<br><br>"6. As part of my investigation, I also requested, received, and reviewed factual and documentary information from Authority personnel, Board members, and Hernandez' email and hard drive files." | Lacks foundation. | The objection should be overruled.<br><br>Burchyett's statement establishes that he was the person that requested the information from the Authority, and thus he has personal knowledge that such a request was made. | Sustained<br><br>Overruled |
| | **DECLARATION OF THELLA BOWENS:** | | | |
| 3 | Objection to ¶ 4 (declaration filed separately; ¶ 4 is on 2:7-13):<br><br>"4. In approximately October or November 2005, an employee named Cliffonne Massey resigned from the Authority. Massey asked to meet with me as part of her exit process. She thanked me for the opportunity to work at the Authority. | Hearsay (as to the truth of the matter). | The objection should be overruled.<br><br>The statement is not hearsay because it is offered for the nonhearsay purpose of establishing the reason that Bowens ordered that the investigation take place. It is not offered for the truth of the matter, but rather for the effect that the statement had on Bowens' actions. | Sustained<br><br>Overruled |

PAUL, PLEVIN, SULLIVAN & CONNAUGHTON LLP    DEFENDANT'S RESPONSE TO PLAINTIFF'S OBJECTIONS TO ITS EVIDENCE IN SUPPORT OF ITS MSJ/ MSA    1

72-964

| Objection No. | Proposed Evidence Objected To | Basis for Objection | Authority/Response | Ruling Circled |
|---|---|---|---|---|
| | However, during the course of this meeting, Massey raised plaintiff Jose Hernandez as an issue. She said she did not want to complain, but she said that Hernandez is a dangerous person. She also called him "unethical." Massey seemed reluctant to expand and I did not press her for details at the time. However, my impression was that Massey was referring to ethical issues" | | | |
| 4 | Objection to ¶ 5 (declaration filed separately; ¶ 5 is on 2:14-19): "5. Within a short period of time after my meeting with Massey, another employee named Jim Prentice independently approached me regarding concerns he had about Hernandez taking favors and benefits from Authority vendors. He specifically told me about free airline tickets, Southwest Airlines drink tickets being handed out by Hernandez, golf outings with vendors, and Hernandez' family trip to Hawaii, all of which Prentice believed that Hernandez had received as a free benefit from Authority vendors." | Hearsay (as to the truth of the matter). | The objection should be overruled.<br><br>The statement is not hearsay because it is offered for the nonhearsay purpose of establishing the reason that Bowens ordered that the investigation take place. It is not offered for the truth of the matter, but rather for the effect that the statement had on Bowens' actions. | Sustained<br><br>Overruled |
| 5 | Objection to ¶ 11 (declaration filed separately; ¶ 11 is on 3:13-14): | Vague and ambiguous as to "the level of." | Objection should be overruled.<br><br>Bowens declared that she reviewed | Sustained<br><br>Overruled |

2

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON
LLP

DEFENDANT'S RESPONSE TO PLAINTIFF'S OBJECTIONS TO
ITS EVIDENCE IN SUPPORT OF ITS MSJ/ MSA

72-965

| Objection No. | Proposed Evidence Objected To | Basis for Objection | Authority's Response | Ruling (Circle) |
|---|---|---|---|---|
| | "11. I am unaware of any employee at the Authority, other than Hernandez, receiving the level of free benefits that Hernandez received from the Authority's vendors." | | Swan's January 19, 2006 report, which set forth the amount of benefits that Hernandez received from the Authority's vendors. "The level of" refers to the amount and nature of benefits that he received. | |
| | **DECLARATION OF PATRICK SWAN:** | | | |
| 6 | Objection to ¶ 12 (declaration filed separately; ¶ 12 is on 3:25-4:2): <br><br> "12. As a result of Ms. Bowens' request for a written report, I drafted a 21-page letter with attachments to Ms. Bowens. Mr. Gamberzky also assisted me in drafting the written report. I am informed that a true and correct copy of that letter with attachments is attached as Exhibit 4 to the Notice of Lodgment of Exhibits filed herewith. I sent Exhibit 4 to Ms. Bowens via messenger service on or about January 19, 2006." | Privacy privilege (based on unauthorized recording.) Penal Code § 632(d). | The objection should be overruled. <br><br> Penal Code section 632(d) only makes evidence obtained by recording a communication without consent inadmissible. There is no allegation of an unauthorized recording of a communication. <br><br> Swan has personal knowledge of his act of drafting a report and this testimony is not evidence recorded in violation of Penal Code section 632. | Sustained <br><br> Overruled |
| 7 | Objection to ¶ 13 (declaration filed separately; ¶ 13 is on 4:3-5): <br><br> "13. Exhibit 4 is an accurate report of my findings based on the interviews and gathering of information that I did, as well as the interviews and information obtained | Privacy privilege (based on unauthorized recording.) Penal Code § 632(d). | The objection should be overruled. <br><br> Penal Code section 632(d) only makes evidence obtained by recording a communication without consent inadmissible. There is no allegation of an unauthorized recording of a communication. | Sustained <br><br> Overruled |

3

| Objection No. | Proposed Evidence Objected To: | Basis for Objection | Authority's Response | Ruling Circled |
|---|---|---|---|---|
| | by Mr. Gamberzky that were communicated to me." | | Swan has personal knowledge of his act of drafting a report and this testimony is not evidence recorded in violation of Penal Code section 632. | |
| 8 | Objection to ¶ 14 (declaration filed separately; ¶ 14 is on 4:6-14): <br><br> "14. I concluded, as a result of our investigation into Mr. Hernandez' receipt of benefits, that there was sufficient evidence that Mr. Hernandez had accepted benefits from Authority vendors and contractors from 2003 through January 2006. I also concluded that there was sufficient evidence that Mr. Hernandez had violated Section 2.10 of the Authority's Ethics Code by virtue of accepting benefits from the Authority's vendors in an amount that exceeded more than one-half the amount of gifts permitted under the California Political Reform act in any calendar year from a single source knowing that the source is doing business with the Authority. In 2003 and 2004, the California Political Reform Act permitted gifts of $340, and in 2005, it permitted gifts of $360." | Improper opinion (Swan not designated "expert"); opinions otherwise improper as to matters of law; lack foundation. | The objection should be overruled. <br><br> Swan's statement recounting the conclusions he made in the course of his investigation is not an improper opinion, but his personal knowledge of content of his report. Swan provides ample foundational evidence to support his conclusions, including notes from interviews of Hernandez. Further, this statement is not offered as an expert opinion, but to show the knowledge of the Authority at the time of Hernandez' termination. | Sustained <br><br> Overruled |
| 9 | Objection to ¶ 15 (declaration filed separately; ¶ 15 is on 4:15-21): | Improper opinion (Swan not designated "expert"); opinions otherwise improper as to matters of | The objection should be overruled. <br><br> Swan's statement recounting the | Sustained |

| Objection No. | Proposed Evidence Objected To | Basis for Objection | Authority/Response | Ruling Circled |
|---|---|---|---|---|
|  | "15. Specifically, I concluded that in May 2004, Mr. Hernandez accepted four free round-trip airline tickets to Hawaii from Hawaiian Airlines, which he knew was doing business with the Authority. While these tickets are non-revenue and may be of no value to Hawaiian Airlines, they had value to Mr. Hernandez who otherwise would have to pay for the airline travel. Based on information provided by Hawaiian Airlines, the estimated retail cost of each round trip travel would have been between $199 and $600 per ticket. Therefore, I concluded that the total value of the tickets was estimated to be between $796 and $2,400." | law; lack foundation. | conclusions he made in the course of his investigation is not an improper opinion, but his personal knowledge of content of his report. Swan provides ample foundational evidence to support his conclusions, including notes from interviews of Hernandez. Further, this statement is not offered as an expert opinion, but to show the knowledge of the Authority at the time of Hernandez' termination. | Overruled |
| 10 | Objection to ¶ 16 (declaration filed separately; ¶ 16 is on 4:22-26):<br><br>"16. I also concluded that in 2003, Mr. Hernandez accepted at least two, and possibly four, free San Diego Charger-Oakland Raider football tickets from Ace Parking, the total value of which is estimated to be between $470 and $940 based on the face value of the ticket. I determined that Mr. Hernandez knew that Ace Parking was doing business with the Authority through its ownership of our subcontract with Lindbergh | Improper opinion (Swan not designated "expert"); opinions otherwise improper as to matters of law, lack foundation. | The objection should be overruled.<br><br>Swan's statement recounting the conclusions he made in the course of his investigation is not an improper opinion, but his personal knowledge of content of his report. Swan provides ample foundational evidence to support his conclusions, including notes from interviews of Hernandez. Further, this statement is not offered as an expert opinion, but to show the knowledge of the Authority at the time of Hernandez' termination. | Sustained<br><br>Overruled |

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON
LLP

DEFENDANT'S RESPONSE TO PLAINTIFF'S OBJECTIONS TO
ITS EVIDENCE IN SUPPORT OF ITS MSJ/ MSA

72-968

| Objection No. | Proposed Evidence Objected To | Basis for Objection | Authority's Response | Ruling Circled |
|---|---|---|---|---|
| | Parking, Inc." | | | |
| 11 | Objection to ¶ 17 (declaration filed separately; ¶ 17 is on 4:27-28): "17. I also concluded that it was likely that the free airline tickets that Mr. Hernandez admitted to receiving in 2004 from Southwest Airlines exceeded $170." | Improper opinion (Swan not designated "expert"); opinions otherwise improper as to matters of law; lack foundation. | The objection should be overruled. Swan's statement recounting the conclusions he made in the course of his investigation is not an improper opinion, but his personal knowledge of content of his report. Swan provides ample foundational evidence to support his conclusions, including notes from interviews of Hernandez. Further, this statement is not offered as an expert opinion, but to show the knowledge of the Authority at the time of Hernandez' termination. | Sustained<br><br>Overruled |
| 12 | Objection to ¶ 18 (declaration filed separately; ¶ 18 is on 5:1): "18. The remainder of my conclusions and findings are contained in Exhibit 4." | Improper opinion (Swan not designated "expert"); opinions otherwise improper as to matters of law; lack foundation. | The objection should be overruled. Swan's statement recounting the conclusions he made in the course of his investigation is not an improper opinion, but his personal knowledge of content of his report. Swan provides ample foundational evidence to support his conclusions, including notes from interviews of Hernandez. Further, this statement is not offered as an expert opinion, but to show the knowledge of the Authority at the time of Hernandez' termination. | Sustained<br><br>Overruled |
| | **DECLARATION OF BRYAN ENARSON:** | | | |

6

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON
LLP

DEFENDANT'S RESPONSE TO PLAINTIFF'S OBJECTIONS TO
ITS EVIDENCE IN SUPPORT OF ITS MSJ/ MSA

| Objection No. | Proposed Evidence Objected To | Basis for Objection | Authority's Response | Ruling Circled |
|---|---|---|---|---|
| 13 | Objection to ¶ 3 (declaration filed separately; ¶ 3 is on 2:5-16):<br><br>"3. I was a member of the negotiating team regarding the separation of the Authority from the Port District. Part of the negotiations included the General Dynamics property, which is adjacent to the San Diego International Airport. Negotiations regarding the lease of the General Dynamics property began in approximately 2002. The monetary terms of the lease for calendar years 2003, 2004 and 2005 are set by Public Utility Code section 170056(f)(1), and the Authority complied with those terms and that statute. After the initial three years, the annual rent was determined based on the fair market value of the property as of January 1, 2006, and the market rate of return on that date. The Authority approved the current lease terms for the property at the July 24, 2006 Board meeting. The current lease terms require the Authority to pay $6.75 million per year for a term of 63 years. The amount of $6.75 million annually was reached through arms-length negotiations with the Port. The Authority expects to develop the property and expects that the annual revenues will exceed the annual lease | Improper opinion; legal conclusion; lack of foundation; hearsay | The objection should be overruled.<br><br>The statement is not an out of court statement offered for its truth and thus is not hearsay.<br><br>Enarson's statement is based on his personal knowledge and is not an improper opinion or legal conclusion. | Sustained<br><br>Overruled |

PAUL, PLEVIN, SULLIVAN & CONNAUGHTON LLP

DEFENDANT'S RESPONSE TO PLAINTIFF'S OBJECTIONS TO ITS EVIDENCE IN SUPPORT OF ITS MSJ/MSA

72-970

| Objection No. | Proposed Evidence Objected To | Basis for Objection | Authority's Response | Ruling Circled |
|---|---|---|---|---|
| | amount over the course of the next 62 years." | | | Sustained<br><br>Overruled |
| 14 | Objection to ¶ 4 (declaration filed separately; ¶ 4 is on 2:17-23):<br><br>"4. I was also a member of the negotiation committee with regard to the lease of the Teledyne Ryan property. We began negotiations on the Teledyne Ryan in approximately late 2002, early 2003. The San Diego Unified Port District owns the Teledyne Ryan property and leases it to the Authority. When the former tenant of that property, Allegheny, vacated the property without notice, the Port filed a lawsuit against Allegheny for breach of the lease. After Allegheny vacated the property without notice, the Port began preparing the property for use as a parking lot." | Lacks foundation. | The objection should be overruled. Enarson states that he was a member of the negotiating committee and has personal knowledge of the negotiations. | Sustained<br><br>Overruled |
| 15 | Objection to ¶ 5 (declaration filed separately; ¶ 5 is on 2:24-27):<br><br>"5. The Port failed to comply with CEQA before beginning their work on the property for purposes of using it as a parking lot. As a result, the Authority filed a lawsuit against the Port for their failure to comply with CEQA before beginning their parking lot project (the "CEQA | Lacks foundation. | The objection should be overruled.<br><br>Enarson has personal knowledge as the Vice President of Development of the development-related activities of the Authority. | |

8

| Objection No. | Proposed Evidence Objected to | Basis for Objection | Authority's Response | Ruling Circled | |
|---|---|---|---|---|---|
| | lawsuit')." | | | Sustained | Overruled |
| 16 | Objection to ¶ 8 (declaration filed separately; ¶ 8 is on 3:14-16):<br><br>"8. The Authority has conducted various projections regarding the annual revenue expected from the property once the contamination is cleaned up. The Authority expects that the annual revenue from the property will eventually far exceed the amount of the lease payment." | Lacks foundation; calls for speculation. | The objection should be overruled.<br><br>Enarson has personal knowledge as the Vice President of Development of the development-related activities of the Authority. | Sustained | Overruled |
| 17 | Objection to ¶ 11 (declaration filed separately; ¶ 11 is on 3:25-4:2):<br><br>"11. In 2000, the Authority decided to convert a Southwest Airlines' hold room in Terminal One into concession space, which it leased to Host. This decision resulted in an addendum to the Authority's written agreement with Host to improve space in Terminal 1 into additional concession space. The Host agreement required that Host would have to approve any additional space taken from Host after the improvements were made. The amendment to the Host agreement was approved by the Authority's Board." | Irrelevant. | This objection should be overruled.<br><br>The cited portion of the declaration is relevant to Hernandez' unsupported assertion that Enarson entered into a "side deal" with Host. This declaration contains admissible evidence that the agreement with Host was written and approved by the Authority's Board. | Sustained | Overruled |

9

| Objection No. | Proposed Evidence Objected To | Basis for Objection | Authority's Response | Ruling Circled |
|---|---|---|---|---|
| 18 | Objection to ¶ 12 (declaration filed separately; ¶ 12 is on 4:3-4):<br><br>"12. I do not have any side deals with Host. Any agreements that I have entered into with Host have been memorialized in an approved and fully executed agreement." | Lacks foundation as to time. | The objection should be overruled.<br><br>Enarson's statement is present tense and he addresses "any" agreements, thus covering all time periods. | Sustained<br><br>Overruled |
|  | **DECLARATION OF JAMES PRENTICE:** |  |  |  |
| 19 | Objection to ¶ 4 (declaration filed separately; ¶ 4 is on 2:11-17):<br><br>"4.  In particular, I told Ms. Bowens that I believed that Hernandez received free airline tickets to Phoenix and Las Vegas and a free golfing trip to Mexico from Southwest Airlines.  I also told Bowens that I had observed Hernandez walking up to, and receiving free food from, various concessions run by Host at the Airport, including McDonald's, Starbucks and La Salsa. I also told Bowens that Hernandez went to Florida for his brother's birthday, but he tried to turn it into a business trip to talk to the Superbowl committee.  It was my belief that Hernandez had the Authority pay for Hernandez' hotel room for the entire trip to | Lacks foundation. | The objection should be overruled.<br><br>Prentice has personal knowledge regarding the content of his conversation with Bowens.  His statements are offered to show notice to the Authority, not that Prentice's beliefs were true. | Sustained<br><br>Overruled |

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON
LLP

DEFENDANT'S RESPONSE TO PLAINTIFF'S OBJECTIONS TO
ITS EVIDENCE IN SUPPORT OF ITS MSJ/ MSA

72-973

| Objection No. | Proposed Evidence Objected To | Basis for Objection | Authority's Response | Ruling Circled |
|---|---|---|---|---|
| | Florida." | | | |
| 20 | Objection to ¶ 5 (declaration filed separately; ¶ 5 is on 2:18-21): "5. About one month after I spoke with Ms. Bowens, I was interviewed by an investigator named Pat Swan regarding Hernandez. I told Mr. Swan about my suspicions that Hernandez received the free benefits outlined in the preceding paragraph from the Authority's vendors." | Lacks foundation. | The objection should be overruled. Prentice has personal knowledge regarding the content of his conversation with Swan. His statements are offered to show notice to the Authority and the investigators, not that Prentice's suspicion was true. | Sustained<br><br>Overruled |
| 21 | Objection to ¶ 6 (declaration filed separately; ¶ 6 is on 2:22-24): "6. In my discussions with both Ms. Bowens and Mr. Swan, I told the truth regarding my observations of Hernandez and the information that I received from Hernandez and other employees." | Hearsay; lacks foundation. | The objection should be overruled. This statement does not reference an out-of-court statement. Rather, Prentice is simply saying that he was truthful. Prentice has personal knowledge of his state of mind when he was speaking to the investigators. | Sustained<br><br>Overruled |
| 22 | Objection to ¶ 7 (declaration filed separately; ¶ 7 is on 2:25-28): "7. I am unaware that Hernandez had ever complained about the Authority's alleged violations of the Americans with Disabilities Act with regard to the women's restroom project in Terminal One. I am also unaware of | Lacks foundation. | The objection should be overruled. Prentice has personal knowledge of facts of which he is unaware. | Sustained<br><br>Overruled |

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON
LLP

DEFENDANT'S RESPONSE TO PLAINTIFF'S OBJECTIONS TO
ITS EVIDENCE IN SUPPORT OF ITS MSJ/ MSA

72-974

| Objection No. | Proposed Evidence Objected To | Basis for Objection | Authority's Response | Ruling Circled | |
|---|---|---|---|---|---|
| | Hernandez complaining about any alleged side deal between Host and Bryan Enarson, or about the women's restroom project being too expensive." | | | | |
| 23 | Objection to ¶8 (declaration filed separately; ¶8 is on 3:1-2):<br><br>"8. I am unaware that Hernandez ever disclosed any unlawful aspects regarding the leases of the General Dynamics property or the Teledyne Ryan property leased by the Authority." | Lacks foundation. | The objection should be overruled.<br><br>Prentice has personal knowledge of facts of which he is unaware. | Sustained | Overruled |
| 24 | Objection to ¶9 (declaration filed separately; ¶9 is on 3:3-4):<br><br>"9. I am unaware that Hernandez ever complained that Lindbergh Parking, Inc. ("LPi") double-billed the Authority for workers' compensation or that LPi underbid the Authority." | Lacks foundation. | The objection should be overruled.<br><br>Prentice has personal knowledge of facts of which he is unaware. | Sustained | Overruled |
| | DECLARATION OF THEODORE SEXTON: | | | | |
| 25 | Objection to ¶8 (declaration filed separately; ¶8 is on 2:20-24):<br><br>"8. During Hernandez' employment, I occasionally requested that Hernandez change airline tickets | Improper opinion; lacks foundation. | The objection should be overruled.<br><br>Sexton establishes that he has personal knowledge and experience regarding the subject of his testimony. | Sustained | Overruled |

PAUL, PLEVIN, SULLIVAN & CONNAUGHTON LLP   DEFENDANT'S RESPONSE TO PLAINTIFF'S OBJECTIONS TO ITS EVIDENCE IN SUPPORT OF ITS MSJ/ MSA   12

72-975

| Objection No. | Proposed Evidence Objected To | Basis for Objection | Authority's Response | Ruling (Circle) | |
|---|---|---|---|---|---|
| | for certain Authority employees and board members whose travel plans had changed. Based on my personal experience, airlines routinely process requests for passenger itinerary changes and, consistent with their company guidelines, may or may not add fees to the ticket price." | | | | |
| | **DECLARATION OF JOHN GAMBERZKY:** | | | | |
| 26 | Objection to ¶ 4 (declaration filed separately; ¶ 4 is on 1:13-18):<br><br>"4.   After the first interview with Mr. Hernandez, Mr. Swan and I conducted an additional interview with Mr. Hernandez at his counsel's office on December 9, 2005.  I also interviewed six other non-Authority employees, including Janet Nix from Hawaiian Airlines, Mike Parrish from Southwest Airlines, Tony Hueso from USA Cab, Dave Mueller from Ace Parking, Cheryl Black from Southwest Airlines and Kelly Pond from Image Concepts.  I provided my notes from those interviews to Mr. Swan." | Privacy privilege (based on unauthorized recording), Penal Code § 632(d); calls for speculation. | The objection should be overruled.<br><br>Penal Code section 632(d) only makes evidence obtained by recording a communication without consent inadmissible. There is no allegation of an unauthorized recording of a communication.<br><br>Gamberzky has personal knowledge of his act of drafting a report and this testimony is not evidence recorded in violation of Penal Code section 632. | Sustained<br><br>Overruled | |
| 27 | Objection to ¶ 5 (declaration filed separately; ¶ 5 is on 1:19-21):<br><br>"5.   I obtained documents from | Privacy privilege. | The objection should be overruled.<br><br>Penal Code section 632(d) only makes evidence obtained by recording a | Sustained<br><br>Overruled | |

13

PAUL, PLEVIN, SULLIVAN & CONNAUGHTON LLP    DEFENDANT'S RESPONSE TO PLAINTIFF'S OBJECTIONS TO ITS EVIDENCE IN SUPPORT OF ITS MSJ/ MSA

72-976

| Objection No. | Proposed Evidence Objected To | Basis for Objection | Authority's Response | Ruling Circled |
|---|---|---|---|---|
| | Tony Hueso regarding car repairs that USA Cab performed on Mr. Hernandez' vehicles. I did not require or pressure Mr. Hueso to provide those documents to me." | | communication without consent inadmissible. There is no allegation of an unauthorized recording of a communication.<br><br>Gamberzky has personal knowledge of his act of drafting a report and this testimony is not evidence recorded in violation of Penal Code section 632. | |
| | **DEFENDANT'S EXHIBIT 4** (Swan's 1/19/06 letter): | | | |
| 28 | Objection the entirety of Exhibit 4. | Hearsay (as to the truth of the matter); improper opinion (Swan not identified as an expert); lacks foundation; privacy privilege (derived from unauthorized recording – Penal Code § 632(d)); calls for speculation. | The objection should be overruled.<br><br>Exhibit 4 is not hearsay to the extent that it is not offered for the truth of the matters asserted therein. It is offered to show the effect it had on its reader, Thella Bowens. Exhibit 4 also qualifies for the business records exception to the hearsay rule (Evid. Code § 1270.)<br><br>Further, Exhibit 4 is not being offered as an expert opinion.<br><br>Penal Code section 632(d) only makes evidence obtained by recording a communication without consent inadmissible. There is no allegation of an unauthorized recording of a communication.<br><br>Swan has personal knowledge of his act of drafting a report and this testimony is | Sustained<br><br>Overruled |

14

PAUL, PLEVIN,<br>SULLIVAN &<br>CONNAUGHTON<br>LLP   DEFENDANT'S RESPONSE TO PLAINTIFF'S OBJECTIONS TO<br>ITS EVIDENCE IN SUPPORT OF ITS MSJ/ MSA

72-977

| Objection No. | Proposed Evidence / Objection | Basis for Objection | Authority's Response | Ruling Circled |
|---|---|---|---|---|
| | | | not evidence recorded in violation of Penal Code section 632. | |
| | **DEFENDANT'S EXHIBIT 6 (Burchyett's 9/5/06 report):** | | | Sustained |
| 29 | Objection the entirety of Exhibit 6. | Hearsay (as to the truth of the matter); improper opinion (Burchyett not identified as an expert); lacks foundation (Burchyett's status as auditor does not qualify him to investigate employment matters); calls for speculation. | The objection should be overruled.<br><br>Exhibit 6 is not hearsay to the extent that it is not offered for the truth of the matters asserted therein. It is offered to show the Authority investigated allegations of Ethics Codes violations against employees other than Hernandez. Exhibit 6 also qualifies for the business records exception to the hearsay rule (Evid. Code § 1270.)<br><br>Further, Exhibit 6 is not being offered as an expert opinion. Exhibit 6 has proper foundation because Burchyett indicated that he conducted the investigation and that he is charged with conducting these types of investigations. | Overruled |

Dated: November 9, 2007

PAUL, PLEVIN, SULLIVAN & CONNAUGHTON LLP

By: _Sandra L. McDonough_
FRED M. PLEVIN
SANDRA L. MCDONOUGH
ALBERT R. LIMBERG
Attorneys for Defendant SAN DIEGO COUNTY
REGIONAL AIRPORT AUTHORITY

PAUL, PLEVIN, SULLIVAN & CONNAUGHTON LLP    DEFENDANT'S RESPONSE TO PLAINTIFF'S OBJECTIONS TO ITS EVIDENCE IN SUPPORT OF ITS MSJ/ MSA    15

72-978



EXHIBIT 73

1  FRED M. PLEVIN (SBN 126185)
   SANDRA L. MCDONOUGH (SBN 193308)
2  ALBERT R. LIMBERG (SBN 211110)
   **PAUL, PLEVIN, SULLIVAN & CONNAUGHTON** LLP
3  401 B Street, Tenth Floor
   San Diego, California 92101-4232
4  Telephone: 619-237-5200
   Facsimile: 619-615-0700
5
6  AMY S. GONZALEZ (SBN 181745)
   **SAN DIEGO COUNTY REGIONAL AIRPORT**
   **AUTHORITY**
7  3225 N. Harbor Drive
   San Diego, CA 92138
8  Telephone: (619) 400-2425
   Facsimile: (619) 400-2428
9
10 Attorneys for Defendant
   SAN DIEGO COUNTY REGIONAL AIRPORT
11 AUTHORITY

12                    SUPERIOR COURT OF THE STATE OF CALIFORNIA

13                              COUNTY OF SAN DIEGO

14
   JOSE HERNANDEZ,                        CASE NO. GIC871979
15
           Plaintiff,                     **DEFENDANT SAN DIEGO COUNTY**
16                                         **REGIONAL AIRPORT AUTHORITY'S**
                                           **NOTICE OF LODGMENT OF NON-**
17     v.                                  **CALIFORNIA AUTHORITIES IN SUPPORT**
                                           **OF ITS REPLY TO THE MOTION FOR**
18 SAN DIEGO COUNTY REGIONAL              **SUMMARY JUDGMENT OR, IN THE**
   AIRPORT AUTHORITY, a public entity;     **ALTERNATIVE, SUMMARY**
19 and DOES 1 through 12, inclusive,       **ADJUDICATION**

           Defendants.
20
21                                         Date:        November 16, 2007
                                           Time:        1:30 p.m.
22                                         Dept:        75
                                           Judge:       Hon. Richard E. Strauss
23                                         Complaint Filed: September 1, 2006
                                           Trial Date:  January 4, 2008
24
                                              **EXEMPT FROM FEES**
25                                             **GOVT. CODE § 6103**

26     TO PLAINTIFF JOSE HERNANDEZ AND HIS ATTORNEYS OF RECORD:

27     Defendant San Diego County Regional Airport Authority (hereinafter referred to as "the

28 Authority") hereby lodges the following non-California authorities in support of its Reply to the

PAUL, PLEVIN,     NOTICE OF LODGMENT OF NON-CA                1
SULLIVAN &        AUTHORITIES IN SUPPORT OF REPLY TO
CONNAUGHTON LLP   SUMMARY JUDGMENT MOTION

73-979

1 | Motion for Summary Judgment as to plaintiff Jose Hernandez' Second Amended Complaint:

2 |     1.     *Damon v. Fleming Supermarkets of Florida, Inc.* (11th Cir. 1999) 196 F.3d 1354;

3 |     2.     *Fuentes v. Perskie* (3d Cir. 1994) 32 F.3d 759;

4 |     3.     *Kariotis v. Navistar Intern. Transport Corp.* (7th Cir. 1997) 131 F.3d 672;

5 |     4.     *Mayberry v. Vought Aircraft Co.* (5th Cir. 1995) 55 F.3d 1086;

6 |     5.     *Mitchell v. Toledo Hospital* (6th Cir. 1992) 964 F.2d 577;

7 |     6.     *Randle v. City of Aurora* (10th Cir. 1995) 69 F.3d 441.

Dated: November 9, 2007

PAUL, PLEVIN, SULLIVAN & CONNAUGHTON LLP

By: *Sandra L. McDonough*
FRED M. PLEVIN
SANDRA L. MCDONOUGH
Attorneys for Defendant SAN DIEGO
COUNTY REGIONAL AIRPORT
AUTHORITY

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

NOTICE OF LODGMENT OF NON-CA
AUTHORITIES IN SUPPORT OF REPLY TO
SUMMARY JUDGMENT MOTION

2

73-980

1

73-981

Westlaw.

196 F.3d 1354                                                                                          Page 1

196 F.3d 1354, 82 Fair Empl.Prac.Cas. (BNA) 899, 77 Empl. Prac. Dec. P 46,350, 13 Fla. L. Weekly Fed. C 198
(Cite as: 196 F.3d 1354)

▷
Damon v. Fleming Supermarkets Of Florida, Inc.
C.A.11 (Fla.),1999.

United States Court of Appeals,Eleventh Circuit.
Walter DAMON, Richard Kanafani,
Plaintiffs-Appellants,
v.
FLEMING SUPERMARKETS OF FLORIDA,
INC., f.d.b.a. Wooley's Fine Foods, etc.,
Defendant-Appellee.
No. 98-5554.

Dec. 3, 1999.

Former employees sued former employer under Age Discrimination in Employment Act (ADEA) and Florida Civil Rights Act. The United States District Court for the Southern District of Florida, No. 97-230-CV-JA L, Joan A. Lenard, J., entered summary judgment for employer. Employees appealed. The Court of Appeals, Marcus, Circuit Judge, held that: (1) employees established prima facie case, despite employer's allegations of poor performance, and (2) fact questions existed as to whether employer's reasons for termination were a pretext for age discrimination, thus precluding summary judgment.

Reversed and remanded.
West Headnotes
[1] Civil Rights 78 ☞1551

78 Civil Rights
    78IV Remedies Under Federal Employment
Discrimination Statutes
        78k1543 Weight and Sufficiency of Evidence
            78k1551 k. Age Discrimination. Most Cited Cases
    (Formerly 78k388)
Alleged comment by district manager to plaintiff's replacement, immediately after plaintiff's termination, that the company needed aggressive young men like the replacement to be promoted, did

not qualify as direct evidence of age discrimination; though it was probative circumstantial evidence of district manager's state of mind, the comment still required court to infer that manager's interest in promoting young men motivated his decision to terminate plaintiff. Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.

[2] Civil Rights 78 ☞1551

78 Civil Rights
    78IV Remedies Under Federal Employment
Discrimination Statutes
        78k1543 Weight and Sufficiency of Evidence
            78k1551 k. Age Discrimination. Most Cited Cases
    (Formerly 78k388)
To qualify as direct evidence of age discrimination, evidence must indicate that complained-of employment decision was motivated by decision-maker's ageism, and only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age, will constitute direct evidence of discrimination. Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.

[3] Evidence 157 ☞317(2)

157 Evidence
    157IX Hearsay
        157k315 Statements by Persons Other Than Parties or Witnesses
            157k317 Oral Statements
                157k317(2) k. Statements in General. Most Cited Cases
Alleged comment by district manager that he wanted "a younger influx of blood" was inadmissible double hearsay, and it could not be considered as probative evidence of age discrimination, where coworker testified that another employee overheard the comment at a store meeting and told coworker about it, but that other

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

196 F.3d 1354

Page 2

196 F.3d 1354, 82 Fair Empl.Prac.Cas. (BNA) 899, 77 Empl. Prac. Dec. P 46,350, 13 Fla. L. Weekly Fed. C 198
(Cite as: 196 F.3d 1354)

employee averred in affidavit that he never heard the alleged comment nor told co-worker about it. Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.

**[4] Evidence 157 ☞264**

157 Evidence
    157VII Admissions
        157VII(E) Proof and Effect
            157k264 k. Construction. Most Cited Cases
District manager's admission that, under his direction, there was a pattern of firing or demoting older managers, and replacing them with younger managers, did not qualify as direct evidence of age discrimination, since such evidence did not directly establish that manager's termination decisions were motivated by age bias. Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.

**[5] Civil Rights 78 ☞1201**

78 Civil Rights
    78II Employment Practices
        78k1199 Age Discrimination
            78k1201 k. Practices Prohibited or Required in General; Elements. Most Cited Cases
    (Formerly 78k168.1)
In age discrimination claims based on circumstantial evidence, plaintiff must initially satisfy a four-part prima facie requirement by showing (1) that she was member of protected group of persons between ages of 40 and 70, (2) that she was subject to adverse employment action, (3) that a substantially younger person filled the position that she sought or from which she was discharged, and (4) that she was qualified to do the job for which she was rejected. Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.

**[6] Civil Rights 78 ☞1204**

78 Civil Rights
    78II Employment Practices
        78k1199 Age Discrimination
            78k1204 k. Discharge or Layoff. Most

Cited Cases
    (Formerly 78k170)
Plaintiff employee satisfied "substantially younger" replacement requirement for establishing prima facie case of age discrimination, where plaintiff was 42 at time of his termination, and his replacement was 37 years old. Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.

**[7] Civil Rights 78 ☞1203**

78 Civil Rights
    78II Employment Practices
        78k1199 Age Discrimination
            78k1203 k. Particular Cases. Most Cited Cases
    (Formerly 78k168.1)
Plaintiffs were "qualified" for their respective positions as grocery store managers, as required as part of prima facie case of age discrimination, where first plaintiff held position of store manager for 34 years, and consistently received numerous awards, commendations, and merit raises, and second plaintiff was store manager for 13 years, and also received his share of bonus awards and merit raises. Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.

