1    Cathryn Chinn, Esq. (State Bar 93340)
     Peter G. Friesen, Esq. (State Bar 107631)
2    1901 First Avenue, Suite 400
     San Diego, California  92101
3    Telephone (619) 234-9000
     Facsimile (619) 699-1159
4

5
     Attorney for Plaintiff
6    JOSE HERNANDEZ

7

8              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9        **COUNTY OF SAN DIEGO, CENTRAL BRANCH, GENERAL UNLIMITED**

10   JOSE HERNANDEZ,                          Case No. : GIC 871979

11                    Plaintiff,              PLAINTIFF JOSE HERNANDEZ'
                                              COMPENDIUM OF FOREIGN AUTHORITY
12   v.                                       IN OPPOSITION TO DEFENDANT SAN
                                              DIEGO COUNTY REGIONAL AIRPORT
13   SAN DIEGO COUNTY REGIONAL                AUTHORITY'S MOTION FOR SUMMARY
     AIRPORT AUTHORITY, a public entity       JUDGMENT OR, IN THE ALTERNATIVE,
14   and DOES 1 through 12, Inclusive,        SUMMARY ADJUDICATION

15                    Defendants.             DATE:       December 14, 2007
                                              TIME:       1:30 p.m.
16                                            DEPT.:      75
                                              JUDGE:      HON. RICHARD E. STRAUSS
17                                            ACTION FILED:    9/1/06
                                              TRIAL DATE:      1/4/08
18

19

20           Plaintiff JOSE HERNANDEZ hereby submits his Compendium of Foreign Authority in

21   Opposition to Defendant SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY's Motion

22   for Summary Judgment or, in the Alternative, Summary Adjudication:

23   Exhibit 1      -      *Chapin v. Aguirre* 2007 U.S. Dist. LEXIS 41459;

24   Exhibit 2      -      *Harmston v. City & County of San Francisco* 2007 U.S. Dist. LEXIS 74891;

25   ///

26   ///

27   ///

28   ///

     PL'S COMPENDIUM OF FOREIGN AUTHORITY IN OPPOS. TO DEF SDCRAA'S MSJ OR SUMM. ADJUD.

1  Exhibit 3  —  *Cleveland Bd. of Educ. v. Loudermill* (1985) 470 U.S. 532, 538-541; and

2  Exhibit 4  —  *Waters v. Churchill* (1994) 511 U.S. 661.

3  DATED:  December 3, 2007

4  CATHRYN CHINN, ESQ.
   PETER G. FRIESEN, Attorneys for
5  Plaintiff JOSE HERNANDEZ

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

84-1122

EXHIBIT 1

2007 U.S. Dist. LEXIS 41459, *

LEXSEE

**JAMES M. CHAPIN and PENNY L. CASTLEMAN, Plaintiff, vs. MICHAEL J. AGUIRRE and THE CITY OF SAN DIEGO, Defendant.**

**CASE NO. 05CV1906 R (POR)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

*2007 U.S. Dist. LEXIS 41459*

**June 5, 2007, Decided**
**June 7, 2007, Filed**

**PRIOR HISTORY:** *Chapin v. Aguirre, 2006 U.S. Dist. LEXIS 91773 (S.D. Cal., Dec. 14, 2006)*

**COUNSEL:** [*1] For James M Chapin, Penny L Castleman, Plaintiffs: Alan K Brubaker, LEAD ATTORNEY, Wingert Grebing Brubaker and Goodwin, San Diego, CA.

For Michael J Aguirre, San Diego City Of, Defendants: Richard A Paul, LEAD ATTORNEY, Paul Plevin Sullivan and Connaughton, San Diego, CA.

**JUDGES:** JOHN S. RHOADES, SR., UNITED STATES DISTRICT JUDGE.

**OPINION BY:** JOHN S. RHOADES, SR.

**OPINION**

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS PLAINTIFFS' STATE LAW CLAIMS

**1. Introduction**

Defendants the City of San Diego ("the City") and Michael Aguirre (collectively "defendants") bring a motion to dismiss the state law claims of Plaintiffs James Chapin and Penny Castleman (collectively "plaintiffs") for retaliation in violation of *California Government Code § 12940, et seq.*, retaliation in violation of *California Labor Code § 1102.5*, discrimination and retaliation in violation of *California Labor Code § 232.5*, wrongful termination in violation of public policy, and defamation. For the reasons set forth *infra*, the motion is granted in part and denied in part.

**II. Background**

Construing [*2] the First Amended Complaint in the light most favorable to plaintiffs, the relevant facts are as follows:

Plaintiffs are former Senior Deputy City Attorneys for the City of San Diego. Plaintiffs were trial attorneys for the City and "had no power to control employees or officials, no authority to speak in the name of policymakers, no influence on City programs and [were] in no position to participate in partisan politics or respond to political leaders." FAC PP 9, 10.

Defendant Aguirre was elected by the citizens of San Diego to be the City Attorney. After being elected, defendant Aguirre began investigating a controversy regarding City

2007 U.S. Dist. LEXIS 41459, *

employee pension benefits and harassing and retaliating against City employees who did not share his view regarding the controversy. FAC P 12. Defendant Aguirre also informed the Administrator of the San Diego City Employees' Retirement System ("SDCERS") that he was taking over as counsel for SDCERS and that SDCERS counsel Loraine Chapin, the wife of plaintiff Chapin, should report to defendant Aguirre for reassignment. FAC PP 14, 15. Upon being informed of defendant Aguirre's intent to assume the position of SDCERS counsel, Loraine Chapin informed [*3] defendant Aguirre that she did not work for him and that she would not report to him for reassignment as he had requested. Subsequently, defendant Aguirre informed plaintiff Chapin that he would be fired if he did not convince his wife to quit her position as SDCERS counsel. Chapin refused, and as a result of his refusal, he was repeatedly threatened with termination. FAC PP 16, 17, 29. "Aguirre also told Chapin, under threat of termination, that he was not to express his feelings about the working conditions in the office and that he could not express any legal opinions other than Aguirre's." FAC P 16; see also FAC P 30.

During this same time, plaintiffs Chapin and Castleman were involved in organizing a labor union known as the Deputy City Attorneys' Association ("DCAA"). Plaintiff Chapin was the President of the DCAA and plaintiff Castleman was the Recording Secretary. FAC P 22. "Each was instrumental in forming the union." FAC P 22.

At a meeting on December 21, 2004, the DCAA Executive Board "met and discussed the necessity of the DCAA meeting with Aguirre because of his threats to fire Chapin due to his wife's role as counsel for SDCERS and other transitional concerns, such [*4] as Aguirre's stated 8 insistence he represents the taxpayers of the City of San Diego, even if that 'representation' was adverse to the City of San Diego and its Departments and employees."

FAC P 22.

"On January 5, 2005, Castleman sent an email to all attorneys in the City Attorney's office advising them of a DCAA meeting scheduled for January 13." FAC P 32. Minutes later, defendant Aguirre called plaintiff Castleman to his office and "complained that Castleman was not supporting him, citing her protest of his treatment of" plaintiff Chapin. FAC P 33.

On January 13, 2005, the Civil Trial Unit held a meeting. At the end of the meeting, plaintiff Castleman stated that there was a need to address the issue of the attorney-client privilege given defendant Aguirre's public pronouncement that he represents the taxpayers of San Diego in addition to the City itself. FAC P 38. Later that day, the DCAA met. FAC P 39. "The focus of that meeting was to discuss the DCAA certification process, ethical issues caused by Aguirre's public pronouncement that the City Attorney's client included taxpayers, and other concerns." FAC P 39.

On January 24, 2005, defendant Aguirre told plaintiff Castleman [*5] that she was fired and that she should vacate her office immediately despite the fact that she was to begin a trial involving eight police officers the following week. FAC P 50. Subsequently, the Chief of Police requested that plaintiff Castleman be allowed to proceed with the trial. FAC P 51. Defendant Aguirre agreed but instructed others to inform plaintiff Castleman that "she would be allowed to continue employment with the City of San Diego on the condition that she not speak to anyone employed by the City of San Diego about any matter other than the trial." FAC P 51. "She was also told she could not tell anyone in the City of San Diego about the foregoing condition of employment." FAC P 51. "She was further told that she would be terminated immediately, even in the middle of the trial, if it was learned she violated these instructions." FAC P 51.

On January 26, plaintiff Castleman was

2007 U.S. Dist. LEXIS 41459, *

given a severance agreement which she declined to sign. FAC P 52. That agreement provided that Castleman "could remain employed until 5:00 p.m. on the day she received a verdict in the trial, and that during the remainder of her time with the City she was to refrain from discussing with any other [*6] City employees the status of her employment and/or any matter not related to the trial." FAC P 52.

On January 26, plaintiff Chapin was informed he was fired. FAC P 53. He was advised that, effective that afternoon, "he was not allowed to be in the office after hours or on weekends and that he would be shadowed one hundred percent of the time during working hours through February 4." From January 26 until February 3, his last day of work, another attorney who was recently hired by defendant Aguirre "sat in Chapin's office, followed him to meetings and to court, and listened to all of his phone calls and office conversations with attorneys and staff visiting his office." FAC P 53.

On January 28, 2006, defendant Aguirre called a mandatory meeting of the trial deputies but specifically excluded plaintiffs. FAC P 54. At that meeting, defendant Aguirre made false statements about plaintiff Castleman. FAC P 54.

Plaintiff Castleman's last day of work was February 28, 2005, after the conclusion of her trial. FAC P 55.

## II. Analysis

### A. Defendants' Motion to Dismiss Count Five (Retaliation in Violation of *Gov't Code § 12940*)

In Count Five, plaintiffs allege retaliation [*7] in violation of *California Government Code § 12940(a)* and *(h). Section 12940(h)* prohibits terminating an employee who has opposed an unlawful or potentially unlawful employment practice prohibited by the California Fair Employment and Housing Act

("FEHA"), codified at *Government Code § 12900, et seq. Section 12940(a)* makes it an unlawful employment practice to discharge a person from employment based on marital status. Plaintiffs allege that defendant Aguirre violated these statutory provisions by "retaliat[ing] against Chapin and Castleman because they challenged Aguirre's threats to terminate Chapin because of his marital status." FAC P 94.

To plead a claim for retaliation, plaintiffs must plead that they were retaliated against for complaining of conduct that either is prohibited by FEHA or that they reasonably and in good faith believed was prohibited by FEHA. *Yanowitz v. L'Oreal USA, Inc., 36 Cal. 4th 1028, 1043, 32 Cal. Rptr. 3d 436, 116 P.3d 1123 (2005).* As long as the mistake was reasonable and in good faith, it does not matter whether the mistake was one of law or fact. See *Miller v. Department of Corrections, 36 Cal.4th 446, 475, 30 Cal. Rptr. 3d 797, 115 P.3d 77 (citing Moyo v. Gomez, 40 F.3d 982, 985 (9th Cir. 1994)).*

[*8] On the facts as plead, plaintiffs could not have reasonably believed that they were complaining of conduct prohibited by FEHA. As explained in *Chen v. County of Orange, 96 Cal.App.4th 926, 116 Cal. Rptr. 2d 786 (2002),* FEHA prohibits discrimination based on one being single or married. It does not prohibit discrimination because of political animus towards one's spouse. *Id. at 944.* Thus, in Chen the court of appeal affirmed the trial court decision granting the defendant's motion for nonsuit of the plaintiff's claim for marital status discrimination because "[a]ny arguable adverse action was the result of having a relationship (whether married or not) with a *particular* man, and not just because he was a fellow employee, but because he was allegedly on the 'outs' with the then regnant management of the district attorney's office." Id.

The only reasonable interpretation of the facts as pled here is that defendant Aguirre threatened to fire plaintiff Chapin not because

2007 U.S. Dist. LEXIS 41459, *

he was married, but because he had a relationship with a *particular* woman -- Loraine Chapin -- with whom Aguirre was on the "outs." Under Chen, such adverse action is clearly not prohibited [*9] by FEHA. Moreover, plaintiffs Chapin and Castleman, both lawyers, could not have reasonably believed that such action was prohibited by FEHA in light of Chen. In other words, to the extent Chapin and Castleman believed, based on a mistake of law, that they were complaining of conduct prohibited by FEHA, such mistake was, as a matter of law, unreasonable. Accordingly, they are not protected under § 12940(h) from retaliation for their complaints, and the motion to dismiss Count Five is granted as to both defendants for failure to state a claim.

**B. Defendant Aguirre's Motion to Dismiss Counts Five Through Nine, Eleven** and Twelve based on governmental immunity

Defendant Aguirre moves to dismiss Counts Five through Nine as well as Counts Eleven and Twelve on the ground that he is entitled to statutory immunity. Defendant Aguirre begins with the premise that the "Tort Claims Act and cases interpreting it make clear that in California public *employee* liability is the exception, not the rule." Memorandum in Support of Defendant Aguirre's Motion to Dismiss at 20:20-21 (emphasis added). However, in actuality, the Federal Tort Claims Act "establishes the basic rules that [*10] public *entities* are immune from liability except as provided by statute (§ 815, subd. (a)), [but] that public *employees* are liable for their torts except as otherwise provided by statute (§ 820, subd. (a))." *Caldwell v. Montoya, 10 Cal.4th 972, 980, 42 Cal. Rptr. 2d 842, 897 P.2d 1320 (1995)*; see also *Taylor v. City of Local Angeles Department of Water and Power, 144 Cal.App.4th 1216, 1238, 51 Cal. Rptr. 3d 206 (2006)* (explaining that under the California Tort Claims Act, "public employees are liable for their torts *unless* a statute provides otherwise") (emphasis added).

1 *Colome v. State Athletic Comm., 47 Cal.App.4th 1444, 55 Cal. Rptr. 2d 300 (1996)*, cited by defendant Aguirre, is not to the contrary. In that case, the court recognized that immunity for governmental entities is the rule and that liability is the exception. *Id. at 1454-55.*

*1. Government Code 820.2*

*Section 820.2* provides an exception to tort liability for public employees. *California Govt. Code 820.2* [*11] provides in relevant part:

Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused.

It is defendant Aguirre's burden to prove on a motion to dismiss that, as a matter of law, he is entitled to immunity under this provision.

The inquiry here is whether the acts of defendant Aguirre that underlie plaintiffs' various claims were discretionary acts within the meaning of *section 820.2.* Defendant Aguirre's reliance on the definition of "discretionary act" set forth in *Burgdorf v. Funder, 246 Cal.App.2d 443, 449, 54 Cal. Rptr. 805 (1966)* is unavailing. Despite the fact that defendant Aguirre represents the case to be a 1996 case, it is actually a 1966 case that was decided before the seminal California Supreme Court case of *Johnson v. State, 69 Cal.2d 782, 73 Cal. Rptr. 240, 447 P.2d 352 (1968).* Moreover, in Johnson, the California Supreme Court eschewed Burgdorf's mere semantic approach to construing the meaning of the term "discretionary" as used in § 820.2 in favor of an approach that takes [*12] into account the public policy considerations behind granting qualified immunity. See *Johnson, 69 Cal.2d at*

*788-789, 794-95.*

As explained in the later California Supreme Court case of *Caldwell, supra,* the "workable definition" of discretionary act to be gleaned from Johnson "draws the line between 'planning' and 'operational' functions of government.'" *10 Cal.4th at 981* (quoting *Johnson, 69 Cal.2d at 793-94*). In other words:

> Immunity is reserved for those *"basic policy decisions* [which have] ... been [expressly] committed to coordinate branches of government," and as to which judicial interference would thus be "unseemly." (*Id. at p. 793,* italics in original.) Such "areas of quasi-legislative policy-making ... are sufficiently sensitive" (*id. at p. 794*) to call for judicial abstention from interference that "might even in the first instance affect the coordinate body's decision-making process" (*id. at p. 793*).

> On the other hand, said Johnson, there is no basis for immunizing lower-level, or "ministerial," decisions that merely implement a basic policy already formulated. (*Johnson, supra, 69 Cal.2d at p. 796.*) [*13] Moreover, we cautioned, immunity. applies only to *deliberate and considered* policy decisions, in which a "[conscious] balancing [of] risks and advantages ... took place. The fact that an employee normally engages in 'discretionary activity' is irrelevant if, in a given case, the employee did not render a considered decision. [Citations]." (*Id. at p. 795, fn. 8.*).

*Caldwell, 10 Cal.4th at 981.*

In Caldwell, the plaintiff was a former

school superintendent who brought claims for breach of contract, for violation of FEHA, and for retaliatory discharge in violation of public policy against members of a school board who voted against renewing his contract for employment. Applying the standard set forth supra, the court concluded that the school board was immune under *§ 820.2." Id. at 982.* Noting that it had previously held that school district trustees must have immunity for inquiring into a superintendent's fitness because, *inter alia,* "[t]here is a vital interest in securing free and independent judgment of school trustees in dealing with personnel problems," id., the court concluded that the final [*14] decision to terminate the superintendent must be entitled to the same protection.

In support of its decision, the court noted that the statutes "specifically limit the length of a superintendent's contract and otherwise place the superintendent's employment within the sole authority and discretion of the district's governing board," thereby satisfying the requirement that the matter be "'expressly entrusted to a coordinate branch of government at its highest level.'"Id. (citing *Johnson, 69 Cal.2d at 793*). It further explained that because the superintendent was "the district's foremost appointed official, with primary responsibility for representing, guiding, and administering" the district, the "board's choice about who should occupy this crucial post is therefore a peculiarly sensitive and subjective one, with fundamental policy implications." *Id. at 983.* The court concluded:

> Where such an important policy issue is at stake, it would be unwise and unseemly to hold individual board members personally accountable at law for things they said or considered in the course of deliberations, or for their subsequent explanations of their decision. [citation [*15] omitted]. Accordingly, the board's collective determination whether

to hire or fire a person as the district's superintendent must be considered a basic policy decision, immune form civil damage actions that seek to hold individuals board members liable for the motives behind their votes.

Id. Finally, later in the opinion, the court concluded that "[w]hen elected school board members, representing their constituencies, decide in whom they will repose confidence as the chief executive, policy architect, and personal symbol of a diverse public school system, they engage in the quintessential discretionary act of government." Id. 988.

Although Caldwell involved a termination, defendant Aguirre has failed to demonstrate it is controlling authority here. Taking as true the allegations of the complaint, plaintiffs were trial attorneys who played no role in formulating policy. See FAC PP 9, 10. Thus, unlike the plaintiff in Caldwell, plaintiffs here cannot, at this juncture, be said to "occupy a crucial post" so that the decision as to who should fill their position was "a peculiarly sensitive and subjective one, with fundamental policy implications" rather [*16] than an a decision that merely implemented a basic policy already formulated. Id. at 983.

The crux of defendant Aguirre's argument for immunity is that "[c]ity attorneys have always been among those public officials who are vested with discretionary authority and are immune from their exercise of that discretion even if the discretion is erroneous, malicious or abused." Memo. in Support of Defendant Aguirre's Motion to Dismiss at 21:28-22:2. However, this argument completely ignores the fact that the applicable test for immunity § 820.2 focuses not on the government employees's job title or day-to-day job duties but, rather, on the nature of the act or omission upon which the employee's liability is predicated. See Caldwell, 10 Cal.4th at 981

(noting that "[t]he fact that an employee normally engages in 'discretionary activity' is irrelevant if, in a given case, the employee did not render a considered decision").

Moreover, Miller v. Hoagland, 247 Cal.App.2d 57, 55 Cal. Rptr. 311 (1966), the one case defendant Aguirre cites involving a defendant who was a city attorney, is not authority for the proposition that defendant Aguirre is entitled to § 820.2 immunity here. In [*17] Miller, which was also decided before Johnson, the plaintiff sued a city attorney for defamation. In the context of representing the city as counsel of record in a previous case, the city attorney had made the allegedly defamatory statements in a "letter in the nature of an informal brief' that was presented to a judge in an attempt to persuade the judge to rule in the city's favor. Id. at 59. In affirming the trial court's decision in the city attorney's favor, the court of appeal concluded, without analysis, that the statements in the letter were the result of the exercise of discretion. Given Miller's lack of analysis regarding the discretionary nature of the act at issue, the different capacities in which Miller and defendant Aguirre were acting, and the fact that Miller was decided prior to Johnson, Miller is not authority for the proposition that the acts here, which were performed by defendant Aguirre in his role as an administrator and not as an attorney representing a client in a court matter, are of a similarly discretionary nature.

Nor do the other cases upon which defendant Aguirre relies dictate that he is entitled [*18] to immunity.

In Kemmerer v. County of Fresno, 200 Cal.App.3d 1426, 246 Cal. Rptr. 609 (1988), the plaintiff, a civil service employee, brought an action against the County of Fresno and two of his superiors after his superiors investigated him for misconduct and recommended that he be placed in a disciplinary proceeding. As a result of the disciplinary proceeding, he was dismissed from County service, although on

appeal his discipline was reduced from termination to a letter of reprimand that was placed in his personnel file. After he was reinstated, he sued the County and his superiors, alleging, *inter alia,* tortious breach of the covenant of good faith and fair dealing in his employment contract, intentional infliction of emotional distress, and intentional inducement of breach of contract arising out of the investigation and initiation of the disciplinary proceedings.

The court of appeal began its analysis with mention of Burgdorf and its definition of "discretionary act" as "one which requires the exercise of judgment or choice," *200 Cal.App.3d at 1437* (quoting *Burgdorf, 246 Cal.App.2d at 449*), despite the fact that, as discussed *supra,* [*19] the Burgdorf definitional approach has been abandoned. See *Johnson, 69 Cal.2d at 787-790; Caldwell, 10 Cal.4th at 981* (explaining that Johnson reasoned that "almost all acts involve some choice among alternatives, and the statutory immunity thus cannot depend upon a literal or semantic parsing of the word 'discretion"). Then, after noting Johnson's emphasis on abstention in cases where a government employee is engaged in basic policy decisions, the court in Kemmerer concluded that "the decision . .. to institute disciplinary proceedings against [the plaintiff] was a policy decision involving the exercise of discretion" because

> [t]he decision whether or not to initiate disciplinary proceedings and what discipline to impose is placed initially on the department head and the decision is entirely within his discretion. The decision involves the exercise of analysis and judgment as to what is just and proper under the circumstances and is not a purely ministerial act.

*200 Cal.App.3d at 1438.* The propriety of the court of appeal's focus on the fact that the

decision involved "the exercise of analysis and judgment" is highly [*20] questionable in light of *Johnson.* However, the court of appeal also concluded that

> there are strong policy considerations in favor of upholding immunity. [The defendants] investigated allegations of misconduct on the part of Kemmerer, allegations which were later found to be partially true by the civil service commission although it did reduce the disciplinary action taken. They then made the recommendation that he be dismissed from County service. If every public entity employee who was found to have committed an act of misconduct and later disciplined were allowed to bring a tort action against his co-workers and superiors, this would certainly bode ill for the continuing efficiency and morale of the civil service commission. Supervisors within the civil service system would not be able to fulfill their function without the overhanging threat of legal action from employees who become subject to discipline.

