511 U.S. 661, *; 114 S. Ct. 1878, **;
128 L. Ed. 2d 686, ***; 1994 U.S. LEXIS 4104

other conduct by hospital [*682] management that, if viewed in the light most favorable to her, would show that they were hostile to her because of her criticisms. *977 F.2d at 1125-1126*. A reasonable factfinder might therefore, on this record, conclude that petitioners actually fired Churchill not because of the disruptive things she said to Perkins-Graham, but because of nondisruptive statements about cross-training that they thought she may have made in the same conversation, or because of other statements she may have made earlier. If this is so, then the court will have to [***704] determine whether those statements were protected speech, a different matter than the one before us now.

Because of our conclusion, we need not determine whether the defendants were entitled to qualified immunity. We also need not decide whether the defendants were acting pursuant to hospital policy or custom, because that question, though argued by petitioners in their merits brief, was not presented in the petition for certiorari. See *Izumi Seimitsu Kogyo Kabushiki Kaisha v. U.S. Philips Corp., 510 U.S. 27, 126 L. Ed. 2d 396, 114 S. Ct. 425 (1993) (per curiam)*. Rather, we vacate the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*So ordered.*

**CONCUR BY: SOUTER; SCALIA**

**CONCUR**

JUSTICE SOUTER, concurring.

I

I join JUSTICE O'CONNOR's plurality opinion stating that, under the Free Speech Clause, a public employer who reasonably believes a third-party report that an employee engaged in constitutionally unprotected speech may punish the employee in reliance on that report, even if it turns out that the employee's actual remarks were constitutionally protected.

I add these words to emphasize that, in order to avoid liability, the public employer must not only reasonably investigate the third-party report, but must also actually believe [*683] it. Under the plurality's [**1892] opinion, an objectively reasonable investigation that fails to convince the employer that the employee actually engaged in disruptive or otherwise unprotected speech does not inoculate the employer against constitutional liability. A public employer violates the Free Speech Clause, that is, by invoking a third-party report to penalize an employee when the employer, despite the report and the reasonable investigation into it, believes or genuinely suspects that the employee's speech was protected in its entirety or in that part on which the employer purports to rely in taking disciplinary action; or if the employer invokes the third-party report merely as a pretext to shield disciplinary action taken because of protected speech the employer believes or genuinely suspects that the employee uttered at another time.

*First Amendment* limitations on public employers, as the plurality explains, must reflect a balance of the public employer's interest in accomplishing its mission and the public employee's interest in speaking on matters of public concern. See *ante*, at 668-675. Where an employer penalizes an employee on the basis of a third-party report of speech that the employer should have suspected, based on the content of the report and the employer's familiarity with the employee and the workplace, to have been constitutionally protected, this balance must reflect the facts that employees' speech on matters of public concern will often (as we said of employees' union activities) "engender strong emotions and give rise to active rumors," and, critically, that "the example of employees who are discharged on false charges would or might have a deterrent effect on other employees." *NLRB v. Burnup & Sims, Inc., 379 U.S. 21, 23, 13 L. Ed. 2d 1, 85 S. Ct. 171 (1964)*; see also *Rankin v. McPherson, 483 U.S. 378, 384, 97 L. Ed. 2d*

*315, 107 S. Ct. 2891 (1987)* ("'The threat of dismissal [***705] from public employment is . . . a potent means of inhibiting speech'") (quoting *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty., 391 U.S. 563, 574, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968)).* As the plurality's opinion frankly recognizes, [*684] permitting public employers to punish employees in reliance on third-party reports "involve[s] some risk of erroneously punishing protected speech." *Ante,* at 676.

This is a risk that the public employer's interests justify tolerating, as the plurality's opinion explains, but only when the public employer's conduct was reasonable, see *ante,* at 677-678, and only when the employer "really did believe" the third-party report, *ante,* at 679; see also *ante,* at 680 (an employer need not investigate further "'if the belief an employer forms supporting its adverse personnel action is "reasonable"'") (citation omitted); *ante,* at 677 (courts must "look to the facts as the employer reasonably found them to be") (emphasis deleted). · A public employer who did not really believe that the employee engaged in disruptive or otherwise punishable speech can assert no legitimate interest strong enough to justify chilling protected expression, whether the employer affirmatively disbelieved the third-party report or merely doubted its accuracy. Imposing liability on such an employer respects the "longstanding recognition that the *First Amendment's* primary aim is the full protection of speech upon issues of public concern, as well as the practical realities involved in the administration of a government office." *Connick v. Myers, 461 U.S. 138, 154, 75 L. Ed. 2d 708, 103 S. Ct. 1684 (1983).*

\* In addition, and also because of the risk of chilling protected expression, the public employer must believe that the discipline chosen is an appropriate, and not excessive, response to the employee's speech as reported. I do not understand respondents in this case to raise any claim that the discharge was pretextual in this respect.

Accordingly, even though petitioners conducted an objectively reasonable investigation into Ballew's report about respondent Churchill's conversation with Perkins-Graham, I believe that petitioners' dismissal of Churchill would have violated the Free Speech Clause if after the investigation they [**1893] doubted the accuracy of the report and fired Churchill for speech, or for a portion of her speech, that they genuinely suspected was nondisruptive (assuming that the speech was [*685] actually on a matter of public concern). Though under the plurality's opinion the presentation of such an argument is open to Churchill on remand, Churchill would not, of course, have to rely on it if she can establish that, despite the reasonable investigation, petitioners believed that Churchill said nothing disruptive in her conversation with Perkins-Graham; that they believed that Churchill made some nondisruptive remarks to Perkins-Graham and fired her because of those remarks; or that they fired her because of nondisruptive comments about cross-training they knew she made earlier (again, assuming in each case that the speech at issue was on a matter of public concern).

II

Though JUSTICE O'CONNOR's opinion speaks for just four Members of the [***706] Court, the reasonableness test it sets out is clearly the one that lower courts should apply. A majority of the Court agrees that employers whose conduct survives the plurality's reasonableness test cannot be held constitutionally liable (assuming the absence of pretext), see *ante,* at 679-681 (plurality opinion); *post,* at 686-692 (SCALIA, J., concurring in judgment); and a majority (though a different one) is of the view that employers whose conduct fails the plurality's reasonableness test have violated the Free Speech Clause, see *ante,* at 677-678 (plurality opinion); *post,* at 694-699 (STEVENS, J.,

511 U.S. 661, *; 114 S. Ct. 1878, **;
128 L. Ed. 2d 686, ***; 1994 U.S. LEXIS 4104

dissenting); see also *post*, at 697-698, n. 4 (STEVENS, J., dissenting) ("JUSTICE O'CONNOR appropriately rejects [JUSTICE SCALIA's] position, at least for those instances in which the employer unreasonably believes an incorrect report concerning speech that was in fact protected and disciplines an employee based upon that misunderstanding. I, of course, agree with JUSTICE O'CONNOR that discipline in such circumstances violates the *First Amendment*"). Accordingly, the plurality opinion may be taken to state the holding of the Court. See *Marks v. United States, 430 U.S. 188, 193-194, 51 L. Ed. 2d 260, 97 S. Ct. 990 (1977)* (discussing *Book Named "John Cleland's [\*686] Memoirs of a Woman of Pleasure" v. Attorney General of Mass., 383 U.S. 413, 16 L. Ed. 2d 1, 86 S. Ct. 975 (1966))*.

JUSTICE SCALIA, with whom JUSTICE KENNEDY and JUSTICE THOMAS join, concurring in the judgment.

The central issue in this case is whether we shall adhere to our previously stated rule that a public employer's disciplining of an employee violates the Speech and Press Clause of the First Amendment only if it is in retaliation for the employee's speech on a matter of public concern. JUSTICE O'CONNOR would add to this prohibition a requirement that the employer conduct an investigation before taking disciplinary action in certain circumstances. This recognition of a broad new *First Amendment* procedural right is in my view unprecedented, superfluous to the decision in the present case, unnecessary for protection of public-employee speech on matters of public concern, and unpredictable in its application and consequences.

I

[\*\*\*LEdHR3B] [3B]I do not doubt that the *First Amendment* contains within it some procedural prescriptions -- that in some circumstances, "the freedom of speech" recognized by the Constitution consisted of a right to speak unless and until certain

procedures to prevent the speech had first been complied with. Thus, for example, I have no quarrel in principle with (though I have not inquired into the historical justification for) decisions such as *Freedman v. Maryland, 380 U.S. 51, 13 L. Ed. 2d 649, 85 S. Ct. 734 (1965)*, which established the administrative and judicial review provisions that a film licensing process must contain in order to avoid constituting an unconstitutional prior restraint, see *Patterson v. Colorado ex rel. Attorney General of Colo., 205 U.S. 454, 462, 51 L. Ed. 879, 27 S. Ct. 556 (1907)* (Holmes, J.).

[\*\*1894] We have, however, been most circumspect about acknowledging procedural components of the *First [\*\*\*707] Amendment*. Almost all of the cases JUSTICE O'CONNOR cites as exemplars are elaborations upon the limitation on defamation suits first [\*687] announced in *New York Times Co. v. Sullivan, 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710 (1964)*. See, *e. g., Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 80 L. Ed. 2d 502, 104 S. Ct. 1949 (1984); Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 89 L. Ed. 2d 783, 106 S. Ct. 1558 (1986); Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 115 L. Ed. 2d 447, 111 S. Ct. 2419 (1991)*. These cases deal with alleged governmental deprivation of the freedom of speech specifically *through the judicial process*, in which context procedures are necessarily central to the discussion. *Speiser v. Randall, 357 U.S. 513, 2 L. Ed. 2d 1460, 78 S. Ct. 1332 (1958)*, also involved judicial (and pre-judicial adjudicative) process, holding that a state tax deduction could not be denied for a speech-related reason (advocacy of overthrow of the Government of the United States or of the State by unlawful means) by placing the burden of *disproving* that speech-related reason upon the taxpayer. Moreover, although the existence of a *First Amendment* right was central to the Court's reasoning, the decision was squarely rested on the Due Process Clause, see *id., at 529*, and not on the *First Amendment*, see *id., at 517, n. 3*. The last

511 U.S. 661, *; 114 S. Ct. 1878, **;
128 L. Ed. 2d 686, ***; 1994 U.S. LEXIS 4104

case cited by JUSTICE O'CONNOR, *Freedman, supra,* was, as I described earlier, a prior restraint case; review and requirement of procedures were to be expected.

> * Moreover, the remedy in that context is self-evident: remand for readjudication pursuant to the proper procedures. In the present context, by contrast, the remedy is not all clear, see *infra*, at 693-694.

In today's opinion by JUSTICE O'CONNOR, our previous parsimony is abandoned, in favor of a general principle that "it is important to ensure not only that the substantive *First Amendment* standards are sound, but also that they are applied through reliable procedures," *ante*, at 669. Although we are assured that "not every procedure that may safeguard protected speech is constitutionally mandated," *ante*, at 670, the implication of that assurance is that many are. We never are informed how to tell mandated speech-safeguarding procedures from nonmandated ones, except for the clue that "each procedure involves a different mix of administrative burden, risk of erroneous punishment of [*688] protected speech, and risk of erroneous exculpation of unprotected speech," *ibid*.

[***LEdHR5B] [5B]The proposed right to an investigation before dismissal for speech not only expands the concept of "*First Amendment* procedure" into brand new areas, but brings it into disharmony with our cases involving government employment decided under the Due Process Clause. As JUSTICE O'CONNOR acknowledges, see *ante*, at 678, those cases hold that public employees who, like Churchill, lack a protected property interest in their jobs, are not entitled to any sort of a hearing before dismissal. See, e. g., *Board of Regents of State Colleges v. Roth, 408 U.S. 564, 577-578, 33 L. Ed. 2d 548, 92 S. Ct. 2701 (1972)*. Such employees can be dismissed with impunity (insofar as federal constitutional protections are [***708] concerned) for the reason, *accurate or not*, that they are incompetent, that they have

been guilty of unexcused absences, that they have stolen money from the faculty honor bar - - or indeed *for no reason at all*. But under JUSTICE O'CONNOR's opinion, if a reason happens to be given, and if the reason relates to speech and "there is a substantial likelihood that what was actually said was protected," (whatever that means), *ante*, at 677, an investigation to assure that the speech was not the sort protected by the *First Amendment* must be conducted -- after which, presumably, the dismissal can still proceed even if the speech was not what the employer had thought it was, so long as it was not speech on an issue of public importance. In the present case, for example, if the requisite "*First Amendment* investigation" disclosed that Nurse Churchill had not [**1895] been demeaning her superiors, but had been complaining about the perennial end-of-season slump of the Chicago Cubs, her dismissal, erroneous as it was, would have been perfectly OK.

