2.    **Neither the Airport Authority Nor Mr. Swan has Waived the Attorney-Client Privilege or Attorney Work Product Privilege.**

In his opposition, Plaintiff contends that the Airport Authority and Mr. Swan waived the right to assert the attorney-client privilege and/or work product privilege by attaching to the Airport Authority's motion for summary judgment the letter summarizing the findings of Mr. Swan's investigation and Mr. Swan's declaration regarding his investigation. Certainly, the Airport Authority and Mr. Swan would not now contend that those specific documents are privileged. However, this limited waiver does not entitle Plaintiff to the documents requested.

Waiver is effective only for the information disclosed and does not remove the protection from other material that has not been revealed. (*See Transamerica Title Insurance Company v. Superior Court (Bank of West)* (1987) 188 Cal.App.3d 1047, 1053; *Rodriguez v. Superior Court* (1993) 14 Cal.App.4th 1260, 1270; *Schlumberger Ltd. v. Superior Court (Kindel & Anderson)* (1981) 115 Cal.App.3d 386, 392 [the production of certain communications and memoranda during a certain time period does not waive the privilege as to the same types of communications and memoranda during a different time period].)

In *Transamerica, supra,* Transamerica Title Insurance Company was a defendant in an action for, among other things, breach of title insurance contract, and tortious breach of the covenant of good faith and fair dealing. (*Transamerica* at p. 1049.) In its answer to the bad faith action, Transamerica did not raise the affirmative defense of advice of counsel, but when asked by way of interrogatory whether Transamerica contended that it relied on the advice of counsel in connection with its handling of the plaintiff's claims against it, Transamerica answered that it had relied on an advisory opinion letter prepared by its attorneys, and attached a copy of the letter to its responses. (*Id.* at 1050.) The 14 page letter outlined the facts of the case, the various duties imposed on Transamerica, and the options available to it under the circumstances. (*Id.*) The plaintiff then demanded that Transamerica produce all notes, memoranda and other documents relating to the advice given to Transamerica relating to

/ / /

/ / /

/ / /

3

93-1275

1   plaintiff's claim. (*Id.*)  Transamerica refused to produce the documents, claiming attorney-client

2   privilege. (*Id.*)  The plaintiff then sought to compel production on the grounds that the attorney-client

3   privilege no longer existed with respect to any communications between the attorneys and

4   Transamerica with respect to the advice given about plaintiff's claim. (*Id.* at 1050-1051.)  The court

5   found that no statutory nor implied waiver of the sought after communications had occurred . (*Id.* at

6   1053.) The court held that the scope of waiver "is narrowly defined and the information required to be

7   disclosed must fit strictly within the confines of the waiver." (*Id.* at 1052.)  As such, the Court of

8   Appeal directed the trial court to enter an order denying plaintiff's motion to compel.

9        In *Rodriguez, supra,* where defendant was charged with rape, robbery, burglary, and first

10  degree murder, counsel for defendant notified the Attorney General, counsel for the People, that he

11  intended to call a psychologist as a witness during the guilt phase of the trial. (*Rodriguez,* at p. 1263.)

12  Defendant wished to present the testimony of the psychologist in a motion *in limine* to show that

13  certain statements had been made by the defendant involuntarily and should not be admitted as

14  evidence at trial. (*Id.*)  The psychologist had been retained by the defense for the purpose of

15  evaluating the defendant to see if any mental defenses should be raised. (*Id.*)  Defense counsel

16  provided the Attorney General with most of a nine-page report authored by the psychologist, but

17  deleted one portion of the fourth page of the report. (*Id.*)  The Attorney General moved to compel

18  production of a complete, unedited copy of the psychologist's report. (*Id.*)  The issue was whether the

19  disclosure of a portion of the psychologist's report constituted a waiver of the privilege as to the

20  remaining portions of the report. (*Id.* at 1265.)  The Court of Appeal held that the privilege was not

21  waived, stating "[w]aiver of privilege as to one aspect of a protected relationship does not necessarily

22  waive the privilege as to other aspects of the privileged relationship." (*Id.* at 1270.)

23       The facts and procedural history in *Transamerica* and this action are similar.  In both actions,

24  the party asserting the privilege produced a letter prepared by its attorney.  In both actions, the

25  opposing party sought the production of all notes, memoranda, and other documents pertaining to the

26  ///

27  ///

28  ///

---

4

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PROTECTIVE
ORDER [CCP § 2025.420]

1   subject of the letter. In *Transamerica*, the court refused to compel production on the grounds that the

2   production of the letter did not waive the privilege as to the notes, memoranda, and other documents.

3   Likewise, this Court should grant this motion for protective order and quash the deposition subpoena

4   because the production of Mr. Swan's letter and his declaration in connection with the filing of the

5   motion for summary judgment does not waive the privilege as to documents other than the letter and

6   declaration.

7           Plaintiff's Opposition cites no case law to the contrary. Each case cited by Plaintiff is either

8   inapplicable or merely stands for the proposition that a party cannot assert the privilege as to specific

9   documents that have already been produced. Plaintiff fails to cite a single case wherein the court held

10  that waiver of the privilege as to one document waives the privilege as to a different document.

11          Plaintiff cites to four cases in support of his proposition that the Airport Authority and Mr.

12  Swan expressly waived the privilege with respect the documents demanded in the subpoena. (See

13  Opposition, p. 3-5.)  However, none of these cases is applicable.  In *McKesson HBOC, Inc. v.*

14  *Superior Court* (2004) 115 Cal.App.4th 1229, plaintiffs in consolidated shareholder lawsuits against a

15  publicly traded company moved to compel disclosure of an audit committee report and interview

16  memoranda that the company's law firm had prepared and disclosed to the United States Attorney and

17  the Securities and Exchange Commission ("SEC") in connection with the SEC's formal investigation

18  of the company.  The court granted the motion to compel on the grounds that those particular

19  documents had already been disclosed to a party with whom the company's interests were not aligned,

20  thereby waiving the privilege.  The other cases cited by Plaintiff are either limited to situations

21  seeking the production of documents that have already been produced, or are inapplicable to the facts

22  in the instant case. (See *Klang v. Shell Oil Co.* (1971) 17 Cal.App.3d 933 [regarding a statement of

23  the circumstances surrounding an automobile accident made by a party to his attorney, the privilege as

24  to that statement is lost when the disclosure of the confidential statement is made for the client's

25  benefit in negotiations on his behalf], *Kadelbach v. Amaral* (1973) 31 Cal.App.3d 814 [party could not

26  assert privilege with respect to a document that is used as an offensive weapon for cross-examination

27  or to refresh the recollection of a witness], *Williamson v. Superior Court* (1978) 21 Cal.3d 829

28  [pertains to expert witnesses who have been designated to testify at trial].)

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PROTECTIVE
ORDER [CCP § 2025.420]

93-1277

1    The case cited by Plaintiff in support of his contention that the Airport Authority and Mr.

2  Swan impliedly waived any privilege is inapplicable and factually distinct from the current action.

3  That case, *Venture Law Group v. Superior Court* (2004) 118 Cal.App.4th 96, addresses the implied

4  waiver of the attorney-client privilege where defendants raised advice of counsel as a defense.  No

5  such defense was raised in the current case.  Moreover, the court held that "while the general rule is

6  that the deliberate injection of the advice of counsel into a case waives the attorney-client privilege as

7  to communications and documents relating to that advice, [a party] does not waive the attorney-client

8  privilege where it is not defending itself on the basis of the advice it received." (*Venture Law Group*

9  at p. 104.)

10    Accordingly, because Mr. Swan and the Airport Authority have not waived any privilege with

11  respect to documents other than the letter and declaration produced in connection with the Airport

12  Authority's motion for summary judgment, the Court should grant the protective order and quash the

13  deposition notice and accompanying document requests.

14  **B.    The Document Demands in the Subpoena are Overbroad and Burdensome**

15    California law does not allow discovery requests that are improperly vague, overbroad, or

16  burdensome.  (*Calcor Space Facility, Inc. v. Superior Court* (1997) 53 Cal.App.4th 216, 218; Code

17  Civ. Proc. 2020.510(a)(2) ["a deposition subpoena…shall designate the…documents…to be produced

18  either by specifically describing each individual item or by reasonably particularizing each category of

19  items"].)[1]

20    The subpoena lists the following eight categories of documents to be produced at the

21  deposition.

22      1.    All notes, memoranda, reports, letters, and audio recordings,
23          including those of John Gambersky, reflecting, mentioning or
          otherwise pertaining to the investigation of Jose Hernandez' alleged
24          violation(s) of ethical rules.

25

26  _____

27  [1] On November 21, 2007, Mr. Swan served objections to the document requests.  The attorney-client
  privilege and/or work product privilege was raised in response to all categories requested. (See Third
28  Party Edward P. Swan, Jr.'s Objections to Plaintiff Jose Hernandez' Deposition Subpoena for
  Personal Appearance and Production of Documents and Things, NOL, Ex. 2.)

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PROTECTIVE
ORDER [CCP § 2025.420]

2.    All notes, memoranda, reports, letters, or other oral communications, and audio recordings reflecting, mentioning or otherwise pertaining to conversations with all officers, directors, agents and/or employees of the Airport Authority including, but not limited to, Thella Bowens, Ted Sexton, Brian Enarson, Jeffrey Woodson, John Gamberzky, Diane Richards, Clifforine Massey, and Jim Prentice.

3.    All time records [Mr. Swan has] generated or maintained referencing or reflecting the time [Mr. Swan has] spent working on, investigating, research and/or evaluating the conduct of Jose Hernandez.

4.    All time records [Mr. Swan has] generated or maintained referencing or reflecting the time [Mr. Swan has] spent working on, investigating, research and/or evaluating Airport Authority individuals other than Jose Hernandez for possible ethical violations.

5.    The complete electronic folder(s) and/or subdirectory(s) which contain(s) the computerized record of the final version of [Mr. Swan's] report on Jose Hernandez, as well as rough drafts of that report.

6.    All transcripts of audio recordings of any and all conversations pertaining to the investigation of Jose Hernandez.

7.    The complete contents of all files regarding [Mr. Swan's] investigation of Jose Hernandez.

8.    All documents that reflect [Mr. Swan's] training, education, and certification as an investigator.

(NOL, Ex. 1.) Each of these eight categories of documents is overbroad and burdensome. For example, Demand No. 8 asks for "all documents that reflect [Mr. Swan's] training, education, and certification as an investigator." Mr. Swan has been an attorney for the government and in private practice for more than 25 years. With that experience, there is an immeasurable amount of documents that are responsive to this demand. If Plaintiff desires to know what Mr. Swan's qualifications are, he does not need all of those documents, Mr. Swan's resume or curriculum vitae would suffice. The demand, as drafted, is overbroad.