**[8] Civil Rights 78 ☞1201**

78 Civil Rights
    78II Employment Practices
        78k1199 Age Discrimination
            78k1201 k. Practices Prohibited or Required in General; Elements. Most Cited Cases
    (Formerly 78k168.1)
In age discrimination cases, court focuses on plaintiff's skills and background to determine if plaintiff was qualified for a particular position. Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.

**[9] Civil Rights 78 ☞1203**

78 Civil Rights
    78II Employment Practices
        78k1199 Age Discrimination
            78k1203 k. Particular Cases. Most Cited

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

73-983

196 F.3d 1354

Page 3

196 F.3d 1354, 82 Fair Empl.Prac.Cas. (BNA) 899, 77 Empl. Prac. Dec. P 46,350, 13 Fla. L. Weekly Fed. C 198
(Cite as: 196 F.3d 1354)

Cases
    (Formerly 78k168.1)
In evaluating whether plaintiffs established prima facie case of age discrimination, district court erred in concluding that plaintiffs were not "qualified" for their positions based on employer's allegations of poor performance, since, given the significant period of time that plaintiffs had held their positions, qualification for the position sufficient to satisfy the test of prima facie case could be inferred. Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.

[10] Civil Rights 78 ☞1204

78 Civil Rights
    78II Employment Practices
        78k1199 Age Discrimination
            78k1204 k. Discharge or Layoff. Most Cited Cases
    (Formerly 78k170)

Civil Rights 78 ☞1539

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1534 Presumptions, Inferences, and Burden of Proof
            78k1539 k. Age Discrimination. Most Cited Cases
    (Formerly 78k380)
Employer offered legitimate, nondiscriminatory reasons for terminating first employee, based on poor performance, and terminating second employee for yelling vulgarities in front of customers, thus shifting burden to employees, as plaintiffs in age discrimination case, of offering enough probative evidence so that reasonable jury might conclude that employer's reasons for termination were a pretext for age discrimination. Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.

[11] Civil Rights 78 ☞1539

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes

        78k1534 Presumptions, Inferences, and Burden of Proof
            78k1539 k. Age Discrimination. Most Cited Cases
    (Formerly 78k380)
Once prima facie case of age discrimination is established, defendant must proffer legitimate, nondiscriminatory reasons for its employment decision, and, if such reasons are identified, plaintiff then bears ultimate burden of proving them to be a pretext for age discrimination. Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.

[12] Civil Rights 78 ☞1137

78 Civil Rights
    78II Employment Practices
        78k1137 k. Motive or Intent; Pretext. Most Cited Cases
    (Formerly 78k141)
Courts are not in the business of adjudging whether employment decisions are prudent or fair, but, instead, courts' sole concern in discrimination case is whether unlawful discriminatory animus motivates a challenged employment decision. Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.

[13] Federal Civil Procedure 170A ☞2497.1

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2497 Employees and Employment Discrimination, Actions Involving
                    170Ak2497.1 k. In General. Most Cited Cases
In summary judgment context, inquiry as to whether reasonable jury might conclude that employer's reasons for termination were a pretext for age discrimination is conducted by determining whether jury could reasonably infer discrimination if the facts presented by plaintiffs remain unrebutted. Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.

[14] Federal Civil Procedure 170A ☞2497.1

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

73-984

196 F.3d 1354

Page 4

196 F.3d 1354, 82 Fair Empl.Prac.Cas. (BNA) 899, 77 Empl. Prac. Dec. P 46,350, 13 Fla. L. Weekly Fed. C 198
**(Cite as: 196 F.3d 1354)**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2497   Employees   and
Employment Discrimination, Actions Involving
                    170Ak2497.1 k. In General. Most
Cited Cases
Fact questions existed as to whether employer's
reasons for termination were a pretext for age
discrimination, given circumstantial evidence of
district manager's discriminatory animus towards
older store managers under his direct supervision,
and disputed fact questions as to whether employees
violated work rules with which they were charged
and whether work rule violation charges were used
as pretext to terminate employees, thus precluding
summary judgment on age discrimination claims.
Age Discrimination in Employment Act of 1967, §
2 et seq., 29 U.S.C.A. § 621 et seq.

**[15] Civil Rights 78 ☞1551**

78 Civil Rights
    78IV Remedies Under Federal Employment
Discrimination Statutes
        78k1543 Weight and Sufficiency of Evidence
            78k1551 k. Age Discrimination. Most
Cited Cases
    (Formerly 78k388)
Pattern of firing and demoting older workers and
replacing them with younger workers, by the
relevant decision-maker during the same time
period,   constituted   probative   circumstantial
evidence of age discrimination. Age Discrimination
in Employment Act of 1967, § 2 et seq., 29
U.S.C.A. § 621 et seq.

**[16] Civil Rights 78 ☞1539**

78 Civil Rights
    78IV Remedies Under Federal Employment
Discrimination Statutes
        78k1534   Presumptions,   Inferences,   and
Burden of Proof
            78k1539 k. Age Discrimination. Most
Cited Cases
    (Formerly 78k380)
District manager's remark to plaintiff's younger

successor, right after plaintiff was terminated, that
district manager wanted "aggressive, young men" to
be promoted, was not mere stray remark, but was
highly suggestive circumstantial evidence from
which jury could infer discriminatory animus. Age
Discrimination in Employment Act of 1967, § 2 et
seq., 29 U.S.C.A. § 621 et seq.

**[17] Civil Rights 78 ☞1551**

78 Civil Rights
    78IV Remedies Under Federal Employment
Discrimination Statutes
        78k1543 Weight and Sufficiency of Evidence
            78k1551 k. Age Discrimination. Most
Cited Cases
    (Formerly 78k388)
District manager's remark to first plaintiff's younger
successor, that district manager wanted "aggressive,
young men" to be promoted, was probative as to
whether age animus motivated the decision to
terminate second plaintiff, where remark was
allegedly made only three months after second
plaintiff was terminated, remark immediately
followed the termination of first plaintiff, someone
similarly situated to second plaintiff and in the same
protected class, and it came from the same
decision-maker responsible for second plaintiff's
termination. Age Discrimination in Employment
Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.

**[18] Civil Rights 78 ☞1539**

78 Civil Rights
    78IV Remedies Under Federal Employment
Discrimination Statutes
        78k1534   Presumptions,   Inferences,   and
Burden of Proof
            78k1539 k. Age Discrimination. Most
Cited Cases
    (Formerly 78k380)

**Civil Rights 78 ☞1551**

78 Civil Rights
    78IV Remedies Under Federal Employment
Discrimination Statutes
        78k1543 Weight and Sufficiency of Evidence
            78k1551 k. Age Discrimination. Most

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

73-985

196 F.3d 1354                                                                                    Page 5

196 F.3d 1354, 82 Fair Empl.Prac.Cas. (BNA) 899, 77 Empl. Prac. Dec. P 46,350, 13 Fla. L. Weekly Fed. C 198
(Cite as: 196 F.3d 1354)

Cited Cases
    (Formerly 78k388)
Age discrimination plaintiff bears ultimate burden to prove by preponderance of evidence that employer terminated plaintiff based on a discriminatory motive. Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.

[19] Civil Rights 78 €═1122

78 Civil Rights
    78II Employment Practices
        78k1122 k. Discharge or Layoff. Most Cited Cases
    (Formerly 78k144)
Employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct; employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.

*1357 Scott Walter Rothstein, Michael Anthony Pancier, Ft. Lauderdale, FL, for Plaintiffs-Appellants.
Joseph Lester Rebak, Miami, FL, for Defendant-Appellee.

Appeal from the United States District Court for the Southern District of Florida.

Before EDMONDSON and MARCUS, Circuit Judges, and ALARCON [FN*], Senior Circuit Judge.

        FN* Honorable Arthur L. Alarcon, Senior U.S. Circuit Judge for the Ninth Circuit, sitting by designation.

MARCUS, Circuit Judge:
In this age discrimination suit, Appellants Walter Damon and Richard Kanafani appeal from an order of the district court granting summary judgment in favor of the defendant, Fleming Supermarkets of Florida, Inc. d/b/a Hyde Park Markets, f/d/b/a Wooley's Fine Foods ("Fleming"). Damon and Kanafani brought this action against Fleming, their

former employer, alleging violations of the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §§ 621-634, and the Florida Civil Rights Act of 1992, Fl.Stat.Ann. §§ 760.01-760.11. The district court concluded that neither plaintiff had established a prima facie case of age discrimination, nor, in the alternative, had demonstrated that the legitimate nondiscriminatory reasons proffered by Fleming for their terminations were a pretext for age discrimination. We disagree, finding material facts in dispute. Accordingly, we reverse the order of summary judgment and remand for trial.

I.

We review a district court's order granting summary judgment de novo. *1358Browning v. AT&T Paradyne, 120 F.3d 222 (11th Cir.1997). Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c). A factual dispute is genuine " if the evidence is such that a reasonable jury could return a verdict for the non-moving party." United States v. Four Parcels of Real Property, 941 F.2d 1428, 1437 (11th Cir.1991) (en banc) (citation omitted). In making this determination, we review the record, drawing all reasonable inferences in the light most favorable to the nonmoving party. See Jameson v. Arrow Co., 75 F.3d 1528, 1531 (11th Cir.1996).

II.

The facts presented are reasonably straightforward. Fleming, a nationwide supermarket chain, acquired twenty South Florida supermarket stores in September 1993 from Pantry Pride (d/b/a Wooley's Fine Foods). It immediately installed Harry Soto as district manager of seven of the stores. At the time, Appellants Walter Damon and Richard Kanafani were store managers at two of the stores acquired by Fleming. Each of their stores was placed under the direct supervision of Soto. The undisputed evidence demonstrates that, within a period of slightly over one year after assuming the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

196 F.3d 1354                                                                              Page 6

196 F.3d 1354, 82 Fair Empl.Prac.Cas. (BNA) 899, 77 Empl. Prac. Dec. P 46,350, 13 Fla. L. Weekly Fed. C 198
(Cite as: 196 F.3d 1354)

position of district manager, Soto terminated or demoted five older, more experienced managers, including Damon and Kanafani, and replaced them with men who were younger and less experienced. The older managers were all over forty, and the younger managers were all under forty. Soto himself acknowledged that this pattern occurred. No evidence was presented by Fleming that any younger managers were terminated by Soto while he was district manager. Damon was fired for alleged poor performance. Kanafani was fired for allegedly yelling profanities at an employee on the sales floor.

### III.

In its September 16, 1998 summary judgment order, the district court made several pertinent conclusions of law. First, the district court reasoned that Appellants had not established all the elements of a prima facie case of age discrimination. Specifically, the district court found that Damon and Kanafani neither established that they were qualified for their positions under the *McDonnell Douglas* rubric nor proffered direct evidence of discrimination by Fleming. The district court also suggested in dicta that Kanafani had failed to establish that he was replaced by someone substantially younger because, at the time of his termination, Kanafani was forty-two and his replacement was thirty-seven. Finally, the district court concluded that Appellants did not establish that the nondiscriminatory reasons Fleming offered for the terminations were a pretext for age discrimination. We discuss each conclusion in turn.

### A. Prima Facie Case

In proving an age discrimination claim, a plaintiff can establish a prima facie case of discrimination through either direct evidence of discrimination or a variation of the four-part test outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) for circumstantial evidence. *See Carter v. City of Miami*, 870 F.2d 578, 581(11th Cir.1989) Appellants' claims rely on both methods.

### 1. Direct Evidence of Discrimination

[1][2] We agree with the district court that neither plaintiff has presented direct evidence of age discrimination. We have defined direct evidence of discrimination as evidence which reflects " 'a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee.' " *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641 (11th Cir.1998) (quoting *Caban-Wheeler v. Elsea*, 904 F.2d 1549, 1555 (11th Cir.1990)). In other words, the evidence*1359 must indicate that the complained-of employment decision was *motivated* by the decision-maker's ageism. As a result, "only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age " will constitute direct evidence of discrimination. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081-82 (11th Cir.1990) (citations and quotations omitted); *see also City of Miami*, 870 F.2d at 582.
An example of "direct evidence would be a management memorandum saying, 'Fire Earley-he is too old.' " *Earley*, 907 F.2d at 1082. No evidence presented by Appellants meets this rigorous standard.

[3][4] The most probative piece of alleged direct evidence cited by Appellants is a comment by Soto to Dennis D'Angelo, Kanafani's replacement, immediately after Kanafani's termination that "what the company needed was aggressive *young* men like [D'Angelo] to be promoted." [FN1] While the statement was made right after Kanafani's termination, and it was made by Soto, the decision-maker, to Kanafani's younger replacement, the comment does not amount to direct evidence of discrimination. Though probative circumstantial evidence of Soto's state of mind, the comment still requires us to *infer* that Soto's interest in promoting young men motivated his decision to terminate Kanafani. In similar instances, our court has refused to classify such comments as direct evidence of discrimination. *See, e.g., Beaver v. Rayonier Inc.*, 188 F.3d 1279, 1285-86 (11th Cir.1999) (finding that decision-maker's comment that he wanted to attract "younger, engineer-type employees or supervisors" in reduction-in-force case did not rise to level of direct evidence of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

73-987

196 F.3d 1354                                                                                    Page 7

196 F.3d 1354, 82 Fair Empl.Prac.Cas. (BNA) 899, 77 Empl. Prac. Dec. P 46,350, 13 Fla. L. Weekly Fed. C 198
(Cite as: 196 F.3d 1354)

discrimination); *Burrell v. Board of Trustees of Georgia Military College*, 125 F.3d 1390, 1393-94 (11th Cir.1997) (holding that evidence which suggests, but does not prove, a discriminatory motive, is circumstantial evidence by definition). We therefore conclude that the district court correctly found no direct evidence of age discrimination.

> FN1. In addition to this comment, Appellants also rely on an alleged comment by Soto that he wanted "a younger influx of blood." There is no record evidence that Soto ever made this comment. The only evidence of this comment is double hearsay testimony from a co-worker, Charlie Guerra, that another employee, Justo Varela, overheard the comment at a store meeting and told Guerra about it. Varela avers in an affidavit that he never heard the comment nor told Guerra about the alleged comment. Guerra did not hear Soto make the comment, and was not even present at the meeting in question. This comment is inadmissible double hearsay, and we refuse to consider it as probative evidence. *See Zaben v. Air Products & Chemicals, Inc.*, 129 F.3d 1453, 1455-57 (11th Cir.1997). Finally, Appellants rely on Soto's admission that, under his direction, there was a pattern of firing or demoting older managers, and replacing them with younger managers. While probative circumstantial evidence, this pattern is not direct evidence of discrimination because it does not directly establish that Soto's termination decisions were motivated by age bias.

2. Circumstantial Evidence of Discrimination

[5] In evaluating age discrimination claims based on circumstantial evidence, we require a plaintiff to initially satisfy a four-part prima facie requirement: (1) that she was a member of the protected group of persons between the ages of forty and seventy; (2) that she was subject to adverse employment action;

(3) that a substantially younger person filled the position that she sought or from which she was discharged; and (4) that she was qualified to do the job for which she was rejected. *See Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1432 (11th Cir.1998) (citations omitted).

[6] We conclude that both Appellants established prima facie cases of age discrimination. First, there is no dispute that Appellants satisfied the first two requirements. Both Appellants are members of the protected group and were subjected to adverse employment actions. As for the third element, Appellees concede that Damon satisfied the third requirement*1360 in that he was replaced by someone "substantially younger." However, both the Appellees and the district court, in dicta, suggest that Kanafani did not meet this requirement because, at the time of Kanafani's termination, his replacement was thirty-seven, while Kanafani was only forty-two. We disagree. Previously, we have held that a replacement who is only *three* years younger is sufficient to establish a prima facie case. *See Carter v. DecisionOne Corp.*, 122 F.3d 997, 1003 (11th Cir.1997) (holding that plaintiff aged 42, who was replaced by employee aged 39, met the "substantially younger" replacement requirement under ADEA) (citing *Carter v. City of Miami*, 870 F.2d 578, 582-83 (11th Cir.1989)). Here, there is a five year age difference between Kanafani and his replacement. We therefore find that Kanafani has satisfied the "substantially younger" replacement requirement.

[7][8] Finally, we conclude that Kanafani and Damon were "qualified" for their respective positions, satisfying the fourth and final prima facie requirement. In age discrimination cases, our court focuses on a plaintiff's "skills and background to determine if they were qualified for a particular position." *Clark v. Coats & Clark*, 990 F.2d 1217, 1227 (11th Cir.1993). Our precedent holds that if a plaintiff has enjoyed a long tenure at a certain position, we can infer that he or she is qualified to hold that particular position. *See id.*(inferring a plaintiff's job qualifications from his 25' years of experience); *Pace v. Southern Railway System*, 701 F.2d 1383, 1386 n. 7 (11th Cir.1983) (finding that " where a plaintiff has held a position for a significant

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

73-988

196 F.3d 1354                                             Page 8

196 F.3d 1354, 82 Fair Empl.Prac.Cas. (BNA) 899, 77 Empl. Prac. Dec. P 46,350, 13 Fla. L. Weekly Fed. C 198
**(Cite as: 196 F.3d 1354)**

period of time, qualification for that position, sufficient to satisfy a prima facie case, can be inferred"). Based on the employment history of Damon and Kanafani, we can infer that they were qualified for their respective positions. Appellants were store managers for more than a decade, and, by all accounts, had performed their jobs with distinction during the bulk of that period. Damon held the position of store manager for 34 years, and consistently received numerous awards, commendations, and merit raises. Kanafani was a store manager for 13 years, and also received his share of bonus awards and merit raises.

[9] In finding the Appellants unqualified, the district court incorrectly considered Fleming's allegations of Appellants' poor performance. Our caselaw quite clearly instructs that plaintiffs, who have been discharged from a previously held position, do not need to satisfy the *McDonnell Douglas* prong " 'requiring proof of qualification.' " *Young v. General Foods Corp.,* 840 F.2d 825, 830 n. 3 (11th Cir.1988) (quoting *Rosenfield v. Wellington Leisure Products, Inc.,* 827 F.2d 1493, 1495 n. 2 (11th Cir.1987)). We have explained that the " 'reason for this modification [of *McDonnell Douglas* ] is that in cases where a plaintiff has held a position for a significant period of time, qualification for that position sufficient to satisfy the test of a prima facie case can be inferred.' " *Young,* 840 F.2d at 830 n. 3 (quoting *Rosenfield,* 827 F.2d at 1495 n. 2). We also have unambiguously held that allegations of poor performance against plaintiffs discharged from long-held positions may be properly considered, only *after* a prima facie case has been established, when a court evaluates the pretextual nature of an employer's proffered nondiscriminatory reasons for termination. *See Clark,* 990 F.2d at 1227 (holding that evidence of employee's performance reprimands does not establish that employee was unqualified, but may indicate company was legitimately concerned about employee's performance); *Young,* 840 F.2d at 830 n. 3 (same). The district court therefore erred in concluding that Appellants were not "qualified" based on Fleming's allegations of poor performance.

### B. Pretext

[10][11][12][13] Having concluded that Appellants met their prima facie burdens, we turn to the remaining issue of pretext. *1361 Once a prima facie case is established, a defendant must proffer legitimate, nondiscriminatory reasons for its employment decision. If such reasons are identified, a plaintiff then bears the ultimate burden of proving them to be a pretext for age discrimination. *See Turlington,* 135 F.3d at 1432. We have repeatedly and emphatically held that a defendant may terminate an employee for a good or bad reason without violating federal law. *See Elrod v. Sears, Roebuck & Co.,* 939 F.2d 1466, 1470 (11th Cir.1991). We are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision. *See Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1187 (11th Cir.1984). In this case, Fleming clearly offered legitimate, nondiscriminatory reasons for terminating Damon (poor performance), and Kanafani (yelling vulgarities in front of customers). Therefore, Appellants bore the burden of offering enough probative evidence so that a reasonable jury might conclude that Fleming's reasons for termination were a pretext for age discrimination. *See Bogle v. Orange County Bd. of County Comm'rs,* 162 F.3d 653, 658 (11th Cir.1998). In the summary judgment context, we conduct this inquiry by determining whether a jury "could reasonably infer discrimination if the facts presented [by Appellants] remain unrebutted." *Jameson,* 75 F.3d at 1531 (citations omitted). We must avoid weighing conflicting evidence or making credibility determinations. Rather, " '[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. ' " *Hairston v. Gainesville Sun Publishing Co.,* 9 F.3d 913, 918 (11th Cir.1993) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). After a painstaking review of the entire record, we find that Appellants have made this requisite showing.

[14][15] First, circumstantial evidence was presented of Soto's discriminatory animus towards

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

196 F.3d 1354

196 F.3d 1354, 82 Fair Empl.Prac.Cas. (BNA) 899, 77 Empl. Prac. Dec. P 46,350, 13 Fla. L. Weekly Fed. C 198
(Cite as: 196 F.3d 1354)

older store managers under his direct supervision. Within a one-year period, *four* older, highly experienced store managers, out of a total of *seven* managers under Soto's *direct supervision*, were terminated or demoted, and each was replaced by an employee under forty years old. In addition, Soto also terminated a highly experienced, older assistant store manager, during this time period, and replaced him with an employee under forty years old. As Soto conceded, "[I]t certainly turns out that what has occurred is that older managers were either fired or demoted and replaced by younger people," and that "in every instance ... the older store managers had more years of experience than the people that replaced them." While not direct evidence of discriminatory animus, we believe that this pattern of firing and demoting *so many* older workers and replacing them with younger workers, *by the relevant decision-maker during the same time period*, constitutes probative circumstantial evidence of age discrimination. *See Stamey v. Southern Bell Telephone & Telegraph Co.*, 859 F.2d 855, 862 (11th Cir.1988). Moreover, the probative value of this pattern was underscored by direct testimony. Kanafani testified that, in January 1994, Fleming began placing advertisements for new store managers even though there were no managerial vacancies at the time. According to Kanafani, Harry Soto then began interviewing younger managerial candidates at Kanafani's store. Several of these candidates were later hired by Soto to replace Kanafani and the other older managers. Record evidence also reveals that shortly thereafter, older managers with good employment histories, under Soto's direct supervision, began receiving written reprimands for "poor store conditions" or " poor sales." Three former managers of Fleming, in addition to Damon, averred that they were demoted or terminated by Soto, after receiving written reprimands for "poor store conditions," "poor performance,"*1362 or "poor sales," and replaced by a substantially younger manager. Each former manager also disputed the veracity of their reprimands.

[16][17]  Second, Soto's remark to Kanafani's younger successor, D'Angelo, right after Kanafani was terminated, that Soto wanted "aggressive, *young* men" like himself to be promoted is highly

suggestive circumstantial evidence from which a jury could infer discriminatory animus.[FN2] Far from being a stray remark, the comment may evince probative evidence of the state of mind of the decision-maker at the time of Kanafani's termination. The comment also arguably suggests that Soto had an ageist preference for young managers. Given the substance, context, and timing of Soto's comment, if credited, we find it to be a significant piece of circumstantial evidence. *See Jones v. Bessemer Carraway Medical Ctr.*, 151 F.3d 1321, 1323 n. 11 (11th Cir.1998) (holding that "language not amounting to direct evidence, but showing some racial animus, may be *significant* evidence of pretext once a plaintiff has set out a prima facie case") (emphasis added); *see also Rayonier*, 188 F.3d at 1286 (finding decision-maker's comment that he wanted "younger" employees to constitute circumstantial evidence of a discriminatory motive); *Alphin v. Sears, Roebuck & Co.*, 940 F.2d 1497, 1499 (11th Cir.1991) (finding*1363 remark by supervisor to plaintiff that he had "been around too long and [was] too old and [was] making too much money" immediately after a "corrective interview" to be circumstantial evidence of age discrimination). Moreover, we also find Soto's statement to be probative as to whether age animus motivated the decision to terminate Damon because the remark (1) was allegedly made only three months after Damon was terminated, (2) immediately followed the termination of someone similarly situated to Damon and in the same protected class, and (3) came from the same decision-maker responsible for Damon's termination. *See Ryder v. Westinghouse Electric Corp.*, 128 F.3d 128, 130-133 (3d Cir.1997) (holding that remarks made *one year* after termination, and not directly about plaintiff, could be taken by a jury as an accurate reflection of the existing managerial attitude toward older workers) (emphasis added).

> FN2.  D'Angelo twice averred that Soto used the term "aggressive *young* men," although D'Angelo, who still works for Fleming, later stated, under examination by defense counsel, that he was not sure whether Soto actually used the word " young." Kanafani also testified that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

196 F.3d 1354                                                                                    Page 10

196 F.3d 1354, 82 Fair Empl.Prac.Cas. (BNA) 899, 77 Empl. Prac. Dec. P 46,350, 13 Fla. L. Weekly Fed. C 198
(Cite as: 196 F.3d 1354)

D'Angelo told him that Soto had used the term "aggressive *young* men." The entire transcript of D'Angelo's testimony reads as follows:

Q. [Plaintiff's Attorney]: Did you ever have a one-on-one conversation with Harry Soto where Mr. Soto told you that what the company needed was aggressive young men like yourself to be promoted.

A. [D'Angelo]: Yes.

Q. Why don't you tell me how this conversation went?

A. This was right after Rick [Kanafani] was terminated and Harry had brought me up to the main office to explain to me that he had terminated Rick, and that the company was going in a new direction, and we had to hold onto our pants, was like the catch phrase at the time. Things were moving fast.

Q. That's when he told you that the company needed aggressive young men like yourself?

A. He included me in-I can't remember the exact word he used, but he included me in that mix, because I was in charge of the store for a week and a half until Tony Calaverio came in.

Q. But he did tell you that the company needed aggressive young men?

A. I can't recall that. I really can't.

Attorney: Could you read back to me my question?

(Thereupon, a portion of the record was read by the reporter as follows: Question: Did you ever have a one-on-one conversation with Harry Soto where Mr. Soto told you that what the company needed was aggressive young men like yourself to be promoted. Answer. Yes.)

Q. Is that what happened?

[Objection to form]

A. Yes.

...

Q. [Defendant's Attorney]:. Do you have a recollection that these following words came out of Harry Soto, Harry Soto said the following words: We need aggressive young men like yourself? Do you have

the recollection that he said that to you?

...

A. [D'Angelo]: It was something similar to that. It could be a paraphrase, so-I know aggressive was in there. He used me-I guess it was a motivational tool.

Q. Did he say the word "young"?

A. That, I can't recall.

Q. But you can recall that he said aggressive?

A. Aggressive, yes, yes, aggressive.

Q. And he included yourself?

A. Yes.

Q. But you're not sure if he said young?

A. I'm not sure about that.

We are satisfied that a jury should weigh the credibility of this circumstantial evidence. *See Walker v. NationsBank,* 53 F.3d 1548, 1563 (11th Cir.1995) (Johnson, J. specially concurring)( noting that "the factfinder must evaluate the credibility of the witnesses and the weight of the evidence. This task is peculiarly the province of the jury.") (citing *Castle v. Sangamo Weston, Inc.,* 837 F.2d 1550, 1559 (11th Cir.1988)); *see also Combs,* 106 F.3d at 1530 (stating, in the summary judgment context, that "[i]ssues of fact and sufficiency of evidence are properly reserved for the jury") (citation omitted).

[18][19] In addition to this circumstantial evidence, we conclude that Appellants have offered evidentiary support by which a reasonable jury could conclude that the specific reasons for termination given by Fleming were a pretext. Appellants both were terminated for alleged violations of company work rules. On summary judgment, we have written that the "work rule" defense is arguably pretextual when a plaintiff submits evidence (1) that she did not violate the cited work rule, or (2) that if she did violate the rule, other employees outside the protected class, who engaged in similar acts, were not similarly treated. *See Alphin,* 940 F.2d at 1501 n. 1 (citing *Anderson v. Savage Laboratories, Inc.,* 675 F.2d 1221, 1224 (11th Cir.1982)). We are satisfied that Appellants have made this requisite showing.FN3

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

196 F.3d 1354                                                                    Page 11

196 F.3d 1354, 82 Fair Empl.Prac.Cas. (BNA) 899, 77 Empl. Prac. Dec. P 46,350, 13 Fla. L. Weekly Fed. C 198
(Cite as: 196 F.3d 1354)

FN3. Of course, this framework is simply used to assess whether a plaintiff has presented sufficient evidence to establish pretext-that is, the employer has not given an honest explanation of the employer's behavior-and thereby reach a jury on the ultimate question of discrimination. This framework, however, does not vitiate a plaintiff's ultimate burden to prove by a preponderance of the evidence that an employer terminated the plaintiff based on a discriminatory motive. An employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct. An employer " ' may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long *as its action is not for a discriminatory reason.*' " *Jones,* 151 F.3d at 1324 n. 16 (quoting *Nix,* 738 F.2d at 1187) (emphasis added).

With respect to Damon, Fleming contends that Damon was fired for poor performance; specifically, that over a six month period his store was cited by Fleming management on four separate occasions for "poor conditions." Damon flatly denies these allegations, and has adduced sufficient evidence to create a genuine dispute of material fact as to his job performance.

The first set of relevant allegations involve a February 24, 1994 visit by Soto to Damon's store. According to Damon, he and Soto discussed the store's overall appearance during the visit, but Soto never stated that conditions were below acceptable company standards. However, a week later, on March 4, 1994, Soto issued a written reprimand to Damon for store conditions in violation of company policy. According to Damon, Soto ordered him to sign the reprimand even though he did not agree with the reprimand's charges. Damon also averred that his store was in good condition on February 24, 1994, that the letter was a "fabrication," and that at no time prior to the reprimand did Soto tell him that store conditions were unacceptable. The reprimand gave Damon until March 15 to correct the violations. Soto conducted a follow-up store

inspection on March 12, 1994. In an internal memo of the same day, which apparently was never shown to Damon, Soto found several uncorrected store violations. However, Soto subsequently testified that, by March 15, all of the store's violations had been fixed by Damon. Indeed, Soto admitted *1364 that Damon's ability to bring his store into compliance showed impressive managerial drive. For the next few months, Damon received no reprimands.

On May 30, 1994, during Memorial Day Weekend, Mel Beech, Fleming's Vice President of Store Operations and Soto's direct supervisor, visited Damon's store. On June 9, 1994, ten days after this visit, Damon received a written reprimand from Soto for conditions allegedly found at the store during Beech's visit. The reprimand charged that Damon had been warned previously about performance improvements expected from him, that Damon was not performing consistently enough to continue in his position, and that any further operational problems would result in Damon's immediate termination. Damon disputes that the store was in poor condition during Beech's visit, and denies every single specific criticism contained in the June reprimand, save one minor point.FN4 Damon also reiterates that the memorandum was a " fabrication" designed to justify his eventual firing, and that other older store managers in Soto's district received similar letters threatening to terminate or demote them, while he knew of no younger manager who received a similar letter.FN5

FN4. Of eight specific criticisms, Damon only conceded that three clerks may have been taking a break in the back room for a portion of Beech's visit. Among other things, he disputes that the meat and seafood cases were empty, that there were miscellaneous floor displays all over the store, that there was poor signage, that floor conditions were deplorable, and that there was poor customer service.

FN5. Damon testified that he personally spoke to several older managers about their receipt of threat-to-terminate memos

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

196 F.3d 1354                                                                          Page 12

196 F.3d 1354, 82 Fair Empl.Prac.Cas. (BNA) 899, 77 Empl. Prac. Dec. P 46,350, 13 Fla. L. Weekly Fed. C 198
(Cite as: 196 F.3d 1354)

in 1994. He also stated that he spoke to several of the younger managers, including Dave Applebaum, who denied receiving similar letters despite the fact that their stores were kept in similar condition to Damon's store.

Finally, on July 1, 1994, at the start of the busy July 4th weekend, Soto revisited Damon's store, and filed another reprimand of Damon. Five days later, Soto terminated Damon, by letter, for poor performance. Damon disputes the specific allegations of his store's poor condition, contained in the July reprimand, as well as Soto's claim that he had given Damon repeated verbal warnings about his alleged performance deficiencies. Moreover, Damon asserts that, Soto told him in the course of *direct* conversations, that he was doing a good job, and that his store's conditions had improved since Damon had become store manager. Damon also avers that he visited the stores of younger store managers and found that their stores were either in the same or worse shape during this relevant time period. None of these younger managers were terminated. Damon's testimony is corroborated by Julio Nunez, a former Fleming manager promoted by Soto, who testified that Damon's store was essentially in the same condition as the rest of Fleming's South Florida stores during the relevant time period. Additionally, Soto also conceded that two of Damon's three reprimands for "poor store conditions" occurred during busy holiday weekends-a time, according to Soto, when stores may well be in poor condition. Finally, evidence was presented that Luis Requejo, Damon's younger replacement, experienced substantially more severe problems in maintaining proper store conditions, and yet, was not fired. In addition to receiving two performance reprimands from Soto in August and October 1994, Requejo's meat department received several reprimands from state food inspectors beginning in July 1995, one month after Soto was promoted to another company position. Eventually, Requejo's meat department was shut down for failure to comply with these state reprimands. Although Soto admitted that this problem was more serious than Damon's alleged deficiencies, Fleming took no disciplinary action against Requejo.

Based on the totality of this evidence, the age-based comment allegedly made by Soto to Kanafani's replacement, and Soto's *1365 purported pattern of demoting and firing numerous older managers in favor of younger replacements, we conclude that Damon has introduced sufficient evidence to avoid summary judgment on his age discrimination claim.

We draw a similar conclusion with respect to Kanafani's claim. The sole reason advanced by Soto, the actual decision-maker, for Kanafani's termination is a yelling incident involving Kanafani and his seafood department manager on October 1, 1994.[FN6] Dennis D'Angelo, Kanafani's replacement, also testified that Soto told him that the only reason Kanafani was fired was because he yelled at a fellow employee on the sales floor. Fleming claims that Kanafani uttered several vulgarities on the sales floor, where customers could overhear, and that this breach of company policy justified his immediate firing five days later. Kanafani admitted that he yelled during the *1366 incident, but vehemently denies using any vulgarity aside from the word "hell" once.[FN7] Kanafani's testimony creates a genuine issue of material fact with respect to whether he uttered profanities on the sales floor.