*Id. at 1438-39.*

In the present case, defendant Aguirre is not being sued for initiating disciplinary proceedings or for imposing discipline for misconduct by plaintiffs. Thus, *Kemmerer* is not directly on point. Moreover, because defendant [*21] Aguirre is not being sued for conduct involving the formal discipline of plaintiffs, the public policy considerations present in Kemmerer is not present here. Furthermore, because the court in *Summers v. City of Cathedral City, 225 Cal.App.3d 1047, 1064, 275 Cal. Rptr. 594 (1990),* also cited by Aguirre, concluded that the facts before it were

2007 U.S. Dist. LEXIS 41459, *

"indistinguishable" from those in Kemmerer, Summers is similarly not controlling authority here.

Although defendant Aguirre suggests that Kemmerer, Summers and Caldwell should be broadly read as authority for the proposition that all employment-related decisions are discretionary and subject to immunity, the later case of *Taylor, supra,* counsels against such an interpretation. In Taylor, the plaintiff brought a claim for retaliation pursuant to FEHA. He claimed that because he opposed race discrimination against his subordinate, he was, *inter alia,* stripped of his supervisory position; threatened with a change in his work schedule; barred from completing supervisory certification courses; embarrassed in front of subordinates; excluded from meetings and deprived of information necessary to carry out his [*22] duties; and labeled a troublemaker to prospective supervisors in other groups. The defendant supervisor sought immunity under *§ 820.2.* However, the court of appeal determined "that the acts alleged here do not fit within the type of policy decisions that the Supreme Court determined would be immune under the statute." *144 Cal.App.4th at 1239.* It explained that "decisions regarding job assignments, training and promotion may not be characterized as" the type of "'quasi-legislative policy-making'" decisions that should not be subject to judicial interference. Id. (quoting *Barner v. Leeds, 24 Cal.4th 676, 685, 102 Cal. Rptr. 2d 97, 13 P.3d 704 (2000)).* Thus, it held that "the alleged retaliatory actions . . . as pleaded, are not the type accorded discretionary immunity under *section 820.2.*" Id.

As can be seen, there is no blanket immunity for governmental employers for employment-related decisions as defendant Aguirre contends. Rather, where an employee sues a former employer, the California courts have carefully considered the circumstances of each case and the facts underlying each claim. Consequently, the court now turns to the specific claims asserted against defendant

Aguirre.

[*23] i. *Count Five*

As noted *supra,* in Count Five, plaintiffs allege that defendants retaliated against them in violation of *California Government Code § 12940, et seq.,* by firing them because they opposed what they believed to be unlawful marital status discrimination. Because defendant Aguirre is entitled to dismissal of this count on other grounds, the court need not determine whether he would be entitled to dismissal of this count pursuant to *§ 820.2.*

ii. *Count Six*

In Count Six, plaintiffs allege they were retaliated against in violation of *California Labor Code § 1102.5,* which prohibits an employer from retaliating against an employee "for disclosing to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation." *Section 1102.5* also prohibits retaliation "against an employee for refusing to participate in an activity that would result in a violation of a state or federal statute, or a violation or noncompliance with a state or federal rule or regulation." As the California [*24] court of appeal has explained, to afford *§ 820.2* immunity to a government employer who terminates a plaintiff "even though such discharge was a retaliatory act expressly prohibited by" a whistleblower statute such as *§ 1102.5* "would emasculate the entire effect and purpose of the statute." *Southern California Rapid Transit District v. Superior Court, 30 Cal App. 4th 713, 726, 36 Cal. Rptr. 2d 665 (1994);* see also *Shoemaker v. Myers, 2 Cal. App.4th 1407, 1425, 4 Cal. Rptr. 2d 203 (1992)* (concluding that allowing immunity pursuant to *§ 821.6* in actions involving violations of Gov. Code 19683, a whistleblower statute, "would largely emasculate the latter section and thereby frustrate the legislative purpose behind its enactment."). Although *Southern California*

*Rapid Transit District* and *Shoemaker* involved different whistleblower statutes, their reasoning is equally applicable here. Accordingly, the motion to dismiss Count Six pursuant to § 820.2 is denied. [2]

> 2    At oral argument, defendants challenged this claim on the ground that plaintiff fail to state a claim for whistleblowing under the statute. Because defendants did not raise this argument in their papers, the court declines to consider it at this time. See *Kim v. Kang, 154 F.3d 996, 1000 (9th Cir. 1998)* (declining to consider argument raised for the first time in the reply brief). To the extent that defendants, for the first time at oral argument, challenged plaintiffs' other state claims on the merits, the court declines to consider those challenges as well.

[*25] *iii. Counts Seven and Eight*

In Counts Seven and Eight, plaintiffs allege discrimination and retaliation in violation of *Labor Code § 232.5*, which precludes an employer from discriminating or retaliating against an employee who discloses information about the employer's working conditions or protests the employer's instruction not to disclose information about the employer's working conditions. At this juncture, defendant Aguirre has failed to sufficiently articulate the basic policy decision he contends is at issue here so as to demonstrate as that, as a matter of law, the acts upon which this count is predicated were in the nature of "basic policy decisions" rather than merely the implementation of "a basic policy already formulated." *Caldwell, 10 Cal.4th at 981.* However, by this conclusion, the court does not intend to preclude defendant Aguirre, in the context of a summary judgment motion, from shedding further light on what he contends to be the applicable policy. Accordingly, defendant Aguirre has failed to demonstrate

that he is entitled to dismissal of these claims.

*iv. Count Nine*

In Count Nine, plaintiff Castleman alleges that defendant Aguirre [*26] violated *Labor Code § 432.5*, which makes it unlawful for an employer to require an employee to agree in writing to any term or condition which is known by the employer to be prohibited by law. Plaintiff Castleman alleges that defendant Aguirre violated this provision by requiring her to sign a severance agreement that forbid her to speak about the conditions of her employment. Defendant Aguirre, at this juncture, has failed to demonstrate that the act of requiring plaintiff Castleman to sign an agreement with such a provision was in the nature of "a basic policy decision" rather than the mere implementation of a basic policy decision already formulated. Id. Again, by this conclusion, the court does not intend to preclude this issue from being revisited in the context of a summary judgment motion. Accordingly, the motion to dismiss Count Nine is denied.

*v. Counts Eleven and Twelve*

In Counts Eleven and Twelve, plaintiffs allege that they were defamed. Defendant Aguirre has failed to demonstrate that the making of the alleged defamatory statements was in the nature of a "'basic policy decision[]' made at the 'planning' stage" of the operations of his office rather than the [*27] implementation of an already-formulated policy decision. *Taylor, 144 Cal.App.4th at 1238-39* (quoting *Barner, 24 Cal.4th at 685*). As noted *supra*, although the city attorney in *Miller* was found to be immune for making defamatory statements, such statements were made by the city attorney in his capacity as legal counsel in the context of a judicial proceeding. Here, defendant Aguirre was not acting in such a capacity.

The facts of the present case are more analogous to those in *Sanborn v. Chronicle Publishing Co., 18 Cal.3d 406, 134 Cal. Rptr. 402, 556 P.2d 764 (1976).* In that case, the

California Supreme Court held that a city clerk who made defamatory statements to the media in the course of his official duties was not entitled to immunity under § 820.2 because a "governmental officer's discussions with the public or press regarding the functioning of his office would . . . fall within the category of routine, ministerial duties incident to the normal operations of that office." *Id.* at 415. Although here the alleged defamatory statements were made to others in the office rather than to the public or the press, discussions with other employees [*28] would also appear to fall within the "category of routine, ministerial duties incident to the normal operations" of the City Attorney's Office. Id.; see also *McQuirk v. Donnelley, 189 F.3d 793, 799 (1999)* (concluding that although sheriff's decision to provide references to other law enforcement agencies about past employees was in the nature of a policy decision, the decision as to what to include in the reference was "an operational judgment rather than a planning judgment" and, therefore, sheriff was not entitled to § 820.2 immunity in suit for defamation arising out of reference given). Accordingly, defendant Aguirre is not entitled to qualified immunity under *§ 820.2.*

### 2. *California Civil Code § 47(c)*

Alternatively, defendant Aguirre seeks dismissal of Counts Eleven and Twelve pursuant to *California Civil Code § 47(c)*. Pursuant to *§ 47(c)*, certain communications are privileged if made "without malice." Here, plaintiffs allege that defendant Aguirre made the allegedly defamatory statements "with malice." FAC PP 145, 152. Whether the statements were made with or without malice is a factual issue that cannot be [*29] determined as a matter of law on a motion to dismiss. Accordingly, defendant Aguirre's motion to dismiss Counts Eleven and Twelve pursuant to *section 47 (c)* is denied.

### 3. *California Civil Code § 47(a)*

Defendant Aguirre also seeks dismissal of

Counts Eleven and Twelve pursuant to *California Civil Code § 47(a)*, which provides that a statement made in the proper discharge of an official duty is privileged. As explained in McQuirk, "the California Supreme Court defines such statements as those made in the discharge of an official duty that are related to a policy-making function." *189 F.3d at 801.* And, the "requirement that the statements at issue be related to the exercise of a policy-making function is closely related to the inquiry into whether an official was acting at a planning, as opposed to an operational, level under *§ 820.2.*" Id. For the reasons defendant Aguirre is not entitled to immunity for his alleged defamatory statements under *§ 820.2*, he is not entitled to immunity for such statements under *§ 47(a)*. See id. ("Because we concluded that Donnelley was not immune from liability under *§ 820.2* [*30] because his actions were operational judgments, we also conclude that he was not acting in a policy-making role. Therefore, his statements were not privileged pursuant to *§ 47(a)* . . . ."). Accordingly, defendant Aguirre's motion to dismiss Counts Eleven and Twelve pursuant to *§ 47(a)* is denied.

### 4. Miscellaneous Immunities

Finally, defendant Aguirre has failed to demonstrate that he is entitled to immunity under *California Government Code §§ 820.4* and *821.6.*

### C. City's Motion to Dismiss Counts Five Through Twelve pursuant to *§ 820.2*

The City move to dismiss Counts Five Through Twelve pursuant to *§ 820.2*. Although *§ 820.2* on its face applies to individual employees, pursuant to *California Government Code § 815.2(b)* "a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability." Therefore, to the extent that defendant Aguirre is entitled to dismissal of plaintiffs' claims pursuant to *§ 820.2*, the City is also entitled to dismissal. See

2007 U.S. Dist. LEXIS 41459, *

*Shoemaker, 2 Cal.App.4th at 1422* ("If a public employee is immune from [*31] prosecution, *section 815.2, subdivision (b)*, also immunizes the public employer.").

As discussed *supra*, Count Five fails to state a claim. Therefore, the City is entitled to dismissal of Count Five on this ground, and the court need not determine whether, had plaintiffs stated a claim, the City would be entitled to immunity. For the reasons that defendant Aguirre is not entitled to dismissal of Counts Five through Ninth and Counts Eleven and Twelve pursuant to § 820.2, neither is the City. However, as discussed *infra*, the City is entitled to dismissal of Counts Eleven and Twelve on other grounds. Finally, the court need not analyze Count Ten in the context of the present arguments because, as discussed *infra*, the City is entitled to dismissal of Count Ten for other reasons.

### D. City's Motion to Dismiss Count Ten

In Count Ten, plaintiffs bring a claim for wrongful termination against the City, alleging that they were terminated in violation of public policy. The City contends that it is entitled to immunity pursuant to *California Government Code § 815(a)*, which provides in relevant part that "*[e]xcept as otherwise provided by statute* [*32] *" a public entity such as a municipality "is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person." The City contends that pursuant to the terms of § 815(a), a common law cause of action (as opposed to a statutorily-created one) cannot be asserted against it. While the City is, perhaps, a bit broad in its interpretation (one could surmise that the legislature could enact a statute providing that certain common law causes of action could be asserted against a public entity without actually codifying those common law causes of action), plaintiffs have failed to demonstrate that there is an applicable statute allowing for the maintenance of a wrongful termination claim against the City in

this case.

Plaintiffs' reliance on a quotation from *Palmer v. Regents, 107 Cal.App. 4th 899, 132 Cal. Rptr. 2d 567 (2003)* is unavailing. In that case, the court simply noted that it had previously held in an unpublished decision in the same case that Palmer "had stated a 'classic' common law cause of action for discharge in violation of public policy" against a governmental entity despite the trial court's construction [*33] of the complaint as raising only a cause of action for discharge in violation of *Labor Code § 1102.5. Id at 902.* Absent from this portion of the opinion is any discussion of the government entity's entitlement to immunity under § 815.2. Moreover, later in the same decision, the court noted that the government entity in that case had not argued in either appeal that the entity was immune from liability under § 815. *Id. at 910.* As for plaintiffs' citation of Shoemaker, plaintiffs fail to explain the basis of their reliance on that case, and the basis for such reliance is not evident.

Finally, in light of the fact that § 815.2 limits public entity liability to liability "provided by statute," it is too great a leap to conclude that because plaintiffs are not barred by § 815.2 from bringing a statutory claim for violation of *Labor Code § 1102.5*, they are not barred from bringing a common law cause of action for wrongful termination in violation of public policy simply because § 1102.5 is the source of the public policy. Accordingly, the City's Motion to Dismiss Count Ten is granted.

### E. City's Motion to Dismiss Counts Eleven and Twelve [*34] Pursuant to *Government Code § 818.8*

The City also seeks dismissal of Counts Eleven and Twelve pursuant to *California Government Code § 818.8*, which provides that "[a] public entity is not liable for an injury caused by misrepresentation by an employee of the public entity, whether or not such misrepresentation be negligent or intentional."

2007 U.S. Dist. LEXIS 41459, *

Plaintiffs contend that § 818.8 is not applicable here because the complaint alleges that defendant Aguirre acted with malice. However, plaintiffs fail to cite any authority suggesting that § 818.8 immunity is unavailable to a municipality where its employee's defamatory statements were made with malice. Moreover, the legislative history clarifies that a public entity does not lose its immunity where the employee's misrepresentation was made with malice. According to the Senate Legislative Committee Comment:

> This section provides public entities with an *absolute immunity* from liability for negligent or intentional misrepresentation. *A similar immunity is provided public employees by Section 822.2,* except that an employee may be held liable if he is guilty of actual fraud, corruption or *actual malice.* **[*35]**

Accordingly, the court finds that the City is

entitled to dismissal of Counts Eleven and Twelve pursuant to § 818.8. Because the City is entitled to dismiss of these claims pursuant to § 818.8, the court need not determine whether the City would also be entitled to dismissal of these claims pursuant to § 47(a) or (c).

## IV. Conclusion

That portion of defendant Aguirre's motion to dismiss that attacks plaintiffs' state law claims is granted as to Count Five but denied as to the remaining state law claims. That portion of the City's motion to dismiss that attacks plaintiffs' state law claims is granted as to Counts Five, Ten, Eleven and Twelve but denied as to the remaining state law claims.

**IT IS SO ORDERED.**

DATED: 6/5, 2007

JOHN S. RHOADES, SR.

United States District Judge

EXHIBIT 2

2007 U.S. Dist. LEXIS 74891, *

LEXSEE

**CLAYTON HARMSTON, et al., Plaintiffs, v. CITY AND COUNTY OF SAN FRANCISCO, et al., Defendants.**

## No. C 07-01186 SI

## UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA

*2007 U.S. Dist. LEXIS 74891*

September 25, 2007, Decided
September 25, 2007, Filed

**COUNSEL:** [*1] For Clayton Harmston, an individual, GiGi George, an individual, James Lewis, an individual, Erik Evanson, an individual, Erik Solares, an individual, Dave Parry, an individual, Andrew Cohen, an individual, Noah Mallinger, an individual, Carlos Mustafich, an individual, Luis Dejesus, an individual, James D. Aherne, an individual, Jason Kirchner, an individual, Reginald Scott, an individual, Gerald P. Lyons, an individual, Wendy Hurley, an individual, Holly Stoumen, an individual, Christine Arndt, an individual, Shareef Nasir, an individual, Plaintiffs: Waukeen Quandrico McCoy, LEAD ATTORNEY, Dave Parry, Law Offices of Waukeen Q. McCoy, San Francisco, CA.

For City and County of San Francisco, Heather Fong, Defendants: Adelmise Roseme Warner, LEAD ATTORNEY, San Francisco Office of the City Attorney, San Francisco, CA; Lawrence Hecimovich, LEAD ATTORNEY, City Attorney's Office, San Francisco, CA.

**JUDGES:** SUSAN ILLSTON, United States District Judge.

**OPINION BY:** SUSAN ILLSTON

**OPINION**

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS, DENYING PLAINTIFFS' MOTION FOR LEAVE TO AMEND COMPLAINT, AND GRANTING DEFENDANTS' REQUEST FOR JUDICIAL NOTICE**

On September 21, 2007, the Court heard [*2] argument on defendants' motion for judgment on the pleadings and plaintiffs' motion for leave to amend their complaint. Having considered the arguments of counsel and the papers submitted, the Court hereby GRANTS in part and DENIES in part defendants' motion for judgment on the pleadings and DENIES plaintiffs' motion for leave to amend their complaint. The Court also GRANTS defendants' request for judicial notice and DENIES as moot plaintiffs' request for judicial notice.

**BACKGROUND**

Plaintiffs are eighteen police officers employed by the San Francisco Police Department. Each officer was involved in some way in the making of a video that was meant to parody the work of police officers assigned to

2007 U.S. Dist. LEXIS 74891, *

the Bayview-Hunter's Point District. First Amended Complaint P 26. In December 2005, shortly after it was made, the video came to the attention of San Francisco Police Chief Heather Fong and San Francisco Mayor Gavin Newsom, who believed the video contained racist, sexist, and homophobic scenes. *Id.* at PP 28, 29. Newsom and Fong appeared before the press to condemn the video, and Fong temporarily suspended some, but apparently not all, of the police officers involved in making the video. *Id.* at P 29.  [*3] The City and Fong also launched an investigation into the video sometime after it was discovered by Fong. *Id.* at P 32. That investigation concluded in December 2006, at which point certain plaintiffs were given additional suspensions as well as other forms of reprimand. *Id.* at PP 40-42.

Plaintiffs identify themselves as being white, African American, and Latino, but no plaintiff identifies as being Asian American. *Id.* at P 25. Plaintiffs allege that the City and Fong disciplined only those officers involved in the video who were not Asian American, and failed to discipline Asian-American police officers who were involved in making the video. *Id.* at PP 28, 30, 43-46, 48, 54. Plaintiffs allege that the temporary suspensions of the officers violated the San Francisco Charter and department regulations. *Id.* at P 29. Plaintiffs also allege that after plaintiffs filed notices of tort claims against the defendants, on May 31, 2006, the City and Fong retaliated against some of the plaintiffs by giving them undesirable positions and undesirable hours, and also by requiring some plaintiffs to appear before the police commissioner to answer charges against them. *Id.* at PP 62-64.

Plaintiffs originally    [*4] brought the instant suit in state court in August, 2006. They amended their complaint in February 2007, whereupon defendants removed the suit to federal court. Plaintiffs' First Amended Complaint includes claims for (1) racial discrimination under state law, (2) racial

discrimination under Title VII, (3) retaliation under state law, (4) retaliation under Title VII, (5) defamation, and (6) intentional infliction of emotional distress.

After removal to federal court, plaintiffs filed two motions for leave amend: on June 8, 2007, plaintiffs sought leave to add a state law claim of defamation against Mayor Gavin Newsom; six weeks later, on July 24, 2007, plaintiffs sought leave to add a claim for a violation of due process under *42 U.S.C. § 1983*.

In between the two motions to amend, defendants City and Fong filed a motion for judgment on the pleadings as to the First Amended Complaint. Defendants seek to dismiss the claims of retaliation (under state law), defamation, and intentional infliction of emotional distress against Fong on various grounds of immunity under California law. Defendants also seek to dismiss the Title VII claim of retaliation against Fong because Title VII does not contemplate    [*5] individual liability. Finally, defendants seek to dismiss the claims of defamation and intentional infliction of emotional distress against the City based on Fong's immunity from suit on the same claims.

Defendants' motion for judgment on the pleadings and both of plaintiffs' motions to amend are now before the Court.

**LEGAL STANDARD**

"After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." *Fed. R. Civ. P. 12(c)*. "Judgment on the pleadings is proper when the moving party clearly establishes on the face of the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law." *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc., 896 F.2d 1542, 1550 (9th Cir. 1989)* (citation omitted). "For purposes of the motion, the allegations of the non-moving party must be accepted as true, while the

2007 U.S. Dist. LEXIS 74891, *

allegations of the moving party which have been denied are assumed to be false." *Id.* (citation omitted).

Although *Rule 12(c)* neither specifically authorizes nor prohibits motions for judgment on the pleadings "directed to less than the entire complaint or answer . . . [i]t is the [*6] practice of many judges to permit 'partial' judgment on the pleadings (e.g., on the first claim for relief, or the third affirmative defense)." *See* William W. Schwarzer, A. Wallace Tashima & James M. Wagstaffe, *Federal Civil Procedure Before Trial* 9:340 ( 2004). "[C]ourts have discretion to grant a *Rule 12(c)* motion with leave to amend." *Id.* at 9:341.

## DISCUSSION

### 1. Motion for judgment on the pleadings

#### A. Individual employee liability under Title VII

Defendants argue that plaintiffs' fourth cause of action -- a federal law claim of retaliation under Title VII -- fails to state a claim against Fong because individuals are not liable for retaliation under Title VII. Plaintiffs do not argue otherwise. The Ninth Circuit has held that "individual defendants cannot be held liable for damages under Title VII." *Miller v. Maxwell's Intl Inc.*, 991 F.2d 583, 587 (9th Cir. 1993). The Court agrees with defendants that plaintiffs' cause of action for retaliation under Title VII fails to state a claim against Fong and any other individual employees of the City. Accordingly, the Court GRANTS defendants' motion for judgment on the pleadings with respect to the fourth cause of action against Fong; plaintiffs' [*7] fourth cause of action may be brought only against the City itself.

#### B. Immunity

Defendants assert that plaintiffs' third, fifth, and sixth causes of action must be dismissed against Fong because she is immune from liability under Government Codes §§ 820.2 and 821.6 and Civil Code § 47(a).