This is a strange jurisprudence indeed. And the reason it is strange is that JUSTICE O'CONNOR has in effect converted the government employer's *First Amendment* liability with respect to "public concern" speech from liability for [*689] intentional wrong to liability for mere negligence. What she proposes is, at bottom, not new procedural protections for established *First Amendment* rights, but rather new *First Amendment* rights. *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty., 391 U.S. 563, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968)*, did not require government-employer "protection" of "public concern" speech, but merely forbade government-employer hostility to such speech. "It is essential," *Pickering* said, "that [public employees] be able to speak out freely on such questions without fear of *retaliatory* dismissal." *Id., at 572* (emphasis added). See also *Connick v. Myers, 461 U.S. 138, 149, 75 L. Ed. 2d 708, 103 S. Ct. 1684 (1983)* (same). The critical inquiry for the factfinder in these cases is whether the employment decision was, "in fact, made in retaliation for [the] exercise of the

511 U.S. 661, *; 114 S. Ct. 1878, **;
128 L. Ed. 2d 686, ***; 1994 U.S. LEXIS 4104

constitutional right of free speech." *Perry v. Sindermann, 408 U.S. 593, 598, 33 L. Ed. 2d 570, 92 S. Ct. 2694 (1972).* A category of employee speech is certainly not being "retaliated against" if it is no more and no less subject to being mistaken for a disciplinable infraction than is any other category of speech or conduct.

II

The creation of procedural *First Amendment* rights in this case is all the more remarkable because it is unnecessary to the disposition of the matter. After imposing the new duty upon government employers, JUSTICE O'CONNOR's opinion concludes that it was satisfied anyway -- *i. e.,* that the investigation conducted by the hospital was "entirely reasonable." *Ante,* at 680. And then, to make the creation of the new duty doubly irrelevant, it finds that the case must be remanded anyway for a pretext inquiry: whether "petitioners actually fired Churchill not because of the disruptive things she said to Perkins-Graham, but because of nondisruptive statements about cross-training that they thought she may have made in the same conversation, or because of other statements she may [***709] have made earlier." *Ante,* at 682; see also *ante,* at 682-685 (SOUTER, J., concurring). Surely this [*690] offends the doctrine that constitutional questions that need not be addressed should be avoided.

[***LEdHR1C] [1C]The requirement of a pretext inquiry, I think, renders creation of the new *First Amendment* right of investigation not only superfluous to the disposition of the present case, but superfluous to the protection of previously established speech rights. JUSTICE O'CONNOR makes no attempt to justify the right of investigation on historical grounds (it is quite unheard of). The entire asserted basis for it is pragmatic and functional: without it the government employee's right not to be fired for his speech cannot be protected. The availability of a pretext inquiry disproves that argument. Judicial inquiry into the

genuineness of a public employer's asserted permissible justification for an employment decision -- be it unprotected speech, general insubordination, or laziness -- is all that is necessary to avoid the targeting of "public interest" speech condemned in *Pickering.*

Our cases have hitherto considered this sort of inquiry all the protection needed. *Mt. Healthy City Bd. of Ed. v. Doyle, 429 U.S. 274, 50 L. Ed. 2d 471, 97 S. Ct. 568 (1977),* involved an arguably weaker case for the public employer than the present one, in that there was a "mixed motive" for the disciplinary action -- that is, the employer admitted that the "public concern" speech was part of the reason for the discharge, but asserted that other valid reasons were in any event sufficient. In deciding that case, we found no need to invent procedural requirements, but simply directed the District Court "to determine whether the Board had shown by [**1896] a preponderance of the evidence that it would have reached the same decision as to respondent's employment even in the absence of the protected conduct." *Id., at 287.* The objective, we said, was to "protect against the invasion of constitutional rights without commanding undesirable consequences not necessary to the assurance of those rights." *Ibid.*

The Court considers "pretext" analysis sufficient in many other areas. See, *e. g., Eastman Kodak Co. v. Image Technical* [*691] *Services, Inc., 504 U.S. 451, 484 (1992)* (antitrust laws); *Hernandez v. New York, 500 U.S. 352, 363-364, 114 L. Ed. 2d 395, 111 S. Ct. 1859 (1991)* (plurality opinion) (constitutionality of peremptory challenges); *Patterson v. McLean Credit Union, 491 U.S. 164, 187-188, 105 L. Ed. 2d 132, 109 S. Ct. 2363 (1989)* (employment discrimination suit under 42 U.S.C. § 1981); *New York v. Burger, 482 U.S. 691, 716-717, n. 27, 96 L. Ed. 2d 601, 107 S. Ct. 2636 (1987)* (*Fourth Amendment* challenge to administrative searches); *Sure-Tan, Inc. v. NLRB, 467 U.S. 883, 895-896, n. 6,*

511 U.S. 661, *; 114 S. Ct. 1878, **;
128 L. Ed. 2d 686, ***; 1994 U.S. LEXIS 4104

*81 L. Ed. 2d 732, 104 S. Ct. 2803 (1984)* (unfair labor practice suit under the National Labor Relations Act); *Geduldig v. Aiello, 417 U.S. 484, 496-497, n. 20, 41 L. Ed. 2d 256, 94 S. Ct. 2485 (1974)* (Equal Protection Clause sex-discrimination claim against legislation); *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 804-805, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)* (discrimination claim under Title VII). And it considers "pretext" analysis sufficient in other *First Amendment* contexts. For example, in *Renton v.* [***710] *Playtime Theatres, Inc., 475 U.S. 41, 54, 89 L. Ed. 2d 29, 106 S. Ct. 925 (1986),* after holding that zoning laws restricting the location of movie theaters do not violate the *First Amendment* unless they are a pretext for preventing free speech, we did not think it necessary to prescribe "reasonable" procedures for zoning commissions across the Nation; we left it to factfinders to determine whether zoning regulations are prompted by legitimate or improper factors. See also *Arcara v. Cloud Books, Inc., 478 U.S. 697, 708, 92 L. Ed. 2d 568, 106 S. Ct. 3172 (1986)* (O'CONNOR, J., concurring) (same). There is no reason why the same approach should not suffice here.

**[***LEdHR2B]   [2B]   [***LEdHR6B] [6B]**JUSTICE STEVENS believes that "pretext" review is inadequate, since "it provides less protection for a fundamental constitutional right than the law ordinarily provides for less exalted rights"; and "ordinarily," he contends, "when someone acts to another person's detriment based upon a factual judgment, the actor assumes the risk that an impartial adjudicator may come to a different conclusion." *Post,* at 696. But that is true in contractual realms only to the extent that the contract provides a "right" whose elimination constitutes a legal "detriment." An employee dismissable at will *can* [*692] be fired on the basis of an erroneous factual judgment, with no legal recourse -- which is what happened here. Churchill also had a *noncontractual* right: the right not to be dismissed (even from an at-will government

job) in retaliation for her expression of views on a matter of public concern. That right was not violated, since she was dismissed for another reason, erroneous though it may have been. The issue before us has nothing to do with according the deprivation of a right the ordinary degree of protection; it has to do with expanding the protection accorded a government employee's public interest speech from (1) protection against retaliation, to (2) protection against retaliation and mistake.

## III

The approach to this case adopted by JUSTICE O'CONNOR's opinion provides more questions than answers, subjecting public employers to intolerable legal uncertainty. Despite the difficulties courts already encounter in distinguishing between protected and unprotected speech, see, *e. g., Miller v. California, 413 U.S. 15, 22, 37 L. Ed. 2d 419, 93 S. Ct. 2607 (1973),* and in determining whether speech pertains to a matter of public concern, compare *O'Connor v. Steeves, 994 F.2d 905, 915 (CA1),* cert. denied, *510 U.S. 1024 (1993),* with *Gillum v. City of Kerrville, 3 F.3d 117, 120-121* [**1897] *(CA5 1993),* cert. denied, *510 U.S. 1072, 127 L. Ed. 2d 76, 114 S. Ct. 881 (1994),* JUSTICE O'CONNOR creates yet another speech-related puzzlement that government employers, judges, and juries must struggle to solve. The new constitutional duty to provide certain minimum procedural protections is triggered when "an employment action is based on what an employee supposedly said, and a reasonable supervisor would recognize that there is a substantial likelihood that what was actually said was protected," *ante,* at 677. But on what does the "reasonable supervisor" base his judgment as to whether "there is a substantial likelihood that what was actually said was protected?" Can he base it upon the *report* of what was [***711] said? Seemingly not, since otherwise JUSTICE O'CONNOR [*693] would not have found the minimum procedural protection of investigation to have been required in the

511 U.S. 661, *; 114 S. Ct. 1878, **;
128 L. Ed. 2d 686, ***; 1994 U.S. LEXIS 4104

present case (the report of Churchill's conversation gave no hint of protected speech). It remains entirely unclear what the employer's judgment *must* be based on. To avoid liability, he had better assume that it must be based on *what was actually said* -- which means that he had better investigate the incident in order to determine whether he has an obligation to investigate the incident. Hopefully I am wrong, however, and (despite today's holding) the basis for judging whether investigation is required will be solely the *report*. Then the public employer will only have to figure out what a hypothetical reasonable supervisor would infer about actual speech from that report, and then determine whether that constructed "actual speech" has a substantial likelihood of being on a matter of public concern. May the employer at least assume that no investigation is required if the report does not *mention* speech? Or can he be liable if the recommended basis for the discipline (for example, "disrupting the workplace") had a substantial likelihood of involving speech which would have had a substantial likelihood of being on a subject of public concern? I suppose ultimately it will be up to the jury to answer all these nice, once-removed questions. Or come to think of it, perhaps it will be up to the judge. JUSTICE O'CONNOR does not specify whether all this is a question of law or fact.

JUSTICE O'CONNOR states that "employer decisionmaking will not be unduly burdened by having courts look to the facts as the employer *reasonably* found them to be." *Ante*, at 677 (emphasis in original). This explains the subsequent course of events when the employer's investigation has been found reasonable: The court (or the jury) decides whether, on the facts as found by the employer, the speech was on a matter of public concern, and if not, whether the employer's reliance on the report was pretextual. But what happens when the employer's investigation has been found unreasonable? [*694] I presume that there has then been established a violation of

the procedural component of the *First Amendment* -- the failure to treat possibly protected speech with the requisite "amount of care" -- without regard to whether the employee's speech was in fact on a matter of public concern. JUSTICE O'CONNOR does not reveal what the remedy for this violation is to be. There are various possibilities: One could say that the discharge without observance of the constitutionally requisite procedures is invalid, and must be set aside unless and until those procedures are complied with. Alternatively, one could charge the employer who failed to conduct a reasonable investigation with knowledge of the protected speech that a jury later finds -- producing a sort of constructive retaliatory discharge, and entitling the employee to full reinstatement and damages. Or alternatively again, the jury could be required to determine what information a reasonable investigation would have turned up, and then to decide whether it would have been permissible for the employer to fire the employee based on that information.

These are only a few of the numerous questions left unanswered by [***712] JUSTICE O'CONNOR's opinion. Loose ends are the inevitable consequence of judicial invention. We will spend decades trying to improvise the limits of this new *First Amendment* procedure that is unmentioned in text and unformed [**1898] by tradition. It seems to me clear that game is not worth the candle, given the adequacy of "pretext" analysis to protect the constitutional interest at stake.

**DISSENT BY:** STEVENS

**DISSENT**

JUSTICE STEVENS, with whom JUSTICE BLACKMUN joins, dissenting.

This is a free country. Every American has the *right* to express an opinion on issues of public significance. In the private sector, of course, the exercise of that right may entail

511 U.S. 661, *; 114 S. Ct. 1878, **;
128 L. Ed. 2d 686, ***; 1994 U.S. LEXIS 4104

unpleasant consequences. Absent some contractual or statutory provision limiting its prerogatives, a private-sector [*695] employer may discipline or fire employees for speaking their minds. The *First Amendment*, however, demands that the government respect its employees' freedom to express their opinions on issues of public importance. As long as that expression is not unduly disruptive, it simply may not provide the basis for discipline or termination. The critical issues in a case of this kind are (1) whether the speech is protected, and (2) whether it was the basis for the sanction imposed on the employee.