Similarly, Demand No. 7 requests the complete contents of all files regarding Mr. Swan's investigation of Jose Hernandez. The request is far too broad and seeks documents that are covered by the attorney client and work product doctrine. Plaintiff is already in possession of Mr. Swan's 21

7

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PROTECTIVE ORDER [CCP § 2025.420]

1  page letter detailing the results of his investigation. This document demand and the deposition is just

2  an 11th hour response to Defendant's motion for summary judgment and perhaps a disguised motion

3  to continue the trial date as well.[2]

4  **C.  Mr. Swan and His Counsel Properly Met and Conferred Prior to Moving for a
     Protective Order**

5

6           In his Opposition, Plaintiff attempts to create an artificial record of cooperation by misstating

7  communications between counsel for Mr. Swan and Plaintiff's counsel and relying exclusively on a

8  declaration containing inadmissible statements. (See Objections to and Request to Strike Declaration

9  of Cathryn Chinn filed herewith.) On November 20, 2007, Lawrence J. Kouns, counsel for Mr. Swan,

10  contacted Plaintiff's counsel's office to request that the deposition be rescheduled because November

11  27, 2007 was not a convenient date for Mr. Swan. (See Declaration of Lawrence J. Kouns filed in

12  support of the Motion for Protective Order ("Kouns Decl."), ¶¶ 3-4.) Plaintiff's attorney Cathryn

13  Chinn was not available, so Mr. Kouns spoke with Ms. Chinn's assistant Silvia. (Kouns Decl. ¶ 4.)

14  After explaining that the 27th was not a convenient date, Mr. Kouns suggested that the deposition be

15  postponed until after the hearing on the summary judgment motion, because if the motion were

16  granted, the deposition would be unnecessary. (Kouns Decl. ¶ 4.) He said if the motion were denied,

17  Mr. Swan could be deposed within a couple of days thereafter. (Kouns Decl ¶ 4.) Silvia called Mr.

18  Kouns back later that day and left a voicemail stating that Ms. Chinn wanted Mr. Swan to produce all

19  the documents on November 26, the day before the deposition was scheduled, and then she would

20  consider rescheduling the deposition. (Kouns Decl. ¶ 4.) This proposal was unacceptable and

21  necessitated the filing of this protective order.

22

23

24

25

26  ---

    [2] Plaintiff has also argued that Mr. Swan has not met his burden because he has not provided a
27  privilege log. However, the authority Plaintiff cites (Code. Civ. Proc. § 2025.420) does not support
    that contention. It would be unreasonably burdensome for a non-party witness to have to supply such
28  a log when the documents requested are clearly privileged.

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PROTECTIVE
ORDER [CCP § 2025.420]

93-1280

1

## V.

2

## CONCLUSION

3      For all of the foregoing reasons, Mr. Swan requests that that the Court grant the protective

4  order and quash the deposition notice and the accompanying document requests.

5

6  DATED:  December 12, 2007         LUCE, FORWARD, HAMILTON & SCRIPPS LLP

7

8                                   By

9                                      Lawrence J. Kouns
   101059019.1                         Attorneys for Edward Patrick Swan, Jr.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

9

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PROTECTIVE
ORDER [CCP § 2025.420]

93-1281

1  Lawrence J. Kouns, State Bar No. 095417
   LUCE, FORWARD, HAMILTON & SCRIPPS LLP
2  600 West Broadway, Suite 2600
   San Diego, California 92101-3372
3  Telephone No.: 619.236.1414
   Fax No.: 619.232.8311
4  E-Mail:    lkouns@luce.com

5  Attorneys for Edward P. Swan, Jr.

6

7

8           SUPERIOR COURT OF THE STATE OF CALIFORNIA

9        FOR THE COUNTY OF SAN DIEGO, SAN DIEGO JUDICIAL DISTRICT

10

11  JOSE HERNANDEZ,                          Case No. GIC 871979

12          Plaintiff,
                                             **PROOF OF SERVICE**
13  v.

14  SAN DIEGO COUNTY REGIONAL
    AIRPORT AUTHORITY, a public entity and
15  DOES 1 through 12, inclusive,

16          Defendants.

17

18      I, Renee' M. Evans, declare as follows:

19      I am employed with the law firm of Luce, Forward, Hamilton & Scripps LLP, whose address is

20  600 West Broadway, Suite 2600, San Diego, California 92101-3372.  I am over the age of eighteen

21  years, and am not a party to this action.

        On December 12, 2007, I served the following:
22
    **REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION**
23              **FOR PROTECTIVE ORDER [CCP § 2025.420]**

24  on the interested parties in this action by:

25  _____   **U. S. MAIL:** I placed a copy in a separate envelope, with postage fully prepaid, for
             each address named on the attached service list for collection and mailing on the below
26           indicated day following the ordinary business practices at Luce, Forward, Hamilton &
             Scripps LLP.  I certify I am familiar with the ordinary business practices of my place of
27           employment with regard to collection for mailing with the United States Postal Service.
             I am aware that on motion of the party served, service is presumed invalid if postal
28           cancellation date or postage meter date is more than one day after date of deposit or

                                        1
                                  PROOF OF SERVICE

93-1282

1    mailing affidavit.

2    __XX__    **BY FEDEX:** I enclosed said document(s) in an envelope or package provided by
      FedEx and addressed to the persons at the addresses listed in the Service List. I placed
3    the envelope or package for collection and overnight delivery at an office or a regularly
      utilized drop box of FedEx or delivered such document(s) to a courier or driver
4    authorized by FedEx to receive documents.

5    _____    **OVERNIGHT MAIL:** I sent a copy via overnight mail, Airbill
      No. _____.
6
      **OVERNIGHT COURIER SERVICE:** I placed a copy in a separate envelope
7    _____    addressed to each addressee as indicated below, and caused such envelope(s) to be
      delivered via _____.
8
      **HAND DELIVERY:** I placed a copy in a separate envelope addressed to each
9    _____    addressee as indicated below, and delivered it to Cal Express for personal service.

10   _____    **FACSIMILE:** I sent a copy via facsimile transmission to the telefax number(s)
      indicated below. The facsimile machine I used complied with California Rules of
11   Court, Rule 2003 and no error was reported by machine. Pursuant to California Rules
      of Court, Rule 2006(d), I caused the machine to print a transmission record of the
12   transmission, a copy of which is attached to this declaration.

13   Cathryn Chinn                          Sandra McDonough
      1901 First Avenue, Suite 400           Paul, Plevin, Sullivan & Connaughton
14   San Diego, CA 92101                    401 B Street, Tenth Floor
      Tel: (619) 234-9000                    San Diego, California 92101
15   Fax: (619) 699-1159                    Tel: 619.744.3641

16   Peter Friesen
      1901 First Avenue, Suite 400
17   San Diego, CA 92101
      Tel: (619) 234-9000
18

19   __XX__    **(STATE):** I declare under penalty of perjury under the laws of the State of California
      that the foregoing is true and correct.
20

21   _____    **(FEDERAL):** I declare that I am employed in the office of a member of the bar of this
      court at whose direction the service was made.
22
      Executed at San Diego, California on December 12, 2007.
23

24

25

26   101054213.1                         Renee' M. Evans

27

28

2

PROOF OF SERVICE

93-1283



BLUEBIRD
OFFICE SUPPLIES
(888) 477-0700
www.bluebirdonline.com

**SUPERIOR COURT OF CALIFORNIA,**
**COUNTY OF SAN DIEGO**
**HALL OF JUSTICE**
**TENTATIVE RULINGS - November 15,2007**

EVENT DATE: 12/14/2007          EVENT TIME:    01:30:00 PM        DEPT.: C-75
JUDICIAL OFFICER: Richard E. L. Strauss

CASE NO.:    GIC871979

CASE TITLE:  HERNANDEZ VS S D COUNTY REGIONAL AIRPORT AUTHRTY

CASE CATEGORY: Civil - Unlimited          CASE TYPE: Wrongful Termination

EVENT TYPE:  Motion Hearing (Civil)
CAUSAL DOCUMENT Motion for Summary Judgment and/or Adjudication, 08/31/2007
/DATE FILED:
_____

The court, having taken Defendant San Diego County Regional Airport Authority's motion for summary judgment under submission and having considered the parties' arguments following the hearing on November 16, 2007, grants summary judgment in Defendant's favor. Based on the legal authority provided by Defendant in both its November 26 and December 11, 2007 submissions, the Court finds that Defendant San Diego County Regional Airport Authority is immune from liability under Government Code § 821.6 because

"investigations are considered to be part of judicial and administrative proceedings for purpose of section 821.6 immunity." (*Richardson-Tunnell v. School Insurance Program for Employees* (Dec. 10, 2007, B195938) __ Cal.App.4th __, *3 [2007 WL 4295547].)

---

94-1284



**EXHIBIT 95**

CATHRYN CHINN, ESQ. #93340
PETER FRIESEN, ESQ. #107631
1901 First Avenue, Suite 400
San Diego, California 92101
Telephone (619) 234-9000
Facsimile (619) 699-1159

Attorneys for Plaintiff
JOSE HERNANDEZ

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF SAN DIEGO

| | |
|---|---|
| JOSE HERNANDEZ,<br><br>                    Plaintiff,<br><br>        v.<br><br>SAN DIEGO COUNTY<br>REGIONAL AIRPORT AUTHORITY,<br>a public entity; THELLA BOWENS, an<br>individual; and<br>DOES 1 through 20,<br><br>                    Defendants. | ) Case No.  GIC 871979<br>)<br>)<br>)<br>)<br>) **THIRD AMENDED COMPLAINT**<br>)<br>) VIOLATION OF CONSTITUTIONAL<br>) RIGHTS<br>) **(42 U.S.C. section 1983);**<br>) **Violations of California Constitution**<br>) **Article I, section 7, subdivisions (a)(b);**<br>) **section 26, et seq.)**<br>)<br>)<br>)<br>) Dept.:              75<br>)<br>) Judge:            Hon.  Richard E.  Strauss<br>) Complaint Filed:   September 1, 2006<br>) Trial Date:        None Set |

I

## FACTS COMMON TO ALL CAUSES OF ACTION

### (Against All Defendants)

1.      All the events herein alleged occurred within the County of San Diego, State of California. Plaintiff is a resident of the County of San Diego, State of California and was employed by the San Diego County Regional Airport Authority at the time of the events herein alleged. This action arises under 42 U.S.C. section 1983, which provides that every

PLAINTIFF'S THIRD AMENDED COMPLAINT

95-1285

1    "person" who, under color of any statute, ordinance, regulation, custom, or usage of any State

2    subjects, or "causes to be subjected," any person to the deprivation of any federally protected

3    rights, privileges, or immunities shall be civilly liable to the injured party; and the federal

4    Constitution due process clause of the Fourteenth Amendment; and violations of the provisions

5    of the California Constitution, Article I, section 7, subdivisions (a) and (b), Article I, section 26,

6    et.seq., including, but not limited to violation of the Plaintiff's due process liberty interest by

7    failing to provide him with a timely hearing and denial of the equal protection of the laws.

8    2.    The defendant SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY

9    (hereafter "AUTHORITY") is, and at all material times herein was, a public entity created by

10    state law pursuant to the California Public Utilities Code Section 170000, et seq., Division 17,

11    Chapter 1, Chapter 2, Chapter 3 to operate the San Diego International Airport (Lindbergh

12    Field) and is an  entity charged by law as the employer of the staff members of the

13    AUTHORITY and is duly organized and existing under the laws of the State of California.

14    Under California Public Utilities Code Section 170032 et seq. the AUTHORITY may be sued

15    in all actions and proceedings in all courts of competent jurisdiction.

16    3.    The AUTHORITY is responsible for public health and safety surrounding the San

17    Diego Airport, including airport land development and charged with minimizing "the public's

18    exposure to excessive safety hazards around airports." The AUTHORITY'S management and

19    budget of $113.8 million is overseen by the AUTHORITY'S President/CEO, defendant Thella

20    Bowens. Bowens reports to a Board of Directors and her employment is approved by the San

21    Diego Port District. Bowens was the Plaintiff's termination decision-maker who followed the

22    biased recommendation of a subordinate without independently investigating the complaint

23    against the employee. Bowens had the authority to establish policy and custom on behalf of the

24    Authority as its CEO/President. Bowens committed acts against the Plaintiff for the purpose

25    of silencing his criticism of her policy and practice of seemingly corrupt and illegal acts of the

26    Authority. These acts of harm under Bowens were policy of the Authority even though a public

27    employer does not have a legitimate interest in covering up mismanagement or corruption.