FN6. Fleming now claims, despite repeated statements by Soto, the decision-maker, during his deposition that Kanafani was fired *solely* because of his yelling vulgarities at an employee on the sales floor, that Kanafani also was terminated, in part, because of his " previous disregard of company rules and blatant unprofessionalism." As evidence, Fleming introduced a subsequent affidavit from Soto in its motion for summary judgment that somewhat broadens Soto's termination motives. In the affidavit, Soto claimed that he fired Kanafani after the yelling incident for his "failure to improve his people skills,""[his] disregard of company rules, and his blatant unprofessionalism." However, during his earlier deposition, Soto unequivocally stated that the *sole* reason for Kanafani's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

196 F.3d 1354                                                                    Page 13

196 F.3d 1354, 82 Fair Empl.Prac.Cas. (BNA) 899, 77 Empl. Prac. Dec. P 46,350, 13 Fla. L. Weekly Fed. C 198
(Cite as: 196 F.3d 1354)

termination was the yelling incident.
Q. What was the basis for his [Kanafani's] termination?
A. Using profanity on the sales floor where the customers were out in the open.
...
Q. Was he terminated because of poor store conditions or was he terminated because of using vulgarity on the sales floor in front of customers?
·A. He was terminated for using vulgarity on the sales floor in front of customers.
Q. No other reason?
A. That was the reason for the termination.
...
Q. So again, the only reason he was terminated was for using vulgarity on the sales floor, correct?
A. That is correct.
Moreover, Dennis D'Angelo, Kanafani's replacement, also testified that Soto told him that Kanafani was fired solely because of the yelling incident. Based on the repeated statements by Soto during his deposition that he fired Kanafani solely for the yelling incident (as well as D'Angelo's corroboration of Soto's termination motive), we find that a jury could infer that the "inconsistencies" between Soto's deposition and affidavit may be evidence of pretext. *See Tidwell v. Carter Products,* 135 F.3d 1422, 1427-28 (11th Cir.1998) (citing *Bechtel Construction Co. v. Secretary of Labor,* 50 F.3d 926 (11th Cir.1995); *Howard v. BP Oil Co., Inc.,* 32 F.3d 520, 525 (11th Cir.1994)). Furthermore, Kanafani has produced sufficient evidence to create genuine issues of material fact as to his previous reprimands from Soto. Kanafani received three reprimands prior to the yelling incident for "poor sales," "poor store conditions," and an altercation with a beer vendor respectively. First, Kanafani testified that his store had become more profitable since he became store manager, creating a genuine issue of material fact as to the first reprimand. Second, while Kanafani received a reprimand for "poor

store conditions" during the busy Memorial Day Holiday Weekend, Fleming does not directly proffer this reprimand as a basis for Kanafani's termination. Even if this reprimand were cited as a termination factor, we believe Kanafani has presented sufficient evidence that the reprimand was a pretext. During Memorial Day weekend, Kanafani was on vacation, and not in charge of the store. Julio Nunez, a younger assistant manager at the time, actually was acting store manager for the weekend. Despite this fact, Kanafani, and not Nunez, was reprimanded for the store's "poor condition." Nunez subsequently was promoted to store manager by Soto, replacing an older store manager, despite Soto's admission that he was aware that Nunez, and not Kanafani, was primarily responsible for the poor store conditions during Memorial Day Weekend. Finally, Kanafani vigorously denies that he upbraided the beer vendor over complimentary football tickets offered to him, or told the vendor "deliver better tickets or else." All Kanafani admits to is politely returning the tickets because they were not to his satisfaction, creating a genuine issue of material fact as to this incident. We believe that this evidence, when combined with all of the previously-cited circumstantial evidence, could convince a jury that Kanafani's reprimands were a pretext for his termination.

FN7. Fleming asserts that Kanafani used the word "fuck" several times during the incident. Kanafani denies this claim, admitting only to stating at the end of the incident, "what the *hell* do you want me to do?"

In addition, Kanafani also presented evidence which, if credited, could convince a jury that the incident was a pretext for his termination. Kanafani's replacement, Dennis D'Angelo, testified that he had observed members of Fleming management, including Soto himself, yell at

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

196 F.3d 1354                                                                Page 14

196 F.3d 1354, 82 Fair Empl.Prac.Cas. (BNA) 899, 77 Empl. Prac. Dec. P 46,350, 13 Fla. L. Weekly Fed. C 198
(Cite as: 196 F.3d 1354)

employees *in front* of store customers. Soto admitted to yelling at employees with profane language, but claimed these incidents occurred in employee-only store areas. Previously, we have held that evidence demonstrating that the decision-maker engaged in the same policy violation proffered for an employee's termination is "especially compelling" evidence of pretext. *Ross v. Rhodes Furniture,* Inc., 146 F.3d 1286, 1291 (11th Cir.1998). As a result, if a jury were to credit D'Angelo's testimony, they could reasonably find the yelling incident to be a pretext. When this testimony is combined with Soto's comment to D'Angelo, immediately after Kanafani's termination, that Soto wished to promote *"younger* aggressive men," and Soto's pattern of demoting and firing numerous older managers in favor of younger replacements, we conclude that Kanafani too has introduced sufficient circumstantial evidence to survive summary judgment.

In short, we find that the circumstantial evidence presented by Damon and Kanafani, taken as a whole, is sufficient to make a prima facie showing of age discrimination, and to rebut the nondiscriminatory reasons proffered by Fleming for their terminations. Material facts remain in dispute, precluding summary judgment. Accordingly, we reverse the district court's order of summary judgment and remand the case for further proceedings consistent with this opinion.

REVERSED and REMANDED.

C.A.11 (Fla.),1999.
Damon v. Fleming Supermarkets Of Florida, Inc.
196 F.3d 1354, 82 Fair Empl.Prac.Cas. (BNA) 899, 77 Empl. Prac. Dec. P 46,350, 13 Fla. L. Weekly Fed. C 198

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2

73-996

Westlaw.

32 F.3d 759

Page 1

32 F.3d 759, 65 Fair Empl.Prac.Cas. (BNA) 890
(Cite as: 32 F.3d 759)

▷
Fuentes v. Perskie
C.A.3 (N.J.),1994.

United States Court of Appeals,Third Circuit.
Luis A. FUENTES, Appellant,
v.
Steven P. PERSKIE, Chairman of the New Jersey
Casino Control Commission; the New Jersey
Casino Control Commission.
No. 93-5561.

Argued June 23, 1994.
Decided Aug. 1, 1994.

Casino employee brought Title VII national origin
discrimination suit against employer. The United
States District Court for the District of New Jersey,
Joseph E. Irenas, J., granted summary judgment for
employer. Employee appealed. The Court of
Appeals, Becker, Circuit Judge, held that: (1)
standards for withstanding summary judgment after
employer has proffered legitimate,
nondiscriminatory reason for adverse employment
action would be set forth, and (2) employee failed
to show that employer's failure to rehire him after
reorganization was result of national origin
discrimination.

Affirmed.
West Headnotes
[1] Federal Civil Procedure 170A ⟨⟩2497.1

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2497 Employees and
Employment Discrimination, Actions Involving
                    170Ak2497.1 k. In General. Most
Cited Cases
In Title VII action, for plaintiff to withstand
summary judgment after employer has proffered
legitimate, nondiscriminatory reason for adverse

employment action, plaintiff generally must submit
evidence which: (1) casts sufficient doubt upon
each proffered reason so that fact finder could
reasonably conclude that each reason was
fabrication, or (2) allows fact finder to infer that
discrimination was more likely than not a
motivating or determinative cause of adverse action.
Civil Rights Act of 1964, §§ 701 to 718, as
amended, 42 U.S.C.A. §§ 2000e to 2000e-17.

[2] Civil Rights 78 ⟨⟩1535

78 Civil Rights
    78IV Remedies Under Federal Employment
Discrimination Statutes
        78k1534 Presumptions, Inferences, and
Burden of Proof
            78k1535 k. In General. Most Cited Cases
            (Formerly 78k377.1)
At trial, plaintiff in Title VII action must convince
fact finder both that employer's articulated reason
for adverse employment action is false, and that
discrimination was the real reason for action. Civil
Rights Act of 1964, §§ 701 to 718, as amended, 42
U.S.C.A. §§ 2000e to 2000e-17.

[3] Civil Rights 78 ⟨⟩1137

78 Civil Rights
    78II Employment Practices
        78k1137 k. Motive or Intent; Pretext. Most
Cited Cases
        (Formerly 78k153)
In Title VII action, fact finder's rejection of
employer's proffered, legitimate reason permits, but
does not compel, verdict for plaintiff. Civil Rights
Act of 1964, §§ 701 to 718, as amended, 42
U.S.C.A. §§ 2000e to 2000e-17.

[4] Civil Rights 78 ⟨⟩1544

78 Civil Rights
    78IV Remedies Under Federal Employment
Discrimination Statutes

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

32 F.3d 759

32 F.3d 759, 65 Fair Empl.Prac.Cas. (BNA) 890
(Cite as: 32 F.3d 759)

78k1543 Weight and Sufficiency of Evidence
78k1544 k. In General. Most Cited Cases
(Formerly 78k382.1)

**Civil Rights 78 ☜1545**

78 Civil Rights
78IV Remedies Under Federal Employment
Discrimination Statutes
78k1543 Weight and Sufficiency of Evidence
78k1545 k. Prima Facie Case. Most Cited
Cases
(Formerly 78k383)
Test of whether plaintiff will prevail in Title VII
action is whether plaintiff ultimately persuades fact
finder that employment decision was caused by
bias, and for that purpose both plaintiff's prima
facie case and fact finder's rejection of employer's
proffered evidence are circumstantial evidence of
unlawful discrimination. Civil Rights Act of 1964,
§ 701 to 718, as amended, 42 U.S.C.A. §§ 2000e to
2000e-17.

**[5] Civil Rights 78 ☜1137**

78 Civil Rights
78II Employment Practices
78k1137 k. Motive or Intent; Pretext. Most
Cited Cases
(Formerly 78k141)
To prevail at trial, Title VII plaintiff must prove not
that illegitimate factor was sole reason for
employer's adverse decision, but that illegitimate
factor was a determinative factor in decision, that is,
that but for the protected characteristic, plaintiff
would have been hired or promoted. Civil Rights
Act of 1964, §§ 701 to 718, as amended, 42
U.S.C.A. §§ 2000e to 2000e-17.

**[6] Civil Rights 78 ☜1535**

78 Civil Rights
78IV Remedies Under Federal Employment
Discrimination Statutes
78k1534 Presumptions, Inferences, and
Burden of Proof
78k1535 k. In General. Most Cited Cases
(Formerly 78k377.1)
Where appropriate, analysis used in describing

evidentiary burdens in ADEA case are also used in
Title VII case. Civil Rights Act of 1964, §§ 701 to
718, as amended, 42 U.S.C.A. §§ 2000e to 2000e-17
; Age Discrimination in Employment Act of 1967, §
2 et seq., 29 U.S.C.A. § 621 et seq.

**[7] Civil Rights 78 ☜1544**

78 Civil Rights
78IV Remedies Under Federal Employment
Discrimination Statutes
78k1543 Weight and Sufficiency of Evidence
78k1544 k. In General. Most Cited Cases
(Formerly 78k382.1)

**Civil Rights 78 ☜1545**

78 Civil Rights
78IV Remedies Under Federal Employment
Discrimination Statutes
78k1543 Weight and Sufficiency of Evidence
78k1545 k. Prima Facie Case. Most Cited
Cases
(Formerly 78k383)
In Title VII case, fact finder may infer from
combination of plaintiff's prima facie case and its
own rejection of employer's proffered
nondiscriminatory reasons that employer unlawfully
discriminated against plaintiff and was merely
trying to conceal its illegal act with the articulated
reasons. Civil Rights Act of 1964, §§ 701 to 718,
as amended, 42 U.S.C.A. §§ 2000e to 2000e-17.

**[8] Federal Civil Procedure 170A ☜2497.1**

170A Federal Civil Procedure
170AXVII Judgment
170AXVII(C) Summary Judgment
170AXVII(C)2 Particular Cases
170Ak2497 Employees and
Employment Discrimination, Actions Involving
170Ak2497.1 k. In General. Most
Cited Cases
Plaintiff who has made out prima facie case in Title
VII action may defeat motion for summary
judgment by either discrediting the proffered
reasons, either circumstantially or directly, or by
adducing evidence, whether circumstantial or direct,
that discrimination was more likely than not a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

32 F.3d 759

Page 3

32 F.3d 759, 65 Fair Empl.Prac.Cas. (BNA) 890
(Cite as: 32 F.3d 759)

motivating or determinative cause of adverse employment action. Civil Rights Act of 1964, §§ 701 to 718, as amended, 42 U.S.C.A. §§ 2000e to 2000e-17.

**[9] Federal Civil Procedure 170A ☜2497.1**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)2 Particular Cases
            170Ak2497 Employees and
Employment Discrimination, Actions Involving
               170Ak2497.1 k. In General. Most Cited Cases
In Title VII action, if plaintiff has pointed to some evidence discrediting employer's proffered reasons for adverse decision, to survive summary judgment plaintiff need not also come forward with additional evidence of discrimination beyond his or her prima facie case. Civil Rights Act of 1964, §§ 701 to 718, as amended, 42 U.S.C.A. §§ 2000e to 2000e-17.

**[10] Federal Civil Procedure 170A ☜2497.1**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)2 Particular Cases
            170Ak2497 Employees and
Employment Discrimination, Actions Involving
               170Ak2497.1 k. In General. Most Cited Cases
In Title VII action, to avoid summary judgment, plaintiff's evidence rebutting employer's proffered legitimate reasons for adverse employment action must allow fact finder to reasonably infer that each of the proffered reasons was either post hoc fabrication or otherwise did not actually motivate employment action, that is, proffered reason is pretext. Civil Rights Act of 1964, §§ 701 to 718, as amended, 42 U.S.C.A. §§ 2000e to 2000e-17.

**[11] Federal Civil Procedure 170A ☜2497.1**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)2 Particular Cases

            170Ak2497 Employees and
Employment Discrimination, Actions Involving
               170Ak2497.1 k. In General. Most Cited Cases
To avoid summary judgment in Title VII action, plaintiff is not required to cast doubt on each proffered nondiscriminatory reason for adverse employment action in a vacuum; if defendant proffers a bagful of legitimate reasons, and plaintiff casts substantial doubt on a fair number of them, plaintiff may not need to discredit the remainder. Civil Rights Act of 1964, §§ 701 to 718, as amended, 42 U.S.C.A. §§ 2000e to 2000e-17.

**[12] Civil Rights 78 ☜1137**

78 Civil Rights
   78II Employment Practices
      78k1137 k. Motive or Intent; Pretext. Most Cited Cases
   (Formerly 78k153)
In Title VII action, to discredit employer's proffered legitimate nondiscriminatory reasons for adverse employment action, plaintiff cannot simply show that employer's decision was wrong or mistaken, since factual dispute at issue is whether employer was motivated by discriminatory animus, not whether employer is wise, shrewd, prudent, or competent. Civil Rights Act of 1964, §§ 701 to 718, as amended, 42 U.S.C.A. §§ 2000e to 2000e-17

**[13] Civil Rights 78 ☜1137**

78 Civil Rights
   78II Employment Practices
      78k1137 k. Motive or Intent; Pretext. Most Cited Cases
   (Formerly 78k153)
In Title VII action, to discredit employer's proffered legitimate nondiscriminatory reasons for adverse employment action, plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in employer's proffered legitimate reasons for its action that reasonable fact finder could rationally find them unworthy of credence, and hence infer that employer did not act for asserted reasons. Civil Rights Act of 1964, §§ 701 to 718, as amended, 42

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

32 F.3d 759

32 F.3d 759, 65 Fair Empl.Prac.Cas. (BNA) 890
(Cite as: 32 F.3d 759)

U.S.C.A. §§ 2000e to 2000e-17.

**[14] Civil Rights 78 ☜1544**

78 Civil Rights
    78IV Remedies Under Federal Employment
Discrimination Statutes
      78k1543 Weight and Sufficiency of Evidence
        78k1544 k. In General. Most Cited Cases
    (Formerly 78k382.1)
Employee failed to show that employer's failure to
rehire him after reorganization was result of
national origin discrimination; employee failed to
throw enough doubt on employer's proffered
legitimate nondiscriminatory reasons so that fact
finder could reject them, fact that supervisors
disagreed about employee's job performance did not
evidence discrimination, fact that employee had
been working for employer for three years at time of
reorganization justified departure from normal
interviewing process in his case, and supervisor's
failure to use Puerto Rican pronunciation of
employee's name did not evidence bias. Civil
Rights Act of 1964, §§ 701 to 718, as amended, 42
U.S.C.A. §§ 2000e to 2000e-17.

**[15] Civil Rights 78 ☜1544**

78 Civil Rights
    78IV Remedies Under Federal Employment
Discrimination Statutes
      78k1543 Weight and Sufficiency of Evidence
        78k1544 k. In General. Most Cited Cases
    (Formerly 78k382.1)
In Title VII action, absent evidence providing
independent reason to suspect the act,
documentation of reasons for rejecting applicant is
insufficient, in and of itself, to give rise to
reasonable inference of discriminatory motive.
Civil Rights Act of 1964, §§ 701 to 718, as
amended, 42 U.S.C.A. §§ 2000e to 2000e-17.

**\*761** Louis M. Barbone (argued) and Lynn M.
Handler, Jacobs, Bruso & Barbone, P.A., Atlantic
City, NJ, for appellant.
John R. Zimmerman (argued) and Catherine A.
Walker, Casino Control Com'n, Atlantic City, NJ,
for appellees.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Before: BECKER and HUTCHINSON, Circuit
Judges, and PADOVA, District Judge [FN*] .

    FN* The Honorable John R. Padova,
    United States District Judge for the Eastern
    District of Pennsylvania, sitting by
    designation.

**OPINION OF THE COURT**
BECKER, Circuit Judge.
[1] Plaintiff Luis A. Fuentes appeals from the
district court's grant of summary judgment for the
defendants, the New Jersey Casino Control
Commission (the "Commission") and Commission
Chairman Steven Perskie, in this national origin
employment discrimination suit brought by Fuentes
in the district court for the District of New Jersey
pursuant to Title VII of the Civil Rights Act of 1964
("Title VII"), as amended, 42 U.S.C.A. §§ 2000e to
2000e-17 (1981 & Supp.1994). The question
before us is the proper standard for granting
summary judgment in a claim arising under Title
VII in the wake of **\*762** the Supreme Court's
decision in *St. Mary's Honor Center v. Hicks*, 509
U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).
In particular, we consider the evidence that a
plaintiff, who has made out a prima facie case, must
adduce to survive a motion for summary judgment
when the defendant offers a legitimate reason for its
employment action in a "pretext" employment
discrimination case. We hold that, to do so, the
plaintiff generally must submit evidence which: 1)
casts sufficient doubt upon each of the legitimate
reasons proffered by the defendant so that a
factfinder could reasonably conclude that each
reason was a fabrication; or 2) allows the factfinder
to infer that discrimination was more likely than not
a motivating or determinative cause of the adverse
employment action. Because Fuentes failed to
throw sufficient doubt on any of the Commission's
proffered reasons, we will affirm the district court's
grant of summary judgment.

**I. FACTS AND PROCEDURAL HISTORY** [FN1]

    FN1. In reviewing the grant of a motion

32 F.3d 759

Page 5

32 F.3d 759, 65 Fair Empl.Prac.Cas. (BNA) 890
(Cite as: 32 F.3d 759)

for summary judgment, we (i) resolve conflicting evidence in favor of the nonmovant, (ii) do not engage in credibility determinations, and (iii) draw all reasonable inferences in favor of the nonmovant. The movant has the burden of pointing out that evidence cognizable in a motion for summary judgment which the movant believes entitles it to summary judgment; the nonmovant must then respond by pointing to sufficient cognizable evidence to create material issues of fact concerning every element as to which the nonmoving party will bear the burden of proof at trial. *See Davis v. Portline Transportes Maritime Internacional*, 16 F.3d 532, 536 & n. 3 (3d Cir.1994).

The Commission, an agency of the State of New Jersey, *see* N.J.STAT.ANN. §§ 5:12-1 *et seq.* (1988 & Supp.1994), employed Fuentes on May 18, 1987 as Director of Affirmative Action and Planning. At that time the Commission was comprised of five divisions. Fuentes' position placed him in charge of the Division of Affirmative Action and Planning ( "AA & P"). Fuentes reported directly to the Chairman of the Commission, Walter Read, from his initial hiring until Read's retirement in January 1990. Read was at all times satisfied with Fuentes' performance. Fuentes also developed a close working relationship with Commissioner David Waters, who had a special interest in affirmative action. Waters was fond of Fuentes, and credited him with the turnaround of the Division.

On August 20, 1990, newly elected Governor James Florio appointed defendant Perskie as Chairman of the Commission. In the ensuing two months, Perskie undertook an informal review of the entire Commission, including its structure. Faced with a declining budget and state-issued directives to reduce staffing, Perskie requested his Executive Assistant Joseph Papp to develop a reorganization plan (the "Plan"). The resulting Plan incorporated most of the recommendations made by a private consulting firm hired by the Commission to audit its utilization of resources. On November 7, 1990, Perskie announced an ambitious Plan to the

Commission staff, and the Commission adopted it two weeks later.

The Plan called for the elimination of two divisions, including AA & P, [FN2] the creation of a new Compliance Division, and the considerable reorganization of two others. The Plan transferred the primary functions of AA & P to a subdivision, entitled the Affirmative Action/Equal Employment Opportunity Unit ("AA/EEO"), within the new Compliance Division. The reorganization reduced the Commission's staff from 542 to 446 employees.

> FN2. Fuentes does not contend that illegal discrimination caused the elimination of his old position as Director of AA & P.

The Commission resolved to post and advertise all new management positions. Fuentes, along with all other personnel whose positions would be eliminated under the Plan, was advised to apply for the new positions that interested him, and he, along with twenty-five other candidates, applied for the position of Chief of AA/EEO. Fuentes and four others were eventually interviewed for that position. The Committee, meeting in an executive session, agreed that several of the other interviewees were better qualified than Fuentes for that position. Acting on the Committee's behalf, Perskie met with Fuentes to inform him that he would probably *763 not be hired to fill it.[FN3] Approximately one month later, on January 2, 1991, the Committee reached its decision to hire Gustave Thomas for that position by a vote of four to one.[FN4] Fuentes, who is Latino (Puerto Rican), brought the proceedings which led to this action.[FN5]

> FN3. Two other directors, who were similarly approached, tendered their resignations. Neither was a member of plaintiff's protected class.

> FN4. The Commission voted on all the proposed personnel actions as a package.

> FN5. Fuentes is also an African-American, but he does not claim racial discrimination,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

32 F.3d 759

32 F.3d 759, 65 Fair Empl.Prac.Cas. (BNA) 890
(Cite as: 32 F.3d 759)

perhaps because Thomas-the person who was hired for the job he sought-is also an African-American.

The district court concluded that Fuentes had made out a prima facie case of employment discrimination under the McDonnell Douglas/Burdine/Hicks line of cases, see McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), a conclusion which the defendants have never challenged. The court concluded, however, that the plaintiff had not adduced sufficient evidence to enable a factfinder reasonably to conclude that defendants' numerous proffered reasons for failing to hire Fuentes were pretextual and that the real reason was discriminatory, and hence it granted summary judgment for the Commission. It is from this judgment that Fuentes appeals. We exercise plenary review.

## II. LEGAL ANALYSIS

In a case of failure to hire or promote under Title VII, the plaintiff first
must carry the initial burden under the statute of establishing a prima facie case of [unlawful] discrimination. This may be done by showing (i) that he belongs to a [protected category]; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. at 1824. If the plaintiff succeeds, the burden of production shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." Id.

The employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision. See Hicks, 509 U.S. at ----, 113 S.Ct. at 2748. The employer need not prove that the tendered reason actually motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff. See Burdine, 450 U.S. at 253, 254, 256, 101 S.Ct. at 1093, 1094, 1095. Once the employer answers its relatively light burden by articulating a legitimate reason for the unfavorable employment decision, the burden of production rebounds to the plaintiff, who must now show by a preponderance of the evidence that the employer's explanation is pretextual (thus meeting the plaintiff's burden of persuasion).

[2][3][4] At trial, the plaintiff must convince the factfinder "both that the reason was false, and that discrimination was the real reason." Hicks, 509 U.S. at ----, 113 S.Ct. at 2752; see id. at ----, 113 S.Ct. at 2754 ("It is not enough ... to dis believe the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination." (emphasis in original)). The factfinder's rejection of the employer's proffered, legitimate reason permits, but does not compel, a verdict for the plaintiff. See Hicks, 509 U.S. at ----, 113 S.Ct. at 2749. The test is whether the plaintiff ultimately persuades the factfinder that the employment decision was caused by bias, and for that purpose both the plaintiff's prima facie case and the factfinder's rejection of the employer's proffered evidence are circumstantial evidence of unlawful discrimination. See Hicks, 509 U.S. at ----, 113 S.Ct. at 2749.

*764 [5][6] To prevail at trial, the plaintiff must prove not that the illegitimate factor was the sole reason for the decision, but that the illegitimate factor was a determinative factor in the adverse employment decision, that is, that but for the protected characteristic, the plaintiff would have been hired (or promoted). See Hazen Paper Co. v. Biggins, 507 U.S. 604, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993) (holding under the Age Discrimination in Employment Act ("ADEA") that "a disparate treatment claim cannot succeed unless the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

32 F.3d 759

32 F.3d 759, 65 Fair Empl.Prac.Cas. (BNA) 890
(Cite as: 32 F.3d 759)

employee's protected trait actually played a role in [the decisionmaking] process and had a determinative influence on the outcome").[FN6]

FN6. *Hazen* is an ADEA case but, where appropriate, the evidentiary burdens applicable in an ADEA case are also used in a Title VII case. *See, e.g., Duffy v. Wheeling Pittsburgh Steel Corp.,* 738 F.2d 1393, 1396 (3d Cir.), *cert. denied,* 469 U.S. 1087, 105 S.Ct. 592, 83 L.Ed.2d 702 (1984).

[7][8][9] This basic framework under Title VII illustrates that, to defeat summary judgment when the defendant answers the plaintiff's prima facie case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. *See, e.g., Hicks,* 509 U.S. at ---, 113 S.Ct. at 2479; *Ezold v. Wolf, Block, Schorr & Solis-Cohen,* 983 F.2d 509, 523 (3d Cir.1992) (quoting *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095),*cert. denied,* 510 U.S. 826, 114 S.Ct. 88, 126 L.Ed.2d 56 (1993). In other words, because the factfinder may infer from the combination of the plaintiff's prima facie case and its own rejection of the employer's proffered non-discriminatory reasons that the employer unlawfully discriminated against the plaintiff and was merely trying to conceal its illegal act with the articulated reasons, *see Hicks,* 509 U.S. at ---, 113 S.Ct. at 2749, a plaintiff who has made out a prima facie case may defeat a motion for summary judgment by *either* (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action. Thus, if the plaintiff has pointed to evidence sufficiently to discredit the defendant's proffered reasons, to survive summary judgment. the plaintiff need not also come forward with additional evidence of discrimination beyond

his or her prima facie case. *See Anderson v. Baxter Healthcare Corp.,* 13 F.3d 1120, 1122-24 (7th Cir.1994); *Washington v. Garrett,* 10 F.3d 1421, 1433 (9th Cir.1993).

[10][11] We have stated that a plaintiff may avoid summary judgment by pointing to "some" evidence from which a factfinder could reasonably conclude that the defendant's proffered reasons were fabricated (pretextual). Next, we consider what quantum of evidence is required. We can reject out of hand the two extreme positions: that the plaintiff can avoid summary judgment simply by arguing that the factfinder need not believe the defendant's proffered legitimate explanations on the one hand, or that the plaintiff must adduce evidence directly contradicting the defendant's proffered legitimate explanations on the other. *See Chauhan v. M. Alfieri Co., Inc.,* 897 F.2d 123, 128 (3d Cir.1990). The correct solution lies somewhere in between: to avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons, *see Logue v. International Rehab. Assocs., Inc.,* 837 F.2d 150, 155 (3d Cir.1988) (holding that "the district court erred in failing to consider *all* of [the employer's] proffered evidence of legitimate business reasons for [the plaintiff's] termination" (emphasis supplied)), *aff'd after remand,* 866 F.2d 1411 (3d Cir.1989), was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext). *See Anderson,* 13 F.3d at 1124; *Bodenheimer v. PPG Indus., Inc.,* 5 F.3d 955, 958 (5th Cir.1993). [FN7]

FN7. We do not hold that, to avoid summary judgment, the plaintiff must cast doubt on each proffered reason in a vacuum. If the defendant proffers a bagful of legitimate reasons, and the plaintiff manages to cast substantial doubt on a fair number of them, the plaintiff may not need to discredit the remainder. That is because the factfinder's rejection of some of the defendant's proffered reasons

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

73-1003

32 F.3d 759

Page 8

32 F.3d 759, 65 Fair Empl.Prac.Cas. (BNA) 890
(Cite as: 32 F.3d 759)

may impede the employer's credibility seriously enough so that a factfinder may rationally disbelieve the remaining proffered reasons, even if no evidence undermining those remaining rationales in particular is available.

*765 [12][13] To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. *See Ezold,* 983 F.2d at 531, 533; *Villanueva v. Wellesley College,* 930 F.2d 124, 131 (1st Cir.), *cert. denied,* 502 U.S. 861, 112 S.Ct. 181, 116 L.Ed.2d 143 (1991). Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them "unworthy of credence," *Ezold,* 983 F.2d at 531, and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons." [FN8] *Josey v. John R. Hollingsworth Corp.,* 996 F.2d 632, 638 (3d Cir.1993) (internal quotation omitted); *see id.* at 638 (holding that the proper inquiry is whether the plaintiff has proffered sufficient evidence of "inconsistencies and implausibilities in the employer's proffered reasons"); *Ezold,* 983 F.2d at 527 ("[A] plaintiff has the burden of casting doubt on an employer's articulated reasons for an employment decision."(internal quotations omitted)); *Chauhan,* 897 F.2d at 128. While this standard places a difficult burden on the plaintiff, "[i]t arises from an inherent tension between the goal of all discrimination law and our society's commitment to free decisionmaking by the private sector in economic affairs." *Ezold,* 983 F.2d at 531.

FN8. Of course, a decision foolish, imprudent, or incompetent by comparison to the employer's usual mode of operation can render it implausible, inconsistent, contradictory, or weak.

### III. APPLICATION TO THIS CASE

[14] As just developed, to survive summary judgment, Fuentes may either (i) to present sufficient evidence to meaningfully throw into question, i.e., to cast substantial doubt upon, the Commission's proffered reasons for not hiring him (e.g., by painting them as weak, implausible, contradictory, or incoherent), or (ii) to come forward with sufficient evidence from which a factfinder could reasonably conclude that an illegitimate factor more likely than not was a motivating or determinative cause of the adverse employment decision (e.g., by showing that the employer in the past had subjected him to unlawful discriminatory treatment, that the employer treated other, similarly situated persons not of his protected class more favorably, or that the employer has discriminated against other members of his protected class or other protected categories of persons). Fuentes has failed to raise a material issue of fact on either ground.

The Commission has advanced a multitude of reasons for not hiring Fuentes. Notably, none of the reasons was that Fuentes was *unqualified* for the job; in the end, the Commission elected to hire Thomas instead of Fuentes because it felt that Thomas was *better* qualified. In considering Fuentes for the newly created position of Chief of AA/EEO, the Commission faulted Fuentes for (i) lacking leadership qualities (Fuentes, in response to a request by Perskie for proposals for reorganization by each division head, had issued a brief and insubstantial recommendation; he failed to arrange to meet with Perskie about that memorandum, although it was clear Perskie wished to discuss it; [FN9] in a report he included issues critical of a casino which he had not first discussed with the casino; and he failed to seek a meeting with Perskie after the press on two separate occasions reported that Perskie publicly criticized Fuentes' Division of AA & P); (ii) lacking management ability (Fuentes habitually arrived to work late, departed early, and took extended lunches; morale in AA & P was *766 declining and the staff was unproductive; and despite repeated requests Fuentes declined to participate in committees including casino representatives to discuss major issues facing the casino industry, including labor and minority business set-asides); (iii) lacking developed interpersonal skills (Fuentes

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

32 F.3d 759

Page 9

32 F.3d 759, 65 Fair Empl.Prac.Cas. (BNA) 890
(Cite as: 32 F.3d 759)

had a poor working relationship with some of the Commissioners; and he lacked a good rapport with casino industry affirmative action officers because they felt he considered himself too important to meet with them); and (iv) unprofessional conduct (Fuentes was observed inside a car in a casino parking lot engaging in sexual activities; he got into a brawl at a casino, then misrepresented himself to be a police officer and used his influence as a Commission employee to receive special treatment; and on one occasion he shared confidential casino information with the public). The defendants contrast those incidents with Thomas' superior qualifications, corroborated by his remarkable accomplishments since being hired. Without going into each justification in detail, we simply note that Fuentes has not succeeded in throwing enough doubt on any of those explanations so that a rational factfinder could reject it.

> FN9. Although the parties dispute whether Perskie explicitly instructed the Directors to arrange a meeting with him or whether Perskie was to arrange the meetings, Fuentes' failure to contact Perskie for ten weeks is pertinent to his initiative and leadership (we note that every Director besides Fuentes arranged such a meeting).

Fuentes does make a timing argument, predicated on *Josey, see id.,* 996 F.2d at 638-39 (illustrating that, "[o]n different occasions, this court has found that factors such as the defendant's credibility, the timing of an employee's dismissal, and the employer's treatment of the employee could raise an inference of pretext which would make summary judgment for the employer inappropriate"), that things were going well for him until Perskie was appointed to head the Commission. But that is not the type of timing evidence *Josey* was referring to, namely, the timing of events which can give rise to an inference of improper motivation. The fact that a newly appointed chairman, in a time of shrinking budgets state-wide and a governor's directive to eliminate staff positions, reorganizes a state agency and hires new managers for positions newly created by the reorganization who he believes will best perform the tasks at hand does not throw real doubt

on the employer's proffered legitimate reason.

[15] Additionally, Fuentes complains of the fact that the Commission documented its reasons for not hiring Fuentes *after* it had decided not to hire him (he refers to this as a calculated accumulation of all the negative facts and inferences from his past experience at the Commission) and argues that this post-decision undertaking leads to a strong inference of coverup (i.e., fabrication). As the district court pointed out, however, the Commissioners were not unrealistic to anticipate that Fuentes, no stranger to employment discrimination laws, would sue the Commission, and in this case the Commission's documentation can only be described as displaying business acumen. Given the frequency of employment discrimination suits, an employer which documents its reasons for taking adverse employment actions can often be more suitably described as sensible than as devious. Absent evidence providing an independent reason to suspect the act, the documentation of the reasons for rejecting an applicant is insufficient, in and of itself, to give rise to a reasonable inference of discriminatory motive.