*California Government Code § 820.2* states, "a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused." *Cal. Gov't Code § 820.2*. The discretionary act immunity extends to basic governmental policy decisions entrusted to broad official judgment. *Caldwell v. Montoya*, 10 Cal. 4th 972, 976, 42 Cal. Rptr. 2d 842, 897 P.2d 1320 (Cal. 1995). Because "almost all acts involve some choice among alternatives, and the statutory immunity thus cannot depend upon a literal or semantic parsing of the word 'discretion,'" California courts distinguish between an employee's ministerial and policy decisions in determining whether the decision was discretionary. *Caldwell*, 10 Cal. 4th at 981. Ministerial decisions are those that involve the "'operational' functions of government," whereas policy decisions are [*8] those that involve the "'planning' . . . functions of government." *Id.* Immunity is reserved for basic policy decisions which have been expressly committed to coordinate branches of government, "'areas of quasi-legislative policy-making [which] are sufficiently sensitive' to call for judicial abstention." *Id.* (quoting *Johnson v. California*, 69 Cal. 2d 782, 794, 73 Cal. Rptr. 240, 447 P.2d 352 (1968)). In contrast, there is no immunity for ministerial decisions that "merely implement a basic policy already formulated." *Id.* Additionally, this immunity "cannot be abrogated by a statute which simply imposes a general legal duty or liability" on public employees, but only by a statute with a "clear indication of legislative intent that statutory *immunity* is *withheld or withdrawn* in the particular case." *Id. at 986* (italics in original).

Government Code § 821.6 states, "[a] public employee is not liable for injury caused by his instituting or prosecuting any judicial or

2007 U.S. Dist. LEXIS 74891, *

administrative proceeding within the scope of his employment, even if he acts maliciously and without probable cause." *Cal. Gov't Code § 821.6.* A supervisor's conducting of an investigation and initiating formal disciplinary proceedings against a public employee [*9] fall within the scope of an "administrative proceeding" and are immune from liability. *See Kemmerer v. County of Fresno, 200 Cal. App. 3d 1426, 1436-37, 246 Cal. Rptr. 609 (Cal. Ct. App. 1988).* This immunity also applies to a public employee's statements relating to an investigation or proceeding, as long as there is "a causal relationship between the publication and the prosecution process." *Ingram v. Flippo, 74 Cal. App. 4th 1280, 1292-93, 89 Cal. Rptr. 2d 60 (Cal. Ct. App. 1999)* (citing *Cappuccio, Inc. v. Harmon, 208 Cal. App. 3d 1496, 1499, 257 Cal. Rptr. 4 (Cal. Ct. App. 1989)).*

Civil Code § 47(a) states that "[a] privileged publication or broadcast is one made: (a) In the proper discharge of an official duty." *Cal. Civ. Code § 47(a).* This privilege applies to any communication made by a "qualifying executive officer," including a city or county officer, *Copp v. Paxton, 45 Cal. App. 4th 829, 843, 52 Cal. Rptr. 2d 831 (Cal. Ct. App. 1996)* (applying § 47(a) to the head of a county department); *Tutor-Saliba Corp. v. Herrera, 136 Cal. App. 4th 604, 614-15, 39 Cal. Rptr. 3d 21 (Cal. Ct. App. 2006)* (applying § 47(a) to San Francisco's city attorney), acting within the scope of his or her official duties and "'while exercising policy-making functions,'" *Copp, 45 Cal. App. 4th at 843* (quoting [*10] *Royer v. Steinberg, 90 Cal. App. 3d 490, 501, 153 Cal. Rptr. 499 (Cal. Ct. App. 1979)).* There is some question whether this policy-making requirement tracks the policy-making requirement of Government Code § 820.2, discussed above, or whether it applies more broadly to "encompass all discretionary acts essential to the proper exercise of an executive function." *Id. at 844.*

**(1) Third cause of action**

Plaintiffs' third cause of action claims that the City and Fong retaliated against plaintiffs in violation of *California Government Code § 12940* in two ways: by transferring plaintiffs Evanson, Parry, and Harmston to less desirable positions with less desirable hours, after they filed race discrimination claims against defendants; and by sending letters of reprimand to plaintiffs Cohen, Hurley, Lewis, Parry, and Harmston, requiring them to appear before the police commissioner to answer various charges.

Defendants argue that Fong is immune from liability under Government Code § 820.2 for any disciplinary actions because such actions are discretionary. However, based solely on the pleadings to date, which the Court must presently accept as true, the Court cannot make such a finding. The decision to move police [*11] officers to new positions with new hours, as well as the decision to order officers to answer various charges, are generally operational decisions that do not implicate the policymaking and planning functions of the police department. *Taylor v. City of L.A. Dep't of Water and Power, 144 Cal. App. 4th 1216, 1239, 51 Cal. Rptr. 3d 206 (Cal. Ct. App. 2006)* (characterizing similar decisions as "routine duties incident to the normal operations of the employee's office or position" (internal quotation marks omitted)). As the California Court of Appeal has explained, "decisions regarding job assignments, training and promotion may not be characterized as a quasi-legislative policy-making [decision which] is sufficiently sensitive to call for judicial abstention . . . ." *Id.* (internal quotation marks omitted) (alteration in original). *See also Corales v. Bennett, 488 F. Supp. 2d 975, 990 (C.D. Cal. 2007)* (denying immunity under Government Code § 820.2 to a principal engaged in school discipline).

Defendants rely on *Caldwell,* in which the California Supreme Court held that school board members were immune from liability stemming from their termination of a school superintendent for discriminatory and retaliatory [*12] reasons. *Caldwell, 10 Cal. 4th*

2007 U.S. Dist. LEXIS 74891, *

at 976-977, 989. There, however, the court relied on the importance of a school superintendent, "the [school] district's foremost appointed official" who occupies a "crucial post" which has "fundamental policy implications." Id. at 983. The court also relied in part on "a state statute that gave the school board authority over the superintendent's employment," indicating that the decision was "expressly entrusted to a coordinate branch of government at its highest level." Mc Quirk v. Donnelley, 189 F.3d 793, 800 (9th Cir. 1999) (citing Caldwell, 10 Cal. 4th at 982) (internal quotation marks omitted). Here, by contrast, the parties have not pointed to similar governing statutes, and the plaintiff police officers do not hold the same high-level positions of authority as the school superintendent in Caldwell. See also Chapin v. Aguirre, 2007 U.S. Dist. LEXIS 41459 *15, 2007 WL 1660740 *6 (S.D. Cal. June 7, 2007) (plaintiff trial attorneys did not play a role in formulating policy, and thus did not occupy the same "crucial post" as a school superintendent).

Defendants also rely on cases -- see Lipman v. Brisbane Elementary School District, 55 Cal. 2d 224, 11 Cal. Rptr. 97, 359 P.2d 465 (1961), and Hopper v. Allen, 266 Cal. App. 2d 797, 72 Cal. Rptr. 435 (Cal. Ct. App. 1968) [*13] -- that predate the seminal case of Johnson v. California, in which the California Supreme Court rejected a literal interpretation of the word "discretionary," see McQuirk, 189 F.3d at 798-99. As such, they are no longer reliable indicators of California law. See Sanborn v. Chronicle Publ'g Co., 18 Cal. 3d 406, 414-15, 134 Cal. Rptr. 402, 556 P.2d 764 (1976). Similarly, the case of Kemmerer, 200 Cal. App. 3d 1426, 246 Cal. Rptr. 609, employs an incorrect definition of "discretionary" actions and relies on cases predating Johnson, see Chapin, 2007 U.S. Dist. LEXIS 41459 at *20-21, 2007 WL 1660740 at *7 (dismissing Kemmerer on similar grounds). The case of Eldridge v. Sierra View Local Hospital District, 224 Cal. App. 3d 311, 273 Cal. Rptr. 654 (Cal. Ct. App. 1990), in turn relies on

Kemmerer and does not discuss the meaning of "discretionary" actions. Accordingly, Taylor and other cases applying the current definition of "discretionary" carry more weight.

The chief of police undoubtedly exercises a great deal of discretion as a result of her position. However, the Court must examine the nature of the particular action at issue, in the context of the decision-maker's position. Caldwell, 10 Cal. 4th at 981 ("The fact that an employee normally engages in discretionary activity is irrelevant if, in [*14] a given case, the employee did not render a considered decision." (internal quotation marks omitted)). Such a nuanced examination cannot be made on the bare pleadings now before the Court. As this case develops, it may become clear that Fong actually was involved in making policy when/if she decided to alter employment conditions and reprimand certain plaintiffs, due to the nature of plaintiffs' conduct and its impact on the police department and the community at large. It may therefore be necessary to revisit this question of § 820.2 immunity at the summary judgment stage.

In the alternative, defendants argue that Government Code § 821.6 immunizes Fong from plaintiffs' retaliation claim. Defendants refer to the suspension of plaintiffs in December 2005, which may have arisen out of the initial investigation, but these suspensions are not at issue in plaintiffs' third cause of action. The actions complained of here -- transferring plaintiffs Evanson, Parry, and Harmston to less desirable positions with less desirable hours -- allegedly occurred in June 2006, prior to the close of the investigation. The actions were not alleged in the complaint to be tied to or a product of the investigation [*15] itself, nor do defendants appear to make this claim in their motion papers. Section 821.6 applies only to injuries caused by the institution or prosecution of an investigation or proceeding. Kemmerer, 200 Cal. App. 3d at 1436-37. Accordingly, absent a further factual showing, the Court cannot extend immunity to

Fong for alleged retaliation relating to changes to the employment conditions of certain plaintiffs.

Plaintiffs' third cause of action also alleges retaliation based on letters of reprimand sent to plaintiffs Cohen, Hurly, Lewis, Parry, and Harmston after the investigation, letters which required them to "appear before the Police Commissioner to answer various charges as set forth above." First Amended Complaint P 64. In contrast to the change in employment conditions, this action by its very nature was related to the investigation and disciplinary proceedings against the plaintiffs. *See id.* at PP 32-38. Accordingly, the Court finds that Fong is immune under *§ 821.6* from plaintiffs' retaliation claim as it relates to the letters of reprimand discussed in plaintiffs' complaint. *Kemmerer, 200 Cal. App. 3d at 1436-37.* [1]

   1 Defendants' actions in sending letters of reprimand to certain [*16] plaintiffs may be immune under Civil Code *§ 47(a)* if these letters were sent by qualifying executive officers. *Copp, 45 Cal. App. 4th at 843.* It is unclear from the pleadings who sent these letters of reprimand to the five plaintiffs, so the Court will reserve judgment on this question.

Finally, the Court holds that defendants cannot rely on Civil Code *§ 47(a)* to provide immunity to Fong for the alleged retaliation stemming from the June 2006 change in employment conditions. *Section 47(a)* applies only to a publication or broadcast; what is at issue in the alleged change in positions and hours for the three plaintiffs is not the communication of this change but the change in employment conditions itself.

The Court GRANTS defendants' motion for judgment on the pleadings on the third cause of action against Fong, with respect to the letters of reprimand and orders to appear to answer charges. In all other respects, the motion is denied subject to further consideration based on

a fuller record.

**(2) Fifth cause of action**

Plaintiffs' fifth cause of action is that the City and Fong defamed the plaintiffs by, among other things, publicizing allegations that plaintiffs are bigots. Defendants contend [*17] that Government Code *§ 820.2* shields Fong from liability stemming from plaintiffs' claim of defamation. The Court agrees. Fong's decision to speak to the press about plaintiffs qualifies as a discretionary, policy-making decision because Fong, as Chief of the Police Department, faced a novel and potentially volatile situation that could have had an impact on departmental relations with the community as well as the department's public image. This qualifies as a "'sufficiently sensitive' situation in which judicial abstention is necessary under Government Code *§ 820.2*. *See Caldwell, 10 Cal. 4th at 981* (quoting *Johnson, 69 Cal. 2d at 794*). Although it is true, as plaintiffs argue, that the California Supreme Court has held that the decision by a lower-level employee to speak to the press is not a discretionary decision because an employee's "discussions with the public or press regarding the functioning of his office would seem, instead, to fall within the category of those routine, ministerial duties incident to the normal operations of that office," *Sanborn, 18 Cal. 3d at 415*, Fong was not a lower-level employee and the context in which Fong made her decision was by no means "routine" [*18] or "incident to the normal operations of her office, *id.* Rather, Fong's decision to speak to the press was a high-level decision that concerned the way the police department conducted its business. *Cf. McQuirk, 189 F.3d at 800* (statements about a plaintiff's "reputation and work habits constituted a low-level decision that did not concern the way in which the sheriff's office conducted its business"). The Court also agrees with defendants that Fong is immune from liability under Government Code *§ 821.6* because Fong made the allegedly defamatory statements while announcing

2007 U.S. Dist. LEXIS 74891, *

plaintiffs' temporary suspensions and in connection with launching an investigation into plaintiffs' conduct. Such statements relating to an investigation of misconduct are protected by § 821.6, regardless of Fong's motivations or the presence of probable cause. *Ingram, 74 Cal. App. 4th at 1292-93; Citizens Capital Corp. v. Spohn, 133 Cal. App. 3d 887, 889, 184 Cal. Rptr. 269 (Cal. Ct. App. 1982).*

Because Government Codes §§ 820.2 and 821.6 immunize Fong from plaintiffs' defamation claim, the Court need not reach defendants' assertion that Civil Code § 47(a) also provides immunity from this cause of action. The Court GRANTS defendants' [*19] motion to dismiss the fifth cause of action against Fong on the basis of immunity under Government Codes §§ 820.2 and 821.6.

### (3) Sixth Cause of Action

Plaintiffs' sixth cause of action alleges intentional infliction of emotional distress, evidently based on the alleged defamation, retaliation and discrimination. Defendants assert that Fong is immune from this claim under Government Codes §§ 820.2 and 821.6 and Civil Code § 47(a). Because the sixth cause of action is based on plaintiffs' claims of retaliation and defamation, Fong's immunity from liability for this claim necessarily tracks her immunity in the third and fifth causes of action. The Court finds that Fong is immune, under § 821.6, from liability for intentional infliction of emotional distress related to the letters of reprimand sent to five of the plaintiffs, but not immune, at this time, from liability for intentional infliction of emotional distress related to the change in employment conditions for plaintiffs Evanson, Parry, and Harmston. Fong is also immune, under §§ 820.2 and 821.6, from claims of intentional infliction of emotional distress based on the allegedly defamatory statements, as Fong's decision to speak to [*20] the press was discretionary and these statements were made at the start of an investigation into misconduct by the plaintiffs.

Defendants do not contend that Fong is immune from a claim of intentional infliction of emotional distress based on the allegations of racial discrimination.

The Court GRANTS defendants' motion to dismiss the sixth cause of action against Fong, with respect to the letters of reprimand and defamation. In all other respects, the motion is denied subject to further consideration based on a fuller record.

### C. Public entity liability regarding the Fifth and Sixth Causes of Action

In general, in California "[a] public entity is not liable for an injury." *Cal. Gov't Code § 815(a).* California law provides that there are two avenues by which a public entity, such as the City of San Francisco, may be liable for an injury. The first avenue is where a statute provides for liability by creating a mandatory duty. *Id. §§ 815 & 815.6; Forbes v. County of San Bernardino, 101 Cal. App. 4th 48, 53, 123 Cal. Rptr. 2d 721 (Cal. Ct. App. 2002).* "An enactment creates a mandatory duty if it requires a public agency to take a particular action." *County of L.A. v. Superior Court, 102 Cal. App. 4th 627, 639, 125 Cal. Rptr. 2d 637 (Cal. Ct. App. 2002).* [*21] A "litigant seeking to plead the breach of a mandatory duty must specifically allege the applicable statute or regulation." *Id. at 638* (internal quotation marks omitted).

The second avenue by which a public entity may be liable for an injury is where an employee of the entity would be liable for the injury: "[a] public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would . . . have given rise to a cause of action against that employee or his personal representative." *Cal. Gov't Code § 815.2(a).* This derivative liability does not apply, however, where "the employee is immune from liability." *Id. § 815.2(b).* That is, "public entities are immune

2007 U.S. Dist. LEXIS 74891, *

[from vicarious liability] where their employees are immune, except as otherwise provided by statute." *Caldwell, 10 Cal. 4th at 980.*

Defendants argue that plaintiffs' fifth and sixth causes of action fail to state a claim against the City because both of these avenues of liability against the City are closed. Plaintiffs do not seriously respond to this assertion. With respect to a mandatory duty imposed by statute, plaintiffs have [*22] failed to specifically allege any applicable statute that makes the City directly liable for the injuries of defamation or intentional infliction of emotional distress; as a result, the City cannot be held directly liable under plaintiffs' fifth or sixth causes of action. *County of L.A., 102 Cal. App. 4th at 638.* The City also cannot be held vicariously liable for defamation under the fifth cause of action because Fong is immune from liability for these statements under Government Codes §§ 820.2 and 821.6. As for plaintiffs' sixth cause of action, the City is not liable for intentional infliction of emotional distress stemming from the alleged defamation and from the letters of reprimand sent to five plaintiffs because Fong is immune from liability arising out of these actions under Government Codes §§ 820.2 and 821.6. The City remains potentially liable, through Fong, for intentional infliction of emotional distress stemming from alleged racial discrimination and retaliation in the form of changes to the positions and working hours of Evanson, Parry, and Harmston. *Cal. Gov't Code § 815.2(a).* Accordingly, the Court GRANTS defendants' motion to dismiss the fifth cause of action against [*23] the City and GRANTS defendants' motion to dismiss the sixth cause of action against the City only as it relates to the letters of reprimand and defamation.

## 2. Motion for leave to file another Amended Complaint

Plaintiffs move for leave to amend the first amended complaint to add a claim of defamation against San Francisco Mayor Gavin Newsom, and to add a seventh cause of action under *42 U.S.C. § 1983* against Fong and the City for alleged denial of plaintiffs' due process rights in connection with plaintiffs' suspensions. Defendants oppose both amendments to the complaint, both on timeliness and futility grounds.

*Federal Rule of Civil Procedure 15(a)* permits a party to amend its pleading "only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." *Fed. R. Civ. Pro. 15(a).* Leave to amend should be granted "with extreme liberality," *Eminence Capital, LLC v. Aspeon, Inc., 316 F.3d 1048, 1051 (9th Cir. 2003),* so long as factors "such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of [*24] the amendment, [or] futility of amendment" are not present, *id. at 1052* (quoting *Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962)).* In addition, "the district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint." *Allen v. City of Beverly Hills, 911 F.2d 367, 373 (9th Cir. 1990)* (internal quotation marks omitted).

Defendants assert that plaintiffs unduly delayed their attempt to amend their complaint to add a defamation claim against Mayor Newsom. The Court agrees. The events at issue in this amendment occurred in December 2005 and January 2006. Plaintiffs filed their complaint in August 2006. They then amended their complaint in February 2007 but did not seek to add the amendments at issue here. Plaintiffs did not seek leave to add Mayor Newsom as a defendant until June 2007. Plaintiffs have made no attempt to justify this delay. They do not, and cannot, claim that they were unaware of the facts at issue, and have given no explanation why they did not include

the claim against Mayor Newsom in their original complaint or why they failed to include this amendment when they last amended their complaint in February 2007. *See Allen, 911 F.2d at 373.*

Defendants [*25] also argue that the amendment would be futile, because Mayor Newsom is clothed with the same statutory immunities as is Chief Fong. The Court agrees that at least Government Code §§ 820.2 and 821.6 would apply to the defamation claim against Mayor Newsom, making this amendment futile. [2]

> 2    There are also indications that the additional defamation claim may be intended solely to embarrass Mayor Newsom, and thus plaintiffs' motion for leave to amend may not have been made entirely in good faith. *See Eminence Capital, 316 F.3d at 1052.* Given the disposition of this motion on timeliness and futility grounds, the Court need not make a finding on this question at this time.

The Court therefore DENIES plaintiffs' motion for leave to amend the First Amended Complaint to add a claim of defamation against Mayor Newsom.

Plaintiffs also seek leave to amend their complaint to add a seventh cause of action for a violation of their due process rights under *42 U.S.C. § 1983,* presumably in connection with their temporary suspensions in December 2005. Defendants argue persuasively that plaintiffs' motion for leave to amend is futile because plaintiffs may have received all the process they were due under [*26] California law, *see Civil Serv. Ass'n v. City and County of San Francisco, 22 Cal. 3d 552, 562-64, 150 Cal. Rptr. 129, 586 P.2d 162 (1978),* but the question of futility is less clear under federal law. Plaintiffs have not explained, however, what events form the factual basis of their § 1983 claim, including how the suspensions occurred, what notice plaintiffs received, and

what process was provided. Accordingly, the Court DENIES the current leave to amend without prejudice to a further request, based on a fuller statement of the facts related to the due process claim. **Any further motion must be filed no later than October 6 2007.**

### 3. Request for judicial notice

Defendants ask the Court to take judicial notice of portions of the San Francisco City Charter and of a recent decision by the California Court of Appeal in the case of *Cohen v. City and County of San Francisco.* The Court GRANTS defendants' request. Plaintiffs also ask the Court to take judicial notice of the same decision. The Court DENIES plaintiffs' request as moot.

### 4. Further case management conference

A further case management conference is scheduled for **Thursday, September 27, 2007 at 4:00 p.m.**

### CONCLUSION

For the foregoing reasons and for good cause shown, the [*27] Court hereby GRANTS defendants' motion for judgment on the pleadings with regard to the third cause of action against Fong as it relates to the letters of reprimand, and DENIES defendants' motion as it relates to changes to the employment conditions of certain plaintiffs (Docket # 15). The Court GRANTS defendants' motion for judgment on the pleadings with regard to the fourth cause of action against Fong (Docket # 15). The Court GRANTS defendants' motion for judgment on the pleadings with regard to the fifth cause of action against Fong and the City (Docket # 15). The Court GRANTS defendants' motion for judgment on the pleadings with regard to the sixth cause of action against Fong and the City, as it relates to the letters of reprimand and defamation, and DENIES defendants' motion as it relates to any other underlying claims (Docket # 15).

With respect to plaintiffs' motion for leave

2007 U.S. Dist. LEXIS 74891, *

to amend their complaint, the Court DENIES plaintiffs' motion to add a defamation claim against Mayor Newsom and DENIES without prejudice plaintiffs' motion to add a seventh cause of action against the City and Fong under *42 U.S.C. § 1983* (Docket # 27). The Court also GRANTS defendants' request for judicial [*28] notice (Docket # 15) and DENIES as moot plaintiffs' request for judicial notice (Docket # 39).