Applying these standards to the case before us is quite straightforward. Everyone agrees that respondent Cheryl Churchill was fired because of what she said in a conversation with co-workers during a dinner break. Given the posture in which this case comes to us, we must assume that Churchill's statements were fully protected by the *First Amendment*. [1] Nevertheless, the plurality concludes that a dismissal for speech is valid as a matter of law as long as the public employer reasonably believed that the employee's speech was unprotected. See *ante*, at 677-678. [1] This conclusion is erroneous because it provides less protection for a fundamental constitutional right than the law ordinarily provides for less exalted rights, including contractual and statutory rights applicable in the private sector.

1  On review of the Court of Appeals' reversal of a summary judgment for petitioners, we naturally accept as true the version of Churchill's statements described in her testimony and that of two supporting witnesses. See *977 F.2d 1114, 1118-1126 (CA7 1992)*. According to Churchill, Thomas Koch, and Jean Welty, the dinner-break conversation concerned the merits of hospital policy, and Churchill did not direct any "personal criticism" against her supervisors. See *id., at 1118-1119, 1122.* According to two other witnesses,

Melanie Perkins-Graham and Mary Lou Ballew, Churchill's speech was filled with "unkind and inappropriate . . . things," "negativism," and personal comment about petitioner Cynthia Waters and the hospital administration. *Id., at 1118-1119.*

If, for example, a hospital employee had a contract providing that she could retain her job for a year if she followed the employer's rules and did competent work, that employee [*696] could not be fired because her supervisor reasonably but mistakenly believed she had been late to work or given a patient the wrong medicine. Ordinarily, when someone acts to another person's detriment based upon a factual judgment, the actor assumes the risk that an impartial adjudicator may come to a different conclusion. [2] Our legal system generally delegates the determination [***713] of facts upon which important rights depend to neutral factfinders, notwithstanding the attendant risks of error and overdeterrence.

2  In *NLRB v. Burnup & Sims, Inc., 379 U.S. 21, 13 L. Ed. 2d 1, 85 S. Ct. 171 (1964)*, two employee labor organizers were fired based upon a report that they had threatened to dynamite the employer's plant if a coming representation election was unsuccessful. The National Labor Relations Board found that the employees had never made the threatening statements. Although we recognized that the employer had acted in good faith, this Court held that the discharge "plainly violated" the organizers' right under § 8 of the National Labor Relations Act. *Id., at 22.* "Union activity," we observed, "often engenders strong emotions and gives rise to active rumors. A protected activity acquires a precarious status if innocent employees can be discharged while engaging in it, even though the employer acts in good faith." *Id., at 23.* The plurality does not explain why *First*

511 U.S. 661, *; 114 S. Ct. 1878, **;
128 L. Ed. 2d 686, ***; 1994 U.S. LEXIS 4104

*Amendment* rights should receive any lesser protection than the statutory right at issue in *Burnup & Sims*.

Federal constitutional rights merit at least the normal degree of protection. Doubts concerning the ability of juries to find the truth, an ability for which we usually have high regard, should be resolved in favor of, not against, the protection of *First Amendment* rights. See, *e. g., New York Times Co.* [**1899] *v. Sullivan, 376 U.S. 254,* 279-280, *11 L. Ed. 2d 686, 84 S. Ct. 710 (1964).* Unfortunately, the plurality underestimates the importance of freedom of speech for the more than 18 million civilian employees of this country's Federal, State, and local Governments, [3] and subordinates that freedom to an abstract interest in bureaucratic efficiency. The need for governmental efficiency that so concerns the plurality is amply protected by the substantive [*697] limits on public employees' rights of expression. See generally *Connick v. Myers, 461 U.S. 138, 75 L. Ed. 2d 708, 103 S. Ct. 1684 (1983); Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty., 391 U.S. 563, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968).* Efficiency does not demand an *additional* layer of deference to employers' "reasonable" factual errors. Today's ruling will surely deter speech that would be fully protected under *Pickering* and *Connick*.

3    See U.S. Dept. of Commerce, Statistical Abstract of the United States 318 (113 ed. 1993) (Table No. 500) (figure from 1991).

[***LEdHR2C]    [2C]  [***LEdHR4C] [4C]The plurality correctly points out that we have never decided whether the governing version of the facts in public employment free speech cases is "what the government employer thought was said, or . . . what the trier of fact ultimately determines to have been said." *Ante,* at 664. [4] To [*698] me it is clear that the latter must be controlling. The *First Amendment*

assures public employees [***714] that they may express their views on issues of public concern without fear of discipline or termination as long as they do so in an appropriate manner and at an appropriate time and place. A violation occurs when a public employee is fired for uttering speech on a matter of public concern that is not unduly disruptive of the operations of the relevant agency. The violation does not vanish merely because the firing was based upon a reasonable mistake about what the employee said. [5] A *First Amendment* claimant need not allege bad faith; the controlling question is not the regularity of the agency's investigative procedures, or the purity of its motives, [**1900] but whether the employee's freedom of speech has been "abridged."

[***LEdHR4D]  [4D]

4    JUSTICE SCALIA would recharacterize employees' right to free speech as a more modest protection against "retaliatory" discharges, a protection that would not extend to those terminated for speech that was fully protected but incorrectly reported. The only support he cites for this restrictive theory is that three of our prior public employment speech opinions have used the word "retaliation." See *ante,* at 688-689 (opinion concurring in judgment) (citing *Connick v. Myers, 461 U.S. 138, 149, 75 L. Ed. 2d 708, 103 S. Ct. 1684 (1983); Perry v. Sindermann, 408 U.S. 593, 598, 33 L. Ed. 2d 570, 92 S. Ct. 2694 (1972); Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty., 391 U.S. 563, 572, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968)).* Our use of that word in the cases JUSTICE SCALIA cites, however, does not resolve the present question, since none of those decisions involved any factual dispute over the content of employee speech. More importantly, other passages from two of those opinions support the view

511 U.S. 661, *; 114 S. Ct. 1878, **;
128 L. Ed. 2d 686, ***; 1994 U.S. LEXIS 4104

that the *causal* connection between the employee's speech and her discharge is all the "retaliation" that must be shown. See *Perry, 408 U.S. at 598* (nonrenewal of a teacher's contract "may not be predicated on his exercise of *First* and *Fourteenth Amendment* rights"); *ibid.* ("[A] teacher's public criticism of his superiors on matters of public concern may be constitutionally protected and may, therefore, be an impermissible basis for termination of his employment"); *Pickering, 391 U.S. at 574* ("In sum, . . . a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment"). Precedent certainly does not command JUSTICE SCALIA's approach, and nothing in the *First Amendment* recommends a rule that makes ignorance or mistake a complete defense for a discharge based on fully protected speech. JUSTICE O'CONNOR appropriately rejects that position, at least for those instances in which the employer unreasonably believes an incorrect report concerning speech that was in fact protected and disciplines an employee based upon that misunderstanding. I, of course, agree with JUSTICE O'CONNOR that discipline in such circumstances violates the *First Amendment.*

5 The reasonableness of the public employer's mistake would, of course, bear on whether that employer should be liable for damages. See *Butz v. Economou, 438 U.S. 478, 507, 57 L. Ed. 2d 895, 98 S. Ct. 2894 (1978)* ("Federal officials will not be liable for mere mistakes in judgment, whether the mistake is one of fact or one of law"). It is wrong, however, to constrict the substantive reach of a public employee's right of free speech in response to such remedial considerations. See *ante,* at 677

(government employers who use reasonable procedures should be free to act "without fear [of] *liability*") (emphasis added).

The risk that a jury may ultimately view the facts differently from even a conscientious employer is not, as the plurality would have it, a needless fetter on public employers' ability to discharge their duties. It is the normal means by which our legal system protects legal rights and encourages those in authority to act with care. Here, for example, attention to "conclusions a jury would later draw," *ante,* at 676, about the content of Churchill's speech might have caused petitioners to talk to Churchill about what she said before deciding to fire her. There is nothing unfair or onerous [*699] about putting the risk of error on an employer in these circumstances. [6]

6 Because there is no dispute that Churchill was fired for the content of her speech, this case does not involve the problem of determining whether the public employee would have been terminated anyway for reasons unrelated to speech. See *Mt. Healthy City Bd. of Ed. v. Doyle, 429 U.S. 274, 50 L. Ed. 2d 471, 97 S. Ct. 568 (1977).*

Government agencies are often the site of sharp differences over a wide range of important public issues. In offices where the *First Amendment* commands respect for candid deliberation and individual opinion, such disagreements are both inevitable and desirable. When those who work together disagree, reports of speech are often skewed, and supervisors are apt to misconstrue even accurate reports. The plurality, observing that managers "can spend only so much of their time on any one employment decision," *ante,* at 680, adopts a rule that invites discipline, rather than further discussion, [***715] when such disputes arise. That rule is unwise, for deliberation within the government, like deliberation about it, is an essential part of our

511 U.S. 661, *; 114 S. Ct. 1878, **;
128 L. Ed. 2d 686, ***; 1994 U.S. LEXIS 4104

"profound national commitment" to the freedom of speech. Cf. *New York Times, 376 U.S. at 270*. A proper regard for that principle requires that, before firing a public employee for her speech, management get its facts straight.

I would affirm the judgment of the Court of Appeals.

**REFERENCES**
*56 Am Jur 2d, Municipal Corporations, Counties, and Other Political Subdivisions 318; 63 Am Jur 2d, Public Officers and Employees 232*

USCS, *Constitution, Amendment 1*

Employment Coordinator EP-22,687, EP-22,722

L Ed Digest, Appeal 1699; Constitutional Law 956

L Ed Index, Discipline; Hospitals and Asylums; Nurses; Public Officers and Employees; Removal or Discharge from Employment of Office

ALR Index, Discharge from Employment or Office; Discipline and Disciplinary Actions; Freedom of Speech and Press; Hospitals; Nurses and Nursing; Public Officers and Employees

Annotation References:

Public employee's right of free speech under *Federal Constitution's First Amendment*. 97 L Ed 2d 903.

*First Amendment* protection for public hospital or health employees subjected to discharge ,transfer, or discipline because of speech. 107 ALR Fed 21.

Recycled Paper

BLUEBIRD
(310) 477-0700

EXHIBIT 85

1  Cathryn Chinn, Esq. (State Bar 93340)
   Peter G. Friesen, Esq. (State Bar 107631)
2  1901 First Avenue, Suite 400
   San Diego, California 92101
3  Telephone (619) 234-9000
   Facsimile (619) 699-1159
4

5  Attorneys for Plaintiff
   JOSE HERNANDEZ
6

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9      COUNTY OF SAN DIEGO, CENTRAL BRANCH, GENERAL UNLIMITED

10 JOSE HERNANDEZ,                    Case No. : GIC 871979

11              Plaintiff,            PLAINTIFF JOSE HERNANDEZ'
                                      MEMORANDUM OF POINTS AND
12 v.                                 AUTHORITIES IN OPPOSITION TO THIRD
                                      PARTY EDWARD P. SWAN, JR.'S MOTION
13 SAN DIEGO COUNTY REGIONAL          FOR PROTECTIVE ORDER [CCP §
   AIRPORT AUTHORITY, a public entity 2025.420]
14 and DOES 1 through 12, Inclusive,
                                      DATE:       December 19, 2007
15              Defendants.           TIME:       9:00 a.m.
                                      DEPT.:      75
16                                    JUDGE:      HON. RICHARD E. STRAUSS
                                      ACTION FILED:   9/1/06
17                                    TRIAL DATE:     1/4/08

18

19

20      Plaintiff JOSE HERNANDEZ submits his memorandum of points and authorities in

21 opposition to Third Party Edward P. Swan, Jr.'s Motion for Protective Order as follows:

22                                    I.

23                            INTRODUCTION

24      At the leading edge of the Airport Authority's motion for summary judgment–reset for

25 hearing on December 14, 2007–is the declaration of Patrick Swan (Exhibit A to Notice of Lodgment

26 filed herewith), a partner of Luce, Forward, Hamilton and Scripps. In that declaration he described

27 an investigation he performed on behalf of the Airport Authority, along with his impressions and

28

   PL'S MEMO OF P'S&A'S IN OPPOS. TO THIRD PARTY SWAN'S MOTION FOR PROTECTIVE ORDER

1  opinions concerning the investigation. Accompanying his declaration is the declaration of Thella

2  Bowens (Exhibit B to Notice of Lodgment filed herewith), the Airport Authority CEO, who claims

3  to have relied on his analysis in her decision to terminate the employment of Plaintiff.  Counsel for

4  the Authority contends Mr. Swan is and will continue to be an important witness in the Authority's

5  case.