28    4.    The Plaintiff JOSE HERNANDEZ began employment at the San Diego County

2    PLAINTIFF'S THIRD AMENDED COMPLAINT

1    Regional Airport Authority in March 2001 as Manager, Ground Transportation and was then

2    promoted to Director, Landside Operations.. In this position Plaintiff managed the operations

3    of the airport terminal buildings, the parking lots, the ground transportation services and

4    provided "expert assistance in the planning and long-range business decision making for

5    managing the airport's facilities." Plaintiff reported to the Vice President, Airport Operations,

6    who had managerial responsibility for all aspects of airport operations. Plaintiff was specifically

7    required to make decisions "in operating the parking facilities to ensure the highest levels of

8    efficiency [and] economic advantage." Plaintiff was also required to represent the Authority in

9    dealing with tenants and contractors.

10    5.    Plaintiff does not know the true names or capacities (whether individual or other

11    wise) of defendants DOES 2 through 20) and will amend this pleading when their true

12    identities have been ascertained.

13    6.    All defendants were the agents and employees of each other and performed the

14    acts alleged in this complaint in the course and scope of their agency and employment with the

15    consent and direction of the other; and in dual capacity as individuals, subjecting

16    Plaintiff to, but not limited to, acts of harm, harassment and hostility.

17    7.    Plaintiff was an outstanding employee who always performed at levels above and

18    beyond what could normally be asked of an employee. Plaintiff's performance was

19    greatly praised by staff members, Board members and individuals from external agencies. The

20    Vice President of Airport Operations stated that the number of employees performing at the

21    Plaintiff's level could be "counted on one hand with several fingers left over."

22    Plaintiff consistently and constantly reported on a daily basis to this Vice President all actions

23    and events he was involved in, and withheld no information regarding his own

24    activities, viewpoints, opinions and observance of the activities of other employees, including

25    management. Plaintiff has never been criticized or disciplined for anything during his

26    employment with the Authority until the events of December 2005 that led to

27    his improper termination from the Authority in February 2006.

28

                            3    PLAINTIFF'S THIRD AMENDED COMPLAINT

**FIRST CAUSE OF ACTION**

**Violation of 42 U.S.C. section 1983; the due process clause of the**

**Fourteenth Amendment;**

**Violation of the California Constitution;**

**Article 1, section 7, subdivisions (a) and (b); Article I, section 26, et seq.**

Retaliatory termination for employee's right to exercise free speech and expression

sounded in the public interest; and

Right to due process where termination affects employee's "liberty" interests

(Against All Defendants).

8.      Plaintiff incorporates paragraphs 1 through 7 of the Facts Common to All Causes of Action as though fully set forth herein.

9.      Within the Airport Authority there was tension between the two operating divisions: the Operations Division headed by the Vice President to whom Plaintiff reported that was responsible for Airside, Terminal, and Parking/Ground Transportation; and the Real Estate and Capitol Development Division headed by Vice President Bryan Enarson. There were two distinct camps: Operations was primarily driven to respond to the Authority's airline tenants and airport guests; while Enarson's Real Estate/Capital Development was driven by his need for bureaucracy that prolonged project completion times and substantially increased project expenses. Enarson had ingratiated himself to Bowens and set himself up as her close advisor. Bowens comes from a background as a budget analyst and is not considered a good public speaker or as a comfortable public spokesperson for the Authority. She looked to Enarson on a daily basis as a confidante and leaned on him as her closest ally. Enarson had Bowen's ear and had not only constant access but also constant influence on Bowen. The tension between Enarson and the Vice President of Airport Operations began to involve Plaintiff and escalated after Enarson's Real Estate/Capital Development received insufferable ratings on the Airport's commissioned Tenant/Customer Satisfaction Survey. Instead of focusing efforts on improving the areas that were weakest, Enarson chose to take a proactive approach to diminish the accomplishments of

4      PLAINTIFF'S THIRD AMENDED COMPLAINT

1    the Operations Division.   Enarson began to insert himself in areas that were not his

2    responsibility such as taking Bowens on walk-throughs of the terminal buildings without the

3    presence of a member from the Operations Division to point out what displeased him and sought

4    to take credit for Operations initiating projects that were not his initiatives and were not pushed

5    forward by him.   While Enarson's team was involved in the projects such as Flight Display

6    Upgrades and Security Check Point Reconfiguration the projects were driven by the Operations

7    Division, and not by Enarson.   Enarson began escalating his obstruction of development

8    projects.

9    10.       With space at a premium in the airport, the airport's redevelopment plan included

10   development of an overall concessions plan.  Enarson had received unacceptable ratings on the

11   concessions program which he oversaw as Vice President.  In the past, Enarson's Development

12   Division had simply taken space, but now resisted and refused to negotiate

13   space needed to improve the women's restroom. The improvement plans had been in the works

14   for over five years and called for a removal of approximately 30 square feet from the news and

15   gift stand belonging to Host.  In the process it was revealed that Enarson had entered into side

16   deals with a handshake agreement with Host that restricted the Operations Division's ability to

17   annex the space which was needed to comply with ADA requirements.  The Plaintiff had

18   reasonable cause to believe that the Authority was in violation of the federal American

19   Disabilities Act and its enabling regulations.  Because Enarson refused to either take the space

20   away from Host or renegotiate with them, major modifications had to be made that increased

21   the project budget by over $2 million. During the long delays women were forced to endure the

22   long lines to use the restrooms. There was no access for the disabled to the restroom for which

23   the Plaintiff also had reasonable cause to believe that the Authority was in violation of the equal

24   access provision and regulation of the ADA.

25   11.       The Plaintiff disclosed to members of the Authority Enarson's "side deal" made

26   with out negotiation that restricted the Authority's ability to annex the space needed to comply

27   with ADA requirements for the airport restroom.  Plaintiff also disclosed that Enarson's refusal

28   had increased the project budget by over $2 million.  On both counts, Plaintiff believed that he

5    PLAINTIFF'S THIRD AMENDED COMPLAINT

95-1289

1   was disclosing legal violations: violations of the ADA requirements and also disclosing the
2   unauthorized use of public assets because Enarson had a "handshake" deal. The project suffered
3   over three (3) years of delays due to Enarson's conflict with the airport's food and beverage
4   concessionaire.

5   12.   The General Dynamics property is approximately 85 acres and sits along Pacific
6   Coast Highway on the north side of the airport. The property contains a 1,600 parking stall long
7   term parking lot (SAN Park Pacific Highway), and provides for Convention
8   Center truck staging, rental car storage, and Cruise Ship truck staging. The terms of the
9   original three year lease called for rent of $4.6 million year one, $6.6 million year two, and $8.6
10   million year three. Enarson was the lead negotiator on the lease. When Plaintiff compared the
11   revenue potential of the approximately $3 million net from the parking operation and $1 million
12   from the vehicle storage, the lease payments were too expensive and out of line. Plaintiff
13   disclosed that the increased lease payments pulled funds away from the operating budget and
14   he believed it was an unauthorized use of the Authority funds. Plaintiff also believed the failure
15   to negotiate the lease properly was a violation of law and contrary to public interest. The
16   Plaintiff had reasonable cause to believe that this failure and other actions related to the lease
17   were unlawful acts that violated California Public Utilities Code section 170056 (f)(1)(2)(3)
18   Plaintiff had reasonable cause to believe that the terms of the lease were in violation of the
19   California Public Utilities Code section 1700056(f)(3). Despite the Plaintiff's objections to the
20   actual revenue streams, Enarson decided the matter would go up to the Vice President level,
21   where it died and no corrective action was taken. The lease was signed contrary to the
22   objections of true forms of revenue streams.

23   13.   The Authority's Teledyne Ryan property lease calls for $3 million in annual
24   payments for the 46.77 acre property, located immediately east of the airport along Harbor
25   Drive. At the time the lease was negotiated, with Enarson as the lead negotiator, contamination
26   of the property allegedly required approximately $10 million. The failure to properly inspect
27   and analyze the actual contamination resulted in a finding that the contamination remediation
28   range would be approximately $30 million and would limit the use of the property to the

6   PLAINTIFF'S THIRD AMENDED COMPLAINT

95-1290

existing 350 space long term parking lot (SAN Park Harbor Drive). Current revenues derived from the parking lot are approximately $1.2 million a year with about $700,000.00 in expenses, netting the Authority only $500,000.00. The original plan for the property was to phase in the parking development from what is now Phase I, 350 parking stalls, to Phase 2, approximately 1,300 stalls. If the project had stayed as planned the property would now be developed and be positioned to take advantage of the increasing occupancy levels in the market. When the development process began the discovery of the deep environmental concerns with the property, which were not previously disclosed before Enarson completed the negotiations for the lease, significantly curtailed the purpose of the lease because of the unusable areas. Plaintiff disclosed the findings that there was no way to open Phase 2 of the parking development and also disclosed the enormous amount of money the Authority was paying for the lease. The Plaintiff believed that these acts by the Authority were unlawful and in violation of California Public Utilities Code section 170056(a)(1)(B). Further, the Plaintiff's disclosure of the unlawful acts occurred at committee meetings closed to the public, at management and staff meetings closed to the public. Plaintiff asked the Authority members, including Enarson, "Why are we paying all this money? Why are we paying the rent?" Enarson replied, "We're obligated to pay the rent." Plaintiff stated that "we can use a little bit, 351 parking stalls, yet we're paying $3 million and we can't use any of the rest. We're on the hook for the $30 million. We should only pay a pro rata amount." Enarson's response was that it would get pushed up to the Vice President group. When the Teledyne Ryan transition team, of which the Plaintiff was a member, re-briefed the Vice Presidents, at a second meeting, the members and officers were in awe, and asked, "Are you sure it's $30 million? Are you kidding me?" Enarson was agitated and Plaintiff received reports that Enarson was angry.

14.    In January 2004 Lindbergh Parking (hereafter "LPi") was awarded a new five (5) year service agreement for the management of the airports' employee and public parking lots. Services included the management of the airport's inter-terminal, "Red Bus" and the Employee shuttle service, as well as the taxicab and shuttle-for-hire dispatch system. The total operating budget is approximately $8 million. Although the Request for Proposal process was highly

7    PLAINTIFF'S THIRD AMENDED COMPLAINT

95-1291

1    contested LPi was the preferred candidate largely because of its' lower operating expenses. The

2    contract commenced on February 1, 2004. There were immediate disagreements with the

3    operator because of contractual requirements. As a key component of the shuttle service, the

4    operator was to provide new vehicles at the beginning of the agreement and change them over

5    every 2 ½ years. The vehicles did not arrive until four months later. During these four months,

6    the operator was able to make a substantial amount of profit because they did not have to make

7    monthly lease payments for the vehicles since they had already been paid off. The fleet

8    consisted of six (6) employee, three (3) Red Bus vehicles, and two (2) interchangeable shuttles.

9    The average lease of a vehicle was $1,650.00 per month and amounted to approximately

10    $18,150.00 per month in extra profit for the operators. Their contract provided for an hourly

11    reimbursable for operating hours plus fuel expense. No vehicle lease cost meant more profit.