Fuentes also attacks Papp's testimony that he received complaints from five to ten members of the Division of Licensing critical of Fuentes because Papp did not remember their names almost three years after the events in question transpired. Additionally, he discounts two of the four complaints Papp received from members of Fuentes' staff (Papp was able to name all four staff members raising the complaints) because two of those members were allegedly biased against him and hence not credible (we note that Fuentes has not contended that those staff members were biased against him because of his national origin). These criticisms amount to little more than the schoolground retort, "Not so," an approach which, as discussed *supra* at 765, does not create a material issue of fact. In the context at hand, the issue is not whether the staff members' criticisms of Fuentes were substantiated or valid, or whether Papp was remiss to rely upon feedback received from members of Fuentes' staff who might be (nondiscriminatorily) biased against him. Instead, since Papp, not the staff members, was the relevant

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

32 F.3d 759

Page 10

32 F.3d 759, 65 Fair Empl.Prac.Cas. (BNA) 890
(Cite as: 32 F.3d 759)

decisionmaker,*767 the question is whether Papp believed those criticisms to be accurate and actually relied upon them, since only if Fuentes can ultimately prove that Papp in fact did not rely upon them can Fuentes show "pretext." We conclude that a factfinder could not reasonably find that Fuentes' cross-examination impeached Papp's statements to the point of rendering them weak, implausible, or incredible.

Instead of throwing doubt on defendants' explanations, Fuentes principally tries to go the alternate route by pointing to evidence from which a factfinder could reasonably conclude that discrimination was the more likely cause of his discharge. First, plaintiff argues that Chairman Read, his direct supervisor, thought that he was doing a fine job. Commissioner Waters, who took a special interest in affirmative action, also approved of Fuentes' job performance.[FN10] But, as we stated in *Ezold,* the fact that the relevant decisionmakers disagree about the plaintiff's qualifications does not evidence discrimination. *See id.,* 983 F.2d at 533. To avoid summary judgment, the plaintiff must point to some evidence from which a factfinder could reasonably conclude that the plaintiff satisfied the criterion that the decisionmakers disapproving of him relied upon (e.g., by showing that others no more qualified than he under that criterion were not treated adversely), or that the decisionmakers did not actually rely upon that criterion. As noted in the preceding paragraph, Fuentes' proffered evidence does not reasonably permit either conclusion.

> FN10. While he also cites his positive yearly Commission evaluations, Fuentes admits that he himself filled them out without any supervision or review.

Second, Fuentes argues that during his interview for the Chief of AA/EEO position, he was not questioned but was "interrogated" about Perskie's dissatisfaction with his job performance. As the district court noted, however, the facts that Fuentes had been working at the Commission for over three years, and that he was known to the interviewers (if not personally, then at least by reputation, opinion,

and report), justified a departure from the normal interviewing process, and hence the "interrogation" does not raise an inference of invidious discrimination. It would defy common sense for an interviewer to put aside all his or her personal and/or acquired knowledge of the interviewee and to proceed as if the interviewee were a stranger, and Title VII does not mandate so much. In any event, at his deposition Fuentes described the nature of the "interrogatories" directed at him as "[g]eneral questions about the industry," hardly an improper or suspicious subject given the position for which he was applying.

Third, Fuentes complains that, having corrected Commissioner Dodd's mispronunciation of his name some 20 months prior to the Commission's failure to hire Fuentes as Chief of AA/EEO (Fuentes testified that Dodd had asked to call Fuentes the English "Louis" instead of the Latino "Luis" because Dodd asserted he had "difficulty" pronouncing "Luis" and felt "more comfortable" with "Louis," and that he had responded that he would prefer Dodd call him by his Latino name), Dodd thereafter referred to him as "Director" instead of by his first name.[FN11] This evidence shows only that Dodd disliked Fuentes' first name because he had difficulty pronouncing it (not because it was a Latino name), and may reflect on Dodd's insensitivity and unprofessionalism. But we do not think that a factfinder could reasonably construe these incidents, standing alone (as they do), as evidencing Dodd's bias against Puerto Ricans or Latinos, or to mean that Dodd invidiously discriminated against Fuentes because of his national origin. *Cf. Ezold,* 983 F.2d at 545 ("Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision.").

> FN11. The defendants concede that Dodd referred to other Directors by their first names. The record does not give any indication how often Dodd and Fuentes had contact or, in particular, how often Dodd referred to Fuentes as "Director."

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

32 F.3d 759

Page 11

32 F.3d 759, 65 Fair Empl.Prac.Cas. (BNA) 890
(Cite as: 32 F.3d 759)

For the foregoing reasons, the district court's order granting summary judgment to the defendants will be affirmed.

C.A.3 (N.J.),1994.
Fuentes v. Perskie
32 F.3d 759, 65 Fair Empl.Prac.Cas. (BNA) 890

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

3

Westlaw.

131 F.3d 672                                                                                Page 1

131 F.3d 672, 72 Empl. Prac. Dec. P 45,115, 21 Employee Benefits Cas. 2188, 4 Wage & Hour Cas.2d (BNA)
1168, 7 A.D. Cases 1313, 11 NDLR P 149
(Cite as: 131 F.3d 672)

▷

Kariotis v. Navistar Intern. Transp. Corp.
C.A.7 (Ill.),1997.

United States Court of Appeals,Seventh Circuit.
Kathleen A. KARIOTIS, individually and as best
friend of Peter Kariotis, a minor, and Angelo
Kariotis, Plaintiffs-Appellants,
v.
NAVISTAR INTERNATIONAL
TRANSPORTATION CORPORATION,
Defendant-Appellee.
No. 97-1470.

Argued Sept. 3, 1997.
Decided Dec. 9, 1997.

Employee sued her former employer for allegedly
terminating her in violation of the Americans with
Disabilities Act (ADA), Age Discrimination in
Employment Act (ADEA), Employee Retirement
Income Security Act (ERISA), Consolidated
Omnibus Budget Reconciliation Act (COBRA),
Family and Medical Leave Act (FMLA), and the
Illinois Health Insurance Claim Filing Act. The
United States District Court for the Northern
District of Illinois, James H. Alesia, J., 951 F.Supp.
144, granted employer's motion for summary
judgment. Employee appealed. The Court of
Appeals, Manion, Circuit Judge, held that: (1)
evidence that employer was careless in not checking
its facts before firing employee for allegedly
fraudulently accepting disability benefits was
insufficient to show that employer's reason for
termination was pretext for discrimination in
violation of ADA, ADEA, ERISA, or FMLA; (2)
ERISA preempted Illinois Health Insurance Claim
Filing Act claim; but (3) employer's mere belief that
employee fraudulently accepted disability benefits
was insufficient, by itself, to relieve employer of its
obligation to provide terminated employee with
continued health care coverage under COBRA.

Affirmed in part, reversed and remanded in part.
West Headnotes
**[1] Civil Rights 78 ⊙⊐1209**

78 Civil Rights
    78II Employment Practices
        78k1199 Age Discrimination
            78k1209 k. Motive or Intent; Pretext.
Most Cited Cases
    (Formerly 78k170)

**Civil Rights 78 ⊙⊐1221**

78 Civil Rights
    78II Employment Practices
        78k1215 Discrimination by Reason of
Handicap, Disability, or Illness
            78k1221 k. Motive or Intent; Pretext.
Most Cited Cases
    (Formerly 78k173.1)

**Civil Rights 78 ⊙⊐1251**

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1251 k. Motive or Intent; Pretext.
Most Cited Cases

**Labor and Employment 231H ⊙⊐368**

231H Labor and Employment
    231HVI Time Off; Leave
        231Hk361 Rights of Employee; Violations
            231Hk368 k. Discharge or Layoff. Most
Cited Cases
    (Formerly 255k30(6.10) Master and Servant)

**Labor and Employment 231H ⊙⊐797**

231H Labor and Employment
    231HVIII Adverse Employment Action
        231HVIII(A) In General

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**73-1009**

131 F.3d 672

Page 2

131 F.3d 672, 72 Empl. Prac. Dec. P 45,115, 21 Employee Benefits Cas. 2188, 4 Wage & Hour Cas.2d (BNA) 1168, 7 A.D. Cases 1313, 11 NDLR P 149
(Cite as: 131 F.3d 672)

231Hk793 Pensions and Benefits
231Hk797 k. Motive and Intent; Pretext. Most Cited Cases
(Formerly 255k30(6.10) Master and Servant)
Employer who honestly believes it is firing fraudulent employee may not be liable for intentional discrimination under ADA, ADEA, ERISA, or FMLA. Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.; Employee Retirement Income Security Act of 1974, § 2 et seq., as amended, 29 U.S.C.A. § 1001 et seq.; Family and Medical Leave Act of 1993, § 2 et seq., 29 U.S.C.A. § 2601 et seq.; Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

[2] Federal Civil Procedure 170A ⟲2497.1

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2497 Employees and Employment Discrimination, Actions Involving
                    170Ak2497.1 k. In General. Most Cited Cases
To survive motion for summary judgment, plaintiff in discrimination case need not produce equivalent of admission of guilt by defendant; rather, plaintiff need only raise inference of discrimination, which can be either by putting in enough evidence, whether direct or circumstantial, to raise genuine issue whether employer has discriminatory motivation in carrying out challenged employment action or by using McDonnell Douglas burden-shifting framework. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

[3] Civil Rights 78 ⟲1210

78 Civil Rights
    78II Employment Practices
        78k1199 Age Discrimination
            78k1210 k. Disparate Treatment. Most Cited Cases
    (Formerly 78k168.1)

Civil Rights 78 ⟲1539

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1534 Presumptions, Inferences, and Burden of Proof
            78k1539 k. Age Discrimination. Most Cited Cases
    (Formerly 78k380)
Coworker to whom employee compares her treatment is "substantially younger," for purposes of prima facie case under ADEA, if there is at least ten-year age difference; any age disparity less than ten years is presumptively insubstantial. Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.

[4] Civil Rights 78 ⟲1209

78 Civil Rights
    78II Employment Practices
        78k1199 Age Discrimination
            78k1209 k. Motive or Intent; Pretext. Most Cited Cases
    (Formerly 78k170)

Civil Rights 78 ⟲1221

78 Civil Rights
    78II Employment Practices
        78k1215 Discrimination by Reason of Handicap, Disability, or Illness
            78k1221 k. Motive or Intent; Pretext. Most Cited Cases
    (Formerly 78k173.1)

Labor and Employment 231H ⟲368

231H Labor and Employment
    231HVI Time Off; Leave
        231Hk361 Rights of Employee; Violations
            231Hk368 k. Discharge or Layoff. Most Cited Cases
    (Formerly 255k40(4) Master and Servant)

Labor and Employment 231H ⟲797

231H Labor and Employment
    231HVIII Adverse Employment Action

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

73-1010

131 F.3d 672                                                                    Page 3

131 F.3d 672, 72 Empl. Prac. Dec. P 45,115, 21 Employee Benefits Cas. 2188, 4 Wage & Hour Cas.2d (BNA) 1168, 7 A.D. Cases 1313, 11 NDLR P 149
**(Cite as: 131 F.3d 672)**

231HVIII(A) In General
231Hk793 Pensions and Benefits
231Hk797 k. Motive and Intent; Pretext. Most Cited Cases
(Formerly 255k40(4) Master and Servant)
Evidence that employer was careless in not checking its facts before firing employee for allegedly fraudulently accepting disability benefits was insufficient to show that employer's reason for termination was pretext for discrimination in violation of ADA, ADEA, ERISA, or FMLA. Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.; Employee Retirement Income Security Act of 1974, § 2 et seq., as amended, 29 U.S.C.A. § 1001 et seq.; Family and Medical Leave Act of 1993, § 2 et seq., 29 U.S.C.A. § ·2601 et seq.; Americans· with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

**[5] Civil Rights 78 ☞1033(1)**

78 Civil Rights
78I Rights Protected and Discrimination Prohibited in General
78k1030 Acts or Conduct Causing Deprivation
78k1033 Discrimination in General
78k1033(1) k. In General. Most Cited Cases
(Formerly 78k153)
Reason that is honestly described but poorly founded is not "pretext" as that term is used in law of discrimination.

**[6] Labor and Employment 231H ☞757**

231H Labor and Employment
231HVIII Adverse Employment Action
231HVIII(A) In General
231Hk757 k. Preemption. Most Cited Cases
(Formerly 255k30(6.10) Master and Servant)

**States 360 ☞18.49**

360 States
360I Political Status and Relations

360I(B) Federal Supremacy; Preemption
360k18.45 Labor and Employment
360k18.49 k. Discrimination; Retaliatory Discharge. Most Cited Cases
ERISA preempted employee's claim that she was fired ·for seeking medical and disability benefits ·under· employer's welfare plans in violation of Illinois Health· Insurance Claim Filing Act. Employee Retirement Income Security Act of 1974, § 514(c)(1), as amended, 29 U.S.C.A. § 1144(c)(1).

**[7] Statutes 361 ☞188**

361 Statutes
361VI Construction and Operation
361VI(A) General Rules of Construction
361k187 Meaning of Language
361k188 k. In General. Most Cited Cases
Where statute's language is plain, court's function is to enforce it according to its terms.

**[8] Insurance 217 ☞2457(2)**

217 Insurance
217XX Coverage--Health and Accident Insurance
217XX(B) Medical Insurance
217k2455 Duration of Coverage
217k2457 Group Insurance
217k2457(2) k. Termination of Employment in General. Most Cited Cases
(Formerly 296k121)
To relieve employer of its obligation to ·provide terminated employee with continued health care coverage under Consolidated Omnibus Budget Reconciliation Act (COBRA), employer's belief that employee engaged in gross misconduct must be more than its honest, actual belief-the record must demonstrate that employee did indeed engage in gross misconduct. Employee Retirement Income Security Act of 1974, § 603(2), as amended, 29 U.S.C.A. § 1163(2).

**[9] Insurance 217 ☞2457(2)**

217 Insurance
217XX Coverage--Health and Accident

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

131 F.3d 672

Page 4

131 F.3d 672, 72 Empl. Prac. Dec. P 45,115, 21 Employee Benefits Cas. 2188, 4 Wage & Hour Cas.2d (BNA) 1168, 7 A.D. Cases 1313, 11 NDLR P 149
**(Cite as: 131 F.3d 672)**

Insurance
    217XX(B) Medical Insurance
        217k2455 Duration of Coverage
            217k2457 Group Insurance
                217k2457(2) k. Termination of
Employment in General. Most Cited Cases
  (Formerly 296k121)
Even if honestly held, employer's mere belief that employee fraudulently accepted disability benefits was insufficient, by itself, to relieve employer of its obligation to provide terminated employee with continued health care coverage under Consolidated Omnibus Budget Reconciliation Act (COBRA). Employee Retirement Income Security Act of 1974, § 603(2), as amended, 29 U.S.C.A. § 1163(2).

*674 Micaela M. Daly,Marc D. Fisher (argued), Bell, Boyd & Lloyd, Chicago, IL, for Plaintiffs-Appellants.
David J. Parsons (argued), Allison Despard, Littler & Mendelson, Chicago, IL, for Defendant-Appellee.

Before POSNER, Chief Judge, and MANION and KANNE, Circuit Judges.
MANION, Circuit Judge.
[1] Kathleen Kariotis was discharged from her position as an executive assistant at Navistar after the company decided she had fraudulently accepted disability benefits following her knee replacement surgery. Kariotis filed suit in federal court claiming violations of the ADA, ADEA, ERISA, COBRA, FMLA, and the Illinois Health Insurance Claim Filing Act. After some discovery, Navistar filed a motion for summary judgment, invoking the so-called "honest belief" rule, which in this context means that while the company may have been mistaken in concluding Kariotis actually had committed fraud, at the very least it had an honest belief that she had done so. The district court agreed and granted summary judgment, prompting Kariotis to appeal. Navistar's "honest belief" defeats all of Kariotis' claims except her COBRA claim. Accordingly, we affirm in part and reverse and remand in part.

               I.

Kathleen Kariotis began her disability leave on account of knee replacement surgery in March 1995, and for the following ten weeks she received full pay. Ten weeks is about how long her doctor initially expected she would need to recover. But her return-to-work date was extended several times, and her doctor soon determined that she required two post-operative procedures known as knee " manipulations." The first manipulation occurred on May 12, 1995; the second on June 28. By the time Kariotis had her second manipulation, her 10 weeks of fully-paid leave had expired; she then received 60% of her base pay. Under Navistar's disability plan, she could expect to receive that percentage until her physician released her to return to work.

Kariotis' extended leave did not go unnoticed. By mid-June it came to the attention of William Vlcek, the company's manager of human resources. He discussed the extensions with his boss, Robert Goldie. According to Navistar, Vlcek and Goldie were concerned because Kariotis' claimed disability was inconsistent with observations made by some Navistar employees. And two years earlier Kariotis had been accused of unethical conduct. Kariotis claims that Vlcek actually was suspicious of her leave before he learned of her extensions, and that his suspicion was based on the length of time his mother needed to recover from knee replacement surgery. This dispute over what prompted Vlcek's suspicion is hardly material (neither version, if true, would suggest a discriminatory motive). For our purposes, it is important only that Vlcek and Goldie were sufficiently suspicious of the validity of Kariotis' leave to investigate it.

*675 Objectively speaking, their investigation left something to be desired. Rather than approaching Kariotis or her doctor, they hired a company to videotape her movements while off-duty. The private investigators videotaped Kariotis on three separate occasions: June 17, June 20, and June 26, 1995. Each time they reported seeing Kariotis walking, driving, sitting, bending, and shopping (pushing a grocery cart). They were not medical experts, but they nevertheless reported that while

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

131 F.3d 672                                                                                     Page 5

131 F.3d 672, 72 Empl. Prac. Dec. P 45,115, 21 Employee Benefits Cas. 2188, 4 Wage & Hour Cas.2d (BNA)
1168, 7 A.D. Cases 1313, 11 NDLR P 149
(Cite as: 131 F.3d 672)

Kariotis' stride did not exactly appear even, neither did she appear disabled or physically impaired. Even then Navistar could have followed up by speaking with Kariotis' physician-the one who scheduled the two post-operative manipulations-but it didn't. Nor did the company insist on a second opinion by having its own doctor examine Kariotis.

Kariotis next met with Vlcek at Navistar's offices on June 30. The meeting appears to have been cordial, probably because Vlcek did not tell Kariotis about the videotape. Both parties agree that during the meeting Kariotis stated she now could do physical things she could not do "before." But before what? Based on what he saw on the videotape-Kariotis shopping and walking around long before her second knee manipulation-Vlcek interpreted Kariotis' "before" statement to be a lie. But Kariotis now says that she was not comparing her activity to what she could do days before her second knee manipulation (on June 28); she was comparing her activity to what she could do before her initial knee surgery in March. In the district court, Kariotis complained that Vlcek made no attempt to clarify what she meant.

After his conversation with Kariotis, Vlcek convened a meeting with Goldie and other Navistar managers to discuss Kariotis' future. The group watched the videotape of Kariotis' off-duty activities since her surgery. Kay Carroll, one of the managers in attendance, was asked to be an objective third party. Carroll suggested that Vlcek confront Kariotis' physician with the videotape and ask him if Kariotis could do her job, but Vlcek declined, finding the videotape capable of speaking for itself. On July 6, Vlcek met Kariotis at the office of the company's physician and personally handed a termination letter to her. The letter stated that Kariotis was being discharged for cause because she dishonestly had claimed disability benefits since June 17. In addition, she had been absent from work for more than five days without good reason. The letter gave Kariotis until July 20 to seek reinstatement in writing, and within that time period she did just that. She wrote Goldie and contended that she should not have been terminated while on disability leave. Her doctor also wrote

Goldie a letter in which he labeled the charge of disability fraud "preposterous" given Kariotis' physical condition. But the letters did not win Kariotis' reinstatement; instead, Goldie wrote Kariotis and effectively told her that her case was closed. At the time, Kariotis was about 57 years old; eventually, Navistar replaced her with a 32-year-old woman.

Goldie's letter did not close the case as far as Kariotis was concerned. She filed a complaint alleging numerous statutory violations (the ADA, ADEA, ERISA, COBRA, FMLA, the Illinois Health Insurance Claim Filing Act) and one pendent state common law claim for negligent infliction of emotional distress. The district court entertained cross-motions for summary judgment and granted Navistar's in full with one exception: it left alone the negligent infliction claim, but declined to exercise supplemental jurisdiction over it once it had dismissed all the statutory claims. Now Kariotis appeals that decision.

II.

In an apparent effort to leave no stone unturned, Kathleen Kariotis is suing Navistar under five federal statutes (the ADA, ADEA, ERISA, COBRA, FMLA) and one state statute (the Illinois Health Insurance Claim Filing Act). In other words, Kariotis believes that she was fired because she was disabled, because of her age, because she opted to receive benefits under Navistar's welfare benefit plan, and because she required leave to recuperate from her surgery. The multiplicity of claims makes Kariotis' case cumbersome, but it is not legally impossible for a plaintiff to be aggrieved under all of these statutes at the same time. Still, in *676 order to avoid immediate suspicion that she is just throwing darts in the hope that one claim sticks, Kariotis has spliced together a theory of the case that touches each statute. As she argues in her main appellate brief, Navistar's motivation for firing her "was based on a combination of unlawful purposes. Navistar wanted to get rid of [her] because she was an aging woman whom Navistar perceived to be disabled and who had increasingly

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

131 F.3d 672                                                                                         Page 6

131 F.3d 672, 72 Empl. Prac. Dec. P 45,115, 21 Employee Benefits Cas. 2188, 4 Wage & Hour Cas.2d (BNA)
1168, 7 A.D. Cases 1313, 11 NDLR P 149
(Cite as: 131 F.3d 672)

severe physical problems that were costing Navistar money."

[2] At its core Kariotis' claim is, as it must be, one of discrimination, which is why the parties group her claims under the ADA, ADEA, and ERISA. In order to survive a motion for summary judgment, a plaintiff in a discrimination case need not "produce the equivalent of an admission of guilt by the defendant." *Troupe v. May Dep't Stores Co.,* 20 F.3d 734, 737 (7th Cir.1994). Rather, the plaintiff need only raise an inference of discrimination, which can be done in two ways. The first is by putting in enough evidence (whether direct or circumstantial) to raise a genuine issue whether the employer has a discriminatory motivation in carrying out the challenged employment action. *Id.* at 736. The second is the so-called *McDonnell Douglas* method, the frequently used burden-shifting framework first set out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-03, 93 S.Ct. 1817, 1824-25, 36 L.Ed.2d 668 (1973).

The district court approached this case under the *McDonnell Douglas* framework, and the parties appear to agree that this is the approach we should use. Of course, *McDonnell Douglas* involved a claim of discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e*et seq.,* but we have applied the burden-shifting framework to claims brought under other employment discrimination statutes. *See Weigel v. Target Stores,* 122 F.3d 461, 465 (7th Cir.1997) (applying the framework to a claim under the ADA); *Hartley v. Wisconsin Bell Inc.,* 124 F.3d 887, 890 (7th Cir.1997) (ADEA), and *Salus v. GTE Directories Service Corp.,* 104 F.3d 131, 135 (7th Cir.1997) (ERISA).

The *McDonnell Douglas* framework is by now routine. If a plaintiff can present a prima facie case of discrimination, then the defendant has the burden of explaining why it fired her, and if its reasons are nondiscriminatory on their face, the burden of proving discrimination remains with the plaintiff. She must demonstrate that the employer's reasons (each of them, if the reasons independently caused

her employer to take the action it did, *Russell v. Acme-Evans Co.,* 51 F.3d 64, 69 (7th Cir.1995)) are not true. Moreover, if the company honestly believed in those reasons, the plaintiff loses even if the reasons are foolish or trivial or baseless. *See McCoy v. WGN Continental Broadcasting Co.,* 957 F.2d 368, 373 (7th Cir.1992) ("[T]he issue of pretext does not address the correctness or desirability of reasons offered for employment decisions. Rather, it addresses the issue of whether the employer honestly believes in the reasons it offers.").

[3][4] Navistar concedes that Kariotis has established a prima facie case of discrimination under the ADA, ADEA, and ERISA.[FN1] Therefore, the only issue is whether she successfully called into question Navistar's reasons for firing her. There is no dispute that Navistar says it fired Kariotis for disability fraud. From the company's perspective, the physical activities it saw Kariotis performing *677 on the surveillance videotape equaled and perhaps even exceeded what she was asked to do on the job. In addition, Kariotis had lied (according to the company) when she told Vlcek that she could not grocery shop or walk straight before her second knee manipulation on June 28; the videotape showed her doing these things as early as June 17, eleven days before that manipulation.

> FN1. Much of the plaintiff's prima facie case under each statute is the same. The plaintiff must show (1) she is a member of a protected group ("disabled" within the meaning of the ADA; aged 40 or older under the ADEA; and a "participant" or " beneficiary" under ERISA); (2) she was performing her job satisfactorily; and (3) she was discharged. The fourth elements of the prima facie case differ. Under the ADA, the plaintiff must demonstrate that the circumstances surrounding her discharge make it more likely than not she was fired because of her disability. *Weigel v. Target Stores,* 122 F.3d 461, 465 (7th Cir.1997). Under the ADEA, the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

131 F.3d 672                                                                                    Page 7

131 F.3d 672, 72 Empl. Prac. Dec. P 45,115, 21 Employee Benefits Cas. 2188, 4 Wage & Hour Cas.2d (BNA)
1168, 7 A.D. Cases 1313, 11 NDLR P 149
(Cite as: 131 F.3d 672)

plaintiff must show that substantially younger employees were treated more favorably. *Hartley v. Wisconsin Bell Inc.,* 124 F.3d at 892. In this circuit, " substantially younger" means at least a ten-year age difference; any age disparity less than ten years is "presumptively insubstantial." *Id.* at 893. There is no formal fourth element under ERISA, though in addition to establishing her discharge (the third element), the plaintiff also must point to circumstances allowing a reasonable inference that the defendant had the specific intent to discriminate. *Salus,* 104 F.3d at 135.

At this juncture the burden Kariotis has to meet is well-established. To successfully challenge the honesty of the company's reasons she must specifically rebut those reasons. But an opportunity for rebuttal is not an invitation to criticize the employer's evaluation process or simply to question its conclusion about the quality of an employee's performance. Rather, rebuttal must include facts tending to show that the employer's reasons for some negative job action are false, thereby implying (if not actually showing) that the real reason is illegal discrimination. In other words, arguing about the accuracy of the employer's assessment is a distraction, *see Brill v. Lante Corp.,* 119 F.3d 1266, 1273 (7th Cir.1997), because the question is not whether the employer's reasons for a decision are "*right* but whether the employer's description of its reasons is *honest.*" *Gustovich v. AT & T Communications, Inc.,* 972 F.2d 845, 848 (7th Cir.1992).

Navistar fired Kariotis for disability fraud after commissioning a private firm to follow her activities while off-duty and videotape them. After viewing the tapes of Kariotis' activities, Vlcek concluded she was not suffering from physical problems that merited disability leave and decided to fire her. There is no question that Kariotis denies acting fraudulently. She points to the fact that Navistar never spoke with her physician concerning the extent of her injury. In fact the company terminated her on July 6 even though

Kariotis' doctor notified the company that she could not return to work until July 11. The company did not even show the videotape to its own physician. At Vlcek's request, the company's doctor was scheduled to examine Kariotis on July 6, but that never happened. As soon as Kariotis showed up for the examination, she was ushered aside by Vlcek and fired. As far as Vlcek and Navistar were concerned, the videotape spoke for itself. Obviously, Vlcek never took Kay Carroll up on her suggestion that the company confront Kariotis' doctor with the videotape.

[5] From Kariotis' perspective, the company's investigation was "imprudent, ill-informed, and inaccurate." Its refusal to confirm its suspicions with its own doctor or with Kariotis' made it guilty of "knowing ignorance" (an oxymoron) and a " conscious disregard for any facts that would show whether Mrs. Kariotis was or was not disabled." Navistar's investigation hardly looks world-class. (Surely there are better ways to investigate an employee like Kariotis who is suspected of dishonestly extending her disability leave-better, that is, than clandestinely following her around and videotaping her.) Yet this investigation was the reason given for the discharge, and "a reason honestly described but poorly founded is not a pretext as that term is used in the law of discrimination." *Pollard v. Rea Magnet Wire Co., Inc.,* 824 F.2d 557, 559 (7th Cir.1987). In short, " [n]o federal rule requires just cause for discharges." *Id.* at 558. Therefore, Kariotis' energy is misspent by attacking the company's decisional process, unless she could point to facts suggesting that the company investigated her differently because she was an older employee (she has claimed age discrimination), or because she was on disability leave. She offers no comparative evidence suggesting that the company would have been more careful before firing a younger employee or one not on leave though suspected of fraudulent activity. Instead, her main argument is that the company was careless in not checking its facts before firing her, and while that may be true, there is no evidence that the company approached her case differently than others. While the decision arguably was wrong, she has not shown it was based on illegal

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

131 F.3d 672                                                                                 Page 8

131 F.3d 672, 72 Empl. Prac. Dec. P 45,115, 21 Employee Benefits Cas. 2188, 4 Wage & Hour Cas.2d (BNA)
1168, 7 A.D. Cases 1313, 11 NDLR P 149
(Cite as: 131 F.3d 672)

discrimination.

We were confronted with similar circumstances in *Pollard,* wherein Oliver Pollard, a black employee, asked for a one-week leave to attend a bodybuilding event, but his employer said no. The week of the event arrived, and Pollard called in to report that he *678 would not be showing up because of personal reasons and an ankle injury. When he did return to work, he claimed he had been absent because of his ankle but did not bring an explanation from his physician. He was suspended on the spot and later fired. At trial Pollard received a favorable verdict of race discrimination, but we reversed because at most the evidence suggested that his employer had made a mistake in firing him. The employer never actually proved that Pollard had lied about his ankle and had attended the bodybuilding event; in fact, the company's "investigation went nowhere." 824 F.2d at 559. In addition, the company fired Pollard in part because he failed to produce a physician's report, even though the company had no written rules establishing how employees could obtain permission to miss work and even though it never asked Pollard to bring in an excuse. Nevertheless, at most Pollard had established that his employer's business "was not well run," *id.* at 560, which did not help him because it appeared to be that way for all employees regardless of their race.

Just as we found in *Pollard,* it would have made sense for Navistar to have been more systematic in its investigation of Kariotis. Instead of speaking with Kariotis' physician, or having the company's doctor examine her, Navistar hired an investigator to observe her. Obviously it did not trust the information it was receiving from Kariotis' doctor; Vlcek wanted to see for himself what Kariotis was doing during her leave. He isn't a doctor, but he was her boss, so it was significant that after seeing the video he concluded (along with his own boss, Goldie), that Kariotis was collecting disability benefits even though she could perform her administrative job. Vlcek may have come to this conclusion rather impulsively; again, he did not honor Kariotis' work release from her physician because he thought the video "spoke for itself." But nothing in the record suggests that he came to

the conclusion because Kariotis was (in her words) an "aging woman" or because she had (again, in her words) "severe physical problems that were costing Navistar money."

In the end, we are left with Kariotis' theory that the company's investigation was so impulsive and shoddy that it reeks of discriminatory intent-a theory that we rejected in *Pollard* on the ground that a federal court is not a court of industrial relations, and one which we again reject today. This is probably the classic case where a court must observe its limitations and "not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers," the laws barring discrimination do not interfere. *McCoy v. WGN,* 957 F.2d 368, 373 (internal citations omitted). The same principle dooms each of Kariotis' discrimination claims under the ADA, ADEA and ERISA.

Ordinarily, a plaintiff's failure to call into question the employer's reason for her discharge puts an end to her case. But Navistar offered a second reason for firing Kariotis: the videotape not only spoke for itself but it also contradicted Kariotis' representations to Vlcek concerning her physical activity while on leave. (We already have determined that Kariotis failed to call Vlcek's opinion of the tape into question.) It is clear from the record (and Navistar's briefs) that the perceived misrepresentation by Kariotis poisoned Vlcek's viewing of the tape, and that Vlcek fired her in large part because as he watched the videotape he concluded that Kariotis had lied to him. Moreover, it is impossible to untangle these reasons from one another; Navistar itself concedes they are "coupled" and should be taken "together." This means that Kariotis' claims still would survive summary judgment if she successfully called into question Vlcek's purported belief that she had lied to him. *Russell v. Acme-Evans Co.,* 51 F.3d 64, 69 (7th Cir.1995) (a plaintiff must rebut each reason the employer gives for its decision only if each reason independently caused the employer to make the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

131 F.3d 672                                                                                                      Page 9

131 F.3d 672, 72 Empl. Prac. Dec. P 45,115, 21 Employee Benefits Cas. 2188, 4 Wage & Hour Cas.2d (BNA)
1168, 7 A.D. Cases 1313, 11 NDLR P 149
(Cite as: 131 F.3d 672)

challenged decision; where the reasons are enmeshed, rebutting one reason will do).

Kariotis' purported "lie" comes out of her conversation with Vlcek in his office on June 30, less than a week before she was fired. *679 Both parties agree that Kariotis stated she could do physical things she could not do "before." Based on what he saw on the videotape-Kariotis shopping and walking around before her second knee manipulation-Vlcek interpreted Kariotis' statement to be a lie. But Kariotis says that she was not comparing her activity to what she recently could do before her second knee manipulation (on June 28); she was comparing her activity to what she could do before her initial knee surgery in March. From Kariotis' perspective, then, her statement was not a lie. What Kariotis meant to say is unimportant; at most she has proven that Vlcek misinterpreted her reference to "before." In her view she made a mistake that apparently should have prompted him to clarify her remarks. Kariotis conceded as much in her response to Navistar's proposed undisputed facts in the district court: " 'Kathleen Kariotis' statements that she could not walk straight 'before' were in reference to the time before [she] had knee replacement surgery. Responding further, ... Vlcek made no attempt to clarify what Kariotis meant." In hindsight it obviously would have been helpful if Vlcek had asked for clarification. But in that context his interpretation was plausible. It also would have been helpful if he had weighted her physician's opinion at least as much as his own. But whatever curious process a company employs to reach its decisions is irrelevant so long as nothing in the record suggests that the process is discriminatory-in this case, so long as no evidence suggests that older, disabled workers received much more scrutiny than others. Kariotis has not made this argument, nor does our own review of the record suggest it.