**IT IS SO ORDERED.**

Dated: September 25, 2007

SUSAN ILLSTON

United States District Judge

EXHIBIT 3

470 U.S. 532, *; 105 S. Ct. 1487, **;
84 L. Ed. 2d 494, ***; 1985 U.S. LEXIS 68

LEXSEE 470 U.S. 532

## CLEVELAND BOARD OF EDUCATION v. LOUDERMILL ET AL.

### No. 83-1362

### SUPREME COURT OF THE UNITED STATES

*470 U.S. 532; 105 S. Ct. 1487; 84 L. Ed. 2d 494; 1985 U.S. LEXIS 68; 53 U.S.L.W. 4306; 1 I.E.R. Cas. (BNA) 424; 118 L.R.R.M. 3041*

**December 3, 1984, Argued
March 19, 1985, Decided ·**

\* Together with No. 83-1363, Parma Board of Education v. Donnelly et al., and No. 83-6392, Loudermill v. Cleveland Board of Education et al., also on certiorari to the same court.

**PRIOR HISTORY:** CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT.

**DISPOSITION:** *721 F.2d 550*, affirmed and remanded.

**DECISION:**

Tenured public employees held entitled to pretermination hearing.

**SUMMARY:**

In the first of two consolidated cases, a security guard employed by a board of education was dismissed on grounds that he had failed to disclose a prior felony conviction on his job application. In the second case, a school bus mechanic was discharged because he failed an eye examination. Both employees were classified civil servants who could be terminated only for cause and both were entitled to posttermination administrative review of the decisions. However, neither employee was afforded a pretermination opportunity to respond to the charges. Subsequent complaints in the United States

District Court for the Northern District of Ohio were dismissed, the District Courts concluding that the statutory procedures for dismissal satisfied due process. The United States Court of Appeals for the Sixth Circuit reversed, finding that the discharged employees were entitled to a pretermination hearing and thus had been deprived of due process (*721 F2d 550*).

On certiorari, the United States Supreme Court affirmed and remanded. In an opinion by White, J., joined by Burger, Ch. J., and Blackmun, Powell, Stevens, and O'Connor, JJ., by Brennan, J., as to Parts I, II, III, and IV, and by Marshall, J., as to Part II, it was held: (1) that the employees had a property interest in continued employment which could not be defined by the procedures provided for its deprivation (Part II); (2) that the employees were entitled to a pretermination opportunity to respond but not to a full evidentiary hearing (Parts III & IV); and (3) that a 9-month delay in the security guard's posttermination hearing did not constitute a separate due process violation (Part V).

Marshall, J., concurred in Part II and in the judgment, stating that before a decision is made

470 U.S. 532, *; 105 S. Ct. 1487, **;
84 L. Ed. 2d 494, ***; 1985 U.S. LEXIS 68

to terminate an employee's wages, the employee should be entitled to confront and cross-examine adverse witnesses and to present witnesses on his own behalf whenever there are substantial disputes in testimonial evidence.

Brennan, J., concurred in part and dissented in part, expressing the view that the record was insufficiently developed to permit an informed judgment on the issue of administrative delay and that the security guard's case should be remanded for further evidentiary proceedings.

Rehnquist, J., dissented, expressing the view that the *Fourteenth Amendment* does not support the conclusion that the state's effort to confer a limited form of tenure upon the employees resulted in the creation of a "property right" in their employment.

## LAWYERS' EDITION HEADNOTES:

**[\*\*\*LEdHN1]**

CONSTITUTIONAL LAW §800.3

due process -- right to pretermination opportunity to respond --

Headnote:[1A][1B][1C][1D][1E][1F]

A public employee who can be discharged only for cause and who is entitled to a posttermination administrative hearing under state law must also be given a pretermination opportunity to respond to the charges as a matter of due process; the governmental interest in immediate termination does not outweigh the private interest in retaining employment and the risk of an erroneous termination. (Marshall, J., dissented in part from this holding; Rehnquist, J., dissented from this holding.)

**[\*\*\*LEdHN2]**

CIVIL SERVICE §2

CONSTITUTIONAL LAW §717

due process -- property interest in continued employment --

Headnote:[2A][2B]

A state statute providing that classified civil service employees are entitled to retain their positions during good behavior and efficient service and prohibiting dismissal except for misfeasance, malfeasance, or nonfeasance in office creates a property interest in continued employment which such employees may not be deprived of without due process. (Rehnquist, J., dissented from this holding.)

**[\*\*\*LEdHN3]**

CONSTITUTIONAL LAW §529

due process -- substantive and procedural rights --

Headnote:[3A][3B]

A substantive due process right in property cannot be defined by the procedures provided for its deprivation, since the categories of substance and procedure provided by the *due process clause of the Fourteenth Amendment* are distinct. (Rehnquist, J., dissented from this holding.)

**[\*\*\*LEdHN4]**

CONSTITUTIONAL LAW §800.3

due process -- administrative delay --

Headnote:[4]

A complaint by a discharged public employee alleging a violation of due process on grounds that his posttermination administrative proceedings took too long does not state a claim of a constitutional deprivation, where the employee offers no indication that his wait was unreasonably prolonged other than the fact that it took 9 months. (Brennan, J., dissented from this holding.)

**[\*\*\*LEdHN5]**

CONSTITUTIONAL LAW §528.5

deprivation of liberty -- accusation of dishonesty against public employee --

470 U.S. 532, *; 105 S. Ct. 1487, **;
84 L. Ed. 2d 494, ***; 1985 U.S. LEXIS 68

Headnote:[5A][5B]

A discharged public employee does not state a claim for an unconstitutional deprivation of liberty on grounds that an accusation of dishonesty hung over his head during posttermination administrative proceedings, where the employee fails to allege that the reasons for his dismissal were published.

**SYLLABUS**

In No. 83-1362, petitioner Board of Education hired respondent Loudermill as a security guard. On his job application Loudermill stated that he had never been convicted of a felony. Subsequently, upon discovering that he had in fact been convicted of grand larceny, the Board dismissed him for dishonesty in filling out the job application. He was not afforded an opportunity to respond to the dishonesty charge or to challenge the dismissal. Under Ohio law, Loudermill was a "classified civil servant," and by statute, as such an employee, could be terminated only for cause and was entitled to administrative review of the dismissal. He filed an appeal with the Civil Service Commission, which, after hearings before a referee and the Commission, upheld the dismissal some nine months after the appeal had been filed. Although the Commission's decision was subject to review in the state courts, Loudermill instead filed suit in Federal District Court, alleging that the Ohio statute providing for administrative review was unconstitutional on its face because it provided no opportunity for a discharged employee to respond to charges against him prior to removal, thus depriving him of liberty and property without due process. It was also alleged that the statute was unconstitutional as applied because discharged employees were not given sufficiently prompt postremoval hearings. The District Court dismissed the suit for failure to state a claim on which relief could be granted, holding that because the very statute that created the property right in continued employment also specified the

procedures for discharge, and because those procedures were followed, Loudermill was, by definition, afforded all the process due; that the post-termination hearings also adequately protected Loudermill's property interest; and that in light of the Commission's crowded docket the delay in processing his appeal was constitutionally acceptable. In No. 83-1363, petitioner Board of Education fired respondent Donnelly from his job as a bus mechanic because he had failed an eye examination. He appealed to the Civil Service Commission, which ordered him reinstated, but without backpay. He then filed a complaint in Federal District Court essentially identical to Loudermill's, and the court dismissed for failure to state a claim. On a consolidated appeal, the Court of Appeals reversed in part and remanded, holding that both respondents had been deprived of due process and that the compelling private interest in retaining employment, combined with the value of presenting evidence prior to dismissal, outweighed the added administrative burden of a pretermination hearing. But with regard to the alleged deprivation of liberty and Loudermill's 9-month wait for an administrative decision, the court affirmed the District Court, finding no constitutional violation.

*Held*: All the process that is due is provided by a pretermination opportunity to respond, coupled with post-termination administrative procedures as provided by the Ohio statute; since respondents alleged that they had no chance to respond, the District Court erred in dismissing their complaints for failure to state a claim. Pp. 538-548.

(a) The Ohio statute plainly supports the conclusion that respondents possess property rights in continued employment. The Due Process Clause provides that the substantive rights of life, liberty, and property cannot be deprived except pursuant to constitutionally adequate procedures. The categories of substance and procedure are distinct.

"Property" cannot be defined by the procedures provided for its deprivation. Pp. 538-541.

(b) The principle that under the Due Process Clause an individual must be given an opportunity for a hearing *before* he is deprived of any significant property interest, requires "some kind of hearing" prior to the discharge of an employee who has a constitutionally protected property interest in his employment. The need for some form of pretermination hearing is evident from a balancing of the competing interests at stake: the private interest in retaining employment, the governmental interests in expeditious removal of unsatisfactory employees and the avoidance of administrative burdens, and the risk of an erroneous termination. Pp. 542-545.

(c) The pretermination hearing need not definitively resolve the propriety of the discharge, but should be an initial check against mistaken decisions -- essentially a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action. The essential requirements of due process are notice and an opportunity to respond. Pp. 545-546.

(d) The delay in Loudermill's administrative proceedings did not constitute a separate constitutional violation. The Due Process Clause requires provision of a hearing "at a meaningful time," and here the delay stemmed in part from the thoroughness of the procedures. Pp. 546-547.

**COUNSEL:** James G. Wyman argued the cause for petitioners in Nos. 83-1362 and 83-1363 and respondents in No. 83-6392. With him on the brief for petitioner in No. 83-1362 was Thomas C. Simiele. John F. Lewis and John T. Meredith filed a brief for petitioner in No. 83-1363. John D. Maddox and Stuart A. Freidman filed a brief for respondents Cleveland Civil Service Commission et al. in No. 83-6392.

Robert M. Fertel, by appointment of the *Court, 468 U.S. 1203*, argued the cause and filed briefs for respondents in Nos. 83-1362 and 83-1363 and petitioner in No. 83-6392. •

+ Briefs of amici curiae urging reversal in Nos. 83-1362 and 83-1363 were filed for the State of Ohio et al. by Anthony J. Celebrezze, Jr., Attorney General of Ohio, Gene W. Holliker and Christine Manuelian, Assistant Attorneys General, Charles A. Graddick, Attorney General of Alabama, Robert K. Corbin, Attorney General of Arizona, Tany S. Hong, Attorney General of Hawaii, Lindley E. Pearson, Attorney General of Indiana, Robert T. Stephen, Attorney General of Kansas, Frank J. Kelley, Attorney General of Michigan, Hubert H. Humphrey III, Attorney General of Minnesota, William A. Allain, Attorney General of Mississippi, Michael T. Greely, Attorney General of Montana, Brian McKay, Attorney General of Nevada, Gregory H. Smith, Attorney General of New Hampshire, Irwin I. Kimmelman, Attorney General of New Jersey, Robert WeFald, Attorney General of North Dakota, Michael Turpen, Attorney General of Oklahoma, David Frohnmayer, Attorney General of Oregon, LeRoy S. Zimmerman, Attorney General of Pennsylvania, Mark V. Meierhenry, Attorney General of South Dakota, Bronson C. La Follette, Attorney General of Wisconsin, and Archie G. McClintock, Attorney General of Wyoming; and for the National School Boards Association by Gwendolyn H. Gregory and August W. Steinhilber.

Briefs of amici curiae urging affirmance in Nos. 83-1362 and 83-1363 were filed for the American Civil Liberties Union of Cleveland Foundation by Gordon J. Beggs, Edward R. Stege, Jr., and Charles S. Sims; for the American Federation of State, County,

and Municipal Employees, AFL-CIO, by Richard Kirschner; and for the National Educational Association by Robert H. Chanin and Michael H. Gottesman.

**JUDGES:** WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACKMUN, POWELL, STEVENS, and O'CONNOR, JJ., joined, in Parts I, II, III, and IV of which BRENNAN, J., joined, and in Part II of which MARSHALL, J., joined. MARSHALL, J., filed an opinion concurring in part and concurring in the judgment, post, p. 548. BRENNAN, J., filed an opinion concurring in part and dissenting in part, post, p. 551. REHNQUIST, J., filed a dissenting opinion, post, p. 559.

**OPINION BY:** WHITE

**OPINION**

[*535] [***499] [**1489] JUSTICE WHITE delivered the opinion of the Court.

[***LEdHR1A] [1A]In these cases we consider what pretermination process must be accorded a public employee who can be discharged only for cause.

I

In 1979 the Cleveland Board of Education, petitioner in No. 83-1362, hired respondent James Loudermill as a security guard. On his job application, Loudermill stated that he had never been convicted of a felony. Eleven months later, as part of a routine examination of his employment records, the Board discovered that in fact Loudermill had been convicted of grand larceny in 1968. By letter dated November 3, 1980, the Board's Business Manager informed Loudermill that he had been dismissed because of his dishonesty in filling out the employment application. Loudermill was not afforded an opportunity to respond to the charge of dishonesty or to [**1490]

challenge his dismissal. On November 13, the Board adopted a resolution officially approving the discharge.

Under Ohio law, Loudermill was a "classified civil servant." *Ohio Rev. Code Ann. § 124.11* (1984). Such employees can be terminated only for cause, and may obtain administrative review if discharged. *§ 124.34.* Pursuant to this provision, Loudermill filed an appeal with the Cleveland Civil Service Commission on November 12. The Commission appointed a referee, who held a hearing on January 29, 1981. Loudermill argued that he had thought that his 1968 larceny conviction was for a misdemeanor rather than a felony. The referee recommended reinstatement. On July 20, 1981, the [*536] full Commission heard argument and orally announced that it would uphold the dismissal. Proposed findings of fact and conclusions of law followed on August 10, and Loudermill's attorneys were advised of the result by mail on August 21.

[***500] Although the Commission's decision was subject to judicial review in the state courts, Loudermill instead brought the present suit in the Federal District Court for the Northern District of Ohio. The complaint alleged that *§ 124.34* was unconstitutional on its face because it did not provide the employee an opportunity to respond to the charges against him prior to removal. As a result, discharged employees were deprived of liberty and property without due process. The complaint also alleged that the provision was unconstitutional as applied because discharged employees were not given sufficiently prompt postremoval hearings.

Before a responsive pleading was filed, the District Court dismissed for failure to state a claim on which relief could be granted. See *Fed. Rule Civ. Proc. 12(b)(6).* It held that because the very statute that created the property right in continued employment also specified the procedures for discharge, and because those procedures were followed,

470 U.S. 532, *; 105 S. Ct. 1487, **;
84 L. Ed. 2d 494, ***; 1985 U.S. LEXIS 68

Loudermill was, by definition, afforded all the process due. The post-termination hearing also adequately protected Loudermill's liberty interests. Finally, the District Court concluded that, in light of the Commission's crowded docket, the delay in processing Loudermill's administrative appeal was constitutionally acceptable. App. to Pet. for Cert. in No. 83-1362, pp. A36-A42.

The other case before us arises on similar facts and followed a similar course. Respondent Richard Donnelly was a bus mechanic for the Parma Board of Education. In August 1977, Donnelly was fired because he had failed an eye examination. He was offered a chance to retake the examination but did not do so. Like Loudermill, Donnelly appealed to the Civil Service Commission. After a year of wrangling about the timeliness of his appeal, the Commission heard **[\*537]** the case. It ordered Donnelly reinstated, though without backpay. [1] In a complaint essentially identical to Loudermill's, Donnelly challenged the constitutionality of the dismissal procedures. The District Court dismissed for failure to state a claim, relying on its opinion in *Loudermill.*

1      The statute authorizes the Commission to "affirm, disaffirm, or modify the judgment of the appointing authority." *Ohio Rev. Code Ann. § 124.34* (1984). Petitioner Parma Board of Education interprets this as authority to reinstate with or without backpay and views the Commission's decision as a compromise. Brief for Petitioner in No. 83-1363, p. 6, n. 3; Tr. of Oral. Arg. 14. The Court of Appeals, however, stated that the Commission lacked the power to award backpay. *721 F.2d 550, 554, n. 3 (1983).* As the decision of the Commission is not in the record, we are unable to determine the reasoning behind it.

The District Court denied a joint motion to alter or amend its judgment, [2] and the **[\*\*1491]**

cases were consolidated for appeal. A divided panel of the Court of Appeals for the Sixth Circuit reversed in part and remanded. *721 F.2d 550 (1983).* After rejecting arguments that the actions were barred by failure to exhaust administrative remedies and by res **[\*\*\*501]** judicata -- arguments that are not renewed here -- the Court of Appeals found that both respondents had been deprived of due process. It disagreed with the District Court's original rationale. Instead, it concluded that the compelling private interest in retaining employment, combined with the value of presenting evidence prior to dismissal, outweighed the added administrative burden of a pretermination hearing. *Id., at 561-562.* With regard to the alleged deprivation of liberty, and Loudermill's 9-month wait for an administrative decision, the court affirmed the District Court, finding no constitutional violation. *Id., at 563-564.*

2      In denying the motion, the District Court no longer relied on the principle that the state legislature could define the necessary procedures in the course of creating the property right. Instead, it reached the same result under a balancing test based on JUSTICE POWELL's concurring opinion in *Arnett v. Kennedy, 416 U.S. 134, 168-169 (1974),* and the Court's opinion in *Mathews v. Eldridge, 424 U.S. 319 (1976).* App. to Pet. for Cert. in No. 83-1362, pp. A54-A57.

**[\*538]** The dissenting judge argued that respondents' property interests were conditioned by the procedural limitations accompanying the grant thereof. He considered constitutional requirements satisfied because there was a reliable pretermination finding of "cause," coupled with a due process hearing at a meaningful time and in a meaningful manner. *Id., at 566.*

Both employers petitioned for certiorari. Nos. 83-1362 and 83-1363. In a cross-petition,

Loudermill sought review of the rulings adverse to him. No. 83-6392. We granted all three petitions, *467 U.S. 1204 (1984)*, and now affirm in all respects.

## II

[***LEdHR2A]   [2A]Respondents' federal constitutional claim depends on their having had a property right in continued employment. ³ *Board of Regents v. Roth, 408 U.S. 564, 576-578 (1972); Reagan v. United States, 182 U.S. 419, 425 (1901).* If they did, the State could not deprive them of this property without due process. See *Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 11-12 (1978); Goss v. Lopez, 419 U.S. 565, 573-574 (1975).*

> 3   Of course, the Due Process Clause also protects interests of life and liberty. The Court of Appeals' finding of a constitutional violation was based solely on the deprivation of a property interest. We address below Loudermill's contention that he has been unconstitutionally deprived of liberty. See n. 13, *infra.*

[***LEdHR2B]   [2B]Property interests are not created by the Constitution, "they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law . . . . " *Board of Regents v. Roth, supra, at 577.* See also *Paul v. Davis, 424 U.S. 693, 709 (1976).* The Ohio statute plainly creates such an interest. Respondents were "classified civil service employees," *Ohio Rev. Code Ann. § 124.11* (1984), entitled to retain their positions "during good behavior and efficient service," who could not be dismissed "except . . . for . . . misfeasance,   [*539]   malfeasance, or nonfeasance in office," *§ 124.34.* ⁴ The statute plainly supports the conclusion, reached by both lower courts, that respondents possessed property rights in continued employment.

Indeed,   [***502]   this question does not seem to have been disputed below. ⁵

> 4   The relevant portion of *§ 124.34* provides that no classified civil servant may be removed except "for incompetency, inefficiency, dishonesty, drunkenness, immoral conduct, insubordination, discourteous treatment of the public, neglect of duty, violation of such sections or the rules of the director of administrative services or the commission, or any other failure of good behavior, or any other acts of misfeasance, malfeasance, or nonfeasance in office."

> 5   The Cleveland Board of Education now asserts that Loudermill had no property right under state law because he obtained his employment by lying on the application. It argues that had Loudermill answered truthfully he would not have been hired. He therefore lacked a "legitimate claim of entitlement" to the position. Brief for Petitioner in No. 83-1362, pp. 14-15.

For several reasons, we must reject this submission. First, it was not raised below. Second, it makes factual assumptions -- that Loudermill lied, and that he would not have been hired had he not done so -- that are inconsistent with the allegations of the complaint and inappropriate at this stage of the litigation, which has not proceeded past the initial pleadings stage. Finally, the argument relies on a retrospective fiction inconsistent with the undisputed fact that Loudermill was hired and did hold the security guard job. The Board cannot escape its constitutional obligations by rephrasing the basis for termination as a reason why Loudermill should not have been hired in the first place.

[**1492]   [***LEdHR3A]   [3A]The

Parma Board argues, however, that the property right is defined by, and conditioned on, the legislature's choice of procedures for its deprivation. Brief for Petitioner in No. 83-1363, pp. 26-27. The Board stresses that in addition to specifying the grounds for termination, the statute sets out procedures by which termination may take place. [6] The [*540] procedures were adhered to in these cases. According to petitioner, "[to] require additional procedures would in effect expand the scope of the property interest itself." *Id., at* 27. See also Brief for State of Ohio et al. as *Amici Curiae* 5-10.

6 After providing for dismissal only for cause, see n. 4, *supra*, § 124.34 states that the dismissed employee is to be provided with a copy of the order of removal giving the reasons therefor. Within 10 days of the filing of the order with the Director of Administrative Services, the employee may file a written appeal with the State Personnel Board of Review or the Commission. "In the event such an appeal is filed, the board or commission shall forthwith notify the appointing authority and shall hear, or appoint a trial board to hear, such appeal within thirty days from and after its filing with the board or commission, and it may affirm, disaffirm, or modify the judgment of the appointing authority." Either side may obtain review of the Commission's decision in the State Court of Common Pleas.

This argument, which was accepted by the District Court, has its genesis in the plurality opinion in *Arnett v. Kennedy, 416 U.S. 134 (1974).* *Arnett* involved a challenge by a former federal employee to the procedures by which he was dismissed. The plurality reasoned that where the legislation conferring the substantive right also sets out the procedural mechanism for enforcing that right, the two cannot be separated:

"The employee's statutorily defined right is

not a guarantee against removal without cause in the abstract, but such a guarantee as enforced by the procedures which Congress has designated for the determination of cause.

. . . . .

"[Where] the grant of a substantive right is inextricably intertwined with the limitations on the procedures which are to be employed in determining that right, a litigant in the position of appellee must take the bitter with the sweet." *Id., at* 152-154.

This view garnered three votes in *Arnett,* but was specifically rejected by the other six Justices. See *id., at 166-167* (POWELL, J., joined by BLACKMUN, J.,); [***503] *id., at 177-178, 185* (WHITE, J.,); *id., at 211* (MARSHALL, J., joined by Douglas and BRENNAN, JJ.). Since then, this theory has at times seemed to gather some additional support. See *Bishop v. Wood, 426 U.S. 341, 355-361 (1976)* (WHITE, J., dissenting); *Goss v. Lopez, 419 U.S., at 586-587* (POWELL, J., joined [*541] by BURGER, C. J., and BLACKMUN and REHNQUIST, JJ., dissenting). More recently, however, the Court has clearly rejected it. In *Vitek v. Jones, 445 U.S. 480, 491 (1980),* we pointed out that "minimum [procedural] requirements [are] a matter of federal law, they are not diminished by the fact that the State may have specified its own procedures that it may deem adequate for determining the preconditions to adverse official action." This conclusion was reiterated in *Logan v. Zimmerman Brush Co., 455 U.S. 422, 432 (1982),* where we reversed the lower court's holding that because the entitlement arose from a state statute, the legislature had [**1493] the prerogative to define the procedures to be followed to protect that entitlement.