6        These declarations are lodged herewith and prove beyond any doubt that both the Airport

7  Authority and Mr. Swan have placed Mr. Swan's investigative interviews, beliefs, impressions and

8  opinions related to the investigation at issue. Notwithstanding Mr. Swan's generously-shared

9  opinions and analyses in this case, he presently contends his deposition cannot be taken because it

10  would invade attorney client and attorney work product privileges. This response addresses the issue

11  of whether the Airport Authority and Mr. Swan have waived these privileges.

12                                      **II.**

13                            **STATEMENT OF FACTS**

14        The notice of deposition and subpoena duces tecum which are the subject of this motion were

15  served on Patrick Swan on November 9, 2007.  The subpoena demands his presence, as well as

16  records pertaining to his investigation of Plaintiff (Exhibit 1 to Swan's motion).  He served an

17  objection (Exhibit 2 to Swan's motion) to the production of documents based on a claim of attorney-

18  client and attorney-work product privileges.

19        In a motion currently pending before this Court, Defendant Airport Authority submitted the

20  declaration of Thella Bowens.  In that declaration she stated that she based her decision to terminate

21  Hernandez' employment on Patrick Swan's investigation and report, after conferring over that report

22  with Dianne Richards (head of personnel). [Exhibit B to Hernandez' opposition (Decl. T. Bowens

23  ¶ 9)]  His report was attached to her declaration in support of the motion. [Exhibit C to Hernandez'

24  opposition (Swan's letter dated January 19, 2006)]

25        Mr. Swan also signed a declaration about his investigation of Hernandez and submitted it in

26  support of the Airport Authority's motion for summary judgment.  In that declaration he stated,

27  among other things:

28

1    I concluded, as a result of our investigation into Mr. Hernandez'
     receipt of benefits, that there was sufficient evidence that Mr.
2    Hernandez had accepted benefits from Authority vendors and
     contractors from 2003 through January 2006. I also concluded that
3    there was sufficient evidence that Mr. Hernandez had violated Section
     2.10 of the Authority's Ethics Code by virtue of accepting benefits
4    from the Authority's vendors in an amount that exceeded more than
     one half the amount of gifts permitted under the California Political
5    Reform Act in any calendar year from a single source knowing that
     the source is doing business with the Authority. [Exhibit A to Notice
6    of Lodgment filed herewith (Decl. P. Swan ¶ 14)]

7         Mr. Swan further incorporated all of his opinions and conclusions of his report to Thella

8    Bowens and incorporated that report by reference. [Exhibits A and C to Notice of Lodgment filed

9    herewith (Decl. P. Swan ¶ 18)] Throughout the report he describes the investigative measures which

10   supported his report and the reasoning in support of those opinions and conclusions.

11        During Thanksgiving week, approximately two weeks after the Mr. Swan was served with

12   a subpoena, his office contacted Hernandez' counsel (Cathryn Chinn) requesting rescheduling Mr.

13   Swan's deposition. Ms. Chinn agreed to contact counsel regarding changing the date provided that

14   Mr. Swan produce documents on November 26. On November 26, Hernandez' co-counsel (Peter

15   Friesen) returned to his office to discover a request had been made to change the date of the

16   deposition and that Mr. Swan had not produced documents and would not testify about his work for

17   the Authority without a court order. Mr. Swan then filed this motion for protective order.

18        While this motion was pending, Hernandez requested that Mr. Swan itemize the documents

19   to which he is asserting privilege, so that the Court may rule comprehensively over the matters in

20   dispute, and avoid the need for multiple hearings. This request for itemization (otherwise known

21   as a "privilege log") was refused, despite the fact that CCP § 2025.420 requires that protective orders

22   specify records for which protection is sought.

23                                              **III.**

24                                         **ARGUMENT**

25   A.    **The Authority and Swan Expressly Waived Privilege**

26        Section 912(a) of the California Evidence Code provides that any privilege can be waived

27   by conduct which discloses or indicates a consent to the disclosure of privileged material:

28

PL'S MEMO OF P'S&A'S IN OPPOS. TO THIRD PARTY SWAN'S MOTION FOR PROTECTIVE ORDER
                                        - 3 -

85-1199

1  Except as otherwise provided in this section, the right of any person
   to claim a privilege provided by Section 954 (lawyer-client privilege),
2  980 (privilege for confidential marital communications), 994
   (physician-patient privilege), 1014 (psychotherapist-patient privilege),
3  1033 (privilege of penitent), 1034 (privilege of clergyman), 1035.8
   (sexual assault counselor-victim privilege), or 1037.5 (domestic
4  violence counselor-victim privilege) is waived with respect to a
   communication protected by the privilege if any holder of the
5  privilege, without coercion, has disclosed a significant part of the
   communication or has consented to disclosure made by anyone.
6  Consent to disclosure is manifested by any statement or other conduct
   of the holder of the privilege indicating consent to the disclosure,
7  including failure to claim the privilege in any proceeding in which the
   holder has the legal standing and opportunity to claim the privilege.

8

9  Consent to a disclosure is manifested by any statement or other conduct by the holder of the

10 privilege that indicates consent, including failure to claim the privilege when the holder has the

11 standing and opportunity to claim it [Evid. Code § 912(a)]. Consent may also be inferred. For

12 instance, consent of an attorney's client may be inferred from a disclosure by the attorney for the

13 client's benefit during negotiations on behalf of the client. [*Klang v. Shell Oil Co.* (1971) 17

14 Cal.App.3d 933, 938]

15     The Airport Authority had standing to assert a privilege involving conversations between its

16 employees and Mr. Swan and failed to do so. Instead, the Airport Authority made offensive use of

17 Mr. Swan's investigation to support its motion for summary judgment, including his opinions and

18 conclusions drawn from his conversations with airport personnel. Mr. Swan might have asserted a

19 work product privilege as to his investigative acts and his opinions derived from those acts, but he

20 failed to do so. Instead, he acquiesced to his insertion by the Authority as a witness to the case. His

21 opinions, as well as the preparatory investigation, were offered to attempt to persuade the Court to

22 dismiss Hernandez' claims.

23     Even though privileges would ordinarily apply to attorneys' work product, including his

24 opinions and impressions, this privilege is waived when the same are offered as evidence to

25 influence an official proceeding. [*See McKesson HBOC, Inc. v. Superior Court* (2004 Cal.App.1st

26 Dist) 115 Cal.App.4th 1229–Corporation waived attorney-client privilege and work product

27 protection where it shared with the government the results of an audit review and interview

28

PL'S MEMO OF P'S&A'S IN OPPOS. TO THIRD PARTY SWAN'S MOTION FOR PROTECTIVE ORDER
- 4 -

85-1200

1   memoranda that its attorneys prepared when the corporation discovered its subsidiary had misstated

2   revenues; *Williamson v. Superior Court of Los Angeles County* (1978) 21 Ca.3d 829–the discovery

3   of confidential expert reports which would ordinarily be privileged is lost when the witness is used

4   or designated for trial; *Kadelbach v. Amaral* (1973, Cal.App.3d Dist) 31 Cal.App.3d 814–An

5   attorney's work product lost statutory protection against discovery when used as an offensive weapon

6   for cross-examination or to refresh a witness' recollection.]  Attorneys can refrain from becoming

7   witnesses and in many cases should do so, but their opinions and expertise may be valuable as

8   evidence to a client as well.

9          It is not appropriate, however, for an attorney to insert his work product as evidence in an

10   official proceeding, and thereafter claim it cannot thereafter be scrutinized.  Nothing in the laws

11   concerning the application of work product privilege provide for its use as a shield against cross-

12   examination–once an attorney's opinions and impression have been submitted into evidence.

13   **B.   The Authority and Swan Otherwise Impliedly Waived Any Privilege**

14          Implied waiver is established by showing that "the client put the otherwise privileged

15   communication directly at issue and that disclosure is essential for a fair adjudication of the action"

16   [*Venture Law Group v. Superior Court* (2004) 118 Cal.App.4th 96, 105, 12 Cal.Rptr.3d 656

17   (attorney-client privilege)].  Since the Authority has made Mr. Swan's investigation the center of its

18   defense, and since he has acquiesced to this, he should be subject to complete and rigorous cross-

19   examination.

20   **C.   In Order to Avoid Further Delay, Mr. Swan Should Be Ordered to Produce All**

21        **Documents Which Bear on His Investigation**

22          Since Mr. Swan has offered his opinions as evidentiary support of a motion to dismiss

23   Hernandez' lawsuit, he must produce all documents bearing a reasonable relationship to the

24   investigation.  These would include:

25          1.      His complete investigative file

26          2.      Notes and recordings made of interviews

27          3.      Billing statements and hourly records reflecting time spent

28

85-1201

)

4.    Reports, memos and correspondence (and drafts held electronically)

A privilege log of relevant documents was requested, but has not yet been provided.  Mr. Swan's response was that since the code did not require him to identify documents for which a privilege is claimed, he would not do so.  This refusal is not in compliance with § 2025.420(11) of the California Code of Civil Procedure, which requires that the moving party properly identify the document or class of documents subject to protection with sufficient particularity so that the Court may rule on the disputed protective issue.

The need to identify objectionable documents and records is especially pressing given the proximity of this case to trial (currrently set for January 4, 2008).[1]  Mr. Swan's refusal to specify the documents to which he claims privilege suggests that the purpose of this motion may, among other things, be to delay the proceedings. Hernandez respectfully requests the Court order production of all documents within the scope of Hernandez' subpoena duces tecum, there being sought no protective order as to any particular document.

**D.    There Is No Basis for the Imposition of Sanctions Against Hernandez**

The gist of Mr. Swan's request for sanctions is Hernandez' alleged refusal to meet and confer on the dispute concerning his deposition. The dispute, which arose during Thanksgiving week, faults Hernandez' counsel for failing to address scheduling objections raised by Mr. Swan during that week. Hernandez' counsel agreed to reschedule provided that responsive documents were delivered on the day of the deposition.

Since Mr. Swan objected to the production of those documents, and to the content of the deposition on the ground of privilege, documents were not produced as requested, and Mr. Swan filed this motion for protective order.  Mr. Swan refused what would have been a reasonable request for documents, if not for the fact that he had reasons for objecting to them which had nothing to do with scheduling conflicts.  Apparently, the controversy in this motion centers on the privilege issue, which is not going to be resolved without judicial intervention.   The outstanding motion for

---

[1]    Mr. Swan and the Airport Authority placed his reports and opinions at issue upon the filing of a Motion for Summary Judgment set for hearing on December 14, 2007.

85-1202

1   sanctions applicable to scheduling conflicts is superfluous.

2        As noted above, Mr. Swan does not appear to be interested in achieving a prompt resolution

3   of outstanding document production issues.  He has not provided a privilege log, nor has he

4   identified any document which might be subject to judicial examination "in camera."  His refusal,

5   moreover, persists despite meet-and-confer efforts to have him provide a privilege log in advance

6   of this hearing.

7                                        IV.

8                                    **CONCLUSION**

9        This matter is not terribly complicated.  Mr. Swan's testimony has been offered in support

10  of the Airport's defense.  Mr. Swan did not object to testifying to his opinions and conclusions, and

11  there is no indication that the Airport wishes to withdraw his testimony.  Because of the press of this

12  case toward trial, and because CCP § 2025 requires records and/or classes of records by properly

13  identified in a motion of this nature, Hernandez respectfully requests that Mr. Swan or his

14  representative appear at this hearing prepared to discuss all of the documents to which the protective

15  order is sought.