12    These difficulties were chalked up as operational issues and the Authority moved on.

13       During the Request for Proposal process LPI had indicated they could operate the long

14    term parking lot, SAN Park Pacific Highway, 1,600 parking stalls along Pacific Highway, for

15    approximately $1.3 million annually. As the operating numbers began to appear the actual

16    expenses were projected at $1.7 million annually, higher than the previous operator. Expense

17    projections for the other Authority parking properties projected similar increases. I t was clear

18    that LPI purposely submitted unattainable expense numbers in order to bolster their proposal.

19    The Plaintiff had reasonable cause to believe that he was disclosing unlawful violations of both

20    the Authority's Contract Code and the California Code of Contracts section 100. Although

21    unhappy with the operator the Plaintiff had no choice but to work with the operator to control

22    expenses.

23       Maurice Grey is the President of LPI. Plaintiff made it clear to Grey that he wanted to

24    see the Liability and Workers Compensation Coverage for the parking service competitively bid

25    for renewal. On the day before the existing coverage was set to expire Grey presented Plaintiff

26    with a premium scale which far exceed expense projections. Plaintiff met with Grey and

27    stressed to him that he needed to go through in detail all of the operating expenses and analyze

28    each of the employee job positions, including Grey's. As part of the process Plaintiff asked Grey

8     PLAINTIFF'S THIRD AMENDED COMPLAINT

1   to prepare a job description of his own job and the jobs of each of his managers. All of them

2   were interviewed to get a good understanding of their duties. The process determined that most,

3   if not all, of the duties claimed by Grey were actually performed by others. Plaintiff explained

4   to Grey that he needed to be able to justify continuing paying his salary and that on paper, the

5   salary was not justified. Plaintiff informed Grey he would give him three months, until the end

6   of summer, to show his job duties that would justify the pay and if not he would have to go.

7   Subsequently, Grey's management skills resulted in his expenses being out of control, he failed

8   to hire proper personnel, and he could not properly bid items. Again Plaintiff extended Grey's

9   deadline to substantiate his job worth until the end of the year, December 31, 2005. The

10  Plaintiff's disclosures of the Authority's failure to follow the California Code of Contracts,

11  section 100 were protected disclosures that the Plaintiff had reasonable cause to believe were

12  unlawful, and also were in violation of the Authority's Contract Code. The Plaintiff worked

13  under the requirements of both of these laws in his position as a Director, and expected the

14  Authority to comply with each and every one of the Code requirements and regulations.

15        Plaintiff then discovered that LPI was double billing the Authority for Workers

16  Compensation Insurance. He had noted that the premiums were running twice the amount of

17  the previous year and were being billed to a different expense category. As a result Plaintiff

18  posted a credit of approximately $150,000.00 against LPI's monthly request for reimbursement.

19  Plaintiff had communicated throughout the process and disclosed LPI's wrongdoing and

20  financial misuse issues with his direct supervisor, the Vice President of Airport Operations.

21  The Vice President asked Plaintiff to work out the issues with Grey because he was a Minority

22  Owned Business and the Authority needed the relationship in order to comply with FAA

23  regulations governing Minority participation. Plaintiff had disclosed computational or other

24  errors in LPI's bid submission; the unsatisfactory performance of the contract; the failure of LPI

25  to submit insurance documents acceptable to the Authority; Grey's unjustified refusal to warrant

26  his performance and other offenses and actions that indicated a lack of business integrity by LPI.

27  Plaintiff believed that disclosures he made pursuant to the contract contained violations of the

28  Ethics Code and also of rules and regulations of law.

9    PLAINTIFF'S THIRD AMENDED COMPLAINT

95-1293

15.     On or about July 11, 2006 Plaintiff filed his San Diego County Regional Airport Authority Damage Claim Form alleging the incidents of disclosure contained above herein and for the retaliation he suffered based on the disclosures of legal violations described above. On or about August 1, 2006 defendant AUTHORITY denied Plaintiff's claim.

16.     Plaintiff in good faith reported, disclosed, divulged and brought to the attention of his employer facts and information relative to both suspected and actual violations of law directly related to his job. Plaintiff observed improper governmental activity by employees of the San Diego County Regional Airport Authority undertaken in the performance of the employees' official duties that demonstrated economic waste, incompetency and inefficiency in a government agency. The plaintiff had reasonable cause to believe that the information disclosed a violation of state or federal statute, or a violation of noncompliance with a state or federal rule or regulation.

17.     By September 2005 an Authority Internal Audit of parking management operating expenses had determined that LPI had double-billed the Authority for Workers Compensation Insurance for a total of four (4) months.

18.     By October 2005 the Plaintiff had met with the Vice President of Operations to inform the Vice President of Operations of the status of LPI's non-compliance and areas of deficiencies and to obtain agreement that Maurice Gray would step down as President of LPI should he not be able to comply with the standards and improve the deficiencies and clarify his job duties for his position. Pursuant to the California Code of Contracts section 1100, the Authority was required to comply with the California Code of Contracts, section 100(b), which the Plaintiff had reasonable cause to believe was being violated by the Authority. The Authority's Contracts Code, Article 5, sections 5.11(a)(3)(4)(5)(6)(8) and section 5.18(a) were also a basis for the Plaintiff to have reasonable cause of violation by the Authority. The Plaintiff regularly worked with these Codes and regulations and expected the Authority to follow them.

19.     By November 2005 the Vice President to whom the Plaintiff reported was well aware that the Plaintiff would be leaving early in December for a planned vacation out of state. On the late afternoon of December 1, 2005 the Plaintiff met with the Vice President of

10    PLAINTIFF'S THIRD AMENDED COMPLAINT

95-1294

1    Operations to see if there were any matters that needed to be attended to before the start of his

2    vacation. The Vice President of Operations advised the Plaintiff that talks of "reorganization"

3    had "resurfaced" but that final outcome of any "reorganization" would be determined by Thella

4    Bowens (Doe No. 1) and the Authority Administration.

5    20.    On December 6, 2005 while on vacation the Plaintiff received a telephone call

6    from the Vice President of Operations, who was clearly upset, and who informed him of

7    the specifics of the plan of the reorganization. Both the responsibilities of the Vice

8    President and those of the Plaintiff were severely diminished. Over two-thirds of the

9    Authority employees had reported to the Vice President's office: now he had been

10   reassigned Chief of Staff for defendant Thella Bowens even though no one reported

11   to him in that assignment.. He was permitted to keep the title of Vice President. .

12   21.    Vice President Bryan Enarson had convinced defendant Thella Bowens  to

13   relieve him from the problems he had created as the Vice President of Development

14   (including the unresolved monetary havoc he had negotiated with the properties of

15   Jim's Air, General Dynamics, and Teledyne Ryan) and reposition him in a position with

16   Terminal Operations and other responsibilities.

17   22.    On December 7, 2005 the Plaintiff participated in a single telephone conference

18   call to discuss the Authority's reorganization specific to Parking and Ground Transportation.

19   The Authority no longer has a person with expertise managing those positions. On December

20   8, 2005 all Authority employees were informed by e-mail that the reorganization would take

21   effect on January 3, 2006.

22   23.    On December 14, 2005 the Plaintiff was requested to attend a meeting with two

23   individuals, an attorney with LUCE FORWARD and an investigator hired by LUCE

24   FORWARD. Neither of the individuals informed the Plaintiff of what the purpose of

25   their meeting was with the Plaintiff. The attorney asked a number of vague and a

26   number of specific questions, interviewing the Plaintiff and asking him if he had requested or

27   taken personal gifts from any company at the airport (No); if he had

28   requested airline tickets from any airline (No); if he had requested first-class

11    PLAINTIFF'S THIRD AMENDED COMPLAINT

95-1295

1   upgrades from airlines (No); if he had attended a wedding in Jacksonville, Florida (No);

2   if he had received money from an airport vender (Never) and if he knew of other

3   employees at the airport that accepted gifts or items of value (Yes). The questions did

4   not include follow-up inquiries to the information regarding his knowledge of other

5   employees who had in fact accepted gifts or items of value. The attorney's questions were asked

6   in a hostile and unprofessional manner and the Plaintiff knew that the attorney had been hired

7   specifically to find some wrong-doing on his part. Following this odd

8   interrogation the Plaintiff was told by two Vice Presidents that he was being put on Paid

9   Administrative Leave "until an investigation could be completed." He was also told

10  specifically that he could not discuss anything related to this interrogation or "the

11  investigation" with anyone else.

12  24.    The attorney from LUCE FORWARD and his hired investigator then began to

13  contact various people of the Plaintiff's acquaintance. These witnesses immediately contacted

14  the Plaintiff to complain about the hostile, rude and demanding treatment of the attorney from

15  LUCE FORWARD and the Plaintiff informed each witness that he was

16  unable to discuss anything regarding the matter, but all of the contacting witnesses

17  reported similar unprofessional treatment and reported their own conversations and

18  attempts at conversation with the lawyer from LUCE FORWARD. The lawyer seemed

19  to be fishing to find anything he could about the Plaintiff that might put him in a negative

20  light, and by all accounts he seemed to be failing. The lawyer from LUCE FORWARD was

21  reduced to "suggesting" various scenarios to the witnesses, some of whom

22  laughed at the lawyer and concluded he was engaged in a "witch hunt" to do harm to the

23  Plaintiff. The Plaintiff, unable to respond and tell the contacting witnesses anything, was unable

24  to defend himself. The Plaintiff knew what Thella Bowens (Doe No.1) was

25  doing to him and why she was doing it but could not disclose anything about it.

26  25.    As the attorney for LUCE FORWARD became more desperate to find some

27  wrong doing from people who did not want to see the Plaintiff harmed, he utilized the Private

28  Investigator to go after tangential subjects and try to get some "hard evidence" that the Plaintiff

12    PLAINTIFF'S THIRD AMENDED COMPLAINT

95-1296

1   had done something, anything, wrong. The attorney for LUCE FORWARD sent the investigator

2   over to the car repair place the Plaintiff used and threatened and coerced the owner to give him

3   copies of the repair bills for the Plaintiff's car. The investigator specifically represented himself

4   as working for the Authority and not for LUCE FORWARD. The Plaintiff had never been

5   asked to produce these car repair bills and did not give his permission to the owner of the repair

6   place to give them to the investigator or to anyone else. The investigator produced the

7   documents in front of the attorney for LUCE FORWARD and in front of the Plaintiff. The

8   investigator and the attorney for LUCE FORWARD refused to say where they had obtained

9   them. In fact, it was the witness who called the Plaintiff and told him about the incident. The

10  car repair bills yielded no evidence of wrong doing by the Plaintiff.

11  26.    Next the attorney for LUCE FORWARD questioned witnesses about what they

12  knew about the Plaintiff's marriage, including whether they had observed "communication"

13  problems in the marriage. The witnesses quickly defended the Plaintiff's marriage and quickly

14  informed the Plaintiff of the attorney's specific invasion into the Plaintiff's marriage and

15  informed him that it was a great marriage and asked the Plaintiff why this attorney was asking

16  questions that had nothing to do with the Plaintiff's job and were also none of his business.