[6] That leaves us with Kariotis' claim under the Illinois Health Insurance Claim Filing Act, which the district court also dismissed under the *McDonnell Douglas* framework. We need not determine whether *McDonnell Douglas* should be applied whenever a state statute has an anti-retaliation provision because Kariotis' claim is so clearly preempted by ERISA. Her claim is that Navistar violated Illinois law by firing her for seeking medical and disability benefits under Navistar's welfare plans. The Supreme Court has found that § 514(a) of ERISA expressly preempts state common laws protecting employees from wrongful discharge when the claim relates to an employee's rights under an ERISA plan. *Ingersoll-Rand Co. v. McClendon,* 498 U.S. 133, 140, 111 S.Ct. 478, 483-84, 112 L.Ed.2d 474 (1990). The result is no different where a state statute rather than common law fuels the claim. *See* 29 U.S.C. § 1144(c)(1) (preempted state "laws" include "all laws, decisions, rules, regulations, or other State action having the effect of law"). Not only does ERISA expressly preempt the Illinois state law claim, it impliedly preempts the claim as well by providing Kariotis with a remedy. By its terms, § 510 of ERISA protects plan participants from the retaliation Kariotis alleges; indeed, her state law claim is "prototypical of the kind Congress intended to cover under § 510." *Ingersoll-Rand Co.,* 498 U.S. at 143, 111 S.Ct. at 485. Consequently, Kariotis' state law claim must give way to her claim under ERISA, *id.* at 145, 111 S.Ct. at 486, which we already have concluded was properly dismissed.

### III.

We have concluded that an employer who honestly believes it is firing a fraudulent employee may not be liable for intentional discrimination. Under Title VII, the ADA, the ADEA, and ERISA, an employer's honest belief is critical; it is not liable under a disparate treatment framework because its decisions (and suspicions) happen to work to the disadvantage of a member of a protected group. Liability results only if the employer *intends* to disadvantage an individual precisely because he belongs to a protected group.

[7] In analyzing Kariotis' COBRA [FN2] claim, however, we must take a different approach. While antidiscrimination statutes compel us to discern an employer's intentions, COBRA does not. It is a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

131 F.3d 672                                                                                          Page 10

131 F.3d 672, 72 Empl. Prac. Dec. P 45,115, 21 Employee Benefits Cas. 2188, 4 Wage & Hour Cas.2d (BNA)
1168, 7 A.D. Cases 1313, 11 NDLR P 149
(Cite as: 131 F.3d 672)

welfare benefit statute, not a wrongful discharge statute. All employees are protected by its terms, not just those who fall into special *680 classes. And while COBRA allows an employer to refuse continued health coverage if an employee is terminated for "gross misconduct" (meaning the employee is no longer a "qualified beneficiary" under 29 U.S.C. § 1163), what if the perceived gross misconduct turns out to be a mistake? Where the statute's language is plain, the court's function is to enforce it according to its terms. See Pittway Corp. v. United States, 102 F.3d 932, 934 (7th Cir.1996).

FN2. Consolidated Omnibus Budget Reconciliation Act, 29 U.S.C. § 1161 et seq.

Navistar would have us allow the "honest belief" rule to defeat Kariotis' COBRA claim just as it defeated her discrimination claims. It is not an unreasonable argument; indeed, we have invited it while reserving judgment on it for another day. See Misna v. Unitel Communications, Inc., 91 F.3d 876, 883 (7th Cir.1996) ("[Defendant's] argument that [under COBRA] it only needed a good faith basis for its determination that [the plaintiff] committed gross misconduct meriting termination is interesting and does have a certain resonance with both traditional and modern concepts of employment law, particularly discriminatory discharge law, but we need not decide the issue here.").

[8][9] With the issue now squarely before us, we conclude that COBRA requires more than a good faith belief by the employer. Discrimination statutes allow employers to discharge employees for almost any reason whatsoever (even a mistaken but honest belief) as long as the reason is not illegal discrimination. Thus when an employee is discharged because of an employer's honest mistake, federal anti-discrimination laws offer no protection. Likewise, when an employer discharges an employee because of inefficient work habits, excess absenteeism, an unacceptable attitude with customers and coworkers, or for a myriad of other reasons, anti-discrimination laws do not come

into play. But in each of these instances, where gross misconduct is not involved, the terminated employee retains the option under COBRA of continuing medical insurance coverage by individually paying the designated premiums. COBRA relieves an employer (and plan sponsor) from its obligation to provide continued health care coverage only in very limited circumstances, such as a termination prompted "by reason of ... gross misconduct." 29 U.S.C. § 1163(2). We do not interpret this language as referring to the employer's articulated reason or explanation for the employee's discharge. It refers to the fact (not the suspicion) of gross misconduct. In other words, the employer's belief that the employee engaged in gross misconduct must be more than its honest, actual belief-the record must demonstrate that the employee did indeed engage in gross misconduct.

In this case, the record demonstrates that Navistar honestly believed Kariotis was misusing her leave. But Navistar could have been mistaken. As Kariotis points out, the company's doctor did not examine her, nor did the company show the videotape to the physician who had excused Kariotis from work. Kay Carroll's suggestion made sense-simply ask Kariotis' doctor whether anything in the videotape changed his mind about Kariotis' condition. Navistar did not do that, and no other evidence comes close to proving Kariotis to be a fraud (and thus to have engaged in gross misconduct). Navistar's honest belief means that she cannot make a federal case about losing her job, but more is required to deprive her of her federally guaranteed COBRA benefits. If a discharged employee can demonstrate to the court that the employer was mistaken-that the employee had not engaged in gross misconduct-the employee should not be deprived of COBRA coverage under §§ 1161 and 1163. Accordingly, if Kariotis can show that Navistar's honest belief was wrong, her COBRA benefits should be restored.

IV.

Kariotis' final claim lies under the Family and Medical Leave Act of 1993. In a nutshell, she

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

131 F.3d 672                                                    Page 11

131 F.3d 672, 72 Empl. Prac. Dec. P 45,115, 21 Employee Benefits Cas. 2188, 4 Wage & Hour Cas.2d (BNA) 1168, 7 A.D. Cases 1313, 11 NDLR P 149
(Cite as: 131 F.3d 672)

claims that Navistar violated the return-to-work provisions of the Act when it refused to reinstate her. Kariotis is correct to say that under the FMLA an employee on leave from work "for the intended purpose of the leave" must be restored to her position (or an equivalent position) once the leave expires. See29 U.S.C. § 2614(a)(1). The problem for Kariotis is that Navistar has demonstrated that it honestly believed she \*681 was not on a legitimate FMLA leave; or, tracking the language in the statute, Navistar suspected Kariotis was not using her leave for its "intended purpose" of recovering from knee surgery.

Unlike Kariotis' COBRA claim, Navistar need not conclusively prove that Kariotis had misused her leave; an honest suspicion will do. This is because the FMLA's regulations plainly state that an employee like Kariotis has "no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period." 29 C.F.R. § 825.216(a). In other words, because Navistar lawfully could have terminated Kariotis after suspecting she committed fraud while on duty, the company can discharge her after suspecting she committed fraud while on leave. If Navistar had to prove more than an honest suspicion simply because Kariotis was on leave, she would be better off (and enjoy "greater rights") than similarly situated employees (suspected of fraud) who are not on leave. The statute and the regulations rule out that inequity.

### V.

Navistar honestly suspected fraud on the part of Kariotis, and while that is sufficient to defeat most of her claims, COBRA is different. Accuracy must take the place of honesty under that statute. Accordingly, the dismissal of each of Kariotis' claims is AFFIRMED, with one exception: the dismissal of the COBRA claim is REVERSED, and that claim is REMANDED to the district court for further proceedings. Of course, reinstating the COBRA claim means that the district court now has jurisdiction over Kariotis' pendent state law claim

for negligent infliction of emotional distress. In declining to exercise jurisdiction over that claim, the district court hinted that the common law claim might be preempted (by the Illinois Human Rights Act, or perhaps even by Illinois' Workers Compensation Act). We express no opinion on the matter; it is best left to the district court in the first instance.

C.A.7 (Ill.),1997.
Kariotis v. Navistar Intern. Transp. Corp.
131 F.3d 672, 72 Empl. Prac. Dec. P 45,115, 21 Employee Benefits Cas. 2188, 4 Wage & Hour Cas.2d (BNA) 1168, 7 A.D. Cases 1313, 11 NDLR P 149

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

73-1019

4

Westlaw.

55 F.3d 1086

Page 1

55 F.3d 1086, 68 Fair Empl.Prac.Cas. (BNA) 401, 66 Empl. Prac. Dec. P 43,595
**(Cite as: 55 F.3d 1086)**

C
Mayberry v. Vought Aircraft Co.
C.A.5 (Tex.),1995.

United States Court of Appeals,Fifth Circuit.
Robert MAYBERRY, Plaintiff-Appellant,
v.
VOUGHT AIRCRAFT COMPANY,
Defendant-Appellee.
No. 94-10825.

June 28, 1995.

Employee sued employer for race discrimination and retaliation. The United States District Court for the Northern District of Texas, Barefoot Sanders , J., granted summary judgment for employer. Employee appealed. The Court of Appeals, Rhesa Hawkins Barksdale, Circuit Judge, held that: (1) employee failed to establish prima facie case of race discrimination, and (2) employee failed to establish prima facie case of retaliation.

Affirmed.
West Headnotes
**[1] Federal Courts 170B ☜➁776**

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(K) Scope, Standards, and Extent
         170BVIII(K)1 In General
            170Bk776 k. Trial De Novo. Most Cited Cases
Court of Appeals reviews summary judgments de novo, to determine inter alia whether any genuine issue of material fact exists. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**[2] Federal Courts 170B ☜➁776**

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(K) Scope, Standards, and Extent
         170BVIII(K)1 In General

            170Bk776 k. Trial De Novo. Most Cited Cases
On de novo review of summary judgments, Court of Appeals draws all reasonable inferences in favor of nonmovant, and asks whether evidence in summary judgment record is such that no reasonable juror could find in favor of nonmovant. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**[3] Civil Rights 78 ☜➁1545**

78 Civil Rights
   78IV Remedies Under Federal Employment Discrimination Statutes
      78k1543 Weight and Sufficiency of Evidence
         78k1545 k. Prima Facie Case. Most Cited Cases
     (Formerly 78k383)
Under *McDonnell-Douglas/Burdine* burden-shifting analysis, employment discrimination plaintiff must establish prima facie case that defendant made employment decision that was motivated by protected factor. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[4] Civil Rights 78 ☜➁1536**

78 Civil Rights
   78IV Remedies Under Federal Employment Discrimination Statutes
      78k1534 Presumptions, Inferences, and Burden of Proof
         78k1536 k. Effect of Prima Facie Case; Shifting Burden. Most Cited Cases
     (Formerly 78k378)
Under *McDonnell-Douglas/Burdine* burden-shifting analysis, once employment discrimination plaintiff establishes prima facie case that defendant made employment decision that was motivated by protected factor, defendant bears burden of producing evidence that its employment decision was based on legitimate nondiscriminatory reason. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

55 F.3d 1086

Page 2

55 F.3d 1086, 68 Fair Empl.Prac.Cas. (BNA) 401, 66 Empl. Prac. Dec. P 43,595
(Cite as: 55 F.3d 1086)

**[5] Civil Rights 78 ☞1536**

78 Civil Rights
 78IV Remedies Under Federal Employment Discrimination Statutes
  78k1534 Presumptions, Inferences, and Burden of Proof
   78k1536 k. Effect of Prima Facie Case; Shifting Burden. Most Cited Cases
  (Formerly 78k378)
Under *McDonnell-Douglas/Burdine* burden-shifting analysis, if defendant in employment discrimination action meets burden of producing evidence that its employment decision was based on legitimate nondiscriminatory reason, following plaintiff's establishment of prima facie case, burden shifts back to plaintiff to prove that defendant's proffered reasons were pretext for discrimination. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[6] Civil Rights 78 ☞1536**

78 Civil Rights
 78IV Remedies Under Federal Employment Discrimination Statutes
  78k1534 Presumptions, Inferences, and Burden of Proof
   78k1536 k. Effect of Prima Facie Case; Shifting Burden. Most Cited Cases
  (Formerly 78k378)
Under *McDonnell-Douglas/Burdine* burden-shifting analysis, if defendant in employment discrimination action has offered legitimate nondiscriminatory reason for its action, following plaintiff's establishment of prima facie case, presumption of discrimination derived from plaintiff's establishment of prima facie case simply drops out of the picture, and ultimate question is discrimination vel non. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[7] Civil Rights 78 ☞1545**

78 Civil Rights
 78IV Remedies Under Federal Employment Discrimination Statutes
  78k1543 Weight and Sufficiency of Evidence
   78k1545 k. Prima Facie Case. Most Cited Cases
  (Formerly 78k383)
In work-rule violation cases, Title VII plaintiff may establish prima facie case of race discrimination by showing either that he did not violate the rule, or that if he did, white employees who engaged in similar acts were not punished similarly. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[8] Civil Rights 78 ☞1545**

78 Civil Rights
 78IV Remedies Under Federal Employment Discrimination Statutes
  78k1543 Weight and Sufficiency of Evidence
   78k1545 k. Prima Facie Case. Most Cited Cases
  (Formerly 78k383)
Black employee failed to establish prima facie case of race discrimination based on disparate treatment for violations of work rules, as his evidence could not support reasonable juror's finding that he was treated differently from white employees; of the 14 other employees in his division who were disciplined for their workmanship in three-year period, none were black, 12 were white, and two were Hispanic. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[9] Civil Rights 78 ☞1545**

78 Civil Rights
 78IV Remedies Under Federal Employment Discrimination Statutes
  78k1543 Weight and Sufficiency of Evidence
   78k1545 k. Prima Facie Case. Most Cited Cases
  (Formerly 78k383)
To establish prima facie case of race discrimination based on disparate treatment of similarly situated white employees for work-rule violations, black employee had to show that white employees were treated differently under circumstances nearly identical to his. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[10] Civil Rights 78 ☞1545**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

55 F.3d 1086                                                           Page 3

55 F.3d 1086, 68 Fair Empl.Prac.Cas. (BNA) 401, 66 Empl. Prac. Dec. P 43,595
(Cite as: 55 F.3d 1086)

78 Civil Rights
    78IV Remedies Under Federal Employment
Discrimination Statutes
        78k1543 Weight and Sufficiency of Evidence
            78k1545 k. Prima Facie Case. Most Cited
Cases
    (Formerly 78k383)
Prima facie case of employment discrimination may
be established in work-rule violation case by
showing that employee did not violate work rule for
which he was disciplined. Civil Rights Act of 1964,
§ 701 et seq., 42 U.S.C.A. § 2000e et seq.

[11] Civil Rights 78 ☞1545

78 Civil Rights
    78IV Remedies Under Federal Employment
Discrimination Statutes
        78k1543 Weight and Sufficiency of Evidence
            78k1545 k. Prima Facie Case. Most Cited
Cases
    (Formerly 78k383)
Black employee established prima facie case of race
discrimination in connection with his suspension for
poor workmanship in violation of work rule, by
raising fact question on whether he was responsible
for damage to parts for which he was disciplined.
Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A.
§ 2000e et seq.

[12] Civil Rights 78 ☞1536

78 Civil Rights
    78IV Remedies Under Federal Employment
Discrimination Statutes
        78k1534 Presumptions, Inferences, and
Burden of Proof
            78k1536 k. Effect of Prima Facie Case;
Shifting Burden. Most Cited Cases
    (Formerly 78k378)
Employer discharged its burden of production,
following employee's establishment of prima facie
case of race discrimination in connection with his
suspension for poor workmanship in violation of
work rule, and thus burden shifted to employee to
prove that employer's proffered reason was mere
pretext for discrimination, where employer insisted
that there was no racial motivation in its decision to
suspend employee and that suspension decision was

based solely on its conclusion, following
investigation, that employee was at least partially at
fault for $8,000 in damaged parts which had to be
scrapped. Civil Rights Act of 1964, § 701 et seq.,
42 U.S.C.A. § 2000e et seq.

[13] Civil Rights 78 ☞1536

78 Civil Rights
    78IV Remedies Under Federal Employment
Discrimination Statutes
        78k1534 Presumptions, Inferences, and
Burden of Proof
            78k1536 k. Effect of Prima Facie Case;
Shifting Burden. Most Cited Cases
    (Formerly 78k378)
Employer need not persuade court that it was
actually motivated by proffered reasons for adverse
employment action to discharge its burden of
production following employee's establishment of
prima facie case of race discrimination; burden is
only one of production. Civil Rights Act of 1964, §
701 et seq., 42 U.S.C.A. § 2000e et seq.

[14] Civil Rights 78 ☞1122

78 Civil Rights
    78II Employment Practices
        78k1122 k. Discharge or Layoff. Most Cited
Cases
    (Formerly 78k144)
Black employee failed to rebut employer's
nondiscriminatory reason for his suspension based
on poor workmanship in violation of work rule, that
following investigation employee was determined to
be at least partially at fault for $8,000 in damaged
parts which had to be scrapped, even though
employer could not be certain that machine
malfunction did not occur; in employer's opinion it
was clear enough that employee was partially at
fault, and because it was not certain that employee
was completely at fault employer chose to suspend,
rather than terminate, employee. Civil Rights Act
of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

[15] Civil Rights 78 ☞1137

78 Civil Rights
    78II Employment Practices

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

55 F.3d 1086

Page 4

55 F.3d 1086, 68 Fair Empl.Prac.Cas. (BNA) 401, 66 Empl. Prac. Dec. P 43,595
(Cite as: 55 F.3d 1086)

78k1137 k. Motive or Intent; Pretext. Most Cited Cases
　(Formerly 78k141)
Question, for purposes of employer's burden to produce nondiscriminatory reason for employment action challenged as discriminatory, is not whether employer made erroneous decision; it is whether decision was made with discriminatory motive. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

[16] Civil Rights 78 ⮌1535

78 Civil Rights
　78IV Remedies Under Federal Employment Discrimination Statutes
　　78k1534 Presumptions, Inferences, and Burden of Proof
　　　78k1535 k. In General. Most Cited Cases
　(Formerly 78k377.1)
Court could not assume, in race discrimination action brought by black employee, that employer's past conduct, as reflected by finding by Department of Labor (DOL) that employer had occasionally discriminated on basis of race in its promotion decisions, suggested it had discriminated against employee; DOL found only individual instances of discrimination in promotion decisions, and those instances did not occur in any pattern or practice that would have suggested that blacks, as a class, were treated differently because of their race. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

[17] Civil Rights 78 ⮌1243

78 Civil Rights
　78II Employment Practices
　　78k1241 Retaliation for Exercise of Rights
　　　78k1243 k. Practices Prohibited or Required in General; Elements. Most Cited Cases
　(Formerly 255k40(1) Master and Servant)
Prima facie case of retaliation exists if plaintiff establishes that: he participated in statutorily protected activity; he received adverse employment action; and causal connection exists between protected activity and adverse action. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

[18] Civil Rights 78 ⮌1252

78 Civil Rights
　78II Employment Practices
　　78k1241 Retaliation for Exercise of Rights
　　　78k1252 k. Causal Connection; Temporal Proximity. Most Cited Cases
　(Formerly 255k40(1) Master and Servant)
Employee failed to establish prima facie case of retaliation, as he failed to establish causal connection between protected activity and adverse action; there was nothing inherently suspicious about 13-day suspension that occurred at least several years after protected activity began. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

[19] Civil Rights 78 ⮌1252

78 Civil Rights
　78II Employment Practices
　　78k1241 Retaliation for Exercise of Rights
　　　78k1252 k. Causal Connection; Temporal Proximity. Most Cited Cases
　(Formerly 255k40(4) Master and Servant)
Timing of adverse employment action can be significant, although not necessarily determinative, factor in retaliation action. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

[20] Civil Rights 78 ⮌1252

78 Civil Rights
　78II Employment Practices
　　78k1241 Retaliation for Exercise of Rights
　　　78k1252 k. Causal Connection; Temporal Proximity. Most Cited Cases
　(Formerly 255k40(4) Master and Servant)
There is nothing inherently suspicious about 13-day suspension that occurs at least several years after protected activity begins, for purposes of retaliation claim. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

*1088 Noemi A. Collie, Dallas, TX, for appellant.
Maureen F. Moore, True, Rohde & Sewell, Dallas, TX, for appellee.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

55 F.3d 1086

Page 5

55 F.3d 1086, 68 Fair Empl.Prac.Cas. (BNA) 401, 66 Empl. Prac. Dec. P 43,595
(Cite as: 55 F.3d 1086)

Appeal from the United States District Court for the Northern District of Texas.

**\*1089** Before GARWOOD, JOLLY and BARKSDALE, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge: Robert Mayberry challenges an adverse summary judgment on his employment discrimination and retaliation claims. Because the summary judgment record fails to create a genuine issue of material fact (restated, would not permit a reasonable juror to find for Mayberry on either claim), we AFFIRM.

I.

Mayberry, who is black, has been employed as a machine operator by Vought Aircraft Company since 1979. Vought uses a progressive discipline program consisting of a verbal warning, written warning, suspension, and termination. Only disciplinary actions occurring within the prior year can be considered in imposing progressive discipline.

Mayberry was disciplined three times in 1991 for poor workmanship in violation of the Vought Code of Conduct, receiving a verbal warning in March, two written warnings in June, and a three-day suspension in December.FN1 He filed union grievances for each disciplinary action, resulting, *inter alia*, in the agreement that, if he had no further problems with his work until December 2, 1992, he would be reimbursed for his 1991 suspension.FN2 On October 26, 1992, $8,000 in parts were " scrapped" (damaged) at Mayberry's work station. He blamed the damage on a machine malfunction, but Vought determined that he was at least partially at fault. Although Vought could have terminated Mayberry (because his suspension was less than a year old), it elected instead to suspend him, in view of his seniority and the fact that it could not determine the degree to which the machine may have been responsible for the damage. Mayberry was suspended for 13 days.

FN1. Vought's Code of Conduct states, in relevant part: "Defective work resulting

from inattention to the job, negligence or carelessness may make it necessary for the company to take corrective action. Deliberate production of defective work may result in discharge".

FN2. Mayberry also filed discrimination charges with the Equal Employment Opportunity Commission, none of which resulted in a finding of discrimination.

Mayberry filed this action in September 1993, claiming that his suspension was on account of his race, and/or in retaliation for prior discrimination claims brought against Vought and his participation in demonstrations against Vought for its alleged discriminatory practices. On Vought's motion for summary judgment, the district court held that Mayberry failed to establish a prima facie case for retaliation, and, assuming a prima facie case of discrimination, that Mayberry was unable to overcome Vought's defense that the suspension resulted from its honest belief that Mayberry had violated the work-rule. Accordingly, summary judgment was entered for Vought.

II.

[1][2] Mayberry contests the dismissal of both claims. We review summary judgments *de novo*, to determine, *inter alia*, whether any genuine issue of material fact exists. *Calpetco 1981 v. Marshall Exploration, Inc.*, 989 F.2d 1408, 1412 (5th Cir.1993). For that aspect, we draw all reasonable inferences in favor of the nonmovant, and ask whether the evidence in the summary judgment record is such that no reasonable juror could find in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510-11, 91 L.Ed.2d 202 (1986).

[3][4][5][6] The analysis for Title VII discrimination claims is well-known. *See e.g., St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

73-1025

55 F.3d 1086

Page 6

55 F.3d 1086, 68 Fair Empl.Prac.Cas. (BNA) 401, 66 Empl. Prac. Dec. P 43,595
**(Cite as: 55 F.3d 1086)**

93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The plaintiff must establish a prima facie case that the defendant made an employment decision that was motivated by a protected factor. Once established, the defendant bears the burden of producing evidence that its employment decision was based on a legitimate nondiscriminatory reason. The burden then shifts back to the plaintiff to prove that the defendant's proffered reasons were a pretext for discrimination.*1090 But, if the defendant has offered a legitimate nondiscriminatory reason for its action, the presumption of discrimination derived from the plaintiff's prima facie case "simply drops out of the picture", *Hicks*, 509 U.S. at ----, 113 S.Ct. at 2749, and "the ultimate question [is] discrimination *vel non* ". *Id.* at ----, 113 S.Ct. at 2753 (citation omitted).

### A.

[7] In work-rule violation cases, a Title VII plaintiff may establish a prima facie case by showing "either that he did not violate the rule or that, if he did, white employees who engaged in similar acts were not punished similarly". *Green v. Armstrong Rubber Co.,* 612 F.2d 967, 968 (5th Cir.), *cert. denied,*449 U.S. 879, 101 S.Ct. 227, 66 L.Ed.2d 102 (1980). Mayberry travels both avenues, claiming that he was not responsible for the damage, and that, even assuming he was, similarly situated white employees have not been disciplined.

### 1.

[8] For showing that white employees were not disciplined, Mayberry's evidence consists of reports from Vought's Accumulated Scrappage Material record (ASM), read together with Vought's list of violations of its Code of Conduct. The ASMs, which record each instance when a part is scrapped, reveal such instances (for white and black employees) that have no corresponding entry on Vought's violations list. Significantly, the ASMs often include notations such as "poor workmanship" or "operator error", apparently to assign cause for the scrappage. Based on this evidence, Mayberry urges that white employees were treated differently

from him.

[9] To establish a prima facie case in this manner, Mayberry must show that white employees were treated differently under circumstances "nearly identical" to his. *Little v. Republic Ref. Co.,* 924 F.2d 93, 97 (5th Cir.1991); *Smith v. Wal-Mart Stores,* 891 F.2d 1177, 1180 (5th Cir.1990); *Davin v. Delta Air Lines, Inc.,* 678 F.2d 567, 570-71 (5th Cir. Unit B 1982). In this regard, Mayberry has offered evidence that white (and black) employees have scrapped parts due, apparently, to operator error or poor workmanship, and were not disciplined. However, as Vought explained, and as Mayberry's own evidence confirms, it does not even conduct a disciplinary investigation, much less take disciplinary action, each time a part is scrapped. The decision to investigate is based on two factors: the history of poor work performance of the employee, and the cost of the damaged parts. Mayberry fit both factors; he had several recent instances of poor work performance, and the amount of damage was $8,000.

For whether a white employee in "nearly identical" circumstances has received treatment different from Mayberry, reference to the ASMs is of little value. Vought notes that they are not intended, and are not used, for disciplinary purposes. Rather, they serve only to maintain a record of each part that is scrapped, and to provide authorization for the part's replacement. Most importantly, they make no reference to the work history of the employee or the amount of damage. Accordingly, they are not evidence that white employees in "nearly identical" circumstances have been treated differently.[FN3] To the contrary, Mayberry's own evidence reveals that, of the 14 other employees in his division who were disciplined for their workmanship between 1991 and 1994, none were black-12 were white and two were Hispanic. In sum, Mayberry's evidence could not support a reasonable juror's finding that he was treated differently from white employees. As such, he fails to make a prima facie case on this basis.

FN3. The ASMs may well have been a starting point from which to build a case

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

55 F.3d 1086                                                                                                    Page 7

55 F.3d 1086, 68 Fair Empl.Prac.Cas. (BNA) 401, 66 Empl. Prac. Dec. P 43,595
(Cite as: 55 F.3d 1086)

that would withstand summary judgment. Mayberry could have gained information, through discovery, on the individuals listed in the ASMs, which may well have substantiated his claim of disparate treatment. Without more, however, the ASMs are not helpful.

### 2.

[10][11] On the other hand, a prima facie case may be established by showing that the plaintiff did not violate the work-rule for which he was disciplined. *Green,* 612 F.2d at 968. We agree with the district court that *1091 Mayberry created a fact question on whether he was responsible for the damage. Although the conclusion from Vought's investigation was that Mayberry was at least partially at fault, Vought admitted that "it could have been possible to have had a software problem" . Furthermore, Mayberry offered evidence that his machine had malfunctioned in the past. This, combined with Mayberry's affidavit statement that he was not at fault, creates a reasonable question of whether Mayberry violated the work-rule.

[12][13] Vought responds to Mayberry's prima facie case by insisting that there was no racial motivation in its decision to suspend Mayberry; that the decision was based solely on its conclusion, following an investigation, that Mayberry was at least partially at fault. With this, Vought has discharged its burden of production,[FN4] and the burden shifted to Mayberry to prove that Vought's proffered reason is merely a pretext for discrimination. *Hicks,* 509 U.S. at ----, 113 S.Ct. at 2749.

FN4. Mayberry appears to suggest that he need not rebut Vought's nondiscriminatory reason because a fact issue exists on whether he violated the work-rule. Vought's burden, however, is only one of production. *Hicks,* 509 U.S. at ----, 113 S.Ct. at 2749. It "need not persuade the court that it was actually motivated by the proffered reasons". *Id.* (quoting *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094).

[14] Mayberry attempts to overcome Vought's nondiscriminatory reason essentially by reasserting his prima facie evidence. As discussed below, we conclude that, as a matter of law, Mayberry has failed to rebut that nondiscriminatory reason.

[15] The material fact issue on whether Mayberry was at fault exists only because Vought admitted that, although it found no evidence of machine error, it could not be *certain* that some sort of machine malfunction did not occur.[FN5] Nonetheless, in Vought's judgment it was clear enough that Mayberry was partially at fault. And, because it was not *certain* that Mayberry was completely at fault, Vought elected only to suspend him, whereas it could have terminated him. Even so, Vought's uncertainty, together with Mayberry's adamant denial, allows for a reasonable question of fact. Mayberry seizes on this fact question as the basis for his contention that Vought's nondiscriminatory reason for the suspension is not credible.[FN6] Mayberry misses the mark. The question is not whether an employer made an erroneous decision; it is whether the decision was made with discriminatory motive.

FN5. The data read-out on the machine, which would apparently have indicated if there had been machine error, "had been cleared". Mayberry denied having cleared the machine, and insisted that it lost power and cleared itself.

FN6. In their briefs, the parties argued at length over whether a plaintiff may rebut a defendant's nondiscriminatory reason by showing only that the reason is not credible, without offering proof, in addition to the prima facie case, of discriminatory motive. Our en banc court may soon consider this issue. *See Rhodes v. Guiberson Oil Tools,* 39 F.3d 537 (5th Cir.1994), *reh'g en banc granted,* 49 F.3d 127 (5th Cir.1995). Because we conclude that no reasonable juror could find that Vought's nondiscriminatory reason was not credible, we do not reach this issue.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

55 F.3d 1086                                                          Page 8

55 F.3d 1086, 68 Fair Empl.Prac.Cas. (BNA) 401, 66 Empl. Prac. Dec. P 43,595
(Cite as: 55 F.3d 1086)

[E]ven an incorrect belief that an employee's performance is inadequate constitutes a legitimate, nondiscriminatory reason. We do not try in court the validity of good faith beliefs as to an employee's competence. Motive is the issue.... [A] dispute in the evidence concerning ... job performance does not provide a sufficient basis for a reasonable factfinder to infer that [the] proffered justification is unworthy of credence.
*Little*, 924 F.2d at 97. *See also Sherrod v. Sears Roebuck & Co.*, 785 F.2d 1312 (5th Cir.1986); *Turner v. Texas Instruments, Inc.*, 555 F.2d 1251, 1256 (5th Cir.1977); *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir.1989).

Attempting to offer more than the mere dispute over whether Vought properly found him at fault, Mayberry resorts to the evidence we rejected in the context of his prima facie case: that white employees are treated differently. Needless to say, Mayberry's evidence of disparate treatment is no more helpful or persuasive in the context of rebutting Vought's nondiscriminatory explanation. As noted, Mayberry has not offered evidence sufficient to support a finding that white *1092 employees in circumstances "nearly identical" to his have been treated differently. *See Little*, 924 F.2d at 96-97 (rejecting rebuttal evidence of disparate treatment because circumstances were not "nearly identical").

[16] Finally, Mayberry appears to suggest that Vought's nondiscriminatory explanation is suspect because, according to Mayberry, Vought has a propensity for discrimination because of a finding by the Department of Labor that Vought had occasionally discriminated on the basis of race in its promotion decisions.[FN7] We will not entertain such a suggestion. According to his affidavit, Mayberry has brought, or been a party to, at least six prior charges of discrimination against Vought, none of which have resulted in a finding of discrimination against Mayberry. Just as we cannot assume that Mayberry's past conduct suggests a propensity to file false charges, we cannot assume that Vought's past conduct suggests it has discriminated against Mayberry.[FN8]

FN7. Mayberry also asserts that his workmanship violations began to issue only after he joined in a class action discrimination complaint against Vought, and after his participation in picketing against it.

FN8. We note that the Department of Labor found only individual instances of discrimination in promotion decisions, and "[t]hese instances did not occur in any pattern or practice that would suggest Blacks, as a class, were treated differently because of their race".

In sum, based on the summary judgment record, a reasonable juror could not conclude that Mayberry received the 13-day suspension because of his race. Therefore, summary judgment on this claim was proper.

B.

[17][18] A prima facie case of retaliation exists if the plaintiff establishes that (1) he participated in statutorily protected activity, (2) he received an adverse employment action, and (3) a causal connection exists between the protected activity and the adverse action. *Armstrong v. City of Dallas*, 997 F.2d 62, 65 n. 3 (5th Cir.1993). The parties agree that Mayberry meets the first two elements. Vought contends, however, and the district court agreed, that Mayberry failed to create a material fact issue on the existence of a causal connection between his protected activity and his suspension.

[19] Mayberry asserts that the timing of the suspension in relation to his protected activity establishes the required nexus.[FN9] The timing of the adverse employment action can be a significant, although not necessarily determinative, factor. *See e.g., Shirley v. Chrysler First, Inc.*, 970 F.2d 39, 42 (5th Cir.1992) (discussing evaluation of "timing" evidence). In this case, however, it is unclear that the timing of the suspension benefits Mayberry's case.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

55 F.3d 1086, 68 Fair Empl.Prac.Cas. (BNA) 401, 66 Empl. Prac. Dec. P 43,595
(Cite as: 55 F.3d 1086)

FN9. Mayberry also rests a prima facie case on the basis of the evidence offered for his discrimination claim. To the extent that such evidence may be relevant to a prima facie case for retaliation, we find it insufficient, as discussed in part II.A., *supra.*

[20] According to his affidavit, Mayberry first engaged in protected activity (filed an EEOC charge) sometime "in the mid 1980's", and continued, with regularity, in protected activity through 1992.[FN10] In this regard, there is nothing inherently "suspicious" about a 13-day suspension that occurs at least several years after protected activity begins. Indeed, one might argue that the "timing" here is evidence *against* retaliation. We need not go that far. Suffice it to say that we find insufficient evidence to support a finding that "but for" Mayberry's protected activity, he would not have received the 13-day suspension. *See Jack v. Texaco Research Ctr.,* 743 F.2d 1129, 1131 (5th Cir.1984) (noting that prima facie retaliation requires "but for" causation).