[***LEdHR3B] [3B]In light of these holdings, it is settled that the "bitter with the sweet" approach misconceives the constitutional guarantee. If a clearer holding is needed, we provide it today. The point is

470 U.S. 532, *; 105 S. Ct. 1487, **;
84 L. Ed. 2d 494, ***; 1985 U.S. LEXIS 68

straightforward: the Due Process Clause provides that certain substantive rights -- life, liberty, and property -- cannot be deprived except pursuant to constitutionally adequate procedures. The categories of substance and procedure are distinct. Were the rule otherwise, the Clause would be reduced to a mere tautology. "Property" cannot be defined by the procedures provided for its deprivation any more than can life or liberty. The right to due process "is conferred, not by legislative grace, but by constitutional guarantee. While the legislature may elect not to confer a property interest in [public] employment, it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards." *Arnett v. Kennedy, supra, at 167* (POWELL, J., concurring in part and concurring in result in part); see *id., at 185* (WHITE, J., concurring in part and dissenting in part).

In short, once it is determined that the Due Process Clause applies, "the question remains what process is due." *Morrissey v. Brewer, 408 U.S. 471, 481 (1972).* The answer to that question is not to be found in the Ohio statute.

[*542]  III

An essential principle of due process is that a deprivation of life, liberty, or property "be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313 (1950).* We have described "the root requirement" of the Due Process Clause as being "that an individual be given an opportunity for a hearing *before* he is deprived of any significant [***504] property interest." ' *Boddie v. Connecticut, 401 U.S. 371, 379 (1971)* (emphasis in original); see *Bell v. Burson, 402 U.S. 535, 542 (1971).* This principle requires "some kind of a hearing" prior to the discharge of an employee who has a constitutionally protected property interest in his employment. *Board of Regents v. Roth, 408 U.S., at 569-570; Perry v. Sindermann, 408 U.S. 593, 599 (1972).* As we pointed out last

Term, this rule has been settled for some time now. *Davis v. Scherer, 468 U.S. 183, 192, n. 10 (1984); id., at 200-203* (BRENNAN, J., concurring in part and dissenting in part). Even decisions finding no constitutional violation in termination procedures have relied on the existence of some pretermination opportunity to respond. For example, in *Arnett* six Justices found constitutional minima satisfied where the employee had access to the material upon which the charge was based and could respond orally and in writing and present rebuttal affidavits. See also *Barry v. Barchi, 443 U.S. 55, 65 (1979)* (no due process violation where horse trainer whose license was suspended "was given more than one opportunity to present his side of the story").

> 7. There are, of course, some situations in which a postdeprivation hearing will satisfy due process requirements. See *Ewing v. Mytinger & Casselberry, Inc., 339 U.S. 594 (1950); North American Cold Storage Co.* v. *Chicago, 211 U.S. 306 (1908).*

[***LEdHR1B]  [1B]The need for some form of pretermination hearing, recognized in these cases, is evident from a balancing of the competing interests at stake. These are the private interest in [*543] retaining employment, the governmental interest in the expeditious removal of unsatisfactory employees and the avoidance of administrative burdens, and the risk of an erroneous termination. [**1494]  See *Mathews v. Eldridge, 424 U.S. 319, 335 (1976).*

First, the significance of the private interest in retaining employment cannot be gainsaid. We have frequently recognized the severity of depriving a person of the means of livelihood. See *Fusari v. Steinberg, 419 U.S. 379, 389 (1975); Bell v. Burson, supra, at 539; Goldberg v. Kelly, 397 U.S. 254, 264 (1970); Sniadach v. Family Finance Corp., 395 U.S. 337, 340*

(1969). While a fired worker may find employment elsewhere, doing so will take some time and is likely to be burdened by the questionable circumstances under which he left his previous job. See *Lefkowitz v. Turley, 414 U.S. 70, 83-84 (1973).*

Second, some opportunity for the employee to present his side of the case is recurringly of obvious value in reaching an accurate decision. Dismissals for cause will often involve factual disputes. Cf. *Califano v. Yamasaki, 442 U.S. 682, 686 (1979).* Even where the facts are clear, the appropriateness or necessity of the discharge may not be; in such cases, the only meaningful opportunity to invoke the discretion of the decision maker [***505] is likely to be before the termination takes effect. See *Goss v. Lopez, 419 U.S., at 583-584; Gagnon v. Scarpelli, 411 U.S. 778, 784-786 (1973).* [8]

8   This is not to say that where state conduct is entirely discretionary the Due Process Clause is brought into play. See *Meachum v. Fano, 427 U.S. 215, 228 (1976).* Nor is it to say that a person can insist on a hearing in order to argue that the decisionmaker should be lenient and depart from legal requirements. See *Dixon v. Love, 431 U.S. 105, 114 (1977).* The point is that where there is an entitlement, a prior hearing facilitates the consideration of whether a permissible course of action is also an appropriate one. This is one way in which providing "effective notice and informal hearing permitting the [employee] to give his version of the events will provide a meaningful hedge against erroneous action. At least the [employer] will be alerted to the existence of disputes about facts and arguments about cause and effect. . . . [His] discretion will be more informed and we think the risk of error substantially reduced." *Goss v. Lopez, 419 U.S., at 583-584.*

[*544]   [***LEdHR1C]   [1C]The cases before us illustrate these considerations. Both respondents had plausible arguments to make that might have prevented their discharge. The fact that the Commission saw fit to reinstate Donnelly suggests that an error might have been avoided had he been provided an opportunity to make his case to the Board. As for Loudermill, given the Commission's ruling we cannot say that the discharge was mistaken. Nonetheless, in light of the referee's recommendation, neither can we say that a fully informed decision-maker might not have exercised its discretion and decided not to dismiss him, notwithstanding its authority to do so. In any event, the termination involved arguable issues, [9] and the right to a hearing does not depend on a demonstration of certain success. *Carey v. Piphus, 435 U.S. 247, 266 (1978).*

9.   Loudermill's dismissal turned not on the objective fact that he was an ex-felon or the inaccuracy of his statement to the contrary, but on the subjective question whether he had lied on his application form. His explanation for the false statement is plausible in light of the fact that he received only a suspended 6-month sentence and a fine on the grand larceny conviction. Tr. of Oral Arg. 35.

The governmental interest in immediate termination does not outweigh these interests. As we shall explain, affording the employee an opportunity to respond prior to termination would impose neither a significant administrative burden nor intolerable delays. Furthermore, the employer shares the employee's interest in avoiding disruption and erroneous decisions; and until the matter is settled, the employer would continue to receive the benefit of the employee's labors. It is preferable to keep [**1495] a qualified employee on than to train a new one. A governmental employer also has an interest in keeping citizens usefully employed rather than

470 U.S. 532, *; 105 S. Ct. 1487, **;
84 L. Ed. 2d 494, ***; 1985 U.S. LEXIS 68

taking the possibly erroneous and counterproductive step of forcing its employees onto the welfare rolls. Finally, in those situations where the employer perceives a significant hazard in [*545] keeping the employee on the job, " it [***506] can avoid the problem by suspending with pay.

10    In the cases before us, no such danger seems to have existed. The examination Donnelly failed was related to driving school buses, not repairing them. *Id., at 39-40.* As the Court of Appeals stated, "[no] emergency was even conceivable with respect to Donnelly." *721 F.2d, at 562.* As for Loudermill, petitioner states that "to find that we have a person who is an ex-felon as our security guard is very distressful to us." Tr. of Oral Arg. 19. But the termination was based on the presumed misrepresentation on the employment form, not on the felony conviction. In fact, Ohio law provides that an employee "shall not be disciplined for acts," including criminal convictions, occurring more than two years previously. See Ohio Admin. Code § 124-3-04 (1979). Petitioner concedes that Loudermill's job performance was fully satisfactory.

IV

[***LEdHR1D]    [1D]The foregoing considerations indicate that the pretermination "hearing," though necessary, need not be elaborate. We have pointed out that "[the] formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings." *Boddie v. Connecticut, 401 U.S., at 378.*See *Cafeteria Workers v. McElroy, 367 U.S. 886, 894-N95 (1961).* In general, "something less" than a full evidentiary hearing is sufficient prior to adverse administrative action. *Mathews v. Eldridge, 424 U.S., at 343.* Under state law, respondents were later entitled to a full

administrative hearing and judicial review. The only question is what steps were required before the termination took effect.

In only one case, *Goldberg v. Kelly, 397 U.S. 254 (1970),* has the Court required a full adversarial evidentiary hearing prior to adverse governmental action. However, as the *Goldberg* Court itself pointed out, see *id., at 264,* that case presented significantly different considerations than are present in the context of public employment. Here, the pretermination hearing need not definitively resolve the propriety of the discharge. It should be an initial check against mistaken decisions -- essentially, a determination of whether [*546] there are reasonable grounds to believe that the charges against the employee are true and support the proposed action. See *Bell v. Burson, 402 U.S., at 540.*

[***LEdHR1E]    [1E]The essential requirements of due process, and all that respondents seek or the Court of Appeals required, are notice and an opportunity to respond. The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement. See Friendly, "Some Kind of Hearing," 123 U. Pa. L. Rev. 1267, 1281 (1975). The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story. See *Arnett v. Kennedy, 416 U.S., at 170-171* (opinion of POWELL, J.); *id., at 195-196* (opinion of WHITE, J.); see also *Goss v. Lopez, 419 U.S., at 581.* To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee.

V

[***LEdHR4] [4] [***LEdHR5A] [5A]Our holding rests in part on the provisions in Ohio law for a full post-termination hearing. In his

470 U.S. 532, *; 105 S. Ct. 1487, **;
84 L. Ed. 2d 494, ***; 1985 U.S. LEXIS 68

cross-petition Loudermill asserts, as [***507] a separate constitutional violation, that his administrative proceedings took too long. 11 The Court of [*547] [**1496] Appeals held otherwise, and we agree. 12 The Due Process Clause requires provision of a hearing "at a meaningful time." E. g., Armstrong v. Manzo, 380 U.S. 545, 552 (1965). At some point, a delay in the post-termination hearing would become a constitutional violation. See Barry v. Barchi, 443 U.S., at 66. In the present case, however, the complaint merely recites the course of proceedings and concludes that the denial of a "speedy resolution" violated due process. App. 10. This reveals nothing about the delay except that it stemmed in part from the thoroughness of the procedures. A 9-month adjudication is not, of course, unconstitutionally lengthy per se. Yet Loudermill offers no indication that his wait was unreasonably prolonged other than the fact that it took nine months. The chronology of the proceedings set out in the complaint, coupled with the assertion that nine months is too long to wait, does not state a claim of a constitutional deprivation. 11

11 Loudermill's hearing before the referee occurred two and one-half months after he filed his appeal. The Commission issued its written decision six and one-half months after that. Administrative proceedings in Donnelly's case, once it was determined that they could proceed at all, were swifter. A writ of mandamus requiring the Commission to hold a hearing was issued on May 9, 1978; the hearing took place on May 30; the order of reinstatement was issued on July 6.

Section 124.34 provides that a hearing is to be held within 30 days of the appeal, though the Ohio courts have ruled that the time limit is not mandatory. E. g., In re Bronkar, 53 Ohio Misc. 13, 17, 372 N. E. 2d 1345, 1347 (Com. Pl. 1977). The statute does not provide a time limit for the actual decision.

12 It might be argued that once we find a due process violation in the denial of a pretermination hearing we need not and should not consider whether the post-termination procedures were adequate. See Barry v. Barchi, 443 U.S. 55, 72-74 (1979) (BRENNAN, J., concurring in part). We conclude that it is appropriate to consider this issue, however, for three reasons. First, the allegation of a distinct due process violation in the administrative delay is not an alternative theory supporting the same relief, but a separate claim altogether. Second, it was decided by the court below and is raised in the cross-petition. Finally, the existence of post-termination procedures is relevant to the necessary scope of pretermination procedures.

[***LEdHR5B] [5B]

13 The cross-petition also argues that Loudermill was unconstitutionally deprived of liberty because of the accusation of dishonesty that hung over his head during the administrative proceedings. As the Court of Appeals found, 721 F.2d, at 563, n. 18, the failure to allege that the reasons for the dismissal were published dooms this claim. See Bishop v. Wood, 426 U.S. 341, 348 (1976).

VI

[***LEdHR1F] [1F]We conclude that all the process that is due is provided by a pretermination opportunity to respond, coupled with post-termination [*548] administrative procedures as provided by the Ohio statute. Because respondents allege in their complaints that they had no chance to respond, the District Court erred in dismissing for failure to state a claim. The judgment of the Court of Appeals is affirmed, and the case is remanded for further

470 U.S. 532, *; 105 S. Ct. 1487, **;
84 L. Ed. 2d 494, ***; 1985 U.S. LEXIS 68

proceedings consistent with this opinion.

[***508] So ordered.

**CONCUR BY:** MARSHALL (In Part);
BRENNAN (In Part)

**CONCUR**

JUSTICE MARSHALL, concurring in part and concurring in the judgment.

I agree wholeheartedly with the Court's express rejection of the theory of due process, urged upon us by the petitioner Boards of Education, that a public employee who may be discharged only for cause may be discharged by whatever procedures the legislature chooses. I therefore join Part II of the opinion for the Court. I also agree that, before discharge, the respondent employees were entitled to the opportunity to respond to the charges against them (which is all they requested), and that the failure to accord them that opportunity was a violation of their constitutional rights. Because the Court holds that the respondents were due all the process they requested, I concur in the judgment of the Court.

I write separately, however, to reaffirm my belief that public employees who may be discharged only for cause are entitled, under the *Due Process Clause of the Fourteenth Amendment*, to more than respondents [**1497] sought in this case. I continue to believe that *before the decision is made to terminate an employee's wages*, the employee is entitled to an opportunity to test the strength of the evidence "by confronting and cross-examining adverse witnesses and by presenting witnesses on his own behalf, whenever there are substantial disputes in testimonial evidence," *Arnett v. Kennedy, 416 U.S. 134, 214 (1974)* (MARSHALL, J., dissenting). Because the Court suggests that even in this situation due process requires no more than notice and an opportunity to be heard before wages are cut off, I am not able to join the Court's opinion in its entirety.

[*549] To my mind, the disruption caused by a loss of wages may be so devastating to an employee that, whenever there are substantial disputes about the evidence, additional predeprivation procedures are necessary to minimize the risk of an erroneous termination. That is, I place significantly greater weight than does the Court on the public employee's substantial interest in the accuracy of the pretermination proceeding. After wage termination, the employee often must wait months before his case is finally resolved, during which time he is without wages from his public employment. By limiting the procedures due prior to termination of wages, the Court accepts an impermissibly high risk that a wrongfully discharged employee will be subjected to this often lengthy wait for vindication, and to the attendant and often traumatic disruptions to his personal and economic life.

Considerable amounts of time may pass between the termination of wages and the decision in a post-termination evidentiary hearing -- indeed, in this case nine months passed before Loudermill received a decision from his postdeprivation hearing. During this period the employee is left in limbo, deprived of his livelihood and of wages on which he may well depend for basic sustenance. In that time, his ability to secure another job might be hindered, either because of the nature of the charges against him, or because of the prospect that he will return to his prior public employment if permitted. Similarly, his access to unemployment benefits might [***509] seriously be constrained, because many States deny unemployment compensation to workers discharged for cause. Absent an interim source of wages, the employee might be unable to meet his basic, fixed costs, such as food, rent or mortgage payments. He would be forced to spend his savings, if he had any, and to convert his possessions to [*550] cash before becoming eligible for public assistance. Even in that instance

470 U.S. 532, *; 105 S. Ct. 1487, **;
84 L. Ed. 2d 494, ***; 1985 U.S. LEXIS 68

"[the] substitution of a meager welfare grant for a regular paycheck may bring with it painful and irremediable personal as well as financial dislocations. A child's education may be interrupted, a family's home lost, a person's relationship with his friends and even his family may be irrevocably affected. The costs of being forced, even temporarily, onto the welfare rolls because of a wrongful discharge from tenured Government employment cannot be so easily discounted," *id., at 221.*

    \* See U.S. Dept. of Labor, Comparison of State Unemployment Insurance Laws §§ 425, 435 (1984); see also *id., at 4-33 to 4-36* (table of state rules governing disqualification from benefits for discharge for misconduct).

Moreover, it is in no respect certain that a prompt postdeprivation hearing will make the employee economically whole again, and the wrongfully discharged employee will almost inevitably suffer irreparable injury. Even if reinstatement is forthcoming, the same might not be true of backpay -- as it was not to respondent Donnelly in this case -- and the delay in receipt of wages would thereby be transformed into a permanent deprivation. Of perhaps equal concern, the personal trauma experienced during the long months in which the employee awaits decision, during which he suffers doubt, humiliation, and the loss of an opportunity to perform work, will never be recompensed, and indeed probably could not be with dollars alone.

    [\*\*1498] That these disruptions might fall upon a justifiably discharged employee is unfortunate; that they might fall upon a wrongfully discharged employee is simply unacceptable. Yet in requiring only that the employee have an opportunity to respond before his wages are cut off, without affording him any meaningful chance to present a defense, the Court is willing to accept an impermissibly high risk of error with respect to a deprivation that is substantial.

    Were there any guarantee that the postdeprivation hearing and ruling would occur promptly, such as within a few days of the termination of wages, then this minimal predeprivation [\*551] process might suffice. But there is no such guarantee. On a practical level, if the employer had to pay the employee until the end of the proceeding, the employer obviously would have an incentive to resolve the issue expeditiously. The employer loses this incentive if the only suffering as a result of the delay is borne by the wage earner, who eagerly awaits the decision on his livelihood. Nor has this Court grounded any guarantee of this kind in the Constitution. Indeed, this Court has in the past approved, at least implicitly, an average 10- or 11-month delay in the receipt of a decision on Social Security benefits, *Mathews v. Eldridge, 424 U.S. 319, 341-342* [\*\*\*510] *(1976)*, and, in the case of respondent Loudermill, the Court gives a stamp of approval to a process that took nine months. The hardship inevitably increases as the days go by, but nevertheless the Court countenances such delay. The adequacy of the predeprivation and postdeprivation procedures are inevitably intertwined, and only a constitutional guarantee that the latter will be immediate and complete might alleviate my concern about the possibility of a wrongful termination of wages.

    The opinion for the Court does not confront this reality. I cannot and will not close my eyes today -- as I could not 10 years ago -- to the economic situation of great numbers of public employees, and to the potentially traumatic effect of a wrongful discharge on a working person. Given that so very much is at stake, I am unable to accept the Court's narrow view of the process due to a public employee before his wages are terminated, and before he begins the long wait for a public agency to issue a final decision in his case.

470 U.S. 532, *; 105 S. Ct. 1487, **;
84 L. Ed. 2d 494, ***; 1985 U.S. LEXIS 68

**DISSENT BY:** BRENNAN (In Part);
REHNQUIST

**DISSENT**

JUSTICE BRENNAN, concurring in part and dissenting in part.

Today the Court puts to rest any remaining debate over whether public employers must provide meaningful notice and hearing procedures before discharging an employee for [*552] cause. As the Court convincingly demonstrates, the employee's right to fair notice and an opportunity to "present his side of the story" before discharge is not a matter of legislative grace, but of "constitutional guarantee." *Ante*, at 541, 546. This principle, reaffirmed by the Court today, has been clearly discernible in our "repeated pronouncements" for many years. See *Davis v. Scherer, 468 U.S. 183, 203 (1984)* (BRENNAN, J., concurring in part and dissenting in part).

Accordingly, I concur in Parts I-IV of the Court's opinion. I write separately to comment on two issues the Court does not resolve today, and to explain my dissent from the result in Part V of the Court's opinion.

I

First, the Court today does not prescribe the precise form of required pretermination procedures in cases where an employee disputes the *facts* proffered to support his discharge. The cases at hand involve, as the Court recognizes, employees who did not dispute the facts but had "plausible arguments to make that might have prevented their discharge." *Ante*, at 544. In such cases, notice and an "opportunity to present reasons," *ante*, at 546, are sufficient to protect the important interests at stake.

[**1499] As the Court also correctly notes, other cases "will often involve factual disputes," *ante*, at 543, such as allegedly erroneous records or false accusations. As JUSTICE MARSHALL has previously noted

and stresses again today, *ante*, at 548, where there exist not just plausible arguments to be made, but also "substantial disputes in testimonial evidence," due process may well require more than a simple opportunity to argue or deny. *Arnett v. Kennedy, 416 U.S. 134, 214 [***511] (1974)* (MARSHALL, J., dissenting). The Court acknowledges that what the Constitution requires prior to discharge, in general terms, is pretermination procedures sufficient to provide "an initial check against mistaken decisions -- essentially, a determination of whether there are reasonable grounds to believe [*553] that the charges against the employee are *true* and support the proposed action." *Ante*, at 545-546 (emphasis added). When factual disputes are involved, therefore, an employee may deserve a fair opportunity before discharge to produce contrary records or testimony, or even to confront an accuser in front of the decisionmaker. Such an opportunity might not necessitate "elaborate" procedures, see *ante*, at 545, but the fact remains that in some cases only such an opportunity to challenge the source or produce contrary evidence will suffice to support a finding that there are "reasonable grounds" to believe accusations are "true."

Factual disputes are not involved in these cases, however, and the "very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Cafeteria Workers v. McElroy, 367 U.S. 886, 895 (1961)*. I do not understand Part IV to foreclose the views expressed above or by JUSTICE MARSHALL, *ante*, p. 548, with respect to discharges based on disputed evidence or testimony. I therefore join Parts I-IV of the Court's opinion.