16

17  DATED:  December 6, 2007

18                                    CATHRYN CHINN, ESQ.
                                      PETER G. FRIESEN, Attorneys for
19                                    Plaintiff JOSE HERNANDEZ

20

21

22

23

24

25

26

27

28

**Hernandez v. SD Regional Airport Authority**
Diego County Superior Court Case No. GIC 871979

## DECLARATION OF PERSONAL SERVICE

    I, the undersigned, declare: That I am, and was at the time of service of the papers herein referred to, over the age of eighteen years, and not a party to the action; and I am employed in the County of San Diego, State of California, in which county the within-mentioned service occurred. My business address is _____ , San Diego, California.  I served the following document(s):

see attached list

on the parties in said action by personal service on:

Lawrence J. Kouns, Esq.
Luce, Forward, Hamilton & Scripps, LLP
600 West Broadway, Suite 2600
San Diego, CA 92101
Telephone (619) 236-1414
Fax (619) 645-5359
**ATTORNEY FOR THIRD PARTY EDWARD P. SWAN, JR.**

by delivery to:

    Name (and title) of person left with:    _____

    Address where served:    same as above

    Date of delivery:    December 6, 2007

    Time of delivery:    _____ _.m.

    I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on December 6, 2007, at San Diego, California.

    _____

    #____

85-1204

**Hernandez v. SD Regional Airport Authority**
Diego County Superior Court Case No. GIC 871979

## DECLARATION OF PERSONAL SERVICE

I, the undersigned, declare: That I am, and was at the time of service of the papers herein referred to, over the age of eighteen years, and not a party to the action; and I am employed in the County of San Diego, State of California, in which county the within-mentioned service occurred. My business address is _____ , San Diego, California. I served the following document(s):

see attached list

on the parties in said action by personal service on:

FRED M. PLEVIN (SBN 126185)
SANDRA L. MCDONOUGH (SBN 193308)
ALBERT R. LIMBERG (SBN 211110)
PAUL, PLEVIN, SULLIVAN & CONNAUGHTON LLP
401 B Street, Tenth Floor
San Diego, California  92101-4232
Telephone: 619-237-5200
Facsimile: 619-615-0700
ATTORNEYS FOR DEFENDANT SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

by delivery to:

Name (and title) of person left with:      _____

Address where served:      same as above

Date of delivery:      December 6, 2007

Time of delivery:      ____ _.m.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on December 6, 2007, at San Diego, California.

_____

#____

85-1205

## LIST OF DOCUMENTS

PLAINTIFF JOSE HERNANDEZ' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THIRD PARTY EDWARD P. SWAN, JR.'S MOTION FOR PROTECTIVE ORDER [CCP § 2025.420]

DECLARATION OF CATHRYN CHINN IN OPPOSITION TO DEFENDANT SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

PLAINTIFF JOSE HERNANDEZ' NOTICE OF LODGMENT IN OPPOSITION TO THIRD PARTY EDWARD P. SWAN, JR.'S MOTION FOR PROTECTIVE ORDER [CCP § 2025.420]

Recycled Paper

**BLUEBIRD**
(310) 477-0700

**EXHIBIT 86**

1  Cathryn Chinn, Esq. (State Bar 93340)
   Peter G. Friesen, Esq. (State Bar 107631)
2  1901 First Avenue, Suite 400
   San Diego, California  92101
3  Telephone (619) 234-9000
   Facsimile (619) 699-1159
4

5  Attorneys for Plaintiff
   JOSE HERNANDEZ
6

7

8                    SUPERIOR COURT OF THE STATE OF CALIFORNIA

9         COUNTY OF SAN DIEGO, CENTRAL BRANCH, GENERAL UNLIMITED

10  JOSE HERNANDEZ,                          Case No. :  GIC 871979

11                  Plaintiff,               PLAINTIFF JOSE HERNANDEZ' NOTICE
                                             OF LODGMENT IN OPPOSITION TO
12  v.                                       THIRD PARTY EDWARD P. SWAN, JR.'S
                                             MOTION FOR PROTECTIVE ORDER [CCP
13  SAN DIEGO COUNTY REGIONAL                § 2025.420]
    AIRPORT AUTHORITY, a public entity
14  and DOES 1 through 12, Inclusive,        DATE:        December 19, 2007
                                             TIME:        9:00 a.m.
15                  Defendants.              DEPT.:       75
                                             JUDGE:       HON. RICHARD E. STRAUSS
16                                           ACTION FILED:  9/1/06
                                             TRIAL DATE:  1/4/08
17

18

19

20        Plaintiff JOSE HERNANDEZ submits his Notice of Lodgment of documents in support of

21  his opposition to Third Party Edward P. Swan, Jr.'s Motion for Protective Order as follows:

22
    Exhibit A    -    8/28/7 Declaration of Edward Patrick Swan, Jr. in Support of Defendant San
23                    Diego County Regional Airport Authority's Motion for Summary Judgment
                      or, in the Alternative, Summary Adjudication;
24
    Exhibit B    -    8/30/7 Declaration of Thella F. Bowens in Support of Defendant San Diego
25                    County Regional Airport Authority's Motion for Summary Judgment or, in
                      the Alternative, Summary Adjudication; and
26  ///

27  ///

28
         PL'S NOTICE OF LODG. IN OPPOS. TO THIRD PARTY SWAN'S MOTION FOR PROTECTIVE ORDER

1     Exhibit C    -        1/19/06 Letter from Edward Patrick Swan, Jr., to Thella Bowens.

2

    DATED: December 7, 2007

3                                        CATHRYN CHINN, ESQ.

PETER G. FRIESEN, Attorneys for

4                                        Plaintiff JOSE HERNANDEZ

86-1208

EXHIBIT A

1   FRED M. PLEVIN (SBN 126185)
    SANDRA L. MCDONOUGH (SBN 93308)
2   ALBERT R. LIMBERG (SBN 211111)
    PAUL, PLEVIN, SULLIVAN & CONNAUGHTON LLP
3   401 B Street, Tenth Floor
    San Diego, California 92101-4232
4   Telephone: 619-237-5200
    Facsimile: 619-615-0700
5
    AMY S. GONZALEZ (SBN 181745)
6   SAN DIEGO COUNTY REGIONAL AIRPORT
    AUTHORITY
7   3225 N. Harbor Drive
    San Diego, CA 92138
8   Telephone: (619) 400-2425
    Facsimile: (619) 400-2428
9
10  Attorneys for Defendant
    SAN DIEGO COUNTY REGIONAL AIRPORT
11  AUTHORITY

12                  SUPERIOR COURT OF THE STATE OF CALIFORNIA

13                           COUNTY OF SAN DIEGO

14

15  JOSE HERNANDEZ,                        CASE NO. GIC871979

16              Plaintiff,                 DECLARATION OF EDWARD PATRICK
                                           SWAN, JR. IN SUPPORT OF DEFENDANT
17         v.                              SAN DIEGO COUNTY REGIONAL
                                           AIRPORT AUTHORITY'S MOTION FOR
18  SAN DIEGO COUNTY REGIONAL              SUMMARY JUDGMENT OR, IN THE
    AIRPORT AUTHORITY, a public entity;    ALTERNATIVE, SUMMARY
19  and DOES 1 through 12, inclusive,      ADJUDICATION

20              Defendants.

21                                         Date:          November 16, 2007
                                           Time:          1:30 p.m.
22                                         Dept:          75
                                           Judge:         Hon. Richard E. Strauss
23                                         Complaint Filed: September 1, 2006
                                           Trial Date:    January 4, 2008
24
                                              EXEMPT FROM FEES
25                                           GOVT. CODE § 6103

26

27

28

PAUL, PLEVIN,                    1
SULLIVAN &
CONNAUGHTON LLP                                 SWAN DECLARATION IN SUPPORT OF
                                                SUMMARY JUDGMENT MOTION

86-1210

I, Edward Patrick Swan Jr., declare as follows:

1.    Except as otherwise stated, the facts contained in this declaration are true of my own personal knowledge, and if called as a witness in this matter I could and would testify to the following facts.

2.    I am currently a partner at Luce, Forward, Hamilton and Scripps ("Luce Forward"), and I have held that position since 1993.    I have been an attorney licensed to practice in California since 1979.    In my current position, as well as my former position as Assistant U.S. Attorney. I have conducted numerous factual and legal investigations.

3.    On or about November 2, 2005, the San Diego County Regional Airport Authority (the "Authority") contacted Luce Forward regarding conducting an investigation into potential violations of the Authority's Ethics Code by one of its employees, Jose Hernandez.  I was asked by one of my partners to conduct the investigation.

4.    I initially met with Jeffrey Woodson and Diane Richards of the Authority on November 4, 2005, who informed me that two different individuals had reported to Thella Bowens, the President and CEO of the Authority, on separate occasions that Mr. Hernandez may have accepted benefits from Authority vendors.

5.    After my initial meeting with Mr. Woodson and Ms. Richards, I met with four different individuals, including the two individuals who made the initial disclosures to Ms. Bowens.  The first four individuals advised me that they believed that Mr. Hernandez was accepting benefits from the Authority's vendors.

6.    Shortly after those initial interviews, I retained John Gamberzky, a private investigator who previously was a Special Agent with the Federal Bureau of Investigation to assist me with the investigation.  Mr. Gamberzky and I met with Mr. Hernandez on December 14, 2005, to ask him questions regarding benefits that he may have obtained from Authority vendors.

7.    During my first meeting with Mr. Hernandez, I advised him that the investigation was an attorney-client privileged investigation.  I also told him that because the Authority was the holder of the attorney-client privilege, he should keep our interview confidential.

///

SWAN DECLARATION IN SUPPORT OF
SUMMARY JUDGMENT MOTION

86-1211

8.    After the first interview with Mr. Hernandez, Mr. Gamberzky and I conducted additional interviews with current and former Authority employees, as well as interviews with non-Authority personnel, to determine whether Mr. Hernandez received benefits from the Authority's vendors. In addition, we conducted an additional interview with Mr. Hernandez at his counsel's office on December 29, 2005. In total, I interviewed approximately nine current Authority employees and two former Authority employees. I also spoke to several current Authority employees in order to obtain background information, policies, and other documents related to my investigation. In addition, I spoke to one non-Authority employee and Mr. Gamberzky provided notes to me regarding interviews that he conducted with five other non-Authority employees.

9    In the second interview with Mr. Hernandez, Mr. Hernandez admitted to me that he had received non-revenue tickets from Hawaiian Airlines in 2004 for his entire family of four, and that he had also received free tickets from a Southwest Airlines station manager. Mr. Hernandez also told me that he had received several rounds of golf for free from Southwest Airlines, from a representative from Ace Parking, and from Baggage Claimers, an entity that does business with the Authority.

10    In my second interview with Mr. Hernandez, he admitted to receiving tickets to a Chargers-Raiders game on December 28, 2003. He recalled receiving at least two of those tickets, valued at $235 each, from Dave Mueller, the Vice President of Operations for Ace Parking.

11.    On January 5, 2006, Ms. Bowens requested that I prepare a written summary of the factual findings of our investigation of the benefits received by Mr. Hernandez. I was also asked to opine as to whether I believed that Mr. Hernandez had violated the Authority's Ethics Code through receipt of those benefits.

12.    As a result of Ms. Bowens' request for a written report, I drafted a 21-page letter with attachments to Ms. Bowens. Mr. Gamberzky also assisted me in drafting the written report. I am informed that a true and correct copy of that letter with attachments is attached as Exhibit 4 ///

SWAN DECLARATION IN SUPPORT OF
SUMMARY JUDGMENT MOTION

86-1212

1    to the Notice of Lodgment of Exhibits filed herewith.  I sent Exhibit 4 to Ms. Bowens via

2    messenger service on or about January 19, 2006.

3        13.    Exhibit 4 is an accurate report of my findings based on the interviews and

4    gathering of information that I did, as well as the interviews and information obtained by Mr.

5    Gumberzky that were communicated to me.

6        14.    I concluded, as a result of our investigation into Mr. Hernandez' receipt of

7    benefits, that there was sufficient evidence that Mr. Hernandez had accepted benefits from

8    Authority vendors and contractors from 2003 through January 2006.  I also concluded that there

9    was sufficient evidence that Mr. Hernandez had violated Section 2.10 of the Authority's Ethics

10   Code by virtue of accepting benefits from the Authority's vendors in an amount that exceeded

11   more than one-half the amount of gifts permitted under the California Political Reform Act in any

12   calendar year from a single source knowing that the source is doing business with the Authority.