17  27.    On February 7, 2006 the Plaintiff was called into a meeting by his former

18  Vice President of Operations and told they were here to "discuss the disposition of

19  of the recent investigation concerning possible misconduct on your behalf." The Plaintiff was

20  specifically told that he was unable to leave the meeting until a decision had been made

21  regarding his employment status and that he did not have the right to discuss the matter with

22  anyone regarding his options. The former Vice President had prepared a written outline

23  reference which he claimed would show the Plaintiff that "it was no witch hunt." The Plaintiff

24  vehemently objected and told him that the 'investigation' "was just that: a witch hunt aimed at

25  specifically terminating my employment' with the Authority" and "the point was made clear to

26  me by the was the 'investigation' was conducted and through the questions asked by the

27  'investigators'." The Plaintiff asked the former Vice President if it was his opinion that the

28  Plaintiff had asked for favors in exchange for 'gifts.' The former Vice President then reiterated

13    PLAINTIFF'S THIRD AMENDED COMPLAINT

1   his statement that the 'investigation' had concluded that there was no Quid Pro Quo. The former

2   Vice President then stated that "the reason for such an extensive 'investigation' was to assure

3   the Authority that there were no signs of criminal activity from [the Plaintiff's] behavior." The

4   Plaintiff asked him if there was and the former Vice President stated: "to date" no evidence to

5   support this allegation could be found.

6        The former Vice President and the Plaintiff then discussed the Authority Policy

7   concerning "Conflict of Interest". He specifically singled out one airline for his

8   acceptance of a comp stand-by ticket, available by the airline to the general public.

9   28.   Plaintiff then pointed out his points of concern to the former Vice President: (1)

10   the ambiguousness of the "Conflict of Interest" Code, and (2) more importantly, the

11   application of the policy among Authority employees.  The Plaintiff mentioned the specific

12   abuse of the policy from the Authority Vice Presidents, Board Members, and

13   the President/CEO Thella Bowens (Doe No.1) This included airline ticket changes, upgrades,

14   access to First Class lounges and other routinely-demanded expensive privileges not allowed

15   to other Authority employees.   The Plaintiff pointed out to the Vice President that the

16   application of the "Conflict of Interest" Code policy was selective and unfairly enforced.

17   SDCRAA Code of Ethics Article 2, part 2 et.seq.

18   29.   The Plaintiff had discussed such items as the above-stated violations of the

19   Authority's policy with the former Vice President when he had been the Vice President

20   and the Plaintiff's supervisor and he had always seen no reason for concern, and no

21   action had been taken.  This same former Vice President had himself directed the Plaintiff

22   to take care of tickets for Authority employees and Board Members.  The Plaintiff asked

23   why it was okay for Thella Bowens (Doe No.1) to ask and receive favors and not okay

24   for employees to receive the same benefits.  One example was Bowen's request to fly in

25   in BBQ meat from Texas.  The former Vice President defended this practice as

26   approved as an "Accepted Industry Practice", which connotes that among the Regional

27   Airport Authority for the Counties paying to fly in meat from another state is a billable

28   expense .SDCRAA Code of Ethics Article 2, section 2.10 (d)(9)(A)(B)

14    PLAINTIFF'S THIRD AMENDED COMPLAINT

95-1298

30.    The former Vice President then told the Plaintiff that the Authority could no longer trust his judgment and they are "forced to discontinue working relations."

His "choice" was to sign a resignation or they would terminate him. When the former Vice President, now Chief of Staff to Thella Bowens (Doe No.1), asked the Plaintiff for final comments he told him his opinion as to the unfairness of the 'investigation' and the lack of professionalism on the part of the 'hired help' (the lawyer from LUCE FORWARD and the 'investigator' he hired). The Plaintiff stated that the outcome of the investigation had already been pre-determined and that the 'investigators' were not impartial and did not let the 'truth come out.' The Plaintiff asked the following questions, all of which went unanswered: How did this 'investigation' come about? Why were the allegations made against him never explained? Why was the reasoning behind being placed on administrative leave never disclosed? Am I the only person being 'investigated' or are there others? What authority was given to the 'investigators' to allow them to invade my privacy and procure privileged information? The former Vice President's last comment to the Plaintiff was: "Holy shit, I knew something like this would happen as part of the reorganization."

31.    The policies of the Authority are published and distributed to all employees and Board members. Specifically, these policies state: that (a) Public officials, both elected and appointed, shall comply with both the letter and the spirit of the laws affecting the operations of government; (b) Public officials shall be independent, impartial and fair in their judgment and actions; ( c ) Public office shall be used for the public good, not for personal gain;." SDCRAA Policies Art. 2 Ethics, Part 2.0; Section 2.01 POLICY STATEMENT  The Authority then adopted a Code of Ethics and Conduct and specifically designated that the "employees" includes "the Authority's Executive Director" [Thella Bowens, Doe No.1]   General Counsel [Bret Lobner] "other officers and consultants." Further, "This Ethics Code shall be broadly construed to effectuate its purposes." The citizens served by the Authority "are entitled to fair, ethical and accountable . . . government." Code of Ethics, Art. 2, Part 2.0, Section 2.01

32.    The Authority has enacted specific standards of conduct that include the

15    PLAINTIFF'S THIRD AMENDED COMPLAINT

1    following: Ethics Code Art. 2, Part 2.0, Section 2.02 "Act in the Public Interest" requires

2    "[e]mployees of the Authority will work for the common good of the people of the County of

3    San Diego and not for any private or personal interest. . . ." Under the Code of Ethics, Art. 2,

4    Part 2.0, Section 2.10 "Prohibited Receipt of Benefits" (a) **"Benefit"** means any honorarium,

5    gift or **travel expense** made to, or in the interest of, an individual or a member of the

6    individual's immediate family." (2) **"Gift"** means any payment that confers a personal benefit

7    on the recipient . . . *unless the rebate or discount is made in the regular course of business to*

8    *members of the public without regard to official status.*" The standard airline issued trip pass

9    which is used when ticketing employees, other airline personnel and non-employees authorized

10   for non-revenue travel ticket given to the Plaintiff is only valid for ninety days and the seats are

11   limited because it is a stand-by ticket. All airlines have the autonomy to give them to anybody

12   and is routinely given in the regular course of business to members of the public "without regard

13   to official status." There was no requirement for the Plaintiff to report the gift of a stand-by

14   complementary ticket whether it was used or not. In order to be a "benefit" the recipient must

15   know that the rebate or discount is not made in the regular course of business to members of the

16   public. Ethics Code, *supra, I* (4)(d)

17   33.    The Authority did not follow the Ethics provisions that governed it. There was no

18   enforcement of the policies or code when violations blatantly occurred, particularly by the

19   Authority President and her Vice Presidents, or by the Board members. It wasn't until Bowens

20   and Enarson determined that they would get rid of the Plaintiff were accusations of violations

21   of the ethics provisions made against the Plaintiff. The "investigation" initiated by Bowens was

22   a selective enforcement of ethics provisions that singled out the Plaintiff for retaliation because

23   he had complained and disclosed matters that he believed were violations of law. The

24   Authority's Ethics Code Art. 2, Part 2.0, Section 2.10 contains specific <u>Restriction on</u>

25   <u>Benefits</u> under (b) (1) No Board member or employee of the Authority shall request a

26   benefit from any person or entity or accept any benefit intended to influence official duties.

27   (B)(2) No Board member or employee of the Authority shall accept anything of value from

28

16    PLAINTIFF'S THIRD AMENDED COMPLAINT

1  anyone, other than the Authority or another Board member or employee, for doing his or her job.

2  Violations of the above-stated Ethics Code, Sections 2.01; 2.02; and 2.10 occurred during the

3  Plaintiff's employment as a Director with the Authority including, but not limited to the

4  following incidents:

5      a.     The Vice President of Operations paid $1200.00 for a ticket on an airline

6  to get Blue Bell ice cream for Thella Bowen's BBQ, received reimbursement for the

7  travel expense under the guise that he was attending a cultural awareness development meeting

8  with another airline. The ice cream was available in Southern California. When word got

9  around the Authority about the cost of going to Texas for ice cream, the Vice President directed

10  the Plaintiff to "shut that little shit up" referring to the budget analyst who continued to

11  comment on it. The Plaintiff refused the directive. This travel expense was not reasonably

12  related to a governmental purpose.

13      b.     Each time an Authority employee requested a change to be made to an

14  airline ticket a benefit was accepted when the recipient took "any action exercising control over

15  the benefit." Thella Bowen would purchase her own tickets and then request date changes and

16  upgrades, along with Premier Lounge Access (only permitted for airline premier club members).

17  This practice was so prevalent by Bowens and her staff that on the day that the investigation of

18  the Plaintiff began, Bowens had secured access to an airline Premier lounge prior to her trip to

19  Asia. Any change to any ticket itinerary is approximately fifty to one hundred dollars, a service

20  charge, plus the cost in set p rice for an upgrade on a ticket, ranging from one hundred fifty to

21  two hundred dollars each way. Thella Bowens routinely instructed her Assistant to contact either

22  the Plaintiff or the Vice President that the Plaintiff reported to, to make the changes described

23  above. The Plaintiff would make the changes for Bowen by going directly to the airline Station

24  Manager and requesting the change for Thella Bowens. The Plaintiff performed this benefit

25  accommodation more than thirty times for Bowen and her staff. All of these requested benefits

26  were in violation of the Ethics policy.

27      c.     Each year Thella Bowens requested an employee BBQ named "Thella's

28

        17   PLAINTIFF'S THIRD AMENDED COMPLAINT

95-1301

BBQ." The event drew from fifty to over three hundred attendees. The centerpiece of the event called for pork, beef ribs and brisket to be flown out from her favorite restaurant in the Dallas Fort Worth area, Angelo's. Employees from the Director level and above were required to pay money to help subsidize the expense of the meat. Currently Thella's BBQ has been renamed the "Annual Employee Appreciation Employees BBQ" and now costs approximately ten to fifteen thousand dollars, not including the cost of the labor for the Authority employees who are designated to support the event. The Plaintiff was then instructed to contact an airline to make arrangements at her behest for free airline delivery of the meat. The net weight of the total delivery was over two hundred pounds at an approximate cost of $2500.00. The free airline flight of the meat violated the Ethics policy. The cost of the BBQ comes from the revenue collected by the Authority from the airlines and its users.

    d.    Thella Bowens requested through a Vice President that he obtain special airline flight privileges for her sister who lives in Texas. Bowens asked for the ability to get privileges for her sister for her business in order to make a deadline for a client. The request was made to the airline Station Manager. The airline Station Manager then responded to the conditions under which they could do it. This request by defendant Thella Bowens violated the Ethics Code.

    e.    The request from the Chairman of the Board of the Authority to secure First Class upgrade airline tickets on the day of his planned departure for his wife and himself required the intervention of the airline Station Manager. This tactic allowed the Chairman of the Board of the Authority to save approximately two hundred fifty dollars for the upgrade expenses. This action violates the Ethics Code.

    f.    The Chairman of the Board of the Authority on several occasions requested to enter into a temporary lease to use a portion of the parking lot at Harbor Island for no expense for an activity he is involved with annually. The lease of Authority property for non-aviation use is strictly prohibited and a violation of the Ethics Code as well as other laws and regulations.

18   PLAINTIFF'S THIRD AMENDED COMPLAINT

g.    An Authority Board member annually inserts his official authority to influence negotiations between a community event and the rental of the General Dynamics property at a rate lower than the fair market value.  As a condition of this use, all rental cars must be removed from the property and a large amount of vehicles relocated from the property. This violates the Ethics Code as well as other laws and regulations.

h.    An Authority Board member requested assistance in rearranging his itinerary so that he could attend the Little League World Championships in Williamsport, Pennsylvania.  The Plaintiff had to work with three different airlines to coordinate the First Class upgrade the Board member requested, as well as the time changes to allow the Authority Board member his desired schedule.  This violates the Ethics Code.