FN10. It is unclear when Mayberry filed his first EEOC complaint. Mayberry states in his affidavit that he had filed EEOC complaints "in the mid 1980's". Mayberry filed an EEOC charge in connection with his delayed promotion to Class B machine operator. He again filed an EEOC charge in connection with his delayed promotion to Class A machine operator. The class A promotion occurred in 1988; therefore, his first EEOC complaint (if it was for his class B promotion) must have occurred prior to 1988. Mayberry also engaged in protected activity (discrimination charges and/or picketing against Vought) in 1988, 1990, 1991, and 1992.

*1093 Furthermore, assuming *arguendo* that Mayberry established a prima facie case, he fails, for summary judgment purposes, to overcome Vought's legitimate nondiscriminatory reason for the suspension-its belief that Mayberry violated the work-rule. The analysis in part II.A, *supra,* applies here.

III.

For the foregoing reasons, the judgment is

AFFIRMED.

C.A.5 (Tex.),1995.
Mayberry v. Vought Aircraft Co.
55 F.3d 1086, 68 Fair Empl.Prac.Cas. (BNA) 401, 66 Empl. Prac. Dec. P 43,595

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

5

Westlaw.

964 F.2d 577

Page 1

964 F.2d 577, 59 Fair Empl.Prac.Cas. (BNA) 76, 59 Empl. Prac. Dec. P 41,640
**(Cite as: 964 F.2d 577)**

▷
Mitchell v. Toledo Hosp.
C.A.6 (Ohio),1992.

United States Court of Appeals,Sixth Circuit.
Shirley J. MITCHELL, Plaintiff-Appellant,
v.
TOLEDO HOSPITAL, Defendant-Appellee.
No. 91-3268.

Submitted Sept. 30, 1991.
Decided May 21, 1992.

Black employee filed action against hospital, claiming that she was a victim of race and age discrimination. The United States District Court for the Northern District of Ohio, Nicholas J. Walinski, J., granted the hospital's motion for summary judgment. Employee appealed. The Court of Appeals, Rosen, District Judge, sitting by designation, held that: (1) the black employee failed to establish that she was "similarly situated" to white employees who had not been discharged for allegedly having done "worse things," and, therefore, the black employee could not establish a prima facie case of discrimination; (2) the employee's misuse of hospital property was a legitimate, nondiscriminatory reason for the discharge; and (3) the employee failed to raise a factual question on whether the stated reason was merely a pretext for discrimination.

Affirmed.

Nathaniel R. Jones, Circuit Judge, dissented with opinion.
West Headnotes
**[1] Federal Civil Procedure 170A ☞2544**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)3 Proceedings
                170Ak2542 Evidence
                    170Ak2544 k. Burden of Proof.
Most Cited Cases
In order to defeat summary judgment, plaintiff must come forward with more persuasive evidence to support his or her claim than would otherwise be necessary; "mere possibility" of factual dispute is not enough. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

**[2] Federal Civil Procedure 170A ☞2544**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)3 Proceedings
                170Ak2542 Evidence
                    170Ak2544 k. Burden of Proof.
Most Cited Cases
Summary judgment should be granted if defendant demonstrates that, after reasonable period of discovery, plaintiff is unable to produce sufficient evidence beyond bare allegations of complaint to support essential element of his or her case. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

**[3] Civil Rights 78 ☞1405**

78 Civil Rights
    78III Federal Remedies in General
        78k1400 Presumptions, Inferences, and Burdens of Proof
            78k1405 k. Employment Practices. Most Cited Cases
        (Formerly 78k240(2))

**Civil Rights 78 ☞1536**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1534 Presumptions, Inferences, and Burden of Proof
            78k1536 k. Effect of Prima Facie Case; Shifting Burden. Most Cited Cases

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

73-1031

964 F.2d 577                                                                          Page 2

964 F.2d 577, 59 Fair Empl.Prac.Cas. (BNA) 76, 59 Empl. Prac. Dec. P 41,640
(Cite as: 964 F.2d 577)

(Formerly 78k378)

**Civil Rights 78 ☞1743**

78 Civil Rights
    78V State and Local Remedies
        78k1742 Evidence
            78k1743 k. In General. Most Cited Cases
    (Formerly 78k453)
*McDonnell    Douglas/Burdine*    evidentiary
framework applies not only to claims under Title
VII, but to age discrimination claims, to claims
under Ohio statutes, and to claims under § 1981. 42
U.S.C.A. §§ 1981, 1983; Age Discrimination in
Employment Act of 1967, § 2 et seq., 29 U.S.C.A. §
621 et seq.; U.S.C.A. Const.Amend. 14; Civil
Rights Act of 1964, § 701 et seq., 42 U.S.C.A. §
2000e et seq.; Ohio R.C. §§ 4112.02(A), 4112.99.

**[4] Civil Rights 78 ☞1138**

78 Civil Rights
    78II Employment Practices
        78k1138 k. Disparate Treatment. Most Cited
Cases
    (Formerly 78k153)
Black employee failed to establish that she was "
similarly situated" to nonminority employees who
allegedly engaged in more serious misconduct, but
were not discharged; black employee offered only
her subjective belief that nonminority employees
were treated better and produced no evidence to
establish that white employees who were not fired
had been "similarly situated in all respects." Civil
Rights Act of 1964, § 701 et seq., 42 U.S.C.A. §
2000e et seq.

**[5] Civil Rights 78 ☞1122**

78 Civil Rights
    78II Employment Practices
        78k1122 k. Discharge or Layoff. Most Cited
Cases
    (Formerly 78k144)

**Civil Rights 78 ☞1204**

78 Civil Rights
    78II Employment Practices

78k1199 Age Discrimination
    78k1204 k. Discharge or Layoff. Most
Cited Cases
    (Formerly 78k170)
Hospital articulated legitimate, nondiscriminatory
reason for discharging black employee who had
misused hospital property; review board member
stated in affidavit that there was no one similar who
had been caught misusing hospital property who
was not discharged and that decision was made
without consideration of race or age. Civil Rights
Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et
seq.; Age Discrimination in Employment Act of
1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.

**[6] Federal Civil Procedure 170A ☞2539**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)3 Proceedings
                170Ak2536 Affidavits
                    170Ak2539 k. Sufficiency of
Showing. Most Cited Cases
Affidavit submitted by black employee was not
proper affidavit in response to motion for summary
judgment where it was not made on personal
knowledge and did not set forth "facts" that would
be admissible in employment discrimination action;
statements in employee's affidavit offered to prove
pretext were nothing more than rumors, conclusory
allegations, and subjective beliefs. Fed.Rules
Civ.Proc.Rule 56(e), 28 U.S.C.A.

**[7] Civil Rights 78 ☞1137**

78 Civil Rights
    78II Employment Practices
        78k1137 k. Motive or Intent; Pretext. Most
Cited Cases
    (Formerly 78k153)
Black employee's denial that her conduct amounted
to "misuse of hospital property" was insufficient,
without substantiation, to show that hospital's
articulated legitimate reason for discharging
employee had been mere pretext for discrimination.
Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A.
§ 2000e et seq.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

964 F.2d 577

964 F.2d 577, 59 Fair Empl.Prac.Cas. (BNA) 76, 59 Empl. Prac. Dec. P 41,640
(Cite as: 964 F.2d 577)

*578 William J. Peters (briefed), Toledo, Ohio, for plaintiff-appellant.
Michael S. Scalzo (briefed), Marshall & Melhorn, Toledo, Ohio, for defendant-appellee.

Before: JONES and NELSON, Circuit Judges; and ROSEN, District Judge.[FN*]

> FN* The Honorable Gerald E. Rosen, United States District Judge for the Eastern District of Michigan, sitting by designation.

ROSEN, District Judge.
Plaintiff Shirley Mitchell appeals the District Court's entry of summary judgment in favor of Defendant Toledo Hospital in this race and age discrimination/termination of employment action. For the following reasons, we affirm the decision of the District Court.

I. INTRODUCTION

This is a race and age discrimination/termination of employment case. In her Complaint filed in the U.S. District Court for the Northern District of Ohio on December 8, 1989, Plaintiff alleged that her discharge from employment at the Defendant hospital on December 12, 1988 was in violation of the Fourteenth Amendment, 42 U.S.C. §§ 1981 and 1983, Title VII, the ADEA and Sections 4112.02(A) and 4112.99 of the Ohio Revised Code. Paragraph 1 of Plaintiff's Complaint also contained a passing allegation that Ms. Mitchell had once been denied a promotion at the hospital because of her race, but she admitted in her deposition that this lawsuit only dealt with her discharge and her attorney confirmed that the allegation in the Complaint was a "misprint"[FN1]

> FN1. This is actually the second lawsuit Ms. Mitchell has filed against her former employer, Toledo Hospital. In 1986, she filed a race and age discrimination suit against the hospital which was predicated on the hospital's promotion of a younger white female co-worker instead of her to a position for which both Ms. Mitchell and

the white co-worker had applied and were interviewed. As in this case, Plaintiff alleged separate causes of action under the Fourteenth Amendment, Section 1981, Section 1983, Title VII and ADEA.
The District Court granted the hospital's motions to dismiss and for summary judgment in that "denial of promotion" suit on June 19, 1987 and May 25, 1988, finding that there was no legal basis for Plaintiff's allegations of violation of the Fourteenth Amendment and Section 1981 and 1983, and subsequently finding, with respect her Title VII and ADEA claims, that Plaintiff had failed to show that a genuine issue of material fact existed as to whether the hospital's articulated reasons for the employment decision were pretextual. (In that case, the District Court made no determination as to whether Ms. Mitchell had established a *prima facie* case.)
The Sixth Circuit affirmed the District Court in that denial-of-promotion case in an unpublished opinion on June 23, 1989.
In her deposition in the instant action, Ms. Mitchell further admitted that she has no evidence of having been denied a promotion because of her race or her age other than the evidence given by her in her deposition in the prior litigation. Thus, even if she and her attorney had not withdrawn the denial of promotion allegations, she would be barred from proceeding with a denial of promotion claim by virtue of the doctrine of *res judicata*.

In an Opinion and Order dated February 14, 1991, the District Court granted the *579 Defendant's Motion for Summary Judgment, finding that Plaintiff had failed to establish a *prima facie* case of race or age discrimination, and even assuming *arguendo* that she did establish a *prima facie* case, Plaintiff failed to establish that the non-discriminatory reason given by the hospital for her discharge-misuse of hospital property-was pretextual. A Judgment of dismissal was accordingly entered on February 20, 1991.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

73-1033

964 F.2d 577

Page 4

964 F.2d 577, 59 Fair Empl.Prac.Cas. (BNA) 76, 59 Empl. Prac. Dec. P 41,640
(Cite as: 964 F.2d 577)

Plaintiff timely filed her Notice of Appeal to the Sixth Circuit.

## II. FACTUAL BACKGROUND

Plaintiff Shirley Mitchell is a 51-year old black female who had been employed by Defendant Toledo Hospital ("the Hospital") for 29 years prior to the termination of her employment in December 1988. At the time of her discharge, Ms. Mitchell was employed as an accounts examiner.[FN2] As an accounts examiner, Ms. Mitchell was responsible for billing Welfare for charges incurred by Welfare patients at the Hospital. It was Ms. Mitchell's responsibility to review the appropriate forms and make sure they were correctly filled out before sending them to Welfare so that the Hospital could be reimbursed for the patients' charges by that agency.

> FN2. There were five accounts examiners in Plaintiff's department at the time of Plaintiff's discharge.

On December 5, 1988, certain "Sterilization Consent Forms" (the "forms") turned up missing. The forms had been seen in a box on a coffee table in the office two days earlier. Because her "team leader" and immediate supervisor, Martha Holmes, was absent, she went to Ron Wachsman, the "billing manager" who apparently was Plaintiff's supervisor's supervisor, and asked him if he had seen the box of forms that had been on the coffee table.

Wachsman told Ms. Mitchell that he had recently moved the coffee table but did not indicate to her whether he had seen any box of forms on the table. *See* J.A. 63. From Wachsman's statement that he had moved the coffee table, Ms. Mitchell surmised that he must have set the box of forms on the floor and that housekeeping might have thrown the box in the trash. *Id.* Plaintiff then proceeded to look for the box of forms for two or three hours on December 5th but to no avail.

Around 8 o'clock in the morning the next day,

Tuesday, December 6, 1988, Plaintiff found the box of forms in the hospital basement. She took the box to her office and placed it under her desk. Plaintiff testified at her deposition that on December 6th she only told one person-Cathy Brown, one of Plaintiff's co-workers-that she had found the forms. J.A. 83. She did not tell any of her supervisors. *Id.*

Plaintiff subsequently told three of her fellow welfare accounts examiners about finding the forms, and she and these three co-workers agreed to play a "practical joke" on Wachsman:

[MITCHELL]
A: I remember we were jokingly, Mary [Mihalko], Sue [Sheronick], Cindy [Dawson] and I, saying that we weren't going to tell Ron Wachsman until, jokingly, December....
[DEFENSE COUNSEL]
Q: You said until December. It was December.
A: Christmas I was saying. We were jokingly saying it.
Q: You were not going to tell Ron until the day before Christmas?
A: Uh-huh, or something like that.
Q: Was it you or the-
A: Mary Mihalko and I jokingly said it.
Q: Okay.
A: And Cindy said yes, he doesn't need to know anytime soon.
Q: Who said it first?
A: We all said it in unison.
Q: You all said it in unison?
A: Uh-huh, and I said not until Christmas.
Q: You were the one that said not until Christmas. That was going to be his Christmas present or what?
*580 A: No. It was said jokingly.... ·

J.A. at 80-82.

A couple of hours later that morning, Mitchell's supervisor, Ronald Wachsman asked her if she had seen the forms. She denied having seen them, even though she knew that she had them under her desk.[FN3] She kept the forms hidden under her desk for another day and then moved them to her personal file cabinet which she locked with a key. On Thursday morning, December 8, Plaintiff was advised by a co-worker that Mr. Wachsman and Mr.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

964 F.2d 577                                                                                          Page 5

964 F.2d 577, 59 Fair Empl.Prac.Cas. (BNA) 76, 59 Empl. Prac. Dec. P 41,640
(Cite as: 964 F.2d 577)

Mike Swick, another supervisor, had been looking for the forms and had looked under her desk on Wednesday evening. Later on Thursday, Mr. Wachsman again asked Plaintiff if she had located the forms and she again denied having seen them.

> FN3. Ms. Mitchell testified at her deposition that she decided not to tell her supervisors about having found the forms " as a practical joke." The subject forms were not blank forms, but rather forms that were already filled out and ready to be reviewed and/or sent to Welfare, and represented several hundred thousand dollars of income to the hospital.

On Friday, December 9, Mr. Wachsman called Ms. Mitchell into his office and informed her that the forms had been found. When he asked her why she had not told him that she had found them, Mitchell replied that "she wanted him to stew in his own mess." J.A. at 89.

Plaintiff was informed that her actions constituted a misuse of Hospital property, a terminable offense according to the Hospital's employee handbook. The Hospital's five member review board was convened and unanimously agreed that discharge was the appropriate disciplinary action.

Accordingly, on Monday, December 12, 1988, in a meeting with Mr. Wachsman and Mr. Baranski of the hospital's Human Resources department, Plaintiff was advised that her employment was terminated. Mitchell then brought the instant action, claiming that she was terminated because of her race and her age.

### III. PLAINTIFF'S ARGUMENTS IN THE DISTRICT COURT AND IN THIS APPEAL

While Plaintiff alleged in her Complaint that the hospital has not terminated any white or younger employees for the same type of conduct in which she engaged, she admitted at her deposition that she knows of no white employees or employees under the age of 40 who engaged in similar conduct and

were not discharged. Her only basis for her claims of discrimination is her contention that "a lot of white people have not been discharged who have done what Plaintiff believes were worse things than what she did. However, at her deposition she could only identify two non-minority employees, Karen Lind, one of Plaintiff's fellow account examiners whom Plaintiff claims had a poor absentee record, and Bobbie Walley, an employee in charge of filing, who in 1987 once cursed her team leader. Neither of these two individuals was fired, and Plaintiff believes that they were afforded more lenient treatment because they were white.

Additionally, after Defendant moved for summary judgment, Plaintiff submitted with her Response to the Summary Judgment Motion a hearsay Affidavit, which is dated February 8, 1991, seven months after her deposition, in which she states that she had " been advised by [unidentified] employees of Toledo Hospital" that at some unspecified point in time, two white female employees, Connie Kortgoede and Karen Lind, kept medicare checks and personal checks payable to Toledo Hospital hidden in their desks for two years but the only disciplinary action taken against either woman was that one of them was transferred out of the Billing Department to another department.

Further, although Plaintiff admits having hidden the subject forms as described above, and admits having intentionally misled her supervisor every time he asked her if she had seen them, Plaintiff argues that her hiding the forms from her supervisor does not constitute a misuse of Hospital property-which was the reason given for her discharge. Rather, she contends that because she had hidden the forms under her desk and in her filing cabinet, "[a]t no *581 time after December 6, 1988 were the forms any place than in a proper location. [T]he forms after being found did not leave the Hospital Billing Department. The Hospital property was under lock and key for approximately twenty four (24) hours and certainly were not misused."

### IV. THE DISTRICT COURT'S DECISION

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

964 F.2d 577                                                                      Page 6

964 F.2d 577, 59 Fair Empl.Prac.Cas. (BNA) 76, 59 Empl. Prac. Dec. P 41,640
(Cite as: 964 F.2d 577)

Applying the four-part *McDonnell Douglas* test for a *prima facie* showing of discrimination, *i.e.*, showing that the plaintiff
(1) was a member of a protected class,
(2) was discharged,
(3) was qualified for the position, and
(4) was replaced by a person outside the class,

the District Court determined that Plaintiff failed to establish a *prima facie* case of race or age discrimination because "nowhere in the record is it alleged that she was replaced by a person outside the [protected] class." Further, noting that Plaintiff could also have established a *prima facie* case by presenting credible, direct evidence of discrimination, the Court observed that Mitchell had not presented any such evidence. .

The District Court went on, however, to hold that even assuming *arguendo* that Mitchell had met all four prongs of the *McDonnell Douglas* test, the Hospital had articulated a legitimate, nondiscriminatory reason for her discharge-misuse of Hospital property-and Plaintiff failed to establish that the Hospital's reason was pretextual. In so doing, the Court held that Ms. Mitchell's hearsay affidavit, regarding what she had been told by unnamed Hospital employees about the two woman who had kept medicare and personal checks in their desk drawers but had either not been disciplined or received lesser discipline, failed to satisfy the requirements of Fed.R.Civ.Pro. 56(e) which requires that affidavits in support of, or in opposition to, a motion for summary judgment be made on personal knowledge, set forth such facts as would be admissible into evidence and show affirmatively that the affiant is competent to testify to the matters stated therein. Therefore, the Court refused to consider the affidavit, and because all that Ms. Mitchell had offered in support of her claims were "mere allegations of discrimination", it entered summary judgment in favor of the Hospital.

## V. DISCUSSION

### A. THE STANDARDS GOVERNING REVIEW OF A GRANT OF A MOTION FOR SUMMARY JUDGMENT

The general standard that an appellate court applies in reviewing the grant or denial of a summary judgment motion is the same standard utilized by the trial court initially: As provided in Fed.R.Civ.Pro. 56(c), summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions of file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

The principles governing consideration of motions for summary judgment were redefined by the United States Supreme Court in a 1986 trilogy of cases: *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); and *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The Sixth Circuit expressly adopted the Supreme Court trilogy's "new era" in summary judgment practice in its recent decision in *Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir.1989).

[1][2] In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the Supreme Court held:
The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by *582 a *preponderance of evidence* that the plaintiff is entitled to a verdict....

106 S.Ct. at 2512 (emphasis added). The "mere possibility" of a factual dispute is not enough. *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir.1986). Rather, in order to defeat summary judgment a plaintiff "must come forward with more persuasive evidence to support [his or her] claim than would otherwise be necessary." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1350, 1356, 89 L.Ed.2d 538 (1986). Where the defendant demonstrates that after a reasonable period of discovery the plaintiff is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

964 F.2d 577, 59 Fair Empl.Prac.Cas. (BNA) 76, 59 Empl. Prac. Dec. P 41,640
(Cite as: 964 F.2d 577)

unable to produce sufficient evidence beyond the bare allegations of the complaint to support an essential element of his or her case, summary judgment should be granted. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). *See also, Street v. J.C. Bradford & Co., supra,* 886 F.2d at 1478-1480.

### B. THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT IN FAVOR OF THE DEFENDANT HOSPITAL.

*1. The District Court Properly Applied the McDonnell Douglas/Burdine Evidentiary Framework to Plaintiff's Claims of Discrimination.*

[3] The *McDonnell Douglas/Burdine* formula is the evidentiary framework applicable not only to claims brought under Title VII, but also to claims under ADEA, *Laugesen v. Anaconda Co.,* 510 F.2d 307 (6th Cir.1975), to claims of discrimination under Ohio state law, *In re Brantley,* 34 Ohio App.3d 320, 518 N.E.2d 602 (1987), and to claims under 42 U.S.C. § 1981, *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 2378, 105 L.Ed.2d 132 (1989). Therefore, the District Court correctly "lumped together" Plaintiff's Title VII, ADEA, Section 1981 and Ohio state law theories of discrimination and applied the *McDonnell Douglas/Burdine* evidentiary framework in analyzing the factual and legal merits of Plaintiff's claims.

*2. Plaintiff Failed to Establish a Prima Facie Case of Race Or Age Discrimination.*

[4] It is well-established that the burden is on an employment discrimination plaintiff to establish a *prima facie* case of discrimination. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1972); *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981).

As the District Court explained, under *McDonnell*

*Douglas* and *Burdine,* Plaintiff can establish a *prima facie* case of discrimination by showing that (1) she was a member of a protected class; (2) she was discharged; (3) she was qualified for the position; and (4) she was replaced by a person outside the class.[FN4]

> FN4. The District Court also correctly noted that Plaintiff could have alternatively established her *prima facie* case by presenting credible, direct evidence of discriminatory intent. *See Terbovitz v. Fiscal Court of Adair County,* 825 F.2d 111 (6th Cir.1987). However, she did not present any such direct evidence and, therefore, the Court properly proceeded with application of the *McDonnell Douglas/Burdine* formula.

The District Court held that Plaintiff satisfied the first three *McDonnell Douglas/Burdine* elements but failed to satisfy the fourth element-*i.e.,* she failed to show that she was replaced by a white or younger person. Therefore, the District Court held that Plaintiff failed to establish a *prima facie* case of either race or age discrimination.

Although the District Judge found no *prima facie* case had been established by Plaintiff because of the lack of the fourth "replaced-by-a-non-protected'-person" element of the *McDonnell Douglas/Burdine* criteria, a plaintiff can also make out a *prima facie* case by showing, in addition to the first three elements, that "a comparable non-protected person was treated better".

As the Sixth Circuit has frequently phrased the requirements of a *prima facie* claim of disparate treatment using such a "comparable non-protected person was *583 treated better" element as one of the requisites, the plaintiff must produce evidence which at a minimum establishes (1) that he was a member of a protected class and (2) that for the same or similar conduct he was treated differently than similarly-situated non-minority employees. *See e.g., Davis v. Monsanto Chemical Co.,* 858 F.2d 345 (6th Cir.1988), *cert. denied,* 490 U.S. 1110, 109 S.Ct. 3166, 104 L.Ed.2d 1028 (1989);

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

964 F.2d 577                                                                                    Page 8

964 F.2d 577, 59 Fair Empl.Prac.Cas. (BNA) 76, 59 Empl. Prac. Dec. P 41,640
(Cite as: 964 F.2d 577)

*Long v. Ford Motor Co.*, 496 F.2d 500 (6th Cir.1974).

It appears that it is under this formula that Plaintiff here attempted to make out her case. She alleges that one non-minority Hospital employee, Karen Lind, had a poor attendance record. She also alleges that, in 1987, Bobbie Walley, an employee in charge of filing, cursed at her team leader. But neither Lind nor Walley was fired.

According to Plaintiff, these "facts" establish a *prima facie* case that non-minority employees, guilty of conduct of "comparable seriousness" to the conduct for which she was fired, received more lenient treatment.

However, as the facts of this case demonstrate, Plaintiff's allegations regarding other employees not being fired are different, but what she subjectively believes to be more serious, misconduct simply does not satisfy that element either.

It is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-minority employees, the plaintiff must show that the "comparables" are similarly-situated *in all respects. Stotts v. Memphis Fire Department*, 858 F.2d 289 (6th Cir.1988). Thus, to be deemed " similarly-situated", the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it. *Mazzella v. RCA Global Communications, Inc.*, 642 F.Supp. 1531 (S.D.N.Y.1986), *aff'd,* 814 F.2d 653 (2d Cir.1987); *Linear v. Safeway Grocery*, 843 F.2d 298 (8th Cir.1988) (plaintiff must prove that he and the white employee were similarly situated in all respects and that the other employee's acts of comparable seriousness to his own); *Cox v. Electronic Data Systems Corp.*, 751 F.Supp. 680 (E.D.Mich.1990).

Plaintiff produced no facts to establish that the two white employees she identified as not having been fired were "similarly situated in all respects".

Moreover, she did not produce sufficient information about Ms. Lind's alleged absenteeism and Ms. Walley's insubordination to indicate whether the absenteeism and insubordination were of "comparable seriousness" to the conduct for which Plaintiff was discharged.[FN5]

> FN5. The dissent would hold that Plaintiff has established a *prima facie* case. This determination is based principally upon the dissent's conclusion that Ms. Walley's conduct in allegedly once swearing at her team leader was of "comparable seriousness" to Plaintiff's deliberate concealment of records on which the hospital depended for getting paid, and her subsequent lying about it under direct questioning from her superior. However, Plaintiff presented no evidence regarding Ms. Walley's cursing incident so as to establish the "comparable seriousness" of conduct on which the dissent relies. It is the discrimination plaintiff's burden to establish that the other employee's acts were of "comparable seriousness" to his or her own infraction. *Linear v. Safeway, supra*, 843 F.2d at 301. Plaintiff here has not met that burden.
>
> Moreover, even if the majority were constrained to find sufficient record evidence that Ms. Walley's cursing at her team leader was, as the dissent suggests, of "comparable seriousness" to Ms. Mitchell's concealment of records and lying, the dissent does not address the fact that Plaintiff simply *produced no evidence* to establish that she and Ms. Walley were otherwise "similarly situated in all respects ". It is undisputed that Plaintiff and Ms. Walley were employed in different capacities-Ms. Walley was a file clerk while Plaintiff was an accounts examiner. There is *no evidence of record* to establish that such different positions, or the duties and responsibilities required of holders of these jobs, are sufficiently similar so as to render them "comparable" positions. In determining that Ms. Walley's and Ms.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

964 F.2d 577, 59 Fair Empl.Prac.Cas. (BNA) 76, 59 Empl. Prac. Dec. P 41,640
(Cite as: 964 F.2d 577)

Mitchell's positions were comparable, the dissent assumes that a file clerk and an accounts examiner are simply "specialized secretarial positions", and thus concludes that the positions are similar because they represent "jobs at the same level in occupational hierarchy". Based on that assumption-without any record evidence to support it-the dissent summarily determined that Walley and Mitchell were sufficiently similarly-situated to validate a comparison of their treatment.

Further, in finding sufficient comparability, the dissent refuses to require Plaintiff to establish that she and Ms. Walley "dealt with the same supervisor and were subject to the same standards". The dissent appears to assume that Ms. Walley and Ms. Mitchell were subject to the same standards because they were both hospital employees and the hospital had an "employee handbook". However, without evidence that these two employees reported to the same supervisor, there can be no showing that they were " subject to the same standards".

**\*584** It is now quite well-established that, in order to withstand a motion for summary judgment, the party opposing the motion must present "affirmative evidence" to support his/her position; a mere " scintilla of evidence" is insufficient. *Anderson v. Liberty Lobby, supra,* 106 S.Ct. at 2510, 2514; *Street v. J.C. Bradford & Co., supra,* 886 F.2d at 1479.

Because Plaintiff failed to produce sufficient affirmative evidence to establish that the non-minority employees with whom she compares her treatment were "similarly situated in all respects ", or that their conduct was of "comparable seriousness" to the conduct for which she was discharged, no claim for discrimination can be based upon a comparison of Plaintiff's and their treatment.

*3. The Hospital Articulated a Legitimate Non-Discriminatory Reason for Plaintiff's*

*Discharge.*

[5] The District Court, however, went on to assume *arguendo* that Plaintiff had established a *prima facie* case and proceeded with the *Burdine* burden-shifting framework.[FN6] The Court found that the Hospital articulated a legitimate non-discriminatory reason for Plaintiff's discharge-misuse of Hospital property. As the District Court noted, the non-discriminatory nature of the Hospital's decision is bolstered by the Affidavit of Donald Currier, the Vice-President of the Hospital's Human Resources Department who was a member of the Review Board that voted to discharge Plaintiff for her actions. In his Affidavit, Currier stated that there was no one similar to Plaintiff who was caught misusing Hospital property who was not discharged and that the decision by the Board to terminate Plaintiff was made without any consideration of her race or age.

> FN6. *Burdine* provides that:
> First, the plaintiff has the burden of proving by the preponderance of the evidence a *prima facie* case of discrimination. Second, if the plaintiff succeeds in proving the *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.
> 450 U.S. at 252-53, 101 S.Ct. at 1093 (citations omitted).

*4. Plaintiff Failed to Establish Pretext.*

Because the Hospital articulated a legitimate non-discriminatory reason for Plaintiff's termination, to withstand summary judgment, Plaintiff had to establish that the proffered reason was pretextual.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

964 F.2d 577

964 F.2d 577, 59 Fair Empl.Prac.Cas. (BNA) 76, 59 Empl. Prac. Dec. P 41,640
(Cite as: 964 F.2d 577)

As the District Court found, Plaintiff has not met this burden.

All that Plaintiff offers to rebut the Hospital's articulated non-discriminatory reason is (1) her hearsay Affidavit that she had heard from some unidentified Hospital employees that at some unspecified point in time two white female employees supposedly had kept medicare and personal checks payable to the Hospital in their desks but were not discharged when this was discovered and (2) her denial that her actions on December 6-9, 1988 constituted "misuse of Hospital property".

[6] First of all, with regard to Plaintiff's hearsay Affidavit, the District Court correctly found that the Affidavit was not a proper Rule 56(e) affidavit because it was not made on personal knowledge and did not set forth "facts" that would be admissible into evidence. Even if the Court were to consider the Affidavit, the statements *585 contained therein are nothing more than rumors, conclusory allegations and subjective beliefs which are wholly insufficient evidence to establish a claim of discrimination as a matter of law. *See, O'Shea v. Detroit News,* 887 F.2d 683 (6th Cir.1989); *Simpson v. Midland-Ross Corp.,* 823 F.2d 937 (6th Cir.1987); *Chappell v. GTE Products Corp.,* 803 F.2d 261, 268 (6th Cir.1986), *cert. denied,* 480 U.S. 919, 107 S.Ct. 1375, 94 L.Ed.2d 690 (1987); *Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181 (11th Cir.1984); *Locke v. Commercial Union Insurance Co.,* 676 F.2d 205 (6th Cir.1982).

[7] With respect to Plaintiff's contention that her denial that her actions on December 5-9, 1988 constituted a "misuse of hospital property" is sufficient to get to a jury, Plaintiff is mistaken. Courts have repeatedly held that the plaintiff's denial of the defendant's articulated legitimate reason without producing substantiation for the denial is insufficient to withstand a motion for a race discrimination claim to withstand a motion for summary judgment. *Irvin v. Airco Carbide,* 837 F.2d 724 (6th Cir.1987); *Ridenour v. Lawson Co.,* 791 F.2d 52 (6th Cir.1986)

Thus, this Court agrees with the District Court-the

record in this case reveals no genuine issue of material fact as to whether Plaintiff's conduct constituted a misuse of hospital property or as to whether Ms. Mitchell told her superiors that the missing forms were locked in her file cabinet.

VI. CONCLUSION

In sum, as the District Court held,
The Hospital's motion for summary judgment was made and supported as required by Fed.R.Civ.P. 56. Mitchell was required to "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). This she has not done. Mere allegations of discrimination are not sufficient. As such, summary judgment must be entered for the Hospital.

This Court finds no error in the District Court's holding. Therefore, the Judgment entered by the District Court on February 20, 1991 is hereby AFFIRMED.

NATHANIEL R. JONES, Circuit Judge, dissenting.
I take a substantially different view of the evidence in this case, and that view leads me to a result opposite from that of the majority. Accordingly, I respectfully dissent.

In her deposition, Mitchell testified at some length and in great detail about the fact that she and her co-workers agreed to play a practical joke on Wachsman, their team leader's supervisor. In furtherance of their agreement, Mitchell told her co-workers where the hospital's billing forms were located. When Wachsman later came looking for the forms, none of Mitchell's co-workers told him that the forms were under Mitchell's desk. Instead, Cindy Dawson merely told Mitchell the next day that Wachsman and another billing manager had come looking for the forms. Thus, all the accounts examiners clearly participated in the practical joke. Nonetheless, Mitchell was the only one singled out for punishment.

Mitchell was, concededly, the only one who actually lied to Wachsman. I agree with the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

964 F.2d 577

964 F.2d 577, 59 Fair Empl.Prac.Cas. (BNA) 76, 59 Empl. Prac. Dec. P 41,640
(Cite as: 964 F.2d 577)

majority that this factor distinguishes Mitchell. Specifically, I would find that she was more insubordinate than the others. Of course, the problem with the majority's analysis is that Mitchell was not discharged for insubordination.

With this factual background in mind, I turn to Mitchell's legal claims. I join the majority in holding that this case is more appropriately viewed under a four-factor test that replaces the replaced-by-a-non-protected-person element of *McDonnell Douglas/Burdine* with a comparable-non-protected-person-was-treated-better element. Mitchell was comparable to her co-workers but for the insubordination involved in lying to Wachsman. In this regard, I would find that Mitchell met the fourth element of the test by alleging that, in 1987, Bobbie Walley, an employee in charge of filing, cursed at her team leader. Walley was not fired. This is a clear example of how Toledo*586 Hospital has dealt with insubordinate employees in the past. Walley's act is of a similar type-verbal insubordination-and of "comparable seriousness." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804, 93 S.Ct. 1817, 1825, 36 L.Ed.2d 668 (1973).

In the textual discussion preceding footnote 5, the majority relies upon *Stotts v. Memphis Fire Department*, 858 F.2d 289 (6th Cir.1988) for the proposition that Walley is not similarly situated *in all respects* to Mitchell. *Stotts* involved an action filed under the terms of a 1980 consent decree issued in a separate class action against the Memphis Fire Department. *Id.* at 291. In this context, the court addressed the district court's finding of a pattern and practice of disparate treatment in the Department's discipline of its employees. *Id.* at 296. We repeatedly stressed, either by way of emphasis or quotation marks, that the relevant inquiry was whether the white employees were engaged in acts of comparable seriousness. *E.g., id.* at 296-98. Nowhere does that case discuss the meaning of "similarly situated."