II

The second issue not resolved today is that of administrative delay. In holding that Loudermill's administrative proceedings did not take too long, the Court plainly does *not* state a flat rule that 9-month delays in deciding

84-1162

470 U.S. 532, *; 105 S. Ct. 1487, **;
84 L. Ed. 2d 494, ***; 1985 U.S. LEXIS 68

discharge appeals will pass constitutional scrutiny as a matter of course. To the contrary, the Court notes that a full post-termination hearing and decision must be provided at "a meaningful time" and that "[at] some point, a delay in the post-termination hearing would become a constitutional violation." *Ante*, at 547. For example, in *Barry v. Barchi, 443 U.S. 55 (1979)*, we disapproved as "constitutionally infirm" the shorter administrative delays that resulted under a statute that required "prompt" postsuspension hearings for suspended racehorse trainers with decision to follow within 30 days of the hearing. *Id., at 61, 66.* As JUSTICE MARSHALL demonstrates, when an employee's wages are terminated pending [*554] administrative decision, "hardship inevitably increases as the days go by." *Ante*, at 551; see also *Arnett v. Kennedy, supra, at 194* (WHITE, J., concurring in part and dissenting in part) ("The impact on the employee of being without a job pending a full hearing is likely to be considerable because '[more] than 75 percent of actions contested within employing agencies take longer to decide than the 60 days required by . . . regulations'") (citation omitted). In such cases the Constitution itself draws a line, as the Court declares, "at some point" beyond which the State may not continue a deprivation [***512] absent decision. [1] The holding in Part V is merely that, in this particular case, Loudermill failed to allege facts sufficient [**1500] to state a cause of action, and not that nine months can never exceed constitutional limits.

---

1   Post-termination administrative procedures designed to determine fully and accurately the correctness of discharge actions are to be encouraged. Multiple layers of administrative procedure, however, may not be created merely to smother a discharged employee with "thoroughness," effectively destroying his constitutionally protected interests by overextension. *Cf. ante*, at 547 ("thoroughness" of

procedures partially explains delay in this case).

## III

Recognizing the limited scope of the holding in Part V, I must still dissent from its result, because the record in this case is insufficiently developed to permit an informed judgment on the issue of overlong delay. Loudermill's complaint was dismissed without answer from the respondent Cleveland Civil Service Commission. Allegations at this early stage are to be liberally construed, and "[it] is axiomatic that a complaint should not be dismissed unless 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *McLain v. Real Estate Bd. of New Orleans, Inc., 444 U.S. 232, 246 (1980)* (citation omitted). Loudermill alleged that it took the Commission over two and one-half months simply to hold [*555] a hearing in his case, over two months *more* to issue a nonbinding interim decision, and more than three and one-half months after *that* to deliver a final decision. Complaint paras. 20, 21, App. 10. The Commission provided no explanation for these significant gaps in the administrative process; we do not know if they were due to an overabundance of appeals, Loudermill's own foot-dragging, bad faith on the part of the Commission, or any other of a variety of reasons that might affect our analysis. We do know, however, that under Ohio law the Commission is obligated to hear appeals like Loudermill's "within thirty days." *Ohio Rev. Code Ann. § 124.34 (1984).* [2] Although this [**1501] statutory [***513] limit has been [*556] viewed only as "directory" by Ohio courts, those courts have also made it clear that when the limit is exceeded, "[the] burden of proof [is] placed on the [Commission] to illustrate to the court that the failure to comply with the 30-day requirement . . . was reasonable." *In re Bronkar, 53 Ohio Misc. 13, 17, 372 N. E. 2d 1345, 1347 (Com. Pl. 1977).* I cannot conclude on this record that Loudermill

470 U.S. 532, *; 105 S. Ct. 1487, **;
84 L. Ed. 2d 494, ***; 1985 U.S. LEXIS 68

could prove "no set of facts" that might have entitled him to relief after nine months of waiting.

2    The interim decision, issued by a hearing examiner, was in Loudermill's favor and recommended his reinstatement. But Loudermill was not reinstated nor were his wages even temporarily restored; in fact, there apparently exists no provision for such interim relief or restoration of backpay under Ohio's statutory scheme. See *ante*, at 537, n. 1; cf. *Arnett v. Kennedy, 416 U.S. 134, 196 (1974)* (WHITE, J., concurring in part and dissenting in part) (under federal civil service law, discharged employee's wages are only "provisionally cut off" pending appeal); *id., at 146* (opinion of REHNQUIST, J.) (under federal system, backpay is automatically refunded "if the [discharged] employee is reinstated on appeal"). See also *N. Y. Civ. Serv. Law § 75(3)* (McKinney 1983) (suspension without pay pending determination of removal charges may not exceed 30 days). Moreover, the final decision of the Commission to reverse the hearing examiner apparently was arrived at without any additional evidentiary development; only further argument was had before the Commission. *721 F.2d 550, 553 (CA6 1983)*. These undisputed facts lead me at least to question the administrative value of, and justification for, the 9-month period it took to decide Loudermill's case.

3    A number of other States similarly have specified time limits for hearings and decisions on discharge appeals taken by tenured public employees, indicating legislative consensus that a month or two normally is sufficient time to resolve such actions. No state statutes permit administrative delays of the length

alleged by Loudermill. See, *e. g., Ariz. Rev. Stat. Ann. § 41-785(A), (C)* (Supp. 1984-1985) (hearing within 30 days, decision within 30 days of hearing); *Colo. Rev. Stat. § 24-50-125(4)* (Supp. 1984) (hearing within 45 days, decision within 45 days of hearing); *Conn. Gen. Stat. Ann. § 5-202(b)* (Supp. 1984) (decision within 60 days of hearing); Ill. Rev. Stat. ch. 24 1/2, para. 38b14 (1983) (hearing within 45 days); *Ind. Code § 4-15-2-35* (1982) (decision within 30 days of hearing); Iowa Code § 19A.14 (1983) (hearing within 30 days); *Kan. Stat. Ann. § 75-2949(f)* (Supp. 1983) (hearing within 45 days); *Ky. Rev. Stat. § 18A.095(3)* (1984) (hearing within 60 days of filing, decision within 90 days of filing); Maine Rev. Stat. Ann., Tit. 5, § 753(5) (1979) (decision within 30 days of hearing); Md. Ann. Code, Art. 64A, §§ 33(b)(2), (e) (Supp. 1984) (salary suspension hearing within 5 days and decision within 5 more days; discharge hearing within 90 days and decision within 45 days of hearing); *Mass. Gen. Laws Ann., ch. 31, § 43* (Supp. 1984-1985) (hearing within 10 days, findings "forthwith," decision within 30 days of findings); *Minn. Stat. § 44.08* (1970) (hearing within 10 days, decision within 3 days of hearing); *Nev. Rev. Stat. § 284.390(2)* (1983) (hearing within 20 days); N. J. Stat. Ann. §§ 11:15-4, 11:15-6 (West 1976) (hearing within 30 days, decision within 15 days of hearing); *Okla. Stat., Tit. 74, §§ 841.13, 841.13A* (Supp. 1984) (hearing within 35 days, decision within 15 days of hearing); *R. I. Gen. Laws §§ 36-4-40, 36-4-40.2, 36-4-41* (1984) (initial hearing within 14 days, interim decision within 20 days of hearing, appeal decision within 30 more days, final decision of Governor within 15 more days); *S. C. Code §§ 8-17-330, 8-17-340* (Supp. 1984) (interim decision within 45 days of filing, final decision

within 20 days of hearing); Utah Code Ann. § 67-19-25 (Supp. 1983) (interim decision within 5-20 days, final hearing within 30 days of filing final appeal, final decision within 40 days of hearing); *Wash. Rev. Code § 41.64.100* (1983) (final decision within 90 days of filing); *Wis. Stat. § 230.44(4)(f)* (Supp. 1984-1985) (decision within 90 days of hearing); see also *Ala. Code § 36-26-27(b)* (Supp. 1984) (hearings on citizen removal petitions within 20 days of service); D. C. Code § 1-617.3(a)(1)(D) (1981) ("Career and Educational Services" employees "entitled" to decision within 45 days); *Ga. Code Ann. § 45-20-9(e)(1)* (1982) (hearing officer's decision required within 30 days of hearing); *Miss. Code Ann. § 21-31-23* (Supp. 1984) (hearing required within 20 days of termination for "extraordinary circumstances").

[*557] The Court previously has recognized that constitutional restraints on the timing, no less than the form, of a hearing and decision "will depend on appropriate accommodation of the competing interests involved." *Goss v. Lopez, 419 U.S. 565, 579 (1975).* The relevant interests have generally been recognized as threefold: "the importance of the private interest and the length or finality of the deprivation, the likelihood of governmental error, and the magnitude of the governmental interests involved." *Logan v. Zimmerman Brush Co., 455 U.S. 422, 434 (1982)* (citations omitted); accord, *Mathews v. Eldridge, 424 U.S. 319, 334-335 (1976);* cf. *United States v. $ 8,850, 461 U.S. 555, 564 (1983)* (four-factor test for evaluating constitutionality of delay between time of property seizure and initiation of forfeiture action). "Little can be said on when a delay becomes presumptively improper, for the determination necessarily depends on the facts of the particular case." *Id., at 565.*

Thus the constitutional analysis of delay

requires some development of [***514] the relevant factual context when a plaintiff alleges, as Loudermill has, that the administrative process has taken longer than some minimal amount of time. Indeed, all of our precedents that have considered administrative delays under the Due Process Clause, either explicitly or *sub silentio,* have been decided only after more complete proceedings in the District Courts. See, *e. g., $ 8,850, supra; Barry v. Barchi, 443 U.S. 55 (1979); Arnett v. Kennedy, 416 U.S. 134 (1974); Mathews v. Eldridge, supra.* 4 Yet in Part V, the Court summarily holds Loudermill's allegations [*558] insufficient, without adverting to any considered balancing of interests. Disposal of Loudermill's complaint without examining the competing interests involved marks an unexplained departure from the careful multifaceted analysis of the facts we consistently have employed in the past.

4 After giving careful consideration to well-developed factual contexts, the Court has reached results that might be viewed as inconsistent in the abstract. Compare *Barchi, 443 U.S., at 66* (disapproving statute requiring decision within 30 days of hearing), with *Arnett, 416 U.S., at 194* (WHITE, J., concurring in part and dissenting in part) (approving statutory scheme under which over 50 percent of discharge appeals "take more than three months"). Rather than inconsistency, however, these differing results demonstrate the impossibility of drawing firm lines and the importance of factual development in such cases.

I previously have stated my view that

"[to] be meaningful, an opportunity for a full hearing and determination must be afforded at least at a time when the potentially irreparable and substantial harm caused by a suspension can still be avoided -- *i. e.,* either before or

immediately after suspension." *Barry v. Barchi, supra,* at 74 (BRENNAN, J., concurring in part).

[**1502] Loudermill's allegations of months-long administrative delay, taken together with the facially divergent results regarding length of administrative delay found in *Barchi* as compared to *Arnett,* see n. 4, *supra,* are sufficient in my mind to require further factual development. In no other way can the third *Mathews* factor -- "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement [in this case, a speedier hearing and decision] would entail," *424 U.S., at 335* -- sensibly be evaluated in this case. [5] I therefore would remand the delay issue to the District Court for further evidentiary proceedings consistent with the *Mathews* approach. I respectfully dissent from the Court's contrary decision in Part V.

5   In light of the complete absence of record evidence, it is perhaps unsurprising that the Court of Appeals below was forced to speculate that "[the] delays in the instant cases in all likelihood were inadvertent." *721 F.2d, at 564, n. 19.* Similarly, the Cleveland Board of Education and Civil Service Commission assert only that "[no] authority is necessary to support the proposition" that administrative resolution of a case like Loudermill's in less than nine months is "almost impossible." Brief for Respondents in No. 83-6392, p. 8, n. 4. To the contrary, however, I believe our precedents clearly require demonstration of some "authority" in these circumstances.

[*559]     JUSTICE REHNQUIST, dissenting.

In *Arnett v. Kennedy, 416 U.S. 134 (1974),* six Members of this Court agreed [***515] that a public employee could be dismissed for

misconduct without a full hearing prior to termination. A plurality of Justices agreed that the employee was entitled to exactly what Congress gave him, and no more. THE CHIEF JUSTICE, Justice Stewart, and I said:

"Here appellee did have a statutory expectancy that he not be removed other than for 'such cause as will promote the efficiency of [the] service.' But the very section of the statute which granted him that right, a right which had previously existed only by virtue of administrative regulation, expressly provided also for the procedure by which 'cause' was to be determined, and expressly omitted the procedural guarantees which appellee insists are mandated by the Constitution. Only by bifurcating the very sentence of the Act of Congress which conferred upon appellee the right not to be removed save for cause could it be said that he had an expectancy of that substantive right without the procedural limitations which Congress attached to it. In the area of federal regulation of government employees, where in the absence of statutory limitation the governmental employer has had virtually uncontrolled latitude in decisions as to hiring and firing, *Cafeteria Workers v. McElroy, 367 U.S. 886, 896-897 (1961),* we do not believe that a statutory enactment such as the Lloyd-La Follette Act may be parsed as discretely as appellee urges. Congress was obviously intent on according a measure of statutory job security to governmental employees which they had not previously enjoyed, but was likewise intent on excluding more elaborate procedural requirements which it felt would make the operation of the new scheme unnecessarily burdensome in practice. Where the focus of legislation was thus strongly on the procedural mechanism for enforcing the substantive [*560] right which was simultaneously conferred, we decline to conclude that the substantive right may be viewed wholly apart from the procedure provided for its enforcement. The employee's statutorily defined right is not a guarantee against removal without cause in the abstract,

470 U.S. 532, *; 105 S. Ct. 1487, **;
84 L. Ed. 2d 494, ***; 1985 U.S. LEXIS 68

but such a guarantee as enforced by the procedures which Congress has designated for the determination of cause." *Id.*, at 151-152.

In these cases, the relevant Ohio statute provides in its first paragraph that

"[the] tenure of every officer or employee in the classified service of the state [**1503] and the counties, civil service townships, cities, city health districts, general health districts, and city school districts thereof, holding a position under this chapter of the Revised Code, shall be during good behavior and efficient service and no such officer or employee shall be reduced in pay or position, suspended, or removed, except . . . for incompetency, inefficiency, dishonesty, drunkenness, immoral conduct, insubordination, discourteous treatment of the public, neglect of duty, violation of such sections or the rules of the director of administrative services or the commission, or any other failure of good behavior, or any other acts of misfeasance, [***516] malfeasance, or nonfeasance in office." *Ohio Rev. Code Anh. § 124.34* (1984).

The very next paragraph of this section of the Ohio Revised Code provides that in the event of suspension of more than three days or removal the appointing authority shall furnish the employee with the stated reasons for his removal. The next paragraph provides that within 10 days following the receipt of such a statement, the employee may appeal in writing to the State Personnel Board of Review or the Commission, such appeal shall be heard within 30 days from the time of its filing, and the Board may affirm, disaffirm, or modify the judgment of the appointing authority.

[*561] Thus in one legislative breath Ohio has conferred upon civil service employees such as respondents in these cases a limited form of tenure during good behavior, and prescribed the procedures by which that tenure may be terminated. Here, as in *Arnett*, "[the] employee's statutorily defined right is not a guarantee against removal without cause in the

abstract, but such a guarantee as enforced by the procedures which [the Ohio Legislature] has designated for the determination of cause." *416 U.S.*, at 152 (opinion of REHNQUIST, J.). We stated in *Board of Regents v. Roth, 408 U.S. 564, 577 (1972)*:

"Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law -- rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."

We ought to recognize the totality of the State's definition of the property right in question, and not merely seize upon one of several paragraphs in a unitary statute to proclaim that in that paragraph the State has inexorably conferred upon a civil service employee something which it is powerless under the United States Constitution to qualify in the next paragraph of the statute. This practice ignores our duty under *Roth* to rely on state law as the source of property interests for purposes of applying the *Due Process Clause of the Fourteenth Amendment*. While it does not impose a federal definition of property, the Court departs from the full breadth of the holding in *Roth* by its selective choice from among the sentences the Ohio Legislature chooses to use in establishing and qualifying a right.

Having concluded by this somewhat tortured reasoning that Ohio has created a property right in the respondents in these cases, the Court naturally proceeds to inquire what process is "due" before the respondents may be divested of [*562] that right. This customary "balancing" inquiry conducted by the Court in these cases reaches a result that is quite unobjectionable, but it seems to me that it is devoid of any principles which will either instruct or endure. The balance is simply an ad hoc weighing which depends to a great extent upon how the Court subjectively views the

underlying interests at stake. The results in previous cases and in these cases have been quite unpredictable. To paraphrase Justice Black, today's balancing act [***517] requires a "pretermination opportunity to respond [**1504] " but there is nothing that indicates what tomorrow's will be. *Goldberg v. Kelly, 397 U.S. 254, 276 (1970)* (Black, J., dissenting). The results from today's balance certainly do not jibe with the result in *Goldberg* or *Mathews v. Eldridge, 424 U.S. 319 (1976).* The lack of [*563] any principled standards in this area means that these procedural due process cases will recur time and again. Every different set of facts will present a new issue on what process was due and when. One way to avoid this subjective and varying interpretation of the Due Process Clause in cases such as these is to hold that one who avails himself of government entitlements accepts the grant of tenure along with its inherent limitations.

* Today the balancing test requires a pretermination opportunity to respond. In *Goldberg* we required a full-fledged trial-type hearing, and in *Mathews* we declined to require any pretermination process other than those required by the statute. At times this balancing process may look as if it were undertaken with a thumb on the scale, depending upon the result the Court desired. For example, in *Mathews* we minimized the importance of the benefit to the recipient, stating that after termination he could always go on welfare to survive. *424 U.S., at 340-343;* see also *id., at 350* (BRENNAN, J., dissenting). Today, however, the Court exalts the recipient's interest in retaining employment; not a word is said about going on welfare. Conversely, in *Mathews* we stressed the interests of the State, while today, in a footnote, the Court goes so far as to denigrate the State's interest in firing a school security guard who had lied about a prior felony conviction. *Ante*, at 545, n. 10.

Today the Court purports to describe the State's interest, *ante*, at 544-545, but does so in a way that is contrary to what petitioner Boards of Education have asserted in their briefs. The description of the State's interests looks more like a makeweight to support the Court's result. The decision whom to train and employ is strictly a decision for the State. The Court attempts to ameliorate its ruling by stating that a State may always suspend an employee with pay, in lieu of a predischarge hearing, if it determines that he poses a threat. *Ibid.* This does less than justice to the State's interest in its financial integrity and its interest in promptly terminating an employee who has violated the conditions of his tenure, and ignores Ohio's current practice of paying back wages to wrongfully discharged employees.

Because I believe that the *Fourteenth Amendment of the United States Constitution* does not support the conclusion that Ohio's effort to confer a limited form of tenure upon respondents resulted in the creation of a "property right" in their employment, I dissent.

## REFERENCES

*15A Am Jur 2d, Civil Service 68*

16 Federal Procedure, L Ed, Government Officers and Employees 40:461 et seq.

10 Federal Procedural Forms, L Ed, Government Officers and Employees 35:31 et seq.

24 Am Jur Trials 421, Defending Civil Service Employee from Discharge

USCS, *Constitution, 14th Amendment*

RIA Employment Coordinator EP-22,631

US L Ed Digest, Civil Service 2; Constitutional

470 U.S. 532, *; 105 S. Ct. 1487, **;
84 L. Ed. 2d 494, ***; 1985 U.S. LEXIS 68

Law 528.5, 529, 717, 759, 800.3

L Ed Index to Annos, Civil Service; Due
Process of Law; Officers

ALR Quick Index, Civil Service; Discharge
from Employment; Due Process of Law; Public
Officers and Employees

Federal Quick Index, Civil Service; Discharge

from Employment

Annotation References:

Termination of public employment: right to
hearing under *due process clause of Fifth* or
*Fourteenth Amendment*--Supreme Court cases.
*48 L Ed 2d 996.*

EXHIBIT 4

Page 1

511 U.S. 661, *; 114 S. Ct. 1878, **;
128 L. Ed. 2d 686, ***; 1994 U.S. LEXIS 4104

LEXSEE 511 U.S. 661

## CYNTHIA WATERS, ET AL., PETITIONERS v. CHERYL R. CHURCHILL, ET AL.

### No. 92-1450

## SUPREME COURT OF THE UNITED STATES

*511 U.S. 661; 114 S. Ct. 1878; 128 L. Ed. 2d 686; 1994 U.S. LEXIS 4104; 62 U.S.L.W. 4397; 9 I.E.R. Cas. (BNA) 801; 94 Cal. Daily Op. Service 3850; 94 Daily Journal DAR 7224; 8 Fla. L. Weekly Fed. S 163*

**December 1, 1993, Argued**
**May 31, 1994, Decided**

**PRIOR HISTORY:**     ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT.

**DISPOSITION:**   *977 F.2d 1114*, vacated and remanded.

**DECISION:**

Remand held necessary to determine whether public hospital nurse was fired because of workplace conversation statements that were not protected under *Federal Constitution's First Amendment*.

**SUMMARY:**

After a public hospital in Illinois fired a nurse who had worked in the hospital's obstetrics department, the nurse filed an internal grievance in which she claimed that (1) she had been fired because of a conversation that she had had with a second nurse at the hospital; and (2) in the conversation, she had criticized the hospital's cross-training policy and the staffing policies of the hospital's vice president of nursing. According to other hospital personnel, the fired nurse had complained about her department and her supervisor in the conversation and had discouraged the second nurse from transferring to the obstetrics department. The hospital's president rejected the grievance after meeting with the fired nurse, reviewing the written reports of the supervisor and the vice president, and having another hospital official interview the second nurse. The fired nurse subsequently brought suit under *42 USCS 1983* against the hospital, president, vice president, and supervisor in the United States District Court for the Central District of Illinois. Among the fired nurse's claims in the suit was that her speech had been protected under the *Federal Constitution's First Amendment* and that the firing had thus violated her *First Amendment* rights. The fired nurse produced evidence to the effect that she had criticized the cross-training policy prior to the conversation in question, and that the hospital management might have been hostile to her because of the criticisms. The District Court, in granting summary judgment to the defendants on the free speech claim, expressed the view that (1) the fired nurse's speech was not protected under the *First Amendment* as a matter of law; and (2) even if the speech were so protected, the hospital's interest in maintaining workplace harmony outweighed the fired nurse's interest in expressing her opposition to the cross-training

511 U.S. 661, *; 114 S. Ct. 1878, **;
128 L. Ed. 2d 686, ***; 1994 U.S. LEXIS 4104

policy to her coworker. The United States Court of Appeals for the Seventh Circuit, in reversing and remanding, concluded that (1) there were genuine issues of material fact in dispute regarding the content of the fired nurse's speech; (2) when a public employer fires an employee for engaging in speech which is later found to be protected under the *First Amendment*, the employer is liable for violating the employee's free speech rights regardless of what the employer knew about the speech at the time of the termination; and (3) if, on remand, the jury were to determine that the point of the fired nurse's conversation was to raise the issue of inadequate nurse staffing because of the cross-training policy, rather than simply to complain, then the fired nurse was engaged in protected conduct (*977 F2d 1114*).

On certiorari, the United States Supreme Court vacated and remanded. Although unable to agree on an opinion, seven members of the court agreed that the Court of Appeals' judgment should be vacated and the case be remanded for a determination as to the actual motivation for the firing.