13   In 2003 and 2004, the California Political Reform Act permitted gifts of $340, and in 2005, it

14   permitted gifts of $360.

15       15.    Specifically, I concluded that in May 2004, Mr. Hernandez accepted four free

16   round-trip airline tickets to Hawaii from Hawaiian Airlines, which he knew was doing business

17   with the Authority.  While these tickets are non-revenue and may be of no value to Hawaiian

18   Airlines, they had value to Mr. Hernandez who otherwise would have to pay for the airline travel.

19   Based on information provided by Hawaiian Airlines, the estimated retail cost of each round trip

20   travel would have been between $199 and $600 per ticket.  Therefore, I concluded that the total

21   value of the tickets was estimated to be between $796 and $2,400.

22       16.    I also concluded that in 2003, Mr. Hernandez accepted at least two, and possibly

23   four, free San Diego Charger-Oakland Raider football tickets from Ace Parking, the total value of

24   which is estimated to be between $470 and $940 based on the face value of the ticket.  I

25   determined that Mr. Hernandez knew that Ace Parking was doing business with the Authority

26   through its ownership of or subcontract with Lindbergh Parking, Inc.

27       17.    I also concluded that it was likely that the free airline tickets that Mr. Hernandez

28   admitted to receiving in 2004 from Southwest Airlines exceeded $170.

4

SWAN DECLARATION IN SUPPORT OF
SUMMARY JUDGMENT MOTION

1    18.    The remainder of my conclusions and findings are contained in Exhibit 4.

2    19.    I was never advised by anyone, including Mr. Hernandez, during the course of my

3    investigation of any complaints that Mr. Hernandez may have made regarding the Authority's

4    lease on the General Dynamics property or the Teledyne Ryan property. I was also unaware of

5    any complaints that Mr. Hernandez may have made regarding the women's restroom project in

6    Terminal One of the San Diego International Airport, or regarding the Authority's contract with

7    Lindberg Parking, Inc.

8    20.    In the course of my investigation of Mr. Hernandez, I did not ask any of the

9    individuals that I interviewed any questions about the status of Mr. Hernandez' marriage.

10    I declare under penalty of perjury under the laws of the State of California that the

11   foregoing is true and correct.

12   Executed this 26th day of August, 2007 at San Diego, California.

13

14

15                                   _____
                                     EDWARD PATRICK SWAN, JR.

16

17

18

19

20

21

22

23

24

25

26

27

28

5

86-1214

EXHIBIT B

86-1215

1  FRED M. PLEVIN (SBN 126135)
   SANDRA L. MCDONOUGH (SBN 193308)
2  ALBERT R. LIMBERG (SBN 211110)
   PAUL, PLEVIN, SULLIVAN & CONNAUGHTON LLP
3  401 B Street, Tenth Floor
   San Diego, California 92101-4232
4  Telephone: 619-237-5200
   Facsimile: 619-615-0700
5
   AMY S. GONZALEZ (SBN 181745)
6  SAN DIEGO COUNTY REGIONAL AIRPORT
   AUTHORITY
7  3225 N. Harbor Drive
   San Diego  CA 92138
8  Telephone: (619) 400-2425
   Facsimile: (619) 400-2428
9
10 Attorneys for Defendant
   SAN DIEGO COUNTY REGIONAL AIRPORT
11 AUTHORITY

12            SUPERIOR COURT OF THE STATE OF CALIFORNIA

13                    COUNTY OF SAN DIEGO

14 JOSE HERNANDEZ,                        CASE NO. GIC871979

15          Plaintiff,                     DECLARATION OF THELLA F. BOWENS
                                           IN SUPPORT OF DEFENDANT SAN DIEGO
16      v.                                 COUNTY REGIONAL AIRPORT
                                           AUTHORITY'S MOTION FOR SUMMARY
17 SAN DIEGO COUNTY REGIONAL               JUDGMENT OR, IN THE ALTERNATIVE,
   AIRPORT AUTHORITY, a public entity;     SUMMARY ADJUDICATION
18 and DOES 1 through 12, inclusive,

19          Defendants.                    Date:            November 16, 2007
                                           Time:            1:30 p.m.
20                                         Dept:            75
                                           Judge:           Hon. Richard E. Strauss
21                                         Complaint Filed: September 1, 2006
                                           Trial Date:      January 4, 2008
22

23                                             EXEMPT FROM FEES
                                               GOVT. CODE § 6103
24

25     I, Thella F. Bowens, declare as follows:

26     1.   The facts contained in this declaration are true of my own personal knowledge, and

27 if called as a witness in this matter I could and would testify to the following facts.

28     2.   I am the President and Chief Executive Officer of the San Diego County Regional

BOWENS DECLARATION IN SUPPORT OF              1
SUMMARY JUDGMENT MOTION

BY FAX

86-1216

1  Airport Authority ("the Authority"), a defendant in this action. I have held that position since

2  March 2003. Prior to my appointment as President and CEO of the Authority, I served as the

3  Senior Director of Aviation for the Port District of San Diego for seven years.

4        3.      The Authority tries to conduct exit interviews with employees who leave. Human

5  Resources usually conducts the exit interview, and an employee has the option to meet with me for

6  the exit process.

7        4.      In approximately October or November 2005, an employee named Clifforine Massey

8  resigned from the Authority. Massey asked to meet with me as part of her exit process. She

9  thanked me for the opportunity to work at the Authority. However, during the course of this

10 meeting, Massey raised plaintiff Jose Hernandez as an issue. She said she did not want to complain,

11 but she said that Hernandez is a dangerous person. She also called him "unethical." Massey

12 seemed reluctant to expand and I did not press her for details at the time. However, my impression

13 was that Massey was referring to ethical issues.

14       5.      Within a short period of time after my meeting with Massey, another employee

15 named Jim Prentice independently approached me regarding concerns he had about Hernandez

16 taking favors and benefits from Authority vendors. He specifically told me about free airline

17 tickets, Southwest Airlines drink tickets being handed out by Hernandez, golf outings with vendors,

18 and Hernandez' family trip to Hawaii, all of which Prentice believed that Hernandez had received as

19 a free benefit from Authority vendors.

20       6.      I called Jeffrey Woodson, the Vice President of Administration at the Authority, and

21 advised him of what I had heard from both Prentice and Massey. I instructed Woodson to hire an

22 outside investigator to investigate the concerns raised by Prentice and Massey.

23       7.      I never advised the investigators to prevent Hernandez from disclosing information,

24 or to otherwise prevent Hernandez from speaking about any topic.

25       8.      I received a full briefing from Edward Patrick ("Pat") Swan and John Gamberzky,

26 the individuals who conducted the investigation, in early January 2006 regarding their findings.

27 Based on the information they presented, I requested a written report of their findings and

28 conclusions.

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

Dec 04 07 11:19a    Cathryn                    619 295-4190                    p.5

86-1217

1    9.    On or about January 19, 2006, I received a written report from Swan (an accurate

2  copy of which is attached as Exhibit 4 to the Notice of Lodgment of Exhibits) detailing the factual

3  findings from the investigation into Hernandez. I discussed the findings of that report with

4  Woodson and Diane Richards, the Director of Human Resources. Woodson and Richards

5  recommended terminating Hernandez' employment because there was sufficient evidence presented

6  by the investigators that Hernandez had engaged in a pattern of conduct that violated the Authority's

7  Ethics Code. Specifically, I was persuaded that Hernandez accepted benefits from the Authority's

8  vendors in excess of that permitted on an annual basis by the California Political Reform Act. I

9  supported and approved Hernandez' termination, and I was the person who made the final decision

10  to terminate his employment based on the investigator's findings and Woodson's recommendation.

11    10.    In my opinion, airplane tickets received by Hernandez and his family from Hawaiian

12  Airlines and Southwest Airlines had value and conferred a benefit on Hernandez.

13    11.    I am unaware of any employee at the Authority, other than Hernandez, receiving the

14  level of free benefits that Hernandez received from the Authority's vendors.

5    12.    I am aware that the Authority conducted another investigation into alleged benefits

6  received by another employee at the Authority. The allegations that led to this additional

7  investigation came to light during the investigation of Hernandez.

18    13.    I was unaware that Hernandez raised any issues regarding the legality of the women's

19  restroom project in Terminal One or that he ever complained that the project violated any rules or

20  regulations.

21    14.    I am aware that Hernandez was in meetings where staff discussed the fact that the

22  terms of the General Dynamics lease were set by statute and that the Authority had no choice but to

23  pay the amount set by statute for that lease. I do not recall, however, any statements made by

24  Hernandez regarding the lease, nor do I recall Hernandez ever objecting to the General Dynamics

25  lease.

25    15.    I am not aware of any concerns or issues that Hernandez may have raised regarding

27  the Authority's lease of property from Teledyne Ryan. I have never served on the Teledyne Ryan

23  task force, and I never received any report or information regarding what Hernandez may or may

1  not have disclosed to the task force regarding the Teledyne Ryan lease.

2      16.    I am unaware of any issues that Hernandez may have raised regarding the request

3  for proposal ("RFP") process by Lindbergh Parking, Inc. ("LPi"), LPi's workers' compensation

4  billing practice, LPi or Maurice Grey's business integrity, or any alleged illegality between LPi

5  and the Authority. LPi currently has a contract with the Authority, which was entered into on

6  January 30, 2004 with an effective date of February 1, 2004 through January 31, 2009. The

7  current LPi contract was entered into through the RFP process. I did not exert any influence over

8  the process.

9      17.    I do not grant any special favors to LPi due to its status as a minority-owned

10  business. In fact, Maurice Grey, LPi's President, requested in 2005 that the Authority assign LPi's

11  contract to Ace Parking. I did not agree to have the parking agreement assigned to Ace Parking.

12      18.    The Authority assumed ownership and operations of San Diego International

13  Airport from the Unified Port of San Diego on January 1, 2003. From the time that the Authority

14  assumed ownership and operation of San Diego International Airport, to the best of my

15  recollection, I have only received one gratuitous upgrade on an airplane flight. When I checked

16  into my flight, I received a seat in First Class. I do not know why I received the First Class

17  upgrade, and I do not know if I received the upgrade because of my status with the Authority. I

18  did not ask anyone for the upgrade and I am unaware of anyone providing the upgrade to me

19  because of my status with the Authority.

20      19     I have never requested that anyone change a scheduled flight for me without

21  charging the customary fee charged to members of the public. I am unaware of any "free" ticket

22  changes provided to me, other than those that would be provided to any member of the public free

23  of charge.

24      20.    On one occasion, I was scheduled for a flight, and arrived at the hold room with

25  time to spare before departure. Hernandez met me at the terminal and offered to take me into the

26  Delta Crown Room as I waited for my flight. Although I initially declined the invitation,

27  Hernandez insisted that I wait in the lounge and also indicated that Mark, the Delta station

28  manager, wanted to talk to me. While Hernandez went to find Mark, the station manager, I

LAW  FLEVIN,
SULLIVAN, IIS
JOHNSON

BOWENS DECLARATION IN SUPPORT OF
SUMMARY JUDGMENT MOTION                    4

1  waited in the entrance area to the Delta lounge. When Mark arrived, he had some complaints

2  regarding Delta's assigned ticket counter locations, and conflicts with Jet Blue's proximity to

3  them. I had a brief conversation with Mark, promising to talk to the appropriate person about the

4  issue, and then politely excused myself and left the lounge area.

5      21.    The only other times I have been in any airline lounge was to conduct Authority

6  business, such as meeting with consultants who are traveling and will be in the lounge, or to

7  attend an opening or other event sponsored by an airline. I also have used an airline lounge for

8  international travel when access to the lounge is part of the airplane ticket price.

9      22.    I have never requested any benefits on behalf of my sister. To my knowledge, my

10  sister has not received any free airline tickets, ticket changes, or free shipments from any person

11  or entity as a result of my position with the Authority.

12      23.    I do not know the owner of the Orlando Magic nor have I ever requested that he

13  receive benefits or free favors from the Authority or any of its vendors. I have never requested,

14  even through a third party, that an airline donate airplane tickets to benefit the Jackie Robinson

15  YMCA.

16      24.    I was not personally involved in securing any donations from Authority vendors or

17  airlines for any United Way campaigns.

18      25.    I did not take the inaugural flight from San Diego to Maui on Hawaiian Airlines.