I.    The Authority's Vice President of Budget and Finance repeatedly requested from the Plaintiff assistance in changing flight schedules.  Over a one year period the Plaintiff assisted with the change of approximately fifteen to twenty schedules, all to accommodate personal and non Authority business travel to Las Vegas and Texas. This violates the Ethics Code.

j.    The General Counsel of the Authority Bret Lobner used his official position to obtain fifty-yard-line premier seating at the Poinsettia Bowl football game by getting the Plaintiff to use his official position as Director, Landside Operations to make contact with the Holiday Bowl Committee and request premium seating for the event.  This involved securing six tickets for $300.00, which the Plaintiff paid for so that the General Counsel Bret Lobner had to reimburse the Plaintiff.  When the Holiday Bowl Committee member asked the Plaintiff if the tickets were complimentary for no charge the Plaintiff refused the gift and paid for them. The General Counsel Bret Lobner knew he was in violation of the Ethics Code when he made the request for the favors from the Plaintiff.

After the Plaintiff filed his Claim with the Airport Authority, the General Counsel Bret Lobner wrote to the Plaintiff that "the facts about me are false, misleading, defamatory, slanderous, libelous" because the number of tickets he requested was six, not eight, and the price

19    PLAINTIFF'S THIRD AMENDED COMPLAINT

1    he paid for the tickets was $300.00 not $400.00.  Lobner then threatened to pursue legal action

2    against the Plaintiff for "filing a false defamatory accusation against [him]" because "Mr.

3    Hernandez had volunteered to pick up the tickets since he already had plans to visit the ticket

4    the ticket [sic] location", a statement which is untrue. The General Counsel Bret Lobner's threat

5    is an additional and separate violation of the Ethics Code.

6            k.      The Plaintiff was present with the Vice President of Operations when the

7    Chairman of the Board of the Authority requested a contractor to be hired to re-survey

8    his Authority office space for "listening devices." The Chairman's office space had previously

9    on two separate occasions been surveyed for "bugging devices" or other "listening apparatus."

10   The Chairman was worried that his communications could be intercepted by the FBI or similar

11   such agencies.  This contract request  is a gross waste of the Authority funds.

12           l.      The Vice President of Budget and Finance, representing himself and

13   Thella Bowens as Board members of the Jackie Robinson YMCA, requested that the Plaintiff

14   secure a free round trip airline ticket for the owner of national basketball team.

15   The request was made so that the owner could be the featured speaker at a banquet.

16           m.      The Vice President of Operations with the full knowledge of Thella

17   Bowens, requested that the Plaintiff secure free round tip airline tickets to be donated

18   as the featured prizes of the annual United Way campaign.  The Plaintiff did this twice.

19           n.      Thella Bowens requested from the Plaintiff that a marked reserved parking

20   stall be designated in the employee parking lot at the Commuter Terminal for her personal use.

21   Bowens then never used the stall, choosing to park elsewhere and

22   she reassigned the stall to the Vice President of Budget and Finance.  That particular

23   reserved parking staff is clearly marked for use only by the President/CEO of the

24   Airport Authority.  The designation of the parking stall to the Vice President of Budget and

25   Finance clearly connotes preferential treatment and is a violation of Airport Authority rules and

26   regulations.

27           o.      The Vice President of Operations instructed the Plaintiff to use his

28

20    PLAINTIFF'S THIRD AMENDED COMPLAINT

1 | position as Director of Landside Operations to secure a limousine from one of the Airport's

2 | service providers to be used as part of the procession for a colleague's wife's

3 | funeral.

4 | 34.   Under the Authority's Ethics Code found in Article 2, et seq.: "No Board member

5 | or employee of the Authority shall use or threaten to use any official power or influence to

6 | discourage, restrain or interfere with any other person for the purpose of preventing such person

7 | from acting in good faith to report or otherwise to bring to the attention of the Board *or any*

8 | *other appropriate agency, office or department* any information which, if true, would constitute:

9 |       (1) a work-related violation by a Board member or employee of any law or regulation,

10 | including this Ethics Code;

11 |       (2) a gross waste of Authority funds;

12 |       (3) a gross abuse of power;

13 |       (4) a conflict of interest of a Board member or employee; or

14 |       (5) No Board member or employee of the Authority shall use or threaten to use any

15 | official authority or influence to effect any action as a reprisal against a Board member or

16 | employee who reports or otherwise brings to the attention of the Board or other appropriate

17 | agency, office or department, any information regarding the subjects described in Subsection

18 | (a)

19 |       The Plaintiff attempted, time and time again, to bring to the attention of the

20 | attorney from LUCE FORWARD the above-stated Ethics violations and every single time the

21 | attorney from LUCE FORWARD interrupted and spoke over the Plaintiff to prevent the

22 | Plaintiff from reporting violations, both legal and ethical, that he was aware of and had not been

23 | 'investigated.' The attorney was not interested in knowing about the above-stated violations or

24 | any incident that did not show wrongdoing by the Plaintiff. The Plaintiff did his best to report,

25 | disclose, divulge and bring to the attention of his employer's 'investigator' (the attorney from

26 | LUCE FORWARD) facts and information relative to both suspected and actual violations of

27 | state law directly related to his job. The Plaintiff observed improper governmental activity by

28 |

21   PLAINTIFF'S THIRD AMENDED COMPLAINT

**95-1305**

1　employees of the Authority undertaken in the performance of the employee's official duties that
2　demonstrated economic waste, incompetency and inefficiency.  The 'investigator' Thella
3　Bowens hired (the lawyer from LUCE FORWARD) attempted to use and used, both directly
4　and indirectly, intimidating, threatening, coercing, and commanding tactics to influence the
5　information he was told by the Plaintiff and by the witnesses during their interviews.
6　Thella Bowens could not have reasonably believed that taking personnel action, including hiring
7　and directing an 'investigation' into the Plaintiff's alleged but not articulated violations of the
8　Authority's Ethics policy was and is justified based on her own and her direct report employees'
9　own well-know violations of the same policies and Codes.  Bowens was well aware that the
10　evidence of her own violations were known to the Plaintiff and when he reported those
11　violations to her hired 'investigator' he was cut off and told not to discuss them.  Other
12　witnesses also disclosed to Bowen's 'investigator' knowledge of Bowen's wrongdoing as well
13　as the Ethics violations by her Vice Presidents that Bowens condoned and ratified.
14　35.　The Plaintiff contends he disclosed a number of legal violations for which the Authority
15　retaliated against him.
16　　　The first disclosure arose from the Plaintiff's opposition to a "side deal" that Bryan
17　Enarson made with a concessionaire at the airport, Host, that restricted the Authority's ability
18　to annex the space needed to comply with ADA requirement for the
19　women's restrooom at the airport..  The result of Enarson's actions increased the project budget
20　by over $2 million.  The Plaintiff believed this resulted in legal noncompliance with the ADA
21　requirements that demand access for disabled individuals which were well settled at that time
22　and took precedence over the handshake agreement Enarson made without negotiation with
23　Host.
24　　　The second disclosure also arose from events involving Enarson, who was the lead
25　negotiator on behalf of the Airport for the property known as the General Dynamics property.
26　Enarson proceeded with the negotiations without ascertaining the extent of the "public hazards
27　around the airport"and resulted in a lease agreement that loses millions of dollars per year for
28

　　　22　PLAINTIFF'S THIRD AMENDED COMPLAINT

95-1306

1    the Authority.

2        The third disclosure involved the misuse and waste of the usable land around the

3    property known as the Teledyne Ryan property. Enarson proceeded with the negotiations

4    without ascertaining the extent of the "public hazards around the airport" and that resulted in

5    a lease agreement that loses millions of dollars per year for the Authority. Enarson then blocked

6    open discussion of the problem and no resolution has been attempted.

7        The fourth and final disclosure encompassed the issue of the contract bid by the

8    Lindbergh Parking, Inc. (LPI) and its failure to meet its contract expectations and the

9    offenses and actions by the LPI that indicate a lack of business integrity.

10       The Plaintiff believes it was the personal relationship of the President/CEO of the

11   Authority, defendant Thella Bowens who has shown favoritism, partiality and a refusal to hold

12   those of the same minority race as herself to the same accountability as the Ethics Code and

13   other laws and regulations require. Besides Enarson, who is white, and a

14   premier kiss ass, Bowens has never applied the same policy standards to herself or to her

15   Vice Presidents who are black. Maurice Gray is black and is the beneficiary of not having to

16   comply with the standards and requirements that other Authority contractors have been held to.

17   By eliminating the Plaintiff from his job she has assured that no one else surrounding her at the

18   high management levels will speak up or oppose whatever it is she desires to do, both personally

19   and in her job position. Thella Bowens (Doe No.1) made it clear through the attorney she hired

20   from LUCE FORWARD and through the investigator the attorney hired that she alone would

21   make the determinations as to conclusions and findings of the two. Bowens (Doe No.1) met on

22   a regular, if not daily basis, with the two she hired and reviewed their "findings" and personally

23   directed them in their 'work', including their 'work' that invaded the Plaintiff's privacy and had

24   no relation whatsoever to the Plaintiff's job or his job performance.

25   36.  The Ethics Code, Art. 2, Part 2.0, Section 2.05 (a) requires that : "Board members

26   and employees of the Authority shall comply with the laws of the . . . State of California and the

27   ordinances, codes, rules and regulations of the Authority in the performance of their public

28

            23    PLAINTIFF'S THIRD AMENDED COMPLAINT

95-1307

1    duties. . . ." Section 1.17 (a) of the Ethics Code provides: "Whenever in this Code any act or

2    omission is made unlawful, it shall include causing, permitting, aiding or abetting such act or

3    omission." Under these laws, all employees, including Thella Bowens (Doe No.1) and her Vice

4    Presidents and Directors who participated in acts that violated the Ethics Code, whether by

5    requesting them, directing them, condoning them or ratifying them, are "causing, permitting,

6    aiding or abetting" the acts.

7    37.    The Plaintiff believed in good faith that LPI was in violation of California Public

8    Contracting laws found in the California Public Contract Code Section 100 et seq.  The

9    discovery that LPI had presented false expenses in its bid submission, combined with the

10   unsatisfactory performance of the contract, its failure to submit insurance documents and its lack

11   of business integrity when given time and opportunities to correct its wrongdoing seriously

12   affected the reliability and credibility of the performance of LPI.  The final deadline for Maurice

13   Gray to submit a job description that detailed the duties he performed as President of LPI to

14   justify his salary of $60,000.00 was quickly approaching when Thella Bowens (Doe No.1) made

15   the decision to begin an 'investigation' of the Plaintiff.  Bowens wanted Maurice Gray to

16   continue in that position, partly because he was black, and she favored protection of the black

17   employees, but also because she did not want anyone, including the Plaintiff, to speak up and

18   oppose whatever decisions she made, whether they involved misuse of government funds as the

19   Plaintiff believed when he opposed and objected to the leases that cost the Authority millions

20   of dollars for nothing in exchange.  Over and over again the Plaintiff voiced his opinions that

21   waste of money occurred when Enarson, with Bowen's approval, failed to consider the budget

22   and its inability to sustain payments when no revenue could be generated from projects

23   improperly negotiated and Bowen's refusal to address those problems.  LPI was the last straw

24   for Bowens.  The Plaintiff believed that Bowens and her Vice Presidents were using favoritism

25   as a form of corruption in the LPI contract.  There is no other "justification" for the timing, the

26   identity of the retaliations, and the secretive and calculated course of conduct that Bowens called

27   for choosing to 'investigate' the Plaintiff at that time.  Bowens cannot show independent reasons

28

24    PLAINTIFF'S THIRD AMENDED COMPLAINT

1   for her hiring of an 'investigator' that demonstrates clear and convincing evidence that she

2   would have conducted an 'investigation' if the Plaintiff had not engaged in protected disclosures

3   or refused to participate in suspected and actual violations of state law governing public

4   contracts.