In fact, the *Stotts* court compared the conduct of Captain Tom Phillips, a white manager in the Department's administration, and Chief William Posey, a white, higher-ranking official, who both stole a promotional exam, with the conduct of the

plaintiff, Jesse Jones, Jr., a fire fighter, who was disciplined for fighting. *Id.* at 291, 300. In concluding that Jones's case and Phillips' case lacked similarity and comparability, the court focused upon a comparison of the acts of stealing and fighting, without ever mentioning the fact that Phillips was an administrator while Jones was a fire fighter. *Id.* at 300. Thus, *Stotts* provides ample support for the proposition that the primary inquiry is into conduct rather than into precise occupational status.

Similarly, *Lanear v. Safeway Grocery*, 843 F.2d 298 (8th Cir.1988) does not support the position expressed in footnote 5. The actual quotation from *Lanear* is " 'similarly situated in all *relevant* respects.' " *Id.* at 301 (emphasis added) (quoting *Smith v. Monsanto*, 770 F.2d 719, 723 (8th Cir.1985), *cert. denied*,475 U.S. 1050, 106 S.Ct. 1273, 89 L.Ed.2d 581 (1986)). Furthermore, the *Lanear* court does not engage in any analysis supporting the fine distinction in occupational status suggested by footnote 5 of the majority's opinion in the instant case.

The district court in *Mazzella v. RCA Global Communications*, 642 F.Supp. 1531 (S.D.N.Y.1986) , *aff'd*,814 F.2d 653 (2d Cir.1987) attempted to provide some objective standards to measure the relevant aspects in determining whether a fellow employee is similarly situated:

Employees are not "similarly situated" merely because their conduct might be analogized. Rather, in order to be similarly situated, other employees must have reported to the same supervisor as the plaintiff, must have been subject to the same standards governing performance evaluation and discipline, and must have engaged in conduct similar to the plaintiff's, without such differentiating or mitigating circumstances that would distinguish their conduct or the appropriate discipline for it.

*Id.* at 1547. Like *Lanear*, *Mazzella* is relevant here only for whatever persuasive effect it may have. *Mazzella*, however, is not persuasive, because after stating the facts and its rule of law, the district court engages in no analysis whatsoever. *Id.* Rather, it refers the reader back to the facts. From those facts, one may infer that *Mazzella* compared herself

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

964 F.2d 577

Page 12

964 F.2d 577, 59 Fair Empl.Prac.Cas. (BNA) 76, 59 Empl. Prac. Dec. P 41,640
(Cite as: 964 F.2d 577)

to dissimilar employees. *Id.* at 1546. Nonetheless, this inference falls far short of supporting the view that the fellow employees must be engaged in exactly the same occupation and report to the same supervisor. The *Mazzella* court's holding is based on many other factors, the bulk of which address the other employees' *conduct* and the absence of proof thereof. *Id.*

Applying these principles to the instant case, Walley and Mitchell held jobs at the same level in the occupational hierarchy-specialized secretarial positions. Whether they reported to different supervisors is irrelevant here, because decisions regarding employee discipline at Toledo Hospital were made by a five-member review board. Furthermore, both employees are judged *587 by the same standards-the hospital's employee handbook. Accordingly, although Walley and Mitchell are certainly not similarly situated in all respects, the majority cites no *relevant* respects in which they differ. In any event, the primary inquiry, once again, examines the similarity of the employee's conduct, not their occupational status.

Having found a prima facie case, I would turn to Toledo Hospital's proffered nondiscriminatory reason for Mitchell's discharge: "misuse" of hospital property. The burden then shifts back to Mitchell to present evidence that the hospital's reason was merely a pretext for discrimination. As the Supreme Court explained in *Burdine,* a plaintiff may succeed in proving intentional discrimination " either directly by persuading the court that a discriminatory reason more likely motivated the employer *or indirectly by showing that the employer's proffered explanation is unworthy of credence.*" *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981) (emphasis added).

The majority somehow finds it immanently logical that an employer, after firing employees with personal filing cabinets, would fire an employee for locking important forms in one of those cabinets. I find this remarkable on its face, but all the more remarkable in the instant case, because Mitchell was the only one with the insight to rescue the forms from the trash after Wachsman carelessly left them

to be discarded by housekeeping. Keep in mind that the hospital is not claiming that it discharged Mitchell for her conduct in lying to Wachsman. Rather, it alleges that she was discharged only for misuse of hospital property or, in other words, solely for locking the forms away for safekeeping. I would suggest that such an explanation is unworthy of credence.

Other considerations also lead me to the conclusion that summary judgment was inappropriate in this case. Even in the "new era" of summary judgment, the party moving for summary judgment bears the burden of proving that no genuine issue of material fact exists. *Boyd v. Ford Motor Co.,* 948 F.2d 283, 285 (6th Cir.1991), *cert. denied,* 503 U.S. 939, 112 S.Ct. 1481, 117 L.Ed.2d 624 (1992). The district court granted summary judgment in the instant case based upon the affidavit of Donald Currier, Toledo Hospital's Vice-President of Human Resources. Currier represented therein that Mitchell was discharged for misuse of hospital property, a terminable offense pursuant to the employee handbook. The district court accepted this representation even though the employee handbook was not in evidence. I would hold that the hospital could not meet its burden by a mere allegation that misuse is a terminable offense; I would require that the hospital cite to a handbook in evidence or, at the very least, quote the relevant portion of the handbook.

A second problem arises from this court's attempt to review this case in the absence of the employee handbook's exact language. Assuming the handbook provision refers to "misuse" in only general terms, the jury would be entitled to decide whether the hospital was offering a genuine interpretation of that language or merely a pretext for discrimination. I would surmise that a jury would be likely to interpret a general "misuse" provision as being addressed to the problem of *misappropriation* of hospital property. In any event, I posit that no one, except apparently the majority of this Court, would conclude that a person could "misuse" what she did not in fact "use."

In sum, I would find that Mitchell responded sufficiently to Toledo Hospital's motion for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

964 F.2d 577

964 F.2d 577, 59 Fair Empl.Prac.Cas. (BNA) 76, 59 Empl. Prac. Dec. P 41,640
(Cite as: 964 F.2d 577)

summary judgment by alleging that the hospital's proffered nondiscriminatory reason is unworthy of credence.[FN1]  Accordingly,*588 I would reverse the district court, because the record demonstrates a genuine issue of material fact as to whether Mitchell's conduct constituted misuse of hospital property.

> FN1.  Mitchell also alleged specific evidence of disparate treatment involving "misuse," namely that two other employees, Karen Lind and Connie Kortgoede, kept personal and medicare checks payable to the hospital locked in their desk drawers, yet the hospital did not discharge either of them for misuse of hospital property. Her allegations, however, were not based upon personal knowledge, and her counsel did not preserve the matter for discovery by a Rule 56(f) motion. *See Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir.1989).

C.A.6 (Ohio),1992.
Mitchell v. Toledo Hosp.
964 F.2d 577, 59 Fair Empl.Prac.Cas. (BNA) 76, 59 Empl. Prac. Dec. P 41,640

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

73-1043

6

Westlaw.

69 F.3d 441

Page 1

69 F.3d 441, 69 Fair Empl.Prac.Cas. (BNA) 489
(Cite as: 69 F.3d 441)

▷
Randle v. City of Aurora
C.A.10 (Colo.),1995.

United States Court of Appeals,Tenth Circuit.
Ofelia RANDLE, Plaintiff-Appellant,
v.
CITY OF AURORA, Defendant-Appellee.
No. 94-1137.

Oct. 26, 1995.

Employee sued employer, a city, for race and national origin discrimination under §§ 1981 and 1983, and Title VII. The United States District Court for the District of Colorado, Edward W. Nottingham, J., granted summary judgment for city. Employee appealed. The Court of Appeals, Ebel, Circuit Judge, held that: (1) employee failed to demonstrate that city maintained custom of discriminatory personnel practices for purposes of §§ 1981 and 1983 claims; (2) genuine issue of material fact as to whether city officials were final policymakers precluded summary judgment on §§ 1981 and 1983 claims; (3) genuine issue of material fact on pretext precluded summary judgment on failure to promote and wage discrimination claims; but (4) employee failed to prove failure to announce position was pretext for discrimination.

Affirmed in part and reversed and remanded in part.
West Headnotes
[1] Federal Courts 170B ⟜776

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk776 k. Trial De Novo. Most Cited Cases
Court of Appeals reviews district court's grant of summary judgment de novo, applying same legal standard used by district court. Fed.Rules

Civ.Proc.Rule 56(c), 28 U.S.C.A.

[2] Civil Rights 78 ⟜1351(5)

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1351 Governmental Ordinance, Policy, Practice, or Custom
                78k1351(5) k. Employment Practices. Most Cited Cases
    (Formerly 78k206(3))
City could not be liable under §§ 1981 and 1983 based on alleged custom of discriminatory employment practices; employee failed to allege existence of similar discrimination against others. 42 U.S.C.A. §§ 1981, 1983..

[3] Federal Courts 170B ⟜411

170B Federal Courts
    170BVI State Laws as Rules of Decision
        170BVI(C) Application to Particular Matters
            170Bk411 k. Constitutional and Civil Rights in General; Waiver. Most Cited Cases
"Final policymaking authority" for purposes of imposing liability on municipality under §§ 1981 and 1983 is legal issue to be determined by court based on state and local laws. 42 U.S.C.A. §§ 1981 , 1983.

[4] Civil Rights 78 ⟜1351(1)

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1351 Governmental Ordinance, Policy, Practice, or Custom
                78k1351(1) k. In General. Most Cited Cases
    (Formerly 78k206(3))
Three elements help to determine whether

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 F.3d 441

69 F.3d 441, 69 Fair Empl.Prac.Cas. (BNA) 489
(Cite as: 69 F.3d 441)

individual is "final policymaker" for purposes of imposing §§ 1981 or 1983 liability on municipality: whether official is meaningfully constrained by policies not of that official's own making; whether official's decisions are final-i.e., whether they are subject to any meaningful review; and whether policy decision purportedly made by official is within realm of official's grant of authority. 42 U.S.C.A. §§ 1981, 1983.

**[5] Civil Rights 78 ☞1351(1)**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1351 Governmental Ordinance, Policy, Practice, or Custom
                78k1351(1) k. In General. Most Cited Cases
    (Formerly 78k206(3))
Any review procedure or constraints on official must be meaningful, as opposed to hypothetical, in order to strip official of final policymaking authority for purposes of imposing §§ 1981 or 1983 liability on municipality. 42 U.S.C.A. §§ 1981, 1983.

**[6] Federal Civil Procedure 170A ☞2497.1**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2497 Employees and Employment Discrimination, Actions Involving
                170Ak2497.1 k. In General. Most Cited Cases
Genuine issues of fact material regarding whether city officials were final policymakers in area of personal matters for purposes of imposing §§ 1981 or 1983 liability on city precluded summary judgment in race and national origin discrimination action. 42 U.S.C.A. §§ 1981, 1983; Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**[7] Civil Rights 78 ☞1351(5)**

78 Civil Rights

78III Federal Remedies in General
    78k1342 Liability of Municipalities and Other Governmental Bodies
        78k1351 Governmental Ordinance, Policy, Practice, or Custom
            78k1351(5) k. Employment Practices. Most Cited Cases
    (Formerly 78k206(3))
If city officials were final policymakers in area of personnel matters, city could be held liable for any impermissible employment decisions under §§ 1981 and 1983 pursuant to *McDonnell Douglas* burden-shifting analysis. 42 U.S.C.A. §§ 1981, 1983; Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[8] Civil Rights 78 ☞1116(1)**

78 Civil Rights
    78II Employment Practices
        78k1108 Employers and Employees Affected
            78k1116 Public Employers and Employees
                78k1116(1) k. In General. Most Cited Cases
    (Formerly 78k146)
City was "employer" for purposes of Title VII, and could be sued in that capacity. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[9] Civil Rights 78 ☞1545**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1543 Weight and Sufficiency of Evidence
            78k1545 k. Prima Facie Case. Most Cited Cases
    (Formerly 78k383)
Under *McDonnell Douglas* burden-shifting analysis, employment discrimination plaintiff must first establish prima facie case of discrimination.

**[10] Civil Rights 78 ☞1545**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1543 Weight and Sufficiency of Evidence
            78k1545 k. Prima Facie Case. Most Cited

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

73-1046

69 F.3d 441

Page 3

69 F.3d 441, 69 Fair Empl.Prac.Cas. (BNA) 489
(Cite as: 69 F.3d 441)

Cases
  (Formerly 78k383)
In order to establish prima facie case of employment discrimination, plaintiff must prove that: he or she is member of protected class; he or she applied for and was qualified for available position; he or she was rejected despite being qualified; and position remained open as employer continued to search for applications or position was filled by person not of protected class.

**[11] Civil Rights 78 ☞1545**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1543 Weight and Sufficiency of Evidence
            78k1545 k. Prima Facie Case. Most Cited Cases
  (Formerly 78k383)
Prima facie case of employment discrimination under *McDonnell Douglas* burden-shifting analysis is flexible standard that may be modified to relate to different factual situations.

**[12] Civil Rights 78 ☞1536**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1534 Presumptions, Inferences, and Burden of Proof
            78k1536 k. Effect of Prima Facie Case; Shifting Burden. Most Cited Cases
  (Formerly 78k378)
Under *McDonnell Douglas* burden-shifting analysis, once employment discrimination plaintiff establishes prima facie case, employer must offer facially nondiscriminatory reason for its employment decision.

**[13] Civil Rights 78 ☞1137**

78 Civil Rights
    78II Employment Practices
        78k1137 k. Motive or Intent; Pretext. Most Cited Cases
  (Formerly 78k153)
At summary judgment stage in employment discrimination action, after employer offers facially nondiscriminatory reason for its employment decision under *McDonnell Douglas* burden-shifting analysis, plaintiff must show that there is genuine issue of material fact as to whether employer's proffered reason for challenged action is pretextual-i.e., unworthy of belief. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**[14] Federal Civil Procedure 170A ☞2497.1**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2497 Employees and Employment Discrimination, Actions Involving
                    170Ak2497.1 k. In General. Most Cited Cases
If employment discrimination plaintiff succeeds in establishing prima facie case and presents evidence that employer's proffered reason for employment decision was pretextual, plaintiff can withstand summary judgment and is entitled to go to trial. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**[15] Federal Civil Procedure 170A ☞2497.1**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2497 Employees and Employment Discrimination, Actions Involving
                    170Ak2497.1 k. In General. Most Cited Cases
If employment discrimination plaintiff concedes that real, albeit concealed, reason for employment decision was motive that itself was not prohibited under civil rights laws, plaintiff is vulnerable to summary judgment, as concession of lawful motive would take issue of motive from jury and preclude inference of discriminatory motive that jury could otherwise drawn from fact of pretext. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**[16] Federal Civil Procedure 170A ☞2497.1**

170A Federal Civil Procedure

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

73-1047

69 F.3d 441

Page 4

69 F.3d 441, 69 Fair Empl.Prac.Cas. (BNA) 489
(Cite as: 69 F.3d 441)

170AXVII Judgment
  170AXVII(C) Summary Judgment
    170AXVII(C)2 Particular Cases
      170Ak2497    Employees    and
Employment Discrimination, Actions Involving
        170Ak2497.1 k. In General. Most
Cited Cases
Showing of prima facie case and pretext at summary
judgment stage of employment discrimination
action is sufficient to get case to jury, as jury may
find illegal discrimination upon showing nothing more than
prima facie case and pretext. Fed.Rules
Civ.Proc.Rule 56, 28 U.S.C.A.

**[17] Civil Rights 78 ☞1535**

78 Civil Rights
  78IV Remedies Under Federal Employment
Discrimination Statutes
    78k1534 Presumptions, Inferences, and
Burden of Proof
      78k1535 k. In General. Most Cited Cases
   (Formerly 78k377.1)
Showing of pretext is evidence which allows jury to
infer discriminatory intent in employment
discrimination action.

**[18] Civil Rights 78 ☞1535**

78 Civil Rights
  78IV Remedies Under Federal Employment
Discrimination Statutes
    78k1534 Presumptions, Inferences, and
Burden of Proof
      78k1535 k. In General. Most Cited Cases
   (Formerly 78k377.1)
Jury is not required to find discriminatory animus in
employment discrimination action based upon
showing of pretext, but such showing is inferential
evidence of discrimination from which jury may
make such a finding.

**[19] Federal Civil Procedure 170A ☞2497.1**

170A Federal Civil Procedure
  170AXVII Judgment
    170AXVII(C) Summary Judgment
      170AXVII(C)2 Particular Cases
        170Ak2497    Employees    and

Employment Discrimination, Actions Involving
        170Ak2497.1 k. In General. Most
Cited Cases
It is not purpose of motion for summary judgment
in employment discrimination action to force judge
to conduct mini-trial to determine employer's true
state of mind. Fed.Rules Civ.Proc.Rule 56, 28
U.S.C.A.

**[20] Federal Civil Procedure 170A ☞2497.1**

170A Federal Civil Procedure
  170AXVII Judgment
    170AXVII(C) Summary Judgment
      170AXVII(C)2 Particular Cases
        170Ak2497    Employees    and
Employment Discrimination, Actions Involving
        170Ak2497.1 k. In General. Most
Cited Cases
So long as employment discrimination plaintiff has
presented evidence of pretext upon which jury
could infer discriminatory motive, summary
judgment motion should be denied and case should
go to trial. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A
.

**[21] Federal Civil Procedure 170A ☞2497.1**

170A Federal Civil Procedure
  170AXVII Judgment
    170AXVII(C) Summary Judgment
      170AXVII(C)2 Particular Cases
        170Ak2497    Employees    and
Employment Discrimination, Actions Involving
        170Ak2497.1 k. In General. Most
Cited Cases
Judgments about intent are best left for trial and are
within province of jury in employment
discrimination action; they should not be made on
motion for summary judgment. Fed.Rules
Civ.Proc.Rule 56, 28 U.S.C.A.

**[22] Civil Rights 78 ☞1536**

78 Civil Rights
  78IV Remedies Under Federal Employment
Discrimination Statutes
    78k1534 Presumptions, Inferences, and
Burden of Proof

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 F.3d 441

Page 5

69 F.3d 441, 69 Fair Empl.Prac.Cas. (BNA) 489
(Cite as: 69 F.3d 441)

78k1536 k. Effect of Prima Facie Case; Shifting Burden. Most Cited Cases
(Formerly 78k378)
If employment discrimination plaintiff establishes prima facie case and shows either that defendant's facially nondiscriminatory reasons are pretextual or otherwise introduces as direct evidence of illegal discriminatory motive, case moves to trial, where presumption of discrimination created by prima facie showing drops out of the picture.

[23] Civil Rights 78 ⚖1544

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1543 Weight and Sufficiency of Evidence
            78k1544 k. In General. Most Cited Cases
    (Formerly 78k382.1)
At trial of employment discrimination action, plaintiff must prove illegal discrimination either inferentially by showing that proffered reason is pretext for discrimination, or directly by offering direct evidence of discrimination.

[24] Civil Rights 78 ⚖1137

78 Civil Rights
    78II Employment Practices
        78k1137 k. Motive or Intent; Pretext. Most Cited Cases
    (Formerly 78k153)
At trial of employment discrimination action, plaintiff must convince jury not only that reason proffered by defendant was pretextual, but also that jury should infer that defendant's pretext concealed motive of discriminating against plaintiff in violation of civil rights laws.

[25] Civil Rights 78 ⚖1555

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1555 k. Questions of Law or Fact. Most Cited Cases
    (Formerly 78k389)
In employment discrimination action, inference that defendant's pretextual reason for employment action

concealed motive of discrimination must be established at trial, but need not be found by judge at summary judgment stage, as that ultimate inference from evidence is within province of jury. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

[26] Federal Civil Procedure 170A ⚖2497.1

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2497 Employees and Employment Discrimination, Actions Involving
                    170Ak2497.1 k. In General. Most Cited Cases
Genuine issues of material fact regarding whether employee was qualified for position and whether city's proffered reason for not hiring her for position was pretextual precluded summary judgment on her race and national origin discrimination claims. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

[27] Civil Rights 78 ⚖1127

78 Civil Rights
    78II Employment Practices
        78k1124 Public Employment
            78k1127 k. Hiring. Most Cited Cases
    (Formerly 78k142)
City's alleged failure to follow its posting procedures in filling position was not race or national origin discrimination; city apparently filled position with most qualified candidate and disappointed applicant had no evidence suggesting that reason was pretextual. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

[28] Civil Rights 78 ⚖1137

78 Civil Rights
    78II Employment Practices
        78k1137 k. Motive or Intent; Pretext. Most Cited Cases
    (Formerly 78k153)
Fact that employer failed to follow its own internal procedures does not necessarily suggest that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 F.3d 441

Page 6

69 F.3d 441, 69 Fair Empl.Prac.Cas. (BNA) 489
(Cite as: 69 F.3d 441)

employer was motivated by illegal discriminatory intent or that substantive reasons given by employer for its employment decision were pretextual.

[29] Federal Civil Procedure 170A ⚖2497.1

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2497 Employees and Employment Discrimination, Actions Involving
                    170Ak2497.1 k. In General. Most Cited Cases
Genuine issue of material fact on pretext precluded summary judgment on wage discrimination claim. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

[30] Civil Rights 78 ⚖1544

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1543 Weight and Sufficiency of Evidence
            78k1544 k. In General. Most Cited Cases
    (Formerly 78k382.1)
At trial of race discrimination action employee had to prove intentional discrimination, but could do so with either direct or inferential proof. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

*444 Neal S. Cohen of Chrisman, Bynum & Johnson, P.C., Boulder, Colorado (Rebecca L. Fischer with him on the briefs), for Plaintiff-Appellant.
Teresa Kinney, Assistant City Attorney, Office of City Attorney, Aurora, Colorado (Charles H. Richardson with her on the brief), for Defendant-Appellee.

Before BALDOCK, MCKAY, and EBEL, Circuit Judges.
EBEL, Circuit Judge.
This is an appeal from the district court's grant of summary judgment to the Defendant-Appellee City

of Aurora ("the City") on Plaintiff-Appellant Ofelia Randle's ("Randle") claims of employment discrimination under 42 U.S.C. § 2000e-2(a)(1) (" Title VII") [FN1] as well as under 42 U.S.C. § 1983 [FN2] and 42 U.S.C. § 1981.[FN3] In this appeal, we first review the district court's ruling that the City neither maintained a custom of discriminatory employment practices nor granted sufficient authority to the City Manager, Finance Director and the Human Resources Director (collectively "the City officials") to make them "final policymakers" so as to give rise to §§ 1981 and 1983 liability on behalf of the City. We AFFIRM the district court's ruling that there was no showing that the City maintained a custom of discriminatory employment practices, but REVERSE the district court's summary judgment ruling that the City officials were not "final policymakers" so as to impute liability to the City, and REMAND for further proceedings on this issue.

FN1. This section provides, in relevant part, that it shall be an unlawful employment practice:
to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.
42 U.S.C. § 2000e-2(a)(1).

FN2. This statute provides that:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State of Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
42 U.S.C. § 1983.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 F.3d 441

Page 7

69 F.3d 441, 69 Fair Empl.Prac.Cas. (BNA) 489
(Cite as: 69 F.3d 441)

FN3. This statute provides, in relevant part, that:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981.

*445 Turning to the merits of the employment discrimination claims, we consider Randle's disparate treatment claims based on the City's (1) failure to promote her; (2) failure to announce a position to which she could have applied; and (3) discrimination against her by paying a higher salary to a white co-worker with the same job title. As to these claims, we AFFIRM the district court's grant of summary judgment for the City on the failure to announce claim, but REVERSE the grant of summary judgment for the City on the failure to promote and wage discrimination claims. Thus, we REMAND this case for further proceedings consistent with this opinion.

## I. BACKGROUND

Randle, an Asian woman of Filipino nationality, has been employed by the City as a Liquor Licensing Administrative Assistant in the Liquor Licensing Section of the City's Finance Department since October 29, 1984. When Randle was hired by the City, she was trained by Ruby Allman, a white woman, who had been working with the City since 1983, and who, since the inception of Randle's employment with the City, has continued to be paid $5,000 more per year than Randle. By 1988, Randle had completed her training and assumed at least 90% of the job responsibilities performed by Allman. Randle began receiving as good or better job evaluations as Allman, but never received a raise to equalize her salary with Allman's salary.

In May 1989, Randle applied for a promotion to Licensing Technician III.[FN4] The City certified Randle as qualified for the position and interviewed her, but passed over her in favor of Beverly Gilmore, a white woman.

FN4. The requirements for this job were a high school diploma and an associate's degree in Business Administration with emphasis in Accounting or Finance, plus one year related experience and one year collection experience. The job posting also explained that equivalent combinations of training and experience may be considered.

As a result of a May 1991 reorganization, both Allman's and Randle's job descriptions were redrafted to be made identical and both of their titles were changed to Licensing Clerk, but Allman retained her higher salary. Despite their identical job descriptions, Allman continued to perform additional responsibilities outside of her job description, including preparing reports for the City Council, changing the licensing authority's rules and regulations, researching various issues and preparing the budget-which, taken together, consumed approximately ten percent of her time. Due to her concern over the wage differential between her and Allman, Randle requested an explanation from the City Manager, who referred the matter to Nancy Carney, the City's Director of Human Resources. Carney responded that the differential was based solely on the fact that Allman was hired 1.5 years before Randle and received pay raises since then that preserved the differential. However, based on the 1.5 additional years of employment, Randle claims, relying on the expert opinion of Patricia Pacey, a labor economist, that Allman only merits 6% more pay than Randle, rather than the 24% differential that presently exists and has existed between them. Pacey, however, only testified on the basis of "typical pay plans in labor economics," and the 6% figure only reflected her estimate of inflation for 1.5 years. Additionally, Randle questions the City's explanation for the differential because such a wage differential did not occur when Karen Richards was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 F.3d 441

Page 8

69 F.3d 441, 69 Fair Empl.Prac.Cas. (BNA) 489
(Cite as: 69 F.3d 441)

hired for a Licensing Technician III position, as Richards was paid the same salary (or slightly more) than that earned by Beverly Gilmore, who had previously held that position and enjoyed several years of seniority over Richards.

The May 1991 reorganization not only gave both Allman and Randle the same job titles, but also eliminated one of the Licensing Technician III positions and created a new Licensing and Enforcement Administrator position. This position was responsible for supervising the licensing clerks (i.e. Allman and Randle), the remaining Licensing Technician III position, and an assistant. The Finance Director, John Gross, consulted with the Human Resources Director, Nancy Carney, about how to fill this position and she told him that he need not post the vacancy because it resulted from a reorganization. *446 Gross was wary of not announcing the position because that would deviate from the City's normal practice of announcing new positions-reflected in the Personnel Manual's requirement that all permanent positions be announced internally for a minimum of five days. However, Carney explained that Administrative Policy Memorandum ("APM") 3.4 permitted such an exception from normal practice. Gross ultimately reassigned Beverly Gilmore to this new position without a formal announcement of the opening-a decision sanctioned by Carney as well as the City Manager, John Pazour.

In September 1991, the Technician III position again became vacant, but the position now required an Associate's Degree-that is, the ability to substitute other education or experience for this degree was dropped from the job posting. Randle applied for the position, but the City refused to certify her application because she did not have an Associate's Degree. As no other internal candidates met the requirements for the position, the City hired Karen Richards, an outside applicant and a white woman, for the position. While Richards also lacked an Associate's Degree, the City viewed her two years of college as a sufficient substitute; however, when the City thereafter discovered that she had not actually completed these two years of college, it chose to allow her to remain in the position even though it had

customarily fired other employees for misrepresenting material facts on their employment applications.

On January 24, 1992, Randle filed a complaint with the Colorado Civil Rights Division ("CCRD") and the Equal Employment Opportunity Commission (" EEOC"), alleging discrimination on the basis of race and national origin based on the City's failure to promote her in 1991 and the disparity between her compensation and Allman's. The CCRD issued its determination of no probable cause and the Colorado Civil Rights Commission subsequently denied Randle's appeal; the EEOC issued Randle's right to sue letter on October 7, 1992 and Randle filed this lawsuit two months later.

The district court granted the City's motion for summary judgment, ruling against Randle on her §§ 1981 and 1983 claims by determining that the City was not liable for the challenged actions and concluding that the City did not violate Title VII. *Randle v. City of Aurora,* No. 92-N-2528 (D.Colo. Jan. 5, 1994). The district court then dismissed her state law claim because supplemental jurisdiction was no longer warranted.[FN5] Randle moved to alter or amend the judgment, but the district court denied that motion in a written opinion. Randle now appeals the district court's rulings on her §§ 1981 and 1983 claims as well as on her Title VII claim.

> FN5. The district court explained that " [s]ince all of plaintiff's federal claims are dismissed, I no longer have jurisdiction over her state law claim for breach of contract." *Randle,* slip op. at 2.

## II. DISCUSSION

A. *MUNICIPAL LIABILITY UNDER § 1983 AND §*
*1981* [FN6]

> FN6. The Supreme Court recently explained that "to prevail on [a] claim for damages against [a governmental entity],

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

73-1052

69 F.3d 441

Page 9

69 F.3d 441, 69 Fair Empl.Prac.Cas. (BNA) 489
(Cite as: 69 F.3d 441)

petitioner must show that the violation of his [or her] 'right to make contracts' protected by § 1981 was caused by a custom or policy within the meaning of *Monell* [v. *New York City Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) ] and subsequent cases. " *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 735-36, 109 S.Ct. 2702, 2723, 105 L.Ed.2d 598 (1989). · Hence, all references to § 1983 with regard to the issues of custom and policy also address the question of whether the City can be held liable under § 1981.

[1] We first analyze whether the City is liable under § 1983 and § 1981 for the alleged discriminatory acts of its City Manager, Finance Director and Human Resources Director.[FN7] In the instant case, Randle has alleged that the City is liable for the actions *447 of the City officials [FN8] because (1) they were acting pursuant to a custom of discriminatory employment practices; or (2) the actions of these officials in setting Randle's salary and in declining to promote her were the actions of City officials with final policymaking authority.

FN7. We review the district court's grant of summary judgment de novo, applying the same legal standard used by the district court pursuant to Fed.R.Civ.P. 56(c). *Universal Money Ctrs., Inc. v. AT & T,* 22 F.3d 1527, 1529 (10th Cir.), *cert. denied,* 513 U.S. 1052, 115 S.Ct. 655, 130 L.Ed.2d 558 (1994); *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.,* 912 F.2d 1238, 1241 (10th Cir.1990).

FN8. While Randle contends that the City Manager, Finance Director and Human Resource Director qualify as "final policymakers," the City argues that none of them so qualify, and that the City Council is the sole final policymaker in the area of personnel policy. Thus, the opinion treats all three City officials collectively and does not distinguish between them.

## 1. Custom Or Usage

[2] Randle's failure to allege the existence of similar discrimination as to others seriously undermines her claim that the City maintained a custom of discriminatory personnel practices. *See City of St. Louis v. Praprotnik,* 485 U.S. 112, 127, 130, 108 S.Ct. 915, 926, 927-28, 99 L.Ed.2d 107 (1988) (plurality opinion) (custom requires that the illegal practice be "widespread"-i.e., involving a "series of decisions"); *Melton v. City of Oklahoma City,* 879 F.2d 706, 725 n. 26 (10th Cir.1989) (distinguishing case from *Praprotnik* because plaintiff offered evidence that the City acted similarly against another person in addition to himself, and thus, was potentially able to demonstrate the existence of a custom), *modified on other grounds,*928 F.2d 920, 922 (10th Cir.) (en banc) (explicitly leaving panel's judgment on § 1983 liability intact), *cert. denied,* 502 U.S. 906, 112 S.Ct. 296, 116 L.Ed.2d 241 (1991). The Supreme Court recently reiterated that governmental entities may be held liable for a " longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity." *Jett. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 736, 109 S.Ct. 2702, 2724, 105 L.Ed.2d 598 (1989) (quotation omitted). Here, based on the few incidents of discrimination alleged by Randle (which were all directed against her), we agree with the district court that Randle has failed to establish a genuine dispute of material fact about whether the City had a custom of discriminatory employment practices.

## 2. The City Officials As Final Policymakers

In *Pembaur v. City of Cincinnati,* the Supreme Court held that the search of a doctor's office without a warrant gave rise to municipal liability because the County Prosecutor was acting as a " final decisionmaker" when he ordered the illegal search. 475 U.S. 469, 484-85, 106 S.Ct. 1292, 1301, 89 L.Ed.2d 452 (1986). Justice Brennan explained that if an official, who possesses final policymaking authority in a certain area, makes a decision-even if it is specific to a particular situation-that decision constitutes municipal policy for § 1983 purposes. *Id.* at 481,106 S.Ct. at 1299.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 F.3d 441, 69 Fair Empl.Prac.Cas. (BNA) 489
(Cite as: 69 F.3d 441)

Hence, such an act can be understood as an act "of the municipality" which the municipality "officially sanctioned or ordered." *Id.* at 480, 106 S.Ct. at 1298.

[3] However, *Pembaur* left open the question of how to determine who is a "final policymaker." That question was later addressed in *City of St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988).[FN9] First, *Praprotnik* explained that ."final policymaking authority" is a legal issue to be determined by the court based on state and local law. *Id.* at 124, 108 S.Ct. at 924. *Praprotnik* then reasoned that, since the St. Louis Civil Service Commission possessed final authority on personnel decisions, *id.* at 129-30, 108 S.Ct. at 927-28, the discretionary hiring and firing decisions by subordinate employees did not constitute final policymaking by the municipality. This reasoning relied on the four touchstones of municipal liability outlined in *Pembaur. Id.* at 123,108 S.Ct. at 924. First, a municipality can only be held liable for acts which the municipality itself is responsible-that is, those it has "officially sanctioned or ordered." Second, only those officials with "final policymaking authority" can subject a municipality to liability. Third, the question of whether an official has "final policymaking authority" is a question of state law. Fourth, the challenged*448 conduct must have been pursuant to a policy adopted by the official or officials responsible under state law for making policy in that area. *Id.*

FN9. While the references to *Praprotnik* refer to Justice O'Connor's plurality opinion, that opinion can fairly be read as binding precedent because it was apparently adopted by a full majority of the Supreme Court in *Jett,* 491 U.S. at 737-38, 109 S.Ct. at 2724.