O'Connor, J., announced the judgment of the court and, in an opinion joined by Rehnquist, Ch. J., and Souter and Ginsburg, JJ., expressed the view that (1) in a case where an employment action is based on what a government employee supposedly said, and a reasonable supervisor would recognize that there is a substantial likelihood that what was actually said was protected under the *First Amendment*, the employer must proceed with the care that a reasonable employer would use before making an employment decision of the sort involved in the particular case; and (2) in the case at hand, the hospital and its officials would win if they really had believed the hospital personnel's unfavorable report of the nurse's conversation and had fired the nurse because of the report, because (a) such a belief, based on the investigation conducted, would have been reasonable, and (b) the nurse's speech, as so reported, would have been

unprotected by the *First Amendment* as potentially disruptive; but (3) the District Court had erred in granting summary judgment, because a material issue of disputed fact remained as to whether the nurse actually had been fired not because of the alleged disruptive statements but because of other statements which hospital officials thought the nurse might have made in the same conversation, or which she might have made earlier, which statements might have been protected speech.

Souter, J., concurring, expressed the view that (1) under the *First Amendment's* free speech clause, a public employer who reasonably believes a third-party report that an employee engaged in constitutionally unprotected speech may properly punish the employee in reliance on that report, even if it turns out that the employee's actual remarks were constitutionally protected; and (2) the hospital had conducted an objectively reasonable investigation into the fired nurse's conversation; but (3) the nurse's dismissal would constitute a violation of the free speech clause if the hospital officials, after the investigation, had fired the nurse for speech that they believed or genuinely suspected was nondisruptive, assuming that such speech was on a matter of public concern.

Scalia, J., joined by Kennedy and Thomas, JJ., concurring in the judgment, expressed the view that (1) a public employer's disciplining of an employee violates the *First Amendment* only if the disciplining is in retaliation for the employee's speech on a matter of public concern; (2) recognition of a government employee's *First Amendment* right to have the employer conduct an investigation before the employer takes disciplinary action based on the employee's speech was unprecedented, superfluous to the decision in the case at hand, unnecessary for protection of public employee speech on matters of public concern, and unpredictable in its application and consequences; (3) judicial inquiry into the genuineness of a public employer's asserted

511 U.S. 661, *; 114 S. Ct. 1878, **;
128 L. Ed. 2d 686, ***; 1994 U.S. LEXIS 4104

permissible justification for an employment decision is all that is necessary to avoid the targeting of public interest speech; and (4) thus, remand for a pretext inquiry as to the actual grounds for the nurse's firing would suffice in the case at hand.

Stevens, J., joined by Blackmun, J., dissenting, expressed the view that (1) given the posture in which the case at hand had come to the Supreme Court, the nurse's statements ought to have been assumed to be fully protected by the *First Amendment*; and (2) the governing version of the facts in public employment free speech cases is not what the government employer reasonably thought was said, but rather what the trier of fact ultimately determines to have been said.

**LAWYERS' EDITION HEADNOTES:**

[***LEdHN1]

APPEAL §1692.2

remand -- issue not decided below --

Headnote:[1A][1B][1C]

In a case involving a nurse who was fired by a public hospital allegedly because of statements that the nurse made in a workplace conversation with a coworker, which conversation is alleged by the hospital to have contained complaints that were disruptive statements but is alleged by the nurse to have contained criticisms of hospital policy that were nondisruptive statements of public concern constituting protected speech under the *Federal Constitution's First Amendment*, the United States Supreme Court--on certiorari to review a Federal Court of Appeals judgment which (1) reversed a Federal District Court's grant of summary judgment against the nurse, and (2) remanded the case for a resolution of the factual dispute as to the content of the nurse's conversation--will vacate the Court of Appeals' judgment and remand the case for further proceedings to determine whether the nurse actually was fired because of the alleged

disruptive statements and not because of something else. [Per O'Connor, J., Rehnquist, Ch. J., and Souter, Ginsburg, Scalia, Kennedy, and Thomas, JJ. Dissenting: Stevens and Blackmun, JJ.]

[***LEdHN2]

CONSTITUTIONAL LAW §956

freedom of speech -- public employees --

Headnote:[2A][2B][2C]

Under some circumstances, a government employee is protected under the *Federal Constitution's First Amendment* against dismissal based on the employee's speech on a matter of public concern. [Per all members of the court.]

[***LEdHN3]

CONSTITUTIONAL LAW §927

freedom of speech --

Headnote:[3A][3B]

The *Federal Constitution's First Amendment* contains within it some procedural prescriptions with respect to freedom of speech. [Per O'Connor, J., Rehnquist, Ch. J., and Souter, Ginsburg, Scalia, Kennedy, and Thomas, JJ.]

[***LEdHN4]

CONSTITUTIONAL LAW §956

freedom of speech -- public employees --

Headnote:[4A][4B][4C][4D]

A government employer violates the *Federal Constitution's First Amendment* where (1) an employee engages in speech that is protected under the *First Amendment*; and (2) the employer, holding an erroneous and unreasonable belief about what the employee said, disciplines the employee based on the employee's speech. [Per O'Connor, J., Rehnquist, Ch. J., and Souter, Ginsburg, Stevens, and Blackmun, JJ.]

511 U.S. 661, *; 114 S. Ct. 1878, **;
128 L. Ed. 2d 686, ***; 1994 U.S. LEXIS 4104

[***LEdHN5]

CONSTITUTIONAL LAW §800.3

due process -- public employees --

Headnote:[5A][5B]

Public employees who lack a protected property interest in their jobs are not entitled, under the due process clause of the *Federal Constitution's Fourteenth Amendment*, to a hearing before dismissal. [Per O'Connor, J., Rehnquist, Ch. J., and Souter, Ginsburg, Scalia, Kennedy, and Thomas, JJ.]

[***LEdHN6]

MASTER AND SERVANT §21

discharge -- at-will employee --

Headnote:[6A][6B]

It is not a violation of the Federal Constitution for an employer to discharge an at-will employee based on a substantively erroneous factual judgment. [Per O'Connor, J., Rehnquist, Ch. J., and Souter, Ginsburg, Scalia, Kennedy, and Thomas, JJ.]

SYLLABUS

Petitioners fired respondent Churchill from her nursing job at a public hospital, allegedly because of statements she made to co-worker Perkins-Graham during a work break. What Churchill actually said during the conversation is in dispute. Petitioners' version was based on interviews with Perkins-Graham and one Ballew, who had overheard part of the conversation, and indicated that Churchill made disruptive statements critical of her department and of petitioners. However, in Churchill's version, which was corroborated by others who had overheard part of the conversation, her speech was largely limited to nondisruptive statements critical of the hospital's "cross-training" policy, which she believed threatened patient care. Churchill sued under *42 U.S.C. § 1983*, claiming that her speech was protected

under *Connick v. Myers, 461 U.S. 138, 142, 75 L. Ed. 2d 708, 103 S. Ct. 1684*, in which the Court held that the *First Amendment* protects a government employee's speech if it is on a matter of public concern and the employee's interest in expressing herself on this matter is not outweighed by any injury the speech could cause to the government's interest, as an employer, in promoting the efficiency of the public services it performs through its employees. The District Court granted petitioners summary judgment, holding that management could fire Churchill with impunity because neither version of the conversation was protected under *Connick*. The Court of Appeals reversed, concluding that Churchill's speech, viewed in the light most favorable to her, was on a matter of public concern and was not disruptive, and that the inquiry must turn on what her speech actually was, as determined by a jury, not on what the employer thought it was.

*Held:*

The judgment is vacated, and the case is remanded.

JUSTICE O'CONNOR, joined by THE CHIEF JUSTICE, JUSTICE SOUTER, AND JUSTICE GINSBURG, concluded:

1. The *Connick* test should be applied to what the government employer reasonably thought was said, not to what the trier of fact ultimately determines to have been said. Pp. 668-679.

(a) Absent a general test for deciding when the *First Amendment* requires a procedural safeguard, the question must be answered on a case-by-case basis, by considering the procedure's cost and the relative magnitude and constitutional significance of the risks of erroneous punishment of protected speech and of erroneous exculpation of unprotected speech that the procedure involves. In evaluating these factors here, the key is the government employer's interest in achieving its goals as effectively and efficiently as possible. Pp. 668-

511 U.S. 661, *; 114 S. Ct. 1878, **;
128 L. Ed. 2d 686, ***; 1994 U.S. LEXIS 4104

675.

(b) The Court of Appeals' approach gives insufficient weight to this interest, since it would force the government employer to come to its factual conclusions through procedures that substantially mirror the evidentiary rules used in court, whereas employment decisions are frequently and properly based on hearsay, past similar conduct, personal knowledge of people's credibility, and other factors that the judicial process ignores. Pp. 675-677.

(c) On the other hand, courts must not apply the *Connick* test only to the facts as the employer thought them to be, without considering the reasonableness of the employer's conclusions. It is necessary that the decisionmaker reach its conclusion about what was said in good faith, rather than as a pretext; but it does not follow that good faith alone is sufficient under the *First Amendment*. *Mt. Healthy City Bd. of Ed. v. Doyle, 429 U.S. 274, 50 L. Ed. 2d 471, 97 S. Ct. 568,* and *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty., 391 U.S. 563, 88 S. Ct. 1731, 20 L. Ed. 2d 811,* distinguished. P. 677.

(d) Thus, if an employment action is based on what an employee supposedly said, and a reasonable supervisor would recognize that there is a substantial likelihood that what was actually said was protected, the *First Amendment* requires that the manager proceed with the care that a reasonable manager would use before making an employment decision of the sort involved in the particular case. In situations in which reasonable employers would disagree about who is to be believed, or how much investigation needs to be done, or how much evidence is needed to come to a particular conclusion, many different courses of action will necessarily be reasonable, and only procedures outside the range of what a reasonable manager would use may be condemned as unreasonable. Pp. 677-678.

2. Applying the foregoing to this case demonstrates that petitioners must win if they really did believe Perkins-Graham's and Ballew's story, and fired Churchill because of it. That belief, based on the investigation petitioners conducted, would have been entirely reasonable. Moreover, as a matter of law, the potential disruptiveness of Churchill's speech would have rendered it unprotected under the *Connick* test. Nonetheless, the District Court erred in granting petitioners summary judgment, since Churchill has produced enough evidence to create a material issue of disputed fact about whether she was actually fired because of disruptive statements, or because of nondisruptive statements about cross-training, or because of other statements she may have made earlier. If either of the latter is so, the court will have to determine whether the statements in question were protected speech. Pp. 679-682.

JUSTICE SCALIA, joined by JUSTICE KENNEDY and JUSTICE THOMAS, concluded that the Court should adhere to its previously stated rule that a public employer's disciplining of an employee violates the *First Amendment* only if it is in retaliation for the employee's speech on a matter of public concern, see, *e. g., Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty., 391 U.S. 563, 572, 88 S. Ct. 1731, 20 L. Ed. 2d 811,* and should not add to this prohibition a requirement that the employer conduct an investigation before taking disciplinary action. The plurality's recognition of a broad new *First Amendment* right to an investigation before dismissal for speech is unprecedented and unpredictable in its application and consequences. In light of the requirement of a pretext inquiry, it is also superfluous to the disposition of this case and unnecessary for the protection of public-employee speech on matters of public concern. Judicial inquiry into the genuineness of a public employer's asserted permissible justification for an employment decision -- be it unprotected speech, general insubordination, or laziness -- is all that is necessary to avoid the targeting of "public interest" speech condemned in *Pickering.* See,

e. g., *Mt. Healthy City Bd. of Ed. v. Doyle, 429 U.S. 274, 287, 50 L. Ed. 2d 471, 97 S. Ct. 568.* Churchill's right not to be dismissed in retaliation for her expression of views on a matter of public concern was not violated, since she was dismissed for another reason, erroneous though it may have been. Pp. 686-694.

**COUNSEL:** Lawrence A. Manson argued the cause for petitioners. With him on the briefs was Donald J. McNeil.

Richard H. Seamon argued the cause for the United States as amicus curiae urging reversal. With him on the brief were Solicitor General Days, Assistant Attorney General Hunger, Acting Deputy Solicitor General Kneedler, Barbara L. Herwig, and Robert D. Kamenshine.

John H. Bisbee argued the cause for respondents. With him on the brief was Barry Nakell. ·

    * Richard Ruda and Glen D. Nager filed a brief for the International City/County Management Association et al. as amici curiae urging reversal.

    Briefs of amici curiae urging affirmance were filed for the American Nurses Association by Ronald C. Jessamy; for the National Education Association et al. by Robert H. Chanin, Jeremiah A. Collins, and Larry P. Weinberg; and for the Southern States Police Benevolent Association et al. by J. Michael McGuinness.

    Charles E. Tucker, Jr., Patricia C. Benassi, and Mary Lee Leahy filed a brief for the National Employment Lawyers Association as amicus curiae.

**JUDGES:** O'CONNOR, J., announced the judgment of the Court and delivered an opinion, in which REHNQUIST, C. J., and SOUTER and GINSBURG, JJ., joined.

SOUTER, J., filed a concurring opinion, post, p. 682. SCALIA, J., filed an opinion concurring in the judgment, in which KENNEDY and THOMAS, JJ., joined, post, p. 686. STEVENS, J., filed a dissenting opinion, in which BLACKMUN, J., joined, post, p. 694.

**OPINION BY:** O'CONNOR

**OPINION**

    **[*664]** **[***692]** **[**1882]** JUSTICE O'CONNOR announced the judgment of the Court and delivered an opinion, in which THE CHIEF JUSTICE, JUSTICE SOUTER, and JUSTICE GINSBURG join.

    **[***LEdHR1A]** **[1A]**In *Connick v. Myers, 461 U.S. 138, 75 L. Ed. 2d 708, 103 S. Ct. 1684 (1983)*, we set forth a test for determining whether speech by a government employee may, consistently with the *First Amendment*, serve as a basis for disciplining or discharging that employee. In this case, we decide whether the *Connick* test should be applied to what the government employer thought was said, or to what the trier of fact ultimately determines to have been said.

I

    This case arises out of a conversation that respondent Cheryl Churchill had on January 16, 1987, with Melanie Perkins-Graham. Both Churchill and Perkins-Graham were nurses working at McDonough District Hospital; Churchill was in the obstetrics department, and Perkins-Graham was considering transferring to that department. The conversation took place at work during a dinner break. Petitioners heard about it and fired Churchill, allegedly because of it. There is, however, a dispute about what Churchill actually said, and therefore about whether petitioners were constitutionally permitted to fire Churchill for her statements.

    **[*665]** The conversation was overheard in part by two other nurses, Mary Lou Ballew and Jean Welty, and by Dr. Thomas Koch, the clinical head of obstetrics. A few days later,

511 U.S. 661, *; 114 S. Ct. 1878, **;
128 L. Ed. 2d 686, ***; 1994 U.S. LEXIS 4104

Ballew told Cynthia Waters, Churchill's supervisor, about the incident. According to Ballew, Churchill took "'the cross trainee into the kitchen [***693] for . . . at least 20 minutes to talk about [Waters] and how bad things are in [obstetrics] in general.'" *977 F.2d 1114, 1118 (CA7 1992).* Ballew said that Churchill's statements led Perkins-Graham to no longer be interested in switching to the department. Supplemental App. of Defendants-Appellees in No. 91-2288 (CA7), p. 60.

Shortly after this, Waters met with Ballew a second time for confirmation of Ballew's initial report. Ballew said that Churchill "was knocking the department" and that "in general [Churchill] was saying what a bad place [obstetrics] is to work." Ballew said she heard Churchill say Waters "was trying to find reasons to fire her." Ballew also said [**1883] Churchill described a patient complaint for which Waters had supposedly wrongly blamed Churchill. *Id.,* at 67-68.

Waters, together with petitioner Kathleen Davis, the hospital's vice president of nursing, also met with Perkins-Graham, who told them that Churchill "had indeed said unkind and inappropriate negative things about [Waters]." *Id., at 228.* Also, according to Perkins-Graham, Churchill mentioned a negative evaluation that Waters had given Churchill, which arose out of an incident in which Waters had cited Churchill for an insubordinate remark. *Ibid.* The evaluation stated that Churchill "'promotes an unpleasant atmosphere and hinders constructive communication and cooperation,'" *977 F.2d at 1118,* and "'exhibits negative behavior towards [Waters] and [Waters'] leadership through her actions and body language'"; the evaluation said Churchill's work was otherwise satisfactory, *id., at 1116.* Churchill allegedly told Perkins-Graham that she and Waters had discussed the evaluation, and that Waters "wanted to wipe the slate clean . . . but [Churchill thought] this wasn't possible." [*666] Supplemental App. of Defendants-Appellees in No. 91-2288, at 228. Churchill

also allegedly told Perkins-Graham "that just in general things were not good in OB and hospital administration was responsible." *Id., at 229.* Churchill specifically mentioned Davis, saying Davis "was ruining MDH." *Ibid.* Perkins-Graham told Waters that she knew Davis and Waters "could not tolerate that kind of negativism." *Ibid.*

Churchill's version of the conversation is different. For several months, Churchill had been concerned about the hospital's "cross-training" policy, under which nurses from one department could work in another when their usual location was overstaffed. Churchill believed this policy threatened patient care because it was designed not to train nurses but to cover staff shortages, and she had complained about this to Davis and Waters. According to Churchill, the conversation with Perkins-Graham primarily concerned the crosstraining policy. *977 F.2d at 1118.* Churchill denies that she said some of what Ballew and Perkins-Graham allege she said. She does admit she criticized Davis, saying her staffing policies threatened to "ruin" the hospital because they "'seemed to be impeding nursing care.'" *Ibid.* She claims she actually defended Waters and encouraged Perkins-Graham to transfer to obstetrics. *Ibid.*

Koch's and Welty's recollections of the conversation match Churchill's. *Id., at 1122.* Davis and Waters, however, never talked to Koch or Welty about this, and they did not talk to [***694] Churchill until the time they told her she was fired. Moreover, Churchill claims, Ballew was biased against Churchill because of an incident in which Ballew apparently made an error and Churchill had to cover for her. Brief for Respondents 9, n. 12.

After she was discharged, Churchill filed an internal grievance. The president of the hospital, petitioner Stephen Hopper, met with Churchill in regard to this and heard her side of the story. App. to Pet. for Cert. 75-77. He then reviewed [*667] Waters' and Davis' written reports of their conversations with Ballew and

Perkins-Graham, and had Bernice Magin, the hospital's vice president of human resources, interview Ballew one more time. Supplemental App. of Defendants-Appellees in No. 91-2288, at 108, 139-142. After considering all this, Hopper rejected Churchill's grievance.

Churchill then sued under Rev. Stat. § 1979, *42 U.S.C. § 1983*, claiming that the firing violated her *First Amendment* rights because her speech was protected under *Connick v. Myers, 461 U.S. 138, 75 L. Ed. 2d 708, 103 S. Ct. 1684 (1983)*. In May 1991, the United States District Court for the Central District of Illinois granted summary judgment to petitioners. The court held that neither version of the conversation was protected under *Connick:* Regardless of whose story was accepted, the speech was not on a matter of public concern, and even if it was on a matter of public concern, its potential for disruption nonetheless stripped it of *First Amendment* protection. Therefore, the court held, management could fire Churchill for **[**1884]** the conversation with impunity. App. to Pet. for Cert. 45-49.

The United States Court of Appeals for the Seventh Circuit reversed. *977 F.2d 1114 (1992)*. The court held that Churchill's speech, viewed in the light most favorable to her, was protected speech under the *Connick* test: It was on a matter of public concern -- "the hospital's [alleged] violation of state nursing regulations as well as the quality and level of nursing care it provides its patients," *id., at 1122* -- and it was not disruptive, *id., at 1124*.

The court also concluded that the inquiry must turn on what the speech actually was, not on what the employer thought it was. "If the employer chooses to discharge the employee without sufficient knowledge of her protected speech as a result of an inadequate investigation into the employee's conduct," the court held, "the employer runs the risk of eventually being required to remedy any wrongdoing **[*668]** whether it was deliberate or accidental." *Id., at 1127* (footnote omitted).

We granted certiorari, *509 U.S. 903 (1993)*, to resolve a conflict among the Circuits on this issue. Compare the decision below with *Atcherson v. Siebenmann, 605 F.2d 1058 (CA8 1979); Wulf v. Wichita, 883 F.2d 842 (CA10 1989); Sims v. Metropolitan Dade County, 972 F.2d 1230 (CA11 1992)*.

II

A

**[***LEdHR2A]** **[2A]**There is no dispute in this case about when speech by a government employee is protected by the *First Amendment*: To be protected, the speech must be on a matter of public concern, and the employee's interest in expressing herself on this **[***695]** matter must not be outweighed by any injury the speech could cause to "'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Connick, supra, 461 U.S. at 142* (quoting *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty., 391 U.S. 563, 568, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968))*. It is also agreed that it is the court's task to apply the *Connick* test to the facts. *461 U.S. at 148, n. 7*, and 150, n. 10.

The dispute is over how the factual basis for applying the test -- what the speech was, in what tone it was delivered, what the listener's reactions were, see *id., at 151-153* -- is to be determined. Should the court apply the *Connick* test to the speech as the government employer found it to be, or should it ask the jury to determine the facts for itself? The Court of Appeals held that the employer's factual conclusions were irrelevant, and that the jury should engage in its own factfinding. Petitioners argue that the employer's factual conclusions should be dispositive. Respondents take a middle course: They suggest that the court should accept the employer's factual conclusions, but only if those conclusions were arrived at reasonably, see Brief for Respondents 39, something they say did not

511 U.S. 661, *; 114 S. Ct. 1878, **;
128 L. Ed. 2d 686, ***; 1994 U.S. LEXIS 4104

happen here.

[*669]  We agree that it is important to ensure not only that the substantive *First Amendment* standards are sound, but also that they are applied through reliable procedures. This is why we have often held some procedures -- a particular allocation of the burden of proof, a particular quantum of proof, a particular type of appellate review, and so on -- to be constitutionally required in proceedings that may penalize protected speech. See *Freedman v. Maryland, 380 U.S. 51, 58-60, 13 L. Ed. 2d 649, 85 S. Ct. 734 (1965)* (government must bear burden of proving that speech is unprotected); *Speiser v. Randall, 357 U.S. 513, 526, 2 L. Ed. 2d 1460, 78 S. Ct. 1332 (1958)* (same); *Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 775-778, 89 L. Ed. 2d 783, 106 S. Ct. 1558 (1986)* (libel plaintiff must bear burden of proving that speech is false); *Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 510, 115 L. Ed. 2d 447, 111 S. Ct. 2419 (1991)* (actual malice must be proved by clear and convincing evidence); *Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, [**1885] 503-511, 80 L. Ed. 2d 502, 104 S. Ct. 1949 (1984)* (appellate court must make independent judgment about presence of actual malice).