19      26.    On one occasion, when my car was being detailed, Ted Sexton volunteered to pick

20  my car up for me because I was stuck in a meeting. I paid for all the work done on my car, and I

21  did not request that Sexton pick the car up for me.

22      27.    I have more than one parking space assigned to me at the San Diego International

23  Airport, but I do not routinely use one of the spaces. Upon his request, I gave Vernon Evans

24  permission to use the extra space when it is vacant. However, I did not give him exclusive use of

25  the space. As far as I am concerned, anyone at the Authority may use that space when it is vacant.

26      28.    Management at the Authority holds an annual employee appreciation barbecue.

27  Each year, approximately 300 people attend the barbecue. The Authority does not pay for the

28  food for the barbecue. Instead, employees at the director-level and above voluntarily decide

PAUL PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

BOWENS DECLARATION IN SUPPORT OF
SUMMARY JUDGMENT MOTION                          5

86-1220

1  whether they will contribute to the cost of the barbecue. Each year, the meat for the barbecue is

2  purchased from Angelo's Barbecue in Fort Worth, Texas. When we first started shipping the meat

3  in 1998 or 1999, I inquired of the Port's Attorney and he verbally told me that because the meat

4  was for the organization and I received no personal benefit, it was "OK" to allow Southwest

5  Airlines who volunteered to handle the meat to do so at no cost.

6      29.     In 2005, I and several other Authority Vice Presidents, including Ted Sexton, went

7  to Dallas, Texas for a one day meeting with Southwest Airlines management representatives in

8  order to learn about Southwest Airlines employee development programs. It was proper for

9  Sexton to be at that meeting, and his presence accomplished a business purpose.

10     30.     Bryan Enarson did not influence my decision to terminate Hernandez. Further,

11  Enarson had absolutely no input into my decision to initiate an investigation into Hernandez, or to

12  terminate Hernandez' employment. Finally, Enarson has never recommended that I take any

13  employment action with regard to Hernandez.

14     I declare under penalty of perjury under the laws of the State of California that the

15  foregoing is true and correct.

16     Executed this 30th day of August 2007 at San Diego, California.

17
                                        _Thella A Bowens_
18                                      THELLA F. BOWENS

19

20

21

22

23

24

25

26

27

28

EXHIBIT C

**LUCE FORWARD**
ATTORNEYS AT LAW • FOUNDED 1873
Luce, Forward, Hamilton & Scripps LLP

600 West Broadway
Suite 2600
San Diego, CA 92101
619.236.1414
619.232.8311 fax
www.luce.com

EDWARD PATRICK SWAN, JR., PARTNER
DIRECT DIAL NUMBER 619.699.2415
DIRECT FAX NUMBER 619.645.5321
EMAIL ADDRESS pswan@luce.com

January 19, 2006

<u>**VIA MESSENGER**</u>

<u>**PRIVILEGED AND CONFIDENTIAL**</u>

Ms. Thella F. Bowens
President and CEO
San Diego County Regional Airport Authority
San Diego International Airport
Post Office Box 82776
San Diego, CA 92130

Re:    Results of the Investigation Regarding the Alleged Acceptance of Benefits by Jose
Hernandez

Dear Ms. Bowens:

On behalf of the San Diego County Regional Airport Authority (the "Authority"), you requested
that Luce, Forward, Hamilton & Scripps LLP ("LFHS") conduct a confidential internal
investigation into allegations that Authority employee Jose Hernandez ("Hernandez") was
accepting benefits from vendors, contractors and airlines doing business with the Authority. In
the course of our investigation, we interviewed 17 persons who are listed in Exhibit A, and
consulted with Bret Lobner, Jeffrey Woodson and Diane Richards. We also reviewed documents
provided to us by the Authority and others, including Hernandez.

On January 5, 2006, we met with you and provided a summary of the results of our investigation.
We asked whether you wanted us to do further investigation, or to submit a written report of our
investigation to date. You requested a written report.

This report summarizes the results of our investigation. It contains LFHS' mental impressions
and thoughts, is protected by the attorney-client privilege and the work product protection, and is
not discoverable.

<u>**Questions Presented**</u>

1.    Is there sufficient evidence that Hernandez accepted benefits from Authority vendors and
contractors?

2.    If so, is there sufficient evidence that Hernandez violated the Authority's Ethics Code?

PRIVILEGED AND CONFIDENTIAL PURSUANT
TO THE ATTORNEY-CLIENT PRIVILEGE AND
WORK PRODUCT PROTECTION – NOT DISCOVERABLE

CARMEL VALLEY-DEL MAR   •   LOS ANGELES   •   SAN DIEGO   •   SAN FRANCISCO

**86-1223**

**LUCE FORWARD**
ATTORNEYS AT LAW · FOUNDED 1873
LUCE, FORWARD, HAMILTON & SCRIPPS LLP

Ms. Thella F. Bowens
January 19, 2006
Page 2

## Short Answers

1.    Yes.  Interviews and documents demonstrate there is sufficient evidence that Hernandez accepted benefits from Authority vendors and contractors from 2003 to date.[1]

2.    Yes.  Interviews and documents demonstrate there is sufficient evidence that Hernandez violated the Authority's Ethics Code.[2]

## Background

The Authority is a public entity created by California State law to operate the San Diego International Airport (the "Airport").  On January 1, 2003, the San Diego Unified Port District (the "Port District") transferred the Airport to the Authority.

Hernandez was an employee of the Port District before the Authority was formed.  The Port District hired him on March 23, 2001 as the Manager of Ground Transportation.  Prior to his employment by the Port District, Hernandez was the Director of Business Development for Five Star Parking from January 1, 2000 to March 2001.  Prior to that, he was the Vice President of Operations for Ace Parking from May 1, 1999 through December 1, 1999.[3]

Hernandez became an Authority employee on January 1, 2003.  On October 3, 2003, Hernandez was promoted to be the Director of Landside Operations at the Authority.  Hernandez has held that position through the current date.

---

[1]   We were not asked to investigate what benefits Hernandez may have accepted as a public employee of the San Diego Unified Port District in 2001 and 2002.

[2]   We were not asked to determine whether Hernandez violated any state or federal laws by accepting gifts as a public employee from Authority vendors and contractors, and we have not made any such determination.  Likewise, we have not been asked to investigate or make any determination regarding benefits accepted by other Authority employees or Board members from Authority vendors and contractors.  During the course of our investigation, we were told of such benefits.  However, the types and value of such benefits pale in comparison to the benefits accepted by Hernandez from 2003 to date.

[3]   Hernandez' prior employment history is from his Port District job application.  In the application, he listed the reason for leaving Ace Parking as "Mutual Split."  He also stated that he graduated from college in 1992.  He is 36 years old.

PRIVILEGED AND CONFIDENTIAL PURSUANT
TO THE ATTORNEY-CLIENT PRIVILEGE AND
WORK PRODUCT PROTECTION – NOT DISCOVERABLE

**LUCE FORWARD**
ATTORNEYS AT LAW · FOUNDED 1873
LUCE, FORWARD, HAMILTON & SCRIPPS LLP

Ms. Thella F. Bowens
January 19, 2006
Page 3

As Director of Landside Operations, Hernandez has approximately nine direct reports. His department exercises discretion over contracts with and the operations of numerous Authority vendors and contractors. His authority extends to all Airport operations from the parking lots into the terminals, and includes taxi and shuttle operations.[4] By all accounts, Hernandez is a hard worker and gets along well with Authority vendors and contractors. Based on his excellent performance reviews, he appears to be an effective manager, although a number of Authority employees had complaints about his management style.[5]

Because of his managerial status, the Authority requires Hernandez to file a State of California Statement of Economic Interests, Fair Political Practices Commission ("FPPC") Form 700. In this form, Hernandez is required to list, among other things, gifts. According to the FPPC, a gift is anything of value for which the reporting person has not provided equal or greater consideration to the donor. A gift is reportable if its fair market value is $50.00 or more. The FPPC states that it is the acceptance of a gift, not the ultimate use to which it is put, that imposes a reporting obligation. Since January 1, 2005, gifts are limited to a value of $360 from any one source in a calendar year.[6]

To date, Hernandez has only been required to file one Form 700, which he signed on February 4, 2005 and filed on February 9, 2005. The reporting period started on December 14, 2004 and it appears that the Form 700 only covered the last 18 days of 2004 up to December 31, 2004. For that period, Hernandez reported no reportable gifts.[7] Hernandez' Form 700 for 2005 is not due to be filed until later this calendar year.

---

[4] Lindbergh Parking, Inc. ("LPI") operates the Airport parking system through an Authority contract. The parking contract generated in excess of $25 million in gross income last year Ace Parking owns 40% of LPI, and also serves as a subcontractor to LPI on the Airport contract. Ace Parking also handles all the "back office" operations for LPI.

[5] A number of employees complained about Hernandez' management style. We were not asked to investigate these complaints and we have not. However, we considered these complaints in evaluating possible bias, interest and motives of the interviewees.

[6] The limit was $340 for 2003 and 2004.

[7] A copy of Hernandez' Form 700 is attached as Exhibit B.

PRIVILEGED AND CONFIDENTIAL PURSUANT
TO THE ATTORNEY-CLIENT PRIVILEGE AND
WORK PRODUCT PROTECTION – NOT DISCOVERABLE

**LUCE FORWARD**
ATTORNEYS AT LAW • FOUNDED 1873
LUCE, FORWARD, HAMILTON & SCRIPPS LLP

Ms. Thella F. Bowens
January 19, 2006
Page 4

The Authority has adopted Codes to govern and regulate the conduct of, among other persons, Authority employees.[8] Included in the Codes is an Ethics Code at Article 2. Section 2.10 is titled "Prohibited Receipt of Benefits." Section 2.10(b)(3) prohibits any employee of the Authority from accepting benefits aggregating more than one-half the amount permitted under the California Political Reform Act in any calendar year from any source that the employee knows or should know is doing business with the Authority, or intends to do business with the Authority or has done business with the Authority during the previous 12 months, or that the employee knows or should know has or is seeking a license, permit, grant or benefit from the Authority, or that the employee knows or should know is an agent of such a person or entity.[9] Section 2.10(b)(2) prohibits an employee from accepting anything of value from anyone, other than the Authority or another board member or employee, for "doing his or her job."

Pursuant to the Authority's Ethics Code, Hernandez is prohibited from accepting benefits aggregating more than $180 in 2005 (or $170 in 2003 or 2004) from any single source that he

---

[8]  Section 2.01(b) states that the Ethics Code governs the conduct of the Authority's Board of Directors and its "employees." Section 2.01(b) further states that "employees" includes the "Authority's Executive Director, General Counsel, other officers and consultants." While an argument might be made that this definition limits who is an employee, we do not believe this is the intended meaning. Otherwise, it would be contrary to the preceding sentence that states that the Ethics Code is to govern Authority employees, and the last sentence that the Ethics Code should be broadly construed to effectuate its purpose. It would also be contrary to section 2.01 of the Authority's Policies that states the purpose was to establish a policy that governs the ethical conduct of "members of the Board of Directors, officers and employees of" the Authority.

We believe the language in Section 2.01(b) regarding "employees" is to include persons who might not otherwise be considered Authority employees, such as the Executive Director and General Counsel who are employed by the Authority's Board. The term "includes" does not mean that other persons working for the Authority, such as Hernandez, are not Authority employees. If this was the purpose of the language, it would have been easy to state that "employees" "means" or is "limited to" certain individuals. Instead, inclusive, not exclusive language was used. Therefore, we believe Hernandez is an employee governed by the Authority's Ethics Code. We consulted with Mr. Lobner on this issue, and he agreed with our position.

[9]  We believe this definition would include Ace Parking. Through its 40% ownership of LPI, and its subcontract with LPI, Ace parking is either "doing business with the Authority," or is an agent of LPI, such a person.

PRIVILEGED AND CONFIDENTIAL PURSUANT
TO THE ATTORNEY-CLIENT PRIVILEGE AND
WORK PRODUCT PROTECTION – NOT DISCOVERABLE

**LUCE FORWARD**
ATTORNEYS AT LAW · FOUNDED 1873
LUCE, FORWARD, HAMILTON & SCRIPPS LLP

Ms. Thella F. Bowens
January 19, 2006
Page 5

knows does business with the Authority. If the benefit is for "doing his . . . job," Hernandez is prohibited from accepting anything of value.[10]

## Benefits Accepted by Hernandez while an Authority Employee

The investigation was initiated based on allegations that Hernandez had accepted benefits from vendors and contractors at the Airport. Our investigation focused on determining whether the allegations were credible and substantiated. As discussed below, we were able to confirm a number of the allegations through statements by the giver of the benefit, and the receiver of the benefit, Hernandez.