5   38.    The Ethics policies and Code are not uniformly followed, enforced or used by

6   Authority management.  The Plaintiff was singled out because he opposed and objected on

7   numerous occasions to the actions of the Authority's President/CEO Thella Bowens and her

8   Vice Presidents when he believed he had reasonable cause to believe that the opposition was

9   necessary to disclose a violation of state statute, or a violation or noncompliance with a state

10   statute, rule or regulation.  The Authority, as the Plaintiff's employer, retaliated against the

11   Plaintiff for having exercised his rights under Labor Code section 1102.5(a)(b) ( c).

12   39.    Defendant Thella Bowens  hired an attorney from LUCE FORWARD and he

13   hired an investigator to supposedly look into "allegations" of violations of the Ethics policy and

14   Code by the Plaintiff.  There is nothing in either the Ethics policy or the Ethics Code of the

15   Authority that invites "investigating" anything in regard to his marriage. The Plaintiff's private

16   life, including his marriage, has nothing to do with his job duties, his job position or any matter

17   that is of any concern to the Authority or to Thella Bowens personally.  The attorney from

18   LUCE FORWARD hired by Thella Bowens and the investigator hired by the attorney from

19   LUCE FORWARD are both subject to the Authority's Ethics policies and to the Ethics Code

20   of the Authority, as both were hired by Thella Bowens on behalf of the Authority as consultants

21   to her and the officers of the Authority with whom she shared the decision making of the

22   'investigation.' In addition, Thella Bowens and all of those with whom she  shared the

23   'investigation' responsibilities were and are charged with knowledge of the Ethics policies and

24   Ethics Code of the Authority.

25   40.    The interrogation of witnesses as to their observations, personal knowledge or opinions

26   regarding the Plaintiff's marriage, including communication within his marriage, the manner

27   of communication between the Plaintiff and his wife, the appearance of the marriage to

28

25    PLAINTIFF'S THIRD AMENDED COMPLAINT

1    outsiders, and any other matters that the attorney for LUCE FORWARD and his hired

2    investigator made regarding the Plaintiff's marriage from witnesses who were being interviewed

3    regarding an 'investigation' whose subject matter had not been revealed to the Plaintiff was

4    intentionally intruded in by the hired help of the Authority.  The intrusion of the Authority's

5    'consultants' and the stated discussion regarding the findings of the 'consultants' with the

6    Authority management on a regular basis that included findings of the interrogation of witnesses

7    on the subject of the Plaintiff's marriage was highly offensive to the Plaintiff.

8    41.    The investigator hired by the attorney from LUCE FORWARD coerced the owner of the

9    car repair shop (where the Plaintiff had his car repaired) to hand over copies of car repair

10    records and invoices showing payment of the car repairs.  The owner immediately contacted the

11    Plaintiff to explain that the investigator told him he was hired by the Authority to look into the

12    Plaintiff's records and threatened him with legal proceedings if he did not immediately turn over

13    the records to him.  The owner protested and opposed the demand but was coerced into

14    providing the records by the investigator.  Neither the Authority, the attorney for LUCE

15    FORWARD or the investigator had sought permission from the Plaintiff to obtain or look at

16    those private records. The Plaintiff was furious at the intrusion into his private affairs without

17    his knowledge or permission.  Given the instruction that he could not tell the owner what the

18    circumstances of the invasion into his privacy meant, the Plaintiff was further denied the

19    opportunity to defend himself from the accusations made by the Authority.  Once again, the

20    Plaintiff was left in a position of not knowing himself the reason for the 'investigation' and the

21    embarrassment that this investigator could act to further leave the Plaintiff in another position

22    of

23    looking like he had done something wrong when he had not.

24    42.    The circumstances surrounding the Authority's "investigation" were part of a calculated

25    scheme to find some violation that could "justify" the termination of the Plaintiff because he had

26    made disclosures regarding the Authority's operations and budget that he believed were illegal

27    and would prevent the Plaintiff and others from reporting similar violations by the Authority and

28

26    PLAINTIFF'S THIRD AMENDED COMPLAINT

1  allow the Authority to continue to operate in whatever manner it desired to do so regardless of

2  the consequences to the budget of the Authority.

3  43.    The Plaintiff was forced to resign his position from the Authority because he

4  had disclosed in good faith to his own Authority, a government agency, the violations of the

5  Authority regarding its misuse of money, waste of government funds, the violations of law

6  regarding four projects of which he had personal knowledge of the violations of law and rules

7  and regulations that the Authority violated repeatedly.

8  44.    The Plaintiff absolutely made  clear his opposition in private meetings, in public

9   meetings, and at open door and closed door meetings, to the failure of the Authority

10  to implement the annexation of the space needed to have the women's restroom comply with

11  the ADA requirements to provide access to disable travelers and to complete the project at a

12  reasonable cost and in a timely manner. The American Disabilities Act and its enabling statutes

13  and regulations are federal law and federal regulations.

14  45.    The Plaintiff made clear to the Vice President to whom he reported that he

15  objected and opposed during the negotiations and the due diligence process that Enarson

16  ( Vice President and confidante to Thella Bowens ) was not properly understanding the lawful

17  use and conditions of the General Dynamics property that resulted and continues

18  to result in losses of millions of dollars for the Authority in violation California Public Utilities

19  Code section 170056(f)(1)(2)(3)

20  46.    The Plaintiff disclosed and opposed the misuse and waste of the unusable land

21  around the Teledyne Ryan property at Capitol Improvement meetings, at weekly

22  Operations meetings, at Directors meetings and other times that the acts violated the California

23  Public Utilities Code section 170056(a)(1)(B)

24  47.    The Plaintiff conducted numerous disclosure meetings with the Vice President

25  to whom he reported regarding the failure of LPI to meet the expenses and conditions that the

26  company had used to bid on the parking operations contract in violation of  California Code of

27  Contracts section 1100; section 100.  The Plaintiff also met repeatedly with Maurice Gray of

28

27    PLAINTIFF'S THIRD AMENDED COMPLAINT

95-1311

1   LPI and gave him extended help and time to come into compliance on the contract and he failed

2   and refused to do so. This correlated with the idea of conducting an 'investigation' of the

3   Plaintiff rather than of the contractor.

4   48.   The conduct of the Defendants was a substantial factor in causing the Plaintiff's

5   harm. The decision to terminate the Plaintiff infringed his Fourteenth Amendment rights.

6   49.   The true reason for the decision to terminate the Plaintiff was to punish him for certain

7   statements critical of the Authority's administration, and that it therefore violated his right to

8   freedom of speech, because his termination was substantially motivated by statements he made

9   in the public interest, including criticisms of the Authority's repeated waste of public resources.

10   50.   The failure of the Authority's officials to give the Plaintiff any notice of any reason for

11   his termination and an opportunity for a hearing violated his right to procedural due process of

12   law. The Plaintiff had a constitutional right to a statement of reasons and a hearing on the

13   Authority's decision to terminate him.

14   51.   The Plaintiff had a "liberty" interest in his employment with the Authority that he had

15   acquired in specific benefits that are safeguarded by the Fourteenth Amendment's procedural

16   protection of the security of his interest. That interest included his right and ability to pursue

17   a career in airport operations management. Due process would have accorded an opportunity

18   for the Plaintiff to refute the charges before Authority officials and such opportunity was

19   expressly recognized in the Authority's enabling statute. The purpose of such notice and

20   hearing is to provide the Plaintiff an opportunity to clear his name. The Plaintiff was not

21   accorded such an opportunity when he was not provided with such a hearing.

22   52.   In terminating the Plaintiff the Authority subjected him to stigma that foreclosed his

23   freedom to take advantage of other employment opportunities and to continue unimpeded in his

24   chosen occupation. The Plaintiff also had a "liberty" interest under the due process clause of

25   the Fourteenth Amendment, because the charges brought against him would tend to damage his

26   standing and associations in the community and did so in fact. The Authority based its decision

27   to terminate the Plaintiff's employment on charges that he was guilty of dishonesty and

28

28   PLAINTIFF'S THIRD AMENDED COMPLAINT

1    misjudgment. The Plaintiff's good name, reputation, honor, and integrity are at stake because

2    of what the Authority did to him, both in bringing the charges and allegations of misconduct and

3    in failing to give him the notice and opportunity to be heard that are essential under the due

4    process clause of the Fourteenth Amendment.

5    53.    Under the California Constitution, Article I, section 7, subdivisions (a) and (b), et seq.,

6    it is a violation of the Plaintiff's due process "liberty" interest to fail to provide him with a

7    timely 'name-clearing' hearing: a person may not be . . . denied equal protection of the laws .

8    . .". Under Article I, section 26 of the California Constitution all branches of the government

9    are required to comply with all provisions of the Constitution, including the due process clause.

10   54.    Local governing bodies, including the Airport Authority, can be sued directly under

11   section 1983 because the unconstitutional acts and decisions herein alleged were adopted by the

12   officials of the Airport Authority and personally authorized by the defendant THELLA

13   BOWENS, the CEO/President of the Authority. The acts of investigation and termination of

14   the Plaintiff were formally approved by the defendant BOWENS. These acts were promulgated

15   and committed by Bowens pursuant to policy, practice and custom of the Authority..

16   55.    As a direct and proximate cause of the acts and conduct described above, Plaintiff

17   has ben and continues to be subjected to shame, humiliation and extreme emotional distress, all

18   to the Plaintiff's damages in a sum as yet undetermined, and Plaintiff requests leave of court to

19   state such damages in accordance with proof at trial.

20   56.    As a direct and proximate cause of said acts of harm and conduct against the

21   Plaintiff by Defendants and DOES 1 through 20 the Plaintiff has lost standing in his community,

22   been held up to ridicule and shame, suffered great mental and emotional distress, worry, fear

23   of his economic future and depression, all to the Plaintiff's

24   damage in a sum that cannot be computed at this time, and the Plaintiff requests leave to amend

25   this complaint to state those damages in accordance with proof at trial.

26   57.    In performing the acts and/or omissions alleged herein, Defendants, and each of them,

27   acted maliciously, fraudulently, despicably, and oppressively, with the wrongful intention of

28

29    PLAINTIFF'S THIRD AMENDED COMPLAINT

1    injuring the Plaintiff, from an improper and evil motive amounting to malice, and in conscious

2    disregard of Plaintiff's rights.   Plaintiff is thus entitled to recover exemplary and punitive

3    damages in an amount to be determined at trial.

4    WHEREFORE, Plaintiff JOSE HERNANDEZ respectfully prays this Court:

5         1.    For general damages according to proof;

6         2.    For attorney's fees and costs on this suit;

7         3.    For exemplary and punitive damages against Defendant THELLA BOWENS

8              in an amount to be determined according to proof; and

9         3.    For such other and further relief as the Court deems just and proper.