*Praprotnik* also set out the basic "conundrum" and " line drawing exercise" that lower courts face in ascertaining the existence of a municipal policy: If the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from *respondeat superior* liability. If, however, a city's lawful

policymakers could insulate the government from liability simply by delegating their policymaking authority to others, § 1983 could not serve its intended purpose.

*Id.* at 126-27, 108 S.Ct. at 926. In outlining the " elegant line" drawing exercise of assigning municipal liability, Justice O'Connor highlighted two guiding inquiries: (1) whether a subordinate's discretionary decisions are constrained by general policies enacted by others; and (2) whether the subordinate's specific decisions are reviewable by others. *Id.* at 127, 108 S.Ct. at 926. This guidance largely flowed from an example offered in Justice Brennan's plurality opinion in *Pembaur v. Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Justice Brennan explained that in the case where the Board of County Commissioners established county employment policy and delegated to the County Sheriff alone the discretion to hire and fire employees pursuant to that policy, the county itself would not be liable if the Sheriff unconstitutionally exercised this authority because the "decision to act unlawfully would not be a decision of the Board." *Id.* at 483 n. 12, 106 S.Ct. at 1300 n. 12. However, if the sheriff had been delegated final responsibility for establishing employment policy-i.e., if the sheriff was not subject to any meaningful review or constraints-then the county could be held liable for his actions within the grant of his official authority. *Id.* Justice Brennan defined a "policy" as "a course of action [consciously chosen] from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id.* at 483-84, 106 S.Ct. at 1300. However, he underscored that while the quintessential policy is a governmental entity's " establish[ed] fixed plans of action to be followed under similar circumstances consistently and over time,"*id.* at 480-81, 106 S.Ct. at 1299, policy can also be established pursuant to a specific and one-time decision made by a "final policymaker," *id.* at 481, 106 S.Ct. at 1299.

[4] Guided by the general principles outlined above, we can identify three elements that help determine whether an individual is a "final policymaker": (1) whether the official is meaningfully constrained "by

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

73-1054

69 F.3d 441

69 F.3d 441, 69 Fair Empl.Prac.Cas. (BNA) 489
(Cite as: 69 F.3d 441)

policies not of that official's own making;" (2) whether the official's decision are final-i.e., are they subject to any meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority. *Praprotnik,* 485 U.S. at 127, 108 S.Ct. at 926; *Ware v. Unified School Dist.,* 902 F.2d 815, 818 (10th Cir.1990) ("Delegation does not occur when a subordinate's decisions are constrained by policies not of his making or when those decisions are subject to review by the authorized policymaker. ").FN10

> FN10. *See also Flanagan v. Munger,* 890 F.2d 1557, 1568-69 (10th Cir.1989) (assigning § 1983 liability because the municipal code granted unconstrained authority to Police Chief to manage department and there was no established procedure to review his decisions); *Starrett v. Wadley,* 876 F.2d 808, 819 (10th Cir.1989) (explaining that county assessor was final policymaker because his personnel decisions were not made pursuant to any constraints and staff members "had no meaningful avenues of review of [the county assessor's] employment decisions").

[5] In order to determine whether an individual holds "final policymaking" authority, we begin by examining the legal chain of authority. *See Jantz v. Muci,* 976 F.2d 623, 631 (10th Cir.1992) (school board not liable for school principal's actions because the school board had ultimate legal authority to review decisions involving the hiring and firing of employees); *Ware,* 902 F.2d at 819 (municipality not liable because the principal, who fired the plaintiff, was not the final policymaker on personnel matters as he was not vested with such authority and any decisions he made were reviewable by the school *449 board); *Wulf v. City of Wichita,* 883 F.2d 842, 868-69 (10th Cir.1989) (municipality not liable because the police chief who fired plaintiff was not the final policymaker of the city's personnel policy nor was the police chief's decision the basis for it ratified by the city manager who had the legal authority to hire and fire

employees). Nevertheless, our decisions also underscore that any review procedure or constraints must be *meaningful*-as opposed to merely hypothetical-in order to strip an official of "final policymaking" authority. *See Melton,* 879 F.2d at 724 n. 24 (although not explicitly addressing its significance, charter provision that all personnel decisions were to be made solely based upon "merit and fitness" did not immunize City from liability based upon City Manager's personnel decision); *Flanagan v. Munger,* 890 F.2d 1557, 1569 (10th Cir.1989) ("[F]or all intents and purposes the Chief's discipline decisions are final, and any meaningful administrative review [by the City Council or City Manager] is illusory."); *Starrett v. Wadley,* 876 F.2d 808, 818-19 (10th Cir.1989) (" Wadley had final authority to set employment policy as to the hiring and firing of his staff" because City did not offer any "meaningful avenues of review").

[6] Applying the proper legal standard for determining whether an official is a final policymaker to the circumstances of the instant case, we conclude that the record before us contains disputes of material fact which preclude a grant of summary judgment for the City. Thus, we remand this case for further proceedings.

Randle contends that summary judgment was improper because there was significant evidence suggesting that the City officials were final policymakers. Specifically, Randle points to Charter provisions that (1) grant the City Manager full authority over personnel policies (albeit subject to any personnel regulations that may be adopted by the City Council); and (2) prevent the City Council from any involvement in employment decisions. The City Charter provides that
The city manager shall be responsible to the council for the proper administration of all affairs of the city placed in his charge, and to that end he shall have the power and duty to:

. . . . .

(b) Appoint, suspend, transfer and removal of all employees of the city, except as otherwise provided herein, subject to the personnel regulations of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

73-1055

69 F.3d 441

69 F.3d 441, 69 Fair Empl.Prac.Cas. (BNA) 489
(Cite as: 69 F.3d 441)

city adopted by the council.

Charter of City of Aurora § 7-4 (Nov. 3, 1987) [hereinafter "City Charter"]. The City of Aurora Personnel Policy and Procedures Manual (June, 1989) [hereinafter "Manual"] also provides that:The City Manager is responsible for the employment of personnel other than appointees of the City Council, for proposing and administering these Policies and Procedures, for keeping the City Council advised of personnel matters and for the overall effectiveness of the personnel management program.

Manual at 3. The Manual also sets forth the authority of the department directors (such as Gross and Carney) as follows: "Department Directors are responsible for appointment, promotion, transfer, or separation of employees and for managing employees in accordance with these Policies and Procedures." Manual at 4.

By contrast, the City relies on the following provision of the City Charter to support its position: The council shall provide for a comprehensive public employment system for all full time regular employees of the city except the heads of departments. The system shall provide for a classification of all employments in the public service, as specified herein; open and competitive examinations and/or interviews to determine qualifications for employment; employment and promotions based upon merit, experience and record of service; establishment of pay scales; and such other matters as the council may deem proper.

City Charter § 3-13. However, even though the City Charter mandates that the Council pass such regulations, the absence of any mention of such regulations in the City's brief or evidence of them in the record prevents us from considering whether the Council*450 has, in fact, enacted such regulations or whether they provide a meaningful constraint on the City Officials' employment decisions as to Randle. Moreover, there is nothing in this record to suggest that the City Council in fact involved itself in the terms and conditions of Randle's employment or the hiring and promotion decisions which affected her.[FN11] The Manual also states

that:

> FN11. The possible existence of any meaningful constraints on personnel policy is cast into doubt by the fact that Administrative Policy Memorandum 3.4, presented as governing personnel policy and relied on by the City in defending the failure to announce claim discussed in Part II.B.2.b. *infra*, was authorized and signed only by the City Manager-the same official the City claims lacks final policymaking authority.

The City Council shall be the ultimate policy making authority for the City of Aurora in matters pertaining to personnel administration. No changes in the compensation plan, fringe benefits, or Personnel Policies shall be effective unless submitted to and approved formally by the City Council.
Manual at 3.

Perhaps most significantly, the City Charter precludes the City Council from reviewing the City Manager's (or any other city official's) personnel decisions regarding employees, such as Randle, who not are Council appointees:
Neither the council nor any of its committees or members shall direct or request the appointment of any person to, or his removal from, employment by city manager, or in any manner take part in the appointment or removal of employees in the administrative service of the city, except as otherwise provided in this Charter. The council and its members shall deal with that portion of the administrative service for which the city manager is responsible solely through the manager, and neither the council nor any member thereof shall give orders to any employee of the city either publicly or privately.

City Charter § 3-10 (Powers Withheld From Council).[FN12]

> FN12. The City countered at oral argument that the Career Service Commission has

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 F.3d 441

Page 13

69 F.3d 441, 69 Fair Empl.Prac.Cas. (BNA) 489
(Cite as: 69 F.3d 441)

the power to review personnel decisions and that strips the City officials of final policymaking authority. We reject this argument at this stage of the proceedings because this alleged role of the Career Service Commission is neither mentioned in the City's brief nor supported in the record before us.

Based on the record before us, we conclude that a genuine dispute remains as to whether the City officials exercise final policymaking authority in the area of personnel matters. Accordingly, we reverse the district court's grant of the City's motion for summary judgment and remand the issue of whether the City officials are final policymakers on personnel matters for further proceedings consistent with this opinion.

## B. EMPLOYMENT DISCRIMINATION CLAIMS

[7][8] If the City officials are final policymakers in the area of personnel policy (i.e. are authorized to make final employment decisions as to wages, promotions, hiring and termination), the City can be held liable for any impermissible employment decisions under §§ 1981 and 1983 pursuant to the *McDonnell Douglas* framework originally developed to determine the existence of intentional discrimination in violation of Title VII. *Patterson v. McLean Credit Union,* 491 U.S. 164, 186, 109 S.Ct. 2363, 2378, 105 L.Ed.2d 132 (1989) (adopting *McDonnell Douglas* framework for § 1981); *Drake v. City of Fort Collins,* 927 F.2d 1156, 1162 (10th Cir.1991) ( "[T]he elements of a plaintiff's case are the same, based on the disparate treatment elements outlined in *McDonnell Douglas,* whether that case is brought under §§ 1981 or 1983 or Title VII."); *see also St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, ---- n. 1, 113 S.Ct. 2742, 2746 n. 1, 125 L.Ed.2d 407 (1993) (assuming that *McDonnell Douglas* framework applies to § 1983 actions). Furthermore, even if the district court determines that the City officials do not make personnel policy for the City so as to give rise to §§ 1981 and 1983 liability, the City still is an employer for Title VII purposes and can be sued on that ground alone. *Crowley v. Prince George's Cty.,*

890 F.2d 683, 687 (4th Cir.1989); *Hamilton v. Rodgers,* 791 F.2d 439, 442 (5th Cir.1986). Thus, *451 we need to address the substance of Randle's claim that the City wrongfully discriminated against her in her terms and conditions of employment.

### 1. The *McDonnell Douglas* standard

[9][10][11][12][13][14][15] In the context of employment discrimination cases analyzed pursuant to the *McDonnell Douglas* framework, the plaintiff must first establish a prima facie case of discrimination.[FN13] Once this is done, the employer must offer a facially nondiscriminatory reason for its employment decision. *McDonnell Douglas,* 411 U.S. at 802-03, 93 S.Ct. at 1824; *EEOC v. Flasher Co., Inc.,* 986 F.2d 1312, 1317-19 (10th Cir.1992). At the summary judgment stage, it then becomes the plaintiff's burden to show that there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual-i.e. unworthy of belief. *Ingels v. Thiokol Corp.,* 42 F.3d 616, 622 (10th Cir.1994). If the plaintiff succeeds in showing a prima facie case and presents evidence that the defendant's proffered reason for the employment decision was pretextual-i.e. unworthy of belief, the plaintiff can withstand a summary judgment motion and is entitled to go to trial.[FN14]

> FN13. This framework requires that a plaintiff first establish a prima facie case of employment discrimination by proving that: (1) the plaintiff is a member of a protected class; (2) the plaintiff applied for and was qualified for an available position; (3) the plaintiff was rejected despite being qualified; and (4) the position remained open as the employer continued to search for applications or the position was filled by a person not of the protected class. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). The prima facie case is a flexible standard that may be modified to relate to different factual situations. *Mohammed v. Callaway,*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

73-1057

69 F.3d 441

69 F.3d 441, 69 Fair Empl.Prac.Cas. (BNA) 489
(Cite as: 69 F.3d 441)

698 F.2d 395, 398 (10th Cir.1983).

FN14. Of course, in the unlikely event that the plaintiff concedes that the real, albeit concealed, reason for the employment decision was a motive that itself is not prohibited under the civil rights laws, the plaintiff would remain vulnerable to summary judgment because the plaintiff's concession of a lawful motive would take the issue of motive from the jury and preclude the inference of a discriminatory motive that the jury could otherwise draw from the fact of pretext. For example, if a defendant stated that the plaintiff was fired for unexcused absences and the plaintiff offered evidence that reason was pretextual and contended instead that he or she was really fired because the boss wanted to make that job available to his or her spouse, the defendant would be entitled to summary judgment because of plaintiff's concession that the true reason was not a prohibited discriminatory reason, even if it was concealed. The defendant would also be entitled to summary judgment if plaintiff could not offer evidence tending to show the defendant's innocent explanation for his employment decision was false. However, this situation is inapplicable to the instant case.

[16] The City argues that there is still one more hurdle that the plaintiff must overcome to escape summary judgment; it is the City's position that in addition to a prima facie case and a showing of pretext, the plaintiff must come forward with some direct evidence that the City was motivated by an illegal discriminatory animus or summary judgment may be entered against the plaintiff. We disagree.

[17][18] The defendant fails to appreciate that the Supreme Court has said that discriminatory animus *may be inferred* from the simple showing of pretext. Thus, a showing of pretext *is* evidence which allows a jury to infer discriminatory intent. Consequently, because a jury may find illegal discrimination upon nothing more than a prima facie case and pretext, such a showing at the

summary judgment stage is sufficient to get the case to the jury.[FN15] This conclusion flows directly from the Supreme Court's analysis in *St. Mary's Honor Ctr.*, where the Court observed that " rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination." *Id.,* 509 U.S. at ----, 113 S.Ct. at 2749. The Supreme Court had issued a similar ruling earlier in *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) when it said that a plaintiff may satisfy her "ultimate burden of persuading the court that she has been a victim of intentional discrimination *452 ... by showing that an employer's proffered explanation is unworthy of credence." *Id.* at 256, 101 S.Ct. at 1095. Although both *St. Mary's Honor Ctr.* and *Burdine* addressed a plaintiff's burden at trial, those rulings have *a fortiori* applicability to plaintiff's burden at the summary judgment stage because if this inferential evidence is sufficient to allow a plaintiff to prevail at trial, it is surely sufficient to permit a plaintiff to avoid summary judgment so that the plaintiff can get to trial.

FN15. The jury is not *required* to find discriminatory animus from pretext, but it is simply regarded as inferential evidence of discrimination from which the jury *may* make such a finding. *Ingels v. Thiokol Corp.,* 42 F.3d 616, 622 (10th Cir.1994); *E.E.O.C. v. Flasher Company,* 986 F.2d 1312, 1320-21 (10th Cir.1994).

The Tenth Circuit has, on several occasions, explicitly reached the same conclusion.[FN16] In *Cole v. Ruidoso Mun. Sch.,* 43 F.3d 1373, 1379-81 (10th Cir.1994), we held that it was error for the district court to grant summary judgment to the defendant when the plaintiff had established a prima facie case and had presented evidence that the facially nondiscriminatory reasons proffered by the defendant were pretextual. Although there the plaintiff had presented no evidence other than pretext to show that the defendant acted with an illegal discriminatory motive, we concluded that disbelief of the defendant's articulated reasons for its actions, together with a prima facie case, can

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 F.3d 441, 69 Fair Empl.Prac.Cas. (BNA) 489
(Cite as: 69 F.3d 441)

establish unlawful discrimination). *Id.* at 1379-81. *See also Durham v. Xerox Corp.,* 18 F.3d 836, 839-40 (10th Cir.), *cert. denied,*513 U.S. 819, 115 S.Ct. 80, 130 L.Ed.2d 33 (1994), where we said,

FN16. This approach has also been adopted by most of the other circuits. *See E.E.O.C. v. Ethan Allen, Inc.,* 44 F.3d 116, 120 (2d Cir.1994) ("A finding of pretextuality allows a juror to reject a defendant's proffered reasons for a challenged employment action and thus permits the ultimate inference of discrimination."); *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir.1994) ("a plaintiff who has made out a prima facie case may defeat a motion for summary judgment by .. . discrediting the proffered reasons, either circumstantially or directly"); *Mitchell v. Data General Corp.,* 12 F.3d 1310, 1316 (4th Cir.1993) (employee can withstand summary judgment by creating a factual dispute about the veracity of the employer's proffered reason for the challenged decision); *Anderson v. Baxter,* 13 F.3d 1120, 1123-24 (7th Cir.1994) (explaining that *St. Mary's* adopted the approach that a plaintiff can withstand a motion for summary judgment by " ' produc[ing] evidence from which a rational factfinder could infer that the company lied' ") (quotation omitted); *Gaworski v. ITT Commercial Finance Corp.,* 17 F.3d 1104, 1110 (8th Cir.) (combination of prima facie case and disproof of employer's proffered reason allows jury to find intentional discrimination), *cert. denied,*513 U.S. 946, 115 S.Ct. 355, 130 L.Ed.2d 310 (1994); *Washington v. Garrett,* 10 F.3d 1421, 1433 (9th Cir.1993) ( "If a plaintiff succeeds in raising a genuine factual issue regarding the authenticity of the employer's stated motive, summary judgment is inappropriate, because it is for the trier of fact to decide which story is to be believed. "); *Hairston v. Gainesville Sun Publishing Co.,* 9 F.3d 913, 919-21 (11th Cir.1993)

(noting the need to allow discrimination to be proved through circumstantial evidence, and concluding that "Appellant has provided a sufficient factual basis in the record upon which a reasonable trier of fact may find that the stated reasons for the adverse employment actions were mere pretext."); *Barbour v. Merrill,* 48 F.3d 1270, 1277 (D.C.Cir.1995) ("Because Barbour introduced sufficient evidence that he had proven a prima facie case of discrimination and that Medlantic's proffered reasons were pretextual, the jury could have reasonably concluded that Barbour had proven unlawful discrimination."). *But see Rhodes v. Guiberson Oil Tools,* 39 F.3d 537, 545 (5th Cir.1994) (requiring direct evidence of discrimination to withstand summary judgment).

"Although a prima facie case combined with disproof of the employer's explanations does not prove intentional discrimination as a matter of law, it may permit the factfinder to infer intentional discrimination, and thus preclude summary judgment for the employer.... 'The factfinder's disbelief of the reasons put forward by the defendant ... may, together with the elements of the prima facie case, suffice to show intentional discrimination' [quoting *St. Mary's Honor Ctr.*].... ' The district court erroneously thought that respondent was required to submit direct evidence of discriminatory intent....' [citing *Burdine* ]" *Ingels v. Thiokol Corp.,* 42 F.3d 616, 622, n. 3 (10th Cir.1994) ( "Pretext *may* support a factual conclusion of discrimination.... Thus, establishing pretext gets a plaintiff over the hurdle of summary judgment against it.... [T]he ultimate questions resides with the trier of fact.") FN17

FN17. Admittedly, the Tenth Circuit's language on this issue has not always been clear. Compare *Durham v. Xerox Corp.,* 18 F.3d at 839-40 ("Although a prima facie case combined with disproof of the employer's explanations does not prove intentional discrimination as a matter of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

73-1059

69 F.3d 441, 69 Fair Empl.Prac.Cas. (BNA) 489
(Cite as: 69 F.3d 441)

law, it may permit the factfinder to infer intentional discrimination, and thus preclude summary judgment for the employer.") with *Jones v. Babbitt,* 52 F.3d 279, 281 (10th Cir.1995) ("Because defendant met his burden, plaintiff then was required to show that defendant's reason was merely a pretext for unlawful reprisal and that defendant intentionally discriminated against plaintiff because of his claim."). "[T]o secure or maintain uniformity of [our] decisions," Fed.R.App.P. 35(a), the en banc court has unanimously adopted this panel's holding that a civil rights plaintiff may withstand a motion for summary judgment and is entitled to present his claim to the factfinder if the plaintiff establishes a prima facie case and presents evidence that the defendant's proffered nondiscriminatory reason was pretextual-i.e., unworthy of belief. All of our cases, or parts of cases, inconsistent with the rule announced herein are overruled.

***453** [19][20][21] It is not the purpose of a motion for summary judgment to force the judge to conduct a "mini trial" to determine the defendant's true state of mind. So long as the plaintiff has presented evidence of pretext (by demonstrating that the defendant's proffered non-discriminatory reason is unworthy of belief) upon which a jury could infer discriminatory motive, the case should go to trial. Judgments about intent are best left for trial and are within the province of the jury. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) ("at the summary judgment stage the judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial"); *Brown v. Parker-Hannifin Corp.,* 746 F.2d 1407, 1411 (10th Cir.1984) ("where different ultimate inferences may be drawn from the evidence presented by the parties, the case is not one for summary judgment.") (citing *United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Romero v. Union Pac. R.R.,* 615 F.2d 1303, 1309 (10th Cir.1980) (questions of

motive and intent are "particularly inappropriate for summary judgment disposition"); *see also Washington v. Garrett,* 10 F.3d 1421, 1433 (9th Cir.1993) ("If the plaintiff succeeds in raising a genuine factual issue regarding the authenticity of the employer's stated motive, summary judgment is inappropriate, because it is for the trier of fact to decide which story is to be believed.").

[22][23][24][25] If the plaintiff establishes a prima facie case and shows either that the defendant's facially nondiscriminatory reasons are pretextual or otherwise introduces direct evidence of illegal discriminatory motive, the case then moves to trial, where the presumption of discrimination created by the prima facie showing "simply drops out of the picture." *St. Mary's Honor Ctr.,* 509 U.S. at ----, 113 S.Ct. at 2749. At trial, the plaintiff must prove illegal discrimination either (1) *inferentially* by showing that the proffered reason is a pretext *for discrimination;* [FN18] and/or (2) *directly* by offering direct evidence of discrimination. *Ingels,* 42 F.3d at 621.

FN18. *At trial,* the plaintiff must convince the jury not only that the reason proffered by the defendant was pretextual, but that the jury should infer that the defendant's pretext concealed a motive of discriminating against the plaintiff in violation of the civil rights laws. It is this last inference which must be established at trial, but which is not required to be found by the judge at the summary judgment stage because drawing that ultimate inference from the evidence is within the province of the jury.

**2. Randle's Employment Discrimination Claims** [FN19]

FN19. We note that Randle's failure to promote claim arises under pre-1991 Civil Rights Act law, but her wage discrimination claim covers time after the enactment of the new act as well as time covered under pre-1991 law.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 F.3d 441

Page 17

69 F.3d 441, 69 Fair Empl.Prac.Cas. (BNA) 489
(Cite as: 69 F.3d 441)

#### a. The failure to promote claim

[26] Randle's failure to promote claim involves the questions of whether there is a disputed issue of material fact on: (1) whether Randle was qualified for the Technician III position; and (2) whether the City's proffered reason for not hiring Randle for this position was pretextual. We conclude that there is a disputed issue of fact on each question so as to preclude a grant of summary judgment on Randle's failure to promote claim.

The district court concluded that Randle was not qualified for the Technician III position because she "has no college credit whatsoever." *Randle,* slip. op. at 15-16. However, as Randle points out, this fact may not disqualify her for the position if the requirement of college training was not a genuine prerequisite for the position. Randle highlights*454 the fact that the City retained Richards in this position even when it discovered that she did not meet the stated requirement of having an associate's degree; in any event, the City previously posted an announcement of this position with the explanation that other experience could substitute for this qualification and the City certified Randle's application on that ground. Based on these facts, Randle has established a genuine issue of fact as to whether she was qualified to be hired as a Technician III and as to whether the City's claim that she was not qualified was pretextual and untruthful. *See Drake v. City of Fort Collins,* 927 F.2d 1156, 1160 (10th Cir.1991) (explaining that plaintiff established a prima facie case even though he did not meet a two year college requirement because the City certified others who also did not meet this requirement).

The City also contends that it hired the most qualified applicant. However, Randle's evidence of pretext and the City's failure to fire Richards after it discovered her misrepresentation as to her qualifications enable Randle to withstand summary judgment. At trial, of course, Randle will bear the burden of *proving*-without the benefit of any presumptions-that the City's decision not to promote her resulted from illegal discrimination. Thus, we reverse the district court's grant of summary judgment to the City on Randle's failure to promote

claim.

#### b. The failure to announce the Administrator's position

[27] It is undisputed that the City did not announce the opening of the Administrator's position even though the City's practice, as reflected in Section 1-2 of its Personnel Manual, was that "permanent positions shall be announced internally." Aplt.App. at 308. The City justified its failure to announce the opening of the Administrator position-which precluded Randle from applying for and potentially receiving a promotion to the position-based upon APM 3.4, which states that "employees may be reassigned with[in] a department at the discretion of the department directors," Aplt.App. at 150, and Nancy Carney's interpretation of that provision as it applied to the Administrator position. Randle argues that to the extent that permanent reassignments can be made pursuant to this provision, they must be positions of the same skill level because Section 1-4 of the Personnel Manual provides that a "change from one position to another position within a Department where there is no change in skill level is at the discretion of the Department Director." Aplt.App. at 310. While that may be the most obvious interpretation of this provision, the district court concluded that Carney's interpretation of APM 3.4 was not "so unreasonable" as to defy credulity. *Randle,* slip. op. at 19.

[28] The mere fact that an employer failed to follow its own internal *procedures* does not necessarily suggest that the employer was motivated by illegal discriminatory intent or that the substantive reasons given by the employer for its employment decision were pretextual. *Ingels,* 42 F.3d at 623 ("To the extent there is any inconsistency at all [in following the employer's internal procedures], it only goes to *process* and not to purpose or motivation, and could not provide a sufficient basis for a jury to find pretext for age discrimination."). Here, the City is not offering its procedures as a *reason* for its ultimate decision to promote Gilmore, rather than Randle, to the Administrator's position.[FN20] The City apparently promoted Gilmore because she was the most qualified candidate for the position and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 F.3d 441                                                                 Page 18

69 F.3d 441, 69 Fair Empl.Prac.Cas. (BNA) 489
(Cite as: 69 F.3d 441)

Randle has offered no evidence suggesting that this reason was pretextual-i.e., that she was more *455 qualified for the position. Thus, Randle has failed to show how the City discriminated against her by allegedly failing to follow its own posting procedures.

> FN20. The authority cited by Randle in support of the proposition that procedural irregularities can suggest the existence of illegal discrimination all involved cases where the disregarded procedures directly and uniquely disadvantaged a minority employee. *See Mohammed*, 698 F.2d at 400-01 (departure from criteria set out in job announcement so as to disadvantage a Hispanic applicant was probative of discrimination); *Lucy v. Manville Sales Corp.*, 674 F.Supp. 1426, 1427 (D.Colo.1987) (contrary to company policy, qualified black employee not interviewed even though other qualified white employees were interviewed was evidence of pretext). In the instant case, the alleged procedural irregularity disadvantaged all potential applicants, and thus, in and of itself, does not suggest either that the defendant's proffered reasons for its employment decisions were pretextual or that the defendant was motivated by illegal discrimination.

In any event, the City offered evidence that it believed that it was following its own internal procedures, and thus, even if the failure to announce this position was a mistake, it was not pretextual. That is, just because the reasoning relied upon for a certain action is mistaken does not mean that the reason is pretextual. Thus, we affirm the district court's grant of summary judgment to the City on this claim.

### c. The wage discrimination claim

[29]   The district court accepted the City's explanations that Allman's seniority and additional responsibilities explained the 24% pay differential

between them and granted the City's motion for summary judgment on Randle's wage discrimination claim. Moreover, the district court ruled further that Randle did not offer any evidence that this reason was pretextual. Randle argues that she set out four such reasons: (1) an expert opined that the seniority differential only accounts for 6% of the differential if one looked just at the inflation factor which was utilized in some labor pay plans; (2) the City and Allman acknowledged that Randle shares 90% of the responsibilities assumed by Allman; (3) Randle and Allman share the identical job title; and (4) other white employees (i.e., the newly hired Richards and the more senior, Gilmore) were not subject to such disparities upon assuming a new position. Moreover, Randle points out that Carney initially explained that the pay differential was due entirely to Allman's seniority (the only reason for pay differential is the fact that Allman was employed for City for a year and a half longer than Randle), and now the City suggests that the differential also results from different job responsibilities-a shifting of explanations which Randle claims adds force to her pretext argument.

[30]   In addition to asserting its proffered non-discriminatory reasons for the wage differential, the City again argues that the:
burden falls on Randle to show that racial discrimination actually motivated the City. *Durham v. Xerox Corp.*, 18 F.3d 836, 839 (10th Cir.)[, *cert. denied*, [115 U.S. 819] [115 S.Ct. 80 [130 L.Ed.2d 33] (1994) ]. Despite having ample opportunity, Randle has failed to do so. She can point to no comments on her race or her national origin during her employment, nor can she point to any other [direct] evidence....

Br. of Aplee at 23. While it is undeniably true that at trial Randle must prove intentional race discrimination, she can do so with either direct or inferential proof. As we pointed out previously, at the summary judgment stage, Randle can establish a sufficient possible inference of discriminatory intent by demonstrating that there is a genuine dispute as to whether the reasons offered for the challenged employment decision were pretextual-e.g. that they were not the true motivating reasons defendant professed them to be. We conclude that Randle's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 F.3d 441

69 F.3d 441, 69 Fair Empl.Prac.Cas. (BNA) 489
(Cite as: 69 F.3d 441)

four arguments and the evidence supporting them cast sufficient doubt on the City's proffered reasons for the wage differential so as to allow a reasonable jury to find that these explanations were pretextual-and thus, a reasonable jury might ultimately infer that these explanations were a pretext for racial discrimination. Thus, we reverse the district court's grant of summary judgment to the City on Randle's wage discrimination claim.

### III. CONCLUSION

With respect to the issue of the City's liable under §§ 1981 and 1983, we AFFIRM the district court's ruling that there is no evidence showing that the City maintained a custom of discriminatory personnel decisions, but REVERSE the district court's determination that the City officials are not final policymakers whose actions can give rise to §§ 1981 and 1983 liability and we REMAND that issue for further proceedings. As to Randle's Title VII (and possible §§ 1981 and 1983) claims, we AFFIRM the district court's grant of the City's motion for summary judgment on Randle's claim of failure to announce the Administrator's position, but we REVERSE the district court's grant of summary judgment for the City on Randle's failure to promote and wage discrimination claims and REMAND those issues for trial. *456 Thus, we AFFIRM in part, REVERSE in part, and REMAND this case to the district court for further proceedings consistent with this opinion.

C.A.10 (Colo.),1995.
Randle v. City of Aurora
69 F.3d 441, 69 Fair Empl.Prac.Cas. (BNA) 489

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

73-1063

Recycled Paper

BLUEBIRD
(310) 477-0700

**SUPERIOR COURT OF CALIFORNIA,**
**COUNTY OF SAN DIEGO**
**HALL OF JUSTICE**

**TENTATIVE RULINGS - November 15, 2007**

EVENT DATE: 11/16/2007          EVENT TIME: 01:30:00 PM          DEPT.: C-75
JUDICIAL OFFICER: Richard E. L. Strauss

CASE NO.:   GIC871979
CASE TITLE: HERNANDEZ VS S D COUNTY REGIONAL AIRPORT AUTHRTY

CASE CATEGORY:    Civil - Unlimited                CASE TYPE:  Wrongful Termination

EVENT TYPE:  Motion Hearing (Civil)
CAUSAL DOCUMENT/DATE FILED:    Motion for Summary Judgment and/or Adjudication, 08/31/2007

The Court asks the parties to appear at the hearing prepared to discuss a further briefing schedule on the issue of whether Defendant San Diego County Regional Airport Authority is immune under Government Code § 821.6; more specifically, whether the actions taken by Defendant constitute a"judicial or administrative proceeding," in which case the Defendant is arguably immune from liability.

74-1064

Recycled Paper

**BLUEBIRD**
(310) 477-0700

**EXHIBIT 75**

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO**
STREET ADDRESS:   330 West Broadway
MAILING ADDRESS:   330 West Broadway
CITY AND ZIP CODE:   San Diego, CA 92101
BRANCH NAME:      Central
TELEPHONE NUMBER: (619) 685-6148

PLAINTIFF(S) / PETITIONER(S):  JOSE HERNANDEZ

DEFENDANT(S) / RESPONDENT(S):  SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY et.al.

HERNANDEZ VS S D COUNTY REGIONAL AIRPORT AUTHRTY

| NOTICE OF RESCHEDULED HEARING | CASE NUMBER:<br>GIC871979 |
|---|---|

Notice is given that the hearing in the above-entitled case has been rescheduled from 11/16/2007  01:30 PM   to date
and time shown below.  All inquiries regarding this notice should be referred to the court listed above.

| TYPE OF HEARING | DATE | TIME | DEPT | JUDGE |
|---|---|---|---|---|
| Motion Hearing (Civil) | 12/14/2007 | 01:30 pm | C-75 | Richard E. L. Strauss |

SUPCT CIV-700  (Rev. 12-06)        **NOH - NOTICE OF RESCHEDULED HEARING**        Page: 1

**75-1065**

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO**

Central
330 West Broadway
San Diego, CA 92101

**SHORT TITLE:** HERNANDEZ vs S D COUNTY REGIONAL AIRPORT AUTHRTY

| **CLERK'S CERTIFICATE OF SERVICE BY MAIL** | CASE NUMBER:<br>**GIC871979** |
|---|---|

I certify that I am not a party to this cause. I certify that a true copy of the NOTICE OF RESCHEDULED HEARING was mailed following standard court practices in a sealed envelope with postage fully prepaid, addressed as indicated below. The mailing and this certification occurred at San Diego, California, on 11/19/2007.

Clerk of the Court, by: _T. Johnson_ _____ , Deputy

CATHRYN CHINN
1901 FIRST AVE., STE 400
SAN DIEGO, CA 92101

SANDRA MCDONOUGH
401 B ST 10TH FLOOR
SAN DIEGO, CA 92101

PETER G. FRIESEN
1901 FIRST AVENUE, SUITE 400
SAN DIEGO, CA 92101

75-1066

SUPERIOR COURT OF CALIFORNIA
SAN DIEGO COUNTY
330 West Broadway
San Diego, CA 92101

ADDRESS SERVICE REQUESTED

592.CRT37-20071117.S11
SANDRA   MCDONOUGH
401 B ST 10TH FLOOR
SAN  DIEGO, CA 92101

75-1067