These cases establish a basic *First Amendment* principle: Government action based on protected speech may under some circumstances violate the *First Amendment* even if the government actor honestly believes the speech is unprotected. And though JUSTICE SCALIA suggests that this principle be limited to licensing schemes and to "deprivation[s] of the freedom of speech specifically *through the judicial process," post,* at 687 (emphasis in original), we do not think the logic of the cases supports such a limitation. Speech can be chilled and punished by administrative action as much as by judicial processes; in no case have we asserted or even implied the contrary. In fact, in *Speiser v. Randall,* we struck down procedures, on the

grounds that they were insufficiently protective of free [***696] speech, which involved both administrative and judicial components. *Speiser,* like this case, dealt with a government decision to deny a speaker certain benefits -- in *Speiser* a tax exemption,  in this case a government job -- based on what the speaker said. Our [*670] holding there did not depend on the deprivation taking place "specifically through the judicial process," and we cannot see how the result could have been any different had the process been entirely administrative, with no judicial review. We cannot sweep aside *Speiser* and the other cases cited above as easily as JUSTICE SCALIA proposes.

Nonetheless, not every procedure that may safeguard protected speech is constitutionally mandated. True, the procedure adopted by the Court of Appeals may lower the chance of protected speech being erroneously punished. A speaker is more protected if she has two opportunities to be vindicated -- first by the employer's investigation and then by the jury -- than just one. But each procedure involves a different mix of administrative burden, risk of erroneous punishment of protected speech, and risk of erroneous exculpation of unprotected speech. Though the *First Amendment* creates a strong presumption against punishing protected speech even inadvertently, the balance need not always be struck in that direction. We have never, for instance, required proof beyond a reasonable doubt in civil cases where *First Amendment* interests are at stake, though such a requirement would protect speech more than the alternative standards would. Compare, *e. g., California ex rel. Cooper v. Mitchell Brothers' Santa Ana Theater, 454 U.S. 90, 93, 70 L. Ed. 2d 262, 102 S. Ct. 172 (1981) (per curiam),* with *McKinney v. Alabama, 424 U.S. 669, 686, 47 L. Ed. 2d 387, 96 S. Ct. 1189 (1976)* (Brennan, J., concurring in judgment in part). Likewise, the possibility that defamation liability would chill even true speech has not led us to require an actual malice standard in all libel cases.   *Dun & Bradstreet, Inc. v.*

511 U.S. 661, *; 114 S. Ct. 1878, **;
128 L. Ed. 2d 686, ***; 1994 U.S. LEXIS 4104

*Greenmoss Builders, Inc., 472 U.S. 749, 761, 86 L. Ed. 2d 593, 105 S. Ct. 2939 (1985)* (plurality opinion); *Gertz v. Robert Welch, Inc., 418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974).* Nor has the possibility that overbroad regulations may chill commercial speech convinced us to extend the overbreadth doctrine into the commercial speech area. *Bates v. State Bar of Ariz., 433 U.S. 350, 380-381, 53 L. Ed. 2d 810, 97 S. Ct. 2691 (1977).*

[*671] [***LEdHR3A] [3A]We have never set forth a general test to determine when a procedural safeguard is required by the *First Amendment* -- just as we have never set forth a general test to determine what constitutes a compelling state interest, see *Boos v. Barry, 485 U.S. 312, 324, 99 L. Ed. 2d 333, 108 S. Ct. 1157 (1988),* or what categories of speech are so lacking in value that they fall outside the protection of the *First Amendment, New York v. Ferber, 458 U.S. 747, 763-764, 73 L. Ed. 2d 1113, 102 S. Ct. 3348 (1982),* or many other matters -- and we do not purport to do so now. But though we agree with JUSTICE SCALIA that the lack of such a test is inconvenient, see *post,* at 687-688, this does not relieve us of our responsibility to decide the case that is before us today. Both JUSTICE SCALIA and we agree that some procedural requirements are mandated [**1886] by the *First Amendment* and some are not. See *post,* at 686. None of us have [***697] discovered a general principle to determine where the line is to be drawn. See *post,* at 686-688. We must therefore reconcile ourselves to answering the question on a case-by-case basis, at least until some workable general rule emerges.

Accordingly, all we say today is that the propriety of a proposed procedure must turn on the particular context in which the question arises -- on the cost of the procedure and the relative magnitude and constitutional significance of the risks it would decrease and increase. And to evaluate these factors here we

have to return to the issue we dealt with in *Connick* and in the cases that came before it: What is it about the government's role as employer that gives it a freer hand in regulating the speech of its employees than it has in regulating the speech of the public at large?

B

We have never explicitly answered this question, though we have always assumed that its premise is correct -- that the government as employer indeed has far broader powers than does the government as sovereign. See, e. g., *Pickering, 391 U.S. at 568; Civil Service Comm'n v. Letter Carriers,* [*672] *413 U.S. 548, 564, 93 S. Ct. 2880, 37 L. Ed. 2d 796 (1973); Connick, 461 U.S. at 147.* This assumption is amply borne out by considering the practical realities of government employment, and the many situations in which, we believe, most observers would agree that the government must be able to restrict its employees' speech.

To begin with, even many of the most fundamental maxims of our *First Amendment* jurisprudence cannot reasonably be applied to speech by government employees. The *First Amendment* demands a tolerance of "verbal tumult, discord, and even offensive utterance," as "necessary side effects of . . . the process of open debate," *Cohen v. California, 403 U.S. 15, 24-25, 29 L. Ed. 2d 284, 91 S. Ct. 1780 (1971).* But we have never expressed doubt that a government employer may bar its employees from using Mr. Cohen's offensive utterance to members of the public or to the people with whom they work. "Under the *First Amendment* there is no such thing as a false idea," *Gertz, supra,* at 339; the "fitting remedy for evil counsels is good ones," *Whitney v. California, 274 U.S. 357, 375, 71 L. Ed. 1095, 47 S. Ct. 641 (1927)* (Brandeis, J., concurring). But when an employee counsels her co-workers to do their job in a way with which the public employer disagrees, her managers may tell her to stop, rather than relying on counterspeech. The *First Amendment* reflects the "profound

511 U.S. 661, *; 114 S. Ct. 1878, **;
128 L. Ed. 2d 686, ***; 1994 U.S. LEXIS 4104

national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan, 376 U.S. 254, 270, 11 L. Ed. 2d 686, 84 S. Ct. 710 (1964).* But though a private person is perfectly free to uninhibitedly and robustly criticize a state governor's legislative program, we have never suggested that the Constitution bars the governor from firing a high-ranking deputy for doing the same thing. Cf. *Branti v. Finkel, 445 U.S. 507, 518, 63 L. Ed. 2d 574, 100 S. Ct. 1287 (1980).* Even something as close to the core of the *First Amendment* as participation in political campaigns may be prohibited [***698] to government employees. *Broadrick v. Oklahoma, 413 U.S. 601, 37 L. Ed. 2d 830, 93 S. Ct. 2908 (1973); Letter Carriers, supra; Public Workers v. Mitchell, 330 U.S. 75, 91 L. Ed. 754, 67 S. Ct. 556 (1947).*

[*673] Government employee speech must be treated differently with regard to procedural requirements as well. For example, speech restrictions must generally precisely define the speech they target. *Baggett v. Bullitt, 377 U.S. 360, 367-368, 12 L. Ed. 2d 377, 84 S. Ct. 1316 (1964); Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 55, 99 L. Ed. 2d 41, 108 S. Ct. 876 (1988).* Yet surely a public employer may, consistently with the *First Amendment*, prohibit its employees from being "rude to customers," a standard almost certainly too vague when [**1887] applied to the public at large. Cf. *Arnett v. Kennedy, 416 U.S. 134, 158-162, 40 L. Ed. 2d 15, 94 S. Ct. 1633 (1974)* (plurality opinion) (upholding a regulation that allowed discharges for speech that hindered the "efficiency of the service"); *id., at 164* (Powell, J., concurring in part and concurring in result in part) (agreeing on this point).

Likewise, we have consistently given greater deference to government predictions of harm used to justify restriction of employee speech than to predictions of harm used to justify restrictions on the speech of the public

at large. Few of the examples we have discussed involve tangible, present interference with the agency's operation. The danger in them is mostly speculative. One could make a respectable argument that political activity by government employees is generally not harmful, see *Public Workers v. Mitchell, supra, at 99*; or that high officials should allow more public dissent by their subordinates, see *Connick, supra, 461 U.S. at 168-169* (Brennan, J., dissenting); Whistleblower Protection Act of 1989, 103 Stat. 16, or that even in a government workplace the free market of ideas is superior to a command economy. But we have given substantial weight to government employers' reasonable predictions of disruption, even when the speech involved is on a matter of public concern, and even though when the government is acting as sovereign our review of legislative predictions of harm is considerably less deferential. Compare, e. g., *Connick, supra, 461 U.S. at 151-152; Letter Carriers, supra, at 566-567,* with *Sable Communications of Cal., Inc. v. FCC, 492 U.S. 115, 129, 106 L. Ed. 2d 93, 109 S. Ct. 2829 (1989); Texas v. Johnson,* [*674] *491 U.S. 397, 409, 109 S. Ct. 2533, 105 L. Ed. 2d 342 (1989).* Similarly, we have refrained from intervening in government employer decisions that are based on speech that is of entirely private concern. Doubtless some such speech is sometimes nondisruptive; doubtless it is sometimes of value to the speakers and the listeners. But we have declined to question government employers' decisions on such matters. *Connick, supra, 461 U.S. at 146-149.*

This does not, of course, show that the *First Amendment* should play no role in government employment decisions. Government employees are often in the best position to know what ails the agencies for which they work; public debate may gain much from their informed opinions. *Pickering, supra, 391 U.S. at 572.* [***699] And a government employee, like any citizen, may have a strong, legitimate interest in speaking out on public matters. In many such situations the government may have

511 U.S. 661, *; 114 S. Ct. 1878, **;
128 L. Ed. 2d 686, ***; 1994 U.S. LEXIS 4104

to make a substantial showing that the speech is, in fact, likely to be disruptive before it may be punished. See, e. g., *Rankin v. McPherson, 483 U.S. 378, 388, 97 L. Ed. 2d 315, 107 S. Ct. 2891 (1987); Connick, supra, 461 U.S. at 152; Pickering, supra, 391 U.S. at 569-571.* Moreover, the government may certainly choose to give additional protections to its employees beyond what is mandated by the *First Amendment,* out of respect for the values underlying the *First Amendment,* values central to our social order as well as our legal system. See, e. g., Whistleblower Protection Act of 1989, *supra.*

But the above examples do show that constitutional review of government employment decisions must rest on different principles than review of speech restraints imposed by the government as sovereign. The restrictions discussed above are allowed not just because the speech interferes with the government's operation. Speech by private people can do the same, but this does not allow the government to suppress it.

Rather, the extra power the government has in this area comes from the nature of the government's mission as employer. Government agencies are charged by law with [*675] doing particular tasks. Agencies hire employees to help do those tasks as effectively and efficiently as possible. When someone [**1888] who is paid a salary so that she will contribute to an agency's effective operation begins to do or say things that detract from the agency's effective operation, the government employer must have some power to restrain her. The reason the governor may, in the example given above, fire the deputy is not that this dismissal would somehow be narrowly tailored to a compelling government interest. It is that the governor and the governor's staff have a job to do, and the governor justifiably feels that a quieter subordinate would allow them to do this job more effectively.

The key to *First Amendment* analysis of government employment decisions, then, is

this: The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer. The government cannot restrict the speech of the public at large just in the name of efficiency. But where the government is employing someone for the very purpose of effectively achieving its goals, such restrictions may well be appropriate.

C

1

The Court of Appeals' decision, we believe, gives insufficient weight to the government's interest in efficient employment decisionmaking. In other *First Amendment* contexts the need to safeguard possibly protected speech may indeed outweigh the government's efficiency interests. See, e. g., *Freedman v. Maryland, 380 U.S. 51, 13 L. Ed. 2d 649, 85 S. Ct. 734 (1965); Speiser v. Randall, 357 U.S. at 526.* But where the government is acting as employer, its efficiency concerns should, as we discussed [***700] above, be assigned a greater value.

The problem with the Court of Appeals' approach -- under which the facts to which the *Connick* test is applied are determined [*676] by the judicial factfinder -- is that it would force the government employer to come to its factual conclusions through procedures that substantially mirror the evidentiary rules used in court. The government manager would have to ask not what conclusions she, as an experienced professional, can draw from the circumstances, but rather what conclusions a jury would later draw. If she relies on hearsay, or on what she knows about the accused employee's character, she must be aware that this evidence might not be usable in court. If she knows one party is, in her personal experience, more credible than another, she must realize that the jury will not share that personal experience. If she thinks the alleged

offense is so egregious that it is proper to discipline the accused employee even though the evidence is ambiguous, she must consider that a jury might decide the other way.

But employers, public and private, often do rely on hearsay, on past similar conduct, on their personal knowledge of people's credibility, and on other factors that the judicial process ignores. Such reliance may sometimes be the most effective way for the employer to avoid future recurrences of improper and disruptive conduct. What works best in a judicial proceeding may not be appropriate in the employment context. If one employee accuses another of misconduct, it is reasonable for a government manager to credit the allegation more if it is consistent with what the manager knows of the character of the accused. Likewise, a manager may legitimately want to discipline an employee based on complaints by patrons that the employee has been rude, even though these complaints are hearsay.

It is true that these practices involve some risk of erroneously punishing protected speech. The government may certainly choose to adopt other practices, by law or by contract. But we do not believe that the *First Amendment* requires it to do so. Government employers should be allowed to use personnel procedures that differ from the evidentiary [*677] rules used by courts, without [**1889] fear that these differences will lead to liability.

2

[***LEdHR4A] [4A]On the other hand, we do not believe that the court must apply the *Connick* test only to the facts as the employer thought them to be, without considering the reasonableness of the employer's conclusions. Even in situations where courts have recognized the special expertise and special needs of certain decisionmakers, the deference to their conclusions has never been complete. Cf. *New Jersey v. T. L. O.*, 469 U.S. 325, 342-343, 83 L. Ed. 2d 720, 105 S. Ct. 733 (1985);*United States v. Leon*, 468 U.S. 897,

914, 82 L. Ed. 2d 677, 104 S. Ct. 3405 (1984);*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 490-491, 95 L. Ed. 456, 71 S. Ct. 456 (1951).It is necessary that the decisionmaker reach its conclusion about what was said in good faith, rather than as a pretext; but it does not follow that good faith is sufficient. JUSTICE SCALIA is right in saying that we have often held various laws to require only an inquiry into the decisionmaker's intent, see *post*, at 690-691, but, as discussed *supra* in [***701] Part II-A, this has not been our view of the *First Amendment*.

We think employer decisionmaking will not be unduly burdened by having courts look to the facts as the employer *reasonably* found them to be. It may be unreasonable, for example, for the employer to come to a conclusion based on no evidence at all. Likewise, it may be unreasonable for an employer to act based on extremely weak evidence when strong evidence is clearly available -- if, for instance, an employee is accused of writing an improper letter to the editor, and instead of just reading the letter, the employer decides what it said based on unreliable hearsay.

[***LEdHR5A] [5A]If an employment action is based on what an employee supposedly said, and a reasonable supervisor would recognize that there is a substantial likelihood that what was actually said was protected, the manager must tread with a certain amount of care. This need not be the care with which trials, with their rules of evidence and procedure, are [*678] conducted. It should, however, be the care that a reasonable manager would use before making an employment decision -- discharge, suspension, reprimand, or whatever else -- of the sort involved in the particular case. JUSTICE SCALIA correctly points out that such care is normally not constitutionally required unless the employee has a protected property interest in her job, *post*, at 688; see also *Board of Regents of State Colleges v. Roth*,

511 U.S. 661, *; 114 S. Ct. 1878, **;
128 L. Ed. 2d 686, ***; 1994 U.S. LEXIS 4104

*408 U.S. 564, 576-578, 33 L. Ed. 2d 548, 92 S. Ct. 2701 (1972)*; but we believe that the possibility of inadvertently punishing someone for exercising her *First Amendment* rights makes such care necessary.

Of course, there will often be situations in which reasonable employers would disagree about who is to be believed, or how much investigation needs to be done, or how much evidence is needed to come to a particular conclusion. In those situations, many different courses of action will necessarily be reasonable. Only procedures outside the range of what a reasonable manager would use may be condemned as unreasonable.

[***LEdHR4B]    [4B]Petitioners argue that *Mt. Healthy City Bd. of Ed. v. Doyle, 429 U.S. 274, 50 L. Ed. 2d 471, 97 S. Ct. 568 (1977)*, forecloses a reasonableness test, and holds instead that the *First Amendment* was not violated unless "'the defendant[s'] intent [was] to violate the plaintiff['s] constitutional rights.'" Brief for Petitioners 25; see also *post*, at 690 (SCALIA, J., dissenting). JUSTICE SCALIA makes a similar argument based on *Pickering, Connick*, and *Perry*, which alluded to the impropriety of management "retaliation" for protected speech. *Post*, at 689. But in all those cases the employer assertedly knew the true content of the employee's protected speech, and fired the employee in part because of it. In none of them did we have occasion to decide what should happen if the defendants hold an erroneous and unreasonable belief about what plaintiff said. These cases cannot be read as foreclosing an argument that they never dealt with. *United States v. L. A. Tucker Truck Lines, Inc., 344 U.S. 33,* [**1890] *38, 97 L. Ed. 54, 73 S. Ct. 67 (1952)*.

[*679] 3

[***LEdHR6A] .[6A]We disagree with JUSTICE STEVENS' contention that the test we adopt "provides less protection for a fundamental constitutional right than the law ordinarily provides for [***702] less exalted

rights." *Post*, at 695. We have never held that it is a violation of the Constitution for a government employer to discharge an employee based on substantively incorrect information. Where an employee has a property interest in her job, the only protection we have found the Constitution gives her is a right to adequate procedure. And an at-will government employee -- such as Churchill apparently was, App. to Pet. for Cert. 70 -- generally has no claim based on the Constitution at all.

Of course, an employee may be able to challenge the substantive accuracy of the employer's factual conclusions under state contract law, or under some state statute or common-law cause of action. In some situations, the employee may even have a federal statutory claim. See *NLRB v. Burnup & Sims, Inc., 379 U.S. 21, 13 L. Ed. 2d 1, 85 S. Ct. 171 (1964)*. Likewise, the State or Federal Governments may, if they choose, provide similar protection to people fired because of their speech. But this protection is not mandated by the Constitution.

The one pattern from which our approach does diverge is the broader protection normally given to people in their relationship with the government as sovereign. See, e. g., *New York Times Co. v. Sullivan, 376 U.S. at 279-280*, cited *post*, at 696, 699 (STEVENS, J., dissenting). But the reasons for this are those discussed *supra* in Part II-B: "Our 'profound national commitment' to the freedom of speech," *post*, at 699 (STEVENS, J., dissenting), must of necessity operate differently when the government acts as employer rather than sovereign.

III

Applying the foregoing to this case, it is clear that if petitioners really did believe Perkins-Graham's and Ballew's [*680] story, and fired Churchill because of it, they must win. Their belief, based on the investigation they conducted, would have been entirely reasonable. After getting the initial report from

511 U.S. 661, *; 114 S. Ct. 1878, **;
128 L. Ed. 2d 686, ***; 1994 U.S. LEXIS 4104

Ballew, who overheard the conversation, Waters and Davis approached and interviewed Perkins-Graham, and then interviewed Ballew again for confirmation. In response to Churchill's grievance, Hopper met directly with Churchill to hear her side of the story, and instructed Magin to interview Ballew one more time. Management can spend only so much of their time on any one employment decision. By the end of the termination process, Hopper, who made the final decision, had the word of two trusted employees, the endorsement of those employees' reliability by three hospital managers, and the benefit of a face-to-face meeting with the employee he fired. With that in hand, a reasonable manager could have concluded that no further time needed to be taken. As respondents themselves point out, "if the belief an employer forms supporting its adverse personnel action is 'reasonable,' an employer has no need to investigate further." Brief for Respondents 39.

And under the *Connick* test, Churchill's speech as reported by Perkins-Graham and Ballew was unprotected. Even if Churchill's criticism of cross-training reported by Perkins-Graham and Ballew was speech on a matter of public concern -- something we need not decide -- the potential disruptiveness of the speech as reported was enough [***703] to outweigh whatever *First Amendment* value it might have had. According to Ballew, Churchill's speech may have substantially dampened Perkins-Graham's interest in working in obstetrics. Discouraging people from coming to work for a department certainly qualifies as disruption. Moreover, Perkins-Graham perceived Churchill's statements about Waters to be "unkind and inappropriate," and told management that she knew they could not continue to "tolerate that kind of negativism" from Churchill. This is strong evidence that Churchill's complaining, if not dealt with, threatened to undermine [*681] management's authority in Perkins-Graham's eyes. And finally, Churchill's [**1891] statement, as reported by Perkins-Graham, that it "wasn't

possible" to "wipe the slate clean" between her and Waters could certainly make management doubt Churchill's future effectiveness. As a matter of law, this potential disruptiveness was enough to outweigh whatever *First Amendment* value the speech might have had.

This is so even if, as Churchill suggests, Davis and Waters were "deliberately indifferent," Brief for Respondents 31, to the possibility that much of the rest of the conversation was solely about cross-training. So long as Davis and Waters discharged Churchill only for the part of the speech that was either not on a matter of public concern, or on a matter of public concern but disruptive, it is irrelevant whether the rest of the speech was, unbeknownst to them, both on a matter of public concern and nondisruptive. The *Connick* test is to be applied to the speech for which Churchill was fired. Cf. *Connick, 461 U.S. at 149* (evaluating the disruptiveness of part of plaintiff's speech because that part was "upon a matter of public concern *and contributed to [plaintiff's] discharge*" (emphasis added)); *Mt. Healthy, 429 U.S. at 286-287.* An employee who makes an unprotected statement is not immunized from discipline by the fact that this statement is surrounded by protected statements.

[***LEdHR1B] [1B]Nonetheless, we agree with the Court of Appeals that the District Court erred in granting summary judgment in petitioners' favor. Though Davis and Waters would have been justified in firing Churchill for the statements outlined above, there remains the question whether Churchill was actually fired because of those statements, or because of something else. See *Mt. Healthy, supra, 429 U.S. at 286-287.*

Churchill has produced enough evidence to create a material issue of disputed fact about petitioners' actual motivation. Churchill had criticized the cross-training policy in the past; management had exhibited some sensitivity about the criticisms; Churchill pointed to some