We interviewed Hernandez on two occasions. The first interview took place on December 14, 2005 on Authority premises at the Authority. At the beginning of the first interview, we informed Hernandez that you had retained us on behalf of the Authority to investigate allegations that he had accepted benefits from vendors and contractors at the Airport. We asked for his cooperation, and asked him to give his most truthful and complete answers to our questions. Hernandez agreed. We also advised Hernandez that the interview was covered by the attorney-client privilege, that the Authority was the client and held the privilege, and that only the Authority could waive the privilege. Hernandez said he understood and agreed not to discuss the interview without the Authority's permission. Finally, we asked and Hernandez agreed not to contact or communicate with other Authority employees or third parties who would be witnesses or potential witnesses or interviewees in the investigation.[11] We then interviewed Hernandez and he admitted the acceptance of certain benefits, but denied the receipt of other benefits that he later acknowledged during the second interview that took place on December 29, 2005.[12]

---

[10]  Hernandez admitted to us that he knew the Authority had an Ethics Codes, and he said he signed for it. We have not seen any document confirming his receipt. Hernandez told us he received little if any training on the Ethics Code or Conflict of Interest issues. We have not seen any document showing that he received training on the Ethics Code, but we have reviewed documents showing he attended a Conflict of Interest presentation on February 4, 2005, and that he was given written materials regarding Form 700 and related issues, including the receipt of benefits.

[11]  We similarly advised each of the other Authority employees we interviewed, and received similar promises from them.

[12]  A copy of a memorandum summarizing the December 14, 2005 interview is attached as Exhibit C.

PRIVILEGED AND CONFIDENTIAL PURSUANT
TO THE ATTORNEY-CLIENT PRIVILEGE AND
WORK PRODUCT PROTECTION – NOT DISCOVERABLE

**LUCE FORWARD**
ATTORNEYS AT LAW · FOUNDED 1873
Luce, Forward, Hamilton & Scripps LLP

Ms. Thella F. Bowens
January 19, 2006
Page 6

After the first interview, we learned that Hernandez contacted or was communicating with other Authority employees or third parties who might be witnesses and or interviewees in this investigation. We also interviewed individuals who told us of benefits accepted by Hernandez that Hernandez denied during the first interview.

San Diego attorney Cathryn Chinn contacted us and said Hernandez retained her in connection with our investigation. Chinn requested that we reinterview Hernandez, and that we do so in her office where Hernandez might be more comfortable. We agreed.

The second interview of Hernandez was conducted on December 29, 2005 in Chinn's office. During the second interview, Hernandez admitted the receipt of additional benefits that we independently verified between the first and second interviews, and which Hernandez apparently knew we knew since he had communications with several of the witnesses or interviewees between the first interview (December 14, 2005) and the second interview (December 29, 2005).[13]

Based upon our investigation, we believe there is sufficient evidence that Hernandez accepted benefits in violation of the Authority's Ethics Code. These benefits include, but are not limited to the following:

1. **Free Airline Tickets**

**Finding:** In May 2004, Hernandez accepted four free round-trip airline tickets from Hawaiian Airlines to travel with his wife and two minor children from San Diego to Oahu to Maui for a family vacation. The approximate retail value of the tickets was between $796 and $2,400.

Prior to interviewing Hernandez on December 14, 2005, we were told by interviewees that Hernandez and his family took a vacation trip to Maui in 2004, and that he may have received free airline tickets. During our interview of Hernandez on December 14, 2004, we asked him about his family's vacation trip to Maui in 2004. We asked him who paid for the trip, and whether he had received any airline tickets for free. Hernandez told us he paid all the expenses of the trip, including the airline tickets.

---

[13]  A copy of a memorandum summarizing the December 29, 2005 interview is attached as Exhibit D.

PRIVILEGED AND CONFIDENTIAL PURSUANT
TO THE ATTORNEY-CLIENT PRIVILEGE AND
WORK PRODUCT PROTECTION – NOT DISCOVERABLE

## LUCE FORWARD
ATTORNEYS AT LAW • FOUNDED 1873
LUCE, FORWARD, HAMILTON & SCRIPPS LLP

Ms. Thella F. Bowens
January 19, 2006
Page 7

On December 22, 2005, we interviewed Janet Nix, the San Diego Station Manager for Hawaiian Airlines. Nix told us that as Station Manager, she has the "autonomy" to issue free air travel tickets to anyone she chooses. These tickets are coach-class stand-by tickets. In approximately April or May 2004, Nix said she decided to offer these tickets to Hernandez for travel to Maui with his family. She said she called Hernandez and asked him if he would like the tickets. She said Hernandez accepted her offer and chose a travel date in approximately May 2004. On the day of the planned travel, Hernandez and his family arrived at the Airport. Nix escorted them aboard the aircraft and waited while Hernandez' wife Roxy and their two children were seated. Unfortunately, a full flight prevented Hernandez from being seated, and Hernandez had to fly to Oahu the next day when a stand-by seat was available. The Hernandez family then flew free on Hawaiian Airlines from Oahu to Maui.

Nix recalled that the Hernandez family stayed in Hawaii for four to seven days and then returned on free stand-by tickets on Hawaiian Airlines to San Diego. Nix believed that the entire family flew back to San Diego together. Nix assessed the value of the stand-by tickets as zero dollars because they are free to her and not resalable by the user. She estimated that the purchased tickets would cost between $199.00 and $600.00 each. Therefore, the value of the four round-trip airline tickets was at least $796 and may have been as much as $2,400.

When we interviewed Hernandez on December 29, 2005, he admitted the receipt of the four free round-trip airline tickets from Hawaiian Airlines to Maui in May 2004.[14] Hernandez said he did not recall us asking him during the first interview about the receipt of free airline tickets from Hawaiian Airlines. He further denied that he told us he had paid for the Hawaii Airline tickets during the first interview.

During the second interview, Hernandez told us that the four free Hawaiian Airline round-trip tickets to Maui were non-revenue, stand-by tickets that had no value.[15] Hernandez said that the tickets were offered to him by Nix, and he confirmed the travel details provided by Nix. Both Hernandez and his attorney did not believe he did anything wrong in accepting the four free round-trip airline tickets to Hawaii.[16]

---

[14] Hernandez admitted that he had spoken to Nix after we interviewed her.

[15] Chinn contended that these non-revenue, stand-by tickets are generally available to the public.

[16] After the December 29, 2005 interview, we were told that Nix is Chinn's sister (although we did not independently confirm this). At no time did Chinn or Hernandez disclose the relationship to us.

PRIVILEGED AND CONFIDENTIAL PURSUANT
TO THE ATTORNEY-CLIENT PRIVILEGE AND
WORK PRODUCT PROTECTION – NOT DISCOVERABLE

SDRAA 122

**LUCE FORWARD**
ATTORNEYS AT LAW • FOUNDED 1873
LUCE, FORWARD, HAMILTON & SCRIPPS LLP

Ms. Thella F. Bowens
January 19, 2006
Page 8

**Finding:** **Hernandez accepted at least five free round-trip airline tickets from Southwest Airlines, and used at least four for travel by himself and his family between San Diego and Las Vegas in approximately 2004.**

During our first interview of Hernandez on December 14, 2004, he denied receiving any free airline tickets from Southwest Airlines other than once for Authority-related travel.[17]

On December 29, 2005, we interviewed Mike Parrish, the Assistant Customer Service Manager for Southwest Airlines in Las Vegas, Nevada. From December 2002 through June 2005, Parrish was the San Diego Station Manager for Southwest Airlines. During that period of time, he worked closely with Hernandez, and they became friends.

Parrish said he has access to free Southwest Airline tickets that are given to him and are known as "Buddy Passes." Parrish has the ability to give the Buddy Passes away to personal friends, which he does, including to Hernandez (but to no other Authority employee). A Buddy Pass may be used on any flight that has room for a stand-by passenger, and has a one-year expiration date.

On more than one occasion, and less than five times, Parrish said he gave Buddy Passes to Hernandez. He typically gave Hernandez one Buddy Pass at a time, except on one occasion when he gave Hernandez two Buddy Passes for use by Hernandez and his wife Roxy. Parrish said he did not know where Hernandez and his wife traveled to with the passes. Parrish said he last gave Hernandez a Buddy Pass in 2005. On one occasion, Hernandez told Parrish that he used the Buddy Pass to fly to Las Vegas. Parrish did not know the details of the trip. Other than the one Las Vegas trip, Parrish said he did not know where Hernandez flew using the Buddy Passes. Parrish said Hernandez was free to use or give away the Buddy Passes. He did not know whether Hernandez ever gave away any of the Buddy Passes.

When we re-interviewed Hernandez on December 29, 2005, Hernandez admitted that he did receive and use free Southwest Airline tickets provided by Parrish for travel by himself, his wife and children, between San Diego and Las Vegas.[18]

---

[17] Hernandez told us that Authority employee Amiel Porta and he traveled to Las Vegas with Southwest Airline representatives (including Mike Parrish) on Authority-related business, and Southwest Airlines paid for all the airline tickets. Hernandez said that this was an "error in judgment."

[18] Hernandez admitted that he had spoken to Parrish after we interviewed him, Hernandez, the first time.

PRIVILEGED AND CONFIDENTIAL PURSUANT
TO THE ATTORNEY-CLIENT PRIVILEGE AND
WORK PRODUCT PROTECTION – NOT DISCOVERABLE

86-1230

**LUCE FORWARD**
ATTORNEYS AT LAW · FOUNDED 1873
LUCE, FORWARD, HAMILTON & SCRIPPS LLP

Ms. Thella F. Bowens
January 19, 2006
Page 9

Hernandez said approximately one year ago he was planning to attend an Authority-related conference in Las Vegas, sponsored either by the American Association of Airport Executives ("AAAE") or the International Parking Institute.[19]  Parrish was aware of the conference and offered free air travel to Hernandez for his family's use, so that their families, who are friends, could get together in Las Vegas. Hernandez accepted the offer of the three free round-trip airline tickets for his wife and children.  Hernandez said he flew to Las Vegas on an Authority-paid-for ticket and his family followed later that day using the free tickets from Parrish. Hernandez said he did not know the details as Parrish handled the arrangements.  Hernandez did not recall whether his family returned to San Diego with him on the same flight or whether they returned on a different flight.[20]

During the December 29, 2005 interview, Hernandez acknowledged accepting one or two "buddy tickets" from Parrish, but only recalled using one to fly to Las Vegas on a weekend, date unknown, to attend a friend's 30th birthday party.  Hernandez denied any other free travel for personal use. Hernandez does not believe he used the one additional Buddy Pass he received from Parrish, and he did not give it away.  We do not know the whereabouts of or the expiration date on this Buddy Pass.

2.    **Free Sport Tickets and Golf Outings**

Finding:  Hernandez accepted two or four free San Diego Charger-Oakland Raider football tickets from Ace Parking for the game in San Diego on December 28, 2003, and used at least two of the tickets for himself and Amiel Porta.

We interviewed an individual who produced copies of four San Diego Charger-Oakland Raider football tickets for the game in San Diego on December 28, 2003.  The individual made the copies after the tickets were delivered to Hernandez' office in an envelope that the individual believed came from Ace Parking. The tickets were for Club Level seats and had a face value of $235 each, for a total value of $940.  Copies of the tickets are attached as Exhibit E.

During his interview on December 14, 2005, Hernandez recalled receiving two free tickets from Dave Mueller of Ace Parking for the 2003 Charger-Raider game. Hernandez said Mueller called

---

[19]  According to Hernandez' expense reports, the conference was the 76th Annual AAAE Conference and Exposition in Las Vegas, Nevada from June 21-24, 2004.

[20]  During the trip, Hernandez stayed at the Mandalay Bay Hotel with his wife and children.  The Authority paid for the hotel room, and it does not appear that the number of occupants increased the room rate.

PRIVILEGED AND CONFIDENTIAL PURSUANT
TO THE ATTORNEY-CLIENT PRIVILEGE AND
WORK PRODUCT PROTECTION – NOT DISCOVERABLE