11    Dated:  December 28, 2007

12                                    CATHRYN CHINN, Attorneys for
                                     Plaintiff JOSE HERNANDEZ

                                     30    PLAINTIFF'S THIRD AMENDED COMPLAINT

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, state bar number, and address):*
Cathryn Chinn, Esq. (Bar No. 93340), R. G. Friesen, Esq. (Bar No. 107631)
1901 First Avenue, Suite 400
San Diego, CA 92101
San Diego, CA 92101
TELEPHONE NO.: (619) 234-9000     FAX NO. *(Optional):* (619) 699-1159
E-MAIL ADDRESS *(Optional):*
ATTORNEY FOR *(Name):* Plaintiff JOSE HERNANDEZ

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** SAN DIEGO
STREET ADDRESS: 330 W. Broadway
MAILING ADDRESS: San Diego, CA 92101
CITY AND ZIP CODE:
BRANCH NAME: CENTRAL BRANCH

PLAINTIFF/PETITIONER: JOSE HERNANDEZ

DEFENDANT/RESPONDENT: SD COUNTY REGIONAL AIRPORT, et al.

| | |
|---|---|
| **PROOF OF SERVICE OF SUMMONS** | |

CASE NUMBER:
GIC 871979

Ref. No. or File No.:

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.

2. I served copies of:

   a. ☐ summons

   b. ☐ complaint

   c. ☐ Alternative Dispute Resolution (ADR) package

   d. ☐ Civil Case Cover Sheet *(served in complex cases only)*

   e. ☐ cross-complaint

   f. ☑ other *(specify documents):* THIRD AMENDED COMPLAINT; SUMMONS (on 3rd amndd cmplnt)

3. a. Party served *(specify name of party as shown on documents served):*
   Defendant SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY, a public entity

   b. ☐ Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a):*

4. Address where the party was served:
   Sandra L. McDonough, Esq., Paul Plevin et al., 401 B St., Tenth Floor, San Diego, CA 92101-4232

5. I served the party *(check proper box)*

   a. ☐ by personal service. I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date):*       (2) at *(time):*

   b. ☐ by substituted service. On *(date):*       at *(time):*       I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3):*

      (1) ☐ (business) a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him or her of the general nature of the papers.

      (2) ☐ (home) a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.

      (3) ☐ (physical address unknown) a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.

      (4) ☐ I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., § 415.20). I mailed the documents on *(date):*       from *(city):*       or ☐ a declaration of mailing is attached.

      (5) ☐ I attach a declaration of diligence stating actions taken first to attempt personal service.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
POS-010 [Rev. January 1, 2007]

**PROOF OF SERVICE OF SUMMONS**

Code of Civil Procedure, § 417.10
American LegalNet, Inc.
www.FormsWorkflow.com

95-1315

| PLAINTIFF/PETITIONER: JOSE HERNANDEZ | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: SD COUNTY REGIONAL AIRPORT, et al. | GIC 871979 |

5. c. ☐ **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

(1) on *(date):*                                         (2) from *(city):*

(3) ☐ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed Notice and Acknowledgement of Receipt.)* (Code Civ. Proc., § 415.30.)

(4) ☐ to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

d. ☑ **by other means** *(specify means of service and authorizing code section):*

mail service of complaint ordered amended pursuant to Court's order

☐ Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:
   a. ☐ as an individual defendant.
   b. ☐ as the person sued under the fictitious name of *(specify):*
   c. ☐ as occupant..
   d. ☑ On behalf of *(specify):*
   under the following Code of Civil Procedure section:

   ☐ 416.10 (corporation)                          ☐ 415.95 (business organization, form unknown)
   ☐ 416.20 (defunct corporation)                  ☐ 416.60 (minor)
   ☐ 416.30 (joint stock company/association)      ☐ 416.70 (ward or conservatee)
   ☐ 416.40 (association or partnership)            ☐ 416.90 (authorized person)
   ☑ 416.50 (public entity)                        ☐ 415.46 (occupant)
                                                    ☐ other:

7. **Person who served papers**
   a. Name: Silvia Flores
   b. Address: 1901 First Avenue, Second Floor, San Diego, CA 92101
   c. Telephone number: (619) 234-9000
   d. **The fee for service was:** $ none
   e. I am:
      (1) ☑ not a registered California process server.
      (2) ☐ exempt from registration under Business and Professions Code section 22350(b).
      (3) ☐ a registered California process server:
         (i) ☐ owner ☐ employee ☐ independent contractor.
         (ii) Registration No.:
         (iii) County:

8. ☑ I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

   or

9. ☐ I am a California sheriff or marshal and I certify that the foregoing is true and correct.

Date: December 28, 2007

Silvia Flores
(NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)                    (SIGNATURE )

95-1316

**EXHIBIT 76**

1  FRED M. PLEVIN (SBN 126185)
   SANDRA L. MCDONOUGH (SBN 193308)
2  ALBERT R. LIMBERG (SBN 211110)
   **PAUL, PLEVIN, SULLIVAN & CONNAUGHTON** LLP
3  401 B Street, Tenth Floor
   San Diego, California 92101-4232
4  Telephone: 619-237-5200
   Facsimile: 619-615-0700
5
   AMY S. GONZALEZ (SBN 181745)
6  **SAN DIEGO COUNTY REGIONAL AIRPORT**
   **AUTHORITY**
7  3225 N. Harbor Drive
   San Diego, CA 92138
8  Telephone:  (619) 400-2425
   Facsimile: (619) 400-2428
9

10 Attorneys for Defendant
   SAN DIEGO COUNTY REGIONAL AIRPORT
11 AUTHORITY

12

13             SUPERIOR COURT OF THE STATE OF CALIFORNIA

14                      COUNTY OF SAN DIEGO

15 JOSE HERNANDEZ,                    CASE NO. GIC871979

16         Plaintiff,                 **DEFENDANT SAN DIEGO COUNTY**
                                      **REGIONAL AIRPORT AUTHORITY'S**
17     v.                             **ANSWER TO PLAINTIFF'S THIRD**
                                      **AMENDED COMPLAINT**
18 SAN DIEGO COUNTY REGIONAL
   AIRPORT AUTHORITY, a public entity;
19 and DOES 1 through 12, inclusive,  Dept:            75
                                      Judge:           Hon. Richard E. Strauss
20         Defendants.                Complaint Filed: September 1, 2006
                                      Trial Date:      TBD
21
                                      **EXEMPT FROM FEES**
22                                    **GOVT. CODE § 6103**

23

24      Defendant San Diego County Regional Airport Authority ("defendant") answers plaintiff

25 Jose Hernandez's ("plaintiff") unverified third amended complaint as follows:

26                          **GENERAL DENIAL**

27      Pursuant to California Code of Civil Procedure section 431.30, defendant denies generally

28 each and every allegation of plaintiff's unverified complaint.

PAUL, PLEVIN,
SULLIVAN &    ANSWER TO PLAINTIFF'S THIRD AMENDED        1
CONNAUGHTON LLP  COMPLAINT                                              **96-1317**

1

## AFFIRMATIVE DEFENSES

2      For a further and separate answer to the allegations contained in plaintiff's third amended

3  complaint, defendant submits the following affirmative defenses.

4

### FIRST AFFIRMATIVE DEFENSE

5      The third amended complaint fails to state facts sufficient to constitute a cause of action

6  against defendant.

7

### SECOND AFFIRMATIVE DEFENSE

8      Plaintiff's third amended complaint is barred, in whole or in part, by the applicable statute

9  of limitations, including, but not limited to, 42 U.S.C. § 1988 and California Code of Civil

10  Procedure sections 335.1, 338 and/or 340.

11

### THIRD AFFIRMATIVE DEFENSE

12      Plaintiff has failed, refused, or neglected to mitigate or avoid the damages complained of

13  in his third amended complaint and is thereby barred, in whole or in part, from recovering

14  monetary damages from this answering defendant.

15

### FOURTH AFFIRMATIVE DEFENSE

16      Each of plaintiff's claims is barred because the actions taken by defendant, if any, were

17  justified and/or privileged, and consistent with all applicable obligations and duties of defendant.

18

### FIFTH AFFIRMATIVE DEFENSE

19      Plaintiff's third amended complaint is barred by the doctrine of unclean hands.

20

### SIXTH AFFIRMATIVE DEFENSE

21      Plaintiff's third amended complaint is barred because the alleged conduct of which

22  Plaintiff complains, if committed, was made in good faith, honestly, not maliciously, and in the

23  exercise of business judgment and for business reasons.

24

### SEVENTH AFFIRMATIVE DEFENSE

25      Plaintiff's third amended complaint is barred by the doctrine of estoppel.

26

### EIGHTH AFFIRMATIVE DEFENSE

27      All damages allegedly incurred by plaintiff were proximately caused by, and

28  are attributable to, the acts of plaintiff, and plaintiff's conduct bars any and all claims for relief or,

PAUL, PLEVIN,
SULLIVAN &
CONNAUGHTON LLP

ANSWER TO PLAINTIFF'S THIRD AMENDED
COMPLAINT

2

96-1318

1  at a minimum, any recovery by plaintiff must be diminished by the percentage and extent of the

2  plaintiff's own fault in the matters encompassed in his complaint.

3  **NINTH AFFIRMATIVE DEFENSE**

4       Plaintiff has by his actions waived the right, if any, to seek the relief requested in his third

5  amended complaint.

6  **TENTH AFFIRMATIVE DEFENSE**

7       Defendant is immune from liability under the Federal Civil Rights Act because it would

8  have taken the same employment action even in the absence of Plaintiff's allegedly protected

9  conduct.

10  **ELEVENTH AFFIRMATIVE DEFENSE**

11       Defendant is immune from liability under the Federal Civil Rights Act because its conduct

12  did not violate clearly established rights of which a reasonable person would have known.

13  **TWELFTH AFFIRMATIVE DEFENSE**

14       Defendant does not presently know all of the facts and circumstances respecting Plaintiff's

15  claims. Defendant therefore reserves the right to amend this answer should it later discover facts

16  demonstrating the existence of additional affirmative defenses.

17       WHEREFORE, defendant prays that:

18     1.    Plaintiff be denied relief by way of his third amended complaint;

19     2.    Plaintiff's third amended complaint be dismissed;

20     3.    Defendant be dismissed with its cost of suit and attorneys' fees; and

21     4.    For such other and further relief as the Court deems proper.

22  Dated: January 29, 2008         PAUL, PLEVIN, SULLIVAN &
                                  CONNAUGHTON LLP

24                           By:_____

25                            FRED M. PLEVIN
                              SANDRA L. MCDONOUGH

26                              ALBERT R. LIMBERG
                              Attorneys for Defendant

27                              SAN DIEGO COUNTY REGIONAL
                              AIRPORT AUTHORITY

28

ANSWER TO PLAINTIFF'S THIRD AMENDED
COMPLAINT

3

**96-1319**

## PROOF OF PERSONAL SERVICE

I, the undersigned, certify and declare that I am a citizen of the United States, over the age of eighteen, employed in the County of San Diego, State of California, and not a party to the within-entitled action. My business address is 4665 Park Blvd., San Diego, CA 92116.

On January 29, 2008 at _____ a.m./p.m., I served a true copy of the within:

- **DEFENDANT SAN DIEGO COUNTY REGIONAL AIRPORT AUTHORITY'S ANSWER TO PLAINTIFF'S THIRD AMENDED COMPLAINT**

by delivering for personal service to the following:

Cathryn Chinn / Peter G. Friesen
1901 First Avenue, Suite 400
San Diego, CA 92101
Tel: 619-294-9183 / Fax: 619-295-4190
**Attorneys for Plaintiff Jose Hernandez**

I hereby certify that I am employed by Diversified Legal Services, at whose direction the personal service was made.

Executed January 29, 2008, at San Diego, California.

DIVERSIFIED LEGAL SERVICES
MESSENGER

PROOF OF PERSONAL SERVICE                    1

96-1320